# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Cause No. 4:14 CV 2077 RWS |
| FERGUSON-FLORISSANT SCHOOL DISTRICT, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT FERGUSON-FLORISSANT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDMENT

Defendant Ferguson-Florissant School District ("District"), by its undersigned counsel, hereby files this memorandum of law in support of its motion for summary judgment. The District respectfully requests this Court grant the District's motion and dismiss Plaintiffs' claim with prejudice.

## I.  INTRODUCTION

The Ferguson Florissant School District's ("District") voting structure is required by Missouri law. Seven school board directors are elected to represent the entire district. This arrangement is called an at-large electoral system. Plaintiffs Missouri State Conference of the National Association for the Advancement of Colored People, Redditt Hudson, F. Willis Johnson and Doris Bailey, ("Plaintiffs") claim the at-large scheme impermissibly denies African-American voters an equal opportunity to participate in the political process in violation of Section 2 of the Voting Rights Act. Plaintiffs are incorrect as a matter of law. The at-large

1

system allows African Americans an equal or better opportunity to participate than their white counterparts.

The District is a vibrant, integrated and dynamic environment. The demographics from the 2010 Census indicate that no single race was a majority of the voting age population. At that moment, the races were near parity. That moment has passed. In 2013, the scales were tipped so that African Americans are now a majority of the voting age population. Not a large majority, but a majority nonetheless.

The at-large system is beneficial to the largest group of voters. Political scientists and Plaintiffs' own experts acknowledge that fact. Plaintiffs' expert even authored an article that concludes as much. The reason the at-large system is beneficial is that it allows the largest group of voters the opportunity to elect all seven board members in this winner-take-all system.

Plaintiffs request the Court to override Missouri law and divide the District into seven, geographically smaller, single-member district. This "remedy" is only helpful if African American voters live in concentrated areas of the District. They do not. African American voters are more geographically dispersed than white voters. That dispersion is an asset in an at-large system. It is an impediment in single-member districts. Thus, single-member districts are not a remedy under these facts.

Finally, voters in the District are independent and not cohesive. Neither African American nor white voters utilize race as the sole factor in determining which candidate to support. African American votes are split among different races and among different African American candidates. The same holds true for white voters. This is as it should be. That independent, non-cohesive behavior should be applauded not litigated.

As Bert Lance, the former Director of the Office of Management and Budget under Jimmy Carter famously said, "If it aint broke, don't fix it."  He explained: "That's the trouble with government: Fixing things that aren't broken and not fixing things that are broken.[1]"  The at-large system is not broken and it is not in violation of Section 2 of the Voting Rights Act.

## II.  <u>BACKGROUND</u>

**A.  The District's Election System**

The District is governed by a board of seven elected representatives.  (Statement of Uncontroverted Material Facts in Support of the District's Mot. for Summ. J. ("SUMF") ¶1)  Each board member serves three-year terms.  (SUMF ¶2)  Elections occur every year in April.  (SUMF ¶2)  In every election, either two or three seats are contested (*e.g.*, two seats were contested in 2012; two seats were contested in 2013; three seats were contested in 2014, etc.).  (SUMF ¶3)

All board members are elected at-large.  (SUMF ¶4)  Each voter may cast as many votes as there are seats up for election.  (SUMF ¶5)  Each voter had two votes in the 2012 and 2013 elections; in 2014, each voter had three votes.  Voters may only cast one vote per candidate. (SUMF ¶6)  Voters are permitted to engage in "bullet voting" or "single shot voting," which "occurs when voters refrain from casting all their votes to avoid the risk that by voting for their lower ranked choices they may give those candidates enough votes to defeat their higher ranked choices."  *Thornburg v. Gingles*, 478 U.S. 30, 86, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (White, J., concurring); (SUMF ¶7)  The candidates who receive the highest vote totals are elected.  (SUMF ¶8)

---

[1] Bert Lance as quoted in the newsletter of the US Chamber of Commerce, *Nation's Business*, May 1977.

## B.    The District's Demographics

The area covered by the District's boundaries has experienced a significant population decline.  In 1990, the District had a population of 80,938.[2]  (SUMF ¶9)  By 2010, the population decreased by 15.17% to 68,663.  (SUMF ¶9)  While the overall population declined, the single-race black population increased dramatically over the same period by 81.27%, from 16,077 in 1990 to 35,860 in 2010.  (SUMF ¶10)  The non-Hispanic ("NH") white population, in contrast, dropped from 59,995 in 1990 to 29,581 in 2010, a decline of 59.69%.  (SUMF ¶11)

By 2010, the single-race black population was a majority of the overall District population (52.23%) and the NH white population was a minority (43.08%).  (SUMF ¶¶12-13)  The more expansive classification of Any Part ("AP") black[3] was 53.85% of the overall population in 2010.  (SUMF ¶14)  There were 1,111 more people who identified as AP black than single-race black.  (SUMF ¶12, 14)  The total minority population, consisting of all persons who are not single-race, NH white, was 56.92%.  (SUMF ¶6)

The statistics for voting-age population followed a similar pattern.  In 2010, the District had a total voting-age population ("VAP") of 50,711.  (SUMF ¶17)  Single-race blacks comprised 47.33% of the VAP (or 24,030 persons).  (SUMF ¶18)  AP blacks comprised 48.19% of the VAP (or 24,466 persons).  (SUMF ¶19)  In contrast, NH whites comprised 48.95% of the VAP (or 24,852 persons).  (SUMF ¶20)  In 2010, there were only 386 more persons of voting-age who

---

[2] The District recognizes that, on summary judgment, the facts must be construed in a light most favorable to the nonmoving party.  *Schoelch v. Mitchell*, 625 F.3d 1041, 1045 (8th Cir. 2010).  When available, this memorandum relies on the population statistics supplied by Plaintiffs' expert demographer, William Cooper.

[3] The Any Part black classification counts as "black" all persons who identified in the 2010 Census as single-race black and all persons who identified as more than one race and some part Black.  (SUMF ¶15)  This classification has been approved by the Supreme Court.  *Georgia v. Ashcroft*, 539 U.S. 461, 474 n.1, 123 S. Ct. 2498, 156 L. Ed. 2d 428 (2003) ("Here, however, the case involves an examination of only one minority group's effective exercise of the electoral franchise. In such circumstances, we believe it is proper to look at all individuals who identify themselves as black.").

identified as AP black than NH white.  (SUMF ¶¶19, 20, 21)  The AP black VAP and the NH white VAP were near parity five years ago.

In the past 20 years, the AP black VAP has risen sharply.  In 1990, the District's VAP was only 20.77% AP black (12,613).  (SUMF ¶22)  By 2010, the District's VAP was 48.19% AP black (24,455).  (SUMF ¶19)  In 1990, the District's VAP was 77.88% NH white (47,290).  (SUMF ¶23)  By 2010, the District's VAP was only 48.95% NH white (24,852).  (SUMF ¶20)  In the past 20 years, the District lost 22,438 NH white voters.  (SUMF ¶¶20, 23)  Over the same period, the District gained 11,853 AP black voters.  (SUMF ¶¶19, 22)

## III  ARGUMENT

### A.  Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts.  *Famous Brands, Inc. v. David Sherman Corp.*, 814 F.2d 517 (8th Cir. 1987).  Summary judgment is therefore appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Beukes v. GMAC Mortg., LLC*, 786 F.3d 648 (8th Cir. 2015).  Once the moving party has met its initial burden of proving that no genuine issue of material fact exists, the burden shifts to the opposing party to establish otherwise.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B.  Overview of Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act forbids state and local voting processes that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race." 52 U.S.C. § 10301(a).  The challenged process is unlawful if "based on the totality of the circumstances, it is shown that the political processes leading to nomination or election" are not

"equally open to participation by members" of a racial or ethnic group and members of the group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

At-large elections "may not be considered per se violative of Section 2." *Gingles*, 478 U.S. at 47. Instead, the plaintiff must establish three "necessary preconditions" set forth in *Gingles*: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive", and (3) the majority must vote "sufficiently as a block to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51. If the plaintiff has satisfied these "*Gingles* preconditions" or "*Gingles* factors," then the court proceeds to examine the totality of the circumstances to determine whether minorities have fully established their claim.[4]

"[T]he ultimate right of Section 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 508, 126 S. Ct. 2594, 165 L. Ed. 2d 609 (2006) (internal quotation omitted); *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994) ("[R]eading Section 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast.")

---

[4] Because Plaintiffs have failed to satisfy the *Gingles* preconditions, the totality-of-the-circumstances analysis is not relevant to the District's arguments.

**C.  Plaintiffs' Claim is Barred Because the District's VAP is More than 50% AP Black**

**1.  The 50% threshold establishes an effective voting majority**

The 50% VAP figure is a bright-line rule to establish whether a group constitutes an effective voting majority.  If blacks are a majority in the District, then Plaintiffs cannot complain of vote dilution in this case.

In *Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009), the plurality opinion rejected the plaintiffs' argument that Section 2 required the creation of a single-member district in which African-Americans were less than 50% of the VAP.  *Id.* at 12-26.  Instead, the plaintiffs satisfied the first *Gingles* factor if they "show[ed] by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent."  *Id.* at 19-20.  Courts have followed the plurality opinion in *Bartlett* and held that "[a] majority is a majority, by however small a margin, and every other court addressing the question has held a 50% numerical majority sufficient."  *Thompson v. Glades County Bd. of County Com'rs*, 493 F.3d 1253, 1262 (11th Cir. 2007) (citing *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852-53 (5th Cir. 1999); *Cousin v. Sundquist*, 145 F.3d 818, 828-29 (6th Cir. 1998); *Parker v. Ohio*, 263 F. Supp. 2d 1100, 1104-05 (S.D. Ohio)).

Other courts have applied *Bartlett* and dismissed challenges to single-member districts in which the racial or ethnic group already comprises 50% or more of the entire jurisdictions.  *Jeffers v. Beebe*, 985 F. Supp. 2d 920 (E.D. Ark. 2012) (rejecting the plaintiffs' argument that a senate district should be redrawn because the district was "*already* a majority-minority district under *Bartlett*'s decision"; the black VAP was 52.8%, "which is 'greater than 50 percent.'") (quoting *Bartlett*, 556 U.S. at 20).

The 50% threshold has also been applied to preclude a vote dilution challenge to at-large elections. In *Aldasoro v. Kennerson*, 922 F. Supp. 339 (S.D. Cal. 1995), the plaintiffs challenged the method of electing a school district's board of trustees. The method was similar to that used by the District. The elections were at-large and voters could cast a vote for each contested seat, but could vote only once per candidate. In the year before the court issued its opinions, Latinos composed a majority of the citizen voting-age population ("CVAP"). The court entered judgment in favor of the defendants, finding that "[w]hile Hispanics presently have the ability to elect in a single member district, this Court also has determined that Hispanics now have the ability to elect at-large. There is no current condition of vote dilution in El Centro." *Id.* at 375.

As established below, blacks comprise more than 50% of the VAP in the District. Accordingly, there can be "no current condition of vote dilution" in the District. *Id.*

**2.      Single-race blacks are a plurality of the VAP**

The Census Bureau administers an "ongoing survey" that provides "vital information on a yearly basis" about demographics in the United States. (SUMF ¶24) This survey, called the American Community Survey ("ACS"), "is a critical element of the Census Bureau's reengineered decennial census program. (SUMF ¶25). The ACS data are released in 1-year, 3-year, and 5-year period estimates. (SUMF ¶26). The Census Bureau considers it the "premier source for detailed information about the American people and workforce." (SUMF ¶24)

Courts have found ACS data reliable. In *Benavidez v. City of Irving*, 638 F. Supp. 2d 709 (N.D. Tex. 2009), the court noted that the ACS is "intended to replace the Census long form" and is "conducted annually with the results leveraged over time periods to get the same level of statistical sampling as the long form." *Id.* at 715. The court found that the "the Census Bureau

considers ACS data reliable and intends for it to be relied upon in decisions such as Voting Rights Act compliance." *Id*. at 721.

Dr. Richard Engstrom, who is Plaintiffs' political science expert in this case, was also retained by the plaintiffs in *Benavidez*. *Id.* at 713. In that case, Dr. Engstrom and his colleague convinced the court to use the ACS over the decennial Census. The court explained that decennial Census data are "presumptively accurate until proven otherwise." *Id.* at 729. To overcome Census data, a party must offer "[p]roof of changed figures" that is "thoroughly documented, ha[s] a high degree of accuracy, and [is] clear, cogent and convincing to override the presumptive correctness of the prior Census." *Id.* (quoting *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853-54 (5th Cir. 1999)); *see also Garza v. Cnty. of Angeles*, 756 F. Supp. 1298 (9th Cir. 1990).

The *Benavidez* court found that the ACS qualified as sufficient "proof of changed figures," noting that "ACS data *is* Census data" because it is "produced and promulgated by the Census Bureau." 638 F. Supp. 2d at 729. Notably, the court relied on the ACS to conclude that the Latino share of the citizen voting-age population "remains upward." *Id.* at 720.

Plaintiffs' expert William Cooper and the District's expert Dr. Jonathan Rodden, both relied on the 3-year ACS period estimates from 2011-2013. (SUMF ¶27) The ACS guidelines state that a 3-year period estimate is best used for areas "within populations of 20,000+." (SUMF ¶28). The District has a population larger than 20,000. (SUMF ¶9) Further, the 3-year period estimates are more precise than the 1-year period estimates and more current than the 5-year period estimates. (SUMF ¶29)

The 2011-2013 ACS confirms that the demographic trends of the past 20 years are continuing: the District's overall and NH white populations are declining, while the single-race black population is growing:

**Table 1 – Overall Population Changes**

|  | 2010 CENSUS | 2011-2013 ACS |
|---|---|---|
| **Total Pop.** | 68,663<br>(SUMF ¶9) | 66,758<br>(SUMF ¶30) |
| **NH White Pop.** | 29,581 (43.08%)<br>(SUMF ¶11) | 27,587 (41.3%)<br>(SUMF ¶31) |
| **Single Race Black Pop.** | 35,860 (52.23%)<br>(SUMF ¶10) | 34,955 (52.4%)<br>(SUMF ¶32) |

The 2011-2013 ACS also corroborates the trends of decreasing overall VAP and NH white VAP and an increasing single-race black VAP:

**Table 2 – Voting-Age Population Changes**

|  | 2010 CENSUS | 2011-2013 ACS |
|---|---|---|
| **Total VAP** | 50,771<br>(SUMF ¶17) | 49,679<br>(SUMF ¶33) |
| **NH White VAP** | 24,852 (48.95%)<br>(SUMF ¶20) | 23,242 (46.78%)<br>(SUMF ¶¶36, 37) |
| **Single Race Black VAP** | 24,030 (47.33%)<br>(SUMF ¶18) | 24,313 (48.94%)<br>(SUMF ¶¶34, 35) |

The ACS is more recent and satisfies the "proof of changed" figures standard, and this Court should rely on the ACS to determine the single-race blacks' share of the VAP.[5] *Benavidez*, 638 F. Supp. at 709. The 2011-2013 ACS conclusively establishes that single-race blacks are a plurality[6] of the District's VAP. Indeed, Plaintiffs' own expert acknowledged that single-race blacks have the largest share of the VAP. (SUMF ¶¶35, 36)

### 3. AP blacks are a majority of the VAP

The sum of the NH white and single-race black VAP (46.78% and 48.94%) is only 95.72%, which is less than 100%. (SUMF ¶¶35, 36). This gap closes somewhat if the single-race black VAP is added to the *Hispanic* white VAP, which is 47.24% (compared to the *non-Hispanic* white VAP of 46.78%). (SUMF ¶39) Still, this sum is only 96.18%, which leaves a remainder of 3.82% of the VAP. Some of this remaining percentage is attributable to the AP black population, which is a more expansive classification than single-race black. (SUMF ¶15) However, Plaintiffs' expert also admitted that he did not consider the AP black share of VAP for the 2011-2013 ACS. (SUMF ¶40)

Although the ACS does not publish estimates for the AP black classification, the ACS publishes estimates for those who identify as two or more of any race. (SUMF ¶¶41, 42) Based on this, Defendants' expert Dr. Rodden calculated the AP black share of the VAP. First, Dr. Rodden obtained the number of individuals in the overall population (regardless of age) who identified as two or more of any race. (SUMF ¶43) This figure is available in the 2011-2013 ACS.

---

[5] However, this Court should also note that the Census Bureau admitted that the 2010 Census "overcounted the non-Hispanic white alone population by 0.8 percent" and "undercounted 2.1 percent of the black population." (SUMF ¶38) According to the 2010 Census, single-race blacks were 47.33% of the VAP. By the Census Bureau's own admission, this figure should be adjusted upward and the NH white VAP figure should be reduced. Under both the 2011-2013 ACS and the 2010 Census, single-race blacks are a plurality of the VAP.

[6] Plurality is "the greatest number (esp. of votes), regardless of whether it is a simple or an absolute majority." Black's Law Dictionary 1193 (8th Ed. 2004).

*Id.* Dr. Rodden then obtained the percentage of those individuals who identified as two or more races with some part African American (*i.e.*, those who identified as AP black). (SUMF ¶44) This figure is also available in the 2011-2013 ACS. *Id.* Next, Dr. Rodden obtained the number of *voting-age* individuals who identified as two or more of any race. This figure is available in the 2011-2013 ACS as well. To determine the percentage of voting-age individuals who identified as AP black (which is not available in the 2011-2013 ACS), Dr. Rodden applied the percentage of all individuals who identified as AP black to the number of voting-age individuals who identified as two or more of any race. (SUMF ¶45) Dr. Rodden's calculation assumes that the percentage of multiracial individuals who are AP black is the same for both the voting-age population and the total population. (SUMF ¶46) Dr. Colin Gordon, one of Plaintiffs' experts, endorsed this assumption. (SUMF ¶47)

Under Dr. Rodden's analysis, the AP black share of the VAP is 51.0% as of the 2011-2013 ACS. (SUMF ¶48) This exceeds the 50% threshold for an effective voting majority. *Thompson*, 493 F.3d at 1262 ("A majority is a majority, by however small a margin.")

Dr. Rodden's conclusion that the AP blacks are a majority of the VAP is supported by the undeniable demographic trends of the past 20 years, which show a 51.58% *increase* in the AP black and 52.55% *decrease* in the NH white VAP—have either stopped or reversed. (SUMF ¶¶19, 20, 22, 23). The Supreme Court has held that "[s]ituations may arise where substantial population shifts over such a period may be anticipated. Where these shifts can be predicted with a high degree of accuracy, States . . . may properly consider them." *Kirkpatrick v. Preisler*, 394 U.S. 526, 535, 89 S. Ct. 1225, 22 L. Ed. 2d 519 (1969). Dr. Rodden's calculation of the AP black VAP in the 2011-2013 ACS is corroborated by the District's unquestionable demographic shifts.

Further, Plaintiffs' expert admitted that the overall minority percentage of the District's VAP is greater than 50%. (SUMF ¶49) When asked for his estimation of the AP black share of the VAP, Mr. Cooper "[r]oughly" estimated 49.8%. (SUMF ¶¶50, 51) This concession by an adverse party supports the reasonableness of Dr. Rodden's conclusion.

The District's expert provided formal analysis (the methodology of which was endorsed by one of Plaintiffs' experts) demonstrating that AP blacks have crossed the threshold of 50% VAP. This analysis, when considered with the District's definitive demographic trends and the concession by Mr. Cooper, proves "by a preponderance of the evidence" that AP blacks form a majority of the VAP. *Bartlett*, 556 U.S. at 19-20. Thus, Plaintiffs cannot complain of vote dilution and their claim should be dismissed.[7] *Aldasoro*, 922 F. Supp. at 375.

**D.      Plaintiffs' Claim is Barred Because Plaintiffs' Proposed Remedy Will Not Provide Greater Electoral Opportunity**

This Court should also dismiss this claim because Plaintiffs' proposed remedial plans will actually impair the ability of African Americans to participate in the District's political process. African Americans have better electoral opportunities under the existing at-large system. Plaintiffs are, in effect, asking this Court to fix something that is not broken.

**1.      Plaintiffs' experts did not analyze whether African Americans would have greater electoral opportunities under a single-member district plan**

"Vote dilution . . . is a comparative inquiry where the court must measure a minority group's ability to elect under the existing system to some 'alternative system that would provide greater electoral opportunity to minority voters,' which under *Thornburg* is single member districts.'" *Aldasoro*, 922 F. Supp. at 369 (quoting *Holder v. Hall*, 512 U.S. 784, 887, 114 S. Ct.

---

[7] *See also Gingles*, 478 U.S. at 56 (explaining that the "theoretical basis" for the vote dilution claim was that "minority and majority voters consistently prefer different candidates, [and] the majority, *by virtue of its numerical superiority*, will regularly defeat the choices of minority voters.") (emphasis added).

2581, 129 L. Ed. 2d 687 (1994) (plurality)).   Therefore, Plaintiffs must "postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 480, 117 S. Ct. 1491, 137 L. Ed. 2d 730 (1997) (quoting *Holder*, 512 U.S. at 881).   "[T]he court should consider whether the changes proposed in a redistricting plan make members of racial or language minorities . . . worse off than they were before the change in terms of their ability to participate effectively in the electoral process." *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1084 (1992).

Plaintiffs' did not carry this burden.   None of their experts analyzed the effectiveness of the two proposed districting plans.  (SUMF ¶52)  When asked if he considered the effectiveness of the plans he created, Mr. Cooper conceded that he did not. (SUMF ¶53)  Mr. Cooper responded, "I will have to defer to Dr. Engstrom to speak in terms of what's effective and not effective." (SUMF ¶54)  Dr. Engstrom, however, did not analyze effectiveness either.   He testified that it would be "too much to ask of [him]" to analyze "illustrative districts for viability or effectiveness or anything like that."  (SUMF ¶55)

"It is the plaintiffs' burden to demonstrate the existence of vote dilution." *Cottier v. City of Martin*, 604 F.3d 553, 559 (8th Cir.2010).   Plaintiffs' burden includes "postulat[ing] a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Reno*, 520 U.S. at 480.  Plaintiffs have failed to satisfy this element of their burden, which is fatal to their claim. *Fairly v. Hattiesburg*, 584 F.3d. 660, 669 (5th Cir. 2009) ("[P]laintiffs bear the burden of proof in a VRA case, and any lack of record evidence on VRA violations is attributed to them.")

## 2. African Americans have more electoral opportunities in the existing at-large election system

Unlike Plaintiffs, the District actually analyzed the effectiveness of the Plaintiffs' proposed districting plans. Both plans were created by Mr. Cooper. (SUMF ¶56) Each plan contains seven districts, four of which contain a VAP that is more than 50% African American. (*Id.*) Dr. Rodden's analysis establishes that African Americans' ability to elect their candidates of choice would be weakened under either plan compared to the existing at-large election system.

Dr. Rodden examined data from every contested election since 2000. (SUMF ¶57) Dr. Rodden created a "least-squares regression model" to determine whether there was a linear relationship between (1) the percentage of votes that were cast for African American candidates;[8] and (2) the percentage of votes cast by African Americans in each precinct. (SUMF ¶58) Dr. Rodden used this model to derive an equation that estimates the percentage of votes African American candidates received in each precinct. (SUMF ¶59)

For each contested election, Dr. Rodden applied precinct-level estimates of African American votes to his equation, which provided the percentage of votes that the African American candidates would have received in each precinct. (SUMF ¶60) Each precinct belongs within one of the seven single-member districts in Plaintiffs' districting plans. (SUMF ¶61) After aggregating the data from all the precincts within a district, Dr. Rodden was able to demonstrate whether the African American candidates would have received more votes than their white counterparts within that district. (SUMF ¶62) Dr. Rodden concluded that "[t]here is little reason to believe that chopping the School District up into smaller winner-take-all districts" would result in more African-American voters supporting African American candidates. (SUMF ¶63)

---

[8] Although Dr. Rodden examined the percentage of votes that were cast for African Americans, it is well-established that African American voters can prefer white candidates. *Clay v. Board of Education of the City of St. Louis*, 90 F.3d 1357 (8th Cir. 1996)

Dr. Rodden further noted that dividing the District into single-member districts might actually "hurt" African American candidates. (SUMF ¶64) Using a Gini coefficient, which measures statistical dispersion, Dr. Rodden analyzed the geographic distribution of votes for the candidate most-preferred by African American voters and the candidate most preferred by white voters. (SUMF ¶65)

Dr. Rodden found that, in 2015, the candidate most preferred by African Americans had support that was more geographically dispersed than her opponent, who was the candidate most preferred by white voters. (SUMF ¶66) After examining every contested election since 2000, Dr. Rodden concluded that, with a few exceptions, African Americans tended to have more geographically-dispersed support than white candidates. (SUMF ¶67) As such, dividing the District into single-member districts would benefit white candidates more than their African American counterparts.

Finally, Dr. Rodden noted that one of Plaintiffs' districting plans contains a district in which two incumbent board members reside. (SUMF ¶68) These two board members were both preferred by African Americans in their respective elections. (SUMF 69) Additionally, these board members are both African American. (SUMF ¶70) Plaintiffs' districting plan would result in either one of these candidates losing or declining to run for reelection.

Not only are Plaintiffs' districting plans deleterious to African American voters, but Plaintiffs' own experts have acknowledged that at-large election systems are beneficial to groups that form a majority or plurality of the VAP. In a published article, Dr. Engstrom wrote, "There are numerous variations in how at-large elections are implemented, but regardless of the particular arrangement, this system does have a tendency to favor candidates preferred by a majority group or at least the largest group of voters within the jurisdiction." "Cumulative and Limited Voting:

Minority Electoral Opportunities and More." *St. Louis University Public Law Review*, 2010. In his deposition, Dr. Engstrom testified that "an at-large election "provides the largest group of voters an opportunity to determine the winners of all of the seats." (SUMF ¶71)

Dr. David Kimball, another expert for Plaintiff, testified that if blacks were a majority, they could potentially determine the winners of all of the seats. (SUMF ¶72) Dr. Kimball further testified that "majority" could be of either total population or voting age population. (SUMF ¶73) He cited an academic article stating "if a group composes a majority of the city population in a majoritarian, at-large system, the group may be able to win all of the council seats." (SUMF ¶¶74, 75) Dr. Kimball even conceded that if a racial or ethnic group holds a majority, then single-member districts might decrease the group's representation on an elected body. (SUMF ¶76)

Plaintiffs bear the burden of proof for their claim. *Fairly*, 584 F.3d. at 669. They failed to carry it by neglecting to analyze whether their proposed districting plans "would provide greater electoral opportunity to minority voters." *Aldasoro*, 922 F. Supp. at 369. For this reason, their claim should be dismissed. Furthermore, Plaintiffs' claim fails because the electoral opportunities for African Americans would be worse under Plaintiffs' districting plans than the status quo. Plaintiffs' own experts acknowledge that at-large election systems strengthen the voting power of groups who hold a plurality or majority. Yet Plaintiffs seek to have this Court abolish at-large elections, which would harm the group that Plaintiffs purport to represent. This Court should not fix what is not broken.

D.     **Plaintiffs Have Not Satisfied the Second and Third *Gingles* Preconditions**

In addition to dismissing Plaintiffs' claim for the reasons above, this Court may also grant the District's motion because Plaintiffs have failed to demonstrate racially polarized voting. Racially polarized voting is composed of the second and third *Gingles* preconditions. *Gingles*,

478 U.S. at 56 ("The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates."); *Shirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006). Plaintiffs have not satisfied either precondition because: (1) African Americans prefer many of the same candidates as whites and therefore are not politically cohesive (second *Gingles* precondition); and (2) African American candidates are not "usually" defeated and, when they are, the defeats are not due to white bloc voting (third *Gingles* precondition).

### 1. The District's African Americans Are Not Politically Cohesive (Second *Gingles* Precondition)

"The second *Gingles* precondition requires a showing that the . . . minority is politically cohesive." *Shirt*, 461 F.3d at 1020 (citing *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 126 S. Ct. 2594, 165 L. Ed. 2d 609 (2006) ("*LULAC*"). "If the minority group is not politically cohesive, it cannot be said that the . . . electoral structure thwarts distinctive minority group interests." *Gingles*, 478 U.S. at 51. The "inquiry" into political cohesiveness is "essentially whether the minority group has expressed clear political preferences that are distinct from those of the majority." *Gomez v. Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988); *Shirt*, 461 F.3d at 1020 ("Evidence of political cohesiveness is shown by minority voting preferences, distinct from the majority, demonstrated in actual elections.")

Before analyzing the second *Gingles* precondition, it is necessary to answer several predicate questions that have been raised during this litigation:

- Can a white candidate be preferred by African Americans?

- Can a candidate be preferred by African Americans if the candidate finishes second or third among African Americans, but behind an unsuccessful candidate who was African Americans' first choice?

- What elections should be analyzed to determine the African American preferred candidates?

- What is the best decision rule for identifying the African American preferred candidates?

### i. *Can a white candidate be preferred by African Americans?*

The first predicate question to resolve is whether African Americans can ever prefer a candidate who is not African American. Although the answer to this question should be self-evidently "yes", Plaintiffs have suggested otherwise. But the Eighth Circuit has strongly rejected the pernicious idea that a voter can only prefer a candidates of his or her race.

In *Clay v. Board of Education of the City of St. Louis*, the plaintiffs "offered, by implication, a definition of 'minority preferred candidate' based solely on the candidate's race." 90 F.3d 1357, 1361 (8th Cir. 1996). The Eighth Circuit refused to adopt this definition, explaining that it "offends the principles of equal protection." *Id.* (citing *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1386 (8th Cir. 1995)). The court held that, "[a]s a matter of law, such a definition is untenable and must be rejected in favor of the alternative offered by the Board of Education." *Id.* The Eighth Circuit adopted the school board's definition of "minority-preferred candidate" as "the four candidates receiving the highest number of African-American votes." *Id.* at 1361-62. The court noted that "[t]his definitional approach . . . has been used before." *Id.* at 1362 n.10 (citing *Harvell*, 71 F.3d at 1386-87; *Clarke v. City of Cincinatti*, 40 F.3d 807, 810 (6th Cir. 1994)).

Importantly, the election system in *Clay* was very similar to this case. Elections in the St. Louis School District were held during odd-numbered years. In each election, four seats on the twelve-member board were contested. Each voter had four votes that could be allocated. Voters could only cast one vote per candidate, but could opt to cast fewer than four votes. The four candidates receiving the most votes were elected. The Eighth Circuit held that the "four candidates

receiving the highest number of African-American votes" were "'minority preferred candidates.'" *Clay*, 90 F.3d at 1362. Thus, this Court should apply the same test: When *n* seats are contested, the *n* candidates receiving the most African American votes are the candidates preferred by African Americans, regardless of the candidate's race.[9]

### ii. Can a candidate be preferred by African Americans if the candidate finishes second or third among African Americans, but behind an unsuccessful candidate who was African Americans' first choice?

Although *Clay* provides a clear rule for identifying African American preferred candidates, Plaintiffs seek to weaken the rule by introducing several exceptions. Plaintiffs' expert, Dr. Richard Engstrom, claimed that it is "inappropriate" to designate candidates as preferred by African Americans if the candidate finishes second or third among African Americans behind an unsuccessful candidate who was African Americans' first choice. Since 2000, this has occurred only twice: (1) in 2013, when Hogshead was elected but finished second among African Americans with 24.2% of votes behind Henson, who received 43.7% of the vote and was not elected (SUMF ¶¶121, 122); and (2) in 2012, when Schroeder was elected but finished second among African Americans with 25.05% of votes behind Morris, who received 51.90% of the vote and was not elected (SUMF ¶¶117, 118).[10]

---

[9] The District intentionally avoids using the term "minority preferred candidate," as this term assumes that African American voters are a numerical minority of the entire voting population. As established earlier, this is not the case.

[10] These figures are taken from Dr. Engstrom's EI analysis. Dr. Engstrom testified that EI analysis is "preferable" to other forms of analyses, such as homogenous precinct analysis. (SUMF ¶137). Although the figures from Dr. Rodden's EI analysis are slightly different, evidence must be construed in a light most favorable to the nonmoving party. *Schoelch v. Mitchell*, 625 F.3d 1041, 1045 (8th Cir. 2010). Consequently, Dr. Engstrom's EI figures are used when available (*i.e.*, for elections held between 2011 and 2015).

The results of EI analysis in an election system such as the District's can be counterintuitive. For elections in which voters have only one vote, perfect political cohesion occurs when a candidate receives 100% of the votes from a racial or ethnic group. This is because the number of votes cast is equal to the number of voters casting them. With perfect political cohesion in a single-vote election, a minority-preferred candidate receives every vote cast by the racial or ethnic group.

For elections in which voters have more than one vote, such as the District elections, the analysis is different. Each voter has multiple votes but may cast only one vote per candidate. Thus, the total number of votes cast will almost always be greater than the number of voters casting them. The only exception would be if voters exercised

Dr. Engstrom cited to *Collins v. City of Norfolk*, 883 F.2d 1232 (4th Cir. 1989), which held that if a candidate receives a "significantly higher percentage of [votes] of the minority community" and is still defeated, then the second- and third-place candidates of the minority community "must be reviewed individually to determine whether the elected candidates can be fairly considered as representatives of the minority community." *Id.* at 1238. Dr. Engstrom misunderstands *Collins*. The Fourth Circuit did not establish a per se rule against designating candidates as preferred by African Americans simply because they finished behind an unsuccessful candidate who was preferred most by African Americans.[11] Instead, each second- and third-place candidate must be "reviewed individually" to determine whether the elected candidates can be fairly considered as representatives of the minority community." *Id.* at 1238.

More importantly, *Collins* is not good law in this circuit, as it conflicts with the Eighth Circuit's controlling decision in *Clay*. The Eighth Circuit did not draw a distinction between unsuccessful first-place candidates among African Americans and successful candidates who were

---

their right to "single-shot vote" by casting only one vote and declining to cast their remaining votes. Assuming that every voter casts all their votes, then perfect political cohesion will occur when a candidate receives the maximum percentage of votes available. If every voter uses all their votes, then the maximum percentage of votes can be expressed as $1/n$, where n is the number of seats that are being contested. However, if voters exercise their right to "single-shot vote", a candidate could theoretically achieve 100% of votes from a racial or ethnic group.

For example, assume that Candidate A and Candidate B are running in a two-seat election. There are 100 African American voters and each voter may cast two votes. Assume that all African American voters cast both their votes for Candidate A and Candidate B. Importantly, Candidates A and B do not need to be African American to be preferred by African Americans. *Clay*, 90 F.3d at 1361. The total number of African American votes cast is 200 (100 voters x 2 votes each). Candidate A received 100 votes (or 50% of total votes cast). Same with Candidate B. This hypothetical illustrates perfect political cohesion among African Americans because Candidates A and B received the maximum percentage of votes available with each voter using all their votes.

To further illustrate, assume Candidates A, B, and C are running in a three-seat election. There are 50 African American voters with three votes each. All 50 African American voters cast all their ballots for Candidates A, B, and C. The total number of African American votes cast is 150 (50 voters x 3 votes each). Candidate A will have received 50 votes (or 33% of total votes cast). Same with Candidates B and C. This hypothetical also illustrates perfect political cohesion among African Americans.

[11] The Fourth Circuit has cautioned against reading its own decision in *Collins* too broadly. In *Levy v. Lexington County*, 589 F.3d 708 (4th 2009), the court explained that "to determine whether a candidate who received less support from minority voters than an unsuccessful first choice may be deemed a minority-preferred candidate of choice in a multi-seat election, a district court should first consider the number of candidates on the ballot and the number of seats to be filled." *Id.* at 717.

runners-up among African Americans. Instead, the rule announced in *Clay* is straightforward: In an election for *n* seats, the *n* "candidates receiving the highest number of African-American votes [are] the 'minority preferred candidates.'" *Clay*, 90 F.3d at 1361-62. Other circuits have also explicitly disagreed with *Collins*, noting that "courts generally have understood blacks' preferred candidates simply to be those candidates who receive the greatest support from black voters." *Clarke v. City of Cincinnati*, 40 F.3d 807, 810 (6th Cir. 1994).

By urging this Court to ignore most victorious candidates who were second- or third-place among African American voters, Plaintiffs are asking this Court to apply artificial criteria to the definition of an African American preferred candidate. This is a purely tactical argument that deviates from the controlling rule of this circuit.

### iii. *Which elections should be considered in determining minority-preferred candidates?*

#### a. <u>Recent vs. older elections</u>

Dr. Engstrom only performed ecological inference ("EI") analysis for the five most recent District elections (*i.e.*, 2011-2015). Dr. Engstrom did not explain why he used 2011 as the cutoff. Although "[t]he more recent an election, the higher is probative value," *Shirt*, 461 F.3d at 1021 (citing *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995)), courts are not precluded from considering older elections. *See*, *e.g.*, *Fabela v. City of Farmers Branch*, No. 3:10-cv-1425-D, 2012 U.S. Dist. LEXIS 10806, at *52 n.30 (N.D. Tex. Aug. 2, 2012) ("Although defendants suggest that the court ignore the 2007 election merely because it is older, the court declines.") While Dr. Engstrom only provided EI analysis for elections since 2011, the District's expert, Dr. Rodden, analyzed each election since 2000. This Court should evaluate the totality of elections considered by both parties' experts.

### b. Uncontested elections

This Court should also consider uncontested elections, which have occurred four times since 2000 in the District (2005, 2007, 2008, and 2010). Although no election data is available for these uncontested elections, they are still probative. An African American board member (Graham) was elected in 2002 as the candidate most preferred by African Americans. (SUMF ¶¶85, 86) Graham did not draw any challengers, white or otherwise, in 2005 or 2008. (SUMF ¶¶97, 105) Additionally, an African American candidate appointed to a vacant seat (Henson) did not face any challengers in his 2010 reelection. (SUMF ¶¶103, 110) This is legally significant and should not be discounted. *See, e.g.*, *Milwaukee Branch of the N.A.A.C.P. v. Thompson*, 935 F. Supp. 1419, 1428-29 (E.D. Wis. 1996) ("Uncontested elections involving incumbent black judges are also relevant to the issue of white bloc voting in the context of judicial elections. If a white majority voting bloc is able 'usually' to defeat a black candidate, then one might expect to see, with some degree of frequency, challenges by white candidates against black incumbents, and, where a challenge was mounted, the black candidate losing. This pattern is not present in the instant case.").

### c. Post-litigation elections

Plaintiffs have also challenged the relevancy of the 2015 election, in which Graves, an African American candidate, was elected. Graves received the most African American votes and the second-highest number of white votes. (SUMF ¶131) Dr. Engstrom has expressed doubts about the probative value of the 2015 election because it was held after this action was filed.

Dr. Engstrom's skepticism of the 2015 election is not well-founded. This action was filed on December 18, 2014. Dkt. No. 1. The 2015 election occurred less than 16 weeks later on April 7, 2015. Dr. Engstrom suggests that, within this four-month period, there was "'unusual organized

political support by white leaders concerned to forestall single-member district.'" Exhibit A, pg. 11 n.8 (quoting *Gingles*, 478 U.S. at 76). This alleged political mobilization, according to Dr. Engstrom, led to Graves being elected.

There are several problems with this narrative. First, it is completely speculative. Dr. Engstrom admitted in his deposition that he has no factual basis to support his claim that the filing of this action influenced voters. (SUMF ¶134) At the summary judgment phase, a plaintiff must offer "more than mere speculation, conjecture, or fantasy." *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 19994). Dr. Engstrom's narrative is nothing more than rote supposition.

Second, Dr. Engstrom's attempt to compare this case to *Gingles* is misguided. Although the Supreme Court remarked in *Gingles* that "[n]othing in [Section 2] or its legislative history prohibited the [trial] court from viewing with some caution black candidates' success" in elections that occurred after the underlying action was filed, the circumstances of *Gingles* were drastically different than those here. *Gingles*, 478 U.S. at 76.

The *Gingles* plaintiffs challenged the redistricting plan for North Carolina's bicameral legislature. The action was filed in September 1981. One month later, the North Carolina General Assembly convened a special session and repealed the original districting plan for the state House of Representatives and enacted another. After the United States Attorney General formally objected to certain provisions of the North Carolina constitution, the General Assembly held another special session in February 1982 and a yet another in April 1982 to enact redistricting plans. The action was then designated by stipulation as a plaintiff class action. The elections conducted in September 1982 were viewed as less probative by the trial court. *Gingles v. Edmisten*, 590 F. Supp. 345, 350-51 (E.D. N.C. 1984). This is not surprising, as the lawsuit had

been pending for one year, and the elections were for the state legislature, which had just undergone three different districting plans in less than 12 months.

In contrast, the action in this case had been pending for less than four months before the election occurred on April 7, 2015. (SUMF ¶130) Plaintiffs have offered nothing but conjecture about the litigation's influence on the 2015 election, which is insufficient to survive summary judgment. *Moody*, 23 F.3d at 1412.

Dr. Engstrom also believes the 2015 election is not probative because it was a two-seat election and one of the two white candidates was "a minor candidate." Exhibit A, pg. 12. According to Dr. Engstrom, previous two-seat elections involved two white candidates who were "competitive" in that both received a substantial amount of the white vote. But the second white candidate in 2015, Dameron, received 9.9% of white votes and "was not a competitive candidate." Dr. Engstrom opines that this was also a "one-time advantage" that explains the election of Graves. Exhibit A, pg. 12.

This is a puzzling basis for doubting the relevancy of the 2015 election. Dr. Engstrom apparently believes that Graves's victory cannot be explained by her ability to attract nearly a quarter of white votes (21.4%), or by the strength of the other African American candidates (Hines and Person) who garnered a combined 26.14% of white votes. (SUMF ¶132) Instead, according to Dr. Engstrom, Graves benefited only because one of the white candidates was "minor" and therefore did not attract a larger share of white votes. Exhibit A, pg. 12. This is a troubling argument, as it assumes that African American candidates should be viewed equally, regardless of their qualifications or the strength of their campaign.[12] Besides offering nothing more than

---

[12] Graves ran a sophisticated campaign that encouraged voters to use single-shot voting, which increased her likelihood of success. (SUMF ¶136)

conjecture about why Graves succeeded, Dr. Engstrom's narrative represents a pernicious and reductionist view of race and politics in the District.

In sum, Plaintiffs have not offered any persuasive reason to treat the 2015 elections as less probative than any previous elections. Although some courts have viewed post-litigation elections cautiously, those cases all involved special circumstances. *Gingles*, 590 F. Supp. at 350-51. Plaintiffs have not offered any evidence that this Court could rely on to discount the relevancy of the 2015 elections.

###     d.     Elections involving only white candidates

Finally, this Court should consider elections that did not include any African American candidates. Notably, this occurred only once out of 12 contested elections since 2000. (SUMF ¶¶77-132) The rarity of this occurrence shows the District's election system is equally open to participation by both whites and African Americans. *Overton v. City of Austin*, No. A-84-CA-189, 1985 U.S. Dist. LEXIS 21887 (W.D. Tex. Mar. 12, 1985) (finding that an election system had "equality of access" because, among other reasons, African Americans "r[a]n for office, and [had] been elected to office"). If the system placed electoral success out of reach of African Americans, then African American candidates would be discouraged from entering into politics. There is no such disincentive in the District.

In 2009, three white candidates ran to fill two seats. (SUMF ¶107) Although no African American candidate entered this race, the voting behavior and results of this election are probative in Section 2 analysis. As the Tenth Circuit has cogently explained:

> We do not believe that a per se rule against examining races that have only white candidates is implicit in *Gingles*. Such a rule would be clearly contrary to the plurality opinion, which views the race of the candidates as irrelevant in voting analysis. Moreover, such a rule is questionable in light of the language of § 2, which seeks to give minorities equal opportunity to "elect representatives of their choice." 42 U.S.C. § 1973(b). Nothing in the statute indicates that the chosen

representative of a minority group must be a minority. Additionally, § 2 requires that the district court make a determination from the totality of the circumstances, not from a selected set of circumstances. Accordingly, we conclude that there is no rule of law prohibiting the district court from examining those elections having only Anglo candidates.

*Sanchez v. Bond*, 875 F.2d 1488, 1495 (10th Cir. 1989).

Plaintiffs would have this Court examine only a "selected set of circumstances" chosen by Plaintiffs to serve their goal of prevailing in this lawsuit. *Id.* This Court should reject that approach and consider the "totality of the circumstances," including contested and uncontested elections since 2000, regardless of whether they involved African American candidates or were conducted after this action commenced.

### iv. *What is the best decision rule for identifying the African American preferred candidates?*

Both Drs. Engstrom and Rodden used EI analysis to draw inferences about the voting behavior of African Americans and whites. Dr. Engstrom testified that the results of his analysis were "so close" to Dr. Rodden's that they are interchangeable. (SUMF ¶138) However, the parties disagree about how to identify the African American preferred candidates based on these results.

Dr. Rodden's decision rule for identifying African American voters is that, in elections for *n* seats, the *n* candidates receiving the highest percentage of African American votes are the candidates preferred by African American votes. The percentage of African American votes is represented by the "point estimate," which is the "most likely value given by the data and methodology." *Fabela v. City of Farmers Branch*, No. 3:10-cv-1425-D, 2012 U.S. Dist. LEXIS 108086, at *18 (N.D. Tex. Aug. 2, 2012). Each point estimate also has a "confidence interval," which is a "statistical measure of reliability which provides a range of values within which the actual range will fall 95% of the time." *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1404 n.5

(E.D. Wash. 2014). Since 2000, there have been 27 contested seats for the District board. Using Dr. Rodden's decision rule, African Americans have had 27 preferred candidates. (SUMF ¶¶78, 82, 86, 90, 94, 100, 108, 113, 118, 122, 126, 131)

Plaintiffs have challenged Dr. Rodden's decision rule on the basis that it does not actually identify who is preferred by African Americans. According to Plaintiffs, if a point estimate for a candidate lies within a confidence interval of another candidate, then the two candidates are statistically indistinguishable. For example, assume Candidate A had a point estimate of 23% and a confidence interval of 11% to 38%. Assume that Candidate B had a point estimate of 33% and a confidence interval of 31% to 45%. Because Candidate B's point estimate (33%) falls within Candidate A's confidence interval (11% to 38%), Plaintiffs believe that neither candidate was preferred over the other because the two are statistically indistinguishable.

During Dr. Rodden's deposition, Plaintiffs proposed a decision rule that only statistically-distinguishable candidates could be preferred by voters. *See* Exhibit I pg. 156:18-228:25. Plaintiffs asked Dr. Rodden to examine the results of each contested election since 2000 using Plaintiffs' decision rule. Only 19 statistically distinguishable candidates were identified as preferred by African Americans, compared with 27 candidates under Dr. Rodden's decision rule of ranking candidates according to their point estimates.

Plaintiffs' decision rule does not identify Hogshead as a candidate preferred by African Americans in the two-seat election of 2013, even though Dr. Engstrom's own EI analysis shows she received the second-highest number of African American votes (24.2%). (SUMF ¶122) Hogshead was elected. (SUMF ¶122) The rule also does not identify Schroeder as an African American preferred candidate in the two-seat election of 2012, despite receiving the second-highest percentage of African American votes (25%). (SUMF ¶118) Schroeder was elected.

(SUMF ¶118)  Under Plaintiffs' decision rule, neither of these candidates would be considered successful African American preferred candidates.  Plaintiffs' decision rule excludes another four candidates who were elected and received the second- or third-highest number of African American votes.[13]

This Court should reject Plaintiffs' decision rule because it artificially narrows the pool of successful African American candidates.  The decision rule is inconsistent with the straightforward rule of *Clay* that in an election for *n* seats, the *n* "candidates receiving the highest number of African-American votes [are] the 'minority preferred candidates.'"  *Clay*, 90 F.3d at 1361-62.  The Eighth Circuit did not distinguish between candidates who have point estimates outside the bounds of other candidates' confidence intervals, and this Court should not do so here.

In sum, the best decision rule for identifying candidates preferred by African Americans is the rule employed by Dr. Rodden and approved of in *Clay*:  In an election with *n* contested seats, the *n* candidates receiving the highest percentage of African American votes are those preferred by African Americans.  Using any other decision rule would artificially constrict the definition of an African American candidate and prevent this Court from making a decision based on the "totality of the circumstances."  *Sanchez*, 875 F.2d at 1495.

### 2.     African American voters are not politically cohesive

Having answered the predicate questions, the preferences of African American and white voters can now be analyzed.  Political cohesiveness requires that African Americans have "voting preferences" that are "distinct" from whites.  *Shirt*, 461 F.3d at 1020.  As demonstrated below,

---

[13] In the two-seat election of 2003, Knorr received the second-highest percentage of African American votes (30.2%) and was elected.  (SUMF ¶¶89, 90)  In the three-seat election of 2002, Clark received the third-highest percentage of African American votes (12.6%) and was elected.  (SUMF ¶¶85, 86)  In the two-seat election of 2001, Garofalo received the second-highest percentage of African-American votes (24.7%) and was elected.  (SUMF ¶¶81, 82)  In the two-seat election of 2000, Hirsch received the second-highest level of African American votes (18.7%) and was elected.  (SUMF ¶¶77, 78) Under Plaintiffs' decision rule, none of these candidates are considered successful African American preferred candidates.

African American and white voters frequently have the same voting preferences, which precludes a finding of cohesiveness.

In eight of twelve (66%) of contested elections since 2000, African American and white voters have preferred at least one of the same candidate. (SUMF ¶¶78, 82, 86, 90, 108, 118, 112, 131) In two of these elections (2009 and 2000), African American and white voters have preferred two of the same candidates. (SUMF ¶¶78, 108) Narrowing the sample size to only the contested elections since 2009, African Americans and whites share a preference for a candidate in five out of six (83.3%) of the contested elections:

**Table 3 – Candidates Preferred by Both Whites and African Americans**

| Year | Candidate | % of African American votes | % of white votes |
|------|-----------|------------------------------|------------------|
| 2015 | Graves | 52.4% (1st) | 21.4% (2nd) |
| 2013 | Hogshead | 24.2% (2nd) | 37.2% (1st) |
| 2012 | Schroeder | 25.0% (2nd) | 40.9% (2nd) |
| 2009 | Knowles | 47.7% (1st) | 36.5% (2nd) |
| 2009 | Schroeder | 35.1% (2nd) | 44.2% (1st) |
| 2003 | Knorr | 30.2% (2nd) | 52.1% (1st) |
| 2002 | Clark | 12.6% (3rd) | 17.8% (3rd) |
| 2001 | Garofalo | 24.7% (2nd) | 35.1% (1st) |
| 2000 | Hirsch | 18.7% (2nd) | 34.1% (2nd) |
| 2000 | Thomas | 33.4% (1st) | 18.9% (2nd) |

As the table above demonstrates, 11 of the 27 (40.7%) victorious candidates are preferred by both African American and white voters. Even narrowing the period to the past six years (*i.e.*, contested elections since 2009), a similar figure emergences: 5 of the 14 (35.7%) of the victorious candidates are preferred by both races.

The next table further undermines the notion of political cohesiveness among African Americans in the District. In half of the contested elections since 2000, more than 50% of white votes were cast for African American preferred candidates and/or more than 50% of African American votes were cast for white preferred candidates. (SUMF ¶¶79, 91, 108, 118, 122, 131) In 2009 and 2000, both races cast a majority of their votes for the other race's preferred candidates.

### Table 4 – Percentage of Crossover Voting

| Year/Number of Contested Seats | % of white votes cast for African American preferred candidates | % of African American votes cast for white preferred candidates |
|---|---|---|
| 2015 (two seats) | 42.3% | 62.2% |
| 2014 (three seats) | 18.2% | 11.3% |
| 2013 (two seats) | 54.2% | 44.4% |
| 2012 (two seats) | 53.7% | 48.1% |
| 2011 (three seats) | 21.5% | 25% |
| 2009 (two seats) | 80.7% | 82.7% |
| 2006 (two seats) | 19.0% | 29.4% |
| 2004 (two seats) | 21.2% | 27.6% |
| 2003 (two seats) | 71.6% | 46.1% |
| 2002 (three seats) | 43.0% | 36.9% |
| 2001 (two seats) | 35.0% | 44.4% |
| 2000 (two seats) | 53.0% | 52.7% |

In two elections (2015 and 2002), whites cast more than 40% of their votes for the African American preferred candidates (42.3% and 43.0%, respectively). (SUMF ¶¶87, 132) In four elections (2013, 2012, 2003, and 2001), African Americans cast more than 40% of their votes for the white preferred candidates (44.4%, 48.1%, 46.1%, and 44.4%, respectively). (SUMF ¶¶83, 91, 119, 123)

Thus, in eight of the twelve (66%) of the contested elections since 2000, whites have cast a majority or near-majority of their votes for African American preferred candidates, African Americans have cast a majority or near-majority of their votes for white preferred candidates, or both. In five out of twelve (41.6%) of the contested elections, both races cast a majority or near-majority of their votes for the other race's preferred candidates.

Political cohesiveness requires that African Americans have "voting preferences" that are "distinct" from whites. *Shirt*, 461 F.3d at 1020. The tables above show this to be false in the District. In a vast majority of elections, African Americans and whites share at least one preferred candidate. More than a third of successful candidates have been preferred by both races. In half of the contested elections since 2012, whites have cast a majority of their votes for African American preferred candidates or vice versa. In two elections, both races cast a majority of their votes for the other race's preferred candidates. These data confirm that the voting behavior of African Americans in the District is not "distinct" from whites. *Shirt*, 461 F.3d at 1020. Accordingly, Plaintiffs' claim should be dismissed as a matter of law for failing to satisfy the second *Gingles* precondition.

**3.    African American Preferred Candidates Are Not Usually Defeated by White Bloc Voting (Third *Gingles* Precondition)**

"The third *Gingles* precondition asks whether the white majority typically votes in a bloc to defeat the minority candidate." *Shirt*, 461 F.3d at 1020 (citing *LULAC*, 548 U.S. at 425). The Eighth Circuit has set forth a three-prong inquiry for this precondition: "(1) identifying the minority-preferred candidates; (2) determining whether 'the white majority vote as a bloc to defeat the minority preferred candidate;' and (3) determining whether 'there [were] special circumstances

such as the minority candidate running unopposed present when minority-preferred candidates won.'"[14] *Shirt*, 461 F.3d at 1020 (quoting *Cottier*, 445 F.3d at 1119-20).

As explained above, identifying the candidate preferred by African Americans is simple in this circuit: In elections with *n* contested seats, the *n* candidates receiving the highest percentage of African American votes are the candidates preferred by African Americans. *Clay*, 90 F.3d at 1361-62. Having already identified the African American preferred candidates, the only unanswered questions are (1) whether African American candidates are "typically" defeated; and (2) whether the white voting bloc is responsible for those defeats. *Shirt*, 461 F.3d at 1020. The answer to both these questions is "no." Moreover, Plaintiffs have not identified any "special circumstances" that would diminish the significance of victorious African American preferred candidates. Accordingly, Plaintiffs' claim must be dismissed as a matter of law for failing to satisfy the third *Gingles* precondition.

### A. African American Preferred Candidates Are Not Usually Defeated

Before determining whether white bloc voting is responsible for typically causing African American preferred candidates to lose, this Court must ask whether African American preferred candidates typically lose in the first place. The undisputed evidence shows they do not.

In 9 out of 12 (75%) contested elections since 2000, at least one African American preferred candidate was elected. (SUMF ¶¶77-134) Out of 27 contested seats since 2000, 13 (48%) of those seats were won by candidates preferred by African Americans. (SUMF ¶¶77-134) Narrowing the period to contested elections since 2009, African American preferred candidates still have been elected to six of fourteen (42.8%) seats.

---

[14] The formulation of this three-part inquiry does not reflect the facts of this case because, as explained above, African Americans voters are not a minority and white voters are not a majority.

Further, the most-preferred African American candidate has been elected in half of all contested elections. Since 2000, there have been 12 candidates who received the largest share of African American votes (*i.e.*, one candidate in election). Those candidates have been elected six times (50%). The same figure emerges for elections since 2009.

**Table 5 – Electoral Success of Candidates Most Preferred by African Americans**

| Year | Candidate most-preferred by African Americans | Elected? |
|------|-----------------------------------------------|----------|
| 2015 | Graves | Yes |
| 2014 | Paulette-Thurman | Yes |
| 2013 | Henson | No |
| 2012 | Morris | Yes |
| 2011 | Graham | No |
| 2009 | Knowles | Yes |
| 2006 | Thomas | No |
| 2004 | Van | No |
| 2003 | Thomas | Yes |
| 2002 | Graham | Yes |
| 2001 | Butler | No |
| 2000 | Thomas | Yes |

(SUMF ¶¶77-134)

The District's election history shows that nearly half of all candidates elected since 2000 have been preferred by African Americans, and that the most-preferred African American candidate has been successful in half of elections. Even narrowing the period to include only contested elections since 2009, African American preferred candidates have been elected 42.8% of the time, and the most-preferred African American candidate has been successful in half of those elections. In *Gingles*, the Supreme Court found vote dilution because African Americans had only "minimal and sporadic success in electing representatives of their choice." 478 U.S. at 60. That is not the case here.

Under the Eighth Circuit's analysis of the third *Gingles* precondition, courts must ask whether were "special circumstances" to explain the success of the African American preferred candidates. *Shirt*, 461 F.3d at 1020 (internal quotation omitted). Throughout this litigation, Plaintiffs have only complained about the circumstances surrounding the 2015 election. As established above, however, Plaintiffs' grounds for challenging the 2015 election are at best dubious. Plaintiffs assert that within four months after this action was filed, white political leaders in the District rapidly mobilized and organized support around Graves on the assumption that her election would "forestall single-member districting" (if this is true, Plaintiffs have not explain why these unidentified leaders did not rally around two African American candidates instead of just one). Exhibit A pg. 11 n.8. Devoid of any evidence, this conspiracy theory does not qualify as a "special circumstance" that would undermine the success of an African American preferred candidate. Plaintiffs' other basis for challenging Graves's victory is that white voters only had one viable white candidate to support. This assertion is also rote speculation and does a disservice to qualities of the African American candidates in 2015.

This Court should also note that Graham, an African American candidate who was preferred by African Americans in the 2002 contested election, did not draw any challengers in 2005 and 2008. (SUMF ¶¶97, 105) Henson, another African American board member, also did not face any challengers in his 2010 reelection bid. (SUMF ¶¶110-111) Although not as probative as prevailing in a contested election, this fact is relevant in establishing that African American preferred candidates have achieved electoral success. *Mallory v. Ohio*, 38 F. Supp. 2d 525, 571 (S.D. Ohio 1997) ("The absence of white challengers to black incumbent judges is indicative of the lack of legally significant racial bloc voting.")

Finally, this Court should note the success of African American preferred candidates in exogenous elections. "Although they are not as probative as endogenous elections, exogenous elections hold some probative value." *Shirt*, 461 F.3d at 1021 (citing *Cottier* 445 F.3d at 1121). In 12 exogenous elections analyzed by Dr. Rodden, the African American candidate prevailed in every election, often by extremely large margins. (SUMF ¶¶139) These elections included high-turnout November presidential elections, November off-year elections, February presidential primaries, and August primaries with very low turnout. In even the narrow contests, the African American candidates prevailed. (SUMF ¶¶139)

In sum, the undisputed facts show that African Americans are not "typically" defeated. *Shirt*, 461 F.3d at 1020. Accordingly, Plaintiffs have failed to satisfy the third *Gingles* precondition.

**B.     White Bloc Voting Is Not Responsible for the Defeat of African American Preferred Candidates**

Because African American preferred candidates are elected frequently enough to preclude a vote dilution claim, this Court need not determine whether white bloc voting is responsible for the defeat of the unsuccessful African American preferred candidates. Nevertheless, the analysis below establishes that other factors have contributed to the defeat of African American preferred candidates.

It bears repeating that the Supreme Court intended vote dilution claims to be asserted in jurisdictions where the racial or ethnic voting group is a numerical "minority" and white voters are a numerical "majority." *Gingles*, 478 U.S. at 50-51. In this case, white voters are a minority, and single-race blacks are a plurality of the VAP. AP blacks are a majority. Regardless of whether this Court considers single-race blacks or AP blacks, African Americans have the numerical

superiority to prevail in every election.  Thus, white bloc voting cannot be responsible for the defeat of African American preferred candidates.  Other factors must be responsible.

Since 2000, there have been 14 candidates preferred by African Americans who were not elected.  (SUMF ¶¶77-134)  Three of those candidates came remarkably close to prevailing.  In 2014, Savala lost in a three-seat election by 91 votes.  (SUMF ¶125)  He received 2,425 votes, which was 96.4% of the amount received by Morris, the third-place winner, who garnered 2,516 votes.  (SUMF ¶125)  In 2013, Henson received 2,109 votes, which was 94.4% of the amount received by Brown, the second-place winner who received 2,234 votes.  (SUMF ¶121)  In 2011, Hawkins lost a three-seat election by only 190 votes—93.83% of the votes received by Chabot (3,080), the third-place winner.  (SUMF ¶112)

In 2014, African Americans concentrated about 75% of their votes around three candidates (Paulette-Thurman, Savala, and Johnson).  (SUMF ¶127)  Paulette-Thurman was elected.  Savala, who lost by a mere 91 votes, also could have been elected if African Americans did not inefficiently spread the remaining 25% of their votes among five other candidates.  (SUMF ¶121)  A similar phenomenon occurred in 2011, where African Americans cast 60% of their votes for three candidates, and then spread the remaining 40% among six other candidates.  (SUMF ¶114)

In an at-large jurisdiction where African Americans comprise a majority of the voting age population, there are no structural barriers to electoral success.  Under these circumstances, every African American preferred candidate can prevail if African American and white turnout is comparable and African Americans do not scatter their votes among many different candidates.  With only small changes in the voting behavior of African Americans in 2011 and 2014, both Savala and Hawkins could have been elected, raising the total number of African American

candidates elected since 2011 to six out of a possible twelve (50%). That success rate is approximately equal to the current African American share of the District's voting age population.

Thus, the impediments to the electoral success of African Americans are not driven by the structure of the District's election system, but by voter behavior. These obstacles are not within the control of the District and are not actionable under a Section 2 vote dilution claim. In *Gingles*, the Supreme Court held that "[t]he essence of a submergence claim [*i.e.*, a claim that the preferences of a racial or ethnic group are suppressed by a larger and different racial or ethnic group] is that minority group members prefer candidates whom they *could* elect were it not for the interaction of the challenged electoral law or *structure* with a white majority that votes as a significant bloc for different candidates." *Id.*, 478 U.S. at 68 (emphasis added). Given that the number of African American voters are numerically superior in the District, African American voters "could elect" their candidates of choice under the District's existing at-large system. *Id.*, 478 U.S. at 68 (emphasis added). Therefore, the election "structure" is not inherently dilutive and the defeats of African American candidates cannot be attributed to white bloc voting. *Id.* For this reason, Plaintiffs' claim fails to satisfy the third *Gingles* precondition.

## IV.  CONCLUSION

For the reasons set forth above, the District respectfully requests that this Court grant the instant motion and dismiss Plaintiffs' claim with prejudice.

Respectfully submitted,

CROTZER & ORMSBY, LLC

Cindy Reeds Ormsby, #50986
Angela Gabel, #58227
130 S. Bemiston, Ste. 602
Clayton, MO 63105
(314) 726-3040
(314) 726-5120 (fax)
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

FLOYD, PFLUEGER & RINGER, P.S.

s/ John A. Safarli*
John Armen Safarli, *pro hac vice*
200 W. Thomas St., Ste. 500
Seattle, WA 98119
(206) 441-4455
(206) 441-8484 (fax)
jsafarli@floyd-ringer.com

*Attorneys for Defendant Ferguson-Florissant School District*

*Pursuant to Local Rule 2.11, the filing attorney verifies that a signed original exists with the original signatures of the attorneys.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he is a person of such age and discretion as to be competent to serve papers. It is further certified that on September 30, 2015, the undersigned electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participant(s):

Anthony E. Rothert
Andrew J. McNulty
Jessie M. Steffan
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: 314-652-3114
Fax: 314-652-3112
trothert@aclu-mo.org
andrew.joseph.mcnulty@gmail.com
jsteffan@aclu-mo.org
*Counsel for Plaintiffs*

Dale Ho
Julie A. Ebenstein
Sophia Lin Lakin
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: 212-549-2686
dale.ho@aclu.org
jebenstein@aclu.org
slakin@aclu.org
*Counsel for Plaintiffs*

M. Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: 404-500-1235
lmcdonald@aclu.org
*Counsel for Plaintiffs*

Gillian R. Wilcox
ACLU of Missouri
3601 Main St.
Kansas City, MO 64111
gwilcox@aclu-mo.org
*Counsel for Plaintiffs*

Dated this 30th day of September, 2015.

s/ John A. Safarli
John A. Safarli, *pro hac vice*