EXHIBIT F

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, REDDIT HUDSON, F. WILLIS JOHNSON and DORIS BAILEY, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CASE NO. 14-2077 ) |
| FERGUSON-FLORISSANT SCHOOL DISTRICT and ST. LOUIS COUNTY BOARD OF ELECTIONS COMMISSIONERS, | ) ) ) ) ) |
| Defendants. | ) |

Deposition of WILLIAM COOPER, taken on

Behalf of the Defendant.

August 17, 2015

Reported by Sandra McGraw, CCR, CSR
MCGRAW REPORTING, L.L.C.
Certified Court Reporter

2927 Droste Road

St. Charles, MO  63301

314.704.2727

Page 2

1    UNITED STATES DISTRICT COURT FOR THE
     EASTERN DISTRICT OF MISSOURI
2
3    MISSOURI STATE CONFERENCE OF  )
     THE NATIONAL ASSOCIATION FOR  )
4    THE ADVANCEMENT OF COLORED   )
     PEOPLE, REDDIT HUDSON,        )
5    F. WILLIS JOHNSON and         )
     DORIS BAILEY,                 )
6                                  )
          Plaintiffs,              )
7                                  )
     vs.              ) CASE NO. 14-2077
8                                  )
     FERGUSON-FLORISSANT SCHOOL    )
9    DISTRICT and ST. LOUIS COUNTY )
     BOARD OF ELECTIONS            )
10   COMMISSIONERS,                )
                                   )
11        Defendants.              )
12
13       Deposition of WILLIAM COOPER, produced, sworn and
14   examined on the 17th day of August, 2015, between the
15   hours of nine-thirty in the forenoon and two o'clock in
16   the afternoon of that day in the law offices of Crotzer
17   & Ormsby, 130 South Bemiston Avenue, Suite 602, in the
18   County of St. Louis, State of Missouri, before Sandra
19   McGraw, CCR #614, in a certain cause now pending in the
20   United States District Court for the Eastern District
21   of Missouri, MISSOURI STATE CONFERENCE OF THE NATIONAL
22   ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,
23   REDDIT HUDSON, F. WILLIS JOHNSON, and DORIS BAILEY,
24   Plaintiffs, vs. FERGUSON-FLORISSANT SCHOOL, et al.,
25   Defendants; on behalf of the Defendants.

Page 3

1              INDEX
2    Direct Examination by Ms. Ormsby        Page 5
3
4
5         INDEX OF EXHIBITS
6    Defendant's Exhibit:
7    A, Report              Page 28
8    B, Report              Page 30
9    C, Government Census Website documents   Page 52
10   D, Yakima Deposition        Page 81
11   E, Dr. Rodden's Supplemental Report      Page 96
12   F, Dr. Kimball's Supplemental Report     Page 106
13   G, 2010 Census Overcount/Undercount
14      Estimate            Page 116
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              APPEARANCES
2
3    For Plaintiff:  American Civil Liberties Union
4                    Foundation
5                    2700 International Tower
6                    229 Peachtree Street, NE
7                    Atlanta, Georgia 30303
8               By:  Mr. Laughlin McDonald
9                    Special Counsel and Director
10                   Emeritus, Voting Rights Project
11
12                   American Civil Liberties Union
13                   125 Broad Street, 18th Floor
14                   New York, New York 10004-2400
15              By:  Ms. Sophia Lin Lakin
16                   SLS Post Graduate
17                   Public Interest Fellow
18
19   For Defendant:  Crotzer & Ormsby
20                   Attorneys at Law
21                   130 South Bemiston Avenue, Suite 602
22                   St. Louis, Missouri 63105
23              By:  Ms. Cindy Reeds Ormsby
24                   and Ms. Angela Bullock Gabel
25

Page 5

1              WILLIAM COOPER,
2    of lawful age, being duly sworn to tell the truth, the
3    whole truth, and nothing but the truth, deposes and
4    says on behalf of the Defendant as follows:
5              DIRECT EXAMINATION
6    BY MS. ORMSBY:
7         Q.  Okay.  Mr. Cooper, I know you've had your
8    deposition taken many times but I'll just go briefly
9    over the depo rules, which I'm sure you could probably
10   cite better than I can.
11        A.  Oh, no.
12        Q.  Let's take turns speaking.  Don't answer my
13   question until I'm finished asking it and I'll try to
14   do the same and not interrupt you when giving your
15   answer so that the court reporter can get everything
16   down and we can have a clean transcript.
17        A.  Okay.
18        Q.  Answer verbally like you just did.  Yes, no,
19   okay.  Nodding of the head, shaking of the head,
20   doesn't read very well in a transcript as well.
21        If you need a break at any time, if any of you do,
22   just say the word and just -- I would just ask that you
23   answer any question that's on the table before we take
24   a break.  Okay?
25        A.  Okay.

2  (Pages 2 to 5)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 6

1    Q. All right.
2       MR. McDONALD: Can I just note that we will
3    reserve the right to make any objections given the
4    proposed use of the deposition?
5       MS. ORMSBY: Okay.
6       MR. McDONALD: We won't make any objections
7    now.
8       MS. ORMSBY: Okay. All right.
9       MR. McDONALD: Okay.
10      Q. (By Ms. Ormsby) All right. If you're ready,
11   what have you done to prepare for this deposition?
12      A. I reviewed my declarations.
13      Q. Okay.
14      A. That's the extent of it really.
15      Q. Have you spoken with any of other experts in
16   this case?
17      A. To prepare for this deposition?
18      Q. Uh-huh.
19      A. No.
20      Q. Okay. You just said you reread your reports.
21   Did you read any of the other reports that were filed
22   in this case?
23      A. I did read Dr. Rodden's initial expert report
24   and the joint supplemental declaration filed by
25   Dr. Rodden and Dr. Chen.

Page 7

1       Q. And have you spoken to anyone besides the
2    Plaintiffs' attorney in order to prepare for this
3    deposition?
4       A. No.
5       Q. I'd like to start with just some basic
6    education background. Can you tell me where you when
7    to high school?
8       A. I went to Virginia High School in Bristol,
9    Virginia. It's right on the state line so Virginia
10   High School is in Bristol, Virginia, and Tennessee High
11   School is in Tennessee.
12      Q. Okay. And where did you go to college?
13      A. I went to Davidson College in Davidson, North
14   Carolina.
15      Q. Okay.
16      A. Which is just outside of Charlotte.
17      Q. Did you graduate?
18      A. I did.
19      Q. And what is your degree in?
20      A. BA in economics.
21      Q. Okay. Did you go on to grad school?
22      A. I took some graduate level courses at Virginia
23   Tech and Urban Planning but I did not finish that
24   master's program.
25      Q. Okay.

Page 8

1       A. Just because I decided that was not a field I
2    was particularly interested in obtaining employment in.
3       Q. Okay. And then where were you employed
4    immediately out of college?
5       A. Immediately out of college, I think my first
6    job was putting some sort of yellow foam on an
7    industrial plant in Bristol, Tennessee, in the summer.
8    And then later that fall I -- I was interested in
9    seeing some of the American West so I traveled to
10   Albuquerque, New Mexico, and worked in an Arby's roast
11   beef for about six months. And then I worked in
12   Glacier Park that summer at the concessionaire in West
13   Glacier. It's like McDonald.
14      Q. So --
15      A. But go ahead. We're getting off on a tangent.
16      Q. So when did you graduate? What year did you
17   graduate from college?
18      A. '75.
19      Q. Okay. And so was it the summer of '75 where
20   you started working putting the yellow stuff down?
21      A. I did.
22      Q. Okay.
23      A. I did.
24      Q. And you worked -- and then you headed west?
25      A. Uh-huh.

Page 9

1       Q. And you ended up at Estes Park the following
2    summer; would that be accurate?
3       A. Not Estes Park, West Glacier.
4       Q. West Glacier. Sorry.
5       A. I did work in Estes Park one summer but that
6    was in college.
7       Q. Okay. What did you do after that?
8       A. Then I -- well, I took a trip to British,
9    Columbia, and the southeast corner of Alaska with a
10   couple of buddies. But after that I worked the apple
11   harvest in the Yakima Valley of Washington state.
12      Q. Okay.
13      A. And then I returned back to Bristol and worked
14   at my uncle's nursery for a few months, and then I left
15   for a lengthy journey to South America.
16      Q. Okay.
17      A. That would have been in 1978.
18      Q. And how long were you in South America?
19      A. I was there about eight or nine months.
20      Q. What did you do down in South America?
21      A. Just trekking around with a backpack.
22      Q. So you weren't in one specific country, you
23   just went?
24      A. No, I -- I spent some time in Mexico.
25   Actually took a quick class in Spanish in Cuernavaca, I

3 (Pages 6 to 9)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 10

1    guess, there in the initial stage of my trip.  But most
2    of the journey was either in Mexico or in the Andean
3    countries:  Columbia, Ecuador, Peru, Chili, Argentina.
4        Q.  How did you fund your trip?
5        A.  From picking apples and working in my uncle's
6    nursery.  I mean, it was really cheap.  I just -- I
7    stayed in, you know, really inexpensive lodging while I
8    was down there.
9        Q.  Okay.
10       A.  And in those days it was really cheap.
11       Q.  So you came back from South America?
12       A.  Uh-huh.
13       Q.  What did you do then?
14       A.  I enrolled at Virginia Tech in the Urban
15   Regional Planning Program.
16       Q.  Okay.  And did you work while you were in that
17   program?
18       A.  Well, I did have an assistance -- what do they
19   call it?  Assistantship?  So I did do some stuff.  It
20   was not particularly enlightening I didn't think.
21       Q.  But at Virginia Tech?
22       A.  Yeah.  Uh-huh.
23       Q.  And how long were you at Virginia Tech?
24       A.  About a year.
25       Q.  Okay.  And then what did do you?

Page 11

1        A.  Then I started working as an outreach person
2    for a migrant farm worker employment training program.
3    That organization also did other -- other things.  That
4    was a primary concern.  But they also worked on housing
5    issues and nutrition issues.
6        Q.  And what was your job there?
7        A.  Outreach worker.  I worked in -- initially in
8    Northern Virginia visiting migrant labor camps as part
9    of the apple harvest up there.
10       Q.  Okay.
11       A.  And then later I worked on a housing program
12   in Richmond, Virginia, that was designed to assist farm
13   workers find more permanent housing in towns and cities
14   if they choose to leave farm work for other kinds of
15   appointment.
16       Q.  And what was the organization that you were
17   employed with?
18       A.  It's Telamon, T-E-L-A-M-O-N.
19       Q.  And how long did you work for them?
20       A.  A couple of years.
21       Q.  Can you give me the years?  What years?
22       A.  '81, '80.  Then with those earnings I went
23   back to Latin America for about seven or eight months.
24       Q.  Okay.
25       A.  And then I came back to Richmond.  Worked

Page 12

1    briefly for the Virginia -- it's a student loan
2    authority.  I can't remember the name of it now.  But I
3    work there for about six months or so.  And then I
4    started working for another migrant farm worker
5    organization that was based in Delaware called
6    Delmarva, D-E-L-M-A-R-V-A, Rural Ministries.  They were
7    primarily focused on health and nutrition issues.
8        Q.  Okay.
9        A.  And it was with that job that I ended up
10   working out of the American Civil Liberties Union
11   Office in Richmond working on migrant farm worker
12   nutrition issues as well as nutrition issues relating
13   to all kids who are school age, summer food and school
14   breakfast programs in particular.
15       Q.  So was the Delmarva organization an arm of the
16   ACLU?
17       A.  No, no.  It was based in Dover, Delaware, with
18   health clinics in Nassawadox, Virginia, and obviously
19   in Dover and also in Snow Hill, Maryland.  Some of the
20   migrant farm worker impacted areas on the eastern shore
21   of Virginia.  But I was the only employee really based
22   in Richmond.
23       Q.  Okay.
24       A.  And -- because it was just me, I needed office
25   space so I worked out of an ACLU office.

Page 13

1        Q.  Okay.  So how long did you work for Delmarva?
2        A.  Well, I ended up working part-time for
3    Delmarva and part-time for the ACLU of Virginia.
4        Q.  What year was that?
5        A.  This would have been from around 1984 to --
6    part-time for the ACLU till around 1991 or so.  On the
7    Voting Rights Project, specifically doing election
8    maps.  And at some point around 1991 it just got kind
9    of overwhelming.  There was no way I could keep up with
10   the demand to do election maps, so I resigned from
11   Delmarva and just started working for the ACLU of
12   Virginia full time.
13       Q.  So what training did you have to begin drawing
14   voting maps for the ACLU when you started doing that?
15       A.  Well, there's no -- at that point in time I'm
16   not sure if there was any real training available per
17   se.  I had taken a couple of classes, I guess, at
18   Virginia Tech where I did have some involvement with
19   census data and rudimentary mapping as it existed in
20   the early 1980s, rudimentary computer mapping, but
21   beyond that I really didn't have any specific training.
22       When I started, really most of the mapping work
23   had to be done with paper maps because so much of the
24   country was not digitized so you had to work with
25   census paper maps.  And I essentially just used a Lotus

1    123 spreadsheet and sorted and allocated blacks to
2    wards and then colored them in on paper maps.  I was
3    doing that for the ACLU Southern Regional Office by the
4    late '80s as well.
5        The ACLU of Virginia had filed a number of Section
6    2 lawsuits in the late '80s in southside Virginia
7    counties that had predominantly African American or
8    significant African-American populations but no
9    representation on county board of supervisors or school
10   boards.
11       So there was a lot of litigation underway at that
12   time.  And because it was still the 1980s and the
13   census had not provided digitized census maps for
14   electronic analysis with computer mapping, all of that
15   work was done with paper maps.
16       Q.  So have you had any classes in demography?
17       A.  Not specifically, no.
18       Q.  Have you had any classes in statistics?
19       A.  I have had statistics classes at Davidson, as
20   well as a couple at Virginia Tech in the Urban Planning
21   Program.
22       Q.  About how many hours in statistics have you
23   had?
24       A.  I don't know.  I don't do statistical analysis
25   in my work.  I mean, I did fine in them but I don't

1    really recall what -- I mean, the term hours, they were
2    like semester courses.
3        Q.  Okay.
4        A.  So I had a semester at Davidson as part of the
5    Economics Program, and I think I had a full year of
6    statistics as it related to Urban and Regional Planning
7    while I was at Virginia Tech.
8        Q.  Okay.
9        A.  I also studied under Brady Deaton at Virginia
10   Tech.  I just discovered about a month ago by chance
11   that -- I was trying to think of if I could really
12   remember anything of great value at Virginia Tech.  And
13   I recall having a class of agricultural economics at
14   Virginia Tech taught by a professor named Brady Deaton.
15   I said, I wonder whatever happened to Brady Deaton.
16   Well, it turns out he became president of the
17   University of Missouri and just recently retired.
18       Q.  Uh-huh.
19       A.  So that's my only connection with the
20   University of Missouri.
21       Q.  So you said you worked for the ACLU until
22   about 1991?
23       A.  Well, no, I worked for the ACLU until around
24   1998, but I worked in a part-time capacity until 1991
25   and then after that I worked full time.

1        Q.  Okay.  And during from '91 to '98 you pretty
2    much only did voting maps; is that right?
3        A.  That's correct.
4        Q.  Okay.
5        A.  Yeah.
6        Q.  What happened in 1998?
7        A.  At that point the ACLU of Virginia had pretty
8    much done all that could be done as it related to
9    Section 2 lawsuits and anything related to mapping as
10   it pertains to voting.  So I left and just started
11   working on my own out of my house.
12       And at that point I was still doing lots of maps
13   'cause I was working for the ACLU Southern Regional
14   Office and the Lawyers Committee for Civil Rights and
15   other groups.
16       So that's what I've been doing since then.  And
17   I've not really worked on any project specifically for
18   the ACLU of Virginia except a little bit around the
19   spring of 2011.  Most of my work has really been
20   outside of Virginia.
21       Q.  Okay.  Would you -- is the ACLU your only
22   client right now?
23       A.  No.  I do some work for Norfolk State
24   University on some -- some on vetting but other matters
25   as well.  And I also do a lot of work for the Food

1    Research and Action Center, which is a nationwide
2    policy organization on hunger and nutrition issues
3    based in Washington, D.C.
4        Q.  So what percentage of your work would you say
5    is billed through the ACLU?
6        A.  Through the ACLU right now, oh, maybe thirty
7    percent.  I work some for the national office.  I mean,
8    it really would vary from year to year.  And some of my
9    work is for the national office.  But recently a lot of
10   the hours and billing would have gone to state
11   affiliates, as in the state of Washington, the ACLU.
12   And I'm working on a case in Florida right now with the
13   state of Florida ACLU.  And Connecticut for that
14   matter -- not Connecticut.  Excuse me.  Rhode Island.
15       Q.  But all of those ACLU cases, that only makes
16   up thirty percent of your work?
17       A.  Well, it might be more than that once you add
18   in -- I don't really know exactly.  It might be more
19   than that because -- and this year probably not much
20   more than thirty percent.  But last year for the
21   Yakima, Washington, case, it was probably more than
22   that.
23       Q.  How many of the cases that you worked on have
24   been on behalf of the Plaintiffs?
25       A.  Most of them but not all.  I have worked for

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 18

1  counties in Mississippi and I'm currently -- and
2  Louisiana, if memory serves me correct. I've worked on
3  one case that involved East Carroll Parish. Police
4  Jury it was called at the time. It may be a Parish
5  Commission.
6       And presently I am working for the city of
7  Decatur, Alabama, on a voting lawsuit there.
8       Q. So you're actually defending a Voters Rights
9  Act, Section 2 case, that was brought against those
10  entities?
11      A. No. Well, the Decatur, Alabama case is a -- a
12  little odd. It was filed by a citizen of Decatur who
13  believes that the city has to revert to a three
14  district to at-large voting plan for the city council
15  because there was an election in 2010, a referendum,
16  where the citizens of Decatur voted to move to that
17  sort of a system.
18      But the Department of Justice objected to that
19  because it would have eliminated the single majority
20  black district. And the city council has chosen not to
21  try to create a plan that would switch from district to
22  at-large. And because of that there is this lawsuit.
23      And it's seems to be in abeyance. I mean, I filed
24  an expert report about a year ago but nothing much has
25  happened since then. I'm not sure why.

Page 19

1       Q. How many voting plans would you guess that you
2  had -- have prepared in your career?
3       A. Oh, thousands and thousands. I have no idea.
4  My estimate is I worked in probably seven hundred and
5  fifty different jurisdictions. Some of them would have
6  just been a single plan drawn at the request of a
7  community group or maybe the ACLU or a legal defense
8  fund or someone like that. And one map would be
9  produced and that would be the end of it. But then
10  others just go on and on and on and on. I mean for
11  years and years. And hundreds of, you know, dozens and
12  dozens of plans are produced for a single jurisdiction
13  for whatever reason.
14      Q. Have you ever worked on any other cases in
15  Missouri?
16      A. I have not.
17      Q. When were you first contacted about this case?
18      A. In this particular case, it would have been
19  late August of 2014.
20      Q. And who contacted you?
21      A. Dale Ho I believe. Dale Ho, H-O.
22      Q. And have you worked for him before?
23      A. I have.
24      Q. How many times?
25      A. Well, when I initially met Dale I -- he was

Page 20

1  working for the NAACP Legal Defense Fund. So I did
2  some maps for him. And the cases that I am still
3  involved in that he worked on would be the Terrebonne
4  Parish Judicial case and Fayette County, Georgia,
5  County Commission School Board case. And I did some
6  other maps for him at that time while he was at LDF.
7  Again, many of those may have just been one shot, like
8  can you do this, we're looking into it. But those two
9  cases come to mind. I may be overlooking something but
10  that's where I first encountered Dale.
11      Q. Were you retained immediately upon the
12  Plaintiffs contacting you?
13      A. No. No. I mean, I did some initial -- an
14  initial draft plan and, I mean, at some point in the
15  fall of 2014, I guess, I was retained.
16      Q. And do you have an agreement with regard
17  to your compensation?
18      A. I do.
19      Q. And how much are you being paid?
20      A. It's a hundred and fifty dollars an hour for
21  the work I do relating to Gingles 1 in this case.
22      Q. Have you submitted invoices to the ACLU?
23      A. I submitted a couple I think, yes.
24      Q. And have you been paid?
25      A. I have been paid. Actually I sent one for

Page 21

1  April to July about two weeks ago so I haven't really
2  been paid for that one.
3       Q. Okay. So how many hours do you estimate
4  you've billed on this case through July?
5       A. Well, it would be probably seven -- I'm just
6  guessing. Probably seventy hours. Something like
7  that.
8       Q. And what percent of your annual income would
9  you say comes from expert testimony?
10      A. Maybe half.
11      Q. What's the other half derived from?
12      A. Well, again, I do a lot of maps that are
13  unrelated to cases that are voting related district
14  maps. Then I also have other little projects that are
15  totally unrelated to voting per se, like my work with
16  the Food and Research Action Center and some of the
17  work I do for Norfolk State. And I also do some work
18  for the Prison Policy Initiative. Some of that is
19  voting related and some of it is not.
20      Q. Okay. How many voting plans have you prepared
21  with regard to the Ferguson-Florissant School District?
22      A. Oh, well, there are two illustrative plans,
23  and a couple of hypothetical plans. And I did
24  variations on the two illustrative plans early on, in
25  part because there was a different set of incumbents so

6 (Pages 18 to 21)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 22

1 I had to make some adjustments to take that into
2 account for the initial drafts in 2014. Of course, we
3 used the incumbents who were in office prior to 2015
4 election so probably eight or nine drafts, I'm just
5 guessing, looking at different configurations.
6     Q. Are the plans that the Plaintiffs intend to
7 rely on contained in your two reports?
8     A. Well, they rely on for Gingles 1. They would
9 not necessarily be the remedy but just to show that we
10 can meet Gingles 1.
11     Q. And the draft plans, there's not going to be
12 any reliance on those as far as you're aware that
13 aren't included in your reports?
14     A. I don't think so but they certainly could be.
15 I mean, they were all plans that created four more
16 majority black districts.
17     Q. Have you prepared any other plans that you
18 intend to rely on at trial that have not yet been
19 disclosed in these two reports?
20     A. No. I think we're just relying on those plans
21 and maybe additional plans will be submitted for the
22 remedy phase. But for now, I think it's just those two
23 plans, the Illustrative 1 and Illustrative 2, and the
24 hypothetical plans just to make certain points.
25     Q. Okay. Have you prepared or provided any

Page 23

1 information or data to Dr. Engstrom?
2     A. I provided him with population figures for the
3 polling place precincts for the elections that were
4 held in April 2011 through April 2015. Municipal
5 elections -- or rather school district elections just
6 for that month of April for each of those years.
7 That's when the elections are held.
8     Q. And did you provide any data or information to
9 Dr. Kimball?
10     A. To who?
11     Q. Dr. Kimball.
12     A. No, I'm not familiar with him.
13     Q. How about Dr. Gordon?
14     A. No.
15     Q. So the only other expert that you've provided
16 information to is Dr. Engstrom?
17     A. As far as I know. I mean, that's the only
18 other expert I've directly provided information to.
19 Whether they've looked at something in my reports, I
20 don't know.
21     Q. So you state that Plaintiffs' counsel asked
22 you to create a plan with four single-member districts
23 out of seven; is that right?
24     A. I think that's what I was initially asked to
25 do, right.

Page 24

1     Q. How many times in the past have you drafted a
2 plan that created a majority of districts where the
3 minority has the most seats?
4     A. Oh, dozens, dozens, dozens probably. I
5 wouldn't -- I wouldn't really have a figure off the top
6 of my head but many.
7     Q. So based on your belief that African Americans
8 aren't in a majority voting age population, shouldn't
9 you have only created plans that had three
10 single-member districts?
11     A. Well, I would argue that there is no evidence
12 just yet that African Americans are a majority -- did
13 you say majority or minority?
14     Q. I said based on your belief that African
15 Americans are not a majority of the voting age
16 population, shouldn't you have created three
17 single-member districts?
18     A. Well, not really. Because they are a majority
19 of the total population, so I would argue that there
20 should be four. But you may argue differently and I
21 will leave that up to the attorneys to make the legal
22 arguments on that.
23     Q. Were any of the other -- any of your previous
24 cases a situation where the minority population
25 exceeded fifty percent?

Page 25

1     A. Any other cases?
2     Q. Uh-huh.
3     A. Yes, I've been involved in other cases where
4 the minority population exceeded fifty percent.
5     Q. Which ones?
6     A. Well, the Yakima, Washington, case for one.
7 Not citizen but I believe -- well, I should back off on
8 that. I may be wrong about that so I won't mention
9 that one.
10     A number in Mississippi. East Carroll Parish was
11 majority black if I'm not mistaken. Maybe there are
12 not as many as I think. I'm drawing a blank. I'd have
13 to think some more about that. But it's not totally.
14     Q. And we can go back and check these cases to
15 verify that there's -- the minority population exceeded
16 fifty percent.
17     A. Well, yeah, if you looked at all my cases you
18 would find some that --
19     Q. -- I've looked at a lot of your cases and I
20 haven't found any, so that's why I'm asking.
21     A. Oh, okay. Well, there's a Hattiesburg,
22 Mississippi, case that we just lost even though we won
23 on Gingles 1, 2, and 3. Hattiesburg is majority black.
24 All persons as of the 2010 Census. That case will be
25 appealed.

Page 26

1    You know, there have to be some and I'm almost --
2    I'm pretty sure that East Carroll Parish is majority
3    black, and I know Madison Parish in Louisiana is
4    majority black.
5         Q.  Okay.
6         A.  Brunswick County, Virginia, is probably
7    majority black now.  Probably it was -- may have been
8    in the 1990s but I'm not sure.
9         There are some out there.  I just -- it's not
10   something I've thought about recently.
11        Q.  Okay.  Prior to this case have you worked on a
12   case where the majority voting age population exceeded
13   fifty percent?
14        A.  Yeah.  Yes, I have.
15        Q.  What happened in those cases?
16        A.  Well, I mean, there are two I can think of
17   specifically right now that -- now that I jog my memory
18   a little bit there are two cases in Mississippi that
19   are -- that have not even gotten to the point of filing
20   summary judgments or whatever.  Those two counties are
21   Quitman and Coahoma County, and both of those counties
22   the black population exceed fifty percent for both
23   total and voting age.
24        Q.  But there has been no decision in those cases?
25        A.  No, no decision or trial or anything like

Page 27

1    that.
2         Q.  Well, how many cases have you worked on where
3    the minority voting age population -- well, never mind.
4         Did you use the American Community Survey for
5    2011-13 to determine voting age population estimates by
6    race?
7         A.  Well, I did look at that.  And I would argue
8    that that's probably not the appropriate metric to use
9    for Section 2 cases.  But I am aware of that
10   information and included it in my supplemental report.
11   It's just under fifty percent.  It's like -- single
12   race around forty-eight percent.  Forty-eight point
13   nine eight four, I think.  I'd have to look at my
14   report to actually give you the exact figure but it's
15   not quite above fifty.
16        Q.  Did Plaintiffs' counsel ask you to rely on ACS
17   and the census to compile your reports?
18        A.  No.  I did not rely on the ACS to report
19   population figures for my initial report, I only looked
20   at the ACS data in response to something that had been
21   mentioned in Dr. Rodden's report.  So I did look at
22   black voting age under the 2011-2013 ACS, but it's a
23   sample survey so it's, you know, I think the courts
24   generally require jurisdictions to rely on the 2010
25   Census.

Page 28

1         Q.  Okay.  Well, this is a good point to enter
2    your two reports into evidence so let's do that.
3         (Defendant's Exhibits A and B were marked for
4         identification.)
5         Q.  (By Ms. Ormsby)  Could you turn to page --
6    paragraph 9 of your initial report?
7         A.  Paragraph 9?
8         Q.  Uh-huh.
9         In this paragraph don't you state that the
10   Plaintiffs' counsel asked you to rely on both the ACS
11   and the census to compile your information?
12        A.  Oh, that's true.  I looked at the
13   socioeconomic data because that's not really in the
14   2010 complete count census.  So I did rely on the
15   socioeconomic data from the ACS for my initial report.
16   You're exactly right.
17        Q.  Did you use the ACS data for anything other
18   than what you just stated?
19        A.  In my initial report?
20        Q.  Uh-huh.
21        A.  Well, I mean, I printed out the full slate of
22   data that is available from the 2011-2013 ACS.  Most of
23   it is socioeconomic but there is a breakout showing
24   population estimates by race according to the 2011 ACS.
25   It's in Exhibit D, I guess it is, but it's not

Page 29

1    discussed in my report for purposes of population
2    figures.  I just discussed the socioeconomic data as
3    general background.
4         Q.  Have you used the ACS in past cases?
5         A.  Yes.  I frequently look at the socioeconomic
6    data as part of my work.  It's sort of tied in
7    Gingles 1 and how you might consider drawing
8    illustrative plans.  But it's also one of the Senate
9    Factors and so depending on the case I often produce
10   and discuss the general figures without going into
11   great detail.  Usually if there's a lot of detail on
12   socioeconomic differences, that's something that the
13   Plaintiffs' attorneys would probably prefer to use a
14   historian or someone else who's studied the community
15   in great detail.  So I'm basically just reporting the
16   figures as they are reported by the Census Bureau.
17        Q.  Have you used the ACS to determine citizen
18   VAP?
19        A.  I have.  I have.  In the Yakima case and in a
20   few other cases.
21        Q.  And you find it reliable?
22        A.  It's an estimate.  It's the only thing
23   available.  Unlike -- unlike the complete count 2010
24   Census, which gives you a figure for the voting age
25   population of a community and the total population by

Page 30

1  race at the time of 2010 Census.  The complete count
2  census does not provide a figure for citizen voting age
3  population.  So in that instance the only data
4  available, and it's an estimate, is from the American
5  Community Survey.
6       Q.  How did you learn your methodology?
7       A.  Methodology for what?
8       Q.  For creating your maps, for making your
9  determinations.
10      A.  Well, it's just -- I went to college.  I
11 understand how to do this stuff.  I have not taken a
12 class in redistricting, if that's what you mean.
13      Q.  Has your method been reviewed by a
14 statistician?
15      A.  I don't think it's really necessary for a
16 statistician to review my method.  I'm not aware of
17 one.  But maybe.  I mean, there are statisticians that
18 have been involved in every single case I've ever done
19 and sometimes they comment on Gingles 1 factors, so to
20 that extent, yeah, they've reviewed my methodology.
21      Q.  Has your methodology been peer reviewed?
22      A.  No.  I'm not an academic so I've never
23 submitted a paper for review.
24      Q.  So let's talk briefly about the 2010 Census.
25 If you could turn to Exhibit B of your initial report,

Page 31

1  can you describe what the table is at the top of the
2  page?
3       A.  Exhibit B, which one would that be?
4       Q.  The one you have marked Exhibit B in the back
5  of your report.
6       A.  Oh, yes, that's the official census tabulation
7  of the population in the Ferguson-Florissant School
8  District, which differs slightly from the boundaries
9  that are identified by the St. Louis County Board of
10 Elections.  Very little difference.  The percentages
11 are also identical but there are a few spots where the
12 Census Bureau's definition of the school district does
13 not line up perfectly with the St. Louis County Board
14 of Elections' school district boundary.
15      Q.  So in this chart you show that the 2010 total
16 population for the district is sixty-nine thousand
17 fifty.  Is that right?
18      A.  According to the U.S. Census Bureau, that's
19 right.
20      Q.  And that would be a hundred percent of the
21 population?
22      A.  That would be a hundred percent of the
23 population, but the U.S. Census Bureau map is not a
24 perfect match to the St. Louis County Board of
25 Elections' map.  For example, the Census Bureau map

Page 32

1  boundary of the school board -- of the school district
2  extends and picks up, for example, a few blocks in the
3  city of Black Jack.
4       There's just like a little arm that reaches out.
5  That you can actually see it on Exhibit B.  Two little
6  arms stretches out there sort of in the northeast,
7  along the northeast boundary in red.  You probably
8  know -- you can probably go straight to the map and
9  find Black Jack.  I mean, it's right here.
10      Q.  Yeah.
11      A.  Yeah.  So I don't know why that is.
12      But in the end, it really doesn't matter.  The
13 differences between the Census Bureau definition and
14 the Board of Elections' definition is minuscule.  It
15 amounts to less than one-tenth of one percent, I think,
16 for all of the racial categories.
17      Q.  Okay.  So --
18      A.  I do not know why there's that discrepancy.
19 It's very unusual but that can happen.
20      Q.  So if we -- if you go down to the bottom of
21 that chart, the number for any part black is
22 thirty-seven thousand two hundred and twelve, which
23 makes up fifty-three point eight nine percent; is that
24 right?
25      A.  Right.  And I think the Board of Elections'

Page 33

1  figure is -- according to my analysis would be
2  fifty-three point eight four.  So they're almost the
3  same.
4       Q.  Okay.  Right.  All right.  If you could turn
5  to page 61 of your initial report -- or paragraph 61 I
6  bet.
7       Paragraph 61.
8       A.  Paragraph 61.
9       Q.  You conclude in paragraph 61 under the first
10 bullet that the black voting age population has
11 increased over the last two decades.
12      A.  Yes, that's pretty obvious.
13      Q.  And you conclude in your Figure 4 that the
14 population -- black voting age population has doubled
15 in the last twenty years; is that right?
16      A.  In figure?
17      Q.  Figure 4.
18      A.  In Figure 4.  That would probably be the case
19 but I will double check.
20      Q.  Figure 4 is on page?
21      A.  Right, it is --
22      Q.  Ten?
23      A.  Well, single race, it is -- oh, I'm looking at
24 VAP, excuse me.
25      Q.  It's on page 10.

9 (Pages 30 to 33)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 34

1    A. Oh, Figure 4.  So you're talking about the
2    voting age?
3    Q. Uh-huh.
4    A. Yes, it is almost -- almost doubled.  Not
5    quite.
6    Q. Yet in paragraph 12 of your rebuttal report,
7    you say the projections based on trend lines from prior
8    years are highly speculative.  So are you testifying
9    that you think the trends from the last twenty years
10   will reverse?
11   A. I'm testifying giving the events of August
12   2014 and following months, that it's really problematic
13   to rely on trend lines because we just don't know what
14   impact that's going to have on in-migration and
15   out-migration.
16   It might have been reasonable to think, even
17   though it would have been speculative, that the trend
18   lines would continue but we just don't know now.
19   Q. Do you believe they'll reverse?
20   A. I have no idea.  It's a crap shot really.
21   Who's going to move into the Ferguson and the
22   Florissant area based on recent events?  I mean, there
23   may not be as much in-migration of the black population
24   as there has been in past years.  In fact, there might
25   be black out-migration.  So I just don't know.  I just

Page 35

1    don't think you can make any kind of assessment at this
2    stage of the game.
3    Q. And are you aware of any housing reports
4    within the last six months about what has happened in
5    Ferguson as far as move-in rates?
6    A. No, I have not analyzed that.
7    Q. Okay.
8    A. But you couldn't just look at Ferguson, you've
9    got to look at eleven different communities.
10   Q. Well, you just brought up Ferguson as a result
11   of August 14th so I just wanted to --
12   A. Right.
13   Q. -- refer to Ferguson and housing reports --
14   A. Right.
15   Q. -- that came out within the last six months.
16   A. Right.  And you would have to look into the
17   entire school district and portions of those
18   communities that are -- the eleven communities that are
19   in the school district.
20   Q. I just want to take you through a few
21   calculations and you're just -- please just bear with
22   me.  I just want to make sure that I'm understanding
23   this.
24   So if you look at Figure 4, from 1990 to 2000 what
25   is the change in non-Hispanic white population?

Page 36

1    A. From 1990 to 2000?
2    Q. I have a calculator here if you really want to
3    look into it.
4    A. From 1990 to 2000, the population that was
5    non-Hispanic white, we're looking at voting age,
6    dropped by about thirteen thousand, so.
7    Q. So if you -- if you express that as a percent
8    change, by dividing that forty-seven two ninety into
9    that thirteen thousand, it comes out to be about
10   twenty-seven point five percent; is that right?
11   A. That sounds right to me.
12   Q. Decrease?
13   A. I'm not going to dispute that.
14   Q. Then from 2000 to 2010 what is the change in
15   the non-Hispanic white population VAP number?
16   A. Well, again, it would be around twenty-five
17   percent I think but I haven't calculated out to a
18   precise figure.
19   Q. Would it surprise you that the difference in
20   population is nine thousand four hundred and twenty-two
21   and when you figure out the rate change, it's exactly
22   twenty-seven point five percent?
23   A. No, it would not.  Obviously I was not
24   calculating that right.  It is close to ten thousand.
25   So, yeah, that doesn't surprise me.

Page 37

1    Q. Okay.  So we agree, at least over this
2    twenty-year period, it's been a quite steady decrease;
3    would you agree?
4    A. I would agree.
5    Q. And then if you look at the single race black
6    population, how did it -- much did it increase from
7    1990 to 2000?
8    A. Voting age?
9    Q. Yes.
10   A. It was under fifty percent -- oh, to 2000?
11   Q. Uh-huh.
12   A. Well, it increased by almost five thousand
13   people, so I guess it was somewhere in the range of --
14   in the forties.
15   Q. Thirty-seven point five percent?
16   A. Okay.
17   Q. And then from 2000 to 2010 it increased by six
18   thousand six hundred and eighty-two; would you agree
19   with that?
20   A. That looks right.
21   Q. And for a percent increase of thirty-eight
22   point five percent?
23   A. That would be conceivable.
24   Q. So the population, the single race black
25   population, unlike the white decrease, it actually --

Page 38

1    the black population was -- it accelerated from
2    thirty-seven point five percent to thirty-eight point
3    five percent?
4        A. Well, it was about the same. I mean, one
5    percentage point is not enough to really call
6    accelerating. But it was a rapid increase 1990 and
7    2010.
8        Q. So if we -- if we -- over that twenty-year
9    period, the black population increased about five
10   hundred per year; would you agree with that?
11       A. Well, I'm not sure if you can say it was -- on
12   average.
13       Q. On average?
14       A. On average.
15       Q. On average. I'll live with that.
16       So now we're in the summer of 2015 and we've
17   passed a midway point between decennial censuses; isn't
18   that right?
19       A. As of --
20       Q. Right now?
21       A. -- right now or about the midpoint, uh-huh.
22       Q. And even if we take a conservative approach,
23   up until even -- we'll use the year 2014 before the
24   Michael Brown incident, we could assume based on the
25   previous twenty years that the white population is

Page 39

1    going to decrease by about a thousand per year and the
2    black population is going to increase by about five
3    hundred a year? We can assume that?
4        A. We can't really assume that. You can look at
5    it retrospectively but we just don't know. We just
6    don't know. And we especially don't know given the
7    events of last year.
8        Q. I'm talking about up to 2014.
9        A. Well, you can make that assumption but we
10   really don't know. There's no evidence of it really in
11   the ACS as of 2012. I can tell you that. But the ACS
12   is a population sample so you have to take it with a
13   grain of salt anyway.
14       Q. I just lost my train of thought when you said
15   that.
16       Can you tell me what housing reports you reviewed
17   between -- in the Ferguson-Florissant School District
18   between 2010 and 2015?
19       A. I have not reviewed housing reports. I've
20   reviewed housing by owner occupied or rental status for
21   the 2010 Census and also using the ACS data, but I have
22   not looked at anything outside of those two data sets.
23       Q. So you haven't looked at house sales in
24   specific areas or anything like that?
25       A. I have not at this point. It's not to say I

Page 40

1    couldn't or wouldn't but at this point I have not.
2        Q. So if you look at paragraph 7 of your
3    supplementary report, you state that according to the
4    2011-2013 ACS, which has a midpoint of 2012, that the
5    district's total VAP had already fallen to forty-nine
6    thousand six hundred and seventy-nine; is that right?
7        A. Paragraph?
8        Q. Seven.
9        A. Seven. Oh, well, I don't know if it's --
10   again, you're comparing the ACS with the 2010 Census
11   count. I don't know whether it's fallen or not
12   compared to the -- say 2006-2010 ACS or 2008-2012 ACS.
13       Q. Do you agree with me that the number you put
14   in there for the total VAP is forty-nine thousand six
15   hundred and seventy-nine?
16       A. Well, that's true. That's true.
17       Q. Thank you.
18       A. According to the 2011-2013 ACS, which is a
19   sample estimate.
20       Q. And if you divide twenty-six thousand thirty
21   by forty-nine thousand, what would that be?
22       A. Twenty-six thousand thirty, where are you
23   getting that?
24       Q. Twenty-six thousand thirty is -- where am I
25   getting that? That's forty-nine thousand six hundred

Page 41

1    and seventy-nine divided by two, would be about twenty
2    thirty -- twenty-six thousand thirty; is that right?
3        A. No. I mean, the figure I report there, single
4    race black population, according to the ACS estimate is
5    twenty-four thousand three hundred thirteen, which
6    would be forty-eight point nine four percent single
7    race black as of the July 2012 midpoint. So I don't
8    know where you get twenty-six thousand.
9        Q. In your analysis do you consider any part
10   blacks at all?
11       A. For what?
12       Q. For anything. For -- when you consider any
13   estimates as far as VAP.
14       A. Yes, in the 2010 Census. But there is no any
15   part figure available in the American Community Survey
16   as far as I know.
17       Q. So you have zero? You're counting -- you're
18   not counting them at all?
19       A. In this -- in this particular figure I am not
20   counting them. I am counting single race black,
21   including Hispanics. So if that figure were available,
22   it would be a little bit higher; although, I would
23   maintain it would still be under fifty percent because
24   there's about a one percentage point difference between
25   the single race black Hispanic population and the any

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 42

1  part black voting age population. So it is still going
2  to be slightly under fifty percent.
3      Q. We're going to go through those calculations
4  in a minute.
5      A. Well, they're absolutely correct but go ahead.
6      Q. But it is your firm testimony that the
7  twenty-year trend established in twenty-four of your
8  expert report has either ceased or reversed since that
9  date?
10     A. No one knows. No one knows. I'm not saying
11  it hasn't reversed, I'm saying we just don't know.
12  There's no evidence on the table that I've seen yet
13  that would suggest that it has continued.
14     Q. And it's your firm belief that single race
15  African Americans are currently less than fifty percent
16  of the district's voting age population?
17     A. Based on the 2010 Census, based on the
18  2011-2013 ACS, and, of course, if you look at the other
19  probative figure from the ACS, the citizenship VAP,
20  African Americans are under forty-eight. I think I've
21  got that figure in Figure 9, forty-eight point one two.
22     Q. And you're going to -- it's -- you're going to
23  stand by your belief that even if we included any part
24  African Americans, it would still be less than fifty
25  percent voting age population?

Page 43

1      A. I believe so. That's my opinion.
2      Q. And that's as of 2015?
3      A. Well, no, I don't know what it is in 2015. I
4  can only rely on the published estimates from the
5  2011-2013 ACS. We won't know 2015 -- well, we're not
6  going to know 2015 until very late in the decade
7  because the three-year ACS is being eliminated this
8  year. So to get a figure for 2015 we will have to rely
9  on the 2012-2017 five-year ACS, which will not be
10  available until December of 2018.
11     Q. And you believe that professional demographers
12  would come to the same conclusion that you have?
13     A. Well, I -- what do you mean -- what do you
14  mean come to the same conclusion?
15     Q. That the voting age population of African
16  Americans have not increased? That we have to rely
17  totally on the 2010 and we can't look at any trends
18  going forward?
19     A. Well, you can make trends but they're going to
20  speculative because there's no documented evidence to
21  suggest or prove that there is a majority black voting
22  age population in Ferguson-Florissant School District
23  as of today.
24     The best we can come up with as a possible
25  estimate using the -- using the American Community

Page 44

1  Survey still leaves you below fifty percent, and a
2  couple of percentage points below fifty percent if you
3  take into account the citizen voting age population.
4      Q. So if I'm hearing you right, paragraphs 5 and
5  6 of your expert report, the supplementary report, you
6  draw attention to the fact that the Census Bureau
7  cautions against using the ACS for population estimates
8  because, unlike decennial censuses, it is a rolling
9  sample that doesn't attempt to count everyone. Does
10  that summarize what you said?
11     A. Right. It's a sample based on a survey,
12  annual survey, that has a one out of forty respondent
13  rate.
14     Q. And it's your contention then that for
15  population counts we can only rely on the decennial
16  census?
17     A. Well, you can make -- you can go ahead and
18  make projections if you prefer. It's my understanding
19  that the courts generally only rely on the 2010 Census.
20     Q. Well, you're not aware of any court cases in
21  your experience as an expert witness where a court
22  looked at a trend?
23     A. It may look at a trend. I don't know. I have
24  not been involved in a case where a trend was discussed
25  and actually taken as a fact. As far as I know I've

Page 45

1  not been involved in a case like that.
2      Q. And you've not read any cases in which the
3  court relied on a trend?
4      A. I can't -- none come to mind. It's
5  conceivable but none come to mind.
6      Q. Okay. What if I wanted to count
7  African-American families living below poverty level or
8  living in a particular income category, can I use the
9  decennial census for that?
10     A. Well, I mean, we're mixing two different
11  things here.
12     Q. I'm just asking you a question. Can I rely on
13  the decennial census?
14     A. No. And I use the ACS for socioeconomic
15  analysis and the courts use the ACS for socioeconomic
16  analysis. I don't want to confuse things here.
17     Certainly I have reported, and in every case I've
18  ever been involved in probably, there has been a
19  discussion of socioeconomic characteristics of the
20  minority population involved vis-à-vis the non-Hispanic
21  white population. And in some cases, excuse me, as in
22  the -- I'm better.
23     MS. ORMSBY: Do you need some water?
24     THE WITNESS: Maybe coffee.
25     MS. ORMSBY: More coffee?

12 (Pages 42 to 45)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 46

1    THE WITNESS:  Yeah, that would be better.
2    MS. ORMSBY:  Do you take it black or?
3    THE WITNESS:  With a little cream.
4    A.  May I proceed?
5    Q.  (By Ms. Ormsby)  Sure.
6    A.  Well, yeah, in some cases it's not just a
7  single race black population or single race American-
8  Indian population.  There are different minority
9  populations involved.
10    For example, in Albany County, New York, in a case
11  I was involved in I actually reported statistics for
12  the African-American population and for the Latino
13  population.  Because there's a significant Latino
14  population in Albany County, New York.
15    Q.  So you're saying we can trust all of the
16  various population counts reported in the body of your
17  initial report as well as in your Appendix D, which are
18  all of those charts, we can -- we can trust all of
19  those numbers?  That we can rely on all of those
20  numbers except for page 6 of Exhibit D, which is the
21  sex by age?
22    A.  Well, you can rely on it but it is an
23  estimate.  It's not a complete count.  And again, it's
24  under fifty percent so at this point there's no issue
25  there.  The African Americans are still not a majority

Page 47

1  of the voting age population of the Ferguson-Florissant
2  School District as reported in the 2011-2013 ACS.
3    Q.  So we can rely on it as long as it agrees with
4  your narrative?
5    A.  No.  I mean, in 2017 or whatever, 2018, when
6  the 2015 midpoint becomes available, you can certainly
7  report that.  Whether the court takes that into
8  consideration or not, I don't know.
9    Q.  Why don't you turn to page 8 of your Exhibit
10  D, which is in your first report.
11    A.  Exhibit what?
12    Q.  D.  Page 8.  The numbers are at the bottom of
13  the page of Exhibit D.
14    A.  Exhibit D.
15    Q.  Eight of forty-six.
16    A.  Oh, okay.
17    Q.  So you're comfortable making claims in the
18  table of page 8 about the number of African American
19  and whites who moved from a different state or from
20  abroad --
21    A.  Well, I'm not making --
22    Q.  Let me finish.
23    A.  Okay.
24    Q.  But you're not comfortable making claims about
25  the total number of African Americans over the age of

Page 48

1  eighteen?  I just want to clarify that.  You're
2  comfortable?
3    A.  I'm just -- I'm comfortable reporting what the
4  ACS reports.  I'm not making any claim.  This is just
5  the official data that is reported by the American
6  Community Survey.  And the official data reported by
7  the American Community Survey now shows that as of July
8  2012, African Americans were still not a majority of
9  the voting age population.
10    Q.  Isn't it a little odd that since the African
11  Americans over the age of eighteen is a rather large
12  category and the ACA (sic) sample, that that -- because
13  it's such a large category that the ACS sample should
14  be rather reliable?
15    A.  Is it odd?
16    Q.  Don't you feel like it's -- because it's such
17  a large group -- this is a very, very small group, six
18  hundred and ninety-six and five African Americans moved
19  either from a different state or from abroad?  That's a
20  very, very small group that the ACS is reporting on
21  that you include in your report; whereas, the African
22  American black population is very large, that's not
23  something we can --
24    (Interruption.)
25    A.  Well, you're right that the margin of error is

Page 49

1  greater the smaller the component, so it's less
2  reliable.
3    Q.  (By Ms. Ormsby)  Let's look at paragraph 6 of
4  your supplemental report.  This paragraph disavows the
5  use of samples to make population estimates and states
6  it should be read as a general expression of skepticism
7  about the use of the three-year ACS to estimate
8  population estimates; is that correct?
9    A.  Right.  I mean, because at this point the ACS
10  has a July 1, 2012, survey midpoint.  So that's pretty
11  close to 2010.  So after taking in the margin of error
12  into account, the margin of error, among other things,
13  you know, there's really no compelling reason to rely
14  on the 2012 ACS for total population counts in my mind
15  for other purposes for other metrics that are not
16  included in the 2010 Census.  Like citizenship, like
17  socioeconomic characteristics, poverty and other
18  things.  If you're going to report any figure at all
19  you have to rely on the ACS.  So in those cases it
20  would be the best available information.
21    Q.  But you didn't put this caveat in your initial
22  report that the ACS should be looked at skeptically?
23  You didn't warn your reader about the estimates -- that
24  they're estimates in your initial report which contains
25  a lot of information from the ACS; is that right?

13 (Pages 46 to 49)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 50

1     A. Well, first of all, I never discussed the ACS
2 population data in my report at all, I discussed the
3 socioeconomic data.  So there was no reason to put that
4 warning in there.  I just included all of the tables I
5 could find that had some comparison of non-Hispanic
6 whites and African Americans.  And that included those
7 population tables, but they're not discussed in my
8 report.  The socioeconomic characteristics are.  Maybe
9 not completely.  I didn't go through it table by table,
10 I just hit some of the high points.  But I'm not -- I
11 was in no way trying to hide something, it just didn't
12 seem to be of consequence.
13     Q. Going back to your initial report, Figure 4,
14 you've established that the population of the district
15 is rapidly transforming in those twenty years?
16     A. Right.  I don't dispute that.
17     Q. And in the context of quickly changing
18 demographics, shouldn't the goal be to have the most
19 recent data?
20     A. Well, you know, I have the most recent data.
21 I have reported the 2011-2013 ACS.
22     Q. Could you have used the five-year ACS to
23 provide all the figures in the table?
24     A. I could have but I did not -- well, actually,
25 the -- no.  The five-year ACS, 2009-2013, had a survey

Page 51

1 midpoint of 2011 so I could have used that and the
2 margins of errors would be less.
3     Q. And would that have been more reliable because
4 of the larger sample size than the three-year ACS?
5     A. For that particular year, yes, it would have
6 been more reliable than, say, the 2010-2013 ACS.
7 That's true.  But the difference is, between the
8 2009-2013 ACS and the 2011-2013 three-year ACS, when
9 you're looking at socioeconomic data, which is really
10 why I included those tables, are probably not of
11 consequence.  I mean, there will be differences but I
12 would be able to make the same point whether I used
13 2009-2013 or 2011-2013.
14     Q. And what about when you're reporting on things
15 like poverty and home ownership, could you have used
16 the five-year report for that?
17     A. I could have.  That's the point I was making.
18 I could have.  I chose to use the 2011-2013, but I
19 could have used 2009-2013.  I often do.
20     See, in many -- in many localities where I work
21 there's a cutoff point of twenty thousand people, so
22 you have to use a five-year ACS because the 2011-2013
23 ACS is not available for jurisdictions that are under
24 twenty thousand.
25     (Defendant's Exhibit C was marked for

Page 52

1     identification.)
2     Q. (By Ms. Ormsby)  I'm marking what's been
3 marked as Exhibit C.  And this is from the government
4 census website, correct?
5     A. I assume so, right.
6     Q. It says at the top when to use one-year,
7 three-year, or five-year estimates; is that right?
8     A. That's what it says.
9     Q. And they're talking about the American
10 Community Survey, right?
11     A. Yes.
12     Q. All right.  Can you look down near the bottom
13 under the three-year estimates best used when.  What
14 does it say when it's best to use the three-year ACS?
15     A. Well, it says best used when -- it's more
16 precise than one year.  Well, there is no one year --
17     Q. -- I just want you to read what it says,
18 please.
19     A. Oh.  "More precise than one year and more
20 current than five year analyzing smaller populations,
21 examining smaller geographies, because one-year
22 estimates are not available."
23     Q. Okay.  So wouldn't you agree that this box
24 adequately describes the goals you had in writing your
25 initial report, which is why you choose to rely on the

Page 53

1 three-year ACS?
2     A. No.  I used the three-year ACS because it was
3 there.  But I could have very easily used the five-year
4 ACS.  In fact, I have used the five-year ACS for a
5 couple of the maps that are included in -- or at least
6 one of the maps that is included in my first report
7 because of the block group level.  You have to use the
8 five-year estimate, the median income map.
9     Q. But the vast majority of your initial report
10 you chose to use the three-year; is that right?
11     A. I used it, that's right, but I could have used
12 the five-year.  I have that data.  I could have
13 produced charts just like this under the five-year data
14 estimates.
15     Q. Okay.  Let's look up a little bit.  For what
16 areas of population size does the census department
17 tell us we should use the three-year data?
18     A. It says for areas with populations of twenty
19 thousand plus.  But I will say that because of the
20 margins of error and sample issues, in many instances
21 jurisdictions that are, say, between twenty thousand
22 and fifty thousand often have data suppressed for the
23 three-year estimates.  So that if you really want to
24 get a full slate of charts, you have to use the
25 five-year estimates because then you get everything.

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 54

1    For example, I do not believe in my -- in my
2  initial set of charts using the three-year estimates, I
3  don't think there's a citizenship breakout for African
4  Americans.  I could be wrong about that.  Let me
5  refresh my memory.  Don't believe so.  But if you had
6  gone to the five-year charts, you would have gotten the
7  ACS estimates by race block for citizenship.
8    Q.  All of those charts in the back of your
9  initial report are from the three-year; is that right?
10   A.  They're from three-year but the point is --
11   Q.  -- Okay.
12   A.  Okay.  Yeah.
13     MR. McDONALD:  Let him finish answering the
14  question.
15   A.  The point is that as you go down below
16  sixty-five thousand -- as you go down below sixty-five
17  thousand, the issue of data suppression becomes greater
18  and greater as you approach twenty thousand.  So at
19  some point for jurisdictions, say they're between
20  twenty and forty thousand, it's probably better to use,
21  if you want to get all the data, the five-year data
22  set, even though you could get the three-year data set.
23   Q.  So --
24   A.  -- In this case because the only -- the only
25  variable, I believe, that was suppressed was black

Page 55

1  citizenship, I went ahead and used the three-year
2  table, just because citizenship really isn't an issue
3  in this case.
4    Q.  You used the three-year table for everything
5  in your initial report, right?
6    A.  I did, yeah.
7    Q.  Okay.  And --
8    A.  -- I don't understand your point.
9    Q.  Just to be --
10   A.  Go ahead.
11   Q.  Just to be clear, the sixty-five thousand is
12  for one-year estimates.  The population of sixty-five
13  thousand plus is for one-year estimates, not -- right?
14   A.  Right.
15   Q.  And this, according to the government census
16  bureau, data for areas of population of twenty thousand
17  plus, that's what it says, correct?  There's no --
18  that's what it says; isn't that right?
19   A.  What do you mean that's what it says?
20   Q.  Data for areas with populations of twenty
21  thousand plus.
22   A.  That's -- that's where you can get the
23  three-year ACS.
24   Q.  Great.
25   A.  They're not saying that's necessarily the best

Page 56

1  table to use or the best ACS selection of data, but
2  it's available.  But I don't know why we're arguing
3  about this, really, because I used the three-year
4  estimates.  I'm not disputing that.
5    Q.  And there's -- the district has more than
6  twenty thousand residents?
7    A.  It does, yes.
8    Q.  And it has more than twenty thousand black
9  residents?
10   A.  It does.
11   Q.  And in paragraph 61, your second bullet of
12  your initial report, you rely -- wait for you to get
13  there.  It's on page 28.
14   A.  Oh, okay.
15   Q.  You rely on the 2011-2013 ACS to determine
16  that whites outpace African Americans in most
17  socioeconomic measures, right?
18   A.  That's true.
19   Q.  And you believe your conclusions are reliable?
20   A.  Well, that's what is reported in the ACS based
21  on the survey sample and so I do think that it is
22  reliable.
23   Q.  In paragraph 7 of your supplemental report you
24  point out the district has a total VAP of forty-nine
25  thousand six hundred and seventy-nine?  On paragraph 7.

Page 57

1    A.  Uh-huh.
2    Q.  Of them, forty-eight point nine percent are
3  single race black?
4    A.  Correct.
5    Q.  And single white VAP, including Hispanics, is
6  forty-seven point two four percent of the population,
7  right?
8    A.  Correct.
9    Q.  So just to be clear, it's your testimony that
10  single race blacks are the largest racial group in the
11  Ferguson-Florissant School District?
12   A.  Based on the 2011-2013 ACS, which is a sample
13  estimate which at this point may not be more reliable
14  than the 2010 Census.  Because the 2010 Census is a
15  complete count and it gives us these same figures;
16  whereas, with the socioeconomic data and the
17  citizenship data, that information is not available
18  through the 2010 complete count.  So it would be the
19  most reliable data that we have to use, either the
20  2011-2013 ACS or the 2009-2013 five-year ACS.
21   Q.  You didn't -- you didn't give us those numbers
22  in your report though, did you?
23   A.  Which numbers?
24   Q.  The numbers you just said.  That the five-year
25  report would have been better.  You didn't give us the

Page 58

1  five --
2      A. -- What do you mean I said it would have been
3  better?
4      Q. What did you just say?
5      A. Well, I don't know.  I have to read back.
6  What I said was that the 2010 Census at this point in
7  time is probably more reliable than the 2011-2013 ACS
8  which has a July 1, 2012, midpoint but is based on a
9  sample survey of one out of forty persons roughly in
10 the American population in any given year.
11     But I am saying that if you want to look at
12 socioeconomic data, if you want to get a rough
13 approximation of citizenship data, then it is okay to
14 rely on either the 2011-2013 ACS or the 2009-2013 ACS
15 which would have a smaller margin of error.
16     And in the case of the Ferguson-Florissant School
17 District, because there's data suppression in the
18 2011-2013 ACS for African-American citizenship rights,
19 you absolutely have to rely on the 2009-2013 ACS.
20     Q. But you agree that your conclusion what you
21 write in paragraph 7 of your rebuttal report, despite
22 the caveat that you just stated, that the
23 Ferguson-Florissant single race VAP, black VAP, is
24 larger than the white, non-Hispanic white VAP, correct?
25     A. That's correct.

Page 59

1      Q. Okay.  And then in your next paragraph you
2  state that even though they're a large group they're
3  not the majority, correct?
4      A. That's correct.  According to the 2011-2013
5  ACS.
6      Q. But whites also are not a majority; is that
7  correct?
8      A. That's correct.
9      Q. So no group constitutes a majority VAP under
10 this?
11     A. That would appear so from the 2011-2013 ACS.
12     Q. And you reach this conclusion because we're
13 leaving aside all the people over eighteen who claim to
14 be -- report to be more than one race, right?  The
15 people who claim to be more than one race are not
16 included in these numbers; would you agree with that?
17     A. I did not arrive at a calculation for the any
18 part black VAP because it is not reported in the
19 2011-2013 ACS data.
20     Q. So your statement in eight, it really should
21 read:  Single race blacks are not a majority?  Not
22 blacks are not a majority?  Because we're not including
23 AP blacks in these numbers; is that right?
24     A. Which statement are you referring to?
25     Q. Paragraph 8, you say blacks are not a majority

Page 60

1  of the VAP, but you really mean single race blacks are
2  not a majority of the VAP, correct?
3      A. That's -- that's true.
4      Q. Do you believe that individuals that have one
5  white parent and one black parent or even those with
6  three black parents and one white grandparent should be
7  counted as black?
8      A. Well, it's up to the individual respondent in
9  the census to make that determination.
10     Q. But it makes sense to characterize Barrack
11 Obama as black?
12     A. Yes.  I understand he identifies as -- I think
13 I heard somewhere that he identifies single race black.
14 But he could have selected black and white and that
15 would have been considered any part black or single
16 race non-Hispanic DOJ black, which counts anyone who's
17 black and white as black.
18     Q. And you don't dispute that your Footnote 3 on
19 page 6 of your initial report states that any part
20 black is the preferred definition?
21     A. Footnote 3 of my initial report?  Oh.
22     Q. Page 6 of your initial report, Footnote 3.
23     A. Well, it's certainly an acceptable definition.
24 Is it appropriate census classification?
25     Q. It's appropriate.

Page 61

1      A. It's appropriate in most instances, I think,
2  except that in some -- in some instances where there
3  are significant other minority populations, it might
4  not be appropriate.
5      Q. Are there --
6      A. -- For example, in South Florida it's probably
7  better to use non-Hispanic black and Hispanics as
8  separate categories and not include Hispanic blacks
9  necessarily as part of the black population.
10     Q. Is that true in Ferguson-Florissant?
11     A. In Ferguson-Florissant there are so few
12 Hispanic blacks that it just doesn't really matter.
13     Q. Okay.
14     A. And I would include Hispanic blacks as part of
15 the black population in Ferguson-Florissant.
16     Q. Okay.  So let's go back to paragraph 7 of your
17 rebuttal report.  And using the caveat that you don't
18 believe the ACS are the best numbers to use, yet we're
19 using the numbers that you are supplying in
20 paragraph 7, you say that the VAP of the district is
21 forty-nine thousand six hundred and seventy-nine.  And
22 if I --
23     A. -- I'm sorry, which?
24     Q. Paragraph 7 of your rebuttal report.
25     A. Oh.

16 (Pages 58 to 61)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 62

1      Q. On page 4.
2      A. Right.
3      Q. Okay. Forty-six -- forty-nine thousand six
4  hundred and seventy-nine is what the VAP is of the
5  district, right?
6      A. Right.
7      Q. And if I divide that number in half, I get
8  twenty-four thousand eight hundred and thirty-nine
9  point five. So would you agree that using this number,
10 that twenty-four thousand eight hundred and forty would
11 constitute a majority?
12     A. Of the sample estimate, I think that's right.
13 I'm not doing the calculation in my head.
14     Q. All right. And you state that the single race
15 African American is twenty-four thousand three hundred
16 and thirteen. So single race African Americans are
17 short of a majority by five hundred and twenty-seven;
18 would you agree with that?
19     A. According to the sample estimate, right.
20     Q. And it's also the case that you classify
21 single race white -- that the single race white -- the
22 numbers that you give here though for single race white
23 and single race black does not include everybody?
24     A. That's right. I do not break out Hispanic
25 whites in that figure.

Page 63

1      Q. So if we add the twenty-four thousand
2  hundred and thirteen single race black number to the
3  twenty-three thousand seven hundred and forty
4  non-Hispanic white VAP number, we get a total of
5  forty-eight thousand fifty-three. Which is short by
6  sixteen twenty-six of the overall VAP of forty-nine
7  thousand six hundred and seventy-nine.
8      There's a calculator there if you want to check
9  the math.
10     A. I'll take your word for it.
11     Q. Okay. So there's a sizable group of VAP
12 that's not classified as either single race white or
13 single race black?
14     A. Or single race black and non-Hispanic white.
15 I said that there was not a calculation in that
16 paragraph for non-Hispanic white VAP but actually there
17 is. So it's a few hundred less than the twenty-three
18 seven four oh who are white and that would include
19 Hispanics.
20     Q. So three point three percent of the VAP aren't
21 classified as single race black or single race white?
22     A. I'll -- forty-six point seven eight are white,
23 non-Hispanic white, and forty-eight point nine four are
24 Hispanic blacks, some of whom may be Hispanic, so what
25 is that? I think it's a little higher than three

Page 64

1  percent.
2      Q. Okay.
3      A. Isn't it?
4      Q. I have three point three percent.
5      A. Forty-six -- well, forty-seven and forty-nine
6  would be --
7      Q. -- There's a calculator right there.
8      A. So it's going to be more than four percent.
9      Q. Okay. And it's not your belief that those one
10 thousand six hundred and twenty-six people, that
11 there's -- some of them are going to be any part
12 African American, correct?
13     A. That's true.
14     Q. So let's go to your initial report page --
15 your Exhibit D -- page 2 of your Exhibit D in the
16 big -- in your initial report.
17     A. Page 2 of Exhibit D?
18     Q. Page 2 of Exhibit D. Let me know when you're
19 there.
20     A. Okay.
21     Q. According to this table how many people in the
22 Ferguson-Florissant School District report two races?
23     A. This is not voting age.
24     Q. I agree.
25     A. Two thousand and forty-three.

Page 65

1      Q. I understand it's not voting age.
2      A. I'm sorry, that's -- yeah, two thousand
3  forty-three.
4      Q. Right.
5      A. Correct.
6      Q. And how many people report to be both black
7  and white?
8      A. One thousand one hundred and eighty-three.
9      Q. And how many people report to be black and
10 American Indian or Alaskan?
11     A. One hundred and seventeen.
12     Q. Now, I would -- black or African American,
13 three hundred and eighty-one?
14     A. I'm sorry. Three hundred and eighty-one.
15 You're right.
16     Q. So if we add these up, we get one thousand
17 five hundred and sixty-four. So the vast majority
18 of -- I understand this is just population. The vast
19 majority of people reporting two or more races include
20 black or African American as one of those two
21 categories, right?
22     A. That's true.
23     Q. Over three-quarters of them?
24     A. About three-quarters.
25     Q. Okay. And isn't it true that the 2011-13 ACS

17 (Pages 62 to 65)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 66

1    tells us that the vast majority of the people who
2    report two or more races report themselves as being at
3    least one-half black or African American in the ACS?
4        A.  One thousand one hundred and eighty-three.  So
5    that is a little bit over fifty percent, that's right.
6    Of persons who report two races.
7        Q.  So now let's go back to the voting age data
8    from the ACS in your paragraph 7 and 8.  We know the
9    overall population that the overwhelming majority of
10   people, the five hundred and twenty-seven people not
11   classified as either white or black, we know --
12       A.  -- Where are we now?
13       Q.  Going back to your conclusions about -- on
14   seven and eight of your supplemental?
15       A.  Uh-huh.
16       Q.  I know.  We're going back and forth but this
17   is the only way I could figure out how do it.
18       Recall that there were --
19       A.  -- And which paragraph?
20       Q.  I'm in six, seven, and eight mainly.
21       A.  Okay.  Okay.
22       Q.  Recall we did the calculations that there were
23   one thousand six hundred and twenty-six people not
24   classified, and when we -- and we also determined that
25   five hundred -- the blacks fell short of a majority

Page 67

1    status by five hundred and twenty-seven.  We know that
2    the overall population is overwhelmingly a majority of
3    such people -- or classify themselves as part African
4    American?
5        A.  Overwhelmingly majority of what?
6        Q.  Of people who report themselves as two races
7    classify themselves as African American.
8        A.  Some part African American.  So three-fourths.
9    Roughly three-fourths.
10       Q.  So you concluded that African Americans are
11   not a majority of the VAP.  So you're stating that of
12   those one thousand six hundred and twenty-six people,
13   fewer than five hundred and twenty-seven are African
14   American -- part African American?  That's your
15   conclusion, right?
16       A.  Well, first of all, you're using total
17   population, not voting age population.
18       Q.  To determine an overall percentage of part
19   African American, and I'm applying that overall
20   percentage to this number here, you're right, I am.
21   I'm trying to get --
22       A.  Yeah.
23       Q.  -- some sort of a ratio number here.
24       A.  Yeah.
25       Q.  So I just -- I just want to know, are you

Page 68

1    stating that you do not believe that at least five
2    hundred and twenty-seven of that sixteen hundred people
3    are not part African American, based on these
4    statistics that we just went through?
5        A.  You mean the five hundred and some of the two
6    thousand people?
7        Q.  Yeah.
8        A.  Wait a minute.  You got me --
9        Q.  -- Sixteen twenty-six, that's the number
10   between -- that's the number of people that are not
11   identified in your numbers as either black, all black,
12   or all white.
13       A.  Uh-huh.
14       Q.  There's sixteen hundred and twenty-six people
15   in there.
16       A.  Uh-huh.
17       Q.  We only need five hundred and twenty-seven of
18   those to be part African American for the African
19   Americans to be the majority VAP.  Are you saying that
20   based on the overall population statistics applied then
21   to this number, that there's no way that five hundred
22   and twenty-seven of them are African American or part
23   African American?
24       A.  Well, you really can't apply the overall
25   statistics to the voting age population.  The reason

Page 69

1    being is that with each successive generation the any
2    part multi-race category is increasing.  So it's
3    totally inappropriate to apply a factor from a total
4    population to the voting age population.  The only
5    reliable way to do that would be to look at the 2010
6    Census and apply that factor, which is only about fifty
7    percent as opposed to seventy-seven percent or whatever
8    it is.
9        Q.  So -- okay.  Let me see if I'm understanding
10   you right then.  So your assertion that blacks do not
11   make up a majority of the VAP rests on one or two -- or
12   of two assumptions.
13       The first assumption is people who report one of
14   two races as black shouldn't be counted in VRA cases.
15   Or two, there's something radically different about the
16   overall population and the VAP with respect to people
17   who report multiple races.
18       Which one is it?
19       A.  What is your question again?  I'm not --
20       Q.  Which assertion?  I mean, it's either --
21       A.  -- My assertion is simple.  The American
22   Community Survey does not report in any part
23   calculation for the voting age population.  So I have
24   given you a figure of forty-eight point nine four
25   percent, which includes single race blacks.  We simply

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 70

1  don't know what the estimate is for the any part
2  definition.  That is not reported by the census so you
3  then have to make some assumptions.
4      And to assume that the ratio of any part blacks
5  for the voting age population is the same as the ratio
6  for the total population is just flawed because that
7  ratio will not be the same.  It's going to always --
8  and at least in most instances, be higher for the any
9  part all age population than the any part VAP
10 population.  Because there are more mixed marriages
11 with each successive generation, generally speaking.
12 And that appears to be the case in Ferguson-Florissant
13 as well.
14     Q.  Going back to your table, page 2 of Table D.
15 And I'll just show you mine so you don't have to go
16 back and find it again.
17     If we add up those who report to be African
18 American -- no, I can't see it upside down.  I thought
19 I could do this.
20     Okay.  Those who say they're black -- of the
21 population of two races, black -- white and black or
22 African American, that's one point eight percent,
23 correct?
24     A.  Of two races according to the ACS.
25     Q.  Yes.  And if you go down and the blacks or

Page 71

1  African Americans -- there are black or African
2  American or American Indian or Alaskan native, that's
3  point six percent, correct?
4      A.  Correct.
5      Q.  If we add those together, it's two point four
6  percent?
7      A.  Correct.
8      Q.  Okay.  So some part African Americans make up
9  two percent -- two point four percent of the overall
10 population, but you're stating that of that two point
11 four percent not even one percent would be over
12 eighteen?
13     A.  Well, if you want me to give you a ballpark
14 estimate of what I think the any part ACS black VAP
15 according to the 2011-2013 survey is?
16     Q.  Uh-huh.
17     A.  I believe it's just around forty-nine point
18 eight percent.  And I'm basing that on similar analysis
19 that you've conducted and applying what is the true
20 factor, which is based on the 2010 Census, which shows
21 that approximately fifty-five percent of the voting age
22 any part African American population is -- wait, I'm
23 confusing myself now.
24     But in that subcategory of persons who are of two
25 races, approximately fifty-five percent are any part

Page 72

1  African American compared to the 2010 total population
2  where it's around seventy-five percent.  And you should
3  be using the fifty-five percent, not the seventy-five
4  percent.
5      If you use fifty-five percent, it comes in just
6  under fifty percent.
7      Q.  Forty-nine point eight?
8      A.  Roughly.
9      Q.  Okay.  But we at least agree on this, I hope.
10 That paragraph 7 of your rebuttal report doesn't take
11 in any part blacks into account at all?
12     A.  No, it doesn't.  But if it did, if I were to
13 speculate and make a rough estimate, I would say it is
14 about forty-nine point eight percent.  And I stand by
15 that estimate.
16     Q.  Okay.  And do we also agree that there are
17 other ethnic groups besides any part African Americans
18 that are represented in the Ferguson-Florissant School
19 District?  There are Asians.  There are Hispanic.
20 There are Indians.  We do -- you acknowledge that there
21 are some population that are minority, correct?
22     A.  That's true.  That's absolutely correct.  Both
23 based on the 2010 Census, which is a better number to
24 use, and this estimate from the 2011-2013 ACS.
25     Q.  And when you made your rough estimate of

Page 73

1  forty-nine point eight percent, did you take into
2  that -- that population into account at all in your
3  calculation?
4      A.  No.  I suspect that if you looked at the
5  minority voting age population, all races, not just any
6  part black, that it would be just above fifty percent.
7      Q.  Okay.  Okay.
8      MS. ORMSBY:  I think I'd like maybe 11:30 to
9  break for lunch and then I don't think I'll have that
10 much after lunch.
11     Does anybody need a break?
12     MR. McDONALD:  Want to take a break?
13     A.  No, I want to keep going.  I just want to get
14 out of here.  I'm just kidding.  I don't care.
15     MS. ORMSBY:  I don't need a break.  I just
16 want to make sure no one else does.
17     A.  I don't care.
18     MS. ORMSBY:  Speak up.  Okay.
19     MR. McDONALD:  Can I get some water?
20     MS. ORMSBY:  Absolutely.
21     (Short break.)
22     Q.  (By Ms. Ormsby)  You're going to have to help
23 me on this one and I'm really dead serious.  Can you
24 explain Reock to me?
25     A.  Explain what?

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 74

1    Q. Reock?
2    A. Reock.
3    Q. Uh-huh.
4    A. Oh, oh, that's a compactness measure that has
5  been accepted by the courts to determine for
6  comparative analysis compactness.
7    Q. And how do you calculate it?
8    A. Just read that footnote. I can't tell you off
9  the top of my head.
10    It's calculated automatically by maptitude. I
11  used to almost never use it but now it seems like we
12  have to use it for court cases, even though it's just
13  as useful to simply look at the district and you can
14  make a determination. Because really compactness goes
15  beyond -- it really should go beyond just a pure
16  calculation to look at other factors.
17    Q. So you think visual inspection is just as --
18    A. -- Among other things. But if you're doing a
19  cross-jurisdictional analysis, that's hard to do, so
20  that's where Reock scores probably come in handy.
21    But, I mean, I can look at the Illustrative Plan 1
22  and 2 and tell whether that would -- both of those
23  plans would pass muster with the court in my opinion
24  without any doubt.
25    Q. Okay. Paragraph 30 of your initial report,

Page 75

1  the thick one there, you state that by 2010 a plurality
2  of the VAP, approximately forty-eight point nine
3  percent, was non-Hispanic white, right? Is that what
4  you state?
5    By 2010 a plurality of the voting age population,
6  approximately forty-eight point nine percent, was
7  non-Hispanics white?
8    A. That's right.
9    Q. So if forty-eight point nine percent of the
10  VAP was non-Hispanic white, doesn't it necessarily mean
11  that fifty-one point oh five of the VAP was minority in
12  2010?
13    A. Yes, but that would include Asian Americans,
14  American Indians, some of the other racial categories.
15    Q. Okay. In your supplemental report you include
16  a Hypothetical Plan B, which creates six of seven
17  majority BVAP districts, correct?
18    A. Yes.
19    Q. Okay. Doesn't Gingles 1 require the minority
20  group to be geographically concentrated?
21    A. Well, they are in Ferguson-Florissant School
22  District. That's how you can draw four out of seven
23  and five out of seven. And if you really stretch it,
24  and this is arguably not going to work because these
25  districts look a little funny, but you could even get

Page 76

1  six out of seven.
2    Q. But doesn't the fact that you can show six
3  majority black districts indicate that African
4  Americans are not concentrated?
5    A. No. No. But this Hypothetical Plan B was
6  drawn with race as a sole criterion, just to show that
7  if you really stretch things and make irregularly
8  shaped districts, you could get six out of seven
9  districts in Ferguson-Florissant. So this would
10  constitute in my opinion a racial gerrymander.
11    Q. So we just established using your numbers that
12  forty-eight point -- did you say forty-eight point nine
13  five of the voting age population in 2010 was
14  non-Hispanic white, fifty-one point oh five was some
15  combination of minorities, and yet you can draw six
16  districts and say with that population split that the
17  African Americans are concentrated?
18    A. Well, this particular plan arguably is
19  inappropriate to use to make that point because race
20  was the sole criterion and I had to really do some
21  weird things with Districts 4 or 5 and 1 in particular
22  to accomplish that objective.
23    But if you slip back and look at Illustrative Plan
24  1, Illustrative Plan 2, or for that matter in my
25  supplemental report, if you just look at the areas that

Page 77

1  are included in the areas that have been --
2    Q. I just want to --
3    A. -- If you look at the Figure 1, you can see
4  that African Americans live in a general area in the
5  south and a part of the north where -- where arguably
6  they live in a concentrated area. Those are the black
7  majority districts that I drew in districts -- in
8  Illustrative Plan 1.
9    Q. Going back to your Hypothetical Plan B, have
10  you ever presented a plan with anything like eighty-six
11  percent supermajority of African American districts in
12  any other VRA case that you've been involved with?
13    A. Not in -- certainly not in a county that is
14  only -- or a jurisdiction that is only fifty percent
15  black. Not to my knowledge. And if I did, they
16  certainly wouldn't have looked like that because
17  Hypothetical Plan B would, in my opinion, probably not
18  pass muster with the court.
19    Q. Okay. So let's go to your Plans 1 and 2 in
20  your initial report. Did you use AP BVAP or single
21  race BVAP in your calculations?
22    A. Well, I use both. I report both in my
23  exhibits.
24    Q. But when you determine your percentage of BVAP
25  for the plans, what did you use, AP BVAP or single race

Page 78

1  BVAP?
2      A. There's hardly any difference.  I mean, in the
3  tables I produced, I reported both figures and so I
4  think it's okay to use either one.  I believe in my
5  report I may have just used AP BVAP in the summary
6  paragraphs.  Let me go back and look at my -- yeah.
7      Q. If I could turn you to page 23 of your initial
8  report, it shows Illustrative Plan 1.  And in this plan
9  you have percentage A over eighteen -- eighteen and
10 over black and you give percentages for each of the
11 seven districts.  And my question is simply, Is that
12 using -- are those numbers AP BVAP or single race BVAP?
13     A. I will tell you in a moment.
14     Those are single race, good, because the
15 indication there is eighteen plus black.  I don't say
16 eighteen AP black.  So, yes, those are single race.
17     Q. These are single race?
18     A. Right.
19     Q. Thank you for that clarification.
20     A. Exhibit **E-2 reports both any part and single
21 race --
22     Q. Okay.
23     A. -- VAP.  And then Exhibit **F-2 would do the
24 same for Illustrative Plan 2.
25     So I report both.  And I could have reported more

Page 79

1  combinations but at some point that's overkill.
2      Q. Okay.
3      A. As you can see, there's very little
4  difference.  You know, about a percentage point
5  difference in the district-by-district tabulation.
6      Q. Okay.
7      A. Just as there's about a percentage point
8  difference in District 1.
9      Q. I just want to clarify -- a clarification on
10 what that number was.
11     A. Okay.
12     Q. So in your Figure 10, back on page 23, you
13 have a District 7.  It's fifty-two point eight six
14 percent BVAP, right?
15     A. Single race.
16     Q. BVAP then?
17     A. Uh-huh, right.
18     Q. Single race BVAP.
19     Do you believe that that's an effective
20 single-member district?
21     A. I will have to defer to Dr. Engstrom to speak
22 in terms of what's effective and not effective.  But
23 it's a seat that is currently held by an African
24 American who is elected at-large in a school district
25 that is slightly under fifty percent African American

Page 80

1  VAP.  So there is a reason to believe it would be
2  effective in my opinion but Dr. Engstrom's opinion
3  would be the probative one.
4      Q. Okay.  And would your answer be the same when
5  we look at your Illustrative Plan 2 where you have
6  created a district with fifty-one point five percent
7  single race BVAP?  If I ask if it was -- if you
8  believed it was an effective single-member district?
9      A. I believe it is.  I mean, that district is
10 currently represented by someone who is elected
11 at-large, so there is reason to believe that
12 Ms. Thurman could win in that district at fifty-one
13 point five.
14     Q. What's the lowest number possible to create an
15 effective BVAP in your opinion?
16     A. Somewhere right around fifty-one.  I mean,
17 it's got to be more than fifty.  So, I mean, I think in
18 that part of the school district, which appears to be a
19 higher income area, and the fact that there's a black
20 incumbent living in that district, that it is viable.
21     I suspect a figure that low in Ferguson would not
22 be viable based on the fact that, from what I
23 understand, Ferguson wards that often are above sixty
24 percent or close to sixty percent black VAP
25 multi-member, have not historically elected African

Page 81

1  Americans consistently.
2      So in the south end of the school district I think
3  you'd probably need to be closer to sixty percent
4  black.  But again, I have to defer to Dr. Engstrom.
5      Q. Okay.  You were deposed in the Yakima case; is
6  that right?
7      A. I was.
8      Q. Okay.  And I have a copy of it if you need to
9  look at it, but do you remember testifying in your
10 deposition there that over fifty percent is over fifty
11 percent?
12     A. I do recall.  I don't recall that specific
13 statement but -- because in Yakima we have to rely on
14 citizenship data.  We're looking at estimates.  And at
15 the time of the deposition it was just above fifty
16 percent in one of the illustrative plans.  Just above
17 fifty percent Latino CVAP and so it did meet the
18 threshold according to Bartlett.
19     Q. Okay.  Let's go ahead and enter the Yakima
20 depo.
21     (Defendant's Exhibit D was marked for
22     identification.)
23     Q. (By Ms. Ormsby) Okay.  Could you turn to
24 page 105 of that deposition?
25     MS. ORMSBY: But I need a copy of it.

21 (Pages 78 to 81)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 82

1        MS. GABEL:  Yeah, go ahead.
2        Q.  (By Ms. Ormsby)  And there's four to a page so
3    it's actually on page 27 of the actual deposition.  And
4    I believe it's the part that I'm referring you to, you
5    have my copy, it's highlighted.
6        A.  Right.
7        Q.  I'll give you a minute to look over that
8    testimony that's highlighted there and ask you, Did you
9    testify that one person over fifty percent is an
10   effective district?
11       A.  I believe it is effective in the City of
12   Yakima, that's right.  These are two totally different
13   cases.  But that was my testimony and I think it's
14   being borne out now because there will be primaries
15   sometime this month.  Maybe they've just had them today
16   or tomorrow.  I mean, it's imminent.
17       Q.  All right.  So do you believe that District Y,
18   if it was ever determined that the BVAP was over fifty
19   percent even by one person, that that would be an
20   effective district?
21       A.  In Ferguson-Florissant School District?
22       Q.  Uh-huh.
23       A.  My gut feeling is that it's not but I would
24   defer to Professor Engstrom.  But I think for a large
25   area that is over seventy thousand people or near

Page 83

1    seventy thousand and if it's just barely above fifty
2    percent black VAP, a district in an at-large election
3    under those circumstances would probably not lead to
4    four out of seven African Americans being elected.
5        Q.  What about three out of seven?
6        A.  Unlikely.  Maybe it's happened.  I don't know.
7    Again, I have to defer to Professor Engstrom.  But I
8    think in Ferguson-Florissant it is more likely that
9    African Americans will run successful campaigns in
10   districts as opposed to at-large, just as it's
11   definitely the case in Yakima where Latinos make up
12   over forty-five percent of the population but could
13   never win in an at-large election.
14       Q.  What turnout rate is required for your plans
15   to achieve the result you assume?
16       A.  Well, that's -- turnout, I don't know what you
17   mean by turnout.  But more than -- more than fifty
18   percent of the votes cast would have to go to an
19   African-American candidate.
20       Q.  Obviously.  But, I mean, do you even include
21   in your calculation at all what the voter turnout rate
22   would be?
23       A.  No.  That's extremely speculative, in part
24   here because we're starting with an at-large system,
25   which would tend to depress turnout rates naturally in

Page 84

1    the minority population if you were a minority voter
2    and realized that you may not be able to successfully
3    choose a candidate of choice due to being a minority in
4    a majority-wide school district.  So that suppresses
5    turnout historically.
6        So I just don't think you can use at-large
7    elections to make that kind of speculative
8    determination.
9        Q.  Okay.  Do you agree that in your Hypothetical
10   Plans 1 and 2 in your initial report that the four
11   majority BVAP districts are constructed around areas of
12   the district that have a higher overall
13   African-American population?
14       A.  Yes.  They're in the African-American areas of
15   the city.  Of the school district, excuse me.
16       Q.  And are you aware that plaintiffs in VRA cases
17   typically try to assess things like turnout
18   differentials between racial groups in specific
19   neighborhoods in order to assess whether specific
20   districts are effective for African Americans?
21       A.  I'm aware that kind of analysis can be
22   done.  But again, I will defer to Dr. Engstrom to make
23   a comment on that because I do not do statistical
24   analysis.  I do the easy stuff.
25       Q.  So you haven't looked at turnout rates at all

Page 85

1    then?
2        A.  I mean, I have not seen Dr. Engstrom's report.
3    I'm sure if there was something about District 7 that
4    made it highly problematic, I would have been alerted
5    to that fact and it wouldn't have been filed as
6    Plaintiffs' Illustrative Plan 1 or Plaintiffs'
7    Illustrative Plan 2 with a fifty point one, fifty point
8    two percent.  Fifty-one or fifty-two percent any part
9    black VAP.
10       I did see in Dr. Rodden's analysis that he did
11   some sort of an estimate of turnout and determined that
12   there were only two districts that would potentially
13   elect African Americans.  But again, that's based on
14   at-large voting historical patterns that are probably
15   not that relevant to the question at hand.
16       Q.  So did Professor Engstrom contact you at all
17   and talk to you about your hypothetical plans?
18       A.  No, I've had no -- I've had no contact with
19   Professor Engstrom about my plans.  I'm sure that if
20   there were an issue, he would have relayed that to the
21   attorneys and they would have told me, yeah, that that
22   particular configuration would not work.
23       Q.  Okay.  And you haven't heard anything -- any
24   comments from the attorneys regarding Professor
25   Engstrom's?

22 (Pages 82 to 85)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 86

1    A. No. No. I mean, it's reasonable to assume
2   that Ms. Thurman would win in the district that is
3   configured around fifty-one or fifty-two percent black
4   VAP because she has been successful at-large with
5   numbers that are under fifty.
6    Q. How many cases have you been involved in where
7   there has consistently been minority representation on
8   an elected governing board?
9    A. Oh, many. Often it's underrepresented but
10  many, many cases I've been involved in where there's
11  been minority representation.
12   For example, Albany County, New York, recently off
13  the griddle, a lawsuit was filed in 1990 that created a
14  new third minority-majority district African American.
15   Another lawsuit had to be filed in 2003 that I was
16  involved in. That created a fourth. And now a fifth
17  minority-majority district has been ordered by the
18  court.
19   And again, there will be elections. I guess their
20  primary election's this month and the general election
21  in November. And that case is resolved. It's not
22  being appealed.
23   Not resolved yet on the legal phase. County
24  received a tab for six point nine million dollars from
25  Gibson Dunns' work on behalf of the plaintiffs in that

Page 87

1   case. I don't know how long it's going to take to
2   resolve that.
3    Q. Are you aware that Ferguson-Florissant's board
4   has had one or two elected minorities on the board of
5   education going back to the 1980s?
6    A. I did not know it was consistent but now I
7   know.
8    Q. How many cases have you been involved in where
9   the minority VAP is -- let me back up.
10   Using the 2010 Census and your numbers, you've
11  determined that the any part black VAP is forty-eight
12  point nine percent, correct?
13   Do you need to go back and look at your report?
14   A. According to 2010 Census?
15   Q. Uh-huh.
16   A. Yes, I think that's right. I think it's
17  forty-eight point nine four but close enough.
18   Q. Okay. How many cases have you been involved
19  in where the minority VAP is so near the white VAP?
20   A. You know, I can't -- I mean, I have no way to
21  tell you that. I mean, I know it's happened. It's
22  happening right now in a case in Hattiesburg, of
23  course, which has not been resolved. That will be
24  appealed.
25   It's happening in San Juan County, Utah, where the

Page 88

1   minority population, which is predominantly American
2   Indian, is just about fifty percent Indian VAP
3   countywide. There are others out there. I just can't
4   name them off the top of my head
5    Sussex County, Virginia. I worked for the County
6   in that instance in both 2000 and 2010, to just remind
7   myself, and helped them draft their plans. And at one
8   point in sometime around 2003 or so a lawsuit was
9   filed, which is when I became involved with the County.
10  And there was concern about the shape of the districts
11  or something and I drew another plan and the case
12  settled. And Sussex County, Virginia, I think, is just
13  over fifty percent black VAP.
14   But that was not really a Section 2 case, the one
15  in 2000, so there was no pending because the case
16  settled. But that's another instance of a county
17  that's right around fifty percent. It's a little
18  higher now. I think it's closer to fifty-five.
19   Q. In paragraph 9 of your rebuttal report, this
20  report here, you rely on the five-year ACS, the '09-'13
21  to -- is that right?
22   A. Well, I report it. And it's the only
23  information available. That's right.
24   Q. And this data, it includes data that's older
25  than the data that's in the 2010 Census since it goes

Page 89

1   back to 2009?
2    A. The survey midpoint would be 2011 so even
3   though some of these survey respondents obviously
4   filled out their forms in 2009, on average it's a
5   little more current with the survey midpoint of July
6   2011. So it's very, you know, it's one year after the
7   2010 Census.
8    Q. And you used that data to assess citizenship?
9    A. Right.
10   Q. Is it your understanding there's a substantial
11  number of black noncitizens living in the
12  Ferguson-Florissant School District?
13   A. No, there are not very many.
14   Q. Have you been asked in other cases to analyze
15  black CVAP?
16   A. I have analyzed black CVAP in other instances.
17  This is becoming a more common thing. Back in the old
18  days it was never an issue. But I believe when I was
19  working on the -- it's not a case. When I was working
20  on the Miami-Dade County Commission Redistricting
21  Project, which involved other demographers also in
22  Florida, I think I calculated black CVAP by district.
23  And I've look at it in some other cases, including
24  Albany County and in other places.
25   Q. But CVAP is usually more prevalent in Hispanic

23  (Pages 86 to 89)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 90

1    populations; can we agree on that?
2        A. Well, no. CVAP is prevalent everywhere. And
3    in this case it's every bit as reliable as the total
4    population voting age estimates. So here you see that
5    in terms of black citizenship rates, the overall black
6    citizenship rate in the school district is forty-eight
7    point one two percent while the overall non-Hispanic
8    white citizenship rate is forty-nine point one four.
9        So in that instance whites are still a plurality
10   of the citizen voting age population, which I would
11   argue is more relevant for voting purposes than just
12   the straight-up voting age population calculation from
13   the estimates.
14       Q. Can you tell me why you used the five-year
15   report for this number and not the three-year report as
16   you used in your other numbers?
17       A. Because it's not available in the three-year
18   report due to data suppression. That's why it's not in
19   my Exhibit D. That's the point I was raising. That as
20   you start getting below sixty-five thousand or, you
21   know, even as high as sixty-five thousand or seventy
22   thousand, there's still going to be some data
23   suppression just due to survey issues, which is why one
24   has to fall back on the five-year survey.
25       So really, I mean, I can't stress enough that

Page 91

1    paragraph 9 is all that matters in this particular
2    case. If you are forced to use the ACS data as a
3    metric, then you've got to use the citizen voting age
4    population, not total age voting population because
5    only citizens can vote.
6        Q. Would you turn to page 11 of your initial
7    report. I'm looking at Figure 5.
8        A. Oh, page 11 of my initial report?
9        Q. Uh-huh.
10       A. Yes.
11       Q. Okay. In this figure and in the paragraph
12   above you note the rapid changes that have occurred in
13   the district. Is this based -- is that right?
14       A. Well, that's right. That just compares the
15   voting age population for African Americans, including
16   Hispanics and non-Hispanic whites, over the three
17   decennial censuses, 1990, 2000, 2010.
18       Q. So I guess I'm a little confused because in
19   your rebuttal report you very clearly state, quote,
20   projections based on trend lines from prior years are
21   highly speculative.
22       But you spend quite a few paragraphs in your
23   initial report pointing out the rapid changes within
24   the school districts.
25       A. Right. Historical trends. I'm not making any

Page 92

1    projections that I'm aware of.
2        Q. But they're significant to point -- they were
3    significant enough to point out in your initial report,
4    the rapid changes, correct?
5        A. Right. Because it was documented. There's a
6    historical trend from 1990 to 2010. What we don't know
7    is the trend from 2010 to 2015. You can speculate, you
8    can draw linear trend lines, but it's still
9    speculation.
10       Q. Are you -- have you been hired as an expert
11   demographer in this case?
12       A. Expert redistricting consultant.
13       Q. So your expertise is analyzing and -- is an
14   area of expertise analyzing and determining population
15   trends?
16       A. Not -- no. I mean, I was hired to assist the
17   Plaintiffs with redistricting plans, redistricting
18   analysis, and demographics. But I was not asked ever
19   to do any kind of trend analysis.
20       Q. So you're not saying that a respectful
21   demographer would never make projections based on a
22   strong trend from prior years and that a court should
23   never consider such a trend then?
24       A. It's fine to make projections and perhaps the
25   court should consider it. I don't know. But I'm still

Page 93

1    saying that it is simply a projection and a guess in
2    the final analysis. And it becomes especially
3    problematic in this instant case because of the events
4    of last year.
5        MS. ORMSBY: Okay. I think this is a great
6    place for a break for lunch. It's twenty-five till
7    12:00. I don't have all that much more so to be a
8    shorter afternoon than it was morning.
9        (Lunch break.)
10       Q. (By Ms. Ormsby) Okay. Your rebuttal report
11   takes issues with Dr. Rodden's statement that the
12   majority of African-American households are occupied by
13   owners rather than renters. If you want to look at
14   paragraph 17 of your rebuttal report, I believe that's
15   where you take issue.
16       A. Yeah.
17       Q. It's on page 10.
18       A. Oh, on page 10. I'm sorry. I'll say yes.
19   All right.
20       Q. What is the percentage of home ownership that
21   you cite in paragraph 17 according to the 2011-13 ACS?
22       A. It is fifty point seven percent.
23       Q. Okay. So you don't deny that African-American
24   home ownership is in excess of fifty percent?
25       A. That's true. I mean, I'm not saying -- that

24 (Pages 90 to 93)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 94

1  technically is correct, it's just about fifty. It's
2  just if you read his report, it implies that things are
3  going swimmingly well in the home ownership arena and
4  that would not be the case if you look back ten years
5  or if you compare the gap between whites and blacks in
6  the Ferguson-Florissant area.
7      Q. If you look at paragraph 18 of your rebuttal
8  report, what home ownership rate for African American
9  is the entire State of Missouri according to the
10 '11-'13 ACS?
11     A. Forty point five percent.
12     Q. So your own statistics indicate that the rate
13 of African-American homeowners in the district is
14 approximately ten percent higher than the rest of the
15 state?
16     A. Ten percentage point's higher. It's not my
17 statistics, it's just the Census Bureau's.
18     Q. Okay. And then Figure 3 of your report, which
19 is on page?
20     A. Eleven.
21     Q. Thank you. Yeah.
22     Shows that between 2005 and 2013 the number of
23 homeowners dropped in the district and then it began to
24 rise again; is that right?
25     A. It has risen, it appears, since the 2009-11

Page 95

1  ACS by a couple of percentage points, right.
2      Q. Could that have anything to do with the Great
3  Recession?
4      A. Would have a lot to do with the Great
5  Recession I would assume. And recovery. Things seem
6  to be recovering a little bit now. As of 2012. But
7  again because of last year's events, it's a crap shot
8  as to which way this goes in the future ACS iterations.
9      Q. But you don't know how it's going to go,
10 right?
11     A. No, I don't. Nobody does.
12     Q. Why didn't you provide similar data such as
13 this for the State of Missouri?
14     A. I just thought this was adequate to make the
15 point. Like, I could. It's certainly available.
16     Q. And is this data available nationwide as well?
17     A. It is available nationwide as well. Year by
18 year for sure.
19     Q. But as of right now your most recent year's
20 data, it's better -- how would you compare district
21 home ownership statistics with state statistics? Do
22 you think it's better to live inside the district or
23 outside the district?
24     A. Well, it just all depends on where you're
25 living outside. I mean, it's -- obviously the

Page 96

1  percentage of African-American home ownership in the
2  Ferguson-Florissant School District area is higher than
3  it is statewide. So, I mean, that's a fact.
4      Q. Okay.
5      A. Not disputing that.
6      Q. Have you -- have you had the opportunity to
7  read Dr. Rodden's supplemental report that focuses on
8  VRA Senate Factors?
9      A. I read a supplemental report which was a
10 rebuttal to my report. Is that what you're referring
11 to or is it another report?
12     Q. Yeah. Let's go ahead and enter it so we're
13 talking about the same document.
14     (Defendant's Exhibit E was marked for
15     identification.)
16     Q. (By Ms. Ormsby) Could you look at Figure 3 on
17 page 17?
18     There is no seventeen.
19     A. Figure 3 on?
20     Q. Page --
21     MR. McDONALD: Doesn't have seventeen pages.
22     MS. ORMSBY: Yeah, I know. That's what I'm --
23 my typing is not all that great. Trust me.
24     A. Well, I have seen this report or this
25 supplemental declaration.

Page 97

1      MS. GABEL: Maybe I gave you the wrong one.
2      MS. ORMSBY: I don't think this is the right
3  report. This is not it.
4      (Defendant's Exhibit E was remarked for
5      identification.)
6      Q. (By Ms. Ormsby) Now page 17. I promise
7  that's correct.
8      A. Okay. I don't think I have seen this report.
9      Q. You have not seen this report?
10     A. I have not seen it, no.
11     Q. Okay. If you would still turn to page 17,
12 Figure 3, this is just a presentation -- Dr. Rodden's
13 presentation of ACS data. So you've looked at the ACS
14 data. Can you -- do you have any reason to believe
15 that his data's wrong?
16     A. Well, I have no way of knowing 'cause I have
17 not looked at metro St. Louis or the State of Missouri.
18 I have data available. I can make that data available
19 to myself. I have it but I've never used it for this
20 particular case. I was simply focusing on the
21 disparities within the school district itself.
22     Q. Okay. So this table compares
23 Ferguson-Florissant School District with the St. Louis
24 metropolitan area and then the State of Missouri. And
25 at least as far as I understand that you haven't looked

25 (Pages 94 to 97)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 98

1   at this data and compared it to this chart, but
2   according to this chart anyway, in the area of
3   bachelor's degree's gap, college degree gap, poverty
4   gap, SNAP gap, and unemployment gap,
5   Ferguson-Florissant School District is better off than
6   both the St. Louis metropolitan area and Missouri.
7   Would you agree that that's what this table says
8   anyway?
9       I'm not asking you to commit yourself to the
10  actual data.
11      A. That would appear to be the case. But again,
12  I haven't looked at the data so I can't confirm that
13  that's the case.
14      Q. But you just said you do have access to that
15  data?
16      A. Well, yeah, I do.
17      Q. Okay.
18      A. But I've not -- I was not asked to do that
19  sort of an analysis, and I assume that Professors
20  Gordon and Kimball are on that, so.
21      Q. Okay.
22      A. Whatever I might say would not be of value
23  probably.
24      Q. But you were asked to include different social
25  indicators in your initial report; is that right?

Page 99

1       A. That's right. Just comparing African
2   Americans and non-Hispanic whites in the school
3   district.
4       Q. But you didn't -- you didn't give any sort of
5   benchmark as to how those numbers related to outside of
6   Ferguson-Florissant School District?
7       A. No. I was just showing the disparities exist
8   there, which is really the primary issue in this case I
9   would think.
10      Q. So do you not believe that this sort of
11  information is relevant?
12      A. Well, it's interesting. I just don't think
13  it's as relevant as the disparities within the school
14  district itself. But that's my own opinion. And
15  again, I have not read Professors Gordon and Kimball's
16  report either. Not because I am remiss, it's just that
17  I think the attorneys in most of these cases prefer
18  that experts not review reports written by experts from
19  the same side, just to keep up kind of a Chinese wall
20  between experts. That's what I think happens.
21      Q. Are you aware of any municipality or school
22  district anywhere that doesn't have disparities between
23  African Americans and whites?
24      A. Yes.
25      Q. Where?

Page 100

1       A. Fayette County, Georgia.
2       Q. I'm sorry, where?
3       A. Fayette County, Georgia. There may be slight
4   disparities favoring whites in that county but it is
5   remarkably homogeneous whites and African Americans.
6   African Americans are very well off or reasonably well
7   off in Fayette County, Georgia, unlike the rest of the
8   state.
9       Q. Okay. And with regard to all of the social
10  areas that are listed in Dr. Rodden's report?
11      A. Yeah, I think maybe the poverty rate is a
12  little bit higher. There's probably no difference --
13  I'm talking about Fayette County, Georgia?
14      Q. Yeah, that's what I'm asking about.
15      A. Yeah, I think the poverty rate is a little bit
16  higher in African Americans. The whites are very off.
17  Fayette County is a suburban county that has grown
18  significantly since 1990 and it's a bedroom community
19  for Atlanta. And there are a lot of high income
20  families now living in Fayette County, Georgia. Both
21  white and black.
22      Q. Other than Fayette County, Georgia, are you
23  aware of any other areas?
24      A. Actually, I think if you looked at a lot of
25  Appalachian counties you would find parity between

Page 101

1   whites and blacks. Both are very bad off. But those
2   are never in Section 2 cases.
3       So there would be other places I'm sure. But in
4   most Section 2 cases I'm involved in, whites are better
5   off than blacks -- now you -- but what I'm looking at
6   mainly is the gap in the disparity. Because in some
7   places you would find white poverty rate and white
8   education levels to be as low or lower than African
9   Americans in Ferguson-Florissant, but you would also
10  find a corresponding lower rate among whites. So
11  there's still the disparity, it's just a different gap.
12      Q. How do you determine whether or not the gap
13  between African Americans and whites is exceptional
14  unless you compare it to other areas?
15      A. Well, you could. I mean, you could do that.
16  I wasn't asked to do that in this case, but I think it
17  is very significant. I mean, I have not read this
18  report so there's no way I can really comment on what
19  Professor Rodden did with this report. But he appears
20  to be addressing Professor Kimball and Professor Gordon
21  if I'm not mistaken. So I'll leave it up to them to
22  respond to this.
23      Q. So you would agree the stats that you provide
24  in your two reports aren't in any context as it relates
25  to outside the Ferguson-Florissant School District?

McGraw Reporting, L.L.C. (314) 704-2727

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 102

1      A. That's correct.

2      Q. Okay.

3      A. Except to the extent that I did report white
4  home ownership rates because Dr. Rodden focused on that
5  in his initial report. And while it's true that
6  African-American home ownership is higher in
7  Ferguson-Florissant School District than it is
8  statewide, it's not surprising because it's suburban.

9      By the same token, white home ownership rates are
10  significantly higher in Ferguson-Florissant School
11  District than they are statewide. So there's still a
12  gap. And the gap is almost as large statewide as it is
13  in Ferguson-Florissant but it starts from a different
14  floor.

15      Q. Did you make any comparisons to surrounding
16  school districts?

17      A. No.

18      Q. Of similar racial makeup?

19      A. No. I wasn't asked to.

20      Q. When thinking about racial integration of
21  census block groups, would you say that an African
22  American is understood to be living in segregated
23  living conditions if the black population of the tract
24  or block group is more than sixty percent?

25      A. Well, that's a fair assumption but it could be

Page 103

1  defined other ways.

2      Q. Would you say that a block group of
3  fifty/fifty, you wouldn't say that is segregated, would
4  you?

5      A. Well, it's certainly less than sixty.
6  Fifty/fifty. I mean, it would really vary from
7  jurisdiction to jurisdiction. But I wouldn't say that
8  it's segregated but it could be an indication of an
9  area where a majority black district could be drawn.

10      For example, the segregation rate in Fayette
11  County, Georgia, would not be as high as it is in the
12  Ferguson-Florissant School District based on that
13  metric. There are many more fifty/fifty blocks than
14  blocks that are sixty percent or higher probably in
15  Fayette County, Georgia.

16      Q. Let's look at paragraph 15 of your
17  supplemental report.

18      You state that there are twenty-six of seventy-one
19  block groups in the district with African-American
20  population percentages equal to or greater than sixty
21  percent; is that right?

22      A. Right. Uh-huh.

23      Q. And that's reflected on Figure 2, your map on
24  Figure 2?

25      A. Right.

Page 104

1      Q. And these predominantly black census groups
2  have a total of 2010 black -- total in 2010, black
3  population of nineteen thousand one hundred and
4  twenty-six; is that right?

5      A. Right.

6      Q. And that represents fifty-three percent of the
7  total black population in the districts?

8      A. Correct.

9      Q. So do I understand you correctly that this
10  minimal definition of segregation, a little more than
11  one-half of the black population in Ferguson-Florissant
12  lives in block groups that are segregated by this very
13  minimal definition?

14      A. That's -- that's true. I mean, unless I made
15  a calculation error, that is the reality. That over
16  half of the African-American population in
17  Ferguson-Florissant School District resides in census
18  blocks that are -- census block groups that are sixty
19  percent or more African American.

20      Q. So around half of the African Americans living
21  in the district live in racially integrated census
22  block groups?

23      A. Well, there is that range of fifty to sixty so
24  at that -- in those blocks, I don't have a figure for
25  that, but one could argue that, well, I should use

Page 105

1  fifty-five/forty-five instead of sixty-forty. I mean
2  sixty/forty -- sixty percent is a good figure to use
3  because in a landslide election, for example, anything
4  over sixty percent is going to be a landslide. So
5  that's a good cutoff point.

6      But if I use fifty-five, I don't have that figure
7  in front of me, but it would obviously be a higher
8  percentage than fifty-three percent. It would be
9  fifty-five black, forty-five white.

10      Q. Do you know how this compares with other
11  municipalities and school districts in the metropolitan
12  St. Louis area?

13      A. I have not done that analysis. Obviously the
14  City of St. Louis is more segregated than St. Louis
15  County. I know that just because I at one point in
16  early 2002 actually did some work for the ACLU on a
17  plan of the City Council in the City of St. Louis and
18  it was clear that there was sharp segregation there.

19      I do know that metro St. Louis, at least according
20  to one study I examined, ranks seventh in the nation in
21  terms of segregation. But that's looking at everything
22  in the City of St. Louis as well as St. Louis County
23  and presumably other counties in the core-based
24  statistical area that encompasses St. Louis.

25      Q. Are you able to name another school district

27 (Pages 102 to 105)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 106

1    in the metropolitan St. Louis area where the population
2    is more racially integrated than Ferguson-Florissant?
3        A. I can't -- I can't tell you. I've not looked
4    at other examples.
5        Q. You just stated you hadn't read any of the
6    other experts' reports, so you haven't read
7    Dr. Kimball's supplement report, have you?
8        A. I have not. I have not read anything produced
9    by Dr. Kimball or Dr. Gordon or any response to
10   anything they've written.
11       Q. I'm going to --
12       A. Not because I was lazy or.
13       Q. I'm not accusing you of that.
14       A. I just wasn't provided with that information.
15       Q. I understand. We're going to go ahead and
16   mark Dr. Kimball's supplemental report and it will be F
17   as in Frank. And I'm just doing this so -- I want to
18   quote from it and I want you to make sure that you know
19   I'm not making it up.
20          (Defendant's Exhibit F was marked for
21          identification.)
22       Q. (By Ms. Ormsby) All right. So if you could
23   turn to page 4 of this report. We'll look at the
24   middle paragraph, the second sentence. And you can
25   check me. It says, "There are many precincts in the

Page 107

1    school district with similar proportions of black and
2    white adults." Is that what it says?
3        A. That's what it says.
4        Q. Okay. And then he goes on in that paragraph,
5    if you want to peruse it, that he states that it's
6    difficult or a challenge to use either ecological
7    inference or homogeneous precinct analysis because of
8    this similar proportions of black and white adults.
9        And then he goes on in his report to conduct
10   homogeneous precinct analysis where he uses two
11   homogeneous white precincts and four homogeneously
12   black districts.
13       So I understand, did you use -- did you use
14   homogeneous precinct analysis when doing your report?
15       A. No, I never did for Gingles 1. And I would
16   point out that while he's correct -- I mean, he's using
17   consolidated precincts, I think, to do this analysis.
18       There are about ninety-six precincts in
19   Ferguson-Florissant School District. But when there's
20   an election contest, some of the precincts are
21   consolidated for purposes of polling places.
22       So there are -- so each precinct actually is
23   covering a larger geographic area, which reduces the
24   likelihood that you'll be able to find homogeneous
25   precincts in a place like Ferguson-Florissant School

Page 108

1    District 'cause you're working with larger -- larger
2    entities of voting blocs.
3        Q. So would you agree with his statement that
4    there are many precincts with similar proportions of
5    black and white adults?
6        A. I have not -- I mean, I actually produced
7    those numbers but have not studied that, I mean, as
8    part of my work with Dr. Engstrom so I can't say. But
9    it would not surprise me in part because of the
10   consolidated precinct issue.
11       Q. Okay.
12       A. So that there would not be very many
13   homogeneous precincts after consolidation.
14       Q. Okay.
15       A. But you would see more areas that might
16   qualify for homogeneous precincts if you used the
17   original precinct itself. Because there are ninety-six
18   precincts. Some of them are unpopulated. I think
19   probably about eighty of them are populated, which is
20   not that far off from the number of block groups in the
21   County.
22       So a rough -- you could get a rough estimate of
23   perhaps of what would constitute a consolidated
24   precinct -- what would constitute a homogeneous
25   precinct by looking at the block group data. But you

Page 109

1    couldn't do any voting analysis from the block group
2    data so.
3        Q. Right. Okay. And thinking back into all of
4    the VRA cases that you've been involved with, which
5    cases dealt with a district or -- school district or a
6    municipality where the population was more racially
7    integrated than the Ferguson-Florissant School
8    District?
9        A. Oh, well, there are many. Fayette County,
10   Georgia, immediately comes to mind. Albany County, New
11   York, is probably -- well, I mean, there's a
12   significant Hispanic population there but there's a
13   fair amount of integration at Albany County, New York.
14   Maybe not more than Ferguson-Florissant though.
15       I mean, I just -- I don't typically do a racial
16   segregation analysis. I look to see where the minority
17   population is and then determine whether or not you can
18   draw one or more districts using traditional
19   redistricting principles.
20       And so going a step further and trying to do a
21   racial segregation analysis is kind of far afield from
22   just making the point with Gingles 1.
23       Q. Okay. Okay. Before lunch you stated
24   reluctantly that you did -- that if you had -- were
25   forced to determine the BVAP under the ACS, it would be

Page 110

1  forty-nine point eight percent; is that correct?
2      A. Thereabouts. Just a rough estimate, that's
3  right.
4      Q. Can you tell me how you calculated that?
5      A. Yeah. I mean, I did it two or three weeks ago
6  or more. But I simply took -- I took twenty -- I
7  started with the ACS data set. Is that in my
8  supplemental report?
9      We know there are forty-nine thousand sixty-seven
10 persons of -- forty-nine thousand six hundred and
11 seventy-nine persons of voting age of whom twenty-four
12 thousand three hundred and eight -- three hundred and
13 thirteen are single race black. And so that's the
14 floor that I started with.
15     And in effect I looked at the -- any -- the
16 multi-race category and applied a factor of point five
17 five to that category to determine that roughly one
18 more percentage point would be added. Then the point
19 five five factor -- I think it's point five five. It
20 could be a little bit more, a little bit less. Comes
21 from the percentage of the African-American voting age
22 population under 2010 Census, which is multi-race
23 black. Which I think is the only one you can possibly
24 use. There may be other approaches to take but that's
25 really the only one that would not be totally flawed.

Page 111

1      Q. Okay. So you -- I'm slow. Forty-nine
2  thousand six hundred and seventy-nine total VAP?
3      A. Right.
4      Q. And then you used the single race black?
5      A. Including Hispanics, which is twenty-four
6  thousand three hundred and thirteen.
7      Then I looked at the multi-race categories and
8  whatever that number is, I don't have in front of me.
9  It doesn't really matter. I applied a factor of point
10 five five or thereabouts. I don't have it in my head
11 because I did it a month ago. Based on the 2010 Census
12 and it adds another -- almost another percentage point
13 onto the single race black VAP according to the
14 2011-2013 ACS estimates.
15     Of course there's not a Census Bureau estimate.
16 That is just simply my back of the envelope estimate.
17 It adds about another percentage point, which is
18 consistent with what we see in the 2010 Census where
19 the difference between black voting age and any part
20 black voting age is roughly one percentage point. So
21 it's not a surprise that we get another percentage
22 point.
23     Q. Okay. So one of Dr. Gordon -- in his report,
24 he actually takes the 2010 Census numbers and he argues
25 that those are actually too high for BVAP because you

Page 112

1  have to take into consideration the disenfranchised
2  blacks. Have you heard of that argument before?
3      A. Well, if you -- if you have a reliable figure
4  on the number of felons, for example, living in the
5  school district, then, yes, that would -- I mean,
6  potentially, yes.
7      Q. And how he determined that, he's took the
8  national figures, the national numbers, because that's
9  all he had and he took the percentage and applied that
10 percentage to the Ferguson-Florissant BVAP?
11     A. Okay.
12     Q. Do you agree with that method?
13     A. It's somewhat speculative. But obviously
14 there is going to be some -- there is going to be some
15 disenfranchised African Americans of voting age because
16 they're felons. I don't have any idea what that number
17 is. He used the national percentage. That may be the
18 best percentage you can come up with. You can't get
19 that kind of information at the precinct or block group
20 or census block level. So you have to use some sort of
21 an outside measure to arrive at that.
22     Maybe there's something available from the State
23 of Missouri or St. Louis County. I don't know. But
24 that would lower the overall black VAP. Of course,
25 you'd also have to look at the percentage of the white

Page 113

1  population that is felon as well.
2      Q. Okay. So you testified this morning that you
3  prefer to rely on the U.S. Decennial Census for
4  figures?
5      A. For right now. Because the 2011-2013 ACS is
6  only two years out from the census. The 2011-2012 ACS
7  is a survey of one out of every forty people on an
8  annual basis. It includes at least one year prior --
9  well, I'm sorry. It does not include one year prior.
10 One year after.
11     So the midpoint is July 2012. But it's an
12 estimate. And so I think it's fair to continue using
13 the 2010 Census. Some courts would require you to use
14 the 2010 Census all the way through 2020 for purposes
15 of drawing districts.
16     In terms of drawing districts you basically have
17 to use the 2010 Census all the way till 2021. But as
18 far as I know, most courts would continue to use the
19 2010 Census to report the percentage of the
20 African-American population that is of voting age
21 rather than the ACS.
22     But I may not be aware -- I haven't read every
23 court case out there so there may be some courts that
24 are relying on the ACS for all I know. That's
25 possible.

29 (Pages 110 to 113)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 114

1    But again, I keep coming back to the critical
2  point here in Figure 9, that if you use the ACS, then
3  you must use citizen voting age population.  And if you
4  use citizen voting age population, then African
5  Americans represent only forty-eight point one two
6  percent of the eligible population in the district and
7  whites, non-Hispanic whites, are forty-nine point one
8  four.  That's before you get into issues of felons who
9  do not show up in any census report.  So you would have
10  to make a different estimate, as Dr. Kimball has done.
11    Q.  Do you believe that the census counts every
12  person?
13    A.  No.
14    Q.  So you understand that they don't?  There's a
15  sampling done?
16    A.  Well, it's -- not everybody gets counted.
17  That's right.  There's typically an undercount of the
18  minority population but it really does vary from
19  community to community.
20    Q.  And can you tell me the difference between a
21  sampling bias and a nonsampling bias?
22    A.  Well, a sampling bias would be a problem with
23  the way the survey methodology was constructed.  A
24  nonsampling -- or I assume.  I'm not a statistician.  I
25  probably shouldn't even answer it.  It would be a case

Page 115

1  where, for example, that there is not a hundred percent
2  complete count actually because some people are missed,
3  some people are double counted.
4    Q.  All right.  And are you aware of any efforts
5  from the Census Department to assess the size of a
6  decennial census's nonsampling bias?
7    A.  I'm aware but I couldn't tell you what studies
8  there are or exactly what the percentage bias might be.
9    Q.  And are you aware that the census does a very
10  careful follow-up to the census and they carefully
11  measure the level of nonsampling bias?
12    A.  I know they do lots of follow-up studies.
13    Q.  And are you aware that they actually quantify
14  overcounting and undercounting of various groups?
15    A.  They do that at the national and the state
16  level.  I don't think they do it at the school district
17  level in contrast to the year 2000 when there was
18  actually a secondary alternative file produced that
19  took into account the overcount and the undercount.
20  P.L. 94-171 file.  So that you could have actually used
21  that file to redistrict at the block level.
22    But there were problems with that file ultimately
23  so the Census Bureau disavowed it around 2003 or so.
24  So it was never really used in any of the cases I was
25  ever involved in.  And they did not produce a similar

Page 116

1  undercount/overcount corrected file for the 2010
2  Census.
3    (Defendant's Exhibit G was marked for
4    identification.)
5    Q.  (By Ms. Ormsby)  Can you tell me what this is?
6    A.  The Census Bureau releases estimates of
7  undercount and overcount in the 2010 Census.
8    Q.  And if you could go halfway down the page
9  where it says variation by characteristics, do you see
10  that?
11    A.  Yes.
12    Q.  And if you go then to the third paragraph
13  under that, it starts, "As with prior censuses,
14  coverage varied by race and Hispanic origin."  Could
15  you read that next sentence?
16    A.  What's the -- I'm sorry.  Where are you
17  talking about?
18    Q.  Three paragraphs down under the heading
19  Variation By Characteristics.
20    A.  I see that.
21    Q.  And the first sentence is, "As with prior
22  censuses, coverage varied by race and Hispanic origin."
23  Do you see that?
24    A.  Uh-huh.  Yes, I do.
25    Q.  What does the next sentence say?

Page 117

1    A.  You're saying the 2010 Census is undercounted?
2    Q.  Overcounted.
3    A.  Oh, overcounted.  Okay.  Nationwide, the 2010
4  Census overcounted the non-Hispanic white alone
5  population by zero point eight percent, not
6  statistically different from an overcount of one point
7  one percent.  Of course that's nationwide.
8    Q.  One point one percent in 2000?
9    A.  Right.  But I have to stress this is a
10  nationwide study, so it has no relevance for
11  Ferguson-Florissant.  It means nothing.
12    Q.  Well, in your opinion, correct?
13    A.  In my opinion, yes.
14    Q.  And then could you read the first sentence of
15  that next paragraph?
16    A.  "The 2010 Census undercounted two point one
17  percent of the black population, which was not
18  statistically" significant -- "which was not
19  statistically different from a one point eight percent
20  undercount in 2000."
21    Q.  Okay.  So are you aware that the census used a
22  sample for this study?
23    A.  A sample for what study?
24    Q.  This study, to correct the 2010 census.
25    A.  Well, they're not correcting the 2010 Census.

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 118

1    I think they're just doing an analysis of undercount
2    and overcount nationwide.  So this is not a correction
3    as opposed to the file that actually exists for 2000
4    that did do an undercount/overcount all the way down to
5    block level.
6        I mean, they were using statisticated statistics
7    to do it.  And because of that, eventually they
8    disowned that particular population data set due to
9    other issues relating to sampling error and nonsampling
10   error.
11       Q.  From 2000?
12       A.  Right.
13       Q.  We're talking about 2000?
14       A.  Right.  Right.  So they did not do it again in
15   2010.
16       Q.  But this document is related to the 2010
17   Census; is that correct?
18       A.  Right.  But nationwide.
19       Q.  Nationwide.
20       And your colleague Dr. Gordon used nationwide
21   figures to determine the percentage of disenfranchised
22   African Americans in the Ferguson-Florissant School
23   District, right?
24       A.  Well, I don't know.  I've not seen the report.
25   And you're telling me that and I assume that.

Page 119

1        Q.  And if he did that, is it okay for him to use
2    a national number to determine disenfranchised African
3    Americans but not to adjust your numbers when it comes
4    to BVAP?
5        A.  Well, he can do what he wants to do.  It is
6    somewhat speculative.  But I'm saying that just from my
7    own opinion.  That has nothing do with his work
8    regarding Gingles 2 and 3.
9        But to really -- to really be definitive we would
10   need to know the numbers of black felons in the school
11   district vis-a-vis white felons and then arrive at a
12   figure.
13       Q.  So as a result of this release from the Census
14   Bureau you would not adjust your numbers in any way?
15       A.  Oh, of course not.  This is nationwide.  It
16   has absolutely no relevance.
17       I do recall reading it.  In fact, I remember
18   reading the next paragraph.  "Coverage of the American
19   Indian and Alaska Native population varied by
20   geography.  American Indians and Alaska natives living
21   on reservations were undercounted by four point nine
22   percent, compared with a zero point nine percent
23   overcount in 2000.
24       Now, I read that paragraph.  I remember reading
25   this.  And I'm involved in a very significant case,

Page 120

1    Section 2 case, out in San Juan County, Utah, where
2    Indians make up about fifty-one percent of the voting
3    age population and about fifty-four percent of the
4    total population.
5        I chose not to use this in that case in my expert
6    report because it's a nationwide study.  And I cannot
7    take four point nine percent and nationwide --
8    indicating an undercount nationwide and apply that
9    specifically to the portion of the Navaho Reservation
10   which is in San Juan County.
11       So that's an instance of where I'm being
12   completely consistent in not using data that is
13   extremely favorable to my position because it's
14   nationwide data and not local data.
15       Q.  So, I think I'm clear on the fact that you do
16   not believe that an expert should use nationwide data
17   to affect local numbers?
18       A.  To affect local numbers?
19       Q.  Uh-huh.
20       A.  Probably not.  But there's nothing wrong with
21   Dr. Kimball pointing that out.  But it shouldn't have
22   an impact on how you're drawing districts at the block
23   level in a Gingles 1 exercise.
24       Q.  Okay.  In Dr. Rodden's initial report he shows
25   that the white population is more geographically

Page 121

1    concentrated than the black population.  Have you used
2    data from census blocks, block groups, or tracts to
3    examine the relative geographic concentration of
4    African Americans and whites in the district?
5        A.  No.  I think -- I mean, that's interesting
6    that he applied that measure.  Yeah, I suppose it's
7    interesting but it's going a step beyond what's
8    necessary in a Gingles 1 case because I share in my
9    opinion without a doubt conclusively that African
10   Americans live in an area that is sufficiently compact.
11   And they're numerous enough to be included in four out
12   of seven majority black districts.
13       And I've shown that graphically as well at the
14   block group level and also looked at census blocks.
15       And so, you know, that measure is fine and it does
16   show a certain level of integration perhaps compared to
17   some places but it's not enough to overcome the Gingles
18   1 yardstick that we can get four out of seven districts
19   easy.
20       Q.  And you don't think it's useful for the court
21   to know that whites are more geographically
22   concentrated than African Americans?
23       A.  It doesn't mean anything.  But there's nothing
24   wrong with telling the court that.  And you can sort of
25   maybe see that even from my block group map.  You can

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 122

1    see that a large chunk of the whites appear to live in
2    old town Florissant and a little bit up towards
3    Jamestown. You can see it on my block group map.
4        Q. So if African Americans and whites are roughly
5    similar in their population size, as you've already
6    stated in your report, wouldn't a system of
7    single-member districts actually be better for whites
8    if they're more geographically concentrated?
9        A. Sometime deep in the future maybe. If your
10   demographers are correct that the trend is going
11   towards higher and higher African-American populations,
12   maybe but maybe not. I mean, at some point with
13   single-member districts as the percentage of blacks
14   increase in the school district, assuming it does, then
15   it will be easier to create five and then six. That's
16   what happened over in Albany County, New York, over
17   time where it's gone from three to four to five with
18   each successive census.
19       So I could easily envision, assuming trends result
20   in a higher majority -- a higher percentage of African
21   Americans in 2020, I could easily envision where you
22   could get five out of seven and still conform to
23   traditional redistricting principles. Or you could do
24   that now for that matter.
25       Q. Okay. On page 9 and 10, paragraph 16 of your

Page 123

1    supplemental report. You argue we should use visual
2    reality rather than looking at geographic concentration
3    indexes or the dissimilarity index; is that right?
4        A. Well, you know, it's fine to do that, to use
5    dissimilarity indexes or indices, but in this case you
6    can quickly tell from this map in Figure 2 and the
7    accompanying map in the -- I don't know what the
8    exhibit is. I think it's like B or B-2 or C or
9    something in my -- with my original expert report.
10       You can see that African Americans are
11   sufficiently concentrated in the south end as well as
12   part of the northern part of the district to create
13   four out of seven districts.
14       Q. Okay. So I grew up in Ferguson-Florissant
15   School District so I know the area really, really well.
16       A. Uh-huh.
17       Q. So will you agree with me that the part that's
18   dark pink, I will say, that is to the -- in the
19   center -- or south of 270, west of 170 is almost all
20   airport?
21       A. That's true. But it's a single census block
22   group. For whatever reason they did not create a
23   second block group of just the airport. Sometimes the
24   Census Bureau does that there, I think. But in this
25   case, it's all one block group.

Page 124

1        And if we look at Exhibit -- Exhibit C, we have
2    population totals for black population. And it's kind
3    of hard to see those little purple lines, but that
4    particular block group that includes the airport
5    extends all the way over to Kinloch. And it has five
6    hundred and sixty-one persons. And there's another
7    block group south of 70 with seven hundred and
8    forty-eight.
9        Q. I just want to make a point about your visual
10   inspection here. Looking at this map where you made
11   the report -- made the point in this report, not your
12   initial report, that visual inspection is usually good.
13   But wouldn't a general visual inspection of this give
14   the wrong impression of the number of blacks living in
15   that section when we know there's no blacks living or
16   anybody living in the airport?
17       A. Well, you know, not really. It would actually
18   show that the minority population is even more
19   concentrated because you've got the airport there. And
20   you can pretty much see where it is because there's no
21   roads or anything.
22       If you blank that out and just made it gray, like
23   I did for part of the Hazelton component of the school
24   district, then what you would have basically all
25   that population being concentrated over around Kinloch

Page 125

1    and so it would be more concentrated.
2        Q. But what I see being from the area is one
3    concentrated area in the south of the district of
4    majority African Americans, one concentrated area in
5    the north part of the district around Old Town
6    Florissant of white population, and the entire rest of
7    the distract fairly integrated. That's what I see.
8    That's what my visual inspection says.
9        A. Well, yeah. I mean, the area around Old Town
10   is under twenty percent black so that's predominantly
11   white area concentrated, and then there are some blocks
12   in the north that appear to be reasonably integrated,
13   forty to sixty percent, and a lot of the south end,
14   everything south of 270 -- well, not everything but
15   everything from, you know, Ferguson and over into the
16   Kinloch and Berkeley areas is sixty to eighty or even
17   eighty to ninety-five percent black.
18       But in some ways you don't even have to do the
19   block group level analysis. If you can show as I have
20   shown in the Illustrative Plans 1 and 2 that you can
21   draw two reasonably compact -- two different plans that
22   are reasonably compact -- with reasonably compact
23   districts following traditional redistricting
24   principles, then you've basically proven Gingles 1.
25       Now, there's nothing wrong with doing the work

32 (Pages 122 to 125)

f65cdf2d-136b-4c46-a8ec-392618531a5e

Page 126

1    that Dr. Rodden does and I'm sure it's great for
2    academic papers and what -- it may show something, it
3    may not. But it's just not going to -- it's not going
4    to be particularly meaningful for Gingles 1.
5        Q. I'm only talking about your comment that
6    visual reality is -- visual inspection is probably more
7    effective than the calculations of dissimilarity
8    indexes. And I'm saying my visual inspection shows a
9    fairly integrated school district.
10       A. Okay. Well, you have your opinion, I have my
11   opinion. And we'll let the judge have his opinion.
12       Q. So doesn't the fact that our opinions are
13   different show that it's probably a better way to
14   settle this is by using statistics?
15       A. No, no, it really doesn't.
16       Q. Really? Okay.
17       A. That particular statistical measure is really
18   meaningless for Gingles 1.
19       Q. Are you aware of any cases in which the ACLU
20   actually uses quantitative indicators of segregation or
21   geographic concentration to address Gingles 1?
22       A. No.
23       Q. None?
24       A. Not that I've ever been involved in.
25       Q. They always use visual inspections?

Page 127

1        A. Yes. But, you know, I haven't been involved
2    in all of them. I've never been involved in any case
3    where a dissimilarity index was used.
4        Q. How about geographic concentration index, ever
5    been involved in a case that uses that?
6        A. Neither.
7        MS. ORMSBY: Can we take maybe about a
8    ten-minute break. I'm about done. Just want to go
9    over some notes.
10       (Short break.)
11       Q. (By Ms. Ormsby) I just have, hopefully, two
12   more questions, depending on your answers.
13       A. First one is, well, I won't give you the
14   answers yet.
15       MR. McDONALD: Yes or no.
16       A. Maybe, maybe.
17       I don't know if that would work either.
18       Q. (By Ms. Ormsby) Have you been asked to form
19   an opinion on any subject that is not included already
20   in your two submitted reports?
21       A. I don't believe so.
22       Q. Do you plan or have you been asked to do any
23   additional work on this between now and trial?
24       A. Not been asked to but I could.
25       Q. But as of today you have not been asked to?

Page 128

1        A. As of today I have not.
2        MS. ORMSBY: I have nothing further.
3        MR. McDONALD: We have no questions at this
4    time.
5        MS. ORMSBY: Waive signature or not?
6        THE WITNESS: I constantly misspeak and speak
7    in fragments with improper punctuation and verb tense
8    so I will certainly want to sign it myself and fix it.

Page 129

MCGRAW REPORTING, L.L.C.
Certified Court Reporter
2927 Droste Road
St. Charles, MO  63301
314.704.2727

August 23, 2015

American Civil Liberties Union
Ms. Sophia Lin Lakin
125 Broad Street, 18th Floor
New York, New York 10004-2400

In re:  Deposition of William Cooper
       NAACP, et al vs. Ferguson-Florissant

Dear Ms. Lakin,
    Enclosed please find your copy of the transcript,
the original signature page, and the errata sheets for
the deposition of Mr. Cooper. Please have him read the
transcript, make any necessary corrections on the
errata sheets, and sign the original signature page and
the errata sheets in front of a notary public.

    Please send the signed and notarized signature
page and errata pages directly to Ms. Ormsby, as she
will have the original transcript.

    If you have any questions, please don't hesitate
to call me.

                    Sincerely,


                    Sandy McGraw

33 (Pages 126 to 129)

f65cdf2d-136b-4c46-a8ec-392618531a5e

## Page 130

1     I, WILLIAM COOPER, do hereby state that I have
2  read the foregoing questions and answers in this
3  transcript of my deposition, page 5 through and
4  including page 128, and that this is a true and
5  accurate report of said answers given in response to
6  the questions propounded and appearing herein.

7

8     _____

9       WILLIAM COOPER

10

11

12    Subscribed and sworn to before me this _____

13  day of _____, 2015.

14    _____

15       NOTARY PUBLIC

16

17   My commission expires _____.

18
19
20
21
22
23
24
25

## Page 131

1      E R R A T A  S H E E T
2    I do hereby certify that I have read the foregoing
deposition and that, to the best of my knowledge, said
3  deposition is true and accurate (with the exception of
the following corrections listed below):

4
5  PAGE/LINE   CORRECTION AND REASON FOR CORRECTION
6
7
8
9
10
11
12
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24     _____
25       WILLIAM COOPER

## Page 132

1      E R R A T A  S H E E T
2    I do hereby certify that I have read the foregoing
deposition and that, to the best of my knowledge, said
3  deposition is true and accurate (with the exception of
the following corrections listed below):

4
5  PAGE/LINE   CORRECTION AND REASON FOR CORRECTION
6
7
8
9
10
11
12
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24
25     _____
        WILLIAM COOPER

## Page 133

1  STATE OF MISSOURI    )
                 ) ss
2  COUNTY OF ST. CHARLES  )
3
4    I, Sandra McGraw, Certified Court Reporter within
5  and for the State of Missouri, do hereby certify that
6  pursuant to agreement between counsel came before me in
7  the law offices of Crotzer & Ormsby, 130 South Bemiston
8  Avenue, Suite 602, in the County of St. Louis, State of
9  Missouri, WILLIAM COOPER, who was by me first duly
10  sworn to testify the whole truth of his knowledge
11  touching the matter in controversy aforesaid; that he
12  was examined and his examination was reduced to
13  shorthand writing by me on the day, between the hours,
14  and at the place, and in that behalf aforesaid; and
15  afterwards transcribed into typewriting, and presented
16  to the deponent for signature and his said deposition
17  is now herewith returned.

18
19    IN WITNESS WHEREOF, I have hereunto subscribed my
20  name on this _____ day of _____, 2015.
21
22
23     _____
24      Sandra McGraw, CCR #614
25

McGraw Reporting, L.L.C. (314) 704-2727

f65cdf2d-136b-4c46-a8ec-392618531a5e