EXHIBIT N

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

# CUMULATIVE AND LIMITED VOTING:
## MINORITY ELECTORAL OPPORTUNITIES AND MORE[1]

### RICHARD L. ENGSTROM*

#### INTRODUCTION

Geographically based majority-minority single member districts (SMDs) have been the medium generally, but not exclusively, for providing minority groups protected by the Voting Rights Act (VRA) with new opportunities to elect representatives of their choice to legislative bodies.[2] Two other election systems have been used for this purpose as well: cumulative (CV) and limited voting (LV). Depending on the situation, these alternative systems can provide electoral opportunities for minorities when majority-minority SMDs cannot be created and sometimes provide more and/or better opportunities even when such districts can be created. While proposed at times for the election of members of the United States House of Representatives and state legislatures,[3] their adoption so far has been limited to elections for local legislative bodies.

---

1. This is a revised and updated version of a paper presented at the Symposium on "Voting 25 Years after the Voting Rights Act," *St. Louis University Public Law Review*, St. Louis, MO, Mar. 26, 2010.

* Visiting Research Fellow at the Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University. *Disclosure*: The author served as an expert witness for the defendants in the remedial portions of the two cases that are the focus of this article, *United States of America v. Village of Port Chester, NY* and *United States of America v. Euclid City Sch. Bd.* The defendants' preferences for cumulative or limited voting remedies in these cases were established prior to his retention in both instances. Portions of this paper rely heavily on his reports in those cases.

2. Minority groups protected by the VRA are African Americans and "language minorities." 42 U.S.C. §§ 1973(a), 1973b(f)(2) (2006). "Language minorities" are defined in the statute as Latinos, Native Americans, Asian Americans, and Alaskan Natives. 42 U.S.C. § 1973*l*(c)(3) (2006).

3. For cumulative voting, *see, e.g.*, Dan Johnson-Weinberger, *Cumulative voting legislation introduced in state senate*, CHI. INDEP. MEDIA CTR. (Oct. 14, 2001, 11:50 PM), http://chicago.indymedia.org/newswire/display/5413/index.php. On limited voting, *see, e.g.*, Lee Mortimer, *Want Political Competition?; Create Multi-member Legislative Districts, Allow Each Voter Just One Vote*, CHARLOTTE OBSERVER, Nov. 19, 2006, at A26.



DEFENDANT'S EXHIBIT
Sm-8-18-15

*SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW* [Vol. XXX:97]

There are about 100 local governing bodies across seven states now using CV or LV for this purpose.[4]  Almost all of these adoptions have been in response to vote dilution litigation under the Voting Rights Act (VRA), or threats thereof, alleging that at-large (jurisdiction-wide) elections used to elect members of these bodies dilute the votes cast by minority voters.  The critical issue in these cases is whether an at-large system has the effect of submerging the votes of minority voters into those cast by the rest of the electorate, thereby denying minority voters with equal opportunities to elect representatives of their choice.  Minority plaintiffs have been the party that proposed these systems, often in the context of settlement.[5]  In the past few years however some defendant jurisdictions have brought these alternatives to the table, and more can be expected to do so in the future.

Local government jurisdictions have discovered that their at-large election systems can be cleansed of dilutive effects by attaching either CV or LV rules to the at-large format.  This also allows them to avoid features of SMD systems that they consider unfavorable, especially in jurisdictions that have a small population or small geographic area.  Recently, two defendant jurisdictions, after federal courts found their at-large arrangements to be impermissibly dilutive, have expressed a preference for these systems over SMDs as remedies for the problem, and in both instances federal courts have adopted these systems rather than the plaintiffs' proposed SMD remedies.  This will no doubt stimulate increased interest in these modified at-large systems by numerous local government jurisdictions in the future.

The two recent cases were challenges brought by the United States Department of Justice (DOJ), on behalf of protected minorities, to local government at-large election systems under section 2 of the VRA.[6]  The DOJ brought suit in late 2006 against the Village of Port Chester, New York, a jurisdiction 2.4 square miles in area with a population of 27,867 according to the 2000 census,[7] claiming that the at-large system used to elect its Board of Trustees diluted the voting strength of the village's Latino minority.[8]  The citizen voting age population (CVAP) in the village was estimated by a DOJ

---

4. Sixty-two such bodies use cumulative voting and thirty-five use limited voting.  *See Communities in America Currently Using Proportional Voting*, FAIRVOTE, http://archive.fairvote.org/?page=2101.

5. *See, e.g.*, Edward Still, *Cumulative and Limited Voting in Alabama, in* UNITED STATES ELECTORAL SYSTEMS: THEIR IMPACT ON WOMEN AND MINORITIES 183 (Wilma Rule and Joseph Francis Zimmerman eds., 1992).

6. Section 2 of the VRA precludes electoral arrangements that provide a protected group with less opportunity to elect representatives of their choice than "other members of the electorate." 42 U.S.C. § 1973(b) (2006).

7. Declaration of Andrew A. Beveridge at 4, United States v. Vill. of Port Chester, 704 F. Supp. 2d 411 (S.D.N.Y. 2010) (No. 06-15173).

8. Complaint at 1, *Vill. of Port Chester*, 704 F. Supp. 2d 411 (No. 06-15173).

expert witness to be 27.5% Latino that year.[9]  After a federal court, in 2008, agreed with the DOJ,[10] the village proposed CV as the remedy for the dilution. Over the objections of the DOJ, the court approved the use of the CV alternative.[11]  The first CV election in the village was on June 15, 2010, and resulted in the election of the first Latino to the Board of Trustees.[12]

The DOJ also sued the Euclid City School Board (Euclid CSB) in Ohio in late 2008, claiming that the at-large election system for its Board of Education similarly diluted the voting strength of the African American minority in the school district.[13]  The district is 10.3 square miles in area[14] and had a population of 51,357 in 2007, according to the estimate provided by the American Community Survey for that year.[15]  African Americans comprised 40.2% of the voting age population.[16]  This case followed a decision by a federal court in another lawsuit brought by DOJ challenging the mixed election system, containing both at-large and district elections, for the Euclid City Council.  The court in that case held that the at-large portion of this system diluted the voting strength of the city's African American minority.[17]

The Euclid CSB and the City of Euclid are coterminous jurisdictions, and therefore share the same electorate.[18]  In light of the decision in the city case, the school board stipulated that its at-large format had the same dilutive effect in school board elections.[19]  Unlike the city, however, the school board eschewed an SMD remedy, again favored by DOJ, preferring instead either CV or LV as the remedy.[20]  The court approved the LV voting option.[21]  Voters would have one vote in each of the staggered school board elections, with

---

9. All estimates for 2006 in the case are found in Declaration of Andrew A. Beveridge, *supra* note 7, at 4, 6.

10. *Vill. of Port Chester*, 704 F. Supp. 2d at 416.

11. *Id.*

12. *See infra* Part V.

13. United States v. Euclid City Sch. Bd., 632 F. Supp. 2d 740, 743 (N.D. Ohio 2009).

14. *About the City of Euclid: Statistics*, CITY OF EUCLID, http://www.cityofeuclid.com/about/census (last visited Mar. 8, 2011).

15. *See* U.S. Census Bureau, 2005-2007 American Community Survey 3-Year Estimates, http://factfinder.census.gov/servlet/CTTable?_bm=y&-context=ct&-ds_name=ACS_2007_3YR_G00_&-mt=_name=ACS_2007_3YR_G2000_B09001&-tree_id=3307&-redoLog=false&-geo_id=06000US3903525704&-search_results=01000US&-dataitem=ACS_2007_3YR_G2000_B0100 3.B01003_1_EST|ACS_2007_3YR_G2000_B09001.B09001_1_EST&-format=&-subj_treenode _id=17465966&-_lang=en.

16. *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 745.

17. United States v. City of Euclid, 523 F. Supp. 2d 641 (N.D. Ohio 2007); United States v. City of Euclid, 580 F. Supp. 2d 584, 586, 613 (N.D. Ohio 2008).

18. Factual Stipulation of the Parties as to Liability at 2, *Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (No. 08-2832), ECF No. 2.

19. *Id.* at 2, 5.

20. *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 744–45, 755.

21. *Id.* at 771.

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

three-seats up one year and two the other.[22] The first LV election did not result in the election of the only African American candidate, but did result in the candidate clearly preferred by the African American voters being elected.[23]

This article addresses how CV and LV systems work, and how they provide electoral opportunities for minority voters. It also identifies other features of these systems, or consequences of them, that jurisdictions might find attractive, as did Port Chester and the Euclid CSB, as well as features of the SMD system that jurisdictions might find unattractive, as was also the case

---

22. *Id.* at 744–46.

23. *See* Table 6, *infra.* Two other cases recently brought by the DOJ were settled by the adoption of a one vote LV system. One filed in 2009 concerned at-large elections for the Commission in the Town of Lake Park, Florida. Consent Judgment and Decree at 1, United States v. Town of Lake Park, Fla., No. 09-80507 (S.D. Fla. Oct. 26, 2009), ECF No. 39. The town is 2.3 square miles in area with a population of 8,721 according to the 2000 census. *Id.* at 2; Telephone Interview with Thomas J. Baird, Attorney for Lake Park, Fla. (Feb. 3, 2010). African Americans constituted 38% of the VAP in the city at that time. Consent Judgment and Decree, *supra* note 23, at 2. Prior to trial, the town proposed to add either CV or LV to its at-large election system, and the case was settled when the DOJ accepted the limited voting alternative, a one vote per voter in four-seat elections. *Id.* at 4; Telephone Interview with Thomas J. Baird, *supra* note 23.

The other case, an enforcement action by DOJ under section 5 of the VRA, resulted in the adoption of LV on an interim basis in the City of Calera, Alabama. Calera's total population was estimated by the U.S. Census Bureau to be 9,398 as of July 2007, and African Americans reportedly constituted 16.5% of the registered voters in the city as July 30, 2008. Complaint at 4, United States v. City of Calera, 08-BE-1982-S (N.D. Ala. Oct. 24, 2008), ECF No. 1. Section 5 imposes a "preclearance" requirement on jurisdictions, primarily in the South, that are captured by a coverage formula contained in section 4 of the Act. 42 U.S.C § 1973(c) (2006). This requires covered jurisdictions, prior to implementing any change in their election arrangements, to convince the DOJ, or a three-judge panel of the U.S. District Court for the District of Columbia, that the change will not have a retrogressive purpose or effect on minority voters' opportunity to elect representatives of their choice. *Id.* For a brief overview of section 5 and a recent constitutional challenge to it, *see* Richard L. Engstrom, *NAMUDNO: A Curveball on Voting Rights*, 30 JUST. SYS. J. 351 (2009). The DOJ has rarely denied preclearance to at-large elections with CV or LV rules.

Calera had not received preclearance for 177 annexations, nor for a 2008 redistricting plan for elections to its city council that included the annexed areas. Complaint, *supra* note 23, at 5. This plan eliminated the only African American majority district in the city, which had been the source for the only African American representative on the council. *Id.*; Telephone Interview with Frank C. Ellis, Attorney for Calera (July 3, 2010). The DOJ in 2008 objected to the annexations and the new districts, resulting in the 2008 municipal election held the day after the objection being invalidated. Complaint, *supra* note 23, at 5–6. The enforcement action was settled by an agreement to use a LV system, a one vote for six seats arrangement, until the city precleared a new election arrangement following the 2010 census. Judgment and Order Modifying Consent Decree, *City of Calera*, 08-BE-1982-S, ECF No. 10; Telephone Interview with Frank C. Ellis, *supra* note 23.

in Port Chester and the Euclid CSB. The decisions in these cases, which were fully litigated, will be highlighted.[24]

## I. MINORITY ELECTORAL OPPORTUNITIES

Local legislative bodies are often elected through jurisdiction-wide elections in which all the voters may cast votes for as many candidates as there are seats to be filled.[25] This is especially common in jurisdictions with relatively small populations. Many counties, municipalities, and school districts employ this format to elect their legislatures.[26] For example, if there are five seats to be filled in an election to such a body, all of the voters residing in the jurisdiction may cast a vote for up to five candidates. There are numerous variations in how at-large elections are implemented, but regardless of the particular arrangement, this system does have a tendency to favor the candidates preferred by a majority group, or at least the largest group, of voters within the jurisdiction.[27] It provides the largest group of voters an opportunity to determine the winners of all of the seats.

Minority groups protected by the Voting Rights Act have been particularly vulnerable to being left without any representation by people from within their own group when these arrangements have been employed.[28] If their preferences among the candidates are not shared by the other voters, the other voters can veto their choices.

### A.  *Cumulative Voting*

In an at-large CV system, each voter may be provided with as many votes as there are seats to be filled in a particular election.[29] However, the usual restriction, in this country at least, that only a single vote may be cast for any particular candidate is removed. Voters have more flexibility in exercising their franchise under CV. They may distribute their votes across their preferred candidates as they wish. In a five-seat, five-vote context, for example, voters retain the option of providing a single vote to five different candidates. But if a voter prefers two candidates more intensely than the

---

24. The DOJ appealed the district court's decision in the Euclid case, but the appeal was voluntarily dismissed. Order Granting Voluntary Dismissal, United States v. Euclid City Sch. Bd., No. 09-4154 (6th Cir. Nov. 13, 2009).

25. *Communities in America Currently Using Proportional Voting*, *supra* note 4.

26. *Id.*

27. *See* Richard L. Engstrom & Michael D. McDonald, *'Enhancing' Factors in At-Large Plurality and Majority Systems: A Reconsideration*, 12 ELECTORAL STUD. 385, 385–86 (1993).

28. *See* THE QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT 1965-1990 at 7 (Chandler Davidson & Bernard Grofman eds., 1994).

29. Richard L. Engstrom, Delbert A. Taebel & Richard L. Cole, *Cumulative Voting as a Remedy for Minority Vote Dilution: The Case of Alamogordo, New Mexico*, 5 J.L. & POL. 469, 476–77 (1989).

*SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW* [Vol. XXX:97]

others, for example, he or she may cast three votes for one of them and two votes for the other, while a voter who strongly prefers the election of one particular candidate may cast all five of their votes for that candidate (a practice known as "plumping"). Generally, the only restriction in distributing votes among the candidates is that the votes be cast in whole units.[30] The winning candidates in a CV election are determined by a simple plurality rule, i.e., the five candidates receiving the most votes are elected to the five seats.[31]

Despite the at-large context, minority voters can have opportunities to elect representatives of their choice when CV rules are employed. The removal of the limit of one vote for any particular candidate permits minority voters, and all other voters, to cast a more efficacious type of "single-shot" vote than they may in more traditional multi-seat elections. The single-shot voting strategy entails group members voting for only one particular candidate. Under the traditional voting rules, when a group employs the single-shot strategy, members of the group do not use all the votes available to them.[32] The group's voters cast a vote for the candidate that they want elected, and *withhold* the rest of their votes from all of the other candidates so as not to add to the vote totals of those other candidates.[33] The idea behind single-shot voting is that by voting for one particular candidate and not contributing votes to the others, the candidate preferred by the group might finish among the top N vote recipients (N is the number of seats being filled) and win one of the seats.[34]

When CV rules are used, a group will not need to withhold its remaining votes, as the group's voters may cast those votes as well for the candidate or candidates of their choice. CV allows voters to concentrate their votes much more effectively, and thereby increase the opportunity that minority group voters have to elect representatives preferred by them. A group does not have

---

30. Cottier v. City of Martin, 475 F. Supp. 2d 932, 936 (D.S.D. 2007), *vacated on other grounds by* Cottier v. City of Martin, 604 F.3d. 553 (8th Cir. 2010).

31. It is not necessary that voters cast votes in whole units. In Peoria, Illinois, for example, a five-seat, five-vote cumulative system has been adopted whereby voters simply identify up to five candidates for whom they vote and then their five votes are allocated evenly among those candidates. Larry T. Aspin & William K. Hall, *Cumulative Voting and Minority Candidates: An Analysis of the 1991 Peoria City Council Elections*, 17 AM. REV. POL. 225, 226–28 (1996). If a voter votes for only one candidate, five votes are allocated to that candidate. *Id.* If a voter votes for two candidates, then two and one-half votes are allocated to each. *Id.* If a voter votes for three, four, or five candidates, then one and two-thirds votes, one and one-fourth votes, or one vote, respectively, are allocated to each of the chosen candidates. *Id.* For analyses of CV elections in Peoria, *see id.*; Larry T. Aspin, *Cumulative Voting and Straight Voting: An Empirical Comparison*, 22 AM. REV. POL. 55 (2001).

32. Engstrom & McDonald, *supra* note 27, at 386.

33. *Id.*

34. The successful application of the single-shot strategy depends not only on a group's voters complying with it, but also on the other voters dispersing their votes across more candidates than there are seats to be filled. *See id.*

to constitute a plurality of the voters in the entire jurisdiction in order for a candidate or candidates preferred by it to receive enough votes to finish among the top N candidates.

An at-large CV system satisfies the basic "one person, one vote" rule, or individual voter equality requirement, because every voter has the same number of votes and the same options through which to cast them. Every voter, in short, is treated equally.[35]

This alteration in the voting rules within an at-large system, however, can cleanse the multi-seat format of its tendency to dilute the vote of a minority. The alteration in the voting rules counters the submergence effect that so often accompanies the traditional rules, and thereby can provide minority voters with opportunities to elect representatives of their choice, even when voting occurs along group lines. These opportunities can be demonstrated theoretically through a coefficient known as the *Threshold of Exclusion*.[36] This coefficient identifies the percentage of the electorate that a group must exceed in order to elect a candidate of its choice *regardless of how the rest of the voters vote*.[37] This coefficient is based on a set of worst-case assumptions, from the minority group's perspective, about the behavior of the other voters.[38] These assumptions are:

(1) the other voters cast all of the votes available to them, but

(2) none of their votes are cast for the candidate preferred by the minority voters, but rather are

(3) concentrated entirely on a number of other candidates equal to the number of seats to be filled, and are

(4) divided evenly among those other candidates.[39]

The other voters, in short, are assumed to cast their votes as efficiently as possible in a multi-seat election.

---

35. When adopting a CV remedy for a dilutive elective system for the city council in Martin, SD, in 2007, the District Court stated "Plan C [the CV system] achieves precise population equality because the entire City of Martin is contained in one district and all voters in that district receive three votes." *City of Martin*, 475 F. Supp. 2d at 939. *See also* McCoy v. Chi. Heights, 6 F. Supp. 2d 973, 984 (N.D. Ill. 1998) ("By allowing each voter the same number of votes, cumulative voting subscribes to the one-person, one-vote requirement with numeric exactness."), *reversed sub nom. on other grounds by* Harper v. City of Chi. Heights, 223 F.3d. 593 (7th Cir. 2000).

36. Douglas Rae, Victor Hanby & John Loosemore, *Thresholds of Representation and Thresholds of Exclusion: An Analytic Note on Electoral Systems*, 47 COMP. POL. STUD. 479, 480 (1971).

37. Robert R. Brischetto & Richard L. Engstrom, *Cumulative Voting and Latino Representation: Exit Surveys in Fifteen Texas Communities*, 78 SOC. SCI. Q. 973, 982 (1997).

38. *Id.*

39. *Id.* at 982 n.19.

104          *SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW*          [Vol. XXX:97

The formula for calculating the threshold of exclusion values for CV systems, expressed as a percentage, is:[40]

$$\frac{1}{1 + (\text{Number of Seats})} \times 100$$

In a four-seat, four-vote cumulative context, therefore, the threshold of exclusion is 20.0%. In other words, out of 1,000 voters, if a group constituting 20% + 1, or 201, of the voters chooses to "plump" all of their votes for a particular candidate, giving him or her 804 votes, then that candidate must win one of the seats. The other 799 voters could distribute their 3,196 votes evenly across four other candidates, resulting in each receiving 799 votes. In this situation, the candidate preferred by the minority will be a winner. If the other voters deviate from the worst-case assumptions, for example by giving more votes to one of their choices, then at least one of their other choices would have fewer votes than 799 and the minority preferred candidate would still win a seat. Values of the threshold of exclusion for different numbers of seats are reported in Table 1. As is clear from the table, when the number of seats at issue in an election increases, the value of the threshold always decreases.

The threshold of exclusion, it must be remembered, identifies the percentage of the voters in a particular election that a group sharing the same candidate preference must exceed in order to elect that candidate with *no assistance whatsoever from the other voters*.[41] If the behavior of other voters deviates in any way from the worst-case assumptions, then a minority group may be smaller and/or less cohesive in its preferences and still have a realistic opportunity to elect a representative or representatives of its choice.[42] As the federal District Court in *Dillard v. Chilton County* recognized, the threshold of exclusion for CV systems is "not an automatic cut-off point" for minority electoral success, but it does serve as a useful guideline.[43]

---

40. *Id.* at 982.

41. *Id.*

42. In the 1995 CV election for the Olton city council in Texas, for example, a Latino candidate preferred by Latino voters was elected to one of the two seats at issue despite the Latino percentage of the turnout being 11% less than the Threshold of Exclusion, 22% versus 33%. *Id.* at 984–85. This result was facilitated by Anglo voters concentrating their votes on a particular Anglo candidate rather than more evenly dividing their vote across two Anglo candidates. *Id.*

43. Dillard v. Chilton Cnty Bd. of Educ., 699 F. Supp. 870, 875 (M.D. Ala. 1988). The court noted that "based on a particular jurisdiction's totality of circumstances, a questioned election system may very well not be adequate for the jurisdiction, even though the percentage of black voters in the jurisdiction exceeds the threshold of exclusion for the system; and conversely, the system may very well be fully adequate in another jurisdiction, even though the percentage of black voters in the jurisdiction is less than the system's threshold of exclusion." *Id.*

Case: 4:14-cv-02077-RWS   Doc. #: 82-13   Filed: 09/30/15   Page: 10 of 42 PageID #: 1266

The ability of minority voters to elect candidates favored by them, but not by other voters, when cumulative voting rules are used has been documented in numerous elections. African Americans, Latinos, and Native Americans have all elected the candidates of their choice under cumulative voting arrangements.[44]

It is sometimes suggested that cumulative voting rules are too complicated for voters to understand and use.[45] Allowing voters to cast more than one vote for a candidate or candidates of their choice, it is alleged, will be a difficult task for voters, especially for less educated voters.[46] This, it is further alleged, will negate the minority electoral opportunities associated with the system because minority voters are more likely to be among the less educated than are white or Anglo voters.[47] These allegations have never been backed up with empirical evidence, however, and studies of cumulative voting elections demonstrate that they are not valid. The studies cited in notes 44 and 45 show that minority voters, including African American voters, have understood, used, and supported the cumulative system in the elections examined.[48] And not only were the minority candidates elected in them the choice of minority voters, but their elections were almost always attributable to minority voters actually cumulating their votes on their behalf. This is true for the African American, Hispanic, and Native American candidates.[49]

---

44. Exit polls have provided documentation that, in the elections studied, the minority candidates that were elected were also the choice of the minority voters. *See generally* Brischetto & Engstrom, *Cumulative Voting and Latino Representation*, *supra* note 37; Engstrom, Taebel & Cole, *Cumulative Voting as a Remedy for Minority Vote Dilution*, *supra* note 29, at 489; Richard L. Cole, Richard L. Engstrom & Delbert A. Taebel, *Cumulative Voting in a Municipal Election: A Note on Voter Reactions and Electoral Consequences*, 43 W. POL. Q. 191, 196 (1990); Richard L. Cole & Delbert A. Taebel, *Cumulative Voting in Local Elections: Lessons from the Alamogordo Experience*, 73 SOC. SCI. Q. 194, 195 (1992); Richard L. Engstrom & Charles J. Barrilleaux, *Native Americans and Cumulative Voting: The Sisseton Wahpeton Sioux*, 72 SOC. SCI. Q. 388, 388–89 (1991); Richard L. Engstrom, Jason Kirksey & Edward Still, *One Person, Seven Votes: The Cumulative Voting Experience in Chilton County, Alabama*, *in* AFFIRMATIVE ACTION AND REPRESENTATION: *SHAW V. RENO* AND THE FUTURE OF VOTING RIGHTS 285, 304–06 (Anthony Peacock ed., 1997).

45. Richard L. Engstrom & Robert R. Brischetto, *Is Cumulative Voting Too Complex? Evidence from Exit Polls*, 27 STETSON L. REV. 813, 817 (1998).

46. *Id.* at 817–19.

47. *See id.*

48. For a review of these findings, *see* Richard L. Engstrom, *The Political Thicket, Electoral Reform, and Minority Voting Rights*, *in* FAIR AND EFFECTIVE REPRESENTATION?: DEBATING ELECTORAL REFORM AND MINORITY RIGHTS 3, 47–49 (Mark E. Rush & Richard L. Engstrom eds., 2001).

49. *See* Brischetto & Engstrom, *Cumulative Voting and Latino Representation*, *supra* note 37, at 979; *see also* Engstrom, Taebel & Cole, *Cumulative Voting as a Remedy for Minority Vote Dilution*, *supra* note 44, at 489–95; Engstrom & Barrilleaux, *Native Americans and Cumulative*

106         *SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW*         [Vol. XXX:97

### B.   Limited Voting

In an at-large limited voting system each voter is given a number of votes that is less than the number of seats to be filled. In a four-seat election, for example, voters may be limited to one vote, or two, or even three votes. When voters receive more than one vote, the usual limit of casting only one vote for any particular candidate applies. As with cumulative voting, winning candidates in a limited voting election are determined by a plurality vote rule; in this example, the four candidates receiving the most votes are each elected to a seat.

Limited voting provides minority voters with an opportunity to elect candidates in a multi-seat election by reducing the ability of a cohesive plurality to win every seat.[50] The restriction on the number of votes reduces the larger group's ability to submerge the votes of a smaller group. The smaller the number of votes allocated to each voter, the fewer votes the larger group has to distribute across the candidates of its choice, and the less dominant it is likely to be. The more limited the vote compared to the number of seats, therefore, the greater the minority voters' opportunity to place a candidate of their choice among the winners. As with cumulative voting, a group does not need to constitute a plurality of the voters for its preferred candidate or candidates to finish among the top number of candidates and win a seat.

The value of the threshold of exclusion for limited voting systems depends on both the number of seats to be filled and how limited the vote is.[51] The formula for calculating the threshold of exclusion for limited voting, based on the same set of worst case assumptions identified above, expressed as a percentage, is:[52]



$$\frac{(\text{Number of Votes})}{(\text{Number of Votes}) + (\text{Number of Seats})} \times 100$$

When the voter is limited to a single vote, as he or she would be in a single member district arrangement, the threshold of exclusion formula and values for limited voting are the same as those for cumulative voting, for example, 20.0% in a four-seat election. In other words, out of 1,000 voters, if a group constituting 20% + 1, or 201, of the voters chooses to vote for the same

*Voting*, *supra* note 44; Engstrom, Kirksey & Still, *One Person, Seven Votes*, *supra* note 44, at 306.

50.  *See* Michael S. Kang, *Voting as Veto*, 108 MICH. L. REV. 1221, 1274 (2010).

51.  Richard L. Engstrom, *Missing the Target: The Supreme Court, "One Person, One Vote," and Partisan Gerrymandering*, *in* REDISTRICTING IN THE NEW MILLENNIUM 313, 331 (Peter F. Galderisi ed. 2005).

52.  *Id.*

Case: 4:14-cv-02077-RWS   Doc. #:  82-13   Filed: 09/30/15   Page: 12 of 42 PageID #: 1268

candidate, giving him or her 201 votes, then that candidate must win one of the seats. The other 799 voters could distribute their votes evenly across four other candidates, resulting in each receiving either 200 or 199 votes. In this situation, the candidate preferred by the minority will be a winner. If the other voters deviate from the worst case assumptions, for example by giving more votes to three of their choices, then their fourth choice would have fewer votes than 199 and the minority preferred candidate would still win a seat. When LV restricts a voter to a single vote, it offers minorities of voters with equivalent opportunities, theoretically, to elect representatives of their choice as does CV (see Table 1).[53]

Table 1: Threshold of Exclusion Values[54]

| Number of Seats | Cumulative Voting | Limited Voting | | |
|---|---|---|---|---|
| | | 1 Vote | 2 Votes | 3 Votes |
| 2 | 33.3 | 33.3 | — | — |
| 3 | 25.0 | 25.0 | 40.0 | — |
| 4 | 20.0 | 20.0 | 33.3 | 42.9 |
| 5 | 16.7 | 16.7 | 28.6 | 37.5 |
| 6 | 14.3 | 14.3 | 25.0 | 33.3 |
| 7 | 12.5 | 12.5 | 22.2 | 30.0 |
| 8 | 11.1 | 11.1 | 20.0 | 27.3 |
| 9 | 10.0 | 10.0 | 18.2 | 25.0 |

## II. APPLICATIONS TO PORT CHESTER AND EUCLID CSB

Neither cumulative nor limited voting guarantee any particular election outcome, but they can, depending on the setting and the implementation, provide minority voters with reasonable opportunities to elect representatives of their choice.[55] The usual procedure for assessing these opportunities is to

---

53. *Id.*

54. Author's calculation based on the formulas described *supra*.

55. CV and LV are incorrectly referred to by some as "proportional representation" systems. *See, e.g.*, Abigail Thernstrom, *Lani's Heir: The New Old Racial Ideology of the Holder Justice*

Case: 4:14-cv-02077-RWS   Doc. #: 82-13   Filed: 09/30/15   Page: 13 of 42 PageID #: 1269

compare a group's percentage of the Voter Age Population (VAP) or CVAP in the jurisdiction to the applicable value for the threshold of exclusion, which, as noted above, varies in a cumulative system with the number of seats to be filled in an election, and in a limited system with the number of seats to be filled and the number of votes each voter may cast. In the Euclid CSB case the number of votes was limited to one, so the value of the threshold in that arrangement is identical to that for a cumulative system when the number of seats to be filled is the same.[56]

The threshold of exclusion, it must be remembered, sets a high bar for assessing electoral opportunities. It does not identify a floor under which a group has no chance of electing a representative of its choice, only a floor for when it can, theoretically, do so without that candidate receiving any votes from other voters.[57] If the worst-case assumptions concerning the voting behavior of the other voters are violated, and it is hard to imagine an election in which they are not, the group at issue could be smaller and/or less cohesive and still elect a representative of its choice. The following provides these comparisons for the Port Chester and Euclid CSB situations.

*A.  Port Chester*

The Port Chester election system that was found to violate the VRA was used to elect a six-member village Board of Trustees.[58] All members were elected at-large to staggered terms, with two members elected every year over three years.[59] The staggered feature of the system, reducing each election to a two-seat contest, presented a potential problem for the viability of the cumulative system. The Court concluded, in its decision on liability, that the staggered elections enhanced the dilutive effect of the at-large system, stating "it is substantially less likely that white bloc voting could defeat all Hispanic-

---

*Department*, NAT'L REV., Dec. 21, 2009, at 34; Cousin v. Sundquist, 145 F.3d 818, 829 (6th Cir. 1998). A proportional representation system is designed to convert the votes of a group into seats for the group in a proportional manner. Arend Lijphart, *Trying to Have the Best of Both Worlds: Semi-Proportional and Mixed Systems*, *in* CHOOSING AN ELECTORAL SYSTEM: ISSUES AND ALTERNATIVES 207, 208–11 (Arend Lijphart & Bernard Grofman eds., 1984). CV and LV are designed instead to counter the "sweep effect" in multi-seat elections, in which one group of voters tends to win all the seats, that benefits majority groups. DAVID FARRELL, ELECTORAL SYSTEMS: A COMPARATIVE INTRODUCTION 45–46 (2001). They are properly classified, therefore, as "semi-proportional," or even "semi-plurality" systems. Duane A. Cooper, *The Potential of Cumulative Voting to Yield Fair Representation*, 19 J. THEORETICAL POL. 277, 280 (2007) (referring to cumulative voting as a "quasi-proportional" system because it "does not impose quotas on how a population should be represented in an elected body.").

56. United States v. Euclid City Sch. Bd., 632 F. Supp. 2d 740, 755 (N.D. Ohio 2009).

57. Engstrom, *Missing the Target*, *supra* note 51, at 331.

58. United States v. Vill. of Port Chester, 704 F. Supp. 2d 411, 416 (S.D.N.Y. 2010).

59. *Id.* at 434.

preferred candidates if all six trustees were chosen at one time."[60]  The same would be true, in the Port Chester context, if cumulative voting elections were for six rather than for two seats at a time.[61]

Table 2 contains information comparing the Latino percentage of the CVAP in Port Chester to the threshold of exclusion for each proposed remedy. Identified in the first column of Table 2 are the different values of the threshold of exclusion for each electoral context.  Reported in the second column is the Latino percentage of the CVAP in each context, the village itself and each of the SMDs in the plaintiff's proposed districting plan, as of the 2000 Census.  The third column contains the estimated Latino CVAP percentage, based on the 2006 estimates provided by the plaintiff's expert, in the jurisdiction and the districts proposed by DOJ.  The fourth and fifth columns identify the percentage of the relevant threshold of exclusion values that the Latino CVAP constituted, the first based on the 2000 census and the second on the 2006 estimates.

The percentage of the CVAP that Latinos constituted in Port Chester, as of 2006, was estimated to be 27.5% (the corresponding figure from the 2000 Census was 21.9).  The value of the threshold of exclusion for a two-seat cumulative voting election is larger than that, 33.3% (see Table 1).  However, if all six board members were elected in a single cumulative voting election, the opportunity Latinos would have to elect a representative of their choice would be greatly enhanced.  The threshold of exclusion value for a six-seat cumulative arrangement is 14.3%, considerably lower than the two-seat threshold (see Table 1).  Latino CVAP in 2006 was almost twice the size of that threshold (192.3%, see Table 2 column five).  The village's proposed remedy therefore was to eliminate the staggered terms and elect all six Trustees in a single at-large cumulative voting election every three years.[62]

---

60. *Id.* at 444.

61. A negative effect of staggered terms on the election of Latino candidates to local governing boards in CV elections in Texas has been reported by Brischetto & Engstrom, *Cumulative Voting and Latino Representation*, *supra* note 37, at 988–89.  *See also* SHAUN BOWLER, TODD DONOVAN & DAVID BROCKINGTON, ELECTORAL REFORM AND MINORITY REPRESENTATION 105 (2003).

62. *Vill. of Port Chester*, 704 F. Supp. 2d at 416.

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

 *SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW*          [Vol. XXX:97

Table 2: Threshold of Exclusion Values, Six-Vote Cumulative System and
Proposed Majority-Hispanic Single Member Districts, Port Chester[63]

| | Threshold of Exclusion | CVAP 2000 | CVAP 2006 est. | CVAP as % of threshold 2000 | 2006 |
|---|---|---|---|---|---|
| Cumulative Voting | 14.3 | 21.9 | 27.5 | 153.1 | 192.3 |
| Plaintiff's Districts | | | | | |
| 1 | 50.0 | 8.7 | 10.2 | 17.4 | 20.4 |
| 2 | 50.0 | 9.6 | 19.6 | 19.2 | 39.2 |
| 3 | 50.0 | 27.2 | 34.6 | 54.4 | 69.2 |
| 4 | 50.0 | 56.3 | 70.4 | 112.6 | 140.8 |
| 5 | 50.0 | 24.7 | 31.4 | 49.4 | 62.8 |
| 6 | 50.0 | 29.7 | 31.9 | 59.4 | 63.8 |

A comparison of the threshold of exclusion value for a six vote cumulative
election offered Latinos, at least theoretically, a better opportunity to elect a
representative of their choice than the Latino SMD district advocated by the
DOJ,[64] which was estimated to be 70.4% in CVAP.[65]  The threshold value for a
single member district is 50.0, as it takes a majority of the voters in a SMD to
guarantee the election of a candidate.  The village-wide CVAP was almost
twice as high as the cumulative voting threshold, and exceeded that threshold
by about 50 percentage points more than the proposed Latino district exceeded

63. For the threshold of exclusion in the cumulative voting context, *see supra* Table 1. For
columns two and three, *see* Reply Affidavit of Prof. Andrew Beveridge at 11, *Vill. of Port
Chester*, 704 F. Supp. 2d 411 (No. 06-15173), ECF No. 49. Columns four and five are calculated
by the author.

64. *See* Richard L. Engstrom, Report on Citizen Voting Age Deviations in Plaintiffs'
Proposed Single Member District Plan at 7, *Vill. of Port Chester*, 704 F. Supp. 2d 411 (No. 06-
15173) (on file with author).

65. Reply Affidavit of Prof. Andrew Beveridge, *supra* note 63, at 11.

that for a SMD (192.3 – 140.8). This reflects the fact that an estimated *82.5 percent* of the Latino CVAP resided outside the Latino district.[66]

The fact that the estimated CVAP in the village was almost twice the threshold value for a cumulative voting election reveals that the village's proposal would also, theoretically, provide Latinos with a much better opportunity to elect two representatives of their choice to the board than would the plaintiff's districting plan. The second highest CVAP percentage in a district within that plan, as of 2006, was 34.6%, which was 69.2% of the threshold for a SMD. If the Latino CVAP in Port Chester continued to grow relative to that of non-Latinos, as expected,[67] the Latino opportunity to elect two members would grow with it. There would be no need to wait for a new districting plan, after a new census, to create a second Latino opportunity district, if it could be done even then.

### B.   Euclid CSB

The Euclid City School District is governed by a five-member body elected through staggered elections, three members being elected one year and two the other.[68] After stipulating to the dilutive effect of its at-large system, the board proposed that either cumulative voting or limited voting with each voter having one vote be the remedy for the dilutive effects.[69] Unlike in Port Chester, the staggered system in Euclid did not have to be disturbed because the estimated African American percentage of the CVAP, based on the 2007 Annual Community Survey, exceeded the threshold of exclusion value for both a three-seat election and a two-seat election.[70] Reasonable opportunities to elect a representative of their choice therefore would be provided in each of the staggered elections.

Table 3 contains the information comparing the relative presence of African Americans of voting age in Euclid to the threshold of exclusion for each proposed remedy. As with Table 2, identified in the first column of Table 3 are the different values of the threshold of exclusion for each electoral context. Reported in the second column is the African American percentage of the VAP in each context, the school district itself and each of the SMDs in the plaintiff's proposed districting plan, as of the 2000 Census. The third column

---

66. The plaintiff's expert estimated the Latino CVAP in 2006 to be 3,929. *Id.* After subtracting the 686 estimated to reside in the Latino district (district No. 4), 3,243 (82.5%) of the Latino CVAP remain. *See id.*

67. Declaration of Andrew A. Beveridge, *supra* note 7, at 4–6.

68. United States v. Euclid City Sch. Bd., 632 F. Supp. 2d 740, 746 (N.D. Ohio 2009).

69. *Id.* at 744–45.

70. *Id.* at 745. This estimate is based on data collected from January 2005 through December 2007. It was the latest estimate provided by the Census Bureau at the time of the remedial hearing.

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

*SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW*           [Vol. XXX:97]

contains the estimated African American percentage of the VAP in the jurisdiction in 2007. No estimates for any year later than 2000 were provided for the districts in the Plaintiff's plan. The fourth and fifth columns identify the percentage of the relevant threshold of exclusion values that the African American VAP constituted, the first based on the 2000 census and the second on the 2007 estimate.

Revealed in the fourth column is the fact that the African American voting age population in Euclid in 2000 was 27.8% and that this percentage exceeded the threshold of exclusion value for the Board's proposed cumulative and limited voting systems when three seats are up for election. African Americans of voting age exceed that threshold by 11.2%. Likewise, African American VAP exceeded that threshold in District 1 in the Plaintiff's proposed single member district plan. In this context, they exceed the threshold by 22.0%. Based on the 2000 Census, both the Plaintiff and the Board clearly provide a reasonable opportunity for African Americans to elect a candidate of their choice.

Also revealed in column four is that African Americans have a better chance of electing a second candidate of their choice under the Board's proposals. The African American percentage of the threshold of exclusion for these proposals in the other election, the two-seat election, is 83.5. In contrast, the second most African American district in the Plaintiff's plan is District 2, in which the African American voting age percentage is 31.3. This is only 62.6% of the threshold value, 50.0%, for a single member district. The opportunity to elect a second person to the Board in 2000 would have been better therefore under the Board's proposal than that of the Plaintiff.

Table 3: Threshold of Exclusion Values, Three-Seat and Two-Seat Elections[71]

| | Threshold of Exclusion | VAP 2000 | VAP 2007 est. | VAP as % of threshold 2000 | 2007 |
|---|---|---|---|---|---|
| Cumulative and Limited Proposals | | | | | |
| Three seats | 25.0 | 27.8 | 40.2 | 111.2 | 160.8 |
| Two seats | 33.3 | 27.8 | 40.2 | 83.5 | 120.7 |

71. For column one *see supra* Table 1. For column two, *see* Lisa Handley, Expert Report at 3, *Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (No. 08-2832), ECF No. 19-2. For column 3, *see Euclid City Sch. Bd.*, 632 F. Supp. 2d at 745.

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

Single Member
District Proposal

| | | | | | |
|---|---|---|---|---|---|
| Dist 1 | 50.0 | 61.0 | — | 122.0 | — |
| Dist 2 | 50.0 | 31.3 | — | 62.6 | — |
| Dist 3 | 50.0 | 21.1 | — | 42.2 | — |
| Dist 4 | 50.0 | 17.0 | — | 34.0 | — |
| Dist 5 | 50.0 | 9.1 | — | 18.2 | — |

The American Community Survey indicates that the African American VAP had grown relative to that of the other residents in Euclid since 2000. The Census Bureau's latest estimate of the African American percentage of the VAP at the time of trial was that for 2007, and was 40.2%. Under the Board's proposals, African Americans would clearly have a reasonable chance to elect two representatives of their choice. As revealed in column five, not only is the threshold for the three-seat election now exceeded by the African American VAP percentage by over 60%, but the threshold for the two-seat election is exceeded by over 20%. The African American estimate of the voting age population exceeds the threshold for the two-seat election by 20.7%, only 1.3% less than the African American VAP in District 1 exceeded that for a single member district using the 2000 Census figures.

Both of the proposed remedies chosen by the Board provided African Americans in Euclid with reasonable opportunities to elect two representatives of their choice, including fellow African Americans if they are the African American voters' choices. Without more recent figures for the districts in the Plaintiff's plan, it is not known whether the same can be said for its single member districting arrangement.

The Board's remedies would not confine the opportunity to elect to just those African American voters who reside within an African American opportunity district. Based on the 2000 Census figures, more than half (56.0%) of the African American VAP in Euclid resided outside the Plaintiff's District 1.[72] The dilutive effect of the current at-large election format, however, is across the entire school district. Cumulative or limited voting would provide a remedy that matches the jurisdiction-wide violation. It would allow all of the African Americans to participate in the opportunity to elect.

---

72. The plaintiff's expert stated the African American VAP in 2000 was 11,415. *See* Lisa Handley, Expert Report, *supra* note 71, at 3. After subtracting the 5,019 African Americans of voting age who reside in the African American district (district No. 1), 6,396 (56.0%) of the African American VAP remains. *See id.*

114            *SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW*            [Vol. XXX:97

Under the Board's proposed remedy, based on the 2007 estimate, the threshold of exclusion is exceeded by over 60% in the election when three seats are to be filled, and over 20% in the election when two seats are to be filled.

### III. OTHER REASONS TO PREFER CUMULATIVE OR LIMITED VOTING OVER DISTRICT ELECTIONS

There are reasons for a jurisdiction to prefer cumulative or limited voting over SMDs other than the minority electoral opportunities they provide. One is that these remedies match the dilution problem sometimes present in at-large election systems. Minority vote dilution in an at-large system is a jurisdiction-wide problem; it affects all minority voters residing within a jurisdiction, not just those residing in a particular area that can provide the basis for a majority-minority SMD. In Port Chester, the DOJ's proposed remedy for the dilution left 82.5% of the estimated Latino CVAP in 2006 outside the majority-Latino district (59.0% based on the 2000 census).[73]  In the Euclid CSB, 56.0% of the African American VAP remained outside the DOJ's majority-African American district (based on the 2000 census).[74]  CV and LV provide all of the minority group's voters in a jurisdiction, regardless of where they reside, with an opportunity to participate in electing a representative of the group's choice, rather than just those residing in the majority-minority district. It would certainly be a rational policy choice to allow all of the minority voters to participate in the opportunity to elect representatives favored by their group.

In addition, voters in CV and LV systems can choose representatives, including those from within their group, from anywhere in the jurisdiction, rather than among those residing in a restricted geographic area. These systems do not preclude the election of candidates from particular areas of a jurisdiction if that is important to the voters. CV and LV rules allow voters to form "voluntary constituencies" with other like-minded voters. If geography is an important criterion to the voters they are free to vote along those lines. Neither CV nor LV entail a geographical constraint, as districts do. They leave it up to the voters to decide whether having a representative who lives close to them is important. These systems allow "communities defined by actual shared interests"[75] to be determined by the voters, rather than those who draw, or adopt, district lines.[76]  Allowing voters in a jurisdiction to form voting

---

73. *See supra* note 66.

74. *See supra* note 72.

75. Miller v. Johnson, 515 U.S. 900, 916 (1995).

76. The concept of "communities of interest" is a so-called "traditional" districting criterion, but also an extremely ambiguous one. There is no widely agreed upon definition, identification procedure, or measurement of the concept, nor established priorities concerning which "communities" are more important to protect within a districting plan than others. There is also no reason why communities that are geographically concentrated should be protected by an

Case: 4:14-cv-02077-RWS  Doc. #: 82-13  Filed: 09/30/15  Page: 20 of 42 PageID #: 1276

communities based on their shared interests, including, but not limited to, those based on geographical proximity, in a nondilutive election system is also a rational policy choice.[77]

Another feature of districting plans gaining increased attention is the large disparity that can occur across districts in VAP or CVAP.[78] This has been the case especially when districts are drawn to provide electoral opportunities to a Latino minority. Port Chester provides a useful example of this. The plan proposed by the DOJ satisfied the "one person, one vote" criterion based on total population, which has been the criterion employed to-date in the redistricting of virtually all legislative bodies of general purpose governments, and of school boards. Total population deviations in the plan ranged from 70 people below the average district deviation in the smallest district to 86 above it in the largest.[79] In percentage terms, these were -1.84 and +1.50,[80] for a total combined deviation of 3.34, well under the frequently relied upon rule of thumb of less than 10.

However, the village noted that the one person, one vote standard was not satisfied if it is based on CVAP. The disparities in CVAP across the districts were primarily a function of the low CVAP in the majority-Latino district in the plan, which was estimated to be 975 as of 2006.[81] The other five districts

---

election system while groups that are more geographically dispersed are not. *See* Engstrom, *The Political Thicket, Electoral Reform, and Minority Voting Rights, supra* note 48, at 25–30.

77. In addition, CV and LV would not require redistricting after every census, and possibly more frequently, given the U.S. Supreme Court's acceptance of the redistricting of congressional districts in 2003 in Texas. *See generally* League of United Latin Am. Citizens v. Perry, 548 U.S. 399 (2006). Changes in population and demographics will be accounted for naturally in any at-large system, and therefore the usually contentious process of redistricting, often followed by expensive litigation, will be avoided. *See generally* Richard L. Engstrom, *The Post-2000 Round of Redistricting: An Entangled Thicket within the Federal System*, 32 PUBLIUS: THE J. OF FEDERALISM 51 (2002).

78. *See generally* Joshua M. Rosenberg, *Defining Population for One Person, One Vote*, 42 LOY. L.A. L. REV. 709 (2009); Stacy Robyn Harold, *The Right to Representation and the Census: Is it Permissible for Congress to Exclude Illegal Immigrants from the Apportionment Base?*, 53 WAYNE L. REV. 921 (2007); Edward Blum, *Are We a Nation of One Person, One Vote*, THE AM. (Mar. 11, 2010), http://www.american.com/archive/2010/march/are-we-a-nation-of-one-person-one-vote; Hans A. von Spakovsky, *The Left's Pernicious Redistricting Strategy*, NAT'L REV. ON-LINE (Feb. 17, 2010), http://www.nationalreview.com/corner/194979/lefts-pernicious-redistricting-strategy/hans-von-spakovsky; Hans A. von Spakovsky, *Re: One Person, One Vote*, NAT'L REV. ON-LINE (Feb. 19, 2010), http://www.nationalreview.com/corner/195155/re-one-person-one-vote/hans-von-spakovsky.

79. Reply Affidavit of Prof. Andrew Beveridge, *supra* note 63, at 11.

80. United States v. Vill. of Port Chester, 704 F. Supp. 2d 411, 421 (S.D.N.Y. 2010). In the opinion, the direction of these deviations, + or −, is reported incorrectly. *See* Reply Affidavit of Prof. Andrew Beveridge, *supra* note 63, at 11.

81. Reply Affidavit of Prof. Andrew Beveridge, *supra* note 63, at 11.

*SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW* [Vol. XXX:97]

ranged from 2,014 to 3,122 in CVAP, and averaged 2,657.[82] The smallest district in CVAP, the Latino district, was 58.98% below the average CVAP for a district, and the largest district was 31.36% above, for a combined deviation of 90.34.[83] The average deviation was 25.78%.[84] These CVAP deviations were considerably higher than those in the districts for the U.S. House of Representatives in New York, the state Assembly and Senate, the New York City Council, and several other municipalities.[85]

Total population has served as the basis for assessing equality in the size of districts within a districting plan. The Supreme Court has relied on total population counts numerous times while reviewing whether districting plans comply with the one person, one vote rule.[86] It has not said, in any of these cases, that CVAP should be used for this purpose. But then it has not addressed this issue specifically. Three federal appeals courts have opined on it, however, and are divided. In *Garza v. County of Los Angeles*, the Ninth Circuit held in a two to one decision in 1990 that the use of CVAP to assess compliance with the one person, one vote rule would violate the equal protection rights of Hispanics.[87] The Fourth and Fifth Circuits have held that it is a determination to be made by the political process, rather than courts. In these circuits, districting by CVAP appears to be an option.[88]

---

82. *Id.*

83. Engstrom, Report on Citizen Voting Age Deviations, *supra* note 64, at 5.

84. *Id.* at 4.

85. The sizes of the CVAP disparities are reported in Richard Engstrom's Report. *Id.* This criticism of plaintiffs' illustrative single member districting plans in Section 2 challenges to at-large elections has been made recently in at least three cases involving local governments in Texas. *See* Reyes v. City of Farmers Branch, Tx., No. 3:07-CV-900-O, 2008 U.S. Dist. LEXIS 89599 (N.D. Tex. Nov. 4, 2008) (issue not addressed); Benavidez v. City of Irving, Tx., 638 F. Supp. 2d 709, 714 (N.D. Tex. 2009) (finding total population is "entirely appropriate" for assessing compliance with the population equality requirement); Benavidez v. Irving Indep. Sch. Dist., 690 F. Supp. 2d 451 (N.D. Tex. 2010) (issue not addressed). For the size of the disparities in these cases, *see* John Alford, Expert Report at 3–5, *in* Appendix to City's Motion for Summary Judgment, *Reyes*, 2008 U.S. Dist. LEXIS 89599 (No. 07-900), ECF No. 18; John Alford, Expert Report at 7–9, *City of Irving*, 638 F. Supp. 2d 709 (No. 07-01850); John Alford, Expert Report at 5–6, *Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451 (No. 08-0924) (on file with PUBLIC LAW REVIEW).

86. *See* GERALD HEBERT ET AL., THE REALIST'S GUIDE TO REDISTRICTING: AVOIDING THE LEGAL PITFALLS 8–10 (1st ed. 2000).

87. Garza v. County of L.A., 918 F.2d 763, 775–76 (9th Cir. 1990). Proponents of districting based on CVAP heavily reference the dissent by Judge Alex Kozinski on this issue. *See, e.g.*, Blum, *supra* note 78; Rosenberg, *supra* note 78, at 722–25.

88. In *Daly* v. *Hunt*, a case involving districts for the Mechlenburg County, North Carolina, Board of Commissioners and Board of Education, the Fourth Circuit held that the choice of total population or voting age population as the basis for district equality "is quintessentially a decision that should be made by the state, not the federal courts, in the inherently political and legislative process of apportionment. Daly v. Hunt, 93 F.3d 1212, 1227 (4th Cir. 1996). In *Chen* v. *City of*

2010]                    *CUMULATIVE AND LIMITED VOTING*                    117

The court in *Port Chester* noted that, in a districting context, this issue "raises important legal questions deserving of full analysis."[89]   The Court deemed it unnecessary to address this issue, however, because it was not relevant to the city-wide CV system the Court approved.[90]   Regardless of how the total population versus CVAP issue is ultimately resolved, avoiding VAP or CVAP disparities in a districting plan the size of those in Port Chester, for example, when a CV or LV arrangement could provide a protected group with a comparable, or even better, opportunity to elect a candidate or candidates of its choice, would be another rational reason to adopt one of those systems.[91]

## IV. JUDICIAL RESPONSE

As noted above, when at-large election systems have been found to dilute the votes of protected minorities in violation of Section 2 of the VRA, and plaintiffs and defendants settle the remedy issue by agreeing to CV or LV, those settlements have been approved by federal courts.[92]   When plaintiffs propose these remedies but defendants do not favor them, courts have refused

---

*Houston*, a case involving city council districts, the Fifth Circuit held likewise that whether districts should be based on total population or CVAP was a "close question", but that without more guidance from the Supreme Court concluded that "this eminently political question has been left to the political process." Chen v. City of Houston, 206 F.3d 502, 528 (5th Cir. 2000), *cert. denied*, 532 U.S 1046 (2001). The only Supreme Court Justice in favor of granting review on the total population versus CVAP issue was Clarence Thomas, who wrote, "[w]e have never determined the relevant 'population' that States and localities must equally distribute among their districts." *Id.* at 1047 (Thomas, J., dissenting from denial of certiorari).

89. United States v. Vill. of Port Chester, 704 F. Supp. 2d 411, 421 n.5 (S.D.N.Y. 2010).

90. *Id.*

91. The issue was again before a federal district court recently, in Texas. After the at-large election system used to elect the council in the City of Irving was found to violate section 2 of the VRA, Benavidez v. City of Irving, Tx., 638 F. Supp. 2d 709, 732 (N.D. Tex. 2009), the remedial issue was settled by the adoption of a mixed election format, with seats filled by both at-large and SMD elections. Original Complaint at 1, Lepak v. City of Irving, No. 3:10-CV-00277-P (N.D. Tex. Feb. 11, 2010), ECF No. 1. The six SMDs in the remedy, drawn based on total population, were challenged for violating the one person, one vote principle because one district, the majority Latino district, contains an estimated CVAP of 13,029, while two others have CVAPs estimated to be 22,932 and 23,884. *Id.* at 4, 5. This challenge was rejected however when the court granted summary judgment to the city in Lepak v. City of Irvine, No. 3:10-CV-0277-P (N.D. Tex. Feb. 11, 2011). In addition, a complaint has been filed in another federal district court in Texas claiming that the inclusion of "undocumented immigrants" in the population counts for redistricting the state's U.S. House districts, Texas Senate and House districts, and state School Board of Education districts results in "inaccurate" counts in violation of the several provisions of the U.S. Constitution, Texas Constitution, and section 2 of the Voting Rights Act. Plaintiffs' Original Complaint and Request for Injunctive and Declaratory Relief, and Designation of a Three-Judge Court, Teuber v. State of Texas, No. 4:11-CV-00059 (E.D. Tex. Feb. 10, 2011).

92. For recent examples, *see* Judgment and Order Modifying Consent Decree, *supra* note 23, at 2; Consent Judgment and Decree, *supra* note 23, at 4.

*SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW*        [Vol. XXX:97]

to impose them.[93]  Some courts have made it clear that the refusal is not driven by objections to the systems themselves, but rather by the deference courts are supposed to give to the remedial preferences of the jurisdictions, provided their preferred remedies are not dilutive themselves.[94]  And recently, a court has adopted a CV system preferred by plaintiffs when the defendant refused to offer a remedy.[95]

*Port Chester* and *Euclid CSB* appear to be the first instances, however, in which the defendants proposed CV or LV as a remedy and plaintiffs objected, in both cases favoring a SMD arrangement.  In the remedy stage of section 2 litigation under the VRA, courts are to examine the defendant's proposed remedy first and accord it a high level of deference.  As the Court in *Port Chester* stated, "[t]he Court must give the defendant jurisdiction the first opportunity to suggest a legally acceptable remedial plan, based on the theory that the judiciary should not intrude on legislative policy any more than necessary."[96]  The court in *Euclid CSB* commented that "[u]ndoubtedly, it is a 'curious doctrine that allows the foxes, once challenged, to tell this Court that it must accept their plan for protecting and assuring the rights of the hens.'  It is, however, the doctrine this Court is compelled to apply."[97]  While the traditional remedy has been a SMD arrangement, these cases make clear that the deference to defendants' proposals does not vary with the type of remedy offered, as long as the courts find they cleanse the dilution found in the challenged at-large arrangement.

*A.  Euclid CSB*

The court in *Euclid CSB*, in April of 2009, provided the required level of deference to the limited voting proposal by the school board.[98]  It stated, in very clear language, that it was "not to inquire whether the Board's proposal is the 'best' possible proposal, or even to weigh the Board's proposal against other possibilities to see if it could somehow be made 'better.'"[99]  It viewed its discretion as far more limited; "[a] district court may reject the defendant's

---

93.  *See, e.g.*, Cane v. Worcester Cnty., 35 F.3d 921, 927, 929 (4th Cir. 1994).

94.  *E.g.*, Harper v. City of Chi. Heights, 223 F.3d 593, 601–02 (7th Cir. 2000); Cane v. Worcester Cnty., 35 F.3d 921, 928–29 (4th Cir. 1994).

95.  Cottier v. City of Martin, 475 F. Supp. 2d 932, 936 (D.S.D. 2007), *vacated on other grounds*, Cottier v. City of Martin, 604 F.3d 553 (8th Cir. 2010).

96.  United States v. Vill. of Port Chester, 704 F. Supp. 2d 411, 447 (S.D.N.Y. 2010).

97.  United States v. Euclid City Sch. Bd., 632 F. Supp. 2d 740, 750 (N.D. Ohio 2009) (quoting Henderson v. Bd. of Supervisors, No. 87-0560-R, 1988 U.S. Dist. LEXIS 16729, at *13 (E.D. Va. June 6, 1988)).

98.  *Id.*  The court also found that, given the stipulation as to liability, as well as its findings in *City of Euclid* and the fact that no African American had ever been elected to the Board, the at-large election arrangement violated section 2.  *Id.* at 754–55.

99.  *Id.* at 770.

proposal under *only one condition*: if that proposal 'is legally unacceptable because it violates anew constitutional or statutory voting rights.'"[100]

The court found the one vote limited arrangement for school board elections in Euclid to be a "valid remedy," one that would "give minorities the opportunity to elect minority candidates" if they were their choice.[101] The court stressed that the standard was one of "*meaningful opportunity*," not a guaranteed *result*.[102] The court noted its findings in the Euclid City Council case that African Americans in Euclid had participated in elections at a much lower rate than non-African Americans in the past.[103] To satisfy itself that the opportunity would be meaningful, it supplemented its comparison of the threshold of exclusion values and the African American VAP in the district with a consideration of "the existing political realities of the district."[104] It therefore undertook its own viability analysis of the one vote limited remedy.[105]

The court noted that in the context of SMDs, some courts had adopted a 60% VAP standard as the cutoff for a viable minority district.[106] The court also noted this was, in effect, the standard used by the plaintiff in its own remedial proposal; the African American percentage of the VAP in the only majority-African American district in that plan, which plaintiff described as an "opportunity" district, was just above 60%.[107] Quoting from its decision in the Euclid City Council case, in which an SMD remedy was adopted, the court stated, "[g]enerally, it is clear that 'a district gives minorities a reasonable opportunity to elect candidates of choice where it has a sufficient cushion of approximately 60% of the voting-age population.'"[108] The court then compared the LV remedy to the 60% standard, and determined that it compared favorably with it.[109]

The Board's expert witness had pointed out at trial that a 60% African American VAP district would constitute 120% of the threshold of exclusion

---

100. *Id.* at 750 (emphasis added) (quoting McGhee v. Granville Cnty., 860 F.2d 110, 115 (4th Cir. 1988)).

101. *Id.* at 752. The court cited its language in the *City of Euclid* decision that "[t]he Voting Rights Act's guarantee of equal opportunity is not met when candidates favored by blacks can win, but only if the candidates are white." *Id.* (quoting United States v. City of Euclid, 580 F. Supp. 2d 584, 597 (N.D. Ohio 2008)).

102. *Id.* at 744, 752, 763 (emphasis added).

103. *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 746.

104. *Id.* at 763.

105. *See id.* at 769.

106. The court relied most notably on Ketchum v. Byrne, 740 F.2d 1398, 1415 (7th Cir. 1984). *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 768.

107. *Id.* at 769.

108. *Id.* at 768 (quoting United States v. City of Euclid, 523 F. Supp. 2d 641, 645 (N.D. Ohio 2007)).

109. *Id.* at 769.

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

value for a SMD, which is 50%.[110]  The 2007 estimate of the citywide African American VAP in Euclid, 40.2%, would itself constitute 161% of that threshold in the three-seat LV election, and 121% in the two-seat election.[111]  A citywide LV system therefore exceeded the threshold of exclusion for a 60% district by roughly 40% in the three-seat context, and was essentially the same in the two-seat context (see Table 3 above).  The opportunity for African Americans to elect a representative or representatives of their choice in the LV system proposed by the defendant was therefore "comparable or better," the expert opined, than that offered by a 60% district.[112]

The court undertook its own analysis that inevitably reached the same conclusion.  The court noted that the 60% standard for a SMD assumes that minority participation in a district would be two-thirds that of the other voters.[113]  The court concluded that a two-thirds guideline, given both the past turnout disparities in city council elections and growing African American presence in Euclid, would also be an appropriate standard for assessing whether the limited voting remedy would provide a "sufficient cushion" to provide African Americans with a reasonable opportunity to elect a candidate of their choice.[114]  Applying the two-thirds assumption to the estimated 40% African American VAP in Euclid in 2007, the court found that African Americans would constitute 27% of the voters.[115]  This figure exceeded the value of the threshold of exclusion for a three-seat limited voting election, 25, and therefore was "enough to elect one candidate" to the board.[116]  The court also noted that if the African Americans were to turnout at 85% the rate of the other voters, they "would be able to elect two candidates" because that would

---

110.  Transcript 19MY09 Euclid Hearing at 24:14–17, *Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (No. 08-2832).

111.  *Id.* at 22:14–17, 31:25.

112.  *Id.* at 24:14–20.

113.  The court illustrated this by use of a hypothetical district with a voting-age population of 100, of whom 60 are minority group members. *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 769 n.28. If all 40 of the non-African Americans of voting age voted, they would cast 40 votes. *Id.* If the minority turnout is two-thirds of that of the non-African Americans, then 40 African Americans also would vote (60 x .667 = 40.02 voters). *Id.*

114.  *Id.* at 769. As part of this determination, the court recognized that "it is unreasonable to assume that minority turnout will not increase under a system in which that turnout is made meaningful, relative to a system in which that turnout was entirely ineffective." *Id.* at 765.

115.  *Id.* at 770. The court was mistaken at this point. Again, assuming a VAP of 100, but now 40 of whom are African American and 60 are not African American, it would actually be 31% of the voters; [27 African American voters / (27 African American voters + 60 other voters)] = 31% of the voters.

116.  *Id.* According to the court, the threshold of exclusion for a three-seat election is 25%. *Id.* at 770 n.30. The correct percentage, as explained in note 115, *supra*, is 31, not 27, which is even further above the 25% threshold.

exceed the threshold of exclusion for a two-seat election as well.[117] The court therefore concluded that limited voting would provide Euclid's African Americans with a "meaningful opportunity" to participate in school board elections, but noted that African American turnout would need to increase in order to take "full advantage" of it.[118] Given that this opportunity was present while the elections were staggered, the court declined to require that elections for all seats be simultaneous.[119]

The school district had proposed that either CV or LV with a one vote limit serve as the remedy.[120] At the beginning of the remedial phase the district had expressed a preference for CV, but given the threshold of exclusion values are identical for the two, by the end of the hearing it expressed no preference between them.[121] This may have been because the other defendant in the case, the Cuyahoga County Board of Elections, was maintaining that it could not readily implement cumulative voting using its current election software, but it could do so for a one-vote limited scheme.[122] In addition, the DOJ stated on the final day of trial that if the remedy was not to be its SMD plan, it preferred a one vote limited over cumulative arrangement, with all five seats elected simultaneously, and suggested that this be used on an interim basis and revisited following the 2010 census.[123]

The court chose the one vote limited option.[124] It noted that LV and CV have the "same theoretical effect" on minority opportunities to elect representatives of their choice.[125] The preference for LV was based on practical considerations: its "use throughout Ohio," whereas CV was "currently unknown in the State"; the substantial difficulty in implementing cumulative voting, according to the Cuyahoga County Board of Elections,

---

117. *Id.* at 770. If it is assumed that African Americans of voting age vote at two-thirds the rate of the non-African Americans of voting age, the African American percentage of the voters would be 31, only 2.3% below the threshold value of 33.3. *Id.* at 770 n.32.

118. *Id.* at 770. The court noted that would also be true if the remedy was the plaintiff's SMD plan. *Id.* at 770 n.33.

119. *See Euclid City Sch. Bd.*, 632 F. Supp. 2d at 770–71.

120. *Id.* at 744.

121. The School Board's attorney explained to the court that the initial preference for CV was based on the fact that voters in School Board elections under CV would be allocated a number of votes equal to the number of seats up for election, as they had been in the past, and stated "[b]ut beyond that, because of the fact that one vote limited in this situation provides the same opportunity to elect a minority preferred candidate, the fact that cumulative voting was listed first and limited second is almost a toss-up." Hearing Transcript at 216, *Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (No. 08-2832), ECF No. 43.

122. *See id.* at 173–75, 189, 204–06.

123. *Id.* at 257–59. The DOJ suggested the implementation of its SMD plan on the same interim basis as well. *Id.* at 264.

124. *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 757.

125. *Id.* at 755.

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

*SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW* [Vol. XXX:97

compared to the one vote limited arrangement, which would create "no additional burden"; and that CV was "a more difficult concept (than LV) for voters to understand."[126]

As noted above, the court had made clear that it had narrow discretion on the choice of a remedy. It stated that "[a]s a matter of law, the particular reasons that the Board might have for its preference is not of overwhelming importance."[127] But it also stated that, "[a]s a practical matter, however, it is the better practice for a district court to acknowledge the non-discriminatory reasons that underlie a defendant's proposal where, as here, the Plaintiff challenges that proposal's compliance with Section 2."[128] On this matter the court relied, as did the school board, on an amicus curiae brief provided by the Ohio School Board Association (OSBA).[129]

It was argued in the OSBA brief that two important dimensions of the Euclid CSB election system are widely viewed as "good government" features for school governance: at-large elections and staggered terms.[130] At-large elections make school board members electorally accountable, at least formally, to all voters in a school district. This, the OSBA argued, impedes school board members from favoring particular schools in a jurisdiction, and facilitates collaborative behavior on the part of board members.[131] Staggered terms are designed to promote continuity in school governance. Wholesale turnover in board membership is not possible, at least through elections. "Gradual turnover," the OSBA argued, is to be preferred when it comes to school governance.[132] It also argued that SMDs would politicize education governance, making it difficult to attract candidates, especially quality candidates, for school board elections.[133] The court noted that the DOJ did not challenge any of these non-discriminatory reasons for the preference for at-large and staggered elections, and the court itself found them to provide "legitimate, non-discriminatory justifications."[134] The court also referenced

---

126. *Id.* at 756. The extensive use of the LV system in Ohio was not documented in any way other than the statements by the Director of the Bd. of Elections and the attorney for that Board. Further research is needed to verify that these statements were referring to the same LV arrangement proposed by the School Board.

127. *Id.* at 757.

128. *Id.*

129. *Id.* (citing Brief for Ohio School Boards Association as Amicus Curiae Supporting Defendant, *Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (No. 08-2832), ECF No. 22).

130. *See* Brief for Ohio School Boards Association as Amicus Curiae Supporting Defendant, *supra* note 129, at 6–7, 10–11.

131. *Id.* at 9.

132. *Id.* at 10.

133. *Id.* at 11–12.

134. *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 759. While the OSBA's brief was written in support of a CV remedy, then preferred by the Euclid CSB, the justifications would apply to LV as well.

Case: 4:14-cv-02077-RWS   Doc. #: 82-13   Filed: 09/30/15   Page: 28 of 42 PageID #: 1284

one other reason to support a nondilutive at-large arrangement over SMDs, which was that "at-large voting also prevents 'communities of interest' that may be developed around school-related issues" from being arbitrarily divided by district lines.[135]

### B.   United States v. Village of Port Chester

The federal court in *United States v. Village of Port Chester* issued a Summary Order in November of 2009 adopting the defendant's proposed remedy of cumulative voting without staggered terms.[136] It stated, as had the court in *Euclid CSB*, that it was obligated to accept the village's preference as long as it was legally acceptable, and held that it was.[137] In support of its decision, the court recognized that the Latino CVAP in Port Chester exceeded the threshold of exclusion for the six-vote CV system "by a large enough margin to suggest that Hispanics could prevail without voting 100% cohesively," and that "experiences from other jurisdictions that use cumulative voting show that minority communities are able to take advantage of their voting power under cumulative voting to elect the representative of their choice."[138] It rescheduled the next village election from March 2010 to June 2010 in order to give the village time to educate the voters about the new voting system and mandated the parties draft a Consent Decree providing details about the implementation of the new system.[139]

The court followed its order with a full opinion the following April. It again recognized that the degree of deference accorded to the village's choice of CV was "quite strong," agreeing with the court in *Euclid CSB* that "[a] district court may not substitute its own remedial plan for defendant's legally acceptable one, even if it believes another plan would be better."[140] It further noted that "[t]here is no case law that rejects cumulative voting as a lawful remedy under the Voting Rights Act" and stated, to the contrary, that "[f]ederal courts have repeatedly mentioned cumulative voting as a remedial option in Voting Rights Act cases."[141]

---

135. *Id.* at 758 n.19.

136. *See* Summary Order at 3–4, United States v. Vill. of Port Chester, 704 F. Supp. 2d 411 (S.D.N.Y. 2009) (No. 06-15173), ECF No. 115.

137. *Id.* at 4.

138. *Id.* at 3, 5. The Consent Decree was approved on December 22, 2009. An Addendum to Consent Decree, concerning the design of the ballot and early voting sites, was approved on February 23, 2010. *Vill. of Port Chester*, 704 F. Supp. 2d at 452.

139. Summary Order, *supra* note 136, at 5–6. The details were to include, at a minimum, "the form, format, and schedule for providing voter education; bilingual poll workers; Spanish-language materials; practice voting; and the duration of such outreach efforts." *Id.* at 5.

140. *Vill. of Port Chester*, 704 F. Supp. 2d at 448. The court dismissed the DOJ's argument that SMDs are "preferable remedies" in section 2 cases as "not relevant." *Id.* at 453.

141. *Id.* at 448.

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

It also stated, as did the court in *Euclid CSB*, that the remedy must provide minority voters with "a genuine opportunity" to elect representatives of their choice, not a guarantee.[142] It again concluded that because the Hispanic CVAP percentage in the village, whether based on the 2000 census (21.9) or the 2006 estimate (27.5), was "well above" the value of the threshold of exclusion (14.3 in a six-seat CV election), the CV arrangement would provide Hispanics with a genuine opportunity to elect a representative to the board.[143]  And further, the court found that based on the 2006 CVAP estimate, "the Hispanics are also close to being able to guarantee the election of two representatives of their choice using plumping" (see Table 3).[144]

The court's conclusion was bolstered by evidence from the liability phase of the case that Hispanics had voted in a very cohesive fashion for Hispanic candidates in previous elections, and therefore it was "highly likely" that they would plump their votes behind a candidate in a CV election.[145]  It was also bolstered by its expectation that Hispanic turnout would increase in a CV election because their opportunity to elect a representative of their choice was enhanced by that arrangement.[146]  The court also repeated its insistence on an educational program as a condition of meeting the genuine opportunity standard.[147]

## V. FIRST ELECTIONS

The first use of the CV system in Port Chester was in the June 15, 2010 special election for all six seats on the Board of Trustees.  It resulted in a Hispanic candidate finishing fourth in the vote and winning a seat.  The initial LV election for the Euclid City School Board was held on November 3, 2009. The African American candidate in that contest was not elected, although the candidate with by far the largest support among African American voters did win.

---

142. *Id.* at 451; United States v. Euclid City Sch. Bd., 632 F. Supp. 2d 740, 744 (N.D. Ohio 2009).

143. *Vill. of Port Chester*, 704 F. Supp. 2d at 450–51.

144. *Id.* at 451.

145. *Id.* at 450.

146. *Id.* at 451.  The court also noted that the at-large CV system complied with the one person, one vote rule, and did not entail an "improper use of race," issues that are present in district-based remedies. *Id.* at 452–53.

147. *Id.* at 451.  For details of the implementation of the extensive voter education program, *see* VILLAGE OF PORT CHESTER, FINAL REPORT – CONSENT DECREE COMPLIANCE: JUNE 15, 2010 BD. OF TRUSTEE ELECTIONS (July 15, 2010) (on file with PUBLIC LAW REVIEW).

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

## A. Port Chester

There were 13 candidates on the ballot for the CV election in Port Chester, two of whom were Latino.[148]  A third Latino also filed to be a candidate but submitted his papers too late to make the ballot.[149]  He subsequently ran a write-in campaign.[150]  This election was a partisan election, with several parties listing candidates on the ballot.[151]  Lever voting machines were used, with parties identified along the columns of the ballot and levers for each candidate along the rows.[152]  The Republicans were the only party to nominate a full-slate of candidates, and all six were also listed under Citizen's for Tax Relief, so there were 114 levers available to be pulled.[153]

The number of votes cast in the CV election was 3,357, which is reportedly "at least 10% higher than in recent Port Chester municipal elections."[154]  Over 95% of the respondents to the poll stated that they had cast all six of their votes in the election.[155]  The percentage of the votes received by each candidate is reported in Table 4, along with their party identifications and the absolute numbers of votes they received.  Luis Marino, one of four Democratic nominees, was the successful Latino candidate, placing fourth with 10.1% of the vote and winning a seat.  This was the first time a Latino had ever obtained a position on the board.[156]  Fabiola Montoya, a Latina nominated by the Republican Party, finished tenth with 5.1%, and the Latino write-in candidate finished thirteenth overall with 3.7%.[157]

There were three incumbents in the contest, two Democrats seeking reelection and one Republican who had been appointed to fill a vacancy on the board.[158]  One Democratic incumbent, Daniel Brakewood, placed second with

---

148. *See infra* Appendix.

149. Nathan Mayberg, *Candidate thrown off ballot starts write-in campaign*, PORT CHESTER WESTMORE NEWS (June 11, 2010), http://pc.westmorenews.com/index.php?current_edition=2010-06-11.

150. *Id.*

151. *See infra* Appendix.

152. *Id.*

153. *Id.*

154. DAVID C. KIMBALL & MARTHA KROPF, CUMULATIVE VOTING EDUCATIONAL PROGRAM EXIT POLL REPORT PORT CHESTER, NY, FINAL REPORT 1 (July 20, 2010), *available at* http://www.scribd.com/doc/34680247/PC-Survey-Report-July20.

155. *Id.* at 30.

156. Leah Rae, *Port Chester's six trustees sworn in after landmark election*, SOUND SHORE (July 6, 2010), http://soundshore.lohudblogs.com/2010/07/06/port-chesters-six-trustees-sworn-in-after-landmark-election/#more-7564.

157. Leah Rae, *Port Chester elects first Latino trustee: Winners are Marino, Didden, Brakewood, Branca, Kenner, Terenizi*, SOUND SHORE (June 16, 2010), http://soundshore.lohud blogs.com/2010/06/16/port-chester-elects-first-latino-trustee-winners-are-marino-didden-brake wood-branca-kenner-terenzi/#more-6918.

158. *Id.*

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

SAINT LOUIS UNIVERSITY PUBLIC LAW REVIEW          [Vol. XXX:97

13.0% of the votes and won a seat, the other, Gregory Adams, finished seventh with 6.6%.[159]  The Republican incumbent, Joseph Kenner, also won a seat, finishing fifth with 7.2% of the vote.[160]  This was the first time an African American had ever been elected to the board.[161]  Joining Brakewood, Marino, and Kenner on the board were Bart Didden, an independent candidate listed under the ballot label Taxpayers Relief Movement, with 13.2% of the vote, John Branca, the only nominee of the Conservative Party, with 10.8%, and Saverio Terenzi, a Republican with 6.8%.[162]  The party breakdown on the board therefore would be two Democrats, two Republicans, a Conservative, and an independent.

Table 4: Vote for Candidates in the Port Chester City Council Cumulative Voting Election, June 15, 2010[163]

| Candidate | Party Affiliation | Total Votes | % of Votes |
|-----------|-------------------|-------------|------------|
| Bart Didden | independent | 2,584 | 13.2 |
| Daniel Brakewood* | Democratic | 2,529 | 13.0 |
| John Branca | Conservative | 2,101 | 10.8 |
| Luis Marino | Democratic | 1,966 | 10.1 |
| Joseph Kenner* | Republican | 1,406 | 7.2 |
| Saverio Terenzi | Republican | 1,327 | 6.8 |
| Gregory Adams* | Democratic | 1,283 | 6.6 |
| Gene Ceccarelli | independent | 1,238 | 6.3 |
| Richard Cuddy | Republican | 1,033 | 5.3 |
| Fabiola Montoya | Republican | 1,002 | 5.1 |
| Philip Semprevivo | Republican | 903 | 4.6 |

159. Id.

160. Id.

161. Jenny Shen and Nic Riley, *On Port Chester's Election*, BRENNAN CENTER FOR JUST. (June 22, 2010), http://www.brennancenter.org/blog/archives/on_port_chesters_election_and_counting_minority_votes/.

162. Rae, *supra* note 157.

163. Calculated by author from the Official Return of Votes for General Officers, Village of Port Chester, NY, June 15, 2010, provided by the Village Clerk.

| Michael Scarola | Republican | 761 | 3.9 |
| John Palma | independent (write-in) | 718 | 3.7 |
| Anothny Saline | Democratic | 656 | 3.4 |

* = Incumbent.

The Consent Decree on the implementation of the CV system specified that an exit poll be conducted for purposes of evaluating the extent to which voters understood their options to cumulate votes behind a candidate or candidates, how frequently they used those options, and how they reacted to the new voting system.[164] The poll did not ask voters the number of votes they gave to the various candidates.[165] Voter responses to some of the items on the poll are reported in Table 5, in which the responses of all voters participating in the poll, and those for Latino voters participating in the poll, are provided.

Table 5: Reponses to the Port Chester Exit Poll[166]

| Item | % of All Respondents | % of Latino Respondents |
| --- | --- | --- |
| A. "Before voting, today, how familiar were you with cumulative voting?" | | |
| Very familiar | 23.3 | 41.1 |
| Somewhat familiar | 28.6 | 32.9 |
| Not very familiar | 22.8 | 15.8 |
| Not at all familiar | 25.4 | 10.3 |
| B. "How easy was it to understand the voting instructions in this election?" | | |
| Very easy | 72.2 | 77.3 |

164. Consent Decree at 23–24, United States v. Vill. of Port Chester, 704 F. Supp. 2d 411 (S.D.N.Y. 2010) (No. 06-15173).

165. *See generally* KIMBALL & KROPF, *supra* note 154.

166. These results are reported in or calculated from *id.* at 1.

| | | |
|---|---|---|
| Somewhat easy | 21.8 | 18.2 |
| Somewhat difficult | 4.4 | 4.0 |
| Very difficult | 1.7 | 0.5 |

C. "Which answer below best describes how you voted in the Board of Trustees election?"

| | | |
|---|---|---|
| I gave all my votes to 1 candidate | 34.2 | 50.9 |
| I gave my votes to 2 candidates | 18.4 | 14.9 |
| I gave my votes to 3 candidates | 15.8 | 11.1 |
| I gave my votes to 4 candidates | 8.3 | 4.2 |
| I gave my votes to 5 candidates | 4.2 | 2.1 |
| I gave my votes to 6 candidates | 19.1 | 16.7 |

D. "Compared to previous elections, was casting your ballot in this election easier, about the same, or more difficult?"

| | | |
|---|---|---|
| Easier | 23.5 | 48.7 |
| About the same | 66.5 | 46.8 |
| More difficult | 9.8 | 4.5 |

Reported in the first column of the table are the percentages of participants in the exit poll that responded to an option for the respective items in the table. Item A is a question concerning how familiar they were with the CV system before they voted. Just over half of the respondents, 51.9%, reported that they were either "very familiar" (23.3%) or "somewhat familiar" (28.6%) with the system before they voted. Item B is a question concerning how understandable the voting instructions for casting votes in the cumulative election were to voters. Almost all of the respondents, 94.0%, found them to be "very easy" (72.2%) or "somewhat easy" (21.8%) to understand.

Item C is a question concerning whether voters exercised their option to cumulate votes behind a particular candidate or candidates. Over 80% of the respondents reported cumulating votes to some extent, with 34.2% saying they "plumped" all six of their votes behind one candidate, and another 34.2%

Case: 4:14-cv-02077-RWS   Doc. #: 82-13   Filed: 09/30/15   Page: 34 of 42 PageID #: 1290

saying they cast their votes for just two of three candidates. Less than 20% (19.1%) reported voting in the traditional way in an at-large election, giving six different candidates one vote apiece. Clearly, the cumulative voting system is not nearly as complex for voters to understand and use as critics of cumulative voting assert. This is now a consistent finding in studies of CV elections.[167]

Respondents to the poll were asked to evaluate their experience with the CV election on a scale from excellent to poor. The result was, "[a]cross all demographic groups, roughly nine in ten voters rated the voting experience as excellent or good."[168] The final item in Table 5, item D, is a question asking voters to compare the degree of difficulty in voting in this CV election with voting in previous elections. Almost two-thirds said that it was "about the same," while 23.5% said it was "easier" compared to only 9.8% who said it was more difficult. The fact that more find it easier than more difficult might be counterintuitive, given that cumulative voting increases the number of permutations in which votes may be cast. But it could also make it easier for voters who prefer one or a few candidates more strongly than any of the others, relieving them of strategic considerations they might face under traditional voting rules in multi-seat elections. In that context, in addition to voting for their more preferred candidate or candidates, voters have to decide whether to cast their remaining votes for less preferred candidates who are competing with their more preferred choice or choices. Those votes could assist in the defeat of those more preferred. Voters with strong relative preferences could find that the option to cumulate votes simplifies their decision.

Latinos constituted 22.1% of the respondents to the exit poll.[169] The pollsters concluded that they were only "slightly overrepresented" in the poll due to their participation rate in it being somewhat higher than that for the other voters.[170] Latino voters therefore appear to have exceeded the threshold of exclusion for the six-vote CV system, 14.3%, by a comfortable margin. Latino voters' responses to the poll questions are reported in the second column in Table 5. They reported being more familiar with the voting system before voting than did the other voters, with 74.0% reporting being either "very familiar" (41.1%) or "somewhat familiar" (32.9%) with it. Given that the cumulative system was adopted to enhance their opportunity to elect a representative of their choice, Latinos might have been more receptive to the

---

167. Abigail Thernstrom, for example, in writing about the CV remedy in Port Chester, asserts that CV is "generally considered hard for voters to understand and use effectively." Thernstrom, *supra* note 55, at 36. This is inconsistent with not only the evidence from the Port Chester poll itself, but also the empirical studies cited in notes 45 and 48, *supra*.

168. KIMBALL & KROPF, *supra* note 154, at 43.

169. *Id.* at 52.

170. *Id.* at 51.

village's educational outreach program. They also reported, at a 95.5% rate, finding the CV instructions to be "very easy" (77.3%) or "somewhat easy" (18.2%).

Latino respondents were also far more likely to use their cumulative options than other voters. Just over half of the Latino respondents to the poll reported plumping all six of their votes for one candidate, while another 26.0% stated that they divided their votes between just two or three candidates. Only 16.7% of the Latinos reported casting one vote for each of six different candidates. As noted above, respondents to the poll were not asked which candidate or candidates they voted for, but it is certainly reasonable to believe that the extensive plumping by Latinos was a major factor in the first election of a Latino to the village Board of Trustees.[171] Numerous studies of CV have documented that plumping by minority voters has been a major factor in the election of minority candidates in those elections.[172]

Latino voters were also more likely to report that they found CV to be an "easier" way to cast their ballot than other voters. Almost half of them, 48.7%, stated as such, while another 46.8% found it "about the same" in difficulty. Only 4.5% reported it to be "more difficult." This could be expected given the high percentage of Latino voters plumping for one candidate, or otherwise cumulating some of their votes for one or more candidates, and thereby avoiding casting many or any votes for competing candidates.[173]

## B. *Euclid City School Board*

The first election under LV in Euclid, a nonpartisan election, drew four candidates for the three seats, the three white incumbents and an African American.[174] All three incumbents were reelected. Reported in Table 6 are the

---

171. *See supra* note 157. The court had found, in its decision finding that Port Chester's previous at-large system resulted in minority vote dilution in violation of Section 2 of the VRA, that "voting in the Village is polarized along racial lines." *See* United States v. Vill. of Port Chester, 704 F. Supp. 2d 411, 444 (S.D.N.Y. 2010). Hispanics were found to vote "cohesively," while "the non-Hispanic community tends to vote as a bloc, generally resulting in the defeat of the Hispanic preferred candidates." *Id.*

172. *See* studies cited *supra* note 44.

173. The Port Chester Board of Trustees voted 4 to 2 on February 22, 2011, to appeal the district court's decision holding that Port Chester's previous at-large system violated the VRA. Mr. Marino, the newly elected Latino member to the Board, voted against the appeal. Leah Rae, *Port Chester board votes to appeal voting rights case*, SOUND SHORE (Feb. 23, 2011), http://soundshore.lohudblogs.com/2011/02/23/port-chester-board-votes-to-appeal-voting-rights-case/.

174. Votes were cast in the School Board election by 30.6% of the registered voters in Euclid. CUYAHOGA COUNTY GENERAL ELECTION NOVEMBER 3, 2009, AMENDED RESULTS, http://boe.cuyahogacounty.us/pdf_boe/en-US/Nov03AmendedresultsCanvass.htm.

Case: 4:14-cv-02077-RWS   Doc. #: 82-13   Filed: 09/30/15   Page: 36 of 42 PageID #: 1292

total votes received by each candidate and an estimate of the racial breakdown in candidate support by the DOJ's expert in *Euclid CSB*, Lisa Handley.[175]

Kent Smith was the candidate most preferred by both the African American and white voters. His margin of preference however was much larger among African Americans. He is estimated to have received a majority of the votes cast by African Americans, 51.9%. The candidate with the second most support from African American voters was the African American, Evette Moton, whose support within the group is estimated to have been just 18.9%. Ms. Moton not only trailed Mr. Smith by 33.0% among African American voters, she also did not win a majority of the remaining African American votes that were not cast for Smith. Her second place finish in the African American vote is based on her exceeding the group's support for Angela Lisy and Donna Sudar, the other incumbents, by just 2.1% and 5.0% respectively. The white vote was divided almost entirely among the three incumbents; Mr. Smith received an estimated 36.9%, Ms. Lisy 33.2%, and Ms. Sudar 24.4%. The estimate for Ms. Moton is only 5.2%.

Table 6: Vote for Candidates in the Euclid City School Board Cumulative Voting Election, November, 2009[176]

| Candidate | Total Vote | | Estimated % African American Vote | Estimated % White Vote |
|---|---|---|---|---|
| | Number | % | | |
| Smith, Kent | 4,429 | 40.6 | 51.9 | 36.9 |
| Lisy, Angela | 3,171 | 29.1 | 16.8 | 33.2 |
| Sudar, Donna | 2,358 | 21.6 | 13.9 | 24.4 |
| Moton, Evette | 939 | 8.6 | 18.9 | 5.2 |

175. Lisa R. Handley, Analysis of 2009 School Board Election for U.S. v. Euclid City School District Board of Education at 8, United States v. Euclid City Sch. Bd., 632 F. Supp. 2d 740 (N.D. Ohio 2009) (No. 08-2832), ECF No. 51-2 [hereinafter Handley Report]. Dr. Handley provides estimates based on three procedures. Those reported in this article are based on the ecological inference procedure (EI) developed by Gary King and identified in GARY KING, A SOLUTION TO THE ECOLOGICAL INFERENCE PROBLEM: RECONSTRUCTING INDIVIDUAL BEHAVIOR FROM AGGREGATE DATA 17–22 (1997). EI is widely preferred over the other two used, ecological regression and homogeneous precinct analysis.

176. Total Vote, *see* CUYAHOGA COUNTY GENERAL ELECTION, NOVEMBER 3, 2009 AMENDED OFFICIAL SUMMARY REPORT, http://www.boe.cuyahogacounty.us/pdf_boe/en-US/Nov03OfficialSummaryAmended.htm. Estimated Votes, *see* Handley Report, *supra* note 175, at 8.

The following April the DOJ moved to vacate the remedy based on this single election.[177] Its argument focused on the turnout differences between African Americans and whites.[178] The court in *Euclid CSB* stated that the LV system provided African Americans a meaningful opportunity "*even though* they will need to increase their turnout percentage to take full advantage of it."[179] African American turnout in this election was estimated by Handley to be 11.4% of their VAP, while white turnout was 31.2%.[180] In a report in support of the DOJ's motion, she stated that African Americans had turned out in this election at "a rate comparable to their past participation in local elections."[181] Her estimate of the African American percentage of all the voters in this election was 19.8%, leaving them 5.2% below the threshold of exclusion.[182]

DOJ argued that the election demonstrated that the LV remedy was not legally valid because it did not cleanse the dilution found in the previous at-large arrangement, and should be replaced by a SMD arrangement or LV without the staggered terms, which would lower the LV threshold of exclusion to 16.7%.[183] As noted above, the challenge was based primarily on the African American turnout in this election, which it stated "remained ineffectually low."[184] This was attributed to the persistent vestiges of racial discrimination in Euclid.[185]

It further maintained that given the racial disparity in turnout in the election, "African-American voters will not be able, in the foreseeable future, to elect a candidate of their choice unless that candidate also happens to be white."[186] This is hardly demonstrated by one election, especially this one, given that it was not an election in which non-African American voters vetoed an African American candidate who was the choice of a cohesive set of African American voters.

---

177. United States' Motion for Relief Pursuant to Rule 60(b)(6), *Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (No. 08-2832), ECF No. 51 (hereinafter U.S. Motion for Relief). The DOJ had filed a notice to appeal *Euclid* to the Sixth Circuit on September 10, 2009, but voluntarily dismissed it on November 13, after the 2009 election. *More Lawsuit News*, BALLOT ACCESS NEWS (Oct. 1, 2009), http://www.ballot-access.org/2009/100109.html; *U.S. Justice Department Drops Appeal in Euclid, Ohio Case; Victory for Limited Voting*, BALLOT ACCESS NEWS (Nov. 13, 2009), http://www.ballot-access.org/2009/11/13/u-s-justice-department-drops-appeal-in-eu clid-ohio-case-victory-for-limited-voting/.

178. U.S. Motion for Relief, *supra* note 177, at 5–7.

179. *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 770 (emphasis added).

180. Handley Report, *supra* note 175, at 4.

181. *Id.* at 3–4.

182. *See id.* at 5.

183. U.S. Motion for Relief, *supra* note 177, at 11–13.

184. *Id.* at 1.

185. *Id.* at 10.

186. *Id.* at 9.

DOJ argued, however, that voting was racially polarized under the "separate electorates test of *Thornburg* v. *Gingles.*"[187] It considered this "test" satisfied because "[w]hite voters would have elected the three white candidates; African-American voters would have elected two of the white candidates and the African-American candidate."[188] In short, the LV system was dilutive, the DOJ argued, because an African American candidate receiving 18.9% of the African American vote was not elected.

In *Gingles*, however, the Supreme Court did not endorse a "mechanical reliance on this standard," such as that employed by the DOJ, as a basis for determining whether the degree of racially polarized voting is "legally significant" and the system therefore dilutive.[189] Whether the defeat of an African American candidate who received 18.9% of the votes cast by African Americans, and finished a distant second from the group's most preferred candidate, a white candidate who received a majority of their votes, would satisfy this standard, is very questionable. When over 80% of the African American voters cast their vote for one of the white opponents of the only African American candidate, African Americans can hardly be considered cohesive in their support of her.

The Euclid school board responded by stressing that the candidate that was the "strong preference" of African American voters in this contest, Mr. Smith, was elected, and that African American voters "simply did not vote for Ms. Moton in great numbers."[190] Ms. Moton's low level of support from African Americans was further evident in the fact that she finished last among the four candidates, with only 12.1% of the total vote, in the geographical area of the illustrative majority-African American school board district that the DOJ presented at trial.[191] She also finished last in the geographical areas of the two majority-African American districts used in city council elections in Euclid, with 14.7% of the vote in one and 13.8% in the other.[192]

187. *Id.* at 5; Thornburg v. Gingles, 478 U.S. 30 (1986) (identifying the basic evidentiary issues in a minority vote dilution case under Section 2).

188. U.S. Motion for Relief, *supra* note 177, at 5.

189. *See Thornburg*, 478 U.S. at 58.

190. Defendant Euclid City School District Board of Education's Response to Plaintiff's Motion for Relief Pursuant to Rule 60(b)(6) at 9–10, United States v. Euclid City Sch. Bd., 632 F. Supp. 2d 740 (N.D. Ohio 2009) (No. 08-2832), ECF No. 54 [hereinafter Euclid City Sch. Bd. Response to Mot. for Relief].

191. *Id.* at 11.

192. *See* Richard L. Engstrom, Report in Response to Dr. Lisa Handley's Analysis of 2009 School Board Election for U.S. v. Euclid City District Board of Education at 5, *Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (No. 08-2832), ECF No. 54-1 [hereinafter Engstrom Response]. The African American percentage of the VAP in the DOJ's illustrative School Board district was 61% based on the 2000 census. *Id.* at 4. Dr. Handley provided a "guesstimate" at trial, however, that it had increased to 74.7% by then. *Id.* at 5. The two city council districts were 67.3% and 62.3% African American respectively in VAP as of the 2000 census. *Id.*

The defendant argued that this one election was not a basis for vacating the remedy.[193] It noted that not only did Ms. Moton not receive much of the African American vote, she did not run a campaign comparable to those of the other candidates.[194] She was a "self-starting candidate" who had "little name recognition."[195] She had no previous political experience. She had never worked in a campaign, even as a volunteer, and soon recognized that she faced a "steep learning curve" about campaigning.[196] She spent less money on the campaign than her competitors and engaged in fewer and less extensive campaign activities than the other candidates.[197] Yet she found the campaign to be "fair and friendly."[198] She further opines that the new LV system gives her a "fighting chance," and plans to run again, relying on what she has learned from her first campaign.[199]

A decision on the DOJ's motion to vacate the remedy had not been made at the time this article was completed.

## VI. CONCLUSION

The acceptance of CV and LV by the judges in *Port Chester* and *Euclid CSB*, after adversarial remedial proceedings,[200] will result in these election systems gaining increased attention, especially as we enter the post-2010 round of redistricting. Small political jurisdictions that do not want to break their elections down into even smaller districts can be expected to be the most attentive. The attorney for Lake Park, Florida, for example, concluded that, given the turnout expected in municipal elections, there would be only about 75 voters casting ballots per district if four SMDs were used in town

---

193. *Id.* at 14.

194. The mayor of Euclid was reported to have said that Ms. Moton campaigned less than the other candidates. He observed campaign material around the city for the three incumbents, but not for her. Patrick O'Donnell, *Euclid Voting Change Doesn't Net Intended School Board Results*, PLAIN DEALER, Nov. 5, 2009, at A8.

195. Euclid City Sch. Bd. Response to Mot. for Relief, *supra* note 190, at 12.

196. *Id.*; Engstrom Response, *supra* note 192, at 7–11.

197. Euclid City Sch. Bd. Response to Mot. for Relief, *supra* note 190, at 12–13. Ohio Campaign Finance Reports filed by the candidates in this election are attached as an Appendix to the Euclid City School Board's Response. The following are the campaign expenditures reported: by Mr. Smith, $4,037.06; by Ms. Sudar, $2,493.95; by Ms. Lisy, $1,517.43; and by Ms. Moton, $764.23.

198. *Id.*

199. *Id.* at 13.

200. Abigail Thernstrom has somehow read into these recent cases that the DOJ is a proponent of CV and LV, given "its seeming enthusiasm for their much wider adoption." Thernstrom, *supra* note 55, at 34. As an expert witness subjected to cross-examination by DOJ lawyers during the remedial hearings in both *Port Chester* and *Euclid City Sch. Bd.*, I can state that their enthusiasm was in a much different direction.

of these systems around the country, especially among small local jurisdictions. They can be adopted without adversely affecting minority electoral opportunities, and in some contexts even increasing them. The release of the 2010 census figures will stimulate increased attention to how electoral competition is structured in many jurisdictions, and more adoptions of CV and LV systems are likely.

SAINT LOUIS UNIVERSITY SCHOOL OF LAW

SAINT LOUIS UNIVERSITY SCHOOL OF LAW