EXHIBIT Q

# The Context Matters: The Effects of Single-Member versus At-Large Districts on City Council Diversity

**Jessica Trounstine** Princeton University
**Melody E. Valdini** Portland State University

*Scholars continue to debate the degree to which electoral institutions matter for representation. The literature predicts that minorities benefit from districts while women benefit from at-large elections. The mechanisms by which institutions affect the ability of traditionally underrepresented groups to win seats have been understudied. Using an analysis of over 7,000 cities and interviews with city councilors, we find that compared to at-large systems, district systems can increase diversity only when underrepresented groups are highly concentrated and compose a substantial portion of the population. In addition, we find that the electoral system has a significant effect on representation only for African American male and white female councilors; the proportion of African American women and Latina councilors is not affected by the use of either district or at-large systems.*

Extensive research has been devoted to understanding the continuing underrepresentation of women and people of color in legislatures. At the city level scholars have found mixed results for the effect of single-member district elections in increasing descriptive representation. Particularly in places where citywide elections were implemented to dilute the vote strength of racial groups, districts have been seen as a key factor in increasing racial and ethnic diversity. Alternatively for women, districts have been found to be detrimental to the election of female councilors. Scholars have proposed numerous, contradictory explanations for these findings. For minorities the focus has been on residential segregation and size of the group, while women are said to benefit from the multicandidate setting of at-large elections. For women of color these explanations are in direct conflict. This article contributes to this large literature by exploring the mechanisms by which institutions affect the representation of different groups, concurrently testing the segregation and group size hypotheses and taking into account the joint relationship between race and gender. Many of our findings confirm conventional wisdom, but advance our knowledge in this area by offering empirical estimates of the effect of different demographic contexts in varied institutional environments.

As the Supreme Court anticipated in the landmark case *Thornburg v. Gingles* (1986), we demonstrate that compared to citywide elections, districts increase representation when a group is geographically concentrated and moderately sized. Further, we find districts only benefit black men. That is, the positive effect of districts is conditional on the context. Districts can increase opportunities for representation, but in some cases districts are not helpful. Only rarely do districts have a substantial impact. Taking advantage of variation among city institutional structures, council composition, and demographics, we use quantitative and qualitative methods to study these relationships. We analyze data from surveys of city clerks and election results from more than 7,000 cities and connect this analysis to the experience of local legislators through interviews with city councilors.

While the existing literature on underrepresentation is vast, our article makes several contributions to the understanding of the relationship between electoral institutions and representation. First, we offer a methodological contribution. While no model is perfect, our analyses

Jessica Trounstine is assistant professor of politics and public affairs, Princeton University, Woodrow Wilson School, 303 Robertson Hall, Princeton, NJ 08544 (jessica@trounstine.com). Melody E. Valdini is assistant professor of political science, Portland State University, Division of Political Science, Hatfield School of Government, P.O. Box 751, Portland, OR 97207 (mev@pdx.edu).

The authors would like to thank Zoltan Hajnal for the generous use of his data. They would also like to thank Chris Achen, Chuck Cameron, David Lewis, Doug Massey, Nolan McCarty, and Melody Rose for extremely helpful comments on drafts of the article, and Gretchen Kafoury for her very helpful advice on securing interviews with city council members. Benjamin Tagoe provided excellent research assistance.

*American Journal of Political Science*, Vol. 52, No. 3, July 2008, Pp. 554–569

©2008, Midwest Political Science Association




ISSN 0092-5853

T
Jm 8-21-15

improve on previous research by taking into account the large number of cities with no female or minority councilors, allowing us to make more precise predictions. We use tobit models to predict, first, the likelihood that a city will elect any women or people of color and then, to estimate the proportion of female and minority councilors. Second, while existing research on electoral systems and underrepresentation has tested the effects of either segregation *or* group size, we are the first to include both variables in our analysis. Further, much of the work on the effect of districts studies councils at or before 1990 and/or is limited to a small sample of cities; we use recent data on a large number of cities to analyze patterns across time and place. Finally, most previous research as well as the *Thornburg v. Gingles* (1986) decision assumes that the effect of electoral systems on the election of people of color is constant across gender. For example, the justices refer to the effect of districts on the representation of "minority groups" or "black citizens," but there is no discussion of the possibility that electoral institutions work differently for men as opposed to women of color. The fourth contribution of our article is to question this assumption, and, although we have limited data, we present evidence that the effect of electoral institutions is significantly different for men versus women of color.

Even after decades of progress there remain substantial disparities in the representation of black/African American, Latino/Hispanic, and women city council members compared to their population proportions.[1] The average city in our data set has a population that is 8% African American, 7.6% Latino, and 52% female while the average city council has a membership that is 4.8% African American, 2.3% Latino, and 20.5% female. Yet, there is wide variation among municipalities and across time. A clear question emerges: why do some cities do better than others at electing women and people of color?

## Single-Member Districts: An Institutional Solution?

One of the most persistent findings by scholars of urban politics is that single-member district elections increase descriptive representation of underrepresented racial and ethnic groups on city councils.[2] This effect has been found to be particularly strong for African Americans (see, for example, Arrington and Watts 1991; Bullock and MacManus 1990; Davidson and Grofman 1994; Polinard, Wrinkle, and Longoria 1991; Welch 1990).[3] Districts have also been found to be beneficial to Latinos (e.g., Davidson and Korbel 1981; Heilig and Mundt 1983; Leal, Martinez-Ebers, and Meier 2004; Taebel 1978).[4] These statistical findings have been supported by extensive case study and historical research as well (Bridges 1997; Rice 1977). In sum, the literature concludes that "the effect of . . . districts is unequivocally . . . greater equity" (Mundt and Heilig 1982, 1035).

The literature on the representation of women finds precisely the opposite effect for single-member districts. While there are some exceptions, the vast majority of the research has concluded that districts are either meaningless (Alozie and Manganero 1993; Bullock and MacManus 1991) or disadvantageous for women candidates (see, for example, Darcy, Welch, and Clark 1987; Hogan 2001; King 2002; Matland 1995; Matland and Brown 1992; Norris 1985; Rule 1994; Schwindt-Bayer and Mishler 2005, Welch and Studlar 1990).

Because race and gender are not mutually exclusive categories, a handful of scholars have also sought to understand how electoral institutions affect women of color given that they face a potential double disadvantage (Githens and Prestage 1977) and conflicting institutional effects. Existing research finds that black women are most likely to be elected in state multimember districts (analogous to at-large elections in cities) while black men are disadvantaged by this structure (Darcy, Hadley, and Kirksey 1993; Rule 1992). Similarly, Herrick and Welch (1992) and Karnig and Welch (1979) find that black men, but not black women, are advantaged by districts. Further, Karnig and Welch (1979) find no effect of districts for Mexican American men or women. This suggests that the effect of districts should be conditional on the characteristics of the group as well as the candidate in question.

In addition to academic work, the process of vote dilution and the effect of institutional structures on representation have been the subject of intense legal analysis. The United States Supreme Court held in *Thornburg v. Gingles* (1986) that in challenging at-large or multimember districts minority plaintiffs must demonstrate (among other things) that the group in question is sufficiently large and compact enough to constitute a majority of a single-member district. While these criteria are consistently used in legal and scholarly work, there have been

[1] We use the terms *black/African American* and *Hispanic/Latino* interchangeably. Due to data limitations we are not able to study the effect of electoral institutions for Asian Americans.

[2] Descriptive representation and substantive representation are not interchangeable. See Guinier (1992) and Tate (2003) for in-depth discussions.

[3] Others find that districts are not superior (e.g., Bullock and MacManus 1993) or that the effect of districts has substantially weakened over time (Welch 1990).

[4] Others find that at-large systems offer better representation for Latinos (e.g., Mladenka 1989)

no studies that have determined whether or not districts serve to increase representation when these conditions are met at the local level. We begin to do so here.

Cities in the United States tend to elect their city councils using two electoral system types: single-member districts or at-large elections. When councilors are elected by district, the city is divided into geographic areas of roughly equal population size that elect a single member to the city council in a plurality or majoritarian contest. An at-large system is one in which members of the city council are selected by the entire city electorate. In most cities this means that voters are offered a slate of candidates and are allowed the same number of votes as there are seats available. Cities often have majoritarian requirements such that if a candidate does not receive 50% of the vote she is forced into a run-off election. Some cities designate seats or residency requirements for at-large positions turning the election into a series of single-member contests, while other cities vote for only one at-large member in any given election. A small but growing number of cities use mixed systems, electing some council members by district and others at-large. Scholars have found that these mixed systems as well as modified at-large systems that employ different vote count procedures lead to descriptive representation at levels closer to single-member districts (Brockington et al. 1998; Karnig and Welch 1982; Welch 1990). The number of cities using pure at-large systems has declined over the past 20 years, but at-large elections remain a common feature in city politics. The majority of cities in our study elect their members at-large.

In order for district elections to increase the proportion of councilors relative to the population size of an underrepresented group, previous literature has posited that three factors might come into play: concentration, size, and polarization of the vote. First, the group must be geographically concentrated to take advantage of districts (Sass 2000; Vedlitz and Johnson 1982). If group members are spread throughout the city so that they do not compose a simple majority of any one district, presumably districts would not increase representation of the group compared to an at-large system.

The size of the group (of voting age citizens) should also impact the efficacy of districts (Brace et al. 1988; Bullock and MacManus 1990; Grofman and Handley 1989; Leal, Martinez-Ebers, and Meier 2004). At minimum, if the group represents less than one-half of the population needed to elect a single council seat, districts are unlikely to ensure greater representation than at-large systems. Alternatively, if a group composes a majority of the city population in a majoritarian, at-large system, the group may be able to win all of the council seats. Districts might even decrease the group's representation on the city council. We predict that geographically concentrated, midsized groups will benefit most from district elections.

Finally, these expectations rely on an assumption of polarized voting. The group must vote in a substantial bloc for candidates who are members of the group, and other groups must be substantially unwilling to vote for members of the group (Brace et al 1988; Davidson and Korbel 1981; Engstrom and McDonald 1982). If either one of these does not hold, it is unclear whether the electoral system will have any direct effect on group representation.

Polarized voting affects different racial and ethnic minorities to different degrees. For instance, the more heterogeneous the group is, the less likely they may be to vote as a bloc, which is particularly important for Latino communities (Pachon 1999). For this reason we expect the effect of districts to be less pronounced for Latinos relative to African Americans. However, we still expect districts to have some impact. Research has found that Latinos share a significant number of characteristics that encourage ethnically based voting, including discrimination, immigrant experiences, Latin American heritage, and Spanish language (see Barreto 2004 for a literature review). Further, due to the lack of partisan identification in most city-level contests, candidate characteristics like race, ethnicity, or gender may take on additional importance for voters looking for informational cues (Bobo 1988; Kaufmann 2004; Popkin 1991; Tate 2003; Valdini 2006).

Nearly all of the research on racially polarized voting has concentrated on state- and federal-level elections (see Hutchings and Valentino 2005 for a review). At the local level, Hajnal and Trounstine (2005) found that blacks and Latinos tended to vote most cohesively for the same candidate. Across 10 of the United States' largest cities, 74% of blacks and 72% of Latinos voted for the group's majority preferred candidate. This was compared to 67% of whites voting for the group's first choice. Additionally they find a significant racial/ethnic divide in votes for the winning candidate, with a 39 percentage point gap between whites and African Americans, and a 20 percentage point gap between whites and Latinos. These figures bolster our prediction that districts will be most helpful for African Americans.

The logic of concentration and group size also works to explain potential differential effects of districts for people of color and women. Women are rarely (if ever) highly concentrated in a community. The same can be said for group size and the representation of women. Because women are nearly always between 48% and 52% of a community's population, we cannot expect that they will be aided by districts. Furthermore, there is little evidence of gender-polarized voting. A number of studies have found

that voters evaluate female candidates drawing on gendered stereotypes (e.g., Dolan 2004; Huddy and Terkildsen 1993; McDermott 1997; Valdini 2006) and that these stereotypes can affect perceptions about candidates (Koch 2000) and vote choice (Brown 1994; Brown, Heighberger, and Shocket 1993; Sanbonmatsu 2002).

However, stereotyping only equates to polarized voting when there are gendered differences in the judgments of voters. Some research has determined that women are more likely to prefer female candidates and men to prefer male candidates (Sanbonmatsu 2002). But, other scholars argue that there is little evidence of gender group consciousness (Conover 1988; Gurin 1985) and that women are equally if not more unlikely to vote for female candidates as men (Darcy and Schramm 1977; Karnig and Walter 1976). In the aggregate, the gender gap (while persistent) tends to be small with regard to support for parties and candidates (see Norrander 2003 for a review).

So although it is likely that women are treated differently from men in elections, it is unclear how these differences should interact with institutional variation. According to the criteria specified in *Thornburg v. Gingles* (1986), women are unlikely to benefit from districts. Scholars have suggested, among other reasons, that women might do better in multimember elections (such as at-large systems) because the competition is not zero-sum, meaning that voters need not choose women at the expense of men (Karnig and Welch 1979; Matland and Brown 1992; Matland and Studlar 1996). On the other hand, scholars have not proposed that the zero-sum calculation applies to racial and ethnic minorities.[5] This implies that the electoral structure is predicted to affect racial and ethnic minorities in a different way and for different reasons than women. So how should our expectation change when we are talking about women of color; do the predictions for multimember elections only apply to white women?

There is some evidence that racial bloc group voting does not apply to women of color, particularly when men of color are also running. McClain, Carter, and Brady (2005) find that black women have a harder time gaining the support of race-based organizations compared to black men, and Philpot and Walton (2007) find that black women are the strongest supporters of black female candidates. Given that our concentration and size hypotheses depend on polarized voting, we might not expect districts to help black women. On the other hand, some scholars have found that black women and Latinas are *better* represented than white women (Darcy and Hadley 1988; Garcia Bedolla, Tate, and Wong 2005; Montoya, Hardy-Fanta, and Garcia 2000). Garcia Bedolla, Tate, and Wong (2005) explain this finding as potentially resulting from block group voting. This would also be supported by Philpot and Walton's (2007) finding that black men tend to be stronger supporters of black female candidates than white women or white men. Further, a number of studies have found that race trumps gender in determining voting behavior and attitudes (Gay and Tate 1998; Lien 1998) and that the gender gap is essentially the same across racial and ethnic groups (Welch and Sigelman 1992). In sum, while we expect white women to benefit from at-large elections, and black men to benefit from districts, there are no clear hypotheses that emerge for black women and Latinas with regard to the effect of institutional structure.

## Testing the Effects of the Electoral System on Representation

To understand more about why single-member districts help certain underrepresented groups and not others, we begin by testing the relationship between electoral structure and diversity in cities. Our data come from surveys by the International City/County Manager's Association (ICMA) conducted in 1986, 1992, 1996, and 2001. The ICMA survey is mailed to city clerks in approximately 7,500 cities including all municipalities with more than 2,500 residents. The average survey response rate for the years we analyze is 63%.[6] The survey provides demographic information about council members and institutional variables for the cities. To control for city-level demographics we use 1990 census data for all 1986 observations, 2000 census data for all 2001 observations, and linearly interpolate values for 1992 and 1996. In total we have 7,174 unique cities in the data set.

[5] Clearly more research should be done to determine the extent to which zero-sum calculations apply to different groups. It is possible that even in at-large settings such a calculation could be invoked, particularly when cities use designated post systems or staggered elections.

[6] Determining the effect of response rates to the ICMA is difficult because no other source contains institutional data for the same time period; but we can use data from the 1987 Census of Governments (COG) as a comparison for our main independent variable. The proportions of councilors elected in each type of system are similar in the two data sets. In the 1986 ICMA data 72.3% of cities elected councilors at-large, 11.6% used districts, and 16.2% used a mixed system. The COG reports 74.2% of cities elected councilors at-large, 13.5% used districts, and 12.3% used a mixed system. It does appear that western and southern cities are underrepresented in the ICMA compared to the census. The control variables included in our analyses should mitigate the effect of this underrepresentation; nonetheless we add the caveat that our findings are most directly applicable to the types of cities included in the ICMA sample. Weighting by region does not change our conclusions. Summary statistics for all variables are available from the authors.

In addition to the statistical analysis, we present responses from interviews of current city councilors from a sample of cities with mixed electoral systems.[7] These interviews served a number of purposes in our investigation. First, they helped us to identify the contextual factors that interact with institutions and affect the election of women and minority councilors. Secondly, they provide useful examples of our empirical findings. Finally, they offer face validity of our findings from people working in city politics. As we had hoped, all of the interviewees in our sample were familiar with both types of electoral systems and made a decision to run in one type rather than the other. Of the 174 councilors serving in 2006, 98 (or 56%) were female and/or persons of color. We randomly selected one-third of these members for an interview. Eleven councilors chose to participate in a phone interview in which we asked respondents open-ended questions regarding the effect of electoral institutions for electing white women, women of color, and men of color.[8]

In the quantitative analysis our dependent variables are the proportion of city councils that are black, Latino, and female. Unfortunately, the ICMA survey data do not specify the race of women councilors or the gender (or ethnic background) of those in the included racial categories. While it would be ideal to augment our discussion of women of color with ICMA data, we cannot. However, using data from a different source for 1986 we are able to perform a separate analysis of the effect of districts for black women versus black men and Latinas versus Latinos. In all of the analyses our primary independent variable is the percentage of councilors elected by district in each city. The majority of cities in our data set have a city council that is either elected wholly by districts or at-large, but some have mixed systems in which a portion of the council is elected by district and a portion elected at-large. To capture this variation we use a continuous version of the variable.

We add to these regressions a number of other institutional variables that have been linked to minority council representation either directly or indirectly through turnout and mobilization effects. These controls include nonpartisan versus partisan elections, mayor council versus council manager systems,[9] the size of the city council,[10] the presence of term limits, and a dummy variable noting whether city elections are held concurrently with national elections.[11] Because some city institutions are subject to closer scrutiny as a result of the Voting Rights Act (VRA) and our primary independent variable (elections by district) may in fact be the result of challenges brought under the VRA, we include a dummy variable indicating jurisdictions required to secure preclearance as per Section 5. We include citywide socioeconomic variables to account for the possibility that female or minority presence on the council is linked to wealthier or more educated communities.[12]

We control for potential region effects and the racial and ethnic makeup of the city population. Latinos have lower citizenship rates and younger populations than whites and African Americans, perhaps limiting their ability to affect election outcomes (Jones-Correa 1998). To control for this we include a measure of the total proportion of the city population that are noncitizens and the proportion that is 18 and older. To account for liberal leaning communities that might be more likely to elect women and minorities, we include a measure of the countywide vote for the Democratic presidential candidate in 1988 and a dummy variable for central cities. To control for the likely relationship between time and our independent and dependent variables, we include year fixed effects (with 2001 as the base category). Finally, in all models we include the population proportions of African Americans, Latinos, and Asians in each city.[13] As was true with our dependent measure of racial and ethnic representation, we

[7]The cities are the 10 largest mixed system cities: Houston, Philadelphia, Charlotte, Jacksonville, Indianapolis, Boston, Washington DC, Denver, Nashville, and New Orleans.

[8]We interviewed six white women, two African American men, one African American woman, one Latino, and one Latina. Prior to each interview we requested permission to record and quote each councilor. We received consent from all but one council member who is not quoted by name in this manuscript. Transcripts are available from the authors upon request.

[9]Using a more nuanced version of this variable allowing for mayor council systems with a city manager makes no difference to the results.

[10]Scholars have argued that in smaller councils the value of each seat is greater and therefore less likely to be represented by minorities or women (see Welch and Karnig 1979).

[11]Ideally we would have also included controls for the city's vote-count procedure, but these data are not collected by ICMA, and the large size of the data set precluded us from collecting it.

[12]Unfortunately, group-specific versions of these demographic variables are not available from the 1990 census so we were unable to test the alternative argument that group resources determine representation (see, for example, Cole 1974; Karnig 1979).

[13]Ideally these proportions would be in reference to the population of citizens over the age of 18. However, the census did not provide data for citizens over the age of 18 by race/ethnicity for our entire time period. We tested alternative formulations of population measures assuming in 2000 a constant citizenship rate across age groups and in 1990 a constant citizenship rate across racial and ethnic groups. The alternative specification made little difference to the results and is available from the authors.

cannot account for racial and ethnic group heterogeneity in these models.[14]

Like most research on this topic, we restrict our results to cities with substantial minority populations. Rather than select an arbitrary minimum for the size of groups, we allow the threshold to vary by city depending on the size of the city council. An observation is included if the group in question composes at least one-half of the percentage that a single council seat represents.[15] Our analysis assumes that black residents will be the strongest supporters of black candidates and Latino residents for Latino candidates. The larger the city council the easier it should be for any group to win representation. Using a varying threshold takes this into consideration.

The mean number of council seats is six, so on average a city is included if the underrepresented group is at least 8% of the city's total population. We apply this selection criterion regardless of the electoral system employed. When we test the hypothesis that the size of the group matters for the effectiveness of the electoral system, we relax this selection criterion and restrict the analysis to cities that have nonzero populations of the group in question. This allows us to directly test the assumption that a group will benefit most from districts when its population is larger than one-half of the percentage of a single council seat but less than a majority of the total population.

Due to the extremely large number of cities that have no female or minority councilors, we use a random-effects tobit model to estimate the effects of districts on council representation [$y_i^* = x_i'\beta + \varepsilon_i^*$, where $y_i = y_i^*$ if $y_i^* > 0$ & $y_i = 0$ if $y_i^* \leq 0$].[16] The model, a maximum-likelihood estimation censored at zero, combines the logic of probit and multiple regression to estimate both the probability of a council having any female or minority members, and given this, predicts the expected proportion of female councilors and councilors of color.

Do districts increase the proportion of African American, Latino, and women councilors? The results displayed in Table 1 confirm that district elections continue to aid minority members in getting elected and are a nominal detriment to women. A variety of simulations help to clarify the relationships between district elections and representation. We predict the marginal effect of the electoral system on the proportion of women and minority council members when moving from a system in which a majority of the council is elected at-large to a system in which a majority of the council is elected by district, holding all other variables constant at their mean values. First, we predict the effect of districts on the probability of a city having any members of the underrepresented group on the council. Then, we predict the effect of districts on the expected proportion of female and minority council members, weighted by the probability that this value is positive.[17]

For African Americans, having a majority of council members elected by district increases the probability of electing any African Americans to the city council by more than 10 percentage points, from 73% in at-large cities to 84% in district cities.[18] The expected proportion of African American councilors increases by about five percentage points under districts, from 13% to 18%. Because the average city in our data set has six council members, in order for a group to gain an additional seat districts need to provide about a 16-point advantage. In our model, districts clearly fall short of this threshold for African Americans.

The key factor in increasing African American representation is the proportion of the city that is black. For Latinos, districts have a weaker effect on representation. For both at-large and district systems the probability of having any Latino councilors at all is low; 27% in at-large systems and 33% in district systems. When this is taken into consideration the relationship between district systems and the expected proportion of the Latino councilors is limited to about $1\frac{1}{2}$ percentage points, going from 4.1% in at-large systems to about 5.5% in district systems. The Latino population in a city plays a key role in the election of Latino council members. Nearly equal in effect is the percentage of the city that has the rights of citizenship.

Echoing the results of our regression analyses, nearly every interviewee in our sample agreed that district systems were better than at-large systems for electing people of color. For example, Councilman Jamie Isabel, an African American member on the Nashville City Council, explained, "It's happened again and again where African Americans can't get enough votes to win at-large." Susan Burgess, a white woman serving in an at-large seat in the Charlotte City Council, echoed his

[14]Scholars find that assuming ethnic or racial group homogeneity severely biases estimates of representation (DeSipio 1996; Sass 2000; Tam 1995), but we have no fix for this problem.

[15]We repeated the analyses using a 5% threshold of the group in question instead of allowing the threshold to vary based on council size (available upon request from the authors). The results are extremely similar and our conclusions hold in all cases.

[16]The likelihood function for each unit is computed using the Gauss-Hermite quadrature. The estimates were stable in multiple tests. Alternate specifications using a tobit model with Huber/White clustered standard errors are nearly identical. We further tested weighted models to correct for heteroskedasticity and got similarly strong results.

[17]Effects on uncensored observations are also available from the authors.

[18]Predictions calculated using Stata/SE 9.2 mfx command.

sentiments, stating that districts are "absolutely" better than at-large seats for electing people of color. Councilwoman Rosemary Rodriguez, a Latina serving on the Denver City Council, believes so strongly in the positive consequences of district elections for increasing the representation of people of color that she worked for electoral reform for other local offices in her city. She explains: "I actually persuaded the legislature to adopt single-member districts for Denver for a majority of the school board seats so that we could try to achieve Hispanic representation. And ever since that bill was passed, we have had a Hispanic member elected to the school board."

## The Effect of Institutions for Women

For women, the results in Table 1 suggest that the probability of a council having at least one female councilor is high: about 83% in at-large systems and about 80% in district systems, with the expected proportion of female

**TABLE 1 Tobit Regression on the Percentage of Minority and Female Council Members**

| | % Black | | % Latino | | % Women | |
|---|---|---|---|---|---|---|
| | Coefficient | St Err | Coefficient | St Err | Coefficient | St Err |
| % District | 0.06** | 0.01 | 0.05** | 0.02 | −0.02** | 0.01 |
| Demographics | | | | | | |
| % Latino | 0.18** | 0.07 | 1.68** | 0.08 | −0.00 | 0.03 |
| % Black | 0.85** | 0.03 | 0.17* | 0.09 | 0.12** | 0.02 |
| % Asian | −0.41** | 0.21 | 0.53** | 0.16 | 0.08 | 0.07 |
| % Women | 0.43** | 0.16 | −0.53* | 0.32 | −0.16 | 0.10 |
| Total Pop (mil) | 0.02 | 0.03 | 0.02 | 0.05 | 0.05* | 0.03 |
| % Poor | 0.29** | 0.10 | −0.00 | 0.18 | −0.07* | 0.04 |
| Med. Income (ths) | −0.00 | 0.00 | 0.00 | 0.00 | −0.00 | 0.00 |
| % Coll. Grad | 0.23** | 0.07 | 0.26** | 0.13 | 0.21** | 0.03 |
| % Noncitizens | −0.05 | 0.15 | −1.26** | 0.14 | 0.00 | 0.07 |
| % Pop Over 18 | 0.02 | 0.11 | −0.02 | 0.15 | 0.18** | 0.05 |
| Democratic Vote | −0.14** | 0.05 | 0.15* | 0.09 | −0.01 | 0.02 |
| Institutions | | | | | | |
| Term Limits | −0.00 | 0.01 | 0.03 | 0.02 | 0.02** | 0.01 |
| Nonpartisan | 0.00 | 0.01 | −0.01 | 0.03 | −0.00 | 0.01 |
| Mayor Council | −0.00 | 0.01 | 0.02 | 0.02 | −0.00 | 0.00 |
| Council Size | 0.00 | 0.00 | 0.01** | 0.00 | 0.00** | 0.00 |
| Concurrent | −0.01 | 0.02 | 0.02 | 0.02 | 0.01* | 0.01 |
| VRA | 0.00 | 0.01 | 0.04 | 0.03 | | |
| Geography | | | | | | |
| Central City | 0.07** | 0.01 | 0.08** | 0.02 | 0.02** | 0.01 |
| West | 0.08** | 0.03 | 0.05* | 0.03 | 0.10** | 0.01 |
| Northeast | 0.02 | 0.02 | −0.03 | 0.04 | 0.02** | 0.01 |
| Midwest | −0.00 | 0.01 | 0.00 | 0.04 | 0.04** | 0.01 |
| 1986 | −0.07** | 0.01 | −0.03 | 0.03 | −0.07** | 0.01 |
| 1992 | −0.02** | 0.01 | −0.01 | 0.02 | −0.02** | 0.01 |
| 1996 | −0.01 | 0.01 | −0.00 | 0.03 | 0.07** | 0.01 |
| Constant | −0.37** | 0.15 | −0.46* | 0.26 | 0.03 | 0.06 |
| *N* | 3042 | | 2749 | | 11537 | |
| Wald $\chi^2$ | 1670.83** | | 1258.24** | | 1668.51** | |

*p < .10, **p < .05.
*Source*: International City/County Manager's Association (ICMA) surveys of 1986, 1992, 1996, and 2001.

councilors going from 20% in at-large cities to 18% in cities with district elections. None of the other variables perform particularly well predicting women's representation. The model suggests that increasing the proportion of women in a city negatively impacts the chance of having women on the council. Women are also aided by larger city councils. To test whether or not this finding reflects the benefit of increased district magnitude that other scholars identify, we interact this variable with a dummy variable indicating whether the majority of the councilors are elected at-large or by district. Our findings reflect the conventional wisdom (e.g., Alozie and Manganaro 1993); women do better with larger city councils, but in at-large cities this effect is much more pronounced. Once the interaction is included, the independent effect of at-large elections actually disappears. This offers indirect support for the argument that women benefit from a nonzero-sum setting.

The opinions of our interviewees reflect these muddled findings of the effects of at-large versus district elections for women. Councilperson Carol Boigon felt strongly that at-large seats are better for electing women candidates. She explained that in her council, "the two at-large seats run at the same time—no differentiation occurs—one race, two top vote getters get seated. So there were seven men and me. So you win by a plurality, which really strengthens the hand of women." Council members Jamie Isabel, Glorious Johnson, Susan Burgess, and Anna Verna, on the other hand, all felt that districts are the better choice for increasing the number of women in office. However, when asked *why* they felt that district elections are better for electing women, every respondent gave a different answer.

Councilwoman Johnson explained districts were better because of the ability of women to be active and known within their districts, stating that the women currently serving in district seats on her council "have . . . clout when it comes to that district because they have been known since they were children." Councilwoman Burgess suggested that districts are better for women because they are less competitive. She explained, "Once you win a district election, many times the district representatives don't even have competition in their subsequent elections. At-large is always competitive. Very tough races, to be truthful and we have only one woman and three men." Three other council members all argued, however, that it was a toss-up and/or that the election of women depended on factors specific to each electoral contest, not the electoral system. Councilwoman Sanders of Indianapolis stated, "I don't know that there's really much difference [between at-large versus district elections], at least not in my experience."

Clearly, the variety of responses and opinions given on this subject is quite different from the nearly uniform responses given on the effects of district elections for the election of people of color. The wide range of responses regarding the effect of institutions on the representation of women is not too surprising given our statistical results. We found that women are negatively affected by districts, but the results were small, with the predicted proportion of women increasing only about 2% in at-large cities. In sum, after controlling for a variety of factors, it appears that districts have a limited but distinctly positive effect on increasing representation for underrepresented racial and ethnic groups and a small negative effect for women that appears to be driven by the multimember nature of at-large elections.

## The Intersection of Race and Gender

Given that racial and ethnic minority groups seem to benefit from districted systems while women seem to do better in at-large systems, how do black women and Latinas fare in these cities? Our main data set does not provide the racial and ethnic background by gender of city councilors; however, the United States Census of Governments collected these statistics in one year that matches our data—1986. In this year about 16% of white and black councilors and about 18% of Hispanic councilors were women. For the following analyses we use as dependent variables the proportion of the city council that is black women, black men, Latinas, Latinos, and white (non-Hispanic) women. We include all of the controls described above. As above we only include cities with substantial minority and female populations.[19]

The results in Table 2 suggest differential effects of districts for black women and Latinas. Where district elections have no significant effect on increasing the proportion of councilors who are black women, black men get a significant boost from this institutional structure. In fact all of the predicted increase in representation found in Table 1 is attributable to black men. The predicted probability of a council having any black women is about 13%, and the expected proportion of black women is about 1.6% regardless of the electoral system. The probability of a council having any black men is much higher, about 53%

[19]We chose not to select cities on the combined basis of race and gender (e.g., only including cities with a substantial population of black women) because previous scholarship has indicated that race is a more important predictor of vote choice than gender. Thus we assume that the presence of black men and Latinos are important for the election of black women and Latinas.

TABLE 2 **Tobit Regression on the Percentage of Council Members of Color by Gender**

| | % Black Women | | % Black Men | | % Latinas | | % Latinos | | % White Women | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Coefficient | St Er | Coefficient | St Er | Coefficient | St Er | Coefficient | St Er | Coefficient | St Er |
| % District | −0.00 | 0.03 | 0.08** | 0.02 | 0.04 | 0.09 | −0.01 | 0.05 | −0.02 | 0.01 |
| Demographics | | | | | | | | | | |
| % Latino | 0.29 | 0.28 | 0.08 | 0.15 | 0.97** | 0.27 | 1.63** | 0.15 | −0.15** | 0.05 |
| % Black | 0.54** | 0.1 | 0.58** | 0.05 | 0.67** | 0.33 | 0.27 | 0.19 | −0.08** | 0.04 |
| % Asian | 1.36** | 0.63 | −0.03 | 0.36 | 0.43 | 0.6 | 0.21 | 0.36 | −0.09 | 0.13 |
| % Women | −0.19 | 0.57 | 0.49 | 0.31 | −0.02 | 1.22 | 0.58 | 0.78 | −0.36* | 0.19 |
| Total Pop (mil) | −0.06 | 0.11 | 0.01 | 0.05 | 0.07 | 0.13 | −0.04 | 0.08 | 0.06 | 0.05 |
| % Poor | 0.01 | 0.36 | 0.42** | 0.19 | 0.67 | 0.6 | 0.25 | 0.36 | −0.03 | 0.07 |
| Med. Income (ths) | −0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.01 | 0.00 | 0.00* | 0.00 |
| % Coll. Grad | 0.42* | 0.23 | 0.01 | 0.13 | 0.06 | 0.54 | 0.13 | 0.32 | 0.19** | 0.05 |
| % Noncitizens | −0.61 | 0.64 | −0.07 | 0.34 | −0.7 | 0.46 | −1.21** | 0.26 | 0.00 | 0.14 |
| % Pop Over 18 | −0.09 | 0.45 | −0.07 | 0.24 | 0.25 | 0.79 | 0.17 | 0.47 | 0.32** | 0.09 |
| Democratic Vote | −0.03 | 0.15 | −0.20** | 0.08 | −0.35 | 0.35 | 0.15 | 0.18 | 0.03 | 0.03 |
| Institutions | | | | | | | | | | |
| Term Limits | 0.12** | 0.06 | −0.04 | 0.04 | −0.04 | 0.11 | 0.08 | 0.06 | 0.04** | 0.02 |
| Nonpartisan | 0.01 | 0.04 | 0.00 | 0.02 | 0.04 | 0.12 | −0.04 | 0.06 | 0.00 | 0.01 |
| Mayor Council | −0.03 | 0.03 | −0.03** | 0.02 | −0.13 | 0.09 | 0.03 | 0.04 | −0.02* | 0.01 |
| Council Size | 0.01 | 0.01 | 0.00 | 0.00 | 0.03* | 0.02 | 0.02 | 0.01 | 0.01** | 0.00 |
| Concurrent | 0.03 | 0.05 | 0.00 | 0.03 | 0.06 | 0.08 | 0.04 | 0.05 | 0.01 | 0.01 |
| VRA | −0.03 | 0.04 | −0.01 | 0.02 | −0.03 | 0.10 | 0.04 | 0.06 | | |
| Geography | | | | | | | | | | |
| Central City | 0.12** | 0.04 | 0.08** | 0.02 | 0.01 | 0.09 | 0.10* | 0.05 | 0.04** | 0.01 |
| West | −0.14 | 0.11 | 0.03 | 0.05 | 0.03 | 0.10 | 0.09 | 0.06 | 0.12** | 0.01 |
| Northeast | 0.06 | 0.06 | 0.00 | 0.03 | −0.12 | 0.19 | −0.15 | 0.11 | 0.01 | 0.01 |
| Midwest | 0.00 | 0.05 | −0.02 | 0.02 | −0.15 | 0.20 | −0.02 | 0.10 | 0.04** | 0.01 |
| Constant | −0.35 | 0.55 | −0.38 | 0.3 | −1.44 | 1.03 | −1.45** | 0.63 | −0.13 | 0.12 |
| *N* | 893 | | 893 | | 698 | | 698 | | 3563 | |
| Wald $\chi^2$ | 62.12** | | 303.92** | | 30.31 | | 321.97** | | 430.62** | |

*p < .10, **p < .05.
*Source*: United States Census of Governments 1986.

in at-large councils and nearly 70% for district councils. The expected proportion goes from 8% in at-large cities to 14% in districted cities.

For Hispanics the story is different. The electoral structure has no significant effect on the proportion of the council that is Latino or Latina. However, Latinos are much more likely to be represented on councils. The probability of having any Latinos on the council is about 21% and the expected proportion about 3.5%, while the probability of having Latinas on the council is about 4% and the expected proportion less than 1%. Finally, in these results it appears that the positive effect of at-large elections is all going toward white women, although the coefficient does not quite reach statistical significance. The probability of a council having any white women increases from 64% under districts to 67% in at-large cities, with the expected proportion increasing from 12% to 13%.

In sum, black men and white women are the only groups in our analysis that are substantively and significantly affected by electoral institutions, and the biggest benefit of the system appears to be increasing the probability of having any black men or white women, rather than the proportion.

## Concentration of Population Matters

The reason that the electoral system may have a relatively small overall effect for racial and ethnic minorities may

lie in population size and residential concentration of the groups. We now look to see whether districts have a larger effect if these factors are taken into consideration. As opposed to women, African American and Latino voters can be heavily concentrated. The theory that concentration drives the relationship between district elections and representation of racial and ethnic minorities has a substantial number of subscribers (Brace et al. 1988; Davidson and Korbel 1981; Engstrom and McDonald 1982; Mladenka 1989; Vedlitz and Johnson 1982). Yet there have been few attempts to actually test this claim directly (Sass 2000 is an exception). We use 1990 and 2000 census data on concentration in 331 metropolitan areas to do so here.[20]

Demographers rely on a variety of different measures of racial and ethnic concentration and segregation calculated using demographic data collected at the census-tract level (Massey and Denton 1988). One measure is the isolation index, which ranges from 0 to 1 and represents the probability that group members will meet members of their own group in their census tract. A score of .6 for African Americans means that the average African American lives in a census tract that is 60% black. This measure has the benefit of being sensitive to a group's size in addition to the distribution of the group throughout a community. It would be impossible to have a high isolation score unless a group composes a substantial portion of the total community. Both factors are likely important for a group to transform membership into voting strength.

In order to analyze the effect of concentration, we split our data into four samples based on the isolation index for each group and run the same tobit models presented above for each quartile.[21] We hypothesize that the benefits of district elections should be most likely if a group can reasonably generate a voting majority in some neighborhoods. In other words we predict increasingly significant effects as the isolation index increases. The following analyses are restricted to cities with nonzero populations of African Americans and Latinos. We present only the variables of interest, but the models include all of the controls listed in Table 1. The full models are available from the authors.

The results in Table 3 are clear. Only when a group is concentrated will districts promote increased descriptive representation on the council. For African Americans, the effect of districts goes from being negative at very low levels of concentration to significantly positive at high levels. Districts have the largest effect for cities in the third quartile, where moving from an at-large system to a district system increases the estimated probability of electing an African American council member by about 10 percentage points, from 14% to 24%. This is a powerful effect compared to the first quartile, where districts decreased both the probability of having any African American councilors (from 7% to 3%) and the expected proportion from .9% to .3%. When the isolation index is very high for African Americans the effect of districts becomes insignificant. This could indicate the decreased importance of the electoral system when a group makes up a majority of the electorate. The size of the black population is most dominant in the first and fourth models, suggesting that African American council representation in cities at the two ends of the isolation spectrum is best predicted by the size of the minority group itself.

We repeated this analysis with the 1986 census data using the proportion of black men and the proportion of black women as dependent variables. As expected the results hold systematically for the election of black men, but not black women. For black men districts have a negative effect in the first quartile and an increasingly powerful effect in the second through fourth quartiles. For black women the electoral institution has no effect in the first through third quartiles, but districts are extremely powerful and positive in the fourth quartile. When blacks compose a majority of a city's population, districts—not at-large elections—help black women.

As shown in the bottom half of Table 3, for Latinos, the effect of the interaction between districts and concentration is even more striking. The effect of districts is small and highly insignificant in the first and second quartiles. The effect in the third quartile is substantial but not quite statistically significant. Unless Latinos are extremely concentrated, districts make little difference for representation. In the fourth quartile, the impact is large. Districts increase the probability of electing Latinos to the council to 98% from 75% under at-large systems.[22] The predicted proportion of Latinos on the council increases by more than 25 percentage points from 19% in at-large cities to 48% in district systems.[23]

[20]The census did not produce concentration data at the municipality level until 2000, and then only for large cities. To show the effects of concentration across time for as many cases as we can, we rely on the MSA-level statistics, but because of the potential mismatch between MSA- and city-level concentration, we rerun the analysis using 2000 data at the city level for 596 cases.

[21]We elected not to present an interaction model because the effect is nonlinear. We had enough data to estimate the effect in a split sample allowing the coefficients to vary.

[22]We could not run these models on Latinos and Latinas separately because of a lack of data.

[23]Using city-level isolation measures from 2000 for large cities, the results are extremely similar though not exactly the same. For blacks

**TABLE 3 Tobit Regression on Proportion of African American Council Members, Controlling for Concentration**

| | $0 \leq$ isolation $< .25$ | | $.25 \leq$ isolation $< .50$ | | $.50 \leq$ isolation $< .75$ | | $.75 \leq$ isolation $\leq 1$ | |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | St Err | Coefficient | St Err | Coefficient | St Err | Coefficient | St Err |
| % District | −0.13** | 0.05 | 0.04** | 0.02 | 0.08** | 0.02 | 0.06 | 0.04 |
| % Black | 3.15** | 0.48 | 1.29** | 0.08 | 1.22** | 0.06 | 1.31** | 0.10 |
| VRA | 0.14** | 0.06 | −0.03** | 0.02 | 0.06** | 0.03 | −0.90 | 73.3 |
| Constant | −0.92 | 0.60 | −0.05 | 0.22 | 0.13 | 0.26 | 1.44 | 0.68 |
| N | 1373 | | 2247 | | 2735 | | 908 | |
| Wald $\chi^2$ | 94.15** | | 680.00** | | 902.92** | | 383.65** | |

**Tobit Regression on Proportion of Latino Council Members, Controlling for Concentration**

| | $0 \leq$ isolation $< .25$ | | $.25 \leq$ isolation $< .50$ | | $.50 \leq$ isolation $< .75$ | | $.75 \leq$ isolation $\leq 1$ | |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | St Err | Coefficient | St Err | Coefficient | St Err | Coefficient | St Err |
| % District | 0.03 | 0.11 | −0.00 | 0.04 | 0.06 | 0.05 | 0.32** | 0.16 |
| % Latino | 4.63** | 0.94 | 1.53** | 0.17 | 1.53** | 0.15 | 2.14** | 0.40 |
| % Noncitizens | −4.98** | 1.67 | −1.22** | 0.35 | −0.97** | 0.23 | −0.64 | 0.67 |
| Constant | −2.80 | 1.73 | −0.35 | 0.48 | −0.53 | 0.46 | 1.61 | 1.19 |
| N | 4542 | | 1966 | | 968 | | 133 | |
| Wald $\chi^2$ | 163.28** | | 241.99** | | 427.35** | | 198.88** | |

*p < .10, **p < .05.
*Source*: U.S. Census Bureau 1990 & 2000; International City/County Manager's Association (ICMA) surveys of 1986, 1992, 1996, and 2001.

There are at least two reasons that the effect of districts occurs only at the highest levels of isolation for Latinos. First, Latinos have lower levels of turnout compared to their population proportions than African Americans or whites. This may indicate that Latinos need to be a larger share of the population before they can affect electoral outcomes as a group. Secondly, these results may indicate a lower level of polarized voting and bloc group voting until Latinos are highly concentrated and a large portion of the population. It is plausible that ethnic group identity would be associated with a higher degree of segregation and a larger minority group presence. In general though, these data provide strong support for our hypothesis that the benefit of single-member district elections for minority groups operates through patterns of concentration. Furthermore, the negative results for African Americans in the first quartile of isolation suggest that underrepresented groups may fare better in at-large elections when they are highly dispersed throughout the community.

the effect of districts is negative in the first quartile, small and insignificant in the second quartile, and increasingly positive in the third and fourth quartiles. For Latinos the effect is negative in the first quartile, nearly zero in the second and fourth quartiles, and very powerful in the third quartile.

This is precisely the conclusion drawn by one of our interviewees, Councilman Felix Arroyo, the first Latino elected to the Boston City Council. Councilman Arroyo stated that he chose to run for an at-large seat rather than the district seats also available because "it is very difficult to win if you are a person of color by district except for two districts which are actually communities of colors." Further, he explained that because of the demographics of the city, the at-large seat was better for electing Latinos in Boston, "because most of the Latino community is spread across the city, as well as the immigrant community and the progressive groups." For Arroyo, the lack of concentration of his primary constituency means that districts do not offer him the best opportunity for election.

Councilor Carol Boigon, a white woman serving on the Denver City Council, also emphasized the power of district elections when groups are concentrated. She explains:

> ... in a district seat ... some of the ethnic concentrations have an opportunity to be represented .... That's the advantage I see. We have two seats that could reliably elect a black council person, the 8th and 11th. And those of us who feel

> that it's important to have diverse voices at the table and who are not black, you would say "Why would you run from one of those seats then?" I wouldn't.

Councilwoman Boigon's point is clear: African American council members benefit electorally in areas of the city that have large concentrations of black voters.

## Size of the Group Interacts with Districts

We hypothesized that the effect of districts should interact with group size, being most effective when groups are moderately sized. Our use of the isolation variable in the previous section tested this indirectly, but because the index combines concentration with group size, in this section we test this hypothesis directly by splitting our sample by the size of the underrepresented group.[24] We divided our data into three subsamples for African Americans and Latinos. The first sample includes cities that have minority populations greater than zero, but less than the one-half of the percentage that a council seat represents. The second sample includes cities with minority groups equal to or larger than one-half of the percentage the council seat represents, but less than a majority of the population. The third sample includes cities where the group in question composes a majority of the population.

The results confirm our expectations. Districts matter most for groups that are a moderate proportion of the population. For very small and very large groups the electoral system has no significant effect on representation in the models. Rather than present these as regression results, we have included a graph of the benefit of districts compared to at-large systems for African Americans and Latinos depending on the size of the black or Latino population.

The results in Figure 1 suggest that districts have a much stronger effect for African Americans than Latinos, as would be expected given the differences in concentration and bloc voting between the groups. For both groups the only statistically significant differences between electoral systems occur when the group is moderately sized. In no case does the electoral system bring a group to representational parity, but in cities where there are very large populations of African Americans and Latinos, there is virtually 100% probability of at least a single council member being African American or Latino. This suggests that African Americans and Latinos are breaking into the political system when they command a substantial voting bloc.

In our interviews a number of councilors emphasized group size in combination with concentration in their discussion of the superiority of district for electing people of color. Councilman Jamie Isabel, an African American member on the Nashville City Council, explained that districts are better because at-large systems "dilute the votes." Similarly, Councilor Susan Burgess, a white woman on the Charlotte City Council, stated that

> . . . the reason is because we have drawn our districts to make sure we have minority representation. Three [out of seven] of our districts are majority-minority. And there's always a minority elected there. We have had difficulty electing minorities at-large, even when they are extremely qualified . . . We've had awesome African American candidates who have tried to go from districts to at-large and lost citywide.

Councilperson Joanne Sanders, a white woman serving in the Indianapolis council (which is consolidated with the county), nearly repeated the sentiments of Councilwoman Burgess, stating that

> because of the demographics of the county, I think that the district level was better for people of color . . . we still have heavily black areas, in our communities, where it's easily a seventy-thirty Democrat district. So for people of color that's much easier than trying to run county-wide where some of the outlying areas are predominantly white. Although, the black people who have run on the at-large ticket have been successful but again you can tell by the numbers unfortunately they don't always glean the most amount of votes.

Councilor Sanders's response hints at the presence of racially polarized voting in Indianapolis. Other interviewees expressed similar sentiments. When asked why black candidates had been unsuccessful in winning at-large seats, Councilman Isabel ascribed the outcome to polarization:

[24] A single model including the interactions between districts, group size, and dummy variables for subsamples also generated significant results. There is no significant difference between at-large and district systems when a group is very small; increasing the group population increases the proportion of minority group members and districts enhance this result. We present the split sample analysis because the results are easier to interpret.

FIGURE 1 **Estimated Benefit of Districts Compared to At-Large Elections by Group Population Size, 1986–2001**




*Source:* U.S. Census Bureau 1990 & 2000; International City/County Manager's Association (ICMA) surveys of 1986, 1992, 1996, and 2001.

> I think whites have a reluctance to vote for African Americans. We're in the south, I think up north or back where you are out west, there may be some differences. But I think here in the south whites really haven't come to the reality that African Americans can represent them well.

Similarly, Councilor Burgess suggested that "subtle racism" kept African Americans from winning citywide elections. A number of our interviewees also insinuated that some groups formed more cohesive voting blocs than others. Councilor Rodriguez from Denver highlighted the benefits of districts for Latino candidates because of the strategy of "single-shot[ting]" where voters pool votes in a multicandidate, at-large race for a single candidate. She told us that the African American community used this approach successfully to elect representatives whereas Latinos tended to divide their votes among a slate of candidates and so "every time a Hispanic candidate would run, they would be defeated." According to these council members, racially polarized voting continues to be a significant factor in city council elections, and different groups are affected in different ways by these types of vote patterns.

## Conclusions

One final possibility in explaining the benefit of districts for female and minority council membership is the attraction of running in a district versus citywide election. Districts might aid racial and ethnic minorities because more traditionally underrepresented candidates choose to run in district races. If the organizing, fundraising,

and campaign costs are substantially different between districts and citywide races, this may well be a factor. Furthermore, it remains to be explained why some cities elect more women than others: it does not appear to make a substantial difference whether women run in district or at-large electoral systems. Nonetheless, we believe that we have taken a step forward in explaining the effect of electoral systems on underrepresented groups.

By taking advantage of the institutional variation across cities in the United States, we have gained a more nuanced understanding of the representation of women and racial and ethnic minorities. Single-member district systems can increase diversity only when underrepresented groups are highly concentrated and compose moderate portions of the population. These factors are most important in an arena where polarized voting predominates and where groups leverage their population size to achieve descriptive representation. In addition, the effect of the electoral system is not constant across all people of color, nor is it constant across both genders; race and gender interact to produce different results. Our findings demonstrate the need for caution when making declarations of the benefit or detriment of institutional settings; while the electoral rules certainly have an effect, the context in which they are employed is also crucial to gain a complete understanding.

## References


Alozie, Nicholas, and Lynne Manganaro. 1993. "Women's Council Representation: Measurement Implications for Public Policy." *Political Research Quarterly* 46(2): 383–98.

Arrington, Theodore, and Thomas Gill Watts. 1991. "The Election of Blacks to School Boards in North Carolina." *The Western Political Science Quarterly* 44(4): 1099–1105.

Barreto, Matt A. 2004. "The Role of Latino Candidates in Mobilizing Latino Voters: Revisiting Latino Vote Choice." Prepared for Latino Politics: The State of the Discipline. College Station: Texas A&M University.

Bobo, Lawrence. 1988. "Group Conflict, Prejudice, and the Paradox of Contemporary Racial Attitudes." In *Eliminating Racism: Profiles in Controversy*, ed. Phyllis A. Katz and Dalmas A. Taylor. New York: Plenum Press, 85–116.

Brace, Kimball, Bernard Grofman, Lisa Handley, and Richard Niemi. 1988. "Minority Voting Equality: The 65 Percent Rule in Theory and Practice." *Law and Policy* 10(1): 43–62.

Bridges, Amy. 1997. *Morning Glories: Municipal Reform in the Southwest*. Princeton, NJ: Princeton University Press.

Brockington, David, Todd Donovan, Shaun Bowler, and Robert Brischetto. 1998. "Minority Representation under Cumulative and Limited Voting." *The Journal of Politics* 60(4): 1108–25.

Brown, Clyde. 1994. "Judgments about the Capabilities of City Councilors and Support for Female Representation on City Council." *Social Science Journal* 31(4): 355–73.

Brown, Clyde, Neil Heighberger, and Peter Shocket. 1993. "Gender-Based Differences in Perceptions of Male and Female City Council Candidates." *Women & Politics* 13(1): 1–17.

Bullock, Charles, and Susan MacManus. 1990. "Structural Features of Municipalities and the Incidence of Hispanic Councilmembers." *Social Science Quarterly* 71(4): 665–81.

Bullock, Charles S., III, and Susan A. MacManus. 1991. "Municipal Electoral Structure and the Election of Councilwomen." *Journal of Politics* 53(1): 75–89.

Bullock, Charles S., III, and Susan A. MacManus. 1993. "Testing Assumptions of the Totality-of-the-Circumstances Test: An Analysis of the Impact of Structures on Black Descriptive Representation." *American Politics Quarterly* 21(3): 290–306.

Cole, Leonard. 1974. "Electing Blacks to Municipal Office: Structural and Social Determinants." *Urban Affairs Quarterly* 10(1): 17–39.

Conover, Pamela. 1988. "The Role of Social Groups in Political Thinking." *British Journal of Political Science* 18(1): 51–96.

Darcy, Robert, and Charles Hadley. 1988. "Black Women in Politics—The Puzzle of Success." *Social Science Quarterly* 69(3): 629–45.

Darcy, Robert, Charles D. Hadley, and Jason F. Kirksey. 1993. "Election Systems and the Representation of Black Women in American State Legislatures." *Women and Politics* 13: 73–89.

Darcy, Robert, and Sarah Schramm. 1977. "When Women Run Against Men." *Public Opinion Quarterly* 41(1): 1–12.

Darcy, Robert, Susan Welch, and Janet Clark. 1985. "Women Candidates in Single-Member and Multimember Districts: American State Legislative Races." *Social Science Quarterly* 66(4): 945–53.

Davidson, Chandler, and Bernard Grofman, eds. 1994. *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965–1990*. Princeton, NJ: Princeton University Press.

Davidson, Chandler, and George Korbel. 1981. "At-Large Elections and Minority-Group Representation: A Re-Examination of Historical and Contemporary Evidence." *The Journal of Politics* 43(4): 982–1005.

DeSipio, Louis. 1996. *Counting on the Latino Vote: Latinos as a New Electorate*. Charlottesville: University of Virginia Press.

Dolan, K. 2004. "The Impact of Candidate Sex on Evaluations of Candidates for the US House of Representatives." *Social Science Quarterly* 85(1): 206–17.

Engstrom, Richard, and Michael McDonald. 1982. "The Underrepresentation of Blacks on City Councils: Comparing the Structural and Socioeconomic Explanations for South/Nonsouth Differences." *Journal of Politics* 44(4): 1088–99.

Garcia Bedolla, Lisa, Katherine Tate, and Janelle Wong. 2005. "Indelible Effects: The Impact of Women of Color in the U.S. Congress." In *Women and Elective Office: Past, Present, and Future*, 2nd ed., ed. Sue Thomas and Clyde Wilcox. Oxford: Oxford University Press, 152–75.

Gay, Claudine, and Katherine Tate. 1998. "Double Bound: The Impact of Gender and Race on the Politics of Black Women." *Political Psychology* 19(1): 169–84.

Githens, Marianne, and Jewell Prestage, eds. 1977. *A Portrait of Marginality: The Political Behavior of American Women*. New York: McKay.

Grofman, Bernard, and Lisa Handley. 1989. "Black Representation: Making Sense of Electoral Geography at Different

Levels of Government." *Legislative Studies Quarterly* 14(2): 265–79.

Guinier, Lani. 1992. "Voting Rights and Democratic Theory—Where Do We Go From Here?" In *Controversies in Minority Voting: The Voting Rights Act in Perspective*, ed. B. Grofman and C. Davidson. Washington, DC: The Brookings Institution, 283–91.

Gurin, Patricia. 1985. "Women's Gender Consciousness." *Public Opinion Quarterly* 49(2): 143–63.

Hajnal, Zoltan, and Jessica Trounstine. 2005. "Where Turnout Matters: The Consequences of Uneven Turnout in City Politics." *Journal of Politics* 67(2): 515–35.

Heilig, Peggy, and Robert Mundt. 1983. "Changes in Representational Equity: The Effect of Adopting Districts." *Social Science Quarterly* 64(2): 393–97.

Herrick, Rebekah, and Susan Welch 1992. "The Impact of At-Large Elections on the Representation of Black and White Women." *National Political Science Review* 3: 62–77.

Huddy, Leonie, and Nayda Terkildsen. 1993. "The Consequences of Gender Stereotypes for Women Candidates at Different Levels and Types of Office." *Political Research Quarterly* 46(3): 503–25.

Hutchings, Vincent, and Nicholas Valentino. 2005. "The Centrality of Race in American Politics." *Annual Review of Political Science* 7: 383–408.

Jones-Correa, Michael. 1998. *Between Two Nations: The Political Predicament of Latinos in New York City*. Ithaca, NY: Cornell University Press.

Karnig, Albert. 1979. "Black Resources and City Council Representation." *Journal of Politics* 41(1): 134–49.

Karnig, Albert, and Susan Welch. 1979. "Sex and the Ethnic Differences in Municipal Representation." *Social Science Quarterly* 60(3): 465–81.

Karnig, Albert, and Susan Welch. 1982. "Electoral Structure and Black Representation on City Councils." *Social Science Quarterly* 63(1): 99–114.

Karnig, Albert K., and Oliver Walter. 1976. "Election of Women to City Councils." *Social Science Quarterly* 56(4): 605–13.

Kaufmann, Karen. 1994. *The Urban Vote: Group Conflict and Mayoral Voting Behavior in American Cities*. Ann Arbor: University of Michigan Press.

Koch, J. 2000. "Do Citizens Apply Gender Stereotypes to Infer Candidates' Ideological Orientations?" *Journal of Politics* 62(2): 414–29.

Leal, David, Valerie Martinez-Ebers, and Kenneth J. Meier. 2004. "The Politics of Latino Education: The Biases of At-Large Elections." *Journal of Politics* 66(4): 1224–44.

Lien, Pei-Te. 1998. "Does the Gender Gap in Political Attitudes and Behavior Vary across Racial Groups?" *Political Research Quarterly* 51(4): 869–94.

Massey, Douglas S., and Nancy Denton. 1988. "The Dimensions of Residential Concentration." *Social Forces* 67(2): 281–315.

Matland, Richard, and Donley Studlar. 1996. "The Contagion of Women Candidates in Single-Member District and Proportional Representation Electoral Systems: Canada and Norway." *Journal of Politics* 58(3): 707–33.

Matland, Richard E. 1995. "How the Electoral System Structure Has Helped Women Close the Representation Gap." In *Closing the Gap, Women in Nordic Politics*, ed. Lauri Karvonen and Per Selle. London: Dartmouth, 281–312.

Matland, Richard E., and Deborah Dwight Brown. 1992. "District Magnitude's Effect on Female Representation in U.S. State Legislatures." *Legislative Studies Quarterly* 17(4): 469–92.

McClain, Paula, Niambi Carter, and Michael Brady. 2005. "Gender and Black Presidential Politics: From Chisholm to Moseley Braun." *Journal of Women Politics & Policy* 27(1–2): 51–68.

McDermott, M. 1997. "Voting Cues in Low-Information Elections: Candidate Gender as a Social Information Variable in Contemporary United States Elections." *American Journal of Political Science* 41(1): 270–83.

Mladenka, Kenneth R. 1989. Barriers to Hispanic Employment Success in 1200 Cities. *Social Science Quarterly* 70(2): 391–407.

Montoya, Lisa J., Carol Hardy-Fanta, and Sonia Garcia. 2000. "Latina Politics: Gender, Participation, and Leadership." *PS: Political Science and Politics* 33(3): 555–61.

Mundt, Robert, and Peggy Heilig. 1982. "District Representation: Demands and Effects in the Urban South." *Journal of Politics* 44(4): 1035–48.

Norrander, Barbara. 2003. "The Intraparty Gender Gap: Differences between Male and Female Voters in 1980–2000 Presidential Primaries." *PS: Political Science and Politics* 36(2): 181–86.

Norris, Pippa. 1985. *Politics and Sexual Equality*. Boulder, CO: Reinner.

Pachon, Harry. 1999. "California Latino Politics and the 1996 Elections: From Potential to Reality." In *Awash in the Mainstream*, ed. Rodolfo O. de la Garza and Louis DeSipio. Boulder, CO: Westview Press, 167–90.

Philpot, Tasha, and Hanes Walton, Jr. 2007. "One of Our Own: Black Female Candidates and the Voters Who Support Them." *American Journal of Political Science* 51(1): 49–62.

Polinard, Jerry, Robert Wrinkle, and Tomas Longoria. 1991. "The Impact of District Elections on the Mexican American Community: The Electoral Perspective." *Social Science Quarterly* 72(3): 608–14.

Popkin, Samuel. 1991. *The Reasoning Voter*. Chicago: University of Chicago Press.

Rice, Bradley Robert. 1977. *Progressive Cities*. Austin: University of Texas Press.

Rule, Wilma. 1992. "Multimember Legislative Districts: Minority and Anglo Women's and Men's Recruitment Opportunity." In *United States Electoral Systems: Their Impact on Women and Minorities*, ed. Wilma Rule and Joseph F. Zimmerman. New York: Greenwood Press, 57–72.

Rule, Wilma. 1994. "Parliaments of, by, and for the People: Except for Women?" In *Electoral Systems in Comparative Perspective: Their Impact on Women and Minorities*, ed. Wilma Rule and Joseph F. Zimmerman. Westport, CT: Greenwood, 15–30.

Sanbonmatsu, Kira. 2002. "Gender Stereotypes and Vote Choice." *American Journal of Political Science* 46(1): 20–34.

Sass, Tim R. 2000. "The Determinants of Hispanic Representation in Municipal Government." *Southern Economic Journal* 66(3): 609–30.

Schwindt-Bayer, Leslie A., and William Mishler. 2005. "An Integrated Model of Women's Representation." *Journal of Politics* 67(May): 407–28.

Taebel, Delbert. 1978. "Minority Representation on City Councils: Impact of Structure on Blacks and Hispanics." *Social Science Quarterly* 59(1): 142–52.

Tam, Wendy K. 1995. "Asians—A Monolithic Voting Bloc?" *Political Behavior* 17: 223–49.

Tate, Katherine. 2003. *Black Faces in the Mirror: African Americans and Their Representatives in the U.S. Congress*. Princeton, NJ: Princeton University Press.

Thornburg v. Gingles, 478 US 30 (1986).

Valdini, Melody Ellis. 2006. "Electoral Institutions and Information Shortcuts: The Effect of Decisive Intraparty Competition on the Behavior of Voters and Party Elites." PhD dissertation. University of California, San Diego.

Vedlitz, Arnold, and Charles Johnson. 1982. "Community Racial Concentration, Electoral Structure, and Minority Representation." *Social Science Quarterly* 63(4): 729–36.

Welch, Susan. 1990. The Impact of At-Large Elections on the Representation of Blacks and Hispanics. *Journal of Politics* 52: 1050–76.

Welch, Susan, and Albert Karnig. 1979. "Correlates of Female Office Holding in City Politics." *Journal of Politics* 41(2): 478–91.

Welch, Susan, and Lee Sigelman. 1992. "A Gender Gap among Hispanics? A Comparison with Blacks and Anglos." *The Western Political Quarterly* 45(1): 181–99.

Welch, Susan, and Donley Studlar. 1990. "Multimember Districts and the Representation of Women: Evidence from Britain and the United States." *Journal of Politics* 52(2): 391–412.