EXHIBIT X

**<u>Report of Jonathan Rodden, PhD</u>**


Missouri NAACP v. Ferguson-Florissant School District

May 27, 2015


1. My name is Jonathan Rodden and I am a resident of Stanford, California.  I grew up in Florissant, Missouri and attended McCluer North Senior High School.  I am Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab.  Prior to my employment at Stanford, I was the Ford Professor of Political Science at the Massachusetts Institute of Technology.  I received my PhD from Yale University, and my B.A. from the University of Michigan, Ann Arbor.

2. I conduct academic research on the relationship between political geography, electoral districts, and the representation of social groups.  I have published papers on political geography and representation in a variety of academic journals including *Proceedings of the National Academy of Science, American Economic Review Papers and Proceedings, The Journal of Economic Perspectives, The Virginia Law Review, The American Journal of Political Science, The British Journal of Political Science, The Annual Review of Political Science,* and *The Journal of Politics.*  I am currently writing a book on the relationship between political districts, the residential geography of social groups, and their political representation in the United States and other countries that use winner-take-all electoral districts.

3. I have expertise in the use of geographic information systems (GIS) to analyze the impact of districting plans.  I recently wrote a paper—co-authored with Jowei Chen and published in the *Quarterly Journal of Political Science*—that developed a technique that can be

used to develop a series of valid alternative districting plans for a state, municipality, or school district via computer simulations.  An updated version of this simulation approach has been developed in a paper entitled "Cutting through the Thicket: Redistricting Simulations and the Detection of Partisan Gerrymanders," which was chosen as a winner in the Common Cause "Gerrymander Standard" writing competition, and will soon be published in *Election Law Journal*.

4. Based on this work, Professor Chen and I have testified as expert witnesses on behalf of the plaintiffs in *Romo v. Detzner*, in which the 2012 Florida Congressional districting plan was found to be in violation of the Florida Constitution.  We are currently testifying in a related case for the plaintiffs—the League of Women Voters and Common Cause—challenging the constitutionality of Florida's state legislative districts.

5. I am being compensated at a rate of $300 per hour for my work on this case.

6. The defendants in this case have asked me to:

a)  assess whether African Americans in the Ferguson-Florissant School District constitute what the United States Supreme Court refers to in *Thornburg v. Gingles* as a "geographically insular minority group,"

b)  determine the extent to which this group constitutes "a political cohesive unit," and

c)   assess "whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidate." (Thornburg v. Gingles 478 U.S. at 30).

The first section of this report considers the first question, and the following section addresses the second and third questions in a common analytical framework.

### THE SIZE AND GEOGRAPHY OF THE AFRICAN AMERICAN POPULATION IN THE FERGUSON-FLORISSANT SCHOOL DISTRICT

7. The Ferguson-Florissant School District has undergone a major demographic transformation in recent decades.  The African-American population of the City of St. Louis has been in decline, and the African-American population of the suburbs of North St. Louis County, including Ferguson, Florissant and surrounding communities, has been steadily increasing. North St. Louis County is quite similar to inner- and middle-ring suburbs in other U.S. cities that have experienced a large scale suburbanization of the African-American middle class since the beginning of the era of school and housing desegregation.

8. The current manifestation of the Ferguson-Florissant School District began with the order of a district court in 1975 to annex the neighboring school districts of Kinloch and Berkeley.  These districts were predominantly African-American and poor, while the communities of Ferguson and Florissant were largely white and middle class.  Thus at the time of the formation of the district, African Americans and whites were geographically segregated and socio-economically quite distinct, and whites were a sizable majority.

9. However, this situation has changed dramatically in recent decades.  African Americans began moving from St. Louis City to the communities of Ferguson and then Florissant, settling first in multi-family apartment buildings and then in single-family houses, attracted to the relative safety, affordable single-family houses, and high-quality racially integrated schools offered by these communities.  During the same period, the white population declined precipitously, especially in Ferguson.  In a pattern similar to many other American

metropolitan areas, the departing whites from the inner- and middle-ring suburbs of North St. Louis County sought out larger, sparser housing in the exurbs of St. Charles County.



**Figure 1:  Population by Race in the Ferguson-Florissant School District**

10. This transformation can be visualized in Figure 1, which utilizes data from the United States Census and the American Communities Survey (henceforth ACS).[1]  The black line represents total African-American population, the white line represents total white population, and the red line is a catch-all category for others, which includes Native Americans, Asians, Pacific Islanders, those reporting other racial categories, and those reporting more than one race.

---

[1] The first observation comes from the 2000 Decennial Census, which does not report data by school district.  I have collected data by race and age at the level of census blocks and then summed over the blocks falling within the boundaries of the Ferguson-Florissant School District.  For more recent years, I obtained three-year population estimates from the American Community Survey, which has now replaced the long-form census.  These are placed on the graph at the position of the middle of the three years, but it must be stressed that these estimates are averages of responses over three years.   These estimates were available beginning with the period 2008 to 2010, and the most recent observation is the three-year average from 2011 to 2013.  The data were obtained from the National Historical GIS project at nhgis.org.

Figure 1 shows that late in the last decade, African Americans became a majority in the Ferguson-Florissant School District.  The latest three-year estimate for the period from 2011 to 2013 from the ACS is that the district contains 35,087 African Americans, 28,160 whites, and 2,196 "other," most of whom report more than one race.



**Figure 2:  Population under 18 by Race in the Ferguson-Florissant School District**

11. It is worth noting that the suburbanization pattern driving the data in Figure 1 has important implications for the age structure of each racial group in the district. Many of the children of the white adults who resided in the district in the 1980s and 1990s have left the small ranch-style houses of Ferguson and Florissant, moving to other metro areas or suburbs of St. Louis with larger and newer housing stock.  They have not been replaced by younger white families moving in, and the district's white population is increasingly elderly.  In contrast, the

number of African-American families with school-age children has been slowly increasing.  This process is captured in Figure 2, which uses the 2000 Decennial Census and subsequent American Community Surveys to show that while the black and white populations under the age of 18 were at parity in 2000, school-age children in the district are now overwhelmingly African American. This demographic trend is, of course, reflected in school enrollments.

12. While African Americans constitute a sizable majority in the overall and under-18 populations, they are only a slight majority of the population aged 18 and above.  Figure 3 presents census and ACS data on voting-age population broken down by race.  The most recent snapshot provided by the ACS is the three-year average from 2011 to 2013, which estimated the African-American population aged 18 and above at 24,313 and the white population at 23,740.



**Figure 3:  Voting-Age Population by Race in the Ferguson-Florissant School District**

13. In other words, the best and most recent estimate of the United States Census Department indicates that the voting-age population of African Americans was already larger than that of whites in the Ferguson-Florissant School District prior to the filing of this lawsuit.[2] It must be stressed that this estimate was obtained from a sample collected by the United States Census department between January 1, 2011 and December 30, 2013.  As shown in Figure 3, the white voting-age population has demonstrated a continued decline in recent three-year sample estimates.  To get a sense of the relevant voting age-populations in 2015, Figure 3 also plots extrapolations of voting-age population by race with dashed lines, using the best linear fit from trends in each previous three-year ACS estimate going back to the 2008-2010 ACS.  According to these estimates, the number of voting-age African Americans now exceeds the number of voting-age whites by more than 3000, and the African-American majority is growing substantially each year.

14. The white and African-American populations have changed not only in size, but also in their geographic distribution.  Figure 4 uses block-level data from the decennial censuses to make maps of African-American and white population in 2000 and 2010.  Each dot corresponds to 5 individuals.  Note that the large unpopulated area in the Southwestern extension of the district is Lambert St. Louis International Airport.  When Kinloch and Berkeley—the communities immediately to the East of the airport—were annexed in 1975, African Americans were highly concentrated in this Southwest corner of the district.  The left panel of Figure 4

---

[2] The census department suggests that three-year estimates are most appropriate for a geographic entity the size of the Ferguson-Florissant School district when a researcher is also concerned about having the most recent estimates. Specifically, three-year estimates are most appropriate for populations greater than 20,000.  The sample size of the three-year estimates is substantially larger than that used to obtain one-year estimates—the most recent of which was in 2013—and estimates by race and age are thus considerably more reliable, if less current, using the three-year data.  While five-year estimates would be even less prone to sampling error, they are insufficiently current for this analysis, providing little improvement over the 2010 decennial count.  See http://www.census.gov/acs/www/guidance_for_data_users/estimates/

shows that the legacy of this segregation still remained as recently as 2000.  Since then, African Americans have continued to displace outgoing whites in every part of the district except for Old Town Florissant in the Northwest.  In fact, Ferguson, Florissant, and the other municipalities in the district are among the most racially integrated in the St. Louis area.  Indeed, by the standards of American suburbia, Ferguson and Florissant in 2015 are remarkable in their level of racial integration.

Racial Composition of the Ferguson-Florissant School District,
2000 and 2010 United States Census




**Figure 4: African American and White Population Distribution, 2000 and 2010**

15. While some of the dense clusters of African Americans in Figure 4 correspond to apartment complexes, the 2010 map shows that African Americans in the Ferguson-Florissant School District are now largely scattered in single-family homes on racially integrated streets.

According to the 2006-2008 American Community Survey (accessed through the Census Factfinder), the majority of African American households in the district are occupied by owners rather than renters.

16. In a remarkable transformation, African Americans have gone from a geographically concentrated minority to a geographically dispersed majority.  African Americans are now *more* geographically dispersed than whites in the district, who are relatively concentrated in pockets of Ferguson as well as Old-Town Florissant.[3]

17. In sum, African Americans in the Ferguson-Florissant School District are not the type of "insular" or "geographically compact" minority group discussed by the United States Supreme Court in *Gingles*.  In fact, African Americans in the Ferguson-Florissant School District are neither a minority nor are they geographically concentrated.  Rather, they are a geographically dispersed majority.  As such, it is not clear how § 2 of the Voting Rights Act might apply, or how a transition to smaller single-member districts might plausibly enhance minority representation in the Ferguson-Florissant School District.  Indeed, the logic of the Voting Rights Act and the Court's interpretation in *Gingles* are predicated on the notion that at-large electoral schemes are

---

[3] To draw this conclusion, I have calculated a standard adjusted geographic concentration index as follows:

$$AGC_x = \frac{\sum_{i=1}^{N} \left| v_i - p_i \right|}{2(1 - p_{\min})}$$

where there are $N$ geographic units (census blocks, block groups, or tracts), and $v_i$ indicates the share of all members of racial group $v$ residing in geographic unit $i$ and $p_i$ indicates the share of all people living in geographic unit $i$. Thus the numerator is a geographic concentration index that captures the difference in each geographic unit between the percent of the group residing in that geographic unit and the percent of the overall population living in that unit, and then sums over the absolute values of these differences for all geographic units.  To facilitate comparison given heterogeneity in the size of the units, it is divided by the maximum obtainable value of the numerator—the value it would take if all the racial group's members were concentrated in the smallest unit.  This adjusted geographic concentration index lies between 0 (no concentration) and 1 (maximum concentration).  Using census blocks as the geographic units, the index is .225 for African Americans and .27 for whites.  Using a higher level of aggregation—census block groups—the index is .19 for African Americans and .22 for whites.  Finally, at the higher level of aggregation offered by census tracts, the index is .16 for African Americans and .19 for whites.

often advantageous for relatively dispersed white majorities and harmful for concentrated

minority groups.  It is not clear why the same logic would not hold when African Americans are

the relatively dispersed majority group and whites are the concentrated minority, as is currently

the case in the Ferguson-Florissant School District.


## DOES RACIALLY POLARIZED VOTING UNDERMINE THE ABILITY OF MINORITIES TO ELECT CANDIDATES OF CHOICE?


18. I have been asked to examine whether racially polarized voting consistently prevents

African Americans from electing candidates of their choosing due to the nature of the at-large

electoral system used in school board elections in the state of Missouri.  First, it is useful to

explain the operation of the electoral system.  In most years, two of the seven seats are contested

simultaneously, and every third year, three seats are contested.  In these elections, voters are

allowed to cast as many ballots as seats contested, but only one of their votes may be cast for any

particular candidate.  The seats are awarded to the candidates with the most votes, such that

when $n$ seats are contested, the top $n$ vote recipients win the $n$ seats.   Voters are allowed to cast a

smaller number of votes if they so desire.  That is, voters may select either one or two names

from the list of candidates in a two-seat election, and either one, two, or three names in a three-

seat election.  Declining to cast all of one's votes is referred to as a "bullet" or "single shot"

voting strategy, and can be employed by members of a minority group who wish to increase the

opportunity for their favored candidate to finish among the top $n$ candidates and avoid adding to

the vote totals of non-favored candidates.

19.  In this at-large electoral system, it is difficult to understand why African Americans would be unable to elect candidates of their choice given that African Americans constitute a slim majority of the voting-age population in the district.  This would be plausible only if 1) African American turnout is significantly lower than white turnout in April School Board elections and 2) racially polarized voting is exceptionally strong, such that a slightly whiter electorate implies losses for the candidates preferred by African Americans.   In order to examine these possibilities, I created a data set through the following steps:

- I collected election results for Ferguson-Florissant School Board races including ballots cast, valid votes for each candidate, and registered voters at the level of polling places.  The source for these data is the St. Louis County Board of Election Commissioners.

- These data were then joined with digitized geographic boundaries of St. Louis County election precincts for each year, also obtained from the St. Louis County Board of Election Commissioners.[4]

- Next, block-level data on race from the United States Decennial Census were aggregated up to the level of polling places.  For elections from 2000 to 2006, I used data from the 2000 census.  For elections from 2009 to 2015, I used data from the 2010 census.

- This leaves me with a data set containing data on race, turnout, and voting behavior at the level of polling places for each School Board election in the Ferguson-Florissant District since the 2000 election.  The number of the polling-place units fluctuates

---

[4] The election data are reported in clumps of precincts that correspond to individual polling places, while the yearly digitized boundary files contain polygons for individual precincts.  Both of these change with each election.  Thus for each year, it was necessary to create a new set of digitized district boundaries by combining individual precincts into units that correspond to the smallest units of election data provision (polling places).  This was done using the dissolve tool in ESRI ArcMap software.

from one election to another, ranging from 48 in 2014 to from 61 in 2000.  While

technically these units are sometimes individual precincts and sometimes

aggregations of several precincts, I will refer to them as precincts and polling places

interchangeably.

**An Assessment of Turnout by Race in Ferguson-Florissant School Board Elections**

20. The first task is to use these data to estimate turnout by racial group.  It is not possible

to obtain a direct measure because Missouri does not keep a record of race in its individual-level

voter file.  Thus the quantity of interest must be estimated from the precinct-level data. To gain

an understanding of how this is done, it is useful to first examine scatter plots of the precinct

data.  Given the rapid population transformation described above, it is useful to begin by

focusing on the most recent school board elections.

21. Figure 5 presents a scatter plot using data from the polling places in April elections to

the Ferguson-Florissant school board.  The vertical axis in each graph measures turnout, which is

defined as the number of ballots cast in the April election divided by the number of registered

voters.  The horizontal axis displays the share of the voting-age population that is African

American according to the 2010 census.  Each data marker corresponds to a polling place.  The

line running across each graph is a representation of the relationship between turnout and race

that is produced by a locally-weighted regression.[5]  If turnout is higher in whiter precincts, we

should expect to see a downward sloping line.  If turnout is higher in precincts where African

---

[5] This is simply an improvement on the typical display of a straight line produced by a linear regression in that it
allows for the flexibility to capture a non-linear relationship.

Americans make up a larger share of the voting age population, we would expect to see an

upward-sloping line.



**Figure 5:  Race and Turnout in April Municipal Elections in the Ferguson-Florissant
School District**

22. Figure 5 does not tell a clear story about race and turnout in recent school board

elections, other than that turnout is quite low—typically below 20 percent—in both white and

African-American locales.  The lines are quite flat, indicating there is either no relationship or a

very weak relationship between race and turnout in these elections.  If anything, there is a very

slight positive slope in 2012 and a slight negative slopes in 2014 and again in 2015.

23. While they provide a useful visualization of the data, these scatter plots do not fully

answer the question at hand:  what is the turnout rate among whites versus African Americans in

13

each of these school board elections?  We cannot obtain a direct measure.  From the 2010 block-level census data that have been aggregated to the precincts, we know the percentage of the voting-age population that is African-American, and from election officials we know the number of ballots cast in each precinct.  The challenge is to estimate the percentage of voting-age African-Americans who cast ballots.  This challenge—inferring individual behavior from aggregate data—is known as the ecological inference problem.

24. In recent years, expert witnesses in cases related to the Voting Rights Act have relied heavily on the method of ecological inference proposed by Gary King and his collaborators.[6] This procedure utilizes precinct-level information about turnout and race to draw deterministic bounds around the plausible range of values for African-American and white turnout in each precinct.  That is, we can rule out certain levels of white and African-American turnout that are impossible given what we know about the numbers in each racial group and the number of ballots cast.  Then, a statistical model is used to bring together information from the entire distribution of districts and hone in further on the most likely location of these quantities of interest within their deterministic bounds in each precinct.  These precinct-level estimates can then be aggregated into a summary estimate for the entire school district.

---

[6] See Gary King:  *A Solution to the Ecological Inference Problem:  Reconstructing Individual Behavior from Aggregate Data*.  Princeton, NJ:  Princeton University Press.  1997.



**Figure 6:  Ecological inference estimates of African American and white turnout for each contested Ferguson-Florissant School Board election since 2000**


25. Figure 6 presents the estimates of African-American and white turnout for each contested April school board election since 2000.  Note that when the number of candidates who file for the election is equal to the number of open seats, no election is held and the candidates are placed in office without a formal election.  This happened relatively frequently in the late 2000s, usually because popular incumbents did not face challengers. Figure 6 thus contains no data for the years 2005, 2007, 2008 or 2010.  The black and white dots are the turnout estimates produced by the ecological inference analysis, and the vertical lines represent the 95 percent confidence intervals.

26. The confidence interval provides a sense of the uncertainty associated with the estimates of turnout for each group.  We can be relatively confident that the true turnout rate for each group lies somewhere in the range indicated by these lines.  When one of the dots is only slightly higher than the one of the opposite color and sits within the confidence interval of the other, we cannot say with confidence that the estimates of black and white turnout are different.  When the white lines are clearly separated from the black lines in Figure 6, we can be confident that the ecological inference estimates of turnout for African Americans and whites are different.  In six of the cases, white turnout estimates clearly surpass black turnout estimates:  2001, 2003, 2006, 2009, 2011, and 2015.  In the other six election years, turnout differences between the two racial groups are indistinguishable.  In three of these cases, the point estimates for African-American turnout are actually higher, though the difference is not quite statistically significant.

27. One of the striking things about Figure 6 is the extent to which estimated turnout among whites spiked dramatically in the 2011 and 2015 April elections.  This can be explained in large part because the city of Florissant—still white by a comfortable majority— had an intense and bitter mayoral election in each of those years, while in other years, Florissant mayoral elections were either not concurrent with School Board elections or uncontested.  Ferguson, which has an African-American majority, has not experienced contested mayoral elections during this period.  Likewise, some of the spikes in African-American turnout might also be attributable to other items on the April ballot in African-American neighborhoods.  For instance, Berkeley experienced close mayoral elections in 2000 and 2004.

28. As discussed further below, the 2011 election attracted unusually high turnout due to widespread anger over the revelation that a retiring superintendent had been offered an exceptionally expensive package of lifetime benefits.  This led to a tax revolt of sorts, in which

all of the sitting incumbents were removed from office.  This only happened one other time during the period for which data are available: 2006.  Increased turnout among both racial groups in 2014 was likely a function of another controversy involving an outgoing superintendent (discussed further below), and of course the 2015 election took place amid national attention and serious get-out-the-vote efforts following the Michael Brown shooting and associated protests.

29. Moving beyond idiosyncrasies, the broad trends in turnout are quite interesting. Turnout among both African Americans and whites was relatively strong and similar at the turn of the century.  Turnout among both groups fell over the course of the next 10 years—a period also characterized by many uncontested mayoral and school board elections.  The decline was steeper for African Americans, and a temporary turnout gap opened up.  In recent years, however, turnout for both groups has recovered, and with the exception of the hotly contested Florissant mayoral years, the turnout gap between whites and African Americans has disappeared.

30. This trend toward equal turnout across racial groups must be considered in light of the transition of the voting-age population from white to African-American majority that was documented above.  When whites still made up a slim majority of the voting age population before the 2011-2013 ACS, a heavier turnout among whites—as in 2001 or 2006— translated into a majority-white electorate.  However, in the most recent years, not only has the white majority of the voting-age population disappeared, but with one exception, so has the white turnout advantage.  Thus April elections are now likely characterized by the participation of very similar numbers of African-American and white voters, with the balance now clearly shifting toward African Americans.

17

**An Assessment of Race and Voting Behavior in Recent School Board Elections**

31. I have been asked to examine whether there exists "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes" (*Gingles* citation).  If white voters in April elections do not outnumber minority voters, it is difficult to understand how this is possible.  The situation envisioned by the Court in *Gingles* only makes sense in years with relatively low African American turnout—e.g. those like 2015 with Florissant mayoral elections—when whites might plausibly outnumber African Americans at the polls.  Even so, the Supreme Court in *Gingles* makes it clear that a valid Section 2 VRA claim would require a rather extraordinary level of racial polarization in this context.

32. To see why this is true, imagine a school board election where the white majority typically casts 70 votes, and the African-American minority casts only 30.  Let us assume that the African-American minority is completely cohesive, and all 30 cast votes for an African-American candidate.  Imagine that 40 of the whites will always prefer a white candidate regardless of her policy platforms or the strength of her campaign, but the other 30 whites are indifferent to race and choose candidates based on issues or campaign appeals.  Let us assume that white and black candidates are equally likely to take popular positions or run effective campaigns, such that we typically expect these white "policy voters" to be evenly split between the African-American and white candidate.  We would thus expect the white candidate to receive 55 of the 100 votes (40 from its race-based voters and 15 from policy-based voters).  In this situation, African-American voters are systematically disadvantaged.

33. Next consider an alternative school district where 52 of the election-day voters are typically white and 48 are black.  Imagine that this community is more racially polarized than the

18

first community, such that 46 of the whites are pure race-based voters, and only 6 split their votes between the two candidates based on issues and campaign appeals.  Again let us assume for simplicity that all African-Americans vote for the African-American candidate.  In this case the vast majority of whites vote for the white candidate and polarization is nearly perfect, yet only 3 cross-over votes from whites are sufficient for the African-American candidate to secure victory.

34. In the first example, voting is far less racially polarized, yet the level of polarization is sufficient for a Section 2 claim due to the large disparity in the racial composition of the electorate.  In the second example, the small difference between the size of the white and minority electorate means that polarization must be extremely high—indeed almost perfect—in order for the minority candidate to be at a systematic disadvantage.  For this reason, the Supreme Court is very clear in *Gingles* that there is no one-size-fits-all threshold for polarized voting.  A mere correlation between race and voting behavior is insufficient for an at-large electoral system to be out of compliance with Section Two of the Voting Rights Act.  Rather, polarization must be sufficiently high that "a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group" (Thornburg v. Gingles 478 U.S. at 49).

35. In a political entity like the Ferguson-Florissant School District of recent years, where the white electorate only plausibly exceeds the minority electorate by the slimmest of margins if at all, the Plaintiffs must demonstrate near-perfect polarization, such that cross-over voting is almost completely absent.  Let us now examine whether this is the case.

36. In *Gingles,* the Supreme Court endorsed an examination of voting by race in the most recent elections in which white and minority candidates were on the ballot.  This is true of each of the recent Ferguson-Florissant School Board elections, so let us begin with those.  Again, it is useful to start with a visual inspection of scatter plots and then move on to the results of ecological inference analysis.



**Figure 7:  Race and voting in the Ferguson-Florissant School District**

37. Figure 7 displays the African-American share of voting-age population on the horizontal axis, and the combined vote share of all African American candidates on the vertical axis.  Vote share here is defined as the total votes cast for all African-American candidates at a polling place divided by the total number of votes cast for all candidates (excluding invalid votes).  Each dot represents a polling place, and the blue line summarizes the relationship

between race and voting using a locally weighted regression, as above.  The red line corresponds
to a hypothetical baseline scenario of perfect polarization, where for example, a 30 percent
African-American population corresponds to a 30 percent vote share for African-American
candidates, or a 70 percent African-American population corresponds to a 70 percent vote share
for African-American candidates, and so on.

38. It is immediately clear from Figure 7 that voting in Ferguson-Florissant School board
elections falls far short of what would be necessary to prevent minority-preferred candidates
from winning.  In fact, with the lone exception of 2014, racially polarized voting has been quite
mild in the Ferguson-Florissant School District.  Of course it is not surprising to see that vote
shares of African-American candidates are higher in precincts with larger African-American
populations, but with the exception of 2014, the blue line in each graph is quite flat relative to the
polarized baseline captured by the red line.  Vote shares of African-American candidates are
much higher in overwhelmingly white precincts than the polarized baseline in 2013 and 2015.  In
the most recent election, precincts with white populations of 80 percent gave at least *half* of their
votes to black candidates.  Likewise, in each election but 2014, white candidates receive
considerable support in overwhelmingly African-American precincts.  In 2012 and 2013, white
candidates received around *60 percent* of the vote in precincts where the voting-age population is
80 percent African American, and in 2015 they received more than 40 percent of the vote in such
neighborhoods.

39. Figure 7 reveals that for both African Americans and whites, significant cross-over
voting is the norm in Ferguson-Florissant School Board elections.  The 2014 election is a stark
outlier, which would come as no surprise to residents of the district.  The election was held less
than one month after the resignation of a popular African-American superintendent who had

21

been embroiled in a conflict with the School Board.  The affair ended with a mutual agreement not to release any details of the charges against the outgoing superintendent, but the lack of information angered many parents, and the affair led to the creation of a slate of African-American candidates who made race an explicit part of their campaign.  This racially polarizing event produced an unusually polarized election outcome.

40. One might have expected this moment of racial polarization to continue into the April 2015 election, which took place in the aftermath of the Michael Brown shooting in the summer of 2014 and the subsequent months of unrest.  Remarkably, the opposite happened.  The 2015 election was substantially *less* polarized than its predecessors.  In a return to the previous pattern, African-American candidates received substantial support from whites and vice-versa.

41. Figure 7 also reveals another remarkable fact about recent Ferguson-Florissant School Board Elections that is deeply at odds with the logic of Section Two:  African-American candidates received more votes than white candidates in each of the last two elections.  In 2014, African-American candidates received a combined vote total of 8,434, and white candidates received a combined total of 7,645.  In the 2015 election, the electoral advantage of African-American candidates increased substantially.  African-American candidates received an overwhelming 9,153 votes in 2015, while white candidates received 6,408.  Only once in the period for which data are available has the combined total of *white* candidates exceeded 9,000. As Figure 7 clarifies, a large share of that support comes from white precincts.  Recall from Figure 6 above that 2015 was the only recent election in which white turnout was clearly higher than African-American turnout.  It is quite striking that this surge in white turnout was associated with a surge in support for African-American candidates.  All of these facts are deeply at odds with the logic of the requirements of the Voting Rights Act and their explication in *Gingles*.

22

42. These aggregate vote totals according to the race of candidates mask a good deal of important variation across candidates, and indeed, the Supreme Court in *Gingles* calls for a more fine-grained analysis.  It is necessary for successful Plaintiffs to identify specific candidates that are preferred by minority groups, and demonstrate that they are usually defeated because of bloc voting by whites.  The Court in *Gingles* clarifies that "Under § 2, it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important" (Thornburg v. Gingles, 478 U.S. 30 at 68).

43. As described above in the case of turnout, expert witnesses do not have access to direct measures of voting by race for specific candidates.  Again, it is necessary to estimate these vote breakdowns from the precinct-level data, and again, ecological inference is the appropriate empirical approach.  In the study of turnout above, the task was to fill in the missing cells of a two-by-two table where the categories included African-Americans and whites as rows, and voters and non-voters as columns.  Now the task is to fill in a table that has a larger number of columns, ranging from 3 to 9 depending on the number of candidates running for office in a given year.  This is best achieved by applying a recent extension of the initial 2-by-2 ecological inference model that allows for inferences with larger numbers of columns or rows.  This can be implemented using Jason Wittenberg, Ferdinand Alimadhi, Badri Narayan Bhaskar, and Olivia Lau, 2007: "ei.RxC: Hierarchical Multinomial-Dirichlet Ecological Inference Model for R X C Tables" in Kosuke Imai, Gary King, and Olivia Lau, "Zelig: Everyone's Statistical Software."[7]

---

[7] This software is available at http://gking.harvard.edu/zelig.  I have also used a simpler and more traditional approach described in Gary King, *A Solution to the Ecological Inference Problem*.  Princeton, NJ: Princeton University Press (1997), pages 153-156, whereby one estimates a separate 2x2 table for each candidate.  This yields broadly similar results, but it is preferable to estimate vote shares for all candidates in the same model.

44. The Court in *Gingles* makes it clear that recent elections are the most probative.  A focus on recent elections might be especially prudent in the Ferguson-Florissant School District given that, as described above, the demographics of the district were startlingly different only ten years ago.  However, in order to gain an understanding of the evolution of voting by race over time as African Americans have gone from the minority to majority racial group, I have examined all School Board elections for which data were available, beginning with the year 2000.

45. In the precinct-level data, we know the number of African Americans and whites of voting-age population from the block-level census data that have been aggregated to the level of precincts.  Moreover, we know the number of votes for each candidate in each precinct. Ecological inference then allows us to estimate the number of votes cast for each candidate by African Americans as a share of African-American voting-age population and those cast by whites as a share of white voting-age population.  Since we are not accustomed to assessing votes as a share of voting-age population, I transform the estimates into more familiar shares of votes cast.  Figure 8 plots the estimates and 95 percent confidence intervals for all candidates who filed for office in Ferguson-Florissant School Board elections since 2000.  The most recent elections are at the top of the graph, and one can assess earlier elections by scanning down the page.  A thin black line separates each election.  As in the turnout graph above, note that no data are present for years in which elections were uncontested.  The candidates' names are on the left, and years are indicated on right.



**Figure 8:  Ecological Inference Estimates of Voting Behavior by Racial Group**

25

The white dots capture each candidate's estimated vote share among whites, and the black dots capture each candidate's estimated vote share among African Americans.  The black and white thick lines correspond to the 95 percent confidence interval for each candidate.

46. Two seats were contested in each election, with the exception of 2002, 2011, and 2014, when three seats were contested.  Thus it is necessary to identify, where possible, two and sometimes three minority-preferred candidates in each election.

47. Let us begin with the 2015 election, in which five candidates filed for two seats. Three of the candidates were African Americans—Person, Hines, and Graves—and two were white: Ebert and Dameron. Graves and Ebert were elected to the Board.  Ms. Graves was extraordinarily successful, and received one of the highest vote totals ever achieved by any candidate in the period for which data are available.  She received very strong support from African Americans, but Figure 8 reveals that she also performed quite well in a crowded field among whites.

48. Ms. Graves ran a sophisticated campaign in which she very explicitly encouraged her supporters to engage in a "single shot" voting strategy and cast a single vote for her, foregoing the use of their second vote.  This strategy evidently worked:  precinct-level school-board votes cast per ballot cast are significantly lower in the precincts where Ms. Graves received her highest support.  This is an optimal strategy for any individual candidate who wants to win in an at-large system, but it must be noted that with two other African-American candidates on the ballot, it was a strategy that seriously undermined the possibility of gaining a second African-American seat.  The results clarify that many African-Americans did not cast a vote for either of the other African American candidates, either withholding it or giving it to one of the white candidates.

African Americans lacked cohesiveness to an extent that it is difficult to identify a clear second minority-preferred candidate. The black dots are clustered together and their confidence intervals overlap. The estimates suggest that African-American support was slightly higher for Ms. Dameron, who is white, than Mr. Hines, who is African American, though the difference is not statistically significant. In fact, Mr. Hines—tied for second-place among African-Americans—appears to have received *more* support from whites than from African-Americans. While Ebert was clearly the first candidate of choice for whites, the second and third candidates of choice for whites were both African Americans who received substantially more support among whites than Dameron, the other white candidate, whose support was stronger among African Americans than whites.

49. In sum, one minority-preferred candidate won in a landslide in 2015. The second minority-preferred candidate did not lose because of bloc voting by whites, but rather, because of a lack of cohesiveness among African Americans. The second minority-preferred candidate was either a white candidate with slightly more support among African-Americans than whites, or an African-American candidate with slightly more support among whites than African Americans.

50. Let us now consider the highly polarized 2014 election in which three seats were contested. Two white incumbents were running for reelection: Mr. Morris and Mr. Chabot. A third white challenger, Ms. Benz, also filed for the election. In the wake of the controversial resignation of the superintendent, an unprecedented five African-American challengers filed for the election. The top minority-preferred candidate, Ms. Paulette-Thurman, was elected to the board. In contrast to 2015, the second and third candidates among African Americans were clear: Rev. Johnson and Mr. Savala, who joined her on a reform-oriented slate of candidates. The other two African-American candidates also received African-American support, especially

Ms. Wallace.  While Rev. Johnson's support was almost exclusively from African-American precincts, Mr. Savala also drew considerable support from white neighborhoods, as did the victorious Ms. Paulette-Thurman.  Mr. Savala came within 91 votes of winning a seat, and Mr. Johnson trailed Mr. Savala by only 307 votes.

51. The white candidates of choice were clearly the two incumbents, both of whom won by a very slim margin.  As tempting as it may be to conclude that their victories were the product of bloc voting among whites, recall from the analysis above that the electorate in 2014 was likely almost evenly split or had a slight African-American majority.  Moreover, racial polarization in this election was still far from perfect:  Figures 7 and 8 both show that the top two African-American candidates had substantial cross-over support from whites.  Only a handful of votes separated the top six candidates, and the African-American candidates received 800 more votes than the white candidates in total.

52. How, then, did only one of the three African-American candidates manage to win, especially since the top two had such strong cross-over white support?  Above all, African-American voters wishing to elect an African-American candidate faced a difficult coordination problem, with five candidates running for three seats.  Among African-American candidates, the third and fourth place finishers, Ms. Wallace and Mr. Thomas, received almost 1200 votes.  Imagine if these less-successful African-American candidates had declined to run, and most of these votes had been split between Mr. Savala and Mr. Johnson, as seems likely given the strong racial polarization of the 2014 election: Mr. Savala would have easily gained the requisite 92 votes and passed the winning threshold, and with the right split, Mr. Johnson would have done so as well.

53. In sum, 2014 was a year in which the top African-American-preferred candidate was elected to the board, but the second and third preferred candidates narrowly lost. As in 2015, these losses can be explained by a lack of cohesiveness among the African-American majority.

54. In 2013, two seats were contested by four candidates.  Two long-serving incumbents were running:  Ms. Hogshead, who is white, and Mr. Henson, who is African-American.  Both are from Ferguson.  There was also a white challenger (Mr. Brown, also from Ferguson) and an African-American challenger (Mr. Thomas).  As revealed in the scatter plots above, this election was not especially polarized by race.  Although the estimates indicate that Mr. Henson had higher support among African Americans than the other candidates, the confidence interval overlaps substantially with that of Ms. Hogshead, who traditionally performs well among African Americans in the Southern part of the districts (see other years in Figure 8).  The other white candidate, Mr. Brown, also received considerable support from African Americans.  The other African-American candidate, Mr. Thomas, finished in last place among African-American voters, well behind the white candidates.  While Hogshead and Brown received the largest support among white voters, Henson was not far behind.

55. The winners were Ms. Hogshead and Mr. Brown, but Mr. Henson fell short by only 125 votes.  Once again, it is difficult to blame bloc voting among whites for Mr. Henson's narrow loss.  Given the relatively similar turnout rates of African Americans and whites (Figure 6 above) and the fact that white cross-over voting for Mr. Henson was substantial, it is important to note that Mr. Henson only received a majority of the votes cast in two of the 47 precincts.  In fact, in precincts where more than 80 percent of the voting-age population was African American, Henson only received 39 percent of the votes cast.  As revealed in the scatter plot in Figure 7 above, even the combined vote share of both African-American candidates rarely

approached 50 percent in these overwhelmingly African-American precincts.  If only a very small number of African-American supporters of Mr. Henson would have cast their second ballot for Mr. Thomas rather than the white candidates or simply used a single-shot strategy, Mr. Henson would have been reelected.  Instead, their cross-over support to white candidates with strong roots in Ferguson helped these candidates secure victory at Mr. Henson's expense.

56. In sum, the 2013 election was one in which one minority-preferred candidate—Leslie Hogshead—was elected, and the other lost by 125 votes amid widespread cross-over voting.

57. In 2012, there were three candidates for two seats.  Mr. Schroeder was a long-serving incumbent, and Ms. Morris and Mr. Ebert were challengers.  Schroeder and Ebert are white, and Ms. Morris is African American.  Figure 8 reveals that Ms. Morris was the top minority-preferred candidate.  By a small margin, the second minority-preferred candidate appeared to have been Mr. Schroeder.  Schroeder and Ebert were elected with substantial cross-over support from African-Americans.  This election had many similarities to 2013, although in this case there was not a second African-American candidate.  Like Mr. Henson, Ms. Morris failed to achieve a majority of the votes cast even in the precincts where 80 percent of the voting-age population was African American.  Again, it appears to be the case that her minority supporters also cast votes for white candidates. As in 2013, one minority-preferred candidate was elected and the other lost by a relatively small margin.

58. To sum up the experience of recent elections, one minority-preferred candidate was victorious in each of the last four elections.  In two cases this candidate was the most preferred candidate, and in two cases it was the second-highest vote recipient among African Americans. In two cases the candidate was an African American, and in two cases it was a white candidate.

Furthermore, if not for a lack of cohesiveness among African-American voters in 2014 and 2015, the board could easily have a comfortable if not dominant African-American majority today. Moreover, minority voters were insufficiently cohesive in 2012 and 2013 to secure the election of African-American candidates who enjoyed considerable cross-over support. Finally, with the exception of the chaotic and polarized election of 2014, support from African Americans was crucial to the victories of all the successful white candidates during this period.

**An Assessment of Race and Voting Behavior in Historical School Board Elections**

59. I t is also useful to examine School Board elections in the era when whites most likely still constituted a majority of the voting-age population in the Ferguson-Florissant School District. First, 2011 was a rather unusual election in that an unprecedented nine candidates filed for three seats. Three incumbents were running—Mr. Lentz, Mr. Clark, and Ms. Graham—but widespread outrage over a generous compensation package offered to the retiring superintendant led to the expectation that the incumbents would be soundly defeated, as indeed they were. This event, combined with the first competitive Florissant mayoral election in the lives of many Florissant residents, created a massive surge in white turnout. The minority-preferred candidates were Ms. Hawkins, Ms. Graham, and Mr. Clark. Two of them, Graham and Clark, however, were targets of the anti-incumbent outrage, and finished far back in the large field. Ms. Hawkins, in spite of considerable cross-over voting from whites, fell around 400 votes short of the winning threshold.

60. The 2010 election was less exciting. Two long-serving incumbents did not draw challengers. One was Charles Henson, the African-American candidate who lost by 125 votes in

2013, and the other was Leslie Hogshead—the other minority-preferred candidate in 2013. These two candidates also did not draw challengers in their previous elections in 2007.

61. In 2009 there were three candidates for two seats.  The candidates of choice for African Americans were similar to those of whites—Schroeder and Knowles—and both won easily.

62. 2008 was another year in which incumbents did not draw challengers.  One of these was Doris Graham, an African-American first elected in 2002 who was not challenged in 2005. Another was James Clark, a white School Board member who was also not challenged in 2005, but who was a candidate of choice for African Americans both in his 2002 victory and his 2011 loss.

63. Figure 6 above revealed that the 2006 election was a relatively low-turnout affair for African Americans.  It was also another rare anti-incumbent election.   Five candidates ran for two seats.  Gwen Thomas, an African-American incumbent, was the top minority-preferred candidate, along with Pat Washington (also an African American).  Both were defeated, in spite of some evident white cross-over support, along with the white incumbent, Ms. Knorr.  Two white challengers, Schroeder and Knowles, achieved success in part due to significant cross-over support from African Americans.

64. In 2004, two long-serving white incumbents—Hogshead and Garofalo—were reelected.  They were challenged by three African Americans: Witherspoon, Van, and McLendon.  The minority-preferred candidates were Van and McLendon, though Witherspoon also received considerable support.  Hogshead and Garofalo also appear to have received some cross-over support from African-American voters.

65. In 2003 three candidates contested two seats.  Gwen Thomas, an African-American incumbent, faced off against Mr. Lentz and Ms. Knorr, both white.  Ms. Thomas and Ms. Knorr were the minority-preferred candidates, and both were victorious.

66. 2002 was a year in which three seats were contested, and six candidates filed for the election: two African-Americans and four whites.  The African-American incumbent, Doris Graham, received more votes than any other candidate, and was elected to the Board.  Figure 8 reveals that her victory, like that of Gwen Thomas the following year, came with considerable support from white voters.  The other minority-preferred candidates were Mr. Clark and Ms. Butler.  Mr. Clark was elected and Ms. Butler narrowly lost.  The other winner was Mr. Fletcher, the most popular candidate among whites.

67. 2001 was similar to 2004 in that two very popular incumbents—Hogshead and Garofalo—were running for reelection.  They were challenged by an African-American candidate, Ms. Butler, and a white candidate, Mr. Lentz.  The minority-preferred candidates were Butler and Garofalo. Garofalo and Hogshead were reelected with considerable support from African Americans.

68. In 2000, six candidates contested two seats.  Four of the candidates were white, and two—Gwen Thomas and Anthony Smith—were African-American.  The minority-preferred candidates were Gwen Thomas and an incumbent white candidate, Michael Hirsch.  Both of the minority-preferred candidates were victorious, and again, Ms. Thomas received strong support from whites.

**The Success of Minority-Preferred Candidates Past and Present**

69. Figure 8 and the accompanying narrative make it clear that minority-preferred candidates have had success in Ferguson-Florissant School Board elections, and significant cross-over voting is the norm.  In fact, the confluence of cross-over voting and a lack of cohesiveness among racial groups make it difficult in many years to identify a clear minority-preferred candidate for the second and third seats.  It is potentially misleading to simply count up wins and losses for minority-preferred candidates, especially in cases where the difference between the ecological inference estimate for the second and third ranked candidate is not clearly distinguishable.  Moreover, a number of the recent losses by "minority-preferred" candidates were by a tiny number of votes, and the candidates were not clearly "preferred" in the first place. In many cases, a very slight increase in cohesiveness among minorities would have led to victory.

70. Nevertheless, the task of the plaintiffs in a Section Two case is to demonstrate that "whites vote sufficiently as a bloc usually to defeat the minority's preferred candidate" (Thornburg v. Gingles, 478 U.S. at 31).  Thus it makes sense to go beyond narratives of individual elections and attempt to aggregate the data in order to assess what is "usual."  Let us simply ignore the question of whether losses of minority-preferred candidates can be laid at the feet of bloc voting, and engage in a pure counting exercise.  Regardless of the reason, how often do minority-preferred candidates win and lose?

71. In order to begin this exercise, one additional challenge must be addressed.  Popular white and African-American incumbents did not attract challengers in the elections of 2005, 2007, 2008, and 2010.  In 2005 and 2008, one of these was Doris Graham, an African American

34

who was always the top candidate of choice among African Americans whenever she ran in contested elections.  Another is James Clark, a white candidate who was also a candidate of choice for African Americans in each of his contested elections.  Likewise, in 2007 and 2010, Chuck Henson (an African-American incumbent) was not challenged, but he was a top candidate of choice for African Americans when he was challenged.  Thus it is reasonable to infer that these were still minority-preferred candidates in years when they did not attract opposition.

72. If we include these five uncontested elections, at least one minority-preferred candidate was elected in 13 of 16 elections (81 percent).  If we exclude them, this is true of 9 of 12 elections (75 percent).  Only in the years 2004, 2006, and 2011 did a minority-preferred candidate fail to win a seat.  As demonstrated above, 2006 and 2011 were years with unusually large gaps between black and white turnout, and in both years, African-American incumbents were caught up in idiosyncratic anti-incumbent waves.

73. Given the multi-winner at-large system, it is useful to ask not only whether a single minority-preferred candidate wins, but how many.  Let us ignore the complexities of the overlapping confidence intervals for second and third candidates in Figure 8, and simply count up wins and losses of the candidates ranked by the ecological inference estimates among the top $N$ candidates for African American voters when there are $N$ seats.  Of the 37 seats up for election since 2000, 20 were won by minority-preferred candidates (54 percent).  If we ignore the uncontested years, minority-preferred candidates win 14 of 27, or 52 percent of contested seats from 2000 to 2015.

74. One might object to this approach since it identifies some candidates as "minority-preferred" even though the ecological inference estimate is statistically indistinguishable from

35

the next-ranked candidate who is rather arbitrarily treated as "non-preferred." One way around this is to focus only on the top-ranked candidate among African Americans in each election and ask: how often does the *most* preferred candidate among African Americans win a seat? The top-ranked candidate is often relatively easy to identify. The disadvantage of this approach is that it simply ignores more than half of the seats. If we make the reasonable assumption that Doris Graham and Chuck Henson—always the top choice of African Americans when running in contested elections—are the top minority-preferred candidates when running uncontested, we find that the top candidate of choice for African Americans was elected to the school board in 10 of the 16 elections since 2000. If we focus only on the 12 contested elections, the top African-American candidate wins a seat in six (50 percent).

75. In sum, each of these approaches to seat-counting has a different set of benefits and flaws, but no method of counting facilitates the conclusion that minority-preferred candidates are "usually" defeated.


CONCLUSION

76. The Ferguson-Florissant School District has undergone a remarkable transformation over the last 15 years. While whites made up a sizable majority in 2000, African Americans now constitute a majority not only of the overall population, but in all likelihood, the voting-age population as well. Even back in the era when whites outnumbered African Americans, the district had a strong tradition of cross-over voting, and as a result, at least one minority-preferred candidate has been elected in all but three elections since 2000. Some of these candidates were whites with strong minority support, but of course many of these candidates were themselves

African Americans, and since 2000, the board has had African-American members in every year but one.  In more than two-thirds of the years, there were multiple African-American board members.

77. In the most recent elections, when African Americans likely constituted a majority of the voting-age population, the tradition of cross-over voting has continued, but largely to the detriment of African-American candidates.  In three of the most recent four elections, African-American candidates were undermined in part by heavy support for white candidates among African American voters.  In the other (2014) election, African-American candidates fell just shy of the winning threshold because African-American votes were inefficiently split across five African-American candidates.  If African-American voters had displayed only slightly greater cohesiveness in these recent elections, the Ferguson-Florissant School board would have a comfortable if not dominant majority of African-American members today.  Indeed, the vote totals for African-American candidates have surpassed those for white candidates in the last two elections, and the second- and even third-ranked African-American candidates fell short of the threshold because of an unfortunate vote split across candidates.

78. As a geographically dispersed majority group, African Americans are now poised to reap the benefits of the existing at-large system if voting were to take place purely along racial lines.  This report has shown that voting does not take place purely along racial lines in the school district.  But if highly polarized voting were to emerge, as it did in 2014, perhaps in response to a racially polarizing event such as this lawsuit, the numerically inferior white population, concentrated as it is in Florissant, would very likely be better off under a system with seven single-member districts—three of which would likely continue to have white majorities. Under the existing system, pure race-based voting with no coordination problems, no candidate

recruitment problems, and continued equal turnout by racial group would lead to a board that is dominated by African Americans. In contrast, pure race-based voting under a 7-district plan would likely carve out three white seats, three African-American seats, and one pivotal but majority-African-American seat.

79. In short, given the facts presented in this report, electoral reform aimed at producing small winner-take-all districts in the Ferguson-Florissant School District could produce a stunning setback for minority representation.  In stark contrast to the history of minority representation in the Ferguson-Florissant School District under the at-large system, the system of winner-take-all wards proposed by the plaintiffs is already used for city council races in Ferguson and Florissant, and has led to an almost complete lack of representation for African Americans over the last 15 years.

80.  Like Ferguson-Florissant, the neighboring Hazelwood School District, with its comparable racially integrated suburban population, has experienced a steady increase in minority representation on the school board under the at-large system, and now has a school board with an African-American majority.  In contrast, the winner-take-all ward system has facilitated the maintenance of an all-white Hazelwood City council.

81. Of course there are other reasons to favor the maintenance of an at-large representation scheme for schools.  The at-large system encourages candidates to make appeals, and members to conduct board business, in ways that consider the good of the entire district, including middle schools and high schools, rather than the agenda of a single elementary school. Moreover, there is undoubtedly something valuable about creating incentives for candidates to make appeals across racial lines in integrated communities like Ferguson, Florissant, and

Hazelwood.  Figure 8 above reveals that the winning candidates in most recent elections, black and white, have been those that manage to win substantial numbers of votes from both racial groups.  Exclusive reliance on one racial group in the current at-large system is not a wise campaign strategy.  This could change in a system of winner-take-all districts.

82. In addition to carving out majority-white electoral districts in a majority-black school district, the electoral reform proposed by the plaintiffs could also undermine minority representation in another subtle way.  The most successful recent African-American candidates—Ms. Paulette-Thurman and Ms. Graves—are residents of Florissant and neighbors who would likely be forced not only to compete against one another, but to do so in a majority-white district.  More broadly, their campaign strategies of assembling diverse coalitions of local whites and dispersed African Americans throughout the district would no longer be available.

83. In conclusion, the facts in the Ferguson-Florissant School District of 2015 bear little resemblance to the requirements laid out in Section Two of the Voting Rights Act and clarified by the United States Supreme Court in *Thornburg v. Gingles*.  Now that African Americans have become the majority group, an at-large system does not dilute their voting strength.  In contrast, a single-member district system could easily do so, especially if current demographic trends continue.  It would be a cruel irony if Section Two of the Voting Rights Act were inadvertently used as a minority-protection device for Florissant whites.