EXHIBIT GG

## Supplemental Report of Jonathan Rodden, PhD:

## Bloc Voting and Cohesion

Missouri NAACP v. Ferguson-Florissant School District

1.  I have been retained as an expert by the defense.  The details of my background and compensation are included in my original report in this case.  In this supplemental report, I respond to the expert report of Professor Richard Engstrom.

2.  The body of Professor Engstrom's report uses ecological inference as well as homogeneous precinct analysis to demonstrate that when both African-American and white candidates are on the ballot in elections for the Ferguson-Florissant School Board, although crossover voting is very common, African Americans are more likely to vote for African-American candidates and whites are more likely to vote for white candidates.  The same story also emerges from my initial report.  These findings are not surprising: a correlation between the race of voters and the race of candidates is a ubiquitous feature of American politics, and indeed, politics in many other countries.

3.  After noting that the candidate with the most support among African-American voters is often an African-American candidate, Professor Engstrom draws the conclusion in paragraph 45 of his report that "not only did the non-African-American voters not share the preference for these African American candidates, they usually vetoed their elections.  These vetoes occurred in 2011, 2012, and 2013, when not a single African American candidate preferred by African American voters won a seat.  Two additional African American candidates preferred by African American voters were vetoed by the non-African American voters in 2014 as well."

1

4. Professor Engstrom does not explain the nature of these "vetoes" or define the concept, nor does he explain how it relates to the notion of bloc voting or cohesiveness as developed in *Thornburg v. Gingles*. Given that African Americans constituted a larger share of the voting-age population than whites during the period analyzed by Dr. Engstrom (see Mr. Cooper's expert report, page 6 of Exhibit D appendix), it is unclear how it is possible for whites to consistently veto the preferred candidates of African Americans. This would be logically plausible only if a significant turnout advantage for whites combined with near-perfect cohesion among both groups. Professor Engstrom's report does not provide evidence or assertions about turnout, nor does it attempt to grapple in a principled way with the difficult concepts of cohesion and bloc voting in a multi-winner electoral system.

5. Rather, paragraph 45 of the report makes the rather jarring assertion that *any* victory by a white candidate constitutes a white veto of African-American preferences—even if African Americans preferred a white candidate, or cast their votes in a way that undermined the victory of the African-American candidates, indeed even if no African American candidate was running for the seat.

6. The bulk of this supplemental report demonstrates that this notion of "racial vetoes" cannot be sustained. To show this, I begin by examining the key assumptions and definitions that appear to drive Dr. Engstrom's conclusions. Next, I show that even if one adopts these rather unusual assumptions and definitions, one must reject the notion that recent narrow losses of African-American candidates in School Board elections can be understood as racial "vetoes" by whites. In most instances, given the level of crossover support for African-American candidates from white voters, only a very slight increase in cohesion among African-American voters would

2

have delivered victory to African-American candidates who already received substantial crossover support from whites.

7. Finally, I acknowledge that much of the confusion about cohesion and vetoes has to do with inherent difficulties of assessing the relevant standard for cohesion in a multi-winner system with single-shot voting—complexities that are not acknowledged in any of the Plaintiffs' reports.  A good way to get around this problem is to examine other, simpler, winner-take-all elections held in the entirety of the Ferguson-Florissant School District in which an African-American candidate was on the ballot.  I have identified 12 such races dating back to 2008. Remarkably, the African-American candidate received the highest vote total in every one of these 12 races, including primary and general elections held in August, February, and November for three different offices.  This provides further evidence that the notion of a "white veto" in recent Ferguson-Florissant School District is simply not tenable.

BASIC ASSUMPTIONS AND DEFINITIONS

8. In order to examine whether African-American and white voters are sufficiently cohesive and whether whites vote sufficiently as a bloc to "usually defeat the minority's preferred candidate" (Thornburg v. Gingles 478 U.S. at 30), one must make several analytical choices.  First, one must decide whether to follow the logic of the Court in *Gingles* and examine the candidates that receive the most votes among minorities, or to assume that minorities can only truly prefer candidates who are themselves minorities.  Although the former approach is called for by the Supreme Court and is typical in other VRA cases, Professor Engstrom adopts the second approach.  In paragraph 45 of his report, he implies that whites "vetoed" the choice of

3

African Americans in both seats in the 2013 Ferguson-Florissant School Board election, even though his analysis indicates that in a two-seat election, the second-ranked candidate among African Americans was a white candidate whose support was more than twice as high as the third-ranked candidate, an African American. According to the *Gingles* approach, having defeated an African American candidate for the second seat, Ms. Hogshead is clearly a victorious candidate of choice for African Americans, but according to Professor Engstrom's approach, this is impossible because she is white.

      9. A second analytical decision has to do with uncontested elections. As described in my initial report, popular African-American incumbents often did not attract challengers in the absence of a scandal or controversy. Doris Graham and Chuck Henson were reelected without challengers several times until they ran into controversies. Dr. Engstrom has chosen to focus only on the races in which African-American incumbents drew challengers (and subsequently lost).

      10. A related analytical decision has to do with situations in which the number of minority candidates filing for the election is lower than the number of seats being contested. This was the case in 2011 and 2012. Since Professor Engstrom has adopted the view that a white candidate cannot qualify as "preferred" by African Americans, paragraph 45 indicates that the victory of a white candidate in the second (or third) seat should also count as evidence of a white veto, even though no second African-American candidate was running.

4

## COHESION, BLOC VOTING, AND ELECTORAL OUTCOMES

11. Each of these unusual choices is crucial to the sweeping characterization made in paragraph 45 of the Engstrom report. Perhaps the most important analytical choice, however, is how one defines "cohesion" and "bloc voting" in the context of a multi-winner system with single-shot voting and different numbers of white and minority candidates in each election. It is important to define these difficult concepts and provide a standard for how one might know when the cohesion of African Americans and bloc voting of whites is sufficient to produce a white "veto." Understandably, this question receives little or no attention in a typical VRA Section Two case involving at-large districts because typically the minority group is a minority of the voting-age population of the municipality or school district, usually by a large margin. When 30 percent of the population is African-American or Hispanic and 70 percent is white, even a good deal of cross-over voting among whites for minority candidates and perfect cohesion among minority voters could lead to consistent losses for minority candidates. Thus the typical approach in expert reports for plaintiffs is to merely point out that African Americans and whites generally choose different candidates, and that white candidates typically win.

12. However, this approach does not work in a setting like the Ferguson-Florissant School district where African Americans constitute a majority of the voting-age population. Even if one accepts Professor Engstrom's unusual approach to defining minority candidates of choice and dealing with uncontested elections and seats, one needs an explanation and an associated empirical standard in order to identify the phenomenon whereby white bloc voting and African-American cohesion conspire to defeat African-American candidates in an at-large, multi-winner system with single-shot voting.

5

13. Rather than providing a definition or standard, Professor Engstrom provides an example. In paragraph 13, he explains that in a hypothetical race where two seats are contested and two African Americans are running, "perfect cohesion" is obtained when each African-American candidate receives 50 percent of the votes of African-American voters. This happens because each African-American voter gives one vote to one African-American candidate, and the other vote to the other. Thus Professor Engstrom appears to define perfect cohesion as a situation in which every voter in a particular racial group is behaving so as to maximize the representation of candidates belonging to that racial group. By the same logic, we might specify that white bloc voting is "perfect" if there are two white candidates and each receives 50 percent of the votes of white voters. In this situation, if the electorate was 51 percent white and 49 percent African-American, both white candidates would win narrow victories and one might speak of a "white veto."

14. Imagine the same electorate and the same candidates, but with a large reduction in white bloc voting, such that whites only give 35 percent to each of the white candidates, giving 20 percent of their support to the first African-American candidates and 10 percent to the second. It would make no sense to speak of a "white veto," because the crossover support of whites would be more than enough to ensure a comfortable victory of both African-American candidates.

15. However, imagine further that the cohesion of African-American voters also breaks down, so that the first African-American candidate now receives 40 percent of the African-American vote, and the second receives 10, while the other half of the African-American votes go to the white candidates, 25 percent to each. This reduction in African-American cohesion causes the African-American candidates to lose. The first candidate would lose by a very small

6

margin and the second would lose by a large margin. Certainly one would not now conclude that this lack of cohesion among African Americans has generated a white "veto." It makes just as much sense to blame the absence of African-American cohesion as it does to blame the presence of white cohesion.

16. This is not a hypothetical example. It is based on Professor Engstrom's estimates for the 2013 election. Mr. Henson is the first African American candidate discussed above, and Mr. Thomas is the second. Mr. Henson's exceptionally narrow loss could have easily been avoided had African Americans not given around half of their votes to the white candidates. It simply not reasonable to view the losses of Mr. Henson and Mr. Thomas as "white vetoes."

17. The difficulty with Professor Engstrom's approach to minority cohesion and majority bloc voting becomes even more pronounced when we try to assess elections when there are fewer African-American candidates than seats, as in 2011 and 2012, or when there are more African-American candidates than seats, as in 2014 and 2015. First let us consider the cases in which too few African-American candidates decide to run. If cohesion is defined as a situation in which a large number of African-American voters cast their votes so as to maximize the chances of victory for African-American candidates, the cohesion of African-American voters in 2011 and 2012 was actually quote low. According to Professor Engstrom's definition, perfect cohesion in 2011 would have been a 50 percent vote share among African-Americans for each of the African-American candidates. According to Professor Engstrom's report, each of these candidates received around 27 percent of the African-American vote. Because of the possibility of single-shot voting, African-American voters who were motivated by the race of the candidates had the option of casting two votes: one for each of the African-American candidates. As Professor Engstrom has argued elsewhere:

7

> …members of a minority group may employ a "single shot" voting strategy to increase the opportunity for their candidate of choice to finish among the top N candidates and win a seat. Single shot voting entails group members casting one vote, if they wish, for the candidate favored by the group, and not casting any of their remaining votes for any candidate. By withholding their remaining votes from the candidates competing with their preferred choice, their candidate of choice has a better opportunity to finish among the top N candidates and win one of the N seats. (Expert Report of Richard L. Engstrom, Ph.D., *Rogelio Montes and Mateo Arteaga v. City of Yakima)*.

18. African-American voters evidently passed on this opportunity, and cast 46 percent of their votes for white candidates in 2011 according to the Engstrom Report, and around half of those votes helped put the winning white candidates over the top. Ms. Hawkins was only 190 votes shy of gaining a seat, and Ms. Graham fell short by only 285. Again, only a slight increase over the rather low level of African-American cohesion would have yielded one or perhaps two victories for African-American candidates, in spite of the fact that the 2011 electorate was clearly majority-white (see Figure 6 of my initial report). In fact, whites were not at all cohesive in this election, spreading their votes across 9 candidates (including African-American candidates), such that the most successful candidate only received 23 percent of the white vote according to Professor Engstrom's analysis. Because white voters failed to act cohesively and coordinate on three white candidates, the door was wide open for Ms. Graham and Ms. Hawkins to achieve victory. They came very close, and could have achieved victory had only a small handful of African-Americans behaved more cohesively, either by voting for African-American candidates or withholding their votes from white candidates. Again, one must apply some unusual logic to arrive at the notion of a white veto.

19. A similar situation occurred in 2012. By Professor Engstrom's logic, perfect cohesion would have entailed 100 percent of the African-American vote for Ms. Morris—the

8

only African-American candidate running in a two-seat election.  The estimates in the Engstrom report suggest that African-American support for Ms. Morris was only around half that, and almost half of the votes cast by African Americans went to the two victorious white candidates, helping put them over the top.  As revealed in Figure 6 of my initial report, there was no significant difference between the turnout of African Americans and whites in the 2012 election.  Once again, if only a relatively small number of African Americans would have withheld their votes from white candidates, the African-American candidate would have been victorious.  Once again, it is very difficult to see the logic whereby bloc voting by the majority constituted a "veto" of minority preferences.

20.  This logic becomes even more difficult to understand in 2014 and 2015, when there were more African-American candidates than seats, and African-American candidates received more votes than white candidates.  In 2014, Professor Engstrom's notion of perfect cohesion would presumably require that three African-American candidates each receive one third of the African-American vote.  The top three African-American candidates received 26, 24, and 23 percent according to Professor Engstrom.  The cohesion of whites was roughly similar, with the top candidates receiving 27, 24, and 21 percent.  Again, Figure 6 in my initial report reveals that there was no significant turnout advantage for whites.  Moreover, the Engstrom report suggests that 28 percent of white votes went to African-American candidates.  While one of the African-American candidates won, the other two fell short by 91 and 307 votes.  Given these facts, it is very difficult to spin a narrative in which Mr. Savala and Mr. Johnson's losses can be explained as vetoes by whites.  The simplest explanation for this outcome is that African-American support was inefficiently split across five candidates who, collectively, received a majority of the votes cast.

21. Finally, let us consider the 2015 election, in which there were three African-American candidates and two white candidates for two seats. Perfect cohesion by African Americans would require 50 percent support for two of the African-American candidates. Indeed, one of the African-American candidates, Ms. Graves, received even more than that according to the Engstrom report, which can only be true if she received "single-shot" votes from African Americans. The second-ranked African-American candidate received only 14.5 percent of the votes of African Americans according to Engstrom's report, and thus had little chance of winning. Whites were far less racially cohesive, and in fact gave 47 percent of their votes to African-American candidates. Their second and third ranked candidates were African Americans. Thus the 2015 election lacked both African-American cohesion and white bloc voting, and once again, one cannot claim that whites "vetoed" the preferences of African Americans.

22. Professor Engstrom provides an alternative explanation of this election. Rather than noting that Ms. Graves campaigned successfully in the integrated Florissant neighborhoods where she resides and soundly defeated the white candidate, Ms. Dameron, Professor Engstrom argues that Ms. Graves benefited from Ms. Dameron's status as a "minor candidate" among whites, which "left a seat available for an African-American candidate to win" (paragraph 46). It is not clear what defines a candidate as "minor" other than the fact that other candidates receive far more votes. In fact, Mr. Hines and Mr. Person were "minor" candidates among African Americans, which left a seat available for a white candidate to win. Given the lack of cohesion among whites and their relatively strong support for Mr. Hines, he had an excellent opportunity to win had he only gained more traction among African Americans.

10

23. Finally, Professor Engstrom also implies that Ms. Graves' impressive victory was a result of this lawsuit. This claim implies that white voters 1) knew about the lawsuit, 2) preferred at-large to single-member districts, 3) believed the Court would look favorably upon an African-American victory, and 4) coordinated so as to strategically split their votes between Mr. Ebert and Ms. Graves so that one but not two African-Americans would be elected. Such behavior is not consistent with what political scientists have come to know about the information and coordination capacity of voters.

24. In conclusion, Professor Engstrom's report is correct in pointing out that the highest-ranked candidate among African-Americans and whites in Ferguson-Florissant School Board elections is often different. It is also true that in recent years, African-American candidates have lost some exceptionally close elections, especially for the second and third seats. However, given the prevalence of crossover voting among both African Americans and whites and the lack of cohesion among African Americans, these losses cannot be explained by bloc voting by the white minority.

## OTHER ELECTIONS

25. The discussion above revealed that it is necessary to grapple with the complexities of the at-large, multi-winner voting system in order to evaluate the logic of Section Two of the Voting Rights Act and its clarification in *Gingles*. However, there is a way to avoid these complexities altogether. One can examine elections for other offices for which the geographic basis of the office completely subsumes the Ferguson-Florissant School District. This includes

11

winner-take-all elections for the First United States Congressional District as well as statewide and presidential elections, all of which typically involve only two major candidates.

26. Since 2008, I have found 12 such elections in which voters in the Ferguson-Florissant School District had a choice between African-American and white candidates. Incumbent County Executive Charlie Dooley, an African American, faced white challengers in the August Democratic primary in both 2010 and 2014, and a white general-election challenger in 2010. Incumbent member of the United States Congress, William Lacy Clay, Jr., faced white challengers in the August Democratic primaries of 2010 and 2012, and in the general elections of 2008, 2010, 2012, and 2014. President Barack Obama faced off against Hillary Clinton in the 2008 February Democratic presidential primary, and against white candidates in the November general elections of 2008 and 2012.

27. The Ferguson-Florissant School District lies completely within the boundaries of the First Congressional district both before and after the most recent round of redistricting, as well as within St. Louis County and of course the state of Missouri, as displayed in Figure 1 below.

28. If bloc voting among whites has the capacity to prevent African-American candidates from winning at-large elections encompassing the entirety of the Ferguson-Florissant School District, we should expect to see that white candidates defeat African-American candidates within the FFSD boundaries in these races. In order to examine this possibility, I have collected precinct-level election results from the St. Louis County Board of Election Commissioners for each of these races. Next, I merged these with the relevant geographic boundary files (also provided by the Board of Election Commissioners) for each precinct in each year. As in my initial report, it was necessary to create clusters of precincts in some instances to correspond to

the smallest unit of election reporting. I then identified all of the precincts or precinct clusters that lie completely or partially within the Ferguson-Florissant School District. I then sum the votes of the candidates within the district.



**Figure 1: Map overlays of Boundaries: St. Louis County, the First U.S. Congressional District, and the Ferguson-Florissant School District**

13

Table 1:  Various election results aggregated to the level of the Ferguson-Florissant School District

| Contest | Month | African-American candidate | | White candidate | |
|---|---|---|---|---|---|
| 2008 Presidential Democratic Primary | February | Barack Obama | 70.3% | Hillary Clinton | 29.7% |
| 2008 Presidential General | November | Barack Obama | 76.5% | John McCain | 23.5% |
| 2008 U.S. Congress General | November | William Lacy Clay | 84.6% | Robb Cunningham | 15.4% |
| 2010 County Executive Dem. Primary | August | Charlie Dooley | 80.0% | Ronald Levy | 20.0% |
| 2010 County Executive General | November | Charlie Dooley | 70.7% | Bill Corrigan | 27.0% |
| 2010 U.S. Congress Dem. Primary | August | William Lacy Clay | 78.9% | Candice Britton | 21.1% |
| 2010 U.S. Congress General | November | William Lacy Clay | 69.8% | Robyn Hamlin | 27.1% |
| 2012 U.S. Congress Dem. Primary | August | William Lacy Clay | 65.0% | Russ Carnahan | 32.6% |
| 2012 U.S. Congress General | November | William Lacy Clay | 78.5% | Robyn Hamlin | 21.5% |
| 2012 Presidential General | November | Barack Obama | 77.9% | Mitt Romney | 22.1% |
| 2014 County Executive Dem. Primary | August | Charlie Dooley | 50.7% | Steve Stenger | 49.3% |
| 2014 U.S. Congress General | November | William Lacy Clay | 73.0% | Daniel Elder | 27.0% |

29.  The results, summarized in Table 1, are quite striking.  The African-American candidate was victorious in all 12 of these elections—often by extremely large margins.  These elections include high-turnout November presidential elections, November off-year elections, February presidential primaries, as well as August primaries with very low turnout.  Some of them were romps by safe incumbents, but others were hotly contested in the larger jurisdiction.  For instance, Obama narrowly defeated Clinton in the 2008 primary in Missouri, and Obama narrowly lost the state to both McCain and Romney statewide.  In the Ferguson-Florissant School District, Obama received over 70 percent of the vote in each of these races.  After the most recent round of redistricting, Lacy Clay was forced to run in the Democratic primary against a white incumbent member of Congress, Russ Carnahan, but still won a large majority in the FFSD.  In 2010, a difficult mid-term election for Democrats, Dooley won a narrow victory over the Republican nominee, Bill Corrigan, with just over 51 percent of the vote in St. Louis County.  In the FFSD, Dooley won almost 70 percent of the vote.  Finally, Dooley was defeated in the 2014 Democratic primary by Steve Stenger, but still achieved a narrow majority within the Ferguson-Florissant School District.

14

30. In sum, these additional elections only demonstrate more clearly what can also be seen in Ferguson-Florissant School Board elections. In contrast to Professor Engstrom's conclusion, white voters in the Ferguson-Florissant School district do not "veto" the election of African-American candidates.

31. Should additional documents or information be provided to me to review and analyze, I reserve the right to take these additional materials into account, modify and/or supplement my opinions, as well as to offer new opinions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in Palo Alto, CA on July 2, 2015.

Jonathan Rodden