**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, REDDITT HUDSON, F. WILLIS JOHNSON and DORIS BAILEY, <br><br> Plaintiffs, <br><br> v. <br><br> FERGUSON-FLORISSANT SCHOOL DISTRICT and ST. LOUIS COUNTY BOARD OF ELECTIONS COMMISSIONERS, <br> Defendants. | Case No. 4:14 CV 2077 RWS |

**PLAINTIFFS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

Pursuant to E.D. Mo. L.R. 4.01(E), the following are the uncontroverted material facts supporting Plaintiffs' Motion for Summary Judgment.

## BACKGROUND

1. Plaintiffs Doris Bailey, Redditt Hudson, F. Willis Johnson, and the Missouri State Conference of the National Association for the Advancement of Colored People filed this lawsuit on December 18, 2014 against Defendants the Ferguson-Florissant School District ("FFSD" or "the District") and the St. Louis County Board of Elections Commissioners ("St. Louis BOEC"). Doc. No. 1, *Complaint*.

## I. Parties

2. Plaintiff Doris Bailey is a U.S. citizen; registered, regular voter; and an African-American resident of FFSD. Ex. A1, *Decl. of Doris Bailey*, Sept. 16, 2015, at ¶¶ 1-3, 6-7.[1] She resides in Berkeley, Missouri, an area of FFSD that could constitute a single-member district in which African Americans are a majority of the voting age population, and where African Americans could elect their preferred candidates if the elections were not held at-large. Doc. No. 1, *Compl.*, at ¶ 5; Ex. A1, *Bailey Decl.*, at ¶ 3; *see* Ex. B1, *Expert Decl. of William S. Cooper*, May 27, 2015, at Ex. E (illustrative plan 1), Ex. F (illustrative plan 2).

3. Plaintiff Redditt Hudson is a U.S. citizen; registered, regular voter; and an African-American resident of FFSD. Ex. A5, *Decl. of Redditt Hudson*, Sept. 18, 2015, at ¶¶ 1-3, 5; Doc. No. 1, *Compl.* He is the father of two children who attend school in FFSD. Ex. A5, *Hudson Decl.*, at ¶ 4. He resides in an area of FFSD that could constitute a single-member district in which African Americans are a majority of the voting age population, and where African Americans

---

[1] Exhibits to this Statement of Uncontroverted Material Facts are designated according to categories: A – declarations; B – expert reports; C – expert depositions; D – exhibits from expert depositions; E – other (non-expert) depositions; F – exhibits from other (non-expert) depositions; G – miscellaneous; and H – documents produced in discovery.

could elect their preferred candidates if the elections were not held at-large. Doc. No. 1, *Compl.*, at ¶ 5; Ex. B1, *Cooper Decl.*, at Ex. F (illustrative plan 2).

4.  Plaintiff F. Willis Johnson is a U.S. citizen; registered, regular voter; and an African-American resident of FFSD. Ex. A6, *Decl. of F. Willis Johnson*, Sept. 29, 2015, at ¶¶ 1-3, 9. He resides in Ferguson, Missouri, an area of FFSD that could constitute a single-member district in which African Americans are a majority of the voting age population, and where African Americans could elect their preferred candidates if the elections were not held at-large. Doc. No. 1, *Compl.*, at ¶ 5; Ex. A6, *Johnson Decl.*, at ¶ 1; *see* Ex. B1, *Cooper Decl.*, at Ex. E (illustrative plan 1), Ex. F (illustrative plan 2). He is currently the pastor of Wellspring Community Church in Ferguson, Missouri. Ex. A6, *Johnson Decl.*, at ¶ 4.

5.  Plaintiff the Missouri State Conference of the National Association for the Advancement of Colored People ("MO NAACP") is a state affiliate of the NAACP, the nation's oldest and largest civil rights organization, whose mission is to ensure the political, educational, social, and economic equality of rights of all persons, to eliminate hatred and racial discrimination, and to remove all barriers of racial discrimination through democratic processes. Ex. A7, *Decl. of Adolphus M. Pruitt, II*, Sept. 15, 2015, at ¶¶ 2-3.

6.  Plaintiff MO NAACP is active in efforts to increase voter registration, education, and turnout, and emphasizes the importance of local elections, including local school board elections. Ex. A7, *Pruitt Decl.*, at ¶¶ 10-14; *see* Ex. A5, *Hudson Decl.*, at ¶ 6.

7.  The membership of the MO NAACP includes African Americans who reside, work, and raise families in the District. Ex. A7, *Pruitt Decl.*, at ¶ 4.

8.  Among these members are individuals, including Plaintiff Hudson, who reside in areas of the District that could constitute single-member districts in which African Americans are a

majority of the voting age population, and where African Americans could elect their preferred candidates if the elections were not held at-large. Ex. A7, *Pruitt Decl.*, at ¶ 4; Ex. A5, *Hudson Decl.*, at ¶ 1; *see* Ex. B1, *Cooper Decl.*, at Ex. F (illustrative plan 2).

9.  Defendant FFSD is a governmental entity that maintains an electoral system comprised of at-large elections for seven positions on the Ferguson-Florissant School Board (the "Board"). The Board is responsible for the governance and administration of FFSD, a political subdivision of the State of Missouri within the meaning of Article 4, Section 12, of the Missouri Constitution. Doc. No. 1, *Compl.*, at ¶ 6; Doc. No. 46, *FFSD Am. Answer*, at ¶ 6.

10. Defendant St. Louis BOEC is the governmental entity charged with conducting elections in St. Louis County. It is responsible for conducting elections for positions on the Board in FFSD. Doc. No. 1, *Compl.*, at ¶ 7; Doc. No. 8, *St. Louis BOEC Answer*, at ¶ 2.

11. FFSD is located in northern St. Louis County, Missouri. Ex. B1, *Cooper Decl.*, at ¶ 12. The District was created by a 1975 desegregation order, which required the then-Ferguson-Florissant School District to annex the primarily African-American neighboring school districts of Kinloch and Berkeley. *See United States v. Missouri*, 515 F.2d 1365, 1369-73 (8th Cir. 1975); Ex. B5, *Expert Report of Jonathan Rodden*, May 27, 2015, at ¶ 8.

12. As part of the annexation, the order directed that two seats on the then-six-member Ferguson-Florissant School Board be declared vacant and replaced by designees of the annexed school boards. The four remaining members were to draw lots to determine the length of their individual terms in office to create staggered elections for an "initial period of stable governance for the new district." Doc. No. 1, *Compl.*, at ¶ 14 (quoting *Missouri*, 515 F.2d at 1373); Doc. No. 46, *FFSD Am. Answer*, at ¶ 14.

13. The District covers all or part of eleven municipalities: Berkeley, Calverton Park, Cool

Valley, and Kinloch in their entirety, and parts of Black Jack (one block), Ferguson, Florissant, Dellwood, Hazelwood, Normandy, and Old Jamestown. Ex. B1, *Cooper Decl.*, at ¶ 32 Fig. 6. Its headquarters are in Florissant. Doc. No. 1, *Compl.*, at ¶ 6; Doc. No. 46, *FFSD Am. Answer*, at ¶ 6.

14. Based on data provided to the U.S. Department of Education for the 2011 survey year, the District public schools serves 13,234 students from preschool through 12th grade, of which 77.1% are Black and 15.6% are white. Ex. F1, *FFSD Data Reported to Office of Civil Rights (Ex. 17 to Dep. of Brian Scott Ebert, June 16, 2015)*, at 4; Ex. F2, *FFSD Data on Office of Civil Rights Website (Ex. 5 to Dep. of Paul Thomas Morris, June 15, 2015)*, at 1.

15. According to the 2010 Decennial Census, the District has a total population of 68,663, with a Black population of 36,967 (53.84%) and a white population of 29,581 (43.08%). Ex. B1, *Cooper Decl.*, at ¶ 21 Fig. 2. The total voting age population ("VAP") in the District is 50,771, of whom 24,466 (48.19%) are any-part Black, 24,030 (47.33%) are single-race Black, and 24,852 (48.95%) are non-Hispanic white. Ex. B1, *Cooper Decl.*, at ¶ 18, ¶ 27 Fig. 4. There are 1,324 (1.93% of the total population) Latinos in the District, of whom 824 (1.62% of the VAP) are voting-aged. Ex. B1, *Cooper Decl.*, at ¶ 20, ¶ 21 Fig. 2.

16. In addition to the Decennial Census, the Census Bureau publishes one-, three-, and five-year estimates of population demographics estimates based on the American Community Survey ("ACS"). The ACS is a rolling sample survey based on responses from one in about 40 persons on an annual basis. Ex. B6, *Supplemental Decl. of William S. Cooper*, July 2, 2015, at ¶¶ 5-6; *See* Ex. C5, *Dep. of Jonathan Rodden*, Aug. 20, 2015, at 57:11 − 58:5.

17. Because ACS population estimates are based on a sample, they are subject to sampling bias, *i.e.*, error margins or confidence intervals. These error margins are larger for smaller sample

sizes, smaller geographic units, and individual demographic groups within geographic areas. Ex. C5, *Rodden Dep.*, at 57:11 – 58:20; Ex. B8, *Rebuttal Report of Colin Gordon*, June 30, 2015, at 1.

18. Unlike the Decennial Census, the ACS does not report block-level data used in software for redistricting and other types of demographic analyses. Ex. C5, *Rodden Dep.*, at 58:21 – 59:14.

19. The 2011 – 2013 three-year ACS estimates that the FFSD single-race Black VAP is 24,313, or 48.94% of the District's VAP, the single-race white VAP (including Hispanic whites) is 23,740, or 47.24% of the District's VAP, and the non-Hispanic White VAP is 23,242, or 46.78% of the District's VAP. Ex. B6, *Cooper Suppl. Decl.*, at ¶ 7; Ex. B5, *Rodden Rep.*, at ¶ 12; Ex. B10, *Supplemental Report of Jonathan Rodden & Jowei Chen: Plaintiffs' Redistricting Proposals*, July 2, 2015, at Tbl. 1 (p. 3).

20. According to the 2011-2013 ACS, the VAP in the District is 49,679, of whom just 732 (1.47%) are not citizens. Ex. B6, *Cooper Suppl. Decl.*, at ¶ 22.

## II. <u>Election System</u>

21. The Board is comprised of seven members who serve three-year terms and who are elected through an at-large election system. Board elections are staggered and held off-cycle so that either two or three Board seats are elected every April. Doc. No. 1, *Compl.*, at ¶¶ 6, 15, 16; Doc. No. 46, *FFSD Am. Answer*, at ¶¶ 6, 15, 16.

22. When the number of candidates equals the number of Board seats to be filled, no election is held, and the candidates automatically assume responsibilities as members of the Board. Mo. Rev. Stat. § 115.124.

23. As of the April 2015 election, the seven members of the Board are: Mr. Paul Morris, Mr. Robert Chabot, Mr. Brian Scott Ebert, Ms. Leslie Hogshead, Mr. Keith Brown, Dr. Donna

Paulette-Thurman, and Dr. Courtney Graves. *See* Doc. No. 58-3, *Resp'ts' 2d Am. Disclosures*, at 1-2; Ex. F3, *May 13, 2015 Board Meeting Mins.* (*Ex. 24 to Dep. of Courtney Graves, July 1, 2015)*, at 1. Dr. Paulette-Thurman and Dr. Graves are African-American. The remaining five Board members are white. *See* Ex. B5, *Rodden Rep.*, at ¶¶ 47, 50, 54-55.

24. Each voter has the right to cast up to two votes in a two-seat election and up to three in a three-seat election. Voters can engage in bullet, or single-shot voting: that is, they can forego casting all of the votes that they are allotted, but they cannot vote more than once for the same candidate in a single election. If every voter casts all of his or her votes in a two-seat election, *i.e.*, voters do not engage in single-shot voting, a candidate can receive at most 50% of all votes. If every voter casts all of his or her votes in a three-seat election, a candidate can receive at most 33.33% of all votes. *See* Ex. C5, *Rodden Dep.*, at 130:6 – 131:17; Ex. B5, *Rodden Rep.*, at ¶ 18; Ex. B2, *Expert Report of Richard L. Engstrom*, May 27, 2015, at ¶¶ 7, 12-13.

25. Board seats are awarded to the candidates with the most votes, such that when two seats are contested, the top two vote recipients win the two seats, and when three seats are contested, the top three vote recipients win the three seats. Ex. B5, *Rodden Rep.*, at ¶ 18; Ex. B2, *Engstrom Rep.*, at ¶ 7.

## GINGLES I

26. Plaintiffs' expert demographer, William S. Cooper, drew two seven-district plans in which Blacks are a majority of the VAP in four of the districts. Ex. B1, *Cooper Decl.*, at ¶¶ 38-57.

27. In creating these illustrative plans, Plaintiffs' expert relied upon population and geographic data from the 1990 to 2010 Decennial Censuses and the ACS. Ex. B1, *Cooper Decl.*, at ¶ 38.

28. He used a commonly accepted software package called *Maptitude for Redistricting*.

*Maptitude for Redistricting* was developed by the Caliper Corporation, to process Topologically Integrated Geographic Encoding and Reference ("TIGER") and PL 94-171 files. This software is deployed by many local and state governing bodies across the country for redistricting and other types of demographic analyses. Ex. B1, *Cooper Decl.*, at ¶¶ 39-42.

29. TIGER files contain boundaries for the various levels of Census geography. PL 94-171 files contain race and ethnicity data on the total population and VAP found in units of Census geography from the state level down to census blocks. Ex. B1, *Cooper Decl.*, at ¶ 40.

30. A census block is the smallest geographic tabulation area from the Decennial Census. Generally, a census block is bounded on all four sides by visible features such as streets, rivers, and railroad tracks. Ex. B1, *Cooper Decl.*, at ¶¶ 42-43.

31. To develop the illustrative plans, he obtained Geographic Information System (GIS) shapefiles from the St. Louis County GIS Department depicting current boundaries of the District as well as precincts for the District from 2011 to 2015. Where precinct boundaries did not match census blocks, he used the "whole block" criterion, which assigns all the population in a split census block to the nearest precinct boundary. Ex. B1, *Cooper Decl.*, at ¶¶ 43-46.

32. Plaintiffs' illustrative plans use the 2010 Census total population for the apportionment base. *See Cooper Decl.*, at ¶ 40.

33. "The population of any political subdivision of the state for the purpose of representation . . . is determined on the basis of the last previous decennial census of the United States." Mo. Rev. Stat. § 1.100(1).

34. The ideal district size using total population as the apportionment base is 9,809 (68,663/7). Ex. B6, *Cooper Suppl. Decl.*, at ¶ 24.

35. The population statistics by district for Plaintiffs' Illustrative Plan 1 are as follows:

**Plaintiffs' Illustrative Plan 1 – 2010 Census Summary**

| District | Population | % Dev | % Black | 18+ Pop | % 18+ Black | % 18+ NH White |
|----------|-----------|-------|---------|---------|-------------|----------------|
| 1 | 9841 | 0.33% | 69.63% | 6918 | 63.93% | 32.68% |
| 2 | 10025 | 2.20% | 66.36% | 7071 | 60.95% | 35.75% |
| 3 | 9923 | 1.16% | 77.64% | 6984 | 74.36% | 21.12% |
| 4 | 9321 | -4.98% | 30.50% | 7406 | 27.84% | 68.09% |
| 5 | 9997 | 1.92% | 20.33% | 7790 | 17.45% | 79.11% |
| 6 | 9980 | 1.74% | 44.05% | 7442 | 38.94% | 57.58% |
| 7 | 9576 | -2.38% | 56.18% | 7160 | 52.86% | 43.25% |

Ex. B1, *Cooper Decl.*, at ¶ 51 Fig. 10.

36. The four majority-Black districts range from 52.86% black voting age population (BVAP) in District 7 to 74.36% BVAP in District 3. The total deviation from ideal district size is 7.18% (calculated by adding the largest + and – deviations: 2.20% and 4.98%).

37. Three of the 96 precincts in the District are split by district boundaries in Plan 1 with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to five schools. Three incumbents are paired in District 2 and two in District 7. Ex. B1, *Cooper Decl.*, at ¶¶ 51-53.

38. The population statistics by district for Plaintiffs' Illustrative Plan 2 are as follows:

**Plaintiffs' Illustrative Plan 2 – 2010 Census Summary**

| District | Population | % Dev | % Black | 18+ Pop | % 18+ Black | % 18+ NH White |
|----------|-----------|-------|---------|---------|-------------|----------------|
| 1 | 10020 | 2.15% | 70.15% | 7039 | 64.53% | 32.09% |
| 2 | 9494 | -3.21% | 66.46% | 6688 | 60.89% | 35.90% |
| 3 | 9736 | -0.74% | 78.66% | 6816 | 75.67% | 19.76% |
| 4 | 9755 | -0.55% | 31.10% | 7671 | 28.12% | 68.35% |
| 5 | 10232 | 4.31% | 20.20% | 8008 | 17.42% | 78.87% |
| 6 | 9620 | -1.93% | 55.71% | 7149 | 51.50% | 45.14% |
| 7 | 9806 | -0.03% | 44.90% | 7400 | 40.86% | 54.85% |

Ex. B1, *Cooper Decl.*, at ¶ 55 Fig. 12.

39. The four majority-Black districts range from 51.50% BVAP in District 6 to 75.67% BVAP in District 3. The total deviation from ideal district size is 7.52% (calculated by adding 4.31% and 3.21%).

40. Nine of the 96 precincts in the School District are split by district boundaries in Plan 2 with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to four schools. Two incumbents who reside in the same Census block in District 2 are paired, but no other incumbents are paired. Ex. B1, *Cooper Decl.*, at ¶¶ 55-57.

41. For each of Plaintiffs' illustrative plans, all parts (*i.e.*, census blocks) of each component election district are connected at some point with the rest of the district. Ex. B1, *Cooper Decl.*, at ¶ 60.

42. The "compactness" of a district can be measured using the Reock test. "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan." Ex. B1, *Cooper Decl.*, at ¶ 58 n.11 (quoting *Maptitude For Redistricting* documentation).

43. The overall mean average Reock compactness score for Plaintiffs' Illustrative Plan 1 is .41, ranging from a low of .26 in District 4 to a high of .66 in District 6. The overall mean average Reock compactness score for Plaintiffs' Illustrative Plan 2 is .38, ranging from a low of .29 in District 3 to a high of .46 in District 2. Ex. B1, *Cooper Decl.*, at ¶ 58. Of the 221

municipal wards in St. Louis County the mean average Reock score is .39, ranging from a low of .15 to a high of .66. Ex. B1, *Cooper Decl.*, at ¶ 59.

## GINGLES II AND GINGLES III

44. From 2000 through 2015, there have been twelve contested Board elections. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8, at ¶ 72.

45. By statute, where the number of candidates who have filed for a Board election equals the number of seats to be elected, no election is held, and the candidates automatically assume Board member responsibilities. Mo. Rev. Stat. § 115.124(1). From 2000 through 2015, there were four such non-elections (2005, 2007, 2008, 2010). Ex. B5, *Rodden Rep.*, at ¶ 71.

46. For each of the past twelve contested elections, the District's expert, Dr. Jonathan Rodden, used Gary King's Ecological Inference ("EI") procedure to estimate the level of support for each candidate among Black and white voters. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8.

47. Plaintiffs' expert, Dr. Richard Engstrom, also performed an EI analysis for the 2011 through 2015 Board elections. Ex. B2, *Engstrom Report*, at ¶¶ 15-39, Tbl. 1 (pp. 17-19); Ex. B7, *Rebuttal Report of Richard L. Engstrom*, July 2, 2015, at Tbls. 1-5 (pp. 10-13). Dr. Rodden would describe Dr. Engstrom as one of the nation's leading scholar in political science on the study of racially polarized voting. Ex. C5, *Rodden Dep.*, at 25:24 – 26:4.

48. For purposes of estimating levels of support, EI generates a specific estimate (the "point estimate") of the votes cast for each candidate by African-American voters and white voters as a percentage share of the respective groups' VAP, as well as a confidence interval for that point estimate. The confidence intervals identify the range of estimates within which we can be 95% confident, statistically, of where the actual value of a group's support for a candidate falls. Ex. B2, *Engstrom Rep.*, at ¶ 10; Ex. C5, *Rodden Dep.*, at 76:14-19. The point estimate

lies at the median of the confidence interval. Ex. C5, *Rodden Dep.*, at 77:4-8.

49. A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally-accepted standards in the field of political science, and is consistent with peer-review standards for research in that field. *See* Ex. C5, *Rodden Dep.*, at 76:20 – 77:3.

50. EI is used widely by expert witnesses in assessing RPV in voting rights cases. It was developed subsequent to the U.S. Supreme Court's decision in *Gingles* for the explicit purpose of improving estimates of candidate preferences between or among groups of voters. Ex. B2, *Engstrom Rep.*, at ¶ 10 n.4.

51. According to Dr. Rodden, as a "rule of thumb," when the point estimate for the level of support for one candidate lies within the confidence interval of support for another candidate, there is no statistically significant difference between the two candidates. Ex. C5, *Rodden Dep.*, at 77:19 – 78:12, 80:13-24; *see also* Ex. B5, *Rodden Rep.*, at ¶ 26.

52. Dr. Rodden concedes that when the point estimate for one candidate lies within the confidence interval of the estimate for another candidate, we cannot say with statistical certainty to a level that is generally accepted within the field of political science that one candidate received more support than the other. Ex. C5, *Rodden Dep.*, at 161:12-17. Conversely, when the point estimate for the level of support for one candidate lies outside the confidence interval of the level of support for another candidate, the rule of thumb indicates that there is a statistically significant difference in the levels of support between the two candidates. *See* Ex. C5, *Rodden Dep.*, at 168:11-18, 198:16 – 199:3.

53. Dr. Rodden admits that it may be objectionable to identify "some candidates as 'minority-preferred' if the ecological inference estimate is statistically indistinguishable from the next-

ranked candidate who is rather arbitrarily treated as 'non-preferred.'" Ex. B5, *Rodden Rep.*, at ¶ 74. In such cases, "[i]t is potentially misleading to simply count up wins and losses for minority-preferred candidates." Ex. B5, *Rodden Rep.*, at ¶ 69.

54. Dr. Rodden and Dr. Engstrom do not materially disagree as to the various levels of support each Board candidate received among different racial groups in each election and report consistent estimates of the respective levels of support received by the candidates from Black and white voters in the past five elections. *See* Ex. B7, *Engstrom Rebuttal*, at ¶ 4, Tbls. 1-5 (pp. 10-13).

55. For purposes of summary judgment, Plaintiffs do not dispute Dr. Rodden's estimates for the 2000 to 2010 elections.

56. Based on the past sixteen FFSD elections, "African Americans are more likely to vote for African American candidates and whites are more likely to vote for white candidates." Ex. B11, *Supplemental Report of Jonathan Rodden: Racial Bloc Voting and Cohesion*, July 2, 2015, at ¶ 2; Ex. C5, *Rodden Dep.*, at 272:22 – 274:3; *see also* Ex. C4, *Dep. of Jowei Chen*, Aug. 19, 2015, at 54:23 – 56:3.

57. Each of the elections held since 2000 (*i.e.*, the past sixteen elections) is described briefly below. For contested elections, tables are provided that identify each candidate's name, race, total number of votes received, and level of support (the "point estimate") among Black and white voters with confidence intervals for each estimate as calculated by Dr. Rodden and, for 2011 through 2015, Dr. Engstrom, and identifies the winning candidates. Percentages reported are the percentage of <u>votes</u> received by a candidate from each group, not the percentage of <u>voters</u> supporting from each group supporting each candidate. *See* Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8; Ex. D1, *Underlying Data for Fig. 8 in Rodden Report (Ex. 10 to*

*Dep. of Jonathan Rodden, Aug. 20, 2015)*; Ex. D2, *Rodden's Underlying Data Reformatted (Ex. 11 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; Ex. B2, *Engstrom Rep.*, at ¶¶ 15-39, Tbl. 1 (pp. 17-19); Ex. B7, *Engstrom Rebuttal*, at Tbls. 1-5 (pp. 10-13).

## I. The 2000 – 2015 Board Elections

### A. *The 2000 Election*

58. In 2000, six candidates (incumbent Michael Hirsch and challengers Paul Charney, Gregory Fulton, Michael Hirsch, Les Lentz, Anthony Smith, and Gwendolyn Thomas) ran for two seats. Hirsch, who is white, and G. Thomas, one of two African-American candidates, were successful. Ex. B5, *Rodden Rep.*, at ¶ 68; Ex. G1, *Official 2000 FFSD Election Results*.

59. Dr. Engstrom did not provide EI estimates for the 2000 election.

60. Dr. Rodden's EI estimates and confidence intervals for the 2000 election are as follows:

| The 2000 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Charney (W) 1,222 votes | 9.51% (8.18 – 11.43%) | N/A | 9.92% (8.49 – 11.61%) | N/A |
| Fulton (W) 1,490 votes | 11.59% (9.41 – 14.25%) | N/A | 11.71% (9.35 – 14.79%) | N/A |
| Hirsch (W)* (incumbent) 4,406 votes | 18.71% (12.75 – 26.27%) | N/A | 34.13% (28.23 – 40.79%) | N/A |
| Lentz (W) 1,939 votes | 9.39% (7.28 – 12.40%) | N/A | 15.92% (13.19 – 18.47%) | N/A |
| Smith (B) 1,554 votes | 16.81% (14.50 – 19.95%) | N/A | 9.43% (7.77 – 11.17%) | N/A |
| G. Thomas (B)* 3,413 votes | 33.99% (25.70 – 43.21%) | N/A | 18.89% (14.26 – 23.56%) | N/A |

* Indicates winner
Ex. B5, *Rodden Rep.*, at ¶ 68; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G1, *Official FFSD Election Results, Apr. 4, 2000*, available at http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0400/fergus1.htm.

### 1. Black Voters in the 2000 Election

61. Dr. Rodden estimated that G. Thomas and Hirsch were the candidates who received the highest and second-highest levels of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8, ¶ 68; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 132:17 – 133:1.

62. G. Thomas was the top-ranked candidate among Black voters. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 185:16-23. The difference between G. Thomas and Hirsch in terms of support among Black voters is statistically significant. Ex. C5, *Rodden Dep.*, at 185:24 – 186:3. According to Dr. Rodden's estimates, G. Thomas received almost double the level of support from Black voters as compared to Hirsch. Ex. C5, *Rodden Dep.*, at 173:11 – 174:18. Dr. Rodden agreed that G. Thomas received "substantially" more support than Hirsch among Black voters. Ex. C5, *Rodden Dep.*, at 174:19-21.

63. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden, the levels of support among Black voters received by Hirsch and another candidate, Smith, are not different to a statistically significant degree. Ex. D2, *Rodden's Underlying Data Reformatted*. It is therefore impossible to know which candidate received more support among Black voters. Ex. C5, *Rodden Dep.*, at 186:4-13.

### 2. White Voters in the 2000 Election

64. Dr. Rodden estimated that Hirsch and G. Thomas were the candidates who received the highest and second-highest levels of support among white voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8; Ex. D2, *Rodden's Underlying Data Reformatted*.

65. Hirsch was the top-ranked candidate among white voters. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 187:1-3. According to Dr. Rodden's estimates, the difference between Hirsch and G. Thomas in terms of support among white voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*. According to Dr. Rodden's estimates, Hirsch received almost double the level of support from white voters as compared to G. Thomas. Ex. D2, *Rodden's Underlying Data Reformatted*.

66. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among white voters. As estimated by Dr. Rodden, the difference in the levels of support among white voters received by G. Thomas and by another candidate, Lentz, is not statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 187:4-9. It is therefore impossible to know which candidate received more support among white voters. Ex. C5, *Rodden Dep.*, at 187:4-9, 188:3-10.

   B. *The 2001 Election*

67. In 2001, four candidates (incumbents Jeanne Garofalo and Leslie Hogshead and two challengers, Felicia Butler and Les Lentz) ran for two seats. Ms. Garofalo and Ms. Hogshead who are both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 67.

68. Dr. Engstrom did not provide EI estimates for the 2001 election.

69. Dr. Rodden's EI estimates and confidence intervals for the 2001 election are as follows:

| The 2001 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Butler (B) 2,374 votes | 40.54% (24.45 – 62.09%) | N/A | 16.15% (10.98 – 20.08%) | N/A |

| | | | | |
|---|---|---|---|---|
| Garofalo (W)* 3,680 votes | 24.67% (17.32 − 35.97%) | N/A | 35.06% (29.02 − 40.83%) | N/A |
| Hogshead (W)* (incumbent) 3,229 votes | 19.73% (14.71 − 24.89%) | N/A | 32.21% (25.65 − 38.82%) | N/A |
| Lentz (W) 1,716 votes | 15.05% (12.69 − 18.32%) | N/A | 16.59% (13.79 − 19.53%) | N/A |

\* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶¶ 64, 67; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G2, *Official FFSD Election Results, Apr. 3, 2001*, *available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0401/fergus1.htm.

### 1. Black Voters in the 2001 Election

70. Dr. Rodden estimated that Butler and Garofalo were the candidates who received the highest and second-highest levels of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8, ¶ 67; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 188:20 − 189:2.

71. Butler was a top choice among Black voters for one of the two available seats. The difference between Butler and Hogshead, who received the third-highest level of support among Black voters, is statistically significant. Ex. C5, *Rodden Dep.*, 190:17 − 191:2, 192:1-5, 192:23 − 193:2; Ex. D2, *Rodden's Underlying Data Reformatted*. According to Dr. Rodden's estimates, Butler's level of support among Black voters was approximately 15 percentage points higher than that received by Garofalo, who received less than two-thirds the estimated level of support received by Butler among Black voters. Ex. C5, *Rodden Dep.*, at 193:922; Ex. D2, *Rodden's Underlying Data Reformatted.*

72. Butler was not elected to one of the two available seats on the Board in 2001. Ex. B5, *Rodden Rep.*, at ¶ 67.

73. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden, the

difference in the levels of support among Black voters received by Garofalo and by Hogshead, the candidates with the second- and third-highest point estimates, is not statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 193:3-8. It is therefore impossible to know which candidate received more support among Black voters. Ex. C5, *Rodden Dep.*, at 192:23 – 193:8.

        2. <u>White Voters in the 2001 Election</u>

74. Garofalo and Hogshead were the two top choices among white voters. Dr. Rodden estimated that they received the two highest levels of support among white voters, Ex. C5, *Rodden Dep.*, at 193:23 – 194:5; Ex. D2, *Rodden's Underlying Data Reformatted*, and the difference in terms of support among white voters between them and the candidate with the next highest estimated level of white support, Lentz, is statistically significant, Ex. C5, *Rodden Dep.*, at 194:6-15; Ex. D2, *Rodden's Underlying Data Reformatted*. According to Dr. Rodden's estimates, the levels of support among white voters received by Garofalo and Hogshead were each approximately double that received by Lentz and Butler. Ex. D2, *Rodden's Underlying Data Reformatted*.

        C. <u>*The 2002 Election*</u>

75. In 2002, six candidates (incumbent Doris Graham and challengers Brian Fletcher, James Clark, Nancy Knorr, Felicia Butler and Lawrence Morie), ran for three seats. Ex. G3, *Official 2002 FFSD Election Results*.

76. Graham, an African-American, and Fletcher and Clark, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 66.

77. Dr. Engstrom did not provide EI estimates for the 2002 election.

78. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2002 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Butler (B) 2,610 votes | 25.07% (18.33 – 31.89%) | N/A | 11.43% (9.20 – 13.49%) | N/A |
| Clark (W)* (incumbent) 3,093 votes | 12.56% (9.66 – 17.17%) | N/A | 17.83% (15.32 – 20.24%) | N/A |
| Fletcher (W)* 3,378 votes | 10.14% (7.82 – 13.21%) | N/A | 22.00% (17.54 – 26.28%) | N/A |
| Graham (B)* (incumbent) 3,388 votes | 31.86% (21.63 – 43.77%) | N/A | 13.84% (11.01 – 16.40%) | N/A |
| Knorr (W) (incumbent) 3,026 votes | 11.25% (8.49 – 14.69%) | N/A | 18.03% (15.63 – 20.71%) | N/A |
| Morie (W) 2,522 votes | 9.12% (7.06 – 12.09%) | N/A | 16.87% (13.07 – 20.69%) | N/A |

\* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶ 66; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G3, *Official FFSD Election Results, Apr. 2, 2002, available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0402/fergus1.htm.

1. Black Voters in the 2002 Election

79. Dr. Rodden estimated that Graham, Butler, and Clark had the highest, second-highest, and third-highest levels of support among Black voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 196:25 – 197:16.

80. Graham and Butler were the two top choices among Black voters. Their respective estimated levels of support among Black voters are both higher to a statistically significant degree than the estimated level of support for Clark, the third-highest ranked candidate among Black voters. Ex. C5, *Rodden Dep.*, at 198:16 – 199:3; Ex. D2, *Rodden's Underlying Data Reformatted*.

81. According to Dr. Rodden's estimates, Graham and Butler each received approximately

18

double the estimated level of support among Black voters as compared to Clark. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 196:25 – 197:16.

82. Butler was not elected to one of the two available seats on the Board in 2002. Ex. B5, *Rodden Rep.*, at ¶ 66; Ex. C5, *Rodden Dep.*, at 199:18-20.

83. It is impossible to know to a degree of statistical significance which candidate received the third-highest level of support among Black voters. As estimated by Dr. Rodden, the differences in the estimated levels of support from Black voters received by four candidates (Clark, Morie, Fletcher, and Knorr) are not statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 199:6-17. It is therefore impossible to know which of these candidates received more support among Black voters. Ex. C5, *Rodden Dep.*, at 199:6-17.

2. White Voters in the 2002 Election

84. Dr. Rodden estimated that Fletcher, Knorr, and Clark were the candidates who received the highest, second-highest, and third-highest estimated levels of support among white voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*.

85. Fletcher was a top choice among white voters for one of the three available seats. Fletcher's estimated level of white support is higher to a statistically significant degree than the estimated level of white support for the candidate with the fourth-highest level of support, Morie. Ex. D2, *Rodden's Underlying Data Reformatted*.

86. It is impossible to know to a degree of statistical significance which candidate received the second- or third-highest level of white support. As estimated by Dr. Rodden, neither the estimated level of white support enjoyed by Knorr nor the estimated level of white support enjoyed by Clark is different to a degree of statistical significance from the estimated level of white support received by Morie. Ex. D2, *Rodden's Underlying Data Reformatted*. It is

therefore impossible to know which two of these three candidates received higher levels of white support.

   D. *The 2003 Election*

87. In 2003, three candidates (incumbent Gwendolyn Thomas and challengers, Knorr and Les Lentz) ran for two seats. Thomas and Knorr, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 65.

88. Dr. Engstrom did not provide EI estimates for the 2003 election.

89. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2003 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Knorr (W)* 3,584 votes | 30.19% (11.65 – 50.40%) | N/A | 52.09% (41.03 – 62.07%) | N/A |
| Lentz (W) 1,995 votes | 15.85% (11.58 – 21.04%) | N/A | 28.42% (23.55 – 32.69%) | N/A |
| Thomas (B)* 2,102 votes | 53.96% (21.93 – 84.52%) | N/A | 19.48% (12.73 – 26.66%) | N/A |

* Indicates winner
Ex. B5, *Rodden Rep.*, at ¶ 65; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G4, *Official FFSD Election Results, Apr. 8, 2003, available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0403/fergflorschool.html.

   1. Black Voters in the 2003 Election

90. Dr. Rodden estimated that G. Thomas, who is African-American and Knorr were the candidates who received the highest and second-highest level of support among Black voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 200:17 – 201:7.

91. G. Thomas was a top choice among Black voters for one of the two available seats. According to Dr. Rodden's estimates, Thomas's estimated level of Black support is higher to

20

a statistically significant degree than the estimated level of Black support for the candidate with the third-highest estimated level of support, Lentz. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 202:21 – 203:11.

92. According to Dr. Rodden's estimates, G. Thomas's estimated level of support among Black voters is approximately 23 percentage points higher than that estimated for Knorr. Ex. D2, *Rodden's Underlying Data Reformatted*. Knorr received less than two-thirds the estimated level of support received by G. Thomas among Black voters. Ex. D2, *Rodden's Underlying Data Reformatted*. Dr. Rodden agreed that Thomas received "substantially more support than Knorr amongst black voters." Ex. C5, *Rodden Dep.*, at 201:4-15.

93. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden, the difference in the estimated levels of Black support received by Knorr and by Lentz is not statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*. It is therefore impossible to know which candidate received more support among Black voters. Ex. C5, *Rodden Dep.*, at 201:16-20, 203:12-15.

2. White Voters in the 2003 Election

94. Dr. Rodden estimated that Knorr and Lentz were the candidates who received the highest and second-highest levels of support among white voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 203:19 – 204:7.

95. Knorr was the top choice candidate among white voters. According to Dr. Rodden's estimates, the difference between Knorr and Lentz in terms of estimated support among white voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 203:23 – 204:1. According to Dr. Rodden's estimates, Knorr's estimated level of support among white voters is also almost 24 percentage points higher than that

estimated for Lentz, and Lentz received less than two-thirds the estimated level of support received by Knorr. Ex. D2, *Rodden's Underlying Data Reformatted*.

      E.   *The 2004 Election*

96. In 2004, five candidates (incumbents Garofalo and Hogshead and three African-American challengers, Tommie Van, Ingrid McClendon, and Pernell Witherspoon) ran for two seats. Garofalo and Hogshead, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 64.

97. Dr. Engstrom did not provide EI estimates for the 2004 election.

98. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2004 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Garofalo (W)* (incumbent) 3,232 votes | 14.55% (12.31 – 17.23%) | N/A | 39.31% (35.00 – 44.34%) | N/A |
| Hogshead (W)* (incumbent) 2,400 votes | 13.14% (11.24 – 15.88%) | N/A | 30.80% (26.38 – 35.09%) | N/A |
| McClendon (B) 1,302 votes | 28.29% (17.65 – 38.45%) | N/A | 9.50% (7.51 – 11.66%) | N/A |
| Van (B) 1,571 votes | 28.71% (18.75 – 40.91%) | N/A | 11.73% (9.64 – 14.22%) | N/A |
| Witherspoon (B) 676 votes | 15.31% (12.98 – 17.91%) | N/A | 8.66% (7.87 – 9.44%) | N/A |

\* Indicates winner
Ex. B5, *Rodden Rep.*, at ¶ 64; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G5, *Official FFSD Election Results, Apr. 6, 2004, available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0404/fergflorschool.html.

      1.   Black Voters in the 2004 Election

99. McClendon and Van, both African-American, were the two top choices among Black voters.

    Dr. Rodden estimated that they received the highest and second-highest level of support among Black voters, respectively, and the difference between them and other candidates in

terms of estimated support among Black voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 204:15-24. Dr. Rodden estimated that all other candidates received less than two-thirds of the estimated level of support among Black voters received by Van and McClendon. Ex. D2, *Rodden's Underlying Data Reformatted*.

100.    Neither Van nor McClendon was elected to one of the two available seats on the Board in 2004. Ex. B5, *Rodden Rep.*, at ¶ 64.

    2.    White Voters in the 2004 Election

101.    Garofalo and Hogshead were the two top choices among white voters. Dr. Rodden estimated that they received the two highest levels of support among white voters, and the difference between them and other candidates in terms of estimated support among white voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 205:9-18. According to Dr. Rodden's estimates, Garofalo and Hogshead each received more than double the estimated level of white support received by Van. Ex. D2, *Rodden's Underlying Data Reformatted*.

    F.    The 2005 Election

102.    In 2005, no Board election was held. Incumbents Clark and Graham, along with Les Lentz, were the only candidates for the three available seats, and assumed their responsibilities on the Board. Ex. B5, *Rodden Rep.*, at ¶¶ 62, 71. Graham is African-American. Ex. A3, *Graham Decl.*, at ¶ 6; Ex. B5, *Rodden Rep.*, at ¶ 62. Clark and Lentz are both white. Ex. B5, *Rodden Rep.*, at ¶¶ 62, 67.

    G.    The 2006 Election

103.    In 2006, five candidates (incumbents G. Thomas and Knorr and three challengers, Paul Schroeder, John Knowles, and Pat Washington) ran for two seats. Schroeder and Knowles,

both white, won. Ex. B5, *Rodden Rep.*, at ¶ 63.

104.  Dr. Engstrom did not provide EI estimates for the 2006 election.

105.  Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2006 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Knorr (W) (incumbent) 1,303 votes | 17.29% (15.10 − 20.21%) | N/A | 15.95% (13.65 − 18.50%) | N/A |
| Knowles (W)* 1,959 votes | 15.11% (12.43 − 18.21%) | N/A | 27.03% (21.31 − 32.26%) | N/A |
| Schroeder (W)* 2,954 votes | 14.27% (11.66 − 17.91%) | | 37.96% (32.39 − 43.12%) | |
| G. Thomas (B) (incumbent) 1,122 votes | 28.21% (23.29 − 33.38%) | N/A | 9.83% (8.88 − 10.80%) | N/A |
| Washington (B) 944 votes | 25.11% (19.44 − 30.91%) | | 9.23% (8.26 − 10.22%) | |

\* Indicates winner
Ex. B5, *Rodden Rep.*, at ¶ 63; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G6, *Official FFSD Election Results, Apr. 4, 2006, available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0406/fergflorschool.html.

1.  Black Voters in the 2006 Election

106.  G. Thomas and Washington, both African-American, were the two top choices among Black voters. Dr. Rodden estimated that they received the highest levels of support among Black voters, Ex. B5, *Rodden Rep.*, at ¶ 63; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 206:1-9, and the difference in terms of estimated support among Black voters between them and the candidate with the third-highest estimated level of Black support, Knorr, is statistically significant, Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 206:10-24.

107.    Neither G. Thomas nor Washington was elected to either of the two available seats on the Board in 2006. Ex. B5, *Rodden Rep.*, at ¶ 63.

       2.   <u>White Voters in the 2006 Election</u>

108.    Schroeder and Knowles were the two top choices among white voters. Dr. Rodden estimated that they received the highest levels of support among white voters, Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 207:8-14, and the difference in terms of estimated support among white voters between them and the candidate with the third-highest estimated level of white support, Knorr, is statistically significant, Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 207:15-22. According to Dr. Rodden's estimates, the estimated level of support among white voters received by Knorr is also less than two-thirds the estimated levels of white support received by Schroeder and Knowles. Ex. D2, *Rodden's Underlying Data Reformatted*.

   *H.  The 2007 Election*

109.    In 2007, no Board election was held. Hogshead, an elected incumbent, and Charles Henson, an incumbent who had been appointed to the Board after the resignation of Jeanne Garofalo in January 2007, were the only candidates for the two available seats, and assumed their responsibilities on the Board. Ex. B5, *Rodden Rep.*, at ¶¶ 25, 60, 71; Ex. A4, *Decl. of Charles Henson*, at ¶ 7; Ex. E6, *Dep. of Leslie Hogshead*, July 1, 2015, at 100:12-25. Hogshead is white. Ex. B5, *Rodden Rep.*, at ¶ 54. Henson is African-American. Ex. B5, *Rodden Rep.*, at ¶ 54.

   *I.  The 2008 Election*

110.    In 2008, no Board election was held. Incumbents Clark, Graham, and Lentz were the only candidates for the three available seats, and resumed their responsibilities on the Board. Ex. B5, *Rodden Rep.*, at ¶¶ 25, 71. Clark and Lentz are both white. Ex. B5, *Rodden Rep.*, at

¶¶ 62, 67. Graham is African-American. Ex. B5, *Rodden Rep.*, at ¶ 62.

J. *The 2009 Election*

111. In 2009, three candidates (incumbents Schroeder and Knowles and one challenger, Gregory Heise) ran for two seats. Schroeder and Knowles, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 61; ¶ 45 Fig. 8.

112. No Black candidates ran in the 2009 election. Ex. C5, *Rodden Dep.*, at 215:916.

113. Dr. Engstrom did not provide EI estimates for the 2009 election.

114. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2009 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Heise (W)<br>1,216 votes | 17.22%<br>(12.07 – 25.50%) | N/A | 19.29%<br>(15.09 – 23.59%) | N/A |
| Knowles (W)*<br>(incumbent)<br>3,123 votes | 47.66%<br>(27.49 – 74.02%) | N/A | 36.50%<br>(26.18 – 47.54%) | N/A |
| Schroeder (W)*<br>(incumbent)<br>3,233 votes | 35.12%<br>(22.54 – 52.55%) | N/A | 44.22%<br>(36.34 – 51.91%) | N/A |

* Indicates winner
Ex. B5, *Rodden Rep.*, at ¶¶ 61; Ex. C5, *Rodden Dep.*, at 215:9-16; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G7, *Official FFSD Election Results, Apr. 7, 2009, available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0409/fergusonschool.htm.

1. Black Voters in the 2009 Election

115. Dr. Rodden estimated that Knowles and Schroeder were the candidates who received the highest and second-highest level of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 61; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 214:10-13. The difference in terms of estimated support among Black voters between them and the remaining candidate, Heise, is statistically significant. Ex. C5, *Rodden Dep.*, at

214:14-24; Ex. D2, *Rodden's Underlying Data Reformatted*.

2. White Voters in the 2009 Election

116.  Schroeder and Knowles were the two top choices among white voters. Dr. Rodden estimated that they received the highest levels of support among white voters, Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 215:5-13, and the difference in terms of estimated support among white voters between them and the remaining candidate, Heise, is statistically significant, Ex. C5, *Rodden Dep.*, at 214:10 − 215:8; Ex. D2, *Rodden's Underlying Data Reformatted*. According to Dr. Rodden's estimates, Heise received less than half the estimated level of support received by Schroeder and less than two-thirds the estimated level of support received by Knowles. Ex. D2, *Rodden's Underlying Data Reformatted*.

117.  Knowles resigned from the Board in 2011 and was replaced with Brian Fletcher, a former Board member, who is white. Ex. E6, *Hogshead Dep.*, at 49:5-19, 52:1-7. Fletcher was the lone white candidate among the three candidates interviewed by the Board to replace Knowles. Ex. E6, *Hogshead Dep.*, at 50:21 − 51:16; 54:5-7; Ex. F4, *July 12, 2011 Board Sess. Mins. (Ex. 26 to Dep. of Leslie Hogshead, July 1, 2015)*; Ex. E7, *Dep. of Paul Schroeder*, July 2, 2015, at 76:10-12. The two African-American candidates interviewed for the position were rejected by the Board, which at the time, included one African-American member only (Henson). *See* Ex. E6, *Hogshead Dep.*, at 54:5-7; Ex. F4, *July 12, 2011 Board Sess. Mins.*

K. *The 2010 Election*

118.  No Board election was held in 2010. Incumbents Hogshead and Henson were the only candidates for the two available seats, and resumed their responsibilities on the Board. Ex. B5, *Rodden Rep.*, at ¶ 59. Hogshead is white. Ex. B5, *Rodden Rep.*, at ¶ 54. Henson is

African-American. Ex. B5, *Rodden Rep.*, at ¶ 54.

### L. *The 2011 Election*

119.    In 2011, nine candidates (incumbents Graham, Clark, and Lentz and six challengers, Chris Martinez, Paul Morris, Robert Chabot, Vanessa Hawkins, Brian Scott Ebert, and Joseph Hosea) ran for three seats. Ex. F5, *Official FFSD Election Results, Apr. 5, 2011 (Ex. 10 to Dep. of Brian Scott Ebert, June 16, 2015)*. Martinez, a white-Hispanic candidate,[2] Ex. B7, *Engstrom Rebuttal*, at ¶ 9 n.5, and Chabot and P. Morris, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 63; Ex. F5, *Official 2011 FFSD Election Results*.

120.    Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2011 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Chabot* (W) 3,080 votes | 7.31% (5.33 − 11.04%) | 7.1% (4.6 − 9.6%) | 14.05% (11.68 − 17.01%) | 15.6% (13.4% − 18.3%) |
| Clark (W) (incumbent) 2,257 votes | 12.58% (10.33 − 14.42%) | 13.5% (11.2 − 16.1%) | 8.92% (7.96 − 9.97%) | 8.0% (6.5 − 9.3%) |
| Ebert (W) 2,667 votes | 7.45% (4.86 − 10.40%) | 7.9% (5.4 − 11.3%) | 13.61% (11.19 − 16.12%) | 14.1% (11.6 − 16.2%) |
| Graham (B) (incumbent) 2,795 votes | 21.95% (16.32 − 28.80%) | 24.1% (21.0 − 27.0%) | 9.04% (7.76 − 10.43%) | 6.1% (4.3 − 7.7%) |
| Hawkins (B) 2,890 votes | 21.87% (14.10 − 30.46%) | 21.5% (17.2 − 25.5%) | 9.20% (7.52 − 10.68%) | 7.4% (5.4 − 9.4%) |
| Hosea (W) 566 votes | 6.88% (6.18 − 7.80%) | 3.2% (2.8 − 3.5%) | 2.91% (2.65 − 3.21%) | 3.1% (2.8 − 3.5%) |
| Lentz (W) (incumbent) 1,027 votes | 7.58% (6.38 − 9.20%) | 4.7% (3.1 − 7.6%) | 4.49% (3.76 − 5.38%) | 4.5% (3.2 − 5.7%) |

---

[2] The U.S. Census "defines 'Hispanic or Latino' as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." Persons who report themselves as Hispanic can be of any race.  U.S. Census Bureau, *About Hispanic Origin* (July 25, 2013), *available at* http://www.census.gov/topics/population/hispanic-origin/about.html.

| | | | | |
|---|---|---|---|---|
| Martinez* (W-H)<br>4,598 votes | 5.93%<br>(4.60 − 8.17%) | 8.6%<br>(7.0 − 10.6%) | 22.97%<br>(19.58 − 25.63%) | 24.9%<br>(23.7 − 25.9%) |
| P. Morris* (W)<br>3,305 votes | 8.44%<br>(6.62 − 11.00%) | 9.3%<br>(7.6 − 11.4%) | 14.79%<br>(12.46 − 17.03%) | 16.1%<br>(14.4 − 18.1%) |

\* Indicates winner

Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1; Ex. B7, *Engstrom Rebuttal*, at ¶ 9, Tbl. 1 (p. 10); Ex. F5, *Official 2011 FFSD Election Results.*

### 1. Black Voters in the 2011 Election

121.　Both Dr. Rodden and Dr. Engstrom estimated that Graham and Hawkins, the only Black candidates, and Clark, who is white, were the candidates who received the highest, second-highest, and third-highest level of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 59; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 217:4-16; Ex. B2, *Engstrom Rep.*, at ¶ 16, Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10).

122.　Graham and Hawkins were the top choices for Black voters for two of the three available seats. The differences between them and Clark in terms of estimated support among Black voters are statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 217:4-10; Ex. B2, *Engstrom Rep.*, at ¶ 16, Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at ¶ 9, Tbl. 1 (p. 10). According to the estimates of both Dr. Rodden and Dr. Engstrom, Graham's and Hawkins's estimated levels of support among Black voters are over 8 percentage points more than the estimated support enjoyed by Clark, who received less than two-thirds of Graham's and Butler's estimated levels of support among Black voters. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 217:17-25; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10). Dr. Rodden agreed that Graham and Hawkins received "substantially more black votes" than Clark. Ex. C5, *Rodden Dep.*, at 218:1-4.

123. Dr. Engstrom identified two candidates of choice of Black voters in 2011: Graham and Hawkins. Ex. B2, *Engstrom Rep.*, at ¶ 16; Ex. C2, *Dep. of Richard Engstrom*, Aug. 18, 2015, at 26:14-16.

124. According to Dr. Rodden's estimates, Graham and Hawkins together received 43.82% of the total votes cast by African Americans in a race with nine candidates. Ex. D2, *Rodden's Underlying Data Reformatted.*

125. Neither Graham nor Hawkins was elected to one of the three available seats on the Board in 2011. Ex. B5, *Rodden Rep.*, at ¶ 59; Ex. B7, *Engstrom Rebuttal*, at ¶ 9.

### 2. White Voters in the 2011 Election

126. Both Dr. Rodden and Dr. Engstrom estimated that Martinez, P. Morris, and Chabot were the candidates who received the highest, second-highest, and third-highest levels of support among white voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 17, Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10).

127. Martinez was the top-ranked candidate among white voters. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 215:17-23; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10). According to the estimates of both Dr. Rodden and Dr. Engstrom, the difference between Martinez and every other candidate in terms of estimated support among white voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 215:24 – 216:7; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10).

128. As estimated by both Dr. Rodden and Dr. Engstrom, neither the estimated level of white support enjoyed by P. Morris nor the estimated level of white support enjoyed by Chabot is different to a degree of statistical significance from the estimated level of white support received by Ebert, the candidate with the fourth-highest estimated level of white support. Ex.

D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10). It is impossible to know to a degree of statistical significance which two of these three candidates received higher levels of white support. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 215:24 – 216:7; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10).

> M. *The 2012 Election*

129. In 2012, three candidates (incumbent Schroeder and two challengers, Ebert and Barbara Morris) ran for two seats. Ebert and Schroeder, the two white candidates, were successful. Ex. B5, *Rodden Rep.*, at ¶ 57.

130. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2012 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Ebert* (W) 2,809 votes | 23.09% (16.64 – 28.70%) | 23.1% (18.1 – 28.2%) | 46.93% (39.08 – 53.79%) | 46.3% (43.8 – 48.5%) |
| B. Morris (B) 1,988 votes | 51.33% (34.94 – 75.04%) | 51.9% (45.7 – 58.4%) | 12.01% (6.96 – 17.76%) | 12.8% (10.1 – 15.6%) |
| Schroeder* (W) (incumbent) 2,566 votes | 25.58% (15.90 – 36.68%) | 25.0% (19.8 – 29.9%) | 41.05% (33.88 – 47.71%) | 40.9% (38.7 – 43.5%) |

* Indicates winner
Ex. B5, *Rodden Rep.*, at ¶ 57; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11); Ex. F6, *Official FFSD Election Results, Apr. 3, 2012 (Ex. 11 to Dep. of Brian Scott Ebert, June 16, 2015)*.

> 1. Black Voters in the 2012 Election

131. Both Dr. Rodden and Dr. Engstrom estimated that B. Morris, the one Black candidate, and Schroeder were the candidates who received the highest and second-highest level of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8, ¶ 57; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 20, Tbl. 1 (p. 18); Ex.

B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11).

132.    B. Morris was the top-ranked candidate among Black voters. Ex. C5, *Rodden Dep.*, at 219:5-16; Ex. B2, *Engstrom Rep.*, at ¶ 20. The difference between B. Morris and Schroeder in terms of estimated support among Black voters is statistically significant. Ex. C5, *Rodden Dep.*, at 219:9-12; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 20, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11). According to the estimates of both Dr. Rodden and Dr. Engstrom, B. Morris also received approximately double the estimated level of support from Black voters as compared to the other two candidates in the race, Schroeder and Ebert. Ex. C5, *Rodden Dep.*, at 221:9-15; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 20, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 12, Tbl. 2 (p. 11). Dr. Rodden agreed that B. Morris received "substantially more support" from Black voters than either Schroeder or Ebert. Ex. C5, *Rodden Dep.*, at 221:16-19, 222:20-24.

133.    It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of support among Black voters received by Schroeder and Ebert is not statistically significant. Ex. C5, *Rodden Dep.*, at 219:13-16; Ex. B5, *Rodden Rep.*, at ¶ 57; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 20, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11). It is therefore impossible to know whether Schroeder or Ebert received more estimated support among Black voters. Ex. C5, *Rodden Dep.*, at 219:13-16. Dr. Rodden agreed that Black voters were not cohesive behind either Ebert or Schroeder. Ex. C5, *Rodden Dep.*, at 219:17-20.

134. Dr. Engstrom identified one candidate of choice of Black voters in 2012: B. Morris. Ex. B2, *Engstrom Rep.*, at ¶ 20; Ex. C2, *Engstrom Dep.*, at 26:14-18.

135. B. Morris was not elected to one of the two available seats on the Board in 2012. Ex. B5, *Rodden Rep.*, at ¶ 57.

2. White Voters in the 2012 Election

136. Ebert and Schroeder were two top choices among white voters. Both Dr. Rodden and Dr. Engstrom estimated that Ebert and Schroeder were the candidates who received the highest and second-highest level of support among white voters, respectively. Ex. C5, *Rodden Dep.*, at 218:11-15; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 21, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11). The difference in terms of estimated support among white voters between them and the only other candidate in the race, B. Morris, is statistically significant. Ex. C5, *Rodden Dep.*, at 218:16-19; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11). According to the estimates of both Dr. Rodden and Dr. Engstrom, Ebert's and Schroeder's estimated levels of support among white voters are each over 28 percentage points more than the estimated support enjoyed by B. Morris, who received less than one-third of Ebert's and Schroeder's estimated levels of support among white voters.. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 21, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 11, Tbl. 2 (p. 11).

137. According to Dr. Rodden's estimates, white voters in 2012 cast 88% of their votes for the two white candidates. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B7, *Engstrom Rebuttal*, at ¶ 11.

*The 2013 Election*

138.    In 2013, four candidates (incumbents Hogshead and Henson, and two challengers, Keith

Brown and Larry Thomas) ran for two seats. Brown and Hogshead, both white, were

successful. Ex. B5, *Rodden Rep.*, at ¶¶ 54-55.

139.    Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2013 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Brown* (W) 2,234 votes | 22.74% (15.59 – 35.35%) | 20.2% (16.2 – 24.3%) | 32.01% (23.98 – 40.51%) | 33.9% (31.8 – 36.0%) |
| Henson (B) (incumbent) 2,109 votes | 38.66% (29.88 – 48.47%) | 43.7% (37.2 – 50.7%) | 20.06% (12.20 – 27.27%) | 17.0% (13.3 – 20.4%) |
| Hogshead* (W) (incumbent) 2,475 votes | 25.00% (17.41 – 37.61%) | 24.2% (20.0 – 27.8%) | 34.49% (26.31 – 42.70%) | 37.2% (35.0 – 39.4%) |
| L. Thomas (B) 875 votes | 13.60% (11.86 – 16.33%) | 11.9% (9.4 – 15.3%) | 13.44% (11.89 – 15.16%) | 11.8% (10.0 – 13.7%) |

* Indicates winner
Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex.
B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11); Ex. G8, *Official FFSD Election Results, Apr. 2, 2013*,
*available at*
http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el130402/S005.
HTML.

1.    Black Voters in the 2013 Election

140.    Both Dr. Rodden and Dr. Engstrom estimated that Henson and Hogshead were the

candidates who received the highest and second-highest level of support among Black voters,

respectively. Ex. B5, *Rodden Rep.*, at ¶ 54; Ex. D2, *Rodden's Underlying Data Reformatted*;

Ex. C5, *Rodden Dep.*, at 227:17 – 228:1; Ex. B2, *Engstrom Rep.*, at ¶¶ 24-25, Tbl. 1 (p. 18);

Ex. B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11).

141.    Henson was the top-ranked candidate among Black voters. Ex. C5, *Rodden Dep.*, at

227:17-22; Ex. B2, *Engstrom Rep.*, at ¶ 24. The difference between Henson and Hogshead in

terms of estimated support among Black voters is statistically significant. Ex. C5, *Rodden Dep.*, at 227:17-22; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11). According to the estimates of both Dr. Rodden and Dr. Engstrom, Henson's estimated level of support among Black voters is approximately 13 percentage points more than the levels of support estimated for Hogshead, and is approximately 16 to 23 percentage points more than the levels of support estimated for Brown. Each received less than two-thirds of Henson's estimated levels of support among Black voters. Ex. C5, *Rodden Dep.*, at 228:6-9; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 14, Tbl. 3 (p. 11).

142.    It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of support among Black voters received by Hogshead and Brown is not statistically significant. Ex. C5, *Rodden Dep.*, at 228:15-18; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 14, Tbl. 3 (p. 11). It is therefore impossible to know whether Hogshead or Brown received more support among Black voters. Ex. C5, *Rodden Dep.*, at 228:15-18.

143.    Dr. Engstrom identified one candidate of choice of Black voters in 2013: Henson. Ex. B2, *Engstrom Rep.*, at ¶ 24; Ex. C2, *Engstrom Dep.*, at 26:14-20.

144.    Henson was not elected to one of the two available seats on the Board in 2013. Ex. B5, *Rodden Rep.*, at ¶ 55; *see* Ex. A4, *Henson Decl.*, at ¶ 13.

        2.    White Voters in the 2013 Election

145.    Hogshead and Brown were the two top choices among white voters. Both Dr. Rodden

and Dr. Engstrom estimated that Brown and Hogshead were the candidates who received the highest and second-highest level of support among white voters, respectively. Ex. C5, *Rodden Dep.*, at 226:24 – 227:2; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 25, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11). The difference in terms of estimated white support between them and the candidate with the third-highest estimated level of white support, Henson, is statistically significant. Ex. C5, *Rodden Dep.*, at 227:3-6; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11).

146.   According to Dr. Rodden's estimates, Henson's estimated level of support among white voters is approximately 12 and 14 percentage points less than the estimated level of white support enjoyed by Brown and Hogshead, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 13, Tbl. 3 (p. 11).

   O.   <u>The 2014 Election</u>

147.   In 2014, eight candidates (two incumbents Rob Chabot and Paul Morris, and six challengers, Donna Paulette-Thurman, James Savala, Kimberly Benz, F. Willis Johnson, LaWanda Wallace, and Larry Thomas), ran for three seats. Ex. F7, *Official FFSD Election Results, Apr. 8, 2014 (Ex. 21 to Dep. of Donna Paulette-Thurman, June 17, 2015)*. Chabot and P. Morris, both white, and Paulette-Thurman, one of five African-American challengers, were successful. Ex. B5, *Rodden Rep.*, at ¶¶ 50-51.

148.    Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2014 Election | | | | |
| --- | --- | --- | --- | --- |
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Benz (W) 2,231 votes | 6.00% (4.79 – 7.49%) | 3.3% (2.1 – 4.7%) | 19.06% (15.29 – 23.34%) | 22.0% (20.5 – 23.4%) |
| Chabot* (W) (incumbent) 2,898 votes | 6.20% (4.28 – 9.02%) | 4.8% (2.4 – 9.4%) | 25.68% (19.80 – 32.40%) | 29.0% (27.1 – 30.6%) |
| Johnson (B) 2,118 votes | 21.54% (15.72 – 29.06%) | 24.5% (21.1 – 27.2%) | 5.71% (4.10 – 7.84%) | 2.8% (1.5 – 4.5%) |
| P. Morris* (W) 2,516 votes | 5.78% (4.39 – 7.90%) | 3.2% (2.0 – 5.4%) | 22.32% (17.69 – 27.83%) | 25.8% (24.4 – 27.1%) |
| Paulette-Thurman* (B) 2,733 votes | 24.21% (17.52 – 32.95%) | 26.1% (23.7 – 28.5%) | 8.92% (6.28 – 11.94%) | 8.4% (6.9 – 10.0%) |
| Savala (B) 2,425 votes | 21.36% (15.76 – 28.73%) | 24.7% (22.3 – 26.8%) | 8.74% (6.09 – 11.37%) | 7.0% (4.9 – 8.7%) |
| L. Thomas (B) 568 votes | 6.61% (5.68 – 7.68%) | 4.7% (3.4 – 6.3%) | 5.09% (4.42 – 5.76%) | 3.2% (2.3 – 4.0%) |
| Wallace (B) 590 votes | 8.31% (6.58 – 10.85%) | 8.6% (6.4 – 10.9%) | 4.47% (3.95 – 5.03%) | 1.9% (1.2 – 2.6%) |

* Indicates winner
Ex. B5, *Rodden Rep.*, at ¶ 50; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12); Ex. F7, *Official FFSD 2014 Election Results.*

149.    Dr. Rodden and Dr. Engstrom agree that the 2014 election was a highly racially polarized election. Ex. C5, *Rodden Dep.*, at 233:23 − 234:17; Ex. B5, *Rodden Rep.*, at ¶ 50; Ex. B7, *Engstrom Rebuttal*, at ¶ 15.

1. Black Voters in the 2014 Election

150.    Both Dr. Rodden and Dr. Engstrom estimated that Paulette-Thurman, Johnson, and Savala, all of whom are African-American, were the candidates who received the three highest estimated levels of support among Black voters. Ex. B5, *Rodden Rep.*, at ¶ 50; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 234:18-22; Ex. B2,

*Engstrom Rep.*, at ¶ 28, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

151.    Paulette-Thurman, Johnson, and Savala were the three top-choice candidates among Black voters. Ex. B5, *Rodden Dep.*, at 234:18 – 235:5, Ex. B2, *Engstrom Rep.*, at ¶ 28. The differences in estimated support among Black voters between them and other candidates are statistically significant. Ex. C5, *Rodden Dep.*, at 234:18 – 235:5; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 28, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

152.    According to Dr. Rodden's estimates, Black voters cast 67.11% of their votes for Paulette-Thurman, Johnson, and Savala. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

153.    According to the estimates of both Dr. Rodden and Dr. Engstrom, the estimated levels of support among Black voters for Paulette-Thurman, Johnson, and Savala are each more than double that for the candidate with the fourth-highest estimated support, Wallace, who is also African-American. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12); Ex. B5, *Rodden Rep.*, at ¶ 50.

154.    Dr. Engstrom identified three candidates of choice of Black voters in 2014: Paulette-Thurman, Johnson, and Savala. Ex. B2, *Engstrom Rep.*, at ¶ 28; Ex. B7, *Engstrom Rebuttal*, at ¶ 15; Ex. C2, *Engstrom Dep.*, at 26:14-22.

155.    Neither Johnson nor Savala was elected to one of the three available seats on the Board in 2014. Ex. B5, *Rodden Rep.*, at ¶¶ 50, 52.

### 2.    White Voters in the 2014 Election

156.    Both Dr. Rodden and Dr. Engstrom estimated that Chabot, P. Morris, and Benz, the three white candidates, were the candidates who received the highest, second-highest, and third-highest level of support among white voters, respectively. Ex. B5, *Rodden Dep.*, at 235:15-

18; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 29, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

157.    Chabot, P. Morris, and Benz were the three top choices among white voters. The differences in estimated support among white voters between them and the remaining candidates are statistically significant. Ex. C5, *Rodden Dep.*, at 235:19-22; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

158.    According to Dr. Rodden's estimates, white voters cast 67.06% of their votes for the three white candidates. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

159.    According to the estimates of both Dr. Rodden and Dr. Engstrom, the estimated levels of support among white voters for Chabot, Morris, and Benz are each more than double that for the candidate with the fourth-highest estimated support, Paulette-Thurman. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

160.    Benz was not elected to one of the three available seats on the Board in 2014. Ex. B5, *Rodden Rep.*, at ¶¶ 50, 51.

3.    Special Circumstances in the 2014 Election

161.    The 2014 election took place less than one month after the "controversial" resignation of Dr. Art McCoy, the first African-American District Superintendent. Ex. B5, *Rodden Rep.*, at ¶¶ 39, 50; Ex. C5, *Rodden Dep.*, at 97:17-20, 236:9 – 237:3; Ex. B7, *Engstrom Rebuttal*, at ¶ 15.

162.    According to Dr. Rodden, the separation of the Superintendent from the District led to a high level of interest among African-American voters and "an unprecedented five African

American challengers." Ex. B5, *Rodden Rep.*, at ¶¶ 39, 50.

163. Dr. McCoy is highly respected within the African-American community, whose members viewed him as a very successful and effective superintendent. Ex. A1, *Bailey Decl.*, at ¶¶ 12-13; Ex. A5, *Hudson Decl.*, at ¶ 8; Ex. A7, *Pruitt Decl.*, at ¶ 22; Ex. A4, *Henson Decl.*, at ¶ 15; Ex. A3, *Decl. of Doris Graham*, Sept. 23, 2015, at ¶ 18; Ex. E4, *Dep. of Donna Paulette-Thurman*, June 17, 2015, at 82:1-3.

164. Prior to his resignation, Dr. McCoy "had been embroiled in conflict with the School Board." Ex. B5, *Rodden Rep.*, at ¶ 39.

165. The three top-choice candidates among African-American voters, Paulette-Thurman, Johnson, and Savala, ran together as a slate under the name "Grade A for Change." They were motivated to run as a slate because "they were concerned about how Dr. McCoy was treated" and "because the Board did not represent the community in terms of race." Ex. E4, *Paulette-Thurman Dep.*, at 37:18-22, 38:5-9; *see* Ex. A6, *Johnson Decl.*, at ¶¶ 10, 15.

   P.   *The 2015 Election*

166. In 2015, five candidates (incumbent Brian Scott Ebert and four challengers, Courtney Michelle Graves, Roger Hines, Donna Marie Dameron, and Michael Pierson) ran for two seats. Ebert, who is white, and Graves, who is African-American, were successful. Ex. B5, *Rodden Rep.*, at ¶¶ 47-48; Ex. B2, *Engstrom Rep.*, at ¶¶ 33-34.

167. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2015 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Dameron (W) 1,711 | 14.09% (11.18 – 17.92%) | 14.5% (11.1 – 18.3%) | 10.08% (8.56 – 11.54%) | 9.9% (7.5 – 12.1%) |

| | | | | |
|---|---|---|---|---|
| Ebert* (W) (incumbent) 4,697 | 10.06% (6.43 – 13.41%) | 9.8% (7.7 – 12.2%) | 40.89% (35.17 – 46.53%) | 43.0% (39.6 – 45.9%) |
| Graves* (B) 5,279 | 49.43% (37.90 – 60.83%) | 52.4% (48.7 – 56.0%) | 22.90% (17.10 – 29.46%) | 21.4% (18.3 – 24.8%) |
| Hines (B) 2,728 | 13.89% (9.84 – 18.26%) | 12.3% (8.9 – 15.9%) | 19.37% (16.06 – 23.09%) | 19.7% (17.7 – 21.9%) |
| Person (B) 1,146 | 12.53% (9.43 – 16.86%) | 11.0% (8.6 – 13.5%) | 6.77% (5.63 – 7.99%) | 6.0% (4.8 – 7.5%) |

* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶ 47; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13); Ex. F8, *Official FFSD Election Results, Apr. 7, 2015 (Ex. 12 to Dep. of Brian Scott Ebert, June 16, 2015).*

1. Black Voters in the 2015 Election

168. Dr. Rodden and Dr. Engstrom estimated that Graves and Dameron, a white candidate, received the highest and second-highest levels of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 48; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13).

169. Graves was the top-ranked candidate among Black voters. Ex. C5, *Rodden Dep.*, at 158:8 – 159:15; Ex. B2, *Engstrom Rep.*, at ¶ 34. The difference between Graves and Dameron in terms of estimated support among Black voters is statistically significant. Ex. C5, *Rodden Dep.*, at 159:23 – 160:2; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13). Dr. Rodden agreed that Black voters were cohesive behind Graves. Ex. C5, *Rodden Dep.*, at 158:16-19, 166:8-11.

170. According to the estimates of both Dr. Rodden and Dr. Engstrom, Dameron's estimated level of support is also approximately 35 percentage points lower than and less than one-third the estimated level of Black support for Graves. Ex. C5, *Rodden Dep.*, at 159:8-17; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13). Dr. Rodden agreed that Dameron received "much less"

support among Black voters when compared to Graves. Ex. C5, *Rodden Dep.*, at 159:13-15.

171.    It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by both Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of Black support received by Dameron and the candidate with the third-highest estimated level of Black support, Hines, is not statistically significant. Ex. C5, *Rodden Dep.*, at 160:15 − 161:21; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13). It is therefore impossible to know whether Dameron or Hines received more support among Black voters. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 160:15 − 161:21. Dr. Rodden agreed that Black voters were not cohesive behind a second-choice candidate in this election. Ex. C5, *Rodden Dep.*, at 161:22 − 162:3, 164:24 − 165:3; Ex. B5, *Rodden Rep.*, at ¶ 48.

172.    Dr. Engstrom identified one candidate of choice of Black voters in 2015: Graves. Ex. B2, *Engstrom Rep.*, at ¶ 34; Ex. C2, *Engstrom Dep.*, at 26:14-24.

### 2. White Voters in the 2015 Election

173.    Both Dr. Rodden and Dr. Engstrom estimated that Ebert and Graves were the candidates who received the highest and second-highest level of support among white voters, respectively. Ex. C5, *Rodden Dep.*, at 168:8 − 169:9; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 35, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13).

174.    Ebert was the top-ranked candidate among white voters. The difference between Ebert and all other candidates in the race, including Graves, in terms of estimated support among white voters, is statistically significant. Ex. C5, *Rodden Dep.*, at 168:11-18; Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*,

at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13). Dr. Rodden agreed that white voters were cohesive behind Ebert. Ex. C5, *Rodden Dep.*, at 168:19-23.

175. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among white voters. As estimated by both Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of white support received by Graves and the candidate with the third-highest estimated level of white support, Hines, is not statistically significant. Ex. C5, *Rodden Dep.*, at 169:11-22; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13). Dr. Rodden agreed that white voters were not cohesive behind a second-choice candidate in the 2015 election. Ex. C5, *Rodden Dep.*, at 169:23 – 170:9.

3. Special Circumstances in the 2015 Election

176. The 2015 election was held on April 7, 2015, less than four months after the complaint in this case was filed on December 18, 2014. *See* Ex. F8, *Official FFSD 2015 Election Results*; Doc. No. 1, *Complaint*.

177. The 2015 election was held "in the aftermath" of the shooting death of Michael Brown in Ferguson in August 2014 and the "subsequent months of unrest." Ex. B5, *Rodden Rep.*, ¶¶ 17, 40; Ex G9, U.S. Dep't of Justice, *Investigation of the Ferguson Police Department*, Mar. 4, 2015,[3] at 5-6, *available at* http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf.

---

[3] Federal Rule of Evidence 803(8) allows the admission of a record of a public office when, as relevant here, it sets out "factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 161-70 (1988). The DOJ Report is a public record that includes factual findings from an investigation authorized "under the pattern-or-practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d ('Safe Streets Act'), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ('Title VI')." Ex. G9, *Investigation of the Ferguson Police Department*, at 1. Moreover, it is not unusual for courts to rely on reports issued by the Department of Justice. *United States v. Woods*, 159 F.3d 1132, 1135-36 (8th Cir. 1998) (considering Department of Justice

178. The Michael Brown shooting triggered large protests in the Ferguson area. Ex. E2, *Dep. of Brian Scott Ebert*, June 16, 2015, at 109:10-20; Ex. E3, *Dep. of Keith Brown*, June 16, 2015, at 49:7-13; Ex. E1, *Dep. of Paul Morris*, June 15, 2015, at 98:16-24; Ex. E4, *Paulette-Thurman Dep.*, at 73:5-20; Ex. B5, *Rodden Rep.*, at ¶ 28. These included a protest organized by high school students in the District. Ex. E10, *Dep. of Frank Green*, Sept. 2, 2015, at 61:18-21. Protests related to the Michael Brown shooting are ongoing. Ex. E4, *Thurman Dep.*, at 73:5-74:1; Ex. E5, *Graves Dep.*, at 59:4-9.

179. The shooting and subsequent protests "[h]ad a huge impact on the school district," Ex. E10, *Green Dep.*, at 60:2-9, affecting "thousands of our kids," Ex. E8, *Dep. of Robert Chabot*, July 2, 2015, at 82:22 – 83:8. Schools in the District had to shut down. Ex. E10, *Green Dep.*, at 60:6 – 61:21; Ex. E8, *Chabot Dep.*, at 82:22 – 83:8; Ex. E5, *Graves Dep.*, at 58:8 – 59:9. Teachers and students received counseling. Ex. E10, *Green Dep.*, at 61:5-17; Ex. E8, *Chabot Dep.*, at 83:6-7.

180. The Michael Brown shooting and subsequent protests drew national attention. Ex. B5, *Rodden Rep.*, at ¶ 28; Ex. C5, *Rodden Dep.*, at 97:21-98:8; Ex. E6, *Hogshead Dep.*, at 62:20-25.

181. In September 2014, the Civil Rights Division of the United States Department of Justice opened an investigation into the Ferguson Police Department. *See* Ex. G9, *Investigation of the Ferguson Police Department*, at 1. On March 4, 2015, one month before the 2015 Board election, the Department of Justice released a report detailing the results of its investigation. It found extensive discrimination by government officials in Ferguson, including racial bias

---

report in determining whether district court abused its discretion). Indeed, courts consider such reports as trustworthy evidence. *See Miller v. Field*, 35 F.3d 1088, 1092 (6th Cir. 1994) (quoting *Roland v. Johnson*, 933 F.2d 1009 (6th Cir. 1991) (unpublished) (holding that "Department of Justice report was the result of an investigation … admissible under Fed. R. Evid. 803(8)(C) as a public report[, and] [t]he admission of the[] report[] did not constitute an abuse of discretion.")).

and intentional discrimination in local law enforcement and municipal court practices. *See* Ex. G9, *Investigation of the Ferguson Police Department*, at 15-41 (racial profiling, excessive force, First Amendment violations, use of tasers); 42-62 (unnecessary obstacles to paying fines, lack of transparency, harsh penalty for missed payments, use of warrants and jail to induce payment); 62-78 (policies driven by racial bias and discriminatory intent).

182. Candidates, and voters more broadly, were aware of the report, which ignited local, national and international interest in the April 2015 elections. *See* Ex. B5, *Rodden Rep.*, at ¶ 28; *see also* Ex. G10, John Eligon, *Election in Scarred Ferguson Carries Hope of 'New Tomorrow,'* N.Y. Times (Apr. 4, 2015); Ex. G19, Brent McDonald, *An Election in Ferguson* (video), N.Y. Times (Apr. 5, 2015), http://www.nytimes.com/video/us/100000003608386/an-election-in-ferguson.html; Ex. G11, Carey Gillam, *Race, reforms eyed as Ferguson, Missouri, voters head to polls*, Reuters/Business Insider (Apr. 7, 2015); Ex. G12, Carey Gillam, *Surge in voter turnout gives blacks new voice in Ferguson, Missouri*, Reuters (Apr. 9, 2015); Ex. E6, *Hogshead Dep.*, at 64:5-8 (national media attention on April 2015 election was unique in her 23 years on the board); Ex. E2, *Ebert Dep.*, at 110:17 – 111:4 (knows of DOJ report); Ex. E3, *Brown Dep.*, at 48:10-15 (same); Ex. E4, *Paulette-Thurman*, 74:2-25 (same); Ex. E5, *Graves Dep.*, at 59:17-20; Ex. E8, *Chabot Dep.*, 81:10-23 (same); Ex. E7, *Schroeder Dep.*, at 37:4-11 (same).

183. Board member Paul Morris stated that the Michael Brown shooting and subsequent demonstrations caused Ferguson City Council incumbents not to run for office allowing an opportunity for African Americans to get elected. Ex. E1, *Morris Dep.*, at 99:6-19.

184. Frank Green confirmed that "the Michael Brown situation" had an effect on the 2015 election. Ex. E10, *Green Dep.*, at 50:16-25.

185. Dr. Rodden acknowledged that the national attention surrounding the 2015 election due to the Michael Brown shooting may have caused turnout and get-out-the-vote efforts to increase in that election. Ex. C5, *Rodden Dep.*, at 97:21 – 98:8; Ex. B5, *Rodden Rep.*, at ¶ 28.

186. The Board's newest member, Graves, filed her candidacy in January 2015. Ex. E5, *Graves Dep.*, at 73:6-8; Mo. Rev. Stat. § 115.127(5). She ran for elected office in part to address the injustice that the Michael Brown shooting and resulting protests brought to light. *See* Ex. E5, *Graves Dep.*, at 16:9-25.

187. According to Dr. Rodden, Graves "ran a sophisticated campaign in which she very explicitly encouraged supporters to engage in a 'single shot' voting strategy." Ex. B5, *Rodden Rep.*, at ¶ 48. Graves acknowledged that she encouraged voters to cast one vote only, a vote for her. Ex. E5, *Graves Dep.*, at 14:3-5; *see also* Ex. E1, *Morris Dep.*, at 69:8-13.

188. Other Board members stated that they did not promote or engage in single-shot voting. Ex. E1, *Morris Dep.*, at 69:11-20; Ex. E6, *Hogshead Dep.*, at 15:18 – 16:6 (does not encourage single-shot voting publically but asks family and close friends to vote only for her); Ex. E2, *Ebert Dep.*, at 19:13 – 20:19 (always casts all votes, except when he is a candidate, he votes for himself only).

## II. Defendants' Proposed Approaches to Identifying Candidates of Choice

189. The District's expert, Dr. Rodden, proposed two decision rules for identifying a racial group's candidates of choice. Ex. C5, *Rodden Dep.*, at 356:5 – 357:4.

190. The first method proposed identifies one candidate of choice for each group in each election, focusing exclusively on the single candidate who was estimated to have received the highest percentage of votes from each group (the "Top-Ranked Candidate" approach). Although voters may vote for up to two or three candidates in each election, this approach considers only the candidates estimated to have received the highest levels of support from

each racial group. Ex. B5, *Rodden Rep.*, at ¶ 74 ("focus only on the top-ranked candidate among African Americans in each election and ask: how often does the *most* preferred among African-Americans win a seat?); Ex. C5, *Rodden Dep.*, at 162:21 – 163:1.

191.    The second method proposed identifies two or three candidates of choice in each election depending on the available seats in each election, by identifying the two or three candidates in each election who are estimated to have received the highest percentages of votes from each group (the "Point Estimate" approach). This approach ignores the relative levels of support that candidates receive in comparison to each other, as well as whether the differences in estimated levels of support for candidates are statistically significant. Ex. B5, *Rodden Rep.*, at ¶ 73 ("simply count up wins and losses of the candidates ranked by ecological inference estimates among the top *N* candidates for African American voters when there are *N* seats."); Ex. C5, *Rodden Dep.*, at 135:2 – 136:5.

A.    *The District's "Top-Ranked Candidate" Approach*

192.    Employing the Top-Ranked Candidate approach, the Black and white candidates of choice in contested elections for the FFSD Board from 2000 through 2015, and their respective levels of success, are as follows:

| Comparative Success Rates of White- and Black-Preferred Candidates: The District's Top-Ranked Candidates | | | | |
|---|---|---|---|---|
| **Election Year** | **Black Voters** | | **White Voters** | |
| | **Top Ranked Candidate** | **Elected?** | **Top Ranked Candidate** | **Elected?** |
| 2000 | G. Thomas (B) | Yes | Hirsch (W) | Yes |
| 2001 | Butler (B) | No | Garofalo (W) | Yes |
| 2002 | Graham (B) | Yes | Fletcher (W) | Yes |
| 2003 | G. Thomas (B) | Yes | Knorr (W) | Yes |
| 2004 | Van (B) | No | Garofalo (W) | Yes |
| 2006 | G. Thomas (B) | No | Schroeder (W) | Yes |
| 2009 | Knowles (W) | Yes | Schroeder (W) | Yes |

| 2011 | Graham (B) | No | Martinez (W-H) | Yes |
|------|------------|-----|----------------|-----|
| 2012 | B. Morris (B) | No | Ebert (W) | Yes |
| 2013 | Henson (B) | No | Hogshead (W) | Yes |
| 2014 | Paulette-Thurman (B) | Yes | Chabot (W) | Yes |
| 2015 | Graves (B) | Yes | Ebert (W) | Yes |
| | **Overall Success Rate:** | 6/12 | **Overall Success Rate:** | 12/12 |
| | **Success Rate Last 10 Years:** | 3/7 | **Success Rate Last 10 Years:** | 7/7 |
| | **Success Rate Last 5 Years:** | 2/5 | **Success Rate Last 5 Years:** | 5/5 |

Ex. C5, *Rodden Dep.*, at 260:21 − 272:5; Ex. D3, *Top-Ranked Candidate Approach Worksheet (Ex. 18 to Dep. of Jonathan Rodden, Aug. 20, 2015).*

193.    Employing this approach results in twelve candidates of choice for each group in twelve contested elections, dating back through the 2000 election. Ex. C5, *Rodden Dep.*, at 264:17-25, 270:17-20; Ex. D3, *Top-Ranked Candidate Approach Worksheet.*

194.    In twelve contested elections from 2000 through 2015, Black voters and white voters have never preferred the same candidate as their top choice in a contested election. Ex. C5, *Rodden Dep.*, at 264:17-25, 270:17-20; Ex. D3, *Top-Ranked Candidate Approach Worksheet.*

195.    In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was white (twelve of twelve). Ex. C5, *Rodden Dep.*, at 264:22-25.

196.    In the twelve contested elections from 2000 through 2015, all but one of the top-ranked candidates among Black voters was Black (eleven of twelve). Ex. C5, *Rodden Dep.*, at 272:1-5. Black voters' top-ranked candidate was not Black for the 2009 election, which featured no Black candidates. Ex. C5, *Rodden Dep.*, at 215:9-16.

197.    In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was elected (twelve of twelve), as compared to six out of twelve top-ranked candidates among Black voters. Ex. C5, *Rodden Dep.*, at 264:17-21, 270:17-20.

198.    In the seven contested elections over the last ten years (*i.e.*, from 2006 through 2015), every top-ranked candidate among white voters was elected (seven out of seven), as

compared to three out of seven top-ranked candidates among Black voters. Ex. C5, *Rodden Dep.*, at 265:1-5, 270:21-24.

199. In the five contested elections over the last five years (*i.e.*, from 2011 through 2015), every top-ranked candidate among white voters was elected (five out of five), as compared to two out of five top-ranked candidates among Black voters. Ex. C5, *Rodden Dep.*, at 265:6-10, 271:12-16.

B. *The District's "Point Estimate" Approach*

200. Employing the Point Estimate approach, the Black and white candidates of choice in contested elections for the Board from 2000 through 2015 and their respective levels of success are as follows:

| Comparative Success Rates of White- and Black-Preferred Candidates: The District's Point Estimate Approach | | | | | |
|---|---|---|---|---|---|
| Election Information | | Black Voters | | White Voters | |
| Year | Seats | Candidates with Highest Estimated Support | Number Successful | Candidates with Highest Estimated Support | Number Successful |
| 2000 | 2 | G. Thomas (B), Hirsch (W) | 2 | Hirsch (W), G. Thomas (B) | 2 |
| 2001 | 2 | Butler (B), Garofalo (W) | 1 | Garofalo (W), Hogshead (W) | 2 |
| 2002 | 3 | Graham (B), Butler (B), Clark (W) | 2 | Fletcher(W), Knorr (W), Clark (W) | 2 |
| 2003 | 2 | G. Thomas (B), Knorr (W) | 2 | Knorr (W), Lentz (W) | 1 |
| 2004 | 2 | Van (B), McClendon(B) | 0 | Garofalo (W), Hogshead (W) | 2 |
| 2006 | 2 | G. Thomas (B), Washington (B) | 0 | Schroeder (W), Knowles (W) | 2 |
| 2009 | 2 | Knowles (W), Schroeder (W) | 2 | Knowles (W), Schroeder (W) | 2 |
| 2011 | 3 | Graham (B), Hawkins (B), Clark (W) | 0 | Martinez (W-H), P. Morris (W), Chabot (W) | 3 |
| 2012 | 2 | B. Morris (B), Schroeder (W) | 1 | Ebert (W), Schroeder (W) | 2 |
| 2013 | 2 | Henson (B), Hogshead (W) | 1 | Brown (W), Hogshead (W) | 2 |
| 2014 | 3 | Paulette-Thurman (B), Johnson (B), Savala (B) | 1 | P. Morris (W), Chabot (W), Benz (W) | 2 |
| 2015 | 2 | Graves (B), Dameron (W) | 1 | Ebert (W), Graves (B) | 2 |
| Totals: | 27 | -- | 13/27 | -- | 24/27 |
| Last 10 years | 16 | -- | 6/16 | -- | 15/16 |
| Last 5 years | 12 | -- | 4/12 | -- | 11/12 |

Ex. C5, *Rodden Dep.*, at 136:22 – 137:6, 356:19 – 357:9; Ex. D4, *Point Estimate Approach Worksheet (Ex. 12 to Dep. of Jonathan Rodden, Aug. 20, 2015).*

201.	Under this approach, there were 27 candidates of choice for each racial group in twelve contested elections, dating back through the 2000 election. Ex. D4, *Point Estimate Approach Worksheet*; Ex. C5, *Rodden Dep.*, at 356:19 – 357:9.

202.	Under this approach, white voters preferred white candidates for 25 out of 27 seats during the twelve contested elections from 2000 through 2015. Ex. D4, *Point Estimate Approach Worksheet*; Ex. C5, *Rodden Dep.*, at 252:11-14.

203.	Under this approach, Black voters preferred Black candidates for 17 out of 27 seats during the twelve contested elections from 2000 through 2015. Ex. D4, *Point Estimate Approach Worksheet*; Ex. C5, *Rodden Dep.*, at 251:19-22.

204.	Under this approach, 24 out of 27 white-preferred candidates were elected (88.9%), as compared to 13 out of 27 Black-preferred candidates (48.2%) during the twelve contested elections from 2000 through 2015. Ex. D4, *Point Estimate Approach Worksheet*; Ex. C5, *Rodden Dep.*, at 148:19 – 150:24.

205.	Under this approach, 15 out of 16 white-preferred candidates were elected (93.8%), as compared to six out of 16 Black-preferred candidates (37.5%) during the seven contested elections over the last ten years (*i.e.*, from 2006 through 2015). Ex. C5, *Rodden Dep.*, at 152:25 – 155:7.

206.	Under this approach, during the five contested elections over the last five years (*i.e.*, from 2011 through 2015), 11 out of 12 white-preferred candidates were elected (91.7%), as compared to four out of 12 preferred candidates among Black voters (33.3%). Ex. C5, *Rodden Dep.*, at 155:8 – 156:12.

207.	Under this approach, the success rate for Black-preferred candidates is lower during the past seven contested elections (37.5%) as compared to the past twelve contested elections

(48.2%). Ex. C5, *Rodden Dep.*, at 154:1-13.

208.    Under this approach, the success rate for Black-preferred candidates is lower during the past five contested elections (33.3%) as compared to the past seven contested elections (37.5%). Ex. C5, *Rodden Dep.*, at 155:20 − 156:2.

209.    Using the point estimate approach to identify candidates of choice, the gap in the success rate for white-preferred candidates as compared to Black-preferred candidates is larger during the past seven contested elections (approximately 55 percentage points) as compared to the past twelve contested elections (approximately 40 percentage points). Ex. C5, *Rodden Dep.*, at 150:5-24, 155:1-7.

210.    Using the point estimate approach to identify candidates of choice, the gap in the success rate for white-preferred candidates as compared to Black-preferred candidates is larger during the past five contested elections (approximately 60 percentage points) as compared to the past seven contested elections (approximately 55 percentage points). Ex. C5, *Rodden Dep.*, at 155:1-7, 156:13-17.

**SENATE FACTORS**

**I.  The "Predominant" Senate Factors (Factors 2 and 7)**

    *A.  Racially Polarized Voting (Senate Factor 2)*

211.    The number of Black and white candidates of choice in the twelve contested elections from 2000 through 2015 identified using the District's Top-Ranked Candidate and Point Estimate approaches, their respective levels of success, and the rate at which the candidates of choice for each racial group overlaps are as follows:

| Table 7 - Racial Polarization in FFSD Elections | | | | | |
|---|---|---|---|---|---|
| **Method of Identification** | **Black Voters** | | **White Voters** | | **Overlapping Candidates** |
| | **Number of Candidates of Choice** | **Number Black** | **Number of Candidates of Choice** | **Number White** | |
| Top-Ranked Candidate Approach | 12 | 11 (91.7%) | 12 | 12 (100%) | 0/12 (0%) |
| Point Estimate Approach | 27 | 17 (63%) | 27 | 25 (92.6%) | 10/27 (37%) |

*See supra* ¶¶ 192, 200.

212. Under the District's Top-Ranked Candidate approach, the preferred candidates of Black voters and white voters overlapped 0% of the time. Black voters preferred Black candidates 92% of the time, while white voters preferred white candidates 100% of the time. *See supra* ¶ 192.

213. Under the District's Point Estimate approach, the preferred candidates of Black voters and white voters overlapped 37% of the time. Black voters preferred Black candidates 63% of the time, while white voters preferred white candidates 93% of the time. *See supra* ¶ 200.

### B. *Election of minorities to the Board (Senate Factor 7)*

214. African Americans' representation on the Board is disproportionately low compared to their share of the FFSD population. *See supra* ¶¶ 15, 19. There are presently two African-American Board members—Paulette-Thurman and Graves—out of seven (28.57%). *Supra* ¶ 23. According to the Decennial Census, African Americans comprise 53.84% of the District's total population, and 47.33% (single-race) of the District's VAP. *See supra* ¶ 15.

215. The District's expert Dr. Rodden observed that the current composition of the Board, as well as other municipal elected bodies in the area, reflects a racial composition significantly out of line with the population demographics. Ex. C5, *Rodden Dep.*, at 38:19 – 40:4; Ex. D4, Jonathan Rodden, "*Is segregation the problem in Ferguson?*," Wash. Post (Aug. 18, 2014) *(Ex. 3 to Dep. of Jonathan Rodden, Aug. 20, 2015)*, at 6.

216. Dr. Rodden agrees that the underrepresentation of African Americans in elected office despite the recent growth in the African-American population in the District is a "problem." Ex. C5, *Rodden Dep.*, at 38:19 – 40:4; Ex. D4, *Is Segregation the Problem in Ferguson?*, at 6.

217. Former Board member Graham states that "[t]he lack of African-American representation on the Board exacerbates the Board's non-responsiveness to the needs of African-American students." Ex. A3, *Graham Decl.*, at ¶ 17.

218. Plaintiff Bailey does "not see [herself] or other African Americans represented on the school board." Ex. A1, *Bailey Decl.*, at ¶ 12.

219. From 1988 until 2000, Dr. Doris Graham was the only African American on the Board. Ex. A3, *Graham Decl.*, at ¶ 6.

220. Current Board member Paulette-Thurman stated that having African-American Board members makes a "difference," because "when issues come up that pertain to race, there's a different perspective now on the Board, who can say we've got to be very cognizant of . . . the dynamics of what's happening in a certain situation," like personnel issues or disciplinary appeals. Ex. E4, *Paulette-Thurman Dep.*, at 31:6-19.

221. Since 2000, there have never been more than two African-American members on the Board at the same time. Ex. E1, *Morris Dep.*, at 11:2-14, 13:5-8, 81:12-19; Ex. E2, *Ebert Dep.*, at 79:3-10; Ex. E6, *Hogshead Dep.*, at 65:17-20; Ex. E7, *Schroeder Dep.*, at 29:23 – 30:23; Ex. E8, *Chabot Dep.*, at 73:21-23.

222.    The following table summarizes the number of candidates and overall success rates of candidates of each race in each of the twelve contested election from 2000 through 2015:

| Table 8 - Comparative Success Rates of Black and White Candidates | | | | |
|---|---|---|---|---|
| | **Black Candidates** | | **White Candidates** | |
| **Election** | **Total Number** | **No. Successful** | **Total Number** | **No. Successful** |
| 2000 | 2 | 1 | 4 | 1 |
| 2001 | 1 | 0 | 3 | 2 |
| 2002 | 2 | 1 | 4 | 2 |
| 2003 | 1 | 1 | 2 | 1 |
| 2004 | 3 | 0 | 2 | 2 |
| 2006 | 2 | 0 | 3 | 2 |
| 2009 | 0 | 0 | 3 | 2 |
| 2011 | 2 | 0 | 7 | 3 |
| 2012 | 1 | 0 | 2 | 2 |
| 2013 | 2 | 0 | 2 | 2 |
| 2014 | 5 | 1 | 3 | 2 |
| 2015 | 3 | 1 | 2 | 1 |
| **TOTALS:** | **24** | **5 (20.8%)** | **37** | **22 (59.5%)** |

*See supra* ¶¶ 60, 69, 78, 89, 98, 105, 114, 120, 130, 139, 148, 167.

223.    During the twelve contested elections from 2000 to 2015, twenty-four Black candidates ran for Board seats. African-American candidates were successful in five elections (20.8%) (G. Thomas, Graham, G. Thomas, Paulette-Thurman, Graves). *See supra* ¶¶ 60, 69, 78, 89, 98, 105, 114, 120, 130, 139, 148, 167.

224.    During the twelve contested elections from 2000 to 2015, thirty-seven white candidates ran for Board seats. White candidates were successful twenty-two out of thirty-seven times (59.5%) (Hirsch, Garofalo, Hogshead, Clark, Fletcher, Knorr, Garofalo, Hogshead, Schroeder, Knowles, Schroeder, Knowles, Martinez, P. Morris, Chabot, Ebert, Schroeder, Hogshead, Brown, Chabot, P. Morris, Ebert). *See supra* ¶¶ 60, 69, 78, 89, 98, 105, 114, 120, 130, 139, 148, 167, 222.

225.    During the five contested elections from 2011 to 2015, 13 African-American candidates

ran for Board seats. Two (15.38%) were successful (Paulette-Thurman, Graves). *See supra*

¶ 222.

226.    During the five contested elections from 2011 to 2015, 16 white candidates ran for Board

seats. They were successful ten times (62.5%). *See supra* ¶ 222.

227.    During the 2013-2014 term, following Henson's loss during the April 2013 election,

there were no African-American Board members. *Supra* ¶¶ 138-39, 144; Ex. A3, *Graham*

*Decl.*, at ¶ 15.

228.    Henson was appointed to the Board and has never won a Board election. *Supra* ¶¶ 109,

118, 138-39, 144.

229.    Immediately after Henson's loss at the polls, former Board member Graham attended a

Board meeting "and publically challenged the School Board to advocate for all students in

the District, especially African American students." Ex. A3, *Graham Decl.*, at ¶ 15; Ex. E1,

*Morris Dep.*, at 53:8 − 54:6; Ex. F9, *Apr. 10, 2013 Board Meeting Mins. (Ex. 3 to Dep. of*

*Paul Morris, June 15, 2015)*, at 11.

## II.    <u>Factors Related to the Historical and Current Context of Discrimination (Factors 1, 5,</u>
<u>and 8)</u>

### A.    *<u>Official discrimination (Senate Factor 1) and its continuing effects on African-</u>*
*<u>American residents of FFSD (Senate Factor 5)</u>*

#### 1.    <u>History of Official Discrimination</u>

230.    The State, and St. Louis area in particular, gave rise to the case *Dred Scott v. Sandford*.

60 U.S. 393, 398 (1856).

231.    The State's Constitution of 1865, ratified two months after the end of the Civil War,

expressly restricted the franchise to white males. Mo. Const. of 1865, art. II, § 18.

232.    Black men were not permitted to vote until the State ratified the Fifteenth Amendment in

1870. Ex. G13, Tim O'Neil, *Look Back 250: Women, blacks in Missouri seek voting rights*

*after Civil War*, St. Louis Post-Dispatch, July 5, 2014.

233.    The Missouri Constitution of 1865 barred African Americans from holding statewide office. Mo. Const. of 1865, art. V, § 2 (requiring that the governor be a white man), art. V, § 12 (requiring that the lieutenant governor be a white man), art. IV, § 3 (requiring that members of the Missouri house of representatives be white men), art. IV, § 5 (requiring that state senators be white men), art. III, § 6 (requiring that all voters be white men).

234.    African Americans were also barred by statute from bearing witness in court, Mo. Rev. Stat. ch. "Negroes and Mulattoes," § 2, at 600 (1825), or serving as jurors, Mo. Rev. Stat. ch. 146, § 2-2, at 797 (1870).

2.    <u>Housing</u>

235.    St. Louis County used and acquiesced in the private maintenance of discriminatory real estate and exclusionary zoning practices designed to compel African Americans to remain in designated, underserved areas. *See* Ex. B3, *Expert Report of Colin Gordon*, May 27, 2015, at 7-16; Ex. B4, *Expert Report of David Kimball*, May 27, 2015, at 8-10; *see also* Ex. C5, *Rodden Dep.*, at 42:2-13; Ex. E7, *Schroeder Dep.*, at 31:21 – 32:2, 33:4-14.

236.    The region's use of discriminatory real estate practices and exclusionary zoning practices led to three landmark residential racial discrimination cases: *Shelley v. Kraemer*, 334 U.S. 1 (1948), *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), and *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975). *See* Ex. B3, *Gordon Rep.*, at 5; Ex. B4, *Kimball Rep.*, at 8-9.

237.    In *Shelley v. Kraemer*, a case arising out of the city of St. Louis, the Supreme Court held unconstitutional state enforcement of racially restrictive housing covenants. 334 U.S. at 4, 23; *see* Ex. B3, *Gordon Rep.*, at 5, 9; Ex. B4, *Kimball Rep.*, at 8-9.

238.    After *Shelley*, municipalities in St. Louis County (including those within the bounds of

FFSD) relied on private realty practices, such as exclusionary zoning practices like large-lot single-family residential zoning, which by design excluded most African Americans. *See* Ex. B3, *Gordon Rep.*, at 15-16; Ex. E4, *Paulette-Thurman Dep.*, at 62:22-25.

239. These discriminatory practices were in turn subsidized and regulated by local and federal public policies. *See* Ex. B3, *Gordon Rep.*, at 15-16.

240. These discriminatory practices were challenged in court. In *Jones v. Alfred H. Mayer Co.*, the Supreme Court outlawed discrimination in private real estate transactions. 392 U.S. at 412-13; *see* Ex. B3, *Gordon Rep.*, at 5. In *United States v. City of Black Jack*, the Eighth Circuit, in one of the first exclusionary zoning cases, struck down the town of Black Jack's zoning ordinance banning construction of multifamily housing. 508 F.2d at 1181-82; *see* Ex. B3, *Gordon Rep.*, at 5, 16; Ex. B4, *Kimball Rep.*, at 9.

241. The city of St. Louis did not pass a public accommodations bill until 1961, and the bill that passed excluded landlord-tenant relationships. Ex. B4, *Kimball Rep.*, at 9.

242. Late into the 1980s, so-called urban renewal efforts in North St. Louis County were "designed and pursued as a means of relocating suburban pockets of American-American settlement 'back' into [St. Louis] City." Ex. B3, *Gordon Rep.*, at 26.

243. Historical housing discrimination has in large part caused the current race gap in family wealth. Ex. B3, *Gordon Rep.*, at 20-21, 23-24, 27-28, 32.

244. Home equity is the centerpiece of family wealth for moderate-income Americans. Ex. B3, *Gordon Rep.*, at 21.

245. The rate of African-American homeownership remains depressed in the St. Louis area. Ex. B8, *Gordon Rebuttal*, at 3-4.

246.    African-American homeowners are often cornered into less stable neighborhoods on subprime terms, where there is little access to public services and high-performing schools. Ex. B3, *Gordon Rep.*, at 21, 23-24, 27-28.

247.    Property values of African Americans' homes have grown more slowly in comparison to whites' homes. Ex. B3, *Gordon Rep.*, at 21; Ex. B8, *Gordon Rebuttal*, at 3-4.

248.    The homeownership gap between African Americans and whites, coupled with the slower rate of property value growth of African Americans' homes in comparison to whites' homes, has resulted in disparities in wealth among African-American and white households. Ex. B3, *Gordon Rep.*, at 20-21.

249.    These disparities in homeownership have inter-generational effects. Ex. B3, *Gordon Rep.*, at 20-21.

250.    In 2013, median family wealth for African Americans nationally was 8.2% of median family wealth for whites. Ex. B3, *Gordon Rep.*, at 20.

251.    The wealth gap is one chief driver of continuing (and in some cases widening) disparities between African Americans and whites in FFSD in areas such as educational achievement, level of poverty, employment, and health care. Ex. B4, *Kimball Rep.*, at 10; Ex. B3, *Gordon Rep.*, at 21.

252.    Racial disparities in educational achievement, level of poverty, employment, homeownership, health care, and criminal justice persist in FFSD and the St. Louis metropolitan region. Ex. C5, *Rodden Dep.*, at 42:2 – 43:5, 300:16 – 301:11; Ex. B12, *Supplemental Report of Jonathan Rodden: Senate Factors*, July 2, 2015, ¶¶ 26, 32, 34, 36; Ex. B4, *Kimball Rep.*, at 9-10, 12; Ex. B3, *Gordon Rep.*, at 20-21; Ex. B8, *Gordon Rebuttal*,

at Tbl. 4 (p. 4); Ex. B1, *Cooper Decl.*, at ¶¶ 36-37; Ex. B6, *Cooper Suppl. Decl.*, at ¶¶ 17-20.

253.    Racial disparities in FFSD are higher than national averages in areas such as unemployment, education, health, homeownership, and criminal justice. Ex. B4, *Kimball Rep.*, at 10, 12; Ex. B3, *Gordon Rep.*, at 3, 5-7, 19; Ex. B8, *Gordon Rebuttal*, at Tbl. 4 (p. 4); Ex. B1, *Cooper Decl.*, at ¶¶ 36-37; Ex. B6, *Cooper Suppl. Decl.*, at ¶¶ 17-20. The District's expert does not dispute these findings. Ex. B12, *Supplemental Report of Jonathan Rodden: Senate Factors*, July 2, 2015, ¶¶ 26, 32, 34, 36.

254.    Residential segregation persists and in some cases has worsened in St. Louis County and FFSD. Ex. B3, *Gordon Rep.*, at 4, 27-28, Map 10 (p. 29); Ex. B8, *Gordon Rebuttal*, at 3-4; Ex. E4, *Paulette-Thurman Dep.*, at 63:8-13.

255.    The lived experience of segregation is multidimensional, and in FFSD African Americans are "more segregated across all dimensions simultaneously." Ex. B8, *Gordon Rebuttal*, at 3-4; Ex. C3, *Dep. of Colin Gordon*, Aug. 19, 2015, at 72:13-73:11.

256.    Patterns of housing segregation in FFSD are reflected in and reinforced by the disparities in education, employment, wealth, home ownership, access to health care and other factors in basic economic security. Ex. B3, *Gordon Rep.*, at 27-28; Ex. B8, *Gordon Rebuttal*, at 3-4.

        3.  <u>Education</u>

257.    The State and St. Louis County engaged in official discrimination in education. *See* Ex. B4, *Kimball Rep.*, at 10; Ex. E4, *Paulette-Thurman Dep.*, at 63:1-3; Ex. E1, *Morris Dep.*, at 96:14-16; Ex. E5, *Graves Dep.*, at 56:14-16.

258.    In 1875, the State revised its then-ten-year-old constitution to require, rather than merely permit, racially segregated schools. Mo. Const. of 1875, art. XI, § 3.

259.   A provision in the Missouri Constitution of 1904 that permitted segregated schooling was not officially rescinded until 1976. *See Missouri v. Jenkins*, 515 U.S. 70, 176 (1995) (Ginsburg, J., dissenting) (noting the "deep, inglorious history of segregation in Missouri").

260.   Kinloch is one of the municipalities completely inside FFSD's borders. *Supra* ¶ 13. It was once an unincorporated area that had included the territory of the adjacent city of Berkeley. Ex. B3, *Gordon Rep.*, at 16, 22.

261.   Prior to 1937, the areas of present-day Kinloch and Berkeley together formed the Kinloch School District, whose schools were segregated under Missouri law. Ex. B3, *Gordon Rep.*, at 22; *Missouri*, 515 F.2d at 1367.

262.   In 1937, white residents of Kinloch split the city, incorporated the city of Berkeley, and formed a new predominantly white school district. The student population of the new Berkeley District was 80% white, while the student population of the remnant of the Kinloch District was 99.3% African-American. Ex. B3, *Gordon Rep.*, at 16, 22; *Missouri*, 515 F.2d at 1367. "This was done despite the strong opposition of the new Kinloch district." *Missouri*, 515 F.2d at 1367.

263.   "[A]s a direct consequence of the creation and maintenance of Kinloch as a small, all-black school district, educational opportunities provided were markedly inferior to the opportunities offered in the adjoining Berkeley and Ferguson districts, as well as those offered in most other school districts in St. Louis County." *Missouri*, 515 F.2d at 1367.

264.   The cities of Berkeley and Ferguson together surrounded Kinloch almost completely. Ex. B3, *Gordon Rep.*, at 16.

265.   Berkeley and Ferguson took direct measures to segregate Kinloch's African-American residents. Berkeley and Ferguson streets dead-ended before they reached Kinloch, and, until

1968, Ferguson barricaded through streets shared with Kinloch. Ex. B3, *Gordon Rep.*, at 16; Ex. B4, *Kimball Rep.*, at 9.

266.    In 1975, nearly two decades after *Brown v. Board of Education*, 349 U.S. 294 (1955), the school districts of Kinloch and Berkeley were court-ordered to desegregate and merge into the adjacent Ferguson-Florissant School District, resulting in the present-day FFSD. *See United States v. Missouri*, 388 F. Supp. 1058 (E.D. Mo. 1975).

267.    An achievement gap exists between African-American and white students in FFSD. Ex. E10, *Green Dep.*, at 64:10-13; Ex. E3, *Brown Dep.*, at 52:13-21; Ex. E7, *Schroeder Dep.*, at 34:12-17, 34:20 – 35:14.

268.    Currently, in FFSD, African American students have disproportionately low enrollment in advanced classes such as calculus, chemistry, physics and advanced placement, and more limited access to enrichment programs and extracurricular activities. Ex. F1, *FFSD Data Reported to Office of Civil Rights*, at 1-3, 18; Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 1-4; Ex. E4, *Paulette-Thurman Dep.*, at 66:4-22; Ex. E1, *Morris Dep.*, at 106:13 – 107:15, 108:10-21.

269.    For example, based on data provided to the U.S. Department of Education for the 2011 survey year, 77.1% of the District's enrollment is African-American and 15.6% is white, but of the students enrolled in calculus, 51.4% were African-American and 37.8% were white. Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 4. Of the students enrolled in FFSD's gifted and talented program, 35.3% were African-American and 48% were white. Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 2.

270.    Educational attainment, measured by the percent of the population with a Bachelor's degree or higher, falls as you compare the St. Louis metropolitan area to FFSD to the

majority-African-American block groups within FFSD. Ex. B3, *Gordon Rep.*, at 3.

271.    Disparities in the use of discipline between African-American and white students also exist in FFSD. Ex. E4, *Paulette-Thurman Dep.*, at 26:6 – 30:16; Ex. E10, *Green Dep.*, at 64:14-17; Ex. F1, *FFSD Data Reported to Office of Civil Rights*, at 7-13, 15-16.

272.    During the 2011 survey year, African-American students in FFSD disproportionately received in-school suspensions: African-American students comprised 77.1% of the District's student population but 87.8% of students who received in-school suspensions. Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 5. During the 2011 survey year, African-American students in FFSD also disproportionately received out-of-school suspensions in the FFSD: African-American students comprised 77.1% of the District's student population but 87% of students who received out-of-school suspensions. Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 5.

273.    African-American students in FFSD are disproportionately referred to law enforcement for infractions in school. Ex. F1, *FFSD Data Reported to Office of Civil Rights*, at 16; Ex. F10, *FFSD Data on Office of Civil Rights Website – Discipline of Students Without Disabilities, Law Enforcement Referral (Ex. 6 to Dep. of Paul Morris, June 15, 2015)*, at 1; Ex. F11, *FFSD Data on Office of Civil Rights Website – Discipline of Students With Disabilities, Law Enforcement Referral (Ex. 7 to Dep. of Paul Morris, June 15, 2015)*, at 1.

274.    During the 2011 survey year, African-American students comprised 76.9% of the District's student population without disabilities but 92.6% of students without disabilities who were referred to law enforcement. Ex. F10, *FFSD Discipline of Students Without Disabilities, Law Enforcement Referral*, at 1.

275.    Every student who reportedly received corporal punishment in the District during the

2011 survey year was African-American. Ex. F1, *FFSD Data Reported to Office of Civil Rights*, at 8, 13; Ex. E4, *Paulette-Thurman Dep.*, at 104:16 – 105:16.

276. Current Board member Paulette-Thurman stated that although she was not aware of this data, it would not surprise her "based on the data that [she has] seen and heard and the comments that [she] get[s] from people, even based on the reports that [she has] read and [she has] seen in serving on the Board -- serving on the discipline board in the district." Ex. E4, *Paulette-Thurman Dep.*, at 78:20-22, 79:1-8.

277. According to the September 2015 report issued by the Ferguson Commission, "a volunteer group of 16 diverse community leaders" appointed by Missouri Governor Jay Nixon, "to listen to and engage with area organizations, national thought leaders, institutions, experts and citizens," Ferguson Comm'n, *Commission Work*, http://stlpositivechange.org/commission-work, Missouri ranked 50th out of 50 in school discipline gap for primary school-aged students and 47th out of 50 for secondary school students Ex. G14, Ferguson Comm'n, *Forward Through Ferguson: A Path Toward Racial Equity (Sept. 21, 2015)*, at 56.

278. In its *Investigation of the Ferguson Police Department* report, the U.S. Department of Justice documented a pattern of force used against African American students and law enforcement's "insufficient appreciation for the negative educational and long-term outcomes that can result from treating disciplinary concerns as crimes and using force on students." Ex. G9, *Investigation of the Ferguson Police Department*, at 37-38.

279. The U.S. Department of Justice issued a report in July 2013 detailing the results of a DOJ investigation into the St. Louis County Family Court. According to the report, the investigation found that in the County the disparity in the rates at which Black and white

juvenile defendants are subjected to pretrial detention is "large" and "unexplained by factors other than race" and that, when detained before trial, a child is removed from school for between 21 and 30 days, and occasionally longer. Ex. G15, U.S. Dep't of Justice, *Investigation of the St. Louis County Family Court* (July 31, 2015), at 26, 47.

### 4. Other Socioeconomic Disparities

280. According to 2011 – 2013 ACS data, African Americans in FFSD are more than twice as likely to live below the poverty line and more likely to be unemployed than are white residents. Ex. B1, *Cooper Decl.*, at ¶ 36.

281. According to 2008-2012 ACS data, most of the predominantly African-American neighborhoods in FFSD are in areas with lower median household incomes. Ex. B1, *Cooper Decl.*, at ¶ 37, Fig. 8.

282. Individual and family poverty rates and the unemployment rate in the majority-African-American area of FFSD are nearly double the rate in the St. Louis metro area. Ex. B3, *Gordon Rep.*, at 3.

283. In FFSD, over twice as many African-American households rely on food stamps compared to white households. Ex. B1, *Cooper Decl.*, at ¶ 36.

284. The rates of reliance on public assistance in the majority-African-American areas of the District are more than double the averages for the St. Louis metro area. Ex. B3, *Gordon Rep.*, at 3.

285. African-American residents of FFSD are less likely to have health insurance. Ex. B1, *Cooper Decl.*, at Ex. D.

286. Florissant and Ferguson together make up most of the geographic area covered by FFSD.

287. African-American residents of Florissant and Ferguson face racial profiling by law enforcement and a disproportionate number of stops, arrests, fines, and fees. Ex. G9,

*Investigation of the Ferguson Police Department*, at 3-5; Ex. G16, Better Together, *Public Safety – Municipal Courts* (Oct. 2014), at 8; Ex. G17, excerpts from Mo. Att'y General's Office, *2014 Vehicle Stops Report*, Racial Profiling Data, at pp. 367-68 (Ferguson), 377-78 (Florissant), App'x B pp. 182 (Ferguson), 186 (Florissant) (*full report available at* https://ago.mo.gov/home/vehicle-stops-report/2014-executive-summary).

288.    According to the DOJ *Investigation of the Ferguson Police Department* report, African-American residents of Ferguson in 2013 were 68% less likely to have their cases dismissed by the municipal judge and 50% more likely to have their cases lead to an arrest warrant; and accounted for 95% of all "Manner of Walking" charges, 94% of all "Failure to Comply" charges; 92% of all "Peace Disturbance" charges; and 89% of all "Failure to Obey" charges. Ex. G9, *Investigation of the Ferguson Police Department*, at 5, 62.

289.    A report sponsored by The Missouri Council for a Better Economy notes that, although only 24% of St. Louis County residents are African-American, in the 21 County municipalities that collect more than 20% of their revenue from court fines and fees, 62% of the residents are African-American. Ex. G16, *Public Safety – Municipal Courts*, at 8.

290.    The Missouri Attorney General 2014 Vehicle Stops Report found that the indices for traffic stops of African Americans in Ferguson for the years 2000-2014 range from 1.30 to 1.57 and in Florissant from 2.66 to 4.79, where an index over 1 shows race disparity. Ex. G17, *2014 Vehicle Stops Report*, at App'x B pp. 182, 186.

    5.    Continuing Effects of Past Discrimination and Effect on Political Participation

291.    African Americans in St. Louis County and in FFSD still suffer the effects of past official discrimination. *See* Ex. E4, *Paulette-Thurman Dep.*, at 63:1-13; Ex. E10, *Green Dep.*, at 58:12 – 59:1; Ex. E7, *Schroeder Dep.*, at 35:18 – 36:5.

292.    Former FFNEA president Green stated that he "believe[s] that there are still certain

privileges or rights that are not afforded to certain African-American individuals [in Ferguson]." Ex. E10, *Green Dep.*, at 58:12 – 59:1.

293.    Current Board member Graves stated that as an African-American, she "ha[s] to be more qualified than a counterpart to get the same position." Ex. E5, *Graves Dep.*, at 57:11-15.

294.    St. Louis County Council member Hazel Erby, the only African-American Council member, states that educational disparities persist today in public schools in the area and that "[u]ntil just a few years ago there was still segregation in the [area public] schools." Ex. A2, *Erby Decl.*, at ¶¶ 2, 9.

295.    The ongoing effects of the history of official discrimination in St. Louis County and FFSD are reflected in present day socioeconomic disparities between African Americans and whites. Ex. E4, *Paulette-Thurman Dep.*, at 63:1-13. Current Board member Paulette-Thurman "think[s] that there's discrimination in terms of housing, in terms of education, in terms of even churches." Ex. E4, *Paulette-Thurman Dep.*, at 63:8-13.

296.    Dr. Rodden acknowledges that discriminatory redlining and zoning and restrictive housing covenants continue to be an issue in the socioeconomic life of St. Louis County. Ex. C5, *Rodden Dep.*, at 41:16 – 43:5.

297.    According to Plaintiffs' expert Dr. Gordon, "in St. Louis and its suburbs, . . . a long history of discrimination and segregation effectively 'lived on' in the form of the black-white wealth gap." Ex. B3, *Gordon Rep.*, at 21.

298.    African Americans are highly segregated in FFSD in terms of their economic, social, and political exclusion. Ex. B8, *Gordon Rebuttal*, at 3-4.

299.    Current Board member Paulette-Thurman observed that churches are highly segregated in FFSD and that "Sunday is probably the most segregated day of the week." Ex. E4, *Paulette-*

*Thurman Dep.*, 63:15-16.

300.   The ongoing socioeconomic effects of past discrimination hinder the ability of African-Americans voters in FFSD to participate in the political process. Ex. C5, *Rodden Dep.*, at 71:15 – 72:5.

301.   Depressed socioeconomic wellbeing increases voting "costs" and dampens political participation among African Americans. Ex. B4, *Kimball Rep.*, at 11-12.

302.   The District's expert agrees that socioeconomic disparities "feed directly into turnout" and registration behavior because "people who live in conditions of poverty are less likely to take the effort to become registered and go through the hoops that one needs to go through to get registered." Ex. C5, *Rodden Dep.*, at 71:15 – 72:5.

303.   According to Plaintiff Hudson, the voters in the African-American community "are marginalized because they have historically faced barriers to voting, and may not have the resources to volunteer or donate to school board campaigns." Ex. A5, *Hudson Decl.*, at ¶ 17.

304.   According to Plaintiff Johnson, "white candidates have access to structured campaign resources and funds that [African-American candidates] lack." Ex. A6, *Johnson Decl.*, at ¶ 15. For example, Larry Thomas and LaWanda Wallace, two African-American Board candidates in 2014, were unable to attend candidate forums due to the lack of private transportation. Ex. E4, *Paulette-Thurman Dep.*, at 46:2-4 (Wallace), 48:22 – 49:9 (L. Thomas). Wallace was also inexperienced and did not have enough money to support a campaign. Ex. E10, *Green Dep.*, at 40:24 – 41:6.

   B.   *Lack of responsiveness (Senate Factor 8)*

305.   Many of the current Board members are completely unaware of the particularized needs and concerns of the FFSD African-American community or believe that no such needs or

concerns exist. Ex. E2, *Ebert Dep.*, at 107:3 – 108:3; Ex. E3, *Brown Dep.*, at 49:24 – 50:4; Ex. E6, *Hogshead Dep.*, at 73:17 – 74:15; Ex. E8, *Chabot Dep.*, at 86:14 – 87:9; Ex. E1, *Morris Dep.*, at 97:2-20.

306.    Current Board member Paulette-Thurman, however, recognized that there was a "difference in resources for North Side schools as opposed to South Side schools" in the District and identified this as a particularized need of the African-American community. Ex. E4, *Paulette-Thurman Dep.*, at 26:15 – 27:1.

307.    Most Board members are unaware of the disparate use of school discipline against Black students in the District. Ex. E2, *Ebert Dep.*, at 107:3 – 108:3; Ex. E3, *Brown Dep.*, at 49:24 – 50:4; Ex. E6, *Hogshead Dep.*, at 77:24 – 78:7; Ex. E8, *Chabot Dep.*, at 86:14 – 87:9; Ex. E1, *Morris Dep.*, at 97:2-20.

308.    Most Board members are unaware of the full extent of continuing racial socioeconomic disparities in the District, Ex. E3, *Brown Dep.*, at 47:17 – 48:4, or that they exist at all, Ex. E2, *Ebert Dep.*, at 108:9 – 109:2; Ex. E6, *Hogshead Dep.*, at 73:22 – 74:23; Ex. E8, *Chabot Dep.*, at 78:18 – 80:15; Ex. E1, *Morris Dep.*, at 97:21 – 98:11; Ex. E5.

309.    Several Board members do not know that public schools were segregated in the District, in St. Louis County, and in the State. Ex. E2, *Ebert Dep.*, at 105:21-23; Ex. E6, *Hogshead Dep.*, at 71:7-9; Ex. E8, *Chabot Dep.*, at 77:18-21.

310.    Some Board members do not know that historic discrimination existed in St. Louis County or in the State. Ex. E2, *Ebert Dep.*, at 105:21 – 106:17; Ex. E8, *Chabot Dep.*, at 77:12 – 80:15.

311.    Despite the recent reports on racial bias in policing, *see supra* ¶ 181, several Board members are unaware of racial profiling by law enforcement. Ex. E2, *Ebert Dep.*, at 109:3-9;

Ex. E3, *Brown Dep.*, at 48:5-9; Ex. E1, *Morris Dep.*, at 98:12-15.

312. Most Board members are generally aware of the racial achievement gap in the District and a few are aware that this achievement gap is likely a particularized concern of the African-American community. Ex. E1, *Morris Dep.*, at 104:22 – 105:8; Ex. E2, *Ebert Dep.*, at 112:8-19; Ex. E3, *Brown Dep.*, at 52:13-21; Ex. E6, *Hogshead Dep.*, at 76:21 – 77:1; Ex. E8, *Chabot Dep.*, at 87:15-22; Ex. E4, *Paulette-Thurman Dep.*, at 26:11 – 27:1; Ex. E7, *Schroeder Dep.*, at 34:12-19.

313. A few Board members were unable to point to a Board policy designed to specifically address either the racial achievement gap or racial disparities in the use of school discipline. Ex. E3, *Brown Dep.*, at 52:22 – 53:25; Ex. E8, *Chabot Dep.*, at 88:22 – 89:24; Ex. E7, *Schroeder Dep.*, at 42:9 – 43:8.

314. Board members have claimed that the achievement gap and disciplinary disparities stem from parenting or "parental involvement" or other factors in the community or home life, such as "family structure," transience, poverty, homelessness, and parents' own academic abilities. Ex. A7, *Pruitt Decl.*, at ¶ 15; Ex. A4, *Henson Decl.*, at ¶ 11; Ex. E8, *Chabot Dep.*, at 87:15 – 88:13; Ex. E1, *Morris Dep.*, at 110:13-24, 111:18 – 113:7; Ex. E3, *Brown Dep.*, at 50:25 – 51:17, 53:6-19; Ex. E6, *Hogshead Dep.*, at 77:2-21.

315. As evidence of bias and stereotyping, the *Investigation of the Ferguson Police Department* report cites the fact that "[c]ity officials have frequently asserted that harsh and disparate results of Ferguson's law enforcement system do not indicate problems with the police practices, but instead reflect a pervasive lack of 'personal responsibility' among 'certain segments' of the community." Ex. G9, *Investigation of the Ferguson Police Department*, at 5.

316.    Dr. McCoy was the District's first African-American Superintendent. Ex. A3, *Graham Decl.*, at ¶ 18; Ex. A4, *Henson Decl.*, at ¶ 15.

317.    The Board voted to hire Dr. McCoy as the District's Superintendent in December 2010. Ex. A3, *Graham Decl.*, at ¶ 18. For three years prior, Dr. McCoy served as an Assistant Superintendent for the District. Ex. E7, *Schroeder Dep.*, at 49:21-24; Ex. E6, *Hogshead Dep.*, at 88:19 – 89:1.

318.    Dr. McCoy began his tenure as Superintendent on July 1, 2011. Ex. E7, *Schroeder Dep.*, at 49:18-20.

319.    Dr. McCoy is highly respected within the African-American community, whose members view him as a very successful and effective superintendent. Ex. A1, *Bailey Decl.*, at ¶¶ 12-13; Ex. A5, *Hudson Decl.*, at ¶ 8; Ex. A4, *Henson Decl.*, at ¶ 15; Ex. A3, *Graham Decl.*, at ¶ 18; Ex. E4, *Paulette-Thurman Dep.*, at 82:1-3.

320.    Dr. McCoy's success as a superintendent was publicly recognized. Ex. A4, *Henson Decl.*, at ¶¶ 15-16; Ex. A3, *Graham Decl.*, at ¶ 18; Ex. F12, *Sept. 11, 2013 Board Meeting Mins. (Ex. 14 to Dep. of Brian Scott Ebert, June 16, 2015)*, at 3; Ex. F13, *Nov. 12, 2013 Board Letter to FFSD Families (Ex. 9 to Dep. of Paul Morris, June 15, 2015)*; Ex. G20, *Dec. 11, 2013 Board Letter to FFSD Families*.

321.    On November 6, 2013, the Board voted to suspend Dr. McCoy with pay. Ex. E2, *Ebert Dep.*, at 132:6-25; Ex. F14, *Nov. 6, 2013 Board Sess. Mins. (Ex. 19 to Dep. of Brian Scott Ebert, June 16, 2015)*, at 2-3.

322.    At the time, all members of the Board were white. *Supra ¶¶* 227, 138, 144; Ex. A7, *Pruitt Decl.*, at ¶ 19; Ex. A3, *Graham Decl.*, at ¶ 15.

323.    On November 7, 2013, the Board sent a letter to FFSD families announcing that it had

suspended Dr. McCoy. The announcement stated that the "decision reflects differences in focus and philosophy between the Board and superintendent and is not an indication of wrongdoing." Ex. F15, *Nov. 7, 2013 Board Letter to FFSD Families (Ex. 8 to Dep. of Paul Morris, June 15, 2015)*.

324. In the African-American community, there was widespread opposition to the decision to suspend Dr. McCoy. Ex. A7, *Pruitt Decl.*, at *¶* 22; Ex. A1, *Bailey Decl.*, at ¶ 13; Ex. A5, *Hudson Decl.*, at ¶¶ 14-15; Ex. A3, *Graham Decl.*, at ¶¶ 18-19; Ex. A4, *Henson Decl.*, at ¶ 17; Ex. A6, *Johnson Decl.*, at ¶ 17; Ex. E4, *Paulette-Thurman Dep.*, at 37:18 – 38:9, 81:17-21; Ex. E5, *Graves Dep.*, at 64:6-9.

325. Some community members publically expressed concern that the Board's decision was racially motivated. Ex. E1, *Morris Dep.*, at 136:12-17, 137:3-8, 138:13-24; Ex. E2, *Ebert Dep.*, at 137:2-9; Ex. E6, *Hogshead Dep.*, at 93:14 – 94:5.

326. FFSD students sent the Board written concerns regarding the suspension of Dr. McCoy and sought his reinstatement. Ex. E1, *Morris Dep.*, at 138:3-12.

327. On November 12, 2013, the Board sent another letter to FFSD families in which it acknowledged "the concerns expressed by some members of the community that this move [to suspend Dr. McCoy] was in any way racially motivated." Ex. F13, *Nov. 12, 2013 Board Letter to FFSD Families*.

328. The next day, on November 13, 2013, the Board held a meeting attended by over 1,000 parents, community leaders, and other District residents. Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. E4, *Paulette-Thurman Dep.*, at 82:4 – 83:6; Ex. E3, *Brown Dep.*, at 67:17-22; Ex. E7, *Schroeder Dep.*, at 53:6-16; Ex. H1, *Nov. 13, 2013 Board Meeting Mins*; Ex. H2(A), *Nov. 13, 2013 Board Meeting* (video), https://www.youtube.com/watch?v=zmWqO20tbsw.

329.    At the November 13, 2013 meeting, over 50 individuals voiced their support for Dr. McCoy, expressed concerns about the suspension, particularly the lack of transparency in the process that led up to the suspension and the possibility that it had been racially motivated, and sought an explanation for Dr. McCoy's suspension. Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. A3, *Graham Decl.*, at ¶ 19; Ex. E1, *Morris Dep.*, at 137:19 − 138:19; Ex. E4, *Paulette-Thurman Dep.*, 82:8-21; Ex. E6, *Hogshead Dep.*, at 93:14 − 94:21; Ex. E3, *Brown Dep.*, at 66:22 − 68:5; Ex. E8, *Chabot Dep.*, at 96:14-18, 98:10-13; Ex. E7, *Schroeder Dep.*, at 53:24 − 54:6; Ex. H1, *Nov. 13, 2013 Board Meeting Mins.*; Ex. H2(A), *Nov. 13, 2013 Board Meeting* (video), https://www.youtube.com/watch?v=zmWqO20tbsw.

330.    The meeting lasted close to four hours. Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. E6, *Hogshead Dep.*, at 92:19 − 93:1; Ex. H2(A), *Nov. 13, 2013 Board Meeting* (video), https://www.youtube.com/watch?v=zmWqO20tbsw.

331.    During the meeting, current Board member Chabot read a statement in which he claimed that he had "trust issues" with respect to Dr. McCoy. Ex. E8, *Chabot Dep.*, at 97:12 − 98:9; Ex. H2(A), *Nov. 13, 2013 Board Meeting* (video), https://www.youtube.com/watch?v=zmWqO20tbsw; Ex. A5, *Hudson Decl.*, at ¶ 14.

332.    None of the other Board members made a statement or responded or otherwise addressed the concerns expressed. Ex. E1, *Morris Dep.*, at 138:20-24; Ex. E6, *Hogshead Dep.*, at 95:3-10; Ex. E4, *Paulette-Thurman Dep.*, at 83:3-6; Ex. E3, *Brown Dep.*, at 67:3-11; Ex. E7, *Schroeder Dep.*, at 54:14-20; Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. A3, *Graham Decl.*, at ¶ 19; Ex. A4, *Henson Decl.*, at ¶ 17.

333.    In the weeks following the November 13, 2013 meeting, Board members did not provide any explanation for their decision to suspend Dr.McCoy, citing only "personnel" reasons. Ex.

E1, *Morris Dep.*, at 57:3-16; 138:25 – 139:15; Ex. E3, *Brown Dep.*, at 68:6-18; Ex. E8, *Chabot Dep.*, at 98:14-24.

334.    The MO NAACP was not contacted by the Board following the suspension of Dr. McCoy. Ex. A7, *Pruitt Decl.*, at ¶ 22.

335.    Over 150 parents and other community members appeared before the Board again on December 11, 2013. Several of these individuals asked the Board for an explanation for its treatment of Dr. McCoy and a response to their impression that it was racially motivated. Ex. A5, *Hudson Decl.*, at ¶ 15; Ex. A3, *Graham Decl.*, at ¶ 19.

336.    Board members did not provide any explanation for their actions. Ex. A5, *Hudson Decl.*, at ¶ 15; Ex. A3, *Graham Decl.*, at ¶ 19; Ex. H3, *Dec. 11, 2013 Board Regular Meeting Mins.*, at 3, 5.

337.    On December 11, 2013, the Board voted in a closed meeting to issue charges for termination for cause against Dr. McCoy. Ex. E7, *Schroeder Dep.*, at 55:17-23; Ex. H4, *Dec. 11, 2013 Board Closed Meeting Mins.*

338.    On December 19, 2013, the Board sent a letter to FFSD "Families, Staff and Community" announcing that it had issued a notice of charges for termination for cause against Dr. McCoy. The letter did not include any explanation for the decision to issue a notice of charges. Ex. G20, *Dec. 19, 2013 Board Letter to FFSD Families, Staff and Community*; Ex. A4, *Henson Decl.*, at ¶ 17.

339.    The Board chose to close and to keep closed their meetings and records related to Dr. McCoy's suspension. Ex. F14, *Nov. 6, 2013 Board Minutes*; Ex. H4, *Dec. 11, 2013 Board Closed Meeting Mins.*; Ex. F16, *Feb. 20, 2014 Board Meeting Mins. (Ex. 31 to Dep. of Paul Schroeder, July 2, 2015).*

340.     One Board member voted against closing the February 20, 2014 Board meeting, during which the Board addressed and voted on a motion to change the status of Dr. McCoy from paid leave to non-paid administrative leave. Ex. E7, *Schroeder Dep.*, at 73:14 – 75:24; Ex. F16, *Feb. 20, 2014 Board Meeting Mins*.

341.     Dr. McCoy resigned as Superintendent in March 2014. Ex. H5, *Mar. 12, 2014 Board Meeting Mins.*; Ex. A3, *Graham Decl.*, at ¶ 18; Ex. B5, *Rodden Rep.*, at ¶ 39; Ex. B7, *Engstrom Rebuttal*, at ¶ 15.

342.     Members of the African-American community believe the decision to suspend Dr. McCoy was racially-based. Ex. A6, *Johnson Decl.*, at ¶ 17; Ex. A4, *Henson Decl.*, ¶¶ 15-17.

343.     Plaintiffs and other members of the African-American community understood the Board's refusal to justify its actions to be an example of the Board's unresponsiveness to their particularized needs. Ex. A7, *Pruitt Decl.*, at ¶ 23; Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. A1, *Bailey Decl.*, at ¶¶ 13-14; Ex. A6, *Johnson Decl.*, at ¶ 17; Ex. A4, *Henson Decl.*, at ¶ 15; Ex. A3, *Graham Decl.*, at ¶¶ 18-19.

344.     Plaintiff Hudson "felt as though, when [he] was airing [his] grievances to School Board members about the dismissal of the previous superintendent, [his] voice was ignored." Ex. A5, *Hudson Decl.*, at ¶ 16.

345.     Disaffection with the Board's decision to suspend Dr. McCoy and the Board's overall non-responsiveness to the FFSD African-American community prompted a reform slate to challenge the Board in the 2014 election. Only one member of the slate was successful due, as discussed above, to white bloc voting. Ex. E4, *Paulette-Thurman Dep.*, at 37:18 – 38:16, 39:8-21; Ex. E8, *Chabot Dep.*, at 55:16-21, 57:23 – 58:8; Ex. B5, *Rodden Rep.*, at ¶ 50

346.     Some members of the African-American community do not know if the decision even

now to maintain secrecy is an effort to shield the Board from scrutiny and accountability. Ex. A3, *Graham Decl.*, at ¶ 19; Ex. A4, *Henson Decl.*, at ¶ 17; Ex. A6, *Johnson Decl.* at ¶ 17.

347.    Current Board member Graves included in her campaign platform her position that "[t]he school board must operate in a way that represents the collective interests and the needs of the community," noting that she felt that there were times in the past "where people weren't being heard." Since being on the Board, she has observed the Board's failure to provide the necessary "dialogue going back and forth" between the Board and community members who have expressed "a valid concern." Ex. E5, *Graves Dep.*, at 29:23 – 30:14, 31:3-7, 31:17 – 32:10.

## III. Factors Related to Campaigns and Electoral Structure (Factors 3, 4, 6, and 9)

### A.  *Access to candidate slating (Senate Factor 4)*

348.    The FFNEA is the local affiliate of the Missouri National Education Association ("MNEA"). The organization endorses candidates for the Board. *See* Ex. B4, *Kimball Rep.*, at 7-8; Ex. E10, *Green Dep.*, at 16:12-22, 20:12 – 21:3.

349.    The FFNEA provides a variety of benefits to the endorsed candidates, including: mailing and distributing flyers, paying for signs, initiating robo-calls or phone banking, giving monetary campaign contributions, access to volunteers, canvassing, and working the polls election day to pass out campaign information to voters. Ex. E1, *Morris Dep.*, at 29:23 – 30:1, 30:21 – 31:11; Ex. E2, *Ebert Dep.*, at 37:19 – 39:3, 52:6-14; Ex. E4, *Paulette-Thurman Dep.*, at 43:14 – 44:23; Ex. E3, *Brown Dep.*, at 21:1-6, 22:16 – 23:3, 23:17-21, 30:10-19; Ex. E6, *Hogshead Dep.*, at 24:2-17, 25:17 – 27:6; Ex. E8, *Chabot Dep.*, at 21:16-18, 23:15 – 25:8; Ex. F17, *MNEA 2011 Committee Expenditures for Chabot (Ex.29 to Dep. of Robert Chabot, July 2, 2015)*; Ex. F18, *MNEA 2014 Committee Expenditures for Chabot (Ex. 30 to Dep. of Robert Chabot, July 2, 2015)*; Ex. E10, *Green Dep.*, at 22:10-11, 31:25 – 32:11.

350. Current Board member Paul Morris was the Political Action Committee Chair for the MNEA for fifteen years. In that role, he was active in the endorsement process for the FFNEA for many years. Ex. E1, *Morris Dep.*, at 12:2 – 13:11, 75:17 – 76:13.

351. Morris has described FFNEA-endorsed candidates as a "slate." Ex. E1, *Morris Dep.*, at 12:2 – 13:11, 75:17 – 76:13.

352. The FFNEA promotes all endorsed candidates for an election jointly, sending mailers and making robo-calls to voters that include all FFNEA-endorsed candidates. Ex. E2, *Ebert Dep.*, at 6312 – 65:13, Ex. F19, *2014 FFNEA Flyer (Ex. 13 to Dep. of Brian Scott Ebert, June 16, 2015)*; Ex. E10, *Green Dep.*, at 32:21-24; Ex. E6, *Hogshead Dep.*, at 28:10-14.

353. In selecting which candidates to endorse, the FFNEA sends a letter to all candidates who have filed for the Board election inviting them to seek FFNEA endorsement. Interested candidates are given a questionnaire with questions that will be asked during an interview before the endorsement committee, which they can fill out ahead of time. Ex. E10, *Green Dep.*, at 23:16 – 24:3; Ex. E1, *Morris Dep.*, at 16:12-24; Ex. E8, *Chabot Dep.*, at 22:16-24; Ex. E4, *Paulette-Thurman Dep.*, at 41:8 – 42:16; Ex. E6, *Hogshead Dep.*, at 29:3-17; Ex. E5, *Graves Dep.*, at 35:19 – 36:1; Ex. E7, *Schroeder Dep.*, at 20:19-23.

354. Candidates are notified shortly after their interviews whether they have received FFNEA endorsement, but are not given reasons for the decision. Ex. E4, *Paulette-Thurman Dep.*, at 42:17-24; Ex. E5, *Graves Dep.*, at 35:25 – 36:1; Ex. E7, *Schroeder Dep.*, at 23:24 – 24:5; Ex. A6, *Johnson Decl.*, at ¶ 14; Ex. A3, *Graham Decl.*, at ¶ 9.

355. There are no published criteria for endorsement, and candidates are unaware of how the FFNEA decides whom to endorse. Ex. E1, *Morris Dep.*, at 18:4-9; Ex. E2, *Ebert Dep.*, at 31:14-16; Ex. E3, *Brown Dep.*, at 30:6-9; Ex. E6, *Hogshead Dep.*, at 29:18-20; Ex. E4,

*Paulette-Thurman Dep.*, at 42:22-24; Ex. E5, *Graves Dep.*, at 36:8-10; Ex. E8, *Chabot Dep.*, at 23:3-5; Ex. E7, *Schroeder Dep.*, at 21:1-7; Ex. A6, *Johnson Decl.*, at ¶ 14; Ex. A4, *Henson Decl.*, at ¶ 10; Ex. A3, *Graham Decl.*, at ¶ 11.

356.    Former FFNEA president Green stated that the major criterion was being "teacher-friendly." Ex. E10, *Green Dep*., at 26:24 – 27:10. Board member and former MNEA Political Action Committee Chair Morris stated that the MNEA Political Action Committee would help get "educational friendly candidates" election. Ex. E1, *Morris Dep.*, at 13:1-4.

357.    The FFNEA has endorsed more white candidates than Black candidates. Of the seven current Board members and the most recent outgoing Board member, all sought FFNEA endorsement. All current white Board members received FFNEA endorsement. Ex. E1, *Morris Dep.*, at 26:23 – 27:1, 44:23 – 45:7; Ex. E2, *Ebert Dep.*, at 36:11-15, 50:13 – 51:11, 61:25 – 62:9; Ex. E3, *Brown Dep.*, at 28:6-15; Ex. E6, *Hogshead Dep.*, at  24:2-20 ; Ex. E8, *Chabot Dep.*, at 21:12 – 23:14, 46:4-11. Neither of the two Black Board members received FFNEA endorsement, Ex. E5, *Graves Dep.*, at 69:4-25; Ex. E4, *Paulette-Thurman Dep.*, at 40:14 – 43:23.

358.    Former Board member Schroeder was endorsed by the FFNEA in 2006 and 2009, but not in 2012. Ex. E7, *Schroeder Dep.*, at 20:5-18, 23:4 – 24:1.

359.    African-American former Board candidates Plaintiff Johnson, Graham, and Henson also sought but did not receive FFNEA endorsement. Ex. E9, *Deposition of F. Willis Johnson*, Aug. 26, 2015, at 46:12-17; Ex. A6, *Johnson Decl.*, at ¶ 14; Ex. A4, *Henson Decl.*, at ¶ 8, Ex. A3, *Graham Decl.*, at ¶¶ 9-10.

360.    Since 2004, similar numbers of African-American and white candidates have run in each contested election. In the six elections for which FFNEA endorsement information was

available, there were 19 white candidates and 15 Black candidates. Ex. B9, *Kimball Rebuttal*, at 7.

361.    Eleven of the 14 candidates endorsed by the FFNEA were white, all of whom won election to the Board. Ex. B9, *Kimball Rebuttal*, at 7.

362.    Put differently, "11 of 19 white candidates (58 percent) received an NEA endorsement while only 3 of 15 African-American candidates (20 percent) received an NEA endorsement." Ex. B9, *Kimball Rebuttal*, at 7.

363.    Former FFNEA president Green states that it is important to have a racially diverse school board and a diverse endorsement committee because "[w]e represent everyone." Ex. E10, *Green Dep.*, at 51:6-8, 73:13 – 74:6. Whether endorsement committee diversity is a priority "[d]epends on the chair." Ex. E10, *Green Dep.*, at 76:23 – 77:3.

364.    Green is the only African-American man on the FFNEA endorsement committee. Ex. E10, *Green Dep.*, at 77:16-20.

365.    Former FFNEA president Green stated that the FFNEA would likely not endorse a candidate who did not acknowledge the particularized needs and concerns of FFSD's African American community. Ex. E10, *Green Dep.*, at 66:19-22.

366.    The FFNEA endorsed Ebert and Chabot, both of whom testified that they are unaware of historic discrimination, historic school segregation, or disparities in discipline. *Supra* ¶¶ 307, 309-10.

367.    The FFNEA endorsed Hogshead, who testified that she is unaware of historic school segregation, present-day socioeconomic disparities, or disparities in discipline. *Supra* ¶¶ 307-09.

368.    The North County Labor Club is a local affiliate of the AFL-CIO labor council's

Committee on Political Education. The organization also endorses candidates for the Board. *See* Ex. B4, *Kimball Rep.*, at 8; Ex. E1, *Morris Dep.*, at 19:1-9.

369.   Current Board member Paul Morris, who participates in the decision of whom to endorse as a member of the North County Labor Club, has understood North County Labor Club-endorsed candidates could be a part of a "slate." Ex. E1, *Morris Dep.*, at 72:17-19, 75:17-20.

370.   The North County Labor Club promotes all endorsed candidates for an election jointly, sending mailers to voters that include all North County Labor Club-endorsed candidates. Ex. E8, *Chabot Dep.*, at 52:8-13.

371.   The North County Labor Club endorsement comes with a variety of benefits, including lists of members and other unions from which to solicit monetary donations and volunteers, financial contributions, mailings, and notice of the endorsement in the *Labor Tribune*. Ex. E1, *Morris Dep.*, at 29:23-30:1; Ex. E2, *Ebert Dep.*, at 32:20-34:12; Ex. E3, *Brown Dep.*, at 31:8-17; Ex. E6, *Hogshead Dep.*, at 24:18-20; Ex. E8, *Chabot Dep.*, at 51:9-19, 52:14-22; Ex. G18, *Kimball Sources for North County Labor Club Endorsements*.

372.   The endorsement correlates well with success: since 2004, the North County Labor Club has endorsed 13 candidates for Board elections. Only two of the endorsed candidates lost; 11 of the 13 endorsees won. Ex. B4, *Kimball Rep.*, at 8.

373.   Candidates are unaware of endorsement criteria employed by North County Labor Club. Ex. E3, *Brown Dep.*, at 32:13-15; Ex. E8, *Chabot Dep.*, at 46:18-21; Ex. E7, *Schroeder Dep.*, at 68:2-8.

374.   The North County Cllub's pattern of endorsements reveals racial disparities. The five current white Board members sought and received North County Labor Club endorsement. Ex. E2, *Ebert Dep.*, at 30:11-17, 52:21-25, 61:25 – 62:7; Ex. E3, *Brown Dep.*,

at 20:9 – 21:6, 28:6-18; Ex. E6, *Hogshead Dep.*, at 23:12 – 24:20, 27:7 – 28:3; Ex. E8, *Chabot Dep.*, at 46:4-17; Ex. E1, *Morris Dep.*, at 25:18 – 27:1, 72:9-21. Neither of the two Black Board members sought or received an endorsement from the North County Labor Club. Ex. E5, *Graves Dep.*, at 37:5-7; Ex. E4, *Paulette-Thurman Dep.*, at 45:3-11.

375. The most recent outgoing Board member, Schroeder, who is white, also received the endorsement from North County Labor Club in the one year that he sought it. Ex. E7, *Schroeder Dep.*, at 67:2-7 (endorsed in 2009, the only time he sought the endorsement).

376. Since 2004, the North County Labor Club endorsed 13 candidates for the Board, 12 of whom are white. Ex. B4, *Kimball Report*, at 8.

B. *Subtle racial appeals (Senate Factor 6)*

377. Plaintiffs and other members of the African-American community have witnessed subtle racial appeals in Board elections, including the 2013 election and the highly polarized 2014 election. Ex. B5, *Rodden Rep.*, at ¶ 50; Ex. A7, *Pruitt Decl.*, at ¶¶ 16-17; Ex. A4, *Henson Decl.*, at ¶¶ 11-13, Ex. A5, *Hudson Decl.*, at ¶¶ 8-10; Ex. A6, *Johnson Decl.*, at ¶¶ 12-13; Ex. A3, *Graham Decl.*, at ¶ 16; Ex. E10, *Green Dep.*, at 41:18-22.

378. Current Board member Morris stated that race was made a part of the 2014 election because "[t]here was a slate of African American candidates" who did not "think that there was enough African American candidates on the Board." Ex. E1, *Morris Dep.*, at 46:22 – 47:17.

379. Disciplinary problems, classroom disruptions, and safety in the schools were issues raised during the 2014 Board election campaigns. Ex. A7, *Pruitt Decl.*, at ¶ 17; Ex. A5, *Hudson Decl.*, at ¶ 10.

380. Current Board member Morris, one of the two successful white candidates in 2014,

agreed that the enforcement of discipline was a priority in his campaign. Ex. E1, *Morris Dep.*, at 33:15-20, 126:10-14.

381.    During the April 3, 2014 Board candidate forum, he characterized his vision for FFSD as "[c]reating environments where [students] can . . . feel safe, that they can learn, and they can do it without disruption . . . a school district where discipline is not an issue." Ex. H2(B), *Apr. 3, 2014 Candidate Forum* (video), https://www.youtube.com/watch?v=ewuStFb5uBc, at 19:26.

382.    Current Board member Chabot stated that one focus of his campaign was "discipline" because students and District employees have a right to "feel safe" and be in an environment that is "conducive" to both learning and teaching. Ex. E8, *Chabot Dep.*, at 32:20-24, 41:17 – 42:6; Ex. H1, *Nov. 13, 2013 Board Meeting Mins.*, at 2.

383.    Plaintiffs and other members of the African-American community understand references to "discipline," which is disproportionately levied against Black students, to be well-recognized subtle racial appeals. Ex. A5, *Hudson Decl.*, at ¶ 10; Ex. A4, *Henson Decl.*, at ¶ 11; Ex. A7, *Pruitt Decl.*, at ¶¶ 15-16; Ex. A2, *Erby Decl.*, at ¶ 7.

384.    The transfer of predominantly Black students to FFSD from neighboring unaccredited school districts was another issue raised during 2014 Board election campaigns. Ex. A7, *Pruitt Decl.*, at ¶¶ 17, 23; Ex. A6, *Johnson Decl.*, at ¶ 12; Ex. A5, *Hudson Decl.*, at ¶ 10.

385.    The transfer program was championed by Dr. McCoy. Ex. A7, *Pruitt Decl.*, at ¶¶ 17, 23; Ex. A6, *Johnson Decl.*, at ¶ 12; Ex. A5, *Hudson Decl.*, at ¶ 10.

386.    The student-transfer issue is racially-charged in Missouri and in the District. Ex. A7, *Pruitt Decl.*, at ¶ 19; Ex. A5, *Hudson Decl.*, at ¶ 13; Ex. A6, *Johnson Decl.*, at ¶ 12.

387.    Board candidates in 2014 made statements suggesting that they opposed the transfer

program during their campaigns. Ex. A5, *Hudson Decl.*, at ¶ 10; Ex. A6, *Johnson Decl.*, at ¶ 12; Ex. A7, *Pruitt Decl.*, at ¶ 23; Ex. E9, *Johnson Dep.*, at 50:23 − 51:17, 52:12 − 54:8.

388. During the March 6, 2014 Board candidate forum, current Board member Chabot stated that "student transfer is a punitive law that's destroyed school districts. It's going to be kind of a rippling effect across the State of Missouri." Ex. H2(C), *Mar. 6, 2014 Candidate Forum* (video), https://www.youtube.com/watch?v=c6ZR_sNW66o, at 1:12:20.

389. During the March 6, 2014 Board candidate forum, current Board member Morris noted that the "money issue that follows transfers students is . . . a huge issue." He stated that he opposed a bill that would have limited what transfer students pay to 70% of the tuition cost. Ex. H2(C), *Mar. 6, 2014 Candidate Forum* (video), https://www.youtube.com/watch?v=c6ZR_sNW66o, at 1:10:40.

390. Plaintiffs and other African-American voters in the District understood candidates' statements highlighting concerns with the transfer program to be an attempt to "appeal[] to the clear fear of voters of a growing African American student body in the District." Ex. A7, *Pruitt Decl.*, at ¶ 23; *see* Ex. A5, *Hudson Decl.*, at ¶ 13; Ex. A6, *Johnson Decl.*, at ¶ 12.

391. Many African Americans also viewed candidates' opposition to the transfer program and the District's treatment of transfer students "as an attempt by an all-white School Board to keep African American students out of some largely white schools." Ex. A7, *Pruitt Decl.*, at ¶ 19.

392. During his 2014 campaign, Plaintiff Johnson faced allegations implying that he was an absentee father and accusations that he was too supportive of the school-transfer issue and a renter, not a homeowner. Ex. A6, *Johnson Decl.*, at ¶ 12.

393. At least one white candidate had previously been accused of embezzling funds from the

District. Ex. A6, *Johnson Decl.*, at ¶ 13; Ex. E1, *Morris Dep.*, at 139:16 – 141:21. None of the other candidates used campaign language or materials that raised the issue of that candidate's departure from his prior position. Ex. A6, *Johnson Decl.*, at ¶ 13.

394.    Plaintiff Johnson understood these attacks on him, particularly in comparison to how other candidates were treated, as racially-charged campaign tactics. Ex. A6, *Johnson Decl.*, at ¶¶ 12-13.

395.    As in 2014, white Board candidates during the 2013 election frequently discussed the issue of school discipline. Ex. A4, *Henson Decl.*, at ¶ 11

396.    In debates, Board members failed to recognize the known biases towards disciplining Black students and particularly Black male students. Ex. A4, *Henson Decl.*, at ¶ 11.

397.    Candidates also tied the racial achievement gap to "bad parenting," primarily in African-American families. Ex. A4, *Henson Decl.*, at ¶ 11; *see* Ex. A7, *Pruitt Decl.*, at ¶¶ 15, 16.

398.    During his time on the Board, former Board member Henson made racial inclusion a priority and recognized and took a number of steps to bridge the achievement gap, and was outspoken on the lack of diversity in District hiring. Ex. A4, *Henson Decl.*, at ¶¶ 12-13; Ex. E1, *Morris Dep.*, at 52:4 – 53:1.

399.    Former Board members Henson and Graham believe that during the 2013 election campaigns, opponents exploited Henson's outspoken recognition of racial bias during his campaign and his emphasis on racial inclusion and bridging the racial achievement gap while on the Board to rally support for other candidates. Ex. A4, *Henson Decl.*, at ¶¶ 12-13; Ex. A3, *Graham Decl.*, at ¶ 16.

   C. *Discriminatory voting practices and procedures (Senate Factor 3) and Tenuous rationales for maintaining these practices and procedures (Senate Factor 9)*

400.    FFSD employs at least three voting practices that increase the opportunity for

discrimination against African-American residents: (1) an at-large voting scheme, (2) staggered terms, and (3) off-cycle election. Ex. B4, *Kimball Rep.*, at 5-7.

      1.   At-large voting scheme

401.   At-large voting schemes can "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (alteration in original) (citation and internal quotation marks omitted); Ex. C1, *Dep. of William Cooper*, Aug. 17, 2015, at 83:24 – 84:5.

402.   Research has found that racial and ethnic minorities have more difficulty electing candidates of choice in local at-large elections that in local district elections and that where there is RPV, a white majority can more effectively determine the winners of all at-large seats. Ex. B4, *Kimball Rep.*, at 6.

403.   Historically, an at-large system "tends[s] to depress turnout rates naturally in the minority population" where the minority voter realizes that she "may not be able to successfully chose a candidate of choice due to being a minority in a majority-wide school district." Ex. C1, *Cooper Dep.*, at 83:24 – 84:4.

404.   Plaintiff Hudson states that he feels that "[his] voice in the electoral process is lessened by at-large elections" because "[c]ertain neighborhoods and racial groups within the school district, particularly the African-American community, are marginalized because they have historically faced barriers to voting, and may not have the resources to volunteer or donate to school board campaigns." Ex. A5, *Hudson Decl.*, at ¶ 17.

405.   According to Plaintiff Johnson, "the current election system stifles the voice and concerns of the African American community in school board elections." Ex. A6, *Johnson Decl.*, at ¶ 18.

406. At-large voting can work in conjunction with socioeconomic racial disparities to disadvantage minority candidates who "are likely to have less access to the necessary resources for travel and advertising" outside the immediate area surrounding the candidates' homes. *Ward v. Columbus Cnty.*, 782 F. Supp. 1097, 1104 (E.D.N.C. 1991).

407. According to Plaintiff Johnson, "white candidates have access to structured campaign resources and funds that [African-American candidates] lack." Ex. A6, *Johnson Decl.*, at ¶ 15.

408. Larry Thomas and LaWanda Wallace, two African-American Board candidates in 2014, were unable to attend candidate forums due to the lack of private transportation. Ex. E4, *Paulette-Thurman Dep.*, at 45:18 – 46:4 (Wallace), 48:22 – 49:9 (L. Thomas). Wallace was also inexperienced and did not have enough money to support a campaign. Ex. E10, *Green Dep.*, at 40:24 – 41:6.

409. Former FFNEA president Green agreed that an at-large election system makes it harder for Black voters to elect candidates of their choice. Ex. E10, *Green Dep.*, at 55:15-21.

410. Board members state that an at-large election scheme ensures that Board members represent the entire District, rather than specific sub-districts. Ex. E1, *Morris Dep.*, at 149:6-12; Ex. E3, *Brown Dep.*, at 72:23 – 74:12; Ex. E4, *Paulette-Thurman Dep.*, at 61:8-25; Ex. E5, *Graves Dep.*, at 51:24 – 52:11; Ex. E6, *Hogshead Dep.*, at 101:19 – 103:17; Ex. E7, *Schroeder Dep.*, at 82:9-24.

411. Under the at-large voting scheme, there have never been more than two Black members on the Board, despite the sizeable population of African-American voters who reside in the District. *Supra* at ¶¶ 15, 19, 221.

412. Under the at-large voting scheme, there are no current Board members who reside in

municipalities other than Florissant or Ferguson. Ex. B1, *Cooper Decl.*, at Ex. E-7 (p. 92). The last Board member who lived in a municipality other than Florissant or Ferguson was Graham, who lost her Board seat in 2011. Ex. A3, *Graham Decl.*, at ¶ 1; *supra* at ¶ 119; Ex. B1, *Cooper Decl.*, at Ex. E-7 (listing current Board members' residential addresses)  Ex. A4, *Henson Decl.*, at ¶ 1 (listing Henson's residential address).

413.    African-American FFSD voter Doris Bailey, who lives in Berkeley, believes that because there are no Board members who live in her portion of the District, that the Board is "less familiar with the schools in this neighborhood and the issues facing its residents." Ex. A1, *Bailey Decl.*, at ¶ 10.

414.    Former Board member Graham agrees that "there is underrepresentation on the School Board of residents of Berkeley, [a] predominantly African American neighborhood . . . , and other neighborhoods that are nearly all African American." Ex. A3, *Graham Decl.*, at ¶ 21. Graham "support[s] holding elections through single-member districts to increase the representation of African Americans and predominantly African American neighborhoods." Ex. A3, *Graham Decl.*, at ¶ 21.

415.    Bailey states that other politicians have come into her neighborhood while campaigning, but "[n]o candidate for the School Board has ever come to [her] house and [she] do[es] not ever recall seeing any candidates campaigning in [her] neighborhood." Ex. A1, *Bailey Decl.*, at ¶ 11.

    2.    Staggered terms

416.    Staggered terms "promote the dilution of minority voting strength because they limit the number of seats, [and] create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting." *Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469, 475 (8th Cir. 1986).

417. Local governments with staggered terms tend to generate less voter participation than localities that elect all seats at once. Ex. B4, *Kimball Rep.*, at 6.

418. As part of the 1975 annexation order resulting in the present-day FFSD, the district court created staggered elections for an "initial period of stable governance for the new district." *Missouri*, 515 F.2d at 1373.

419. Some Board members believe generally that staggered terms ensure that institutional knowledge is retained after each election. These Board members have not stated any reason why the current staggered system of three-year terms is necessary to provide that continuity. Ex. E5, *Graves Dep.*, at 53:20-24; Ex. E8, *Chabot Dep.*, at 75:16-21.

### 3. Off-cycle elections

420. Off-cycle elections are "[h]istorically . . . a favored strategy of established ethnic groups in American cities who wish to keep immigrants and minorities out of power." Ex. D5, *Is Segregation the Problem in Ferguson?*, at 6; Ex. C5, *Rodden Dep.*, at 37:8 – 38:8.

421. Off-cycle elections tend to generate unusually low voter turnout generally and disproportionately low turnout among African-American voters. Ex. B4, *Kimball Rep.*, at 6; Ex. E6, *Hogshead Dep.*, at 69:15-18; Ex. E8, *Chabot Dep.*, at 76:25 – 77:2; Ex. C6, *Dep. of David Kimball*, Aug. 21, 2015, at 63:18 – 64:13.

422. Turnout among FFSD voters for April Board elections is low. Ex. B5, *Rodden Rep.*, at ¶ 21, Fig. 5, ¶ 22. Historically it is lower than the turnout for November elections. Ex. E7, *Schroeder Dep.*, 61:14-18.

423. The parties' experts agree that during the last twelve contested elections, white turnout in FFSD clearly surpassed African-American turnout in six elections (2001, 2003, 2006, 2009, 2011, and 2015). Ex. C5, *Rodden Dep.* at 84:5-13; Ex. B9, *Kimball Rebuttal*, at 6. They also agree that African-American turnout has always been lower than or statistically

indistinguishable from white turnout. Ex. C5, *Rodden Dep.* at 85:3-6; Ex. B9, *Kimball Rebuttal*, at 6.

424.    According to Plaintiff Johnson, "African American voters are understandably disillusioned with School Board elections because we have had extremely limited success electing our supported candidates to the Board and have found the members who are elected to the Board unresponsive to community needs." Ex. A6, *Johnson Decl.*, at ¶ 15. Plaintiff Hudson agrees, stating that "[t]he school board's lack of concern for the African American community only exacerbates the low turnout and common sentiment that African Americans are excluded from the school district decision-making process." Ex. A5, *Hudson Decl.*, at ¶ 17.

425.    According to the District's expert Dr. Rodden, off-cycle elections increase the relative influence of "well-organized interest groups[] such as unionized teachers and municipal workers," which are motivated to maintain the status quo. Ex. D5, *Is Segregation the Problem in Ferguson?*, at 6; Ex. C5, *Rodden Dep.*, at 34:14 – 38:20. He acknowledges that he has no basis for believing that teachers' unions in FFSD do not likewise benefit from off-cycle elections. Ex. C5, *Rodden Dep.*, at 36:12 – 37:7.

426.    In FFSD, the FFNEA and the North County Labor Club are two such "well-organized interest groups." *See* Ex. B4, *Kimball Rep.*, at 8; *supra* at ¶¶ 348, 368. Both organizations generally endorse white candidates. *Supra* at ¶¶ 357, 374.

427.    Board members either did not know the reason for maintaining off-cycle elections, Ex. E2, *Ebert Dep.*, at 103:3-6, Ex. E3, *Brown Dep.*, at 45:18-22; Ex. E4, *Paulette-Thurman Dep.*, at 62:5-8, or claimed that holding Board elections off-cycle ensures that they are not overshadowed by statewide or national races or gives Board members an opportunity to

provide input in the following school year, Ex. E5, *Graves Dep.*, at 54:18 – 55:3; Ex. E6, *Hogshead Dep.*, a 69:3-14; Ex. E8, *Chabot Dep.*, at 76:6 – 77:11; Ex. E7, *Schroeder Dep.*, at 61:5-13.

428.    A few Board members stated that they were unconcerned by the fact that off-cycle elections have lower turnout, claiming that if a voter really cares then he or she will vote regardless of when the election is held. Ex. E6, *Hogshead Dep.*, at 69:15-24; Ex. E8, *Chabot Dep.*, at 76:25 – 77:11.

429.    Some Board members do not believe it makes a difference if Board elections are held in April or November. Ex. E3, *Brown Dep.*, at 45:23 – 46:2; Ex. E4, *Paulette-Thurman Dep.*, at 62:9-11.

Dated this 30th day of September, 2015.      Respectfully submitted,
/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235
*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, Julie A. Ebenstein, hereby certify that on September 30, 2015, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

Respectfully Submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

* appearing pursuant to Local Rule 12.01(F)

ATTORNEY FOR PLAINTIFFS