**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF MISSOURI**

MISSOURI STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, REDDITT HUDSON,
F. WILLIS JOHNSON and
DORIS BAILEY,

              Plaintiffs,

v.

FERGUSON-FLORISSANT SCHOOL
DISTRICT and ST. LOUIS COUNTY
BOARD OF ELECTIONS
COMMISSIONERS,
              Defendants.

Case No. 4:14 CV 2077 RWS

**DEFENDANT FFSD'S RESPONSE TO PLAINTIFFS' STATEMENT OF**
**UNCONTROVERTED MATERIAL FACTS**

Pursuant to E.D. Mo. L.R. 4.01(E), the following are the uncontroverted material facts supporting Plaintiffs' Motion for Summary Judgment.

## BACKGROUND

1. Plaintiffs Doris Bailey, Redditt Hudson, F. Willis Johnson, and the Missouri State Conference of the National Association for the Advancement of Colored People filed this lawsuit on December 18, 2014 against Defendants the Ferguson-Florissant School District ("FFSD" or "the District") and the St. Louis County Board of Elections Commissioners ("St. Louis BOEC"). Doc. No. 1, *Complaint*.

**RESPONSE:**

Undisputed.

## I. Parties

2. Plaintiff Doris Bailey is a U.S. citizen; registered, regular voter; and an African-American resident of FFSD. Ex. A1, *Decl. of Doris Bailey*, Sept. 16, 2015, at ¶¶ 1-3, 6-7.[1] She resides in Berkeley, Missouri, an area of FFSD that could constitute a single-member district in which African Americans are a majority of the voting age population, and where African Americans could elect their preferred candidates if the elections were not held at-large. Doc. No. 1, *Compl.*, at ¶ 5; Ex. A1, *Bailey Decl.*, at ¶ 3; *see* Ex. B1, *Expert Decl. of William S. Cooper*, May 27, 2015, at Ex. E (illustrative plan 1), Ex. F (illustrative plan 2).

**RESPONSE:**

Object to the legal conclusion that Plaintiff Bailey lives in an area of FFSD that could constitute a single-member district in which African Americans are a majority of the voting age population,

---

[1] Exhibits to this Statement of Uncontroverted Material Facts are designated according to categories: A – declarations; B – expert reports; C – expert depositions; D – exhibits from expert depositions; E – other (non-expert) depositions; F – exhibits from other (non-expert) depositions; G – miscellaneous; and H – documents produced in discovery.

and where African Americans could elect their preferred candidates if the elections were not held at-large. Rather, Plaintiffs' expert's research finds that at-large voting schemes favor the largest group of voters, which in the FFSD, is the African American population. Ex. L, *Engstrom Dep.,* at 100:18 – 101:22.

3. Plaintiff Redditt Hudson is a U.S. citizen; registered, regular voter; and an African-American resident of FFSD. Ex. A5, *Decl. of Redditt Hudson*, Sept. 18, 2015, at ¶¶ 1-3, 5; Doc. No. 1, *Compl.* He is the father of two children who attend school in FFSD. Ex. A5, *Hudson Decl.*, at ¶ 4. He resides in an area of FFSD that could constitute a single-member district in which African Americans are a majority of the voting age population, and where African Americans could elect their preferred candidates if the elections were not held at-large. Doc. No. 1, *Compl.*, at ¶ 5; Ex. B1, *Cooper Decl.*, at Ex. F (illustrative plan 2).

**RESPONSE:**

Object that Plaintiff Hudson resides in an area of FFSD that could constitute a single-member district in which African Americans are a majority of the voting age population, and where African Americans could elect their preferred candidates if the elections were not held at-large. Rather, Plaintiffs' expert's research finds that at-large voting schemes favor the largest group of voters, which in FFSD, is the African American population. Ex. L, *Engstrom Dep.,* at 100:18 – 101:22.

4. Plaintiff F. Willis Johnson is a U.S. citizen; registered, regular voter; and an African-American resident of FFSD. Ex. A6, *Decl. of F. Willis Johnson*, Sept. 29, 2015, at ¶¶ 1-3, 9. He resides in Ferguson, Missouri, an area of FFSD that could constitute a single-member district in which African Americans are a majority of the voting age population, and where African Americans could elect their preferred candidates if the elections were not held at-

large. Doc. No. 1, *Compl.*, at ¶ 5; Ex. A6, *Johnson Decl.*, at ¶ 1; *see* Ex. B1, *Cooper Decl.*, at Ex. E (illustrative plan 1), Ex. F (illustrative plan 2). He is currently the pastor of Wellspring Community Church in Ferguson, Missouri. Ex. A6, *Johnson Decl.*, at ¶ 4.

**RESPONSE:**

Object that Plaintiff Johnson resides in an area of FFSD that could constitute a single-member district in which African Americans are a majority of the voting age population, and where African Americans could elect their preferred candidates if the elections were not held at-large. Rather, Plaintiffs' expert's research finds that at-large voting schemes favor the largest group of voters, which in FFSD, is the African American population. Ex. L, *Engstrom Dep.,* at 100:18 – 101:22.

5. Plaintiff the Missouri State Conference of the National Association for the Advancement of Colored People ("MO NAACP") is a state affiliate of the NAACP, the nation's oldest and largest civil rights organization, whose mission is to ensure the political, educational, social, and economic equality of rights of all persons, to eliminate hatred and racial discrimination, and to remove all barriers of racial discrimination through democratic processes. Ex. A7, *Decl. of Adolphus M. Pruitt, II*, Sept. 15, 2015, at ¶¶ 2-3.

**RESPONSE:**

Undisputed.

6. Plaintiff MO NAACP is active in efforts to increase voter registration, education, and turnout, and emphasizes the importance of local elections, including local school board elections. Ex. A7, *Pruitt Decl.*, at ¶¶ 10-14; *see* Ex. A5, *Hudson Decl.*, at ¶ 6.

**RESPONSE:**

Undisputed.

7. The membership of the MO NAACP includes African Americans who reside, work, and raise families in the District. Ex. A7, *Pruitt Decl.*, at ¶ 4.

**RESPONSE:**

Objection. Defendant FFSD requested a membership list of the MO NAACP, but Plaintiffs refused to produce said list. Rather, Plaintiff attempts to provide vague information by declaration, failing to provide the requested proof, thereof. Ex. ZZ, *Plaintiff MO NAACP's Responses to Defendant FFSD's 1ˢᵗ Set of Requests for Production, Response #8.*

8. Among these members are individuals, including Plaintiff Hudson, who reside in areas of the District that could constitute single-member districts in which African Americans are a majority of the voting age population, and where African Americans could elect their preferred candidates if the elections were not held at-large. Ex. A7, *Pruitt Decl.*, at ¶ 4; Ex. A5, *Hudson Decl.*, at ¶ 1; *see* Ex. B1, *Cooper Decl.*, at Ex. F (illustrative plan 2).

**RESPONSE:**

Objection. Plaintiffs' expert's research finds that at-large voting schemes favor the largest group of voters, which in FFSD, is the African American population. Ex. L, *Engstrom Dep.,* at 100:18 – 101:22.

9. Defendant FFSD is a governmental entity that maintains an electoral system comprised of at-large elections for seven positions on the Ferguson-Florissant School Board (the "Board"). The Board is responsible for the governance and administration of FFSD, a political subdivision of the State of Missouri within the meaning of Article 4, Section 12, of the Missouri Constitution. Doc. No. 1, *Compl.*, at ¶ 6; Doc. No. 46, *FFSD Am. Answer*, at ¶ 6.

**RESPONSE:**

Undisputed.

10. Defendant St. Louis BOEC is the governmental entity charged with conducting elections in St. Louis County. It is responsible for conducting elections for positions on the Board in FFSD. Doc. No. 1, *Compl.*, at ¶ 7; Doc. No. 8, *St. Louis BOEC Answer*, at ¶ 2.

**RESPONSE:**

Undisputed.

11. FFSD is located in northern St. Louis County, Missouri. Ex. B1, *Cooper Decl.*, at ¶ 12. The District was created by a 1975 desegregation order, which required the then-Ferguson-Florissant School District to annex the primarily African-American neighboring school districts of Kinloch and Berkeley. *See United States v. Missouri*, 515 F.2d 1365, 1369-73 (8th Cir. 1975); Ex. B5, *Expert Report of Jonathan Rodden*, May 27, 2015, at ¶ 8.

**RESPONSE:**

Undisputed.

12. As part of the annexation, the order directed that two seats on the then-six-member Ferguson-Florissant School Board be declared vacant and replaced by designees of the annexed school boards. The four remaining members were to draw lots to determine the length of their individual terms in office to create staggered elections for an "initial period of stable governance for the new district." Doc. No. 1, *Compl.*, at ¶ 14 (quoting *Missouri*, 515 F.2d at 1373); Doc. No. 46, *FFSD Am. Answer*, at ¶ 14.

**RESPONSE:**

Undisputed.

13. The District covers all or part of eleven municipalities: Berkeley, Calverton Park, Cool Valley, and Kinloch in their entirety, and parts of Black Jack (one block), Ferguson, Florissant, Dellwood, Hazelwood, Normandy, and Old Jamestown. Ex. B1, *Cooper Decl.*, at

¶ 32 Fig. 6. Its headquarters are in Florissant. Doc. No. 1, *Compl.*, at ¶ 6; Doc. No. 46, *FFSD Am. Answer*, at ¶ 6.

**RESPONSE:**

Undisputed.

14. Based on data provided to the U.S. Department of Education for the 2011 survey year, the District public schools serves 13,234 students from preschool through 12th grade, of which 77.1% are Black and 15.6% are white. Ex. F1, *FFSD Data Reported to Office of Civil Rights (Ex. 17 to Dep. of Brian Scott Ebert, June 16, 2015)*, at 4; Ex. F2, *FFSD Data on Office of Civil Rights Website (Ex. 5 to Dep. of Paul Thomas Morris, June 15, 2015)*, at 1.

**RESPONSE:**

Undisputed.

15. According to the 2010 Decennial Census, the District has a total population of 68,663, with a Black population of 36,967 (53.84%) and a white population of 29,581 (43.08%). Ex. B1, *Cooper Decl.*, at ¶ 21 Fig. 2. The total voting age population ("VAP") in the District is 50,771, of whom 24,466 (48.19%) are any-part Black, 24,030 (47.33%) are single-race Black, and 24,852 (48.95%) are non-Hispanic white. Ex. B1, *Cooper Decl.*, at ¶ 18, ¶ 27 Fig. 4. There are 1,324 (1.93% of the total population) Latinos in the District, of whom 824 (1.62% of the VAP) are voting-aged. Ex. B1, *Cooper Decl.*, at ¶ 20, ¶ 21 Fig. 2.

**RESPONSE:**

Undisputed.

16. In addition to the Decennial Census, the Census Bureau publishes one-, three-, and five-year estimates of population demographics estimates based on the American Community Survey ("ACS"). The ACS is a rolling sample survey based on responses from one in about 40

persons on an annual basis. Ex. B6, *Supplemental Decl. of William S. Cooper*, July 2, 2015, at ¶¶ 5-6; *See* Ex. C5, *Dep. of Jonathan Rodden*, Aug. 20, 2015, at 57:11 – 58:5.

**RESPONSE:**

Undisputed.

17. Because ACS population estimates are based on a sample, they are subject to sampling bias, *i.e.*, error margins or confidence intervals. These error margins are larger for smaller sample sizes, smaller geographic units, and individual demographic groups within geographic areas. Ex. C5, *Rodden Dep.*, at 57:11 – 58:20; Ex. B8, *Rebuttal Report of Colin Gordon*, June 30, 2015, at 1.

**RESPONSE:**

Objection. Mischaracterizes Dr. Rodden's testimony. Dr. Rodden specifically states that the Census department is clear about the conditions under which the five-year ACS might be used and that it is appropriate to do so in this case to determine voting age populations. Ex. I, *Rodden Dep.,* at 60:9 – 61:17.

18. Unlike the Decennial Census, the ACS does not report block-level data used in software for redistricting and other types of demographic analyses. Ex. C5, *Rodden Dep.*, at 58:21 – 59:14.

**RESPONSE:**

Objection. Mischaracterizes Dr. Rodden's testimony.  Dr. Rodden specifically states that the Census department is clear about the conditions under which the five-year ACS might be used and that it is appropriate to do so in this case to determine voting age populations. Ex. I, *Rodden Dep.,* at 60:9 – 61:17.

19. The 2011 – 2013 three-year ACS estimates that the FFSD single-race Black VAP is 24,313, or 48.94% of the District's VAP, the single-race white VAP (including Hispanic whites) is 23,740, or 47.24% of the District's VAP, and the non-Hispanic White VAP is 23,242, or 46.78% of the District's VAP. Ex. B6, *Cooper Suppl. Decl.*, at ¶ 7; Ex. B5, *Rodden Rep.*, at ¶ 12; Ex. B10, *Supplemental Report of Jonathan Rodden & Jowei Chen: Plaintiffs' Redistricting Proposals*, July 2, 2015, at Tbl. 1 (p. 3).

**RESPONSE:**

Undisputed however, these numbers do not include the Any Part Black VAP.

20. According to the 2011-2013 ACS, the VAP in the District is 49,679, of whom just 732 (1.47%) are not citizens. Ex. B6, *Cooper Suppl. Decl.*, at ¶ 22.

**RESPONSE:**

Undisputed.

## II. <u>Election System</u>

21. The Board is comprised of seven members who serve three-year terms and who are elected through an at-large election system. Board elections are staggered and held off-cycle so that either two or three Board seats are elected every April. Doc. No. 1, *Compl.*, at ¶¶ 6, 15, 16; Doc. No. 46, *FFSD Am. Answer*, at ¶¶ 6, 15, 16.

**RESPONSE:**

Undisputed.

22. When the number of candidates equals the number of Board seats to be filled, no election is held, and the candidates automatically assume responsibilities as members of the Board. Mo. Rev. Stat. § 115.124.

**RESPONSE:**

Undisputed.

23. As of the April 2015 election, the seven members of the Board are: Mr. Paul Morris, Mr. Robert Chabot, Mr. Brian Scott Ebert, Ms. Leslie Hogshead, Mr. Keith Brown, Dr. Donna Paulette-Thurman, and Dr. Courtney Graves. *See* Doc. No. 58-3, *Resp'ts' 2d Am. Disclosures*, at 1-2; Ex. F3, *May 13, 2015 Board Meeting Mins.* (*Ex. 24 to Dep. of Courtney Graves*, *July 1, 2015)*, at 1. Dr. Paulette-Thurman and Dr. Graves are African-American. The remaining five Board members are white. *See* Ex. B5, *Rodden Rep.*, at ¶¶ 47, 50, 54-55.

**RESPONSE:**

Undisputed.

24. Each voter has the right to cast up to two votes in a two-seat election and up to three in a three-seat election. Voters can engage in bullet, or single-shot voting: that is, they can forego casting all of the votes that they are allotted, but they cannot vote more than once for the same candidate in a single election. If every voter casts all of his or her votes in a two-seat election, *i.e.*, voters do not engage in single-shot voting, a candidate can receive at most 50% of all votes. If every voter casts all of his or her votes in a three-seat election, a candidate can receive at most 33.33% of all votes. *See* Ex. C5, *Rodden Dep.*, at 130:6 – 131:17; Ex. B5, *Rodden Rep.*, at ¶ 18; Ex. B2, *Expert Report of Richard L. Engstrom*, May 27, 2015, at ¶¶ 7, 12-13.

**RESPONSE:**

Undisputed.

25. Board seats are awarded to the candidates with the most votes, such that when two seats are contested, the top two vote recipients win the two seats, and when three seats are contested, the top three vote recipients win the three seats. Ex. B5, *Rodden Rep.*, at ¶ 18; Ex. B2, *Engstrom Rep.*, at ¶ 7.

**RESPONSE:**

Undisputed.

## GINGLES I

26. Plaintiffs' expert demographer, William S. Cooper, drew two seven-district plans in which Blacks are a majority of the VAP in four of the districts. Ex. B1, *Cooper Decl.*, at ¶¶ 38-57.

**RESPONSE:**

Undisputed, however, Mr. Cooper failed to assess whether these two seven-district plans were effective districts. He failed to consider turnout differentials between racial groups within his proposed districts. Ex. F, *Coopers Dep.,* at 84:9-24

27. In creating these illustrative plans, Plaintiffs' expert relied upon population and geographic data from the 1990 to 2010 Decennial Censuses and the ACS. Ex. B1, *Cooper Decl.*, at ¶ 38.

**RESPONSE:**

Undisputed.

28. He used a commonly accepted software package called *Maptitude for Redistricting*. *Maptitude for Redistricting* was developed by the Caliper Corporation, to process Topologically Integrated Geographic Encoding and Reference ("TIGER") and PL 94-171 files. This software is deployed by many local and state governing bodies across the country for redistricting and other types of demographic analyses. Ex. B1, *Cooper Decl.*, at ¶¶ 39-42.

**RESPONSE:**

Undisputed.

29. TIGER files contain boundaries for the various levels of Census geography. PL 94-171 files contain race and ethnicity data on the total population and VAP found in units of Census geography from the state level down to census blocks. Ex. B1, *Cooper Decl.*, at ¶ 40.

**RESPONSE:**

Undisputed.

30. A census block is the smallest geographic tabulation area from the Decennial Census. Generally, a census block is bounded on all four sides by visible features such as streets, rivers, and railroad tracks. Ex. B1, *Cooper Decl.*, at ¶¶ 42-43.

**RESPONSE:**

Undisputed.

31. To develop the illustrative plans, he obtained Geographic Information System (GIS) shapefiles from the St. Louis County GIS Department depicting current boundaries of the District as well as precincts for the District from 2011 to 2015. Where precinct boundaries did not match census blocks, he used the "whole block" criterion, which assigns all the population in a split census block to the nearest precinct boundary. Ex. B1, *Cooper Decl.*, at ¶¶ 43-46.

**RESPONSE:**

Undisputed.

32. Plaintiffs' illustrative plans use the 2010 Census total population for the apportionment base. *See Cooper Decl.*, at ¶ 40.

**RESPONSE:**

Undisputed.

33. "The population of any political subdivision of the state for the purpose of representation . . . is determined on the basis of the last previous decennial census of the United States." Mo. Rev. Stat. § 1.100(1).

**RESPONSE:**

Objection. Plaintiff totally misrepresents the meaning and purpose of the statute cited, which

reads in its totality:

> 1.100. 1. The population of any political subdivision of the state for the purpose of representation or other matters including the ascertainment of the salary of any county officer for any year or for the amount of fees he may retain or the amount he is allowed to pay for deputies and assistants is determined on the basis of the last previous decennial census of the United States. For the purposes of this section the effective date of the 1960 decennial census of the United States is July 1, 1961, and the effective date of each succeeding decennial census of the United States is July first of each tenth year after 1961; except that for the purposes of ascertaining the salary of any county officer for any year or for the amount of fees he may retain or the amount he is allowed to pay for deputies and assistants the effective date of the 1960 decennial census of the United States is January 1, 1961, and the effective date of each succeeding decennial census is January first of each tenth year after 1961.

34. The ideal district size using total population as the apportionment base is 9,809 (68,663/7).

Ex. B6, *Cooper Suppl. Decl.*, at ¶ 24.

**RESPONSE:**

Undisputed.

35. The population statistics by district for Plaintiffs' Illustrative Plan 1 are as follows:

### Plaintiffs' Illustrative Plan 1 – 2010 Census Summary

| District | Population | % Dev | % Black | 18+ Pop | % 18+ Black | % 18+ NH White |
|----------|-----------|-------|---------|---------|-------------|----------------|
| 1 | 9841 | 0.33% | 69.63% | 6918 | 63.93% | 32.68% |
| 2 | 10025 | 2.20% | 66.36% | 7071 | 60.95% | 35.75% |
| 3 | 9923 | 1.16% | 77.64% | 6984 | 74.36% | 21.12% |
| 4 | 9321 | -4.98% | 30.50% | 7406 | 27.84% | 68.09% |
| 5 | 9997 | 1.92% | 20.33% | 7790 | 17.45% | 79.11% |
| 6 | 9980 | 1.74% | 44.05% | 7442 | 38.94% | 57.58% |
| 7 | 9576 | -2.38% | 56.18% | 7160 | 52.86% | 43.25% |

Ex. B1, *Cooper Decl.*, at ¶ 51 Fig. 10.

**RESPONSE:**

Undisputed; however, Mr. Cooper failed to consider turnout differentials between racial groups,

which is required to create effective districts. Ex. F, *Coopers Dep.,* at 84:9-24

36. The four majority-Black districts range from 52.86% black voting age population (BVAP) in District 7 to 74.36% BVAP in District 3. The total deviation from ideal district size is 7.18% (calculated by adding the largest + and − deviations: 2.20% and 4.98%).

**RESPONSE:**

Undisputed; however, Mr. Cooper failed to consider turnout differentials between racial groups, which is required to create effective districts. Ex. F, *Coopers Dep.,* at 84:9-24

37. Three of the 96 precincts in the District are split by district boundaries in Plan 1 with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to five schools. Three incumbents are paired in District 2 and two in District 7. Ex. B1, *Cooper Decl.*, at ¶¶ 51-53.

**RESPONSE:**

Undisputed.

38. The population statistics by district for Plaintiffs' Illustrative Plan 2 are as follows:

### Plaintiffs' Illustrative Plan 2 – 2010 Census Summary

| District | Population | % Dev | % Black | 18+ Pop | % 18+ Black | % 18+ NH White |
|----------|-----------|-------|---------|---------|-------------|----------------|
| 1 | 10020 | 2.15% | 70.15% | 7039 | 64.53% | 32.09% |
| 2 | 9494 | -3.21% | 66.46% | 6688 | 60.89% | 35.90% |
| 3 | 9736 | -0.74% | 78.66% | 6816 | 75.67% | 19.76% |
| 4 | 9755 | -0.55% | 31.10% | 7671 | 28.12% | 68.35% |
| 5 | 10232 | 4.31% | 20.20% | 8008 | 17.42% | 78.87% |
| 6 | 9620 | -1.93% | 55.71% | 7149 | 51.50% | 45.14% |
| 7 | 9806 | -0.03% | 44.90% | 7400 | 40.86% | 54.85% |

Ex. B1, *Cooper Decl.*, at ¶ 55 Fig. 12.

**RESPONSE:**

Undisputed; however, Mr. Cooper failed to consider turnout differentials between racial groups,

which is required to create effective districts.  Ex. F, *Coopers Dep.,* at 84:9-24

39. The four majority-Black districts range from 51.50% BVAP in District 6 to 75.67% BVAP in District 3. The total deviation from ideal district size is 7.52% (calculated by adding 4.31% and 3.21%).

**RESPONSE:**

Undisputed; however, Mr. Cooper failed to consider turnout differentials between racial groups, which is required to create effective districts.  Ex. F, *Coopers Dep.,* at 84:9-24

40. Nine of the 96 precincts in the School District are split by district boundaries in Plan 2 with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to four schools. Two incumbents who reside in the same Census block in District 2 are paired, but no other incumbents are paired. Ex. B1, *Cooper Decl.*, at ¶¶ 55-57.

**RESPONSE:**

Undisputed.

41. For each of Plaintiffs' illustrative plans, all parts (*i.e.*, census blocks) of each component election district are connected at some point with the rest of the district. Ex. B1, *Cooper Decl.*, at ¶ 60.

**RESPONSE:**

Undisputed.

42. The "compactness" of a district can be measured using the Reock test. "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always

between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan." Ex. B1, *Cooper Decl.*, at ¶ 58 n.11 (quoting *Maptitude For Redistricting* documentation).

**RESPONSE:**

Undisputed; however, Mr. Cooper failed to consider turnout differentials between racial groups, which is required to create effective districts. Ex. F, *Cooper Dep.,* at 84:9-24

43. The overall mean average Reock compactness score for Plaintiffs' Illustrative Plan 1 is .41, ranging from a low of .26 in District 4 to a high of .66 in District 6. The overall mean average Reock compactness score for Plaintiffs' Illustrative Plan 2 is .38, ranging from a low of .29 in District 3 to a high of .46 in District 2. Ex. B1, *Cooper Decl.*, at ¶ 58. Of the 221 municipal wards in St. Louis County the mean average Reock score is .39, ranging from a low of .15 to a high of .66. Ex. B1, *Cooper Decl.*, at ¶ 59.

**RESPONSE:**

Undisputed; however, Mr. Cooper failed to consider turnout differentials between racial groups, which is required to create effective districts. Ex. F, *Cooper Dep.,* at 84:9-24

**GINGLES II AND GINGLES III**

44. From 2000 through 2015, there have been twelve contested Board elections. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8, at ¶ 72.

**RESPONSE**:

Undisputed.

45. By statute, where the number of candidates who have filed for a Board election equals the number of seats to be elected, no election is held, and the candidates automatically assume Board member responsibilities. Mo. Rev. Stat. § 115.124(1). From 2000 through 2015, there

were four such non-elections (2005, 2007, 2008, 2010). Ex. B5, *Rodden Rep.*, at ¶ 71.

**RESPONSE**:

Undisputed.

46. For each of the past twelve contested elections, the District's expert, Dr. Jonathan Rodden, used Gary King's Ecological Inference ("EI") procedure to estimate the level of support for each candidate among Black and white voters. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8.

**RESPONSE**:

Undisputed.

47. Plaintiffs' expert, Dr. Richard Engstrom, also performed an EI analysis for the 2011 through 2015 Board elections. Ex. B2, *Engstrom Report*, at ¶¶ 15-39, Tbl. 1 (pp. 17-19); Ex. B7, *Rebuttal Report of Richard L. Engstrom*, July 2, 2015, at Tbls. 1-5 (pp. 10-13). Dr. Rodden would describe Dr. Engstrom as one of the nation's leading scholar in political science on the study of racially polarized voting. Ex. C5, *Rodden Dep.*, at 25:24 – 26:4.

**RESPONSE**:

Undisputed.

48. For purposes of estimating levels of support, EI generates a specific estimate (the "point estimate") of the votes cast for each candidate by African-American voters and white voters as a percentage share of the respective groups' VAP, as well as a confidence interval for that point estimate. The confidence intervals identify the range of estimates within which we can be 95% confident, statistically, of where the actual value of a group's support for a candidate falls. Ex. B2, *Engstrom Rep.*, at ¶ 10; Ex. C5, *Rodden Dep.*, at 76:14-19. The point estimate lies at the median of the confidence interval. Ex. C5, *Rodden Dep.*, at 77:4-8.

**RESPONSE**:

Undisputed.

49. A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally-accepted standards in the field of political science, and is consistent with peer-review standards for research in that field. *See* Ex. C5, *Rodden Dep.*, at 76:20 – 77:3.

**RESPONSE**:

Undisputed.

50. EI is used widely by expert witnesses in assessing RPV in voting rights cases. It was developed subsequent to the U.S. Supreme Court's decision in *Gingles* for the explicit purpose of improving estimates of candidate preferences between or among groups of voters. Ex. B2, *Engstrom Rep.*, at ¶ 10 n.4.

**RESPONSE**:

Undisputed.

51. According to Dr. Rodden, as a "rule of thumb," when the point estimate for the level of support for one candidate lies within the confidence interval of support for another candidate, there is no statistically significant difference between the two candidates. Ex. C5, *Rodden Dep.*, at 77:19 – 78:12, 80:13-24; *see also* Ex. B5, *Rodden Rep.*, at ¶ 26.

**RESPONSE**:

Objection. Dr. Rodden testified that it would not be "analytically appropriate" to use this method to determine African American-preferred candidates. Ex. I, Rodden Depo., 164:20-21.  Dr. Rodden repeatedly "object(ed)" to this method and stated that it was "not an appropriate approach to the data." Ex. I, *Rodden Dep*. at 164:20-22.

52. Dr. Rodden concedes that when the point estimate for one candidate lies within the confidence interval of the estimate for another candidate, we cannot say with statistical certainty to a level that is generally accepted within the field of political science that one candidate received more support than the other. Ex. C5, *Rodden Dep.*, at 161:12-17. Conversely, when the point estimate for the level of support for one candidate lies outside the confidence interval of the level of support for another candidate, the rule of thumb indicates that there is a statistically significant difference in the levels of support between the two candidates. *See* Ex. C5, *Rodden Dep.*, at 168:11-18, 198:16 – 199:3.

**RESPONSE**:

Objection. Dr. Rodden testified that there is a "difficult analytical choice" in "trying to identify more than one preferred candidate" in a "multi-winner system." Ex. I, *Rodden Dep*, 162:14-21.

Dr. Rodden did not adopt the approach that Plaintiffs are attempting to impute to him.

53. Dr. Rodden admits that it may be objectionable to identify "some candidates as 'minority-preferred' if the ecological inference estimate is statistically indistinguishable from the next-ranked candidate who is rather arbitrarily treated as 'non-preferred.'" Ex. B5, *Rodden Rep.*, at ¶ 74. In such cases, "[i]t is potentially misleading to simply count up wins and losses for minority-preferred candidates." Ex. B5, *Rodden Rep.*, at ¶ 69.

**RESPONSE**:

Objection. When Dr. Rodden was asked whether a candidate is preferred by minorities only if that candidate's point estimate is outside the confidence interval of another candidate, Dr. Rodden responded, "I don't agree to the approach that's being taken. . . . I don't believe that throwing out all of the candidates in every situation, when African-Americans are incohesive in their voting behavior, is an analytically appropriate choice. I object to that approach." Ex. I at

164:16-23. Dr. Rodden testified that he was at an "impasse" with Plaintiffs on this point. Ex. I, *Rodden Depo*, 165:10-11. Dr. Rodden further testified that Plaintiffs' approach is "not an approach that would be acceptable if submitted to a peer-reviewed journal." Ex. I, *Rodden Depo*, 179:6-7. Plaintiffs' counsel even acknowledged that Dr. Rodden "disagree[d] with the substance of the decision rule" that a candidate is African American-preferred only if that candidate's point estimate lies outside the confidence interval of support for another candidate. Ex. I, *Rodden Depo*., 244:19-20.

54. Dr. Rodden and Dr. Engstrom do not materially disagree as to the various levels of support each Board candidate received among different racial groups in each election and report consistent estimates of the respective levels of support received by the candidates from Black and white voters in the past five elections. *See* Ex. B7, *Engstrom Rebuttal*, at ¶ 4, Tbls. 1-5 (pp. 10-13).

**RESPONSE**:

Undisputed.

55. For purposes of summary judgment, Plaintiffs do not dispute Dr. Rodden's estimates for the 2000 to 2010 elections.

**RESPONSE**:

Undisputed.

56. Based on the past sixteen FFSD elections, "African Americans are more likely to vote for African American candidates and whites are more likely to vote for white candidates." Ex. B11, *Supplemental Report of Jonathan Rodden: Racial Bloc Voting and Cohesion*, July 2, 2015, at ¶ 2; Ex. C5, *Rodden Dep.*, at 272:22 – 274:3; *see also* Ex. C4, *Dep. of Jowei Chen*, Aug. 19, 2015, at 54:23 – 56:3.

**RESPONSE**:

Objection. While Dr. Rodden acknowledged "African Americans are more likely to vote for African American candidates and whites are more likely to vote for white candidates." However, Dr. Rodden also testified that "[t]he correlation of that kind would be found in really any jurisdiction in the United States in which African-American candidates and white candidates are on the ballot and there are African-Americans and whites in the jurisdiction." Ex. I, *Rodden Depo.*, 273:21-25.

57. Each of the elections held since 2000 (*i.e.*, the past sixteen elections) is described briefly below. For contested elections, tables are provided that identify each candidate's name, race, total number of votes received, and level of support (the "point estimate") among Black and white voters with confidence intervals for each estimate as calculated by Dr. Rodden and, for 2011 through 2015, Dr. Engstrom, and identifies the winning candidates. Percentages reported are the percentage of <u>votes</u> received by a candidate from each group, not the percentage of <u>voters</u> supporting from each group supporting each candidate. *See* Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8; Ex. D1, *Underlying Data for Fig. 8 in Rodden Report (Ex. 10 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; Ex. D2, *Rodden's Underlying Data Reformatted (Ex. 11 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; Ex. B2, *Engstrom Rep.*, at ¶¶ 15-39, Tbl. 1 (pp. 17-19); Ex. B7, *Engstrom Rebuttal*, at Tbls. 1-5 (pp. 10-13).

**RESPONSE**:

Undisputed.

**I.   The 2000 – 2015 Board Elections**

    *A.   The 2000 Election*

58. In 2000, six candidates (incumbent Michael Hirsch and challengers Paul Charney, Gregory

Fulton, Michael Hirsch, Les Lentz, Anthony Smith, and Gwendolyn Thomas) ran for two seats. Hirsch, who is white, and G. Thomas, one of two African-American candidates, were successful. Ex. B5, *Rodden Rep.*, at ¶ 68; Ex. G1, *Official 2000 FFSD Election Results*.

**RESPONSE**:

Undisputed.

59. Dr. Engstrom did not provide EI estimates for the 2000 election.

**RESPONSE**:

Undisputed.

60. Dr. Rodden's EI estimates and confidence intervals for the 2000 election are as follows:

| The 2000 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Charney (W) 1,222 votes | 9.51% (8.18 – 11.43%) | N/A | 9.92% (8.49 – 11.61%) | N/A |
| Fulton (W) 1,490 votes | 11.59% (9.41 – 14.25%) | N/A | 11.71% (9.35 – 14.79%) | N/A |
| Hirsch (W)* (incumbent) 4,406 votes | 18.71% (12.75 – 26.27%) | N/A | 34.13% (28.23 – 40.79%) | N/A |
| Lentz (W) 1,939 votes | 9.39% (7.28 – 12.40%) | N/A | 15.92% (13.19 – 18.47%) | N/A |
| Smith (B) 1,554 votes | 16.81% (14.50 – 19.95%) | N/A | 9.43% (7.77 – 11.17%) | N/A |
| G. Thomas (B)* 3,413 votes | 33.99% (25.70 – 43.21%) | N/A | 18.89% (14.26 – 23.56%) | N/A |

* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶ 68; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G1, *Official FFSD Election Results, Apr. 4, 2000*, available at http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0400/fergus1.htm.

**RESPONSE**:

Undisputed.

61. Dr. Rodden estimated that G. Thomas and Hirsch were the candidates who received the highest and second-highest levels of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8, ¶ 68; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 132:17 – 133:1.

**RESPONSE**:

Undisputed.

62. G. Thomas was the top-ranked candidate among Black voters. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 185:16-23. The difference between G. Thomas and Hirsch in terms of support among Black voters is statistically significant. Ex. C5, *Rodden Dep.*, at 185:24 – 186:3. According to Dr. Rodden's estimates, G. Thomas received almost double the level of support from Black voters as compared to Hirsch. Ex. C5, *Rodden Dep.*, at 173:11 – 174:18. Dr. Rodden agreed that G. Thomas received "substantially" more support than Hirsch among Black voters. Ex. C5, *Rodden Dep.*, at 174:19-21.

**RESPONSE**:

Undisputed.

63. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden, the levels of support among Black voters received by Hirsch and another candidate, Smith, are not different to a statistically significant degree. Ex. D2, *Rodden's Underlying Data Reformatted*. It is therefore impossible to know which candidate received more support among Black voters. Ex. C5, *Rodden Dep.*, at 186:4-13.

**RESPONSE**:

Objection. Dr. Rodden disagreed with Plaintiffs' analysis that neither Hirsch nor Smith can be considered the second African American-preferred candidate. Dr. Rodden objected to this analysis repeatedly in his deposition. Ex. I, *Rodden Depo.*, 164:14-23, 165:10-11, 179:6-7, 244:19-20, 273:21-25.

### 2. White Voters in the 2000 Election

64. Dr. Rodden estimated that Hirsch and G. Thomas were the candidates who received the highest and second-highest levels of support among white voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8; Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

65. Hirsch was the top-ranked candidate among white voters. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 187:1-3. According to Dr. Rodden's estimates, the difference between Hirsch and G. Thomas in terms of support among white voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*. According to Dr. Rodden's estimates, Hirsch received almost double the level of support from white voters as compared to G. Thomas. Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

66. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among white voters. As estimated by Dr. Rodden, the difference in the levels of support among white voters received by G. Thomas and by another candidate, Lentz, is not statistically significant. Ex. D2, *Rodden's Underlying Data*

*Reformatted*; Ex. C5, *Rodden Dep.*, at 187:4-9. It is therefore impossible to know which candidate received more support among white voters. Ex. C5, *Rodden Dep.*, at 187:4-9, 188:3-10.

**RESPONSE**:

Objection. Dr. Rodden disagreed with Plaintiffs' analysis that neither Hirsch nor Smith can be considered the second white-preferred candidate. Dr. Rodden objected to this analysis repeatedly in his deposition. Ex. I, *Rodden Depo*, 164:14-23, 165:10-11, 179:6-7, 244:19-20, 273:21-25.

##### B. *The 2001 Election*

67. In 2001, four candidates (incumbents Jeanne Garofalo and Leslie Hogshead and two challengers, Felicia Butler and Les Lentz) ran for two seats. Ms. Garofalo and Ms. Hogshead who are both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 67.

**RESPONSE**:

Undisputed.

68. Dr. Engstrom did not provide EI estimates for the 2001 election.

**RESPONSE**:

Undisputed.

69. Dr. Rodden's EI estimates and confidence intervals for the 2001 election are as follows:

| The 2001 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Butler (B) 2,374 votes | 40.54% (24.45 – 62.09%) | N/A | 16.15% (10.98 – 20.08%) | N/A |

| | | | | |
|---|---|---|---|---|
| Garofalo (W)* 3,680 votes | 24.67% (17.32 – 35.97%) | N/A | 35.06% (29.02 – 40.83%) | N/A |
| Hogshead (W)* (incumbent) 3,229 votes | 19.73% (14.71 – 24.89%) | N/A | 32.21% (25.65 – 38.82%) | N/A |
| Lentz (W) 1,716 votes | 15.05% (12.69 – 18.32%) | N/A | 16.59% (13.79 – 19.53%) | N/A |

\* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶¶ 64, 67; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G2, *Official FFSD Election Results, Apr. 3, 2001*, *available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0401/fergus1.htm.

**RESPONSE**:

Undisputed.

     1. <u>Black Voters in the 2001 Election</u>

70. Dr. Rodden estimated that Butler and Garofalo were the candidates who received the highest and second-highest levels of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8, ¶ 67; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 188:20 – 189:2.

**RESPONSE**:

Undisputed.

71. Butler was a top choice among Black voters for one of the two available seats. The difference between Butler and Hogshead, who received the third-highest level of support among Black voters, is statistically significant. Ex. C5, *Rodden Dep.*, 190:17 – 191:2, 192:1-5, 192:23 – 193:2; Ex. D2, *Rodden's Underlying Data Reformatted*. According to Dr. Rodden's estimates, Butler's level of support among Black voters was approximately 15 percentage points higher than that received by Garofalo, who received less than two-thirds the estimated level of support received by Butler among Black voters. Ex. C5, *Rodden Dep.*, at 193:922; Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

72. Butler was not elected to one of the two available seats on the Board in 2001. Ex. B5, *Rodden Rep.*, at ¶ 67.

**RESPONSE**:

Undisputed.

73. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden, the difference in the levels of support among Black voters received by Garofalo and by Hogshead, the candidates with the second- and third-highest point estimates, is not statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 193:3-8. It is therefore impossible to know which candidate received more support among Black voters. Ex. C5, *Rodden Dep.*, at 192:23 – 193:8.

**RESPONSE**:

Objection. Dr. Rodden disagreed with Plaintiffs' analysis that neither Garofalo nor Hogshead can be considered the second African American-preferred candidate.  Dr. Rodden objected to this analysis repeatedly in his deposition.  Ex. I, *Rodden Dep*., 164:14-23, 165:10-11, 179:6-7, 244:19-20, 273:21-25.

2. <u>White Voters in the 2001 Election</u>

74. Garofalo and Hogshead were the two top choices among white voters. Dr. Rodden estimated that they received the two highest levels of support among white voters, Ex. C5, *Rodden Dep.*, at 193:23 – 194:5; Ex. D2, *Rodden's Underlying Data Reformatted*, and the difference in terms of support among white voters between them and the candidate with the next highest

estimated level of white support, Lentz, is statistically significant, Ex. C5, *Rodden Dep.*, at 194:6-15; Ex. D2, *Rodden's Underlying Data Reformatted*. According to Dr. Rodden's estimates, the levels of support among white voters received by Garofalo and Hogshead were each approximately double that received by Lentz and Butler. Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

### C. *The 2002 Election*

75. In 2002, six candidates (incumbent Doris Graham and challengers Brian Fletcher, James Clark, Nancy Knorr, Felicia Butler and Lawrence Morie), ran for three seats. Ex. G3, *Official 2002 FFSD Election Results*.

**RESPONSE**:

Undisputed.

76. Graham, an African-American, and Fletcher and Clark, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 66.

**RESPONSE**:

Undisputed.

77. Dr. Engstrom did not provide EI estimates for the 2002 election.

**RESPONSE**:

Undisputed.

78. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2002 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Butler (B) 2,610 votes | 25.07% (18.33 – 31.89%) | N/A | 11.43% (9.20 – 13.49%) | N/A |
| Clark (W)* (incumbent) 3,093 votes | 12.56% (9.66 – 17.17%) | N/A | 17.83% (15.32 – 20.24%) | N/A |
| Fletcher (W)* 3,378 votes | 10.14% (7.82 – 13.21%) | N/A | 22.00% (17.54 – 26.28%) | N/A |
| Graham (B)* (incumbent) 3,388 votes | 31.86% (21.63 – 43.77%) | N/A | 13.84% (11.01 – 16.40%) | N/A |
| Knorr (W) (incumbent) 3,026 votes | 11.25% (8.49 – 14.69%) | N/A | 18.03% (15.63 – 20.71%) | N/A |
| Morie (W) 2,522 votes | 9.12% (7.06 – 12.09%) | N/A | 16.87% (13.07 – 20.69%) | N/A |

* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶ 66; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G3, *Official FFSD Election Results, Apr. 2, 2002, available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0402/fergus1.htm.

**RESPONSE**:

Undisputed.

    1. <u>Black Voters in the 2002 Election</u>

79. Dr. Rodden estimated that Graham, Butler, and Clark had the highest, second-highest, and third-highest levels of support among Black voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 196:25 – 197:16.

**RESPONSE**:

Undisputed.

80. Graham and Butler were the two top choices among Black voters. Their respective estimated levels of support among Black voters are both higher to a statistically significant degree than the estimated level of support for Clark, the third-highest ranked candidate among Black voters. Ex. C5, *Rodden Dep.*, at 198:16 – 199:3; Ex. D2, *Rodden's Underlying Data Reformatted.*

**RESPONSE**:

Undisputed.

81. According to Dr. Rodden's estimates, Graham and Butler each received approximately double the estimated level of support among Black voters as compared to Clark. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 196:25 – 197:16.

**RESPONSE**:

Undisputed.

82. Butler was not elected to one of the two available seats on the Board in 2002. Ex. B5, *Rodden Rep.*, at ¶ 66; Ex. C5, *Rodden Dep.*, at 199:18-20.

**RESPONSE**:

Undisputed.

83. It is impossible to know to a degree of statistical significance which candidate received the third-highest level of support among Black voters. As estimated by Dr. Rodden, the differences in the estimated levels of support from Black voters received by four candidates (Clark, Morie, Fletcher, and Knorr) are not statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 199:6-17. It is therefore impossible to know which of these candidates received more support among Black voters. Ex. C5, *Rodden Dep.*, at 199:6-17.

**RESPONSE**:

Objection. Dr. Rodden disagreed with Plaintiffs' analysis that none of these candidates can be considered the third African American-preferred candidate. Dr. Rodden objected to this analysis repeatedly in his deposition. Ex. I, *Rodden Depo.*, 164:14-23, 165:10-11, 179:6-7, 244:19-20, 273:21-25.

2. White Voters in the 2002 Election

84. Dr. Rodden estimated that Fletcher, Knorr, and Clark were the candidates who received the highest, second-highest, and third-highest estimated levels of support among white voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

85. Fletcher was a top choice among white voters for one of the three available seats. Fletcher's estimated level of white support is higher to a statistically significant degree than the estimated level of white support for the candidate with the fourth-highest level of support, Morie. Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

86. It is impossible to know to a degree of statistical significance which candidate received the second- or third-highest level of white support. As estimated by Dr. Rodden, neither the estimated level of white support enjoyed by Knorr nor the estimated level of white support enjoyed by Clark is different to a degree of statistical significance from the estimated level of white support received by Morie. Ex. D2, *Rodden's Underlying Data Reformatted*. It is

therefore impossible to know which two of these three candidates received higher levels of white support.

**RESPONSE**:

Objection. Dr. Rodden disagreed with Plaintiffs' analysis that neither Knorr nor Clark can be considered the second or third white-preferred candidate. Dr. Rodden objected to this analysis repeatedly in his deposition. Ex. I, *Rodden Depo.*, 164:14-23, 165:10-11, 179:6-7, 244:19-20, 273:21-25

    *D. <u>The 2003 Election</u>*

87. In 2003, three candidates (incumbent Gwendolyn Thomas and challengers, Knorr and Les Lentz) ran for two seats. Thomas and Knorr, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 65.

**RESPONSE**:

Undisputed.

88. Dr. Engstrom did not provide EI estimates for the 2003 election.

**RESPONSE**:

Undisputed.

89. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2003 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Knorr (W)* 3,584 votes | 30.19% (11.65 – 50.40%) | N/A | 52.09% (41.03 – 62.07%) | N/A |
| Lentz (W) 1,995 votes | 15.85% (11.58 – 21.04%) | N/A | 28.42% (23.55 – 32.69%) | N/A |
| Thomas (B)* 2,102 votes | 53.96% (21.93% – 84.52%) | N/A | 19.48% (12.73 – 26.66%) | N/A |

* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶ 65; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G4, *Official FFSD Election Results, Apr. 8, 2003*, *available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0403/fergflorschool.html.

**RESPONSE**:

Undisputed.

     1. <u>Black Voters in the 2003 Election</u>

90. Dr. Rodden estimated that G. Thomas, who is African-American and Knorr were the candidates who received the highest and second-highest level of support among Black voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 200:17 – 201:7.

**RESPONSE**:

Undisputed.

91. G. Thomas was a top choice among Black voters for one of the two available seats. According to Dr. Rodden's estimates, Thomas's estimated level of Black support is higher to a statistically significant degree than the estimated level of Black support for the candidate with the third-highest estimated level of support, Lentz. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 202:21 – 203:11.

**RESPONSE**:

Undisputed.

92. According to Dr. Rodden's estimates, G. Thomas's estimated level of support among Black voters is approximately 23 percentage points higher than that estimated for Knorr. Ex. D2, *Rodden's Underlying Data Reformatted*. Knorr received less than two-thirds the estimated level of support received by G. Thomas among Black voters. Ex. D2, *Rodden's Underlying Data Reformatted*. Dr. Rodden agreed that Thomas received "substantially more support than

Knorr amongst black voters." Ex. C5, *Rodden Dep.*, at 201:4-15.

**RESPONSE**:

Undisputed.

93. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden, the difference in the estimated levels of Black support received by Knorr and by Lentz is not statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*. It is therefore impossible to know which candidate received more support among Black voters. Ex. C5, *Rodden Dep.*, at 201:16-20, 203:12-15.

**RESPONSE**:

Objection. Dr. Rodden disagreed with Plaintiffs' analysis that neither Knorr nor Lentz can be considered the second African American-preferred candidate. Dr. Rodden objected to this analysis repeatedly in his deposition. Ex. I, *Rodden Depo.*, 164:14-23, 165:10-11, 179:6-7, 244:19-20, 273:21-25.

### 2. White Voters in the 2003 Election

94. Dr. Rodden estimated that Knorr and Lentz were the candidates who received the highest and second-highest levels of support among white voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 203:19 – 204:7.

**RESPONSE**:

Undisputed.

95. Knorr was the top choice candidate among white voters. According to Dr. Rodden's estimates, the difference between Knorr and Lentz in terms of estimated support among white voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 203:23 – 204:1. According to Dr. Rodden's estimates, Knorr's estimated

level of support among white voters is also almost 24 percentage points higher than that estimated for Lentz, and Lentz received less than two-thirds the estimated level of support received by Knorr. Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

### E. *The 2004 Election*

96. In 2004, five candidates (incumbents Garofalo and Hogshead and three African-American challengers, Tommie Van, Ingrid McClendon, and Pernell Witherspoon) ran for two seats. Garofalo and Hogshead, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 64.

**RESPONSE**:

Undisputed.

97. Dr. Engstrom did not provide EI estimates for the 2004 election.

**RESPONSE**:

Undisputed.

98. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2004 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Garofalo (W)* (incumbent) 3,232 votes | 14.55% (12.31 – 17.23%) | N/A | 39.31% (35.00 – 44.34%) | N/A |
| Hogshead (W)* (incumbent) 2,400 votes | 13.14% (11.24 – 15.88%) | N/A | 30.80% (26.38 – 35.09%) | N/A |
| McClendon (B) 1,302 votes | 28.29% (17.65 – 38.45%) | N/A | 9.50% (7.51 – 11.66%) | N/A |
| Van (B) 1,571 votes | 28.71% (18.75 – 40.91%) | N/A | 11.73% (9.64 – 14.22%) | N/A |
| Witherspoon (B) | 15.31% | N/A | 8.66% | N/A |

| 676 votes | (12.98 – 17.91%) | | (7.87 – 9.44%) | |

\* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶ 64; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G5, *Official FFSD Election Results, Apr. 6, 2004*, *available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0404/fergflorschool.html.

**RESPONSE**:

Undisputed.

1. Black Voters in the 2004 Election

99. McClendon and Van, both African-American, were the two top choices among Black voters. Dr. Rodden estimated that they received the highest and second-highest level of support among Black voters, respectively, and the difference between them and other candidates in terms of estimated support among Black voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 204:15-24. Dr. Rodden estimated that all other candidates received less than two-thirds of the estimated level of support among Black voters received by Van and McClendon. Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

100. Neither Van nor McClendon was elected to one of the two available seats on the Board in 2004. Ex. B5, *Rodden Rep.*, at ¶ 64.

**RESPONSE**:

Undisputed.

2. White Voters in the 2004 Election

101. Garofalo and Hogshead were the two top choices among white voters. Dr. Rodden estimated that they received the two highest levels of support among white voters, and the

difference between them and other candidates in terms of estimated support among white voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 205:9-18. According to Dr. Rodden's estimates, Garofalo and Hogshead each received more than double the estimated level of white support received by Van. Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

### F. The 2005 Election

102.    In 2005, no Board election was held. Incumbents Clark and Graham, along with Les Lentz, were the only candidates for the three available seats, and assumed their responsibilities on the Board. Ex. B5, *Rodden Rep.*, at ¶¶ 62, 71. Graham is African-American. Ex. A3, *Graham Decl.*, at ¶ 6; Ex. B5, *Rodden Rep.*, at ¶ 62. Clark and Lentz are both white. Ex. B5, *Rodden Rep.*, at ¶¶ 62, 67.

**RESPONSE**:

Undisputed.

### G. The 2006 Election

103.    In 2006, five candidates (incumbents G. Thomas and Knorr and three challengers, Paul Schroeder, John Knowles, and Pat Washington) ran for two seats. Schroeder and Knowles, both white, won. Ex. B5, *Rodden Rep.*, at ¶ 63.

**RESPONSE**:

Undisputed.

104.    Dr. Engstrom did not provide EI estimates for the 2006 election.

**RESPONSE**:

Undisputed.

105.    Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2006 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Knorr (W) (incumbent) 1,303 votes | 17.29% (15.10 – 20.21%) | N/A | 15.95% (13.65 – 18.50%) | N/A |
| Knowles (W)* 1,959 votes | 15.11% (12.43 – 18.21%) | N/A | 27.03% (21.31 – 32.26%) | N/A |
| Schroeder (W)* 2,954 votes | 14.27% (11.66 – 17.91%) | | 37.96% (32.39 – 43.12%) | |
| G. Thomas (B) (incumbent) 1,122 votes | 28.21% (23.29 – 33.38%) | N/A | 9.83% (8.88 – 10.80%) | N/A |
| Washington (B) 944 votes | 25.11% (19.44 – 30.91%) | | 9.23% (8.26 – 10.22%) | |

\* Indicates winner
Ex. B5, *Rodden Rep.*, at ¶ 63; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G6, *Official FFSD Election Results, Apr. 4, 2006*, *available at*
http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0406/fergflorschool.html.

**RESPONSE**:

Undisputed.

1.    Black Voters in the 2006 Election

106.    G. Thomas and Washington, both African-American, were the two top choices among Black voters. Dr. Rodden estimated that they received the highest levels of support among Black voters, Ex. B5, *Rodden Rep.*, at ¶ 63; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 206:1-9, and the difference in terms of estimated support among Black voters between them and the candidate with the third-highest estimated level of Black support, Knorr, is statistically significant, Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 206:10-24.

**RESPONSE**:

Undisputed.

107.    Neither G. Thomas nor Washington was elected to either of the two available seats on the Board in 2006. Ex. B5, *Rodden Rep.*, at ¶ 63.

**RESPONSE**:

Undisputed.

    2.    White Voters in the 2006 Election

108.    Schroeder and Knowles were the two top choices among white voters. Dr. Rodden estimated that they received the highest levels of support among white voters, Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 207:8-14, and the difference in terms of estimated support among white voters between them and the candidate with the third-highest estimated level of white support, Knorr, is statistically significant, Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 207:15-22. According to Dr. Rodden's estimates, the estimated level of support among white voters received by Knorr is also less than two-thirds the estimated levels of white support received by Schroeder and Knowles. Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

    *H.    The 2007 Election*

109.    In 2007, no Board election was held. Hogshead, an elected incumbent, and Charles Henson, an incumbent who had been appointed to the Board after the resignation of Jeanne Garofalo in January 2007, were the only candidates for the two available seats, and assumed their responsibilities on the Board. Ex. B5, *Rodden Rep.*, at ¶¶ 25, 60, 71; Ex. A4, *Decl. of Charles Henson*, at ¶ 7; Ex. E6, *Dep. of Leslie Hogshead*, July 1, 2015, at 100:12-25.

Hogshead is white. Ex. B5, *Rodden Rep.*, at ¶ 54. Henson is African-American. Ex. B5, *Rodden Rep.*, at ¶ 54.

**RESPONSE**:

Undisputed.

*I.    The 2008 Election*

110.    In 2008, no Board election was held. Incumbents Clark, Graham, and Lentz were the only candidates for the three available seats, and resumed their responsibilities on the Board. Ex. B5, *Rodden Rep.*, at ¶¶ 25, 71. Clark and Lentz are both white. Ex. B5, *Rodden Rep.*, at ¶¶ 62, 67. Graham is African-American. Ex. B5, *Rodden Rep.*, at ¶ 62.

**RESPONSE**:

Undisputed.

*J.    The 2009 Election*

111.    In 2009, three candidates (incumbents Schroeder and Knowles and one challenger, Gregory Heise) ran for two seats. Schroeder and Knowles, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 61; ¶ 45 Fig. 8.

**RESPONSE**:

Undisputed.

112.    No Black candidates ran in the 2009 election. Ex. C5, *Rodden Dep.*, at 215:916.

**RESPONSE**:

Undisputed.

113.    Dr. Engstrom did not provide EI estimates for the 2009 election.

**RESPONSE**:

Undisputed.

114. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2009 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Heise (W) 1,216 votes | 17.22% (12.07 − 25.50%) | N/A | 19.29% (15.09 − 23.59%) | N/A |
| Knowles (W)* (incumbent) 3,123 votes | 47.66% (27.49 − 74.02%) | N/A | 36.50% (26.18 − 47.54%) | N/A |
| Schroeder (W)* (incumbent) 3,233 votes | 35.12% (22.54 − 52.55%) | N/A | 44.22% (36.34 − 51.91%) | N/A |

* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶¶ 61; Ex. C5, *Rodden Dep.*, at 215:9-16; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. G7, *Official FFSD Election Results, Apr. 7, 2009, available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el0409/ferguson school.htm.

**RESPONSE**:

Undisputed.

1. Black Voters in the 2009 Election

115. Dr. Rodden estimated that Knowles and Schroeder were the candidates who received the highest and second-highest level of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 61; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 214:10-13. The difference in terms of estimated support among Black voters between them and the remaining candidate, Heise, is statistically significant. Ex. C5, *Rodden Dep.*, at 214:14-24; Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

### 2. Underline: White Voters in the 2009 Election

116.     Schroeder and Knowles were the two top choices among white voters. Dr. Rodden estimated that they received the highest levels of support among white voters, Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 215:5-13, and the difference in terms of estimated support among white voters between them and the remaining candidate, Heise, is statistically significant, Ex. C5, *Rodden Dep.*, at 214:10 – 215:8; Ex. D2, *Rodden's Underlying Data Reformatted*. According to Dr. Rodden's estimates, Heise received less than half the estimated level of support received by Schroeder and less than two-thirds the estimated level of support received by Knowles. Ex. D2, *Rodden's Underlying Data Reformatted*.

**RESPONSE**:

Undisputed.

117.     Knowles resigned from the Board in 2011 and was replaced with Brian Fletcher, a former Board member, who is white. Ex. E6, *Hogshead Dep.*, at 49:5-19, 52:1-7. Fletcher was the lone white candidate among the three candidates interviewed by the Board to replace Knowles. Ex. E6, *Hogshead Dep.*, at 50:21 – 51:16; 54:5-7; Ex. F4, *July 12, 2011 Board Sess. Mins. (Ex. 26 to Dep. of Leslie Hogshead, July 1, 2015)*; Ex. E7, *Dep. of Paul Schroeder*, July 2, 2015, at 76:10-12. The two African-American candidates interviewed for the position were rejected by the Board, which at the time, included one African-American member only (Henson). *See* Ex. E6, *Hogshead Dep.*, at 54:5-7; Ex. F4, *July 12, 2011 Board Sess. Mins.*

**RESPONSE**:

Undisputed.

*K.  The 2010 Election*

118.    No Board election was held in 2010. Incumbents Hogshead and Henson were the only candidates for the two available seats, and resumed their responsibilities on the Board. Ex. B5, *Rodden Rep.*, at ¶ 59. Hogshead is white. Ex. B5, *Rodden Rep.*, at ¶ 54. Henson is African-American. Ex. B5, *Rodden Rep.*, at ¶ 54.

**RESPONSE**:

Undisputed.

*L.  The 2011 Election*

119.    In 2011, nine candidates (incumbents Graham, Clark, and Lentz and six challengers, Chris Martinez, Paul Morris, Robert Chabot, Vanessa Hawkins, Brian Scott Ebert, and Joseph Hosea) ran for three seats. Ex. F5, *Official FFSD Election Results, Apr. 5, 2011 (Ex. 10 to Dep. of Brian Scott Ebert, June 16, 2015)*. Martinez, a white-Hispanic candidate,[2] Ex. B7, *Engstrom Rebuttal*, at ¶ 9 n.5, and Chabot and P. Morris, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶ 63; Ex. F5, *Official 2011 FFSD Election Results*.

**RESPONSE**:

Undisputed.

120.    Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2011 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Chabot* (W) 3,080 votes | 7.31% (5.33 − 11.04%) | 7.1% (4.6 − 9.6%) | 14.05% (11.68 − 17.01%) | 15.6% (13.4 − 18.3%) |
| Clark (W) | 12.58% | 13.5% | 8.92% | 8.0% |

---

[2] The U.S. Census "defines 'Hispanic or Latino' as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." Persons who report themselves as Hispanic can be of any race.  U.S. Census Bureau, *About Hispanic Origin* (July 25, 2013), *available at* http://www.census.gov/topics/population/hispanic-origin/about.html.

| | | | | |
|---|---|---|---|---|
| (incumbent)<br>2,257 votes | (10.33 – 14.42%) | (11.2 – 16.1%) | (7.96 – 9.97%) | (6.5 – 9.3%) |
| Ebert (W)<br>2,667 votes | 7.45%<br>(4.86 – 10.40%) | 7.9%<br>(5.4 – 11.3%) | 13.61%<br>(11.19 – 16.12%) | 14.1%<br>(11.6 – 16.2%) |
| Graham (B)<br>(incumbent)<br>2,795 votes | 21.95%<br>(16.32 – 28.80%) | 24.1%<br>(21.0 – 27.0%) | 9.04%<br>(7.76 – 10.43%) | 6.1%<br>(4.3 – 7.7%) |
| Hawkins (B)<br>2,890 votes | 21.87%<br>(14.10 – 30.46%) | 21.5%<br>(17.2 – 25.5%) | 9.20%<br>(7.52 – 10.68%) | 7.4%<br>(5.4 – 9.4%) |
| Hosea (W)<br>566 votes | 6.88%<br>(6.18 – 7.80%) | 3.2%<br>(2.8 – 3.5%) | 2.91%<br>(2.65 – 3.21%) | 3.1%<br>(2.8 – 3.5%) |
| Lentz (W)<br>(incumbent)<br>1,027 votes | 7.58%<br>(6.38 – 9.20%) | 4.7%<br>(3.1 – 7.6%) | 4.49%<br>(3.76 – 5.38%) | 4.5%<br>(3.2 – 5.7%) |
| Martinez* (W-H)<br>4,598 votes | 5.93%<br>(4.60 – 8.17%) | 8.6%<br>(7.0 – 10.6%) | 22.97%<br>(19.58 – 25.63%) | 24.9%<br>(23.7 – 25.9%) |
| P. Morris* (W)<br>3,305 votes | 8.44%<br>(6.62 – 11.00%) | 9.3%<br>(7.6 – 11.4%) | 14.79%<br>(12.46 – 17.03%) | 16.1%<br>(14.4 – 18.1%) |

\* Indicates winner

Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1; Ex. B7, *Engstrom Rebuttal*, at ¶ 9, Tbl. 1 (p. 10); Ex. F5, *Official 2011 FFSD Election Results.*

**RESPONSE**:

Undisputed.

    1.  <u>Black Voters in the 2011 Election</u>

121.    Both Dr. Rodden and Dr. Engstrom estimated that Graham and Hawkins, the only Black candidates, and Clark, who is white, were the candidates who received the highest, second-highest, and third-highest level of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 59; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 217:4-16; Ex. B2, *Engstrom Rep.*, at ¶ 16, Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10).

**RESPONSE**:

Undisputed.

122.    Graham and Hawkins were the top choices for Black voters for two of the three available

seats. The differences between them and Clark in terms of estimated support among Black

voters are statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5,

*Rodden Dep.*, at 217:4-10; Ex. B2, *Engstrom Rep.*, at ¶ 16, Tbl. 1 (p. 17); Ex. B7, *Engstrom*

*Rebuttal*, at ¶ 9, Tbl. 1 (p. 10). According to the estimates of both Dr. Rodden and Dr.

Engstrom, Graham's and Hawkins's estimated levels of support among Black voters are over

8 percentage points more than the estimated support enjoyed by Clark, who received less

than two-thirds of Graham's and Butler's estimated levels of support among Black voters.

Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 217:17-25; Ex.

B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10).

Dr. Rodden agreed that Graham and Hawkins received "substantially more black votes" than

Clark. Ex. C5, *Rodden Dep.*, at 218:1-4.

**RESPONSE**:

Undisputed.

123.    Dr. Engstrom identified two candidates of choice of Black voters in 2011: Graham and

Hawkins. Ex. B2, *Engstrom Rep.*, at ¶ 16; Ex. C2, *Dep. of Richard Engstrom*, Aug. 18, 2015,

at 26:14-16.

**RESPONSE**:

Objection.  Dr. Rodden identified three African American-preferred candidates. Ex. X, Rodden

Report at ¶59.

124.    According to Dr. Rodden's estimates, Graham and Hawkins together received 43.82% of

the total votes cast by African Americans in a race with nine candidates. Ex. D2, *Rodden's*

*Underlying Data Reformatted.*

**RESPONSE**:

Undisputed.

125.     Neither Graham nor Hawkins was elected to one of the three available seats on the Board in 2011. Ex. B5, *Rodden Rep.*, at ¶ 59; Ex. B7, *Engstrom Rebuttal*, at ¶ 9.

**RESPONSE**:

Undisputed.

> 2.     White Voters in the 2011 Election

126.     Both Dr. Rodden and Dr. Engstrom estimated that Martinez, P. Morris, and Chabot were the candidates who received the highest, second-highest, and third-highest levels of support among white voters, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 17, Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10).

**RESPONSE**:

Undisputed.

127.     Martinez was the top-ranked candidate among white voters. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 215:17-23; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10). According to the estimates of both Dr. Rodden and Dr. Engstrom, the difference between Martinez and every other candidate in terms of estimated support among white voters is statistically significant. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 215:24 – 216:7; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10).

**RESPONSE**:

Undisputed.

128.     As estimated by both Dr. Rodden and Dr. Engstrom, neither the estimated level of white support enjoyed by P. Morris nor the estimated level of white support enjoyed by Chabot is

different to a degree of statistical significance from the estimated level of white support received by Ebert, the candidate with the fourth-highest estimated level of white support. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10). It is impossible to know to a degree of statistical significance which two of these three candidates received higher levels of white support. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 215:24 – 216:7; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 17); Ex. B7, *Engstrom Rebuttal*, at Tbl. 1 (p. 10).

M. *The 2012 Election*

**RESPONSE**:

Objection.  Dr. Rodden disagreed with Plaintiffs' analysis that none of these individuals can be considered the second or third white-preferred candidate.  Dr. Rodden objected to this analysis repeatedly in his deposition.  Ex. I, *Rodden Dep*, 164:14-23, 165:10-11, 179:6-7, 244:19-20, 273:21-25.

129.    In 2012, three candidates (incumbent Schroeder and two challengers, Ebert and Barbara Morris) ran for two seats. Ebert and Schroeder, the two white candidates, were successful. Ex. B5, *Rodden Rep.*, at ¶ 57.

**RESPONSE**:

Undisputed.

130.    Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2012 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Ebert* (W) 2,809 votes | 23.09% (16.64 − 28.70%) | 23.1% (18.1 − 28.2%) | 46.93% (39.08 − 53.79%) | 46.3% (43.8 − 48.5%) |
| B. Morris (B) 1,988 votes | 51.33% (34.94 − 75.04%) | 51.9% (45.7 − 58.4%) | 12.01% (6.96 − 17.76%) | 12.8% (10.1 − 15.6%) |
| Schroeder* (W) (incumbent) 2,566 votes | 25.58% (15.90 − 36.68%) | 25.0% (19.8 − 29.9%) | 41.05% (33.88 − 47.71%) | 40.9% (38.7 − 43.5%) |

\* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶ 57; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11); Ex. F6, *Official FFSD Election Results, Apr. 3, 2012 (Ex. 11 to Dep. of Brian Scott Ebert, June 16, 2015)*.

**RESPONSE**:

Undisputed.

      1. <u>Black Voters in the 2012 Election</u>

131.    Both Dr. Rodden and Dr. Engstrom estimated that B. Morris, the one Black candidate, and Schroeder were the candidates who received the highest and second-highest level of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 45 Fig. 8, ¶ 57; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 20, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11).

**RESPONSE**:

Undisputed.

132.    B. Morris was the top-ranked candidate among Black voters. Ex. C5, *Rodden Dep.*, at 219:5-16; Ex. B2, *Engstrom Rep.*, at ¶ 20. The difference between B. Morris and Schroeder in terms of estimated support among Black voters is statistically significant. Ex. C5, *Rodden Dep.*, at 219:9-12; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 20, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11). According to the

estimates of both Dr. Rodden and Dr. Engstrom, B. Morris also received approximately double the estimated level of support from Black voters as compared to the other two candidates in the race, Schroeder and Ebert. Ex. C5, *Rodden Dep.*, at 221:9-15; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 20, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 12, Tbl. 2 (p. 11). Dr. Rodden agreed that B. Morris received "substantially more support" from Black voters than either Schroeder or Ebert. Ex. C5, *Rodden Dep.*, at 221:16-19, 222:20-24.

**RESPONSE**:

Objection. Dr. Rodden disagreed with Plaintiffs' analysis that neither Schroeder nor Ebert can be considered the second African American-preferred candidate. Dr. Rodden objected to this analysis repeatedly in his deposition. Ex. I, *Rodden Dep.*, 164:14-23, 165:10-11, 179:6-7, 244:19-20, 273:21-25.

133. It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of support among Black voters received by Schroeder and Ebert is not statistically significant. Ex. C5, *Rodden Dep.*, at 219:13-16; Ex. B5, *Rodden Rep.*, at ¶ 57; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 20, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11). It is therefore impossible to know whether Schroeder or Ebert received more estimated support among Black voters. Ex. C5, *Rodden Dep.*, at 219:13-16. Dr. Rodden agreed that Black voters were not cohesive behind either Ebert or Schroeder. Ex. C5, *Rodden Dep.*, at 219:17-20.

**RESPONSE**:

Undisputed.

134.   Dr. Engstrom identified one candidate of choice of Black voters in 2012: B. Morris. Ex. B2, *Engstrom Rep.*, at ¶ 20; Ex. C2, *Engstrom Dep.*, at 26:14-18.

**RESPONSE**:

While Dr. Engstrom only identified one African American-preferred candidate in 2012, Dr. Rodden identified two African American-preferred candidates.  Ex. X at ¶ 57.

135.   B. Morris was not elected to one of the two available seats on the Board in 2012. Ex. B5, *Rodden Rep.*, at ¶ 57.

**RESPONSE**:

Undisputed.

2.   White Voters in the 2012 Election

136.   Ebert and Schroeder were two top choices among white voters. Both Dr. Rodden and Dr. Engstrom estimated that Ebert and Schroeder were the candidates who received the highest and second-highest level of support among white voters, respectively. Ex. C5, *Rodden Dep.*, at 218:11-15; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 21, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11). The difference in terms of estimated support among white voters between them and the only other candidate in the race, B. Morris, is statistically significant. Ex. C5, *Rodden Dep.*, at 218:16-19; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 2 (p. 11). According to the estimates of both Dr. Rodden and Dr. Engstrom, Ebert's and Schroeder's estimated levels of support among white voters are each over 28 percentage points more than the estimated support enjoyed by B. Morris, who received less than one-third of Ebert's and Schroeder's estimated levels of support among white voters..

Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 21, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 11, Tbl. 2 (p. 11).

**RESPONSE**:

Undisputed.

137.  According to Dr. Rodden's estimates, white voters in 2012 cast 88% of their votes for the two white candidates. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B7, *Engstrom Rebuttal*, at ¶ 11.

**RESPONSE**:

Undisputed.

   *N.  The 2013 Election*

138.  In 2013, four candidates (incumbents Hogshead and Henson, and two challengers, Keith Brown and Larry Thomas) ran for two seats. Brown and Hogshead, both white, were successful. Ex. B5, *Rodden Rep.*, at ¶¶ 54-55.

**RESPONSE**:

Undisputed.

139.  Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2013 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Brown* (W) 2,234 votes | 22.74% (15.59 – 35.35%) | 20.2% (16.2 – 24.3%) | 32.01% (23.98 – 40.51%) | 33.9% (31.8 – 36.0%) |
| Henson (B) (incumbent) 2,109 votes | 38.66% (29.88 – 48.47%) | 43.7% (37.2 – 50.7%) | 20.06% (12.20 – 27.27%) | 17.0% (13.3 – 20.4%) |
| Hogshead* (W) (incumbent) 2,475 votes | 25.00% (17.41 – 37.61%) | 24.2% (20.0 – 27.8%) | 34.49% (26.31 – 42.70%) | 37.2% (35.0 – 39.4%) |
| L. Thomas (B) | 13.60% | 11.9% | 13.44% | 11.8% |

| 875 votes | (11.86 – 16.33%) | (9.4 – 15.3%) | (11.89 – 15.16%) | (10.0 – 13.7%) |

Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11); Ex. G8, *Official FFSD Election Results, Apr. 2, 2013*, *available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el130402/S005. HTML.

**RESPONSE**:

Undisputed.

### 1. Black Voters in the 2013 Election

140. Both Dr. Rodden and Dr. Engstrom estimated that Henson and Hogshead were the candidates who received the highest and second-highest level of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 54; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 227:17 – 228:1; Ex. B2, *Engstrom Rep.*, at ¶¶ 24-25, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11).

**RESPONSE**:

Undisputed.

141. Henson was the top-ranked candidate among Black voters. Ex. C5, *Rodden Dep.*, at 227:17-22; Ex. B2, *Engstrom Rep.*, at ¶ 24. The difference between Henson and Hogshead in terms of estimated support among Black voters is statistically significant. Ex. C5, *Rodden Dep.*, at 227:17-22; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11). According to the estimates of both Dr. Rodden and Dr. Engstrom, Henson's estimated level of support among Black voters is approximately 13 percentage points more than the levels of support estimated for Hogshead, and is approximately 16 to 23 percentage points more than the levels of support estimated for Brown. Each received less than two-thirds of Henson's estimated levels of support among Black voters. Ex. C5, *Rodden Dep.*, at 228:6-9; Ex. D2, *Rodden's Underlying*

*Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 14, Tbl. 3 (p. 11).

**RESPONSE**:

Undisputed.

142.    It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of support among Black voters received by Hogshead and Brown is not statistically significant. Ex. C5, *Rodden Dep.*, at 228:15-18; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 14, Tbl. 3 (p. 11). It is therefore impossible to know whether Hogshead or Brown received more support among Black voters. Ex. C5, *Rodden Dep.*, at 228:15-18.

**RESPONSE**:

Objection.  Dr. Rodden disagreed with Plaintiffs' analysis that neither Hogshead nor Brown can be considered the second African American-preferred candidate.  Dr. Rodden objected to this analysis repeatedly in his deposition.  Ex. I, *Rodden Depo.*, 164:14-23, 165:10-11, 179:6-7, 244:19-20, 273:21-25.

143.    Dr. Engstrom identified one candidate of choice of Black voters in 2013: Henson. Ex. B2, *Engstrom Rep.*, at ¶ 24; Ex. C2, *Engstrom Dep.*, at 26:14-20.

**RESPONSE**:

Objection.  While Dr. Engstrom identified only one African American-preferred candidate in 2013, Dr. Rodden identified two African American-preferred candidates.  Ex. X, *Rodden Report* at ¶ 56.

144.    Henson was not elected to one of the two available seats on the Board in 2013. Ex. B5, *Rodden Rep.*, at ¶ 55; *see* Ex. A4, *Henson Decl.*, at ¶ 13.

**RESPONSE**:

Undisputed.

### 2.    White Voters in the 2013 Election

145.    Hogshead and Brown were the two top choices among white voters. Both Dr. Rodden and Dr. Engstrom estimated that Brown and Hogshead were the candidates who received the highest and second-highest level of support among white voters, respectively. Ex. C5, *Rodden Dep.*, at 226:24 − 227:2; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 25, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11). The difference in terms of estimated white support between them and the candidate with the third-highest estimated level of white support, Henson, is statistically significant. Ex. C5, *Rodden Dep.*, at 227:3-6; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at Tbl. 3 (p. 11).

**RESPONSE**:

Undisputed.

146.    According to Dr. Rodden's estimates, Henson's estimated level of support among white voters is approximately 12 and 14 percentage points less than the estimated level of white support enjoyed by Brown and Hogshead, respectively. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 18); Ex. B7, *Engstrom Rebuttal*, at ¶ 13, Tbl. 3 (p. 11).

**RESPONSE**:

Undisputed.

147.    In 2014, eight candidates (two incumbents Rob Chabot and Paul Morris, and six challengers, Donna Paulette-Thurman, James Savala, Kimberly Benz, F. Willis Johnson, LaWanda Wallace, and Larry Thomas), ran for three seats. Ex. F7, *Official FFSD Election Results, Apr. 8, 2014 (Ex. 21 to Dep. of Donna Paulette-Thurman, June 17, 2015)*. Chabot and P. Morris, both white, and Paulette-Thurman, one of five African-American challengers, were successful. Ex. B5, *Rodden Rep.*, at ¶¶ 50-51.

**RESPONSE**:

Undisputed.

148.    Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2014 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Benz (W) 2,231 votes | 6.00% (4.79 – 7.49%) | 3.3% (2.1 – 4.7%) | 19.06% (15.29 – 23.34%) | 22.0% (20.5 – 23.4%) |
| Chabot* (W) (incumbent) 2,898 votes | 6.20% (4.28 – 9.02%) | 4.8% (2.4 – 9.4%) | 25.68% (19.80 – 32.40%) | 29.0% (27.1 – 30.6%) |
| Johnson (B) 2,118 votes | 21.54% (15.72 – 29.06%) | 24.5% (21.1 – 27.2%) | 5.71% (4.10 – 7.84%) | 2.8% (1.5 – 4.5%) |
| P. Morris* (W) 2,516 votes | 5.78% (4.39 – 7.90%) | 3.2% (2.0 – 5.4%) | 22.32% (17.69 – 27.83%) | 25.8% (24.4 – 27.1%) |
| Paulette-Thurman* (B) 2,733 votes | 24.21% (17.52 – 32.95%) | 26.1% (23.7 – 28.5%) | 8.92% (6.28 – 11.94%) | 8.4% (6.9 – 10.0%) |
| Savala (B) 2,425 votes | 21.36% (15.76 – 28.73%) | 24.7% (22.3 – 26.8%) | 8.74% (6.09 – 11.37%) | 7.0% (4.9 – 8.7%) |
| L. Thomas (B) 568 votes | 6.61% (5.68 – 7.68%) | 4.7% (3.4 – 6.3%) | 5.09% (4.42 – 5.76%) | 3.2% (2.3 – 4.0%) |
| Wallace (B) 590 votes | 8.31% (6.58 – 10.85%) | 8.6% (6.4 – 10.9%) | 4.47% (3.95 – 5.03%) | 1.9% (1.2 – 2.6%) |

* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶ 50; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12); Ex. F7, *Official FFSD 2014 Election Results.*

**RESPONSE**:

Undisputed.

149.    Dr. Rodden and Dr. Engstrom agree that the 2014 election was a highly racially polarized election. Ex. C5, *Rodden Dep.*, at 233:23 – 234:17; Ex. B5, *Rodden Rep.*, at ¶ 50; Ex. B7, *Engstrom Rebuttal*, at ¶ 15.

**RESPONSE**:

Objection.  While Dr. Rodden opined that the 2014 election was "highly polarized," he also testified that "racial polarization . . . is not useful to think of as a binary concept so that we can classify it as either polarized or not polarized."  Instead, racial polarization should be thought of as a "sliding scale," and the 2014 election is "the most polarized of any of those elections."  Ex. I, *Rodden Dep*., 234:6-13.

1.    Black Voters in the 2014 Election

150.    Both Dr. Rodden and Dr. Engstrom estimated that Paulette-Thurman, Johnson, and Savala, all of whom are African-American, were the candidates who received the three highest estimated levels of support among Black voters. Ex. B5, *Rodden Rep.*, at ¶ 50; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 234:18-22; Ex. B2, *Engstrom Rep.*, at ¶ 28, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

**RESPONSE**:

Undisputed.

151.    Paulette-Thurman, Johnson, and Savala were the three top-choice candidates among Black voters. Ex. B5, *Rodden Dep.*, at 234:18 – 235:5, Ex. B2, *Engstrom Rep.*, at ¶ 28. The

differences in estimated support among Black voters between them and other candidates are statistically significant. Ex. C5, *Rodden Dep.*, at 234:18 − 235:5; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 28, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

**RESPONSE**:

Undisputed.

152. According to Dr. Rodden's estimates, Black voters cast 67.11% of their votes for Paulette-Thurman, Johnson, and Savala. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

**RESPONSE**:

Undisputed.

153. According to the estimates of both Dr. Rodden and Dr. Engstrom, the estimated levels of support among Black voters for Paulette-Thurman, Johnson, and Savala are each more than double that for the candidate with the fourth-highest estimated support, Wallace, who is also African-American. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12); Ex. B5, *Rodden Rep.*, at ¶ 50.

**RESPONSE**

Undisputed**.**

154. Dr. Engstrom identified three candidates of choice of Black voters in 2014: Paulette-Thurman, Johnson, and Savala. Ex. B2, *Engstrom Rep.*, at ¶ 28; Ex. B7, *Engstrom Rebuttal*, at ¶ 15; Ex. C2, *Engstrom Dep.*, at 26:14-22.

**RESPONSE**:

Undisputed.

155.    Neither Johnson nor Savala was elected to one of the three available seats on the Board in 2014. Ex. B5, *Rodden Rep.*, at ¶¶ 50, 52.

**RESPONSE**:

Undisputed.

2. <u>White Voters in the 2014 Election</u>

156.    Both Dr. Rodden and Dr. Engstrom estimated that Chabot, P. Morris, and Benz, the three white candidates, were the candidates who received the highest, second-highest, and third-highest level of support among white voters, respectively. Ex. B5, *Rodden Dep.*, at 235:15-18; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 29, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

**RESPONSE**:

Undisputed.

157.    Chabot, P. Morris, and Benz were the three top choices among white voters. The differences in estimated support among white voters between them and the remaining candidates are statistically significant. Ex. C5, *Rodden Dep.*, at 235:19-22; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

**RESPONSE**:

Undisputed.

158.    According to Dr. Rodden's estimates, white voters cast 67.06% of their votes for the three white candidates. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

**RESPONSE**:

Undisputed.

159.　According to the estimates of both Dr. Rodden and Dr. Engstrom, the estimated levels of support among white voters for Chabot, Morris, and Benz are each more than double that for the candidate with the fourth-highest estimated support, Paulette-Thurman. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 4 (p. 12).

**RESPONSE**:

Undisputed.

160.　Benz was not elected to one of the three available seats on the Board in 2014. Ex. B5, *Rodden Rep.*, at ¶¶ 50, 51.

**RESPONSE**:

Undisputed.

　　　　　3.　Special Circumstances in the 2014 Election

161.　The 2014 election took place less than one month after the "controversial" resignation of Dr. Art McCoy, the first African-American District Superintendent. Ex. B5, *Rodden Rep.*, at ¶¶ 39, 50; Ex. C5, *Rodden Dep.*, at 97:17-20, 236:9 − 237:3; Ex. B7, *Engstrom Rebuttal*, at ¶ 15.

**RESPONSE**:

Undisputed.

162.　According to Dr. Rodden, the separation of the Superintendent from the District led to a high level of interest among African-American voters and "an unprecedented five African American challengers." Ex. B5, *Rodden Rep.*, at ¶¶ 39, 50.

**RESPONSE**:

Undisputed.

163.　Dr. McCoy is highly respected within the African-American community, whose members

viewed him as a very successful and effective superintendent. Ex. A1, *Bailey Decl.*, at ¶¶ 12-13; Ex. A5, *Hudson Decl.*, at ¶ 8; Ex. A7, *Pruitt Decl.*, at ¶ 22; Ex. A4, *Henson Decl.*, at ¶ 15; Ex. A3, *Decl. of Doris Graham*, Sept. 23, 2015, at ¶ 18; Ex. E4, *Dep. of Donna Paulette-Thurman*, June 17, 2015, at 82:1-3.

**RESPONSE**:

Undisputed.

164.   Prior to his resignation, Dr. McCoy "had been embroiled in conflict with the School Board." Ex. B5, *Rodden Rep.*, at ¶ 39.

**RESPONSE**:

Undisputed.

165.   The three top-choice candidates among African-American voters, Paulette-Thurman, Johnson, and Savala, ran together as a slate under the name "Grade A for Change." They were motivated to run as a slate because "they were concerned about how Dr. McCoy was treated" and "because the Board did not represent the community in terms of race." Ex. E4, *Paulette-Thurman Dep.*, at 37:18-22, 38:5-9; *see* Ex. A6, *Johnson Decl.*, at ¶¶ 10, 15.

**RESPONSE**:

Undisputed.

   P.   *The 2015 Election*

166.   In 2015, five candidates (incumbent Brian Scott Ebert and four challengers, Courtney Michelle Graves, Roger Hines, Donna Marie Dameron, and Michael Pierson) ran for two seats. Ebert, who is white, and Graves, who is African-American, were successful. Ex. B5, *Rodden Rep.*, at ¶¶ 47-48; Ex. B2, *Engstrom Rep.*, at ¶¶ 33-34.

**RESPONSE**:

Undisputed.

167. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2015 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Dameron (W) 1,711 | 14.09% (11.18 − 17.92%) | 14.5% (11.1 − 18.3%) | 10.08% (8.56 − 11.54%) | 9.9% (7.5 − 12.1%) |
| Ebert* (W) (incumbent) 4,697 | 10.06% (6.43 − 13.41%) | 9.8% (7.7 − 12.2%) | 40.89% (35.17 − 46.53%) | 43.0% (39.6 − 45.9%) |
| Graves* (B) 5,279 | 49.43% (37.90 − 60.83%) | 52.4% (48.7 − 56.0%) | 22.90% (17.10 − 29.46%) | 21.4% (18.3 − 24.8%) |
| Hines (B) 2,728 | 13.89% (9.84 − 18.26%) | 12.3% (8.9 − 15.9%) | 19.37% (16.06 − 23.09%) | 19.7% (17.7 − 21.9%) |
| Person (B) 1,146 | 12.53% (9.43 − 16.86%) | 11.0% (8.6 − 13.5%) | 6.77% (5.63 − 7.99%) | 6.0% (4.8 − 7.5%) |

* Indicates winner

Ex. B5, *Rodden Rep.*, at ¶ 47; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13); Ex. F8, *Official FFSD Election Results, Apr. 7, 2015 (Ex. 12 to Dep. of Brian Scott Ebert, June 16, 2015).*

**RESPONSE**:

Undisputed.

### 1. Black Voters in the 2015 Election

168. Dr. Rodden and Dr. Engstrom estimated that Graves and Dameron, a white candidate, received the highest and second-highest levels of support among Black voters, respectively. Ex. B5, *Rodden Rep.*, at ¶ 48; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13).

**RESPONSE**:

Undisputed.

169. Graves was the top-ranked candidate among Black voters. Ex. C5, *Rodden Dep.*, at 158:8 − 159:15; Ex. B2, *Engstrom Rep.*, at ¶ 34. The difference between Graves and Dameron in

terms of estimated support among Black voters is statistically significant. Ex. C5, *Rodden Dep.*, at 159:23 − 160:2; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13). Dr. Rodden agreed that Black voters were cohesive behind Graves. Ex. C5, *Rodden Dep.*, at 158:16-19, 166:8-11.

**RESPONSE**:

Undisputed.

170.    According to the estimates of both Dr. Rodden and Dr. Engstrom, Dameron's estimated level of support is also approximately 35 percentage points lower than and less than one-third the estimated level of Black support for Graves. Ex. C5, *Rodden Dep.*, at 159:8-17; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13). Dr. Rodden agreed that Dameron received "much less" support among Black voters when compared to Graves. Ex. C5, *Rodden Dep.*, at 159:13-15.

**RESPONSE**:

Undisputed.

171.    It is impossible to know to a degree of statistical significance which candidate received the second-highest level of support among Black voters. As estimated by both Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of Black support received by Dameron and the candidate with the third-highest estimated level of Black support, Hines, is not statistically significant. Ex. C5, *Rodden Dep.*, at 160:15 − 161:21; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13). It is therefore impossible to know whether Dameron or Hines received more support among Black voters. Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. C5, *Rodden Dep.*, at 160:15 − 161:21. Dr. Rodden agreed that Black voters were not

cohesive behind a second-choice candidate in this election. Ex. C5, *Rodden Dep.*, at 161:22 –
162:3, 164:24 – 165:3; Ex. B5, *Rodden Rep.*, at ¶ 48.

**RESPONSE**:

Undisputed.

172.    Dr. Engstrom identified one candidate of choice of Black voters in 2015: Graves.
Ex. B2, *Engstrom Rep.*, at ¶ 34; Ex. C2, *Engstrom Dep.*, at 26:14-24.

**RESPONSE**:

Objection. While Dr. Engstrom identified only one African American-preferred candidate in

2015, Dr. Rodden identified two African American-preferred candidates.  Ex. X at ¶ 49.

### 2.    White Voters in the 2015 Election

173.    Both Dr. Rodden and Dr. Engstrom estimated that Ebert and Graves were the candidates
who received the highest and second-highest level of support among white voters,
respectively. Ex. C5, *Rodden Dep.*, at 168:8 – 169:9; Ex. D2, *Rodden's Underlying Data
Reformatted*; Ex. B2, *Engstrom Rep.*, at ¶ 35, Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at
Tbl. 5 (p. 13).

**RESPONSE**:

Undisputed.

174.    Ebert was the top-ranked candidate among white voters. The difference between Ebert
and all other candidates in the race, including Graves, in terms of estimated support among
white voters, is statistically significant. Ex. C5, *Rodden Dep.*, at 168:11-18; Ex. B5, *Rodden
Rep.*, at ¶ 45 Fig. 8; Ex. D2, *Rodden's Underlying Data Reformatted*; Ex. B2, *Engstrom Rep.*,
at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at Tbl. 5 (p. 13). Dr. Rodden agreed that white
voters were cohesive behind Ebert. Ex. C5, *Rodden Dep.*, at 168:19-23.

**RESPONSE**:

Undisputed.

175.    It is impossible to know to a degree of statistical significance which candidate received

the second-highest level of support among white voters. As estimated by both Dr. Rodden

and Dr. Engstrom, the difference in the estimated levels of white support received by Graves

and the candidate with the third-highest estimated level of white support, Hines, is not

statistically significant. Ex. C5, *Rodden Dep.*, at 169:11-22; Ex. D2, *Rodden's Underlying*

*Data Reformatted*; Ex. B2, *Engstrom Rep.*, at Tbl. 1 (p. 19); Ex. B7, *Engstrom Rebuttal*, at

Tbl. 5 (p. 13). Dr. Rodden agreed that white voters were not cohesive behind a second-choice

candidate in the 2015 election. Ex. C5, *Rodden Dep.*, at 169:23 – 170:9.

**RESPONSE**:

Objection. Dr. Rodden disagreed with Plaintiffs' analysis that neither Graves nor Hines can be

considered the second white-preferred candidate.  Dr. Rodden objected to this analysis

repeatedly in his deposition.  Ex. I, *Rodden Dep*., 164:14-23, 165:10-11, 179:6-7, 244:19-20,

273:21-25.

### 3.    Special Circumstances in the 2015 Election

176.    The 2015 election was held on April 7, 2015, less than four months after the complaint in

this case was filed on December 18, 2014. *See* Ex. F8, *Official FFSD 2015 Election Results*;

Doc. No. 1, *Complaint*.

**RESPONSE**:

Undisputed.

177.    The 2015 election was held "in the aftermath" of the shooting death of Michael Brown in

Ferguson in August 2014 and the "subsequent months of unrest." Ex. B5, *Rodden Rep.*,

¶¶ 17, 40; Ex G9, U.S. Dep't of Justice, *Investigation of the Ferguson Police Department,*

Mar. 4, 2015,[3] at 5-6, *available at* http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf.

**RESPONSE**:

Undisputed the election occurred after the shooting. However, the shooting did not occur in the District and most of the unrest took place near, but outside of the District. Ex. KK, *Thurman Dep.,* at 73:5 – 74:1; Ex. JJ, *Graves Dep.,* at 59:4-9.

178. The Michael Brown shooting triggered large protests in the Ferguson area. Ex. E2, *Dep. of Brian Scott Ebert*, June 16, 2015, at 109:10-20; Ex. E3, *Dep. of Keith Brown*, June 16, 2015, at 49:7-13; Ex. E1, *Dep. of Paul Morris*, June 15, 2015, at 98:16-24; Ex. E4, *Paulette-Thurman Dep.*, at 73:5-20; Ex. B5, *Rodden Rep.*, at ¶ 28. These included a protest organized by high school students in the District. Ex. E10, *Dep. of Frank Green*, Sept. 2, 2015, at 61:18-21. Protests related to the Michael Brown shooting are ongoing. Ex. E4, *Thurman Dep.*, at 73:5-74:1; Ex. E5, *Graves Dep.*, at 59:4-9.

**RESPONSE**:

Undisputed that protests occurred in City of Ferguson. The City of Ferguson is only a small portion of the District. Undisputed that the students held a protest in the District. Disputed that neither Dr. Thurman nor Dr. Graves meant that protests were ongoing in the District.

---

[3] Federal Rule of Evidence 803(8) allows the admission of a record of a public office when, as relevant here, it sets out "factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 161-70 (1988). The DOJ Report is a public record that includes factual findings from an investigation authorized "under the pattern-or-practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d ('Safe Streets Act'), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ('Title VI')." Ex. G9, *Investigation of the Ferguson Police Department*, at 1. Moreover, it is not unusual for courts to rely on reports issued by the Department of Justice. *United States v. Woods*, 159 F.3d 1132, 1135-36 (8th Cir. 1998) (considering Department of Justice report in determining whether district court abused its discretion). Indeed, courts consider such reports as trustworthy evidence. *See Miller v. Field*, 35 F.3d 1088, 1092 (6th Cir. 1994) (quoting *Roland v. Johnson*, 933 F.2d 1009 (6th Cir. 1991) (unpublished) (holding that "Department of Justice report was the result of an investigation … admissible under Fed. R. Evid. 803(8)(C) as a public report[, and] [t]he admission of the[] report[] did not constitute an abuse of discretion.")).

179. The shooting and subsequent protests "[h]ad a huge impact on the school district," Ex. E10, *Green Dep.*, at 60:2-9, affecting "thousands of our kids," Ex. E8, *Dep. of Robert Chabot*, July 2, 2015, at 82:22 − 83:8. Schools in the District had to shut down. Ex. E10, *Green Dep.*, at 60:6 − 61:21; Ex. E8, *Chabot Dep.*, at 82:22 − 83:8; Ex. E5, *Graves Dep.*, at 58:8 − 59:9. Teachers and students received counseling. Ex. E10, *Green Dep.*, at 61:5-17; Ex. E8, *Chabot Dep.*, at 83:6-7.

**RESPONSE**:

Undisputed.

180. The Michael Brown shooting and subsequent protests drew national attention. Ex. B5, *Rodden Rep.*, at ¶ 28; Ex. C5, *Rodden Dep.*, at 97:21-98:8; Ex. E6, *Hogshead Dep.*, at 62:20-25.

**RESPONSE**:

Undisputed.

181. In September 2014, the Civil Rights Division of the United States Department of Justice opened an investigation into the Ferguson Police Department. *See* Ex. G9, *Investigation of the Ferguson Police Department*, at 1. On March 4, 2015, one month before the 2015 Board election, the Department of Justice released a report detailing the results of its investigation. It found extensive discrimination by government officials in Ferguson, including racial bias and intentional discrimination in local law enforcement and municipal court practices. *See* Ex. G9, *Investigation of the Ferguson Police Department*, at 15-41 (racial profiling, excessive force, First Amendment violations, use of tasers); 42-62 (unnecessary obstacles to paying fines, lack of transparency, harsh penalty for missed payments, use of warrants and jail to induce payment); 62-78 (policies driven by racial bias and discriminatory intent).

**RESPONSE**:

Undisputed that there was an investigation in the City of Ferguson. The City of Ferguson makes up 27% of the District. Undisputed that there was an investigation of the Ferguson Police Department however, that Department is not part of the District. Ex. K, *Gordon Dep.,* at 19:10-14.

182.    Candidates, and voters more broadly, were aware of the report, which ignited local, national and international interest in the April 2015 elections. *See* Ex. B5, *Rodden Rep.*, at ¶ 28; *see also* Ex. G10, John Eligon, *Election in Scarred Ferguson Carries Hope of 'New Tomorrow,'* N.Y. Times (Apr. 4, 2015); Ex. G19, Brent McDonald, *An Election in Ferguson* (video), N.Y. Times (Apr. 5, 2015), http://www.nytimes.com/video/us/100000003608386/an-election-in-ferguson.html; Ex. G11, Carey Gillam, *Race, reforms eyed as Ferguson, Missouri, voters head to polls*, Reuters/Business Insider (Apr. 7, 2015); Ex. G12, Carey Gillam, *Surge in voter turnout gives blacks new voice in Ferguson, Missouri*, Reuters (Apr. 9, 2015); Ex. E6, *Hogshead Dep.*, at 64:5-8 (national media attention on April 2015 election was unique in her 23 years on the board); Ex. E2, *Ebert Dep.*, at 110:17 – 111:4 (knows of DOJ report); Ex. E3, *Brown Dep.*, at 48:10-15 (same); Ex. E4, *Paulette-Thurman*, 74:2-25 (same); Ex. E5, *Graves Dep.*, at 59:17-20; Ex. E8, *Chabot Dep.*, 81:10-23 (same); Ex. E7, *Schroeder Dep.*, at 37:4-11 (same).

**RESPONSE**:

Objection. There is no evidence that voters were aware of the DOJ report or that the report effected the 2015 District election.

183. Board member Paul Morris stated that the Michael Brown shooting and subsequent demonstrations caused Ferguson City Council incumbents not to run for office allowing an opportunity for African Americans to get elected. Ex. E1, *Morris Dep.*, at 99:6-19.

**RESPONSE**:

Undisputed.

184. Frank Green confirmed that "the Michael Brown situation" had an effect on the 2015 election. Ex. E10, *Green Dep.*, at 50:16-25.

**RESPONSE**:

Undisputed.

185. Dr. Rodden acknowledged that the national attention surrounding the 2015 election due to the Michael Brown shooting may have caused turnout and get-out-the-vote efforts to increase in that election. Ex. C5, *Rodden Dep.*, at 97:21 – 98:8; Ex. B5, *Rodden Rep.*, at ¶ 28.

**RESPONSE**:

Undisputed.

186. The Board's newest member, Graves, filed her candidacy in January 2015. Ex. E5, *Graves Dep.*, at 73:6-8; Mo. Rev. Stat. § 115.127(5). She ran for elected office in part to address the injustice that the Michael Brown shooting and resulting protests brought to light. *See* Ex. E5, *Graves Dep.*, at 16:9-25.

**RESPONSE**:

Undisputed.

187. According to Dr. Rodden, Graves "ran a sophisticated campaign in which she very explicitly encouraged supporters to engage in a 'single shot' voting strategy." Ex. B5, *Rodden Rep.*, at ¶ 48. Graves acknowledged that she encouraged voters to cast one vote only,

a vote for her. Ex. E5, *Graves Dep.*, at 14:3-5; *see also* Ex. E1, *Morris Dep.*, at 69:8-13.

**RESPONSE:**

Undisputed.

188.    Other Board members stated that they did not promote or engage in single-shot voting. Ex. E1, *Morris Dep.*, at 69:11-20; Ex. E6, *Hogshead Dep.*, at 15:18 – 16:6 (does not encourage single-shot voting publically but asks family and close friends to vote only for her); Ex. E2, *Ebert Dep.*, at 19:13 – 20:19 (always casts all votes, except when he is a candidate, he votes for himself only).

**RESPONSE**:

Objection.  Plaintiffs' statement is a mischaracterization.  Schroeder, Hogshead and Dr. Graham engaged in bullet voting.  See, Ex. PP, 19:11-18; Ex. QQ, 15:18-16:6; Ex. MM, 69:25-70:4.

## II.  Defendants' Proposed Approaches to Identifying Candidates of Choice

189.    The District's expert, Dr. Rodden, proposed two decision rules for identifying a racial group's candidates of choice. Ex. C5, *Rodden Dep.*, at 356:5 – 357:4.

**RESPONSE:**

Undisputed.

190.    The first method proposed identifies one candidate of choice for each group in each election, focusing exclusively on the single candidate who was estimated to have received the highest percentage of votes from each group (the "Top-Ranked Candidate" approach). Although voters may vote for up to two or three candidates in each election, this approach considers only the candidates estimated to have received the highest levels of support from each racial group. Ex. B5, *Rodden Rep.*, at ¶ 74 ("focus only on the top-ranked candidate among African Americans in each election and ask: how often does the *most* preferred among African-Americans win a seat?"); Ex. C5, *Rodden Dep.*, at 162:21 – 163:1.

**RESPONSE:**

Objection. Mischaracterizes Dr. Rodden's report, which states, in full: "One might object to this approach [discussed in ¶191, below] since it identifies some candidates as "minority-preferred" even though the ecological inference estimate is statistically indistinguishable from the next-ranked candidate who is rather arbitrarily treated as "non-preferred." One way around this is to focus only on the top-ranked candidate among African Americans in each election and ask: how often does the *most* preferred candidate among African Americans win a seat? The top-ranked candidate is often relatively easy to identify. The disadvantage of this approach is that it simply ignores more than half of the seats. If we make the reasonable assumption that Doris Graham and Chuck Henson – always the top choice of African Americans when running in contested elections – are the top minority-preferred candidates when running uncontested, we find that the top candidate of choice for African Americans was elected to the school board in 10 of the 16 elections since 2000. If we focus only on the 12 contested elections, the top African American candidate wins a seat in six (50 percent). Ex. X, *Rodden Rep.*, at ¶74.

191.    The second method proposed identifies two or three candidates of choice in each election depending on the available seats in each election, by identifying the two or three candidates in each election who are estimated to have received the highest percentages of votes from each group (the "Point Estimate" approach). This approach ignores the relative levels of support that candidates receive in comparison to each other, as well as whether the differences in estimated levels of support for candidates are statistically significant. Ex. B5, *Rodden Rep.*, at ¶ 73 ("simply count up wins and losses of the candidates ranked by ecological inference estimates among the top *N* candidates for African American voters when there are *N* seats."); Ex. C5, *Rodden Dep.*, at 135:2 – 136:5.

**RESPONSE:**

Objection. Mischaracterizes Dr. Rodden's report, which states, in full: "Given the multi-winner at-large system, it is useful to ask not only whether a single minority-preferred candidate wins, but how many. Let us ignore the complexities of the overlapping confidence intervals for second and third candidates . . ., and simply count up wins and losses of the candidates ranked by the ecological inference estimates among the top *N* candidates for African American voters when there are *N* seats. Of the 37 seats up for election since 2000, 20 were won by minority-preferred candidates (54 percent). If we ignore the uncontested years, minority-preferred candidates win 14 of 27, or 52 percent of contested seats from 2000 to 2015." Ex. X, *Rodden Rep.* at ¶73.

    A.   *The District's "Top-Ranked Candidate" Approach*

192.   Employing the Top-Ranked Candidate approach, the Black and white candidates of choice in contested elections for the FFSD Board from 2000 through 2015, and their respective levels of success, are as follows:

| Comparative Success Rates of White- and Black-Preferred Candidates: The District's Top-Ranked Candidates | | | | |
|---|---|---|---|---|
| **Election Year** | **Black Voters** | | **White Voters** | |
| | **Top Ranked Candidate** | **Elected?** | **Top Ranked Candidate** | **Elected?** |
| 2000 | G. Thomas (B) | Yes | Hirsch (W) | Yes |
| 2001 | Butler (B) | No | Garofalo (W) | Yes |
| 2002 | Graham (B) | Yes | Fletcher (W) | Yes |
| 2003 | G. Thomas (B) | Yes | Knorr (W) | Yes |
| 2004 | Van (B) | No | Garofalo (W) | Yes |
| 2006 | G. Thomas (B) | No | Schroeder (W) | Yes |
| 2009 | Knowles (W) | Yes | Schroeder (W) | Yes |
| 2011 | Graham (B) | No | Martinez (W-H) | Yes |
| 2012 | B. Morris (B) | No | Ebert (W) | Yes |
| 2013 | Henson (B) | No | Hogshead (W) | Yes |
| 2014 | Paulette-Thurman (B) | Yes | Chabot (W) | Yes |
| 2015 | Graves (B) | Yes | Ebert (W) | Yes |

| | Overall Success Rate: | 6/12 | Overall Success Rate: | 12/12 |
|---|---|---|---|---|
| | Success Rate Last 10 Years: | 3/7 | Success Rate Last 10 Years: | 7/7 |
| | Success Rate Last 5 Years: | 2/5 | Success Rate Last 5 Years: | 5/5 |

Ex. C5, *Rodden Dep.*, at 260:21 − 272:5; Ex. D3, *Top-Ranked Candidate Approach Worksheet (Ex. 18 to Dep. of Jonathan Rodden, Aug. 20, 2015).*

**RESPONSE:**

Objection. This table does not include non-contested elections. When considering the non-contested elections, African American candidates were elected in 10 of 16 elections, or 62.5% of the time. Ex. X, *Rodden Rep.,* at ¶74.

193.    Employing this approach results in twelve candidates of choice for each group in twelve contested elections, dating back through the 2000 election. Ex. C5, *Rodden Dep.*, at 264:17-25, 270:17-20; Ex. D3, *Top-Ranked Candidate Approach Worksheet.*

**RESPONSE:**

Undisputed.

194.    In twelve contested elections from 2000 through 2015, Black voters and white voters have never preferred the same candidate as their top choice in a contested election. Ex. C5, *Rodden Dep.*, at 264:17-25, 270:17-20; Ex. D3, *Top-Ranked Candidate Approach Worksheet.*

**RESPONSE:**

Undisputed.

195.    In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was white (twelve of twelve). Ex. C5, *Rodden Dep.*, at 264:22-25.

**RESPONSE:**

Objection. In 2011, Chris Martinez, Hispanic, was the top-ranked candidate among white voters. Ex. I, 143:10-24

196.	In the twelve contested elections from 2000 through 2015, all but one of the top-ranked candidates among Black voters was Black (eleven of twelve). Ex. C5, *Rodden Dep.*, at 272:1-5. Black voters' top-ranked candidate was not Black for the 2009 election, which featured no Black candidates. Ex. C5, *Rodden Dep.*, at 215:9-16.

**RESPONSE:**

Undisputed.

197.	In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was elected (twelve of twelve), as compared to six out of twelve top-ranked candidates among Black voters. Ex. C5, *Rodden Dep.*, at 264:17-21, 270:17-20.

**RESPONSE:**

Undisputed.

198.	In the seven contested elections over the last ten years (*i.e.*, from 2006 through 2015), every top-ranked candidate among white voters was elected (seven out of seven), as compared to three out of seven top-ranked candidates among Black voters. Ex. C5, *Rodden Dep.*, at 265:1-5, 270:21-24.

**RESPONSE:**

Undisputed.

199.	In the five contested elections over the last five years (*i.e.*, from 2011 through 2015), every top-ranked candidate among white voters was elected (five out of five), as compared to two out of five top-ranked candidates among Black voters. Ex. C5, *Rodden Dep.*, at 265:6-10, 271:12-16.

**RESPONSE:**

Undisputed.

200.     Employing the Point Estimate approach, the Black and white candidates of choice in contested elections for the Board from 2000 through 2015 and their respective levels of success are as follows:

| Comparative Success Rates of White- and Black-Preferred Candidates: The District's Point Estimate Approach | | | | | |
|---|---|---|---|---|---|
| Election Information | | Black Voters | | White Voters | |
| Year | Seats | Candidates with Highest Estimated Support | Number Successful | Candidates with Highest Estimated Support | Number Successful |
| 2000 | 2 | G. Thomas (B), Hirsch (W) | 2 | Hirsch (W), G. Thomas (B) | 2 |
| 2001 | 2 | Butler (B), Garofalo (W) | 1 | Garofalo (W), Hogshead (W) | 2 |
| 2002 | 3 | Graham (B), Butler (B), Clark (W) | 2 | Fletcher(W), Knorr (W), Clark (W) | 2 |
| 2003 | 2 | G. Thomas (B), Knorr (W) | 2 | Knorr (W), Lentz (W) | 1 |
| 2004 | 2 | Van (B), McClendon(B) | 0 | Garofalo (W), Hogshead (W) | 2 |
| 2006 | 2 | G. Thomas (B), Washington (B) | 0 | Schroeder (W), Knowles (W) | 2 |
| 2009 | 2 | Knowles (W), Schroeder (W) | 2 | Knowles (W), Schroeder (W) | 2 |
| 2011 | 3 | Graham (B), Hawkins (B), Clark (W) | 0 | Martinez (W-H), P. Morris (W), Chabot (W) | 3 |
| 2012 | 2 | B. Morris (B), Schroeder (W) | 1 | Ebert (W), Schroeder (W) | 2 |
| 2013 | 2 | Henson (B), Hogshead (W) | 1 | Brown (W), Hogshead (W) | 2 |
| 2014 | 3 | Paulette-Thurman (B), Johnson (B), Savala (B) | 1 | P. Morris (W), Chabot (W), Benz (W) | 2 |
| 2015 | 2 | Graves (B), Dameron (W) | 1 | Ebert (W), Graves (B) | 2 |
| Totals: | 27 | -- | 13/27 | -- | 24/27 |
| Last 10 years | 16 | -- | 6/16 | -- | 15/16 |
| Last 5 years | 12 | -- | 4/12 | -- | 11/12 |

Ex. C5, _Rodden Dep._, at 136:22 – 137:6, 356:19 – 357:9; Ex. D4, _Point Estimate Approach Worksheet (Ex. 12 to Dep. of Jonathan Rodden, Aug. 20, 2015)._

**RESPONSE:**

Objection.  This table does not include non-contested elections.  When considering the non-contested elections, African American candidates won 20 of 37 available seats, or 54% of the time. Ex. X,  _Rodden Rep.,_ at ¶73.

201.    Under this approach, there were 27 candidates of choice for each racial group in twelve contested elections, dating back through the 2000 election. Ex. D4, *Point Estimate Approach Worksheet*; Ex. C5, *Rodden Dep.*, at 356:19 – 357:9.

**RESPONSE:**

Undisputed.

202.    Under this approach, white voters preferred white candidates for 25 out of 27 seats during the twelve contested elections from 2000 through 2015. Ex. D4, *Point Estimate Approach Worksheet*; Ex. C5, *Rodden Dep.*, at 252:11-14.

**RESPONSE:**

Objection.  White voters preferred white candidates for 24 out of 27 seats and preferred 1 Hispanic candidate for 1 out of 27 seats during the twelve contested elections from 2000 through 2015.

203.    Under this approach, Black voters preferred Black candidates for 17 out of 27 seats during the twelve contested elections from 2000 through 2015. Ex. D4, *Point Estimate Approach Worksheet*; Ex. C5, *Rodden Dep.*, at 251:19-22.

**RESPONSE:**

Undisputed.

204.    Under this approach, 24 out of 27 white-preferred candidates were elected (88.9%), as compared to 13 out of 27 Black-preferred candidates (48.2%) during the twelve contested elections from 2000 through 2015. Ex. D4, *Point Estimate Approach Worksheet*; Ex. C5, *Rodden Dep.*, at 148:19 – 150:24.

**RESPONSE:**

Undisputed.

205.    Under this approach, 15 out of 16 white-preferred candidates were elected (93.8%), as compared to six out of 16 Black-preferred candidates (37.5%) during the seven contested elections over the last ten years (*i.e.*, from 2006 through 2015). Ex. C5, *Rodden Dep.*, at 152:25 – 155:7.

**RESPONSE:**

Undisputed.

206.    Under this approach, during the five contested elections over the last five years (*i.e.*, from 2011 through 2015), 11 out of 12 white-preferred candidates were elected (91.7%), as compared to four out of 12 preferred candidates among Black voters (33.3%). Ex. C5, *Rodden Dep.*, at 155:8 – 156:12.

**RESPONSE:**

Undisputed.

207.    Under this approach, the success rate for Black-preferred candidates is lower during the past seven contested elections (37.5%) as compared to the past twelve contested elections (48.2%). Ex. C5, *Rodden Dep.*, at 154:1-13.

**RESPONSE:**

Undisputed; however, Dr. Rodden went on to say in his deposition that this finding is based on some elections that were won by exceedingly small number of votes, and a very small number of votes would change those results substantially. Ex. I, *Rodden Dep.,* at 358:8-11.

208.    Under this approach, the success rate for Black-preferred candidates is lower during the past five contested elections (33.3%) as compared to the past seven contested elections (37.5%). Ex. C5, *Rodden Dep.*, at 155:20 – 156:2.

**RESPONSE:**

Undisputed; however, Dr. Rodden went on to clarify in his deposition that this impression of a downward trend is something that depends on a very small margin and that African American candidates have been more successful in the past two years because the African American voting age population has increased. Ex. I, *Rodden Dep.,* at 360:21 – 361:8. In addition, Dr. Rodden determined that Plaintiff's suggestion that single member districts without staggered terms would lead to worse results than with the current system. Ex. I, *Rodden Dep.*, at 342:1-13.

209. Using the point estimate approach to identify candidates of choice, the gap in the success rate for white-preferred candidates as compared to Black-preferred candidates is larger during the past seven contested elections (approximately 55 percentage points) as compared to the past twelve contested elections (approximately 40 percentage points). Ex. C5, *Rodden Dep.*, at 150:5-24, 155:1-7.

**RESPONSE:**

Undisputed; however, Dr. Rodden went on to clarify in his deposition that this impression of a downward trend is something that depends on a very small margin and that African American candidates have been more successful in the past two years because the African American voting age population has increased. Ex. I, *Rodden Dep.,* at 360:21 – 361:8. Dr. Rodden went on to clarify in his deposition that this impression of a downward trend is something that depends on a very small margin and that African American candidates have been more successful in the past two years because the African American voting age population has increased. Ex. I, *Rodden Dep.,* at 360:21 – 361:8. In addition, Dr. Rodden determined that Plaintiff's suggestion that single member districts without staggered terms would lead to worse results than with the current system. Ex. I, *Rodden Dep.*, at 342:1-13.

210.	Using the point estimate approach to identify candidates of choice, the gap in the success rate for white-preferred candidates as compared to Black-preferred candidates is larger during the past five contested elections (approximately 60 percentage points) as compared to the past seven contested elections (approximately 55 percentage points). Ex. C5, *Rodden Dep.*, at 155:1-7, 156:13-17.

**RESPONSE:**

Undisputed; however, Dr. Rodden went on to clarify in his deposition that this impression of a downward trend is something that depends on a very small margin and that African American candidates have been more successful in the past two years because the African American voting age population has increased. Ex. I, *Rodden Dep.,* at 360:21 – 361:8. Dr. Rodden went on to clarify in his deposition that this impression of a downward trend is something that depends on a very small margin and that African American candidates have been more successful in the past two years because the African American voting age population has increased. Ex. I, *Rodden Dep.,* at 360:21 – 361:8. In addition, Dr. Rodden determined that Plaintiff's suggestion that single member districts without staggered terms would lead to worse results than with the current system. Ex. I, *Rodden Dep.*, at 342:1-13.

## SENATE FACTORS

### I.	The "Predominant" Senate Factors (Factors 2 and 7)

#### A.	*Racially Polarized Voting (Senate Factor 2)*

211.	The number of Black and white candidates of choice in the twelve contested elections from 2000 through 2015 identified using the District's Top-Ranked Candidate and Point Estimate approaches, their respective levels of success, and the rate at which the candidates of choice for each racial group overlaps are as follows:

| Table 7 - Racial Polarization in FFSD Elections | | | | | |
|---|---|---|---|---|---|
| | Black Voters | | White Voters | | Overlapping Candidates |
| Method of Identification | Number of Candidates of Choice | Number Black | Number of Candidates of Choice | Number White | |
| Top-Ranked Candidate Approach | 12 | 11 (91.7%) | 12 | 12 (100%) | 0/12 (0%) |
| Point Estimate Approach | 27 | 17 (63%) | 27 | 25 (92.6%) | 10/27 (37%) |

*See supra ¶¶* 192, 200.

**RESPONSE:**

Undisputed when considering only disputed elections.

212.    Under the District's Top-Ranked Candidate approach, the preferred candidates of Black

voters and white voters overlapped 0% of the time. Black voters preferred Black candidates

92% of the time, while white voters preferred white candidates 100% of the time. *See supra*

*¶* 192.

**RESPONSE:**

Undisputed when considering only disputed elections.

213.    Under the District's Point Estimate approach, the preferred candidates of Black voters

and white voters overlapped 37% of the time. Black voters preferred Black candidates 63%

of the time, while white voters preferred white candidates 93% of the time. *See supra ¶* 200.

**RESPONSE:**

Undisputed.

B.    *Election of minorities to the Board (Senate Factor 7)*

214.    African Americans' representation on the Board is disproportionately low compared to

their share of the FFSD population. *See supra ¶¶* 15, 19. There are presently two African-

American Board members—Paulette-Thurman and Graves—out of seven (28.57%). *Supra*

¶ 23. According to the Decennial Census, African Americans comprise 53.84% of the District's total population, and 47.33% (single-race) of the District's VAP. *See supra ¶* 15.

**RESPONSE:**

Undisputed in that there are presently two African-American Board members; however, there are three Minority Preferred Candidates on the current Board – Paulette-Thurman, Graves and Hogshead. Ex. I, *Rodden Dep.,* 342:13 – 346:4.

215.    The District's expert Dr. Rodden observed that the current composition of the Board, as well as other municipal elected bodies in the area, reflects a racial composition significantly out of line with the population demographics. Ex. C5, *Rodden Dep.*, at 38:19 – 40:4; Ex. D4, Jonathan Rodden, "*Is segregation the problem in Ferguson?*," Wash. Post (Aug. 18, 2014) *(Ex. 3 to Dep. of Jonathan Rodden, Aug. 20, 2015)*, at 6.

**RESPONSE:**

Undisputed in that in August of 2014, six of seven Board members were white and currently five of seven Board members are white.  Ex I, *Rodden Dep.*, at 40: 12-22.

216.    Dr. Rodden agrees that the underrepresentation of African Americans in elected office despite the recent growth in the African-American population in the District is a "problem." Ex. C5, *Rodden Dep.*, at 38:19 – 40:4; Ex. D4, *Is Segregation the Problem in Ferguson?*, at 6.

**RESPONSE:**

Undisputed that Dr. Rodden stated in his article that the mismatch between the composition of the population and the municipal government in the Ferguson area is a problem.  Defendant FFSD objects in that Dr. Rodden was not specifically referencing the Ferguson-Florissant School District in this quote from his article.

217.   Former Board member Graham states that "[t]he lack of African-American representation on the Board exacerbates the Board's non-responsiveness to the needs of African-American students." Ex. A3, *Graham Decl.*, at ¶ 17.

**RESPONSE:**

Undisputed that Dr. Graham makes such a statement in her declaration. Defendant District objects in that Dr. Graham is not qualified to make such a determination and fails to state how the Board was more responsive during her time on the Board when minorities had proportional representation.

218.   Plaintiff Bailey does "not see [herself] or other African Americans represented on the school board." Ex. A1, *Bailey Decl.*, at ¶ 12.

**RESPONSE:**

Undisputed that Plaintiff Bailey makes this declaration. Defendant District objects in that Plaintiff Bailey fails to provide any specific reason other than not being told the reasons for Dr. McCoy's suspension. *Id.*

219.   From 1988 until 2000, Dr. Doris Graham was the only African American on the Board. Ex. A3, *Graham Decl.*, at ¶ 6.

**RESPONSE:**

Undisputed.

220.   Current Board member Paulette-Thurman stated that having African-American Board members makes a "difference," because "when issues come up that pertain to race, there's a different perspective now on the Board, who can say we've got to be very cognizant of . . . the dynamics of what's happening in a certain situation," like personnel issues or disciplinary appeals. Ex. E4, *Paulette-Thurman Dep.*, at 31:6-19.

**RESPONSE:**

Undisputed.

221.    Since 2000, there have never been more than two African-American members on the

Board at the same time. Ex. E1, *Morris Dep.*, at 11:2-14, 13:5-8, 81:12-19; Ex. E2, *Ebert*

*Dep.*, at 79:3-10; Ex. E6, *Hogshead Dep.*, at 65:17-20; Ex. E7, *Schroeder Dep.*, at 29:23 –

30:23; Ex. E8, *Chabot Dep.*, at 73:21-23.

**RESPONSE:**

Undisputed.

222.    The following table summarizes the number of candidates and overall success rates of

candidates of each race in each of the twelve contested election from 2000 through 2015:

| Table 8 - Comparative Success Rates of Black and White Candidates | | | | |
|---|---|---|---|---|
| | **Black Candidates** | | **White Candidates** | |
| **Election** | **Total Number** | **No. Successful** | **Total Number** | **No. Successful** |
| 2000 | 2 | 1 | 4 | 1 |
| 2001 | 1 | 0 | 3 | 2 |
| 2002 | 2 | 1 | 4 | 2 |
| 2003 | 1 | 1 | 2 | 1 |
| 2004 | 3 | 0 | 2 | 2 |
| 2006 | 2 | 0 | 3 | 2 |
| 2009 | 0 | 0 | 3 | 2 |
| 2011 | 2 | 0 | 7 | 3 |
| 2012 | 1 | 0 | 2 | 2 |
| 2013 | 2 | 0 | 2 | 2 |
| 2014 | 5 | 1 | 3 | 2 |
| 2015 | 3 | 1 | 2 | 1 |
| **TOTALS:** | **24** | **5 (20.8%)** | **37** | **22 (59.5%)** |

*See supra* ¶¶ 60, 69, 78, 89, 98, 105, 114, 120, 130, 139, 148, 167.

**RESPONSE:**

Undisputed.

223.    During the twelve contested elections from 2000 to 2015, twenty-four Black candidates ran for Board seats. African-American candidates were successful in five elections (20.8%) (G. Thomas, Graham, G. Thomas, Paulette-Thurman, Graves). *See supra* ¶¶ 60, 69, 78, 89, 98, 105, 114, 120, 130, 139, 148, 167.

**RESPONSE:**

Undisputed.

224.    During the twelve contested elections from 2000 to 2015, thirty-seven white candidates ran for Board seats. White candidates were successful twenty-two out of thirty-seven times (59.5%) (Hirsch, Garofalo, Hogshead, Clark, Fletcher, Knorr, Garofalo, Hogshead, Schroeder, Knowles, Schroeder, Knowles, Martinez, P. Morris, Chabot, Ebert, Schroeder, Hogshead, Brown, Chabot, P. Morris, Ebert). *See supra* ¶¶ 60, 69, 78, 89, 98, 105, 114, 120, 130, 139, 148, 167, 222.

**RESPONSE:**

Undisputed.

225.    During the five contested elections from 2011 to 2015, 13 African-American candidates ran for Board seats. Two (15.38%) were successful (Paulette-Thurman, Graves). *See supra* ¶ 222.

**RESPONSE:**

Undisputed.

226.    During the five contested elections from 2011 to 2015, 16 white candidates ran for Board seats. They were successful ten times (62.5%). *See supra* ¶ 222.

**RESPONSE:**

Undisputed.

227. During the 2013-2014 term, following Henson's loss during the April 2013 election, there were no African-American Board members. *Supra ¶¶* 138-39, 144; Ex. A3, *Graham Decl.*, at ¶ 15.

**RESPONSE:**

Undisputed.

228. Henson was appointed to the Board and has never won a Board election. *Supra ¶¶* 109, 118, 138-39, 144.

**RESPONSE:**

Undisputed, however Henson was unchallenged in the 2007 Board election. *Supra* at ¶109.

229. Immediately after Henson's loss at the polls, former Board member Graham attended a Board meeting "and publically challenged the School Board to advocate for all students in the District, especially African American students." Ex. A3, *Graham Decl.*, at ¶ 15; Ex. E1, *Morris Dep.*, at 53:8 − 54:6; Ex. F9, *Apr. 10, 2013 Board Meeting Mins. (Ex. 3 to Dep. of Paul Morris, June 15, 2015)*, at 11.

**RESPONSE:**

Undisputed.

## II. Factors Related to the Historical and Current Context of Discrimination (Factors 1, 5, and 8)

### A. *Official discrimination (Senate Factor 1) and its continuing effects on African-American residents of FFSD (Senate Factor 5)*

#### 1. History of Official Discrimination

230. The State, and St. Louis area in particular, gave rise to the case *Dred Scott v. Sandford*. 60 U.S. 393, 398 (1856).

**RESPONSE:**

Undisputed that this event took place 158 years ago.

231.    The State's Constitution of 1865, ratified two months after the end of the Civil War,

expressly restricted the franchise to white males. Mo. Const. of 1865, art. II, § 18.

**RESPONSE:**

Undisputed that this event took place 149 years ago.

232.    Black men were not permitted to vote until the State ratified the Fifteenth Amendment in

1870. Ex. G13, Tim O'Neil, *Look Back 250: Women, blacks in Missouri seek voting rights*

*after Civil War*, St. Louis Post-Dispatch, July 5, 2014.

**RESPONSE:**

Undisputed that black men were not permitted to vote 145 years ago in Missouri.

233.    The Missouri Constitution of 1865 barred African Americans from holding statewide

office. Mo. Const. of 1865, art. V, § 2 (requiring that the governor be a white man), art. V,

§ 12 (requiring that the lieutenant governor be a white man), art. IV, § 3 (requiring that

members of the Missouri house of representatives be white men), art. IV, § 5 (requiring that

state senators be white men), art. III, § 6 (requiring that all voters be white men).

**RESPONSE:**

Undisputed that black men and all women were barred from holding statewide office by the

Missouri Constitution of 1865.

234.    African Americans were also barred by statute from bearing witness in court, Mo. Rev.

Stat. ch. "Negroes and Mulattoes," § 2, at 600 (1825), or serving as jurors, Mo. Rev. Stat. ch.

146, § 2-2, at 797 (1870).

**RESPONSE:**

Undisputed.

### 2. Housing

235. St. Louis County used and acquiesced in the private maintenance of discriminatory real estate and exclusionary zoning practices designed to compel African Americans to remain in designated, underserved areas. *See* Ex. B3, *Expert Report of Colin Gordon*, May 27, 2015, at 7-16; Ex. B4, *Expert Report of David Kimball*, May 27, 2015, at 8-10; *see also* Ex. C5, *Rodden Dep.*, at 42:2-13; Ex. E7, *Schroeder Dep.*, at 31:21 – 32:2, 33:4-14.

**RESPONSE:**

Undisputed; however, no defendant is accused of such practices and these practices included areas outside of the Ferguson-Florissant School District. *Id.*; Ex. K, *Gordon dep.* at 13:12 – 14:2.

236. The region's use of discriminatory real estate practices and exclusionary zoning practices led to three landmark residential racial discrimination cases: *Shelley v. Kraemer*, 334 U.S. 1 (1948), *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), and *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975). *See* Ex. B3, *Gordon Rep.*, at 5; Ex. B4, *Kimball Rep.*, at 8-9.

**RESPONSE:**

Undisputed that this relates to the region and not to the District specifically.

237. In *Shelley v. Kraemer*, a case arising out of the city of St. Louis, the Supreme Court held unconstitutional state enforcement of racially restrictive housing covenants. 334 U.S. at 4, 23; *see* Ex. B3, *Gordon Rep.*, at 5, 9; Ex. B4, *Kimball Rep.*, at 8-9.

**RESPONSE:**

Undisputed. However, this case did not involve the District.

238. After *Shelley*, municipalities in St. Louis County (including those within the bounds of FFSD) relied on private realty practices, such as exclusionary zoning practices like large-lot single-family residential zoning, which by design excluded most African Americans. *See* Ex.

B3, *Gordon Rep.*, at 15-16; Ex. E4, *Paulette-Thurman Dep.*, at 62:22-25.

**RESPONSE:**

Undisputed, however, Plaintiffs fail to provide such realty practices specific to the District. Ex. K, *Gordon Dep.* at 13:12 – 14:2.

239. These discriminatory practices were in turn subsidized and regulated by local and federal public policies. *See* Ex. B3, *Gordon Rep.*, at 15-16.

**RESPONSE:**

Undisputed, however, Plaintiffs fail to provide discriminatory practices specific to the District. Ex. K, *Gordon Dep.* at 13:12 – 14:2.

240. These discriminatory practices were challenged in court. In *Jones v. Alfred H. Mayer Co.*, the Supreme Court outlawed discrimination in private real estate transactions. 392 U.S. at 412-13; *see* Ex. B3, *Gordon Rep.*, at 5. In *United States v. City of Black Jack*, the Eighth Circuit, in one of the first exclusionary zoning cases, struck down the town of Black Jack's zoning ordinance banning construction of multifamily housing. 508 F.2d at 1181-82; *see* Ex. B3, *Gordon Rep.*, at 5, 16; Ex. B4, *Kimball Rep.*, at 9.

**RESPONSE:**

Undisputed. However, these cases are not specific to the District.

241. The city of St. Louis did not pass a public accommodations bill until 1961, and the bill that passed excluded landlord-tenant relationships. Ex. B4, *Kimball Rep.*, at 9.

**RESPONSE:**

Undisputed.

242. Late into the 1980s, so-called urban renewal efforts in North St. Louis County were "designed and pursued as a means of relocating suburban pockets of American-American settlement 'back' into [St. Louis] City." Ex. B3, *Gordon Rep.*, at 26.

**RESPONSE:**

Undisputed.

243. Historical housing discrimination has in large part caused the current race gap in family wealth. Ex. B3, *Gordon Rep.*, at 20-21, 23-24, 27-28, 32.

**RESPONSE:**

Undisputed; however, Mr. Gordon also stated that his finding were "broad historical conclusions" going back to the early part of the 20th century and does not relate to the District specifically. Ex. K, *Gordon dep.* at 21:19-25

244. Home equity is the centerpiece of family wealth for moderate-income Americans. Ex. B3, *Gordon Rep.*, at 21.

**RESPONSE:**

Undisputed. However, this does not relate to the District specifically.

245. The rate of African-American homeownership remains depressed in the St. Louis area. Ex. B8, *Gordon Rebuttal*, at 3-4.

**RESPONSE:**

Undisputed; however, Mr. Gordon admits the majority of African Americans in the District are homeowners. Ex. K, *Gordon dep.* at 35:23-25.

246. African-American homeowners are often cornered into less stable neighborhoods on subprime terms, where there is little access to public services and high-performing schools. Ex. B3, *Gordon Rep.*, at 21, 23-24, 27-28.

**RESPONSE:**

Undisputed, however, Mr. Gordon admits this information is not specific to the District, but relates to the St. Louis metropolitan area. Ex. K, *Gordon dep.* at 24:15-23.

247.     Property values of African Americans' homes have grown more slowly in comparison to whites' homes. Ex. B3, *Gordon Rep.*, at 21; Ex. B8, *Gordon Rebuttal*, at 3-4.

**RESPONSE:**

Undisputed, however, Mr. Gordon admits this information is not specific to the District, but relates to the St. Louis metropolitan area. Ex. K, *Gordon dep.* at 24:15-23

248.     The homeownership gap between African Americans and whites, coupled with the slower rate of property value growth of African Americans' homes in comparison to whites' homes, has resulted in disparities in wealth among African-American and white households. Ex. B3, *Gordon Rep.*, at 20-21.

**RESPONSE:**

Undisputed, however, Mr. Gordon admits this information is not specific to the District, but relates to the St. Louis metropolitan area.  Ex. K, *Gordon dep.* at 24:15-23.

249.     These disparities in homeownership have inter-generational effects. Ex. B3, *Gordon Rep.*, at 20-21.

**RESPONSE:**

Undisputed, however, Mr. Gordon admits this information is not specific to the District, but relates to the St. Louis metropolitan area.  Ex. K, *Gordon dep.* at 24:15-23.

250.     In 2013, median family wealth for African Americans nationally was 8.2% of median family wealth for whites. Ex. B3, *Gordon Rep.*, at 20.

**RESPONSE:**

Undisputed that these are national statistics.

251.    The wealth gap is one chief driver of continuing (and in some cases widening) disparities between African Americans and whites in FFSD in areas such as educational achievement, level of poverty, employment, and health care. Ex. B4, *Kimball Rep.*, at 10; Ex. B3, *Gordon Rep.*, at 21.

**RESPONSE:**

Undisputed as this fact applies to the St. Louis metropolitan area; however, neither Dr. Gordon nor Dr. Kimball apply this fact specifically to the District. Ex. P, *Kimball rep.,* at 10; Ex. DDD, *Gordon rep.,* at 21

252.    Racial disparities in educational achievement, level of poverty, employment, homeownership, health care, and criminal justice persist in FFSD and the St. Louis metropolitan region. Ex. C5, *Rodden Dep.*, at 42:2 – 43:5, 300:16 – 301:11; Ex. B12, *Supplemental Report of Jonathan Rodden: Senate Factors*, July 2, 2015, ¶¶ 26, 32, 34, 36; Ex. B4, *Kimball Rep.*, at 9-10, 12; Ex. B3, *Gordon Rep.*, at 20-21; Ex. B8, *Gordon Rebuttal*, at Tbl. 4 (p. 4); Ex. B1, *Cooper Decl.*, at ¶¶ 36-37; Ex. B6, *Cooper Suppl. Decl.*, at ¶¶ 17-20.

**RESPONSE:**

Undisputed that these experts state that there are racial disparities in educational achievement, level of poverty, employment, homeownership, health care and criminal justice in the St. Louis metropolitan region. However, Dr. Rodden clearly shows how those disparities are much less in the District than they are in the metropolitan area, the state and the nation. Ex. I, *Rodden Dep.,* at 42:2 – 43:5, 300:16 – 301:11; Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors*, July 2, 2015, ¶¶ 26, 32, 34, 36.

253. Racial disparities in FFSD are higher than national averages in areas such as unemployment, education, health, homeownership, and criminal justice. Ex. B4, *Kimball Rep.*, at 10, 12; Ex. B3, *Gordon Rep.*, at 3, 5-7, 19; Ex. B8, *Gordon Rebuttal*, at Tbl. 4 (p. 4); Ex. B1, *Cooper Decl.*, at ¶¶ 36-37; Ex. B6, *Cooper Suppl. Decl.*, at ¶¶ 17-20. The District's expert does not dispute these findings. Ex. B12, *Supplemental Report of Jonathan Rodden: Senate Factors*, July 2, 2015, ¶¶ 26, 32, 34, 36.

**RESPONSE:**

Objection in that racial disparities in the District are lower than national, state and the metropolitan areas and these findings are specifically disputed by FFSD's expert. Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors*, July 2, 2015, ¶¶ 26, 32, 34, 36.

254. Residential segregation persists and in some cases has worsened in St. Louis County and FFSD. Ex. B3, *Gordon Rep.*, at 4, 27-28, Map 10 (p. 29); Ex. B8, *Gordon Rebuttal*, at 3-4; Ex. E4, *Paulette-Thurman Dep.*, at 63:8-13.

**RESPONSE:**

Objection in that residential segregation persists and in some cases has worsened in St. Louis County, but dispute that residential segregation has worsened in the FFSD. Ex. I, *Rodden Dep.,* at 44:6-13; Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors,* July 2, 2015, ¶¶ 22, 23, 27, 34, 36.

255. The lived experience of segregation is multidimensional, and in FFSD African Americans are "more segregated across all dimensions simultaneously." Ex. B8, *Gordon Rebuttal*, at 3-4; Ex. C3, *Dep. of Colin Gordon*, Aug. 19, 2015, at 72:13-73:11.

**RESPONSE:**

Objection in that Plaintiffs fail to put this statement into context. Specifically, FFSD African Americans are less segregated across all areas compared to the St. Louis metropolitan area and the State of Missouri. Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors,* July 2, 2015, ¶¶ 20, 23, 27, 28, 30, 31, 32, 34.

256. Patterns of housing segregation in FFSD are reflected in and reinforced by the disparities in education, employment, wealth, home ownership, access to health care and other factors in basic economic security. Ex. B3, *Gordon Rep.*, at 27-28; Ex. B8, *Gordon Rebuttal*, at 3-4.

**RESPONSE:**

Objection in that this fact was specifically challenged by FFSD's expert. Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors,* July 2, 2015, ¶¶ 20, 23, 27, 28, 30, 31, 32, 34.

3. Education

257. The State and St. Louis County engaged in official discrimination in education. *See* Ex. B4, *Kimball Rep.*, at 10; Ex. E4, *Paulette-Thurman Dep.*, at 63:1-3; Ex. E1, *Morris Dep.*, at 96:14-16; Ex. E5, *Graves Dep.*, at 56:14-16.

**RESPONSE:**

Undisputed.

258. In 1875, the State revised its then-ten-year-old constitution to require, rather than merely permit, racially segregated schools. Mo. Const. of 1875, art. XI, § 3.

**RESPONSE:**

Undisputed that the State revised its constitution to require racially segregated school 140 years ago.

259.    A provision in the Missouri Constitution of 1904 that permitted segregated schooling was not officially rescinded until 1976. *See Missouri v. Jenkins*, 515 U.S. 70, 176 (1995) (Ginsburg, J., dissenting) (noting the "deep, inglorious history of segregation in Missouri").

**RESPONSE:**

Undisputed.

260.    Kinloch is one of the municipalities completely inside FFSD's borders. *Supra* ¶ 13. It was once an unincorporated area that had included the territory of the adjacent city of Berkeley. Ex. B3, *Gordon Rep.*, at 16, 22.

**RESPONSE:**

Undisputed that Kinloch is currently a municipality completely inside FFSD's borders subsequent to the 1975 reorganization of the District. Prior to the reorganization, Kinloch was not a part of the FFSD.

261.    Prior to 1937, the areas of present-day Kinloch and Berkeley together formed the Kinloch School District, whose schools were segregated under Missouri law. Ex. B3, *Gordon Rep.*, at 22; *Missouri*, 515 F.2d at 1367.

**RESPONSE:**

Undisputed.

262.    In 1937, white residents of Kinloch split the city, incorporated the city of Berkeley, and formed a new predominantly white school district. The student population of the new Berkeley District was 80% white, while the student population of the remnant of the Kinloch District was 99.3% African-American. Ex. B3, *Gordon Rep.*, at 16, 22; *Missouri*, 515 F.2d at 1367. "This was done despite the strong opposition of the new Kinloch district." *Missouri*, 515 F.2d at 1367.

**RESPONSE:**

Undisputed.

263.    "[A]s a direct consequence of the creation and maintenance of Kinloch as a small, all-black school district, educational opportunities provided were markedly inferior to the opportunities offered in the adjoining Berkeley and Ferguson districts, as well as those offered in most other school districts in St. Louis County." *Missouri*, 515 F.2d at 1367.

**RESPONSE:**

Undisputed.

264.    The cities of Berkeley and Ferguson together surrounded Kinloch almost completely. Ex. B3, *Gordon Rep.*, at 16.

**RESPONSE:**

Undisputed.

265.    Berkeley and Ferguson took direct measures to segregate Kinloch's African-American residents. Berkeley and Ferguson streets dead-ended before they reached Kinloch, and, until 1968, Ferguson barricaded through streets shared with Kinloch. Ex. B3, *Gordon Rep.*, at 16; Ex. B4, *Kimball Rep.*, at 9.

**RESPONSE:**

Undisputed.

266.    In 1975, nearly two decades after *Brown v. Board of Education*, 349 U.S. 294 (1955), the school districts of Kinloch and Berkeley were court-ordered to desegregate and merge into the adjacent Ferguson-Florissant School District, resulting in the present-day FFSD. *See United States v. Missouri*, 388 F. Supp. 1058 (E.D. Mo. 1975).

**RESPONSE:**

Undisputed.

267. An achievement gap exists between African-American and white students in FFSD. Ex. E10, *Green Dep.*, at 64:10-13; Ex. E3, *Brown Dep.*, at 52:13-21; Ex. E7, *Schroeder Dep.*, at 34:12-17, 34:20 – 35:14.

**RESPONSE:**

Undisputed that an achievement gap exists between African-American and white students in every school district Missouri, and the vast majority of all school districts in the United States. Ex. PP, *Schroeder Dep.,* at 79:20 – 80:6; Ex. RR, *Chabot Dep.,* at 87:15-22.

268. Currently, in FFSD, African American students have disproportionately low enrollment in advanced classes such as calculus, chemistry, physics and advanced placement, and more limited access to enrichment programs and extracurricular activities. Ex. F1, *FFSD Data Reported to Office of Civil Rights*, at 1-3, 18; Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 1-4; Ex. E4, *Paulette-Thurman Dep.*, at 66:4-22; Ex. E1, *Morris Dep.*, at 106:13 – 107:15, 108:10-21.

**RESPONSE:**

Undisputed.

269. For example, based on data provided to the U.S. Department of Education for the 2011 survey year, 77.1% of the District's enrollment is African-American and 15.6% is white, but of the students enrolled in calculus, 51.4% were African-American and 37.8% were white. Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 4. Of the students enrolled in FFSD's gifted and talented program, 35.3% were African-American and 48% were white. Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 2.

**RESPONSE:**

Undisputed.

270. Educational attainment, measured by the percent of the population with a Bachelor's degree or higher, falls as you compare the St. Louis metropolitan area to FFSD to the majority-African-American block groups within FFSD. Ex. B3, *Gordon Rep.*, at 3.

**RESPONSE:**

Objection in that disparities regarding educational attainment measured by the percent of the population with a Bachelor's degree or higher are far smaller in the FFSD than in the rest of St. Louis and the state of Missouri as a whole. Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors,* ¶¶ 31. 33, 34.

271. Disparities in the use of discipline between African-American and white students also exist in FFSD. Ex. E4, *Paulette-Thurman Dep.*, at 26:6 – 30:16; Ex. E10, *Green Dep.*, at 64:14-17; Ex. F1, *FFSD Data Reported to Office of Civil Rights*, at 7-13, 15-16.

**RESPONSE:**

Undisputed that disparities in discipline exist between African American and white students in every school district in Missouri and the vast majority of districts in the United States, according to the U.S. Department of Education. www.ed.gov/news/press-releases/expansive-survey-americas-public-schools-reveals-troubling-racial-disparities

272. During the 2011 survey year, African-American students in FFSD disproportionately received in-school suspensions: African-American students comprised 77.1% of the District's student population but 87.8% of students who received in-school suspensions. Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 5. During the 2011 survey year, African-American students in FFSD also disproportionately received out-of-school suspensions in the FFSD: African-American students comprised 77.1% of the District's student population but

87% of students who received out-of-school suspensions. Ex. F2, *FFSD Data on Office of Civil Rights Website*, at 5.

**RESPONSE:**

Undisputed. *Supra*, Response to ¶271.

273.    African-American students in FFSD are disproportionately referred to law enforcement for infractions in school. Ex. F1, *FFSD Data Reported to Office of Civil Rights*, at 16; Ex. F10, *FFSD Data on Office of Civil Rights Website – Discipline of Students Without Disabilities, Law Enforcement Referral (Ex. 6 to Dep. of Paul Morris, June 15, 2015)*, at 1; Ex. F11, *FFSD Data on Office of Civil Rights Website – Discipline of Students With Disabilities, Law Enforcement Referral (Ex. 7 to Dep. of Paul Morris, June 15, 2015)*, at 1.

**RESPONSE:**

Undisputed, with the understanding that Missouri public schools are required by statute to report certain infractions to law enforcement.  *§160.261 RSMo.*

274.    During the 2011 survey year, African-American students comprised 76.9% of the District's student population without disabilities but 92.6% of students without disabilities who were referred to law enforcement. Ex. F10, *FFSD Discipline of Students Without Disabilities, Law Enforcement Referral*, at 1.

**RESPONSE:**

Undisputed, with the understanding that Missouri public schools are required by statute to report certain infractions to law enforcement.  *§160.261 RSMo.*

275.    Every student who reportedly received corporal punishment in the District during the 2011 survey year was African-American. Ex. F1, *FFSD Data Reported to Office of Civil Rights*, at 8, 13; Ex. E4, *Paulette-Thurman Dep.*, at 104:16 – 105:16.

**RESPONSE:**

Undisputed.

276.    Current Board member Paulette-Thurman stated that although she was not aware of this

data, it would not surprise her "based on the data that [she has] seen and heard and the

comments that [she] get[s] from people, even based on the reports that [she has] read and

[she has] seen in serving on the Board -- serving on the discipline board in the district."

Ex. E4, *Paulette-Thurman Dep.*, at 78:20-22, 79:1-8.

**RESPONSE:**

Undisputed, however, Board member Paulette-Thurman also stated that most principals consider

the age and the infraction when disciplining students and not the race of a student.  Ex. KK,

*Paulette-Thurman Dep.,* at 89:5-15.

277.    According to the September 2015 report issued by the Ferguson Commission, "a

volunteer group of 16 diverse community leaders" appointed by Missouri Governor Jay

Nixon, "to listen to and engage with area organizations, national thought leaders, institutions,

experts    and    citizens,"    Ferguson    Comm'n,    *Commission    Work*,

http://stlpositivechange.org/commission-work, Missouri ranked 50th out of 50 in school

discipline gap for primary school-aged students and 47th out of 50 for secondary school

students Ex. G14, Ferguson Comm'n, *Forward Through Ferguson: A Path Toward Racial*

*Equity (Sept. 21, 2015)*, at 56.

**RESPONSE:**

Undisputed that the Commission was formed as a result of the City of Ferguson.  The City of

Ferguson only makes up 27% of the population of the District. Ex. K, *Gordon Dep*., at 19:10-14.

278.    In its *Investigation of the Ferguson Police Department* report, the U.S. Department of

Justice documented a pattern of force used against African American students and law enforcement's "insufficient appreciation for the negative educational and long-term outcomes that can result from treating disciplinary concerns as crimes and using force on students." Ex. G9, *Investigation of the Ferguson Police Department*, at 37-38.

**RESPONSE:**

Undisputed, with the understanding that only 27% of the District's population lives in the City of Ferguson. Ex. K, *Gordon Dep.,* at 19:10-14.

279.    The U.S. Department of Justice issued a report in July 2013 detailing the results of a DOJ investigation into the St. Louis County Family Court. According to the report, the investigation found that in the County the disparity in the rates at which Black and white juvenile defendants are subjected to pretrial detention is "large" and "unexplained by factors other than race" and that, when detained before trial, a child is removed from school for between 21 and 30 days, and occasionally longer. Ex. G15, U.S. Dep't of Justice, *Investigation of the St. Louis County Family Court* (July 31, 2015), at 26, 47.

**RESPONSE:**

Undisputed, with the understanding that the FFSD is a small fraction of the jurisdiction of the St. Louis County Family Court.

4.    Other Socioeconomic Disparities

280.    According to 2011 – 2013 ACS data, African Americans in FFSD are more than twice as likely to live below the poverty line and more likely to be unemployed than are white residents. Ex. B1, *Cooper Decl.*, at ¶ 36.

**RESPONSE:**

Objection. Dr. Rodden reports that according to the 2011-2013 ACS, the median household income for African-American households in the FFSD is lower than that of whites by about

$14,000; whereas in the St. Louis metropolitan area, this gap is more than twice as large, at around $30,000. Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors,* at ¶ 32.

281.  According to 2008-2012 ACS data, most of the predominantly African-American neighborhoods in FFSD are in areas with lower median household incomes. Ex. B1, *Cooper Decl.*, at ¶ 37, Fig. 8.

**RESPONSE:**

Objection.  Dr. Rodden reports that according to the 2011-2013 ACS, the median household income for African-American households in the FFSD is lower than that of whites by about $14,000; whereas in the St. Louis metropolitan area, this gap is more than twice as large, at around $30,000. Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors,* at ¶ 32.

282.  Individual and family poverty rates and the unemployment rate in the majority-African-American area of FFSD are nearly double the rate in the St. Louis metro area. Ex. B3, *Gordon Rep.*, at 3.

**RESPONSE:**

Objection. The unemployment rate gap between African-Americans and whites is below both the St. Louis Metropolitan area and the state of Missouri. Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors,* at ¶ 32.


283.  In FFSD, over twice as many African-American households rely on food stamps compared to white households. Ex. B1, *Cooper Decl.*, at ¶ 36.

**RESPONSE:**

Objection. The gap between African-American and white households that rely on food stamps is below both the St. Louis Metropolitan area and the state of Missouri. Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors,* at ¶ 33.

284. The rates of reliance on public assistance in the majority-African-American areas of the District are more than double the averages for the St. Louis metro area. Ex. B3, *Gordon Rep.*, at 3.

**RESPONSE:**

Objection. *Supra*, Response to ¶283.

285. African-American residents of FFSD are less likely to have health insurance. Ex. B1, *Cooper Decl.*, at Ex. D.

**RESPONSE:**

Undisputed.

286. Florissant and Ferguson together make up most of the geographic area covered by FFSD.

**RESPONSE:**

Undisputed, with the understanding that only 27% of the District's population lives in the City of Ferguson. Ex. K, *Gordon Dep.,* at 19:10-14.

287. African-American residents of Florissant and Ferguson face racial profiling by law enforcement and a disproportionate number of stops, arrests, fines, and fees. Ex. G9, *Investigation of the Ferguson Police Department*, at 3-5; Ex. G16, Better Together, *Public Safety – Municipal Courts* (Oct. 2014), at 8; Ex. G17, excerpts from Mo. Att'y General's Office, *2014 Vehicle Stops Report*, Racial Profiling Data, at pp. 367-68 (Ferguson), 377-78 (Florissant), App'x B pp. 182 (Ferguson), 186 (Florissant) (*full report available at* https://ago.mo.gov/home/vehicle-stops-report/2014-executive-summary).

**RESPONSE:**

Undisputed, with the understanding that the FFSD has no input or authority with regard to the Ferguson and Florissant police departments.

288. According to the DOJ *Investigation of the Ferguson Police Department* report, African-American residents of Ferguson in 2013 were 68% less likely to have their cases dismissed by the municipal judge and 50% more likely to have their cases lead to an arrest warrant; and accounted for 95% of all "Manner of Walking" charges, 94% of all "Failure to Comply" charges; 92% of all "Peace Disturbance" charges; and 89% of all "Failure to Obey" charges. Ex. G9, *Investigation of the Ferguson Police Department*, at 5, 62.

**RESPONSE:**

Undisputed, with the understand that the FFSD has no input or authority with regard to the Ferguson Police Department and only 27% of the District's population lives in the City of Ferguson. Ex. K, *Gordon Dep.,* at 19:10-14.

289. A report sponsored by The Missouri Council for a Better Economy notes that, although only 24% of St. Louis County residents are African-American, in the 21 County municipalities that collect more than 20% of their revenue from court fines and fees, 62% of the residents are African-American. Ex. G16, *Public Safety – Municipal Courts*, at 8.

**RESPONSE:**

Undisputed, with the understanding that the FFSD has no connection, input or authority with regard to the municipal courts of St. Louis County.

290. The Missouri Attorney General 2014 Vehicle Stops Report found that the indices for traffic stops of African Americans in Ferguson for the years 2000-2014 range from 1.30 to

1.57 and in Florissant from 2.66 to 4.79, where an index over 1 shows race disparity. Ex. G17, *2014 Vehicle Stops Report*, at App'x B pp. 182, 186.

**RESPONSE:**

Undisputed, with the understanding that the FFSD has no connection, input or authority with regard to the Ferguson and Florissant police departments.

     5.   <u>Continuing Effects of Past Discrimination and Effect on Political Participation</u>

291.    African Americans in St. Louis County and in FFSD still suffer the effects of past official discrimination. *See* Ex. E4, *Paulette-Thurman Dep.*, at 63:1-13; Ex. E10, *Green Dep.*, at 58:12 – 59:1; Ex. E7, *Schroeder Dep.*, at 35:18 – 36:5.

**RESPONSE:**

Objection. Courtney Graves, current African-American board member in FFSD, does not believe that African-Americans in the FFSD suffer from effects of past discrimination. Ex. JJ, *Graves Dep.,* at 56:17-20.

292.    Former FFNEA president Green stated that he "believe[s] that there are still certain privileges or rights that are not afforded to certain African-American individuals [in Ferguson]." Ex. E10, *Green Dep.*, at 58:12 – 59:1.

**RESPONSE:**

Undisputed.

293.    Current Board member Graves stated that as an African-American, she "ha[s] to be more qualified than a counterpart to get the same position." Ex. E5, *Graves Dep.*, at 57:11-15.

**RESPONSE:**

Objection, in that Dr. Graves was not speaking specific to the FFSD, but in general terms regarding struggles of the African American community. Ex. JJ, *Graves Dep.,* at 57:4-15.

294.    St. Louis County Council member Hazel Erby, the only African-American Council

member, states that educational disparities persist today in public schools in the area and that "[u]ntil just a few years ago there was still segregation in the [area public] schools." Ex. A2, *Erby Decl.*, at ¶¶ 2, 9.

**RESPONSE:**

Undisputed, with the understanding that Ms. Erby was not speaking specifically of the FFSD in her Declaration. *Erby Decl.*, at ¶¶ 2, 9.

295.    The ongoing effects of the history of official discrimination in St. Louis County and FFSD are reflected in present day socioeconomic disparities between African Americans and whites. Ex. E4, *Paulette-Thurman Dep.*, at 63:1-13. Current Board member Paulette-Thurman "think[s] that there's discrimination in terms of housing, in terms of education, in terms of even churches." Ex. E4, *Paulette-Thurman Dep.*, at 63:8-13.

**RESPONSE:**

Undisputed as to Dr. Paulette-Thurman's thoughts regard present day socioeconomic disparities.

296.    Dr. Rodden acknowledges that discriminatory redlining and zoning and restrictive housing covenants continue to be an issue in the socioeconomic life of St. Louis County. Ex. C5, *Rodden Dep.*, at 41:16 – 43:5.

**RESPONSE:**

Undisputed, with the understanding Dr. Rodden's comments were specific to St. Louis County as a whole and not the FFSD.

297.    According to Plaintiffs' expert Dr. Gordon, "in St. Louis and its suburbs, . . . a long history of discrimination and segregation effectively 'lived on' in the form of the black-white wealth gap." Ex. B3, *Gordon Rep.*, at 21.

**RESPONSE:**

Undisputed, in that Dr. Gordon's comments were with regard to the St. Louis metropolitan area and not specific to the FFSD.

298.     African Americans are highly segregated in FFSD in terms of their economic, social, and political exclusion. Ex. B8, *Gordon Rebuttal*, at 3-4.

**RESPONSE:**

Objection. Disparities between African Americans and whites are far smaller in the FFSD than in the rest of St. Louis and the state of Missouri as a whole. Ex. SS, *Supplemental Report of Jonathan Rodden: Senate Factors,* at pp.15-19.

299.     Current Board member Paulette-Thurman observed that churches are highly segregated in FFSD and that "Sunday is probably the most segregated day of the week." Ex. E4, *Paulette-Thurman Dep.*, 63:15-16.

**RESPONSE:**

Undisputed with regard to Dr. Paulette-Thurman's observation.

300.     The ongoing socioeconomic effects of past discrimination hinder the ability of African-Americans voters in FFSD to participate in the political process. Ex. C5, *Rodden Dep.*, at 71:15 – 72:5.

**RESPONSE:**

Objection.  Dr. Rodden's responses in this section of the deposition were not in reference to the FFSD, but with regard to the state of Missouri.  Dr. Rodden specifically states: ". . . I do think it's appropriate for me, in answer that question, to point out to the Court that - - that the assumption that the Ferguson-Florissant school district with respect to disparities between African-Americans and whites is the same as the state of Missouri is demonstrably a bad assumption, so I would not find that hypothetical analysis, nor would I find the state of Missouri

analysis to be especially useful to the Court in determining turnout rates in the school district."
Ex. I, *Rodden Dep.,* at 70:18 – 71:1. Dr. Rodden also finds that April elections are characterized
by the participation of very similar numbers of African-American and white voters, with the
balance now clearly shifting toward African Americans. Ex. SS, *Report of Jonathan Rodden,* at
¶30.

301.    Depressed socioeconomic wellbeing increases voting "costs" and dampens political
        participation among African Americans. Ex. B4, *Kimball Rep.*, at 11-12.

**RESPONSE:**

Objection. Dr. Kimball concluded that the relationship between race and turnout in the 2014
FFSD Board elections was "weak". Ex. O, *Kimbell Dep.,* at 51:6-11.

302.    The District's expert agrees that socioeconomic disparities "feed directly into turnout"
        and registration behavior because "people who live in conditions of poverty are less likely to
        take the effort to become registered and go through the hoops that one needs to go through to
        get registered." Ex. C5, *Rodden Dep.*, at 71:15 – 72:5.

**RESPONSE:**

Objection.  The District's expert specifically pointed out to the Court in this quote this he was
speaking with regard to the state of Missouri and not the FFSD. Ex. I, *Rodden Dep.,* at 70:18 –
71:1.

303.    According to Plaintiff Hudson, the voters in the African-American community "are
        marginalized because they have historically faced barriers to voting, and may not have the
        resources to volunteer or donate to school board campaigns." Ex. A5, *Hudson Decl.*, at ¶ 17.

**RESPONSE:**

Undisputed that Plaintiff Hudson makes this declaration.

304. According to Plaintiff Johnson, "white candidates have access to structured campaign resources and funds that [African-American candidates] lack." Ex. A6, *Johnson Decl.*, at ¶ 15. For example, Larry Thomas and LaWanda Wallace, two African-American Board candidates in 2014, were unable to attend candidate forums due to the lack of private transportation. Ex. E4, *Paulette-Thurman Dep.*, at 46:2-4 (Wallace), 48:22 – 49:9 (L. Thomas). Wallace was also inexperienced and did not have enough money to support a campaign. Ex. E10, *Green Dep.*, at 40:24 – 41:6.

**RESPONSE:**

Undisputed. However, Plaintiffs Johnson cannot know the entirety of access for white candidates or African American candidates. In addition, there is no evidence that this lack of transportation or inexperience is limited to African Americans.

      *B.*   <u>*Lack of responsiveness (Senate Factor 8)*</u>

305. Many of the current Board members are completely unaware of the particularized needs and concerns of the FFSD African-American community or believe that no such needs or concerns exist. Ex. E2, *Ebert Dep.*, at 107:3 – 108:3; Ex. E3, *Brown Dep.*, at 49:24 – 50:4; Ex. E6, *Hogshead Dep.*, at 73:17 – 74:15; Ex. E8, *Chabot Dep.*, at 86:14 – 87:9; Ex. E1, *Morris Dep.*, at 97:2-20.

**RESPONSE:**

Objection. Board member Ebert stated that any needs and concerns particular to the African American community in the FFSD should be viewed through their lens and it was not for him to speculate. Ex. NN, *Ebert Dep.,* at 107:3-7. Board member Chabot stated that there are particularized needs for people in the community who cannot feed their children or pay their electric bill, and that race is not the only defining factor for that. Mr. Chabot also referenced the

conclusions of the DOJ report with regard to particular African American needs in the FFSD. Ex. RR, *Chabot Dep.,* 86:14 – 87:9. Board member Brown stated that African Americans in the district have concerns and needs similar to most people's concerns and needs, depending on the individual and the family. Ex. OO, *Brown Dep.,* 49:24 – 51:17. Board member Hogshead stated that needs and concerns are more associated with socioeconomics, rather than race. Ex. QQ, *Hogshead Dep.,* at 73:7 – 74:15. Board member Morris stated that he is aware that the African American community has special needs and concerns, such as more African Americans sitting on the Board and hiring more African American employees. Ex. MM, *Morris Dep.,* at 97:2 – 97:11. African American Board member Graves stated that every ethnic group has their own issues and concerns and that there were not specific to the African American community. Ex. JJ, *Graves Dep.,* at 56:21 – 57:10.

306.    Current Board member Paulette-Thurman, however, recognized that there was a "difference in resources for North Side schools as opposed to South Side schools" in the District and identified this as a particularized need of the African-American community. Ex. E4, *Paulette-Thurman Dep.*, at 26:15 – 27:1.

**RESPONSE:**

Undisputed.

307.    Most Board members are unaware of the disparate use of school discipline against Black students in the District. Ex. E2, *Ebert Dep.*, at 107:3 – 108:3; Ex. E3, *Brown Dep.*, at 49:24 – 50:4; Ex. E6, *Hogshead Dep.*, at 77:24 – 78:7; Ex. E8, *Chabot Dep.*, at 86:14 – 87:9; Ex. E1, *Morris Dep.*, at 97:2-20.

**RESPONSE:**

Objection. Board member Chabot was not asked, nor did he opine on whether there was disparate use of school discipline against Black students in the District. *Chabot Dep.,* at 86:14 – 87:9. Board member Morris stated that the Board has taken action to address the disparities in discipline. *Morris Dep.,* 126:3-9. Board member Graves (African American) stated she was unaware of disparity in the use of discipline by race in the FFSD. *Graves Dep.,* 62:4-15. The school board does participate in any disciplinary decisions unless there is an appeal to the Board of a suspension in excess of ten (10) days, or if there is a recommendation to suspend a student for more than one-hundred eighty (180) days or to expel the student. *§§ 167.161, 167.171 RSMo.;*Ex. NN*, Ebert Dep.,* 122:13 – 123:13; Ex. OO, *Brown Dep.*, at 54:1-18; Ex. PP*, Schroeder Dep.*, at 38:7 – 39:8;

308.    Most Board members are unaware of the full extent of continuing racial socioeconomic disparities in the District, Ex. E3, *Brown Dep.*, at 47:17 – 48:4, or that they exist at all, Ex. E2, *Ebert Dep.*, at 108:9 – 109:2; Ex. E6, *Hogshead Dep.*, at 73:22 – 74:23; Ex. E8, *Chabot Dep.*, at 78:18 – 80:15; Ex. E1, *Morris Dep.*, at 97:21 – 98:11; Ex. E5.

**RESPONSE:**

Undisputed, with the notation that African American board member Graves also stated she was unaware of racial disparities in the District. *Graves Dep.,* 57:18 – 58:7. In addition, African American board member Paulette-Thurman stated that the Board's role in addressing the issue of disparity between African Americans and Caucasians is to hire a superintendent to run the school district property, and that the Board had hired the right man to do so. Ex. KK, *Paulette-Thurman Dep.,* 97:11 – 99:22.

309.	Several Board members do not know that public schools were segregated in the District, in St. Louis County, and in the State. Ex. E2, *Ebert Dep.*, at 105:21-23; Ex. E6, *Hogshead Dep.*, at 71:7-9; Ex. E8, *Chabot Dep.*, at 77:18-21.

**RESPONSE:**

Undisputed.

310.	Some Board members do not know that historic discrimination existed in St. Louis County or in the State. Ex. E2, *Ebert Dep.*, at 105:21 – 106:17; Ex. E8, *Chabot Dep.*, at 77:12 – 80:15.

**RESPONSE:**

Undisputed, with the understanding that Board member Chabot did not move to Missouri until 1989 and did not move to the St. Louis area until the 1990's. Ex. RR, *Chabot Dep.*, at 7:25-8:9.

311.	Despite the recent reports on racial bias in policing, *see supra* ¶ 181, several Board members are unaware of racial profiling by law enforcement. Ex. E2, *Ebert Dep.*, at 109:3-9; Ex. E3, *Brown Dep.*, at 48:5-9; Ex. E1, *Morris Dep.*, at 98:12-15.

**RESPONSE:**

Objection. Board member Brown did not state he was unaware, but rather that he did not have enough facts to make a determination whether there is racial profiling by law enforcement. Ex. OO, *Brown Dep.,* at 48:10 – 49:6.  Board member Morris stated he was aware of the report but did not have an opinion on the disparity. Ex. MM, *Morris Dep.,* 100:7 – 101:24.

312.	Most Board members are generally aware of the racial achievement gap in the District and a few are aware that this achievement gap is likely a particularized concern of the African-American community. Ex. E1, *Morris Dep.*, at 104:22 – 105:8; Ex. E2, *Ebert Dep.*, at 112:8-19; Ex. E3, *Brown Dep.*, at 52:13-21; Ex. E6, *Hogshead Dep.*, at 76:21 – 77:1;

Ex. E8, *Chabot Dep.*, at 87:15-22; Ex. E4, *Paulette-Thurman Dep.*, at 26:11 – 27:1; Ex. E7, *Schroeder Dep.*, at 34:12-19.

**RESPONSE:**

Undisputed.

313.    A few Board members were unable to point to a Board policy designed to specifically address either the racial achievement gap or racial disparities in the use of school discipline. Ex. E3, *Brown Dep.*, at 52:22 – 53:25; Ex. E8, *Chabot Dep.*, at 88:22 – 89:24; Ex. E7, *Schroeder Dep.*, at 42:9 – 43:8.

**RESPONSE:**

Undisputed.

314.    Board members have claimed that the achievement gap and disciplinary disparities stem from parenting or "parental involvement" or other factors in the community or home life, such as "family structure," transience, poverty, homelessness, and parents' own academic abilities. Ex. A7, *Pruitt Decl.*, at ¶ 15; Ex. A4, *Henson Decl.*, at ¶ 11; Ex. E8, *Chabot Dep.*, at 87:15 – 88:13; Ex. E1, *Morris Dep.*, at 110:13-24, 111:18 – 113:7; Ex. E3, *Brown Dep.*, at 50:25 – 51:17, 53:6-19; Ex. E6, *Hogshead Dep.*, at 77:2-21.

**RESPONSE:**

Undisputed that some Board members attributed these as contributing factors to the cause of the achievement gap.

315.    As evidence of bias and stereotyping, the *Investigation of the Ferguson Police Department* report cites the fact that "[c]ity officials have frequently asserted that harsh and disparate results of Ferguson's law enforcement system do not indicate problems with the police practices, but instead reflect a pervasive lack of 'personal responsibility' among

'certain segments' of the community." Ex. G9, *Investigation of the Ferguson Police Department*, at 5.

**RESPONSE:**

Undisputed that this is relevant to the Ferguson Police Department, object to the inference that it is relevant to the District.

316.　Dr. McCoy was the District's first African-American Superintendent. Ex. A3, *Graham Decl.*, at ¶ 18; Ex. A4, *Henson Decl.*, at ¶ 15.

**RESPONSE:**

Undisputed.

317.　The Board voted to hire Dr. McCoy as the District's Superintendent in December 2010. Ex. A3, *Graham Decl.*, at ¶ 18. For three years prior, Dr. McCoy served as an Assistant Superintendent for the District. Ex. E7, *Schroeder Dep.*, at 49:21-24; Ex. E6, *Hogshead Dep.*, at 88:19 – 89:1.

**RESPONSE:**

Undisputed.

318.　Dr. McCoy began his tenure as Superintendent on July 1, 2011. Ex. E7, *Schroeder Dep.*, at 49:18-20.

**RESPONSE:**

Undisputed.

319.　Dr. McCoy is highly respected within the African-American community, whose members view him as a very successful and effective superintendent. Ex. A1, *Bailey Decl.*, at ¶¶ 12-13; Ex. A5, *Hudson Decl.*, at ¶ 8; Ex. A4, *Henson Decl.*, at ¶ 15; Ex. A3, *Graham Decl.*, at ¶ 18; Ex. E4, *Paulette-Thurman Dep.*, at 82:1-3.

**RESPONSE:**

Undisputed that Dr. McCoy was highly respected. Object to the characterization that all African Americans viewed him as very successful and an effective superintendent.

320.    Dr. McCoy's success as a superintendent was publicly recognized. Ex. A4, *Henson Decl.*, at ¶¶ 15-16; Ex. A3, *Graham Decl.*, at ¶ 18; Ex. F12, *Sept. 11, 2013 Board Meeting Mins. (Ex. 14 to Dep. of Brian Scott Ebert, June 16, 2015)*, at 3; Ex. F13, *Nov. 12, 2013 Board Letter to FFSD Families (Ex. 9 to Dep. of Paul Morris, June 15, 2015)*; Ex. G20, *Dec. 11, 2013 Board Letter to FFSD Families*.

**RESPONSE:**

Undisputed.

321.    On November 6, 2013, the Board voted to suspend Dr. McCoy with pay. Ex. E2, *Ebert Dep.*, at 132:6-25; Ex. F14, *Nov. 6, 2013 Board Sess. Mins. (Ex. 19 to Dep. of Brian Scott Ebert, June 16, 2015)*, at 2-3.

**RESPONSE:**

Undisputed.

322.    At the time, all members of the Board were white. *Supra* ¶¶ 227, 138, 144; Ex. A7, *Pruitt Decl.*, at ¶ 19; Ex. A3, *Graham Decl.*, at ¶ 15.

**RESPONSE:** Objection. One of the Board members was Hispanic. Ex. QQ, *Hogshead Dep.,* at 101:9-10; Ex. RR, *Chabot Dep.,* at 99:5-14; Ex. NN, *Ebert Dep.,* at 87:25 – 88:2.

323.    On November 7, 2013, the Board sent a letter to FFSD families announcing that it had suspended Dr. McCoy. The announcement stated that the "decision reflects differences in focus and philosophy between the Board and superintendent and is not an indication of wrongdoing." Ex. F15, *Nov. 7, 2013 Board Letter to FFSD Families (Ex. 8 to Dep. of Paul*

*Morris*, June 15, 2015).

**RESPONSE:**

Undisputed.

324.    In the African-American community, there was widespread opposition to the decision to suspend Dr. McCoy. Ex. A7, *Pruitt Decl.*, at ¶ 22; Ex. A1, *Bailey Decl.*, at ¶ 13; Ex. A5, *Hudson Decl.*, at ¶¶ 14-15; Ex. A3, *Graham Decl.*, at ¶¶ 18-19; Ex. A4, *Henson Decl.*, at ¶ 17; Ex. A6, *Johnson Decl.*, at ¶ 17; Ex. E4, *Paulette-Thurman Dep.*, at 37:18 – 38:9, 81:17-21; Ex. E5, *Graves Dep.*, at 64:6-9.

**RESPONSE:**

Undisputed.

325.    Some community members publically expressed concern that the Board's decision was racially motivated. Ex. E1, *Morris Dep.*, at 136:12-17, 137:3-8, 138:13-24; Ex. E2, *Ebert Dep.*, at 137:2-9; Ex. E6, *Hogshead Dep.*, at 93:14 – 94:5.

**RESPONSE:**

Undisputed.

326.    FFSD students sent the Board written concerns regarding the suspension of Dr. McCoy and sought his reinstatement. Ex. E1, *Morris Dep.*, at 138:3-12.

**RESPONSE:**

Undisputed.

327.    On November 12, 2013, the Board sent another letter to FFSD families in which it acknowledged "the concerns expressed by some members of the community that this move [to suspend Dr. McCoy] was in any way racially motivated." Ex. F13, *Nov. 12, 2013 Board Letter to FFSD Families*.

**RESPONSE:**

Undisputed.

328.    The next day, on November 13, 2013, the Board held a meeting attended by over 1,000 parents, community leaders, and other District residents. Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. E4, *Paulette-Thurman Dep.*, at 82:4 – 83:6; Ex. E3, *Brown Dep.*, at 67:17-22; Ex. E7, *Schroeder Dep.*, at 53:6-16; Ex. H1, *Nov. 13, 2013 Board Meeting Mins*; Ex. H2(A), *Nov. 13, 2013 Board Meeting* (video), https://www.youtube.com/watch?v=zmWqO20tbsw.

**RESPONSE:**

Undisputed.

329.    At the November 13, 2013 meeting, over 50 individuals voiced their support for Dr. McCoy, expressed concerns about the suspension, particularly the lack of transparency in the process that led up to the suspension and the possibility that it had been racially motivated, and sought an explanation for Dr. McCoy's suspension. Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. A3, *Graham Decl.*, at ¶ 19; Ex. E1, *Morris Dep.*, at 137:19 – 138:19; Ex. E4, *Paulette-Thurman Dep.*, 82:8-21; Ex. E6, *Hogshead Dep.*, at 93:14 – 94:21; Ex. E3, *Brown Dep.*, at 66:22 – 68:5; Ex. E8, *Chabot Dep.*, at 96:14-18, 98:10-13; Ex. E7, *Schroeder Dep.*, at 53:24 – 54:6; Ex. H1, *Nov. 13, 2013 Board Meeting Mins.*; Ex. H2(A), *Nov. 13, 2013 Board Meeting* (video), https://www.youtube.com/watch?v=zmWqO20tbsw.

**RESPONSE:**

Undisputed.

330.    The meeting lasted close to four hours. Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. E6, *Hogshead Dep.*, at 92:19 – 93:1; Ex. H2(A), *Nov. 13, 2013 Board Meeting* (video), https://www.youtube.com/watch?v=zmWqO20tbsw.

**RESPONSE:**

Undisputed.

331.    During the meeting, current Board member Chabot read a statement in which he claimed that he had "trust issues" with respect to Dr. McCoy. Ex. E8, *Chabot Dep.*, at 97:12 – 98:9; Ex. H2(A), *Nov. 13, 2013 Board Meeting* (video), https://www.youtube.com/watch?v=zmWqO20tbsw; Ex. A5, *Hudson Decl.*, at ¶ 14.

**RESPONSE:**

Undisputed.

332.    None of the other Board members made a statement or responded or otherwise addressed the concerns expressed. Ex. E1, *Morris Dep.*, at 138:20-24; Ex. E6, *Hogshead Dep.*, at 95:3-10; Ex. E4, *Paulette-Thurman Dep.*, at 83:3-6; Ex. E3, *Brown Dep.*, at 67:3-11; Ex. E7, *Schroeder Dep.*, at 54:14-20; Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. A3, *Graham Decl.*, at ¶ 19; Ex. A4, *Henson Decl.*, at ¶ 17.

**RESPONSE:**

Undisputed.

333.    In the weeks following the November 13, 2013 meeting, Board members did not provide any explanation for their decision to suspend Dr.McCoy, citing only "personnel" reasons. Ex. E1, *Morris Dep.*, at 57:3-16; 138:25 – 139:15; Ex. E3, *Brown Dep.*, at 68:6-18; Ex. E8, *Chabot Dep.*, at 98:14-24.

**RESPONSE:**

Undisputed.

334.    The MO NAACP was not contacted by the Board following the suspension of Dr. McCoy. Ex. A7, *Pruitt Decl.*, at ¶ 22.

**RESPONSE:**

Undisputed that the MO NAACP was not contacted but that the St. Louis County NAACP was contacted instead. The Board also contacted North County Churches United for Racial Justice and Harmony, and County Executive Charles Dooley. Ex. MM, *Dep. Paul Morris*, 147:1-16.

335.    Over 150 parents and other community members appeared before the Board again on December 11, 2013. Several of these individuals asked the Board for an explanation for its treatment of Dr. McCoy and a response to their impression that it was racially motivated. Ex. A5, *Hudson Decl.*, at ¶ 15; Ex. A3, *Graham Decl.*, at ¶ 19.

**RESPONSE:**

Undisputed.

336.    Board members did not provide any explanation for their actions. Ex. A5, *Hudson Decl.*, at ¶ 15; Ex. A3, *Graham Decl.*, at ¶ 19; Ex. H3, *Dec. 11, 2013 Board Regular Meeting Mins.*, at 3, 5.

**RESPONSE:**

Undisputed. The Board has a policy not to discuss personnel matters. Ex. OO, *Dep. Keith Brown*, 67:12-16.

337.    On December 11, 2013, the Board voted in a closed meeting to issue charges for termination for cause against Dr. McCoy. Ex. E7, *Schroeder Dep.*, at 55:17-23; Ex. H4, *Dec. 11, 2013 Board Closed Meeting Mins.*

**RESPONSE:**

Undisputed.

338.    On December 19, 2013, the Board sent a letter to FFSD "Families, Staff and Community" announcing that it had issued a notice of charges for termination for cause

against Dr. McCoy. The letter did not include any explanation for the decision to issue a notice of charges. Ex. G20, *Dec. 19, 2013 Board Letter to FFSD Families, Staff and Community*; Ex. A4, *Henson Decl.*, at ¶ 17.

**RESPONSE:**

Undisputed.

339.    The Board chose to close and to keep closed their meetings and records related to Dr. McCoy's suspension. Ex. F14, *Nov. 6, 2013 Board Minutes*; Ex. H4, *Dec. 11, 2013 Board Closed Meeting Mins.*; Ex. F16, *Feb. 20, 2014 Board Meeting Mins. (Ex. 31 to Dep. of Paul Schroeder, July 2, 2015)*.

**RESPONSE:**

Undisputed.  Personnel records are closed records under §610.021(13) RSMo.

340.    One Board member voted against closing the February 20, 2014 Board meeting, during which the Board addressed and voted on a motion to change the status of Dr. McCoy from paid leave to non-paid administrative leave. Ex. E7, *Schroeder Dep.*, at 73:14 – 75:24; Ex. F16, *Feb. 20, 2014 Board Meeting Mins*.

**RESPONSE:**

Undisputed.

341.    Dr. McCoy resigned as Superintendent in March 2014. Ex. H5, *Mar. 12, 2014 Board Meeting Mins.*; Ex. A3, *Graham Decl.*, at ¶ 18; Ex. B5, *Rodden Rep.*, at ¶ 39; Ex. B7, *Engstrom Rebuttal*, at ¶ 15.

**RESPONSE:**

Undisputed.

342. Members of the African-American community believe the decision to suspend Dr. McCoy was racially-based. Ex. A6, *Johnson Decl.*, at ¶ 17; Ex. A4, *Henson Decl.*, ¶¶ 15-17.

**RESPONSE:**

Objection. Some members of the African American community do not believe the decision to suspend Dr. McCoy was racially-based, including current African American Board member Dr. Paulette-Thurman. Ex. KK, *Paulette-Thurman Dep.,* at 84:18-20. Dr. McCoy himself released a mutual statement, "To those who have framed the issues as racially motivated, the parties are satisfied that each acted in good faith and with the best interests of the Ferguson/Florissant School District in mind." Ex. AAA, See Mutual Statement.

343. Plaintiffs and other members of the African-American community understood the Board's refusal to justify its actions to be an example of the Board's unresponsiveness to their particularized needs. Ex. A7, *Pruitt Decl.*, at ¶ 23; Ex. A5, *Hudson Decl.*, at ¶ 14; Ex. A1, *Bailey Decl.*, at ¶¶ 13-14; Ex. A6, *Johnson Decl.*, at ¶ 17; Ex. A4, *Henson Decl.*, at ¶ 15; Ex. A3, *Graham Decl.*, at ¶¶ 18-19.

**RESPONSE:** Objection. Not all members of the African-American community understand the Board's refusal to justify its actions to be an example of the Board's unresponsiveness to their particularized needs. Ex. KK, *Paulette-Thurman Dep.,* at 83:20 – 84:9.

344. Plaintiff Hudson "felt as though, when [he] was airing [his] grievances to School Board members about the dismissal of the previous superintendent, [his] voice was ignored." Ex. A5, *Hudson Decl.*, at ¶ 16.

**RESPONSE:**

Undisputed that Hudson felt that way.

345. Disaffection with the Board's decision to suspend Dr. McCoy and the Board's overall

non-responsiveness to the FFSD African-American community prompted a reform slate to challenge the Board in the 2014 election. Only one member of the slate was successful due, as discussed above, to white bloc voting. Ex. E4, *Paulette-Thurman Dep.*, at 37:18 – 38:16, 39:8-21; Ex. E8, *Chabot Dep.*, at 55:16-21, 57:23 – 58:8; Ex. B5, *Rodden Rep.*, at ¶ 50

**RESPONSE:**

Objection. Only one member of the slate was successful due to lack of cohesiveness among the African-American majority. Ex. X, *Rodden Report* at ¶ 53.

346.     Some members of the African-American community do not know if the decision even now to maintain secrecy is an effort to shield the Board from scrutiny and accountability. Ex. A3, *Graham Decl.*, at ¶ 19; Ex. A4, *Henson Decl.*, at ¶ 17; Ex. A6, *Johnson Decl.* at ¶ 17.

**RESPONSE:**

Objection. Not all members of the African-American community understand the Board's refusal to justify its actions to be an example of the Board's effort to shield the Board from scrutiny and accountability. Ex. KK, *Paulette-Thurman Dep.,* at 83:20 – 84:9.

347.     Current Board member Graves included in her campaign platform her position that "[t]he school board must operate in a way that represents the collective interests and the needs of the community," noting that she felt that there were times in the past "where people weren't being heard." Since being on the Board, she has observed the Board's failure to provide the necessary "dialogue going back and forth" between the Board and community members who have expressed "a valid concern." Ex. E5, *Graves Dep.*, at 29:23 – 30:14, 31:3-7, 31:17 – 32:10.

**RESPONSE:**

Objection. Current Board member Graves states that prior to her being on the board, she believed there was transparency, open communication and dialogue between the school board and parents. Ex. JJ, *Graves Dep.,* at 29:18-22. She further states that the district, but not the board themselves, need to establish a strong communication structure. Ex. JJ, *Graves Dep.,* at 32:11-21.

### III. Factors Related to Campaigns and Electoral Structure (Factors 3, 4, 6, and 9)

    *A. Access to candidate slating (Senate Factor 4)*

348.    The FFNEA is the local affiliate of the Missouri National Education Association ("MNEA"). The organization endorses candidates for the Board. *See* Ex. B4, *Kimball Rep.*, at 7-8; Ex. E10, *Green Dep.*, at 16:12-22, 20:12 – 21:3.

**RESPONSE:**

Undisputed. However, the FFNEA does not always endorse. Ex. II, *Frank Green Dep*, 76:15-18.

349.    The FFNEA provides a variety of benefits to the endorsed candidates, including: mailing and distributing flyers, paying for signs, initiating robo-calls or phone banking, giving monetary campaign contributions, access to volunteers, canvassing, and working the polls election day to pass out campaign information to voters. Ex. E1, *Morris Dep.*, at 29:23 – 30:1, 30:21 – 31:11; Ex. E2, *Ebert Dep.*, at 37:19 – 39:3, 52:6-14; Ex. E4, *Paulette-Thurman Dep.*, at 43:14 – 44:23; Ex. E3, *Brown Dep.*, at 21:1-6, 22:16 – 23:3, 23:17-21, 30:10-19; Ex. E6, *Hogshead Dep.*, at 24:2-17, 25:17 – 27:6; Ex. E8, *Chabot Dep.*, at 21:16-18, 23:15 – 25:8; Ex. F17, *MNEA 2011 Committee Expenditures for Chabot (Ex.29 to Dep. of Robert Chabot, July 2, 2015)*; Ex. F18, *MNEA 2014 Committee Expenditures for Chabot (Ex. 30 to Dep. of Robert Chabot, July 2, 2015)*; Ex. E10, *Green Dep.*, at 22:10-11, 31:25 – 32:11.

**RESPONSE:**

Undisputed.

350. Current Board member Paul Morris was the Political Action Committee Chair for the MNEA for fifteen years. In that role, he was active in the endorsement process for the FFNEA for many years. Ex. E1, *Morris Dep.*, at 12:2 – 13:11, 75:17 – 76:13.

**RESPONSE:**

Undisputed.

351. Morris has described FFNEA-endorsed candidates as a "slate." Ex. E1, *Morris Dep.*, at 12:2 – 13:11, 75:17 – 76:13.

**RESPONSE:**

Objection. Mischaracterizes Board member Morris' testimony. In response to the question ". . . when you're NEA endorsed, does that mean that you run as a slate together?", Morris responded, "Not necessarily, they had separate campaign literature. Anything that NEA sent out was together." Morris further clarified: "If the candidates send out a mailing together, it would be considered a slate. If the FFNEA sends out one together, it **could** be considered a slate." (emphasis added). Ex. MM, *Morris Dep.,* at 75:21-25 and 76:10-13.

352. The FFNEA promotes all endorsed candidates for an election jointly, sending mailers and making robo-calls to voters that include all FFNEA-endorsed candidates. Ex. E2, *Ebert Dep.*, at 6312 – 65:13, Ex. F19, *2014 FFNEA Flyer (Ex. 13 to Dep. of Brian Scott Ebert, June 16, 2015)*; Ex. E10, *Green Dep.*, at 32:21-24; Ex. E6, *Hogshead Dep.*, at 28:10-14.

**RESPONSE:**

Undisputed. However, the FFNEA does not always endorse. Ex. II, *Frank Green Dep*, 76:15-18.

353.    In selecting which candidates to endorse, the FFNEA sends a letter to all candidates who have filed for the Board election inviting them to seek FFNEA endorsement. Interested candidates are given a questionnaire with questions that will be asked during an interview before the endorsement committee, which they can fill out ahead of time. Ex. E10, *Green Dep.*, at 23:16 – 24:3; Ex. E1, *Morris Dep.*, at 16:12-24; Ex. E8, *Chabot Dep.*, at 22:16-24; Ex. E4, *Paulette-Thurman Dep.*, at 41:8 – 42:16; Ex. E6, *Hogshead Dep.*, at 29:3-17; Ex. E5, *Graves Dep.*, at 35:19 – 36:1; Ex. E7, *Schroeder Dep.*, at 20:19-23.

**RESPONSE:**

Undisputed.

354.    Candidates are notified shortly after their interviews whether they have received FFNEA endorsement, but are not given reasons for the decision. Ex. E4, *Paulette-Thurman Dep.*, at 42:17-24; Ex. E5, *Graves Dep.*, at 35:25 – 36:1; Ex. E7, *Schroeder Dep.*, at 23:24 – 24:5; Ex. A6, *Johnson Decl.*, at ¶ 14; Ex. A3, *Graham Decl.*, at ¶ 9.

**RESPONSE:**

Undisputed.

355.    There are no published criteria for endorsement, and candidates are unaware of how the FFNEA decides whom to endorse. Ex. E1, *Morris Dep.*, at 18:4-9; Ex. E2, *Ebert Dep.*, at 31:14-16; Ex. E3, *Brown Dep.*, at 30:6-9; Ex. E6, *Hogshead Dep.*, at 29:18-20; Ex. E4, *Paulette-Thurman Dep.*, at 42:22-24; Ex. E5, *Graves Dep.*, at 36:8-10; Ex. E8, *Chabot Dep.*, at 23:3-5; Ex. E7, *Schroeder Dep.*, at 21:1-7; Ex. A6, *Johnson Decl.*, at ¶ 14; Ex. A4, *Henson Decl.*, at ¶ 10; Ex. A3, *Graham Decl.*, at ¶ 11.

**RESPONSE:**

Undisputed, however, FFNEA president Green also stated that the candidates' responses to the questions provided to them prior to their interview are the main determining factors in the FFNEA's decision regarding who to endorse.  Ex. II, *Green Dep.,* 75:13-25.

356.    Former FFNEA president Green stated that the major criterion was being "teacher-friendly." Ex. E10, *Green Dep*., at 26:24 – 27:10. Board member and former MNEA Political Action Committee Chair Morris stated that the MNEA Political Action Committee would help get "educational friendly candidates" election. Ex. E1, *Morris Dep.*, at 13:1-4.

**RESPONSE:**

Undisputed; however, FFNEA president Green also stated that the candidates' responses to the questions provided to them prior to their interview are the main determining factor in the FFNEA's decision regarding who to endorse. Ex II, *Green Dep.,* 75:13-25.

357.    The FFNEA has endorsed more white candidates than Black candidates. Of the seven current Board members and the most recent outgoing Board member, all sought FFNEA endorsement. All current white Board members received FFNEA endorsement. Ex. E1, *Morris Dep.*, at 26:23 – 27:1, 44:23 – 45:7; Ex. E2, *Ebert Dep.*, at 36:11-15, 50:13 – 51:11, 61:25 – 62:9; Ex. E3, *Brown Dep.*, at 28:6-15; Ex. E6, *Hogshead Dep.*, at  24:2-20 ; Ex. E8, *Chabot Dep.*, at 21:12 – 23:14, 46:4-11. Neither of the two Black Board members received FFNEA endorsement, Ex. E5, *Graves Dep.*, at 69:4-25; Ex. E4, *Paulette-Thurman Dep.*, at 40:14 – 43:23.

**RESPONSE:**

Objection. Plaintiffs' expert failed to analyze whether all Black and all white candidates applied for the endorsement.  Ex. O, *Kimball Dep*., 67:7-14.  Therefore, Plaintiffs cannot know the truth of its statements.  Undisputed that the white members of the Board were endorsed by the

FFNEA; however, African Americans were endorsed by the FFNEA that did not win their election. Ex. II, *Green Dep.,* 29:18 – 30:1. Both James Savala and Roger Hines are African American candidates endorsed by FFNEA that did not win their elections.

358. Former Board member Schroeder was endorsed by the FFNEA in 2006 and 2009, but not in 2012. Ex. E7, *Schroeder Dep.*, at 20:5-18, 23:4 – 24:1.

**RESPONSE:**

Undisputed.

359. African-American former Board candidates Plaintiff Johnson, Graham, and Henson also sought but did not receive FFNEA endorsement. Ex. E9, *Deposition of F. Willis Johnson*, Aug. 26, 2015, at 46:12-17; Ex. A6, *Johnson Decl.*, at ¶ 14; Ex. A4, *Henson Decl.*, at ¶ 8, Ex. A3, *Graham Decl.*, at ¶¶ 9-10.

**RESPONSE:**

Objection. Board candidate Graham was endorsed by the FFNEA in all of here elections except for the 2011 election. Ex. FFF, *Hogshead Decl*. ¶2. Graham was not endorsed by the FFNEA in 2011 because she was an incumbent that voted against a raise. Ex. II, *Green Dep*. 47:17-48:3.

360. Since 2004, similar numbers of African-American and white candidates have run in each contested election. In the six elections for which FFNEA endorsement information was available, there were 19 white candidates and 15 Black candidates. Ex. B9, *Kimball Rebuttal*, at 7.

**RESPONSE:**

Objection. Plaintiffs' expert fails to inform the Court that he did not investigate whether candidates sought endorsements. Ex. O, *Kimball Dep*., 100:14-20 and 101:13-17.

361.   Eleven of the 14 candidates endorsed by the FFNEA were white, all of whom won election to the Board. Ex. B9, *Kimball Rebuttal*, at 7.

**RESPONSE:**

Undisputed. Plaintiffs' expert fails to inform that Court that he does not know whether African American and white candidates sought the endorsement at the same rate. Ex. O, *Kimball Dep*., 67:7-14.

362.   Put differently, "11 of 19 white candidates (58 percent) received an NEA endorsement while only 3 of 15 African-American candidates (20 percent) received an NEA endorsement." Ex. B9, *Kimball Rebuttal*, at 7.

**RESPONSE:**

Undisputed; however, Plaintiff's Expert Dr. Kimball fails to take into account how many African American candidates actually sought the FFNEA endorsement or to exclude in his numbers those candidate that did not seek FFNEA endorsement. Ex. O, *Kimball Dep.,* 67:7 – 68:1.

363.   Former FFNEA president Green states that it is important to have a racially diverse school board and a diverse endorsement committee because "[w]e represent everyone." Ex. E10, *Green Dep.*, at 51:6-8, 73:13 – 74:6. Whether endorsement committee diversity is a priority "[d]epends on the chair." Ex. E10, *Green Dep.*, at 76:23 – 77:3.

**RESPONSE:**

Objection, in that Plaintiffs fail to provide FFNEA present Green's full statement with regard to the endorsement committee's diversity.  Mr. Green stated further in response to the question: "We kind of, you know, make sure you have so many - - you know, make sure you try to split it down the middle and get as many African-Americans and as many males. . . I don't think it's set in stone anywhere, but it's one of those unwritten rules, because we - - in our policy, when we

hire and have hiring committees, we try to follow that standard. We try to make it as diverse as possible. Ex. II, *Green Dep.,* 77:16-25.

364.     Green is the only African-American man on the FFNEA endorsement committee. Ex. E10, *Green Dep.*, at 77:16-20.

**RESPONSE**:

Undisputed.

365.     Former FFNEA president Green stated that the FFNEA would likely not endorse a candidate who did not acknowledge the particularized needs and concerns of FFSD's African American community. Ex. E10, *Green Dep.*, at 66:19-22.

**RESPONSE:**

Undisputed; however FFNEA president Green also stated that those type of questions are not "a flat, straight-out question" posed to the candidates. Ex. II, *Green Dep.* at 66:3-9.  Further, Mr. Green stated that he could not say that a candidate's awareness of historic discrimination was considered when deciding whether or not to endorse a candidate because that sort of question is never asked. Ex. II, *Green Dep.,* at 57:20-25.

366.     The FFNEA endorsed Ebert and Chabot, both of whom testified that they are unaware of historic discrimination, historic school segregation, or disparities in discipline. *Supra* ¶¶ 307, 309-10.

**RESPONSE:**

Objection.  FFNEA president Green stated that he could not say that a candidate's awareness of historic discrimination was considered when deciding whether or not to endorse a candidate because that sort of question is never asked. Ex. II, *Green Dep.,* at 57:20-25.

367. The FFNEA endorsed Hogshead, who testified that she is unaware of historic school segregation, present-day socioeconomic disparities, or disparities in discipline. *Supra* ¶¶ 307-09.

**RESPONSE:**

Objection. FFNEA president Green stated that he could not say that a candidate's awareness of historic discrimination was considered when deciding whether or not to endorse a candidate because that sort of question is never asked. Ex. II, *Green Dep.,* at 57:20-25.

368. The North County Labor Club is a local affiliate of the AFL-CIO labor council's Committee on Political Education. The organization also endorses candidates for the Board. *See* Ex. B4, *Kimball Rep.*, at 8; Ex. E1, *Morris Dep.*, at 19:1-9.

**RESPONSE:**

Undisputed**.**

369. Current Board member Paul Morris, who participates in the decision of whom to endorse as a member of the North County Labor Club, has understood North County Labor Club-endorsed candidates could be a part of a "slate." Ex. E1, *Morris Dep.*, at 72:17-19, 75:17-20.

**RESPONSE:**

Objection. The very next lines in Board member Morris' deposition states, when asked if when you are NEA endorsed does that mean you run as a slate together: "Not necessarily, they had separate campaign literature." Mr. Morris further explains that only if the candidates send out a mailing together is it considered a slate – otherwise, it is only possible that the candidates are considered a slate. Ex. MM, *Morris Dep.,* at 75:21 – 76:13.

370.    The North County Labor Club promotes all endorsed candidates for an election jointly, sending mailers to voters that include all North County Labor Club-endorsed candidates. Ex. E8, *Chabot Dep.*, at 52:8-13.

**RESPONSE:**

Undisputed. However, North County Labor does not endorse for all campaigns. Ex. MM, *Morris Dep.*, 21:9-17

371.    The North County Labor Club endorsement comes with a variety of benefits, including lists of members and other unions from which to solicit monetary donations and volunteers, financial contributions, mailings, and notice of the endorsement in the *Labor Tribune*. Ex. E1, *Morris Dep.*, at 29:23-30:1; Ex. E2, *Ebert Dep.*, at 32:20-34:12; Ex. E3, *Brown Dep.*, at 31:8-17; Ex. E6, *Hogshead Dep.*, at 24:18-20; Ex. E8, *Chabot Dep.*, at 51:9-19, 52:14-22; Ex. G18, *Kimball Sources for North County Labor Club Endorsements*.

**RESPONSE**

Undisputed.

372.    The endorsement correlates well with success: since 2004, the North County Labor Club has endorsed 13 candidates for Board elections. Only two of the endorsed candidates lost; 11 of the 13 endorsees won. Ex. B4, *Kimball Rep.*, at 8.

**RESPONSE:**

Undisputed.

373.    Candidates are unaware of endorsement criteria employed by North County Labor Club. Ex. E3, *Brown Dep.*, at 32:13-15; Ex. E8, *Chabot Dep.*, at 46:18-21; Ex. E7, *Schroeder Dep.*, at 68:2-8.

**RESPONSE:**

374.    Objection. Candidates state that they are asked a series of questions and then North County Labor makes its determination who to endorse. It is reasonable to assume that the questions outline the criteria for endorsement. Ex. OO, *Brown Dep.*, at 32:13-15; Ex. RR, *Chabot Dep.*, at 46:18-21; Ex. PP, *Schroeder Dep.*, at 68:2-8.

375.    The North County Labor Club's pattern of endorsements reveals racial disparities. The five current white Board members sought and received North County Labor Club endorsement. Ex. E2, *Ebert Dep.*, at 30:11-17, 52:21-25, 61:25 – 62:7; Ex. E3, *Brown Dep.*, at 20:9 – 21:6, 28:6-18; Ex. E6, *Hogshead Dep.*, at 23:12 – 24:20, 27:7 – 28:3; Ex. E8, *Chabot Dep.*, at 46:4-17; Ex. E1, *Morris Dep.*, at 25:18 – 27:1, 72:9-21. Neither of the two Black Board members sought or received an endorsement from the North County Labor Club. Ex. E5, *Graves Dep.*, at 37:5-7; Ex. E4, *Paulette-Thurman Dep.*, at 45:3-11.

**RESPONSE:**

Undisputed that five of the current white Board members sought and received endorsement from the North County Labor Club.  However, African American Board members Donna Paulette-Thurman and Courtney Graves did not seek North County Labor's endorsement.  And other unsuccessful African American candidates did receive North County Labor's endorsement in recent elections.  Ex. KK, *Paulette-Thurman Dep.,* at 45:3-17; Ex. JJ, *Graves Dep.* at 37:5-7.

376.    The most recent outgoing Board member, Schroeder, who is white, also received the endorsement from North County Labor Club in the one year that he sought it. Ex. E7, *Schroeder Dep.*, at 67:2-7 (endorsed in 2009, the only time he sought the endorsement).

**RESPONSE:**

Undisputed.

377. Since 2004, the North County Labor Club endorsed 13 candidates for the Board, 12 of whom are white. Ex. B4, *Kimball Report*, at 8.

**RESPONSE:**

Undisputed. However, Plaintiffs do not know how many African Americans sought the endorsement. Ex. O, *Kimball Dep.,* 68:24-69:1.

> B. *Subtle racial appeals (Senate Factor 6)*

378. Plaintiffs and other members of the African-American community have witnessed subtle racial appeals in Board elections, including the 2013 election and the highly polarized 2014 election. Ex. B5, *Rodden Rep.*, at ¶ 50; Ex. A7, *Pruitt Decl.*, at ¶¶ 16-17; Ex. A4, *Henson Decl.*, at ¶¶ 11-13, Ex. A5, *Hudson Decl.*, at ¶¶ 8-10; Ex. A6, *Johnson Decl.*, at ¶¶ 12-13; Ex. A3, *Graham Decl.*, at ¶ 16; Ex. E10, *Green Dep.*, at 41:18-22.

**RESPONSE:**

Objection. Mischaracterizes Dr. Rodden's report, which merely states that the 2014 election was highly polarized but says nothing regarding subtle racial appeals. Ex X, *Rodden Rep.,* at ¶50. Dr. Graves did not witness discipline used a subtle racial appeal nor did she perceive the student transfer issue as a subtle racial appeal. Ex. HHH, *Graves Decl*. ¶2-3. Hogshead was a candidate in 2013 and did not witness racial undertones. Ex. FFF, Hogshead Decl. ¶¶3-5.

379. Current Board member Morris stated that race was made a part of the 2014 election because "[t]here was a slate of African American candidates" who did not "think that there was enough African American candidates on the Board." Ex. E1, *Morris Dep.*, at 46:22 – 47:17.

**RESPONSE:**

Undisputed.

380.    Disciplinary problems, classroom disruptions, and safety in the schools were issues raised during the 2014 Board election campaigns. Ex. A7, *Pruitt Decl.*, at ¶ 17; Ex. A5, *Hudson Decl.*, at ¶ 10.

**RESPONSE:**

Objection. No candidate for the 2014 Board election made any such statements specific to disciplinary problems, classroom disruptions and/or safety in the schools, but rather discussed discipline in general terms. Neither Mr. Pruitt nor Mr. Hudson were candidates.

381.    Current Board member Morris, one of the two successful white candidates in 2014, agreed that the enforcement of discipline was a priority in his campaign. Ex. E1, *Morris Dep.*, at 33:15-20, 126:10-14.

**RESPONSE:**

Current Board member Morris, along with other candidates (both African American and white) stated discipline was a concern in the election. Ex. KK, *Paulette-Thurman Dep.,* at 28:14 – 29:9. In addition, Plaintiff Johnson stated that he campaigned on discipline "quite a bit." Ex. LL, Jo*hnson Depo*., 47:17-48:5 and 64:20

382.    During the April 3, 2014 Board candidate forum, he characterized his vision for FFSD as "[c]reating environments where [students] can . . . feel safe, that they can learn, and they can do it without disruption . . . a school district where discipline is not an issue." Ex. H2(B), *Apr. 3, 2014 Candidate Forum* (video), https://www.youtube.com/watch?v=ewuStFb5uBc, at 19:26.

**RESPONSE:**

Undisputed that Mr. Morris made this statement but object to the characterization that this was a subtle racial appeal. In addition, Plaintiff Johnson campaigned on discipline "quite a bit." Ex.

LL, J*ohnson Depo*., 47:17-48:5 and 64:20

383.     Current Board member Chabot stated that one focus of his campaign was "discipline"
because students and District employees have a right to "feel safe" and be in an environment
that is "conducive" to both learning and teaching. Ex. E8, *Chabot Dep.*, at 32:20-24, 41:17 –
42:6; Ex. H1, *Nov. 13, 2013 Board Meeting Mins.*, at 2.

**RESPONSE:**

Undisputed that Current Board member Chabot made this statement but object to the
characterization that this was a subtle racial appeal. Discipline is a general topic brought up at
candidate forums for the school board.  Parents are concerned that all students are safe.  See, Ex.
FFF, *Hogshead Decl.*, ¶3. Finally, Plaintiff Johnson himself campaign on discipline "quite a bit."
Ex. LL, J*ohnson Depo*., 47:17-48:5 and 64:20.

384.     Plaintiffs and other members of the African-American community understand references
to "discipline," which is disproportionately levied against Black students, to be well-
recognized subtle racial appeals. Ex. A5, *Hudson Decl.*, at ¶ 10; Ex. A4, *Henson Decl.*, at
¶ 11; Ex. A7, *Pruitt Decl.*, at ¶¶ 15-16; Ex. A2, *Erby Decl.*, at ¶ 7.

**RESPONSE:**

Objection.  Plaintiff Johnson campaigned on discipline "quite a bit." Ex. LL, *Johnson Depo*.,
47:17-48:5 and 64:20.  Plaintiffs' assertion means that Plaintiff Johnson conducted subtle racial
appeals against his own race.  Dr. Graves did not recognize student disciple to be a subtle racial
appeal.  See, Ex. HHH, Graves Dep., ¶ 2.

385.     The transfer of predominantly Black students to FFSD from neighboring unaccredited
school districts was another issue raised during 2014 Board election campaigns. Ex. A7,
*Pruitt Decl.*, at ¶¶ 17, 23; Ex. A6, *Johnson Decl.*, at ¶ 12; Ex. A5, *Hudson Decl.*, at ¶ 10.

**RESPONSE:**

Objection. No candidate for the 2014 election made such an allegation. While the transfer of students from the Normandy Schools Collaborative may have been a subject matter of a specific school board meeting in the conducting of business for the District, the transfer situation was not a subject discussed in any campaign. Ex. LL, *Johnson Dep.,* at 51:5 – 53:17.

386. The transfer program was championed by Dr. McCoy. Ex. A7, *Pruitt Decl.*, at ¶¶ 17, 23; Ex. A6, *Johnson Decl.*, at ¶ 12; Ex. A5, *Hudson Decl.*, at ¶ 10.

**RESPONSE:**

Objection. The transfer program is required by state statute. Dr. McCoy championed the District paying for transporting the transfer students to the District from the Normandy Schools Collaborative and/or Riverview Gardens School District, a cost that, under statute, is the burden of the district in which the students reside. *§167.241 RSMo.* Dr. McCoy, without speaking to the Board, advocated to transportation costs for any student that wanted to transfer. The cost to the District to pay for the transportation was a concern due to the District's fiscal problems, frozen salaries and budget cuts. Ex. FFF, *Hogshead Decl.* ¶¶ 9-12; Ex. GGG, *Morris Decl.* at ¶¶ 3-5.

387. The student-transfer issue is racially-charged in Missouri and in the District. Ex. A7, *Pruitt Decl.*, at ¶ 19; Ex. A5, *Hudson Decl.*, at ¶ 13; Ex. A6, *Johnson Decl.*, at ¶ 12.

**RESPONSE:**

Objection. The student-transfer issue is not racially charged in the District. Ex. HHH, *Graves Decl.,* at ¶ 3.

388. Board candidates in 2014 made statements suggesting that they opposed the transfer program during their campaigns. Ex. A5, *Hudson Decl.*, at ¶ 10; Ex. A6, *Johnson Decl.*, at

¶ 12; Ex. A7, *Pruitt Decl.*, at ¶ 23; Ex. E9, *Johnson Dep.*, at 50:23 – 51:17, 52:12 – 54:8.

**RESPONSE:**

Objection. Plaintiffs provide no campaign literature or candidate forum statements from any board candidate in which they made statements suggesting they opposed the transfer program during their campaigns. Board candidate Johnson clarified in his deposition that any statements regarding the transfer program were in a board meeting or board forum and not as a part of a candidate's campaign. Ex. LL, *Johnson Dep.* at 51:5 – 53:17; Ex. GGG, *Morris Decl.* at ¶¶ 3-5.

389. During the March 6, 2014 Board candidate forum, current Board member Chabot stated that "student transfer is a punitive law that's destroyed school districts. It's going to be kind of a rippling effect across the State of Missouri." Ex. H2(C), *Mar. 6, 2014 Candidate Forum* (video), https://www.youtube.com/watch?v=c6ZR_sNW66o, at 1:12:20.

**RESPONSE:**

Board member Chabot was referring to the destruction of the sending school districts (Normandy Schools Collaborative), not the Ferguson-Florissant School District. *Mar. 6, 2014 Candidate Forum* (video), https://www.youtube.com/watch?v=c6ZR_sNW66o.

390. During the March 6, 2014 Board candidate forum, current Board member Morris noted that the "money issue that follows transfers students is . . . a huge issue." He stated that he opposed a bill that would have limited what transfer students pay to 70% of the tuition cost. Ex. H2(C), *Mar. 6, 2014 Candidate Forum* (video), https://www.youtube.com/watch?v=c6ZR_sNW66o, at 1:10:40.

**RESPONSE:**

Undisputed. This statement was made in the context of financial concerns for the District. Ex. GGG, *Morris Decl.*, at ¶ ¶ 3-5.

391.    Plaintiffs and other African-American voters in the District understood candidates' statements highlighting concerns with the transfer program to be an attempt to "appeal[] to the clear fear of voters of a growing African American student body in the District." Ex. A7, *Pruitt Decl.*, at ¶ 23; *see* Ex. A5, *Hudson Decl.*, at ¶ 13; Ex. A6, *Johnson Decl.*, at ¶ 12.

**RESPONSE:**

Objection. Dr. Graves did not perceive any statements regarding the school transfer issue to racially charged.  See, Ex. HHH, *Graves Decl.* ¶3.  Further, any concerns regarding the student transfer program were in reference to the financial stress of additional costs at a time when the District was facing fiscal problems, frozen salaries and budget cuts. Ex. FFF, *Hogshead Dep.* ¶ ¶11.

392.    Many African Americans also viewed candidates' opposition to the transfer program and the District's treatment of transfer students "as an attempt by an all-white School Board to keep African American students out of some largely white schools." Ex. A7, *Pruitt Decl.*, at ¶ 19.

**RESPONSE:**

Objection. Candidates did not oppose the transfer program. Dr. Graves did not view the candidates' positions regarding the transfer program to be an attempt by an all-white School Board to keep African American students out of some largely white schools.  Ex. HHH*, Graves Decl.* at ¶3. In addition, there are no "largely white schools", as all schools are majority African American.

393.    During his 2014 campaign, Plaintiff Johnson faced allegations implying that he was an absentee father and accusations that he was too supportive of the school-transfer issue and a renter, not a homeowner. Ex. A6, *Johnson Decl.*, at ¶ 12.

135

**RESPONSE:**

Objection.  Plaintiffs provide no statement of any other candidate, either African American or white that heard any such statements, nor did they provide any video of such statements. Plaintiffs do not allege that a candidate made such an accusation. No such statement was made in the presence of other candidates. Dr. Thurman attended all forums and large gatherings where candidates were invited and is not aware of any such statements. Ex. EEE, *Thurman Decl*. at ¶¶2-4.

394.    At least one white candidate had previously been accused of embezzling funds from the District. Ex. A6, *Johnson Decl.*, at ¶ 13; Ex. E1, *Morris Dep.*, at 139:16 – 141:21. None of the other candidates used campaign language or materials that raised the issue of that candidate's departure from his prior position. Ex. A6, *Johnson Decl.*, at ¶ 13.

**RESPONSE:**

Objection. No white candidate was ever accused of embezzling funds from the District. Ex. MM, *Morris Dep.*, at 139-16 – 141:21.  Undisputed that no other candidate used campaign language or materials that raised the issue of that candidate's departure from his prior position.

395.    Plaintiff Johnson understood these attacks on him, particularly in comparison to how other candidates were treated, as racially-charged campaign tactics. Ex. A6, *Johnson Decl.*, at ¶¶ 12-13.

**RESPONSE:**

Objection.  No attacks on Johnson occurred.  Rather, Johnson's behavior alone was enough to cause voters, both white and African American, not to support his candidacy, such as taking a telephone call during a candidate forum and failing to complete the League of Women Voters questionnaire that was published in the St. Louis Post Dispatch.  Ex. LL, *Johnson Dep.* at 85:2 –

88:5.  Further, Dr. Thurman was a candidate in 2014 and attended all forums and large events.

Dr. Thurman did not witness these attacks on Plaintiff Johnson. Ex. EEE, *Thurman Decl*. ¶ 4.

396.    As in 2014, white Board candidates during the 2013 election frequently discussed the

issue of school discipline. Ex. A4, *Henson Decl.*, at ¶ 11

**RESPONSE:**

Objection, in that school safety and security are always concerns brought forward by all parents,

both African American and white.  School safety is not a racial issue.  Ex. FFF, *Hogshead Decl*.,

¶ 3. Ex. HHH, *Graves Decl.*, at ¶2.

397.    In debates, Board members failed to recognize the known biases towards disciplining

Black students and particularly Black male students. Ex. A4, *Henson Decl.*, at ¶ 11.

**RESPONSE:**

Objection. The subject of biases towards disciplining Black students was not a subject brought

up during the 2013 campaign. Ex. FFF, , *Hogshead Decl*., ¶ 3 and ¶6.

398.    Candidates also tied the racial achievement gap to "bad parenting," primarily in African-

American families. Ex. A4, *Henson Decl.*, at ¶ 11; *see* Ex. A7, *Pruitt Decl.*, at ¶¶ 15, 16.

**RESPONSE:**

Objection. No candidate tied the racial achievement gap to bad parenting in 2013 or in any other

election. Ex. FFF, *Hogshead Decl*. at ¶5.

399.    During his time on the Board, former Board member Henson made racial inclusion a

priority and recognized and took a number of steps to bridge the achievement gap, and was

outspoken on the lack of diversity in District hiring. Ex. A4, *Henson Decl.*, at ¶¶ 12-13; Ex.

E1, *Morris Dep.*, at 52:4 – 53:1.

**RESPONSE**:

Objection. Former Board member Henson only brought up race during his time on the Board as it related to the hiring of minority employees. Other than hiring a superintendent, bridging the achievement gap specifically is not a function of the School Board. Ex. MM, *Morris Dep.* at 52:4 – 53:7; Ex. KK, *Paulette-Thurman Dep,* at 29:19 – 30:8.

400.   Former Board members Henson and Graham believe that during the 2013 election campaigns, opponents exploited Henson's outspoken recognition of racial bias during his campaign and his emphasis on racial inclusion and bridging the racial achievement gap while on the Board to rally support for other candidates. Ex. A4, *Henson Decl.*, at ¶¶ 12-13; Ex. A3, *Graham Decl.*, at ¶ 16.

**RESPONSE:**

Objection. Henson's viewpoints on racial bias, racial inclusion and the racial achievement gap were not subjects of the 2013 campaign by any candidate. Ex. FFF, *Hogshead Decl.* at ¶6.

   C. *Discriminatory voting practices and procedures (Senate Factor 3) and Tenuous rationales for maintaining these practices and procedures (Senate Factor 9)*

401.   FFSD employs at least three voting practices that increase the opportunity for discrimination against African-American residents: (1) an at-large voting scheme, (2) staggered terms, and (3) off-cycle election. Ex. B4, *Kimball Rep.*, at 5-7.

**RESPONSE:**

Undisputed that the FFSD follows the statutes of Missouri with regard to school board elections, which are at-large, with staggered terms, during the month of April. *§§115.121.3, 162.261-291 RSMo.*

   1. At-large voting scheme

402.   At-large voting schemes can "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986)

138

(alteration in original) (citation and internal quotation marks omitted); Ex. C1, *Dep. of William Cooper*, Aug. 17, 2015, at 83:24 – 84:5.

**RESPONSE:**

Objection. Plaintiff's expert research finds that at-large voting schemes favor the largest group of voters. Ex. A, *Engstrom Dep.,* at 100:18 – 101:22.

403.    Research has found that racial and ethnic minorities have more difficulty electing candidates of choice in local at-large elections that in local district elections and that where there is RPV, a white majority can more effectively determine the winners of all at-large seats. Ex. B4, *Kimball Rep.*, at 6.

**RESPONSE:**

Objection. Plaintiffs' expert's research finds that at-large voting schemes favor the largest group of voters. Ex. A, *Engstrom Dep.,* at 100:18 – 101:22.

404.    Historically, an at-large system "tends[s] to depress turnout rates naturally in the minority population" where the minority voter realizes that she "may not be able to successfully chose a candidate of choice due to being a minority in a majority-wide school district." Ex. C1, *Cooper Dep.*, at 83:24 – 84:4.

**RESPONSE:**

Objection. Plaintiffs' expert's research finds that at-large voting schemes favor the largest group of voters. Ex. A, *Engstrom Dep.,* at 100:18 – 101:22.

405.    Plaintiff Hudson states that he feels that "[his] voice in the electoral process is lessened by at-large elections" because "[c]ertain neighborhoods and racial groups within the school district, particularly the African-American community, are marginalized because they have

historically faced barriers to voting, and may not have the resources to volunteer or donate to school board campaigns." Ex. A5, *Hudson Decl.*, at ¶ 17.

**RESPONSE:**

Undisputed that Plaintiff Hudson makes the foregoing statement. However, African American Board members believe that the current system is the most beneficial system and that no individuals or communities are marginalized. In fact, Board member Paulette-Thurman believes single member district elections would be divisive. Ex. JJ, *Graves Dep.,* at 51:24 – 55:21; Ex. KK, *Paulette-Thurman Dep.,* at 61:8 – 62:11.

406. According to Plaintiff Johnson, "the current election system stifles the voice and concerns of the African American community in school board elections." Ex. A6, *Johnson Decl.*, at ¶ 18.

**RESPONSE:**

Undisputed that Plaintiff Johnson makes the foregoing statement. However, African American Board members believe that the current system is the most beneficial system and that no individuals or communities are marginalized. In fact, Board member Paulette-Thurman believes single member district elections would be divisive. EX. JJ, *Graves Dep.,* at 51:24 – 55:21; Ex. KK, *Paulette-Thurman Dep.,* at 61:8 – 62:11.

407. At-large voting can work in conjunction with socioeconomic racial disparities to disadvantage minority candidates who "are likely to have less access to the necessary resources for travel and advertising" outside the immediate area surrounding the candidates' homes. *Ward v. Columbus Cnty.*, 782 F. Supp. 1097, 1104 (E.D.N.C. 1991).

**RESPONSE:**

Objection, in that in *Ward v. Columbus County*, whites were the majority population (66.34%) and African Americans were the minority population (30.61%). In addition, the white voting age population in Columbus County was 69.55% and the African American voting age population was 27.58%. In the present case, African Americans are the majority population and have, undisputedly, a plurality of the voting age population. *Ward v. Columbus Cnty.*, 782 F. Supp. 1097 (E.D.N.C. 1991); Ex. F, *Cooper Dep.,* at 72:9-15.

408.　According to Plaintiff Johnson, "white candidates have access to structured campaign resources and funds that [African-American candidates] lack." Ex. A6, *Johnson Decl.*, at ¶ 15.

**RESPONSE:**

Objection. Plaintiff Johnson admits that in his campaign for the Board he sought out the same resources and funds as the white candidates, as did all of the other African American candidates. Ex. LL, *Johnson Dep.*, at 46:11 – 22; 82:16 – 86:24.

409.　Larry Thomas and LaWanda Wallace, two African-American Board candidates in 2014, were unable to attend candidate forums due to the lack of private transportation. Ex. E4, *Paulette-Thurman Dep.*, at 45:18 – 46:4 (Wallace), 48:22 – 49:9 (L. Thomas). Wallace was also inexperienced and did not have enough money to support a campaign. Ex. E10, *Green Dep.*, at 40:24 – 41:6.

**RESPONSE:**

Objection. FFNEA president Green stated that Ms. Wallace **may** not have had enough money (emphasis added) and that she was very "green" with regard to running a campaign. Ex. II, *Green Dep.* at 40:20 – 41:6.

410. Former FFNEA president Green agreed that an at-large election system makes it harder for Black voters to elect candidates of their choice. Ex. E10, *Green Dep.*, at 55:15-21.

**RESPONSE:**

Undisputed. However, both African American board members support at-large elections. Ex. KK, *Thurman Depo*, 61:8-1, and Ex. JJ, *Graves depo.*, 52:1-8.

411. Board members state that an at-large election scheme ensures that Board members represent the entire District, rather than specific sub-districts. Ex. E1, *Morris Dep.*, at 149:6-12; Ex. E3, *Brown Dep.*, at 72:23 – 74:12; Ex. E4, *Paulette-Thurman Dep.*, at 61:8-25; Ex. E5, *Graves Dep.*, at 51:24 – 52:11; Ex. E6, *Hogshead Dep.*, at 101:19 – 103:17; Ex. E7, *Schroeder Dep.*, at 82:9-24.

**RESPONSE:**

Undisputed.

412. Under the at-large voting scheme, there have never been more than two Black members on the Board, despite the sizeable population of African-American voters who reside in the District. *Supra* at ¶¶ 15, 19, 221.

**RESPONSE:**

Undisputed that there have not been more than two Black board members serving at the same time.

413. Under the at-large voting scheme, there are no current Board members who reside in municipalities other than Florissant or Ferguson. Ex. B1, *Cooper Decl.*, at Ex. E-7 (p. 92). The last Board member who lived in a municipality other than Florissant or Ferguson was Graham, who lost her Board seat in 2011. Ex. A3, *Graham Decl.*, at ¶ 1; *supra* at ¶ 119; Ex. B1, *Cooper Decl.*, at Ex. E-7 (listing current Board members' residential addresses) Ex. A4,

*Henson Decl.*, at ¶ 1 (listing Henson's residential address).

**RESPONSE:**

Undisputed.

414.    African-American FFSD voter Doris Bailey, who lives in Berkeley, believes that because there are no Board members who live in her portion of the District, that the Board is "less familiar with the schools in this neighborhood and the issues facing its residents." Ex. A1, *Bailey Decl.*, at ¶ 10.

**RESPONSE:**

Objection.  Board members regularly visit the schools in Berkeley. Ex. JJ, *Graves Dep.* at 41:22-25.

415.    Former Board member Graham agrees that "there is underrepresentation on the School Board of residents of Berkeley, [a] predominantly African American neighborhood . . . , and other neighborhoods that are nearly all African American." Ex. A3, *Graham Decl.*, at ¶ 21. Graham "support[s] holding elections through single-member districts to increase the representation of African Americans and predominantly African American neighborhoods." Ex. A3, *Graham Decl.*, at ¶ 21.

**RESPONSE:**

Undisputed that former Board member Graham made the above statements in her declaration.

416.    Bailey states that other politicians have come into her neighborhood while campaigning, but "[n]o candidate for the School Board has ever come to [her] house and [she] do[es] not ever recall seeing any candidates campaigning in [her] neighborhood." Ex. A1, *Bailey Decl.*, at ¶ 11.

**RESPONSE:**

Undisputed that Baily makes the above statements in her declaration, however, Board candidates do campaign in Berkeley. Board member Graves grew up in Berkeley and attended Berkeley Middle School and Berkeley Senior High School. Board member Paulette-Thurman was a principal at Holman Elementary School, located in Berkeley. Board member Morris taught at Berkeley High School and Berkeley Middle School. *Ebert Dep.,* at 29:13-18, 60:8-16; Ex. JJ, *Graves Dep.* at 8:1-15, 19:5-17, Ex. KK, *Paulette-Thurman Dep.,* at 13:8-24; Ex. MM, *Morris Dep.* at 11:4-6; Ex. QQ, *Hogshead Dep.* at 37:14-17.

## 2. Staggered terms

417.    Staggered terms "promote the dilution of minority voting strength because they limit the number of seats, [and] create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting." *Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469, 475 (8th Cir. 1986).

**RESPONSE:**

Objection. The Court in *Buckanaga v. Sisseton Indep. Sch. Dist.* found that a staggered term requirement **combined** with a white majority and white block voting places a minority at a disadvantage. There is no white majority or white block voting in the present case; rather there is a black majority population and undisputedly a black plurality of the voting age population. *Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469, 475 (8th Cir. 1986); Ex.F, *Cooper Dep.,* at 72:9-15.

418.    Local governments with staggered terms tend to generate less voter participation than localities that elect all seats at once. Ex. B4, *Kimball Rep.*, at 6.

**RESPONSE:**

Objection. Dr. Kimball fails to provide evidence that staggered terms has an asymmetric impact across racial groups and provides no reasoning why it would enhance minority representation in

the District if all seven seats were contested at once. Ex.SS, *Supplemental Report of Jonathan Rodden: Senate Factors*, at ¶11.

419.  As part of the 1975 annexation order resulting in the present-day FFSD, the district court created staggered elections for an "initial period of stable governance for the new district." *Missouri*, 515 F.2d at 1373.

**RESPONSE:**

Objection. Staggered terms were in place prior to the 1975 annexation and were required by Missouri statute. *§162.261 RSMo.*

420.  Some Board members believe generally that staggered terms ensure that institutional knowledge is retained after each election. These Board members have not stated any reason why the current staggered system of three-year terms is necessary to provide that continuity. Ex. E5, *Graves Dep.*, at 53:20-24; Ex. E8, *Chabot Dep.*, at 75:16-21.

**RESPONSE:**

Objection. African American Board member Graves states that even if there was a high rate of incumbency that she believes staggered terms are necessary. Board member Chabot stated that staggered terms would be disruptive to the District. Ex. JJ, *Graves Dep.,* at 54:4-9; Ex. RR, *Chabot Dep.*, at 75:16-21.

> 3.  Off-cycle elections

421.  Off-cycle elections are "[h]istorically . . . a favored strategy of established ethnic groups in American cities who wish to keep immigrants and minorities out of power." Ex. D5, *Is Segregation the Problem in Ferguson?*, at 6; Ex. C5, *Rodden Dep.*, at 37:8 – 38:8.

**RESPONSE:**

Undisputed that off-cycle elections historically have been used by established ethnic groups to keep immigrants and minorities out of power. There is no evidence this has occurred in the District.

422. Off-cycle elections tend to generate unusually low voter turnout generally and disproportionately low turnout among African-American voters. Ex. B4, *Kimball Rep.*, at 6; Ex. E6, *Hogshead Dep.*, at 69:15-18; Ex. E8, *Chabot Dep.*, at 76:25 – 77:2; Ex. C6, *Dep. of David Kimball*, Aug. 21, 2015, at 63:18 – 64:13.

**RESPONSE:**

Objection. Dr. Kimball concluded that in FFSD Board elections (at least in 2014), the relationship between race and voter turnout is "pretty weak". Ex. O, *Kimball Dep.,* at 51:6-11

423. Turnout among FFSD voters for April Board elections is low. Ex. B5, *Rodden Rep.*, at ¶ 21, Fig. 5, ¶ 22. Historically it is lower than the turnout for November elections. Ex. E7, *Schroeder Dep.*, 61:14-18.

**RESPONSE:** Undisputed that turnout for April Board elections is lower than the turnout for elections in November; object to any conclusion that African Americans turnout in lower numbers that whites for FFSD Board elections, according to Plaintiffs' expert. Ex. O, *Kimball Dep.,* at 51:6-11.

424. The parties' experts agree that during the last twelve contested elections, white turnout in FFSD clearly surpassed African-American turnout in six elections (2001, 2003, 2006, 2009, 2011, and 2015). Ex. C5, *Rodden Dep.* at 84:5-13; Ex. B9, *Kimball Rebuttal*, at 6. They also agree that African-American turnout has always been lower than or statistically indistinguishable from white turnout. Ex. C5, *Rodden Dep.* at 85:3-6; Ex. B9, *Kimball Rebuttal*, at 6.

**RESPONSE:**

Objection. In six of the elections since 2000, including three very recent elections, there is no statistically significant difference between black and white voter turnout. Ex. I, *Rodden Dep.*, at 84:14-17.

425. According to Plaintiff Johnson, "African American voters are understandably disillusioned with School Board elections because we have had extremely limited success electing our supported candidates to the Board and have found the members who are elected to the Board unresponsive to community needs." Ex. A6, *Johnson Decl.*, at ¶ 15. Plaintiff Hudson agrees, stating that "[t]he school board's lack of concern for the African American community only exacerbates the low turnout and common sentiment that African Americans are excluded from the school district decision-making process." Ex. A5, *Hudson Decl.*, at ¶ 17.

**RESPONSE:**

Undisputed that Plaintiffs Johnson and Hudson make the above stated declarations however two African American board members have been elected in the last two years. Ex. EEE, *Thurman Decl.* at ¶1, Ex. HHH, *Graves Decl.* at ¶1.

426. According to the District's expert Dr. Rodden, off-cycle elections increase the relative influence of "well-organized interest groups[] such as unionized teachers and municipal workers," which are motivated to maintain the status quo. Ex. D5, *Is Segregation the Problem in Ferguson?*, at 6; Ex. C5, *Rodden Dep.*, at 34:14 – 38:20. He acknowledges that he has no basis for believing that teachers' unions in FFSD do not likewise benefit from off-cycle elections. Ex. C5, *Rodden Dep.*, at 36:12 – 37:7.

**RESPONSE:**

Objection.  Dr. Rodden stated that it is unknown whether this finding is true of every school district in the United States and that he had done no analysis on union involvement in local elections in the FFSD.  Dr. Rodden also acknowledges that he did not conduct any investigation into the number of candidates who have applied for union endorsements or the number of African American's involved in making endorsement decisions.  Ex. I, *Rodden Dep.,* at 35:25 – 36:6; 36:12 – 37:7, 292:7-10, 293:4-8.

427.    In FFSD, the FFNEA and the North County Labor Club are two such "well-organized interest groups." *See* Ex. B4, *Kimball Rep.*, at 8; *supra* at ¶¶ 348, 368. Both organizations generally endorse white candidates. *Supra* at ¶¶ 357, 374.

**RESPONSE:**

Undisputed that the FFNEA and North County Labor Club are interest groups. Object that both organizations generally endorse white candidates.  *Supra* at ¶374.

428.    Board members either did not know the reason for maintaining off-cycle elections, Ex. E2, *Ebert Dep.*, at 103:3-6, Ex. E3, *Brown Dep.*, at 45:18-22; Ex. E4, *Paulette-Thurman Dep.*, at 62:5-8, or claimed that holding Board elections off-cycle ensures that they are not overshadowed by statewide or national races or gives Board members an opportunity to provide input in the following school year, Ex. E5, *Graves Dep.*, at 54:18 – 55:3; Ex. E6, *Hogshead Dep.*, a 69:3-14; Ex. E8, *Chabot Dep.*, at 76:6 – 77:11; Ex. E7, *Schroeder Dep.*, at 61:5-13.

**RESPONSE:**

Objection. Schroeder testified that the thinking behind April elections is that the new board begins in time to deal with the budget for the upcoming school year.  Ex. PP Schroeder depo., 61:5-13.

429. A few Board members stated that they were unconcerned by the fact that off-cycle elections have lower turnout, claiming that if a voter really cares then he or she will vote regardless of when the election is held. Ex. E6, *Hogshead Dep.*, at 69:15-24; Ex. E8, *Chabot Dep.*, at 76:25 – 77:11.

**RESPONSE:**

Objection. There is no evidence that off-cycle elections have lower turnout in the District. Plaintiffs' statement that turnout among African-American voters tends to be disproportionately low in off-cycle elections, is a reference to political science research in general. Ex. O, 65:9-23. Plaintiffs' expert did not examine whether turnout is disproportionately low in off-cycle elections in the District. Ex. O, 65: 9-19. In addition, mischaracterizes testimony. Board member Chabot stated that voters in April are more engaged and have taken time to learn about the candidates and the issues. Ex. RR, *Chabot Dep.,* at 77:5-8. Board member Hogshead stated that April elections are better so that voters can be focused on what is important for the school district and not get lost in the shuffle of a large election. Ex. QQ, *Hogshead Dep.,* at 69:9-14.

430. Some Board members do not believe it makes a difference if Board elections are held in April or November. Ex. E3, *Brown Dep.*, at 45:23 – 46:2; Ex. E4, *Paulette-Thurman Dep.*, at 62:9-11.

**RESPONSE:**

Undisputed. Additionally, Plaintiffs have no evidence whether it makes a difference if elections are held in April or November. Plaintiffs' statement that turnout among African-American voters tends to be disproportionately low in off-cycle elections, is a reference to political science research in general. Ex. O, 65:9-23. Plaintiffs' expert did not examine whether turnout is disproportionately low in off-cycle elections in the District. Ex. O, 65: 9-19. Plaintiffs have not

examined turnout differentials in elections held in the district in any other months. Ex. O, 65:9-66:8.

Dated this 23rd day of October, 2015.     Respectfully submitted,

CROTZER & ORMSBY, LLC

*/s/ Angela Bullock Gabel*
Angela Bullock Gabel, 58227MO
130 S. Bemiston Ave., Suite 602
Clayton, MO 63105
314.726.3040 / 314.726.5120 (fax)
agabel@crotzerormsby.com

*Attorney for Defendant Ferguson-Florissant School District*

## CERTIFICATE OF SERVICE

On October 23, 2015, a copy of the foregoing was electronically filed with the Clerk of the Court using the e-filing system, an electronic copy therefore being served on Anthony E. Rothert, Grant R. Doty, Andrew J. McNulty, Gillian R. Wilcox, Dale E. Ho, Julie A. Ebenstein, and M. Laughlin McDonald, Attorneys for Plaintiffs, and Darold E. Crotzer, Jr., Attorney for Defendant St. Louis County Board of Election Commissioners.

*/s/ Angela Bullock Gabel*
Angela Bullock Gabel, 58227MO
130 S. Bemiston Ave., Suite 602
Clayton, MO 63105
314.726.3040 / 314.726.5120 (fax)
agabel@crotzerormsby.com

*Attorney for Defendant Ferguson-Florissant School District*