**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF | ) | |
| THE NATIONAL ASSOCIATION FOR THE | ) | |
| ADVANCEMENT OF COLORED PEOPLE, | ) | |
| REDDITT HUDSON, F. WILLIS JOHNSON | ) | |
| and DORIS BAILEY, | ) | |
| | ) | Civ. No. 14-2077 |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FERGUSON-FLORISSANT SCHOOL | ) | |
| DISTRICT and ST. LOUIS COUNTY BOARD | ) | |
| OF ELECTION COMMISSIONERS, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT'S ADDITIONAL STATEMENT OF UNCONTROVERTED MATERIAL
FACTS**

*Gingles* **1**

1.  Cooper's Illustrative Plans are based on the 2010 decennial census single-race BVAP. Ex. F, *Cooper Dep.,* at 78:7-14 and Ex. B, *Cooper Rep.,* at Figures 10 and 12.

2.  Plaintiffs' attorneys asked Cooper to develop four majority African American districts in a seven single-member district plan. Ex. B, *Cooper Rep.,* at ¶9.

3.  Cooper states, "Had I made race predominant, I could have created six out of seven majority-black districts." Ex. G, *Cooper Supp Rep.,* at ¶27.

4.  The Supplemental Declaration of William S. Cooper contains a hypothetical plan with six of the seven single-members districts that are majority African American voters.  Ex. G, *Cooper Supp Rep.,* at Figures 7 and 8.

5.  Hypothetical Plan B contains African American BVAP ranging from 51% - 60.29% in six of the seven proposed single-member districts.  Ex. G, *Cooper Supp Rep.,* at Figure 8.

6.  Dr. Kimball concludes that precincts that are between 10-90% African American are racially integrated.  Ex. BBB, *Kimball Rebuttal Rep.,* at p. 6.

7.  Kimball opined that, in an at-large election system, a racial or ethnic majority can "effectively determine the winners of all" elections if there is racially polarized voting. Ex. P, *Kimball Rep.,* at p. 6.

**FFSD is racially integrated**

8.  Dr. Thurman states that her neighborhood is 60% African American and 40% white. Ex. KK, *Thurman Dep.,* at 93:11-14.

9.  Johnson's neighborhood is racially integrated "literally and figuratively". Ex. LL, *Johnson Dep.,* at 21:1-13.

10. Schroeder testified that the District is very integrated at this point. Ex. PP, *Schroeder Dep.,* at 33:22–34:8.

11. The Ferguson Florissant School District is a bright spot because it is desegregated. Ex. I, *Rodden Dep.,* at 45:14-23.

## *Gingles* 2

12. Plaintiffs' counsel asked Dr. Rodden, "And we established earlier, didn't we, Dr. Rodden, that to get through peer review, one should quantitatively test hypotheses, not rely simply on sort of qualitative judgments about whether or not something was the cause of something else, right?"  Dr. Rodden responded, "Yes."  Ex. I, *Rodden Dep.,* at 89:11-16.

13. Dr. Rodden testified that, in his opinion, it would not be "analytically appropriate" to use Plaintiffs' "rule of thumb" method that "when the point estimate for the level of support for one candidate lies within the confidence interval of support for another candidate, there is no statistically significant difference between the two candidates." Ex. I, *Rodden Dep*., 164:20-21.

14. Rodden repeatedly objected to this method and stated it was "not an appropriate approach to the data." Ex. I, *Rodden Dep*., 164:20-22.

15. In reference to Plaintiffs' method, Dr. Rodden testified, "I don't agree to the approach that's being taken. . . I don't believe that throwing out all of the candidates in every situation, when African-Americans are incohesive in their voting behavior, is an analytically appropriate choice.  I object to that approach.  Ex. I, Rodden Dep., 164:16-23.

16. Dr. Rodden testified that the parties were at an "impasse" on this point. Ex. I, Rodden Dep., 165:10-11.

17. Dr. Rodden testified that there is a "difficult analytical choice" in "trying to identify more than one preferred candidate" in a "multi-winner system." Ex. I, *Rodden Dep*., 162:14-21.

18.    Dr. Rodden testified that Plaintiffs' approach is "not an approach that would be acceptable if submitted to a peer-reviewed journal." Ex. I, *Rodden Dep*., 179:6-7.

19.    Dr. Rodden testified that "African Americans are more likely to vote for African American candidates and whites are more likely to vote for white candidates." However, he also testified that "[t]he correlation of that kind would be found in really any jurisdiction in the United States in which African-American candidates and white candidates are on the ballot and there are African-Americans and whites in the jurisdiction." Ex. I, *Rodden Dep*., at 273:21-25.

20.    In 2013, precincts where more than 80% of the VAP was African American, Henson (a African American candidate) received only 39% of votes cast.  Ex. X, *Rodden Rep.,* at   ¶ 55.

21.    In 2013, Henson (an African American candidate) only received a majority of votes cast in 2 of the 47 precincts.  Ex. X, *Rodden Rep.,* at ¶ 55.

22.    In 2012, Morris (an African American candidate), failed to achieve a majority of the votes cast in precincts where 80% of the VAP was African American.  Ex. X, *Rodden Rep.,* at ¶ 57.

23.    Precincts with a VAP that is 80% or more white gave at least half of their votes to African American candidates in 2015.  Ex. X, *Rodden Rep.,* at ¶ 38.

24.    Precincts with a VAP that is 80% or more African American gave approximately 60% of their votes to white candidates in 2012 and 2013.  Ex. X, *Rodden Rep.,* at ¶ 38.

25.    Precincts with a VAP that is 80% or more African American gave more than 40% of their votes to white candidates in 2015.  Ex. X, *Rodden Rep.,* at ¶ 38.

26.    Plaintiffs' expert, David Kimball, refused to opine that the formation of the coalition of African-American candidates was "racially motivated."  Ex. O, *Kimball Dep.,* at 58:2-6.

27.    Brown testified people tend to vote based on the candidates they feel are best qualified and not based on race. Ex. OO, *Brown Dep.,* at 38:6-11.

### *Gingles* 3

28.    Dr. Kimball admitted that he had "no idea" whether this lawsuit influenced the behavior of voters in the 2015 election.  Ex. O, *Kimball Dep.,* at 76:18-21.

29.    Dr. Kimball admitted that he did not know whether any candidates decided not to run in the 2015 election because of this lawsuit.  Ex. O, *Kimball Dep.,* at 76:22-24.

30. Dr. Kimball testified that to determine the minority-preferred candidates in a multiwinner election, one would first determine the candidate who received the most minority votes.  Ex. O at 77:15-17.  Next, one would find out which candidate "got the second most votes from . . . the minority group and which candidate got the third most votes."  Ex. O, *Kimball Dep.,* at 77:20-78:1.

## Special Circumstances

31. Plaintiffs are not aware of any research that shows a Voting Rights Act lawsuit affects the pool of candidates that run in the next election. Ex. O, *Kimball Dep.,* at 77:9-12.

32. Donna Thurman supported Doris Graham, an African American former board member, many years ago. Ex. KK, *Thurman Dep.,* at 50:14-19.

33. Donna Thurman did not support Doris Graham in 2011.  Ex. KK, *Thurman Dep.,* at 55:14-19.

34. A lot of people were supporting candidates other than the incumbents in 2011 because the board members voted to give the former superintendent lifetime insurance. Ex. QQ, *Hogshead Dep.,* at 47:23-48:14.

35. The 2011 campaign was unique because of the Jeff Speigel's health insurance.  Ex. RR, *Chabot Dep.,* at 31:4-17.

36. Jeff Speigel is a former superintendent of the District. Ex. NN, *Ebert Dep.* at 82:20-25.

37. Robert Chabot has not had any constituents mention this lawsuit to him. Ex. RR, *Chabot Dep.,* at 110:10-12.

38. There was an anti-incumbent sentiment in 2011. Ex. NN, *Ebert Dep.,* at 71:5-12.

39. Voting for lifetime health insurance for Jeff Speigel was a hindrance to the incumbents' campaigns. All three incumbents lost in 2011. Ex. MM, *Morris Dep.,* at 61:8-62:8.

## Senate Factor One – The extent of any history of official discrimination.

40. Dr. Gordon's book, entitled *Mapping Decline: St. Louis and the Fate of the American City*, was published in 2008.  Ex. K, *Gordon Dep.*, at 11:5-22.

41. Data from Gordon's book is at least eight years old. Ex. K, *Gordon Dep.,* at 17:16-21.

42. There is no evidence that restrictive covenants existed in the FFSD.  Ex. K, *Gordon Dep.,* at 13:24-14:2

4

43.     At least half of Gordon's report is based on old research that does not involve the District specifically.  Ex. K, *Gordon Dep.,* at 21:13-18.

44.     Dr. Graves does not believe African Americans today suffer from effects of past discrimination. Ex. JJ, *Graves Dep.,* at 56:17-20.

45.     There is no significant difference in turnout between African American and white voters in the 2012, 2013 and 2014 District elections. Ex. I, *Rodden Dep.,* at 47:21-48:21.

46.     Turnout is defined by as the number of ballots cast divided by the number of registered voters. Ex. I, *Rodden Dep.,* at 53:8-13.

47.     Cooper admits that he did not analyze turnout.  Ex. F, *Cooper Dep.,* at 84:16-24.

48.     Engstrom did not analyze whether African Americans and whites turned out at the same or different rates in April elections. Ex. L, *Engstrom Dep.,* at 114:10-16.

49.     Engstrom did not analyze voter turnout for any election outside of the April election either. Ex. L, *Engstrom Dep.,* at 114:10-16.

50.     Kimball did not analyze turnout in elections in the District outside of the April 2014 election. Ex. O, *Kimball Dep.,* at 65:20-25.

51.     The relationship between race and turnout in 2014 is weak. Ex. O, *Kimball Dep.,* at 51:6-11.

52.     Rodden analyzed turnout of African American and white voters in District. See, Ex. GG, *Rodden Supp Rep: Assessment of Plaintiffs Redistricting Proposals;* at ¶14.

53.     Rodden concluded there was no significant difference in turnout in the recent years of 2012, 2013, 2014.  See I, *Rodden Dep.,* at 48:13-18.

**<u>Senate Factor Two – the extent to which voting is racially polarized.</u>**

54.     Plaintiffs' expert cannot name a school district that is more integrated than FFSD. Ex. K, *Gordon Dep.,* at 25:21-25.

55.     Dr. Graves, an African American board member, testified that she voted for a white candidate in the 2014 election.  Ex. JJ, *Graves Dep.,* at 42:34-43:8.

56.     Dr. Graves, an African American, received the most votes of any candidate in the April 7, 2015 election. Ex. JJ, *Graves Dep.,* at 67:7-22.

57.    Dr. Graves received 33.75% of the votes in 2015. Brian Scott Ebert received 30.3% of the votes.  Ex. JJ, 67:7-68:1.  Dr. Graves is African American and Brian Scott Ebert is white. Ex. A, *Engstrom Rep.,* at ¶33.

58.    Brown testified people tend to vote based on the candidates they feel are best qualified and not based on race. Ex. OO, *Brown Dep.,* at 38:6-11.

59.    Race was an issue in the 2014 election in response to the Dr. McCoy situation. Ex. OO, *Brown Dep.,* at 70:18-71:2.

60.    Schroeder had the support of African American voters. Ex. PP, *Schroeder Dep.,* at 25:20-26:8.

61.    Schroeder testified he does not believe white voters vote in a bloc or that African Americans vote in a bloc. Ex. PP, *Schroeder Dep.,* at 26:13-25.

62.    Schroeder attended fundraisers for Dr. Graves and constructed all of her yard signs. Ex. PP, *Schroeder Dep.* at 62:1–11.

63.    Schroeder made yard signs for Donna Thurman. Ex. PP, *Schroeder Dep.*, at 70:24-70:3.

64.    Brown had support from African American voters. Ex. OO, *Brown Dep.*, at 32:16-33:11.

65.    Brown campaigned for Roger Hines, an African American candidate in 2015. Ex. OO, *Brown Dep.,* at 37:20 – 38:5.

66.    Hogshead had support from the African American community.  She campaigned in both sections of Berkeley and her neighborhood is primarily African American. Ex. QQ, *Hogshead Dep.,* at 36:10-37:4.

67.    Hogshead supported Doris Graham in her elections. Ex. QQ, *Hogshead Dep.,* at 40:18-41:3.

68.    Hogshead testified that people in the District do not vote along racial lines. Ex. QQ, *Hogshead Dep.,* at 64:16-65:1.

69.    Chabot supported Roger Hines in 2015. Ex. RR, *Chabot Dep.,* at 67:19-68:7.

70.    Chabot does not believe voters in the District vote along racial lines. Ex. RR, *Chabot Dep.,* at 70:8-17.

71.    Ebert supported Donna Thurman in 2014. Ex. NN, *Ebert Dep.* at 72:7-21.

72.     Ebert does not believe people vote along racial lines. Ex. NN, *Ebert Dep.,* at 76:11-77:2.

73.     Dr. Thurman had the support from African Americans and whites in her campaign. Ex. KK, *Thurman Dep.,* at 93:15-23.

74.     Dr. Thurman has supported both African American and white candidates for the Board. Ex. KK, *Thurman Dep.,* at 50:14-19 and 99:23-100:7.

75.     Dr. Graves testified she voted Kimberly Benz in the 2014 election.  Ex. JJ, *Graves Dep.,* at 42:34-43:8.  Ms. Benz is white.  Ex. A, *Engstrom Rep.,* at ¶ 27.

76.     Johnson received the support of African Americans and whites when he ran for school board.  Ex. LL, *Johnson Dep.*, at 21:5-22:1.

77.     Kimball's basis for concluding that voting is racially polarized in his initial report is based solely on the 2014 election. Ex. O, *Kimball Dep.,* at 17:21-25.

78.     Kimball was not aware that 2014 was an outlier for racially polarized voting because he did not analyze any other election in his initial report. Ex. O, *Kimball Dep.,* at 19:23-20:6.

## Senate Factor Three – Enhancing Procedures

### At-large elections

79.     Dr. Thurman testified that at-large elections ensure that every community is represented. Ex. KK, *Thurman Dep.,* at 61:8-13.

80.     Brown testified that at-large voting does not make it harder for black candidates to elect candidates of their choice because African Americans were elected in the last two elections. Ex. OO, *Brown Dep.,* at 44:19-45:2.

81.     The school board should think about the entire district and not just their own neighborhood. Ex. PP, *Schroeder Dep.*, at 57:24-58:5.

82.     Dr. Graves, an African American board member, testified that at-large elections are better because it prevents school board members from fighting for the schools that are in their district.  Ex. JJ, *Graves Dep.,* at 52:1-8.

83.     Dr. Graves testified that the at-large system allows the best qualified candidate to be elected. Ex. JJ, *Graves Dep.,* at 52:9-14.

84.     African Americans are better off under the current at-large system than if the District were divided up into seven single-member districts.  Ex. I, *Rodden Dep.,* at 341:24-342:12.

85. Dr. Thurman testified that single-member districts would be divisive. Ex. KK, *Thurman Dep.,* at 61:14-20.

86. A negative effect of single-member districts is that it segregates the community.  Ex. KK, *Thurman Dep.,* at 96:11-20.

87. Single member districts would be bad because it would handcuff the district in that every board member would be defending the schools in their own section. Ex. OO, *Brown Dep.,* at 73:5-74:2.

**Staggered Terms**

88. Dr. Graves testified that staggered terms are necessary to prevent a whole new board and to know what happened in the past. Ex. JJ, *Graves Dep.,* at 53:20-54:12.

89. The advantage of staggered terms is that you don't have complete turnover of a board because that would be very disruptive to the District. Ex. RR, *Chabot Dep.,* at 75:12-21.

**April elections**

90. Plaintiffs' statement that turnout among African-American voters tends to be disproportionately low in off-cycle elections, is a reference to political science research in general.  Ex. O, *Kimball Dep.,* at 65:9-23.

91. Plaintiffs' expert did not examine whether turnout is disproportionately low in off-cycle elections in the District. Ex. O, *Kimball Dep.,* at 65: 9-19.

92. Plaintiffs have not examined turnout differentials in elections held in the district in any other months. Ex. O, *Kimball Dep.,* at 65:9-66:8.

93. The FFNEA vice-treasurer for the 2014-2015 school year testified that April elections allow new board members time to prepare for the new school year and for the upcoming fiscal year prior to its beginning in July. Ex. II, *Green Dep.,* at 56:6-14.

94. Dr. Graves testified that April elections are beneficial because it allows voters to focus on the school board election. Ex. JJ, *Graves Dep.,* at 54:22-55:3.

95. The thinking behind April elections is that the new board begins in time to deal with the budget for the upcoming school year.  It allows the new board to have input into the budget for the following year. Ex. PP, *Schroeder Dep.,* at 61:5-13.

## Bullet Voting

96.    Dr. Graves utilized bullet voting in her campaign because she felt that an informed voter would know she was the best candidate and should only vote for her. Ex. JJ, *Graves Dep.,* at 13:14-14:15.

97.    Schroeder has often only voted for one candidate despite being able to vote for two or three candidates. Ex. PP, *Schroeder Dep.,* at 19:11-18.

98.    Hogshead has encouraged bullet voting. Ex. QQ, *Hogshead Dep.,* at 15:18-16:6.

99.    Graham liked to bullet vote. Ex. MM, *Morris Dep.,* at 69:25-70:4.

100.    African Americans have the same opportunity to engage in bullet voting as whites. Ex. O, *Kimball Dep.,* at 45: 20-25.

## Senate Factor Four – The candidate slating process.

## FFNEA Endorsement

101.    Kimball does not know how many African Americans applied for the Ferguson Florissant National Education Association ("FFNEA") endorsement. Ex. O, *Kimball Dep.,* at 67:7-9.

102.    Plaintiffs' expert does not know whether whites apply for the FFNEA endorsement more than blacks. Ex. O, *Kimball Dep.,* at 67:10-14.

103.    Plaintiffs' expert does not know whether all of the African American candidates in 2015 applied for the FFNEA endorsement. Ex. O, *Kimball Dep.,* at 67:20-23.

104.    Plaintiffs' expert did not know or investigate the process for FFNEA endorsement when he made his conclusions. Ex. O, *Kimball Dep.,* at 70:8-71:2.

105.    Plaintiffs' expert fails to inform the reader that he did not investigate whether candidates sought endorsements. Ex. O, *Kimball Dep.,* at 100:14-20 and 101:13-17.

106.    An African American was president-elect in 2013-2014 and president in the 2014-2015 of the FFNEA. Ex. II, *Green Dep.,* at 39:13-15 and 51:23-25.  He is currently vice treasurer for the FFNEA and a member of the executive board. Ex. II, *Green Dep.,* at 17:3-7.

107.    The FFNEA does not recruit candidates. Ex. II, *Green Dep.,* at 35:22-24.

108.    The FFNEA may not endorse a candidate at all. Ex. II, *Green Dep.,* at 76:15-18.

109.    The FFNEA sends letters to all school board candidates to invite them to apply and interview for their endorsement.  Ex. II, *Green Dep.,* at 23:13-23.

110.    The candidates are sent a questionnaire ahead of time that informs them of the questions that will be asked during the interview. Ex. II, *Green Dep.,* at 23:13 - 24:3.

111.    Every candidate that wants an interview is interviewed. Ex. II, *Green Dep.,* at 25:7-9.

112.    The FFNEA forms a committee to conduct the interviews. Ex. II, *Green Dep.,* at 73:5-8.

113.    The FFNEA committee that conducts the interview is racially diverse. Ex. II, *Green Dep.,* at 74:7-9.

114.    Frank Green, the FFNEA representative states, "We want to make sure that everything is as fair as possible. We don't want anybody going back and saying, well, I didn't get the job because I'm African-American and everyone on the panel was white, or, you know, we want to keep it as diverse as possible. We want to make sure that everyone is represented.  We don't even want that from our members." Ex. II, *Green Dep.,* at 82:5-15.

115.    After the FFNEA interviews, the committee goes over the candidates' answers.  The candidates that do not have "teacher friendly" answers are not endorsed. Ex. II, *Green Dep.,* at 75:14-23.

116.    The committee votes on whom to endorse among the "teacher friendly" candidates. Ex. II, *Green Dep.,* at 75:14-25.

117.    Once the committee decides whom to endorse, they put those candidates' names before the FFNEA membership for a vote. Ex. II, *Green Dep.,* at 76:1-22.

118.    The FFNEA chose not to endorse any incumbents in 2011 because the incumbents voted against a raise.  Ex. II, *Green Dep.,* at 47:17-48:3.

119.    The 2014 FFNEA endorsed candidates did not run as a slate. Ex. MM, *Morris Dep.,* at 45:8-9 and Ex. FFF, *Hogshead Decl.* at ¶7.

120.    Individual candidates raised funds for their own campaigns, sent out mailings, put out yard signs, went door-to-door, and conducted other typical campaign activities.   See, Ex. MM, *Morris Dep.,* at 25:24-26:6 and Ex. FFF, *Hogshead Decl.*, at ¶7.

121.    The FFNEA chose not to endorse Dr. Graham in 2011 because she was an incumbent. Ex. II, *Green Dep.,* at 47:17-48:3.  Dr. Graham was, however, endorsed by the FFNEA in all of her other contested elections. Ex. FFF, *Hogshead Decl.,* at ¶2

122.  Graham's race was not a consideration in the endorsement. Ex. II, *Green Dep.,* at 80:3-6.

123.  The FFNEA endorsed Hogshead in 2011 because she was for the teachers and she voted to give the teachers a raise. Ex. II, *Green Dep.,* at 48:9-16.

124.  Race was not an issue in the FFNEA's decision not to endorse Johnson in 2014. Ex. II, *Green Dep.,* at 79:15-17.

125.  The FFNEA committee disliked Johnson's answer about class size. Ex. II, *Green Dep.,* at 79:1-14.

126.  The FFNEA has a strong stance on class size. Ex. LL, *Johnson Dep.,* at 84:3-6.

127.  The racial make-up of the FFNEA endorsement committee both times Paul Morris ran for office was roughly equal between African Americans and whites. Ex. MM, *Morris Dep.,* at 142:22-25.

128.  Dr. Thurman was not endorsed by the FFNEA and does not believe the lack of endorsement mattered. Ex. KK, *Thurman Dep.,* at 90:12-91:1.

129.  Dr. Graves did not receive the FFNEA endorsement but won her election. Ex. JJ, *Graves Dep.,* at 35:16-36:13.

**North County Labor Endorsement**

130.  Plaintiffs do not know how many candidates of either race applied for the North County Labor endorsement. Ex. O, *Kimball Dep.,* at 68:24-69:1.

131.  Dr. Thurman did not seek the North County Labor endorsement in 2014.  Ex. KK, *Thurman Dep.,* at 45:3-11.

132.  Johnson did not seek an endorsement from North County Labor. Ex. LL, *Johnson Dep.,* at 20-22.

133.  North County Labor does not endorse candidates for all elections. Ex. MM, *Morris Dep.,* at 21:9-17.

**Grade A for Change**

134.  The Citizens Task Force for Quality Education was a group formed to help Normandy Schools.  Ex. KK, *Thurman Dep.,* at 34:20–35:10.

135.  The Citizens Task Force wanted to put together a slate of candidates to run for the Ferguson-Florissant School Board. Ex. KK, *Thurman Dep.,* at 34:20-35:10.

136.    The Citizens Task Force changed its name to Grade A for Change. Ex. KK, *Thurman Dep.,* at 35:4-25.

137.    Grade A for Change sent out information asking candidates to apply to be on the slate. Ex. KK, *Thurman Dep.,* at 36:25-37:5.

138.    The original slate included Dr. Thurman, Savala, and a third person that dropped out. Ex. KK, *Thurman Dep.,* at 35:11-36:23.

139.    Johnson was recruited after the third person dropped out. Ex. KK, *Thurman Dep.,* at 37:1-13.

140.    The three members of the slate were all African American. Ex. A, *Engstrom Rep.,* at ¶28.

141.    One of the issues that motivated Grade A for Change was race. Ex. KK, *Thurman Dep.,* at 38:5-9.

142.    Grade A for Change created, produced and distributed literature.  Ex. LL, *Johnson Dep.,* at 44:5-45:16.

143.    Judy Shaw was the campaign manager for Grade A for Change.  She organized the slate. Ex. LL, *Johnson Dep.,* at 44:22-45:6.

144.    The Grade A for Change candidates ran as a slate. Ex. JJ, *Graves Dep.,* at 17:23-25.

145.    Grade A for Change did not endorse in 2015. Ex. JJ, *Graves Dep.,* at 35:6-10.

**Senate Factor 5 - Socioeconomic factors that hinder African Americans' ability to participate.**

146.    Kimball's analysis of Senate Factor Five did not include analysis specific to the entire District. Ex. O, *Kimball Dep.,* at 71:10-72:23.

147.    The City of Ferguson only accounts for 27% of the population of the District.  Ex. B, *Cooper Rep.,* at Figure 6, Column 1 and *Gordon Dep.,* at 19:10-14.

148.    The most relevant benchmark for socioeconomic statistics is the St. Louis Metropolitan area. Ex. K., *Gordon Dep.,* at 24:15-23.

**Disparity in General**

149.    Dr. Graves is unaware of any racial disparity between African American and white students in the District. Ex. JJ, *Graves Dep.,* at 61:15-62:3.

12

150.   Racial disparities between African Americans and whites are smaller in the District than in the St. Louis metropolitan region and with one exception, in the state of Missouri.  Ex. SS, *Rodden Supp Rep.: Senate Factors.,* at ¶34.

## Housing

151.   Plaintiffs' conclusion that the FFSD is in an unusually vulnerable position with low-income housing is not based on information specific to the District.  Ex. K, *Gordon Dep.,* at 31:17 – 32:6.

152.   Plaintiffs expert's statement that "African Americans in Ferguson-Florissant have settled overwhelmingly in the apartment complexes (Suburban Heights, Northwinds, Canfield) along Malin Creek…." is not based on an analysis of the District.  Ex. K, *Gordon Dep.* at 32:16 – 33:25.

153.   Canfield Green is not within the District. Ex. K, *Gordon Dep.,* at 32:16 – 34:16.

154.   Plaintiffs' expert does not know how many African Americans in the District live in apartment complexes.  Ex. K, *Gordon Dep.,* at 34:22 – 35:10.

155.   Over half (50.7%) of African Americans in the District are homeowners. Ex. HH, *Gordon Response to Rodden Report,* at page 4, Table 4.

156.   Dr. Graves was unaware of racially restricted housing, covenants and zoning in St. Louis County. Ex. JJ, *Graves Dep.,* at 56:10-13.

157.   Dr. Graves was born and raised in St. Louis and attended Berkeley Senior High School in the District. Ex. JJ, *Graves Dep.,* at 7:24-8:15.

158.   Dr. Graves is unaware of any racial disparity in home ownership, employment levels or income or poverty levels within the District. Ex. JJ, *Graves Dep.,* at 57:18-58:7.

## Income

159.   In context, the District has a small income gap. Ex. SS, *Rodden Supp Rep: Senate Factors*, at ¶32.

160.   The income gap between African Americans and whites in the FFSD is narrower than in the region at large.  Ex. K., *Gordon Dep.,* at 24:4-9.

161.   Plaintiffs' expert failed to provide any evidence of a racial wealth gap in the District.  Plaintiffs' evidence on the racial wealth gap is based on national statistics.  Ex. K, *Gordon Dep.,* at 29:25 – 30:13.

162.   The median household income for the African American households in the District is $14,000 lower than that of whites.  The median household income gap for African-

Americans and whites in the St. Louis metropolitan region is around $30,000.  The median gap is around $19,000 in the state of Missouri and $21,000 for the entire country.  Ex. SS, *Rodden Supp Rep: Senate Factors,* at ¶32.

163.    The gap between African Americans and whites for individuals with incomes below the poverty line, individuals relying on the Supplemental Nutrition Assistance Program ("SNAP"), and the unemployment rate is smaller in the District than in the St. Louis metropolitan region. Ex. SS, *Rodden Supp Rep: Senate Factors,* at Figure 3.

**<u>Employment</u>**

164.    Frank Green, an African American FFNEA representative, testified that he is unaware of racial disparities in employment that are unique to the District. Ex. II, *Green Dep.,* at 59:8-16.

**<u>Education</u>**

165.    African Americans in the District have a high graduation rate relative to other African American communities in St. Louis and beyond.  Ex. K, *Gordon Dep.,* at 44:21-45:2.

166.    There is no indication that higher achieving and lower achieving schools are racially identifiable. Ex. JJ, *Graves Dep.,* at 27:10-21.

167.    The gap between African Americans and whites in obtaining a bachelor's degree is smaller in the District than in the St. Louis metropolitan region and the state of Missouri. Ex. SS, *Rodden Supp Rep: Senate Factors,* at Figure 3.

168.    The gap between African Americans and whites in obtaining "some college" is smaller in the District the St. Louis metropolitan region and the state of Missouri. Ex. SS, *Rodden Supp Rep: Senate Factors,* at Figure 3.

169.    The FFNEA representative does not believe that African Americans in the District suffer from discrimination in education attainment any more or less than African Americans nationwide. Ex. II, *Green Dep.,* at 80:20-81:11.

**<u>The achievement gap and discipline.</u>**

170.    Schroeder testified that the achievement gap is not unique to the District. Ex. PP, *Schroeder Dep.,* at 79:17-80:6.

171.    The achievement gap exists nationwide and in the District. Ex. RR, *Chabot Dep.,* at 87:15-22.

172.    The District has committees that are working on improving the curriculum to address the racial disparities in the achievement gap. Ex. PP, *Schroeder Dep.,* at 42:9-15.

173. Dr. Graves is unaware of the achievement gap. Ex. JJ, *Graves Dep.,* at 61:12-14.

174. Dr. Davis, as superintendent, is capable of handling issues of racial disparity. Ex. LL, *Johnson Dep.,* at 81:20-24 and Ex. KK, 99:13-18.

175. Discipline is a reality in every school corporation and is a daily struggle for parents. Ex. LL, *Johnson Dep.,* at 65:1-66:1.

176. Dr. Thurman, as a former principal, was in charge of disciplining students. Ex. KK, *Thurman Dep.* at 89:1-4.

177. The Board is not responsible for individual principals' decisions. That is not the Board's role. Ex. KK, *Thurman Dep.,* at 97:11-23.

178. Dr. Thurman did not consider race when disciplining students. Ex. KK, *Thurman Dep.,* at 89:5-7.

179. Dr. Thurman does not believe principals in the FFSD consider race when disciplining a student. Ex. KK, *Thurman Dep.,* at 95:23 – 96:4.

**Senate Factor 6 – Whether political campaigns have been characterized by overt or subtle racial appeals.**

180. Johnson campaigned on discipline "quite a bit." Ex. LL, *Johnson Dep.,* at 47:17-48:5 and 64:20.

181. When asked whether he campaigned on morale of the teachers and discipline, F. Willis Johnson replied, "…yes, ma'am.." Ex. LL, *Johnson Dep.,* at 48:1-5.

182. Dr. Thurman testified that one of reasons she ran was to address concerns about discipline. Ex. KK, *Thurman Dep.,* at 28:14-29:11.

183. Dr. Thurman attended the forums and large gatherings where candidates were invited in her 2014 campaign. Ex. EEE, *Thurman Decl*. ¶2.

184. Dr. Thurman was not aware of statements made by any other 2014 candidate that accused Plaintiff Johnson of being an absentee father, of being too supportive of the student transfer issue or of being a renter rather than a homeowner. Ex. EEE, *Thurman Decl*. ¶4.

185. The subject of discipline is usually a general topic brought up at candidate forums during an election. Ex. FFF, *Hogshead Decl*., ¶3.

186. Dr. Courtney Graves, the board's newest African American member, did not perceive any candidates' platform with regard to student discipline as a subtle racial appeal. Ex. HHH, *Graves Decl*. ¶2.

187. Leslie Hogshead was a candidate in 2013. Biases toward the disciplining of African American students was not a topic that year or any other election since she has been on the Board. Ex. FFF, *Hogshead Decl*., ¶4.

188. Chuck Henson was also a candidate in 2013. He did not express his views on racial bias, racial inclusion or the achievement gap during that campaign. Ex. FF, *Hogshead Decl*., ¶6.

189. Even if a candidate is endorsed by the FFNEA or North County Labor, that candidate still runs an individual campaign and does not run as a slate. Ex. FF, *Hogshead Decl*., ¶7.

190. Dr. McCoy advocated for the District to pay the transportation costs for any student from Normandy or Riverview Gardens that wanted to attend the District during a time of fiscal problems, frozen salaries and budget cuts. Ex. FF, *Hogshead Decl*., ¶¶10-11.

191. The race of the transferring student was not a consideration. The transportation cost was the concern. Ex. FF, *Hogshead Decl*., ¶¶9-11.

192. When Board member Paul Morris stated that the money issue that follows transfer students is a "huge issue", he was concerned that the District would be responsible for 30% of the transferring students' costs at the time when the District had salary freezes and program cuts. Ex. GGG, *Morris Decl*., ¶3.

193. Morris' comments regarding the student transfer issue were financial appeals not racial appeals. Ex. GGG, *Morris Decl*., ¶5.

194. Dr. Graves did not think discussions regarding the student transfer issue were racial in context. Ex. HHH, *Graves Decl*., ¶3.

**Senate Factor 7 – The extent to which members of the minority group have been elected to public office in the jurisdiction.**

195. Dr. Gordon cannot name a school district that is more integrated than FFSD. Ex. K, *Gordon Dep.,* at 25:21-25.

196. When asked whether there is sufficient representation of the African American community on the board, Dr. Graves, the newest African American Board member, responded that she does not believe the racial makeup of the board matters. She believes the board should be people that are best qualified. Ex. JJ, *Graves Dep.,* at 34:14-22.

197.    Dr. Thurman was elected in 2014 and is a current board member.  Ex. KK, *Thurman Dep.,* at 24:24-25:10.

198.    Dr. Thurman ran on the Grade A for Change slate in 2014.  Ex. KK, *Thurman Dep.,* at 34:17-36:6.

199.    Race was an issue in the 2014 election in response to the Dr. McCoy situation. Ex. OO, *Brown Dep.,* at 70:18-71:2.

200.    The other candidates on the Grade A for Change slate did not do as much to win their election as Dr. Thurman did. Ex. KK, *Thurman Dep.,* at 91:2-5.

201.    Savala did not attend as many functions as Dr. Thurman attended. Ex. KK, *Thurman Dep.,* at 91:11-15.

202.    Savala showed up late for the McCluer forum in 2014. Ex. MM, *Morris Dep.,* at 32:2-6.

203.    Savalla barely lost his election.  He lost by 91 votes. Ex. O, *Kimball Dep.,* at 46:11-24.

204.    Johnson was 398 votes short of winning a seat on the FFSD Board. Ex. LL, *Johnson Dep.,* at 59:13-15.

205.    Johnson did not attend all of the coalition (also referred to as Grade A for Change) meetings. Ex. LL, *Johnson Dep.,* at 39:3-10 and 61:11-14.

206.    Johnson did not complete the League of Women Voters information form. Ex. LL, *Johnson Dep.,* at 85:3-5.

207.    The benefit of filling out the League of Women Voters form is that the League sent the information to the Post-Dispatch, which got that information out to a lot of voters. Ex. KK, *Thurman Dep.,* at 91:24-94:2.

208.    Dr. Thurman filled out the League of Women Voters form. Ex. KK, *Thurman Dep.,* at 91:2-23.

209.    Dr. Graves responded to the League of Women Voters' questionnaire. Ex. JJ, *Graves Dep.,* at 18:19-20:4.

210.    Johnson talked on his cell phone during a candidate forum. Ex. LL, *Johnson Dep.,* at 86:25-87:2.

211.    Dr. Graham was not a strong campaigner. Ex. QQ, *Hogshead Dep.,* at 44:24-41:3.

212.    The 2000 decennial census showed a single-race black voting age population of 32.61%.  See, Ex. B, *Cooper Rep.,* at Figure 4.

**Exogenous Elections**

213.    Barack Obama received 70.3% of the District's votes in the 2008 Democratic Presidential Primary. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

214.    Barack Obama received 76.5% of the District's votes in the 2008 general election. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

215.    William Lacy Clay received 84.6% of the District's votes in the 2008 general election for U.S. Congress.  Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

216.    Charlie Dooley received 80% of the District's votes in the 2010 St. Louis County Executive Democratic primary. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

217.    Charlie Dooley received 70.7% of the District's votes in the 2010 County Executive general election. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

218.    William Lacy Clay received 78.9% of the District's votes in the 2010 democratic primary for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

219.    William Lacy Clay received 69.5% of the District's votes in the 2010 general election for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

220.    William Lacy Clay received 65% of the District's votes in the 2012 democratic primary for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

221.    William Lacy Clay received 78.5% of the District's votes in the 2012 general election for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

222.    Barack Obama received 77.9% of the District's votes in the 2012 presidential general election. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

223.    Charlie Dooley received 50.7% of the District's votes in the 2014 St. Louis County Executive democratic primary. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

224.    William Lacy Clay received 73% of the District's votes in the 2014 general election for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

225.    There were 12 elections in which voters in the District had a choice between African American and white candidates. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at ¶26.

226.    The District lies within the boundaries of all 12 electoral districts analyzed. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at ¶27.

227.    The African American candidate was victorious in all 12 exogenous elections analyzed. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at ¶29.

**Hazelwood School District**

228.    The 2010 total population of the Hazelwood School District was 89,529. Ex. TT, *Hazelwood 2010 Single Years – Age and Sex.*

229.    The 2010 single race black voting age population of the Hazelwood School District was 42,913. (47.93%) Ex. UU, *Hazelwood 2010 Sex by Age.*

230.    The 2011-2013 ACS total voting age population for the Hazelwood School District was 94,167. Ex. WW, *Hazelwood 2013 ACS Sex by Age total population.*

231.    The 2013 single race black VAP was 47,224 (50.15%) for the Hazelwood School District. Ex. XX, *Hazelwood 2013 ACS Black alone.*

232.    The Hazelwood School District is majority African American. Ex. FFF, *Hogshead Decl.* ¶8.

**Senate Factor 8 – Was there a significant lack of response from elected officials to the needs of the minority group.**

**Superintendents**

233.    The Board selected Dr. Joseph Davis as the new superintendent. He is African American. Ex. JJ, *Graves Dep.,* at 66:22-25.

234.    Both the current and former superintendent are African American. Ex. KK, *Thurman Dep.,* at 99:11-22.

235.   The Board that hired Dr. McCoy was majority white. Ex. O, *Kimball Dep.,* at 58:19-21.

236.   The racial make-up of the board that hired Dr. Davis was one African American and six white board members. Ex. KK, *Thurman Dep.,* at 98:20-23 and 99:11-12.

237.   Before hiring the new superintendent, the Board held three sets of forums for parents or constituents in the area to hear the top two candidates for superintendent speak. Ex. JJ, *Graves Dep.,* at 66:6-14.

**The former superintendent controversy**

238.   Dr. McCoy resigned February 2014. Ex. PP, *Schroeder Dep.,* at 56:11-20.

239.   Dr. McCoy refused to sign a release so the board could discuss the issues that led to his suspension. See, 4:14 CV 2077 RWS, 49 and Ex. AAA, *McCoy/FFSD Separation Agreement.*

240.   Dr. McCoy refused to let the District disclose the charges against him.  See, 4:14 CV 2077 RWS, 49 and Ex. AAA, *McCoy/FFSD Separation Agreement.*

241.   In this litigation, Dr. McCoy has continued to refuse to let the District disclose the documentation surrounding the charges against him. See, 4:14 CV 2077 RWS, 49 and Ex. AAA, *McCoy/FFSD Separation Agreement.*

242.   Dr. McCoy could sue the Board for releasing information about the issues surrounding his suspension and the charges against him. See, 4:14 CV 2077 RWS, 49 and Ex. AAA, *McCoy/FFSD Separation Agreement.*

243.   The District School Board held a special meeting to take public comments on Dr. McCoy's suspension. Ex. KK, *Thurman Dep.,* at 82:4-83:6.

244.   Dr. McCoy stated that his suspension was not racially motivated. Ex. AAA, *McCoy/FFSD Separation Agreement, Ex. B.*

245.   The FFNEA representative did not have an opinion on whether Dr. Art McCoy should have been suspended because he did not have all of the facts.  Ex. II, *Green Dep.,* at 69:9-70:12.

246.   As a board member and former principal, Dr. Thurman does not believe that the FFSD board should have given a reason for Dr. McCoy's suspension. Ex. KK, *Thurman Dep.,* at 83:24-84:5.

247.   Dr. Thurman does not believe race was a factor in Dr. McCoy's situation. Ex. KK, *Thurman Dep.,* at 84:18-20.

248.  Despite knowing Dr. McCoy personally, Johnson never asked Dr. McCoy why he was suspended. Ex. LL, *Johnson Dep.,* at 69:4-6.

249.  Despite knowing Dr. McCoy personally, Johnson never asked Dr. McCoy why he resigned. Ex. LL, *Johnson Dep,* at 69:7-8.

250.  Johnson believes the Board should respect and honor its understanding with Dr. McCoy and should not release the details of his suspension and resignation. Ex. LL, *Johnson Dep.,* at 24-70:6.

251.  Dr. McCoy received low marks on his evaluation prior to his suspension. Ex. PP, *Schroeder Dep.,* at 87:14-88:18.

252.  One of the reasons Dr. McCoy was suspended was because he attempted to hire a person for a Dean of Students position when that position had been previously eliminated by the Board.  Ex. OO, *Brown Dep.,* at 61:4-62:6.

253.  The Dean of Students position was eliminated prior to April 2013. Ex. OO, *Brown Dep.,* at 63:3-5 and 17:6-16.

254.  Dr. McCoy did not tell the truth when he later attempted to hire the same woman he tried to hire for the Dean of Students position.  Ex. OO, *Brown Dep.,* at 63:6-65:15.

255.  One of the chief catalysts for the board's decision to suspend Dr. McCoy was that he failed to tell the truth. Ex. OO, *Brown Dep.,* at 63:6-65:15.

256.  Some of the reasons for Dr. McCoy's suspension were the situation at McCluer North with the Dean of Students position, the PE position at Berkeley and concerns about honesty.  Ex. OO, *Brown Dep.,* at 66:5-15.

257.  The Board's policy is not to discuss personnel matters. Ex. OO, *Brown Dep.,* at 67:12-16.

258.  The Board contacted Charlie Dooley's office to address the community's concern that race was a factor in Dr. McCoy's suspension.  Ex. OO, *Brown Dep.,* at 68:6-18.

259.  Martinez, a former board member, met with the NAACP to address their concerns that Dr. McCoy's suspension was racially based. Ex. RR, *Chabot Dep.,* at 98:14-20.

260.  The District board was in contact with the St. Louis County NAACP, North County Churches United for Racial Justice and Harmony, and County Executive Charles Dooley to discuss the community's concerns regarding Dr. Art McCoy. Ex. MM, *Morris Dep.,* at 147:1-16.

**Michael Brown Shooting and Protests**

261.   The protests in Ferguson regarding Michael Brown were outside of the District. Ex. O, *Kimball Dep.,* at 60:9-15.

262.   Canfield Apartment complex is outside of the District. Ex. O, *Kimball Dep.,* at 60:9-15.

263.   The Board approved counseling to District staff and students after the Michael Brown shooting to help them feel safe while attending school.  Ex. II, *Green Dep.,* at 61:5-21, 80:12-19.

264.   Dr. Graves believes the 2015 FFSD school board acted to protect District students after the Michael Brown shooting. Ex. JJ, *Graves Dep.,* at 18:5-15.

**The particular needs of the African American community**.

265.   The newest African American board member, Dr. Graves, does not believe that the African American community has unique needs. Ex. JJ, *Graves Dep.,* at 33:20-34:6.

266.   Dr. Graves believes that the board, prior to her election in 2015, supported all communities within the District. Ex. JJ, *Graves Dep.,* at 53:11-14.

267.   Dr. Thurman was motivated to run for the board to address the particularized needs of the African American community.  Ex. KK, *Thurman Dep.,* at 29:9-13.

268.   Dr. Thurman was elected in 2014 and is a current board member.  Ex. KK, *Thurman Dep.,* at 24:24-25:10.

269.   There are two strong African American board members on the board now. Ex. KK, *Thurman Dep.,* at 30:25-31:5.

270.   Donna Thurman adds an awareness of race on the board.  Ex. KK, *Thurman Dep.,* at 34:2-10.

271.   The board has made adjustments in response to Dr. Thurman's racial awareness. Ex. KK, *Thurman Dep.,* at 32:15-33:24.

272.   The Board hired the best candidate for the new superintendent position "who happens to be African American." Ex. KK, *Thurman Dep.,* at 99, 6-12.

**Senate Factor Nine – Whether the policy underlying the jurisdiction's use of the current boundaries tenuous.**

273. The at-large system is established by Missouri statute. See, Sections 162.291, 162.341 and 162.261 RSMo.

Respectfully submitted,

CROTZER & ORMSBY, LLC

*/s/ Angela Bullock Gabel*
Angela Bullock Gabel, 58227MO
130 S. Bemiston Ave., Suite 602
Clayton, MO 63105
314.726.3040 / 314.726.5120 (fax)
agabel@crotzerormsby.com

*Attorney for Defendant Ferguson-Florissant School District*

## CERTIFICATE OF SERVICE

On October 23, 2015, a copy of the foregoing was electronically filed with the Clerk of the Court using the e-filing system, an electronic copy therefore being served on Anthony E. Rothert, Grant R. Doty, Andrew J. McNulty, Gillian R. Wilcox, Dale E. Ho, Julie A. Ebenstein, and M. Laughlin McDonald, Attorneys for Plaintiffs, and Darold E. Crotzer, Jr., Attorney for Defendant St. Louis County Board of Election Commissioners.

*/s/ Angela Bullock Gabel*