UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, REDDITT HUDSON, F. WILLIS JOHNSON and DORIS BAILEY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 14-2077 |
| v. | ) ) | |
| FERGUSON-FLORISSANT SCHOOL DISTRICT and ST. LOUIS COUNTY BOARD OF ELECTION COMMISSIONERS, | ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANT FERGUSON FLORISSANT SCHOOL DISTRICT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendant Ferguson Florissant School District hereby files its Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment.  Plaintiffs' Motion mischaracterizes the law and relies on multiple disputed material facts.  As a result, Plaintiffs' Motion for Summary Judgment must be denied.

Defendant hereby incorporates its Motion and Memorandum in Support of its Motion for Summary Judgment filed on September 30, 2015.

**I. Plaintiffs cannot meet the first Gingle precondition because the district is already majority African American.**

To satisfy the first *Gingles* precondition, Plaintiffs must show that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50.  Plaintiffs' Motion for Summary Judgment seeks to impose seven single-member districts, four of which are a majority African American. ECF No. 84 at 5.

Plaintiffs argue the first *Gingles* precondition is satisfied by showing that African Americans are sufficiently numerous and geographically compact to constitute a majority "in at least one single-member district." ECF No. 84 at 5.  Defendant stipulates that African Americans are numerous enough to constitute a majority in at least one single-member district.  That is not the issue under these facts.  The issue is whether African Americans are already a majority in the entire district.  If they are, the first *Gingles* precondition cannot be satisfied.

As Defendant's Motion for Summary Judgment demonstrates, African Americans are a majority of the voting age population in the District.  See, ECF No. 82, ¶48.  Majority status creates the ability to elect all seven board members.  See, ECF No. 82, ¶¶71 – 75.

Courts have declined to find liability when the rare lawsuit has occurred where the "minority" population was already a numerical majority of the voting age population.  See*, Jeffers v. Beebe*, 895 F.Supp.2d 920, 932 (E.D.Ark.2012) "…(W)e conclude that the plaintiffs have not established a claim for vote dilution under §2 because the … challenged district is already a majority-minority district under *Bartlett's* definition."  (quoting *Bartlett*, 556 U.S. at 20.

In a very recent case, a Mississippi Court declined to find liability when the "minority" was a plurality of the voting age population.  See, *Fairley v. Hattiesburg*, 2:13-CV-18-KS-MTP issued on August 11, 2015, 2015 WL 4744315.  Plaintiffs' expert, William Cooper admits that single-race African Americans are a plurality of the voting age population in 2013.  ECF No. 82 ¶¶35-36 and Defendant's Ex. F, *Cooper Dep* at 58:20-25.

The *Jeffers* court stated it had not found a case where Defendants were held liable when the voting age population was greater than 50 percent.  *Id*. at 935.  The *Fairley* court expands that majority/minority standard to deny liability when the voting age population is a plurality,

even without being a majority.  See, *Fairley* at 2015 WL 4744315.  Since Plaintiffs' own expert revealed that African Americans are a plurality, there can be no liability under the first *Gingles* precondition.

As argued in Defendant's Memorandum in Support, the current at-large system is a winner-take-all system for the largest group of voters.  Both Plaintiffs' and Defendant's experts endorse that notion.  Dr. Engstrom authored an article in 2010 for the St. Louis University Law Review that concludes, "There are numerous variations in how at-large elections are implemented, but regardless of the particular arrangement, *this system does have a tendency to favor candidates preferred by a majority group or at least the largest group of voters* within the jurisdiction."  See, Cumulative and Limited Voting: Minority Electoral Opportunities and More." *St. Louis University Public Law Review*, 2010.  See, ECF No. 82 ¶71; Ex. N.  Dr. Kimball goes even further.  Dr. Kimball stated that the 'majority' group could be of the total population or of the voting age population. See, ECF No. 82, ¶48-49.  Since African Americans currently have the ability to win all seven seats, Plaintiffs' proposed remedy for an African American majority in four districts actually limits African American representation.

Defendant's Memorandum in Support of its Motion for Summary Judgment gives a detailed explanation of the statistics behind African Americans' majority status.  In sum, Defendant's expert concludes the any-part black voting age population ("AP BVAP") is 51% of the District's voting age population as of 2013. See, ECF No. 82, ¶48.  Plaintiff's expert calculated the more restrictive category of single race black and found the African American population was 48.94% in 2013. See, ECF No. 82, ¶34.  Plaintiffs' numbers indicate the most restrictive category of single-race black is 0.06% +1 shy of a majority.  However, Plaintiffs admit they do not place 3.82% of the voting age population in the 2013 ACS into any category.

See, ECF No. 82, ¶35 plus ¶36 plus ¶39.  Nor did they calculate the more expansive AP BVAP under the ACS.  See, ECF No. 82, ¶41.  Regardless, Plaintiffs admit that the restrictive single-race black category is a 48.94% plurality while conceding they have not accounted for almost 4% of the voting age population.  Under *Bartlett*, *Beebe* and *Fairley*, Plaintiffs cannot meet the first *Gingles* precondition.

Furthermore, Plaintiffs' proposed remedies acknowledge that African Americans are a majority of the voting age population in the District.  Plaintiffs seek to carve four out of seven single-member Districts with an African American majority.  That is, Plaintiffs argue African Americans are lawfully entitled to a majority of the seats.  Indeed, Plaintiffs have even drawn Hypothetical Plan B where African Americans are a majority in six of seven districts. See, Defendant's Additional SUMF ¶¶3-5.  Either African Americans are a majority of the voting age population and the *Bartlett* standard is already met, (see *Jeffers*) or Plaintiffs' demand for a majority of the single-member districts is disproportionate to African Americans' voting age population.  Plaintiffs cannot have it both ways.

Plaintiffs' Illustrative Plans are based on the 2010 decennial census, single-race black voting age population. ("BVAP")  See, Defendant's Additional SUMF ¶1.  Under the 2010 census, single-race African American voters were 47.33% of the voting age population.  See, ECF No. 82, ¶18.  Yet, Plaintiffs' remedy creates four (57.1%) of the seven single-member districts as majority African American.  In other words, Plaintiffs propose African American political power 33.3% above their numerical strength.[1]  That type of proposal has been flatly rejected by the United States Supreme Court. ("However prejudiced a society might be, it would be absurd to suggest that the failure of a districting scheme to provide a minority group with

---

[1] This percentage is obtained by using the 43.77% (BVAP) x 7 Districts = 3.31 or 3 single member districts according to BVAP. Plaintiffs seek 4 single member districts.  Four districts divided by 3 districts = 33.33% increase in voting power.

effective political power 75 percent above its numerical strength indicates a denial of equal participation in the political process. Failure to maximize cannot be the measure of § 2." *Johnson v. De Grandy*, 114 S.Ct. 2647, 2660, 512 U.S. 997, 1017 (1994)).

Finally, the first *Gingles* precondition includes the requirement of compactness. Plaintiffs' maintain its single-member districts are compact because "all parts of a district are connected at some point with the rest of the district;" and "(t)he plans pass the 'eyeball' test…" ECF No. 84 at 8.  However, that evidence is insufficient.

"(T)he minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.  If it is not, *as would be the case in a substantially integrated district*, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates."  *Gingles* at 50 *emphasis added*. (Compactness is the first of three preconditions to analyzing whether, based on a totality of the circumstances, Latinos are entitled to §2 relief.  *Gonzalez v. Harris County*, 601 Fed.Appx. 255 (5th Cir.2015)).

The Ferguson Florissant School District is integrated.  Plaintiffs' own experts provide the best evidence for that.  Both Drs. Engstrom and Kimball conducted homogenous precinct ("HP") analysis that indicates 87% of the precincts in the District are racially integrated.[2]  HP analysis "simply adds up the votes received by each candidate within the precincts that are deemed to be homogenously African American or homogeneously non-African American."  See, Ex. A, *Engstrom Report*, ¶40.  This analysis typically involves precincts with more than 90 percent African American VAP and less than 10 percent African American voting age population.  See, Ex. A, *Engstrom Report*, footnote 9.  Utilizing the 90/10 threshold results in the following:

---

[2] See, Table 1 below.

**Table 1**

| Election Year | Total Precincts | # above 90% | # below 10% | Level of Integration[3] |
|---|---|---|---|---|
| 2011 | 47 | 4 | 2 | 87% |
| 2012 | 53 | 5 | 2 | 87% |
| 2013 | 46 | 5 | 1 | 87% |
| 2013 | 47 | 4 | 2 | 87% |
| 2015 | 53 | 5 | 2 | 87% |

As Dr. Kimball concludes, precincts between 10% - 90% African American are racially integrated. See, Ex. BBB, *Kimball Rebuttal*, p. 6. Thus, 87% of the District's precincts are integrated under the HP analysis.

Dr. Rodden employed a different measure for integration. Dr. Rodden analyzed geographic dispersion to find that the candidates most-preferred by African American voters had more geographically dispersed votes than the candidates most preferred by white voters. See, ECF No. 82, ¶65. With few exceptions, African Americans tended to have more geographically-dispersed support than white candidates since 2000. See, ECF No. 82, ¶67. All three experts found strong evidence of racial integration within the District using two different analytical methods. Both sets of analysis indicate that the District is heavily integrated. Analytically, the first *Gingles* precondition is not met.

Finally, Plaintiff Johnson and two additional board members testified the District is racially integrated. Plaintiff Johnson states his neighborhood is integrated "both literally and figuratively." See, Defendant's Additional SUMF ¶9. Dr. Thurman states her neighborhood is approximately 60% African American and 40% white. See, Defendant's Additional SUMF ¶8.

---

[3] This percentage divides the over 90% and under 10% precincts by the total number of precincts.

Paul Schroeder testified the District is "very integrated" at this point. See, Defendant's Additional SUMF ¶10.

The first *Gingles* precondition is not satisfied. Plaintiffs' argument that they can draw "at least one" single-member district is misplaced. The issue under these facts is whether African Americans are a majority of the voting age population in the entire District. In the alternative, the issue is whether African Americans are a plurality. Either way, they are the largest group and benefit most from the current system. Plaintiffs' own remedies demonstrate this point clearly. In addition, Plaintiffs fail to address the racial integration of the District. This District is "very integrated" and a bright spot because it is desegregated. See, Defendant's Additional SUMF ¶¶10-11. Plaintiffs fail to address both of these arguments in it Memorandum in Support. As such, summary judgment cannot be granted.

## II. Genuine issue of material fact preclude summary judgment under the second and third *Gingles* preconditions.

### A.     Which elections should be considered for the second and third *Gingles* factors?

Plaintiffs acknowledge that older elections and exogenous elections have some probative value under the second and third *Gingles* factors, which is consistent with the District's position. *Compare* ECF No. 84 at pg. 17 *with* ECF No. 81 at pgs. 23-24.

Plaintiffs then assert that elections involving only white candidates have no probative value. ECF No. 84 at pg. 17. This argument, however, runs contrary to the controlling opinion in *Gingles* and the language of Section 2 itself. *Sanchez v. Bond*, 875 F.2d 1488, 1495 (10th Cir. 1989) ("[T]here is no rule of law prohibiting the district court from examining those elections having only Anglo candidates."). Since 2000, there has been only one contested election involving only white candidates (2009). Contrary to Plaintiffs' contention, the results of this election are probative. *Sanchez*, 875 F.2d at 1495. Moreover, the rarity of a monoracial election

event itself undermines Plaintiffs' vote dilution claim.  *Overton v. City of Austin*, No. A-84-CA-189, 1985 U.S. Dist. LEXIS 21887 (W.D. Tex. Mar. 12, 1985)

Plaintiffs also contend that the success of an African-American candidate in an uncontested election has "no probative value."  ECF No. 84 at pg. 18.  This argument is also meritless.  *See Milwaukee Branch of the N.A.A.C.P. v. Thompson*, 935 F. Supp. 1419, 1428-29 (E.D. Wis. 1996); *Sanchez*, 875 F.2d at 1490-901.  Graham, an African-American candidate, did not draw any challengers in uncontested elections in 2005 and 2008.  ECF No. 81 at pg. 36.  Henson, also an African-American candidate, ran unopposed in 2010.  *Id.*  These results are probative.  *Mallory v. Ohio*, 38 F. Supp. 2d 525, 571 (S.D. Ohio 1997) ("The absence of white challengers to black incumbent judges is indicative of the lack of legally significant racial bloc voting.")

Finally, Plaintiffs' claim that the probative value of elections may be reduced by "special circumstances," such as "the pendency of a Section 2 lawsuit" and "national press attention." ECF No. 84 at pgs. 18-19.  Plaintiffs' claim that the 2014 election should be discounted because it was preceded by the resignation of an African American superintendent.  *Id.* at pgs. 23-24. Plaintiffs then claim the 2015 election is not probative because it occurred after this action was filed and in the aftermath of the shooting death of Michael Brown.  *Id.* at pg. 24.  Plaintiffs also argue that Graves, the successful African American candidate in 2015 who was the top-ranked candidate for African Americans and second-place candidate for whites, ran a "'sophisticated campaign'" that encouraged single-shot voting.  *Id.*

Plaintiffs' "special circumstances" argument is based largely on speculation.  Plaintiffs' own experts, Dr. Engstrom and Dr. Kimball, admitted they had no idea whether the filing of this action influenced voters in 2015.  ECF No. 82 at ¶135; Defendant's Additional SUMF ¶¶29 and

¶31.  Plaintiffs failed to provide quantitative analysis to evaluate voter behavior, even though Plaintiffs' counsel asked Defendants' expert during his deposition that "we established earlier, didn't we . . . that to get through peer review, one should quantitatively test hypothesis, not rely simply on sort of qualitative judgments about whether or not something was the cause of something else, right?"  Defendant's Additional SUMF ¶12.  Plaintiffs have offered mostly conjecture as to the special circumstances in 2014 and 2015, which is insufficient to discount their probative value.  *Valladolid v. City of National City*, 976 F.2d 1293, 1298 (9th Cir. 1992) (rejecting a claim of special circumstances based on pending litigation where plaintiffs failed to prove unusual white support of non-white candidates).

In sum, Plaintiffs have failed to demonstrate that any elections presented in this case are beyond consideration.  This Court should evaluate elections based on the "totality of the circumstances," not just some of the circumstances.  *Gingles*, 478 U.S. at 46.

**B.**     **How should this Court identify the African-American preferred candidates?**

As the District established in its opening motion, the proper method for selecting the African-American preferred candidates is to use point estimates to identify the *n* candidates who received the most African American votes in an election for *n* seats.  ECF No. 81 at pg. 29.  This method was used by the District's expert, Dr. Rodden, and endorsed by the Eighth Circuit in *Clay v. Board of Education of the City of St. Louis*, 90 F.3d 1357 (8th Cir. 1996).

In opposition, Plaintiffs offer the following three rules for determining who can be considered an African American preferred candidate:

- If the top-ranked candidate among African Americans is unsuccessful and received more than two-thirds the votes of successful second- or third-place candidates among African Americans, then those candidates cannot be preferred by African Americans (ECF No. 84 at pg. 29);

- If the top-ranked candidate among African Americans is an African American candidate who loses, then second- or third-place candidates among African Americans who are white cannot be preferred by African Americans (ECF No. 8 at pg. 30); and

- If the point estimate for a candidate falls within the confidence interval of another candidate, then the candidates cannot be considered preferred by African Americans (ECF No. 84 at pg. 31).

Plaintiffs argue that these three rules (which they term the "Case-by-Case Approach") provide the "fact-intensive" inquiry required by the Supreme Court in Section 2 litigation. *Gingles*, 478 U.S. at 46; ECF No. 84 at pg. 25.  Plaintiffs criticize Dr. Rodden for using "blunt bright-line rules" to determine African-American preferred candidates.  This is ironic because Plaintiffs' "Case-by-Case Approach" is simply a set of their own, more convoluted "bright-line rules."  ECF No. 84 at pg. 28.  Plaintiffs' approach is designed to reduce both the overall number of candidates preferred by African Americans (from 27 under the District's point-estimate approach to 19 under Plaintiffs' "Case-by-Case Approach") and the number of successful candidates preferred by African Americans (from 13 to 7).  *Compare* ECF No. 81 at pg. 33 *with* ECF No. 84 at pg. 42.

The design of Plaintiffs' approach becomes obvious when considered with their selection of relevant elections.  Plaintiffs do not believe the 2009, 2014, or 2015 elections should be considered due to "special circumstances."  Not surprisingly, candidates preferred by African Americans under Plaintiffs' "Case-by-Case Approach" were elected in each of these elections. ECF No. 84 at pg. 42.  After these three elections are excluded, the "Case-by-Case Approach" yields zero African American candidates elected in the last 10 years.  *Id.* at pg. 43 (tbl. 10). Plaintiffs claim they have the "proper contextual approach" to analyzing elections under the second and third *Gingles* factors.  ECF No. 84 at pg. 28.  In reality, Plaintiffs shot an arrow, drew the target around the arrow, and claimed they are more accurate than the District.

Dr. Rodden's point-estimate approach, in contrast, is not subject to manipulation.  It simply identifies the *n* candidates who received the most African American votes in an election for *n* seats.   Although Dr. Rodden acknowledged that it was "difficult" to identify preferred candidates in a multi-winner system, (See, Defendant's Additional SUMF ¶17) he rejected Plaintiffs' rule of identifying a candidate as preferred only if the candidate's point estimate fell outside the confidence interval of another candidate (which is one of Plaintiffs' three bright-line rules for their "Case-by Case Approach").  Defendant's Additional SUMF ¶¶14-17.  Dr. Rodden further testified that Plaintiffs' rule would not be acceptable if submitted to a peer-reviewed journal. See, Defendant's Additional SUMF ¶¶18.

Finally, Plaintiffs' "Case-by-Case Approach" finds no basis in the Eighth Circuit.  *Clay* is the only precedent binding on this Court for this issue.  The approach endorsed by the Eight Circuit is the same as that of Dr. Rodden: the candidates preferred by African Americans were the candidates receiving the *n* highest votes in an election for *n* positions.  *Clay*, 90 F.3d at 1361.  The Eighth Circuit did not adopt any additional elaborate rules, as Plaintiffs have proposed here.  Plaintiffs attempt to distinguish *Clay* by arguing that the plaintiffs in *Clay* did not offer any "election-by-election" approach for identifying African-American preferred candidates.  ECF No. 84 at pg. 28.  Regardless, the precedent in the Eight Circuit as it stands is clear and identical to Dr. Rodden's point-estimate approach.

**C.     Genuine issues of material fact preclude summary judgment for Plaintiffs under the second *Gingles* factor.**

To satisfy the second *Gingles* precondition, Plaintiffs must establish that African Americans in the District are "politically cohesive."  *Thornburg v. Gingles*, 478 U.S. 30, 51, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986).  If African Americans are not politically cohesive, then "it

11

cannot be said" that the challenged election system dilutes the voting strength of African

Americans.  *Id.*

As evidence of political cohesion, Plaintiffs quote Dr. Rodden as stating that, in the

District, "African Americans are more likely to vote for African-American candidates and whites

are more likely to vote for white candidates."  ECF No. 84 at pg. 19.  But Plaintiffs omit Dr.

Rodden's deposition testimony in which he stated that such a "correlation" between the race of

voters and candidates "would be found in really any jurisdiction in the United States in which

African-American candidates and white candidates are on the ballot and there are African-

Americans and whites in the jurisdiction."  See, Defendant's Additional SUMF ¶19.  Plaintiffs'

interpretation of the second *Gingles* factor cannot be correct; otherwise, politically cohesive

voting would be present in every jurisdiction in this country and the second *Gingles* factor would

have no teeth.

Plaintiffs also contend that "Black voters and white voters have *never* preferred the same

candidate as their top choice in any of the last twelve contested elections."  ECF No. 84 at pg.

22.  By focusing only on the top choice of each group, Plaintiffs ignore evidence that African

American and white voters have preferred at least one of the same candidate in eight of the

twelve contested elections since 2000.  ECF No. 81 at pg. 30.  Since 2009, African American and

white voters have shared a candidate preference in five out of six (83.3%) of contested elections.

*Id.*  And 11 of the 27 (40.7%) of the successful candidates since 2000 have been preferred by

both African American and white voters.  *Id*.  Moreover, African American and white voters

frequently cast a majority or near-majority of their votes for the candidates preferred by the other

racial group. [4]  *Id.* at pg. 31 (tbl. 4).

---

[4] Plaintiffs apparently believe political cohesion exists because 25 out of 27 candidates preferred by voters have been white, while 17 out of 27 candidates preferred by African Americans have been African American.  ECF No.

Plaintiffs' claim of racial cohesiveness is further undermined by the election results from precincts that have heavy concentrations of a single race.  Precincts where African Americans or whites make up a near majority of the VAP are called "homogeneous" precincts because a single race comprises most or all of the precinct's population.  *Johnson v. Hamrick*, 296 F.3d 1065, 1076 n.2 (11th Cir. 2002).  The results of homogenous precinct analysis can be used to "estimate general racial preferences" based on the behavior of precincts with heavy concentrations of a single race.  *Id.*

In 2013, Henson (an African-American candidate) received only 39% of votes cast in precincts where more than 80% of the VAP was African American.  See, Defendant's Additional SUMF ¶20.  Henson only lost by 125 votes (the second-place candidate, Brown, received 2,234 votes while Henson received 2,109).  ECF No. 81.  In predominantly African American precincts, Henson did not even receive a majority of the votes cast.  Indeed, these precincts cast more than 60% of their votes to white candidates.  See, Defendant's Additional SUMF ¶20.  Had Henson received even a slightly larger share of the votes in these precincts, he likely would have been elected.  But the precincts dominated by African American voters did not demonstrate sufficient political cohesiveness to elect Henson.  See, Defendant's Additional SMUF ¶21.

Similarly in 2012, Morris (an African American candidate) failed to receive a majority of votes cast in precincts where the VAP is at least 80% African American.  See, Defendant's Additional SUMF ¶22.  As in 2013, these precincts gave approximately 60% of their votes to white candidates.  See, Defendant's Additional SUMF ¶24.  The 2015 election tells a similar story:  Precincts with a VAP that is at least 80% African American gave more than 40% of their

---

84 at pg. 26.  This corrosive analysis assumes that voters of a racial group can or should prefer candidates only of that same race.  Plaintiffs fail to ask how many of these candidates were preferred by *both* races.  As demonstrated by the District, white and African American votes frequently share preferences for candidates and cast a majority or near-majority of their votes for candidates of the other race.

votes to white candidates, while precincts with a white VAP of 80% or more gave at least half their votes to African American candidates. See, Defendant's Additional SUMF ¶23.

Aside from statistical evidence, this Court may also consider "non-statistical evaluation[s] of the relevant elections," *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1020 (8th Cir. 2006), including "lay testimony" of political cohesiveness of the lack thereof. *Sanchez v. Colorado*, 97 F.3d 1303, 1321 (10th Cir. 1996). Brown, a current white Board member who campaigned for an African American candidate in 2015 and had the support of African American voters, testified that the District's voters choose their candidates based on qualifications, not on race. See, Defendant's Additional SUMF ¶27. Graves, a current African-American Board member, testified that she voted for a white candidate in the 2014 election. See, Defendant's Additional SUMF ¶55. Schroeder, a former white Board member elected in 2006 who had the support of African American voters, testified that neither whites nor blacks engage in bloc voting. See, Defendant's Additional SUMF ¶¶60-61. Hogshead, Chabot, and Ebert, all current white Board members, testified that District voters do not vote along racial lines. Defendant's Additional SUMF ¶68, ¶70 and ¶72. Dr. Thurman, a current African-American Board member, had the support from both African Americans and whites in her campaign, and she also supported candidates of both races. Defendant's Additional SUMF ¶¶73-74. This lay testimony demonstrates that, at a minimum, genuine issues of material fact exist under the second *Gingles* factor.

Plaintiffs have failed to demonstrate that African American votes have sufficiently "distinct" voting preferences from white voters. *Shirt*, 461 F.3d at 1020. Thus, "it cannot be said" that the District's at-large system thwarts the voting strength of African Americans.

*Gingles*, 478 U.S. at 51.  Plaintiffs are not entitled to summary judgment under the second

*Gingles* precondition.

**D.      Genuine issues of material fact preclude summary judgment for Plaintiffs under the third *Gingles* precondition.**

The third *Gingles* precondition asks whether the African American preferred candidate is

"usually" defeated by white bloc voting.  *Harvell*, 71 F.3d at 1385.  Analysis of this factor

depends on which candidates are preferred by African American voters.  As established above,

Plaintiffs' "Case-by-Case Approach" is a medley of exploitable rules designed to minimize the

success of African American preferred candidates.  It is also inconsistent with Eight Circuit

precedent.  Accordingly, the third *Gingles* precondition should be analyzed under the District's

"top-ranked candidate" (which simply identifies the African American preferred candidate as the

candidate who received the highest number of African American votes) and "point-estimate"

approaches.

Plaintiffs perform their own analysis of the third *Gingles* precondition under the "top-

ranked candidate" approach.  Plaintiffs concede that the top-ranked African-American candidate

has been elected in six of the twelve contested elections (50%) since 2012, which is

commensurate with the African American share of total population and VAP.  ECF No. 84 at pg.

15.  *See Fairley v. Hattiesburg*, 2015 WL 4744315 (finding for defendants in Section 2 vote

dilution case because "African-Americans in Hattiesburg enjoy political power in rough

proportion to their share of the voting-age population).  Plaintiffs minimize this electoral success

by arguing that the 2009, 2014, and 2015 elections should be ignored and pointing out top-

ranked candidate among African-American voters has not been elected since 2003.  *Id.* at pg. 18.

However, as demonstrated above, Plaintiffs' special circumstances argument is unpersuasive.

The "totality of the circumstances" establishes that the top-ranked candidate for African

American voters has been elected in four of the past six (66.6%) contested elections.  *Gingles*, 478 U.S. at 46.

Next, Plaintiffs use the "point estimate" approach, relied on by Dr. Rodden and the Eighth Circuit.  Plaintiffs acknowledge that since 2000, candidates preferred by African Americans have been elected almost 50% of the time (13 out of 27).  ECF No. 84 at pg. 26. Plaintiffs again seek to downplay the electoral success of African American candidates by focusing on the past five years (*i.e.,* 2011-2015) and excluding the 2009, 2014, and 2015 elections.  *Id.* at pg. 27.  Under this extremely restricted analysis, Plaintiffs conclude that only two of seven candidates preferred by African Americans have been elected.  But this reasoning fails because Plaintiffs have not offered adequate reasons for ignoring the 2009, 2014, and 2015 elections.

Additionally, since 2011, three African American candidates have come extraordinarily close to prevailing.  In 2011, Hawkins lost by only 190 votes (93.83% of votes received by the third-place candidate); in 2013, Henson lost by 125 votes (94.4% of the votes received by the second-place candidate); and in 2014, Savala lost by 91 votes (96.4% of the votes received by the third-place candidate).  ECF No. 81 at pg. 37.  These exceedingly close losses do not support a finding of vote dilution.[5]  *See Sanchez v. Bond*, 875 F.2d 1488, 1492-93 (10th Cir. 1989) (Hispanic candidates who lost by 53 votes in one race and 22 votes in another race supported a finding that Hispanics "ha[d] the ability to elect commissioners under the at-large system currently in use in the county"); *Romero v. Pomona*, 665 F. Supp. 853, 861 (C.D. Cal. 1987) (candidate lost by 71 votes; this "near miss . . . demonstrates the potential electability of black candidates").

---

[5] As explained in the District's motion, the narrow losses in 2011 and 2014 are attributable to African American voters spreading their votes inefficiently across a large number of candidates.  ECF No. 81 at pg. 37.

The electoral losses of these three "near miss" candidates (Hawkins in 2011, Henson in 2013, and Savala in 2014) should not weigh against the District under the third *Gingles* factor. *Sanchez*, 875 F.2d at 1492-93; *Romero*, 665 F. Supp. at 861.  If these losses are excluded from the number of unsuccessful African American preferred candidates (14), then only 11 African American preferred candidates have failed to win an election by a significant margin, in contrast to 13 African American preferred candidates who have been elected.  Since 2000, more African American preferred candidates have been elected than lost by a significant margin (13 successful candidates out of 24, or 54.2%).  And in the past five years, four African American preferred candidates have prevailed, while only five have lost by a substantial number of votes (44.4%).  These figures are approximately equal to or greater than the African American share of the District's VAP.  *Fairley v. Hattiesburg*, 2015 WL 4744315.

Under the two appropriate methods of identifying African American preferred candidates, it is clear that African American preferred candidates are not "typically" defeated. *Shirt*, 461 F.3d at 1020.  The defeat of African American candidates, moreover, cannot be attributed to the structural features of the District's at-large election system, as African Americans already possess the numerical superiority to elect their candidates of choice.  ECF No. 81 at pgs. 37-38 (citing *Gingles*, 478 U.S. at 68).  Accordingly, Plaintiffs are not entitled to summary judgment on the third *Gingles* precondition.

### III. Factual disputes preclude summary judgment on the fact-intensive totality of the circumstances test.

Defendants maintain that Plaintiffs have not met their burden under any of the *Gingles* preconditions.  If however, the Court finds it necessary to continue its analysis, Defendants maintain Plaintiffs' factual appraisal of each and every Senate Factor is replete with disputes.

A voting procedure violates §2 if it has the "result" under the "totality of the circumstances" of affording minority voters less opportunity than white voters "to elect representatives of their choice." *Stabler v. County of Thurston*, 129 F.3d 1015, 1020 (8th Cir. 1997), *citing* 42 U.S.C. §1972(b). "Once the preconditions are met, §2 plaintiffs must further show that, under the totality of the circumstances, vote dilution has occurred because the challenged plan denies minority voters equal political opportunity." *Id. citing Johnson v. De Grandy*, 512 U.S. at 1011-12.

The totality of the circumstances analysis is a "flexible, fact-intensive inquiry predicated on an intensely local appraisal of the design and impact of the contested electoral mechanisms." *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 367 (5th Cir. 2001). "Courts evaluating vote dilution claims, therefore, must consider all relevant evidence, "no single statistic provides courts with a short-cut to determine whether a set of (electoral structures) unlawfully dilutes the minority voting strength." *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) *citing Johnson*, 114 S.Ct. 2467, 2661-62.

Because the court must conduct a "searching practical evaluation of the "past and present reality" of the challenged electoral system in operation, (*Gingles*, 478 U.S. at 45) the types of evidence that would be relevant under this standard plainly defy categorization. Instead, a court gradually draws together a picture of the challenged electoral scheme and the political process in which it operates by accumulating pieces of circumstantial evidence. Like a Seurat painting, a portrait of the challenged scheme emerges against the background of the voting community. Only by looking at all of the dots on the canvas is a district court able to determine whether vote dilution has occurred. A court should not exclude certain types of relevant evidence - certain colors on the canvas - from its examination if doing so would leave an incomplete view of the

18

circumstantial evidence picture. A piece of evidence is irrelevant only if, after the receipt of that evidence, the existence of a fact appears no more or less probable than it did before that evidence was offered. That is, an item of circumstantial evidence is irrelevant only if it does not allow the trier of fact reasonably to infer anything about whether or not the voting strength of the minority group has been impermissibly diluted." *Smith* at 110.

The totality of the circumstances test does not lend itself to summary judgment, especially in this case.  Defendants dispute Plaintiffs' claims in every single Senate factor. Defendants direct the Court to additional evidence as well.  The evidence is lengthy but necessary.  Defendants respectfully request the Court consider the canvass of the painting and that each piece of evidence connects the Court to the conclusion that the District has not violated Section 2.

**A. Past History of Discrimination Affecting Voting.[6]**

The first Senate factor is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process."  *Shirt*, 461 F.3d at 1021.  Plaintiffs must prove the history of discrimination acts to "hamper the ability of minorities to participate," to support a finding that the history of discrimination effects African Americans' voting today. *League of United Latin Am. Citizens, Council No. 4434 (LULAC IV) v. Clements*, 999 F.2d 831, 866 (5th Cir. 1993.)

The parties cannot and do not dispute the racial history of the St. Louis region. However, the totality of the circumstances requires more than history. It requires a link from the

---

[6] While Plaintiffs' Memorandum in Support of its Motion for Summary Judgment combines several factors together in random order, Defendant's response is in the numerical order established in *Gingles*.  Furthermore, Defendant's argue it is necessary for the Court to analyze each factor individually without having to guess which evidence relates to which factor.

past to the present.  That is where Plaintiffs fail.  Plaintiffs fail to provide the Court with the necessary vestiges of that discrimination that depress African Americans' ability to participate. (It would seem tautological that a factor directing courts to determine whether past discrimination hinders a minority group's access to the political process would require a showing that the group does not in fact participate to the same extent as other citizens.  *LULAC IV*, 999 F.2d at 866.)

Plaintiffs paint the District with the broad brush of the region's history.  Yet they rarely admit to the Court that their facts are not specific to the District.  Most of Plaintiffs' facts were gathered by their expert several years prior to write his book on the history of St. Louis.  The District is not even mentioned in the book.  Ex. CCC and Defendant's Additional SUMF ¶¶40-43.  Plaintiffs argue historical practices of segregated housing included areas of the District.  See, Plaintiffs' SUMF ¶238.  The evidence does not support that conclusion.  See, Defendant's Response to Plaintiffs' SUMF ¶¶238-239; ¶¶242-246.  Instead, Plaintiffs' expert admits his findings were "broad historical conclusions" going back to the early part of the 20th Century.  Ex. K, *Gordon Dep.,* 21:19-25.  There is no evidence in the record that these historical practices touched the entire District.

More importantly, there is no evidence those historical practices affect African Americans' ability to participate in the electoral process today.  Dr. Graves, the District's newest African American board member, flatly denies African Americans suffer from the effects of past discrimination.  See, Defendant's Additional SUMF ¶44. Depressed levels of participation can be demonstrated through evidence of voter registration and voter turnout.  Plaintiffs would have the court infer a link between historical practices and participation without a shred of evidence regarding participation.  (Courts have recognized that disproportionate educational, employment,

income level and living conditions arising from past discrimination tend to depress minority

political participation.  Where these conditions are shown, *and where the level of black*

*participation in politics is depressed*, plaintiffs need not prove any further causal nexus between

their disparate socio-economic status and the depressed level of political participation.  See,

*LULAC IV*, 999 F.2d at 866-867 emphasis added.)

Plaintiffs fail to provide any evidence of voter registration for either African Americans

or whites.  Dr. Kimball analyzed turnout in 2014 and found the relationship between turnout and

race "weak." See, Defendant's Additional SUMF ¶51.  Dr. Rodden found no significant

differences in turnout in the 2012, 2013 and 2014 elections.  See, Defendant's Additional SUMF

¶¶52-53.  Even if there were evidence of turnout, the *Clay* court held that insufficient.  While

evidence of turnout "may evidence an electoral scheme in which minorities lack an equal

opportunity to participate in the electoral process, this Court must consider only the choices of

those minority voters who actually voted…" *Clay v. Board of Education of City of St. Loui*s, 896

F.Supp. 929, 943 (1995).  "Consequently, the Court finds this contention unpersuasive and this

factor unsatisfied." *Id.*

 Plaintiffs have not provided that evidence that any past discrimination effects voter

participation today.  There is "weak" evidence regarding turnout and no evidence on voter

registration.  As in *Clay*, the first Senate factor is unsatisfied.

**B. Racially Polarized Voting.**

The second Senate factor is the extent to which voting in the elections of the state or

political subdivision is racially polarized.  See, *Shirt*, 461 F.3d at 1021.  The District has

demonstrated above that Plaintiffs have not satisfied the second or third *Gingles* factors which,

taken together, establish racially polarized voting.  *Gingles*, 478 U.S. at 56.  Consequently, the

second Senate factor weighs in the District's favor.  At a minimum, there are genuine issues of material fact that preclude summary judgment.

African American and white voters prefer at least one of the same candidate in a vast majority (83.3%) of elections, and more than 40% of successful candidates have been preferred by both races.  African American and white voters routinely cast a majority or near-majority of their votes for candidates preferred by the other racial group.  In the 2012 and 2013 elections, precincts with heavy concentrations of African American voters cast less than half their votes for an African American candidate (Morris in 2012 and Henson in 2013).  See, Defendant's Additional SUMF ¶24.  In 2012, these same precincts cast 60% of their votes for white candidates and 40% in 2013.  See, Defendant's Additional SUMF ¶¶24-25.  Notably, Plaintiffs have not argued that the 2012 or 2013 elections were influenced by special circumstances.  Additionally, current and former Board members have all consistently testified that voters choose their candidates based on qualifications, not race.  Finally, the number of African American preferred candidates who lost by something more than a razor-thin margin (11) is actually less than the number of African American preferred candidates who have prevailed (13).

A "searching and practical evaluation of the past and present reality" and "intensely local appraisal" establishes that the second Senate factor weighs in favor of the District.  *Gingles*, 478 U.S. at 79.

## C. The Use of Enhancing Practices.

The third Senate factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Shirt*, 461 F.3d at 1021.  There is no allegation that the District utilizes

unusually large election districts, a majority vote requirement,[7] or anti-single shot provisions. Instead, Plaintiffs allege the following practices enhance the opportunity for discrimination: the at-large voting structure; staggered terms; and off-cycle (i.e. April versus November) elections. ECF 84 No. 84 at p. 56.

**i. The at-large system.**

"[E]lectoral devices, such as at-large elections, may not be considered *per se* violative of §2.  Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." *Gingles* at 46.

Defendant reiterates its arguments above.  The at-large system benefits the largest group of voters.  The largest group of voters in the District is African American.  This system cannot "minimize or cancel out the voting strength of African Americans" as Plaintiffs argue (ECF No. 84 at pg. 56) because they are the largest group of voters.[8]   Drs. Engstrom, Kimball, and Rodden agree on this point.  See, ECF 82 ¶¶63-63 and ¶¶71-75.  Dr. Rodden concludes single-member districts could "hurt" African American candidates.  See, ECF 82, ¶64.

Of the board members that were asked whether they prefer the at-large system to single-member districts, they all support the current system.  See, Defendant's Additional SUMF ¶79, ¶82 and ¶87.  That includes both of the African American board members.  See, Defendant's Additional SUMF ¶79 and ¶82.  Dr. Graves testified that at-large elections are better because it prevents school board members from fighting for the schools that are in their (single member) district.  See, Defendant's Additional SUMF ¶82.  Dr. Thurman testified that at-large elections ensure that every community is represented. Defendant's Additional SUMF ¶79.  The

---

[7] Plaintiffs cite to cases with a majority vote requirement as if the District utilizes one. It does not.  The District's at-large structure allows the candidate that receives the most votes to win.  That candidate does not need to receive over 50% of the vote to be successful.

[8] Defendant reiterates that African Americans are the largest group of voters and a majority as of the 2013 ACS. See, ECF 82, ¶¶35-36 and ¶48.

experiences and preferences of Dr. Graves and Dr. Thurman should not be dismissed.  Both women live in the District; both women are African American and both women are current board members.  They know the District from the perspective that Plaintiffs want addressed and do not believe the current system should be changed.

Additionally, board members testified that single-member districts would be "divisive," "handcuff the District" and a "negative."  Defendant's Additional SUMF ¶¶85-87.  The most compelling comment came from Dr. Thurman.  She testified that single member districts would "segregate the community." Defendant's Additional SUMF ¶86.  In other words, one of the African American school board members believes that Plaintiffs' remedy would reintroduce segregation.  Surely that was not the intent of the Voting Rights Act.

## ii. Staggered Terms.

Plaintiffs claim that staggered terms, ones in which only two or three seats are up for election each year, put African Americans at a disadvantage. ECF No. 84 at pg. 58.  However, Plaintiffs' claim is based on case law and not evidence from the District.  See, Plaintiffs' SUMF ¶¶417-418.  The evidence from the District indicates that staggered terms were installed to provide stability.  See, Plaintiffs' SUMF ¶419.  Board members' testimony supports that conclusion.  See, Defendant's Additional SUMF  ¶¶88-89.  Every board member that was asked favors staggered terms because they allow for institutional memory and stability.  See, Defendant's Additional SUMF ¶88-89.  One board member indicated that an entirely new board would be "disruptive." See, Defendant's Additional SUMF ¶89.

## iii. Off-Cycle Elections.

Plaintiffs argue that off-cycle elections, meaning elections that occur in a month other than November, enhance the opportunity for discrimination because they generate low voter

turnout and increase the influence of groups like the FFNEA and North County Labor. ECF No. 84 at pg. 58-59. Once again, Plaintiffs' claims are unsupported.  The evidence indicates there is no significant different in turnout in three of the last four elections.  See, Defendant's Additional SUMF ¶53.

In addition, one Board member testified that April elections are helpful because it allows new board members to learn and to have input on the budget for the upcoming school year.  See, Defendant's Additional SUMF ¶95.  Dr. Graves supports April elections because she believes it allows voters to focus on the school board election.  See, Defendant's Additional SUMF ¶94.

In sum, Plaintiffs' claim that the at-large structure, staggered terms and April elections enhance the opportunity for discrimination is unsupported.  The at-large structure helps African Americans in the District.  Both African American board members as well as white board members support the current system.  Plaintiffs failed to compare turnout in April elections to turnout in elections held in other months and cannot know whether off-cycle elections hurt African Americans.  Finally, Plaintiffs fail to provide evidence that staggered elections harm African Americans in the District.

**iv. Bullet Voting.**

In addition, Plaintiffs fail to address District practices that enhance minority voting strength.  The District utilizes bullet voting.  Bullet voting (sometimes referred to as single-shot voting) is defined as "a practice by which voters can direct their votes to a single candidate running in a multi-member district, and choose not to case their remaining votes for other candidates running at the same time.  Doing so increases the relative weight of their votes by reducing the number of votes other candidate receive. Senate Report No. 97-417 (1992), 27-30.

At least three board members testified they utilize bullet voting.  See, Defendant's Additional SUMF ¶¶96-98.  Dr. Graves made bullet voting an explicit part of her campaign and received more votes than any other candidate in 2015.  See, Defendant's Ex. YY.  Dr. Graves' success demonstrates that bullet voting is a successful strategy for African American candidates.

The evidence for Senate Factor three is decisively in Defendant's favor.  Plaintiffs' evidence consists of generic conclusions without District-specific evidence.  The current electoral system aids African Americans, Plaintiffs fail to provide evidence that off-cycle elections harm African Americans in the District, and staggered terms provide stability.  In addition, the District employs bullet voting.  Plaintiffs have not satisfied the third Senate factor.

## D. Candidate slating process.

The fourth Senate factor is "if there is a candidate slating process, whether members of the minority group have been denied access to that process." *Shirt*, 461 F.3d at 102.  Plaintiffs claim the Ferguson Florissant National Education Association ("FFNEA") and the North County Labor organizations slate candidates because they endorse candidates.  ECF No. 84 at pg. 51-53. Defendant disagrees.

Courts recognize official and unofficial slating processes.  Official slating is typically done by political party organizations.  See, *Goosby v. Town Bd.*, 180 F.3d 476, 496 (2nd Cir. 1999).  Plaintiffs assert the FFNEA and North County Labor have an informal or unofficial slating process that excludes African Americans.  That assertion is not supported by the evidence.

A slating group has been defined as, "a permanent or semi-permanent organization who recruits candidates to run for office.  Having recruited them, it puts them up as a slate for as

many seats are open, and organizes a campaign and promotes those candidates in a campaign as a slate." *Collins v. Norfolk*, 605 F.Supp. 377, 390 (1984).

There is no evidence that either organization recruits candidates or organizes a campaign around them. See, Defendant's Additional SUMF ¶107. The evidence indicates that neither organization always endorse for every campaign. See, Defendant's Additional SUMF ¶108 and SUMF ¶133. The evidence indicates that the FFNEA provides its endorsed candidates with a variety of benefits. See, Plaintiffs' SUMF ¶349. However, the individual candidates send out their own individual mailings, walk door-to-door, put out yard signs and conduct typical campaign activities. See, Defendant's Additional SUMF ¶120.

While Defendant disputes that either organization has an informal slating process, even if they did, Plaintiffs failed to prove African Americans have been denied access to them.[9] The FFNEA endorsement process is transparent and race neutral. The FFNEA only endorses candidates that are "teacher friendly." Defendant's Additional SUMF ¶115-116.

Once a candidate has declared, the FFNEA sends the candidate a letter inviting that person to apply for the endorsement. Defendant's Additional SUMF ¶109. The candidates are sent a questionnaire with every question that will be asked in the endorsement interview. Defendant's Additional SUMF ¶110. Every candidate that wants an interview receives one. Defendant's Additional SUMF ¶111. The FFNEA forms a racially diverse committee to interview and to make an initial endorsement decision. Defendant's Additional SUMF ¶¶112-113. Once the committee has made its initial decision, the committee puts the candidates' names before the FFNEA membership for a vote. Defendant's Additional SUMF ¶117.

---

[9] Defendant submits that the organization that most closely fits the legal definition for the slating process is the Grade A for Change organization. However, that organization has not been active outside of 2014. See, Defendant's Additional SUMF ¶¶1-10 and ¶12.

Frank Green, the African American FFNEA president-elect in 2013-2014, president in 2014-2015 and vice treasurer for 2015-2016 testified: "We want to make sure that everything is as fair as possible. We don't want anybody going back and saying, well, I didn't get the job because I'm African-American and everyone on the…panel was white….we want to keep it as diverse as possible.  Defendant's Additional SUMF ¶114.

In the 2011 election, the FFNEA chose not to endorse Doris Graham because she voted against a raise. Defendant's Additional SUMF ¶118.  Race was not a consideration in her lack of endorsement. Defendant's Additional SUMF ¶122.  In 2014, the FFNEA failed to endorse Plaintiff Johnson because of his stance on class size.  The FFNEA has a strong stance on the issue of class size and the committee disliked his answer. There is no evidence that race was a factor in that decision either.  Defendant's Additional SUMF ¶¶124-126. The FFNEA endorses candidates they believe to be "teacher friendly."  Defendant's Additional SUMF ¶116.  That claim is amply supported by the evidence.

Interestingly, it is not clear whether the FFNEA endorsement even matters.  Dr. Donna Thurman did not receive the FFNEA endorsement in 2014 but won. Defendant's Additional SUMF ¶128.  Dr. Graves did not receive the endorsement in 2015, and won decisively. Defendant's Additional SUMF ¶129.  This evidence indicates that, even if there is a slating process, it does not prevent electoral success of African American candidates.

What is most troubling about Plaintiffs' claim that African Americans are excluded from the alleged FFNEA and North County Labor informal slates is that Plaintiffs do not have the evidence to make that conclusion.  Plaintiffs' expert admits that he does not know how many African Americans applied for the FFNEA endorsement.  Defendant's Additional SUMF ¶¶101-104.  Thus, he cannot know whether African Americans applied for the endorsement at the same

28

rate as whites.  Defendant's Additional SUMF ¶¶101-104.  Nor can he determine whether African Americans voluntarily excluded themselves from this process.  He failed to find out.

The same problems exist for Plaintiffs' claims regarding North County Labor's endorsement.  Plaintiffs do not know how many candidates of either race applied for the North County Labor endorsement.  Defendant's Additional SUMF ¶130.  Both Plaintiff Johnson and Dr. Thurman testified that they did not apply.  Defendant's Additional SUMF ¶¶131-132.  Yet, Plaintiffs would have the Court infer that African Americans are involuntarily excluded.  Plaintiffs' claim is incredibly presumptuous and unsupported.

Defendant maintains that neither organization has an informal slating process because they don't recruit or endorse for every election or organize the candidates' campaigns.  Yet, if the Court disagrees, Plaintiffs still cannot claim African Americans are involuntarily excluded without knowing whether African Americans even applied.  Nor can they prove that the organization's endorsement is based on race.  Plaintiffs cannot succeed on this factor.

**E. Socioeconomic factors that hinder African Americans' ability to participate.**

The fifth Senate factor is "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Shirt*, 461 F.3d at 102.  While Plaintiffs' provide myopic evidence of disparity, they fail to link the disparity to African Americans' ability to participate.

Plaintiffs' position on this factor is inconsistent.  Plaintiffs continuously paint the District with the broad brush of the region's past.  See, Defendant's Response to Plaintiffs' SUMF ¶¶242-256 and Defendant's Additional SUMF ¶¶40-43.  Yet, Plaintiffs' fail to use the region as an indicator of relative disparity when it is to their disadvantage.

The evidence indicates that African Americans are better off in the District than in the greater St. Louis Metropolitan Region and, in most instances, than in the rest of Missouri.[10] First, Plaintiffs' own expert points out that a majority of African Americans in the District are homeowners.  See, Defendant's Additional SUMF ¶155.  He does this while claiming that "African Americans in the District have settled overwhelmingly in apartment complexes.[11]" See, Defendant's Additional SUMF ¶152.

As for other socioeconomic disparities, Plaintiffs fail to mention that African Americans in the District are better off than African Americans in the St. Louis Metropolitan region and in the state of Missouri in income, wealth, median household income, government assistance ("SNAP"), high school graduation, some college and obtaining a bachelor's degree. Defendant's Additional SUMF ¶160, ¶162, ¶165, ¶¶167-168.  Plaintiffs' silence on relative disparity is even more striking based on their admission that the St. Louis Metropolitan region is the most relevant benchmark for socioeconomic statistics. Defendant's Additional SUMF ¶148.

The parties do not dispute an achievement gap between African Americans and whites in the District.  However, Plaintiffs once again fail to place that evidence in context.  First, the reality is that the achievement gap is a nation-wide problem and not unique to the District.  See, Defendant's Additional SUMF ¶¶170-171.  Second, the District is aware of the achievement gap and has committees working on improving the curriculum to address it.  See, Defendant's Additional SUMF ¶172.  Third, the superintendent is responsible for addressing racial disparity in the District and the District's current and former superintendent are both African American. See, Defendant's Additional SUMF ¶174 and ¶234.  Finally, Plaintiffs would have the Court

---

[10] Plaintiffs' SUMF ¶¶252-253 are disputed by Defendant's expert.
[11] Plaintiffs' expert admits he does not know how many African Americans in the District live in apartment complexes.  See, Defendant's Additional SUMF ¶154.  He also claims that Canfield, Michael Brown's apartment complex, is in the District when it is not. See, Defendant's Additional SUMF ¶153.

infer that a lack of awareness regarding the achievement gap amounts to racial insensitivity. ECF No. 84 p. 48.  Yet, Dr. Graves, the District's newest African American board member, admitted that she was unaware of the achievement gap. Defendant's Additional SUMF ¶173.

There are two main flaws with Plaintiffs' Senate factor five arguments.  First, Plaintiffs fail to place socioeconomic disparities in context.  Second, Plaintiffs fail to link any disparities to African Americans' ability to participate in the political process.  Plaintiffs' Memorandum contains one paragraph attempting to link disparity to participation. ECF No. 84 p.47.  However, that paragraph fails to contain evidence that is specific to the District.  Plaintiffs would have the Court infer that despite the fact that African Americans are better off in the District than in the region, generic research indicates that any disparity means depressed participation.  Plaintiffs have no evidence of African American participation (depressed or otherwise) or registration (depressed or otherwise) from the District.  Plaintiffs' argument on the fifth Senate factor must fail.

**F. Overt or subtle racial appeals**

The sixth Senate factor is "whether political campaigns have been characterized by overt or subtle racial appeals." *Shirt*, 461 F.3d at 1021.  As Plaintiffs indicate racial appeals can include the use of racially-charged campaign tactics and the highlighting of racially-charged campaign issues "that prey on racial anxiety." *United States v. City of Euclid*, 580 F.Supp.2d 584, 610, 613 (N.D. Ohio 2001).

Plaintiffs fail to submit any evidence of campaign tactics with a racial element or issues that "prey on racial anxiety."  Instead, Plaintiffs highlight a common issue in schools – discipline – and claim discussing discipline is racial.  Plaintiffs also claim discussing the student transfer issue at a board meeting was somehow a campaign tactic or issue that preyed on racial anxiety.

Even if that is an issue that "preys on racial anxiety," it is one that must be discussed by school boards. It directly affects schools, education, teaching and resources. There is no indication that discussing student transfers or discipline was a campaign tactic, must less one that preyed on racial anxiety.

Plaintiffs argue that the 2014 campaign contained subtle racial appeals from two white candidates that focus on discipline, classroom disruption and making students feel safe. ECF No. 84 p. 54. Defendant objects or clarifies all but one of Plaintiffs' facts to support this assertion. See, Defendant's Response to Plaintiffs' SUMF ¶¶378-82.[12]

Plaintiffs fail to point out that African American candidates campaigned on discipline. Plaintiff Johnson admitted in deposition that he campaigned on discipline "quite a bit." See, Defendant's Additional SUMF ¶¶180-181. Dr. Thurman stated that one of the reasons she ran was to address the issue of discipline. See, Defendant's Additional SUMF ¶182. Plaintiffs would have the Court infer that mentioning discipline is a discriminatory effort to appeal to white voters. It is not. It is an issue that was addressed by African American candidates and one that is common in school board elections. See, Defendant's Additional SUMF ¶180, ¶182 and ¶185. There is no indication of any appeals that were "racially charged" and "prey(ed) on racial anxiety." *United States v. City of Euclid*, 580 F.Supp. 2d 584, 610, 613 (N.D. Ohio 2001).

Plaintiffs also claim the FFSD Board was against the transfer of African American students to the District for racial reasons. ECF No. 84 at p. 54. Defendant objects to every statement of fact provided by Plaintiffs on this issue. See, Defendant's Response to Plaintiffs' SUMF ¶¶384-389. Furthermore, as Defendant's evidence indicates, the transfer issue was a financial concern for the cash-strapped District. See, Defendant's Additional SUMF ¶¶190-194.

---

[12] The only statement Defendant does not dispute is that the slate of African American candidates believed there were not enough African Americans on the Board. See, Defendant's Response to Plaintiffs' SUMF ¶379.

It was not an issue Dr. Graves perceived as racial.  See, Defendant's Additional SUMF ¶194. Finally, there is absolutely no evidence of a campaign tactic involving the student transfer issue or that anyone tried to prey on racial anxiety.

In the case closest to home, the *Clay* Court found, "..debate over issues such as busing and school desegregation reflects legitimate public concern, while also having an undeniable racial dimension.  Plaintiffs have not presented any evidence to suggest that such issues have been raised in an effort to appeal to members of a particular race.  The absence of evidence on this factor militates against plaintiffs, who bear the burden of proof." *Clay*, 896 F.Supp. at 943. The same holds true for the instant case.

## G. Election of African Americans.

Senate factor seven is "the extent to which African Americans have been elected to public office in the jurisdiction."  *Shirt*, 461 F.3d at 1021.  Plaintiffs argue this factor is satisfied because the number of African Americans on the Board is "disproportionately low" compared to the District's African American population. ECF No. 84 p. 39.  However, the seventh factor weighs in favor of the District for multiple reasons.

*First*, Plaintiffs offer no analysis of the quality of the individual candidates or their campaigns.  *See, e.g., Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1220-21 (5th Cir. 1996) (discussing probative value of strength of candidates and their campaigns).  Dr. Thurman, an African American candidate elected in 2014 and top-ranked candidate among African American voters, did more than other African American candidates to win the election.  See, Defendant's Additional SUMF ¶¶200-201 and ¶208.  For example, Dr. Thurman attended more functions than Savala, an African American candidate, who showed up late to an important

forum.  See, Defendant's Additional SUMF ¶¶201-202.  Savala, the second choice among African American voters, only lost by 91 votes. Defendant's Additional SUMF ¶203.

Johnson, another African American candidate from 2014 who lost, did not attend all the meetings of his political coalition, and failed to fill out the League of Women Voters information form.  Defendant's Additional SUMF ¶¶205-206.  This form would have been sent to the St. Louis Post-Dispatch, which would have publicized information about Johnson to many voters. Defendant's Additional SUMF ¶207.  Drs. Thurman and Graves (both successful African American candidates) filled out the League of Women Voters' form. Defendant's Additional SUMF ¶¶208-209.  Plaintiff Johnson, who was the third choice among African American voters, also talked on his cell phone during a candidate forum. Defendant's Additional SUMF ¶210. Lastly, Graham (an unsuccessful African American candidate in 2011 and the top-ranked choice among African American voters) was described as not a strong campaigner.  Defendant's Additional SUMF ¶211.

*Second*, Plaintiffs ignore the number of African American preferred candidates currently serving on the Board.  Drs. Graves and Thurman were elected in 2015 and 2014, respectively, and were the top-ranked candidates among African Americans.  See, Defendant's Ex. EE and FF. Additionally, Hogshead was elected in 2013 after receiving the second-highest percentage of African American votes.  See, ECF No. 82, ¶123.  Thus, three out of seven (43%) of the District's Board members are minority preferred candidates.  If the Court relies on Plaintiffs' single-race black voting age population in 2013 as 48.94% of the District's voters, African Americans' representation is roughly proportional to their voting age population.[13] See, Plaintiffs' SUMF ¶19.  *Clay*, 896 F. Supp. at 944 ("In *Johnson v. DeGrandy*, the Supreme Court

---

[13] Defendant maintains this calculation is overly restrictive and in error. However, Plaintiffs cannot prove vote dilution even using that calculation.

indicated that even if a plaintiff succeeds in establishing the *Gingles* preconditions, a defendant may be able to defeat a §2 claim by showing that the minority group in question ***has achieved, or will achieve***, substantially proportional representation under the challenged districting plan. However, proportionality is only one factor in the totality of circumstances. ….While proportionate representation on the Board is not a "safe harbor" in and of itself, in this case, the sustained electoral success by minority-preferred candidates in Board elections is simply inconsistent with a §2 violation.")

*Third*, African Americans maintained roughly proportional representation from 2000 - 2010.  The 2000 decennial census indicates the single-race African American voting age population was 32.61% of the District's voting age population.  See, Defendant's Additional SUMF ¶212.  Plaintiffs submit that there have been 1-2 African Americans (not including non-African Americans that are minority preferred candidates) on the Board since 2000.  Plaintiffs' SUMF ¶221.  In fact, 2006-2007 was the only year the Board had only one African American member.  See, Defendant's Ex. V, X and Y.  Thus, for the majority of the decade, a minimum of the board was 28% African American for 32.6% of the voting age population.[14]

*Fourth*, exogenous races indicate that African American candidates have achieved tremendous success in the District. "Although they are not as probative as endogenous elections, exogenous elections[15] hold some probative value."  *Shirt*, 461 F.3d at1018.  In *Shirt*, the Court found that in two exogenous, interracial elections, the Indian-preferred candidate lost because the white majority was able to vote as a bloc to defeat them.  The Court found that it was only in

---

[14] This is a rough calculation based on the number of African American VAP and not on the number of African American preferred candidates.  Therefore, the actual number of minority preferred candidates could be higher.

[15] Exogenous races are elections in a district for positions that are not exclusively representative of that district, such as governor and attorney general.  *Shirt*, 461 F.3d 1018 footnote 9.

exogenous elections between white candidates that Native Americans were able to elect their preferred candidate. *Id*. at 1018.

Evidence from exogenous elections in the District overwhelmingly supports the conclusion that African American candidates are successful in the District.  *See Meza v. Galvin*, 322 F. Supp. 2d 52, 72 (D. Mass. 2004) (acknowledging the relevance of minority candidate success in exogenous elections within the context of the seventh Senate factor).

**Table 2 – Various election results aggregated to the level of the Ferguson-Florissant School District**

| Contest | Month | African-American Candidate | White candidate |
|---|---|---|---|
| 2008 Presidential Democratic Primary | February | Barack Obama 70.3% | Hillary Clinton 29.7% |
| 2008 Presidential General | November | Barack Obama 76.5% | John McCain 23.5% |
| 2008 U.S. Congress General | November | William Lacy Clay 84.6% | Robb Cunningham 15.4% |
| 2010 County Executive Democratic Primary | August | Charlie Dooley 80.0% | Ronald Levy 20.0% |
| 2010 County Executive General | November | Charlie Dooley 70.7% | Bill Corrigan 27.0% |
| 2010 U.S. Congress Democratic Primary | August | William Lacy Clay 78.9% | Candice Britton 21.1% |
| 2010 U.S. Congress General | November | William Lacy Clay 69.8% | Robyn Hamlin 27.1% |
| 2012 U.S. Congress Democratic Primary | August | William Lacy Clay 65.0% | Russ Carnahan 32.6% |
| 2012 U.S. Congress General | November | William Lacy Clay 78.5% | Robyn Hamlin 21.5% |
| 2012 Presidential General | November | Barack Obama 77.9% | Mitt Romney 22.1% |
| 2014 County Executive Democratic Primary | August | Charlie Dooley 50.7% | Steve Stenger 49.3% |
| 2014 U.S. Congress General | November | William Lacy Clay 73.0% | Daniel Elder 27.0% |

Defendant's Additional SUMF ¶¶213-227 and Ex. GG, Table 1.

    *Fifth* and finally, the Hazelwood School District demonstrates that a school district with similar demographics and an identical electoral structure can elect a majority African American board.  First, the FFSD and Hazelwood maintain identical electoral structures.[16]  Both Districts elect board members in April.[17]  The Districts share geographic boundaries.[18]  African Americans hold four of the seven seats on the Hazelwood School Board. See, Defendant's Additional SUMF ¶232.

**Table 3 – Demographic Comparison of Ferguson-Florissant and Hazelwood School Districts**

|  | Ferguson-Florissant | Hazelwood |
|---|---|---|
| **Total VAP** <br> **2010 Census** | 50,771 | 89,529[19] |
| **Single race Black VAP** <br> **2010 Census** | 24,030 (47.335%) | 42,913 (47.93%)[20] |
| **AP Black VAP** <br> **2010 Census** | 24,466 (48.19%) | 43,659 (48.77%)[21] |
| **Total VAP** | 49,679 | 94,167[22] |

---

[16] The seven-member, three year terms are established by Section 162.261 RSMo.

[17] Section 115.121 RSMo.

[18] The District requests the Court take judicial notice of this fact. However, the District will supplement with maps from the Board of Elections if necessary.

[19] Source: Single Years of Age and Sex: 2010 (2010 Census Summary File 1) (QT-P2), http://factfinder.census.gov/bkmk/table/1.0/en/DEC/10_SF1/QTP2/9700000US2913830

[20] SEX BY AGE (BLACK OR AFRICAN AMERICAN ALONE) Universe: People who are Black or African American alone  more information 2010 Census Summary File 1 (P12B) http://factfinder.census.gov/bkmk/table/1.0/en/DEC/10_SF1/P12B/9700000US2913830

[21] RACE FOR THE POPULATION 18 YEARS AND OVER Universe: Population 18 years and over  more information 2010 Census Summary File 1 (P10) http://factfinder.census.gov/bkmk/table/1.0/en/DEC/10_SF1/P10/9700000US2913830

| 2011-2013 3-year ACS | | |
|---|---|---|
| **Single-race Black VAP** | 24,313 (48.94%) | 47,224 (50.15%)[23] |
| **2011-2013 3-year ACS** | | |

The above table demonstrates that voters in a similar electoral structure, with similar demographics and similar geography can elect a majority African American board.  In 2010, the single-race Black VAP and Any Part ("AP") Black VAP was nearly identical for the Ferguson-Florissant School District and Hazelwood.  According to the 3-year American Community Survey in 2013, the difference in the single-race Black VAP in Hazelwood and in the District was less than 1.5%.  See, Defendant's Additional SUMF ¶231 and ECF 82, ¶35. And yet, Hazelwood re-elected an African American Board member in 2015 (Desiree Whitlock[24]), another African American Board Member in 2014 (Brenda Youngblood[25]), and two more African American Board members in 2010 (Karlton Thornton and Cheryl Latham[26]) who were reelected without opposition in 2013.[27]

The success of African American candidates in the Hazelwood School District establishes that the at-large election system in the Ferguson-Florissant School District is not to blame for the perceived lack of electoral success among African American and African American-preferred candidates.  "The essence of a submergence claim is that a minority group prefer candidates whom they could elect were it not for the interaction of the challenged electoral

---

[22] SEX BY AGE Universe: Total population  more information 2011-2013 American Community Survey 3-Year Estimates (B01001), http://factfinder.census.gov/bkmk/table/1.0/en/ACS/13_3YR/B01001/9700000US2913830

[23] SEX BY AGE (BLACK OR AFRICAN AMERICAN ALONE) Universe: People who are Black or African American alone  more information 2011-2013 American Community Survey 3-Year Estimates (B01001B) http://factfinder.census.gov/bkmk/table/1.0/en/ACS/13_3YR/B01001B/9700000US2913830

[24] http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el150407/S007.HTM

[25] http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el140408/S007.HTM

[26] http://www.stlouisco.com/Portals/8/docs/document%20library/elections/eresults/el100406/hazelwoodsch.htm

[27] http://patch.com/missouri/hazelwood/incumbents-seek-re-election-hazelwood-school-district8543077d5f

law or structure with a white majority that votes as a significant bloc for different candidates."
*Gingles*, 478 U.S. at 68.

## H. Lack of Response to the Needs of the African American Community

"Two additional factors are also probative in determining whether Section 2 was violated: (1) was there a significant lack of response from elected of officials to the needs of the minority group, and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous." *Shirt,* 461 F.3d at 102 added. Plaintiffs refer to these additional factors as Senate factors 8 and 9. For clarity, Defendant will do the same.

Instead of a lack of response, the District board has actually taken affirmative measures to address the concerns of the African American community. While Plaintiffs insist that Dr. McCoy's resignation was a forced action that was somehow racially biased, Plaintiffs fail to point out that a majority white board hired Dr. McCoy. See, Defendant's Additional SUMF ¶235. In addition, the District held a special meeting to take public comments regarding Dr. McCoy. See, Defendant's Additional SUMF ¶243. The Board also reached out to the County NAACP, County Executive Charlie Dooley, and the North County Churches United for Racial Justice and Harmony to respond to the African American community's concern over Dr. McCoy. See, Defendant's Additional SUMF ¶¶260. (See, *Black Political Task Force v. Galvin*, 300 F.Supp.2d, 313 (2004) considering "evidence of instances in which legislators sought out minority groups and instituted programs designed to address the groups' requests.")

The board has taken additional steps to address the concerns of the African American community. For example, the Board held three sets of forums for parents and constituents to hear the top two superintendent candidates speak. See, Defendant's Additional SUMF ¶237. (See *Vecinos de Barrio Uno v. City of Holyoke*, 960 F.Supp. 515, 524 (D.Mass.1997) "The

administration of the new Mayor has witnessed a greatly increased effort to recruit Hispanic officials, include Hispanic viewpoints, and address the interests of all the citizens…")  The Board ultimately hired the best person for the job, "who happens to be African American."  See, Defendant's Additional SUMF ¶272.

Board member testimony demonstrates that the Board responds positively to concerns for racial awareness. See, Defendant's Additional SUMF ¶¶270-271 and *Solomon v. Liberty County, Florida*, 957 F.Supp. 1522, 1567 (N.D. Fla. 1997) ("Blacks have no problem approaching county commissioners, and even those commissioners elected from other residential districts, listen to their complaints and are responsive to their needs.")

While, Plaintiffs highlight the turmoil created by the Michael Brown shooting in 2014, they fail to acknowledge the District's board made provisions for its students and staff to address the issue.  The Board acted to protect its students after the shooting and hired counselors for faculty, staff and students in order to make them feel safe. See, Defendant's Additional SUMF ¶¶263-264.

Plaintiffs argue the Court should infer a lack of response to the needs of the African American community because some board members (not all) stated they were unaware of racial disparities, the achievement gap and the particularized needs of African American students. ECF 84 p. 48.  Again, Plaintiffs fail to indicate that the Dr. Graves does not believe African Americans have particularized needs.  See, Defendant's Additional SUMF ¶265.  Nor was she aware of the achievement gap.  See, Defendant's Additional SUMF ¶173.

More importantly, these inferences do not rise to the level of "significant lack of responsiveness."  Courts have found significant lack of responsiveness when legislators have repeatedly voted against or tabled numerous pieces of legislation that would have benefitted

minorities, and when federally mandated minority positions have remained unfilled, failure to ever appoint a minority for certain positions, and failure to provide polling places at minority-friendly locations. (See, *Bone Shirt v. Hazeltine*, 336 F.Supp.2d 976, 1043-1046 (S.D. 2004) and *Buckanaga v. Sisseton Indep. School District*, 804 F.2d 469, 477 (8th Cir.1986).  Plaintiffs complaints are not supported by the evidence, but if they were, they do not meet the legal standard for significant.

One of the more misleading arguments of Plaintiffs' Complaint is that the Board did not respond to the needs of the African American community after Dr. McCoy was suspended and resigned.  Plaintiffs are fully aware that the Board was unable to legally release the details regarding Dr. McCoy's suspension and resignation and that the Board had a policy not to discuss personnel matters.  Defendant's Additional SUMF ¶¶238-242 and ¶257.  Release of that information was the subject of a Motion to Compel that resulted in an objection from Dr. McCoy's attorney.  Defendant has provided ample evidence for Dr. McCoy's suspension and resignation that is not based on race.  See, Defendant's Additional SUMF ¶¶251-256.  In addition, testimony indicates his suspension and resignation were not based on race.  See, Defendant's Additional SUMF ¶244 and ¶247.  Finally, Dr. McCoy himself released a Mutual Statement stated his resignation was not based on race.  See, Defendant's Additional SUMF ¶244.

Plaintiffs' evidence for lack of responsiveness is weak and disingenuous.  Plaintiffs are aware of the facts yet they have failed to change their argument from the time of their Complaint. The evidence indicates that the Board has affirmatively responded to the concerns of the African American community.  At the very least, there is no evidence of a significant lack of response.

**I. The District's policy for using the current boundaries.**

Senate factor nine is whether "the policy underlying the jurisdiction's use of the current boundaries is tenuous."  Plaintiffs claim the District is responsible for the at-large electoral structure, the use of staggered terms and for holding elections in April.  Plaintiffs are mistaken.

The current electoral system was established by Missouri statute.  See, Sections 162.291, 162.341 and 162.261 RSMo.  As Plaintiffs admit, staggered terms were initiated to provide stability for the Board.  See, Plaintiffs' SUMF ¶418.

Though the District is not responsible for this system, it submits this system ensures that board members represent the entire community instead of segregating it into small divisions.  See, Defendant's Additional SUM ¶¶79-87.  Defendant will not re-iterate its argument from above about the benefits of the current system, it merely points out that the current system was established by the state of Missouri. As such, Missouri has an interest in its continuity.

## IV. CONCLUSION

Plaintiffs' summary judgment motion should be denied.  It is based on multiple factual disputes and a misinterpretation of the law.  Plaintiffs have not provided evidence when it is warranted.  In many instances, Plaintiffs would have the Court be persuaded by inference.  When Plaintiffs do provide evidence, it is often at odds with Defendant's facts.  "The Eight Circuit has mandated that this Court engage in a very detailed factual finding to support its consideration of the totality of the circumstances." *Clay*, 896 at 942.  When the Court does that, it will find Plaintiffs' motion cannot be granted.

Respectfully submitted,

CROTZER & ORMSBY, LLC

*/s/ Angela Bullock Gabel*
Cindy Reeds Ormsby, 50986MO
Angela Bullock Gabel, 58227MO
130 S. Bemiston Ave., Suite 602
Clayton, MO 63105
314.726.3040 / 314.726.5120 (fax)
agabel@crotzerormsby.com

*Attorney for Defendant Ferguson-Florissant
School District*

## CERTIFICATE OF SERVICE

On October 23, 2015, a copy of the foregoing was electronically filed with the Clerk of the Court using the e-filing system, an electronic copy therefore being served on Anthony E. Rothert, Grant R. Doty, Andrew J. McNulty, Gillian R. Wilcox, Dale E. Ho, Julie A. Ebenstein, and M. Laughlin McDonald, Attorneys for Plaintiffs, and Darold E. Crotzer, Jr., Attorney for Defendant St. Louis County Board of Election Commissioners.

*/s/ Angela Bullock Gabel*