**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, REDDITT HUDSON, F. WILLIS JOHNSON and DORIS BAILEY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 4:14-cv-02077-RWS |
| v. | ) ) | |
| FERGUSON-FLORISSANT SCHOOL DISTRICT and ST. LOUIS COUNTY BOARD OF ELECTIONS COMMISSIONERS, | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT FERGUSON-FLORISSANT SCHOOL
DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.    Plaintiffs' Claim Is Not Barred By The Size Of The Black Or Any Part Black Population In FFSD. ....................................................................................................... 2

    A.    In the Eighth Circuit, there is no *per se* rule prohibiting minority voters who constitute a numerical majority of a jurisdiction from bringing a vote dilution claim under Section 2. ................................................................................................. 3

    B.    There is no dispute that, according to available government statistics, African Americans are a minority of the FFSD VAP. ................................................................ 8

        1.    There is no dispute that Decennial Census data indicate that African Americans are less than one-half of the FFSD VAP. ............................................... 9

        2.    There is no dispute that the most recent three-year ACS estimates indicate that African Americans remain less than half of the VAP in FFSD. ................... 11

        3.    The Court should not credit the District's population projections. ........................... 13

II.    Plaintiffs Need Not Establish The Effectiveness Of The Illustrative Single-Member Districts To Satisfy *Gingles* I. ......................................................................... 15

    A.    The District misstates the standard for *Gingles* I. ..................................................... 15

    B.    Even though a showing of effectiveness is not required at this stage, the District's analysis of the effectiveness of Plaintiffs' illustrative maps is faulty. ..................................................................................................................... 17

III.    The Undisputed Election Results Establish that Plaintiffs Have Satisfied *Gingles* II And III, Even Under The District's Proposed Rule For Identifying Candidates Of Choice. .............................................................................................. 20

    A.    The District improperly considers uncontested elections. ......................................... 21

    B.    The District improperly treats all elections as equally probative. ............................. 24

        1.    Recent elections are more probative than older elections. ........................................ 24

        2.    The 2009 election, which featured no Black candidates, should be assigned little probative value. ................................................................................................ 25

3. Special circumstances marked the success of minority and minority-preferred Board candidates in 2014 and 2015, which should be assigned little probative value. ................................................................................................ 25

C. The District misstates the standard for political cohesion as requiring that race be the "sole factor" in voters' preferences. ............................................................... 28

D. The District uses the wrong metric for measuring racial polarization and the success rate of Black-preferred candidates. ............................................................... 29

IV. The District's Method For Identifying Preferred-Candidates Of Choice Fails To Consider "All The Relevant Circumstances" In Each Election. .................................. 34

CONCLUSION .................................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*African American Voting Rights Legal Defense Fund, Inc. v. Villa*,
   54 F.3d 1345 (8th Cir. 1995) ............................................................................. 10, 18

*Aldasaro v. Kennerson*,
   922 F. Supp. 339 (S.D. Cal. 1995) .......................................................................... 7

*Askew v. City of Rome*,
   127 F.3d 1355 (11th Cir. 1997) .............................................................................. 21

*Bartlett v. Strickland*,
   556 U.S. 1 (2009) ..................................................................................................... 7

*Benavidez v. City of Irving*,
   638 F. Supp. 2d 709 (N.D. Tex. 2009) .................................................................. 14

*Benavidez v. Irving Independent School District*,
   690 F. Supp. 2d 451 (N.D. Tex. 2010) .................................................................. 14

*Benavidez v. Irving Independent School District*,
   No. 3:13-cv-00087-D, 2014 WL 4055366 (N.D. Tex. Aug. 15, 2014) ................... 27

*Bone Shirt v. Hazeltine*,
   336 F. Supp. 2d 976 (D.S.D. 2004) ....................................................................... 10

*Bone Shirt v. Hazeltine*,
   461 F.3d 1011 (8th Cir. 2006) ........................................................................ passim

*Chisom v. Roemer*,
   501 U.S. 380 (1991) ................................................................................................. 5

*Clay v. Board of Education of St. Louis*,
   90 F.3d 1357 (8th Cir. 1996) ...................................................... 10, 25, 34, 35

*Collins v. City of Norfolk*,
   816 F.2d 932 (4th Cir. 1987) ........................................................................... 28, 33

*Conway School District v. Wilhoit*,
   854 F. Supp. 1430 (E.D. Ark. 1994) ..................................................................... 10

*Corbett v. Sullivan*,
   202 F. Supp. 2d 972 (E.D. Mo. 2002) ................................................................... 10

*Cousin v. Sundquist*,
   145 F. 3d 818 (6th Cir. 1998) .................................................................................. 7

*DeGrandy v. Wetherell*,
   794 F. Supp. 1076 (N.D. Fla. 1992) ...................................................................... 17

*Department of Commerce v. United States House of Representatives*,
   525 U.S. 316 (1999) ............................................................................................... 11

*Dickinson v. Indiana State Election Board*,
   933 F.2d 497 (7th Cir. 1991) .................................................................... 16

*Gomez v. City of Watsonville*,
   863 F.2d 1407 (9th Cir. 1988) .................................................................. 33

*Gonzalez v. Harris County*,
   601 F. App'x 255 (5th Cir. 2015) ......................................................... 6, 16

*Harvell v. Blytheville School District No. 5*,
   71 F.3d 1382 (8th Cir. 1995) ........................................................... passim

*Harvell v. Ladd*,
   958 F.2d 226 (8th Cir. 1992) .................................................................... 10

*Houston v. Lafayette County*,
   56 F.3d 606 (5th Cir. 1995) ...................................................................... 16

*Jeffers v. Beebe*,
   895 F. Supp. 2d 920 (E.D. Ark. 2012) ................................................. 7, 10

*Jeffers v. Clinton*,
   730 F. Supp. 196 (E.D. Ark. 1989) .......................................................... 30

*Jenkins v. Red Clay Consolidated School District Board of Education*,
   4 F.3d 1103 (3d Cir. 1993) .................................................................. 28, 33

*Johnson v. Mortham*,
   926 F. Supp. 1460 (N.D. Fla. 1996) ........................................................ 17

*Ketchum v. Byrne*,
   740 F.2d 1398 (7th Cir. 1984) ............................................................... 5, 18

*Kirkpatrick v. Preisler*,
   394 U.S. 526 (1969) .................................................................................. 14

*League of United Latin American Citizens v. Perry*,
   548 U.S. 399 (2006) .................................................................................... 3

*Little Rock School District v. Pulaski County Special School District No. 1*,
   831 F. Supp. 1453 (E.D. Ark. 1993) ........................................................ 10

*Mallory v. Ohio*,
   38 F. Supp. 2d 525 (S.D. Ohio 1997) ..................................................... 22

*Martinez v. Bush*,
   234 F. Supp. 2d 1275 (S.D. Fla. 2002) .................................................... 30

*Meek v. Metropolitan Dade County*,
   908 F.2d 1540 (11th Cir. 1990) .................................................................. 6

*Milwaukee Branch of NAACP v. Thompson*,
   935 F. Supp. 1419 (E.D. Wis. 1996) ....................................................... 22

*Monroe v. City of Woodville*,
   881 F.2d 1327 (5th Cir. 1989) .................................................................... 6

*Montes v. City of Yakima,*
 40 F. Supp. 3d 1377 (E.D. Wash. 2014) ................................ 33

*Nash v. Blunt,*
 797 F. Supp. 1488 (W.D. Mo. 1992) ................................... 10

*Overton v. City of Austin,*
 Civ. No. A-84-CA-189, 1985 WL 19986 (W.D. Tex. Mar. 12, 1985) .................. 25

*Parker v. Ohio,*
 263 F. Supp. 2d 1100 (S.D. Ohio 2003) ................................. 7

*Pope v. County of Albany,*
 687 F.3d 565 (2d Cir. 2012) ........................... 6, 16, 24

*Rogers v. Lodge,*
 458 U.S. 613 (1982) ................................................. 4

*Ruiz v. City of Santa Maria,*
 160 F.3d 543 (9th Cir. 1998) ...................... 26, 27, 28

*Salas v. Southwest Texas Junior College District,*
 964 F.2d 1542 (5th Cir. 1992) ......................... 6

*Sanchez v. Bond,*
 875 F.2d 1488 (10th Cir. 1989) ...................... 25

*Sanchez v. Colorado,*
 97 F.3d 1303 (10th Cir. 1996) ....................... 28, 33

*Smith v. Brunswick County Board of Supervisors,*
 984 F.2d 1393 (4th Cir. 1993) ......................... 6, 7

*Smith v. Clinton,*
 687 F. Supp. 1361 (E.D. Ark. 1988) ..................... 4

*Southern Christian Leadership Conference of Alabama v. Sessions,*
 56 F.3d 1281 (11th Cir. 1995) ......................... 21

*Stabler v. County of Thurston,*
 129 F.3d 1015 (8th Cir. 1997) ......................... 10

*Thompson v. Glades County Board of Commissioners,*
 493 F.3d 1253 (11th Cir. 2007) ........................ 7

*Thornburg v. Gingles,*
 478 U.S. 30 (1986) ................................ passim

*United States v. Blaine County,*
 363 F.3d 897 (9th Cir. 2004) ......................... 33

*United States v. Dallas County Commission,*
 739 F.2d 1529 (11th Cir. 1984) ....................... 33

*United States v. Marengo County Commission,*
 731 F.2d 1546 (11th Cir. 1984) ....................... 33

*Uno v. City of Holyoke,*
   72 F.3d 973 (1st Cir. 1995) ........................................................ 21

*Valdespino v. Alamo Heights Independent School District,*
   168 F.3d 848 (5th Cir. 1999) ....................................................... 7

*Valladolid v. City of National City,*
   976 F.2d 1293 (9th Cir. 1992) ..................................................... 6

*Westwego Citizens for Better Government v. City of Westwego,*
   872 F.2d 1201 (5th Cir. 1989) ............................................... 24, 25

*Williams v. City of Texarkana,*
   861 F. Supp. 756 (W.D. Ark. 1992) ........................................... 10

**Statutes**

52 U.S.C. § 10301 ................................................................... 1, 3

Mo. Rev. Stat. § 1.100 ................................................................ 10

Mo. Rev. Stat. § 115.133 .............................................................. 5

**Legislative History**

S. Rep. No. 97-417 (1982) ............................................................ 4

**Other Authorities**

Brief of Former Directors of the U.S. Census Bureau as *Amici Curiae* in Support of
   Appellees, *Evenwel v. Abbott*, No. 14-940 (U.S. Sept. 25, 2015) ........................................... 12

**INTRODUCTION**

Plaintiffs are members of a historically disadvantaged racial minority facing ongoing barriers to full and equal electoral participation. The parties agree that the three *Gingles* preconditions for Plaintiffs' claim for vote dilution under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("VRA"), can be resolved on summary judgment. The disputes between the parties are not factual but legal: (1) whether Plaintiffs' vote dilution claim is precluded by virtue of the size of the African American population in the Ferguson-Florissant School District ("FFSD" or "the District"), calculated as a percentage of the District's voting age population ("VAP"); (2) whether the first *Gingles* precondition ("*Gingles* I") requires Plaintiffs to establish the "effectiveness" of the illustrative districts that they have proposed; and (3) the appropriate legal standard for assessing undisputed election results under the second and third *Gingles* preconditions ("*Gingles* II and III"). There are no material factual disputes once these legal questions are decided. As set forth below, the proper resolution of these legal disputes demonstrates that the District's motion for summary judgment should be denied, and summary judgement should be resolved in favor of Plaintiffs.

*First*, contrary to the assertions of the District, there is no legal rule in the Eighth Circuit prohibiting minority voters who represent a numerical majority of a jurisdiction's VAP from bringing a claim for vote dilution under Section 2 of the VRA. Indeed, the Supreme Court has made clear that where, as here, the minority group in question has suffered from a sustained pattern of discrimination and longstanding socioeconomic inequalities, minority voters require more than a bare numerical majority in order to elect their preferred candidates. Moreover, even if this Court were to adopt such a rule, there is no legal basis for the Court to use anything other than published government statistics to determine the composition of the FFSD VAP, and there is no dispute between the parties that those government statistics show that African Americans

1

remain a minority of the FFSD VAP.

*Second*, there is no dispute of fact that it is possible to draw four single-member election districts within FFSD in which minority voters would comprise a majority of the VAP. That is all that is required to satisfy the first precondition for vote dilution liability under *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Although the District claims (baselessly) that Plaintiffs' illustrative districts would not provide minority voters an effective opportunity to elect their preferred candidates, it ignores long-standing precedent holding that this issue is inappropriate at the liability stage of a case, where the plaintiffs' hypothetical districts are not intended as proposed remedies, but only to satisfy *Gingles* I.

*Third*, there are no disputes about the material facts necessary to assess *Gingles* II and III, *i.e.*, the winning and losing candidates in FFSD School Board elections ("Board elections") and their relative levels of support among Black and white voters, respectively. The only disputes among the parties concern the appropriate legal standard for assessing the undisputed elections results—and as explained below, once the appropriate legal standard is employed, it is clear that voting in FFSD is racially polarized, and that Black-preferred candidates usually lose. This is true regardless of the method that the Court uses for identifying candidates of choice.

## ARGUMENT

## I. PLAINTIFFS' CLAIM IS NOT BARRED BY THE SIZE OF THE BLACK OR ANY PART BLACK POPULATION IN FFSD.

The District argues that Plaintiffs' claim is barred because, according to speculative projections by the District's expert, African Americans are a majority of the FFSD VAP. That argument is unavailing for two reasons. *First*, there is no *per se* rule in the Eighth Circuit prohibiting members of a racial minority group from bringing a vote dilution claim simply because they constitute a bare numerical majority of the VAP of the jurisdiction in question.

Indeed, the Eighth Circuit has recognized that there may be situations in which minority voters who, as here, are hindered politically by a long and undisputed history of discrimination and continuing socioeconomic inequality, may need far more than a bare numerical majority to exercise effective political power. *Second*, courts in the Eighth Circuit have uniformly relied on published government data when assessing a jurisdiction's VAP, and it is undisputed that there is no such data here showing that African Americans constitute more than 50% of the VAP in FFSD. The only suggestion to the contrary is based on a notional projection contrived by the District's expert, and, as a matter of law, this figure should not be relied on by this Court.

### A. In the Eighth Circuit, there is no *per se* rule prohibiting minority voters who constitute a numerical majority of a jurisdiction from bringing a vote dilution claim under Section 2.

The District's assertions about the size of the Black VAP ("BVAP") in FFSD are ultimately immaterial because members of a racial or ethnic minority may lack the ability to elect their preferred candidates even in situations where they constitute a numerical majority of a jurisdiction's VAP. Consistent with this principle, the Eighth Circuit has not recognized a *per se* rule prohibiting minority voters from bringing a vote dilution claim if they constitute more than 50% of the VAP, and indeed, all but one of the Courts of Appeals that have considered this question have rejected such a rule.

Under Section 2, the critical element of a vote dilution claim is a showing that, under "the totality of circumstances," members of a racial or ethnic minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). And, as the Supreme Court explained in *League of United Latin American Citizens v. Perry*, "it may be possible for a citizen voting-age majority to lack real electoral opportunity." 548 U.S. 399, 428 (2006). Assessing a racial minority group's ability to elect its preferred candidates depends "upon a searching practical

evaluation of the 'past and present reality.'" *Gingles*, 478 U.S. at 79 (quoting S. Rep. No. 97-417 at 30 (1982)). Section 2 requires courts to engage in "a functional understanding of the phenomenon of vote dilution," such that determining liability requires "an intensely local appraisal of the design and impact of the contested electoral mechanisms." *Gingles*, 478 U.S. at 67, 79 (internal quotation marks omitted) (quoting *Rogers v. Lodge*, 458 U.S. 613, 622 (1982)).

Members of a historically disadvantaged racial minority group may face present-day barriers to electoral participation as a result of ongoing socioeconomic effects of discrimination, as well as electoral processes that favor the status quo, even when that racial minority constitutes a bare majority of a jurisdiction's population. Thus, in reviewing remedial districting plans, courts in the Eighth Circuit have explained that "historically disadvantaged minorities require more than a simple majority in a voting district in order to have . . . a practical opportunity to elect candidates of their choice." *Smith v. Clinton*, 687 F. Supp. 1361, 1362 (E.D. Ark. 1988) (three-judge court), *aff'd*, 488 U.S. 988 (1988) (mem.); *see id.* at 1363 (ordering Board to implement plaintiffs' plan providing for single-member majority-Black district with a 60.55% BVAP to "give blacks a fair opportunity to elect the candidate of their choice . . . and help to eradicate the effect of the dual-member, at-large system on participation by blacks in the political process"); *see also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1023 (8th Cir. 2006) (applying 65% minority population as a "guideline" to consider in fashioning remedial relief and correctly considering turnout rate and incumbency in formulating a districting plan).

Indeed, the facts of this case demonstrate precisely why the *per se* rule urged by the District would frustrate the purpose of Section 2. Even assuming, *arguendo*, that African Americans represent just over 50% of the FFSD VAP, it is undisputed that in FFSD, the ongoing socioeconomic effects of past discrimination inhibit the ability of African-American voters in

4

FFSD to participate equally in the political process and elect candidates of their choice. PSUMF[1]

¶¶ 300-301. The District's expert agrees that socioeconomic disparities "feed directly into turnout" and registration behavior. PSUMF ¶ 302. As a result, as the parties' experts agree, voter registration rates are lower for African Americans (67.1%) than for whites (72.2%) in Missouri, *Reported Voting and Registration by Sex, Race, and Hispanic Origin (Ex. 5 to Dep. of Jonathan Rodden, Aug. 20, 2015)*, at 7, filed concurrently herewith as Ex. D6 to Pls.' DSUMF Resp., and since 2000, African-American turnout for Board elections has always been lower than or statistically indistinguishable from white turnout, PSUMF ¶ 423.[2] This effect on voter behavior in turn has meant that African Americans' preferred candidates have never been elected to the Board in numbers commensurate with their proportion of the population. A rule barring a vote dilution claim under the undisputed broad socioeconomic inequality in FFSD, merely because the District's expert claims that African Americans have barely crossed the threshold of 50% of the District's VAP, would be inappropriate and inconsistent with the Supreme Court's guidance that Section 2 "should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citation and internal quotation marks omitted).[3]

---

[1] "PSUMF" refers to Doc. No. 85, Plaintiffs' Statement of Uncontroverted Material Facts; "DSUMF" refers to Doc. No. 82, FFSD's Statement of Uncontroverted Material Facts, and "Pls.' DSUMF Resp." refers to Plaintiffs' Response to DSUMF, filed concurrently herewith.

[2] Other factors decrease the vote-eligible African-American population. A State law prohibits persons on parole or probation after conviction of a felony from registering to vote. Mo. Rev. Stat. § 115.133. Felon disenfranchisement disproportionately impacts African Americans in Missouri, further diminishing the proportion of African-American voters in the VAP. The rate of disenfranchisement for the Missouri population as a whole is 2.32 percent; for the African-American population it is 6.88 percent. Doc. No. 85-17, PSUMF Ex. B8, *Gordon's Resp. to Rep. of Jonathan Rodden*, June 30, 2015, at 2; *see also* PSUMF ¶ 181 (citing Doc. No. 87-9, PSUMF Ex. G9, *Investigation of the Ferguson Police Department* (finding racial bias in local law enforcement in Ferguson)).

[3] *See also Ketchum v. Byrne*, 740 F.2d 1398, 1413 (7th Cir. 1984) (holding that "minorities must have something more than a mere majority even of [VAP] in order to have a reasonable opportunity to elect a candidate of their choice.").

Consistent with this Supreme Court guidance, three of the four Courts of Appeals that have considered this question of whether plaintiffs are barred from bringing a vote dilution claim where a minority racial group constitutes a majority of a jurisdiction's VAP (the Second, Fifth, and Eleventh Circuits) have rejected the *per se* rule urged by the District here.[4] *See Monroe v. City of Woodville*, 881 F.2d 1327, 1332–33 (5th Cir. 1989) ("Unimpeachable authority from [the Fifth Circuit] has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution.");[5] *Meek v. Metro. Dade Cty.*, 908 F.2d 1540, 1545–46 (11th Cir. 1990) (holding that a claim brought by minority voters who constitute a numerical majority could be viable due to "functional effect" of existing system, and that the district court "properly rejected the county's contention that *Gingles* could not apply at all in a setting where the Non Latin White bloc did not constitute a majority of the total population"); *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012) (approvingly citing *Salas*'s conclusion that majority-minority vote dilution claims are not barred as a matter of law). As the Fifth Circuit explained, "the plain text of [Section 2 of the VRA], as affirmed by case law, makes clear that the Act is concerned with protecting the minority in its capacity as a national racial or language group," not in its capacity as a numerical minority in any particular jurisdiction. *Salas*, 964 F.2d at 1547.[6]

---

[4] Without expressly addressing this issue, the Ninth Circuit has considered claims by minority voters from a group that constituted a plurality of a jurisdiction's VAP, without suggesting that this would act as a *per se* bar to relief. *See Valladolid v. City of Nat'l City*, 976 F.2d 1293, 1294 (9th Cir. 1992) (considering a vote dilution claim in which the plaintiff minority groups formed a plurality of the population (49.6%)).

[5] The Fifth Circuit has repeatedly reaffirmed this holding. *See Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1547 (5th Cir. 1992) (reaffirming that minorities may bring *Gingles* claims even if they constitute a voting-age population or registered-voter majority); *Gonzalez v. Harris Cty.*, 601 F. App'x 255, 256 (5th Cir. 2015) (per curiam) (reviewing vote dilution case involving Hispanic plurality).

[6] Among the Courts of Appeals, only the Fourth Circuit has applied a rule similar to the rule advocated by the District. *See Smith v. Brunswick Cty. Bd. of Supervisors*, 984 F.2d 1393, 1401 (4th Cir. 1993) (holding that if minority voters "have the numbers necessary to win and members of the group are allowed equal access to the polls, it cannot be rationally maintained that the vote is diluted"). And, even then, the Fourth Circuit's decision barring the plaintiffs' claim arose in a vastly different context, where African Americans constituted a supermajority of the

The District presents no basis for adopting a rule that runs contrary to the weight of Circuit authority. The District cites *Bartlett v. Strickland*, 556 U.S. 1 (2009), but *Bartlett* held only that a numerical majority of a district's VAP is a necessary condition for minority electoral opportunity. It did not hold that a majority is *sufficient* to establish that such opportunity already exists, or that a claim by a member of the numerical majority would be barred. Several of the other cases cited by the District similarly address the requirements for satisfying *Gingles* I, but do not adopt the *per se* rule advocated by the District;[7] some of the District's cited cases even reject the notion that a Section 2 claim is automatically precluded where minority voters constitute a majority of a jurisdiction's VAP. *See Aldasaro v. Kennerson*, 922 F. Supp. 339, 372 (S.D. Cal. 1995) (concluding that "demonstrating that Hispanics are a majority of voting age citizens is simply one *evidentiary* method of proving an ability to elect. While a voting age citizen majority may be evidence from which it may be inferred that a group can generate a cohesive majority of voters, this inference may be disproved and, in this case quite clearly is, by other evidence that Hispanics were not a registration or turnout majority."). The other cases cited by the District are inapposite. *See, e.g.*, *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 933 (E.D. Ark. 2012) (holding that, in a challenge to a single-member redistricting plan, the legislature need not increase the Decennial Census-based BVAP in an undisputedly majority-minority single-member district from 52.88% to 58.41% to comply with Section 2).

---

relevant districts' VAP (60%) and had a consistently higher turnout rate than white voters. *See id.* at 1400-02. That is a far cry from what the District asserts is the case here.

[7] *See, e.g.*, *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852–54 (5th Cir. 1999) (confirming that plaintiffs must prove that group could constitute more than 50% of relevant population in their demonstration district to satisfy *Gingles* I and distinguishing reliable methodology from a "crude straight-line population projection"); *Thompson v. Glades Cty. Bd. of Comm'rs*, 493 F.3d 1253, 1262 (11th Cir. 2007) (confirming that *Gingles* I is satisfied when Blacks constitute 50.23% of an illustrative district); *Cousin v. Sundquist*, 145 F. 3d 818, 828 (6th Cir. 1998) (concluding that *Gingles* I could not be satisfied based on a 34% "influence" district and rejecting cumulative voting remedy imposed by district court); *Parker v. Ohio*, 263 F. Supp. 2d 1100, 1104–05 (S.D. Ohio 2003) (same).

Thus, this Court should follow the majority of the Circuits that have considered this issue and reject FFSD's proposed *per se* rule, which runs contrary to the remedial principles articulated by the Eighth Circuit. *See, e.g., Bone Shirt*, 461 F.3d at 1023.

**B. There is no dispute that, according to available government statistics, African Americans are a minority of the FFSD VAP.**

In any event, this Court need not consider the District's proposed bar because it is uncontested that the available government statistics—upon which this Court should rely as a matter of law—demonstrate that African Americans remain a minority of the VAP in FFSD.

The parties have submitted three sets of statistics concerning the VAP of FFSD:

| Summary of Demographic Data Offered By Parties | | | |
|---|---|---|---|
| **Data Source** | **Total FFSD VAP** | **FFSD BVAP** | **% BVAP** |
| 2010 Decennial Census | 50,771[8] | 24,030 single-race Black[9] <br> 24,466 any-part Black[10] | 47.33% single race Black[11] <br> 48.19% any-part Black[12] |
| 2011-2013 American Community Survey ("ACS") Estimate | 49,679[13] | 24,313 single-race Black[14] <br> No any-part BVAP estimate | 48.94% single-race Black[15] <br> No any-part BVAP estimate |
| Estimates by the District's Expert Dr. Rodden | 49,009[16] | 24,313 single-race Black[17] <br> 24,994 any-part BVAP estimate[18] | 49.6% single race Black[19] <br> 51.0% any-part Black[20] |

---

[8] PSUMF ¶ 15; Pls.' DSUMF Resp. ¶ 17.

[9] PSUMF ¶ 15; Pls.' DSUMF Resp. ¶ 18.

[10] PSUMF ¶ 15; Pls.' DSUMF Resp. ¶ 19.

[11] PSUMF ¶ 15; Pls.' DSUMF Resp. ¶ 18.

[12] PSUMF ¶ 15; Pls.' DSUMF Resp. ¶ 19.

[13] PSUMF ¶ 20; Pls.' DSUMF Resp. ¶ 33.

[14] PSUMF ¶ 19; Pls.' DSUMF Resp. ¶ 34.

[15] PSUMF ¶ 19; Pls.' DSUMF Resp. ¶ 35.

[16] Dr. Rodden's calculation here appears to be erroneous. The District in its statement of facts reports that the total FFSD VAP according to the 2011-2013 ACS estimates is 49,679. *See* Pls.' DSUMF Resp. ¶ 33. Dr. Rodden, however, reports the FFSD VAP as 49,009 without explanation, Doc. No. 85-19, PSUMF Ex. B10, *Suppl. Rep. of Jonathan Rodden & Jowei Chen: Assessment of Pls.' Redistricting Proposals*, at Table 1 (p. 3), which appears to be in error and is nowhere explained in the District's summary judgment brief. Using the 49,679 denominator for total VAP, Dr. Rodden's projections would calculate single-race BVAP at 48.9% (24,313 / 49,679) and any-part BVAP at 50.3% (24,994 / 49,679).

[17] PSUMF ¶19; Pls.' DSUMF Resp. ¶ 34

The parties agree that no published government data shows that African Americans constitute a majority of the FFSD VAP.[21] Faced with this lack of data, the District relies on figures contrived by its expert. *See* Pls.' DSUMF Resp. ¶ 48. The question here is a legal one: whether, as a matter of law, the Court may reject presumptively valid government statistics in favor of an unsubstantiated projection custom-made for this litigation by the District's expert, relying on population estimates with substantial margins of error. *See* Pls.' DSUMF Resp., ¶¶ 24, 44, 48. Consistent with prior decisions in this Circuit and with Missouri law, this Court should rely on government population data, and focus in particular on the 2010 Decennial Census data, when assessing the FFSD VAP.

> **1. There is no dispute that Decennial Census data indicate that African Americans are less than one-half of the FFSD VAP.**

The Decennial Census is a full count of the nation's entire population every ten years. As such, it provides an accurate and complete count of the FFSD population and its demographics. *See* Pls.' DSUMF Resp. ¶ 24. The District agrees that Census data are "presumptively accurate." Mem. in Supp. of Def. FFSD's Mot. for Summ. J., Doc. No. 81 ("Def.'s Br."), at 9. And there is no dispute that African Americans are a minority of the FFSD VAP according to 2010 Decennial

---

[18] *See supra* n.16. The correct calculation for single-race BVAP is 48.9%.

[19] Doc. No. 85-19, Ex. B10, *Rodden & Chen Suppl. Rep.*, at Table 1 (p. 3); *see supra* n.16.

[20] DSUMF ¶ 48; *see supra* n.16. The correct calculation for any-part BVAP is 50.3%.

[21] The parties agree that African Americans constitute less than 50% of the FFSD VAP according to either the 2010 Decennial Census or the most recent three-year ACS estimates. According to the 2010 Decennial Census, the District has a total population of 68,663, with a Black population of 36,967 (53.84%) and a white population of 29,581 (43.08%). PSUMF ¶ 15; Pls.' DSUMF Resp. ¶ 14. The total VAP in the District is 50,771, of whom 24,466 (48.19%) are any-part Black; 24,030 (47.33%) are single-race Black; and 24,852 (48.95%) are non-Hispanic white. PSUMF ¶ 15; Pls.' DSUMF Resp. ¶¶ 17-20. According to 2011-2013 three-year ACS estimates, the FFSD single-race BVAP (including the Hispanic BVAP) is 24,313, or 48.94% of the District's VAP; the single-race white VAP (including Hispanic whites) is 23,740, or 47.24% of the District's VAP; and the non-Hispanic White VAP is 23,242, or 46.78% of the District's VAP. PSUMF ¶ 19; Pls.' DSUMF Resp. ¶¶ 34-36. According to either set of reported government data, African Americans are not a majority of the FFSD VAP.

Census. PSUMF ¶ 15 (single-race BVAP is 47.33%; any-part BVAP is 48.19%); Pls.' DSUMF Resp. ¶¶ 18-19.

Courts resolving VRA claims in the Eighth Circuit regularly rely *exclusively* on Decennial Census figures in determining the demographics of a jurisdiction. *See, e.g.*, *Stabler v. Cty. of Thurston*, 129 F.3d 1015, 1019 (8th Cir. 1997); *Clay v. Bd. of Educ. of St. Louis*, 90 F.3d 1357, 1359 (8th Cir. 1996); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385 n.1 (8th Cir. 1995) (en banc); *African Am. Voting Rights Legal Def. Fund, Inc. v. Villa*, 54 F.3d 1345, 1347–48 (8th Cir. 1995); *Beebe*, 895 F. Supp. 2d at 926; *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 983 (D.S.D. 2004); *Corbett v. Sullivan*, 202 F. Supp. 2d 972, 975 (E.D. Mo. 2002); *Conway Sch. Dist. v. Wilhoit*, 854 F. Supp. 1430, 1432 (E.D. Ark. 1994); *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1*, 831 F. Supp. 1453, 1456, 1460 (E.D. Ark. 1993), *aff'd*, 56 F.3d 904 (8th Cir. 1995); *Williams v. City of Texarkana*, 861 F. Supp. 756, 758 (W.D. Ark. 1992); *Nash v. Blunt*, 797 F. Supp. 1488, 1492–93 (W.D. Mo. 1992) (three-judge court), *aff'd sub nom. African Am. Voting Rights Legal Def. Fund, Inc. v. Blunt*, 507 U.S. 1015 (1993) (mem.).[22]

Furthermore, Missouri state law requires use of Census figures in redistricting. PSUMF ¶ 33; Mo. Rev. Stat. § 1.100(1) ("The population of any political subdivision of the state for the purpose of representation . . . is determined on the basis of the last previous decennial census of the United States."). Although this case is brought under federal law, the District offers no reason to depart from the requirements of Missouri law when assessing the demographics of FFSD.

In sum, there is no legal basis to depart from Missouri state law or the practice in this Circuit of using the Decennial Census to measure the VAP of FFSD. The parties agree that those

---

[22] The Eighth Circuit does not treat Census figures as unreliable simply because they are several years old. *See Stabler*, 129 F.3d at 1019 (1997 decision relying on 1990 Census); *Harvell v. Ladd*, 958 F.2d 226, 228 n.1 (8th Cir. 1992) (relying on 1980 Census, but noting that district court "may" use 1990 Census on remand). The District does not point to a single VRA case from within the Eighth Circuit in which a court relied on anything other than the

figures show that African Americans do not constitute a majority of the VAP of FFSD.

>    **2.    There is no dispute that the most recent three-year ACS estimates indicate that African Americans remain less than half of the VAP in FFSD.**

This Court should rely on total counts from the Decennial Census, not American Community Survey ("ACS") estimates, to determine the VAP of FFSD. The Decennial Census is the appropriate source to use in determining population totals. *See* Pls.' DSUMF Resp. ¶ 24; U.S. Census Bureau, *Comparing ACS Data*, attached to the Second Ebenstein Decl. (filed concurrently herewith) as Ex. G21. Unlike the Decennial Census, the ACS is not an actual enumeration of the entire population, but rather a sample of the population, which forms the basis for population estimates produced by the Census Bureau on a rolling basis. *See* Pls.' DSUMF Resp. ¶ 24. Although the ACS is the only available source of data for certain population characteristics like citizenship status (and is therefore an appropriate data source in some circumstances), the Census Bureau cautions against using the ACS for total population estimates because, unlike the Decennial Census complete count, the ACS uses estimates with a sampling error. *See* Pls.' DSUMF Resp. ¶ 24. For that reason alone, the Decennial Census data are presumptively a better source of data upon which to rely in assessing the District's total VAP.

Indeed, "[f]rom the very first census, the census of 1790, Congress has prohibited the use of statistical sampling in calculating the population for purposes of apportionment." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 335 (1999). The Census Bureau itself notes that the ACS survey sample data "do[] not provide official counts of the population in between censuses." U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data* (Oct. 2008) at 4, attached to the Second Ebenstein Decl. (filed concurrently herewith) as Ex. G22. Decennial data is therefore generally a superior basis for

---

Decennial Census figures to determine the VAP of a jurisdiction.

redistricting because it is a complete count, rather than an estimate. Because the ACS is an estimate, it includes error margins that make precise determinations about the VAP of a small jurisdiction like the FFSD difficult, if not impossible.[23]

Even if this Court were to consider ACS estimates, the most recent available three-year ACS estimates (for the years 2011-2013) show that individuals identifying themselves as single-race Black remain a minority (48.94%) of the District VAP. *See* PSUMF ¶ 19; Pls.' DSUMF Resp. ¶ 34. As the District acknowledges, "the ACS does not publish estimates for the [any part] black classification." Def.'s Br. at 11. Thus, the only information published in the most recent three-year ACS estimates indicates that African Americans remain a minority of the FFSD VAP. Indeed, the District's expert acknowledged that there is no official government data that directly states that African Americans are a majority of the FFSD VAP. *See* DSUMF ¶ 41; Doc. No. 82-9, DSUMF Ex. I, *Dep. of Jonathan Rodden*, Aug. 20, 2015, at 315:17-316:21.

To be sure, the most recent three-year ACS estimates indicate that African Americans are now a very slight plurality of the FFSD VAP. But the District does not cite a single case in which a court has held that a *plurality* is precluded from bringing a vote dilution claim pursuant to Section 2 of the VRA. Thus, even taking the ACS data at face value, voting-age African Americans remain outnumbered by other voters in the District.

---

[23] The 2011–13 three-year ACS estimated the Ferguson-Florissant BVAP to be 24,313 and the WVAP to be 23,740. PSUMF ¶ 19; DSUMF ¶¶ 35-36. The margin of error for the 2011–13 three-year ACS estimate of the WVAP is plus/minus 1,789, and the margin of error for the estimate of the BVAP is plus/minus 2,458. Doc. No 85-17, PSUMF Ex. B8, *Gordon Rebuttal*, at 1-2. This represents a 90-percent confidence level. *See* Pls.' DSUMF Resp. ¶ 24 (citing ACS Office, U.S. Census Bureau, *American Community Survey Multiyear Accuracy of the Data*, Sept. 24, 2014, at 11, attached to the Second Ebenstein Decl. (filed concurrently herewith) as Ex. G25).

Thus, a group of former Directors of the Census Bureau recently argued in a pending case before the Supreme Court that "ACS estimates are not reported at the small geographic levels redistricters normally use to build districts," and that "the geographic areas at which such estimates are available carry large error margins because of the small sample sizes." Br. for *Amici Curiae* Former Directors of the U.S. Census Bureau at 4, *Evenwel v. Abbott*, No. 14-940 (U.S. Sept. 25, 2015), *available at* http://www.scotusblog.com/wp-content/uploads/2015/10/Evenwel-FormerCensusBureauDirectorsBrief092515.pdf.

### 3. The Court should not credit the District's population projections.

Unable to identify a single published data set—from the government or otherwise—indicating that African Americans are a majority of the VAP in FFSD, the District concocts a method of extrapolating data from the ACS estimates to produce its own estimate of the share of the FFSD VAP that is "any part Black." As noted, this information is not found in the published ACS data itself. Rather, Dr. Rodden—who admitted that he had never previously performed or even seen population projections of this nature, *see* DSUMF Ex. I, *Rodden Dep.*, at 116:3-15, 116:24 – 117:21—purported to calculate the any-part BVAP of FFSD by undertaking a complicated series of steps, piling estimates on top of estimates:

*First*, he takes the percentage of the *total population*, regardless of age, of mixed-race individuals who are part Black, as estimated by the ACS, then uses that percentage to predict the number of voting-age persons who are some part-Black. Pls.' DSUMF Resp. at ¶ 44. *Second*, he takes the total number of multiple-race voting-age individuals in FFSD, again as estimated by the ACS. *Third*, he multiples the former percentage by the latter number to produce his own estimate of the number of *mixed-race voting-age* individuals in the District whom he estimates are part Black. This step assumes that the percentage of multiple-race individuals *of voting age* who are some-part Black is the same as the percentage of *all* multiple-race individuals *regardless of age* who are some-part Black.[24] But Dr. Rodden admits that there is reason to believe that those numbers might be different, and the parties' experts agree that this assumption is faulty. *See* DSUMF Ex. I, *Rodden Dep.*, at 313:6-19 (assumption "certainly can be criticized"); Doc. No. 82-6; DSUMF Ex. F, *Dep. of William Cooper*, Aug. 17, 2015, at 70:4-13 (assumption is "flawed"). *Fourth*, he projects his estimate of some-part Black VAP from "2012"[25] to 2015

---

[24] Plaintiffs controvert DSUMF ¶ 47 claiming that Professor Gordon endorsed this approach.

[25] The three-year ACS estimates are based on responses collected over three calendar years, but they are not simply

based on dubious trends in a series of three-year ACS estimates, but disregarding both 2010 Decennial Census data and the more reliable five-year ACS estimates. *See, e.g.*, DSUMF Ex. I, *Rodden Dep.*, at 102:9 – 104:15 (testifying that he had included the 2000 Decennial Census figures in his illustrative graph but to include those figures in his projections would have been "apples and oranges"). Courts have cautioned against using uncertain ACS estimates to project population forward. *See, e.g., Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 459 (N.D. Tex. 2010) (rejecting expert's projected population estimate based on uncertain ACS estimates as "correspondingly unreliable").

There is no legal basis for this Court to deny Plaintiffs' motion for summary judgment, let alone grant summary judgment to the District, on the basis of these speculative estimates. The District does not cite a single case in which a court has relied on similar population calculations to find that a minority group exceeded 50% of a jurisdiction's VAP.[26] Nor do they cite a single case in the Eighth Circuit in which a court relied on something other than Decennial Census data to ascertain the demographics of a jurisdiction. And the District's expert—who purports to have

---

averaged; they are pooled and weighted to account for changes in geography and error margins, among other things. *See* Pls.' DSUMF Resp. at ¶¶ 24, 48 (quoting U.S. Census Bureau, *Programs, Datasets and Tables in American FactFinder*, attached to the Second Ebenstein Decl. (filed concurrently herewith) as Ex. G23). Nonetheless, Dr. Rodden represented the estimates as "2012" in the graph he created to illustrate this trend. *See* Doc. No. 82-23, DSUMF Ex. X, *Rodden Rep.*, at Fig. 3 (p. 6); DSUMF Ex. I, *Rodden Dep.*, at 58:2-5, 103:25 – 104:5.

[26] In *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969), cited by the District, the Supreme Court makes clear that ad hoc population projections like Dr. Rodden's cannot be used to justify election practices, particularly when those projections are created in anticipation of litigation. While recognizing that the Decennial Census data was at that point almost nine years out of date, the *Kirkpatrick* Court held that "[f]indings as to population trends must be thoroughly documented and applied throughout the State in a systematic, not an ad hoc, manner." *Id.* at 536. The state's estimates, similarly created in anticipation of litigation and not as part of an existing "policy of population projection," fell "far short of this standard." *Id.* at 535.

The only case cited by the District to support relying on projected data, not Decennial Census population counts, in a Section 2 case is one in which transparent methodology was used to determine the composition of the citizen VAP based on ACS data, with reported margins of error. *See Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 730 (N.D. Tex. 2009). In comparison, Dr. Rodden uses his own estimated data, not data published by ACS, to estimate demographic changes, and fails to report the margin of error for his estimates. *See* Pls.' DSUMF Resp. ¶¶ 24, 44, 48. That district court's accreditation of an expert's estimates was unusual. A different judge of the same court reached the opposite conclusion the following year, declining to use ACS data. *See Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d at 454 (finding that 2007 one-year ACS data were not sufficiently reliable to override the presumption

extensive experience drawing redistricting plans, *see* DSUMF Ex. I, *Rodden Dep.*, at 116:16 –

117:21—acknowledged he was unaware of a single jurisdiction that had drawn its districts based

on projections of the population rather than Census data, and that he himself had never done so.

*See id.* at 116:3-15, 116:24 – 117:21.

To be clear, all of the official, published government data sets submitted by the parties

state that African Americans are *not* a majority of the FFSD VAP. There is no dispute of fact on

that point, *see* DSUMF Ex. I, *Rodden Dep.*, at 113:9-14; 110:25 – 111:11; 305:24 – 306:4, and

no legal basis for rejecting those figures.

## II.   PLAINTIFFS NEED NOT ESTABLISH THE EFFECTIVENESS OF THE ILLUSTRATIVE SINGLE-MEMBER DISTRICTS TO SATISFY *GINGLES* I.

### A.  The District misstates the standard for *Gingles* I.

The District's claim that Plaintiffs' illustrative plans "will actually impair the ability of

African Americans to participate in the District's political process," Def.'s Br. at 13, is both

premature and inaccurate. The Eighth Circuit has conclusively held that it is inappropriate to

inquire into the practical effectiveness of illustrative plans during the liability stage. *Bone Shirt*,

461 F.3d at 1019 (rejecting defendant's efficacy argument against illustrative plans because "the

*Gingles* preconditions are designed to establish liability, and not a remedy").  The plain language

of *Gingles* I requires only that the minority group "demonstrate that it is sufficiently large and

geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S.

at 50. This inquiry determines only whether "minority voters possess the *potential* to elect

representatives in the absence of the challenged structure or practice." *Id.* at 50 n.17.

There is no dispute that Plaintiffs have satisfied this requirement. Plaintiffs' expert,

William S. Cooper, developed two illustrative plans to show that African Americans are

---

that the 2000 Census data were correct, in part because the expert had not accounted for margins of error).

"sufficiently large and geographically compact to constitute a majority" of the VAP in not just one but four of seven illustrative single-member districts. *Gingles*, 478 U.S. at 50; PSUMF ¶ 26. Plaintiffs' illustrative plans show that majority-minority single-member districts are possible, and the District makes no claim to the contrary. *See* Def.'s Br. at 15. Plaintiffs have satisfied the first *Gingles* threshold for establishing a dilution claim under Section 2.

Without citing any authority, the District asserts that Plaintiffs have a burden—in the liability stage—of providing expert testimony about the illustrative plans' ultimate effectiveness. Def.'s Br. at 14. This is incorrect. *See Bone Shirt*, 461 F.3d at 1019 (rejecting defendants' argument that "plaintiffs must prove" the effectiveness of an illustrative plan in the liability stage, in which plaintiffs need only show a "*potentially* viable and stable solution").

Accordingly, the District's claim that Plaintiffs' illustrative plans will make African Americans "worse off" is inappropriate at the liability stage because *Gingles* I tests possibility, not practical efficacy. 478 U.S. at 50 n.17. Case law is clear on this point. *See, e.g.*, *Bone Shirt*, 461 F.3d at 1019; *accord Gonzalez*, 601 F. App'x at 261 ("[T]he ultimate viability and effectiveness of a remedy is considered at the remedial stage of litigation and not during analysis of the *Gingles* preconditions." (citation omitted)); *Pope*, 687 F.3d at 576; *Houston v. Lafayette Cty.*, 56 F.3d 606, 611 (5th Cir. 1995) (holding that the first *Gingles* requirement tests only "whether the proposal demonstrated that a geographically compact district *could be drawn*"); *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991) ("The court may consider, at the *remedial* stage, what type of remedy is possible . . . [b]ut this difficulty should not impede the judge at the liability stage of the proceedings.").

The District mistakenly relies on a case from the Northern District of Florida to imply that Plaintiffs—at the liability stage—must show that their illustrative plans will not make

minorities "worse off than they were before the change in terms of their ability to participate effectively in the electoral process." Def.'s Br. at 14 (quoting *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1084 (N.D. Fla. 1992)). *DeGrandy* was seriously questioned by a later case in the same court. *See Johnson v. Mortham*, 926 F. Supp. 1460 (N.D. Fla. 1996). Apart from this, the District's reliance on *DeGrandy* is inapposite to the *Gingles* analysis required at the liability stage. *See DeGrandy*, 794 F. Supp. at 1083 ("*Gingles* . . . is not dispositive of this case because this case does not involve a traditional section 2 challenge to an existing plan.").

The District's efficacy arguments against Plaintiffs' illustrative plans are especially inapt because the District will have an opportunity to craft its own plan in the remedial stage. *See Bone Shirt*, 461 F.3d at 1022 (noting that "defendants [had been] afforded the first opportunity to submit a remedial plan").

### B. Even though a showing of effectiveness is not required at this stage, the District's analysis of the effectiveness of Plaintiffs' illustrative maps is faulty.

The District's argument that "African Americans have more electoral opportunities in the existing at-large election system" than in Plaintiffs' illustrative plans, Def.'s Br. at 15, is a nonstarter. Even assuming the District could show that the illustrative plans are ineffective, this would not disprove the existence of a Section 2 violation. *See Bone Shirt*, 461 F.3d at 1019. And once a Section 2 violation is found, the District will have the opportunity to craft a remedy, which need not be based on Plaintiff's illustrative plans. *Id.* at 1022.

Nevertheless, the District targets the illustrative plans' effectiveness with arguments that are not only unnecessary, but also unfounded. There can be little doubt that the single-member districts in Plaintiffs' illustrative plans would give African-American voters a better opportunity than the current at-large system to elect candidates of their choice. As noted *supra*, according to the 2010 Decennial Census, African Americans comprise a minority of the VAP in the District at

large. But in each illustrative plan, African Americans make up a VAP majority in four of seven single-member districts; three districts in each plan have BVAPs over 60%, and one of those districts in each plan even has a BVAP of over 74%. *See* PSUMF ¶¶ 35, 38. *See Bone Shirt*, 461 F.3d at 1023 (holding that remedy giving minority voters a supermajority in two single-member districts was effective while noting that a supermajority is not required in the *Gingles* liability stage); *see also Ketchum*, 740 F.2d at 1415-16 (noting that single-member districts with 60% minority VAPs are proven remedies that afford better protection than simple majorities); *accord African Am. Voting Rights Legal Def. Fund*, 54 F.3d at 1348 n.4.

The District's expert's opinion to the contrary is premature for consideration at this point, and in any event flawed. First, the District cites a "least-squares regression" analysis that purported to determine whether "African American candidates [in aggregate] would have received more votes than their white counterparts within [each] district" in past elections. Def.'s Br. at 15. Rather than explaining any results of the analysis, the District summarily concludes that "[t]here is little reason to believe that" single-member districts "would result in more African-American voters supporting African American candidates." *Id.* As an initial matter, this does not answer the question the regression analysis sought to answer.[27] Furthermore, this conclusion does not undercut the effectiveness of the illustrative plans. Regardless of whether more African Americans vote for African-American candidates, the single-member districts of

---

[27] The regression analysis itself is suspect. The District's experts, Drs. Rodden and Chen, submitted a joint report. It is unclear who did what because Dr. Chen did not read the report before he authorized his signature to be affixed or before he was deposed. Doc. No. 85-25, PSUMF Ex. C4, *Dep. of Jowei Chen*, Aug. 19, 2015, at 9:3-5, 15:2 – 16:19. Although he did the statistical analysis and created the data table purporting to support the conclusions quoted above, *id.* at 19:15-23, Dr. Chen did not reach these conclusions; he believed Dr. Rodden had authored this language, *e.g.*, *id.* at 24:12-21. He did not know if his table had been edited. *Id.* at 22:4-11. He had never studied an at-large district before. *Id.* at 70:17-18. The analysis he had conducted, from which these conclusions were drawn, did not take into account racial polarization, *id.* at 34:3-10, nor any factors that courts have recognized as affecting a subdistrict's viability besides racial makeup, *id.* at 35:1 – 36:21. Further, his work did not compare this hypothetical to what had actually happened in FFSD; he testified that none of what he had contributed to the report contained "an

the illustrative plans help prevent African-American votes from being diluted across the entire school district. Thus, if even *one* of the illustrative single-member districts would have elected an African-American candidate, then the District cannot claim that the illustrative plans are less effective than the status quo. The District's experts make this clear. Dr. Jowei Chen testified that he knew African-American candidates would be less successful under the illustrative plans than they are under the existing at-large system, PSUMF Ex. C4, *Chen Dep.*, at 59:7-20, on the basis that "the existing system is going to elect three blacks," *id.* at 59:21-24. But of course, there have never been three African-American Board members at the same time. *See* PSUMF ¶ 221; Pls.' DSUMF Resp. ¶¶ 77-130 (2000–2015 election results). Without a proper comparison to the existing at-large system, even Dr. Rodden's vague assessment of which system "would result in more African-American voters supporting African American candidates" is flawed.

Second, the District mistakenly concludes that single-member districts will hurt African-American voting power because a "Gini coefficient" analysis shows that votes for African-American-preferred candidates were typically more geographically dispersed. Def.'s Br. at 16. This argument is tenuous at best. Each illustrative plan includes seven single-member districts, in which four districts have a majority BVAP. PSUMF ¶ 26. Dispersal, such as it is, is adequately addressed by the district boundaries in the illustrative plans.

The District also notes that one of Plaintiffs' illustrative plans pairs two African-American incumbents, Thurman and Graves, and therefore implementing the plan "would result in either one of these candidates losing or declining to run for reelection." Def.'s Br. at 16. This is misleading. *First*, Plaintiffs provided an alternate illustrative plan that avoids pairing any African-American-preferred candidates. *See* Doc. No. 82-2, DSUMF Ex. B, *Decl. of William S.*

---

analysis of whether or not African-Americans are in a good position to elect candidates of choice under the existing system." *Id.* at 56:12-19; *see also id.* at 59:7 – 60:21.

*Cooper*, May 27, 2015, at 101 (Exhibit F-7). *Second*, it bears repeating that neither of Plaintiffs' illustrative plans is being proposed as a remedy at this time; if liability is established, the District will have an opportunity to propose a remedy that avoids this pairing, as will Plaintiffs.

### III. THE UNDISPUTED ELECTION RESULTS ESTABLISH THAT PLAINTIFFS HAVE SATISFIED *GINGLES* II AND III, EVEN UNDER THE DISTRICT'S PROPOSED RULE FOR IDENTIFYING CANDIDATES OF CHOICE.

The parties agree on all the facts material to this Court's assessment of *Gingles* II and III. The winners and losers of each Board election since 2000 are undisputed, as are the relative levels of support that each candidate received from Black and white voters, respectively. PSUMF ¶¶ 54-55; Def.'s Br. at 27; Pls.' DSUMF Resp. ¶¶ 77-82, 85-86, 89-90, 93-94, 97-100, 103-08, 110-13, 117-18, 121-22, 125-26, 130-31, 138. The only disagreement between the parties is a purely *legal* one: whether the undisputed election results support the conclusion that Plaintiffs have established *Gingles* II and III.

The District's analysis of this legal question is flawed in at least four ways. *First*, it includes the results of uncontested elections contrary to clear Eighth Circuit precedent. *Second*, it treats each election as equally probative, even though the Eighth Circuit holds that certain elections are more probative than others. *Third*, the District misstates the legal standard for *Gingles* II (political cohesion) as requiring that race be the "sole factor" in voters' candidate preferences. Def.'s Br. at 2. *Finally*, the District's analysis improperly assesses racially polarized voting and whether minority-preferred candidates are "usually defeated" by counting the number of *elections* in which Black and white voters shared a preferred candidate and the number of *elections* in which a Black-preferred candidate was successful, rather than the number of *candidates* preferred by Black voters but not white voters, and the number of Black-preferred *candidates* who are defeated by white-preferred candidates. When examined under the correct

legal analysis, the undisputed facts demonstrate that Plaintiffs have satisfied *Gingles* II and III, even under the District's proposed method for identifying candidates of choice.

### A. The District improperly considers uncontested elections.

The District concedes that a candidate's success in an uncontested election is "not as probative as prevailing in a contested election." Def.'s Br. at 35. Nevertheless, it argues that such uncontested victories should not be discounted in evaluating *Gingles* II and III, claiming that the unopposed elections of African-American candidates Graham (in 2005 and 2008) and Henson (in 2010)[28] are evidence that Black voters can elect candidates of their choice. Def.'s Br. at 23, 35.

The District's assertion ignores Eighth Circuit precedent, under which uncontested elections have *no* probative value in determining whether Section 2 plaintiffs have satisfied the *Gingles* preconditions. *See Blytheville*, 71 F.3d at 1389. When faced with uncontested elections, the Eighth Circuit "removed" them from its analysis of "whether the white majority does indeed vote 'sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate,'" and focused on the pattern that emerged from the remaining elections. *Id.* at 1389 (quoting *Gingles*, 478 U.S. at 51); *see also Bone Shirt*, 461 F.3d at 1020 (describing the unopposed election of a minority candidate as a special circumstance); *Gingles*, 478 U.S. at 57 (observing that success of minority-preferred candidate under "special circumstances, such as the absence of an opponent" does "not necessarily prove that the district did not experience polarized voting").[29]

The Eighth Circuit's "remov[al]" of uncontested elections makes sense: uncontested elections offer no data that informs "whether the white majority does indeed vote 'sufficiently as

---

[28] FFSD does not dispute that Henson's uncontested victory in 2007 should not be considered. Def.'s Br. at 35.

[29] The Eleventh and First Circuits agree that the uncontested success of a minority-preferred candidate is "not probative of the ability of blacks to elect candidates of their choice," *see Askew v. City of Rome*, 127 F.3d 1355, 1384 n.18 (11th Cir. 1997), and "reveal[s] little about either minority cohesion or white bloc voting," *Uno v. City of Holyoke*, 72 F.3d 973, 988 (1st Cir. 1995); *S. Christian Leadership Conference of Ala. v. Sessions*, 56 F.3d 1281, 1307 (11th Cir. 1995) ("[U]nopposed victories do not count against a finding of racial bloc voting.").

a bloc to enable it . . . usually to defeat the minority's preferred candidate,'" *Blytheville*, 71 F.3d at 1389. *See* Doc. No. 85-18, PSUMF Ex. B9, *Rebuttal Rep. of David C. Kimball*, July 2, 2015, at 1 n.1. As the Eighth Circuit explained, "[e]ven in an extreme case of total vote dilution a candidate running in the face of no opposition is ensured success." *Blytheville*, 71 F.3d at 1389. By statute, where the number of candidates who have filed for a Board election equals the number of seats to be elected, no election is held, and the candidates automatically assume Board member responsibilities. PSUMF ¶ 45; DSUMF Ex. I, *Rodden Dep.*, at 72:24 – 73:5. As a result, no voting occurs and correspondingly, as the District concedes, "no election data is available" for these non-elections. Def.'s Br. at 23. It is impossible to discern voting behavior or to identify a minority-preferred candidate where no voting has occurred.[30] In arguing against Eighth Circuit precedent, FFSD cites two district court cases, one from Wisconsin and the other from Ohio. *See* Def.'s Br. at 23, 35. Not only is neither case controlling here but both cases are inapposite.[31]

In sum, the results of the Board "non-elections" that occurred in 2005, 2007, 2008, and 2010[32] should, consistent with Eighth Circuit precedent, be "removed" from the analysis of the

---

[30] Take, for example, Henson's uncontested victory in 2010. Henson was appointed to the Board and retained his seat following unopposed races in 2007 and 2010. It was not until his loss in the contested 2013 race that African-American voters expressed a preference for Henson but were unable to elect him. PSUMF ¶¶ 109, 118, 140-41; Pls.' DSUMF Resp. ¶¶ 103-04, 110, 122.

[31] The court in *Milwaukee Branch of NAACP v. Thompson* concluded that uncontested elections involving "incumbent black judges" were relevant because Black incumbents faced white challengers relatively infrequently and were generally successful when they did. 935 F. Supp. 1419, 1428-29 (E.D. Wis. 1996). Here by contrast, sixteen years of Board election results reveal a "pattern" of white challengers unseating Black incumbents "not present in the instant [*Milwaukee NAACP*] case." *Id.* Since 2000, incumbent Black Board members faced opposition 56% of the times (5 out of 9) they were up for reelection and lost to white challengers in 60% (3 of 5) of those contests. PSUMF ¶¶ 78, 89, 102, 105, 109, 110, 118, 120, 139; Pls.' DSUMF Resp. ¶¶ 85, 89, 97, 99, 104, 105, 110, 112, 121. Since 2006, incumbent Black Board members lost their bids for reelection *every time* they faced opposition from white challengers. Pls.' DSUMF Resp. ¶¶ 99, 112, 121. The court in *Mallory v. Ohio*, meanwhile, found relevant "[t]he absence of white challengers to black incumbent judges" only after concluding, in the absence of any statistical evidence by plaintiffs, that there were "sufficient [contested] judicial races from which Defendants' expert could conclude that legally significant racial bloc voting does not exist in the challenged judicial districts." 38 F. Supp. 2d 525, 571 (S.D. Ohio 1997). Here, by contrast, the undisputed results of the parties' statistical analyses of contested elections reveal racially polarized voting. *See* Pls.' Mem. in Supp. of Mot. for Summ. J., Doc. No. 84 ("Pls.' Br."), at 14-15, 18-19, 35.

[32] PSUMF ¶¶ 102, 109, 110, 118; Pls.' DSUMF Resp. ¶¶ 97, 104, 105, 110.

*Gingles* preconditions. Once properly limited to contested elections only, the undisputed election results demonstrate that Plaintiffs have established *Gingles* II and III.

This conclusion holds true under any of the parties' proposed rules for identifying candidates of choice. Thus, the Court need not address the question of which proposed rule is appropriate. Even if the Court were to adopt the District's proposed rule, *i.e.*, those candidates with the highest estimated levels of support from each racial group are those groups' respective candidates of choice (what Plaintiffs previously described as the "Point Estimate" approach, *see* Pls.' Br. at 18; *see also* Def.'s Br. at 27), it is clear that Black and white voters usually prefer different candidates, with white voters preferring white candidates 92.6% of the time (25 out of 27) and Black voters preferring Black candidates 63% of the time (17 out of 27). *See* Pls.' Br. at 19. Based on the data provided in Table 3 (p. 30) of the District's brief, just ten[33] out of 27 (37%) victorious candidates since 2000 were preferred by voters of both races under the District's Point Estimate approach.[34] Moreover, it is undisputed that when employing the District's approach, Black-preferred candidates lose more often than not: 51.9% (14 out of 27) of the time. *See* Pls.' Br. at 18-19; Def.'s Br. at 33. And when they do win, their success depends heavily on whether they also preferred by white votes. *See supra* n.34.

---

[33] In the accompanying text to Table 3, the District erroneously states that 11 (not 10) of the 27 victories candidates are preferred by both African-American and white voters. Def.'s Br. at 30.

[34] The District makes much out of this rate of overlap. Def.'s Br. at 30. But not only is this rate of overlap far from substantial, but the District fails to mention that of the 17 remaining victorious candidates, *only three* were preferred by African-American voters (Graham in 2002, G. Thomas in 2003, Thurman in 2011). The other 14 victorious candidates were preferred by white candidates only. Since 2009, only five of the 14 (35.7%) victorious candidates were preferred by both races, and only one of the remaining nine victorious candidates was preferred by Black voters (Thurman); the other eight were preferred by white voters only. These undisputed numbers show that Black-preferred candidates generally win only when they are also preferred by white voters and thus "serv[e] on the board . . . at the sufferance of the majority" and "must rely on majority benevolence to ensure the adequacy of [their] representation." *Blytheville*, 71 F.3d at 1389. According to the Eighth Circuit, such a system, which "works for minorities only in the absence of white opposition[,] is a system that fails to operate in accord with the law." *Id.* at 1389-90.

## B. The District improperly treats all elections as equally probative.

The District concedes that not all elections are equally probative in determining whether *Gingles* II and III have been satisfied. Def.'s Br. at 22-27, 35-36. It nevertheless suggests that there are no reasons for according less weight to any of the Board elections since 2000. *Id.* This position is inconsistent with both the law and the undisputed facts.

### 1. Recent elections are more probative than older elections.

The parties agree that the Court may consider each of the contested Board elections since 2000 in determining whether the *Gingles* preconditions have been met. As the District concedes, however, more recent elections are more probative than older elections and the voting patterns and outcomes that emerge from more recent elections should thus be given more weight. *See* Pls.' Br. at 10, 15-16, 19-20, 35-36; Def.'s Br. at 22. Applying this basic legal principle to the uncontested facts reveals a declining success rate by Black-preferred candidates. Under the District's Point Estimate approach, the success rate of Black-preferred candidates has been declining, from 48.1% (13 out of 27) since 2000, to 37.5% (six out of 16) during the last 10 years, to only 33.3% (four out of 12) during the last five years.[35] *See* Pls.' Br. at 19-20.[36]

---

[35] The District complains that "Dr. Engstrom did not explain why he used 2011 as the cutoff" for more recent elections. Def.'s Br. at 22. But Dr. Engstrom did explain this decision, pointing out that the *Gingles* Court also evaluated elections over the previous five years and that including 2011 "provided a second observation of a three-vote, three-seat election," which are of particular importance as they "account for over 42 percent of the Board's members." Doc. No. 85-16, PSUMF Ex. B7, *Rebuttal Rep. of Richard L. Engstrom*, July 2, 2015, at ¶ 7. Dr. Engstrom also noted that the four prior elections—2007, 2008, 2009, 2010—were all marked by special circumstances. Doc. No. 85-9, PSUMF Ex. B2, *Rep. of Richard L. Engstrom*, May 27, 2015, at ¶ 8 n.2. By contrast, Dr. Rodden fails to explain why elections prior to 2012 should be considered "[h]istorical," DSUMF Ex. X, *Rodden Rep.*, at 31, nor does FFSD give any reason why it now uses 2009, rather than 2012, to denote more recent elections, Def.'s Br. at 33-34. Given that 2009 is a two-seat, three-candidate election lacking any Black candidates, its arbitrary choice to use 2009 as a cut-off for most recent election is suspect. *See infra* § III.B.2.

[36] The District also admits that exogenous elections "are not as probative as endogenous elections," but asks this Court to nevertheless consider them. Def.'s Br. at 36. However, the exogenous elections the District analyzes are not, as is the "ultimate 'inquiry into the existence of vote dilution cause by submergence,'" district specific, *Pope*, 687 F.3d at 582 (quoting *Gingles*, 478 U.S. at 59 n.28), and, they are, unlike the Board elections, partisan. DSUMF Ex. GG, *Suppl. Rep. of Jonathan Rodden: Bloc Voting and Cohesion*, July 2, 2015, at ¶¶ 25, 26. Because the Court has sufficient endogenous elections from which to discern typical voting behavior and usual results, it should place very little weight on these dissimilar exogenous elections. *See, e.g., Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1208 n.7 (5th Cir. 1989) (evidence from exogenous elections may be used where

## 2. The 2009 election, which featured no Black candidates, should be assigned little probative value.

Under Eighth Circuit precedent, the 2009 election has little probative value because it featured no Black candidates and "interracial elections are the best indicators of whether the white majority usually defeats the minority candidate," *Bone Shirt*, 461 F.3d at 1020-21; Pls.' Br. at 10 & n.3, 16. As the Fifth Circuit has explained, "when there are only white candidates to choose from it is virtually unavoidable that certain white candidates would be supported by a large percentage of . . . black voters. Evidence of black support for white candidates in an all-white field, however, tells us nothing about the tendency of white bloc voting to defeat black candidates." *Westwego*, 872 F.2d at 1208 n.7 (alteration in original; citation and internal quotation marks omitted). Neither of the two out-of-circuit cases the District cites changes that calculus.[37] Thus, although the court *may* consider the results of the 2009 all-white candidate election, it should not assign much probative value to the purported success of Black-preferred candidates in that election.

## 3. Special circumstances marked the success of minority and minority-preferred Board candidates in 2014 and 2015, which should be assigned little probative value.

Although the District concedes that "[u]nder the Eighth Circuit's analysis of the third *Gingles* precondition, courts must ask whether [there] were 'special circumstances' to explain

---

evidence from endogenous elections is sparse); *see also Clay*, 90 F.3d at 1362 ("[E]xogenous elections . . . should be used only to supplement the analysis of the specific election at issue.").

[37] Both cases are inapposite. In *Overton v. City of Austin*, the district court concluded that the fact that minorities had been elected to office was evidence of present-day "equality of access." Civ. No. A-84-CA-189, 1985 WL 19986, at *15 (W.D. Tex. Mar. 12, 1985). It says nothing about what, if any, probative value elections that feature no minority candidates have in evaluating the *Gingles* preconditions. *Id.* In *Sanchez v. Bond*, 875 F.2d 1488 (10th Cir. 1989), the Tenth Circuit observed that while there is no *per se* rule prohibiting courts from "examining those elections having only Anglo candidates[,] [s]uch elections may be relevant and can be used to discern whether racially polarized voting exists and to measure the success of minority preferred candidates, *so long as one of the Anglo candidates can be considered a preferred candidate of the minority group*." *Id.* at 1495 (emphasis added). In *Bond*, there was evidence that the minority group actually selected and supported the campaigns of the white candidates at issue and therefore that the district court did not clearly err in considering those candidates minority-preferred. *Id.* at 1496. The District fails to point to any similar evidence in the record in this case.

the success of the African American preferred candidates," Def.'s Br. at 35, it incorrectly asserts that there have been no special circumstances in any election since 2000, *id.* at 23-27. The undisputed facts, however, demonstrate that the successes of Black-preferred candidates in 2014 and 2015 were marked by special circumstances and are thus less probative of the *Gingles* preconditions.

The District erroneously claims that "Plaintiffs have only complained about the circumstances surrounding the 2015 election." Def.'s Br. at 35. As both parties' experts highlighted, the 2014 election also took place under special circumstances, namely, less than one month after the resignation of Dr. Art McCoy. PSUMF ¶ 161. It is undisputed that this "controversial" event led to unusually high African-American turnout and an "unprecedented" candidate pool comprised of "five African-American challengers." DSUMF Ex. X, *Rep. of Jonathan Rodden*, May 27, 2015, at ¶ 50; DSUMF Ex. I, *Rodden Dep.*, at 236:7 – 237:3; Pls.' Br. at 16-17; PSUMF ¶¶ 161-165. As a result, the 2014 election "was not representative of the typical way in which the electoral process functions," and the Court should discount its results. *Ruiz v. City of Santa Maria*, 160 F.3d 543, 557–58 (9th Cir. 1998); *see also Blytheville*, 71 F.3d at 1389 (removing elections with special circumstances from *Gingles* III analysis).

As for the 2015 election, the District's claim that this election was not held under special circumstances ignores the fact that it took place in the shadow of the shooting death of Michael Brown and the subsequent protests that garnered local, national, and international media attention and public scrutiny. *See* Pls.' Br. at 17-18; PSUMF ¶¶ 177-178, 180-81. It is undisputed that candidates and voters were aware of these events, which impacted the candidate pool and, as Dr. Rodden acknowledges, may have caused turnout and get-out-the-vote efforts to increase. PSUMF ¶¶ 182, 183-86; DSUMF Ex. I, *Rodden Dep.*, at 97:21 – 98:8. Such effects on voter and

candidate behavior are hallmarks of special circumstances. *See, e.g.*, *Ruiz*, 160 F.3d at 557-58 ("special circumstance" inquiry focuses on unusual "voter behavior"); *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-cv-00087-D, 2014 WL 4055366, at *18 (N.D. Tex. Aug. 15, 2014) (observing that a special circumstance "can potentially affect the candidate pool").

Moreover, in 2015, as the District itself highlights, the African-American-preferred candidate, Graves, "ran a sophisticated campaign that encouraged voters to use single-shot voting, which increased her likelihood of success."[38] Def.'s Br. at 25 n.12. *Gingles* explicitly identified "the utilization of bullet voting" as a special circumstance that "may explain minority electoral success in a polarized contest," rendering that success an outlier. *Gingles*, 478 U.S. at 57.

Finally, Plaintiffs do not assert, as the District claims, that the 2015 election should be discounted because "white political leaders in the District rapidly mobilized and organized support around Graves on the assumption that her election would 'forestall single-member districting.'" Def.'s Br. at 35. This is simply one reason given in *Gingles* for why elections held during the pendency of Section 2 litigation may not represent typical voting behavior and usual results.[39] *See* PSUMF Ex. B2, *Engstrom Rep.*, at 11 n.8 (citing *Gingles*, 478 U.S. at 76). Pending Section 2 litigation may affect an election and in many different ways, and "[a] thousand voters may vote for a particular candidate for a thousand different reasons," *Ruiz*, 160 F.3d at 558. For this reason, courts have not required plaintiffs to prove that the success of a minority-preferred

---

[38] White incumbent Schroeder's decision not to seek reelection in 2015, Doc. No. 85-39, PSUMF E7, *Dep. of Paul Schroeder*, July 2, 2015, at 24:11-14, also created an opening for Graves.

[39] The District argues that this lawsuit could not have affected the 2015 election because it had been pending for only four months. Def.'s Br. at 25. The District, however, cites no authority for the proposition that there is some minimum amount of time a case must be pending before a court may appropriately view a subsequent election with caution. Nor does it explain why the four-month period between the filing of Plaintiffs' Section 2 challenge and the April 2015 election was too short to have influenced the election. There is no reason why voters cannot be affected by events occurring four months before an election, and, since this case was filed a month before the end of the candidate filing period, there was also sufficient time for this lawsuit to have an effect on the candidate pool.

candidate during the pendency of Section 2 litigation is a result of "conspiracy" or any intentional conduct. *See, e.g., id.*; *Collins v. City of Norfolk*, 816 F.2d 932, 938 (4th Cir. 1987). Rather, the only relevant question is whether an election's "results are not reliable indicators of typical voting behavior," *Ruiz*, 160 F.3d at 558; *see Gingles*, 478 U.S. at 56-57, such as when voting behavior deviates from the norm, *see, e.g., Collins*, 816 F.2d at 938. As Dr. Rodden reports, the 2015 election attracted unusually high turnout among both racial groups, including a particularly pronounced spike in white turnout, and Graves was "extraordinarily successful," receiving "one of the highest vote totals ever achieved by any candidate in the period for which data are available." DSUMF Ex. X, *Rodden Rep.*, at Fig. 6 (p. 15), ¶¶ 27-28, 47.

### C. The District misstates the standard for political cohesion as requiring that race be the "sole factor" in voters' preferences.

The District asserts that neither Black nor white voters are politically cohesive because neither group "utilize[s] race as the sole factor in determining which candidate to support." Def.'s Br. at 2. This is not the correct standard for cohesiveness. *See* Pls.' Br. at 8-10.

As an initial matter, Plaintiffs need not show such completely divergent racial preferences to demonstrate cohesiveness. Rather, as the Eighth Circuit has explained, cohesiveness is established where "a significant number of minority group members *usually* vote for the same candidates." *Bone Shirt*, 461 F.3d at 1020 (emphasis added); Pls.' Br. at 8-10. Other Circuits have held similarly. *See Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir. 1993) (observing that *Gingles* does not "require[] a consistent level of hostility towards minority-preferred candidates," or "that white voters vote as an unbending monolithic block against whoever happens to be the minority's preferred candidate. To the contrary, the *Gingles* standard presupposes the existence of crossover voting."); *Sanchez v. Colorado*, 97 F.3d 1303, 1319 (10th Cir. 1996) (same). Thus, the fact that several Black-

preferred candidates also receive some support from white voters does not by itself undermine the conclusion that Black voters are cohesive. Dr. Rodden admits this in conceding that Black voters and white voters have voted cohesively behind particular candidates despite some crossover voting. DSUMF Ex. I, *Rodden Dep.*, at 158:16-19, 168:19-23.

This standard is readily met here: both parties' experts estimate that Black voters cast a large percentage of their votes for the same candidate or candidates in each contested election since 2000. PSUMF ¶¶ 60, 69, 78, 89, 98, 105, 114, 120, 130, 139, 148, 167; Pls.' DSUMF Resp. ¶¶ 78, 82, 86, 90, 94, 100, 108, 113, 118, 122, 126, 131. Cohesiveness is also established due to the existence of racially polarized voting, *i.e.*, "a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently." *Gingles*, 478 U.S. at 53 n.21 (alteration in original; citations and internal quotation marks omitted). The District's experts Dr. Rodden and Dr. Chen agree that white voters tend to prefer white candidates, and Black voters tend to prefer Black candidates.[40] PSUMF ¶ 56; Pls.' Br. at 18-19. These divergent preferences are especially on display when considering each group's *most*-preferred candidates: focusing on these candidates, there is 100% polarization, with white voters always preferring white candidates as their top choice, and Black voters always preferring Black candidates except in the 2009 race featuring no Black candidates. *See* Pls.' Br. at 14-15.

**D. The District uses the wrong metric for measuring racial polarization and the success rate of Black-preferred candidates.**

The District argues that voting is not polarized and that Black-preferred candidates usually win, citing the number of *elections* in which Black and white voters shared a preferred

---

[40] In the abstract, Plaintiffs agree that African-American voters can prefer white candidates, and despite the District's intimation to the contrary, *see* Def.'s Br. at 19, have never suggested otherwise. *In FFSD*, however, the undisputed election results demonstrate that African-American voters tend to prefer Black candidates, and white

candidate and the number of *elections* in which a *single* Black-preferred candidate was successful (among candidates elected for *several* seats). Def.'s Br. at 30, 32. That is the wrong metric on both counts.

With respect to assessing racial polarization (*Gingles* II), the question is not the number of *elections* in which minority voters support a candidate who is also supported by white voters, but rather the number of *candidates* who are preferred by both groups. *See Gingles*, 478 U.S. at 56 ("The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred *candidates.*" (emphasis added)); *Jeffers v. Clinton*, 730 F. Supp. 196, 208 (E.D. Ark. 1989) (three-judge court) (finding RPV where "black and white voters prefer different *candidates* with a high degree of frequency"(emphasis added)), *aff'd*, 498 U.S. 1019 (1991) (mem.); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1337 (S.D. Fla. 2002) (three-judge court) (stating that RPV "may most easily be established by a showing that the members of each group tend to vote for the same candidate and that the candidate supported by each group is different from that supported by the other"). A simple example illustrates this point: Consider a seven-seat at-large body in which all seven seats are available in each election. Assume that in each election, Black and white voters share one preferred candidate, but differ with respect to their other six preferences. Adopting the District's chosen metric of elections rather than candidates to assess cohesion, one would conclude that Black and white voters share candidate preferences in every election, even though Black and white voters almost always preferred different candidates (85.7%, or candidates for 6 out of 7 available seats).

---

voters tend to prefer white candidates. PSUMF ¶ 56; Pls.' Br. at 18-19.

Thus, although the District argues here that Black and white voters shared at least one preferred candidate "[i]n eight of twelve elections," Def.'s Br. at 30, they focus on the wrong metric. The undisputed facts reveal that, when taking into account all of the *candidates* in each election under the District's Point Estimate approach, Black and white voters' preferences clearly diverge. As explained *supra*, employing the District's preferred Point Estimate method reveals that white voters almost always preferred white candidates, and Black voters usually preferred Black candidates, with Black and white voters sharing a preference for only 10 out of 27 successful candidates since 2000.[41] That is a far cry from "a vast majority," Def.'s. Br. at 32. And, as noted, Black and white voters have *never* shared the same candidate as their top choice.

With respect to the success of minority-preferred candidates (*Gingles* III), the District again presents misleading statistics using *election*s rather than candidates as a metric. Def.'s Br. at 33 (noting that a Black-preferred candidate was successful ["i]n 9 out of 12 (75%) contested elections since 2000"). But under *Gingles*, the question is not how many elections feature a single successful Black-preferred candidate (out of several available seats), but whether "the minority's preferred *candidate[s]*" are "usually" defeated for each contested seat. *Blytheville*, 71 F.3d at 1385 (emphasis added). This is significant in multi-seat elections. Again, a simple illustrative example explains this point: Consider a seven-seat body, in which all seven seats are elected at-large in every election. Assume that Black voters are over 45% of the VAP (as in FFSD) but that only one out of seven Black-preferred candidates is successful in each election; the remaining six seats are won by white-preferred candidates. In this scenario, the District's focus on the percentage of elections in which a Black-preferred candidate wins would suggest

---

[41] This rate of overlap includes two-seat elections featuring three candidates where there is necessarily at least one overlapping candidate. Such elections may overstate the extent of shared preferences between African-American and white voters, particularly given the fact that in each of the three two-seat/three-candidate Board elections, the

that there is no vote dilution, because one Black-preferred candidate (out of seven) is able to win one of the seven seats in every election. But this is not the law as it masks the fact that the vast majority of Black-preferred candidates lose (85.7%, or six of seven).

Thus, when the District argues here that at least one Black-preferred candidate has been successful in nine out of twelve *elections*, Def.'s Br. at 33, it employs the wrong metric. As demonstrated *supra* at 29-32, in a multi-seat election, when one focuses on *candidates* as the metric, it is clear that Black-preferred candidates are defeated more often than not, with declining success rates as the focus turns to more recent elections.

Unable to contest these facts, the District attempts to mitigate them by first claiming that three elections in which an African-American-preferred candidate lost were "remarkably close." Def.'s. Br. at 37. But that is irrelevant to the *Gingles* III analysis, which is concerned only with whether "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . —usually to *defeat* the minority's preferred candidate," not with whether white bloc voting ekes out a victory or trounces those candidates. *See, e.g.*, *Gingles*, 478 U.S. at 51 (emphasis added); *id.* at 60; *Bone Shirt*, 461 F.3d at 1021 (using low minority-preferred candidate success rates in determining *Gingles* III was met). A loss is a loss no matter by what margin. The District cites no case law to the contrary.

The District next tries to shift responsibility for the defeat of Black-preferred candidates from white bloc voting, arguing that Black voters could prevail "if African American and white turnout is comparable and African Americans do not scatter their votes among many different candidates." Def.'s Br. at 37. That contention is unavailing for several reasons.

Insofar as the District suggests that it is low African-American turnout, not white bloc

overlapping victorious candidate was the candidate with the second-highest estimated level of support among African-American voters. *See* Def.'s Br. at Table 3 (p. 30).

voting, that has hampered Black voters' ability to elect their preferred candidates, that argument has been rejected by numerous courts.[42] *See, e.g.*, *United States v. Dallas Cty. Comm'n*, 739 F.2d 1529, 1536 (11th Cir. 1984); *Gomez v. City of Watsonville*, 863 F.2d 1407, 1416 (9th Cir. 1988) (district court should have focused only on actual voting patterns rather than speculating on reasons why minority voters were apathetic); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1407 (E.D. Wash. 2014) (impact of low minority turnout should not be considered in evaluating *Gingles* II and III). Rejecting this argument makes particular sense here given that African Americans in FFSD undisputedly suffer from "present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984); *Blytheville*, 71 F.3d at 1388 ("[L]ow voter turnout has often been considered the result of the minority's inability to effectively participate in the political process."); *see* PSUMF ¶¶ 245-56, 267-304.

*Gingles* does not, moreover, require white bloc voting to be so severe as to defeat optimal minority voting behavior. *See Collins*, 883 F.2d at 1239–40 (rejecting approach to identifying preferred candidates that would require minority voters to bullet vote). There is no requirement that minority voters be perfectly cohesive before they can maintain a vote dilution claim. *See Bone Shirt*, 461 F.3d at 1020; *Jenkins*, 4 F.3d at 1123; *Colorado*, 97 F.3d at 1319.

In any event, in FFSD, Black-preferred candidates still lose when Black and white turnout rates are relatively equal and Black voters are cohesive. For example, in 2004, Dr. Rodden's estimates for Black and white turnout are statistically indistinguishable, and his

---

[42] As the Ninth Circuit has pointed out, a contrary conclusion would "undermine section 2's effectiveness. After all, '[l]ow voter registration and turnout have often been considered evidence of minority voters' lack of ability to participate effectively in the political process.' Thus, if low voter turnout could defeat a section 2 claim, excluded minority voters would find themselves in a vicious cycle: their exclusion from the political process would increase apathy, which in turn would undermine their ability to bring a legal challenge to the discriminatory practices, which would perpetuate low voter turnout, and so on." *United States v. Blaine Cty.*, 363 F.3d 897, 911 (9th Cir. 2004) (alteration in original; citation omitted).

estimates for Black support demonstrate that McClendon and Van were the clear top two candidates preferred by Black voters, with estimated support reflecting that they garnered the support of a majority of Black voters, and approximately double the estimated support received by each of the remaining candidates. PSUMF ¶¶ 98-99; Pls.' DSUMF Resp. ¶ 94; DSUMF Ex. I, *Rodden Dep.*, at 130:6 – 132:9. They nevertheless lost to the two candidates around whom white voters coalesced. PSUMF ¶¶ 96, 98, 100-01; Pls.' DSUMF Resp. ¶ 93.

In 2012, Black and white turnout was also estimated to be statistically indistinguishable (with estimated Black turnout slightly higher than estimated white turnout), and Black voters were unquestionably cohesive behind Barbara Morris, whose estimated level of support among Black voters indicates not only unanimous support among Black voters but also that some Black voters likely cast a vote only for her. PSUMF ¶¶ 130, 132; Pls.' Br. at 29; Pls.' DSUMF Resp. ¶ 118. And yet, she lost to the two other candidates who both received very high estimated levels of white support (supported by approximately 82% to 94% of white voters). PSUMF ¶¶ 129-30, 136; Pls.' DSUMF Resp. ¶¶ 117-18; DSUMF Ex. I, *Rodden Dep.*, at 130:6 – 132:9.

## IV. THE DISTRICT'S METHOD FOR IDENTIFYING PREFERRED-CANDIDATES OF CHOICE FAILS TO CONSIDER "ALL THE RELEVANT CIRCUMSTANCES" IN EACH ELECTION.

Although the Court need not reach this issue to deny the District's summary judgment motion and grant summary judgment in favor of Plaintiffs, the District's Point Estimate approach for identifying candidates of choice is not appropriate, as it fails to perform an election-by-election review of "all the relevant circumstances" as required by the Eighth Circuit. *See* Pls.' Br. at 20-25 (quoting *Blytheville*, 71 F.3d at 1386). The Court should instead modify the District's method or adopt Plaintiffs' Case-By-Case approach, discussed in detail in their summary judgment brief. Pls.' Br. at 20-25.

Contrary to the District's characterization of the case, *Clay* does not adopt its Point

Estimate approach as the definitive approach to identifying candidates of choice in this Circuit. 90 F.3d 1357. To be sure, the *Clay* Court accepted as the Black candidates of choice the top four vote-getters among African-American voters in a four-seat election. But it did not confront, as does this Court, elections in which it is frequently impossible to determine with statistical certainty which candidates were the top vote-getters. Thus, it is entirely consistent with *Clay*, as well as the Eighth Circuit's directive to consider "all the relevant circumstances," not to accept a candidate as a candidate of choice where, as in this case, it is often impossible to determine to a degree of statistical certainty that the candidate came in in the top two (or three). The District does not dispute that, where a candidate's point estimate falls within the confidence interval of another candidate, it is generally impossible to tell from this information alone whether these candidates have statistically distinguishable levels of support, and concedes that this occurred in several elections in this case. *See* Pls.' Br. at 26-37; Def.'s Br. at 28; PSUMF ¶¶ 52, 63, 66, 73, 83, 93, 133, 142, 171; DSUMF Ex. X, *Rodden Rep.*, at ¶ 26; DSUMF Ex. I, *Rodden Dep.*, at 160:15 – 161:21, 186:4-13, 192:23 – 193:8, 199:6-17, 201:16-20, 203:12-15, 219:13-16, 228:15-18. Declining to treat a candidate as a minority-preferred candidate where it is impossible to determine as a statistical matter whether that candidate actually has the second-(or third-)highest estimated level of support does not "artificially narrow[] the pool of successful African-American [preferred] candidates." Def.'s Br. at 29. It simply recognizes the limitations of the statistical methods employed by the parties' experts.

In any event, far from adopting the District's approach as a matter of law, the *Clay* Court made clear that "[t]here is no blanket definition of 'minority preferred candidate.'" 90 F.3d at 1361. It was only because the plaintiffs in that case failed to meet their burden of identifying and "prov[ing], on an election-by-election basis, which candidates are minority-preferred" under a

legitimate alternative approach that the *Clay* Court affirmed the defendant's approach. *Id.* Here by contrast, Plaintiffs have set forth a "Case-by-Case" approach that considers, as the Eighth Circuit directs, "all the relevant circumstances," and have identified the preferred candidates of each racial group under this approach. *See* Pls.' Br. at 20-25. Under this approach, there is no *per se* rule against designating as minority-preferred a successful candidate who finishes behind an unsuccessful first-choice candidate among minority voters. Where such a candidate receives substantially less support than an unsuccessful first-choice candidate of minority voters, however, he or she cannot be fairly characterized as minority-preferred. As numerous courts have held, this is particularly true where the unsuccessful first-choice candidate is Black and the successful second-(or third-)choice candidate is white.[43] *See* Pls.' Br. at 21-24.

As explained in Plaintiffs' summary judgment brief, this Court should adopt Plaintiffs' Case-By-Case approach to identifying candidates of choice and apply these principles to the uncontested facts. This approach reveals even more severe racial polarization and lower levels of Black-preferred candidate success than that described above. Pls.' Br. at 20-37. Nevertheless, as noted above, under any of the proposed methods for identifying candidates of choice, the undisputed evidence shows that Plaintiffs have established *Gingles* II and *Gingles* III. *See supra* § III; Pls.' Br. at 13-18.

## CONCLUSION

As discussed above, the only material disputes with respect to the *Gingles* preconditions are legal ones. Thus, for the foregoing reasons, the Court can and should grant summary judgment in favor of Plaintiffs and deny the District's motion for summary judgment.

---

[43] There have been four successful white candidates who finished second or third among African-American voters behind an unsuccessful Black candidate since 2000 (2013, 2012, 2002, 2001), *see* PSUMF ¶¶ 139, 130, 78, 69; Pls.' DSUMF Resp. ¶¶ 121-22, 117-18, 85-86, 81-82, not two as the District claims, *see* Def.'s Br. at 20.

Dated this 23rd day of October, 2015.     Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

<u>**CERTIFICATE OF SERVICE**</u>

I, Julie A. Ebenstein, hereby certify that on October 23, 2015, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

Respectfully Submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEY FOR PLAINTIFFS