**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF | ) | |
| THE NATIONAL ASSOCIATION FOR | ) | |
| THE ADVANCEMENT OF COLORED | ) | |
| PEOPLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Cause No. 4:14 CV 2077 RWS |
| | ) | |
| FERGUSON-FLORISSANT SCHOOL | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNCONTROVERTED MATERIAL**
**FACTS IN SUPPORT OF DEFENDANT FERGUSON-FLORISSANT SCHOOL**
**DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

**Election System**

1.      The Ferguson-Florissant School District ("District) is governed by a board of seven
        elected representatives.  Exhibit A (Expert Report of Richard Engstrom, May 27, 2015),
        ¶7.

**RESPONSE: Uncontroverted.**

2.      Each board member serves three year terms.  Ex. A, ¶7.

**RESPONSE: Uncontroverted.**

3.      In every election, either two or three seats are contested.  In 2012, two seats were
        contested.  In 2013, two seats were contested.  In 2014, three seats were contested.  Ex.
        A, ¶¶7, 19, 23, 27.

**RESPONSE: Uncontroverted.**

**There were no elections held in 2005, 2007, 2008, or 2010 because there were the same**
**numbers of candidates as available seats in each of these years.  *See* Defs.' Statement of**
**Uncontroverted Material Facts, Doc. No. 82 ("DSUMF"), ¶¶ 97, 104, 105, 110; *see also* Doc.**
**No. 82-9, DSUMF Ex. I, *Dep. of Jonathan Rodden*, Aug. 20, 2015, at 72:24 – 73:5, 294:4-9**
**(no election is held when there are no challengers).**

4.      All board members are elected at-large.  Ex. A, ¶7.

**RESPONSE: Uncontroverted.**

5.      Each voter may cast a number of votes equal to the number of contested seats.  Ex. A, ¶7.

**RESPONSE: Uncontroverted** insofar as this statement is considered in conjunction with ¶ 6.

6.      Voters may only cast one vote per candidate.  Ex. A, ¶7.

**RESPONSE: Uncontroverted.**

7.      Voters in the District are not required to cast all of their votes.  Ex. A, ¶7.

**RESPONSE: Uncontroverted.**

8.      The candidates who receive the highest vote totals are elected.  Ex. A, ¶7.

**RESPONSE: Uncontroverted. Doc. No. 82-1, DSUMF Ex. A, *Rep. of Richard L. Engstrom*, May 27, 2015, at ¶ 7 ("Winners are determined by a plurality vote rule: the candidates with the largest number of votes and second largest number of votes are elected in a two-seat contest, while those with the most, second most, and third most are elected in the three-seat contest.").**

## Overall Population

9.      In 1990, the overall population of the Ferguson-Florissant School District ("District") was 80,938.  In 2010, the overall population was 68,663.  This represents a loss of 12,275 persons or 15.17%.  Exhibit B (Declaration of William Cooper, May 27, 2015) ¶22.

**RESPONSE: Uncontroverted.**

10.     In 1990, the single-race Black population was 19,783.  In 2010, the single-race Black population was 35,860.  This represents an increase of 16,077 persons or 81.27%.  Ex. B ¶23.

**RESPONSE: Controverted only to the extent that the 1990 Decennial Census did not allow respondents to identify themselves as belonging to multiple racial groups or break down the Black population count into subcategories such as single-race Black population. Thus the 19,783 figure for 1990 in the statement above is for the Black population, not the single-race Black population. *See Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 642 n.21 (D.S.C. 2002) (noting that 2000 was the first Decennial Census that "report[ed] the black population in several racial categories"); Doc. No. 82-2, DSUMF Ex. B, *Decl. of William S. Cooper*, at ¶ 16 n.3, ¶ 21 Fig. 2.**

11.     In 1990, the non-Hispanic White ("NH white") population was 59,995.  In 2010, the NH white population was 29,581.  This represents a decline of 30,414 persons or 81.27%. Ex. B ¶24.

**RESPONSE: Controverted only to the extent that the decrease in non-Hispanic White population of 30,414 persons between the 1990 and 2010 Decennial Censuses represents a decline of 50.69%, not 81.27%. DSUMF Ex. B, *Cooper Decl.*, at ¶ 24. (This appears to be merely a typo.)**

12.     In 1990, single-race Blacks were 28.65% of the total population.  In 2010, single-race Blacks were 52.23% of the total population.  Ex. B ¶25.

**RESPONSE: Controverted only to the extent that the 1990 Decennial Census did not allow respondents to identify themselves as belonging to multiple racial groups or break down the Black population count into subcategories such as single-race Black population. Thus the 28.65% for 1990 in the statement above is for the general Black population, not the single-race Black population. *See Colleton Cty. Council*, 201 F. Supp. 2d at 642 n.21 (noting that 2000 was the first Decennial Census that "report[ed] the black population in several racial categories"); DSUMF Ex. B, *Cooper Decl.*, at ¶ 21 Fig. 2, ¶ 23 Fig. 3, ¶ 25.**

13.     In 1990, NH whites were 74.12% of the total population.  In 2010, NH whites were 43.08% of the total population.  Ex. B ¶25.

**RESPONSE: Uncontroverted.**

14.     In 2010, Any Part (AP) Blacks were 36,967, or 53.85% of the total population.  Ex. B pg. 8, figure 2.

**RESPONSE: Uncontroverted except to the extent that there appears to be a typo: the numbers provided in the 2010 Decennial Census show that Any Part Blacks were 53.84% of the total population. DSUMF Ex. B, *Cooper Decl.*, at ¶ 21 Fig. 2.**

15.     The AP Black classification counts as "Black" all persons who identified in 2010 Census as single-race Black and all persons who identified as more than one race and some part Black.  The AP Black category includes persons who are some part Black and Hispanic. Ex. B pg. 6, n. 3.

**RESPONSE: Uncontroverted.**

16.     The 2010 total minority population in the District was 39,082, or 56.92% of the total population.  The total minority population consists of all persons who are not single-race, non-Hispanic White.  Ex. B pg. 8, figure 2.

**RESPONSE: Uncontroverted to the extent that the population of all persons who are not single-race, non-Hispanic White in the District in 2010 was 39,082, or 56.92% of the total**

**population. However, the cited authority does not provide or define "minority" as a racial or ethnic category.** *See* **DSUMF Ex. B,** *Cooper Decl.***, at ¶ 21 Fig. 2.**

## Voting-Age Population

17.     In 2010, the District's voting-age population ("VAP") was 50,771.  Ex. B pg. 10, figure 4.

**RESPONSE: Uncontroverted.**

18.     In 2010, 47.33% of the District's VAP (or 24,030) was single-race Black.  Ex. B pg. 10, figure 4.

**RESPONSE: Uncontroverted.**

19.     In 2010, 48.19% of the District's VAP (or 24,466) was AP Black.  Ex. B pg. 10, figure 4.

**RESPONSE: Uncontroverted.**

20.     In 2010, 48.95% of the District's VAP (or 24,852) was NH white.  Ex. B pg. 10, figure 4.

**RESPONSE: Uncontroverted.**

21.     In 2010, there were 386 more NH white voters in the District than AP black voters.  Ex. B pg. 10, figure 4.

**RESPONSE: Uncontroverted.**

22.     In 1990, 20.77% of the District's VAP (or 12,613) was AP Black.  Ex. B pg. 10, figure 4.

**RESPONSE**: **Controverted only to the extent that the 1990 Decennial Census did not allow respondents to identify themselves as belonging to multiple racial groups or break down the Black population count into subcategories such as single-race Black population. There was no data about the AP Black population reported in the 1990 Decennial Census, nor in the cited figure. The cited figure reports an AP Black population from the 1990 Decennial Census as "NA." DSUMF Ex. B,** *Cooper Decl.***, at ¶ 27 Fig. 4.**

23.     In 1990, 77.88% of the District's VAP (or 47,290) was NH white.  Ex. B pg. 10, figure 4.

**RESPONSE: Uncontroverted.**

## American Community Survey

24.     The Census Bureau administers an "ongoing survey" that provides "vital information on a yearly basis" about demographics in the United States.  Exhibit C ("What is the American Community Survey?")  The American Community Survey is the "premier

source for detailed information about the American people and workforce." Exhibit D ("American Community Survey (ACS)").

**RESPONSE**: **Uncontroverted that the cited webpages contain the quoted language, but the complete sentence quoted from Exhibit C is "The American Community Survey (ACS) is an ongoing survey that provides vital information on a yearly basis about our nation and its people." Doc. No. 82-3, DSUMF Ex. C, *What is the American Community Survey?*, at 1.**

**This statement of fact misrepresents the appropriate use of ACS data. According to the Census Bureau, "If you are looking for population totals, we recommend the 2010 Census or Population Estimates Program. It is also important to keep in mind that <u>all ACS data are estimates</u>. . . . In general, use ACS to obtain population characteristics (percents, means, medians, and rates) rather than estimates of population totals. Use numbers from the 2010 Census to obtain counts of the population and their basic characteristics (sex, age, race, Hispanic origin, and homeowner status)." U.S. Census Bureau, *Comparing ACS Data*, attached to the Second Ebenstein Decl. (filed concurrently herewith) as Ex. G21.[1]**

**There is a question of law underlying all of the statements of fact in this section entitled "American Community Survey": whether using the ACS estimates to calculate population totals is appropriate. The parties do not dispute that African Americans, whether single-race or so-called "any part Black," make up a large fraction of the FFSD VAP. What the parties do dispute is whether single-race or AP African Americans are a *majority* of the VAP.**

**Plaintiffs dispute that the data show this to be true, for two reasons.**

**First, the parties all agree that according to the 2010 Decennial Census, the most recent "complete count" of VAP, African Americans remain a minority, whether one includes "any part Blacks" or single-race Blacks only. *See, e.g.*, Doc. No. 82-9, DSUMF Ex. I, *Dep. of Jonathan Rodden*, Aug. 20, 2015, at 101:7-11; Doc. No. 82-7, DSUMF Ex. G, *Suppl. Decl. of William S. Cooper*, at ¶ 3. Plaintiffs believe, and the Census Bureau agrees, *see* Ex. G21, *Comparing ACS Data*, that the Decennial Census is the appropriate source to use in determining population totals.**

**The District relies upon the 2011-2013 ACS, along with its own projections, to support its position that a majority of the VAP in FFSD now is either single-race or any-part African-American. The ACS is a population estimate constructed from a rolling sample survey based on responses from one in about 40 persons. *E.g.*, DSUMF Ex. G, *Cooper Suppl. Decl.*, at ¶ 6. In relying upon the ACS, the District disregards (1) the Census Bureau's oft-repeated warning to users *not* to rely upon the ACS for estimates of population totals, *e.g.*, DSUMF Ex. G, *Cooper Suppl. Decl.*, at ¶ 5 (citing Census website); and (2) the ACS's reported margins of error, which are so substantial that they could easily change the result of the District's own inquiry. The District's expert Dr. Rodden acknowledges this. *See* Doc.**

---

[1] **Exhibits filed concurrently herewith will continue numbering in the categories that Plaintiffs used for the original set of exhibits to their Statement of Uncontroverted Material Facts, Doc. No. 85 ("PSUMF"): D – exhibits from expert depositions; G – miscellaneous; and H – documents produced in discovery.**

No. 82-10, DSUMF Ex. J, *Suppl. Rep. of Jonathan Rodden & Jowei Chen: Assessment of Plaintiffs' Redistricting Proposals*, at ¶ 7; DSUMF Ex. I, *Rodden Dep.*, at 58:2-20. The 2011-2013 ACS provided an estimate of 2,196 as the number of people reporting two or more races in FFSD, but the published ACS margin of error was ±743 individuals. *See, e.g.*, DSUMF Ex. B, *Cooper Decl.*, at 42 (Exhibit D, p. 2 of 46). The margin of error associated with the estimate of single-race whites was ±1,789; for single-race Blacks, it was ±2,458. *Id.*

Moreover, in addition to these substantial margins of error, "[a]ll ACS published margins of error are based on a 90 percent confidence level." ACS Office, U.S. Census Bureau, *American Community Survey Multiyear Accuracy of the Data*, Sept. 24, 2014, at 11, attached to the Second Ebenstein Decl. (filed concurrently herewith) as Ex. G25. This is below the generally accepted confidence-interval standard in political science research. *See* DSUMF Ex. I, *Rodden Dep.*, at 76:20 – 77:3.

Finally, the 2011-2013 ACS report estimates of single-race whites and single-race Blacks by age, so it is possible to come to some rough estimate of the *single-race* Black VAP. *See* DSUMF Ex. B, *Cooper Decl.*, at 46 (Exhibit D, p. 6 of 46). However, ACS does not report the VAP of persons who are any-part Black. *Id.* Further, as discussed in several responses above, assuming that the overall population and the VAP include the same percentage of multiracial individuals is inherently flawed, as both parties' experts agree. *See* DSUMF Ex. I, *Rodden Dep.*, at 313:6-19 (assumption "certainly can be criticized"); Doc. No. 82-6, DSUMF Ex. F, *Dep. of William Cooper*, Aug. 17, 2015, at 70:4-13 (assumption is "flawed").

For all these reasons, Plaintiffs submit that this use of the ACS data to determine whether "any part" Blacks are a majority of the VAP in FFSD is in itself inappropriate as a matter of law.

Even if the Court concludes that relying upon ACS data is proper, the ACS estimates do not determine that African Americans are a majority of the FFSD VAP. *See, e.g.*, DSUMF Ex. G, *Cooper Suppl. Decl.,* at ¶¶ 7-10; Doc. No. 85-17, PSUMF Ex. B8, *Gordon's Response to Report of Jonathan Rodden*, at 2 (noting that Rodden ignored the estimated 686 individuals in FFSD who identify as neither white nor Black, rather than properly including them as part of the total population). Only when paired with Dr. Rodden's future *projection* can the District achieve any result that even arguably shows an African-American majority VAP. The Census Bureau itself warns users against doing this. *See, e.g.*, U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data* (Oct. 2008), attached to the Second Ebenstein Decl. (filed concurrently herewith) as Ex. G22, at A-5 ("As noted earlier, caution is needed when using multiyear estimates for estimating year-to-year change in a particular characteristic.").

Rather than repeating these legal arguments after each statement of fact, Plaintiffs will refer to this response except where it is appropriate to add more information.

25.    The nationwide American Community Survey (ACS) is a critical element of the Census Bureau's reengineered decennial census program.  Ex. C.

**RESPONSE**: Controverted. The cited exhibit does not provide any support for this statement. In addition, please see *supra* note 1.

26.     The ACS data are released in 1-year, 3-year, and 5-year period estimates.  Exhibit E ("When to Use 1-year, 3-year, or 5-year Estimates")

**RESPONSE**: Controverted only to the extent that ACS data is no longer released in three-year period estimates, which were discontinued after the 2011-2013 period. Doc. No. 82-5, DSUMF Ex. E, *When to Use 1-year, 3-year, or 5-year Estimates*, at 3.

27.     Both Mr. Cooper and Dr. Jonathan Rodden relied on the 3-year ACS period estimates from 2011-2013.  Exhibit F (Deposition of William Cooper) pg. 55:4-6; Ex. A ¶38.

**RESPONSE**: Controverted to the extent that Cooper uses ACS estimates for the Census Bureau-approved purpose of examining the distribution of socioeconomic factors. *See* DSUMF Ex. B, *Cooper Decl.*, at ¶¶ 36-38, 61 (using ACS data only for socioeconomic data); DSUMF Ex. F, *Cooper Dep.*, at 28:9-29:3, Doc. No. 82-6; *see also* Ex. G21, *Comparing ACS Data*. He does not use the ACS estimates to approximate population totals. *See* DSUMF Ex. B, *Cooper Decl.*, at ¶¶ 16-35, 61 (using Decennial Census data for population). Rodden, on the other hand, uses ACS estimates as population data. *See* DSUMF Ex. I, *Rodden Dep.*, at 105:4 – 107:22; Doc. No. 85-13, PSUMF Ex. B5, *Report of Jonathan Rodden*, May 27, 2105, at ¶¶ 10-13. This use is in contravention of cautionary language from the Census Bureau, repeated in usage guides and on every ACS-derived table it publishes. *See supra* responses to ¶¶ 24-26.

The second cited exhibit is Dr. Engstrom's expert report and says nothing about Cooper or Rodden in paragraph 38 or anywhere else. *See generally* DSUMF Ex. A, *Engstrom Rep*.

28.     The ACS guidelines indicate that the 3-year survey is best used for "data for areas with populations of 20,000+."  Ex. E.

**RESPONSE**: Controverted. The cited website includes a table called "Distinguishing features of ACS 1-year, 3-year, and 5-year estimates." The table does not say that the three-year estimate "is best used for 'data for areas with populations of 20,000+.'" It says rather that three-year estimates are *available* "for areas with populations of 20,000+." DSUMF Ex. E, *When to Use 1-year, 3-year, or 5-year Estimates*.

Furthermore, the cited website is a tool for comparing the one-year, three-year, and five-year ACS estimates with <u>one another</u>, not with other Census Bureau data. According to the Census Bureau, ACS data is useful "in estimating characteristic distributions. If you are looking for population totals, we recommend the 2010 Census or Population Estimates Program." Ex. G21, *Comparing ACS Data*; DSUMF Ex. G, *Cooper Suppl. Decl.*, at ¶ 4.

29.     The 3-year ACS is more precise than the 1-year ACS but more current than the 5-year ACS.  Ex. E.

**RESPONSE**: Uncontroverted. However, the Census Bureau has discontinued its three-year ACS estimates. DSUMF Ex. E, *When to Use 1-year, 3-year, or 5-year Estimates*.

30.    The District had a total population of 66,758 under the 2013 American Community Survey. Ex B pg. 41 (Exhibit D, Page 2 of 46).

**RESPONSE**: Controverted only to the extent that this figure for the total population is from the *2011-2013* ACS estimate, with a July 1, 2012 midpoint. This means that responses were collected over three calendars years beginning in 2011. DSUMF Ex. I, *Rodden Dep.*, at 103:4-7 ("it must be stressed that these estimates are averages of responses over three years").

The margin of error associated with the 2011-2013 estimate is ±2,776 of the population. DSUMF Ex. B, *Cooper Decl.*, at 42 (Exhibit D p. 2 of 46); *see also supra* response to ¶ 24 (discussing confidence level).

31.    Mr. Cooper reported the NH White population at 27,587 or 41.3% of the population according to the 2013 ACS. Ex B pg. 43 (Exhibit D, Page 4 of 46).

**RESPONSE**: Controverted.

*First*, Cooper did not report this. It is not appropriate to use the three-year ACS estimate for total population or population by race, and Cooper did not base his population estimates for any racial group on ACS surveys. *See supra* response to ¶ 24. He used the "complete count" Decennial Census data. DSUMF Ex. B, *Cooper Decl.*, at ¶¶ 16-35. Cooper used the three-year ACS estimates for his study of socioeconomic factors only because the Decennial Census does not include socioeconomic data. DSUMF Ex. B, *Cooper Decl.*, at ¶¶ 36-38, 61; DSUMF Ex. F, *Cooper Dep.*, at 28:9 – 29:3. The Census Bureau states that "the primary purpose of the ACS is to measure the changing social and economic *characteristics* of the U.S. population." Ex. G22, *ACS Compass*, at 4.

*Second*, this figure for the NH White population is from the *2011-2013* ACS estimate, with a July 1, 2012 midpoint, which means that responses were collected over three calendar years beginning in 2011. DSUMF Ex. I, *Rodden Dep.*, at 103:4-7; *see also supra* response to ¶ 30; *infra* response to ¶ 48.

*Third*, Defendant has left out the associated ACS margin of error, which is plus/minus 1,717 for the NH White population. DSUMF Ex. B, *Cooper Decl.*, at 44 (Exhibit D, p. 4 of 46).

32.    Mr. Cooper reported the single race black population at 34,955 or 52.4% according to the 2013 ACS. Ex B pg. 43 (Exhibit D, Page 4 of 46).

**RESPONSE**: Controverted.

Plaintiffs controvert this statement for the same three reasons as listed in the previous

response. *See supra* response to ¶ 31. Cooper did not *report* this as his estimate of population by race; this figure is from the *2011-2013* ACS estimates; and the District did not include the ACS estimate's margin of error, which is ±2,458 for the single-race Black population. *See* DSUMF Ex. B, *Cooper Decl.*, at 42 (Exhibit D, p. 2 of 46); *supra* response to ¶ 24.

33.     Mr. Cooper reported the total voting age population in the District according to the 2011 – 2013 ACS was 49,679.  Ex. F pg. 40:13-16.

**RESPONSE**: **Uncontroverted. However, both at his deposition and in his supplemental declaration, Cooper explained that the Census Bureau cautions against using the ACS for population estimates. DSUMF Ex. F, *Cooper Dep.*, at 40:13-19; DSUMF Ex. G, *Cooper Suppl. Decl.*, at ¶¶ 5-7; *see also supra* response to ¶ 24.**

34.     Mr. Cooper reported the single race black voting age population ("BVAP") was 24,313 according to the 2013 ACS.  Ex. B pg. 45 (Exhibit D, Page 6 of 46).

**RESPONSE**: **Controverted only to the extent that Cooper properly referred to the ACS as the *2011-2013* ACS estimates. DSUMF Ex. B, *Cooper Decl.*, at 46 (Exhibit D, p. 6 of 46); *see also supra* response to ¶ 30.**

**Further, the Census Bureau did not calculate margins of error for its estimates of population by age, but the margins of error for the <u>total</u> African-American and NH White populations are already substantial. *See supra* responses to ¶¶ 24, 31, 32.**

35.     Mr. Cooper finds the single race-black VAP is 48.94% according to the 2013 ACS. Exhibit G (Supplemental Declaration of William S. Cooper, July 2, 2015) ¶7.

**RESPONSE**: **Controverted only to the extent that Cooper properly referred to the ACS estimates as the *2011-2013* ACS. DSUMF Ex. G, *Cooper Suppl. Decl.*, at ¶ 7; *see also supra* response to ¶ 30.**

**Further, the Census Bureau did not calculate margins of error for its estimates of population by age, but the margins of error for the <u>total</u> African-American and NH White populations are substantial. *See supra* responses to ¶¶ 24, 31, 32.**

36.     Mr. Cooper finds the NH white VAP is 46.78% according to the 2013 ACS.  Ex. G ¶7.

**RESPONSE**: **Controverted only to the extent that Cooper properly referred to the ACS estimates as the *2011-2013* ACS. DSUMF Ex. G, *Cooper Suppl. Decl.*, at ¶ 7; *see also supra* response to ¶ 30.**

**Further, the Census Bureau did not calculate margins of error for its estimates of population by age, but the margins of error for the <u>total</u> African-American and NH White populations are substantial. *See supra* responses to ¶¶ 24, 31, 32.**

37.     Mr. Cooper reports the NH white VAP at 23,242 (*i.e.*, the total NH white VAP minus the total NH white VAP "Under 18 Years"). Ex. B pg. 45 (Exhibit D, Page 6 of 46)

**RESPONSE**: **Controverted.**

**The formula given above is not correctly stated. It should be "the total NH white population minus the total NH white population that is under 18 years old," and the <u>result</u> is an estimate of the NH white VAP. *See* DSUMF Ex. G, *Cooper Suppl. Decl.*, at ¶ 7. (This appears to be merely a typo.)**

**Cooper reports that this is the figure for NH white VAP if the 2011-2013 ACS estimate is used. *See id.*; *see also supra* responses to ¶¶ 24, 30-32.**

38.     The Census Bureau states that the 2010 Census undercounts the minority population by 2.1% and over-counted the non-Hispanic white population by 0.8% nationwide.  Exhibit H ("Census Bureau Releases Estimates of Undercount and Overcount in the 2010 Census")

**RESPONSE**: **Controverted. "The survey did not measure a statistically significant undercount or overcount for the population in any counties or places of 100,000 or more." Doc. No. 82-8, DSUMF Ex. H, *Census Bureau Releases Estimates of Undercount and Overcount in the 2010 Census*, at 2. The undercount/overcount figures are not relevant to the FFSD population.**

**In addition, the 2.1% estimated undercount described in the cited exhibit is for the African-American population, not the "minority population." *Id.***

39.     The Hispanic white VAP is 23,740 (47.24%).  Ex. G ¶7.

**RESPONSE: Controverted.**

***First***, **this statement is inaccurate. The figure is an estimate of the single-race white VAP, which *includes* Hispanic whites and non-Hispanic single-race whites. DSUMF Ex. G, *Cooper Suppl. Decl.*, at ¶ 7.**

***Second***, **this figure is based on the 2011-2013 ACS estimates, which the Census Bureau cautions is not an appropriate source of data to determine population by race. *See supra* responses to ¶¶ 24, 30-32.**

40.     Mr. Cooper admitted that he did not calculate the AP black share of VAP for the 2011-2013 ACS.  Ex. F pg. 41:17-42:2.

**RESPONSE: Uncontroverted. *See supra* responses to ¶¶ 24, 31-32.**

41.     The ACS does not publish estimates for the AP black category. Ex. F pg. 41:14-16.

**RESPONSE: Uncontroverted.**

42. The ACS publishes estimates for those who identify as two or more races. Exhibit I (Deposition of Jonathan Rodden) pg. 311:18-312:8; Exhibit J (Supplemental Report of Jonathan Rodden, PhD and Jowei Chen, PhD: Assessment of Plaintiffs' Redistricting Proposals, July 2, 2015) pg. 3 (Table 1 & note).

**RESPONSE: Uncontroverted.**

43. Dr. Rodden determined the number of people (regardless of age) who identified as two or more of any race. This information is available in the 2011-2013 ACS. Ex. I pg. 311:18-312:8; Ex. J pg. 3 (Table 1 & note).

**RESPONSE: Uncontroverted that an estimate of this population is published in the 2011-2013 ACS.**

44. Dr. Rodden determined the number of people (regardless of age) who identified as two or more of any race with some part African American. This information is available in the 2011-2013 ACS. Dr. Rodden then calculated this number as a percentage of the number of people who identified as two or more of any race. Ex. I pg. 311:18-312:8; Ex. J pg. 3 (Table 1 & note).

**RESPONSE: Controverted.**

*First,* **the 2011-2013 ACS does <u>not</u> provide an estimate of the number of people who identified as "two or more of any race with some part African American" in FFSD. The second sentence in this statement of fact is contradicted by DSUMF Ex. B,** *Cooper Decl.***, at 42 (Exhibit D, p. 2 of 46).**

*Second***, Dr. Rodden did not determine the "number of people (regardless of age) who identified as two or more races with some part African American." Instead, the figure in the table cited in the statement of fact above that he sets forth as the number of individuals who identify as two or more races with some part African-American (1,564),** *see* **DSUMF Ex. J,** *Rodden & Chen Suppl. Rep.***, at 3 (Table 1 & note), is actually only the number of individuals who identified as biracial African-American/white (1,183) and biracial African-American/American Indian, Alaska Native (381),** *see* **DSUMF Ex. B,** *Cooper Decl.***, at 42 (Exhibit D, p. 2 of 46).**

**Therefore, Plaintiffs controvert the conversion to a percentage, as stated in sentence 3 above, because the original figure is neither in the ACS estimates nor properly derived.**

45. To determine the percentage of voting-age individuals who identified as AP black (which is not available in the 2011-2013 ACS), Dr. Rodden applied the percentage of all individuals who identified as AP black to the number of voting-age individuals who identified as two or more of any race. Ex. I pg. 311:18-312:8; Ex. J pg. 3 (Table 1 & note).

**RESPONSE**: **Uncontroverted. Plaintiffs do not dispute that Dr. Rodden did this. But the input figures are inaccurate. *See supra* responses to ¶¶ 24, 30-32, 44.**

46.    Rodden's approach assumes that percentage of multiracial individuals who are AP black is the same for both the voting-age population and the total population.  Exhibit K (Deposition of Colin Gordon) pg. 53:5-15.

**RESPONSE**: **Controverted to the extent that the cited testimony from the deposition of Colin Gordon does not support the statement. Plaintiffs do not dispute that Dr. Rodden assumed this. But the input figures are inaccurate. *See supra* responses to ¶¶ 24, 30-32, 44.**

47.    Plaintiffs' expert Dr. Colin Gordon endorsed this approach.  Ex. K pg. 53:5-15.

**RESPONSE**: **Controverted. It is not clear what is meant by "this approach," but Gordon does not endorse any of the steps taken by Dr. Rodden described in ¶¶ 43-46 in the cited portion of his deposition or anywhere else. Insofar as "this approach" refers to Dr. Rodden's assumption in ¶ 46 that a group's share of the total population is the same as its share of the VAP, Gordon states that he is "not sure it's a relevant calculation." Doc. No. 82-11, DSUMF Ex. K, *Dep. of Colin Gordon*, Aug. 19, 2015, at 57:3 – 60:3. Instead, in calculating the VAP share of the non-Black and non-white population in FFSD (a calculation he performed only to demonstrate errors in Rodden's analysis, not as an endorsement of Rodden's use of 2011-2013 ACS data), Gordon averaged the VAP shares of the Black only and white-only populations and checked the accuracy of this average against state and national percentages. DSUMF Ex. K, *Gordon Dep.*, at 53:16 – 54:5; PSUMF Ex. B8, *Gordon Rebuttal*, at 2.  "Rodden's approach" does not document his methodology or corroborate his estimates. Doc. No. 82-23, DSUMF Ex. X, *Report of Jonathan Rodden*, May 27, 2015, at ¶¶ 12-13; *see also* DSUMF Ex. I, *Rodden Dep.*, at 313:6-19.**

48.    Under Dr. Rodden's analysis, the AP black share of the VAP is 51.0%.  Ex. J pg. 3 (Table 1).

**RESPONSE**: **Controverted. Dr. Rodden makes this assertion, but the assertion is not sufficiently supported for five reasons.**

***First*, it relies on the 2011-2013 ACS <u>estimates</u>, which the Census Bureau disapproves for approximating population totals and which are associated with extremely large margins of error, even when calculating for the lower confidence level of 90%. *See supra* responses to ¶¶ 24, 30-32; *see also* DSUMF Ex. I, *Rodden Dep.*, at 58:2-5.**

***Second*, even using the ACS data, it relies on an <u>incorrect estimate</u> for the number of people in FFSD who identify as AP Black. *See supra* response to ¶ 44.**

***Third*, it depends on a future <u>projection</u>, something else the Census Bureau has criticized. The 2011-2013 ACS is not just an average of responses over three years. Those responses have been pooled and weighted. *See, e.g.*, Ex. G22, *ACS Compass*, at A-5 ("As noted earlier,**

caution is needed when using multiyear estimates for estimating year-to-year change in a particular characteristic."); U.S. Census Bureau, *Programs, Datasets and Tables in American FactFinder*, attached to the Second Ebenstein Decl. (filed concurrently herewith) as Ex. G23, at 3 ("To compute these [ACS] estimates the Census Bureau 'pools' the sample responses of what was observed for every month of the entire time period and applies measures to account for changes in geography, value of the dollar, margins of error, etc., to develop weighting of sample cases."). Dr. Rodden did not pool and weight when creating his projection. *See* DSUMF Ex. J, *Rodden & Chen Suppl. Rep.*, at ¶¶ 5-7; DSUMF Ex. I, *Rodden Dep.*, at 58:2-5; *see also* DSUMF Ex. G, *Cooper Suppl. Decl.*, at ¶ 12 (calling the projection "highly speculative," particularly in light of the recent events in Ferguson).

Fourth, it relies on the <u>assumption</u> that the percentage of the VAP who identifies as AP Black is the same as the percentage of the population at large who identifies as AP black. The parties' experts agree that this assumption is faulty. *See* DSUMF Ex. I, *Rodden Dep.*, at 313:6-19 (assumption "certainly can be criticized"); DSUMF Ex. F, *Cooper Dep.*, at 70:4-13 (assumption is "flawed"); DSUMF Ex. K, *Gordon Dep.*, at 57:3 – 60:3. The percentage of the population who identifies as multiracial increases, generally, with every successive generation. *See* DSUMF Ex. F, *Cooper Dep.*, at 68:24 – 69:2.

*Fifth*, Dr. Rodden ignores the members of the VAP that identify as neither Black nor white. Those 686 individuals should be added to the denominator to calculate the AP Black share. PSUMF Ex. B8, *Gordon Rebuttal*, at 2.

49.    Mr. Cooper admitted that if one considered the minority voting age population of all races and ethnicities, it would be above fifty percent. Ex. F pg. 72:25-73:3.

**RESPONSE: Uncontroverted.**

50.    Mr. Cooper's estimate of what he thought the AP BVAP was pursuant to the 2011-2013 ACS was 49.8%. Ex. F pg. 71:17-72:6.

**RESPONSE: Uncontroverted.**

51.    Mr. Cooper admits his estimate is "rough[]." Ex. F pg. 72:8.

**RESPONSE: Uncontroverted.**

However, this estimate is "rough" because it is based on the ACS estimates, which are subject to extremely large margins of error and so are themselves "rough." *See supra* responses to ¶¶ 24, 30-32, 48. It is inappropriate to extrapolate these margins of error to determine a margin of error for the ACS estimate of the AP Black population without more information, which is why Cooper did not attempt it in his report and could give only a rough estimate when asked to do so. *See* DSUMF Ex. F, *Cooper Dep.*, at 70:2 – 73:7; *see also id.* at 71:13-16 (counsel's affirmation that they had asked him to provide only a "ballpark estimate").

**Plaintiffs' Proposed Remedies**

52.     None of Plaintiffs' experts analyzed the effectiveness of their two proposed districting plans.  Ex. F pg. 79:21-80:3; Exhibit L (Deposition of Richard Engstrom) pg. 109:12-19.

**RESPONSE: Controverted.**

***First*, Plaintiffs controvert the use of the word "proposed," because Plaintiffs have not proposed any districting plans. This motion for summary judgment relates to liability only, and effectiveness of an illustrative plan is not at issue at this stage. *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006); *Gonzalez v. Harris Cty.*, 601 F. App'x 255, 261 (5th Cir. 2015). Proposals come into play only at the remedies stage.**

**Plaintiffs note that for purposes of a Section 2 VRA case, an effective district is one in which the oppressed minority has "a realistic opportunity to elect representatives of their choice." *Bone Shirt*, 461 F.3d at 1023.  Multiple courts, including the Eighth Circuit, have held that a single-member district that contains a minority population of at least 65% total population (or 60% VAP) often provides effective electoral opportunities. *See Ketchum v. Byrne*, 740 F.2d 1398, 1415-16 (7th Cir. 1984) (holding such, explaining where this figure is derived, and collecting cases); *Bone Shirt*, 461 F.3d at 1023 (approving *Ketchum*); *accord African Am. Voting Rights Legal Def. Fund, Inc. v. Villa*, 54 F.3d 1345, 1348 n.4 (8th Cir. 1995). In this case, three of the districts in Plaintiffs' Illustrative Plan I have Black majorities of greater than 60% VAP. *See* DSUMF Ex. B, *Cooper Decl.*, at ¶ 51 Fig. 10, ¶ 55 Fig. 12.**

***Second*, the series of questions leading to the cited testimony from Cooper and Engstrom about analyses relating to effectiveness were about *District 7 only* in Plaintiffs' Illustrative Plan 1, which contains a BVAP of 52.86%. *See* Doc. No. 82-12, DSUMF Ex. L, *Dep. of Richard Engstrom*, Aug. 18, 2015, at 108:19 – 109:3; *see also* DSUMF Ex. F, *Cooper Dep.*, at 79:12-20.**

53.     Mr. Cooper admits that he did not analyze the effectiveness of his plans.  Ex. F pg. 79:21-80:3.

**RESPONSE: Uncontroverted, except to the extent that Cooper's response in the cited testimony was limited to District 7 in Plaintiffs' Illustrative Plan 1. DSUMF Ex. F, *Cooper Dep.*, at 79:12 – 81:4. Effectiveness of an illustrative plan is not at issue at this stage in litigation for the reasons given in Plaintiffs' response to ¶ 52.**

54.     Mr. Cooper admits that he defers to Dr. Engstrom Engstrom to determine the effectiveness of his Illustrative Plans 1 and 2.  Ex. F pgs. 79:21-80:3, 84:16-24.

**RESPONSE: Uncontroverted, except to the extent that Cooper's response in the cited testimony was limited to District 7 in Plaintiffs' Illustrative Plan 1. DSUMF Ex. F, *Cooper Dep.*, at 79:12 – 81:4.  Effectiveness of an illustrative plan is not at issue at this stage in litigation for the reasons given in Plaintiffs' response to ¶ 52.**

55.     Dr. Engstrom testified that it would be "too much to ask of [him]" to analyze "illustrative districts for viability or effectiveness or anything like that."  Ex. L pg. 109:12-19.

**RESPONSE: Uncontroverted, except to the extent the quote is incomplete and misleading. Dr. Engstrom stated that he has not assessed "illustrative districts for viability or effectiveness or anything like that" and "for me to sit here and look at one percentage figure and say whether that's an effective district is too much to ask of me. I don't have the information I need." DSUMF Ex. L, *Engstrom Dep.*, at 109:12-19.  Engstrom went on to explain that analysis of illustrative district plans is irrelevant to this stage of the case for the reasons provided in Plaintiffs' response to ¶ 52. *See* DSUMF Ex. L, *Engstrom Dep.*, at 112:9-15.**

56.     Plaintiffs proposed two districting plans created by Mr. Cooper.  Ex. B pgs. 22, 24.  Each plan contains seven districts, four of which contain a VAP that is more than 50% black.  Ex. B pgs. 23, 25.

**RESPONSE: Controverted only for the use of the word "proposed," because Plaintiffs have not proposed any districting plans. This motion for summary judgment relates to liability only, and effectiveness of an illustrative plan is not at issue at this stage. *See Bone Shirt*, 461 F.3d at 1019; *Gonzalez*, 601 F. App'x at 261.**

57.     In his analysis of whether Plaintiffs' proposed districting plans were effective, Dr. Rodden examined data from every contested election since 2000 involving African American candidates.  Ex. J pgs. 7-10.

**RESPONSE: Controverted.**

**First, Plaintiffs dispute the word "proposed," because Plaintiffs have not proposed any districting plans. This is an important distinction because this motion for summary judgment relates to liability only, and effectiveness of an illustrative plan is not at issue at this stage. *Bone Shirt*, 461 F.3d at 1019; *Gonzalez*, 601 F. App'x at 261.**

**Second, Exhibit J is a report submitted by Drs. Rodden and Chen. The parties do not know the source of the data and analysis in the report because Dr. Chen was not given and did not read the report before signing it or before his deposition. Doc. No. 85-25, PSUMF Ex. C4, *Dep. of Jowei Chen*, Aug. 19, 2015, at 9:3-5, 15:2 – 16:19. Though Chen created Table 2 (p. 8) (which is the result of the data examination cited in the statement of fact above), PSUMF Ex. C4, *Chen Dep.*, at 19:22-23, he did not know if or how it had been edited, *id.* at 22:4-11. Because of the confusion, it is not clear that Dr. Rodden undertook this analysis.**

58.     Dr. Rodden created a "least-squares regression model" to determine whether there was a linear relationship between (1) the percentage of votes that were cast for African American candidates; and (2) the percentage of votes cast by African Americans in each precinct.  Ex. J ¶13.

**RESPONSE**: Controverted.

***First***, is not clear that Dr. Rodden or Dr. Chen correctly converted from voters to votes. DSUMF Ex. J, *Rodden & Chen Suppl. Rep.* ¶¶ 12-13. This is a meaningful difference in a multi-seat election where each voter may cast multiple votes. Dr. Chen, who created the table of results from this model, had never analyzed an at-large district before. PSUMF Ex. C4, *Chen Dep.*, at 70:17-18, Doc. No. 85-25.

***Second***, Dr. Rodden's census block turnout estimates used to create this model are unreliable. *See* Doc. No. 85-18, PSUMF Ex. B9, *Rebuttal Rep. of David C. Kimball*, July 2, 2015, at 6-7. Dr. Rodden reports turnout based on the number of ballots cast as a percentage of registered voters, not as a percentage of VAP. DSUMF Ex. I, *Rodden Dep.*, at 59:15-18. Voter registration rates are lower for African Americans (67.1%) than for whites (72.2%) in Missouri. *Reported Voting and Registration by Sex, Race, and Hispanic Origin (Ex. 5 to Dep. of Jonathan Rodden, Aug. 20, 2015)*, attached hereto as Ex. D6. Therefore the turnout rate is likely overstated for Black voters and understated for white voters.

59.     Dr. Rodden derived an equation that estimates the percentage of votes that African American candidates as a function of the percentage of votes cast by African Americans in each precinct. Ex. J ¶13.

**RESPONSE**: Controverted for the reasons given in Plaintiffs' response to ¶¶ 57-58. It is not clear whether Rodden's equation conflates combined aggregate *vote* share received by all African-American candidates with the percentage of *voters* whom he estimates voted for African-American candidates. *See* DSUMF Ex. J, *Rodden & Chen Suppl. Rep.*, at ¶¶ 13-14. Moreover, Rodden's census block turnout estimates are unreliable. *See supra* responses to ¶¶ 57-58.

60.     For each contested election involving African Americans, Dr. Rodden plugged in his precinct-level estimates of African American votes into the equation, which showed the percentage of votes that the African American candidates would have received in each precinct. Ex. J pgs. 7-9.

**RESPONSE**: Controverted. Dr. Rodden appears to have confused *votes* with *voters*, *see* responses to ¶¶ 57-59, an important distinction in a jurisdiction where each voter may vote multiple times. Rodden also calculated turnout using the number of registered voters as the denominator instead of the VAP, which likely overstates Black turnout. *See supra* responses to ¶¶ 58.

61.     Each precinct belongs within one of the seven single-member districts in Plaintiffs' districting plans. Ex. J ¶7.

**RESPONSE**: Controverted. The cited material does not support this statement.

62.     By aggregating the data from all the precincts within a district, Dr. Rodden was able to demonstrate whether the African American candidates would have received more votes than their white counterparts within that district.  Ex. J pg. 8.

**RESPONSE: Controverted. Dr. Rodden's estimates are unreliable for the reasons given in Plaintiffs' responses to ¶¶ 57-59, and theoretical assessment of a hypothetical district cannot demonstrate how a candidate, or group of candidates, would have performed without additional information. DSUMF Ex. L,** *Engstrom Dep.***, at 108:19 – 109:3.**

**Plaintiffs note that in multi-seat elections, the fact that African-American candidates in the aggregate receive more votes than white candidates in the aggregate does not necessarily result in the election of any individual African-American candidate. DSUMF Ex. A,** *Engstrom Rep.***, at ¶ 7 ("Winners are determined by a plurality vote rule: the candidates with the largest number of votes and second largest number of votes are elected in a two-seat contest, while those with the most, second most, and third most are elected in the three-seat contest.").**

63.     Dr. Rodden concluded that "[t]here is little reason to believe that chopping the School District up into smaller winner-take-all districts" would result in more African-American voters supporting African American candidates.  Ex. J ¶17.

**RESPONSE:  Controverted. There is no basis for Dr. Rodden's conclusion.  Dr. Chen determined that two Black candidates have been elected in the past decade under the current at-large system. PSUMF Ex. C4,** *Chen Dep.***, at 68:23 – 69:2.  According to Rodden and Chen's analysis, over the past decade**, **African-American candidates would have received the majority of votes 8 times in single-member winner-take-all districts using either of Plaintiffs' illustrative plans.  DSUMF Ex. J,** *Rodden & Chen Suppl. Rep.***, at Table 2 (p. 8).**

64.     Dr. Rodden further noted that diving the District into single-member districts might actually "hurt" African American candidates.  Ex. J ¶18.

**RESPONSE: Controverted for the reasons given in Plaintiffs' response to ¶ 63.** *See* **DSUMF Ex. I,** *Rodden Dep.***, at 342:4-12.**

65.     Using a Gini coefficient, which measures statistical dispersion, Dr. Rodden analyzed the geographic distribution of votes for the candidate most-preferred by African American voters and the candidate most preferred by white voters.

**RESPONSE: Controverted. The District fails to cite authority for this statement.**

**DSUMF Exhibit J is a report submitted by Rodden and Chen. The parties do not know the source of the data and analysis in the report because Chen was not given and did not read the report before signing it or before his deposition. PSUMF Ex. C4,** *Chen Dep.***, at 9:3-5, 15:2 – 16:19. Though Chen created Table 2 (p. 8) of the report (which is the outcome of the data examination cited above), PSUMF Ex. C4,** *Chen Dep.***, at 19:22-23, he did not know if**

**or how it had been edited, *id.* at 22:4-11. Because of the confusion, it is not clear that Rodden undertook this analysis.**

66.     Dr. Rodden found that, in 2015, the candidate most preferred by African Americans had support that was more geographically dispersed than her opponent, who was the candidate most preferred by white voters.  Ex. J ¶¶18-22.

**RESPONSE: Uncontroverted that Dr. Rodden found this.**

67.     After examining every contested election since 2000, Dr. Rodden concluded that, with a few exceptions, African Americans tended to have more geographically-dispersed support than white candidates.  Ex. J pgs. 13-14 (Figures 3 & 4).

**RESPONSE: Uncontroverted that Dr. Rodden concluded this.**

68.     Dr. Rodden noted that one of Plaintiffs' districting plans contains a district in which two incumbent board members reside.  Ex. J ¶25.

**RESPONSE: Uncontroverted that Dr. Rodden noted this. As noted in Plaintiffs' response to ¶ 52, Plaintiffs' plans are illustrative plans for purposes of establishing liability.**

69.     These two board members were both preferred by African Americans in their respective elections.  Ex. A pg. 19.

**RESPONSE: Uncontroverted.**

70.     These board members are both African American.  Ex. J ¶25.

**RESPONSE: Uncontroverted.**

71.     Dr. Engstrom authored a law review article entitled "Cumulative and Limited Voting: Minority Electoral Opportunities and More."  Ex. L pg. 98:15-99:3; Exhibit M ("Cumulative and Limited Voting: Minority Electoral Opportunities and More").  In the article, Dr. Engstrom wrote that at-large elections "provide the largest group of voters an opportunity to determine the winners of all of the seats."  Ex. L pg. 100:12-17; Ex. M pg. 101.

**RESPONSE: Uncontroverted that the cited material contains this language. Doc. No. 94-1, DSUMF Ex. M, *Cumulative and Limited Voting*, at 101 ("There are numerous variations in how at-large elections are implemented, but regardless of the particular arrangement, this system does have a tendency to favor the candidates preferred by a majority group, or at least the largest group, of voters within the jurisdiction. It provides the largest group of voters an opportunity to determine the winners of all of the seats."). Dr. Engstrom testified that when he wrote "voters," he meant "people who actually vote"; he did not mean VAP. DSUMF Ex. L, *Engstrom Dep.*, at 102:10 – 104:14.**

72.    Dr. David Kimball, another expert for Plaintiff, testified that if blacks were a majority, they could potentially determine the winners of all of the seats.

**RESPONSE: Controverted. Defendants fail to cite authority for this statement.**

73.    Dr. Kimball further testified that "majority" could be of either total population or voting age population.  Exhibit O (Deposition of David Kimball) pg. 61:15-20.

**RESPONSE: Controverted. In this portion of his deposition, Dr. Kimball is questioned about a statement in his expert report concerning previous research findings on the negative effect of at-large voting on racial and ethnic minority voters. Doc. No. 82-14, DSUMF Ex. O,** *Dep. of David Kimball***, Aug. 21, 2015, at 60:16 – 61:3; Doc. No. 82-15, DSUMF Ex. P,** *Kimball Rep.***, at 6. He explains that the terms "majority" and "minority" in this context refer to** *voting-age population***, not total population. DSUMF Ex. O,** *Kimball Dep.***, at 60:24 – 61:3; 96:2-24. He explains that the term "majority" could "probably" apply to either total population or VAP here only because the literature and political science studies he cites "tend to find in places where there's a white majority of the overall population, then there's also a white majority of the voting age population."** *Id.* **at 61:5-11.**

74.    Dr. Kimball's expert report cites to an article entitled, "The Context Matters: The Effects of Single-Member Versus At-Large Districts on City Council Diversity."  Exhibit P (Expert Report of David C. Kimball) pg. 6 n. 5; Exhibit Q ("The Context Matters: The Effects of Single-Member versus At-Large Districts on City Council Diversity").

**RESPONSE: Uncontroverted.**

75.    Dr. Kimball agreed with the statement in the article that "if a group composes a majority of the city population in a majoritarian, at-large system, the group may be able to win all of the council seats."  Ex. O pg. 62:19-63:6.

**RESPONSE: Controverted. Dr. Kimball agreed only that he was citing "the whole article" identified. DSUMF Ex. O,** *Kimball Dep.***, at 62:19-25.**

76.    Dr. Kimball agreed that if a group holds a majority, districts might even decrease the group's representation on the city council.  Ex. O pg. 62:19-63:6.

**RESPONSE: Controverted, for the reasons described in Plaintiffs' response to ¶ 75.**

**Election History - 2000**

77.    In 2000, five candidates ran for two seats.  Exhibit R (Official Results, Ferguson School District, Tuesday, April 4, 2000).  Michael Hirsch received 4,406 votes; Gregory Fulton received 1,490 votes; Paul Charney received 1,222 votes; Gwendolyn Thomas received 3,413 votes; Les Lentz received 1,939 votes; and Anthony Smith received 1,554 votes. Ex. R.  Hirsch and Thomas were elected.

**RESPONSE:** Uncontroverted except to the extent that there are <u>six,</u> not five, candidates listed above and in the cited exhibit.

78.     Thomas received the highest percentage of African American votes (33.99%). Exhibit S (Dr. Rodden's EI analysis). Hirsch received the second-highest percentage of African American votes (18.71%). Ex. S. Hirsch received the highest percentage of white votes (34.12%). Ex. S. Thomas received the second-highest percentage of white votes (18.88%).

**RESPONSE:** Uncontroverted except for rounding errors for white votes cast for Hirsch (34.13%) and Thomas (18.89%).

79.     Whites cast 53% of votes for Thomas and Hirsch. Ex. S. African Americans cast 52.7% of votes for Hirsch and Thomas. Ex. S.

**RESPONSE:** Uncontroverted insofar as these sentences mean that of all the votes cast by whites, 53.02% of them went to either Thomas or Hirsch. Of all the votes cast by African Americans, 52.7% of them went to Thomas or Hirsch.

80.     Thomas is African American. Ex. I, pg. 250:3-5.

**RESPONSE:** Uncontroverted.

**Election History - 2001**

81.     In 2001, four candidates ran for three seats. Exhibit T (Official Results, Ferguson School District, Tuesday, April 3, 2001). Jeanne Garofalo received 3,680 votes; Leslie Hogshead received 3,229 votes; Felicia Butler received 2,374 votes; and Les Lentz received 1,716 votes. Ex. T. Garofalo and Hogshead were elected.

**RESPONSE:** Uncontroverted except to the extent that these four candidates ran for <u>two,</u> not three, seats. The last sentence of the statement above, as well as the cited material, demonstrates this.

82.     Butler received the highest percentage of African American votes (40.54%). Hogshead received the second-highest percentage of African American votes (19.73%). Garofalo received the highest percentage of white votes (35.06%). Hogshead received the second-highest percentage of white votes (32.20%).

**RESPONSE:** Uncontroverted except for a rounding error for white votes cast for Hogshead (32.21%). Doc. No. 82-18, DSUMF Ex. S, *Rodden's Underlying Data*.

83.     Whites cast 35% of votes for Butler and Hogshead. Ex. S. African Americans cast 44.4% of votes for Garofalo and Hogshead. Ex. S.

**RESPONSE: Controverted to the extent that the cited exhibit shows that whites cast 48.35%, not 35%, of their votes for Butler and Hogshead.**

84.     Butler is African American.  Ex. I, pg. 250:8-9.

**RESPONSE: Uncontroverted.**

### Election History - 2002

85.     In 2002, six candidates ran for three seats.  Doris Graham received 3,388 votes; Nancy Knorr received 3,206 votes; Felicia Butler received 2,610 votes; Lawrence Morie received 2,522 votes; Brian Fletcher received 3,378 votes; and James Clark received 3,093 votes.  Exhibit U (Official Results, Ferguson School District, Tuesday, April 2, 2002).  Graham, Fletcher, and Clark were elected.  Ex. U.

**RESPONSE: Uncontroverted except to the extent that the statement transposes two digits in the total votes received by Knorr: Knorr received 3,026, not 3,206, votes. *See* Doc. No. 82-20, DSUMF Ex. U, *FFSD 2002 Election Results*.**

86.     Graham received the highest percentage of African-American votes (31.86%).  Ex. S. Butler received the second-highest percentage of African American votes (25.07%).  Ex. S.  Clark received the third-highest percentage of African American votes (12.56%).  Ex. S.  Fletcher received the highest percentage of white votes (22.00%).  Ex. S.  Knorr received the second-highest percentage of white votes (18.03%).  Ex. S.  Clark received the third-highest percentage of white votes (17.83%).  Ex. S.

**RESPONSE: Uncontroverted.**

87.     Whites cast 43% of votes for Graham, Butler and Clark.  Ex. S.  African Americans cast 36.9% of votes for Fletcher, Knorr, and Clark.  Ex. S.

**RESPONSE: Controverted. The figures are incorrect. Whites cast 43.1% of their votes for Graham, Butler, and Clark (this appears to be a rounding error), and African Americans cast 33.95% of their votes for Fletcher, Knorr, and Clark. DSUMF Ex. X, *Rodden Rep.*, at ¶ 66; Doc. No. 85-29, PSUMF Ex. D2, *Rodden's Underlying Data Reformatted*; DSUMF Ex. U, *FFSD 2002 Election Results*.**

88.     Graham and Butler are African American.  Ex. I, pg. 250:12-15.

**RESPONSE: Uncontroverted.**

### Election History - 2003

89.     In 2003, three candidates ran for two seats.  Nancy Knorr received 3,584 votes; Gwen Thomas received 2,102 votes; and Les Lentz received 1,995 votes.  Exhibit V (Official

Results, Ferguson School District, Tuesday, April 8, 2003). Knorr and Thomas were elected.

**RESPONSE: Uncontroverted.**

90.     Thomas received the highest percentage of African-American votes (53.96%). Ex. S. Knorr received the second-highest percentage of African American votes (30.19%). Ex. S. Knorr received the highest percentage of white votes (52.09%). Ex. S. Lentz received the second-highest percentage of white votes (28.42%). Ex. S.

**RESPONSE: Uncontroverted.**

91.     Whites cast 71.6% of votes for Thomas and Knorr. Ex. S. African Americans cast 46.1% of votes for Knorr and Lentz. Ex. S.

**RESPONSE: Uncontroverted except for a rounding error. African Americans cast 46.04% of their votes for Knorr and Lentz.**

92.     Thomas is African American. Ex. I, pg. 250:3-5.

**RESPONSE: Uncontroverted.**

**Election History - 2004**

93.     In 2004, five candidates ran for two seats. Jeanne Garofalo received 3,232 votes; Tommie Van received 1,571 votes; Ingrid McClendon received 1,302 votes; Pernell Witherspoon received 676 votes; and Leslie Hogshead received 2,400 votes. Exhibit W (Official Results, Ferguson School District, Tuesday, April 6, 2004). Garofalo and Hogshead were elected.

**RESPONSE: Uncontroverted.**

94.     Van received the highest percentage of African-American votes (28.71%). Ex. S. McLendon received the second-highest percentage of African American votes (28.29%). Ex. S. Garofalo received the highest percentage of white votes (39.31%). Ex. S. Hogshead received the second-highest percentage of white votes (30.79%). Ex. S.

**RESPONSE: Uncontroverted except for the misspelling of McClendon and a rounding error. Hogshead received 30.80% of white votes.**

95.     Whites cast 21.2% of votes for Van and McLendon. Ex. S. African Americans cast 27.6% of votes for Garofalo and Hogshead. Ex. S.

**RESPONSE: Uncontroverted except for the misspelling of McClendon and a rounding error. African Americans cast 27.7% of their votes for Garofalo and Hogshead.**

96.     Van and McClendon are African-American.  Ex. I, pg. 250:16-19.

**RESPONSE: Uncontroverted.**

**Election History – 2005**

97.     The 2005 election was uncontested.  Graham, Fletcher, and Clark all retained their seats.  Exhibit X (Report of Jonathan Rodden, PhD, May 27, 2015) pg. ¶62.

**RESPONSE: Controverted only to the extent that Lentz, not Fletcher, obtained a seat on the Board.  *FFSD Board Candidate Interviews*, St. Louis Post-Dispatch (Mar. 25, 2011), attached to the Second Ebenstein Decl. (filed concurrently herewith) as Ex. G24, at 3 (showing that Lentz was elected to the Board in 2005).**

98.     Graham is African American.  Ex. I, pg. 250:12-15.

**RESPONSE: Uncontroverted.**

**Election History - 2006**

99.     In 2006, five candidates ran for two seats.  Nancy Knorr received 1,303 votes; Paul Schroeder received 2,954 votes; John Knowles received 1,959 votes; Pat Washington received 944 votes; and Gwendolyn Thomas received 1,122 votes.  Exhibit Y (Official Results, Ferguson School District, Tuesday, April 4, 2006).  Schroeder and Knowles were elected.

**RESPONSE: Uncontroverted.**

100.    Thomas received the highest percentage of African-American votes (28.21%).  Ex. S.  Washington received the second-highest percentage of African American votes (25.11%).  Ex. S.  Schroeder received the highest percentage of white votes (37.96%).  Ex. S.  Knowles received the second-highest percentage of white votes (27.03%).  Ex. S.

**RESPONSE: Uncontroverted.**

101.    Whites cast 19% of votes for Thomas and Washington.  Ex. S.  African Americans cast 29.4% of votes for Schroeder and Knowles.  Ex. S.

**RESPONSE: Uncontroverted.**

102.    Thomas and Washington are African-American.  Ex. I, pg. 250:20-22.

**RESPONSE: Uncontroverted.**

**Election History – 2007**

103. Charles Henson was appointed to fill out the remaining term of Garofalo, who resigned in December 2006. Exhibit Z ("New member joins school board.") Henson is African American. Ex. Z.

**RESPONSE: Uncontroverted.**

104. The 2007 election was uncontested. Ex. X ¶60. Neither Hogshead nor Henson drew any challengers.

**RESPONSE: Uncontroverted.**

**Election History – 2008**

105. The 2008 election was uncontested. Graham, Fletcher, and Clark all retained their seats. Exhibit X (Report of Jonathan Rodden, PhD, May 27, 2015) pg. ¶62.

**RESPONSE: Controverted only to the extent that <u>Lentz, not Fletcher</u> retained his seat. *See Apr. 9, 2008 Board Reorg. Meeting Mins.*, attached to the Second Lakin Decl. (filed concurrently herewith) as Ex. H6.**

106. Graham is African American. Ex. I, pg. 250:12-15.

**RESPONSE: Uncontroverted.**

**Election History - 2009**

107. In 2009, three candidates ran for two seats. Paul Schroeder received 3,233 votes; John Knowles received 3,123 votes; and Gregory Heise received 1,216 votes. Exhibit AA (Official Results, Ferguson School District, Tuesday, April 7, 2009). Schroeder and Knowles were elected.

**RESPONSE: Uncontroverted.**

108. Knowles received the highest percentage of African-American votes (47.66%). Ex. S. Schroeder received the second-highest percentage of African American votes (35.12%). Ex. S. Schroeder received the highest percentage of white votes (44.21%). Ex. S. Knowles received the second-highest percentage of white votes (36.49%). Ex. S.

**RESPONSE: Uncontroverted except for rounding errors. Schroeder received 44.22% of white votes; Knowles received 36.50% of white votes.**

109. Whites cast 80.7% of votes for Knowles and Schroeder. Ex. S. African Americans cast 82.7% of votes for Schroeder and Knowles. Ex. S.

**RESPONSE: Uncontroverted except for a rounding error. African Americans cast 82.8% of their votes for Schroeder and Knowles.**

## Election History – 2010

110.     The 2010 election was uncontested. Ex. X ¶71. Neither Hogshead nor Henson drew any challengers.

**RESPONSE: Uncontroverted.**

111.     Henson is African American. Ex. Z.

**RESPONSE: Uncontroverted.**

## Election History - 2011

112.     In 2011, nine candidates ran for three seats. Doris Graham received 2,795 votes; Vanessa Hawkins received 2,890 votes; Brian Ebert received 2,667 votes; Les Lentz received 1,027 votes; Paul Morris received 3,305 votes; Joseph Hosea received 566 votes; Robert Chabot received 3,080 votes; Chris Martinez received 4,598 votes; and James Clark received 2,257 votes. Exhibit BB (Official Results, Ferguson School District, Tuesday, April 5, 2011). Martinez, Morris, and Chabot were elected. Ex. U.

**RESPONSE: Uncontroverted.**

113.     Graham received the highest percentage of African-American votes (24.1%). Ex. A pg. 17 (Table 1). Hawkins received the second-highest percentage of African American votes (21.5%). Ex. A pg. 17 (Table 1). Clark received the third-highest percentage of African American votes (13.5%). Ex. A pg. 17 (Table 1). Martinez received the highest percentage of white votes (24.90%). Ex. A pg. 17 (Table 1). Morris received the second-highest percentage of white votes (16.10%). Ex. A pg. 17 (Table 1). Chabot received the third-highest percentage of white votes (15.60%). Ex. A pg. 17 (Table 1).

**RESPONSE: Uncontroverted.**

114.     African Americans cast approximately 60% of their votes for Graham, Hawkins, and Clark, but cast the remaining 40% of their votes among six other candidates. Ex. A pg. 17 (Table 1).

**RESPONSE: Uncontroverted. To be more precise, African Americans cast 59.1% of their votes for Graham, Hawkins, and Clark, and the remaining 40.8% among six other candidates. DSUMF Ex. A, *Engstrom Rep.*, at Table 1 (p. 17).**

115.     Whites cast 21.5% of votes for Graham, Butler and Clark. Ex. S. African Americans cast 25% of votes for Martinez, Morris, and Chabot. Ex. S.

**RESPONSE:** Controverted. Pursuant to the cited exhibit, which is the estimates underlying Dr. Rodden's report, whites cast 27.2% of their votes for Graham, <u>Hawkins (not Butler)</u>, and Clark, and African Americans cast 21.7% of their votes for Martinez, Morris, and Chabot. DSUMF Ex. S, *Rodden's Underlying Data*. Using Dr. Engstrom's estimates, whites cast 21.5% of their votes for Graham, Hawkins, and Clark, and African Americans cast 25% of their votes for Martinez, Morris, and Chabot. DSUMF Ex. A, *Engstrom Rep.*, at Tbl. 1(p. 17).

116.    Graham and Hawkins are African American.  Ex. I, pg. 250:23-251:1.

**RESPONSE: Uncontroverted.**

**Election History - 2012**

117.    In 2012, three candidates ran for two seats.  Brian Ebert received 2,809 votes; Paul Schroeder received 2,566 votes; and Barbara Morris received 1,988.  Exhibit CC (Official Results, Ferguson School District, Tuesday, April 3, 2012).  Ebert and Schroeder were elected.

**RESPONSE: Uncontroverted.**

118.    Morris received the highest percentage of African-American votes (51.90%).  Ex. A pg. 18.  Schroeder received the second-highest percentage of African American votes (25.00%).  Ex. A pg. 18.  Ebert received the highest percentage of white votes (46.3%).  Ex. A pg. 18.  Schroeder received the second-highest percentage of white votes (40.9%).  Ex. A pg. 18.

**RESPONSE: Uncontroverted.**

119.    Whites cast 53.7% of votes for Morris and Schroeder.  Ex. A pg. 18.  African Americans cast 48.1% of votes for Ebert and Schroeder.  Ex. A pg. 18.

**RESPONSE: Uncontroverted.**

120.    Barbara Morris is African American.  Ex. I, pg. 251:4-6.

**RESPONSE: Uncontroverted.**

**Election History - 2013**

121.    In 2013, four candidates ran for two seats.  Charles Henson received 2,109 votes; Leslie Hogshead received 2,475 votes; Keith Brown received 2,234 votes; and Larry Thomas received 875.  Exhibit DD (Official Results, Ferguson School District, Tuesday, April 2, 2013).  Hogshead and Brown were elected.

**RESPONSE: Uncontroverted.**

122. Henson received the highest percentage of African-American votes (43.70%).  Ex. A pg. 18.  Hogshead received the second-highest percentage of African American votes (24.2%).  Ex. A pg. 18.  Hogshead received the highest percentage of white votes (37.2%).  Ex. A pg. 18.  Brown received the second-highest percentage of white votes (33.9%).  Ex. A pg. 18.

**RESPONSE: Uncontroverted.**

123. Whites cast 54.2% of votes for Henson and Hogshead.  Ex. A pg. 18.  African Americans cast 44.4% of votes for Hogshead and Brown.  Ex. A pg. 18.

**RESPONSE: Uncontroverted.**

124. Henson is African American.  Ex. Z.

**RESPONSE: Uncontroverted.**

**Election History - 2014**

125. In 2014, eight candidates ran for two seats.  Rob Chabot received 2,898 votes; Paul Morris received 2,516 votes; LaWanda Wallace received 590 votes; Kimberly Benz received 2,231 votes, F. Willis Johnson, Jr. received 2,118 votes; Donna Paulette-Thurman received 2,733 votes; James Savala received 2,425 votes; and Larry Thomas received 568 votes.  Exhibit EE (Official Results, Ferguson School District, Tuesday, April 8, 2014).  Chabot, Paulette-Thurman, and Morris were elected.

**RESPONSE: Uncontroverted except to the extent that these eight candidates ran for three, not two, seats. *See* DSUMF Ex. EE, *2014 FFSD Election Results*, Doc. No. 82-30.**

126. Paulette-Thurman received the highest percentage of African-American votes (26.1%).  Ex. A pg. 19.  Savala received the second-highest percentage of African American votes (24.7%).  Ex. A pg. 19.  Johnson received the third-highest percentage of African American votes (24.5%).  Ex. A pg. 19.  Chabot received the highest percentage of white votes (29.0%).  Ex. A pg. 19.  Morris received the second-highest percentage of white votes (25.8%).  Ex. A pg. 19.  Benz received the third-highest percentage of white votes (22.0%).  Ex. A pg. 19.

**RESPONSE: Uncontroverted.**

127. African Americans cast approximately 75% of their votes for three candidates (Paulette-Thurman, Savala, and Johnson) but spread the remaining 25% of their votes among five other candidates.  Ex. A pg. 19.

**RESPONSE: Uncontroverted. To be more precise, African Americans cast 75.3% of their votes for Paulette-Thurman, Savala, and Johnson, and the remaining 24.6% among five other candidates. DSUMF Ex. A, *Engstrom Rep.*, at Table 1 (p. 19).**

128.    Whites cast 18.2% of votes for Paulette-Thurman, Savala, and Johnson.  Ex. A pg. 18.  African Americans cast 11.3% of votes for Chabot, Morris, and Benz.  Ex. A pg. 18.

**RESPONSE: Uncontroverted.**

129.    Paulette-Thurman, Johnson, and Savala are African American.  Ex. I, pg. 251:12-14.

**RESPONSE: Uncontroverted.**

**Election History - 2015**

130.    In 2015, five candidates ran for two seats.  Brian Ebert received 4,697 votes; Roger Hines received 2,728 votes; Donna Dameron received 1,711 votes; Michael Person received 1,146 votes; and Courtney Graves received 5,279 votes.  Exhibit EE (Official Results, Ferguson School District, Tuesday, April 7, 2015).  Graves and Ebert were elected.

**RESPONSE: Uncontroverted (except that the citation should be to DSUMF Ex. FF, not EE).**

131.    Graves received the highest percentage of African-American votes (52.4%).  Ex. A pg. 19.  Hines received the second-highest percentage of African American votes (12.3%).  Ex. A pg. 19.  Ebert received the highest percentage of white votes (43.0%).  Ex. A pg. 19.  Graves received the second-highest percentage of white votes (21.4%).  Ex. A pg. 19.

**RESPONSE: Uncontroverted.**

132.    Graves received 21.4% of white votes.  Ex. A pg. 19.  The two African American candidates received a combined 25.7% of white votes.  Ex. A pg. 19.

**RESPONSE: Uncontroverted insofar as the second sentence means that the two African American candidates *other than Graves*—Hines and Person—received a combined 25.7% of white votes. DSUMF Ex. A, *Engstrom Rep.*, at Table 1 (p. 19).**

133.    Whites cast 42.27% of votes for Graves and Hines.  Ex. A pg. 19.  African Americans cast 62.2% of votes for Ebert and Graves.  Ex. A pg. 19.

**RESPONSE: Controverted. Whites cast 41.1% of their votes for Graves and Hines. DSUMF Ex. A, *Engstrom Rep.*, at Table 1 (p. 19).**

134.    Graves, Person, and Hines are African American.  Ex. K ¶47.

**RESPONSE: Uncontroverted.**

135.    Dr. Engstrom admitted in his deposition that he did not know to what extent the filing of this action influenced voters.  Ex. L pg. 65:5-6.

**RESPONSE: Uncontroverted. He went on to state, however, that this litigation "could have affected some voters by itself. But it looks to me like the very difference in the candidate pool after the litigation was filed could have then influenced voters." DSUMF Ex. L,** ***Engstrom Dep.*, at 65:21-25.**

136.    Graves encouraged voters to exercise their right to "bullet vote."  Ex. I pg. 157:27-158:7.

**RESPONSE: Uncontroverted.**

137.    Dr. Engstrom testified that ecological inference ("EI") analysis is "preferable" to other forms of analysis, such as homogenous precinct analysis.  Ex. L pg. 39:2-22.

**RESPONSE: Controverted to the extent that in the cited testimony, Dr. Engstrom stated only that he has testified that EI is "preferable" to homogenous precinct analysis.**

138.    Dr. Engstrom testified that the results of his EI analysis were "so close" to Dr. Rodden's that they are interchangeable.  Ex. L pg. 42:4-5.

**RESPONSE: Uncontroverted.** ***See*** **DSUMF Ex. L,** ***Engstrom Dep.*, at 42:4-5 ("Our EI estimates were so close that I believe we could use either set.").**

139.    In 12 exogenous elections analyzed by Dr. Rodden, the African American candidate prevailed in every election, often by extremely large margins.  These elections included high-turnout November presidential elections, November off-year elections, February presidential primaries, and August primaries with very low turnout.  In even the narrow contests, the African American candidates prevailed.  Exhibit GG (Supplemental Report of Jonathan Rodden, Phd: Bloc Voting and Cohesion, July 2, 2015) at pg. 14.

**RESPONSE: Uncontroverted that Rodden analyzed these exogenous elections in which the African-American candidate prevailed. But these exogenous elections, all of which were, unlike FFSD Board elections, partisan and not district-specific, and many of which report on primary elections, do not help us draw any conclusions about FFSD Board elections.** ***See*** **Doc. No. 82-32, DSUMF Ex. GG,** ***Supplemental Report of Jonathan Rodden: Bloc Voting and Cohesion*, at ¶¶ 25-26.**

Dated this 23rd day of October, 2015.      Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

<u>**CERTIFICATE OF SERVICE**</u>

I, Julie A. Ebenstein, hereby certify that on October 23, 2015, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

Respectfully Submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEY FOR PLAINTIFFS