# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Cause No. 4:14 CV 2077 RWS |
| FERGUSON-FLORISSANT SCHOOL DISTRICT, et al., | ) ) ) | |
| Defendants. | ) | |

## DEFENDANT FERGUSON-FLORISSANT SCHOOL DISTRICT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 7-4.01(E), Defendant Ferguson Florissant School Board ("District") submits the following Reply in support of its Motion for Summary Judgment. For the following reasons, the District requests the Court grant the District's motion and dismiss Plaintiffs' Complaint with prejudice.

## INTRODUCTION

The District is not in violation of Section § 2 of the Voting Rights Act as a matter of law. Plaintiffs cannot meet any of the preconditions set out in *Thornburg v. Gingles*, 478 U.S. 30 (1986). Plaintiffs rely on old data instead of the current reality. While Defendant insists there was no violation in the past, there is certainly no violation presently. African Americans are poised to elect all of their candidates of choice under the most current Census data, the 2011 – 2013 American Community Survey. Any change from the current system limits the ability of African American success and is unwarranted under the Voting Rights Act.

1

## ARGUMENT

## I. PLAINTIFFS CANNOT MEET THE FIRST GINGLES PRECONDITION FOR FAILURE TO PROVIDE A "WORKABLE REMEDY."

Defendant submitted several arguments demonstrating Plaintiffs' failure to meet the first *Gingles* precondition. Defendant does not abandon any one of them. However, one argument remains that relies on completely uncontroverted facts and two questions of law. The legal questions are: 1) whether the Court should rely on the newest Census data in the 2011 – 2013 ACS or the older decennial census; and 2) whether Plaintiffs proffered a "workable solution" to establish liability. Defendant maintains that when the Court relies on the most recent Census data available in the 2011 – 2013 ACS, it will find that Plaintiffs' have not offered a "workable solution" sufficient to meet its burden under the first *Gingles* precondition.

### A. The Court should rely on the 2011 – 2013 ACS Census data over the 2010 decennial census.

The threshold legal question is whether the Court should rely on the most recent Census Bureau statistics provided in the 2011 – 2013 American Community Survey ("ACS") or the older 2010 decennial census. In particular, the question is whether Defendant has met the legal standard to rebut the presumption for utilizing the decennial census. Plaintiffs do not squarely address this issue but remain headstrong that the decennial census applies. Plaintiffs are incorrect.

"[C]ensus figures are presumed accurate until proven otherwise. Proof of changed figures must be thoroughly documented, have a high degree of accuracy, and be clear, cogent and convincing to override the presumptive correctness of the prior decennial census. See, *Valdespino v. Alamo Heights Independent School Dist.*, 168 F.3d 848, 853-854 (5th Cir. 1999).

First, "proof of changed figures…" *Id.* Both parties rely on the 2011 – 2013 ACS for different reasons. Plaintiffs rely on the 2011 – 2013 ACS for "socioeconomic factors." See, Ex.

B, Cooper Declaration, ¶9 ("For background, the attorneys also asked me to review historical and current demographics of the School District (reported in the decennial Census) as well as socio-economic characteristics of African Americans and non-Hispanic Whites (reported in the American Community Survey); ¶¶36-37; and the entirety of exhibit D within Ex. B. Defendant relies on the 2011 – 2013 ACS for demographic and socioeconomic factors. See, Ex. X, Rodden Report and Ex. SS, Rodden Supplemental. Plaintiff alone provides ample evidence that the 2010 decennial census data is no longer valid. See, ECF 100, p. 8 (Plaintiffs' table comparing 2010 decennial census to the 2011 – 2013 ACS); Ex. B Cooper Declaration exhibit D to Ex. G, Cooper Supplemental Declaration, ¶7; ECF 101 ¶34 to ¶18 comparing single race BVAP; ECF 101 ¶36 to ¶20 comparing NH white VAP. All of these comparisons provide proof of changed figures. There is no reason for the Court to rely on old data when the 2011 – 2013 ACS Census data far more accurately reflects the current demographics in the District

Second, "the changed figures must be *thoroughly documented*, have a *high degree of accuracy*, and be *clear, cogent* and *convincing*…." *Id. emphasis added*. While the ACS is a relatively new tool, it is a survey created and conducted by the United States Census Bureau. See, Ex. C1 filed Oct. 30, 2015. The ACS s has already met the legal standard above for use in the Voting Rights Act. It should be the same in the case at bar.

In *Benavidez v. City of Irving*, 638 F.Supp. 709 (2009), the court analyzed this precise issue and agreed with plaintiffs' arguments in favor of the ACS over the decennial census. The Court should note that the *Benavidez* plaintiffs included one of the same experts as the case at bar, Dr. Richard Engstrom. The Court stated:

> "The ACS is another sample survey conducted by the Census Bureau. It is of relatively recent origin and is intended to replace the Census long form, but it is conducted annually with the results averaged over time periods to get the same level of statistical sampling as the long form. Each year the ACS surveys

approximately 1/1000 households. At the time that Mr. Ely performed his analysis for this case, the 2006 ACS data was the most current data that had been released by the Census Bureau." *Id*. at 715.

Plaintiffs' expert, Mr. David Ely advocated for the ACS survey data by "claiming that it is highly accurate. He argues that the ACS is conducted with a rigorously researched sampling frame and survey model, it is put together by an organization that knows the process, huge investment has been made in conducting it, everything is done according to normal statistical procedures, and it is ultimately the best available information about current demographic characteristics." *Id*. at 720.

The Court held, "For the reasons enumerated by Mr. Ely as well as the Census Bureau's reliance on ACS data, the Court finds *that ACS data is accurate and reliable*." *Id*. *emphasis added*. The Court went on to state, "…the Census Bureau considers ACS data reliable and *intends for it to be relied upon in decisions such as Voting Rights Act compliance*." *Id*. at 721. *emphasis added*. This Court should rely on the 2011 – 2013 ACS for the same reasons iterated above. It is the most recent and reliable Census data available.

Plaintiffs would have the Court believe the Eighth Circuit chose to rely on the decennial census over the ACS and offer a multitude of cases in support of that notion. That is simply untrue. The first multiyear ACS was not released until 2008. See, Ex. C. For that reason, there have not been many cases filed in years when it is the best available information available on current demographics. The only times a court would need to rely on the ACS is in a case filed after 2008 when the ACS began but before the release of the 2010 decennial census, or a case filed after the release of the 2011 – 2013 ACS. Not one of the cases Plaintiffs cite was published after 2008. See, ECF 100 p. 10. The Eighth Circuit has simply not addressed this issue.

Defendant has met the rebuttable presumption to rely on the 2011 – 2013 ACS over the five year old 2010 decennial census. The 2011 – 2013 ACS is the most recent data released from the United States Census Bureau and it is "thoroughly documented, ha(s) a high degree of accuracy, and (is) clear, cogent and convincing" *Valdespino*, 168 F.3d at 853-854. There is no dispute that the District's figures have changed since the 2010 decennial census so that it no longer accurately reflects current demographics. The Court should make the legal determination that Defendant has met the standard for relying on the 2011 – 2013 ACS Census data over the 2010 decennial Census..

### B. The 2011 – 2013 ACS demonstrates that single-race African Americans are the largest group of voters.

While the parties dispute whether African Americans are a majority of the voting age population, they do not dispute that African Americans are the largest group of voters. Plaintiffs admit this point. "To be sure, the most recent three-year ACS estimates indicate that African Americans are now a very slight plurality of the FFSD VAP." See, ECF 100 p. 12.

Plaintiffs' table indicates that single-race Black voters are 48.94% of the voting age population according to the 2011 – 2013 ACS.[1] See, ECF 100 at p. 8 and ECF 101 ¶35. Plaintiff also indicates the NH white voters are 46.78% of the voting age population according to the 2011 – 2013 ACS. See, ECF 101, ¶36.[2] The fact that African Americans are the largest group of voters (and of the population) pursuant to the 2011 – 2013 ACS changes the legal analysis from that point forward.

---

[1] Again, this is with the caveat that Plaintiffs did not create or use these numbers for demographic purposes.
[2] Plaintiffs controvert this paragraph only to the extent that Defendant referred to the ACS as the "2013 ACS" instead of the "2011 – 2013 ACS" and that the Census Bureau did not calculate margins of error for its estimates of population by age…" See, ECF 101 ¶36.

## C. The first *Gingles* precondition requires a "workable remedy."

The second legal question is the precise standard required under the first *Gingles* precondition to establish liability. Defendant maintains the Court should follow the standards set by the United States Supreme Court. Plaintiffs misinterpret an Eighth Circuit standard in *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006).[3]

The first *Gingles* precondition provides, "Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. *Gingles*, 478 U.S. 30, 50 n. 17 (1986). A subsequent U.S. Supreme Court case held, "[b]ecause the very concept of vote dilution implies – and, indeed, necessitates – the existence of an "undiluted" practice against which the fact of dilution may be measured, a §2 plaintiff must also postulate a *reasonable alternative voting practice* to serve as the benchmark "undiluted" voting practice. *Reno v. Bossier Parish School. Bd.*, 520 U.S. 471, 480 (1997). Since African Americans are the largest group of voters in the District under the 2011 – 2013 ACS, African Americans' ability to elect candidates of choice will be limited and/or harmed in absence of the at large system.[4]

At least two Circuits have analyzed a potential change from an at-large system to single-member districts and held that an adequate remedy is part of a plaintiffs' *prima facie* case. See, *Nipper v. Smith*, 39 F.3d 1494, 1511 (5th Cir. 1994) "The first precondition, or factor, asks whether the court can fashion a remedy for a demonstrated abridgment." *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998) "As part of any *prima facie* case under Section Two, a plaintiff must

---

[3] Defendant does not disagree with the decision in in *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006), especially in light of the facts of that case, it merely disagrees with Plaintiffs' interpretation as it relates to the instant case.

[4] Defendant maintains two challenges to Plaintiffs' Illustrative Plans. First, that implementing single-member districts is not a "workable solution." Second, that the single-member districts within Plaintiffs' Illustrative Plans are not workable. Since Plaintiffs' dispute facts regarding the Illustrative Plans, this Motion relies on the first argument.

demonstrate the existence of a proper remedy *citing SCLC v. Sessions*, 56 F.3d 1281, 1294-97 (11th Cir.1995). Defendant submits these cases are most appropriate because they involve a potential transition from an at-large to single-member system.

Plaintiffs would have the Court interpret *Bone Shirt* to find the District liable without evidence that the Illustrative Districts are a reasonable alternative to the current system. See, ECF 100 p. 15. Plaintiffs claim the Eighth Circuit has conclusively held that it is inappropriate to inquire into the practical effectiveness of illustrative plans during the liability stage. ECF *100 p. 15*.) Defendant disputes that interpretation of *Bone Shirt* in general, but especially as it relates to this case.

Defendant argues *Bone Shirt* is distinguishable from the case at bar. The *Bone Shirt* plaintiffs' expert William Cooper[5], submitted five redistricting plans that created at least one additional majority-Indian legislative district. In addition, plaintiffs provided expert testimony [that] each district in the remedial plan possessed voter margins that ensured Indian-preferred candidates an opportunity to win. See, *Gingles*, 478 U.S. at 50 (explaining justification for the first *Gingles* precondition)." *Bone Shirt*, 461 F.3d at 1018-1019. As indicated, *Bone Shirt* was already a single-member electoral system and the proposed remedy was merely adding to that. The *Bone Shirt* plaintiffs proffered considerably more evidence regarding their proposals than the case at bar. Finally, the issue was whether "plaintiffs must prove that the minority group enjoys a sufficient super-majority status in the proposed remedial districts." *Id*. at 1019. Defendant is not arguing the finer points within Plaintiffs' Illustrative Plans as the *Bone Shirt* defendants did.[6] Defendant argues a transition from an at-large system to single-member districts does not provide African Americans the "potential to elect" they enjoy under the

---

[5] The *Bone Shirt* expert is the same expert Plaintiffs use in the case at bar.
[6] If this case proceeds past summary judgment, Defendant will argue Plaintiffs' Illustrative Plans are harmful to the African Americans incumbents on the Board.

current system because African Americans are the largest group of voters. See, *Gingles*, 478 U.S. 30, 50 n. 17 (1986). Plaintiffs merely assume single-member districts are better for the largest group without any evidence that assumption is true under these facts.

### D. **Single-member districts are not a "workable remedy" under the first *Gingles* precondition.**

Plaintiffs' experts Drs. Engstrom and Kimball authored and cited to articles that state the at-large system is most beneficial to the largest group. Dr. Engstrom's 2010 article states, "…regardless of the particular arrangement, this system does have a tendency to favor the candidates preferred by a majority group, or at least the largest group, of voters within the jurisdiction. It provides the largest group of voters an opportunity to determine the winners of all of the seats." See, ECF 101, ¶71. Dr. Kimball's article states, "If a group composes a majority of the city population in a majoritarian, at-large system, the group may be able to win all of the council seats." See, ECF 101, ¶75. The article goes on to state that districts might even decrease the group's representation on the city council. See, ECF 101, ¶76. Plaintiffs attempt to distinguish these articles by saying that Dr. Engstrom meant "people who actually vote" and Kimball approved "the whole article" instead of just the portion quoted but that does not disprove the substance of the claims.[7] The fact is that African Americans are now the largest population and the largest voting age population in the District according to the 2011 -2013 ACS. As such, African Americans have the potential to win all of the seats and single-member districts limit African Americans to obtaining four seats, at best.

Defendant maintains that even if the Court utilizes *Bone Shirt*, Plaintiffs have not met their burden of proof under the first *Gingles* precondition. *Bone Shirt* relied and quoted approvingly the standard in *Clay v. City of St. Louis*, "At the outset, the plaintiff must show

---

[7] Defendant accepts Plaintiffs' comments for purposes of this Motion.

Native-Americans are "sufficiently [numerous] and geographically compact to constitute a majority in a [proposed] single member district" in order to demonstrate that a workable solution is possible." *Bone Shirt*, 461 F.3d at 1018 *citing Clay v. Board of Education of St. Louis*, 90 F.3d 1357 (8th Cir. 1996). In other words, *Bone Shirt* relied on a "workable solution." Defendant maintains a "workable solution" is one that is better and not potentially worse than the current system. If the Voting Rights Act is to mean anything, it is meant to aid African Americans' ability to elect candidates of their choice.

Defendant maintains the Court should rely on the most current Census data available, the 2011 – 2013 ACS. When it does, the undisputed facts are that African Americans are a plurality in the District. The at-large system is more beneficial to the plurality (and largest group) of voters than single-member districts. Plaintiffs cannot meet the first *Gingles* precondition.

## II. THE DISTRICT IS ENTITLED TO SUMMARY JUDGMENT ON THE SECOND *GINGLES* FACTOR

The second *Gingles* factor requires Plaintiffs to show that African American voters are "politically cohesive." *Gingles*, 478 U.S. at 51. To satisfy this requirement, Plaintiffs must demonstrate that "a significant number of minority group members usually vote for the same candidates." *Id.* at 56. Plaintiffs cannot meet this standard. It is undisputed that more than one-third of victorious candidates have been preferred by both African American and white voters in contested elections since 2000, and that both races have preferred at least one of the same candidates in nearly every contested election since 2009. Dkt No. 81 at 10.

Plaintiffs attempt to minimize the frequency with which African American and white voters prefer the same candidate.[8] Dkt. No. 100 at 23. They focus instead on how often voters prefer candidates of their own race. But Plaintiffs do not deny that white voters cast more than

---

[8] Table 3 in the District's memorandum correctly shows that 10 out of 27 (37.0%) successful candidates have been preferred by both races. The paragraph immediately below the table miscounts the number as 11.

half of their votes for African American preferred candidates in 2000, 2003, 2009, 2012, and 2013 (and more than 40% of their votes in 2002 and 2015). Dkt No. 81 at 31. African American voters cast more than half of their votes for white preferred candidates in 2000, 2009, and 2015 (and more than 40% of their votes in 2001, 2003, 2012, and 2013). *Id.* These voting patterns conclusively establish that African American voters in the District do not have "distinct" voting preferences from white voters. *Shirt v. Hazeltine*, 461 F.3d 1011, 1020 (8th Cir. 2006).

## III. THE DISTRICT IS ENTITLED TO SUMMARY JUDGMENT ON THE THIRD *GINGLES* FACTOR

Even if this Court rules that genuine issues of material fact preclude summary judgment for the District on the second *Gingles* factor, Plaintiffs can survive summary judgment only if they "create a fact issue on *each* of the three *Gingles* prerequisites." *Campos v. City of Houston*, 894 F. Supp. 1062, 1064 (S.D. Tex. 1995) (emphasis added). There is no triable issue of fact as to the third *Gingles* factor, which requires Plaintiffs to show that white voters cast their "votes sufficiently as a bloc to enable [them]" to "usually defeat" the candidate preferred by African Americans. *Gingles*, 478 U.S. at 51. Summary judgment is appropriate under the third *Gingles* factor because African American preferred candidates are not "usually defeat[ed]" and, when they are, the losses are not due to white bloc voting. *Id.*

Since 2000, 13 out of 27 (48%) African American preferred candidates have been elected.[9] Dkt. No. 81 at 33. Thus, African American preferred candidates do not "usually" lose. *Gingles*, 478 U.S. at 51. To the contrary, African American preferred candidates have prevailed nearly half the time, which is commensurate with the African American share of the District's VAP. *See Fairley v. Hattiesburg*, 2:13-CV-18-KS-MTP, 2015 WL 4744315 (S.D. Miss. Aug. 11, 2015).

---

[9] Plaintiffs erroneously state that Thurman was elected in 2011 as a candidate preferred by African American voters but not by white voters. Thurman was elected in 2014.

In response, Plaintiffs urge this Court to disregard elections before 2011 and argue that, since 2011, only four out of twelve (33.3%) African American preferred candidates have been elected. Dkt. No. 100 at 31. While recent elections are more probative, this Court should not ignore pre-2011 elections simply because they are older. *Fabela v. City of Farmers Branch*, No. 3:10-cv-1425-D, 2012 U.S. Dist. LEXIS 10806, at *52 n.30 (N.D. Tex. Aug. 2, 2012).

In any event, Plaintiffs' assertion of "declining" success among African American preferred candidates is unfounded. Three of the eight unsuccessful African American preferred candidates since 2011 have lost by the narrowest of margins. In 2014, an African American candidate preferred by African Americans (Savala) lost by 91 votes. Dkt. No. 81 at 37. In that election, African American voters concentrated 75% of their votes around three candidates (including Savala) but spread the remaining 25% among five other candidates. Dkt. No. 81 at 37. Similarly, in 2013, Henson (an African American candidate preferred by African Americans) lost by only 125 votes. Dkt. No. 81 at 37. Likewise, in 2011, Hawkins (the second choice among African American voters) lost by 190 votes in an election where African American voters gave 60% of their votes to three candidates and distributed the remaining 40% among six other candidates.[10] Dkt. No. 81 at 37.

These three elections do not support Plaintiffs' conclusion that the success of African American preferred candidates is declining.[11] To the contrary, Savala, Henson, and Hawkins would have been elected if African American voters had focused only a fraction more of their votes around these candidates. There have been a total of twelve African American preferred

---

[10] To illustrate the inefficient distribution of African American votes, the District has included two pie charts as appendices to this reply. These appendices contain a visual display of Dr. Engstrom's ecological inference analysis, which has already been submitted to the Court on summary judgment. Defendant's Statement of Undisputed Material Facts, Exhibit A at pgs. 18-21 (Table 1).

[11] Plaintiffs claim that "[a] loss is a loss no matter by what margin" and that "[t]he District cites no case law to the contrary." Dkt. No. 100 at 39. Plaintiffs are mistaken. *See, e.g., Sanchez v. Bond*, 875 F.2d 1488, 1492-93 (10th Cir. 1989); *Romero v. Pomona*, 665 F. Supp. 853, 861 (C.D. Cal. 1987).

candidates since 2011. Eight of those candidates were unsuccessful. However, if Savala,

Henson, and Hawkins are excluded from the pool of unsuccessful candidates because they lost

by razor-thin margins, *see Sanchez*, 875 F.2d at 1492-93; *Romero*, 665 F. Supp. at 861, then only

five African American preferred candidates have meaningful losses. During the same time

period, four African American preferred candidates were elected. This success rate (four out of

nine, or 44.4%) is commensurate with the African American share of the voting-age population.

Dkt. No. 81 at 4

Plaintiffs believe the District is attempting to "shift responsibility" for the close-call

losses to the African American voters. Dkt. No. 100 at 39. For example, Plaintiffs suggest that

the District blames "low African-American turnout" for the defeats of Savala, Henson, and

Hawkins. *Id.* at 39-40. To the contrary, the District's expert, Dr. Jonathan Rodden concluded

that "the turnout gap between whites and African Americans has disappeared" in the District.

Ex. X at ¶ 29. Plaintiffs also imply that the District believes African Americans must vote

"optimal[ly]" and "perfectly cohesive" before a finding of vote dilution can be established. Dkt.

No. 100 at 40. Again, this misrepresents the District's position. If African Americans had

behaved "perfectly cohesive" in 2014, then Savala would have received 33.3% of the African

American votes. *See* Dkt. No. 81 at 20-21 n.10. But Savala (who received 24.7% of African

American votes) did not need perfectly cohesive support among African African voters to be

elected, as he lost by only 91 votes.[12] Savala needed perhaps only an additional percentage point

of African American votes to succeed, which is far from "perfect[] cohes[ion]." Dkt. No. 100 at

40.

In addition to making straw-man arguments about voter turnout and perfect cohesion,

Plaintiffs attempt to defeat summary judgment under the third *Gingles* factor through several

---

[12] For reference, Savala received 2,425 total votes among all races. Dkt. No. 12 at ¶ 125.

erroneous legal arguments, which are all addressed in the District's response to Plaintiffs' summary judgment motion. However, the District specifically responds to two of those arguments here. First, Plaintiffs claim that uncontested elections categorically have no probative value. Dkt No. 100 at 28. But Plaintiffs misread *Harvell v. Blytheville Sch. Dist. #5*, 71 F.3d 1382 (8th Cir. 1995), which simply holds that uncontested elections, standing alone, do not "vitiat[e]" the third *Gingles* factor. *Id.* at 1389. Although the Eighth Circuit "removed" uncontested elections from its analysis of the third *Gingles* factor, it did so because "most of the elections" won by African American preferred candidates were "done so as incumbents in the face of no opposition." *Harvell*, 71 F.3d at 1389. Here, the District has established that the candidates preferred by African Americans have prevailed in 48% of *contested* elections since 2000. Dkt. 81 at 33.

Second, Plaintiffs advocate for an extremely narrow definition of who can be identified as an African American preferred candidate. Plaintiffs' criteria reduce the number of African American preferred candidates in contested elections since 2000 by 30% (from 27 under the District's point-estimate approach to 19) and the number of successful African American preferred candidates during that same time period by more than 45% (from 13 to 7).[13] Dtk. No. 99 at 10. Plaintiffs' definition has been created by a series of elaborate rules that are cobbled together from different Circuits. Dkt. No. 84 at 27. In contrast, the Eighth Circuit has approved of only one method: In an election for *n* seats, the *n* "candidates receiving the highest number of

---

[13] Plaintiffs appear to suggest that the District agrees that it is "impossible" to determine the candidate preferred by African Americans in many elections. Dkt. No. 100 at 42. The District specifically disputed these facts in its response to Plaintiffs' summary judgment motion. Dkt. No. 97 at ¶¶ 63, 66, 73, 83, 86, 93, 123, 128, 132, 134, 142, 143, 172, 175.

African-American votes [are] the 'minority preferred candidates.'"[14]  *Clay*, 90 F.3d at 1361-62. This is the same method used by the District's expert, Dr. Rodden.

Plaintiffs try to limit *Clay* by arguing that the Eighth Circuit was not "confront[ed]" with similar facts as this case. Dkt. No. 100 at 42. Plaintiffs assert that *Clay* leaves the door open for other criteria for identifying African American preferred candidates. *Id.* While the Eight Circuit may someday have an opportunity to endorse alternative definitions, there is only one method that currently can be given any credit within this Circuit. That method, which at least one other Circuit has endorsed, *see Clarke v. City of Cincinnati*, 40 F.3d 807 (6th Cir. 1994), simply identifies the candidates who received the highest levels of support among the racial group. This approach is inclusive and, unlike Plaintiffs' byzantine rules, is not subject to manipulation.

## CONCLUSION

Simply put, African Americans already have an equal opportunity to elect their candidates of choice. Single-race blacks are a plurality of the VAP according to the 2011 – 2013 ACS. Plaintiffs' own experts acknowledge this numerical superiority gives African Americans the potential to control the outcome of every election in an at-large system. Dkt. No. 82 at ¶ 72. "American law guarantees equal electoral opportunity, not equal electoral results." *Goosby v. Town Bd.*, 180 F.3d 476, 502 (2d Cir. 1999). The District's existing electoral system already provides African Americans with that opportunity. Accordingly, the undisputed facts warrant the dismissal of Plaintiffs' Section 2 claim. *Aldasoro v. Kennerson*, 922 F. Supp. 339 (S.D. Cal. 1995) ("[T]his Court also has determined that Hispanics now have the ability to elect at-large. There is no current condition of vote dilution in El Centro."); *Fairley v. Hattiesburg*, 2:13-CV-18-KS-MTP, 2015 WL 4744315 (S.D. Miss. Aug. 11, 2015).

---

[14] The only difference between this case and *Clay* is that African Americans are not a "minority," and hence the candidates preferred by African Americans should not be considered "minority preferred candidates."

Respectfully submitted,

CROTZER & ORMSBY, LLC

*/s/ Cindy Reeds Ormsby*
Cindy Reeds Ormsby, #50986
Angela Gabel, #58227
130 S. Bemiston, Ste. 602
Clayton, MO 63105
(314) 726-3040
(314) 726-5120 (fax)
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

FLOYD, PFLUEGER & RINGER, P.S.

John Armen Safarli, *pro hac vice*
200 W. Thomas St., Ste. 500
Seattle, WA 98119
(206) 441-4455
(206) 441-8484 (fax)
jsafarli@floyd-ringer.com

*Attorneys for Defendant Ferguson-
Florissant School District*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 30, 2015, the foregoing document was filed
using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Crotzer & Ormsby, LLC
130 S. Bemiston, Site 602
Clayton, MO 63105
314.726.3040

Julie A. Ebenstein, *pro hac vic*
Dale E. Ho, *pro hac vice*
Sophia Lin Lakin, *pro hac vice*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
212.549.2693

Anthony E. Rothert
Jessie Steffan
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
314.652.3114

M. Laughlin McDonald, *pro hac vice*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
404.500.1235                              )

*Attorneys for Plaintiffs*

# APPENDIX A

Distribution of African American voters in 2014 according to ecological inference estimates of Plaintiffs' expert Dr. Richard Engstrom



% of African American votes (2014)



■ Paulette-Thurman ■ Savala ▪ Johnson ■ Wallace ■ Chabot ■ Thomas ■ Benz ■ Morris

Data source: Defendant's Statement of Undisputed Material Facts, Exhibit A at pgs. 17-19 (Table 1)

**APPENDIX B**

Distribution of African American voters in 2011 according to ecological inference estimates of Plaintiffs' expert Dr. Richard Engstrom



% of African American votes (2011)

- Graham ■ Hawkins ■ Clark ■ Morris ■ Martinez ■ Ebert ■ Chabot ■ Lentz ■ Hosea

Data source: Defendant's Statement of Undisputed Material Facts, Exhibit A at pgs. 17-19 (Table 1)