**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF ) | |
| THE NATIONAL ASSOCIATION FOR ) | |
| THE ADVANCEMENT OF COLORED ) | |
| PEOPLE, REDDITT HUDSON, ) | |
| F. WILLIS JOHNSON and ) | |
| DORIS BAILEY, ) | |
| ) | Civ. No. 4:14-cv-02077-RWS |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| FERGUSON-FLORISSANT SCHOOL ) | |
| DISTRICT and ST. LOUIS COUNTY ) | |
| BOARD OF ELECTIONS ) | |
| COMMISSIONERS, ) | |
| Defendants. ) | |


**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 1

   I.   Plaintiffs Have Satisfied The *Gingles* Preconditions ........................................... 1

      A.   The undisputed facts demonstrate that Plaintiffs have satisfied *Gingles* I. .................. 1

      B.   There is no dispute of material fact that Plaintiffs have satisfied *Gingles* II. ............... 3

      C.   The undisputed facts demonstrate that Plaintiffs have satisfied *Gingles* III................ 5

  II.   The Undisputed Facts Establish That African Americans in FFSD Have Less Opportunity Than Other Members Of The Electorate To Elect Candidates Of Their Choice ................................................................................................................... 6

      A.   The "predominant" Senate Factors (Factors 2 and 7) weigh in favor of Plaintiffs. ............................................................................................................... 6

      B.   The remaining Senate Factors also weigh in favor of Plaintiffs................................... 7

CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*African-American Voting Rights Legal Defense Fund v. Missouri*,
   994 F. Supp. 1105 (E.D. Mo. 1997) ........................................................................... 8

*Bone Shirt v. Hazeltine*,
   461 F.3d 1011 (8th Cir. 2006) ............................................................................ 6, 7

*Chisom v. Roemer*,
   501 U.S. 380 (1991) .............................................................................................. 11

*Clay v. Board of Education of St. Louis*,
   90 F.3d 1357 (8th Cir. 1996) ................................................................................ 6

*Collins v. City of Norfolk*,
   605 F. Supp. 377 (E.D. Va. 1984) ....................................................................... 10

*Collins v. City of Norfolk*,
   816 F.2d 932 (4th Cir. 1987) ............................................................................... 10

*Fairley v. Hattiesburg*,
   No. 2:13-CV-18-KS-MTP, 2015 WL 4744315 (S.D. Miss. Aug. 11, 2015) ............................. 3

*Georgia State Conference of the NAACP v. Fayette County Board of Commissioners*,
   No. 3:11-CV-00123-TCB, 2015 WL 4633575 (N.D. Ga. Aug. 3, 2015) ................................. 1

*Harvell v. Blytheville School District No. 5*,
   71 F.3d 1382 (8th Cir. 1995) ..................................................................... 8, 9, 12

*League of United Latin American Citizens v. Clements*,
   999 F.2d 831 (5th Cir. 1993) ................................................................................ 8

*Montes v. City of Yakima*,
   40 F. Supp. 3d 1377 (E.D. Wash. 2014) .............................................................. 1

*Rollins v. Fort Bend Independent School District*,
   89 F.3d 1205 (5th Cir. 1996) ................................................................................ 7

*Romero v. City of Pomona*,
   665 F. Supp. 853 (C.D. Cal. 1987) ...................................................................... 5

*Sanchez v. Bond*,
   875 F.2d 1488 (10th Cir. 1989) ........................................................................... 5

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) .................................................................................... passim

*United States v. Marengo County Commission*,
   731 F.2d 1546 (11th Cir. 1984) ............................................................... 11

*United States v. Missouri*,
   388 F. Supp. 1058 (E.D. Mo. 1975) ......................................................... 8

*White v. Regester*,
   412 U.S. 755 (1973) .................................................................................. 12

**INTRODUCTION**

The electoral processes in the Ferguson-Florissant School District's ("FFSD" or "the District") for electing the FFSD School Board (the "Board") members deprives African-American voters of an equal opportunity to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act. There are no legal disputes with respect to the *Gingles* preconditions and no material factual disputes with respect to the totality of the circumstances that prevent this Court from granting summary judgment in favor of Plaintiffs. For the following reasons Plaintiffs' respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment.

**ARGUMENT**

**I.     PLAINTIFFS HAVE SATISFIED THE *GINGLES* PRECONDITIONS**

**A.  The undisputed facts demonstrate that Plaintiffs have satisfied *Gingles* I.**

Plaintiffs' Illustrative Plans readily demonstrate that African Americans in FFSD are "sufficiently large and geographically compact to constitute a majority in a single-member district," *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Doc. No. 84 Pls.' Br., at 5-8; Doc. No. 85 PSUMF Ex. B1, *Cooper Decl.*, at E1-E8, F1-F8. The District's arguments to the contrary are meritless. *First*, the District incorrectly asserts that Plaintiffs' evidence of compactness is limited to the "'eyeball' test." Def.'s Opp'n at 5. Plaintiffs also demonstrate that the Reock scores for each of the plan's districts are in line with those for St. Louis County's current municipal wards. *See* Pls.' Br. at 8. Courts frequently rely on Reock scores to establish compactness. *See, e.g.*, *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1396 (E.D. Wash. 2014); *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, No. 3:11-CV-00123-TCB, 2015 WL 4633575, at *5 (N.D. Ga. Aug. 3, 2015).

*Second*, the District's argument that FFSD is racially "integrated," Def.'s Opp'n at 5, is

inapposite and incorrect. No court has held that, to demonstrate compactness, plaintiffs must show the total absence of integration, or absolute segregation, across the entire jurisdiction. In referencing integration, the *Gingles* Court made the obvious point that where a jurisdiction reaches a certain level of geographic integration, it will be impossible to draw a compact majority-minority district. 478 U.S. at 50. As Plaintiffs' Illustrative Plans establish, that is simply not the case here, and in fact, Plaintiffs' two Illustrative Plans have not one but four such districts. Pls.' Br. at 5-8; PSUMF Ex. B1, *Cooper Decl.*, at E1-E8, F1-F8. In any event, the District's assertions about integration are plainly wrong and based on mischaracterizations of Dr. Kimball's testimony, which unequivocally describes the FFSD as residentially segregated. *See* Pls.' Add'l SUMF Resp., filed concurrently herewith, at ¶¶ 6, 8-11. The District cites Dr. Rodden's conclusion that some Black-preferred candidates' support was geographically dispersed, Def.'s Opp'n at 5-6, but that says nothing about segregation and is irrelevant to *Gingles* I.

The District also asserts Plaintiffs cannot satisfy *Gingles* I because African Americans are a majority of the FFSD VAP. Def.'s Opp'n at 1-4. This argument fails for two reasons. *First*, in line with the weight of circuit authority, no Eighth Circuit rule prohibits vote dilution claims where a racial minority group that has suffered a history of discrimination constitutes a numerical majority of the jurisdiction's VAP. Pls.' Opp'n at 3-8. *Second*, the undisputed available government statistics demonstrate that African Americans in FFSD are not a majority of the VAP, and there is no legal basis for relying on the District's contrary numbers, which are based on speculation and bad math.[1] *Id.* at 8-15.

---

[1] The District mistakenly suggests that Plaintiffs' "proposed remedies" are proof that African Americans constitute a majority of the FFSD population. Def.'s Opp'n at 4. Plaintiffs submitted their Illustrative Plans for the purpose of meeting *Gingles* I only. Pls.' Opp'n at 15-17. Plaintiffs' Hypothetical Plan B was drawn to illustrate what could constitute an unconstitutional racial gerrymander. *See* Pls.' Add'l SUMF Resp. at ¶¶ 4-5. None of these plans are

The District's reliance on *Fairley v. Hattiesburg* is entirely misplaced. In *Fairley*, the parties stipulated to the existence of all three *Gingles* preconditions, and the court went on to evaluate whether vote dilution existed under the totality of circumstances. No. 2:13-CV-18-KS-MTP, 2015 WL 4744315, at *10 (S.D. Miss. Aug. 11, 2015). Far from establishing a *per se* bar, *Fairley* makes clear that a minority group's plurality VAP status poses no bar to a Section 2 claim, and that liability may well exist where warranted, as it is here, under the totality of circumstances. *Id.* at *22-23.

**B.   There is no dispute of material fact that Plaintiffs have satisfied *Gingles* II.**

Plaintiffs do not argue, as the District intimates, that African-American voters in FFSD are politically cohesive simply because of the undisputed fact that Black and white voters in FFSD tend to prefer candidates of their own races. Critically, the undisputed facts show that these groups in FFSD usually do not prefer the same candidates. This is true regardless of the method used for identifying candidates of choice. *See* Pls.' Br. at 14-15, 38-39 (Black and white voters have *never* preferred the same top choice candidate); *id.* at 23, Pls.' Opp'n at 31 (using District's Point Estimate approach, Black and white voters preferred the same candidate only 10 of 27 times); Pls.' Br. at 35, 38-39 (using Plaintiffs' Case-By-Case approach, Black and white voters preferred the same candidate only 2 of 19 times). Dr. Rodden's homogeneous precinct ("HP") analysis does not change this result.

In arguing that Black-preferred candidates did not receive cohesive support, the District appears to confuse the distinction between *voters* and *votes*. In a two-seat election, each voter has two votes; if every voter casts both of their votes, then it is mathematically impossible for a candidate to receive more than 50% of the votes cast. The only way for a candidate in a two-seat

---

"proposed remedies" or demonstrate that African Americans are a majority of the FFSD VAP. *See id.*

election to receive a "majority" of the *votes* is to receive essentially unanimous support from voters, with some casting a single-shot ballot. Doc. No. 97, Def.'s PSUMF Resp. ¶ 24; Pls.' Add'l SUMF Resp. ¶¶ 20, 22; Def.'s Opp'n at 16 n.5. In other words, a candidate in a two-seat election who receives support from almost all *voters* may receive less than 50% of the *votes*.

Thus, Dr. Rodden's estimate that in the 2013 two-seat election Henson received 39% of the African-American votes in precincts with more than 80% of Black VAP indicates a high level of support for Henson among the voters in those precincts: (approximately 78% of the voters). The same is true of Barbara Morris in the 2012 two-seat election: the fact that she may have received less than 50% of the votes in predominantly Black precincts tells us very little about her level of support from *voters* in these precincts. And, indeed, according to Dr. Rodden's Ecological Inference ("EI") analysis (the method he prefers), Morris received *over 50% of the votes cast by Black voters* overall, Def.'s PSUMF Resp. ¶ 130, which indicates she received essentially universal support among Black voters, with some voting only for her.

The District also points out that HP analysis suggests some cross-over voting, with voters in predominantly Black precincts casting some votes for white candidates and vice versa. Doc. No. 99, Def.'s Opp'n, at 13-14. But that does not establish the absence of minority cohesion, which does not require that *all* minority voters vote for minority candidates exclusively, only that "*a significant number* of minority group members *usually* vote for the same candidates."[2] *Gingles*, 478 U.S. at 56 (emphasis added). Nor does it disprove that Black voters and white voters in FFSD generally prefer different candidates. *See* Pls.' Br. at 38-39.[3] This is particularly apparent in elections with fewer Black candidates than available seats, *e.g.*, the 2012 two-seat

---

[2] Cross-over voting does not negate racially polarized voting ("RPV"). *See* Doc. No. 100, Pls.' Opp'n, at 28-29.

[3] The self-serving reflections of some current Board members that they have at some point in decades of voting supported candidates of and believed they had the support of individuals of a different race does not negate the clear pattern of RPV revealed by the analysis of the District's own expert. *See* Pls.' Add'l SUMF Resp. at ¶¶ 60, 65, 67,

election, which had only one Black candidate. In such elections, Black voters who cast both their votes will necessarily cast a ballot for a white candidate, but that does not disprove cohesion.[4]

### C. The undisputed facts demonstrate that Plaintiffs have satisfied *Gingles* III.

As explained previously, the undisputed election results establish that, under any of the parties' approaches for identifying candidates of choice, Black-preferred candidates are usually defeated, particularly when focusing on the most recent, biracial elections, which no party disputes have the most probative value. *See* Pls.' Opp'n at 20-34; Pls.' Br. at 12-37. The extent of Black-preferred candidates' defeat by white bloc voting is even more striking when the 2014 and 2015 elections—are appropriately discounted.[5] *See* Pls.' Opp'n at 25-28.

Although this Court need not determine the proper method of identifying candidates of choice to resolve this motion, we note that the District mischaracterizes Plaintiffs' Case-by-Case approach in several respects.[6] As set forth previously, this is the appropriate approach to identifying candidates of choice in light of Eighth Circuit directive to consider "all the relevant

---

69, 71, 73, 75-76.

[4] That is, assuming most voters cast both their votes, simple arithmetic dictates that half of the Black voters' votes were cast for a white candidate in 2012. According to Dr. Rodden's EI estimates, Black voters appeared to have no real preference between the two white candidates as their second-choice behind B. Morris, almost evenly splitting their votes between them. Def.'s PSUMF Resp. ¶ 130. This inability to recognize instances in which Black voters have not expressed a clear second- or third-choice preference between two candidates is one obvious problem with the District's Point Estimate approach for identifying candidates of choice.

[5] As explained previously, the losses of "near-miss" Black-preferred candidates are not and should not be counted as successes. *See* Pls.' Opp'n at 32. The two out-of-circuit cases the District cites for the contrary proposition are inapposite. In *Sanchez v. Bond*, the Tenth Circuit noted that the district court had relied on a "near-miss" only in conjunction with a pattern of *actual* successes of minority-preferred candidate, 875 F.2d 1488, 1492-93 (10th Cir. 1989), a pattern that does not exist here. In *Romero v. City of Pomona*, the district court did not consider any "near miss" candidates in evaluating the *Gingles* preconditions; instead, it considered, in dicta, one such candidate in the context of evaluating the Senate Factors only. 665 F. Supp. 853, 861 (C.D. Cal. 1987).

[6] The Case-by-Case approach, for example, does not preclude a candidate who finishes behind an unsuccessful Black candidate from being identified as a candidate of choice; the Court should simply view such candidates cautiously, because, as other courts have found, it is problematic if minority voters can only elect their second- or third-choice candidates. Nor does the Case-By-Case approach preclude a candidate from being identified as a candidate of choice merely because his point estimate falls within the confidence interval of another candidate; rather, it simply notes that, when trying to determine if a candidate actually received the second- or third-highest level of support, the court must take into account whether that candidate's level of support is in fact statistically distinguishable from that of seemingly lower-ranked candidates. Pls.' Br. at 20-26; Pls.' Opp'n at 34-36.

circumstances" of each election, and Plaintiffs have clearly established *Gingles* II and III under this approach. *Clay v. Board of Education of St. Louis* did not adopt the District's Point Estimate approach as the definitive rule in this Circuit, and Plaintiffs have established the *Gingles* preconditions even under that approach. 90 F.3d 1357 (8th Cir. 1996); *see* Pls.' Opp'n at 34-36.

In sum, the undisputed facts demonstrate that Plaintiffs have satisfied the *Gingles* preconditions, and none of the District's arguments alter this conclusion.

## II. THE UNDISPUTED FACTS ESTABLISH THAT AFRICAN AMERICANS IN FFSD HAVE LESS OPPORTUNITY THAN OTHER MEMBERS OF THE ELECTORATE TO ELECT CANDIDATES OF THEIR CHOICE

Under the "totality of circumstances," African Americans in FFSD have less opportunity than other members of the electorate to elect candidates of their choice. The undisputed material facts demonstrate that each of the Senate Factors weighs in favor of Plaintiffs. To succeed in their claim, however, Plaintiffs need not prove "any particular number of factors . . . or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45. Thus, even if the Court were to conclude that factual disputes exist as to some factors, it can nevertheless find liability, because the facts underlying the "predomin[ant]" Senate Factors—*i.e.*, "the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme," *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006) (quotation marks and citation omitted) (Factors 2 and 7)—are undisputed. Indeed, *Gingles* provides that "if [the "predominant" factors are] present, the other factors . . . are supportive of, but *not essential to*, a minority voter's claim." 478 U.S. at 48 n.15.

### A. The "predominant" Senate Factors (Factors 2 and 7) weigh in favor of Plaintiffs.

**Factor 2.** The undisputed facts establish that FFSD Board elections are characterized by racially polarized voting. Although the District cherry-picks a few data points and invents new metrics of polarization, the overall election returns in FFSD reveal that "black voters and white

6

voters vote differently." *Gingles*, 478 U.S. at 53 n.21. This is true under any method for identifying preferred candidates. *See* Pls.' Br. at 38-39. For the reasons stated *supra*, Sections I.B and I.C, none of the District's (primarily *legal*) arguments to the contrary have merit.

**Factor 7.** The undisputed election results establish that African-American candidates have had only minimal success in being elected to the Board (a success rate of about 21%, as compared to a success rate of about 60% for white candidates). *See* Pls.' Br. at 40. Faced with these undisputed numbers, the District instead offers specious arguments and irrelevant facts. By its terms, this factor is concerned with "the extent to which members of the minority group have been elected" in the jurisdiction. *Gingles*, 478 U.S. at 37. The quality of the candidates and their campaigns, the occasional success of white candidates whom the District claims are preferred by Black voters, and the success of Black candidates for offices *outside* FFSD[7] are thus all irrelevant to this inquiry. The District cites no precedential authority to the contrary.[8] And the District's argument concerning the purported roughly proportional representation of African Americans on the Board from 2000-2010 is unavailing. If anything, rough proportionality from 2000-2010 would make the present lack of proportionality on the Board, as a result of the more recent most probative elections, all the more striking.

**B. The remaining Senate Factors also weigh in favor of Plaintiffs.**

**Factor 1.** The District concedes that "the racial history of the St. Louis region" is undisputed. Def.'s Opp'n at 19; Def.'s PSUMF Resp. ¶¶ 230-34. Nevertheless, relying on a Fifth

---

[7] The District's reliance on African Americans' proportional representation on the Hazelwood School Board misunderstands the local appraisal required under Section 2. If anything, Black candidates' success in a district with similar demographics is evidence that in FFSD the at-large system works in conjunction with local circumstances to deprive African Americans of an equal opportunity to elect their preferred candidates to FFSD's Board. Unlike FFSD, Hazelwood was not formed through an involuntary desegregation order.

[8] *Rollins v. Fort Bend Independent School District*, 89 F.3d 1205 (5th Cir. 1996), is a Fifth Circuit case. The Eighth Circuit in *Bone Shirt* indicated only that exogenous elections have some probative value in evaluating the *Gingles* preconditions, 461 F.3d at 1020-21, but the District cites no case suggesting that exogenous elections should be accorded the same weight as endogenous ones.

Circuit case, the District argues that Plaintiffs must explicitly "link" this undisputed history of discrimination "from the past to the present." Def.'s Opp'n at 19-20. This interpretation contradicts the plain language of *Gingles* and Eighth Circuit precedent. *See, e.g., Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1389 (8th Cir. 1995) (concluding that although "strides ha[d] been made," "the district court did not accord sufficient weight to the vestiges of that history," and that "recognized historic effects of discrimination in the areas of health, employment, and education impact negatively on minority political participation"); *see also African-Am. Voting Rights Legal Def. Fund v. Missouri*, 994 F. Supp. 1105, 1125 (E.D. Mo. 1997) (indicating plaintiffs could satisfy Senate Factor 1 with historical evidence).

In any event, the history of official discrimination in Missouri, in St. Louis County, and in the municipalities within the District *is* linked to African Americans' ability to participate in the democratic process in FFSD.[9] The indisputable evidence demonstrates continuing socioeconomic disparities along a host of indicators, and that the effects of official discrimination persist *in the District specifically* through gaps in turnout, campaign funding, available resources to volunteer or donate to elections, and even the inability for two Black candidates to attend forums due to lack of private transportation. *See* Def.'s PSUMF Resp. ¶¶ 300-04, 424-425; *see also* Doc. No. 85-26, PSUMF Ex. C5, *Rodden Dep.*, at 71:15 – 72:5, 84:5-13; PSUMF Ex. B1, *Cooper Decl.*, at ¶ 36. This evidence would satisfy even the District's Fifth Circuit case *LULAC v. Clements*, 999 F.2d 831, 866-67 (5th Cir. 1993) ("Where [disproportionate educational, employment, income level and living] conditions are shown, *and where the level of black participation in politics is depressed*, plaintiffs need not prove any

---

[9] The District repeatedly characterizes itself as exempt from the history of official discrimination in the state, in the larger metropolitan region, and in the cities it contains. But it is undisputed that FFSD exists in its current form only because it was segregated on the basis of race and this Court ordered it to annex two adjacent single-race school districts. *See United States v. Missouri*, 388 F. Supp. 1058 (E.D. Mo. 1975).

further causal nexus between their disparate socio-economic status and the depressed level of political participation." (citation omitted)).

**Factor 3.** The District does not dispute that its electoral system comprises an at-large voting scheme with staggered terms and off-cycle elections. While the District defends these electoral features on policy grounds, *see* Doc. No. 81, Def.'s Br. at 24-25, it does not dispute that they "tend to enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 45 (describing Senate Factor 3); *see Blytheville*, 71 F.3d at 1390 ("[S]taggered terms and at-large structure also tend to suppress minority voters' influence."). The District instead contends that African Americans are not disadvantaged by at-large elections because they are supposedly not a numerical minority in the District, *see* Def.'s Opp'n at 23, an argument lacking any credible basis, *see* Pls.' Opp'n at 8-15.

The District also fails to contest the fact that off-cycle elections increase the influence of interest groups that prefer the District's white candidates. *See* Pls.' Br. at 58-59. The District disclaims any significant racial disparities in voter turnout, but this does not disprove that turnout could be higher in the absence of those features. *See id.* at 58; *cf. Blytheville*, 71 F.3d at 1388 ("[L]ow voter turnout has often been considered the result of the minority's inability to effectively participate in the political process.")..

**Factor 4.** The District does not dispute that Ferguson-Florissant National Education Association ("FFNEA") and the North County Labor Club ("NCLC") both endorse candidates in Board elections; that they nearly always endorse white candidates; and that they have almost never endorsed Black candidates. Def.'s PSUMF Resp. ¶¶ 348, 360, 362; 370, 377; *see* Pls.' Br. at 52. The District also does not dispute that neither organization has published criteria for endorsement, Def.'s PSUMF Resp. ¶¶ 355, 373-74, and neither explains its endorsement

decisions.[10]

Unable to dispute these disparities, the District raises a hodge-podge of meritless arguments. First, despite Board President Paul Morris's concession that FFNEA-endorsed candidates are a "slate," the District suggests that neither FFNEA nor the NCLC constitute slating organizations because they do not recruit candidates. That legal argument relies on a cramped understanding of what constitutes a slating process and is not supported by the case law. As explained, the Supreme Court has "viewed 'slating' as essentially involving the endorsing of candidates." Pls.' Br. at 51 n.29 (quoting *Collins v. City of Norfolk*, 816 F.2d 932, 938-39 (4th Cir. 1987)). Here, the FFNEA and NCLC are slating organizations because, as the District does not deny, both organizations endorse candidates, promote their bloc of preferred candidates, and provide endorsed candidates with significant help campaigning. Def.'s PSUMF Resp. ¶¶ 348-49, 352, 370, 371.

In fact, the District neglects to mention that the lone case upon which it relies was *reversed*. *See* Def.'s Opp'n at 26-27 (quoting *Collins v. City of Norfolk*, 605 F. Supp. 377, 390 (E.D. Va. 1984), *aff'd*, 768 F.2d 572 (4th Cir. 1985), *cert. granted, judgment vacated*, 478 U.S. 1016 (1986), *rev'd*, 816 F.2d 932 (4th Cir. 1987)). Ultimately, the Fourth Circuit rejected the notion that an organization must recruit candidates in order to be a slating organization, holding that "there is no support in the law for the restrictive definition [of slating] chosen by the trial court." *Collins*, 816 F.2d at 938.

Next, the District offers evidence that FFNEA does not intend to be racially discriminatory. But, in Section 2 cases, what matters are the "results alone," not the intent,

---

[10] The District now has elicited post-hoc justifications for FFNEA's decision to not endorse two specific Black candidates (out of 12 Black candidates it did not endorse). These excuses shed no light on the reasons other candidates have not been endorsed. And the same individual providing this testimony fails to explain why FFNEA, which claims concern about endorsing candidates unaware of the particularized needs of African-American students,

*Chisom v. Roemer*, 501 U.S. 380, 403-04 (1991), and the results here are that Black candidates are almost never slated by FFNEA and NCLC. The District then suggests FFNEA's endorsement might not really matter. (The District makes no such claim about NCLC, which has seen all but two of the 13 candidates it has endorsed elected to the Board. Def.'s PSUMF Resp. ¶ 372.) But each of the current white Board members was FFNEA-endorsed. *Id.* ¶ 357.

Last, the District argues that the slating organizations do not prohibit African Americans from seeking endorsements. But access is about more than being allowed to apply. "In jurisdictions where there is an influential official or unofficial slating organization, the ability of minorities to participate in that slating organization and *to receive its endorsement* may be of paramount importance." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984) (emphasis added). Whatever the ability of African Americans to seek FFNEA or NCLC support, it is undisputed that they rarely receive it.

**Factor 5.** Plaintiffs have satisfied Senate Factor 5 for the reasons and evidence provided *supra* and with their motion for summary judgment. *See also* Pls.' Br. at 41-48; Def.'s PSUMF Resp. ¶¶ 235-304.[11] The District does not dispute that African Americans in FFSD suffer from a wide range of socioeconomic disparities, *see* Pls.' Add'l SUMF Resp. ¶ 163, but merely claims that African Americans are better off in the District as compared to the broader metropolitan area or the state of Missouri as a whole, because some socioeconomic indicators show that the gaps between African Americans and whites are even wider in the region at large as compared to within FFSD.

But comparing FFSD to the region or the state is beside the point. Greater St. Louis

---

endorsed Chabot, Ebert, and Hogshead, despite their unawareness. Def.'s PSUMF Resp. ¶¶ 365-67.

[11] In these statements of fact, Plaintiffs describe historical and current discriminatory practices both within FFSD and within the metropolitan region (including, among other practices, racially restrictive covenants, *de jure* and *de facto* school segregation, and law-enforcement racial profiling) and how these practices continue to affect African

remains among the most segregated metropolitan areas in the nation. PSUMF Ex. C5, *Rodden Dep.*, at 45:14-18. Senate Factor 5 does not require that African Americans in FFSD be worse off than African Americans everywhere. *See Blytheville*, 71 F.3d at 1390; *see also White v. Regester*, 412 U.S. 755, 769 (1973) (approving district court's totality-of-the-circumstances "assessment of the multimember district, overlaid, as it was, on the cultural and economic realities of the [minority] community in [a particular county] and its relationship with the rest of the county"). Senate 5 requires only that African Americans in FFSD continue to "bear the effects of discrimination in such areas as education, employment and health," *Gingles*, 478 U.S. at 37, not that they are worse off than African Americans elsewhere. It is undisputed that they do. *See supra* n.11.

Moreover, examining those same socioeconomic indicators by block group, Dr. Gordon demonstrates that majority-Black block groups within FFSD generally do worse than the District at large. *See* Doc. No. 85-10, PSUMF Ex. B3, *Gordon Rep.*, at 3 ("on each metric of socio-economic deprivation, the rate for the school district is worse than that for the larger metro area, and the rate for the majority-black block groups is worse than that for the entire school district"). Finally, it bears repeating that Plaintiffs have submitted substantial evidence showing the effects of discrimination hinder African Americans in FFSD from participating effectively in the political process. *See supra* at 8.[12] In short, both Black voters' and Black candidates' ability to participate effectively in the political process is hindered by the present effects of discrimination.

---

Americans in FFSD and nationwide.

[12] This undisputed evidence includes that: African American candidates in the District are disadvantaged when it comes to campaign funding, available resources to volunteer or donate to elections, and sometimes the ability to attend candidate forums due to lack of private transportation. Def.'s PSUMF Resp. at ¶¶ 304, 405. In addition, it is undisputed that African-American turnout has been lower in half of the contested FFSD elections in the last 15 years and has never exceeded white turnout. *See* Def.'s PSUMF Resp. at ¶ 424. Plaintiffs have adduced additional, uncontroverted evidence tending to show that FFSD candidates do not campaign in majority-Black neighborhoods and that candidates' recognition or responsiveness to racial bias or the achievement gap leads to non-electability.

**Factor 6.** The District disputes that Board campaigns are characterized by *overt* racial appeals, but Plaintiffs have provided four examples of *subtle* racial appeals: (a) a focus on "discipline"; (b) alarm about the transfer of predominantly Black students from neighboring districts; (c) personal attacks on a Black candidate using racial coding; and (d) tying racial achievement gaps to "bad parenting." Pls.' Br. at 54-55. None of the District's arguments create a genuine dispute of fact on this factor.

*First*, the District does not deny that racially-coded personal attacks and comments about bad parenting by African Americans constitute racial appeals, or directly controvert the evidence that these incidents transpired. Instead, it submits the declaration of Hogshead, who avers that she was unaware of them. Her purported ignorance is insufficient to create a genuine dispute of fact. *Second*, although the District claims that candidates' focus on "discipline" was not a racial appeal, it fails to controvert Plaintiffs' evidence that African Americans recognized them as such. The District merely presents the declaration of one African American (a Board member), who did not recognize these tactics as subtle racial appeals, a lone perspective that does not disprove others' views. In addition, the District's observation that Black candidates have also talked about discipline does not disprove that the use of this focus as a subtle racial appeal. *Finally*, the District also denies that the focus on concerns with the transfer student program had any subtle racial appeal, insisting it was entirely an economic issue, despite coverage of costs by the source school district and outside donations for transportation costs for transferring students. Pls.' Add'l SUMF Resp. ¶ 190. Again, the District does not controvert the evidence that candidates sought to make it more difficult for certain students (most of whom are Black) to transfer into the District, and that this was perceived by many Black voters as a racial appeal.

---

See, *e.g.*, Doc. No. 85-1, PSUMF Ex. A1, *Bailey Decl.*, at ¶ 11; Doc. No. 85-4, PSUMF Ex. A4, *Henson Decl.*, at ¶¶ 12-13.

**Factor 8.** The District responds to evidence of its unresponsiveness to the needs and concerns of the African-American community by denying such needs exist or claiming it is prohibited from addressing them. As a general matter, Board members lack a grasp of history with regard to the District's history of discrimination, segregation, and disparities by race in education, *see* Def.'s PSUMF Resp. ¶¶ 309, 310, and are unaware of the disproportionate use of discipline against Black students, *see* ¶¶ 271, 307. And it is not surprising that the Board has done little to address concerns about racial discrimination, discipline disparities, and the achievement gap. Def.'s PSUMF Resp. ¶ 313.

With respect to its failure to respond to African-American residents' concerns regarding its decision to suspend Dr. McCoy, *see* Def.'s PSUMF Resp. ¶¶ 329, 332-33, 336, the Board blames Dr. McCoy for its own lack of transparency, *see* Def.'s Opp'n at 39, 41; Pls.' Add'l SUMF Resp. ¶¶ 239-42, 251-56. But this blame is misdirected. *First*, the March 15, 2014 Separation Agreement with Dr. McCoy is entirely unrelated to the Board's prior refusal from November 2013 to March 2014 to address the community's concerns. *See* Doc. No. 97-20, Def.'s Add'l SUMF Ex. AAA, *Separation Agreement. Second*, the Agreement does not preclude discussion of the suspension or his termination proceedings. Doc No. 51-2, Email from Sedey to parties' counsel, June 12, 2015; Pls.' Add'l SUMF Resp. ¶ 239. *Third*, given Board members' willingness to discuss Dr. McCoy's suspension, the Board either does not, as it claims, have a policy on discussing personnel matters, or has not adhered to that policy.[13]

The Board's recent hire of an African-American Superintendent (after this lawsuit was

---

[13] Indeed, it has discussed Dr. McCoy's suspension publicly on multiple occasions, *see* Doc. No. 85-57, PSUMF Ex. F15, *Nov. 7, 2013 Board Letter to FFSD Families* ("The decision reflects differences in focus and philosophy between the Board and superintendent and is not an indication or wrongdoing."), and willingly in post facto self-serving statements from Board members, Pls.' Add'l SUMF Resp. ¶¶ 251-52, 254-56.

filed) does absolve the Board of its lack of responsiveness.[14] If anything, forums for parents to hear the top superintendent candidates provide yet another example of unresponsiveness, as the Board did not address the concerns raised at these forums. *See* Pls.' Add'l SUMF Resp. ¶ 237.

**Factor 9.** The District fails to counter Plaintiffs' arguments that the purposes underlying the District's discriminatory election practices are tenuous. The District's assertion that the current system "ensures that board members represent the entire community," Def.'s Opp'n at 42, is empirically false. There have never been more than two Black members on the Board, despite the District's claim that African Americans comprise a majority of FFSD. Def.'s PSUMF Resp. ¶ 412. Similarly, no Board member has resided in a municipality other than Florissant or Ferguson since 2011. *Id.* ¶ 413. Additionally, the "stability" rationale is tenuous because the District fails to justify the continued necessity of staggered terms when the "initial period of stable governance for the new district" began over 40 years ago. *Id.* ¶¶ 419-20. Finally, the uncontested argument that off-cycle elections generate lower turnout undermines the District's claim that they allow for more attention to Board races, *id.* ¶¶ 428-29.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to summary judgment.

Dated this 30th day of October, 2015.     Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project

---

[14] That a majority-white Board hired Dr. McCoy is a non-starter. The Board has always been and remains majority-white. Pls.' Add'l SUMF Resp. ¶ 235. The Board that hired Dr. McCoy was as diverse as the Board has ever been (2 Black members out of 7). *Id.* The Board that fired him was all-white. Def.'s PSUMF Resp. ¶ 322.

125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I, Julie A. Ebenstein, hereby certify that on October 30, 2015, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com

agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

Respectfully Submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEY FOR PLAINTIFFS