## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF | ) | |
| THE NATIONAL ASSOCIATION FOR THE | ) | |
| ADVANCEMENT OF COLORED PEOPLE, | ) | |
| REDDITT HUDSON, F. WILLIS JOHNSON | ) | |
| and DORIS BAILEY, | ) | |
| | ) | Civ. No. 14-2077 |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FERGUSON-FLORISSANT SCHOOL | ) | |
| DISTRICT and ST. LOUIS COUNTY BOARD | ) | |
| OF ELECTION COMMISSIONERS, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S ADDITIONAL STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### *Gingles* 1

1.　　Cooper's Illustrative Plans are based on the 2010 decennial census single-race BVAP. Ex. F, *Cooper Dep.,* at 78:7-14 and Ex. B, *Cooper Rep.,* at Figures 10 and 12.

**RESPONSE: Uncontroverted.**

2.　　Plaintiffs' attorneys asked Cooper to develop four majority African American districts in a seven single-member district plan. Ex. B, *Cooper Rep.,* at ¶9.

**RESPONSE: Controverted to the extent that Plaintiffs' attorneys asked Cooper to "determine whether it is *possible* to create four majority-Black districts in a seven single-member district plan" as *Gingles* I requires. Doc. No. 85-8, PSUMF[1] Ex. B1, *Decl. of William S. Cooper*, May 27, 2015, at ¶ 9 (emphasis added).**

3.　　Cooper states, "Had I made race predominant, I could have created six out of seven majority-black districts." Ex. G, *Cooper Supp Rep.,* at ¶27.

**RESPONSE: Uncontroverted that Cooper made this statement. "Predominant" as used in this statement refers to "the predominant criterion" for determining where subdistrict lines are drawn. Doc. No. 85-15, PSUMF Ex. B6, *Suppl. Decl. of William S. Cooper*, July 2, 2015, at ¶ 27. Hypothetical Plan B is neither an illustrative plan to satisfy *Gingles* I, nor a proposed remedial plan. *See* PSUMF Ex. B6, *Cooper Suppl.***

---

[1] "PSUMF" refers to Doc. No. 85, Plaintiffs' Statement of Uncontroverted Material Facts.

*Decl.*, at ¶ 27. Cooper made this statement in response to criticism that the illustrative plans he created were a "racial gerrymander," which the District suggests violates the Fourteenth Amendment of the U.S. Constitution. Doc. No. 46, *FFSD Am. Answer*, at 5. Cooper created Hypothetical Plan B to provide an example of what would be, in his view, districting more akin to a racial gerrymander, to contrast it with Plaintiffs' Illustrative Plans, PSUMF Ex. B6, *Cooper Suppl. Decl.*, at ¶ 27 Fig. 7, which have four out of seven majority African-American districts and "comply with traditional redistricting principles, including one-person, one-vote; compactness; contiguity; avoiding unnecessary splitting of precinct boundaries; and respect for communities of interest," PSUMF Ex. B6, *Cooper Suppl. Decl.*, at ¶ 27.

4.      The Supplemental Declaration of William S. Cooper contains a hypothetical plan with six of the seven single-members districts that are majority African American voters. Ex. G, *Cooper Supp Rep.,* at Figures 7 and 8.

**RESPONSE: Uncontroverted. Hypothetical Plan B is neither an illustrative plan to satisfy *Gingles* I, nor a proposed remedial plan, and was created to provide an example of what would be, in his view, districting more akin to a racial gerrymander, to contrast it with Plaintiffs' Illustrative Plans. *See* response to ¶ 3.**

5.      Hypothetical Plan B contains African American BVAP ranging from 51% - 60.29% in six of the seven proposed single-member districts. Ex. G, *Cooper Supp Rep.,* at Figure 8.

**RESPONSE: Controverted. *See* response to ¶ 3. Hypothetical Plan B contains an African-American VAP ranging from 50.22% to 59.41%. PSUMF Ex. B6, *Cooper Suppl. Decl.*, at ¶ 28 Fig. 8.**

**Cooper's Hypothetical Plan B, drawn with race as the predominant factor, suggests only that using race as the predominant criterion, districts can be drawn to pack white voters in one district so that the majority-white district has the greatest population deviation (+4.64%) and a non-Hispanic White VAP of 85.18%. *Id.* The map does not suggest that African Americans are a majority of the District's VAP; hypothetical district lines do not somehow change the population and demographics of the District.**

6.      Dr. Kimball concludes that precincts that are between 10-90% African American are racially integrated. Ex. BBB, *Kimball Rebuttal Rep.,* at p. 6.

**RESPONSE: Controverted. The District's only support for this statement is a mischaracterization of Dr. Kimball's testimony. Dr. Kimball describes precincts that are over 90% Black as "heavily black" and those that are less than 10% Black as "heavily white." Doc. No. 85-18, PSUMF Ex. B9, *Rebuttal Rep. of David C. Kimball*, July 2, 2015, at 6. He makes no conclusions regarding the *geographic* racial integration of any precincts, and as such, certainly does not conclude that precincts that are between 10% and 90% Black are "racially integrated."**

In the cited section of Dr. Kimball's rebuttal report, Dr. Kimball shows that in the years 2011, 2013, 2014, and 2015, precincts with a population over 90% African-American had lower turnout than precincts with a population less than 10% African-American. *Id.* He compared those "homogeneous precinct" ("HP") turnout estimates to Dr. Rodden's "ecological inference" ("EI") turnout estimates and showed that the HP analysis evidences "more pronounced" turnout disparities than Dr. Rodden's EI turnout estimates. *Id.* As such, he stated that "we should be cautious" with Dr. Rodden's estimates. *Id.* In order "for Rodden's turnout estimates to be correct, then black turnout needs to exceed white turnout in the racially integrated precincts of the school district." *Id.* This is the only time Dr. Kimball uses the phrase "racially integrated." *See generally id.* It is not a conclusion that any precinct that included between 10% and 90% African Americans was geographically racially integrated.

As Dr. Kimball clarified at his deposition, he was not referring to integration, only population numbers that are less homogenous. *See* Doc. No. 85-27, PSUMF Ex. C6, *Dep. of David Kimball*, Aug. 21, 2015, at 93:10-20. A simple snapshot of the population numbers is a "misleading measure" of integration, Doc. No. 85-24, PSUMF Ex. C3, *Dep. of Colin Gordon*, Aug. 19, 2015, at 61:9-17, that "ignor[es] the fact of segregation on the ground," *id.* at 63:19 – 64:4. *See id.* at 66:21 – 67:20.

7.     Kimball opined that, in an at-large election system, a racial or ethnic majority can "effectively determine the winners of all" elections if there is racially polarized voting. Ex. P, *Kimball Rep.,* at p. 6.

**RESPONSE: Controverted. The District has spliced together two sentences of Dr. Kimball's report, thereby changing their meaning. Dr. Kimball testified, "Previous research finds that racial and ethnic minority voters have more difficulty electing candidates of their choice in local at-large elections than in local district elections. When there is racially polarized voting, a white majority can more effectively determine the winners of all at-large seats." Doc. No. 85-12, PSUMF Ex. B4, *Rep. of David C. Kimball*, May 27, 2015, at 6 (emphasis added).**

**FFSD is racially integrated**

8.     Dr. Thurman states that her neighborhood is 60% African American and 40% white. Ex. KK, *Thurman Dep.,* at 93:11-14.

**RESPONSE: Uncontroverted, except that Dr. Paulette-Thurman stated that her neighborhood is "probably" 60% African-American and 40% white. Doc. No. 85-36, PSUMF Ex. E4, *Dep. of Donna Paulette-Thurman*, June 17, 2015, at 93:11-14. Her statement also gives no indication as to the extent, if any, of geographical integration.**

9.     Johnson's neighborhood is racially integrated "literally and figuratively". Ex. LL, *Johnson Dep.,* at 21:1-13.

**RESPONSE: Uncontroverted that Rev. Johnson made this statement. However, Rev.**

Johnson's complete statement is that his African-American and white neighbors "live[] together" and that he has a "[p]retty mixed neighborhood, literally and figuratively." Doc. No. 85-41, PSUMF Ex. E9, *Dep. of Fred Willis Johnson*, Aug. 26, 2015, at 21:10-13. Viewing these statements in context, it is unclear if he is referencing the interracial families on his block or describing his neighborhood.

10.    Schroeder testified that the District is very integrated at this point. Ex. PP, *Schroeder Dep.,* at 33:22–34:8.

**RESPONSE: Uncontroverted that Schroeder so testified. When asked whether racial segregation is still an issue in St. Louis County, Schroeder also testified, "Not legally, but we do have de facto segregation where people tend to live, yes." Doc. No. 85-39, PSUMF Ex. E7, *Dep. of Paul Schroeder*, July 2, 2015, at 33:17-21.**

11.    The Ferguson Florissant School District is a bright spot because it is desegregated. Ex. I, *Rodden Dep.,* at 45:14-23.

**RESPONSE: Controverted. The cited material is incomplete and taken out of context. Dr. Rodden agreed that St. Louis remains among the most segregated metropolitan regions in the United States. He opines that the District is a "bright spot" of desegregation because it was ordered desegregated by federal courts, despite the District's opposition. Doc. No. 85-26, PSUMF Ex. C5, *Dep. of Jonathan Rodden*, Aug. 20, 2015, at 45:14 – 46:2; *id.* at 45:18-23 ("That is correct [that St. Louis remains among the most segregated metropolitan regions in the United States], and as I point out in the [previously discussed] article, there are a few bright spots. There are a few places that are desegregated, and one of those is the Ferguson-Florissant [S]chool [D]istrict. And it's not desegregated by accident. It was desegregated by court order and that court order was successful.").**

### *Gingles* 2

12.    Plaintiffs' counsel asked Dr. Rodden, "And we established earlier, didn't we, Dr. Rodden, that to get through peer review, one should quantitatively test hypotheses, not rely simply on sort of qualitative judgments about whether or not something was the cause of something else, right?"  Dr. Rodden responded, "Yes." Ex. I, *Rodden Dep.,* at 89:11-16.

**RESPONSE: Uncontroverted.**

13.    Dr. Rodden testified that, in his opinion, it would not be "analytically appropriate" to use Plaintiffs' "rule of thumb" method that "when the point estimate for the level of support for one candidate lies within the confidence interval of support for another candidate, there is no statistically significant difference between the two candidates." Ex. I, *Rodden Dep*., 164:20-21.

**RESPONSE: Controverted. The cited material does not contain the quoted language or**

**support this statement. Dr. Rodden stated "I don't believe that throwing out all of the candidates in every situation, when African-Americans are incohesive in their voting behavior, is an analytically appropriate choice." PSUMF Ex. C5, *Rodden Dep.*, at 164:18-21.**

**Plaintiffs do not controvert that ¶ 13 includes an accurate statement regarding overlapping point estimates and confidence intervals, but it is inaccurate to describe it as "Plaintiffs' 'rule of thumb'" since it is a rule that <u>originated with Dr. Rodden</u>, who applied it as part of his turnout analysis. *See* Docs. Nos. 85-13 & 85-14, PSUMF Ex. B5, *Rep. of Jonathan Rodden*, May 27, 2105, at ¶ 26 (applying the rule of thumb to his ecological inference analysis of voter turnout by race: "When one of the dots is only slightly higher the one of the opposite color and sits within the confidence interval of the other, we cannot say with confidence that the estimates of black and white turnout are different."); PSUMF Ex. C5, *Rodden Dep.*, at 78:4-23.**

14.    Rodden repeatedly objected to this method and stated it was "not an appropriate approach to the data." Ex. I, *Rodden Dep.*, 164:20-22.

**RESPONSE: Controverted. The cited material does not support this statement or refer to a "method." Dr. Rodden objected to "throwing out all of the candidates in every situation, when African-Americans are incohesive in their voting behavior." *See supra* response to ¶ 13.**

**The "approach" for identifying preferred candidates is a legal question. See Pls.' Br. in Supp. of Mot. for Summ. J., Doc. No. 84 (Pls.' Br."), at 20-26.  Rodden testified to his opinion that the correct approach for identifying candidates of choice are what Plaintiffs have previously called the "Top-Ranked Candidate" approach and the "Point Estimate" approach. *See* PSUMF Ex. B5, *Rodden Rep.*, at ¶¶ 73-74; PSUMF Ex. C5 at 162:21 – 163:1, 356:5 – 357:4.**

15.    In reference to Plaintiffs' method, Dr. Rodden testified, "I don't agree to the approach that's being taken. . . I don't believe that throwing out all of the candidates in every situation, when African-Americans are incohesive in their voting behavior, is an analytically appropriate choice.  I object to that approach.  Ex. I, Rodden Dep., 164:16-23.

**RESPONSE: Controverted for the reasons stated in responses to ¶¶ 13-14, *supra*. Dr. Rodden made this statement in reference to whether a Black-preferred candidate can be identified in instances where African Americans are not cohesive behind a second-choice candidate. *See* PSUMF Ex. C5, *Rodden Dep.*, at 161:12 – 162:3.**

16.    Dr. Rodden testified that the parties were at an "impasse" on this point. Ex. I, Rodden Dep., 165:10-11.

**RESPONSE: Controverted for the reasons stated in responses to ¶¶ 13-14, *supra*. Dr. Rodden made this statement in reference to whether a Black-preferred candidate can**

be identified in instances where African Americans are not cohesive behind a second-choice candidate. *See* PSUMF Ex. C5, *Rodden Dep.*, at 161:12 – 162:3.

17.     Dr. Rodden testified that there is a "difficult analytical choice" in "trying to identify more than one preferred candidate" in a "multi-winner system." Ex. I, *Rodden De*p., 162:14-21.

**RESPONSE: Uncontroverted.**

18.     Dr. Rodden testified that Plaintiffs' approach is "not an approach that would be acceptable if submitted to a peer-reviewed journal." Ex. I, *Rodden Dep*., 179:6-7.

**RESPONSE: Controverted for the reasons stated in responses to ¶¶ 13-16, *supra*. Where Dr. Rodden criticizes this "approach," he is criticizing a method for identifying preferred candidates in which a candidate is not considered preferred if it cannot be determined to a reasonable degree of certainty whether that candidate was among the top *n* choices of African-American voters. Dr. Rodden testified that "drop[ping] all of the cases in which voting behavior is not cohesive and focus[ing] only on those in which it was and then draw[ing] inferences from that" is not an approach that would be accepted if submitted to a peer-reviewed journal. PSUMF Ex. C5, *Rodden Dep.*, at 178:15 – 179:11.**

19.     Dr. Rodden testified that "African Americans are more likely to vote for African American candidates and whites are more likely to vote for white candidates." However, he also testified that "[t]he correlation of that kind would be found in really any jurisdiction in the United States in which African-American candidates and white candidates are on the ballot and there are African-Americans and whites in the jurisdiction." Ex. I, *Rodden Dep*., at 273:21-25.

**RESPONSE: Controverted as incomplete. Dr. Rodden agreed that "African-American voters are more likely to vote for African-American candidates and white voters are more likely to vote for white candidates *in the Ferguson-Florissant school board elections*." PSUMF Ex. C5, *Rodden Dep.*, at 273:16-21 (emphasis added).**

20.     In 2013, precincts where more than 80% of the VAP was African American, Henson (a African American candidate) received only 39% of votes cast. Ex. X, *Rodden Rep., at      ¶ 55.

**RESPONSE: Untroverted for the purposes of summary judgment. The only support for this statement of fact is Dr. Rodden's report. However, Dr. Rodden did not provide the data underlying the HP analysis on which he based his conclusion that Henson received only 39% of the votes cast in "precincts where more than 80 percent of the [VAP] was African American." PSUMF Ex. B5, *Rodden Rep.*, at ¶ 55. Based on Engstrom's HP analysis, in 2013, Henson received 41.4% of the votes in precincts with over 85% African-American VAP. *See* Doc. No. 85-9, PSUMF Ex. B2, *Rep. of Richard L. Engstrom*, May 27, 2015, at Table 2 (pp. 20-21).**

In addition, the claim that Henson "only" received 39% of votes, whether in all precincts or in precincts where more than 80% of the VAP was African-American, is misleading. The District appears to conflate <u>votes</u> and <u>voters</u>. The 2013 election was a two-seat election, in which each voter had two votes. Def. FFSD's Resp. to PSUMF, Doc. No. 97 ("Def.'s PSUMF Resp.") ¶¶ 24, 138-39. In FFSD, a voter cannot vote twice for the same candidate. Def.'s PSUMF Resp. ¶ 24. Therefore, Henson's receipt of 39% of votes in those precincts means that, if each voter cast his or her two allotted votes, 78% of voters (2 x 39%) in those precincts cast a vote for Henson. This does not warrant the modifier "only."

21.     In 2013, Henson (an African American candidate) only received a majority of votes cast in 2 of the 47 precincts.  Ex. X, *Rodden Rep.,* at ¶ 55.

**RESPONSE**: **Controverted. First, voting occurred in 46 precincts in the 2013 election. PSUMF Ex. B2,** *Engstrom Rep.***, at ¶ 40 n.9. Second, the claim that Henson "only" received a majority of the vote in 2 of 47 precincts is misleading. In precincts where Henson received "a majority of votes cast," this means he received unanimous support, and likely some voters voted only for him. This does not warrant the modifier "only."**

22.     In 2012, Morris (an African American candidate), failed to achieve a majority of the votes cast in precincts where 80% of the VAP was African American.  Ex. X, *Rodden Rep.,* at ¶ 57.

**RESPONSE**: **Controverted. Dr. Rodden does not provide a figure for the percentage of votes B. Morris received in these precincts, or the underlying data on which he bases his conclusions, stating only that she did not receive "a majority." Dr. Engstrom's HP analysis found that in 2012, B. Morris received 52.3% of the votes in precincts with over 85% African-American VAP.** *See* **PSUMF Ex. B2,** *Engstrom Rep.***, at Table 2 (pp. 20-21).**

**Furthermore, it is unclear whether "precincts where 80% of the VAP was African American" includes the same precincts as "precincts where** *more than* **80% of the VAP was African American" or "80%** *or more*"** as described in Def.'s Additional Statement of Uncontroverted Material Facts, Doc. No. 98 ("Def.'s Add'l SUMF") ¶¶ 20, 23, 24, 25. There is no explanation for this inconsistency.**

**Again, the claim that B. Morris "failed to achieve a majority of the votes," whether among African American voters or in precincts where 80% of the VAP was African-American, is not only inaccurate but misleading. The District appears to conflate votes and voters. According to all data provided, B. Morris received a majority of votes cast by African Americans (51.33% according to Dr. Rodden's EI estimates, 51.9% according to Dr. Engstrom's EI estimates), and 52.3% of the votes in precincts where more than 85% of the VAP was African-American. Def.'s PSUMF Resp. ¶ 130; PSUMF Ex. B2,** *Engstrom Rep.***, at Table 1 (pp. 17-19), Table 2 (pp. 20-21). This means that throughout the district, including predominantly Black precincts, B. Morris received**

unanimous support among African-American voters, and likely some Black voters voted only for her. This does not warrant the modifier "only."

23.      Precincts with a VAP that is 80% or more white gave at least half of their votes to African American candidates in 2015. Ex. X, *Rodden Rep.,* at ¶ 38.

**RESPONSE**: **Controverted. Dr. Rodden made this conclusion without providing any underlying data, and it is inconsistent with his ecological inference analysis. Using EI, Dr. Rodden estimated that white voters throughout these precincts gave less than half their votes to African-American candidates.** ***See*** **Def.'s PSUMF Resp. ¶ 167; PSUMF Ex. B2,** ***Engstrom Rep.*****, at Table 1 (pp. 17-19).**

24.      Precincts with a VAP that is 80% or more African American gave approximately 60% of their votes to white candidates in 2012 and 2013. Ex. X, *Rodden Rep.,* at ¶ 38.

**RESPONSE:** **Controverted for reasons described** ***supra*** **in responses to ¶¶ 20, 22. According to Dr. Engstrom's HP analysis, in 2013, Henson received 41.4% of the votes in precincts with over 85% African-American VAP. PSUMF Ex. B2,** ***Engstrom Rep.*****, at Table 2 (pp. 20-21). In 2012, Morris received 52.3% of the votes in precincts with over 85% African American VAP.** ***Id.***

25.      Precincts with a VAP that is 80% or more African American gave more than 40% of their votes to white candidates in 2015. Ex. X, *Rodden Rep.,* at ¶ 38.

**RESPONSE**: **Controverted. Dr. Rodden made this conclusion without providing any underlying data, and it is inconsistent with his EI analysis and both the EI and HP analyses provided by Plaintiffs' expert.** ***See*** **Def.'s PSUMF Resp. ¶ 167; PSUMF Ex. B2,** ***Engstrom Rep.*****, at Table 1 (pp. 17-19), Table 2 (pp. 20-21). According to EI analysis, the "prefer[red]" method due to the shortcomings of HP analysis,** ***see*** **PSUMF Ex. C5,** ***Rodden Dep.*****, at 122:24 – 123:19, Black voters throughout the District cast only 24.15% of their votes for white candidates,** ***see*** **Def.'s PSUMF Resp. ¶ 167; PSUMF Ex. C5,** ***Rodden Dep.*****, at 159:7-12.**

**Dr. Engstrom's HP analysis found that 74.9% of the votes in precincts with more than 85% African-American VAP went to African-American candidates (Graves, Hines and Person). PSUMF Ex. B2,** ***Engstrom Rep.*****, at Table 2 (pp. 20-21). Only 25.1% of the votes in precincts with 85% African American VAP went to white candidates.** ***Id.*** **There is no data supporting significantly higher support among voters in precincts where between 80% and 85% of the VAP was African-American.**

26.      Plaintiffs' expert, David Kimball, refused to opine that the formation of the coalition of African-American candidates was "racially motivated." Ex. O, *Kimball Dep.,* at 58:2-6.

**RESPONSE**: Controverted. This statement inaccurately characterizes Dr. Kimball's testimony as a "refus[al] to opine," a term so vague that it lacks meaning. Dr. Kimball stated that in 2014, African-American candidates may have been motivated to run for office "as a reaction to McCoy's resignation," which followed his suspension by an all-white Board, PSUMF Ex. C6, *Kimball Dep.*, at 57:23 – 58:11. To the extent the District attempts to deduce any meaning from what Dr. Kimball did *not* say, the cited material does not support its statement.

27.    Brown testified people tend to vote based on the candidates they feel are best qualified and not based on race. Ex. OO, *Brown Dep.,* at 38:6-11.

**RESPONSE:** Uncontroverted that Brown so testified. Brown's basis for this opinion was "I guess maybe because that's the way I think." Doc. No. 85-35, PSUMF Ex. E3, *Dep. of Keith Brown*, June 16, 2016, at 38:18-19.

*Gingles* **3**

28.    Dr. Kimball admitted that he had "no idea" whether this lawsuit influenced the behavior of voters in the 2015 election. Ex. O, *Kimball Dep.,* at 76:18-21.

**RESPONSE:** Controverted. The District's only support for this statement is a mischaracterization of Dr. Kimball's testimony. Dr. Kimball testified that he had "no idea" in response to the question "Do you have any reason to believe that whites strategically voted for Dr. Graves because they wanted to influence this lawsuit?" PSUMF Ex. C6, *Kimball Dep.*, at 76:18-21.  He did not testify regarding how this lawsuit influenced voter behavior in FFSD in 2015.

29.    Dr. Kimball admitted that he did not know whether any candidates decided not to run in the 2015 election because of this lawsuit. Ex. O, *Kimball Dep.,* at 76:22-24.

**RESPONSE: Uncontroverted.**

30.    Dr. Kimball testified that to determine the minority-preferred candidates in a multiwinner election, one would first determine the candidate who received the most minority votes. Ex. O at 77:15-17. Next, one would find out which candidate "got the second most votes from . . . the minority group and which candidate got the third most votes." Ex. O, *Kimball Dep.,* at 77:20-78:1.

**RESPONSE: Controverted.** The cited testimony is incomplete, taken out of context, and mischaracterizes Dr. Kimball's testimony. In this portion of his deposition, Dr. Kimball explained that the analysis in his rebuttal report is based on Dr. Rodden's estimates for identifying minority-preferred candidates. PSUMF Ex. C6, *Kimball Dep.*, at 78:11-17. He specified that he does not agree with Dr. Rodden's analysis for determining second- and third-choice candidates when "the confidence intervals were so wide that they were statistically indistinguishable from each other." PSUMF Ex. C6, *Kimball Dep.*, at 78:18 – 79:2.

**Special Circumstances**

31.    Plaintiffs are not aware of any research that shows a Voting Rights Act lawsuit affects the pool of candidates that run in the next election. Ex. O, *Kimball Dep.,* at 77:9-12.

**RESPONSE**: **Controverted. Plaintiffs' expert, Dr. Engstrom, testified that he is aware of court decisions and peer-reviewed publications determining that a Voting Rights lawsuit affects the pool of candidates that run in post-litigation elections. PSUMF Ex. C2, *Engstrom Dep.*, at 67:3 – 68:2.**

32.    Donna Thurman supported Doris Graham, an African American former board member, many years ago. Ex. KK, *Thurman Dep.,* at 50:14-19.

**RESPONSE: Uncontroverted.**

33.    Donna Thurman did not support Doris Graham in 2011. Ex. KK, *Thurman Dep.,* at 55:14-19.

**RESPONSE: Controverted. The District's only support for this statement is a mischaracterization of Dr. Paulette-Thurman's testimony. Dr. Paulette-Thurman stated only that she did not work on any candidate's campaign in 2011. PSUMF Ex. E4, *Thurman Dep.*, at 54:21 – 55:19. She was not asked, and did not disclose, which candidates she supported.**

34.    A lot of people were supporting candidates other than the incumbents in 2011 because the board members voted to give the former superintendent lifetime insurance. Ex. QQ, *Hogshead Dep.,* at 47:23-48:14.

**RESPONSE: Controverted. The District's only support for this statement of fact is Ms. Hogshead's personal opinion. Her opinion may be limited by her lack of familiarity with African-American voters. All expert analyses in this case demonstrate that African-American voters supported an incumbent, Graham, as their top-choice candidate, and two of the three most supported candidates among African Americans (Graham and Clark) were also incumbents. Def.'s PSUMF Resp. ¶ 120; PSUMF Ex. B2, *Engstrom Rep.*, at Table 1 (pp. 17-19); PSUMF Ex. B9, *Kimball Rebuttal*, at 5 n.4 ("Rodden's conclusion that Dr. Graham, an African-American candidate, lost her seat in 2011 as a result of 'anti-incumbency outrage' is inconsistent with the strong support she received from African-American voters, making her their first choice.").**

35.    The 2011 campaign was unique because of the Jeff Speigel's health insurance. Ex. RR, *Chabot Dep.,* at 31:4-17.

**RESPONSE: Controverted. The District's only support for this statement of fact is an incomplete cite to Mr. Chabot's testimony. Mr. Chabot explained that incumbents benefited from experience and name recognition, Doc. No. 85-40, PSUMF Ex. E8, *Dep. of Robert Chabot*, July 2, 2015, at 30:13-16, and that the Board's decision regarding Jeff**

Spiegel's health insurance "could be a good thing, . . . could be a bad thing," *id.* at 31:1-3. He described voters' perception on that issue as "[s]ome knew about it, some didn't, some didn't like it, some didn't care." PSUMF Ex. E8, *Chabot Dep.*, at 31:24-25.

For the reasons stated in response to ¶ 34, *supra*, Mr. Chabot's personal perspective may be of limited value because it is contradicted by the parties' expert analyses on Black voters' preferences.

36.     Jeff Speigel is a former superintendent of the District. Ex. NN, *Ebert Dep.* at 82:20-25.

**RESPONSE: Uncontroverted.**

37.     Robert Chabot has not had any constituents mention this lawsuit to him. Ex. RR, *Chabot Dep.,* at 110:10-12.

**RESPONSE: Uncontroverted.**

38.     There was an anti-incumbent sentiment in 2011. Ex. NN, *Ebert Dep.,* at 71:5-12.

**RESPONSE: Controverted for the reasons stated in response to ¶¶ 34, 35 *supra*. All expert analyses in this case demonstrate that African-American voters supported incumbent Graham as their top-choice candidate and incumbent Clark as one of their top three choice candidates. Def.'s PSUMF Resp. ¶ 120; PSUMF Ex. B2, *Engstrom Rep.*, at Table 1 (pp. 17-19); PSUMF Ex. B9, *Kimball Rebuttal*, at 5 n.4. Mr. Ebert's personal perspective that there was an anti-incumbent sentiment may be limited by his lack of familiarity with African-American voters' sentiments.**

39.     Voting for lifetime health insurance for Jeff Speigel was a hindrance to the incumbents' campaigns. All three incumbents lost in 2011. Ex. MM, *Morris Dep.,* at 61:8-62:8.

**RESPONSE: Controverted. There is no evidence that voting for Jeff Spiegel's health insurance hindered incumbent candidates' 2011 campaigns with respect to African-American voters. *See supra* response to ¶¶ 34-35, 38. Mr. Morris's personal perspective that this decision hindered incumbents may be the result of his limited information about Black voters' preferences.**

**Plaintiffs do not controvert that three incumbent candidates lost in the 2011 election. Plaintiffs note that Ms. Hogshead, an incumbent who supported the Board's vote on Mr. Spiegel's health insurance, did not lose in the 2013 election. Doc. No. 85-38, PSUMF Ex. E6, *Dep. of Leslie Hogshead*, July 1, 2015, at 30:17 – 32:8; Def.'s PSUMF Resp. ¶¶ 138-39.**

**Senate Factor One – The extent of any history of official discrimination.**

40.     Dr. Gordon's book, entitled *Mapping Decline: St. Louis and the Fate of the American City*, was published in 2008.  Ex. K, *Gordon Dep.*, at 11:5-22.

**RESPONSE: Uncontroverted.**

41.     Data from Gordon's book is at least eight years old. Ex. K, *Gordon Dep.,* at 17:16-21.

**RESPONSE: Controverted only to the extent that Dr. Gordon's historical research and analysis is not data linked to a particular year.**

42.     There is no evidence that restrictive covenants existed in the FFSD.  Ex. K, *Gordon Dep.,* at 13:24-14:2

**RESPONSE: Controverted. Not only does the cited material not support this statement of fact, it actually supports the opposite. Dr. Gordon testifies that a particular map in his report shows restrictive covenants in the city of St. Louis, and that he included the map to show how "segregation that originated in the City of St. Louis extended over time out into North County."** *See* **PSUMF Ex. C3,** *Gordon Dep.***, at 13:4 – 14:2;** *see also* **PSUMF Ex. C5,** *Rodden Dep.***, at 41:16 – 43:5 (acknowledging that restrictive covenants continue to play a role in socioeconomic life in the St. Louis area).**

43.     At least half of Gordon's report is based on old research that does not involve the District specifically.  Ex. K, *Gordon Dep.,* at 21:13-18.

**RESPONSE: Controverted. Dr. Gordon is a historian. Part I of his report offers a historic survey of the origins and consequences of segregation and inequality in the Greater St. Louis area.  Part II of his report describes the resulting demographic and economic conditions in the District. "Old research" is a vague and inaccurate depiction of the half of his report focused on historic research. In addition, the modifier "at least" is inaccurate. Dr. Gordon testified: "roughly the first half of the report is a synopsis of the conclusions I reached in my book. Roughly the second half sort of recenters that research on Ferguson. It represents new work."** *See* **PSUMF Ex. C3,** *Gordon Dep.***, at 21:13-18.**

44.     Dr. Graves does not believe African Americans today suffer from effects of past discrimination. Ex. JJ, *Graves Dep.,* at 56:17-20.

**RESPONSE: Uncontroverted that Dr. Graves so testified.**

45.     There is no significant difference in turnout between African American and white voters in the 2012, 2013 and 2014 District elections. Ex. I, *Rodden Dep.,* at 47:21-48:21.

**RESPONSE: Controverted. The District cites Dr. Rodden for this statement of fact, but it is not clear that Dr. Rodden (and not Dr. Chen) conducted the turnout analysis. Pls.' Resp. to Def. FFSD's Statement of Uncontroverted Material Facts, Doc. No. 101 ("Pls.' DSUMF Resp.") ¶ 58. In addition, both the inputs and the results are unreliable. *See* *infra* responses to ¶¶ 46, 52; *see also* Pls.' DSUMF Resp. ¶¶ 58-60, 62.**

46.    Turnout is defined by as the number of ballots cast divided by the number of registered voters. Ex. I, *Rodden Dep.,* at 53:8-13.

**RESPONSE: Controverted. The cited testimony indicates only that Dr. Rodden defined turnout this way. *See* PSUMF Ex. C5, *Rodden Dep.*, at 67:8-17 (acknowledging that he did not examine relative voter registration rates in FFSD between voting-age whites and voting-age African Americans). According to Plaintiffs' experts, this is an unreliable method for measuring turnout because it does not account for differing registration rates between groups. *See* PSUMF Ex. C6, *Kimball Dep.*, at 51:15-22 (noting that turnout estimates should be based on VAP, not registered voters); Doc. No. 101-1, Pls.' DSUMF Resp. Ex. D6, *Reported Voting and Registration by Sex, Race and Hispanic Origin (Ex. 5 to Rodden Dep.)*, at 7 (showing that, in Missouri, registration rates for African Americans are lower than registration rates for whites).**

47.    Cooper admits that he did not analyze turnout.  Ex. F, *Cooper Dep.,* at 84:16-24.

**RESPONSE: Uncontroverted that Cooper did not analyze turnout. Turnout is a factor to consider in whether a proposed majority-minority single-member district is effective, and effectiveness is not relevant at the liability stage of the case. Cooper drew illustrative plans, not proposed remedies. *See* Pls.' DSUMF Resp. ¶¶ 52-56.**

48.    Engstrom did not analyze whether African Americans and whites turned out at the same or different rates in April elections. Ex. L, *Engstrom Dep.,* at 114:10-16.

**RESPONSE: Uncontroverted.**

49.    Engstrom did not analyze voter turnout for any election outside of the April election either. Ex. L, *Engstrom Dep.,* at 114:10-16.

**RESPONSE: Uncontroverted.**

50.    Kimball did not analyze turnout in elections in the District outside of the April 2014 election. Ex. O, *Kimball Dep.,* at 65:20-25.

**RESPONSE: Controverted.  Dr. Kimball analyzed Rodden's turnout analysis.  PSUMF Ex. B9, *Kimball Rebuttal*, at 6-7.**

51.    The relationship between race and turnout in 2014 is weak. Ex. O, *Kimball Dep.,* at 51:6-11.

**RESPONSE:** Controverted to the extent that Dr. Kimball pointed out that this "pretty weak" relationship arose when estimating turnout as a percentage of registered voters, not voting-age population. PSUMF Ex. C6, *Kimball Dep.*, at 51:10-17.

52.     Rodden analyzed turnout of African American and white voters in District. See, Ex. GG, *Rodden Supp Rep: Assessment of Plaintiffs Redistricting Proposals;* at ¶14.

**RESPONSE:** Controverted.

*First*, the cited material does not come from DSUMF Ex. GG.

*Second*, it is not clear whether Dr. Rodden is the person who did this analysis. It was conducted as part of Dr. Rodden and/or Dr. Chen's effort to predict what the results of the 2000-2015 elections would have been had FFSD been divided into subdistricts during those years. The parties do not know the source of the data and analysis in the report because Dr. Chen was not given and did not read the report before signing it or before his deposition. Doc. No. 85-25, PSUMF Ex. C4, *Dep. of Jowei Chen*, Aug. 19, 2015, at 9:3-5, 15:2 – 16:19; *see* Doc. No. 100, Pls.' Opp'n to FFSD's Mot. for Summ. J., at 18 n.27.

*Third*, the input figures are unreliable. *See supra* response to ¶ 46.

*Fourth*, the results are unreliable because it is not clear that Dr. Rodden or Dr. Chen correctly converted from voters to votes. PSUMF Ex. B10, *Rodden & Chen Suppl. Rep.*, at ¶¶ 11-13 (pointing out that African-American candidates had "failed to achieve majorities of the vote" in supermajority-African-American precincts, without acknowledging that if a candidate received even a 50% share of the vote in a two-seat election, this means that, if each voter cast both her votes, *every voter* supported that candidate). This is a meaningful difference in a multi-seat election where each voter may cast multiple votes. Dr. Chen, who created the table of results from this model, had never analyzed an at-large district before. PSUMF Ex. C4, *Chen Dep.*, at 70:17-18.

53.     Rodden concluded there was no significant difference in turnout in the recent years of 2012, 2013, 2014.  See I, *Rodden Dep.,* at 48:13-18.

**RESPONSE:** Controverted. This conclusion is unreliable for the reasons stated *supra* in response to ¶¶ 46 and 52.

**Senate Factor Two – the extent to which voting is racially polarized.**

54.     Plaintiffs' expert cannot name a school district that is more integrated than FFSD. Ex. K, *Gordon Dep.,* at 25:21-25.

**RESPONSE:** Controverted. This statement is incomplete and mischaracterizes Dr. Gordon's testimony. Dr. Gordon explained that he could not, during his deposition, "name any school district in the [St. Louis] metro area at large that is more racially

**integrated than Ferguson-Florissant" only because he "ha[d not] done those calculations," not, as the District seems to suggest, because more integrated school districts do not exist. PSUMF Ex. C3, *Gordon Dep.*, at 25:21-25.**

55.     Dr. Graves, an African American board member, testified that she voted for a white candidate in the 2014 election. Ex. JJ, *Graves Dep.,* at 42:34-43:8.

**RESPONSE: Controverted only to the extent the statement of fact is incomplete. Dr. Graves testified that she voted for three candidates in 2014, two of whom are African-American and one of whom is white. *See* PSUMF Ex. E5, *Graves Dep.*, at 43:3-11, 71:25 – 72:4.**

56.     Dr. Graves, an African American, received the most votes of any candidate in the April 7, 2015 election. Ex. JJ, *Graves Dep.,* at 67:7-22.

**RESPONSE: Uncontroverted.**

57.     Dr. Graves received 33.75% of the votes in 2015. Brian Scott Ebert received 30.3% of the votes. Ex. JJ, 67:7-68:1. Dr. Graves is African American and Brian Scott Ebert is white. Ex. A, *Engstrom Rep.,* at ¶33.

**RESPONSE: Uncontroverted except to the extent that the cited testimony reports that Brian Scott Ebert, who is white, received 30.03%, not 30.3%, of the total votes cast.**

**More relevant to determining whether voting was racially polarized in this election are the preferences among racial groups. Mr. Ebert, the top choice among white voters, received the least amount of support among African-American voters, yet still gained a seat on the Board. Def.'s PSUMF Resp. ¶¶ 167, 174.**

58.     Brown testified people tend to vote based on the candidates they feel are best qualified and not based on race. Ex. OO, *Brown Dep.,* at 38:6-11.

**RESPONSE: Uncontroverted that Brown so testified. However, Brown's basis for this opinion was "I guess maybe because that's the way I think." PSUMF Ex. E3, *Brown Dep.*, at 38:18-19.**

59.     Race was an issue in the 2014 election in response to the Dr. McCoy situation. Ex. OO, *Brown Dep.,* at 70:18-71:2.

**RESPONSE: Controverted. The only support the District provides for this statement is current Board member Brown's personal belief that race became an issue in 2014 "probably [as] a response to the Dr. McCoy situation." PSUMF Ex. E3, *Brown Dep.*, at 70:18 – 71:2. The District's own witnesses offered a number of reasons that race was an issue in the 2014 election. For example, Mr. Morris testified that race was an issue simply because "there was a slate of African American candidates," and one of those candidates "came to a Board meeting and spoke that there was not enough African**

**Americans sitting on the Board."** PSUMF Ex. E1, *Morris Dep.*, at 45:24 – 46:10, 46:22-25.

60.     Schroeder had the support of African American voters. Ex. PP, *Schroeder Dep.,* at 25:20-26:8.

**RESPONSE: Uncontroverted that some African-American voters voted for Mr. Schroeder. However, the undisputed evidence indicates that this support was limited. Mr. Schroeder testified only that he had support from African-American voters, specifically two individual African Americans and his African-American "teacher friends." PSUMF Ex. E7, *Schroeder Dep*., at 25:20 – 26:8. According to the parties' expert analyses, moreover, in 2012, African-American voters unanimously voted in support of B. Morris, and split their second votes between Mr. Ebert and Mr. Schroeder so closely that the candidates' respective levels of support are statistically indistinguishable. Def.'s DSUMF Resp. ¶¶ 130, 133. According to Dr. Rodden's EI estimates, Mr. Schroeder received approximately 25.58% of the votes cast by African Americans. Def.'s DSUMF Resp. ¶ 130.**

61.     Schroeder testified he does not believe white voters vote in a bloc or that African Americans vote in a bloc. Ex. PP, *Schroeder Dep.,* at 26:13-25.

**RESPONSE: Controverted to the extent that this statement is incomplete. In the cited portion of his deposition, Mr. Schroeder testified that he has no reason to believe that people in FFSD vote along racial lines, no reason to believe that they do not vote along racial lines, and did not know whether white voters or black voters vote as a bloc. PSUMF Ex. E7, *Schroeder Dep.*, at 26:13-25.**

**Mr. Schroeder's, or other Board members', disagreement with the proposition that Black voters tend to vote for Black candidates and white voters tend to vote for white candidates in FFSD is a personal perception contradicted by the evidence presented by the District's expert. Pls.' Br. at 14-15, 18-19, 35-37 ; PSUMF Ex. C5, *Rodden Dep.*, at 273:5 – 274:3.**

62.     Schroeder attended fundraisers for Dr. Graves and constructed all of her yard signs. Ex. PP, *Schroeder Dep.* at 62:1–11.

**RESPONSE: Uncontroverted.**

63.     Schroeder made yard signs for Donna Thurman. Ex. PP, *Schroeder Dep.*, at 70:24-70:3.

**RESPONSE: Uncontroverted.**

64.     Brown had support from African American voters. Ex. OO, *Brown Dep.*, at 32:16-33:11.

**RESPONSE**: Uncontroverted that some African-American voters voted for Mr. Brown. However, the undisputed evidence indicates that this support was limited. Mr. Brown testified only that he believed he had support among African-American voters and that individual African-American voters told him they voted for him. *See PSUMF Ex. E3, Brown Dep.*, at 32:16 – 33:11. According to Dr. Rodden's EI estimates, moreover, in 2013, Mr. Brown received 22.74% of votes cast by African Americans, Def.'s PSUMF Resp. ¶ 139, and, under the District's Point Estimate approach, was not one of the top two choices among African-American voters, Def.'s PSUMF Resp. ¶¶ 139, 140.

65. Brown campaigned for Roger Hines, an African American candidate in 2015. Ex. OO, *Brown Dep.,* at 37:20 – 38:5.

**RESPONSE**: Controverted. This statement of fact mischaracterizes the cited testimony and is incomplete. Mr. Brown testified that he assisted Ebert and Hines in 2015. PSUMF Ex. E3, *Brown Dep.*, at 39:25 – 40:5. In response to the question "Have you *ever* helped an African  American candidate get elected to the FFSD?" Mr. Brown testified he "helped" one African-American candidate, who was Mr. Hines in 2015. PSUMF Ex. E3, *Brown Dep.*, at 37:20 – 38:5 (emphasis added).

Mr. Brown's, and other Board members', testimony regarding a particular instance in which they supported an African-American candidate, without comparison to the number of white candidates whom they supported, does not evidence a lack of racially polarized voting, but rather supports the data showing strong racial polarization in voting. Pls.' Br. at 14-15, 18-19, 35-37; *see also* PSUMF Ex. C5, *Rodden Dep.*, at 273:5 – 274:3. Mr. Brown testified that he has lived in the St. Louis area since 1981, PSUMF Ex. E3, *Brown Dep.*, at 10:21 – 11:4, and voted in nearly every election, *id.* at 15:8-18. His testimony that he helped one African-American candidate get elected in his 34 years of elections, without comparison to the instances in which he supported white candidates, does not rebut evidence of racially polarized voting.

66. Hogshead had support from the African American community.  She campaigned in both sections of Berkeley and her neighborhood is primarily African American. Ex. QQ, *Hogshead Dep.,* at 36:10-37:4.

**RESPONSE**: Controverted, except to the extent that *some* African-American voters voted for Ms. Hogshead. However, the undisputed evidence indicates that this support was limited. *See supra* responses to ¶¶ 60, 64. Ms. Hogshead testified only that some African Americans told her they voted for her and that her African-American neighbors put out yard signs in support of her. *See* PSUMF Ex. E6, *Hogshead Dep.*, at 36:10-21. According to Dr. Rodden's EI analysis, moreover, in 2013, Hogshead received 25% of African Americans' votes. Def.'s PSUMF Resp. ¶ 139. Ms. Hogshead was not the top choice candidate among African-American voters, and her support was statistically indistinguishable from Black voters' support for Brown. Def.'s PSUMF Resp. ¶¶ 139, 142 (not controverting that Brown and Hogshead had statistically indistinguishable levels of support).

67.     Hogshead supported Doris Graham in her elections. Ex. QQ, *Hogshead Dep.,* at 40:18-41:3.

**RESPONSE**: **Controverted. This statement of fact mischaracterizes Ms. Hogshead's testimony and is incomplete. Ms. Hogshead testified that in the early 1990s, she supported Dr. Graham's campaign. PSUMF Ex. E6,** *Hogshead Dep.***, at 40:18 – 41:9 (testifying that she supported Dr. Graham's campaign "maybe two years after" Ms. Hogshead "came on"); 16:12-17 (testifying that Ms. Hogshead first ran for a Board seat in 1992). The extent of Ms. Hogshead's support for Dr. Graham was "verbally endors[ing] her to other people" and she undertook no other activities in support of her campaign.** *Id.* **at 45:5-19.**

**Ms. Hogshead's, and other Board members', testimony to a particular instance in which they supported an African-American candidate, without comparison to the number of white candidates that they supported, does not evidence a lack of racially polarized voting for the reasons stated in response to ¶ 65.**

68.     Hogshead testified that people in the District do not vote along racial lines. Ex. QQ, *Hogshead Dep.,* at 64:16-65:1.

**RESPONSE**: **Controverted, except to the extent that Ms. Hogshead so testified. Her testimony is inaccurate and irrelevant, for the reasons stated in response to ¶ 61. Ms. Hogshead's disagreement with the proposition that District residents vote along racial lines is a personal perception contradicted by the evidence. Pls.' Br. at 14-15, 18-19, 35-37; PSUMF Ex. C5,** *Rodden Dep.***, at 273:5 – 274:3.**

69.     Chabot supported Roger Hines in 2015. Ex. RR, *Chabot Dep.,* at 67:19-68:7.

**RESPONSE**: **Controverted as incomplete. Mr. Chabot testified that he donated money, put up yard signs, and did door-to-door canvassing in support of Mr. Ebert in 2015. PSUMF Ex. E8,** *Chabot Dep.***, at 68:1-16. He stated that he did not support any other candidate.** *Id.* **He then changed his answer to include his support of Mr. Hines, which was limited to "word of mouth."** *Id.*

**Mr. Chabot's testimony to a particular instance in which he provided minimal support to an African-American candidate, without comparison to the number of times he supported white candidates, does not evidence a lack of racially polarized voting, but instead supports the data showing strong racial polarization in voting.** *See supra* **responses to ¶¶ 65, 67; Pls.' Br. at 14-15, 18-19, 35-37; PSUMF Ex. C5,** *Rodden Dep.***, at 273:5 – 274:3.**

**Mr. Chabot also testified that he supported Mr. Ebert in 2011, PSUMF Ex. E8,** *Chabot Dep.***, 62:16-18; Mr. Ebert in 2012, PSUMF Ex. E8,** *Chabot Dep.***, 63:6-9; Hogshead in 2013, PSUMF Ex. E8,** *Chabot Dep.***, at 62:16 – 63:2; and P. Morris in 2014, PSUMF Ex. E8,** *Chabot Dep.***, at 47:20-25.**

70.     Chabot does not believe voters in the District vote along racial lines. Ex. RR, *Chabot Dep.,* at 70:8-17.

**RESPONSE: Controverted, except to the extent that Mr. Chabot so testified. Mr. Chabot's disagreement with the proposition that Black voters vote for Black candidates and white voters vote for white candidates is a personal perception contradicted by the evidence.** *See supra* **responses to ¶¶ 61, 68; Pls.' Br. at 14-15, 18-19, 35-37; PSUMF Ex. C5,** *Rodden Dep.***, at 273:5 – 274:3.**

**In addition, Mr. Chabot's basis for his disagreement is his belief that he had "cross appeal for all races." PSUMF Ex. E8,** *Chabot Dep.***, at 70:8-17. This too is inconsistent with the undisputed evidence. According to Dr. Rodden's EI estimates, Mr. Chabot has never been preferred by African-American voters.** *See* **Def.'s PSUMF Resp. ¶¶ 120, 121, 148, 150. In light of the striking disparity between Dr. Rodden's estimates and Mr. Chabot's perceived support from African-American voters, his personal belief is not evidence that he had cross-racial appeal, much less that voters more broadly do not vote along racial lines in the district.**

71.     Ebert supported Donna Thurman in 2014. Ex. NN, *Ebert Dep.* at 72:7-21.

**RESPONSE: Controverted to the extent that the statement is incomplete. Mr. Ebert testified that he supported Paul Morris, Robert Chabot, and Donna Paulette-Thurman in 2014. PSUMF Ex. E2,** *Ebert Dep.***, at 72:17-21.**

**Mr. Ebert's testimony to a particular instance in which he supported three candidates, one of whom was African-American, without comparison to the number of times he supported white candidates, does not evidence a lack of racially polarized voting, but instead supports the data showing strong racial polarization in voting.** *See supra* **responses to ¶¶ 65, 67, 69; Pls.' Br. at 14-15, 18-19, 35-37; PSUMF Ex. C5,** *Rodden Dep.***, at 273:5 – 274:3.**

72.     Ebert does not believe people vote along racial lines. Ex. NN, *Ebert Dep.,* at 76:11-77:2.

**RESPONSE: Uncontroverted that Mr. Ebert so testified. For the reasons stated** *supra* **in response to ¶¶ 61, 68, 70, Mr. Ebert's disagreement with the proposition that, in FFSD, Black voters tend to vote for Black candidates and white voters tend to vote for white candidates is a personal perception contradicted by the evidence presented by the District's expert. Pls.' Br. at 14-15, 18-19, 35-37; PSUMF Ex. C5,** *Rodden Dep.***, at 273:5 – 274:3.**

73.     Dr. Thurman had the support from African Americans and whites in her campaign. Ex. KK, *Thurman Dep.,* at 93:15-23.

**RESPONSE: Uncontroverted that Dr. Paulette-Thurman had the support of African Americans and that some white voters voted for her in 2014. However, the undisputed**

**evidence demonstrates that the extent of her support among white voters was limited. According to Dr. Rodden's EI estimates, in 2014, Dr. Paulette-Thurman received only 8.92% of the votes cast by white voters. Def.'s PSUMF Resp. ¶ 148.**

74.    Dr. Thurman has supported both African American and white candidates for the Board. Ex. KK, *Thurman Dep.,* at 50:14-19 and 99:23-100:7.

**RESPONSE: Uncontroverted.**

**Dr. Paulette-Thurman's testimony that she has supported both African-American and white candidates does not evidence a lack of racially polarized voting, or contradict the data showing strong racial polarization in voting. *See supra* responses to ¶¶ 65, 67, 69; Pls.' Br. at 14-15, 18-19, 35-37; PSUMF Ex. C5, *Rodden Dep.*, at 273:5 – 274:3.**

75.    Dr. Graves testified she voted Kimberly Benz in the 2014 election. Ex. JJ, *Graves Dep.,* at 42:34-43:8. Ms. Benz is white. Ex. A, *Engstrom Rep.,* at ¶ 27.

**RESPONSE: Controverted to the extent that this statement is incomplete. Dr. Graves testified that she supported three candidates in 2014: Dr. Paulette-Thurman, Mr. Savala, and Ms. Benz, two of whom are African-American, and one of whom is white. *See* PSUMF Ex. E5, *Graves Dep.*, at 43:3-11. For the reasons stated *supra* in response to ¶¶ 65, 67, 69, 71, Dr. Graves's testimony to a particular instance in which she supported three candidates, one of whom was white, without comparison to her support of African American candidates, does not evidence a lack of racial polarization in voting. *See* Pls.' Br. at 14-15, 18-19, 35-37; PSUMF Ex. C5, *Rodden Dep.*, at 273:5 – 274:3.**

**Plaintiffs do not controvert that Ms. Benz is white. PSUMF Ex. E5, *Graves Dep.*, at 71:25 – 72:4.**

76.    Johnson received the support of African Americans and whites when he ran for school board. Ex. LL, *Johnson Dep.*, at 21:5-22:1.

**RESPONSE: Uncontroverted that Rev. Johnson had the support of African Americans and that some white voters voted for him in 2014. However, the undisputed evidence demonstrates that he did not receive "*the* support" of white voters. According to Dr. Rodden's EI estimates, moreover, in 2014, Rev. Johnson received only 5.71% of the votes cast by white voters, among the lowest level of support from white voters out of the eight candidates (statistically indistinguishable from Wallace and L. Thomas, also African-American). Def.'s PSUMF Resp. ¶ 148.**

**Rev. Johnson testified only that he had the support of his white neighbors and that those who had African-American family members were "much more readily supportive." PSUMF Ex. E9, *Johnson Dep.*, at 21:5 – 22:11.**

77.    Kimball's basis for concluding that voting is racially polarized in his initial report is based solely on the 2014 election. Ex. O, *Kimball Dep.,* at 17:21-25.

**RESPONSE:** Controverted. Dr. Kimball provides additional evidence of racial polarization in his supplemental report. PSUMF Ex. C6, *Kimball Dep*., at 18:13-16 ("I did in the rebuttal report."); PSUMF Ex. B9, *Kimball Rebuttal*, at 5-6.

78.     Kimball was not aware that 2014 was an outlier for racially polarized voting because he did not analyze any other election in his initial report. Ex. O, *Kimball Dep.,* at 19:23-20:6.

**RESPONSE:** Controverted. This statement of fact mischaracterizes the cited testimony. Dr. Kimball testified that at the time he wrote his initial report, he had not analyzed the correlation between African-American share of VAP and the aggregate vote shares received by all African-American candidates in 2012, 2013 and 2015. PSUMF Ex. C6, *Kimball Dep.*, at 19:23 – 20:6.

In addition, Dr. Kimball notes that in Dr. Rodden's analysis purporting to show a correlation, Dr. Rodden aggregates the votes cast for all five African-American candidates in 2014, and that in all of the elections analyzed (2012, 2013, 2014, 2015), Dr. Rodden does not appear to have weighted the precincts by the number of voters in each precinct. PSUMF Ex. C6, *Kimball Dep.*, at 19:1-13.

**Senate Factor Three – Enhancing Procedures**

**At-large elections**

79.     Dr. Thurman testified that at-large elections ensure that every community is represented. Ex. KK, *Thurman Dep.,* at 61:8-13.

**RESPONSE:** Uncontroverted that Dr. Paulette-Thurman so testified. However, her personal opinion regarding the benefits of at-large elections has nothing to do with whether the District's maintenance of such a system "tend[s] to enhance the opportunity for discrimination." *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986).

80.     Brown testified that at-large voting does not make it harder for black candidates to elect candidates of their choice because African Americans were elected in the last two elections. Ex. OO, *Brown Dep.,* at 44:19-45:2.

**RESPONSE:** Uncontroverted that Brown so testified. However, his personal opinion regarding the effect s of at-large voting, which is based on the election of two African-American candidates, has nothing to do with whether the District's maintenance of such a system "tend[s] to enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 45.

81.     The school board should think about the entire district and not just their own neighborhood. Ex. PP, *Schroeder Dep.*, at 57:24-58:5.

**RESPONSE:** Controverted. The cited material indicates Mr. Schroeder's personal opinion only.

82.     Dr. Graves, an African American board member, testified that at-large elections are better because it prevents school board members from fighting for the schools that are in their district. Ex. JJ, *Graves Dep.,* at 52:1-8.

**RESPONSE:** Uncontroverted that Dr. Graves so testified. However, her personal opinion regarding the benefits of at-large elections has nothing to do with whether the District's maintenance of such a system "tend[s] to enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 45.

83.     Dr. Graves testified that the at-large system allows the best qualified candidate to be elected. Ex. JJ, *Graves Dep.,* at 52:9-14.

**RESPONSE:** Controverted. This statement of fact misstates Dr. Graves' testimony. The cited material states:

> **Q: Do you believe that an at-large system [e]nsures that every community is represented?**
> **A: If the best candidate is chosen, yes.**
> **Q: And do you believe that an at-large system allows the best candidate to be chosen?**
> **A: If they're qualified, yes.**
> **Q: And what do you believe makes a qualified candidate?**
> **A: A candidate such as myself who is a parent in the district. One who is involved in the community, one that has a genuine interest in those, a genuine interest for the students.**

**PSUMF Ex. E5,** *Graves Dep.***, at 52:9-20.**

84.     African Americans are better off under the current at-large system than if the District were divided up into seven single-member districts. Ex. I, *Rodden Dep.,* at 341:24-342:12.

**RESPONSE:** Controverted. Dr. Rodden's testimony concerning his conclusion that African Americans are better off under the current at-large system is not properly supported for the reasons given in the responses to ¶¶ 46 and 52 *supra* and for the reasons given in Pls.' DSUMF Resp. ¶¶ 57-65.

85.     Dr. Thurman testified that single-member districts would be divisive. Ex. KK, *Thurman Dep.,* at 61:14-20.

**RESPONSE:** Uncontroverted that Dr. Paulette-Thurman so testified. However, her personal opinion regarding this purported effect of single-member districts has nothing

to do with whether the District's maintenance of an at-large system "tend[s] to enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 45.

86.    A negative effect of single-member districts is that it segregates the community.  Ex. KK, *Thurman Dep.,* at 96:11-20.

**RESPONSE: Controverted. The cited testimony indicates that this statement of fact is Dr. Paulette-Thurman's personal opinion only. Dr. Paulette-Thurman's personal opinion regarding this purported effect of single-member districts has nothing to do with whether the District's maintenance of an at-large system "tend[s] to enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 45.**

**Moreover, Dr. Paulette-Thurman testified that having a more diverse Board would add perspective when issues pertaining to race come up.  PSUMF Ex. E4, *Thurman Dep.,* at 31:6-12. An electoral system that diversifies representation on the Board may therefore unify the community.**

87.    Single member districts would be bad because it would handcuff the district in that every board member would be defending the schools in their own section. Ex. OO, *Brown Dep.,* at 73:5-74:2.

**RESPONSE: Controverted. The cited testimony indicates that this statement of fact is Mr. Brown's personal opinion only. In addition, his personal opinion regarding these purported negative effects of single-member districts has no basis in fact and has nothing to do with whether the District's maintenance of an at-large system "tend[s] to enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 45.**

**Staggered Terms**

88.    Dr. Graves testified that staggered terms are necessary to prevent a whole new board and to know what happened in the past. Ex. JJ, *Graves Dep.,* at 53:20-54:12.

**RESPONSE: Uncontroverted that Dr. Graves so testified. However, her personal opinion regarding the purported need for staggered terms has nothing to do with whether the District's maintenance of staggered terms "tend[s] to enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 45.**

89.    The advantage of staggered terms is that you don't have complete turnover of a board because that would be very disruptive to the District. Ex. RR, *Chabot Dep.,* at 75:12-21.

**RESPONSE: Controverted. The cited testimony indicates that this statement of fact is Mr. Chabot's opinion only. His personal opinion regarding the purported advantage of staggered terms has nothing to do with whether the District's maintenance of staggered terms "tend[s] to enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 45.**

**April elections**

90.     Plaintiffs' statement that turnout among African-American voters tends to be disproportionately low in off-cycle elections, is a reference to political science research in general. Ex. O, *Kimball Dep.,* at 65:9-23.

**RESPONSE: Controverted. Kimball testified that a specific passage from his report is supported by political science literature.**

91.     Plaintiffs' expert did not examine whether turnout is disproportionately low in off-cycle elections in the District. Ex. O, *Kimball Dep.,* at 65: 9-19.

**RESPONSE: Controverted. Dr. Kimball (and Dr. Rodden) found that, during the last twelve contested off-cycle Board elections, white turnout in FFSD clearly surpassed African-American turnout six times (in 2001, 2003, 2006, 2009, 2011, and 2015). PSUMF Ex. B9,** ***Kimball Rebuttal*, at 6; PSUMF Ex. C5,** ***Rodden Dep.*, at 84:5-13. They also agree that African-American turnout has always been lower than or statistically indistinguishable from white turnout in FFSD. PSUMF Ex. C5,** ***Rodden Dep.*, at 85:3-6; PSUMF Ex. B9,** ***Kimball Rebuttal*, at 6.**

92.     Plaintiffs have not examined turnout differentials in elections held in the district in any other months. Ex. O, *Kimball Dep.,* at 65:9-66:8.

**RESPONSE: Uncontroverted.**

93.     The FFNEA vice-treasurer for the 2014-2015 school year testified that April elections allow new board members time to prepare for the new school year and for the upcoming fiscal year prior to its beginning in July. Ex. II, *Green Dep.,* at 56:6-14.

**RESPONSE: Uncontroverted that the FFNEA vice-treasurer Frank Green so testified. However, he did not testify on behalf of the FFNEA and his personal opinion regarding the purported benefit of April elections has nothing to do with whether the District's maintenance of off-cycle Board elections "tend[s] to enhance the opportunity for discrimination."** ***Gingles*, 478 U.S. at 45.**

94.     Dr. Graves testified that April elections are beneficial because it allows voters to focus on the school board election. Ex. JJ, *Graves Dep.,* at 54:22-55:3.

**RESPONSE: Uncontroverted that Dr. Graves so testified. However, her personal opinion regarding the purported benefit of April elections has nothing to do with whether the District's maintenance of off-cycle Board elections "tend[s] to enhance the opportunity for discrimination."** ***Gingles*, 478 U.S. at 45.**

95.     The thinking behind April elections is that the new board begins in time to deal with the budget for the upcoming school year. It allows the new board to have input into the budget for the following year. Ex. PP, *Schroeder Dep.,* at 61:5-13.

**RESPONSE:** Controverted. The cited testimony indicates that Mr. Schroeder believes that this is "[t]he thinking behind" April elections. However, his personal opinion regarding the purported benefit of April elections has nothing to do with whether the District's maintenance of off-cycle Board elections "tend[s] to enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 45.

**Bullet Voting**

96.     Dr. Graves utilized bullet voting in her campaign because she felt that an informed voter would know she was the best candidate and should only vote for her. Ex. JJ, *Graves Dep.,* at 13:14-14:15.

**RESPONSE:** Uncontroverted that Dr. Graves testified that she bullet-voted for herself in 2015 and mentioned bullet voting when she went door-to-door. PSUMF Ex. E5, *Graves Dep.*, at 13:21 – 14:22.

97.     Schroeder has often only voted for one candidate despite being able to vote for two or three candidates. Ex. PP, *Schroeder Dep.,* at 19:11-18.

**RESPONSE:** Uncontroverted that Mr. Schroeder so testified. However, this statement and his voting behavior as a candidate do not indicate that bullet voting was a practice among other voters in the District.

98.     Hogshead has encouraged bullet voting. Ex. QQ, *Hogshead Dep.,* at 15:18-16:6.

**RESPONSE:** Controverted. This statement of fact mischaracterizes the cited testimony, which states:

> **Q: In your campaigns, have you ever encouraged voters to vote only for you as opposed to voting all of their votes on the ballot?**
> **A. My family.**
> **Q. When you say your family, you say you encourage your family only to vote for you?**
> **A. Yes.**
> **Q. Anyone else?**
> **A. Maybe my close friends, but I don't go out and say just vote for me.**
> **Q. So am I correct that you don't recommend that publicly, but that you've told family and close friends to vote only for you?**
> **A. Right.**

**PSUMF Ex. E6,** *Hogshead Dep.*, **at 15:18 – 16:6.** In addition, Ms. Hogshead's voting behavior as a candidate does not indicate that bullet voting was a practice among other voters in the District.

99. Graham liked to bullet vote. Ex. MM, *Morris Dep.,* at 69:25-70:4.

**RESPONSE**: **Controverted. The District's only support for this statement is the testimony of current Board member Paul Morris as to how Dr. Graham cast her ballot. In addition, this statement does not indicate that bullet voting was a practice among other voters in the District.**

100. African Americans have the same opportunity to engage in bullet voting as whites. Ex. O, *Kimball Dep.,* at 45: 20-25.

**RESPONSE**: **Uncontroverted that African-American and white voters are entitled to forego their right to cast all of their votes, according to facially neutral rules.**

**Senate Factor Four – The candidate slating process.**

**FFNEA Endorsement**

101. Kimball does not know how many African Americans applied for the Ferguson Florissant National Education Association ("FFNEA") endorsement. Ex. O, *Kimball Dep.,* at 67:7-9.

**RESPONSE**: **Uncontroverted that Dr. Kimball stated this during his deposition.**

**However, it is uncontroverted that at least ten African-American Board candidates (Graves, Paulette-Thurman, Johnson, Henson, Graham, Person, Savala, Wallace, Hawkins, and Hines) have sought FFNEA endorsement.** *See* **PSUMF Ex. E5,** *Graves Dep.***, at 69:4-25; PSUMF Ex. E4,** *Paulette-Thurman Dep.***, at 40:14 – 43:23; PSUMF Ex. E9,** *Johnson Dep.***, at 46:12-17; PSUMF Ex. A6,** *Johnson Decl.***, at ¶ 14; Doc. No. 85-4, PSUMF Ex. A4,** *Decl. of Charles Henson***, Sept. 15, 2015, at ¶¶ 8, 10; Doc. No. 85-42, PSUMF Ex. E10,** *Dep. of Frank D. Green, Jr.***, Sept. 2, 2015, at 44:9-10 (past FFNEA president testifying that he believed Henson applied in 2013); PSUMF Ex. A3,** *Graham Decl.***, at ¶¶ 9-10; PSUMF Ex. E10,** *Green Dep.***, at 36:23 – 37:23 (past FFNEA president testifying that candidate Person applied but did not interview with the FFNEA because of a family situation, "[b]ut that doesn't mean he still didn't run"), 39:1-3 (testifying that candidate Hines applied), 40:2-4 (testifying that candidate Savala applied), 40:20-23 (testifying that Wallace "might have been one of the other people that interviewed, yes"), 41:7-12 (testifying that L. Thomas "applies almost every year"), 47:3-16 (naming Hawkins as a candidate in 2011 and when asked which candidates applied for FFNEA endorsement that year, stating "I think they all did").**

102. Plaintiffs' expert does not know whether whites apply for the FFNEA endorsement more than blacks. Ex. O, *Kimball Dep.,* at 67:10-14.

**RESPONSE**: **Controverted.** *See supra* **response to ¶ 101.**

103.    Plaintiffs' expert does not know whether all of the African American candidates in 2015 applied for the FFNEA endorsement. Ex. O, *Kimball Dep.,* at 67:20-23.

**RESPONSE: Uncontroverted that Dr. Kimball stated this, but it is nonetheless uncontroverted that all of the African-American Board candidates in 2015 (Hines, Graves, and Person) applied for FFNEA endorsement.** *See* **PSUMF Ex. E10,** *Green Dep.***, at 39:1-3 (Hines), 36:3-7 (Graves), 37:13-23 (Person); PSUMF Ex. E5***, Graves Dep.***, at 69:4-25.**

104.    Plaintiffs' expert did not know or investigate the process for FFNEA endorsement when he made his conclusions. Ex. O, *Kimball Dep.,* at 70:8-71:2.

**RESPONSE: Controverted. Dr. Kimball stated that he was not aware of the deposed Board members' testimony regarding a particular step in the FFNEA endorsement process. It is uncontroverted that there are no published criteria for endorsement, and candidates are unaware of how the FFNEA decides whom to endorse.** *See* **Def.'s PSUMF Resp. ¶ 355.**

105.    Plaintiffs' expert fails to inform the reader that he did not investigate whether candidates sought endorsements. Ex. O, *Kimball Dep.,* at 100:14-20 and 101:13-17.

**RESPONSE: Controverted. This statement of fact mischaracterizes the cited testimony. Dr. Kimball states that he reported which candidates received endorsements. PSUMF Ex. C6,** *Kimball Dep.***, at 100:14-20, 101:13-17. Whether or not he investigated which candidates** *sought* **endorsements does not bear on his analysis of the candidates who** *received* **endorsements. That he did not list the universe of issues his report does not report is inaccurately characterized as a "fail[ure] to inform," a term so vague that it lacks meaning. To the extent the District attempts to deduce any meaning from what Dr. Kimball did not say, the cited material does not support its statement.**

106.    An African American was president-elect in 2013-2014 and president in the 2014-2015 of the FFNEA. Ex. II, *Green Dep.,* at 39:13-15 and 51:23-25. He is currently vice treasurer for the FFNEA and a member of the executive board. Ex. II, *Green Dep.,* at 17:3-7.

**RESPONSE: Uncontroverted with the understanding that 2013-2014 and 2014-2015 refer to school years, not two-year terms.** *See, e.g.***, PSUMF Ex. E10,** *Green Dep.***, at 17:3-14.**

**Plaintiffs note that Mr. Green does not represent the FFNEA, as he was not produced or designated as such and testified in his personal capacity only.** *See Subpoena to Frank Green***, Aug. 31, 2015, attached to the Third Ebenstein Decl. (filed concurrently herewith) as Ex. G26;** *Resp'ts' 2d Am. Disclosures***, Aug. 31, 2015, attached to the Third Ebenstein Decl. (filed concurrently herewith) as Ex. G27.   Moreover, Mr. Green is an employee of the District.  PSUMF Ex. E10,** *Green Dep.***, at 15:2-6.**

107.     The FFNEA does not recruit candidates. Ex. II, *Green Dep.,* at 35:22-24.

**RESPONSE: Uncontroverted that Mr. Green so testified. *See* PSUMF Ex. E10, *Green Dep.*, at 35:22-24 ("Q: Okay. Does the FFNEA make any effort to recruit candidates for the school board? A: Not really.").**

108.     The FFNEA may not endorse a candidate at all. Ex. II, *Green Dep.,* at 76:15-18.

**RESPONSE: Uncontroverted that Mr. Green so testified. However, it has endorsed candidates in every contested election at least since 2006. *Kimball Sources for FFNEA Endorsements*, at 8, attached to the Third Ebenstein Decl. (filed concurrently herewith) as Ex. G28 (showing 2006 endorsements); PSUMF Ex. E7, *Schroeder Dep.*, at 23:4-8 (testifying that he was endorsed by FFNEA in 2009 and believes John Knowles was as well); Ex. G28, *FFNEA Endorsements*, at 13 (showing 2011 endorsements); PSUMF Ex. E2, *Ebert Dep.*, at 50:13-22 (testifying that he was endorsed by FFNEA in 2012); Ex. G28, *FFNEA Endorsements*, at 15, 20, 26 (showing 2013, 2014, and 2015 endorsements, respectively); Def.'s PSUMF Resp. ¶ 45 (showing that in 2007, 2008, and 2010 Board seats were uncontested and elections were not held).**

109.     The FFNEA sends letters to all school board candidates to invite them to apply and interview for their endorsement.  Ex. II, *Green Dep.,* at 23:13-23.

**RESPONSE: Uncontroverted that Mr. Green so testified.**

110.     The candidates are sent a questionnaire ahead of time that informs them of the questions that will be asked during the interview. Ex. II, *Green Dep.,* at 23:13 - 24:3.

**RESPONSE: Controverted. This statement of fact mischaracterizes the cited testimony. Mr. Green testified that candidates who come in to interview are sent questionnaires beforehand.  PSUMF Ex. E10, *Green Dep.*, at 23:16 – 24:3.**

111.     Every candidate that wants an interview is interviewed. Ex. II, *Green Dep.,* at 25:7-9.

**RESPONSE: Controverted. This statement of fact mischaracterizes the cited testimony. In response to the question "Is everyone who returns a response to that letter interviewed . . . ?" Mr. Green stated "If they set up an appointment time, yes." PSUMF Ex. E10, *Green Dep.*, at 25:7-9.**

112.     The FFNEA forms a committee to conduct the interviews. Ex. II, *Green Dep.,* at 73:5-8.

**RESPONSE: Uncontroverted that Mr. Green so testified, with the understanding that Mr. Green testified that committee membership is "voluntary" and usually "we don't have a whole lot of people that volunteer to do it." If a decision regarding who sits on the committee has to be made, the committee chair "makes the decision." PSUMF Ex. E10, *Green Dep.*, at 73:5-22.**

113.    The FFNEA committee that conducts the interview is racially diverse. Ex. II, *Green Dep.,* at 74:7-9.

**RESPONSE: Controverted. This statement of fact mischaracterizes the cited testimony. In the cited portion of his deposition, Mr. Green agreed only that the interview committee was racially diverse "[i]n [his] experience." PSUMF Ex. E10,** *Green Dep.***, at 74:7-9. It is not clear what "his experience" encompasses. Mr. Green further testified that it "[d]epend[ed] on the chair" whether racial diversity on the committee was a priority, and notes that he is the only African-American man on the committee. PSUMF Ex. E10,** *Green Dep.***, at 77:1-3, 77:19-20.**

114.    Frank Green, the FFNEA representative states, "We want to make sure that everything is as fair as possible. We don't want anybody going back and saying, well, I didn't get the job because I'm African-American and everyone on the panel was white, or, you know, we want to keep it as diverse as possible. We want to make sure that everyone is represented.  We don't even want that from our members." Ex. II, *Green Dep.,* at 82:5-15.

**RESPONSE: Controverted. Although it is uncontroverted that Mr. Green states this (except to the extent there is a minor transcription error), Mr. Green cannot be fairly characterized as "the FFNEA representative," as he was not produced or designated as such and testified in his personal capacity only.** *See* **Ex. G26,** *Green Subpoena***; Ex. G27,** *Resp'ts' 2d Am. Disclosures***.  Moreover, Mr. Green is an employee of the District. PSUMF Ex. E10,** *Green Dep.***, at 15:2-6.**

115.    After the FFNEA interviews, the committee goes over the candidates' answers.  The candidates that do not have "teacher friendly" answers are not endorsed. Ex. II, *Green Dep.,* at 75:14-23.

**RESPONSE: Uncontroverted that Mr. Green so testified.**

116.    The committee votes on whom to endorse among the "teacher friendly" candidates. Ex. II, *Green Dep.,* at 75:14-25.

**RESPONSE: Uncontroverted that Mr. Green so testified.**

117.    Once the committee decides whom to endorse, they put those candidates' names before the FFNEA membership for a vote. Ex. II, *Green Dep.,* at 76:1-22.

**RESPONSE: Uncontroverted that Mr. Green so testified with the understanding that the members vote on the committee-endorsed candidates as a bundle.** *See* **PSUMF Ex. E10,** *Green Dep.***, at 76:10-22 ("We will show -- we will present the endorsees and they usually bundle the -- there's a discussion. We will like say -- well, for instance, what we'll do in a meeting is we'll say we endorse this candidate, this candidate, this candidate, depending on how many candidates we endorse in a particular year.**

**Sometimes it's one, sometimes it's two. The most we've ever endorsed is three. Sometimes we may not endorse a candidate at all. And when we do, then there's a discussion. People will ask questions about the candidates, and if everybody is okay with the three that we've endorsed, then we'll put it to a vote. Majority rules.").**

118. The FFNEA chose not to endorse any incumbents in 2011 because the incumbents voted against a raise. Ex. II, *Green Dep.,* at 47:17-48:3.

**RESPONSE: Controverted to the extent that this statement of fact is Mr. Green's understanding of the reasons the members of the interview committee and the FFNEA voted not to endorse any incumbents in 2011. In addition, Mr. Green testified that "there were several reasons" for no endorsement, including voting against the raise, voting against "any kind of monetary compensation," in the case of one board member "threaten[ing] to lock us out," and for Clark and Graham, the FFNEA "felt that they were on the board way too long" and "it was time for new voices." *See* PSUMF Ex. E10, *Green Dep.*, at 47:17 – 48:8.**

119. The 2014 FFNEA endorsed candidates did not run as a slate. Ex. MM, *Morris Dep.,* at 45:8-9 and Ex. FFF, *Hogshead Decl.* at ¶7.

**RESPONSE: Controverted. This statement is a legal conclusion regarding what constitutes a "slate," not a statement of fact. *See* Pls.' Br. at 50-52, 51 n.29; Pls.' Reply in Supp. of Mot. for Summ. J. (filed concurrently herewith) at 9-11. The 2014 FFNEA-endorsed candidates were Mr. Savala, Mr. Morris, and Mr. Chabot. *See* PSUMF Ex. E10, *Green Dep.*, at 40:10-12. Those candidates received the benefits of FFNEA endorsement. *Id.* at 40:13-17. One of the benefits of FFNEA endorsement is printing and mailing flyers. *Id.* at 32:12-20. When the FFNEA endorses more than one candidate, "[i]t's a single flyer for all candidates. We put them all on the same flyer." *Id.* at 32:21-24.**

120. Individual candidates raised funds for their own campaigns, sent out mailings, put out yard signs, went door-to-door, and conducted other typical campaign activities. See, Ex. MM, *Morris Dep.,* at 25:24-26:6 and Ex. FFF, *Hogshead Decl.*, at ¶7.

**RESPONSE: Controverted to the extent that this statement is vague and does not refer to particular candidates or election years.**

121. The FFNEA chose not to endorse Dr. Graham in 2011 because she was an incumbent. Ex. II, *Green Dep.,* at 47:17-48:3. Dr. Graham was, however, endorsed by the FFNEA in all of her other contested elections. Ex. FFF, *Hogshead Decl.,* at ¶2

**RESPONSE Controverted. This statement is Mr. Green's testimony as to his understanding of the reasons the members of the interview committee and the FFNEA voted not to endorse Dr. Graham in 2011. In addition, Mr. Green testified that "there were several reasons" for no endorsement, including voting against the raise, voting against "any kind of monetary compensation," in the case of one board member**

"threaten[ing] to lock us out," and for Clark and Graham, the FFNEA "felt that they were on the board way too long" and "it was time for new voices." *See* **PSUMF Ex. E10,** ***Green Dep.*, at 47:17 – 48:8.**

**It is uncontroverted that Ms. Hogshead testified as to her personal belief that Dr. Graham was endorsed by the FFNEA in all her other contested elections.**

122.    Graham's race was not a consideration in the endorsement. Ex. II, *Green Dep.,* at 80:3-6.

**RESPONSE: Controverted. This statement is Mr. Green's testimony as to his understanding of the reasons the members of the interview committee and the FFNEA voted not to endorse Dr. Graham in 2011.**

123.    The FFNEA endorsed Hogshead in 2011 because she was for the teachers and she voted to give the teachers a raise. Ex. II, *Green Dep.,* at 48:9-16.

**RESPONSE: Controverted to the extent that this statement is Mr. Green's understanding of the reasons the members of the interview committee and the FFNEA voted to endorse Ms. Hogshead.**

124.    Race was not an issue in the FFNEA's decision not to endorse Johnson in 2014. Ex. II, *Green Dep.,* at 79:15-17.

**RESPONSE: Uncontroverted that Mr. Green so testified.**

125.    The FFNEA committee disliked Johnson's answer about class size. Ex. II, *Green Dep.,* at 79:1-14.

**RESPONSE: Controverted to the extent that this statement is Mr. Green's understanding of what the members of the FFNEA committee liked and disliked.**

126.    The FFNEA has a strong stance on class size. Ex. LL, *Johnson Dep.,* at 84:3-6.

**RESPONSE: Uncontroverted for purposes of summary judgment. However, only the District's only support for this statement of fact is the personal belief of Rev. Johnson as to what the FFNEA's stance on class size is.**

127.    The racial make-up of the FFNEA endorsement committee both times Paul Morris ran for office was roughly equal between African Americans and whites. Ex. MM, *Morris Dep.,* at 142:22-25.

**RESPONSE: Uncontroverted.**

128.    Dr. Thurman was not endorsed by the FFNEA and does not believe the lack of endorsement mattered. Ex. KK, *Thurman Dep.,* at 90:12-91:1.

**RESPONSE: Uncontroverted that Dr. Paulette-Thurman was not endorsed by the FFNEA and that it is her personal belief that the lack of endorsement did not matter.**

129. Dr. Graves did not receive the FFNEA endorsement but won her election. Ex. JJ, *Graves Dep.,* at 35:16-36:13.

**RESPONSE: Uncontroverted.**

**North County Labor Endorsement**

130. Plaintiffs do not know how many candidates of either race applied for the North County Labor endorsement. Ex. O, *Kimball Dep.,* at 68:24-69:1.

**RESPONSE: Controverted. It is uncontroverted that at least the five current white Board members, and the most recent outgoing Board member (who is white), sought and received this endorsement and that neither of the two current Black Board members sought or received this endorsement. *See* Def.'s PSUMF Resp. ¶¶ 375-76.**

131. Dr. Thurman did not seek the North County Labor endorsement in 2014. Ex. KK, *Thurman Dep.,* at 45:3-11.

**RESPONSE: Uncontroverted.**

132. Johnson did not seek an endorsement from North County Labor. Ex. LL, *Johnson Dep.,* at 20-22.

**RESPONSE: Uncontroverted.**

133. North County Labor does not endorse candidates for all elections. Ex. MM, *Morris Dep.,* at 21:9-17.

**RESPONSE: Uncontroverted. However, it has endorsed candidates in every contested election at least since 2004. Doc. No. 87-20, PSUMF Ex. G18, *Kimball Sources for North County Labor Club Endorsements*; Def.'s PSUMF Resp. ¶ 45.**

**Grade A for Change**

134. The Citizens Task Force for Quality Education was a group formed to help Normandy Schools. Ex. KK, *Thurman Dep.,* at 34:20–35:10.

**RESPONSE: Uncontroverted.**

135. The Citizens Task Force wanted to put together a slate of candidates to run for the Ferguson-Florissant School Board. Ex. KK, *Thurman Dep.,* at 34:20-35:10.

**RESPONSE: Uncontroverted.**

136.  The Citizens Task Force changed its name to Grade A for Change. Ex. KK, *Thurman Dep.*, at 35:4-25.

**RESPONSE: Controverted to the extent that Dr. Paulette-Thurman testified that Grade A for Change "broke away from" Citizens Task Force and that "there was a change from Citizens to the new group," so it was not just a name change. *See* PSUMF Ex. E4, *Thurman Dep.*, at 35:22 – 36:6.**

137.  Grade A for Change sent out information asking candidates to apply to be on the slate. Ex. KK, *Thurman Dep.*, at 36:25-37:5.

**RESPONSE: Uncontroverted.**

138.  The original slate included Dr. Thurman, Savala, and a third person that dropped out. Ex. KK, *Thurman Dep.*, at 35:11-36:23.

**RESPONSE: Uncontroverted.**

139.  Johnson was recruited after the third person dropped out. Ex. KK, *Thurman Dep.*, at 37:1-13.

**RESPONSE: Uncontroverted.**

140.  The three members of the slate were all African American. Ex. A, *Engstrom Rep.*, at ¶28.

**RESPONSE: Uncontroverted.**

141.  One of the issues that motivated Grade A for Change was race. Ex. KK, *Thurman Dep.*, at 38:5-9.

**RESPONSE: Controverted. The statement of fact is vague and incomplete. Dr. Paulette-Thurman testified that one of the issues that motivated Grade A for Change was that "the Board did not represent the community in terms of race." PSUMF Ex. E4, *Thurman Dep.*, at 38:5-9. Dr. Paulette-Thurman also testified about several other motivations: "concern[] about how Dr. McCoy was treated," the community "asking for reasons why [McCoy] was placed on administrative leave," and "academically we were starting to lose our accreditation." PSUMF Ex. E4, *Thurman Dep.*, at 37:18 – 38:16.**

142.  Grade A for Change created, produced and distributed literature. Ex. LL, *Johnson Dep.*, at 44:5-45:16.

**RESPONSE: Uncontroverted with the understanding that their literature was "specific to . . . their campaign work" and "specific to Grade A for Change." PSUMF Ex. E9, *Johnson Dep.*, at 44:13-21.**

143.    Judy Shaw was the campaign manager for Grade A for Change. She organized the slate. Ex. LL, *Johnson Dep.,* at 44:22-45:6.

**RESPONSE: Uncontroverted that Judy Shaw was the campaign manager, but Rev. Johnson testified that he "ran [his] own operation." PSUMF Ex. E9, *Johnson Dep.*, at 44:24. Neither Ms. Shaw nor Grade A for Change ran his campaign, participated in his campaign kickoff event, gave him advice, or supplied him with volunteers. *Id.* at 44:5 – 46:10. Rev. Johnson testified that he ran an "independent campaign" and "worked alongside when appropriate," and that "[a]nything [Grade A for Change] passed out was specific to . . . their campaign work." *Id.* at 44:17-18; 45:2-6.**

144.    The Grade A for Change candidates ran as a slate. Ex. JJ, *Graves Dep.,* at 17:23-25.

**RESPONSE: Uncontroverted.**

145.    Grade A for Change did not endorse in 2015. Ex. JJ, *Graves Dep.,* at 35:6-10.

**RESPONSE: Controverted. This statement of fact mischaracterizes the cited testimony. When asked whether she received a Grade A for Change endorsement in 2015, Dr. Graves responded that "Grade A For Change kind of fizzled out after that election, so there was no endorsement to really receive." PSUMF Ex. E5, *Graves Dep.*, at 35:6-10. She did not testify as to whether Grade A for Change did in fact endorse candidates in 2015.**

**Senate Factor 5 - Socioeconomic factors that hinder African Americans' ability to participate.**

146.    Kimball's analysis of Senate Factor Five did not include analysis specific to the entire District. Ex. O, *Kimball Dep.,* at 71:10-72:23.

**RESPONSE: Controverted. Dr. Kimball's report included analysis on geographic areas within FFSD (such as the cities of Berkeley, Kinloch, Ferguson, and Florissant) and geographic areas encompassing FFSD (such as St. Louis County, the larger St. Louis metropolitan region, and the state of Missouri). *See* PSUMF Ex. B4, *Kimball Rep.*, at 8-12.**

147.    The City of Ferguson only accounts for 27% of the population of the District. Ex. B, *Cooper Rep.,* at Figure 6, Column 1 and *Gordon Dep.,* at 19:10-14.

**RESPONSE: Uncontroverted.**

148.    The most relevant benchmark for socioeconomic statistics is the St. Louis
        Metropolitan area. Ex. K., *Gordon Dep.,* at 24:15-23.

**RESPONSE: Controverted. Dr. Gordon states that "in <u>urban studies generally</u>, the
most relevant benchmark is the metropolitan area." PSUMF Ex. C3, *Gordon Dep.*, at
24:22-23 (emphasis added). Dr. Gordon does not identify a benchmark appropriate in
considering Senate Factor 5. It is undisputed that there are racial disparities in FFSD in
areas such as educational achievement, unemployment, education, health,
homeownership, and criminal justice. *See* Def.'s PSUMF Resp. ¶ 252 (not disputing that
socioeconomic disparities in these areas exist).**

### Disparity in General

149.    Dr. Graves is unaware of any racial disparity between African American and white
        students in the District. Ex. JJ, *Graves Dep.,* at 61:15-62:3.

**RESPONSE: Uncontroverted. She states that she "ha[s]n't seen those numbers."
PSUMF Ex. E5, *Graves Dep.*, at 61:15-23, and that since her "children are in the upper
class, . . . [she] really do[es]n't get to see the lower achievement gap if there is," *id.* at
62:1-3.**

150.    Racial disparities between African Americans and whites are smaller in the District
        than in the St. Louis metropolitan region and with one exception, in the state of
        Missouri.  Ex. SS, *Rodden Supp Rep.: Senate Factors.,* at ¶34.

**RESPONSE: Controverted. The cited material illustrates racial disparities between
African Americans and whites for the five indicators chosen by Dr. Rodden only. *See*
Doc. No. 85-21, PSUMF Ex. B12, *Suppl. Rep. of Jonathan Rodden: Senate Factors*, July
2, 2015, at ¶ 33, Fig. 3 (p. 17). In any event, it is not clear how Dr. Rodden's comparison
is material to whether African Americans in FFSD continue to "bear the effects of past
discrimination in such areas as education, employment and health." *Gingles*, 478 U.S. at
45. As to this question, there is no dispute: Dr. Rodden—like Plaintiffs' experts—
identified African-American-white racial disparities within FFSD on most major
socioeconomic indicators. PSUMF Ex. B12, *Rodden Suppl. Rep.: Senate Factors*, at Fig.
3 (p. 17); ¶ 36.**

### Housing

151.    Plaintiffs' conclusion that the FFSD is in an unusually vulnerable position with low-
        income housing is not based on information specific to the District.  Ex. K, *Gordon
        Dep.,* at 31:17 – 32:6.

**RESPONSE: Controverted. As an initial matter, the statement of fact is confusingly
worded such that it is not clear what the District's characterization of Dr. Gordon's
conclusion is. Regardless, Dr. Gordon testified that he reached his conclusion that the
"net result" of the pattern of suburbanization of Greater St. Louis "left Ferguson-**

**Florissant in an unusually vulnerable position," Docs. Nos. 85-10 & 85-11, PSUMF Ex. B3, *Gordon Rep.*, at 21-24, by looking at national data, North County-specific data, and municipal data for cities within the District, *see* PSUMF Ex. C3, *Gordon Dep.*, at 32:1-15 (testifying about these sources of data and testifying that "the logic of this report is to run the quantitative analysis through the census units in which that data is available and then to overlay the district"); *see also* PSUMF Ex. B3, *Gordon Rep.*, at 21-27 (discussing municipality-specific data); PSUMF Ex. C3, *Gordon Dep.*, at 29:10-24 ("one has to use the geographies in which data is reported most reliably and particularly over time. And that unfortunately does not include school districts. The [American Community Survey ("ACS")] has recently begun to include school districts as a unit of census geography. So we have some data for Ferguson-Florissant and other school districts for the past I think six to eight years. But it's – the data is limited. And because my analysis is largely historical, I rely on more conventional units of geography; census blocks, census tracts, municipalities in counties. But consistently highlight the place and the scope of the school district within that larger story.").**

152.   Plaintiffs expert's statement that "African Americans in Ferguson-Florissant have settled overwhelmingly in the apartment complexes (Suburban Heights, Northwinds, Canfield) along Malin Creek…." is not based on an analysis of the District.  Ex. K, *Gordon Dep.* at 32:16 – 33:25.

**RESPONSE: Controverted for the reason stated in the response to ¶ 151, *supra*.**

**In addition, the ellipsis here makes a meaningful change to the sentence. In his report, Dr. Gordon stated that "African Americans in Ferguson-Florissant have settled overwhelming in the apartment complexes (Suburban Heights, Northwinds, Canfield) along Maline Creek and south Ferguson and Kinloch, <u>and in pockets of single-family housing east of West Florissant Avenue and south of I-270</u>." PSUMF Ex. B3, *Gordon Rep.*, at 28 (emphasis added). When the District's counsel previously tried to truncate the statement as the District has in the statement of fact above, Dr. Gordon pointed out the change: "No, it's not what I say. I say overwhelmingly in apartment complexes and in pockets of single-family housing. It's all in the same sentence." *See* PSUMF Ex. C3, *Gordon Dep.*, at 36:6-19.**

153.   Canfield Green is not within the District. Ex. K, *Gordon Dep.,* at 32:16 – 34:16.

**RESPONSE: Uncontroverted. However, the cited material does not support the statement of fact.**

154.   Plaintiffs' expert does not know how many African Americans in the District live in apartment complexes.  Ex. K, *Gordon Dep.,* at 34:22 – 35:10.

**RESPONSE: Uncontroverted.**

155.   Over half (50.7%) of African Americans in the District are homeowners. Ex. HH, *Gordon Response to Rodden Report,* at page 4, Table 4.

**RESPONSE: Uncontroverted with the understanding that African-American homeowners are often cornered into less stable neighborhoods on subprime terms.** *See* **Ex. B3,** *Gordon Rep.*, **at 21, 23-24, 27-28.**

156.  Dr. Graves was unaware of racially restricted housing, covenants and zoning in St. Louis County. Ex. JJ, *Graves Dep.,* at 56:10-13.

**RESPONSE: Uncontroverted.**

157.  Dr. Graves was born and raised in St. Louis and attended Berkeley Senior High School in the District. Ex. JJ, *Graves Dep.,* at 7:24-8:15.

**RESPONSE: Uncontroverted.**

158.  Dr. Graves is unaware of any racial disparity in home ownership, employment levels or income or poverty levels within the District. Ex. JJ, *Graves Dep.,* at 57:18-58:7.

**RESPONSE: Uncontroverted that Dr. Graves testified that she was not aware of these disparities.**

**Income**

159.  In context, the District has a small income gap. Ex. SS, *Rodden Supp Rep: Senate Factors*, at ¶32.

**RESPONSE: Controverted. This statement is inaccurate, or so vague with regard to the "context" that it lacks meaning. The numbers regarding the income gap in FFSD are uncontroverted. In FFSD, the median African-American household income is $38,760, and the median white household income is $52,781.** *See* **PSUMF Ex. B1,** *Cooper Decl.*, **at ¶ 36(a). This is a difference of about $14,000. PSUMF Ex. B12,** *Rodden Suppl. Rep.: Senate Factors*, **at ¶ 32. Stated another way, black median household income in the District is about 70% of white median household income. PSUMF Ex. B1,** *Cooper Decl.*, **at ¶ 36(a).**

160.  The income gap between African Americans and whites in the FFSD is narrower than in the region at large.  Ex. K., *Gordon Dep.,* at 24:4-9.

**RESPONSE: Uncontroverted with the understanding that, as Dr. Gordon testified, the income gap is a measure of relative income. A narrower gap is not "necessarily one of African American advancement" but something "we would fully expect . . . because there are few rich people in the Ferguson-Florissant School District." PSUMF Ex. C3,** *Gordon Dep.*, **at 23:23 – 24:14.** *See also* **PSUMF Ex. B3,** *Gordon Rep.*, **at 3 ("on each metric of socio-economic deprivation, the rate for the school district is worse than that for the larger metro area, and the rate for the majority-black block groups is worse than that for the entire school district").**

161. Plaintiffs' expert failed to provide any evidence of a racial wealth gap in the District. Plaintiffs' evidence on the racial wealth gap is based on national statistics.  Ex. K, *Gordon Dep.,* at 29:25 – 30:13.

**RESPONSE: Controverted.  In FFSD, the median African-American household income is $38,760, and the median white household income is $52,781. *See* PSUMF Ex. B1, *Cooper Decl.*, at ¶ 36(a). Dr. Gordon did not provide District-specific racial wealth gap data in his report. However, "[t]he only statistics we have on racial wealth are national. This is based on the survey consumer finances, which is a survey of only 6,000. And so the inferences are not – the sample size is not sufficient to do local." *See* PSUMF Ex. C3, *Gordon Dep.*, at 30:5-9.**

162. The median household income for the African American households in the District is $14,000 lower than that of whites.  The median household income gap for African-Americans and whites in the St. Louis metropolitan region is around $30,000.  The median gap is around $19,000 in the state of Missouri and $21,000 for the entire country.  Ex. SS, *Rodden Supp Rep: Senate Factors,* at ¶32.

**RESPONSE: Uncontroverted. *See supra* responses to ¶¶ 159, 160.**

163. The gap between African Americans and whites for individuals with incomes below the poverty line, individuals relying on the Supplemental Nutrition Assistance Program ("SNAP"), and the unemployment rate is smaller in the District than in the St. Louis metropolitan region. Ex. SS, Rodden *Supp Rep: Senate Factors,* at Figure 3.

**RESPONSE: Uncontroverted. However, it is not clear how these comparisons are not material to whether African Americans in FFSD continue to "bear the effects of past discrimination in such areas as education, employment, and health." *Gingles*, 478 U.S. at 45. As to this question, there is no dispute: Dr. Rodden—like Plaintiffs' experts— identified African American-white racial disparities within FFSD on most major socioeconomic indicators. PSUMF Ex. B12, *Rodden Suppl. Rep.: Senate Factors*, at ¶ 33, Fig. 3 (p. 17) (finding gaps exist between African Americans and whites in FFSD with respect to unemployment, SNAP, poverty, and bachelor degree attainment); Def.'s PSUMF Resp. ¶¶ 252, 263, 267, 268, 271, 272, 273, 275, 283, 284, 285, 287-90 (existence of racial disparities not disputed by FFSD).**

**According to the three-year 2011-2013 ACS, twenty-three percent of the Black population of FFSD lives in poverty, compared to 9.7% of whites. PSUMF Ex. B1, *Cooper Decl.*, at ¶ 36(a); pp. 57-58 (Exhibit D, pp. 17-18 of 46). Thirty-six percent of Black children live in poverty, compared to 19.6% of white children. PSUMF Ex. B1, *Cooper Decl.*, at ¶ 36(a); pp. 59-60 (Exhibit D, pp. 19-20 of 46). 26.8% of Black households participate in SNAP, compared to 10.0% of white households. PSUMF Ex. B1, *Cooper Decl.*, at ¶ 36(a); pp. 71-72 (Exhibit D, pp. 31-32 of 46). The unemployment rate (of those aged 16-64) for Blacks was 14.3%, compared to 9.9% of whites. *See* PSUMF Ex. B1, *Cooper Decl.*, at ¶ 36(b); pp. 73-76 (Exhibit D, pp. 33-36 of 46).**

**Employment**

164.    Frank Green, an African American FFNEA representative, testified that he is unaware of racial disparities in employment that are unique to the District. Ex. II, *Green Dep.,* at 59:8-16.

**RESPONSE: Controverted. Mr. Green does not represent the FFNEA, as he was not produced or designated as such and testified in his personal capacity only. *See* Ex. G26, *Green Subpoena*; Ex. G27, *Resp'ts' 2d Am. Disclosures*. Mr. Green is an employee of the District. PSUMF Ex. E10, *Green Dep.*, at 15:2-6.**

**Mr. Green was not asked this question. The cited material states, in full:**

> **Q. Are you aware that there's a disparity based on race and whether or not someone is employed if they live in the Ferguson-Florissant School District?**
> **A. If they live in the Ferguson-Florissant School District?**
> **Q. Yeah. If they're white, they're more likely to be employed. If they're black –**
> **A. Right. I understand. I understand the question. My thing is that's everywhere.**

**PSUMF Ex. E10, *Green Dep.*, at 59:8-16.**

**Education**

165.    African Americans in the District have a high graduation rate relative to other African American communities in St. Louis and beyond. Ex. K, *Gordon Dep.,* at 44:21-45:2.

**RESPONSE: Uncontroverted. *See* PSUMF Ex. C3, *Gordon Dep.*, at 44:21 – 45:2 (testifying that "[i]t's on the high end of the scale"). However, it is not clear how this comparison of the extent of racial disparities is material to whether African Americans in FFSD continue to "bear the effects of past discrimination in such areas as education, employment, and health." *Gingles*, 478 U.S. at 45.**

166.    There is no indication that higher achieving and lower achieving schools are racially identifiable. Ex. JJ, *Graves Dep.,* at 27:10-21.

**RESPONSE: Controverted. The District's only support for this statement of fact is Dr. Graves' testimony that based on her research on the Missouri Department of Elementary and Secondary Education website, she did not find that lower achieving and higher achieving schools were racially identifiable.**

167.    The gap between African Americans and whites in obtaining a bachelor's degree is smaller in the District than in the St. Louis metropolitan region and the state of Missouri. Ex. SS, *Rodden Supp Rep: Senate Factors,* at Figure 3.

**RESPONSE: Uncontroverted. However, it is not clear how this comparison of the extent of racial disparities is material to whether African Americans in FFSD continue to "bear the effects of past discrimination in such areas as education, employment, and health." *Gingles*, 478 U.S. at 45. As to this issue, it is uncontroverted that there is a gap between African Americans and whites in obtaining a bachelor's degree. *See* PSUMF Ex. B12, *Rodden Suppl. Rep.: Senate Factors*, at ¶ 33, Fig. 3 (p. 17).**

168.     The gap between African Americans and whites in obtaining "some college" is smaller in the District the St. Louis metropolitan region and the state of Missouri. Ex. SS, *Rodden Supp Rep: Senate Factors,* at Figure 3.

**RESPONSE: Uncontroverted. However, it is not clear how this comparison of the extent of racial disparities is material to whether African Americans in FFSD continue to "bear the effects of past discrimination in such areas as education, employment, and health." *Gingles*, 478 U.S. at 45. As to this issue, it is uncontroverted that there is a gap between African Americans and whites in obtaining "some college." *See* PSUMF Ex. B12, *Rodden Suppl. Rep.: Senate Factors*, at ¶ 33, Fig. 3 (p. 17).**

169.     The FFNEA representative does not believe that African Americans in the District suffer from discrimination in education attainment any more or less than African Americans nationwide. Ex. II, *Green Dep.,* at 80:20-81:11.

**RESPONSE: Controverted. Mr. Green does not represent the FFNEA, as he was not produced or designated as such and testified in his personal capacity only. *See* Ex. G26, *Green Subpoena*; Ex. G27, *Resp'ts' 2d Am. Disclosures*. Moreover, Mr. Green is an employee of the District. PSUMF Ex. E10, *Green Dep.*, at 15:2-6.**

**The achievement gap and discipline.**

170.     Schroeder testified that the achievement gap is not unique to the District. Ex. PP, *Schroeder Dep.,* at 79:17-80:6.

**RESPONSE: Uncontroverted. However, it is is not clear how whether the achievement gap is unique is material to whether African Americans in FFSD continue to "bear the effects of past discrimination in such areas as education, employment, and health." *Gingles*, 478 U.S. at 45. As to this issue, it is undisputed that an achievement gap exists in the District. Def.'s PSUMF Resp. ¶ 267.**

171.     The achievement gap exists nationwide and in the District. Ex. RR, *Chabot Dep.,* at 87:15-22.

**RESPONSE: Controverted. This statement of fact is vague, lacks context, and is supported only by the personal opinion of current Board member Chabot. In addition, whether the achievement gap exists nationwide is not material to whether African Americans in FFSD continue to "bear the effects of past discrimination in such areas as**

**education, employment, and health."** *Gingles*, **478 U.S. at 45. As to this issue, it is undisputed that an achievement gap exists in the District. Def.'s PSUMF Resp. ¶ 267.**

172.     The District has committees that are working on improving the curriculum to address the racial disparities in the achievement gap. Ex. PP, *Schroeder Dep.,* at 42:9-15.

**RESPONSE: Controverted insofar as this statement of fact implies that any corrective measure has been implemented.** *See* **PSUMF Ex. E7,** *Schroeder Dep.***, at 42:9 – 43:8; PSUMF Ex. E3,** *Brown Dep.***, at 52:22 – 53:25; PSUMF Ex. E8,** *Chabot Dep.***, at 89:4-14. In addition, the District cites no evidence that the Board has had any role with respect to these committees.**

173.     Dr. Graves is unaware of the achievement gap. Ex. JJ, *Graves Dep.,* at 61:12-14.

**RESPONSE: Uncontroverted.**

174.     Dr. Davis, as superintendent, is capable of handling issues of racial disparity. Ex. LL, *Johnson Dep.,* at 81:20-24 and Ex. KK, 99:13-18.

**RESPONSE: Controverted. The District's only support for this statement of fact are the personal beliefs and hopes of Rev. Johnson and Dr. Paulette-Thurman, based on their testimony a month after Dr. Davis assumed his position as superintendent. Rev. Johnson testified, "Of what I know of [Davis], I hope so and I do believe [he is capable of addressing issues regarding racial disparities in the district]." PSUMF Ex. E9,** *Johnson Dep.***, at 81:20-24. Dr. Paulette-Thurman testified that, of the approximately 12 candidates that were sent to the Board by the hiring firm, she believed the Board had hired the person best able to address any issues regarding disparities within the district. PSUMF Ex. E4,** *Thurman Dep.***, at 98:5-7, 99:13-16.**

175.     Discipline is a reality in every school corporation and is a daily struggle for parents. Ex. LL, *Johnson Dep.,* at 65:1-66:1.

**RESPONSE: Controverted. Rev. Johnson testified that his personal belief is that "how . . . you create systems of responsibility and accountability" is a reality and daily struggle for parents. PSUMF Ex. E9, Johnson Dep., at 65:25 – 66:3.**

176.     Dr. Thurman, as a former principal, was in charge of disciplining students. Ex. KK, *Thurman Dep.* at 89:1-4.

**RESPONSE: Uncontroverted.**

177.     The Board is not responsible for individual principals' decisions.  That is not the Board's role. Ex. KK, *Thurman Dep.,* at 97:11-23.

**RESPONSE: Uncontroverted that Dr. Paulette-Thurman so testified. Controverted to the extent that the Board makes final employment decisions.** *See* **Mo. Rev. Stat. § 162.301(3).**

178.    Dr. Thurman did not consider race when disciplining students. Ex. KK, *Thurman Dep.,* at 89:5-7.

**RESPONSE: Uncontroverted that Dr. Paulette-Thurman so testified.**

179.    Dr. Thurman does not believe principals in the FFSD consider race when disciplining a student.  Ex. KK, *Thurman Dep.,* at 95:23 – 96:4.

**RESPONSE: Uncontroverted that Dr. Paulette-Thurman so testified. However, controverted to the extent that in responding to the question of whether the African-American community has particularized needs, she answered affirmatively, stating that she has found that there are racial disparities in the use and severity of school discipline. PSUMF Ex. E4,** *Thurman Dep.***, at 26:15 – 27:17.**

**Senate Factor 6 – Whether political campaigns have been characterized by overt or subtle racial appeals.**

180.    Johnson campaigned on discipline "quite a bit." Ex. LL, *Johnson Dep.,* at 47:17-48:5 and 64:20.

**RESPONSE: Uncontroverted.**

181.    When asked whether he campaigned on morale of the teachers and discipline, F. Willis Johnson replied, "…yes, ma'am.." Ex. LL, *Johnson Dep.,* at 48:1-5.

**RESPONSE: Uncontroverted.**

182.    Dr. Thurman testified that one of reasons she ran was to address concerns about discipline. Ex. KK, *Thurman Dep.,* at 28:14-29:11.

**RESPONSE: Controverted. This statement of fact misleadingly characterizes Dr. Paulette-Thurman's testimony. Dr. Paulette-Thurman testified that her "primary concern" was accreditation, that she was "[v]ery concerned about teachers and their rights and having quality schools," and that she was "partly motivated by the fact that people were asking African Americans to run for the School Board." PSUMF Ex. E4,** *Thurman Dep.***, at 25:17-25. She testified that she was not sure the Board was doing enough to address African Americans' particularized needs concerning disproportionate discipline and the people who encouraged her to run did not think the Board was doing enough to address this issue.** *Id.* **at 28:14-22.**

183.    Dr. Thurman attended the forums and large gatherings where candidates were invited in her 2014 campaign.  Ex. EEE, *Thurman Decl*. ¶2.

**RESPONSE: Uncontroverted.**

184. Dr. Thurman was not aware of statements made by any other 2014 candidate that accused Plaintiff Johnson of being an absentee father, of being too supportive of the student transfer issue or of being a renter rather than a homeowner. Ex. EEE, *Thurman Decl.* ¶4.

**RESPONSE: Uncontroverted.**

185. The subject of discipline is usually a general topic brought up at candidate forums during an election. Ex. FFF, *Hogshead Decl.*, ¶3.

**RESPONSE: Controverted to the extent that the District's only support for this statement is Ms. Hogshead's personal opinion provided in a declaration submitted with the District's opposition to Plaintiffs' motion for summary judgment.**

186. Dr. Courtney Graves, the board's newest African American member, did not perceive any candidates' platform with regard to student discipline as a subtle racial appeal. Ex. HHH, *Graves Decl.* ¶2.

**RESPONSE: Uncontroverted with the understanding that Dr. Graves limited this declaration to during her 2015 campaign, that the District's only support for this statement of fact is Ms. Hogshead's personal opinion provided in a declaration submitted with the District's opposition to Plaintiffs' motion for summary judgment. Doc. No. 97-27, Def.'s Add'l SUMF Ex. HHH, *Graves Decl.*, at ¶ 2.**

187. Leslie Hogshead was a candidate in 2013. Biases toward the disciplining of African American students was not a topic that year or any other election since she has been on the Board. Ex. FFF, *Hogshead Decl.*, ¶4.

**RESPONSE: Controverted to the extent that that the District's only support for this statement of fact is Ms. Hogshead's personal opinion provided in a declaration submitted with the District's opposition to Plaintiffs' motion for summary judgment.**

188. Chuck Henson was also a candidate in 2013. He did not express his views on racial bias, racial inclusion or the achievement gap during that campaign. Ex. FF, *Hogshead Decl.*, ¶6.

**RESPONSE: Controverted. Mr. Henson declared that he had engaged in "outspoken recognition of racial bias" during his campaign. PSUMF Ex. A4, *Henson Decl.*, at ¶ 12. He recognized the achievement gap and was "outspoken in favor of hiring African-American-owned subcontractors" and regarding "the lack of diversity among teachers and administrators." *Id.* at ¶ 13; *see also* PSUMF Ex. A3, *Graham Decl.*, at ¶ 16 (stating that Henson made efforts during his time on the Board to "highlight the specialized needs of African American students and promote diversity and inclusion").**

189.   Even if a candidate is endorsed by the FFNEA or North County Labor, that candidate still runs an individual campaign and does not run as a slate. Ex. FF, *Hogshead Decl.*, ¶7.

**RESPONSE: Controverted. Although it is uncontroverted that a candidate endorsed by the FFNEA and/or the North County Labor Club still runs an individual campaign, the statement that candidates endorsed by the FFNEA or North County Labor do not run as a slate is a legal conclusion regarding what constitutes a "slate," not a statement of fact.** *See* **Pls.' Br. at 50-52, 51 n.29; Pls.' Reply (filed concurrently herewith) at 9-11; PSUMF Ex. E1,** *Morris Dep.***, at 12:2 – 13:11, 72:17-21, 75:17 – 76:13 (testifying that he had understood that North County Labor Club-endorsed candidates and FFNEA-endorsed candidates could be a "slate").**

**In any event, the FFNEA promotes endorsed candidates together on its website,** *see* **PSUMF Ex. B9,** *Kimball Rebuttal***, at 12 (Missouri NEA webpages attached as Exs. 1 & 2), and candidates coordinate with the FFNEA and/or each other in newspaper ads, flyers, mailings, robocalls, and in engaging volunteers,** *see* **Def.'s PSUMF Resp. ¶ 349***;* **PSUMF Ex. E10,** *Green Dep.***, at 32:21-24 (combined flyers); PSUMF Ex. E3,** *Brown Dep.***, at 29:7-24 (combined flyers and newspaper ads); PSUMF Ex. E6,** *Hogshead Dep.***, at 27:3-6 (FFNEA asked for combined volunteers on their behalf), 28:10-14 (combined mailings and robocalls); PSUMF Ex. E1,** *Morris Dep.***, at 75:24-25 ("Anything that the NEA sent out was together."); Doc. No. 85-61, PSUMF Ex. F19,** *2014 FFNEA Flyer (Ex. 13 to Ebert Dep.)***;** *see also supra* **response to ¶ 119.**

**The North County Labor Club similarly promotes all endorsed candidates jointly, including through combined mailers,** *see* **PSUMF Ex. E8,** *Chabot Dep.***, at 52:8-13, and a joint note of endorsement in the** *Labor Tribune***,** *see* **PSUMF G18,** *North County Labor Club Endorsements***.**

190.   Dr. McCoy advocated for the District to pay the transportation costs for any student from Normandy or Riverview Gardens that wanted to attend the District during a time of fiscal problems, frozen salaries and budget cuts. Ex. FF, *Hogshead Decl.*, ¶¶10-11.

**RESPONSE: Controverted. When the Board refused to fund the transportation cost, Dr. McCoy arranged student transportation for the transfer students without District funding. Doc. No. 85-7, PSUMF Ex. A7,** *Decl. of Adolphus Pruitt***, Sept. 15, 2015, at ¶ 21.**

191.   The race of the transferring student was not a consideration. The transportation cost was the concern. Ex. FF, *Hogshead Decl.*, ¶¶9-11.

**RESPONSE: Controverted.**

**First, it is not clear from either the statement of fact or the source material what "consideration" means or how or to whom this "concern" was addressed, since Ms. Hogshead continues, "The Board at no time considered the issue of student transfers**

**and transportation of students from [Normandy] and/or [Riverview Gardens] as part of its decision to suspend Dr. McCoy."** *See* **Doc. No. 97-25, Def.'s Add'l SUMF Ex. FFF, *Decl. of Leslie Hogshead*, Oct. 22, 2015, at ¶ 12.**

**Second, the District's only support for this statement of fact is Ms. Hogshead's personal opinion provided in a declaration submitted with the District's opposition to Plaintiffs' motion for summary judgment.**

192.    When Board member Paul Morris stated that the money issue that follows transfer students is a "huge issue", he was concerned that the District would be responsible for 30% of the transferring students' costs at the time when the District had salary freezes and program cuts.  Ex. GGG, *Morris Decl.*, ¶3.

**RESPONSE: Uncontroverted that Mr. Morris so declared in a declaration submitted with the District's opposition to Plaintiffs' motion for summary judgment.**

193.    Morris' comments regarding the student transfer issue were financial appeals not racial appeals. Ex. GGG, *Morris Decl.*, ¶5.

**RESPONSE: Controverted. Mr. Morris so declared in a declaration submitted with the District's opposition to Plaintiffs' motion for summary judgment. However, Plaintiffs and other African-American voters in the District understood his comments as subtle racial appeals. Def.'s PSUMF Resp. ¶ 391.**

194.    Dr. Graves did not think discussions regarding the student transfer issue were racial in context. Ex. HHH, *Graves Decl.*, ¶3.

**RESPONSE: Uncontroverted.**

**Senate Factor 7 – The extent to which members of the minority group have been elected to public office in the jurisdiction.**

195.    Dr. Gordon cannot name a school district that is more integrated than FFSD. Ex. K, *Gordon Dep.*, at 25:21-25.

**RESPONSE: Controverted. This statement is incomplete and mischaracterizes Dr. Gordon's testimony. Dr. Gordon explained that he could not, during his deposition, "name any school district in the [St. Louis] metro area at large that is more racially integrated than Ferguson-Florissant" only because he "ha[d not] done those calculations," not, as the District seems to suggest, because more integrated school districts do not exist. PSUMF Ex. C3, *Gordon Dep.*, at 25:21-25.**

196.    When asked whether there is sufficient representation of the African American community on the board, Dr. Graves, the newest African American Board member, responded that she does not believe the racial makeup of the board matters.  She

believes the board should be people that are best qualified. Ex. JJ, *Graves Dep.,* at 34:14-22.

**RESPONSE:** **Uncontroverted that Dr. Graves stated this. However, Dr. Graves also testified that, at the time she ran for the Board, she did not believe that the African-American community had adequate representation on the Board. PSUMF Ex. E5, *Graves Dep.*, at 34:7-10.**

197.    Dr. Thurman was elected in 2014 and is a current board member. Ex. KK, *Thurman Dep.,* at 24:24-25:10.

**RESPONSE:** **Uncontroverted.**

198.    Dr. Thurman ran on the Grade A for Change slate in 2014. Ex. KK, *Thurman Dep.,* at 34:17-36:6.

**RESPONSE:** **Uncontroverted.**

199.    Race was an issue in the 2014 election in response to the Dr. McCoy situation. Ex. OO, *Brown Dep.,* at 70:18-71:2.

**RESPONSE:** **Controverted. The only support the District provides for this statement of fact is current Board member Brown's personal belief that race became an issue in 2014 "probably [as] a response to the Dr. McCoy situation." PSUMF Ex. E3, *Brown Dep.*, at 70:18 – 71:2.  The District's own witnesses offered a number of reasons that race was an issue in the 2014 election. For example, Mr. Morris testified that race was an issue simply because "there was a slate of African American candidates," and one of those candidates "came to a Board meeting and spoke that there was not enough African Americans sitting on the Board." PSUMF Ex. E1, *Morris Dep.*, at 45:24 – 46:10, 46:22-25.**

200.    The other candidates on the Grade A for Change slate did not do as much to win their election as Dr. Thurman did. Ex. KK, *Thurman Dep.,* at 91:2-5.

**RESPONSE:** **Controverted. The only support the District provides for this statement of fact is Dr. Paulette-Thurman's personal belief that the other members of the Grade A for Change slate did not do as much as she did to win the election. PSUMF Ex. E4, *Thurman Dep.*, at 91:2-5.**

201.    Savala did not attend as many functions as Dr. Thurman attended. Ex. KK, *Thurman Dep.,* at 91:11-15.

**RESPONSE:** **Controverted. This statement of fact mischaracterizes Dr. Paulette-Thurman's testimony. According to Dr. Paulette-Thurman, Savala "was not present at every function that [she] went to." PSUMF Ex. E4, *Thurman Dep.*, at 91:11-15.**

202.  Savala showed up late for the McCluer forum in 2014. Ex. MM, *Morris Dep.,* at 32:2-6.

**RESPONSE: Controverted. Savala was present from the beginning of the McCluer forum in 2014. PSUMF Ex. H2(C),** *Mar. 6, 2014 Candidate Forum* **(video), at 0:00:00.**

203.  Savalla barely lost his election. He lost by 91 votes. Ex. O, *Kimball Dep.,* at 46:11-24.

**RESPONSE: Controverted to the extent that there is no practical difference between losing an election and "barely" losing an election. Savala lost his election and received 91 fewer votes than the winning candidate with the fewest votes. Def.'s PSUMF Resp. ¶ 148.**

204.  Johnson was 398 votes short of winning a seat on the FFSD Board. Ex. LL, *Johnson Dep.,* at 59:13-15.

**RESPONSE: Uncontroverted that Johnson received 398 fewer votes than the winning candidate with the fewest votes. Def.'s PSUMF Resp. ¶ 148.**

205.  Johnson did not attend all of the coalition (also referred to as Grade A for Change) meetings. Ex. LL, *Johnson Dep.,* at 39:3-10 and 61:11-14.

**RESPONSE: Uncontroverted.**

206.  Johnson did not complete the League of Women Voters information form. Ex. LL, *Johnson Dep.,* at 85:3-5.

**RESPONSE: Uncontroverted.**

207.  The benefit of filling out the League of Women Voters form is that the League sent the information to the Post-Dispatch, which got that information out to a lot of voters. Ex. KK, *Thurman Dep.,* at 91:24-94:2.

**RESPONSE: Uncontroverted that Dr. Paulette-Thurman testified to her belief that this is the benefit of filling out the League of Women Voters form. It is unclear from the cited testimony what the Post-Dispatch did with the information the League sent to it, and accordingly, whether and what information reached "a lot of voters." PSUMF Ex. E4,** *Thurman Dep.***, at 91:24 – 92:4. (Note that the District's citation range appears to include a typo.)**

208.  Dr. Thurman filled out the League of Women Voters form. Ex. KK, *Thurman Dep.,* at 91:2-23.

**RESPONSE: Controverted. The cited testimony does not indicate whether Dr. Thurman filled out the League of Women Voters form. PSUMF Ex. E4, *Thurman Dep.*, at 91:2-23.**

209.  Dr. Graves responded to the League of Women Voters' questionnaire. Ex. JJ, *Graves Dep.,* at 18:19-20:4.

**RESPONSE: Uncontroverted.**

210.  Johnson talked on his cell phone during a candidate forum. Ex. LL, *Johnson Dep.,* at 86:25-87:2.

**RESPONSE: Controverted. This statement of fact mischaracterizes Rev. Johnson's testimony. Rev. Johnson stated that he "possibly" took a call during a candidate forum. He explained further that if he did so, it is because he has "a personal rule in [his] professional and personal life that whenever [his] wife or [his] children or [his] parents call, that [he] make[s] it a habit, no matter what [he's] doing, to stop and make sure they're ok." PSUMF Ex. E9, *Johnson Dep.*, at 86:25 – 87:11.**

211.  Dr. Graham was not a strong campaigner. Ex. QQ, *Hogshead Dep.,* at 44:24-41:3.

**RESPONSE: Controverted. The only support the District provides for this statement of fact is current Board member Hogshead's personal opinion that Dr. Graham was not a strong campaigner. PSUMF Ex. E6, *Hogshead Dep.*, at 40:24 – 41:3. (Note that the District's citation range appears to include a typo.) That Dr. Graham was, in reality, not a strong campaigner is inconsistent with the fact that Dr. Graham served on the Board for 23 years, won every election in which she faced challengers from 1988 until her loss in 2011, and was the top choice among African-American voters in every election analyzed. PSUMF Ex. A3, *Graham Decl.*, at ¶ 5; Def.'s PSUMF Resp. ¶¶ 79, 121.**

212.  The 2000 decennial census showed a single-race black voting age population of 32.61%. See, Ex. B, *Cooper Rep.,* at Figure 4.

**RESPONSE: Uncontroverted.**

**Exogenous Elections**

213.  Barack Obama received 70.3% of the District's votes in the 2008 Democratic Presidential Primary. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

214.     Barack Obama received 76.5% of the District's votes in the 2008 general election. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

215.     William Lacy Clay received 84.6% of the District's votes in the 2008 general election for U.S. Congress.  Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

216.     Charlie Dooley received 80% of the District's votes in the 2010 St. Louis County Executive Democratic primary. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

217.     Charlie Dooley received 70.7% of the District's votes in the 2010 County Executive general election. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

218.     William Lacy Clay received 78.9% of the District's votes in the 2010 democratic primary for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

219.     William Lacy Clay received 69.5% of the District's votes in the 2010 general election for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

220.     William Lacy Clay received 65% of the District's votes in the 2012 democratic primary for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

221.     William Lacy Clay received 78.5% of the District's votes in the 2012 general election for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

222. Barack Obama received 77.9% of the District's votes in the 2012 presidential general election. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

223. Charlie Dooley received 50.7% of the District's votes in the 2014 St. Louis County Executive democratic primary. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

224. William Lacy Clay received 73% of the District's votes in the 2014 general election for U.S. Congress. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at Table 1.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

225. There were 12 elections in which voters in the District had a choice between African American and white candidates. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at ¶26.

**RESPONSE: Controverted. This statement of fact is misleading and mischaracterizes the cited portion of Dr. Rodden's supplemental report. Dr. Rodden reports that he "found" 12 *exogenous* elections since 2008 "in which voters in the Ferguson-Florissant School District had a choice between African-American and white candidates." PSUMF Ex. B11, *Rodden Rebuttal re: Bloc Voting*, at ¶¶ 25, 26. He does not report that there were in fact only 12 such elections since 2008; nor does he report that there were 12 such elections since the District's inception.**

226. The District lies within the boundaries of all 12 electoral districts analyzed. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at ¶27.

**RESPONSE: Uncontroverted for purposes of summary judgment.**

227. The African American candidate was victorious in all 12 exogenous elections analyzed. Ex. GG, *Rodden Supp Rep: Assessment of Plaintiff's Redistricting Proposals,* at ¶29.

**RESPONSE: Uncontroverted for purposes of summary judgment that Rodden selected for analysis 12 elections wherein an African-American candidate was victorious.**

**Hazelwood School District**

228. The 2010 total population of the Hazelwood School District was 89,529. Ex. TT, *Hazelwood 2010 Single Years – Age and Sex.*

**RESPONSE: Controverted. According to the cited exhibit, the 2010 total population of the Hazelwood School District is 118,853. Def.'s Add'l SUMF, Ex. TT, *Hazelwood 2010 Single Years – Age and Sex*. The total 2010 <u>voting age population</u> according to the cited exhibit is 89,529. *Id.***

229. The 2010 single race black voting age population of the Hazelwood School District was 42,913. (47.93%) Ex. UU, *Hazelwood 2010 Sex by Age.*

**RESPONSE: Uncontroverted for purposes of summary judgment.**

230. The 2011-2013 ACS total voting age population for the Hazelwood School District was 94,167. Ex. WW, *Hazelwood 2013 ACS Sex by Age total population.*

**RESPONSE: Uncontroverted for purposes of summary judgment. However, the District has mislabeled the proper supporting document, which can be found at Def.'s Add'l SUMF, Ex. <u>XX</u>, not WW.**

231. The 2013 single race black VAP was 47,224 (50.15%) for the Hazelwood School District. Ex. XX, *Hazelwood 2013 ACS Black alone.*

**RESPONSE: Controverted only to the extent that this figure for single-race Black VAP appears to be from the *2011 – 2013* ACS estimate, which can be found at Def.'s Add'l SUMF, Ex. <u>WW</u>, not XX.**

232. The Hazelwood School District is majority African American. Ex. FFF, *Hogshead Decl.* ¶8.

**RESPONSE: Controverted. The cited declaration does not provide any support for this statement of fact. Def.'s Add'l SUMF, Ex. FFF, *Hogshead Decl.***

<u>**Senate Factor 8 – Was there a significant lack of response from elected officials to the needs of the minority group.**</u>

<u>**Superintendents**</u>

233. The Board selected Dr. Joseph Davis as the new superintendent. He is African American. Ex. JJ, *Graves Dep.,* at 66:22-25.

**RESPONSE: Uncontroverted.**

234. Both the current and former superintendent are African American. Ex. KK, *Thurman Dep.,* at 99:11-22.

**RESPONSE: Uncontroverted that the current Superintendent is African-American. All former Superintendents are white, except Dr. Art McCoy, the FFSD superintendent from July 1, 2011 – March 15, 2014, who is African-American. Def.'s PSUMF Resp. ¶ 316 (Dr. McCoy was the District's first African-American Superintendent), ¶ 318 (Dr. McCoy began his tenure on July 1, 2015);** *infra* **response to ¶ 238 (Dr. McCoy resigned on March 15, 2014).**

235. The Board that hired Dr. McCoy was majority white. Ex. O, *Kimball Dep.,* at 58:19-21.

**RESPONSE: Uncontroverted to the extent the FFSD Board has always been and remains majority white. In December 2010, the Board that hired Dr. McCoy had the largest proportion of African-American members that it has ever had (2 out of 7). Def.'s PSUMF Resp. ¶¶ 110, 118, 317, 412;** *Dec. 8, 2010 FFSD Board Meeting Mins.* **at 1, 3, attached to the Third Lakin Decl. (filed concurrently herewith) as Ex. H8; Doc. No. 85-3, PSUMF Ex. A3,** *Decl. of Doris Graham***, at ¶ 18. The Board suspended Dr. McCoy in November 2013 soon after it lost its last African-American member and became all-white. Def.'s PSUMF Resp. ¶ 322 (six Board members were white non-Hispanic; one Board member was white-Hispanic).**

236. The racial make-up of the board that hired Dr. Davis was one African American and six white board members. Ex. KK, *Thurman Dep.,* at 98:20-23 and 99:11-12.

**RESPONSE: Uncontroverted.**

237. Before hiring the new superintendent, the Board held three sets of forums for parents or constituents in the area to hear the top two candidates for superintendent speak. Ex. JJ, *Graves Dep.,* at 66:6-14.

**RESPONSE: Uncontroverted. This was the long standing hiring process according to Hogshead. PSUMF Ex. E6,** *Hogshead Dep.***, at 89:19 – 90:18.**

**Parents raised a number of concerns at these forums. The forums resulted in Email from Jana Shortt to Larry Larrew, Sept. 30, 2014, attached to the Third Lakin Decl. (filed concurrently herewith) as Ex. H7 ("Lack of African American representation on School Board, among teachers, and administrators"; "Racial divide in district," "No trust in the schools"; "Diversity training for teachers"; "Understanding of African American populations"; "the Board is not diverse[, t]hat needs to change"; "Negative is the Board makes decision on Superintendent").**

**The former superintendent controversy**

238. Dr. McCoy resigned February 2014. Ex. PP, *Schroeder Dep.,* at 56:11-20.

**RESPONSE**: Controverted. Dr. McCoy submitted his resignation on March 15, 2014. Def.'s PSUMF Resp. ¶ 341; Doc. 97-20, Def.'s PSUMF Resp. Ex. AAA, *McCoy/FFSD Separation Agreement*, at ¶ 1.

239. Dr. McCoy refused to sign a release so the board could discuss the issues that led to his suspension. See, 4:14 CV 2077 RWS, 49 and Ex. AAA, *McCoy/FFSD Separation Agreement.*

**RESPONSE**: Controverted.  The cited documents do not support this statement.

*First*, the Board entered into agreements with Dr. McCoy in March of 2014, four months after the Board suspended Dr. McCoy.  *See* Doc. No. 49, FFSD's Mot. for Protective Order, at Ex. 1, *McCoy/FFSD Protective Order*; *id.* at Ex. 2, *McCoy/FFSD Separation Agreement*, Mar. 12, 2014.  The Board's refusal to discuss the issues that led to his suspension for those four months cannot be attributed to these documents.

*Second*, there is no evidence that Dr. McCoy was asked to or "refused to sign a release so the board could discuss the issues that led to his suspension."  Dr. McCoy's counsel clearly expressed his position that he does not oppose inquiry related to his suspension. Doc. No. 51-2, Email from Mary Anne Sedey to the parties' counsel, June 12, 2015 ("We do not oppose, nor do we believe the agreements related to the termination proceeding preclude, inquiry related to the suspension of Dr. McCoy and the process leading to the termination proceedings.").

*Third,* the Board has shown a willingness to discuss the issues that led to Dr. McCoy's suspension on a self-serving basis, and conveniently refuses to when it is not advantageous.  The Board publicly discussed the issues that led to his suspension on multiple occasions. Doc. No. 85-57, PSUMF Ex. F15, *Nov. 7, 2013 Board Letter to FFSD Families (Ex. 8 to Morris Dep.)* ("The decision reflects differences in focus and philosophy between the Board and superintendent and is not an indication of wrongdoing."); Doc. No. 85-55, PSUMF Ex. F13, *Nov. 12, 2013 Board Letter to FFSD Families (Ex. 9 to Morris Dep.)*. The District discusses such issues in ¶¶ 252-56, *infra*.

240. Dr. McCoy refused to let the District disclose the charges against him.  See, 4:14 CV 2077 RWS, 49 and Ex. AAA, *McCoy/FFSD Separation Agreement.*

**RESPONSE**: Controverted.  The cited documents do not support this statement.

*First*, the Board entered into agreements with Dr. McCoy in March of 2014, four months after the Board brought employment charges against Dr. McCoy. *See* Doc. No. 49, FFSD's Mot. for Protective Order, at Ex. 1, *McCoy/FFSD Protective Order*; *id.* at Ex. 2, *McCoy/FFSD Separation Agreement*, Mar. 12, 2014; Def.'s PSUMF Resp. ¶¶ 337-38. The cited documents cannot support the statement that the Board's refusal to disclose charges during those four months are attributable to its agreements with Dr. McCoy.

***Second***, there is no evidence that Dr. McCoy was asked to or "refused to let the District disclose the charges against him." The joint protective agreement between the Board and Dr. McCoy related to documents that may be disclosed in proceedings between Dr. McCoy and the Board. FFSD's Mot. for Protective Order, Doc. No. 49, at Ex. 1. As part of Dr. McCoy's separation agreement, the District contracted to "place the Statement of Charges and all documents amassed by the District . . . in a sealed envelope only to be opened by order of court pursuant to Chapter 610 of the Revised Statutes of the State of Missouri." Def.'s PSUMF Resp. Ex. AAA, ***Separation Agreement***, at ¶ 7.

241.    In this litigation, Dr. McCoy has continued to refuse to let the District disclose the documentation surrounding the charges against him. See, 4:14 CV 2077 RWS, 49 and Ex. AAA, *McCoy/FFSD Separation Agreement.*

**RESPONSE: Controverted for the reasons stated in response to ¶¶ 240-241, *supra*.**

**Dr. McCoy did not want the content of these charges disclosed <u>publicly</u> during the present litigation because, as his counsel stated, "[t]he information contained in those records is completely one-sided and was collected in a fishing expedition conducted *after* the suspension and with the clear intent to find a basis to justify his termination." McCoy's Mem. to Court, Doc. No. 44 ("McCoy Mem."), at 3.**

**"The proposed disclosure of the information contained in the file is particularly unfair in the circumstances presented here. In the course of the termination proceedings, Dr. McCoy and his counsel conducted discovery including requests for document production and the taking of several depositions. The information obtained effectively counters many of the charges made in the Charges. It was obtained, however, pursuant to a protective order which forbids Dr. McCoy from sharing that information outside the proceedings related to his termination. He will be unable, therefore, to provide the Plaintiff with any of the exculpatory information collected during discovery related to the Charges." McCoy Mem. at 4.**

242.    Dr. McCoy could sue the Board for releasing information about the issues surrounding his suspension and the charges against him. See, 4:14 CV 2077 RWS, 49 and Ex. AAA, *McCoy/FFSD Separation Agreement.*

**RESPONSE: Controverted. The cited documents do not support this statement.**

**Neither Dr. McCoy's counsel, *see* McCoy Mem., nor the District's counsel, *see* FFSD's Mot. for Protective Order, Doc. No. 49, discuss the District's liability to Dr. McCoy for releasing information. The Separation Agreement between Dr. McCoy and the Board prohibits either party from bringing claims against one another. Def.'s PSUMF Resp. Ex. AAA, *Separation Agreement*, at ¶¶ 4-5. Plaintiffs take no position on whether Dr. McCoy "could sue" the District.**

Moreover, Dr. McCoy's counsel clearly expressed his position that the Board could discuss issues related to his suspension and the process leading to the Board's termination proceedings. *See supra* response to ¶ 239 (email from Mary Anne Sedey to the parties' counsel).

243. The District School Board held a special meeting to take public comments on Dr. McCoy's suspension. Ex. KK, *Thurman Dep.,* at 82:4-83:6.

**RESPONSE: Uncontroverted except to the extent the November 13, 2013 Board meeting to take public comments was not called a "special" or emergency meeting. Doc. No. 86-1, PSUMF Ex. H1, *Nov. 13, 2013 Board Meeting Mins.* at 4; PSUMF Ex. E7, *Schroeder Dep.*, at 52:18 – 53:2.**

244. Dr. McCoy stated that his suspension was not racially motivated. Ex. AAA, *McCoy/FFSD Separation Agreement, Ex. B.*

**RESPONSE: Controverted. The document cited by the District does not support this statement. The Board and Dr. McCoy agreed to a Mutual Statement in response those who viewed the Board's treatment of Dr. McCoy as racially motivated, stating "the parties are satisfied that each acted in good faith and with the best interests of the Ferguson-Florissant School District in mind." Def.'s PSUMF Resp. Ex. AAA, *Separation Agreement*, at Ex. B.**

245. The FFNEA representative did not have an opinion on whether Dr. Art McCoy should have been suspended because he did not have all of the facts. Ex. II, *Green Dep.,* at 69:9-70:12.

**RESPONSE: Controverted to the extent the Frank Green did not testify in his personal capacity not as a representative of the FFNEA. *See* Ex. G26, *Green Subpoena*. The cited document does not support the statement that Mr. Green "did not have an opinion on whether Dr. McCoy should have been suspended." Mr. Green was asked "Did you support the [Board's] decision to suspend Dr. McCoy?" and answered "I didn't know all the facts." PSUMF Ex. E10, *Green Dep.*, at 69:9-11.**

246. As a board member and former principal, Dr. Thurman does not believe that the FFSD board should have given a reason for Dr. McCoy's suspension. Ex. KK, *Thurman Dep.,* at 83:24-84:5.

**RESPONSE: Uncontroverted.**

247. Dr. Thurman does not believe race was a factor in Dr. McCoy's situation. Ex. KK, *Thurman Dep.,* at 84:18-20.

**RESPONSE: Controverted. Dr. Paulette-Thurman testified that she initially believed race was a factor in the Board's treatment of Dr. McCoy and that she changed her opinion after becoming a Board member. PSUMF Ex. E4, *Thurman Dep.*, at 84:10-20.**

248. Despite knowing Dr. McCoy personally, Johnson never asked Dr. McCoy why he was suspended. Ex. LL, *Johnson Dep.,* at 69:4-6.

**RESPONSE: Uncontroverted.**

249. Despite knowing Dr. McCoy personally, Johnson never asked Dr. McCoy why he resigned. Ex. LL, *Johnson Dep,* at 69:7-8.

**RESPONSE: Uncontroverted.**

250. Johnson believes the Board should respect and honor its understanding with Dr. McCoy and should not release the details of his suspension and resignation. Ex. LL, *Johnson Dep.,* at 24-70:6.

**RESPONSE: Controverted. This statement is not supported by the cited material and is contrary to Rev. Johnson's testimony. When Rev. Johnson was asked whether the Board should honor its understanding not to release information on Dr. McCoy's suspension, he testified, "under whatever pretense they came to an understanding is obviously their understanding." PSUMF Ex. E9, *Johnson Dep.*, at 70:2-6. Rev. Johnson did not testify that he believes that Dr. McCoy refused to have the Board release information regarding Dr. McCoy's suspension and resignation or that the Board should not release such information.**

251. Dr. McCoy received low marks on his evaluation prior to his suspension. Ex. PP, *Schroeder Dep.,* at 87:14-88:18.

**RESPONSE: Controverted. The statement is vague and incomplete. The cited material does not support the statement and is entirely unrelated to Dr. McCoy.**

**Dr. McCoy was highly respected within the African-American community. Def.'s PSUMF Resp. ¶ 319. His success as superintendent was publicly recognized. Def.'s PSUMF Resp. ¶ 320. Dr. McCoy received high marks on all of his employee evaluations from July 2011 until September 2013. On September 27, 2013, Dr. McCoy was given lower evaluations by the all-white Board for the first time in his employment with the District.**

252. One of the reasons Dr. McCoy was suspended was because he attempted to hire a person for a Dean of Students position when that position had been previously eliminated by the Board. Ex. OO, *Brown Dep.,* at 61:4-62:6.

**RESPONSE: Controverted. This statement is incomplete and mischaracterizes Mr. Brown's testimony and the events to which he makes reference.**

***First***, this statement that Dr. McCoy "attempted to hire" a person for a Dean of Students position is so vague as to lack meaning. The Board makes final employment

decisions. *See* Mo. Rev. Stat. § 162.301(3). **Brown testified regarding a conflict between Dr. McCoy and the Board relating to Dr. McCoy "br[inging] forward" a Dean of Students position. PSUMF Ex. E3,** *Brown Dep.,* **at 61:11-25. The Dean of Students position was publicly posted on August 16, 2013; the District conducted candidate interviews, selected a candidate, and notified that candidate, and informed the candidate she could not be recommended to the Board until she left her current employment.** *See Complaint to the EEOC by Mariele Landrom, Dec. 12, 2013 (Ex. 15 to Brown Dep.)* **at 5-8, attached hereto as Ex. F20. When the candidate reported for her first day of work, she found out that "[t]he all-Caucasian Board of Directors did not approve [her] position."** *Id.* **at 6.**

*Second***, the Board's decision not to hire a particular person for the Dean of Students position at McCluer North High School was grounds for a complaint to the U.S. Equal Employment Opportunity Commission that the Board "refused to permit [the person] to work based on [her] race/color. African-American/Black."** *See* **Ex. F20,** *Landrom EEOC Complaint***, at 3. That claim was settled by the District's payment to the complainant. Ex. RR,** *Chabot Dep.,* **at 94:15-19. The Board's discriminatory refusal to hire this person for a Dean of Students position may have contributed to "the beginning of the difficulties that [the Board] experienced" with Dr. McCoy. PSUMF Ex. E3,** *Brown Dep.,* **at 61:11-25.**

253.    The Dean of Students position was eliminated prior to April 2013. Ex. OO, *Brown Dep.,* at 63:3-5 and 17:6-16.

**RESPONSE: Uncontroverted.**

254.    Dr. McCoy did not tell the truth when he later attempted to hire the same woman he tried to hire for the Dean of Students position. Ex. OO, *Brown Dep.,* at 63:6-65:15.

**RESPONSE: Controverted for the reasons stated in response to ¶ 252,** *supra***.**

255.    One of the chief catalysts for the board's decision to suspend Dr. McCoy was that he failed to tell the truth. Ex. OO, *Brown Dep.,* at 63:6-65:15.

**RESPONSE: Controverted. The District has repeatedly and publicly claimed that the decision to suspend Dr. McCoy "reflects differences in focus and philosophy between the Board and superintendent and is not an indication or wrongdoing." PSUMF Ex. F15,** *FFSD Nov. 7, 2013 Letter***. There is widespread belief that the decision to suspend Dr. McCoy was racially motivated. Def.'s PSUMF Resp. ¶ 329.**

256.    Some of the reasons for Dr. McCoy's suspension were the situation at McCluer North with the Dean of Students position, the PE position at Berkeley and concerns about honesty. Ex. OO, *Brown Dep.,* at 66:5-15.

**RESPONSE: Controverted for the reasons stated in response to ¶ 252,** *supra***.**

257.	The Board's policy is not to discuss personnel matters. Ex. OO, *Brown Dep.,* at 67:12-16.

**RESPONSE: Controverted. The Board does not have a policy not to discuss personnel matters, or does not adhere to the policy with regard to Dr. McCoy. It has discussed it's suspension of Dr. McCoy on multiple occasion. PSUMF Ex. F15,** *FFSD Nov. 7, 2013 Letter* **("The decision reflects differences in focus and philosophy between the Board and superintendent and is not an indication or wrongdoing."); PSUMF Ex. F13,** *FFSD Nov. 12, 2013 Letter***; supra ¶¶ 251, 252, 254, 255, 256.**

258.	The Board contacted Charlie Dooley's office to address the community's concern that race was a factor in Dr. McCoy's suspension. Ex. OO, *Brown Dep.,* at 68:6-18.

**RESPONSE: Controverted. Patricia Washington, spokeswoman for Charlie Dooley, stated that the Board did not meet with Charlie Dooley, contrary to its publicly disseminated letter to the FFSD community, and described the Board's inaccurate statement as "scurrilous." Doc. No. 86-2, PSUMF Ex. H2(A),** *Nov. 13, 2013 Board Meeting (video)***, at 3:18:30 – 3:19:00 (referring to PSUMF Ex. F13,** *Nov. 12, 2013 FFSD Letter***).**

259.	Martinez, a former board member, met with the NAACP to address their concerns that Dr. McCoy's suspension was racially based. Ex. RR, *Chabot Dep.,* at 98:14-20.

**RESPONSE: Controverted, to the extent there is conflicting testimony as to whether a Board member or the District's counsel met with a member of the St. Louis NAACP, and in what capacity. PSUMF Ex. E3,** *Brown Dep.***, at 68:9-10 ("M[s.] Ormsby actually went to the NAACP").**

260.	The District board was in contact with the St. Louis County NAACP, North County Churches United for Racial Justice and Harmony, and County Executive Charles Dooley to discuss the community's concerns regarding Dr. Art McCoy. Ex. MM, *Morris Dep.,* at 147:1-16.

**RESPONSE:  Controverted. The District released a public statement that it had been in contact with the St. Louis County NAACP, North County Churches United for Racial Justice and Harmony, and County Executive Charles Dooley. PSUMF Ex. E1,** *Morris Dep.***, at 147:1-16 (reading the letter into the deposition record). For the reasons stated in response to ¶ 258, 259 that letter appears to be inaccurate.** *See* **PSUMF Ex. H2(A),** *Nov. 13, 2013 Board Meeting (video)***, at 3:18:30 – 3:19:00.**

**Michael Brown Shooting and Protests**

261.	The protests in Ferguson regarding Michael Brown were outside of the District. Ex. O, *Kimball Dep.,* at 60:9-15.

**RESPONSE: Controverted. This statement is not supported by the cited document. Def.'s PSUMF Resp. ¶¶ 178-79.**

262. Canfield Apartment complex is outside of the District. Ex. O, *Kimball Dep.,* at 60:9-15.

**RESPONSE: Uncontroverted.**

263. The Board approved counseling to District staff and students after the Michael Brown shooting to help them feel safe while attending school. Ex. II, *Green Dep.,* at 61:5-21, 80:12-19.

**RESPONSE: Uncontroverted.**

264. Dr. Graves believes the 2015 FFSD school board acted to protect District students after the Michael Brown shooting. Ex. JJ, *Graves Dep.,* at 18:5-15.

**RESPONSE: Uncontroverted that this is Dr. Graves's belief.**

**The particular needs of the African American community**.

265. The newest African American board member, Dr. Graves, does not believe that the African American community has unique needs. Ex. JJ, *Graves Dep.,* at 33:20-34:6.

**RESPONSE: Controverted only to the extent that the statement mischaracterizes Dr. Graves's testimony. As Dr. Graves explained, "everybody has their own unique needs and it's just a matter of finding out what those needs are and addressing them." PSUMF Ex. E5, *Graves Dep.*, at 33:20 – 34:6.**

266. Dr. Graves believes that the board, prior to her election in 2015, supported all communities within the District. Ex. JJ, *Graves Dep.,* at 53:11-14.

**RESPONSE: Uncontroverted that Dr. Graves testified to this belief in response to questions about single-member districts and geographic communities. Dr. Graves also testified that prior to her election to the Board, she did not believe that the African-American community had adequate representation on the Board. PSUMF Ex. E5, *Graves Dep.*, at 34:7-10.**

267. Dr. Thurman was motivated to run for the board to address the particularized needs of the African American community. Ex. KK, *Thurman Dep.,* at 29:9-13.

**RESPONSE: Controverted as incomplete. Dr. Paulette-Thurman testified that she was motivated to run because people expressed to her that they "didn't feel that the Board had the best interest of African American students at heart" and that the Board was not doing enough to address the African-American community's particularized needs with**

**regard to disparities in discipline and the achievement gap. PSUMF Ex. E4, *Thurman Dep.*, at 28:14 – 29:8.**

268.    Dr. Thurman was elected in 2014 and is a current board member.  Ex. KK, *Thurman Dep.,* at 24:24-25:10.

**RESPONSE: Uncontroverted.**

269.    There are two strong African American board members on the board now. Ex. KK, *Thurman Dep.,* at 30:25-31:5.

**RESPONSE: Uncontroverted, except to the extent the statement is incomplete. Dr. Paulette-Thurman refers to the two African-American Board members "now" in comparison to the previous all-white Board. In addressing whether she believed there is sufficient African-American representation on the Board, Dr. Paulette-Thurman testified, "[t]hat's difficult to answer. We have the two strong African American people on the board right now and we think it's making a difference." PSUMF Ex. E4, *Thurman Dep.,* at 30:25 – 31:5.**

270.    Donna Thurman adds an awareness of race on the board.  Ex. KK, *Thurman Dep.,* at 34:2-10.

**RESPONSE: Uncontroverted**.

271.    The board has made adjustments in response to Dr. Thurman's racial awareness. Ex. KK, *Thurman Dep.,* at 32:15-33:24.

**RESPONSE: Controverted. The cited document does not support the claim that the Board took any action or made any adjustments in response to Dr. Thurman's racial awareness.**

272.    The Board hired the best candidate for the new superintendent position "who happens to be African American." Ex. KK, *Thurman Dep.,* at 99, 6-12.

**RESPONSE: Controverted. This statement reflects one Board member's belief.**

**Senate Factor Nine – Whether the policy underlying the jurisdiction's use of the current boundaries tenuous.**

273.    The at-large system is established by Missouri statute. See, Sections 162.291, 162.341 and 162.261 RSMo.

**RESPONSE: Uncontroverted except that Missouri statute also establishes a subdistrict system for certain school districts. *See* Mo. Rev. Stat. § 162.492 (establishing subdistrict system for "urban districts"); § 162.601 (establishing subdistrict system for "Metropolitan . . . Districts").**

Dated this 30th day of October, 2015.          Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

<u>**CERTIFICATE OF SERVICE**</u>

I, Julie A. Ebenstein, hereby certify that on October 30, 2015, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

Respectfully Submitted,

<u>/s/ Julie A. Ebenstein</u>
JULIE A. EBENSTEIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEY FOR PLAINTIFFS