**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI**

MISSOURI STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, REDDITT HUDSON,
F. WILLIS JOHNSON and
DORIS BAILEY,

                Plaintiffs,

v.

FERGUSON-FLORISSANT SCHOOL
DISTRICT and ST. LOUIS COUNTY
BOARD OF ELECTIONS
COMMISSIONERS,

                Defendants.

Case No. 4:14 CV 2077 RWS

**JOINT STIPULATION OF UNCONTESTED FACTS**

# BACKGROUND

1. Plaintiffs Doris Bailey, Redditt Hudson, F. Willis Johnson, and the Missouri State Conference of the National Association for the Advancement of Colored People filed this lawsuit on December 18, 2014 against Defendants the Ferguson-Florissant School District ("FFSD" or "the District") and the St. Louis County Board of Elections Commissioners ("St. Louis BOEC").

## I. **Parties**

2. Plaintiff Doris Bailey is a U.S. citizen; registered, regular voter; and an African-American resident of FFSD. She resides a t 8321 Whitewater Drive in Berkeley, Missouri.

3. Plaintiff Redditt Hudson is a U.S. citizen; registered, regular voter; and an African-American resident of FFSD. He resides at 2250 Derhake Road in Florissant, Missouri. He is the father of two children who attend school in FFSD.

4. Plaintiff F. Willis Johnson is a U.S. citizen; registered, regular voter; and an African-American resident of FFSD. He resides at 404 Harrison Avenue in Ferguson, Missouri. He is currently the pastor of Wellspring Community Church in Ferguson, Missouri.

5. Plaintiff the Missouri State Conference of the National Association for the Advancement of Colored People ("MO NAACP") is a state affiliate of the NAACP, the nation's oldest and largest civil rights organization, whose mission is to ensure the political, educational, social, and economic equality of rights of all persons, to eliminate hatred and racial discrimination, and to remove all barriers of racial discrimination through democratic processes.

6. Plaintiff MO NAACP is active in efforts to increase voter registration, education, and turnout, and emphasizes the importance of local elections, including local school board elections.

7. Defendant FFSD is a governmental entity that maintains an electoral system comprised of at-large elections for seven positions on the Ferguson-Florissant School Board (the "Board"). The Board is responsible for the governance and administration of FFSD, a political subdivision of the State of Missouri within the meaning of Article 4, Section 12, of the Missouri Constitution.

8. Defendant St. Louis BOEC is the governmental entity charged with conducting elections in St. Louis County. It is responsible for conducting elections for positions on the Board in FFSD.

9. FFSD is located in northern St. Louis County, Missouri. The District was created by a 1975 desegregation order, which required the then-Ferguson-Florissant School District to annex the primarily African-American neighboring school district of Kinloch and the primarily white district of Berkeley.

10. As part of the annexation, the order directed that two seats on the then-six-member Ferguson-Florissant School Board be declared vacant and replaced by designees of the annexed school boards. The four remaining members were to draw lots to determine the length of their individual terms in office to create staggered elections for an "initial period of stable governance for the new district."

11. The District covers all or part of eleven municipalities: Berkeley, Calverton Park, Cool Valley, and Kinloch in their entirety, and parts of Black Jack (one block), Ferguson, Florissant, Dellwood, Hazelwood, Normandy, and Old Jamestown. Its headquarters are in Florissant.

12. Based on data provided to the U.S. Department of Education for the 2011 survey year, the District public schools serve 13,234 students from preschool through 12th grade, of which

77.1% are Black and 15.6% are white.

13. According to the 2010 Decennial Census, the District has a total population of 68,663, with a Black population of 36,967 (53.84%), an any part ("AP") Black population of 36,967 (53.84%), and a white population of 29,581 (43.08%). The total voting age population ("VAP") in the District is 50,771, of whom 24,466 (48.19%) are any-part Black, 24,030 (47.33%) are single-race Black, and 24,852 (48.95%) are non-Hispanic white. There are 1,324 (1.93% of the total population) Latinos in the District, of whom 824 (1.62% of the VAP) are voting-aged.

14. In 2010, there were 386 more non-Hispanic white voters in the District than any part Black voters.

15. In 1990, the overall population of the Ferguson-Florissant School District was 80,938. In 2010, the overall population was 68,663. This represents a loss of 12,275 persons or 15.17%.

16. **Ferguson-Florissant SD – 1990 Census to 2010 Census Population and Race Distribution**

|  | 1990 Number | Percent | 2000 Number | Percent | 2010 Number | Percent |
|---|---|---|---|---|---|---|
| **Total Population** | 80,938 | 100% | 73,350 | 100% | 68,663 | 100% |
| **Total Hispanics** | 656 | 0.81% | 918 | 1.25% | 1,324 | 1.93% |
| **White*** | 59,995 | 74.12% | 43,583 | 59.42% | 29,581 | 43.08% |
| **Black*** | 19,694 | 24.33% | 26,995 | 36.80% | 35,727 | 52.03% |
| **American Indian and Alaska Native*** | 126 | 0.16% | 150 | 0.20% | 167 | 0.24% |
| **Asian*#** | 402 | 0.50% | 491 | 0.67% | 394 | 0.57% |
| **Hawaiian and Pacific Islander*#** | NA | NA | 13 | 0.02% | 14 | 0.02% |
| **Other*** | 65 | 0.08% | 115 | 0.16% | 124 | 0.18% |
| **Two or More Races*** | NA | NA | 1,085 | 1.48% | 1,332 | 1.94% |
| **Black (Including Hispanics)** | 19,783 | 28.65% | 27,095 | 36.94% | 35,860 | 52.23% |
| **Any Part Black (Including Hispanics)** | NA | NA | NC | NC | 36,967 | 53.84% |

* Non-Hispanics only

3

# In 1990, "Asian" includes Hawaiian and Pacific Islander.
NA Not available
NC Not calculated

17. In 1990, the non-Hispanic white ("NH white") population was 59,995. In 2010, the NH white population was 29,581. This represents a decline of 30,414 persons or 50.69%.

18. In 1990, NH whites were 74.12% of the total population. In 2010, NH whites were 43.08% of the total population.

19. The any part Black ("AP Black") classification counts as "Black" all persons who identified in 2010 Census as single-race Black and all persons who identified as more than one race and some part Black. The AP Black category includes persons who are some part Black and Hispanic.

20. In 1990, 77.88% of the District's VAP (or 47,290) was NH white.

21. In addition to the Decennial Census, the Census Bureau publishes one- and five-year estimates, and previously published three-year estimates, of population demographics estimates based on the American Community Survey ("ACS"). ACS data is no longer released in three-year period estimates, which were discontinued after the 2011-2013 period. The ACS is a rolling sample survey based on responses from one in about 40 persons on an annual basis.

22. Because ACS population estimates are based on a sample, they are subject to sampling bias, *i.e.*, error margins or confidence intervals.

23. The 2011-2013 ACS table C02003: DETAILED RACE - Universe: TOTAL POPULATION for FFSD is attached hereto as Exhibit A. For ease of reference the numbers in the table are as follows:

|  | Ferguson-Florissant School District, Missouri | | |
|---|---|---|---|
|  | Population | Margin of Error (+/-) | % of Total |
| **Total:** | **66,758** | **2776** | **100.0%** |
| Population of one race: | 64,562 | 2,878 | 96.7% |
| White | 28,160 | 1,789 | 42.2% |
| Black or African American | 35,087 | 2,458 | 52.6% |
| American Indian and Alaska Native | 85 | 122 | 0.1% |
| Asian alone | 544 | 273 | 0.8% |
| Native Hawaiian and Other Pacific Islander | 0 | 104 | 0.0% |
| Some other race | 686 | 470 | 1.0% |
| Population of two or more races: | 2,196 | 743 | 3.3% |
| Two races including Some other race | 38 | 45 | 0.1% |
| Two races excluding Some other race, and three or more races | 2,158 | 741 | 3.2% |
| Population of two races: | 2,043 | 730 | 3.1% |
| White; Black or African American | 1,183 | 516 | 1.8% |
| White; American Indian and Alaska Native | 117 | 73 | 0.2% |
| White; Asian | 182 | 176 | 0.3% |
| Black or African American; American Indian and Alaska Native | 381 | 401 | 0.6% |
| All other two race combinations | 180 | 150 | 0.3% |
| Population of three races | 153 | 112 | 0.2% |
| Population of four or more races | 0 | 104 | 0.0% |

Note: Hispanics may be of any race.

24. The 2011-2013 ACS table B01001: SEX BY AGE – Universe: Total Population for FFSD is attached hereto as Exhibit B.

25. The 2011 – 2013 three-year ACS estimates that the FFSD single-race Black VAP is 24,313, or 48.94% of the District's VAP, the single-race white VAP (including Hispanic whites) is 23,740, or 47.24% of the District's VAP, and the non-Hispanic white VAP is 23,242, or 46.78% of the District's VAP. The 2011 – 2013 three-year ACS does not include an estimate of the AP Black VAP.

26. The ACS does not publish estimates for the AP Black category.

27. The ACS publishes estimates for those who identify as two or more races.

28. According to the 2011-2013 ACS, the VAP in the District is 49,679, of whom just 732 (1.47%) are not citizens.

29. Mr. Cooper admitted that if one considered the minority voting age population of all races and ethnicities, it would be above fifty percent.

30. Mr. Cooper's estimate of what he thought the AP Black VAP was pursuant to the 2011-2013 ACS was 49.8%.

## II. <u>Election System</u>

31. The Board is comprised of seven members who serve three-year terms and who are elected through an at-large election system. Board elections are staggered and held off-cycle so that either two or three Board seats are elected every April.

32. When the number of candidates equals the number of Board seats to be filled, no election is held, and the candidates automatically assume responsibilities as members of the Board.

33. As of the April 2015 election, the seven members of the Board are: Mr. Paul Morris, Mr. Robert Chabot, Mr. Brian Scott Ebert, Ms. Leslie Hogshead, Mr. Keith Brown, Dr. Donna Paulette-Thurman, and Dr. Courtney Graves. Dr. Paulette-Thurman and Dr. Graves are African-American. The remaining five Board members are white.

34. Each voter has the right to cast up to two votes in a two-seat election and up to three in a three-seat election. Voters can engage in bullet, or single-shot voting: that is, they can forego casting all of the votes that they are allotted, but they cannot vote more than once for the same candidate in a single election. If every voter casts all of his or her votes in a two-seat election, *i.e.*, voters do not engage in single-shot voting, a candidate can receive at most 50% of all votes. If every voter casts all of his or her votes in a three-seat election, a candidate can receive at most 33.33% of all votes.

35. Board seats are awarded to the candidates with the most votes, such that when two seats are contested, the top two vote recipients win the two seats, and when three seats are contested, the top three vote recipients win the three seats.

**GINGLES I**

36. Plaintiffs' expert demographer, William S. Cooper, drew two illustrative seven-district plans.

37. In creating Plaintiffs' illustrative plans, Plaintiffs' expert relied upon population and geographic data from the 1990 to 2010 Decennial Censuses.

38. He used a commonly accepted software package called *Maptitude for Redistricting*. *Maptitude for Redistricting* was developed by the Caliper Corporation, to process Topologically Integrated Geographic Encoding and Reference ("TIGER") and PL 94-171 files. This software is deployed by many local and state governing bodies across the country for redistricting and other types of demographic analyses.

39. TIGER files contain boundaries for the various levels of Census geography. PL 94-171 files contain race and ethnicity data on the total population and VAP found in units of Census geography from the state level down to census blocks.

40. A census block is the smallest geographic tabulation area from the Decennial Census. Generally, a census block is bounded on all four sides by visible features such as streets, rivers, and railroad tracks.

41. To develop the illustrative plans, he obtained Geographic Information System (GIS) shapefiles from the St. Louis County GIS Department depicting current boundaries of the District as well as precincts for the District from 2011 to 2015. Where precinct boundaries did not match census blocks, he used the "whole block" criterion, which assigns all the

population in a split census block to the nearest precinct boundary.

42. Cooper's Illustrative Plans are based on the 2010 decennial census single-race Black VAP.

43. Plaintiffs' illustrative plans use the 2010 Census total population for the apportionment base.

44. The ideal district size using total population as the apportionment base is 9,809 (68,663/7).

45. The population statistics by district for Plaintiffs' Illustrative Plan 1 are as follows:

### Plaintiffs' Illustrative Plan 1 – 2010 Census Summary

| District | Population | % Dev | % Black | 18+ Pop | % 18+ Black | % 18+ NH White |
|----------|-----------|-------|---------|---------|-------------|----------------|
| 1 | 9841 | 0.33% | 69.63% | 6918 | 63.93% | 32.68% |
| 2 | 10025 | 2.20% | 66.36% | 7071 | 60.95% | 35.75% |
| 3 | 9923 | 1.16% | 77.64% | 6984 | 74.36% | 21.12% |
| 4 | 9321 | -4.98% | 30.50% | 7406 | 27.84% | 68.09% |
| 5 | 9997 | 1.92% | 20.33% | 7790 | 17.45% | 79.11% |
| 6 | 9980 | 1.74% | 44.05% | 7442 | 38.94% | 57.58% |
| 7 | 9576 | -2.38% | 56.18% | 7160 | 52.86% | 43.25% |

46. Three of the 96 precincts in the District are split by district boundaries in Plaintiffs' Illustrative Plan 1 with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to five schools. Three incumbents are paired in District 2 and two in District 7.

47. The population statistics by district for Plaintiffs' Illustrative Plan 2 are as follows:

### Plaintiffs' Illustrative Plan 2 – 2010 Census Summary

| District | Population | % Dev | % Black | 18+ Pop | % 18+ Black | % 18+ NH White |
|----------|-----------|-------|---------|---------|-------------|----------------|
| 1 | 10020 | 2.15% | 70.15% | 7039 | 64.53% | 32.09% |
| 2 | 9494 | -3.21% | 66.46% | 6688 | 60.89% | 35.90% |
| 3 | 9736 | -0.74% | 78.66% | 6816 | 75.67% | 19.76% |
| 4 | 9755 | -0.55% | 31.10% | 7671 | 28.12% | 68.35% |
| 5 | 10232 | 4.31% | 20.20% | 8008 | 17.42% | 78.87% |
| 6 | 9620 | -1.93% | 55.71% | 7149 | 51.50% | 45.14% |
| 7 | 9806 | -0.03% | 44.90% | 7400 | 40.86% | 54.85% |

48. Nine of the 96 precincts in the School District are split by district boundaries in Plaintiffs' Illustrative Plan 2 with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to four schools. Two incumbents who reside in the same Census block in District 2 are paired, but no other incumbents are paired.

49. For each of Plaintiffs' illustrative plans, all parts (*i.e.*, census blocks) of each component election district are connected at some point with the rest of the district.

50. In one of Plaintiffs' Illustrative Plans, there is a district in which two board members who were both preferred by African Americans in their respective elections reside.

51. These board members are both African American.

52. Dr. Kimball's expert report cites to an article entitled, "The Context Matters: The Effects of Single-Member Versus At-Large Districts on City Council Diversity."

## GINGLES II AND GINGLES III

53. From 2000 through 2015, there have been twelve contested Board elections.

54. By statute, where the number of candidates who have filed for a Board election equals the number of seats to be elected, no election is held, and the candidates automatically assume Board member responsibilities. From 2000 through 2015, there were four such non-elections (2005, 2007, 2008, 2010).

55. For each of the past twelve contested elections, the District's expert, Dr. Jonathan Rodden, used Gary King's Ecological Inference ("EI") procedure to estimate the level of support for each candidate among Black and white voters.

56. Plaintiffs' expert, Dr. Richard Engstrom, also performed an EI analysis for the 2011 through 2015 Board elections. Dr. Rodden would describe Dr. Engstrom as one of the nation's

leading scholar in political science on the study of racially polarized voting.

57. For purposes of estimating levels of support, EI generates a specific estimate (the "point estimate") of the votes cast for each candidate by African-American voters and white voters as a percentage share of the respective groups' VAP, as well as a confidence interval for that point estimate. The confidence intervals identify the range of estimates within which we can be 95% confident, statistically, of where the actual value of a group's support for a candidate falls. The point estimate lies at the median of the confidence interval.

58. A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally-accepted standards in the field of political science, and is consistent with peer-review standards for research in that field.

59. EI is used widely by expert witnesses in assessing RPV in voting rights cases. It was developed subsequent to the U.S. Supreme Court's decision in *Gingles* for the explicit purpose of improving estimates of candidate preferences between or among groups of voters.

60. Dr. Rodden and Dr. Engstrom do not materially disagree as to the various levels of support each Board candidate received among different racial groups in each election and report consistent estimates of the respective levels of support received by the candidates from Black and white voters in the past five elections.

61. Each of the elections held since 2000 (*i.e.*, the past sixteen elections) is described briefly below. For contested elections, tables are provided that identify each candidate's name, race, total number of votes received, and level of support (the "point estimate") among Black and white voters with confidence intervals for each estimate as calculated by Dr. Rodden and, for 2011 through 2015, Dr. Engstrom, and identifies the winning candidates. Percentages reported are the percentage of <u>votes</u> received by a candidate from each group, not the

percentage of <u>voters</u> supporting from each group supporting each candidate.

**I.  The 2000 – 2015 Board Elections**

62. The complete set of official election results for the 2000 through 2015 FFSD Board elections are attached hereto as Exhibits C through N.

  *A.  The 2000 Election*

63. In 2000, six candidates (incumbent Michael Hirsch and challengers Paul Charney, Gregory Fulton, Les Lentz, Anthony Smith, and Gwendolyn Thomas) ran for two seats. Hirsch, who is white, and G. Thomas, one of two African-American candidates, were successful.

64. Dr. Rodden's EI estimates and confidence intervals for the 2000 election are as follows:

| The 2000 Election | | | | |
| --- | --- | --- | --- | --- |
| | **Estimated Black Support**<br>(with confidence interval) | | **Estimated White Support**<br>(with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Charney (W)<br>1,222 votes | 9.51%<br>(8.18 – 11.43%) | N/A | 9.92%<br>(8.49 – 11.61%) | N/A |
| Fulton (W)<br>1,490 votes | 11.59%<br>(9.41 – 14.25%) | N/A | 11.71%<br>(9.35 – 14.79%) | N/A |
| Hirsch (W)*<br>(incumbent)<br>4,406 votes | 18.71%<br>(12.75 – 26.27%) | N/A | 34.13%<br>(28.23 – 40.79%) | N/A |
| Lentz (W)<br>1,939 votes | 9.39%<br>(7.28 – 12.40%) | N/A | 15.92%<br>(13.19 – 18.47%) | N/A |
| Smith (B)<br>1,554 votes | 16.81%<br>(14.50 – 19.95%) | N/A | 9.43%<br>(7.77 – 11.17%) | N/A |
| G. Thomas (B)*<br>3,413 votes | 33.99%<br>(25.70 – 43.21%) | N/A | 18.89%<br>(14.26 – 23.56%) | N/A |

\* Indicates winner

65. Whites cast 53% of votes for Thomas and Hirsch. African Americans cast 52.7% of votes for Hirsch and Thomas.

  1.  <u>Black Voters in the 2000 Election</u>

66. Dr. Rodden estimated that G. Thomas and Hirsch were the candidates who received the highest and second-highest levels of support among Black voters, respectively.

11

67. G. Thomas was the top-ranked candidate among Black voters. The difference between G. Thomas and Hirsch in terms of support among Black voters is statistically significant. According to Dr. Rodden's estimates, G. Thomas received almost double the level of support from Black voters as compared to Hirsch. Dr. Rodden agreed that G. Thomas received "substantially" more support than Hirsch among Black voters.

2. White Voters in the 2000 Election

68. Dr. Rodden estimated that Hirsch and G. Thomas were the candidates who received the highest and second-highest levels of support among white voters, respectively.

69. Hirsch was the top-ranked candidate among white voters. According to Dr. Rodden's estimates, the difference between Hirsch and G. Thomas in terms of support among white voters is statistically significant. According to Dr. Rodden's estimates, Hirsch received almost double the level of support from white voters as compared to G. Thomas.

B. *The 2001 Election*

70. In 2001, four candidates (incumbents Jeanne Garofalo and Leslie Hogshead and two challengers, Felicia Butler and Les Lentz) ran for two seats. Ms. Garofalo and Ms. Hogshead, who are both white, were successful.

71. Dr. Rodden's EI estimates and confidence intervals for the 2001 election are as follows:

| The 2001 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Butler (B) 2,374 votes | 40.54% (24.45 – 62.09%) | N/A | 16.15% (10.98 – 20.08%) | N/A |
| Garofalo (W)* (incumbent) 3,680 votes | 24.67% (17.32 – 35.97%) | N/A | 35.06% (29.02 – 40.83%) | N/A |

| Hogshead (W)* (incumbent) 3,229 votes | 19.73% (14.71 – 24.89%) | N/A | 32.21% (25.65 – 38.82%) | N/A |
| Lentz (W) 1,716 votes | 15.05% (12.69 – 18.32%) | N/A | 16.59% (13.79 – 19.53%) | N/A |

\* Indicates winner

### 1. Black Voters in the 2001 Election

72. Dr. Rodden estimated that Butler and Garofalo were the candidates who received the highest and second-highest levels of support among Black voters, respectively.

73. Butler was a top choice among Black voters for one of the two available seats. The difference between Butler and Hogshead, who received the third-highest level of support among Black voters, is statistically significant. According to Dr. Rodden's estimates, Butler's level of support among Black voters was approximately 15 percentage points higher than that received by Garofalo, who received less than two-thirds the estimated level of support received by Butler among Black voters.

74. Butler was not elected to one of the two available seats on the Board in 2001.

### 2. White Voters in the 2001 Election

75. Garofalo and Hogshead were the two top choices among white voters. Dr. Rodden estimated that they received the two highest levels of support among white voters, and the difference in terms of support among white voters between them and the candidate with the next highest estimated level of white support, Lentz, is statistically significant. According to Dr. Rodden's estimates, the levels of support among white voters received by Garofalo and Hogshead were each approximately double that received by Lentz and Butler.

76. Whites cast 48.35% of votes for Butler and Hogshead. African Americans cast 44.4% of votes for Garofalo and Hogshead.

C. _The 2002 Election_

77. In 2002, six candidates (incumbents Doris Graham, James Clark, and Nancy Knorr, and challengers Brian Fletcher, Felicia Butler and Lawrence Morie), ran for three seats.

78. Graham, an African-American, and Fletcher and Clark, both white, were successful.

79. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2002 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Butler (B) 2,610 votes | 25.07% (18.33 – 31.89%) | N/A | 11.43% (9.20 – 13.49%) | N/A |
| Clark (W)* (incumbent) 3,093 votes | 12.56% (9.66 – 17.17%) | N/A | 17.83% (15.32 – 20.24%) | N/A |
| Fletcher (W)* 3,378 votes | 10.14% (7.82 – 13.21%) | N/A | 22.00% (17.54 – 26.28%) | N/A |
| Graham (B)* (incumbent) 3,388 votes | 31.86% (21.63 – 43.77%) | N/A | 13.84% (11.01 – 16.40%) | N/A |
| Knorr (W) (incumbent) 3,026 votes | 11.25% (8.49 – 14.69%) | N/A | 18.03% (15.63 – 20.71%) | N/A |
| Morie (W) 2,522 votes | 9.12% (7.06 – 12.09%) | N/A | 16.87% (13.07 – 20.69%) | N/A |

* Indicates winner

1. Black Voters in the 2002 Election

80. Dr. Rodden estimated that Graham, Butler, and Clark had the highest, second-highest, and third-highest levels of support among Black voters, respectively.

81. Graham and Butler were the two top choices among Black voters. Their respective estimated levels of support among Black voters are both higher to a statistically significant degree than the estimated level of support for Clark, the third-highest ranked candidate among Black voters.

82. According to Dr. Rodden's estimates, Graham and Butler each received approximately

14

double the estimated level of support among Black voters as compared to Clark.

83. Butler was not elected to one of the two available seats on the Board in 2002.

   2. <u>White Voters in the 2002 Election</u>

84. Dr. Rodden estimated that Fletcher, Knorr, and Clark were the candidates who received the highest, second-highest, and third-highest estimated levels of support among white voters, respectively.

85. Fletcher was a top choice among white voters for one of the three available seats. Fletcher's estimated level of white support is higher to a statistically significant degree than the estimated level of white support for the candidate with the fourth-highest level of support, Morie.

86. Whites cast 43.1% of votes for Graham, Butler and Clark. African Americans cast 33.95% of votes for Fletcher, Knorr and Clark.

   D. *The 2003 Election*

87. In 2003, three candidates (incumbent Gwendolyn Thomas and challengers, Knorr and Les Lentz) ran for two seats. Thomas and Knorr were successful.

88. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2003 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Knorr (W)* 3,584 votes | 30.19% (11.65 – 50.40%) | N/A | 52.09% (41.03 – 62.07%) | N/A |
| Lentz (W) 1,995 votes | 15.85% (11.58 – 21.04%) | N/A | 28.42% (23.55 – 32.69%) | N/A |
| Thomas (B)* 2,102 votes | 53.96% (21.93% – 84.52%) | N/A | 19.48% (12.73 – 26.66%) | N/A |

* Indicates winner

1. Black Voters in the 2003 Election

89. Dr. Rodden estimated that G. Thomas, who is African-American, and Knorr were the candidates who received the highest and second-highest level of support among Black voters, respectively.

90. G. Thomas was a top choice among Black voters for one of the two available seats. According to Dr. Rodden's estimates, Thomas's estimated level of Black support is higher to a statistically significant degree than the estimated level of Black support for the candidate with the third-highest estimated level of support, Lentz.

91. According to Dr. Rodden's estimates, G. Thomas's estimated level of support among Black voters is approximately 23 percentage points higher than that estimated for Knorr. Knorr received less than two-thirds the estimated level of support received by G. Thomas among Black voters. Dr. Rodden agreed that Thomas received "substantially more support than Knorr amongst black voters."

2. White Voters in the 2003 Election

92. Dr. Rodden estimated that Knorr and Lentz were the candidates who received the highest and second-highest levels of support among white voters, respectively.

93. Knorr was the top choice candidate among white voters. According to Dr. Rodden's estimates, the difference between Knorr and Lentz in terms of estimated support among white voters is statistically significant. According to Dr. Rodden's estimates, Knorr's estimated level of support among white voters is also almost 24 percentage points higher than that estimated for Lentz, and Lentz received less than two-thirds the estimated level of support received by Knorr.

94. Whites cast 71.6% of votes for Thomas and Knorr. African Americans cast 46.04% of votes for Knorr and Lentz.

95. In 2004, five candidates (incumbents Garofalo and Hogshead and three African-American challengers, Tommie Van, Ingrid McClendon, and Pernell Witherspoon) ran for two seats. Garofalo and Hogshead, both white, were successful.

96. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2004 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Garofalo (W)* (incumbent) 3,232 votes | 14.55% (12.31 – 17.23%) | N/A | 39.31% (35.00 – 44.34%) | N/A |
| Hogshead (W)* (incumbent) 2,400 votes | 13.14% (11.24 – 15.88%) | N/A | 30.80% (26.38 – 35.09%) | N/A |
| McClendon (B) 1,302 votes | 28.29% (17.65 – 38.45%) | N/A | 9.50% (7.51 – 11.66%) | N/A |
| Van (B) 1,571 votes | 28.71% (18.75 – 40.91%) | N/A | 11.73% (9.64 – 14.22%) | N/A |
| Witherspoon (B) 676 votes | 15.31% (12.98 – 17.91%) | N/A | 8.66% (7.87 – 9.44%) | N/A |

* Indicates winner

### 1. Black Voters in the 2004 Election

97. McClendon and Van, both African-American, were the two top choices among Black voters. Dr. Rodden estimated that they received the highest and second-highest level of support among Black voters, respectively, and the difference between them and other candidates in terms of estimated support among Black voters is statistically significant. Dr. Rodden estimated that all other candidates received less than two-thirds of the estimated level of support among Black voters received by Van and McClendon.

98. Neither Van nor McClendon was elected to one of the two available seats on the Board in 2004.

2. White Voters in the 2004 Election

99. Garofalo and Hogshead were the two top choices among white voters. Dr. Rodden estimated that they received the two highest levels of support among white voters, and the difference between them and other candidates in terms of estimated support among white voters is statistically significant. According to Dr. Rodden's estimates, Garofalo and Hogshead each received more than double the estimated level of white support received by Van.

100. Whites cast 21.2% of votes for Van and McClendon. African Americans cast 27.7% of votes for Garofalo and Hogshead.

F. *The 2005 Election*

101. In 2005, no Board election was held. Incumbents Clark and Graham, along with Les Lentz, were the only candidates for the three available seats, and assumed their responsibilities on the Board. Graham is African-American. Clark and Lentz are both white.

G. *The 2006 Election*

102. In 2006, five candidates (incumbents G. Thomas and Knorr and three challengers, Paul Schroeder, John Knowles, and Pat Washington) ran for two seats. Schroeder and Knowles, both white, won.

103. Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2006 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Knorr (W) (incumbent) 1,303 votes | 17.29% (15.10 – 20.21%) | N/A | 15.95% (13.65 – 18.50%) | N/A |
| Knowles (W)* 1,959 votes | 15.11% (12.43 – 18.21%) | N/A | 27.03% (21.31 – 32.26%) | N/A |

| | | | | |
|---|---|---|---|---|
| Schroeder (W)*<br>2,954 votes | 14.27%<br>(11.66 – 17.91%) | | 37.96%<br>(32.39 – 43.12%) | |
| G. Thomas (B)<br>(incumbent)<br>1,122 votes | 28.21%<br>(23.29 – 33.38%) | N/A | 9.83%<br>(8.88 – 10.80%) | N/A |
| Washington (B)<br>944 votes | 25.11%<br>(19.44 – 30.91%) | | 9.23%<br>(8.26 – 10.22%) | |

\* Indicates winner

### 1. Black Voters in the 2006 Election

104. G. Thomas and Washington, both African-American, were the two top choices among Black voters. Dr. Rodden estimated that they received the highest levels of support among Black voters, and the difference in terms of estimated support among Black voters between them and the candidate with the third-highest estimated level of Black support, Knorr, is statistically significant.

105. Neither G. Thomas nor Washington was elected to either of the two available seats on the Board in 2006.

### 2. White Voters in the 2006 Election

106. Schroeder and Knowles were the two top choices among white voters. Dr. Rodden estimated that they received the highest levels of support among white voters, and the difference in terms of estimated support among white voters between them and the candidate with the third-highest estimated level of white support, Knorr, is statistically significant. According to Dr. Rodden's estimates, the estimated level of support among white voters received by Knorr is also less than two-thirds the estimated levels of white support received by Schroeder and Knowles.

107. Whites cast 19% of votes for Thomas and Washington. African Americans cast 29.4% of votes for Schroeder and Knowles.

## H. *The 2007 Election*

108.  In 2007, no Board election was held. Hogshead, an elected incumbent, and Charles Henson, an incumbent who had been appointed to the Board after the resignation of Jeanne Garofalo in January 2007, were the only candidates for the two available seats, and assumed their responsibilities on the Board. Hogshead is white. Henson is African-American.

## I. *The 2008 Election*

109.  In 2008, no Board election was held. Incumbents Clark, Graham, and Lentz were the only candidates for the three available seats, and resumed their responsibilities on the Board. Clark and Lentz are both white. Graham is African-American.

## J. *The 2009 Election*

110.  In 2009, three candidates (incumbents Schroeder and Knowles and one challenger, Gregory Heise) ran for two seats. Schroeder and Knowles, both white, were successful.

111.  No Black candidates ran in the 2009 election.

112.  Dr. Rodden's EI estimates and confidence intervals are as follows:

| The 2009 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Heise (W) 1,216 votes | 17.22% (12.07 – 25.50%) | N/A | 19.29% (15.09 – 23.59%) | N/A |
| Knowles (W)* (incumbent) 3,123 votes | 47.66% (27.49 – 74.02%) | N/A | 36.50% (26.18 – 47.54%) | N/A |
| Schroeder (W)* (incumbent) 3,233 votes | 35.12% (22.54 – 52.55%) | N/A | 44.22% (36.34 – 51.91%) | N/A |

\* Indicates winner

### 1. Black Voters in the 2009 Election

113.  Dr. Rodden estimated that Knowles and Schroeder were the candidates who received the

highest and second-highest level of support among Black voters, respectively. The difference in terms of estimated support among Black voters between them and the remaining candidate, Heise, is statistically significant.

2. <u>White Voters in the 2009 Election</u>

114. Schroeder and Knowles were the two top choices among white voters. Dr. Rodden estimated that they received the highest levels of support among white voters, and the difference in terms of estimated support among white voters between them and the remaining candidate, Heise, is statistically significant. According to Dr. Rodden's estimates, Heise received less than half the estimated level of support received by Schroeder and less than two-thirds the estimated level of support received by Knowles.

115. Knowles resigned from the Board in 2011 and was replaced with Brian Fletcher, a former Board member, who is white. Fletcher was the lone white candidate among the three candidates interviewed by the Board to replace Knowles. The two African-American candidates interviewed for the position were rejected by the Board, which at the time, included one African-American member only (Henson).

116. Whites cast 80.7% of votes for Knowles and Schroeder. African Americans cast 82.8% of votes for Schroeder and Knowles.

*K. The 2010 Election*

117. No Board election was held in 2010. Incumbents Hogshead and Henson were the only candidates for the two available seats, and resumed their responsibilities on the Board. Hogshead is white. Henson is African-American.

*L. The 2011 Election*

118. In 2011, nine candidates (incumbents Graham, Clark, and Lentz and six challengers, Chris Martinez, Paul Morris, Robert Chabot, Vanessa Hawkins, Brian Scott Ebert, and

Joseph Hosea) ran for three seats. Martinez, a white-Hispanic candidate,[1] and Chabot and P. Morris, both white, were successful.

119.    Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2011 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Chabot* (W) 3,080 votes | 7.31% (5.33 − 11.04%) | 7.1% (4.6 − 9.6%) | 14.05% (11.68 − 17.01%) | 15.6% (13.4 − 18.3%) |
| Clark (W) (incumbent) 2,257 votes | 12.58% (10.33 − 14.42%) | 13.5% (11.2 − 16.1%) | 8.92% (7.96 − 9.97%) | 8.0% (6.5 − 9.3%) |
| Ebert (W) 2,667 votes | 7.45% (4.86 − 10.40%) | 7.9% (5.4 − 11.3%) | 13.61% (11.19 − 16.12%) | 14.1% (11.6 − 16.2%) |
| Graham (B) (incumbent) 2,795 votes | 21.95% (16.32 − 28.80%) | 24.1% (21.0 − 27.0%) | 9.04% (7.76 − 10.43%) | 6.1% (4.3 − 7.7%) |
| Hawkins (B) 2,890 votes | 21.87% (14.10 − 30.46%) | 21.5% (17.2 − 25.5%) | 9.20% (7.52 − 10.68%) | 7.4% (5.4 − 9.4%) |
| Hosea (W) 566 votes | 6.88% (6.18 − 7.80%) | 3.2% (2.8 − 3.5%) | 2.91% (2.65 − 3.21%) | 3.1% (2.8 − 3.5%) |
| Lentz (W) (incumbent) 1,027 votes | 7.58% (6.38 − 9.20%) | 4.7% (3.1 − 7.6%) | 4.49% (3.76 − 5.38%) | 4.5% (3.2 − 5.7%) |
| Martinez* (W-H) 4,598 votes | 5.93% (4.60 − 8.17%) | 8.6% (7.0 − 10.6%) | 22.97% (19.58 − 25.63%) | 24.9% (23.7 − 25.9%) |
| P. Morris* (W) 3,305 votes | 8.44% (6.62 − 11.00%) | 9.3% (7.6 − 11.4%) | 14.79% (12.46 − 17.03%) | 16.1% (14.4 − 18.1%) |

* Indicates winner

### 1.  Black Voters in the 2011 Election

120.    Both Dr. Rodden and Dr. Engstrom estimated that Graham and Hawkins, the only Black candidates, and Clark, who is white, were the candidates who received the highest, second-highest, and third-highest level of support among Black voters, respectively.

---

[1] The U.S. Census "defines 'Hispanic or Latino' as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." Persons who report themselves as Hispanic can be of any race.

121.    Graham and Hawkins were the top choices for Black voters for two of the three available seats. The differences between them and Clark in terms of estimated support among Black voters are statistically significant. According to the estimates of both Dr. Rodden and Dr. Engstrom, Graham's and Hawkins's estimated levels of support among Black voters are over 8 percentage points more than the estimated support enjoyed by Clark, who received less than two-thirds of Graham's and Butler's estimated levels of support among Black voters. Dr. Rodden agreed that Graham and Hawkins received "substantially more black votes" than Clark.

122.    According to Dr. Rodden's estimates, Graham and Hawkins together received 43.82% of the total votes cast by African Americans in a race with nine candidates.

123.    Neither Graham nor Hawkins was elected to one of the three available seats on the Board in 2011.

124.    African Americans cast approximately 60% of their votes for Graham, Hawkins, and Clark, but cast the remaining approximately 40% of their votes among six other candidates.

        2.    White Voters in the 2011 Election

125.    Both Dr. Rodden and Dr. Engstrom estimated that Martinez, P. Morris, and Chabot were the candidates who received the highest, second-highest, and third-highest levels of support among white voters, respectively.

126.    Martinez was the top-ranked candidate among white voters. According to the estimates of both Dr. Rodden and Dr. Engstrom, the difference between Martinez and every other candidate in terms of estimated support among white voters is statistically significant.

127.    Whites cast 21.5% of votes for Graham, Hawkins and Clark. African Americans cast 25% of votes for Martinez, Morris, and Chabot.

128.    Jeff Speigel is a former superintendent of the District.

M. *The 2012 Election*

129. In 2012, three candidates (incumbent Schroeder and two challengers, Ebert and Barbara Morris) ran for two seats. Ebert and Schroeder, the two white candidates, were successful.

130. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2012 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Ebert* (W) 2,809 votes | 23.09% (16.64 − 28.70%) | 23.1% (18.1 − 28.2%) | 46.93% (39.08 − 53.79%) | 46.3% (43.8 − 48.5%) |
| B. Morris (B) 1,988 votes | 51.33% (34.94 − 75.04%) | 51.9% (45.7 − 58.4%) | 12.01% (6.96 − 17.76%) | 12.8% (10.1 − 15.6%) |
| Schroeder* (W) (incumbent) 2,566 votes | 25.58% (15.90 − 36.68%) | 25.0% (19.8 − 29.9%) | 41.05% (33.88 − 47.71%) | 40.9% (38.7 − 43.5%) |

* Indicates winner

1. Black Voters in the 2012 Election

131. Both Dr. Rodden and Dr. Engstrom estimated that B. Morris, the one Black candidate, and Schroeder were the candidates who received the highest and second-highest level of support among Black voters, respectively.

132. As estimated by Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of support among Black voters received by Schroeder and Ebert is not statistically significant. Dr. Rodden agreed that Black voters were not cohesive behind either Ebert or Schroeder.

133. B. Morris was not elected to one of the two available seats on the Board in 2012.

2. White Voters in the 2012 Election

134. Ebert and Schroeder were two top choices among white voters. Both Dr. Rodden and Dr. Engstrom estimated that Ebert and Schroeder were the candidates who received the highest and second-highest level of support among white voters, respectively. The difference in terms of estimated support among white voters between them and the only other candidate in

the race, B. Morris, is statistically significant. According to the estimates of both Dr. Rodden and Dr. Engstrom, Ebert's and Schroeder's estimated levels of support among white voters are each over 28 percentage points more than the estimated support enjoyed by B. Morris, who received less than one-third of Ebert's and Schroeder's estimated levels of support among white voters.

135. According to Dr. Rodden's estimates, white voters in 2012 cast 88% of their votes for the two white candidates.

136. Whites cast 53.7% of votes for Morris and Schroeder. African Americans cast 48.1% of votes for Ebert and Schroeder.

### N. *The 2013 Election*

137. In 2013, four candidates (incumbents Hogshead and Henson, and two challengers, Keith Brown and Larry Thomas) ran for two seats. Brown and Hogshead, both white, were successful.

138. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2013 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Brown* (W) 2,234 votes | 22.74% (15.59 − 35.35%) | 20.2% (16.2 − 24.3%) | 32.01% (23.98 − 40.51%) | 33.9% (31.8 − 36.0%) |
| Henson (B) (incumbent) 2,109 votes | 38.66% (29.88 − 48.47%) | 43.7% (37.2 − 50.7%) | 20.06% (12.20 − 27.27%) | 17.0% (13.3 − 20.4%) |
| Hogshead* (W) (incumbent) 2,475 votes | 25.00% (17.41 − 37.61%) | 24.2% (20.0 − 27.8%) | 34.49% (26.31 − 42.70%) | 37.2% (35.0 − 39.4%) |
| L. Thomas (B) 875 votes | 13.60% (11.86 − 16.33%) | 11.9% (9.4 − 15.3%) | 13.44% (11.89 − 15.16%) | 11.8% (10.0 − 13.7%) |

* Indicates winner

### 1. Black Voters in the 2013 Election

139.   Both Dr. Rodden and Dr. Engstrom estimated that Henson and Hogshead were the candidates who received the highest and second-highest level of support among Black voters, respectively.

140.   Henson was the top-ranked candidate among Black voters. The difference between Henson and Hogshead in terms of estimated support among Black voters is statistically significant. According to the estimates of both Dr. Rodden and Dr. Engstrom, Henson's estimated level of support among Black voters is approximately 13 percentage points more than the levels of support estimated for Hogshead, and is approximately 16 to 23 percentage points more than the levels of support estimated for Brown. Each received less than two-thirds of Henson's estimated levels of support among Black voters.

141.   Henson was not elected to one of the two available seats on the Board in 2013.

### 2. White Voters in the 2013 Election

142.   Hogshead and Brown were the two top choices among white voters. Both Dr. Rodden and Dr. Engstrom estimated that Brown and Hogshead were the candidates who received the highest and second-highest level of support among white voters, respectively. The difference in terms of estimated white support between them and the candidate with the third-highest estimated level of white support, Henson, is statistically significant.

143.   According to Dr. Rodden's estimates, Henson's estimated level of support among white voters is approximately 12 and 14 percentage points less than the estimated level of white support enjoyed by Brown and Hogshead, respectively.

144.   Whites cast 54.2% of votes for Henson and Hogshead. African Americans cast 44.4% of votes for Hogshead and Brown.

O. *The 2014 Election*

145.　In 2014, eight candidates (two incumbents Rob Chabot and Paul Morris, and six challengers, Donna Paulette-Thurman, James Savala, Kimberly Benz, F. Willis Johnson, LaWanda Wallace, and Larry Thomas), ran for three seats. Chabot and P. Morris, both white, and Paulette-Thurman, one of five African-American challengers, were successful.

146.　Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2014 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Benz (W) 2,231 votes | 6.00% (4.79 – 7.49%) | 3.3% (2.1 – 4.7%) | 19.06% (15.29 – 23.34%) | 22.0% (20.5 – 23.4%) |
| Chabot* (W) (incumbent) 2,898 votes | 6.20% (4.28 – 9.02%) | 4.8% (2.4 – 9.4%) | 25.68% (19.80 – 32.40%) | 29.0% (27.1 – 30.6%) |
| Johnson (B) 2,118 votes | 21.54% (15.72 – 29.06%) | 24.5% (21.1 – 27.2%) | 5.71% (4.10 – 7.84%) | 2.8% (1.5 – 4.5%) |
| P. Morris* (W) 2,516 votes | 5.78% (4.39 – 7.90%) | 3.2% (2.0 – 5.4%) | 22.32% (17.69 – 27.83%) | 25.8% (24.4 – 27.1%) |
| Paulette-Thurman* (B) 2,733 votes | 24.21% (17.52 – 32.95%) | 26.1% (23.7 – 28.5%) | 8.92% (6.28 – 11.94%) | 8.4% (6.9 – 10.0%) |
| Savala (B) 2,425 votes | 21.36% (15.76 – 28.73%) | 24.7% (22.3 – 26.8%) | 8.74% (6.09 – 11.37%) | 7.0% (4.9 – 8.7%) |
| L. Thomas (B) 568 votes | 6.61% (5.68 – 7.68%) | 4.7% (3.4 – 6.3%) | 5.09% (4.42 – 5.76%) | 3.2% (2.3 – 4.0%) |
| Wallace (B) 590 votes | 8.31% (6.58 – 10.85%) | 8.6% (6.4 – 10.9%) | 4.47% (3.95 – 5.03%) | 1.9% (1.2 – 2.6%) |

* Indicates winner

1. Black Voters in the 2014 Election

147.　Both Dr. Rodden and Dr. Engstrom estimated that Paulette-Thurman, Johnson, and Savala, all of whom are African-American, were the candidates who received the three highest estimated levels of support among Black voters.

148.     Paulette-Thurman, Johnson, and Savala were the three top-choice candidates among Black voters. The differences in estimated support among Black voters between them and other candidates are statistically significant.

149.     According to Dr. Rodden's estimates, Black voters cast 67.11% of their votes for Paulette-Thurman, Johnson, and Savala.

150.     According to the estimates of both Dr. Rodden and Dr. Engstrom, the estimated levels of support among Black voters for Paulette-Thurman, Johnson, and Savala are each more than double that for the candidate with the fourth-highest estimated support, Wallace, who is also African-American.

151.     Dr. Engstrom identified three candidates of choice of Black voters in 2014: Paulette-Thurman, Johnson, and Savala.

152.     Neither Johnson nor Savala was elected to one of the three available seats on the Board in 2014.

153.     African Americans cast approximately 75% of their votes for three candidates (Paulette-Thurman, Savala, and Johnson) but spread the remaining 25% of their votes among five other candidates.

2.     White Voters in the 2014 Election

154.     Both Dr. Rodden and Dr. Engstrom estimated that Chabot, P. Morris, and Benz, the three white candidates, were the candidates who received the highest, second-highest, and third-highest level of support among white voters, respectively.

155.     Chabot, P. Morris, and Benz were the three top choices among white voters. The differences in estimated support among white voters between them and the remaining candidates are statistically significant.

156.     According to Dr. Rodden's estimates, white voters cast 67.06% of their votes for the

three white candidates.

157. According to the estimates of both Dr. Rodden and Dr. Engstrom, the estimated levels of support among white voters for Chabot, Morris, and Benz are each more than double that for the candidate with the fourth-highest estimated support, Paulette-Thurman.

158. Benz was not elected to one of the three available seats on the Board in 2014.

159. Whites cast 18.2% of votes for Paulette-Thurman, Savala, and Johnson. African Americans cast 11.3% of votes for Chabot, Morris, and Benz.

### 3. Suggested Special Circumstances in the 2014 Election

160. The 2014 election took place less than one month after the "controversial" resignation of Dr. Art McCoy, the first African-American District Superintendent.

161. According to Dr. Rodden, the separation of the Superintendent from the District led to a high level of interest among African-American voters and "an unprecedented five African American challengers."

162. Dr. McCoy is highly respected within the African-American community, whose members viewed him as a very successful and effective superintendent.

163. Prior to his resignation, Dr. McCoy "had been embroiled in conflict with the School Board."

164. The three top-choice candidates among African-American voters, Paulette-Thurman, Johnson, and Savala, ran together as a slate under the name "Grade A for Change." They were motivated to run as a slate because "they were concerned about how Dr. McCoy was treated" and "because the Board did not represent the community in terms of race."

165. Plaintiffs' counsel asked Dr. Rodden, "And we established earlier, didn't we, Dr. Rodden, that to get through peer review, one should quantitatively test hypotheses, not rely

simply on sort of qualitative judgments about whether or not something was the cause of something else, right?" Dr. Rodden responded, "Yes."

P. *The 2015 Election*

166. In 2015, five candidates (incumbent Brian Scott Ebert and four challengers, Courtney Michelle Graves, Roger Hines, Donna Marie Dameron, and Michael Pierson) ran for two seats. Ebert, who is white, and Graves, who is African-American, were successful.

167. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2015 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Dameron (W) 1,711 | 14.09% (11.18 – 17.92%) | 14.5% (11.1 – 18.3%) | 10.08% (8.56 – 11.54%) | 9.9% (7.5 – 12.1%) |
| Ebert* (W) (incumbent) 4,697 | 10.06% (6.43 – 13.41%) | 9.8% (7.7 – 12.2%) | 40.89% (35.17 – 46.53%) | 43.0% (39.6 – 45.9%) |
| Graves* (B) 5,279 | 49.43% (37.90 – 60.83%) | 52.4% (48.7 – 56.0%) | 22.90% (17.10 – 29.46%) | 21.4% (18.3 – 24.8%) |
| Hines (B) 2,728 | 13.89% (9.84 – 18.26%) | 12.3% (8.9 – 15.9%) | 19.37% (16.06 – 23.09%) | 19.7% (17.7 – 21.9%) |
| Person (B) 1,146 | 12.53% (9.43 – 16.86%) | 11.0% (8.6 – 13.5%) | 6.77% (5.63 – 7.99%) | 6.0% (4.8 – 7.5%) |

* Indicates winner

1. Black Voters in the 2015 Election

168. Dr. Rodden and Dr. Engstrom estimated that Graves and Dameron, a white candidate, received the highest and second-highest levels of support among Black voters, respectively.

169. Graves was the top-ranked candidate among Black voters. The difference between Graves and Dameron in terms of estimated support among Black voters is statistically significant. Dr. Rodden agreed that Black voters were cohesive behind Graves.

170. According to the estimates of both Dr. Rodden and Dr. Engstrom, Dameron's estimated level of support is also approximately 35 percentage points lower than and less than one-third

the estimated level of Black support for Graves. Dr. Rodden agreed that Dameron received "much less" support among Black voters when compared to Graves.

171.     As estimated by both Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of Black support received by Dameron and the candidate with the third-highest estimated level of Black support, Hines, is not statistically significant. Dr. Rodden agreed that Black voters were not cohesive behind a second-choice candidate in this election.

### 2. White Voters in the 2015 Election

172.     Both Dr. Rodden and Dr. Engstrom estimated that Ebert and Graves were the candidates who received the highest and second-highest level of support among white voters, respectively.

173.     Ebert was the top-ranked candidate among white voters. The difference between Ebert and all other candidates in the race, including Graves, in terms of estimated support among white voters, is statistically significant. Dr. Rodden agreed that white voters were cohesive behind Ebert.

174.     Whites cast 41.1% of votes for Graves and Hines. African Americans cast 62.2% of votes for Ebert and Graves.

### 3. Suggested Special Circumstances in the 2015 Election

175.     The 2015 election was held on April 7, 2015, less than four months after the complaint in this case was filed on December 18, 2014.

176.     Robert Chabot has not had any constituents mention this lawsuit to him.

177.     The shooting death of Michael Brown and subsequent protests "[h]ad a huge impact on the school district," affecting "thousands of our kids." Schools in the District had to shut down. Teachers and students received counseling.

178.     The Michael Brown shooting and subsequent protests drew national attention.

179.    In September 2014, the Civil Rights Division of the United States Department of Justice opened an investigation into the City of Ferguson's Police Department. On March 4, 2015, one month before the 2015 Board election, the Department of Justice released a report detailing the results of its investigation. It found extensive discrimination by government officials in Ferguson, including racial bias and intentional discrimination in local law enforcement and municipal court practices. *See Investigation of the Ferguson Police Department*, at 15-41 (racial profiling, excessive force, First Amendment violations, use of tasers); 42-62 (unnecessary obstacles to paying fines, lack of transparency, harsh penalty for missed payments, use of warrants and jail to induce payment); 62-78 (policies driven by racial bias and discriminatory intent).[2]

180.    Board member Paul Morris stated that the Michael Brown shooting and subsequent demonstrations caused Ferguson City Council incumbents not to run for office allowing an opportunity for African Americans to get elected.

181.    Frank Green confirmed that "the Michael Brown situation" had an effect on the 2015 election.

182.    Dr. Rodden acknowledged that the national attention surrounding the 2015 election due to the Michael Brown shooting may have caused turnout and get-out-the-vote efforts to increase in that election.

183.    The Board's newest member, Graves, filed her candidacy in January 2015. She ran for elected office in part to address the injustice that the Michael Brown shooting and resulting protests brought to light.

184.    Dr. Kimball admitted that he did not know whether any candidates decided not to run in

---

[2] The District reserves its objection to these facts on relevance grounds.

the 2015 election because of this lawsuit.

185. According to Dr. Rodden, Graves "ran a sophisticated campaign in which she very explicitly encouraged supporters to engage in a 'single shot' voting strategy." Graves acknowledged that she encouraged voters to cast one vote only, a vote for her.

## II. **Defendants' Proposed Approaches to Identifying Candidates of Choice**

186. The District's expert, Dr. Rodden, proposed two decision rules for identifying a racial group's candidates of choice.

187. Dr. Rodden testified that there is a "difficult analytical choice" in "trying to identify more than one preferred candidate" in a "multi-winner system."

### A. *The District's "Top-Ranked Candidate" Approach*

188. Employing the District's "Top-Ranked Candidate" approach results in twelve candidates of choice for each group in twelve contested elections, dating back through the 2000 election.

189. In twelve contested elections from 2000 through 2015, Black voters and white voters have never preferred the same candidate as their top choice in a contested election.

190. In the twelve contested elections from 2000 through 2015, all but one of the top-ranked candidates among Black voters was Black (eleven of twelve). Black voters' top-ranked candidate was not Black for the 2009 election, which featured no Black candidates.

191. In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was elected (twelve of twelve), as compared to six out of twelve top-ranked candidates among Black voters.

192. In the seven contested elections over the last ten years (*i.e.*, from 2006 through 2015), every top-ranked candidate among white voters was elected (seven out of seven), as compared to three out of seven top-ranked candidates among Black voters.

193. In the five contested elections over the last five years (*i.e.*, from 2011 through 2015),

33

every top-ranked candidate among white voters was elected (five out of five), as compared to two out of five top-ranked candidates among Black voters.

   B. *The District's "Point Estimate" Approach*

194.   Under the District's "Point Estimate" approach, there were 27 candidates of choice for each racial group in twelve contested elections, dating back through the 2000 election.

195.   Under this approach, Black voters preferred Black candidates for 17 out of 27 seats during the twelve contested elections from 2000 through 2015.

196.   Under this approach, 24 out of 27 white-preferred candidates were elected (88.9%), as compared to 13 out of 27 Black-preferred candidates (48.2%) during the twelve contested elections from 2000 through 2015.

197.   Under this approach, 15 out of 16 white-preferred candidates were elected (93.8%), as compared to six out of 16 Black-preferred candidates (37.5%) during the seven contested elections over the last ten years (*i.e.*, from 2006 through 2015).

198.   Under this approach, during the five contested elections over the last five years (*i.e.*, from 2011 through 2015), 11 out of 12 white-preferred candidates were elected (91.7%), as compared to four out of 12 preferred candidates among Black voters (33.3%).

## SENATE FACTORS

## I.  The "Predominant" Senate Factors (Factors 2 and 7)

   A. *Racially Polarized Voting (Senate Factor 2)*

199.   Under the District's Point Estimate approach, the preferred candidates of Black voters and white voters overlapped 37% of the time. Black voters preferred Black candidates 63% of the time, while white voters preferred white candidates 93% of the time.

200.   Dr. Graves, an African American, received the most votes of any candidate in the April 7, 2015 election.

201.    Dr. Graves received 33.75% of the votes in 2015. Brian Scott Ebert received 30.03% of the votes.

202.    Schroeder attended fundraisers for Dr. Graves and constructed all of her yard signs.

203.    Schroeder made yard signs for Donna Thurman.

204.    Dr. Thurman has supported both African American and white candidates for the Board.

205.    Donna Thurman supported Doris Graham, an African American former board member, many years ago.

   B.   *Election of minorities to the Board (Senate Factor 7)*

206.    From 1988 until 2000, Dr. Doris Graham was the only African American on the Board.

207.    Current Board member Paulette-Thurman stated that having African-American Board members makes a "difference," because "when issues come up that pertain to race, there's a different perspective now on the Board, who can say we've got to be very cognizant of . . . the dynamics of what's happening in a certain situation," like personnel issues or disciplinary appeals.

208.    Since 2000, there have never been more than two African-American members on the Board at the same time.

209.    The following table summarizes the number of candidates and overall success rates of candidates of each race in each of the twelve contested elections from 2000 through 2015:

| Table 8 - Comparative Success Rates of Black and White Candidates | | | | |
|---|---|---|---|---|
| | Black Candidates | | White Candidates | |
| Election | Total Number | No. Successful | Total Number | No. Successful |
| 2000 | 2 | 1 | 4 | 1 |
| 2001 | 1 | 0 | 3 | 2 |
| 2002 | 2 | 1 | 4 | 2 |
| 2003 | 1 | 1 | 2 | 1 |
| 2004 | 3 | 0 | 2 | 2 |
| 2006 | 2 | 0 | 3 | 2 |

| 2009 | 0 | 0 | 3 | 2 |
|---|---|---|---|---|
| 2011 | 2 | 0 | 7 | 3 |
| 2012 | 1 | 0 | 2 | 2 |
| 2013 | 2 | 0 | 2 | 2 |
| 2014 | 5 | 1 | 3 | 2 |
| 2015 | 3 | 1 | 2 | 1 |
| **TOTALS:** | **24** | **5 (20.8%)** | **37** | **22 (59.5%)** |

210. During the twelve contested elections from 2000 to 2015, twenty-four Black candidates ran for Board seats. African-American candidates were successful in five elections (20.8%) (G. Thomas, Graham, G. Thomas, Paulette-Thurman, Graves).

211. During the twelve contested elections from 2000 to 2015, thirty-seven white candidates ran for Board seats. White candidates were successful twenty-two out of thirty-seven times (59.5%) (Hirsch, Garofalo, Hogshead, Clark, Fletcher, Knorr, Garofalo, Hogshead, Schroeder, Knowles, Schroeder, Knowles, Martinez, P. Morris, Chabot, Ebert, Schroeder, Hogshead, Brown, Chabot, P. Morris, Ebert).

212. During the five contested elections from 2011 to 2015, 13 African-American candidates ran for Board seats. Two (15.38%) were successful (Paulette-Thurman, Graves).

213. During the five contested elections from 2011 to 2015, 16 white candidates ran for Board seats. They were successful ten times (62.5%).

214. During the 2013-2014 term, following Henson's loss during the April 2013 election, there were no African-American Board members.

215. Henson was appointed to the Board in 2006, retained his seat in the uncontested 2007 and 2010 elections, and lost his seat in the contested 2013 election.

216. Immediately after Henson's loss at the polls, former Board member Graham attended a Board meeting "and publicly challenged the School Board to advocate for all students in the District, especially African American students."

217. The 2010 Decennial Census data for the Hazelwood School District is attached hereto as Exhibit O.[3]

218. The 2011-2013 ACS estimates for the Hazelwood School District are attached hereto as Exhibit P.[4]

219. The current racial makeup of the Hazelwood School District Board of Education is 4 African Americans (Desiree Whitlock, Cheryl Latham, Brenda Youngblood, Karlton Thornton) and 3 whites (Chuck Woods, Rick Roberts, Ann Gibbons).[5]

220. Dr. Thurman was elected in 2014 and is a current board member.

221. Dr. Thurman ran on the Grade A for Change slate in 2014.

222. Johnson did not attend all of the coalition (also referred to as Grade A for Change) meetings.

223. Johnson did not complete the League of Women Voters information form.

224. Dr. Graves responded to the League of Women Voters' questionnaire.

225. The 2000 decennial census showed a single-race black voting age population of 32.61%.

## II. Factors Related to the Historical and Current Context of Discrimination (Factors 1, 5, and 8)

### A. Official discrimination (Senate Factor 1) and its continuing effects on African-American residents of FFSD (Senate Factor 5)

#### 1. History of Official Discrimination

226. The State, and St. Louis area in particular, gave rise to the 1856 case *Dred Scott v. Sandford*, 60 U.S. 393, 398 (1856). 1856 was 159 years ago.[6]

---

[3] Plaintiffs reserve their objection to this data on relevance grounds.

[4] Plaintiffs reserve their objection to this data on relevance grounds.

[5] Plaintiffs reserve their objection to this fact on relevance grounds.

[6] The District reserves its objection to this fact on relevance grounds.

227. The State's Constitution of 1865, ratified two months after the end of the Civil War, expressly restricted the franchise to white males. 1865 was 150 years ago.[7]

228. Black men were not permitted to vote until the State ratified the Fifteenth Amendment in 1870. 1870 was 145 years ago.[8]

229. The Missouri Constitution of 1865 barred African Americans from holding statewide office. Mo. Const. of 1865, art. V, § 2 (requiring that the governor be a white man), art. V, § 12 (requiring that the lieutenant governor be a white man), art. IV, § 3 (requiring that members of the Missouri house of representatives be white men), art. IV, § 5 (requiring that state senators be white men), art. III, § 6 (requiring that all voters be white men). The Missouri Constitution of 1865 barred women from voting.[9]

230. African Americans were barred by statute from bearing witness in court or serving as jurors.

231. Dr. Gordon's book, entitled *Mapping Decline: St. Louis and the Fate of the American City*, was published in 2008.

232. Engstrom did not analyze whether African Americans and whites turned out at the same or different rates in April elections.

233. Engstrom did not analyze voter turnout for any election outside of the April elections either.

234. The City of Ferguson accounts for 27% of the population of the District.

---

[7] The District reserves its objection to this fact on relevance grounds.
[8] The District reserves its objection to this fact on relevance grounds.
[9] The District reserves its objection to this fact on relevance grounds.

### 2. Housing

235. St. Louis County used and acquiesced in the private maintenance of discriminatory real estate and exclusionary zoning practices designed to compel African Americans to remain in designated, underserved areas. St. Louis County includes the Ferguson-Florissant School District in its entirety and areas outside of the Ferguson-Florissant School District.[10]

236. The region's use of discriminatory real estate practices and exclusionary zoning practices led to three landmark residential racial discrimination cases: *Shelley v. Kraemer*, 334 U.S. 1 (1948), *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), and *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975). The region includes the Ferguson-Florissant School District and areas outside of the Ferguson-Florissant School District.[11]

237. In *Shelley v. Kraemer*, a case arising out of the city of St. Louis, the Supreme Court held unconstitutional state enforcement of racially restrictive housing covenants. The Ferguson-Florissant School District is not within the City of St. Louis.[12]

238. After *Shelley*, municipalities in St. Louis County (including those within the bounds of FFSD and areas outside of the District) relied on private realty practices, such as exclusionary zoning practices like large-lot single-family residential zoning, which by design excluded most African Americans.[13]

239. These discriminatory practices were in turn subsidized and regulated by local and federal public policies.[14]

---

[10] The District reserves its objection to this fact on relevance grounds.

[11] The District reserves its objection to this fact on relevance grounds.

[12] The District reserves its objection to this fact on relevance grounds.

[13] The District reserves its objection to this fact on relevance grounds.

[14] The District reserves its objection to this fact on relevance grounds.

240. These discriminatory practices were challenged in court. In *Jones v. Alfred H. Mayer Co.*, the Supreme Court outlawed discrimination in private real estate transactions. In *United States v. City of Black Jack*, the Eighth Circuit, in one of the first exclusionary zoning cases, struck down the town of Black Jack's zoning ordinance banning construction of multifamily housing. The town of Black Jack is only partially within the District.[15]

241. The city of St. Louis did not pass a public accommodations bill until 1961, and the bill that passed excluded landlord-tenant relationships.

242. Late into the 1980s, so-called urban renewal efforts in North St. Louis County were "designed and pursued as a means of relocating suburban pockets of African-American settlement 'back' into [St. Louis] City."

243. Home equity is the centerpiece of family wealth for moderate-income Americans, both within and outside of the District.[16]

244. African-American homeowners in the St. Louis metropolitan area are often cornered into less stable neighborhoods on subprime terms, where there is little access to public services and high-performing schools.[17]

245. Property values of African Americans' homes in the St. Louis metropolitan area have grown more slowly in comparison to whites' homes.[18]

246. The homeownership gap between African Americans and whites in the St. Louis metropolitan area, coupled with the slower rate of property value growth of African Americans' homes in comparison to whites' homes in the St. Louis metropolitan area, has

---

[15] The District reserves its objection to this fact on relevance grounds.

[16] The District reserves its objection to this fact on relevance grounds.

[17] The District reserves its objection to this fact on relevance grounds.

[18] The District reserves its objection to this fact on relevance grounds.

resulted in disparities in wealth among African-American and white households.[19]

247.  These disparities in homeownership in the St. Louis metropolitan area have inter-generational effects.[20]

248.  Race and Owner Occupancy in FFSD, 2007-13.

| | | 2007-9 | 2008-10 | 2009-11 | 2010-12 | 2011-13 |
|---|---|---|---|---|---|---|
| White | Own | 12604 | 12460 | 11953 | 11773 | 11053 |
| | Rent | 2339 | 2118 | 2188 | 2209 | 2301 |
| Black | Own | 6196 | 6528 | 6597 | 6918 | 6924 |
| | Rent | 5980 | 6368 | 6889 | 6966 | 6745 |
| White homeownership rate | | 84.3% | 85.5% | 84.5% | 84.2% | 82.8% |
| Black homeownership rate | | 50.9% | 50.6% | 48.9% | 49.8% | 50.7% |

249.  Plaintiffs' expert Dr. Gordon does not know how many African Americans in the District live in apartment complexes.

250.  Dr. Graves was unaware of racially restricted housing, covenants and zoning in St. Louis County.

### 3.  Education

251.  The State and St. Louis County engaged in official discrimination in education.

252.  In 1875, the State revised its then-ten-year-old constitution to require, rather than merely permit, racially segregated schools. 1875 was 140 years ago.[21]

253.  A provision in the Missouri Constitution of 1904 that permitted segregated schooling was not officially rescinded until 1976.

254.  Kinloch is one of the municipalities that is currently completely inside FFSD's borders. Prior to 1975, it was an unincorporated area outside of the District that had included the territory of the adjacent city of Berkeley.

---

[19] The District reserves its objection to this fact on relevance grounds.

[20] The District reserves its objection to this fact on relevance grounds.

[21] The District reserves its objection to this fact on relevance grounds.

255. Prior to 1937, the areas of present-day Kinloch and Berkeley together formed the Kinloch School District, whose schools were segregated under Missouri law.

256. In 1937, white residents of Kinloch split the city, incorporated the city of Berkeley, and formed a new predominantly white school district. The student population of the new Berkeley District was 80% white, while the student population of the remnant of the Kinloch District was 99.3% African-American. "This was done despite the strong opposition of the new Kinloch district."

257. "[A]s a direct consequence of the creation and maintenance of Kinloch as a small, all-black school district, educational opportunities provided were markedly inferior to the opportunities offered in the adjoining Berkeley and Ferguson districts, as well as those offered in most other school districts in St. Louis County."

258. The cities of Berkeley and Ferguson together surrounded Kinloch almost completely.

259. Berkeley and Ferguson took direct measures to segregate Kinloch's African-American residents. Berkeley and Ferguson streets dead-ended before they reached Kinloch, and, until 1968, Ferguson barricaded through streets shared with Kinloch.

260. In 1975, nearly two decades after *Brown v. Board of Education*, 349 U.S. 294 (1955), the school districts of Kinloch and Berkeley were court-ordered to desegregate and merge into the adjacent Ferguson-Florissant School District, resulting in the present-day FFSD.

261. Currently, in FFSD, African American students have disproportionately low enrollment in advanced classes such as calculus, chemistry, physics and advanced placement, and more limited access to enrichment programs and extracurricular activities.

262. For example, based on data provided to the U.S. Department of Education for the 2011 survey year, 77.1% of the District's enrollment is African-American and 15.6% is white, but

of the students enrolled in calculus, 51.4% were African-American and 37.8% were white. Of the students enrolled in FFSD's gifted and talented program, 35.3% were African-American and 48% were white.

263.   Dr. Graves was born and raised in St. Louis and attended Berkeley Senior High School in the District.

264.   Dr. Graves is unaware of the achievement gap.

265.   Every student who reportedly received corporal punishment in the District during the 2011 survey year was African-American.

266.   According to the September 2015 report issued by the Ferguson Commission, "a volunteer group of 16 diverse community leaders" appointed by Missouri Governor Jay Nixon, "to listen to and engage with area organizations, national thought leaders, institutions, experts and citizens," Missouri ranked 50th out of 50 in school discipline gap for primary school-aged students and 47th out of 50 for secondary school students. The City of Ferguson makes up 27% of the population of the District.[22]

267.   In its *Investigation of the Ferguson Police Department* report, the U.S. Department of Justice documented a pattern of force used against African American students and law enforcement's "insufficient appreciation for the negative educational and long-term outcomes that can result from treating disciplinary concerns as crimes and using force on students." The City of Ferguson makes up 27% of the population of the District.[23]

268.   Dr. Thurman, as a former principal, was in charge of disciplining students.

4.   Other Socioeconomic Disparities

269.   African-American residents of FFSD are less likely to have health insurance.

---

[22] The District reserves its objection to this fact on relevance grounds.

[23] The District reserves its objection to this fact on relevance grounds.

270.     African-American residents of Florissant and Ferguson face racial profiling by law enforcement and a disproportionate number of stops, arrests, fines, and fees. The Ferguson-Florissant School District does not have authority over the Ferguson Police Department.[24]

271.     According to the DOJ *Investigation of the Ferguson Police Department* report, African-American residents of Ferguson in 2013 were 68% less likely to have their cases dismissed by the municipal judge and 50% more likely to have their cases lead to an arrest warrant; and accounted for 95% of all "Manner of Walking" charges, 94% of all "Failure to Comply" charges; 92% of all "Peace Disturbance" charges; and 89% of all "Failure to Obey" charges. The Ferguson-Florissant School District does not have authority over the Ferguson Police Department.[25]

272.     A report sponsored by The Missouri Council for a Better Economy notes that, although only 24% of St. Louis County residents are African-American, in the 21 County municipalities that collect more than 20% of their revenue from court fines and fees, 62% of the residents are African-American. The Ferguson-Florissant School District does not have authority over the municipal courts of St. Louis County.[26]

273.     The Missouri Attorney General 2014 Vehicle Stops Report found that the indices for traffic stops of African Americans in Ferguson for the years 2000-2014 range from 1.30 to 1.57 and in Florissant from 2.66 to 4.79, where an index over 1 shows race disparity. The Ferguson-Florissant School District does not have authority over the Ferguson or Florissant Police Departments.[27]

---

[24] The District reserves its objection to this fact on relevance grounds.
[25] The District reserves its objection to this fact on relevance grounds.
[26] The District reserves its objection to this fact on relevance grounds.
[27] The District reserves its objection to this fact on relevance grounds.

### 5.  Continuing Effects of Past Discrimination and Effect on Political Participation

274.    Former FFNEA president Green stated that he "believe[s] that there are still certain privileges or rights that are not afforded to certain African-American individuals [in Ferguson]."

### B.  *Lack of responsiveness (Senate Factor 8)*

275.    Current Board member Paulette-Thurman recognized that there was a "difference in resources for North Side schools as opposed to South Side schools" in the District and identified this as a particularized need of the African-American community.

276.    Several Board members do not know that public schools were segregated in the District, in St. Louis County, and in the State.

277.    Some Board members do not know that historic discrimination existed in St. Louis County or in the State. Robert Chabot moved to the District in the 1990s.

278.    Most Board members are generally aware of the racial achievement gap in the District and a few are aware that this achievement gap is likely a particularized concern of the African-American community.

279.    A few Board members were unable to point to a Board policy designed to specifically address either the racial achievement gap or racial disparities in the use of school discipline.

280.    As evidence of bias and stereotyping, the *Investigation of the Ferguson Police Department* report cites the fact that "[c]ity officials have frequently asserted that harsh and disparate results of Ferguson's law enforcement system do not indicate problems with the police practices, but instead reflect a pervasive lack of 'personal responsibility' among 'certain segments' of the community." The Ferguson-Florissant School District does not

have authority over the Ferguson Police Department.[28]

281. Dr. McCoy was the District's first African-American Superintendent.

282. The Board voted to hire Dr. McCoy as the District's Superintendent in December 2010. For three years prior, Dr. McCoy served as an Assistant Superintendent for the District.

283. Dr. McCoy began his tenure as Superintendent on July 1, 2011.

284. Dr. McCoy's success as a superintendent was publicly recognized.

285. On November 6, 2013, the Board voted to suspend Dr. McCoy with pay.

286. On November 7, 2013, the Board sent a letter to FFSD families announcing that it had suspended Dr. McCoy. The announcement stated that the "decision reflects differences in focus and philosophy between the Board and superintendent and is not an indication of wrongdoing."

287. In the African-American community, there was widespread opposition to the decision to suspend Dr. McCoy.

288. Some community members publically expressed concern that the Board's decision was racially motivated.

289. FFSD students sent the Board written concerns regarding the suspension of Dr. McCoy and sought his reinstatement.

290. On November 12, 2013, the Board sent another letter to FFSD families in which it acknowledged "the concerns expressed by some members of the community that this move [to suspend Dr. McCoy] was in any way racially motivated."

291. The next day, on November 13, 2013, the Board held a meeting attended by over 1,000 parents, community leaders, and other District residents.

---

[28] The District reserves its objection to this fact on relevance grounds.

292. At the November 13, 2013 meeting, over 50 individuals voiced their support for Dr. McCoy, expressed concerns about the suspension, particularly the lack of transparency in the process that led up to the suspension and the possibility that it had been racially motivated, and sought an explanation for Dr. McCoy's suspension.

293. The meeting lasted close to four hours.

294. During the meeting, current Board member Chabot read a statement in which he claimed that he had "trust issues" with respect to Dr. McCoy.

295. None of the other Board members made a statement or responded or otherwise addressed the concerns expressed.

296. In the weeks following the November 13, 2013 meeting, Board members did not provide any explanation for their decision to suspend Dr.McCoy, citing only "personnel" reasons.

297. Over 150 parents and other community members appeared before the Board again on December 11, 2013. Several of these individuals asked the Board for an explanation for its treatment of Dr. McCoy and a response to their impression that it was racially motivated.

298. On December 11, 2013, the Board voted in a closed meeting to issue charges for termination for cause against Dr. McCoy.

299. On December 19, 2013, the Board sent a letter to FFSD "Families, Staff and Community" announcing that it had issued a notice of charges for termination for cause against Dr. McCoy. The letter did not include any explanation for the decision to issue a notice of charges.

300. One Board member voted against closing the February 20, 2014 Board meeting, during which the Board addressed and voted on a motion to change the status of Dr. McCoy from paid leave to non-paid administrative leave.

301.     Dr. McCoy resigned as Superintendent in March 2014.

302.     The Board selected Dr. Joseph Davis as the new superintendent. He is African American.

303.     The racial make-up of the board that hired Dr. Davis was one African American and six white board members.

304.     As a board member and former principal, Dr. Thurman does not believe that the FFSD board should have given a reason for Dr. McCoy's suspension.

305.     Despite knowing Dr. McCoy personally, Johnson never asked Dr. McCoy why he was suspended.

306.     Despite knowing Dr. McCoy personally, Johnson never asked Dr. McCoy why he resigned.

307.     The Dean of Students position was eliminated prior to April 2013.

308.     Canfield Apartment complex is outside of the District.

309.     The Board approved counseling to District staff and students after the Michael Brown shooting to help them feel safe while attending school.

310.     Dr. Thurman was elected in 2014 and is a current board member.

311.     Donna Thurman adds an awareness of race on the board.

### III. Factors Related to Campaigns and Electoral Structure (Factors 3, 4, 6, and 9)

   A.   *Access to candidate slating (Senate Factor 4)*

312.     The FFNEA provides a variety of benefits to the endorsed candidates, including: mailing and distributing flyers, paying for signs, initiating robo-calls or phone banking, giving monetary campaign contributions, access to volunteers, canvassing, and working the polls election day to pass out campaign information to voters.

313.    Current Board member Paul Morris was the Political Action Committee Chair for the MNEA for fifteen years. In that role, he was active in the endorsement process for the FFNEA for many years.

314.    In selecting which candidates to endorse, the FFNEA sends a letter to all candidates who have filed for the Board election inviting them to seek FFNEA endorsement. Interested candidates are given a questionnaire with questions that will be asked during an interview before the endorsement committee, which they can fill out ahead of time.

315.    Candidates are notified shortly after their interviews whether they have received FFNEA endorsement, but are not given reasons for the decision.

316.    Former Board member Schroeder was endorsed by the FFNEA in 2006 and 2009, but not in 2012.

317.    Green is the only African-American man on the FFNEA endorsement committee.

318.    The racial make-up of the FFNEA endorsement committee both times Paul Morris ran for office was roughly equal between African Americans and whites.

319.    Dr. Thurman was not endorsed by the FFNEA.

320.    Dr. Graves did not receive the FFNEA endorsement but won her election.

321.    The North County Labor Club is a local affiliate of the AFL-CIO labor council's Committee on Political Education. The organization also endorses candidates for the Board.

322.    The North County Labor Club endorsement comes with a variety of benefits, including lists of members and other unions from which to solicit monetary donations and volunteers, financial contributions, mailings, and notice of the endorsement in the *Labor Tribune*.

323. The endorsement correlates well with success: since 2004, the North County Labor Club has endorsed 13 candidates for Board elections. Only two of the endorsed candidates lost; 11 of the 13 endorsees won.

324. The most recent outgoing Board member, Schroeder, who is white, also received the endorsement from North County Labor Club in the one year that he sought it.

325. Dr. Thurman did not seek the North County Labor endorsement in 2014.

326. Dr. Graves did not seek the North County Labor endorsement in 2015.

327. Johnson did not seek an endorsement from North County Labor.

328. The Citizens Task Force for Quality Education was a group formed to help Normandy Schools.

329. The Citizens Task Force wanted to put together a slate of candidates to run for the Ferguson-Florissant School Board.

330. Grade A for Change sent out information asking candidates to apply to be on the slate.

331. The original slate included Dr. Thurman, Savala, and a third person who dropped out.

332. Johnson was recruited after the third person dropped out.

333. The three members of the slate were all African American.

334. The Grade A for Change candidates ran as a slate.

   B.  *Subtle racial appeals (Senate Factor 6)*

335. Current Board member Morris stated that race was made a part of the 2014 election because "[t]here was a slate of African American candidates" who did not "think that there was enough African American candidates on the Board."

336. Johnson campaigned on discipline "quite a bit."

337. When asked whether he campaigned on morale of the teachers and discipline, F. Willis Johnson replied, "…yes, ma'am."

338. Dr. Thurman attended the forums and large gatherings where candidates were invited in her 2014 campaign.

339. Dr. Thurman was not aware of statements made by any other 2014 candidate that accused Plaintiff Johnson of being an absentee father, of being too supportive of the student transfer issue or of being a renter rather than a homeowner.

340. Dr. Graves did not think discussions regarding the student transfer issue were racial in context.

### C. *Discriminatory voting practices and procedures (Senate Factor 3) and Tenuous rationales for maintaining these practices and procedures (Senate Factor 9)*

341. FFSD employs (1) an at-large voting scheme, (2) staggered terms, and (3) off-cycle (*i.e.*, April versus November) elections.

#### 1. At-large voting scheme

342. Board members state that an at-large election scheme ensures that Board members represent the entire District, rather than specific sub-districts.

343. Under the at-large voting scheme, there have never been more than two Black members on the Board.

344. Under the at-large voting scheme, there are no current Board members who reside in municipalities other than Florissant or Ferguson. The last Board member who lived in a municipality other than Florissant or Ferguson was Graham, who lost her Board seat in 2011.

345. Section 162.261 of the Missouri Revised Statutes reads:

1. The government and control of a seven-director school district, other than an urban district, is vested in a board of education of seven members, who hold their office for three years, except as provided in section 162.241, and until their successors are duly elected and qualified. Any vacancy occurring in the board shall be filled by the

remaining members of the board; except that if there are more than two vacancies at any one time, the county commission upon receiving written notice of the vacancies shall fill the vacancies by appointment. The person appointed shall hold office until the next municipal election, when a director shall be elected for the unexpired term.

2. No seven-director, urban, or metropolitan school district board of education shall hire a spouse of any member of such board for a vacant or newly created position unless the position has been advertised pursuant to board policy and the superintendent of schools submits a written recommendation for the employment of the spouse to the board of education. The names of all applicants as well as the name of the applicant hired for the position are to be included in the board minutes.

3. The provisions of article VII, section 6 of the Missouri Constitution apply to school districts.

346. Section 162.291 of the Missouri Revised Statutes reads:

The voters of each seven-director district other than urban districts shall, at municipal elections, elect two directors who are citizens of the United States and resident taxpayers of the district, who have resided in this state for one year next preceding their election or appointment, and who are at least twenty-four years of age.

2. Off-cycle elections

347. Plaintiffs have not examined turnout differentials in elections held in the district in any other months.

Dated this 21st day of December, 2015.

Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2693
jebenstein@aclu.org

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO

/s/ Cindy Reeds Ormsby
Cindy Reeds Ormsby, #50986
Angela Gabel, #58227
CROTZER & ORMSBY, LLC
130 S. Bemiston, Ste. 602
Clayton, MO 63105
(314) 726-3040
(314) 726-5120 (fax)
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John Armen Safarli, WSBA # 44056

ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
(314) 652-3114
arothert@aclu-mo.org

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
(404) 500-1235
lmcdonald@aclu.org

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

*pro hac vice*
FLOYD, PFLUEGER & RINGER, P.S.
200 W. Thomas St., Ste. 500
Seattle, WA 98119
(206) 441-4455
(206) 441-8484 (fax)
jsafarli@floyd-ringer.com

*Attorneys for Defendant Ferguson-Florissant School District*

Darold E. Crotzer, Jr., #19434MO
Kathryn B. Forster, #52923MO
CROTZER & ORMSBY, LLC
130 S. Bemiston Ave., Suite 602
Clayton, MO 63105
314.726.3040 / 314.726.5120 (fax)

*Attorney for Defendant St. Louis County Board of Election Commissioners*

<u>**CERTIFICATE OF SERVICE**</u>

I, Julie A. Ebenstein, hereby certify that on December 21, 2015, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Kathryn B. Forster
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com
kforster@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

<u>/s/ Julie A. Ebenstein</u>
JULIE A. EBENSTEIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEY FOR PLAINTIFFS