## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF | ) | |
| THE NATIONAL ASSOCIATION FOR THE | ) | |
| ADVANCEMENT OF COLORED PEOPLE, | ) | |
| REDDITT HUDSON, F. WILLIS JOHNSON | ) | |
| and DORIS BAILEY, | ) | |
| | ) | Civ. No. 14-2077 |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FERGUSON-FLORISSANT SCHOOL | ) | |
| DISTRICT and ST. LOUIS COUNTY BOARD | ) | |
| OF ELECTION COMMISSIONERS, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT FERGUSON FLORISSANT SCHOOL DISTRICT'S TRIAL BRIEF

**I. Preliminary Statement**

Plaintiffs bring this action pursuant to Section 2 of the Voting Rights Act, 52 U.S.C.

§10301 ("Section 2.")  Plaintiffs request the court enjoin Defendants from holding the at-large

elections in April that are mandated by Missouri statutes.  In addition, Plaintiffs seek attorneys'

fees.

Plaintiffs' Section 2 claim is a novel twist on the Voting Rights Act. ("VRA")  Plaintiffs

seek to use the VRA to upend the Missouri mandated at-large structure in favor of single-

member districts.  The novelty is that Plaintiffs demand that four of the seven single-member

districts contain a majority-minority population.[1]  At the same time, Plaintiffs vehemently deny

the fact that African Americans are a majority of the voting age population.  Defendant has not

found a similar case in the history of the Voting Rights Act: where African Americans are the

---

[1] The term 'minority' can be confusing under these facts because African Americans are a majority of the population in the District. At the same time, African Americans are commonly referred to as a racial minority.  For that reason, the District will limit its use of the word 'minority' to a numerical one and not use the term to reflect race or ethnicity.

largest group of voters in a winner-take-all system, yet Plaintiffs seek to limit African American success by creating majorities in four of seven single member districts.

Plaintiffs argue that single-member districts will "remedy" the alleged vote dilution. However, Plaintiffs must prove by a preponderance of the evidence that the white minority effectively thwarts the larger group of African American voters from electoral success.  This is a required element of the Voting Rights Act and one that must be considered in the present tense.

The Voting Rights Act, as interpreted through the seminal case of *Thornburg v. Gingles*, 478 U.S. 30 (1986), is a complicated combination of legal factors that require the Court to conduct a two-part analysis.  First, Plaintiffs must prove three preconditions.  The Court only moves to the next phase if it finds that Plaintiffs have established all three preconditions.  If the Court finds it necessary to continue, then Plaintiffs must prove that a combination of nine factors (referred to as the "Senate Factors") and any other relevant evidence, add up to a violation of the VRA based on the 'totality of the circumstances.'[2]  In many cases, the parties stipulate to some or all of the preconditions and some or all of the Senate Factors.  While the instant parties agree on some of the facts, they disagree as to each and every precondition and Senate Factor.  If the Court finds it necessary to conduct the entire analysis, it boils down to a two-part analysis: 1) the *Gingles* preconditions; and 2) the totality of the circumstances test.

Defendants' argument is simple.  There is no current Voting Rights Act violation under the first *Gingles* precondition.  There is no past violation under the second and third *Gingles* preconditions.

---

[2] The 'totality of the circumstances' test is established through any combination of the seven Senate Factors listed in Senate Report No. 97-417 (1982).  Case law has added two additional factors and makes clear that any other relevant evidence should be considered at this phase.  See, *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994).  For clarity, the District will refer to these additional factors generically as the Senate Factors.

2

First, the District is already a majority African American district in a winner-take-all system. There is no need to create seven single-member districts.  In fact, the single-member district system would limit African American electoral success and protect the white minority.  It is not a remedy under these facts.

Second, there is no past Voting Rights Act violation under the second and third *Gingles* precondition.  The facts indicate that African Americans enjoyed near-proportional representation from 2000 to 2010.  While representation has been uneven after 2010, the current Board consists of three African American preferred candidates and is poised to become majority African American-preferred as soon as April 2016.

Finally, the totality of the circumstances reinforces that there is no violation.  When the Court considers the totality of the circumstances, it will find that the District as a whole prefers African American candidates in elections for President, County Executive and U.S. Representatives; that this electoral system can result in a majority African American Board such as in Hazelwood School District; that there is no link between past discrimination and the present ability to participate in the process; and more.  When the Court examines the entirety of the circumstances, it will find that Plaintiffs cannot meet their burden of proving vote dilution.  The current facts preclude it; the past facts preclude it; and the combination of relevant evidence precludes it.  While "[t]he ultimate question in any Section 2 case must be posed in the present tense, not the past tense," there is no violation in either tense.  *Uno v. City of Holyoke,* 72 F.3d 973, 990 (1st Cir. 1995).

**II. Background of the Case.**

**A. Parties**

The Missouri State Conference of the National Association for the Advancement of Colored People ("MO NAACP") is a state affiliate of the NAACP.

Plaintiffs Reddit Hudson, F. Willis Johnson and Doris Bailey are African American voters and residents of the District.  Plaintiff Hudson is a former American Civil Liberties Union staffer and current field organizer for the NAACP.  Plaintiff F. Willis Johnson is an unsuccessful candidate for the 2014 School District Board of Education.  Plaintiff Bailey has not been placed on the non-binding witness list shared between parties prior to this date.

Defendant Ferguson Florissant School District (the "District") is located in St. Louis County, Missouri.  The District covers all or part of eleven municipalities.  The City of Florissant comprises the largest portion of the District while Ferguson, the second largest municipality in the District, makes up approximately 27% of the population of the District.  The Board is responsible for the governance of the District and subject to the laws of the State of Missouri.

Defendant St. Louis County Board of Election Commissioners is the governmental entity charged with conducting elections in St. Louis County.  It is responsible for conducting elections for positions to the Board of the Ferguson-Florissant School District.

Plaintiffs' Complaint alleges a violation of Section 2 of the Voting Rights Act.  Plaintiffs' Demand for Relief requests the Court to declare the April, at-large elections a Section 2 violation and to enjoin Defendants from conducting those elections.  Plaintiffs demand the implementation of an election system that complies with Section 2 and the Fourteenth Amendment.  Plaintiffs demand attorneys' fees and costs.

**B. The Facts**

Missouri law mandates at-large elections in April for this District.  The District is governed by a board of seven elected representatives. Each board member serves three-year terms.  See, Sections 162.261 and 162.291 RSMo.  Elections occur every year in April whereby either two or three seats are contested.  See, Section 162.341 RSMo.  Any change in the manner of holding elections, unless by court order, would violate state law.

Voters may cast as many votes as there are seats up for election.  Each voter had two votes in the 2012 and 2013 elections; each voter had three votes in 2014.  Voters may only cast one vote per candidate.  Voters are also permitted to engage in "bullet voting," that allows the voter to refrain from casting all of his or her votes.  By bullet voting, the voter increases the relative weight of his or her vote by reducing the number of votes other candidates receive.  Successful school board candidates have utilized bullet voting in their own campaigns and other elections.  Finally, there is no requirement that a successful candidate receive a majority of the votes.  Candidates may be elected with a plurality of the votes.  The candidates with the most votes win.

The area covered by the District's boundaries has experienced a population decline in the last twenty-three years.  The overall population of the District dropped 15.17% from 1990 to 2010.  The non-Hispanic white ("NH white") population experienced a significant decline of 59.60% from 1990 to 2010.  At the same time, the single-race black population skyrocketed 81.27% from 1990 to 2010.  This trend has continued beyond the 2010 decennial census as evidenced by the 2011 – 2013 American Community Survey ("ACS") conducted by the United States Census Bureau.  The 2011 – 2013 ACS demonstrates that the District's overall population and NH white population continue to decline and the single-race and any-part black populations

continue to increase.  The most recent indicators demonstrate that single-race blacks, at 48.94%, are the largest group of voters in the District.  However, Courts use the more expansive any-part black ("AP black"), a number that includes multi-racial persons that identify as black, in Voting Rights Act cases.  When that number is calculated, a majority of the District, or 51% of the District's voters, are any-part black.

The current Ferguson-Florissant School District ("FFSD") Board is comprised of three African-American preferred candidates.  They are Dr. Courtney Graves, Dr. Donna Thurman and Leslie Hogshead.  Dr. Graves was elected in 2015; Dr. Donna Thurman was elected in 2014; and Leslie Hogshead is a longtime board member first elected in 1992.

From 2000 - 2015, the FFSD Board included two African American board members in twelve of the last fifteen years.  The FFSD Board included at least one African American board member in all but one of the last sixteen years.  The District concedes that there were no African American board members serving in the 2013 – 2014 school year.  However, the evidence indicates that Leslie Hogshead, an African American preferred  candidate, and Chris Martinez, a Hispanic, were serving at that time.

The District maintained roughly proportional representation from 2000 – 2010 and currently is either proportionally represented with three African-American preferred candidates according to Plaintiffs' decennial census and 2011 – 2013 ACS numbers; or is one person shy of proportional representation as demonstrated by the District's 2011 – 2013 ACS any-part black voting age population numbers indicate.

Plaintiffs are in the unjustifiable position of arguing that African Americans are a minority of the voting age population while demanding a majority of the seven seats on the school board.  As discussed below, this and Plaintiffs' additional claims collapse under scrutiny.

### III. Legal Issues

### A. The *Gingles* Framework

At-large elections "may not be considered *per se* violative of Section 2." *Gingles*, 478 U.S. at 47.  Instead, the plaintiff must establish three "necessary preconditions " set forth in *Gingles*: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it…usually to defeat the minority's preferred candidate.[3]" 478 U.S. at 50-51.  If the plaintiff satisfies these "*Gingles* preconditions" or "*Gingles* factors," then the court proceeds to examine the totality of the circumstances to determine whether minorities have fully established their claim.

"[T]he ultimate right of Section 2 is equality of opportunity, not a guarantee of electoral success for minority preferred candidates of whatever race."  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 508, 126 S.Ct. 2594 (2006) (internal quotation omitted); *Johnson v. DeGrandy*, 512 U.S. 997, 1014 n.11 (1994) ("Reading Section 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose.  One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast.")

### B. There is no current violation of the Voting Rights Act under the first *Gingles* precondition.

The District maintains the following arguments under the first *Gingles* precondition.  First, the any-part black voting age population is a majority of the voters.  Any claim of vote dilution fails as a matter of law because the District is already a majority-minority District.  In

---

[3] In context of the instant facts, the "minority" group is white.  White voters have not been a documented majority since the 2000 decennial census.  The "majority" is African American.

addition, single-race blacks are the largest group of voters.  The largest groups' voting strength cannot be diluted by the white minority in the current arrangement.  Second, considering the facts in this case, Plaintiffs have not offered a reasonable alternative to the winner-take-all system.  The single member districts Plaintiffs seek actually limit African American electoral success and insulate the white minority.  While Plaintiffs' entire electoral system is inappropriate under these facts, they also proffer Illustrative Districts that are unreasonably flawed.  Plaintiffs do not demonstrate that a remedy is possible.  For those reasons, Plaintiffs cannot meet the first *Gingles* precondition.

**1. African Americans have the electoral advantage of being the largest group of voters.  The District's calculations based on the 2011 – 2013 ACS demonstrate the any-part black voting age population is 51% and persons that identify as single-race black are at least 48.94% of the voting age population.**

**a. The Court should rely on the 2011 – 2013 American Community Survey.**

"The ultimate question in any section 2 case must be posed in the present tense, not the past tense.  The court must determine whether the challenged electoral structure deprives a racial minority of equal opportunity to participate in the political process *at present*." *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995) emphasis added.  When this Court relies on the most recent data generated by the United States Census Bureau, it will find that the District does not violate Section 2 of the Voting Rights Act.

The United States Census Bureau administers an ongoing survey that provides vital information on a yearly basis about demographics in the United States.  This survey, called the American Community Survey, ("ACS") is a critical element of the Census Bureau's

reengineered decennial census program.  The ACS data are released in 1-year, 3-year, and 5-year period estimates.  The first multiyear ACS was released in 2008.

The reason for this Court and any court to rely on the ACS is that it is a recent and reliable survey of demographic and socioeconomic factors.  The ACS is a necessary tool in situations with a rapidly changing demographic.  When the decennial census information is past its prime, the ACS provides the Census Bureau and the courts with more recent information.

The District's demographics have unquestionably changed and continue to change every year.  Neither party asserts that time stopped in 2010 or that the 20-year trend of an increasing African American population and decreasing white population has reversed.  Both parties agree that the 2011 – 2013 ACS data continues the trend from the last twenty years.  Since Plaintiffs cannot deny this result, they argue the ACS Census data is less reliable than the older 2010 decennial census data.  The District disagrees.

Both parties rely on the 2011 – 2013 ACS for their own purposes.[4]  Plaintiffs' reports, motions and memoranda rely heavily on the ACS for socioeconomic indicators.  The District relies on the ACS for demographics and socioeconomic factors.  While these Plaintiffs maintain that the decennial census is the necessary measure for demographics, one of Plaintiffs' experts has successfully convinced a court to rely on the 2008 ACS for precisely the reasons mentioned above.

A central issue in this case is whether the Court should rely on the older 2010 decennial census data or the more recent 2011 – 2013 ACS.  "[C]ensus figures are presumed accurate until proven otherwise.  Proof of changed figures must be thoroughly documented, have a high degree of accuracy, and be clear, cogent and convincing to override the presumptive correctness of the

_____
[4] All references to the ACS refer to the 2011 – 2013 ACS unless specifically stated otherwise.

prior decennial census." <u>See</u>, *Valdespino v. Alamo Heights Independent School Dist.*, 168 F.3d 848, 853-854 (5th Cir. 1999).

In *Benavidez v. City of Irving*, 638 F.Supp. 709 (N.D. TX 2009), the Court considered whether to rely on the ACS over the decennial census.  Plaintiffs' own expert, Dr. Richard Engstrom, participated in the *Benavidez* case.  The *Benavidez* Court stated:

> "The ACS is another sample survey conducted by the Census Bureau.  It is of relatively recent origin and is intended to replace the Census long form, but it is conducted annually with the results averaged over time periods to get the same level of statistical sampling as the long form.  Each year the ACS surveys approximately 1/1000 households." *Id*. at 715.

In deciding to rely on the ACS, the Court held, "…the Census Bureau considers ACS data reliable and intends for it to be relied upon in decisions such as Voting Rights Act compliance." *Id*. at 721.  Thus, the *Benavidez* Court was confronted with this precise issue and held the ACS was more recent and reliable than the decennial census under those facts.

Both parties' reports indicate that the District's demographics have changed in the five years since the 2010 decennial census was released.  The changes demonstrated in the 2011 – 2013 ACS merely continue the 20-year trend from 1990 – 2010.  This Court should rely on the 2011 – 2013 ACS because it is more recent and reliable than the 2010 decennial census.

Plaintiffs may argue the ACS estimates contain margins of error ("MOE") and are therefore unreliable.  The District and its expert acknowledge that ACS estimates are based on a sample and are subject to sampling bias, i.e. MOEs or confidence intervals.  It does not follow that the 2011 – 2013 ACS estimates are unreliable for purposes of this litigation.

Plaintiffs contradict themselves on this point.  Plaintiffs have previously acknowledged that "the most recent three-year ACS estimates indicate that African Americans are now a very slight plurality of the FFSD VAP." See, ECF 100 pages 11-12.  This acknowledgment refutes

any potential contention that the 2011 – 0213 ACS estimates, including single-race black VAP,

is unreliable.  Additionally, Mr. Cooper has testified in deposition in a previous suit that courts

routinely rely on ACS estimates to determine whether a redistricting plan satisfies a bright-line

threshold, even if those estimates are only tenths or hundredths of a percent over that threshold.

Further, *Benavidez v. City of Irving*, 638 F.Supp. 709 (2009) held the ACS is "accurate and

reliable" in Section 2 litigation.  Thus, even if single-race blacks are a slim plurality in this case,

the Court can and should conclude that they are the largest voting group within the District.  This

conclusion is supported by the obvious demographic trends within the District that show the

black population rapidly climbing and the white population dramatically decreasing.[5]

**b. The District's calculations based on the 2011 – 2013 ACS indicate the any-part black population is a 51% majority of the voters in the District.**

When the Court relies on the ACS, it will find that African Americans are the largest

group of voters.  Within that, the any-part black voting age population ("VAP") is a majority of

the voters and the single-race black VAP is a plurality.[6]

Defendant's expert, Dr. Jonathan Rodden, has calculated the more expansive category of

any-part black at 51% of the District's voters.  The parties have stipulated that the single race

blacks are 48.94% of the District's voters.  Either way, the first and main point is that African

Americans are currently the largest group of voters.  Any analysis of this alleged Voting Rights

Act violation must be conducted with the lens that African Americans have the most voting

power of any race or ethnicity within the District.

---

[5] The Court should note that the *Benavidez* Court relied on the ACS for purpose of determining whether adult Hispanic citizens were sufficiently large to constitute a majority in a single-member district.
[6] The single race black category refers to individuals that identify solely as black.  The any part black category is more expansive.  It includes individuals who identify as more than one race and some part black.  It also encompasses the single race black category.

The ACS does not provide the percent of any-part black voters in the District.  The experts must calculate it based on the information provided in the ACS.  Using Plaintiffs' own statistics, the sum of the NH white and single race black voting age population ("VAP") (46.78% and 48.94%) is only 95.72%, which is less than 100%.  This gap closes somewhat if the single-race black VAP is added to the Hispanic white VAP, which is 47.24%.  Still, these numbers only add to 96.18%, which is 3.82% shy of 100% of the VAP.  Some of this remaining percentage is attributable to the AP black population, which is a more expansive classification than single-race black.  Plaintiffs' expert did not formally calculate the AP black share of the VAP under the 2011 – 2013 ACS.  Instead, Plaintiffs' expert William Cooper provided a "ballpark estimate" of the AP black VAP as "roughly" 49.8%.  Cooper did not formalize his method for calculation.

Although the ACS does not publish estimates for the AP black classification, the ACS publishes estimates for those who identify as two or more of any race.  Based on this, Dr. Rodden calculated the AP black share of the VAP.  First, Dr. Rodden obtained the number of individuals in the overall population (regardless of age) who identified as two or more of any race.  This figure is available in the ACS.  Second, Dr. Rodden obtained the percentage of those individuals who identified as two or more races with some part African American (i.e. those who identified as AP black.)  This figure is also available in the ACS.  Third, Dr. Rodden obtained the number of *voting-age* individuals who identified as two or more of any race.  Again, this figure is available in the ACS.  To determine the percentage of voting-age individuals who identified as AP black (which is not available in the ACS), Dr. Rodden applied the percentage of all individuals who identified as AP black to the number of voting-age individuals who identified as two or more of any race.  Dr. Rodden's calculation assumes that the percentage of multiracial individuals who are AP black is the same for both the voting-age population and the total

population.  The result of Dr. Rodden's calculation is that the any-part African American population is 51% of the voters in the District.

### c. This majority-minority district cannot violate Section 2 as a matter of law.

The legal ramifications of majority status was first discussed by the United States Supreme Court in the plurality opinion *Bartlett v. Strickland*, 556 U.S. 1 (2009).  In *Bartlett*, the Supreme Court addressed the extent to which Section 2 requires "crossover" districts in which minority voters who make up less than a majority of a district's population, could theoretically combine with white voters to elect the minority's preferred representatives.  Although the issue in *Bartlett* was different than the issue in this case, the Court's language and reasoning is instructive.

The *Bartlett* Court adopted a "majority-minority rule" for analyzing Section 2 liability under the first *Gingles* precondition.  The majority-minority rules "relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting age population in the relevant geographic area."  *Bartlett*, 556 U.S. at 18.  The Court held the plaintiffs satisfied the first *Gingles* factor if they "show[ed] by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Id*. at 19-20.

Other courts have applied *Bartlett* to find no Voting Rights Act violation in single-member districts in which the racial or ethnic group already comprises 50% or more of the entire jurisdiction.  See, *Jeffers v. Beebe*, 985 F.Supp.2d 920 (E.D.Ark. 2010) (rejecting the plaintiffs' argument that a senate district should be redrawn because the district was "already a majority-minority district under *Bartlett's* decision"; the black VAP was 52.8%, "which is 'greater than 50 percent.'" (quoting *Bartlett*, 556 U.S. at 20).

13

In *Aldasoro v. Kennerson*, 922 F.Supp. 339 (S.D. Cal. 1995), the plaintiffs challenged the at-large system of elections. In the year before the court issued its opinion, Latinos composed a majority of the citizen voting-age population. The court entered judgment in favor of the defendants, finding that "[w]hile Hispanics presently have the ability to elect in a single member district, this Court also has determined that Hispanics now have the ability to elect at-large. There is no current condition of vote dilution in El Centro." *Id*. at 375. While *Aldasoro* was decided prior to *Bartlett*, the analysis is consistent with it and applies to the at-large system.

The District's expert definitively demonstrates that African Americans are a majority of the voters in the District. The demographic trends corroborate this finding. Plaintiffs' expert testified his "rough," "ballpark estimate" is that African Americans are 0.2% shy of a majority. (Cooper testified his "rough" calculation is that the AP BVAP is 49.8% of the voters in the District.) The evidence at trial will prove that the AP black population is a majority of the voters in the District today.

Plaintiffs respond to this argument in interesting ways. First, they attempt to discredit the reliability of the United States Census Bureau's estimates. Next, Plaintiffs argue there is no *per se* rule in the Eighth Circuit barring their claim if African Americans are a majority of the VAP. Third, Plaintiffs claim that a bare majority is insufficient to establish that equal electoral opportunity exists.[7] Finally, Plaintiffs fabricate an argument that the District's statistical evidence is a "projection."

Plaintiffs' arguments fall apart rather easily. First, the reliability of the United States Census Bureau's statistics in the American Community Survey has been upheld in precisely this situation. Second, of course there is no *per se* rule in the Eighth Circuit barring Plaintiffs' claims

---

[7] This argument is particularly interesting since Plaintiffs' own Illustrative Districts only provide a bare 51.5% majority.

when African Americans are a majority of the VAP.  This case is unique and these facts have

never been decided in the Eighth Circuit.  Regardless, the United States Supreme Court has

reasoned that a 50% majority-minority district is sufficient.  That reasoning is controlling.  Third,

Plaintiffs' argument that a bare majority is insufficient to constitute an effective district is

duplicitous.  Plaintiffs offer two Illustrative Plans as evidence of reasonable alternative remedies

to the current at-large system.  In those plans, Plaintiffs offer District 7 in Plan 1 with a 52.86%

BVAP and District 6 in Plan 2 with a 51.5% BVAP.  If the District's current 51% AP BVAP is

insufficient to prevent a Section 2 violation, then an additional 0.5% should be equally as

suspect.[8] Finally, the District is at a loss to explain why Plaintiffs claim the 51% AP BVAP

based on the 2011 – 2013 ACS is a "projection."  That statistic is not based on anything in the

future.  The number is calculated from a survey that is almost three years old.

In sum, the District's expert was the only one to calculate the any-part black voting age

population.  Dr. Rodden concludes that any-part blacks comprise 51% of the District's voting

age population under the 2011 – 2013 ACS.  Plaintiffs' expert, Mr. Cooper, concedes the 'any-

part' category is the appropriate classification for Voting Rights Act cases yet he failed to

formally calculate that percentage.  Since African Americans are a majority of the voters in the

District, their votes cannot be diluted as a matter of law.

**d. The parties stipulate that single-race African Americans are a plurality of the District's**
**voters under the 2011 – 2013 ACS.  White voters have not held a majority (over 50%) since**
**the 2000 decennial census.**

The parties agree that if the Court relies on the most recent and reliable data in the 2011 –

2013 ACS, then African Americans are a plurality and the largest group of voters in the District.

---

[8] The Court should note that Cooper's Illustrative Plans were based on the single race black VAP despite
acknowledging that any part BVAP is more appropriate.  The District is comparing it to the current any part BVAP.

("To be sure, the most recent three-year ACS estimates indicate that African Americans are now a very slight plurality of the FFSD VAP." See, ECF 100 p. 12.)  Viewing the District as it is today, and not as it was five years ago, African Americans are the largest group of voters.  Even if the Court were to look back in time, whites have not been a majority of the voters since 2000. That evidence is crucial because the Voting Rights Act assumes the numerical minority is also a racial minority in almost every legal standard.

The United States Supreme Court has indicated that Section 2 cases assume that the racial minority is, in fact, a numerical minority.  The converse of that is the assumption that white voters are a majority.  The *Gingles* Court held, "[T]he minority must be able to demonstrate that *the white majority* votes sufficiently as a bloc to enable it…usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. (emphasis added)  In addition, "The essence of a submergence claim is that minority group members prefer certain candidates whom they could elect were it not for the interaction of the challenged electoral law or structure with *a white majority* that votes as a significant bloc for different candidates." *Id*. at 68.

Neither of these assumptions is true in the District.  First, the racial minority is the largest group of voters. (That includes the any-part black voters as a majority and single-race black voters as a plurality.)  Second, there is no white majority.  White voters are a smaller group than both the any-part BVAP and the single-race BVAP.  In fact, there is no statistical evidence that white voters have held a majority since the 2000 decennial census.  The 2010 decennial census indicated that white voters were a very slight plurality of the voters with a 0.76% edge over any-part black voters.[9]

The voting power of African Americans in the District today cannot be ignored.  African Americans that identify as any-part black are a majority of the District's voters under the most

---

[9] This subtracts Plaintiffs' 48.95% NH white VAP from the 48.19% AP BVAP.

recent and reliable Census data available, the 2011 – 2013 ACS.  Single-race African Americans are a plurality of the District's voters under the ACS.  White voters have not held majority status since 2000.  Plaintiffs cannot meet the first *Gingles* factor because the African American vote cannot be submerged.  The Court need not look further.

**2. Single member districts are not a "reasonable alternative" under these facts.  As a result, Plaintiffs cannot meet the first *Gingles* precondition.**

Plaintiffs cannot survive the fatal weakness under *Gingles* I when the Court analyzes the District as it is now and not five years ago.  Even if the Court were to look at the outdated 2010 demographics, whites were a minority of the voting age population even then.  Beyond the problems discussed above, Plaintiffs' remedy is not workable under these facts.

**a. Single-member districts are not a reasonable alternative to the current winner-take-all system for the largest group of voters.**

The United States Supreme Court has held that "a §2 plaintiff must also postulate a *reasonable alternative* voting practice to serve as the benchmark "undiluted" voting practice." *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 480 (1997) emphasis added.  The Eighth Circuit held that Native-Americans must be "sufficiently [numerous] and geographically compact to constitute a majority in a [proposed] single member district" in order to demonstrate that a *workable solution* is possible." *Bone Shirt,* 461 F.3d at 1018 citing *Clay v. Board of Education of St. Louis*, 90 F.3d 1357 (8th Cir. 1996) emphasis added.  Vote dilution. . . is a comparative inquiry where the court must measure a minority group's ability to elect under the existing system to some 'alternative system that would provide greater electoral opportunity to minority voters,' which under *Thornburg* is single member districts.'" *Aldasoro*, 922 F.Supp. at 369.

Courts that have analyzed the potential transition from an at-large system to a system of single-member districts have held that an *adequate remedy* is part of plaintiffs' prima facie case. See, *Nipper v. Smith*, 39 F.3d 1494, 1511 (5th Cir. 1994) stating "The first precondition, or factor, asks whether the court can fashion a remedy for a demonstrated abridgment." See also, *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998), "As part of any *prima facie* case under Section 2, a plaintiff must demonstrate the existence of a proper remedy."

Whether the Court utilizes the "reasonable alternative" standard, the "workable solution" standard, or the "adequate remedy" standard, the result is the same.  The at-large structure provides African Americans the greatest opportunity to elect their preferred candidates.  As a result, a transition to single member districts is not reasonable.  Plaintiffs' only evidence to the contrary is supposition.

The District proffers three reasons that prove single-member districts are not a reasonable alternative under these facts.  First, Plaintiffs' own experts acknowledge the at-large system favors the largest group.  They do this through their own academic writing and academic journals.  Second, the District's expert analyzed these facts and found that single-member districts would be detrimental to African-American voters.  Third, Plaintiffs have not offered a single piece of hard evidence that indicates single-member districts are better in these circumstances.  Supposition is not sufficient.

First, the Court need only look as far as Plaintiffs' own experts for proof that the current system is best under these facts.  Dr. Engstrom authored an article for the St. Louis Law Review that states, "There are numerous variations in how at-large elections are implemented, but regardless of the particular arrangement, this system does have a tendency to favor candidates preferred by a majority group or at least the largest group of voters within the jurisdiction."  See,

*Cumulative and Limited Voting: Minority Electoral Opportunities and More*, St. Louis University Public Law Review, 2010 (emphasis added)

This is not a unique finding based on Dr. Engstrom's research alone.  Another of Plaintiffs' experts, Dr. David Kimball, cited an article that corroborates this finding.  The article cited by Dr. Kimball states, "If a group composes a majority of the city population in a majoritarian, at-large system, the group may be able to win all of the council seats."  See, *The Context Matters: The Effects of Single-Member versus At-Large Districts on City Council Diversity*, American Journal of Political Science, Vol. 52, No. 3, July 2008, at page 556.  The article continues by concluding that single member districts might even decrease the group's representation.

The District's expert, Dr. Rodden, agrees that single member districts are not beneficial to African American voters in the District.  Dr. Rodden testified there is little reason to believe chopping the District up into smaller winner-take-all districts would result in more African American voters supporting African American candidates.  He testified that single-member districts might actually "hurt" African American candidates.

Thus, three experts representing both parties provide evidence that the current system favors the largest group, a winner-take-all system and that a transition to single member districts is potentially harmful.  Interestingly, Plaintiffs do not offer evidence to the contrary.  Instead, Plaintiffs claim they need only rely on the possibility that their remedy is reasonable.  If Plaintiffs' argument is to be considered, then defendants would never win.  A defendant simply cannot refute a standard based on the hypothetical possibility of a remedy.  The District also points out that a hypothetical standard is not a standard at all.  The only actual evidence demonstrates that the current system favors African Americans in the District because they are

the largest group of voters.  The current system is a winner-take-all system and any transition to single-member districts is potentially harmful.

### b. Plaintiffs' Illustrative Plans are not a reasonable alternative.

The Court should find that single-member districts as an electoral structure are not a reasonable alternative under these facts.  However, even if the Court finds that Plaintiffs have demonstrated by a preponderance of the evidence that single-member districts are an adequate remedy, Plaintiffs' Illustrative Plans are unreasonably flawed.

Plaintiffs argue they offer two Illustrative Plans that demonstrate a transition to single-member districts remedies any Voting Rights Act violation.  These Plans do not demonstrate a remedy and Plaintiffs has not offered evidence to the contrary.

First, Illustrative Plan 1 contains a district with a 52.86% BVAP.  Illustrative Plan 2 contains a district with a 51.5% BVAP.  As the District has demonstrated, current demographics indicate the any-part BVAP population is already 51% of the voters in the District.  Plaintiffs have not demonstrated how the additional 0.5 – 1.86% will make the defining difference between an alleged violation and an alleged remedy.  Plaintiffs' argument regarding the first *Gingles* precondition is internally inconsistent and unavailing.[10]

Second, the evidence indicates that both Illustrative Plans will result in a net loss by one of the current African American board members.  Illustrative Plan 1 places both Dr. Donna Thurman and Dr. Courtney Graves in District 7.  Additionally, an African-American candidate who has filed for the 2016 school board election also lives in District 7 of Illustrative Plan 1.  They will be forced to run against one another which will result in the undeniable loss of at least one current African American incumbent – possibly two.  Illustrative Plan 2 contains the lowest

---

[10] To be clear, Cooper's Illustrative Plans rely on the 2010 single race black VAP despite acknowledging that AP black VAP is more appropriate. The District is relying on the AP black VAP.

BVAP with District 6 at 51.5% BVAP.  The bigger problem with Plan 2 is that it places Dr. Courtney Graves in a District that she is likely to lose.  Dr. Graves was placed in District 7 with a 40.86% BVAP.  Dr. Rodden's historical regression model indicates that Dr. Graves will not be re-elected if she is placed there.

Neither of Plaintiffs' Illustrative Plans provides the court with an indication that a transition to single-member districts will result in additional African American preferred representation.  To the contrary, Plaintiffs' Illustrative Plans do the opposite.  They indicate that African Americans will lose at least one of the current African American board members.  As such, Plaintiffs' Illustrative Plans are not a reasonable solution compared to the current winner-take-all system.

### c. Plaintiffs would have their cake and eat it too.

The District would be remiss in failing to point out the inconsistency in Plaintiffs' argument.  Plaintiffs vehemently deny that African Americans are a majority and plurality of the voting age population in the District.  At the same time, Plaintiffs seek to have the Court create four of the seven single-member districts with a majority BVAP.  Plaintiff cannot have it both ways.  Either African Americans are a majority of the voters in the District whereby the current at-large winner-take-all system is most beneficial; or African Americans are a less than a majority of the voting age population so that creating four single member districts is a disproportionate remedy for African American voting power.

The Supreme Court has definitively disagreed with utilizing Section 2 as a method for disproportionate representation.  "Treating equal political opportunity as the focus of the enquiry, we do not see how these district lines, apparently providing political effectiveness in proportion to voting-age numbers, deny equal opportunity."  *Johnson v. DeGrandy*, 512 U.S. 997, 1014

(1994).  "[R]eading Section 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose.  One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast."  *De Grandy*, 512 U.S. at 1016.

### C. There is no past violation of the Voting Rights Act under the second and third *Gingles* factors.

The Court need not move beyond *Gingles* I to determine that Plaintiffs have not met their burden and the District is entitled to judgment.  In the event the Court continues its analysis, Plaintiffs have not met their burden to prove by a preponderance of the evidence the remaining two factors: that African Americans are politically cohesive; and that the white majority typically votes in a bloc to defeat the African American preferred candidate.  See, *Bone Shirt*, 461 F.3d at 1020.

Plaintiffs have failed to demonstrate racially polarized voting, a necessary element that consists of the second and third *Gingles* preconditions.  The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates."  *Bone Shirt*, 461 F.3d 1101, 1018 (8th Cir. 2006).  Plaintiffs cannot satisfy either precondition because: 1. African Americans prefer many of the same candidates as whites and therefore are not politically cohesive (second *Gingles* precondition); and 2. African American candidates are not "usually" defeated and, when they are, the defeats are not due to white bloc voting (third *Gingles* precondition).

**1. African Americans are not politically cohesive as required by the second *Gingles*
    precondition.**

"The second *Gingles* precondition requires a showing that the….minority is politically
cohesive." *Bone Shirt*, 461 F.3d at 1020.  The "inquiry" into political cohesiveness is "essentially
whether the minority group has expressed clear political preferences that are distinct from those
of the majority." *Gomez v. Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988).  Again, the District
points out the absurdity of this analysis.  The "minority group" is white and the "majority" is
either any-part African American or there is no majority.  Either way, the analysis is not meant
for these facts.

In order to determine whether the minority group has clear political preferences, the
Court must determine who the African American preferred candidates are and whether they
differ from the white preferred candidates.  The District follows the clear rule articulated in *Clay
v. Board of Education of the City of St. Louis*, 90 F.3d 1357 (8th Cir. 1996).

In *Clay v. Board of Education of the City of St. Louis*, the plaintiffs "offered, by
implication, a definition of 'minority preferred candidate' based solely on the candidate's race."
90 F.3d 1357, 1361 (8th Cir. 1996).  The Eighth Circuit refused to adopt this definition,
explaining that it "offends the principles of equal protection." *Id*.  The court held that, "[a]s a
matter of law, such a definition is untenable and must be rejected in favor of the alternative
offered by the Board of Education." *Id*. The Eighth Circuit adopted the school board's definition
of "minority preferred candidate as the four candidates receiving the highest number of African-
American votes.'" *Id*. at 1362 n.10.  The court noted that, "[t]his definitional approach…has
been used before." *Id*. at 1362 n.10.

23

Importantly, the election system in *Clay* was very similar to this case.  Elections in the St. Louis School District were held during odd-numbered years.  In each election, four seats on the twelve-member board were contested.  Each voter had four votes that could be allocated.  Voters could only cast one vote per candidate, but could opt to cast fewer than four votes.  The four candidates receiving the most votes were elected.  Thus, the Eighth Circuit adopted the clear rule that the "four candidates receiving the highest number of African American votes" were "minority preferred candidates."  *Clay*, 90 F.3d at 1362.

The District's method for identifying the African-American preferred candidate(s) follows Clay.  In an election for *n* seats, the African-American preferred candidates are identified as the *n* candidates who receive the most African-American votes.  The District utilizes this approach without the exceptions Plaintiffs proffer.  Plaintiffs advocate for a series of exceptions that swallow the rule.  For various reasons, Plaintiffs would have the Court discount or disregard the following elections:

| Election Year | Candidate | Race | Reason |
|---|---|---|---|
| 2015 | Courtney Graves | AA | "Special Circumstances" |
| 2014 | Donna Thurman | AA | "Special Circumstances" |
| 2010 | Charles Henson | AA | Incumbent with no opponent |
| 2009 | No African American Candidate | | |
| 2008 | Doris Graham | AA | Incumbent with no opponent |
| 2007 | Chuck Henson | AA | Incumbent with no opponent |
| 2005 | Doris Graham | AA | Incumbent with no opponent |

The Court should note that Plaintiffs very clearly seek to wipe out every successful African American board member that has served since 2000.  While their reasons are varied, their purpose is clear.  By removing every successful African American board member, then and only then, can they allege a Section 2 violation.

In addition, the District points out that African Americans enjoyed nearly proportional representation from 2000 – 2010.  During that decade, single-race African Americans were 32.61% of the voting age population and held 27% of the seats on the school board.[11]  The electoral system has not changed since 2000.  The evidence demonstrates that the electoral system was properly functioning then and is properly functioning now.  Plaintiffs' response to the evidence that African Americans enjoyed proportional representation from 2000 – 2010 is that the District's argument is "unavailing."[12]  While the District admits that historical proportional representation does not end this Section 2 inquiry, it is highly relevant evidence that the current electoral structure supports the election of African American preferred candidates.

Instead of following the approach identified in *Clay* that the top *n* candidates who receive the most African American votes in an election for *n* seats are the African American preferred candidates, Plaintiffs create a hodgepodge of rules and exceptions that fall under their "Case-by-Case" approach.

Plaintiffs' approach has the following complicated caveats.  A candidate cannot be considered an African American preferred candidate:

1) If the top ranked candidate among African Americans is unsuccessful and received more than two-thirds the votes of successful second or third place candidates among African Americans;

---

[11] The 2000 BVAP was taken from Cooper's initial report p. 10.  The percentage of representation divided the number of African-American board members that served each year from 2000 – 2009 and divided that by seven.
[12] See, Plaintiffs' Reply Memorandum p. 7.

2) If the top ranked candidate among African Americans is an African American candidate who lost, then second or third place candidates among African Americans who are white cannot be preferred by African Americans; and

3) If the point estimate for a candidate falls within the confidence interval of another candidate, then the candidates cannot be considered preferred by African Americans.

Utilizing this complicated and unsupported approach, Plaintiffs eliminate every African American preferred board member elected since 2000.  Thankfully, the Eighth Circuit does not require the Court to navigate that labyrinth.  When the Court utilizes the *Clay* approach, the evidence demonstrates that African American and white voters often prefer the same candidate. Thus, African Americans are not politically cohesive.

Pursuant to *Clay*, African American and white voters have preferred at least one of the same candidate in eight of twelve (66%) contested elections since 2000.  In two of these elections, (2000 and 2009) African American and white voters have preferred two of the same candidates.

Political cohesiveness requires that African Americans have "voting preferences" that are "distinct" from whites.  *Bone Shirt*, 461 F.3d at 1020.  In the vast majority of elections, African Americans and whites share at least one preferred candidate.  More than a third of successful candidates have been preferred by both races.  Plaintiffs cannot prove by a preponderance of the evidence that African American and white voters have distinct preferences.  When the Court considers all of the evidence and weighs each circumstance accordingly, it will find that Plaintiffs have not met their burden.

**2. African American Preferred Candidates are not usually defeated by white bloc voting. Plaintiffs cannot meet the third *Gingles* precondition**.

"The third *Gingles* precondition asks whether the white majority typically votes in a bloc to defeat the minority candidate." *Bone Shirt*, 461 F.3d at 1020. It bears repeating that there is no "white majority" under these facts. *Gingles* specifically asks whether the "white majority" votes in a way to defeat African American candidates. (This language is repeated throughout Voting Rights Act litigation. "..the minority group must be able to demonstrate that the *majority* votes sufficiently as a bloc…" *Clay* at 1361.) In this case, the Court must consider whether there can even be a Voting Rights Act violation without a "white majority."

Again, the undisputed facts indicate that whites were not a majority of the voting age population under the 2010 Census. Instead, the non-Hispanic white population was 48.95% of the District's voters. While whites held a plurality status in 2010, that status fell to minority status under the 2011 – 2013 ACS.

To Defendant's knowledge, no plaintiff has ever succeeded when African Americans were the largest group of voters and there is a white minority. The converse of that being that there is an African American majority. See, *Jeffers v. Beebe*, 985 F.Supp. 2d 920, 935 (E.D. Ark. 2010) ("The plaintiffs have not cited a case, nor can we find one, in which a §2 vote-dilution claim successfully challenged the drawing of a district with a BVAP greater than 50 percent.") In addition, Defendant has not found a successful Section 2 violation when the black population was a *plurality* of the District. (See, *Fairley v. Hattiesburg*, 2015 WL 4744315 (S.D.Miss. Aug.11, 2015). This lack of success is not only legally correct, it is intuitive. The voting power of the white population is less than the voting power of the African American population. The relevant question then, is whether the white minority can ever dilute the largest

population of African American voters.  To add to that, Missouri law mandates a winner-take-all at-large system.  The largest group of voters may win all of the seats if they vote cohesively and as a bloc.  If African American candidates have not succeeded under these facts, it is not due to the electoral structure but to some other circumstance.

That being said, the Eighth Circuit has set forth a three-prong inquiry to establish this pre-condition, "(1) identifying the minority-preferred candidates; (2) determining whether 'the white majority vote as a bloc to defeat the minority preferred candidate;' and (3) determining whether 'there [were] special circumstances such as the minority candidate running unopposed present when the minority-preferred candidates won.'" *Bone Shirt*, 461 F.3d at 1020 (quoting *Cottier*, 445 F.3d at 11119-20).

The District proffers an approach that considers all of the evidence.  The Court may weigh the evidence accordingly, but the District does not categorically eliminate elections or candidates as the Plaintiffs urge.  As discussed above, the District argues the appropriate measure to determine the African American preferred candidate is by considering the *n* candidates that receive the most votes for *n* seats.  The District's approach may be identified as the "top-ranked candidate" approach (which simply identifies the African American preferred candidate as the candidate who received the highest number of African American votes).  The District also utilizes the "point estimate" approach.  The District argues the Court should consider all of the evidence and weigh the evidence accordingly.

**i. The Court should use the approach defined in *Clay*. This approach estimates each candidates' vote share among African Americans and the top *n* candidates for *n* seats are African American preferred. This is called the "point estimate" approach.**

The parties differ in their methods for identifying African American preferred candidates. The District proffers an approach that identifies African American preferred candidates for all of the seats in an election. In two-seat years, the District identifies two African American preferred candidates. In three-seat years, the District identifies three seats.

Both parties draw inferences about the voting behavior of African Americans and whites by utilizing the King's Method of Ecological Inference. Dr. Engstrom testified that the results of his analysis were "so close" to Dr. Rodden's that they are interchangeable. Dr. Rodden identifies the African American preferred candidates as the ones that receive the highest number of African American votes. The percentage of African American votes is represented by the "point estimate," which is the "most likely value given by the data and methodology." *Fabela v. City of Farmers Branch*, No. 3:10-CV-1425-D, 2012 U.S. Dist. LEXIS 108086, at 18 (N.D. Tex. Aug. 2, 2012). Each point estimate also has a "confidence interval," which is a "statistical measure of reliability which provides a range of values within which the actual range will fall 95% of the time." *Montes v. City of Yakima*, 40 F.Supp.3d 1377, 1404 n.5 (E.D.Wash. 2014).

The point estimate lies at the median of the confidence interval. Using the point estimate, Dr. Rodden identified the candidates that received the most votes from African Americans. No two candidates received the same point estimate albeit some of the candidates' vote totals were close. However, Dr. Rodden did not eliminate a candidate from African American preferred status merely because it was a close election. He relied on the point estimate to make his determination.

Plaintiffs' method is radically different.  Plaintiffs advocate for an extremely narrow definition of who can be identified as an African American preferred candidate.  The result of Plaintiffs' narrow definition is that in the last 15 years (since 2000), Plaintiffs only identify 19 (instead of 27) African American preferred candidates.  Plaintiffs narrow the number of successful African American candidates during the same time period from 13 to 7.  If the Court were to review only the five most recent elections, Plaintiffs claim there were only eight African American preferred candidates.  Plaintiffs exclude African Americans' choices 25% of the time due to their various exceptions.  It appears Plaintiffs began with an objective in mind – showing that there is no electoral success among African-American candidates – and then worked backwards to obtain that objective.  In other words, they shot an arrow and then drew the target around the arrow.

Plaintiffs remove candidates from consideration if their point estimates have overlapping confidence intervals.  For example, assume Candidate A had a point estimate of 23% and a confidence interval of 11% to 38%.  Assume that Candidate B had a point estimate of 33% and a confidence interval of 31% to 45%.  Because Candidate B's point estimate (33%) falls within Candidate A's confidence interval (11% to 38%), Plaintiffs believe that neither candidate was preferred over the other.

Thus, Plaintiffs introduce a new rule that eliminates African Americans' preferences in multiple elections.  Plaintiffs categorically eliminate any candidates with overlapping confidence intervals.  This is despite the fact that the candidates have different point estimates.  In addition, Plaintiffs disregard African Americans' choice in 2013 to vote for the two white candidates over an African American because the white candidates have overlapping confidence intervals.  That,

of course, ignores the relevant point. The point is that one of the two white candidates was

African American preferred.  The precise name of which white candidate is irrelevant.

The 2013 election is the perfect example of Plaintiffs' selective elimination and the

differences in the parties' approaches.  It is also one of the elections that determine whether the

current board comprises three African American preferred candidates (Graves, Thurman and

Hogshead) as Defendant argues or two.  Four candidates ran for two seats in 2013.  There were

two African American candidates and two white candidates.  The white candidates (Hosghead

and Brown) won.  The following results are based on Plaintiffs' expert, Dr. Engstrom's

Ecological Inference.

| 2013 Candidates | % of African American votes | Confidence Interval |
|---|---|---|
| Henson* | 43.7% | 37.2 – 50.7 |
| Hogshead | 24.2% | 20.0 – 27.8 |
| Brown | 20.2% | 16.2 – 24.3 |
| Thomas* | 11.9% | 9.4 – 15.3 |

* indicates an African American candidate

African American voters had the choice to vote for two African American candidates in

2013.  They clearly and decidedly did not.  Instead, they voted for one African American and one

white candidate.  Defendant's approach, as outlined in *Clay*, identifies Henson and Hogshead as

the African American preferred candidates because they received the most African American

votes.  Plaintiffs' approach, as outlined in *Clay* and adulterated by a series of elaborate

exceptions, identifies only one African-American preferred candidate in 2013.  That being said,

the 2013 election provides the Court with an important distinction between the parties' different

in approaches.

The District believes the approach outlined by the 8th Circuit in *Clay* applies.  The

approach in *Clay* is the only approach that has been endorsed by the Eighth Circuit.  Further, the

*Clay* approach is consistent with the Supreme Court's instruction from *Gingles* to consider the relevant evidence.  Plaintiffs' approach asks this Court to look at only some of the circumstances (i.e., those that fit Plaintiffs' agenda).  In other words, Plaintiffs promote advantageous exceptions.

Once the Court identifies the rule to determine African American preferred candidates, it can determine the identities of those candidates.  If the Court follows the District's approach, 13 out of 27 (48%) of the contested seats have been won by African American preferred candidates. Further, in 9 out of 12 (75%) contested elections since 2000, at least one African American preferred candidate was elected.  The following table illustrates that point.

**Electoral Success of the Candidate Most Preferred by African Americans.**

| Year | Candidate most-preferred by African Americans | Elected? |
|---|---|---|
| 2015 | Graves | Yes |
| 2014 | Paulette-Thurman | Yes |
| 2013 | Henson | No |
| 2012 | P. Morris | Yes |
| 2011 | Graham | No |
| 2009 | Knowles | Yes |
| 2006 | Thomas | No |
| 2004 | Van | No |
| 2003 | Thomas | Yes |
| 2002 | Graham | Yes |
| 2001 | Butler | No |
| 2000 | Thomas | Yes |

Thus, when the Court reviews the electoral success of African Americans in the District, it will find they have attained more than the "sporadic" success described in *Gingles*.  478 U.S. at 60.  When the Court reviews African American electoral success according to the method outlined in *Clay*, it will find that African Americans are currently represented by at least three

African American preferred candidates.  If the Court relies on Plaintiffs' 2010 demographic representations, African Americans maintain proportional representation on the Board today.[13]

Finally, Defendant would be remiss not to point out that African Americans have come extraordinarily close to prevailing in three elections since 2011.  In 2011, Hawkins lost by only 190 votes (93.83% of votes received by the third-place candidate); in 2013 Henson lost by 125 votes (94.4% of the votes received by the second-place candidate); and in 2014 Savala lost by 91 votes (96.4% of the votes received by the third-place candidate).  Those exceedingly close losses do not support a finding of vote dilution.  See, *Sanchez v. Bond*, 875 F.2d 1488, 1492-93 (10th Cir. 1989) (Hispanic candidates who lost by 53 votes in one race and 22 votes in another race supported a finding that Hispanics "had the ability to elect commissioners under the at-large system currently in use in the county"); *Romero v. Pomona*, 665 F.Supp. 853, 861 (C.D. Cal., 1987) (candidate lost by 71 votes; this "near miss…demonstrates the potential electability of black candidates").  If any of those candidates had won, the entire balance of the board would have shifted.

### ii. Plaintiffs' 'special circumstances' argument is speculative.

The District concedes that courts must ask whether there were 'special circumstances' to explain the success of African American preferred candidates. See, *Bone Shirt*, 461 F.3d at 1020. However, the District vehemently denies that each and every time an African American has been elected is due to special circumstances and/or an election that cannot be considered.

"As explained in *Gingles*, the special circumstances analysis was designed to prevent defendant jurisdictions from arguing that a minority candidate's occasional victory in an otherwise racially polarized electorate defeats a vote dilution claim." *Rodriguez v. Bexar County,*

---

[13] The District does not advocate for the Court's reliance on outdated data. It merely points out that even outdated data supports a finding for the District.

*Tex.*, 385 F.3d 853, 864 (5ᵗʰ Cir. 2004). ". . [W]hile special circumstances may be used to "explain a single minority candidate's victory," the Supreme Court's comment regarding such circumstances "cannot be transformed into a legal standard which requires the court to force *each and every victory of several minority candidates* to fit within a prescribed special circumstance." *Id*. citing *Rollins v. Fort Bend Indep. Sch. Distr.*, 89 F.3d 1204 (5ᵗʰ Cir. 1996).

Plaintiffs seek to undermine the success of Drs. Courtney Graves and Donna Thurman in 2015 and 2014 due to 'special circumstances.' In other words, Plaintiffs would have the court ignore the two most recent elections in favor of older ones.[14] Considering the District's rapidly changing demographics, these elections are the best evidence of the District as it is today and not as it was in 2010. The evidence demonstrates Drs. Graves and Thurman's success is due to the work they put into their campaigns. These are not special circumstances but the result of two well-planned, highly qualified candidates that succeeded.

Plaintiffs proffer several reasons why they believe the 2015 election should not be considered. First and foremost, Plaintiffs claim the filing of the instant lawsuit somehow tainted the April 2015 election. Plaintiffs' claim is based on a statement in *Gingles* that "[n]othing in [Section 2] or its legislative history prohibited the [trial] court from viewing with some caution black candidates' success" in elections that occurred after the underlying action was filed. *Gingles*, 478 U.S. at 76. The District encourages the Court's cautious review of the 2015 election. A cautious review reveals absolutely no evidence from any fact witnesses that the filing of this lawsuit affected the election. A cautious review demonstrates that Plaintiffs' narrative is nothing more than speculation.

The 2015 election results clearly and convincingly speak for themselves. Dr. Courtney Graves won with one of the highest vote totals ever achieved by any candidate in the period for

---

[14] At the same time, Plaintiffs argue earlier that recent elections are most probative.

which data are available.  She was the clear first choice of African American voters but also received significant white support.  A large part of her success can be explained by the fact that she explicitly encouraged voters to bullet vote.  While the evidence demonstrates that several candidates and voters have utilized bullet voting, Dr. Graves was very effective using this known strategy for increasing the relative weight of a voter's choice.  The fact that she used a universally available tool better than others had in the past should not require elimination of her success.

Plaintiffs also claim the Michael Brown shooting and subsequent protests somehow impacted the candidate pool that ran for election.  However, when asked in deposition how the candidate pool was affected, Plaintiffs' expert Dr. Engstrom admitted it "may" have been influenced because some unknown candidates "may" have been encouraged not to run.

In addition, Plaintiffs seek to eliminate the 2014 election from the Court's consideration. Plaintiffs claim 2014 was the result of special circumstances because the former superintendent, Art McCoy, resigned the month prior.  While the evidence indicates the electorate was polarized that year, it does not indicate a difference in turnout.  Plaintiffs merely seek to eliminate this election from the Court's consideration because an African American preferred candidate was elected.

Plaintiffs' tactic to eliminate disadvantageous elections is based on speculation.  The Court should view these arguments with a cautious lens.  Plaintiffs cannot admit that the elections of Drs. Donna Thurman (2014) and Courtney Graves (2015) are the result of the strength of their candidacies and campaigns.  Nor can Plaintiffs admit that this trend is the new norm.  Any such admission disproves their case.

Plaintiffs cannot meet the third *Gingles* precondition for several reasons.  The most obvious reason is that the factor requires a "white majority."  The evidence is undisputed that whites have not been a majority since the 2000 decennial census was published.  The next question is whether and how does the minority "thwart" a larger voting populace.  Obviously, it cannot.  Finally, casting these issues aside, African American candidates have been successful in the District.  The evidence demonstrates that when the Court conducts a comprehensive analysis of the District's history, it will find that there is no current and no past violation of the Voting Rights Act.

### D. Plaintiffs have not met their burden for any of the *Gingles* preconditions.

Plaintiffs cannot meet any of the three required preconditions established in *Gingles*.  The first precondition cannot be met because the AP BVAP is already a majority of the District's voters and the single-race BVAP is a plurality.  Further, Plaintiffs have not provided the Court with a workable remedy in that single member districts are inferior to the current winner-take-all, at-large system.  Yet, even if single-member districts are considered, Plaintiffs' Illustrative Plans will result in the net loss of at least one of the current African American preferred incumbents.

Plaintiffs cannot meet the second or third *Gingles* preconditions either.  The facts demonstrate that African American and white voters do not have distinct preferences.  Instead, African American and white voters preferred the same candidates 66% of the time since 2000.  This indicates a lack of cohesion among African Americans that defeats *Gingles* 2.

The third precondition establishes that African American preferred candidates are not usually defeated.  When the Court considers all of the evidence, it will find there is no "white majority" that defeats African American preferred candidates.  Census data indicates the last time whites held a majority was in the 2000 decennial census.  Sometime between 2000 and

2010, that majority status dropped below 50% of the VAP. In addition, African American preferred candidates have been and continue to be successful.  The facts demonstrate that African American voters were proportionally represented from 2000 – 2010 and are either currently proportionally represented, if the Court relies on the older 2010 census, or are poised to win every seat under the current system.

**E. The totality of the circumstances demonstrates that African Americans' votes are not diluted.**

**a. Totality of the Circumstances Standard.**

Once the preconditions are met, Section 2 plaintiffs must further show that, under the 'totality of the circumstances, vote dilution has occurred because the challenged plan denies minority voters equal political opportunity.  *Stabler v. County of Thurston*, 129 F.3d 1015, 1020 (8th Cir. 1997).  A voting procedure violates Section 2 if it has the "result" under the "totality of the circumstances" of affording minority voters less opportunity than white voters "to elect representatives of their choice."  *Id*.

Because the court must conduct a "searching practical evaluation of the past and present reality" of the challenged electoral system in operation, (*Gingles*, 478 U.S. at 45) the types of evidence that would be relevant under this standard plainly defy categorization.  Instead, a court gradually draws together a picture of the challenged electoral scheme and the political process in which it operates by accumulating pieces of circumstantial evidence.  Like a Seurat painting, a portrait of the challenged scheme emerges against the background of the voting community. Only by looking at all of the dots on the canvas is a district court able to determine whether vote dilution has occurred.  A court should not exclude certain types of relevant evidence - certain colors on the canvas - from its examination if doing so would leave an incomplete view of the

circumstantial evidence picture. A piece of evidence is irrelevant only if, after the receipt of that evidence, the existence of a fact appears no more or less probable than it did before that evidence was offered. That is, an item of circumstantial evidence is irrelevant only if it does not allow the trier of fact reasonably to infer anything about whether or not the voting strength of the minority group has been impermissibly diluted." *Nipper v. Smith*, 39 F.3d 1494, 110 (11th Cir. 1994.)

As Plaintiffs point out, it is the unusual case when plaintiffs can establish the three *Gingles* factors but fail to establish the totality of the circumstances. The instant case certainly qualifies as unusual. In fact, Plaintiffs' own Dr. Engstrom explicitly admitted that a VRA case where the black VAP and the white VAP are roughly identical is unusual.

First, this case involves a white minority and African American majority and plurality. That alone separates it from most Voting Rights Act claims. Second, African Americans have held proportional representation for most of the last fifteen years. When African Americans were 32.51% of the BVAP in the 2000's, African American preferred candidates held near proportional representation of 1.9 seats for 27% of the board's voting power. If the Court relies on the old 2010 decennial census statistics for African American VAP, then African Americans maintain proportional representation now with three preferred board members. If the Court relies on the most recent statistics, then African American voters are poised to control the entire board. This case is anything but typical.

While the District's demographics separate it from the majority of VRA claims, the extent of the evidence proffered in the totality of the circumstances is also unusual. The parties disagree on all of the nine Senate Factors. In addition, the District offers evidence of exogenous elections both within and outside the District for the Court to use as a comparison.[15] Evidence

---

[15] Exogenous elections are elections in a district for positions that are not exclusively representative of that district, such as governor and attorney general. *Bone Shirt*, 461 F.32d 1018, footnote 9.

from exogenous elections is helpful for the following reasons.  The exogenous races that involve only District voters allow the Court to compare the success of African American candidates in an easier one-on-one campaign.  The exogenous comparison to the Hazelwood School District demonstrates that a slim African American voting majority can result in a majority African American board in an at-large system.

The instant case is certainly unusual.  If the Court is not convinced by the preconditions that the District does not violate the VRA by following the state-mandated at-large system, the totality of the circumstances test will assuage any doubts.

### b. Past History of Discrimination Affecting Voting.

The first Senate Factor is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process." *Bone Shirt*, 461 F.3d at 1021.

The parties dispute the plain language of this factor.  The District maintains that the words speak for themselves and that this factor is in two parts.  First, there must be a "history of official discrimination."  Second, that history must have "touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process." *Id*. Plaintiffs maintain that the second part of the factor is unnecessary and history alone will suffice.

Plaintiffs must prove the history of discrimination acts to "hamper the ability of minorities to participate," to support a finding that the history of discrimination effects African Americans' voting today.  *League of United Latin Am. Citizens, Council No. 4434 (LULAC IV) v. Clements*, 999 F.2d 831, 866 (5th Cir. 1993).  The District does not dispute the racial history of the St. Louis region.  As Plaintiffs rightly point out, the Dred Scott case was decided here 158 years ago and the District cannot ever change that.  However, a distant and indelible past cannot

taint the present forever.  Evidence of an alleged history of discrimination that is "too remote in time to establish a present impediment to minority participation in the political process" is not sufficient.  *Barnett v City of Chicago*, 969 F. Supp. 1359, 1446 (N.D. Ill. 1997) (examining 25-year old event), *rev'd in part on other grounds.*

Plaintiffs offer *Harvell v. Blytheville* as support that they need only provide historical evidence to prove this factor.  Plaintiffs fail to point out that the *Harvell Court* already had significant evidence of low minority turnout (i.e. evidence that history touched the right to participate) from which to evaluate.  In addition, the Eighth Circuit in *Bone Shirt* specifically found, "The vestiges of this discrimination remain, dampening Native-American interest in South Dakota politics and affecting the ability of Native-Americans to register, to vote and to participate in the electoral process."  *Bone Shirt*, 461 F.3d at 1022.  In other words, the more recent Eighth Circuit case requires a link from the past to the present to succeed on this factor.

Plaintiffs provide no evidence of voter registration or participation in the District.  Plaintiffs did analyze voter turnout in the 2014 election and found the relationship between race and turnout "weak."  Dr. Rodden found no significant differences between a voters' race and turnout in the 2012, 2013 and 2014 elections.  In other words, there is no evidence that any historical vestiges remain.

Plaintiffs' evidence of a history of discrimination is based on their expert, Dr. Gordon's findings.  Dr. Gordon wrote a book in 2008 that discusses "broad historical conclusions" of the entire St. Louis region that go back to the early part of the 20th Century.  However, Dr. Gordon does not delineate between the District and the region because his book did not involve the District.  Most of Dr. Gordon's report is taken word-for-word from his book.

An example of Dr. Gordon's failure to pay particular attention to the District is that he claims Canfield Green Apartments is within the Ferguson Florissant School District.  Anyone familiar with the region knows that Canfield Green is in the Normandy School District.[16] Plaintiffs' lack of regional knowledge renders their historical descriptions suspect.

Plaintiffs fail to meet their burden to prove a "history of official discrimination …that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process."  *Bone Shirt*, 461 F.3d at 1021.  The history Plaintiffs provide is circumspect and the link from past discrimination to present participation is void. Plaintiffs simply fail to meet their burden.

### c. Racially Polarized Voting

The second Senate Factor is the extent to which voting in the elections of the state or political subdivision is racially polarized.  See, *Bone Shirt*, 461 F.3d at 1021.  "Evidence of political cohesiveness is shown by minority voting preferences, distinct from the majority, demonstrated in actual elections." *Id*. at 1020.

It bears repeating that the "minority" in this case is white voters and the question is whether the white minority has distinct voting preferences from the African American majority. African American and white voters prefer at least one of the same candidates in a vast majority (83.3%) of elections, and more than 40% of successful candidates have been preferred by both races.  African American and white voters routinely cast a majority or near-majority of their votes for candidates preferred by the other racial group.  In the 2012 and 2013 elections, precincts with heavy concentrations of African American voters cast less than half their votes for an African American candidate (P. Morris in 2012 and Henson in 2013).  In 2012, these same

---

[16] This Apartment Complex is well known as the home of Michael Brown.  Brown was a recent graduate of the Normandy School District when he was shot.

precincts cast 60% of their votes for white candidates and 40% in 2013.  Notably, Plaintiffs have

not argued that the 2012 or 2013 elections were influenced by special circumstances.

Additionally, current and former Board members have all consistently testified that voters

choose their candidates based on qualifications, not race.  Finally, the number of African

American preferred candidates who lost by something more than a razor-thin margin (11) is

actually less than the number of African American preferred candidates who have prevailed (13).

A "searching and practical evaluation of the past and present reality" and "intensely local

appraisal" establishes that the second Senate Factor weighs in favor of the District.  *Gingles*, 478

U.S. at 79.

### d. The Use of Enhancing Practices.

The third Senate Factor is "the extent to which the state or political subdivision has used

unusually large election districts, majority vote requirements, anti-single shot provisions, or other

voting practices or procedures that may enhance the opportunity for discrimination against the

minority group." *Bone Shirt*, 461 F.3d at 1021.  There is no allegation that the District utilizes

unusually large election districts, a majority vote requirement,[17] or anti-single shot provisions.

Instead, Plaintiffs allege the at-large voting structure; staggered terms; and off-cycle (i.e. April

versus November) elections enhance the opportunity for discrimination.

The District directs the Court to Plaintiffs' striking lack of evidence.  Plaintiffs never

offer evidence that the at-large electoral system harms the largest group of voters.  In contrast,

Plaintiffs' own Drs. Engstrom and Kimball have testified the at-large system helps the largest

group of voters.

---

[17] The District's at-large structure allows for the candidate that receives the most votes to win.  The winner is not required to have over 50% of the vote, as is required in some at-large structures.

Plaintiffs cite to *Blytheville* that says "the at-large structure ..tend[s] to suppress minority voters' influence." *Blytheville*, 71 F.3d at 1390.  This statement supports Defendant's entire case and proves Plaintiffs cannot meet the *Gingles* preconditions.  In this case, the at-large system tends to suppress the *white minority's* influence.  While this general statement of law typically helps plaintiffs in typical Voting Rights Act cases, the statement as applied to these Plaintiffs is fatal.

Furthermore, the board members that were asked whether they prefer the at-large system to single-member districts all testified they support the current system.  That includes the African American preferred and white preferred board members.  The facts indicate that board members believe at-large elections are better because it prevents school board members from fighting for the schools in their own backyard and that it ensures that every community is represented.  Board members testified that single-member districts would be divisive.  Dr. Thurman, African-American, went as far to say that single member districts would "segregate the community."  Surely a return to segregation was not the intent of the Voting Rights Act.

Plaintiffs' argument regarding staggered terms is similarly flawed.  Plaintiffs cite, "[S]taggered terms[] and at-large structure also tend to suppress minority voters' influence." *DeGrandy*, 512 U.S. at 1018.  When read in the context of this suit, staggered terms tend to suppress white minority voters' influence.

The evidence indicates that staggered terms were initially imposed to provide stability to the board.  Board members testified that staggered terms still promote stability.  Every board member asked favors staggered terms because it allows for institutional memory and stability.  One board member testified that an entirely new board would be "disruptive."

Finally, Plaintiffs argue that off-cycle elections, meaning elections that occur in a month other than November, enhance the opportunity for discrimination because they generate low voter turnout and increase the influence of groups like the Ferguson Florissant National Education Association ("FFNEA") and the North County Labor Organization. ("North County Labor").  As for low voter turnout, the evidence indicates relatively low voter turnout for both races.  Since African Americans are the largest group of voters, off-cycle elections are not more harmful to them than to white voters.

Plaintiffs also claim that off-cycle elections increased the influence of outside groups like the FFNEA and North County Labor.  The evidence does not support that.  The evidence indicates that the African American FFNEA candidates most recently endorsed were unsuccessful (Savalla and Hines); and the candidates not endorsed have won (Drs. Thurman and Graves).  There is no indication that the FFNEA's endorsement is influential or even helpful to African American candidates. Nor is there evidence that their influence is increased through April elections.

Plaintiffs fail to point out that Missouri allows bullet voting, a practice that tends to enhance African American voting strength.  Bullet voting (sometimes referred to as single-shot voting) is defined as "a practice by which voters can direct their votes to a single candidate running in a multi-member district, and choose not to cast their remaining votes for other candidates running at the same time.  Doing so increases the relative weight of their votes by reducing the number of votes other candidates receive." Senate Report No. 97-417 (1992), 27-30.  Dr. Graves made bullet voting an explicit part of her campaign in 2015 and won with more votes than any other candidate.  Bullet voting weighs in favor of the District's current electoral system.

The most striking lack of evidence under this factor is a complete lack of comparison between voter turnout in the April and November elections.  Plaintiffs claim that the April elections disproportionately harm African American voters.  Yet Plaintiffs fail to provide evidence of such.  Nor do they provide evidence of whether and how much African Americans in the District turn out and participate in November.  While the District concedes that November elections are generally higher turnout, that concession is based on politics nationally and not on the District specifically.  Plaintiffs must prove their case.  They cannot prove that April elections have a disproportionate impact without evidence and a comparison.  Plaintiffs have absolutely no evidence.

The evidence for Senate Factor three is decisively in Defendant's favor.  The at-large structure helps the largest group of voters (African Americans) and tends to suppress the (white) minority.  Witnesses testify there are legitimate reasons to hold at-large elections with staggered terms.  The at-large election allows board members more opportunity to represent the entire district and staggered terms provide institutional memory and stability. Plaintiffs cannot prevail on this factor.

### e. Candidate slating process.

The fourth Senate Factor is "if there is a candidate slating process, whether members of the minority group have been denied access to that process." *Bone Shirt*, 461 F.3d at 1021.  The District maintains there are no organizations that meet the legal definition for having a 'slating process.'  But even if there were, minorities have not been denied access.

"A "slating group" is a group of individuals who select candidates to run as a bloc to fill seats which are currently up for election."  *Clay*, 896 F.Supp. at 933.  Similarly, slating has been defined as "the creation of a package or slate of candidates, before filing for office, by an

organization with sufficient strength to make the election merely a stamp of approval of the pre-ordained candidate group." *Overton v. City of Austin*, 871 F.2d 529, 534 (5th Cir.1989) (emphasis added).   Plaintiffs erroneously claim that the Ferguson Florissant National Education Association ("FFNEA") and the North County Labor Club ("North County Labor") have a slating process.

The FFNEA does not qualify as a slating group.  The evidence indicates that <u>after</u> a candidate has filed for office, he or she may apply for the FFNEA endorsement.  The FFNEA does not select individuals to run for the school board; nor does it "run" individuals as a bloc.  The FFNEA merely endorses candidates that the membership believes are "teacher friendly."

The process for the FFNEA endorsement is open to every candidate.  Once a candidate has declared his/her candidacy, the FFNEA sends the candidate a letter inviting that person to apply for the endorsement. The candidates are sent a questionnaire with every question that will be asked in the endorsement interview.  Every candidate that wants an interview receives one.  The FFNEA forms a racially diverse committee to interview and to make an initial endorsement decision.  Once the committee has made its initial decision, the committee puts the candidates' names before the FFNEA membership for a vote.

In the 2011 election, the FFNEA chose not to endorse Doris Graham because she voted against a raise for teachers and all other employees of the District.  Her race was not a consideration.  In fact, she had been endorsed by the FFNEA in earlier elections prior her to controversial vote before the 2011 election.  In 2014, the FFNEA failed to endorse Plaintiff Johnson because of his stance on class size.  The FFNEA has a strong stance on the issue of class size and the committee disliked his answer.

46

The 2014 election provides ample evidence that the FFNEA is not a slating organization. During that year, both Dr. Thurman and Mr. Savalla applied for the endorsement.  Mr. Savalla, an unsuccessful African American candidate, received the endorsement.  Dr. Thurman, a successful African American candidate, did not.  Clearly, the FFNEA lacks "sufficient strength to make the election merely a stamp of approval."  *Overton*, 871 F.2d at 534.  Finally, it does not deny African Americans access to its process because it clearly endorses them when they are "teacher friendly."

The 2015 election provides the same evidence.  During that year, both Mr. Hines and Dr. Graves applied for the endorsement.  Mr. Hines, an unsuccessful African American candidate, was endorsed.  Dr. Graves, a successful African American candidate, was not.  Dr. Graves was extraordinarily successful and received one of the highest vote totals ever achieved by any candidate.  Obviously the FFNEA failed to "pre-ordain" Mr. Hines.  He was unsuccessful.  In contrast, Dr. Graves was the resounding winner without the endorsement.  The FFNEA does not have the strength to determine the outcome of elections and is not a slating organization.

Many of the same problems exist for Plaintiffs' claims about North County Labor.  First, there is no evidence that North County Labor recruits candidates.  Second, there is no evidence that either North County Labor or the FFNEA always endorse candidates for every seat and every election.  Third, there is no evidence that these candidates are "run" by either organization.  Instead, the evidence indicates that each individual candidate runs his/her own campaign.

Finally, what is most troubling about Plaintiffs' claim that African Americans are excluded from the alleged slating process is that Plaintiffs do not have the evidence to make that conclusion.  Plaintiffs' expert, Dr. Kimball, admits that he does not know how many African Americans applied for the FFNEA and North County Labor endorsements.  He never kept track

of applications, only the actual endorsement.  Thus, Plaintiffs mislead the Court with percentages of African Americans endorsed as if they knew how many African Americans actually applied.

This deception is even more pronounced as it relates to North County Labor.  The evidence indicates that Dr. Graves, Dr. Thurman and Plaintiff F. Willis Johnson all failed to apply for the North County Labor endorsement.  Obviously, Drs. Graves and Thurman were successful despite their lack of application and endorsement.  North County Labor does not have the strength to pre-ordain candidates and Plaintiffs' claim that African Americans are excluded from the process is disingenuous.

On summary judgment, Plaintiffs claimed it was irrelevant that African Americans failed to seek the endorsement.  Plaintiffs claim the only relevant determination is whether African Americans received the endorsement.  The District is at a loss to explain how an African American could be endorsed when he/she failed to seek it.

The evidence on this factor is again in the District's favor.  Neither organization recruits candidates.  Neither organization pre-ordains candidates.  Neither organization has the strength to ensure that its endorsed candidates win or that candidates it did not endorse lose.  Neither organization runs the individual candidates' campaigns.  Thus, neither organization has a slating process, nor is there sufficient evidence that they exclude African Americans even if they did.

### f. Socioeconomic factors that hinder African Americans' ability to participate.

The fifth Senate Factor is "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Bone Shirt*, 461 F.3d at 1021.  As with the first Senate Factor, this factor is in two parts: 1) the extent

to which the minority group bears the effects of discrimination; and 2) whether that hinders their ability to participate effectively in the political process. *Id.*

Plaintiffs did not offer evidence to establish this factor. Plaintiffs combined three experts' analysis but neither one of them in isolation or in combination allow them to prevail. Plaintiffs' evidence on this factor is flawed in three ways. First, Dr. Gordon's analysis is a sweeping generalization of the St. Louis Metropolitan Region, state of Missouri and even the entire country. Yet, he fails to specifically analyze or compare this information to the Ferguson Florissant School District. While these sweeping generalizations were the topic of his 2008 book, they are not the topic of the instant litigation. Second, unlike Dr. Gordon, Mr. Cooper offers a myopic snapshot of the District according to the 2011 – 2013 ACS. While this information is specific to the District, it does not place the District in perspective. For example, Cooper fails to relate that African Americans are better off under many socioeconomic indicators than African Americans in the St. Louis Metropolitan region and in the state of Missouri. Third, as with Senate Factor one, Plaintiffs' evidence is flawed because it does not indicate how these socioeconomic indicators hinder African American's ability to participate in the political process.

The evidence indicates that African Americans in the District are better off than African Americans in the St. Louis Metropolitan region and in the state of Missouri in areas of income, wealth, median household income, government assistance ("SNAP"), high school graduation, some college and obtaining a bachelor's degree. The majority of African Americans in the District are homeowners. Thus, while there is disparity between the races, the gap is smaller in the District than in the relevant benchmark regions. Plaintiffs' failure to provide the appropriate

comparison of socioeconomic indicators is telling.  Plaintiffs' three experts tell an incomplete story because the complete one indicates they do not meet their burden.

Plaintiffs respond to this comparison by claiming that it is "beside the point."  However, Plaintiffs' historian expert, Dr. Gordon, continuously paints the District with the broad brush of the region.  He even admits that the St. Louis Metropolitan Region is the most relevant benchmark for socioeconomic statistics.  In fact, Dr. Gordon provides a table in his first report that compares the St. Louis Metropolitan Region with the District in a "quick snapshot" of socio-economic indicators he deems relevant.  Thus, while Plaintiffs vehemently oppose any evidence that African Americans in the District are better off than in the region and state, their own expert defies that opposition.

In addition, Plaintiffs still fail to provide the Court with evidence that any disparity hinders African Americans' "ability to participate effectively in the political process."  Plaintiffs have the same lack of evidence in this factor as they did with the first Senate Factor. They simply do not provide the Court with evidence of low voter registration and participation.  Instead, the evidence indicates there is no significant relationship between the race of the voter and turnout.

There are two main flaws with Plaintiffs' Senate Factor five arguments.  First, Plaintiffs fail to place socioeconomic disparities in context.  Second, Plaintiffs fail to link any disparities to African Americans' ability to participate in the political process.  Plaintiffs would have the Court infer that despite the fact that African Americans are better off in the District than in the region, generic research indicates that any disparity means depressed participation.  Plaintiffs have no evidence of African American participation (depressed or otherwise) or registration (depressed or otherwise) from the District.  Plaintiffs' argument on the fifth Senate Factor must fail.

### g. Overt or subtle racial appeals.

The sixth Senate Factor is "whether political campaigns have been characterized by overt or subtle racial appeals." *Bone Shirt*, 461 F.3d at 1021.  As Plaintiffs indicate, racial appeals can include the use of racially-charged campaign tactics and the highlighting of racially-charged campaign issues "that prey on racial anxiety." *United States v. City of Euclid*, 580 F.Supp.2d 584, 610, 613 (N.D. Ohio 2001).

In U.*S. v. City of Euclid*, 580 F.Supp.2d 584, 610 (2008), the District court held that "Racial appeals can take a variety of forms, from the use of racially-charged campaign issues to candidates using photographs of their African-American opponents on their campaign literature. The use of racially-charged campaign issues, such as campaign literature that preys on racial anxiety, is a well-recognized form of racial appeal." In *Euclid*, the plaintiffs presented two pieces of campaign literature from different sources, 20 years apart, as evidence to support this factor. The Court held plaintiffs' evidence was not particularly compelling. *Id.*

Plaintiffs' main claims of subtle racial appeals include the argument that discussing discipline and school transfers equate to racism and that there were unsubstantiated personal attacks on a board candidate.  Plaintiffs do not provide any evidence of campaign literature or photographs.  They merely provide anecdotal evidence from the Plaintiffs themselves that they perceived certain conversations as racial.

Plaintiffs seek to take advantage of local politics by claiming that campaign issues that necessarily involve race actually "prey on racial anxiety" and are necessarily discriminatory. Curiously, Plaintiffs have claimed the District fails to deny these subtle racial appeals.  For that reason, the District's position will be abundantly clear.  The District denies that Plaintiffs'

examples of racial appeals are "racially-charged campaign tactics" that "prey on racial anxiety." *City of Euclid*, 580 F.Supp.2d at 610, 613.

In the case from the City of St. Louis, the *Clay* Court found, "..debate over issues such as busing and school desegregation reflects legitimate public concern, while also having an undeniable racial dimension.  Plaintiffs have not presented any evidence to suggest that such issues have been raised in an effort to appeal to members of a particular race.  The absence of evidence on this factor militates against plaintiffs, who bear the burden of proof." *Clay*, 896 F.Supp. at 943.

The instant Plaintiffs also attempt to utilize issues of legitimate public concern as evidence of racially charged campaign tactics.  In particular, Plaintiffs misuse the school transfer issue.  Plaintiffs accuse the District of discussing the school transfer issue in a way that assured whites that black students will not be transferring into the District. ("Indeed, many African Americans in the FFSD viewed candidates' statements about transfer student, and the District's treatment of transfer students, as an attempt by an all-white Board to stem any growth of the African-American student population.") ECF 84 at 62.

The evidence indicates that the school transfer issue occurred at a time of severe financial constraints in the District.  The Board's role as a supervisory governing body is to oversee the financial stability of the District.  The Board was obligated to consider the potential financial strain of absorbing additional students in the District.  The Board would have been delinquent in its responsibilities if it had failed to consider that.  Plaintiffs' "evidence" that the transfer issue "preyed on racial anxiety" is nothing more than a conversation by the Board about the potential impact of the students on the Board's finances.

Plaintiffs also complain that one or more candidates campaigned on the issue of school discipline.  Plaintiffs argue that discussing discipline is a "racially charged campaign tactic."  It is general knowledge that discipline is a common topic for school board members and candidates.  Furthermore, Plaintiff F. Willis Johnson, an unsuccessful African American candidate in 2014, admitted that he campaigned on discipline "quite a bit."  He testified that discipline is a "daily struggle" as a parent and is a "reality in every school corporation."  Dr. Thurman, a successful African American candidate in 2014 admits that she was motivated to run for the school board to address discipline.  While discipline and the school transfer issue may have "racial dimensions," they were not used to prey on racial anxiety.  Plaintiffs merely distort these issues of legitimate public concern.

Plaintiffs also claim that Plaintiff Johnson faced allegations implying that he was an absentee father and accusations that he was a renter not a homeowner.  The District cannot corroborate these allegations with other candidates or board members.  Furthermore, Plaintiff Johnson admits that he does not own the home he lives in.  He resides in a parsonage owned by the church.

Plaintiffs provide little to no evidence to support their contention that campaigns in the District have been characterized by overt or subtle racial appeals.  Most courts that find for the plaintiffs on this factor have some form of objective evidence such as literature, pictures or transcripts from which to draw.  Plaintiffs' claims of racism through uncorroborated anecdotal evidence and issues of legitimate public concern are insufficient to succeed on this factor.  See, *Cousin v. Sundquist*, 145 F.3d 818, 833 (1990) (isolated anecdotal evidence is insufficient to prove that racial appeals play any part in Hamilton County's political life.)

### h. Election of African Americans.

Senate Factor seven is "the extent to which African Americans have been elected to public office in the jurisdiction." *Bone Shirt*, 461 F.3d at 1021.  Plaintiffs argue this factor is satisfied because the number of African Americans on the Board is "disproportionately low" compared to the District's African American population.  However, this factor weights in favor of the District for multiple reasons.

First, Plaintiffs offer no analysis of the quality of the individual candidates, their campaigns, or the reasons for any losses other than race.  See, *Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995) ("…when racial antagonism is not the cause of an electoral defeat suffered by a minority candidate, the defeat does not prove a lack of electoral opportunity but a lack of whatever else it takes to be successful in politics (say failure to support popular programmatic initiatives or failure to reflect the majority's ideological viewpoints…")) Dr. Thurman, a successful African American candidate in 2014, did more than other African American candidates to win election.  For example, she attended all of the forums, on time, and without talking on the phone.  She also completed all of the paperwork to obtain free publicity and endorsements.

Dr. Thurman defeated Mr. Savala in 2014.  Savala was the second choice among African American voters and lost by only 91 votes.  The evidence indicates that Savala was not present at every forum and did not do as much door-to-door campaigning as Dr. Thurman.  That same year, Plaintiff Johnson was the third choice among African American voters.  Plaintiff Johnson lost his election by only 398 votes.  The evidence indicates that he talked on his cell phone during forums, failed to fill out the necessary paperwork for free publicity, and failed to attend campaign strategy meetings for the slate of African Americans that ran that year.  Considering

approximately 50% of the electorate consisted of African American voters and two African American candidates lost by very slim margins, the evidence dictates it was failure to take advantage of the opportunities afforded to them and not a systemic problem of racism. The totality of the circumstances analysis requires that the quality of the candidates and the campaigns they ran must be taken into account. See, *Rollins v Fort Bend Indep. Sch. Dist.* 89 F.3d 1205, 1220-21 (5th Cir. 1996) (discussing probative value of strength of candidates and their campaigns).

In 2011, a long-time incumbent, Doris Graham, lost re-election. In fact, every incumbent lost re-election that year. The evidence indicates that the electorate was angry at the incumbents for giving the former superintendent, Jeff Spiegel, lifetime health insurance. The board not only gave Spiegel lifetime insurance, but afforded that benefit to his wife as well. While Plaintiffs would interpret Graham's loss as an indictment on the electoral system, the evidence indicates the electorate blamed her for voting in favor of lifetime health insurance. Every single incumbent lost that year, not just the African American. See, *Uno*, 72 F.3d at 981, loss due to failure to reflect the majority's ideological viewpoints is not the result of racial antagonism.) That same year, Hawkins lost by only 190 votes. She received 93.83% of the votes received by the third-place candidate. The following year, Henson lost by 125 votes. The evidence indicates that he received 94.4% of the votes received by the second-place candidate.

*Second*, Plaintiffs ignore the number of African American preferred candidates currently serving on the Board. Drs. Graves and Thurman were elected in 2015 and 2014, respectively, and were the top-ranked candidates among African Americans. Additionally, Hogshead was elected in 2013 after receiving the second-highest percentage of African American votes. Thus, three out of seven (43%) of the District's Board members are minority preferred candidates. If

the Court relies on Plaintiffs' single-race black voting age population in 2013 as 48.94% of the

District's voters, African Americans' representation is roughly proportional to their voting age

population.[18] *Clay*, 896 F. Supp. at 944 ("In *Johnson v. DeGrandy*, the Supreme Court indicated

that even if a plaintiff succeeds in establishing the *Gingles* preconditions, a defendant may be

able to defeat a §2 claim by showing that the minority group in question **has achieved, or will**

**achieve**, substantially proportional representation under the challenged districting plan.

However, proportionality is only one factor in the totality of circumstances. ….While

proportionate representation on the Board is not a "safe harbor" in and of itself, in this case, the

sustained electoral success by minority-preferred candidates in Board elections is simply

inconsistent with a §2 violation.")

   *Third*, African Americans maintained roughly proportional representation from 2000 -

2010.  The 2000 decennial census indicates the single-race African American voting age

population was 32.61% of the District's voting age population.  Plaintiffs submit that there have

been 1-2 African Americans (not including non-African Americans that are minority preferred

candidates) on the Board since 2000.  In fact, 2006-2007 was the only year the Board had only

one African American member.  Thus, for the majority of the decade, a minimum of the board

was 28% African American for 32.6% of the voting age population.[19]

   *Fourth*, exogenous races indicate that African American candidates have achieved

tremendous success in the District. "Although they are not as probative as endogenous elections,

exogenous elections[20] hold some probative value." *Bone Shirt*, 461 F.3d at1018.  In *Bone Shirt*,

---

[18] Defendant maintains this calculation is overly restrictive and in error. However, Plaintiffs cannot prove vote dilution even using that calculation.
[19] This is a rough calculation based on the number of African American VAP and not on the number of African American preferred candidates.  Therefore, the actual number of minority preferred candidates could be higher.
[20] Exogenous races are elections in a district for positions that are not exclusively representative of that district, such as governor and attorney general.  *Bone Shir*t, 461 F.3d 1018 footnote 9.

the Court found that in two exogenous, interracial elections, the Indian-preferred candidate lost because the white majority was able to vote as a bloc to defeat them.  The Court found that it was only in exogenous elections between white candidates that Native Americans were able to elect their preferred candidate. *Id*. at 1018.

Evidence from exogenous elections in the District overwhelmingly supports the conclusion that African American candidates are successful in the District.  *See Meza v. Galvin*, 322 F. Supp. 2d 52, 72 (D. Mass. 2004) (acknowledging the relevance of minority candidate success in exogenous elections within the context of the seventh Senate Factor).

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**Table 2 – Various election results aggregated to the level of the Ferguson-Florissant School District**

| Contest | Month | African-American Candidate | White candidate |
|---|---|---|---|
| 2008 Presidential Democratic Primary | February | Barack Obama 70.3% | Hillary Clinton 29.7% |
| 2008 Presidential General | November | Barack Obama 76.5% | John McCain 23.5% |
| 2008 U.S. Congress General | November | William Lacy Clay 84.6% | Robb Cunningham 15.4% |
| 2010 County Executive Democratic Primary | August | Charlie Dooley 80.0% | Ronald Levy 20.0% |
| 2010 County Executive General | November | Charlie Dooley 70.7% | Bill Corrigan 27.0% |
| 2010 U.S. Congress Democratic Primary | August | William Lacy Clay 78.9% | Candice Britton 21.1% |
| 2010 U.S. Congress General | November | William Lacy Clay 69.8% | Robyn Hamlin 27.1% |
| 2012 U.S. Congress Democratic Primary | August | William Lacy Clay 65.0% | Russ Carnahan 32.6% |
| 2012 U.S. Congress General | November | William Lacy Clay 78.5% | Robyn Hamlin 21.5% |
| 2012 Presidential General | November | Barack Obama 77.9% | Mitt Romney 22.1% |
| 2014 County Executive Democratic Primary | August | Charlie Dooley 50.7% | Steve Stenger 49.3% |
| 2014 U.S. Congress General | November | William Lacy Clay 73.0% | Daniel Elder 27.0% |

*Fifth* and finally, the Hazelwood School District demonstrates that a school district with similar demographics and an identical electoral structure can elect a majority African American board.  The FFSD and Hazelwood maintain identical electoral structures.[21]  Both Districts elect

---

[21] The seven-member, three year terms are established by Section 162.261 RSMo.

board members in April.[22]  The Districts share geographic boundaries.[23]  African Americans hold

four of the seven seats on the Hazelwood School Board.

**Table 3 – Demographic Comparison of Ferguson-Florissant and Hazelwood School Districts**

|  | Ferguson-Florissant | Hazelwood |
|---|---|---|
| **Total VAP** <br> **2010 Census** | 50,771 | 89,529[24] |
| **Single race Black VAP** <br> **2010 Census** | 24,030 (47.335%) | 42,913 (47.93%)[25] |
| **AP Black VAP** <br> **2010 Census** | 24,466 (48.19%) | 43,659 (48.77%)[26] |
| **Total VAP** <br> **2011-2013 3-year ACS** | 49,679 | 94,167[27] |
| **Single-race Black VAP** <br> **2011-2013 3-year ACS** | 24,313 (48.94%) | 47,224 (50.15%)[28] |

The above table demonstrates that voters in a similar electoral structure, with similar

demographics and similar geography can elect a majority African American board.  In 2010, the

single-race Black VAP and Any Part ("AP") Black VAP was nearly identical for the Ferguson-

Florissant School District and Hazelwood.  According to the 3-year American Community

---

[22] Section 115.121 RSMo.

[23] The District requests the Court take judicial notice of this fact. However, the District will supplement with maps from the Board of Elections if necessary.

[24] Source: Single Years of Age and Sex: 2010 (2010 Census Summary File 1) (QT-P2), http://factfinder.census.gov/bkmk/table/1.0/en/DEC/10_SF1/QTP2/9700000US2913830

[25] SEX BY AGE (BLACK OR AFRICAN AMERICAN ALONE) Universe: People who are Black or African American alone  more information 2010 Census Summary File 1 (P12B) http://factfinder.census.gov/bkmk/table/1.0/en/DEC/10_SF1/P12B/9700000US2913830

[26] RACE FOR THE POPULATION 18 YEARS AND OVER Universe: Population 18 years and over  more information 2010 Census Summary File 1 (P10) http://factfinder.census.gov/bkmk/table/1.0/en/DEC/10_SF1/P10/9700000US2913830

[27] SEX BY AGE Universe: Total population  more information 2011-2013 American Community Survey 3-Year Estimates (B01001), http://factfinder.census.gov/bkmk/table/1.0/en/ACS/13_3YR/B01001/9700000US2913830

[28] SEX BY AGE (BLACK OR AFRICAN AMERICAN ALONE) Universe: People who are Black or African American alone  more information 2011-2013 American Community Survey 3-Year Estimates (B01001B) http://factfinder.census.gov/bkmk/table/1.0/en/ACS/13_3YR/B01001B/9700000US2913830

Survey in 2013, the difference in the single-race Black VAP in Hazelwood and in the District was less than 1.5%. And yet, Hazelwood re-elected an African American Board member in 2015 (Desiree Whitlock), another African American Board Member in 2014 (Brenda Youngblood), and two more African American Board members in 2010 (Karlton Thornton and Cheryl Latham) who were reelected without opposition in 2013.

"The essence of a submergence claim is that a minority group prefers candidates whom they could elect were it not for the interaction of the challenged electoral law or structure with a white majority that votes as a significant bloc for different candidates." *Gingles*, 478 U.S. at 68. As reiterated throughout this brief, there is no white majority. The current board maintains three African American preferred board members. In 2014, two African American preferred candidates lost by very slim margins with a multitude of non-racial reasons to explain their losses. In 2011 one African American board member lost because she voted against the wishes of her electorate. These losses are not due to the at-large system and are not the result of the interaction between the at-large system and the "white majority." These losses do not indicate a Voting Rights Act violation.

### i. Lack of Response to the Needs of the African American Community.

"Two additional factors are also probative in determining whether Section 2 was violated: (1) was there a significant lack of response from elected of officials to the needs of the minority group, and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous." *Bone Shirt,* 461 F.3d at 102. Plaintiffs have referred to these additional factors as Senate Factors 8 and 9. For clarity, the District will do the same.

The evidence indicates the District board has responded to and continues to respond to the needs of the African American community. Current indications of the board's response to

the needs of the African American community include hiring the new African American superintendent, Dr. Joe Davis.  In making the decision to hire him, the board held three sets of forums for parents and constituent to hear the top two candidates speak.  As Dr. Thurman testified, the board ultimately hired the best person for the job "who happens to be African American."

Plaintiffs argue the Board's recent hire of an African American superintendent after this lawsuit was filed *does* absolve it of its lack of responsiveness.  ECF 106 at 15.  The District presumes this was a Freudian slip.  Instead, Plaintiffs complain the District did not respond to parents' complaints that occurred at the forums to hire Dr. Davis.  It is unclear what these complaints were or how Plaintiffs could have received a better outcome.  The board hired the best qualified applicant, an African American.

In addition, board member testimony demonstrates that the Board responds positively to concerns for racial awareness.  See, *Solomon v. Liberty County, Florida*, 957 F.Supp. 1522, 1567 (N.D. Fla. 1997) ("Blacks have no problem approaching county commissioners, and even those commissioners elected from other residential districts, listen to their complaints and are responsive to their needs.")  Dr. Thurman has testified that the board has responded positively when she has added her perspective.

Finally, while Plaintiffs repeatedly highlight the turmoil in the wake of the Michael Brown shooting, they fail to acknowledge the District's board made provisions for its students and staff to address the issue.  The Board acted to protect its students after the shooting and hired counselors for faculty, staff and students in order to make them feel safe.

Plaintiffs' Complaint and subsequent motions make it clear they made up their minds about the controversy involving Dr. Art McCoy before having the evidence.  At this point,

61

they've dug too deeply to change.  At the time of the events, the Board would not and could not release the details surrounding his suspension.  The Board has a policy not to discuss personnel matters and they adhered to that.  Furthermore, a joint statement by Dr. McCoy and the Board indicates that his resignation was not racially motivated.

Plaintiffs' claims on this issue are disingenuous at best.  Plaintiffs are fully aware that the release of this information was the subject of a Motion to Compel in the instant case.  While Dr. McCoy's counsel would not allow the release of all of the information, she did consent to release of the events that led up to his resignation.  That information reveals that Dr. McCoy lied to the board and misrepresented his role in hiring for a position the board had eliminated.

While Plaintiffs are vehement that Dr. McCoy's resignation was racially motivated, Plaintiff Johnson admitted that he never actually asked Dr. McCoy about the events surrounding his suspension and resignation.  Johnson admits he is friends with Dr. McCoy and that he supported Dr. McCoy.  Yet curiously, he never asked the man himself why he was suspended.  Johnson also supports the Board's decision to honor its agreement with McCoy not to release information to the public if that was the parties' agreement.

The legal standard is a "significant" lack of response to the needs of the African American community.  Plaintiffs do not and cannot meet this standard.  The evidence indicates that the Board does respond to the needs of the African American community.  The failure to explain a personnel decision that has since been explained does not rise to the level of "significant," especially in light of the affirmative response the board continues to make to the African American community now.

**j. The District's policy for using the current boundaries.**

Senate Factor nine is whether "the policy underlying the jurisdiction's use of the current boundaries is tenuous."

The current electoral system was established by Missouri statute.  See, Sections 162.291, 162.341 and 162.261 RSMo.  The District did not create the at-large system.  It is merely following state mandate.  Plaintiffs fail to acknowledge the District would be in violation of state law if it did not conduct elections in this manner.

Defendant will not re-iterate its argument from above about the benefits of the current system, it merely points out that it has no choice in the matter.

However, along with the benefits of the current system established above, Courts have concluded the at-large system is helpful to school districts.  In *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2nd 740 (N.D. Ohio 2009), Judge O'Malley "independently conclude[d]" that there were "legitimate, non-discriminatory justifications for the use of both at-large elections and staggered terms" for school districts including that at-large elections are

> "Important to school boards because the types of issues those boards address require district-wide support or accountability.  For example, school boards must determine whether to close a particular school and how to obtain approval for tax levies.  Geographic partisanship would make such decisions far more difficult and, at times, even impossible.  Indeed, use of at-large districts appears more important to school boards than other elected bodies, because unlike other political structures, school boards exist for the precise purpose of cultivating this consensus and shielding the provision of education from the clash of political conflict."

## IV. CONCLUSION

Plaintiffs cannot prevail on one of the three *Gingles* preconditions.  Yet the Supreme Court has mandated they need to prevail on all three.  The first *Gingles* precondition demonstrates that there is no current Voting Rights Act violation.  The second and third preconditions demonstrate there is no past violation.  The Court need only find the District's arguments credible on any one condition sufficient to deny liability.

This is an unusual case.  The facts of this case require turning the legal standards upside down and inside out.  The racial "minority" is in fact a numerical "majority."  White voters are a numerical minority and have been for a long, long time.  These unique circumstances make it extremely difficult if not impossible to find liability.  In fact, the District has not found a case where Plaintiffs have been successful under these facts.  These Plaintiffs should not be the first.

In addition, the totality of the circumstances combines to deny liability.  1. There is no link between past discrimination and current inability to participate.  2. Racially polarized voting in the District is relatively mild.  3. The at-large elections are beneficial to the largest group of African American voters.  4. There are not slating organizations that deny access to African Americans.  5. The socioeconomic indicators demonstrate that African Americans are better off in the District than in the surrounding regions.  6. There is no evidence of subtle racial appeals used to prey on racial anxiety.  7. African Americans have been successful in getting elected to the school board and to exogenous races in and near the District.  8. The District's Board is responsive to the needs of the African American community.  9. The District is required to maintain this electoral system by Missouri law.  The totality of the circumstances test demonstrates the District is not in violation of the Voting Rights Act.

Respectfully submitted,

CROTZER & ORMSBY, LLC

*/s/ Angela Bullock Gabel*
Angela Bullock Gabel, 58227MO
130 S. Bemiston Ave., Suite 602
Clayton, MO 63105
314.726.3040 / 314.726.5120 (fax)
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA  98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com
*Attorneys for Defendant Ferguson-*
*Florissant School District*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is a person of such age and discretion as to be competent to serve papers.  It is further certified that on December 22, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Anthony E. Rothert
Andrew J. McNulty
Jessie M. Steffan
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, Mo 63108
*Counsel for Plaintiffs*

M. Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA  30303
*Counsel for Plaintiffs*

Dale Hoe
Julie A. Ebenstein
Sophia Lin Lakin
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY  10004
*Counsel for Plaintiffs*

Gillian R. Wilcox
ACLU of Missouri
3601 Main Street
Kansas City, MO 64111
*Counsel for Plaintiffs*

*/s/ Angela Bullock Gabel*