# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MISSOURI

MISSOURI STATE CONFERENCE OF )
THE NATIONAL ASSOCIATION FOR )
THE ADVANCEMENT OF COLORED )
PEOPLE, REDDITT HUDSON, )
F. WILLIS JOHNSON and )
DORIS BAILEY, )
                     )    Civ. No. 4:14-cv-02077-RWS
              Plaintiffs, )
                     )
v. )
                     )
FERGUSON-FLORISSANT SCHOOL )
DISTRICT and ST. LOUIS COUNTY )
BOARD OF ELECTIONS )
COMMISSIONERS, )
              Defendants. )

# PLAINTIFFS' TRIAL BRIEF

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ iv

Statement of the Case ............................................................................................. 1

I.  FFSD's At-Large Method of Electing Board Members Violates Section 2 of the Voting Rights Act. ................................................................................... 3

A.  Legal Standard under Section 2 and Summary of Plaintiffs' Claim ............. 3

B.  The Three *Gingles* Preconditions Have Been Satisfied. .............................. 7

   1.  Plaintiffs have satisfied *Gingles* I. .................................................... 7

   2.  Plaintiffs have satisfied *Gingles* II and *Gingles* III. ....................... 9

      a)  The Legal Framework for Gingles II and Gingles III ............... 9

      b)  The Evidence Presented at Trial Will Show that Gingles II and III Have Been Satisfied. ................................................... 11

         i)  The parties have no material disagreements about the relative levels of support received by each candidate from Black and white voters in each election since 2000. ................................................... 11

         ii)  The parties' stipulations demonstrate that Plaintiffs have satisfied Gingles II and III with respect to Black voters' top-ranked candidates ............. 12

         iii)  The evidence will show that Plaintiffs have satisfied Gingles II and III under an appropriate method for identifying second and third candidates of choice ............................................................ 14

         iv)  The stipulated facts show that Gingles II and III are satisfied under the District's "Point Estimate" approach to second- and third-choice candidates ............................................................ 20

C.  Under the Totality of Circumstances, Black Residents Of FFSD Have Less Opportunity Than Other Members Of The Electorate To Elect Candidates Of Their Choice ........................................................................ 22

   1.  The evidence at trial will show that the "predominant" Senate Factors (Factors 2 and 7) weigh in favor of Plaintiffs. ................................. 23

      a)  The evidence will show that Board elections are characterized by RPV (Senate Factor 2). ..................................................... 23

      b)  The evidence will show that African-American candidates have largely not succeeded in being elected to the Board (Senate Factor 7). ...................... 24

i

2. Despite the District's cheerful reimagining of the practical realities, the evidence at trial will clearly set forth the historical and ongoing effects of discrimination in the State, St. Louis metro area, and FFSD (*Senate Factors 1 and 5*). ..................................................................... 25

    a) The evidence at trial will demonstrate that Senate Factor 1 weighs in favor of Plaintiffs. ................................................................................ 25

    b) Continuing effects (Senate Factor 5). ............................................ 27

3. The remaining Senate Factors also weigh in Plaintiffs' favor, findings that are reinforced by the District's misguided attempts to prove otherwise. ............. 30

    a) The evidence will show that the Board is not responsive to the particularized needs of the African-American community (Senate Factor 8). ................................................................................................. 30

    b) The evidence will show that African-American candidates for the Board are denied access to the candidate slating processes (Senate Factor 4). ........... 31

    c) There is evidence that Board campaigns are characterized by racial appeals (Senate Factor 6). .............................................................. 34

    d) FFSD employs voting practices and procedures that tend to enhance the opportunity for discrimination (Senate Factor 3). ............................................ 36

    e) The evidence will show that FFSD's rationales for maintaining these practices and procedures are tenuous (Senate Factor 9). .................................. 37

II. Conclusion ..................................................................................... 38

Relief ................................................................................................. 39

Defenses ............................................................................................ 39

I. Standing ......................................................................................... 39

II. Unlawful Relief .............................................................................. 44

   A. Racial Gerrymandering ........................................................... 44

   B. One-person, One-vote .............................................................. 45

III. Necessary Parties .......................................................................... 47

IV. Illegality ....................................................................................... 47

Disputed Material Facts ...................................................................... 48

Evidentiary Issues ................................................................................................ 49

I.  Evidentiary Issues With Defendants' Anticipated Evidence ............................. 49

    A.  The Supplemental Report purportedly prepared by Drs. Rodden and Chen
        lacks foundation. ..................................................................................... 49

    B.  Evidence concerning the demographics and racial makeup of Board of the
        Hazelwood School District is irrelevant. ................................................ 50

    C.  The use of ACS estimates, not the 2010 Decennial Census, for population
        estimates .................................................................................................. 50

    D.  The use of population projections from the 2011-2013 ACS estimates for
        population estimates ................................................................................. 51

II.  The District's Anticipated Objections to Plaintiffs' Evidence ......................... 52

    A.  Evidence of historical and ongoing discrimination by government entities
        other than FFSD ...................................................................................... 52

    B.  Evidence of discrimination in areas not perfectly contiguous with the borders
        of FFSD .................................................................................................... 52

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. Johnson*,
    521 U.S. 74 (1997) ................................................................................. 7

*African American Voting Rights Legal Defense Fund v. Villa*,
    54 F.3d 1345 (8th Cir. 1995) .................................................. 9, 40, 51

*African-American Voting Rights Legal Defense Fund, Inc. v. Missouri*,
    994 F. Supp. 1105 (E.D. Mo. 1997) ...................................................... 25

*Askew v. City of Rome*,
    127 F.3d 1355 (11th Cir. 1997) ...................................................... 10, 15

*Bartlett v. Strickland*,
    556 U.S. 1 (2009) .................................................................................. 7

*Benavidez v. City of Irving*,
    638 F. Supp. 2d 709 (N.D. Tex. 2009) ................................................ 51

*Benavidez v. Irving Independent School District*,
    690 F. Supp. 2d 451 (N.D. Tex. 2010) ................................................ 52

*Board of Estimate of New York City v. Morris*,
    489 U.S. 688 (1989) .............................................................................. 45

*Bone Shirt v. Hazeltine*,
    336 F. Supp. 2d 976 (D.S.D. 2004) .................................. 28, 34, 40, 51

*Bone Shirt v. Hazeltine*,
    461 F.3d 1011 (8th Cir. 2006) .................................................... passim

*Brown v. Board of Commissioners of Chattanooga*,
    722 F. Supp. 380 (E.D. Tenn. 1989) .................................................. 35

*Brown v. Board of Education*,
    347 U.S. 483 (1954) ................................................................................ 1

*Buckanaga v. Sisseton Independent School District No. 54-5*,
    804 F.2d 469 (8th Cir. 1986) ...................................................... passim

*Citizens for a Better Gretna v. City of Gretna*,
    834 F.2d 496 (5th Cir. 1987) ........................................................ 10, 16

*Clay v. Board of Education of St. Louis*,
    896 F. Supp. 929 (E.D. Mo. 1995) ...................................................... 32

*Clay v. Board of Education of St. Louis*,
 90 F.3d 1357 (8th Cir. 1996) ........................................................ 10, 15

*Cofield v. City of LaGrange*,
 969 F. Supp. 749 (N.D. Ga. 1997) .................................................. 34

*Collins v. City of Norfolk*,
 816 F.2d 932 (4th Cir. 1987) ....................................................... 15, 32

*Collins v. City of Norfolk*,
 883 F.2d 1232 (4th Cir. 1989) .......................................................... 36

*Davis v. Chiles*,
 139 F.3d 1414 (11th Cir. 1998) ......................................................... 14

*Dickinson v. Indiana State Election Board*,
 933 F.2d 497 (7th Cir. 1991) ............................................................. 8

*Evenwel v. Abbott*,
 135 S. Ct. 2349 (2015) ................................................................. 8, 45

*Evenwel v. Perry*,
 No. A-14-CV-335, 2014 WL 5780507 (W.D. Tex. Nov. 5, 2014) ................... 8, 45

*Gaffney v. Cummings*,
 412 U.S. 735 (1973) ...................................................................... 45

*Gonzalez v. Harris County*,
 601 F. App'x 255 (5th Cir. 2015) ...................................................... 43

*Goosby v. Town Board of Hempstead*,
 956 F. Supp. 326 (E.D.N.Y. 1997) ................................................. 34, 35

*Harvell v. Blytheville School District No. 5*,
 71 F.3d 1382 (8th Cir. 1995) ..................................................... passim

*Jeffers v. Beebe*,
 895 F. Supp. 2d 920 (E.D. Ark. 2012) ............................................ 40, 51

*Jenkins v. Red Clay Consolidated School District Board of Education*,
 4 F.3d 1103 (3d Cir. 1993) .............................................................. 22

*Johnson v. De Grandy*,
 512 U.S. 997 (1994) ...................................................................... 36

*Ketchum v. Byrne*,
 740 F.2d 1398 (7th Cir. 1984) ........................................................... 9

*Kirkpatrick v. Preisler*,
    394 U.S. 526 (1969) .................................................................................. 51

*League of United Latin American Citizens v. Perry*,
    548 U.S. 399 (2006) .............................................................................. 42, 48

*Lewis v. Alamance County*,
    99 F.3d 600 (4th Cir. 1996) ................................................................ 12, 15

*Meek v. Metropolitan Dade County*,
    908 F.2d 1540 (11th Cir. 1990) ................................................................. 43

*Monroe v. City of Woodville*,
    881 F.2d 1327 (5th Cir. 1989) .................................................................... 43

*NAACP v. City of Niagara Falls*,
    65 F.3d 1002 (2d Cir. 1995) ................................................................ 12, 15

*NAACP v. City of Thomasville*,
    401 F. Supp. 2d 489 (M.D.N.C. 2005) ...................................................... 16

*NAACP v. Gadsden County School Board*,
    589 F. Supp. 953 (N.D. Fla. 1984) ............................................................ 47

*NAACP v. Gadsden County School Board*,
    691 F.2d 978 (11th Cir. 1982) ................................................................... 47

*NAACP v. Hampton County Election Commission*,
    470 U.S. 166 (1985) ................................................................................. 36

*Nipper v. Smith*,
    39 F.3d 1494 (11th Cir. 1994) ................................................................. 10

*Pope v. County of Albany*,
    687 F.3d 565 (2d Cir. 2012) ..................................................................... 43

*Potter v. Washington County*,
    653 F. Supp. 121 (N.D. Fla. 1986) ............................................................ 47

*Preisler v. Mayor of St. Louis*,
    303 F. Supp. 1071 (E.D. Mo. 1969) .......................................................... 45

*Ruiz v. City of Santa Maria*,
    160 F.3d 543 (9th Cir. 1998) ......................................................... 10, 11, 14

*Rural West Tennessee African American Affairs Council v. Sundquist*,
    29 F. Supp. 2d 448 (W.D. Tenn. 1998) ............................................... 26, 27

*Salas v. Southwest Texas Junior College District*,
   964 F.2d 1542 (5th Cir. 1992) ........................................... 43

*Shaw v. Reno*,
   509 U.S. 630 (1993) ...................................................... 44

*Smith v. Brunswick County Board of Supervisors*,
   984 F.2d 1393 (4th Cir. 1993) ........................................... 43

*Smith v. Clinton*,
   687 F. Supp. 1361 (E.D. Ark. 1988) ...................................... 42

*Southern Christian Leadership Conference of Alabama v. Sessions*,
   56 F.3d 1281 (11th Cir. 1995) ........................................... 10

*St. Charles Tower, Inc. v. Kurtz*,
   643 F.3d 264 (8th Cir. 2011) ............................................ 47

*Stabler v. County of Thurston*,
   129 F.3d 1015 (8th Cir. 1997) ........................................... 45

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ................................................. passim

*United States v. City of Euclid*,
   580 F. Supp. 2d 584 (N.D. Ohio 2001) .................................... 34

*United States v. Marengo County Commission*,
   731 F.2d 1546 (11th Cir. 1984) .................................. 26, 27, 32

*United States v. Village of Port Chester*,
   704 F. Supp. 2d 411 (S.D.N.Y. 2010) ................................. 36, 40

*Uno v. City of Holyoke*,
   72 F.3d 973 (1st Cir. 1995) ............................................. 10

*Upham v. Seamon*,
   456 U.S. 37 (1982) ...................................................... 46

*Valladolid v. City of National City*,
   976 F.2d 1293 (9th Cir. 1992) ........................................... 43

*Ward v. Columbus County*,
   782 F. Supp. 1097 (E.D.N.C. 1991) .................................. 27, 37

*Westwego Citizens for Better Government v. City of Westwego*,
   872 F.2d 1201 (5th Cir. 1989) ...................................... 10, 11

*Whitcomb v. Chavis*,
  403 U.S. 124 (1971) ........................................................................... 32

*White v. Regester*,
  412 U.S. 755 (1973) ........................................................................... 32

*Williams v. City of Dallas*,
  734 F. Supp. 1317 (N.D. Tex. 1999) ............................................. 34, 35

*Williams v. City of Texarkana*,
  861 F. Supp. 756 (W.D. Ark. 1992) ............................................. 40, 51

**Statutes**

42 U.S.C. § 1988 ................................................................................. 39

52 U.S.C. § 10301 ............................................................................. 1, 46

52 U.S.C. § 10304 ................................................................................. 46

52 U.S.C. § 10310 ................................................................................. 39

Mo. Rev. Stat. § 1.100 ................................................................. 40, 46, 51

**Legislative History**

Senate Report No. 97-417 (1982) ................................................. 14, 22, 23, 25

**Other Authorities**

Brief for Amici Curiae Former Directors of the U.S. Census Bureau,
  *Evenwel v. Abbott*, No. 14-940 (U.S. Sept. 25, 2015) .......................... 41

# STATEMENT OF THE CASE

This case is brought under Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ("Section 2") by three African-American citizens who are registered voters in the Ferguson-Florissant School District ("FFSD" or the "District") and the Missouri State Conference of the National Association for the Advancement of Colored People ("MO NAACP") (collectively, "Plaintiffs"). The District's at-large method for electing members of its school board ("Board") deprives its African-American residents of an equal opportunity to elect representatives of their choice, in violation of Section 2. Plaintiffs' challenge endeavors to change the existing at-large system for electing Board members to an electoral system that is more equitable given a practical evaluation of present realities in the District.

The area encompassed by FFSD bears witness to a long and ugly history of racial discrimination. The District itself was created pursuant to a federal order in the face of resistance to school desegregation during the 1970s, some two decades after *Brown v. Board of Education*, 347 U.S. 483 (1954). Notwithstanding some progress, the District continues to suffer from severe patterns of racial inequality across a wide spectrum of socioeconomic indicators – everything from education to income, poverty, employment, and criminal justice outcomes.

Today, the District's student body is largely African-American (77.1%), and, according to the 2010 Decennial Census, the most recent complete count of its population, the voting-age population ("VAP") of FFSD is 48.19% African-American. But there has been a longstanding problem of underrepresentation of the African-American community on the District's seven-seat Board. There have never been more than two African-American Board members serving at the same time and, for much of the last decade, the Board has frequently had only one or zero elected members who are African-American.

To be sure, the Voting Rights Act does not require proportional representation for racial and ethnic minorities. But the pattern of underrepresentation of the African-American community in FFSD has not been for lack of trying. Many African-American candidates have run for Board seats, but few have been elected: approximately only 20% of African-American candidates for the Board have been successful, as compared to approximately 60% of white candidates. This is largely due to substantial racial polarization in voting patterns in FFSD elections. Over the last twelve contested elections, dating back to 2000, African-American voters and white voters in FFSD have *never* preferred the same candidate as their top choice for the District's Board. Indeed, through the last twelve contested elections, white voters have never voted for an African American as their top-ranked choice for the Board. Against the backdrop of a host of other factors that hinder African-American electoral success – such as off-cycle elections, lack of access to union endorsements, racial campaign appeals, and entrenched socioeconomic inequalities that suppress African-American political participation – the unwillingness of white voters to support candidates from the African-American community has effectively blocked African-American voters from exercising effective political power in the District commensurate with their numbers.

The underrepresentation of the African-American community on the FFSD Board is not only undemocratic, it has had real consequences for students: despite the fact that the vast majority of the student body is African-American, the Board has been largely unresponsive to the particularized needs of the African-American community, failing to address significant ongoing racial disparities in terms of academic achievement and school discipline in the District. The patterns of severe socioeconomic inequality that have long plagued this District thus are nurtured by the political system.

This state of affairs violates Section 2. The parties' stipulations and the evidence at trial will establish conclusively that, under the totality of circumstances, the political processes leading to the election of FFSD Board members are not equally open to participation by African Americans, who have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Plaintiffs respectfully request that, at the conclusion of trial, this Court declare the current at-large electoral system in the FFSD to be in violation of the VRA, and to order that the April 2016 FFSD elections be postponed until a single-member districting plan can be adopted that will finally afford African-American voters in FFSD a meaningful opportunity to elect their preferred candidates.

I.     **FFSD'S AT-LARGE METHOD OF ELECTING BOARD MEMBERS VIOLATES SECTION 2 OF THE VOTING RIGHTS ACT.**

    A.  **Legal Standard under Section 2 and Summary of Plaintiffs' Claim.**

To establish that multimember districts operate to dilute the voting strength of African-American voters and impair their ability to elect representatives of their choice in violation of Section 2, plaintiffs must satisfy three preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986). If the three preconditions are met, plaintiffs must then demonstrate that under the totality of circumstances, African Americans have less opportunity than other members of the electorate to participate in the political process and elect candidates of their choice. The evidence at trial will prove that Plaintiffs have satisfied all of the *Gingles* preconditions and that the totality of circumstances weighs in Plaintiffs' favor.

*Gingles* I is satisfied once plaintiffs show that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. At trial, Plaintiffs will submit two illustrative single-member district maps that show that African Americans in FFSD could constitute a majority of not one but four single-member

districts. Each of the maps complies with federal and state constitutional requirements and county law and also with traditional redistricting principles. The illustrative plans alone are sufficient to satisfy the straightforward requirements of *Gingles* I.

At trial, the District will present an unprecedented and convoluted interpretation of *Gingles* I. It will likely argue that the African-American VAP in the District surpasses 50%, not according to reliable government-published population data, but to the District's population projections custom-designed for this lawsuit, and that therefore Plaintiffs' claim should be barred. As Plaintiffs will submit, all published government statistics say that the Black voting-age population comprises less than 50% of the District. And even if African Americans were to constitute a bare majority of a jurisdiction's population, Plaintiffs would not lose the broad protections of the VRA and their claim could go forward. African Americans' unequal opportunity to participate in the political process and elect representatives of choice persists given the practical realities of the District, irrespective of whether the Black voting-age population were to cross a 50% threshold, which it has not.

*Gingles* II is satisfied where the minority group, here the African-American community, is politically cohesive. *See Gingles*, 478 U.S. at 51, 56. Plaintiffs will establish at trial that African Americans in FFSD are politically cohesive and that voting has been starkly racially polarized in FFSD Board elections over at least the past sixteen years. As Plaintiffs' experts will testify, analysis of these elections shows that, in FFSD, Black voters and white voters consistently vote differently. Plaintiffs will present at trial a case-by-case method for determining which candidate, or candidates, were preferred by Black voters and white voters, respectively, in each election. Plaintiffs' approach to determining candidates of choice properly considers the totality of circumstances and allows the Court to make a localized appraisal of the factors

relevant to vote dilution, as required by Section 2.

The District will likely suggest two alternate methods for determining candidates of choice, neither of which is sufficient to capture the nuances of a multi-seat, off-cycle, staggered election. First, the District will suggest that the Court can simply review estimates that identify the single candidate in each election who received the highest estimated level of support among Black and white voters. This method ignores all of the complexities of a multi-seat election and fails to account, "on an election-specific basis," for "all the relevant circumstances." *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1386 (8th Cir. 1995). Second, the District will suggest requiring that the number of candidates preferred by a group in each election must match the number of seats up for election. This method conflicts with voting patterns in FFSD, which show that voters do not always support the same number of candidates as there are seats, particularly when, as in FFSD, Black voters strongly prefer Black candidates. Yet even applying the District's faulty methods for determining candidates of choice, Plaintiffs satisfy the requirements of *Gingles* II.

*Gingles* III, meanwhile, is satisfied where "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . —usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. Regardless of which party's method is used to identify groups' candidates of choice, the evidence at trial will show that a white-preferred candidate has won every single School Board election since at least 2000 and that white residents voted as a bloc to usually defeat Black-preferred candidates. This pattern of white-preferred candidates defeating African Americans' preferred candidates is even more pronounced if the Court properly discounts the elections marked by special circumstances that limit an election's probative value, for instance when only white candidates run for office or when an election is

heavily influenced by unique external events. Plaintiffs satisfy *Gingles* III using any of the proposed metrics for determining candidates of choice, and whether analyzing all elections, or only the most recent and probative elections.

Along with the *Gingles* preconditions, there are several factors that courts consider when determining if elections result in a violation of Section 2. In addition to satisfying the preconditions, Plaintiffs will provide evidence of the "Senate Factors" to demonstrate that the totality of circumstances weigh in favor of finding a Section 2 violation. The two "predominant factors" are racially polarized voting and the limited extent to which Black representatives have been elected. In the District, as a result of racial polarization, Black voters' consistent preference for African-American candidates, and white bloc voting to defeat those candidates, Black residents of the District have had very limited representation on the Board. Among the 27 seats for which the Board held elections between 2000 and 2015, African Americans were only elected 5 times, and the Board has never had more than two African-American members at once. Coupled with the *Gingles* preconditions, the presence of these two predominant factors alone are sufficient for the Court to find that the District's at-large voting scheme violates Section 2.

At trial, Plaintiffs will also prove the presence of the other Senate Factors, including the history of discrimination in the District and its ongoing effects on the ability of Black residents to participate fully and equally in local political life. The District cannot seriously contest the evidence that Plaintiffs will present to show the well-documented history of racial segregation and discrimination in FFSD. The District will attempt to distract from these stark racial disparities or deny them altogether. Its misguided attempt to prove that the effects of discrimination have somehow disappeared only reinforces its unresponsiveness to the African-American community and its policies excluding African Americans from full political

participation.

Plaintiffs' satisfaction of the *Gingles* preconditions, according to either party's methods, and their evidence of the presence of the Senate Factors in the District will prove that the District's at-large system of elections violates Section 2 of the Voting Rights Act.

### B. The Three *Gingles* Preconditions Have Been Satisfied.

#### 1. Plaintiffs have satisfied *Gingles* I.

To satisfy *Gingles* I, Plaintiffs must show that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. This is a straightforward requirement which can be satisfied through the creation of an illustrative plan containing a single-member district in which Black voters constitute a bare majority of the VAP. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (all that is required by Section 2 is that the minority group constitute a majority of the voting-age population in a district). The plan must also: (1) comply with one person, one vote constitutional requirements, *i.e.*, approximate population equality across all districts in the plan, *see Abrams v. Johnson*, 521 U.S. 74, 98 (1997); and (2) be composed of geographically compact districts that comport with other traditional redistricting principles (*e.g.*, contiguity; minimizing the splits of counties, municipalities, and precincts; recognizing communities of interest; and avoiding multi-member districts). At the liability phase, the *Gingles* I precondition does not require a showing that the majority-minority districts in the illustrative plans are effective, *i.e.*, that they provide the minority group a practical opportunity to elect the candidate of its choice. *See Gingles*, 478 U.S. at 50 n.17 (first *Gingles* precondition requires only that "minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice"); *see also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) ("*Bone Shirt II*") (rejecting argument that "plaintiffs must prove" effectiveness of an illustrative plan at liability stage, in which plaintiffs

need show a "*potentially* viable and stable solution" only). That is an inquiry for the actual plan proposed by successful plaintiffs at the remedial phase of a case. *See, e.g.*, *Bone Shirt II*, 461 F.3d at 1019 ("'The court may consider, at the *remedial* stage, what type of remedy is possible . . . [b]ut this difficulty should not impede the judge at the liability stage of the proceedings.'" (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991))).

The testimony and reports of Plaintiffs' expert witness William S. Cooper will prove that FFSD's African-American population is sufficiently large and geographically compact to allow for the creation of seven single-member districts for electing Board members with not one, but four, majority African-American districts. He will testify that, relying on the 2010 Decennial Census, he drew *two* illustrative plans that satisfy *Gingles* I, and that each of these plans complies with federal and state constitutional requirements and county law and also with traditional redistricting principles. As Mr. Cooper will testify, each illustrative plan contains four majority-Black VAP districts and apportions the total population[1] equally across the districts with minimal deviation. He will further testify that, based on stipulated facts, both plans comport with traditional redistricting principles: the districts are geographically compact, district lines respect both precinct and census block boundaries and communities of interest, and the districts are contiguous, *i.e.*, all parts of a district are connected at some point with the rest of the district.

Finally, even if the effectiveness of an illustrative plan were relevant at the liability stage of the case – and it is not – there can be little doubt that the single-member districts in Mr. Cooper's illustrative plans would give African-American voters a better opportunity than the

---

[1] In *Evenwel v. Perry*, No. A-14-CV-335, 2014 WL 5780507, at *3 (W.D. Tex. Nov. 5, 2014), the three-judge court rejected the plaintiffs' claim that Texas violated the equal protection clause of the Fourteenth Amendment by failing to take into account both voting-age population and total population in adopting a Senate redistricting plan as "a theory never before accepted by the Supreme Court or any circuit court." The Supreme Court has noted probable jurisdiction. *Evenwel v. Abbott*, 135 S. Ct. 2349 (2015). As discussed more below, even were the Supreme Court to agree with the plaintiffs that both voting-age population and total population need to be considered in adopting a redistricting plan, Plaintiffs still satisfy *Gingles* I, as Mr. Cooper has drawn a plan that equalizes voting-age population and otherwise satisfies *Gingles* I.

current at-large system to elect candidates of their choice. As Mr. Cooper will testify, according to the 2010 Decennial Census, African Americans comprise a minority of the VAP in the District at large. But in each illustrative plan, African Americans make up a VAP majority in four of seven single-member districts. African Americans will therefore have more potential, than under the status quo, to elect candidates of choice in these four districts. *See Bone Shirt II*, 461 F.3d at 1023 (holding that remedy giving minority voters a supermajority in two single-member districts was effective while noting that a supermajority is not required in the *Gingles* liability stage); *see also Ketchum v. Byrne*, 740 F.2d 1398, 1415-16 (7th Cir. 1984) (noting that single-member districts with 60% minority VAPs are proven remedies that afford better protection than simple majorities); *accord African Am. Voting Rights Legal Def. Fund v. Villa*, 54 F.3d 1345, 1348 n.4 (8th Cir. 1995).

### 2. Plaintiffs have satisfied *Gingles* II and *Gingles* III.

#### a) The Legal Framework for Gingles II and Gingles III

*Gingles* II is satisfied where the minority group, here the African-American community, is politically cohesive. *See Gingles*, 478 U.S. at 51, 56. *Gingles* III, meanwhile, is satisfied where "the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate." *Blytheville*, 71 F.3d at 1385 (citing *Gingles*, 478 U.S. at 50-51). Together, *Gingles* II and *Gingles* III ask:

> (1) whether Black and white voters tend to "vote differently," *i.e.*, whether there is racially polarized voting, *i.e.*, "a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently," *Gingles*, 478 U.S. at 53 n.21 (alteration in original; citations and internal quotation marks omitted); and

> (2) whether the candidates preferred by Black voters "usually" lose to candidates preferred by white voters, *Blytheville*, 71 F.3d at 1385.

Answering these two questions "typically requires a statistical and non-statistical evaluation" of the voting behavior and election results in the "relevant elections." *Bone Shirt II*, 461 F.3d at 1020. As the Eighth Circuit has made clear, the "relevant elections" in evaluating the *Gingles* preconditions are contested elections. Situations in which candidates ascended to office unopposed (*i.e.*, "uncontested elections") have no probative value in this analysis.[2] *See Blytheville*, 71 F.3d at 1389; *see also Gingles*, 478 U.S. at 57 (observing that success of minority-preferred candidate under "special circumstances, such as the absence of an opponent" does "not necessarily prove that the district did not experience polarized voting").

But not all contested elections have equal probative value:

- **More recent elections** are generally more probative. *Bone Shirt II*, 461 F.3d at 1020-21.

- **"Endogenous" elections**—*i.e.*, those elections for the offices at issue, here, the FFSD Board—are more probative than the results of "exogenous" elections—*i.e.*, contests for other offices, such as Congress or President. *Id.*; *see also Clay v. Bd. of Educ. of St. Louis*, 90 F.3d 1357, 1362 (8th Cir. 1996) ("*Clay II*") ("[E]xogenous elections . . . should be used only to supplement the analysis of the specific election at issue."). The Court need not supplement endogenous election data where, as here, the Court has sufficient evidence from endogenous elections from which to discern typical voting behavior and usual results. *See, e.g., Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1208 n.8 (5th Cir. 1989) (evidence from exogenous elections may be used where evidence from endogenous elections is sparse).

- **"[I]interracial elections** are the best indicators of whether the white majority usually defeats the minority candidate," *Bone Shirt II*, 461 F.3d at 1020-21,[3]

---

[2] The Eleventh and the First Circuits agree that the uncontested success of a minority-preferred candidate is "not probative of the ability of blacks to elect candidates of their choice," *see Askew v. City of Rome*, 127 F.3d 1355, 1384 n.18 (11th Cir. 1997), and "reveal[s] little about either minority cohesion or white bloc voting," *Uno v. City of Holyoke*, 72 F.3d 973, 988 (1st Cir. 1995); *see S. Christian Leadership Conference of Ala. v. Sessions*, 56 F.3d 1281, 1307 (11th Cir. 1995) ("[U]nopposed victories do not count against a finding of racial bloc voting.").

[3] Indeed, the *Gingles* Court relied exclusively on interracial legislative contests. *See* 478 U.S. at 80-82. The Fifth, Ninth, and Eleventh Circuits have followed suit in holding that interracial elections are most probative of racially polarized voting. *See Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503-04 (5th Cir. 1987) ("[I]mplicit in the *Gingles* holding is the notion that black preference is determined from elections which offer the choice of a black candidate."); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 552-53 (9th Cir. 1998) ("[A] minority vs. non-minority election is more probative of racially polarized voting than a non-minority vs. non-minority election."); *Nipper v. Smith*, 39 F.3d 1494, 1540 (11th Cir. 1994) ("[Monoracial] elections . . . may reveal little

because "[a] system that works for minorities only in the absence of white opposition is a system that fails to operate in accord with the law," *Blytheville*, 71 F.3d at 1389-90.[4]

- There is *less* probative value in elections marked by **special circumstances** that suggest that the election "was not representative of the typical way in which the electoral process functions." *Ruiz*, 160 F.3d at 557-58; *see Gingles*, 478 U.S. at 76 (holding that district court "could appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance to [plaintiffs'] claim"); *Blytheville*, 71 F.3d at 1389 (removing elections involving special circumstances from analysis of *Gingles* preconditions).

    b) *The Evidence Presented at Trial Will Show that Gingles II and III Have Been Satisfied.*

The evidence at trial will demonstrate that *Gingles* II and III have been satisfied, *i.e.*, that FFSD Board elections are marked by racially polarized voting, and that Black-preferred candidates are usually defeated while white-preferred candidates almost always win.

    i) *The parties have no material disagreements about the relative levels of support received by each candidate from Black and white voters in each election since 2000.*

The parties agree that the Ecological Inference ("EI") method is appropriate for estimating the various levels of support that each Board candidate received in each election from Black voters and white voters, respectively. The parties have no material disagreements as to the estimated levels of support that each Board candidate received from each group of voters in each contested election since 2000, which are set forth in the parties' pretrial stipulations.[5]

---

about the issue to be determined: the capacity for white bloc voting usually to defeat [minority] candidates of choice. Particularly where voting is extremely polarized by race in elections in which [minority] candidates participate, white-on-white elections in which a small majority (or a plurality) of [minority] voters prefer the winning candidate seem comparatively less important.").

[4] *See Westwego*, 872 F.2d at 1208 n.7 ("[W]hen there are only white candidates to choose from it is virtually unavoidable that certain white candidates would be supported by a large percentage of . . . black voters. Evidence of black support for white candidates in an all-white field, however, tells us nothing about the tendency of white bloc voting to defeat black candidates." (citation and internal quotation marks omitted)).

[5] Using EI, the parties' experts (Drs. Engstrom and Rodden) each produced estimates for the various candidates' levels of support in each contested election since 2011; these estimates are substantially similar to each other. Plaintiffs' expert Dr. Engstrom did not produce estimates for Board elections from 2000 through 2010, but Plaintiffs do not dispute Dr. Rodden's estimates for those elections.

> ii) *The parties' stipulations demonstrate that Plaintiffs have satisfied Gingles II and III with respect to Black voters' top-ranked candidates.*

In order to determine whether *Gingles* II and III have been satisfied—*i.e.*, whether Black and white voters "vote differently," and whether Black-preferred candidates are usually defeated—the Court must necessarily identify the candidates preferred by Black voters in each election. The parties have some disagreements as to how to identify candidates of choice in multi-seat elections like FFSD Board elections, where multiple positions are at stake and voters can cast more than one vote. But the parties agree that, as a general matter, a candidate who we can determine receives the greatest number of votes from minority voters is a minority-preferred candidate.[6] *Cf. Lewis v. Alamance Cty.*, 99 F.3d 600, 614 (4th Cir. 1996) (candidate who receives most minority votes is a candidate of choice, so long as that candidate received "substantial" support from minority voters); *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1019 (2d Cir. 1995) (in multi-seat context, holding that "a candidate cannot be 'minority-preferred' if that candidate receives support from fewer than 50% of minority voters").

Focusing exclusively on the candidates with the highest estimated levels of support from minority voters, which the District's expert suggests is one acceptable method to identify minority-preferred candidates (the "Top-Ranked Candidate" approach), it is clear that Plaintiffs have satisfied *Gingles* II and III.

*First*, Black and white voters tend to "vote differently" with respect to their top choices. *See Gingles*, 478 U.S. at 53 n.21. The parties have stipulated that, in the twelve contested FFSD elections held between 2000 and 2015, Black voters and white voters have *never* preferred the same candidate as their top choice. That is, with respect to the top-choice candidates of Black

---

[6] Where the top two candidates in a two-seat election or top three in a three-seat election are clearly identifiable but have overlapping confidence intervals, then both the top two (or all the top three) are treated as candidates of choice.

and white voters, there is absolute racial polarization in the last twelve contested Board elections. In fact, all of the white voters' top-choice candidates are white (12 of 12). At the same time, all but one of the Black voters' top-choice candidates are Black (11 of 12). That lone exception was in 2009, when there were no Black candidates.

*Second*, the top-choice candidates of Black voters have much lower success rates than the top-choice candidates of white voters. The parties have stipulated that the top-ranked candidates of white voters have *always* won, while the top-ranked candidates of Black voters won only six out of twelve times. Top-ranked candidates of Black voters have been even less successful when limiting the analysis to more recent (*i.e.*, more probative) elections: during contested elections held in the past decade (2015, 2014, 2013, 2012, 2011, 2009, and 2006), the top-ranked Black-preferred candidates won a Board seat in three out of seven elections (42.9%). That rate dips even further for contested elections held during the past five years, the most probative years: Black-preferred candidates won a Board seat in two out of five elections (only 40%). During these same time periods, the top-ranked white-preferred candidates always won.

This pattern of losses by Black voters' top choice candidates is even clearer if the Court properly weights the probative value of various elections. The 2009 election, for example, featured no African-American candidates and should be assigned little probative value. Moreover, the evidence at trial will demonstrate that two other elections, the 2014 and 2015 elections, should also be accorded less probative value due to special circumstances. With respect to the 2014 election, the parties have stipulated that it featured unusually high levels of African-American mobilization in response to the controversial decision of a Board with no African-American members to dismiss the highly respected first African-American superintendent over protest from the African-American community. Meanwhile, the 2015

election occurred after Plaintiffs filed this highly-publicized lawsuit, and courts hearing Section 2 claims have routinely discounted post-litigation elections in assessing the normal voting patterns in a jurisdiction. *See Gingles*, 478 U.S. at 75-77 (sanctioning court's decision to reduce the weight accorded Black electoral successes where those successes "increased markedly in . . . an election that occurred after the instant lawsuit had been filed" (citing S. Rep. No. 97-417, at 29 n.115 (1982))); *Davis v. Chiles*, 139 F.3d 1414, 1417 n.2 (11th Cir. 1998) ("Elections of minority candidates during the pendency of Section Two litigation . . . have little probative value); *Ruiz*, 160 F.3d at 555-56, 558 (post-complaint election results are discounted where "unusual circumstances surrounded that election"). Moreover, the 2015 election occurred in the wake of the killing of Michael Brown, subsequent protests, and the national and international media attention to racial discrimination in the Ferguson area that followed, including ongoing national coverage of the April 2015 municipal elections. Indeed, Dr. Engstrom will testify that in his roughly 40 years as an expert in VRA cases, he does not recall a post-litigation election that departed so dramatically from previous elections.

Setting aside the 2009, 2014, and 2015 election results and giving greater weight to the remaining nine elections (2000, 2001, 2002, 2003, 2004, 2006, 2011, 2012, and 2013), only three top-ranked candidates among Black voters have been successful (in 2000, 2002, and 2003); none has been successful since 2003.

> *iii) The evidence will show that Plaintiffs have satisfied* Gingles *II and III under an appropriate method for identifying second and third candidates of choice.*

Of course, looking exclusively at the top-ranked candidates might result in an incomplete picture, because, in a multi-seat seat contest in which a voter can cast more than one vote, minority voters may (but not necessarily) also have a second (or third) candidate of choice. A critical question, then, is how to identify whether minority voters in fact have a second or third

candidate of choice in a given election, and whether the election results with respect to those second- (or third-)choice candidates also demonstrate racially polarized voting.

The Supreme Court has explained that in Section 2 cases, courts must perform "an intensely local appraisal" that accurately reflects voters' preferences. *Gingles*, 478 U.S. at 78 (citation and internal quotation marks omitted). This is not a mechanical task. Rather, a court must employ a contextual case-by-case approach that, as required by the Eighth Circuit, considers, "on an election-specific basis, . . . all the relevant circumstances." *Blytheville*, 71 F.3d at 1386; *see also Collins v. City of Norfolk*, 816 F.2d 932, 937 (4th Cir. 1987) ("*Collins I*") ("Each such situation must be reviewed individually to determine whether the elected candidates can be fairly considered as representatives of the minority community."). Thus, consistent with the Eighth Circuit's observation that "[t]here is no blanket definition of 'minority preferred candidate,'" *Clay II*, 90 F.3d at 1361, other Circuits have recognized that the identification of a second and/or third preferred candidate, if any, requires nuanced analysis that looks closely at the details of each election. *See, e.g.*, *Lewis*, 99 F.3d at 614; *Niagara Falls*, 65 F.3d at 1017-19; *Askew*, 127 F.3d at 1379.

Ultimately, the case law from these Circuits reveals three factors that should guide the identification of minority-preferred candidates in a multi-seat context:

*First*, where the clear first choice candidate among African-American voters is an African-American candidate who has lost, courts should be skeptical of attempts to characterize a winning white candidate as a candidate of choice of minority voters. *See, e.g.*, *Collins I*, 816 F.2d at 937 & n.6. The reason for this skepticism is most clearly illustrated where there is only one Black candidate. In such cases, "it [i]s virtually unavoidable that certain white candidates would be supported by a large percentage of [the relevant community's] black voters.

Significance lies in the fact that the black candidate preferred by the minority was defeated by white bloc voting." *Citizens for a Better Gretna*, 834 F.2d at 502.

*Second*, the candidate who receives the second-most estimated support from minority voters is not necessarily a minority-preferred candidate if the top-choice candidate received significantly higher support. At least one court has accepted as a reasonable method for determining what constitutes significantly higher support a "two-thirds rule" in which a "second-most-favored candidate of black voters" would be deemed a candidate of choice only if he or she "had at least two-thirds of the support of the most favored candidate." *NAACP v. City of Thomasville*, 401 F. Supp. 2d 489, 498 & n.3 (M.D.N.C. 2005).[7]

*Third*, in a two- (or three-)seat election, a candidate with the second- (or third-)highest estimated level of support among minority voters should not necessarily be considered a candidate of choice if it is statistically unclear whether that candidate actually received more support than the next highest-ranked candidate. This is of particular importance in this case because the parties' experts relied on statistical methods to produce *estimated* levels of support for each candidate among different racial groups. These estimates have margins of error, which sometimes lead to situations in which the estimated levels of support received by two candidates are statistically indistinguishable.[8]

Once the Court has determined the candidates of choice for each group, it must determine

---

[7] For example, in the 2012 two-seat election for the FFSD Board, there were one African-American (Barbara Morris) and two white candidates (Scott Ebert and Paul Schroeder). Ms. Morris received essentially unanimous support among Black voters, who then split their second vote almost evenly between the remaining two candidates. Black voters clearly preferred an African-American candidate, who was defeated, but had no preference between the remaining candidates. It is not accurate to characterize either of the two remaining candidates as Black-preferred.

[8] For example, the evidence will show that in the 2001 two-seat election, Butler was the clear top choice among Black voters, but that the estimated levels of support from Black voters for the remaining three candidates (Garofalo, Hogshead, and Lentz) are statistically indistinguishable from each other. This makes it difficult to state with precision which of these candidates actually received the second-highest number of votes from Black voters, and is an indication that Black voters may not have had a clear preference for a second (or third) candidate.

the proportion of Black-preferred candidates who were successful. In a multi-seat election, where voters may vote for two or three candidates, and two or three candidates are elected to the Board, the correct metric for assessing *Gingles* III is the relative success of Black-preferred *candidates*, not simply the number of elections in which a single Black-preferred candidate was successful. For example, the defeat of two Black-preferred candidates by two white-preferred candidates in 2014 should not be ignored because of the success of a single Black-preferred candidate that year.

Applying these principles, the evidence at trial will show that Plaintiffs have satisfied *Gingles* II and III when taking all candidates of choice into account (*i.e.*, where they exist, second- and third-choice candidates in addition to top-choice candidates), for all seats up for election.

*First*, focusing on the five most recent elections (2011-2015), Dr. Engstrom's testimony will show that Black-preferred candidates are usually defeated and have only won in contests marked by special circumstances. Starting with the 2011, 2012, and 2013 elections, Dr. Engstrom will testify that every Black-preferred candidate in these three elections lost. The stipulated facts demonstrate that, in each of these three elections, the top-choice candidate for Black voters was Black and lost (Graham in 2011, B. Morris in 2012, and Henson in 2013). The evidence will also show that there was a second Black-preferred candidate in only one of these three elections (Hawkins in 2011), and that this candidate also lost. It is true that, in two of these three elections, the candidates with the second-highest estimated levels of support among Black voters won seats (Schroeder in 2012 and Hogshead in 2013). As Dr. Engstrom will explain, however, where, as in these elections, the clear first-choice candidate among African-American voters is an African American who has lost, it is inappropriate to characterize a winning white

candidate who received significantly less support as a candidate of choice of African-American voters, particularly when Black voters do not express a clear preference between or among the remaining candidates.

For example, in 2012, there were three candidates competing for two seats. Ms. Morris, an African-American candidate, received near-unanimous support from Black voters (over 50% of Black voters' votes), who then split their votes relatively evenly between the two remaining candidates, Mr. Ebert and Mr. Schroeder, both of whom are white, and both of whom won. Likewise in 2013, approximately 87% of Black voters cast votes for Mr. Henson, who is African-American, and then split their votes relatively evenly, without a statistically significant preference, between two white candidates, Mr. Brown and Mrs. Hogshead, who won. But these two candidates received far lower levels of support from Black voters than did Mr. Henson. As Dr. Engstrom will explain, where, as in these two elections, Black voters clearly had a first-choice preference for a Black candidate, and did not express a clear preference for a second-choice candidate, it is inappropriate to describe wins by white candidates who received far lower levels of support from Black voters as victories for the African-American community. Thus, the evidence will show that, in these three elections (2011-2013), voting was racially polarized and Black voters' candidates of choice were defeated.

Dr. Engstrom will further testify that these patterns have largely continued in more recent elections, despite a few successes for Black candidates. As Dr. Engstrom will explain, in the three-seat 2014 election, Black voters were cohesive in supporting three candidates of choice, all of whom were Black, and all of whom received little to no support from white voters. Two out of the three lost, and even the one victory is of little probative value, because, as described above, the 2014 election was marked by special circumstances. In 2015, Black voters had a clear

preference for one candidate in particular (Graves) and that candidate was successful. But again, this victory was also marked by special circumstances that limit its probative value.

Thus, focusing solely on the five most recent elections, Dr. Engstrom's testimony will show that FFSD elections are marked by racially-polarized voting and that Black-preferred candidates usually lose, with six out of eight losing, and the only winning Black candidates coming in elections marked by special circumstances.

*Second*, taking into account all of the elections that are in the record (including the 2000-2009 elections, which were analyzed by Dr. Rodden alone), the evidence will show that the same trends have existed over a broader period of time.

The evidence will show that voting is starkly polarized along racial lines. In contested elections since 2000, there were a total of 20 white-preferred candidates, all of whom were white. The evidence will also show that there were a total of 19 Black-preferred candidates during that period, and that 17 out of 19 were Black. Moreover, if we exclude the monoracial 2009 election in which there were no Black candidates, then all 17 Black-preferred candidates were Black. Finally, the evidence will show that there were only two Black-preferred candidates who were also preferred by white voters – and that both were white candidates who ran in the 2009 monoracial election (Knowles and Schroeder). Put another way, of the 17 Black-preferred candidates who were Black, none were preferred by white voters.

The evidence at trial will show that the success rate of Black-preferred candidates is much lower than that of white-preferred candidates, and has declined in more recent elections. During the past 16 years, seven out of 19 Black-preferred candidates (36.8%) in contested elections were successful, as compared to 19 out of 20 white-preferred candidates (95%) during the same period. During the past decade, four out of 12 Black-preferred candidates were

successful (33.3%), as compared to 12 out of 13 white-preferred candidates (92.3%). Discounting the 2009 monoracial election, only two of 10 Black-preferred candidates during the past decade were successful (20%), as compared to 10 out of 11 white-preferred candidates (90.9%). Looking only at those Board elections held in the past five years, two out of eight Black-preferred candidates were successful (25%), as compared to eight out of nine white-preferred candidates (88.9%). And, as noted, the only two Black-preferred candidates who were successful during the last five years won election under special circumstances (in 2014 and 2015).

> *iv) The stipulated facts show that* Gingles *II and III are satisfied under the District's "Point Estimate" approach to second- and third-choice candidates*

Although the District's proposed approach for identifying candidates of choice is inappropriate as a legal matter, the evidence will show that, even under this method, Plaintiffs have established *Gingles* II and III.

Rather than setting forth a nuanced case-by-case look at the results of each election individually, the District argues for a categorical approach that bluntly defines the candidates of choice for African Americans as the two candidates (or three, depending on the number of seats) with the highest estimated levels of support among African-American voters in each election (the "Point Estimate approach"). This Point Estimate approach has critical shortcomings: it ignores differences in the *magnitude* of support received by each preferred candidate, and whether the differences among candidates in their estimated levels of support are *statistically significant*. As such, this approach ignores instances where Black voters supported fewer candidates than the number of seats up for election and therefore lacked cohesion behind second- or third-choice candidates.

Nevertheless, even using the District's proposed method for identifying candidates of choice, the EI estimates to which the parties have stipulated prove that Plaintiffs have met *Gingles* II and *Gingles* II, especially when the various elections are accorded their proper weight.

The stipulated facts show that, even under the District's Point Estimate approach, voting was racially polarized. Using this approach, there were 27 candidates of choice for each racial group in twelve contested elections, dating back through the 2000 election. The stipulated facts also show that, under this approach, white voters preferred white candidates for 25 out of 27 seats while Black voters preferred Black candidates for 17 out of 27 seats. In all, Black and white voters preferred different candidates 17 out of 27 times (63%) under this approach.

Moreover, the stipulated facts show that, using the Point Estimate approach, white-preferred candidates were almost always elected, while Black-preferred candidates usually lost. Twenty-four out of 27 white-preferred candidates were elected (88.9%), as compared to 13 out of 27 Black-preferred candidates (48.2%). And the stipulated facts also show that Black-preferred candidates' success is decreasing. Under the Point Estimate approach, during the seven contested elections over the last ten years (*i.e.*, from 2006 through 2015), 15 out of 16 white-preferred candidates were elected (93.8%), as compared to six out of 16 Black-preferred candidates (37.5%). During the five contested elections over the last five years (*i.e.*, from 2011 through 2015), 11 out of 12 white-preferred candidates were elected (91.7%), as compared to four out of 12 preferred candidates among Black voters (33.3%).

In sum, the parties' dispute as to the appropriate method of determining preferred candidates is ultimately immaterial: regardless of which method proposed by the parties is used to identify the Black and white voters' respective candidates of choice, the stipulated facts and the evidence at trial will show that the groups usually prefer different candidates and that the

candidates preferred by Black voters usually lose while the candidates preferred by white voters almost always win. The Plaintiffs have satisfied the three *Gingles* preconditions.

### C. Under the Totality of Circumstances, Black Residents Of FFSD Have Less Opportunity Than Other Members Of The Electorate To Elect Candidates Of Their Choice.

"[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993); *see also Blytheville*, 71 F.3d at 1390 ("Satisfaction of the necessary *Gingles* preconditions carries a plaintiff a long way towards showing a Section 2 violation . . . ."). In analyzing the totality of circumstances, courts look to the non-exhaustive "typical factors" identified in the Senate Report accompanying the 1982 amendments to the VRA ("Senate Factors"), *see* S. Rep. No. 97-417 at 28-29, that are relevant in analyzing whether Section 2 has been violated.[9] "[T]his list of typical factors is neither comprehensive nor exclusive," and Plaintiffs need not prove "any particular number of factors . . . or that a majority of them point one way or the other," *Gingles*, 478 U.S. at 45, "[i]f [the 'predominant' factors are] present, the other factors . . . are supportive of, but *not essential to*, a minority voter's claim," *id.* at 48 n.15. "[T]he question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Id.* at 45 (quoting S. Rep. No. 97-417 at 30 & n.120) (internal quotation marks omitted).

---

[9] The factors include (1) prior history of voting-related discrimination; (2) the degree of racially polarized voting; (3) the presence of voting practices or procedures that tend to subjugate the minority group's voting preferences; (4) the exclusion of minority group members from the candidate slating process; (5) the extent to which the minority group bears the effects of past discrimination in areas that tend to hinder its members' ability to participate effectively in the political process; (6) the use of subtle or overt racial appeals in political campaigns; and (7) the extent to which members of the minority group have succeeded in being elected to public office. *Gingles*, 478 U.S. at 44-45. In an appropriate case, a court may also consider (8) the extent to which elected officials have been unresponsive to the particularized needs of the minority group and (9) the policy underlying the challenged voting practice or procedure. *Id.* at 45.

As discussed below, the evidence at trial will show that under the totality of circumstances, African-American residents of FFSD have less opportunity than other members of the electorate to participate in the political process and elect candidates of their choice. *First*, the incontrovertible evidence establishes not only that the "predominant" Senate Factors weigh in Plaintiffs' favor, which is sufficient to prove a Section 2 violation, *see Gingles*, 478 U.S. at 48 n.15, but also that African Americans in FFSD have suffered and continue to suffer from the effects of discrimination that have hindered their ability to participate in the political process. Plaintiffs' trial evidence will also demonstrate that the remaining Senate Factors weigh in favor of Plaintiffs.

### 1. The evidence at trial will show that the "predominant" Senate Factors (Factors 2 and 7) weigh in favor of Plaintiffs.

"Two factors predominate the totality-of-circumstances analysis: 'the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme.'" *Bone Shirt II*, 461 F.3d at 1022 (quoting *Blytheville*, 71 F.3d at 1390); *see Gingles*, 478 U.S. at 48 n.15 (citing S. Rep. No. 97-417 at 28-29). Because the trial evidence readily demonstrates these factors weigh in Plaintiffs' favor, Plaintiffs claim succeeds on that basis alone. *See Gingles*, 478 U.S. at 48 n.15 ("[I]if [the 'predominant' factors are] present, the other factors . . . are supportive of, but *not essential to*, a minority voter's claim").

#### a) The evidence will show that Board elections are characterized by RPV (Senate Factor 2).

The first "predominant" factor (Senate Factor 2) considers "the extent to which voting in the elections of the State or political subdivision is racially polarized." *Gingles*, 478 U.S. at 44-45. RPV exists "where there is a consistent relationship between [the] race of the voter and the way in which the voter votes." *Id*. at 53 n.21 (alteration in original; internal quotation marks omitted). As outlined above in the discussion of *Gingles* II and *Gingles* III, the trial evidence will

establish that Board elections are clearly racially polarized. *See Bone Shirt II*, 461 F.3d at 1020-22; *Blytheville*, 71 F.3d at 1386-87, 1390.

> **b)** *The evidence will show that African-American candidates have largely not succeeded in being elected to the Board (Senate Factor 7).*

The second "predominant" factor (Senate Factor 7) evaluates "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37. This factor does not require the total absence of minority electoral success. *See id.* at 75 ("[T]he language of § 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose a § 2 claim."). By its terms, this factor is concerned with the success of candidates who are members of the minority group, not all candidates who are minority-preferred.

The parties have stipulated to the underlying facts that prove that African-American electoral successes have been minimal in FFSD, including that: (1) from 1988 until 2000, Dr. Doris Graham, who will testify at trial, was the only African American on the Board; (2) according to the 2010 Decennial Census, African Americans comprise 48.19% of the District's voting-age population, yet, at least since 1988, there have been at most two African-American Board members out of seven on the Board at the same time (28.6%); (3) this underrepresentation is not due to a shortage of Black candidates: 24 Black candidates ran for Board seats in the 12 contested elections from 2000 to 2015, but were successful only five times (20.8%), while white candidates have been successful 22 out of 37 (59.5%) times since 2000, a success rate almost three times that of Black candidates.

The stipulated facts will also show that despite the growth of the African-American population in the District since 2000, minority electoral success has not improved. From 2011 to 2015, the more recent (and most probative) elections, 13 Black candidates ran for Board seats,

but only two (15.4%) were successful. During that period, 16 white candidates ran for Board

seats, and ten (62.5%) were successful. There were no African-Americans elected to the Board in

2011, 2012, or 2013. As recently as the 2013-2014 term, there were *no* African-American Board

members. In addition, there were no *elected* African Americans on the Board from 2011 to 2014,

as the sole African-American Board member during those Board terms was Plaintiffs' witness

Charles Henson, who never won an election and was defeated in the only contested election in

which he ran, in 2013. And although there are currently two African-American Board members,

they still represent only 28.6% of Board seats, and, as noted, the evidence will demonstrate that

both of these candidates won elections marked by special circumstances (2014 and 2015).

> **2. Despite the District's cheerful reimagining of the practical realities, the evidence at trial will clearly set forth the historical and ongoing effects of discrimination in the State, St. Louis metro area, and FFSD (*Senate Factors 1 and 5*).**

>> *a) The evidence at trial will demonstrate that Senate Factor 1 weighs in favor of Plaintiffs.*

Senate Factor 1 asks this Court to consider the extent to which the "history of official

discrimination in the state or political subdivision" has "touched the right of the members of the

minority group to register, to vote, or otherwise to participate in the political process." *Bone Shirt

II*, 461. F.3d at 1021 (quoting S. Rep. No. 97-417 at 28-29). Plaintiffs' evidence at trial, along

with the parties' stipulated facts, will demonstrate that this factor weighs in favor of Plaintiffs.

*First*, there is incontrovertible evidence of a history of official discrimination in the State

of Missouri, St. Louis County, and FFSD itself. *See African-Am. Voting Rights Legal Def. Fund,

Inc. v. Missouri*, 994 F. Supp. 1105, 1125 (E.D. Mo. 1997) (noting that a "litany of Missouri

constitutional provisions, statutes, ordinances, and decisions dating from 1820 to 1976" could

constitute sufficient evidence of "official discrimination" to satisfy Senate Factor 1), *aff'd*, 133

F.3d 921 (8th Cir. 1998). For example, the parties have stipulated that: (1) the State expressly

restricted African Americans' ability to participate in the political system in its Constitution and statutory provisions and engaged in official discrimination in education; (2) St. Louis County, which subsumes FFSD, engaged in discriminatory real estate and exclusionary zoning practices designed to compel African Americans to remain in designated, underserved areas, which gave rise to three landmark residential discrimination cases; and (3) FFSD's very creation was a remedy to state-sanctioned discrimination. These stipulated facts and others will be explored in more depth through the trial testimony and expert report of Plaintiffs' expert Colin Gordon.

*Second*, despite the District's attempts to downplay it as irrelevant, this historical discrimination forms, as the trial evidence will establish, the backdrop for the present conditions in FFSD that work together to prevent African Americans in FFSD from having an equal opportunity to elect candidates of their choice. As an initial matter, the proof of "[a] history of pervasive, purposeful discrimination" itself is "'strong circumstantial evidence' . . . that the present day ability of minorities to participate on an even footing in the political process has been seriously impaired by the past discrimination." *Buckanaga v. Sisseton Indep. Sch. Dist. No. 54-5*, 804 F.2d 469, 474 (8th Cir. 1986) (quoting *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984)); *see also Gingles*, 478 U.S. at 45. This is true because, as Plaintiffs' witnesses will testify, "[o]fficial discrimination not only prevents blacks from electing representatives of their choice, it [has] also [led] to disillusionment, mistrust, and disenfranchisement" that has "cause[d] black voters to drop out of the political process and potential black candidates to forgo an election run." *Rural W. Tenn. African Am. Affairs Council v. Sundquist*, 29 F. Supp. 2d 448, 459 (W.D. Tenn. 1998). Dr. Gordon, moreover, will testify that, among other things, the historical housing discrimination in St. Louis County was and remains a chief driver of a host of socioeconomic disparities between African-American and

white residents in the county and the District itself that, as discussed more below, persists today. As courts have recognized, such disparities place African Americans on an unequal footing as compared to whites when it comes to participating in the political process, *see, e.g., Blytheville*, 71 F.3d at 1390 (concluding that although "strides ha[d] been made," "the district court did not accord sufficient weight to the vestiges of that history," and that "recognized historic effects of discrimination in the areas of health, employment, and education impact negatively on minority political participation"); *Buckanaga*, 804 F.2d at 474 (proof of official discrimination is circumstantial evidence "that past discrimination has also led to present socio-economic disadvantages, which in turn reduces participation and influence in political affairs" (citing *Marengo Cty. Comm'n*, 731 F.2d at 1567)).

b) *Continuing effects (Senate Factor 5).*

Relatedly, Senate Factor 5 considers whether minorities "in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37. These "lingering effects of discrimination a[re] evidenced by economic and social disparity between [the minority group] and whites," *Buckanaga*, 804 F.2d at 474, and can diminish the effective political participation of both minority voters and minority candidates, *see, e.g.*, *Ward v. Columbus Cty.*, 782 F. Supp. 1097, 1104 (E.D.N.C. 1991) (segregation "disadvantages the black community politically by depriving its potential candidates of the opportunity to make acquaintances and to build trust and acceptance among white voters"); *Rural W. Tenn.*, 29 F. Supp. 2d at 459 ("The economic and educational isolation of African-Americans . . . limits their ability to fund and mount political campaigns. In this sense therefore, blacks are not able to equally participate in the political process."). This analysis does not require that African Americans in the relevant jurisdiction be worse off in either an absolute or relative sense than

African Americans elsewhere in the region, the state, or nationally. To the contrary, where courts have considered the existence of socioeconomic disparities outside the jurisdiction, they have treated it as additional evidence that minorities "in the state or political subdivision" continue to bear the effects of discrimination. *See, e.g.*, *Buckanaga*, 804 F.2d at 474; *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1038-39 (D.S.D. 2004) ("*Bone Shirt I*").

The evidence at trial will demonstrate conclusively that this factor weighs in Plaintiffs' favor. *First*, despite Dr. Rodden's cheerful reimagining of present-day realities, the evidence at trial will provide ample proof that African Americans bear the effects of past discrimination. For example, Dr. Gordon will testify that there are persistent socioeconomic disparities in the St. Louis metro area and in FFSD itself, which will be buttressed by the parties' stipulations and ACS data on, among other things, median income, unemployment and poverty rates, and access to health insurance. Dr. Gordon will further explain that because majority-Black block groups in the District tend to do worse on socioeconomic measures than the District as a whole and FFSD residents are not somehow spared the effects of discrimination in the larger regions in which they live, the question of whether disparities along some socioeconomic metrics are smaller in FFSD than in the greater St. Louis area is a red herring. Other evidence of the persistent and pernicious effects of past discrimination will include, among other things: (1) data from the Office of Civil Rights showing the existence of an achievement gap and disciplinary disparities in FFSD, and stipulations to that effect; (2) the findings of the Department of Justice and the Missouri Attorney General reports of discrimination in law enforcement in the area, including in FFSD; and (3) the testimony of Dr. Gordon and other witnesses that the "lived segregation" on the ground in FFSD is very real.

*Second*, although the Eighth Circuit has explicitly acknowledged "the recognized historic effects of discrimination in the areas of health, employment, and education," *Blytheville*, 71 F.3d at 1390, Plaintiffs will set forth evidence linking past discrimination to present-day effects, including: (1) the testimony of current Board members, Plaintiffs, and other witnesses that past discrimination continues to have present everyday effects in FFSD and that discrimination is ongoing in areas such as housing and education; (2) Dr. Gordon's testimony on how and why past housing discrimination reverberates today; and (3) the acknowledgment by the District's own expert that discriminatory redlining and zoning and restrictive housing covenants continue to be an issue in the socioeconomic life of St. Louis County.

*Third*, the trial evidence will demonstrate that the continuing effects of past discrimination continue to hinder African Americans' ability to participate in the political process – both for voters and candidates. *See Gingles*, 478 U.S. at 69 ("[P]olitical participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes."). For example, Plaintiffs and other witnesses, including former candidates for the Board, will testify as to the barriers faced by African-American voters and candidates due to socioeconomic disparities and residential and social segregation. The testimony of Plaintiffs' expert Dr. David C. Kimball, moreover, will establish that the social science literature shows that depressed socioeconomic wellbeing increases voting "costs" and dampens political participation among African Americans, that a disparity exists between African-American voter registration in Missouri as compared to white voter registration, *see Buckanaga*, 804 F.2d at 474 (disparity in state registration races evidence of depressed political participation), and that Dr. Rodden's turnout analysis indicates that African-American turnout has always been lower than or

statistically indistinguishable from white turnout. Dr. Kimball and other witnesses will also testify that unequal access to the political process has a negatively reinforcing effect on candidates and voters, *i.e.*, that the lack of success at the polls has generated a sense of political futility among African-American voters and would-be candidates, which in turn results in continued lack of success at the polls.

### 3. The remaining Senate Factors also weigh in Plaintiffs' favor, findings that are reinforced by the District's misguided attempts to prove otherwise.

#### a) The evidence will show that the Board is not responsive to the particularized needs of the African-American community (Senate Factor 8).

Senate Factor 8 evaluates "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 45. Plaintiffs' trial evidence, much of which will be undisputed, along with the parties' stipulations, will demonstrate that the Board has not been responsive to the needs of the African-American community in FFSD.

*First*, the evidence will show that many of the current Board members are not even aware of the particularized needs and concerns of the African-American community, particularly of the Black students who comprise the vast majority of the school population, let alone responsive to those needs. For example, the trial and deposition testimony of current and former Board members will demonstrate that many current Board members are not even aware of the historic and ongoing effects of discrimination faced by African Americans in FFSD or the State more broadly, or believe that no particularized needs or concerns stemming from this discrimination exist. This is so despite the indisputable evidence, discussed above, that the legacy of a long history of official discrimination persists in exist FFSD. Even in the instances where some Board members seem cognizant of particularized needs of their African-American students, the evidence will show that they have inadequately addressed or inappropriately responded to those

needs by, for example, disclaiming and shifting responsibility for educational and disciplinary disparities.

The evidence, much of it stipulated, will also demonstrate that the Board inadequately responded to the African-American community's concerns regarding the highly controversial suspension in November 2013 and resignation in March 2014 of Dr. Art McCoy, the District's first African-American superintendent, whose success as a superintendent, as the parties have stipulated, was publicly recognized. As Plaintiffs' witnesses will testify, Dr. McCoy is highly respected within the African-American community, whose members viewed him as an accomplished, successful, and effective superintendent. The evidence of the Board's lack of responsiveness to the African-American community's concerns regarding his treatment by the Board will include, among other things, stipulations, and trial and deposition testimony by Plaintiffs' witnesses and Board members that: (1) in the African-American community, there was widespread opposition to and concern about the lack of transparency in the decision to suspend Dr. McCoy that was publicly expressed to the Board on multiple occasions; (2) with the exceptions of citations of "personnel reasons" and "trust issues," the Board did not provide justifications for its actions, let alone adequately address concerns that the Board's actions were racially motivated, and chose to shield itself from any explanation or accountability to the community by keeping closed its meetings and records about Dr. McCoy; and (3) Board members' post-hoc attempts to justify that inadequate response now during this litigation only highlights the inadequacy of their response to the community.

b) *The evidence will show that African-American candidates for the Board are denied access to the candidate slating processes (Senate Factor 4).*

Under this factor, "if there is a candidate slating process," courts consider "whether members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at

37; *accord Clay v. Bd. of Educ. of St. Louis*, 896 F. Supp. 929, 941-42 (E.D. Mo. 1995) ("*Clay I*"). While there may not be a "consensus in federal law or political science texts on a definitive meaning of the phrase 'slating group[,]' . . . there is no support in the law for [a] restrictive definition." *Collins I*, 816 F.2d at 938. In fact, the Supreme Court has "viewed 'slating' as essentially involving the endorsing of candidates," *see id.* at 938-39 (citing *White v. Regester*, 412 U.S. 755, 766-67 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 150-51 & n.30 (1971)), and this Court has described a slating group broadly as "a group of individuals who select candidates to run as a bloc to fill seats which are currently up for election." *Clay I*, 896 F. Supp. at 933. In addition, access to a slating process is about more than being allowed to apply. As the Eleventh Circuit has noted, "[i]n jurisdictions where there is an influential official or unofficial slating organization, the ability of minorities to participate in that slating organization *and to receive its endorsement* may be of paramount importance." *Marengo Cty. Comm'n*, 731 F.2d at 1569 (emphasis added).

The evidence at trial will show that there are two primary slating organizations in FFSD Board elections and that African-American candidates have largely been denied access to their slates.

*First*, the stipulated facts, buttressed by trial and deposition testimony, will show that the Ferguson-Florissant National Education Association ("FFNEA") and the North County Labor Club ("NCLC"), a local affiliate of the AFL-CIO labor council's Committee on Political Education, are both slating organizations. As the evidence will establish, both organizations are influential non-governmental organizations that regularly endorse candidates for the Board, and each group promotes their endorsed candidates jointly through a variety of means, including, as the parties have stipulated: mailings, monetary campaign contributions, and access to volunteer

and/or solicitation lists. The parties' stipulations and testimony of Plaintiffs' expert witness Dr. Kimball will also establish that endorsements from these organizations correlate well with success.

*Second*, the evidence will also show that African Americans have been denied access to these slating groups. As trial and deposition testimony will establish, both FFNEA and NCLC have opaque processes for selecting candidates to endorse; there are no published criteria for endorsement, and candidates—successful in seeking endorsement or not—are not aware of how either group decides whom to endorse. In addition, undisputed trial evidence will show that both groups have endorsed more white candidates than Black candidates.

For example, of the seven current Board members and the most recent outgoing Board member, all sought FFNEA endorsement. All current white Board members, but neither of the two African-American Board members, received FFNEA endorsement. Expert testimony and other evidence, moreover, will demonstrate that, since 2004, similar numbers of African-American and white candidates have run in each contested election, yet in the six elections for which FFNEA endorsement information is available 11 out of 19 white candidates (58%) received a FFNEA endorsement while only 3 of 15 African-American candidates (20%) received a FFNEA endorsement (one of whom was not even the candidate preferred by Black voters). An FFNEA officer will testify that he recognizes the value of a diverse endorsement committee, yet the evidence will establish that the FFNEA has repeatedly declined to support diversity on the Board, and has endorsed individuals who are entirely unaware of the particularized needs of African-American students.

The trial evidence will likewise demonstrate racial disparities in NCLC's pattern of endorsements. The five current white Board members received NCLC endorsement. The most

recent outgoing Board member, Mr. Schroeder, who is white, also received the endorsement the one year that he sought it. Neither of the two African-American Board members received an endorsement from the NCLC. The evidence will show that, since 2004, the NCLC has endorsed 13 candidates for the Board, 12 of whom are white.

c) *There is evidence that Board campaigns are characterized by racial appeals (Senate Factor 6).*

The sixth Senate Factor looks at "the use of overt or subtle racial appeals in political campaigns." *Gingles*, 478 U.S. at 44-45. Racial appeals can take a variety of forms, including the use of racially charged campaign tactics and the highlighting of racially charged campaign issues "that prey[] on racial anxiety," *United States v. City of Euclid*, 580 F. Supp. 2d 584, 610 (N.D. Ohio 2001); *see id.* at 613, such as campaign literature that "appealed to the fears of Town residents that black students . . . would be bused to schools in the Town," *Goosby v. Town Bd. of Hempstead*, 956 F. Supp. 326, 342 (E.D.N.Y. 1997). *See also, e.g.*, *Bone Shirt I*, 336 F. Supp. 2d at 1041 (evidence of racial appeals included accusations that Native Americans were "trying to take land back and put it in trust"); *Williams v. City of Dallas*, 734 F. Supp. 1317, 1348 (N.D. Tex. 1999) (campaigns employed racial appeals where platforms included opposition to busing for school desegregation); *Cofield v. City of LaGrange*, 969 F. Supp. 749, 777 (N.D. Ga. 1997) (evidence that discussion on districting and school consolidation were racially charged issues).

The trial evidence will demonstrate that political campaigns for FFSD Board seats have been characterized by subtle racial appeals, particularly during the 2014 election. This evidence will include, among other things, the witness testimony that white Board candidates in the 2014 race: (1) focused on racially charged issues such as "discipline," classroom disruptions, and making students "feel safe"; and (2) highlighted concerns related to the transfer of predominantly Black students from neighboring unaccredited school districts to FFSD, a racially charged issue

in Missouri and within FFSD, and similar to the focus of campaigns that courts have found to be characterized by racial appeals, *see, e.g.*, *Goosby*, 956 F. Supp. at 342-43; *Williams*, 734 F. Supp. at 1348; *Brown v. Bd. of Comm'rs of Chattanooga*, 722 F. Supp. 380, 394-96 (E.D. Tenn. 1989) (Black candidate's perceived "anti-busing" position enabled him to obtain enough white crossover votes win election). Plaintiffs' witnesses will testify that they and other African-American voters in the District viewed candidates' statements about transfer students, and the District's treatment of transfer students, as an attempt by an all-white Board to stem any growth of the District's African-American student population. The evidence will show that Board members still shroud concerns about the transfer student program in economics, even though the cost of tuition is borne by the source school district and outside donations covered the transportation costs.

The evidence will also show that personal attacks on Plaintiff Johnson, a Board candidate during the 2014 election, also featured racial coding, including allegations that he was an absentee father and accusations that he was a renter, not a homeowner. At the same time, a white candidate in that election had previously been accused of embezzling funds from the District, but none of the other candidates used campaign language or materials that raised the issue of that candidate's integrity. Plaintiffs' witnesses will testify that they understood these attacks on Johnson, particularly in comparison to how other candidates were treated, as racially-charged campaign tactics.

The evidence will show that similar racial appeals occurred during the 2013 election. For example, Plaintiffs' witnesses will testify that, as in 2014, white candidates for the Board: (1) frequently discussed the issue of school discipline, (2) failed to recognize the known biases towards disciplining Black students and particularly Black male students, and (3) tied the racial

achievement gap to "bad parenting." In addition, former Board member Charles Henson will testify that his opponents exploited his outspoken recognition of racial bias and his emphasis on racial inclusion, bridging the racial achievement gap, and correcting the lack of diversity in District hiring. Witnesses will testify that they perceived the exploitation of Mr. Henson's concerns by his opponents as a racial appeal.

### d) FFSD employs voting practices and procedures that tend to enhance the opportunity for discrimination (Senate Factor 3).

The third Senate Factor considers whether the jurisdiction maintains "voting practices or procedures that tend to enhance the opportunity for discrimination the minority group." *Gingles*, 478 U.S. at 45. There is no dispute that FFSD maintains three such practices.

As the parties have stipulated, FFSD employs (1) an at-large voting scheme, (2) staggered terms, and (3) off-cycle (*i.e.*, April versus November) elections. Courts have long held that each of these practices and procedures tends to enhance the opportunity for discrimination, especially when, as here, they are combined.[10]

---

[10] With respect to at-large voting, the Supreme Court has long recognized that such schemes can "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (alteration in original) (citation and internal quotation marks omitted); *see Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994); *see also Blytheville*, 71 F.3d at 1390 ("The majority vote requirement, staggered terms, and at-large structure also tend to suppress minority voters' influence."); *Buckanaga*, 804 F.2d at 471 (observing that the 1982 amendment to Section 2 "was aimed particularly at discriminatory at-large election systems which dilute minority voting strength"). Courts have likewise recognized that staggered terms enhance the opportunity for discrimination, *see, e.g.*, *Buckanaga*, 804 F.2d at 475 (staggered terms "promote the dilution of minority voting strength because they limit the number of seats, [and] create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting"), particularly in conjunction with at-large voting, *see, e.g.*, *Blytheville*, 71 F.3d at 1390 ("[S]taggered terms[] and at-large structure also tend to suppress minority voters' influence." (citing *De Grandy*, 512 U.S. at 1018)); *Collins v. City of Norfolk*, 883 F.2d 1232, 1236 (4th Cir. 1989) ("*Collins II*") (noting dilutive effect of "at-large voting in a multimember political unit . . . may be enhanced by staggered terms"). Off-cycle elections, too, have been found to have dilutive effects on minority voting strength through two mechanisms. First, they disproportionately depress minority turnout. *See NAACP v. Hampton Cty. Election Comm'n*, 470 U.S. 166, 178 (1985); *see also United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 444 (S.D.N.Y. 2010) ("[H]olding local elections at a time when only the most engaged and politically astute citizens—those citizens who feel the most enfranchised—are likely to vote will almost certainly result in the diminished influence of groups who feel generally excluded from the political fabric of the community."). Second, as the District's expert has written, they increase the relative influence of well-organized interest groups to maintain the status quo.

In addition, the evidence at trial will show that these practices do in fact tend to enhance the opportunity for discriminatory effects in FFSD. For example, in addition to the dilutive effects that are evidenced in FFSD by the statistical evidence described in the second and third *Gingles* preconditions above, at-large voting works in conjunction with socioeconomic racial disparities, like those in FFSD, to disadvantage minority candidates who "are likely to have less access to the necessary resources for travel and advertising" outside the immediate area surrounding the candidates' homes. *Ward*, 782 F. Supp. at 1104. The evidence will show that African-American candidates in FFSD have experienced such difficulties. As Dr. Rodden has written, moreover, off-cycle elections increase the relative influence of well-organized interest groups to maintain the status quo. As discussed above, there are two such groups in FFSD: FFNEA and the NCLC, both of which generally endorse white candidates.

### e) The evidence will show that FFSD's rationales for maintaining these practices and procedures are tenuous (Senate Factor 9).

The last factor considers whether the policies underlying the use of these voting practices are "tenuous." *See Gingles*, 478 U.S. at 45. The evidence at trial will show that, under a practical evaluation of present-day conditions, FFSD's rationales for maintaining these practices that tend to enhance the opportunity for discrimination against the minority group are tenuous, especially when weighed against the reality that these practices, taken together, form a considerable barrier to African-American voters' ability to elect their preferred candidates.

**At-large voting.** As the trial and deposition testimony will show, FFSD justifies at-large voting by claiming that it ensures that Board members represent the entire school district rather than specific sub-districts. The evidence will show, however, that the maintenance of at-large voting achieves the *opposite*. As discussed above, the African-American community in FFSD has been underrepresented on the Board, and as the parties have stipulated, no current Board

members reside in municipalities other than Florissant or Ferguson—and have not been since 2011. As Plaintiffs' witnesses will testify, the absence of Board members from predominantly African-American areas of the District exacerbates the Board's lack of awareness about the issues facing African-American residents and the Board's lesser familiarity with schools in African-American neighborhoods. This lack of geographic representation is especially noteworthy when considering that, as part of the desegregation order that created the present-day FFSD, the district court took pains to ensure that the annexed school districts of Kinloch and Berkeley had representation on the school board.

**Off-cycle elections.** As the trial and deposition testimony will show, the District suggests that off-cycle elections are justified because they allow more attention to be paid to school board elections. The evidence will show that since 2000, African-American turnout has always been lower than, or statistically indistinguishable from, white turnout and that African-American voters are understandably disillusioned with Board elections in which they have had limited success electing candidates who are aware of and responsive to the community's needs. The District rationale is tenuous when weighed against the depressive effect that off-cycle elections have on the political participation of minority voters in FFSD.

## II.    CONCLUSION

As set forth above, the evidence at trial will demonstrate that Ferguson-Florissant School District's at-large method for electing Board members deprives its African-American residents of an equal opportunity to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act.

# RELIEF

Plaintiffs seek both declaratory and injunctive relief:

(1) Plaintiffs request this Court declare that FFSD's at-large method of electing members to the Board violates Section 2 of the Voting Rights Act;

(2) Plaintiffs request this Court enjoin Defendants, and their agents and successors in office, from administering, implementing, or conducting any future elections in the FFSD under the current election scheme, and as per Plaintiffs' motion for interim relief, Plaintiffs request that as an interim measure, the Court postpone the upcoming April 2016 election until the next practicable date on which elections are currently scheduled to take place (either the August 2016 statewide primary or the November 2016 general election);

(3) Plaintiffs request this Court set a timeline for crafting and implementing an election system for the FFSD School Board that complies with Section 2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment;

(4) Plaintiffs request this Court order all future elections for the FFSD School Board comply with Section 2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment;

(5) Plaintiffs request this Court order Defendants to undertake a public education campaign regarding the new election system once it is ordered;

(6) Plaintiffs request this Court grant an award of attorneys' fees and costs incurred, pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

# DEFENSES

Defendant FFSD advanced several defenses in its amended answer, Doc. No. 46:

## I. STANDING

The District argues that Plaintiffs lack standing and their claim is otherwise barred because a majority of the FFSD VAP is African-American. This argument fails for two reasons:

*First*, there are no supportable numbers that demonstrate that African Americans constitute a numerical majority of FFSD's VAP. As the parties agree and the stipulated population data establish, no published government data shows that African Americans constitute a majority of the FFSD VAP.

Mr. Cooper will testify that the Decennial Census population data is the appropriate metric by which to determine the VAP of the FFSD. The Decennial Census data is a full count of the nation's entire population every ten years and provides an accurate and complete count of the FFSD population and its demographics. Missouri state law requires the use of Census figures to determine the population of a jurisdiction for redistricting purposes. *See* Mo. Rev. Stat. § 1.100(1) ("The population of any political subdivision of the state for the purpose of representation . . . is determined on the basis of the last previous decennial census of the United States."). Courts consider Decennial Census data "presumptively accurate." *See Vill. of Port Chester*, 704 F. Supp. 2d at 439. Courts resolving VRA claims in the Eighth Circuit regularly rely exclusively on Decennial Census figures in determining the demographics of a jurisdiction.[11] And as Mr. Cooper will explain, the Decennial Census figures are the most accurate for ascertaining the VAP of the FFSD.

Those stipulated 2010 Decennial Census figures show that African Americans in FFSD are not a majority of the VAP: of the District's total VAP, 47.33% are single-race African-American and 48.19% are any part African-American. Under neither figure are African Americans a majority of the FFSD VAP.

Mr. Cooper will also testify that the American Community Survey ("ACS") estimates should not be used for population estimates. Unlike the Decennial Census, the ACS is not an actual enumeration of the entire population, but rather a sample of the population, which forms the basis for population estimates produced by the Census Bureau on a rolling basis. Although the ACS is the only available source of data for certain population characteristics like citizenship, income, and homeownership (and is therefore an appropriate data source in some

---

[11] *See, e.g.*, *Blytheville*, 71 F.3d at 1385 n.1; *African Am. Voting Rights*, 54 F.3d at 1347-48; *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 926 (E.D. Ark. 2012); *Bone Shirt I*, 336 F. Supp. 2d at 983; *Williams v. City of Texarkana*, 861 F. Supp. 756, 758 (W.D. Ark. 1992).

circumstances), Mr. Cooper will explain that the Census Bureau itself cautions against using ACS estimates for total population estimates because, unlike the Decennial Census complete count, the ACS uses estimates with a sampling error.[12] *See* Joint Stip. ¶ 24, Ex. B (2011 – 2013 3-Year ACS Table B01001: Sex by Age, FFSD). For that reason alone, the Decennial Census data are presumptively a better source of data upon which to rely in assessing the District's total VAP.

But even if the Court were to rely on ACS data, the parties have stipulated that the 2011 – 2013 three-year ACS estimates that the FFSD single-race Black VAP is 24,313, or 48.94% of the District's VAP.[13] There is no dispute that according to the 2011 – 2013 three-year ACS estimates, African Americans are not a majority of the FFSD VAP. Thus, all published government statistics show that African Americans are a minority of the FFSD VAP.

Nevertheless, the District has advanced the defense that Plaintiffs' complaint is barred based on the District's expert's contrived population projections, which, contrary to the government's published data, project the Black VAP in FFSD is greater than 50%. Mr. Cooper will explain that the District's expert's projections are based on speculation and fuzzy math. The District's calculations were derived without considering the ACS's caution against using ACS estimates as a population count and by disregarding the ACS-reported margin of error. As a matter of law, there is no basis or precedent for the Court to reject presumptively valid government statistics in favor of an unsubstantiated projection custom-made for this litigation by

---

[12] A group of former Directors of the Census Bureau recently argued in a pending case before the Supreme Court that "ACS estimates are not reported at the small geographic levels redistricters normally use to build districts," and that "the geographic areas at which such estimates are available carry large error margins because of the small sample sizes." Br. for Amici Curiae Former Dirs. of U.S. Census Bureau at 4, *Evenwel v. Abbott*, No. 14-940 (U.S. Sept. 25, 2015), *available at* http://www.scotusblog.com/wp-content/uploads/2015/10/Evenwel-FormerCensusBureauDirectorsBrief092515.pdf.

[13] The 2011 – 2013 three-year ACS does not include an estimate of the any part Black VAP.

the District's expert, relying on population estimates with substantial – but conveniently ignored – margins of error. Consistent with prior decisions in this Circuit and with Missouri law, this Court should rely on government population data, and focus in particular on the 2010 Decennial Census data, when assessing the FFSD VAP.

*Second*, even if the Black VAP ("BVAP") reaches 50%, there is no Eighth Circuit rule prohibiting vote dilution claims where a racial minority group that has suffered a history of discrimination constitutes a numerical majority of the jurisdiction's VAP. Indeed, the Supreme Court has made clear that where, as here, the minority group in question has suffered from a sustained pattern of discrimination and longstanding socioeconomic inequalities, minority voters require more than a bare numerical majority in order to elect their preferred candidates. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) ("[I]t may be possible for a citizen voting-age majority to lack real electoral opportunity."); *see also Smith v. Clinton*, 687 F. Supp. 1361, 1362 (E.D. Ark. 1988) (three-judge court), *aff'd*, 488 U.S. 988 (1988) (mem.); *see id.* at 1363 (ordering Board to implement plaintiffs' plan providing for single-member majority-Black district with a 60.55% BVAP to "give blacks a fair opportunity to elect the candidate of their choice . . . and help to eradicate the effect of the dual-member, at-large system on participation by blacks in the political process"); *see also Bone Shirt II*, 461 F.3d at 1023 (applying 65% minority population as a "guideline" to consider in fashioning remedial relief and correctly considering turnout rate and incumbency in formulating a districting plan).

Consistent with this Supreme Court guidance, three of the four Courts of Appeals that have considered this question of whether plaintiffs are barred from bringing a vote dilution claim where a minority racial group constitutes a majority of a jurisdiction's VAP (the Second, Fifth,

and Eleventh Circuits) have rejected the *per se* rule proposed by the District in this case.[14] *See Monroe v. City of Woodville*, 881 F.2d 1327, 1332-33 (5th Cir. 1989) ("Unimpeachable authority from [the Fifth Circuit] has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution.");[15] *Meek v. Metro. Dade Cty.*, 908 F.2d 1540, 1545-46 (11th Cir. 1990) (holding that a claim brought by minority voters who constitute a numerical majority could be viable due to "functional effect" of existing system, and that the district court "properly rejected the county's contention that *Gingles* could not apply at all in a setting where the Non Latin White bloc did not constitute a majority of the total population"); *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012) (approvingly citing *Salas*'s conclusion that majority-minority vote dilution claims are not barred as a matter of law). As the Fifth Circuit explained, "the plain text of [Section 2 of the VRA], as affirmed by case law, makes clear that the Act is concerned with protecting the minority in its capacity as a national racial or language group," not in its capacity as a numerical minority in any particular jurisdiction. *Salas*, 964 F.2d at 1547.[16] In line with the weight of circuit authority, even if African Americans were to constitute a bare majority of a jurisdiction's population, Plaintiffs claim would not be barred.

Indeed, the facts of this case demonstrate precisely why the *per se* rule urged by the

---

[14] Without expressly addressing this issue, the Ninth Circuit has considered claims by minority voters from a group that constituted a plurality of a jurisdiction's VAP, without suggesting that this would act as a *per se* bar to relief. *See Valladolid v. City of Nat'l City*, 976 F.2d 1293, 1294 (9th Cir. 1992) (considering a vote dilution claim in which the plaintiff minority groups formed a plurality of the population (49.6%)).

[15] The Fifth Circuit has repeatedly reaffirmed this holding. *See Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1547 (5th Cir. 1992) (reaffirming that minorities may bring *Gingles* claims even if they constitute a voting-age population or registered-voter majority); *Gonzalez v. Harris Cty.*, 601 F. App'x 255, 256 (5th Cir. 2015) (per curiam) (reviewing vote dilution case involving Hispanic plurality).

[16] Among the Courts of Appeals, only the Fourth Circuit has applied a rule similar to the rule advocated by the District. *See Smith v. Brunswick Cty. Bd. of Supervisors*, 984 F.2d 1393, 1401 (4th Cir. 1993) (holding that if minority voters "have the numbers necessary to win and members of the group are allowed equal access to the polls, it cannot be rationally maintained that the vote is diluted"). And, even then, the Fourth Circuit's decision barring the plaintiffs' claim arose in a vastly different context, where African Americans constituted a supermajority of the relevant districts' VAP (60%) and had a consistently higher turnout rate than white voters. *See id.* at 1400-02. That is a far cry from what the District asserts is the case here.

District would frustrate the purpose of Section 2. The evidence will show that members of the African-American community in FFSD are a historically disadvantaged group that faces present-day barriers to electoral participation as a result of ongoing socioeconomic effects of discrimination, as well as electoral processes that favor the status quo. Expert witnesses Gordon and Kimball will testify to the ongoing effects of racial discrimination that hinder African Americans' ability to participate equally in school board elections. NAACP representatives, individual Plaintiffs, and lay witnesses who have served on the FFSD Board will testify to the Board's lack of responsiveness to the needs of the African-American community, explain how the slating and campaign processes favor the status quo and hinder African-American voters' ability to elect candidates of their choice.

## II.   UNLAWFUL RELIEF

### A.  Racial Gerrymandering

The District contends that Plaintiffs are seeking relief that constitutes racial gerrymandering. Doc. No. 46, Am. Answer, at 5. As an initial matter, Plaintiffs' illustrative plans have not been proposed as a remedy, but were submitted to satisfy the requirements of *Gingles* I. Insofar as this is an attack on Plaintiffs' illustrative plans, Plaintiffs' plans clearly do not meet the standard for proof of a racial gerrymander set out in *Shaw v. Reno*, 509 U.S. 630, 644-45, 658 (1993), *i.e.*, that a plan is "bizarre" or "irrational" on its face, results in a pattern "unexplainable on grounds other than race," and that the only possible explanation for the plan was to "segregate" the races for purposes of voting.

Instead, the illustrative plans, as would be the case for any remedial plan Plaintiffs would support, were drawn, as discussed above, in compliance with traditional redistricting principles. Had Plaintiffs in fact intended to create a racially gerrymandered plan they could have done so by drawing one that contained six out of seven majority-Black districts, PLTF-45, *Suppl. Decl. of*

*William S. Cooper*, July 2, 2015, Figs. 7 & 8 (pp. 16-17), ¶¶ 27-28, with BVAP ranges from a low of 50.22% in District 6 to a high of 60.29% in District 3 and a total deviation of 8.81%. But Plaintiffs are not proposing that plan.

## B.  One-person, One-vote

The District contends that the relief sought by Plaintiffs impermissibly departs from the one-person, one-vote principle in violation of the Fourteenth Amendment. Plaintiffs' illustrative plans have not been proposed as a remedy, but were submitted to satisfy the requirements of *Gingles* I. However, as discussed above, Plaintiffs' illustrative plans do comply with one person, one vote.

Insofar as this defense is meant to suggest that Plaintiffs' illustrative plans violate one person, one vote because they are based on 2010 Census total population rather than VAP or citizen voting-age population ("CVAP"), then it readily fails. In voting and election cases, courts have regularly relied on Decennial Census total population data in determining the demographics of districts. *See Stabler v. Cty. of Thurston*, 129 F.3d 1015, 1019 (8th Cir. 1997) (relying on Census total population data in resolving plaintiffs' challenges to districting plans under Section 2 of the Voting Rights Act); *Preisler v. Mayor of St. Louis*, 303 F. Supp. 1071, 1075 (E.D. Mo. 1969) (because of "variances from the ideal based upon total population," the use of registered voters as a basis for apportionment of aldermanic wards is unconstitutional); *see also Bd. of Estimate of N.Y.C. v. Morris*, 489 U.S. 688, 692-93 (1989); *Gaffney v. Cummings*, 412 U.S. 735, 736-37 (1973).[17]

But even if voting-age population is used as the apportionment base, it is still possible to

---

[17] In *Evenwel v. Perry*, No. A-14-CV-335, 2014 WL 5780507, at *3 (W.D. Tex. Nov. 5, 2014), the three-judge court rejected plaintiffs' claim that Texas violated the equal protection clause of the Fourteenth Amendment by failing to take into account both voting-age population and total population in adopting a Senate redistricting plan as "a theory never before accepted by the Supreme Court or any circuit court." The Supreme Court has noted probable jurisdiction. *Evenwel v. Abbott*, 135 S. Ct. 2349 (2015).

create an illustrative seven single-member district plan for FFSD in which there are four majority-Black districts. Plaintiffs' Hypothetical Plan A, PLTF-45, *Cooper Suppl. Decl.*, Figs. 5 & 6 (pp. 14-15), achieves a total deviation of less than 10% based on either total population or voting-age population. According to the 2011 – 2013 ACS published by the Census Bureau, the voting-age population in Ferguson-Florissant School District is 49,679, of whom just 732 (1.47%) are not citizens. Given the minuscule size of the non-citizen population, it would be pointless to use CVAP for the apportionment base in the School District.

The District's experts also suggest districting plans for the District should be drawn based on population estimates contained in the ACS. Doc. No. 89-19, *Supplemental Report of Jonathan Rodden & Jowei Chen: Plaintiffs' Redistricting Proposals*, July 2, 2015, pp. 2-3. But state law provides that: "The population of any political subdivision of the state for the purpose of representation or other matters . . . is determined on the basis of the last previous decennial census of the United States." Mo. Rev. Stat. § 1.100(1). It would thus be a violation of state law, and unnecessary, to create a remedial plan based on ACS data. In *Upham v. Seamon*, 456 U.S. 37, 43 (1982), a case under Section 5 of the Voting Rights Act, 52 U.S.C. § 10304, the Court held that the requirements of federal law and the goals of state policy can be reconciled "only . . . if the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." In light of *Upham*, the Court here is bound to respect, in the absence of a conflict with federal law, the choice of the Missouri legislature that the population of any political subdivision of the state for the purpose of representation is determined on the basis of the last previous decennial Census. The adoption of a plan based on ACS would be contrary to state law and would not be necessary to remedy a violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

### III. NECESSARY PARTIES

The District contends that the Complaint is deficient and subject to dismissal due to the failure by the Plaintiffs to name those persons necessary to afford full and proper relief under Federal Rule of Civil Procedure 19. Specifically, FFSD contends that it lacks the legal authority to change the voting process because the voting processes for school board elections are statutory. The Eighth Circuit has recognized that "[w]hile parties can settle their litigation with consent decrees, they cannot agree to disregard valid state laws." *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 268 (8th Cir. 2011) (citation and internal quotation marks omitted). However, the Court went on to say that "if the consent judgment's remedy is necessary to rectify a violation of federal law, the district court can approve a consent decree which overrides state law provisions." *Id.* at 270 (citation, quotation marks, and emphases omitted).

Numerous federal courts have entered remedial orders contravening state statutes requiring at-large elections, in the absence of state actor defendants. *See, e.g.*, *NAACP v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978 (11th Cir. 1982) (remanding a county's statute-prescribed at-large election system in violation of the Fourteenth Amendment's Equal Protection Clause for the district court to impose a new single-member district system); *NAACP v. Gadsden Cty. Sch. Bd.*, 589 F. Supp. 953, 957 (N.D. Fla. 1984) ("The Court concludes that certain deviations from present state law will be required in the implementation of the new plan."); *Potter v. Washington Cty.*, 653 F. Supp. 121 (N.D. Fla. 1986) (accepting a proposal after consent judgment replacing statute-prescribed at-large school board elections with a single-member district plan).

### IV. ILLEGALITY

The District also contends that the Complaint violates Section 2's prohibition against voting schemes designed to effect racially proportional representation. Defendants appear to challenge as unlawful a hypothetical remedy map stemming from a hypothetical remedial

47

process that would follow after this Court's liability determination. Defendants' suggestion that Plaintiffs' illustrative plans, submitted to demonstrate that minority voters could constitute a majority within individual districts, would give rise to a Section 2 violation lacks merit and does not affect Plaintiffs' claim. Moreover, as demonstrated above, Plaintiffs' claim is based on the dilution of minority voting power through at-large multi-seat elections. It is not based on the disproportionate underrepresentation of African Americans on the FFSD Board. It is also not based on a claim of jurisdiction-wide disproportionality. *See League of United Latin Am. Citizens*, 548 U.S. at 403.

## DISPUTED MATERIAL FACTS

- The following material facts are in dispute:

    o Whether the districts in Plaintiffs' illustrative plans, upon visual inspection and given their Reock scores, are compact. (*Gingles* I)

    o Which candidates are candidates of choice for Black voters and for white voters in each contested election? (*Gingles* II and III)

    o Whether the unusual events surrounding the 2014 and 2015 Board elections constitute "special circumstances" such that the results of those elections should be discounted. (*Gingles* II and III, SF 2, SF 7)

    o Whether Black voters are cohesive and Board elections are characterized by racially polarized voting. (*Gingles* II, SF 2)

    o Whether Black-preferred candidates are usually defeated by white bloc voting. (*Gingles* III, SF 2)

    o Whether the history of official discrimination in Missouri, St. Louis County, and FFSD has touched upon the ability of African Americans in FFSD to participate in the political process. (SF 1)

    o Whether the socioeconomic disparities, disparities in law enforcement, and continuing segregation in FFSD are evidence that African Americans in FFSD continue to bear the ongoing effects of discrimination and whether those ongoing effects hinder their ability to participate effectively in the political process. (SF 5)

    o Whether the Board has been unresponsive to the particularized needs of the African-American community in FFSD, as evidenced by Board members' lack of awareness of particularized needs, disclaiming and shifting of responsibility for

addressing those needs, and silence in the face of clear community concern with the Board's treatment of Dr. McCoy. (SF 8)

o Whether the FFNEA and NCLC constitute slating groups (and their endorsement processes slating processes), and if so, whether African-American Board candidates have been denied access to the slating process of those groups. (SF 4)

o Whether (1) white candidates' statements that they were focused on "discipline," classroom disruptions, and making students "feel safe"; (2) white candidates' statements indicating opposition to transfer student program; (3) personal attacks on Johnson as compared to Morris; and (4) exploitation of Henson's outspoken recognition of racial bias and his emphasis, while on the Board, on racial inclusion, bridging the racial achievement gap, and correcting the lack of diversity in District hiring constitute subtle racial appeals. (SF 6)

o Whether African Americans in FFSD constitute a majority of FFSD's VAP.

## EVIDENTIARY ISSUES

Based on available information, Plaintiffs anticipate that there will be several evidentiary issues.

## I. EVIDENTIARY ISSUES WITH DEFENDANTS' ANTICIPATED EVIDENCE

### A. The Supplemental Report purportedly prepared by Drs. Rodden and Chen lacks foundation.

Plaintiffs anticipate that the District will attempt to place into the record Dr. Rodden's testimony concerning the *Supplemental Report of Jonathan Rodden & Jowei Chen: Plaintiffs' Redistricting Proposals*, July 2, 2015 (Doc. No. 85-19), as well as the report itself. Both should be excluded for lack of foundation for several reasons.

First, the parties do not know the source of the data and analysis in the report because Dr. Chen was not given and did not read the report before signing it or before his deposition. Doc. No. 85-25, *Dep. of Jowei Chen*, Aug. 19, 2015, at 9:3-5, 15:2 – 16:19 (designation filed concurrently herewith). Though Chen created the original version of Table 2 (p. 8) (which is the result of the data examination cited in the statement in ¶ 16 on the same page), *id.* at 19:22-23, he did not know if or how it had been edited, *id.* at 22:4-11.

Second, even with respect to tables and paragraphs that Dr. Chen has been able to recognize as stemming at least in some part from work he performed, the methods he used and facts and assumptions that he relied upon are not evident, let alone clearly reliable, and thus any testimony on these parts of the supplemental report must be excluded unless Dr. Chen himself is able to lay a proper foundation through live testimony.

### B. Evidence concerning the demographics and racial makeup of Board of the Hazelwood School District is irrelevant.

The parties have stipulated to demographic data for the Hazelwood School District and the racial makeup of the Hazelwood School Board, which Plaintiffs anticipate the District will use to support its claim that Senate Factor 7 weighs in its favor. The "totality of circumstances" evaluation is a local appraisal, and Senate Factor 7 looks specifically at the extent to which minorities are elected in the jurisdiction at issue. As a result, evidence concerning the demographics and racial makeup of the Board of the Hazelwood School District is irrelevant to the analysis of Senate Factor 7. If anything, Black candidates' success in a district with similar demographics is evidence that in FFSD, the at-large system works in conjunction with local circumstances to deprive African Americans of an equal opportunity to elect their preferred candidates to FFSD's Board. Unlike FFSD, Hazelwood was not formed through an involuntary desegregation order.

### C. The use of ACS estimates, not the 2010 Decennial Census, for population estimates

Plaintiffs anticipate that the District will argue that this Court should rely on ACS population estimates for purposes of analyzing the first *Gingles* threshold. As Cooper will explain at trial, however, the ACS, as an estimate, includes error margins that make precise determinations about the VAP of a small jurisdiction like the FFSD difficult, if not impossible. Accordingly, it is the Decennial Census, which is a complete population count, not the ACS

estimates, that is the appropriate source to use in determining population totals. The Court should therefore follow the approach of other courts resolving VRA claims in the Eighth Circuit and rely *exclusively* on Decennial Census figures in determining the demographics of FFSD[18] and disregard ACS estimates. Such an approach would also be consistent with Missouri state law, which requires the use of Census figures in redistricting. *See* Mo. Rev. Stat. § 1.100(1) ("The population of any political subdivision of the state for the purpose of representation . . . is determined on the basis of the last previous decennial census of the United States.").

### D. The use of population projections from the 2011-2013 ACS estimates for population estimates

The District is also likely to introduce population demographic estimates generated by a method of extrapolating data from ACS estimates created out of whole cloth by Dr. Rodden and not found in or directly ascertainable through the published ACS data itself. In particular, Dr. Rodden—who has admitted that he has never previously performed or even seen population projections of this nature—purported to calculate the any part BVAP of FFSD by undertaking a complicated series of steps, piling estimates on top of estimates. However, not only has the District been unable to cite a single case in which a court has relied on similar speculative calculations for population demographics,[19] but the District's expert—who purports to have

---

[18] *See, e.g.*, *Blytheville*, 71 F.3d at 1385 n.1; *African Am. Voting Rights*, 54 F.3d at 1347-48; *Beebe*, 895 F. Supp. 2d at 926; *Bone Shirt I*, 336 F. Supp. 2d at 983; *Texarkana*, 861 F. Supp. at 758.

[19] In *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969), cited by the District, the Supreme Court makes clear that ad hoc population projections like Dr. Rodden's cannot be used to justify election practices, particularly when those projections are created in anticipation of litigation. While recognizing that the Decennial Census data was at that point almost nine years out of date, the *Kirkpatrick* Court held that "[f]indings as to population trends must be thoroughly documented and applied throughout the State in a systematic, not an ad hoc, manner." *Id.* at 535. The state's estimates, similarly created in anticipation of litigation and not as part of an existing "policy of population projection," fell "far short of this standard." *Id.* at 535.

The only case cited by the District to support relying on projected data, not Decennial Census population counts, in a Section 2 case is one in which transparent methodology was used to determine the composition of the citizen VAP based on ACS data, with reported margins of error. *See Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 729-30 (N.D. Tex. 2009). In comparison, Dr. Rodden uses his own estimated data, not data published by ACS, to estimate demographic changes, and fails to report the margin of error for his estimates. That district court's accreditation of

extensive experience drawing redistricting plans—has acknowledged he is unaware of a single jurisdiction that has drawn its districts based on projections of the population rather than Census data, and that he himself had never done so. *See* Doc. No. 85-26, *Deposition of Jonathan Rodden*, Aug. 20, 2015, at 116:3-15, 116:24 – 117:21. To the contrary, courts have cautioned against using uncertain ACS estimates to project population forward. *See, e.g., Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 459 (N.D. Tex. 2010) (rejecting expert's projected population estimate based on uncertain ACS estimates as "correspondingly unreliable"). This Court should similarly regard such speculative projections with skepticism and set them aside in evaluating *Gingles* I.

## II.  THE DISTRICT'S ANTICIPATED OBJECTIONS TO PLAINTIFFS' EVIDENCE

### A.  Evidence of historical and ongoing discrimination by government entities other than FFSD

The District has reserved its objection on relevance grounds to facts concerning the historical and ongoing discrimination by government entities other than FFSD (*e.g.*, the State, St. Louis County, the Ferguson Police Department and Municipal Court). In doing so, it seems to misunderstand the nature of this Section 2 claim. This claim is not premised on intentional discrimination, but rather on its effects. When it comes to the effects of discrimination, the source of the discrimination is largely immaterial.

### B.  Evidence of discrimination in areas not perfectly contiguous with the borders of FFSD

The District also has reserved its objection on relevance grounds to facts concerning discrimination and socioeconomic disparities in a defined geographic area that overlaps with but

---

an expert's estimates was unusual. A different judge of the same court reached the opposite conclusion the following year, declining to use ACS data. *See Irving Indep. Sch. Dist.*, 690 F. Supp. 2d at 454 (finding that 2007 one-year ACS data were not sufficiently reliable to override the presumption that the 2000 Census data were correct, in part because the expert had not accounted for margins of error).

is not perfectly contiguous with the borders of FFSD. But it is unclear why discrimination that the District cannot dispute affects a subset of FFSD residents is somehow not relevant. And, in any event, FFSD residents who live just outside the overlapping areas are not somehow spared from the effects of discrimination experienced by their neighbors.

Dated this 22nd day of December, 2015.       Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

<u>**CERTIFICATE OF SERVICE**</u>

I, Julie A. Ebenstein, hereby certify that on December 22, 2015, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Kathryn B. Forster
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com
kforster@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

Respectfully Submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEY FOR PLAINTIFFS