UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, REDDITT HUDSON, F. WILLIS JOHNSON and DORIS BAILEY,<br><br>Plaintiffs,<br>v.<br><br>FERGUSON-FLORISSANT SCHOOL DISTRICT and ST. LOUIS COUNTY BOARD OF ELECTION COMMISSIONERS,<br><br>Defendants. | Civ. No. 4:14 CV 2077 RWS |

## DEFENDANT FERGUSON FLORISSANT SCHOOL DISTRICT'S REPLY TO PLAINTIFFS' TRIAL BRIEF

The District files the instant Reply to Plaintiffs' Trial Brief to address specific portions of Plaintiffs' Brief and arguments. This is not intended to restate the multitude of reasons for finding that the District is not liable for violating the Voting Rights Act as those have already been detailed in the District's Trial Brief and Motion for Summary Judgment. As a result, this Reply addresses the following issues: Plaintiffs' burden under Section 2 of the Voting Rights Act; reliance on the 2011 – 2013 ACS over the 2010 decennial census; the *Bartlett* decision; population trends; liability without a remedy; disputed facts; and evidentiary issues.

**I. Plaintiffs must prove, by a preponderance of the evidence, all three *Gingles* factors plus the totality of the circumstances.**

"The essence of a §2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives. This Court has long recognized that

1

multimember districts and at-large schemes may 'operate to minimize or cancel out the voting strength of the racial [minorities in] the voting population. The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, *by virtue of its numerical superiority*, will regularly defeat the choices of minority voters." *Thornburg v. Gingles*, 478 U.S. 30, 47-48 (1986). (emphasis added.)

"A successful §2 plaintiff must show three necessary preconditions: (1) the minority group is sufficiently large and geographically compact to constitute an effective majority in a single-member district; (2) the minority group is politically cohesive; and (3) *the majority* votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Stabler v. County of Thurston, Neb.,* 129 F.3d 1015, 1020-1021 (8th Cir. 1997). Emphasis added. "In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives." *Gingles* at 51.

Satisfaction of the *Gingles* preconditions is necessary, but not sufficient to establish liability under § 2. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993). "Once the preconditions are met, §2 plaintiffs must further show that, under the totality of the circumstances, vote dilution has occurred because the challenged plan denies minority voters equal political opportunity." *Stabler* at 1021.

Plaintiffs must prove, by a preponderance of the evidence, each and every *Gingles* factor. Plaintiffs must also prove that African American votes are submerged, despite the fact that they are the larger group. Finally, they must prove that African American votes are submerged by the minority of white voters. They must prove all of this by a preponderance of the evidence.[1] That submergence is the essence of the §2 claim. It is also the reason these Plaintiffs cannot win.

---

[1] The parties have stipulated to the 2000 and 2010 decennial census numbers. In those numbers, it is clear that whites have not been more than 50% of the voters in the District (a majority) since the 2000 decennial census.

2

Plaintiffs claim there is no legal basis for barring their claim if African American voters are a majority or plurality of the voting-age population. But this legal basis is found in the very text of Section 2 itself: a violation occurs only if the "political processes leading to the nomination or election in the . . . [District] are not *equally open* to participation" by African Americans. (emphasis added). By definition, the District's at-large election system *is* "equally open" to African Americans, who are the largest segment of the voting-age population (arguably, the status quo is *more* open to African Americans by virtue of their numerical superiority). Plaintiffs cannot avoid this stark reality, which precludes their claim.

## II. Reliance on the 2011 – 2013 ACS over the 2010 decennial census.

Vote dilution is determined in the present tense and not in the past. ("The Court must determine whether the challenged electoral structure deprives a racial minority of equal opportunity to participate in the political process at present." *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995). In this case, the evidence is clear that the demographics have changed since the 2010 decennial census and it cannot be relied on to accurately represent the current state of the District. The Court should find the presumption for the decennial census has been overcome.

The Court must decide if the 2011-2013 ACS published by the United States Census Bureau is "proof of changed figures" that "have a high degree of accuracy, and are clear, cogent and convincing" *Valdespino v. Alamo Heights Independent School Dist.*, 168 F.3d 848, 853-854 (5th Cir. 1999). That is the legal standard and the legal issue presented.[2]

The 2011 – 2013 ACS demonstrates, and the parties agree, that the 2011 – 2013 ACS provides "proof of changed figures." This change merely continues and corroborates the trends of an increase in the black population and dramatic decrease of the white population in the last

---

[2] Plaintiffs present this as an evidentiary issue in their Trial Brief but fail to respond or address the legal standard.

twenty years. It is expected that the testimony of both the Plaintiffs' and the District's experts will establish these trends and that they will continue into the future.

The Census Bureau itself demonstrates that the presumption for the Census is overcome:

"The American Community Survey, a relatively new survey conducted by the Census Bureau, is ushering in the most substantial change in the decennial census in more than 60 years. The ACS is a nationwide, continuous survey designed to provide communities with *reliable* and *timely* demographic, housing, social and economic data every year. The ACS will replace the decennial census long form in 2010 and thereafter by collecting long-form-type information throughout the decade rather than only once every ten years." See, PLTF-133 "*A Compass for Understanding and Using the American Community Survey Data*" p. 1.

Plaintiffs point out that the ACS collects data on socioeconomic characteristics. Plaintiffs fail to acknowledge that two of the characteristics specifically collected in the ACS are "Age" and "Race." PLTF 133 p. 1. As Plaintiffs point out, the ACS is not a complete population count. The ACS is a survey that the Census Bureau uses to measure characteristics such as "Race" and "Age." While Plaintiffs are correct that the decennial census is a complete count of the population and the ACS is a survey, this case *is* about the number of black and white voters in the District, a number collected by the Census Bureau in the ACS. The case does not rely on a complete count.

The 2011 – 2013 ACS is "proof of changed figures that have a high degree of accuracy, and are clear, cogent and convincing." Notably, Plaintiffs admit and stipulate to changed figures. Plaintiffs are silent as to whether the numbers are clear, cogent and convincing. They merely argue in favor of older data because the current demographics of the District are unfavorable to their claim.[3]

---

[3] If data from the Census Bureau is insufficient to overcome the rebuttable presumption, it would appear that Plaintiffs would set the bar so high that it can never be rebutted. However, as the District pointed out in its Trial Brief, Dr. Engstrom participated in a case that successfully argued in favor of the ACS over the decennial census.

Furthermore, Plaintiffs seek to confuse the ACS evidence the District has presented. For that reason, the District clarifies that it relies on the ACS in two separate ways. First, the District relies on the 2011 – 2013 ACS to demonstrate that African Americans are the largest group of voters. Single race blacks are a plurality and have the most voting power of any racial group in 2013. That number is actually published by the Census Bureau in the ACS. Second, the District relies on the data provided in the 2011 – 2013 ACS to calculate the number of voters that are any-part black in the District.

To be clear, both parties provide the Court with ACS data that is published by the Census Bureau. The parties are merely re-printing that data; they are not changing it. The single race black voting age population is a number published by the ACS. The non-Hispanic white voting age population is also published by the ACS. The only number that is not published and merely re-printed by the parties is the any-part black number.[4]

The parties have stipulated that the ACS is subject to sampling errors with a margin of error and confidence intervals. See, Joint Stip. ¶22. This error does not make the survey unreliable. In fact, *Benavidez v. City of Irving*, 638 F.Supp. 709 (N.D. TX 2009), specifically addressed this issue and held, . "…[T]he Census Bureau considers ACS data reliable and intends for it to be relied upon in decisions such as Voting Rights Act compliance." *Id*. at 721.

Plaintiffs seek to discredit the ACS by claiming the margin of error makes it unreliable. The margin of error is published alongside the ACS numbers. See, Deft FFSD Exhibit S and Plaintiffs' Exhibit 30. These margins of error are determined by the ACS and are part of the

---

[4] The any-part black number is explained in further detail below.

survey methodology. They are clear and transparent and they have not kept the Court, the Census Bureau, or local governments from relying on it.[5]

In fact, the Census Bureau places such reliance on the survey methodology that it uses a survey, similar to the ACS, to determine the errors in the decennial census. See, Def-FFSD R. ("The U.S. Census Bureau released today results from its *post-enumeration survey*, providing a measure of the accuracy of the 2010 Census." "The post-enumeration survey, called "Census Coverage Measurement"…surveys a sample of the 300.7 million people living in housing units and then matches the responses to the census, resulting in estimates of error.")

Where there is some dispute is whether and how to count the any-part black voting age population. The 2011 – 2013 ACS does not distinguish the any part black population by age. It does not print a number of *individuals of voting age* that are any part black. Instead, it prints the total population.[6] Therefore, Plaintiffs ignore all individuals that identify as any part black. However, Courts generally rely on this "any-part black" category in Voting Rights Act cases. Mr. Cooper specifically states that this is the appropriate number to use in his expert report:

> "The Any Part Black classification counts as "Black" all persons who identified in the 2010 Census as single-race Black and all persons who identified as more than one race and some part Black. The AP Black category includes persons who are some part Black and Hispanic. It is my understanding that following the U.S. Supreme Court decision in *Georgia v Ashcroft*, 539 U.S. 461 (2003), the "any part" definition is an appropriate Census classification to use in most Section 2 cases." See, Def-FFSD E.

The 2011 – 2013 ACS does not publish a number of voting age individuals that identify as any-part black. Instead, it publishes the raw numbers from which to determine that number. The District's methodology in determining the AP BVAP is described in its Trial Brief. See,

---

[5] "And state and local governments are using ACS information to keep track of year-to-year changes in their jurisdictions." A Compass for Understanding and Using American Community Survey Data, "Who Uses the ACS and Why" PLTF 133 p. 2.
[6] Plaintiffs' Findings of Fact #28 incorrectly claims the ACS does not publish estimates for the AP black category." That is simply untrue and will be proven at trial.

6

ECF 130 pp. 12-13.  The District's method is sound and the result is that individuals that identify as any-part black are 51% of the voters in the District.  Any doubt about the majority status of African Americans now and in the future will be resolved by testimony at trial.

The District wants to make it abundantly clear that it relies on the 2011 – 2013 ACS in two ways.  First, the 2011 – 2013 ACS demonstrates conclusively that African Americans have the largest voting power of any racial group in the District.  The Census Bureau made this determination; not the District.  Second, people that identify as any-part black are a majority of the voters in the District.  Plaintiffs' own expert concedes the any-party black measurement is the optimal measurement to use.  Thus, Plaintiffs' claim is barred on two grounds:  (1) single-race blacks are indisputably the largest segment of the voting-age population; and (2) any-part blacks are a majority.

The District's evidence presents the Court with two issues: 1) whether to rely on the 2011 – 2013 ACS over the 2010 decennial census; and 2) whether to rely on the any-part black voting age population derived from the ACS.  While Plaintiffs attempt to confuse the two issues, they are separate determinations that require separate analysis.

Plaintiffs' attempt to discredit the ACS is even more disingenuous because they fail to point out the errors in the 2010 decennial census. The decennial census contains non-sampling errors that are a particular concern to this case.  "Broadly speaking, nonsampling error refers to any error affecting a survey estimate outside of sampling error.  Nonsampling error can occur in complete censuses as well as in sample surveys, and is commonly recognized as including coverage error, unit nonresponse, item nonresponse, response error and processing error."  PLTF-133 p.A-24.

On May 22, 2012, the Census Bureau released its "Estimates of Undercount and Overcount in the 2010 Census." See, Deft-FFSD R. This Census Bureau found that "(t)he 2010 Census overcounted the non-Hispanic white alone population by 0.8 percent.." and "(t)he 2010 Census undercounted 2.1 percent of the black population…" In this case, the overcount and undercounts are crucial. The 2010 decennial census indicated the NH white VAP was 48.95% and the AP black VAP was 48.19%. (See, Joint Stip. ¶13) While the Plaintiffs would have the Court believe that the 2010 decennial census is infallible, the Census Bureau itself disclaims that.

In an effort to disclaim decennial census errors, Plaintiffs claim that the overcount and undercount in the 2010 decennial census is not relevant in counties or places of 100,000 or more. However, the parties have stipulated that the District's total population was 68,663 according to the 2010 decennial census. See, Joint Stip. ¶16. Thus, the overcount and undercount *is* relevant to this District that is less than 100,000 people.

Neither the 2010 decennial census nor the 2011 – 2013 ACS is foolproof. Both sets of data have advantages and disadvantages. While the decennial census is supposed to be a complete count of the population, the Census Bureau itself admits that it is not. While the ACS is a survey subject to sampling errors, the ACS is more recent and undeniably more reliable in 2016 than data from 2010. The ACS is consistent with the undeniable population trends of the past twenty years and it specifically collects data on 'race' and age.' The decennial census is stale and unreliable in this District at this point. The Court should rely on the ACS.

### III. Can the Voting Rights Act be violated if the District is already a majority-minority District?

Section 2 states that a violation occurs only if the "political processes leading to the nomination or election in the . . . [District] are not *equally open* to participation" by African

Americans. (emphasis added). 52 U.S.C. § 10301. If they are not equally open, then Courts can order a remedy. That remedy often involves the creation of majority-minority districts. That is the remedy the instant Plaintiffs request.

Plaintiffs would have this Court override state law to create seven single member districts where four of them are majority African American. Yet Plaintiffs ignore the recent rulings that there is no violation when the District as a whole is already a majority minority district. They also ignore the logic that the electoral process is at least, if not more than, equally open when the minority group is the largest group of voters.

Plaintiffs provide the following case to support their argument that there is no majority-minority rule: *League of United Latin Am. Citizens v. Perry*, 548, U.S. 399 (2006); *Smith v. Clinton*, 687 F.Supp. 1361 (E.D. Ark. 1988); and *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006).

Since the parties have already belabored this issue, the District will be brief. The District's argument relies on the United States Supreme Court case of *Bartlett v. Strickland*, 556 U.S. 1 (2009). *Bartlett* adopted a "majority-minority rule" for analyzing Section 2 liability. Courts have relied on *Bartlett* to deny liability when the district at issue is already a majority-minority district.[7] Plaintiffs fail to distinguish or even mention *Bartlett*. Instead, every single case Plaintiffs rely upon pre-dates the *Bartlett* decision. Thus Plaintiffs' cases could not have considered the *Bartlett* reasoning and cannot rebut the District's argument. Plaintiffs' argument is unsupported and mistaken.

### III. Population Trends in the District

Plaintiffs argue that Missouri state law requires the use of Census figures to determine the population of a jurisdiction for redistricting purposes. See, ECF 135 p. 40. Plaintiffs cite to

---
[7] See, ECF 130 pp. 13-15 for a more complete discussion.

Section 1.100(1) RSMo, "The population of any political subdivision of the state for the purpose of representation. . . is determined on the basis of the last previous decennial census…."[8]

The District would point out the obvious. The District is not offering the 2011 – 2013 ACS in support of redistricting. Instead, the District is offering the 2011 – 2013 ACS in opposition to redistricting and as convincing evidence that African Americans are the largest segment (and a majority) of the voting age population. Thus, the Court would not violate Section 1.100(1) RSMo because reliance on the ACS avoids the necessity to redistrict. Reliance on the ACS proves there is no violation and no need to redistrict.

Further, the District would point out that this statute pre-dates the American Community Survey. Even if it didn't, the Supreme Court has held, "Situations may arise where substantial population shifts over such a period can be anticipated. Where these shifts can be predicted with a high degree of accuracy, States that are redistricting may properly consider them." *Kirkpatrick v. Preisler*, 394 U.S. 526, 535 (1969)[9]. Not only has the District already experienced substantial population shifts since the 2010 decennial census, the evidence at trial will demonstrate that this shift will only continue.

To be clear, Plaintiffs' argument is a red herring. Plaintiffs claim, "The adoption of a plan based on ACS (sic) would be contrary to state law and would not be necessary to remedy a violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301." ECF 135 p. 46. The District does not want to adopt a plan based on the ACS. There is no 'remedy' in changing the current system because it is the best method to obtain African American representation. Plaintiffs' argument is merely a distraction.

---

[8] The District notes that Plaintiffs' suit seeks to dismantle multiple state laws that requires at-large elections in April. The instant statute is the only exception.
[9] The *Kirkpatrick* case originated in Missouri.

## IV. No Liability without a Remedy

Plaintiffs' Trial Brief cites to a case that contradicts one of their major arguments in *Gingles* I. Plaintiffs claim, "At the liability phase, the *Gingles* I precondition does not require a showing that the majority-minority districts in the illustrative plans are effective, i.e., that they provide the minority group a practical opportunity to elect the candidate of its choice." ECF 135 p. 7. While the argument that Plaintiffs do not need to provide a solution seems counterintuitive, it is also legally incorrect.

This Eastern District found there can be no liability, under the totality of the circumstances, without an available remedy. See, *African-American Voting Rights Legal Defense Fund, Inc., v. State of Missouri*, 994 F.Supp. 1105 (E.D. Mo. 1997). While the finding is not under *Gingles* I, the effect is the same. There can be no liability in the Eastern District without a remedy. Plaintiffs have not offered a "remedy" because they offer a system of single-member districts that are worse than the current one. A remedy is a way of correcting or solving a problem. See, http://www.merriam-webster.com/dictionary/remedy. Plaintiffs have not offered one.

## IV. Disputed Facts

The District provides the following list of disputed facts.

1. Whether the single race black voting age population is 48.94% (the largest group of voters) under the 2011 – 2013 ACS, or whether the single race black voting age population is 47.33% according to the 2010 decennial census.[10] (*Gingles* I)

2. Whether the District is already a 51% majority of African American voters. (*Gingles* I)

3. Whether single member districts are a remedy under these facts. (*Gingles* I)

---

[10] Plaintiffs include this discussion under Evidentiary Issues.

11

4. Which candidates are candidates of choice for black and white voters in each election. (*Gingles* II and III)

5. Whether the current board consists of at least three African American preferred candidates. (*Gingles* II, III)

6. Whether African American voters are cohesive. (*Gingles* II, III)

7. Whether District elections are racially polarized. (*Gingles* II and SF 2)

8. Whether the white majority usually defeats African American preferred candidates. (*Gingles* III, SF 2 and SF 7)

9. Whether a larger group of voters can be submerged by a smaller group of voters. (*Gingles* III)

10. What extent, if any, have Plaintiffs provided evidence that any past discrimination touches the right of African Americans to register, to vote or otherwise participate in the political process? (SF 1)

11. What evidence, if any, have Plaintiffs provided ~~evidence t~~that April at-large elections with staggered terms enhance the opportunity for discrimination against African Americans in this District? (SF 3)

12. Have Plaintiffs provided evidence that the FFNEA and North County Labor recruit candidates? (SF 4)

13. What evidence, if any, have Plaintiffs provided to show that African Americans bear the effects of discrimination?  What evidence demonstrates those effects hinder their ability to participate effectively in the political process? (SF 5)

14. What evidence, if any, have Plaintiffs provided to show that District campaigns have included overt or subtle racial appeals. (SF 6)

15. Was African American representation proportional to their share of the population from 2000 – 2010? (SF 7)

16. What evidence, if any, proves the Board has shown a significant lack of response to the needs of the African American community? (SF 8)

17. Whether there are legitimate reasons for a school district to rely on at-large elections.

## V. Evidentiary Issues

### A. The Supplemental Report prepared by Drs. Rodden and Chen.

Plaintiffs seek to exclude the District's Supplemental Report prepared by Drs. Rodden and Chen for lack of foundation. Plaintiffs claim they do not know the source of the data because Dr. Chen was not given and did not read the report before signing it. They also claim that the methods and assumptions Chen relied on in creating some of the tables and paragraphs in the report are not evident.

The District offers the attached Affidavit from Dr. Rodden as additional foundation for the above-cited report. Dr. Rodden created, prepared, supervised and collaborated on the work that went into the Supplemental Report. Dr. Rodden is prepared to testify to every aspect of the report and will provide answers to any foundational questions Plaintiffs may have. Further, Plaintiffs did not raise this issue until their trial brief instead of during discovery, when foundational issues could have been dealt with and established by the parties instead of consuming the Court's attention at this late stage.

### B. Exogenous elections including the Hazelwood School District.

Plaintiffs claim the "totality of the circumstances" does not allow the Court to review evidence from a neighboring school district with an identical electoral structure and a similar set of demographics. Plaintiffs claim the evidence is irrelevant.

13

Plaintiffs ignore the premise of the 'totality of the circumstances' test in making this claim. "A piece of evidence is irrelevant only if, after the receipt of that evidence, the existence of a fact appears no more or less probable than it did before that evidence was offered. That is, an item of circumstantial evidence is irrelevant only if it does not allow the trier of fact reasonably to infer anything about whether or not the voting strength of the minority group has been impermissibly diluted." *Nipper v. Smith*, 39 F.3d 1494, 110 (11th Cir. 1994).

The Hazelwood evidence allows the court to examine a neighboring school district with an identical electoral structure. Hazelwood maintains an at-large election, in April, with staggered terms and bullet voting.[11] The Hazelwood School Board maintains four out of seven African American board members.

The District offers this as evidence that a similar population with an identical electoral structure has a majority black board. In other words, the at-large system is not an impediment in the neighboring school district with similar demographics. The District concedes this evidence does not and should not carry the same weight as evidence from within the District. However, the evidence is relevant. That is all that is required.

### C. Use of the ACS for population estimates.

The District considers the use of the ACS a legal issue. The District has argued the legal standard to overcome the presumption for the decennial census and believes it has been met. Plaintiffs have not responded to that argument.

Instead, in this evidentiary portion, Plaintiffs claim the Court should follow the approach of other courts resolving VRA claims and rely exclusively on the decennial census. Plaintiffs present this issue in a manner as if the Eighth Circuit has analyzed whether to rely on the ACS (or any other data for that matter) over the census and decided against it. That insinuation is

---

[11] This structure is mandated by state law.

misleading, incorrect and disingenuous. The Eighth Circuit has not confronted this situation and Plaintiffs do not offer evidence to the contrary. The District urges the Court to review the cases Plaintiffs misrepresent.

For example, Plaintiffs offer *Harvell v. Blytheville School Dist., No. 5*, 71 F.3d 1382 (1995) as evidence that the 8th Circuit relies exclusively on the decennial census. The *Blytheville* parties never challenged reliance on the census. The Court relied on the census because it had no choice. In addition, the District would point out that the ACS was not in existence when the *Blytheville* decision was rendered.

## **Conclusion**

For the reasons cited above, in the Trial Brief and in the District's Motion for Summary Judgment, the District respectfully requests a finding that it is not liable for violating Section 2 of the Voting Rights Act.

    Respectfully submitted,

    CROTZER & ORMSBY, LLC

    */s/ Angela Bullock Gabel*
    Angela Bullock Gabel, 58227MO
    130 S. Bemiston Ave., Suite 602
    Clayton, MO 63105
    314.726.3040 / 314.726.5120 (fax)
    agabel@crotzerormsby.com

    John A. Safarli
    Floyd, Pflueger & Ringer, P.S.
    200 W. Thomas Street, Suite 500
    Seattle, WA 98119
    Phone: (206) 441-4455
    jsafarli@floyd-ringer.com
    *Attorneys for Defendant Ferguson-*
    *Florissant School District*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is a person of such age and discretion as to be competent to serve papers. It is further certified that on January 4, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Anthony E. Rothert
Andrew J. McNulty
Jessie M. Steffan
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, Mo 63108
*Counsel for Plaintiffs*

Dale Hoe
Julie A. Ebenstein
Sophia Lin Lakin
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY  10004
*Counsel for Plaintiffs*

M. Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA  30303
*Counsel for Plaintiffs*

Gillian R. Wilcox
ACLU of Missouri
3601 Main Street
Kansas City, MO 64111
*Counsel for Plaintiffs*

*/s/ Angela Bullock Gabel*