<pre>
 1                    UNITED STATES OF AMERICA
                   EASTERN DISTRICT OF MISSOURI
 2                        EASTERN DIVISION

 3   MISSOURI STATE CONFERENCE OF    )
     THE NATIONAL ASSOCIATION FOR    )
 4   THE ADVANCEMENT OF COLORED      )
     PEOPLE, REDDITT HUDSON,         )
 5   F. WILLIS JOHNSON, and DORIS    )
     BAILEY,                         )
 6                                   )
                Plaintiffs,          )
 7                                   )
        vs.                          )   No. 4:14-CV-2077 RWS
 8                                   )
     FERGUSON-FLORISSANT SCHOOL      )
 9   DISTRICT, and ST. LOUIS COUNTY  )
     BOARD OF ELECTION COMMISSIONERS,)
10                                   )
                Defendants.          )
11

12                  BENCH TRIAL - VOLUME VI

13          BEFORE THE HONORABLE RODNEY W. SIPPEL
                UNITED STATES DISTRICT JUDGE
14
                     JANUARY 19, 2016
15

16   APPEARANCES:

17   For Plaintiffs:      Mr. Anthony E. Rothert
                          Ms. Jessie M. Steffan
18                        AMERICAN CIVIL LIBERTIES UNION OF
                          MISSOURI FOUNDATION
19                        454 Whittier Street
                          St. Louis, MO  63108
20
                          Ms. Julie A. Ebenstein
21                        Ms. Sophia Lin Lakin
                          Mr. Dale E. Ho
22                        AMERICAN CIVIL LIBERTIES UNION
                          FOUNDATION
23                        125 Broad Street
                          18th Floor
24                        New York, NY  10004

25
</pre>

1    For Defendants:         Ms. Cindy Reed Ormsby
                              Ms. Angela Gabel
2                            Ms. Kathryn B. Forster
                            CROTZER AND ORMSBY, LLC
3                            130 S. Bemiston
                            Suite 602
4                            St. Louis, MO  63105

5

6    REPORTED BY:             SUSAN R. MORAN, RMR, FCRR
                            Official Court Reporter
                            111 South 10th Street
7                            St. Louis, MO  63102
                            (314) 244-7983

8

9

10   Proceedings recorded by mechanical stenography, produced by
computer-aided transcription.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                    Direct    Cross    Redirect    Recross

3    DEFENDANTS' WITNESSES

4    COURTNEY GRAVES, Ph.D.
          (By Ms. Gabel)         4
5         (By Ms. Lakin)                   19
          (By Ms. Gabel)                            26

6

7    CLOSING ARGUMENTS

8
          (By Ms. Ebenstein)     28
9         (By Mr. Rothert)       44
          (By Ms. Ormsby)        61
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The following proceedings were held in open court

 2    on January 19, 2016 at 9:40 a.m.:)

 3              THE COURT:  Good morning.

 4              ALL ATTORNEYS:  Good morning.

 5              THE COURT:  You ready?  Who has cross over here?

 6    Who has cross?  I want to make sure you're ready.  You've got

 7    the pattern down after a week.  If you'd call your next

 8    witness, please.

 9              MS. GABEL:  Good morning, Your Honor.  The District

10    calls Dr. Courtney Graves.

11              THE COURT:  If you would step forward, ma'am, and be

12    sworn.

13              You may proceed.

14                   COURTNEY GRAVES, Ph.D.,

15    Having been first duly sworn, was examined and testified as

16    follows:

17                   DIRECT EXAMINATION

18    BY MS. GABEL:

19    Q.    Good morning.

20    A.    Good morning.

21    Q.    My name is Angela Gabel.  I represent the

22    Ferguson-Florissant School District.  Could you please state

23    your name for the record.

24    A.    Courtney Graves.

25    Q.    And do you live in the Ferguson-Florissant School
```

1    District?

2    A.    Yes, I do.

3    Q.    What's your address?

4    A.    3169 Santiago Drive, Florissant, Missouri 63033.

5    Q.    Thank you.  And would you describe your neighborhood as

6    racially integrated?

7    A.    Yes.

8    Q.    Okay.  What percentage would you say is approximately

9    African American?

10   A.    In the community that I live in, I live in an apartment

11   community, so I would say maybe about 75 to 85 percent

12   African American, and the rest is another denomination or

13   Caucasian.

14   Q.    Thank you.  Do you own your own home?

15   A.    No.

16   Q.    How long have you lived in the district?

17   A.    I've lived in the district for about 14 years, give or

18   take a few.

19   Q.    And what's your education?

20   A.    I have a doctorate in education, counseling psychology;

21   I have my master's in psychology; and my bachelor's is also

22   in psychology.

23   Q.    And what's your occupation?

24   A.    Currently I serve as the clinical director or the

25   Director of Clinical Services at St. Vincent Home for

1    Children.

2    Q.     Is that a new job?

3    A.     Yes, that is as of November.

4    Q.     Are you currently on the School Board of the District?

5    A.     Yes, I am.

6    Q.     And when were you elected?

7    A.     I was elected last April of 2015.

8    Q.     Do you have children?

9    A.     Yes, I do.

10   Q.     And do they attend school in the District?

11   A.     Yes.

12   Q.     Have you moved since your election in April 2015?

13   A.     Yes, I have.

14   Q.     What motivated you to run for School Board in 2015?

15   A.     There are several things that motivated me to run for

16   School Board.  It started off I was attending a School Board

17   meeting and Dr. McCoy was talking about the -- we just had a

18   tornado in the area in Berkeley and they were just talking

19   about how some of the property owners left, and it was

20   talking about a lot of the financial things and how it was

21   impacting the school district.  That was the first thought

22   about when I was at that School Board meeting that I wanted

23   to run.

24         Then the second reason came after the Mike Brown

25   incident.  There were a lot of people out protesting.  And

1    for me, I'm a little scary so I wasn't the type to go out to

2    protest.  But I knew that I could do something to help my

3    community and so I decided to run.

4          And then the last thing was that I was encouraged by

5    my campaign manager to get out and run.  She told me that I

6    was -- she felt that I was ready.  And I believed in her,

7    so -- and I believed in myself, so that's why I decided to

8    run.  And just to make sure that my children had the best

9    education possible.

10   Q.    How do you believe the School Board prior to your being

11   elected responded to the situation regarding Michael Brown?

12   A.    They really took the safety of our children to heart.

13   It was a little disheartening as a parent, though, because we

14   missed a lot of days.  We actually missed the first week of

15   school because of the unrest in our community.  But it was

16   really because of the safety.

17   Q.    Can you tell me what sort of activities you engaged in

18   to get elected in 2015?

19   A.    It's a long list of activities.  It first started with

20   a pipeline, which was by the Shear Institute.  It was like a

21   course that I took basically on how to run.  From there I

22   attended various activities at the schools in the district.

23   I went to black history programs at Berkeley Middle.  I

24   served pancakes at -- it was a probe event.  I served

25   pancakes.  It was two forums that I went to.  I had

billboards, knocked doors.  Even for my son's spring break

they were actually out with my campaign manager knocking

doors.  We did robo calls.  I said the billboards.  We had

T-shirts.  I had a lot of endorsements from faculty at

different schools, from past board members.  I think that was

about it.  Oh, I had a web page, Facebook, Twitter.  I did it

all.

Q.    So did you work hard to win your election?

A.    Extremely.

Q.    You said a minute ago that you have a campaign manager.

Who was your campaign manager?

A.    It started off at the beginning Nicole McCoy, she

worked with me at the Salvation Army when I was working

there, but later on it was Judy Ferguson-Shaw.

Q.    And why do you think people voted for you?

A.    Because I was the best candidate.

Q.    During your campaign was student discipline a subject

that was discussed?

A.    I believe some people talked about it at one of the

forums.

Q.    When candidates discussed discipline, do you believe

that it was actually a racial appeal for whites to vote

against black candidates or vice versa?

A.    No.

Q.    Did you use discipline as a campaign strategy?

1  A.    No.

2  Q.    Do you believe that student discipline is an issue, a

3  legitimate issue for a candidate for School Board?

4  A.    Of course.  I mean, I think it's an issue that plagues

5  our community and a lot of people are concerned about it.

6  And so if it's an issue that people are concerned about it,

7  you will make it at least some form or fashion a part of your

8  platform I would think.

9  Q.    And since you've been on the Board has the Board

10 discussed discipline?

11 A.    Yes, I know we talked about -- we reviewed the Code of

12 Conduct policy.

13 Q.    Did you seek the endorsement from the Ferguson-

14 Florissant National Education Association?

15 A.    Yes, I did.

16 Q.    Did they recruit you to run for office?

17 A.    No.  No.

18 Q.    What was the process to seek the endorsement?

19 A.    We received a letter in the mail asking if you would

20 like the endorsement and for you to call.  And from there you

21 will call and then they will schedule an interview, and then

22 you will go to the interview.

23 Q.    And did they give you a list of questions with the

24 letter?

25 A.    Yes, it was the questions that were asked actually at

the interview.

Q.    And were you -- were you interviewed by a committee?

A.    Yes, I was.

Q.    And what was the approximate racial breakdown of that committee?

A.    I'm not exactly sure, I don't remember, but I know it was a mixed group.

Q.    Did you receive the FFNEA endorsement?

A.    No, I did not.

Q.    Who did?

A.    Current School Board member Scott Ebert and Roger Hines.

Q.    And what is the race of Mr. Ebert?

A.    Caucasian.

Q.    And Mr. Hines?

A.    African American.

Q.    Do you believe that FFNEA's decision not to endorse you had anything to do with your race?

A.    No.

Q.    Did any of the candidates tell you in 2015 that they ran as a result of this lawsuit?

A.    No.

Q.    Did anyone tell you that they thought about running but did not run for election because of this lawsuit?

A.    No.

1  Q.   Did you have voters ask you about this lawsuit when you

2  were campaigning in 2015?

3  A.   No.

4  Q.   Did you have voters tell you they were going to vote

5  differently because of the Michael Brown situation?

6  A.   No.

7  Q.   And do you know of anyone that decided not to run

8  because of Michael Brown?

9  A.   No.

10  Q.   Is race an important factor when you decide who to

11  support for the School Board?

12  A.   No, I tend to look for the best candidate.

13  Q.   Have you supported white candidates for the School

14  Board in the past?

15  A.   Yes, I have.

16  Q.   Have you supported African American candidates for

17  School Board?

18  A.   Yes.

19  Q.   Were you endorsed by any specific individuals for your

20  campaign?

21  A.   Yes, I was.  As I stated before, I was endorsed by past

22  School Board members, principals that I -- because I'm a

23  part of the -- I was a student in the Ferguson-Florissant

24  School District as well, so even past principals.  My

25  treasurer was even my past principal.

1    Q.    And who were some of the past School Board members that

2    endorsed you?

3    A.    Jim Clark, Paul Schroeder, Les Lentz, Chuck Henson,

4    Doris Graham -- Dr. Doris Graham.

5    Q.    And what was -- what is the race of Mr. Schroeder,

6    Clark, and Lentz?

7    A.    Caucasian.

8    Q.    And Henson and Graham?

9    A.    African American.

10   Q.    Do you remember which candidates were on the 2014 Grade

11   A for Change slate?

12   A.    That was Dr. Thurman, F. Willis, Savala, Kimberly Benz,

13   and I don't know who else was running.

14   Q.    So there were four candidates on the Grade A for Change

15   slate?

16   A.    Oh, the Grade A for Change slate, it was just three,

17   I'm sorry.

18   Q.    That's okay.  And, I'm sorry, who were the Grade A for

19   Change slate candidates, do you know?

20   A.    Those was Dr. Paulette-Thurman, James Savala, and F.

21   Willis.

22   Q.    And who did you support in the 2014 election?

23   A.    Dr. Thurman and Savala.

24   Q.    Did you vote for all three seats that year or no?

25   A.    Oh, yes, and then the other one was Kimberly Benz.

1    Q.    And what race is Dr. Thurman?

2    A.    African American.

3    Q.    And Mr. Savala?

4    A.    African American.

5    Q.    And Ms. Benz?

6    A.    Caucasian.

7    Q.    Dr. Graves, do you vote?

8    A.    Yes.

9    Q.    Is there anything that prevents you from voting?

10    A.    No.

11    Q.    And you've registered to vote as well?

12    A.    Correct, yes.

13    Q.    Have you experienced any problems in participating in

14    the electoral process?

15    A.    No.

16    Q.    Okay.  So what do you think of at-large elections

17    compared to smaller single member districts?

18    A.    I would personally believe at-large elections are the

19    best election because it gives you the opportunity to choose

20    from a pool of candidates.  And at that time you can kind of

21    weed out the ones that are not best fit for the school

22    district, and you can choose the best candidates.  If we go

23    to a single district, it's almost like you get what you get,

24    whoever runs.  If it's just only one person that runs, we're

25    kind of just stuck with that one person.  And for our

1    district it wouldn't be best suited.

2         And if we are a district as we say we are moving to

3    a one district united, it has to be the same for our School

4    Board as well, that we are united at large.  If we go into

5    the single districts, we won't be able to do that.  It will

6    be people fighting for I would say our own turf or you'll

7    fight for just your one area, not the whole district united,

8    which we're moving forward to.

9    Q.    What is one district united?

10   A.    I've coined that slogan from our new superintendent.

11   At our back-to-school program this summer we got to do, it

12   was really neat where it's this big huge puzzle, and every

13   school piece was mentioned in the puzzle, and each person

14   even in the community got to write on a puzzle piece and it

15   all fit together as one district united.  And that's

16   basically what we're moving towards where everybody gets the

17   same things, we're all teaching the same curriculum.  We are

18   becoming one district united.

19   Q.    Which system do you believe ensures that the entire

20   district is represented fairly?

21   A.    An at-large district.

22   Q.    Do you believe that the School Board represents all

23   communities within the district equally?

24   A.    Yes.

25   Q.    Okay.  You said that you've moved since you were

1  elected last April.  If the district was divided up into

2  seven smaller districts, could that have been a problem for

3  you?

4  A.    Yes, because I would have to see -- I would have to

5  take out a map and I would have to figure out, okay, if I

6  move here, would I be staying -- you know, if I -- it depends

7  if I was like here, would I be in this board member's or can

8  I keep my slot if I moved here.  Because I am a renter, I

9  might switch around.  I mean, I know that I have the whole

10  community of Ferguson-Florissant that I can move to currently

11  the way it's set up, but if we did move to those member

12  districts, I might have to choose an area where I wouldn't

13  want to particularly stay in just to keep my seat.

14  Q.    And how do you think dividing the district up into

15  seven subdistricts would affect the people that decide to

16  run, the candidate pool?

17  A.    It can be anybody.  If nobody is running, maybe just

18  somebody be like, "Okay, well, I just want to run."  And if

19  there's not enough pool in that, we can just get anybody for

20  the district, and that wouldn't be what is best for our

21  children.

22  Q.    So currently the Board members have staggered terms.

23  Do you think that's a good idea?

24  A.    I think that's the best idea.  Coming in as a new board

25  member you learn a lot.  And it's a lot that you have to

1    learn at that same time period.  And if it's all new members

2    coming in, we're going to miss something.  And I know for me

3    when we're sitting at our Board meetings, I always sit and I

4    ask Rob, who has been a board member for awhile now, I'll

5    always ask him, "Okay, well, what does that mean?"  You know,

6    "How do you do this or that?"  And you have to learn from

7    somewhere.  And it's kind of hard to get all that information

8    just going to conferences.  So with the staggered terms

9    you're there with veterans basically and you learn and you

10   get mentored.

11   Q.    Do you think the School Board elections should be held

12   in April or do you think another month would be better?

13   A.    I think April is a good time for the elections to be

14   held.  If it was say, for instance, in November during the

15   Presidential elections, the School Board I would say is very,

16   very important, and if it's during the Presidential election

17   like in November, it will get buried under basically all the

18   hype that will go on like at a November election.  I think

19   April elections it gives that opportunity for School Board

20   elections to have that focus, and it can be that main

21   important focus which is needed for our schools.

22   Q.    Do you know what bullet voting is?

23   A.    Yes.

24   Q.    What is it?

25   A.    Basically bullet voting is where you choose one

1  particular candidate, if it's maybe like two slots open like

2  it was in my election, and then you put all your -- you only

3  cast one vote.

4  Q.    Did you ask people to bullet vote for you as part of

5  your campaign?

6  A.    Yes.

7  Q.    Do you think that bullet voting is one of the reasons

8  you won?

9  A.    Besides me being the best candidate, then in addition

10 to that, it helped out a lot.  No offense, Scott.

11 Q.    Is bullet voting something that only you can use?

12 A.    No, anyone can use it.

13 Q.    Since you've been on the Board have you seen the Board

14 act in any way that would treat African American students

15 differently than white students?

16 A.    No.

17 Q.    Do you believe the Board listens to your perspective

18 and takes it into account when it's making decisions?

19 A.    Yes, I do.

20 Q.    So the current superintendent was hired before you were

21 elected; is that right?

22 A.    That's correct.

23 Q.    Did you have any involvement in his hiring?

24 A.    Not per se in his hiring, but I did attend one of the

25 forums that they had when they were down to the last two

1  candidates for that position. And so as a parent I attended

2  that event.

3  Q.    What do you think of Dr. Davis?

4  A.    He's awesome. I really feel that he is the

5  revitalization we need for our community, for our school.

6  And he is really passionate about what he is doing, and I

7  think that's what our School District needs, we need a jump

8  start to get us back on the right track.

9  Q.    And how would you describe the Board's relationship

10  with Dr. Davis?

11  A.    It's very -- we have a very open relationship. Any

12  time we call, check in, we're able to get basically the

13  things that we need done. And Dr. Davis is quick to say that

14  he has seven bosses, and we all work together.

15  Q.    So do you believe the prior Board chose the best

16  candidate for the job?

17  A.    Yes, I do.

18  Q.    And I need to go back for just a minute. You said you

19  went to school in the district?

20  A.    Yes, I started when I was in the fourth grade. I went

21  to Walnut Grove Elementary School. Then I went to Berkeley

22  Middle School. And I'm a graduate of the class of 1997 at

23  Berkeley Senior High School.

24  Q.    Where are they located?

25  A.    All in the Ferguson-Florissant School District.

1    MS. GABEL:  That's all I have.

2    THE COURT:  Any cross-examination?

3    MS. LAKIN:  Yes, Your Honor.

4    THE COURT:  You ready?  You may proceed.

5                    CROSS-EXAMINATION

6    BY MS. LAKIN:

7    Q.    Good morning, Dr. Graves.

8    A.    Good morning.

9    Q.    My name is Sophia Lakin.  I represent the Plaintiffs in

10   this case.  As you may recall, we met at your deposition.

11   I'm going to ask you just a few questions.

12          You testified during your direct that one of the

13   reasons you ran for the Board was because of the Michael

14   Brown shooting and subsequent protests; is that right?

15   A.    Yes.

16   Q.    And it was because you were fighting for equality,

17   right?

18   A.    That was one of the reasons.

19   Q.    And before your election to the Board in 2015, you'd

20   agree, wouldn't you, that African Americans did not have

21   adequate representation on the Board?

22   A.    I felt that the best candidates or the best people

23   wasn't on the Board in regards to -- it wouldn't just be

24   African American I would say.  It needed to be candidates

25   such as myself, so that's why I ran.

1   Q.    Okay.  Dr. Graves, you sat for your deposition in this

2   case on July 1st, 2015, correct?

3   A.    Correct.

4   Q.    And you gave testimony at that time, correct?

5   A.    Correct.

6   Q.    And you were under oath to tell the truth?

7   A.    Yes.

8   Q.    Did you tell the truth?

9   A.    Yes.

10  Q.    I'd like to direct your attention to page 34, line 7 of

11  your deposition transcript, which is now up on the screen.

12  You were asked this question and you gave this answer:

13        "QUESTION:  Now, at the time you ran, did you

14  believe that the African American community had adequate

15  representation on the Board?

16        "ANSWER:  No."

17        This was the testimony you gave under oath at your

18  deposition; isn't that right?

19  A.    Yes.

20  Q.    In your experience as an African American you found

21  that you must be more qualified than others to get the same

22  position; isn't that right?

23  A.    True.

24  Q.    Now, Dr. Graves, you're aware that the Board suspended

25  the District's former superintendent, Dr. McCoy, correct?

1    A.    Correct.

2    Q.    And the community was upset at not knowing why the

3    Board suspended Dr. McCoy; isn't that right?

4    A.    Yes.

5    Q.    And you'd agree, wouldn't you, that even beyond

6    Dr. McCoy there have been times while you've been on the

7    Board when community members voiced concerns to the Board and

8    do not get a response to those concerns?

9    A.    At that time when I -- during -- and you're talking

10   about during my deposition.  At that time when I made that

11   statement it was during -- we were talking about people not

12   being heard in the community.  And that was actually at --

13   during what I later found out is how our normal proceedings

14   go where the people in the community get a portion of time

15   where they can speak, and they get to basically voice any

16   concerns.  And we don't give any feedback after that.  So

17   that's when I said that people wasn't being heard, it was at

18   that time because I didn't know how the process works.

19         So what I've later found out that that's how it

20   works, that people can have any comments at the portion -- at

21   that portion of our Board meeting where they can speak.  And

22   I know that at that time I'd also said that I wanted it to be

23   a way where we can possibly give that person some type of

24   feedback to know that whatever it was that they discussed

25   can -- you know, that we made some type of decision.

1  Q.    And at that time during your deposition as you stated,

2  did you state whether or not individuals were getting that

3  feedback?

4        MS. GABEL:  Your Honor, we're outside of the scope

5  of direct.

6        THE COURT:  I'll give you some latitude on this.

7        MS. LAKIN:  Thank you, Your Honor.

8  A.    Can you reask that question?

9  Q.    During your deposition as you've just described you

10  mentioned there were individuals who expressed concern that

11  you believed that they should be getting feedback back after

12  they expressed their concerns.  At the time do you recall if

13  they were getting that feedback?

14  A.    No, but I later found out that that's the way the

15  process works, and that sometimes we can send stuff back in

16  writing or add it as an agenda item.

17  Q.    Okay.  And you didn't really attend Board meetings

18  before you joined the Board; isn't that right?

19  A.    Yes, it was very sporadic.

20  Q.    As an African American resident of the district you

21  don't know one way or another whether the district has become

22  more African American in the past ten years; is that correct?

23  A.    I'm not understanding the question.  Can you repeat

24  that?

25        MS. GABEL:  I object.  Again, this is outside of the

1    scope of direct.

2              THE COURT:  I'll give you some latitude on this.

3              MS. LAKIN:  Thank you, Your Honor.

4    BY MS. LAKIN:

5    Q.    As an African American resident of the district, you

6    don't know one way or the other whether the district has

7    become more African American in the past ten years; is that

8    right?

9    A.    It has.  I mean, I've not been in the district for 14

10   or 15 years.  Not only did I go to school in the district but

11   I see in my kids' classrooms that the majority of the

12   students are African American.  I mean, the majority of our

13   school is -- the school district is African American.  I

14   believe when I was running I found some type of quote that we

15   were at least 85 percent African American.  So I can see it

16   in our classrooms that the school district is predominantly

17   African American.

18   Q.    And when you say "school district," you mean the

19   enrollment in the schools; is that correct?

20   A.    In the classrooms.

21   Q.    You testified that race isn't important to you when you

22   vote.  But you'd agree, wouldn't you, that people in the

23   district tend to vote along racial lines?

24   A.    I would hope that they vote for the best candidate.  I

25   can't speak to what other people vote for.

1    Q.    Can we go to your deposition, page 48, line 11.  You

2    can sort of see it already here.  On line 11 the question is:

3         "QUESTION:  Do you think people tend to vote along

4    racial lines in the FFSD?

5         ANSWER:  Yes."

6         This was the testimony you gave under oath at your

7    deposition; isn't that right?

8    A.    Yes.

9    Q.    This lawsuit was discussed on a radio show after

10   your -- sometime in late January, early February last year,

11   right?

12        MS. GABEL:  Your Honor, I object, outside of the

13   scope.

14        THE COURT:  Sustained.

15        MS. LAKIN:  Your Honor, she discussed during the

16   direct that no one mentioned the lawsuit.

17        THE COURT:  I'll give you some latitude upon

18   recollection that there was some discussion about the lawsuit

19   not having any impact on last year's election.  You may

20   proceed.

21        MS. LAKIN:  Thank you.

22   BY MS. LAKIN:

23   Q.    This lawsuit was discussed on a radio show in late

24   January or early February of last year; is that right?

25   A.    What radio show?

1  Q.    A talk radio panel on which you were a panelist.

2  A.    Yes, it was.

3  Q.    You testified a little about the 2014 campaign.  You

4  don't recall whether race was an implicit part of the 2014

5  Board campaign, right?

6  A.    I'm not understanding your question.

7  Q.    During the 2014 campaign did you -- you do not remember

8  one way or the other whether race was an implicit part of

9  that campaign; is that right?

10 A.    I'm not understanding what you mean by that question.

11 Q.    Did campaigns -- you don't recall whether campaigns

12 used any subtle racial appeals during the campaign one way or

13 the other?

14 A.    No, I don't think race was an issue.

15 Q.    And you aren't aware that there are disparities in the

16 use of discipline in the district; is that right?

17 A.    No.

18 Q.    No, it's not right or no, you're not aware?

19       MS. GABEL:  Again, Your Honor, we didn't discuss

20 this on direct.

21       THE COURT:  There was some discussion about

22 discipline.  You may proceed.

23 A.    I'm not aware.

24 Q.    And you testified that you encouraged others to bullet

25 vote in your election?

1    A.    Yes.

2    Q.    And you haven't bullet voted in any other School Board

3    election; isn't that right?

4    A.    That's correct.

5          MS. LAKIN:  Just a moment, Your Honor.  No further

6    questions.  Thank you.

7          THE COURT:  Thank you.  Any redirect?  Are you ready

8    on the Plaintiffs' side?  You may proceed.

9                    REDIRECT EXAMINATION

10   BY MS. GABEL:

11   Q.    Dr. Graves, had you thought about running for the

12   School Board prior to the events involving Michael Brown?

13   A.    Yes, I did.

14   Q.    When was that?

15   A.    Like I said at the beginning of my testimony, when I

16   was at a prior board meeting and Dr. McCoy was talking about

17   the issues in regards to people leaving the district due to

18   the tornado.

19   Q.    Okay.  And let's look back at your deposition.  This

20   is the page that you were just shown.  And you were asked,

21   line 7:

22          "Now, at the time that you ran, did you believe that

23   the African American community had adequate representation on

24   the Board?"  And you answered, "No."  "And is that part of

25   the reason you ran for the Board?"  And you answered?

1    A.    "No."

2    Q.    Is that correct?

3    A.    Yes.

4    Q.    Do you believe that there is sufficient representation

5    for the African American community?

6          MS. LAKIN:  Objection, Your Honor.  She's impeaching

7    her own witness.

8          THE COURT:  She's not, she's making it complete from

9    your cross-examination.

10   BY MS. GABEL:

11   Q.    I'd just like to make sure we get the entire testimony

12   that you said from your deposition just to give, like the

13   Judge said, a complete picture.

14         So you were asked, "Do you believe that there is

15   sufficient representation for the African American community

16   on the Board now?"  Did you say, "I would say for the makeup

17   of the Board it doesn't matter what race it is.  It should be

18   people who are best qualified"?

19   A.    Yes, and that's what I continue to say.

20         MS. GABEL:  That's all I have.

21         THE COURT:  Thank you, ma'am.  You may step down.

22         THE WITNESS:  Thank you.

23         THE COURT:  I appreciate your time.  Anything

24   further on behalf of the Defendants?

25         MS. ORMSBY:  I'm sorry, Your Honor?

1           THE COURT:  Anything further on behalf of the

2  Defendants?

3           MS. ORMSBY:  No, Your Honor.  We rest.

4           THE COURT:  Does the Election Board elect to put on

5  any evidence?

6           MS. FORSTER:  No, Your Honor, not at this time.

7           THE COURT:  Yes, Mr. Rothert.

8           MR. ROTHERT:  We have no rebuttal witnesses.

9           THE COURT:  Very good.  All right.  The evidence

10  is -- we'll proceed to closing.  I was going to say the

11  evidence is complete, but I know better than just to assume I

12  know everything is complete in this case.

13           So we'll take a 20-minute recess, let everybody

14  organize themselves, think about what happened rather than

15  just rush into it.  So we'll proceed with closing arguments

16  at 10:35.  Thank you very much.

17           (Court in recess from 10:14 a.m. until 10:45 a.m.)

18           THE COURT:  Ready for closing arguments?  Who is

19  going to proceed on behalf of the Plaintiffs?

20           MS. EBENSTEIN:  I am.

21           THE COURT:  Very good.

22           MS. EBENSTEIN:  Good morning.

23           THE COURT:  You have a play-by-play binder.  Thanks.

24           MS. EBENSTEIN:  Julie Ebenstein on behalf of

25  Plaintiffs.  I will explain the presence of evidence about

1    the preconditions and then Mr. Rothert is going to review the

2    senate factors and the totality of circumstances.

3              THE COURT:  Great.

4              MS. EBENSTEIN:  Before I start with the *Gingles*

5    preconditions, I just wanted to remind the Court of three

6    factors that underlie all Section 2 claims.

7              First, that Section 2 only requires Plaintiffs to

8    show -- to prove that the process for electing School Board

9    members has discriminatory results.  Plaintiffs' claim is not

10   premised on intentional discrimination and Plaintiffs have

11   not discussed the intent of the Board or any other

12   institution or party in the school district.  Merely a

13   showing of results can satisfy Section 2.

14             The second is that the Court needs to engage in a

15   functional analysis of what actually happens in the district,

16   not a hypothetical of what could happen.

17             And third is that the protections of Section 2 are

18   broad to protect against racial discrimination.

19             Going through the *Gingles* factors one by one and

20   beginning with *Gingles I*.  *Gingles I* requires Plaintiff to

21   show that the African American population in the school

22   district is sufficiently large and geographically compact to

23   constitute a majority in a single member district.

24   Plaintiffs have clearly satisfied that requirement with their

25   two illustrative plans.  Those plans have a majority in four

1    of the seven districts, including a majority of over

2    60 percent in three out of the seven.

3         The illustrative plans comply with the

4    constitutional requirements of one person, one vote and with

5    the four principles of redistricting.  They are compact and

6    contiguous according to their reorg scores and what's called

7    the eyeball test.  They minimize splits between precincts and

8    census blocks.  They keep communities of interest together

9    and they adhere to the state requirements of compact and

10   contiguous districts.

11        The *Gingles I* requirement or the *Gingles I* standard

12   should end there as Plaintiffs have satisfied it.  But since

13   the Defendants have raised some additional arguments related

14   to the size of the black voting age population in the

15   district, I'm going to address those as part of *Gingles I.*

16        Again, the requirements are straightforward and

17   simply through our illustrative plans we've satisfied the

18   requirements already.

19        Plaintiffs' claim seems to be that -- I'm sorry,

20   Defendants' claim seems to be that Plaintiffs have not

21   satisfied *Gingles I* based on their projections of the black

22   voting age population, which they believe is higher than

23   50 percent in the district.

24        This claim fails for two reasons.  First of all,

25   there is no supportable evidence that the black voting age

1    population is, in fact, over 50 percent of the district.

2    And, second, even if it were, that does not prohibit

3    Plaintiffs' claim, especially given the amount of racial

4    disparities that we've shown are present.

5         As far as the Defendants not being able to support

6    their argument that the black voting age population is over

7    50 percent, the reason is primarily the census data.  The

8    census data is presumptively accurate.  It's used by Missouri

9    state law to determine the population for purposes of

10   representation.  It's used by Eighth Circuit courts in

11   adjudicating Section 2 claims.  And, like I said, as a

12   standard it's presumptively accurate, a presumption that

13   Defendants have not overcome.

14        Defendants have put forward two sets of numbers to

15   try to overcome the strong presumption that census data is

16   accurate.  One is the ACS data and the other are projections

17   created by their expert.

18        As far as the ACS data, you heard testimony from

19   Dr. Gordon that the ACS data is first only a 2 percent survey

20   of the population, so it's not a full population count the

21   way that the census is.  Two, it's appropriately -- according

22   to the Census Bureau, it's appropriately used for

23   socioeconomic comparisons and determinations, not for

24   population comparisons and determinations.

25        And he gave an example of some of the shortcomings

1    of ACS.  For example, he showed that in St. Louis using the

2    2006 to 2009 ACS data there was an assumption that the

3    population would increase by 2 percent.  When the 2010 census

4    data came out for the City of St. Louis, in fact, the

5    population had decreased by 8 percent.  So the ACS data is in

6    many ways imperfect and can be unreliable.  And the census

7    acknowledges that by including ACS data with a margin of

8    error.

9          The margin of error -- the Defendants in this case

10   haven't established that the ACS data, the margin of error

11   for the ACS data, the confidence interval, is outside of the

12   census numbers.

13         So, for instance, going from the census data to the

14   ACS data, the difference in the black voting age population

15   is only 283 people if you look at single race black, or 528

16   people if you look at Dr. Rodden's projections for any part

17   black.  The confidence interval for the -- or the margin of

18   error for the ACS numbers is, in fact, 2,458 people for the

19   population overall, and would likely be a larger percent of a

20   voting age population determination since that's a smaller

21   sample and a smaller number.  So Defendants have not overcome

22   this presumption that the total count of the population

23   should be the count that's used.

24         As far as Dr. Rodden's projected estimates for where

25   the current population stands, there is a number of reasons

1    that they should not be relied upon.  First, again, there's a

2    small sample for ACS, which does not give the age breakdown

3    for those who report having two or more races.  Dr. Rodden

4    has made an estimate of which part of that census category or

5    that ACS category is any part black and incorporated that

6    into his estimates or projections without reporting the

7    margin of error.

8            He doesn't include a margin of error in any part of

9    his projections, so unlike the ACS, we cannot even determine

10   how accurate or inaccurate those projections might be.

11           And there are other small consistencies --

12   inconsistencies, again, at the margins.  For instance, in

13   Dr. Cooper's report he explains that the Board of Elections'

14   designation of the district is slightly different than the

15   Census Bureau's designation.  It's only a few hundred people,

16   but, again, as Defendants are arguing that we're a few people

17   above the 50 percent line, those small changes become even

18   more significant.

19           Now, for a few reasons even if the voting age

20   population were above 50 percent, that wouldn't preclude

21   Plaintiffs' claim.  Vote dilution claims are not prohibited

22   simply because there's a numerical majority.  Black voters in

23   the district still can lack real opportunities to elect

24   candidates of their choice.  And I believe in the last week

25   we've shown a lot of examples of that.  Three circuit courts

1    have looked at this issue of whether or not there's a per se

2    bar, and all have determined that a population above

3    50 percent does not --

4         THE COURT:  I assume you're not including the Ninth

5    Circuit, right?

6         MS. EBENSTEIN:  No, not including the Ninth Circuit.

7    The Fourth, Eleventh, and Second Circuit have determined, and

8    the Ninth Circuit has cited it in a footnote, that having

9    more than 50 percent population does not preclude this sort

10   of claim.  And, in fact, in the Fifth Circuit one of those

11   cases looked not at the population but at the registered

12   voter population.  So it already implicitly took into account

13   some of the other barriers that might come up.

14        Those barriers that may come up, and I think that

15   Fifth Circuit case is significant because in FFSD the

16   50 percent mark is even less significant due to some of the

17   other considerations that have come out over the course of

18   the trial.  First is that turnout in FFSD is lower for black

19   residents than for white residents.  Dr. Kimball did an

20   analysis that showed a lower level of turnout among black

21   residents.  And Dr. Rodden's own analysis showed that in 11

22   out of 12 elections that he analyzed, the turnout was either

23   lower -- the black turnout was either lower or equal to the

24   white turnout.  Only in one of those 12 elections did he

25   determine that the estimate of the black turnout was, in

1    fact, higher.

2          And those numbers have some -- there are some

3    additional considerations with those numbers.  First of all,

4    we know at least in the state as a whole that the black

5    registration rate is lower than the white registration rate.

6    For black residents the registration rate is 67.1 percent,

7    and for white residents it's 72.2 percent.  Dr. Rodden

8    determined turnout as the number of people who cast a ballot

9    over the number who are registered in the district.  So his

10   numbers actually may overcount the turnout among black voters

11   since they don't consider the differential in registration

12   rates.

13         On top of that Dr. Gordon testified that due to

14   disparities in felon disenfranchisement, specifically of the

15   100,000 people who are on some sort of oversight, prison

16   oversight, 60,000 or so of them are on probation and parole

17   living in their home community.  As is generally

18   acknowledged, felony convictions and the loss of voting

19   rights related to felony convictions impacts black voters and

20   residents more harshly than it does white voters and

21   residents.

22         So for those three reasons, even if black voters had

23   crossed the 50 percent line, they don't have the same

24   electoral opportunities as white voters may have.

25         Another issue that Defendants brought up in terms of

1    *Gingles I* was that Plaintiffs have not shown how effective

2    our illustrative plans are.  Again, that's not a requirement

3    of *Gingles I*, but we did produce evidence from Dr. Gordon --

4    or first off, Mr. Cooper's plans show over 60 percent black

5    voting age population in three of the seven districts, over

6    50 percent in one of the seven districts.  So in four

7    districts there's a majority and a greater or much greater

8    majority than what Defendants claim there is in the at-large

9    district overall.  If nothing else the single member

10   districts based on that showing population-wise would be more

11   effective.

12           The second Defendants' analysis of effectiveness in

13   their response to Dr. Cooper is in many ways unreliable.  It

14   assumes that black candidates are candidates of choice when

15   it counts up how many people would win under Dr. Cooper's

16   illustrative plans versus the current at-large district.  And

17   it doesn't consider the differential in each of those

18   districts and the security with which a candidate could be

19   successful.

20           Again, the *Gingles I* is clearly satisfied.  But in

21   terms of those two arguments Plaintiffs have shown that they

22   are either not relevant or have shown that they fail based on

23   the facts that we've presented.

24           Coming to *Gingle II* --

25           THE COURT:  Well, let's stop a second.  I asked

1   Dr. Kimball myself that given all these factors,

2   disenfranchisement, at-will voter registration rates, at what

3   percentage of the voting age population the African American

4   population would need to be before we knew they could

5   exercise the majority just as a matter of course.  And he

6   said he didn't know.  What do I do with that?

7          MS. EBENSTEIN:  Well, I know that he hasn't made

8   that calculation, and there's generally not a single

9   numerical threshold.

10          THE COURT:  No, but you could take out the

11   difference in registration and the estimate of

12   disenfranchisement and extrapolate that across the voting age

13   population and make a determination as to what percentage of

14   the voting age population African Americans would need to be

15   before you completely believe the playing field was level.

16   Right?

17          MS. EBENSTEIN:  Yes.

18          THE COURT:  But nobody has done that.

19          MS. EBENSTEIN:  No, I think during the remedial

20   phase if there are different plans proposed, effectiveness

21   would be a part of it.  And either calculating, maybe not one

22   given percentage that could carry across other school

23   districts, but certainly calculating or explaining to you the

24   factors in FFSD that would lead to an effective district and

25   where that number would be would all be done at the remedial

1       stage.

2               Courts have at different points used a 60 or 65

3       percent number.  But, again, it makes more sense at the

4       remedial stage to factor in the specifics of the FFSD when

5       making that determination.

6               As far as *Gingles II*, we've shown throughout the

7       week that black and white voters have divergent preferences

8       as to who they want to represent them on the school board.

9       And when you consider that in the face of racial disparities

10      in the district, it's prevented African American voters from

11      having an equal opportunity to elect their candidates of

12      choice.

13              *Gingles II* requires that voting is racially

14      polarized, which put simply means black and white voters vote

15      differently.  And *Gingles III* requires that candidates

16      preferred by black voters usually lose.  We've shown both of

17      these things, primarily through Dr. Engstrom's testimony.

18              First, it's important to consider which elections

19      are probative in making these considerations.  And both

20      courts in the Eighth Circuit and the explanation of the

21      witnesses have shown that recent endogenous and interracial

22      elections are the most probative in highlighting the patterns

23      among voters and whether or not they vote differently from

24      voters of another race.

25              There has been according to Dr. Engstrom a

1    consistent relationship between the race of the voter and the

2    candidates they choose.  In this particular instance the

3    candidates of choice have primarily been African American and

4    have been African American since 2011.  However, black voters

5    could certainly prefer any candidate that they wish.  The

6    question is based on these EI estimates who they've shown

7    that they do prefer in the school district.

8         For that reason the difference in voting patterns

9    between black and white voters, racial -- voting in the

10    district for School Board is racially polarized.  There's a

11    consistent relationship between race of the voter and the way

12    they vote, and black and white voters vote differently.

13         To move on to *Gingles III*, *Gingles III* is met where

14    the white majority vote sufficiently as a block to enable it

15    in the absence of special circumstances, usually to defeat

16    the minority preferred candidate.  And as the case *Bone Shirt*

17    lays out, that's determined through three inquiries:  One,

18    identifying the minority preferred candidate; two,

19    determining whether the white majority votes has a block to

20    defeat that candidate; and, three, determining whether there

21    are any special circumstances.

22         Now, the parties have put forward a number of

23    different methods for identifying the candidate of choice,

24    and Plaintiffs satisfied *Gingles III* under any of those three

25    determinations.  The case-by-case approach that Plaintiffs

1    have put forward is the legally appropriate approach to take.

2    There is no -- as courts have held, there's no blanket

3    definition of minority preferred candidate, it is a

4    determination made on an election-by-election basis.  And it

5    typically requires both a statistical and a nonstatistical

6    analysis.

7        Dr. Engstrom identified eight candidates of choice

8    since 2011, and he did that based on three principles:

9    First, candidates' level of support must be statistically

10   significantly higher than a candidate who is not a preferred

11   candidate.  So, for instance, if we identify choice of

12   preference No. 1 as a candidate of choice and you can tell

13   that there is a statistically significant difference between

14   them and the next preferred candidate, that next preferred

15   candidate should not be considered a candidate of choice.

16       Another consideration Dr. Engstrom made was that

17   those considered a candidate of choice had a substantially

18   higher level of support.  So we don't just say that anyone

19   who is in the top end number of seats that are up for

20   election becomes a candidate of choice, we have to actually

21   look at the numbers.  Part of the reason for that, as he

22   explained, is that black voters or any voters are not

23   required to prefer as many candidates as there are seats in

24   the election, which is why this case-by-case approach is so

25   important.

1          The third principle that Dr. Engstrom explained is

2     that voters should have an opportunity to elect candidates

3     from within their own racial group if they show a preference

4     for candidates within their own racial group.  So courts

5     should be skeptical of attempts to characterize a second

6     choice winning white candidate as a candidate of choice when

7     the first choice clear preferred candidate is an African

8     American candidate.  Based on Defendants' method for counting

9     candidates of choice, there's certainly a pattern of adding

10    the identification of white lesser preferred candidates as --

11    to count as a success among black voters, when black voters

12    have actually shown a strong preference towards voting within

13    their racial group.

14          Next white voters usually vote as a block to defeat

15    the black preferred candidates.  And, again, Dr. Engstrom

16    showed eight candidates that he identified as candidates of

17    choice, only two of whom were elected.  The percentage of

18    black preferred candidates who are successful is, in fact,

19    decreasing.  Only seven out of the 19 preferred -- black

20    preferred candidates in contested elections were successful

21    since 2000 as compared to 19 of 20 white preferred

22    candidates.  In the past five -- in the past decade, four of

23    12 black preferred candidates were elected.  And then in the

24    past five years that Dr. Engstrom analyzed only two of eight

25    black preferred candidates were elected.

1          THE COURT:  But the two were in the last two

2    elections.

3          MS. EBENSTEIN:  Right, which brings us to special

4    circumstances that have affected the lasts two elections.

5    But I just wanted to mention one more thing, which is that

6    there does not need to be a showing of no crossover voting at

7    all.  You don't need perfect polarization between black and

8    white voters such that not a single white candidate votes --

9    excuse me, a white voter votes for a black candidate.  There

10   simply needs to be sufficient lack of white crossover voting

11   or white voting as a block to usually defeat the black

12   preferred candidate.

13          And I also just wanted to note the possibility

14   that's come up of single shop voting.  Straightforwardly

15   it's -- if black voters are required to give up half of their

16   voting rights and single shot vote in order to elect their

17   candidates of choice when white voters are not, certainly

18   that's not an equal opportunity to participate, first of all.

19   Second of all, even when black voters have done that, for

20   example, in the 2012 election, it was ineffective, the two

21   white candidates were still elected over black voter single

22   shot choice of a candidate.

23          And then as far as the 2015 election, there are

24   special circumstances present, the first of which is commonly

25   recognized in Section 2 cases, which is that it's a

1  post-litigation election.  That can change both who runs for

2  office, the candidate pool, and the voting patterns.

3  Dr. Engstrom said in his report in his roughly 40 years as an

4  expert he doesn't recall a post-litigation election that

5  departed as dramatically from previous elections.

6       Now, Defendants have presented the recent success of

7  two black candidates as a shift attributable to the addition

8  of a few hundred -- or not even addition, addition of a few

9  hundred black residents into the pool of the voting age

10  population in the district.  That doesn't quite make sense.

11  The fact that a few people may have turned 18 among the black

12  population or that some people, 18-year-olds or others may

13  have left from among the white population doesn't account for

14  this vast dramatic change in the voting behavior.

15       More likely it's two things; a post-litigation

16  election and the events of the summer of 2014, the shooting

17  of Michael Brown, which very much brought national attention

18  and a number of other changes that haven't been seen before

19  into the school district.  Because of those special

20  circumstances, the election is not an indication of the usual

21  patterns in the district and should be discounted as less

22  probative.

23       If you don't have any questions, I'll have my

24  colleague --

25       THE COURT:  I'll save them to the end out of

1    fairness to your presentation.

2          MS. EBENSTEIN:  All right.  Thank you.

3          THE COURT:  Mr. Rothert.

4          MR. ROTHERT:  Good morning, Your Honor.  I'm going

5    to talk about the Senate Factors, there are only nine and I

6    have 15 minutes, so no problem.

7          THE COURT:  Don't talk so fast we don't have a

8    record, okay.

9          MR. ROTHERT:  I'll annunciate.  After establishing

10   the *Gingles* preconditions, the Court turns to the -- to see

11   the totality of the circumstances on the ground.  And as the

12   Eighth Circuit notice in the en banc *Blytheville* case,

13   satisfying --

14         THE COURT:  That's *Blytheville*.

15         MR. ROTHERT:  *Blytheville*.

16         THE COURT:  Blytheville, Arkansas.

17         MR. ROTHERT:  It is Arkansas for sure.  Satisfying

18   the preconditions from *Gingles* takes us a long way toward

19   showing a Section 2 violation.

20         So there are nine Senate Factors that are in the

21   Senate report that accompanied the 1982 amendments to the

22   Voting Rights Act.  We don't have to prove any set number or

23   even a majority.

24         I'll start by talking about Factors 2 and 7.  And

25   that might be a pinch confusing to talk about two and seven,

1    but they are the predominant factors, and according to

2    *Gingles* when they are present the other factors aren't

3    essential.

4         Senate Factor 2 is looking for a relationship

5    between the race of the voter and the way in which voters --

6    the voter votes.  So Dr. Kimball, Dr. Engstrom, Dr. Rodden

7    each provided evidence of a consistent relationship between

8    the way African Americans on the one hand vote and white

9    voters on the other hand, how they vote.

10        Dr. Kimball's -- or, I'm sorry, Dr. Engstrom's

11   case-by-case analysis found an overlap of about 10 percent

12   overlap in voting.  Dr. Rodden's top choice analysis found

13   0 percent overlap.  And even Dr. Rodden's questionable

14   district point estimate approach found overlap only about a

15   third of the time.

16        In addition to these experts who examined the data

17   and showed very little overlap in how black voters vote and

18   how white voters vote, the fact witnesses, all of the fact

19   witnesses testified that African American voters vote for

20   different candidates than white voters.

21        Senate Factor 7 looks at the extent to which African

22   American candidates win school board elections.  *Gingles*

23   again explained that this doesn't take -- mean a complete

24   lack of success.  And as Dr. Kimball testified, this is not a

25   close call.  White candidates have a much higher rate of

1    success than African American candidates.  There's a slide
2    here that explains it, but the success rate for white
3    candidates is about 70 percent, for black candidates it's
4    about 11 percent.  Not a close call at all.
5           So if you look at the chart on the next slide, the
6    experts on -- it shows in the last 12 contested elections
7    four times as many candidates win and white candidates have
8    three times the success rate of African American candidates.
9    And that's roughly -- I mean, we talked about how terrible it
10   is that in Ferguson African Americans are three times as more
11   likely to be pulled over by the police.  Well, here white
12   candidates are three times as more likely to win than African
13   Americans.
14          And experts on both sides talked about the power of
15   incumbency and how important that is in elections like school
16   board elections.  But since 2006 no African American
17   incumbent has won reelection; although in the same period
18   there have been white incumbents who have won reelection.
19          So African Americans usually lose.  White candidates
20   usually win.  And in Senate Factor 7 we're looking at the
21   race of the candidate.  So Senate Factor 7 is established.
22          I was going to talk about Senate Factor 1 and 5
23   together because many courts discuss them together, or back
24   to back anyhow.  Because as in this case they often go hand
25   in hand.  So Senate Factor 1 is the history of discrimination

1    that touches on voting.  And Senate Factor 5 is whether

2    minorities in the jurisdiction bear the effects of past

3    discrimination.

4        For Senate Factor 1, Plaintiffs have shown a history

5    of discrimination that has touched on the right of African

6    Americans to participate in the political process.  The

7    Eighth Circuit reminds district courts that they should

8    recognize the historic effects of discrimination in areas

9    like employment and education and how that impacts negatively

10   on minority political participation.

11       In this case Plaintiffs have shown a history of

12   racial discrimination affecting residents of the district.

13   It starts explicitly with Missouri law when it was the policy

14   of the State not to allow African Americans to vote.  But it

15   also comes up in education, and in this very school district

16   that we're talking about where racial segregation was

17   maintained as a matter of policy even 20 years after *Brown v.*

18   *Board of Education.*

19       It's also present in housing.  Dr. Colin Gordon

20   testified about how housing and segregation in housing is the

21   chief driver of socioeconomic disparities by race and how

22   those persist today.

23       As Senate Factor 5 requires, Plaintiffs have shown

24   that African Americans in the school district bear the

25   effects of historical discrimination.  There are a lot of

1    racial disparities.  The OCR, Office of Civil Rights, data on

2    disciplinary disparities based on race is in Exhibits 85, 86,

3    and 93.

4        The OCR data reported by the Board on gaps in

5    achievements based on race are at Exhibits 84 and 93.

6    Dr. Kimball testified about the disparities in treatment of

7    law enforcement, income, employment, education.  And

8    Dr. Gordon provided the table that's on this slide showing

9    how the disparities are in the metro area as a whole, in the

10   district where they are even worse, and in the census blocks

11   that are majority African American.  And you can see for

12   almost every category looked at, each metric looked at,

13   African Americans are worse off.  And Dr. Kimball explained

14   how the socioeconomic disparities, the lack of socioeconomic

15   well-being increased the cost of voting which in turn dampens

16   the political participation.  And that's what Senate Factor 5

17   requires Plaintiffs to show.

18       And, again, this is important.  We've said it a few

19   times, but Section 2 looks at how electoral processes and

20   laws, how they interact with socioeconomic realities on the

21   ground and with history to cause inequity and opportunity.

22   So, again, we don't have to show purpose and we certainty

23   don't have to show purpose of the current regime.  We just

24   have to show that there's a history of discrimination and

25   that there are lingering effects of that discrimination that

1    have the effect of creating an unequal opportunity to select

2    a preferred representative.

3           The rest of the factors I'll take in order.  Senate

4    Factor 3 examines whether election practices and procedures

5    tend to enhance the opportunity for discrimination.

6    Dr. Kimball explained how at-large, staggered, and off-cycle

7    features of the district's elections enhance the opportunity

8    for discrimination.  And his conclusion should not be

9    surprising because courts, including the Supreme Court, have

10   found such procedures enhance discrimination.

11          Which to change, to get rid of the inequities or how

12   to change or, you know, different ways of dealing with

13   districts, subdistricts, there could be a hybrid, whether to

14   address all three of these, parts of them, and how to address

15   them is a question of remedy.  And we're certainly not going

16   to ask you to change every feature of Ferguson-Florissant

17   School District elections, but for Senate Factor 3 it

18   suffices that there are these features that exist, and the

19   proof is that they do tend to enhance the opportunity for

20   discrimination.

21          Senate Factor 4 involves denial of access of

22   minorities to well established slating processes.

23          THE COURT:  This goes to -- is the definition of

24   "slating" recruiting candidates?

25          MR. ROTHERT:  It is not.  According to the Second

1   Circuit, I believe Second Circuit -- Fourth Circuit --

2   according to the Fourth Circuit the Supreme Court has viewed

3   slating as essentially involving the endorsement of

4   candidates.  And described -- the Eastern District of

5   Missouri, a court here has said that -- the court has

6   described slating as a group of individuals who run as a

7   block.  So we don't believe it's necessary that there be

8   recruitment.

9         THE COURT:  Well, if the NEA interviews all the

10  candidates and endorses some, that doesn't mean they are

11  running as a block.  I mean, we heard a lot about the NEA

12  endorsement, a little bit about North County labor, but I

13  didn't hear anybody then running as a block.  That's a little

14  different.

15        MR. ROTHERT:  The evidence was that they have shared

16  materials and shared resources.

17        THE COURT:  We heard about candidates running as a

18  block, but I never heard it really with the NEA.

19        MR. ROTHERT:  Again, this is an area where we don't

20  have to show purposeful exclusion of African Americans.  And,

21  you know, I don't believe that there is a purposeful

22  exclusion of African Americans, but just the results.  And

23  the results are that it matters to be endorsed by the FFNEA

24  or North County Labor Club because the endorsees almost

25  always win.  And the endorsees are also almost never black.

1          THE COURT:  But you got two counterintuitive

2     moments.  The president of the FFNEA was an African American

3     most recently.

4          MR. ROTHERT:  Right.

5          THE COURT:  And they endorsed an African American

6     last election who lost when another African American won.  If

7     this was a TV screen I'd say it's pretty scrambled as to what

8     the effect is here and what we're dealing with.

9          MR. ROTHERT:  Well, the effect overall is FFNEA

10    endorsees, the last 14, 11 have won.  And the ones who

11    haven't have been African American, all of them.  So it makes

12    a difference whether or not you get the FFNEA endorsement, at

13    least if you're white.  And you usually are if you've --

14         THE COURT:  But in the last election an African

15    American won who wasn't endorsed by the FFNEA.

16         MR. ROTHERT:  That is true.

17         THE COURT:  An African American endorsed by the

18    FFNEA wasn't elected.

19         MR. ROTHERT:  Right.  And it's important I think to

20    note that the African American who was endorsed was not a

21    black preferred candidate.

22         THE COURT:  Well, by definition, since they didn't

23    win.

24         MR. ROTHERT:  Well, if they both would have won,

25    they could have both been black preferred.  But he didn't --

1  he also did not get support from the African American

2  community.

3          The North County Labor Club shows the similar

4  outcome, 12 white endorsees, one African American.  The

5  African American loses.  All 11 of the 12 white endorsees

6  wins.  So it makes a difference.  It makes a difference to

7  get the endorsement.

8          Senate Factor 6 is the use of overt and subtle

9  racial appeals.  You heard credible testimony from several

10  fact witnesses who said they understood, they heard, and they

11  understood subtle racial appeals that were made.  The

12  district chose not to call a single one of its white Board

13  members to testify that those witnesses were incorrect.

14          Senate Factor 8 is proved by providing evidence that

15  elected officials are unresponsive to the needs of African

16  Americans.  Again, each fact witness, no matter who called

17  by, testified about a lack of responsiveness by the district.

18  And, again, no white Board members were called to testify or

19  respond to the claim that the Board has not been responsive.

20  And that's not surprising because in their deposition

21  designations many Board members are wholly unaware that the

22  African American community has particularized needs, much

23  less what they are.  The Board is the policy maker for the

24  district.  But unlike Hazelwood and Jennings, it hasn't

25  engaged in policy initiatives to address the achievement gap.

1          And unlike the board for the St. Louis Public

2   Schools, it hasn't undertaken an initiative to address racial

3   disparities in discipline.  They've just talked about it.

4   And Mr. Green testified that disciplinary policies are varied

5   by building, which allows the disparities to grow greater.

6          And there's the testimony about the suspension of

7   Dr. McCoy.  You learned from Mr. Morris's deposition that it

8   was over a hiring decision.  The community cried out

9   literally for an explanation.

10          THE COURT:  Let's be honest, this Dr. McCoy piece is

11   really difficult for me.

12          MR. ROTHERT:  Yes.

13          THE COURT:  Because Dr. McCoy signed -- wouldn't

14   allow the School District to release the reasons for which he

15   agreed -- he was suspended.  What do I do with that?  All I

16   have is speculation.

17          MR. ROTHERT:  Well, there is no evidence of that.

18          THE COURT:  There is no evidence of why he resigned.

19          MR. ROTHERT:  Well, right.

20          THE COURT:  There is no hard evidence.  There is

21   people saying they think or they saw or they heard.

22          MR. ROTHERT:  Okay.

23          THE COURT:  And I have Dr. McCoy apparently saying I

24   do not for whatever reason want the world to know why I'm

25   resigning.

1          MR. ROTHERT:  Well, we've --

2          THE COURT:  What do I do with that?

3          MR. ROTHERT:  Well, we've tried not to focus.  We're

4     not talking about the resignation.

5          THE COURT:  All your witnesses talked about

6     Dr. McCoy.

7          MR. ROTHERT:  Yes, they did, but they are not

8     talking about the resignation, they are talking about the

9     suspension that happened five months later.

10          THE COURT:  He was suspended and then resigned, but

11     refused to allow the School District to say why.  So that's

12     almost like hitting somebody with their hand tied behind

13     their back.  Help me out.  I'm not telling you I want to

14     disregard it, but tell me how I handle that.

15          MR. ROTHERT:  Well, Dr. McCoy, the only thing that

16     he asked to be confidential were the reasons for his

17     resignation and the charges that were filed, and that came

18     four months later and it was very different than the reason

19     why he was suspended.

20          THE COURT:  How do I know that?  Because it's a

21     secret.  How do I know that?  I've got to take your word.

22          MR. ROTHERT:  It's not a secret.

23          THE COURT:  Well, he said he didn't want it

24     disclosed, so how do I know it's different.

25          MR. ROTHERT:  He never said he didn't want the

1    suspension information disclosed.  And we know --

2            THE COURT:  Assuming then how do I know that the

3    suspension and resignation were for different reasons if we

4    don't know why he resigned?

5            MR. ROTHERT:  It's in the deposition designations of

6    the Board members including Mr. Morris who told you why he

7    was suspended, which was a hiring decision.  And they tell us

8    that.  And they us they can't tell us the reason for the

9    charges.  So --

10           THE COURT:  So how do we know they are not the same

11   if we don't know what it was?

12           MR. ROTHERT:  Well, because they are not allowed to

13   tell us the reasons for the dismissal or the charges.

14           THE COURT:  I'm asking your help.

15           MR. ROTHERT:  Yes.

16           THE COURT:  What do I do with that if I don't know?

17   If it's an empty set as to why he resigned, but you want to

18   use as an example of how the district is unresponsive, how do

19   I know that that's fact?

20           MR. ROTHERT:  Well, no matter what the reason, what

21   is significant is that the Board for whatever reason chose

22   not to give any explanation to the public for the suspension.

23   And the public is asking for it.  And maybe -- and whether or

24   not it's reasonable for the Board to do that or not, you

25   know, that is -- that could be a legitimate question.  But as

1    far as the public -- that being a need of the public to know

2    that and the choice not to give it to them is a decision that

3    the Board made.  And it doesn't matter ultimately why he was

4    suspended or what the reason was, but especially when as all

5    the witnesses testified, the feeling and the word in the

6    community was that it was because of race.  To respond to

7    that with silence and to choose not to give an explanation

8    allows that to fester and allows that to grow and it shows

9    unresponsiveness to that concern.

10          THE COURT:  So that's the piece I should take from

11   it?

12          MR. ROTHERT:  Yes.

13          THE COURT:  All right.

14          MR. ROTHERT:  All right.  And I'm just saying today,

15   you know, we heard from Dr. Graves that, you know, before she

16   was on the Board she thought the Board was nonresponsive to

17   the concerns, that they didn't respond, and now that she's on

18   the Board she learned that's how it works, they don't respond

19   to the --

20          THE COURT:  She was talking about the public comment

21   period before a Board meeting.

22          MR. ROTHERT:  Right.

23          THE COURT:  She didn't say the Board doesn't respond

24   to community interest.

25          MR. ROTHERT:  I'm sorry.

1          THE COURT:  She said that she understood now --

2          MR. ROTHERT:  They don't respond to the comments.

3          THE COURT:  -- that at board meetings there's a

4    public comment period, and it's not their practice to engage

5    in a discussion with the public when they are making a

6    comment.  That's a total -- you're extrapolating a procedure

7    at a Board meeting --

8          MR. ROTHERT:  I'm not trying to extrapolate.

9          THE COURT:  -- to a philosophy of the Board, and

10   those are entirely different issues.

11         MR. ROTHERT:  No, I'm just giving the procedure that

12   we just learned about as another example of the choice, it's

13   a choice.  The don't -- certainly you cannot -- you can

14   choose not to respond to comments in the comment period.

15         THE COURT:  I just don't want you to extrapolate

16   that they had a public comment period and they don't debate

17   the public during that public comment --

18         MR. ROTHERT:  No.

19         THE COURT:  -- period as that they are unresponsive.

20   Whatever we do here it's going to be real and based upon

21   what's really going on.

22         MR. ROTHERT:  Right.

23         THE COURT:  And what she said was not that's the way

24   it is, but that's the process and procedure by which they run

25   the Board meeting.

1     MR. ROTHERT:  Right.  And that evidence is a choice

2     to not follow up with those comments or engage with those

3     comments.  And that gave Dr. Graves before she ran a sense

4     that they weren't being responsive to those concerns.  And so

5     it's just the appearance of nonresponsiveness.

6          So the final factor, because I'm over my time --

7          THE COURT:  I've interrupted you, so fundamental

8     fairness.

9          MR. ROTHERT:  All right.  The final factor is the

10    tenuousness of the justification for the procedures that tend

11    to discriminate.  And here this is primarily at-large

12    districts that we're talking about, and the justification

13    that we've heard is that it allows --

14          THE COURT:  Well, first and foremost it's required

15    by state law.  That's the hard part.

16          MR. ROTHERT:  Yes.  Well, I mean, that is --

17          THE COURT:  They can never come to you and say we

18    want to ignore state law and do it some other way.

19          MR. ROTHERT:  That is true.  In fact, if the state

20    law and the way it operates violates the Federal Voting

21    Rights Act then it's not a problem.  But certainly that is a

22    justification.

23          THE COURT:  That's why we're here, but they couldn't

24    do anything about it.

25          MR. ROTHERT:  Right.  That is a justification for

1    one of the laws or for maintaining that.  But we also have to

2    discuss or decide whether or not the reason for that state

3    law is tenuous.  Because state laws have been passed that

4    have racially discriminatory effects and that's what Section

5    2 is all about.

6            So the justification is that it allows the Board to

7    represent the whole district.  And that testimony comes from

8    current Board members in their deposition designations and in

9    the live testimony you've seen.

10           But they all live in Ferguson and Florissant.  And

11   the testimony from the fact witnesses on both sides of the

12   case is that there is a north/south divide.  There is a

13   division of resources, and not all schools are represented

14   equally and not all parts of the district are represented

15   equally.  So that's not what's happening.  And that makes the

16   justification so much as that's a justification tenuous.

17           So in closing I would just say that at the end of

18   2014 as you know the world got in on our secret, and our

19   secret is that in many parts of St. Louis, including

20   particularly in North County, African Americans and whites

21   have a very different lived experience.  And one of the

22   differences is that many, many white folks do not know just

23   how different that experience is.  And a result of that is

24   that some local governments are not responsive to the

25   particularized needs of the African American community, and

1    that Ferguson-Florissant School District has been one of

2    those government entities.  And there are several features of

3    elections there, primarily though the at-large feature that

4    combined with the historical and present day circumstances to

5    have a dilutive effect on the votes cast by African

6    Americans.

7           We like to think of our country -- I like to think

8    of our country as one that promises everyone an equal vote.

9    But, of course, we didn't start out that way.  We refused

10   people the vote if they weren't white, if they weren't male,

11   if they didn't own property.  And even after the 15th

12   Amendment, long after the 15th Amendment black voters were

13   still facing laws and procedures that prevented them from

14   having an equal opportunity to elect their preferred

15   candidates.  And that's why the Voting Rights Act was enacted

16   in 1965 and why it's still the law today.

17          The totality of the circumstances in

18   Ferguson-Florissant School District demonstrates that equal

19   opportunity has not yet arrived for African American voters.

20   And just as the promise was supposed to be now, I think when

21   we started our country, and the promise of equal opportunity

22   to vote was supposed to be now when the 15th Amendment was

23   enacted, and the promise was supposed to be now when the

24   Voting Rights Act was enacted in 1965, the promise of an

25   equal opportunity to elect candidates of choice is now.  Not

1    that it may come in the future, but the African American

2    voters have that right now.

3          So for this reason we'd ask the Court to find a

4    violation of Section 2 and proceed to a remedy phase.

5          THE COURT:  Thank you.  Are you ready, Mr. Rothert?

6    Mr. Rothert, are you ready?

7          MR. ROTHERT:  Yes.

8          THE COURT:  You may proceed.

9          MS. ORMSBY:  Thank you, Your Honor.

10         Let no crisis go to waste.  That should be the theme

11   of Plaintiffs' case against the Ferguson-Florissant School

12   District.  Let's face it, if the word "Ferguson" was not in

13   the name of the school district, we would not be here today.

14   If only the Missouri NAACP and the ACLU had reached out to

15   the Board around district administrators prior to filing this

16   suit, they would have discovered a group of people who strive

17   each day to meet the needs of all students in the

18   Ferguson-Florissant School District.  Perhaps they would have

19   realized there was another way, that partnering --

20         THE COURT:  Slow down.

21         MS. ORMSBY:  Okay.  I'm sorry.  That partnering -- I

22   have only 35 minutes.

23         THE COURT:  Well, Mr. Rothert took an extra three or

24   four, so don't panic.

25         MS. ORMSBY:  All right.  Thanks, I won't.  That

1 partnering with the School District to meet the needs of the

2 students was preferable to filing a lawsuit against the

3 district for simply complying with the State of Missouri's

4 election laws, election laws that ensure that the district is

5 represented as a unit and not segregated into separate

6 regions.  They would have realized what people who live here

7 know, that the School District is so much more than the

8 world's perception of Ferguson.

9 Let me introduce to you the district's Board of

10 Education and superintendent.  If you would just stand when I

11 call your name.  First we have Paul Morris.  Mr. Morris was a

12 teacher in the district for many years.  When first elected

13 in 2011 riding a wave of anti-incumbent sentiment, he lived

14 in Ferguson.  His children attended and graduated from the

15 district.  During his time on the Board he moved to

16 Florissant where he currently resides.

17 Leslie Hogshead, who couldn't be here due to a

18 doctor's appointment, is the longest serving Board member and

19 lives in Ferguson right on the boundary of Berkeley.  Leslie

20 Hogshead is the longest serving Board member.  Her daughter

21 Erin graduated from the School District.

22 Rob Chabot, also first elected in 2011, lives in

23 Ferguson and his two kids attend district schools.

24 Scoot Ebert, elected in 2012, lives in Florissant

25 and also has two kids attending district schools.

1          Keith Brown, elected in 2013, lives in Ferguson and

2     his daughter Tara graduated and now teaches in the school

3     district.  Mr. Brown has decided not to run for reelection in

4     this year's April election.

5          Donna Thurman, you heard from Dr. Thurman on

6     Thursday, was elected in 2014.  She told you that she lives

7     in Florissant and worked as a principal in the district

8     serving at Griffith Elementary in Ferguson and Holman

9     Elementary in Berkeley.  She testified under oath that she

10    believed the current at-large system was the best system for

11    governing the district.  She told you of her fears of not

12    having qualified candidates who care about the entire

13    district elected under a single member district electoral

14    system.  She also testified that April elections makes the

15    most sense for Board elections, and not having staggered

16    terms would be detrimental.

17         And, finally, Dr. Courtney Graves, just elected last

18    April 2015.  She lives in Florissant and has two kids that

19    attend Cross Keys Middle School.  She agreed with Dr. Thurman

20    that the at-large system is the best system for Board

21    elections citing the same concerns expressed by Dr. Thurman

22    last week.

23         Three Board members currently living on the south

24    side of the district, and four Board members living on the

25    north side.

1          And finally there's Dr. Davis, the newly hired

2    superintendent.  You heard Dr. Thurman and Dr. Graves testify

3    that Dr. Davis is the man to lead this district forward to

4    address the issues of achievement gaps and discipline gaps

5    and accreditation and all the issues that plague not only

6    Ferguson-Florissant School District but all school districts,

7    not only in the St. Louis metropolitan area but across the

8    country.  You heard many of Plaintiffs' witnesses share the

9    same sentiment about Dr. Davis.

10          We talk about cohesiveness in this case with regard

11   to election behavior, but this Board wants the Court to know

12   that they are cohesive.  They cohesively support the

13   superintendent.  They cohesively support the entire School

14   District and all of its students from border to border.  The

15   Board cohesively supports the statutory at-large April

16   elections and serving staggered terms which are currently in

17   place.

18          Further, the Court should note that this Board is in

19   favor of proportional representation for African Americans on

20   their Board.  They feel strongly that this point be made.

21   This Board is not standing against single member districts in

22   order to protect the status quo.  This Board believes

23   at-large elections are the best way to conduct elections for

24   the school board in the district.  They believe that at-large

25   elections provide the best opportunity for African Americans

1     to elect African American candidates.

2            Plaintiffs have failed to prove any violation of

3     Section 2 of the Voting Rights Act.  Plaintiffs have failed

4     to provide -- to prove a violation of the *Gingles* factors,

5     and they failed to provide any evidence of violation of the

6     Senate Factors under the totality of the circumstances

7     standard.

8            Your Honor, I believe it makes sense to look at the

9     text of Section 2 itself; 52, USC, Section 10301.  It

10     prohibits a voting practice or process that is not equally

11     open to voters of all ethnicities.  In other words, Section 2

12     requires an equality of opportunity.  And the Supreme Court

13     has repeatedly clarified that.

14            Under the current at-large system in

15     Ferguson-Florissant School Districts, African Americans have

16     that equal opportunity.  Throughout this case Plaintiffs have

17     tried to persuade you that the at-large system violates

18     Section 2 because the outcome between the white voters and

19     African American voters has been unequal.  But that's not

20     what Section 2 requires.  It's not a guarantee of equal

21     outcomes.  The question is whether there is an equality of

22     opportunity.  And there is.

23            Whether there is a Section 2 violation should be

24     analyzed in the present day, and the evidence and expert

25     opinions in this case show that as of today African Americans

1    are a majority of the voting age population.

2          Dr. Rodden showed that no later than 2013, African

3    Americans were 51 percent of the voting age population.

4    Dr. Rodden testified that using trend analysis that

5    percentage is likely higher today.  How do we know?  First,

6    since 1990 the white population has rapidly shrunk and the

7    African American population has rapidly grown.  Further,

8    there is a huge asymmetry in the school age population.  The

9    student population is overwhelmingly African American.

10          Plaintiffs tried to steer this court away from trend

11   analysis, even though their expert witness, William Cooper,

12   relied on trend analysis for his opinion in *Fairley v.*

13   *Hattiesburg,* which was decided in an August 11th, 2015 order

14   that I would encourage this court to look at, it's Case No.

15   2:13-CV-18.

16          Mr. Cooper and Dr. Gordon offered up these

17   speculative theories as to why we can't rely on trends in

18   this case.  It's because African Americans may be fleeing the

19   Ferguson area or we don't know how many African American

20   students are sticking around in the district after they turn

21   18.  As Dr. Rodden pointed out, these speculative theories

22   are not consistent with good social science practice, and

23   there's been no data offered to support them.  Plus, if you

24   look at evidence of trends in this case, you'll see that the

25   African American population has doubled in the last 20 years

1   while the white population has halved.  If there were a

2   phenomena that were going to counteract those trends, the

3   magnitude of these phenomena would have to be massive, but we

4   don't have any evidence of them.

5           Let's talk a little more about Dr. Rodden's

6   calculation that any part African American voting population

7   is 51 percent based on the most current American Community

8   Survey data.  As this court is well aware, Plaintiffs do not

9   want this court to look any further than the 2010 decennial

10  census, as if time were static and it stopped in 2010.  But

11  the decennial census has its own flaws such as undercounting

12  African Americans.  The district contends that the decennial

13  census should not be the exclusive and sole source of

14  demographic information in this case, especially when there

15  is more recent data out there; namely, the 2011, 2013

16  American Community Survey or ACS.

17          Plaintiffs tried to further distract from this issue

18  by claiming that Missouri state law requires the use of the

19  decennial census for certain purposes such as redistricting,

20  but that's not what we're doing here.  We're trying to figure

21  out as of today the African American share of the voting age

22  population.  There's no state law that prevents us from using

23  the ACS to do that.

24          Mr. Cooper admitted that his back of the envelope

25  calculation, which he would stand by, showed that in 2012 the

1     any part black voting age population was 49.8 percent, even

2     though he improperly used two different data sets to make

3     that calculation.  0.2 percent equals 102 people.  While we

4     disagree with his method and calculation and his results,

5     it's impossible to believe that the African American voting

6     age population hasn't increased by 102 people in the last

7     four years.

8              Now, you heard Plaintiffs' counsel repeatedly ask

9     whether the U.S. Census Bureau actually publishes a

10    percentage for the any part African American percentage of

11    voting age population in the 2011, 2013 ACS.  Dr. Rodden

12    acknowledged that it didn't, and that the 51 percent number

13    was based on his own estimate.  Plaintiffs' counsel also

14    asked Dr. Rodden about margins of error in the ACS and

15    whether sampling methodology is reliable for population

16    estimates.

17             The district contends that there is plenty of

18    evidence to show that the ACS is reliable for purposes of

19    this case, and so are Dr. Rodden's estimates of any part

20    black voting age population as of the 2011, 2013 ACS.  But

21    remember, Your Honor, Section 2 asks whether there is a

22    violation as of today.  The 2011, 2013 ACS data is at least

23    three years old.  Therefore, the question is what has been

24    happening since then?

25             I remember Dr. Gordon refused to answer any

1    questions about trend analysis because he didn't want to

2    speculate about the future; we're not talking about the

3    future.  We're talking about what has happened up to today.

4    And there has been no evidence to persuade this court that

5    the undeniable trends of the last 25 years have discontinued

6    or reversed.  When you combine that with the 2011, 2013 ACS

7    data and Dr. Rodden's estimates based on that data, you can

8    only reach one conclusion; African Americans are the majority

9    of the voting age population as we stand in this courtroom

10   today.

11          Now, Plaintiffs tried to temper this claim by

12   claiming that even if African Americans are the majority of

13   the voting age population, they are not a majority of the

14   voters.  To make this point, it was incumbent on the

15   Plaintiffs to show that there are depressed rates of voter

16   registration and voter turnout among African Americans within

17   the district.  You yourself asked Plaintiffs if they planned

18   to provide this information to the Court, to which they

19   replied in the affirmative.  They didn't do it.  Instead they

20   only offered evidence on a statewide registration rate of

21   African Americans and the statewide felony disenfranchisement

22   rates, and then they wanted this Court to assume that the

23   statewide rates are the same in the district.

24          But as Dr. Rodden testified, the gaps in

25   socioeconomic measurements between African Americans and

1  whites are actually smaller in the district than in the state

2  and that there are no prisons in the district, which is where

3  felons typically appear when it comes to demographics.  This

4  means that if anything the gap in voter registration in the

5  district is actually smaller than it is statewide.

6          So Plaintiffs have a failure of proof as far as

7  voter registration goes.  And then when it comes to turnout,

8  there is also a failure of proof.  The only evidence

9  Plaintiffs offered was some homogenous precinct analysis

10  performed by Dr. Kimball.  As both Dr. Rodden and Plaintiffs'

11  expert, Dr. Engstrom, testified, this sort of analysis is

12  unreliable.  It relies on only a handful of precincts, five

13  in this case, instead of looking at the district as a whole.

14  Dr. Kimball incredibly offered this unreliable analysis after

15  writing in a blog that at least in 2014 the differential

16  between African American and white voter turnout was weak.

17          Dr. Rodden on the other hand examined voter turnout

18  as a percentage of registered voters.  He found out with the

19  exception of two elections, African Americans and white voter

20  turnout has been basically the same in recent years.  The two

21  exceptions were 2011 and 2015 in which there was a mayoral

22  election in Florissant that may have spurred voter turnout in

23  an area that is mostly white.  Even though that increased the

24  gap in voter turnout in the district, it was an exogenous

25  influence and not something intrinsic within the district

1    that could help Plaintiffs' case.

2         And recall that Plaintiff's case tried to make a big

3    deal about Dr. Rodden calculating voter turnout as a percent

4    of registered voters as opposed to the voting age population

5    as a whole.  That criticism would matter if we actually knew

6    the voter registration rate in the district, but the

7    Plaintiffs never offered it.  And we know that African

8    Americans have a larger share of the voting population -- age

9    population, and so even if whites have a slightly better

10   turnout rate, there's an equal opportunity on both sides.

11   And now we're back to the text of the statute, an equal

12   opportunity means no Section 2 violation.

13        So what are we left with?  Without a doubt African

14   Americans are majority of the voting age population.  Without

15   a doubt African Americans are also the largest group of

16   voters.  Without a doubt whites are minority of the voting

17   age population.  And Plaintiffs have failed to establish the

18   voting age population is not a reliable proxy for actual

19   voters, so how can a larger group of voters be submerged into

20   a smaller group of voters?  The answer is they can't.

21        Hazelwood School District uses the same election

22   system with comparable demographics, and they have a majority

23   African American School Board.  I believe Plaintiffs' fact

24   witnesses were asked about that, one especially, and he said

25   it's self evident.  We agree, we think that when African

1   Americans are the largest share of voters, it's self evident

2   that they have an equal opportunity to elect their candidate

3   of choice.  And that's why this court should find in favor of

4   the District and not disrupt the current system.

5          *Gingles II* requires that African Americans and white

6   voters have distinctly different political preferences.  And

7   *Gingles III* asks whether African American preferred

8   candidates typically lose because of white block voting.  It

9   bears repeating here that cases discussing *Gingles II and III*

10  speak of a white majority that cancels out the votes of

11  African Americans.  Of course we don't have a white majority

12  here.

13         There's been evidence showing that whites typically

14  prefer white candidates, and blacks typically prefer black

15  candidates.  No one disputes that.  In fact, that's the case

16  around the country as Dr. Rodden testified.  But there are

17  also many elections where white and black voters share the

18  same candidate of choice, and there are also several

19  elections where whites cast a significant share of their

20  ballots for black preferred candidates and vice versa.  In

21  other words, there's a lot of crossover voting.

22         Plaintiffs would have this court ignore the overlap

23  in voter preferences by imposing an unduly narrow definition

24  of what qualifies as a minority preferred candidate.

25  Plaintiffs have offered a series of restrictions such as if

1   there's an overlap in the confidence intervals then we can't

2   qualify that as a candidate of choice.

3           Now, it's true that in other contexts confidence

4   intervals mean we don't know for certain whether one number

5   is higher than the other, such as in voting turnout.  But as

6   Dr. Rodden testified, it does not make sense to use this

7   confidence interval restriction when identifying candidates

8   of choice because it ignores the inherent feature of a

9   multi-vote system.  In other words, Plaintiffs want to go

10  inside the minds of the voters and say, well, they didn't

11  really prefer this person, but we can't know what the voters

12  really thought, so the best method available is to rank

13  preferences according to the highest point estimates.

14          But it's not enough just to show a correlation.

15  *Gingles III* also requires that white block voting be

16  responsible for African American preferred candidates losing.

17  As we have shown throughout trial, when an African American

18  preferred candidate loses an election, there is more to it

19  than meets the eye.  For example, even though African

20  American voters did not see any of their preferred candidates

21  elected in 2011, there was a huge anti-incumbent sentiment

22  among voters, and African American voters supported two

23  incumbents.

24          I found it deeply ironic that Dr. Engstrom testified

25  that electoral success of Dr. Graves in 2015 should be

1    chalked up to some alternative cause, but when it came to

2    election years such as 2011, he was unwilling to look at

3    alternative causation.  I believe Dr. Engstrom was on the

4    stand and said that *Gingles* does not require causation

5    analysis, but then he admitted that he did causation analysis

6    in 2015.  Why?  Because Plaintiffs want to discount the

7    success of African Americans, but they don't want to hear

8    about alternative causation whenever African Americans lose.

9    For them it's always about race, unless it's a good election

10   for African Americans, then it's about something else.

11           I want to talk briefly about those close calls.  As

12   Dr. Rodden testified, if there were only 216 votes that had

13   been cast for Mr. Savala and Mr. Henson, we would have a

14   majority African American Board today.  Only 216 votes.  I

15   want that to sink in.  Does that sound like a system that

16   does not provide an equal opportunity to both sides?  Does

17   that sound like a system that needs to be overhauled.

18   Changing an election system is not something that this court

19   takes lightly, and rightly so.  The corollary is that

20   Plaintiffs must give this court a sufficient basis to do so,

21   and they haven't.

22           Even if the Court should find some violation under

23   the *Gingles* factors, which the District vigorously argues is

24   not possible, Plaintiffs must also prove under a totality of

25   the circumstances standard violations of the Senate Factors.

1  Defendants do not deny the historical and shameful past of

2  discrimination against African Americans in the St. Louis

3  area, but the analysis must go farther.  Does that past

4  discrimination prevent African Americans today from

5  participating in the electoral process?  Plaintiffs provided

6  no evidence, as I previously discussed, that in the

7  Ferguson-Florissant School District African Americans do not

8  register to vote at the same level as whites.  I've also

9  discussed the testimony that showed that African Americans

10  and white voters turn out to vote at relatively the same

11  rate.

12         And Mr. Hudson, Mr. Henson, Dr. Graham, Mr. Johnson,

13  Dr. Thurman, and Dr. Graves all testified under oath that

14  they had full access to the political process.  The evidence

15  shows that African Americans are not preventing --

16         THE COURT:  Doesn't that really go to more of the

17  systemic problems?  As we know in the school district,

18  80 percent of whites own their homes, 50 percent or fewer of

19  the African Americans rent, right?

20         MS. ORMSBY:  50.7 of African Americans own their

21  homes.

22         THE COURT:  But almost 50 percent rent.

23         MS. ORMSBY:  Right.

24         THE COURT:  And we know by definition, and we

25  actually heard your witness this morning, moving engenders

1    another obligation to register.  And the historical housing

2    discrimination creates that.  It's not anything the School

3    Board did, but we're left with the reality that renters are

4    less stable typically by definition and, therefore, the

5    barrier to voting is greater because every time they move

6    they are going to have to register.  Where that 80 percent of

7    the whites who register, it's done.  Just systemic issues in

8    housing discrimination otherwise.  I mean, that's all built

9    into this that I have to consider, correct?

10          MS. ORMSBY:  That's correct.

11          THE COURT:  All right.  So you can't say there's no

12   evidence or there's no impact.  And it does matter.

13          MS. ORMSBY:  I believe it does matter, but it's

14   incumbent on the Plaintiffs to show you if it matters enough,

15   and they haven't done that.

16          THE COURT:  All right.

17          MS. ORMSBY:  Mr. Green, former Ferguson-Florissant

18   NEA president -- wait a minute, I lost my space, I'm going to

19   go back.

20          We've heard lots of testimony with regard to

21   racially polarized voting.  The parties agreed that 2014 was

22   an election that was racially polarized, but Plaintiffs fail

23   to provide any convincing evidence of such in the other

24   elections analyzed.  And you've heard Dr. Thurman and

25   Dr. Graves testify that just because a candidate is black

1    does not mean that candidate is someone they have supported.

2    Every fact witness has testified that they have voted for and

3    supported candidates of the opposite race.  Testimony

4    supported the fact that whether a candidate is deemed

5    qualified is the most important criteria for choosing a

6    candidate.

7           Mr. Green, former Ferguson-Florissant NEA president,

8    testified that there is no FFNEA slating process that

9    excludes African American candidates.  Candidates are not

10   recruited to run.  Their endorsement process is open to all

11   candidates.  And there is no control over the endorsed

12   candidate's campaign.  FFNEA is not a slating organization.

13   Dr. Kimball carelessly did not even bother to find out the

14   FFNEA or the North County Labor Club's endorsement process or

15   which candidates even applied before irresponsibly alleging

16   that the endorsement system was detrimental to African

17   American candidates.

18          Your Honor, I really want to focus on this candidate

19   slating issue for a minute here because I think it's a

20   microcosm of the Plaintiffs' case.  Senate Factor 4 asks

21   about the exclusion of members of the minority group from

22   candidate slating processes.  In other words, are African

23   Americans shut out of the slating process itself?  We've

24   already shown that the FFNEA and North County Labor are not

25   slating organizations.  However, Plaintiffs focus their

1    entire case on outcomes of the slating process.  In other

2    words, did African American candidates receive the same

3    number of endorsements as whites?  But what Plaintiffs didn't

4    focus on, as they should have, is whether African Americans

5    were excluded from the process itself, such as whether the

6    slating groups refused to send them questionnaires or invite

7    them to interviews.  There was no evidence on this.

8         But if you look at Plaintiffs' case from trial, you

9    would think that Senate Factor 4 requires slating groups,

10   should they exist, to give equal number of endorsements to

11   both races.  But that's not what it requires.  It only

12   requires that the slating process be equally open to both

13   races, and it is, as Mr. Green, Dr. Graves, Dr. Graham, and

14   Dr. Thurman all testified.

15        Now, I said that Plaintiffs' treatment of Senate

16   Factor 4 is a microcosm of Plaintiffs' entire case.  Why?

17   Because Plaintiffs treat Section 2 as requiring equality of

18   outcomes in elections, just as they treat Senate Factor 4 as

19   requiring equality of endorsements in its slating process.

20   That's not what either issue is about.

21        That brings me to the issue of responsiveness to the

22   needs of the African American community.  During this trial

23   you didn't only hear from Board members Dr. Thurman and

24   Dr. Graves, you also heard from Dr. Graham, a former Board

25   member who was elected in 1988 and who served until 2011.

1    She herself told you how in her experience the Board has been

2    responsive to the concerns of the African American community

3    during her time on the Board, and that her failure to receive

4    the FFNEA endorsement in 2011 and her eventual loss had

5    nothing to do with her race, but had to do with an agitated

6    electorate that as a result of some of the incumbent's votes.

7    Past and present African American Board members

8    testified the Board was responsive to their suggestions.

9    Mr. Green testified that the Board acted in the best interest

10    of all students, both black and white. But Plaintiffs would

11    rather you look at the emotional issue of Dr. McCoy's

12    suspension and eventual resignation. Because the Board did

13    not announce to the world the specifics of the personnel

14    issue with Dr. McCoy, Plaintiffs would have you believe that

15    the Board is not responsive to the African American

16    community. No other examples of unresponsiveness was

17    presented, only the issue of Dr. McCoy's suspension and

18    eventual resignation. The Board followed its policies and

19    procedures with regard to personnel issues, the same policy

20    and procedure that Dr. Graham testified was in place during

21    the time she served on the Board. The Board protected

22    Dr. McCoy's privacy. The Board attempted to show concern

23    about the community's confusion and anger while following

24    their policies. You saw how angry the crowd was at the

25    infamous board meeting shown on the video played by

1  Plaintiffs.  The Board moved the meeting to a facility that

2  would provide an opportunity for everyone to attend.  They

3  listened to each and every person who wanted to voice their

4  concerns.  They sat there while people like Mr. Hudson

5  screamed and threatened them with legal action.  Yet when you

6  asked Mr. Hudson or Mr. Henson or Mr. Pruitt or Mr. Johnson,

7  all who claim to have known Dr. McCoy personally, whether

8  they asked Dr. McCoy for the information they so desperately

9  wanted, they all said they did not, they didn't think it

10  would be appropriate.

11       Other than this one example which holds no merit,

12  Plaintiffs failed to provide any other examples of the

13  Board's lack of responsiveness to the needs and concerns of

14  the African American community.

15       It's true that this area has an unfortunate history,

16  and no one disputes that, and there are vestiges of that

17  history.  But there has been no evidence presented that the

18  Board members are perpetuating those vestiges.  To the

19  contrary, as you heard via testimony, and you'll see in the

20  deposition designations, the Board members are doing

21  everything in their power to provide the best education for

22  all students.

23       You've heard testimony that the Board members, no

24  matter where they live, are able to learn about and interface

25  with residents of all geographic areas.  Some went to school

1  in those other areas.  Some worked in those other areas.

2  They represent the entire district.  And, in fact, an

3  at-large system helps guarantee responsiveness because Board

4  members are accountable to all geographic areas, not just

5  some.

6         Even Plaintiffs' fact witness, Dr. Graham, testified

7  that running an election across the entire district is

8  possible as long as you work hard and get out the vote.  And

9  you have heard testimony that a single member district system

10 would reduce the candidate pool and entrench incumbents.  In

11 fact, that's what's happened in the cities in this area that

12 use single member districts.

13        Plaintiffs want to ignore those comparisons but they

14 are there and they should not be ignored.  The bottom line is

15 that both expert witnesses' and lay witnesses' testimony

16 confirm that the at-large system is best for the district,

17 both for its voters and its students.  Plaintiffs wanted to

18 impugn the District for holding elections in April when we

19 know that's a creature of state law and there are legitimate

20 public policy reasons for doing so.  Plaintiffs wanted to

21 impugn the District for staggered terms, but that's actually

22 helpful so we don't get a fresh Board coming in and out and

23 having to learn from scratch.  That's the best they could

24 come up with, and it's just not enough under the totality of

25 the circumstances.

1        I could go on and on but the pattern is the same,

2   Plaintiffs failed to provide evidence that vote dilution has

3   occurred which prevents African Americans an equal political

4   opportunity.

5        I would be remiss, however, if I failed to point out

6   to the Court an example of how -- an example of how

7   Plaintiffs want both their cake and to eat it too.

8   Plaintiffs argued vigorously against Dr. Rodden's findings

9   and opinion that currently the African American voting age

10  population is over 50 percent as I previously discussed.  Yet

11  in their proposed illustrative plans they ask there be four

12  majority African American districts.  Does this make sense?

13  If the African American voting population is less than

14  50 percent, wouldn't three districts be proper?  But they ask

15  for four.  Plaintiffs can't have it both ways.

16       The Ferguson-Florissant School District is following

17  Missouri statutes.  As a result they are faced with this

18  lawsuit.  The costs have been high, not just monetarily, but

19  in terms of time, effort, and attention.  All of these costs

20  are better spent on the students of the Ferguson-Florissant

21  School District.

22       I urge this Court to find in favor of the District.

23  Let these good people go about their jobs of educating the

24  students of the District.  That's why they volunteer for the

25  job of School Board.  That's why Dr. Davis was hired.  Let

1   them spend the District's money on educating and caring for

2   the students of the District.  Let them spend their time,

3   efforts, and attention on educating and caring for the kids

4   attending school in the District.  Let them focus on what is

5   important.  Let these Board members do what they've been

6   elected and volunteer to do.  Let this superintendent get on

7   with what he was hired to do.  Agree with these Defendants

8   that the best opportunity for African American representation

9   is the current at-large system.  Find that the District has

10  not violated Section 2 of the Voting Rights Act.

11          Thank you.

12          THE COURT:  Thank you all very much.  Who is going

13  to take the lead here?  Mr. Rothert, you're anticipating

14  something, so what do you got?

15          MR. ROTHERT:  Are we going to talk about scheduling?

16          THE COURT:  Yeah.

17          MR. ROTHERT:  Well --

18          THE COURT:  I still have to read two binders of

19  depositions you all gave me on Thursday.

20          MR. ROTHERT:  You're welcome.  I spoke with

21  Ms. White, the court reporter from last week, and she

22  indicated that she thinks the transcripts could be addressed

23  within six weeks, and that she is going to try to get them

24  out on a rolling basis.

25          THE COURT:  That would be helpful to everybody.

1          MR. ROTHERT:  So I think the earliest --

2          THE COURT:  Have you all talked about a schedule?

3          MS. ORMSBY:  No, Your Honor.

4          MR. ROTHERT:  We haven't.

5          THE COURT:  Why don't you approach.  Let's work

6     through it.  So what were you thinking?

7          MR. ROTHERT:  What is it that you're looking for?

8          THE COURT:  Well, there's two things at this point:

9     Proposed findings of fact and conclusions of law from the

10    parties.  We have some issues that were kind of left

11    outstanding as to Dr. Kimball's testimony on voter

12    registration, bullet voting, and super majority testimony.

13    Weigh in on that, tell me what you think.

14         And maybe you all can agree on this, why I hesitated

15    to say the evidence is over, Dr. -- it wasn't Dr. --

16    Mr. Cooper, he has the Washington apple picker history, but

17    obviously he's done a lot of this work.  Wanted to get into

18    some new ACS data I thought, but it was objected to because

19    nobody had seen it.  Not to strike terror in anybody's heart,

20    but the world didn't end in 2010 as we all know.  A lot of

21    things have happened, a lot of things continue to happen.

22         You know, if there is out there a better set of data

23    as to the voting age population in the school district, I'd

24    like to know it.

25         MS. ORMSBY:  Your Honor, that --

1              THE COURT:  But I --

2              MS. ORMSBY:  I would just state that he was

3     referring to the 2014, one year ACS.

4              THE COURT:  Oh, okay.

5              MS. ORMSBY:  Which is not applicable to the size of

6     the school district.

7              THE COURT:  There's a three-year ACS and a five-

8     ACS, but the one-year ACS is --

9              MS. ORMSBY:  Correct.

10             THE COURT:  I get it, if that's all we were talking

11    about.

12             MS. ORMSBY:  Yes.

13             THE COURT:  But if there's a five-year ACS that's

14    available.  I mean, any speech I give in any case, I don't

15    like to create an artificial universe.  We need to deal with

16    reality, right?

17             MS. ORMSBY:  Your Honor, the five-year is actually

18    data that's older than the three years.

19             THE COURT:  Oh, so it's a rolling five-year?

20             MR. ROTHERT:  It's a rolling five years so it goes

21    back.

22             THE COURT:  But you understand my point.

23             MS. ORMSBY:  I absolutely do.

24             THE COURT:  If there is better information.

25             MS. ORMSBY:  Absolutely do.

1          THE COURT:  Because -- and let me just throw out,

2     and I know we're not at the remedy phase, but even if we

3     take, I assume the facts in the light most favorable to the

4     Plaintiffs, the voting age population is roughly equal within

5     the margin of error.  If I were to take a graph from 1980 or

6     1990 forward, which I bet it's flattened out a little bit,

7     but if I were just to draw a graph, Dr. Rodden has got a

8     point.

9          I'm just telling you what I need to hear from you

10    all, you know what I mean.  If I were to still find a

11    violation, are there remedies out there that sunset?  I mean,

12    one of the problems I have, of course, is this is a state law

13    and every other school district in the state, I guess save

14    for the Kansas City School District --

15         MR. ROTHERT:  Correct.

16         THE COURT:  -- follows that state law.  I'm just

17    talking out loud to be honest with you guys.  The points you

18    make, there's a lot of valid points, but they are not just

19    valid in Ferguson-Florissant, right, the state legislature at

20    some point evaluated all those factors and made some

21    decisions, so there's public policy of the state.  You're

22    asking me to change it because it contributes to the

23    situation that you described.  But it's not unique, I mean,

24    there's -- how many school districts are there in North

25    County?  One of our biggest Balkanization problems was St.

1    Louis, right?  There's a lot.  Why is Ferguson-Florissant

2    unique among them?  I need to understand, and what, if

3    anything, I should do.

4         And is the remedy -- I mean, you know, the first

5    thing Dr. Rodden said is I didn't want to take this case

6    because I thought it was antithetical to my view of African

7    American participation in their community.  But the more I

8    looked at it, he said, the more I concluded that the remedy

9    that the Plaintiffs are seeking actually damages the African

10   American community.

11        The last thing any of us want is a counterintuitive

12   result.  I need help on that.  I need help on the Dr. McCoy

13   issue.  I'm just telling you where I see the strengths and

14   weakness and where I need the most help in understanding the

15   situation, because there isn't anyone here who doesn't want a

16   school board that represents the students that make sure that

17   the students get educated.  I don't doubt the sincerity and

18   the motives of everyone in this room.

19        MS. ORMSBY:  May I --

20        THE COURT:  There's nuances to the facts, and what

21   do we do about it.  And you need to help me so I get to that

22   place.  I mean, Mr. Cooper was able to draw not just four but

23   six African American districts out of seven.  That's pretty

24   amazing stuff.  So anyway, I'm all ears to it.

25        What other issues do you all think you need to weigh

1    in on?  I mean, obviously you're not going to do this in 15

2    pages, I kind of feel that coming.

3            MR. ROTHERT:  And these issues that you want us to

4    weigh in on, do you want that as part of the proposed

5    conclusions of law?

6            THE COURT:  No, I think a separate brief.

7            MR. ROTHERT:  Or a separate brief.

8            THE COURT:  A separate brief.

9            MR. ROTHERT:  Okay.

10           THE COURT:  And then you have your proposed findings

11   of fact and conclusions of law.  I see them as separate

12   documents.  And I'm being totally honest with you about what

13   I need to understand better so I can do the right thing in

14   this case, whatever that is.

15           MS. ORMSBY:  Your Honor.

16           THE COURT:  Yeah.

17           MS. ORMSBY:  As far as the McCoy issue, I personally

18   can provide information because I was the attorney for the

19   district in that case and had the conversations with

20   Dr. McCoy and his counsel.  I'm happy to provide an affidavit

21   providing the information I have.

22           THE COURT:  No, I mean, I don't --

23           MS. ORMSBY:  I don't think there's any testimony --

24           THE COURT:  -- think disclosing secrets to me helps

25   anybody.

1          MS. ORMSBY:  Right.  I just don't think there's any

2     testimony that can be provided.

3          THE COURT:  No, the confidential nature of that, I

4     don't see any reason to invade that.

5          MS. ORMSBY:  Okay.

6          THE COURT:  But I need to understand --

7          MR. ROTHERT:  How it's applicable.

8          THE COURT:  -- how it's applicable to this case.

9          MS. ORMSBY:  Okay.

10         THE COURT:  I find it a difficult issue at best.

11    But I understand Mr. Rothert's argument that the failure to

12    respond to it, even if appropriate on one hand there were

13    other ways that could have been responded to.  I've got to

14    figure out in context what to do with it.

15         But I'm just -- you asked me what I was curious

16    about, those are the things -- and I got a lot -- apparently

17    I got several hundred, maybe a thousand pages of reading to

18    do before I get to your briefs when I read all the deposition

19    excerpts you've agreed on.

20         And of course there's just the overarching issue of

21    is the remedy appropriate in a roughly equal jurisdiction;

22    that is, roughly equal between African American and

23    non-Hispanic white voters.  What do you do, and what are the

24    potential remedies?

25         So now is the time when we're being honest, what

1　else do you think we ought to cover?

2　　　　MR. ROTHERT:  Well, do you want us -- I mean, we've

3　not talked about potential remedies in our briefing so far.

4　Is that something that would be helpful?

5　　　　THE COURT:  You've shown me there's a remedy.

6　　　　MR. ROTHERT:  Right.

7　　　　THE COURT:  I mean, let's be honest, say here's a

8　remedy that's available, I get that.  That's probably the

9　lowest barrier you got in some ways.

10　　　　MR. ROTHERT:  But we could be more deliberate about

11　that and more specific.

12　　　　THE COURT:  The one piece I know is you have an

13　interest in telling me why I don't listen to Dr. Rodden and

14　not upset the apple cart if things are trending a certain

15　way, let's be honest.  And I would hate to institutionalize a

16　remedy that has the opposite effect of what you wanted, and

17　that is to limit the voting power of African American voters

18　by carving up the District and preserving white non-Hispanic

19　white seats.  Right?  Are there any cases out there where the

20　remedy has a sunset or the Court retains jurisdiction to

21　revisit after the next census, those kind of things?  I just

22　want --

23　　　　MR. ROTHERT:  Right.

24　　　　THE COURT:  -- it for the calculus.  That's all part

25　of it.  So when -- unfair to you now, when do you want to

1    write all this?

2        MR. ROTHERT:  Well, it seems like the brief part

3    probably happened before there was a transcript maybe.  But I

4    think -- I calculate around March 4th is when we'll probably

5    have the whole transcript, although it will be rolling in

6    before then.

7        THE COURT:  So given that, when do you think --

8        MS. ORMSBY:  Well, considering our testimony is at

9    the end of that rolling transcript --

10       MR. ROTHERT:  That's true.

11       MS. ORMSBY:  -- I would certainly like two to three

12   weeks after that transcript is complete before any sort of

13   facts or conclusion, preferably four weeks actually.  Thirty

14   days would be nice.

15       THE COURT:  Yeah.  What do you think, Mr. Rothert?

16       MR. ROTHERT:  Well, we'd like it to be shorter than

17   that.

18       THE COURT:  Sure.

19       MR. ROTHERT:  Four weeks after would be April Fool's

20   Day.

21       THE COURT:  We're going to make it April the 8th.

22       MS. ORMSBY:  Thank you, Your Honor.

23       THE COURT:  The weekend before that is Good Friday,

24   April Fool's Day, none of those feel good at the moment.  So

25   April the 8th.  And how long to respond?  I'll give you a

1    chance to respond to each others' -- because it's

2    simultaneous briefs and simultaneous responses, we're not

3    going to do a staggered brief or response reply.  You want

4    two weeks, three weeks, and I'll take it under submission?

5            MR. ROTHERT:  I think there will be -- we'll

6    probably be anticipating each other's responses pretty well,

7    so two weeks?

8            MS. ORMSBY:  That's fine.

9            THE COURT:  So April the 22nd.  Anything else we

10   should talk about while we're together?

11           MS. ORMSBY:  The brief that you want on these

12   issues, the same date?

13           THE COURT:  Same dates.

14           MS. ORMSBY:  All right.  I can't think of anything

15   else.

16           MR. ROTHERT:  I think that's it.

17           THE COURT:  Well, thank you all very much.  It was a

18   well tried case.  I enjoyed everyone's efforts, appreciate

19   them, and look forward to working with you in the future.

20   Thank you.

21           MS. ORMSBY:  Thank you, Your Honor.

22           (Court in recess at 12:17 p.m.)

23

24

25

1                    C E R T I F I C A T E

2          I, Susan R. Moran, Registered Merit Reporter, in

3     and for the United States District Court for the Eastern

4     District of Missouri, do hereby certify that I was present

5     at and reported in machine shorthand the proceedings in the

6     above-mentioned court; and that the foregoing transcript is

7     a true, correct, and complete transcript of my stenographic

8     notes.

9          I further certify that I am not attorney for, nor

10    employed by, nor related to any of the parties or attorneys

11    in this action, nor financially interested in the action.

12         I further certify that this transcript contains

13    pages 1 - 93 and that this reporter takes no responsibility

14    for missing or damaged pages of this transcript when same

15    transcript is copied by any party other than this reporter.

16         IN WITNESS WHEREOF, I have hereunto set my hand

17    at St. Louis, Missouri, this 26th day of February, 2016.

18

19                        _____

                          /s/ Susan R. Moran
20                        Registered Merit Reporter

21

22

23

24

25