# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MISSOURI STATE CONFERENCE OF THE  )
NATIONAL ASSOCIATION FOR THE      )
ADVANCEMENT OF COLORED PEOPLE,   )
REDDITT HUDSON, F. WILLIS JOHNSON, )
and DORIS BAILEY,               )
                            )
    Plaintiffs.          )
    v.                    )
                            )
                            ) No 4:14-CV-2077 RWS
FERGUSON-FLORISSANT SCHOOL       )
DISTRICT, and ST. LOUIS COUNTY    )
BOARD OF ELECTIONS COMMISSIONERS,  )
                            )
    Defendants.          )

### BENCH TRIAL – VOLUME I
#### BEFORE THE HONORABLE RODNEY W. SIPPEL
#### UNITED STATES DISTRICT JUDGE
#### JANUARY 11, 2016

APPEARANCES:
For Plaintiffs:       Anthony E. Rothert, Esq.
                  Jessie M. Steffan, Esq.
                  AMERICAN CIVIL LIBERTIES UNION OF MISSOURI
                  FOUNDATION
                  454 Whittier Street
                  St. Louis, MO  63108

                  Julie A. Ebenstein, Esq.
                  Sophia Lin Lakin, Esq.
                  Dale E. Ho, Esq.
                  AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                  125 Broad Street, 18th Floor
                  New York, NY  10004

Appearances Cont'd on Page 2:

REPORTED BY:         SHANNON L. WHITE, RMR, CRR, CSR, CCR
                  Official Court Reporter
                  United States District Court
                  111 South Tenth Street, Third Floor
                  St. Louis, MO  63102
                  (314) 244-7966
    PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

Appearances Continued:


For Plaintiffs:      M. Laughlin McDonald, Esq.
                     ACLU VOTING RIGHTS PROJECT
                     2700 International Tower
                     229 Peachtree Street, N.E.
                     Atlanta, GA  30303

For Defendants:      Cindy Reeds Ormsby, Esq.
                     Angela Gabel, Esq.
                     CROTZER AND ORMSBY, LLC
                     130 S. Bemiston, Suite 602
                     Clayton, MO  63105

                     Kathryn B. Forster, Esq.
                     CROTZER AND ORMSBY, LLC
                     130 S. Bemiston, Suite 602
                     Clayton, MO  63105

                     John A. Safarli, Esq.
                     FLOYD, PFLUEGER & RINGER, P.S.
                     200 West Thomas Street, Suite 500
                     Seattle, WA  98119

# I N D E X

Opening Statement by Ms. Ebenstein .................   5

Opening Statement by Ms. Gabel .....................  12


### PLAINTIFFS' WITNESSES

ADOLPHUS M. PRUITT
Direct Examination by Mr. Rothert ..................  18
Cross-Examination by Ms. Ormsby ....................  53
Redirect Examination by Mr. Rothert ................  76
Recross-Examination by Ms. Ormsby ..................  79

COLIN GORDON
Direct Examination by Ms. Lakin ....................  87
Cross-Examination by Ms. Ormsby .................... 146
Redirect Examination by Ms. Lakin .................. 169
Examination by The Court ........................... 172
Recross-Examination by Ms. Ormsby .................. 174
Further Examination by The Court ................... 174
Further Redirect Examination by Ms. Lakin .......... 176

WILLIAM COOPER
Direct Examination by Mr. McDonald ................. 177
Cross-Examination by Ms. Ormsby .................... 215

4

**(PROCEEDINGS STARTED AT 9:06 AM.)**

1

2      THE COURT:  Good morning.  We're here this morning in

3 the case styled the Missouri State Conference of the NAACP, et

4 al., against the Ferguson-Florissant School District, et al.

5      Would counsel make their appearances, please?

6      MS. EBENSTEIN:  Morning, Your Honor.  Julie Ebenstein

7 representing plaintiffs Missouri State Conference of the

8 NAACP, Redditt Hudson, Doris Bailey, and F. Willis Johnson.

9      MS. LAKIN:  Good morning, Your Honor.  Sophia Lakin

10 for the plaintiffs.

11      MS. STEFFAN:  Morning.  Jessie Steffan for the

12 plaintiffs.

13      MR. ROTHERT:  Anthony Rothert for the plaintiffs.

14      MR. HO:  Dale Ho for the plaintiffs, Your Honor.

15      MS. WILCOX:  Gillian Wilcox for the plaintiffs.

16      MR. MCDONALD:  M. Laughlin McDonald for the

17 plaintiffs, Your Honor.

18      THE COURT:  Is that everybody?

19      MR. ROTHERT:  That's it.

20      THE COURT:  All right.  On behalf of the defendants?

21      MS. ORMSBY:  Cindy Ormsby on behalf of

22 Ferguson-Florissant School District.

23      MS. GABEL:  Angela Gabel on behalf of the

24 Ferguson-Florissant School District.

25      MR. SAFARLI:  John Safarli for the school district.

1    MS. FORSTER:  Kathryn Forster for the St. Louis Board

2  of Election.

3    THE COURT:  Very good.  So it was discussed last week

4  that we'd have some short opening statements.  Who is going to

5  make the opening on behalf of the plaintiffs?

6    MS. EBENSTEIN:  Good morning, Your Honor.  Julie

7  Ebenstein on behalf of plaintiffs.

8    THE COURT:  Good morning.

9    MS. EBENSTEIN:  Plaintiffs and other African-American

10  citizens who live, vote, and raise their families in the

11  Ferguson-Florissant School District have been denied an equal

12  say on the issue most meaningful to them:  The education of

13  their children.

14    The evidence at this trial will show that the

15  at-large method for electing members of the school board,

16  combined with the racial disparities in the district, deprives

17  African-American residents of an equal voice in the political

18  process and violates Section 2 of the Voting Rights Act.

19    The area encompassed by the Ferguson-Florissant

20  School District bears witness to an ugly history of

21  discrimination.  The district itself was created pursuant to a

22  federal court order in the face of its resistance to school

23  desegregation some two decades after the decision in *Brown v.*

24  *Board of Education*.

25    Black residents of the district continue to suffer

1  from a host of socioeconomic disparities which hinders their

2  ability to participate fully and equally in the electoral

3  process.  The evidence will show that the patterns of

4  inequality, which have long plagued the district, nurture an

5  unequal political system.

6       School board elections in the district epitomize

7  racially polarized rating.  Since 2000, in each and every

8  contested election, white voters' top-choice candidates for

9  the school board was white.  Each time that candidate won.

10 During the same years, in each and every election, black

11 voters' top-choice candidate for the school board was black

12 except for one year when there were no black candidates.

13 During those same years, black voters' preferred candidates

14 usually lost.

15      This is no coincidence.  Black residents face

16 structural barriers in the electoral system that deny them an

17 equal opportunity to elect the representatives of their

18 choice.  As the evidence will show, this electoral system

19 violates Section 2.  As Section 2 requires, plaintiffs will

20 prove that the process for electing school board members has

21 discriminatory results, results that fall within the broad

22 scope of Section 2's prohibition against racial

23 discrimination, and the totality of the circumstances in the

24 Ferguson-Florissant School District results in a political

25 system that is functionally unequal.

1    As witnesses will explain, the area surrounding and

2    including the district is a testament to the debilitating,

3    ongoing effects of state-sanctioned segregation and the

4    sustained, uneven economic development.

5    This afternoon, Dr. Colin Gordon, a historian and

6    professor at the University of Iowa, who's published

7    extensively about segregation and inequality in the St. Louis

8    area, will testify about racial segregation patterns in North

9    County and their implications for current public policy.  He

10   will address the district's severe racial disparities in

11   everything from education to housing, income, employment, and

12   criminal justice outcomes.

13   In the face of these disparities, many of the current

14   school board members testify that they lack even a basic

15   awareness of the district's history of state-sanctioned

16   segregation and claim that they are totally unaware of the

17   continuing racial disparities that plague the district.

18   Today close to 80 percent of the district's public

19   school students are African American.  Yet many members of the

20   predominantly white board are unaware of the challenges faced

21   by its students despite recent scathing widespread reports.

22   Over the course of the week you will also hear

23   testimony from African-American former board members

24   concerning the barriers faced by black candidates.  Those

25   former board members, Mr. Chuck Henson and Dr. Doris Graham,

1  will recount how advocates for diversity and inclusion are

2  driven off the board and out of the administration in

3  particularly shameful manner.  Mr. Henson will describe how

4  subtle racial appeals are used during campaign elections to

5  bring in opposition to black candidates.  Dr. Doris Graham,

6  the only resident of Berkeley who has ever served on the

7  board, will address the board's failure to represent the

8  predominantly black municipalities in the district.

9       Frank Green, the former president of the FFNEA, will

10  explain the candidate slating and endorsement process that

11  provides tangible benefits for candidates but almost always

12  endorses white candidates.

13       Plaintiff F. Willis Johnson will identify additional

14  structural barriers to the election of black candidates.

15       Later this week, Dr. David Kimball, a professor of

16  political science at the University of Missouri-St. Louis,

17  with expertise in voting patterns and local elections, will

18  explain how at-large election systems candidate slating and

19  other election practices enhance the opportunity for

20  discrimination in school board elections.

21       This past and present reality has nurtured racially

22  polarized voting throughout the districts.  Later this week,

23  Dr. Richard Engstrom, recognized as one of the nation's

24  most -- foremost scholars on racially polarized voting

25  analysis, will testify that the voting patterns of the

1  district's black residents are politically cohesive in board

2  elections.  A significant number of minority group members

3  usually vote for the same candidates.

4        He will explain that the unwillingness of the white

5  voting bloc to support candidates from the black community has

6  effectively blocked black voters from getting adequate

7  political representation on the board.  Dr. Engstrom's

8  analysis will demonstrate that despite African-American

9  voters' overwhelming support for black candidates, they are

10  usually defeated by the white voting bloc's voting.

11        The evidence will show that the resulting

12  underrepresentation of the African-American community on the

13  board is not only democratic, it has real consequences for

14  students' outcomes.

15        This morning Adolphus Pruitt, on behalf of the NAACP,

16  will testify to the board's unwillingness to recognize, much

17  less address, the issues of particular concern to the black

18  community.  The board has failed to address disparities in

19  academic achievement and has failed to address the racially

20  disparate imposition of school discipline against black

21  students.  He will explain how this results in real harm to

22  black residents and students.

23        Redditt Hudson is a voter, parent, and social justice

24  advocate who lives in the district, and a plaintiff in this

25  lawsuit.  He will testify to black voters' commitment to

1    political participation and desire to see their preferred

2    candidates included in the decisions that affect his two

3    daughters' education and future.  He will explain black

4    voters' disillusionment with the electoral process that leaves

5    them unable to elect candidates who would bring a diverse and

6    representative perspective to the board.

7         You will also hear testimony today that it is

8    possible to structure elections in the district in a way that

9    complies with the Voting Rights Act.  Mr. William Cooper, a

10   demographer who has served as an expert in over 35 Voting

11   Right Act cases, will testify that the black vote -- the

12   district's black population is sufficiently large and

13   geographically compact to constitute a majority of the

14   voting-age population in four out of seven properly

15   apportioned single-member districts.

16        Mr. Cooper will describe two illustrative

17   single-member district plans.  The voting districts in these

18   illustrative plans comply with the one-person, one-vote

19   requirements of the equal protection clause, are compact and

20   contiguous to satisfy the requirements of both state and

21   federal law, respect communities of interest with schools

22   balanced across all seven districts.

23        Mr. Cooper will also testify that the current school

24   board lacks not just racial diversity but also graphic

25   diversity, as all of the current board members hail from just

1    two of the 11 municipalities within the school district.

2         Later this week we expect to hear the district -- we

3    expect the district to present testimony from their proffered

4    expert, who has concocted a population projection custom-made

5    for this lawsuit which purports to show that African Americans

6    are a majority of the district's voting-age population.  The

7    evidence will show that that population projection is entirely

8    unreliable.

9         All available government statistics report that

10   African Americans remain less than 50 percent of the voting

11   population in the district.  No published government data

12   shows otherwise.  As Mr. Cooper will explain, official

13   population data is the most reliable measure of the

14   population, not projections custom-made for litigation.

15        The evidence will also show that, under the facts of

16   this particular case, whether the African-American voting-age

17   population is 49 percent or 51 percent is functionally

18   irrelevant.  African Americans living in the district remain

19   disadvantaged by the at-large electoral district and largely

20   unable to elect their preferred candidates to the board.

21        The district may say that over time its black

22   population will eventually grow so large that some day it

23   might be able to control the at-large electoral district as a

24   majority of the area.  Underlying the district's theory is the

25   peculiar premise that white flight is somehow both inevitable

1   and a suitable substitute for the protections of the Voting

2   Rights Act.  Despite the district's suggestion that plaintiff

3   should wait to see if the effects of discrimination suddenly

4   evaporates, plaintiffs seek to remedy the present and ongoing

5   violation of their fundamental right to vote.  Members of the

6   district's black community seek an equal opportunity to elect

7   their preferred candidates to the board before any more

8   discriminatory elections take place.

9          At the conclusion of trial, plaintiffs will

10  respectfully request that this Court find that, in light of

11  the total of the circumstances, the use of at-large elections

12  in the district violates Section 2 of the Voting Rights Act

13  then move to the next stage of this case to determine an

14  appropriate remedy for the violation.  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         On behalf of the defendants?

17         MS. GABEL:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MS. GABEL:  May it please the Court.  My name is

20  Angela Gabel, and I represent the Ferguson-Florissant School

21  District.

22         Your Honor, this case does not fit into Section 2.

23  This is a case with an African-American majority of the

24  population and a white minority.  This is a case with an

25  African-American plurality of the voters and an

1    African-American majority of the voters.  Whites are the

2    undisputed minority.

3           Plaintiffs have a tortured interpretation of Section

4    2, and it ignores the text of the statute and turns Section 2

5    upside down.  The district will prove this through five simple

6    points.  Number one.  First, the parties agree the ultimate

7    right of Section 2 is equality of opportunity, not a guarantee

8    of electoral success for minority-preferred candidates of

9    whatever race.  And that opportunity is measured today, in the

10   present tense.  Now, there are multiple ways to get there, but

11   when the Court looks at the most recent evidence, it will find

12   that African Americans are the largest group of voters.

13          Plaintiffs ask the Court to override multiple state

14   laws and redraw the district based on the flawed premise that

15   time somehow stopped in 2010.  We know that's not true.  In

16   other words, plaintiffs cherry-pick and select the data that's

17   most advantageous.  They ignore the rest.

18          The Court can and should consider the most recent

19   census data when it makes its decision.  The most recent data

20   shows that, at a minimum, African Americans are the largest

21   group of voters.  And that's stipulated.  Our expert will show

22   that African Americans are a majority of the voters.  This is

23   not a projection.

24          Your Honor, *Gingles* I deals with creating smaller

25   subdistricts with African-American majorities.  This district

1    is already a majority-minority district.  There is no need to

2    subdivide it any further.  That alone is enough for the Court

3    to find for the district because Section 2 is about equal

4    opportunity.  African Americans, as a largest group, already

5    possess that.  So, once again, Section 2 is simply not meant

6    for these facts.  It turns the legal standard on its head and

7    up-ends the premise of Section 2.

8              Number two.  So let's talk about what plaintiffs

9    actually propose.  The Supreme Court holds that Section 2

10   plaintiffs must propose a reasonable alternative to the

11   current at-large system.  So plaintiffs proposed smaller

12   single-member districts.

13             Plaintiffs' own expert published an article in 2010

14   in the St. Louis University Law Review that states that the

15   at-large system, the system that we already have in place,

16   favors the largest group of voters.  It favors African

17   Americans.  Here is what Dr. Engstrom says.  He says, "There

18   are numerous variations in how at-large elections are

19   implemented, but regardless of the particular arrangement,

20   this system does have a tendency to favor candidates preferred

21   by a majority group, or at least the largest group of voters

22   within the jurisdiction."  These are the words of plaintiffs'

23   own expert.

24             His own theory admits the at-large system is most

25   appropriate under these facts, but plaintiffs propose

single-member districts where African Americans are a majority
in four of them. Plaintiffs' specific proposals utterly fail
to increase African-American representation for multiple
reasons, but the most obvious is that plaintiffs put the two
African-American board members in the same subdistrict. It's
as simple as that.

So to sum up the first two points under *Gingles* I,
first, African Americans presently possess an opportunity to
elect candidates of their choice; and, number two, plaintiffs
cannot, and do not, propose a reasonable alternative to the
current at-large system.

Now, let's turn to the third point, under the second
*Gingles* precondition. This factor requires plaintiffs to show
that African-American and white voters have distinct and
different preferences. Plaintiffs will tell you that
African-American and white voters never have the same one
preference. But, Your Honor, there is always more than one
preference on the ballot. There's two. Every two years
there's two seats on the ballot. Every three years there's
three seats up for election. There are always at least two
choices. Every three years there is three choices.

When the Court looks at all the evidence in all of
the African-American votes, as the district proposes, it will
find that the African-American and white voters have legally
significant overlap. In other words, their preferences are

1  not distinct.  But plaintiffs don't do that.  They cherry-pick

2  and narrow the data to their best possible advantage.

3        Again, when the Court looks at all of the evidence,

4  it will find plaintiffs can't meet the second *Gingles*

5  precondition, and it bears repeating that the failure to meet

6  any one of these preconditions is fatal to their claim.

7        Our fourth point looks at the third *Gingles*

8  precondition.  *Gingles* III says -- it asks whether the white

9  majority typically votes in a bloc to defeat the minority

10  candidate.  Again, this case turns Section 2 upside down.

11  There is no white majority.  There was no white majority in

12  the census data under the 2011-2013 American Community Survey.

13  There was no white majority in the 2010 decennial census.  In

14  fact, you have to go back 16 years to find published data

15  where whites were a majority of the voters.  That's

16  stipulated.  And African Americans have maintained consistent

17  representation on this board for the last several decades.

18        Plaintiffs offer a variety of exceptions that they

19  characterize as rules for determining who is the

20  African-American representative.  They attempt to discredit

21  the district's approach of including all of the

22  African-American preferences to bolster their approach of

23  selecting the best data.  If an election is close, they throw

24  it out.

25        It will be important for the Court to know that

1   plaintiffs' approach discounts each and every time an African

2   American is elected.  This just demonstrates the method of

3   selecting and cherry-picking the data.  Plaintiffs are merely

4   attempting to hide African-American achievements.

5           But you'll hear from the two most recent

6   African-American board members, Dr. Courtney Graves and Dr.

7   Donna Thurman.  These are impressive ladies.  I mean, they're

8   incredibly well qualified.  But instead of including these

9   ladies' success in their analysis, plaintiffs discount it.

10  They claim their success was due to special circumstances.

11          Your Honor, you will hear from these ladies, and the

12  amount of work they put into their elections it really is

13  something to behold.  Their success was not the result of

14  special circumstances.  It was a result of hard work.

15          Fifth, and finally, Your Honor, plaintiffs' case

16  fails on all three *Gingles* preconditions, any one of which is

17  fatal to their claim.  But the last step, if we get there, is

18  the totality of the circumstances.  Under this test plaintiffs

19  bear the burden to prove a combination of nine factors, which

20  they can't do.  I'm not going to go through them right now.  I

21  thought you would appreciate that.

22          When the time comes, you will hear from our board

23  members about their campaigns, about their responsiveness to

24  all the children in the district, about their reasons to keep

25  staggered terms and April elections and about their support

1    for the current at-large system.

2         Judge, the district asked me to remind the Court that

3    we are a school district.  Our sole purpose is to educate, and

4    we are operating under the laws of the state of Missouri.  We

5    believe the at-large system is best for our school system, and

6    we believe the at-large system is best for African-American

7    representation.

8         Your Honor, this case does not fit into the premise

9    of Section 2, and there's no liability.

10        Thank you.

11        THE COURT:  Thank you.  Do you want to call your

12   first witness?

13        MR. ROTHERT:  The plaintiffs would call Mr. Adolphus

14   Pruitt, Your Honor.  I'm going to -- I have a -- for each of

15   our witnesses we'll have a binder of the exhibits the

16   witnesses are using that we will give to opposing counsel, to

17   you, and to the witness.

18        THE COURT:  Thank you.

19              **(WITNESS SWORN BY THE CLERK.)**

20        THE COURT:  Counsel, are you ready?  You may proceed.

21              **ADOLPHUS M. PRUITT,**

22   **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

23   **FOLLOWS:**

24              **DIRECT EXAMINATION**

25   **BY MR. ROTHERT:**

1   Q    Good morning.

2   A    Morning.

3   Q    Could you state your name for the record, please?

4   A    Adolphus M. Pruitt.

5   Q    Mr. Pruitt, are you familiar with an organization known

6   as the National Association for the Advancement of Colored

7   People?

8   A    Yes, I am.

9   Q    What is the mission of the NAACP?

10  A    To ensure the political, social, educational, and

11  economic equality for all folks and also to combat and deal

12  with race-based discrimination.

13  Q    Does the NAACP have a constitution that sets forth its

14  objectives?

15  A    Yes, we do.

16  Q    Is one of those objectives to seek enforcement of federal

17  laws, securing civil rights?

18  A    Yes, it is.

19  Q    And is one of those federal laws securing civil rights

20  that the NAACP seeks to enforce the Voting Rights Act?

21  A    Yes.

22  Q    Why does the NAACP care about the Voting Rights Act?

23  A    In spite of section, article, the Voting Rights Act, you

24  know, we still have local and state governments that employ

25  tactics that will impede the free and unfettered rights of

1    individuals to vote, and also it provides that we have the

2    ability to challenge dilution or any efforts to deny us the

3    right to vote, period.

4    Q    Is there a statewide Missouri unit of the NAACP?

5    A    Yes, it is.

6    Q    What is that called?

7    A    The Missouri State Conference of branches.

8    Q    And are you affiliated with the Missouri State Conference

9    of the NAACP?

10   A    Yes, I am.

11   Q    And are you authorized to speak on behalf of the Missouri

12   State Conference of the NAACP on the issues related to this

13   case?

14   A    Yes, I am.

15   Q    Are there local units of the NAACP in Missouri other than

16   the state conference?

17   A    Yes, there are.

18   Q    About how many of them are there?

19   A    Forty, fifty.

20   Q    Are you associated with one of those units?

21   A    Yes.  I'm the president of the St. Louis City branch of

22   the NAACP.

23   Q    Are you aware of any NAACP members who reside within the

24   boundaries of the Ferguson-Florissant School District?

25   A    Many.

1   Q     Is one of them a Mr. Redditt Hudson?

2   A     Yes.

3   Q     Did you have an opportunity in this case to execute a

4   declaration or an affidavit?

5   A     Yes, I did.

6   Q     If you could look in your binder book at what's been

7   marked as Exhibit 119, do you know what that is?

8   A     Yes.

9   Q     What is it?

10  A     It is titled "Declaration of Adolphus M. Pruitt, II on

11  behalf of the Missouri State Conference of the National

12  Association for the Advancement of Colored People, Missouri,

13  NAACP."

14  Q     Is that the declaration that you executed?

15  A     Yes, I did.

16  Q     Have you recently had an opportunity to review that?

17  A     Yes, I have.

18  Q     And are those statements in the declaration -- were they

19  true when you signed the declaration?

20  A     Absolutely.

21  Q     And are they true now?

22  A     Absolutely.

23        MR. ROTHERT:  Your Honor, we would move for admission

24  of Plaintiffs' Exhibit 119.

25        THE COURT:  Any objection?

1    MS. ORMSBY:  No, Your Honor.  It's been stipulated.

2    THE COURT:  Received without objection.

3  Q   (BY MR. ROTHERT) Are you familiar with the

4  Ferguson-Florissant School District?

5  A   Yes, I am.

6  Q   How did you become familiar with it?

7  A   Well, as the -- through the Black Leadership Roundtable.

8  Q   Okay.  What's the Black Leadership Roundtable?

9  A   It's an organization that was pulled together of several

10  selected African-American leaders throughout the St. Louis

11  region by Jim Buford in 1989 to address issues that impact

12  African Americans in this region and has some influence over

13  those issues.

14  Q   And what's your involvement with the Black Leadership

15  Roundtable?

16  A   I'm on the board and serve as vice chair.

17  Q   Does the Black Leadership Roundtable have a focus on

18  education?

19  A   Yes, we do.

20  Q   Okay.  When did that Black Leadership Roundtable begin

21  focusing on education?

22  A   Back in 2001, as we started examining the districts in

23  the St. Louis region and looking at the ever-growing

24  achievement gap between minorities and non-minority students,

25  we decided to take a real hard focus at it.

1 Q    When you say "achievement gap," what do you mean when

2 you're saying "achievement gap"?

3 A    I'm talking about those areas where there is a disparity

4 between minorities and non-minority students, especially

5 African-American students, as relates to a number of different

6 educational outcomes when we talk about the difference in

7 performance in standardized testing, when we talk about the

8 difference in opportunity for advanced placement courses, talk

9 about the difference in math and communication, art schools,

10 across the board.

11 Q    Did your work with the Black Leadership Roundtable

12 involve engaging with any school districts?

13 A    Yes.  We reached out and engaged with every school

14 district in St. Louis city and county, roughly around 25 of

15 them, to take on issues and strategies to deal with

16 achievement gap.

17 Q    So did the Black Leadership Roundtable provide any

18 training on how to eliminate African-American achievement

19 gaps?

20 A    Yes, we did.  We put on conferences, we brought in

21 national leaders to speak on it, and actually we put together

22 an annual report that outlined what the achievement gap was

23 for each one of those districts and encouraged the districts

24 to take on strategies to address it directly.

25 Q    When you're talking about strategies, what kinds of

1 strategies are you talking about to address the

2 African-American achievement gap?

3 A    You know, parental engagement, higher level of parental

4 engagement, the opportunity for what we call professional

5 development that addresses courts of competency, things of

6 that nature.

7 Q    And in doing this work and preparing these resources, are

8 you aware of there being any evidence that there are ways to

9 reduce and eliminate achievement gaps?

10 A    Yeah.  There are some great things going on.

11 Q    Like what?

12 A    Well, there's one district that simply did a survey

13 between the students and the faculty to talk about their

14 common interests, and results were significant, about 60

15 percent to reduce achievement gap.

16         There was a middle school that did a survey between

17 the students where they looked at the -- identified the value

18 issue and discussed it, and I think they had a 40 percent

19 reduction there.  There are a number of things going across

20 the country.

21 Q    To your knowledge, are any of these things happening in

22 the Ferguson-Florissant School District?

23 A    Not to my knowledge.

24 Q    If they were, do you think you would know?

25 A    Yeah.  Absolutely.

1  Q    Why?

2  A    Well, it's extremely important for us and the folks we

3  represent to know what's going on in the school district, to

4  have some idea how they're performing.  African Americans

5  really have expressed a lot of concern about the performance

6  of their students in the districts.

7  Q    Okay.  Now, you mentioned earlier that the Black

8  Leadership Roundtable made some reports.  Is that right?

9  A    Yes.

10  Q    Were those reports specific to the Black Leadership

11  Roundtable's work on the achievement gap?

12  A    Absolutely.

13  Q    And how often did those reports come out?

14  A    Annually.

15  Q    And what areas of educational attainment did you look at

16  in those reports?

17  A    Primary focus was looking at the state scores, looking at

18  the math scores, and really taking a hard look at

19  communication arts.

20  Q    And this started around 2001 or --

21  A    Yeah, 2001 to 2009, was the last report.

22  Q    The last one was in 2009?

23  A    The last one was in 2009.

24  Q    Did you stop in 2009 because the problem of the

25  African-American achievement gap stopped in 2009?

1    A    That would have been a party.  No.  Absolutely not.

2    Q    Why did you stop?

3    A    Ironically, the funding we was using to do that lapsed.

4    Q    Is the Ferguson-Florissant School District one that was

5    evaluated each of those years?

6    A    Absolutely.

7    Q    And in those years was the Ferguson-Florissant School

8    District one of the districts in the area that had a large

9    achievement gap for African Americans?

10    A    Yes, to date.

11    Q    Now, Ferguson-Florissant School District isn't the only

12    school district that has an achievement gap for African

13    Americans, is there?

14    A    Absolutely not.

15    Q    Are there school district boards in the St. Louis area

16    that have been responsive to the need to address the

17    African-American academic achievement gap?

18    A    Yes.  Several.

19    Q    Can you provide me an example locally?

20    A    Well, right next door to Ferguson, it borders the

21    Hazelwood School District.

22    Q    What has the Hazelwood School District's board done?

23    A    I'm sorry?

24    Q    Hazelwood -- what's the school board done there about the

25    achievement gap?

1   A    Oh, my God.  They took a strong effort to engage with the

2   parents, parental engagement.  They began to do some strong

3   assessment to figure out what the problems were.  They did a

4   lot of things, took on a lot things.

5   Q    Did they do any training?

6   A    Yes, did a lot of teacher training.

7   Q    And does the Hazelwood School District's board -- does it

8   promote its efforts to reduce the African-American academic

9   achievement gap?

10  A    It is -- according to their website and from the board

11  meetings I've attended, it is their number-one priority.

12  Q    Do you view the board's action in Hazelwood regarding

13  addressing the academic achievement gap as being responsive to

14  the needs of the African-American community?

15  A    Extremely responsive.

16  Q    How many members are on the Hazelwood School District's

17  board?

18  A    Seven.

19  Q    Do you know how many are African American?

20  A    Four.

21  Q    Are there any other school districts locally that you can

22  give us as an example where the school board is proactively

23  attempting to address the African-American achievement gap?

24  A    Yeah.  Jennings is doing some great things.

25  Q    What's the board doing in Jennings?

1  A     Oh, my God.  Jennings has took a hard look at all the

2  issues impacting African-American students overall as relates

3  to access to food.  They partner with the St. Louis Food Bank

4  to make sure that the kids could have access to food to take

5  home, and they provide dinners for them.  They've kept the

6  libraries open late.  They open up their recreational

7  facilities and make sure the physical health is okay.

8          They provide health services on site, including

9  mental health.  And most recently they opened up a homeless

10 shelter to deal with the transient issue because they had a

11 lot of students that went into the buildings that were just

12 homeless, and that was having a big impact on their

13 educational outcomes.

14 Q     And do they also offer full-day free day care -- or, I'm

15 sorry -- pre-K and kindergarten?

16 A     Early childhood education is a main foundation of what

17 they're trying to do to address achievement gap.

18 Q     Do you view the board's actions in the Jennings School

19 District regarding, you know, to address this academic

20 achievement gap as being responsive to the particularized

21 needs of the African-American community?

22 A     Extremely.

23 Q     Okay.  And how many members are on their board?

24 A     Seven.

25 Q     Do you know how many are African American?

1  A   Six.

2  Q   Other than the academic achievement gap the

3  African-American students experience in the

4  Ferguson-Florissant School District, are there other

5  education-related gaps in the Ferguson-Florissant School

6  District that concern you?

7  A   One that concerns me extremely much is the one as relates

8  to discipline, the disparity in discipline.

9  Q   Okay.  What does disparity in discipline mean?

10 A   It means that you have one group of population which is

11 subject to more harsh and more frequent discipline than the

12 others.

13 Q   Okay.  And when you say "one group" --

14 A   I'm talking about African Americans.

15 Q   And what kind of discipline are you talking about?

16 A   Suspensions and school suspensions, out-of-school

17 suspensions, expulsions, corporal punishment.  And one that in

18 this climate that bothers me the most is referring them to

19 local police departments, especially the ones in Ferguson.

20 Q   And you know about these disciplinary data because the

21 board of the school district reports it?

22 A   Absolutely.

23 Q   They report it to the state and to the federal

24 government.

25 A   Absolutely.

1  Q    Okay.  Why is a disparity, a racial disparity in

2  discipline -- why does the NAACP care about that?

3  A    The primary issue is the prison to pipeline, the

4  prison-to-pipeline issue as relates to the disparities in

5  discipline in school districts.

6  Q    Okay.  Is there anything else that being out of school

7  suspended causes problems for students?

8  A    Oh, my God.  I would probably best say it is that the

9  number-one indicator of whether a child drops out of school,

10  goes down the path to unemployment, or underemployment

11  subsequently is adjudicated to wind up in the system is not

12  poverty; it's suspensions.

13  Q    Are there any -- you know, based on that, that DESE, the

14  Missouri DESE, Department of Education and -- I forget what it

15  stands for, but the education -- the state education

16  department data that was according to that data on suspension,

17  are there any statistics that --

18  A    Yes.

19  Q    -- jump out to you as especially troublesome about

20  Ferguson-Florissant School District?

21  A    I think it's 20 percent of African-Americans students are

22  subject to suspension versus 7 percent for the white

23  population last set of numbers I looked at.

24  Q    Do you remember what year that was?

25  A    2014 maybe.

1   Q    Maybe 2011?

2   A    Yeah.  Well --

3   Q    All right.  Relatively recently.

4         THE COURT:  Not to lead the witness, but we'll decide

5  it's 2011.

6   Q    Are you aware of any resources for school districts that

7  want to address discipline disparities based on race?

8   A    Yeah.  The Department of Education is, a lot of stuff.

9   Q    And has the NAACP put on any programs about reducing

10  disciplinary disparities based on race?

11  A    Yes.

12  Q    And locally have you done that?

13  A    Yes.

14  Q    Do you know does the Department of Education put out any

15  resources about zero-tolerance policies?

16  A    Absolutely.  They have on their website a resource

17  directory that can direct districts to any number of events,

18  practices, and other interventions to address their

19  disparities in discipline.

20  Q    Okay.  Are you aware of any school districts in the St.

21  Louis metropolitan area doing anything to address disciplinary

22  disparities based on --

23  A    Yes.  Yes, I am.

24  Q    Give me an example, please.

25  A    St. Louis Public Schools.

1   Q     Okay.  What happened there?

2   A     You know, a report came out, and the numbers were off the

3   chart for the St. Louis Public Schools.  The special

4   administrative board got with the superintendent, and the

5   superintendent took immediate action.  He called for a

6   moratorium on out-of-school suspensions.  Immediately began to

7   address the faculty with some training interventions.  And one

8   of the main things he did was require that the staff document

9   what interventions they took before they brought the student

10  up for suspension.  In other words, if the student was being

11  disruptive or other things or had a pattern, what were the

12  interventions you did prior to suspending them?

13  Q     Okay.  Do you view these kind of actions by the St. Louis

14  Public Schools and their special administrative board as

15  specifically addressing the disciplinary gap based on race as

16  being responsive to the particularized needs of the

17  African-American community?

18  A     Very responsive.

19  Q     Are you aware of any initiatives that are just widely

20  known that school board can use if they want to address

21  achievement gaps?

22  A     Yes.

23  Q     Can you give me an example?

24  A     The NEA -- and, well, let me -- there are couple of

25  initiatives that I think of off the top of my head in which

1  they are -- best way to put it, the staff is providing some

2  direct intervention to the students as relates to prepping

3  them and getting them prepared for AP courses.  They are doing

4  some extensive professional development in training that

5  teaches to identify exactly what are the root causes for those

6  gaps and things of that nature.

7  Q    Let me ask you about that.  Has the NAACP locally done

8  any conferences on this issue?

9  A    Absolutely.  We've brought in Dr. Ronald Ferguson, head

10  of the Harvard Achievement Gap Institute, and hosted a

11  workshop for the districts to participate in and to look at

12  the best practices and strategies.

13  Q    And are you aware of anything -- is the U.S. Chamber of

14  Commerce doing anything?

15  A    Yes.  We are partnering with the U.S. Chamber of

16  Commerce --

17  Q    Can I interrupt you?  When you say "we partnered" --

18  A    I'm sorry.  The NAACP is partnering with the U.S. Chamber

19  of Commerce Foundation to address the disparity in minority

20  students participating in AP courses, advanced placement

21  courses.

22  Q    Tell me what that's about.  What's the issue with African

23  Americans having access to AP courses?

24  A    Yeah.  It's couple of things.  One is that, you know, in

25  some cases 75 percent or more of the students who are eligible

1    to participate in AP courses are not involved in them.  Most

2    cases is because the districts are not doing the things

3    necessary to make sure those courses are available, those

4    opportunities exist for them.  In another cases it's just that

5    some kids who may be on the cusp of being able to participate

6    and achieve at the AP level and they're not getting those

7    opportunities either.

8    Q    Okay.  So what's the NAACP and the U.S. Chamber of

9    Commerce -- what are you trying to do about that?

10   A    Yeah.  Well, we had a workshop, brought in a lot of

11   experts to bring in to identify a different number of best

12   practices, and more than anything we were encouraging all of

13   our branches across the country to partner up with their local

14   chamber to address the issue of education, and education is an

15   extremely big issue and priority for our local chamber.

16   Q    And is that access to advanced placement classes, is that

17   one of areas in which there is a racial gap?

18   A    It's a significant racial gap.

19   Q    And that's in Ferguson-Florissant School District?

20   A    Absolutely.  Absolutely.

21   Q    You mentioned the NEA.  Are you aware of anything they

22   have put together?

23   A    Yeah.  The NEA has had a number of directories and things

24   they put out for -- as relates to resources that districts can

25   call upon as a way of finding best practices and initiatives

1   that are out there that will help them address the gap.

2   Q    Okay.  I'd like you to look in your binder there,

3   Plaintiffs' Exhibit 175.  Can you tell me what that is?

4   A    Oh, yeah.  The CARE Project:  Culture, Abilities,

5   Resilience, and Effort.

6           MS. ORMSBY:  Objection to this exhibit, Your Honor,

7   on relevance, on the fact it's hearsay.  The NAACP doesn't

8   have anything to do with the --

9           THE COURT:  I'll take it for what it's worth as a

10  reference.  Obviously, you haven't laid a foundation for the

11  document.

12          MR. ROTHERT:  Right.  I also haven't offered it into

13  evidence.

14          THE COURT:  But to the extent that he's read it and

15  he's thought about it.

16  Q    (BY MR. ROTHERT) Okay.  So is this the resource that

17  provides strategies for closing achievement gaps?

18  A    Absolutely.

19  Q    And have you read it?

20  A    Yes.

21  Q    And does it include activities, exercises, strategies for

22  reducing the achievement gap --

23  A    Yes, they do.  Training and materials, the works.

24  Q    Was it hard to find?

25  A    No.  It was on their website.

1   Q    All right.  If you take a look at Exhibit 176, what's

2   that?

3   A    Racial profiling curriculum guide.

4   Q    Is this from the NEA also?

5   A    Yes, it is.

6   Q    All right.  And, you know, was this hard to find?

7   A    No.  It's on their website.

8   Q    Going back all these years when you and others have been

9   talking about the gaps, are you aware of the board of the

10  Ferguson-Florissant School District adopting any policies like

11  other districts have done to address the achievement gap in

12  the Ferguson-Florissant School District?

13  A    I briefly recall maybe a committee or two but nothing

14  significant whatsoever.

15  Q    Any policies that you're aware of?

16  A    No.

17  Q    Any new curricula?

18  A    Not that I know of.

19  Q    Are you aware of the board adopting any policies to

20  address the racial discipline gap in the Ferguson-Florissant

21  School District?

22  A    Absolutely not.

23  Q    And what do you and your members -- I mean, when there is

24  no policy and there is no action, what does that -- what do

25  you guys think of that?

1  A     You know, for a board to be aware of the disparity and

2  the numbers and the impact it can have on educational outcomes

3  of children and not to have any concrete policies, activities

4  in place, demonstrates that the board doesn't care about those

5  African-American children who are suffering.

6  Q     Do these disparities play a role in elections for school

7  board?

8  A     Absolutely.

9  Q     In what way?

10 A     Oh, I think it was the 2014 election when the board

11 chairman, Paul Morris, was quoted that discipline was the

12 number one issue for the school district.

13         MS. ORMSBY:  Objection.  Hearsay, Your Honor.

14         THE COURT:  Sustained.

15 Q     Okay.  If you --

16 A     It was printed in the paper.

17         THE COURT:  Well, that must mean it's true.

18 Q     All right.  If you were -- if there was evidence that the

19 school board was calling for more discipline in light of the

20 disparities, what would that -- how would you feel about that?

21         MS. ORMSBY:  Objection.  Speculation.

22         THE COURT:  Are you going to tie that up later?

23         MR. ROTHERT:  In this witness, or in this case?

24         THE COURT:  No.  In some time in the trial.

25         MR. ROTHERT:  Yes.

1    THE COURT:  Okay.  Overruled.

2  A    What was the question?  I'm sorry.

3  Q    (BY MR. ROTHERT) If there's evidence later in this case of

4  a person running for school board and it happens to be the

5  president of the school board calling for more discipline, in

6  light of these racial disparities what message does that send

7  to the African-American community?

8  A    Oh, my God.  It basically says that, again, they have no

9  interest in addressing the educational outcomes and the things

10  that impact the educational outcomes of African-American

11  children.

12  Q    Okay.  Let's turn back to 2013.  Were there any area --

13  St. Louis area school districts that completely lost their

14  accreditation that year from the state?

15  A    Yes.  Normandy and Riverview.

16  Q    And when you say Riverview, the official name of that

17  school district is Riverview Gardens?

18  A    Yeah, Riverview Gardens School District.

19  Q    In that year were there any changes to the rights of

20  students in unaccredited school districts?

21  A    Mainly it was that the supreme -- state supreme court

22  upheld existing law that provided for students to be able to

23  transfer to accredited districts.

24  Q    Now, if students in an unaccredited school district

25  transfer to a different school district, how does the

1  receiving school district pay for that, having extra students?

2  A    Well, the receiving district unfortunately had the right

3  to set its own tuition rate, and that tuition was a charge

4  that they could bill, that they could bill the sending

5  district, and the sending district had to pay it.

6  Q    Did some parents from the unaccredited school districts

7  in Normandy and Riverview Gardens want to send their children

8  to the Ferguson-Florissant School District?

9  A    Absolutely.

10  Q    Why?

11  A    Two good reasons.  One was that they bordered and lived

12  in some of the same neighborhoods or next door to other

13  children and families in the district; so it was convenient.

14  They were there.  And then, two, because they wanted to get

15  their kids a better educational opportunity than the school

16  district they were in.

17  Q    Do you know the racial make-up approximately of the

18  student body of the Riverview Gardens School District?

19  A    Roughly 97 percent African American.

20  Q    And what about the Normandy School District?

21  A    Ninety-eight percent African American.

22  Q    Did the board at the Ferguson-Florissant School

23  District -- did they have any emergency meetings after this

24  court ruling and they were going to have to accept students?

25  A    Yes, they did.

1  Q    And was that a meeting about how to encourage students to

2  come to the district and feel welcome?

3  A    Absolutely not.

4  Q    What did they have a meeting about?

5  A    It was a meeting about how they were going to adjust the

6  class sizes to provide for seats for kids who wanted to

7  transfer into the district.

8  Q    Adjust upward or downward the class sizes?

9  A    Downward.

10 Q    Did you attend that meeting?

11 A    No.  I didn't know about the meeting.

12 Q    And why not?

13 A    It was a closed meeting.

14 Q    What do you think about that meeting being closed?  What

15 message does that send?

16 A    Well, I think you go to the school board and you're going

17 to sit and deliberate about how you're going to disenfranchise

18 African-American kids, black kids, in an unaccredited district

19 from coming into your district by reducing the seats, that's

20 probably something they did not want to discuss in public.

21 Q    Okay.  And why do you say -- when you say they're trying

22 to keep black children from transferring in, why do you say

23 black children?

24 A    The two districts that were trying --

25         MS. ORMSBY:  I object, Your Honor.  It's speculation.

He wasn't at the meeting. He's speculating to what was
discussed.

THE COURT: Sustained.

Q    How is -- in this transfer scheme that the state statute
has, how is transportation paid for?

A    The sending district can choose one school district in
which it will pay transportation. All of the other -- if they
went to any other district, they had to pay for transportation
themselves or find transportation by any means necessary.

Q    Okay. And did anyone do anything to help students
transferring into Ferguson-Florissant School District get
transportation?

A    Yeah. One of the most humane things through all of this
was that the superintendent of Ferguson-Florissant School
District at the time, Art McCoy, realized that in order for
the kids to take advantage of the educational opportunities in
Ferguson-Florissant, that he reached out to the churches at
first. The churches were actually providing transportation to
get the kids to school and then subsequently raising money and
bought bus passes and things of that nature. He did what it
took to make sure that the kids can take advantage of what
Ferguson had to offer.

Q    Now, did some people in Ferguson-Florissant School
District not want transfer students?

A    Absolutely.

1   Q    And what were the excuses for not wanting transfer

2   students?

3          MS. ORMSBY:  Objection, Your Honor.  Speculation.

4          THE COURT:  Well, lay a better foundation.

5   Q    Did you hear anything -- did the school board members

6   make any public statements about not wanting transfer

7   students?

8   A    Absolutely.

9   Q    And what were the reasons that the school board members

10  gave publicly for not wanting transfer students?

11  A    Said it was an economic issue.

12         MS. ORMSBY:  Objection, Your Honor.  Hearsay.

13         THE COURT:  Overruled.  I assume he was talking about

14  the Ferguson-Florissant School District.

15         MR. ROTHERT:  I am talking about the

16  Ferguson-Florissant School District.

17         THE COURT:  The board.

18  Q    (BY MR. ROTHERT) I'm not offering it for being true.

19         Does that ring true to you that it was an economic

20  issue?

21  A    Well, no.  I mean, whatever it cost them, they had the

22  opportunity to bill the sending district to get it, and

23  transportation was being provided from other sources.  So, no,

24  it did not ring true.

25  Q    Okay.  Now, has there ever been a history in this part of

1 Missouri of school districts actively working to keep black

2 children out of their schools?

3 A    Yes.

4 Q    And does the Ferguson-Florissant School District have any

5 role in that history?

6 A    Yeah.  In 1975 that's how it became the

7 Ferguson-Florissant School District.

8 Q    What happened in 1975 that created the

9 Ferguson-Florissant School District?

10 A    Well, a court order to deal with the segregated school

11 system.  So they merged Berkeley and Kinloch School Districts

12 into what was -- what now has become the Ferguson-Florissant

13 School District.

14 Q    When people campaign as being against transfers or

15 wanting to reduce or limit transfer students, does that have a

16 racial overtone?

17 A    Not only does it have it, but it was very vocal and

18 nasty, and I hadn't seen anything like it except when I look

19 at old footage of what happened when the busing took place in

20 the '60s.  I hadn't seen any -- that's my first experience of

21 seeing something like that live and up front.

22 Q    Why would campaigning against transfer students in this

23 context -- why would that have a racial overtone?

24 A    Because the districts that the kids will be coming from

25 were predominantly African American, and they did not want to

1    have these African-American children in their school district.

2    Q    Did the school board response to the transfer issue in

3    Ferguson-Florissant School District -- did that put the

4    district on the Missouri NAACP's radar?

5    A    Well, they were already on there based on the achievement

6    gap, but that reinforced what some of our concerns were and

7    some of the concerns of the folks in the community.

8    Q    And why does the Missouri NAACP care about the, you know,

9    whether or not students in unaccredited school districts are

10   being allowed to transfer to schools that are accredited?

11   A    Well, I think the -- two things.  One, the Missouri

12   constitution requires that all children have access to -- I

13   would say a good education, but I think the second promise of

14   *Brown* basically said they should have access to a quality

15   education.  And if you're in an unaccredited school district

16   and you live next door to a district that has a -- that is

17   accredited, those children should have the opportunity to be

18   there.  And I think our state constitution requires it.  I

19   think *Brown* requires it.

20   Q    Okay.  Did you view, and the Missouri NAACP view, the

21   class sizes, changes in the tuition rates as putting obstacles

22   in the way of black children to transfer into the

23   Ferguson-Florissant School District?

24   A    We viewed it as the sole reason that -- was to prevent

25   those kids from transferring to the district.

1    Q    So that was all happening right as the 2013-2014 school

2    year was starting?

3    A    Yes.

4    Q    Did anything else happen in the Ferguson-Florissant

5    School District in 2013 that concerned the Missouri NAACP?

6    A    They suspended the only, first African-American

7    superintendent they ever had.

8    Q    And that's Dr. Art McCoy?

9    A    Dr. Art McCoy, yes.

10   Q    When did that happen; do you remember?

11   A    November 2013.

12   Q    Okay.  Why did this -- why did the Missouri NAACP care

13   about Dr. McCoy being suspended?

14   A    One, he was an excellent superintendent, excellent

15   credentials; but, two, he had opened his arms and embraced

16   those African-American children like no other district I think

17   in the area.  As a matter of fact, I think Ferguson-Florissant

18   was on the -- number two on accepting kids.

19           After the program, he nurtured them and even reached

20   out and got them transportation.  He was doing what it took to

21   ensure that those children that wanted to come to the school

22   district had that opportunity to do it.

23   Q    Okay.  And so did it seem to the -- given the timing to

24   the Missouri NAACP that the suspension could be in retaliation

25   for Dr. McCoy's welcoming attitude of transfer students?

1   A     We think it was solely in response to him welcoming the

2   transfer students.

3   Q     And when I say transfer students --

4   A     Talking about the black -- I'm talking about those

5   African-American kids that lived next door in the

6   neighborhoods that the same kids in Ferguson did right now

7   because of they were coming from Normandy and Riverview

8   Gardens, which was predominantly African American.

9   Q     Now, did you attend or watch any of the board meetings

10  that happened right after the suspension?

11  A     Yes.

12  Q     All right.  So did the board say that it suspended Dr.

13  McCoy in retaliation for his welcoming attitude toward black

14  students?

15  A     Well, it wouldn't say anything.  It was silent for a very

16  long time.

17  Q     Did anyone ask why?

18  A     Oh, my God, yes.  The community overall was in an uproar

19  and wanted to know why Dr. McCoy was suspended.

20  Q     Were there any special meetings to discuss this?

21  A     Yeah.  We had a number of meetings, and as a matter of

22  fact, the sitting school board member attended, I think, some

23  of those meetings, yeah.

24  Q     And were there any -- did the school board have any

25  meetings to listen to questions from the community?  If you

1   remember.

2   A     Not that I recall.  Not specifically listening to

3   questions from the community, no.

4   Q     So how did the board respond to the questions about why

5   it had suspended Dr. McCoy?

6   A     At one point in time, there were made some statements

7   that it wasn't about race.  That was right after a press

8   conference that we did at a church, and we sort of riled up,

9   and they said it wasn't about race.

10  Q     Other than saying it's not about race, did they say

11  anything else?

12  A     No.

13  Q     So did that satisfy you that it wasn't about race?

14  A     You know, normally when -- when this dealing with black

15  children or people of color and the first thing they say "it's

16  not about race," in most cases that's exactly what it is.

17  Q     Can you give me -- I mean, you say that.  Give me an

18  example of that.

19  A     I mean, you know, if you look at some of the reasons why

20  blacks were given literacy tests as a prerequisite to register

21  to vote, of course they said it was not about race, but it

22  was -- turned out to be exactly that.  It had a disparate

23  impact and prevented African Americans from being -- from

24  registering to vote and participating in the electoral

25  process.

1  Q    So other than saying it was not about race, did the board

2  give the public any more information about why it had

3  suspended Dr. McCoy?

4  A    Not really.

5  Q    Was this a problem?

6  A    It was a big problem.  We all were concerned, especially

7  the parents of the kids that attended the district and the

8  people in the community.  We wanted to know why was such a

9  delightful, well-mannered, well-equipped, educated

10 professional being treated that way.

11 Q    So in the absence of anything from the board explaining

12 why it had suspended Dr. McCoy, you know, what did people

13 think?

14 A    Again, most folks thought --

15         MS. ORMSBY:  Objection, Your Honor.  Speculation.

16         THE COURT:  Sustained.

17 Q    Were there rumors about why he was suspended?

18 A    There were all sort of innuendos and rumors, and we

19 received any number of calls from individuals asking us as to

20 why we were not engaging directly with the school board to

21 have them to explain exactly what was going on with Dr. McCoy.

22 Q    Did the board publicly give any reason -- I mean, except

23 for when it was saying it wasn't about race, did it give any

24 reason for why it was otherwise remaining silent about why it

25 had suspended Dr. McCoy?

1   A    Well, they told us that because it was a personnel issue,

2   under Missouri law would not allow them to disclose that.

3   Q    And did you buy that?

4   A    Absolutely not.

5   Q    Why not?

6   A    I'm familiar with Missouri open records law, and it gives

7   them the ability to make a choice one way or another.

8   Q    On personnel information?

9   A    Yeah.  On personnel information, absolutely.

10   Q    Do you know, after suspending Dr. McCoy, did the board

11   later come up with a statement of charges and proceed toward

12   going after Dr. McCoy?

13   A    Yes, it did.

14   Q    On those charges?

15   A    Yes, it did.

16   Q    And how was that ultimately resolved?

17   A    Dr. McCoy resigned.

18   Q    If you would look at Exhibit 161, which is in your

19   binder, have you seen that before?

20   A    Yes.

21   Q    What is it?

22   A    Separation agreement and release dated March 12, 2014.

23   Q    Do you need some water?

24   A    Yeah.  That would be helpful.

25        THE CLERK:  There is some right there.  There is some

1  by you.

2  A    Great.  Great.  Separation agreement and release dated

3  March 12 between the Ferguson-Florissant School District and

4  Dr. Art McCoy.

5  Q    All right.  Could you turn to paragraph 7 and read that

6  to me?

7  A    Seven.  The district agrees that it will place the

8  statement of charges and all documents amassed by the district

9  in support of said charges in a sealed envelope only to be

10  opened by order of a court, pursuant to Chapter 16 of the

11  Missouri Revised Statutes of the State -- Revised Statutes of

12  the State of Missouri.

13  Q    And when is this agreement dated?

14  A    March 14, 2014 -- March 12, 2014.

15  Q    March 12, 2014?

16  A    Yeah.

17  Q    Correct?

18  A    Yes.

19  Q    All right.  You're familiar with that agreement?

20  A    Yes.

21  Q    So is there anything in that agreement that prevented the

22  board from being transparent about Dr. McCoy's suspension back

23  in November of 2013?

24  A    Not in my opinion.

25  Q    Was that agreement signed before or after the community

1    was asking for transparency in November of 2013?

2    A    After.

3    Q    Before or after the community is asking for transparency

4    in December of 2013 and January 2014?

5    A    After.

6    Q    Do you -- that agreement is signed by Dr. McCoy, right?

7    A    Yes, it is.

8    Q    Do you blame him for negotiating for confidentiality of

9    charges in March 2014?

10   A    If you're African American, you're being demonized, I

11   would have done the same thing.

12   Q    Are you aware or have you heard that the Department of

13   Justice conducted a civil rights investigation into the City

14   of Ferguson?

15   A    Yes.

16   Q    Did you read the report that came from that

17   investigation?

18   A    I'm very much involved, yes.  I've read it from page to

19   page.

20   Q    And what did you think of it?

21        MS. ORMSBY:  Objection, Your Honor.  Relevance as to

22   the school district.

23        THE COURT:  Are you going to tie it up?

24        MR. ROTHERT:  It will definitely be tied up in the

25   case.

```
 1          THE COURT:  Okay.  You may proceed under that
 2    understanding.
 3    A     Horrific.  It outlined the unequal and unfair treatment
 4    and overpolicing of the residents and the children of the city
 5    of Ferguson, even those who are being educated in the
 6    Ferguson-Florissant School District -- the courts' excessive
 7    fines, the violation of all sort of constitutional rights of
 8    the individuals out there.  It was horrific.
 9    Q     So that was about the City of Ferguson, though, right?
10    That report?
11    A     Yes.
12    Q     So it doesn't have anything to do with the
13    Ferguson-Florissant School District?
14    A     Yes, it does.
15    Q     Why?  Why would you say that?
16    A     Because it dealt with the policing, and it was the police
17    officers of the Ferguson -- City of Ferguson who also -- the
18    safety officer, resource officers in the Ferguson-Florissant
19    School District.
20    Q     Okay.  And do the things that are highlighted in that
21    report -- do they affect the students and parents that live in
22    the school district, the African-American students?
23    A     Yeah.  The issues that the report outlined as relates to
24    those resource officers and how they treated those children,
25    those African-American children in the school district, was
```

1  horrific.  The examples that they gave raised the hair on the

2  back of my neck.

3          MR. ROTHERT:  I have no further questions of this

4  witness.

5          THE COURT:  How long is your cross?  More than ten

6  minutes?

7          MS. ORMSBY:  Yes.

8          THE COURT:  Okay.  We will take a morning recess at

9  this time.  We will reconvene at 10:45.

10         **(COURT RECESSED FROM 10:20 AM UNTIL 10:50 AM.)**

11         THE COURT:  I'll remind you, sir, you're still under

12  oath.

13         Mr. Rothert, are you ready?

14         MR. ROTHERT:  Yes.

15         THE COURT:  You may proceed.

16                      **CROSS-EXAMINATION**

17  **BY MS. ORMSBY:**

18  Q    Thank you, Your Honor.

19         Mr. Pruitt, my name is Cindy Ormsby.  I represent the

20  Ferguson-Florissant School District.  You don't live in the

21  Ferguson-Florissant School District, do you?

22  A    No.

23  Q    And what's your highest level of education?

24  A    Bachelor's.

25  Q    In what?

1    A    Business administration and accounting.

2    Q    What's your occupation?

3    A    I'm a consultant.

4    Q    For who?

5    A    Pruitt and Associates.  Self-employed.

6    Q    What kind of consulting do you do?

7    A    Business management, real estate -- wherever I can get a

8    paying client.

9    Q    I get that.  Are you paid by the Missouri NAACP?

10   A    Absolutely not.

11   Q    Have you ever been on a school board?

12   A    No.

13   Q    Have you ever run for school board?

14   A    No.

15   Q    So you're not quite sure exactly what school boards do,

16   are you?

17   A    I'm very much familiar what school boards do.

18   Q    What is a school board's role?

19   A    Primarily to prepare -- to institute policy that the

20   superintendent and the staff would carry out as relates to

21   educating school children.  I serve on the deseg committee for

22   the St. Louis Public Schools based on our court case.  I'm

23   extremely experienced -- familiar what school boards do and

24   what their responsibilities are.

25   Q    Have you talked to any of the current school board

1    members about the issues that you talked about in your

2    testimony?

3    A    No.

4    Q    Do you know Esther Haywood?

5    A    Yes.

6    Q    How long have you known her?

7    A    Fifteen, twenty years.

8    Q    Is she a member of the NAACP?

9    A    Yes, she is.

10   Q    Is she the president of the county NAACP?

11   A    Yes, she is.

12   Q    The Ferguson-Florissant School District's located within

13   the county of St. Louis; is that right?

14   A    Yes, it is.

15   Q    Would you agree that you and Esther have a contentious

16   relationship?

17   A    No.

18   Q    How would you describe your relationship?

19   A    Well, we were together Saturday, and we spoke and had a

20   very good conversation.

21   Q    Did you talk to Esther before the filing of this lawsuit?

22   A    No.

23   Q    Even though the subject of this lawsuit is located in the

24   county in which she's president?

25   A    Because the Missouri State Conference has a chairman of

1   education who focuses on these larger issues, that chairman

2   reports to me as a member of my branch, a member of my

3   executive board, and all issues that relates to whether

4   they're legal, economic development, and education related,

5   that's my responsibility as the first vice president for the

6   Missouri State Conference.  So when these issues come up

7   across the state, I am the person who represents the NAACP in

8   dealing with them, whether it's Kansas City, St. Louis, the

9   Bootheel, or Ferguson.

10  Q    And it's not even a matter of politeness to talk to the

11  president of the NAACP of the county in which it's located

12  prior to filing?

13       MR. ROTHERT:  I would object.  It's irrelevant as

14  to -- at this point.

15       THE COURT:  Overruled.

16  A    I think it's -- well, last time I looked at our

17  administrative chart and how we do things, I didn't see

18  politeness in that.  What happens is, is that issues come up

19  that are going to rise to a level where they're going to have

20  to have litigation in order for a local branch to take on the

21  issue, especially as relates to litigation.  They have to

22  apply to the state.  Then the state has to sign off on it.

23  Then we have to apply it to our national level.  So whatever

24  decision they were going to make, it would have to come to us,

25  and we would have to be the ones to ultimately say, yes, we

1  want to elevate it up and get approval on the national level

2  and take it on as a organization.

3          So, no, I don't think it was an issue of politeness.

4  I think that our local branches understand what the role and

5  responsibility of our state conference is, and they know what

6  the role is, and we fulfill it.

7  Q    Did you talk to her after the lawsuit was filed?

8  A    Yeah.

9  Q    About the case?

10 A    A little bit, yeah.  Not her directly, no.

11 Q    You did or you didn't?

12 A    Are you asking me if I talked to Esther Haywood directly

13 after the case -- this case was filed?  No, I have not had a

14 conversation with her directly.

15 Q    Did she ever advise you that she didn't agree with the

16 lawsuit and she believed it was ill-advised?

17 A    No.  Never.

18 Q    Did you ever determine prior to the filing of this

19 lawsuit whether or not the district had reached out to the

20 county NAACP about the Dr. McCoy controversy?

21 A    No.  I reached out to the district.  They didn't --

22 wouldn't talk to me, period.  So, no.  I don't know.

23 Q    So you don't know if they talked to the county NAACP?

24 A    No.

25 Q    And you didn't think that was important to ask prior to

1    filing this lawsuit?

2    A    No.

3    Q    You talked a lot about the achievement gap.  Do you know

4    what data is measured in determining the achievement gap?

5    A    Not extensively, no.

6    Q    Do you know whether the achievement gap existed ten years

7    ago?

8    A    Yes.  It probably wouldn't -- I don't know whether it was

9    called "achievement gap," but the disparity as relates to the

10   educational outcomes of children, yes, I think that whatever

11   they measuring, it existed ten years ago.

12   Q    Did it exist when Dr. McCoy was superintendent?

13   A    I would assume so.  I don't know.

14   Q    Are you aware it's the superintendent's responsibility to

15   address issues, academic issues, such as the achievement gap?

16   A    No.  I believe it's the board's responsibility to make

17   sure that the kids are getting a quality education, and the

18   superintendent reports to them.

19   Q    Is it your understanding that school board members have

20   degrees in education?

21   A    No.

22   Q    Is it your understanding that school board members have

23   degrees in curriculum?

24   A    No.

25   Q    Is it your understanding that the school board hires a

1    superintendent that has those qualities?

2    A    I would think that it would be impossible for me to

3    respond and say all school boards hire superintendents based

4    on those qualities.  They may be hiring them because of

5    favoritism.  They may be hiring them for any number of

6    reasons.  They may be hiring them because there's one aspect

7    of what their superintendent does that may be more prevalent

8    as a problem in their district.  So I think it varies from

9    board to board, individual to individual.  I don't think

10   there's a set standard that I know of anywhere that says all

11   school boards must follow this standard as relates to making

12   hiring decisions of superintendents.  I don't think that

13   exists.

14   Q    Is it your opinion that school boards should be qualified

15   to choose the programs that are needed to address the

16   achievement gap?

17   A    Yes.

18   Q    Even though they don't have degrees in education or

19   curriculum?

20   A    I think school board members in some cases hopefully are

21   parents, and I think all parents are concerned about the

22   things that important for them for they kids to learn; so I

23   expect that the parental concern will penetrate them being a

24   school board member and definitely something they will want to

25   know about as relates to the kids in the district, especially

1   when you're looking at numbers that says that there is a

2   impact to certain population in the district and that the

3   impact is negative.

4           I think any time a superintendent, DESE, the

5   Department of Secondary Elementary Education, anybody submits

6   to me numbers that says that I have a population within my

7   district that is failing or is being disproportionally

8   impacted one way or another, that as a school board member I

9   have a fiduciary responsibility more than anything else to

10  understand why that's happening and to hold the superintendent

11  accountable to fix it.

12  Q    Hold the superintendent accountable, correct?

13  A    Yes.

14  Q    And that was Dr. McCoy a few years ago, correct?

15  A    Yes.

16  Q    And there was an achievement gap under Dr. McCoy,

17  correct?

18  A    Yes, I would assume.

19  Q    Okay.  How many school board meetings of the

20  Ferguson-Florissant School District have you attended in the

21  last year?

22  A    Let's see, Dr. McCoy left, let's see, March.  So prior to

23  March of 2014, the separation agreement, I think maybe two.  I

24  attended the ones that you moved to the -- this other building

25  because it didn't have enough room, and I can't think of the

1    other one.  So maybe two or three.

2    Q     How many curriculum committee meetings have you attended?

3    A     None.

4    Q     How many discipline committee meetings have you attended?

5    A     None.

6    Q     How many board workshops have you attended?

7    A     Am I allowed to?  Are they open to the public?

8    Q     They are.

9    A     Okay.  None.

10   Q     So how can you be so sure that the board hasn't addressed

11   the issue of the achievement gap?

12   A     Because of the parents with children in the district that

13   we interface with and talk to are complaining about the very

14   same things that we just talked about now, and then again I

15   think the numbers -- unless the numbers you're reporting to

16   DESE and the Department of Education are incorrect, I think

17   the numbers are a pretty good indication that there is a

18   disparity going on.

19   Q     How many parents have you interviewed?

20   A     Interviewed directly or have conversations with?

21   Q     How many parents have you interviewed directly about the

22   achievement gap?

23   A     Maybe two or three.

24   Q     How many parents have you interviewed directly about

25   discipline?

1  A    Oh, we've got at least over the past couple of years at

2  least maybe ten, fifteen calls where parents are complaining

3  about they felt that they child was not receiving a fair

4  treatment as relates to discipline.  And then at your

5  meetings, board meetings, or in when we were having the

6  rallies at the churches and stuff in respond to McCoy, then

7  there were tons of parents complaining about discipline and

8  achievement gap and all sort of inequities that they felt were

9  going on in the district.

10  Q    And are you positive that everybody that spoke at that

11  meeting were residents of the school district?

12  A    I'm positive that they were enough informed that I relied

13  on that information, yes.

14  Q    So the information that you gave to the Court today with

15  regard to whether or not the school board has addressed the

16  achievement gap and whether or not the school board has

17  addressed the discipline issues, that's based on approximately

18  twenty parents total that you've spoken to about that

19  directly?

20  A    Like I said at those meetings, we talked to any number of

21  parents and individuals; so, no, I would not say that.

22  Q    How many.  How many --

23  A    I -- I couldn't tell you how many people are in this

24  courtroom; so I may have had a bunch of conversations, but I

25  couldn't tell you how many of them were in there.  So, no, I

1  didn't -- at those meetings I didn't go around with a clicker

2  and every time I talked to somebody click off a number and

3  keep count.

4  Q    Have you spoken to fifty parents?

5  A    I would say easily, yes.

6  Q    Seventy-five?

7  A    Quite possible.

8  Q    Hundred?

9  A    I don't know.

10  Q    Do you know how many thousands of parents there are in

11  the Ferguson-Florissant School District?

12  A    No.

13  Q    Okay.  How many Hazelwood School Board meetings have you

14  attended?

15  A    Oh, my God.

16  Q    In the last year.

17  A    In the last year?  Maybe two or three.

18  Q    How many curriculum meetings have you attended?

19  A    None.  The teachers, when they report out at the school

20  board meetings, they get those curriculum reports there at the

21  meeting.

22  Q    I'm at every single meeting.  Do you see me there when

23  you're there at the Hazelwood School Board meetings?

24  A    No.  I don't know.

25  Q    Because I've been there for the last five, ten years, and

1    I've never heard a report out from the teachers at the

2    Hazelwood School Board meeting.  So I'm wondering which ones

3    are you talking about?

4              MR. ROTHERT:  Your Honor --

5              THE COURT:  Your question's argumentative and assumes

6    facts not in evidence; so why don't you rephrase.

7    Q    I will, Your Honor.

8              Are you sure that the teachers report out at the

9    Hazelwood school meeting?

10   A    When they are principals report out at the Hazelwood

11   School Board meetings where they put out the performances for

12   each one of those school buildings, and they do -- yeah, they

13   do report out.  Did you see me at the meetings?

14   Q    No.

15             THE COURT:  Look, this is not a two-way street, all

16   right?  You ask the questions, and you answer them.

17             THE WITNESS:  Yes, sir.

18             THE COURT:  And your attorney will have the

19   opportunity to ask you some --

20             THE WITNESS:  I'm sorry, Your Honor.

21             THE COURT:  That's all right.

22   Q    Are you aware of the racial make-up of the Hazelwood

23   School District?

24   A    Somewhat, yes.

25   Q    Do you believe that the Hazelwood School District has a

1  higher percentage of African Americans than the

2  Ferguson-Florissant School District does?

3  A    Yes.  It's a larger school district, larger population,

4  yes.

5  Q    I'm talking about percentage-wise.  Is the

6  African-American population in Hazelwood larger or smaller

7  than that of Ferguson-Florissant?

8  A    I believe larger.

9  Q    Do you know that to be true?

10  A    No.

11  Q    Have you looked at it?

12  A    Recently to compare them?  No.

13  Q    How are school board members in Hazelwood elected?

14  At-large or single-member districts?

15  A    At large.

16  Q    And how many school board members do they have that are

17  African American?

18  A    Four.

19  Q    If it was -- if it's on the record in this court that the

20  African-American population is slightly smaller than the

21  Ferguson-Florissant School District, would that surprise you?

22  A    I'm sorry.  Say that -- are you talking about the

23  percentage?

24  Q    Yes.

25  A    No, it wouldn't.

1    Q    Yet they were able to elect a majority African Americans

2    to their school board?

3    A    I mean, the fact that the four are there, I think the

4    answer to that is self-evident.

5    Q    I think you're right.  I talked a little bit about

6    discipline.  And you said you have not attended any of the

7    discipline committee meetings in the Ferguson-Florissant

8    School District, correct?

9    A    No.

10   Q    Correct?  Are you aware of a statute that requires

11   certain discipline infractions to be reported to the police?

12   A    Somewhat.

13   Q    Under state law?

14   A    Yes, somewhat.

15   Q    Do you believe school districts should comply with state

16   law?

17   A    Yes.

18   Q    Are you aware that the Ferguson-Florissant has an

19   alternative school where the vast majority of the students

20   that are -- that receive out-of-school suspensions actually go

21   and attend there so they are not on the streets?

22   A    Somewhat.

23   Q    Do you have any more recent data than 2011 with regard to

24   discipline infractions?

25   A    Not that I can rely on.  I've gotten numbers that I read

1  in publications, but I haven't done any due diligence to

2  ascertain whether they are accurate or not.

3  Q    How many school board campaign events have you attended?

4  A    None.

5  Q    Do you believe that generally parents are concerned about

6  discipline and student safety in the schools?

7  A    I think they're more concerned that their kid gets a good

8  education; but, yes, I think safety also is a concern.

9  Q    If school board candidates are asked about discipline

10  issues, should they answer those questions?

11  A    Of course.

12  Q    Will you concede that discipline is a legitimate area of

13  concern and a matter for discussion in school board elections?

14  A    Yes.

15  Q    So achievement scores and students transferring.  Are you

16  aware -- well, why does a school become unaccredited; do you

17  know?  School district become unaccredited.

18  A    There are a number of different performance levels that

19  the DESE requires school districts to meet.  When that does

20  not happen over a two-year span of period, it gives the DESE

21  the ability to go in and render the school provisionally

22  accredited or subsequently unaccredited.

23  Q    Is student achievement one of those factors that DESE

24  considers?

25  A    Yes.

1  Q    And are you aware that the achievement scores of students

2  transferring from unaccredited school districts become the

3  scores of the receiving school districts?

4  A    What I'm more aware of is that the --

5  Q    It's just a yes-or-no question.  Are you aware that the

6  achievement scores of students transferring from unaccredited

7  school districts become the achievement scores of the

8  receiving school district?

9  A    At a period of time that was designated by DESE in their

10 guidelines -- I think it's the second year, or something like

11 that; I forgot what the ruling was -- but --

12 Q    So you don't know?

13 A    Eventually.  Eventually, yes.

14 Q    Do you have that DESE document in front of you?

15 A    Of course not.

16 Q    So you're speculating on what it says.  You don't know

17 for sure?

18 A    I'm confident that the scores are weighed in after a

19 period of time.

20      MR. ROTHERT:  Your Honor, I object to the original

21 question since it apparently calls for speculation.

22      THE COURT:  Overruled.

23 Q    Explain to me how the achievement gap will change under a

24 single-member district as opposed to an at-large district.

25 A    Are you asking me for a professional opinion or just my

1   personal opinion?

2   Q    I'm asking for -- I'm asking you to explain to the Court

3   how the achievement gap will change if the electoral system

4   changes.

5   A    As a consultant, I can give a very technical response

6   that professionally I probably should not because I don't have

7   as much expertise, but I would say as a civil rights leader

8   and activist, I think the fact that in those districts, those

9   smaller districts, that those parents who live within that

10  district will have a better opportunity to interface with the

11  person who serves on the school board, and that will result in

12  those school board members having the more direct

13  understanding and input as relates to how that school board

14  member carry out their duties from time to time.

15  Q    Are you aware of the -- what the financial condition of

16  the Ferguson-Florissant School District was in 2014?

17  A    No.

18  Q    You state in your declaration, and I quote, "Although the

19  source school provided a substantial share of the

20  transportation costs for transferring students, there were

21  small remaining costs to guarantee adequate transportation."

22  Did I quote you correctly?

23  A    What number, paragraph number?

24          THE COURT:  It's paragraph 21.

25          MS. ORMSBY:  Thank you, Your Honor.

1   Q   (BY MS. ORMSBY) Oh, no wonder.  I flipped too far.  I was

2   in somebody else's.

3           Paragraph 21.  Do you see that?

4   A   Yes.  I'm reading it.

5   Q   That's not accurate, is it?

6   A   What you mean it's not accurate?  I don't understand the

7   question.

8   Q   It's not accurate that the sending school district

9   provides transportation funds to the Ferguson-Florissant

10  School District.  You say they provide a substantial share of

11  transportation costs.  The source school, which would be

12  Normandy School District or Riverview Gardens, provides a

13  substantial share of transportation costs for transferring

14  students.  That's not correct, is it?

15  A   I'm looking at No. 21.  (Reading.)  Transfer student was

16  transportation, although the source provided -- although the

17  source school provide substantial share of transportation,

18  costs for transferring students that were remaining costs of

19  adequate transportation.

20          And I was talking about in general.

21  Q   So specifically to Ferguson-Florissant, no transportation

22  costs were provided by the what you call "source school"?

23  A   I agree.

24  Q   Thank you.  So if the school district was having

25  financial issues -- in fact, they just in 2015 -- I don't know

1   if you remember.  Do you remember if they ran a bond issue for

2   a tax increase the last April election?  Do you remember that,

3   Mr. Pruitt?

4   A    No.  I don't recall.

5   Q    Okay.  So if finances were an issue at the

6   Ferguson-Florissant School District, in transportation, Dr.

7   McCoy wanted the district to pay for transportation, would

8   that be a legitimate concern of the school district?

9   A    I would say not in this instance, no.

10  Q    Are you aware whether Dr. McCoy provided any budget

11  adjustments to the board with regard to providing

12  transportation funds?

13  A    No, I'm not.  No, I'm not.

14  Q    Are you aware whether Dr. McCoy ever provided any sort of

15  plan to the board where those transportation costs would be

16  paid by outside sources?

17  A    No, I'm not.

18  Q    So can you agree with me that there's other reasons than

19  your excuse of race that the school board could be concerned

20  about the transfer program?

21  A    No, there are not.

22  Q    There's nothing else besides race?  Finances could not be

23  an issue?

24  A    No.  A prime example would be the St. Louis Public School

25  opened its doors to all sort of children, and we had financial

1   issues for a very long time.  I think they --

2   Q    Did they provide transportation for them?  Did they pay

3   for the transportation?

4   A    I don't know.  I can ask.

5   Q    You don't know.

6   A    No, I don't know.  I know they took them.

7   Q    And the Ferguson-Florissant School District took them.

8   Didn't you testify they took the second highest number of

9   kids?

10  A    Yes.  Yes, they did.

11  Q    They accepted those kids, right?

12  A    Yes.

13  Q    The second highest number of kids under Francis Howell;

14  isn't that right?

15  A    Dr. McCoy did.

16  Q    And the school board never turned them away, did they?

17  A    They could not turn them away.

18  Q    They did not turn them away.

19  A    They could not turn them away.

20  Q    They did not try to turn them away, did they?

21  A    I think when they changed the number of seats in the

22  classroom, I think that was attempt to turn them away.

23  Q    Are you aware they hired additional teachers to

24  educate the -- were you there when they approved additional

25  teachers to be hired for the transfer students?

1  A    I think since they had to take the children, they had to

2  have teachers to teach them.

3  Q    They spent more money because of those transfer students,

4  correct?

5  A    I would assume that the teachers didn't come for free.

6  Q    And they were required by DESE to set their class sizes,

7  weren't they?

8  A    No.  I don't think so.

9  Q    Really?  You don't --

10 A    I think DESE gave them an option.  I don't think DESE's

11 guidelines dictated that the districts had to change they

12 class sizes.  There were any number of districts -- what

13 happened, I think DESE intervened because districts were

14 changing their class size, and they saw that it would be

15 prohibitive for the kids to get transferred in there.  So they

16 issued these guidelines so that they can have some uniform way

17 of how these districts operate.

18      MS. ORMSBY:  Your Honor, I'd like the opportunity to

19 supplement the record with the actual DESE guidelines so the

20 Court could see what they actually are rather than what that

21 witness is testifying to.

22      THE COURT:  We'll take that up as part of your case.

23 Q    (BY MS. ORMSBY) Thank you.

24      Is Dr. McCoy your friend?

25 A    No.  I didn't know him before he became superintendent of

1    the Ferguson-Florissant School District.

2    Q    And we've already talked about the fact that when he was

3    superintendent, the achievement gap was not solved.  Correct?

4    A    Absolutely not.

5    Q    And neither was the discipline issue?

6    A    Absolutely not.

7    Q    Would you have had the school district release all of the

8    personnel information about Dr. McCoy against his wishes?

9    A    Yes.  I think transparency is in the public's best

10   interest.

11   Q    And do you believe that the school board's decision not

12   to release personnel information with regard to Dr. McCoy is

13   unique?

14   A    I don't have enough history of those sort of instances

15   that say whether it's unique or not.

16   Q    Have you ever known a school district,

17   Ferguson-Florissant in particular or any other school

18   district, in which personnel decisions, especially regarding

19   suspensions and terminations, are a subject for public

20   consumption?

21   A    I think in every instance where a superintendent has been

22   terminated for or with or without cause by a district, I

23   subsequently read about why it occurred in the newspaper,

24   which may not be accurate, but I subsequently read about it.

25   Q    You seem very familiar with the Hazelwood School

1  District.  Why was Dr. Grayling Tobias put on suspension last

2  year?

3  A    I would be speculating.

4  Q    Because it wasn't released, was it?

5  A    I don't know whether it was or not, but I would be

6  speculating.  I've had extensive discussions with a lot of

7  folks around in that, and that would be speculating or I guess

8  it would be hearsay.  I would be telling you what people in

9  professional positions do know or had the opportunity to know,

10  I would have to tell you what they told me.

11  Q    Sir, I'm just following up on your comment that you said

12  that usually when these situations happened, you read about it

13  in the newspaper and you know.  And I'm asking you for a

14  specific example, and you can't give me one, can you?

15  A    I can give you example of where in the newspaper where

16  they've talked about where a superintendent was ultimately

17  fired and why they were fired, yes.  I think the one in

18  Riverview, I think it was an issue of some spending.

19  Q    Okay.  I'm going to stop you right there.  Wasn't that

20  released because he was charged criminally?

21  A    I don't know if that's why it was released.

22  Q    The school board didn't release it, did they?

23  A    I don't know.  I read it in the paper, though.

24  Q    Has the -- okay.  Has the Ferguson-Florissant School

25  District hired a new superintendent?

1  A    Yes.

2  Q    Have you met him?

3  A    Yes.

4  Q    Do you see him here in the district today?

5  A    Yeah.

6  Q    I mean in the courtroom today.

7  A    Yeah.  He's sitting back there.

8  Q    Can you raise your hand, Dr. Davis?

9         What do you think about Dr. Davis?

10 A    I don't know.  I've spent maybe couple hours with him on

11 a trip to Baltimore to look at a school there, and that was --

12 I think that's mainly the extent of it.

13        MS. ORMSBY:  I don't have anything further, Your

14 Honor.

15        THE COURT:  Any redirect, Mr. Rothert?

16        I assume the election board wasn't going to ask

17 questions; is that right?

18        MS. FORSTER:  No, Your Honor.

19        THE COURT:  Are you ready for redirect?

20        MS. ORMSBY:  Yes.

21        THE COURT:  You may proceed.

22                    **REDIRECT EXAMINATION**

23 **BY MR. ROTHERT:**

24 Q    Mr. Pruitt, do you know whether the voting in the

25 Hazelwood School District School Board elections is racially

1  polarized?

2  A    Yes.  I would say so.

3         MS. ORMSBY:  Objection, Your Honor.  Calls for a

4  legal conclusion.

5         THE COURT:  In his opinion.  For what it's worth.

6         MR. ROTHERT:  I'll just withdraw the question.

7  That's fine.

8         THE COURT:  All right.

9  Q    (BY MR. ROTHERT) Do you need a degree in curriculum or in

10  education to understand that there's an African-American

11  achievement gap?

12  A    No.

13  Q    And you rely on publicly available records from DESE and

14  Office of Civil Rights, the Department of Education?

15  A    Absolutely.

16  Q    And who provides that information to DESE and the Office

17  of Civil Rights, if you know?

18  A    The school district.

19  Q    Are you familiar -- have you ever heard of a program

20  called Higher Achievement For All that was in the

21  Ferguson-Florissant School District previously?

22  A    No.  Not really.

23  Q    Do you know if Dr. McCoy, prior to being suspended, had

24  implemented any programs to address the achievement gap in the

25  Ferguson-Florissant School District?

1  A    Yes.  I've heard, but I don't know to any great extent

2  the -- what those programs were.  But, yes, I've heard that

3  from a lot of folks.

4  Q    And do you know did they also -- he also adopted new

5  procedures under the policies for discipline, correct?

6  A    Yes.

7  Q    And what did the school board do with him, Dr. McCoy?

8  A    They castrated him in the public and forced his

9  resignation.

10         MS. ORMSBY:  Objection, Your Honor.  Objection.

11  Q    Are you aware of any personnel information about the

12  current Ferguson-Florissant School District superintendent in

13  his previous employment?

14  A    Other than what I read in the paper.

15  Q    And what did you read in the paper?

16  A    There was some questions as relates to the outcomes of a

17  financial audit.

18  Q    I need to get one thing.  Did the Missouri NAACP reach

19  out to the Ferguson-Florissant School District to discuss --

20  A    Yes.

21  Q    Well, let me ask.  -- to discuss gaps, achievement in

22  disciplinary gaps?

23  A    No.

24  Q    Okay.  But to discuss Dr. McCoy?

25  A    Yes.

1   Q    And the Black Leadership Roundtable, when you were

2   involved in that, did that organization reach out to the

3   Ferguson-Florissant School District?

4   A    Absolutely.

5   Q    And was that every year?

6   A    Yes.

7        MR. ROTHERT:  I have no further questions.

8        THE COURT:  Okay.  I don't usually allow -- but as to

9   the current superintendent if you have any questions.

10       MS. ORMSBY:  That's it.

11       THE COURT:  That was a new topic.

12                   **RECROSS-EXAMINATION**

13  **BY MS. ORMSBY:**

14  Q    Did you read the press release from the prosecutor in

15  North Carolina with regard to that incident?

16  A    No.

17  Q    So you don't know that the prosecutor found absolutely no

18  wrongdoing and that Dr. Davis was acting under the direction

19  of the school board in each and every incident?

20  A    I'll go further.  I think that it was another example of

21  how black superintendents are castrated by boards and other

22  folks, just as Art McCoy was.  I think he was a victim too.

23       MS. ORMSBY:  Nothing further.

24       THE COURT:  Thank you.  Thank you, sir.  You may step

25  down.

1          If you would call your next witness, please.

2          MR. ROTHERT:  Your Honor, at this point we would like

3    to move for admission of several exhibits to which the parties

4    have stipulated to their authenticity.

5          THE COURT:  Okay.

6          MR. ROTHERT:  And there's no objection.  The first

7    would be Plaintiffs' Exhibit 1, which is the 2000 official

8    Ferguson-Florissant School District election results.

9          THE COURT:  Received without objection.

10          MS. ORMSBY:  Yes, Your Honor.

11          MR. ROTHERT:  Exhibit 2 is the 2001 official

12    Ferguson-Florissant School Board.

13          MS. ORMSBY:  No objection.

14          THE COURT:  Received.

15          MR. ROTHERT:  Exhibit 3 is the 2002 election results.

16          MS. ORMSBY:  No objection.

17          THE COURT:  Received without objection.

18          MR. ROTHERT:  Plaintiffs' Exhibit 4 is the 2003.

19          MS. ORMSBY:  No objection.

20          THE COURT:  Received without objection.

21          MR. ROTHERT:  Plaintiffs' Exhibit 5, the 2004

22    election results.

23          MS. ORMSBY:  No objection.

24          THE COURT:  Received without objection.

25          MR. ROTHERT:  Exhibit 6 is the 2006 election results.

1          MS. ORMSBY:  No objection.

2          THE COURT:  Received without objection.

3          MR. ROTHERT:  Plaintiffs' Exhibit 7 is the 2009

4     election results.

5          MS. ORMSBY:  No objection.

6          THE COURT:  Received without objection.

7          MR. ROTHERT:  Exhibit 8 is the 2011 election results.

8          MS. ORMSBY:  No objection.

9          THE COURT:  Received without objection.

10         MR. ROTHERT:  Exhibit 9 is the 2012 election results.

11         MS. ORMSBY:  No objection.

12         THE COURT:  Received without objection.

13         MR. ROTHERT:  Exhibit 10 is the 2013 election

14    results.

15         MS. ORMSBY:  No objection.

16         THE COURT:  Received without objection.

17         MR. ROTHERT:  Exhibit 11 is the 2014 official

18    election results.

19         MS. ORMSBY:  No objection.

20         THE COURT:  Received without objection.

21         MR. ROTHERT:  Exhibit 12 is the 2015 election

22    results.

23         MS. ORMSBY:  No objection.

24         THE COURT:  Received without objection.

25         MR. ROTHERT:  Exhibit 13 is U.S. Census Bureau Table

1    B07004B.

2          MS. ORMSBY:  No objection.

3          THE COURT:  Received without objection.

4          MR. ROTHERT:  Exhibit 14 is U.S. Census Bureau Table

5    BO8105B.

6          MS. ORMSBY:  No objection.

7          THE COURT:  Received without objection.

8          MR. ROTHERT:  Exhibit 15 is U.S. Census Bureau Table

9    B16005B.

10          MS. ORMSBY:  No objection.

11          THE COURT:  Received without objection.

12          MR. ROTHERT:  Exhibit 16 is U.S. Census Bureau Table

13    B17010B.

14          MS. ORMSBY:  No objection.

15          THE COURT:  Received without objection.

16          MR. ROTHERT:  Exhibit 17 is U.S. Census Bureau Table

17    B17020B.

18          MS. ORMSBY:  No objection.

19          THE COURT:  Received without objection.

20          MR. ROTHERT:  Exhibit 18, U.S. Census Bureau Table

21    B18101B.

22          MS. ORMSBY:  No objection.

23          THE COURT:  Received without objection.

24          MR. ROTHERT:  Exhibit 19 is U.S. Census Bureau

25    B19013B.

1      MS. ORMSBY:  No objection.

2      THE COURT:  Received without objection.

3      MR. ROTHERT:  Exhibit 20 is U.S. Census Bureau Table

4  B19113B.

5      MS. ORMSBY:  No objection.

6      THE COURT:  Are you going to go all the -- how far

7  are you going?  Are you going all the way to 35, 36, 37?

8      MS. ORMSBY:  Can go to 42 without objection.

9      MR. ROTHERT:  Do you need to -- does it need to be in

10  the record what they are?

11      THE COURT:  No.

12      MR. ROTHERT:  Okay.  One through -- or 21 through 42?

13      MS. ORMSBY:  Correct.  No objection.

14      THE COURT:  Received without objection.

15      MR. ROTHERT:  Then 44, 45, and 46.

16      MS. ORMSBY:  No objection.

17      THE COURT:  Received without objection.

18      MR. ROTHERT:  48, 49, 50, 51, 52, 53, 54, 55.

19      MS. ORMSBY:  No objection.

20      THE COURT:  Received without objection.

21      MR. ROTHERT:  Exhibit 61.

22      MS. ORMSBY:  What about Exhibit --

23      MR. ROTHERT:  We are not moving for admission of that

24  at this point.

25      MS. ORMSBY:  You're going to 61?

1          MR. ROTHERT:  61.

2          MS. ORMSBY:  No objection.

3          THE COURT:  Received without objection.

4          MR. ROTHERT:  62(a).

5          MS. ORMSBY:  No objection.

6          THE COURT:  Received without objection.

7          MR. ROTHERT:  Then 63 through 69.

8          MS. ORMSBY:  No objection.

9          THE COURT:  Received without objection.

10          MR. ROTHERT:  71.

11          MS. ORMSBY:  No objection.

12          THE COURT:  Received without objection.

13          MR. ROTHERT:  75.

14          MS. ORMSBY:  No objection.

15          THE COURT:  Received without objection.

16          MR. ROTHERT:  79.

17          MS. ORMSBY:  I'm objecting to this as 78 if 78 is not

18     put in as well.

19          THE COURT:  Well, 78 is blank.  So what's your

20     objection?

21          MR. ROTHERT:  We withdrew 78.

22          THE COURT:  So is there -- what's your objection

23     to --

24          MS. ORMSBY:  No objection, Your Honor.

25          THE COURT:  Received without objection.

1          MR. ROTHERT:  82 through 91.

2          MS. ORMSBY:  No objection.

3          THE COURT:  Received without objection.

4          MR. ROTHERT:  93 through 101.

5          MS. ORMSBY:  No objection.

6          THE COURT:  Received without objection.

7          MR. ROTHERT:  104 through 108.

8          MS. ORMSBY:  No objection.

9          THE COURT:  Received without objection.

10          Are we ready to move on to your next witness, or you

11    still have some more documents as to --

12          MR. ROTHERT:  Almost done.

13          THE COURT:  All right.

14          MR. ROTHERT:  130.

15          MS. ORMSBY:  No objection.

16          THE COURT:  Received without objection.

17          MR. ROTHERT:  132 to 134.

18          MS. ORMSBY:  No objection.

19          THE COURT:  Received without objection.

20          MR. ROTHERT:  136 to 138.

21          MS. ORMSBY:  No objection.

22          THE COURT:  Received without objection.

23          MR. ROTHERT:  140 to 143.

24          MS. ORMSBY:  No objection.

25          THE COURT:  Received without objection.

1      MR. ROTHERT:  145 to 152.

2      MS. ORMSBY:  No objection.

3      THE COURT:  Received without objection.

4      MR. ROTHERT:  154 to 166.

5      MS. ORMSBY:  No objection.

6      THE COURT:  Received without objection.

7      MR. ROTHERT:  And 168 to 171.

8      MS. ORMSBY:  No objection.

9      THE COURT:  Received without objection.

10      MR. ROTHERT:  And that is all for now.

11      THE COURT:  All right.

12      MR. ROTHERT:  Sophia Lakin will be handling the next

13  witness.

14      THE COURT:  Okay.

15      MS. LAKIN:  Good morning, Your Honor.  Sophia Lakin

16  on behalf of the plaintiffs.  The plaintiffs call Dr. Colin

17  Gordon.

18      THE COURT:  If you would step forward, sir, and be

19  sworn.

20      MS. LAKIN:  And as with Mr. Pruitt, I have a binder

21  full of trial exhibits.

22      THE COURT:  Very well.

23                **(WITNESS SWORN BY THE CLERK.)**

24                     **COLIN GORDON,**

25  **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

**FOLLOWS:**

**DIRECT EXAMINATION**

**BY MS. LAKIN:**

Q    Good morning, Dr. Gordon.  Can you please state your name for the record?

A    Colin Gordon.

Q    Are you currently employed?

A    Yes.

Q    And where are you employed?

A    I'm a professor of history at the University of Iowa.

Q    Do you have tenure?

A    Yes.

Q    What is your educational background?

A    I have a bachelor's degree, honors in history from the University of Alberta, a master's degree in history from York University in Toronto, and a Ph.D. in history from the University of Wisconsin at Madison.

Q    Where have you worked since obtaining your Ph.D.?

A    I taught for four years at the University of British Columbia.  Since 1994 I've taught at the University of Iowa.

Q    And how long has that been?

A    Twenty-one going on twenty-two years.

Q    Have you held any leadership positions in the department during that time?

A    Yes.  I've served in the department as the director of

1    undergraduate studies, as the director of graduate studies,

2    and a five-year term as chair of the department.

3    Q    In addition to being a professor, do you work for any

4    research centers?

5    A    Yes.  I'm an affiliate in the social science group with

6    the University of Iowa's Public Policy Center, and I'm a

7    senior research consultant with the Iowa Policy Project, which

8    is a state-level think tank.

9    Q    Have you received any awards and grants for your work in

10   history or public policy?

11   A    Yes.  So my research has been supported by grants from

12   the National Endowment for Humanities, the National Science

13   Foundation, and a number of small sources, including the

14   Robert Seilor Fellowship from the Missouri Supreme Court

15   Historical Society.

16          In 2013 I was named a Collegiate Fellow, which is the

17   highest distinction in -- at the University of Iowa for

18   faculty research.  And last year I received the university's

19   Distinguished Achievement Award for publicly engaged research.

20   Q    Are you a member of any professional organizations?

21   A    Yes.  I'm a member of the American Historical

22   Association, the Organization of American Historians, the

23   Social Science History Association, the Urban History

24   Association, and the Labor and Working-Class History

25   Association.

1    Q    What is the focus of your research?

2    A    Across my career, my research has been on the history of

3    American public policy and political economy.

4    Q    And more recently?

5    A    And more recently has focused on urban history, including

6    my 2008 monograph on the History of Greater St. Louis.

7    Q    Can you provide a brief overview of your publications and

8    research projects?

9    A    Yes.  I've published four research monographs:  One on

10   business labor and the New Deal, one on health care policy,

11   and one -- the one I just mentioned on the history of St.

12   Louis.  I've published about 20 peer-reviewed articles, a

13   large number, perhaps 70 or 80, shorter pieces, a number of

14   chapters in anthologies and books, a textbook on American

15   history between the wars, as well as a number of digital

16   projects, including two which relate directly to mapping, the

17   history of racial disparity and discrimination across the St.

18   Louis region.

19   Q    Can you describe what some of the shorter articles you've

20   written in recent years have focused on?

21   A    My recent work has been on the history of inequality in

22   the U.S. and also a wide range of articles flowing from my

23   work on St. Louis; so commentary in the wake of Ferguson and

24   that sort of thing.

25   Q    Can you explain what a monograph is?

A    Yes.  In my field of research, monograph distinguishes a book-length piece of research based on original research as distinct from more a synthetic account or a textbook.

Q    And what is a peer-reviewed or refereed article?

A    The scholarly convention for most journal publications would be -- is a double-blind review process; so that you submit to a journal and it goes out to readers.  The readers don't know who the author is.  The author doesn't know who the readers are.  So the idea is it's published on merit rather than on reputation or -- you know.

Q    Now, as a scholar, has your work focused on any regions in particular?

A    Yes.  My -- in particularly over the last decade, my work has focused closely on the history of greater St. Louis.

Q    And how did you come to focus on the greater St. Louis area?

A    I was interested in a substantial research project on the history of urban decline or urban public policy.  So St. Louis is a site in part because it's a troubled setting in those respects and in part because as a historian it had an usually rich archival base, which is often hard to find at local history.

Q    And when you say "greater St. Louis," what are you referring to?

A    Generally speaking, that it flows from the census

definition of a metropolitan statistical area.  So it's an

urbanized area or metro area which includes the central city

of St. Louis.  At present day I think it includes a total of

15 counties on the Illinois and the Missouri sides of the

river.

Q     And what does the "St. Louis metropolitan area" mean?

A     I generally use the terms interchangeably:  Greater St.

Louis/St. Louis metropolitan area.

Q     Does this area you describe include the

Ferguson-Florissant School District?

A     Yes.

Q     You testified a moment ago that your research has focused

on greater St. Louis.  Can you describe the work you've done

here in more detail?

A     Yes.  So my 2008 monograph, *Mapping Decline:  St. Louis

and the Fate of the American City*, combined original archival

research and local resources with GIS, or Geographic

Information System, mapping of data, including census data but

also local data on things like urban renewal and zoning across

the metro area.  So it's a history of St. Louis from about

1916 to the present, greater St. Louis.

Q     And since your book, have you done additional work on the

greater St. Louis area?

A     Yes.  I have continuing research on St. Louis on --

African-American suburbs in St. Louis County is one area of

1  continuing research.  I'm also engaged in a new project on the

2  racial wealth gap in St. Louis.

3  Q    And you mentioned earlier that you also worked on some

4  digital projects related to the greater St. Louis area.  Can

5  you describe that for us?

6  A    Yes.  Because my monograph depended heavily on the

7  collection of historical and current data on greater St.

8  Louis, that is, geo-spatial data, mapping, political

9  phenomena, socioeconomic characteristics and disparities

10 across the region, I now have two digital projects or websites

11 which allow users to play with that data interactively.

12 Q    Have you written any law review articles since publishing

13 your book on the greater St. Louis area?

14 A    Yes.  I have three substantive law review articles which

15 were, you know, in a sense commissioned in the wake of my

16 book, two of them published in the St. Louis Public Law

17 Review.

18 Q    Has your work related to the St. Louis metro area

19 included any work in a legal context other than this case?

20 A    Yes.  I mean, defining that broadly, I've given talks at

21 SIU on my work.  I've given talks at the Missouri State --

22 Missouri Supreme Court Historical Society talk on my work.  I

23 completed a expert opinion for a mitigation defense in a

24 capital case I think two years ago.  It's sort of a close

25 analysis of neighborhood conditions in north St. Louis.

1  Q    And these talks that you gave at the Missouri -- I'm

2  sorry -- at the American Historical Society and so forth, were

3  those invited talks?

4  A    Yes.  I've given a number of invited talks, I would say a

5  flurry in the wake of the publication of the book, which is

6  not unusual, but also a flurry in the wake of the events of

7  August 2014, in Ferguson, when both many local institutions

8  but also national professional organizations were putting

9  together panels or wanted speakers to try and make historical

10  sense of what had happened in Ferguson.

11  Q    Can you give us some additional examples of places where

12  you've spoken?

13  A    Yes.  I've -- so I've participated in a workshop on this

14  research at Yale.  I've spoken at the Washington University

15  School of Social Work.  I've spoken at the St. Louis

16  University Law School.  I've given a presidential or plenary

17  address at the New York Meeting of the American Historical

18  Association a year ago, at the Organization of American

19  Historians, and a number of other sort of more local

20  specialized talks, including the East/West Gateway

21  Coordinating Council, the Regional Council of Governments in

22  this area.

23  Q    Has your work on greater St. Louis been cited by the news

24  media?

25  A    Yes.  It's been cited by the *New York Times*, the *LA*

1    *Times*, the *Boston Globe*.  I've been interviewed on National

2    Public Radio twice with respect to my research.

3    Q    And when was the last time you're aware that your work on

4    greater St. Louis was cited in the news media?

5    A    My -- I think I was in the *St. Louis Post Dispatch* about

6    three days ago.

7    Q    Since writing your book, have you been to the St. Louis

8    metropolitan region to do any continuing research in the area?

9    A    Yes.  I've been to the region both for follow-up talks

10   and for the continuing research that I've described a moment

11   ago.

12   Q    How recently?

13   A    The last time I was in St. Louis, once during the fall

14   and a couple times last summer.

15         MS. LAKIN:  Your Honor, the plaintiffs offer Dr.

16   Gordon as an expert in urban history, the history of public

17   policy and political economy in the United States since 1920,

18   and the historical development of and the effects of

19   residential restrictions and patterns of segregation across

20   the St. Louis metropolitan area.

21         THE COURT:  Any objection?

22         MS. ORMSBY:  No.

23         THE COURT:  You may proceed.

24   Q    (BY MS. LAKIN) Dr. Gordon, what were you asked to do in

25   this case?

A    I was asked to prepare a report or opinion based on my

historical expertise on greater St. Louis as it pertained to

the continuing disadvantages faced by the African-American

population of St. Louis County, North County, and the district

particularly.

Q    After performing your analysis, did you form an opinion?

A    Yes, I did.

Q    And what is that opinion?

A    My opinion is that the historical circumstances that I

described in my report cast what I would characterize as a

sort of long shadow over the current life chances and

opportunities of African Americans who live in greater St.

Louis, in North County, and in the footprint of the district.

Q    And did you have any conclusion as to their current

effects of those, of that long shadow?

          MS. ORMSBY:  Excuse me.  Could I just ask that the

witness speak more -- we're having a difficult time hearing

you over here.

          THE WITNESS:  I'm sorry.  Am I not close enough to

the mic, or am I just mumbling?

          THE COURT:  You have a soft voice.

          THE WITNESS:  Oh, okay.

          THE COURT:  That's all.

A    Yes.  In terms of sort of fleshing out what I

characterize as sort of long shadow of those historical

1  processes, I think what you end up with is a very sort of

2  tangled fabric of disadvantage across a variety of

3  socioeconomic characteristics -- we heard a little bit about

4  educational attainment this morning -- but also in terms of

5  poverty, reliance on public assistance, opportunity with

6  respect to housing, and, you know, the full dimensions of

7  democratic citizenship, how people contact local governments,

8  whether it's schools, police, or other institutions.

9  Q    Did you prepare any expert reports in this case?

10 A    Yes.

11 Q    Dr. Gordon, would you please turn to the tab marked 40,

12 which is Plaintiffs' Exhibit 40 in the binder I handed you

13 earlier.  What is this document?

14 A    This is the report completed May 2015 that I prepared for

15 this case.

16 Q    Would you turn to Tab 41, which is Plaintiffs' Exhibit

17 41.  And what is that document?

18 A    This is a shorter report that I prepared in response to a

19 part of the report of Dr. Rodden.

20 Q    Do these reports accurately describe the analyses that

21 you undertook and summarize your findings and conclusions in

22 this case?

23 A    Yes, they do.

24 Q    Were they signed under oath?

25 A    Yes, they were.

Q     Did you review your reports before you signed them?

A     Yes, I did.

        MS. LAKIN:  Your Honor, I'd just like to note that
Plaintiffs' Exhibit 40 and 41 have been admitted into
evidence.

        MS. ORMSBY:  They've been admitted.

        THE COURT:  They have been received.

Q     (BY MS. LAKIN) Dr. Gordon, turning to your methodology,
how did you go about analyzing the question you were asked to
evaluate in this case?

A     I think in terms of scholarly conventions, my methodology
is -- might be characterized as a sort of mixed methods.  I
used the methods of a conventional historian, that is, I used
archival sources extensively, particularly local archival
sources.  So the files of local civic officials, the files of
local municipalities, that sort of thing.

        But I also rely on a number of social scientific
methods, including GIS mapping and the use of relevant
socioeconomic data, particularly the decennial census.

Q     Did you rely on work that you performed in creating and
writing your mapping decline 2008 monograph?

A     Yes.

Q     And did you do additional supplemental work for this
case?

A     Yes.

1  Q    And can you describe that additional work?

2  A    The additional work really took two forms.  Part of it

3  was going back through the material I collected from my book

4  to get a keener sense of how I might recenter that analysis on

5  North County and on the school district, and then there was a

6  range of additional work on circumstances in the district,

7  both plumbing the most currently available data.

8  Q    What kind of data did you look at?

9  A    I used a variety of data sources for the most current

10  socioeconomic data relating to the district and to North

11  County.  I relied on a special tabulation that's done by the

12  Housing and Urban Development, which is specifically designed

13  to capture, at a very local level, measures of neighborhood

14  distress.

15  Q    Is this mixed method approach consistent with your

16  standard research practices?

17  A    Yes.

18  Q    Is this method also consistent with the generally

19  accepted standards and history in public policy and social

20  sciences generally?

21  A    Yes.

22  Q    Dr. Gordon, I'd like to show you what has been marked for

23  identification purposes as Plaintiffs' Demonstrative Exhibit

24  1.

25  A    Okay.

1    Q    It should be up on your screen as well.

2    A    Yes.

3    Q    What is this map?

4    A    This is, roughly speaking, a map of what we've been

5    referring to as greater St. Louis or the metro area.  It

6    doesn't quite include the full 15-county footprint, but it is

7    centered on North County.

8         And so we see the city as the -- St. Louis city,

9    rather, is the sort of crescent-shaped area on the

10   Mississippi, the Illinois counties to the east and the

11   Missouri counties in the Missouri suburbs to the west.

12   Highlighted on this particular map is the particular sort of

13   fragmented municipal organization of St. Louis County,

14   something on the order of just under 100 municipalities.

15   Those are outlined in gray throughout the county.  And on this

16   particular map, the North County municipalities are outlined

17   in blue, and the outline of the school district itself and its

18   central role in North County is outlined in red.

19   Q    And in your report you reference the inner suburbs.  Can

20   you describe what you're referring to on the map?  You can

21   actually touch the screen if you want to.

22   A    Sure.  I don't think I need to.  I mean, the inner

23   suburbs would be those that fall in the first couple of rings

24   of suburban development moving west from the city.  And

25   conventionally when we write about St. Louis, the inner

1    suburbs would include University City, Clayton, and the

2    suburbs extending north from that through North County; so

3    Wellston, Normandy, Ferguson, Florissant, and the like.

4    Q    For your work in this case, did you limit your analysis

5    to the Ferguson-Florissant School District alone?

6    A    No.  And, in fact, I think that would make it impossible

7    to offer a credible analysis of the processes, which are both

8    historically and spatially happen metro-wide.  So if I was

9    writing just a history of the city of St. Louis, I would not

10   take it out of its state or national context.  And if I'm

11   writing a history about a frag -- or if I'm focusing on a

12   fragment of a metropolitan area such as a school district, I

13   would not take it out of its greater metropolitan context

14   either.

15   Q    Why is that?

16   A    Because I think the larger processes matter, and so there

17   are, as I will -- you know, as we'll tease out in the course

18   of my testimony, there are processes of segregation and

19   discrimination that don't originate in the school district but

20   nevertheless fundamentally affect the life chances of people

21   who live there.

22        I think it's particularly important to have this

23   broader focus for a metropolitan area like St. Louis because

24   the municipal fragments, the corporate fragments, including

25   municipalities and the school districts, are very small and in

1    some respects very artificial political divisions.

2    Q    Dr. Gordon, what was the starting point for the analysis

3    that you performed in this case?

4    A    Chronologically?

5    Q    Sure.

6    A    Okay.  The starting point in -- I guess the best way to

7    answer that would be in the logic of the reports, or the

8    starting point is establishing the broader historical patterns

9    of segregation and discrimination in the greater metropolitan

10   area and then, in a sense, focusing closer and closer as to

11   how they might affect North County and the district.

12   Q    And why is it important to start with the historical view

13   of segregation and discrimination?

14   A    Because as I trace in my report and as I develop as one

15   of the sort of fundamental arguments of my book, there are

16   highly sort of formalized forms of segregation sort of

17   invented and pursued early in the 20th century that live on in

18   fundamental ways, either in their consequences or in the ways

19   in which the spirit of them is imported into other forms of

20   policy that last to the present day.

21   Q    So as a historian, why would you look at historical

22   trends in evaluating current conventions of discrimination and

23   segregation?

24   A    Because I think -- I mean, the best way to answer that, I

25   think, is just to give you a sense of how the research for

1  this book developed, because I entered my project on St. Louis

2  really interested more in contemporary, you know, the last

3  generation of local economic development policies.  But at

4  each turn of the research, every archive I visited I sort of

5  got pushed further back into, you know -- because the policies

6  were redressing damage from an earlier era.  So I wanted to

7  understand how that damage occurred.

8          And so I think -- you know, the argument is it's a

9  very sort of, in many respects, seamless historical process

10 that takes us from the first efforts to sharply segregate

11 black and white populations in the city of St. Louis to racial

12 disparities and race relations today.

13 Q    In performing your analysis for this case, did you focus

14 on any particular kinds of policies?

15 A    Yes.  Both in the book and that I rely upon in the

16 original -- in the early pages of the report and in the

17 subsequent analysis, I looked particularly closely at land use

18 policies and urban development and redevelopment policies.

19 Q    Why was this your focus?

20 A    I think if you're interested in explaining patterns of

21 racial disparity and racial discrimination at the local level,

22 that land use and restrictions on land use are in a sense sort

23 of ground zero in that explanation.  They are the principal

24 policy tool that local governments use to organize the local

25 population to determine who lives where.  And they have

1    enormous consequences.  They have consequences in terms of the

2    opportunities of populations to buy houses and accumulate

3    housing equity, and that has sort of sustained consequences in

4    terms of a racialized gap in wealth, which persist to the

5    present day.

6            And, you know, particularly in any American setting,

7    land use policies are particularly potent because where you

8    live determines the quality of your education and the quality

9    of schools you go to.  So for all of these reasons I think

10   looking closely at how metropolitan areas, and particularly

11   the local governments that make them up, organize land is

12   particularly important.

13   Q    Using this focus, what, if any, are the primary

14   historical forces that have shaped the current dimensions of

15   segregation and the effects of discrimination that you

16   evaluated in this case?

17   A    Well, at the very sort of high level, I think the primary

18   forces are various sort of formalized and what I would

19   characterize as private forms of segregation and

20   discrimination that were systematically pursued in the first

21   half of the 20th century and then, in a sense, public policies

22   that succeeded and, I would argue, sustained them and those

23   would include land use planning, zoning, urban renewal, or

24   economic redevelopment, and federal policies with regard to

25   mortgage finance.

1  Q    So let's start with these more formalized restrictions on

2  property development.  At a high level just for now, what are

3  the key chapters or elements in the story of property

4  development in the St. Louis metro area?

5  A    I mean, I think the general pattern, if I was going to

6  sketch it, you know, across that long sort of century-long

7  arc, would be that you begin with, you know, what amount to

8  very stark, formal, legal sort of proposals or mechanisms to

9  say that whites can live here and blacks can live here or, you

10  know, or not.

11         And these -- and, you know, again just at that high

12  level, what happens is that these practices are at times

13  blocked by the courts, but in the argument of the book what I

14  try and show is they just sort of -- they shift in form; so

15  the motives remain the same, that is, to sustain a form of

16  segregation, but they're imported from private policy to

17  public policy from one kind of public policy to another.

18  Q    So let's talk about these formal type of restrictions on

19  land use.  Did any such exist in the St. Louis metro area?

20  A    Oh, yes.

21  Q    Can you explain?

22  A    Sure.  Well, the first such example of this is the city

23  of St. Louis' passage in 1916 of an explicit zoning ordinance

24  that delineated white and black blocks, that is, those blocks

25  in which African Americans and whites were allowed to live.

1    The logic of the ordinance was it inscribed the

2  existing African-American neighborhood, what's commonly called

3  "The Ville," and just a few other blocks in industrial sort of

4  riverfront areas as the only places in which African Americans

5  could live.

6  Q    And did that law ever go into effect?

7  A    The law was passed in the greater St. Louis area, but it

8  was -- I'm not quite sure of the legal term but took a --

9  bundled with a number of other similar attempts -- one in

10  Louisville, one in Baltimore -- and struck down by the U.S.

11  Supreme Court in 1917 in the *Buchanan v. Warley* case on equal

12  protection grounds.

13  Q    And did that signal an end of segregation in housing

14  discrimination in the St. Louis metro area?

15  A    No.

16  Q    What happened next?

17  A    This is in a sense the first chapter of a process which I

18  trace across the last century, and in fact realtors and civic

19  leaders who had campaigned for that ordinance were not

20  terribly put out by *Buchanan v. Warley* and moved quickly to

21  establish the same restrictions by other means.

22    The first such effort by the St. Louis Real Estate

23  Exchange, which was the organization of white relators in the

24  St. Louis area, was to establish what they called a restricted

25  area or an unrestricted area, rather, which delineated the

1    same footprint as the racial zoning ordinance and established

2    instead as a matter of -- instead of as a matter of local

3    zoning, as a matter of professional practice as a realtor the

4    restriction that property could not be sold to an African

5    American outside that zone, and if a realtor engaged in such a

6    transaction, they would lose their license.

7    Q    Were there any other practices that perpetuated this

8    policy of segregation and housing discrimination in the area?

9    A    Yes.  So contemporaneous with that, proceeding most

10   starkly from about 1911 into the middle 1940s, the St. Louis

11   Real Estate Exchange led a campaign to establish

12   race-restrictive deed covenants, neighborhood schemes of

13   restriction, across the city.

14          These were covenants that were attached to property

15   deeds on a neighborhood basis.  So a group of, say, 30 to 80

16   property owners would sign the same restriction, and it bound

17   all of them to not allow their properties to be sold to,

18   rented to, occupied by in any manner an African American.

19   Q    And were these practices employed in areas within the

20   boundaries of the district today?

21   A    Yes.  And so the general pattern of race-restricted deed

22   covenants in greater St. Louis was that in the older areas of

23   North St. Louis, where property development, that is, the

24   building of houses, had preceded African-American occupancy,

25   these restrictive covenants were cobbled together by the Real

1    Estate Exchange by going door to door and having neighbors

2    sign, essentially saying, you know, the African-American

3    community is expanding; if you don't sign, they will be living

4    next door to you.

5         And so these were cobbled together in a ragged

6    horseshoe around the existing African-American neighborhood in

7    North St. Louis.  In areas of newer development, including in

8    South St. Louis and across much of St. Louis County as

9    suburban development proceeded, these race-restricted deed

10   covenants were original to the deeds of subdivisions.

11   Q    And did these practices ever come to an end?

12   A    Yes.  In 1948, in a case that again began in St. Louis,

13   *Shelley v. Kraemer*, the Supreme Court struck down not the

14   practice of deed covenants themselves, but state enforcement

15   of them and so that they -- it was no longer possible for the

16   Real Estate Exchange, who was a party to most of these

17   agreements, to take someone to court if they sold a property

18   to an African American.

19   Q    And did this signal an end of segregation and housing

20   discrimination in the St. Louis metro area?

21   A    No.

22   Q    And why not?

23   A    I think for three reasons.  First of all, just as in

24   1916, realtors and developers who had pressed these agreements

25   were, you know, somewhat surprisingly not particularly put out

by the court decision which they expected and quite publicly

mobilized to accomplish the same thing by other means.  And so

in the terms -- in terms of the practice of private realty,

realtors reinforced the notion of maintaining segregation as a

matter of professional practice.  And so they reinforced the

clause in the realtors code of ethics, which required that a

realtor not introduce inharmonious groups into an existing

neighborhood, to maintain those lines of segregation.

Q     Were there any other local or federal policies that

continued segregation and housing discrimination in the area?

A     Yes.  So that was the realtors' response.  The second

important response, which actually came before the *Kraemer*

decision was decided, was that when the federal government

reinvented the system of home mortgage financing -- the

context of the Great Depression sort of invented the

contemporary high-ratio mortgage in which mortgage payments

resembled rent -- this dramatically expanded homeownership

after the 1930s.

        When the federal government established the rules of

that system by which they subsidized the home loans made by

local banks, they went into cities like St. Louis, and they

meticulously risk rated neighborhoods as to whether they were

suitable for what was first called the Homeowners Loan

Corporation and later just the Federal Housing Administration

for mortgage rates.  And their primary criteria in the greater

St. Louis area in rating those neighborhoods was, first of
all, African-American occupancy, which earned a low rating.
It was the first check box on the form.  But, secondly, what
was contained in the sort of narrative reports on
neighborhoods in the national archives is they consistently
and meticulously referred to the existence of race-restrictive
deed covenants.  And so if a neighborhood was covered by a
restrictive deed covenant, the FHA considered it a good risk.
If it was not or if the covenant was about to expire --
because a Missouri law, they could last 23 years -- then the
FHA recommended the loans not be made.

Q    Were there any other policies during this era that
perpetuated segregation and housing discrimination in the
area?

A    Yes.  So in a similar manner, local government used
zoning, and quite explicitly, to accomplish the same means.
So what we see in particularly in St. Louis County is that
much of the suburban development, that is, the actual building
of houses, in the '30s, '40s, and '40s particularly, took
place on unincorporated land.  And so it was on county land
and it did not have a corporate government.

In the wake of *Shelley v. Kraemer*, there was a flurry
of incorporation, one of the primary motives of which was once
you incorporated as a municipality, you then earned the right
to zone land use.  And in the correspondence of civic leaders

1  working with planning firms to develop these incorporations in

2  these early zone plans, the motives are quite explicit.  And

3  there are a number of instances in which civic leaders will

4  say to the planners that they have hired "*Shelley v. Kraemer*

5  has struck down our race-restricted deed covenants.  How do we

6  accomplish the same segregation?  How do we keep the African

7  Americans out?"

8         And the planners' response was, you know, what

9  infamously became not only in St. Louis a pattern of

10  exclusionary zoning, that is, prohibiting the building of

11  multi-family housing, mandating large-lot, single-family loans

12  on much of the suburban footprints, and beginning to use

13  income segregation as a proxy for racial segregation.

14  Q    Did any of these policies and practices -- exclusionary

15  zoning and private discrimination in real estate practices --

16  ever come to an end?

17  A    Not in as decisive a way as the deed covenants or their

18  racial zoning.  So the *Jones v. Mayer* decision, which is also

19  a decision rooted in St. Louis, comes out of an unincorporated

20  area of North County, a subdivision called Paddock Woods, in

21  1968 applied the Civil Rights Act to private real estate

22  transactions.  And so this had the effect of loosening at

23  least the explicit ability of realtors to deny access, deny

24  home showings, that sort of thing, deny sales to African

25  Americans.  Although, you know, in the St. Louis area, as in

1    many other settings, fair housing advocates routinely, even to

2    the present day, trace patterns of steering by realtors of

3    showing African-American families one set of homes in one

4    neighborhood and white families another in another.

5           The practice of redlining under federal mortgage

6    guarantees under the FHA lasted into the early civil rights

7    era.  There are records in the archives of St. Louis area

8    lending institutions using those redlines as late as the mid

9    to late 1960s.

10   Q    Can you explain what you mean by redlining?

11   A    I mean, the name "redlining" really comes from those

12   original security maps that I've described earlier where, when

13   the FHA deemed a neighborhood unworthy of mortgage insurance,

14   they colored it red.

15   Q    What has happened with respect to segregation and housing

16   discrimination in the St. Louis metro area since the 1960s?

17   A    Well, I mean, I think what's remarkable and, you know,

18   and one can see it sort of inscribed on their landscape, I

19   mean, locals in greater St. Louis still refer to the Delmar

20   divide as a hard line between north and south St. Louis.  In

21   some respects that divide now extends out into St. Louis

22   County, and one can see in patterns of racial occupancy the

23   persistence of that core pattern of segregation.

24           And because the older patterns of segregation, the

25   sort of more formalized ones such as the deed covenants became

1  written into land use zoning, which is still very much the way

2  in which we organize property and housing opportunity in a

3  metro area, those sort of patterns persist to the present day.

4  Q    Now, you mentioned one more policy, urban renewal, that

5  is relevant to your analysis.  Can you explain how urban

6  renewal policies shape the current dimensions of segregation

7  and effects of discrimination?

8  A    Sure.  This is, you know, in some respects, perhaps

9  ironic, perhaps sort of particularly tragic part of this

10 story, because urban renewal, as practiced in St. Louis and

11 elsewhere, was meant to address some of the damage that I've

12 described, some of the sort of first-generation damage of

13 segregation and the collapse of central cities, in the local

14 case, much of north St. Louis.

15        But what happened is that local redevelopment

16 interest, redevelopment corporations and local governments,

17 used the federal resources and federal money and the power of

18 eminent domain, which was in a sense sort of lent to them

19 under these statutes, to actually sharpen and deepen

20 segregation both in St. Louis and in St. Louis County.

21 Q    And how so?

22 A    Well, I can give you a couple of examples.  The early

23 efforts at urban renewal -- so beginning in the 1940s and

24 continuing into the 1950s in greater St. Louis -- were almost

25 always known as slum clearance.  And, you know, the local

1  NAACP referred to them more sarcastically as negro removal

2  because inevitably they targeted neighborhoods of mixed use

3  and largely African-American occupancy for removal or

4  destruction so the land could be used for a higher use.

5  So examples in St. Louis, the two most notable

6  examples from the early history, would be the building of the

7  first Busch Stadium and the clearance of the Mill Creek Valley

8  for largely commercial redevelopment.

9  Q    So what happened to the individuals who were living in

10  these areas targeted for slum clearance?

11  A    The federal laws, particularly as they were administered

12  locally, had very weak protections for displaced families.

13  And so while redevelopment corporations were required by

14  federal law to offer relocation assistance, in fact Housing

15  and Urban Development did audits of the St. Louis -- St.

16  Louis-based projects in the '50s and '60s and found that such

17  relocation assistance was rarely offered.

18  The most substantial form of assistance, such as it

19  was, was the warehousing of displaced populations in big box

20  public housing, and so the building of the Pruitt-Igoe towers

21  and other central city public housing projects were designed

22  explicitly to absorb at least some of those displaced by these

23  projects.

24  But, in fact, you know, my best estimates are that if

25  you combine urban renewal and urban highway development, so

1   those displaced by government action between 1950 and 1970,

2   which is the heyday of urban renewal, it's about 75,000 people

3   in greater St. Louis.  And the vast majority of those are

4   African American, about 84 percent, and the vast majority did

5   not receive any relocation assistance.  So you have this

6   pattern by which displaced families are, in a sense, moving

7   ahead of the bulldozer, looking for affordable housing

8   elsewhere in the region.

9         What happened early in this history was that African

10   Americans moving from sort of a downtown footprint moved west

11   and north into residential neighborhoods, which then became

12   targeted for renewal or code enforcement or other attention.

13         The second part of this story, which is, I think,

14   equally poignant, is the way in which urban renewal was --

15   took place in St. Louis County.  St. Louis County was

16   initially reluctant to engage in urban renewal because under

17   federal law to do so you had to create a local public housing

18   authority.  And so there are a number of instances in St.

19   Louis County where either the county or municipalities

20   identified a pocket of African-American occupancy that they

21   wanted to remove, but the plans sort of frittered away when

22   they found out they had to create a public housing authority.

23         What St. Louis redevelopment officials in the '50s

24   and '60s wanted to do -- and they said this quite

25   explicitly -- was relocate pockets of African-Americans

1   occupancy in the county, most of which dated to the 19th

2   century, and so this is areas like Meacham Park, Elmwood Park,

3   and Kinloch, which is in the footprint of the district, back

4   into the city.  And so the idea was to give them housing

5   vouchers to move to Pruitt-Igoe so the land could be cleared

6   for a different kind of development.

7           MS. LAKIN:  Your Honor, I have about 30 to 40 minutes

8   left.  Do you want --

9           THE COURT:  We can go on for a while, unless you

10  heard the lunch bell ring.

11          MS. LAKIN:  No.  Just wanted to make sure that --

12          THE COURT:  Let's see how we're doing.

13  Q    (BY MS. LAKIN) I'd like to turn now to the

14  Ferguson-Florissant School District more specifically.  Can

15  you walk us through what the effect of these policies and

16  historical forces were for North County and the district in

17  particular?

18  A    Yeah.  I mean, I think these historical forces converge

19  on North County, including the footprint of the

20  Ferguson-Florissant School District, in particularly powerful

21  ways.  And in a sense what you have is a number of these

22  circumstances sort of come together in ways that really

23  fundamentally affect particularly the smaller footprint

24  municipalities in North County.

25          The first of those that I would identify is the

1    sustained gap in racial wealth that we see quite clearly. The

2    racial wealth gap in the United States is quite clearly a

3    consequence of housing discrimination because housing equity

4    is, for most families, their principal form of wealth.

5          And so if you consider the ways in which

6    opportunities to both invest in property under federal

7    mortgage insurance but also opportunities to invest in given

8    areas, given land-use zoning decisions and more formal forms

9    of segregation, in effect I think the best way to characterize

10    it is that white families in the St. Louis area were able to

11    get on a sort of escalator-of-wealth creation in the 1930s and

12    1940s that African Americans were largely barred from for at

13    least a generation.

14    Q    What impact did that have on the landscape of segregation

15    in the county?

16    A    Well, what's remarkable about this, I think, is that, you

17    know, running counter to the sort of, you know, the general

18    arc of the whole civil rights revolution, the wealth gap

19    actually widens over time, and so that while, you know,

20    African-American wages now approach about 75 percent of white

21    wages at the median and African-American incomes approach

22    about two thirds of white incomes at the median,

23    African-American wealth is less than 10 percent of white

24    wealth at that median. And it's actually gotten worse in the

25    last few years as a result of the last housing bubble and

1   bust.

2          And if you think of that in terms of generation of

3   wealth across generations, in families, in neighborhoods, that

4   has dramatic impact on the sorts of residential opportunities

5   that people have.

6   Q    Can you explain what you mean in more detail?

7   A    Yeah.  I mean, it's -- it affects the ability of people

8   to get into the housing market.  It affects the age of which

9   they are able to get into the housing markets.  It affects the

10  kind of housing that they are able to buy, the sort of

11  residential opportunities they have.  And if you consider

12  then -- so then they'll move to a sort of second factor which,

13  I think, helps explain how the racial wealth gap is

14  consequential.

15         If we go back, then, to my characterization of the

16  way in which property development occurs across St. Louis

17  County as a way of sustaining those background patterns of

18  segregation, so you have municipality fragments, each of which

19  play, you know, a small role in that larger project of

20  segregation.  And so some footprints have what we would

21  characterize as a very sort of exclusive suburban form; so

22  cul-de-sacs, estate-like development three-acre lots, that

23  sort of thing, as is typical, for example, in a municipality

24  like Ladue in central county.

25         In the older fragments of the county, particularly

1  those developed a little bit earlier, the inner suburbs of

2  North County particularly, land use is less exclusive.  There

3  is some allowance for multi-family housing.  And the

4  single-family zones are much smaller and more modest.  So in

5  Ferguson-Florissant you have a lot of 5,000-square-foot lots

6  and 10,000-square-foot lots.

7          So what that means is that, you know -- and then let

8  me add one third piece to that puzzle in which -- and give a

9  sense of how it works together.  Then you have

10  African-American families which are essentially being cut

11  loose by a number of forces.  One is displacement by urban

12  renewal, but another is just the utter failure of north St.

13  Louis, particularly in the 1960s and 1970s.

14          So as those families look for precisely the same kind

15  of opportunities that white families are looking for -- safe

16  neighborhoods, good schools -- their opportunities, because of

17  their inter-generational ability to build housing equity

18  because of this sort of long pattern of segregation, are

19  sharply constrained.

20  Q    Before you get into a third factor, let me put a map up

21  on the screen, Dr. Gordon.  Can we turn to page 23 of your

22  initial report, which is Plaintiffs' Exhibit 40, and look at

23  Map 7.

24  A    Yeah.

25  Q    What is this map?

1    A    This again, the red outline, is map of the

2    Ferguson-Florissant School District.  What this map captures,

3    I think, very well is the sort of stark municipal

4    fragmentation that lies underneath the organization of the

5    district.  So the district contains, you know, by my count, 11

6    municipalities, but only two in their entirety.  Most of it is

7    sort of fragmentary in its organization.

8    Q    Now, if my counting is right, I think there are only ten

9    municipalities labeled on this map?

10   A    You may be right.  There's -- I'm not sure.  Between Cool

11   Valley and Jennings there's one unlabeled.

12   Q    Might that be Normandy?

13   A    Might be.  Yeah.

14   Q    And can you explain how the fragmentation and these

15   patterns of segregation you describe are reflected in the

16   creation and organization of the school district?

17   A    Sure.  Well, in part what you see on a map like this is

18   the pattern of development, incorporation, and annexation that

19   I described earlier; that these footprints, many of them, are

20   in fact really just subdivisions that incorporate as

21   municipalities in order to win the right to zone.

22         A good example of that is the community of Berkeley,

23   which has this sort of ragged, half-doughnut shape coming

24   around Kinloch.  Berkeley sought incorporation in the late

25   1930s -- 1938, I believe -- for the express purpose of

1  creating a school district that would quarantine the Kinloch

2  children.  And so at its incorporation Berkeley managed to

3  establish its own school district, which was over 90 percent

4  white, and leave aside the Kinloch district, which was well

5  over 98 percent African American.  I think Kinloch at that

6  time was an unincorporated pocket of the county.  It's

7  incorporated at a few points in time but never on a very

8  stable basis.

9  Q    Did Kinloch establish its own school district?

10  A    Yes.

11  Q    And did those school districts remain separate entities?

12  A    Yes, until 1975.  So as the witness this morning

13  emphasized, 21 years after *Brown*, by court order, the Justice

14  Department sort of recognizes the motives that lie behind the

15  separation of the districts and ordered the merger of the

16  district.  So this is a sort of microcosm of what happened

17  across St. Louis County where the school districts have begun

18  to have over this period sort of combined either by court

19  order or not, but the municipality fragmentation that lies

20  underneath has remained the same.

21  Q    So just to go back for a second, in the late 1930s what

22  was the population demographics of the Berkeley School

23  District?

24  A    It was over 90 percent white.

25  Q    And the Kinloch district at that time?

1    A    Almost entirely African American.

2    Q    And what effect, if any, did consolidation have on the

3    pattern of segregation in the district?

4    A    Well, it's sort of an interesting example, because the --

5    what you see in the underlying organization of the

6    municipalities is the sort of the -- the powerful way in which

7    local incorporation and local zoning is used to sustain

8    segregation -- not only just in, you know, the way in which

9    houses are built and municipal lines are drawn, but it's

10   important to recognize that, you know, when Berkeley is

11   incorporated and when development proceeds around Kinloch,

12   that, as a general practice, the communities surrounding

13   Kinloch don't run their streets through.  They dead-end them

14   at Kinloch.  The infrastructure doesn't run into Kinloch.  And

15   this is a pattern of development that occurred elsewhere in

16   North County, at Elmwood Park, and Meacham Park, as well as

17   examples.

18        What happens when you have that very sort of stark

19   original pattern of segregation, in this sense intended and

20   designed to create starkly segregated and separate districts,

21   once they're consolidated what you really do is you trade

22   segregation between districts for segregation within a

23   district, which I think is the accurate way to characterize

24   the district today.

25   Q    Let's look at another image from your report.  Can we

1  turn to page 38 of Plaintiffs' Exhibit 40?

2  A     Okay.

3  Q     What is this map?

4  A     So this is a map of -- the larger map is the greater St.

5  Louis area.  The inset zooms in on North County and the

6  district in particular.  On both maps the district is outlined

7  in blue.  The shading system for the map, which shows percent

8  black by block group, proceeds from the darkest color, which

9  is over 90 percent African American, to the lightest color,

10 which is under 10 percent.

11          And what this map is meant to capture in the metro

12 area within the district is the pattern of sort of north -- is

13 the stark segregation of the African-American population even

14 today.

15 Q     And is that pattern reflected in the St. Louis metro area

16 as a whole?

17 A     Yes.

18 Q     And how does the St. Louis metro area compare to other

19 metro areas in the country in terms of segregation?

20 A     The St. Louis -- there are a number of indices of

21 segregation that you can use.  By the most conventional one,

22 which is called the dissimilarity index, I think St. Louis is

23 currently the sixth most segregated city or metropolitan area

24 in the country.

25 Q     And if you can just state -- for the inset what does the

1  pattern of shading suggest about the landscape of segregation

2  in the district?

3  A    The argument that I've developed in my report is that the

4  general sort of north-south pattern of segregation is, in a

5  sense, replicated and reinvented within the district largely

6  as a result of disparate patterns of land development.  And so

7  you have in Ferguson and in the southern tier of the district

8  smaller lots, single -- I mean, multi-family developments,

9  whereas it bleeds much more into exclusively single-family

10  development in the north.  And so you see that same

11  north-south pattern replicated within the district.

12  Q    Is it your opinion that historical patterns of

13  segregation still exist within the district today?

14  A    Yes.

15  Q    I'd like to turn now to the economic and social

16  consequences of this pattern that you've been describing of

17  discrimination and segregation.

18        THE COURT:  This is a new topic.  How long is this

19  topic?  I'm trying to figure out if it's a good place to take

20  a break.

21        MS. LAKIN:  Maybe 15 minutes.

22        THE COURT:  Okay.  Let's go ahead and take our lunch

23  break at this time.  We will reconvene at 1:30.  Thank you

24  very much.

25     **(COURT RECESSED FOR LUNCH FROM 12:30 PM UNTIL 1:36 PM.)**

1    THE COURT:  I'll remind you, sir, you're still under

2  oath.

3    Are you ready?  At defense table, are you ready?

4    MS. ORMSBY:  Oh, I'm sorry.  Yes, Your Honor.

5    THE COURT:  You may proceed.

6  Q   (BY MS. LAKIN) Dr. Gordon, before the break we were about

7  to talk about economic and social consequences of the pattern

8  that you've been describing of discrimination and segregation.

9  Are there any such effects in the district today?

10  A    Yes.  As I hope I summarized accurately a couple of

11  points in my testimony before the break, what I characterize

12  as sort of long shadow of segregation, discrimination does

13  sort of fundamentally affect socioeconomic disparities today

14  on a wide variety of measures.

15  Q    Dr. Gordon, I'd like to show you another image from your

16  report.  Can we turn to page 3 of Plaintiffs' Exhibit 40 and

17  bring Table 1 up on the screen.  Dr. Gordon, what is this

18  table?

19  A    This is a summary table of selected socioeconomic metrics

20  for -- in order of columns, moving across, for the metro

21  region as a whole, for the Ferguson-Florissant School

22  District, and for the majority African-American blocks in the

23  school district.

24  Q    And where is this data from?

25  A    The data is from a blended data set maintained by HUD for

1    the specific purpose of measuring indicators of neighborhood

2    distress.  So it combines elements of the 2010 census, the

3    ACS, as well as independent data sets such as local employment

4    dynamics.

5    Q    And can you walk us through what the different columns

6    and rows in this table show?

7    A    Sure.  So the first column runs the metrics for the metro

8    area as a whole; so those are all the block groups that make

9    up metropolitan St. Louis, the full 15-county area.  The

10   second column labeled "FFSD" is for all those blocks which

11   fall within the boundaries of the school district with the

12   same metrics.  Then the third column looks at the majority

13   African-American blocks.

14          And the basic sort of, you know, summary of logic of

15   this is that we see certain disparities of the metro level

16   that are wider at the district level because, as I

17   characterized, North County and the district has a less

18   affluent, more struggling area of the metro area, and they're

19   starker still in the majority African-American blocks within

20   the district.

21   Q    If we can go back to the previous image on page 38 of

22   your report, where do these majority-black block groups fall

23   within the district?

24   A    Largely in the southern tier of the district.

25   Q    Do you have any reason to believe that the pattern

1  revealed by these metrics has changed since the 2010 HUD data

2  that you just discussed?

3  A    No.

4  Q    And has HUD released a more recent set of data for

5  this --

6  A    No.

7  Q    -- neighborhood distress?  I'd like to show you an image

8  from -- another image from your report.  Can we turn to page

9  30 of Plaintiffs' Exhibit 40 and bring Map 12 up on the

10  screen.  Dr. Gordon, what is depicted in this map?

11  A    This map uses the same data set.  It's mislabeled here as

12  2012.  In fact, the data is from the same HUD data set, and it

13  depicts poverty by block group.  Following the logic of some

14  of my earlier maps, first for the entire metro area in the

15  larger map.  So moving, you know, from red, where poverty

16  rates are over 40 percent, to the green, where poverty rates

17  are under 5 percent, and then the inset shows the same rates

18  for the district.

19  Q    What does the pattern of the different colors demonstrate

20  in the inset?

21  A    The pattern echos the same sort of spatial pattern and

22  dynamic that I suggested earlier.  As you can see very

23  starkly, north-south in the city of high poverty rates in the

24  northern tier of the city following the pattern of

25  African-American occupancy, and that extends out into the

1  county, and on the footprint of the district is again

2  replicated on that north-south logic.  So the southern tier of

3  the district, which is predominantly African American, much

4  more intensively multi-family housing, has much higher poverty

5  rates.

6  Q    Can we zoom in on the inset.  What do the outlined areas

7  represent?

8  A    The outlines are census block groups, which is a

9  intermediate unit of census geography.  It's the smallest unit

10 at which we can measure these sorts of dynamics.  Like all

11 units of census geography, they're scaled by population.  So

12 rather than being even spatial dimensions, they try and

13 capture equal numbers of population.  This is why, for

14 example, at the western end of the southern tier you see some

15 larger census blocks because some of this is actually the St.

16 Louis airport, which is lightly populated.

17 Q    Now, can we turn to the next page, page 31, of

18 Plaintiffs' Exhibit 40, and bring Map 13 up on the screen.

19 What is depicted in this map, Dr. Gordon?

20 A    Again, same data, 2010 HUD extract from ACS and other

21 sources.  And this maps unemployment by block group across the

22 metro area and then more particularly across the district,

23 again highlighting the sort of sharp north-south divisions.

24 So you can clearly see the Delmar divide in the city

25 replicated in a sense by a stark north-south divide on the

1  footprint of the district as well.

2  Q    Can you just go through the legend down in the left-hand

3  corner?

4  A    Sure.  So this again is 2010 data; so it's coming at the

5  tail end of the great recession.  So the red areas are over 25

6  percent unemployment.  The orange is 20 to 25 percent.  The

7  yellow is 15 to 20 percent.  Then the green shades are all

8  under 10 percent unemployment.

9  Q    Are there other examples of economic consequences of

10 regional and local race and income segregation that we haven't

11 gone over here?

12 A    Yes.  In fact, the HUD data set, which is particularly

13 directed at these sorts of measures, includes a wide variety

14 of socioeconomic characters, some of which are included in the

15 appended maps to my report.  These include rates of public

16 assistance.

17      HUD also develops a couple of indexes of neighborhood

18 stress or neighborhood strength, one of which is engagement

19 with the labor market, which combines educational attainment

20 and unemployment rates.  Another is unlike -- instead of just

21 using a poverty rate, they use a poverty index, which combines

22 rates of poverty with rates of public assistance.  But the

23 spatial patterns are virtually identical on all of these.

24 Q    Does that include the spatial pattern within the district

25 itself?

1  A    Yes.

2  Q    Based upon the socioeconomic data and patterns that

3  you've just described, did you reach any conclusions about the

4  effects of the sustained racial segregation and discrimination

5  in the district?

6  A    Yes.  I think the historical circumstances that I've

7  described -- the pattern and the way in which they're

8  reflected in patterns of development, patterns of wealth,

9  patterns of life opportunity -- fall very heavily on

10  African-American individuals and families in North County and

11  in the district.

12  Q    Dr. Gordon, is it possible that on some socioeconomic

13  measures the gap between African-American residents and white

14  residents in the district is smaller than it is in the metro

15  area, the state, or the country?

16  A    Well, it's not just possible; one would expect that to be

17  so, because when you are measuring disparity in this way, the

18  geographic unit you pick matters a lot.  So, you know, if, for

19  example, we imagined this courtroom as a couple of

20  municipalities or three or four municipalities in St. Louis

21  County, and this was an affluent community, the jury box, and,

22  you know, the back of the room was a more modestly developed

23  area, if we threw in that over the entire courtroom and said,

24  "What's the disparity?" we would be capturing the wealthy area

25  and the poor area, and it would have a wide gap.  But if we

1    were just to throw that net over a small unit like the school

2    district, we would expect a much smaller disparity because, as

3    I emphasized in my earlier testimony, the municipal units of

4    St. Louis County in fact reflect efforts to sort people by

5    income and by race.

6    Q    But based on the data presented in your Table 1 and other

7    maps we've reviewed, is there a gap on socioeconomic measures

8    between African-American and white residents of the district?

9    A    Yes.  So, I mean, in my view, the surprising fact is not

10   that the gap is narrower, but given the development patterns,

11   the surprising fact is the gap doesn't virtually disappear.

12   Q    What does that gap reflect, in your opinion?

13   A    The gap reflects sustained patterns of discrimination and

14   sharply disparate life chances and life opportunities.

15   Q    Do you have an opinion on whether these effects of

16   discrimination that you've identified bear on the ability of

17   African Americans in the district to participate in the

18   political process?

19   A    I do.

20   Q    What is that opinion?

21   A    Based on my own research on material that I've read both

22   for teaching and for research, I think the scholarly consensus

23   is very clear that when a population is disadvantaged

24   economically, when they're disadvantaged in terms of job

25   opportunities, educational opportunities, or residential

1  opportunities, that these affect civic participation.

2  Q    I'd like to turn to some of your other findings and

3  conclusions.  Would you please turn to Tab A in your binder,

4  which has been marked for identification as Defendants'

5  Exhibit A?

6  A    Okay.

7  Q    What is this document?

8  A    This is a report of the defendants' expert, Jonathan

9  Rodden.

10  Q    And what is the date of this report?

11  A    May 27, 2015.

12  Q    Have you read this report?

13  A    I have.

14  Q    Were you asked to do anything with respect to this

15  report?

16  A    Yes.  I was asked to read and give my professional

17  response to particularly pages 3 through 10, the portion of

18  the report entitled "The Size and Geography of the

19  African-American Population in the District."

20  Q    Were there any particular conclusions that you responded

21  to?

22  A    Yes.  My response to this report was organized around two

23  particular conclusions, one of which was the contention that

24  African Americans might constitute a majority of voting-age

25  population, which I dispute in my response, and the other was

1  the characterization in the report of the district as being a

2  happily integrated district.

3  Q   Dr. Gordon, can you explain what voting-age population

4  means?

5  A   Age 18 or older.

6  Q   In preparing your response, did you form any opinions

7  with respect to whether African Americans are presently a

8  majority of the voting-age population in the district?

9  A   I did.

10 Q   What is that opinion?

11 A   My opinion is that we have no basis for saying that.

12 Q   What did you base your opinion on?

13 A   I based my opinion on the established social science

14 conventions for using the 2010 census, ACS, and other census

15 products.

16 Q   The parties have stipulated in paragraph 13 of their

17 joint stipulations that, according to the 2010 decennial

18 census, that 48.19 percent of the voting-age population in the

19 district is any-part black and 48.95 percent of the voting-age

20 population is non-Hispanic white.  Does that sound right to

21 you?

22 A   Yes.

23 Q   You testified a moment ago that you reviewed Dr. Rodden's

24 initial report.  Is there anything in that report that leads

25 you to reconsider your opinion that African Americans are less

1     than a majority of the voting-age population?

2     A     No.

3     Q     Why is that?

4     A     As I argue in my response to the report, there are, I

5     think, three fundamental problems with that conclusion, the

6     first of which is, I think in this respect, that the ACS is

7     misused.

8     Q     Let me stop you for a second there.  Can you explain what

9     the ACS is?

10     A     The American Community Survey.  The American Community

11     Survey is -- has been designed to replace the long form of the

12     census.  It's a survey taken every year but on a much smaller

13     sample of the population than the decennial product.

14     Q     And do you know what percent of the population?

15     A     About 2 percent, I think.

16     Q     And I'm sorry I interrupted you.  You were explaining the

17     first of the reasons.

18     A     Well, the first two reasons is fairly straightforward,

19     and that is the census bureau was clear in its own

20     documentation of these data sources that the ACS can be used

21     for identifying socioeconomic characteristics and percentages,

22     but it should not be used for hard counts of population for

23     the purposes such as reapportionment or redistricting.

24          And the reason for that is fairly straightforward:

25     Because the ACS is only a 2 percent sample of the population,

1   there are serious concerns about sample size.  And that's

2   particularly acute when you zoom in on an area as small as the

3   school district.  So what the ACS does is a couple things to

4   try and manage the sample size problem, the unreliability of

5   the numbers.

6        First of all, on small geographies, particularly

7   something as small as a school district, the ACS requires that

8   we average over a number of years.  And recently they've moved

9   their standard for this level of geography from three years to

10  five.  So we're actually averaging five years of data in order

11  to get a sample size that is sufficient to even draw

12  conclusions about socioeconomic characteristics.

13       The Bureau of Census again in its documentation is

14  very clear that because this is a five-year-average sample,

15  that it cannot be used as a proxy for a point-in-time sample;

16  that it not represent the midpoint of those five years, does

17  not represent the end of those five years, and it would be

18  comparable apples to oranges to say that this five-year sample

19  census says this and the 2010 census says this, because

20  they're different sample sizes, and in some respects different

21  questions are asked.

22  Q    You mentioned that there were two other reasons that

23  underlie your conclusion that African Americans are not a

24  majority of the voting-age population.

25  A    Yeah.  And one sees that particularly -- or we can

1  illustrate the problem of sample size and draw conclusions,

2  and the reason why the ACS itself does not recommend that its

3  estimates be used for such purposes as hard counts of the

4  population, and that is even at the five-year average when you

5  look at a small geography, and particularly when you start to

6  break down the geography demographically, so say you're just

7  looking at black voting-age population, the margin of error of

8  that number is very high.

9          So just to use rough numbers from the most recent

10  five-year estimate -- and these are not exact, but they're

11  sufficient for illustrative purposes -- according to the

12  five-year ACS, we have about 25,000 in the white voting-age

13  population and about 26,000 in the black voting-age

14  population.  But both those numbers report margins of error of

15  over a thousand.  So that means that either number could be as

16  much as a thousand less, as much as a thousand more.

17          The way to manage this is if you can imagine the

18  25,000 and the 26,000 as bars on a graph, you then put a point

19  a thousand below the line and a point a thousand above, and

20  that's your confidence interval; so you have some confidence

21  that the number lies between those points.

22          Well, if you're comparing two numbers and the

23  confidence intervals overlap, then there's no statistical

24  significance between those two numbers.  There's no basis for

25  claiming that one number is bigger than the other, because the

1   supposed difference between the numbers is completely

2   swallowed by the margin of error as reported by ACS.

3   Q    And these are just rough estimates that you've calculated

4   for illustrative purposes; is that right?

5   A    Yes.  Yeah.  And the margin -- that margin of error grows

6   larger the smaller the demographic unit you're talking about.

7   So -- and this is particularly true when we make any effort to

8   tease out how many African-American identified voters are in

9   the nonsingle-race category.  There the number reported is in

10  the hundreds, but the margin of error is also in the hundreds.

11  So we really have no confidence as to what that number really

12  is.

13  Q    Can you give us an example of the perils of relying on

14  the ACS to predict population change?

15  A    Yeah.  One example that comes to mind is the fact that

16  the city of St. Louis itself leaned heavily on the pre-2010

17  ACS, that is, preceding the last decennial census, to

18  celebrate the fact that the city, after 60 years of decline,

19  had begun to gain in population only to discover that when the

20  hard population count was released in 2010 as a result of the

21  100 percent count in the decennial census, that the city had

22  lost another 30,000 inhabitants.

23  Q    Are there reasons why the eligible voting-age population

24  for African Americans might be lower than the voting-age

25  population for African Americans in the district?

1  A    Yes.  The other issue I raised with respect to any

2  calculation of voting-age population is that, you know, for

3  the purposes of assessing civic participation and democratic

4  opportunity, I think it's important to consider not just the

5  voting-age population but the voting-eligible population.

6        And so it's fairly simple in that respect to apply

7  felony disenfranchisement rates to the voting-age population

8  and discount them in order to get an estimate not of those who

9  are 18 or older but those who are 18 or older and are allowed

10 to vote.

11 Q    Can you explain why felon disenfranchisement affects the

12 voting-eligible population?

13 A    Yeah.  Every state has their own rules on felony

14 disenfranchisement, on what proportion of those or what

15 characteristics of those who are under supervision of the

16 judicial system in some respect are disenfranchised and what

17 the terms for perhaps getting the vote back are.

18       This is an object of a fairly extensive scholarly

19 literature.  The most recent estimate by scholars from the

20 University of Minnesota and New York University looks at this

21 on a state-by-state basis and allows us to work with an

22 effective disenfranchisement rate for the general population

23 and for the African-American population in the state of

24 Missouri.

25 Q    So for purposes of your response report, did you rely on

1  statewide data?

2  A    Yes.

3  Q    Why didn't you use district-specific data?

4  A    There is no district-specific data.

5  Q    Why do you believe that it's appropriate to apply the

6  statewide felon disenfranchisement rates to the district?

7  A    I mean, the estimate of disenfranchisement that I include

8  in my report is, I think, conservative in two respects.  The

9  extant scholarly research identifies an African-American rate

10  and a rate for the general population.  So I arrived -- I

11  applied the rate for the general population to the white

12  voting-age population, which overestimates their level of

13  disenfranchisement by a small degree, and then I have every

14  reason to assume, given what we know about patterns of

15  policing in North County in the wake of the Department of

16  Justice report after Ferguson, that an application of the

17  African-American rate to voting-eligible African Americans in

18  Ferguson-Florissant would be a conservative estimate of the

19  rate of disenfranchisement.

20  Q    How do rates in urban areas compare to race of felon

21  disenfranchisement in other areas?

22  A    They are generally higher.

23  Q    Would you consider the district an urban area?

24  A    Yes.

25  Q    Would you please turn to Tab 43 in your binder, which has

1    been marked for identification as Plaintiffs' Exhibit 43.

2    What is this?

3    A    This is the academic research upon which I relied for a

4    estimate of the rate of disenfranchisement.

5    Q    What year is this data from?

6    A    2010.

7    Q    Based on this data, about how many individuals are

8    disenfranchised under Missouri felon disenfranchisement laws?

9    A    About 106,000.

10   Q    What is the rate of felon disenfranchisement for the

11   population as a whole versus for the African-American

12   population?

13   A    I think it's 2.32 percent for the population as a whole

14   and 6.2 or 6-something percent -- I don't have it right in

15   front of me -- for the African-American population.

16   Q    Does 6.88 percent sound familiar?

17   A    That sounds about right.

18         THE COURT:  Taking a note from Mr. Rothert's book.

19   When in doubt, supply the answer.

20   Q    I'd like to show you an image from your supplemental

21   report.  Can we turn to page 2 of Plaintiffs' Exhibit 41,

22   which is your supplemental report, and bring Table 3 on the

23   screen.

24   A    Okay.

25   Q    Dr. Gordon, what does this table show?

1  A    This table is the result of the calculations adjusting

2  the voting-age population for the felony disenfranchisement

3  rates.

4  Q    Can you explain how it affects what you call in this row

5  "share"?

6  A    Yes.  For each category -- for single-race white,

7  single-race black, and other -- I've calculated, first of all,

8  a share of the 18-and-older population, that is, the

9  voting-age population, and then, applying the

10  disenfranchisement rates, a share for the eligible voting

11  population.  So the white and the other are discounted by the

12  rate for the general population.  The black are discounted by

13  the rate for African-American disenfranchisement.

14  Q    Now, are you saying that these numbers reflect the actual

15  shares of the African-American voting-eligible population in

16  the district?

17  A    No.  The table is meant only to be illustrative because

18  it rests on the same somewhat tenuous logic, I would argue, of

19  using the ACS in the first instance.  So the raw numbers here

20  come from the 2011-2013 ACS, but we've already established

21  that the difference between those numbers is not statistically

22  significant and, in fact, you know, could range in the single

23  rate shares as much as 1,000 or 1,200 in one direction or the

24  other.

25        MS. LAKIN:  Your Honor, I would like to move to admit

1    Plaintiffs' Exhibit 43 into evidence.

2            MS. ORMSBY:  I object, Your Honor.

3            THE COURT:  On what basis?

4            MS. ORMSBY:  On relevance.  This is not localized

5    data.

6            THE COURT:  Here, I'll make it easy.  I mean, I will

7    receive it maybe not as substantive evidence; but, obviously,

8    any expert is permitted to rely on data that an expert in the

9    field would normally rely on.  This is clearly that type of

10   data.  So I'll receive it as background information to his

11   testimony.  Is that sufficient?

12           MS. ORMSBY:  Thank you, Your Honor.

13   Q    (BY MS. LAKIN) Thank you, Your Honor.

14           Now, you testified earlier that you also responded to

15   the portrayal of the district as happily integrated.  What is

16   your understanding of the basics of this characterization?

17   A    You mean from Dr. Rodden's report?

18   Q    Yes.

19   A    I think Dr. Rodden relies heavily on descriptions of

20   certain portions of the district where there is perhaps a

21   rough balance of bi-racial occupancy even by measures of

22   homeownership.  And I think it also rests on, you know,

23   somewhat tenuous use of segregation indices which are -- can

24   be quite problematic when used on a geography of this size.

25   Q    Do you agree with the assessment that the district is, as

1  you say, happily integrated?

2  A    I do not.

3  Q    And why not?

4  A    Again, I mean, I would float a number of reasons.  First

5  of all, I mean, most urban demographers and urban historians

6  would not rely on a single index of segregation for assessing

7  the degree of integration; that there are a number of ways in

8  which populations can be segregated.  They can be spread

9  unevenly across a spatial area.  They can be concentrated in a

10 certain part of that area.  They could be clustered in more

11 than one area.  They could be isolated.

12        And the problems with these indices, I think, are

13 twofold.  First of all, they, like almost -- like much of the

14 data we've been talking about today, they're very much shaped

15 and often distorted by the geographies in which they're

16 counted.

17        So I'll give you an example from the research on

18 segregation.  If you want to measure the dissimilarity, use

19 the dissimilarity index and measure the dispersion of a

20 position across an area, a good example of a setting where you

21 know this clearly doesn't work is in a city in the American

22 South in the first part of the 20th century where you would

23 have a street on which white families lived in houses facing

24 the street and black families lived in houses facing the

25 alley.  And if you drew a line around that neighborhood,

1  defined it as a neighborhood, you would find African Americans

2  and whites living in proximity to each other in roughly equal

3  numbers, and on a dissimilarity index it would show up as an

4  integrated neighborhood, but no one who walked into that

5  neighborhood in -- at the height of Jim Crow would define the

6  conditions as integrated in any socially or historically

7  meaningful -- meaning of the word.

8  Q    You use a concept called "lived experience" in your

9  report.  Can you explain what you mean by that?

10  A    Yeah.  It's an extension of the example I just gave.  I

11  think in order to understand integration or segregation, you

12  need to go beyond simply measuring the dispersal of

13  populations or their rough balance in the population and think

14  about what the actual experience is.

15        And in this list I would include things like patterns

16  of racial transition.  In fact, the segregation index is -- or

17  the segregation measure is a point-in-time measure, and it

18  doesn't capture the way in which neighborhoods might be

19  changing in one direction or another.

20        More importantly, I think you need to supplement

21  quantitive measures of integration using these indices with

22  qualitative measures of how people live their daily lives --

23  going to school, going to work, interacting in neighborhoods.

24  And it would be very difficult, I think, to say, particularly

25  what we know in the wake of the events in Ferguson two years

1  ago, in the wake of the Department of Justice report, in the

2  wake of ongoing research done in the area by local scholars,

3  that African Americans in North County or into the footprint

4  of the district don't live under sharply disparate

5  circumstances than many of their white neighbors, particularly

6  in the way in -- if we think of the way in which citizenship

7  and civic participation is shaped by the sort of

8  confrontations that we have with public institutions, whether

9  they be the police, whether they be schools, whether they be

10 local governments; that I think you have to understand, you

11 know, the statistical distribution of the population, but you

12 have to understand it as a historical phenomena and as

13 something that has social meaning to the people who live

14 there.

15 Q    Dr. Gordon, what does the term "resegregation" mean?

16 A    In the context of my report, I use the term

17 "resegregation" to capture the larger dynamic that I've

18 described at various points in which a pattern of segregation

19 and a pattern of disparity that flows from segregation that

20 was, in a sense, invented in north St. Louis has moved

21 spatially into North County and been replicated and reinvented

22 on the footprint of the district and in North County more

23 generally.

24 Q    Now, you've stated that you reviewed Jonathan Rodden's

25 initial report.  Would you please turn to Tab D in your

1 binders, which has been marked for identification as

2 Defendants' Exhibit D.  What is this document?

3 A    Supplemental report by Dr. Rodden.  I don't see a date on

4 it, but --

5 Q    Fine.  Have you reviewed this supplemental report?

6 A    I have.

7 Q    Did either Dr. Rodden's initial report or this

8 supplemental report cause you to change any of your opinions?

9 A    No.

10 Q    Based on your survey of historical discrimination and

11 segregation and their impact today, did you come to any

12 conclusions about whether African Americans in the

13 Ferguson-Florissant School District bear the effects of past

14 discrimination that affects their ability to participate in

15 the political process?

16 A    Yes.

17 Q    What is that opinion?

18 A    I think it's fundamentally the case that if we take into

19 account the historic circumstances and the patterns that exist

20 on the ground today, that it is sort of clear and demonstrable

21 that the burden of that historical pattern of segregation

22 falls heavily on African Americans, many that now live in

23 North County in the school district, particularly in the

24 southern tier.

25          MS. LAKIN:  I have no further questions.  Thank you,

1    Dr. Gordon.

2            THE COURT:  Cross-examination?

3            MS. ORMSBY:  Yes, Your Honor.

4            THE COURT:  Are you ready on the plaintiffs' side?

5            You may proceed.

6                    **CROSS-EXAMINATION**

7    **BY MS. ORMSBY:**

8    Q    Thank you, Your Honor.

9            Professor Gordon, we met at your deposition.  My name

10   is Cindy Ormsby, to remind you.

11   A    Hi.

12   Q    How are you?

13   A    Hi.  Fine.

14   Q    Great.

15           THE COURT:  I'm sure he's been better.  Nobody wants

16   to be in court if they can help it.

17   Q    I've been better as well, if it's any consolation.

18           Can you tell me how much of your 2015 report was

19   taken verbatim or near verbatim from your 2008 book and

20   inserted into your report?

21   A    I think, as I was clear in my deposition, that the first

22   half of my report, that which describes the historical

23   circumstances, the larger background of segregation in the

24   greater St. Louis area, is almost exclusively drawn from my

25   2008 monograph.

1    Q    And it's sometimes exactly quoted, correct?

2    A    Yes.

3    Q    Okay. Can you explain how the segregation that you just

4 described for the Court was caused by the electoral system

5 that the State of Missouri requires of school districts in

6 Missouri?

7    A    I don't claim that it was caused by that.

8    Q    And you claim that the school boards had anything to do

9 with the segregation in Ferguson-Florissant School District?

10    A    In the sense of the historical causation or --

11    Q    Did they pass any policies that would cause the

12 segregation to occur?

13    A    No. The logic of my argument is that current political

14 institutions such as school boards have the effect of living

15 within institutions and replicating those older patterns,

16 something which I think was made clear when we talked about

17 the formation of the district in the first instance.

18    Q    Could you please turn to page 3 of your initial report,

19 specifically Table 1.

20    A    Sure.

21    Q    Now, the first line of that table is labeled "black

22 population." Is that correct?

23    A    Yes.

24    Q    You're saying that 15.7 percent of the population in

25 metro -- which I assume is the metropolitan region, St. Louis

1    metropolitan region?

2           THE COURT:  Just so we're clear, you mean an SMSA,

3    right?  Is that what you're using?

4           THE WITNESS:  Yeah.

5    Q    That's --

6    A    The Metropolitan Statistical Area, which is the 15-county

7    metropolitan region, yeah.

8    Q    And that's 15.7 percent African American?

9    A    Yes.

10   Q    And then you state that 44 percent of the black

11   population in Ferguson-Florissant School District is African

12   American, correct?

13   A    Forty-four percent of the population, yeah.

14   Q    Of the population.  Where did you get this data?

15   A    As I stated on direct, the data is from the 2010 census.

16   Some of the socioeconomic indicators are from ACS.

17   Q    Do you remember in your deposition when I asked you that

18   question what your answer was?

19   A    Yeah.  I think I characterized it as being from ACS.

20   Q    And is that --

21   A    I was mistaken.

22   Q    You were --

23   A    The population counts are from the census.  The

24   socioeconomic as calculated by HUD come from ACS.

25   Q    So this 44 percent is based on 2010 census?

1    A    Yes.

2    Q    And what you testified to in your deposition was

3    incorrect?

4    A    Yes, on that score.

5    Q    Did you identify where you got this information in your

6    report?

7    A    There's not a source line for the table, but the same

8    data is used in the maps throughout the report where it's

9    labeled as HUD data.

10   Q    And all of the maps that you referred to in your

11   testimony said that the data was 2012, but it was actually

12   from 2010?

13   A    Yes.  I think two of the maps are mislabeled as 2012.

14   Q    So should the Court decide to read your initial report,

15   it shouldn't assume that the information that you're giving is

16   later data.  It's from 2010, not from 2012?

17   A    Yes.

18   Q    And did you file a correction to your report at any time

19   so that everyone would be clear on that?

20   A    No.  I, in fact, didn't notice the error until I was

21   preparing for this exercise.

22   Q    Can you agree with me that most, if not all, of your

23   conclusions regarding the school district is based on national

24   metropolitan region or, at the closest level, North County

25   statistics and information?

1 A I can agree that in the context of writing the report I

2 used the data which was most relevant to the conclusions I was

3 seeking to draw, and so some of these conclusions relate to

4 the metropolitan area, some of them relate to North County

5 more specifically, and some of them relate to smaller

6 footprints, municipalities in the district.

7 Q Did you do any analysis specific to the

8 Ferguson-Florissant School District?

9 A Yes.

10 Q What was that?  What analysis did you do?

11 A So I include the table which we were just referring to,

12 uses the block group data that falls solely within the

13 district.  I had also clarified that in this kind of scholarly

14 exercise one is constrained by the way in which data is

15 reported.  In fact, very little data, particularly

16 historically, is reported for the district other than, say,

17 enrollment data and that sort of thing.

18    So one uses the data at hand, much of which is from

19 census, which is why in the course of this kind of analysis

20 the common method is exactly as I have done to describe the

21 broader processes and then to identify the school district's

22 place in that larger story.

23 Q Let's turn to page 28 of your initial report, second full

24 paragraph.

25 A Okay.

1    Q    And I've put that up on your screen.  Could you read

2    aloud that highlighted section from your report?

3    A    Sure.  "The patterns and mechanisms of segregation

4    invented and sustained in the city of St. Louis migrated along

5    the north-south line into St. Louis County.  This extended the

6    contours of segregation so engrained in the city's history,

7    and it reinvented them in new settings, including

8    Ferguson-Florissant, in the inner suburbs.  Here segregation

9    was spatial:  African Americans in Ferguson-Florissant have

10   settled overwhelmingly in the apartment complexes, Suburban

11   Heights, Northwinds, Canfield, along Maline Creek in south

12   Ferguson and Kinloch, and in pockets of single-family housing

13   east of West Florissant Avenue and south of I-270."

14   Q    So you were speaking specifically of the

15   Ferguson-Florissant School District in this paragraph,

16   correct?

17   A    No.  The Ferguson, hyphen, Florissant refers to those two

18   municipalities.

19   Q    Really?  Is that what you said in your deposition?

20   A    I don't recall.

21   Q    You don't remember me asking you that question and you

22   said Ferguson-Florissant represented -- you were referring to

23   the district?

24   A    As I read this paragraph, the logic of it is to move from

25   the metro area, from the city, to North County to those two

1  municipalities.

2  Q    So -- all right.  Is Suburban Heights in Ferguson or in

3  Florissant, the Suburban Heights apartment complex?

4  A    I'm not sure.

5  Q    Is Northwinds in Ferguson or in Florissant?

6  A    I believe Northwinds is in Ferguson.

7  Q    Do you believe Canfield is in Ferguson or in Florissant?

8  A    I think it's in the southern tier of Ferguson.

9  Q    Could you pull up the map, please.

10       This is a map provided by the St. Louis County Board

11  of Elections.  It's very difficult to see on my screen.  Is it

12  on yours?

13  A    I think I can see it okay.

14  Q    Okay.  The white area represents the Ferguson-Florissant

15  School District.

16  A    Okay.

17  Q    And the yellow and green surrounding it is outside of the

18  school district.

19  A    I understand.

20  Q    I'm going to blow up the area of West Florissant on the

21  east side of the school district.  And do you see where West

22  Florissant is?

23  A    Do you have a pointer?  Can you show me?

24  Q    Right --

25  A    I can't read this text.

1  Q    I'm underlining it.  Can you see it?

2  A    Okay.

3  Q    So that's West Florissant.  And does that look like that

4  street is inside or outside of the Ferguson-Florissant School

5  District?

6  A    It's outside.

7  Q    And you believe that that is -- that West Florissant,

8  east of West Florissant is in the city of Ferguson?

9  A    I don't see the municipal boundaries on this map.  I just

10  see the school district map.

11  Q    Okay.  Can we show where Canfield and Northwinds is,

12  please.  Canfield Drive -- do you see that's even more east of

13  West Florissant and farther outside the school district as is

14  Northwinds?

15  A    Uh-huh.  I see.

16  Q    So neither of those locations are inside the school

17  district.  You'll agree with that anyway.

18  A    Yes.

19  Q    And --

20  A    In this paragraph I'm representing patterns of

21  development, the pattern of single-family housing and

22  multi-family housing as it flowed out through the county.  I

23  have emphasized on direct that I view the corporate fragments,

24  including the school district, as sort of largely artificial

25  political boundaries superimposed on that pattern of

154

1    development.

2    Q    But this lawsuit is about the Ferguson-Florissant School

3    District, isn't it?

4    A    I understand that.

5    Q    And on page 19 -- I think when we talked in your

6    deposition, you were really clear that beginning on page 19

7    everything you said was specific to the Ferguson-Florissant

8    School District, right?

9         THE COURT:  Slow down.

10   Q    I'm sorry.

11   A    I mean, the section that we're referring to, I'm on

12   Section 5 in my report, is entitled "The Transformation of

13   North County."  What I'm describing is patterns of

14   development, pattern of segregation in North County as they

15   affect the footprint of the school district.

16   Q    You don't believe that citing the fact that, as you say

17   in this highlighted paragraph, that segregation was spatial,

18   African Americans in Ferguson-Florissant settled

19   overwhelmingly in apartment complexes, and you cite three

20   apartment complexes -- along Maline Creek in south Ferguson

21   and Kinloch -- which I don't believe any of those locations

22   are in Kinloch.  Do we agree with that?

23   A    Well, the sentence "apartment complexes along Maline

24   Creek in south Ferguson and Kinloch," there are apartment

25   complexes in Kinloch.

1  Q    But none of the three you cite are --

2  A    No.

3  Q    Right.  "And in pockets of single-family housing east of

4  West Florissant and south of 270."  And nothing east of West

5  Florissant and south of 270 is in the Ferguson-Florissant

6  School District, is it?

7  A    No.  But I'm characterizing patterns of development in

8  North County.

9  Q    Okay.  Could you turn now to your rebuttal report, page

10  5.

11  A    What's the tab number?

12  Q    That's not my --

13        THE COURT:  Forty-one.

14  A    Forty-one, okay.

15  Q    I'm looking specifically at the chart that's entitled

16  "Figure 1:  Enrollment in Ferguson-Florissant by Race, 1991 to

17  2015."

18  A    Sure.

19  Q    I'm going to try to clear the red mark off there.  What

20  does this chart show?

21  A    This is enrollment data from the district showing

22  enrollment of single-race black, single-race white, and other,

23  from 1991 to 2014.

24  Q    So we're talking specifically about school children on

25  this?

1   A    Yes.

2   Q    Okay.  And how do you define the age of school children?

3   A    Over the age of 5, under the age of 18.

4   Q    What is the white school-age population?  And I think if

5   you want to look at your rebuttal report, Table 1 on page 1,

6   what's the age of school-age -- I'm sorry.  Describe to the

7   Court what this table is that's also in your rebuttal report.

8   A    So Table 1 from the three-year ACS, 2011-2013, has an age

9   breakdown of the white-alone and black-alone population.

10  Q    So how many white school-age children are -- and this is

11  from the ACS -- 2011-2013 ACS?

12  A    Uh-huh.

13  Q    Is that where this data is from?

14  A    Yes.

15  Q    And what's the number of school-age children?

16  A    2,912.

17  Q    And African-American school-age children?

18  A    8,359.

19  Q    So, obviously, you believe -- do you believe there's

20  significantly more young African Americans in the districts

21  than whites?

22  A    This table would be subject to the same sort of

23  margin-of-error concerns that I have with the ACS more

24  generally for population counts, but I think your statement is

25  true.

1  Q    And we know, since this data is based on the 2011-2013

2  ACS, it is a significant portion of those students will have

3  already turned 18, and if they haven't already, they will in

4  the next few years, correct?  Going back to 2012.  It's 2016.

5  So four years' worth.

6  A    I mean, you're asking me for a conclusion that lies

7  outside my area of expertise.

8  Q    Would you say that the high school students at the time

9  that this table was created have now all turned 18?

10  A    Okay.

11  Q    So can we be fairly certain that since 2012, based on the

12  fact that there's a significant difference in the number of

13  white and black school-age populations, that the voting-age

14  population of blacks have increased since 2012?

15  A    No.

16  Q    Why not?

17  A    For two reasons.  First of all, I would not draw

18  conclusions about voting-age population based on the ACS

19  because it's not designed for that purpose, for a threshold of

20  population, and because the margins of error are too wide.

21         Secondly, it would not be a responsible demographic

22  conclusion to assume that every child who reaches the age of

23  18 in Ferguson stays in Ferguson and becomes a part of the

24  voting-age population.  I don't know what those patterns look

25  like.  I don't know what the retention rate for young adults

1    is in Ferguson or in Ferguson-Florissant.  So I would not draw

2    a conclusion.

3    Q    Would you draw a conclusion that the trend shows that

4    there are more African Americans graduating than whites

5    graduating from the Ferguson-Florissant School District?

6    A    Yes.

7    Q    Would you turn to page 1, the second paragraph.

8    A    Of the same report?

9    Q    Of the same report.  Can you read that sentence that's

10   highlighted?

11   A    "Rodden and I agree substantially on the basic

12   demographic trends.  The district is in the midst of an

13   ongoing racial transition marked by white flight to the outer

14   suburbs."

15   Q    Then you go on in your report to give the details how the

16   white population has decreased and the African-American

17   population has increased since 2000.  Correct?

18   A    The same paragraph?

19   Q    Yes.

20   A    Yes.  Although I say that the reliability of the numbers

21   shrink as we zoom in on the size of the geography.

22   Q    Can you explain to me what you mean by when you say that

23   the racial transition is ongoing?

24   A    From the sentence you highlighted?

25   Q    Yes.

1  A    Time doesn't stop.  So my point is that when you're

2  looking at segregation, you're taking a snapshot in time, and

3  you don't know -- you know it's not going to stay like that,

4  but you don't know what's going to happen afterwards.

5  Q    But doesn't "ongoing" tend to indicate that the white

6  population's going to continue to decrease and the black

7  population's going to continue to increase?  Isn't that what

8  "ongoing" means?

9  A    No.  It means that the racial demographics will continue

10 to change, but I'm an historian, and I don't have the

11 expertise to offer any basis for what that change will look

12 like in the future.

13 Q    Let's turn to the last three sentences of that paragraph.

14 A    Of the paragraph marked --

15 Q    I'm going to put it up on the screen here in just a

16 minute.  Page 3.  Page 3, the last third page.  Can you read

17 those last three sentences, highlighting starting with "the

18 inner suburb"?

19 A    "The inner suburbs either start this period with an

20 already-high African-American share of the population --

21 Pagedale and Wellston as examples -- or see dramatic

22 transition as in Country Club Hills, Flordell Hills, Jennings,

23 Moline Acres, from one kind of segregation, majority white, to

24 another, majority black.  The middle tier of North County

25 suburbs, including Ferguson, are all marked by sustained and

1   ongoing transition.  The outer North County suburbs are, for

2   the most part, at an earlier stage of that transition, with

3   increases in the African-American share from the low single

4   digits into the 20-30 percent range."

5   Q    So aren't you describing a trend where the racial

6   population shift is moving steadily through North County?

7   A    I'm describing a trend through the 2010 census, which are

8   the last reliable numbers we have.  My -- go ahead.

9   Q    No.  Finish, please.

10  A    And I've restricted my analysis to that trend to an

11  historical analysis of that, which enables me to describe it

12  both statistically and with qualitative evidence up through

13  2010.

14  Q    You criticize Dr. Rodden for taking a snapshot in time

15  right now, right?  Don't you?

16  A    That's one of the limits of a segregation index.

17  Q    So you criticize him for taking a snapshot of what the

18  school district looks at right now.  You talk about these

19  trends that come up -- that go up to, as you state now, 2010.

20  You don't want the Court to look at anything past 2010, but

21  you don't want the Court to look at the snapshot that's taken

22  right now.  Does that summarize what it is?

23  A    No.  I think that's inaccurate in the sense that my

24  criticism of the use of a dissimilarity index at a point in

25  time does not assume that racial transition will continue in

1    one direction or another.  It's simply -- it's simply that:

2    That the demographics of that population, the pattern in which

3    people live, the pattern in which races live next to each

4    other, will be different.  How it will be different, I'll

5    leave those with other forms of expertise to say.

6    Q    But you do state in your report that there is a trend

7    towards resegregation, don't you?

8    A    As I clarified on direct, by segregation does not mean an

9    expectation of majority-black population.  Segregation means

10   the pattern, the spatial pattern, by which people live in any

11   geographic footprint.

12   Q    You remember having your deposition taken on August 19,

13   2015, right?

14   A    I do.

15   Q    And you were under oath when you were -- when you had

16   your deposition taken?

17   A    Yes.

18   Q    The same as you are today?

19   A    Yes.

20   Q    And you remember when I asked you "But you do state there

21   is a trend in Ferguson-Florissant towards resegregation?" do

22   you remember your response?

23   A    I do not, off the top of my head.

24   Q    May I read it to you, please?

25   A    Sure.

1   Q    "I think the trend is clear in my report that the

2   African-American population in Ferguson-Florissant between

3   1940 and 2010, particularly after 1970, began to displace the

4   white population.  There was second generation of white

5   flight."  Is that accurate?

6   A    Yeah.  I think I've testified to that today as well.

7   Q    Okay.

8         MS. EBENSTEIN:  I'm sorry, Your Honor.  Could we go

9   get the citation?

10        THE COURT:  Sure.  Why don't you put it on the screen

11  for everybody to see.  That way there's no confusion.

12        MS. ORMSBY:  Absolutely.

13        THE COURT:  What page and line number were you

14  reading from?

15  Q    (BY MS. ORMSBY) Page 64.  Can you switch to the ELMO.

16  It's page 64, lines 5 through 12.  Do you see that?

17  A    I see it, yeah.

18  Q    Now, you described Dr. Rodden's description of the

19  district as happily integrated.  Those weren't his words, were

20  they?

21  A    No.  That was the impression I got from his report.  I

22  thought it was a rosy view of --

23  Q    I just wanted to make clear that those were your -- that

24  was your description and not Dr. Rodden's, correct?

25  A    That's fine.  That's fair.

1  Q    Okay.  You talked a little bit in your direct exam about

2  felony disenfranchisement.  And we talked about that in your

3  deposition as well, didn't we?

4  A    Uh-huh.

5       THE COURT:  Just a second.  I don't mean to

6  interrupt, but you got to say "yes" or "no."  Otherwise, these

7  lawyers will debate about whether it was uh-huh or huh-uh

8  later, okay?

9  A    Yes.  I think my answer was yes.  Yes or no.

10 Q    I just wanted to remind you we talked about it in our

11 deposition.

12 A    Yes.

13 Q    During your deposition.

14      THE COURT:  Just trying to get in the routine now.

15 Q    Isn't it true that prisoners are counted for census

16 purposes in an area where a prison is located?

17 A    Yes.

18 Q    And do you know if there's any prisons located in the

19 Ferguson-Florissant School District?

20 A    I know that there are not.

21 Q    So the numbers that you cite in your report for disparate

22 impact of felony disenfranchisement would actually be lower if

23 you took out the number of felons living in prisons?

24 A    Yes.  So the numbers in Missouri of 106,000 who are

25 disenfranchised, I think about 30-, maybe 31,000, are in

1  prison.  So more than two thirds are probationary, parole, or

2  local jail.

3  Q    And are you aware of any studies that have found that the

4  African-American felony rate is lower if you consider high

5  school graduation rate?

6  A    I'm not aware.

7  Q    Do you remember testifying in your deposition that that

8  wouldn't surprise you?

9  A    It still doesn't surprise me.

10  Q    Did you look at the graduation rate of African Americans

11  in the Ferguson-Florissant School District?

12  A    I did, although not in this context.

13  Q    Do you know whether or not Ferguson-Florissant School

14  District has a relatively high or low graduation rate for

15  African Americans compared to communities in St. Louis or

16  beyond?

17  A    I did not do that analysis in my report.

18  Q    Do you remember in your deposition you testified that you

19  believed it was on the high end of the scale?

20  A    Yes.  I think that's probably right.

21  Q    Did you take any of that into account in your numbers

22  that you put in your report?

23  A    With regard to the disenfranchisement issue?

24  Q    Uh-huh.

25  A    No.

1  Q    Did you have any specific data on the number of parolees

2  or individuals on probation or former felons that are actually

3  living within the school district boundaries?

4  A    No.  The data is not reported or available in that way.

5  Q    But all that would have an effect on those numbers?

6  A    Yes.

7  Q    Could you -- I just want to head on to another few --

8  it's not going to be in any order because I'm kind of reacting

9  to direct.

10  A    Sure.

11  Q    So don't get whiplash here.  Could you calculate an index

12  of dissimilarity at the level of block groups?

13  A    You mean for a single block group?

14  Q    Yes.

15  A    No.

16  Q    What level could you do it at?

17  A    Well, you need more than one block group; so it's

18  conventionally done for --

19  Q    Two or three block groups?  Three or more block groups?

20  A    Yeah.  It's conventionally done on a unit of census

21  geography, which would be a municipality or a tract.

22  Q    Do you know what percent -- what percent of the district

23  population lives in integrated versus segregated block groups?

24  A    No, I do not.

25  Q    Would you agree that your testimony and your report

1  relies on your lived experience?  You talked about lived

2  experience.  Does your lived experience --

3  A    I'm not sure I understand the question or its relevance.

4  Q    Have you ever lived in the school district?

5  A    No.

6  Q    So your -- I want to go back to your Table 1 in your

7  first report.

8  A    Okay.

9  Q    You wrote that you indicate that the African-American

10  population is 44 percent.  Are you aware that the parties have

11  stipulated that in 2010 the black population, single race, was

12  42.03 percent?

13  A    Yes.

14  Q    Why is your number different than what has been

15  stipulated to?

16  A    The discrepancy arises from the fact that as the map on

17  the next page summarizes, what I've done is run these metrics

18  across all the block groups that fall within the

19  Ferguson-Florissant School District.  Because the school

20  district is not itself a unit of census geography, some of

21  those block groups fall partially outside.  So the population

22  upon which these metrics are calculated is marginally larger

23  than the population of the district.

24  Q    So how did the parties come to the 52.03 percent?  How do

25  you think they got to that number?

1    A    I'm sorry.  I'm not sure what number you're referring to.

2    Q    The stipulated number that the parties have come to in

3    our Stipulation No. 16 is that the single-race

4    African-American population as of the 2010 census was 52.03.

5    What did they do different than what you did; do you know?

6    A    Yes.  The census does a special tabulation for the school

7    district in which they split those census blocks, and so they

8    have a precise measurement of the district.

9    Q    Why didn't you do that?

10   A    Because it was not necessary for this level of analysis

11   to simply get a sense of the way in which those socioeconomic

12   metrics are distributed across the metro area, across North

13   County, across the district, and across the district's

14   predominantly African-American blocks.

15   Q    But doesn't your number, 44 percent, which is not

16   specific only to the Ferguson-Florissant School District, skew

17   all those other numbers underneath it?  It's not specific to

18   the Ferguson-Florissant School District, correct?  I'm sorry.

19        THE COURT:  It's a subset, I think he would tell you.

20   A    Yeah.  So if you include all of the census blocks that

21   fall within the district, you're measuring this across a

22   population -- I don't have the numbers in front of me -- I

23   think a population of about 80,000 instead of a population of

24   67,000.

25   Q    So it includes areas outside the school district?

1    A    Yeah.  And the map on page 4 makes this clear.

2    Q    It's larger than the school district, this group that

3    you're looking at?

4    A    Yes.

5    Q    So it's not just the Ferguson-Florissant numbers?

6    A    No.

7    Q    So I have one more question, and then I will end.  Or

8    maybe two.  You're a historian?

9    A    Yes.

10   Q    You want to stop any trend analysis as of 2010, correct?

11   A    Yeah.  I mean, I'm not quite sure of the phrasing of the

12   question.  I would -- yeah.  As an historian, I view the

13   latest reliable data on the trends that I am assessing as the

14   2010 census.

15   Q    So historians never look past the last census.  They

16   won't look to 2013 or 2014 or 2015, all of which is in the

17   past.  You won't make any conclusions based on that past?

18   A    Well, in fact I'm running much closer to the present than

19   most historians would do because most historians use solely

20   archival sources, and they're not open for recent years.  I

21   can't speak to the motives of all historians or their

22   willingness to speculate.

23        MS. ORMSBY:  I don't have anything further.  Thank

24   you.

25        THE COURT:  Any redirect?

1    MS. LAKIN:  Briefly, Your Honor.

2    THE COURT:  Lawyers' famous last words.

3    Are you ready on the defendants' side?  Are you ready

4    over here?

5    MS. ORMSBY:  Yes.

6    THE COURT:  You may proceed.

7                   **REDIRECT EXAMINATION**

8    **BY MS. LAKIN:**

9    Q    Thank you.

10   Dr. Gordon, is it your opinion that the patterns of

11   segregation and discrimination you've described over the

12   course of your direct testimony stop at political boundaries

13   such as those surrounding the Ferguson-Florissant School

14   District?

15   A    No.  I mean, I hope I've made it clear that I actually

16   view those boundaries as sort of highly artificial in terms of

17   the underlying social and historical dynamics; so they flow

18   across those boundaries in some respects, and in some respects

19   those boundaries are drawn to reinforce or to create those

20   forms of segregation.

21   Q    You were asked a moment ago about your statements about

22   resegregation during your deposition.  Were you also asked on

23   page 64, in the lines just following --

24   A    Do I have my deposition here?

25   Q    It will come up on the screen shortly.  In lines -- so

1    you were asked about lines 5 through 12.

2    A    Sure.

3    Q    And were you also asked in lines 13 through 14, "And is

4    it your belief that this trend will continue?"

5         Your answer, "That does not lie in my area of

6    expertise."

7    A    Yes.

8    Q    And were you also asked on page 72, on lines -- beginning

9    at line 7, "I just want to verify that when you say 'trend

10   towards,' that Dr. Rodden didn't consider the trends towards

11   resegregation; that you're not talking about going forward.

12   You're talking about the fact he didn't consider the trend up

13   until 2010.  That's what you're stating?"

14        And the answer, "I think it's important to clarify

15   the terms.  When I say 'segregation' or 'resegregation,' it

16   does not imply the balance between the white and the black

17   population, a numerical balance.  So you have a segregated

18   setting in which the black population is a tiny minority.  You

19   can have a segregated setting in which the African-American

20   population is the majority.  So what I'm describing as a trend

21   towards resegregation is, as I clarify, more substantially in

22   my original report.  I think that phrase is in my response to

23   Rodden."

24        Did you -- were you asked those questions, and did

25   you give that answer?

1    A    I think so.

2    Q    Does the concept of resegregation apply to the

3    Ferguson-Florissant School District?

4    A    Yes, in the sense that I hope I've clarified it this

5    afternoon as a pattern of lived experience, as a pattern of

6    the way in which citizens interact with each other and

7    interact with elements of their government.  It's not meant to

8    imply some sort of trajectory of population, which, again, is

9    beyond my area of expertise.

10   Q    And is it also reflected in patterns of settlement in the

11   district?

12   A    Yes.

13   Q    Now, you were asked a moment ago about a figure in your

14   supplemental report, on page 5.  It's enrollment in FFSD --

15   A    Yes.

16   Q    -- by race.  Is this enrollment data for public schools?

17   private schools? parochial schools?

18   A    It's just for public schools; so it's for the school

19   district.  So there is a distinction, for example, between

20   Table 3, which is -- sorry -- Table 1, which has the

21   school-age population, which is census based, and then the

22   enrollment-based population is from the district.

23        So my point in emphasizing the wider disparity for

24   the district-reported data was precisely to underscore the

25   investment that African-American parents have in the school

172

1    district.

2    Q    So is it your -- do you have an opinion on whether the

3    white versus black student enrollment in public schools is

4    different than the white versus black school-age population in

5    the district as a whole?

6    A    Yes.

7    Q    What is that opinion?

8    A    The enrollment disparity is much wider than the

9    population disparity because African-American families and

10   students rely more heavily on the public school system.

11            MS. LAKIN:   Thank you.   No further questions.

12                         **EXAMINATION**

13   **BY THE COURT:**

14   Q    Help me out in plain English.   A few things.   And I

15   follow your testimony as to the effects of the, for lack of a

16   different word, the resegregation.   And the African-American

17   community continues to suffer its consequences in education,

18   employment, and health.   That's the last sentence of your

19   opinion.

20   A    Okay.

21   Q    Focusing on participation in the elected government

22   process, are there pieces of the segregation you've described

23   that limit the African-American community's ability to

24   participate in the electoral process in their representative

25   government?

1    A    Yes.

2    Q    And how would you describe that?

3    A    I mean, there I lean more on the sort of general

4    scholarly literature about the relationship between poverty,

5    transitional populations, you know, single-parent families,

6    and civic participation.

7            We know the African-American population, for example,

8    of Ferguson -- I mean of the district particularly, which has

9    a much higher rate of rental population, it's a more

10   transitional population; so factors like that affect civic

11   participation.

12   Q    Were you asked to look at all -- and that's a pretty

13   obvious piece.  The lower you go on the economic scale, the

14   more transient the housing stability is.

15   A    Uh-huh.

16   Q    Which would affect, I mean, if nothing else, the statute

17   requires you to live at a certain place for a certain period

18   of time to register to vote.  Do you have any -- did you look

19   or someone else can be asked to look at the percentage of

20   registration of the African-American community versus the

21   percent of registration of the non-African-American community?

22   A    I think that falls in the laps of other --

23   Q    Elsewhere?  Is that elsewhere?

24           MS. ORMSBY:  Yes.

25           THE COURT:  Okay.  All right.

174

1    Any follow-up, since I opened or asked a question, to

2  what I inquired about?

3    MS. LAKIN:  No, Your Honor.

4    MS. ORMSBY:  Just one.

**RECROSS-EXAMINATION**

**BY MS. ORMSBY:**

7  Q    Do you know what the African-American homeowner

8  percentage rate is in the Ferguson-Florissant School District?

9  A    50.7 percent.

10    MS. ORMSBY:  Thank you.

**FURTHER EXAMINATION**

**BY THE COURT:**

13  Q    I did have another question.  They showed you over this

14  Table 2 and 3 -- I don't know if somebody could put it up --

15  voting-age shares of population.  And I know you don't like

16  the interim numbers because of the margin of error is too

17  great.  You said as much as a thousand.

18  A    Uh-huh.

19  Q    I want to make sure I see this table correctly.  You show

20  the population of -- the white population voting age of

21  23,740, the voting-age population for the African-American

22  community at 24,313.  Is that right?

23  A    Uh-huh.

24  Q    So that could be as high -- the African-American

25  voting-age population could be as high as 25,300 or as low as

1    23,300 if we --

2    A    Roughly speaking.  I think the -- we don't have margins

3    of error specifically for the voting-age population, but for

4    the single-race black population for the 2011-'13 ACS, I think

5    the margin of error is 1,240 or something.

6    Q    Twelve hundred.  Because when I do the spread, the

7    closest it would be, would be within 1,200 of each other.  The

8    furthest apart would be where the white population might be

9    1,200 higher, or the spread the other direction could be the

10   African-American population could be 2,600 higher.  If we took

11   the extremes on each end, a thousand up or a thousand down.

12   A    Okay.  Okay.

13   Q    Am I reading this correctly?

14   A    Yeah.

15   Q    You don't think I should rely on it, I understand.

16   A    Right.  I don't think you should rely on it.  We can't

17   assume, given the way -- given the samples, that the margins

18   will work in the same direction either.  So it's the -- which

19   is why, when you do the confidence intervals, it's the overlap

20   that concerns us.

21          THE COURT:  Okay.  Anything further?

22          MS. LAKIN:  Can I ask just one follow-up based on

23   that?

24          THE COURT:  You may.  I mean, the one thing you don't

25   know about me is we're not going to leave without figuring out

1    whatever it is we want to figure out, okay?  So don't hesitate

2    to ask.

3                    **FURTHER REDIRECT EXAMINATION**

4    **BY MS. LAKIN:**

5    Q    Thank you, Your Honor.

6              Let me turn to, Dr. Gordon, the supplemental report,

7    page 4, Table 4.

8              THE COURT:  Race and owner occupancy, or is that a

9    different one?

10   Q    Different table, the page before.

11             Dr. Gordon, what is the homeownership rate for white

12   residents of the district?

13   A    82.8 percent.

14   Q    How does these rates -- how do these rates compare to

15   rates nationally?

16   A    Off the top of my head, I would say the national rate is

17   on the order of 72 to 74 percent; so the appropriate metric

18   here, I think, is the gap.

19   Q    And are these hard numbers?

20   A    No.  They reflect all of the same uncertainty with the

21   ACS estimate.

22             MS. LAKIN:  Thank you.

23             THE COURT:  You don't want them to be hard numbers.

24   They do.  You don't.

25             MS. ORMSBY:  Nothing, Your Honor.

1      THE COURT:  Thank you, sir, for your time.

2      THE WITNESS:  Thank you.

3      THE COURT:  We will take our afternoon recess at this

4  time.  We will reconvene at 3:25.

5      **(COURT RECESSED FROM 2:55 PM UNTIL 3:30 PM.)**

6      THE COURT:  We have a new arrangement.  So somebody

7  new must be up.

8      MR. MCDONALD:  May it please the Court.  I'm Laughlin

9  McDonald, one of the plaintiffs' lawyers, and we'd like to

10  call William Cooper as our next witness.

11      THE COURT:  If you would step forward, sir, and be

12  sworn.

13      **(WITNESS SWORN BY THE CLERK.)**

14      **WILLIAM COOPER,**

15  **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

16  **FOLLOWS:**

17      **DIRECT EXAMINATION**

18  **BY MR. MCDONALD:**

19  Q    Would you state your name for the record, please?

20  A    My name is William S. Cooper.

21  Q    And what is your age, Mr. Cooper?

22  A    I'm --

23      THE COURT:  You don't have to answer that.

24  A    Okay.

25  Q    I'll withdraw that question.  Where do you reside?

1    THE COURT:  You're obviously a person of majority; so

2  we'll go from there.

3  Q    Where is your residence, Mr. Cooper?

4  A    I live in Bristol, Virginia, southwest Virginia, on the

5  Tennessee state line.

6  Q    And what is your academic background, please?

7  A    I have a BA in economics from Davidson College in

8  Davidson, North Carolina.

9  Q    And when did you receive that degree?

10  A    1975.

11  Q    And what is your current occupation?

12  A    I'm a private consultant.  I provide services on

13  redistricting, demographic analysis, other projects involving

14  census mapping.  A good deal of my work is with civil rights

15  organizations on voting issues, like the American Civil

16  Liberties Union, the NAACP Legal Defense Fund, also Indian

17  tribes in some part of the country, and I do some other work

18  that's nonvoting related for the Food Research and Action

19  Center, which is based in Washington, D.C., and the Prison

20  Policy Initiative in Massachusetts.  Some of that is voting

21  related.  So those are some of the organizations I'm currently

22  working with.

23  Q    Can you speak a little closer to the microphone, please?

24  A    Sure.

25  Q    Thanks very much.  And how long have you done that work

1  that you described?

2  A    I've been involved in demographic analysis,

3  redistricting, computer mapping for about 25 years.

4  Q    Well, how many districting plans have you drawn over that

5  period of time?

6  A    I've drawn thousands and thousands of plans and developed

7  plans in probably 700-and-some-odd jurisdictions around the

8  country, most of them local plans, with varying degrees of

9  intensity.  Some are one-shot plans that I never then proceed

10  any further with for whatever reason, and others are much more

11  involved, even more involved than this case has been.

12  Q    Have you drawn any statewide plans?

13  A    For civil rights organizations, I have drawn after the

14  2010 census for statewide redistricting state legislatures.

15  I've developed plans in Virginia, Georgia, South Carolina,

16  Alabama, Kentucky.  I may be leaving a state out.  Florida.

17  Q    What about South Carolina?  Did you mention it?

18  A    South Carolina as well.  And most of those were for the

19  ACLU Voting Rights Project, although the Alabama case -- I'm

20  working for the Alabama Black Legislative Conference, which is

21  made up of members of the Alabama legislature who are African

22  American in both the Senate and the House.

23  Q    In how many states have you done local redistricting

24  plans for subjurisdictions?

25  A    Over the course of the past 25 years, probably 40 states,

1    some of them no more than one or two plans, but there are very

2    few states that I have not drawn plans in -- for a local

3    jurisdiction, because my main focus is on local jurisdictions.

4    Q    Have you testified as an expert witness in any other

5    cases?

6    A    I've testified in about 35 Section 2 cases.

7    Q    Have you listed those cases in your Exhibit No. 44?

8    A    I have, in Attachment A, Exhibit A attached to my initial

9    report.

10    Q    Yes.  Well, I will just remind you that Exhibit 44, which

11    is your report, and Exhibit 45, your supplemental report, have

12    been accepted as exhibits.

13            When you testified, what did you testify about in

14    those cases?

15    A    Usually, I'm accepted as an expert on redistricting and

16    demographics.

17    Q    And have you submitted declarations in those other cases?

18    A    Typically prior to testifying in court, I submit

19    declarations.  I've also submitted declarations in many other

20    cases where I did not get to the point of testifying in court

21    because the lawsuit was settled or decided on summary

22    judgment.

23    Q    And were you also deposed in those cases, too, that

24    you've testified as an expert witness in?

25    A    In most of them but not all.  I think there have been

1    some where I was not -- I know there have been some where I

2    was not deposed and I just testified directly in court.

3    Q    In those cases in which you've testified as an expert,

4    were you accepted as an expert witness by the court?

5    A    I've always been accepted.

6          MR. MCDONALD:  Well, Your Honor, we'd move to qualify

7    William Cooper as an expert in the field of districting and

8    demography.

9          THE COURT:  Any objection?

10          MS. ORMSBY:  Yes, Your Honor.  We do object to this,

11   this witness being termed an expert.  We have some further

12   questions about that.  I'm happy to address them now or later

13   in my cross.

14          THE COURT:  You may proceed.

15   Q    (BY MR. MCDONALD) Thank you, Your Honor.

16          Tell me just briefly how do you go about drawing a

17   districting plan?

18   A    Well, initially I will obtain data from the U.S. Census

19   Bureau, population data from the decennial census -- in this

20   case now, it's the 2010 census -- that nowadays can be

21   obtained almost instantaneously off of the Census Bureau

22   website.

23          So I obtained the PL94171 redistricting file from the

24   Census Bureau for the state that I'm doing the plan in, and I

25   then merge that data set with the set of geography boundary

1   files, which I also get from the Census Bureau and which can

2   also be downloaded instantaneously, and those Census Bureau

3   boundary files are designed to allow you to see census blocks,

4   which are the smallest unit of geography in a jurisdiction, as

5   well as census block groups which Dr. Gordon discussed here

6   earlier today, census tracts, municipal boundaries, school

7   district boundaries, previous legislative district boundaries.

8   So there are multiple layers of geography which you can obtain

9   very quickly from the Census Bureau to develop a plan.

10  Q    Well, when you work as a demographer, is analyzing census

11  data a part of that job as well?

12  A    Yes.

13  Q    And explain in what way.

14  A    Well, often as part of my reports in Section 2 lawsuits

15  I'm asked to look at historical data -- demographics by race,

16  for example -- for a given jurisdiction as I've done in this

17  case; so I will go back and obtain the Census Bureau data sets

18  for prior decennial censuses.  In this case, I looked at 1990,

19  2000, and 2010.  I usually do a 30-year period without going

20  way back in time, and using that I can determine how racial

21  demographics have changed in a given jurisdiction over that

22  time period.  And then I also can obtain from the Census

23  Bureau socioeconomic data under the now-current American

24  Community Survey.

25          Prior to that, I was using in the earlier decennial

1   censuses the data sets that were produced by the Census Bureau

2   from the census long form which allowed you to access

3   socioeconomic information based on a sample of one out of six

4   persons in the 2010 census, a snapshot at the time of the

5   decennial census.

6   Q    I will ask you more about that shortly, but what were you

7   asked to do in this case?

8   A    Well, at the outset, I was contacted by Dale Ho, I think,

9   sometime in late August of 2014, and he just had a basic

10  question as to whether it would be possible to develop a

11  district plan for the Ferguson-Florissant School District that

12  would have possibly four out of seven majority-black

13  districts.

14       So I followed the procedure I just described.  I got

15  hold of the Missouri state geographic boundary files and

16  PL94171 file, merged them, and then proceeded to analyze the

17  demographics of the Ferguson-Florissant School District.

18       And really within a couple of hours just using my

19  mapping software I was able to answer in the affirmative that

20  indeed you could do a redistricting plan or a district plan

21  for the Ferguson-Florissant School District which would have

22  four out of seven majority-black districts.  So it's very

23  straightforward.  This is not a complicated case in that

24  regard.

25  Q    Well, what else were you asked to do?

1  A    Well, later on, after I made that determination, I spoke

2  with both you and Dale, I think, and I was asked to obtain

3  precinct boundaries that had been updated to take into account

4  redistricting which would have taken place in

5  Ferguson-Florissant School District after the 2010 census,

6  because each of the jurisdictions in the school district --

7  many of them would have reconfigured their ward boundaries,

8  and, of course, there was state legislative redistricting

9  also.  So all of that would have meant that the precinct

10  boundary files that I was using to do the initial draft would

11  need to be updated to develop a plan that would more closely

12  follow existing precinct lines.

13        So I did two things.  I contacted the St. Louis

14  County GIS department and got a full set of geographic files

15  showing municipal wards for all of St. Louis County as well as

16  school district boundaries for all of St. Louis County, street

17  names and street files so I could see where all the streets

18  were.  I could also see that from the Census Bureau's data

19  files, though.

20        And then the second thing I did was contact the St.

21  Louis County Board of Elections to obtain precincts, shape

22  files of precincts, electronic files, that would allow me to

23  look at them on the map and allocate population by precinct.

24  I did that for 2011, 2012, 2013, 2014, and that was a request

25  that you had made to provide information to Dr. Engstrom on

1   the racial demographics of the precincts in

2   Ferguson-Florissant School District.

3           So I did that for each one of those years:  2011,

4   2012, 2013, 2014.  And then later this spring, after the April

5   elections, I obtained the 2015 ward lines, precinct lines,

6   rather, for the school district and produced another set of

7   numbers for Dr. Engstrom showing voting-age population by race

8   for all precincts in the school district.

9   Q    Did you know what Dr. Engstrom intended to do with the

10  data you sent him?

11  A    He was going to conduct a statistical analysis analyzing

12  racial polarization in voting.

13  Q    Were you asked to review any census data dealing with

14  socioeconomic conditions of African Americans?

15  A    I was.  I obtained the 2011-2013 American Community

16  Survey data set from the Census Bureau and produced a set of

17  charts showing socioeconomic characteristics of the school

18  district, and those charts are included in Exhibit D of my

19  initial report.

20  Q    Now, let me refer you to your declaration, which would be

21  Exhibit 44.  Have you discovered any errors in your reports

22  since you finished it and supplied it to the plaintiffs?

23  A    I have discovered a typo.  It's of no major consequence,

24  but for the record, the figure I report for the black

25  population in 1990 ––

1  Q    Before you go to it, tell me what page of your report

2  that's on.

3  A    Page 8, Figure 2.

4  Q    Okay.  Go ahead.  Explain what the error was.

5  A    I have a figure of 28.65 percent for the black population

6  in the school district in 1990, and that number should

7  actually be 24.44 percent.

8  Q    Well, did that error affect in any way any of your

9  findings or conclusions contained in your report?

10  A    Not at all.  It simply needs to be corrected for the

11  record.  And I also cite that figure erroneously,

12  unfortunately, in paragraph 25, where I'm discussing black

13  population percentage changes from 1990 to 2010.  That's on

14  page 9.

15  Q    Well, did that figure that you gave in your initial

16  report enter into in any way your calculations?

17  A    No.  It has no significant impact at all on my opinions.

18  Q    Well, now, did you determine that it was possible to

19  create a single-member district plan containing reasonably

20  compact majority-black districts?

21  A    Yes.  I determined that at the outset, within a couple of

22  hours, then proceeded over time to make adjustments, various

23  drafts, to take into account factors like the existing ward

24  lines or existing precinct lines as of 2014 and then slight

25  modification with the precinct lines in 2015, I think.  So,

1   yes, I determined that it is possible to draw compact,

2   contiguous districts in a seven-member plan for the school

3   district, unquestionably.

4   Q    And what data did you rely upon in drawing that plan?

5   A    Well, I relied, as I always do, on the 2010 census.

6   Q    And why did you use the 2010 decennial census data?

7   A    Because that is always the data one uses in order to

8   create a redistricting plan.  Local governments around the

9   country always rely on the 2010 census to do their

10  redistricting plan.  As far as I know, I've never come across

11  one that did not use a 2010 census.

12  Q    Well, do you know whether or not there's any state law

13  that requires redistricting to be based upon the census data,

14  the decennial census data?

15  A    Well, I've been told by you and Mr. Ho that there is a

16  Missouri state law that requires it, the 2010 --

17          MS. ORMSBY:  Objection, Your Honor.  Hearsay.

18          THE COURT:  Sustained.  But to the extent he relies

19  on that for his opinion, he can state the basis of reaching

20  that opinion, but, obviously, his testimony that there is a

21  law but maybe he was told that by somebody else doesn't prove

22  there is a statute, but I will take judicial notice of it when

23  you tell me to.

24          MR. MCDONALD:  All right, Your Honor.  It's Statute

25  1-100 is the state statute that requires redistricting to be

1   done based on the last previous decennial census.  We ask the

2   Court to take judicial notice of it.

3           THE COURT:  Well, I need to see it.

4           MR. MCDONALD:  We can provide the Court with a copy

5   of it.

6           THE COURT:  All right.  Very good.

7   Q   (BY MR. MCDONALD) And I think you may have answered this,

8   but did you use any software in drawing your plan?

9   A   I used Maptitude for Redistricting, which is produced by

10  the Caliper Corporation in Massachusetts.  It's a widely used

11  software program for redistricting as well as other forms of

12  demographic analysis.

13  Q   And did you encounter any problems in drawing the plan

14  for the school district?

15  A   Not in the technical aspect of using the software, but I

16  did discover at some point early in the fall of 2014, when I

17  was analyzing the school district boundaries that were

18  provided to me by St. Louis County Board of Elections as well

19  as the St. Louis County GIS department, that the school

20  district boundary is not exactly the same as defined by the

21  St. Louis County Board of Elections.  It is not exactly the

22  same as the school district boundary defined by the Census

23  Bureau.  The differences are minor, but there are differences.

24  And I used the St. Louis County Board of Elections' boundary

25  for the plans that I developed in order to make sure I was

1    consistent with the way they saw things.

2          It's unusual to have that kind of discrepancy.  The

3    net difference was 327 persons.  The Census Bureau has a total

4    population for the school board in 2010 of 69,050, I believe.

5    Q    Well, look on page 8 of your declaration.

6    A    Okay.

7    Q    Figure 2.  What does that show the population of the

8    school district as being?

9    A    That's 68,663, and that is based on the St. Louis County

10   Board of Elections' boundary.

11   Q    What's the voting-age population of the school district?

12   A    The voting-age population of the school district would be

13   found in Figure 4.  That is 50,771.

14   Q    And on what page of your declaration does that number

15   appear?

16   A    It's on page 10, Figure 4.

17   Q    Okay.  And what percent of the voting-age population is

18   single-race black?

19   A    According to the 2010 census, the single-race black

20   population voting-age population in Ferguson-Florissant School

21   District is 47.33 percent.

22   Q    And on what page of your report does that figure appear?

23   A    In the same Figure 4 we were just discussing on page 10.

24   Q    What does "single-race black" mean?

25   A    That means any person who's self-identified as of one

1  race, black or African American.  That would include a small

2  number of Hispanic blacks, because Hispanics are not a race,

3  an ethnicity, and there are, I believe, 80 African-Americans

4  single race who are Hispanic, voting-age Hispanic -- African

5  Americans of voting age.  I should clarify that.

6  Q    What is the percent of the, quote, "any-part black

7  voting-age population" in the school district?

8  A    According to the 2010 census, it is 48.19 percent.

9  Q    And what does "any-part black" mean or refer to?

10  A    That would include individuals who are of more than one

11  race, at least one part African American or black.  It's only

12  about a half percentage point higher than the single-race

13  black percentage according to the 2010 census.  It's not a

14  large number of people, but there are people who check two

15  races, one of which was black.

16  Q    Well, according to the decennial census, the data that

17  you've just quoted from, does including individuals who are

18  any-part black show that blacks are less than 50 percent of

19  the voting-age population of the school district?

20  A    According to the 2010 census, they are less than 50

21  percent:  48.19 percent.  That's the "any-part black"

22  definition is the most expansive definition one can use to

23  classify some person as African American.  So that's the

24  ceiling.  The floor would be non-Hispanic single-race black,

25  which would be 47.17 percent.

1 Q    What percent of the voting-age population in the school

2 district is white?

3 A    In the 2010 census, the non-Hispanic white voting-age

4 percentage was 48.95 percent.

5 Q    Well, according to the decennial census, do whites

6 outnumber blacks among the voting-age population of the school

7 district?

8 A    They do.  Whites were tabulated at 24,852, and there were

9 24,446 any-part black individuals.

10 Q    Well, how many municipalities in whole or in part are

11 included within the school district?

12 A    Well, there are 11 municipalities in whole or in part.

13 There is one municipality, Black Jack, which really just has a

14 single populated block.  I think there are a few unpopulated

15 blocks, of four persons, that's in the school district,

16 according to the Board of Elections School District boundary

17 files.  So there are 11, but for all intents and purposes,

18 it's only ten.

19       And this Black Jack area is one spot on the map where

20 the Census Bureau's definition of the school district boundary

21 is quite different than the St. Louis County Board of

22 Elections' definition.  And I actually prepared a map that I

23 think is in Exhibit B-3.

24       Let me make sure I have the right number.  I'm sorry.

25 It's B-2 that overlays the Census Bureau's definition of the

1   school district boundary with the St. Louis County Board of

2   Elections' definition.  And if you look in the extreme west,

3   northwest, you will see a little appendage which goes out into

4   part of Black Jack, and that's counted in the Census Bureau's

5   definition of the school district but not counted in the St.

6   Louis County.

7   Q    What page of your report does that appear on?

8   A    Well, that's an exhibit in -- that's Exhibit B-2.  There

9   are some other spots on the map where that happens as well,

10  but that's the most obvious point.

11  Q    Okay.  Now, let me direct your attention to the first

12  plan that you drew.  That's on page 22, paragraph 5 of your

13  report, your 44 Exhibit.

14  A    Okay.

15  Q    Well, tell me how many black districts you drew, and

16  describe the demographics of that plan, please.

17  A    Okay.  This plan creates four majority-black districts.

18  Three are focused in the south end of the county:  District 1,

19  2, and 3.  District 1 is 63.93 percent black; District 2,

20  60.95; that's black voting age; District 3, 74.36 percent.

21       And I also have -- as you can see in Figure 10, these

22  numbers are produced, and you can also see the non-Hispanic

23  white percentage in those three districts, or all districts

24  for that matter.  But you can see in those three districts

25  there's an overwhelming majority of African Americans of

voting age compared to the non-Hispanic white population.

And it's not surprising.  If you were to flip back to look at a map I produced showing racial segregation in Ferguson-Florissant in Figure 7, you can see in the south end most of the block groups are around Berkeley, Kinloch, Cool Valley, Normandy, are all in the 60 to 95 percent range.  So it's not surprising at all I was able to produce three majority-black districts in the south end of the county.

And then the fourth district is in the extreme north, District 7.  That one is 52.86 percent black voting age.  This plan, this Plaintiffs' Illustrative Plan 1, was prepared by me in the early spring of 2015, before the April 2015 elections.  So there are some incumbents who are paired in this plan who were elected in April 2015.

Q    I think this question is obvious, but will you tell me how the percentages in Plan 1 that you drew compare to the black percentages in the school district as a whole?

A    Well, according to the 2010 census, the black-white margin for the school district as a whole would be basically about minus 1 percent.  If you go back to Figure 4, you can see that whites -- well, whites outnumber any-part blacks by about less than 1 percentage point.  About three quarters of a percentage point.  So that's negative three quarters.

And in Plaintiffs' Illustrative Plan 1, all of these districts have a large margin of African Americans.  The

1  district that is the closest would be District 7, which is a

2  10-point margin, 52.86 percent African-American voting age

3  versus 43.25 percent non-Hispanic white.

4  Q    In drawing your plans, what standards did you apply?

5  A    Well, I applied what are known as traditional

6  redistricting principles.  In a nutshell, that means that each

7  district must be within plus or minus 5 percent deviation of

8  an ideal district size, and the ideal district size is just

9  calculated by dividing the total population of the district,

10  which in this case is over 68,000, by the number of individual

11  districts you're drawing, which is seven.  So the typical

12  district would have a population of -- an ideal population of

13  9,809.

14        And in this particular plan, the overall deviation,

15  if you add up all the seven districts, turning the negative

16  numbers into an absolute value and creating a positive number,

17  the overall deviation for Illustrative Plan 1 is 7.18 percent.

18  So it's within the plus or minus 5 percent range across all

19  seven districts.

20        The other redistricting principles that would be

21  followed, of course, would be to draw districts that are

22  contiguous, reasonably compact, that take into account

23  communities of interest, and that do not dilute minority

24  voting strength, to comply with Section 2 of the Voting Rights

25  Act.

1   Q     How do you determine compactness?

2   A     Well, in this case I was able to do so really just

3   visually.  They are clearly compact and regularly shaped.

4   Illustrative Plan 1 splits just three precincts of the 96

5   precincts in the school district, and in my opinion each

6   district is compact and reasonably shaped.

7           But there are statistical measures that one can use

8   to determine whether a group of districts is compact,

9   vis-a-vis a group of another set of districts.  Maptitude has

10  one measure called the Reock Test which allows you to

11  calculate scores for each district, and in this case I did run

12  that analysis just, for the record, to demonstrate that, in

13  fact, this plan stacks up well against all of the municipal

14  wards in St. Louis County.  There are over 200 wards -- there

15  are 221 municipal wards in the county as of 2014.  And I ran a

16  Reock score for all of those 221 municipal wards, and the

17  average score, the mean average, was .39.  In Illustrative

18  Plan 1, the mean average score for the seven districts is, I

19  believe, .41.  So it compares favorably with municipal wards

20  as drawn in St. Louis County.

21  Q     Well, how did you determine contiguity?

22  A     There is a automated check procedure within Maptitude

23  that tells you if any part of the district is not contiguous,

24  and if you get that error message, then you can proceed to fix

25  it.

1    Q    And you've indicated that you also wanted to respect

2    communities of interest.  Will you tell me what you mean by

3    that and how you went about doing that?

4    A    Well, I looked at -- I looked at neighborhood patterns,

5    and obviously from Figure 7 it was clear that there were areas

6    of the school district where most of the African Americans

7    live, mainly in the south end again.  And I also looked at

8    median income.  Again, you can see sort of a correlation there

9    between areas where African Americans reside and lower median

10   income levels.

11        And I also had a point file that I created geo-coding

12   all of the addresses of the schools in the county so I was

13   able to make sure that I had schools balanced across the seven

14   districts so that I didn't have, like, eight schools in one

15   district or something, but schools are fairly well distributed

16   throughout the district; so it was not hard to make sure that

17   each district had two or more schools.

18   Q    Yeah.  And you're familiar with the standards of Section

19   2 of the Voting Rights Act?

20   A    I am.

21   Q    And did you take that into account in drawing your plan?

22   A    I did.  I did.  Because it's important, if it's possible,

23   to draw compact and contiguous, reasonably shaped districts,

24   that one attempt to do so that are minority opportunity or

25   majority-minority districts.  And in this case, as I say, that

1    proved to be very easy to do.

2    Q    Did you take incumbency into account at all in drawing

3    your plan?

4    A    Well, I did.  In Plaintiffs' Illustrative Plan 1, at the

5    time, I'm fairly certain, if memory serves me correct, that

6    there was just one district with an incumbent conflict, and

7    that was District 2 where two incumbents live in the same

8    census block.  So any plan that's drawn as a single-member

9    district plan for this Ferguson-Florissant School District as

10   it now stands is going to have two incumbents paired in

11   District 2 down in Ferguson.  There's no way to separate them.

12          But after doing this plan, then the April elections

13   were held, and it turned out that new people took office, and

14   so I had to make some additional changes to eliminate

15   incumbent conflicts.  So that was a genesis of Plaintiffs'

16   Illustrative Plan 2, still with two incumbents paired in

17   District 2.

18   Q    Well, before we get to your Plan No. 2, how many current

19   members of the board live in which municipalities; do you

20   know?

21   A    Yes.  According to the list of addresses that I obtained

22   last spring, all of the current board members live in either

23   Ferguson or Florissant.  There is no board member who resides,

24   for example, in Berkeley or Kinloch or Cool Valley or any of

25   the areas that are -- Normandy -- that are predominantly

African American.  So basically the seven board members come

from an area that represents about two thirds of the

population of the county.  But some of these communities that

are predominantly African American like Berkeley and Kinloch

that have -- Berkeley has a position of almost 10,000 persons,

and there's nobody really nearby in that community that is on

the board.  And it's 80 percent black.

Q    So are you saying that there are no board members who

reside in any of the other nine municipalities in the school

district?

A    That's correct.

Q    Now, I think you indicated why you drew the second plan,

but just tell me again why you drew Plan No. 2.  And let me

refer you to page 25 of your report, Figure 2.

A    Yes.  I drew -- I drew Plaintiffs' Illustrative Plan 2

after getting an update of the addresses for the newly elected

members to the school board in April 2015.  And it turned out,

for example, that there were two incumbents paired in

majority-black District 7.  Ms. Thurman and Ms. Graves, Dr.

Graves, were paired in 7; so I had to make a modification

there to eliminate that conflict.

        And so in Illustrative Plan 2, District 6 is the

majority-black district with 51.50 percent, and District 7

would be 40.86 percent.  And I think that Dr. Thurman is in

District 6 and Dr. Graves is in District 7.

1    Q    What standards did you apply in drawing your second

2    illustrative plan?

3    A    The same standards.  The plan is compact.  It's

4    contiguous, regularly shaped.  I had to split a few more

5    precincts.  This plan splits nine precincts, whereas the

6    Illustrative Plan 1 just split three populated precincts.

7    Q    Just tell us briefly what the demographics of your second

8    plan are.

9    A    Very similar.  District 1 is 64.53 percent single-race

10   African-American voting age.  District 2 is 60.89 percent.

11   District 3 is 75.67 percent.  District 6 is 51.50 percent.

12          And of the four majority-black districts, I guess the

13   black-white margin is the lowest in District 6.  It's about 6

14   percentage points.  So it's still significantly stronger than

15   the black-white margin in the district as a whole under an

16   at-large system, where it's actually negative three quarters

17   of a percentage point.

18   Q    Well, did you apply the same standards -- contiguity,

19   compactness, traditional redistricting principles -- to your

20   Plan No. 2 that you applied to Plan No. 1?

21   A    I did.  I started with Plan 1 and just made some

22   modifications to deal with the incumbency issues.

23   Q    Well, did you have to split any census blocks in drawing

24   your plans?

25   A    No.  The plans are all drawn at the census-block level;

1    so there's no population estimation involved.

2    Q    And would you care about splitting census blocks?

3    A    If possible, you should avoid splitting census blocks

4    because that means that you don't have an absolutely precise

5    calculation for the underlying population in a given district.

6    Q    Now, I want to ask you a few questions about the

7    demographics that you reported.  Would you look at pages 15

8    and 16 and Exhibit B of your report, your first report, 44.

9    A    Okay.

10    Q    And did you determine, based on your analysis, that

11    blacks in the school district have a depressed socioeconomic

12    status compared to whites?

13    A    Yes.  On almost every metric, African Americans lag

14    behind non-Hispanic whites.  For example --

15    Q    Which metrics did you report and look at?

16    A    Well, there are probably 25 different measures that are

17    included in Exhibit D attached to my report, but I just hit

18    some of the high spots in the text of the report.  One fourth

19    of the black population in the school district lives in

20    poverty, or 23 percent, almost one fourth, compared to 9.7

21    percent of whites.  That's non-Hispanic whites.

22        Black median household income is only about 70

23    percent of white median household income.  African Americans

24    earn -- have incomes of $38,760 in constant 2013 dollars

25    compared to $52,781 median income of white households.  And

1    you get the same disparity if you just look at family

2    households.  Twice as many African-American households rely on

3    food stamps compared to white households.

4    Q    What about employment?  Was there any disparity that you

5    found there?

6    A    There again, the median earnings level for African

7    Americans working full time is 83 percent of the median

8    earnings of whites, 26,671 annual median earnings level for

9    African Americans versus 32,202 for whites.

10   Q    What about education?  Were there any disparities there

11   reflected in the decennial census?

12   A    There are some disparities.  You can see that -- it's on

13   page 13 in Exhibit D, page 13 of 46 in Exhibit D.  I have a

14   chart.  You can see that there's a slight difference in the

15   number -- percentage of African Americans who did not finish

16   high school, 10.5 versus 8.3.

17        The education levels, high school graduate, is pretty

18   close.  It's just 1.7 percentage point difference.  The big

19   difference maybe is with the college degrees.  Bachelor's

20   degree or higher, there you see that African Americans are

21   lagging behind; 17.1 percent have college degrees versus 28

22   percent of the whites in the school district.  This is based

23   on the 2011-2013 American Community Survey, three-year

24   estimate.

25   Q    Well, based upon the census data in your report, did you

1  find whether or not blacks in the school district have a

2  depressed socioeconomic status compared to whites?

3  A    Yes.  There's no question about that in my mind.  I'm

4  essentially just reporting the information from the Census

5  Bureau's American Community Survey.  I'm not going beyond

6  that, doing super sophisticated statistical analysis, but you

7  just have to thumb through these charts, and you can see that

8  that is the case -- the charts in Exhibit D.

9  Q    Now, we've had some testimony about the American

10  Community Survey, but just very briefly tell me what it is and

11  why you relied upon it to determine those socioeconomic

12  disparities.

13  A    Well, it is an annual release now from the Census Bureau

14  that provides information that you cannot get from the

15  decennial census -- socioeconomic statistics, poverty rates,

16  educational levels -- just things we've been going over here a

17  few moments ago.  And it's a sample.  It's based on a survey

18  of one out of 40 individuals on an annual basis.  And it's a

19  rolling sample.

20        So in this particular instance I'm using the

21  2011-2013 three-year survey.  So the survey was conducted

22  between January 1 of 2011 and December 31 of 2013; so the

23  midpoint of that survey period would have been 2012.  So this

24  is something of an historical view.  It's not really current.

25  And it's also based on a sample.  So there are margins of

1   error associated with all of these, and I actually report the

2   margins of error.  So you can see in the tables that are

3   associated with each chart just what the margin of error is,

4   and absolute numbers.

5   Q    So while you looked at the ACS, American Community

6   Survey, for determining socioeconomic factors, you did not, so

7   you testified, rely upon that in drawing your redistricting

8   plans.  Can you tell me why you did not?

9   A    Well, you cannot use the American Community Survey for

10  redistricting purposes because it's only available down to the

11  block group level, which is not enough granularity, really, to

12  develop redistricting plans at the local level, where often

13  you need to go down to the block level to follow precinct

14  lines.  But, moreover, it's an estimate.  It's an estimate

15  with large margins of error, and for that reason the only

16  appropriate data set to use is the decennial census.  That's

17  what every jurisdiction that I have ever encountered uses.

18  Q    Now, do you know whether or not the Census Bureau itself

19  has taken a position on whether you should use the ACS in

20  drawing redistricting plans?

21  A    I don't know if they specifically mention redistricting

22  plans, but they do make it clear that if you're looking at

23  population totals by age and race, that you need to rely on

24  the 2010 census.  If you're concerned about socioeconomic

25  estimates, then the American Community Survey is fine to use

1  because that's going to be the only source of information for

2  that purpose.

3  Q    Let me refer you to Plaintiffs' Exhibit 132, which has

4  also been admitted into evidence.  Can you identify that for

5  me?

6  A    Yes.  That's a document I produced by the Census Bureau

7  that explains how one should use ACS data.  And it underscores

8  the reality that ACS data are estimates and that for even just

9  determining something basic, like the total population of a

10  county or a state or a municipality, one should not use ACS

11  data; one should use a separate data product produced by the

12  Census Bureau which is released on an annual basis that gives

13  you an estimate of the total population for cities, counties,

14  and states, but --

15  Q    Well --

16  A    Especially that information that is not available for

17  school districts.

18  Q    Yeah.  Okay.  Now, I think you indicate that since 1990

19  there have been changes in the growth rates of the black and

20  white populations in the school district.  Is that correct?

21  A    That's correct.  There's been a sharp drop in the

22  non-Hispanic white population between the 1990 census and the

23  2010 census and, of course, finding significant increase in

24  the black population in the school district between 1990 and

25  2010, and the overall population for the school district has

1  dropped from 80,938 in 1990 to 68,663 in 2010.

2  Q    Well, given the trend of increasing black population, do

3  you think that blacks will eventually become a majority of the

4  voting-age population in the school district?

5  A    To date, I've seen no evidence that has happened yet.  I

6  mean, I don't have a crystal ball.  Anything is possible.  But

7  you cannot use the ACS data to make that sort of an

8  assumption.  That's just a trend line.  It's a guess,

9  speculation.  It's not -- I don't think it would be admissible

10  for determining what the current population is.

11  Q    Do you have any opinion one way or another that there

12  might be an actual decline in future black population in the

13  school district?

14  A    Well, I do think that, you know, it's possible to develop

15  trend lines using whatever data set you want.  I think it's

16  inappropriate to it with the ACS data set.  But let's say you

17  do.  Something happened in Florissant, in Ferguson in

18  particular, about a year and a half ago, a bad incident, and

19  that could have completely changed the trend line.  There's no

20  way to know how that may affect future population changes in

21  the school district.  It could have resulted in a significant

22  outflow of African Americans for that matter as opposed to

23  what appears to have been some in-migration over the past 20

24  years.

25  Q    Now, you prepared a supplemental declaration, Plaintiffs'

1    Exhibit 45.  Can you tell me why you did that?

2    A    That was prepared to respond to some points that were

3    raised by Dr. Rodden in his initial declaration as well as

4    some other things that apparently the lawyers for the

5    defendants had indicated they were going to argue in this

6    case.

7         Specifically, I questioned Dr. Rodden's assertion

8    that African Americans are now a majority of the voting-age

9    population because, again, he was using the ACS data which I

10   maintain should not be used.

11        Then there is the second assertion that the

12   plaintiffs in the lawsuit cannot meet the *Gingles* I

13   precondition that the minority population is sufficiently

14   large and geographically compact.  I don't understand why he

15   would make that assertion, because it's clearly not the case.

16   It's very, very easy to get four out of seven districts that

17   are compact, contiguous, and comply with all traditional

18   restricting prescriptions.

19        And then he also went on to make the argument that

20   African-American homeownership rates in the

21   Ferguson-Florissant School District were quite high, and in

22   point of fact African Americans really are in a situation

23   where half live in owner-occupied housing, but the other half

24   lives in rental housing.  And, more importantly, non-Hispanic

25   whites in the school district have a very high homeownership

1  rate.  According to the latest ACS data, I think it's about 83

2  percent.

3          So it's a 30 percentage point gap.  So he was

4  implying that African Americans and whites both enjoy high

5  percentages of homeownership, but that's not the case.  It's

6  true that African-American homeownership rates in

7  Ferguson-Florissant using -- whether you use the decennial

8  census which actually provides that data or one of the America

9  Community Surveys, it's true that African Americans are a

10  little better off in terms of homeownership rates compared to

11  African Americans statewide, but it's also true that whites in

12  Ferguson-Florissant School District are significantly better

13  off than whites statewide.  So the gap is there, and it's as

14  sharp in Ferguson-Florissant School District as it is

15  statewide.

16  Q    But did you address any other issues in your supplemental

17  report?

18  A    Well, there was -- this is the claim that I believe the

19  attorneys are raising that the illustrative plans I've

20  developed violate one-person, one-vote requirements because

21  they don't use voting-age population.  They use a 2010 census.

22  I mean, this is a completely bogus claim.  Now, that could

23  change with the Supreme Court's *Evanwel* ruling, we shall see,

24  but as of now it's totally bogus.

25          And, moreover, it's very easy, if it were necessary

1   to balance citizen voting-age population or voting-age

2   population and total population at the same time, one can do

3   so, which is what I did in Hypothetical Plan A, which is on

4   page 15, Figure 6.  And the map is in Figure 5.  It's almost

5   identical to Plaintiffs' Illustrative Plan 1.  I just had to

6   make some minor changes to Districts 4 and 5 because, under

7   Plaintiffs' Illustrative Plan 1, the deviation, if you based

8   deviation on total voting-age population, would be 12 percent.

9   So I made a few changes to make sure that the deviation based

10  on voting-age population is under 10 percent.  And you can see

11  those calculations in the table in Figure A.  So it is plus or

12  minus 5 percent based on total population or voting-age

13  population.

14         I didn't do an analysis of citizen voting-age

15  population because only a little over 1 and a half percentage

16  points of the population in the school district is noncitizen.

17  And so it would make no difference.  This is not a place where

18  citizenship would be a factor.

19  Q    So just so I understand your answer to clarify, did you

20  find that even using voting-age population you could draw

21  majority-minority districts?

22  A    You certainly can, that's right.

23  Q    Now --

24  A    And you could do so with citizenship voting-age

25  population if you took that step, no doubt.

1  Q    And were you also asked to address whether or not the

2  first two plans you drew were racial gerrymanders?

3  A    Yes.  Again, I don't understand why that claim is being

4  made, but I thought I would go ahead and produce a

5  Hypothetical Plan B that really shows what a racial

6  gerrymander might look like.  And you can see that the

7  districts are much more contorted, less regularly shaped.

8         And in Hypothetical Plan B, I was actually able to

9  create six out of seven majority-black districts.  Couple of

10 them are in the 50s.  Three of them are in the 50s, but

11 they're still majority black.

12        But Districts 1 and 5 and 4 in Hypothetical Plan B

13 are really problematic from a compactness standpoint, and I

14 don't think you can justify districts that look like that

15 unless you were following municipal boundaries.  Sometimes

16 municipalities look like that, but in this case we're

17 splitting up municipalities.  So I don't think that would pass

18 muster.  It would not be an acceptable plan.

19 Q    Is there any governmental data of which you are aware

20 showing that blacks are a majority of the voting-age

21 population in the school district?

22 A    I have not seen a single product from the Census Bureau,

23 either the America Community Survey or the 2010 census, that

24 has a five handle on the voting-age population.  It's always

25 under 50 percent.

1    Q    Are there any discrepancies between the boundaries of the

2    school district as defined by the Census Bureau and the

3    boundaries as defined by the Board of Elections, the St. Louis

4    County Board of Elections?

5    A    There are.  There are inconsistencies.  There are over a

6    dozen census blocks that are not included in one or the

7    other -- one or the either boundaries.  The end result means

8    that the ACS is not really reflecting the true boundary of the

9    Ferguson-Florissant School District.  So you can never really

10   claim, if you use the ACS, that the school district boundary

11   as defined by the school board is over 50 percent black

12   because it's a different boundary than that reported in the

13   ACS.

14          So there's never going to be definitive proof.  If

15   you take that line of argument and draw a trend line and try

16   to claim that, following the trend lines, the district's now

17   over 50 percent, which I think is what Dr. Rodden and the

18   defendants feel should be done in this case.

19   Q    But which boundaries did you use in drawing your plans?

20   A    Well, I've consistently used the Board of Elections'

21   district boundaries.  But the America Community Survey is not

22   using the Board of Election district boundaries.  It is using

23   their own boundaries, which are almost identical but not

24   quite, and there's a net difference of 327 persons, as I've

25   indicated, but that's net.  And the absolute difference, if

1  you take into account all 15 or so census blocks that are

2  different under the two plans, you've got a population of, I

3  think, close to 6- or 700 people that are in kind of an

4  unknown territory, and so that's going to affect the sampling

5  of the American Community Survey.

6       Had the Census Bureau used the Board of Elections'

7  boundary, then you could say that that sample does reflect a

8  certain reality of the school board as defined by the Board of

9  Elections, but because it does not, it creates a whole other

10 level of uncertainty.  So I see no way that one can claim that

11 the school district currently is over 50 percent.

12 Q    Well, how did you calculate the population of the

13 districts you drew using the Board of Education boundaries?

14 A    Well, I used census block data from the Census Bureau and

15 aligned that with the Board of Education boundaries.  So I was

16 able to come up with an accurate figure, I think, but it's not

17 the same figure that is reported by the Census Bureau.

18      If you go to the Census Bureau's website and ask for

19 the population of Ferguson-Florissant School District, you

20 will get a report back that will say 69,050 persons, and

21 that's, of course, different than the school board's boundary

22 population.

23 Q    Well, just to clarify, does the difference in boundaries

24 used by the Census Bureau and the Board of Education have any

25 impact on the claim that the recent five-year SCS [sic] report

1   shows that all parts black VAP and the black citizen VAP

2   estimates are above 50 percent?

3   A    Yes.  Because it's so -- any way you cut it, it would be

4   very close to 50 percent even if you used a trend line, as the

5   defendants want to do.  And because of that, just the least

6   little difference here introduces a level of uncertainty,

7   which means that you just can't make that claim, because

8   there's no evidence.  The evidence that is on -- that is being

9   proffered here is the Census Bureau's data set, which does not

10  match the actual boundaries of the school district.

11  Q    Now, you may have answered this, but just to clarify, did

12  you find that the plaintiffs' plans violated one-person,

13  one-vote because they were based on total population rather

14  than voting-age population or citizen voting-age population?

15  A    No.  As I say, I've testified in 35 cases over the past

16  25 years.  In every single case the total population has been

17  used for the apportionment base, not voting age.  And so I do

18  not think that the plaintiffs' plans violate one-person,

19  one-vote.  And if they did by some chance based on the ruling

20  out of *Evanwel*, then Hypothetical Plan A shows that a remedy

21  plan could be created that would take that adjustment into

22  account.

23  Q    Now, I know that you have not relied upon the ACS data,

24  but is there any more recent ACS data that tends to undercut

25  the reliance upon ACS data of the defendants in this case?

1  A     Yes.  Yes.  There's a one-year survey for the year 2014

2  that was released in the fall, and it has a calculation for

3  the African-American voting-age population.

4          MS. ORMSBY:  I'm going to object, Your Honor.  This

5  is information that's not in evidence.  He hasn't provided it

6  in any of his reports.  This is the very first we are hearing

7  about this.

8          MR. MCDONALD:  Well, Your Honor, the Court can

9  judicially notice this.  We can provide --

10         THE COURT:  I don't think so.  If you didn't disclose

11  it in a case, we don't come up with new evidence at trial

12  after discovery for over a year.  So the answer is, yes, we've

13  already produced or and we identified it, or, no, we have

14  haven't; not that I will find it.

15         MR. MCDONALD:  Well, it just came up, Your Honor.

16         THE COURT:  You understand my question.

17         MR. MCDONALD:  I do, Your Honor.

18         THE COURT:  The reason we have rules of discovery and

19  Federal Rules of Civil Procedure is we identify materials that

20  we're going to use in trial so that we don't have surprises.

21  So the answer is either we've already disclosed it or we

22  haven't.

23         MR. MCDONALD:  Well, Your Honor, can I just respond

24  to that question?

25         THE COURT:  No.  You can answer my question.

1    MR. MCDONALD:  I will, Your Honor.  It's just because

2    we didn't become aware of it until Wednesday.

3         THE COURT:  Well, then you didn't disclose it.

4         MR. MCDONALD:  Because we're not aware of it.  It

5    hadn't been released.

6         THE COURT:  Well, then you can't use it because you

7    didn't disclose it.

8         MR. MCDONALD:  Because it hadn't been released, Your

9    Honor.

10        THE COURT:  I don't care why.

11        MR. MCDONALD:  Okay.

12        THE COURT:  We don't come up with materials we

13    haven't disclosed to the opposing party.

14        MR. MCDONALD:  Because it was not available to

15    disclose, Your Honor.

16        THE COURT:  For whatever reason.  I don't care why.

17        MR. MCDONALD:  Okay.

18        THE COURT:  Or you would have given them notice

19    before today that you had new material.  But there are rules

20    of procedure we follow out of fundamental fairness to each

21    other.

22        MR. MCDONALD:  Okay.  Can I just --

23        THE COURT:  Period.

24        MR. MCDONALD:  Can I just ask --

25        THE COURT:  Period.

1     MR. MCDONALD:  -- the witness one more question?

2     THE COURT:  About this topic or something different?

3   Q   (BY MR. MCDONALD) Yeah.  When did you become aware of

4   this --

5     THE COURT:  It's irrelevant.  It's irrelevant.

6     MR. MCDONALD:  Okay.  Thank you very much.

7     THE COURT:  You had it before five minutes ago.  Did

8   you have it before the testimony started today?

9     MR. MCDONALD:  We did.

10     THE COURT:  Well -- and you didn't disclose it; so

11   we're done.

12     MR. MCDONALD:  All right.  Thank you very much, Your

13   Honor.

14     THE COURT:  Cross-examination?

15     MS. ORMSBY:  Yes, Your Honor.

16                    **CROSS-EXAMINATION**

17   **BY MS. ORMSBY:**

18   Q   Good afternoon, Mr. Cooper.

19   A   Good afternoon.

20   Q   We met a few months ago, right?

21   A   In August.

22   Q   In August.  You said you graduated from college in 1975.

23   What was your degree in?

24   A   In economics.

25   Q   And did you have any classes in redistricting in that

1    major?

2    A    I did not.

3    Q    Did you have any classes in demography?

4    A    Not in my economics coursework.  I did attend graduate

5    school at Virginia Tech for over a year, and I was working on

6    a master's in urban regional planning but ultimately decided I

7    didn't want to pursue it, but in that coursework I did have

8    some classes in demographics.

9    Q    Do you remember having your deposition taken in August

10   like we just talked about?

11   A    I do recall that, yes.

12   Q    And you were under oath at that time?

13   A    Right.

14   Q    And do you remember me asking you, "So have you had any

15   classes in demography?" and your answer was, "Not

16   specifically, no," on page 14, line 16 and 17.

17   A    Well, not specifically, but they were classes in urban

18   planning, and we did analyze census data.  So it was not

19   coursework in demography in a sense that it was a -- if it

20   were a demography department at Virginia Tech.

21   Q    Okay.  So you did not.  So which is right?  You did take

22   classes in demography or you didn't take classes in

23   demography?

24   A    I did not take a class in demography from a department of

25   demography at some university.  I did have access and did work

1    with demographics as part of my year in urban regional

2    planning at Virginia Tech.

3    Q    Did you have any classes in statistics?

4    A    I did.

5    Q    How many?

6    A    I had a class in statistics in my economics coursework at

7    Davidson and a couple of classes in statistics at Virginia

8    Tech related to urban regional planning.

9    Q    Do you consider yourself a statistician?

10   A    No.

11   Q    You said you were a consultant currently?

12   A    Correct.

13   Q    Where did you work prior to being a consultant?

14   A    Prior to being a consultant, I worked for the ACLU of

15   Virginia for many years.

16   Q    How many years?

17   A    It would have been about ten years.  Initially part time,

18   but over the course of my period of working out of that

19   office, my part-time voting rights work began to overwhelm my

20   part-time work with a migrant farm worker health organization;

21   so eventually I resigned that position so I could just work on

22   voting rights.

23   Q    Okay.  And how did you come about drawing maps for the

24   ACLU?

25   A    Initially, I drew plans using paper maps in the 1980s

1  working off of a Lotus spreadsheet to speed things up, to run

2  the calculations for the various districts.  Beginning in --

3  Q    I'm just asking how did you come from working for a

4  non-for-profit to working part time for the ACLU?

5  A    Oh, well, the nonprofit had an office, shared office,

6  with the ACLU.  And around about 1987 the ACLU began to

7  litigate Section 2 cases in a number of counties in south-side

8  Virginia, where the board's county commissions were -- we call

9  them wards of supervisors -- were all white or nearly all

10 white, didn't reflect the underlying African-American

11 population.  And they needed some help in figuring out how to

12 draw districts, and I had that skill of a sort, and so I took

13 over that part of the project.

14 Q    And before you worked for the ACLU, you worked for where?

15 A    I worked for DELMARVA World Ministries, which is a

16 migrant farm worker health and nutrition organization based in

17 Delaware, but my office was in Richmond, Virginia.  I worked

18 on other things beyond just migrant farm worker health issues.

19 I had a statewide school breakfast expansion program that I

20 started, among other things.

21 Q    Prior to working for DELMARVA, where did you work?

22 A    Prior to working for DELMARVA, I was employed briefly at

23 the Student Loan Authority in Virginia, and then I was at

24 Virginia Tech, and prior to that, I was doing a number of odd

25 jobs in various places in order to go to South America, with a

1    backpack.

2    Q    Okay.  So you graduated from college in '75?

3    A    Right.

4    Q    You worked odd jobs from '75 until when?

5    A    Well, off and on, I made two trips to Latin America, and

6    so I was working odd jobs from '75 till around '79.

7    Q    What kind of odd jobs did you --

8    A    I worked fast-food joints, picked apples in Washington

9    state, worked in a grape juice factory in Washington state,

10   worked a few weeks on a military base in Washington state.  I

11   worked for my uncle at his nursery in southwest Virginia.  So

12   I did various odd jobs.

13   Q    So your college training both for your BA and the one

14   year of graduate school -- is that correct that you said?  One

15   year?

16   A    One year.

17   Q    That was not in preparation for doing demography?

18   A    Oh, it put me in good -- I had very good coursework at

19   Davidson in economics, and the work I did in urban regional

20   planning was right in line with doing this sort of thing.

21   Q    Why did you --

22   A    I recall this was in the early '80s, but even at that

23   time Virginia Tech had CRTs with census tract display; so we

24   were able to look at socioeconomic data for Hampton Roads on

25   CRTs like in 1981 or so, which was pretty advanced.  They had

1    a very good computing department at Virginia Tech, even at

2    that time.

3    Q    Why did you stop that program in urban planning?

4    A    I just didn't want to work -- in the end, I decided I did

5    not want to go to work for a single agency in the sense that I

6    would just be doing the same stuff over and over again,

7    comprehensive plans for the same jurisdiction.

8    Q    How many cases have you worked on for the -- for or with

9    the ACLU?

10   A    I'm not sure.  Many.  I mean --

11   Q    Too many to count?

12   A    Well, there have been several dozen.

13   Q    How many times did you communicate with Dr. Engstrom with

14   regard to this case?

15   A    I think I may have one time explained to him about the

16   consolidated precincts and how I arrived at those numbers.

17   Beyond that, nothing.  I've had no contact with any of the

18   experts in this case.

19   Q    How many cases have you and Dr. Engstrom worked on

20   together?

21   A    Very few, actually.  I'm working with him in a case in

22   Terrebonne Parish.  I say "working with him."  I've given

23   data.  And I was also involved in a case in Yakima,

24   Washington, Section 2 case, and provided data to him in that

25   case.

1  Q    How do you define majority?

2  A    Well, typically a majority is something over 50 percent.

3  Q    And would you agree that the last time we knew that

4  whites were a majority of the voters was 16 years ago,

5  according to the 2000 census, in the Ferguson-Florissant

6  School District?

7  A    I have to look at the chart.  You said the 2000 census?

8  Q    Yes.

9  A    Right.  In the 2000 census, non-Hispanic white comprise

10  64.43 percent of the voting-age population.

11  Q    That's the last time we know for sure they were the

12  majority, correct?

13  A    The last time you know for sure.

14  Q    Would you concede that whites are a minority of the

15  voters in the Ferguson-Florissant School District today?

16  A    Don't know today.  I know in 2010 they were a plurality

17  but not a majority.

18  Q    So isn't it true that you completely ignored the ACS for

19  population purposes, but you relied on the ACS for other

20  reasons?

21  A    Well, that's because the ACS is useful for at least

22  coming up with reasonable estimates of socioeconomic factors,

23  but there is a reliable and much better source for population

24  data, and that is called the decennial census.

25  Q    Isn't it true that you didn't use the ACS population data

1   because it showed that whites were a minority of the voters?

2   A    Not -- that's not true.  As we discussed in the

3   deposition, I did look --

4            THE COURT:  Deposition.  You just testify here.

5   A    Right.  Right.

6   Q    How do you define a trend?

7   A    A trend is just, in a directional term, something is

8   going up or down.

9   Q    Would you agree that trends --

10  A    Maybe not going anywhere.

11  Q    Would you agree that trends are relevant in this case?

12  A    You know, maybe as background information, but there is

13  just no strong evidence that there is a trend since 2010.

14  There's no evidence at all.

15  Q    Did you do a trend analysis of this case?

16  A    I did not do a trend analysis because there is no reason

17  to do one.

18  Q    How long would it take you to do a trend analysis?

19  A    You know, you can look at the ACS data and I suppose do a

20  trend analysis --

21  Q    My question is how long?

22           THE COURT:  Hang on.  Everybody slow down.

23  Q    How long would it take you to do a trend analysis?

24  A    How long would it take me?

25  Q    Uh-huh.

1  A    I don't know.  I've not done one in this case.  I'd have

2  to think about it.

3  Q    Do you use Microsoft Excel at all in your analysis?

4  A    These charts were produced with Microsoft Excel.

5  Q    And isn't it true that you just have to push a button in

6  order to get a trend analysis?

7  A    You do, but there are different formulas one could use,

8  and you're looking at different time periods.  So one could do

9  it, but, again, my understanding is the ACS data should not be

10 done -- should not be used to develop definitive population

11 totals for any given year.  Just is not appropriate when you

12 have a 2010 census that's only four years old, five years old

13 now.

14 Q    You've used trends in other cases, though, haven't you?

15 A    I think I have produced a chart or two in other cases for

16 background information, right.

17 Q    Do you remember on January 29, 2008, being deposed in the

18 *Fairley v. Hattiesburg* case?

19 A    I do remember that.  Not the deposition per se, but I do

20 know that I was deposed in that case.

21 Q    And this was a Voting Rights Act case, correct?

22 A    Sort of.  That particular case involved whether or not

23 college students should be included in the apportionment base

24 of Hattiesburg; so it was not a pure Section 2 case at all.

25 Q    Were you under oath when you gave this deposition just as

1  you're under oath today?

2  A    I believe so.

3  Q    I will refer you to Exhibit VV, which is a stipulated

4  exhibit in this case.  It is the 2008 deposition that I just

5  spoke of.  Well, first I'm going to ask you would it be fair

6  to say that --

7       THE COURT:  Slow down.  Tell them what page and line

8  number you're on.

9       MS. ORMSBY:  I don't think he has it.  Do we have --

10      THE COURT:  Another one of those fairness issues.

11  They have a right to know what you're reading from.

12      MS. ORMSBY:  I agree with you, Your Honor.  May I

13  approach the witness?

14      THE COURT:  You may.  You can put it on the screen.

15      MS. ORMSBY:  Okay.

16      THE COURT:  That way everybody can see at the same

17  time.

18  Q   (BY MS. ORMSBY) All right.  On page 24 of your deposition,

19  you were asked, "Would it be fair to say that at this point in

20  history, given the census data available, given the changes

21  through annexation, given the new construction, that there are

22  no reliable current numbers that would accurately reflect the

23  racial distribution within the city of Hattiesburg?"

24      And you responded, "Well, there's no definitive

25  numbers.  You can look at things like the driver's license

1  database that showed in 2004 roughly over 40 percent of the

2  persons who had received drivers' licenses that were African

3  American compared to the 42.5 in 2000.  You can look at the

4  trends, you can look at the school system and see there's more

5  African-American kids, and you can look at the trend lines

6  that have changed 1990, 2000 and project it out towards which

7  is not at the seemly going to lead to you the definitive

8  conclusion you can see from 1980, '80 and '90, that the

9  American increased about 6 percent and 6 percent in '90 and

10  2000.  And that seems to be like the driver's license

11  information.  Then black voting-age population is increasing."

12         Do you remember testifying to that?

13  A    Well, it's clearly in my typical garbled syntax; although

14  I don't even think I'm quite --

15         THE COURT:  We never talk the way we write.  That's

16  one of the problems with depositions.

17  A    I'm not even sure if I'm really always that bad, though.

18  But, yeah, you can look at it, but as I said, right up front

19  there's no definitive numbers.

20  Q    And then I'll take you to page 120 of that same

21  deposition, page 120 and -21.

22         You were asked, "You've reached the conclusion that

23  the city of Hattiesburg is majority African American at the

24  present time?"

25         And you answered, "I reached that conclusion based on

1    majority minority as of the 2000 census.  As of the 2000

2    census, the any-part black population -- and this was before

3    the annexation was -- we don't really have that data for the

4    annexed area.  It's in my report.  It's -- it was 47.8

5    percent, so it was almost 48 percent.  So based on everything

6    I had seen, I think it's almost a lock, has to be, that the

7    city's population is well over 50 percent black, all ages, any

8    part, now eight years after the 2000 census."

9         "QUESTION:  Is that not a projection of population

10   that -- or would a projection of population not be required to

11   reach that conclusion?

12        "ANSWER:  I don't think so, because I'm not trying to

13   do anything more than look at the '80-to-'90, '90-to-2000

14   trends, factor in what I know about drivers' licensures, and

15   what I know about the student populations; so I think it's

16   certainly over 50 percent, but I can't give you an exact

17   figure.  I mean, that's just my opinion."

18   A    Exactly.  And I was exactly right.

19   Q    And you --

20   A    It is over 50 percent now in Hattiesburg.

21   Q    And you projected, didn't you?

22   A    I looked at what I knew about the city of Hattiesburg and

23   made that assessment.  I cannot do that in Ferguson-Florissant

24   School District, nor do I believe anyone else can.

25   Q    So you relied on trends in this case, but you won't rely

1    on trends --

2    A    I am relying on trends in this case.  To the extent that

3    I have not seen a single data point that has a five handle on

4    it, all of them are under 50 percent no matter which ACS you

5    use.

6    Q    If you had done a trend analysis in this case, you would

7    have discovered that African Americans are majority of the

8    voting-age population, wouldn't you?

9    A    No.  I would not, because I have looked at 2014 one-year

10   survey.

11           MS. ORMSBY:  Objection, Your Honor.

12   A    I'm sorry.  But I have to --

13           THE COURT:  I assume that you -- if you looked at it,

14   you didn't look at it while you were sitting there, and your

15   attorneys let you down by not disclosing it when we were

16   together last week that that might be a factor here today,

17   and I -- you know, it's unfortunate, but both sides have to

18   play by the same set of rules.  If we've got documents or we

19   got information, we got to tell each other about it.  And you

20   can't show up -- I mean, I hate, at the end of the day,

21   artificial landscapes.  I like to know everything I can

22   possibly know, but if we didn't tell anybody about it, we

23   can't use it.

24           THE WITNESS:  Okay.

25           THE COURT:  That's just a common-sense problem that

1   we are up against right now.  I mean, I'd like to, but because

2   the more I know, the better job I can do, but both sides, for

3   them to meet it, they had to know about it.

4           THE WITNESS:  I apologize.  It's partly my fault.

5           THE COURT:  It's just the way it goes.  You know,

6   it's good, bad, or otherwise.  And it will cut both ways

7   before this case is over.

8   Q    (BY MS. ORMSBY) Do you remember having your deposition

9   taken for this case in August of 2015?

10  A    I do.

11  Q    And in that deposition you admitted that you did do an

12  APV VAP calculation, didn't you?

13  A    I did.

14  Q    What was the number you came up with?

15  A    My recollection it was around 49.8 percent.

16  Q    You have a good memory.  That's exactly what you said it

17  was.  Do you remember stating it was a back-of-an-envelope

18  calculation that you would stand by?  Do you remember saying

19  those words?

20  A    I do recall saying that because -- but, again, as I

21  insisted during that deposition then, I felt like it was

22  inappropriate to try to actually state definitively that the

23  population was over 50 percent any-part black based on one

24  American Community Survey.

25  Q    Can you explain how you reached that percentage of 49.8

1  percent according to the ACS, 2011-2013 ACS?

2  A    Well, I essentially just took the single-race black

3  population percentage and then added a factor in based on the

4  percentage of the any-part black population that was not

5  single-race black in the 2010 census, and my factor was .55.

6         I believe Dr. Chen or Dr. Rodden, one of the two, did

7  a separate calculation that has it over 50 percent, but they

8  were looking at the any-part black percentage ratio based on

9  all persons.  And as I indicated, one would expect to have

10 higher levels of any part -- persons who are any-part black in

11 the overall population than in the voting-age population.

12        So for that reason I feel like it's more appropriate

13 to rely on a ratio based on the 2010 any-part voting-age

14 population as opposed to the 2010 total population any part.

15 Q    So in August you admitted that you believed the AP VAP

16 was -- well, your back-of-the-envelope calculation that you

17 would stand by was 49.8 percent.  And we agreed that the

18 all-minority VAP was over 50 percent.  Do you remember that?

19 A    Well, the all-minority VAP is over 50 percent based on

20 the 2010 census; so we can agree on that.

21 Q    Okay.  Do you have any idea how many people .2 percent

22 equals in the Ferguson-Florissant School District?

23 A    I guess it would be about 1,200 people.

24 Q    Be about 102 people?

25 A    Sorry.  I'm a decimal point off there.

1   Q     So it's your belief that, since 2012, African Americans

2   could not have increased net by 102 people?

3   A     That they could have, but I don't know that to be a fact.

4   And I have seen no evidence to suggest that anyone can show

5   that to be a fact.  And as I mentioned briefly in my initial

6   testimony today, the events in Ferguson in 2014 could put an

7   end to a trend line.  I mean, the trend is your friend until

8   it's not your friend, and I would submit that it's no longer

9   necessarily a friend because things have really changed.

10  Q     So that's interesting.  You mentioned in your direct

11  testimony that, because of the events that occurred in 2014,

12  there could have been an exodus of African Americans from at

13  least the city of Ferguson, correct?

14  A     At least the city of Ferguson.  And there was so much bad

15  press about West Florissant, that it could have had an effect

16  on the Florissant -- and not just out-migration but also

17  in-migration.

18  Q     Well, I'm going to represent to you that nothing near

19  West Florissant is Florissant -- city of Florissant, but are

20  you saying that white people would stay because of the events

21  in August of 2014 and black people would exodus as a result of

22  2014?

23  A     No.  I'm not saying that at all.  I think it's quite

24  possible that it led to higher percentage of whites leaving

25  the area.  Perhaps.

1  Q    Thank you.

2  A    But we don't know that to be fact.  But one thing we do

3  know to be a fact is that 83 percent of whites in

4  Ferguson-Florissant School District live in owner-occupied

5  housing, and it's a lot tougher to unload an owner-occupied

6  house than it is to break a lease on a rental property.  So

7  it's going to be easier for African Americans to leave should

8  they so desire.

9  Q    Did you do any analysis about that?

10 A    No.  No.  I'm just --

11 Q    And you brought this up in August, and you didn't do any

12 analysis since August, correct?

13 A    There is -- I don't think you could do an analysis.

14 Q    Okay.  Let's just talk a little bit about your

15 illustrative plans and your hypothetical plans.  You talked a

16 little bit about -- I guess my question is you did your

17 illustrative plans with the single-member districts.  Do you

18 believe that if the district has single-member districts would

19 make -- it would make it more difficult for people or board

20 members or anyone to move within the school district if they

21 had any interest of serving on the school board?

22 A    What do you mean by "move within the school district"?

23 Q    I mean, I live in District 2, and I want to move to

24 District 6, but I'm on the school board or I'm thinking about

25 running for the school board.  And if I move, then I have to

1   either give up my seat if I'm already on the school board, or

2   I won't have any friends nearby who know me to run for the

3   school board.  Could that be an issue?

4   A    It could be for a potential candidate.

5   Q    So you've testified in a lot of these cases, and you're

6   pretty familiar with Section 2 of the Voting Rights Act; is

7   that right?

8   A    Reasonably familiar.  I'm not a lawyer.

9   Q    Are you familiar with *Gingles* I?

10  A    Yes.

11  Q    So you will agree with me, won't you, that if African

12  Americans are a majority, there's no violation of Section 2

13  under *Gingles*?

14  A    Well, first I'm not a lawyer, but I totally disagree with

15  that statement.  That's preposterous.

16  Q    Really?  If majority -- if African Americans are the

17  majority, under *Gingles* I, it would not be -- a violation of

18  Section 2 would be moot?

19  A    Well, the point is you can meet *Gingles* I in the

20  Ferguson-Florissant School District.  Whether the district is

21  49 percent, 47 percent, or 53 percent*, Gingles* I is met.  Now,

22  you can argue that it doesn't need -- that that Section 2 case

23  may fail because the jurisdiction is majority black at large,

24  but I've met *Gingles* I in Hypothetical Plan A and -- I'm

25  sorry -- Illustrative Plan 1 and Illustrative Plan 2 and, for

1    that matter, Hypothetical Plan A.  So there's no -- there just

2    cannot be an issue of *Gingles* I.  You may have many other

3    issues in this case, you obviously do, but *Gingles* I won't

4    fly.

5          MS. ORMSBY:  Thank you.  I have nothing further.

6          THE COURT:  Thank you.

7          MS. ORMSBY:  Excuse me.

8          THE COURT:  Just a second.

9          MS. ORMSBY:  I might have.

10         THE COURT:  Consult with counsel, and then we'll see

11   where we are.

12         MS. ORMSBY:  I don't have anything further, Your

13   Honor.

14         THE COURT:  Thank you.

15         Any redirect?

16         MR. MCDONALD:  Nothing further from the plaintiffs,

17   Your Honor.

18         THE COURT:  Very good.  Thank you, sir.  You may step

19   down.

20         THE WITNESS:  Thank you.

21         THE COURT:  All right.  Magically, it's five o'clock.

22   Who knew?  How far did we get today compared to where you

23   thought we would be?

24         MR. ROTHERT:  Exactly where we thought.

25         THE COURT:  Who are we going to hear from tomorrow,

1   just so --

2          MR. ROTHERT:  We have already let them know.  Do you

3   want to know?

4          THE COURT:  Moi?  I'm just an innocent bystander.

5          MR. ROTHERT:  Would you like to know?

6          THE COURT:  Yeah, I would kind of like to know.  Idle

7   curiosity.  I'll be here.

8          MR. ROTHERT:  Our first witness is -- our first two

9   witnesses will be fact witnesses, Ms. Doris Graham and Mr.

10  Henson.  Dr. David Kimball is a political scientist.  He will

11  be an expert witness, the third.

12         THE COURT:  Where does he teach?

13         MR. ROTHERT:  UMSL.  And time permitting, we will be

14  calling Mr. Frank Green as a fact witness.

15         THE COURT:  Okay.  And you know that?  You're ready?

16         MS. ORMSBY:  He told us after lunch, Your Honor.

17         THE COURT:  Laser-like focus.

18         MS. ORMSBY:  And if it please the Court, Frank Green

19  is also on our will-call list and if I can do a direct cross.

20         THE COURT:  We'll see how it goes.  We talked about

21  that last week, but, you know, I try not to borrow any

22  trouble.  We'll take it as it comes.

23         All right.  Thank you all.  We'll start promptly at

24  nine o'clock.

25         **(PROCEEDINGS CONCLUDED AT 5:00 PM.)**

CERTIFICATE


I, Shannon L. White, Registered Merit Reporter and
Certified Realtime Reporter, hereby certify that I am a duly
appointed Official Court Reporter of the United States
District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case and that said transcript is a true and
correct transcription of my stenographic notes.

I further certify that this transcript contains
pages 1 through 234 inclusive and that this reporter takes no
responsibility for missing or damaged pages of this transcript
when same transcript is copied by any party other than this
reporter.

Dated at St. Louis, Missouri, this 26th day of January,
2016.


_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter