UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MISSOURI STATE CONFERENCE OF THE ) 
NATIONAL ASSOCIATION FOR THE ) 
ADVANCEMENT OF COLORED PEOPLE, ) 
REDDITT HUDSON, F. WILLIS JOHNSON, ) 
and DORIS BAILEY, ) 
  ) 
    Plaintiffs. ) 
    v. ) 
  ) 
  ) No 4:14-CV-2077 RWS
FERGUSON-FLORISSANT SCHOOL ) 
DISTRICT, and ST. LOUIS COUNTY ) 
BOARD OF ELECTIONS COMMISSIONERS, ) 
  ) 
    Defendants. ) 

BENCH TRIAL – VOLUME II
BEFORE THE HONORABLE RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE
JANUARY 12, 2016

APPEARANCES:
For Plaintiffs:    Anthony E. Rothert, Esq.
    Jessie M. Steffan, Esq.
    AMERICAN CIVIL LIBERTIES UNION OF MISSOURI
    FOUNDATION
    454 Whittier Street
    St. Louis, MO  63108

    Julie A. Ebenstein, Esq.
    Sophia Lin Lakin, Esq.
    Dale E. Ho, Esq.
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    125 Broad Street, 18th Floor
    New York, NY  10004

Appearances Cont'd on Page 2:

REPORTED BY:    SHANNON L. WHITE, RMR, CRR, CSR, CCR
    Official Court Reporter
    United States District Court
    111 South Tenth Street, Third Floor
    St. Louis, MO  63102
    (314) 244-7966
    PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

Appearances Continued:


For Plaintiffs:        M. Laughlin McDonald, Esq.
                       ACLU VOTING RIGHTS PROJECT
                       2700 International Tower
                       229 Peachtree Street, N.E.
                       Atlanta, GA  30303

For Defendants:        Cindy Reeds Ormsby, Esq.
                       Angela Gabel, Esq.
                       CROTZER AND ORMSBY, LLC
                       130 S. Bemiston, Suite 602
                       Clayton, MO  63105

                       Kathryn B. Forster, Esq.
                       CROTZER AND ORMSBY, LLC
                       130 S. Bemiston, Suite 602
                       Clayton, MO  63105

                       John A. Safarli, Esq.
                       FLOYD, PFLUEGER & RINGER, P.S.
                       200 West Thomas Street, Suite 500
                       Seattle, WA  98119

I N D E X

PLAINTIFFS' WITNESSES

CHARLES HENSON
Direct Examination by Ms. Lakin ..................... 6
Cross-Examination by Ms. Ormsby ..................... 41
Redirect Examination by Ms. Lakin .................. 59

DORIS A. GRAHAM
Direct Examination by Mr. McDonald .................. 63
Cross-Examination by Ms. Ormsby ..................... 92
Redirect Examination by Mr. McDonald ............... 101

DAVID C. KIMBALL
Direct Examination by Mr. Rothert .................. 105
Cross-Examination by Ms. Ormsby .................... 184

1    **(PROCEEDINGS STARTED AT 9:07 AM.)**

2         THE COURT:  Morning.  Any announcements before we

3    begin this morning?  All right.

4         Mr. Rothert, if you would call your next witness.

5         MR. ROTHERT:  Just prior to calling our next witness,

6    we would like to ask the Court to take judicial notice of

7    Missouri Revised Statute Section 1.100 regarding population

8    for the purpose of representation of Missouri being measured

9    by the last decennial census.  I have a copy of the statute.

10        THE COURT:  Thank you.

11        Any objection?

12        MS. ORMSBY:  No objection, Your Honor.

13        THE COURT:  Very good.  Court will take judicial

14   notice of Missouri Revised Statute 1.120 -- actually 1.100.1.

15        MR. ROTHERT:  Yes.  And since we're doing that, we'd

16   also ask the Court to take judicial notice of Missouri Revised

17   Statutes Section 610.021, which governs the permissive closure

18   of certain meetings and records.

19        THE COURT:  Any objection?

20        MS. ORMSBY:  No objection, Your Honor.

21        THE COURT:  Court will take judicial notice of the

22   Missouri Revised Statute.

23        MR. ROTHERT:  And one final matter just to clarify

24   for the record.  Yesterday we offered Mr. William Cooper as an

25   expert, and there was an objection to him being an expert.

1    Obviously, he gave opinions, but --

2         THE COURT:  He did give opinions.

3         MR. ROTHERT:  So we just wanted to clarify.  There

4    had been an objection to him being considered an expert

5    witness.  We wanted to see if that issue has been resolved and

6    he's been accepted as an expert or if --

7         THE COURT:  I'm going to reserve ruling on that until

8    the conclusion of the trial.  Don't panic.  Probably goes more

9    to the weight, the discussion about -- I mean, you can be an

10   expert not just on education but on experience.  Obviously, he

11   has a substantial amount of experience, nobody is going to

12   deny that.  An interesting background.  Not a traditional

13   expert background.

14        But if you've been in the St. Louis legal community

15   for any length of time at all, Boulter Kelsey was an expert on

16   anything.  Told him what you wanted.  He would go out and

17   figure it out and come back and be an expert; so . . .

18        MR. ROTHERT:  And often accepted by the court.

19        THE COURT:  But often -- but sometimes marginalized,

20   sometimes not.  But we will have a lot of legal issues, I

21   suspect, at the end of the trial, and I'm not going to

22   forestall a further discussion about that.

23        MR. ROTHERT:  Okay.

24        THE COURT:  But I didn't want you to think that my

25   reserving it meant that I was going to eliminate him.  I mean,

1　we're in a unique position.  I can evaluate it on a number of

2　levels.

3　　　　　MR. ROTHERT:  Very well.  So I think we're ready to

4　call our first witness.

5　　　　　MS. LAKIN:  Good morning, Your Honor.  Sophia Lakin

6　on behalf of the plaintiffs.  At this time, plaintiffs call

7　Mr. Charles Henson.

8　　　　　THE COURT:  If you would step forward, sir, and be

9　sworn.

10　　　　　　　　　**(WITNESS SWORN BY THE CLERK.)**

11　　　　　MS. LAKIN:  I'm going to hand the witness a document

12　marked as Plaintiffs' Exhibit 116 to take with him on the

13　stand.

14　　　　　THE COURT:  Very well.

15　　　　　Are you ready?  You may proceed.

16　　　　　　　　　　　**CHARLES HENSON,**

17　**HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

18　**FOLLOWS:**

19　　　　　　　　　　**DIRECT EXAMINATION**

20　**BY MS. LAKIN:**

21　Q    Good morning, Mr. Henson.  Can you please state your name

22　for the record?

23　A    Charles Henson.

24　Q    Where were you born?

25　A    St. Louis, Missouri.

1    Q     Where do you live?

2    A     I live in Ferguson, Missouri.

3    Q     Do you reside within the Ferguson-Florissant School

4    District?

5    A     Yes, I do.

6    Q     Did you have an opportunity in this case to execute a

7    declaration or affidavit?

8    A     Yes.

9    Q     Can you please look at the document I handed you as you

10   took the stand, which has been marked for identification as

11   Plaintiffs' Exhibit 116.  Do you recognize this document?

12   A     Yes, I do.

13   Q     What is this document?

14   A     It is the declaration that I --

15   Q     Did you sign this document?

16   A     Yes, I did.

17   Q     Did you have an opportunity to review this declaration

18   before you signed it?

19   A     Yes, I did.

20   Q     Were each of the statements in this declaration true when

21   you signed it?

22   A     They were, yes.

23   Q     Have you recently had an opportunity to review each of

24   the statements in this declaration?

25   A     Yes, I have.

1  Q    And are each of the statements in your declaration still

2  true?

3  A    Yes.

4       MS. LAKIN:  Your Honor, I'd like to move to admit

5  into evidence Plaintiffs' Exhibit 116.

6       THE COURT:  Any objection?

7       MS. ORMSBY:  No objection.

8       THE COURT:  Received without objection.

9  Q    (BY MS. LAKIN) For how long after you were born did you

10 live in St. Louis city?

11 A    I lived in St. Louis city from K through eighth grade.

12 Q    Where did you -- when did you first move to the district?

13 A    I moved into the district in 1973.

14 Q    Where did you live when you first moved to the district?

15 A    I lived in the -- in Kinloch, but in the unincorporated

16 area of St. Louis County.  That was inside the district of

17 Ferguson-Florissant.

18 Q    How long did you live in this unincorporated part of

19 Kinloch?

20 A    I was there -- we moved into Ferguson in '75; so

21 approximately two years.

22 Q    And how many years have you been a resident of the

23 district?

24 A    Since '73.  So that's quite a long time, I guess.

25 Q    Did you attend a school in the district?

1  A    Yes.  I attended Ferguson Junior High and then McCluer

2  High School, where I graduated.

3  Q    What was the racial composition of Ferguson Junior High

4  while you attended?

5  A    There was probably 5 percent African-American population

6  at best.

7  Q    And the rest of the population?

8  A    I would say it would be 95 percent white.

9  Q    What about the racial composition of McCluer High School?

10 A    We were probably -- African Americans probably 10

11 percent; 90 percent white at the time.

12 Q    What was the approximate demographic breakdown of the

13 administrators and teachers in the district while you attended

14 schools there?

15 A    I would say 98 percent white.

16 Q    While you were growing up in St. Louis city and the

17 Ferguson-Florissant School District, did you experience any

18 racial discrimination or segregation?

19 A    Yes.

20 Q    Can you give us some examples?

21 A    Well, one of the things -- I was an athlete.  So playing

22 on certain sports teams there were just some unwritten

23 positions and things like that on the football field that they

24 just -- they were not for minorities.  You couldn't -- there

25 was no pitchers on the baseball team.  No quarterbacks on the

1  football team.  There was -- some of the things that I

2  experienced in the classroom, my fellow white students, they

3  would tell me that "Charles, we can be friends at school, but

4  you can't come to my house.  My parents would forbid it."

5          And then there was experiences that I had as well.

6  We attended -- one night there was a party at a young lady --

7  she was a cheerleader, a white cheerleader, at her home.  And

8  me and another African-American football player, we walked

9  into the house, and her parents were sitting in the kitchen,

10  and they asked us -- the party was going on in the basement,

11  and they asked us what were we there for.

12          We said, "The party."

13          And the parents said, "Not for you."  So that was

14  just among several things.

15  Q    And what about your experience as a student in the

16  classroom?

17  A    Well, one of the things is that growing up in the city,

18  the K-through-eighth-grade experience that I noticed the

19  difference when I got to Ferguson-Florissant was the missing

20  part of the nurturing part of the classroom.  The teachers and

21  educators in St. Louis City School District, I think, cared a

22  great deal more about my personal achievement.  When I got to

23  Ferguson-Florissant, it seemed to me more of I was just

24  another number.

25  Q    And what was the racial composition of the teachers and

1 administrators of the school that you attended in St. Louis

2 city?

3 A    It was probably -- of the administrators?

4 Q    And teachers.

5 A    And teachers.  I would say 98 percent African American.

6 Q    What is the approximate current demographic breakdown of

7 the district student body today?

8 A    I don't know exactly, but I would assume that the

9 African-American student body is probably in the 80

10 percentile.

11 Q    Eighty percent?  I'm sorry.

12 A    Eighty percentile.  Somewhere in the 80 percent, mid 80

13 percentile, African-American student body.

14 Q    And what is the approximate current breakdown of the

15 administrators and teachers in the district today?

16 A    I would say just the opposite.  I would think that the

17 administrators are probably somewhere in the 80 percent white.

18 Q    Do African Americans in the district continue to suffer

19 the effects of discrimination today?

20 A    I think so because, I mean, we just look at the evidence

21 of what's happened in the last year and a half in our district

22 area in the city of Ferguson with regard to the Department of

23 Justice report and to look at the -- some of the blatant

24 racial issues that still exist inside our community.

25 Q    Are you first generation of your family to reside in the

1    district?

2    A     No.

3    Q     Who else in your family has lived in the district?

4    A     We go back quite a ways.  Four generations of my family

5    have lived in the district.  My grandfather moved to Kinloch

6    in the early 1900s.  My mom obviously was born and raised in

7    Kinloch.  And so then myself and my children.  So we've been

8    here for four generations.

9    Q     And did your mother attend a school in the district?

10   A     Yes and no.

11   Q     Can you explain what you mean by that?

12   A     She attended elementary school, started out in a one-room

13   building somewhere in the city of Ferguson off of Florissant

14   Road, and then the district built Vernon Elementary School

15   inside Kinloch for the black students.

16   Q     What about for high school?  Did she attend a school

17   within the district?

18   A     She could not attend Ferguson High School; so she had

19   to -- at 12 years old, she had to take public transportation

20   to Webster Groves to attend Douglass College -- Douglass High

21   School, I'm sorry.

22   Q     And why could she not attend the high school in the

23   district?

24   A     The Ferguson-Florissant District at that time was

25   segregated; so it would not allow black students in the

1  district.

2  Q    And you mentioned that she had to take transportation to

3  Webster Groves.  How did she get to --

4  A    They called it the streetcar, and that was

5  transportation, the mode.

6  Q    And how long did it take her on the streetcar?

7  A    Probably over an hour, I would guess, because right now

8  just to drive to Webster Groves from Ferguson is a 20-,

9  30-minute drive.  So on a streetcar with public

10 transportation, hour to two hours, I would think, every

11 morning.

12 Q    And how old was she when she started taking the streetcar

13 to the school in the other district?

14 A    My mom was 12 years old because she had received a double

15 in one of her classes; so she was a young student.

16 Q    Do you have any children?  You mentioned you had

17 children.

18 A    Yes.

19 Q    And how many children do you have?

20 A    I have two children.  My daughter is the oldest, and my

21 son is obviously younger.

22 Q    Did your children attend schools within the district?

23 A    Yes.  They both attended Lee Hamilton Elementary School

24 and then on to graduate from McCluer High School.

25 Q    And when did they graduate?

1   A    My daughter graduated in 2008, and my son graduated in

2   2012.

3   Q    What is your current occupation?

4   A    I'm the project director of the Minority Business

5   Development Agency Business Center here in St. Louis.

6   Q    What is the Minority Business Development Agency Business

7   Center?

8   A    Certainly.  The MBDA is a federal agency under the

9   Department of Commerce, and it is the only federal agency with

10  the main objective of growing and developing existing

11  minority-owned businesses.  So there's 44 centers around the

12  country.  I run the center here in St. Louis.

13  Q    And how long have you run the center in St. Louis?

14  A    For just over three years.

15  Q    Where did you work prior to your current role as a

16  project director for the Minority Business Development Agency

17  Business Center?

18  A    Certainly.  I spent one year with McCarthy Building Group

19  as the -- a new position they created for me, director of

20  community relations.  That position came to me because prior

21  to that I had run my own business called Design Alternatives

22  for nearly 20 years, and my relationship with the McCarthy,

23  when I closed my company, asked me to come to work for them.

24  Q    And what did you do in your role as director of community

25  relations at McCarthy Building Group?

1  A    Part of -- there was a cadre of responsibilities.  One

2  was cultural change internally.  So I developed and

3  facilitated diversity training.  I also became McCarthy's

4  representative in the public eye.  I would go and represent

5  them in certain functions and with regard to other

6  organizations.  I handled volunteerism throughout the

7  community and aspects like that.

8  Q    What kind of internal trainings did you facilitate?

9  A    Diversity was the training that I did for new employer

10 orientation.  So all of their employees nationally came to St.

11 Louis because the headquarters is here.  So throughout the

12 year there was at least four or five different orientations,

13 and during that process I would facilitate the training on

14 cultural acceptance and inclusion.

15     And I did training also with regard to four

16 generations in the workplace, also a part of helping employees

17 and managers work together closer, closer together.

18 Q    And what services did you provide -- did your business

19 provide, Design Alternatives?

20 A    Sure.  We were an employee consulting firm for the most

21 part, temporary and permanent placement for technical

22 professionals, and then we did training and development as

23 well.

24 Q    What kind of training and development did you provide?

25 A    We provided personal and professional skills training

1    for -- primarily for corporations and institutions, training

2    like conflict resolution, team building, diversity, sexual

3    harassment, things like that.

4    Q    Did you attend college?

5    A    Yes.  I graduated from Washington University with a

6    bachelor's degree in architectural technology.

7    Q    Have you been a part of any community organizations or

8    associations?

9    A    A number of associations and organizations.  Most

10   notably, I chaired the PROUD Group in Ferguson from 1995 to

11   approximately 2006 -- '11.  PROUD:  People Reaching Out for

12   Unity and Diversity.  We started.  And that particular

13   organization started a discussion and continued the discussion

14   on race and equity and promotion of diversity in the community

15   of Ferguson.  In actuality, we also tried on two attempts

16   the -- mayors of Florissant approached me to try and put

17   together a PROUD group in the city of Florissant.  However,

18   they just -- they couldn't keep it going.

19         Then I served on the board of a nonprofit.  I served

20   on a number of boards for the City of Ferguson.  I helped to

21   hire a number of city administrators on public review boards

22   and things like that.

23   Q    Can you give us some examples of how you continued the

24   discussion of diversity as a member of PROUD?

25   A    Certainly.  We did a number of -- every month we met, and

1  throughout the year we had workshops and guest speakers, and

2  we held an annual dinner.  We participated in all of the

3  annual parades and ceremonies.  We started a welcoming --

4  neighborhood welcoming committee.  Just a number of -- host of

5  things that continued the dialogue.

6  Q    What was your role within PROUD?

7  A    I was the chair.  So all the responsibilities fall on the

8  chair.  So when they saw Chuck Henson coming, they knew

9  exactly what was -- the conversation was going to be about,

10  because I truly believe that we are all blessed and born by

11  the same creator; so why shouldn't we get along?

12  Q    And how long were you chair of PROUD?

13  A    2011 we kind of ceased the regular meetings, things like

14  that; so from 1995 to 2011.

15  Q    Have you served on any school district committees?

16  A    I served on a number of committees even prior to being on

17  the board.  I served on the finance committee, which was --

18  they had convened a group of public citizens to be part of

19  this board, the technology committee.  And there was a host of

20  committees.  Even going back probably several superintendents

21  had asked me to participate on other things like that, that

22  where they brought the public in to be a part of some of those

23  committees.

24  Q    Were these volunteer positions?

25  A    These were volunteer.

1  Q    And were you involved in school district activities in

2  any other capacity while your children were in school?

3  A    Oh, definitely.  I was on the PTO, PTA meetings -- so

4  much so that my children -- and because my business was also

5  located in Ferguson for 17 years, and so in the school

6  district I was so involved with -- on some of these committees

7  that my children would tell me, "Dad, look, if my principal

8  says 'I'm going to tell Chuck on you if you don't get things

9  together,'" it was something.  So I was heavily involved.

10  Q    Much to the chagrin of your children?

11  A    That's exactly right.  They were not happy.

12  Q    Are you registered to vote?

13  A    Yes.

14  Q    And where are you registered to vote?

15  A    In the city of Ferguson.

16  Q    Do you vote in district school board elections?

17  A    Yes.

18  Q    How regularly do you vote in board elections?

19  A    I can't remember when I missed.

20  Q    In board elections where you can, if you choose, cast

21  more than one vote, have you ever forgone casting one or more

22  of the votes you were entitled to cast?

23  A    Yes.

24  Q    When did you do that?

25  A    Certainly once for myself and then once for Courtney

1  Graves.

2  Q    Why did you cast only one vote for Courtney Graves in

3  2015?

4  A    There was two options.  However, I felt that she was the

5  better option, and I didn't feel comfortable with the other

6  candidate.  So I felt that that was in the best interest.

7  Q    Do you recall ever forgoing casting all of your votes in

8  a board election in other years?

9  A    Oh, yes.

10 Q    In what other years?

11 A    Casting all of my votes?

12 Q    No.  Casting just -- not casting all of your votes.

13 A    Not casting.  No.  No.

14 Q    Have you served on the Ferguson-Florissant School Board?

15 A    Yes.

16 Q    For how long?

17 A    From 2007 to 2013.

18 Q    When you first began your board service in 2007, were you

19 elected to the school board?

20 A    No.  I was actually appointed to the board because a

21 current member had decided to vacate her position, and I was

22 then appointed for -- from January to the April election.

23 Q    Can you describe how you came to be appointed to the

24 board?

25 A    I think it was a selection process, superintendent and

1  several board members.  I remember Doris Graham was on that

2  board at the time as well.  And I think I went through an

3  interview process with them, and they decided and asked me to

4  hold that position until the election process.

5  Q    And in what years were you up for reelection?

6  A    2007, 2010, and '13.

7  Q    Did you face any challengers in 2007 or 2013?  Or 2010,

8  I'm sorry.

9  A    No.  Unopposed.

10  Q    Was a board election held in either of those years?

11  A    I don't believe so.

12  Q    Did you face challengers in 2013?

13  A    Yes.

14  Q    Was a board election held in 2013?

15  A    Yes.

16  Q    Was that the first time you stood for election for the

17  school board?

18  A    Yes.

19  Q    Were you successful in 2013?

20  A    No.

21  Q    Who won that election?

22  A    That election was won by Leslie Hogshead, an incumbent,

23  and then a virtual unknown, Mr. Keith Brown.

24  Q    What race is Keith Brown?

25  A    Keith Brown is white.

1   Q    What race is Leslie Hogshead?

2   A    She's white.

3   Q    Other than you, Keith Brown, and Leslie Hogshead, were

4   there any other candidates in the 2013 election?

5   A    Yes.  There was a Mr. Larry Thomas.  However, for some

6   reason he was on the ballot, but he did not run a campaign at

7   all.

8   Q    What do you mean by that?

9   A    There was no -- he didn't participate in any of the

10  forums.  He didn't put out any campaign literature or signage.

11  So he was on the ballot.  I don't know why.

12  Q    When you were first appointed to the board, were there

13  any other African Americans serving?

14  A    Yes, one.  Ms. Doris Graham.

15  Q    During your time on the board, were there ever any

16  African-American board members other than you and Ms. Doris

17  Graham?

18  A    No.

19  Q    Was there ever a time during your service on the board

20  when you were the only African-American board member?

21  A    Yes.

22  Q    When was that?

23  A    That was following the 2011, I believe, election; so from

24  2011 to 2013.

25  Q    When you lost your election in April 2013, were there any

1  African Americans serving on the board?

2  A    No.

3  Q    When you first ran for the school board in 2013, how did

4  you conduct your campaign?

5  A    Basically -- I mean, we did everything that you normally

6  do.  We formed a committee.  We had a treasurer, a campaign

7  manager.  We provided -- we participated in the forums.  We

8  did canvassing, did printed literature, signage, meet and

9  greets, fund-raising events.  The typical process.

10 Q    Did you seek any endorsement?

11 A    And we sought endorsements as well.

12 Q    Did you fill out a League of Women Voters questionnaire?

13 A    I believe someone in my campaign did, yes.

14 Q    Now, you mentioned that you sought endorsements.  Whom

15 did you seek endorsements from?

16 A    I think the other was the FFNEA as well.

17 Q    And what does FFNEA stand for?

18 A    That is the union, the Ferguson-Florissant National

19 Education Association.

20 Q    Does the FFNEA regularly endorse candidates for school

21 board?

22 A    My knowledge is -- my experience has been that every

23 campaign they do offer the endorsements to.

24 Q    And what is the process by which FFNEA chooses candidates

25 to endorse?

1   A   Well, one of the things is we -- once you are granted the

2   opportunity, then to be considered you go before a panel of

3   folks and there's an interview process, and that's what

4   happened; so . . .

5   Q   And how do you come to be granted an opportunity to be

6   interviewed?

7   A   I guess -- and then you -- they let you know within a

8   relative amount of time whether or not you're going to be the

9   endorsee, you're going to be endorsed. But there's no -- I

10   don't know what actually they use to decide.

11   Q   How do you come to be invited for an interview with the

12   FFNEA?

13   A   There's a form that you fill out and, I think, submit. I

14   don't recall the whole process.

15   Q   To your knowledge, does the FFNEA publish the criteria by

16   which it determines whom to endorse?

17   A   No. And I asked, but no.

18   Q   Did you interview with the FFNEA?

19   A   Yes.

20   Q   Did you receive FFNEA endorsement?

21   A   No.

22         MS. ORMSBY: Your Honor, I'm going to object to the

23   leading questions.

24         THE COURT: I will give you some latitude, but try

25   not to lead.

1  Q    While you were on the board, did other African-American

2  candidates receive FFNEA endorsement?

3  A    Not that I know of, no.

4  Q    Do you know why the FFNEA did not endorse you?

5  A    I have no idea.

6  Q    In 2013, when you ran, did the FFNEA endorse any other

7  candidates?  Any candidate?

8  A    Yes, they did.  The two, Leslie Hogshead and Keith Brown.

9  Q    Does the FFNEA -- how does the FFNEA promote the

10 candidates they endorse in an election?

11 A    Through campaign literature.  They have -- they help out

12 at the polls.  They provide -- I think they provide a stipend

13 as well; so advertisement.  And certainly make it publicly

14 known who their candidates are.

15 Q    And when you say they make it publicly known who their

16 candidates are, what do you mean by that?

17 A    Through written literature, through the campaign, through

18 the polling.  It's evident when you walk up to a poll.

19 They've said who the two candidates are they're supporting.

20 So it's when you come to vote, you know exactly who the union

21 is supporting.

22 Q    So when you say the two candidates that the union is

23 supporting, what do you mean by that?

24 A    Who they have selected to endorse.

25 Q    Did the other board members support you during your 2013

1  campaign?

2  A    No.  None of the other board members.  And that was

3  disappointing.  But there was one particular situation to

4  where, actually, the then president, Paul Morris, of the board

5  actually held a fund-raising event for Mr. Keith Brown at his

6  house.  And certainly individually you have the autonomy to do

7  whatever you like, but he actually put on the invitations that

8  he was the president of the school board.  And to me, that was

9  certainly disrespectful.  That was probably somewhat illegal,

10  but -- because we're not supposed to endorse anyone as the

11  board.

12  Q    Did any board member support you during the 2013

13  campaign?

14  A    Certainly.  Mr. Paul Schroeder.

15  Q    In your view, what is the role of the school board?

16  A    The school board -- there's a number of things that we --

17  certainly set policy, governance.  We do -- if you're in a

18  situation where we hire a superintendent, not always is that

19  the case, but certainly that is the employee of the district.

20  But even more so the school district -- I mean the school

21  board sets -- has to set examples for an oversight somewhat to

22  the goals and things that we establish every year as a school

23  board.

24        And so the administration and the teachers -- they

25  kind of look up and have a great deal of respect for the board

1    members.  So we care not only -- we carry not only just the

2    policy and governance side of it, but also we have to set

3    examples and role models, because we have to approve

4    curriculum, we have to approve budget expenditure and things

5    like that; so . . .

6    Q    What were your priorities when you were on the school

7    board?

8    A    Well, just things that I just talked about; plus we

9    were -- in 2007 the Black Leadership Roundtable challenged a

10   number of the -- all of the, I think, metropolitan districts

11   to look at their issues with regarding to race in the

12   classroom.  And certainly we -- Ferguson-Florissant -- did

13   that.  And that was always obviously, going back to PROUD, the

14   things that were important to me as well.  So the school

15   district took on that responsibility, and so we were -- I

16   think we were really poised at how do we embrace diversity in

17   our district and to make that environment more inclusive.

18   Q    Can you give us some examples of how the board embraced

19   diversity?

20   A    Certainly.  We created an organization, created a

21   committee inside the district called HAFA, High Achievement

22   For All, which included administrators, teachers, bus drivers,

23   every department, every employee, and then we also brought in

24   the public as well was a part of that.  For the first year, we

25   met as a group to look at issues of diversity and the

1  embracing of different cultures and how we would create an

2  environment that was just more inclusive.  And then after

3  about a year, we -- every school building was asked to develop

4  its own HAFA team and to continue that aspect and inviting in

5  the certainly not only the administrators and employers, like

6  I said, but also the outside public as well.

7  So it was just -- and there was a lot of training

8  going on.  We brought in some of the world-renowned training,

9  Sharroky Hollie, John Singleton.  And every administrator,

10  teacher, every employee went through diversity training.

11  Q    Did the board play a role in HAFA?

12  A    The board participated.  The members were a part of the

13  HAFA teams.  We participated in the meetings.  We had to set

14  the example.  There was no way we could have asked the

15  administrators and the teachers to go through what they had to

16  be involved with without being -- certainly set the example.

17  Q    Were there any other ways in which you, as a board

18  member, advocated for the priorities of embracing diversity

19  while you were on the board?

20  A    Certainly.  I also talked openly at board meetings about

21  the importance of our hiring practices, to look at -- I talked

22  about the hiring of minority contractors for work that was

23  being done and let -- in the school, you know, different

24  maintenance roles and things like that.

25  Q    What effect, if any, did these priorities related to

1  diversity and race and your support of these initiatives have

2  on your 2013 board campaign?

3  A    You know, I think sometimes being -- talking about issues

4  of sensitivity like race and the importance of embracing

5  diversity and importance of talking about those issues

6  sometimes will alienate some people and to the point of,

7  during my campaign in 2013, people were saying that -- there

8  were some said that Chuck Henson was a racist.

9  Q    And why were you called a racist?

10 A    I think because of my opinion and my outwardly outspoken

11 dialogue about how important it is for us to be -- as a

12 majority-minority district and with the difference of

13 disparities of administration to student body, I think it was

14 just so important.  So I've never shied away from what I

15 thought was right.

16 Q    When you say "majority-minority district," what do you

17 mean?

18 A    The majority of our district, the student body.

19 Q    Based on your experience, is being outspoken about

20 diversity and racial bias a liability if you're a board

21 candidate?

22 A    Say the question again.  I'm sorry.

23 Q    Based on your experience, is being outspoken about

24 diversity and racial bias a liability as a board candidate?

25        MS. ORMSBY:  Objection.  Leading.

1    THE COURT:  Overruled.

2  A    Yes, I think it is.  And I think some members -- I think

3  because we have to be careful during the campaign process of

4  not having -- having people to understand exactly where we're

5  coming from; that we're not saying that that is the only issue

6  we need to be concerned about, but it is an issue.  And it's

7  not always popular to talk about race.

8  Q    During the 2013 board election, did you observe any

9  racially coded language being used?

10  A    One of the things that you always hear in our district

11  talk about -- during forums we're asked about some of the

12  important things that we want to take on once we're -- if

13  we're selected to the board.  And some of the coded language

14  that goes on from I think some of the white candidates is that

15  the biggest challenge in our district is student discipline or

16  the lack of parental involvement, and I think that's typically

17  targeted toward black students and black families.  And I

18  think that, to me, that is not.  Certainly that is important,

19  but that is not the key issue.  Student achievement has to be

20  the focus point.

21    And that's what HAFA did as well.  We -- in doing the

22  HAFA, the development of HAFA, one of the things we had to

23  explain to all the teachers and administrators is that there's

24  no excuse for student -- for a student to gain achievement.

25  We are not going to allow economics, the lack of parental

1  involvement, the discipline -- and I used to talk to

2  principals, and they'd tell me that certainly they have a

3  discipline problem in the building, but it's about 10 percent

4  of the students.  So 10 percent cannot be the majority of the

5  problem for the other 90 percent to learn.

6  Q    You testified earlier about the HAFA program?

7  A    Yes.

8  Q    Does this program still exist?

9  A    I think it was totally eliminated as far as I know.

10  Q    When?

11  A    After my election I know -- I would assume probably after

12  Dr. McCoy was no longer there.

13  Q    Do you know why the HAFA program was eliminated?

14  A    No --

15         MS. ORMSBY:  Objection, Your Honor.  Speculation.

16         THE COURT:  He said he didn't know.

17  Q    In your view, what does the elimination of HAFA mean?

18  A    I think how can you not have -- see the importance of

19  what we were doing not still be an issue?  When you look at

20  the -- like I referred to earlier, the situation that the

21  Department of Justice has uncovered in our community, how can

22  we not still be talking about that within our buildings?

23         We also had a thing, Each Child is My Own, and that

24  was displayed in every building throughout the district.  How

25  can you eliminate that?

Q    Have you ever expressed a concern regarding the lack of

African-American representation on the board?

A    Yes, I have.

Q    Does the African-American community have particularized

needs?

A    Yes, I think you do.  Because I think in any culture with

regard to educating children, any good teacher will tell you

that they had to figure out ways how to find the students, you

know, because every student doesn't learn the same.  Every

student of different cultures learn -- certain things are

different for them.  So you have to somewhat be certainly

intuitive and try to understand what's in the best interest of

the student and how do I get to that student.

Q    Has the school board been responsive to the

particularized needs of African-American students?

A    Which board?

Q    Whichever board that you would like to speak about.

A    The board that I served on certainly did.  The current

board has eliminated HAFA; so I can't speak for them.

        MS. ORMSBY:  Objection, Your Honor.  He said he

didn't know why HAFA was eliminated.

        THE COURT:  That's all right.  Overruled.

Q    Did you have any role models while you were in elementary

or high school?

A    I certainly did.

1  Q    Is it important to have role models?

2  A    Excuse me a minute.  Yes.

3  Q    Why is it important to have role models?

4  A    Well, my -- my father was certainly a strong role model.

5  My coaches, people like that.  And it's just important.  I

6  mean, I'm sorry that I took a while, but it was just my dad is

7  no longer with us.  That's why.  So it was extremely important

8  to have somebody that I could -- lay a foundation for me.

9       And I know it's important because I had to take on

10  that role as an adult for my children and for all the children

11  in the district.  I mean, I used to go through the building

12  and look at those children, those beautiful children, and how

13  they looked up to me as a school board member.

14       And one particular incident.  In 2008, if you recall,

15  Obama, Barack Obama, was elected as the President, the first

16  black President of our country.  And every year the elementary

17  teachers have asked for volunteers and board members to come

18  in and read to the students.  And one day I was asked to come

19  and read to a second grade class, and there was actually two

20  classes they brought together.  It was Dr. Sues Month, I

21  think.

22       And so I was sitting there reading a number of books

23  to the kids, and the teacher had introduced me as Chuck

24  Henson, the president of the school board.  I was the

25  president at that time.  And I read to the children.  We

1    answered questions and dialogued with them and had a good

2    time.  And when I finished up and the teacher had asked the

3    children to say, you know, "Thank you, Mr. Henson for coming

4    in," one of the kids said, "So you're the president?"

5             I said, "Yes."

6             He said, "Can I have your autograph?"

7             And I'm going to tell you something -- and then

8    another kid.  And 30 kids lined up to get my autograph.  And

9    I'm going to tell you something.  Those 30 kids are probably

10   going to never forget that situation.  I know I won't.  And

11   that was very humbling.

12            And I think being who I was, and certainly the

13   relative nature for them was the President of the country; so

14   to see me as the president of the school board, you know, they

15   were making some certainly correlation between that.  And I

16   think that was -- that was a touching moment.  And that's one

17   of those things that I think that an African American does for

18   other African-American students.

19   Q    Do you know who Dr. Art McCoy is?

20   A    Certainly.

21   Q    And who is he?

22   A    He was the former superintendent, former assistant

23   superintendent and then superintendent -- first black

24   superintendent of the district.

25   Q    Were you on the school board at any point during his

1    tenure as superintendent?

2    A    Yes.  I was actually a part of the board that hired Dr.

3    McCoy.

4    Q    And how would you characterize his tenure as a

5    superintendent?

6    A    The two years that I was there, the gentleman was -- he

7    took the school district over or attempted to take the school

8    district to a new level, to raise the bar.  He was really

9    doing quite well, but the --

10   Q    On what basis do you think that?

11   A    Because of some of the things -- the things that he

12   instituted, the cabinet that he started to build, the level of

13   education inside that cabinet.  They were -- in my mind, they

14   were equal to that of a junior college or college district.

15   Folks -- their education, the things that he did.

16        He introduced us to social media.  He started not

17   only from websites, but we got Twitter accounts and things

18   like that.  And just the other thing was, he was also an

19   inspiration to me and almost at half my age, you know.  So

20   when I saw him one day, the district had decided to join two

21   schools together, a middle school and a high school together,

22   because that was part of this program because they were

23   failing schools, and they thought that we'd do a unified

24   situation.  And the parents came out in just an uproar, and

25   they were really upset.  Dr. McCoy was leading this effort.

He was an assistant superintendent.  And there was such anger

in that room of this auditorium, but Dr. McCoy kept his cool.

I mean, I was standing on the sidelines wanting to grab some

of these people because they were very upset and very

frustrated about him.

　　　　And he stayed and answered every question, embraced

everybody.  Even the folks that were the most vile, he still

supported them, put his arm around one lady.  Two years later

when he ran for and he was in the process of being considered

for superintendent, that lady was his strongest proponent,

supporter.  Strongest supporter.  And that was just

inspirational to see that.  The gentleman is state of the art.

He's a class.

Q    Are you aware that the board suspended Dr. McCoy in

November 2013?

A    Yes.

Q    What was your reaction?

A    I was totally upset.  I was just so frustrated, I

couldn't believe it.  But I was not surprised.

Q    And why were you not surprised?

A    Because the two years that I served on that board I had

never seen any -- the blatant disdain for his authority, the

undermining of his administration from other board members,

the lack of trust for Dr. McCoy was just so evident that it

was just blatantly ridiculous.

1  Q    On what basis do you say that there was a lack of trust

2  and disdain?

3  A    There was the conversation.  It was said during our

4  meetings, "We don't trust him."  And the gentleman would try

5  and institute things, and they would say "no" just because.

6  There was just no respect.  And we talked about trust and

7  things like that.  It wasn't there.

8  Q    Was there a board meeting held after the board announced

9  the suspension of Dr. McCoy?

10 A    Yes, there was.  There was probably, I don't know for a

11 fact, but probably one of the largest board meetings that it's

12 ever happened; that they had to hold it in the gym at McCluer

13 North, and there was well over a thousand people in that

14 gymnasium.

15 Q    Did you attend this board meeting?

16 A    Yes.

17 Q    What happened during the board meeting?

18 A    There was so much anger and passion in the audience.

19 Everybody just came out in total disarray and disappointment

20 and spoke -- a line of people spoke at the podium about their

21 frustration about what was going on with the undermining and

22 the suspension for Dr. McCoy.

23 Q    Did you express any concerns at the board meeting?

24 A    Yes, I did.  I certainly spoke from the podium and talked

25 about the realities of just things that I just mentioned; that

1    the trust factor and just some of the disdain that was going

2    on from the administration.

3    Q    How did the board respond to the concerns expressed at

4    this meeting?

5    A    So for -- it looks like they chose to just not take it

6    seriously because they continued to proceed with eventually

7    forcing Mr. McCoy out of the district.

8    Q    Was there ever a concern that the board suspension was

9    racially motivated?

10   A    There was -- certainly there was some concern.

11   Q    Did the board respond to these concerns?

12   A    No.

13   Q    Did they say anything one way or the other about whether

14   their decision was based on race?

15   A    They certainly did not say it was based on race; that it

16   was based on things that they couldn't speak about.  However,

17   it was just interesting that one particular board member was

18   in opposition.

19   Q    What do you mean by there was one particular board member

20   that was in opposition?

21   A    Well, there was one board member who was not for the

22   dismissal.  There's one board member who was -- basically, it

23   was a 6-to-1 vote.  So there was something there.

24   Q    And what do you mean by "dismissal"?

25   A    No.  I said there was something there that --

1  Q    You said that there was a 6-to-1 vote in favor of his

2  dismissal?

3  A    Yes.

4  Q    What do you mean by "dismissal"?

5  A    I think -- the suspension.

6  Q    How did the students in the district respond to the

7  suspension of Dr. McCoy?

8  A    The students were outraged.  The students tried to --

9  some students formed sit-ins and things like that.  They were

10 very much outraged about the process, because this is somebody

11 who they had come to love.  I mean, really, I had never seen

12 an administrator loved by so many students in that district.

13         And then what we're saying is the gentleman that we

14 supported and we hired as a role model is being removed for

15 some unknown reason.

16 Q    Are you aware of any other times that members of the

17 African-American community expressed concerns to the board

18 about the decision to suspend Dr. McCoy?

19 A    There was other board meetings that followed, certainly,

20 and people -- there was press conferences and things that went

21 on over the next three or four months.

22 Q    And you said that the board stated that there were things

23 that they couldn't speak about that motivated the decision to

24 suspend Dr. McCoy.  Can you explain what you mean by that?

25 A    I don't know.  They said that they couldn't talk because

1    it was a personnel issue or something.

2    Q    As a former board member and someone who has worked for

3    many years in business and human resources, do you believe

4    that it would have been inappropriate to discuss this

5    personnel issue with the public?

6    A    You know, it would -- certainly there are laws in the

7    corporate sector about HR, the security of the privacy laws

8    and things like that, but I think with Dr. McCoy's situation

9    to where it was certainly a public situation where it affected

10   so many people in such a broad audience, when I'm talking

11   about the community and a 12,000-student body, I think we

12   needed some kind of resolution that was credible for us to

13   accept.  So I think there's -- sometimes there's some

14   exceptions should have been made in the process.

15   Q    Has the board ever responded to requests to know why Dr.

16   McCoy had been suspended?

17   A    No.

18   Q    Do you believe the board has adequately responded to the

19   African-American community's concerns and the need for

20   information with respect to the board's decision to suspend

21   Dr. McCoy?

22   A    I don't think so.

23   Q    Are all parts of the district, including predominantly

24   African-American neighborhoods, adequately represented on the

25   board?

1  A    I think we only have two African-American members of

2  seven on the board; so I don't think that there's an adequate

3  representation, in my mind.

4  Q    And do you believe that only African-American

5  representative can represent the interests of all parts of the

6  district, including African American neighborhood?

7  A    No.  I don't think so.  I'm not saying that.  I'm not

8  saying that whites can't represent part of the black district,

9  but I think we certainly have to be -- when you do things like

10  random sampling, I think we have to have some role models as I

11  talked about earlier.  I think there's certain things --

12  there's certain aspects of the culture.

13        You know, culture competency training is serious, and

14  certainly understanding that is one thing, but living it is

15  another thing.  So I think that any organization, if they're

16  going to represent a body of people or body or community,

17  should be representative of that community.  I think it would

18  be the same if it was an all-Asian community and an all-white

19  board.  I would say predominantly something needs to change.

20  Q    Do you favor single-member districts for the school

21  board?

22  A    I think that our current situation does not serve the

23  community at its best.  So I think it's worthy of a

24  consideration certainly.

25  Q    And why is that?

1  A    Because I think the representatives, as I talked about, I

2  think being represented in a district -- you know, when you

3  look at -- when you work hard for a campaign or if a

4  community, I think, had the opportunity to send its own

5  representative from their district, I mean that's a neighbor.

6  That's somebody -- I think we talked about the importance --

7  we would always talk about the importance of communication to

8  the public, and certainly I think that would certainly

9  increase that opportunity for the public to have its voice

10  heard by a neighbor, someone -- so if you broke it into seven

11  districts, I think that would give us an opportunity that's

12  worthy of reviewing.

13        MS. LAKIN:  Thank you, Mr. Henson.  I have no further

14  questions at this time.

15        THE COURT:  Are you ready?

16        MS. LAKIN:  Yes.

17        THE COURT:  You may proceed.

18                    **CROSS-EXAMINATION**

19  **BY MS. ORMSBY:**

20  Q    Thank you, Your Honor.  Hi, Mr. Henson.  We met this

21  morning, correct?

22  A    Yes, ma'am.

23  Q    I've heard your name for many years.  It's nice to

24  finally meet you.

25  A    Sure.  Same here.

1   Q    My name is Cindy Ormsby.  I want to first start with the

2   history regarding your mother.  And she lived in Kinloch; is

3   that right?

4   A    Yes.

5   Q    Okay.  And she graduated from high school when?

6   A    In 19, probably, 41, or somewhere around there.

7   Q    And what was the nearest high school to her?

8   A    Ferguson High School.

9   Q    And at that point in time, Kinloch was not a part of the

10  Ferguson-Florissant School District; is that right?

11  A    Kinloch wasn't, but where she lived it was.  She lived in

12  an unincorporated -- one side of the street of Kinloch, in

13  Kinloch.  So you grew up in a -- it was -- I mean, that's a

14  strange situation because as it exists today.  The east-north

15  side of Mabel Avenue or the east side of Mabel Avenue is in

16  the Ferguson-Florissant School District, where she lived.

17  However, across the street is Kinloch; so . . .

18  Q    So we both graduated the same year, I noticed, when I was

19  looking at your declaration.  You graduated from McCluer,

20  graduated from McCluer North in 1977.  And I just wanted to

21  note that I know you didn't write this declaration because you

22  wouldn't have spelled "McCluer" wrong.

23  A    Well, I didn't type it up.

24  Q    I know.  I know.  I just found it amusing because we know

25  how -- people misspell it all the time.

1  A    Sure.  Sure.

2  Q    Why do you think that the school board at the time that

3  you were appointed, appointed you?

4  A    I think because I was someone who was noted in the

5  community.  I had been involved with a number of things.  I

6  had served on several independent committees for the board.  I

7  was the Citizen of the Year in Ferguson in 2006.

8  Q    Could it have been that that board felt it was important

9  to have more African-American representation on the board?

10  A    That could be.  I don't know.  But I think it was more to

11  it than just that.

12  Q    And what was --

13  A    Because there's a number of African Americans they could

14  have chosen.

15  Q    And what was the racial make-up of the board when you

16  were appointed in 2007?

17  A    There was Ms. Doris Graham was the only minority on the

18  district -- on the board at the time.

19  Q    And then in 2007 you were going to run for a three-year

20  term; is that right?

21  A    That's correct.

22  Q    And so a majority-white board appointed you in 2007, and

23  when you then signed up to run for school board as a candidate

24  in 2007, there was no uproar from the white constituents of

25  the school district against you at that time; is that right?

1   A    No.

2   Q    And no one filed against you?

3   A    No one ran against me.

4   Q    Do you think -- and then in 2010 the same thing, right?

5   You served for three years?

6   A    Right.  Right.

7   Q    In 2010 you signed up to be a candidate for board again?

8   A    Uh-huh.

9   Q    No one filed against you; is that right?

10  A    That's correct.

11  Q    Still no uproar from the white community about your

12  service on the school board; is that right?

13  A    There was no uproar.

14  Q    Isn't it usually the case when an incumbent is unopposed

15  that it is an indication that the constituents are content

16  with the governance?

17        MS. LAKIN:  Objection, Your Honor.  Calls for

18  speculation.

19        THE COURT:  Overruled.

20  A    Ask your question again.  I'm sorry.

21  Q    Isn't it usually an indication when the incumbents are --

22  or run unopposed that it's an indication that the constituents

23  are content with the governance of the school district?

24  A    I would suppose, but it also could be that there's no

25  qualified candidate to challenge that person.

1  Q    No qualified candidate in the entire school district?

2  Okay.  So that brings us to 2013.  You had competition in that

3  election, you testified to; is that right?

4  A    That's correct.

5  Q    And the FFNEA did not endorse you?

6  A    That's correct.

7  Q    Was there anything that the FFNEA was upset about during

8  that time?

9  A    In 2013?  I'm not sure.  You would have to ask them.

10  Q    Were you board president at the time that Jeff Spiegel

11  and his wife were provided lifetime insurance?

12  A    Yes.

13  Q    FFNEA didn't like that, did they?

14  A    I'm not sure.

15  Q    Did they endorse any of the 2011 candidates after that

16  happened?

17  A    I don't know.  No.  I don't know.  I wouldn't argue if

18  you'd say they didn't.

19  Q    Okay.  You know who Les Lentz is?

20  A    Yes.

21  Q    And in 2005 Mr. Lentz came on the board because there

22  was the same number of candidates as there were open spaces;

23  is that right?

24  A    Okay.

25  Q    There was no election.

1   A    Okay.  I don't recall.

2   Q    And then in 2008 were you on the board with him at that

3   point in time?

4   A    I was on the board in 2008.

5   Q    And he again ran unopposed in 2008; isn't that right?

6   A    If you say so, Ms. Ormsby.  I don't know.

7   Q    And then he ran in 2011?

8   A    Okay.

9   Q    And he was not endorsed by the FFNEA.

10  A    That's true.

11  Q    And he was defeated?

12  A    Okay.

13  Q    So two elections unopposed; one election he's defeated.

14  Same as you, right?

15  A    No.  But I was reelected in 2010.

16  Q    Because no one ran against you?

17  A    Right.

18  Q    And he was reelected in 2008 because no one ran against

19  him.

20  A    Okay.

21  Q    So two unopposed elections.  The third election defeated.

22  Right?

23  A    For?

24  Q    For school board.

25  A    For me?

1    Q    You had two uncontested elections, and then you were

2    defeated; is that right?

3    A    Yes.

4    Q    Mr. Lentz had two unopposed elections and then was

5    defeated in his third, right?

6    A    If you say so, sure.

7    Q    What race is Mr. Lentz?

8    A    He's white.

9    Q    But you believe when it happened to you it's because you

10   were African American?

11   A    In 2013?

12   Q    Uh-huh.

13   A    I think the issues of me being a racist was spread in the

14   community for some reason, and I think that added to a

15   detriment to my being reelected.

16   Q    Do you recall what the racial make-up of the FFNEA

17   committee that was deciding who to endorse was?

18   A    I don't remember, but it was not majority -- it was

19   majority white.

20   Q    Was it diverse?

21   A    It was diverse, yeah.

22   Q    All right.  And you stated in your testimony that you

23   have no idea what the FFNEA criteria is for choosing who to

24   endorse.  Is that what you said?

25   A    That's correct.

1  Q    Didn't the FFNEA supply you with the questions that you

2  were going to be asked at the interview prior?

3  A    Yes.

4  Q    They gave you a list of all of the questions, right?

5  A    Yes.

6  Q    And would it make sense that those were questions that

7  had to do with and concerned what FFNEA was concerned about?

8  A    I would think so.

9  Q    Do you believe that the answers to those questions has

10 something to do with what -- who FFNEA endorses?

11 A    It could possibly, certainly.  Certainly.

12 Q    Does the FFNEA choose who they're going to endorse prior

13 to candidates filing?

14 A    I don't know.  I don't know that answer.  I've never been

15 a part of the FFNEA.

16 Q    Does the FFNEA exclude any candidate from seeking their

17 endorsement?

18 A    Are you asking that is there someone they don't invite?

19 Q    Yes.

20 A    I'm not sure.  I have nothing to do -- I don't know how

21 they operate, actually.

22 Q    Did you apply for endorsement from North County Labor?

23 A    I think we did.

24 Q    And did you receive that endorsement?

25 A    I don't believe so.

1    Q    Do you know how many votes you lost by in 2013?

2    A    No.  I don't recall.

3    Q    Would it surprise you that it was 125 votes?

4    A    No, that wouldn't surprise me.

5    Q    Is the board involved in the discipline of students on a

6    day-to-day basis?

7    A    The board?  No.

8    Q    And if a student is suspended at an elementary school for

9    ten days, does the board get notice of that?

10   A    No.

11   Q    Do they approve the suspension?

12   A    No.

13   Q    Did Dr. McCoy ever ask the board to adopt specific

14   policies with regard to a bias in disciplining students, in

15   your memory?

16   A    What are you asking?  Restate that.  I don't understand.

17   Q    Did Dr. McCoy ever ask the board to adopt any policies

18   with regard to bias in disciplining students while you served

19   on the board?

20   A    I don't recall that language being used.

21   Q    And you'll agree with me, don't you, that the achievement

22   gap is a problem in most every school district in the state of

23   Missouri and probably in the nation?

24   A    Certainly.

25   Q    Would you agree that there's factors besides the race of

50

1   a student that could add to the disparity in student

2   achievement?

3   A    Certainly.

4   Q    Are you an educator by training?

5   A    Am I an educator?  Not for public education, no.  My

6   mother was.  My mother was a teacher.

7   Q    Are most school board members -- do they -- do most

8   school boards -- I know some do, but is it a requirement to

9   have a degree in education in order to serve on the school

10  board?

11  A    It's not a requirement, but I think it would be helpful.

12  Q    Are you qualified to propose solutions on how to close

13  the achievement gap?

14  A    Yes.

15  Q    You are qualified?

16  A    I think so.

17  Q    Did you propose -- make proposals while you were on the

18  board that were adopted?

19  A    Certainly.

20  Q    In what form?

21  A    One of the things -- certainly we had changes in policy

22  for homework.  We looked at curriculum.  Certainly, I had some

23  ideas about it.

24  Q    Did Dr. McCoy present proposals to close the achievement

25  gap between 2007 and 2013?

1   A     For certain.

2   Q     And did the board approve those?

3   A     Yes.

4   Q     Do you know whether the achievement gap got better or

5   worse while Dr. McCoy was there?

6   A     It got better, or it closed more.

7   Q     Did -- under Dr. McCoy's leadership, did the

8   accreditation points of the school district under the Missouri

9   School Improvement Plan go up or down?

10  A     There was -- between the time that I was there, there was

11  no change, but we didn't go down like it is going now.

12  Q     You don't know -- you don't know that whether the points

13  went down, your total points went down while you were on the

14  school board?

15  A     It didn't go down.  No.

16  Q     What was the racial make-up of the board when Dr. McCoy

17  was hired?

18  A     There was two.  Doris Graham and I were the only

19  minorities on the board.

20  Q     What was the racial make-up of the board -- are you aware

21  that the school board recently hired a new superintendent?

22  A     Yes.

23  Q     And have you met him?

24  A     Yes.

25  Q     What was the racial make-up of the board that hired Dr.

1  Davis?

2  A    The racial make-up, I think -- I don't know.  I know Ms.

3  Thurman was there.  I don't think -- I think there was one at

4  the time.

5  Q    Is Dr. Davis African American?

6  A    Yes.

7  Q    Do you believe he's qualified to lead the school

8  district?

9  A    The gentleman that I've met -- he seems to be qualified.

10  I mean, he just got here; so . . .

11  Q    I believe you state in your declaration that

12  Ferguson-Florissant is the only majority-minority school

13  district in Missouri that was fully accredited?

14  A    While I was there, yes.

15  Q    What about Hazelwood?

16  A    But that's not a majority-minority district.

17  Q    Are you sure about that?

18  A    They weren't at the time.

19  Q    You also mention in your declaration that the board had

20  issues with regard to Dr. McCoy's residency.  Do you remember

21  that?

22  A    Yes.

23  Q    Did Dr. McCoy's contract require him to live in the

24  school district?

25  A    Yes.

1  Q    And that was a contract that was negotiated when you were

2  on the board; isn't that right?

3  A    That was already in place.

4  Q    You didn't change it?

5  A    I don't recall changing it, no.

6  Q    Do you know if Dr. McCoy's family lived in the house that

7  he purchased within the school district?

8  A    I don't know that question.  I mean --

9  Q    Do you know?

10 A    We weren't concerned about his family.  It was Dr. McCoy

11 who we were concerned --

12 Q    Do you know whether Dr. McCoy's child attended

13 Ferguson-Florissant School District schools?

14 A    Did not.

15 Q    She did not?

16 A    She did not.  And I understand why.

17 Q    Where did she attend?

18 A    I'm not sure.

19 Q    And didn't Dr. McCoy, to be generous, spend most nights

20 with his family in his home outside the school district?

21 A    I can't say that.  No, I wouldn't think so.

22 Q    And you don't believe that that's an issue that the

23 school board should be concerned with?

24 A    I don't -- what - I don't think -- I think he's spent the

25 nights in Florissant, where he lives.

1    Q    Away from his family?

2    A    I don't know where his family was, ma'am.

3    Q    Did you ever ask -- do you consider yourself a personal

4    friend of Dr. McCoy?

5    A    I think now.

6    Q    And did you ever ask him why he was suspended?

7    A    I never asked that question, because I knew.

8    Q    You know?

9    A    I knew.

10   Q    You know?

11   A    I knew.

12   Q    How do you know?

13   A    Because I sat there for two years, and I saw the blatant

14   disrespect for that gentleman.

15   Q    Did you see the reasons he was given for his suspension?

16   A    No, I didn't.

17   Q    Did you see the notice of charges that he was given?

18   A    No.

19   Q    So you don't know, do you?

20   A    I think I do.

21   Q    You think you know.

22   A    Yes.

23   Q    Did you ask him why he resigned rather than going forward

24   with the termination hearing where all of those charges would

25   have been made public?

1   A    Did I ask him?

2   Q    Yeah.

3   A    No, I didn't ask him.

4   Q    And you believe the board should have discussed those

5   reasons with the public?

6   A    I think the public should have been given some more

7   information than it was provided.

8   Q    And you believe they should have done that against Dr.

9   McCoy's wishes?

10  A    I think Dr. McCoy should -- could have the decision,

11  certainly.

12  Q    Do you know whether he did or not?

13  A    I don't know.

14  Q    Do you know whether he was asked to sign a release and he

15  refused?

16  A    I don't know.

17  Q    What would you have done differently if you were on the

18  board?

19  A    I would have fought like hell to keep that man on the

20  board as a superintendent.

21  Q    What would you have said to the public at that meeting?

22  A    What I said to the public during the big board meeting,

23  that the disrespect and the undermining of that man's

24  administration is what was at hand.

25  Q    Does it make sense that, if the school board terminated

1   Dr. McCoy because they're a bunch of racists, that they would

2   have hired another African-American superintendent?

3   A   Did you see what was going on in our community?  Yes, I

4   understand the pressure's probably on them to do that at that

5   time.

6   Q   So you think that's why they hired Dr. Davis?

7   A   I think that's part of the reason.

8   Q   Do you know that to be the truth?

9   A   I don't think it -- not to discredit Dr. Davis because I

10  think he's a fine gentleman, but I think the pressure was on

11  to make a decision.

12  Q   But you don't know, do you?

13  A   Neither of us do.

14  Q   Were you there during the conversation -- were you there

15  at the meetings when they discussed who to hire?

16  A   Yes.

17  Q   You were at the closed meetings when --

18  A   No.  I thought you were --

19       THE COURT:  Slow down.  Everybody slow down.

20  A   I thought you meant --

21       THE COURT:  Stop.  We have to stop first.  And then

22  we'll reboot and we'll try again.

23  Q   My question is were you there at the closed session

24  meetings when they discussed who to hire and chose Dr. Davis?

25  A   No.

1    MS. ORMSBY:  I don't have anything further.

2    THE COURT:  Thank you, ma'am.

3    MS. ORMSBY:  Oh, I'm sorry.  I need to check with my

4  counsel.

5    THE COURT:  Okay.  One second.

6  Q   (BY MS. ORMSBY) I actually do have a couple more

7  questions.

8    You said that, when you ran for election in 2013,

9  that one school board member did support you, correct?

10  A    Yes.

11  Q    And that was Mr. Paul Schroeder?

12  A    Yes.

13  Q    What race is he?

14  A    White.

15  Q    I believe you testified in your direct, correct me if I'm

16  wrong, that when you sat on the board with another African

17  American, that they were able to appropriately address the

18  concerns of the African-American community.  Is that what you

19  said?

20  A    I said we got to that point, yes.

21  Q    And how many African Americans are sitting on the current

22  board?

23  A    Two.

24  Q    Did you vote in 2010, when you were president of the

25  board, to give Mr. Spiegel and his wife lifetime health

1  insurance?

2  A    Yes.

3  Q    Was that a popular decision?

4  A    Yes.

5  Q    Among the public?

6  A    Oh, I thought you were talking among the board.

7  Q    No.  Was the board's decision a very popular decision?

8  A    No.

9  Q    That was quite a public uproar, wasn't there?

10 A    Yes, because the public didn't understand why we did it.

11 Q    Did Mr. Lentz vote for lifetime health insurance?  Did

12 Les Lentz vote for lifetime?

13 A    I don't recall, but it was -- go ahead.  Sorry.

14 Q    No.  Finish.

15 A    No.  I don't recall.  But I know that the majority of the

16 board did.

17 Q    Do you remember what the vote was?

18 A    I don't remember what the vote was.

19 Q    Have you ever released personnel information about

20 another school board member?

21 A    I didn't have that authority.  I mean, I didn't have that

22 opportunity to do; so, no.

23 Q    And you stated that you would have fought like hell to

24 keep McCoy as the superintendent of the school district,

25 right?

1  A    Yes, because it was in the best interest of the district.

2  Q    Would you have fought like hell for any reason at all?

3  Could Dr. McCoy have done anything wrong?

4  A    Paul Schroeder supported him, and I give that man the

5  highest integrity.  So there's nothing that man could have

6  done -- I think because of Paul Schroeder would not have

7  supported him.

8  Q    If Paul Schroeder -- first of all, you don't know --

9  well, never mind.  If Paul Schroeder would have voted to

10  suspend Dr. McCoy, then you would have been okay with it?

11  A    I don't know.  I would have still questioned it, because

12  I know Art McCoy like they don't know.

13          MS. ORMSBY:  Thank you.  Nothing further.

14          THE WITNESS:  Sure.

15          THE COURT:  Any redirect?

16          MS. LAKIN:  Yes, Your Honor.

17                    **REDIRECT EXAMINATION**

18  **BY MS. LAKIN:**

19  Q    Mr. Henson, in November 2013, when Dr. McCoy was

20  suspended, what was the racial make-up of the board at that

21  time?

22  A    It was an all-white board.

23  Q    You testified just now that earlier, during your direct,

24  that one of your opponents in 2013 was Leslie Hogshead; is

25  that correct?

1    A     That's correct.

2          MS. ORMSBY:  Objection.  I don't think that was

3    addressed at all.

4          THE COURT:  It wasn't discussed on cross.  So try to

5    stay focused on what she covered on cross; although that

6    election was certainly discussed.  You have latitude to

7    explore it.

8    Q     During the 2013 election, were there any other candidates

9    on the board who had served during the period of time when the

10   board undertook the vote to -- regarding Dr. Spiegel's health

11   insurance package?

12   A     Yes.  Leslie Hogshead.

13   Q     And --

14   A     She supported it.

15   Q     Do you know if she was endorsed by the FFNEA?

16   A     Yes.

17   Q     You testified a moment ago that Mr. Paul Schroeder

18   supported you in 2013.

19   A     Yes.

20   Q     Is that correct?

21   A     Yes.

22   Q     How do you know?

23   A     Well, he had a -- well, he came to some of my

24   fund-raisers, my meet and greets.  He had a campaign sign in

25   his yard.

1  Q    Was there anything that occurred during his support of

2  you that raised any concerns for you?

3  A    Yeah.  He told me that --

4         MS. ORMSBY:  Objection.  Hearsay.

5  A    Certainly.

6         THE COURT:  Overruled.

7  A    Mr. Schroeder shared with me that one of his white

8  neighbors saw my sign.

9         THE COURT:  Now we're -- the question you asked:  Was

10  there anything that occurred during his support of you that

11  raised any concerns?

12         Now, instead of saying something that occurred,

13  you're talking about what somebody said.  So you need to work

14  on this because we're not going to do hearsay, what other

15  people said.  You asked for an occurrence.  So we got to stay

16  focused.  Do you follow me?  That's why I overruled the

17  hearsay objection.

18         But if we're going to talk about what other people

19  said if they're not a party opponent or you give me a hearsay

20  exception, I have a limitation.  So that may seem arcane, but

21  I know your attorney and the attorney understands what I just

22  said.

23         THE WITNESS:  Okay.

24         MS. LAKIN:  Nothing further, then, Your Honor.

25         THE COURT:  Thank you.

1    Thank you, sir.  You may step down.

2    We will take -- I'm sorry.  Was there something else?

3 I don't mean to cut anybody off.

4    MR. HO:  No, Your Honor.

5    THE COURT:  All right.  Fair enough.  We'll take our

6 morning recess at this time.  We'll reconvene at 10:50.

7    **(COURT RECESSED FROM 10:20 AM UNTIL 11:00 AM.)**

8    THE COURT:  All right.  If you would call your next

9 witness.

10   MR. ROTHERT:  Your Honor, before we call our next

11 witness, we wanted to inquire about for planning purposes for

12 tomorrow.  Do you expect us to end at --

13   THE COURT:  Around one o'clock.  The message is eat a

14 nice breakfast, and we'll work through till one-ish, depending

15 on how the witnesses are going.

16   MR. ROTHERT:  Okay.

17   MR. MCDONALD:  May it please the Court, we'd like to

18 call Doris Graham.

19   THE COURT:  If you would step forward, ma'am, and be

20 sworn.

21   **(WITNESS SWORN BY THE CLERK.)**

22   THE COURT:  You may proceed.

23   **DORIS GRAHAM,**

24 **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

25 **FOLLOWS:**

# DIRECT EXAMINATION

**BY MR. MCDONALD:**

Q    Would you please state your name for the record?

A    My name is Doris Ann Graham.

Q    What is your age, Ms. Graham?

A    Seventy.

Q    Where were you born?

A    Clayton, Missouri.

Q    And is that in St. Louis County?

A    Yes.

Q    And where do you currently reside?

A    Berkeley, Missouri.

Q    How long have you resided there?

A    Forty-three years.

Q    And what's the racial composition of the Berkeley township?

A    Over 90 percent black.

Q    And are you married?

A    Yes.  January 31 will be 51 years.

Q    And do you have any children?

A    Yes.  One daughter.

Q    And what does she do?

A    She's an educator, teaches at the Aspire Academy in St. Louis, Missouri.

Q    Before I ask about your educational background, are you

1  currently employed?

2  A    Part time with Deer Valley Home Health Services.  I serve

3  as their compassionate care coordinator.  I pray for their

4  clients upon request, as an ordained preacher.

5  Q    And what was your prior occupation?

6  A    Educator.  St. Louis Public Schools for 38 years.

7  Q    And tell us exactly where you taught.

8  A    I taught at Clark School for ten years.  Left there and

9  went to Shepard School as a reading specialist.  Left there

10  and went to Patrick Henry as instructional coordinator and

11  then Froebel Elementary School as instructional coordinator.

12  Then I retired from Ames Visual and Performing Arts as the

13  assistant principal.

14  Q    And performing arts -- can you explain what that means?

15  A    Well, that was one of our special schools in the St.

16  Louis Public Schools where we emphasized the arts at the

17  elementary level.  We had the band.  We had the orchestra.  We

18  had dance classes.  We had the speaking and all of the art

19  forms and along with the elementary regular curriculum.  And

20  from the elementary school they would go to Carr Lane, which

21  was the middle school, for performing arts.  And then the high

22  school, they would go to Central Visual and Performing Arts

23  High School.

24  Q    All right.  Well, what is your educational background?

25  A    Well, I started in a one-room schoolhouse in Clayton.  It

1  was on the corner of Hanley and Bonhomme.  I went from

2  kindergarten to third grade there, and then --

3  Q    Before you tell me about that one-room schoolhouse, what

4  year was that?  What year?

5  A    I was born in 1945; so that had to be 1950.

6  Q    What was that school like?

7  A    It was segregated.  It was known in Clayton as the school

8  for the colored children.  And we also had children who were

9  bused to our school from Robertson, Missouri, and from

10  Kinloch.

11  Q    Then after you got out of the one-room schoolhouse, where

12  did you go?

13  A    To the city of St. Louis.  My mother married, and I went

14  to Benton School for about a year.  And then with the *Brown v.*

15  *Board of Education* where they desegregated the schools,

16  supposedly, I didn't have to bypass Gundlach School anymore,

17  which was only a block away from my home.  I started going to

18  Gundlach School, and then from there, for a short time, when

19  my house burned down, I lived downtown at 2713 Gamble and went

20  to Duvall School, and then we moved back out west on Burd and

21  Wells, and I went to Emerson School from fifth to eighth

22  grade, where I graduated, went to Soldan High School,

23  graduated, and from there went to Harris Teachers College.  I

24  got a scholarship and graduated from there and started

25  teaching right across the street at Clark School from Soldan

1  High.

2  　　　　And then after that, I went to UMSL, got my master's

3  from there.  Went to St. Louis U., got my Ph.D in 1979.  And

4  then I went to Aquinas Institute of Theology and got a second

5  master's in pastoral studies and preaching.

6  Q    What did you get your doctorate degree in?

7  A    I got my doctorate degree in educational administration,

8  superintendency.

9  Q    And were the schools racially segregated prior to *Brown*

10  *v. Board of Education* decision?

11  A    Yes.  Yes, sir.

12  Q    How long after the *Brown* decision were the schools

13  desegregated?

14  A    How long after that?  A long time.  Well, the attempt was

15  made in the city, and when I became a reading specialist, I

16  was sent to Shepard School, which was deep south St. Louis.

17  They had tried to get black children to come to the schools in

18  the south, but the parents in south St. Louis just were not

19  going to have that.  So instead they sent the teachers.

20  Q    Now, you went to high school where?

21  A    Soldan High School in St. Louis city.

22  Q    Was that an integrated high school?

23  A    Yes.  When I first went there in 1959, it was integrated.

24  We had quite a number of white students, but within about two

25  years of white flight, they were gone, and there were just a

1    handful left.

2    Q    Well, how did you respond to that?

3    A    How did I respond?  Well, I looked around and they were

4    gone and -- except for my little white friend named Linda

5    Whiff, who graduated from eighth grade with me from Emerson

6    School, and she stayed because she lived in the neighborhood

7    and did not flee to a private or parochial school.

8           And she and a few others stayed.  Kenvi Sheenan

9    stayed, and she lived right up the street from Soldan High

10   School.  When she graduated, she came back and became a math

11   teacher there until she retired.

12   Q    As a student in the school, did that flight, white

13   flight, have any or no impact upon you whatsoever?

14   A    Yes, it did.

15   Q    Explain what impact it had.

16   A    The impact it had on me was that it made me work harder

17   in the club that we had called the Human Relations Club, and I

18   knew that there were good people of all races, and it made me

19   work harder as a kid and a teen-ager, 15, 16, 17 years old.

20   That's the impact it had on me.

21          And then I decided at that time that whatever I could

22   do as a young person, as an adult, as a community leader, that

23   I was going to try and make a difference to pull and bring

24   people together.

25   Q    Well, when you were growing up in Missouri in St. Louis

1  County, did you experience any segregation other than in the

2  public schools?

3  A    Other than in the public schools, I can remember we all

4  got together to go up to White Castle on Natural Bridge and

5  Kingshighway.  We were preteens, teen-agers.  We could walk

6  there from our neighborhood.  And we were denied service.

7        And I can remember when I was a freshman at Harris

8  Teachers College at that time -- now it's called Harris-Stowe

9  State University -- that our teacher, Dr. Nicholson, he told

10  us if we went to hear this guy speak at this seminar about the

11  Holocaust, we would get extra credit in our class.

12        So I went with my friend, Ronald Moore.  He was

13  white.  And he said, Doris, I'll pick you up, and I'll pick

14  Freddie Pryor up, who's black, and we'll all go to Lemay to

15  the restaurant where my wife works, and when she gets off from

16  work, then we'll all go together, all four of us.

17        So we went into the restaurant.  He dropped us off.

18  And we went to the back to sit down because we had already

19  eaten and we didn't need to order any food.  And then the chef

20  or the manager -- somebody -- came back in the back room where

21  we were, with the white apron, white outfit on.  He said,

22  "Would you like to have something to eat?"

23        And we said, "No, thank you."

24        He said, "Well, then you'll have to leave because you

25  can buy something and take it out, but you certainly can't eat

1  it in here."

2         And I said, "Well, okay.  Come on, Freddie.  Let's

3  go."

4         So we started walking out.  And Mr. Moore's wife, you

5  know, she looked really embarrassed.  But what she did, she

6  called her husband to come and pick us up.  We stood outside

7  until he picked us up and took us to his home.  And then we

8  went on to hear the speaker.  And every time he said the word

9  "Jew," I thought about "black," how I had been discriminated,

10 and I said, "This is not right."

11 Q    So how did you deal with that experience?

12 A    It became a part of my fabric, part of me.  I just was

13 made aware of it every time to make sure that just speak up

14 and that wouldn't happen to other people or to tell them how

15 to deal with it.

16 Q    Yeah.  Well, have you run for public office?

17 A    Yes.

18 Q    Tell me when and whether you were elected or not.

19 A    1988 I ran for school board.  I was teaching, as I said

20 earlier, at Shepard School, teaching reading.  I got a phone

21 call.  It was from Ted Hoskins, who was then the mayor of

22 Berkeley.  And he said, "Our committee met last night, and

23 there's going to be an opening on the Board of Education for

24 Ferguson-Florissant, and we all decided that we need to call

25 you and ask you if you would write a letter saying that you

1    would like to fill that position."

2            And I remember it so well.  I told him, I said, "I

3    don't know anything about being a board member."

4            He said, "That's okay.  They don't know either, but

5    you can get on there and learn."

6            So I did.  And from grass roots I had family members

7    and friends and church members who just helped me because I

8    hadn't ever campaigned for a public office before, but I know

9    what it is to campaign from high school and college.  And I

10   won.

11   Q    Well, what was the race of the mayor who --

12   A    Black.  Black, Uh-huh.

13   Q    And how did you -- it was an appointment that you were

14   applying for?

15   A    Well, I wrote a letter, you know, as it was advertised:

16   If you're interested, to write a letter saying that you would

17   like to be on the board.  And I wrote the letter, and the

18   board rejected my letter.  And I don't know if it's because I

19   said I specifically wanted to be on the board to be an

20   advocate for African Americans but also an advocate for all

21   children, and what happened was I was running at the same time

22   for president of Local 420 Teachers Union, and when Jim Clark

23   came to my home and said that the board wants some kind of

24   information about you, I just handed him a brochure that

25   talked about me and what I do.

1    And then two days later I got a phone call saying

2 that the board was not going to interview me.  And then a day

3 later, after that, one of the members of FFNEA called me and

4 he said, "We heard that the board turned you down, but what

5 we're saying is we'd rather have somebody who knows about

6 unionism through AFT even though we are FFNEA, and we told

7 them they need to interview you."  So they did interview me.

8 And I was not chosen by them, but I told them that if I was

9 not chosen, I had just decided that I would run and with the

10 intentions of winning.

11 Q    Who was chosen to fill the position?

12 A    There was a black lady, a little short black lady.  I

13 think she stayed on for about a month.  I don't know her name.

14 Q    And did she stay on the board?

15 A    For about a month.

16 Q    And then resigned?

17 A    Quit, yes.

18 Q    And did they have an election for the board then or

19 another appointment?

20 A    I don't know what they did.  I know I had readied myself

21 to start my campaign.  I had to start campaigning about a week

22 after the interview.

23 Q    And then you ran for office?

24 A    Yes, sir.

25 Q    And that would have been in 1988?

1    A    1988, yes.

2    Q    And did you win or not?

3    A    I did win.  I did win.  And I had the support of so many

4    people in Berkeley that I didn't even know I had supporters,

5    and I'm looking at one right now.  And the next time I ran and

6    the next time and next time, she became my -- one of my

7    campaign managers, Judy Shaw.

8    Q    Were there any other blacks serving on the school board

9    when you were elected?

10   A    No, sir.

11   Q    And when was the next black elected, to your knowledge?

12   A    Gwendolyn Thomas was elected.  I think that was around

13   2000.

14   Q    Okay.  Now, can you explain your success in the election?

15   Why do you think you won?

16   A    Well, I think I won -- one thing, hard work; and number

17   two, a lot of people knew me, name recognition from being very

18   visible in the county as well as in the city where I worked --

19   I mean, you know, where I held employment.

20            And then I had people at the different churches in

21   Berkeley who knew me and were committed to getting the word

22   out, telling people to vote for Doris Graham.  And later on,

23   three or four years later, one of the board members, Ralph

24   Ranken -- Rankenbrand -- Ankenbrand, thank you -- Ralph

25   Ankenbrand said, "Doris, I hate to tell you this, but a lot of

people voted for you because they thought you were Dr. Delores

Graham."

          I said, "But she's the principal at Cross Keys."

          And he said, "It doesn't matter.  They just thought

that she was the one on the ballot and they were voting for

her, and she's white."

          I said, "Well, I bet you the next brochure I put out

they'll see my face, and they'll know who I am and that I

certainly am not white.  I'm black."

Q    Well, you testified that you were on the board from 1988

to 2002; is that correct?

A    Till 2011.

Q    I'm sorry, 2011.

A    But there was one time in between now -- I'm 70 years

old, because I can't tell you what year it was that I lost,

that I lost the election.  I don't know it was '94, '90,

whatever, but whatever that year was, I lost.  And some

people, including my sister, said, "I don't think you

campaigned hard enough."

          But I did.  But I lost.  And so what happened,

somebody on the board, their job was -- had moved them to

Texas, and so there was an empty seat.  And again I wrote a

letter saying that I'd like to fill that seat, and that

sitting board did vote for me to come back, but I had to

promise to run that following April, which I did, and I did

1    win.

2    Q    What year was that?

3    A    I can't remember.

4    Q    Well, you ran in subsequent elections with opposition and

5    won?

6    A    Yes.  And there were two years that I had no opposition

7    and I had no campaign and, you know, won because of that.

8    Q    Can you remember the dates of those elections?

9    A    No, I do not.

10   Q    Okay.  And then you lost again in 2011, I believe you

11   said?

12   A    I remember that, yes.  I lost that election.  There were

13   nine people running, and they only needed three seats.

14   Q    Well, do you have any views one way or another whether or

15   not African-American candidates of the school board face any

16   barriers to their election?

17   A    Yes, I do.

18   Q    Well, explain what you think those barriers are.

19   A    I think the barriers are people vote for people that are

20   much like themselves, and if every black that there was in

21   Berkeley would have voted for me, I still would not have won

22   any election.  I would need the votes of white, Hispanic,

23   other people.

24          And for a black -- I'm going to speak specifically

25   from Berkeley -- it's hard to get them to run, to spend the

1  money, spend the time and the energy to run, because they're

2  looking overwhelmingly at the district and saying it seems

3  like it's impossible.

4        But I tell them it is possible, but you just have to

5  get the votes out.  You just have to campaign in Ferguson in

6  Florissant, Berkeley, Cool Valley, you know.  You just have to

7  campaign and get people at every polling place to perpetuate

8  your name and pass out fliers for you.

9  Q    Well, do you think that African-American candidates face

10  any barriers in their election campaigns?

11  A    Yes, sir.

12  Q    And what are those barriers, in your judgment?

13  A    In my judgment is, first of all, race, the color of their

14  skin.  They're black.  And some people will not vote for you

15  because they don't know that much about you, and if you're

16  black and they're white, they're not going to vote for you

17  unless they know of something good that you've done.  That's

18  my opinion, though.

19  Q    Okay.  Well, what about the role of the

20  Ferguson-Florissant National Educational Association?  In your

21  judgment, does that play some or no role whatsoever in the

22  electoral process?

23  A    Yes, sir.  It does play a role.  The first year, 1988, I

24  ran, they did not support me.  I didn't go to an interview or

25  anything to even ask to be supported, but after that, they did

1    support me.  In this last election, 2011, they did not support

2    me.  But I think it's important for them to support you

3    because what they will do, they will help you with poll

4    workers.  They will help you with signs, putting signs in

5    yards of your constituents, and they will give you -- back in

6    the day they would give you, like, $200 to have -- to do what

7    you want to do with it.  I used it for my signs to be made.

8          And the person they had assigned to help their

9    candidates at that time was Paul Morris, and he would -- he

10   just called and asked me, "What color signs you want?"

11          I said, "Red and white."

12          And right away, he said, "Okay.  I can do it."

13          So I went and picked them up when they were ready,

14   and I took half of them and put it -- gave them to my

15   committee to put in yards, and then he kept half and gave it

16   to FFNEA people to put in their yards.

17   Q    So how do you go about trying to get the NEA support?

18   A    Well, you fill out a questionnaire, and then they will

19   invite you to be interviewed.  Then after the interview, you

20   answer the questions.  They have already given you a list of

21   questions that might be asked.  And they have a committee of

22   people, and they ask the questions, and then you wait to see

23   what their decision is, and they'll tell you either they will

24   support you or they won't.

25   Q    Will they give you the reasons for their decision?

1   A    No.  They normally don't give you the reasons for the

2   decision, but I was told that at that time, in 2011, that they

3   had decided that the incumbents -- three incumbents, Les

4   Lentz, who was president, I believe, at that time, I don't

5   remember, but I think he was, and Jim Clark, who had been on

6   for about 30 years plus, and I had been on for 23 years --

7   they said that's long enough.  It's time for some new blood.

8   Q    Okay.

9   A    Even though I had been a big supporter, you know, of the

10   teachers and, of course, the students because I always think

11   good teachers and students go together like soup and salad.

12   Q    Well, what's the racial composition of the FFNEA?

13   A    Well, back in the day, it was like about 85 percent

14   white, and now I believe it's more African Americans are part

15   of FFNEA.

16   Q    When you ran in 2011, I think you may have said this, but

17   just to clarify, did the NEA actually support any of the

18   candidates in that election?

19   A    Yes.  They supported some candidates.  They made it known

20   who they were supporting.

21   Q    Were they white candidates?

22   A    Yes, sir.  Well, I'm going to take this back.  Martinez,

23   Hispanic.  There was one young man.  His name was Martinez.

24   And Paul Morris, I think Paul.

25   Q    Who won the seats that were up?

```
1    A    The three that were supported by the FFNEA.

2    Q    All right.  Do you know whether or not the FFNEA has

3    endorsed equal numbers of black and white candidates for

4    public office for the school board?

5    A    Well, from what I read, no, they have not.

6    Q    Okay.  And I don't want to be repetitive, but in 2012 the

7    school board elected how many candidates?  And what was their

8    race; do you remember?

9    A    In 2012, that was after I lost in 2011, but I do remember

10   that -- no, I don't remember.  I'm not going to say I do.  I

11   don't.

12   Q    Well, do you remember who won the seats in the 2012

13   election?  Were they white or black candidates?

14   A    Could you tell me who their candidates were?

15   Q    Well, Barbara Morris, Brian Ebert, and Paul Schroeder.

16   A    Paul Schroeder won.  Barbara did not.

17   Q    Okay.  And do you know whether or not FFNEA endorsed both

18   of those winning candidates?

19   A    I know they endorsed Paul Schroeder.  I don't know about

20   the other two.

21   Q    Well, are you familiar with the candidates who ran in

22   2013 for the school board?

23   A    Henson.  And he was not endorsed by FFNEA.  I did work on

24   his campaign.

25   Q    And do you remember who won that election?
```

1   A    He didn't.

2   Q    Well, could I tell you Hogshead and Brown?  Do those

3   names ring a bell?

4   A    Yes.  I remember Hogshead won, and Mr. Brown, he won, and

5   he was proud to let me know that even though I wasn't on the

6   board, he just loved to see me come to the meetings because I

7   always smile.  And he let me know that he had been Cindy's

8   Sunday school teacher when she was a youth.  And I said,

9   "Well, you must be a good person, then," because I knew

10  nothing about Mr. Brown at that time.

11  Q    Well, as a longtime member of the school board, were you

12  familiar with whether or not Mr. Henson promoted the special

13  needs of black students in the school district?

14  A    Yes, sir.  He -- most certainly he did.

15  Q    And do you think that had any impact one way or another

16  on his defeat in the 2013 election?

17        MS. ORMSBY:  I'm going to object as to speculation,

18  Your Honor.

19        THE COURT:  Rephrase the question.

20  Q    Well, do you think that his promotion of the special

21  needs of African-American students had any impact one way or

22  the other?

23  A    Yes, it did.

24  Q    Well, please give us your answer.

25  A    Well, he was always advocating for African-American

students.  And sometimes when people -- like I heard when

people would see him coming, they would know what his agenda

was, and everybody was not in favor of his agenda.  I'm going

to give you an example.  We had gone to a national --

THE COURT:  Wait a minute.  There is no question

pending now.

THE WITNESS:  Okay.

THE COURT:  Let's ask questions.

THE WITNESS:  I answered the question.  Fine.

Q    Can you give me an example of what you think is the

significance of race in this contest?

A    Yes, I can give you an example.  We had attended a

national school board meeting, and we went to some of the

caucuses of the boards, and one was that we saw the drumming

that was done by this particular caucus.  And it was such an

engaging thing.  And we came back to our own board meeting,

and he brought up the idea that we were trying to get our

discipline to be better in the district, and maybe if we can

have that kind of thing going on during our lunch periods

that, you know, have some drumming going on, that it could cut

down on the noise and the confusion and the students would

enjoy that and would not be a discipline problem.  And I

agreed, but it didn't go anywhere.  I don't think they started

drumming in the lunchroom.

Q    Well, how long have you lived in Berkeley?

1   A    Forty-three years.

2   Q    And do any other board members live in Berkeley during

3   your time on the board?

4   A    No, sir.

5   Q    And do you know if anyone has ever been elected to the

6   board from Berkeley?

7   A    No, sir.

8   Q    Well, do you think that not having anybody on the school

9   board from Berkeley has any impact on the interests of the

10   residents of Berkeley?

11   A    Yes, sir.

12   Q    Well, explain what your answer is.

13   A    When I was on the board as a member of the Berkeley

14   community, people would call me many, many times, different

15   issues, and they would be resolved.  And after I wasn't on the

16   board anymore, they felt that like they didn't really have

17   anyone they could just particularly call to and tell what

18   their concerns are.  But I would tell them who to call.  Let

19   the board president know what your concern is, and he will

20   tell the superintendent.  I never tried to micromanage at all.

21   Q    Well, do you have any examples of what you believe is the

22   problem with Berkeley not having a representative on the

23   school board?

24   A    Yes.  Our community of voters in Berkeley is small

25   compared to others, and I believe if everybody in Berkeley

1    voted for you, you still wouldn't win.

2    Q    Has Berkeley had any special problems that haven't been

3    addressed, in your judgment, by the school board?

4    A    You know what?  I can remember when the airport

5    authority, you know, had an agreement, they took our land, and

6    they were supposed to give us our schools, replace our

7    schools.  And one was an elementary school which we named

8    Johnson-Wabash, and the other one was we named McCluer

9    South-Berkeley, the high school.

10           And there was such big uproar in the naming of the

11   elementary school.  They wanted to name it McCluer -- I mean

12   they wanted to name it January-Wabash, and we had been given

13   information from Dr. Wright about the history of that area,

14   and January was a plantation named after the January family.

15   And I told them that I thought it would be an insult to name a

16   school after plantation owners when the majority of the

17   people, young people who would be going there, would be black.

18           And so after much discussion, we named it

19   Johnson-Wabash, and Johnson after the Reverend Johnson who had

20   been appointed to that school board back in the day by -- I

21   guess by the State of Missouri.  But I did read the history

22   that he had to be escorted to the board meetings because of

23   racism.

24   Q    Escorted by whom?

25   A    By the police.  Armed guards, they said.

Q    Now, you say you objected to the naming of the district

after a, quote, "plantation," end quote.  What's wrong with a

plantation?  Just explain your answer.

A    Okay.  What's wrong with a plantation?  For a person, a

black like me, it's a derogatory memory of how the black folks

on the plantation were not treated as first-class citizens.

Q    Well, were they treated as slaves in Missouri?

A    Yes.

Q    Okay.  So do you know someone named Dr. Art McCoy?

A    Yes.

Q    And tell us who he is as you understand it.

A    Well, Dr. Art McCoy -- I was on the board when he was

hired as assistant superintendent, and I was on the board, I

believe, when they were about to hire him as superintendent.

And I do know that in 2011 I did not win my election to be a

board member again, and I had a conversation with his mother

through another organization, and she said, "I sure hope" --

          MS. ORMSBY:  Objection, Your Honor.  Hearsay.

          THE COURT:  Just be careful not to --

A    Okay.  Yes, I do know him.

          THE COURT:  All right.  Great.

Q    What is your assessment of him?

A    Excellent educator, excellent visionary, a person who

loves children.

Q    And do you recall the circumstances of his departure?

1    Did you have any insight or understanding of that?

2    A    I only knew what came out in the paper and what people

3    were talking about, because I was not on the board.  But I did

4    go to the meetings that were held at the high school to hear

5    what people were saying.

6    Q    Okay.

7    A    I'm not going to say what they were saying because it

8    would be hearsay.

9    Q    Okay.  Well, did you hear anything from members of the

10   school board --

11          THE COURT:  I'll just leave.  You go ahead and rule

12   on the objection.

13   Q    Well, did you hear anything from members of the school

14   board?  That would not be hearsay, if I'm correct, Your Honor.

15   A    Yes, I did.  And it was from Paul Morris.  I went to him

16   and I just --

17          MS. ORMSBY:  Actually, it is hearsay, Your Honor.

18          THE COURT:  It is hearsay.  He's not a member -- he's

19   not a party opponent.

20   Q    I'm sorry, Your Honor.  I asked if members of the

21   board --

22   A    Of the board?

23   Q    No.  Current members of the board?

24   A    Did I talk to current members who are on the board?

25   Q    Yes.

1    THE COURT:  Current members of the

2  Ferguson-Florissant School District board.

3    THE WITNESS:  Yes.  And that's what I'm answering to.

4    THE COURT:  All right.

5    THE WITNESS:  And --

6    THE COURT:  Let's identify who we're talking about.

7  A    Okay.  Mr. Paul Morris.  I talked with him just

8  privately, just one on one, at the meeting.  And I asked him,

9  "What is so wrong?"

10    And he said, "You just don't know."  He said, "It's

11  Art McCoy's way or the highway."

12    And by that time, it was time for them to reconvene;

13  so . . .

14  Q    Well, do you know whether or not the school board ever

15  gave a public reason for suspending and then adopting his

16  dismissal as a superintendent?

17  A    They did not publicly say what the reason was.

18  Q    Did you ever approach the school board to try to find out

19  the reason or object to his departure?

20  A    Well, no, I didn't, because I know that a school board,

21  when you talk about personnel, they're not supposed to talk

22  about it unless the board, unless they decide as a board, what

23  they're going to say.

24  Q    Okay.

25  A    Publicly.

1  Q    Well, do you have a position one way or another about the

2  adoption of single-member districts for the school district?

3  A    I am for it.  I am in favor of it.

4  Q    Tell me why.

5  A    The reason is I believe that it will have a better

6  reflection on the community that the board serves.

7  Q    And can you explain why you think that is true?

8  A    I think that people will feel more comfortable about

9  running for a position believing that their own community will

10 be the ones who will support them and vote for them and get

11 them elected as support to a wider range of communities.

12 Q    Well, as someone who has lived in St. Louis County for so

13 many years, do you have any view whether or not there is still

14 evidence of racial segregation in the county?

15 A    Yes, sir.

16 Q    Tell me what you base your answer on.

17 A    I base my answer on what I see, what I see in the city of

18 Ferguson, what I see in the city of Berkeley.

19 Q    What do you see?

20 A    Well, I see, until this last election, that the city

21 council in Ferguson was basically white, and the city council

22 in Berkeley is all black except for a long time we had one

23 white city council member, Jean Montgomery, and because of age

24 and health, she did not run again for the Area 5, where I

25 live.

Q    Well, you testified about your involvement in a church in

St. Louis County.

A    Yes.

Q    Do you have any knowledge of whether or not churches tend

to be predominantly of one race or another?

A    Yes, they do.

Q    And please explain your answer.

A    Well, I love going to Ferguson Baptist Church.  I've been

there for several things, and they do have some blacks, but

it's basically white, back in the day.  And then I go to

Second Baptist Church, where Dr. Miller, when he was living he

was the pastor, and that's where my mayor, Ted Hoskins,

belonged, and many times I was involved -- invited there to

speak, and it's all black.

Q    Have you ever gone to any churches that were

predominantly white?

A    I thought I just said Ferguson Middle -- I mean Ferguson

Baptist Church.

Q    Okay.  I'm sorry.  I'm sorry.

A    Yes.

Q    I have just a few more questions.  Now, during the time

that you served on the school board, did you think it was

responsive to the particularized needs of the African-American

community?

A    You know, when it was brought up to the board, on the

early years of my boardsmanship we had people even, you know,

black -- I was black, of course, and but the white members on

the board, they were open to all children, black and white.

And we did see eye to eye, and we did make a lot of good

decisions, and I was happy about that.

But over the years, I don't know how it is now, but

it just does not appear that that's the same kind of lens that

they're looking at.  Maybe they have more problems now.  But

we were very concerned about having excellent opportunities

for all children.

We were just so excited to be able to brag about we

have six Bill Gates Scholars, and now I understand we have

eight Bill Gates Scholars.  That means that a student can

graduate from high school and have all of their education paid

for, all the way up to Ph.D.

Q    Okay.  Well, the naming of the schools, that was an issue

when you were on the school board?

A    Yes, sir.  It was.  They wanted the high school to be

called McCluer South.  We already had a McCluer North, and we

had a McCluer, and they wanted it to be called McCluer South.

And we had many, many board members -- I'm sorry.  We had many

board meetings where the room was just filled with people to

come up to the mic and tell their reasons why they wanted the

school to be called what they wanted it to be called.

We had some people from Berkeley saying it should

1  just be called Berkeley High School.  Some people said it

2  would be only fair that it should be called McCluer South

3  because it was no longer in the city of Berkeley; it was in

4  Ferguson, because that's the space where they could find to

5  build the high school in the district.

6          But anyway, we finally came to a compromise and named

7  it McCluer South-Berkeley.  But people were very, very adamant

8  about how and what that school should be called.

9  Q    Well, do you think that the African-American communities

10  are adequately represented on the school board today?

11  A    No, sir.

12  Q    And tell me why that's your view.

13  A    Well, we do have two wonderful ladies on the board:  Dr.

14  Thurman, she was elected recently; and a year after her, Dr.

15  Graves.  But we need more to reflect the population of the

16  students in that district.

17  Q    Okay.  Now, you've been involved in politics for many,

18  many years?

19  A    Long time.  Yes, sir.

20  Q    Yeah.  And do you have a view one way or another as to

21  whether or not voting is racially polarized in the school

22  district elections?

23          MS. ORMSBY:  Objection, Your Honor.  Calls for a

24  legal conclusion.

25          THE COURT:  Lay a foundation for her to give an

1    opinion, if you can.

2              MR. MCDONALD:  I will, Your Honor.  I'll try.

3              THE COURT:  I mean, that's a lot of foundation.

4    Q    (BY MR. MCDONALD) Well, have you had an opportunity to

5    observe and form an opinion about how blacks and whites tend

6    to vote for school board elections based on your experience,

7    long-time experience running for public office?

8              MS. ORMSBY:  I'm going to object as speculation.

9              THE COURT:  You have to lay a better foundation than

10   that -- what data she looked at, what analysis has she made.

11   Q    Well, have you had an opportunity to look at election

12   returns to determine who wins?

13   A    Yes, sir.  I've looked at election returns that are on --

14   that are published in the newspaper.

15   Q    And have you been able to form any opinion about racial

16   bloc voting based on your analysis of those elections?

17             MS. ORMSBY:  Objection, Your Honor.  Race is not

18   included in the election returns.

19             THE COURT:  I'll take it for what it's worth, but the

20   point is well taken.  Unless it's -- you know.

21   Q    Well, for example, what about in Berkeley?  Were you able

22   to determine the election results or the number of votes

23   people get from residents of Berkeley, whether they were white

24   or black candidates?

25   A    Yes, sir.  I've been able to do that.

1  Q    And who tends to get the black votes?  White candidates

2  or black candidates?

3  A    Black candidates tend to get the black votes in Berkeley.

4  Q    And what about are you familiar with any white

5  jurisdictions or precincts and who they tend to vote for?

6  A    No, I'm not.

7  Q    Okay.  Well, do you base your opinion about racial bloc

8  voting based on your analysis of the voting in the

9  majority-black areas?

10  A    Yes, sir.

11  Q    And what about other than Berkeley?

12  A    I look at, you know, there are quite a few people who are

13  African American who do live in Ferguson, and I look at those

14  numbers to see how many of them or, you know, how many votes

15  there are, but I can't tell if they're black or white.

16  Q    Yeah.  One last question.  Have you observed any subtle

17  or overt racial appeals in campaigns for the school board?

18  A    Campaigning?  No, I have not, because they all campaign

19  the same way:  You know, robocalls, telephone calls, passing

20  out leaflets, and speaking at the different forums that are

21  held district-wide.  And so that answer is no.

22  Q    Well, do white candidates -- candidates for the school

23  board come and campaign in person in places like Berkeley?

24  A    Yes.  They pass out their literature, and I've seen them

25  knock on doors.  Yeah, they knock on my doors.  They're not

1   afraid to come.

2   Q    Well, did you campaign in the white areas when you --

3   A    I most certainly did, yes.

4   Q    What kind of response did you get?

5   A    The response I got were polite responses, like "I'm still

6   considering" or "I vote for you all the time."  I never really

7   got someone who was very belligerent, ill-mannered, and I

8   guess it's because I'm not ill-mannered when I speak to them.

9   Q    Yeah.  But you, nonetheless, didn't win your last

10  election?

11  A    I most certainly did not.

12  Q    Thank you.

13  A    I wanted to, but I didn't.

14          MR. MCDONALD:  Well, you may have some questions.

15          THE COURT:  You may proceed.

16                      **CROSS-EXAMINATION**

17  **BY MS. ORMSBY:**

18  Q    Dr. Graham?

19  A    Yes, Cindy.

20  Q    It's going to be hard for me to call you "Dr. Graham"; so

21  if I slip and call you "Doris," you won't be offended, will

22  you?

23  A    Not at all.

24  Q    We go way, way, way, way back, don't we?

25  A    Yeah.  Worked hard together, uh-huh.

1  Q   Dr. Graham, how many times in your -- in every time you

2  ran since 1988, how many times were you endorsed by the FFNEA?

3  A    I can't remember the times; that I know the first time

4  and the last time I was not.  And two elections I was

5  unopposed; so . . .

6  Q   And you stated that even before you were on the board,

7  however, that the FFNEA reached out to you about applying for

8  an appointment; is that right?

9  A   No.  What happened was they did not reach out to me.

10  What happened was they publicized that anyone who was

11  interested in fulfilling that empty seat to write a letter to

12  them -- I mean to the board -- and let them know.  And so I

13  did that.

14       And I said Mr. Jim Clark came to my home -- he was a

15  board member -- to get any kind of information he could get.

16  And I happened to be running for president of Local 420

17  Teachers Union; so I just handed him a brochure that he took

18  back to his board, and they decided not to invite me for an

19  interview.

20       And a couple of days later, I got a phone call from a

21  member of NEA in the leadership who said that, "We told the

22  board we wanted them to interview you."

23  Q   Okay.  Thank you.

24       THE COURT:  Just so I know, you were talking about

25  Local 420 in the city public schools.

1    THE WITNESS:  Yes, in the public schools where I

2  worked.

3    THE COURT:  Historically, that's AFT as opposed to --

4    THE WITNESS:  AFT.

5    THE COURT:  -- as opposed to NEA.  Okay.

6    THE WITNESS:  Yes, sir.

7  Q    You were running for president of AFT in your city school

8  district?

9  A    Yes.

10  Q    And someone from the FFNEA, which is

11  Ferguson-Florissant's union --

12  A    Called me.

13  Q    Called you.  Okay.

14  A    Yes.  They said even though -- he said that they had

15  talked to the board and they thought it would be a conflict by

16  me being AFT and they were NEA, and they said, no, it won't be

17  a conflict; they're both unions.

18  Q    Okay.  Thanks.

19    THE COURT:  The AFT and NEA haven't always gotten

20  along.

21    THE WITNESS:  No, they have not.  And how well do I

22  know.

23  Q    Now, in 2011, when you ran for reelection, that was quite

24  an anti-incumbent movement that year.  Would you agree with

25  that?

A    Totally agree.  I was told that they had decided to get rid of the incumbents; it's time for new blood.

Q    And when you were on the board just that prior year, you had voted for lifetime health insurance for Mr. Spiegel, correct?

A    Correct.  It was unanimous.

Q    And that also -- you also included his wife in that, correct?

A    Yes.

Q    Now, do the teachers of the school district -- do they have to pay for their insurance after they have retired; do you know?

A    I don't know specifically, no, huh-uh.

Q    But if they did, you could understand why the union might be a little upset that the superintendent, who made a lot more money than they did, was getting free insurance and they weren't.  You would understand that sentiment, wouldn't you?

A    I can understand that, but may I say something else?

Q    I didn't ask you anything else.

        THE COURT:  Your lawyer will get a chance to ask you some follow-up questions.  I'm sure it will come up.

Q    And Mr. Spiegel's wife, she wasn't an employee of the school district; isn't that right?

A    Correct.

Q    And isn't it true that that was an election issue that

1   year?  All the candidates got a lot of questions about that?

2   A    What year are you referring to?

3   Q    2011, when you were running for reelection.

4   A    I didn't get a lot of questions about that.

5   Q    Did it come up at the forums that you went to?

6   A    Yes.  And that's about the only place it came up.

7   Q    And the forums is where members of the --

8   A    District-wide, yeah, where the members of the community

9   could come and hear the candidates speak.

10  Q    And I think you already testified you weren't the only

11  incumbent that wasn't endorsed by the FFNEA, right?

12  A    Right.

13  Q    And the other two that were not endorsed was Jim Clark

14  and Les Lentz?

15  A    Correct.

16  Q    And what race are they?

17  A    They're white.

18  Q    And I think you testified as well that the NEA gives you

19  a list of questions prior to you coming to your interview for

20  an endorsement.

21  A    Yes.

22  Q    Was that always the practice when you ran for the school

23  board?

24  A    When I ran, that was the practice.

25  Q    And the questions that they give you are the questions

1  they ask you in the interview?

2  A    Those questions were generally the same, but the people

3  on the PAC committee, they were given the opportunity to

4  extend the question for clarity.

5  Q    Do you believe that the answers to your questions, other

6  than your voting record as an incumbent, was a big

7  consideration in what -- in the FFNEA's decision on who to

8  endorse?

9  A    The answers to my questions?  Oh, no.

10  Q    You don't think so?

11  A    No, because --

12  Q    Do you think it was your voting record?

13  A    No.

14  Q    Do you think it was that you had been on the board for a

15  long time?

16  A    That's it.

17  Q    Okay.  You don't think that they didn't endorse you

18  because of your race, do you?

19  A    I think they just didn't endorse me because they said it

20  was time for me to go, time for the incumbents to go and get

21  new blood.  So because of my race I can't say.  I don't know.

22  Q    And all the years that you served on the school board,

23  from 1988 until 2011, do you believe that the board did not

24  properly address the needs of the district's students, both

25  black and white?

1  A    Because I was at the board table, I would bring up

2  whatever the issue was and it would be addressed.  And I felt

3  that if I was not at the table, that it would not have been

4  addressed.

5  Q    But the board listened to you, didn't they?

6  A    To me, yes.

7  Q    And the board -- you had board members that shared your

8  opinion on a lot of things, didn't you?

9  A    Correct.  Yes.

10 Q    And they were -- they weren't African American, but they

11 agreed with you, right?

12 A    Yes.

13 Q    And you talked about the naming of the two schools.

14 A    Yes.

15 Q    They listened to you, didn't they?

16 A    Yes.

17 Q    And they didn't name the school after a plantation owner,

18 did they?

19 A    No, they did not.

20 Q    And they added Berkeley to the name of the high school,

21 didn't they?

22 A    Correct.

23 Q    When you were on the board all those years, did the board

24 ever publicly discuss a personnel issue?

25 A    Publicly, no.  Well, I'm saying no because, you know, you

1    know, we went to training.  I went as high as you could go to

2    get a master's from Missouri School Board Association.  That's

3    one thing you learn.  You do not take anything in public that

4    has to do with personnel unless there's a decision by the

5    board to do it.

6    Q    And you said you went to that big board meeting that they

7    had to hold in McCluer North gym?

8    A    Yes.

9    Q    Did the board sit there and listen to every single

10   comment that was made?

11   A    Every one, yes.

12   Q    You talked a little bit about when you were talking about

13   single-member -- well, let me hit on something.  You talked

14   about the drumming that you went to, the drumming caucus you

15   went to, I believe you called it, at the National School Board

16   Association convention.

17   A    Yes.

18   Q    And that Mr. Henson brought that up at a school board

19   meeting.  But it's not really the job of the school board to

20   institute a program in the high school with regard to drumming

21   at the lunch periods, right?

22   A    It's not our job to do that, but it's our job to report

23   when we come back from a convention what things impressed us

24   that we might be able to try in our own district.

25   Q    And you never heard back from any of the high school

1  principals about wanting to try to institute that?

2  A    No, ma'am.

3  Q    But it would be their job to do that, right?  The

4  principals of the schools to bring back --

5  A    I would imagine so.  I don't know.  I know we give our

6  principals a lot of autonomy how to run their schools and how

7  to -- who to hire and all of that.

8  Q    And you talked about how Paul Morris helped you out

9  before he was on the school board and he was a teacher and

10  part of the NEA.  He helped you out with your elections; is

11  that right?

12  A    Well, yes.  He helped all of those who were -- he was the

13  go-to person for those who were endorsed by FFNEA.

14  Q    And what race is Paul Morris?

15  A    White.

16  Q    And you believe that you had a lot of white voters that

17  voted for you in your elections, don't you?

18  A    Well, I know I couldn't have won without them.

19  Q    You had -- you know that you had white households that

20  put your signs in their yard?

21  A    Yes.

22  Q    And you had white voters tell you that they voted for

23  you?

24  A    Yes.

25  Q    You talked when you were giving your opinion about

1    single-member districts versus an at-large election, you gave

2    the example of the Ferguson City Council, didn't you?

3    A    Yes.

4    Q    And until this last election, the Ferguson City Council

5    only had one African-American council member; isn't that

6    right?

7    A    I believe so.

8    Q    And it's your understanding that Ferguson City Council

9    members run in single-member districts?  The city is divided

10   up?

11   A    Yes.

12   Q    And yet they only had one African American until the last

13   election?

14   A    Now they have two.

15   Q    Now they have two.

16          I don't have anything further.  Thank you, Your

17   Honor.

18          THE WITNESS:  Thank you.

19          THE COURT:  Any redirect?

20          MR. MCDONALD:  I just have, I think, two questions,

21   Your Honor.

22                    **REDIRECT EXAMINATION**

23   **BY MR. MCDONALD:**

24   Q    In 2011, when you ran for reelection, do you have any

25   opinion one way or another on whether you had the support of

1  the black community?

2  A    Yes, I did have the support of the black community.

3  Q    And tell me why you know that to be true.

4  A    I know that to be true because in my campaigning I was

5  told -- I was promised that they would vote for me.  My --

6  through the churches, through the community.  I had key people

7  who were phone banking for me and writing down "yes, I will

8  vote for her" or "no, I won't vote for her," and I had so many

9  yes's and very few no's.

10  Q    Okay.  And one last question.  Did you vote in 2011 for

11  Spiegel's health insurance?

12  A    It was unanimous.  Yes, I did.

13        MR. MCDONALD:  Yeah.  Okay.  That's all I have, Your

14  Honor.

15        THE COURT:  Thank you, ma'am.

16        MR. MCDONALD:  Oh, wait just one minute.

17        THE COURT:  I think they want to debate MSTA versus

18  AFT now.

19        THE WITNESS:  But I wanted to say something else, but

20  like you said, I wasn't asked; so . . .

21        THE COURT:  They can't even decide themselves what to

22  ask; so . . .

23        MR. MCDONALD:  I don't want to be repetitive.

24        THE COURT:  That's all right.  It's too late.

25  Q    (BY MR. MCDONALD) Co-counsel are asking me.  Do you recall

1    who the FFNEA endorsed in 2013?  Was it Hogshead?

2    A    Yes, sir.

3    Q    Okay.  Do you recall whether -- well, you said that

4    Hogshead was on in 2011, yes?

5    A    Yes.  She was on.  And we had worked on the board, you

6    know, together for a long time, from the time she was elected,

7    and we did a lot of great things together.  But at one of our

8    executive board meetings she just told me, she said, "Some of

9    you around this table will not be elected."

10   Q    Well, Hogshead voted for Spiegel's health insurance too?

11   A    Yes, sir.  Unanimous --

12        MR. MCDONALD:  Okay.  Thank you very much.

13   A    -- vote.

14        THE COURT:  Thank you, ma'am.  You may step down.

15        THE WITNESS:  Thank you, Your Honor.

16        THE COURT:  Appreciate your time.

17        THE WITNESS:  Thank you so much.

18        THE COURT:  If you would call your next witness.

19        MR. ROTHERT:  Our next witness is going to take quite

20   a bit of time; so could we maybe do some deposition

21   designations?

22        THE COURT:  I'm not going to tell you how to try your

23   case.  If you want to read some depositions, that's fine.

24        MR. ROTHERT:  I would like to read the deposition.

25   Okay.  If we can get ready.

1    THE COURT:  All right.

2    MR. ROTHERT:  It will be very exciting.

3    MS. WILCOX:  We will be starting with the deposition

4 of Paul Thomas Morris.  It's page 5, starting at line 19

5 through 22 on that page.

6    **(DEPOSITION EXCERPTS OF PAUL THOMAS MORRIS READ INTO THE**

7    **RECORD.)**

8    MS. ORMSBY:  Your Honor, I'm just curious.  We have

9 counterdesignations.  Would it be appropriate to read those in

10 now as well, or do you want to go back and read our

11 counterdesignations later?

12    THE COURT:  Do you mind reading them all together?

13 Might as well.  It will make more sense.

14    MS. EBENSTEIN:  Do you want all of them?  Do you want

15 all of the counterdesignations?

16    MS. ORMSBY:  I think in this case where it just

17 flows, it just makes sense to just put it all in at the same

18 time, you know.

19    MS. EBENSTEIN:  Fine with me.

20    MS. ORMSBY:  And it's fine if you read them.  I don't

21 have a --

22    MS. WILCOX:  Fine.  I stopped at line 11.  I'll pick

23 up back at 12.

24    THE COURT:  All right.

25 **(CONTINUATION OF THE DEPOSITION EXCERPTS OF PAUL THOMAS MORRIS**

1  READ INTO THE RECORD.)

2  MS. WILCOX:  This ends this deposition.

3  THE COURT:  Very good.  I would say it's magically

4  12:30, but it's not.  It's 12:45.  We will reconvene at 1:40.

5  Thank you very much.

6  **(COURT RECESSED FROM 12:45 PM UNTIL 1:55 PM.)**

7  THE COURT:  All right.  Any announcements before we

8  begin?

9  MR. ROTHERT:  No.

10  MS. ORMSBY:  No, Your Honor.

11  THE COURT:  If you would call your next witness,

12  please.

13  MR. ROTHERT:  The plaintiffs for their next witness

14  call Dr. David Kimball.

15  THE COURT:  If you would step forward, sir, and be

16  sworn.

17  **(WITNESS SWORN BY THE CLERK.)**

18  THE COURT:  Are you ready?

19  MS. ORMSBY:  Yes, Your Honor.

20  THE COURT:  You may proceed.

21  **DAVID KIMBALL,**

22  **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

23  **FOLLOWS:**

24  **DIRECT EXAMINATION**

25  **BY MR. ROTHERT:**

1  Q    Good afternoon.  Could you please state your name for the

2  record?

3  A    David Kimball.

4  Q    Dr. Kimball, are you currently employed?

5  A    Yes, at the University of Missouri-St. Louis.

6  Q    What is your job title at the University of Missouri-St.

7  Louis?

8  A    I'm a Professor of Political Science and Director of

9  Graduate Studies in the Department of Political Science.

10 Q    How long have you been a Professor of Political Science

11 at the University of Missouri-St. Louis, Dr. Kimball?

12 A    I've been at UMSL since 2001.  I've been a full professor

13 since 2012.

14 Q    Prior to being a Professor of Political Science at the

15 University of Missouri-St. Louis, were you a Professor of

16 Political Science elsewhere?

17 A    Yes.  I was an Assistant Professor of Political Science

18 at Southern Illinois University in Carbondale.

19 Q    What are some of the courses you've taught, particularly

20 at the graduate level?

21 A    I teach courses on American government, public opinion,

22 elections, and research methods both at the undergraduate and

23 graduate level.

24 Q    Turning to your own education, what's the highest degree

25 you've obtained?

1    A    Ph.D. in political science.

2    Q    Where did you receive your Ph.D. in political science?

3    A    At Ohio State University.

4         THE COURT:  You didn't say that right, did you?

5    Q    It's "thee."  (As pronounced.)

6    A    "Thee" Ohio State.  Sorry.

7    Q    "Thee" Ohio State University, for the record.  Okay.  And

8    what year -- when did you receive your Ph.D. in political

9    science from "Thee" Ohio State University?

10   A    1997.

11   Q    Where did you attend for undergraduate studies?

12   A    Brown University.

13   Q    You've co-authored a number of refereed books, correct?

14   A    Yes.  I've co-authored three and co-edited one.

15   Q    And what makes a refereed book different from *Fifty*

16   *Shades of Grey*?

17   A    Well --

18        THE COURT:  From which end of the prism do you want

19   him to talk about?

20   A    I'm only familiar with the academic publishing process.

21   Q    What makes a refereed book different?

22   A    Yeah.  A refereed book means that, before it's accepted

23   for publication, the manuscript is sent out to other scholars

24   to review and recommend publishing it.

25   Q    And did you say how many books you've authored or

1    co-authored?

2    A    I've co-authored three and co-edited one book.

3    Q    And what were those?  Can you describe those books?

4    A    One -- the co-edited book's called *Controversies in*

5    *Voting Behavior*.  One of the co-authored books is called

6    *Helping America Vote:  The Limits of Election Reform.*  Another

7    of the co-authored books is called *Why Americans Split their*

8    *Tickets*.

9    Q    And the co-edited book?

10   A    Another co-authored book is called *Lobbying and Policy*

11   *Change*.

12   Q    So all those books have to do with voting behaviors or

13   interest groups?

14   A    Right.  Three of them deal with voting in elections and

15   the fourth with interest groups and lobbying.

16   Q    And what's a refereed article?

17   A    That's an article published in an academic journal, and

18   the same kind of peer review process applies:  Scholars review

19   it first and recommend either to publish it or not.

20   Q    Do you know how many refereed articles you've authored or

21   co-authored on voting behavior generally or on American

22   politics?

23   A    Overall, I think I have about 20 or so refereed journal

24   articles.  Probably, I don't know, 12 to 15 of them deal with

25   voting elections.

1   Q    Are you on the editorial board of any political science

2   journals?

3   A    Yes.  *Election Law Journal.*

4   Q    Do you do journal manuscript reviews for any political

5   science journals?

6   A    Yes.

7   Q    And what is a journal manuscript review?

8   A    That's the other side of the peer review process.  So

9   when people send manuscripts into journals, I'm sometimes one

10  of the reviewers that reads them and recommends to publish

11  them or not, make suggestions to the authors.

12  Q    How many political science journals do you provide

13  manuscript reviews for?

14  A    Several journals.  I probably do maybe about 10 to 12

15  manuscript reviews a year.

16  Q    Can you provide by name some examples of the journals for

17  which you provide manuscript review?

18  A    Yes.  *American Political Science Review, Journal of*

19  *Politics, American Journal of Political Science, Election Law*

20  *Journal.*  Those are some.

21  Q    Okay.  Have you testified as an expert witness before?

22  A    Yes.

23  Q    Does that include in this courthouse?

24  A    Yes.  I was an expert witness in one case in this

25  courthouse.  That dealt with drawing district lines for the

1  St. Louis County Council.

2  Q    Have you testified as an expert in Missouri state courts?

3  A    Once.  I testified in a case where I examined the

4  compactness of congressional districts.

5  Q    And have you served as an expert witness in federal

6  courts in other states?

7  A    Yes.  I think in maybe three or four other cases I filed

8  expert reports.

9  Q    Could you look in your binder there at Plaintiffs'

10 Exhibit 48.  Is that something that you recognize?

11 A    Yes.  That's my expert report for this case.

12 Q    And if you would hop ahead to the attachment.  It's the

13 16th page of Exhibit 48.  Can you tell me what that is?

14 A    That's the copy of my CV, my curriculum vitae.

15 Q    Given your education and experiences you discussed today

16 and as set forth more completely on Plaintiffs' Exhibit 48

17 which has already been admitted into evidence, do you have a

18 general area of professional expertise?

19 A    My general area of expertise is American politics, voting

20 in elections, public opinion, and research methods.

21 Q    Okay.  Do you have a particular expertise in elections or

22 election administration at a particular level?

23 A    More recently of the state and local level, with

24 elections at the state and local level, yes.

25 Q    Are you familiar with something called the federal Voting

1  Rights Act?

2  A    Yes.

3  Q    And what's your understanding of what that is?

4  A    It was originally passed, I think, in 1965, and it

5  generally prohibits election practices that discriminate on

6  the basis of race or color or language.

7  Q    Can you provide me with an example of an election

8  practice that would have been present in 1965 that

9  discriminated on the basis of race?

10 A    Like literacy tests or poll taxes would be two prominent

11 examples.

12 Q    How did literacy tests discriminate on the basis of race?

13 A    Well, the effect was that voter registration rates and

14 voter turnout rates among African Americans were much lower

15 than among whites in the places that use that practice.

16 Q    And what about poll taxes?

17 A    Same thing.  Voter registration rates and turnout rates

18 among African Americans were much lower than among whites in

19 the places that used that practice.

20 Q    Have you ever heard the term "Senate factors" as related

21 to cases brought under the Voting Rights Act?

22 A    Yes, I have.

23 Q    What does that mean to you, Senate factors?

24 A    I think that applies to a report from the Senate

25 Judiciary Committee that went along with the 1982

1    reauthorization of the Voting Rights Act.

2    Q    And were you asked to form an opinion about how many --

3    or how some of those factors, those Senate factors, operate in

4    the scheme used to elect members to the school board for the

5    Ferguson-Florissant School District?

6    A    Yes.

7    Q    And are there factors about which you've been able to

8    form an opinion within a reasonable degree of certainty?

9    A    Yes.  Some of the factors was dealing with the degree of

10   racially polarized voting in the district, the degree to which

11   minority candidates win election to seats in the district.

12   What else?  Exclusion of minority candidates from slating

13   processes, whether there's a history of discrimination in the

14   area that's at play.

15   Q    I know we asked you about a lot of factors.

16   A    Yeah.  Those are the main numbered ones.  Oh --

17   Q    What about --

18   A    Lack of responsiveness.  You know, the unnumbered

19   factors, the lack of responsiveness on the part of elected

20   officials and whether the election practice was tenuous.

21   Q    You've identified Exhibit 48 as your original expert

22   report in this case, correct?

23   A    Yes.

24   Q    Did you read your report before you signed it?

25   A    Yes.

1  Q    Do you always read your expert reports before you sign

2  them?

3  A    Yes.

4  Q    Does Exhibit 48 still represent your opinions?

5  A    Yes.

6  Q    You also submitted a rebuttal report; is that correct?

7  A    Yes.

8  Q    If you could look at Exhibit 49, Plaintiffs' Exhibit 49,

9  which also has already been admitted into evidence, can you

10 identify what Plaintiffs' Exhibit 49 is?

11 A    It's my rebuttal report as well as some additional

12 endorsement information that I --

13 Q    That you relied on?

14 A    Yeah.

15 Q    Okay.  Does Exhibit 49 still represent your opinions?

16 A    Yes.

17 Q    Based on your analysis of those factors that you've

18 looked at in your reports, are you able to form an opinion

19 whether the use of at-large elections held in April to select

20 members of the Ferguson-Florissant School District's board

21 deprives African-American residents of the Ferguson-Florissant

22 School District of an equal opportunity to influence the

23 outcome of those elections?

24 A    Yes.

25 Q    And what is your opinion?

A    That the use of at-large elections in April for the
Ferguson-Florissant School District implicate several of the
Senate factors in a way that deprives African-American voters
an equal opportunity to elect candidates of their choice.

Q    All right.  In your report you reference the calculus of
voting; is that right?

A    Yes, the calculus of voting.

Q    So to try to understand better, we have a little slide
here.  If you can look at that and explain what is the
calculus of voting.  What is that formula, and what does it
represent?

A    In brief, it's sort of a cost-benefit, basically,
analysis of the decision of whether to vote or not.  This
formula, likelihood of voting equals P times B minus C is one
that's frequently used in political science.  The letter "P"
represents the probability that one's own vote might determine
the outcome of an election.  The letter "B" represents the
benefits one would receive of seeing one's preferred
candidates win, win election and possibly implement policies
that the voter preferred.  And the letter "C" represents the
costs of voting, which include information costs of learning
about the candidates running for office, the costs associated
with the administrative process of registering to vote,
finding out where one's polling place is, getting away from
work to go vote, things like that.

1    Q    And is this idea of a calculus of voting to help

2    determine the likelihood of voting -- is that something that's

3    commonly accepted and commonly used in your field?

4    A    Yes.  In political science, yes.

5    Q    Why is the calculus of voting important?

6    A    It's important -- the basic cost-benefit framework

7    indicates that for many people the decision of whether to vote

8    or not can be a close call, and that is that relatively small

9    changes in either the benefits or the cost side of the

10   equation can substantially increase or decrease the likelihood

11   of voting in an election.

12   Q    Do these small changes that you're talking about that

13   can -- small changes in benefits or costs that can have

14   dramatic changes on the likelihood of voting, or substantial

15   changes in the likelihood of voting, do those have a more

16   pronounced effect with certain types of voters?

17   A    Yes.  Particularly important for voters with less

18   education, less income, people who are less habitual voters.

19   Q    Why is that?

20   A    Partly because -- mainly because on the cost side there

21   is a strong correlation between education and voting, between

22   income and voting; so people with lower levels of those

23   resources, it's a little more difficult to overcome the cost

24   that is associated with registering and turning out to vote,

25   learning about candidates and so forth.

Q    And looking at the big picture before we get into the

different factors, can you tell me how the calculus of voting

plays out in the Ferguson-Florissant School District?

A    Yes.  I mean, I think several of the Senate factors sort

of interact with the type of election system used in the

Ferguson-Florissant School District, particularly the at-large

and the April scheduling, in a way that may sort of weigh the

cost side in such that it may be more burdensome on

African-American voters and make it more difficult for them to

influence the outcome of elections.

Q    Do those factors also intersect with the socioeconomic

conditions in the district?

A    Yes.

Q    And does that also make voting more burdensome for

African Americans, or tend to?

A    Right.  Socioeconomic conditions in district -- I think

Dr. Gordon yesterday testified that there's a racial disparity

in income and wealth and education levels, and those factors

come into play here.

Q    Could you look at Plaintiffs' Exhibit 63, which is in

your binder and on the screen, but it may be hard to read on

the screen.  Do you know what this is?  And just for the

record, Plaintiffs' Exhibit 3 has already been admitted into

evidence.  But do you know what it is?

A    Looks like it's a report from the United States Census on

1    voting and registration by race and sex from November 2014.

2    Q    Could you look at the information for the state of

3    Missouri and tell me what page that's on?

4    A    Missouri's probably on the sixth page or so back.  My

5    pages aren't numbered.

6    Q    I agree.  Sixth page.  What's the registration rate,

7    according to this data, for African Americans in Missouri?

8    Voter registration rate.

9    A    Give me a second here.  For black alone, it's 67.9

10   percent.  For black alone or in combination, it's 68.5

11   percent.

12   Q    What's the voter registration rate for whites in

13   Missouri?

14   A    For white alone, it's 73.1 percent.  For white alone or

15   in combination, it's 72.8 percent.

16   Q    I'd like to talk to you -- ask you some questions about

17   the voting practices and procedures that enhance the

18   opportunity for discrimination.  Based on your expertise, are

19   there any features of the elections for the

20   Ferguson-Florissant School District's school board that

21   increase the opportunity for discrimination against the

22   African-American residents and voters?

23   A    The most important ones are the at-large feature and the

24   April -- the off-cycle scheduling of elections for the

25   Ferguson-Florissant School Board.

1  Q    Let's start with the feature of at-large elections.  Is

2  there research regarding whether racial and ethic minority

3  voters have more difficulty electing a candidate of their

4  choice in local at-large elections rather than in local

5  subdistrict elections?

6  A    Yes.  There is political science research that finds that

7  racial minorities have more difficulty electing candidates of

8  their choice in at-large local elections than in at-large

9  district elections.

10  Q    Do you know why that is?

11  A    Well, yeah.  The general explanation is that if there's

12  racially polarized voting, that is, if white voters are

13  supporting different candidates than, say, African-American

14  voters, then a white majority can basically outvote the

15  African-American minority and see the -- so that the

16  white-preferred candidates tend to win and the candidates

17  preferred by African Americans then tend to lose.

18  Q    Now, if someone were to characterize that opinion that

19  you just gave as being that in an at-large election system a

20  racial or ethic minority can effectively determine the winners

21  of all elections if there is racially polarized voting, would

22  that be an accurate representation of your opinion or your

23  report?

24  A    Can you ask that again?  I'm not sure I got the whole

25  question.

1    Q    Well, you mentioned that if there is racially polarized

2    voting in at-large elections, a white majority can effectively

3    determine the winners of all the seats.

4    A    Uh-huh.

5    Q    Is it fair to characterize it to say the exact opposite

6    is true; that if you have an at-large election, racially

7    polarized voting, that a racial or ethic majority could

8    determine all the winners?

9    A    Not necessarily.  I think my view you would want to see

10   the racial or ethic group be a super majority to be able to

11   control at-large elections.

12   Q    Okay.  What's a super majority?

13   A    Much higher than 50 percent.  Say, like, 70 percent.  For

14   a number of reasons.  So we just looked at the registration

15   rates, and Missouri registration rates tend to be lower for

16   African Americans than for whites.  Voter turnout in local

17   elections tends to be lower for racial and ethnic minorities

18   than for whites.

19        In order to win elections, it takes also some

20   coordination, recruiting candidates, coordinating support that

21   impose costs and take organizing and take resources.  And so

22   being just above 50 percent is probably, in my view, not

23   enough to ensure control of the outcome of those -- of

24   at-large elections.

25   Q    Okay.  You mentioned that in addition to at-large

1  elections there was another voting practice or procedure for

2  the Ferguson-Florissant School District elections that enhance

3  the -- that make it more difficult for African Americans to

4  have an opportunity to elect the candidate of their choice.

5  A    Right.  This is the April -- by state law in Missouri,

6  municipal -- local elections are in March and April, or what

7  we call "off-cycle" in political science.  So an on-cycle

8  election is one that's held in November of an even-numbered

9  year and coincides with usually major statewide and national

10 offices like President, Congress, and governor.

11       Those on-cycle, or November of even-numbered

12 elections, tend to have much higher voter turnout, voter

13 participation than off-cycle elections like one held in April

14 at a different time of year.

15 Q    Do they have -- do on-cycle elections have more benefits

16 for voters?

17 A    On the turnout -- so part of the reason turnout is higher

18 in those occasions is the benefit side is more clear.  There's

19 more information readily available to voters about the

20 candidates.

21 Q    Okay.  How do off-cycle elections -- how do they, well,

22 either enhance the opportunity for discrimination or make it

23 more difficult for African Americans to elect candidates of

24 their choice?

25 A    They tend to make it more difficult.  Those off-cycle

1  elections there's less news coverage.  There's generally less

2  outside information available to voters about the candidates

3  running for office.  And so it takes more -- the cost side is

4  a little bit higher for voters.  It takes more effort on their

5  part to find out who's running, find out information about the

6  candidates and their policies.

7  Q    Now, in addition to at-large and off-cycle elections, are

8  there other voting practice and procedures in the

9  Ferguson-Florissant School District School Board elections

10 that make it harder for African Americans to elect candidates

11 of their choice?

12 A    The staggered part -- I think this is not as important a

13 factor as the at-large and the April scheduling, but there's

14 some research indicating when all seats in a local legislative

15 body are up for election at the same time, voter participation

16 tends to be higher.  In that case, the perceived benefits are

17 more evident.  All the seats are at play.  That means majority

18 control is at stake in that election.  There's more candidates

19 running.  There's more campaigning going on.  So voters are

20 likely to have more information about the election.

21 Q    How does that change voter participation?

22 A    So you tend to get higher voter participation when all

23 the seats are up at the same time in the same election rather

24 than stagger, rather than two or three seats being up in one

25 election and then another two in the next election and so

1  forth.

2  Q    Okay.  And thinking again about that calculus of voting,

3  determining the likelihood of voting for African Americans,

4  how do off-cycle, at-large, staggered elections in the

5  Ferguson-Florissant School District -- how does that

6  contribute to the calculus of voting for African Americans?

7  A    I think it can contribute to sort of a disproportionate

8  lower turnout among African-American voters in those kind of

9  at-large, off-cycle, staggered local elections than among

10 white voters.

11 Q    Can you explain why.

12 A    For one, there's political science research examining

13 local elections that have found that to be the case.  I think

14 I sort of touched on this already; that in the case of in this

15 calculus of voting framework in those at-large, off-cycle,

16 staggered elections, the costs tends to be a bit higher than

17 in other elections.  And given the socioeconomic disparities

18 in the district and in the region, that cost-benefit framework

19 then tends to work against African-American voters.

20 Q    And is there, in fact, lesser turnout for

21 African-American voters compared to white voters for the

22 at-large elections, those at-large, staggered, off-cycle

23 elections in the Ferguson-Florissant School District?

24 A    The turnout in those elections is certainly lower than it

25 is in presidential elections or midterm, November midterm

1  elections.

2  Q    What about is there lesser turnout for African Americans

3  as compared to white voters in those elections?

4  A    Oh, specifically in the Ferguson-Florissant School

5  District?

6  Q    Yes.  Yes.

7  A    I think the evidence from a couple of the reports finds

8  that in some elections voter turnout is lower among African

9  Americans than among whites, and in other elections it's more

10  similar or indistinguishable.

11  Q    How do you determine voter turnout?

12  A    The number of ballots cast divided by the voting-age

13  population.

14  Q    When you say "ballots cast," do you mean the number of

15  voters?

16  A    Yeah.  It's the same, yeah.  The number of ballots cast

17  indicates how many voters showed up to vote.

18  Q    So you're not counting the number of votes in a given

19  election?

20  A    Right.

21  Q    I guess what I'm asking is do you have to adjust in

22  elections like the Ferguson-Florissant School District where

23  voters are permitted to cast more than one vote?

24  A    Right.  So it's distinct from the number of total votes

25  cast in elections like the Ferguson-Florissant School District

1  where voters have up to two or three votes cast.  Ballots cast

2  is a separate quantity that the election board reports that

3  just indicates how many voters there were.

4  Q     And for turnout you use ballots cast or votes cast?

5  A     To measure turnout, I use ballots cast as the numerator.

6  Q     What method did you use to analyze voter turnout in

7  contested elections for the Ferguson-Florissant School

8  District board?  Which one did you use first?

9  A     Oh.  I use homogeneous precinct analysis.  I mean how to

10 estimate the turnout by race --

11 Q     Okay.

12 A     -- I used homogeneous precinct analysis, and then I also

13 used ecological inference estimates from Dr. Rodden's report.

14 Q     And Dr. Rodden's report -- is that Plaintiffs' Exhibit 56

15 in your binder?

16 A     Yes.

17 Q     Does Dr. Rodden also use homogeneous precinct analysis to

18 estimate voter turnout or just ecological inference estimates?

19 A     I think he just uses the ecological inference.

20 Q     If you could look -- we'll put it on the screen here, but

21 Exhibit 49, Table 3 on page 6.  And this is your rebuttal

22 report, correct?

23 A     Yes.

24 Q     Can you describe what this table shows?

25 A     The right -- so it's examining each of the last five

1    elections to the Ferguson-Florissant School Board.  The

2    numbers in the far two right-hand columns are estimates from

3    Dr. Rodden's report on white turnout and African-American

4    turnout --

5    Q    Okay.

6    A    -- in each of those elections.

7    Q    And the two columns after the year?

8    A    Those are homogeneous precincts analysis that I did.  So

9    the first column computes voter turnout in the precincts where

10   African Americans comprise more than 90 percent of the

11   voting-age population, and then the next column indicates

12   voter turnout in the precincts where African Americans

13   comprise less than 10 percent of the voting-age population.

14   Q    So the first column is the year; the second column is

15   voter turnout in homogeneous.  Is that right?

16   A    Heavily African-American precincts.

17   Q    Okay.  Heavily African-American precincts.  The third

18   column is voter turnout in heavily white precincts.  And --

19        THE COURT:  It doesn't really say that.  That's a

20   question.

21   Q    Is the third column --

22   A    Turnout in heavily white precincts.

23   Q    Okay.

24   A    In each of those elections.

25   Q    And the fourth column is what?

1   A    Is Dr. Rodden's estimate of African-American turnout in

2   each of those elections.

3   Q    And the fourth column?

4   A    Is Dr. Rodden's estimate of white turnout in each of

5   those five elections.

6   Q    Now, this is labeled "precincts less than 10 percent

7   African American," the third column over?

8   A    Yes.

9   Q    In the Ferguson-Florissant School District, does a

10  precinct that's -- what is the racial make-up a precinct that

11  is less than 10 percent African American?

12  A    It's over 90 percent non-African American; so it's

13  heavily white.

14  Q    Does non-African American in the Ferguson-Florissant

15  School District generally mean white?

16  A    Yes.

17  Q    So based on the homogeneous precinct analysis that you

18  conducted on turnout, were you able to conclude in your report

19  the homogeneous analysis of -- precinct analysis you did, were

20  you able to conclude whether there's a difference in turnout

21  based on race for Ferguson-Florissant School District's

22  at-large, off-cycle elections?

23  A    Yeah.  I mean, in my analysis, in four of those five

24  elections, by my estimates white turnout was higher than

25  African-American turnout, and in just one in 2012 African

turnout was higher than white turnout. In Dr. Rodden's

estimates, I think the racial differences in turnout are not

quite as large.

Q    Okay.

A    But he finds in at least a couple of them white turnout

exceeds African-American turnout and a couple of the others

they're very similar.

Q    Okay. He, like you, does find white turnout exceeds

black turnout in four of the five elections; is that correct?

A    Yes. If you're just looking at the point estimates. If

you include the confidence intervals, then it's a little

bit -- and we're not certain how much different they really

are.

Q    Okay. Is it helpful to do both homogeneous precinct

analysis and ecological inference estimates to measure

turnout?

A    I think the homogeneous precinct analysis is a helpful

supplement to the ecological inference to examine turnout or

candidate support. So it is basically three different -- what

we're doing here is we're trying to make inferences about

individual-level behavior: How did African-Americans votes;

what percentage of them voted out; how did white voters vote;

and what percentage of them voted? We're trying to make

individual-level inferences based on aggregate data.

          And so because people vote a secret ballot, we can't

1    observe them in the voting booth to know exactly how many

2    white people vote and how many African-Americans voted and who

3    they selected.  So we generally have to rely on aggregate data

4    at the precinct level to try and make these inferences.  And

5    so each method is making an estimate.  Each method has --

6    makes assumptions.  Each method has some advantages and

7    disadvantages.  There's no guarantee that any of these methods

8    gives us the exact truth or gives us the --

9    Q    So is it helpful to use more than one method?

10   A    I think it's useful, particularly to use homogeneous

11   precincts, to supplement the ecological inference.

12   Q    How does that help?

13   A    Well, the advantage of homogeneous precincts is if you're

14   looking at heavily African-American precincts and heavily

15   white precincts, because of the homogeneous nature of them

16   they give you a pretty good -- pretty confident evidence of

17   how members of that racial group voted at least in those

18   precincts.

19        I mean, the big disadvantage of the homogeneous

20   precincts analysis is you're leaving out other precincts that

21   are more racially mixed.  So you're not examining all the

22   precincts.  You're leaving out some of the data.

23   Q    What are the disadvantages to using ecological inference

24   estimates for turnout?

25   A    So I mean one advantage, which is consistent with all

1    these, is that we're using aggregate data to try and make

2    estimates about individual behavior.  The challenge with

3    ecological inference is -- and, I mean, I guess I will say

4    that -- so the third method is ecological regression, which we

5    haven't discussed yet.  That's one where you're basically

6    fitting the regression means, fitting a straight line to data,

7    data that compares race, racial composition of precincts to

8    some measure of voting behavior.

9          Ecological regression -- one of the big drawbacks

10   with that is it assumes basically a constant voter rate across

11   all precincts.  So, for example, it assumes that

12   African-American voters support particular candidate at the

13   same level in every precinct, which probably an unrealistic

14   assumption.  And ecological regression can also produce

15   nonsensical estimates that it can estimate for you that over

16   100 percent of white voters voted for a particular candidate

17   or less than zero percent of African-American voters voted for

18   a particular candidate when we know percentages have to be

19   between from zero to 100.  You can't go below zero; you can't

20   go below 100 [sic].

21         Ecological inference improves on things because it,

22   number one, it doesn't assume that constant voter rate across

23   all precincts, and it prevents the nonsensical estimates from

24   occurring.

25         I think one critical assumption that ecological

1    inference makes is that the voting quantity that you're

2    estimating is uncorrelated with the racial composition of the

3    precincts you're analyzing, and so if you have reason to

4    suspect that, for example, African-American voters in heavily

5    African-American precincts may vote for different candidates

6    than African-American voters in majority-white precincts, that

7    violates that assumption, and that can lead to the ecological

8    inference estimates to be biased.

9    Q    Well, getting back to turnout, when you look --

10         THE COURT:  He doesn't want to talk to you about --

11   A    Sorry.

12   Q    Oh, no.  That's fine.  I want to talk too.  Getting back

13   to turnout, when you confirm or you look at white turnout

14   versus African-American turnout with more than one method,

15   does that help confirm that it's actually -- you're getting

16   accurate numbers instead of just -- it's a result of the

17   method you're using?

18   A    Right.  I mean, I think you should use some caution with

19   any of these estimates.  And so if more than one -- if

20   multiple of these methods are giving you a similar picture, I

21   think you could be a little more confident that you're getting

22   at the way things really are.

23   Q    And you said your opinion was that white turnout often

24   clearly exceeds African-American turnout in

25   Ferguson-Florissant School District elections, and sometimes

1    it's indistinguishable.  Is that your opinion?

2    A    Yes.

3    Q    And are you confident in that opinion based on the

4    homogeneous precinct analysis and the ecological inference

5    estimates provided by Dr. Rodden?

6    A    Yes.  I think his estimates support that conclusion.

7    Q    Next I'd like to talk to you about the candidate slating

8    process in the Ferguson-Florissant School District.  As a

9    political scientist, do you have an understanding of what

10   slating means?

11   A    Slating means organized interests that endorse particular

12   candidates for office.

13   Q    What's the benefit of being on a slate?

14   A    Well, it's a signal to voters that that particular group

15   wants the endorsed candidate to be elected.  Candidates who

16   are endorsed can coordinate with other candidates who are

17   endorsed to promote that information, to share that

18   information to voters through phone calls and mailings and

19   newsletters, and endorsed candidates can also work with the

20   group making the endorsement to promote that information and

21   to help recruit members of the group to volunteer for the

22   candidate's campaign.

23           Campaigns can stand outside -- sometimes stand

24   outside polling place on an election day and hand out slating

25   cards or materials that indicate which candidates are endorsed

1  by that group so that voters have information when they go

2  into the polling place.

3  Q    And are those benefits or advantages to being a slate --

4  are they heightened in off-cycle elections?

5  A    Yes.  Off-cycle elections tend to be lower-information

6  elections so that voters are generally receiving less

7  information about the election, about the candidates than in

8  some other elections.  And so the payoff of this endorsement

9  information can be bigger in those kind of local, off-cycle

10  elections.

11  Q    Are there any organizations that endorse a slate of

12  candidates in Ferguson-Florissant School District School Board

13  elections?

14  A    Yes.  The two I found are the FFNEA, the

15  Ferguson-Florissant local of the National Education

16  Association, and the North County Labor Club.

17  Q    Are those both labor organizations?

18  A    Yes.

19  Q    Do you have an opinion whether African-American

20  candidates have the same access to the slating processes in

21  Ferguson-Florissant School District elections as compared to

22  white candidates?

23  A    Yes.

24  Q    What is your opinion?

25  A    That African-American candidates are relatively rarely

1    endorsed by each of these groups compared to white candidates.

2    Q    Let's talk about how you reached that conclusion.  If you

3    could look at Tab 129.  This is Plaintiffs' Exhibit 129.  Is

4    this the information you used to determine who the North

5    County Labor Club has endorsed for Ferguson-Florissant School

6    District in contested elections from 2004 to 2015?

7    A    Yes.  These are from the *Labor Tribune*, which is a

8    newspaper that publishes the Labor Club endorsements.

9    Q    And these records were what you used to determine how

10   often candidates were endorsed or who was endorsed by the

11   North County Labor Club?

12   A    Yes.

13        MR. ROTHERT:  I move for admission of Plaintiffs'

14   Exhibit 129.

15        THE COURT:  Any objection?

16        MS. ORMSBY:  Object as to hearsay, Your Honor.

17        THE COURT:  Overruled on the basis of his testimony

18   as an expert and the type of data he would normally rely on.

19   You should have made that response instead of me, but --

20   Q    I was prepared to ask another question.

21        That's the data you rely on that you would normally

22   rely on in your field to determine who was endorsed?

23   A    Right.

24   Q    Okay.  Thank you.  Now, we're going to put up a

25   demonstrative exhibit for you here so you don't have to keep

1    leafing through those pages.  How were you able to determine

2    the race of candidates, various candidates?

3    A    From newspaper reports primarily.  In some cases I looked

4    at photos of the candidates that were on the internet or in

5    newspaper reports.

6    Q    From 2004 to 2015, how many candidates for the

7    Ferguson-Florissant School District School Board did North

8    County Labor endorse?

9    A    In the elections since 2014, I found endorsement

10   information in six of those elections.  I didn't find any

11   endorsement information, I think, for the 2004 and 2009

12   elections, but the other six I did.

13   Q    Okay.  And what was the total number of candidates -- do

14   you know the total number of candidates that were endorsed by

15   North County Labor during that time period?

16   A    Thirteen, I believe.

17   Q    Okay.  And how many of those 13 candidates on the North

18   County Labor slate won their elections?

19   A    I think 11 of the 13 were elected.

20   Q    And of those 13 candidates that were on the North County

21   Labor slate, how many were white?

22   A    Twelve of the 13.

23   Q    And of the 13 candidates endorsed by North County Labor,

24   how many were African American?

25   A    One.

1    Q    Do you know how many candidates there were for

2    Ferguson-Florissant School Board elections in those years?

3    A    Total I think there were 19 white candidates and 15

4    African-American candidates.  So that would be what?

5    Thirty-four candidates total?

6    Q    You consider those similar numbers?

7    A    Nineteen and 15?  So there were a few more white

8    candidates than African Americans, but they are similar.

9    Q    So of the 12 candidates that were endorsed by North

10   County Labor Club who were white, do you know how many won

11   their elections?  You can consult your report if you need to.

12   Just tell us what exhibits you're looking at.

13   A    I think this is in my original report.  Yes.  You asked

14   me how many of the --

15   Q    -- twelve white candidates endorsed by North County Labor

16   won.

17   A    And 11 of the 12 endorsed whites candidates won.

18   Q    And the one African-American candidate endorsed by North

19   County Labor?

20   A    Did not win.

21   Q    So does the fact that the single African-American

22   candidate to have been endorsed by North County Labor didn't

23   win, does that mean that there was no benefit to African

24   Americans or to that African-American candidate from the

25   endorsement?

1  A    Not necessarily.  I mean, I think the benefits I

2  described earlier mean that that candidate may have earned

3  more votes than otherwise might have occurred but just not

4  enough to get over the top to win election to the school

5  board.

6  Q    Could you look at Plaintiffs' Exhibit 130.  This exhibit

7  has already been introduced into evidence.  Is this the

8  information you used to determine who the FFNEA endorsed?

9  A    Yes, plus a couple pages attached to my rebuttal report.

10  Q    Okay.  So for your initial report, Plaintiffs' Exhibit

11  130 is the data you used to determine who the FFNEA had

12  endorsed?

13  A    Right.  Yes.

14  Q    Okay.  And then attached to your rebuttal report, that's

15  Exhibit 49, correct?

16  A    Yes.

17  Q    And there are two exhibits to your rebuttal report?

18  A    Yes.

19  Q    And that had FFNEA data for?

20  A    Those are for the 2012 and 2013 elections.

21  Q    Were you able to find information about FFNEA's slate

22  from 2004 to 2015 like you were for North County Labor, or

23  were there some years you were not able to find?

24  A    Yeah.  For North County Labor I was able to find the

25  endorsing information for all the elections.  For FFNEA it was

1   just for the six elections.  That's where I was missing 2004

2   and 2009.

3   Q    All right.  From 2006 to present, how many contested

4   elections have you found in which FFNEA has endorsed a slate

5   of candidates?

6   A    Six elections.

7   Q    All right.  And do you know how many white candidates

8   there were in those six elections?

9   A    In those six elections, yeah, there were 19 white

10  candidates.

11  Q    And how many African-American candidates in those six

12  elections?

13  A    Fifteen African-Americans candidates.  Yeah, so my

14  earlier answer on the Labor Club, I think I gave the wrong

15  numbers.

16  Q    Okay.  I think you may have.

17  A    Sorry about that.

18  Q    All right.  Upon further reflection, do you think the

19  total number of -- for the years -- I know it's a little

20  confusing because you have data for a different number of

21  elections, but for the North County Labor do you know how many

22  African-American candidates there were in the years for which

23  we discussed?

24  A    There were 16 African-American candidates in those -- I'm

25  sorry.  No.  There were 19 African-American candidates.

1    Q    In those years for which we discussed North County Labor

2    endorsements?

3    A    Right.

4    Q    And how many white candidates were there for those years

5    in which we discussed North County Labor candidates?

6    A    There were 23 white candidates in those elections.

7    Q    Okay.  And so for the years that we have FFNEA data about

8    slates, you mentioned there were six elections and 19 white

9    candidates in those elections and 15 African-American

10   candidates; is that right?

11   A    Yes.  Uh-huh.

12   Q    All right.  How many candidates has the FFNEA endorsed in

13   the contested elections since 2006 that you were able to find

14   data about?

15   A    In those six elections, FFNEA endorsed 14 candidates.

16   Q    How many of those 14 candidates slated by FFNEA since

17   2006 were African American?

18   A    Three.

19   Q    So 11 of the 14 candidates were white?

20   A    Yes.

21   Q    So what's the percentage of white candidates receiving

22   the FFNEA -- or never mind that question.  What percentage of

23   the candidates who were white and who received the FFNEA

24   endorsement won their elections?

25   A    I think all 11 of the white-endorsed candidates won the

1    election of the school board.

2    Q      So what percent?

3    A      One hundred percent.

4    Q      Okay.  And what percentage of the African-American

5    candidates who received the FFNEA endorsement won in those

6    years, won their elections?

7    A      The three African-American candidates endorsed by FFNEA,

8    all three of them lost; so zero percent.

9    Q      Does the fact that no African-American candidate has won

10   with an FFNEA endorsement, at least since 2006, mean that

11   African Americans did not and would not benefit from being

12   endorsed by FFNEA?

13   A      No.  I mean, as my answer earlier, I think same things --

14   the endorsement may have earned them more votes than they

15   otherwise would have gotten, just not enough to put them over

16   the top.

17   Q      Now, you mentioned that there was a report by another

18   expert in this case that you looked at on the other side?

19   A      Yes.  Yes.  Dr. Rodden's report.

20   Q      And did you use his figures to determine -- let me ask

21   you this.  Did he label candidates as white preferred or

22   minority preferred?

23   A      Yes, based on his ecological inference analysis.

24   Q      Were you able to use his figures or his labels, rather,

25   of white preferred and minority preferred to consider how

1    candidates are slated by North County Labor or FFNEA?

2    A    Yes, I did.

3    Q    So we'll go back to talking about North County Labor Club

4    again for a moment.

5    A    Okay.

6    Q    As Dr. Rodden assigns them labels -- white preferred --

7    from 2004 to 2015, how many white-preferred candidates

8    received the North County Labor Club endorsement?

9    A    Eleven.

10   Q    And how many of the candidates, the North County Labor

11   candidates that Rodden considers white preferred, how many of

12   them won their election?

13   A    All 11 of them won.

14   Q    And how many of the candidates that Rodden considers --

15   Dr. Rodden -- considers minority preferred were on a North

16   County Labor slate?

17   A    Three.  So three of the 18 minority-preferred candidates

18   in those elections were endorsed by the North County Labor

19   Club.

20   Q    And how many of the North County Labor Club slatees that

21   Dr. Rodden considers minority preferred -- how many of them

22   won their elections?

23   A    Two of the three minority-preferred candidates endorsed

24   by the Labor Club won their elections.

25   Q    Okay.  Now, let's talk about a top-choice candidate for

1  white voters versus black voters.  And you and Dr. Rodden

2  agree that it's never been the same -- white voters' top

3  choice has never been the same as black voters' top choice; is

4  that correct?

5  A    Right.  I think in each of the elections that he analyzed

6  going back to 2000, the top-choice candidate for white voters

7  was a different candidate than the top-choice candidate of

8  black voters.  I think in every instance the top choice of

9  white voters was a white candidate, and in all but one

10  election the top choice of black voters was a black candidate.

11  Q    And in the one instance when the top choice of black

12  voters was a white candidate, were there any black candidates

13  running that year, if you know?

14  A    No.  I think that was 2009.  There were no black

15  candidates that year.

16  Q    So how did the candidates with the highest estimated

17  support from each racial group fare in getting a spot on the

18  North County Labor Club slate?

19  A    Six -- so there were eight elections from 2004 to 2015.

20  In six of those eight elections, the top choice among white

21  voters was endorsed by the North County Labor Club.  In those

22  same eight elections, just one of the eight top-choice

23  candidates among African-American voters was endorsed by the

24  North County Labor Club.

25  Q    So six out of eight of the top choice for white voters

1    was endorsed by North County Labor, and one out of eight of

2    the top choice for African-American voters?

3    A    Yes.

4    Q    On the six occasions that the top-choice candidate

5    amongst white voters was slated by North County Labor, how

6    many times did that candidate win?

7    A    All six times.

8    Q    And on the one occasion that the top choice among African

9    Americans was slated by North County Labor, did that candidate

10   win?

11   A    No.  That candidate lost.

12   Q    Now, let's talk again about the FFNEA endorsement.  So

13   for those 14 seats that you already talked about or that were

14   up for election for the elections for which we have data,

15   FFNEA data from 2004 to 2015, how many candidates that Dr.

16   Rodden considers white preferred were slated?

17   A    Eleven of the 14 white-preferred candidates received an

18   FFNEA endorsement.

19   Q    And how many of those 11 white-preferred candidates

20   endorsed by FFNEA won their elections?

21   A    All 11.

22   Q    In the same period, how many minority-preferred

23   candidates -- again accepting Dr. Rodden's labeling -- were

24   endorsed by FFNEA?

25   A    In those same elections, three of the 14

1  minority-preferred candidates were endorsed by the FFNEA.

2  Q     And how many of those won election?

3  A     One of those three endorsed candidates won election to

4  the board.

5  Q     Okay.  And now let's think about the top-choice candidate

6  amongst white voters in those six elections.  How many of them

7  were endorsed by the FFNEA?

8  A     The top choice among white voters was endorsed in all six

9  of those elections.

10  Q     And how many were elected?

11  A     And all six were elected.

12  Q     And during the same time period, how many top choices

13  amongst African Americans were endorsed by the FFNEA?

14  A     None of the top-choice candidates among African-American

15  voters were endorsed by the FFNEA in those six elections.

16  Q     So what conclusion do you draw from this data, in your

17  expertise?

18  A     That white candidates and white-preferred candidates were

19  usually endorsed by labor organizations, white candidates and

20  white-preferred candidates who received those endorsements

21  usually won, and minority candidates and minority-preferred

22  candidates were usually not endorsed by either of those

23  organizations.

24  Q     Okay.  And the white candidates and white-preferred

25  candidates, you know, almost always win, correct?

1   A    Uh-huh.  Yes.

2   Q    I'd like to turn to your opinions about the extent to

3   which African Americans bear the effects of discrimination in

4   a way that hinders their ability to participate effectively in

5   the political process.  Were you able to form an opinion

6   whether African Americans in the Ferguson-Florissant School

7   District bear the effects of discrimination in a way that

8   makes them more likely than white residents to be deterred

9   from voting?

10  A    Yes.

11  Q    And what is your opinion?

12  A    That because of the history of discrimination and

13  segregation, that African-American voters in the district are

14  more likely to be deterred from voting than white voters in

15  the district.

16  Q    And are there any enduring racial disparities that make

17  that so?

18  A    Yes.  I mean, I think yesterday Dr. Gordon mentioned the

19  history of discrimination in housing with segregation

20  ordinances and zoning practices and restrictive covenants and

21  real estate practices that produced and perpetuated

22  segregation in housing, as one example, and also contributed

23  to racial disparities in income and wealth and educational

24  attainment as well.

25  Q    Do disparities in income and wealth and educational

1   attainment -- do those affect the likelihood of voting?

2   A    Yes.   Homeownership, education, and income are all strong

3   predictors of voting and voting in local elections, and so if

4   African Americans have fewer of those things than white

5   voters, expect them to -- African-American voter turnout to be

6   lower than white turnout.

7   Q    Are there any disparities in how residents experience the

8   criminal justice system based on their race?

9   A    Yes.

10  Q    And can you explain what those are?

11  A    There's evidence of racial disparities in experiences

12  with law enforcement and local courts and traffic stops, for

13  example.

14  Q    Okay.   And these disparities that you're talking about,

15  in your opinion are they the result of discrimination?

16  A    I think so.   For example, the state compiles evidence on

17  traffic stops, and in Ferguson and Florissant, which are two

18  municipalities that make up a significant portion of the

19  school district, African Americans are more likely to be --

20  significantly more likely to be pulled over by law enforcement

21  than white drivers.

22  Q    So how do these disparities in the areas of income,

23  housing, employment, education, criminal justice system -- how

24  do they relate to voting?

25  A    They relate to vote -- I think we touched on this a

little bit before.  They relate to voting in that factors like
homeownership and education and income are strong predictors
of voter turnout.  Those factors provide resources that help
people overcome the cost side of the calculus of voting and
lead to voter turnout.  So if there are racial disparities in
those factors, they can contribute to racial disparities in
political participation as well.

Q    And don't worry about being a little repetitious.  If
it's too repetitious -- you might repeat something once in a
while.  If it's too much, someone will complain.  But it might
overlap a little bit, okay?

A    Uh-huh.

Q    All right.  So we've been talking about that calculus of
voting again.  I know this might make you repeat a little bit,
but disparities in income, housing, employment, education,
criminal justice -- how does that fit into the calculus of
voting in those different elements you consider?

A    Right.  Well, so, for example, interaction with the
criminal justice system, particularly when there are racial
disparities, I think when there's -- it can -- there's
research indicating that this leads African Americans to be
less trusting of local government.  And if they are less
trusting of local government, then they may see fewer benefits
of participating in local elections.  So that then reduces the
benefit side of the voting calculus in local elections.

1    Q    Let's talk about education.  Were you done with --

2    A    Sure.  Criminal justice.

3    Q    Can you talk about how education disparities fit in the

4    calculus of voting?

5    A    Sure.  Higher levels of education produce more -- tend to

6    produce more civic skills, more confidence, things that allow

7    people to overcome the cost side of the calculus of voting and

8    make them more likely to register and vote in elections.

9    Q    What about in employment?  How does that fit in the

10   calculus of voting?

11   A    It's related to education, income, but being employed is

12   generally a better predictor of voting in local elections than

13   being unemployed.  And being unemployed similarly contributes

14   to the resources and networks and connections with other

15   organizations that bring people -- get people involved in

16   local government and local elections.

17   Q    How does homeownership fit into the calculus of voting?

18   A    Homeownership is a strong predictor of voting in local

19   elections that people who -- homeowners are more likely to

20   vote in local elections than non-homeowners.  So, again, this

21   is a history of racial discrimination in housing and

22   segregation contributes -- has contributed to lower

23   homeownership rates among African Americans as compared to

24   whites in the St. Louis region.

25   Q    Are there any special features of the Ferguson-Florissant

1  School District that are -- that cause African Americans to be

2  more likely than whites to be deterred from voting because of

3  additional burdens?

4  A    Well, I think the at-large feature and the off-cycle

5  scheduling of those elections combined with these

6  socioeconomic disparities are more likely to deter African

7  Americans from participating in local elections than white

8  voters.

9  Q    Okay.  And as far as the calculus of voting, those

10  disparities make the cost higher for African Americans and the

11  benefits lower; is that correct?

12  A    Right.  Yes.

13  Q    Has there been racial segregation in housing in Missouri

14  in the St. Louis area?

15  A    Yes.

16  Q    Can you tell me what you mean by that?

17  A    Housing segregation?

18  Q    Let me ask you.  Were you in the courtroom when Dr. Colin

19  Gordon testified?

20  A    Yes.

21  Q    And did you listen to his testimony?

22  A    I did.

23  Q    And is his -- is your understanding of racial segregation

24  and housing patterns in St. Louis in the past and present the

25  same as his?

1    A    Yes.

2    Q    How does the St. Louis area compare to other metropolitan

3    areas in terms of segregation?

4    A    Segregation in the St. Louis area tends to be more

5    pronounced than in other metro areas in the United States.

6    Q    Has there been racial segregation in education in

7    Missouri or in the St. Louis area?

8    A    Yes.  I think Dr. Gordon touched on that.

9         MS. ORMSBY:  I'm going to object, Your Honor.  This

10   is not included anywhere in his report, this opinion.

11        THE COURT:  Where are we going with it?

12        MR. ROTHERT:  I believe it's part of the basis for

13   his opinion, and it comes directly from his report.

14        THE COURT:  If you can tie it up, that's fine.

15        MR. ROTHERT:  If I can have just a moment.

16        THE COURT:  Sure.

17   Q    (BY MR. ROTHERT) Dr. Kimball, could you look at page 48.

18   Look at Plaintiffs' Exhibit -- page 10 of Plaintiffs' Exhibit

19   48, please.

20   A    Okay.

21   Q    In that top paragraph there, can you tell me what that

22   paragraph is about?

23   A    School segregation in Missouri and in St. Louis city and

24   county.

25   Q    Okay.  So has there been racial segregation in education

1    in Missouri and in the St. Louis area?

2    A    Yes.

3    Q    And how so?

4    A    I think Dr. Gordon went into this in more detail than me

5    yesterday, but the Missouri constitution sanctioned school

6    segregation many years ago.  The federal courts, after the

7    *Brown v. Board* decision, worked to desegregate public schools

8    in St. Louis County in the 1970s and 1980s.  As part of that

9    effort, the Ferguson-Florissant School District expanded to

10   include Berkeley and Kinloch as well.

11   Q    So has the segregation in housing and education had any

12   effect on educational attainment and personal income in St.

13   Louis County for African Americans?

14   A    Yes.  It's contributed to the racial disparity and

15   educational attainment and income and wealth.

16   Q    Okay.  And those disparities in personal income and

17   educational attainment are substantially higher for whites

18   than African Americans in St. Louis County?

19   A    Yes.

20   Q    And that's true today?

21   A    Yes.

22   Q    Have the income disparities between white and black

23   residents of St. Louis County changed over time?

24   A    I think over the last ten to fifteen years they have

25   actually gotten more pronounced.

1    Q    And by "more pronounced," the disparities are bigger?

2    A    Larger.  Sorry.

3    Q    Yeah.  Are there any other areas in which the St. Louis

4    region generates substantial racial disparities that are above

5    average for metropolitan areas in the United States?

6    A    Unemployment, poverty, and infant mortality are others

7    that I know of.

8    Q    You alluded to this earlier, but are there racial

9    disparities in the experiences with law enforcement and local

10    courts in the St. Louis region?

11    A    Yes.

12    Q    How so?

13    A    Well, I mentioned the traffic stops.

14    Q    Tell me about that.

15    A    This is annual data that the Missouri Attorney General

16    compiles for our municipalities in Missouri.  The latest data

17    that I looked at for this report indicated that in both

18    Florissant and Ferguson African-American drivers are more

19    likely to be pulled over than white drivers.

20    Q    And using that Attorney General's data from 2013, were

21    you able to calculate how much higher the incidents of traffic

22    stops in Ferguson are for African Americans compared to

23    whites?

24    A    Yes.

25    Q    And how much higher?

1    A    So this is in 2013, in Florissant.

2    Q    Ferguson I was asking.

3    A    Oh, Ferguson.  African Americans were roughly 3.6 times

4    more likely to be pulled over than whites.

5    Q    So that means that -- well, we can figure out what it

6    means.  So using that same data, Attorney General's data from

7    2013, were you able to calculate how much higher the incidents

8    of traffic stops are in Florissant, city of Florissant, for

9    African Americans as compared to whites?

10   A    Yes.  In 2013 the rate of traffic stops for African

11   Americans was about seven and a half times higher than for

12   whites.

13   Q    Is there any other data showing disparities on treatment

14   by law enforcement in Ferguson and Florissant?

15   A    The same Attorneys General report also found higher

16   search and arrest rates for African Americans than for whites

17   in both Ferguson and Florissant despite the fact that the

18   proportion of those searches that yielded illegal substances

19   was actually higher for whites than for blacks in both

20   municipalities.

21   Q    So black people are more likely to be searched in

22   Ferguson or Florissant by the police but less likely to have

23   something on them when they're searched.  Is that --

24   A    Correct.

25   Q    And that's true in both those municipalities?

1   A    Yes.

2   Q    Are you aware of any information suggesting that the

3   police department in the Ferguson-Florissant -- any police

4   department in the Ferguson-Florissant School District engages

5   in unconstitutional police practices?

6   A    Yes.  The Department of Justice report on the Ferguson

7   Police Department last year reported on those violations.

8   Q    And could you look at Plaintiffs' Exhibit 120.

9   A    Okay.

10  Q    What is that?

11  A    That's the Department of Justice report on the Ferguson

12  Police Department.

13  Q    Does that report make any findings about Ferguson's

14  municipal court practices?

15  A    Yes.  I think the report found the Ferguson municipal

16  court practices to be abusive.

17  Q    And how so?

18  A    That I think the report concluded that Ferguson relied

19  heavily on traffic fines and municipal court fees as a source

20  of municipal revenues.  I think maybe a quarter of the

21  municipal revenues were from those sources, which, the report

22  concluded, was onerous.

23  Q    Does the report make any findings about whether the

24  practices it points out by the police and by the courts harm

25  African Americans who are in Ferguson or pass through

1    Ferguson?

2    A    Yes.  The report found that law enforcement and municipal

3    court practices in Ferguson disproportionately harmed

4    African-American residents and lowered their trust in local

5    government as a result.

6    Q    Does increased contact with the criminal justice system

7    have any effect on voting?

8    A    Yes.  It tends to lower voting participation.

9    Q    In particular, do neighborhoods with increased contact

10   with the criminal justice system have lower voter turnout

11   rates?

12   A    Yes.  There's political science evidence that

13   neighborhoods with higher levels of contact with the criminal

14   justice system tend to have lower levels of voter

15   participation.

16   Q    And is -- why?  Why is that so?

17   A    I think a number of reasons.  One, contact with the

18   criminal justice system means a loss of economic resources.

19   And as I described before, having fewer economic resources

20   means you're less likely to overcome the cost side of that

21   calculus of voting.

22           Contact with the criminal justice system tends to

23   foster more negative attitudes and less trust of local

24   government, which lowers the benefit side of the cost of

25   voting calculation and makes those distrustful individuals

1    less likely to see the benefit of voting in local elections.

2           Those who have contact with the criminal justice

3    system may have, I think, more difficulty engaging in joining

4    in social -- local organizations and social networks that help

5    bring people into local government and local community affairs

6    as well.

7    Q    By the way, does this Department of Justice report --

8    does it discuss mistreatment of African-American students by

9    the police within schools that are in the Ferguson-Florissant

10   School District?

11   A    Yes.  I think there were -- the report mentions a couple

12   incidents of Ferguson police officers who were school resource

13   officers at schools in the Ferguson-Florissant School District

14   and some incidents where they engaged in excessive force or

15   charged students with criminal offenses for what seemed like

16   routine disciplinary incidents.

17          MR. ROTHERT:  Okay.  Your Honor, we move for

18   admission of Plaintiffs' Exhibit 120.

19          MS. ORMSBY:  Your Honor, I object as to relevance.

20   This report and, in fact, this line of questioning has to do

21   with the City of Ferguson.  If this was a case about how the

22   City of Ferguson conducts their elections, I would agree it

23   would be relevant, but in this case it's about how the school

24   district conducts elections, and I don't believe this line of

25   questioning or this exhibit is relevant.

1    THE COURT:  There's no proper foundation been laid

2  for the report.  We all know what it says.  He used it.  He

3  referenced it as an expert in the area, but I'm not going to

4  receive it as substantive evidence because he's not qualified

5  or capable of producing it as substantive evidence.  But he

6  can use it because he relied on it to reach his opinions.

7    MR. ROTHERT:  The only objection that's been raised

8  to this is relevance in the objections to exhibits and --

9    THE COURT:  Well, there's no foundation for it other

10  than he relied on it for the purpose of reaching his opinion.

11    MR. ROTHERT:  I believe they stipulated to its

12  authenticity.

13    THE COURT:  Did you do that?

14    MS. ORMSBY:  Your Honor, we objected as to it being

15  irrelevant as it pertains to the school district and its

16  election, and we did not stipulate to this exhibit.  And I

17  would add my objection as to foundation.

18    THE COURT:  I mean, I have no trouble with him

19  testifying about it, and you can cross-examine him about it

20  because, obviously, the city of Ferguson is within the school

21  district, and the conduct of the Ferguson Police Department in

22  and outside the schools, to the extent it evidences

23  discrimination and those practices which contribute to his

24  opinion, are all relevant.  But for me to actually receive the

25  exhibit as evidence is different than permitting him to

1    testify about it and use it.

2         MR. ROTHERT:  I understand.

3         THE COURT:  I don't have any basis to receive it as

4    evidence other than you telling me it is what it is.

5         MR. ROTHERT:  Well, can I try one more time?

6         THE COURT:  Sure.

7         MR. ROTHERT:  In ECF Document 147, which is the joint

8    stipulations as to exhibits, Exhibit 120 is one of the

9    exhibits to which the parties stipulate to that the exhibits

10   are authentic but subject to the district's relevance

11   objection.

12        MS. ORMSBY:  I stand corrected, Your Honor.  That's

13   true.

14        MR. ROTHERT:  So they have stipulated to the

15   authenticity of it.

16        THE COURT:  I'll receive it.  Just trying to do the

17   right thing.  You understand.

18   Q    (BY MR. ROTHERT) I appreciate that, Your Honor.

19        How does the -- I'm sorry.  I think I'm going to

20   repeat myself here if I'm not careful.  Based on these points

21   about the disparities in areas in the Ferguson-Florissant

22   School District, do you have an opinion about whether in the

23   communities of the Ferguson-Florissant School District there

24   are substantial and enduring racial disparities that make

25   African Americans in the Ferguson-Florissant School District

1    more likely than whites to be deterred from voting in a

2    Ferguson School Board election?

3    A    Yes.

4    Q    And what is your opinion?

5    A    That the substantial -- that my opinion is that there are

6    substantial and enduring racial disparities in areas such as

7    income and employment and education and criminal justice, and

8    many of these factors, as I described earlier, are strongly

9    related to the likelihood of voting, particularly in local

10   elections.  And so since African Americans in the

11   Ferguson-Florissant School District bear the effects of

12   discrimination in these areas, they're more likely than whites

13   to be deterred from voting by the election procedures used in

14   the Ferguson-Florissant School District.

15   Q    When you're saying more likely to be deterred by the

16   election procedures, you're talking about at large and

17   off cycle primarily?

18   A    Yes.

19   Q    Okay.  The next topic I'd like to talk to you --

20        THE COURT:  How long is your next topic?

21        MR. ROTHERT:  I think there are two more topics; so

22   20 minutes, 25 minutes.

23        THE COURT:  We will take our afternoon recess.  It's

24   3:20 now.  We will reconvene at 3:50.

25        MR. ROTHERT:  Thank you.

1    THE COURT:  Thank you.

2    **(COURT RECESSED FROM 3:20 PM UNTIL 3:55 PM.)**

3    THE COURT:  Are you ready?

4    MS. ORMSBY:  Yes, Your Honor.

5    THE COURT:  I'll remind you, sir, you're still under

6  oath.

7    You may proceed.

8  Q   (BY MR. ROTHERT) Dr. Kimball, just before the break we

9  were getting ready to talk about the extent to which members

10  of a minority group have been elected to public office in the

11  jurisdiction, the jurisdiction here being the

12  Ferguson-Florissant School District, and the effect that has

13  on voter participation.

14    So I know you've alluded to this earlier in your

15  testimony, but have you had an opportunity to examine the

16  election results for the Ferguson-Florissant School Board

17  elections from 2000 through and including last year, 2015?

18  A   Yes.

19  Q   In your initial report you looked at the

20  Ferguson-Florissant School District School Board elections

21  beginning in 2004 but did not look at 2000, 2001 through 2003.

22  Why did you begin your examination with the 2004 election?

23  A   I started with 2004 because that roughly ten-year period

24  allows for approximately three chances for the board to turn

25  over, and more recent elections are more probative in Voting

1   Rights cases.

2   Q    In the eight elections that you examined from 2004 to

3   2015 for your initial report, how many white candidates ran

4   for Ferguson-Florissant School Board?

5   A    That was eight elections.  Twenty-three white candidates

6   ran for the school board.

7   Q    And how many won?

8   A    Sixteen of the white candidates won.

9   Q    So with 16 of 23 candidates, white candidates, winning,

10  what was the success rate for white candidates in elections

11  for Ferguson-Florissant School Board between 2004 and 2015?

12  A    Sixteen out of 23 is about 70 percent, if we round it

13  off.

14  Q    Okay.  Compared to the 23 white candidates who ran in

15  those elections, how many African-American candidates were in

16  those same eight elections from 2004 to 2015?

17  A    Nineteen African-American candidates ran in those eight

18  elections.

19  Q    And how many won?

20  A    Two.

21  Q    So what's the success rate for African-American

22  candidates for Ferguson-Florissant School District School

23  Board between 2004 and 2015?

24  A    Two out of 19 is 10 and a half percent.

25  Q    Have you formed an opinion about whether white candidates

1  have had more success winning seats on the Ferguson-Florissant

2  School District School Board as compared to African-American

3  candidates?

4  A    Yes.

5  Q    And what is your opinion?

6  A    That white candidates have had greater success getting

7  elected to the board in those elections than African-American

8  candidates.

9  Q    Is this question a close call?

10  A    No.  Seventy percent is quite a lot higher than 10 and a

11  half percent.

12  Q    What is bullet voting?

13  A    That's if a candidate, if a voter -- in these elections

14  voters have either two or three votes to cast.  Bullet voting

15  would be casting just one vote for a single candidate and not

16  using the remaining votes on any other candidates.

17  Q    Couldn't African Americans just bullet vote for one

18  African-American candidate and increase the likelihood of

19  electing one African-American candidate?

20  A    I think that's been suggested as one strategy for trying

21  to elect an African-American board member under the at-large

22  system.

23  Q    Would that work?

24  A    It could work.  It would take a lot of efforts, a lot of

25  coordination.  There's nothing to prevent white voters from

1  engaging in bullet voting to negate the effect of

2  African-American voters engaging in bullet voting.

3  Q    Is this a satisfactory way of achieving the election of

4  an African-American candidate for you?

5  A    No.  I don't think it's a very satisfactory long-term

6  solution.  Bullet voting -- you're asking voters to give up

7  some of their franchise so that they might elect one candidate

8  that they prefer.  If they prefer additional candidates,

9  they're giving up the chance to support those other

10  candidates.

11  Q    And in considering the costs of voting, would that be

12  a -- would giving up part of your franchise be a cost of

13  voting?

14  A    It would factor into the calculus of voting, I suppose,

15  in that if you're only supporting one candidate and not using

16  your full franchise, you're not seeing the full benefits of

17  voting, particularly if there are other candidates that you

18  also like.  The coordination part of it, of coordinating lots

19  of voters, educating them to, okay, only vote for this one

20  candidate, don't vote for anyone else, takes a lot of effort,

21  a lot of resources; so it would make the election process more

22  costly.

23  Q    I know this factors about the extent to which members of

24  a minority group have been elected to public office, but have

25  you considered Dr. Rodden's definitions of minority-preferred

1  candidate and white-preferred candidate?  And just assuming

2  for a minute that those definitions are sound, have you been

3  able to ascertain the relative success for minority-preferred

4  and white-preferred candidates?

5  A    Yes.

6  Q    All right.  And have you been able to ascertain the

7  relative success rate of the top choice of whites' candidate

8  and the top choice candidate of minorities?

9  A    Yes.  Yes.  I think that was in my rebuttal report.

10 Q    If you could look at Plaintiffs' Exhibit 49, that's your

11 rebuttal report, correct?

12 A    Yes.

13 Q    And could you look at page 2, Table 1?

14 A    Yes.

15 Q    What does this table show?

16 A    It shows for elections to the Ferguson-Florissant School

17 Board the success rates of minority-preferred and

18 white-preferred candidates as well as the success rates of

19 top-choice candidates for minority voters and the top-choice

20 candidates for white voters.

21 Q    All right.  And, now, in the first section there, you

22 have 2003, the period from 2003 to 2000 -- I'm sorry.  On the

23 first line, you have the period from 2000 to 2003, the second

24 line you have the period from 2004 to 2015, and then the third

25 line you combine them.  Why did you separate them?

1  A    The 2004 to 2015 elections were the ones that I initially

2  only examined in my original report, and Dr. Rodden's report

3  went back to 2000; so I included that earlier period as well.

4  Q    So let's first look at the preferred candidates based on

5  the success rate of African-American-preferred candidates as

6  defined by Dr. Rodden's calculations and definitions.

7         So assuming those are valid based on how he assigned

8  those labels of minority preferred and white preferred, does

9  that change your opinion that white candidates have had more

10 success in winning seats on the Ferguson-Florissant School

11 District than African-American candidates?

12 A    No.  It doesn't change my opinion.

13 Q    Why not?

14 A    Because whether you look at white-preferred versus

15 minority-preferred candidates or the top choice of white

16 voters versus the top choice of minority voters, in either

17 case the candidates preferred by white voters had a

18 substantially higher success rate than candidates preferred by

19 African-American voters.

20 Q    Very well.  When Dr. Rodden was talking about minority

21 top -- I'm sorry -- minority-preferred and white-preferred

22 candidates, were there any problems in the way that he

23 identified second in choice, second- and third-choice

24 preferred candidates?

25 A    In some elections the ecological inference estimates also

1   contain a confidence interval, and in some elections multiple

2   candidates had similar enough estimates for either

3   African-American support or white support that it was not very

4   clear which candidate really was the second-choice or

5   third-choice candidate in some elections.

6   Q    Are there any specific examples of that, that you recall?

7   A    I think in 2015, for example, there are a number of

8   candidates that could have -- that were close to being the

9   second choice for African-American voters.  In 2002 there were

10  number of candidates that were pretty close to their voter

11  support among African-American voters and could have been the

12  third choice.  Those are a couple of examples.

13  Q    Do African-American candidates -- in your opinion, do

14  they lose so frequently because they are weaker candidates?

15  A    I don't think so.

16  Q    Okay.  Why don't you think so?

17  A    Well, in local elections incumbents usually win

18  reelection because incumbents are usually better known among

19  voters.  In the case of the school district, informational

20  materials get sent to all voters that have the names of the

21  current school board members on them; so there's some name

22  recognition advantage there.

23  Q    Does incumbency help African-American candidates in the

24  Ferguson-Florissant School District?

25  A    No.  It doesn't appear to.

1  Q    Okay.  Do you know how often white incumbents have -- in

2  the last 12 cases how many times white incumbents have won

3  reelection in the Ferguson-Florissant School District?

4  A    Nine out of the 12 white incumbents in the elections I

5  examined won reelections.  So that's 75 percent.

6  Q    And how many elections have there been when

7  African-American incumbents have won in that same time?

8  A    There were three African-American incumbents who ran for

9  reelection.

10  Q    And how many of those incumbents won?

11  A    None of them won.

12  Q    Okay.  So what percentage is that?

13  A    Zero.

14  Q    So do you think that is -- is that a significant

15  difference between the success rate of white incumbents and

16  African-American incumbents?

17  A    Yes.  It's a pretty big difference.

18  Q    How does the relative lack of success of African

19  Americans as candidates for the Ferguson-Florissant School

20  Board -- how does that fit into the calculus of voting for an

21  African-American voter?

22  A    Well, we know that African-American voters tend to prefer

23  African-American candidates particularly as their top choice

24  in these elections.  If they -- if African-American voters are

25  seeing that their preferred candidates are usually losing,

1  they may see fewer benefits of participating in local

2  elections, which may then lead them to not vote in future

3  local elections.

4  Q    Finally, I'd like to talk to you a little bit about

5  racially polarized voting in Ferguson-Florissant School

6  District elections.  As a very -- I guess we haven't talked

7  about this yet.  So just very basically, what is racially

8  polarized voting?  What does that mean to you, as a political

9  scientist?

10 A    Basically that white voters support different candidates

11 than African-American voters or other racial minority voters.

12 Q    And what methods can be -- well, do you have an

13 opinion -- were you able to form an opinion whether or not

14 there's racially polarized voting in the Ferguson-Florissant

15 School District School Board elections?

16 A    Yes.

17 Q    What is your opinion?

18 A    That there is racially polarized voting in the

19 Ferguson-Florissant School District elections.

20 Q    So what methods can be used to determine if there's

21 racially polarized voting in a jurisdiction?

22 A    The same -- some of -- the same three methods I mentioned

23 before with turnout, ecological regression, homogeneous

24 precincts analysis, and ecological inference.  The same

25 challenges apply.  We're trying to estimate individual-level

1  behavior, particularly for different racial groups using

2  aggregate-level data.

3  Q    And for homogeneous precinct analysis, how do you

4  determine whether or not a precinct is homogeneous or not?

5  A    I'm not aware of sort of a set cutoff, but typically it's

6  somewhere above 80 percent or above 90 percent of that group

7  as a percentage of the voting-age population.

8  Q    Now, are you aware that in this case there's another

9  expert, Dr. Engstrom, who for some things uses a different

10  cutoff for you -- than you?

11  A    Right.  I think he looked at 85 percent, as I recall.

12  Q    Is that significant that the two of you used a different

13  cutoff; do you think?

14  A    No.  I mean, I think the more extreme the cutoff, that

15  is, the higher you get toward 100, you might get slightly --

16  or at least in this case it seemed like you get slightly

17  larger differences between support of white voters versus the

18  candidate support by African-American voters.

19  Q    That homogeneous precinct analysis that you did in this

20  case, does it suggest that there's racially polarized voting

21  in the Ferguson-Florissant School District?

22  A    Yes, I think so.  I think you're referring to my rebuttal

23  report.  Yes.  Yes.

24  Q    And your ecological regression estimates analysis -- does

25  that suggest whether there's racially polarized voting in the

1 Ferguson-Florissant School District elections?

2 A    That was from my original report of examining the 2014

3 election, yes.  I concluded there was evidence of racially

4 polarized voting.

5 Q    And you've looked at the ecological inference estimates

6 as well -- is that true? -- in your rebuttal report?

7 A    Yes.  In my rebuttal report, the ecological inference

8 estimates from Dr. Rodden's report.

9 Q    And based on the ecological inference estimates from Dr.

10 Rodden's report, do those show racially polarized voting in

11 the Ferguson-Florissant School District?

12 A    I think they do, yes.

13 Q    And how is it beneficial to consider data using all three

14 of those different methods instead of one or --

15 A    Sure.  I think as I mentioned before, each of those

16 methods is trying to estimate individual-level behavior based

17 on aggregate data from precincts.  None of them is guaranteed

18 to give us the correct answer.

19        I think there's political science research indicating

20 that ecological inference tends to be better than ecological

21 regression for the reasons I mentioned earlier.  There is a

22 recent article in *Election Law Journal* that examines racially

23 polarized voting in particular and found that ecological

24 inference tends to have smaller errors than ecological

25 regression.

1    But they are still -- our chances for errors --

2  they're still making estimates.  So I think it's useful to

3  supplement the ecological inference with the homogeneous

4  precincts analysis.

5  Q    And in this case in your analysis and your opinion, does

6  looking at data with the three different methods -- does that

7  confirm your opinion, or does it provide contradictory

8  evidence?

9  A    I think all three methods for me point to the same

10  conclusion that there's racially polarized voting in the

11  Ferguson-Florissant School District.

12  Q    All right.  I'd like you to look -- you can look at

13  Plaintiffs' Exhibit 48, page 4, Figure 1, but it will be on

14  the screen too.  It might be easier and bigger there.

15    This is a handsome figure.  Did you create this?

16  A    Yes.  This is in my original report.

17  Q    Okay.  Can you explain -- well, first of all, before you

18  tell me what everything means on it, does this show -- this is

19  the analyzed data from what election?

20  A    The 2014 election.

21  Q    For Ferguson-Florissant School District?

22  A    Yes.

23  Q    And can you explain to me what Figure 1 shows?

24  A    Figure 1 plots election results from each precinct in the

25  school district in the 2014 election.  The horizontal axis is

the African-American share of the voting-age population in

each precinct.  So each circle in the graph is a different

precinct.  The size of the circles vary because they're sized

in proportion to the number of voters, the number of ballots

cast in each precinct.  So bigger circles mean there were more

voters in that precinct.

The vertical axis is the share of the vote that the

three "Vote for a Change" candidates -- there were three

African-American candidates that sort of ran together under

the banner "Vote for a Change."  I just -- I think I called it

"coalition" for short.  So the vertical axis is the share of

the vote for those three candidates.

And each precinct in the graph shows pretty strong

relationship between race and voter support for those three

candidates, that in the --

Q    Well, let me ask you.  That line down the middle?

A    Yeah.

Q    Did you do that with a ruler yourself, or how did that

come about?

A    The computer program added that.  That's the regression

line.  So that's the ecological regression line, the line that

best fits the circles on that graph.

Q    And what's that line meant to show?

A    It's basically indicating that -- the relationship

between race and support for those three candidates in that

1   election, indicating that in precincts where there was a

2   higher African-American share of the voting-age population

3   were also the precincts where those three African-American

4   candidates running together got the highest share of the vote

5   and in the precincts with the lowest African-American share of

6   voting-age population were the same precincts where those

7   three African-American candidates got the lowest share of the

8   vote.

9   Q    And does this show a strong relationship between race and

10  the candidates selected?

11  A    Yes.

12  Q    If there was not -- so there's a pretty steep slope, you

13  would agree, of the line?

14  A    Yes.  The line slopes upward, indicating that as the

15  racial -- as the African-American share of the population in

16  the precinct increases, so does the vote share for those three

17  candidates.

18  Q    Now, if there were no racial polarization, what would

19  that line look like?

20  A    Then it would look like a horizontal flat line going

21  across, from left to the right, across the screen.

22  Q    Now, please take a look at Table 2 on page 5 of Exhibit

23  49, which is your rebuttal report.

24           THE COURT:  So did they have to vote for all three to

25  chart?

1          THE WITNESS:  The graph before -- so I just --

2          THE COURT:  Do you follow me?  Because you've got --

3          THE WITNESS:  Yeah.

4          THE COURT:  To be honest -- and I don't mean to

5     interrupt -- you have a number of under -- if racial

6     polarization is in play, you have a number of underperforming

7     precincts in there.  Like if you look at 40 percent or above,

8     between 40 and 60, few of those or the voting-age population

9     of African Americans don't reach 60 percent of the vote.  Do

10    you follow me?

11         THE WITNESS:  Uh-huh.  Uh-huh.

12         THE COURT:  So if it's a direct correlation, they're

13    underperforming.

14         THE WITNESS:  Slightly underperforming --

15         THE COURT:  You're getting a fewer percentage of the

16    vote given the percentage of African-American voters.

17         THE WITNESS:  Slightly, yeah.  Yeah.

18         THE COURT:  I mean almost uniformly.

19         THE WITNESS:  Yeah.  So --

20         THE COURT:  So with even some real outliers at almost

21    80 percent, not even barely getting 40 percent.

22         THE WITNESS:  Yeah.  So the regression -- the

23    regression -- where the regression line hits zero on --

24         THE COURT:  So my question was did they have to vote

25    for all three of the slate, if you will, for this to register,

1    or is this just total number of votes cast for

2    African-American candidates?

3          THE WITNESS:  This is votes cast for those three

4    candidates divided by votes cast for everyone is the measure

5    of voters.

6          THE COURT:  But you agree with me they're

7    underperforming almost -- except at the very top.

8          THE WITNESS:  Yeah.  It's not perfect --

9          THE COURT:  Even at the bottom they're overperforming

10   at the very top, but then between they're underperforming for

11   some reason.

12         THE WITNESS:  Yeah.  It's a strong relationship but

13   not a perfect relationship.

14         THE COURT:  Right.

15         THE WITNESS:  I think based on this I estimated that

16   maybe 70, 75 percent of African Americans voted for these

17   three candidates and maybe 15 to 20 percent white --

18         THE COURT:  It seems about right given the way your

19   regression is.

20         THE WITNESS:  Yeah.  Yeah.

21         THE COURT:  Okay.

22   Q    (BY MR. ROTHERT) And you estimated about 75 percent of

23   African Americans voted for the African-American candidates,

24   and about what percentage of whites is your estimate?

25   A    I think 15 to 20.

1    Q    Is that --

2            THE COURT:  Which would be consistent with the

3    bottom, because at almost zero you're still performing close

4    to 20.

5            THE WITNESS:  Yeah.

6    Q    (BY MR. ROTHERT) In your opinion as a political scientist,

7    is that racially polarized?

8    A    Yes, because there's a big difference between who the

9    African-American voters supported and who white voters -- and

10   white voter support for those candidates.

11   Q    Now let's look at Table 2 on Exhibit 49.  Can you tell me

12   what this table shows?

13   A    This is a homogeneous precinct analysis of voting in the

14   last five Ferguson-Florissant School Board elections,

15   particularly comparing the candidate that was the top choice

16   of African-American voters versus the candidate that was the

17   top choice of white voters based on the estimates in Dr.

18   Rodden's report.

19   Q    And in each of these elections, was the -- are these all

20   elections in which the top choice of African-American voters

21   was an African-American candidate?

22   A    Yes.

23   Q    And, of course, the top choice of white voters was a

24   white candidate?

25   A    In each of these five elections, yes.

1   Q    All right.  And so what did these results of the HP

2   analysis tell you about whether there is racially polarized

3   voting in those five elections?

4   A    They show evidence of racially polarized voting in each

5   of the five elections.

6   Q    Let's take the 2015 election, for instance.  So what

7   percentage of the votes in the homogeneous African-American

8   precincts, the heavily African-American precincts, voted for

9   the top-choice African-American candidate?

10  A    In the heavily African-American precincts, 70 percent of

11  the voters chose the top choice of African-American voters.

12  Q    And what percentage in the heavily white precincts chose

13  that top-choice African-American candidate?

14  A    Thirty-three percent.  And I guess I should be clear here

15  that I'm measuring voter support here as the votes for that

16  candidate divided by total ballots cast, which is a little bit

17  different than the Engstrom and Rodden reports.

18  Q    Okay.  Explain how it's different.

19  A    The Engstrom and Rodden reports computed voter support as

20  the percentage of total votes cast; so votes for a particular

21  candidate divided by total votes for all candidate -- given to

22  all candidates.  And since these are multi-seat elections and

23  each election voters had either two or three votes to give, so

24  measuring voter support as a percentage of votes cast tends to

25  produce smaller percentages.

1    The Engstrom report makes this point pretty nicely.

2   If you have a two-seat election, for example, and every voter

3   has two votes to give and every voter indeed casts both votes,

4   then the maximum support any candidate could get is 50

5   percent.  There's sort of an approximate 50-percent ceiling on

6   voter support when you measure it as a percentage of votes

7   cast, not 100 percent.

8    I think it may be harder for some -- harder to make

9   sense of those percentage of votes cast figures, I think

10  particularly in examining racially polarized voting.  To me,

11  the more intuitive measure of voter support is how many white

12  voters supported a candidate X and how many African-American

13  voters supported candidate X.  So that's why I, like in this

14  table, measured voter support as the share of voters who voted

15  for who a particular -- who selected a particular candidate.

16  Q    And in your analysis of -- your HP analysis of these five

17  elections, has racial polarization been greater or less in the

18  last two elections than it had been in the rest of those five?

19  A    Yeah.  Racial polarization is larger in the two most

20  recent elections than in the prior elections.  The -- either

21  comparing a candidate's vote share in African American --

22  heavily African-American precincts versus heavily white

23  precincts, the differences are greater in 2014, 2015 than in

24  the three prior elections.  Or if you compare that, say, the

25  top choice of African-American voters versus the voter support

1  for the top choice of white voters within heavily African

2  American or heavily white precincts, the differences are

3  greater in the 2014 and 2015 than in the three prior

4  elections.

5  Q    And do all three ways of analyzing this homogeneous

6  precinct analysis, ecological regression analysis, and

7  ecological inference analysis -- do they all confirm the

8  racial polarization that you believe there is?

9  A    Yes.  I think all three methods provide evidence of

10  racial polarization in the Ferguson-Florissant School Board

11  elections.

12  Q    And you've reviewed Dr. Rodden's report, correct?

13  A    Yes.

14  Q    Does he properly characterize the racially -- racial

15  polarization in voting in Ferguson-Florissant School District?

16  A    I think in the text, in the analysis of his estimates, I

17  think he tends to understate the degree of racial

18  polarization.

19  Q    Can you say what you mean by "in the text"?

20  A    Well, there's a section of his report where he examines

21  the success or he discusses the success rate of

22  minority-preferred candidates, but he doesn't compare that to

23  the success rate of white-preferred candidates to see how

24  similar or different they are.  And I think that's sort of an

25  essential comparison that needs to be made for -- to examine

1    racially polarized voting.

2         I think computing voter support as percentage of

3    total votes cast, as I mentioned earlier, can -- since you're

4    going to get smaller percentages or there's sort of a lower

5    ceiling on what that voter support measure can be, you tend to

6    get numbers that look more similar.  And so I think -- that's

7    in my rebuttal report.  That's why I computed the voter

8    support as percentage of ballots cast.  I think that makes it

9    clear to know how much support are white -- what percentage of

10   white voters are supporting a particular candidate and what

11   percentage of black voters are supporting a particular

12   candidate.

13   Q    Let me give you -- can you look at Plaintiffs' Exhibit

14   56?  Dr. Rodden's report, correct?

15   A    Yes.

16   Q    Could you turn to page 29?  And look at paragraph 55.  Do

17   you see there where it says about the 2013 election?

18   A    Yes.

19   Q    Do you see where it says "It is important to note that

20   Mr. Henson received" -- I'm sorry.  I screwed it up.  "It is

21   important to note that Mr. Henson only received a majority of

22   the votes cast in two of the 47 precincts.  In fact, in

23   precincts where more than 80 percent of the voting-age

24   population was African American, Henson only received 39

25   percent of the votes cast."  Did I read that correctly?

1   A    Yes.

2   Q    All right.  Is that a fair characterization of the data?

3   A    Well, I think it's an incomplete characterization.

4   Q    Could you explain what you mean?

5   A    Well, so as I described before, in a two-vote election,

6   assuming everyone cast both votes, 50 percent is the maximum a

7   candidate can hope to get.  We know not all voters do that.

8   If there's some voters who engage in bullet voting, then you

9   can get instances above 50 percent.  So I think the two

10  precincts where Mr. Henson did get a majority is evidence that

11  there was some bullet voting in those two precincts.

12  Q    It's also evidence that he got most of the votes -- a

13  vote on most of the ballots on those precincts as well?

14  A    Yeah, that the vast majority of voters selected him in

15  those two precincts, yeah, yeah.  The 39 percent of votes cast

16  that he received in the precincts where more than --

17          COURT REPORTER:  Whoa.

18  A    I'm sorry.  Slower.

19          THE COURT:  When you read, it's --

20  A    Sorry about that.  The second sentence about that Henson

21  received only 39 percent of the votes cast in the precincts

22  with more than -- where more than 80 percent of the voting-age

23  population was African American, I think keeping in mind that

24  sort of approximate 50 percent ceiling makes that 30 percent

25  number look pretty good.  It's closer to 50 than it is to

1   zero.

2        In my rebuttal report, I looked at the same set of

3   precincts with more than 80 percent -- where more than 80

4   percent of the voting-age population was African American, and

5   in those precincts a majority of the voters selected Henson on

6   their ballots.

7   Q    So if he received -- only received 39 percent of the

8   votes cast as is characterized here, and assuming -- I mean,

9   we don't know this, but assuming that every voter cast the two

10  votes they had available, that would mean that he got 78

11  percent -- 78 percent of the voters supported him in that

12  precinct?

13  A    Right, as an estimate, assuming everybody cast both their

14  votes.

15       THE COURT:  Do you need to guess?  I mean, could you

16  know by precinct how many ballots were cast and how many votes

17  were made, thereby determining how many people only voted once

18  as opposed to twice?

19       THE WITNESS:  That we'd have to ask --

20       THE COURT:  That data?  I mean, you would know how

21  many people voted.

22       THE WITNESS:  We know how many ballots were cast.

23       THE COURT:  And you would know how many votes were

24  cast.

25       THE WITNESS:  For a particular candidate, yeah.

1    THE COURT:  And from that you could extrapolate how

2 many people voted for one and how many people voted for two.

3 I mean, the election --

4    THE WITNESS:  You could try and estimate --

5    THE COURT:  The election board would know that.

6 Q   (BY MR. ROTHERT) Well, did some people vote for zero in a

7 given --

8 A   Some probably -- some may have skipped the school board

9 election on the contest on the ballot --

10    THE COURT:  Depends what else was on the ballot?

11    THE WITNESS:  Yeah.  To answer your question, Your

12 Honor, I mean, ideally you'd want to look at the actual

13 ballots themselves and --

14    THE COURT:  Well, we're not going to do that.

15    THE WITNESS:  But we can't -- yeah.  Yeah.  I think I

16 would add to this -- so depending on how you measure voter

17 support, I think things can look a little different in the --

18 when I use my voter -- measure of voter support, that is,

19 votes for Henson divided by total ballots cast, I found 13

20 precincts where more than a majority of voters chose Henson,

21 and they were almost all in heavily African-American

22 precincts.

23 Q   (BY MR. ROTHERT) So is this the kind of error -- does this

24 repeat throughout Exhibit 56?

25 A   Yeah.  I don't know that I'd call it an error.  Maybe not

1    a complete description of what the results show.

2    Q    And does this lack of a complete description of what the

3    results show, does it cause Dr. Rodden to give an inaccurate

4    picture of the racial polarization of the Ferguson-Florissant

5    School District voting?

6         MS. ORMSBY:  I'm going to object as to leading.

7         THE COURT:  Overruled.

8    A    I think he tends to understate the degree of racial

9    polarization in the Ferguson-Florissant School District

10   elections.

11   Q    So, ultimately, is racial polarization a -- about the

12   behavior of voters or the number of votes cast?

13   A    Well, it's about the behavior of voters.

14        MR. ROTHERT:  Could I have just one moment?

15                    **(OFF THE RECORD.)**

16        MR. ROTHERT:  I have no further questions for this

17   witness.

18        THE COURT:  I assume your cross is going to be more

19   than thirty minutes.

20        MS. ORMSBY:  It is, Your Honor.

21        THE COURT:  But let's get started.  What do you

22   think?

23        MS. ORMSBY:  Okay.

24        THE COURT:  Mr. Rothert, are you ready?

25        MR. ROTHERT:  Yes.

1    THE COURT:  You may proceed.

2                    **CROSS-EXAMINATION**

3    **BY MS. ORMSBY:**

4    Q    Good afternoon, Dr. Kimball.  Good to see you again.  I'm

5    Cindy Ormsby.

6    A    Hi.

7    Q    I just want to touch on a couple of areas first.  You

8    talked at the beginning of your testimony about voter

9    registration.  I can't remember seeing anything in your report

10   about voter registration.  Could you point it out to me,

11   please?

12   A    About voter registration?

13   Q    Yes.

14   A    I know I was asked to look at that census support

15   comparing voter registration by race in the state of Missouri.

16   Q    When were you asked to look at that information?

17   A    Earlier today when I testified.

18   Q    But did you look at it and include it into your report?

19   A    I don't think I did.

20        MS. ORMSBY:  Your Honor, I would like to object to

21   that line of questioning and ask that it be stricken.

22        THE COURT:  Okay.  We'll take that up at the

23   conclusion.

24   Q    (BY MS. ORMSBY) I also didn't see anything in your report

25   about bullet voting.  Can you point in your report where you

1    opined about bullet voting?

2    A    I don't think I did.

3        MS. ORMSBY:  Your Honor, I'd like you to strike that

4    as well.

5        THE COURT:  I'll take that under advisement.

6    Q    (BY MS. ORMSBY) Did you happen to look at voter

7    registration by race in the Ferguson-Florissant School

8    District?

9    A    No, I did not.

10   Q    Could you have done so?

11   A    Probably could have, yes.

12   Q    Because doesn't the Board of Elections put on their

13   website even and certify a column in the results for voter

14   registration?

15   A    The number of registered voters, yes.

16   Q    And you could have done either a homogeneous precinct or

17   a ecological inference analysis just like you did for turnout,

18   right?

19   A    Uh-huh.

20   Q    But you didn't do that?

21   A    Correct.

22   Q    You also testified about how even if African-American

23   voting-age population was a majority, it would have to be a

24   super majority of 70 percent plus -- is that what you said? --

25   in order for them to be successful in electing their

1   candidates?

2   A    To --

3   Q    It's a yes-or-no question.

4   A    To control the at-large elections, yes.

5   Q    And is that in your report anywhere?

6   A    The 70 percent?

7   Q    Anything about a super majority?  Anything at all?

8   A    No.

9   Q    You talk about the largest group -- voting group -- being

10  able to elect their candidate of choice, don't you?  In fact,

11  you cite specifically to an article that you considered.

12  A    Which one was that?

13  Q    Well, I will have you turn to -- well, Your Honor, I'd

14  also like you to consider striking any testimony as far as a

15  super majority.  It's not referred to in his report.

16         THE COURT:  I will take that with the rest.

17  Q    Thank you, Your Honor.  I'll come back to that subject

18  later on.  I want to kind of take things in more order.

19         How many African-American ballots were -- how many

20  African-American candidates were on the ballot in 2014?

21  A    I think there were five maybe.

22  Q    And how many seats were up for election?

23  A    Three.

24  Q    And how many of those five African-American candidates

25  were running as a slate?

1   A    Three.

2   Q    In any of your analysis, did you take into account the

3   votes received by the other two African-American candidates?

4   A    No.  They were less viable candidates; so I focused on

5   the three that ran together.

6   Q    Did you write a blog post in 2014, August 28 of 2014,

7   that you updated on September 9 of 2014?

8   A    I think so, yes.

9   Q    Your Honor, this is a stipulated exhibit for the

10  district, No. QQ.

11       Can we look at the first graph on the next page of

12  this blog.  Now, this graph looks very similar to the graph

13  that was put up on the screen a few minutes ago, doesn't it?

14  A    It's similar.

15  Q    It's the same analysis as far as turnout in the 2014

16  election -- I mean as far as racial polarization in the 2014

17  election?  I have them side by side so you can compare.

18  A    Yeah, they look pretty similar.

19  Q    And if you look right below your first graph in your

20  blog, you have a second graph; is that right?

21  A    Yes.

22  Q    What is that graph analyzing?

23  A    That compares voter turnout measured as a percentage of

24  registered voters by the racial composition of the precincts

25  in that 2014.

1  Q    So it analyzes voter turnout in that election, correct?

2  A    Yeah.

3  Q    What did you conclude about voter turnout in 2014 as it

4  compares African American to Caucasian?

5  A    I said the relationship between race and turnout is

6  pretty weak.

7  Q    Did you include this information in your report, your

8  initial report?

9  A    Not in my initial report.

10  Q    And in your report, actually, you opine that it's more

11  difficult to prevent -- that there are costs involved for

12  African Americans that prevent African Americans from voting,

13  right?  We talked about that "C" in your calculus of --

14  A    Yes.

15  Q    -- turnout?  Yet in this blog, you actually conclude that

16  turnout -- the turnout comparison was insignificant.

17  A    I said it was pretty weak compared to the stronger

18  relationship between race and support for the three coalition

19  candidates.

20  Q    Why did you not include this in your report?  You talked

21  about turnout in your report.  Why didn't you include this in

22  your report?

23  A    My original report I didn't -- don't think I did any

24  estimation of turnout in the Ferguson-Florissant School

25  District.

1  Q    Was it your choice to leave this information out?

2  A    Yes.

3  Q    On page 6 and 7 of your initial report, you talk about

4  turnout.  Can you pull that up?  You say "Local elections held

5  during off-cycle periods such as in April tend to generate

6  relatively low levels of information about the candidates and

7  produce unusually low voter turnout.  In addition, turnout

8  among African-American voters tends to be disproportionately

9  low in off-cycle elections."

10          So you opined generally about low turnout in

11  off-cycle elections such as April, but you didn't choose to

12  talk about specific to Ferguson-Florissant turnout in April

13  elections.

14  A    Right.  I was referring to several studies in political

15  science that found lower turnout in off-cycle elections

16  particularly among African-American voters.

17  Q    But not specific to the district?

18  A    No.  The only thing specific to the district in my

19  original report was the next page where I looked at turnout in

20  the Ferguson municipal election in 2013 or where I cited

21  estimates from another study.

22  Q    From --

23  A    Looked at turnout in that Ferguson municipal election in

24  2013.

25  Q    But that was to the city of Ferguson, not the

1  Ferguson-Florissant School District?

2  A    Yes.

3  Q    Did you compare turnout in Ferguson-Florissant School

4  Board elections in April to turnout in Ferguson-Florissant

5  School District voters in November?

6  A    In my reports, no.  I assumed it was pretty common

7  knowledge that, like in a presidential election, turnout is

8  more like 60 or 70 percent compared to the 10 to 20 percent

9  numbers we were looking at in the April elections.

10 Q    But you didn't look at it specific to Ferguson-Florissant

11 School District?

12 A    Correct.

13 Q    In fact, on these several pages in your report, none of

14 the information that you give is specific to this school

15 district; is that right?

16 A    Which pages are you referring to?

17 Q    In that section of your report that begins on -- that

18 talks about Senate Factor 3.  You don't give any analysis

19 specific to the school district.

20 A    In that discussion of Senate Factor 3, I was talking

21 about at large, the at-large system and scheduling elections

22 in April.  No.  I was citing political science research

23 generally and then the one study that looked at the Ferguson

24 municipal election, 2013.

25 Q    Have you examined or analyzed racial turnout

1  differentials in elections held in the district in August or

2  November?

3  A    No.  I was just looking at the April elections since

4  that's when the school district elections are in the

5  Ferguson-Florissant district.

6  Q    So in your initial report, the only -- well, prior to

7  your rebuttal report, the only analysis that you did was for

8  the April 2014 election, and in that analysis you found out

9  that the relationship between race and turnout was weak?

10 A    In my original report --

11 Q    You didn't include that in your original report, but the

12 only analysis you had done at any point in time prior to your

13 rebuttal report was for the 2014 election.  That's specific to

14 this school district.

15 A    The blog post I had a -- estimated white turnout was

16 about 6 points higher than African-American turnout.  I think

17 that was similar to what I had in the rebuttal report, but

18 that turnout part wasn't in my original report.

19 Q    Thank you.  Did you examine whether any other of the

20 Ferguson-Florissant School District elections were racially

21 polarized for your initial report?

22 A    My initial report for racial polarization I examined the

23 2014.  My rebuttal report I examined racial polarization in, I

24 think, the five most recent elections.

25 Q    There was a more recent election to analyze, wasn't

1    there, at the time that you did your report?

2    A    The 2015 -- yeah.  The 2015 election was in April 2015.

3    Q    But you didn't include that one?

4    A    Not in my original report.  It's in my rebuttal report.

5    Q    And you did that because Dr. Rodden had done it, correct?

6    A    I analyzed more elections in my rebuttal report partly to

7    respond to Dr. Rodden's report.

8    Q    So let's talk about how you determined racial

9    polarization.  Can you tell me how you analyze that?  What did

10   you look at specifically?

11   A    I looked at the voting returns by precinct and measures

12   of the racial composition of the voting-age population in each

13   precinct.

14   Q    And you only looked at the three candidates in the slate

15   to determine whether or not there was racial polarization,

16   right?

17   A    In my initial report, I examined the three candidates

18   running as a slate in the 2014 election.  In my rebuttal

19   report, I looked at the five most recent elections.

20   Q    Can you just explain why you didn't -- why you only

21   included an election that wasn't even the most recent election

22   in your initial report?  Why did you choose the 2014 election

23   to include?

24   A    When I wrote my initial report, my understanding was that

25   another expert was reporting on racial polarization, and so I

1  figured when I found evidence from one -- election for racial

2  polarization.  So I didn't think I needed to go beyond that in

3  my initial report.

4  Q    So you didn't expect the Court to make a decision on

5  whether or not there was racially polarized voting in the

6  Ferguson-Florissant School District based on one election, did

7  you?

8  A    It helps to look at more elections than one election, if

9  that's your question.

10  Q    Yeah.  What sort of analysis did you use when you were

11  considering the 2014 election?  What sort of analysis did you

12  use?

13  A    In my initial report, I used ecological regression

14  estimates and the homogeneous precinct analysis.  In the

15  rebuttal report, I used homogeneous precinct analysis and used

16  the ecological inference estimates from Dr. Rodden's report.

17  Q    And, well, you didn't have Dr. Rodden's -- yeah.  You

18  used Dr. Rodden's report for your rebuttal report, correct,

19  not for your initial report?  Because you didn't have those.

20  A    Correct.

21  Q    And when you did your homogeneous precinct analysis, you

22  compared precincts that were 80 -- 80 percent majority African

23  American or 20 percent African American, correct?  Eighty

24  percent or more or 20 percent or less?

25  A    I compared precincts where the African-American share of

1   the voting population is more than 80 percent versus precincts

2   where the African-American share of the voting-age population

3   is less than 20 percent.  And I also compared the same

4   homogeneous precinct analysis comparing 90 versus 10 percent

5   cutoff as well.

6   Q    When you were looking at racial polarization?

7   A    Yeah, in the original report, in the analysis of the 2014

8   elections.

9   Q    Why didn't you use King's ecological inference method in

10  your initial report?

11  A    My understanding was somebody else was doing racial

12  polarization, and so I thought these two -- these are two

13  different methods.  I thought, at least for my initial report,

14  this was enough to make some estimates of racially polarized

15  voting.

16  Q    But wasn't King's method developed specifically for use

17  in Voting Rights Act cases?

18  A    I think it was developed specifically for ecological

19  analysis cases like this.  I think he was motivated at least

20  in part by Voting Rights analyses.

21  Q    Could you put up Footnote 4 to Dr. Engstrom's report.  It

22  says "This procedure is detailed in Gary King, *A Solution to

23  the Ecological Inference Problem:  Reconstructing Individual

24  Behavior from Aggregate Data,* and is now used widely by expert

25  witnesses in assessing racially polarized voting in Voting

1  Rights cases.  On the superiority of EI over ecological

2  regression for assessing differences in the candidate

3  preferences between or among groups of voters which has been

4  relied upon by the Supreme Court in 1986 in *Gingles*, EI was

5  developed subsequent to that case for the explicit purpose of

6  improving these estimates."

7       Did I read that correctly?

8  A    I think so.

9  Q    Yet you chose not to use ecological inference?

10  A    Right.  It was my understanding that there was another

11  expert doing that.

12  Q    Were you asked not to do it?

13  A    No.

14  Q    And you used ecological inference in the past, haven't

15  you?

16  A    Yes, in one of my books.

17  Q    And don't you leave out a whole lot of data when you use

18  homogeneous precinct method?

19  A    Yes.  I mean, as I mentioned before, the main

20  disadvantage of that is you're leaving out precincts that are

21  more mixed racially.

22  Q    How many precincts were left out of your analysis by

23  using homogeneous precinct?

24  A    Using the 80/20 cutoff, I think then you're examining

25  maybe 25 to 30 percent of the voters in the district; so

1  you're leaving out.

2  Q     And you'll agree with me that most experts use a cutoff

3  of 90 percent and 10 percent, won't you?

4  A     I'm not aware of any standard for what most experts do.

5  I think most -- the work I've seen uses somewhere between 80

6  percent and 90 percent as the cutoff.

7  Q     Could you please put up Footnote No. 9 to Dr. Engstrom's

8  report, please.

9           "HP analyses are typically based on cutoffs of 90

10  percent and 10 percent, but in this application 85 percent and

11  15 percent are employed due to the small number of precincts

12  that satisfy the 90 percent and 10 percent thresholds."

13          So you see Dr. Engstrom told the reader that he was

14  using a different threshold than what is normally used.  Is

15  that correct?

16  A     That's what he said.

17  Q     He goes on to detail exactly "In the 2011 election,

18  voting occurred in 47 precincts, only two of which were less

19  than 10 percent African-American VAP and four above 90

20  percent.  Seven precincts, however, were less than 15 percent

21  and six above 85.  Voting occurred in 53 precincts in the 2012

22  election of which there were only two less than 10 percent and

23  five above 90.  The numbers of precincts less than 15 percent

24  and above 85 were seven and eight respectively.  Voting

25  occurred in 46 precincts in the 2013 election of which only

1   one was below 10 percent in African-American voting-age

2   population and five above 90.  Five precincts were below 15

3   percent and seven above 85.  Voting in the 2014 election

4   occurred in 47 precincts, only two of which were below 10

5   percent African-American voting-age population and four above

6   90 percent."

7           Do you see that?

8   A    Yes.

9   Q    Can you get the next page of the footnote?  "Whereas

10  seven were below 15 and 8 above 85.  Fifty-three precincts

11  were used in the 2015 election, with only two below ten and

12  five above 90, whereas seven were below 15 and eight above

13  85."

14          So Dr. Engstrom was very, very careful to tell the

15  Court, normally, we use 90/10; there's not enough precincts

16  for me to look at using 90/10; so I'm going to lower it to

17  85-15.

18          You lowered it to 80/20, and you didn't tell the

19  Court that that's what you were doing.  Is that right?

20  A    I told the Court what I was doing.  I said where I looked

21  at 80/20, and I explained in my report where I looked at

22  90/10.

23  Q    Did you explain in your report when you were using 90/10?

24  A    Yes.

25  Q    In the text?

1    A    Yes.  On page 5 of my original report, I say "In

2    precincts with a voting-age population is more than 90 percent

3    African American, coalition candidates receive 70 percent" --

4         THE COURT:  It's that reading problem.

5    A    -- "of the votes cast for FFSD school board seats."

6         And then in the next sentence I say "In precincts

7    that are less than 10 percent African American, coalition

8    candidates received 19 percent of the votes cast for FFSD

9    school board seats."

10   Q    So you said on page 5 of your initial report that under

11   homogeneous precinct analysis, using the 80/20 cutoff, that

12   there are 11 precincts that are more than 80 percent African

13   American and eight precincts that are less than 20 percent.

14   Is that right?

15   A    Yes.

16   Q    And how many total precincts were there that year in

17   Ferguson-Florissant?

18   A    I think you said there were 47.

19   Q    Did you include that number in your report?

20   A    On the previous page I did.

21   Q    And then going on to the next two paragraphs, when you

22   use the 90/10 cutoff, there were only three precincts that

23   were more than 90 percent and two precincts that were less

24   than 10 percent.  Correct?

25   A    Yes.

1  Q    So you were looking at a total of five precincts to make

2  that analysis?

3  A    Yes.

4  Q    When you used 80/20, you analyzed 19 precincts, correct?

5  A    Yes.

6  Q    Do political scientists typically make sweeping judgments

7  made -- looking at just tiny, cherry-picked bits of data?

8  A    I wouldn't describe this as cherry-picked.  I mean, I set

9  out the criteria either above 90 percent share of voting-age

10  population or above 80 percent.  I mean, I think in political

11  science in these types of analyses I've seen homogeneous

12  precinct analysis combined with ecological inference

13  estimates, and I've seen other studies that just use

14  ecological inference estimates.

15  Q    Let's turn to page 4 of your rebuttal report.  In the

16  second paragraph you say "There are many precincts in the

17  school district with similar proportions of black and white

18  adults.  However, this poses a challenge for ecological

19  inference and ecological regression estimates of the voting

20  behavior of whites and African Americans."  Is that what you

21  state?

22  A    Yes.

23  Q    Did I read that correctly?

24  A    Yes.

25  Q    When you say "many precincts have similar proportions of

1   black and white adults," what percentage are we talking about?

2   A   Probably be between 40 percent African-American share of

3   voting-age population and 60 percent. We can show it on my

4   earlier graph if --

5   Q   Let's look at your rebuttal report. And you switch in

6   your rebuttal report between using a 90/10 cutoff and then an

7   80/20 cutoff, don't you? You switch back and forth.

8   A   In Table 2, I did an 80/20 cutoff. In Table 3, I did a

9   90/10, 90 percent and 10 percent cutoff.

10   Q   And in the text anywhere, did you tell the reader that

11   you were switching between the two?

12   A   Yes. I explained at the top of each table what the

13   cutoff was that I used.

14   Q   You simply labeled the table. You don't tell the reader

15   that that's what you've done, correct?

16   A   I assume the reader is going to look at the table to see

17   what the cutoff is.

18   Q   Could you please pull up Table 3 on page 6. Can we get

19   the whole table? Is there a way to get the whole table?

20   This is a table that you showed -- that you talked

21   about under direct and which you analyzed voter turnout. Do

22   you think it would be significant for the Court to know that,

23   when you did your analysis, you were looking at five

24   precincts?

25   A   Well, in 2014 it was five precincts.

1  Q    But Dr. Engstrom explains in his report exactly how few

2  that is when you use 90/10; is that correct?  We just went

3  through those.

4  A    Right.

5  Q    It's very few.  It's a very low percentage of the overall

6  precincts.  Would you agree with me?

7  A    Right.  As I said before, the disadvantage of homogeneous

8  precincts is you're leaving out precincts that are more

9  racially mixed.  The advantage is you're comparing precincts

10 that are heavily white versus precincts that are heavily

11 African American so that the voting behavior observed in those

12 precincts you're more confident that they describe the

13 behavior of the group that's --

14 Q    So in Table 3 you used 90/10 to show that they're looking

15 at very few precincts.  Table 2 you use 80/20.  Is that right?

16 A    Yes.

17 Q    And in Table 2 you're looking at voting by race, right?

18 A    Yes.

19 Q    And we get different numbers when we look at

20 approximately 20 precincts or a little bit higher percentage,

21 correct, of the overall precincts -- of voting precincts,

22 right?  You're looking at more precincts when you do an

23 80/20 --

24 A    Correct.

25 Q    -- analysis?  And do you believe that, if this report was

1  submitted for peer review, that this sort of switching back

2  and forth between how many precincts your analysis would pass

3  muster?

4  A    If I was doing this for peer review, I imagine they would

5  tell me to be consistent or use both an 80/20 and a 90/10

6  split for both analyses.

7  Q    But you didn't do that for the Court?

8  A    No.

9  Q    Was it your decision to use the two different cutoffs, or

10 were you asked to use two different cutoffs?

11 A    No.  That was my choice.  I remember you asking about

12 this in the deposition; so I went back on Table 3 and did an

13 80/20 split to see what the turnout numbers were there.

14 Q    But you didn't report that.  You didn't amend your

15 report.  We don't have those numbers on record, do we?

16 A    No.  That was after my deposition --

17 Q    Right.  And you didn't amend your report -- I'm not

18 asking --

19        THE COURT:  Slow down.  Let him finish.  Then you can

20 ask your question.

21        MS. ORMSBY:  I just don't want him to put information

22 on the record that hasn't been produced to us.

23 A    Right.  It was after the deposition; so I had already

24 submitted these reports.

25 Q    And you didn't file an amended report?

1    A    No.  I didn't know that I could.

2    Q    And you didn't produce your calculations to us when you

3    did that analysis?

4    A    Correct.

5         MS. ORMSBY:  Okay.  All right.  I'd like to turn to

6    another subject.  Let's --

7         THE COURT:  All right.  Well, that's perfect.

8         MS. ORMSBY:  Okay.

9         THE COURT:  It's five after five.  So before we start

10   a new topic, we will take a recess.

11        MS. ORMSBY:  Sure.

12        THE COURT:  We'll begin in the morning at nine

13   o'clock.  How long do you think your cross will go?

14        MS. ORMSBY:  Well, Your Honor --

15        THE COURT:  I know you can't predict with any

16   certainty.

17        MS. ORMSBY:  I'm going to give you as good a guess as

18   I can, but if you don't hold me to it, I'd say I'm halfway

19   through.

20        THE COURT:  All right.

21        So who are you calling tomorrow?  I assume we slipped

22   a little bit today, but we're still on track.  Is that fair?

23        MR. ROTHERT:  Yes.  We slipped a little.

24        THE COURT:  Un petit peu.

25        MR. ROTHERT:  We were hoping to start the next

1  witness today but thought we might not get done.  So not

2  terrible.

3        So tomorrow Mr. Frank Green, who we were hoping to

4  start today, will be after Dr. Kimball.  We think we might

5  have to make a slight adjustment for witness availability.

6        THE COURT:  Okay.

7        MR. ROTHERT:  But our remaining witnesses are

8  Reverend Willis Johnson, Dr. Engstrom, Redditt Hudson, and

9  Frank Green, and we were hoping to get them all in tomorrow.

10  I don't think that will happen now.

11        THE COURT:  So first thing Thursday you should finish

12  and then --

13        MR. ROTHERT:  Yes, I think so.

14        THE COURT:  All right.  Any thoughts?

15        MS. ORMSBY:  Well, I'm concerned.  I'm concerned

16  about getting done on Friday and --

17        THE COURT:  Well, if not, we'll get to start Tuesday

18  morning and finish up or whenever everyone is available.  I

19  know you probably didn't plan on it, but without a jury in the

20  box, we'll pick a day to finish.  So I don't want anybody to

21  panic, but we'll figure it out.

22        MS. ORMSBY:  Okay.

23        THE COURT:  All right?  Thank you.

24        Thank you, sir.

25        THE WITNESS:  Thank you.

**(PROCEEDINGS CONCLUDED AT 5:05 PM.)**

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 205 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 1st day of February, 2016.

_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter