# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MISSOURI STATE CONFERENCE OF THE )
NATIONAL ASSOCIATION FOR THE )
ADVANCEMENT OF COLORED PEOPLE, )
REDDITT HUDSON, F. WILLIS JOHNSON, )
and DORIS BAILEY, )
                                       )
      Plaintiffs. )
      v. )
                                         )
                                         ) No 4:14-CV-2077 RWS
FERGUSON-FLORISSANT SCHOOL )
DISTRICT, and ST. LOUIS COUNTY )
BOARD OF ELECTIONS COMMISSIONERS, )
                                       )
      Defendants. )

## BENCH TRIAL – VOLUME III
### BEFORE THE HONORABLE RODNEY W. SIPPEL
### UNITED STATES DISTRICT JUDGE
### JANUARY 13, 2016

APPEARANCES:

For Plaintiffs:     Anthony E. Rothert, Esq.
                     Jessie M. Steffan, Esq.
                     AMERICAN CIVIL LIBERTIES UNION OF MISSOURI
                     FOUNDATION
                     454 Whittier Street
                     St. Louis, MO  63108

                     Julie A. Ebenstein, Esq.
                     Sophia Lin Lakin, Esq.
                     Dale E. Ho, Esq.
                     AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                     125 Broad Street, 18th Floor
                     New York, NY  10004

Appearances Cont'd on Page 2:

REPORTED BY:       SHANNON L. WHITE, RMR, CRR, CSR, CCR
                     Official Court Reporter
                     United States District Court
                     111 South Tenth Street, Third Floor
                     St. Louis, MO  63102
                     (314) 244-7966
    PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

Appearances Continued:


For Plaintiffs:     M. Laughlin McDonald, Esq.
                    ACLU VOTING RIGHTS PROJECT
                    2700 International Tower
                    229 Peachtree Street, N.E.
                    Atlanta, GA  30303

For Defendants:     Cindy Reeds Ormsby, Esq.
                    Angela Gabel, Esq.
                    CROTZER AND ORMSBY, LLC
                    130 S. Bemiston, Suite 602
                    Clayton, MO  63105

                    Kathryn B. Forster, Esq.
                    CROTZER AND ORMSBY, LLC
                    130 S. Bemiston, Suite 602
                    Clayton, MO  63105

                    John A. Safarli, Esq.
                    FLOYD, PFLUEGER & RINGER, P.S.
                    200 West Thomas Street, Suite 500
                    Seattle, WA  98119

# I N D E X

## PLAINTIFFS' WITNESSES

DAVID C. KIMBALL
Cross-Examination Cont'd by Ms. Ormsby .............. 4
Redirect Examination by Mr. Rothert ................ 26
Recross-Examination by Ms. Ormsby .................. 37
Examination by The Court ........................... 39

FRANK GREEN
Direct Examination by Ms. Steffan .................... 44
Cross-Examination by Ms. Ormsby ..................... 87
Redirect Examination by Ms. Steffan ................. 103
Recross-Examination by Ms. Ormsby .................. 107

F. WILLIS JOHNSON, JR.
Direct Examination by Ms. Wilcox .................... 108
Cross-Examination by Ms. Ormsby ..................... 130
Redirect Examination by Ms. Wilcox .................. 143
Recross-Examination by Ms. Ormsby .................. 146

4

1        **(PROCEEDINGS STARTED AT 9:05 AM.)**

2              THE COURT:  Good morning.  Any announcements before

3    we begin?

4              MS. ORMSBY:  No, Your Honor.

5              THE COURT:  I take it by your silence the answer is

6    no.

7              Mr. Rothert, are you ready?

8              MR. ROTHERT:  Yes.

9              THE COURT:  I'll remind you, sir, you're still under

10   oath.

11             You may proceed.

12             MS. ORMSBY:  Thank you, Your Honor.

13                        **DAVID C. KIMBALL,**

14   **HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED**

15   **AS FOLLOWS:**

16                   **CROSS-EXAMINATION CONTINUED**

17   **BY MS. ORMSBY:**

18   Q    I just have a few more questions about your racially

19   polarized voting analysis.  You testified yesterday that your

20   analysis involved only one election; is that right?  2014?

21   A    In my original report, yes.

22   Q    And you prepared a graph that the Court looked at

23   yesterday?

24   A    The graph from my original report, yes.

25   Q    Thank you.  And that's your graph, correct?

1  A    Yes.

2  Q    Okay.  And you also indicated that you'd reviewed Dr.

3  Rodden's report; is that right?

4  A    Yes.

5  Q    And didn't Dr. Rodden prepare similar graphs like this

6  only for four elections?

7  A    Somewhat similar.  I think he examined -- at least in

8  2014 he examined, I think, all African-American candidates,

9  and I looked at the three candidates that ran under that "Time

10 for a Change" banner.

11 Q    I would agree with you.  Could you put up Dr. Rodden's

12 four.

13        So when Dr. Rodden examined these four years'

14 election, he looked at every single African-American

15 candidate.  Would you agree with that?

16 A    I think that's right, yeah.  Another difference is that I

17 weighted the precincts by how many voters there were, and I

18 think he didn't.

19 Q    And if you see very faintly, it doesn't show up as well

20 on the computer screen, but he also added a red line that

21 indicated what perfect racial polarization would look like.

22 A    Yes.  I see that.

23 Q    So looking at Dr. Rodden's maps, other than 2014, those

24 lines look dramatically different.  Would you agree with that?

25 They are more horizontal?

1    A    The black curves you're talking about?

2    Q    Yes.

3    A    The black curve for 2014 is steeper than in the other

4    three graphs.

5    Q    And that indicates less polarization.  Would you agree

6    with that?

7    A    It suggests more polarization in the 2014 election than

8    in the other three when examining all African-American

9    candidates.

10   Q    Yet your report only provided the one year where it

11   showed the most racially polarized voting.

12   A    My original report just examined 2014.  My rebuttal

13   report examined more elections.

14   Q    But you didn't include maps like this to show?  Or did

15   you?

16   A    I didn't include graphs like this in my rebuttal report.

17   Q    Did you believe that this information would be important

18   for the Court to review other than 2014?

19   A    Well I --

20   Q    Your initial --

21   A    In my rebuttal report, I examined other elections in

22   addition to 2014.

23   Q    Isn't that -- isn't that in response to Dr. Rodden

24   looking at other elections?

25   A    My rebuttal report was partly in response to Dr. Rodden's

1  report.

2  Q    I asked you this question yesterday about another issue,

3  but do you believe that this would -- that you including one

4  election, that wasn't even the most recent election in an

5  article for peer review, that it would pass muster?

6  A    I think, as I mentioned yesterday, my understanding was

7  there was another expert doing racially polarized voting

8  analysis, and so my initial report I thought it was sufficient

9  that there was evidence in at least one election, that type.

10  I thought that was enough for my original report.

11  Q    You don't consider that cherry-picking data?

12  A    That was the only election I had analyzed up to that

13  point; so, no.

14  Q    All right.  Let's turn to page 6 of your initial report.

15  The first sentence of the first full paragraph states "Local

16  elections held during off-cycle periods such as April tend to

17  generate relatively low levels of information about the

18  candidates and produce unusually low voter turnout.  In

19  addition, turnout among African-American voters tends to be

20  disproportionately low in off-cycle elections."

21        Doesn't this mean that the black majority -- I think

22  I have the wrong quote up.  I think you have the wrong quote

23  up.

24        Let's try this again.  The first sentence of the

25  first full paragraph says "Seats on the Ferguson-Florissant

1  School Board are filled by at-large elections; so the election

2  district is as large as it can possibly be in the

3  jurisdiction.  Previous research finds that racial and ethnic

4  minority voters have more difficulty electing candidates of

5  their choice in local at-large elections than in local

6  district elections.  When there is racially polarized voting,

7  a white majority can more effectively determine the winners of

8  all at-large seats."  Did I read that correctly?

9  A    Yes.

10  Q    So doesn't this mean that a black majority can also

11  determine the winners of all at-large seats?

12  A    Not necessarily.  As I mentioned yesterday, I think you

13  would more likely need a bigger majority, you know, far above

14  50 percent of a racial group to control at-large elections.

15  Q    But that's an opinion you did not include in your report;

16  is that right?

17  A    Right.

18  Q    Well, in the footnote to that statement, you refer to an

19  article called *The Context Matters:  The Effects of*

20  *Single-Member Versus At-Large Districts.*  Is that right?

21  A    Yes.  That's one of the studies that I cited.

22  Q    And I'd like to show you what defendants have marked as

23  Exhibit SS, and it has been stipulated to.  Page 556 of that

24  article, first column.  Last paragraph of the first column.

25          It reads "Alternatively, if a group composes a

1    majority of the city population in a majoritarian at-large

2    system, the group may be able to win all of the council seats.

3    Districts might even decrease the group's representation on

4    the city council."

5              Now, granted, we're talking -- the author is talking

6    about city councils, but he is talking about at-large versus

7    single-member districts.  Is that right?

8    A    Yes.

9    Q    And this is an article that you relied on in your report,

10   for your report?

11   A    This is one of the articles I cited in my report, my

12   original report.

13   Q    So the claim in your report about single-member districts

14   in this article states that it could actually decrease a

15   group's representation.  You don't agree with that?

16   A    I'm sorry.

17   Q    You don't agree with the sentence that a group that has a

18   majority, if it goes to single-member districts, could

19   actually decrease their representation?

20   A    I think the authors in this study hedge what they're

21   saying.  They say the group "may be" able to win all the

22   council seats if they're a majority, and districts "might"

23   decrease the group's representation.

24   Q    It's a warning, though.  Wouldn't you agree it was a

25   warning that single-member districts might not be the answer

1  to every situation?

2  A    It might not be.  That's what they're saying.

3  Q    Does it say anywhere in this article -- you reviewed it

4  for -- you relied on it for your opinion -- that it doesn't

5  matter whether the smaller group is white or black?  Does it

6  talk about whether or not if the minority -- if the majority

7  group is African American, that this rule doesn't apply?  Does

8  it say that anywhere in the article?

9  A    I don't know.  I don't recall if it does.

10  Q    Did you do any sort of analysis of whether or not the

11  at-large system is better for the largest group of voters?

12  A    Better in what way?  I'm not sure I understand your

13  question.

14  Q    Did you analyze whether an at-large system is better for

15  the largest group of voters?

16  A    I analyzed political science research, which tends to

17  conclude that at-large systems tend to make it more difficult

18  for racial and ethnic minorities to elect candidates of their

19  choice.

20  Q    Would you agree with me that if the smallest group of

21  voters is white, that they don't benefit from an at-large

22  system?

23  A    I think if they are substantially below 50 percent, then

24  they might be on the other end of things in an at-large

25  system.

1  Q    So would you agree, then -- or is your testimony, then,

2  if an electoral system goes to single-member districts, that

3  those single-member districts would also have to have a super

4  majority in order to be successful?

5  A    The single-member districts I hadn't really considered

6  that much, but it might help if some of the districts had well

7  above 50 percent minority population.

8  Q    Have you looked at the proposed plans that -- the

9  illustrative plans that the plaintiffs have put forward?

10 A    I have not.

11 Q    So you're not aware whether or not any of them have --

12 any of the single-member districts proposed have 70 percent or

13 greater, as you testified yesterday, that would be required to

14 be successful?

15 A    I haven't seen the plans; so I don't know.

16 Q    Did you study the effect of staggered terms on voting

17 behavior in the district?

18 A    Just what I mentioned in my original report; that there's

19 some research indicating that staggered -- that local

20 elections with staggered terms tend to produce lower turnout

21 than local elections where all the seats are up in the same

22 election.

23 Q    Did you analyze specific to the Ferguson-Florissant

24 School District whether or not staggered terms would affect

25 voting behavior?

1   A    The elections I analyzed in the Ferguson-Florissant

2   School District only used the staggered terms; so there were

3   no school board elections there with all the seats up at once

4   that I could compare to.

5   Q    Do you remember being quoted in a *New York Times* article

6   dated August 30, 2014?

7   A    It's been a while, but it probably happened.

8   Q    This is Exhibit RR, which has been stipulated to.  The

9   primary -- the article is entitled *Getting Ferguson Majority*

10  *to Show its Clout at Polls*.  And I believe you're talking

11  specifically -- this article is specifically about the city of

12  Ferguson.  Would you agree with that?

13  A    The part I can see here, yes.

14  Q    And is the city of Ferguson a majority African American?

15  A    The population of Ferguson is majority African American,

16  yes.

17  Q    And are elections for city council in Ferguson at-large

18  or single-member district?

19  A    I think Ferguson has three wards, three districts, and I

20  think two council members are elected from each ward, if I

21  remember correctly.

22  Q    But the council members don't run for election within the

23  ward at the same time?

24  A    I think that's correct.  I'm not certain about the timing

25  of each of the seats.

1    Q    Prior to the 2015 election, do you know what the racial

2    make-up of Ferguson City Council was?

3    A    Prior to --

4    Q    I'll help you out.  Could you turn to the second page,

5    last paragraph.  "Over the last 25 years, the population of

6    Ferguson, now about 21,000, has shifted from nearly

7    three-quarters white to mostly black.  Even so, five of the

8    six city council members are white, as Mayor James W. Knowles

9    III."  "As is" Mayor.

10    A    So at that time, five of the six city council members

11    were white.

12    Q    Okay.  And you're quoted on page of 3 of this article in

13    paragraphs 2 and 3, correct?  I pulled those two paragraphs up

14    for you to review.

15    A    Right.  I see my name mentioned in those paragraphs.

16    Q    Could you read those two paragraphs out loud, please?

17    A    "David C. Kimball, a political scientist at the

18    University of Missouri-St. Louis who has studied voting

19    patterns in the county that includes Ferguson, said some other

20    suburbs that became black-majority communities earlier than

21    Ferguson, such as nearby Dellwood, have since begun electing

22    black leaders.  'There is often a lag time,' he said, noting

23    that Ferguson's black population was only slightly higher than

24    half the total as recently as 2000."

25            "There are small indications, Mr. Kimball suggested

1　that black voters in Ferguson had begun to exert at least some

2　political muscle even before Mr. Brown's death.  In a school

3　board election for a district that includes Ferguson

4　residents, three black candidates ran this year, after the

5　removal of a popular black school superintendent.  Only one of

6　the three won a seat, but Mr. Kimball said he viewed the

7　campaign as a modest sign of shifting."

8　Q　So in the first paragraph you talk about a lag time.  Is

9　this lag time phenomenon a common occurrence recognized by

10　political scientists studying voting patterns?

11　A　The lag time I'm not as certain of in the political

12　science literature.  That's been my observation in communities

13　in St. Louis County.

14　Q　And when you talk about the three black candidates in

15　your second paragraph, you're talking about only the Grade A

16　for Change slate, right?

17　A　Right.  The three candidates that ran under the Grade A

18　for Change banner.

19　Q　So you refer, actually, to the Ferguson-Florissant School

20　District as an example of the shift towards electing more

21　African Americans for office, don't you?

22　A　A modest sign of shifting is what they attributed to me.

23　Q　Thank you.  Let's talk a little bit about your testimony

24　with regard to endorsements.  Can you give me the legal

25　definition of what a slate is according to Section 2 of the

1  Voting Rights Act, the Senate factors?

2  MR. ROTHERT:  Objection.  Calls for a legal

3  conclusion.

4  THE COURT:  Rephrase the question.

5  Q    Were you asked to give an opinion regarding Senate

6  factors, specifically Senate factors in this school

7  district -- in your report?

8  A    Yes.  In my original report, yes.

9  Q    So in order to do that, did you review the requirements

10 of those Senate factors under Section 2?

11 A    I looked up a document that summarized the Senate

12 factors.

13 Q    And can you tell me how those Senate factors defined a

14 slate of candidates?

15 A    The sentence that I saw describing Senate Factor 4 was

16 the exclusion of members of the minority group from candidate

17 slating processes.

18 Q    Do you remember reading that it required the endorsing

19 body to recruit candidates to run?

20 A    I didn't look at any or find any more specific definition

21 other than that sentence.

22 Q    So you're unaware of exactly what those Senate factors

23 require for a slate?

24 MR. ROTHERT:  I object.  That assumes, well, a legal

25 conclusion that she's right.

1    THE COURT:  Do you think she's misstated the Senate

2  factor?

3    MR. ROTHERT:  Yes.

4    THE COURT:  I will give you some latitude.

5  Obviously, if you're wrong . . .

6    MS. ORMSBY:  I will move on, Your Honor.

7    THE COURT:  All right.

8  Q   (BY MS. ORMSBY) Did you research the endorsement process

9  for the FFNEA or the North County Labor prior to writing your

10  report?

11  A   "Research the endorsement process" meaning how they

12  decided which candidates to endorse or what criteria?

13  Q    What their entire process is.  How did they come about

14  speaking to the candidates?  The entire process, from start to

15  finish, for FFNEA.  Let's talk about FFNEA.  Did you look at

16  how FFNEA endorses candidates?

17  A    When I wrote my original report and the rebuttal report,

18  I wasn't aware of any published materials that laid out what

19  the criteria that FFNEA used to make endorsements or how they

20  decided which candidates to endorse and which candidates not

21  to endorse.

22  Q    Did you attempt to find out what the process was for

23  endorsing candidates?  Did they interview candidates?  Did

24  they just pick them?  Was there a process in place for

25  candidates to get endorsed?

1    A    No.  I examined which candidates were endorsed by FFNEA

2    and which candidates were not endorsed by FFNEA.

3    Q    And you didn't look to see what the process was for a

4    candidate to receive endorsement from North County Labor, did

5    you?

6    A    No.  I didn't -- I don't know exactly what their process

7    is.

8    Q    Did you research whether or not black and white

9    candidates sought endorsement from FFNEA candidates?

10   A    I'm sorry?  Did I --

11   Q    Did you research whether or not black candidates and

12   white candidates sought their endorsements of these, of

13   both --

14   A    When I wrote my reports, I did not know which candidates

15   sought those endorsements and which candidates did not,

16   although I didn't find any information that suggested that

17   African-American candidates were less likely to seek those

18   endorsements than white candidates.

19   Q    So you didn't determine the differential rate at which

20   whites apply for endorsement compared to the rates that blacks

21   apply for endorsement?

22   A    No.  I didn't know which -- I didn't know which

23   candidates applied for those endorsements and which candidates

24   did not.

25   Q    Did you research the racial make-up of the FFNEA

1  endorsement committee?

2  A     No.  I don't know who's on the endorsement committees.

3  Q     And you didn't do it for the North County Labor?

4  A     No.  I don't know who makes their decisions.

5  Q     Did you research whether or not these endorsements helped

6  or hindered African-American candidates?

7  A     Well, as my reports indicated, the endorsements from both

8  of those labor groups seem to be very important because the

9  candidates who got their endorsements usually won and the

10 candidates who didn't get their endorsements usually lost.

11 And as I mentioned in my report, both of those labor

12 organizations endorsed white candidates almost exclusively

13 over the last ten years or so.

14 Q     Did you research whether or not the African-American

15 candidates endorsed by the FFNEA won or lost?

16 A     Yes.  I think those are in my reports, whether the

17 endorsed candidates won or lost.

18 Q     Do you remember whether or not one of the criteria for

19 whether or not a slate -- an organization who endorses or

20 whether candidates run as a slate is that, if they're

21 endorsed, that it's almost a foregone conclusion that they

22 would win; that the endorsement helps candidates win?

23 A     I'm not sure I understood your question there.

24 Q     Do you remember, when you looked under Section 2 for the

25 Senate factor in question, whether or not it made a

1  difference, if a candidate is endorsed, whether that increased

2  their likelihood of winning?

3  A    As I mentioned before, the sentence I saw describing

4  Senate Factor 4 was the exclusion of members of minority group

5  from the candidate slating processes.

6  Q    Let's talk a little bit about Senate Factor 5, whether or

7  not African Americans bear the effects of past discrimination.

8  And your report, which I believe takes up pages 8 through 12,

9  is not specific to the Ferguson-Florissant School District.

10 You're talking about the area in general.  Would you agree

11 with that?

12 A    Some of it refers to the St. Louis region in general.

13 Some of it refers to St. Louis County.  Some of the

14 information refers to communities that are within or partly

15 within the Ferguson-Florissant School District.

16 Q    Is it your testimony that changing the school board

17 electoral system to single-member districts will change police

18 practices?

19 A    Will changing the --

20 Q    Will it change the --

21 A    -- school district to single-member district change

22 police practices in?  In?

23 Q    Well, you spoke a lot about the city of Ferguson.  But

24 anywhere?

25 A    Police are governed by municipal governments, not school

1   districts.  So I'm not sure I see the connection between the

2   two.

3   Q    I agree.  Would single-member districts mean fewer

4   traffic stops?

5   A    Not necessarily.  No.  School districts don't govern the

6   police or the law enforcement.

7   Q    And so changing from a single-member -- an at-large

8   district to a single-member district isn't going to change any

9   of the factors that you testified to yesterday with regard to

10  Senate 5?

11  A    I think in describing Senate 5, I think the point there

12  is that because of this history of discrimination and

13  segregation and racial disparities in income and education,

14  that tends to put African-American voters in the

15  Ferguson-Florissant School District as well as in other parts

16  of St. Louis County at a disadvantage in electing their

17  preferred candidates in at-large elections.

18  Q    Okay.  We will talk about that in just a minute, but

19  first I want to go to the 2011 election.  That's one of the

20  elections that you looked at for your rebuttal report, isn't

21  it?

22  A    The 2000 election, yes.

23  Q    2011 election.

24  A    '11?

25  Q    Yes.  I want to make sure we're on the same page.

1  A    Okay.

2  Q    And one of the sources that you relied on is contained in

3  Plaintiff's Exhibit 130, which was introduced yesterday

4  somewhat, but this was also included in the information that

5  you reviewed.  Would you agree with that?

6  A    I'm just looking for the page here.  Yes.  That's part of

7  Exhibit 130.

8  Q    And do you remember relying on this article in coming to

9  your conclusions?

10  A    I think this article had some information about

11  candidates that were endorsed in the 2011 election.

12  Q    And would you agree that this article discusses the

13  anti-incumbent sentiment that permeated the 2011 election,

14  causing the incumbents to, quote, "lose big"?

15  A    The article, I think, mentions that the incumbents lost

16  in that election, although, as Dr. Rodden -- estimates in Dr.

17  Rodden's report indicate, the top choice among

18  African-American voters in that election was one of the

19  incumbents.

20  Q    Could you go to the section highlighted?  This article

21  states "The three defeated board members agree that the health

22  insurance issue contributed to their loss.  But they say the

23  teachers' union -- which had butted heads with the board over

24  pay issues -- played a major role.  The union interviewed each

25  candidate and endorsed the three who won:  Morris, Chris

1    Martinez, and Robert Chabot.

2              "Sandra Goforth-McDougal, president of the

3    Ferguson-Florissant National Education Association, said it

4    wasn't the union that turned voters away from the incumbents.

5              "'We heard from a number of residents who said it was

6    all about the insurance,' she said.  'The fact that the board

7    gave the superintendent such a generous stipend for the rest

8    of his lifetime opened the door for the public to look more

9    deeply into what the board was doing.  And obviously they came

10   to the conclusion that we did -- the same conclusion that we

11   did:  That there needed to be a positive change.'"

12             Did I read that correctly?

13   A    Yes.  So in that election, looks like all candidates,

14   black and white, sought the union endorsement.

15   Q    And we agree that Dr. Graham is African American?

16   A    Yes.

17   Q    Can you concede that it's likely that Dr. Graham's race

18   probably had nothing to do with her loss in 2011?

19   A    I think there was still racially polarized voting in that

20   2011 election; that Dr. Graham was the most preferred

21   candidate among African-American voters and was not the most

22   preferred candidate among white voters.  So I think race could

23   have played a role in that election.

24   Q    Do you think it's likely based on this article?

25   A    Likely that race played a role in that election?

1    Q    In her defeat.

2    A    I think it still played a role in her defeat because of

3    the racially polarized voting.

4    Q    It played a defeat in the other two incumbents' loss.

5    Did it play a part in the other two incumbents' loss?

6    A    Well, the other two incumbents were white.

7    Q    Right.

8    A    But they didn't get the FFNEA endorsement that year.  And

9    so I think the lack of endorsement, the endorsement going to

10   other white candidates, probably was a factor in the white

11   incumbents losing also.

12   Q    Do you agree that Dr. Graham's race had nothing to do

13   with whether or not she was endorsed by the FFNEA?

14   A    As I mentioned before, I don't know exactly what the

15   endorsement process was.  I just know that the FFNEA usually

16   endorsed white candidates over the last ten years or so.

17   Q    Were you here for Dr. Graham's testimony yesterday?

18   A    I think I was here for part of it.

19   Q    Were you here for the part where she said that she was

20   endorsed many times by the FFNEA prior to the -- prior to

21   2011?

22   A    I didn't hear that part, but I believe it if that's what

23   she said.

24   Q    Okay.  Let's go on to your calculus of voting.  You state

25   on page 3 of your initial report that the costs of voting

1   include the effort needed to become informed about the

2   candidates as well as the effort needed to overcome the

3   administrative and other barriers to registering and casting a

4   ballot as a part of your calculus of voting analysis.  Is that

5   right?

6   A    Yes.

7   Q    And I just want to clarify in this formula.  You don't

8   actually put numbers in for "P," "B," and "C," do you?

9   There's not hard numbers to put in there?

10  A    That's correct.  It's sort of a shorthand used to

11  illustrate this cost-benefit framework.

12  Q    So it's pretty subjective on what the outcomes of this

13  calculus of voting result is?

14  A    It's meant as a kind of shorthand device or heuristic

15  device to convey the kind of cost-benefit calculation that can

16  go into deciding whether or not to vote in an election.

17  Q    Well, let's look at "C," the costs of voting.  Isn't it

18  true that the effort to overcome the administrative and other

19  barriers to registering to vote and casting a ballot would be

20  exactly the same under single-member districts and an at-large

21  system?

22  A    The registration process, the voting process.  I suppose

23  if there were district systems, precincts might be different

24  in polling place locations, might be a little different than

25  in an at-large system possibly.  So finding out where to vote

1  might be a little bit different, but the process of

2  registering to vote would not be affected by the -- whether

3  there's an at-large or district system.

4  Q    And notification of where to vote would be the same exact

5  under at-large and single-member districts, right?

6  A    The county election board would publish what the polling

7  place locations are.

8  Q    Thanks.  You also mentioned partisanship in your initial

9  report on page 6.  "Research indicates that voters have more

10  difficulty learning about candidates and their platforms in

11  nonpartisan elections."

12       Are you advocating that school board members run

13  specific to a political party?

14  A    There I was just citing research that voter turnout tends

15  to be lower in nonpartisan local elections than in partisan

16  ones because voters -- it takes more effort, more cost on the

17  voter's part trying to discern where the candidates stand,

18  what their policy preferences are.

19       In a partisan election, when the voters know the

20  candidate is a Democrat versus a Republican, they usually

21  could make more reasonable inferences about where that

22  candidate stands on a variety of issues.

23  Q    Do you believe that partisan politics has a role to play

24  in the governance of a school district?

25  A    Partisan politics?  Not necessarily.  But I guess some

1    issues dealing with school policies, class size, school choice

2    have become partisan issues in the United States.

3    Q    Those aren't decisions for school boards, are they?

4    Those are decisions for legislatures, aren't they?

5    A    The school choice one is.  Class size is a decision for

6    school boards.

7    Q    Are you aware that class size is mandated by the

8    Department of Elementary and Secondary Education?

9         MR. ROTHERT:  Objection.  Assumes facts not in

10   evidence.

11        THE COURT:  Overruled.  You can cross-examine on

12   that, if you want.

13   A    I'm not that familiar with what the state recommendations

14   are on class size.

15   Q    So you're not asking this Court to order the State of

16   Missouri to have candidates claim allegiance to a specific

17   political party, are you?

18   A    No.  And I don't think in my report I recommended

19   partisan elections specifically.

20        MS. ORMSBY:  Just a minute, please.

21        I'm done, Your Honor.  Thank you.

22        THE COURT:  Any redirect?

23        MR. ROTHERT:  Yes, Your Honor.  Thank you.

24                    **REDIRECT EXAMINATION**

25   **BY MR. ROTHERT:**

1  Q    Dr. Kimball, just while it's fresh in your mind, you were

2  just talking about the calculus of voting and how at-large

3  voting -- switching to district voting rather than at-large

4  voting might or might not affect the costs.  What are the

5  other factors that are considered in the calculus of voting

6  besides costs?

7  A    You mean benefits?

8  Q    Yes.  Yeah.  Benefits and what else?

9  A    And the probability of your vote determining the outcome

10 of an election.

11 Q    And would the benefits and the probability of your vote

12 making a difference in the outcome be higher in subdistrict

13 elections rather than at-large voting?

14 A    Districts by definition are smaller and have a smaller

15 number of voters than the entire -- than an at-large system.

16 And so with a smaller number of voters the probability of your

17 vote making the difference in an election is going to be

18 greater.  So that's going to make the benefits of voting more

19 relevant or weigh more heavily in that calculus.

20 Q    Now, yesterday you gave 70 percent as an example of a

21 super majority; that if African Americans had 70 percent, they

22 could perhaps control elections as compared to a mere -- a

23 bare majority.  Did you mean that to say that 70 percent is

24 necessary for African Americans; that it would have to be 70

25 percent?

1  A    No.  I was using that 70 percent number as sort of a

2  rough target to aim for.

3  Q    Okay.  So when you were asked a few moments ago -- when

4  your testimony was characterized as you having said 70 percent

5  would be necessary, that's not what you said, is it?

6  A    I think I said that something well above 50 percent would

7  be needed to -- for a racial minority group to control the

8  outcome in at-large elections.

9  Q    Now, in Ferguson, the city of Ferguson, you were asked

10 about there.  Isn't it true that African Americans were a

11 majority in two of the three wards in Ferguson?

12 A    In the city of Ferguson, yes.  I believe that's correct.

13 Q    And as you mentioned in that *New York Times* article that

14 you were quoted in, African Americans had a slight majority in

15 Ferguson, correct?  Overall majority?

16 A    Can you ask me the question again.

17 Q    Well, let me ask this.  Even though African Americans had

18 a slight majority in Ferguson, they weren't able to control

19 the elections and --

20 A    Oh, in those particular wards you're describing?

21 Q    Right.

22 A    Because they didn't elect, at least at that point, all

23 African-American candidates to those wards.

24        MS. ORMSBY:  Your Honor, while he's thinking, I just

25 want to renew my objection to the testimony about super

1  majorities since it wasn't included in his report.

2       THE COURT:  Understood.  That's on the list of topics

3  for briefing when we're done.

4  Q    Let's chat about that.

5       THE COURT:  There were three you objected to:  Voter

6  registration, bullet voting, and super majority voting.

7  Q    All right.  Do you remember talking about voter

8  registration data yesterday based on race?

9  A    The Missouri data from the U.S. Census -- I remember

10 looking at that section of one of the exhibits.

11 Q    And did you read that from an exhibit?

12 A    Yes.

13 Q    And from an exhibit that's already in evidence?

14 A    Yes.

15 Q    And I guess I asked you rather passively -- super

16 majority came up -- well, I guess it came up in

17 cross-examination, but other than that, it also came up in my

18 questioning yesterday, when I was asking you rather passively

19 if someone would be misrepresenting your opinion if they said

20 that a racial minority, if they were a majority, could win all

21 the seats in an at-large election.  Do you remember that?

22 A    I remember that, yes.

23 Q    And even though I asked that passively, are you aware of

24 anyone having misrepresented your opinion on that before?

25 A    Well, I think the other side tried to argue that that was

1    my opinion.

2    Q    Okay.  Could you pull up -- I'm going to have you look on

3    the screen here at ECF Document No. 81 at page 17.  Could you

4    read that first sentence for me?

5    A    "Dr. David Kimball, another expert for plaintiff,

6    testified that if blacks were a majority, they could

7    potentially determine the winners of all of the seats."

8    Q    Okay.  And is there a citation for that?

9    A    SUMF272.

10   Q    And do you know what SUMF means?

11   A    No.

12   Q    You're very lucky not to know that.  I'm going to pull

13   up --

14           THE COURT:  Are you going to keep us in suspense?

15   What does it mean?  I don't need to be unlucky.  I need to

16   understand.

17   Q    If you can pull up the statement of uncontroverted

18   material facts --

19           THE COURT:  Oh, okay.  Well, that's all I need to

20   know.  It's in the statement of uncontroverted material facts.

21   Q    Document No. 82.  If you can pull that up and pull up

22   paragraph 72.  Could you read what it says there?

23   A    "Dr. David Kimball, another expert for plaintiff,

24   testified that if blacks were a majority, they could

25   potentially determine the winners of all of the seats."

1  Q    And what's the citation for that fact?

2  A    I don't see one.

3  Q    It's a trick question.

4         THE COURT:  Is this a statement of uncontested

5  material facts or just a proposed statement of uncontested --

6         MR. ROTHERT:  No.  It's the statement of

7  uncontroverted material facts filed by the school district.

8         THE COURT:  You didn't -- they're not uncontroverted.

9         MR. ROTHERT:  They are not uncontroverted.

10         THE COURT:  Okay.  That's what I'm trying to ask you.

11 Q   (BY MR. ROTHERT) Yes.

12         Is that a fair characterization of your testimony,

13 that blacks -- if blacks were a majority, they could

14 potentially determine all seats?

15 A    Well, the key word there is "potentially."  I think it's

16 the size of the majority, as I mentioned earlier, that's the

17 important factor there.

18 Q    So leaving that out is significant?

19 A    Yes.

20 Q    We talked yesterday about the denominator in votes cast

21 in determining whether you're looking at total votes cast or

22 total ballots cast, right?

23 A    To measure voter support for a particular candidate.

24 Q    Okay.  And you explained how the numbers might look lower

25 if you're looking at it one way than the other way; is that

1    correct?

2    A    Right.  The percentages tend to be much lower if you're

3    measuring voter support as a percentage of total votes cast

4    than as a percentage of ballots cast in multi-seat elections

5    where voters have more than one vote that they can cast.

6    Q    Okay.  Now, if everyone voted -- if everyone who cast a

7    ballot voted in every election and voted all their votes,

8    could you easily figure out -- could you just double that

9    number and realize the percentage of votes cast?

10   A    If it was a two-seat election where each voter had two

11   votes to cast and assuming that each voter cast both of his or

12   her votes, then the share of votes cast that a candidate --

13   total votes cast that a candidate receives, you could double

14   that number, and that would indicate how many voters supported

15   that candidate, what percent the voters that supported that

16   candidate.

17   Q    But you can't just do that doubling because of bullet

18   voting and people skipping contests on the ballot, right?

19   A    Right.  If some voters bullet vote or if they skip the

20   contest altogether and cast zero of their votes in their

21   contest, then . . .

22   Q    So if you don't talk -- if you didn't -- we didn't talk

23   yesterday about bullet voting, then your testimony would be

24   misleading if we leave out bullet voting, wouldn't it?

25   A    Yes.

Q    You looked at Exhibit 50 yesterday, which was a blog post

where you created a graph to show the relatively weak

relationship between turnout and race as in one election,

right?

A    In the 2014 election I believe that was.

Q    And that was a graph representing a single year, correct?

A    One election, yes.

Q    And does that graph conflict with either your -- I don't

remember which kind of analysis you did on turnout.  Was it HP

analysis?

A    Oh, in my rebuttal report.

Q    Yeah.

A    The homogeneous precinct analysis, yes.

Q    Your homogeneous precinct analysis or Dr. Rodden's

ecological inference estimates for turnout, does that graph

conflict with either of those?

A    It doesn't conflict with my homogeneous precinct analysis

in my rebuttal report.  Hang on.  I'm looking it up again.

Q    Is that Exhibit 50?

A    And it doesn't conflict with Rodden's estimates of

turnout.  Each of us found that white turnout was somewhat

higher than African-American turnout in that election.

Q    And if we can go down.  Is this where the graph is?  In

looking at that graph again from your blog, what would that

graph look like if there was no relationship between race and

1   turnout?

2   A     The line would be horizontal.

3          THE COURT:  By that you mean it would be absolutely

4   parallel as opposed to --

5          THE WITNESS:  Yeah.  The straight line would be flat,

6   and the -- in the blog post I measured voter turnout, I think,

7   as percentage of registered voters, which was different than

8   how I measured turnout in my rebuttal report.

9   Q     Now, you mentioned Dr. Rodden's -- on cross-examination

10  you mentioned Dr. Rodden's graphs didn't appear to weigh by

11  the numbers -- the number of voters in each precinct.  Is that

12  right?

13  A     Correct.

14  Q     And if that's true, if it doesn't weigh by the number of

15  voters in each precinct, does that mean different votes count

16  for different weights depending on how many people voted in

17  each precinct?

18  A     The reason I weight by the number of voters in each

19  precinct is basically to count each voter equally.  Precincts

20  can vary substantially in terms of the number of voters they

21  have.  Some precincts might have ten or only twenty voters.

22  Some precincts might have hundreds of voters.  So if you don't

23  weight by the number of voters in the precincts, you're not

24  treating each voter equally.

25  Q     Is there any drawback to using King's ecological

1    inference method, especially in precincts that are, you know,

2    less segregated racially, more homogeneous?

3    A    Well, all three of these methods are making steps based

4    on aggregate data.  Nothing guarantees that any of them are

5    going to give us the correct or accurate estimates.

6         One of the weaknesses -- this applies to King's

7    ecological inference method as well as ecological

8    regression -- is that if you have many precincts where the

9    number of African-American and white voters is relatively

10   equal, it's more challenging to try and infer what the

11   underlying voting behavior was in those precincts.

12   Q    So if you had an equal number of African-American and

13   white voters in a precinct and there was 100 percent polarized

14   voting, would that show up?

15   A    So I would answer it this way.  So assume sort of the

16   extreme case.  If you have a precinct where 50 percent of the

17   voters are African American and 50 percent of the voters are

18   white and a particular candidate receives 50 percent of the

19   vote in that precinct, it's possible that all the

20   African-American voters voted for that candidate and none of

21   the white voters did so.  It's also possible that all the

22   white voters in the precinct voted for that candidate and none

23   of the black voters did so.  And it's also possible that

24   African-American and white voters each voted 50 percent for

25   that candidate.

1    So the same aggregate outcome could be generated by

2  extreme racially polarized voting or no racially polarized

3  voting at all.  And so when you have lots of precincts in that

4  middling range of racial composition, it makes it challenging

5  to make these ecological inferences.

6  Q    And how do you overcome that challenge or at least --

7  A    Well, I think it's helpful to supplement the ecological

8  inference analysis with the homogeneous precincts analysis

9  because the advantage of the homogeneous precincts is you're

10  just looking at -- you're comparing precincts that are heavily

11  white to precincts that are heavily African American, and

12  you're more certain about the voting behavior of white

13  candidates in heavily white voting precincts and the

14  African-American candidates in the heavily African-American

15  precincts.

16  Q    I realize that this is going to be an insulting question,

17  but did anyone -- or did you remove anything, omit anything

18  from your initial report at the request of plaintiffs or

19  plaintiffs' attorneys?

20  A    No, I did not.

21  Q    And did anyone ask you to?

22  A    Nobody asked me to remove anything.

23  Q    And I guess it will be an insulting line of questions.

24  Did you remove anything from your rebuttal report at the

25  request of plaintiffs or plaintiffs' attorneys?

1    A    No, I did not.

2    Q    Did anyone ask you to?

3    A    No.

4    Q    Did you decide what methodologies to use at the request

5    of plaintiffs or plaintiffs' attorneys in any of our analyses?

6    A    No.  I used the methods that I thought were most

7    appropriate.

8    Q    And did you decide what cutoffs to use for your

9    homogeneous precinct analysis at the request of plaintiffs or

10   any plaintiffs' attorneys?

11   A    No.

12   Q    And do you feel that you were tampered with by

13   plaintiffs' attorneys?

14   A    No.

15            MR. ROTHERT:  I have no further questions.

16            THE COURT:  All right.

17            MS. ORMSBY:  Your Honor, may I recross just simply on

18   the fact that we misrepresented his testimony?

19            THE COURT:  If you state that as a matter of fact, I

20   mean, what the heck.  No.  Go ahead.

21                        **RECROSS-EXAMINATION**

22   **BY MS. ORMSBY:**

23   Q    Dr. Kimball, do you remember being deposed on August 21,

24   2015?

25   A    Yes.

1  Q    And you were under oath during that deposition just as

2  you are today?

3  A    Yes.

4  Q    I'm referring to page 61 of the deposition, beginning on

5  line 12:  "How do you define a majority?"

6          "Fifty percent or more -- or above 50 percent.  I

7  should be more precise."

8          "QUESTION:  Okay.  So what about if there was a black

9  majority?  Can they determine all the winners of the seats?

10          "ANSWER:  In an at-large election?

11          "QUESTION:  Yes.

12          "ANSWER:  Potentially."

13          Did I read that correctly?

14  A    Yes.  And I think the "potentially" is important there.

15  Q    And then I would refer the Court to our -- paragraph 72

16  states, "Dr. David Kimball, another expert for plaintiff,

17  testified that if blacks were a majority, they could

18  potentially determine the winners of all of the seats."

19          How does that misrepresent what you said in your

20  deposition?

21  A    As long as "potentially" is in there, it doesn't

22  represent -- it doesn't misrepresent my deposition.

23          MS. ORMSBY:  Thank you.

24                        **EXAMINATION**

25  **BY THE COURT:**

1  Q    All right.  There's some undertows here.  There's lot of

2  moving parts, right?

3  A    Yes.

4  Q    Time, manner, and method of conducting elections is

5  uniquely a state law function.  Just that's the law.  So you

6  talked about one of the things that could be done is moving

7  the elections to November, right?  And the reason you said

8  that, if I understand it correctly, is that typically in a

9  November election you have a greater turnout.

10 A    Yes.

11 Q    Right?  But state statute mandates municipal elections

12 should be held in March or April, correct?

13 A    In Missouri that's right, yeah.

14 Q    Is it possible that there is a public -- legitimate

15 public policy reason for that?  That is, that those municipal

16 actors are pretty far down the ballot in a typical November

17 election and so more focus would be put on the municipal

18 election as opposed to being a down-ballot question?  Or do

19 you know -- do you even know if that was considered by the

20 Missouri legislature when they did it?

21 A    I imagine that's one of the arguments made in favor of

22 holding municipal elections in April and March.

23 Q    And you also pointed out that, if you did districts, that

24 each vote has more value.

25 A    Yes.

1    Q    But wouldn't that also be true in March or April?

2    A    Yes.

3    Q    One of the discussions so far in the case, of course, is

4    that discrimination and vestiges of discrimination are

5    barriers to minority participation in electoral process.

6    Something as simple as felony conviction disenfranchisement,

7    which is more -- is found greater in a minority community than

8    in a majority community.  So we were talking about majorities,

9    but we know that 50 percent isn't 50 percent.  50.1 percent in

10   the African-American community probably isn't enough to really

11   be a majority because of some of those barriers.

12   A    Right, to control the elections and --

13   Q    Is that fair?  So do you have an opinion as to what

14   percentage of the voting-age population would be African

15   American before you would have confidence as a political

16   scientist that that would be in a position to exercise what

17   you were just cross-examined about:  That given a majority,

18   the minority community would be able to control all the

19   at-large districts?

20   A    So you're asking what --

21   Q    Here's the point.  The testimony so far is neither the

22   all-white voters nor the part -- some-part black voters are a

23   majority in the district.  Neither are at 50 percent, unless I

24   misread the materials and misheard the testimony.

25          If we accept -- and they'll argue this when this is

1  over, but I'm trying to understand from the expert -- that

2  50.1 percent in the minority community isn't enough to control

3  the outcome of an at-large election, do you have an opinion as

4  to what that percentage would be?  I think that's probably

5  more clear of a question.

6  A    Right.  The voter registration rate for African American

7  tends to be about, at least in Missouri, 5 points lower than

8  for whites.  The turnout rate tends to be lower for African

9  Americans than whites in local elections.  So I would aim, you

10 know, for something high.

11 Q    That's not a -- you wouldn't add those numbers up to get

12 to a number?

13 A    To get to a specific number?  I mean, I'm trying to

14 answer your question.  It's hard for me to give a specific

15 number, but --

16 Q    So you can tell me, "I don't have an opinion as to what

17 that threshold is."

18 A    Yeah.  I don't know what that specific number -- but I

19 think it should be substantially higher than 50.

20 Q    Okay.

21 A    Or 50.1.

22 Q    I mean, because there's other mischief.  I mean, I've

23 read articles where because of the way districts are drawn on

24 the U.S. House, the Democrats have to get something close to

25 53 or 54 percent of the vote to even break even.  I mean, that

1   can surface in other ways, and that's not even a

2   race-generated issue; it's just the way the districts are

3   drawn.

4   A    Right, and the way the population is distributed.

5   Q    Concentrated in certain areas.

6   A    Yeah.

7   Q    So do you believe that moving the elections to November

8   is really a good idea in this instance?

9   A    It would increase voter turnout substantially.

10  Q    But wouldn't it also increase the number of voters who

11  may be voting without any knowledge about the particular

12  election we're talking about?

13  A    I think the concern is the local elections might get

14  swamped by the attention devoted to the state and national

15  elections.  I mean, I think that's a legitimate concern.

16  Q    Obviously, the goal is participation, period, by as many

17  people as possible, but -- all right.  Do you have an opinion

18  from based on what you looked at and what the percentage of

19  the district today is, is of the -- is minority of the

20  voting-age population?  You know that plaintiffs want us to

21  look at 2010 and stay at 2010, but it's not static.

22  A    Right.

23  Q    I mean, in the *New York Times* article you said that

24  there's a progression here, although you weren't referring

25  to --

1  A    I was referring to the election results, not the voting

2  population.  I haven't looked carefully at the voting-age

3  population figures; so I don't have an opinion.

4          THE COURT:  Obviously, I talked about some things.

5          Anything on behalf of Mr. Rothert?

6          MR. ROTHERT:  Nothing from plaintiffs.

7          MS. ORMSBY:  Nothing, Your Honor.

8          THE COURT:  Okay.  Thank you, sir.  You may step

9  down.

10          We will take a ten-minutes recess just so we can stay

11  on track.  So we'll reconvene at 10:20.

12          **(COURT RECESSED FROM 10:10 AM UNTIL 10:22 AM.)**

13          THE COURT:  If you would call your next witness.

14          MS. STEFFAN:  Plaintiffs would call Mr. Frank Green,

15  and I have a binder for the Court with the exhibits.

16          THE COURT:  Great.

17          If you would step forward, sir, and be sworn.

18                  **(WITNESS SWORN BY THE CLERK.)**

19          THE COURT:  Are you ready?

20          MS. ORMSBY:  I am, Your Honor.

21          THE COURT:  You may proceed.

22          MS. STEFFAN:  Thank you, Your Honor.

23                          **FRANK GREEN,**

24  **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

25  **FOLLOWS:**

**DIRECT EXAMINATION**

**BY MS. STEFFAN:**

Q    Good morning, Mr. Green.

A    Good morning.

Q    My name is Jessie Steffan.  I represent the plaintiffs in this case.  Could you please state your name for the record?

A    Frank Deas Green, Jr.

Q    Could you spell your middle name?

A    D-e-a-s.

Q    Thank you.  What do you do for a living, Mr. Green?

A    I'm a technology specialist for the Ferguson-Florissant School District.

Q    And how long have you worked for the Ferguson-Florissant School District?

A    This is my 18th year.

Q    Have you been a technology specialist the whole time?

A    No.  The first two years I was a computer specialist.

Q    And since then a technology specialist?

A    Yes.

Q    Do you live in the Ferguson-Florissant School District?

A    No, I do not.

Q    Where do you live?

A    I live in Bellefontaine Neighbors, which is the Riverview Gardens School District.

Q    About how long is your commute to work?

1  A    Fifteen minutes.

2  Q    So turning back to what you do as a technology

3  specialist, can you just describe a little bit of how you

4  spend a typical day?

5  A    Come in, I check my emails, check to make sure what needs

6  to be taken care of, prioritize my events for the day.

7  Sometimes it's slow and we do a lot of office work.  Sometimes

8  it can be busy where we take care of the machines for the day.

9  We handle the computers and all the peripherals and anything

10  technology-wise in the schools.

11  Q    So do you handle technology issues for multiple schools?

12  A    Yes, I do.  Two schools.

13  Q    What schools are those?

14  A    Johnson-Wabash Elementary and Walnut Grove Elementary.

15  Q    Where are those schools located within

16  Ferguson-Florissant School District?

17  A    They were on the south side of the district.  One is

18  really close to my -- they're both fairly close to my office,

19  within 2 or 3 miles.

20  Q    Do you have opportunity to interact with both teachers

21  and support personnel at those schools?

22  A    Yes, I do.

23  Q    And students as well?

24  A    Yes, I do.

25  Q    Do you ever ask students to help you with

1  technology-related tasks at the schools?

2  A     Yes, I do.

3  Q     Like what?

4  A     Turning on computers every once in a while.  If I have

5  some new machines, like recently we got some new Chromebooks,

6  I had some students help me open up the Chromebooks.  I've had

7  some students actually do some actual work on the keyboards,

8  setting them up.

9  Q     Do you belong to any organizations?

10  A     Yes.

11  Q     What organizations are those?

12  A     I'm a member of the NAACP.  I'm a member of the USGA.

13  I'm a member of the Knights of Columbus.  I'm a member of

14  AARP.  I'm a member of the NEA and a couple of the

15  organizations within the NEA:  Black Caucus and ESP, which is

16  Education Support Professionals.

17  Q     An when you say NEA, what does that stand for?

18  A     The National Education Association.

19  Q     Are you a member of the National Education Association

20  directly, or do you belong to an affiliate?

21  A     I belong to the National Education Association which, in

22  turn, because I am a local, I'm also involved with the

23  Ferguson-Florissant National Education Association and the

24  Missouri National Education Association.

25  Q     And generally what does the National Education

1  Association do?

2  A    We are the teachers' union.  We're the largest union in

3  the nation:  3.1 million members.

4  Q    And you testified you belong to the MNEA, the Missouri

5  NEA, as well as the Ferguson-Florissant NEA; is that right?

6  A    Yes.

7  Q    So the Ferguson-Florissant National Education

8  Association -- is that the smallest constituent of the NEA, or

9  is there anything smaller besides --

10  A    I'd say it's the smallest.

11  Q    And that covers the whole school district?

12  A    Yes.

13  Q    Do all employees of the school district automatically

14  become members of FFNEA upon employment, or is it a voluntary

15  association?

16  A    Voluntary association.

17  Q    And if you know, how many members would you estimate are

18  in the FFNEA?

19  A    930.

20  Q    And if you know, do a majority of the teachers as well as

21  the Education Support Professionals belong to FFNEA in the

22  school district?

23  A    In total, 65 percent of all of our members are members of

24  the FFNEA:  Teachers 80 percent and support professional 20,

25  25.

1  Q    So a smaller percent of the support personnel who work

2  for the school district belong to FFNEA than teachers?

3  A    Yes.

4  Q    And I think you explained as a technology specialist you

5  are -- you consider yourself support personnel; is that

6  correct?

7  A    Yes.

8  Q    How long have you been a member of the FFNEA?

9  A    About 16 years.

10 Q    And have you been an active member that entire time?

11 A    No, I haven't.

12 Q    When did you become an active member?

13 A    I became an active member about eight years ago.

14 Q    Why?

15 A    There was an issue with a principal at one of the

16 elementary schools where I was working.  She wanted to have a

17 certain person work for her school.  I was going to be the

18 person working at that school.  There were things like --

19 there were things that she said -- of course no one can

20 prove -- that was detrimental to me.  And I got pulled out of

21 that building.  I had -- I worked in the admin center for six

22 months, and when I got back to work -- actually, during that

23 time I wanted to clear my name in some of the things; so I

24 recruited the help of my building rep, who happened to be the

25 FFNEA president at that time, and once all the dust settled, I

1    said to myself I'd never let that happen to another employee,

2    especially a tech, and I became active in the FFNEA.

3    Q    And you used the term "building rep."  Can you explain

4    what that is?

5    A    Your building rep -- our building reps are

6    representatives.  They are the people that we give information

7    to on a monthly basis, and they take that information and they

8    spread it among the staff in their buildings.

9    Q    And that's a building rep for the FFNEA; is that right?

10   A    Yes.

11   Q    So when you became an active member of the FFNEA about

12   eight years ago, did you take on any new roles within the

13   organization?

14   A    I ran for seat on the exec board, and I was victorious.

15   Q    And is the exec board the governing body of the FFNEA?

16   A    Yes, it is.

17   Q    How many people are on the exec board?

18   A    Sixteen.

19   Q    If you know, have there always been 16 positions, or how

20   is it determined how many positions there are on the exec

21   board?

22   A    We usually have two positions that are support

23   professional positions.  The rest are positions by teacher,

24   with teacher representation:  A president, a president-elect,

25   and a treasurer, and other duties, corresponding secretary,

1  recording secretary, things like that.

2  Q    Okay.

3  A    And also one of our most important people, our -- the

4  person -- our, oh, boy, she's going to kill me.  She's our --

5  she represents our personnel when there are issues.

6  Q    So you testified about the exec board that is about 16

7  people and the membership which you said it's about 930

8  people.  How many building reps are there, if you know?

9  A    There's at least 45.

10 Q    Since you became an active member of the FFNEA and a

11 member of the exec board about eight years ago, have you been

12 a member of the exec board the entire time since then?

13 A    Yes, I have.

14 Q    And besides just being a member of the exec board, have

15 you ever held an office within the FFNEA?

16 A    Yes.  I was president of the FFNEA for the '14-'15 school

17 year.

18 Q    Do you have any offices currently?

19 A    I'm vice treasurer and past president, which is an

20 honorary-type office.

21 Q    Okay.  When you became president of the FFNEA for the

22 2014 to 2015 school year, how did you become president?

23 A    I ran for the seat unopposed, and I won the position.

24 Q    Was that the first time you had run for president?

25 A    No.  I ran for the '13-'14 seat that year, that previous

1  year.

2  Q    In the prior election, were you successful?

3  A    No, I was not.

4  Q    Can every member of the FFNEA vote for the president

5  position?

6  A    Yes.

7  Q    Does everyone vote?

8  A    No.

9  Q    When you were president of the FFNEA during the 2014 to

10  2015 school year, what were your duties?

11  A    I ran the exec board meetings.  I ran the building rep

12  meetings.  I took place in informal communications once a week

13  with the superintendent and certain members of his cabinet.  I

14  also sat at the formal communications meetings with the entire

15  cabinet on one side, and on our side was our negotiations

16  team.  I sat on the negotiations team.  I became members of

17  committees, and I handled all events concerning interviews.  I

18  made sure that our interview committees were well staffed and

19  staffed with proper association personnel, and I was also the

20  voice of FFNEA.

21  Q    In that capacity did you have any interaction with the

22  school board?

23  A    Yes.

24  Q    Did you attend school board meetings?

25  A    Yes, I did.  I was at every one of them.

1   Q    How did you learn about what your role would be as

2   president?

3   A    Through exec board meetings, watching the president,

4   things like that.  And then when I won my election, the

5   next -- the following year you become what they call

6   president-elect, and it's supposed to be sort of a training

7   for you to become president that following year.

8   Q    Did anything surprise you about your duties as president?

9   A    Oh, very much.  The inner workings of what goes on in the

10  district behind closed doors -- very interesting.

11  Q    Did you run for reelection in the 2015-2016 school year?

12  A    No, I did not.

13  Q    Why not?

14  A    Because we only have one-term elections.  We are changing

15  our bylaws as we speak so that way, now, if you are president,

16  you may run for a second term or continuous terms, if you

17  wish.  As long as, you know, you keep winning, you can stay

18  president.

19  Q    That wasn't a possibility when you were president?

20  A    No, it was not.

21  Q    Are you familiar with the elections for the

22  Ferguson-Florissant School District's Board of Education?

23  A    Yes, I am.

24  Q    Do you know what the legal qualifications are for

25  candidates for the school board?

A    You have to be 25.  You have to live in the district.  I

think pretty much that's pretty much it.

Q    If a person decides that he or she would like to run for

the school board in Ferguson-Florissant, what steps do they

take, if you know?

A    I believe they have to go down to the Board of Elections

and put their name in, register, and once they have

registered, that's when we get in touch with them.  But they

have to, of course, declare at a board meeting.

Q    When you say "we," do you mean the FFNEA?

A    The FFNEA, yes.

Q    Do candidates for school board campaign?

A    Yes.

Q    What does a campaign typically look like?

A    Meet and greets, signs, yard signs, probably some, you

know, door-to-door campaigning -- things like that.

Q    Do candidates typically have campaign staff?

A    Yes.

Q    And do they typically hold fund-raising events?

A    Yes.

Q    And do candidates typically put out campaign materials

like fliers or --

A    Yes.

Q    -- brochures?  And do candidates typically go to debates

or forums of any kind?

1  A    Yes, they do.

2  Q    And you testified that candidates typically go door to

3  door and canvass?

4  A    They canvass, yes.

5  Q    In your view --

6  A    If they want to win, they do.

7  Q    In your view, is there anything that distinguishes a

8  successful campaign for school board from an unsuccessful

9  campaign?

10 A    Getting out there and getting your name and face known.

11 If the people don't know who you are, it's very, very tough to

12 be successful.

13 Q    Do you know if the FFNEA endorses candidates for the

14 Ferguson-Florissant School Board?

15 A    Yes, we do.

16 Q    And does the FFNEA make endorsements every election?

17 A    As far as I know, we do.  There may have been a year

18 where we haven't, but as far as I know, we have done that,

19 yes.

20 Q    And if you would estimate, how far back do you remember?

21 A    Up to probably the 2011 campaign.

22 Q    I'm going to ask you a few questions about how the FFNEA

23 selects the candidates that it endorses.  Can you tell me

24 first how a candidate learns about the possibility of seeking

25 an FFNEA endorsement?

1   A    Well, once a candidate is officially on the ballot, all

2   of the candidates that are officially on the ballot we send

3   out letters to each one of the candidates, and we ask them to

4   come to a conference or a interview, and we send them

5   questions, and we try to set up an appointment for them.

6         Usually the appointment is on a Friday afternoon, or

7   sometimes it will be a Saturday morning, depending on how many

8   candidates we have, and then they reply, and they let us know

9   what particular time they would like to meet.

10        Once that's done, we set up an interview committee,

11  and we get the committees together, and they get a copy of the

12  questions, and on those particular days we interview the

13  candidates.

14  Q    And so generally your interviews are all held on that

15  same Friday-to-Saturday time period?

16  A    Yes.

17  Q    What month is that generally, if you recall?

18  A    Probably February, March.  Probably late February.

19  Q    Is this a process that is specific to the FFNEA, or does

20  it follow the same procedures as other affiliates of the

21  Missouri NEA?

22  A    I'm not sure.

23  Q    Do you know if the FFNEA has written down this process

24  anywhere?

25  A    They may have, but I have not seen it.  We usually have

1    someone that's been doing it for years and it's just, you

2    know, old hat to her.  And then we just -- it's just been

3    handed down and passed down.

4    Q     You mentioned that the candidates who are interested in

5    seeking endorsement come to interviews; is that right?

6    A     Yes.

7    Q     Who from the FFNEA interviews those candidates?

8    A     We have an election committee that does it.

9    Q     Do you know if it is voluntary for an FFNEA member to

10   participate in the FFNEA endorsement committee?

11   A     Yes, it is.

12   Q     Is the make-up of the committee different every year, or

13   is it the same people every year?

14   A     It's different every year because it's -- because of time

15   and, you know, we don't know what's going to be happening

16   during that particular year for someone.  We hope that it can

17   be that way, but it's almost never the same.  At least as far

18   as I've been involved with it, it hasn't been the same.

19   Q     Does the endorsement committee have a leader?

20   A     Usually our PAC person, our PAC chair, is the person that

21   runs the committee.

22   Q     When you use the term "PAC," what does that stand for?

23   A     Political Action Committee.

24   Q     And so from your knowledge, the Political Action

25   Committee chair is the person who chairs the endorsement

1   committee?

2   A    Yes.

3   Q    Who, if you know, recruits people for the endorsement

4   committee?  Is it the PAC chair?

5   A    The PAC chair.  Sometimes the president may say something

6   during a meeting, but usually the PAC chair is the person

7   that --

8   Q    If you know, how does a person become the PAC chair and

9   the chair of the endorsement committee?

10  A    Usually that person is given that responsibility by the

11  president.

12  Q    So going as far back as you remember, who have the chairs

13  been of the endorsement committee?  So starting with this

14  year, the 2015 to 2016 school year, who is the current chair?

15  A    Carolyn Cook.

16  Q    And last year?

17  A    It was Carolyn Cook and Kristin Calvert-French.

18  Q    And if you recall the year prior to that?  So that would

19  be the 2013 to '14 school year.

20  A    It was probably Luann Rohrer.

21  Q    And before that do you remember?

22  A    Luann Rohrer and then one year it was Benjamin Eye.

23  Q    If you know, why did Ms. Calvert-French decide not to be

24  the PAC chair this year?

25  A    I think she wanted to do it last year because we really

1    didn't get anyone to do it, and she volunteered.  And I think

2    because of that -- and it's a lot of work -- I think it was

3    just a bit much for her.  She decided that it probably wasn't

4    something that she was, you know, made up for or inclined to

5    do.

6    Q    If you know, do you know why Mr. Eye decided not to

7    continue being the PAC chair?

8    A    He had a baby -- or his wife had a baby.  And he decided

9    that it was just a bit too much on his plate.  So when his

10   time was up, he stopped.

11   Q    Do you know how many people serve on the endorsement

12   committee typically?

13   A    Seven.

14   Q    Is it a requirement if a person wants to serve on the

15   endorsement committee that they be available to participate in

16   the candidate interviews?

17   A    Yes.

18   Q    Is there anything else that the PAC chair or the

19   president looks for when recruiting people to be on the

20   endorsement committee?

21   A    Well, we try to make it as fair and as equitable as

22   possible.  We try to get African American, white, female, and

23   male, and we try to get a good mixture of those participants.

24   Q    Do you also try to get both teachers and support

25   personnel?

1   A    Yes, we do.

2   Q    You testified earlier that there are 16 positions on the

3   exec board.

4   A    Yes.

5   Q    And usually are members of the endorsement committee

6   recruited from the exec board?

7   A    That's where we start, yes.

8   Q    If you know, do you know the racial make-up of the exec

9   board currently?  Approximately.

10  A    The racial make-up, it's -- let's see.  It's probably

11  3 to 1 white to black ratio.

12  Q    And men to women; do you know?

13  A    There are only two men and 14 women.

14  Q    And how many male African-American members of the exec

15  board are there?

16  A    Just me.

17  Q    In your experience -- so looking back as far as you

18  recall, has the FFNEA endorsement committee been racially

19  diverse?

20  A    As far as I know, we have, yes.

21  Q    And would you say it is a priority that for --

22  A    Yes.  It's in our policy bylaws.  We try to be as close

23  to that as possible.

24  Q    Do you recall being deposed in this case?

25  A    Yes.

1   Q    If I may, could you pull up -- could you pull up page 77

2   of Mr. Green's deposition.

3          MS. ORMSBY:  What page?

4   Q    It's 77.  I'm sorry.  Let's start on page 76, toward the

5   bottom.  I'm going to read page 76, starting at line 23.

6          "Okay.  And to your recollection, is it common

7   practice that the committee members are racially diverse?"

8          "ANSWER:  Yes."

9          Turning to the next page.

10         "QUESTION:  And that's a priority among the committee

11   chair?

12         "ANSWER:  Depends on the chair."

13         Is that correct?  Did I read that correctly?

14   A    Yes, you did.

15   Q    Do you still agree with that characterization?

16   A    I would say so.  It does depend upon the chair.

17   Q    Have you ever participated in the FFNEA endorsement

18   committee?

19   A    Yes, I have.

20   Q    And when?

21   A    I was on the 2013-'14 -- '14-'15, school year.  The

22   '14-'15 school year.  No.  '13-'14, I'm sorry.

23   Q    And that's the year that you were president-elect; is

24   that correct?

25   A    Yes.

1  Q    And you participated that year in interviews of

2  candidates for the school board?

3  A    Yes.

4  Q    Is that the only year that you participated in interviews

5  for candidates for the school board?

6  A    In that type of setting, yes.

7  Q    And you -- therefore, you were not on the committee when

8  you were president during the 2014 to 2015 school year?

9  A    No, I was not.

10 Q    Okay.  You testified previously that you give the

11 candidates a list of questions that you will ask during the

12 interview.  Is that correct?

13 A    Yes.

14 Q    Do you ever ask additional questions that were not given

15 to the candidate ahead of time?

16 A    No.

17 Q    And do you ever not ask a question that is on the list

18 that you give candidates?

19 A    No.

20 Q    Are the questions the same every year?

21 A    For the most part.  I'm sure there may be changes here or

22 there depending on what big event or what is the talking point

23 or the reason for that particular school year maybe.

24 Q    Do you remember during your time on the exec board if a

25 question was ever added to the questionnaire that you gave to

1  candidates interested in seeking an endorsement from the

2  FFNEA?

3  A    That particular year --

4  Q    Any year that you were --

5  A    -- or in general?  Probably so.  Yes.

6  Q    And how does a question get added, if you know?

7  A    Usually the exec board or maybe even possibly the

8  interview board may get together and put a question in.

9  Q    Is there a vote about adding a question or not, to your

10  knowledge?

11  A    Usually it's a consensus-type thing.  I don't know if

12  they actually vote on the issue.

13  Q    If you recall, on the year that you participated in the

14  endorsement committee interviews, was there a question about

15  class sizes?

16  A    Yes, there was.

17  Q    And if you remember, when was that question added to the

18  questionnaire?

19  A    I don't know when it was added.  As far as I know, it

20  could have been something that could have been added the year

21  before.  I wasn't part of that particular discussion when that

22  question was added.

23  Q    Okay.  Can you describe what happens within the FFNEA

24  after all the interested candidates have interviewed?

25  A    We clear the room, and then we talk about each candidate

1    individually, and then we vote on whether we want to endorse

2    that candidate or not.

3    Q    What are the kinds of things you're looking for?

4    A    Well, first and foremost, we're looking for someone

5    that's teacher friendly.  If you're not going to -- if you

6    want to be endorsed by a teachers' union, you need to be

7    teacher friendly.  Otherwise, you know, why are we here?

8         We also would like to know if a person is caught up

9    on events that are going on in the district.  We'd like to

10   know how that person feels about what goes on in the schools,

11   with the teachers, with the students, certain things like

12   that, yeah.

13   Q    But you don't send those preferences to candidates ahead

14   of time?

15   A    No, we do not.  We just send the questions, and we ask

16   them for information about when they want to set up an

17   interview time.

18   Q    You testified that you look for candidates who are up on

19   things that are concerning to teachers and to students.  Would

20   not being aware of the racial achievement gap eliminate

21   someone from being endorsed?

22   A    Probably, yeah.

23   Q    After discussing each candidate, does the endorsement

24   committee vote on the potential endorsees?

25   A    Yes.

1  Q    And how do you vote?

2  A    By show hands or just by "aye" or something like that.

3  Usually a show of hands.

4  Q    So it's not by secret ballot?

5  A    No, it's not.

6  Q    After the endorsement committee has voted on the

7  candidates that the endorsement committee would recommend for

8  endorsement, what happens next within the FFNEA?

9  A    I'm sorry.  Can you repeat that?

10 Q    After the endorsement committee votes and decides whom

11 they'd like to recommend, what happens next within the FFNEA?

12 A    We let the candidates that we've endorsed know that they

13 are going to be endorsed, and we have to make that unfortunate

14 phone call and let the other candidates that applied or

15 interviewed with us that we're sorry; they have not been

16 endorsed that year.

17 Q    So does the rest of the membership of the FFNEA get any

18 say on whom the FFNEA will endorse?

19 A    Yes.  Then we talk about it at exec board, about the

20 person -- about the persons we've endorsed, or the person.

21 Then we invite them -- usually they come to an exec board

22 meeting, but really the big event is when they come to a

23 building rep meeting and we invite the endorsed or potentially

24 endorsed candidates to the building rep meeting.  They have

25 their five, ten, fifteen minutes, however long they need.

1  Usually we try to give them five.  Some people take longer.

2  And then once they leave, we put it to a vote among the

3  building reps, and that's when the official endorsement will

4  become -- that's when the endorsement will become official.

5  Q    And just to be clear, you don't send out those letters

6  that you testified about until after that step takes place?

7  A    Correct.

8  Q    So in your experience, has the endorsement committee ever

9  recommended a group of candidates for endorsement but then the

10 building reps disagreed?

11 A    Disagree?

12 Q    Chose not to --

13 A    There are some that -- well, we have a discussion before

14 there's an election.  And the building reps can also -- they

15 also have an opportunity to be asked the potential endorsed

16 candidates questions as well.  So some may disagree.

17 Q    Has there ever been an occasion, if you recall, where the

18 endorsement committee voted to recommend candidates for

19 endorsement and then the building reps voted their choices

20 down?

21 A    I have not seen that ever, no.

22 Q    And when you say the building reps are voting, is it just

23 the building reps, or are there other people present in the

24 room at the same time?

25 A    Well, usually when we have our building rep meetings,

1  it's the building reps, or exec board, and that's it, because

2  the exec board are de factos -- is that the word, how you

3  pronounce it? -- members of -- their building reps whether

4  they want to be or not.

5  Q    I understand.  I'm going to ask you a couple questions

6  now about what happens after a candidate successfully gets

7  endorsement from the FFNEA.  What benefit does the candidate

8  get from FFNEA endorsement?

9  A    Well, a candidate will get a stipend, usually a few

10  hundred dollars.  We will help them with fliers.  We will help

11  them if they want to do phone banks.  We can help with

12  membership and canvassing.  We can support meet and greets.

13  We usually let the candidate take care of that themselves.  We

14  also can help produce, as I said, fliers and things like that,

15  help with mailings.

16  Q    And in your experience, has the FFNEA ever printed

17  refrigerator magnets for candidates?

18  A    Yes, we have.

19  Q    And what about little cards to hand out to voters?

20  A    Probably have, yes.

21  Q    In your experience, does the FFNEA put all the

22  candidates' names on those materials that they print?

23  A    Yes.

24  Q    So those materials show the candidates running jointly?

25  A    Yes.

1 Q    Has the FFNEA, to your knowledge, ever produced campaign

2 materials for an individual candidate in a year where the

3 FFNEA endorsed several candidates?

4 A    No.

5 Q    Does the FFNEA ever provide volunteers to endorsed

6 candidates for canvassing or phone banking?

7 A    We have members, if they feel strongly about a candidate

8 and they want to volunteer, they may.  We don't say, "You,

9 you, you, you go help this guy," or, "You, you, you go help

10 this guy."  Usually it depends on the person.  And most of

11 them feel pretty strongly about endorsing a candidate.  I

12 mean, yard signs are huge, and they'll put them up.  They'll

13 definitely do that for a candidate.

14 Q    And I think you testified at least sometimes the FFNEA

15 does phone banking?

16 A    Yes.

17 Q    Does the FFNEA mention all endorsed candidates in those

18 phone calls?

19 A    Depends on the type of phone banking.  If one individual

20 candidate would like to do a phone bank for himself, we can

21 help him with that.  So there are times where I can remember

22 where we did that for a candidate and just used his name.

23 Q    In addition to the monetary benefit that the FFNEA

24 provides -- the fliers, little cards, refrigerator magnets,

25 potentially voluntary help canvassing -- is there any other

benefit that the FFNEA provides to an endorsed candidate?

A    Not anything out of the ordinary that I can recall, no.

Q    Do you believe that the monetary benefit -- the fliers, the cards, the phone banking, potentially voluntarily help, canvassing -- do you believe that they help a candidate at the polls?

A    I believe it helps.  Doesn't guarantee victory, but I believe it helps.

Q    What effect do you think an FFNEA endorsement has on a candidate's campaign for Ferguson-Florissant School Board?

A    I would say up until the past couple of years, every candidate that we've endorsed has probably won.  I think that back then it was easier.  Most of the times we had candidates that ran unopposed, but we've endorsed them.  I'm sure there had to have been some incumbents throughout the years that have run unopposed.

Q    Let me ask this.  Does the FFNEA endorse candidates in years where they are unopposed?

A    That I'm not sure, because in the campaigns where I've been involved, we've had people that we've endorsed that were not incumbents.

Q    So sometimes the FFNEA endorses incumbents and sometimes not.  Is that correct?

A    Correct.

Q    And you testified that the last two years, I think, you

1  saw a different result for candidates.  Why do you say that?

2  A    Because we've endorsed some candidates that we were sure

3  had a really strong chance of winning a seat, and they did

4  not.

5  Q    Who were those candidates, if you recall?

6  A    James Savala and Roger Hines.

7  Q    If you know, what is the race of those candidates?

8  A    They were African American.

9  Q    I'm going to ask you some questions now about specific

10 elections.  Do you remember the April 2015 school board

11 election in the Ferguson-Florissant School District?

12 A    Yes.

13 Q    So I'm going to place on the document reader -- and this

14 is in your binder -- an exhibit that has been previously

15 marked and admitted as Plaintiffs' Exhibit 12.  This is the

16 official election results from the 2015 Ferguson-Florissant

17 School District election.  Do you have them up, Mr. Green?

18 A    Yes.

19 Q    So looking at those results, do you remember how many

20 seats were up for vote in that election?

21 A    Two.

22 Q    How many candidates ran for those seats?

23 A    Five.

24 Q    Who were those candidates?

25 A    Brian Scott Ebert, Roger Hines, Donna Marie Dameron,

1  Michael Person, Courtney Michelle Graves.

2  Q    If you recall, which candidates applied for FFNEA

3  endorsement?

4  A    If I'm not mistaken, they all did.

5  Q    If you recall, whom did the FFNEA endorse?

6  A    Brian Scott Ebert and Roger Hines.

7  Q    Did those candidates win?

8  A    One did.

9  Q    Who won.

10 A    Brian Scott Ebert won his seat.

11 Q    And Mr. Hines lost his seat; is that correct?

12 A    Mr. Hines --

13 Q    Or his election.

14 A    He lost his election, yes.

15 Q    If you know, what is the race of Mr. Ebert?

16 A    He's white.

17 Q    And Mr. Hines?

18 A    African American.

19 Q    And did Mr. Ebert and Mr. Hines both get the benefits of

20 FFNEA endorsement that you testified about previously?  The

21 monetary support?  The fliers?

22 A    Yes, they did.

23 Q    Do you recall the Ferguson-Florissant School District

24 election in April 2014?  So during the time you were

25 president-elect of the FFNEA.

1   A   Yes.

2   Q   I'm going to place on the document reader Plaintiffs'

3   Exhibit 11, which has been previously marked and admitted.

4   These are the official results from the 2014 school district

5   election.  Looking at those results, how many seats were up in

6   that election?

7   A   Three.

8   Q   How many candidates were there that year?

9   A   Eight.

10  Q   It takes a second.  Who were the candidates?

11  A   Rob Chabot, Paul T. Morris, LaWanda Wallace, Kimberly

12  Benz, Willie Johnson, Jr., Donna Paulette-Thurman, James A.

13  Savala, Larry Thomas.

14  Q   Do you recall who applied for endorsement in that

15  election?

16  A   They all did.  They did, but Larry Thomas never showed.

17  Q   Is this the year that you were on the FFNEA endorsement

18  committee?

19  A   Yes, it was.

20  Q   Do you remember which candidates received FFNEA

21  endorsement in the 2014 school district election?

22  A   Rob Chabot, Paul Morris, James A. Savala.

23  Q   Did those endorsed candidates -- Mr. Savala, Mr. Chabot,

24  Mr. Morris -- receive the benefits of FFNEA endorsement that

25  you testified about earlier?

1    A    Yes, they did.

2    Q    Were those candidates elected?

3    A    Two were.

4    Q    Who was elected?

5    A    Rob Chabot and Paul Morris.

6    Q    And who was not elected?

7    A    James A. Savala.

8    Q    If you know, what is the race of Mr. Chabot?

9    A    He's white.

10   Q    Mr. Morris?

11   A    He's white.

12   Q    And Mr. Savala?

13   A    African American.

14   Q    If you know, did Mr. Savala receive endorsements from any

15   other endorsing organizations that year?

16   A    Yes, he did.  He was part of the other slate, the church

17   organization.  I can't remember the name of their

18   organization.

19   Q    Could it be Citizens for Education and Community Change?

20   A    Probably so, yes.

21   Q    And yet Mr. Savala was not successful in being elected?

22   A    No, he was not.

23   Q    In your view, do you think race was an explicit part of

24   the 2014 school board election?

25   A    Oh, yes.

1    Q    And how so?

2    A    That was the year that there was a lot of turmoil in our

3    district.  Our superintendent, who was African American, was

4    dismissed that year.

5    Q    When you say "dismissed," what do you mean?

6    A    It was a mutual agreement that he no longer become

7    superintendent of the Ferguson-Florissant School District.

8    Q    Were there any preceding events to his dismissal

9    involving the superintendent?

10   A    Well, there was some controversy.  For a long -- I mean

11   for a while, it wasn't known to the general public what the

12   controversy was, and there were some things that slowly came

13   out after his dismissal.

14   Q    If you recall, were there any African-American members of

15   the school board when Dr. McCoy was suspended?

16   A    I don't think so that year, no.

17   Q    Did you attend any school board meetings after Dr.

18   McCoy's suspension was announced by the school board?

19   A    Yes, I did.

20   Q    Were there any meetings that were unusual, in your mind?

21   A    The meeting at -- that first school board meeting after

22   was definitely unusual.  It was huge.  There were about 1,200

23   people there.  We had it at the high school.

24   Q    This was while you were president-elect during the 2013

25   to 2014 school year?

1    A    Yes.

2    Q    And you've previously testified that as president of the

3    FFNEA you had attended school board meetings as well?

4    A    Yes.

5    Q    When you were president, was it one of your duties to

6    attend school board meetings and speak on behalf of the FFNEA?

7    A    It was.  I did that year anyway.

8    Q    Was the president -- so your immediate predecessor -- the

9    president of the FFNEA there at that unusual school board

10   meeting with you that night?

11   A    No, she was not.

12   Q    Were other exec board members of the FFNEA there?

13   A    Maybe one, but I don't recall seeing a whole lot -- there

14   weren't a whole lot of exec board members there, no.

15   Q    That night did the school board explain why it had

16   suspended Dr. McCoy, if you recall?

17   A    I don't think they did.

18   Q    Based on your observations at that meeting or at other

19   times, what was the perception of Dr. McCoy's suspension by

20   community members?

21   A    They were outraged.  It was not a good event.

22   Q    So in your mind, is this one way race became an explicit

23   issue in the 2014 school board elections?

24   A    I believe so.

25   Q    So returning to FFNEA endorsements in the 2014 campaign,

1  did the people that you endorsed, that the FFNEA endorsed --

2  Mr. Chabot, Mr. Morris, and Mr. Savala -- receive the usual

3  benefits of FFNEA endorsement that year?

4  A    Yes, they did.

5  Q    Do you recall there being a 2013 school board election in

6  the Ferguson-Florissant School District?

7  A    Yes, there was.

8  Q    So if you'll look at the screen.  I've put up Plaintiffs'

9  Exhibit 10, which has been previously marked and admitted.

10  These are the official election results from the 2013

11  Ferguson-Florissant School District election.  Looking at

12  those results, do you recall how many seats were up for vote

13  in that election?

14  A    Two.

15  Q    In looking at the election results, who were the

16  candidates that year?

17  A    Charles (Chuck) Henson, Leslie Susan Hogshead, Keith A.

18  Brown, Larry Thomas.

19  Q    Do you recall which candidates sought FFNEA endorsement

20  that year?

21  A    Leslie Hogshead, Keith Brown.  I'm not sure if Chuck

22  Henson sought for endorsement.  He may have, but I'm not sure.

23  Q    Do you remember whom the FFNEA endorsed that year?

24  A    Leslie Hogshead and Keith Brown.

25  Q    Did those candidates receive the usual benefits of FFNEA

1    endorsement?

2    A    Yes.

3    Q    If you'll turn to the screen again.  I'm putting up

4    Plaintiffs' Exhibit 9, which has been previously marked and

5    admitted.  These are the official election results from the

6    2012 Ferguson-Florissant School District election.  Looking at

7    those results, Mr. Green, how many seats were up for vote in

8    that election?

9    A    Two.

10   Q    How many candidates were there?

11   A    Three.

12   Q    Who were they?

13   A    Brian Scott Ebert, Paul Schroeder, and Barbara Morris.

14   Q    Do you remember whom the FFNEA endorsed that year?

15   A    Brian Scott Ebert.

16   Q    This is the last year I will go back to.  If you'll turn

17   to the screen, I'm putting up Plaintiffs' Exhibit 8, which has

18   been previously marked and admitted.  These are the official

19   election results from the 2011 Ferguson-Florissant School

20   District election.  Looking at those results, how many seats

21   were up for vote in that election?

22   A    Three.

23   Q    How many candidates ran for those three seats?

24   A    Nine.

25   Q    Who were the candidates?

1  A    Doris Ann Graham, Vanessa Hawkins, Brian Scott Ebert, Leo

2  [sic] Lentz, Paul Morris, Joseph Hosea, Robert Chabot, Chris

3  Martinez, James Clark.

4  Q    Do you recall who sought FFNEA endorsement in the 2011

5  election?

6  A    I'm not sure how many were sent out.  I'm not sure if

7  they sent any out.  I know we endorsed three candidates.  I am

8  not sure if they all sought endorsement.

9  Q    Can you name any that you know sought endorsement?

10 A    Brian Scott Ebert, Paul Morris, Joseph Hosea, Robert

11 Chabot, Chris Martinez.

12 Q    So you're not sure --

13 A    And I cannot recall any of the others.  I was not on that

14 committee, but those people, I know, came to an exec board

15 meeting, and we spoke to them.

16 Q    Okay.  Just a second.  In returning to the 2012

17 election -- and you testified previously that the candidates

18 were Brian Scott Ebert, Paul Schroeder, and Barbara Morris.

19 Do you recall who sought endorsement that year?  I don't think

20 I asked you.

21 A    Probably all three did.

22 Q    So back to the 2011 election, whose results are still up

23 on the screen, do you recall whom the FFNEA chose to endorse,

24 if anyone?

25 A    Brian Scott Ebert -- no, not Brian Scott Ebert.  I'm

1  sorry.  Paul Morris, Robert Chabot, Chris Martinez.

2  Q    If you recall, what is the race of Mr. Morris?

3  A    White.

4  Q    And Mr. Martinez?

5  A    I guess he's white with a Hispanic last name.

6  Q    And Mr. Chabot?

7  A    He's white.

8  Q    And if you recall, did Mr. Morris, Mr. Martinez, and Mr.

9  Chabot receive the usual benefits of FFNEA endorsement that

10 year?

11 A    Yes, they did.

12 Q    Do you recall whether those candidates were successful in

13 being elected to the school board?

14 A    Yes, they were.

15 Q    Do almost all candidates apply for FFNEA endorsement, in

16 your experience?

17 A    I know they are invited.  Whether they accept the

18 invitation or not, I can't say.

19 Q    Has the FFNEA ever endorsed, to your knowledge, an

20 African-American candidate who has then gone on to be

21 successfully elected?

22 A    Not from my time of activity, but I'm sure that probably

23 Doris Graham has been.

24 Q    Do the FFNEA and its parent organization, the NEA, have a

25 long record of trying to narrow the racial achievement gap and

1     raise awareness about racial discrimination in education?

2     A     The union, yes, they do.

3     Q     And as an NEA member, do you think it's important to have

4     a racially diverse school board?

5     A     Yes, I do.

6     Q     So would it concern you if there were an all-white school

7     board in the Ferguson-Florissant School District given the

8     school population?

9     A     The current school population? Yes.

10     Q     As far as you know, as an employee of Ferguson-Florissant

11     and a member of the FFNEA, have there ever been more than two

12     African-American school board members at the same time?

13     A     More than two? No.

14     Q     Are you aware of there being any historical

15     discrimination against African Americans in Missouri?

16     A     Yes.

17     Q     And what about in St. Louis County?

18     A     Oh, yes.

19     Q     You testified earlier, I think, that you live in

20     Riverview Gardens, which is the school district adjacent to

21     Ferguson-Florissant. Is that correct?

22     A     Give or take a small municipality or something like that,

23     yes. Pretty -- relatively close, yes.

24     Q     Nearby. And you also testified that you work at

25     Johnson-Wabash and Walnut Grove elementary schools in the

1  district?

2  A    Those are my two schools, yes.

3  Q    So you know people who live in Ferguson-Florissant School

4  District?

5  A    Yes, I do.

6  Q    And you know students who attend school there?

7  A    Yes, I do.

8  Q    Based on your knowledge and your observation, are there

9  ever outside visitors like government officials who come to

10  the schools in the district?

11  A    Yes, they do, uh-huh.

12  Q    Do they visit all the schools within the district?

13  A    Not that I know of.  I don't think so.  Usually if a

14  state or government official comes to the district, most

15  likely they were invited by that particular school.  If

16  someone's coming to see someone at the administration center,

17  for the most part, just because they're coming to Ferg-Flor

18  then they may see a few schools, but they don't see all

19  schools, no.

20  Q    Where is the administrative center located?

21  A    Administration center's located at 1055 Waterford Drive

22  in Florissant -- Florissant, Missouri, yes.

23  Q    Is that in the north part or the south part of the

24  district?

25  A    It's the north part of the district.

1   Q    Based on your personal experience and your personal

2   knowledge, do you think that African Americans in the

3   Ferguson-Florissant School District today suffer in any way

4   from the effects of past or ongoing discrimination?

5   A    Yes.

6   Q    Can you describe some ways in which you think the effects

7   of past and ongoing discrimination affect African Americans

8   within the school district?

9   A    For years there's always been a difference of the north-

10  and south-side areas of the district, especially in the

11  Ferguson area, which is on the south side of the district.

12  There is no secret that there are differences there and things

13  like, you know, being stopped by the police.  I think even

14  socioeconomically there are differences between those two

15  areas of the district.

16       And for a long time the African-American population

17  lives -- a huge part of the African-American population of the

18  district live on the south side, and it's always -- I think

19  it's just been always a part of that make-up of that area.

20  For a long time, if you speak to people in the district or at

21  least some of the people that work there and have worked there

22  for a while, they will tell you about almost a "have and have

23  not" type of situation.

24       It's getting better, but there's still that dividing

25  line where, well, you know, we're in the south side; we have

1  to work harder.  And it's been that way.  It's getting better,

2  but that's how it's been.

3  Q    And when you say "dividing line," is there a geographic

4  feature that you can --

5  A    Usually they say it's Highway 270.

6  Q    And do those effects that you just described -- does that

7  in any way affect schooling or education within the district?

8  A    I don't think it does, per se, but there is that

9  socioeconomic divide.  There's that perception that the north

10 side, because of where they're located and where the

11 administration center is located, they just feel that that

12 area is -- certain advantages, I would say.

13 Q    Do you recall the shooting death of Michael Brown and the

14 demonstrations that followed thereafter?

15 A    Yes, I do.

16 Q    What effect, if any, do you think those events had on the

17 Ferguson-Florissant School District?

18 A    I think it had a tremendous effect on the district.  We

19 have kids that lived in that area.  The riots and the protests

20 that came through scared a lot of people and worried a lot of

21 people, and we didn't know how far they would go.  We also

22 were worried due to the fact that police headquarters -- the

23 Ferguson police headquarters is basically across the street

24 from one of our schools.  City hall is two doors down from one

25 of our schools.  We have, within probably a 2-, 3-mile radius,

1  eight schools.  And it was very stressful.  Very stressful.

2  Q    Did the district ever cancel school in the aftermath of

3  the shooting?

4  A    Yes, we did.  For a week.

5  Q    Are you aware that after the shooting the Department of

6  Justice made a civil rights investigation into the City of

7  Ferguson?

8  A    Yes.

9  Q    Did the NEA make a statement about that investigation?

10 A    Yes.

11 Q    So if you'll turn to your binder or the screen, whichever

12 is more convenient for you, putting up Plaintiffs' Exhibit

13 112, which is a press release from the NEA website, can you

14 read the title and the date of that press release?

15 A    "NEA Applauds Justice Department's Civil Rights

16 Investigation into Ferguson."  September 4, 2014.

17 Q    And have you read this press release?

18 A    Yes, I have.

19 Q    And did the press release come out while you were

20 president of the Ferguson-Florissant NEA?

21 A    Yes, it did.

22 Q    Do you agree with the NEA statement?

23 A    Yes, I do.

24 Q    You've read the statement in its entirety?

25 A    Yes, I have.

1  Q    So in your experience as a staff member at

2  Ferguson-Florissant School District, are you aware of the

3  school board recommending use of any of the evidence-based

4  strategies for reducing discipline problems and disparities

5  that the NEA references in this press release?

6  A    I would say that they're trying.  There's still a lot of

7  work that needs to be done.

8  Q    When you say "they're trying," do you know what efforts

9  have been made?

10  A    Discipline is a huge issue in the Ferguson-Florissant

11  School District; so the board and the administration are

12  working out ways and trying to deal with it.  Unfortunately,

13  not all schools use the same method.  Hopefully, one day they

14  will.  But, you know, that's where issues can rise, yes.

15  Q    Are you testifying -- is this correct if I say that

16  you're testifying that discipline policies are set mostly on a

17  school-to-school basis?  Is that what you're saying?

18  A    For the most part, yes, uh-huh.

19  Q    Are you familiar with the term "achievement gap"?

20  A    Yes, I am.

21  Q    Are you aware that there are achievement gaps in the

22  Ferguson-Florissant School District between African-American

23  students and white students?

24  A    Yes, I do.

25  Q    And are you aware that there is a disparate use of school

1  discipline by race in the Ferguson-Florissant School District?

2  A    I've heard that, yes.

3  Q    In your experience, would the Ferguson-Florissant NEA

4  endorse a candidate who is unaware of the achievement gap?

5  A    No, we would not.

6  Q    And has it been one of the questions that you've asked

7  candidates before?

8  A    That I cannot answer.

9  Q    Do you think that the African-American community in the

10  Ferguson-Florissant School District has special needs or

11  concerns?

12  A    Yes, I believe so.

13  Q    And what about in education specifically?

14  A    I believe so.

15  Q    Could you provide an example of what, in your view, one

16  of those concerns might be?

17  A    The ability to have resources at home for their students,

18  the ability to be home for their students.  I'm sure people

19  have to work, and I know it's tough, and it may even happen on

20  both sides of the spectrum -- I'm sure that there are white

21  parents that work and may not have the ability to take care or

22  help their children, but in the African-American community I

23  think that's a huge problem.  That and lack of resources.

24  Q    So based on your observation and your experience, is

25  there a difference in the racial make-up of the student body

1   versus the racial make-up of the administrators and teachers

2   and support personnel within the district?

3   A    Yes.

4   Q    Would the -- strike that.  Would the FFNEA endorse a

5   candidate who does not acknowledge the special needs and

6   concerns of the African-American community?

7   A    No, we would not.

8        MS. STEFFAN:  That's all I have for now, Your Honor.

9   Oh, wait.  Give me one second, please.

10       THE COURT:  Apparently, that's not all.

11       MS. STEFFAN:  We would move to admit Plaintiffs'

12  Exhibit 112.

13       THE COURT:  What is 112?

14       MS. STEFFAN:  The NEA press release after the --

15       THE COURT:  Any objection to 112?

16       MS. ORMSBY:  Your Honor, we stipulated to its

17  authenticity, but we objected that it's not relevant specific

18  to the Ferguson-Florissant School District.

19       THE COURT:  I'll receive it subject to argument later

20  as to its effect.

21       MS. STEFFAN:  Thank you, Your Honor.

22       THE COURT:  Any cross-examination?

23       MS. ORMSBY:  Yes, Your Honor.

24                       **CROSS-EXAMINATION**

25  **BY MS. ORMSBY:**

1  Q    Good afternoon Dr. Green -- I mean Mr. Green.  How are

2  you?  I just gave you a degree.

3          THE COURT:  A promotion.

4  A    Yeah.  Wow.  Can I get a raise?

5  Q    I think that's a raise on the pay scale if you're a

6  doctor, isn't it?

7          THE COURT:  Well, you probably have enough people

8  here to vote for a raise.

9  A    Yes, I do.

10 Q    Does the FFNEA recruit people to run for

11 Ferguson-Florissant School Board?

12 A    Not as far as I know.  Not to my knowledge, we do not.

13 Q    I'm checking off the questions you've already answered;

14 so give me just a minute.  In the elections that the FFNEA

15 endorses, does it always endorse the same number of candidates

16 as there are open seats?

17 A    Not necessarily.  We try to, but there is one year where

18 we did not.

19 Q    The year that you only endorsed --

20 A    One candidate.

21 Q    One candidate.  Okay.  And I'm going to have pulled up on

22 the screen Exhibit -- Plaintiffs' Exhibit N -- I mean

23 Defendants' Exhibit MM.  This letter is addressed to Courtney

24 Graves, who was a candidate in last April's election.  But is

25 this the form letter that goes to all candidates after they've

1    filed for election?

2    A    Yes.

3    Q    And that letter goes out after filing has closed?

4    A    Yes.

5    Q    And does every candidate get a letter similar to this?

6    A    Yes.

7    Q    And in this letter it says "The FFNEA invites all

8    candidates to participate in a screening process or interview.

9    Please find the enclosed interview questions for your preview"

10   at the end of the first paragraph.  Correct?

11   A    Yes.

12   Q    So along with this letter, they get a list of questions

13   that they're going to be asked?

14   A    Yes.

15   Q    And I'll ask that we pull up Defendants' Exhibit KK.  And

16   this is the -- well, tell me what this is.

17   A    This is our screener.  These are the lists of questions

18   that we ask each candidate that wants to interview for

19   endorsement.

20   Q    And could you peruse those questions.  It's two pages.

21   Is there a question regarding class size?

22   A    Yes, there is.

23   Q    Is there a question regarding achievement gap?

24   A    I do not see one.

25   Q    Is there a question regarding school discipline?

1   A    Yes.

2   Q    I would like to pull up now Defendants' Exhibit LL.  What

3   is this document?

4   A    This looks like a copy of school board candidate

5   interview questions.

6   Q    For what year?

7   A    2015.

8   Q    Is there a question regarding class size?

9   A    Yes.

10  Q    Is there a question regarding the achievement gap?

11  A    I do not see one.

12  Q    Is there a question regarding discipline?

13  A    Yes, there is.

14  Q    Thank you.  And you testified earlier that these are the

15  only questions that are asked of candidates when they come in

16  to interview.  Is that right?

17  A    Yes.

18  Q    You testified previously about the racial make-up of the

19  interview committee.

20  A    Yes.

21  Q    And you said that every attempt is made to make it

22  racially diverse?

23  A    Yes.

24  Q    How so?  Equal?  Close to equal?  What is your definition

25  of racial --

1  A    Well, we have seven people; so we try to make it as close

2  to equal as possible.  We try to get hopefully four-three,

3  three-four.

4  Q    Okay.  And is that the same with gender as well?

5  A    Yes.  But, unfortunately, it's kind of tough when we only

6  have two men on the exec board.  So sometimes we may have to

7  find someone -- we may have to find someone outside of the

8  exec board to volunteer and hopefully that it's a male.

9  Q    Why is it important that the committee be racially

10  diverse?

11  A    So that there are no questions at the end.  No one can

12  say, "Well, I did not get endorsed because I'm African

13  American and there was an all-white interview committee," or

14  vice versa.

15  Q  Do you believe that race is ever a factor in who the

16  FFNEA endorses for school board?

17  A    No.

18  Q  Do you believe the questions that we looked at, just

19  looked at, represent the subjects that are important to the

20  FFNEA at the time of the elections?

21  A    Yes.

22  Q  Do you believe these questions determine, in your mind,

23  whether or not a candidate is teacher friendly?

24  A    Yes.

25  Q  And do the responses to these questions determine who you

1  endorse?

2  A    Yes.

3  Q    And I think you testified earlier that, while all

4  candidates are invited to be interviewed for endorsement, that

5  sometimes not all candidates take you up on that offer?

6  A    Correct.

7  Q    Once a candidate is endorsed by the FFNEA, does the FFNEA

8  take over their campaign and run their campaign for them?

9  A    No.

10 Q    Does the FFNEA tell a candidate what to do or not do as

11 far as their campaign goes?

12 A    No.

13 Q    So if an incumbent is running for reelection, are they --

14 do they have to follow the same process where they get the

15 letter, come to an interview, answer your questions?

16 A    Yes.

17 Q    They're not given any special consideration?

18 A    No.

19 Q    Does the FFNEA consider an incumbent board member's

20 performance as a board member when deciding on whether or not

21 to endorse him or her?

22 A    Yes.

23 Q    Was there a time when the FFNEA decided not to endorse

24 any of the incumbents on the board?

25 A    Yes.

1    Q    Was that in 2011?

2    A    Yes.

3    Q    Who were the incumbents in 2011?

4    A    Doris Graham, Les Lentz, James Clark.

5    Q    Why did the FFNEA decide not to endorse any of those

6    three candidates?

7    A    There were a few factors.  One of the largest was giving

8    the superintendent at the time lifetime benefits for him and

9    his family.  There was another time where the president of the

10   board, who was Les Lentz at the time, was overheard during

11   negotiations threatening to lock us out.

12          And there was a time where during negotiations it

13   was -- that was a real struggle that year, and when there was

14   no budge on pay raises or pay increases, it was said that some

15   board members smirked, saying it -- they didn't think that it

16   was professional.  So that was probably the final straw.  And

17   we decided then and there, when we talked to our executive

18   committee, that it was time for a change.

19   Q    Did those three board members who were incumbents vote

20   for or against the pay raise?

21   A    They did not vote for the pay raise.

22   Q    So when the FFNEA decided not to endorse Dr. Graham in

23   2011, was it because of her race?

24   A    No.

25   Q    And when they didn't endorse the two white male

1  incumbents, was it because of their race?

2  A    No.

3  Q    How long had Dr. Graham served on the board prior to

4  2011?

5  A    Oh, probably 25 years.

6  Q    And do you know whether the FFNEA had endorsed her in

7  previous elections?

8  A    I can't say for sure, but she's been on a long time.  I'm

9  sure she had to have been.

10  Q    Okay.  So let's move on to the 2012 election.  Paul

11  Schroeder was the only incumbent running for reelection that

12  year; is that correct?

13  A    Yes.

14  Q    Did the FFNEA endorse him that year?

15  A    I have to take a look back.  I can't remember.

16  Q    Sure.  Can I direct him?  What exhibit is it?

17  A    Yeah, I'm sorry.  Now, your question was is he the only

18  incumbent that was endorsed?

19  Q    He was -- was he endorsed that year?

20  A    I believe he was, yes.

21  Q    You believe that Mr. Schroeder was endorsed in 2012?

22        THE COURT:  Actually, your question was whether he

23  was the only incumbent running for reelection.

24  Q    Thank you.  Was he the only incumbent running for

25  recollection?

1         I'm glad you're keeping track, Your Honor.

2    A    Yes, he was.

3    Q    Was he endorsed?

4    A    He was not endorsed that year.

5    Q    And Mr. Schroeder is white?

6    A    Yes.

7    Q    And do you know why they didn't endorse Mr. Schroeder

8    that year?

9    A    During his time on the board, it felt that his objectives

10   were no longer teacher friendly as far as the FFNEA was

11   concerned.

12   Q    And then in 2013 I believe that Leslie Hogshead and Chuck

13   Henson were the incumbents running for reelection?

14   A    Yes.

15   Q    Did the FFNEA endorse either of those candidates?

16   A    Leslie Hogshead.

17   Q    And you don't remember whether or not Mr. Henson even

18   applied for an endorsement that year?

19   A    I'm not sure.  I cannot recall if he did or not.

20   Q    And why did the FFNEA decide to endorse Ms. Hogshead?

21   A    She made it clear that she has always been on the side of

22   FFNEA.  She has said publicly that she was one of the -- if

23   not the only person that did vote for raises for teachers, and

24   I'm assuming that she did a great job on the interview.

25   Q    Did the reason that the FFNEA -- assuming Mr. Henson --

1  we don't even know if -- you don't remember if he even applied

2  for endorsement.

3  A    I do not.

4  Q    Let's move now to 2014.  The incumbents were who?

5  A    Rob Chabot, Paul Morris.

6  Q    And Ms. Martinez decided not to run for -- Mr. Martinez

7  decided not to run for reelection that year?

8  A    Yes.

9  Q    So there were only two incumbents and three seats?

10  A    Yes.

11  Q    And you stated earlier that the FFNEA endorsed Mr.

12  Morris, Mr. Chabot, and Mr. Savala?

13  A    Yes.

14  Q    What race is Mr. Savala?

15  A    African American.

16  Q    Was the FFNEA pleased with the job that Mr. Morris and

17  Mr. Chabot had done while they had been on the board?

18  A    I would say that the FFNEA has -- me speaking personally,

19  I can't say that, as an individual.

20  Q    As an individual.  But did the committee --

21  A    But the committee did, yes.

22  Q    And that was -- probably their endorsement was during the

23  Art McCoy situation.

24  A    Yes.

25  Q    Do you remember why the FFNEA chose not to endorse F.

1  Willis Johnson?

2  A    Yes.  He didn't think that class size mattered.

3  Q    And that was an issue for the FFNEA?

4  A    That was a huge issue for the FFNEA.

5  Q    And what race is Mr. Johnson?

6  A    African American.

7  Q    So your decision not to endorse him had nothing to do

8  with race?

9  A    No.

10  Q    What about Dr. Thurman?  Why didn't the FFNEA endorse

11  her?

12  A    She was close, but we felt that she was far -- she had --

13  she was retired.  We felt that she was just a bit out of

14  what -- out of touch maybe on what the district -- what was

15  going on in the district.  We felt that her retirement -- she

16  wasn't in tune like she was when she was principal in the

17  district.

18  Q    So that brings us to 2015.  And who -- the only

19  incumbent, I believe you stated, was Mr. Ebert?

20  A    I'm sorry?  What was that again?

21  Q    Mr. Ebert was the only incumbent running?

22  A    Yes.

23  Q    Mr. Schroeder had decided not to run for reelection?

24  A    Correct.

25  Q    Who won that election?

1    A    Courtney Michelle Graves and Brian Scott Ebert.

2    Q    So FFNEA -- I think you guys testified you endorsed Mr.

3    Ebert and Mr. Hines?

4    A    Yes.

5    Q    Mr. Ebert won and Courtney Graves won?

6    A    Yes.

7    Q    What's the race of Dr. Graves?

8    A    African American.

9    Q    Did the FFNEA do anything for Mr. Ebert that it did not

10    do for Mr. Hines?

11    A    No. They were both treated equally.

12    Q    Do you believe the school board advocates for

13    African-American and white children equally?

14    A    I would like to think so, yes.

15    Q    Have you ever become aware of a situation where the board

16    treated African-American students unfairly?

17    A    No.

18    Q    I think you testified earlier that discipline is a huge

19    concern.

20    A    It is.

21    Q    So do you think it's appropriate for school board

22    candidates to discuss discipline in their campaigns?

23    A    It was one of the things that originally got Paul Morris

24    elected. That was his format.

25    Q    And that was popular with the FFNEA?

1    A    Yes, it was.  He was an ex-teacher.

2    Q    Is it your experience over the years that different

3    candidates put different levels of effort into their

4    campaigns?

5    A    Yes.

6    Q    And do you believe that the level of effort affects how

7    well they do in the election?

8    A    I believe it does.

9    Q    Do you believe the school board acted appropriately in

10   response to the Michael Brown situation?

11   A    That's a good question.  I believe that they did.  I

12   believe so.  I believe for that time, at that particular time,

13   at that moment, that they did what they could or they did what

14   they could to help ensure the safety of the children, which is

15   very important.

16   Q    Did the board do anything specific to assist both

17   employees and students during that time?

18   A    I'm sure they did.

19   Q    Did they provide counseling?

20   A    Yes, they did.

21   Q    Who did they provide counseling for?

22   A    Teachers and students, staff and students.

23   Q    Did the board allow high school students to express their

24   feelings?

25   A    Yes, they did.

1    Q    How did they do that?

2    A    One day the students were allowed to march, and the high

3    school students took advantage of it and marched.  Peacefully.

4    Q    That didn't happen in every school district, did it?

5    A    I don't think it did.

6    Q    Do you believe that any discrimination that may be felt

7    by African Americans in the Ferguson-Florissant School

8    District is any worse than any other places in St. Louis

9    County?

10   A    I don't think so.

11   Q    Do you believe that the achievement gap for students is

12   worse in the Ferguson-Florissant School District than anywhere

13   else?

14        MS. STEFFAN:  Your Honor, we would object on

15   foundation.

16        THE COURT:  This is stuff you explored.  You asked

17   his opinion about things; so I'm going to give her latitude.

18        MS. STEFFAN:  Your Honor, we asked about his opinion

19   in the district in which he's employed, not in other districts

20   that he might not have knowledge of.

21        THE COURT:  Overruled.

22   Q    Do you want me to repeat the question?

23   A    Yes, please.

24   Q    Do you believe the achievement gap for students is worse

25   in the Ferguson-Florissant than anywhere else?

1    A    I don't think so.

2    Q    Do you believe the Ferguson-Florissant board is trying to

3    make sure that every child has a fair and equal chance at a

4    good education?

5    A    Yes.

6    Q    Do you believe the Ferguson-Florissant School Board is

7    doing its best to include everyone?

8    A    Yes.

9    Q    Do you believe the Ferguson-Florissant board is doing a

10   good job of hiring more minority teachers?

11   A    I believe they're doing a good job trying to find good

12   teachers.  I can't say for sure -- it's something that comes

13   up, but I can't say for sure if that's their central focus.  I

14   can't -- that I can't say.  I don't know.

15   Q    Have you noticed that there are more or less minority

16   teachers being hired?

17   A    Based on the schools where I am and from what I've seen,

18   I can say yes there, but I cannot speak for the total

19   district.

20   Q    I wouldn't want you to if you don't know.  Do you believe

21   the board acted in a racist way when it came to the situation

22   with Dr. McCoy and his eventual decision to resign?

23   A    Knowing what I know, if I didn't have privy to certain

24   things, I could say yes.  But knowing what I know, it's tough

25   to say probably not, but that's because I'm privy to certain

1  things that I can't speak on.

2  Q    But your personal belief?

3  A    My personal belief was no.

4  Q    That they did not act in a racist way?

5  A    No.

6  Q    So currently board elections are in April, right?

7  A    Yes.

8  Q    Do you know why board elections are held in April?

9  A    Well, they want to get the new board member acclimated

10  because July starts our fiscal year, and that's when our

11  school year starts as well.  So if you can get a board member

12  in in April, by the time July rolls around that board member

13  is somewhat prepared to handle the school year.

14  Q    Do you think that's an advantage over having an election

15  in November?

16  A    Yes.

17  Q    So the FFNEA has endorsed two African-American candidates

18  in the past two years -- Mr. Savala and Mr. Hines -- that did

19  not win their elections.  Correct?

20  A    Yes.

21  Q    And Dr. Graves and Dr. Thurman, both African Americans,

22  were not endorsed by the FFNEA, and they did win their

23  elections, right?

24  A    Yes.

25  Q    Why do you think that is?

1  A    I believe that they got a tremendous amount of support.

2  They were probably two people that were well known in their

3  communities, and those people came out and supported them.

4  Q    Did they work hard?

5  A    I'm sure they did.

6  Q    What do you think the effect of hiring Dr. Davis as a new

7  superintendent is on the district?

8  A    I think it's a tremendous effect.  I think it's a

9  positive effect.  The people -- the shareholders,

10  stockholders, the public, the population of the district, I

11  think, are pleased with the board's decision on the new

12  superintendent.  I've met him a few times, and I think he's

13  got some good ideas.  I like him.  I think that we've started

14  a positive path.  I think we're going to be headed in the

15  right direction.

16  Q    I just have a couple more questions.  You were shown a

17  letter or a press release or a statement that was issued by

18  NEA?

19  A    Yes.

20  Q    That's the national organization, correct?

21  A    Yes, it is.

22  Q    Did you have any input into that statement?

23  A    No, I did not.

24  Q    Did they talk to you about it beforehand?

25  A    No, they did not.

1   Q    Did you know about it before it came out?

2   A    No, I did not.

3   Q    And who put together those discipline tools?  Was it

4 something that was created within the school district, or was

5 it something from the national level?

6   A    If it came from this, it's from probably on the national

7 level.

8   Q    And you're not aware that they discussed that with the

9 FFNEA prior to issuing that?

10   A    No, they did not.  I was president at that time.

11         MS. ORMSBY:  I have no further questions.  Thank you.

12         THE COURT:  Any redirect?

13         MS. STEFFAN:  Yes, Your Honor.

14         THE COURT:  You may proceed.

15                 **REDIRECT EXAMINATION**

16 **BY MS. STEFFAN:**

17   Q    Mr. Green, if you can turn to your binder again to

18 Defendants' Exhibit KK, I believe.  You testified that you saw

19 a question there about class size.

20   A    There it is.  Yes.

21   Q    Do you know when that question regarding class size was

22 added to the screener?

23   A    No, I do not.

24   Q    Is it possible it was added that year?

25   A    It's possible.  It could have been there earlier, but

1    it's possible that it could have been added that year, yes.

2    Q    And you testified previously, both on direct and on

3    cross, that the FFNEA endorsed in 2013 Mr. Keith Brown and Ms.

4    Leslie Hogshead; is that right?

5    A    Yes.

6    Q    If you know, was Ms. Hogshead an incumbent in 2013?

7    A    She probably was.  I don't recall her.  I'm not sure if

8    she was off at any time.  So my assumption was she was

9    probably an incumbent at that time.

10   Q    She had previously been on the school board before 2013?

11   If you know.

12   A    As far as I know, she had been, yes.

13   Q    Okay.  Do you know whether in 2010 she voted for the

14   superintendent's health insurance policy?

15   A    She probably did, but I can't recall that.

16   Q    Were you at the endorsement committee interviews in 2013?

17   So that would have been during the 2012 to 2013 school year.

18   A    No, I was not.

19   Q    I'm going to ask you a couple questions about the 2014

20   election.

21   A    Okay.

22   Q    The results are Plaintiffs' Exhibit 11.  And if you could

23   repeat, do you recall who the FFNEA endorsed in 2014?

24   A    Rob Chabot, Paul Morris, James A. Savala.

25   Q    Now, asking you personally, did you agree with all three

1    of those endorsements?

2    A    No, I did not.

3    Q    Whose endorsement did you disagree with, if anyone's?

4    A    Do I have to say?  I mean, it doesn't matter.

5    Q    Let me just ask this.  Did any of those three candidates

6    play any leadership role in the Missouri NEA or in the

7    Ferguson-Florissant NEA at any time that you recall?

8    A    Yes.

9    Q    Which candidate played a leadership role in either MNEA

10   or FFNEA?

11   A    Oh, I'm sorry.  Did you say NEA?  Can you repeat that

12   question before --

13   Q    Sure.  Those three candidates that you just named -- Mr.

14   Chabot, Mr. Morris, and Mr. Savala -- has any of them played

15   any leadership role in either the Missouri NEA or the

16   Ferguson-Florissant NEA at any time that you recall?

17   A    Before they became board members?

18   Q    Yeah.

19   A    Yes.

20   Q    And which candidate played a leadership role?

21   A    Paul Morris.

22   Q    What was his role, if you recall?

23   A    He was -- I think at one point he was PAC chair.  I know

24   that he was at the time -- he may have been a state or local

25   rep in our state functions, and he was also a state rep or

1    local rep that went to the national -- went to one of the

2    national conventions in San Diego.

3    Q    And you testified on cross that Mr. Morris is an

4    ex-teacher; is that right?

5    A    Yes, he is.

6    Q    Do you know when he retired or left teaching, how long

7    ago it was?

8    A    Let's see, he ran in -- I would say probably 2012 or

9    2013, somewhere around that time.

10   Q    You testified earlier that you thought race was a

11   divisive issue in the 2014 election; is that correct?

12   A    Yes.

13   Q    In your view, is race still an issue in the district, or

14   is it disappeared completely?

15   A    It's not -- I don't think it's as divisive as it was the

16   last two years.  I think the hiring of Dr. Davis has helped

17   ease some things.  I think that eased things greatly.  We've

18   kind of now got -- we've gotten the Michael Brown thing

19   somewhat behind us now.  I think that kind of eased some

20   things.  I think the last election hiring aldermen or

21   representatives in Ferguson may have eased some things.  So I

22   don't think it's as volatile as it was two years ago or maybe

23   even last year.

24            MS. STEFFAN:  Okay.  That's all I have, Your Honor.

25            THE COURT:  Thank you.  We kind of bounced back and

1   forth here because obviously you both are getting something

2   out of this.  I'm not sure where it's going to take us.  Do

3   you have any --

4           MS. ORMSBY:  I just really have one, and it's to

5   clear up the record.

6           THE COURT:  I'll hold you to it.

7                        **RECROSS-EXAMINATION**

8   **BY MS. ORMSBY:**

9   Q    You said that Mr. Morris retired 2012, but he ran for

10  election in 2011 the first time, didn't he?

11  A    Then he retired in 2010.

12  Q    Thanks.  I just wanted the record to be clear.

13  A    I was trying to look back to find out that first year.

14  I'm sorry.  It was 2011 when he ran.  So it was like 2010.

15          MS. ORMSBY:  Thank you.

16          MR. ROTHERT:  We'll stipulate that that's true.

17          THE COURT:  Apparently, it's true.

18          Thank you, sir.  You may step down.

19          We'll take a quick ten-minute recess.  We've been

20  going an hour and a half.  We'll reconvene at 12:10.

21          **(COURT RECESSED FROM 12:00 PM UNTIL 12:15 PM.)**

22          THE COURT:  If you would call your next witness.

23          MS. WILCOX:  Plaintiffs call F. Willis Johnson.

24          THE COURT:  If you would step forward, sir, and be

25  sworn.

1    **(WITNESS SWORN BY THE CLERK.)**

2         THE COURT:  You may proceed.

3              **F. WILLIS JOHNSON, JR.**

4    **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

5    **FOLLOWS:**

6              **DIRECT EXAMINATION**

7    **BY MS. WILCOX:**

8    Q    Thank you.  Could you please state your name for the

9    record?

10   A    F. Willis Johnson, Jr.

11   Q    And, Dr. Johnson, you have a document that has previously

12   been marked as Plaintiffs' Exhibit 118.  Do you recognize this

13   document?

14   A    Yes, ma'am.

15   Q    And what is it?

16   A    It is a declaration of F. Willis Johnson.

17   Q    Have you recently had an opportunity to review the

18   statements in this declaration?

19   A    Yes, ma'am.

20   Q    Okay.  And are each of the statements true?

21   A    Yes, ma'am.

22         MS. WILCOX:  Your Honor, we'd move to admit

23   Plaintiffs' Exhibit 118.

24         THE COURT:  Any objection?

25         MS. ORMSBY:  No objection.

1    THE COURT:  Received without objection.

2    Q    (BY MS. WILCOX) Dr. Johnson, what do you do for a living?

3    A    I'm the senior minister at Wellspring Church at Ferguson.

4    Q    Is your church within the Ferguson-Florissant School

5    District?

6    A    Yes, ma'am.

7    Q    How long have you been at Wellspring Church?

8    A    Five years.

9    Q    Dr. Johnson, what's your educational background?

10   A    I have undergrad degree, Bachelor's of Science in

11   secondary education with a minor in journalism.  I have a

12   master's degree in divinity from Christian Theological

13   Seminary in Indianapolis, Indiana.  My undergrad is from

14   Butler University in Indianapolis.  And my doctoral work was

15   successfully completed at United Theological Seminary.  I have

16   a doctorate in ministry.

17   Q    And do you have any experience in the field of education?

18   A    Yes, ma'am.

19   Q    Could you please describe that experience?

20   A    I have served in educational space as a consultant and

21   educator in schools across various places in the country.

22   I've consulted specifically in area of curriculum and

23   programming.  I have served not -- as a nonprofit with

24   nonprofit organizations that have worked closely with schools

25   in developing youth development and instructional materials.

1    Also served as a legislative assistant specific to the

2    Education Commission for the Indiana State Legislature.  I

3    worked for a governor and a former mayor who's now a sitting

4    congressman.

5    Q    Are you currently an adjunct professor?

6    A    Oh, yes.  I am an adjunct at Eden Seminary and do work at

7    United Theological Seminary in Dayton.

8    Q    Have you worked with any schools in the

9    Ferguson-Florissant School District?

10   A    Yes, ma'am.

11   Q    Could you please describe some of that work?

12   A    We have a school partnership with Central Elementary

13   School, which is a neighboring institution to our physical

14   space.  We serve -- have served in volunteer roles both there,

15   McCluer High School, and other schools in the

16   Ferguson-Florissant, and even other surrounding school

17   districts.  Specifically with Central, in addition to what

18   we've done, we serve as their partner in case of emergencies.

19   The school has identified us as their safe zone for that with

20   the district.

21   Q    When you say "we" and "us," are you referring to

22   Wellspring Church?

23   A    Yes, ma'am.

24   Q    And where do you live?

25   A    I live in Ferguson.  404 Harrison Avenue.

1  Q     How long have you lived in Ferguson, Missouri?

2  A     Five years.

3  Q     Could you describe the racial make-up of the neighborhood

4  where you live?

5  A     It's a diverse body.  We have a number of -- a number of

6  mixed-race couples, but Hispanic, Latino population, a number

7  of African Americans, and those who self-identify as kind of

8  Afro Caribbean.

9  Q     Would you say that your neighborhood is a majority one

10  race or another?

11  A     Well, there's majority persons of color, yes.

12  Q     What school district do you live in?

13  A     Our feeder school elementary-wise is Central.

14  Q     Is that in the Ferguson-Florissant School District?

15  A     Yes, ma'am.  I'm sorry.

16  Q     Are you a registered voter in the Ferguson-Florissant

17  School District?

18  A     Yes, ma'am.  I am.

19  Q     Have you ever run for election to the Ferguson-Florissant

20  School Board?

21  A     Yes, ma'am.  I have.

22  Q     When was that?

23  A     April 2014.

24  Q     Could you explain why you decided to run for election in

25  2014?

1 A     Well, after spending time in the community, participating

2 and engaging around not only young people but parents,

3 obviously we have parishioners, persons in the community

4 engaged in our work, hearing their concerns, seeing various

5 issues as a community participant.  Also by the encouragement

6 of others who perceive that I had some experience and some

7 noteworthiness to offer and being prayerful about it with my

8 family, I went after it.

9 Q     And you said there were issues.  Can you describe the

10 specific issues you believed were important when you ran for

11 election?

12 A     Well, in general, at the time of the district, obviously

13 issues around accreditation, issues around fiscal, financial

14 solvency, the life of the district was important.  There was

15 obviously a concern around leadership, and it even heightened

16 over a period of time with various issues that were emerging

17 in the issue of transparency or people not so -- people not

18 only leading but being reflective of the larger constituency

19 of the district not only looking like the residents but also

20 sharing a number of the considerations, the concerns of people

21 particularly around the community in which I live, where our

22 schools were at and on the side of the district where we had,

23 and still have, a large number of struggling schools, that was

24 of importance.  And then the issue ultimately not only of

25 leadership and the diversity of leadership but the concerns

1    around treatment, management, empowerment of young people as

2    it relates to discipline.

3    Q    And when you say diversity of leadership and things like

4    looking like the residents, can you just further clarify what

5    you mean by that?

6    A    Well, you know, obviously the issue of ethnicity or race

7    in that reflection upon the board and its leadership was of

8    question but also understanding even some of the more -- maybe

9    even some more profound or subtle issues in the community,

10   whether that was persons who were newly emerging into the life

11   of the school district and the larger community, persons with

12   experiences that were different than others.

13            We have a strong transient population.  A community

14   that once historically was strong in homeownership and

15   longevity had -- it was beginning to transition.  Really

16   strong cultural concerns about what it meant to be an urban

17   educational system in these times were not strongly reflected,

18   in my opinion, and in the opinion of others.

19   Q    Did you campaign on these issues?

20   A    Yes, ma'am.  I did.

21   Q    And during your campaign, were you endorsed by any

22   organizations?

23   A    Yes, ma'am.  I was.

24   Q    What organizations were those?

25   A    Grade A for Change.

1   Q    Could you describe what Grade A for Change was?

2   A    Grade A for Change was a Political Action Committee that

3   organized to address and support candidates of their interest.

4   Q    Did Grade A for Change support candidates along with

5   yourself?

6   A    Yes, ma'am.

7   Q    And who were those candidates?

8   A    Dr. Donna Thurman and Brother James Savala.

9   Q    And are both of those individuals also African American?

10  A    Yes, ma'am.  They were -- they are.

11  Q    Did Grade A for Change have a press conference

12  introducing the candidates it was supporting?

13  A    Yes, ma'am.

14  Q    And in addition to Grade A for Change, did you have a

15  separate campaign?

16  A    Yes, ma'am.

17  Q    What was the name of your campaign?

18  A    "Lead Forward."

19  Q    Did you have your own campaign manager separate from

20  Grade A for Change?

21  A    Yes, ma'am.

22  Q    And who was that?

23  A    A young lady by the name of Nina Thompson.

24  Q    Did Grade A for Change sponsor events specifically for

25  you?

1    A    No.  They sponsored events for their candidates of their

2    interest.

3    Q    Did they give you advice on how to run your campaign?

4    A    No, ma'am.

5    Q    Did they supply you with any volunteers?

6    A    No, ma'am.

7    Q    Are you familiar with the FFNEA?

8    A    Yes, ma'am.

9    Q    And what is the FFNEA?

10   A    I believe they to be the local chapter of the national

11   teachers' union.

12   Q    Does that organization endorse candidates?

13   A    Yes, ma'am.  They do.

14   Q    Did you seek endorsement by the FFNEA?

15   A    Yes, ma'am.

16   Q    What steps did you take to seek that endorsement?

17   A    They had an open questionnaire, candidate questionnaire,

18   and then a follow-up of an interview.

19   Q    So you recall a question on the questionnaire that

20   related to classroom size?

21   A    Yes, ma'am.

22   Q    Do you recall how you answered that question?

23   A    Yes, ma'am.  I do.

24   Q    Could you please tell us what your answer was?

25   A    I shared in with respect to student ratio --

1  student-teacher ratios and their effect on student achievement

2  or how come -- I said that historically the scholarship, the

3  research around that across the years, has rendered itself

4  inconclusive on the quantitative impact of the effect of

5  ratios, student-teacher ratios.

6  Q    And despite the inconclusiveness, would you say that

7  student-teacher ratio was important to you?

8  A    Oh, yes.  Yes, ma'am.

9  Q    Were you endorsed by the FFNEA?

10  A    No, ma'am.  I was not.

11  Q    Do you know why you were not endorsed by the FFNEA?

12  A    No, ma'am.  I do not know.

13  Q    You were not given an explanation?

14  A    No, ma'am.

15  Q    Are you aware of specific criteria or objective standards

16  that it takes to receive an endorsement from the FFNEA?

17  A    No, ma'am.

18  Q    Did the FFNEA endorse any of the other candidates that

19  were on the slate for Grade A for Change?

20  A    Yes, ma'am.

21  Q    Who was that?

22  A    I believe Candidate Savala.

23  Q    Are you aware of any other African-American former board

24  candidates who sought endorsement but did not receive it?

25  A    Yes, ma'am.

1  Q    Who would that be?

2  A    Candidate Thurman.

3  Q    Do you believe that there are any benefits for candidates

4  associated with FFNEA endorsement?

5  A    Yes, ma'am.

6  Q    Could you describe those, please?

7  A    Well, it typically carries, obviously, whatever weight

8  that organization has and influence it has with its

9  memberships.  I do believe there's some resources that are

10  quite useful.  Some may be monetary.  But largely an

11  infrastructure and a kind of a system of support, particularly

12  around technology, that they're able to lend into the work of

13  their candidates of interest.

14  Q    Do you know what those sort of support mechanisms might

15  be?

16  A    Oh, at minimum, robocalls, maybe dollars, obviously a

17  cadre of volunteers and people particularly out of their

18  network, as well as whatever other internal leverages that

19  they -- I guess they see fit to offer.

20  Q    Are you familiar with North County Labor?

21  A    Yes.

22  Q    Did you seek endorsement from North County Labor?

23  A    No, ma'am.

24  Q    Could you just explain why you did not seek their

25  endorsement?

1   A    I believe that that was not an open process but that they

2   self-identified and invited potential candidates of interest.

3   Q    Okay.  Did you participate in candidate forums when you

4   ran for election?

5   A    Yes, ma'am.  I did.

6   Q    Could you describe some of the forums that you recall

7   participating in?

8   A    Participated in -- the school district itself offered up

9   opportunities specific to its constituency that I participated

10  in.  There were other regional forums, North County

11  Republicans and a couple other organizations, some of them

12  religious based and others more community oriented.

13  Q    What else did you do to promote your "Lead Forward"

14  campaign?

15  A    Bugged a lot of people.  Canvassed door to door, created

16  opportunities for meet and greet, had phone banking that was

17  organized and carried out.  We did some marketing within the

18  community, local publications also into the area businesses

19  that would display.  The usual grassroots effort, yard signs,

20  personal solicitation, and invitation by voters in the

21  district.

22  Q    And when you did phone banking, did you have a group of

23  people making those phone calls?

24  A    Yeah.  We had a small group.  Yeah.  It wasn't robocall

25  like some.

1    Q     Did you hand out fliers?

2    A     Yes, ma'am.  Handed out fliers.  Hung door hangers.

3    Dropped stuff on the ground on purpose.

4    Q     Did you campaign in all of the communities within the

5    Ferguson-Florissant School District?

6    A     Yes, ma'am.

7    Q     Do you believe that all of the candidates in 2014 had

8    access to the same campaign resources?

9    A     No.  No.

10   Q     Could you describe how some candidates may not have had

11   that same access?

12   A     Well, obviously, again there's -- I guess there's a

13   possibility for always to be some variance, but, I mean,

14   particularly as we said before, if you have a strong kind of

15   institution, organization, and particularly a kind of

16   machinery behind you, not every candidate individually could

17   have the use of that.  The ability to raise funds specifically

18   in the community might vary.  We had some candidates that --

19   representative of the constituency that we serve -- who were

20   immobile.  We had two candidates that used public

21   transportation.

22   Q     And --

23   A     And had -- I'm sorry.

24   Q     Please finish.

25   A     And had various demands in their personal life with work

1   and so forth; so . . .

2   Q    When you talk about the other resources, are you

3   referring to things similar maybe to what FFNEA could provide

4   to candidates who were endorsed?

5   A    Yes, ma'am.  Them and others.

6   Q    Do you know Dr. Art McCoy?

7   A    Yes, ma'am.

8   Q    How do you know him?

9   A    Our profession -- initially by professional connection

10  and interaction and subsequently over time spent together.

11  Q    Okay.  Are you familiar with his suspension from his

12  position as superintendent in November of 2013?

13  A    Yes, ma'am.

14  Q    And do you have an opinion regarding the board's

15  motivation to suspend Dr. McCoy?

16  A    Well, I'm sure and have heard that there were various

17  issues.  However, I do believe that his race played a part in

18  some of that decision making.

19  Q    Did the board at the time explain its decision to suspend

20  Dr. McCoy to the public?

21  A    No, ma'am.

22  Q    And how do you feel this lack of explanation -- how did

23  it make you feel as a member of the electorate that his

24  suspension was not explained to the public?

25  A    Well, obviously, I was concerned given the -- at least

the community tenor that I was a part of and information that I knew that people did have a level of respect in engagement and trust in what was happening with him in the schools. And when you have a principal leader like that that is kind of abruptly removed, there is some desire to want to know what might have preempted that or led to it. But, more importantly, I just -- it just -- it was uncomfortable and discomforting given kind of the season and the state of the district at the time.

Q    And why do you think the board failed to explain his suspension?

A    Oh, I don't know.

Q    Are you aware of an issue surrounding transfer students in the beginning of 2013?

A    Yes, ma'am.

Q    And could you explain what your view is as to what those issues were related to transfer students?

A    Well, obviously, the legal mandate imposed begin to send, I'm sure, districts across the county into reflection and response, and I know in Ferguson-Florissant the concern was receiving additional students and the wait and burden that it may place on, one, receiving students that potentially may have deficiency or low achievement and how that would affect the overall achievement of the district.

        Obviously, the increase in volume of student and what

1    that would -- what effect that would have financially on the

2    district and in some often veiled kind of conversation or

3    directives the concern of the -- what these students as, you

4    know, sometimes the language was implied and employed, what

5    these students brought as related to potential issues in both

6    the classroom and the school with culture and discipline.

7    Q    What was the racial make-up of the districts that were

8    going to be sending their students to Ferguson-Florissant

9    School District?

10   A    Oh, disproportionately short of, you know, 90-something

11   percent African American, I would assume.

12   Q    So would you say -- when you say "these students," could

13   you describe what you think those veiled comments referred to?

14   A    Well, these students, the transfer students, you know,

15   for most folks identified not specifically a district.  It was

16   not a reference to geography, but it was -- there was some

17   implicit reference to either students who potentially were

18   deficient, potentially a cause for concern, and obviously

19   coming out of the communities and that the percentage they

20   were coming, it was de facto African American because they

21   were poor black and brown children.

22   Q    What was your position on the issue of transfer students?

23   A    Well, first of all, it was required -- and a responsible

24   and, I thought, a reverent thing to adhere to and honor.

25   Q    Okay.  Were there any candidates in that at that time who

1  thought that Ferguson-Florissant School District should resist

2  accepting transfer students from these majority-black

3  districts?

4  A    I believe so, yes.

5  Q    And do you recall whether these candidates were white or

6  African American?

7  A    Mainly white.

8  Q    Do you know what Dr. McCoy's position was on transfer

9  students?

10  A    He was very supportive of it.

11  Q    And you touched on this.  Would you say the issue of

12  transfer students became a racially charged issue in your

13  election in 2014?

14  A    Well, the fact that it even was mandated and came about,

15  very much so, yes.

16  Q    And, again, you've touched on this a bit, but could you

17  please just explain a little bit what your sense was for why

18  some candidates were resisting accepting the transfer

19  students?

20  A    Well, again, you know, with respect to the fiscal

21  disposition of the district and probably even some of the

22  timing with staffing and internal kinds of structures, there

23  was obviously a concern about cost and probably logistics in

24  those things.  But what was seemed to be what was most

25  emphasized was the direct correlation or concern around what

1  these students would mean to the achievement and potential

2  accreditation of the school and what this would mean to the

3  overall culture and management dynamic of students within the

4  district.

5  Q    Is it fair to say there were racial overtones to the

6  resistance?

7  A    It's hard not to say; so, yes.

8  Q    You said you campaigned on discipline.  Could you

9  describe your position on discipline during your campaign?

10 A    Well, you know, as a parent, as a person who's worked in

11 schools, as a manager/supervisor, I mean, you want to maintain

12 and encourage some sense of order.  You want a productive,

13 healthy, respectful not only work space but in this case

14 learning space.

15       So I understood and spoke about the need to make sure

16 that we provided that for students and yet also that we need

17 to take in account some of the situational and relational

18 possibilities or issues that sometimes lead to some of the

19 pervasive kinds of concerns of -- that were around discipline.

20       I mean, obviously, severe issues, you know, that are,

21 you know, zero tolerance in design -- assaults, weaponry, you

22 know, fighting, those kind of things -- we need to address.

23 At the same time, there were a lot of issues, and there seemed

24 to be a growing culture shared among professional staff in the

25 schools as well as in the community -- as a pastor dealing

1  with parents, with children, I mean with kindergartners who

2  were getting suspended, this internal culture of zero

3  tolerance for anything that was just not by someone's general

4  standard what they didn't think somebody should do, that kind

5  of concerned me, and that was the push that I raised about

6  discipline.

7  Q    And in your experience, did you see any racial

8  disparities in how discipline was implemented in the district?

9  A    Well, I sense that there were some -- let me say it like

10 this.  You know, it was continually disturbing to know that

11 from hearing from principals and leaders in schools that there

12 seemed to be a situation where people were not either

13 culturally astute or sensitive enough to be able to navigate

14 through some of the daily kinds of interactions that would

15 lead to a student being ultimately dismissed from class

16 because there was just an inability to be able to communicate

17 or provide authority not because, you know, they just don't

18 know how to behave, but there's not ability to communicate.

19      There was -- that seemed to be what stood out most.

20 I think the sheer numbers because of the school district, you

21 know, has majority African American, that there's going to be

22 some high volume, but what was really -- what was really of

23 concern was the continual kind of miscues and misalignment of

24 practice and this idea that ultimately internally and that

25 this culture that these types of children are not manageable

1  and that we need to separate them out was of concern to me.

2  The disincentivizing of working and rehabilitating or

3  strengthening relationship in the classroom and in the schools

4  was of concern racially.  I believe that has strong racial

5  underpinnings to it.

6  Q    Okay.  Do you recall during the campaign any public

7  discussions that you participated in where discipline was an

8  issue or raised where it was discussed?

9  A    Oh, yeah.  I mean, there were candidates that obviously

10 that honed in and really lifted up that issue and said that

11 that was a chief concern of theirs as well and that they

12 wanted to create, you know, a greater intolerance and maybe

13 even offer up things that would further again this

14 isolation -- this isolationist kind of programmatic and

15 strategic or this hard enforcement particularly from the board

16 level down.  There was times where people -- they -- one of

17 their concerns was, you know, we're not having suspension

18 hearings like at the rate that we used to have them, and

19 that's something -- something is wrong.

20 Q    Do you recall specifically any candidates who took that

21 position?

22 A    Paul Morris.

23 Q    During your campaign was there anything that occurred

24 that you thought was racially coded or had any racial

25 overtones?

1  A    Yeah.  When people make strong inference and reference to

2  candidates not being homeowners, when you are questioned about

3  whether or not you have biological children in the district,

4  which would insinuate that you're obviously not a good parent

5  or, you know, deadbeat parent, not being a longstanding

6  resident of the community, those were both some direct but

7  also very implied references about -- of establishing what was

8  kind of a cultural standardizing of what leadership could and

9  should be in that community that was often raised.

10 Q    When you say "direct," do you mean they were made

11 directly toward you?

12 A    Some.  I mean, in -- or questioned in that regard, which,

13 you know, it is what it is.

14 Q    And do you have an opinion as to why you believe that

15 certain issues that were racially coded or had racial

16 overtones were brought up or used during the campaign?

17 A    You know, it's like boxing and any kind of strategy:  You

18 can't get my credentials; so I guess you try to, you know, go

19 for the body, get personal.

20 Q    Would you say that the personal attacks were evenly done

21 across to all candidates?

22 A    Not necessarily, but I wasn't the only one.

23 Q    Okay.  Can you think of any examples of something that

24 maybe could have come out that didn't?

25 A    Yeah.  There was a strong kind of focus paid to candidate

1    Thurman and challenged her commitment in leadership.

2    Candidates and even supporters of candidates would make sure

3    at forums to raise questions with her voting record or, you

4    know, people made -- took issue with candidates who were not

5    consistently able to be present.  As I mentioned, we had

6    candidates who just had various challenges associated with

7    lifestyle that they couldn't come to everything, and that was

8    often, you know, used against them.

9    Q    Are you familiar with the type of election system that's

10   currently in place in the Ferguson-Florissant School District?

11   A    Yeah.  The at-large you mean?  I'm sorry.  Yeah.

12   Q    Do you think this type of system has any impact on which

13   candidates get elected?

14   A    I do.  I do.

15   Q    Could you just describe that impact?

16   A    Well, I mean, I don't think anyone can look past, you

17   know, what the history has been with how people are -- ended

18   up to be represented or not represented.  I think, you know,

19   in addition to that, not only racially but, you know,

20   geographically we have a disproportionate number of

21   representatives from one side of the district as well, but the

22   race -- the issue of race or cultural -- the focus -- the use

23   of race has led to some of the other designing in that

24   communities where people live, how they function, that kind of

25   thing.  And I think it has -- it has impacted, it can impact,

1    because it also creates some other challenges just in the

2    practices of running an election.  I mean, it's not a small

3    district, and there are a lot of issues across the district.

4    But race continues to be in that community subtly or

5    discretely infused, laced.  It's part of the fabric on any and

6    all issue and system.

7    Q    And do you believe that if the at-large system remains in

8    place, there will be more African-American representation on

9    the board?

10   A    Hadn't happened in any great number in 40 years.  I don't

11   see it changing.

12   Q    Do you have any background experience to lead you to

13   believe that in districts elections could result in greater

14   African-American representation?

15   A    Yeah.  I grew up in Kansas City, Missouri.  I grew up in

16   the space and time of our own desegregating of schools.  I

17   went to Lincoln College Preparatory Academy for Accelerated

18   Studies, magnet.  There.

19           But I remember growing up in the school district, and

20   I believe we had -- you know, we had persons that were

21   representative of particular areas in -- that were

22   school-related zone.  But even more importantly, I mean, I

23   think the district's own science and practice -- the district

24   is designed, Ferguson-Florissant particularly at its

25   elementary school level, to be community-oriented based.  So

1   you have neighborhood schools at the elementary level, and

2   then it's regionalized at the middle school, and obviously

3   opened up a little bit larger in high school.

4          I mean, if that was a good practice to try to invite,

5   create what was necessary to build strong school and

6   community, why can't the representation -- why can't those

7   same people represent their cluster or their feeder system of

8   school and advocate at the highest level in that way?

9          MS. WILCOX:  Thank you.  I don't have any further

10  questions.

11         THE COURT:  Cross-examination?

12         You may proceed.

13         MS. ORMSBY:  Thank you, Your Honor.

14                      **CROSS-EXAMINATION**

15  **BY MS. ORMSBY:**

16  Q    Do you own your home?

17  A    No.  I have company housing.

18  Q    You live in a parsonage, right?  It's provided by your

19  church.

20  A    That's correct.

21  Q    And that's pretty common for pastors, right?

22  A    Yes, ma'am.

23  Q    It's not unusual.

24  A    No, ma'am.

25  Q    Do you have children who attend the Ferguson-Florissant

1    School District?

2    A     No.  My personal -- my biological children do not, no.

3    Q     Do you know how many board members current -- well,

4    sitting on the board at the time you ran, had children who

5    attended the school -- were in the schools at the

6    Ferguson-Florissant School District?

7    A     There were some.  Not all of them.  Others might have had

8    some that had graduated from there.  But, no, I don't know the

9    exact number.

10   Q     Let's think about it.  Rob Chabot.  Do you know if he had

11   kids?

12   A     Yes, ma'am.  He did.

13   Q     What about Scott Ebert?

14   A     I believe so.

15   Q     What about Leslie Hogshead?

16   A     I think so.  I don't know her personally.  I'm sorry.

17   Q     She's more -- she's older than me; so she possibly didn't

18   have kids in the school.

19   A     Okay.  I'm sorry, ma'am.

20   Q     How about Paul Morris?

21   A     Paul Morris?  I don't remember.

22   Q     Keith Brown?

23   A     I don't remember, ma'am.

24   Q     Paul Schroeder?

25   A     Do not believe he had kids in the district.  I believe --

1    I know his daughter is an educator.

2    Q    So it's not unusual for someone to be on the school board

3    that doesn't have kids in the school district?

4    A    I assume not, no.

5    Q    I know you said that you were registered to vote.  Do you

6    vote?

7    A    Yes, ma'am.

8    Q    Do you vote regularly?

9    A    Yes, ma'am.

10   Q    And you've run for election.  Have you run for any other

11   election besides the school board?

12   A    No, ma'am.

13   Q    But you feel like you can participate in the political

14   process?

15   A    Yes, ma'am.

16   Q    Did Dr. McCoy's suspension and subsequent resignation

17   have anything to do with your deciding to run for school

18   board?

19   A    It had -- it strengthened my interest, yes, ma'am.

20   Q    Let's talk a little bit about Grade A for Change.

21   A    Yes, ma'am.

22   Q    Did Grade A for Change recruit or ask for applications

23   for people who wanted to be on their slate?

24   A    I'm not sure of their full process, ma'am.

25   Q    Did you interview in order to be chosen for their slate?

1    A    They reached out to me, yes, ma'am.

2    Q    Were you their first choice?

3    A    Don't believe so.

4    Q    Did you go through any sort of process in order to get on

5    that slate?

6    A    No.  We had a conversation.  They reached out to me.  We

7    talked.

8    Q    And was this prior to you filing for school board?

9    A    Officially, yes.

10    Q    What did Grade A for Change do to assist with your

11    campaign?

12    A    With my campaign?  Nothing.

13    Q    They didn't produce any literature with your face on it?

14    A    Grade A for Change produced literature with the

15    candidates of their interest, yes, ma'am, but that was not

16    specific to "Lead Forward," no.

17    Q    What did they do that assisted your name being out in

18    order for people to know whether or not to vote for you?

19    A    Well, they put out their own collateral material, hosted

20    events specific for their candidates of interest, and we

21    participated in those.

22    Q    Was there any coordination among the three candidates

23    that they endorsed?

24    A    In terms of their events or things that they organized

25    for us, yes.

1   Q    Did you have planning meetings together?

2   A    I'm sure they did meet, yes, ma'am.

3   Q    Did you all strategize together?

4   A    I'm sure at times some of their representative did do

5   that.

6   Q    I'm talking about you and --

7   A    I very rarely went to those meetings, ma'am.

8   Q    But those meetings did take place?

9   A    They had gatherings that were specific to their work,

10  yes, ma'am.

11  Q    So you did not attend all the Grade A for Change slate

12  strategy meetings?

13  A    No, ma'am.

14  Q    When did the FFNEA contact you with regard to obtaining

15  their endorsement?

16  A    I'll be honest.  I'm not sure that date.  I know the

17  information was, you know, open en masse.  And so when made

18  aware of it, I submitted my information.

19  Q    Would you agree with me that you received that material

20  after candidate filing had closed?

21  A    Yes, ma'am.  I believe so, yes.

22  Q    All right.  Let's talk a little about -- I think you say

23  in paragraph 12 of your declaration that you -- "During my

24  campaign, I was attacked using racially coded language."

25           So I guess that means you were subtly attacked.  Is

1   that right?

2   A    Yes, ma'am.

3   Q    What campaign event did this occur in?

4   A    Let's see, I believe there was the McCluer High School

5   forum that we talked.  I believe that was where that was

6   lifted up, yes, ma'am.

7   Q    Who said it?

8   A    To be honest, I really do not remember.

9   Q    What was said?

10  A    I think what I shared, in terms of a reference to not

11  having children in the district.

12  Q    And was that said by another candidate, or was it a

13  question of the audience?  How did it come up?

14  A    That one was, I believe, referenced in passing and

15  presentation from a candidate.  There were other times where

16  there had been questions that people asked, yes, ma'am.

17  Q    Is that a legitimate question for someone of the public

18  to want to know?

19  A    It was asked; so I responded.

20  Q    You say you were accused of being too supportive of the

21  student transfer issue.  Where were you accused of this?

22  A    I mean, in various forums, whether that was in personal

23  engagement with folks.  I mean, again, in talking about these

24  things, whether they were in question or if they are pointed

25  at -- pointed in the way of these persons, this is what they

1    endorse, that's what it was experienced.

2    Q    Did specific other candidates make that allegation

3    against you?

4    A    No.  I don't have a name for that, no, ma'am.

5    Q    So it was just members of the public that talked about

6    that.  Is that a yes?

7    A    That's a yes.  Yes, ma'am.  I'm sorry.

8    Q    Did you complete the League of Women Voters'

9    questionnaire that was put out to all candidates?

10   A    No, ma'am.  No, ma'am.

11   Q    And what happened with those responses for the candidates

12   that did respond?

13   A    They had a profile posted, I believe, in the *Post*

14   *Dispatch*, I believe.

15   Q    Do you know if other Ferguson-Florissant board candidates

16   that year filled out that form and whether it was published in

17   the *Post*?

18   A    I believe so, yes, ma'am.

19   Q    Do you know whether Mr. Morris, Mr. Chabot, and Dr.

20   Thurman completed those forms?

21   A    I'm not sure, but I know that others in Ferguson did,

22   yes, ma'am.

23   Q    Did you talk on your cell phone during a candidate forum?

24   A    Yes, ma'am.

25   Q    Did you inform the crowd why you were taking calls during

1  a forum?

2  A     I believe I did.  I know I usually do in general.

3  Q     Do you believe that talking on your phone could be

4  perceived by the audience as being arrogant and rude?

5  A     I'm sure they could be perceived that; hence why I'd

6  say -- and I let my professional staff and others know -- I

7  have a personal rule with my family -- my wife, my children.

8  No matter what I'm doing, I respond to them.  And that was no

9  different.

10  Q     So you responded in the middle of a campaign event?

11  A     Yes, ma'am.  I did.

12  Q     Are you aware of any white voters that supported the

13  Grade A for Change slate?

14  A     Yes, ma'am.

15  Q     How do you know that?

16  A     They were at functions.  They were wearing pins.  They

17  had signs.

18  Q     Are you personally aware of any white voters that

19  supported you?

20  A     Yes, ma'am.

21  Q     How do you know that?

22  A     They told me.  They had my paraphernalia.  They said they

23  voted for me.  They had my signs.

24  Q     Have you ever supported a white candidate for the Board

25  of Education?

1   A    I believe so.

2   Q    Have you ever voted for a white candidate?

3   A    In any election you're asking?

4   Q    For board, for school board.

5   A    I believe I just answered that.

6   Q    I support, vote.  I wanted to make sure that you could --

7   A    I'm sorry.

8   Q    -- support someone and not vote --

9   A    Oh, I voted, but I have not participated in someone's

10  campaign or gave a -- I don't believe I've given contributions

11  to anyone's campaign.

12  Q    Did you support Rob Chabot when you ran?

13  A    I believe so.

14  Q    Did you exchange campaign literature for him?

15  A    Yes, ma'am.

16  Q    With him?

17  A    Yes, ma'am.

18  Q    Did he pass out some of your campaign literature?

19  A    I believe someone from his team did, yes, sir.

20  Q    Did you pass out his?

21  A    No, ma'am.

22  Q    Do you think that's fair?

23  A    I don't think I did anything wrong.  He asked for my

24  materials, and I said, "I will take some of yours," but I

25  never said, "I'll pass them out."

1   Q    So you stated that student discipline was a focus of your

2   campaign.  Did you get questions from staff and residents

3   about student discipline?

4   A    I had conversations, yes.

5   Q    Do you believe that discipline is a problem in other

6   school districts besides Ferguson-Florissant?

7   A    Discipline is a problem wherever you have people en

8   masse.

9   Q    What's your understanding of the board's role in the

10   discipline of students in individual schools?

11   A    Well, obviously, the board, along with whatever is handed

12   down from a state level, helps to provide some governance and

13   direction and advisement, I would assume, to the

14   superintendent and his staff.  There are probably issues

15   that -- of certain magnitude that come before them, critically

16   particularly things like expulsion, those kinds of things, and

17   they also probably stay engaged through whatever various

18   reporting and updating that comes from the district staff

19   under the leadership of the superintendent.

20   Q    But you would agree with me that it's mainly under the

21   purview of the superintendent to make sure that the individual

22   schools are following the disciplinary rules?

23   A    Oh, yeah.  Very much so.  And I even lifted that up when

24   people made that as a major issue.  I was like, that's not

25   necessarily the principal function of the board member.

1  Q    And you agree that discipline was also a concern when Dr.

2  McCoy was superintendent?

3  A    Yes, ma'am.

4  Q    Do you know Dr. McCoy personally?

5  A    I do.

6  Q    Do you know the racial make-up of the board when Dr.

7  McCoy was hired?

8  A    I'm sure it was majority white.

9  Q    Do you know what the make-up was?

10  A    I just said I'm sure it was majority white.

11  Q    Did you ask Dr. McCoy why he was suspended?

12  A    No, ma'am.

13  Q    Did you ask Dr. McCoy why he resigned?

14  A    No, ma'am.

15  Q    At any point did Dr. McCoy volunteer to provide that

16  information to you or to the public?

17  A    No, ma'am.

18  Q    Do you believe that the school board should have provided

19  that information to the public when Dr. McCoy was unwilling to

20  provide it?

21  A    That's obviously a decision that they mutually made.

22  Q    Why wouldn't you ask Dr. McCoy directly those questions

23  since you knew him personally?

24  A    There is a scripture in the Bible that, when your friends

25  are in crisis and struggling -- I think it's around Job --

1  that sometimes it's just better to be present and listen.  And

2  they seem to get in trouble when they start asking a whole

3  bunch of questions and giving advice to stuff they didn't have

4  a whole lot of detail about.  So I just kind of leaned on my

5  practice of that in my faith.

6  Q    Speaking about the transfer issue, wasn't the actual

7  issue in that campaign the funding of transportation for

8  student transfer students?

9  A    Was the actual issue?

10  Q    Funding transportation.

11  A    Well, that's an element of responding to what was the --

12  would be the mandate that we had to honor.  That was one

13  element.  The cost and transportation, I'm sure, was included

14  in that.

15  Q    Are you aware that the sending school district was only

16  required to pay for transportation to the school districts

17  that they selected.

18  A    I believe so, yeah.

19  Q    And do you know whether Ferguson-Florissant was a school

20  district that either Riverview Gardens or Normandy selected to

21  provide transportation to?

22  A    I don't believe so.  I'm not sure, though.

23  Q    Are you aware of any budget funding requests that Dr.

24  McCoy presented to the board with regard to transportation?

25  A    To the board, no, I'm not, personally.

1  Q    Are you aware of any votes by the Ferguson-Florissant

2  board to deny the right of students to transfer from Normandy

3  or Riverview Gardens?

4  A    Not personally, no.

5  Q    In fact, are you aware that Ferguson-Florissant accepted

6  the second highest number in the county of transfer students?

7  A    Yes, ma'am.

8  Q    Are you aware of whether or not the achievement gap

9  between African-American and white students increased or

10 decreased under Dr. McCoy's leadership?

11 A    I'm not aware, no, ma'am.

12 Q    Has the school board hired a new superintendent?

13 A    Yes, they have.

14 Q    Do you believe the board selected someone who is capable

15 of addressing the issues regarding racial disparities in the

16 district?

17 A    I think he's a well-qualified individual, a great man,

18 and I look forward, as time will tell.

19 Q    And what was the racial make-up of the school board that

20 selected him?

21 A    Majority white.

22         MS. ORMSBY:  I don't have anything further, Your

23 Honor.

24         THE COURT:  Any redirect?

25

1 **REDIRECT EXAMINATION**

2 **BY MS. WILCOX:**

3 Q    Dr. Johnson, opposing counsel testified in her

4 questioning that sending schools only had to pay the schools

5 that were -- that they selected.  Do you know if that's the

6 law?

7 A    I'm not -- I don't have all the nuances for that.  I

8 thought it was understood that we had to provide an option to

9 students.  And the details between districts I was not aware

10 of.

11 Q    Are you aware of whether Dr. McCoy arranged for any

12 private pay for transportation?

13 A    Yes.  I believe he was very active in trying to find

14 resources to support the work of the district.  I know that

15 personally, as he reached out to me and other community

16 leaders.

17 Q    And he reached out to you in your role as a pastor at

18 Wellspring Church, correct?

19 A    Yes, ma'am.

20 Q    Are you aware that the board sets policy?

21 A    Yes, ma'am.

22 Q    And would this include disciplinary policy?

23 A    I would believe so, yes, ma'am.

24 Q    On cross there was some discussion of the League of Women

25 Voters and a publication in the *Post Dispatch*.

1    A     Yes, ma'am.

2    Q     And you were not part of that publication?

3    A     No.  That was one that got through, through the mail.

4    And why it's, I'm sure, a very noteworthy publication, you

5    know, our practice within the campaign also was to understand

6    that we had -- we made a commitment to what was local, and so

7    we honored where we knew, particularly in the district, in the

8    community, people were attentive and vigilant.  So I hate that

9    we missed that, but we did a good job of staying.

10   Q     So were there other publications that you would say were

11   important to your campaign and possibly more important than

12   the *Post Dispatch* publication?

13   A     I don't -- you know, I want to be respectful.  I don't

14   want to judge and say that paper is bigger.  I mean,

15   obviously, it's a bigger mass distribution.  But as far as

16   with local campaign for school board, it's good that everybody

17   in the city knows you're running, but we were honorable to

18   making sure that we were marketing and lifting out specific in

19   our community.  So we used those mediums.

20   Q     Okay.  There was some talk about attacks on candidates.

21   During your campaign, were there any candidates who had been

22   previously accused of professional misconduct that you're

23   aware of?

24   A     Yes.  Yeah.

25   Q     And at the debates or forums or any campaign events that

1   you attended, did you observe any questions pertaining to that

2   misconduct to that candidate?

3   A    There were questions raised about ethics and particularly

4   around possibly some issues with individuals, yes.

5   Q    Do you have any reason to believe that FFNEA endorsement

6   could hurt a candidate?

7   A    I mean, I don't know how much it can hurt.  I mean, I

8   think it's obviously a help with whatever resources and things

9   they can provide, and I know it feels good.  As a young

10  person -- I'm third-generation educator.  My parents taught

11  public schools.  So I know the importance of union.  My wife

12  teaches right now.  And it's good to have that support

13  internally, but I don't think it's the end-all, be-all.

14  Q    Did Grade A for Change have the same type of what we'll

15  call like a machine or mechanism as the FFNEA or North County

16  Labor had to promote candidates?

17  A    I believe towards the later part of the campaign they

18  were able to do some of those calls, do that -- use that kind

19  of technology.  I don't know if it had the same bandwidth and

20  that kind of thing, but, no, I think they were able to get

21  access to that.

22          MS. WILCOX:  That's all I have, Your Honor.

23          THE COURT:  Thank you, sir.

24          MS. ORMSBY:  Your Honor, opened a new area.

25                    **RECROSS-EXAMINATION**

1    **BY MR. ORMSBY:**

2    Q    Did I hear you say that you were accused during the

3    campaign of professional misconduct?

4    A    No, ma'am.  You did not.

5              THE COURT:  Somebody else.

6              MS. ORMSBY:  I'm sorry.

7              THE COURT:  A different candidate.

8              MS. ORMSBY:  A different candidate.

9              THE COURT:  An unnamed other person is what I got out

10   of it.  Is that fair?

11             MS. ORMSBY:  Then I have no other questions.

12             THE COURT:  All right.  Thank you, sir.  You may step

13   down.

14             So, Mr. Rothert, where are we?  You have two

15   witnesses left, I would surmise?

16             MR. ROTHERT:  Yes.  We have -- we have two witnesses

17   left, plus there was one witness under subpoena that wasn't

18   available till Friday that we were possibly calling.  Other

19   than that, we have two witnesses left.  Dr. Engstrom we

20   believe our part would take about an hour and a half to two

21   hours maybe.

22             THE COURT:  Take a half a day.

23             MR. ROTHERT:  And our other witness is Redditt

24   Hudson, who's 45 minutes probably.

25             THE COURT:  So you'll finish sometime late tomorrow

1    morning or first thing in the afternoon.

2              So who are you going to call first?

3              MS. ORMSBY:  It really depends on how much time we

4    have left.

5              THE COURT:  We are going to get to you early in the

6    afternoon.

7              MS. ORMSBY:  Oh, I forgot the rule of the room.

8              THE COURT:  If it didn't happen at the podium, it

9    didn't happen.

10             MS. ORMSBY:  I know.  It really depends on how much

11   time we have left at the end of the day whether we'll start

12   with our expert or start with another of our fact witnesses.

13             THE COURT:  Okay.  Well, let Mr. Rothert know who the

14   potential fact witnesses are.  I assume you know who the

15   expert is.  Just so they can be ready too.

16             MS. ORMSBY:  I will.  It will be Dr. Thurman if we

17   call a fact witness first.

18             THE COURT:  Okay.  Very good.  We will see you all at

19   nine o'clock.  Thank you.

20             **(PROCEEDINGS CONCLUDED AT 1:10 PM.)**

21

22

23

24

25

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 148 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 8th day of February, 2016.

_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter