# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MISSOURI STATE CONFERENCE OF THE   )
NATIONAL ASSOCIATION FOR THE      )
ADVANCEMENT OF COLORED PEOPLE,   )
REDDITT HUDSON, F. WILLIS JOHNSON, )
and DORIS BAILEY,                )
                               )
    Plaintiffs.          )
    v.                   )
                               )
                               ) No 4:14-CV-2077 RWS
FERGUSON-FLORISSANT SCHOOL     )
DISTRICT, and ST. LOUIS COUNTY   )
BOARD OF ELECTIONS COMMISSIONERS,  )
                               )
    Defendants.         )

### BENCH TRIAL – VOLUME IV
#### BEFORE THE HONORABLE RODNEY W. SIPPEL
#### UNITED STATES DISTRICT JUDGE
#### JANUARY 14, 2016

APPEARANCES:
For Plaintiffs:      Anthony E. Rothert, Esq.
                  Jessie M. Steffan, Esq.
                  AMERICAN CIVIL LIBERTIES UNION OF MISSOURI
                  FOUNDATION
                  454 Whittier Street
                  St. Louis, MO 63108

                  Julie A. Ebenstein, Esq.
                  Sophia Lin Lakin, Esq.
                  Dale E. Ho, Esq.
                  AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                  125 Broad Street, 18th Floor
                  New York, NY 10004

Appearances Cont'd on Page 2:

REPORTED BY:         SHANNON L. WHITE, RMR, CRR, CSR, CCR
                  Official Court Reporter
                  United States District Court
                  111 South Tenth Street, Third Floor
                  St. Louis, MO 63102
                  (314) 244-7966
    PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

Appearances Continued:

For Plaintiffs:          M. Laughlin McDonald, Esq.
                         ACLU VOTING RIGHTS PROJECT
                         2700 International Tower
                         229 Peachtree Street, N.E.
                         Atlanta, GA  30303

For Defendants:          Cindy Reeds Ormsby, Esq.
                         Angela Gabel, Esq.
                         CROTZER AND ORMSBY, LLC
                         130 S. Bemiston, Suite 602
                         Clayton, MO  63105

                         Kathryn B. Forster, Esq.
                         CROTZER AND ORMSBY, LLC
                         130 S. Bemiston, Suite 602
                         Clayton, MO  63105

                         John A. Safarli, Esq.
                         FLOYD, PFLUEGER & RINGER, P.S.
                         200 West Thomas Street, Suite 500
                         Seattle, WA  98119

I N D E X

### PLAINTIFFS' WITNESSES

RICHARD ENGSTROM
Direct Examination by Ms. Ebenstein ................. 4
Cross-Examination by Ms. Ormsby ..................... 49
Redirect Examination by Ms. Ebenstein ............... 74

REDDITT HUDSON
Direct Examination by Ms. Ebenstein ................. 84
Cross-Examination by Ms. Ormsby ..................... 116

### DEFENDANTS' WITNESSES

DONNA PAULETTE-THURMAN
Direct Examination by Ms. Ormsby .................... 131
Cross-Examination by Ms. Ebenstein ................. 165

JONATHAN RODDEN
Direct Examination by Ms. Ormsby .................... 171

4

1    **(PROCEEDINGS STARTED AT 9:10 AM.)**

2         THE COURT:  Good morning.  Any announcements before

3    we begin?

4         MS. ORMSBY:  No, Your Honor.

5         THE COURT:  If you would call your next witness.  Oh,

6    we've been waiting for you.

7         MS. EBENSTEIN:  Good to see you again, Your Honor.

8    Julie Ebenstein for the plaintiffs.  Plaintiffs would like to

9    call Dr. Richard Engstrom.

10        THE COURT:  If you would step forward, sir, and be

11   sworn.

12                **(WITNESS SWORN BY THE CLERK.)**

13        THE COURT:  Are you ready?

14        MS. ORMSBY:  Yes.

15        THE COURT:  You may proceed.

16                       **RICHARD L. ENGSTROM,**

17   **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

18   **FOLLOWS:**

19                      **DIRECT EXAMINATION**

20   **BY MS. EBENSTEIN:**

21   Q    Good morning, Dr. Engstrom.

22   A    Hello.  Morning.

23   Q    Could you please state your name and spell your name for

24   the record?

25   A    My name is Richard L. Engstrom.  The first part is normal

5

1  spelling.  The surname is E-n-g-s-t-r-o-m, as in mother.

2  Q     And where do you live, Dr. Engstrom?

3  A     I live in Chapel Hill, North Carolina.

4  Q     Where do you work?

5  A     Duke University.

6  Q     What is your position at Duke University?

7  A     I'm Visiting Research Scholar at the Social Science

8  Research Institute at Duke, I am a Visiting Professor of

9  Political Science at Duke, and on the graduate faculty in

10 political science at Duke.

11 Q     And where did you earn your degrees?

12 A     My degrees?  Well, my first degree is a bachelor's degree

13 which I received from the University of -- excuse me -- from

14 Hope College in Holland, Michigan.  I majored in political

15 science there.  Then I have a master's -- so that was in '68 I

16 graduated.  Sorry.  Then I received a master's degree from the

17 University of Kentucky in political science in 1969 and a

18 Ph.D. in political science from the University of Kentucky in

19 1971.

20 Q     And briefly could you describe your previous professional

21 positions?

22 A     Well, my first position on the faculty was at the

23 University of New Orleans.  I was at the University of New

24 Orleans for, I think, about 36 years.  I left the University

25 of New Orleans after Katrina and the flood.  Then I went to

1  University of North Carolina Law School as a staff member in

2  the Center for Civil Rights, not a lawyer, but as, like, an

3  in-house social scientist.  And since then I've been at Duke.

4       I've had positions abroad over that time frame.  I've

5  had two Fulbright professorships or -- yeah, fellowships.  I

6  was a Fulbright professor at National Taiwan University and

7  National Chengchi University there.  That's C-h-e-n-c-h-i, if

8  I remember correctly.  And also a position at Academia Sinica

9  in, I believe it was, the Institute for American Studies

10  something like that.  And Sinica is S-I-N-E-C-A, I believe.

11  Q    Along with your --

12  A    Oh, excuse me.  And I've been --

13       THE COURT:  He's not done.

14  A    I've been -- sometimes I forget these titles, but I've

15  been, I think, a Senior Research Fellow at the Institute for

16  Irish Studies at the University of Belfast.  I've been some

17  kind of Senior Fellow at the Australian Defense Force Academy.

18  I've had -- let me see, I think I'm missing one, but it no

19  doubt is on my vitae.  Academics don't take much off their

20  vitae.

21  Q    Dr. Engstrom, what topics do you focus on as a political

22  scientist?

23  A    My area of focus is minority politics, especially when it

24  comes to structuring of electoral competition, how it affects

25  minorities.

Q    Have you taught any courses that related to minority politics and the structure of electoral competitions?

A    Yes.  At Duke I did teach a course called, I think, Voting Rights and Election Systems.  It was a senior honors seminar that was an entire course.  I know I taught a graduate seminar at the University of New Orleans once dealing with basically the same topic, voting rights and election systems.  And I taught seminars in minority politics and urban politics, both of which always had sections on election systems and minorities.

Q    And have you published peer-reviewed books on the topic?

A    Well, I'm a co-author of a peer-reviewed book called -- I believe it's *Fair and Effective Representation?  Debating Minority Rights and Minority Representation*.  I'm sorry.  I forget the title, but it's on the vitae.

Q    Have you written any peer-reviewed articles?

A    Yes.  Many.

Q    Do these articles relate to the way that we structure electoral contests?

A    Many of them do.  Not all of them, but many of them do. It's an area I've been studying for quite a while.

Q    Approximately how many articles have you written, or over what period of time have you written articles?

A    Articles on just --

Q    On electoral structure.

1    A    Oh, I don't have the count.  My work has been published

2    in social science journals and certainly in political journals

3    and others and also law reviews, but the count would be, I

4    think, pretty high by now.

5    Q    Okay.  Do you review the academic work of other political

6    scientists for publication?

7    A    Yes, I do.  I sometimes review book manuscripts, and I've

8    had a lot of experience reviewing articles that are submitted

9    to refereed journals.

10   Q    Have you presented your research to your peers?

11   A    Oh, yes.  I've presented papers on this topic at the

12   America Political Science Review, I think the International

13   Political -- I'm sorry -- the American Political Science

14   Association convention, then the International Political

15   Science Association convention or annual meeting, the Midwest

16   association, the Southern association, the International

17   Conference on Interdisciplinary Social Science.  A number.

18   Q    And have you been on the board of any professional

19   associations related to your work?

20   A    Yes.  I've been on the board of the *Journal of Politics*

21   and *Public Administration Quarterly*.

22   Q    Have you submitted reports or testified at depositions or

23   in court as an expert in other cases related to the Voting

24   Rights Act?

25   A    Yes.  Yes.  I believe it would be fair to probably say a

1  hundred or more in terms of testifying either by deposition

2  or -- and/or in trial.

3  Q    And have you ever been appointed by a court to serve as

4  an expert or a special master in Voting Rights cases?

5  A    I've been appointed to serve in both capacities.  I was a

6  court-appointed special master for redistricting -- I'm

7  sorry -- court-appointed expert, my apologies, in a case

8  involving the Dallas, Texas, city council.

9        And I served as a special master in a case

10  involving -- well, I forget exactly what the election system

11  was, but it was a Section 2 case involving Chicago Heights,

12  Illinois, one of the early suburbs outside Chicago.

13  Q    And in the many times that you've given testimony as an

14  expert in Voting Rights Act cases, have you given testimony

15  for both plaintiffs and defendants in those cases?

16  A    Yes.

17  Q    Were you accepted by -- as an expert by the courts in all

18  of the cases that you just mentioned, or have you --

19  A    Every case I've been to court and testified in, I have

20  been accepted as an expert.  I haven't gone to trial and been

21  told I can't testify; so I've been able to -- I mean, I've

22  always been approved or accepted as an expert.

23        MS. EBENSTEIN:  Okay.  Your Honor, we move to qualify

24  Dr. Richard Engstrom in the fields of electoral systems,

25  minority politics, racial polarization analysis, and

1    statistical methods related to racial polarization analysis.

2              MS. ORMSBY:  No objection.

3              THE COURT:  You may proceed.

4    Q   (BY MS. EBENSTEIN) Briefly, Dr. Engstrom, what were you

5    asked to do in this case?

6    A    I was asked to -- I thought I heard someone.  I was asked

7    to assess the extent to which, if any, voting in recent

8    elections in the Ferguson-Florissant School District elections

9    was racially polarized.

10   Q    And what is racially polarized voting?

11   A    Racially polarized voting refers to a consistent

12   relationship between the race of the voter and the way in

13   which the voter votes or, expressed differently, the way in

14   which black voters and other members of the electorate vote

15   differently.

16   Q    After performing your analysis, did you form an opinion?

17   A    Yes, I have.

18   Q    And what is your opinion?

19   A    I've looked at five lists, the five most recent

20   elections, all of them involving a biracial candidate pool,

21   meaning a choice between or among African-American and

22   non-African-American candidates, and in each of those five

23   elections I have found racially polarized voting; so I'm

24   convinced that there is racially polarized voting in the

25   school district.

1   Q    And did you prepare a report or declaration in this case?

2   A    I prepared two:  An initial report and a rebuttal report.

3   Q    If you can please turn in the binder in front of you to

4   the tab marked 52.

5   A    Fifty-two?

6   Q    Yep.

7   A    Okay.

8   Q    Is that the declaration that you prepared?

9   A    Yes, it is.

10  Q    And does this report state your opinions in this case and

11  the methods and data underlying that opinion?

12  A    Yes, it does.

13  Q    How do you analyze election results to determine whether

14  elections are racially polarized?

15  A    I employ methodology called ecological inference, and we

16  usually refer to in shorthand as "EI."  EI is a statistical

17  procedure that -- it's a statistical procedure that was

18  developed by Professor Gary King at Harvard University, whom I

19  consider the preeminent methodologist in the discipline of

20  political science.  He developed this methodology because he

21  was dissatisfied with the quality of the estimates that were

22  being produced through the methodologies relied upon by the

23  Supreme Court in *Thornburg v. Gingles*.  Those would be

24  ecological regression and homogeneous precinct analyses also

25  referred to as extreme case analysis.

1    THE COURT:  He was dissatisfied with the U.S. Supreme

2    Court.

3    THE WITNESS:  Sorry?

4    THE COURT:  He was unhappy with the U.S. Supreme

5    Court.

6    THE WITNESS:  No.  He was unhappy with the social

7    science that was going into the -- at the time, that was state

8    of the art.

9    THE COURT:  I didn't know if I needed to call Scalia

10   today or, you know.  Just checking in.

11   Q    Dr. Engstrom, before we go into a discussion of EI, did

12   you perform any other type of analysis to determine whether

13   voting was racially polarized in the Ferguson-Florissant

14   School District?

15   A    Well, to determine whether it was racially polarized, I

16   did an analysis using homogenous precincts.  And if there's

17   any conflict, I would rely on ecological inference.  I think

18   it is by far the superior methodology.  But homogeneous

19   precinct is another kind of methodology, and so I sought to

20   show basically what I expected, that the polarization was --

21   you're going to find it whatever methodology you rely on.

22   Q    Have you used EI in your peer-reviewed political science

23   publications in the past?

24   A    I have included material based -- estimates based on

25   ecological inference, yes.

1  Q    And have you used EI in your testimony as an expert

2  witness in Voting Rights Act cases?

3  A    Oh, since, I believe, the late 1990s, early 2000s,

4  sometime around in there.  I've been using it for a long time

5  and for quite a while now.  It's the only methodology I

6  typically use.  It's superior to the others.

7  Q    And was the late 1990s or early 2000s the time when

8  ecological inference was developed?

9  A    Gary King's book came out, I think, around that time.

10  There's a footnote in my report.  I could check the date.  I'm

11  not sure.  But I began using it soon after the software to

12  implement that procedure became available.

13  Q    What is ecological inference?

14  A    Ecological inference is an estimation procedure.  It's

15  used for racially polarized voting analyses, although it's not

16  restricted to that.  You can use it for other areas where

17  you're doing what we call "cross-level inference."  But in

18  terms of a racially polarized voting analysis, it's a

19  procedure that includes all of the precincts that there are in

20  an election, and it looks at -- it does a comparison in effect

21  of the racial composition of the precinct electorates with

22  using the best available measure we can get for a precinct

23  electorate and the votes cast for the various candidates

24  within those precincts.  So it's matching precinct-level data

25  as low as we can go in terms of the votes cast.

Q    And specifically what information does an EI analysis

provide?

A    What it provides are estimates of group support for

different candidates.  And when I say "estimates," it provides

a point estimate, which is the best estimate in terms of the

procedure.  That's one number which the procedure says this is

our best estimate given the data, given the procedure, and

those I report in my declaration.

Q    What other information does EI provide along with a point

estimate?

A    EI also provides confidence intervals.

Q    Could you explain what that is.

A    Yes.  A confidence interval -- what I'm reporting in my

report as well are 95 percent confidence intervals.  Those are

intervals around the point estimate in which, statistically

anyway, we can be 95 percent confident the true value lies.

Now, the true value is what really happened, but like Dr.

Kimball said yesterday, I believe it was, or maybe the day

before, sorry, but because of the secret ballot we have to

estimate.  So we're trying to estimate that true value.  And

the confidence interval says, statistically anyway, in terms

of statistical theory, we can be 95 percent confident that

that true value falls within that range, all right?

        Now, the true value -- the best estimate of the true

value is the point estimate, but so -- but the confidence

1  interval expands to plus and minus other values, but as you go

2  away from the true -- from the point estimate, excuse me, the

3  probability that that point in the confidence interval is a

4  true value declines as you go toward the ends -- from the

5  middle to the ends of the confidence interval.  And I

6  shouldn't have said "middle."  I should have just said "from

7  to the point estimate to the ends," because the confidence

8  intervals we rely on are real -- they're the actual confidence

9  intervals, not estimated.  I mean, maybe I should explain a

10  little.

11      When we talk about confidence intervals, we are --

12  it's the same as, say, somebody reporting a poll and saying,

13  well, our estimate is 35 percent, but it's plus or minus 3.

14      Well, that's a common way to express it, but that's

15  an estimated confidence interval usually.  I mean, if it's --

16  if the confidence interval is symmetrical around the point

17  estimate, that usually means it's done through an estimation

18  procedure.

19      The confidence intervals I report in my declaration,

20  you will notice, are not symmetrical, and that's because they

21  are true confidence intervals.  True confidence intervals --

22  they may turn out to be symmetrical, but they are not

23  necessarily symmetrical.

24  Q    And is the 95 percent confidence interval the standard

25  that political scientists use while doing EI?

1    A    Yes, I believe so.

2    Q    Okay.  Could you explain statistical significance as it

3    relates to confidence intervals?

4    A    Oh, yes.  Okay.  Basically, if the confidence intervals,

5    say, for the vote for two candidates, if they do not overlap,

6    then you can be -- you can rest assured that the point

7    estimates are statistically significantly different.  It's a

8    conservative approach in that it is theoretically possible for

9    confidence intervals to overlap somewhat and still be

10   statistically significantly different, but if they don't

11   overlap, we know they are statistically significantly

12   different.

13   Q    And I'd like to turn to your analysis of the

14   Ferguson-Florissant School District elections.  I'm going to

15   refer to that as the FFSD elections.

16   A    FFSD, okay.

17   Q    Which elections did you analyze?

18   A    The ones held in 2011, 2012, 2013, 2014, and 2015.  The

19   five most recent elections to the school board.

20   Q    What data did you rely on to perform your EI analysis of

21   these elections?

22   A    Well, the data entailed the votes cast for the different

23   candidates, the various candidates in the precincts, and the

24   voting-age population percentages African American,

25   non-African American in those precincts.  Those data were

provided to me by Bill Cooper, another expert in this case and who does demography.

Q    And why did you choose to analyze the 2011 to 2015 elections?

A    Well, they're recent and they're biracial.  In other words, they all involve that choice between or among African-American and non-African-American candidates.  If I'd have gone back further, I would have had to go to 2006. Everything from 2006 to 2011 is either uncontested, they're uncontested elections, or they don't provide that biracial choice.  I believe it's 2009 where all the candidates were white.  So I'm interested in biracial elections.

     Also by going back to -- they're all recent.  In *Thornburg v. Gingles*, the Court relied on three elections held over five years.  Well, this is five elections held over five years.  I think it's a sufficient number of elections to analyze and rely upon.

     In addition, it was important to go back to 2011, I think, so we could at least get two observations of three-vote, three-seat elections.  The school district -- sometimes they're two-vote, two-seat elections, and sometimes three-vote, three-seat elections.

     I thought it was important if we could get that -- at least two observations of three-vote, three-seat elections because those elections, I forget the actual percentage, but

1  they provide -- well, 47 or 48 percent of the seats, I

2  believe, are awarded through three-vote, three-seat elections,

3  and the slight majority of the seats are from two-vote,

4  two-seat elections.

5  Q    And did you identify black voters' candidates of choice

6  in the 2011 to 2015 FFSD elections?

7  A    Yes, in each one.

8  Q    How did you identify black voters' candidates of choice?

9  A    I look at cohesion in terms of the black support for

10  candidates.  I look at whether there are substantial

11  differences in the support for -- between certain candidates.

12  I look to see if the -- I mean, and that generally would

13  entail looking at the point estimate for a candidate, black

14  vote for a candidate, and seeing if it falls within the

15  confidence interval for another candidate.  And then I do

16  employ the statistical significance test in terms of whether

17  the confidence intervals overlap.

18  Q    Are black voters required to prefer as many candidates as

19  there are seats up for election in each of these elections?

20  A    No voter is required to cast as many votes as there are

21  seats.

22  Q    And are black voters --

23  A    Or cast all their votes in that sense.  They're allocated

24  as many votes as seats.  I'm sorry.  But they don't have to

25  cast all those votes.

Q    And are they required to prefer as many candidates as

there are seats up for election?

A    No.

Q    In these five elections, how do you determine if there

was a second- or third-choice candidate of choice among black

voters?

A    I look at whether the other candidates are cohesive.  I

look at the difference in terms of their vote and the other --

like the first preference vote, first preference among the

African Americans.  I look to see what kind of difference

there is in that vote.  Looking at that difference again

entails whether the candidates' votes -- the estimated

African-American vote for the candidate is outside the bounds

of the confidence interval for another, say, less-preferred

candidate, and again whether there's statistically significant

difference.

Q    What patterns, if any, did you find as to the race of

candidates preferred by African-American voters in FFSD

elections?

A    Well, in all the elections I looked at, in all the

elections that I analyzed, African Americans' preference, top

preference, the candidate that received most -- the most votes

from African-American voters was an African-American

candidate.  No exception.  And I understand that exception --

there's no exception going back at least as far as 2000.  The

1  first preference of African-American voters, I understand, has

2  always been since then an African-American candidate.

3       That's important to me, because if the preference is

4  to be represented by people from within their own group, I

5  don't think the opportunity to elect is an equal opportunity

6  to that of the other voters in the electorate unless that

7  includes -- the opportunity includes, then, to elect from your

8  own group.  I believe African Americans have demonstrated

9  their preference to be represented by other African Americans

10  in these school board elections, just looking at the top vote.

11       But then I look at lesser votes, too, and so I

12  identify candidates of the representatives -- I would say

13  representatives of choice in all five of these elections, and

14  in doing so, I name one or more candidates as

15  African-American-preferred representatives.

16  Q    And were there patterns, if any, that you found as to the

17  race of the second- or third-preferred candidates who you

18  identified as candidates of choice?

19  A    Yes.  Actually, they're all black.  All the candidates

20  are African Americans that I can identify as being the

21  preferences of African-American voters in these elections.

22  Q    And you mentioned earlier on that there was one

23  monoracial election over the time period from 2000 until 2015

24  where there were no black-preferred candidates.

25  A    Correct.

1  Q    Was the top-choice candidate in that election black or

2  white?

3  A    Well, if there's no black candidate, there can't be a

4  preference for a black candidate in an election in which there

5  isn't one.

6  Q    Okay.  Are you saying, Dr. Engstrom, as a principle, that

7  black voters cannot prefer white candidates?

8  A    No.  I never said that.

9  Q    And can you give me some examples of cases in which you

10 determined that black voters have preferred white candidates?

11 A    Sure.  One recently -- okay.  Yes.  Not too long ago I

12 worked in a case involving the Euclid City School Board.

13 Euclid is an area -- is a municipality in a school district

14 outside Cleveland.  It's one of the older suburbs in the

15 Cleveland metro area.

16      The school board admitted that their election system

17 was dilutive and violated Section 2.  My only role in the case

18 was to participate in the remedial end.  And there was a

19 remedial election held under a one-vote limited arrangement.

20 I can explain that if necessary, but it was a one-vote limited

21 arrangement.

22      There was -- well, the United States Justice

23 Department didn't feel like it was a remedy based on that

24 election, and they felt that way because a black candidate

25 that had received about 18 percent of the black vote finished,

1    I don't know, second or third.  There were three seats at

2    issue, and they said that, therefore, she should have won

3    because she was in the top two or three for the

4    African-American vote.

5          There was another candidate in that election that got

6    over a majority of the African-American vote.  That candidate

7    was white.  And I testified that they had a candidate -- they

8    had a representative of choice.  It was that white candidate

9    that got 51 percent, I think, of their votes.  And that was

10   it.  And, happily, the court agreed with me.  They said, no,

11   you can't reach down to a candidate that got 18 percent of the

12   vote and say that she necessarily had to be elected.  So the

13   court agreed that they got the candidate of their choice.

14   Q    Okay.  Turning now --

15   A    Oh.

16   Q    Go ahead.

17   A    Well, another one I remember now is I worked a case

18   involving the Chicago City Council a number of years back, and

19   there was, at that time, an alderman by the surname of Bloom.

20   I think his district was somewhere around the University of

21   Chicago.  Mr. Bloom was challenged, as I recall, in one

22   election by an African American, and my analysis showed Mr.

23   Bloom got most of the votes cast by African Americans in that

24   election, and I said he was the candidate of choice or

25   preference.

1    Q    And was Mr. Bloom also a white candidate?

2    A    Mr. Bloom was white.  Excuse me.  I'm sorry I didn't say

3    that.

4    Q    If I can ask you to turn to page 17 of your report in

5    front of you marked as Plaintiffs' Exhibit 52.  And we've

6    enlarged a slide of that page on the page.

7    A    Page 17?

8    Q    Yes.  Tab 52, page 17.

9    A    It's from my vitae.

10   Q    No.

11   A    Oh, my apology.  The vitae is numbered separately.  So,

12   yes, it says Table 1.

13   Q    Okay.  And does that match the screen in front of you,

14   Table 1 that we have up on the screen?

15   A    Yes, it is.  Yes, it is.

16   Q    And what is shown on this table?

17   A    Well, what this table contains are the EI estimates of

18   the votes cast by African Americans that went to each of these

19   candidates in this election.  So the middle column is the

20   percent of the African-American votes that were cast, and the

21   right-hand column is the percent of the non-African-American

22   votes that were cast.  And it's my understanding that

23   non-African Americans in the school district are

24   overwhelmingly white.  So we could say it's a white vote and

25   it could be -- you know, it's a little less awkward, but,

1    technically, it is the non-African-American vote.

2            And then you see every candidate is listed and that

3    the cells contain both the point estimate that I talked about

4    earlier for each candidate and the values -- the range of the

5    95 percent confidence interval for that point estimate for all

6    of the candidates.

7    Q    And was this a three-seat election?

8    A    This was a three-vote, three-seat election, yes.

9    Q    So if each voter cast all of their votes, what's the

10   highest percentage of votes that a candidate could receive?

11   A    If every candidate cast three votes, the highest vote any

12   candidate could get would be 33.3 percent.

13   Q    Did you identify a candidate or candidates of choice

14   among black voters in the 2011 election based on these EI

15   estimates?

16   A    Yes.

17   Q    Who was that?

18   A    They are Graham and Hawkins.

19   Q    And did --

20   A    I might note that the black candidates are in bold font

21   in all the tables.

22   Q    Dr. Engstrom, you just said, I believe, that you

23   identified Graham and Hawkins.  Did either of them win?

24   A    No.

25   Q    And what is your basis for identifying them as candidates

1  of choice among black voters in the 2011 election?

2  A    Well, I think their vote is cohesive.  And in determining

3  that I compared that to, well, what we've just said.  The most

4  vote any candidate could get if every voter in their group --

5  now we're talking about the two groups.  But the greatest vote

6  among African Americans that a candidate could get would be

7  33.3 percent.

8        And these estimates show that, I think, Graham's vote

9  is somewhere above 70 percent of that threshold, and Hawkins'

10 vote is about 65 percent of that threshold.  I consider that

11 to be a cohesive vote.  These aren't single-vote, single-seat

12 elections; so they don't -- they're not comparable to the

13 estimates that come out of single-vote, single-seat elections

14 because there you know, you know, it's one vote and that means

15 every voter.  That means a percentage of voters and the

16 percentage of votes is the same.  But in this that's not.  So

17 I would consider these point estimates to show cohesion.

18 Q    What were Graham and Hawkins' estimated levels of support

19 among white voters?

20 A    Only 6.1 and 7.4 percent, respectively, over the two.

21 Q    How would you characterize their level of support among

22 white voters?

23 A    Minimal.

24 Q    So you identified two black-preferred candidates in this

25 three-seat election; is that correct?

1  A    That's correct.

2  Q    And did you identify a third preferred candidate of

3  African-American voters in this three-seat election?

4  A    No, I did not.  The third -- the candidate with the third

5  highest percentage of the vote is Clark.  His percentage is

6  much lower.  I wouldn't consider that a cohesive vote among

7  African Americans for Mr. Clark.

8         I also look and see that the point estimates for both

9  Graham and Hawkins are outside the confidence interval for Mr.

10 Clark.  In other words, they -- that's a substantial

11 difference in the vote between those two black candidates and

12 Mr. Clark.  And I will also note that the vote for Graham and

13 also the vote for Hawkins are statistically significantly

14 higher among blacks than the vote for Mr. Clark.

15 Q    So as an expert on racial polarization, do you consider

16 Clark to be a black-preferred candidate in the 2011 election?

17 A    No.  There's no cohesive vote for Clark.  He may come in

18 third, but that doesn't mean he -- I wouldn't call him a

19 black-preferred candidate.  He's so far behind the two leading

20 candidates among black voters.

21        And certainly for purposes of Prong 3 I would not

22 consider -- I would not consider Clark -- well, he didn't win

23 either.  So none of the top three won.  But the third one I

24 would not consider a candidate of choice of African-American

25 voters.  It just got 13.5 percent.  That's it.

1  Q    Which candidates received the highest levels of support

2  among white voters?

3  A    That would be Martinez, P. Morris -- "P" is an initial --

4  and what I'm going to pronounce as Chabot.  I could be wrong.

5  Q    And were they elected?

6  A    All three of them.

7  Q    Turning now to page 18, which is also enlarged on your

8  screen, what is shown on that page?

9  A    Well, page 18 actually has the results for two elections.

10  Q    What's shown on the top of this page?

11  A    The 2012 election, which is a two-vote, two-seat

12  election.

13  Q    So in this two-vote, two-seat election, if each voter

14  cast all of their votes, what's the highest percentage that a

15  candidate could receive?

16  A    If each voter cast two, the highest percentage would be

17  50 percent.

18  Q    And did you identify a candidate or candidates of choice

19  among black voters in this election?

20  A    Yes.  I identified B. Morris, and "B" again is an

21  initial.  M-o-r-r-i-s.

22  Q    And did B. Morris win?

23  A    No.

24  Q    What is your basis for identifying her as a candidate of

25  choice among black voters?

1  A    Well, she's got 51.9 percent of the vote.  It exceeds the

2  threshold.  If every voter had cast two votes, I would

3  consider that, in a multi-vote situation like this, to be a

4  cohesive vote among African Americans for Ms. Morris.

5  Q    What was B. Morris' estimated level of support among

6  white voters?

7  A    Only 12.8.

8  Q    How would you characterize B. Morris' level of support

9  among white voters in this election?

10 A    I think 12.8 in an election is minimal.

11 Q    And as an expert in racially polarized voting, would you

12 say that B. Morris received considerable support from white

13 voters?

14 A    From white voters?

15 Q    Yes.

16 A    No.  No.  Not at 12.8.  That's not considerable.

17 Q    What conclusions, if any, do you draw from the level of

18 white support for B. Morris in the 2012 election?

19 A    Well, I would say that the white voters vetoed B. Morris,

20 kept her off the city council.  If we only counted the black

21 vote, she would win.  But when we add in the white vote, you

22 can see that, one, she doesn't win, and she only got 12.8

23 percent estimated of the white vote.  Even the top of the

24 confidence interval is 15.6.

25 Q    And I believe you accidentally said "city council" a

1    moment ago.

2    A    I might have.  I'm sorry.  FFSD.

3    Q    Thank you.  Did you identify a second black-preferred

4    candidate of choice among black voters in this two-seat

5    election?

6    A    No.

7    Q    Who received the second highest estimated level of

8    support among black voters in this election?

9    A    Mr. Schroeder.

10    Q    Who received the third highest?

11    A    Sorry?

12    Q    Who received the third highest estimate of support among

13    black voters in this election?

14    A    Mr. Ebert, the only other two candidates in the election.

15    Q    As an expert in racial polarization, do you consider Mr.

16    Schroeder a representative of choice among black voters?

17    A    No.  Mr. Schroeder is not -- Ms. Morris exceeds the 50

18    percent threshold, and Mr. Schroeder does not.  He's not --

19    he's basically just about halfway there.

20          In addition, if we compare -- if we look at Morris'

21    vote and compare it to Schroeder's, her 51.9 is way outside

22    the confidence interval for the estimate for Schroeder.

23    That's 29.9.

24          In addition, her vote and Schroeder's vote you can

25    see the confidence differences -- confidence intervals do not

1   overlap, which means the black vote for Schroeder is

2   statistically significantly lower than that for Morris.

3   Q    And in this particular two-seat, three-candidate

4   election, did black voters express a particular preference

5   between Schroeder and Ebert?

6   A    Well, statistically, one could say it's pretty much a

7   tie, but Schroeder did get 1.9 percentage points more in terms

8   of the estimate.

9   Q    Why, if at all, is it problematic to call Mr. --

10  A    I say statistically significantly a tie because the

11  confidence intervals do overlap extensively.

12  Q    Why, if at all, is it problematic to call Schroeder a

13  candidate of choice among black voters when the top-preferred

14  candidate of choice lost?

15  A    Well, if you call Schroeder -- or Schroeder [different

16  pronunciation] -- I'm sorry.

17  Q    Schroeder.

18  A    If you call Schroeder a candidate of choice, then you'd

19  also say for Prong 3 purposes that's a win for African

20  Americans, when their choice is Morris and Morris did not win.

21  So I don't think you would cancel out the loss faced by

22  African-American voters for Morris by saying, oh, but they got

23  Schroeder.  No.  And I think courts agree with me on that.

24  Q    And which candidates had the highest level of support

25  among white voters?

1  A    Ebert.

2  Q    Who was the second candidate among white voters?

3  A    Schroeder.

4  Q    And were they elected?

5  A    Both of them were elected.

6  Q    Turning now to the bottom of the page.

7  A    Middle of the page?

8  Q    I'm looking at the screen; so on the page for me.  But,

9  yes, the bottom of the page.

10  A    I apologize.

11  Q    What is that in the middle of the page?

12  A    That's the 2013 election, which was also a two-vote,

13  two-seat election.

14  Q    So, once again, if each voter cast all of their votes,

15  what's the highest percentage of votes that a candidate could

16  receive in this election?

17  A    Fifty percent.

18  Q    Did you identify black voters' candidate or candidates of

19  choice in this election?

20  A    Yes.

21  Q    And who did you identify?

22  A    Henson.

23  Q    Did he win?

24  A    No.

25  Q    What is your basis for identifying Mr. Henson as the

1  candidate of choice among black voters?

2  A    Well, Henson's vote -- his percentage among African

3  Americans is estimated to be 43.7 percent.  I believe that is

4  probably over 80 percent of the threshold I'm using for

5  comparative purposes of what would happen if -- I mean how

6  many can you get if all voters cast their two votes?  So I

7  think that is cohesive support among African Americans for

8  Henson.

9  Q    What was his estimated level of support among white

10  voters?

11  A    17.0.

12  Q    How would you characterize his level of support among

13  white voters?

14  A    Small.

15  Q    And as an expert in racially polarized voting, would you

16  say that Henson received considerable support from white

17  voters?

18  A    At 17.0 percent?  Absolutely not.

19  Q    Did you identify a second black-preferred candidate in

20  this two-seat election?

21  A    No, I did not.

22  Q    Who received the second highest estimated level of

23  support among black voters?

24  A    Ms. Hogshead.

25  Q    And again as an expert on racial polarization, why don't

1   you consider Ms. Hogshead a black-preferred candidate in 2013?

2   A    Well, you can see that she is considerably below Henson.

3   Her vote is estimated to be 24.2.  That -- to me, it would not

4   be a cohesive vote in a two-vote, two-seat election.  In

5   addition, Henson's estimate at 43.7 is again quite a ways

6   beyond her confidence interval, much higher.  And I would also

7   note that given the confidence intervals Henson's vote is

8   statistically significantly higher than Hogshead's vote.

9   She's statistically significantly below.

10          So I don't think that qualifies her as a

11  representative choice of African-American voters.  She simply

12  came in second in the African-American vote.

13  Q    And why, if at all, would it be problematic to call

14  Hogshead's victory in this election a win for black voters

15  when you have not identified her as a candidate of choice?

16  A    Sure.  Same as Schroeder.  I mean, what that would mean

17  if you said she was a candidate of choice, then you would, in

18  effect, be canceling out Henson's loss.

19          And for Prong 3 purposes, I don't think that's

20  appropriate.  I mean, they lost their preference.  And to say

21  that while she replaces Henson I don't think is an appropriate

22  way to view this.

23  Q    Which candidates had the highest estimated level of

24  support among white voters in this election?

25  A    Both Hogshead and Brown.

1   Q    And were they elected?

2   A    Both were elected.

3   Q    Turning now to the next page, page 19, of your report.

4   What is shown on that page?

5   A    Well, at the top of the page, the 2014 election is

6   reported.  This is a three-vote, three-seat election.  This is

7   the second observation of a three-vote, three-seat election.

8   The table is designed just like the others we've talked about.

9   Q    Just so we clear, "like the others," if each voter cast

10  all of their votes, what's the highest percentage of votes

11  that a candidate could receive?

12  A    33.3 percent.

13  Q    Did you identify a candidate or candidates of choice

14  among black voters in the 2014 election based on your EI

15  estimates?

16  A    Yes, I do.

17  Q    And who are they?

18  A    Paulette-Thurman.  That's a surname.  Sorry.  Paulette,

19  dash, Thurman.  Savala and Johnson.  All three, I would say,

20  are representatives of choice of African-American voters.

21  Q    Did they win?

22  A    Only Paulette-Thurman.  Savala was defeated.  Johnson was

23  defeated.

24  Q    What is your basis for identifying all three as

25  candidates of choice among black voters in this election?

1  A    Because all of these -- I think their point estimates are

2  sufficiently close to that 33.3 threshold to say that African

3  Americans gave cohesive support to these three candidates.

4  Indeed if you look at their votes combined, it's like 75

5  percent of their votes go to just these three candidates in a

6  nine-candidate election.  I think that's cohesive.  So I would

7  say that they were the candidates of choice.

8  Q    Were there any close contests for the second- or

9  third-preferred candidate among black voters?

10  A    I mean, Johnson has the lowest of the three, which is

11  24.5.  The next highest percentage is down to 8.6.  So no

12  one's -- I don't think there's another candidate of choice in

13  this election.

14  Q    As an expert on racially polarized voting, do you believe

15  there was a lack of cohesion among African-American voters in

16  the 2014 election?

17  A    No.

18  Q    If you could just tell us why not.

19  A    Well, I think each -- they cohesively supported each of

20  those three candidates I've identified, all right?  And as I

21  said, if you add them together, that's 75 percent of the votes

22  in a nine-candidate contest.  That's cohesion.  I don't see

23  how you could describe it as anything else.

24  Q    Looking to how white voters behaved in the 2014 election,

25  what were the estimated levels of support among white voters

1  for these three candidates in 2014?

2  A    All three of those candidates I've identified as

3  representatives of choice for African-American voters received

4  less than 10 percent of crossover votes:  Paulette-Thurman 8.4

5  percent; Savala 7.0 percent; Johnson 2.8 percent.

6  Q    And how would you characterize their levels of support

7  among white voters in this election?

8  A    Minimal, minimal, minimal.

9  Q    And what conclusions, if any, do you draw from the level

10  of white support for the three black-preferred candidates that

11  you've identified in 2014?

12  A    Well, Paulette Johnson was -- excuse me.

13  Paulette-Thurman was able to be elected, but Savala and

14  Johnson were vetoed by the white voters.

15  Q    Which candidates had the highest level of support among

16  white voters in 2014?

17  A    Chabot, P. Morris -- again, that's an initial -- and

18  Benz.

19  Q    Okay.  I believe you may have said a moment ago that

20  there were nine candidates running in this election.

21  A    Eight.  I'm sorry.  Eight.

22  Q    That's all right.  I just want the record to be clear.

23  A    It's eight, yes.  But that wouldn't change my opinion,

24  eight versus nine.

25  Q    And you just named the three candidates with the highest

1  level of support among white voters.  If you can tell me among

2  all eight candidates running for the school board in 2014,

3  which candidate received the lowest level of support among

4  black voters?

5  A    P. Morris.

6  Q    And who was elected in 2014?

7  A    Chabot, P. Morris, and Benz.

8  Q    Looking now to the bottom, middle bottom of that page.

9  A    I'll accept bottom.

10 Q    That qualifies.  What is shown on this part of the page?

11 A    This is the 2015 election, the last election that's been

12 held in the Ferguson-Florissant School District.  So this

13 again is a two-vote now, two-seat election, and the table is

14 structured the same as the others.

15 Q    And, once again, if each candidate cast all their votes,

16 what's the highest percent of votes that a candidate could

17 receive?

18 A    Fifty percent.

19 Q    Did you identify a candidate or candidates of choice

20 among black voters in the 2015 election?

21 A    Yes.  I identified one candidate as a black-preferred

22 representative, and that is Graves.  Ms. Graves, I believe.

23 Q    And what is your basis for identifying her as a

24 black-preferred representative among black voters in this

25 election?

1  A    I think their vote was cohesive in support of Ms. Graves.

2  As you can see, it's 52.4 percent is the estimate, and that

3  exceeds the 50 percent threshold.  I would say that's doing

4  pretty good among African Americans.

5  Q    Did you identify a second candidate of choice among black

6  voters in this election?

7  A    No, I did not.

8  Q    And why do you identify only one black-preferred

9  candidate in the 2015 election?

10  A    Well, let's go to the next highest in terms of percent of

11  votes among black -- cast by blacks.  That would be Ms.

12  Dameron who received an estimated 14.5 percent of their votes.

13  That's all, 14.5 percent.  I think the difference between that

14  and 52.5 is large.  The point estimate for Graves is way

15  outside the confidence interval for Dameron, and the

16  confidence intervals definitely do not overlap.  There is

17  quite a distance between them.

18       I don't think Dameron is in any way comparable -- I

19  mean, that you could call her a representative of choice or

20  even a candidate of choice simply because she gets the second

21  highest percent, but only at 14.5.

22  Q    And what was Ms. Graves' estimated level of support among

23  white voters in 2015?

24  A    21.4.

25  Q    Which candidate had the highest level of support among

1  white voters in 2015?

2  A    Ebert.

3  Q    And was he elected?

4  A    Yes, he was.

5  Q    What was his estimated level of support among black

6  voters in 2015?

7  A    9.8.

8  Q    What was the lowest level -- was that the lowest level of

9  support among black voters between any of the five candidates

10  in 2015?

11  A    Was that the lowest --

12  Q    Yes.

13  A    -- among black voters?  Yes.

14  Q    Yet he was elected?

15  A    Yes, he was elected.

16  Q    What, if any, observations do you have about the 2015

17  election when a black-preferred candidate was successful along

18  with a white-preferred candidate?

19  A    Well, the 2015 election is a -- what's called a

20  post-litigation election.  The election occurred after this

21  case was filed.  Post-litigation elections, we've been told by

22  courts and by the Supreme Court, are something that judges

23  have to be cautious about and that -- well, I think it's fair

24  to say that this could be some skepticism about whether that's

25  a one-off advantage that was -- that occurred for a minority

1    candidate or whether this represents is typical of elections.

2            So this was a post-litigation election.  It did --

3    it's the only two-vote election that's in my five years, in

4    five elections, it's the only one in which an African American

5    has been elected.  She is -- as I said, I think she got

6    cohesive support from African-American voters.

7            But post-litigation elections can entail changes in

8    candidate pools, changes in voting behavior.  These are things

9    that are looked at in terms of whether these post-litigation

10   elections can be considered like normal in terms of what's

11   going on in the jurisdiction or if there's something

12   aberrational about it.

13           In this election I'd say there's something

14   aberrational.  This is the only two-seat, two-vote election in

15   which there was only one major white candidate.

16   Q    Could you explain why you believe this is the only

17   two-seat election where there was only one major white

18   candidate?

19   A    Well, in all the others -- we can go back to page, I

20   believe -- well, it would be 18.  And you can see Ebert and

21   Schroeder were both far from minor candidates in terms of

22   their competitive status in the election.  The same thing is

23   true of Hogshead and Brown.  So both of those two-seat

24   elections -- two-vote, two-seat elections had two major, I

25   would consider, major white candidates certainly in terms of

1    the kind of electoral support they received.

2          When we get to 2015, the -- no.  The second black --

3    excuse me.  The second white candidate after the winner,

4    Ebert, as I said, got 14.5 percent of the black vote and only

5    9.9 percent of the white vote.  Now, that is minimal white

6    vote in effect.  And I don't think that's the same anywhere

7    near what Ebert and Schroeder and Hogshead and Brown received.

8    So this is an election in which the second white candidate --

9    I would consider a minor candidate, certainly not a

10   competitive candidate, and these numbers would indicate she

11   wasn't competitive among African Americans or whites.

12         The reason I point that out is that functions in

13   effect like leaving a second seat open for an African-American

14   candidate.  Now, this came after the litigation was filed.

15   It's a serious difference from what happened in previous

16   two-vote, two-seat elections.  And I think it could be

17   considered -- the future will see -- as a one-off advantage

18   that Ms. Graves received because there wasn't a second major

19   white candidate in this contest.

20   Q    And if you were going to characterize it, how significant

21   was the departure in this election from patterns in previous

22   elections that you analyzed?

23   A    In this case or in others?

24   Q    In this case.

25   A    In this case?  Well, it's a serious departure.  I mean,

1  you have two candidates very competitive for the white vote in

2  2012 and in 2013.  That doesn't happen in the post-litigation

3  election.  All of a sudden there's only one serious white

4  candidate in terms of competitive status.

5  Q    And just to summarize, based on your analysis once again,

6  did you form an opinion as to whether voting is racially

7  polarized in the FFSD elections?

8  A    In all of them --

9  Q    And if you can supplement --

10  A    -- that I have analyzed, in all five of those most recent

11  elections.

12  Q    And if you can summarize, what is that opinion?

13  A    That voting is racially polarized in each one and

14  therefore in the jurisdiction itself when it comes to voting

15  for school board members.

16  Q    You've gone through each election and identified eight

17  candidates of choice of black voters in the past five

18  elections?

19  A    I have.

20  Q    What percentage or how many of those candidates were

21  unsuccessful?

22  A    I think 75 percent.  I think I've identified eight,

23  including Ms. Graves in 2015.  Only -- well, six of them were

24  defeated; so that would be, I believe, 75 percent.  Correct me

25  if I'm wrong.

1   Q    I think you're correct.  Have you read Dr. Rodden's

2   report?

3          THE COURT:  If you got six over eight wrong, we need

4   to start over.

5   Q    Have you read Dr. Rodden's report in this case?

6   A    I've read two reports by Dr. Rodden, an initial one and

7   a -- well, he calls it a supplement, but it's basically a

8   rebuttal to my report.

9   Q    And are those contained behind Tab A and Tab B in the

10  binder in front of you?

11  A    Tab A is labeled "Report of Jonathan Rodden, Ph.D."  Tab

12  B is labeled "Supplemental Report of Jonathan Rodden, Ph.D."

13  "Bloc Voting and Cohesion" is the title.

14  Q    And in front of you at Plaintiffs' Exhibit 53, the second

15  tab -- or did you prepare a declaration in rebuttal to Dr.

16  Rodden's report?

17  A    To his first report, not his supplemental or rebuttal

18  report.

19  Q    Is that your rebuttal declaration in front of you, behind

20  Tab 53?

21  A    Yes, it is.

22  Q    And is your reasoning set forth in this rebuttal

23  declaration?

24  A    Sorry?

25  Q    Is your reasoning contained in this rebuttal declaration?

1    A    Okay.  I'm sorry.

2    Q    Is your opinion contained in your rebuttal declaration?

3    A    Yes, it is.

4    Q    Your rebuttal declaration responds to a few issues that

5    defendants' expert raised.  First, Dr. Rodden claims in his

6    rebuttal paragraph 10 that you have, quote, "adopted the view

7    that a white candidate cannot qualify as 'preferred' by

8    African-American voters."  Have you adopted that view?

9    A    Never.

10   Q    And how would you respond to Dr. Rodden's claim?

11   A    Well, that's not true.  I've never done that.  I didn't

12   do that in this case, and I've never done that in a previous

13   case.

14   Q    So in this report or ever in your 40 years working as an

15   expert on voting rights, have you ever made the assertion that

16   white voters cannot -- sorry -- that white candidates cannot

17   qualify as a black-preferred candidate?

18   A    Never.

19   Q    Again in Dr. Rodden's rebuttal paragraph 8, he states

20   that instead of following the logic of the Supreme Court in

21   *Gingles*, you, quote, "assume that minorities can only truly

22   prefer candidates who are themselves minorities."  And he

23   gives as an example that, according to your approach, it's --

24   you claim that it's impossible for black voters to have

25   preferred Hogshead in 2013, quote, "because she is white."

1  Have you ever taken this position?

2  A    No.   That is again not true.   And I have never -- I

3  haven't said that in this case, and I haven't said that in any

4  previous case or in my writings.   I do note in my writings

5  that African Americans show a -- certainly demonstrate a

6  preference for within-group representation.   That happens --

7  it's happened here, and it happens all over, but not that a

8  white can't be representative of African Americans.   I

9  identified that person in Euclid.   I've identified the person

10  in Chicago.   Certainly, frankly, I think I could represent

11  African Americans, but I don't think I would be their

12  preference.

13  Q    You never know.

14  A    I'm sorry.

15  Q    Did you -- just to be clear, did you determine that Ms.

16  Hogshead was not a black-preferred candidate because it's

17  impossible for voters to have preferred her because she is

18  white?

19  A    That is absolutely not true.

20  Q    Okay.

21  A    And I'd like to know why he says it.

22  Q    Second, Dr. Rodden states that you made an analytic

23  decision that has to do with uncontested elections, in that he

24  said you chose to focus only on races in which

25  African-American incumbents drew challengers.   Why didn't you

1  perform racially polarized analysis of uncontested elections?

2  A    Why did I not perform?  Because there's no election, it's

3  uncontested, that's not even on the ballot in FFSD elections.

4  There's nothing to analyze.  And so how do we -- we can't

5  assess voter preferences in uncontested elections.

6  Q    So just to be clear, could someone perform racially

7  polarized voting analysis when no votes were cast and no

8  election took place?

9  A    I'm not aware of who that person could be.  No.  I'd say

10  no.

11  Q    Third, Dr. Rodden claims in paragraph 5 of his rebuttal

12  report that you make the, quote, "jarring assertion that any

13  victory of a white candidate constitutes a white veto of

14  African-American preferences."  Do you in this report, or have

15  you ever in your 40 years as an expert --

16  A    I don't say that in this report.  I don't -- have never

17  said that.  And I would love to know why he says that.

18  Q    And, finally, Dr. Rodden claims in his rebuttal that, by

19  your logic, perfect cohesion would have entailed 100 percent

20  of the African-American votes for Ms. Morris, the only

21  African-American candidate running for a two-seat election.

22  He's referring to 2012.

23        Would black voters, in order to be cohesive, need to

24  cast 100 percent of their votes for a black-preferred

25  candidate?  For instance, B. Morris in 2012?

1  A    Well, the only way they could cast 100 percent of their

2  votes is to not cast 50 percent of their franchise.  They have

3  two votes in the election.  If you're going to get -- one

4  candidate is going to get 100 percent, that would entail

5  everybody -- basically all the African Americans single-shot

6  voting, in other words voting for one candidate, withholding

7  their votes for the other.

8         If that's the way you have to win an election in the

9  Ferguson-Florissant School District, then I would certainly

10  say that that's not an opportunity equal to that of other

11  members of the electorate, because they don't have to

12  single-shot vote in order to elect a candidate of their

13  preference.

14  Q    And so just to be clear, are black voters required to

15  give up 50 percent of their votes in order to show cohesion

16  behind a particular candidate?

17  A    Well, I would hope not.  Are they required to?  The only

18  way you can get 100 percent is to withhold your other votes so

19  no other candidate receives one.  Now, that's not -- I mean,

20  that's a voluntary act, but what it represents is -- if that's

21  the way -- if that's what you have to do to win, then, as I

22  said, I don't see how anyone could say the opportunity in this

23  jurisdiction is equal.

24  Q    And you've reviewed Dr. Rodden's report.  Does he at any

25  point suggest in his report that white voters should be

1    required to single-shot vote or give up their second or third

2    vote to elect their candidate of choice?

3    A    Well, I don't know about required, but I do believe his

4    report, in effect, says, if only they single-shot voted more,

5    they might have won seats.

6    Q    Are you referring --

7    A    And I think there's a suggestion that that's what they

8    should do.  I don't hear that suggestion -- well, I don't hear

9    any -- I haven't read or heard any claim by Dr. Rodden in his

10   report or in his deposition that says white voters need to

11   single-shot vote or that white voters have succeeded in

12   electing candidates because of single-shot voting.  There's no

13   allegation that white voters single shot, and yet they will

14   elect their candidates of choice all the time.

15   Q    So does the possibility of single-shot voting in any way

16   undermine your opinion that FFSD elections are racially

17   polarized?

18   A    No.  The ability to single shot?  No.  I mean,

19   polarization is one thing.  The opportunity is another.

20         MS. EBENSTEIN:  Okay.  If you could just give me a

21   moment to consult with my --

22         THE COURT:  Certainly.

23         MS. EBENSTEIN:  That's all the questions that I have

24   for you at this point, Dr. Rodden.  Thank you very much.

25         THE COURT:  Okay.  My instinct is to go ahead and

1  take a 20-minute recess at this time so cross-examination is

2  integrated rather than broken up.  So we will take a recess.

3  We'll reconvene at approximately 10:40.  Thank you.

4           **(COURT RECESSED FROM 10:20 AM UNTIL 10:47 AM.)**

5           THE COURT:  Are you ready?

6           Remind you, sir, you're still under oath.

7           You may proceed.

8                       **CROSS-EXAMINATION**

9  **BY MS. ORMSBY:**

10 Q    Good morning, Dr. Engstrom.  How are you?

11 A    I'm fine.  Good morning.

12 Q    I'm Cindy Ormsby.  We've met before.

13 A    At a deposition.

14 Q    Yes, we did.  Are you familiar with *Gingles* III?

15 A    Yes.

16 Q    And wouldn't you agree that under *Gingles* III there's a

17 precondition that there has to be a white majority?

18 A    No.

19        MS. EBENSTEIN:  Objection, Your Honor.  Calls for a

20 legal opinion.

21        THE COURT:  You can rephrase it.

22 Q    *Gingles* III says -- and I'm going to quote from the

23 *Gingles* case -- "In establishing this last circumstance, the

24 minority group demonstrates that submergence in a white

25 multi-member district impedes its ability to elect its chosen

1  representatives."

2         Is that what you understand the case to say as well?

3  A    Well, I think that was a fact situation in North

4  Carolina.  They were white-majority multi-member districts.

5  Q    So wouldn't the flip side of that also be true?

6  Wouldn't -- doesn't racially polarized voting require a white

7  majority of the voting-age population?

8  A    Absolutely not.

9  Q    Why not?

10  A    You can have racially polarized voting with a black

11  majority, white majority.  It can be -- it's not specific in

12  terms of what the majority is.  It's the way people vote and

13  how differently they vote.

14  Q    In your analysis you told us you analyzed five elections,

15  correct?

16  A    Correct.

17  Q    Yesterday Dr. Kimball -- were you here for Dr. Kimball's

18  testimony yesterday?

19  A    Not yesterday.  I was here on Tuesday.

20  Q    I don't remember if he said it Tuesday or yesterday.  My

21  days are kind of starting to all go together.  But he

22  indicated that he had analyzed three, three-year terms to

23  allow the board to have turned over three times.  So he went

24  back to 2004.  Do you think that that's a good process to use?

25  A    No.  I think if you go back to 2004, I think you're

1    talking about what are referred to as generally stale

2    elections.  This is 2016.  We want to know what's going on

3    now.  So it's a contemporary examination.  I wouldn't go back

4    to 2004.

5    Q    So you went back to 2011?

6    A    I did.

7    Q    And you just testified that you believed 2015 was a

8    special condition?

9    A    I think there are special circumstances.  You know, the

10   impact of that is for the judge to decide.  But, yes, I think

11   it's post-litigation.  It is aberrant fact situation in a way

12   that I think could have created a one-time advantage for an

13   African-American candidate to be elected.  I do believe those

14   things, yes.

15   Q    Is that the only election that you consider special

16   circumstances applied or could have applied?

17   A    It's the only one, yes.

18   Q    So in reality you're asking the judge to really look at

19   only four elections?

20   A    No.  The judge is free to look at the fifth election as

21   well.  I think the Supreme Court has told him to be cautious

22   about a post-litigation election.  And I would add, as a

23   witness, I think that's appropriate in this case to be

24   cautious about it.  It may not carry equal weight with the

25   others.  That's sometimes the way they handle post-litigation

1    cases, post-litigation situations.

2    Q    So it's your belief that Dr. Graves might not have been

3    elected absent the filing of this lawsuit?

4    A    Well, might not?  I don't see how I can disagree that she

5    might not have.

6    Q    Are you aware or did you look at the number of votes that

7    African-American candidates received in 2014 and 2015, total

8    number that African-American candidates received in those two

9    years?

10   A    I believe I've seen them, but I don't recall what they

11   are.

12   Q    Can we pull up 2014 election results.  This is

13   Plaintiffs' Exhibit 11.  It's been admitted into evidence.

14   Can we get a better view of that.

15          So the black candidates in 2014 were LaWanda Wallace,

16   F. Willis Johnson, Donna Paulette-Thurman, James Savala, and

17   Larry Thomas.  Do we agree?

18   A    I believe that's the case, yes.

19   Q    And if we add up all those votes, would you agree with me

20   that those five African-American candidates received more

21   votes than the three caucasian candidates?

22   A    I have never added them up, but I have no reason to

23   disagree with what you're telling me.

24   Q    So can you explain to me how if African-American

25   candidates in total received more votes than the white

candidates, how did the white voters block African Americans

from electing their candidates?

A    They blocked two of the African Americans because their

crossover vote was so minimal that it resulted in vetoing

those two candidates.

Q    Would you agree with me if they would have voted more

cohesively for the three highest vote-receiving

African-American candidates, that more of them, more

African-American candidates, would have been elected that

year?

A    Well, again, I don't think I can disagree with that.

You're not specifying any numbers or anything, but it's

possible that, if they were more cohesive, they would.  Now, I

think they already were cohesive, and I think the crossover

vote was minimal.  So I think there's more room for growth in

terms of support for black candidates within the white

electorate than within the African-American electorate.

You're asking that they be even more cohesive.  I think

they're sufficiently cohesive.

Q    But you would agree with me if they were more cohesive,

three African-American candidates would have been elected that

year?

A    Well, if the increase in cohesion was high enough to

elect three, yes, you're -- you're saying if they voted more,

they could have elected.  I can't disagree with that

1   statement.  It's a "what if" statement.

2   Q    Let's turn to the 2015 election.  In 2015 the

3   African-American candidates were Roger Hines, Michael Person,

4   and Courtney Michelle Graves.  Do you agree with me?

5   A    I believe that's the case, yes.

6   Q    And, again, if you add up all the votes given to

7   African-American candidates, they exceed the number of votes

8   received by caucasian candidates.

9   A    Well, I've never added them up; so, I mean . . .

10  Q    Did you --

11  A    I have no reason to disagree with you about that.

12  Q    And would you agree again that if African Americans would

13  have voted more cohesively, Roger Hines likely would have been

14  elected?

15  A    Well, yes.  Again, it's a "what if" statement.  If it had

16  been different, it would have been different.  I'm not

17  interested in "what if."  I'm interested in what actually

18  happened.  Again, I would point to the very small crossover

19  vote.

20  Q    Do you know how many votes in 2014 Mr. Savala was short

21  from beating Mr. Morris?

22  A    I don't know off the top of my head, no.

23  Q    Let me go back to 2014, please.  Did you bring a

24  calculator up there with you?

25  A    I did.

Q    Could you please use your calculator to deduct the number

of votes Mr. Savala received from the number of votes that Mr.

Morris received?

A    Okay.  Okay.  Do you want me to subtract Savala's vote

from Morris' vote?  Is that correct?

Q    Correct.  2,516 minus 2,425.

A    I get 91 votes.

Q    So if Mr. Savala would have received a mere 92 more votes

in 2014, he'd be sitting on the board right now; is that

correct?

A    If the election had -- voting behavior had been

different, the outcome could have been different, that's true.

I don't know about the others, but, yes, there's a 91-vote

margin between the two.

Q    And we know already that more votes were given to

African-American candidates than white candidates.  So if just

some of those votes that went to the two other African

American -- to LaWanda Wallace or to Larry Thomas, would have

made a difference in Mr. Savala's campaign.  Do you agree?

A    If the votes they received exceed 91, then I believe that

that would be the case.

Q    Can you tell me what evidence you have that the filing of

this lawsuit had anything to do with Dr. Graves being elected?

A    Had to do with -- well, this is my testimony, and that is

that the candidate pool was significantly different than in

1    previous two-vote elections.

2    Q    I heard your testimony.  I'm wondering what evidence you

3    have that the candidate pool was actually influenced because

4    of this lawsuit.

5    A    Oh, I don't know if there was a direct manipulation of it

6    or not.  It's my understanding you don't have to have

7    smoking-gun intent evidence for courts to say this is a

8    special circumstance, it's unusual, and it taints the

9    selection's probative value.  But I haven't done a study --

10   Q    So you --

11   A    -- of who may have talked to them, tried to encourage

12   candidates, why there's all of a sudden only one major white

13   candidate.  And I'm not sure that it's a kind of thing I could

14   get honest answers about.

15   Q    Did you look to see how often this case was cited in the

16   press in the St. Louis area?

17   A    No.

18   Q    So you believe that circumstantial evidence -- that there

19   is circumstantial evidence that a white candidate ran and got

20   more votes than African Americans; that Ms. Dameron ran in

21   order to -- I don't know.  What are you saying about Ms.

22   Dameron?  What is your point?

23   A    I think you'll have to -- well, I don't know what your

24   question was.

25   Q    You know what --

1    THE COURT:  I don't think there was one.

2  Q    Let me try again.  You believe the fact that this lawsuit

3  was filed could have caused a phenomenon in which whites felt

4  that Dr. Graves was one of the two best candidates.

5  A    I think that could have happened.

6  Q    Are you able to provide any peer-reviewed political

7  science literature that finds that the filing of a VRA

8  litigation case causes voters to elect certain candidates

9  because they are against a single-member district electoral

10 system?

11 A    No.  And if I were doing the study, that isn't what I

12 would ask anyway.  Voters react to candidate pools.  So I

13 think the critical thing here was a candidate pool that had

14 only one white major competitive candidate, unprecedented in

15 the other -- well, not present in the two other two-vote,

16 two-seat elections that I've examined.

17         Now, what could have happened?  I forget what your

18 question is.  I'm sorry.

19 Q    My question was is there any peer-reviewed material that

20 supports that contention?

21 A    Well, that voters react in a way -- voters that don't

22 want single-member districts react --

23 Q    Will vote for a --

24 A    Because of the litigation?

25 Q    Right.

1   A    Oh, I'm not aware of a study that has done that.  I'm

2   not.  I don't know of one.

3   Q    So if this case was not in the press but was not well

4   known, I'm still just confused on how it could have affected

5   the candidate pool, as you keep saying.  How could it have?

6   A    Well, something affected the candidate pool because it

7   was different.

8   Q    How is it different again?

9   A    It's different in that in 2015 there's only one

10  competitive white candidate in a two-seat election.  So if

11  there's only one white competitive candidate, that improves

12  the chances of an African-American candidate being elected to

13  one of the two seats.

14  Q    In the elections that you reviewed, you found an election

15  where there was a noncompetitive African-American candidate,

16  didn't you?

17  A    Oh, I'm sure I did.

18  Q    Did you point that out to the Court that that was

19  significant in any way?

20  A    I don't see it as having been anything that affected the

21  outcome of the election.  There was no need to point -- I

22  mean, there are minor -- when you have eight candidates or six

23  candidates or something, you're bound to find some that don't

24  poll with the voters very well.

25  Q    I'm trying to understand why it's important for us to

1    figure out why a candidate pool is what it is after litigation

2    is filed but we don't -- or you don't mention the political

3    atmosphere or the specific events that are going on in 2011

4    specifically that could also have affected a candidate pool.

5    A    Yes, but they weren't post-litigation elections.

6    Q    So --

7    A    And in the three, the first three, no African American

8    was elected.  In the fourth one was one.  I didn't say that

9    that was special circumstances at the 2014, but in 2015 it

10   certainly is circumstantial evidence that something went on.

11   Why?  I don't know why.  I don't know that anybody would be

12   able to assess why.  Like I said, people may not even give

13   honest answers to interviews when it comes to something like

14   that.

15          So it's not -- I don't believe the precedents require

16   that kind of smoking gun.  It's open to the judge to look at

17   circumstantial evidence.  The judge will decide how probative

18   the election is.  He may feel it's equally probative to the

19   four previous.  He may feel it's less probative to -- to

20   opportunities to elect in the school district.

21   Q    Okay.  When you look at African-American-preferred

22   candidates, you decided that if the most-preferred candidate

23   is African American and loses and the lesser-preferred

24   candidates of African Americans is white, that you don't count

25   the winning preferred white candidate as a preferred

1  representative.  Is that right?

2  A    The same would be true of if it was a lesser preferred

3  black candidate.  What I'm saying is they didn't get the level

4  of support from African Americans.

5  Q    But you --

6  A    And they were substantially lower, statistically

7  significantly lower; it could have been a black candidate or a

8  white candidate.

9  Q    But you agree that every voter has two or sometimes three

10  votes.  They have two or three choices in each election?

11  A    These elections are either two-vote, two-seat or

12  three-vote, three-seat.

13  Q    And you find that to be true even if there are other

14  African Americans in the race who receive less votes than the

15  white candidate?

16  A    If there are other African American --

17  Q    Yeah.

18  A    -- less votes than the white candidate who is also far

19  behind a preferred black candidate?

20  Q    Yes.  Yes.

21  A    Well, I'm not sure that that candidate would even finish

22  in the top two or three.  If they're behind both the black

23  candidate that's most preferred by blacks, a white candidate

24  that's lesser preferred by blacks, and if that black candidate

25  gets even less black vote, I don't see that -- if it's a

1  two-vote election, it wouldn't have any consequence in that

2  sense.  If it's a three-vote, then there could be a question

3  of whether the third black candidate was a candidate of

4  choice.  But if I decide that the second-place candidate was

5  not a candidate of choice, then certainly the third-place

6  candidate is not going to be either.

7  Q    But you'll agree with me in the five elections that you

8  analyzed, you failed to identify a white candidate as

9  African-American preferred even when only one African American

10  was running.  Is that right?

11  A    Well, I'm not going to say I failed to.  I'm going to say

12  I didn't.  I don't think there's any failure in that.

13  Q    So --

14  A    There weren't.

15  Q    So aren't you simply throwing out the seats in which

16  African Americans failed to vote cohesively?

17  A    Well, if they don't vote cohesively, then they're not a

18  candidate of choice.  They're not a representative of choice.

19  Q    Do you give any credence to the possibility that an

20  African-American-preferred candidate who loses sometimes by

21  less than 100 votes could be because of ineffectual

22  campaigning, voter anger at incumbents, or just simple bad

23  luck?

24  A    There you go.  What you're asking me is "what if?"  What

25  if they ran a bad campaign?  What if they had bad luck?

1  That's not what -- well, I don't know what happened.  I

2  analyzed the elections as they occurred and the votes cast as

3  they were.  And a "what if" statement doesn't tell me that

4  what I say about the election is inaccurate.  A "what if"

5  statement is simply like a hypothetical that says, well, what

6  if they got more cohesion?  What if they did more single-shot

7  voting?

8  Q   Or what if they --

9  A   Then couldn't they win?  Yes, they could win, and they

10  might win anyway, but that's not what happened.

11  Q   Or what if they didn't talk on a cell phone during a

12  candidate forum?  Or what if they didn't -- what if they

13  filled out the League of Women Voters' questionnaire that got

14  put in the *Post*?  Aren't all those things factors as well?

15  A   We're not doing a causal analysis.  We're looking at the

16  preferences of two groups of voters.  We're not asking why.

17  That's not part of Prongs 2 or 3 of *Thornburg*.  We're asking

18  how did they vote?  Was it different?  Did it affect the

19  outcome?  And that's the analysis.

20      Now, if we want to project something into, you know,

21  that it had been different or into the future or whatever,

22  that's different, but "what if" statements are not going to

23  tell me that my analysis is incorrect in terms of what

24  happened in casting the votes.

25  Q   You don't consider the fact that there's crossover voting

1    in five -- in the five elections that you analyzed?

2    A    Crossover voting by whom?  For whom?

3    Q    Whites for black and blacks for whites.

4    A    Well, there's some.  There's not zero.

5    Q    Do you include that into your analysis?

6    A    Yes.  I include the amount of crossover when a black

7    candidate -- excuse me -- when any candidate would have been

8    the preference of black voters.

9    Q    But you don't --

10   A    And that candidate, yeah, therefore would have won a

11   seat, but the white vote for that candidate is so low that

12   they didn't win the seat.  That's relevant to me.

13   Q    You don't take into consideration that white voters may

14   have voted for an African-American candidate simply because

15   they feel that he or she was the best candidate?

16   A    As I said, my analysis is not a causal analysis.  I don't

17   investigate why voters vote the way they do.  I ask how did

18   they vote, not why did they vote that way.  But are there

19   differences in their candidate preferences?  That's the proper

20   analysis for Prongs 2 and 3 of *Thornburg v. Gingles*.

21   Q    Unless it's --

22   A    The courts are clear those are not causal inquiries.

23   Q    Unless it's an election that takes place after a VRA

24   lawsuit is filed?

25   A    What's the question?

1  Q    Unless -- you don't look at causal effects unless it's an

2  election that takes place after a VRA lawsuit is filed?

3  A    Well, certainly I look at circumstantial evidence of

4  conditions.  Those are special circumstances that the Court --

5  Supreme Court even, looks -- says special circumstances, one

6  of which is a post-litigation election, should give pause or

7  create caution in terms of the probative value of that

8  election.

9         Now, in terms of special circumstances, you know, you

10  can say that I am looking at some causal thing in terms of

11  outcome, but that's not Prongs 2 or 3.  Prongs 2 and 3 are not

12  causal analysis.

13  Q    Did you find crossover voting to be significant in any of

14  the elections that you reviewed?

15  A    I didn't -- I wouldn't say that crossover voting among

16  whites was significant.  I believe the highest level of

17  crossover voting by whites for a black candidate was the 21

18  percent crossover -- that's my estimate -- that occurred in

19  the 2015 election.  It was the highest crossover in all five

20  elections.

21  Q    Is it your opinion that in the Ferguson-Florissant School

22  District single-member districts are better than at-large

23  elections?

24  A    Better for what purpose?

25  Q    For whatever purpose.

1  A    Well, I think they will provide the African-American

2  minority in the FFSD with a closer-to-equal opportunity to

3  elect the candidates of their choice.  Maybe equal.  I haven't

4  seen the single-member district illustrations.  I don't know

5  what they entail other than that there are majority

6  African-American districts.

7          So, yes, I think it would provide a more equal

8  competitive context for African-American voters to be able to

9  elect candidates of their choice.  I do believe that.

10 Q    You've written that at-large elections are beneficial to

11 the largest groups in some of your professional writings,

12 haven't you?

13 A    Yes.

14 Q    Is it your belief that the VRA specifically requires that

15 minorities have the opportunity to elect their chosen

16 candidate?

17 A    I believe the concern is the opportunity provided, not

18 the results obtained.  The opportunity that is provided.

19 Q    Not to be able to actually elect but have the opportunity

20 to elect?

21 A    Well, it's the opportunity, I believe, that the law

22 focuses on.

23 Q    Did you author an article entitled *Cumulative and Limited*

24 *Voting:  Minority Electoral Opportunities and More*?

25 A    Yes.  In the *St. Louis University Public Law Review*, I

1    did.

2    Q    That's right.  I'd like for you to look on your screen.

3    Is that the first page of your article?  It's Defendants'

4    Exhibit NN that's been stipulated to.

5    A    It appears to me to be the first page of my article.

6    Q    Do you know what year this was published?

7    A    2010?  Was that it?  I'm sorry.  I'm not sure about that.

8    Q    I think you're correct when you say 2010.

9    A    Okay.  All right.

10   Q    On page 101 of this article -- and I don't want the Court

11   to think it's that long of an article.  It was just in the

12   middle of a journal.  About halfway down --

13        THE COURT:  I'll read a hundred pages if I have to.

14   It's okay.

15   Q    About halfway down the first paragraph, under "Minority

16   Electoral Opportunities," that's the Roman numeral, will you

17   read the sentence that begins "There are numerous" -- and we

18   blew it up for you so you could read it.

19   A    Oh.  I see where the sentence "There are numerous"

20   begins.

21   Q    Yes.  Yes.

22   A    So I'm going to read there to the end of the paragraph?

23   Q    Right.

24   A    "There are numerous variations in how at-large elections

25   are implemented, but regardless of the particular arrangement,

1    this system does have a tendency to favor the candidates

2    preferred by a majority group, or at least the largest group,

3    of voters within the jurisdiction.  It provides the largest

4    group of voters an opportunity to determine the winners of all

5    of the seats."

6    Q    So if African Americans are a majority or even a

7    plurality of the voting-age population, wouldn't at-large

8    elections be better for African Americans?

9    A    The voting-age population is not equivalent to voters.

10   Q    Did you do any analysis as to African-American turnout in

11   the five elections that you analyzed?

12   A    No.

13   Q    Did you co-author an article entitled *The*

14   *Underrepresentation of Blacks on City Councils:  Comparing the*

15   *Structural and Socioeconomic Explanations for South/Non-South*

16   *Differences*?

17   A    I did co-author an article with that title, yes.

18   Q    Your Honor, this is Defendants' Exhibit 00, which has

19   been stipulated to.

20         And I've put the first page up on the screen for you

21   to identify it as your article.

22   A    Yes, that's my article.

23         THE COURT:  Your co-author was Michael McDonald?  He

24   was a musician from Florissant.

25         MS. ORMSBY:  That's right.

1    THE WITNESS:  This Michael McDonald has never been

2  mistaken for him.

3    THE COURT:  Okay.  All right.

4  Q   (BY MS. ORMSBY) Do you know where this was published?

5  A   Where it's published?  The *Journal of Politics*.

6  Q   And do you know when?  Do you know when?

7  A   I'm going to guess 1982.

8  Q   Your memory is excellent.  It was 1982.  Now, in this

9  paper if the city had an African-American population over 50

10 percent, you threw them out of the study, didn't you?

11 A   I believe so.

12 Q   Why is that?

13 A   Because we were looking at cities that were minority

14 African American.

15 Q   Don't you actually state because if a African-American

16 population is over 50 percent, that that specification

17 assumes -- because you wanted to be able to assume minority

18 status that if it's over -- let me say that again.

19    Let me refer you to your article.  I've highlighted

20 the section that I want you to look at.  On page 1093 to 1094,

21 could you read the highlighted section, please?

22 A   Yes.  It begins "Due to data on black median income not

23 being reported for 15 cities, all of which have less than 1

24 percent black population, and our decision to eliminate the

25 four central cities in which the blacks constitute a majority

of the population, the theoretical specification assumes

minority status, the following analysis is based on central

cities in 224 SMSAs."

Q    What does that stand for, SMSA?  What does SMSA stand

for?

A    Standard metropolitan statistical area.

Q    Thank you.  The conclusion of this article -- correct me

if I'm wrong -- is that at-large elections tend to dilute the

votes of minorities; is that correct?

A    I think that's correct.  I'm not sure about the nuances

in it.  I mean, it's also South/non-South comparisons, which

can make a difference in that sense.

Q    Would you agree with me that in the Ferguson-Florissant

School District whites are the minority of the population?

A    I have no basis to agree with you on that.

Q    You didn't look at census data to determine whether or

not whites were the minority population, total population in

the district?

A    Well, I did not myself look.

Q    Okay.  That's fine.

A    I understand it's a disputed issue.

Q    I'm talking about total population.  I'm not talking

about voter-age population.

A    Okay.  I don't know.

Q    Okay.

1    A    I don't know what that figure is.

2    Q    All right.  Okay.  Finally, does your ecological

3    inference analysis rely on the 2010 decennial census or on the

4    2011-2013 ACS?

5    A    The independent variable is based on the 2010 census of

6    population.

7    Q    Have you been involved in any cases in which you used and

8    relied upon the ACS?

9    A    Me?

10   Q    Yes.

11   A    Probably those cases I discuss in the *St. Louis*

12   *University Public Law Review* because we calculate what's

13   called a "threshold of exclusion," and we want to see what

14   that -- what the figure would be within the city compared to

15   that.  So it may have been that I took more recent data for

16   citywide figures, not for lower-level figures, but citywide

17   figures.

18   Q    Were you an expert in *Benavidez v. City of Irving*?

19   A    Yes, I was.

20   Q    Didn't the court in that case rely on the ACS holding

21   that the Census Bureau considered ACS data reliable and

22   intends for it to be relied upon in decisions such as Voting

23   Rights Act compliance?

24   A    I did not participate in that portion of the case; so

25   actually I don't remember what the Court had to say about it.

1 Q    Why do you choose to rely on the 2010 decennial census

2 rather than the 2011-2013 ACS?

3 A    Because it's a complete enumeration, and we were dealing

4 with the -- my reliance on that concerned precinct

5 configurations, and when you get down to the precinct level,

6 the ACS has lots of errors in it.  Obviously, the lower the

7 level of geography, the less accurate the small samples are.

8        So we chose -- or I chose -- well, I relied upon, and

9 I had no problem relying upon the 2010 census figures, because

10 they are counts.  We know there are errors in the counts, but

11 they are counts, not an estimate, and certainly not an

12 estimate based on very small numbers.

13        So when it comes to precinct-level data, I'm fine

14 with relying on the closest census.  And certainly it was very

15 close to 2011, 2012, 2013, and then '14 or '15 are getting

16 into the mid-decade period.

17 Q    You would agree, though, that in this case the Court

18 would need the most recent data available so that we can look

19 at what the situation is as close to the present?

20 A    The Court would need it?

21 Q    Yes.

22 A    Well, I think it would depend on the purpose.  As I said,

23 the 2010 census was used to calculate the racial composition

24 of precincts, and at that level of geography the ACS has, as I

25 understand it, large confidence intervals in effect.  It's not

1  very precise.

2  Q    And --

3  A    As you go up in geography, the confidence intervals get

4  smaller.  I am not an authority on the ACS, I will admit that,

5  but that's why I'm fine with using their 2010 census for the

6  RPV, racially polarized voting, analysis.

7  Q    I would -- well, isn't it true that relying on the census

8  is important when you're drawing -- when you're redistricting,

9  when you're drawing, you know, borders and guidelines, because

10  the law requires us to rely on the 2010 census for that

11  information?  Would you agree with that?  Or do you know about

12  that?  And if you don't know, that's fine.

13  A    Well, redistricting has been done based on total

14  population in almost all instances.

15  Q    Uh-huh.

16  A    Now, I think the census would have the voting-age

17  population figures as well because in the Voting Rights

18  situation then there's a second analysis beyond population

19  equality of whether there's dilution in the vote.  But the

20  latest census is generally what is used, and it would be the

21  most recent, and in almost all circumstances it has been total

22  population.

23  Q    Do you agree with me that a Voting Rights Act case in

24  which the minority voting-age population and the white

25  voting-age population are roughly identical, as they are in

1   this case, is unusual?

2   A   Well, it's a fact circumstance that is unusual, and so I

3   would think it would be unusual in terms of Voting Rights

4   cases.

5         MS. ORMSBY:  I don't have any further questions.

6   Well, wait a minute.  I better check with my colleagues first.

7                    **(OFF THE RECORD.)**

8   Q   (BY MS. ORMSBY) Dr. Engstrom, you were deposed on August

9   18, 2015, correct?

10   A   I believe it was in August.  I was deposed in this case,

11   that's correct.

12   Q   You were under oath at the time that you gave your

13   deposition?

14   A   I was.

15   Q   Just as you are today.  I'll refer to page 93, line 24.

16   I'm just going to read a few lines.

17         I asked you -- question.  "Well, would you agree that

18   a VRA case in which the minority VAP and the white VAP are

19   roughly identical is rather unusual?"

20         And your response was, "Well, yes.  I think 'unusual'

21   would be an appropriate term."

22         Do you remember giving --

23   A   I think that's what I just testified to.

24   Q   I just needed to verify it.

25         THE COURT:  You are correct.  You just said that.

1      MS. ORMSBY:  All right.  Thank you.  I don't have

2  anything else.

3      THE COURT:  Any redirect?

4      MS. EBENSTEIN:  Yes, Your Honor.

5      THE COURT:  Are you ready?

6      MS. ORMSBY:  Yes.

7      THE COURT:  You may proceed.

8                    **REDIRECT EXAMINATION**

9  **BY MS. EBENSTEIN:**

10  Q    Dr. Engstrom, turning for a moment to the 2011 election

11  results.  And that is on page 17 of your report.

12  A    I'm there.

13  Q    How many white candidates ran in that election?

14  A    Seven.

15  Q    And did you at any point in your report suggest that the

16  white residents of FFSD would have to coordinate to decide who

17  should run and how many people should run for office?

18  A    No.  I don't think I expressed any opinion on that.

19  Q    And could you again repeat for us who are the white

20  candidates, the three white candidates, that received the

21  highest estimated level of support in that election?

22  A    Martinez, P. Morris, Chabot.

23  Q    And were they successful?

24  A    All three of them were successful.

25  Q    They were successful despite the fact that there were

1   seven white candidates running in the 2011 election?

2   A    They were.

3   Q    If you could turn for a moment to 2014.  That is on page

4   19 of your report.

5   A    I'm there.

6   Q    Were black candidates in that election required to

7   coordinate as the entire population of the black residents of

8   FFSD to decide which candidates should run and which should

9   not run for office?

10  A    Were they required to do that?  I don't know of any

11  source that would say you must do that.

12  Q    And do the --

13  A    The answer would be no, you know.

14  Q    Did the three black-preferred candidates win in that

15  election as the three white-preferred candidates won in 2011?

16  A    Did the three black candidates win?

17  Q    Yes.

18  A    No.  Only one.

19  Q    Turning now to the EI estimates for 2015.  Did you at any

20  point claim that Mr. Hines, who you estimate received 12.3

21  percent of black voters' votes -- did you at any point claim

22  that he was a black-preferred candidate?

23  A    Well, let me -- my numbers is 14.5 percent.

24  Q    That's for Ms. Dameron, who is white.  For Mr. Hines, who

25  is black and received 12.3 percent of the vote, did you at any

1  time claim --

2  A    I may -- I'm sorry.  That's the homogeneous portion.  My

3  apologies.

4  Q    That's okay.

5  A    Hines did -- my estimate is 12.3 percent of the votes

6  cast by African Americans.

7  Q    Based on that estimate and your earlier testimony, did

8  you at any point claim that Hines was a black-preferred

9  candidate or a candidate preferred among black voters?

10  A    No.  Sorry.  No.

11  Q    So is it relevant how many more votes he could have

12  received if, as opposing counsel asked you, things were

13  different in a number of different ways?

14  A    Is it relevant how many more?

15  Q    Sure.  If he had received a ton more votes because of

16  entirely different circumstances than what occurred, having

17  not identified him as a black-preferred candidate, would that

18  change your estimation of how many black-preferred candidates

19  won?

20  A    If he had received more votes and if he had won?  Is that

21  what the question is?

22  Q    Sorry I'm not being very clear.  You testified a moment

23  ago that you did not identify Hines as a black-preferred

24  candidate.

25  A    I did not.  That's correct.

1    Q    If he had magically won, would that somehow be a victory

2    for black-preferred candidates since he is not a

3    black-preferred candidate?

4    A    If he somehow had won with 12.3 percent of the vote?

5    Black votes?

6    Q    Magically won, having not identified him as a

7    black-preferred candidate, would his victory be a victory for

8    a black-preferred candidate?

9          MS. ORMSBY:  I'm going to object as to leading, Your

10   Honor.

11         THE COURT:  Overruled.  I mean, we're working with

12   magic beans now; so we'll just --

13         MS. EBENSTEIN:  I would say the same magic that

14   opposing counsel was --

15         THE COURT:  I understand.  I overruled the objection.

16   Q    (BY MS. EBENSTEIN) Okay.

17   A    Okay.  So if getting 12.3 percent of the vote he would

18   have won, well, in that instance I'd have to assume that he

19   got much higher white vote than he did in order to win.

20   Q    Okay.

21   A    So under the hypothetical he could have been a black

22   candidate preferred by white voters.  It's possible.

23   Q    Turning to your article *Cumulative and Limited* --

24         THE COURT:  Hang on a second.  I assume it's possible

25   if what you experience here, because you could never know for

1    sure was the one vote voting, the bullet voting, the

2    single-shot voting as you referred to it. You could not

3    necessarily register high on either end, but the numbers -- a

4    lower number could still prevail if all the votes were going

5    in one place. Do you follow me?

6              THE WITNESS: Well --

7              THE COURT: Is that possible?

8              THE WITNESS: What would happen under single-shot --

9    with single-shot voting what would be happening is -- this is

10   what I assume you're asking me -- is that the percentage of

11   the vote would stay the same in the sense that you can't get

12   more than one vote, but your relative position among the

13   candidates in the total vote could be better because you

14   withheld all your votes from all the competing candidates.

15             THE COURT: Go ahead. I'm sorry to interrupt.

16   Q    Turning now to Exhibit NN, your article entitled

17   *Cumulative and Limited Voting: Minority Electoral*

18   *Opportunities and More*.

19   A    Do I have it in here?

20   Q    No. We need it on the screen. Exhibit NN. Page 101

21   that we just looked at.

22   A    That's on my screen, yes.

23   Q    Coming up. Was this -- judging from the title *Cumulative*

24   *and Limited Voting* -- an article about cumulative and limited

25   voting to potential remedies in Voting Rights Act violations?

1   A    Yes.

2   Q    And I believe you pointed out a moment ago, but just to

3   highlight, in that sentence that defense counsel read

4   regarding at-large elections, do you say in there that a

5   particular system has a tendency to favor candidates

6   preferred, or do you say that it always favors candidates

7   preferred?

8   A    I believe it says "tends to."

9   Q    And as you said earlier, does that statement apply to

10  voters within the district or the voting-age population within

11  the district, as you --

12  A    It refers to the group that constitutes the largest

13  number of people casting ballots.

14  Q    Okay.

15  A    Voters, not voting-age population.

16  Q    Turning to Defendants' Exhibit 00, and if we could pull

17  up page -- I'm sorry.  Going back to the last article

18  *Cumulative and Limited Voting*.  And back to page 101.  In the

19  first sentence in the following paragraph, does that start

20  "Minority groups protected by the Voting Rights Act"?

21  A    Of the subsequent paragraph?

22  Q    Yes.

23  A    That's the way it begins.

24  Q    Okay.

25  A    Yes.

Q     Thank you.  Sorry, Michael.  Back to Defendants' Exhibit
00.  And turning to page 1093 that we had up before, do I
understand correctly -- first of all, could you repeat when
this article was published?

A     I think it was -- now I'm drawing a blank.

Q     I will give you a hint.

A     1982, I believe.

Q     Yes, 1982, as it says on the top right of the page.  And
in my --

        THE COURT:  It was during Reagan's first term.  I'll
forgive you for --

Q     And on page 1094 of this article, do I understand
correctly that you're setting the theoretical specifications
of the article to exclude both four central cities -- sorry --
15 cities with less than 1 percent black population and four
central cities, as defense counsel described?  Does that mean
that this article says or does not say one thing one way or
the other about those two groups that are excluded from the
study?

A     Well, they're excluded.  It doesn't -- the analysis does
not include them.  So it wouldn't say anything about them.

Q     With regard to the case *Benavidez* that you were asked
about, did you determine the numbers with which you -- the
numbers that you worked with to perform a racially polarized
voting analysis, or did another expert decide how to classify

1  voters?

2  A    Well, another expert did it, and he's an expert in

3  Spanish surname matching.

4  Q    Do you recall exactly how he matched voters to determine

5  if they were part of the CVAP, the citizen voting-age

6  population, and were Latino?

7  A    Well, I don't know about CVAP.  These were the -- based

8  on the names of the people that signed in to vote in the

9  particular election.  So it doesn't deal with census data.

10 And Davey Lee was the person that did the Spanish surname

11 matching, and he provided me with the results of his Spanish

12 surname match.  Now, the identification of Spanish surnames --

13 I believe he uses United States Census classification of

14 Spanish surnames.  That's my memory anyway.

15 Q    But you didn't classify voters as Latino or non-Latino?

16 Somebody else performed that analysis?

17 A    Yes.  People with Spanish surnames were classified as

18 Latinos, and people that didn't have Spanish surnames were

19 classified as non-Latinos.

20 Q    And defendants' counsel asked you if you recalled

21 particular parts of that decision.  Do you recall that the

22 court relied on your use of EI and your racially polarized

23 voting analysis in this case?

24 A    Yes.  Both would be true, EI and my conclusion about

25 racially polarized voting.

1  Q    Do you recall whether the court relied only on elections

2  in which voters had a choice between Hispanic and non-Hispanic

3  candidates?

4  A    I believe that was the case, yes.  That's the kind of

5  elections I analyze, and I think he relied on that; so, yes,

6  they all would have been providing a choice between or among

7  at least one Latino and at least one non-Latino candidate.

8  Q    Do you recall that the court noted and approved your

9  testimony that low minority turnout does not militate against

10  a finding of a Section 2 violation?

11  A    I believe that is the case.

12  Q    Do you recall whether in reliance on your testimony the

13  Court determined that *Gingles* II was satisfied based on your

14  RPV analysis of three elections?

15  A    Well, yes.  We won the case; so I'm sure he found all

16  three *Gingles* preconditions to be present.

17  Q    And do you recall whether or not in reliance on your

18  testimony the court determined that *Gingles* III was satisfied?

19  A    Same answer as to *Gingles* II:  Yes.  He ruled in favor of

20  us, which means he found racially polarized voting.  That's a

21  prerequisite to going forward.

22       MS. EBENSTEIN:  If I can have a moment, Your Honor,

23  to consult with my co-counsel.

24       THE COURT:  Sure.

25       MS. EBENSTEIN:  These are all the questions that I

1　have.

2　　　　THE COURT:  All right.  Thank you very much.  Thank

3　you, sir.  You may step down.  Who's your next -- you're going

4　to call Mr. Redditt?  Who's your next witness?

5　　　　MS. EBENSTEIN:  Mr. Redditt Hudson.

6　　　　THE COURT:  How long will it --

7　　　　MS. EBENSTEIN:  Forty-five minutes to an hour.

8　　　　THE COURT:  We're going to take a quick five-minute

9　break.  We'll come back -- and I mean 11:45, and we'll at

10　least try to get your direct in, and we'll go from there.  All

11　right.  I have a guilty plea at 12:30-ish.  So the only issue

12　there is it's not like someone in custody, you know.  But just

13　push all your stuff to one end of the table so the U.S.

14　Attorney and the defendant can do their business.  It's not

15　someone that you're going to have to move to the back of the

16　room to be safe or anything.

17　　　　　**(COURT RECESSED FROM 11:40 AM UNTIL 11:50 AM.)**

18　　　　THE COURT:  Call your next witness, please.

19　　　　MS. EBENSTEIN:  Your Honor, plaintiffs call Mr.

20　Redditt Hudson to the stand.

21　　　　THE COURT:  If you would step forward, sir, and be

22　sworn.

23　　　　　　　**(WITNESS SWORN BY THE CLERK.)**

24　　　　THE COURT:  Are you ready?

25　　　　MS. ORMSBY:  Yes, Your Honor.

84

1            THE COURT:  You may proceed.

2                   **REDDITT HUDSON,**

3 **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

4 **FOLLOWS:**

5                 **DIRECT EXAMINATION**

6 **BY MS. EBENSTEIN:**

7 Q    Good morning.

8 A    Good morning.

9 Q    Would you please state your name for the record?

10 A    My name is Redditt Hudson.

11 Q    And you have in front of you a binder with a tab marked

12 Plaintiffs' Exhibit 117.  Could you turn to that, please?

13 A    I see it.

14 Q    Do you recognize this document?

15 A    Yes, I do.

16 Q    And what is it?

17 A    It's my declaration.

18 Q    Did you sign the declaration under oath?

19 A    Yes, I did.

20 Q    And did you read it before you signed it?

21 A    Yes, I did.

22 Q    Have you recently had the opportunity to review each of

23 the statements in this declaration?

24 A    Yes, I have.

25 Q    And are each of the statements in your declaration true?

1    A    Yes, they are.

2    Q    Mr. Hudson, where do you live?

3    A    I live in Florissant.

4    Q    And what is your address?

5    A    2250 Derhake Road.

6    Q    How long have you lived in the St. Louis area?

7    A    I've lived in St. Louis all my life.

8    Q    Did you attend school in the St. Louis area?

9    A    Yes, I did.

10   Q    Where did you attend school?

11   A    I went to the University City schools.

12   Q    Which schools specifically did you attend?

13   A    I went to Pershing Elementary School.  Then I went to

14   Brittany Woods Middle School.  Then I went to Hanley Junior

15   High School.  Then I went to University City Senior High

16   School.

17   Q    And did you attend college?

18   A    I did.

19   Q    Where did you go to college?

20         THE COURT:  In St. Louis all we need to know is where

21   he went to high school.  You know that.

22   A    And I started to say the "Almighty University City High

23   School," but I held back.  I went to St. Louis University here

24   in St. Louis.

25   Q    And --

1   A      Proud former Billiken.

2   Q      What did you study at St. Louis University?

3   A      I was a communications major.

4   Q      When did you move to Florissant?

5   A      Eighteen years ago.

6   Q      And do you live within the Ferguson-Florissant School

7   District?

8   A      Yes, I do.

9   Q      Will you understand me to mean the Ferguson-Florissant

10  School District if I call it "the district" or "FFSD"?

11  A      Yes, I will.

12  Q      Are you familiar with the Ferguson-Florissant School

13  Board?

14  A      Yes, I am.

15  Q      And how did you become familiar with it?

16  A      Well, when me and my wife moved to the district, we took

17  it upon ourselves to become familiar with who was in charge in

18  the school district that our kids were going to be educated

19  in.

20  Q      And how many children do you have?

21  A      Two at Ferguson-Florissant schools.

22  Q      Your daughters currently attend the Ferguson-Florissant

23  schools?

24  A      Yes, they do.

25  Q      Which schools have they attended?

1   A     They started -- I'm sorry.

2   Q     Go ahead.

3   A     They started at Commons Lane Elementary School, and they

4   both went to Cross Keys Middle School, and now they're both

5   students at McCluer North High School.

6   Q     And have you attended school board meetings at any point

7   since your daughters have been students in the district?

8   A     Yes, I have.

9   Q     Mr. Hudson, what is your occupation?

10  A     I'm a social justice advocate.  I've worked for a number

11  of organizations in that capacity.

12  Q     And can you briefly describe your employment history?

13  A     Well, interestingly enough, I started out as a St. Louis

14  metropolitan police officer here in St. Louis, and I was there

15  from 1994 to 1999.

16  Q     Where did you work after you left?

17  A     I went to an organization called Better Family Life,

18  which is a public service organization is the best I would

19  describe it, with a particular focus on bringing resources

20  into the African-American community.

21  Q     And what was your position at Better Family Life when you

22  worked there?

23  A     I was a job developer.

24  Q     When, if you recall, did you leave Better Family Life

25  organization?

1  A    I believe it's 2004.

2  Q    And what did you do after you left Better Family Life

3  organization?

4  A    I cofounded an organization, interestingly enough, with a

5  young man who was a former prisoner and gang member, and me

6  being a former police officer, we put together an organization

7  called Project PEACE.

8  Q    Does Project PEACE -- did Project PEACE have an

9  organizational mission?

10  A    Yes, it did.  Our specific focus was gang violence

11  prevention and intervention, particularly in educational

12  settings.

13  Q    And when did you leave Project PEACE?

14  A    2005.

15  Q    Where did you work after you left Project PEACE?

16  A    I went to work for the ACLU of Eastern Missouri as a

17  racial justice project manager.

18  Q    From -- during which years?

19  A    2005 to 2012.

20  Q    And where did you work after you left the ACLU?

21  A    I was hired by the NAACP, the national NAACP.

22  Q    And what is the mission of the NAACP?

23  A    To ensure the equality of rights of everyone and to

24  eliminate race-based discrimination in a variety of settings.

25  Q    Are you also are a member of the NAACP?

1   A    Yes, I am.

2   Q    And does that mean that you're a member of the Missouri

3   State Conference of the NAACP?

4   A    Yes, it does.

5   Q    Is the NAACP a partisan organization?

6   A    No, it is not.

7   Q    What type of organization is it?

8   A    It's an organization that is not for profit.

9   Q    And does the mission that you described -- ensuring the

10  equality of rights -- include the equality of rights in voting

11  and political rights?

12  A    Absolutely.

13  Q    What is your current position with the NAACP?

14  A    I'm the regional field organizer for Region IV of the

15  NAACP.

16  Q    And what are your responsibilities in your position as

17  the regional field organizer?

18  A    Well, as a regional field organizer, I have ten states,

19  and my responsibility is to ensure that the NAACP branches or

20  units in all of those states are effectively executing the

21  mission of the organization.

22  Q    Does that include executing their mission as it relates

23  to the equality of rights in voting and in elections?

24  A    Yes.

25  Q    What sort of activities do you undertake on behalf of the

1   NAACP that relate to voting in elections?

2   A    Well, working with the units and branches, we do voter

3   education, voter registration, "get out the vote" efforts,

4   phone banking.  We work with other organizations

5   collaboratively to do the same.  We stay pretty busy with

6   that.

7   Q    You mentioned that voter registration is one of your

8   initiatives through the NAACP.  Why is voter registration an

9   important initiative for the NAACP?

10  A    Because historically in many black communities voter

11  registration has been low, and there's always an issue for us,

12  and the relationship between voter turnout and registered

13  voters is obvious.  So the more registered voters we have, the

14  more vote we can turn out or help turn out.

15  Q    And what do you think -- why -- what leads you to believe

16  that voter registration rates are historically low in the

17  African-American community?

18  A    My own experience, the information that we have available

19  as an organization.  Those things are pretty much on the

20  record, I think.  That's, to my knowledge, common knowledge.

21  Q    What are some -- why is voter registration lower?  What

22  are some of those reasons, if you know?

23  A    Well, you have a number of things that impact African

24  Americans when it comes to voter registration.  There's a

25  transient population generally in many municipalities, not

1  just in St. Louis or in Missouri but around the country.

2  Those trends kind of run the same.  There's sometimes

3  difficulties obtaining some of the things that you need to

4  properly register to vote.  And there are just a number of

5  hurdles sometimes in front of black voters when it comes to

6  registering to vote.

7          And not to -- I'm sorry.  I just don't want to --

8  there's also an issue relative to disenfranchisement, felon

9  disenfranchisement, that significantly impacts African

10  Americans' ability to vote and/or feel like they can register

11  to vote.

12  Q    And you said that the work you just described takes place

13  in Missouri as one of the ten states; is that correct?

14  A    Yes.

15  Q    When do you undertake these voting-related activities?

16  A    This is year round.

17  Q    Does that include leading up to both the April and

18  November elections?

19  A    Yes.

20  Q    Are you involved in other community service organizations

21  or activities personally?

22  A    I am.  Yes.

23  Q    Which organizations?

24  A    I'm a member of the Omega Psi Phi fraternity, which is a

25  community service fraternity.  I'm a cofounder and member of

1  National Coalition of Law Enforcement Officers for Justice

2  Reform and Accountability.  I'm also the board chair of the

3  Ethics Project, which is based here in St. Louis.  And from, I

4  want to say, 2006 to 2008, maybe Counsel Rothert can correct

5  me, but I was a member of the U.S. Attorney's Hate Crimes Task

6  Force here in St. Louis.

7  Q    What sort of work do the U.S. Attorney's Hate Crimes Task

8  Force take on?

9  A    We focused on hate crimes and particularly race-based or

10  religion-based hate crimes that took place in the region and

11  efforts to educate the public around the circumstances that

12  create environments where hate crimes can take place and

13  prevention as well.

14  Q    And this may seem obvious based upon your experience, but

15  do you keep up on current events as part of your work?

16  A    Absolutely.  I mean, my news feed is where I spend a lot

17  of time relative to current events.

18  Q    What are some of the news organizations that you read or

19  refer to, to keep up on current events?

20  A    Oh, *New York Times*, *Washington Post*, The *Guardian*.  The

21  *Huffington Post* has a host of publications that are directly

22  concerned with current events and issues.  Vox.com is another

23  one.

24  Q    If you will excuse me for a moment I'm going to get some

25  water.  Thank you.

1          Mr. Hudson, do you vote?

2    A     I do.

3    Q     And is voting important to you?

4    A     Yes, it is.

5    Q     Could you please explain briefly why voting is important

6    to you?

7    A     Well, in my family and in my community we have a deeply

8    engrained sense and reverence and respect for the sacrifices

9    that were made in order for us to have the right to vote --

10   the lives that were lost, the blood that was shed, the laws

11   that were passed.  We have a deeply engrained sense of

12   responsibility when it comes to exercising our right to vote.

13   Q     Which elections do you vote in?

14   A     All of them:  Primary, general -- all of them.

15   Q     Do you vote in April local or municipal elections and

16   November general elections?

17   A     I do.

18   Q     And do you vote in Ferguson-Florissant School District

19   School Board elections?

20   A     I do.  Yes, I do.

21   Q     Is voting in local elections important to you?

22   A     Yes, it is.

23   Q     And why is voting in local elections important?

24   A     I think voting in local elections may be more important

25   than voting in general elections because your local

1    elections -- the results of those elections are going to have

2    the most immediate and direct impact on your quality of life

3    relative to anything from education, taxes, employment,

4    housing.  That is where your vote really has an immediate

5    impact.  So it's very important to me to vote in local

6    elections.

7    Q    Mr. Hudson, have you run for elected office?

8    A    I have.

9    Q    And when did you run for office?

10   A    I ran for the Missouri State Senate, State Senate

11   District 13 in 2012, and I ran for the Forest Park Community

12   College Board of Trustees, I believe, in 2014.

13   Q    And why did you run for public office?

14   A    I wanted to give our community a voice where I felt that

15   it had been absent and that our interests had not been

16   consistently represented in Jefferson City in particular, and

17   I sought the opportunity to do that.  The same thing with the

18   Ferguson -- I'm sorry -- with the Forest Park Community

19   College Board of Trustees.

20   Q    When you say "our community" --

21   A    I mean the African-American community.  I'm sorry.

22   Q    Did you undertake a campaign when you ran for office?

23   A    I did.

24   Q    What sort of activities did you undertake as part of your

25   campaigns?

1  A    All of the standard stuff.  We canvassed and knocked on

2  doors.  We tried to do some fund-raising, phone banking,

3  attempts to get out the vote.

4  Q    Do you think you had strong support in African-American

5  communities when you ran for office?

6  A    Yes, I do.

7  Q    And were you successful in your 2012 state senate

8  campaign?

9  A    No, I was not.

10  Q    Who was successful?

11  A    Gina Walsh.

12  Q    What was her -- was she successful in the primary or in

13  the --

14  A    In the primary and in the general.

15  Q    What is her race?

16  A    She's white.

17  Q    Did she receive endorsements?

18  A    She did.

19  Q    Do you recall which organizations that you know of

20  endorsed her candidacy?

21  A    Some of them I do.  I think it was the North County Labor

22  Association, which I think is kind of a conglomerate of

23  different labor organizations, and I think the

24  Ferguson-Florissant NEA endorsed her as well.

25  Q    Did you receive any union endorsement in that election?

1  A    I did, actually.  The Coalition of Black Trade Unions,

2  which historically kind of votes with those same entities I

3  just described, broke from them to back me as a candidate.

4  Q    And, Mr. Hudson, given your active role in local

5  elections and politics, are you familiar with recent

6  Ferguson-Florissant School District elections?

7  A    I am.

8  Q    In recent elections have you observed any patterns, if

9  any, related to race?

10  A    Yes.

11  Q    What are those patterns?

12  A    The most obvious pattern is that black voters vote one

13  way and white voters vote another way.

14  Q    What do you base your opinion on?

15  A    My own experience, conversations with people who were

16  going to vote, and the election results after talking to

17  people and understanding where their support lies.  Yeah.

18  Q    And you said that black voters vote one way.  Do the

19  candidates who you believe black voters vote for generally

20  win?

21  A    No.

22  Q    Let's talk through some recent school board elections.

23  A    Okay.

24  Q    Mr. Hudson, were you a resident of the FFSD in April of

25  2013?

1    A    Yes.

2    Q    And do you recall the 2013 district election?

3    A    I do.

4    Q    Do you recall the campaigns leading up to the 2013

5    election?

6    A    I do.

7    Q    Based on your observations during the 2013 school board

8    campaigns, which candidate do you think had the support of

9    African-American voters?

10   A    Chuck Henson had overwhelming support, in my opinion, of

11   the African-American voters.

12   Q    What leads you to believe that Chuck Henson had broad

13   support among African-American voters?

14   A    Conversations with a lot of people.  I want to say

15   hundreds, but I don't want to be quoted wrong on that.  But I

16   feel like it was a hundred people over the course of the

17   election cycle.  Yard signs, conversations with people at the

18   "High Achievement for All" meetings that Chuck and I would

19   both attend, the support was very obvious that he had in the

20   African-American community.  I would say it would be

21   substantially large.

22   Q    And what is Chuck Henson's race?

23   A    He's black.

24   Q    Was he elected in 2013?

25   A    No.

1   Q    Who did he run against?

2   A    I believe he ran against Leslie Hogshead and Keith Brown.

3   Q    And do you know Mrs. Hogshead or Mr. Brown's race?

4   A    They were both white.

5   Q    Which candidates were elected in 2013?

6   A    Ms. Hogshead and Mr. Brown.

7   Q    Do you believe that race was an issue in the 2013 school

8   board election?

9   A    Yes, I do.

10  Q    In what way did the topic of race come up in the 2013

11  school board election?

12  A    Well, Chuck was a pretty vocal and outspoken advocate for

13  more inclusion, minority inclusion, in the district relative

14  to staffing.  He was a big advocate of addressing the what we

15  call the "school to prison pipeline," which is something I

16  became familiar with in my professional life, and I've seen it

17  now in my personal life and its effects.  The achievement gap.

18  All the ways that black students are particularly affected in

19  educational settings, he was an advocate for addressing those

20  things.

21       But the board, as it was then constructed, I don't

22  think was very supportive of that, and I think that his

23  presence in the election and the positions that he espoused

24  drove out his opposition, and it probably cost him some

25  endorsements, some funding, and other things that you

1    typically need to win an election.

2    Q    And what is the basis for your belief that his positions

3    affected his campaign in the way that you just described?

4            MS. ORMSBY:  Your Honor, I'm going to object as to

5    speculation.

6            MS. EBENSTEIN:  The basis for --

7            THE COURT:  Overruled.  He can give his opinion.

8    Overruled.

9            MS. EBENSTEIN:  Thank you.

10           THE WITNESS:  Would you repeat the question, please?

11   Q    (BY MS. EBENSTEIN) Sure.  What is the basis for the belief

12   that you just stated that Mr. Henson's positions affected his

13   campaign in the way that you described?

14   A    Well, the basis was what I would call an open secret.  I

15   mean, as a parent in the district and one who's attended the

16   meetings, particularly "High Achievement for All" meetings,

17   that these kinds of things were openly discussed.

18           There was clear opposition to him on the board

19   relative to what he was talking about, and he would talk to me

20   about it.  I think it was reflected in the electorate and the

21   way that people vote.  You either vote for those candidates

22   who that you know support the kinds of positions that he

23   espoused or you don't, and I think that was reflected in the

24   election results.

25   Q    Turning to the 2014 election, were you a resident of

1  Florissant in April of 2014?

2  A    Yes.

3  Q    And were you eligible to vote in 2014 local elections?

4  A    I was.

5  Q    Do you recall the 2014 school board elections?

6  A    I do.

7  Q    Do you recall who ran in that campaign?

8  A    Yes, I do.

9  Q    What were the names of some of the candidates who ran in

10 that --

11 A    Well, on the one side you had kind of a slate of

12 candidates, I would describe them, which was, I believe,

13 Paulette-Thurman, James Savala, and Willis Johnson.  On the

14 other side you had Mr. Morris, Mr. Chabot, and Mr. Martinez.

15 Q    Was there the support for that first group of candidates

16 that you mentioned -- Thurman, Savala, and Johnson -- in the

17 African-American community in the school district?

18 A    Yes, there was.

19 Q    How do you know there was support for those three

20 candidates in the African-American community?

21 A    Well, I attended some forums, some meetings,

22 conversations in the community.  There was huge support for

23 them.  And I think a lot of it had to do with -- I don't know

24 if I want to get ahead of myself here -- but some of the

25 things that were going on at the time.  So the support they

1  had and then yard signs and every other way was pretty

2  obvious.

3  Q    Was race -- was race an issue in the 2014 campaign?

4  A    Yes.

5  Q    And how did race come up in the 2014 campaign?  What

6  issue did it come up related to?

7  A    Well, there were a number of issues that came up in the

8  2014 campaign that were related to race.  Some of them had to

9  do with discipline.  Some of them had to do with student

10  safety in the district.  Some of them had much to do with the

11  dismissal of or the suspension of Dr. Art McCoy.  All of those

12  things, I think, centered around ultimately the issue of race.

13  Q    Do you recall an issue -- have students ever been bused

14  or transferred into the Ferguson-Florissant School District?

15  A    Yes, they have.  State laws requires, I believe, that

16  school districts accept transfer students; so yes.

17  Q    Has that been in any way an issue in the district?

18  A    Yes.

19  Q    The question of transfer students?

20  A    Yes.

21  Q    Do you believe that that does or does not relate to race

22  in any way?

23  A    Absolutely.  I do believe it does.

24  Q    Could you explain how the issue of students transferring

25  to the FFSD relates to race?

1   A    Well, for example, in the most recent case when the

2   controversy erupted around accepting students from Normandy

3   School District, which is almost 95 percent African American,

4   I believe, and Riverview School District, which is almost

5   again 95 percent African American, I think a lot of the

6   resistance that parents in the district saw or perceived was

7   based on the fact that these were more black students coming

8   in our districts.

9   Q    And you mention -- you testified a moment ago in response

10  to my question that student discipline was an issue that came

11  up in the 2014 related to race.  How was student discipline

12  raised in the 2014 school board campaign?

13  A    Well, I think Savala and Thurman and Johnson understood

14  that we needed to take a look at some of the disciplinary

15  policies that are set in the district by the board, some of

16  the zero-tolerance stuff that we had concerns about, because

17  it disproportionately impacts black kids in that school and

18  all our schools.  That was one of the primary reasons

19  disciplinary issues were presented in that election cycle.

20  Q    And could you please explain why you consider student

21  discipline to relate to race?

22  A    A couple of reasons.  I mean, in my professional life,

23  I've done significant work on issues related to what's called

24  a "school to prison pipeline," which is a kind of an aggregate

25  of circumstances that result in more African-American kids

1    being put formally into the criminal justice process and

2    disproportionately into the criminal justice process than

3    white kids are.

4         And it starts in the schools where you have now seen

5    kind of overpolicing or greater law enforcement presence in

6    school settings, policies like zero tolerance that result

7    typically in exponentially higher rates of suspensions and

8    expulsion for black kids.  And so it's a concern for us

9    because we do know that empirically there's almost zero

10   relationship between those policies and educational outcomes.

11   Q    And you mentioned a moment ago -- well, were there other

12   issues that came up in the 2014 campaign that you believe

13   related to race?

14   A    Safety was something that was presented as well.  And I

15   think we saw that early on when the Normandy kids again were

16   up for transfer because there was some things going on with

17   their district that required them to be bused elsewhere.

18   Initially, I think they were going to go to the Francis Howell

19   district, and those parents in that community raised issues

20   relative to safety concerns that were very public and in the

21   media, and I think that was echoed again when the idea of

22   those same kids coming into the Ferguson-Florissant schools

23   was introduced.  Some of the same kinds of concerns about

24   potential violence and other issues would be presented with

25   these kids being introduced into our schools.

1  Q    Were you personally concerned that there were going to

2  be safety issues because of --

3  A    Not at all.  Not at all.  If anything, these kids would

4  have been back on their heels.  In a new environment and an

5  unfamiliar setting where they don't know anybody, I doubt that

6  they would have been very aggressive.

7  Q    And you -- was there an event that occurred just prior to

8  the 2014 campaign that influenced the campaign at all?  I

9  believe you mentioned it a moment ago.  With the

10  superintendent?

11  A    Oh, yeah.  Yeah, Dr. McCoy.

12  Q    Who is Dr. McCoy?

13  A    Dr. McCoy is someone that I know, and he was the first

14  black superintendent of the Ferguson-Florissant School

15  District.

16  Q    How do you view Dr. McCoy -- how did you view Dr. McCoy

17  as the superintendent?

18  A    I had the highest opinion of his ability as an educator

19  and a motivator, and I thought that we were very lucky to have

20  him in our district.

21  Q    Do you believe that Dr. McCoy was successful or

22  unsuccessful as the superintendent?

23  A    I thought he was doing a terrific job.  I mean, he was

24  recognized by the U.S. Chamber of Commerce as the

25  game-changing educator in Missouri.  And I know that my kids

1    even would tell me how he would be in the schools and

2    interacting with students and keeping them focused and

3    motivated.  And I thought that his work particularly with the

4    "High Achievement for All" effort where some of the concerns

5    of African-American parents who make up the majority in terms

6    of school population were being expressed and recognized, and

7    we were actually taking affirmative steps to us trying to

8    address some of those issues.  I thought he was doing a

9    fantastic job.

10   Q    Is Dr. McCoy presently the superintendent of the FFSD?

11   A    No.

12   Q    Did there come a time when he separated from the

13   district?

14   A    Yes.

15   Q    And before he separated from the district, did he have --

16   was there any action taken against him in the district?

17   A    Yes.  He was put on administrative leave, I believe, or

18   suspended, I guess, if those terms are interchangeable, I

19   don't know, but he was relieved of his duties.

20   Q    Do you know why he was suspended in the district?

21   A    No.

22   Q    Did you ask board members why he was suspended in the

23   district?

24   A    Yes.

25   Q    And when did you ask why Dr. McCoy was suspended?

1    A    Specifically, my turn to ask was on November 2013, at a

2    meeting of the board.

3    Q    And where was that meeting of the board in November 2013?

4    A    It was held at McCluer North High School as opposed to

5    where it's regularly held at the administration center on

6    Waterford because the crowd was so large.

7    Q    Did you attend that entire meeting?

8    A    I did.

9    Q    And did you speak at that meeting?

10   A    I did.

11   Q    I'd like to show you a video excerpt marked Plaintiffs'

12   Exhibit 139.  I show an excerpt.

13                    **(VIDEO EXCERPT PLAYED.)**

14   Q    Do you recognize this video, Mr. Hudson?

15   A    I do.

16   Q    And what does it depict?

17   A    That was me addressing the board at the November board

18   meeting of 2013 that I told you about.  It was inside the

19   McCluer North gymnasium, which was filled to capacity mostly

20   with parents there to try and get some explanation from the

21   board as to why Dr. McCoy was no longer our superintendent.

22   Q    Did other people also speak at that meeting?

23   A    Yes, they did.

24   Q    Approximately how many people spoke at that meeting?

25   A    I would say 50.

1  Q    And did the board ever address the concerns that you

2  expressed that day?

3  A    No, they did not.

4  Q    How did the board respond to the concerns that you

5  expressed that day about Dr. McCoy's suspension?

6  A    You know, it was extremely frustrating for me as a parent

7  and others as a parent -- as parents that I know because they

8  kept providing these shifting explanations.  Initially it was

9  described to us or presented that the reason that Dr. McCoy

10 was no longer in position as our superintendent was a

11 difference in philosophy, philosophical differences, which,

12 when we looked at the mission statement of the district, his

13 actions as a superintendent were entirely consistent with

14 that; so we couldn't understand that puzzle.

15          And then it became something different.  I think it

16 was a failure to follow some directive or something like that.

17 And then it morphed, if those who were present and can recall

18 publicly, the idea that there was something to do with

19 attendance records that had been falsely or submitted and then

20 manipulated and that the district got monies that it wasn't

21 supposed to get, which, as it turned out, that was standard

22 practice for districts to amend their numbers to make sure

23 that they got them right.  So that was nothing.  There was

24 never any transparency in it for the parents in the district

25 that we felt like the board were in service to.

1  Q    And you said a moment ago that you requested information

2  on the failure to follow some sort of directive.  Did you ever

3  receive that information from the board?

4  A    Well, I did follow up on my Sunshine Law requests; so I

5  got those records of the minutes from the meetings.  And as I

6  suspected, I could find no thing in the record that would

7  indicate what they had described to us.

8  Q    How did you understand the board's treatment of Dr.

9  McCoy?

10 A    I think I understood it, based on my observations and

11 even conversations that I had with Dr. McCoy, as adversarial

12 and undermining and not a very good relationship at all.

13 Q    Were you surprised by the board's treatment of Dr. McCoy,

14 the first black superintendent?

15 A    I was not.

16 Q    Why not?

17 A    Because the board as it was then constructed I think

18 understood that they didn't have to listen to us.  They didn't

19 have to really, frankly, address our concerns or be concerned

20 about them.  And they acted with indifference towards us as --

21 and when I say "us," I mean African-American parents in the

22 district who overwhelmingly supported Dr. McCoy.  We were

23 treated with great indifference, I believe.

24 Q    Turning now to the 2015 election in Florissant, were you

25 a resident of Florissant in April of 2015?

1    A    Yes, I was.

2    Q    Were you eligible to vote in the 2015 local election?

3    A    Yes, I was.

4    Q    Do you recall the 2015 campaign for the school board?

5    A    Yeah.  Yeah.

6    Q    And do you recall, leading up to the municipal elections

7    in Ferguson, more or less attention than usual paid to local

8    elections generally?

9    A    Significantly more.

10    Q    Could you explain?

11    A    Well, Ferguson -- you know, I don't want to risk

12    overstating it, but I don't think that I can.  Ferguson had

13    become a focal point of interest for the entire world at that

14    point.  After Mike Brown was killed, the entire world was

15    paying attention to what was going on in our community, and I

16    think that definitely had an impact on our elections as well.

17    Q    And you mentioned earlier in your testimony that you

18    follow a number of different news sources, national, and you

19    named those specific news sources.  Were you following news

20    sources in April of 2015?

21    A    Yes.

22    Q    What sort of issues were covered?

23    A    Oh, the racial disparities that were present in Ferguson

24    in a whole host of arenas relative to criminal justice,

25    relative to employment, relative to municipal representation,

1    those things were front and center in many of -- I'm sorry --

2    much of the media reporting about Ferguson at that time.

3    Q    And was there coverage of the local election during that

4    time?

5    A    Yes.

6    Q    How long have you been a resident of the FFSD?

7    A    Eighteen years.

8    Q    Do you recall any other instance in those 18 years where

9    there was national or international coverage of

10   Ferguson-Florissant local elections?

11   A    No.

12   Q    How would you characterize the attention paid to the 2015

13   election, particularly with regard to race and the election?

14   A    It was extraordinary.  I think -- I don't think you can

15   legitimately debate that it was extraordinarily high coverage

16   for that particular community -- both local, national, and

17   international.

18   Q    And in general with regard to school board election

19   campaigns, do you believe that all voters have an equal

20   opportunity to elect the candidates they want to represent

21   them?

22   A    No, I do not.

23   Q    Why not?

24   A    Well, in order to be elected, you have to have more than

25   just numbers.  You need money, funding to do mailers, to do

1    public education about the fact that you are a candidate.  You

2    need resources.  You need an organization.  You certainly

3    would like to get some endorsements.  And black candidates

4    typically in north St. Louis County lack those kinds of

5    resources.

6    Q    What is the organization the Ferguson-Florissant National

7    Education Association?  With you familiar with that

8    organization?

9    A    Yes.  It's a teachers' union, I believe.

10   Q    And is the what I'll call the FFNEA involved at all with

11   FFSD elections?  I know that's a lot of abbreviations.

12   A    Sure.  Sure, they are.  They interview candidates, select

13   candidates, endorse candidates, fund candidates, and work for

14   candidates that they decide to support.

15   Q    Overall, how would you characterize the effect of an

16   FFNEA support or endorsement in FFSD elections?

17   A    I think it has a significant impact on outcomes, election

18   outcomes.  Typically, their candidates win -- their candidates

19   they support.

20   Q    And, Mr. Hudson, do you know the racial composition of

21   the current FFSD school board?

22   A    I believe there are five white board members and two

23   black board members.

24   Q    And do you recall what has been the racial composition of

25   the school board since your daughters have been in high

1  school?

2  A    It's always been a majority-white board.  I think at some

3  points in time, since we've moved here, it's been all white,

4  but I don't think there's ever been any more than two blacks

5  on it.

6  Q    Do you believe that African Americans have adequate or

7  inadequate representation on the board?

8  A    I think it's inadequate.

9  Q    Do you believe that overall the members of the FFSD

10 school board have represented your interests in the last five

11 years?

12 A    Overall?  I would say I don't even feel like they've

13 acknowledged the interests that I have and many in the

14 African-American community have relative to our schools.  No.

15 Q    Do you believe that the African-American community and

16 the white community in the district have the same interests or

17 same needs as one another?

18 A    We all want to see our kids educated, I understand that,

19 but given the impact of race on education, I would say no.

20 Q    What are some of the needs that you believe are different

21 or particular to African-American residents of the district?

22 A    Well, we certainly have issues relative to discipline in

23 the schools or disciplinary policies in the schools, the

24 achievement gap, how our children are being taught, who

25 they're being taught by.  There's a really shameful lack of

1  diversity, I think, in some of the schools relative to

2  staffing.

3          For instance, at my daughter's elementary school,

4  when we first moved to the district, we were shocked to see

5  that even though the student population was 95 percent African

6  American, I think there were only two black teachers in the

7  building.  The rest of the African-American staff in that

8  building was custodial.

9  Q    You mentioned a moment ago school discipline.  Are you

10 aware of any ways in which the school board plays a role in

11 school discipline?

12 A    Yeah.  They set policy for the district, and I think they

13 hear appeals relative to suspensions.  So they play a

14 significant role in disciplinary activity in the district.

15 Q    You mentioned earlier that there are disparities in

16 discipline.  How are you aware of disparities?

17 A    Well, in my professional life, I mean, that's been part

18 of my business for a number of years now, is not only to study

19 those disparities but to try to address them and work with

20 different entities to try to address the disparities.  But

21 this is very common knowledge.  It's widely available public

22 information relative to race and its adverse impact on

23 students of color, and suspensions.

24 Q    Are there other disparities that you're aware of in the

25 district either that implicate students or -- black students

1    or other African-American residents of the district?

2    A    I think educationally I would say relative to advanced

3    courses and advanced placement courses, and those kinds of

4    opportunities, I think they're fairly limited when it comes to

5    our students' access to those opportunities.

6    Q    And you just mentioned two ways in which African-American

7    communities may have different concerns when it comes to race

8    and education.  Has the board been responsive to your concerns

9    related to discipline or the differences in achievement based

10   on race?

11   A    No.

12   Q    Do you think that there's an effect of the board's

13   nonresponsiveness to the concerns of the African-American

14   community when it comes to race and educational --

15   A    Over time?  Over time, yes, I do.  I think if you are

16   confronted with indifference long enough and an inability to

17   address or change the situation that allows for people to be

18   indifferent to your interest, I think people become

19   disaffected.  I think they disengage and try to find other

20   ways to do what it is they need to do for their kids.

21           I think you have some communities that probably feel

22   more marginalized now than they have in the past relative to

23   their ability to have a voice in the systems that affect their

24   families and their kids, and I think African-American

25   participation just in the process relative to the school

1  board, elections -- anything -- is diminished by the idea that

2  people in charge of running this district don't care about us

3  and there's nothing you can do about it.

4  Q    Just to summarize, Mr. Hudson, overall what do you think

5  is the effect of the amount of African Americans' preferred

6  candidates' representation on the school board that you just

7  described?

8  A    Can you say that again?

9  Q    Sure.  I didn't say it very well the first time.  I'm

10  sorry.

11  A    I didn't listen very well.  I'm sorry.

12  Q    Overall what is the effect of what you described as

13  currently only having two black members on the board,

14  previously sometimes having an all-white board?  How do you

15  think that affects the school district?

16  A    I think it has a negative effect on the school district,

17  particularly when it comes to black parents' participation and

18  engagement when we know the history there, we've seen what we

19  think is in the short term some pretty bad history there

20  relative to our interests and the people that we support not

21  just on the board but in the district itself, with Dr. McCoy.

22  So you have a rift that I think is continuing to grow in some

23  respects between the board and the community that is

24  ostensibly there to serve.

25          MS. EBENSTEIN:  Thank you, Mr. Hudson.  If you can

1  just give me a moment to consult.

2          Mr. Hudson, thank you very much.  I have no further

3  questions at this time.

4          THE COURT:  Thank you, sir.  We'll take our lunch

5  recess at this time.  The criminal case will convene in five

6  minutes.  I'll see everybody else at 1:45.

7              **(COURT RECESSED FROM 12:35 PM UNTIL 1:53 PM.)**

8          THE COURT:  Are you ready?

9          MS. EBENSTEIN:  Yes, Your Honor.

10          THE COURT:  I'll remind you, sir, you're still under

11  oath.

12          You may proceed.

13                      **CROSS-EXAMINATION**

14  **BY MS. ORMSBY:**

15  Q    Good afternoon, Mr. Hudson.  My name is Cindy Ormsby, and

16  I'm the attorney for the Ferguson-Florissant School District.

17  A    Good afternoon.

18  Q    How are you this afternoon?

19  A    I'm feeling a little sluggish after lunch, but I'm okay.

20  Q    All right.  Well, maybe I'll try to take a little

21  advantage of that.

22          THE COURT:  Take advantage of him.

23  A    I knew you would.

24          THE COURT:  Did you take advantage of the cafeteria

25  downstairs?

1    THE WITNESS:  No.  I was somewhere else.

2    THE COURT:  Oh, okay.

3  Q    (BY MS. ORMSBY) Mr. Hudson, you stated you voted very

4  often, right?

5  A    Say that again.

6  Q    You vote very often?

7  A    Yes.

8  Q    And you stated that you've run for election a couple of

9  times?

10  A    Yes.

11  Q    Four times?  Did I hear that right?

12  A    Twice.

13  Q    So is there anything that keeps you from voting?

14  A    No.

15  Q    Have you ever done any analysis of the registration

16  numbers of African Americans versus whites specific to the

17  Ferguson-Florissant School District?

18  A    No.

19  Q    Do you know when you ran for election whether or not any

20  white voters voted for you?

21  A    Based -- are you asking me for my opinion?

22  Q    Yes.

23  A    Yeah.  Based on my opinion -- I'm sorry, not based on my

24  opinion, but based on my experience and my interactions, no.

25  They were very vocal in the opposition to me.  In the places

1   where I met them or saw them, they were pretty clear that they

2   didn't support my candidacy.

3   Q    You didn't meet any white people who were supportive of

4   you?

5   A    I had a very small number.

6   Q    Okay.

7   A    Yeah.  So if "any" qualifies as more than one, then yes.

8   Q    "Any" does.  Have you ever supported a white candidate

9   for any election?  Any election?

10  A    Yes.  Do you mean Ferguson-Florissant School District, or

11  you mean just any election?

12  Q    My first question was for any election.

13  A    Yes.

14  Q    I just wanted to clear something up.  You stated with

15  regard to the 2014 election that Chris Martinez was a

16  candidate?

17  A    I think so.

18  Q    Okay.  Is Chris Martinez currently on the board?

19  A    I don't think so.

20  Q    And when would -- if he was on the board, when would his

21  election have been?

22  A    Right now I guess it would have been the 2014.

23  Q    And he's not currently on the board, correct?

24  A    I don't think so.

25  Q    So is it possible he didn't run for reelection in 2014?

1    A    It may be possible.  I thought he did.

2    Q    And you listed several candidates, but you didn't list

3    all of the candidates that year, did you?

4    A    No.

5    Q    So let's talk a little bit about Dr. McCoy.  In your

6    declaration you say that Dr. McCoy was removed, but is it your

7    understanding that Dr. McCoy resigned, or was he terminated?

8    A    I think he was constructively terminated.  He was removed

9    and given several reasons for his removal that were

10   inconsistent, and at some point he decided to leave, which I

11   would have done the same thing under similar circumstances.

12   Q    And you're aware that if Dr. McCoy had gone through with

13   the termination process, that the reasons that the board was

14   terminating him would have been made public at the public

15   hearing?

16   A    No.

17   Q    You weren't aware of that?

18   A    No.

19   Q    You stated that, I believe in your video that we saw,

20   that you stated that the board could release the reasons if

21   Dr. McCoy said it was okay.  Correct?

22   A    Yeah.  I see in the video I said that.

23   Q    Are you aware that Dr. McCoy refused to sign a release

24   for the board to discuss those reasons?

25   A    No.  I'm not aware of that.  But I would like to know

1    what his reasons were, because there are any number of

2    reasons, from my own experience, that refusal to sign

3    something like that does not necessarily lead to the

4    conclusion that you have done something wrong.  There may be

5    any number of reasons, future employment among them.

6    Q    Are you aware that when Dr. McCoy resigned, there was a

7    joint statement issued by both him and the board stating that

8    the reasons for his suspension were not racial in nature?

9    A    No.

10   Q    Do you know Dr. McCoy personally?

11   A    Yes, I do.

12   Q    Did you ask him why he was suspended?

13   A    Did I ask him what?

14   Q    Why he was suspended.

15   A    No.  We talked prior to that about the board's opposition

16   to the transfers, which he made very clear to me that was what

17   he --

18   Q    Sir, my question is did you ask Dr. McCoy why he was

19   suspended?

20   A    No.  You didn't let me finish my question.

21        THE COURT:  Well, but the answer is no.

22        THE WITNESS:  Okay.

23        THE COURT:  Sorry.

24        THE WITNESS:  All right.

25        THE COURT:  The attorney for the plaintiffs will be

1    able to ask you some follow-up questions.

2            THE WITNESS:  I understand.  I understand.

3    Q    Did you ask Dr. McCoy why he resigned?

4    A    No.

5    Q    So you weren't comfortable asking Dr. McCoy for those

6    reasons, but you wanted the school board to tell you those

7    reasons?

8    A    I didn't see him to ask him that after he resigned.  For

9    a very long time, he was not necessarily publicly available,

10   and he's not -- I didn't seek him out for those answers.  I

11   figured I would get an answer from him at some point.  So I

12   would have been comfortable asking him.  I just hadn't had the

13   opportunity at that point.

14   Q    Have you had the opportunity since then?

15   A    I haven't seen him since then.

16   Q    Do you believe that the board should have discussed the

17   reasons for Dr. McCoy's suspension against his wishes?

18   A    Well, as much as they didn't always respect his wishes in

19   other areas, I'm a little confused by it, but I guess

20   ultimately no.

21   Q    You talked a little bit about a situation that came up

22   with regarding the reporting of attendance to the state, and

23   it was your belief that nothing ever came of that.  Is that

24   correct?

25   A    No.

1    Q    That's not what you said?

2    A    No.  That's not what I believed, that nothing ever came

3    of it.  What I was -- my understanding of what came of it was

4    that it was decided that the procedures that were used in

5    reporting those numbers did not fall outside of any

6    regulation; that it is not uncommon for schools to amend the

7    numbers to make sure that they get the right numbers reported;

8    so what could appear as manipulation was really correcting

9    numbers.

10   Q    Are you aware that the school district had to pay money

11   back to the state because attendance numbers were reported

12   incorrectly?

13   A    Intentionally incorrectly?

14   Q    Are you aware that the school board, as a result of that

15   report, had to pay money back to the State of Missouri because

16   attendance numbers were reported incorrectly?

17   A    No.

18   Q    Do you believe that Dr. Thurman is -- do you believe that

19   Dr. Thurman is representing the interests of the African

20   Americans in the school district?

21   A    I will be frank with you.  I have not been as engaged

22   with the activities of the school board since that last

23   election.  I, like so many others in the community, have been

24   a little bit disaffected.  My focus has been more on my own

25   students in the district.  I haven't heard any reports that

1    she's operated adverse to our interests, though.

2    Q    How about Dr. Graves?  Any --

3    A    Same answer.

4    Q    Did Dr. Graham -- when she was on the board, did she

5    represent the interests of African Americans?

6    A    I believe so.

7    Q    Are you aware the board recently hired a new

8    superintendent?

9    A    Yes.

10   Q    Have you met him?

11   A    Just recently.  I was at a forum that he spoke at; and

12   then, of course, I became aware of him again a couple of days

13   ago when the *St. Louis Post Dispatch* reported on some problems

14   he had in his prior district, which I don't think should

15   affect him in this district.  And then I think I met him on

16   the elevator about an hour ago.

17   Q    From what you've met -- from what you know of him, do you

18   believe he's qualified?

19   A    His qualifications on paper, what I heard at the forum,

20   yes.

21   Q    Is the forum you talk about the forum where they were

22   introducing the final list for superintendent?

23   A    At McCluer South-Berkeley, yes.

24   Q    Do you believe the board picked the best candidate out of

25   the two that you met?

1  A    I didn't meet the other one.  I sought the other one.  I

2  don't know.  I didn't really do a thorough investigation; and,

3  you know, I think I was a little bit cynical because I thought

4  the board was out to find a new black superintendent because

5  they fired the last one.  And given the circumstances written

6  large with Mike Brown and the Department of Justice

7  investigation and everything else that was going on here, I

8  think I was a little skeptical about any choice that they

9  made, and I expected them to hire an African-American

10  superintendent to replace Dr. McCoy.

11        But having said that, I'm hopeful that he's

12  qualified.  I don't know which of the two would have been more

13  qualified; but, you know, like I said, on paper he looks

14  pretty good.

15  Q    So you stated in your declaration and in some of your

16  testimony that you heard some board candidates in 2014 discuss

17  the school transfer issue involving unaccredited schools; is

18  that right?

19  A    Yes.

20  Q    And you heard them discussing disciplinary issues; is

21  that right?

22  A    Yes.

23  Q    And classroom disruptions?

24  A    Yes.

25  Q    Safety in the schools?

1   A    Yes.

2   Q    Are you saying that these are not legitimate topics of

3   conversation in a board campaign?

4   A    No.  I never said that.  It would be nice to hear them

5   discussed in context, though, as opposed to tools to leverage

6   the fears of white voters in our district, which is what I

7   think they were doing.

8   Q    Were you at any of the candidate forums that year?

9   A    I don't recall.  I know I was at that board meeting with

10  one of the candidates who was going to run --

11  Q    My question was were you at any candidate forums that

12  year?

13  A    I don't recall.

14  Q    Were you at any events where the candidates were present

15  and other parents or constituents were there to ask questions

16  of the candidates?

17  A    That's the same thing, isn't it?

18  Q    I said "any events," not just forums.  Were you at any

19  school board candidate event in 2014?

20  A    Yeah.  Yeah.  Yeah.  Yeah.

21  Q    What event were you at?

22  A    It wasn't an event.  I think it was a meeting with

23  Savala, Thurman, and Wilson where they met with a small group

24  of people, one that I wouldn't describe as a large meeting,

25  but a small group of people to discuss some of the issues that

1    were important to them during their candidacies.

2    Q    But you weren't there for an event with all of the

3    candidates or the majority of them?

4    A    2014?  I think I was at one at the church at Dr. Rance

5    Thomas' church.  I think he hosted one, and I think I was

6    there for that.

7    Q    Okay.  And did you hear parents bring up concerns about

8    discipline and disruptions in the classroom?

9    A    Yeah.  I expect them to.

10   Q    So those are topics that school board candidates should

11   address?

12   A    Yes.

13   Q    Are you aware of a time when the school board ever voted

14   to prevent student transfers from Normandy or Riverview

15   Gardens?

16   A    I think that would have been illegal under Missouri state

17   law.

18   Q    Are you aware that Ferguson-Florissant accepted the

19   second highest number of transfers from Normandy and Riverview

20   Gardens in St. Louis County and in St. Charles County?

21   A    In 2014?

22   Q    Yes.

23   A    No.  But I think they were compelled to do so because

24   they couldn't under state law necessarily refuse.

25   Q    Are you aware that the board contacted the county branch

1  of the NAACP and had a meeting with regard to Dr. McCoy's

2  suspension?

3  A    I think I became aware of it after the fact.

4           MS. ORMSBY:  I don't have anything else.

5           THE COURT:  Thank you.

6           Any redirect?

7           MS. EBENSTEIN:  Just one second.

8           THE COURT:  Sure.

9           MS. EBENSTEIN:  No, Your Honor.  No redirect.

10          THE COURT:  Thank you, sir.  You may step down.

11          If you would call your next witness, please.

12          MR. ROTHERT:  Your Honor, at this point we would have

13 been calling Mr. Paul Schroeder.  He is under subpoena, and he

14 is not available today; so we'd like to reserve --

15          THE COURT:  Take him out of order?

16          MR. ROTHERT:  Right.  Take him out of order.

17          THE COURT:  If there's no objection to that,

18 obviously we'll do that.

19          MR. ROTHERT:  Okay.  And we'd like to just move for

20 the admission.  I don't know.  Rather than read any deposition

21 designations to you, which we're sure you would find highly

22 entertaining, we'd like the Court to accept the deposition

23 designations for Mr. Keith Brown, Mr. Brian Scott Ebert, Dr.

24 Donna Paulette-Thurman, Dr. Courtney Graves, Ms. Leslie

25 Hogshead, Mr. Paul Schroeder, S-c-h-r-o-e-d-e-r, Mr. Robert

1 Chabot, and Dr. Jowei Chen. The first name is spelled

2 J-o-w-e-i. And we have copies of those designations with the

3 counterdesignations.

4        THE COURT: Good. That's what I was going to ask, if

5 we could amalgamate.

6        MS. ORMSBY: I would move that our

7 counterdesignations also be moved into evidence.

8        MR. ROTHERT: And they're all in one document.

9        THE COURT: Super.

10        MR. ROTHERT: It takes two binders.

11        THE COURT: Okay.

12        MR. ROTHERT: We're also submitting the one that was

13 read as well.

14        THE COURT: Okay. Thanks.

15        MR. ROTHERT: And subject except for maybe calling

16 Mr. Schroeder, we have no further evidence.

17        THE COURT: Okay. Let's go ahead and take a

18 ten-minute break till 2:20, and we'll begin with the

19 defendants' case. Who is your first witness?

20        MS. ORMSBY: First witness is Dr. Donna Thurman.

21        THE COURT: Okay. We'll reconvene at 2:20.

22        **(COURT RECESSED FROM 2:05 PM UNTIL 2:20 PM.)**

23        THE COURT: If you would call your first witness. Do

24 you have a binder?

25        MS. ORMSBY: First, Your Honor, I'd like to move our

1   exhibits into evidence, if that's all right with you.

2         THE COURT:  Sure.  That's fine.

3         MS. ORMSBY:  The exhibits that are stipulated to

4   are -- can I just read them off by letter?

5         THE COURT:  Yeah.

6         MS. ORMSBY:  A, B, D, E, F, G, H, I, J, K, L.

7         THE COURT:  It's a DWI traffic stop.

8         MS. ORMSBY:  L, M, N, O, P, Q.

9         THE COURT:  You'd have to do it backwards to survive

10  the stop, though.

11        MS. ORMSBY:  Skip R.  S, T.  Skip U.  Y.

12        THE COURT:  Y?

13        MS. ORMSBY:  Yes.  KK, LL, MM, NN, OO, PP, QQ, RR,

14  SS, TT, UU, VV, WW, XX.

15        MR. ROTHERT:  No objection.

16        THE COURT:  All right.  All received without

17  objection.

18        MS. ORMSBY:  In addition, Your Honor, we'd like for

19  you to take judicial notice of some statutes.

20        THE COURT:  Super.

21        MS. ORMSBY:  Revised Statutes 160.261; 162.261;

22  167.241; 162.341; 167.131; 167.121; 162.291.

23        THE COURT:  Just make sure you provide those to

24  plaintiffs' counsel so they can cross-reference to make sure

25  they are in fact currently in effect.

1    MS. ORMSBY:  Finally, Your Honor, we'd like for you

2    to take judicial notice of the Missouri Department of

3    Elementary and Secondary Education Guidance for Student

4    Transfers from Unaccredited Districts to Accredited Districts.

5    THE COURT:  Any objection to that?

6    MR. ROTHERT:  We do not object to judicial notice to

7    any of the statutes.  They all look current in these versions.

8    We do object to judicial notice of a document from a website

9    that hasn't previously been disclosed.

10    THE COURT:  All right.  Well, we'll take that up or

11    provide any further information necessary.  And certainly give

12    him -- well, thanks.  All right.

13    So call your first witness.

14    MS. ORMSBY:  Dr. Donna Thurman.

15    THE COURT:  If you would step forward, ma'am, and be

16    sworn.

17    **(WITNESS SWORN BY THE CLERK.)**

18    THE COURT:  Who's up on your side?

19    MS. EBENSTEIN:  I am.

20    THE COURT:  Are you ready?

21    MS. EBENSTEIN:  Yes.

22    THE COURT:  You may proceed.

23    **DONNA PAULETTE-THURMAN,**

24    **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

25    **FOLLOWS:**

1    **DIRECT EXAMINATION**

2    **BY MS. ORMSBY:**

3    Q    Dr. Thurman, would you state your name for the record?

4    A    Donna Paulette-Thurman.

5    Q    Dr. Thurman, do you live in the Ferguson-Florissant

6    School District?

7    A    Yes, I do.

8    Q    What's your address?

9    A    12959 Eadstone Lane, Florissant, Missouri, 63133.

10   Q    Do you currently serve on the Ferguson-Florissant School

11   Board Education -- Board of Education?

12   A    Yes, I do.

13   Q    When were you elected?

14   A    In 2014, April.

15   Q    Do you believe that you bring all perspectives of all

16   people in the district to the board?

17   A    All perspectives?

18   Q    All that come to you?  To the best of your ability.

19   A    To the best of my ability, yes.

20   Q    How would you describe your neighborhood as far as racial

21   integration?

22   A    We have lived in our neighborhood for approximately 29

23   years, and it's pretty mixed.  We have black, white, mixed, or

24   all types.  It's very integrated, I'll put it that way.

25   Q    And how long have you lived in the Ferguson-Florissant

1  School District?

2  A    Twenty-nine years.

3  Q    What's your highest level of education?

4  A    I have my doctorate in education.

5  Q    And what is your current occupation?

6  A    I'm retired.

7  Q    You're retired?

8  A    Yes.

9  Q    What did you do before you retired?

10 A    I was an educator.  I was an administrator.  School

11 principal, elementary school principal.

12 Q    Where were you a school principal at the time of your

13 retirement?

14 A    The Ferguson-Florissant School District at Holman

15 Elementary School.

16 Q    How long did you work for the Ferguson-Florissant School

17 District?

18 A    Fifteen years.

19 Q    Were you at all times an administrator during that time?

20 A    Yes.

21 Q    So when you were hired, you were hired as a principal?

22 A    Yes.

23 Q    And tell me again when you were elected to the school

24 board.

25 A    April of 2014.

1   Q    Since you've been on the board, do you find that the

2   board accepts your input when it comes to the concerns of the

3   African-American community?

4   A    Yes.  I can give you some examples of that.

5        THE COURT:  She'll ask you questions.

6   A    Okay.

7   Q    Sure.  In your experience, how does the board respond to

8   the needs of the African-American community?

9   A    Mainly, our topics of discussion are about children.  In

10  our discussions, many of them come to our African-American

11  children because our schools are predominantly African

12  American.  And we're finding that there is an achievement gap

13  with our students; so there's a lot of discussion about the

14  achievement gap and what we're going to do to help students

15  who are failing -- and not just African-American students but

16  all students who are failing.

17       The other concerns that we do discuss are about

18  discipline and safety.  And I think most of these are the

19  topics that you would hear in any -- I think any school board

20  across the nation.

21  Q    Is the board accepting or hostile to your point of view?

22  What is their reaction to your point of view?

23  A    Since I've been on the board a year and a half now, and

24  what I found is that, when I do speak, they do listen.  It

25  doesn't mean that they always agree with what I say, but they

1    are listening, and we do have a lot of discussions about race.

2    Q    Does the school district have an achievement gap?

3    A    Yes.

4    Q    Does Hazelwood School District have an achievement gap?

5    A    Yes.

6    Q    Are you aware, in your knowledge, of a district in the

7    state of Missouri that does not have an achievement gap?

8    A    No.

9    Q    Can you explain to the Court what an achievement gap is?

10   A    The achievement gap is any type of disparity between the

11   race of -- between races.  For example, in our school district

12   white race tend to do better academically and score better on

13   tests than our African-American students, and that's been that

14   way for a while.

15   Q    Was there an achievement gap when you were a principal in

16   the school district?

17   A    Yes.

18   Q    Who was the superintendent when you were a principal?

19   A    Oh, gosh.  Scheer.  Oh, Walters?  I can't remember his

20   name, but Dr. Scheer, Jeff Spiegel, and there was one other,

21   and I can't think of his -- it was Walters?  I think it was

22   Dr. Walters.  I can't remember his name.

23   Q    During the time that you were an employee of the school

24   district, did the achievement gap get better or worse; do you

25   know?

1  A    The best that I can recall is that it has gotten wider.

2  It's been getting progressively wider, yes.

3  Q    What is the role of the school board in addressing the

4  achievement gap?

5  A    First of all, for them to be aware that there is an

6  achievement gap.  Our major job is to make sure that we have

7  people in place -- "people" meaning our superintendent, a

8  leader in place who knows that, and their responsibility is to

9  work and to make that -- to do things to counteract that and

10 to help the achievement gap to close.

11 Q    Do you believe you currently have a superintendent that

12 is working to do that?

13 A    Yes.  Yes.

14 Q    Let's look a little bit at your election in 2014.  When

15 you ran, were you a part of any sort of slate or group of

16 candidates?

17 A    Yes.

18 Q    How did you become a part of that slate?

19 A    I was asked by several people to run for the board.  I

20 had thought about it, and I thought about it for a couple of

21 years, and I just did not do it; but then I was asked by

22 several people to do it, and I made the decision to do it, to

23 run for the board.

24 Q    And was that a result of requests from the Grade A for

25 Change slate or just individual people?  Who were asking you?

A     Individual people.  And I did -- I was asked by the Grade

A for Change.  It wasn't Grade A for Change at the beginning,

but it was a group of -- it was a Political Action Committee

of citizens who started off looking for candidates to run for

the board.

Q     How did they recruit their candidates?

A     Initially the Political Action Committee, or citizens --

I'll just say "citizens" -- were looking for people to run for

the board for several reasons.  There was the issue of Dr.

McCoy at the time, and there was also the issue of Normandy

becoming unaccredited, and they were looking for people to

help with that, or they were coming together to meet to talk

about those concerns.

Q     So how did it turn into them getting a slate of

candidates to run?

A     Through most of the meetings -- and I attended

approximately, that I can recall, maybe three or four

meetings.  And through discussion, through brainstorming they

came up with several ideas of how we could be helpful to

Normandy and also to Ferguson-Florissant, and one of the

things that came up is that we needed to get more candidates,

African-American candidates, to run for the school board.

Q     Was it difficult for Grade A for Change to recruit the

candidates for their slate?

A     I'd have to say yes, because -- can I explain?

1  Q     Yes, please.

2  A     I can remember -- from what I can remember, people -- we

3  talked about it, we met, and we were or the citizens were

4  asking for people to volunteer and to even, like, stand in the

5  middle of a meeting and say, "Would you be willing to run?"

6  And I would say in a room of maybe, on the average, 100, 120

7  people, maybe three or four people stood.  Not all of those

8  people decided to do it, and at that point is when I really

9  started thinking someone has to do it; someone needs to step

10 forward.

11        And these were some of the things that were being

12 said in the meeting.  Someone needs to do it.  And I finally

13 decided that "someone" maybe could be me.  So I just did a lot

14 of thinking about it and actually praying about it and made

15 the decision that I would go ahead and run.

16 Q     So you put your name in the hat?

17 A     Yes.

18 Q     What happened next?

19 A     Several things happened.  Citizens decided to put

20 together a smaller group or committee to start to interview

21 people who might be interested in running for the board to see

22 if they would be a candidate that they would be -- that they

23 would want to back.  And at that point citizens and Grade A

24 for Change parted.  Grade A for Change became the group that

25 would work with those who were wanting to run for the school

1  board.  They became the Political Action Committee for those

2  people who wanted to run for the board.

3  Q    Okay.

4  A    And so once they got the names together, they invited us

5  to a meeting, and they asked us questions.  First of all, they

6  came up with a list of things that they would want to see in a

7  candidate.

8  Q    Do you remember anything that was on that list?

9  A    Oh, gosh.  I knew you were going to ask that.  Number

10  one, that they were concerned about what was going on with

11  African-American students in the district.  They wanted to

12  make sure that they understood that accreditation was a big

13  thing.  They wanted to have someone who was interested in the

14  community and did work in the community, someone who would be

15  able to go out and speak and be able to articulate the goals

16  of the Grade A for Change committee, and they wanted someone

17  who was able to understand the finances of the district.  It

18  was just quite a few, maybe about ten things, that they wanted

19  the person to be able to do or have that quality or be

20  qualified to run as a candidate.

21  Q    Okay.  So they put out those qualifications; they

22  interviewed the people who were interested.

23  A    Uh-huh.

24  Q    Then what happened?

25  A    We received a phone call and said, "You were selected as

1  a candidate, and now we'd like to get together and talk to you

2  about strategies."

3  Q    Who were the three people that were selected originally?

4  A    Val Bush, James Savala, and myself.

5  Q    And Mr. Bush?  Mr. or Ms.?

6  A    Mr. Bush.

7  Q    Mr. Bush was not a candidate for the 2014 election; so

8  what happened with Mr. Bush?

9  A    Val Bush became ill and made a decision to back out

10  because he didn't feel that he could represent or work -- do

11  the work that needed to be done in order to be a viable

12  candidate for the board.

13  Q    So he was replaced with?

14  A    Well, Grade A for Change decided to go back and ask for

15  more support and let people know that Val would not be able to

16  run and to get some more names to come out and to possibly

17  interview for being on the slate.

18        And so we had a couple of meetings and met with

19  several people.  At one of the meetings, F. Willis Johnson was

20  invited, and I think the other person was a Kelly Gilliard,

21  who had been working with the committee, really working hard

22  with the committee, and they had asked her to possibly become

23  one of the candidates.

24        After talking with her, she decided she did not want

25  to run, and F. Willis was the other person who was selected to

1    be a part of the slate.

2    Q    So was all this done prior to actually filing for school

3    board, or was it during the filing process?  Were you

4    selected -- go ahead.  I'll stop there.  I'll ask only one

5    question.  Was this done before candidate filing?

6    A    Yes, it was.

7    Q    Now, were you motivated by -- what motivated you to run

8    for school board?  Any particular incident?

9    A    No.  And I had this discussion a lot, this discussion

10   especially with my husband.  And he asked me, "What is it that

11   motivated you to run?"  And my primary reason for running was

12   because I'm an educator.  I live in the district.  I love the

13   district.  I really felt that I had a responsibility to do

14   what I could or give back to the community what the community

15   had given to me.

16          We have lived in that community for almost 30 years.

17   And as an educator I also knew what was going on in the

18   schools.  I understood a little bit of the politics and

19   education in the Ferguson-Florissant School District, had a

20   little bit of understanding about governance, but never had I

21   run for a political office.  And that's one of the things that

22   kind of scared me a little bit.

23          The other issue that was going on was the Dr. McCoy

24   issue that came up, and I must say initially I just -- I

25   didn't understand what was going on with that.  And I can't

1  say that that was the reason I ran, but all of those other

2  reasons, including that reason, made me decide that it was

3  time for me to run.  I had thought about it earlier, like

4  maybe two years prior, and my health wasn't the best at that

5  time, and I finally decided this is the time for me.

6  Q    Okay.  Were you in the courtroom when Mr. Hudson provided

7  his testimony?

8  A    Yes.

9  Q    You saw the video of that big meeting at McCluer North?

10 Board meeting -- the board meeting at McCluer North?

11 A    Yes.

12 Q    Were you present at that meeting?

13 A    Yes, I was.

14 Q    What were your feelings before going into that forum and

15 after leaving that forum?

16 A    Initially going into the meeting, I was, I don't want to

17 say angry.  I was disappointed and just -- I'm not sure what

18 word to use, but the closest word that comes to me is somewhat

19 angry about that, the entire situation.  And, of course, with

20 hearing from different friends in the district and talking to

21 people about what's going on and what was going on, I did not

22 know exactly what the reason was for him being suspended.  I

23 know Art, I knew him because I worked with him, and I just

24 thought he walked on water, actually.  I thought he was a

25 very, very intelligent young African-American male who was a

1  good role model for the school district, and I was ecstatic

2  when he was selected as the superintendent.  I had since

3  retired; so I didn't work under him.

4        And I walked into the meeting, and I saw how many

5  people were there and how concerned they were about what was

6  going on with Art McCoy.  And I looked and I saw the board

7  who, I don't know if you saw in the video, they were sitting

8  across the front of the auditorium, or the gym, in front of

9  the table, not behind the table.  And they were listening to

10  the comments that were coming from the audience.

11        And then something struck me as I was in that

12  meeting.  And I thought as -- and I'm going back and I'm

13  putting on my principal cap right now.  And I thought about

14  situations when I had to put a teacher on notice and other

15  teachers may have gotten upset with me but I couldn't discuss

16  it with them.  So, of course, the teachers are hearing one

17  side, and they couldn't hear my side.  And people were upset

18  with me because I couldn't talk to them about what was going

19  on.

20        And for some reason it hit me that day:  They can't

21  talk about this; it's a personnel matter, and I know they

22  can't give an answer.  And I thought, well, maybe somewhere

23  along the way, as this goes on, it will come out what the

24  reason was.

25        And so at that point I started thinking that, you

1  know, this -- I'm kind of understanding how difficult it must

2  be to be on the board, to serve on the board, and that's again

3  when I started thinking -- I had not made the decision then to

4  run for the board, but it just, yeah, kind of changed my

5  thinking about what was going on with Art McCoy.

6  Q    Now that you're on the board, do you believe that -- and

7  you know the members of the board, at least some of them.

8  Some of the same school board members are on the board now

9  that were then on then; is that right?

10 A    Yes.

11 Q    Do you believe that race was involved in the board's

12 decision with regard to Dr. McCoy?

13 A    In what sense do you mean?  I mean --

14 Q    Did they -- is it your belief that a white school board

15 terminated a superintendent because he was black?

16 A    No.

17 Q    Or put on suspension a school superintendent because he

18 was black?

19 A    No.

20 Q    How much money did you raise for your campaign in 2014?

21 A    Do you mean the committee or myself?

22 Q    Well, let's talk about both.  Do you know how much the

23 committee raised?

24 A    Gosh, I know I have to do the paperwork and turn in all

25 the -- and the best that I can remember is approximately $6-

1   to $7,000 maybe.

2   Q    How much did you put in of your own money?

3   A    Approximately 200.

4   Q    And when Grade A for Change was recruiting candidates,

5   was it clear to the candidates that there would be a large

6   output of money personally, or what was relayed as far as the

7   cost of returning?

8   A    As I recall, one of the things that I can remember that,

9   when we started, was that as a slate not only would they be

10  helping us, supporting us by getting out the information that

11  needed to get out like the yard signs and the pamphlets and

12  the cards, that they would be paying for those things.  And I

13  thought it was a wonderful opportunity for anyone who wanted

14  to run, especially an African American who wanted to run.

15  This was a very good opportunity for them to take advantage of

16  that because the costs of running a campaign could be

17  enormous, but with them supporting us it would probably not

18  cost as much out of pocket as it would if you were running

19  individually.

20  Q    Did you seek the endorsement of the FFNEA when you --

21  after you filed to run for board?

22  A    Yes.

23  Q    Do you remember were you here when Mr. Green testified

24  about the process that the NEA has in place for endorsements?

25  A    Yes.

1  Q    Is that your experience as well?

2  A    Yes.

3  Q    He described it accurately?

4  A    Yes.

5  Q    And you applied for their endorsement, and you went

6  through the interview process?

7  A    Yes, I did.

8  Q    What was the racial make-up of the interview committee,

9  if you remember, in 2014?

10 A    I would say 50/50 pretty much.  I remember looking around

11 the room and saying, yeah, this is a pretty integrated group

12 of people to interview -- to interview me.

13 Q    Were you endorsed by the FFNEA?

14 A    No.

15 Q    Were you surprised that you weren't endorsed by the

16 FFNEA?

17 A    No.

18 Q    Why not?

19 A    Well, number one, I'm a former principal, and I've sat on

20 the opposite side of NEA in many -- not many, but in some

21 cases.  And there were situations where I've had to make some

22 decisions about teachers who may -- teachers who did not need

23 to be teaching.

24         And their job is to protect their teachers, and my

25 job is to protect students.  And so I just kind of knew going

1   in there I was one of the -- there's not very many principals

2   who have gotten a tenured teacher released, and I did; so, no,

3   I did not think I would be endorsed, but I wanted the

4   experience.

5   Q    Do you believe that your race had anything to do with

6   whether or not you were endorsed?

7   A    No.  No.

8   Q    Did the FFNEA endorse any of the candidates on your

9   slate?

10   A    Yes.

11   Q    Who did they endorse?

12   A    James Savala.

13   Q    Did you think that with an FFNEA endorsement that it

14   was -- that you would absolutely win?

15   A    No.

16   Q    Did you think that if you wouldn't get their endorsement

17   that you wouldn't win?

18   A    No.

19   Q    Can you tell me did you know what the benefits would have

20   been if you had been endorsed by the FFNEA?  Were you aware of

21   what those benefits were prior to going through the process?

22   A    Prior to, no, I did not know.  I didn't know

23   specifically.  I did know that they provided some help

24   financially.

25   Q    Let's go back in time to the 2011 election.  I know you

1    weren't a candidate, but you did live in the school district,

2    correct?

3    A    Correct.

4    Q    We're going to come back to your election in a little

5    bit, but do you remember if there was any sort of

6    anti-incumbent sentiment during that election?

7    A    Absolutely.

8    Q    Why?

9    A    Because insurance was offered to Jeff Spiegel and his

10   wife for life.

11   Q    How did that make you feel?

12   A    I was quite angry.

13   Q    Why?

14   A    Because I paid almost $700 a month for insurance, and his

15   wife never worked in the district.  He made twice as much

16   money as I did.  And I did not understand why that decision

17   was made.

18   Q    So I think we heard that the incumbents running for

19   reelection were Dr. Doris Graham, Jim Clark, and Les Lentz.

20   Correct?

21   A    Correct.

22   Q    And were you surprised when none of the incumbents were

23   reelected?

24   A    Not at all.

25   Q    Did you vote for any of the incumbents that year?

1  A    I did not.

2  Q    Do you remember who the officers were of the board when

3  the board made the decision to give that insurance to the

4  superintendent and his wife?

5  A    Oh, gosh.  I'm thinking it was Chuck Henson and may have

6  been Doris Graham.  I'm not really sure; so I won't say.

7  Q    Do you know for sure who was president?

8  A    I think it was Chuck Henson.

9  Q    Prior to 2011, had you supported Dr. Graham in her

10  elections?

11  A    Always.

12  Q    What do you think of Dr. Graham?

13  A    I'm getting emotional.  I shouldn't do that.  I don't

14  know why.  She's a wonderful, wonderful person despite the

15  fact she's a Delta.  We have -- we're different sororities.

16  But other than that, I just -- I think the world of her.

17  She's a very compassionate person, very outgoing, very loving,

18  funny.  And we can do this back and forth, and we understand

19  each other, I think.  She's pretty good -- she's okay.

20  Q    So it had to be -- you had to be pretty upset not to vote

21  for her in 2011; would you agree?

22  A    Yeah.  Yeah.

23  Q    Do voters still talk about that issue?

24  A    Yes.  I still talk about it.

25  Q    So you take other reasons into -- well, what factors do

1  you take when -- into when you decide who to vote for for

2  school board?

3  A    Depending on if it's a new candidate or incumbent, just

4  knowing -- I'll start with a new person.  One of the things

5  that is important to me -- and I will tell you I did not -- I

6  was not as active with the school board in the past as -- I

7  just wasn't, and I just have to say that.  I knew a lot about

8  it because I worked for the district.  And once I retired, as

9  I said earlier, I had some health issues, and I kind of did

10 not spend a lot of time being active with school board issues

11 and things like that.  Ask me the question again because I

12 just kind of got off track there a little bit.

13 Q    What are important criteria for you when you decide who

14 to support for school board?

15 A    The campaign that they're running on.  For example, if

16 they're running on -- first of all, I want someone who is

17 child centered.  If I'm hearing more about their concerns

18 about children and what we want for our children in terms of

19 accomplishments, accreditation, safety for kids, discipline,

20 those issues, those issues are important to me.

21      Especially in our district where we have

22 predominantly African-American students who are failing, I

23 want to hear what it is they plan to do or want to do or would

24 request of the superintendent to do to help students become

25 successful.

1  Q    Do you always consider race when you decide who to

2  support?

3  A    No, I don't.

4  Q    Is it fair to -- well, if there's an African-American

5  candidate on the ballot, do you always vote for that

6  candidate?

7  A    Again, it depends on what the candidate says, what the

8  candidate does, what the candidate says.  And it doesn't

9  matter to me if it's black, white, green, or red.

10  Q    So let's go back to your 2014 election.  Did you attend

11  any candidate forums during your campaign leading up to your

12  election?

13  A    Yes.

14  Q    Do you remember how many there were?

15  A    Too many.  Gosh, there were two at churches, one at UMSL,

16  University of Missouri-St. Louis.  We had one at Commons Lane

17  Elementary.  There was one at Ferguson, I think.  Not

18  Ferguson.  I'm sorry.  McCluer.  And I can't remember all of

19  them, but I attended -- oh, the Republican and also the

20  Democratic groups that are in Ferguson and Florissant.

21  Q    Were all of the candidates invited to all of these

22  forums?

23  A    Yes.

24  Q    Did all of the candidates show up to all of the forums?

25  A    No.

1    Q    Did you ever arrive late to any of these forums?

2    A    No, not that I can remember.

3    Q    What other campaign activity did you participate in?

4    A    Well, one of the things that was so great about Grade A

5    for Change is that they provided opportunities for us to meet

6    with the public.  We met weekly.  We met at the Ferguson

7    Library.  Everyone who wanted to come and ask us questions,

8    you know, about our campaign or what we wanted to do were

9    invited to come.  They talked with us about strategies.  We

10   met at Steak 'N Shake.  We met at McDonald's.  We met a lot.

11        And at first it seemed like a lot to me, but -- or

12   too much for me, but it was invaluable.  Those meetings were

13   invaluable.  And Grade A for Change offered so many

14   opportunities for us to learn.

15        We also went to Susan Shear, who did a -- she did a

16   class on running for the board.  We went to the -- oh, I'm

17   trying to think of the office.  I'll come back to it.  But,

18   yeah, we had many opportunities where we were given valuable

19   information and support.

20   Q    Did all the members of your slate take advantage of all

21   these opportunities?

22   A    No.

23   Q    Did you take advantage of all those opportunities?

24   A    I would say 99.9 percent of those.

25   Q    What percentage would you say Mr. Savala took part in?

1  A    75 maybe, 80.

2  Q    What percentage did Mr. Johnson take part in?

3  A    50, 60 maybe.

4  Q    What did you do that the other two candidates on your

5  slate did not do?

6  A    I think the difference between me and the other two

7  candidates is that I was consistent and I made sure that I

8  made all of the -- as many meetings as I could.  I listened to

9  my campaign manager.  I did the footwork.  I did the door to

10  door.  I did the League of Women Voters thing, application or

11  survey.

12  Q    Did the other two candidates do that?

13  A    No.  No.

14  Q    Either one of them do that?

15  A    As I recall, both of them did not do it.

16  Q    And what was the result of filling out that survey from

17  the League of Women Voters?

18  A    What was the result of it?

19  Q    Uh-huh.

20  A    I'm not sure what you mean.  Once I did the survey, the

21  survey was put in the *Post*, and so it kind of went out all

22  over the city.

23  Q    Do you believe that there's a lot of readers of the *Post*

24  in the Ferguson-Florissant School District?

25  A    Yes.

1  Q    What do you think the result was of -- would be the

2  result of not completing that questionnaire and having that in

3  the paper?

4  A    Well, you know, you never know exactly how that's going

5  to affect your campaign, but I can't see -- I thought it was

6  one of the biggest things that we could have done to get the

7  word out about -- they ask so many questions about you

8  personally and about your background and what your campaign

9  was about.  I thought it was invaluable.  So I think it was a

10  big one, but I can't tell you specifically, you know, how it

11  might have helped, but I didn't want to take a chance on not

12  doing it.

13  Q    Did you ever talk on your phone during a candidate forum?

14  A    No.

15  Q    What do you think the result is of talking on the phone

16  during a forum could be?

17  A    That people might not take you seriously or that you may

18  not be paying attention to them or you may be somewhere else

19  and not really there in the moment with them.

20  Q    Mr. Johnson in his testimony yesterday stated that he was

21  criticized for being too supportive of the student transfer

22  program with regard to student transfers from unaccredited

23  school districts.  You were at all the forums.  Did you ever

24  hear such a criticism of him?

25  A    No.  I did not hear that.

Q    Was the transfer issue an issue in your campaign?

A    Yes, it was an issue, but it's not -- I think the problem
was how you say it, not so much that you say it.  And I think
that's what the issue was, might have been or could have been
with the other candidates.

Q    Do you think that the transfer issue was a legitimate
concern of the voters?

A    Yes.  Yes.

Q    Do you think it was appropriate for the transfer issue to
be discussed by a candidate?

A    Yes.

Q    Do you know the approximate racial breakdown of the
student population in Normandy School District?

A    Approximately 95 percent to 98 percent.

Q    What's the breakdown of students in Ferguson-Florissant
School District?

A    80 percent African-American.  Students you mean, right?

Q    Right.

A    Yes, 80 percent African American.

Q    Does it make sense that transferring of African-American
students into a majority African-American school district
would be a concern?  Was it a concern of yours?

A    No.

Q    Did you ever hear anybody challenge Mr. Johnson with
regard to whether he rented or owned his home?

1    A    No.

2    Q    Was the fact that students were transferring from an

3    unaccredited school district into the Ferguson-Florissant

4    School District a concern for you?

5    A    In what way?  I mean --

6    Q    As far as accreditation, race -- any of the issues that

7    have been brought up so far in this trial.

8    A    Okay.  My concern was for the children and how they felt

9    coming into another district and if they were going to be

10   accepted.  That was my concern.

11   Q    Has there been any problem with the acceptance of kids

12   from other school districts in the Ferguson-Florissant

13   District?

14   A    No.  Wait a minute.  What do you mean by that?  Do you

15   mean by --

16   Q    Whatever your concern was.

17   A    For me?

18   Q    Yes.

19   A    No.

20   Q    When you ran, did you believe that you had support from

21   white voters in the district?

22   A    Yes.

23   Q    How did you know?

24   A    Many of my former parents said they would support me.  My

25   neighbors were supportive.  They all put signs in their yards.

1   As a matter of fact, we probably had too many signs in our

2   neighborhood.  But just from conversations after forums; so

3   yes, yes.

4   Q    Do you believe that you had significant support from

5   white voters?

6   A    I think so.

7   Q    Do you believe you had support from African-American

8   voters in your election?

9   A    Yes.

10  Q    How do you know that?

11  A    Because my family voted.  Well, yes, because, again, my

12  neighbors -- we have a very integrated neighborhood -- and

13  going to door to door.  And I really didn't have to because I

14  knew my neighbors anyway, many of them anyway.  And again from

15  forums and church.  My church was very supportive of me.

16  Q    Do you have any concerns about the school district's

17  electoral system being changed to a single-member district

18  system rather than an at-large system?

19  A    I've been thinking about that a lot, and the one thing

20  that bothers me with this single-member district is it makes

21  me feel like we're going backwards.

22  Q    In what way?

23  A    Because it's like segregating us.  If you're putting --

24  you're looking at groups of people like, for example, in

25  Berkeley -- and I worked in Berkeley.  Home and school was in

1  Berkeley.  That's a predominantly African-American group or

2  the group in Normandy -- whatever.  It's like you're putting

3  pockets of African-American people -- it's like segregating

4  all over again.  It's like in '75 when they made -- when they

5  integrated the school districts, they got away from that.  So

6  to me, it seems like we're going backwards if we did that.

7  Q    Why do you prefer an at-large system?

8  A    Because when you're on the board, your dedication should

9  be to the entire school district, not just your pocket, not

10  just your schools that are in this area.  And I think if you

11  get on -- if you get to the system, you're going to be sitting

12  at meetings where people are going to be fighting for their

13  piece of the pie rather than sharing the pie.  And if we do

14  that, then I just -- I don't know what kind of work we can get

15  done if we're segregated.

16  Q    Do you think it would be a good idea to have all seven

17  board members up for election at the same time?

18  A    Well, no.

19  Q    Why not?

20  A    Because it would take us a year just to be able to go

21  through the -- understand the governance and what we need to

22  do as a working board, what has happened in the past, what

23  history has gone -- what has happened in the history of our

24  school boards.  I know as a new person on the board last year

25  it was very difficult for me to -- I mean, for almost a year I

1    had to listen and learn, and I can't -- I could not see seven

2    of me sitting at the table and trying to make decisions and

3    not even knowing how to run a school board meeting.  So, no.

4    I think you need some people who have had experience.

5    Q    Can you think of any negatives to staggered terms?

6    A    No.

7    Q    Currently elections are in April rather than August,

8    November, any other month.  Which month do you think is

9    better?

10   A    For me, April works best because I can tell you from my

11   experience, after running for the board, that's a lot of work.

12   If you come in in November, you're in the middle of the school

13   district -- I mean of the middle of the school year.  It's

14   like coming in and going, okay, what do we do next?

15          In April it gave us time -- it gave me time -- to

16   meet with the board -- the school year is ending, summer is

17   coming.  It's enough time for you to kind of get more

18   acclimated to what the board does and how it works.  And also

19   the training that comes along with it through Missouri School

20   Board Association -- that timing and that training is

21   imperative for a school board member.  It's very valuable.

22          Doing it in November, again, I think you lose time,

23   and we don't have time.  You know, there's an urgency right

24   now, and we talked about this on our board about how important

25   it -- we don't have time to lose.  So I think having it in

1    April gives that transition time, gives you more transition

2    time to get more acclimated to what the expectations are for

3    you serving on the board.

4    Q     What's your opinion regarding whether or not

5    African-American representation on the board will increase or

6    decrease under the current at-large system?

7    A     You know, I'm not sure about that.  I'm not sure about

8    the having the small areas, because you could still have a

9    group or like a Berkeley, and you can have a white person run

10   in Berkeley.  There are white people still in Berkeley,

11   believe it or not, and there are white people in all of these

12   other areas.  No matter how you slice it or cut it up, you can

13   still have an all-white board.  It's still possible.  And

14   besides that, it's a state law for us.  So I just don't -- I

15   don't see how making that change is going to make that big of

16   a difference.  I really don't.

17          I just see that we have, all of us, any one of us,

18   black, white, or whatever, we have an opportunity, if we want

19   to, to run for the board.  Yeah, there's some hindrances which

20   may be financial, but maybe -- it wasn't for me, it wasn't for

21   our slate because we had a wonderful group who helped us.  So

22   no.  I just -- I just don't see that changing right now is the

23   best for the district.

24   Q     Let's talk just a minute about the 2015 election.  Who

25   was elected last year?

1  A    Brian Scott Ebert, who was an incumbent, and a Dr.

2  Courtney Graves.

3  Q    What kind of campaign did Dr. Graves run?

4  A    Dr. Graves was a very busy lady.  She was very active.

5  She was very -- she was -- all of the events that I went to as

6  a board member, she was there.  She attended the board

7  meetings.  She spoke to parents.  She was at the other schools

8  when schools had PTO meetings.  I mean, she was just very,

9  very visible in the district, and she spoke well.  Her

10 forums -- she was prepared.  She was very prepared.

11 Q    As far as you're aware, to the best of your knowledge,

12 was this lawsuit in any way a factor in her election?

13 A    No.  Courtney worked for that position.  She earned it.

14 Q    Do you hear this lawsuit discussed?

15 A    Not very much at all but only because I'm on the board.

16 I will tell you my husband, who lives in the house with me,

17 until I told him about it, he hadn't heard about it.

18 Q    How did the events involving Michael Brown affect the

19 election?

20 A    I'm not really sure.  As a matter of fact, one of the

21 things that I thought, if it was going to affect the election

22 in any way, that more African Americans will come out and

23 apply for the board, but I didn't see that that happened.

24 Q    Did any voters tell you that they were going to vote one

25 way or the other because of the Michael Brown protests?

1   A    Never heard that.

2   Q    Did the Michael Brown shooting and protests change your

3   vote in any way?

4   A    No.

5   Q    Do you vote?

6   A    Yes.

7   Q    Do you feel like you can participate in the political

8   process without interference?

9   A    Yes.

10   Q    Do you feel like as an African American you have the same

11   ability to participate as anyone else in the school district?

12   A    Yes.

13   Q    Do you feel like you have the opportunity to elect the

14   candidate of your choice?

15   A    Yes.

16   Q    Will you run for office again?  Am I putting you on the

17   spot?

18   A    I would do it again.  I would do it all over again, yes.

19   Q    So the board recently hired a new superintendent.  Were

20   you on the board when he was hired?

21   A    Yes.

22   Q    Do you believe the board hired the best person to address

23   the issues of disparities within the school district?

24   A    Yes.  And the board worked very, very hard making that

25   selection.

1  Q    What was the racial make-up of the board when Dr. Davis

2  was hired?

3  A    I was the only African-American board member.

4  Q    As the only African-American board member, do you believe

5  that, as Mr. Hudson said earlier, that the board was intent on

6  hiring an African American no matter what?

7  A    What I can tell you is, when we had our conversations,

8  that was not the intent at all.  The only thing we wanted to

9  do was get the best person for the position.

10 Q    Do you believe you did that?

11 A    Absolutely.

12 Q    What do you think of Dr. Davis so far?

13 A    He walks on water.

14 Q    What's the board's relationship like with Dr. Davis?

15 A    They -- I tell you what.  Dr. Davis is -- I think that

16 the board, when we first selected Dr. Davis, some of the board

17 members wanted to test him a little bit.  And he is extremely

18 strong in where he stands about student achievement and what

19 needs to be done to get us on the right track.  And because of

20 him being able to stand up to some of the suggestions of board

21 members and to be able to say to them "This is what I have in

22 mind" and to strongly say it, he has won the respect of the

23 board, and the board is very supportive of him.  We're backing

24 him.  And I can't speak for the board -- that's one of the

25 things that we learned in our training -- but I can say that I

1    would say that 100 percent of us are behind him 100 percent.

2         MS. ORMSBY:  Thank you.  I don't have anything

3    further.  Oh, wait a minute.  I got to ask.

4         THE COURT:  Apparently, you do.  You just don't know

5    it.

6    Q   (BY MS. ORMSBY) Do you see any differences between the

7    Grade A for Change slate that you were on and the candidates

8    that are endorsed by the FFNEA?  As far as slating, do you

9    think it's the same sort of slate?

10   A    No.

11   Q    Why not?

12   A    Not at all.  Grade A for Change -- I can't speak enough

13   for what they did for me in terms of supporting me, not just

14   financially and doing the signs and doing the pamphlets and

15   making the phone calls, but they taught me how to be a

16   candidate.  They taught me the things that I really needed to

17   do to win votes.  They were supportive.  When I was tired and

18   when I really wanted to just kind of, uh, they were behind me

19   and they supported me.

20        I would say for the FFNEA their support was tangible

21   in that you got the finances -- not very much -- and you got

22   the signs and got their endorsement, but I would take Grade A

23   for Change endorsement over NEA's endorsement any day.

24   Q    Who is your -- did you have a campaign manager?

25   A    Yes.

1  Q    Who was it?

2  A    Judy Shaw.

3  Q    Is she in the courtroom today?

4  A    She's -- I'm afraid to look at her.  I'm still afraid of

5  her.

6       THE COURT:  So she was a good campaign manager if

7  you're afraid of her.

8       THE WITNESS:  Yes.  Very dedicated.  Extremely

9  dedicated.

10  Q    Are you able to represent and learn about the interests

11  or concerns of residents in the Ferguson-Florissant School

12  District even though they don't live near you?

13  A    Yes.

14  Q    How?  Why?

15  A    As a board member, we have, first of all, a

16  responsibility to get out and to know who our constituents are

17  and to meet with them, to talk with them, to help them through

18  a difficult situation, but -- and we get those phone calls.

19  What some people think is that the board does all this work

20  and that it's my responsibility for -- okay.

21       Say, for example, your child gets suspended and

22  someone calls me and says, "My kid's suspended.  Would you

23  help me out?"  They don't understand that's not the

24  responsibility of the board.  Our responsibility is to hire

25  the superintendent and make sure that policies and procedures

1  are followed and that the superintendent does that.

2          And so what I'm learning or teaching people about the

3  board is that is what our responsibility is.  And through the

4  superintendent we're hoping that what he does will effect

5  change, will help those parents who are calling me about their

6  student who's being suspended and other things.  And so I

7  think sometimes people just don't understand what a board

8  member does and what a board does.

9  Q    Do you think that the board -- do you think that all the

10 geographic areas of the school district are represented by the

11 school board?

12 A    Speaking for myself, yes.  Every single school, every

13 school in the Ferguson-Florissant School District, I feel

14 responsible for.  Every one of them.

15         MS. ORMSBY:  I have nothing further.

16         THE COURT:  Cross-examination?

17         MS. EBENSTEIN:  Somewhat briefly, Your Honor.

18         THE COURT:  Are you ready?

19         MS. ORMSBY:  Yes, sir.

20         THE COURT:  You may proceed.

21         MS. EBENSTEIN:  Thank you.

22                    **CROSS-EXAMINATION**

23 **BY MS. EBENSTEIN:**

24 Q    Good afternoon, Dr. Thurman.

25 A    Hi.

1   Q    How are you?  I'm Julie Ebenstein.  I'm counsel for the

2   plaintiffs.  We met at your deposition.

3          We heard testimony earlier this week from Frank Green

4   that the FFNEA's reason for not endorsing you is that you were

5   out of touch.  Do you agree that you were too out of touch

6   with the district to be endorsed by the FFNEA?

7   A    No.

8   Q    And you would agree, wouldn't you, that there are special

9   concerns that affect the African-American community more than

10  the white community?  Wouldn't you?

11  A    In Ferguson-Florissant?

12  Q    Yes.

13  A    Yes.

14  Q    And that these include disparities in achievement?

15  A    Yes.

16  Q    And in the way that African-American students are

17  disproportionately disciplined?

18  A    Yes.

19  Q    And in different schools resources allocated for

20  north-side schools as opposed to south-side schools?

21  A    Yes.

22  Q    And you're aware, are you not, that there is a history of

23  racial discrimination in the state of Missouri?

24  A    Yes.

25  Q    That schools used to be racially segregated?

1  A    Yes.

2  Q    That playgrounds, libraries, and public parks were also

3  segregated?

4  A    Yes.

5  Q    That racially restrictive housing covenants and zoning

6  restrictions were in place in the St. Louis area?

7  A    Yes.

8  Q    And you would agree, would you not, that there are

9  ongoing effects of the history of discrimination in St. Louis

10  County in terms of housing, education, and a number of other

11  issues?

12  A    Yes.

13  Q    And would you agree that there are disparities in home

14  ownership, employment, income, and poverty levels that still

15  exist in the FFSD?

16  A    Yes.

17  Q    You testified a moment ago that one job of the board is

18  to make people aware that there is achievement gap by race; is

19  that correct?

20  A    To make people aware?

21  Q    I believe that's what you said earlier.

22        MS. ORMSBY:  I object.  I don't think that represents

23  her testimony.

24  Q    Okay.  Do you think someone could make other people aware

25  of either discrimination or an achievement gap if they

1    themselves had no idea that that achievement gap existed?

2    A    Well, no.

3    Q    I believe you said a moment ago -- and I'm sure counsel

4    will correct me if I'm wrong -- that you prefer at-large

5    elections because board members represent the entire district,

6    correct?

7    A    Yes.

8    Q    But people asked you to run for the board because they

9    felt the school board didn't represent African-American

10   neighborhoods; is that correct?

11   A    I don't think that's the only reason they asked me to run

12   for the board.

13   Q    Is that one of the reasons they asked you to run for the

14   board?

15   A    Could have been.

16   Q    Do you recall when we met in June, at your deposition, I

17   asked you and you told me "And why do you believe people were

18   asking African Americans to run for the school board?" and you

19   answered, "Because the school board didn't represent our

20   neighborhood"?

21   A    Uh-huh.  Yes.

22   Q    Do you think it's important for you, as an African

23   American, to be on the board?

24   A    Yes.

25   Q    Do you know that in 2014 -- or are you aware that in 2014

1  you only received 8.4 percent of the white vote, of votes from

2  white voters?

3  A    I did not remember that.

4  Q    And if you had known that less than one in ten white

5  voters voted for you, would you think that that was a

6  significant level of support among white voters?

7  A    Say that again.

8  Q    If you were aware that less than one in ten white voters

9  voted for you, would you consider that a significant amount of

10  support from white voters?  One in ten?

11  A    No.

12  Q    Are you aware of any African American who has been

13  elected to the board in the last ten years who does not have a

14  Ph.D.?

15  A    In the last ten years?  Chuck Henson, I think.  And

16  Gwendolyn Thomas.  I'm not sure if she did or not, but I don't

17  think so.

18  Q    Do you know of any white members on the board who have a

19  Ph.D. currently?

20  A    Currently?

21  Q    Uh-huh.

22  A    No.

23  Q    Excuse me for a minute while I consult with my

24  co-counsel.

25          You testified earlier that, after attending the

1  November 2013 meeting related to Dr. McCoy, you changed your

2  mind as to whether or not the board was correct in suspending

3  him; is that right?

4  A    No.  That's not what I said.

5         MS. EBENSTEIN:  Okay.  No further questions.  Thank

6  you, Dr. Thurman.

7         THE WITNESS:  Uh-huh.

8         THE COURT:  Any redirect?

9         MS. ORMSBY:  No, Your Honor.

10        THE COURT:  Thank you, ma'am.  You may step down.

11        We'll take a 15-minute -- let's say 20-minute recess.

12  We'll reconvene at 3:50.  Who's next?

13        MS. ORMSBY:  Dr. Rodden.

14        THE COURT:  Okay.

15        **(COURT RECESSED FROM 3:30 PM UNTIL 3:52 PM.)**

16        THE COURT:  If you would call your next witness,

17  please.

18        MS. ORMSBY:  Call Dr. Jonathan Rodden.

19        THE COURT:  If you would step forward, sir, and be

20  sworn.

21             **(WITNESS SWORN BY THE CLERK.)**

22        THE COURT:  Are we ready?

23        MR. HO:  Yes, your Honor.

24        THE COURT:  Okay.  You may proceed.

25                  **JONATHAN RODDEN,**

1  **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

2  **FOLLOWS:**

3  **DIRECT EXAMINATION**

4  **BY MS. ORMSBY:**

5  Q    Would you state your full name for the record, please?

6  A    Jonathan Rodden.

7  Q    Dr. Rodden, where were you born and raised?

8  A    I was born in St. Louis, Missouri, and I was raised in

9  Florissant, Missouri.

10 Q    So I'll ask the proverbial St. Louis question:  Where did

11 you go to high school?

12 A    I'm a proud graduate of McCluer North Senior High School

13 in Florissant, Missouri.

14 Q    Is that in the Ferguson-Florissant School District?

15 A    It is.

16 Q    Did you graduate with any honors from McCluer North?

17 A    I was salutatorian.  It was close, but I came in second.

18 Q    Did you participate in any athletics?

19 A    I did.  I played on the varsity soccer team, and I was on

20 a swim team.

21 Q    Were you involved in any other activities that were

22 located in other places of the school district?

23 A    Yes.  I was on something called the Ferguson-Florissant

24 Youth Advisory Commission when I was in high school, and I was

25 also very involved in the municipal swim league.  So I started

1  out swimming on the Ferguson swim team and, after a couple

2  summers there, was recruited by a coach in Berkeley, who I had

3  a lot of respect for; so I ended up on the Berkeley swim team.

4  So I was one of those white people hanging around in Berkeley,

5  I guess.  I spent a couple summers there, and so I kind of got

6  to know every part of the district.

7  Q    Does your family still live in the area?

8  A    They do.

9  Q    Were you involved in any other extracurricular activities

10  when you were in Ferguson-Florissant School District?

11  A    Yes.  I was very involved.  In addition to swimming, I

12  also was very involved in music and played in different bands

13  and orchestras around the district.

14  Q    Have you continued to keep in touch with what's going on

15  in the area?

16  A    I have.  I think that's something that social media is

17  helpful with, and I kind of keep up on news from the

18  Ferguson-Florissant area.

19  Q    After you graduated from McCluer North -- which was in

20  what year?

21  A    1989.

22  Q    Did you go to college?

23  A    I did.  I went to the University of Michigan in Ann

24  Arbor.

25  Q    What did you study there?

A     After some time in music and in doing some statistics and some economics, I landed on political science, and that's what I've been doing ever since.

Q     And how long were you at University of Michigan?

A     I was there four years.

Q     You graduated when?

A     I believe it was 1993.

Q     Other than political science, was there any other special area of study?

A     Economics and statistics and some work in demography.

Q     Did you get any special recognitions or awards while at University of Michigan?

A     I was chosen as the Most Outstanding Student by the Michigan Association of Governing Boards.

Q     Did you spend your summers back in Florissant?

A     I did, yes.

Q     What did you do during your summers?

A     I worked in the district as a lifeguard.  I also worked downtown at a law firm called Husch Eppenberger.  I believe they have now moved to Clayton.  And then in the evenings I worked -- I went down to Chippewa to scoop frozen custard at my uncle's frozen custard stand.

Q     What's the name of that frozen custard stand?

A     Ted Drewes.

Q     And what did you do at Husch & Eppenberger?

1   A    I was a mail boy.  I delivered the mail to the attorneys.

2   Q    And in 1993, after you graduated from University of

3   Michigan, what did you do next?

4   A    I went for a year on a Fulbright scholarship to the

5   University of Leipzig in Germany.

6   Q    And what did you study there?

7   A    Political science.

8   Q    And after your year as a Fulbright Scholar, what happened

9   next?

10  A    I started graduate school at Yale University in a Ph.D.

11  program in political science.

12  Q    Anything more specific than political science?  Was there

13  a specific area within political science that you studied?

14  A    Yes.  My work was focused on political economy, a lot of

15  work on economics and statistics, voting behavior, and

16  especially institutions of representation.

17  Q    So you got your doctorate from Yale?

18  A    Yes.

19  Q    And when was that?

20  A    I believe it was in 2000.

21  Q    What was your dissertation on?

22  A    It had to do with the fiscal relationship between central

23  governments, state governments, and lower-level governments,

24  municipal governments around the world, focusing in part on

25  the United States but also on several other countries.

1  Q    And was your dissertation well accepted?

2  A    It was.

3  Q    All right.  After you got your Ph.D., what did you do

4  next?

5  A    I received my first -- I started my first job at

6  Massachusetts Institute of Technology, the year I finished my

7  Ph.D., as an assistant professor.

8  Q    What did you teach while you were an assistant professor

9  at MIT?

10  A    A mixture of the things that I've been teaching ever

11  since:  Courses on representation, elections, some methods

12  courses on statistics, and courses on comparative and American

13  politics.

14  Q    How long were you at MIT?

15  A    I believe I was there six years.

16  Q    Were you an assistant professor the entire time?

17  A    No.  First, I became an associate professor after two or

18  three years, and then I received tenure, I think, in my --

19  beginning of my sixth year.

20  Q    How old were you when you received tenure at MIT?

21  A    I believe I was 35.

22  Q    And did you receive any special honors at MIT?

23  A    I had an endowed chair, a named chair, the Ford

24  Development Chair.

25  Q    What does it mean to have an endowed chair?

1    A    It means you have someone else's name behind your name on

2    your letterhead, I guess, and some resources, some research

3    funds.

4    Q    Is it considered an honor to have --

5    A    Yes.

6    Q    What did you do then?

7    A    As soon as I received tenure at MIT, I was offered a

8    fellowship for a year at the Center for Advanced Study in the

9    Behavioral Sciences in Palo Alto, and I moved my family out

10    there for a year of sabbatical.

11    Q    What is a fellowship at the Center for Advanced Study in

12    Behavioral Sciences?

13    A    It is an institution that was started in the 1950s by the

14    Ford Foundation as a place for scholars to go and try to spend

15    a year away from teaching to focus on their research.

16    Q    And that's what you did?

17    A    Yes.

18    Q    So after a year at the Advanced Study in Behavioral

19    Sciences, what did you do next?

20    A    While I was there, I was recruited by Stanford, and it

21    was a difficult decision, but I decided to make the move to

22    Stanford.

23    Q    Do you remember what year that was in?

24    A    It must have been either 2006 or '07.

25    Q    Were you hired -- what capacity were you hired?

1    A    I was hired as a full professor.

2    Q    What's your current title?

3    A    I'm a Professor of Political Science at Stanford.

4    Q    What classes do you teach at Stanford?

5    A    I teach some of the courses that I've always been

6    teaching on representation and political systems, institutions

7    of representation.  In particular, I do some work on election

8    law and recently have started teaching more intensively in

9    political methodology related to geographic information

10   systems.  It's probably a term I'll use a couple of times,

11   GIS.  So I work a lot with geo-spatial data.  That means

12   fine-grained census data at the level of census blocks and

13   block groups and tracts and so forth and putting that together

14   with other forms of data that can be geo-located.  Lots of

15   nice things we can learn from that kind of analysis.

16   Q    How often do you analyze and work with census data and

17   election data?

18   A    Pretty much every day that I'm not in the classroom

19   teaching.  This is the kind of thing that I do every day.

20   Q    Do you supervise any graduate students?

21   A    I do.  I have a large number of graduate students, maybe

22   on the order of 15 right now.

23   Q    Do you run any other departments or centers or have any

24   other administrative positions?

25   A    Yes.  A few years ago I started something called the

1   Stanford Spatial Social Science Lab, and this is related to

2   what I was just talking about.  It's a center for geo-spatial

3   analysis in the social sciences.  I've brought together a

4   group of faculty members from my department, political

5   science, but also from the Graduate School of Business, from

6   economics, and from the anthropology department.  Also we have

7   some historians who are interested in this kind of work.  And

8   we are working with various kinds of geo-spatial data, making

9   maps and doing spatial analysis.  We do some teaching

10  workshops in various forms of spatial quantitative analysis.

11  Q    Do you work with any other universities in that capacity?

12  A    Yes.  We have a partnership with Harvard University, and

13  we've put together a resource that -- and it's kind of an

14  ongoing resource, but we have got a project where a group from

15  Harvard has collected all of the precinct-level election

16  results for lots of different offices at higher and lower

17  levels of government.  We've put together the precinct-level

18  election results which are -- it's very small, fine-grained

19  level of analysis.  We've put together those results, and then

20  the team at Stanford took what the Harvard group collected,

21  and we've been able to map all of those precinct-level

22  election results and put them together with census geography

23  from 2010.  And so we have the census data at the level of

24  blocks merged together with the precinct-level data so that we

25  can analyze patterns of voting by party and by any census

1  characteristic we might want to look at, including race.

2          And so we have all of this available on the internet

3  in an online interactive format so anyone can go and can kind

4  of zoom into their neighborhood and analyze the political

5  characteristics and social characteristics and can just

6  spatially map lots of interesting patterns.  And we also have

7  the data available for download, and it's been a very popular

8  resource.  Lots of social scientist journalists, you know,

9  economists have been using the data for lots of analysis.

10          That's the kind of thing we do.  We produce data.  We

11  produce various kinds of resources for other scholars to use,

12  including online maps, and we're also now expanding that same

13  kind of work to lots of other countries.  So we hope to

14  eventually have kind of a global resource for census data and

15  political data.

16  Q    So before this case you looked at -- had you looked at

17  voting behavior based on race and ethnicity?

18  A    Yes.  This is something that's come up quite a bit in my

19  research.

20  Q    And did you utilize the same data and methodologies that

21  you utilized in this case?

22  A    Yes.  This case was a very nice fit for some of the

23  substantive questions I've been interested in and also many of

24  the techniques I've been developing.  It was in some ways well

25  timed given the research I've been doing.

1 Q Have you taught any courses on the Voting Rights Act?

2 A I've never taught a course on the Voting Rights Act.

3 I've been including some materials in my courses in recent

4 times, but I've been talking to people at the Stanford Law

5 School and hope to develop a course in the near future.

6 Q Let's pull up Plaintiffs' Exhibit 60.  Is this your

7 vitae?

8 A Yes.

9 Q And let's look at the publications.  And it's in your

10 book as well.  It's on the screen and on your book, so

11 whichever is clearer to see.  Let's look at your publication

12 list.  What is *Hamilton's Paradox:  The Promise and Peril of*

13 *Fiscal Federalism*?

14 A That is a book that emerged from that dissertation

15 project that I described earlier, and it has to do with fiscal

16 relations between governments, focusing a lot on state and

17 local governments around the world, and particular in the

18 United States.

19 Q Did it win any awards?

20 A It was selected as the Best Book award in Comparative

21 Politics in 2007.

22 Q Let's look at the other books on your list.  Are there

23 any books that are particularly relevant to this case?

24 A Yes.  There is a book that I've been working on for a

25 long time and haven't quite finished, haven't convinced myself

1  to send it off to the publisher yet, but it's called *The Long*

2  *Shadow of Industrial Revolution:   Political Geography and the*

3  *Representation of the Left.*

4           And this is a book that focuses on -- given some of

5  what I just described about the geography of support for

6  political parties and some of the new ways we have to collect

7  data on that and understand it at a very low level of

8  analysis, this is a book that has allowed me to learn some

9  things about the way that you might think of as natural

10  geography translates into political support and policies

11  ultimately.

12          So in particular this book is about the way in which

13  the Industrial Revolution in the late 1800s and early 1900s

14  shaped distribution of support for political parties in

15  geographic space.  So it focuses on the fact that voters for

16  parties of the left are concentrated in city centers and along

17  rail corridors and along lakes and oceans, and voters for the

18  right tend to be more dispersed.

19          So what I'm trying to understand in this book is when

20  that is the natural geography that emerges from the Industrial

21  Revolution, what happens when we draw single-member,

22  winner-take-all electoral districts on top of those -- on top

23  of that geography?  This is something that we do in countries

24  that were colonized by Great Britain who have these

25  winner-take-all rules.

1      And so what I'm learning about is what happens when

2  we use electoral districts, small winner-take-all districts

3  versus at-large districts, in a wide variety of settings.  And

4  that's a large part of what this book is about, especially

5  trying to understand concentration versus dispersion.

6  Q    How many peer-reviewed journal articles do you have on

7  your vitae?

8  A    I would say around 20 or 30.

9  Q    Are there any articles that are not included on your CV?

10  A    There are a couple, yes.  There's one article that is, I

11  think, also relevant to the case that recently came out in

12  *Election Law Journal*, and it is about -- it is about

13  gerrymandering and how we recognize gerrymandering.

14      So given the pattern that I just described, the

15  pattern of political preferences and space that I just

16  described, we can expect to see asymmetries emerging in the

17  transformation of votes to seats that come from geography, and

18  we might mistake those for gerrymandering.

19      And so the courts have a very difficult decision --

20  or a very difficult job in trying to disentangle

21  gerrymandering from natural geography.  So I've worked on some

22  techniques to understand how to disentangle those and wrote a

23  paper on how courts might do that, how courts might negotiate

24  that difficult question.  And so that paper was selected as my

25  common cause as a winner in a contest to develop standards for

1    detecting gerrymandering.

2    Q    Are there any other articles on this list that are

3    relevant to this case?

4    A    Yes.  There's a paper that kind of was a precursor to the

5    one I just described called *Unintentional Gerrymandering:*

6    *Political Geography and Electoral Bias in Legislatures*.  That

7    is a paper that got me started in trying to understand the

8    role of geography and shaping the transformation of votes to

9    seats and ultimately electoral support and policies in

10   different countries.  And it's -- again, it's very related to

11   this case both in the techniques that I use and also in some

12   of the substantive questions.

13          There is another one called *The Achilles Heel of*

14   *Plurality Systems:  Geography and Representation in*

15   *Multi-Party Democracies*, and that one also has a lot to do

16   with how geographic distribution of groups translates into

17   representation, which is also very much at the heart of this

18   case.

19          There is a -- there's some other papers, I think,

20   that are relevant.  One in particular is a new paper that I

21   just presented at a conference.  I was working on it right at

22   the time that this lawsuit came up, and it is a paper on --

23   that focuses explicitly on at-large versus single-member

24   districts in the United States.

25   Q    Is that article included --

1   A    That is actually not on my CV.

2   Q    Have you written anything in the popular press?

3   A    I have.  I've been active in some debates about the role

4   of gerrymandering in the current representation of parties in

5   the United States, and I've been involved in some debates

6   about representation and geography.  And so there was an

7   article in the *New York Times* that I authored that created a

8   little debate back and forth in some other outlets.

9        But most recently I wrote an article on Ferguson that

10  brought some of the spatial analysis to bear on the question

11  of "Just what kind of place is Ferguson?" because a lot of

12  people around the world were asking themselves that question

13  and were forming their impressions from watching CNN.

14       And as someone who grew up in the area, I understood

15  that those impressions were false, but I wanted to use some

16  data to analyze that.  And so I wrote an article that

17  demonstrated what I think a lot of the fact witnesses in this

18  case have already mentioned:  That it is an extremely racially

19  integrated place, and it is also a very middle-class place.

20  It does have pockets of poverty, but it is quite a

21  misunderstanding to see the Ferguson-Florissant School

22  District as a impoverished ghetto.  It is a place that is

23  largely composed of middle-class homeowners.

24  Q    All right.  Turning to page 3 of your CV, you have

25  chapters that are included in books.  Is this an exhaustive

1    list of that, of those chapters?

2    A    I believe so.

3    Q    And I count about 13 chapters.  Would that be right?

4    A    That sounds right.

5    Q    And then under "other publications," looks like there

6    were six other publications that you list.  Is that

7    exhaustive?

8    A    It might not be, but it's close enough.

9    Q    Okay.  Have you been retained as an expert witness in --

10   well, no.  I want to skip that.  Do you consult for any

11   organizations?

12   A    I do.  I work frequently for the World Bank and the IMF.

13   I teach a summer course at the IMF every couple of years, and

14   I'm currently doing a lot of work for USAID.

15   Q    We have here on page 4 and 5 a list of fellowships and

16   honors that you've received over the years.

17   A    Yes.

18   Q    Have you been retained as an expert witness in any

19   election law cases?

20   A    Yes.  There are three in particular.  The first one was

21   *Romo v. Detzner* in Florida, and this was a case in Florida

22   state court in which a group of plaintiffs sued the State

23   of -- the legislature of the State of Florida in regards to

24   constitutional amendment in the State of Florida that forbids

25   the use of partisanship when drawing electoral districts.  So

1   you might think of it as a constitutional effort to curb

2   gerrymandering.  It was very difficult to enforce, and one

3   part of the enforcement of it was an effort for us to show

4   that there was -- that the efforts of the Florida legislature

5   to draw electoral districts took partisanship into

6   consideration.

7           So I was an expert witness that filed a report on

8   that matter, and we were able to convince the court that it

9   was indeed, according to the Florida constitution, an

10  unacceptable gerrymander.  It went to the Florida Supreme

11  Court, and the legislature was forced to redraw the electoral

12  districts.

13  Q    So to be clear, were you an expert on the plaintiff's or

14  defense side of that case?

15  A    The plaintiff's.

16  Q    Any other cases that you've been involved in?

17  A    There was another closely related case that was related

18  to the state senate districts in Florida.  It was a very

19  similar type of case, under the same law.  Before it went to

20  trial, it was settled, and the Florida state legislature

21  agreed to redraw the state senate districts.

22  Q    Are you currently working on any other cases besides this

23  one?

24  A    I am.  There is another Voting Rights case in the state

25  of Virginia.  This is a case related to voter identification.

1    The State of Virginia has passed a voter ID law similar to

2    such laws in some other states.  And so I'm testifying for a

3    group of plaintiffs that is arguing that this law

4    disenfranchises African Americans.

5            So my part of this law is an effort to understand

6    where are the African Americans and white Virginians who did

7    not have valid voter ID.  We've been able to get very nice

8    data set from various Virginia state agencies and were able to

9    draw very fine-grain maps down to the level of the census

10   block where people have voter ID and where they don't and were

11   able to show very clearly that the voter ID law discriminates

12   against African Americans.  And so we are including this as

13   part of the effort to have the voter ID law overturned.

14   Q    Prior to this case, have you ever been retained by

15   defendants?

16   A    No.  I believe this is my first experience working for a

17   defendant.

18   Q    How did you get involved in this case?

19   A    I received a call from you sometime, I imagine, shortly

20   after the suit was filed.

21   Q    And did you immediately agree to get involved in this

22   case?

23   A    No.  You may recall that I did not call you back for

24   quite some time.

25   Q    Why was that?

1  A    I was deeply conflicted, and I believed that I wanted to

2  testify for the other side.  I grew up in the area.  I care

3  deeply about voting rights.  I care very deeply about voting

4  rights of African Americans and African-American

5  representation, as I think all the previous work I've been

6  discussing attests to.  And I believe that it was necessary

7  for there to be change in my hometown, and I thought, "Why

8  would I want to testify for the status quo?  That's not

9  something I want to do."

10        But the way I approach these things and other

11  efforts -- other times when I've been asked to serve as expert

12  witness, before I answer, I don't want to work with anyone who

13  I don't believe is absolutely right.  So I was also, of

14  course, for all the reasons I've just described in my academic

15  work, fascinated by the case.  So before calling back, I

16  realized a lot of the data necessary for this analysis was

17  publicly available.

18        I went to the St. Louis County Board of Election

19  Commissioners, collected precinct-level data on election

20  results, and was fascinated by some of what I learned.  Then I

21  went and collected data from the census blocks and block

22  groups and put those together using geographic information

23  systems into the precincts and started analyzing the

24  relationship between turnout and race.  I started analyzing

25  the relationship between votes for specific candidates and

1    race.  I started understanding patterns of voting and outcomes

2    in the district.  And it didn't take me long to realize that a

3    single-member district, election system in the district, is

4    not at all the solution to the problem that I wanted to see

5    fixed.  The more I learned, the more I became convinced that

6    if I wanted to be on the side of minority representation in

7    the Ferguson-Florissant School District, it was the defense,

8    in fact, that I should be talking to.

9            So it was only after determining that, that I called

10   you back and asked if you were still interested in finding a

11   witness, and it turned out that you were.

12   Q    Do you remember what you said to me when you called me

13   back?

14   A    I told you that the way I do expert witness work is not

15   really as an advocate for a cause.  It's someone who just

16   wants to lay out the facts.  I view the job of an expert

17   witness to provide the court with information, and I said, "I

18   will provide you with all the information that I find, and you

19   might not like some of it, and I'm going to put it in a

20   report.  And if you don't like it, that's the way it is.  Some

21   of it will be good for your case.  Some of it will be bad.

22   We'll see how it happens."  And you were comfortable with

23   that.

24   Q    How long did it take you to call me back?

25   A    Oh, ten days.  Maybe more.

1  Q     So once you were accepted as our expert witness, what

2  were you asked to do?

3  A     I was asked to use the various social scientific tools

4  that I've been describing to apply those to data in the

5  Ferguson-Florissant School District and try to ascertain

6  whether the demographics and voting behavior in the district

7  were consistent with a violation of Section 2 of the Voting

8  Rights Act.  In particular, I was asked to examine the three

9  *Gingles* factors and the factors -- the additional factors

10 listed in the Senate report.

11 Q     Did you reach an opinion?

12 A     I did.

13 Q     What was that opinion?

14 A     I think it can be summarized briefly as that African

15 Americans are a voting-age majority of the population.

16 Furthermore, in Ferguson-Florissant School District elections,

17 especially ones that are not contaminated by Florissant

18 mayoral elections, there is no observable -- no sizable

19 difference between turnout of African Americans and whites.

20 And so if there's a African-American majority and there's no

21 substantial difference in turnout, it becomes difficult to

22 understand how a valid Section 2 claim can be made.

23         I discovered that not only is it possible for African

24 Americans to elect candidates of their choosing, I discovered

25 that if the plaintiffs are successful and a single-member

1  district system is imposed in the Ferguson-Florissant School

2  District, my conclusion is rather similar to the one that was

3  just stated by Dr. Thurman.  It would be a step backward for

4  minority representation for a variety of reasons.

5  Q    Just a minute, please.  Before we get into the specifics

6  of your report, of your opinion, I'd like to go through

7  briefly and identify the reports that you wrote.  So if you

8  could turn in your folder to Defendants' Exhibit A, do you

9  recognize that document?

10 A    Will you please state the title of the document?

11 Q    "Report of Jonathan Rodden, Ph.D."

12 A    Yes.

13 Q    Did you review this report prior to signing?

14 A    Yes, I did.

15 Q    Are there any typos that you would like to correct in

16 this report?

17 A    I believe there are.

18 Q    Refer you to page 26 on -- paragraph 26 on page 16.

19 A    Yes.  On page 16, paragraph 26, in the last sentence the

20 number "3" should be "1."

21 Q    Does the change of this typo change your conclusions in

22 any way?

23 A    No, it does not.

24 Q    And are there any other corrections/typographical errors

25 you would like to change?

1  A    I believe there was one more.

2  Q    Direct you to page 35, paragraph 73.

3  A    Yes.  I discovered on page 35, paragraph 73, during an

4  exchange in deposition I discovered a mistake in the last

5  sentence.  The number "13" -- sorry -- the number "14" should

6  actually be "13" and expressed as a percentage.  Instead of

7  "52," it should read "48."

8  Q    And does this correction change your conclusions?

9  A    No, it does not.

10  Q    Does this report accurately reflect your opinion?

11  A    Yes, it does.

12  Q    And, Your Honor, Exhibit A has been entered into

13  evidence.

14        I will turn you now to Exhibit B entitled

15  "Supplemental Report of Jonathan Rodden, Ph.D.:  Bloc Voting

16  and Cohesion."  Do you recognize this document?

17  A    Yes, I do.

18  Q    And did you have a chance to review it prior to signing?

19  A    Yes, I did.

20  Q    Are there any corrections or typos you would like to

21  make?

22  A    Not at this time.

23  Q    Does it accurately reflect your opinion?

24  A    Yes.

25  Q    And, Your Honor, Exhibit B has been admitted into

1    evidence.

2              I'd like you to -- take you to Defendants' Exhibit C

3    entitled "Supplemental Report of Jonathan Rodden, Ph.D., and

4    Jowei Chen, Ph.D.:  Assessment of Plaintiffs' Redistricting

5    Proposals."

6    A    Yes.

7    Q    Is this something that you prepared?

8    A    Yes.

9    Q    When did you prepare it?

10   A    It's dated July 2, 2015.

11   Q    Why did you prepare this supplemental report?

12   A    It was a -- I believe I now realize that the technical

13   term should have been "rebuttal report."  It was a rebuttal to

14   the work of Dr. Gordon and Mr. Cooper.

15   Q    And what does it concern?

16   A    The topics covered in this report are related to

17   primarily assessments of the plaintiffs' redistricting

18   proposals.

19   Q    Did you write the entire report?

20   A    I did.

21   Q    Did you read the report before you signed it?

22   A    Yes, I did.

23   Q    Do you have any changes to this report?

24   A    No.

25   Q    It says it's co-authored by Dr. Chen.  What does that

1    mean?

2    A    I was working to finish three reports on a short time

3    schedule.  There was a section of the analysis with which I

4    thought I could use some assistance.  I reached out to a

5    former student of mine, who has now become a professor at my

6    alma mater, University of Michigan.  We work together

7    frequently as collaborators, and I asked him if he could help

8    me out in a pinch and help write some computer code to conduct

9    a part of the analysis.  He did so, and we collaborated on

10   that.  I sent him the data.  He helped me put together the

11   code.  I verified the code, ran the code, checked on it, and

12   approved of it, and included the analysis that emerged from

13   that in the report.

14   Q    So you reviewed the computer code for accuracy?

15   A    I did.

16   Q    You ran the analysis independently?

17   A    Yes.

18   Q    You wrote up the results?

19   A    Yes.

20   Q    Why was Dr. Chen included on the title of this report?

21   A    It's the way Professor Chen and I work.  And we offer

22   each other status as co-authors when we work together.  And

23   sometimes he's doing more of the work, and sometimes I am.

24   That's been our standard, and that's the standard in my

25   discipline.  That's the why co-authorship is typically done.

1  Q    Can all of the results in this report be replicated?

2  A    Yes.

3  Q    I want you to refer specifically to paragraphs 12 through

4  16.

5  A    Yes.

6  Q    Did you write those paragraphs?

7  A    I did.

8  Q    And this report accurately reflects your opinions?

9  A    Yes.

10       MS. ORMSBY:  Your Honor, I would move that Exhibit C

11  be entered into evidence.

12       THE COURT:  Any objection?

13       MR. HO:  Yes, Your Honor.  The plaintiffs object.  At

14  best, there is an inadequate foundation for this report

15  insofar as there's testimony in the record from Dr. Chen that

16  he, in fact, was the author of the paragraphs that Ms. Ormsby

17  just referenced.  At worst, the report is hearsay to the

18  extent that Dr. Chen is correct that he is the one who wrote

19  the report, because it's an out-of-court statement.

20       MS. ORMSBY:  Your Honor, I would ask you, if you have

21  any questions, to review the deposition in which he refers,

22  because Professor Chen says that he wrote language that Dr.

23  Rodden edited and included in the report.

24       In addition to that, Your Honor, plaintiffs raised

25  this issue -- did not raise this issue during discovery, but

1    they only inappropriately raised it in their trial brief.  In

2    response, we filed an affidavit from Dr. Rodden that clearly

3    explains the fact that he wrote the entire report.

4           THE COURT:  I will read Dr. Chen's deposition

5    testimony, but not to hide anything, I suspect that having

6    people assist you in doing data compilation is pretty standard

7    for experts and that it would not be unusual for an expert to

8    rely on that type of assistance.  And the fact that he gave

9    him credit as opposed to just saying, you know, "I had

10   somebody do some computer runs for me," doesn't invalidate or

11   undermine the validity of the report that he says are his

12   opinions.

13          But on cross-examination you can explore if this is

14   the type of information an expert would typically rely on, but

15   I suspect it is.

16          MR. HO:  Thank you, Your Honor.

17          THE COURT:  Thanks.

18   Q    (BY MS. ORMSBY) Finally, Dr. Rodden, I will take you to

19   Exhibit D, which is entitled "Supplemental Report of Jonathan

20   Rodden, Ph.D.:  Senate Factors."  Do you see that?

21   A    I do.

22   Q    Did you review this report prior to signing?

23   A    Yes, I did.

24   Q    Do you have any typos or corrections to make?

25   A    Nope.

1    Q    Does this report accurately reflect your opinion?

2    A    Yes, it does.

3    Q    And, Your Honor, Exhibit D has already been entered into

4    evidence.

5         Dr. Rodden, what census data did you rely on to

6    analyze the Ferguson-Florissant School District's population

7    and demographics?

8    A    I relied on a variety of different sources.  Overall, I

9    looked at -- when establishing the historical approach, in

10   part of the paper I used 2000 decennial census data.  I also

11   used 2010 decennial census data.  Those decennial census data

12   at the level of blocks were used to understand to count up

13   people and voting-age people of different races at the level

14   of the precincts.

15        So I had to use the block-level decennial census

16   data, as I believe was the case for Dr. Engstrom.  We had to

17   use the 2010 decennial census data.  Unlike Dr. Engstrom, I

18   also had to use the 2000 decennial census data because my

19   report covered quite a bit more years than his.  And so to

20   have the right data for the earlier years, I had to use the

21   decennial census from 2000.

22        So in addition to decennial census data, I also

23   examined data from the American Community Survey, as, I

24   believe, did many of the other experts who have testified in

25   this trial.  I used data from the three-year version of the

American Community Survey, and I used several of those

three-year chunks when examining the trend in population in

the school district.

And I relied finally at the end of that -- of the

most recent data I used was the most recent three-year

American Community Survey, ACS, and that was the one that was

collected in the years 2011, 2012, and 2013.  Again, they're

packaged together into something we call the three-year ACS.

Q    So when we say "ACS," we're referring to the American

Community Survey, correct?

A    Yes.

Q    Why do we have the ACS?

A    The Census Department was attempting to update and

modernize its operation.  In recent years they determined that

they made the decision that it was inefficient to send a

really large army of people to every household to try to

collect a vast array of data on a variety of social and

ecological indicators.  In the old days, they would come to

your house with a very long form, and they would ask you

everything.  They would ask you about your place of birth.

They would ask your marital status.  They would ask about

whether you owned or rented, so on.  You know many of these

census variables.  There's a large number of them.

There were a lot of reasons why this didn't work

well.  One of the reasons is it really required a lot of human

1    capital to hire that many people to go and do that much work.

2    And they determined that this was an inefficient way to

3    collect that information, especially with the advance in

4    modern sampling technology.

5         So they developed a much better way of sampling, and

6    they decided it was better to collect these data from

7    sampling. So what they would do is send out every year,

8    beginning in the middle of the last decade -- so in 2008, I

9    believe -- they started sending out a survey to a sample of

10   households, a well-crafted, well-chosen sample of households.

11   And they would collect all that information they used to

12   collect in the decennial census, and they would collect it

13   every year.

14        And in order to have large enough sample sizes for

15   people to make the inferences that they wanted to make, they

16   would release that data in chunks. They would release it in

17   five-year chunks and three-year chunks. These became known as

18   the five-year and the three-year ACS. And these are the

19   friend of every social scientist who wants to do anything

20   interesting in the United States.

21        It doesn't mean they did away with the decennial

22   census. They still go around and collect a lot of people and

23   hire a new team. You can actually see in the employment

24   statistics every ten years a bump when they go and they

25   collect a lot of people and put them to work going house to

1    house to collect all this information.

2           But now instead of asking you about, you know, your

3    place of birth and all these other variables, they ask you a

4    few very simple variables, and they move on.  They ask you

5    your race, your age, whether you rent or own your home, and

6    maybe one or two other things, and then they move on.  So that

7    means for people like me, who want to do analysis of things

8    like education by race, we have to rely on the ACS.  And that

9    is how the ACS came about.

10          It is not -- I think there was a bit of a confusion

11   earlier.  A distinction was made between the census and the

12   ACS.  The ACS is the census.  It was created by the Census

13   Department.  It is a census product.  That's how we get our

14   data to do our work in the social sciences.

15   Q    Does the Census Bureau give us guidance on which ACS to

16   use when?

17   A    It does.

18   Q    I'd like to refer you to Exhibit Q.  What is this

19   document?

20   A    It is a guideline that the Census Department publishes

21   that tells people under what conditions they might choose to

22   use the one-year ACS estimate for some indicator or the

23   three-year estimate or the five-year estimate.

24   Q    Go ahead.

25   A    That's better.  Thank you.  And it explores trade-offs.

1   So a researcher, when they're deciding what they'd like to

2   use, what kind of census product they'd like to use, they have

3   trade-offs.  You have to think about what is the size of the

4   community that you're trying to understand.  You have to ask

5   yourself whether the sample size is large enough to learn

6   anything about the quantity of interest.  But you also have

7   something that you might care about, which is the recency of

8   the data, and in this case it seemed very clear that having

9   recent data was something that we cared about.

10         So, you know, for any research question you've got

11  kind of a matrix of things you might care about.  You've got

12  to try to decide what's the right census product for you.  In

13  this case, there wasn't really much debate.  It was clear we

14  wanted recent data and we wanted something that would work for

15  this community of the size of the Ferguson-Florissant School

16  District.

17  Q    So it's your belief that the three-year estimate is the

18  proper ACS to use for the Ferguson-Florissant School District?

19  A    Yes.  And I believe this demonstrates that.  It says it's

20  appropriate for areas with population larger than 20,000.

21  Q    And what's the population of the Ferguson-Florissant

22  School District?

23  A    It's more than 60,000.

24  Q    Does the Census Bureau give us any documents giving

25  guidance on how to use the ACS?

1   A    I believe so.  In addition to this, there are some

2   others.

3   Q    We're going to look at Plaintiffs' Exhibit 133.  If you

4   can turn to page 1 of that document.  Does this tell you what

5   subjects are appropriate to review -- to use for review of the

6   ACS?

7   A    Yes.  In fact in that green box, we see many of the

8   characteristics that I was referring to, the kinds of things

9   that people like me really like to spend time diving into.

10  Q    Specific to this case, is there characteristics that you

11  would use it to rely on?

12  A    We see right at the beginning we have age, and we have

13  race, and those are some important variables in this case.

14  Q    And if you look up on that page a little bit at the end

15  of the first column, can you read the very last sentence of

16  that paragraph?  Beginning with "The ACS."

17  A    "The ACS is a nationwide, continuous survey designed to

18  provide communities with reliable and timely demographic,

19  housing, social, and economic data every year."

20  Q    So does that indicate that the Census Bureau believes

21  this to be a reliable document?

22  A    It does.

23  Q    If you would turn to page 2, please, of this same

24  document.  Does this page tell you who relies on the ACS?

25  A    Yes.

1  Q    And in the box there, would it indicate what agencies

2  rely on the ACS?

3  A    It indicates federal agencies, nongovernmental

4  organizations, journalists, state and local governments, and

5  for some reason they leave out college professors and their

6  students.

7  Q    Can you rely on the ACS for population figures?

8  A    Yes.  Certainly.  These are all population figures.  All

9  of these, the things we're talking about, are counts of people

10 who fit into various categories.  Race is a particularly broad

11 category.

12 Q    Do you agree with plaintiffs' expert that the ACS is

13 unreliable?

14 A    No, I do not.

15 Q    You've heard some of the experts say that we shouldn't

16 use the ACS as a population estimate because Missouri state

17 law requires decennial census.  Do you agree with that?

18 A    I believe that is a very --

19     MR. HO:  Objection.  Calls for a legal conclusion,

20 Your Honor.

21     THE COURT:  Asked if he agreed with it.  Didn't say

22 what his legal opinion was.  It's a subtle distinction, but

23 I'll take it for what it's worth.  Obviously, ultimately, if I

24 was instructing a jury, I would tell them whether to rely on

25 it or not to figure it out, and you'll convince me one way or

1  the other when the case is over, but I'll let him talk about

2  it.

3  A    Certainly.  This is easy to clear up.  There's a

4  simple -- a misunderstanding.  I've heard several times in the

5  plaintiffs' testimony that it's necessary to use the official

6  population counts from the decennial census for the purposes

7  of redistricting, but in my expert analysis in this case, I

8  did not conduct any redistricting, while in other cases I've

9  conducted quite a bit of redistricting.  I've drawn thousands

10  of redistricting plans.  I'm quite aware of the need to use

11  decennial census data in official counts when redistricting.

12        In fact, it's impossible to redistrict without using

13  decennial census data, because we need to be able to drill all

14  the way down to the blocks in order to fit those blocks within

15  the boundaries that might create something like, say, a school

16  board district in the Ferguson-Florissant School District.

17        I am not writing reports about redistricting.  In

18  fact, I believe I am defending a party that is opposed to

19  redistricting.  So I don't see what the redistricting laws

20  have to do with my use of ACS.

21  Q    Can you tell the Court about sampling error?

22  A    Yes.  This is, of course, in that figure we were looking

23  at just a moment ago in which there were instructions about

24  how to use the ACS, one of the things mentioned was the fact

25  that it's a sample.  It's a survey.  And when moving from the

1  decennial census to the ACS, the Census Department understood

2  what it was doing.  It was moving from a count to a sample for

3  most of the things that we care about learning.  The reason

4  for doing this is because a sample can give us a very good

5  snapshot of a very good estimate of the things we're trying to

6  count.  This is the way we do things.

7       But, of course, any time there's a sample, there is

8  going to be sampling error.  But the nice thing about it is we

9  can quantify it.  The Census Department always gives us the

10  confidence intervals.  It gives us a margin of error.  And I

11  think we've had several nice demonstrations from the other

12  plaintiffs' witnesses, high-quality representations of what a

13  confidence interval is, and I won't repeat it now.  But

14  samples always have sampling error.  That is a fact of life.

15  Q    Because it's a sample, does that mean it's not reliable?

16  A    That would mean that social scientists can't do anything;

17  so, no, I certainly hope that is not the case.

18  Q    Are there any issues of reliability when it comes to the

19  decennial census?

20  A    In fact there are, and that's one of the reasons why the

21  census has been changing the way it does things.  So after

22  every decennial census, the Census Department tries to look

23  back over its operation and see how well it did.  And the way

24  they go about trying to see how well they did is they sample a

25  survey.  And they do a very good job with the survey.  They

1  put a lot of effort and resources into this survey, and they

2  try to get it right.  And they try to learn from the sample

3  what did we get wrong a couple of years ago when we did the

4  decennial census?

5  Q    How do they --

6            MR. HO:  Your Honor, we're going to object to this

7  line of questioning.  There's nothing in Dr. Rodden's reports

8  that criticizes the enumeration of the decennial census and

9  its accuracy.

10           MS. ORMSBY:  Your Honor, I would just say we're

11  trying -- the ACS has been criticized greatly as being

12  unreliable by plaintiffs in this case, and we are just

13  comparing the reliability of the census to the reliability of

14  the ACS and showing that the census is not foolproof either.

15  Neither document is completely foolproof.

16           MR. HO:  And we made those arguments, Your Honor, and

17  our experts made those arguments in their initial expert

18  reports and their rebuttal reports in this case, and Dr.

19  Rodden had ample opportunity in his rebuttal reports to make

20  whatever points he wants to make about the decennial

21  enumeration and declined to do so.

22           So at this point what's good for the goose should be

23  good for the gander, Your Honor.  We weren't allowed to put in

24  evidence about the five-year ACS estimate.  I don't see why

25  defendants can put in their criticism of the decennial

1    enumeration when they have made no reference to that

2    whatsoever in this case prior to --

3         THE COURT:  Well, in the case of the five-year ACS,

4    nobody had disclosed it one way or the other.  Here we're

5    having a general conversation about your experts attack the

6    ACS as unreliable or at least the margin of error being so

7    great you can't -- you shouldn't use it.

8         I'll give him some latitude to explain why he thinks

9    it's effective.  You'll get to cross-examine on it.  And

10   ultimately if you think that there's sufficient prejudice I

11   should strike his testimony, we can take that up post-trial;

12   so much so that I shouldn't rely on it, I will keep the door

13   open to that conversation.

14        MR. HO:  Thank you, Your Honor.

15        MS. ORMSBY:  I forgot what my question was.

16        THE COURT:  Do you want to know what your question

17   was?

18        MS. ORMSBY:  I would love that, Your Honor.  Thank

19   you.

20        THE COURT:  Do you want to read it back?

21        **(QUESTION READ BACK BY THE COURT REPORTER.)**

22   Q    Are there any issues regarding the reliability of the

23   decennial census?

24   A    As I believe I was describing the follow-up survey that

25   the Census Department does, and when they do that, they always

1    issue a report, and it's based on a sample survey.  And they

2    tell us about the errors in the last census, some undercounts

3    and overcounts and so forth.

4    Q    I'll refer you to Defendants' Exhibit R.  Does the census

5    disclose what their errors are at any point in time?

6    A    Yes.  I believe this document is a release of that

7    information.

8    Q    And if we can go down to "variation by characteristics,"

9    if you could enlarge that area, please.  The third paragraph

10   down, could you read that out loud, please?

11   A    I'm going to have a hard speaking into the microphone and

12   doing that at the same time because I don't believe I see it.

13   Q    Can you look at your screen, perhaps?  It's enlarged.

14   Does that help?

15   A    "As with prior censuses, coverage varied by race and

16   Hispanic origin.  The 2010 census overcounted the non-Hispanic

17   white alone population by .8 percent, not statistically

18   different from an overcount of 1.1 percent in 2000."  So we're

19   looking at about a 1 percent overcount of whites in the

20   decennial census.

21   Q    Could you read the next paragraph down, please?

22   A    "The 2010 census undercounted 2.1 percent of the black

23   population, which was not statistically different from the 1.8

24   percent undercount in 2000.  In 2010, 1.5 percent of the

25   Hispanic population was undercounted.  In 2000, the estimated

1  undercount of .7 percent was not statistically different from

2  zero.  The difference between the two censuses was also not

3  statistically significant."

4  Q    Then further down on this document, does it tell you when

5  it is significant and when it's not, depending on population?

6  Can you highlight that?  Do you see the second bullet down

7  under "other findings"?

8  A    "The survey did not measure a statistically significant

9  undercount or overcount for the population in any counties or

10 places of 100,000 or more."

11 Q    And is the Ferguson-Florissant School District population

12 in excess of 100,000?

13 A    No, it's not.

14      MS. ORMSBY:  Your Honor, I would move the -- I would

15 move Exhibit R be accepted into evidence.

16      MR. HO:  Your Honor, we objected to it as hearsay.

17 It's not an official government record.  It's a press release.

18 It's of the same kind of nature of the newspaper.

19      THE COURT:  I won't receive it as substantive

20 evidence, but to the extent that he uses it and it's the type

21 of material an expert traditionally relies on, it overcomes

22 the hearsay exception but only to the extent it contributes to

23 his opinion, not as proof of what it says.

24      MS. ORMSBY:  Your Honor, I do believe it does fit

25 under a hearsay exception.

1          THE COURT:  Okay.

2          MS. ORMSBY:  803(8)(A).  A record or statement of a

3    public office, which is the census, it sets out its office

4    activities, and the opponent does not show that the source of

5    information or other circumstances indicated a lack of

6    trustworthiness.

7          And I refer you to case *U.S. Equal Opportunity*

8    *Commission v. E.I. DuPont De Nemours*, and in that case it was

9    exactly this sort of a situation where the court did rely on

10   it.  It was downloaded from the internet.  It was a printout

11   from the internet.  It had --

12         THE COURT:  What agency was it?

13         MS. ORMSBY:  It was the -- a printout from the

14   census.

15         THE COURT:  In what circuit?

16         MS. ORMSBY:  It was the Eastern District of

17   Louisiana.

18         THE COURT:  Oh, okay.  Not Judge Vance, by chance,

19   then you'll lose.  If Sarah Vance wrote it, I'm done.  But

20   I'll give you the opportunity to rebut it, okay?  That's where

21   we are.

22         MR. HO:  Okay.

23         THE COURT:  He can certainly rely on it, use it if

24   experts typically rely on it and use it, which I don't think

25   that will be a substantial evidentiary foundation question,

1   but I will leave the door open for you to challenge the

2   reliance on that.

3          MR. HO:  Thank you, Your Honor.  Just so the record

4   is clear, to the extent that he is opining on this document,

5   we would object to this testimony in, you know, as we objected

6   previously.

7          THE COURT:  Understood.  If the foundation is laid

8   that this is the type of information an expert would typically

9   rely on in this type of case, that piece of it is overruled

10  for sure.

11         MR. HO:  Thank you, Your Honor.

12  Q   (BY MS. ORMSBY) Thank you, Your Honor.

13         Looking at the demographics of the

14  Ferguson-Florissant School District in terms of population

15  beginning in 1990 to 2010, I know you only looked back to

16  2000, but you've reviewed Dr. Cooper's report that went back

17  to 1990.  Correct?

18  A   Yes.

19  Q   And I'll refer you to Cooper's initial report, page 8,

20  Table 2.  He'll make it larger for you.  What are your

21  conclusions regarding population in the Ferguson-Florissant

22  School District from 1990 to at least 2010?

23  A   We see here that the African-American population was --

24  if we look at the African-American population, including

25  Hispanics, the number in -- the figure in 1990 is 28.65

1  percent.  Then in the 2000 decennial census it increases to

2  around 37 percent, and then in 2010 it increases to 52.2

3  percent.

4  And then, more recently, there are also data

5  available on any-part African American, including Hispanic,

6  and we see that that has ended up in the 2010 census as almost

7  54 percent.  So 54 percent of the Ferguson-Florissant School

8  District population is African American or was African

9  American back in 2010.

10  If we then look --

11  Q    I want to stop you there.  Do you agree with Dr. Cooper's

12  conclusions here?

13  A    I do.  These are census data that I do not dispute.

14  Q    Okay.  What happened to the demographics after 2010?

15  A    I've -- that's the point at which we have to move beyond

16  the 2010 decennial census.  We have to move beyond the

17  decennial census products, and we have to start to examine the

18  data from the ACS.

19  Q    I'll have you refer to your supplementary report, Exhibit

20  C.  Table 1 on page 3.  And what does the 2011-2013 ACS tell

21  us about any-part black population?

22  A    The 2011 to 2013 American Community Survey three-year

23  estimate tells us that the any-part African-American

24  population in the district -- so when we put together those

25  three years of the ACS, we see that the number is in line --

1    looks like line 12 it is around 55 percent of the population.

2    So it's gone up by a percentage point since the 2010 decennial

3    census according to these estimates.

4    Q    And the non-Hispanic white population?

5    A    It's 42.2 percent.

6    Q    And has the --

7    A    I'm sorry.  That includes Hispanic.  I'm wrong.  Down

8    below, right above where we were, the number is 41.3 percent.

9    That's white alone, non-Hispanic.

10   Q    Let's look at Defendants' Exhibit X, which is a

11   demonstrative exhibit, I believe.  Boy, that's hard to see on

12   this screen.  Can you see those lines?

13   A    I can.  They look fine on my screen.

14   Q    Well, it must be my screen.  Does this graph give you a

15   visual of what has happened with the voting-age population

16   with regard to non-Hispanic white and single-race black

17   population?

18   A    So, right, just to be clear, these data come from similar

19   sources, but we're looking at individuals who are 18 years and

20   over.  That's what we mean by voting-age population.  And we

21   see here -- when we look at these data, we see a very -- a

22   similar trend to the overall population.  However, the

23   transition in the overall population has been much more rapid.

24          So we noticed that there was already a substantial --

25   a substantial African-American majority of the population in

the 2010 census.  What we see here is a similar trend.  But
when we're looking at people who are above the age -- or who
are 18 and older, we see that in the 2010 decennial census the
two lines have not yet crossed, and that's because of some
important demographic differences between African Americans
and whites.

The white population, as was discussed in my report,
is considerably older than the African-American population.
African-American families tend to be younger, and so there's a
large -- in the 2010 decennial census, there was a large
cluster of individuals right on the cusp of turning 18,
whereas for whites there are far fewer individuals in that
category.  And, of course, as I believe the testimony has
revealed, this translates into a school-age population that is
overwhelmingly African American.  It also translates into
enrollment in the Ferguson-Florissant public schools that is
overwhelmingly African American.

That fact does not come from anything related to
private schooling.  The school-age population is
overwhelmingly African American.  That's what the data reveal.
So what we see is that the trend in voting-age population is
over time catching up, of course, with the trend in
population.  The only way that wouldn't be true is if some
individuals failed to turn 18 or left the district.

So what we see in this graph is that we're basically

1    at equality in the 2010 census, and by the time we get the

2    2011 to 2013 sample in and we can look at those estimates, we

3    see that the lines have crossed.

4    Q    And just to be clear with the Court, where the dotted

5    line turns into a solid line, that's from the census data.

6    The solid line reflects the ACS data; is that correct?

7    A    Yes.  There's a transition here in the graph.  Dotted

8    lines for the decennial census, and then when it transitions

9    to the ACS, there is a solid line.

10   Q    Now, these solid lines do not show a projection; is that

11   correct?

12   A    No.  There is no projection in this demonstration.

13        MS. ORMSBY:  Your Honor, this would be a great place

14   to break.  We're going to go into a new subject.

15        THE COURT:  You're going into a new topic.  That's

16   fine.  All right.

17        We will reconvene in the morning at nine o'clock.  I

18   have informals at nine.  Typically, I just swear in a few

19   attorneys.  If anyone needs to be the Western District of

20   Missouri, I'm Eastern and Western.  I'll give you a twofer if

21   you're ready tomorrow morning.  Anything before we break?

22        MS. EBENSTEIN:  No, Your Honor.

23        MS. ORMSBY:  No, Your Honor.

24        THE COURT:  All right.  Thank you all.

25        **(PROCEEDINGS CONCLUDED AT 5:07 PM.)**

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 215 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 23rd day of February, 2016.


_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter