# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF THE )<br>NATIONAL ASSOCIATION FOR THE )<br>ADVANCEMENT OF COLORED PEOPLE, )<br>REDDITT HUDSON, F. WILLIS JOHNSON, )<br>and DORIS BAILEY, )<br> )<br>    Plaintiffs. )<br>    v. )<br> )<br> ) No 4:14-CV-2077 RWS<br>FERGUSON-FLORISSANT SCHOOL )<br>DISTRICT, and ST. LOUIS COUNTY )<br>BOARD OF ELECTIONS COMMISSIONERS, )<br> )<br>    Defendants. ) | |

## BENCH TRIAL – VOLUME V
### BEFORE THE HONORABLE RODNEY W. SIPPEL
### UNITED STATES DISTRICT JUDGE
### JANUARY 15, 2016

APPEARANCES:

For Plaintiffs:    Anthony E. Rothert, Esq.
                      Jessie M. Steffan, Esq.
                      AMERICAN CIVIL LIBERTIES UNION OF MISSOURI
                      FOUNDATION
                      454 Whittier Street
                      St. Louis, MO  63108

                      Julie A. Ebenstein, Esq.
                      Sophia Lin Lakin, Esq.
                      Dale E. Ho, Esq.
                      AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                      125 Broad Street, 18th Floor
                      New York, NY  10004

Appearances Cont'd on Page 2:

REPORTED BY:        SHANNON L. WHITE, RMR, CRR, CSR, CCR
                      Official Court Reporter
                      United States District Court
                      111 South Tenth Street, Third Floor
                      St. Louis, MO  63102
                      (314) 244-7966
    PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

Appearances Continued:


For Plaintiffs:      M. Laughlin McDonald, Esq.
                     ACLU VOTING RIGHTS PROJECT
                     2700 International Tower
                     229 Peachtree Street, N.E.
                     Atlanta, GA  30303

For Defendants:      Cindy Reeds Ormsby, Esq.
                     Angela Gabel, Esq.
                     CROTZER AND ORMSBY, LLC
                     130 S. Bemiston, Suite 602
                     Clayton, MO  63105

                     Kathryn B. Forster, Esq.
                     CROTZER AND ORMSBY, LLC
                     130 S. Bemiston, Suite 602
                     Clayton, MO  63105

                     John A. Safarli, Esq.
                     FLOYD, PFLUEGER & RINGER, P.S.
                     200 West Thomas Street, Suite 500
                     Seattle, WA  98119

I N D E X

DEFENDANTS' WITNESSES

JONATHAN RODDEN
Direct Examination Cont'd by Ms. Ormsby .............   4
Cross-Examination by Mr. Ho ........................  85
Redirect Examination by Ms. Ormsby .................. 215

4

1    **(PROCEEDINGS STARTED AT 9:07 AM.)**

2         THE COURT:  Any announcements before we begin?

3         MR. ROTHERT:  No.

4         MS. ORMSBY:  No, Your Honor.

5         THE COURT:  All right.  You may proceed.

6                    **JONATHAN RODDEN,**

7    **HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED**

8    **AS FOLLOWS:**

9                **DIRECT EXAMINATION CONTINUED**

10   **BY MS. ORMSBY:**

11   Q    Good morning, Dr. Rodden.

12   A    Morning.

13   Q    I want to take us back just a couple of minutes to

14   Exhibit R and ask you a couple questions about that.  Can you

15   tell me where you obtained this document?

16   A    I downloaded it from the census website.

17   Q    Is this the type of document relied upon by political

18   scientists in this sort of analysis?

19   A    Yes, it is.

20   Q    And did you rely on this document in reaching your

21   opinions in this case?

22   A    Yes.

23        MS. ORMSBY:  Your Honor, I would again move Exhibit R

24   into evidence.

25        MR. HO:  Other than the objection we've already

1  stated, Your Honor --

2          THE COURT:  Overruled.  You may proceed.

3          MS. ORMSBY:  So to clarify, it's not into evidence?

4          THE COURT:  It is.  No.  I overruled his objection.

5          MS. ORMSBY:  Okay.  I'm sorry.  I moved it in, and I

6  thought you were overruling.

7          THE COURT:  Received.

8  Q    (BY MS. ORMSBY) Dr. Rodden, can you tell the Court in what

9  sense is the ACS more reliable than the census?

10  A    Primarily for this case, it's the more timely.  It's more

11  recent.

12  Q    And, in your opinion, would you consider it appropriate

13  to rely on the census data to draw conclusions about

14  American-American voting-age population as of today?

15  A    Not the decennial census.  For today we would want the

16  most recent product, which is the 2011-2013 ACS.

17  Q    I'm going to refer you to Table 1 on page 3 of Mr.

18  Cooper's rebuttal report.

19  A    I believe this is my rebuttal to Dr. Cooper, correct?

20  Q    Oh, rebuttal to Mr. Cooper.  I'm sorry.  You are correct.

21  Can you tell us what the single-race black voting-age

22  population is according to the 2011-2013 ACS?

23  A    African American alone?  You asked about the population

24  or the voting population?

25  Q    Voting-age population.

1  A    Okay.  A voting-age population African American alone --

2  let's see.  I'm not sure if I need to do something to make

3  this -- it is -- so African American alone as a share of

4  voting-age population in this table is 49.6 percent.

5  Q    What is the non-Hispanic white voting-age population

6  according to the 2011-2013 ACS?

7  A    47.4 percent.

8  Q    Do you know whether the single-race black voting-age

9  population is statistically distinguishable from the

10  non-Hispanic white voting-age population?

11  A    Whether the single-race African American -- the two that

12  are highlighted on the table currently?

13  Q    Right.

14  A    I believe their confidence intervals slightly overlap,

15  and I believe that Dr. Engstrom gave a very useful explanation

16  of confidence intervals yesterday.

17  Q    So does that mean they are indistinguishable

18  statistically or distinguishable statistically?

19  A    Well, as he explained, we can have overlapping confidence

20  intervals and the difference could be statistically

21  significant.  We can't conduct a formal test of statistical

22  significance unless we actually had the micro data that the

23  ACS relies on.  The actual individual-level data -- that's not

24  something they release.

25          So as a researcher, I'm not able to do a formal test

1    of statistical significance in the difference of those

2    estimates.  We have this rule of thumb that we like to use

3    where we look at the confidence intervals to see if they

4    overlap.  In this case they overlap slightly.  So we cannot

5    say that they are not distinguishable, but I also cannot make

6    the claim with great confidence that they are distinguishable.

7    Q    Even though you don't know which point estimate is

8    actually higher in terms of statistics, does it change your

9    confidence in your opinions as far as single-race or any part

10   black share of the voting-age population as of today?

11   A    Well, as I described in my report, this is a snapshot

12   that comes from the years 2011, 2012, and 2013, a survey that

13   was taken in those years.  And I've also examined trends over

14   time, and I've examined what happens if we examine those

15   trends and bring them to 2016.

16         And, you know, my opinion is that those confidence

17   intervals, although this is something I cannot formally test,

18   it seems quite straightforward that these -- that by today

19   these are distinguishable; that we can say with confidence

20   that the African-American population is larger than the

21   white-alone non-Hispanic population.

22         And I say that because there are lots of other facts

23   that feed into our understanding of this.  The age

24   distribution of the population, I believe we discussed that

25   last time; that there is a large group of individuals who were

1    on the cusp of turning 18 in the 2011-2013 ACS; and, of

2    course, we look at that time trend, and it's quite stark.

3    Q    So you mentioned a trend upward.  Do social scientists in

4    your field usually rely on trends?

5    A    Of course.  When we see a trend in the data, sometimes

6    there is -- the data move around up and down and it's hard to

7    identify a trend, but there's a lot of applications in the

8    social sciences where what we want to do is forecast.

9    Forecasting is a big part of what we engage in.  Election

10   forecasting, economic forecasting -- it's a basic tool of

11   social science.

12   Q    Let's go to page 6 of your initial report.  There is a

13   graph on this page, correct?

14   A    Yes.

15   Q    And can you tell the Court what this graph is showing?

16   A    In this graph I'm using data from -- I begin the time

17   series with an observation from the 2000 decennial census.

18   What I then do is examine each wave of the three-year ACS that

19   begins in 2008.  And so we see each of these three-year ACS

20   observations I plot those, and I put a -- I fit a line.  I

21   just made a connected-line graph.  Those are the solid lines.

22   And then the solid lines stop, and then I begin showing a

23   linear trend with the dashed lines.

24          And it's important for me to point out that these

25   graphs are total -- these are population numbers.  These are

1   not percentages.  So you might notice that this graph has a

2   little bit different look to it than the graph we saw

3   yesterday that involved percentages.  These are just numbers,

4   and one of the things we see here -- one of the reasons why

5   this graph looks a little different is that we see that the

6   African-American population has been growing steadily but not

7   very rapidly, and the white population has been decreasing

8   rather rapidly so that much of the percentage difference comes

9   from the decline in the white population.

10          We also see at the bottom I have kind of a catch-all

11  category where I take the other categories from the census

12  including other races and also including individuals who

13  identify themselves as more than one race.  We also see a

14  slight increase in recent years of that category, and that

15  increase is driven primarily by people who identify themselves

16  as more than one race, and the vast majority of those

17  individuals are people who identify themselves as both white

18  and African American.

19  Q    So you'd almost have to add at least some of those

20  numbers on the -- that's illustrated in the red line to the

21  numbers represented in the black line?

22  A    Yeah.  There's a problem with the -- when the question is

23  "What is the share of the voting-age population that is

24  African American," we have a problem that there's a large

25  number of people who, when they fill out the census, they call

1   themselves both African American and white.

2          And so the question is what do we do with this group

3   of people?  How do we categorize them?  My understanding is

4   that in typical VRA cases they are categorized as African

5   American.  But in the 2011-2013 ACS, these individual -- there

6   are breakdowns for the number of people who refer to

7   themselves -- who choose more than one box, people who

8   identify as more than one race.

9          But, unfortunately, there's no breakdown that tells

10  us how many of those people identify as part African American.

11  That's the number that typically is used in a VRA case.

12  Q    All right.  So these are showing trend lines.  Is it

13  acceptable among social scientists to use trending in

14  forecasting?

15  A    Certainly.

16  Q    Is it controversial?

17  A    No.

18  Q    Have other experts in this case looked at trends?

19  A    Yes.  I think Professor Gordon gave us a presentation

20  that was kind of a description of a long-term trend.  It was a

21  really evocative description of a long-term trend in the

22  transformation of the St. Louis area.  His narrative of that

23  trend fits very well with these graphs.  It really describes

24  in words the same process that's being described here with

25  tables and charts.

1  Q    And is this an example of Professor Gordon -- well, could

2  you read what, actually, Professor Gordon said about the

3  trends?

4  A    Certainly.  "Rodden and I agree substantially on the

5  basic demographic trends.  The district is in the midst of an

6  ongoing racial transition marked by white flight to the outer

7  suburbs.  Since 2000, the white population of the

8  Ferguson-Florissant School District, FFSD, has fallen by

9  almost half -- 50,000 to 28,160 -- while the black population

10 has grown steadily, and there is a stark disparity in

11 population by age, with the share of the African-American

12 population much higher among school-age residents.  But

13 Rodden's conclusion that African Americans have gone from a

14 geographically concentrated minority to a geographically

15 dispersed majority is overstated" in a number of respects.

16 Q    So up until that last census where Dr. Gordon is speaking

17 about dispersion, you guys are in complete agreement.  Do you

18 agree?

19 A    Yes.

20 Q    Did you hear Mr. Cooper testify that we can't rely on

21 trends because there was an exodus of blacks after Michael

22 Brown?

23        MR. HO:  Objection.  Mischaracterizes Mr. Cooper's

24 testimony.

25        THE COURT:  Rephrase.

1  Q     Were you here for Mr. Cooper's testimony?

2  A     Yes.

3  Q     Did you hear Mr. Cooper talk about the effects of the

4  Michael Brown shooting?

5  A     Yes.  He was trying to come up with some scenarios that

6  would make it inappropriate for us to conduct the analysis

7  that I just conducted.  I think he was trying to --

8  Q     Do you remember him saying that African Americans could

9  possibly have left Ferguson in great numbers because it was

10  easier for them because there are more renters that are

11  African Americans and would be easier for them to leave the

12  area?

13  A     I do recall that.

14  Q     Do you find that argument convincing?

15  A     No, I don't, for a couple of reasons.  I think social

16  scientists in my field would typically -- who study urban

17  history and urban dynamics would probably imagine that an

18  event like the Michael Brown shooting and the associated

19  protests would have a bigger impact on the white trend line

20  that I just showed.  It seems quite unlikely that such an

21  event would lead to an increase in the white population and

22  more likely that it would lead to a sharper decrease.  So his

23  claim that this might be a reason for the trends to suddenly

24  reverse is not something I find convincing.

25  Q     Is there any other information that supports your

1  conclusion and opinions regarding the African-American share

2  of the voting-age population?

3  A    I believe I already mentioned the age distribution.  I

4  think that's an important part of it.  In fact, it was cited

5  in the paragraph we just read from, from Dr. Gordon.

6  Q    Let's look at Dr. Gordon's table on page 1 of his report.

7  Did you hear Dr. Gordon testify that we can't rely on the

8  youth cohort because we don't know what the retention rates

9  were in the Ferguson-Florissant School District?

10  A    Yes.

11  Q    Did you find that argument convincing?

12  A    No.  I don't have any reason to believe that there would

13  be any -- I just don't have any theory about why there would

14  be a difference.

15  Q    Have you reviewed any evidence that would show that to be

16  the case?

17  A    No, I have not.

18  Q    Let's go now to Table 1 of your supplemental report.  It

19  will be Exhibit C.  Can you talk about the any part

20  African-American total population?  I think we touched on this

21  yesterday.  Can we remind the Court what was that percentage

22  of total population?

23  A    So if we look at the total population column, there's a

24  line identified as line 12, and this is simply single-race

25  African Americans added to those who identify themselves as

1   both African American and some other race.  When we add those

2   together and take them as a share of the voting-age

3   population, we get a number that is around 55 percent.  That's

4   the total population.

5   Q    And this isn't your number.  Where did this number come

6   from?

7   A    This is just from the ACS.

8   Q    How did you determine what any part black voting-age

9   population is for the -- based on the 2011-2013 ACS?

10  A    So we now want to direct our attention to the column that

11  says "voting-age population."  We see some raw numbers in that

12  column.  The top of that column we see some -- yes, that's the

13  whole column highlighted.  The top of the column -- those

14  numbers come directly from the ACS, but at the bottom there

15  are two numbers there that do not come directly from the ACS,

16  and I would like to describe how I derived those numbers.

17       As I explained a moment ago, there is in the ACS

18  only -- in the 2011-2013 ACS, there is only a total given for

19  individuals who identify as more than one race.  The challenge

20  we have is what to do with those individuals if we want to

21  calculate an any part African-American share.

22       One thing we can do is say, well, we don't know.  We

23  don't know how to distinguish -- to disentangle how many of

24  these individuals are one -- one of the boxes they checked is

25  African American because the data are not there.

1    So we can take all of them and classify them as white

2  and leave them out of the numerator and put them in the

3  denominator.  That would be one option.  This is not a good

4  option.  This is an option that, if President Obama lived in

5  the Ferguson-Florissant School District, he would be

6  classified as white.  So I don't think that is --

7    MR. HO:  Objection to facts not in evidence about how

8  President Obama --

9    THE COURT:  He's giving an opinion.  You can

10 cross-examine him on that, and we'll get there.

11 A    So we have to do something with these individuals.

12 Sticking them in the denominator and not treating them somehow

13 in the numerator is not -- it's misleading.  We wouldn't want

14 to do that.

15    So the best strategy we have is actually quite

16 reasonable.  If we look over to the "total population" column

17 on the left, we do have the data.  We do have the breakdown.

18 We know of all the people who identify themselves as more than

19 one race, we know how many of those people have one of those

20 races mentioned as African American.  So we can simply

21 calculate a ratio -- so that's 632 divided by the sum of 1,564

22 and 632.

23 Q    Now, these numbers in the square, are those provided by

24 the ACS?

25 A    Yes.  Those come directly from the ACS.

1    Q    Go ahead.

2    A    So all I've done is I've taken that ratio and I've

3    applied it to the number that we know has identified as more

4    than one race in the voting-age population in the

5    Ferguson-Florissant School District.  I have broken that group

6    down, and I have assumed that the same ratio is present.  In

7    those who are in the total population and in those who are

8    above the age of 18, I think this is clearly a reasonable

9    thing to do.  I don't see anything misleading or wrong with

10   that approach.

11         So then I get a number here of people who identify as

12   more than one race, one part of which is African American.

13   That number is 681.  If I then add that to the single-race

14   African-American number, I end up in the bottom of the

15   graph -- bottom of the table with the number 24,994, and when

16   expressed as a percentage, it's 51 percent.

17   Q    Now, you heard Mr. Cooper's testimony where he stated he

18   did a back-of-an-envelope calculation that he would stand by

19   that any part black voting-age population was 49.8 percent.

20   Did you hear that?

21   A    I did.

22   Q    And did you hear how he described he got to that number?

23   A    Yes.  He decided that when trying to allocate those

24   people of more than one race, he had the same challenge.  He

25   was confronted with the same challenge.  And he decided the

1    way he would come up with a factor, you know -- I told you

2    about that fraction that I got from that left-hand column.  He

3    decided instead of using that fraction, he would go back to

4    the 2010 census and get a fraction and apply that.  And I have

5    no idea why he would go to a different data set to get that

6    fraction.  There's simply no justification for it.  He seems

7    to have been trying to find a data set that would allow him to

8    keep that number under 50 percent, but I don't know.

9    Q    Dr. Gordon -- I wanted to ask you about one of the things

10   Dr. Gordon testified about, the felony disenfranchisement and

11   how that could depress the eligible voter population for

12   African Americans.  Did you find that persuasive?

13   A    No.

14   Q    Why not?

15   A    I don't believe there are any prisons in the district; so

16   the other angle he may perhaps have been pursuing is the claim

17   that there is a large number of former felons who are

18   disenfranchised in the district.  I have seen no evidence or

19   data to suggest that the Ferguson-Florissant School District

20   is a place that is rich in felon population.  I would caution

21   against an effort to take the felon population from the state

22   of Missouri and simply apply it to the Ferguson-Florissant

23   School District.  That would be an inappropriate use of data.

24           We know that many social and economic indicators are

25   quite different in the Ferguson-Florissant School District

1  than in the St. Louis metropolitan area for African Americans.

2  The Ferguson-Florissant School District, as I described in my

3  report, is a middle-class African-American community.  It is

4  not characterized by the same socioeconomic indicators as the

5  St. Louis metropolitan area or the state of Missouri.

6          So I would not take the felon disenfranchisement

7  information from the state of Missouri and simply apply it to

8  the district.  That would be an inappropriate thing to do.

9  Q    As we sit here in the courtroom today, do you believe the

10 any part black voting-age population is over 50 percent?

11 A    I believe it was over 50 percent several years ago, and I

12 believe it has increased since then.

13 Q    Do you believe that other social scientists looking at

14 the data would come to the same conclusion?

15 A    I believe an objective social scientist looking at the

16 data would come to the same conclusion.

17 Q    In addition to being a majority, African Americans are

18 the largest group of voters in the district as well.  Right?

19 A    Of course.

20 Q    And do you believe that the white voting-age population

21 is over 50 percent, or a majority?

22 A    The white voting-age population is under 50 percent.

23 Q    Is there any doubt in your mind that white voting-age

24 population is a plurality?

25 A    White voting-age population is nowhere near a plurality,

1  no.

2  Q     And what is the definition of "plurality"?

3  A     Simply the largest group.

4  Q     So if it's a majority, it's going to be over 50 percent?

5  A     I think there's no dispute about -- the plurality I think

6  there is just a question of whether it's over 50 percent, and

7  I hope this discussion has cleared that up a bit.

8  Q     Is it your conclusion that whites are the smallest group

9  of voters in the Ferguson-Florissant School District?

10 A     Yes, it is.

11 Q     Can you explain how a larger group of African-American

12 voting-age population can be submerged by a smaller group of

13 white voters?

14 A     This is the puzzle that has occupied me since the

15 beginning of my engagement with this case.  I've been

16 listening to testimony for several days, searching for an

17 explanation of how this is possible, and I have heard nothing

18 that would even get me close to such an explanation.

19 Q     Did you have an opportunity to review the plans that were

20 proposed by plaintiffs in this case?

21 A     I did.

22 Q     What do you understand to be the plaintiffs' proposed

23 plans?

24 A     I believe their proposed remedies include Supplemental

25 Plan 1 and 2.

1  Q     Illustrative plan?

2  A     Illustrative -- I'm sorry -- Plans 1 and 2 that were

3  proposed by Mr. Cooper.

4  Q     And did you understand that the plaintiffs were also

5  proposing Hypothetical Plans A and B?

6  A     I do.  I was never quite clear on the purpose of

7  Hypothetical Plan A.  It seems to have been an attempt to

8  combat a critique that I never understood.  So I don't think

9  it's viewed as a plan that the Court should consider.

10 Q     What did you think about Hypothetical Plan B?

11 A     Well, Hypothetical Plan B was described as an intentional

12 gerrymander.  As someone who --

13       MR. HO:  Your Honor, I'm going to object to this

14 question.  There's no opinion expressed in any of Dr. Rodden's

15 reports about Hypothetical Plan B.

16       THE COURT:  Response?

17       MS. ORMSBY:  Well, I was just having him respond to

18 Dr. Gordon's testimony -- I mean Mr. Cooper's testimony with

19 regard to --

20       THE COURT:  Looks to me like we have a conundrum.  If

21 I understand correctly, Hypothetical Plans A and B were

22 produced in his supplemental report which would have, by

23 definition, not been responded to because he's -- it's kind of

24 like exceeding the scope of the direct on the cross.

25       MR. HO:  That's absolutely correct, Your Honor.

1  Hypothetical Plan B was a response to an affirmative defense

2  that the defendants raised but was not something that Dr.

3  Rodden opined about.

4          THE COURT:  Because he couldn't.  Because it was in

5  response to his report, right?

6          MR. HO:  Well, the affirmative defense that the

7  defendants were raising in their answer was that plaintiffs

8  were seeking to racially gerrymander the district, in

9  violation of the Fourteenth Amendment.  That's something that,

10  obviously, the defendants have known about for a very long

11  time since it's in their answer, and it's not something that

12  they ever asked Dr. Rodden to opine about.

13          MS. ORMSBY:  We couldn't, because we didn't see his

14  plan before the rebuttal.

15          THE COURT:  It's in his supplemental rebuttal report,

16  and there was no opportunity to file a sur-response.  I don't

17  know what I do.  I mean, you introduced new material in a --

18  obviously, it's more than just saying he's wrong.  Not only is

19  he wrong, but I have a new idea, right?

20          MR. HO:  Well --

21          THE COURT:  And so if we interject new material in

22  the rebuttal but there was no opportunity to respond to the

23  rebuttal, what do I do?  Tell me -- I can't just take it

24  now -- it's unopposed.  It's not unopposed.  So like I said,

25  it's like exceeding the scope of the direct on the cross but

1  not letting you deal with the new material that was introduced

2  in the cross-examination on your redirect and limit you only

3  to the direct examination.

4        MR. HO:  I absolutely see your point about that, Your

5  Honor, but the racial gerrymandering issue is something that

6  was raised by the defendants in their answer and was not

7  something that Dr. Rodden opined about.

8        Now, Mr. Cooper's responding to the defendants'

9  arguments that there's some sort of racial gerrymander being

10  proposed by the plaintiffs, but the defendants --

11        THE COURT:  Well, here's the -- this may be easier

12  than we think.  Look, I don't need to reach that, right?  All

13  we have to know is that there is a remedy that's available.

14  If I find that there is liability, we'll have a remedy trial

15  at a later time.  So I don't have to -- to simplify my

16  mission, I don't have to decide.  I just need to determine

17  whether this is possible or not.

18        MR. HO:  I agree entirely.

19        THE COURT:  Fair?  That's the only question I'm being

20  asked.

21        MR. HO:  I agree with that entirely.

22        THE COURT:  Not to get involved in doing anything or

23  is this the best?  Is it the worst?  So, I mean, so keep some

24  focus on your examination.

25        MS. ORMSBY:  I will, Your Honor.

1    THE COURT:  We don't need to debate racial

2  gerrymandering.  All I need to know is whether it's possible

3  to draw seven districts or not.  And I don't think that's a

4  pretty high burden, to tell you the truth.  Is it possible to

5  draw seven districts in a school district?

6    MS. ORMSBY:  I don't think that's --

7    THE COURT:  You know what I mean.

8    MS. ORMSBY:  Yeah.

9    THE COURT:  Of all the factors, this case isn't going

10  to turn on that.

11    MS. ORMSBY:  I will rephrase.

12    THE COURT:  Anyone disagree with my analysis?

13  Because now is the time to correct me.

14    MR. HO:  Not us, Your Honor.

15    THE COURT:  I'll give you a little bit of latitude.

16    MS. ORMSBY:  Thank you.

17    THE COURT:  I understand what we're doing, but you

18  understand, whatever we do, I'm not drawing districts when

19  this part of the trial is over.

20    MS. ORMSBY:  And I will rephrase my question.  Then

21  maybe plaintiffs will be more comfortable with --

22    THE COURT:  Great.  Maybe I should have just said

23  "rephrase" in the first place.

24  Q   (BY MS. ORMSBY) Dr. Rodden, does plaintiffs' Hypothetical

25  Plan B support any of your contentions that you've made with

1  regard to the population of the Ferguson-Florissant School

2  District?

3  A    Yes.  I can't think of a much better way to illustrate

4  one of my key contentions.  The fact that Mr. Cooper was able

5  to draw a districting plan with six majority African-American

6  districts, one has to really get their head around this.  This

7  is a VRA claim in which the argument is being made that

8  there's a minority group that needs to have a remedy, needs to

9  have single-member districts drawn so that it can achieve

10  representation, but he's able to draw six out of seven

11  majority African-American districts.

12          So the setting of a VRA case in which -- building on

13  *Gingles* in which there is a vision of a geographically insular

14  minority, to use the language, a geographically insular

15  minority where it's necessary to draw a single-member district

16  in order for that minority to achieve representation, here we

17  have a minority group for which it is possible to draw six

18  majority-minority districts.  This just merely illustrates

19  that the group is a majority of the population.  Not only is

20  it a majority, is it a geographically dispersed majority.

21          The things I've learned in my research in some of the

22  papers I was describing when we were going through my CV is

23  that in the presence of a geographically dispersed majority,

24  the best possible electoral system is an at-large system.  It

25  is in the presence of the geographically concentrated minority

1  that a group benefits from the imposition of a single-member

2  district system.  So what this demonstrates in part is that

3  the logic of the Voting Rights Act is turned on its head.

4  Q    Do you have any issues with Plaintiffs' Illustrative Plan

5  1?

6  A    Yes.

7  Q    What are they?

8  A    Well, the most basic one is that it takes the two

9  African-American incumbents on the board, and it places them

10 in the same district so that they have to run against one

11 another; so if the plaintiffs were to impose Plan No. 1, we

12 know that one incumbent on the board would be removed from

13 office.

14 Q    Are you aware that Mr. Cooper drew Illustrative Plan 2

15 that moved the two incumbents to different districts?

16 A    Yes, I believe that was his intention.  I'm not sure if

17 he achieved that goal or not.  I don't know exactly where the

18 incumbents' addresses are.  That was his work, not mine.

19 Q    Do you think that solves any other problems?

20 A    No.  I think the first plan and then the effort to fix it

21 with the second plan merely illustrates a larger problem

22 related to candidate recruitment.  I think a lot of aspects of

23 that problem came out in the testimony in the last few days.

24 There will be occasions when candidate recruitment efforts

25 locate good candidates in the same neighborhood, perhaps

1    parents at the same elementary school.  The imposition of a

2    districting plan will make it the case that those individuals

3    cannot run for office successfully.  We are limiting what is

4    already a very difficult problem:  The recruitment of good

5    candidates of any race.  It's a difficult problem.  And when

6    we impose these districts, we run into the dilemma that we

7    dramatically alter the candidate recruitment process in a way

8    that I believe would be detrimental to African Americans more

9    generally, not just the existing two incumbents.

10   Q    Did you do any analysis with regard to the geographic

11   distribution of votes across the electoral precincts of the

12   district?

13   A    Of course, this is a big interest of mine, and I was very

14   lucky to be involved in a case where that was necessary; so I

15   was happy to do that.

16   Q    And what did your analysis indicate about

17   African-American voters' dispersement across the district?

18   A    It would help if I could view the map that I produced in

19   my report.

20   Q    Is this the map you're referring to?

21   A    Yes.  So this is a map -- I just decided to choose the

22   most recent election.  This is the 2015 school board election.

23   And so what we see here -- this is a dot density map.  And it

24   simply represents dots for votes of Dr. Graves and dots for

25   the votes of Mr. Ebert.  The Graves dots are green, and the

1    dots for Mr. Ebert are yellow color.

2          I believe there are a couple of lessons from this

3    graph.  The first one is that -- oh, I want to point out that

4    Mr. Ebert is white and Dr. Graves is African American.  The

5    support for these candidates is quite geographically

6    dispersed.

7          So there's been a bit of a theme emerging that the

8    support for African-American candidates is concentrated in the

9    lower tier of the district.  And this is true to an extent,

10   but it's really -- it's really quite limited.  In fact,

11   African Americans -- support for African-American candidates,

12   just like support -- just like the presence of African

13   Americans, is quite dispersed throughout the district.  As

14   many of the witnesses have testified, African Americans and

15   whites are quite integrated in the -- residentially in the

16   school district.  So the one thing we do see, if anyone is

17   from the area looking at this map and knows the district, they

18   see -- I sure wish I could highlight things.

19   Q    Use your finger.

20          THE COURT:  If you use your finger, you should be

21   able to.

22   A    I wonder if I'm supposed to --

23   Q    Use your finger.

24          THE COURT:  Lisa, can you help him?

25   A    I'm touching the screen, but it's not reacting.  But in

1  Florissant there's an area called Old Town Florissant, and

2  it's got just a slight concentration for Mr. Ebert.  I believe

3  he lives close to that area.  And there's also a concentration

4  for Dr. Graves a little bit close to her neighborhood.  And

5  this is what we see when we look throughout the different

6  elections, there's always a little bit of cluster of support

7  for the candidate around their neighborhood.

8          So what we see here overall is that the support for

9  Dr. Graves is more geographically dispersed than the support

10  for Mr. Ebert.  It's a slight -- Mr. Ebert support is slightly

11  more concentrated.

12  Q    What does this tell you about the current at-large

13  system?

14  A    Well, when we have a dispersed support like this, the

15  group with the dispersed support, a group that is a majority

16  that has dispersed support, benefits from an at-large system.

17  Q    Where did successful African-American-preferred

18  candidates derive most of their support in their elections?

19  A    As I believe this map shows -- and it's only one example.

20  We can go through all the elections.  They received support

21  that was highly dispersed throughout the district.

22  Q    How did you determine that for election?

23  A    I calculated a GINI coefficient, which is something very

24  basic that we use in the social sciences, especially in

25  economics.  It's used -- people are most familiar with it

perhaps in the measurement of income inequality.  We can
examine shares of the population in different income deciles.
We can do the same thing with votes, and that's what I've
done.  I've tried to examine the extent to which votes are
geographically concentrated or dispersed, and I used a GINI
coefficient for that.

Q    And do you discuss this in your rebuttal report to Mr.
Cooper, Exhibit C?

A    I do.

Q    So can you tell the Court what we're looking at here?

A    Well, we've got a couple pages showing here.  The first
one is on page 12.  I just want to point out that the GINI
coefficient that I just described for Dr. Graves was .417 and
for Mr. Ebert was .456.  So it's a bit higher for Mr. Ebert,
indicating that he had a higher level of geographic
concentration.

         And then we might ask ourselves is that unusual?  Is
that rare?  It's just a one-off thing; so I can just calculate
the same GINI coefficient for every election.  And I've done
that going back to 2000, and I've plotted those.  And so what
we see is that this is no one-time, one-off phenomenon; that,
in general, we see most of the time the support for white
candidates is a bit more geographically concentrated than the
support for African-American candidates.  That indicates that
the support for African-American candidates is more

1    geographically dispersed; that -- spread out throughout the

2    district.  It's not concentrated in a couple of places as it

3    would need to be for a single-member district system to be

4    advantageous.

5    Q    Do you see any benefit for African-American-preferred

6    candidates if the district went to a single-district system?

7    A     No, I do not.  I think there are reasons to expect the

8    opposite in addition to the ones I've already laid out.  So if

9    we imagine a scenario in which the plaintiffs are successful

10   and the 2016 election is suspended and we have a kind of a

11   lame duck board for a while and then we impose a districting

12   plan, say, sometime later in the year, whenever it is that the

13   St. Louis County Board of Elections Commissioners is able to

14   produce some districts, if we were to do that, we can

15   anticipate a number of things just from the facts -- from

16   things that we know.

17        First of all, if we ended up with districts that

18   place the two neighbors, Dr. Thurman and Dr. Graves, in the

19   same district, then we would lose one of them.  Another thing

20   that's important that relates to some of the testimony that

21   we've received so far is that a district would be drawn --

22   even if it isn't one of the districts in the existing plans, a

23   district would be drawn in Berkeley; and, of course, the

24   attention -- or in that neighborhood the intention of that

25   would be to achieve African-American representation in

1    Berkeley.  I think that is the whole idea.  And there's been

2    some discussion about the fact that there have been no

3    candidates from Berkeley since the era of -- since the era

4    from 2000 to 2011, when Doris Graham, Dr. Graham, was

5    representing Berkeley in the district.

6          So a statement was made that there have been no

7    candidates from Berkeley since then, but that's not true.  Ms.

8    Dameron is from Berkeley, and she receives -- in my data

9    analysis, she receives support from African Americans in

10   Berkeley.  So I don't see any reason to expect other than in

11   the presence of a single-member district in Berkeley that Ms.

12   Dameron would run in that district, and it seems entirely

13   possible she would win.  So the fact --

14   Q    What race is Ms. Dameron?

15   A    She's white.  So the fact that the Berkeley district that

16   might be drawn has a majority African-American population

17   tells me nothing about what's likely to happen in that

18   district given the history of crossover voting throughout the

19   district.  I have no reason to expect an African-American

20   success in that district.

21         The same thing goes for a district that would be

22   drawn in the neighborhood of Ms. Hogshead, who is also from

23   Ferguson and lives in a majority African-American

24   neighborhood.  Ms. Hogshead is a longstanding incumbent.

25   Incumbents often win.  And we know from all over North County

1    that in single-member district systems with longstanding white

2    incumbents, regardless of the racial composition of the

3    neighborhood, these incumbents have a long history of

4    continued success.

5            So to expect that if we impose a single-member

6    district that Ms. Hogshead would suddenly draw a quality

7    challenger who would remove her from office is also, I think,

8    a stretch.

9            So there's no reason to believe that, because a

10   district has a slight African-American majority in a

11   single-member district plan, that it would produce suddenly

12   African-American victories.  I think those victories are more

13   likely under the facts that we know from the last few

14   elections in the at-large plan in which African Americans are

15   on the cusp of a majority on the school board.

16   Q    You just answered a bunch of my questions; so I'm marking

17   them off.

18   A    I'm sorry.

19   Q    No.  That's totally fine.  I don't want to bore the Court

20   with you saying --

21           THE COURT:  We have our IT gentleman here to look at

22   your screen.

23           Why don't you come up and make sure we can get it to

24   work.  Can you put the map up before?

25           The more technology you have, the more problems you

1  get.

2        MS. ORMSBY:  I know, but it sure is nice.

3        THE COURT:  At least everybody can see everything at

4  the same time.  That's the biggest advantage.

5  Q  (BY MS. ORMSBY) Did you look at local areas that did

6  have -- that do have single-member district structures,

7  electoral structures?

8  A  Yes.  I think the easiest -- political scientists really

9  like experiments.  You know, we like to have good

10  opportunities to draw causal inference, and it's really --

11  there's an excellent opportunity to do that in North County

12  and in the district in particular.  We have, at the same time,

13  covering the same individuals, two forms of election.  In

14  school boards we have at-large systems as mandated by the

15  constitution of the -- I mean by the statute of the State of

16  Missouri.

17        At the same time, we have city councils, boards of

18  aldermen, alderperson, so forth, which are conducted through

19  single-member district -- they're not single-member districts.

20  They're often wards with two elected candidates.  But those

21  elections are held at different times; so effectively an

22  election in a ward or district for a city council is a

23  single-member district of exactly the kind that's being

24  proposed by the plaintiffs.

25        So it's useful to ask ourselves what happens when

34

1    that type of a system is imposed?  We can look at city

2    councils who cover the same people at the same time as when we

3    have an at-large system in the school board elections.  So

4    when we do that, we see that in the Ferguson-Florissant School

5    District we've had a long history of African-American

6    representation going back to the 1980s.  There's always been

7    African-American representation with couple of exceptions, and

8    we see progress in recent years.

9         But if we look at the Ferguson City Council, there's

10   been a long history of having no African Americans on the city

11   council until very recently, when there was a large effort

12   and, you know, some white incumbents backed out of the race,

13   as someone testified, and there was a lot of outside attention

14   given, and that still only produced a small number of

15   African-American victories in the city council election.

16        My understanding is that Florissant has never had an

17   African American on the city council.  It has single-member

18   districts.  The proposed solution by the plaintiffs -- no

19   African American representation.

20        The best example of all is in Hazelwood right next

21   door with the exact same demographic profile as the

22   Ferguson-Florissant district.  As people have testified in the

23   trial thus far, Hazelwood has four out of seven school board

24   members who are African American.  At the same time, in the

25   same community, single-member district elections are used in

1    the Hazelwood City Council.  There are no African Americans on

2    the Hazelwood City Council.  There are white incumbents who

3    live in majority African-American neighborhoods who have been

4    able to stay around and sustain themselves in office.  The

5    single-member district system helps them do that.  They don't

6    attract challengers very often.  The elections are

7    noncompetitive.

8           On the other hand, in the at-large system in the

9    school board election, there's an opportunity for new

10   candidates to run competitive elections; the elections are

11   quite exciting, they're usually close; and in many cases an

12   African-American candidate wins.  They're able to utilize

13   their dispersed support across the district and achieve

14   victory in the school board elections while they're thwarted

15   in the city council elections.

16          MR. HO:  Your Honor, I'd just for the record note an

17   objection to that entire answer.  There's nothing in any of

18   his reports comparing single-member districts in Ferguson or

19   Hazelwood to at-large electoral systems in any of these areas

20   and the results of --

21          THE COURT:  I'll take that under advisement.

22   Q   (BY MS. ORMSBY) In your opinion, Dr. Rodden, have you

23   heard any opinions or evidence that suggests that

24   single-member districts are advantageous to African Americans

25   under the current circumstances in Ferguson-Florissant School

1  District?

2  A    Absolutely not.

3  Q    And, finally, before we leave *Gingles* I, do you believe

4  there is a violation of *Gingles* I in this case?

5  A    No.  There is an African-American majority that is

6  geographically dispersed, and I see no way to fit that with

7  *Gingles* I.

8         MS. ORMSBY:  This would be a good place to break, if

9  you want.

10         THE COURT:  Yeah.  Why don't we take a 15-minute

11  break.  We'll reconvene at 10:15.

12         **(COURT RECESSED FROM 10:00 AM UNTIL 10:22 AM.)**

13         THE COURT:  Are you ready?

14         MR. HO:  Yes.

15         THE COURT:  I'll remind you, sir, you're still under

16  oath.

17         You may proceed.

18  Q    (BY MS. ORMSBY) Thank you, Your Honor.

19         Dr. Rodden, did you analyze voting history in the

20  Ferguson-Florissant School District?

21  A    Yes, I did.

22  Q    What was your method of determining candidates of choice?

23  A    Like Dr. Engstrom, I used ecological inference analysis.

24  This was conducted using data from the census and from

25  precinct-level election results and analyzing them at the

1    level of precincts.

2    Q     And do you agree with Dr. Engstrom that ecological

3    inference is the best method to use in Voting Rights Act

4    cases?

5    A     I do.  I think he stated this well.

6    Q     What did you do to determine confidence intervals?

7    A     This is something that when conducting the ecological

8    inference analysis it's possible to produce again the same

9    type of confidence intervals that we have described earlier,

10   and we can -- a zone in which we can feel 95 percent confident

11   that the true interval lies -- I mean the true value lies --

12   I'm sorry -- in that interval.

13   Q     What do you think about Dr. Engstrom's method of

14   determining candidates of preference?

15   A     When I read the report, it's not entirely clear to me how

16   the method works.  I'm still trying to understand, from some

17   of the things I heard in testimony, how it works.  The rules

18   are not clear to me, but it seems to be an approach in which

19   candidates of choice are only detected if there's a large gap

20   between that candidate and the next ranked candidate in a

21   particular racial group.

22            And so this leads to a situation in a multi-winner

23   system where there are always two seats and sometimes three

24   seats up for election -- this leads to an analysis in which he

25   sometimes identifies one minority-preferred candidate,

38

1    sometimes might identify two, even if there are more seats up

2    for election.

3         And this is something that I do not consider an

4    appropriate approach to the topic.  When I sat down to do this

5    analysis, I gave a lot of thought to what would be the right

6    way to identify candidates of choice in a multi-winner system

7    that includes bullet voting.  The one thing I never considered

8    was to throw out seats arbitrarily and consider different

9    numbers of seats in different years.  This is something that

10   simply didn't occur to me as a reasonable alternative.

11        The problem is a basic methodological problem in

12   political science.  If one is trying to measure a concept like

13   cohesiveness and one decides to throw out the cases that are

14   noncohesive and then only examine the cases that are cohesive

15   and then do some analysis of those and make determinations

16   about the electoral system as a whole, it makes no sense to me

17   to define cohesiveness from a group of candidates for whom all

18   the noncohesive candidate -- the candidates for whom the votes

19   were noncohesive have been eliminated.  So that is not an

20   approach that I considered, and it's still not one that I

21   believe I understand very well.  I only considered approaches

22   where I could examine the same approach to seats in every

23   election.

24        So I came up with two approaches.  I don't consider

25   either of them perfect, and I do believe the Court has a

difficult task ahead in understanding how to think about

candidates of choice. So the first technique that seemed

useful to me was to take the point estimates and, if there are

two seats, take the top two points estimates; if there are

three seats, take the top three point estimates, and so on;

and examine who are the minority-preferred candidates from

that.

Now, this has -- the primary strength of this

approach is that it considers all the elections, and it treats

them in the same way. The weakness of this approach is that

we sometimes have ties or statistically insignificant

differences. Remember, we talked about our overlapping

confidence intervals. Sometimes we have overlapping

confidence intervals among some of the candidates.

And so if we're trying to decide who are the top two

candidates and there's two candidates who are very close --

and, remember, I testified earlier that school board elections

are often rather close. If we have two candidates who are

close together, what do we do with those? I adopted the

approach of taking the higher point estimate, knowing that

there are going to be some occasions in which that point

estimate is not statistically distinguishable from the next

ranked one. So that's the weakness of the approach. I think

I already stated the main strengths.

But because of that problem, I thought it would be

nice to have a second approach, one that I don't -- also I

don't think is really any better, where I simply look at the

top-ranked candidate. Just let's look at the top-ranked

African-American candidate and let's look at the top-ranked --

I'm sorry. Not African-American candidate. I misspoke. The

top-ranked candidate among African Americans, and let's look

at the top-ranked candidate among whites using the ecological

inference analysis. That was the approach I selected, and

both of those approaches were kind of treating the seats in

the same way for every election. We are not throwing out some

seats in some elections and keeping those seats in other

elections. We're considering all the voters' preferences in

the first approach and the top-ranked preferences in the

second approach.

Q    Do you consider plaintiffs' method consistent with

political science methodology?

A    I don't. I would not recommend it.

Q    Was there another method that plaintiffs used in this

case to analyze political cohesiveness?

A    I believe there were a couple. One was homogeneous

precinct analysis. And as I think was described earlier,

again, I rely on Dr. Engstrom's characterization. This is

something that in the early days but before some advances in

modern statistics, this was something we did. It was a very

blunt approach. Let's take the most homogeneous precincts,

1 and let's -- most homogeneous white precincts and let's

2 compare them to the most homogeneous African-American

3 precincts and examine them that way.

4 So that approach was taken as kind of a back-up in

5 supplement by Dr. Engstrom, and it was also included as, I

6 believe, the main analysis in the report of Dr. Kimball.

7 Q    Did anyone use ecological regression?

8 A    There was a scatter plot with a regression line that I

9 believe we examined a couple of days ago in Dr. Kimball's

10 initial report.  It was only for 2014.

11 Q    Could you pull up that graph, please.

12 Is this the graph you're speaking of?

13 A    Yes.

14 Q    Do you have any comments with regard to this graph?

15 A    Not very many.  I would like -- I would merely point out

16 that the horizontal axis begins at zero, and the vertical axis

17 the first marker is at 20.  So it does -- it is a little bit

18 misleading in that it creates the impression of a relationship

19 that is on the 45-degree line, but that line is a regression

20 line.  It's not a 45-degree line.

21 So but it does indicate a, certainly, a high

22 correlation between African-American share of voting-age

23 population and elections for the slate of three candidates in

24 the 2014 election that we've heard a lot of testimony about.

25 Q    Can you pull up Dr. Rodden's graphs, please.

1    Can you tell me how your graphs differ from Dr.

2    Kimball's graphs?

3    A    To begin with the most obvious, I used more elections.  I

4    here present the elections from 2012 to 2015.  I just took the

5    most -- the four most recent elections because it fit on the

6    graph nicely.

7        I look on the "X," or the horizontal axis, at

8    African-American voting-age population share -- I think that's

9    the same as what Dr. Kimball does -- and I look at the vote

10   share of the African-American candidates, and I simply add up

11   all of the African-American candidates.  And so what I've

12   represented in red is the 45-degree line, which we might think

13   of as the kind of polarized, you know, racially polarized

14   voting kind of benchmark.  This is a situation in which the

15   correlation between racial composition of the district and the

16   voting behavior is perfectly correlated.

17       And what I've done is just, instead of a straight

18   regression line, we often like to do is fit a locally weighted

19   regression.  This is simply a better fit to the data, a

20   smoother fit to the data than a regression line, but it's just

21   the same concept.  Characterizes the relationship.

22       And I believe the most important thing to take away

23   from this graph is that these lines are relatively flat.  In

24   the American context, where the correlation between -- at the

25   precinct level between African-American share and the share of

votes for African-American candidates, this is a correlation

that will always be present.  I can't think of a jurisdiction

in the United States where we would not see this correlation.

So, of course, the Voting Rights Act does not call

upon the plaintiffs to simply identify a correlation.  We

would want to know what type of a correlation, some kind of a

threshold for what correlation is considered to be

sufficiently high for a VRA claim.  I don't have any opinion

about what that would be.  In a general sense, I think it has

to be applied specifically to the case.  It doesn't make sense

to think about this without knowing some things about the

demographics.

But the main observation from this graph is that the

line is flatter, of course, than the 45-degree line, and it's

flatter in each year than it was in 2014.  I think a lot of

testimony came out -- and this is discussed in my report --

that 2014 was a year in which there was some -- there was an

important event.  There was a very contentious school board

meeting at the McCluer North High School gym.  There was a lot

of anger about the suspension of Dr. McCoy.  And this seems to

have created a kind of a one-time increase in racial

polarization that then quickly went back to the norm in the

next year.  So the line is much flatter again.

In 2015, conforming to historical standards, we might

only notice that the line, the overall line, is higher in

1   2015; that the vote share of African-American candidates is a

2   bit higher.  We can also see that 2014 and 2015 the lines are

3   higher than previous years, indicating that African-American

4   candidates are receiving more votes in each of these years.

5            And, of course, the combined vote shares of

6   African-American candidates surpasses the combined vote shares

7   of white candidates, as we've heard testimony earlier, in both

8   2014 and 2015.

9   Q    Looking at 2015 -- and this election took place after the

10  Michael Brown shooting and the protests -- do you see anything

11  significant about this line in the wake of that incident?

12  A    I have to admit the first time I saw it I found it -- you

13  know, I would have, as a political scientist, knowing some

14  things about the United States, I would have expected perhaps

15  an increase in racial polarization after an event like that.

16  And really what we see is a return to a line that's really not

17  all that steep.  Looks a bit like the past.

18           2014 is actually the outlier, and one has to have

19  some local context.  One has to know about some things in the

20  district to understand that one-time increase.

21  Q    To determine minority-preferred candidates, how far back

22  did you conduct your analysis?

23  A    I went all the way back to 2000.

24  Q    Did you perform EI analysis on uncontested elections?

25  A    Well, as, I think, again, Dr. Engstrom described, we

1  can't perform analysis on elections where there's no data.

2  Q    Does that mean uncontested elections are irrelevant to

3  voting behavior?

4  A    I think, unfortunately, in the district, it's difficult

5  to get a true picture of what was happening in the district,

6  especially in the middle of the 2000s, without thinking a

7  little bit about those uncontested elections.

8        As a general matter, to draw conclusions about

9  elections without considering the uncontested elections, we

10 would miss so much of what's important.  In many places -- so

11 in the state of Florida there are lots of elections where no

12 one files against someone; and, to save money, the State of

13 Florida simply does not conduct an election.  So the person

14 just wins by acclamation.

15       So if I was to do some analysis of Florida elections

16 and just throw out those observations as if there was nothing

17 there of interest, I would do a very poor job of

18 understanding, because it -- actually in the state legislature

19 it's a lot of people.

20       So the same thing is true here, you know.  It's as

21 if -- it's we treat Dr. Graham -- if we throw out all the

22 years -- I mean, I think people who saw her testify understand

23 why she was such a popular candidate.  She won her seat back

24 in the '80s, when I was in high school, and was on the board

25 for many years, until 2011.  And we heard a lot of testimony,

1    quite a bit of testimony, about how she lost her seat.  She

2    voted for an unpopular pension package for the superintendent.

3          But throughout that period no one wanted to run

4    against her because she was so popular.  It was not an

5    attractive prospect.  In the years when Dr. Graham was up for

6    reelection, smart candidates stayed out.  They waited for a

7    year when Dr. Graham was not on the ballot because she was

8    such a popular candidate.

9          And I believe Dr. Henson testified to something

10   similar.  When he was on the board, smart candidates stayed

11   out because Dr. Henson was a successful and popular incumbent,

12   until, as board president, he voted in favor of and supported

13   the controversial pay package.  He was himself also later

14   booted out, and he lost by 125 votes.  So if we take that

15   entire period and we assume that these elections never

16   happened, we get a really incomplete picture of what happened

17   in the district.

18          It's as if we looked at Massachusetts elections and

19   said that Tip O'Neill never existed.  He was never elected

20   because who's going to want to challenge someone like that?

21   Q    So just to clarify, Dr. Graham did have several

22   elections.  There were just several that she did not have an

23   election --

24   A    Yes.  She won elections when people ran against her, but

25   people were smart enough not to run against her most of the

1    time.  Up until 2011, when they saw their opportunity, she

2    was -- lost her endorsement from the FFNEA, and she was on the

3    way out.

4    Q    Now, I believe you heard Dr. Engstrom testify that he

5    only went back and analyzed 2011 to 2015 elections.  Why

6    didn't you limit your analysis to just those five years?

7    A    I thought it was important for the Court to have as much

8    information as possible going back further, and I think

9    there's useful information there to know something about the

10   success of African-American representation earlier in the

11   decade.  I mean, that wasn't actually something I knew about

12   until I did the analysis.  I didn't have a sense of the

13   history of the school board elections until I did the

14   analysis.  But I thought it was important to use all the data,

15   and I like data.  And my attitude toward data is more is

16   always better than less.

17   Q    I believe you also heard Dr. Engstrom testify that one of

18   the years that he looked at only had white candidates, and

19   that's the reason he didn't really consider it.  Did you

20   discount that election?

21   A    I put in all the data, all the elections, and I believe

22   that's for the Court to decide.  If they want to drop the

23   single-race elections, that's fine.  I think it's useful to

24   create tables and demonstratives that have all of that

25   information.

Q    Did you accuse Dr. Engstrom of believing only -- that

voters can only vote for candidates of their own race?

A    Well, I believed that he designed a set of rules or

guidelines -- I'm not sure how it works, but he designed a set

of justifications for his selection that had that effect.

Now, of course, whether that was his intention or not I don't

know, but his approach has that effect, and it helps drive his

analysis and drive the results he presents.

Q    So did you analyze more or fewer elections than Dr.

Engstrom?

A    I believe I analyzed more elections than any of the other

expert witnesses.

Q    So correct me if I'm wrong.  Dr. Engstrom did not analyze

any elections from 2000 to 2010.  Do you agree?

A    He did discuss minority-preferred candidates.  I think he

made some claims about top-preferred candidates beginning in

2000, and I'm not sure -- I can't remember now whether he went

and re-analyzed the data or just was stating something he got

from my tables, but I believe his analysis was for 2011

through 2015.

Q    Why do you believe it's wrong -- I think you answered

this, but I'll have you reiterate.  Why do you believe it's

wrong to remove elections from the Court's consideration?

A    I think the Court --

Q    And I'll just -- specifically in the elections that Dr.

1  Engstrom looked at, he removed one because there were only

2  white candidates; and then he's asking the Court to give

3  special consideration to 2015.  So why do you believe that's

4  not the correct analysis?

5  A    Well, again, I believe the Court should have as much

6  information as possible.  I think my approach to this is that

7  the identification of special circumstances is something that

8  is very slippery.  If we're going to try to start identifying

9  one election as special, we can find a lot of different things

10  about other elections that are special.  And as I have been

11  sitting here listening to the testimony, the election that

12  emerged as very special in everyone's explanation was 2011.

13       So I don't get into the business of identifying

14  special elections and telling the Court not to consider them,

15  but if I was to do that, I would choose 2011.  And I see

16  nothing in the 2015 data to suggest there's anything special

17  about it or reasons for not considering it.  In fact, it is

18  the most recent election; and, therefore, I find it especially

19  useful.

20  Q    So knowing that you analyzed all the way back to 2000 and

21  not wanting to go through each of those elections from that

22  2000 to 2010 decade, can you tell the Court generally about

23  the Ferguson-Florissant School District School Board elections

24  during that decade?

25  A    Yes.  We had -- as I described, Dr. Graham was on the

1  board at the beginning of that decade.  She had been on the

2  board since the late 1980s, is my understanding, and there

3  were also -- there was also a period when Gwen Thomas was on

4  the board.  And, you know, this is a period when the

5  African-American share of the population of the district was

6  quite low relative to today.  I don't remember the exact

7  number, but -- and there was also, of course, as we heard, a

8  period in which Dr. Henson was on the board for some years.

9  And then kind of this brings us up to the more recent period.

10  Q     So let's start with 2011.  Could you bring up Stipulated

11  Fact Paragraph 119, please.

12             In 2011, how many seats were up for election?

13  A     This was a three-seat year.

14  Q     And who had the highest point estimates among

15  African-American voters?

16  A     Dr. Graham and Ms. Hawkins.  The next was Mr. Clark.

17  Q     What are the races of Ms. Hawkins?

18  A     She's African American.

19  Q     Dr. Graham?

20  A     African American.

21  Q     And Mr. Clark?

22  A     White.

23  Q     Did any of these three candidates get elected?

24  A     No.  We've heard a lot about that election and what

25  happened there.

1    Q    Who had the highest point estimates among white voters?

2    A    Martinez and Mr. Morris and Mr. Chabot.

3    Q    What are the races of Mr. Martinez, Mr. Morris, and Mr.

4    Chabot?

5    A    Hispanic, white, and white.

6    Q    Were there any incumbents running?

7    A    There were, I believe, three incumbents.  So these were,

8    I think -- yes.  Clark, Graham, and Mr. Lentz were all

9    incumbents.

10   Q    Did any of them win?

11   A    No.  This was the big anti-incumbent wave that we've been

12   discussing.

13   Q    Were any of the incumbents preferred by African

14   Americans?

15   A    Dr. Graham was.

16   Q    Anyone else?

17   A    Oh, yes.  Also Dr. Clark.

18   Q    Mr. Clark?  I believe we've exhausted this topic, but do

19   you have any opinions on why all three incumbents lost?

20   A    Yes, of course.  It was clearly the pension package that

21   was so controversial.

22   Q    Do you believe African-American voters behaved cohesively

23   or noncohesively?

24   A    The votes are rather widely split, in my view.

25   Q    I think you had mentioned that all three

1  African-American-preferred candidates lost?

2  A    Yes.

3  Q    Did any of them lose by a close margin?

4  A    I believe that Hawkins was rather close.  I mean, when

5  these elections -- when we have these three-seat elections --

6  Q    The election results are up.

7  A    Thank you.

8  Q    And you have a calculator in front of you, if you need

9  it.

10  A    Oh, okay.  So Hawkins received 2,890 votes, and I don't

11  recall who was the lowest ranked of the winners.

12  Q    I believe it --

13  A    Let's see.  The other -- Martinez and then the other

14  winner was Morris; so it looks like it would be Mr. Chabot who

15  squeaked in.  So, yes, Ms. Hawkins lost by 190 votes.

16  Q    What about Dr. Graham?

17  A    Dr. Graham was right behind her.  So it was 285 votes.

18  Q    Would you describe African-Americans votes as cohesive

19  for the second- and third-place candidates of choice?

20  A    No.  They were quite split.

21  Q    If they had behaved cohesively, what could have happened?

22  A    Well, clearly, when one loses by a small margin in this

23  context, it's really hard to look at that result and blame the

24  loss on one or another racial group.  I mean, the voters are

25  -- the candidates are receiving votes from both groups.  They

1    have, as I've shown, a very widely dispersed support base.   So

2    when I see a close loss like that and I see that minority

3    voting behavior was not especially cohesive, I don't have a

4    clear basis for making the determination as required by the

5    Voting Rights Act that the loss was due to white bloc voting,

6    especially since we know that in this era the size of the

7    African-American population is growing relative to the white

8    population and surpassing it at some point.   That's unclear

9    exactly when, but we know that's happening.

10   Q    Let's go on to the 2012 election.   If you can bring up

11   Stipulated Fact Paragraph 130.

12              How many seats were up for election this year, Dr.

13   Rodden?

14   A    This was a two-seat year.

15   Q    Who had the highest point estimate among African-American

16   voters?

17   A    Barbara Morris.

18   Q    And?

19   A    And the next was Mr. Schroeder.

20   Q    What are the races of Barbara Morris and Mr. Schroeder?

21   A    Barbara Morris is African American, and Mr. Schroeder is

22   white.

23   Q    Were either of these two candidates elected?

24   A    We have an asterisk by the winner; so Mr. Schroeder was

25   elected in 2012.

1    Q    Who had the highest point estimates among white voters?

2    A    Highest point estimate among white voters was Mr. Ebert,

3    and the second highest candidate was Mr. Schroeder.

4    Q    How many of the candidates preferred by African-American

5    candidates were also preferred by white voters?  I mean

6    African-American voters were also preferred by whites voters.

7    A    One candidate, Paul Schroeder.

8    Q    Let's talk about the specific percentages of votes that

9    were cast.  You said that Morris and Schroeder were the

10   African-American candidates of choice; is that right?

11   A    Yes.

12   Q    What percentage of white voters cast their votes for

13   them?

14   A    Roughly 53.

15   Q    How did you come to that conclusion, just so everyone is

16   clear?

17   A    I'm sorry.  I simply added the point estimate for Mr.

18   Schroeder among whites and the point estimate for Ms. Morris

19   among whites.

20   Q    And you came up to 53.05 percent?

21   A    Yes.

22   Q    So what does this tell us?

23   A    Well, that the combined vote share for the candidates of

24   choice for whites was 50 -- whatever I just -- I'm sorry, I

25   already forgot -- 53 percent.

1  Q    In other words, whites cast more than 50 percent of their

2  votes by candidates preferred by African Americans?

3  A    Yes.

4  Q    Who were the white candidates of choice?

5  A    They were Ebert and Schroeder.

6  Q    And what percentage of blacks' votes were cast for them?

7  A    Roughly 48, a little bit more than that.

8  Q    So blacks cast nearly half of their votes for candidates

9  preferred by whites?

10 A    Yes.

11 Q    How would you characterize crossover voting in 2012?

12 A    Well, I think if we think back to the scatter plot, it

13 kind of communicates the same thing.  There's a good deal of

14 crossover voting between African Americans and whites, and I

15 think this also fits with the testimony of many of the

16 witnesses who have come forward.  There is considerable

17 crossover voting in the district.

18 Q    Yesterday you heard Dr. Engstrom testify that Mr.

19 Schroeder is not a candidate of choice among African

20 Americans.  Do you agree with that?

21 A    No, I don't.  I don't understand what type of vote share

22 would be needed for him -- in the expert witness' framework

23 for him to be considered a candidate of choice.  But something

24 that is notable is that in many places in the reports, and

25 also in the testimony in the last few days, plaintiffs'

1    experts have recommended as doing something I'm not quite sure

2    I agree with.  They recommend -- assuming that no one bullet

3    votes and assuming that everyone casts both of their votes and

4    using this to try to understand the percentage of all ballots

5    cast, so all individuals who come to cast a vote, in order to

6    understand that, for a two-seat election they recommend

7    multiplying by two the vote share of the candidate.

8             And so when we do that with Mr. Schroeder, we get

9    that his support among African Americans in this way, viewed

10   in this way, is over 50 percent.  That means more than half of

11   African Americans in this view, in this way of seeing things,

12   cast a vote for Mr. Schroeder.  So I don't understand why it's

13   so preposterous to see him as an African-American candidate of

14   choice.  That logic is not clear to me.

15   Q    What about Dr. Kimball's two times ballot method that he

16   discussed?

17   A    This is what I'm referring to.  He introduced that

18   concept, and I believe it was introduced on other occasions as

19   well, that this is how we should think about understanding

20   someone's support because -- and making comparisons across the

21   elections.  The point is we want kind of a standard we can

22   compare.

23            A two-seat election and a three-seat election and, of

24   course, in a seven-candidate three-seat election, a vote share

25   that might sound rather small is actually quite impressive

1    when we consider it was a three-seat election.  So they

2    recommended multiplying by three or multiplying by two.  And I

3    think there was little back and forth about this because it

4    doesn't consider bullet voting, and so it's not an entirely

5    adequate way to do that, but that's something they

6    recommended.  And when we do it, it's clear that Mr. Schroeder

7    had considerable support among African Americans.  I would use

8    that term.

9    Q    Let's turn to the 2013 election.  Stipulated Fact No.

10   138.  How many seats were up for election this year?

11   A    This was a two-seat election.

12   Q    And who had the highest point estimates among

13   African-American voters?

14   A    Dr. Henson.

15   Q    Mr. Henson?

16   A    Okay.  And Ms. Hogshead.

17   Q    Okay.  What are the races of Mr. Henson and Ms. Hogshead?

18   A    Mr. Henson is African American.  And Ms. Hogshead is

19   white.

20   Q    Were either of these candidates elected?

21   A    Ms. Hogshead was elected.

22   Q    How many black candidates were there in 2013?

23   A    There were two.

24   Q    So one was Mr. Henson, and the other was?

25   A    Mr. Thomas.

1    Q    How many votes did Mr. Thomas receive?

2    A    Well, he received a point estimate of close to 14 percent

3    of the African-American vote; so African Americans clearly

4    preferred Hogshead to Thomas in this approach.

5    Q    Who had the highest point estimate among white voters?

6    A    Hogshead.

7    Q    I want to go back to Mr. Thomas for a second.  Would you

8    state -- I mean, he had the lowest actually preference among

9    African American --

10    A    That's correct.

11    Q    How many candidates preferred by African-American voters

12    were also preferred by white voters?  I'm sorry.  I don't

13    think I let you finish pointing out who the highest point

14    estimates were among white voters.

15    A    I got to Hogshead, and then the second one is Brown.

16    Q    So how many candidates preferred by African-American

17    voters were also preferred by white voters?

18    A    One.  Ms. Hogshead.

19    Q    Let's talk again about specific percentages of votes

20    cast.  You said that Mr. Henson and Ms. Hogshead were the

21    African-American candidates of choice.  What percentage of

22    white voters cast their votes for them?

23    A    Around 55 percent.

24    Q    So, again, whites cast more than 50 percent of their

25    votes for candidates preferred by African Americans?

1    A    Yes.

2    Q    Who were the white candidates of choice?

3    A    They were Hogshead and Brown.

4    Q    What was the percentage of African Americans that cast

5    their votes for them?

6    A    Close to 58 percent.

7    Q    So, again, nearly half of African Americans cast their

8    votes for candidates preferred by whites?

9    A    Yes.

10   Q    How would you characterize the crossover voting in this

11   election?

12   A    Again, I think it's similar to 2012.  If you think back

13   to those scatter plots, they looked pretty similar.  When we

14   look at the precincts, we see that there's a lot of  support

15   for white candidates in African-American precincts and vice

16   versa.

17   Q    Do you understand why Ms. Hogshead would not be a

18   candidate of choice under Dr. Engstrom's technique?

19   A    I do not.  It's the same problem we referred to in the

20   previous election.  It seems much better to me to examine all

21   the seats and not ignore African Americans' preference for the

22   second seat.  And the race of the candidates should not be

23   considered.  That's something that's very clear; that we

24   should only be looking at the top-ranked candidates and

25   ignoring their race.

1    And I don't see any reason myself to impose some

2  standard where the gap between the top candidate and the

3  second candidate needs to be a certain size.  There are two

4  seats.  There are two preferred candidates.  African Americans

5  and whites have two votes to cast.  They have two seats in

6  which they're electing candidates.

7  Q    And how many votes did Mr. Henson lose by in this

8  election?

9  A    I remember this one.  It was 125.  It was very close.

10  Q    So if voter turnout evenly split between African

11  Americans and whites and Henson got considerable crossover

12  support and he lost by 125 votes, can you explain the logic by

13  which his vote was attributable to white bloc voting?

14  A    Again, I find this profoundly unanswerable.  His support

15  among whites was relatively strong.  He lost by 125 votes in

16  an election that clearly was marked by still the anger that we

17  all heard about with respect to the pension package offer.

18    To attribute that narrow loss to white bloc voting

19  when he clearly could have received more votes from either

20  whites or African Americans, there's just no -- there's

21  nothing demographic that would lead us -- or related to

22  turnout or anything, there's nothing about the voters who

23  showed up on election day that would indicate that there was

24  some reason why he couldn't be elected.

25    So just in general this clarifies that the notion of

1  white bloc voting in a place that is roughly 50/50 or even now

2  majority African American, using that as an explanation for

3  Charles Henson's loss -- I just don't understand it.  I can't

4  explain it.

5  Q    Let's move on to the 2014 election.  Stipulated Fact No.

6  146, please.  How many seats were up for in election?

7  A    This was one of those very chaotic three-seat elections.

8  Q    Who had the highest point estimates among

9  African-American voters?

10  A    I believe the slate of candidates running together had

11  the highest point estimates.  They were Dr. Thurman at 24

12  percent, Mr. Savala at 21 percent, and Dr. Johnson at 21.5

13  percent.

14  Q    What are the races of Mr. Savala, Dr. Thurman, and Mr.

15  Johnson?

16  A    They're all African American.

17  Q    Were any of these candidates elected?

18  A    Yes.  Dr. Thurman is here today.

19  Q    And was Dr. Thurman the top-ranked candidate of choice of

20  African Americans?

21  A    She was, but -- yes, by a decent margin, yes.

22  Q    Who had the highest point estimate among the white

23  voters?

24  A    In this election it was Mr. Chabot.  And the

25  second-ranked candidate among whites was Paul Morris, and the

1  third-ranked candidate was Ms. Benz.

2  Q    What are the races of Ms. Benz, Mr. Chabot, and Mr.

3  Morris?

4  A    They're white.

5  Q    How many of the candidates preferred by African-American

6  voters are also preferred by white voters in this election?

7  A    In this election, none.

8  Q    Do you concede that 2014 -- the 2014 election was

9  polarized?

10  A    I do.  I make that claim, and I believe it -- again, if

11  we think back to the scatter plots, we noticed that line

12  became much more -- much closer to the 45-degree line in the

13  2014 election, and I characterize it as a relatively more

14  polarized election.

15  Q    Let's look at the vote totals.  Did African-American

16  candidates -- let me wait until this gets pulled up.  The

17  African-American candidates were who?

18  A    Again, they were Dr. Thurman, Mr. Savala, and Mr. Thomas,

19  and Dr. F. Willis Johnson, Jr., and LaWanda Wallace.

20  Q    Okay.  Did African-American candidates receive more votes

21  than white candidates?

22  A    Yes, they did.

23  Q    Were there any close calls in this election?

24  A    Yes.  This is another very close call.  Mr. Savala came

25  within 91 votes of being elected to the school board.

1  Q    Did black voters act cohesively or noncohesively in this

2  election?

3  A    I would define this behavior as not very cohesive.  The

4  votes were split among five candidates in a three-seat

5  election.

6  Q    Can you explain how it is that Dr. Thurman was not

7  blocked by white voters but Mr. Savala, who received 91 votes

8  fewer, was blocked by white voters?

9  A    I find that nonsensical.

10  Q    Yesterday plaintiffs' counsel represented to Dr. Thurman

11  that she received only 8 percent of white votes.  Then she

12  said she received one out of ten white votes.  Did you hear

13  that?

14  A    I did.

15       MR. HO:  Objection.  I think that mischaracterizes

16  the question from my co-counsel.

17       THE COURT:  Rephrase or lay a better foundation for

18  the question.

19  Q    Were you here yesterday during the testimony of Dr.

20  Thurman?

21  A    I was.

22  Q    Did you hear plaintiffs' counsel represent to Dr. Thurman

23  the percentage of votes that she received from white voters?

24  A    I did.

25  Q    What did you hear that percentage to be?

1   A     I heard 8 percent, and then I heard one out of ten white

2   voters.

3   Q     Do you believe that to be the truth?

4   A     Well, as I described earlier, the plaintiffs have on

5   several occasions recommended that for making these kinds of

6   comparisons we should view this as a share of the ballots

7   cast, and their recommended way of doing this is again to

8   suspend our knowledge of the fact that we have a bullet-voting

9   system and to assume that everyone uses every vote.  In this

10  case it would involve multiplying the figure by three.  So I

11  do believe plaintiffs' counsel misrepresented Dr. Thurman's

12  support among white voters, and she should have been informed

13  that it was 24 percent.

14        She perhaps could have been further informed that it

15  was a seven-seat election in which vote shares are relatively

16  low for everyone because the vote is split among many

17  candidates.

18  Q     Thank you for clearing that up.  Let's move to the 2015

19  election.  Stipulated Fact Paragraph 167.  While it's being

20  pulled up, do you know how many seats were up for election

21  this year?

22  A     This was another two-seat election.

23  Q     Who had the highest point estimate among African-American

24  voters?

25  A     That was Dr. Graves.

1    Q    And the second?

2    A    Among African Americans the second highest was Ms.

3    Dameron.

4    Q    What are the races of Dr. Graves and Ms. Dameron?

5    A    Ms. Dameron is white.

6    Q    And Dr. Graves?

7    A    African American.

8    Q    Were either of these candidates elected?

9    A    Ms. Graves was elected with, I believe, the largest

10   number of votes cast during the period that I've analyzed.

11   Q    And Dr. Graves was African-American top-ranked candidate

12   of choice?

13   A    She was.

14   Q    Who had the highest point estimates among white voters?

15   A    Mr. Ebert, which I believe was true the last time we saw

16   one of his elections.

17   Q    And who else?

18   A    The next highest among whites was Dr. Graves.

19   Q    What is the race of Mr. Ebert?

20   A    He's white.

21   Q    How many candidates preferred by African-American voters

22   were also preferred by white voters?

23   A    Dr. Graves was preferred by both.

24   Q    Did African-American candidates receive more votes than

25   white candidates in this election?

1  A     Yes.  This seems to be becoming a trend.

2  Q     Do you recall Dr. Engstrom testifying that, in order to

3  win, Hines would have to had -- would have had to have

4  received more white votes?

5  A     Yes.  There was a question asked about a magical scenario

6  in which Mr. Hines would have won, and the response was that,

7  well, he would have had to have received more white votes.

8        The logic of this is very unclear to me because Mr.

9  Hines was not an African-American-preferred candidate in the

10  point estimate approach where he was -- had a much higher

11  level of support among whites than among African Americans.

12  Well, he is African American; so I'm not sure what kind of

13  assumption was being made there.  The assumption seems to have

14  been that bloc voting is just something we know to be true

15  without seeing it.

16        So the notion seemed to be that Mr. Hines could have

17  only been successful had he received more votes from whites

18  even though his support among African Americans was lower than

19  that among whites, and this is partly because he resides in a

20  racially integrated part of Florissant and has a lot of white

21  support.

22  Q     So he wasn't blocked by white voters?

23  A     Again, that is incomprehensible and illogical.

24  Q     What do you believe was Mr. Hines' biggest problem with

25  that election?

1   A    I believe that Mr. Hines' biggest problem in that

2   election was the same problem that the other candidates faced:

3   It was Mr. Ebert and Dr. Graves.  And we heard a lot about Dr.

4   Graves and the campaign that she's run.  She was a very

5   successful candidate.  She was described by several witnesses

6   as having worked extremely hard.  And I can't understand any

7   logic whereby she was blocked by white voters.  I cannot see

8   any logic whereby we would explain her victory as owing to

9   anything other than being a good candidate who worked hard for

10  the position.

11  Q    What was Dr. Graves' percentage of the African-American

12  vote?

13  A    It was 49 point --

14  Q    Of the African-American vote?

15  A    Yes.  It was around 50 percent.  In Dr. Engstrom's

16  analysis, it was 52 -- it was over 50 percent.

17  Q    So in Dr. Engstrom's analysis, she received 52.4 percent

18  of the African-American vote?

19  A    Yes.

20  Q    What is the explanation for receiving more than 50

21  percent in a two-person election?

22  A    Even being at 50 percent, I think it is likely that there

23  is bullet voting going on here.  That is a sign of bullet

24  voting.  And we know that -- we know that Dr. Graves ran a

25  campaign that explicitly calling upon voters to bullet vote.

1    So we might -- if there's anything special about the

2  election, it's that there was a candidate that perhaps pushed

3  especially hard on bullet voting, and we might want to

4  interpret some of the other results accordingly.  She really

5  received a lot of votes from people who apparently only cast

6  one ballot.

7  Q    What do you believe the reasons for voters choosing to

8  bullet vote for her -- do you believe that the voters'

9  decision to bullet vote was in any way related to the Michael

10  Brown shooting?

11  A    I can't imagine why it would have been.

12  Q    Dr. Engstrom testified that the filing of this lawsuit

13  could have created a special circumstance for the 2015

14  election in which Dr. Graves won her election.  Are you aware

15  of any peer-reviewed publication to support that hypothesis?

16  A    I've never heard of such a thing.

17  Q    In your review of the 2015 election, did you look at

18  whether this lawsuit affected the election?

19  A    I have been following all the elections, reading about

20  them from local news sources to the extent that I can, and I

21  certainly saw no indication.  I really don't believe that

22  people in the district had any knowledge of the lawsuit.  Of

23  course, I've also followed the media for news about the

24  lawsuit, and there was very little of it at the time that it

25  was filed in St. Louis.

1   Q    Did you consider whether the Michael Brown shooting

2   affected the outcome of the 2015 election in the

3   Ferguson-Florissant School District?

4   A    Well, I certainly thought about it, and as I indicated, I

5   thought I might see something interesting there.  But I must

6   say that, given a whole -- a very large literature in

7   political science on racially polarized voting, one might

8   anticipate that an event like that would generate an increase

9   in racially polarized voting, if anything, but that's not what

10  we see.

11  Q    In your research and in developing your opinion for this

12  case, did you see anything about the filing of this lawsuit

13  with regard to whether it affected the candidate pool for

14  2015?

15  A    Well, I certainly never thought of that argument until I

16  ran across it in Dr. Engstrom's report.  And I don't have

17  any -- I've thought a lot about what the theoretical argument

18  might be about who's running and not running, and I believe

19  Dr. Engstrom was asked to expand upon that, and he -- I don't

20  recall that he was able to do so.  So I don't have -- I can't

21  do any better.  I have no idea what that argument might look

22  like.

23          And it seems that if we're going to be classifying

24  people as minor candidates, we want to see Ms. Dameron as a

25  minor candidate, I believe his logic was that she was not a

1    serious candidate even though she had support among African

2    Americans, higher than whites.  He wants to argue that she is

3    not a serious candidate.  But I don't know why, if we're going

4    to do that, we don't go back through all of the elections and

5    try to make determinations as to who is serious and who is

6    not.  And to do that, we would need to know things about

7    whether people had run effective campaigns, whether they had

8    responded to League of Women Voters' guide, whether they went

9    to candidate events, and so forth.  That's the kind of

10   intensely local analysis we would need to do, but I saw none

11   of that type of analysis.  I saw a claim that one individual

12   was a minor candidate and some idea that this was affected by

13   the lawsuit to have some good candidate didn't run.  I don't

14   understand it.

15   Q    Are African-American voters submerged with a white

16   majority?

17   A    The obvious answer is that by 2015 there is no white

18   majority.  It's an African-American majority district.  An

19   African-American woman received a very large vote share.  She

20   was the most preferred candidates by African Americans and

21   whites.  So, again, the claim that African Americans are

22   submerged in a white majority, which is the assumption of the

23   Voting Rights Act, I don't have any other word than absurd.

24   Q    Have you seen any data on registration and turnout on

25   blacks from the plaintiffs?

1   A    There was —— there have been no data on registration.  I

2   believe there was an exhibit entered telling us that

3   registration varies across race in Missouri, and, of course,

4   we know that's true.  That's true nationally as well.

5        But as regards to turnout, there was, in the initial

6   batch of reports, no analysis of turnout.  We discussed some

7   previous analysis of turnout by Dr. Kimball in his other work

8   that he's published.  That didn't make it into his report.  It

9   was the 2014 election in which he determined there was no

10  relationship between race and turnout.

11       They then —— later on in the follow-up reports, there

12  was a table that was —— that included my point estimates in

13  Dr. Kimball's follow-up report.  He then represented that he

14  was doing a robustness check or something like this of my

15  ecological inference approach to turnout.  And he did this by,

16  as we discussed, comparing, I believe, three homogeneous

17  African-American precincts and two homogeneous white precincts

18  and ascertained that they had different levels of turnout.

19       I think it's clear to anyone who thinks about this

20  that, in a district that is as racially integrated as the one

21  we're looking at, this is not an approach that the Court

22  should take very seriously.  The ecological inference

23  estimates, as Dr. Engstrom would also testify, I think are the

24  place to look.  So I think the turnout analysis here to

25  consider is the turnout analysis in my initial report.

1    Q    So you testified that in 2013 Mr. Henson lost by 125

2    votes.  Is that right?

3    A    That's correct.

4    Q    And you testified in 2014 that Mr. Savala lost by only 91

5    votes.  Correct?

6    A    That's correct.

7    Q    If we add those two together, what do we get?

8    A    216.

9    Q    So if 216 votes had gone to these candidates, would we be

10   here today?

11   A    Well, there would be four out of seven board members who

12   were African-American-preferred candidates and who were

13   themselves African American; so if 216 votes had gone

14   differently in a majority African-American district, we would

15   have four out of seven board members who are African American.

16   Perhaps someone would see fit to file a Section 2 claim, but I

17   would find that unusual, surprising.  So I don't think we'd be

18   here today, no.

19   Q    All right.  Let's move on to some Senate factor issues.

20   Does St. Louis have a history of discrimination?

21   A    It does.

22   Q    Does anyone disagree with that?

23   A    No one disputes that.

24   Q    Let's look at the effects of discrimination that hinder

25   African Americans' ability to participate.  Do you have an

opinion with regard to how the Ferguson-Florissant School

District compares on socioeconomic indicators with the St.

Louis metropolitan statistical area?  And I'll refer to page

17 of Exhibit D, which is Dr. Rodden's supplemental report.

A      Yes, I do have an opinion regarding this matter.

Q      Could you tell the Court what this graph tells us?

A      This is drawn from, again, something we've been talking

about a lot, the 2011-2013 ACS.  These are some demographic

variables.  What I've done here is I've taken some key

socioeconomic indicators for African Americans and for whites,

and then I've calculated the gap between them, and I've done

this for the St. Louis metropolitan statistical area.  I've

represented this in green -- I mean in blue circles.  I've

done this for the state of Missouri, and I've represented that

in red *X*s.  And I've looked at the Ferguson-Florissant School

District, and I've represented that in green triangles.

        So I will walk through this graph.  The first one is

the gap between African Americans and whites in the attainment

of a bachelor's degree.  So here we see -- I mean, I want to

start out by saying that, as Dr. Gordon and others have noted,

there is a gap between African Americans and white in all of

these for -- except for having some college, which is a second

line.  So I want to draw attention.  It is the case that there

is a gap between African Americans and whites on each of these

indicators.  So the green triangles, the Ferguson-Florissant

School District, are only zero for college.  For everything
else, there's a gap there.  And this is something that one
would also ascertain from Dr. Gordon's report and from Dr.
Kimball's report.  I think even Mr. Cooper's report has some
appendix materials.  So we know that there's a gap.

But what I tried to do here is put that gap in
context and try to situate the district and give the reader a
sense of the reality of the district relative to the
comparable places.  I chose Missouri, and I chose the St.
Louis metropolitan statistical area, and what I show is that
the gap on each of these indicators is smaller and usually
substantially smaller in the district than it is for the
metropolitan St. Louis area and for the state of Missouri.

So what this indicates, combined with another
indicator that I did not include in the graph, was income.  So
the income gap is half in the Ferguson-Florissant School
District than it is in the St. Louis metropolitan statistical
area.  So what this indicates is that it's not correct, as Dr.
Gordon has represented, that when we tell the story of the St.
Louis area, we are telling the story of the
Ferguson-Florissant School District.

As I believe others have represented, in 1975
something happened.  The schools were desegregated.  The
Ferguson-Florissant School District did something that did not
happen in the rest of St. Louis.  While the schools remained

1    segregated in the rest of St. Louis, they became desegregated

2    in the Ferguson-Florissant School District.

3         So a period that we've been talking about all

4    morning, from the 1990s to the present, the district became

5    increasingly integrated.  And there was a period during which

6    many African-American students were educated in the district,

7    and they have joined and stayed in the middle class in St.

8    Louis.  The Ferguson-Florissant School District has become the

9    heart of the St. Louis African-American middle class.

10        There is a swath of North County that runs from

11   Highway 270 and points south in Ferguson through Florissant

12   and through Hazelwood including Black Jack and other areas

13   that has become the only cluster of African Americans in the

14   middle class in St. Louis.  The Ferguson-Florissant district

15   is in the heart of that.

16        So it's not quite right to assume that the district

17   is the same as Missouri.  It's not right to assume that the

18   district is the same as St. Louis.  Everything we can measure

19   is different in the district than these other places.

20   Q    But that's not to deny that there are disparities?

21   A    Of course.  The disparities are shameful and must be

22   combated.

23   Q    Have you reviewed Dr. Gordon and Dr. Kimball's reports

24   with regard to turnout?

25   A    Yes.

1  Q    Did they measure turnout specifically to this school

2  district?

3  A    You asked about Dr. Gordon and Dr. Kimball?

4  Q    Yes.

5  A    I don't recall Dr. Gordon doing -- saying anything about

6  turnout.  And I believe I already described the approach that

7  was taken by Dr. Kimball with respect to the homogeneous

8  precinct analysis.

9  Q    How did you look at turnout?

10  A    I took the precinct-level election data that we've seen

11  several images of from the Board of Election Commissioners,

12  and I combined it with the census data on race using the same

13  approach we've been discussing, and I used ecological

14  inference analysis to analyze turnout over time.

15  Q    Did you --

16  A    Among racial -- by racial group, yes.

17  Q    And the graphs that are up on the screen, is that --

18  A    I'm sorry.  This is an initial approach that I took.

19  I've done both of these things.  I took both approaches.  This

20  is a scatter plot.  In my report I begin with a scatter plot,

21  mainly because I think it helps the reader visualize the

22  situation.  I took the same approach that Dr. Kimball had

23  taken in his previous blog post that showed a scatter plot of

24  this kind.

25          Again, I think it's better for the reader.  It's

1  easier to look at a smoothed -- it's called a LOWESS smoother.

2  That's what these lines are.  It's nice to look at those, and

3  what we see here is the relationship between -- at the

4  precinct level between the African-American share of the

5  voting-age population, and turnout is minimal.

6          There's just -- one has to really squint to see a

7  relationship here.  There's a bit of a relationship in 2015.

8  It's not very strong.  What this indicates, and I think

9  probably because of the fact that the school district is

10  different than the rest of the St. Louis metropolitan area in

11  this regard, there is not much of a relationship or any

12  relationship here between turnout and African-American share

13  at precinct level.

14  Q    And that was your conclusion using both ecological

15  inference and using the scatter plots?

16  A    Yes, that's right.  But the ecological inference analysis

17  did find a difference between turnout in some of the years.

18  And the recent years that are analyzed by -- well, that we

19  just went through, 2011 to 2015, these were also the years

20  that Dr. Engstrom went through yesterday.  In those years I

21  did see a difference between white and African-American

22  turnout.  In 2011, the election that we keep talking about --

23  and that we also see a difference, even though this graph

24  doesn't show it, it's very slight we see in the graph, that we

25  did see a significant difference in 2015, a difference where

1    white turnout was a bit higher than African-American turnout.

2    But in those three elections in the middle -- 2012, 2013, and

3    2014 -- there's no difference.

4    Q    Let's move on to registration.  We've already talked

5    about it briefly.  I just want to ask, is it appropriate to

6    use statewide registration percentages and apply that to the

7    Ferguson-Florissant School District?

8    A    Certainly not, for the reasons I've just described.  The

9    Ferguson-Florissant School District is different than the

10   state of Missouri in many ways.

11   Q    And other than looking at the percentages of voter

12   registration in Missouri, did plaintiffs do any other sort of

13   analysis with regard to registration?

14   A    No.  The data are available.  They're there to do that,

15   but no one -- the precinct-level data provide registered voter

16   information; so it would be possible to do that, but, no, they

17   did not do that.

18   Q    What's your opinion with regard to which election system

19   is the most beneficial to the African-American population in

20   Ferguson-Florissant?

21   A    Based on my research about the relationship between

22   geographic concentration and the overall size of the

23   population, it's clear that a majority that is geographically

24   dispersed benefits from an at-large system.  A minority that

25   is geographically concentrated benefits from a single-member

1    district system.  That logic is at the heart of Section 2 of

2    the Voting Rights Act.

3            In the Ferguson-Florissant School District, whites

4    are a geographically concentrated minority.  They are the

5    group who stand to benefit from the imposition of

6    single-member district.

7    Q    Let's talk about the candidate slating process.  What's

8    your opinion with regard to whether the Ferguson-Florissant

9    NEA or the North County Labor -- whether they have a slating

10   process for candidates?

11   A    I don't have any information, any sense, that the slating

12   process exists as I understand what a slating process would

13   be.

14   Q    How do academics define a "slate"?

15   A    There is some group that decides to recruit candidates to

16   run with them, and this is how I understand it.  Perhaps there

17   are other definitions.  But people who go and recruit others

18   to run on a -- they're kind of gatekeepers of who's allowed to

19   be on that slate.

20   Q    From the testimony you heard from Mr. Green and from some

21   of the candidates, is there any exclusion from the

22   Ferguson-Florissant NEA endorsement process?

23   A    I believe the testimony I heard was that it's -- there's

24   a meticulous effort to keep the selection process evenly

25   divided between African Americans and whites, and everyone is

1 open and invited to apply for endorsement. And most

2 candidates do, but some don't.

3 Q    Is there any evidence that's been provided that shows

4 that African Americans are shut out of the process?

5 A    Certainly not.

6 Q    Do you think that April elections increase the influence

7 of slating groups?

8 A    I don't have any reason to believe that.

9 Q    Has there been any evidence of that?

10 A    No.

11 Q    Is there a problem with knowing who applied for different

12 endorsements?

13 A    Well, if one wants to draw a causal inference about being

14 endorsed by an entity and claim that that endorsement predicts

15 success of candidates, then one needs to know whether or not

16 candidates applied to be endorsed. There is no way to draw a

17 causal inference about the importance of being endorsed

18 without that information because, for instance, imagine that

19 energetic, smart, interested candidates who want to win are

20 those who apply for endorsements. Let's also imagine that

21 such candidates are more likely to win. It's, therefore,

22 likely we will see a correlation between those who are

23 endorsed and those who win.

24 Q    Did you analyze, in addition to the Ferguson-Florissant

25 School District elections, any exogenous elections with regard

1  to the Ferguson-Florissant School District?

2  A    I did.  And the reason I did that is because you may

3  recall I was describing the difficulty, the kind of complexity

4  of a multi-winner system with sometimes two and sometimes

5  three seats, and we've got bullet voting.  I described how

6  difficult it is to come up with a way of identifying

7  minority-preferred candidates.

8         I identified two approaches I thought were reasonable

9  for school board elections, but then I thought, well, perhaps

10  we can find a way to kind of move beyond this difficult

11  context and get some other kind of data.  And there is a

12  tradition in VRA cases of looking to so-called exogenous

13  elections; so I decided to do that.

14  Q    Which elections did you review?

15  A    What I decided to do was, working from today backwards,

16  find also -- kind of this is the way this has been done in

17  some other cases as far as I know -- find contests where

18  there's both an African-American and white candidate running

19  and then -- and then take the data, what's -- again, this is

20  another nice use of geographic information systems.  What we

21  can do is we can take the precinct-level data that we can get

22  from the St. Louis County Board of Election Commissioners,

23  okay?  We take those data and we superimpose the district

24  boundary.  We take the precincts that are within the district

25  boundary, and so I'm going to look here at elections where

1   there is a -- where there is an African American versus a

2   white candidate, and I'm going to look at elections for

3   offices where the office is larger, the area encompassed by

4   the office is larger than the school district so that I know

5   everyone's voting in the office.  There's not some part of the

6   school district that's left out.  Everyone is voting in this

7   office.  And so to determine --

8   Q   I'm going to stop you right there.  I've pulled up -- I

9   see people flipping through their notebooks.  This is page 14

10  of Exhibit B, your rebuttal regarding bloc voting.

11  A   Yes.  So the idea here is that in a Section 2 case the

12  plaintiffs need to establish -- remember, I've been -- I say

13  this a few times:  That the white majority needs to defeat the

14  minority group through bloc voting.  And so I thought it would

15  be a simple test here.  Let's look at all of these other races

16  that take place in areas that are larger than the school

17  districts, and let's see what happens in the school district

18  when there's an African-American candidate and a white

19  candidate, and let's see who wins, because if a white majority

20  is blocking the African-American voters, we should see that

21  show up in these data.  And, in fact, we see quite the

22  opposite.

23  Q   And does this chart accurately reflect your findings?

24  A   Yes.

25  Q   Can you go through for your findings for the Court?

1   A    Well, I can -- yes, I can keep it brief.  I've chosen

2   every election with the characteristics I describe, and I've

3   gone backwards, back to 2008.  And we've got some races that

4   are Democrats versus Republicans, and we have some races that

5   are primaries where there are no partisan labels.  I think

6   those are especially useful.

7        We see in all of these cases that the

8   African-American candidate gets a majority of the vote in the

9   district, and often it's a super majority.  Often it's very

10  large.  There's only a couple that are close, and even the

11  close ones are themselves interesting.  Charlie Dooley

12  received more support in the Ferguson-Florissant School

13  District than Steve Stenger even though I believe Steve

14  Stenger won that election in the rest of the St. Louis County.

15  And there are a couple of other races like that, but I'll keep

16  it brief, but the key thing is that the African-American

17  candidate always wins.  Very successful in the district.

18  Q    All right.  Are there other benefits of an at-large

19  election scheme other than it's better for minority

20  representation?

21  A    Yes.  I think the primary benefit is it has to do with

22  making policies related to the education of children.  This is

23  why at-large school districts are used by school boards around

24  the country.  It's the most common form of government for

25  school boards.  There are a -- a lot of people argue in the

1    academic literature and also people who serve on school boards

2    and people in the communities make the observation that it's

3    important to have policies that represent the entire district,

4    especially the high schools, and really take the district as a

5    whole rather than creating a distributive battle between

6    different elementary schools and creating resource battles

7    that play out in board meetings.  This is a known problem with

8    single-member district-based boards, and this is why it's very

9    rarely used.  I think this is why the Missouri statute takes

10   the form that it does.

11   Q    Dr. Rodden, in your opinion, what will be the result if

12   plaintiffs are successful in this case?

13   A    I believe we'll end up with a school board that is, in my

14   view, more likely to represent whites than African Americans.

15   I believe that African Americans are on the cusp of achieving

16   a school board majority just as they have already achieved in

17   Hazelwood next door.  I believe this is the institution that

18   facilitates that transition and that, if plaintiffs are

19   victorious, it will be a step backwards and it will create an

20   opportunity for whites to continue to stay in control of the

21   school board.

22            MS. ORMSBY:  Give me just a minute.  I don't have

23   anything further.

24            THE COURT:  Why don't we take a 15-minute recess.

25   We'll start cross.  I don't expect you to be done in 45

1    minutes.  But I have a 12:30 sentencing; so we'll break about

2    then and take our normal lunch time, but I don't see any

3    reason to lose the 45 minutes, unless you feel strongly

4    otherwise.

5         MR. HO:  No, Your Honor.  Ready to start whenever

6    you're ready.

7         THE COURT:  Okay.  Let's take a 15-minute break.

8    We'll come back at 11:55.

9              **(COURT RECESSED FROM 11:45 AM UNTIL 11:58 AM.)**

10                        **CROSS-EXAMINATION**

11   **BY MR. HO:**

12   Q    Good morning/almost afternoon, Dr. Rodden.

13   A    Good morning.

14   Q    My name is Dale Ho.  I represent the plaintiffs in this

15   matter.  It's nice to see you again.

16   A    Good to see you.

17   Q    Dr. Rodden, your understanding is that a racial

18   polarization analysis attempts to measure whether within a

19   particular jurisdiction minority voters and white voters tend

20   to vote for different candidates for particular elected

21   office, correct?

22   A    I approached the issue of racial polarization in a couple

23   of different ways.  I examined scatter plots.

24   Q    I'm sorry, Dr. Rodden.  I didn't ask how you attempted to

25   measure racial polarization in your report.  I asked you if

1  your understanding of a racial polarization analysis is

2  something that attempts to assess whether or not minority

3  voters, on the one hand, and white voters, on the other hand,

4  tend to vote for different candidates within a particular

5  jurisdiction for particular elected office.  Correct?

6  A    Is that a -- I'm sorry.  Repeat the first part of the

7  question.

8  Q    I can have the court reporter read that back to you if

9  you would like.

10                  **(QUESTION READ BACK.)**

11  A    That is one approach to racial polarization analysis,

12  yes.

13  Q    And as a political scientist, you would describe Dr.

14  Richard Engstrom as one of the nation's leading scholars on

15  the study of racially polarized voting, correct?

16  A    He has done a lot of work in this area, yes.

17  Q    So that's a correct?  You do -- you would describe him as

18  one of the nation's leading scholars on racially polarized

19  voting?

20  A    Yes.

21  Q    Now, I see you have a very extensive list of publications

22  in your CV.  Dr. Rodden, have you -- you have never published

23  any peer-reviewed scholarship that focuses on racially

24  polarized voting patterns, correct?

25  A    No.

1  Q    And, Dr. Rodden, you have never performed peer review for

2  any articles that attempt to measure whether voting is

3  racially polarized in a particular jurisdiction, correct?

4  A    I believe I have.

5  Q    Dr. Rodden, do you remember your deposition in this case?

6  A    I do.

7  Q    It was taken on August 20, 2015; is that right?

8  A    Yes.

9       MR. HO:  Permission to approach, Your Honor, with a

10  copy of the deposition transcript.

11      THE COURT:  Why don't you just put it on the screen.

12      MR. HO:  We can do that too.

13      THE COURT:  He can't read the whole thing.

14      MR. HO:  Oh, no, no, no.  I just wanted to bring him

15  to the correct page.  But we can bring it up on the screen.

16  We were having technical problems earlier.

17      THE COURT:  All right.

18  Q    (BY MR. HO) Could you bring up page 179 on this screen,

19  please.  This is line 17.

20      "QUESTION:  Okay.  And just to be clear, you've never

21  peer reviewed any articles yourself that attempt to measure

22  whether or not voting is racially polarized in a jurisdiction,

23  have you?

24      "ANSWER:  Not that I can recall."

25      Was that my question, and was that your answer?

1    A    It was.

2    Q    Now, you testified that you have served as an expert in

3    three cases other than this one.  Correct, Dr. Rodden?

4    A    I would first like to further answer the last question.

5    I received an article related to racially polarized voting

6    from the *Election Law Journal* recently, and I have been

7    serving as a reviewer since the time of the deposition because

8    I've been doing a lot of work in this area.

9    Q    And when did you receive that article, Dr. Rodden?

10   A    I can't remember.  A couple months ago.

11   Q    It was after your deposition, though, right?

12   A    Yes.

13   Q    And your deposition was under oath as your testimony is

14   here today, right?

15   A    Yes.

16   Q    And that is the one time that you have peer reviewed an

17   article --

18   A    Yes.

19   Q    -- concerning racially polarized voting in a particular

20   jurisdiction, correct?

21   A    Yes.

22   Q    Now, you testified that you have served as an expert

23   witness in three other cases.  Correct, Dr. Rodden?

24   A    Yes.

25   Q    And, Dr. Rodden, other than this case, you have never

1  been offered to a court or qualified by a court as an expert

2  on racially polarized voting patterns, correct?

3  A    That's correct.  Not yet.  The other case in Virginia

4  that I described has not yet come to trial.

5  Q    And, Dr. Rodden, before this case, you had not previously

6  served as an expert witness in a case where the plaintiffs

7  were challenging a districting arrangement for vote dilution

8  under the Voting Rights Act, correct?

9  A    Repeat the question, please.

10  Q    Other than this case, you have not previously served as

11  an expert in a case where the plaintiffs were challenging an

12  electoral arrangement as dilutive under the Voting Rights Act,

13  correct?

14  A    That's correct.

15  Q    I'd like to ask you a little bit about your report.  You

16  have two methods for measuring voting patterns by race in your

17  initial report, correct?

18  A    Yes.

19  Q    Now, one of these is a bivariate correlation analysis.

20  That's how we can describe it, right?

21  A    Yes.

22  Q    And that means that you take two variables.  You take the

23  African-American share of the voting-age population in each

24  precinct, and you also take the vote share for

25  African-American candidates at each precinct, and then you try

1    to determine if there's a correlation between those two

2    variables.  Correct?

3    A    Yes.

4    Q    So fair to say that you're checking to see if, as the

5    African-American percentage of voting-age population

6    increases, the vote share for African-American candidates

7    increased.  Correct?

8    A    Yes.

9    Q    Could we bring up Defendants' Exhibit A, Dr. Rodden's

10   initial report, page 20, Figure 7.

11           This figure shows the results of your bivariate

12   correlation analysis, correct?

13   A    Yes.

14   Q    And you performed this analysis for four elections, the

15   2012 through 2015 elections, correct?

16   A    Yes.

17   Q    You did not look at any elections prior to 2012 in your

18   bivariate correlation analysis, correct?

19   A    That's correct.

20   Q    But, Dr. Rodden, you found that in all four elections

21   that you looked at, 2012 through 2015, as the black voting-age

22   population share increases in a precinct, generally speaking

23   so too does the vote share for African-American candidates.

24   Correct?

25   A    Yes.

1  Q    And you agree, based on your bivariate correlation

2  analysis, that within the Ferguson-Florissant School District

3  African-American voters tend to vote for African-American

4  candidates for school board.  Correct?

5  A    The correlation is positive, yes.

6  Q    Now, in your report you did not compare the

7  Ferguson-Florissant School District to other jurisdictions to

8  see if the correlation was more or less positive in the

9  Ferguson-Florissant School District as compared to the other

10 jurisdictions.  Correct?

11 A    No.  I didn't believe that was required.

12 Q    Correct, you did not make that comparison?  Right?

13 A    That's correct.

14 Q    In this bivariate correlation analysis, you do not

15 attempt to identify the black-preferred candidates.  Correct?

16 A    No.  As I described, this was an initial attempt to give

17 the reader an overview of the data.  To have a sense of what

18 the precinct-level data looked like, I find that data

19 visualizations are useful.  And then we can take that and

20 bring it to the ecological inference analysis with a sense of

21 what the underlying precinct-level data looked like, and that

22 is the spirit in which I presented these graphs.

23 Q    And, Dr. Rodden, you agree that some black candidates are

24 not the preferred candidates of black voters, correct?

25 A    That's correct.

1    Q    And you include some of those black candidates who are

2    not the preferred candidates of black voters in your

3    calculation of the vote share of African-American candidates,

4    correct?

5    A    That's correct.

6    Q    Now, in these charts each dot represents a precinct,

7    correct?

8    A    Yes.

9    Q    Now, in plotting your regression lines to measure if

10   there's a correlation between the black voting-age population

11   and support for black candidates, you treat each precinct

12   equally.  Correct?

13   A    I believe I do.

14   Q    And, Dr. Rodden, you would agree that precincts vary in

15   the number of ballots cast at each precinct?

16   A    Yes.

17   Q    And you know, Dr. Rodden, from working with some of this

18   data, that precincts within the Ferguson-Florissant School

19   District may have as few as two ballots cast for school board

20   and as many as 300 ballots cast for school board?

21   A    I believe that is a description of an extreme case.  In

22   general, the sizes of the precincts are not all that diverse,

23   and it certainly is an issue.  And, in fact, for these graphs,

24   I prepared similar graphs to the one that Dr. Kimball

25   prepared, with bubbles corresponding to the size of the

93

precinct.  I like that type of graph.  I think it's an

attractive graph, and I think it more accurately captures the

size of each precinct.  One can then also weight the

regression line by the size of the precinct.  I prepared those

graphs and I did not present them because they were ugly.

Think about all those bubbles scrunched onto the

graph.  Think about what that would look like.  I wanted the

reader to be able to see time series analysis.  I wanted the

reader to be able to see a simple display they could follow

over time.  I am a -- visual design is something I care about.

I didn't like all the bubbles.  I didn't produce them.

Q    Well, we'll talk about that in a second, but let's just

stick with what's actually in your report and what you

actually submitted to the Court for a moment.  Okay, Dr.

Rodden?

A    Certainly.

Q    So the bivariate turnout -- I'm sorry.  The bivariate

correlation analysis here does not attempt to adjust for the

size of the precincts.  Correct, Dr. Rodden?

A    That is correct.

Q    So when you try to measure the correlation between race

and African-American candidate vote share, you give equal

weight to a precinct in which two ballots are cast as you

would give to a precinct where 300 ballots are cast in the

report that you submitted to the Court.  Correct, Dr. Rodden?

1    A    As I described, there are two or three very small

2    precincts that are outliers with respect to their size.  I did

3    not feel that the problem created by that was worth pursuing

4    in these graphs.  I recognize the situation you're talking

5    about.  I know which precincts you're talking about.  There is

6    a small handful of them.  I'm not sure why the Board of

7    Election Commissioners has not combined them in the way it

8    does others.  I believe it has to do with the location of the

9    airport.

10   Q    But the graphs that you say you did that attempt to

11   adjust for the size of the precinct, those are nowhere in any

12   of your reports.  Right, Dr. Rodden?

13   A    That's correct.

14   Q    Dr. Rodden, you agree, do you not, that this simple

15   bivariate analysis is not the kind of fine-grained analysis

16   that one needs to assess whether voting is racially polarized

17   in the district?

18   A    I believe those are the words I used, yes.

19   Q    So let's then turn to your ecological inference analysis

20   of racial polarization in the Ferguson-Florissant School Board

21   elections.  Now, you used EI to estimate the various levels of

22   support that candidates got from white voters and black

23   voters, respectively, in each election -- each contested

24   election going back to 2000.  Correct, Dr. Rodden?

25   A    Yes.

1  Q    Now, Dr. Engstrom did this too, but he did it slightly

2  differently than you did, Dr. Rodden; that he compared the

3  support that candidates got among black voters and

4  non-African-American voters.  Right, Dr. Rodden?

5  A    I believe so.  I don't recall how he handled that

6  distinction.

7  Q    You compared the support that candidates got from black

8  voters to white voters.  Right, Dr. Rodden?

9  A    I believe that's correct.

10 Q    So you excluded some voters from your analysis, those who

11 are neither black nor white.  Correct?

12 A    I believe that's the case.

13 Q    Now, from 2000 to 2015, there were 12 contested elections

14 that you analyzed.  Correct?

15 A    That sounds correct.

16 Q    And I believe you testified that, when you assessed your

17 results, you gave a lot of thought to how you would identify

18 the candidates of choice.  Right?

19 A    I did.

20 Q    And you proposed two methods for identifying candidates

21 of choice.  Correct, Dr. Rodden?

22 A    Yes.

23 Q    One is to take the single candidate with the highest

24 estimated level of support.  Right, Dr. Rodden?

25 A    Yes.

1   Q    Is it okay if we refer to that today as the top-ranked

2   candidate approach?

3   A    Yes.

4   Q    And the other method you propose is to take the two or

5   three candidates with the highest point estimates for

6   candidate support, depending on if there are two or three

7   seats available, and label all of those the preferred

8   candidates.  Correct?

9   A    Yes.

10  Q    Okay if we call that the point estimate approach?

11  A    Yes.

12  Q    Now, you have never published a peer-reviewed article on

13  racial polarization analysis employing either of these two

14  approaches for identifying candidates of choice.  Correct, Dr.

15  Rodden?

16  A    That's correct.

17  Q    And you testified earlier that you don't understand Dr.

18  Engstrom's method for identifying candidates of choice.  That

19  was your testimony, right?

20  A    There was no description in the text that would lead me

21  to an understanding of how he identified the top candidates --

22  and his minority-preferred candidates and how the next ranked

23  candidates were excluded.

24  Q    So I'd like to ask you a few questions about your

25  top-ranked candidate approach.  Now, under this approach, the

1    total level of support that a candidate receives is

2    irrelevant -- correct, Dr. Rodden? -- as long as that

3    candidate has the top level of support.  Right?

4    A    That's correct.

5    Q    So it doesn't matter if a candidate gets 10 percent of

6    black voters' votes or 70 percent of black voters' vote; if

7    that candidate is the top-ranked candidate, that candidate is

8    a black-preferred candidate.  Correct?

9    A    Yes.

10   Q    And relative levels of support don't matter either --

11   right, Dr. Rodden? -- when you compare the top-ranked

12   candidate to others under this decision rule.  Right?

13   A    That was the approach under that decision, yes.

14   Q    So if Candidate A beats Candidate B by 40 points or beats

15   Candidate B by .1 percentage point, Candidate A is the lone

16   black-preferred candidate.  Correct?

17   A    That's right.

18   Q    Can we bring up Plaintiffs' Exhibit 75.  Now, Dr. Rodden,

19   this is Plaintiffs' Exhibit 75.  It's been admitted into

20   evidence.  This is a document you were shown in your

21   deposition.  I believe we called it Rodden Exhibit 18 during

22   your deposition.

23          This chart lists the candidates of choice for white

24   voters and black voters, respectively, under your top-ranked

25   candidate approach for each contested election that you

1    examined.  Correct?

2    A    Yes.

3    Q    And it looks correct to you?  Looks accurate?

4    A    Yes.

5    Q    I want to ask you about the candidate preferences under

6    this approach.  In the 12 contested elections from 2000

7    through 2015, all of the top-ranked candidates amongst white

8    voters were white.  Correct?

9    A    That's correct.

10   Q    In 12 contested elections from 2000 through 2015, all but

11   one of the top-ranked candidates among black voters was black.

12   Correct?

13   A    Yes.

14   Q    The lone exception, the one time in which the top-ranked

15   candidate among black voters was white, was in 2009.  Correct?

16   A    Yes.

17   Q    And in that election there were no black candidates for

18   Ferguson-Florissant School Board.  Correct?

19   A    That's correct.

20   Q    When we look at your results as a whole in 12 contested

21   elections from 2000 through 2015, black and white voters have

22   never preferred the same candidate as their top choice in a

23   contested election.  Correct?

24   A    Yes.  And I might add that in my lifetime African

25   Americans have -- and whites -- have never had the

1    top-preferred candidate in presidential elections.  I don't

2    find this to be surprising.  This is a reflection of the fact

3    that there is a correlation between the vote share of African

4    American -- between the votes of African Americans and the

5    votes of African-American candidates and that it's not

6    surprising to see difference between those groups and the

7    candidates they prefer.

8           The question as asked in the Voting Rights Act is

9    whether it's possible for a coalition between African

10   Americans and whites to elect a candidate.  Can the

11   African-American candidate of choice be elected?  And we

12   have --

13   Q    Dr. Rodden, I don't think that was my question.

14          THE COURT:  Time out for everybody.  This is going to

15   go a lot better if you just answer the question he asks, and

16   then counsel for the school district will have follow-up

17   questions when he's done.

18          MR. HO:  I move to strike his responses --

19          THE COURT:  I'm not going to do anything.  I mean, he

20   said it.  I'm here.  I'm not going to erase my brain.  But if

21   you want to inquire that and cross-examine him on it, that's

22   fine.  And, obviously, it's better if you just restrict your

23   answers to his questions.

24   Q    (BY MR. HO) So I'm not asking you about presidential

25   elections or other jurisdictions.  I'm simply asking you here

1   in the Ferguson-Florissant School District in the 12 contested

2   elections from 2000 through 2015, black voters and white

3   voters have never preferred the same candidate as their top

4   choice in a contested election for school board.  Correct?

5   A    Yes.  When we restrict ourselves to the top choice, that

6   result emerges, yes, clearly.

7   Q    And restricting ourselves to the top choice is one of the

8   decision rules that you employ in your report for assessing

9   who the candidates of choice are for black and white voters.

10  Correct?

11  A    Yes.

12  Q    Okay.  You mentioned the success rates as being something

13  that is relevant under the Voting Rights Act.  Of the 12

14  candidates who were the top-ranked candidates among white

15  voters in contested elections, all 12 were elected.  Correct,

16  Dr. Rodden?

17  A    Yes.

18  Q    And of the 12 candidates who were the top-ranked

19  candidates among black voters in contested elections, six of

20  the 12, or 50 percent of them, were elected.  Correct?

21  A    That's correct.

22  Q    I'd like to bring up Defendant's Exhibit II on the

23  screen.  I want to show you one of the defendants' exhibits,

24  and in particular I want to focus on this table in the second

25  half of the page.  For the record, this table appears to

1  reprint information located in defendants' pretrial brief at

2  page 32.

3      This table apparently purports to identify the single

4  most preferred candidate among African-American voters in each

5  of the 12 contested elections since 2000.  Right, Dr. Rodden?

6  A    I did not prepare this table.  I'd like to take a moment

7  to look at it.

8  Q    Sure.  Time your time.

9  A    Okay.  Thank you.

10  Q    Now, according to this table, it looks like seven out of

11  12 candidates most preferred by African Americans were elected

12  if you just add up the yes's in the "elected" column.  Right,

13  Dr. Rodden?

14  A    I believe so, yes.

15  Q    But we established that's wrong.  Right, Dr. Rodden?

16  That six out of 12 top-ranked candidates among

17  African-American voters were elected, not seven out of 12.

18  Correct?

19  A    I'm not following where these different -- the data are

20  coming from.  If you can clarify what the previous exhibit

21  was.

22      MS. ORMSBY:  Your Honor, I'd like to object to the

23  offering of this exhibit.  It has not been admitted into

24  evidence.  It's a defendants' exhibit that was not used, and I

25  don't think it's appropriate for plaintiffs' attorney to use

1    it.

2           THE COURT:  Just tell me where we're going.

3           MR. HO:  Well, I haven't offered it into evidence,

4    Your Honor, but this is a table that --

5           THE COURT:  He wasn't asked about it on direct

6    either.  I understand to the extent there's a discrepancy and

7    preferred candidates and their success, let's get to it as

8    opposed to -- you know.  They didn't use it.  They haven't

9    offered it.

10           THE WITNESS:  May I add that I've never --

11           THE COURT:  Saying that it's --

12           MR. HO:  It's also in the pretrial brief, and it

13    creates a mistaken impression about the success rate for

14    African-American-preferred candidates.

15           THE WITNESS:  I've never seen the table before.  This

16    is the first time I've laid eyes on it.

17    Q    (BY MR. HO) I can move along.  Let's look back at

18    Plaintiffs' Exhibit 75.  Now, if we look at the last ten

19    years, from 2006 through the present, there were total of

20    seven contested elections.  Correct, Dr. Rodden?

21    A    Yes.

22    Q    And of the seven candidates who were the top-ranked

23    candidates among black voters in contested elections since

24    2006, three out of seven were elected.  Correct?

25    A    Yes.

1    Q    And that's a success rate of about 43 percent.  Right,

2    Dr. Rodden?

3    A    That's correct.

4    Q    And that's a lower success rate for black voters'

5    top-ranked candidates in contested elections during the past

6    ten years as compared to the full period since 2000.  Correct?

7    A    Yes.

8    Q    And if we limit ourselves to the last five years, 2011 to

9    the present, there were a total of five contested elections.

10   Right, Dr. Rodden?

11   A    Yes.

12   Q    And of the five candidates who were the top-ranked

13   candidates among black voters in contested elections since

14   2011, two out of five were elected.  Correct, Dr. Rodden?

15   A    Yes.  We can divide up the data in a variety of ways and

16   produce different fractions accordingly.

17   Q    That's a success rate of about 40 percent.  Correct, Dr.

18   Rodden?

19   A    Yes.

20   Q    And that's a lower success rate for black voters'

21   top-ranked candidates in contested elections during the last

22   five years than if we compare the same figure for the last ten

23   years.  Correct, Dr. Rodden?

24   A    Yes.  But I certainly testified to the effect that there

25   are some features of the 2014 election that are useful of --

1   worthy of consideration and that the lesson we learned from

2   this bean counting approach are limited when we examine the

3   elections relative to what we learn when we examine the

4   elections individually.

5           But if it's necessary to count up wins and losses and

6   turn them into fractions and make decisions accordingly, then

7   this is the way one would do it.

8   Q    So your answer to my question was "yes."  Correct?

9   Right, Dr. Rodden?

10  A    If I recall the question correctly, I believe it's "yes."

11  Q    I want to ask you a few questions about election results

12  under your point estimate approach, your other approach for

13  identifying candidates of choice.

14          Can we look at Plaintiffs' Exhibit 69.  It's a little

15  hard to read.  I have printed copies which may be easier for

16  the witness and the Court.  If I may approach, Your Honor.

17          THE COURT:  You may.

18  Q    Dr. Rodden, this is Plaintiffs' Exhibit 69, a document

19  that you filled out during your deposition.  We called it

20  "Rodden Exhibit 12" during your deposition.  This chart lists

21  the candidates of choice of white voters and black voters,

22  respectively, employing your point estimate approach for each

23  contested election that you examined.  Does that appear

24  correct to you?

25  A    Yes.

1 Q Now, we established earlier there were 12 contested

2 elections going back to 2000?

3 A Yes.

4 Q And if we look at those 12 contested elections under your

5 point estimate approach, there were 27 candidates of choice

6 for black voters and 27 candidates of choice for white voters.

7 Correct?

8 A Yes. That's the advantage of the approach.

9 Q And on this chart I believe you circled the name of every

10 candidate who is African American. Do you see that?

11 A I do.

12 Q Why don't we bring up a version of this chart that's

13 maybe a little bit easier to read and has some additional

14 information on it. Can we bring up Plaintiffs' Demonstrative

15 6. This is the same information, but you can confirm, if

16 you'd just compare it to the point estimate worksheet that I

17 showed you a moment ago, that this demonstrative identifies

18 the same candidates that you identify as candidates of choice

19 under the point estimate approach. Right, Dr. Rodden?

20 A I will accept that that's what you've done.

21 Q And I will okay -- now, this chart also explicitly

22 identifies the race of each candidate. Correct?

23 A It appears to, yes.

24 Q And it also provides some aggregate totals about the

25 races of the preferred candidates in the bottom row. Do you

1  see that?

2  A    Yes.

3  Q    And there's an additional column on the right that

4  identifies instances where, according to your point estimate

5  approach, black and white voters overlap in a candidate

6  preference.  Do you see that?

7  A    Yes.

8  Q    Okay.  Now, using your point estimate approach during the

9  12 contested elections since 2000, a total of only two out of

10  27 of white-preferred candidates were African American.

11  Correct?

12  A    Will you ask the question again?  I'm sorry.

13  Q    Using your point estimate approach of the 27

14  white-preferred candidates going back to 2000, only two were

15  African American.  Correct?

16  A    I suppose I -- it would take me some time to go through

17  the figure, but I will accept --

18  Q    You don't dispute that under your point estimate approach

19  two out of the 27 white-preferred candidates are African

20  American, do you?

21  A    I've never examined that before, but I will take your

22  word for it.

23  Q    You didn't think to examine the race of the

24  white-preferred candidates using your point estimate approach,

25  Dr. Rodden?

1   A     It was not in my report.

2   Q     Those two African Americans who were white-preferred

3   candidates under your point estimate approach were Gwen Thomas

4   in 2000 and not again until 15 years later, Dr. Graves in

5   2015.  Correct, Dr. Rodden?

6   A     Yeah, that's correct.  I have not done this analysis

7   because I analyzed candidates of choice from the perspective

8   of the -- of what I understood the court decisions to be that

9   it was not to be determined by race.  So that's not something

10  that I examined.

11  Q     Now, using your point estimate approach -- and we

12  looked -- if we look at black candidate -- black voters'

13  candidates of choice, of the 27 -- excuse me.  Of the 27

14  black-preferred candidates going back to 2000, 17 out of 27

15  are African American.  Correct?

16  A     It appears so.  Again, that doesn't seem like information

17  that's related to a Section 2 claim, but I will accept that.

18  Q     Now, using your point estimate approach during the 12

19  contested elections going back to 2000, black voters and

20  whites voters shared a preference for ten out of 27 possible

21  preferred candidates.  Correct, Dr. Rodden?

22  A     Okay.

23  Q     So it's fair to say that under your point estimate

24  approach black voters and white voters diverged in terms of

25  their candidate preferences two thirds of the time?

1  A    The question is whether if we examine the race of the

2  candidate?

3  Q    No, Dr. Rodden.  My question is if we just look at the 27

4  candidates that white voters preferred under your point

5  estimate approach and the 27 candidates that black voters

6  preferred under your point estimate approach, two thirds of

7  the time 17 out of 27 candidate preferences are different.

8  Correct, Dr. Rodden?

9        MS. ORMSBY:  Your Honor, I'm going to object.  This

10  goes beyond the scope of direct examination.

11        THE COURT:  I'll give him some latitude.

12        MR. HO:  He's proposed an --

13        THE COURT:  You just won.  You know, unless you want

14  to lose, I'd keep going.

15  Q    (BY MR. HO) Sorry.  Sorry, your Honor.

16  A    The question again?

17  Q    Sure.  Using your point estimate approach during the 12

18  contested elections since 2000, black voters and white voters

19  diverged on candidate preference with respect to about two

20  thirds of the candidates.  Correct, Dr. Rodden?

21  A    Okay.

22  Q    That's a yes?

23  A    I'm looking at this for the first time.  I would be -- I

24  would prefer to have time, more time, to look at it, but I

25  will accept that you've presented the data correctly.

1    Q    So in conducting your racial polarization analysis, you

2    didn't look to compare the list of candidates under your point

3    estimate approach for --

4            MS. ORMSBY:  Objection, Your Honor.  This has been

5    asked and answered.

6            MR. HO:  I can move on, Your Honor.

7            THE COURT:  Okay.  We're going to take our lunch

8    recess at this time.  We'll reconvene at 1:40.  We will start

9    the sentencing in five minutes.  All right.  Thank you.

10        **(COURT RECESSED FOR LUNCH FROM 12:30 PM UNTIL 1:55 PM.)**

11            THE COURT:  Yes?

12            MS. ORMSBY:  Your Honor, may Tony and I approach

13   briefly?

14            THE COURT:  Sure.  On or off the record?

15            MS. ORMSBY:  Off the record.

16            **(A BENCH CONFERENCE WAS HELD OFF THE RECORD.)**

17            THE COURT:  Are you ready?

18            MS. ORMSBY:  Yes.

19            THE COURT:  Remind you, sir, you're still under oath.

20            You may proceed.

21   Q    (BY MR. HO) Thank you, Your Honor.

22            Can we bring up Plaintiffs' Exhibit 69 back onto the

23   screen, please.

24            Dr. Rodden, before we talk about this, I just want to

25   ask you a question.  Did you discuss your testimony with your

1   counsel during the lunch break today?

2   A    Yes.

3   Q    Okay.  And did you discuss what answers you might give to

4   questions with your counsel during the lunch break today?

5   A    No.  We discussed my brief testimony.

6   Q    Now, we have Plaintiffs' Exhibit 69 here on the screen,

7   and I think we established before the lunch break that this

8   lists the candidates that you identify as black preferred and

9   white preferred using your point estimate approach.  Right,

10  Dr. Rodden?

11  A    Yes.

12  Q    And there are columns here which indicate the number of

13  successful candidates under that approach.  Right, Dr. Rodden?

14  A    Yes.

15  Q    And some sum totals at the bottom of this page.  Right,

16  Dr. Rodden?

17  A    Yes.

18  Q    Now, using your point estimate approach during the 12

19  contested elections since 2000, 24 out of 27 white-preferred

20  candidates were elected.  Correct?

21  A    Yes.

22  Q    And so that means that using your point estimate approach

23  white-preferred candidates have a success rate of about 89

24  percent since the year 2000.  Correct?

25  A    Yes.

Q    Now, let's look at black-preferred candidates.  Using

your point estimate approach during the 12 contested elections

since 2000, 13 out of 27 black-preferred candidates were

elected.  Correct?

A    Yes.

Q    And so that means that under your point estimate approach

fewer than half of black-preferred candidates were elected in

contested elections since 2000.  Correct?

A    Yes.

Q    And you noted on your direct testimony that this number

was the subject of a typo in your initial report.  Right, Dr.

Rodden?

A    Yes, that's correct.

Q    Your initial report said that 14, or a majority, of

black-preferred candidates under your point estimate approach

were successful.  Right?

A    That was a mistake.

Q    Right.  In fact, it's a minority of black-preferred

candidates who were successful under the point estimate

approach.  Right?

A    It's 48 percent, that's right.

Q    Now, I believe Ms. Ormsby asked if there were other

errors in this report that you'd like to bring to the Court's

attention.  Do you remember that?

A    I do.

1   Q    Now, you stated in your report that, if you include

2   uncontested elections, 20 black-preferred candidates out of 37

3   available seats were successful.  Right, Dr. Rodden?

4   A    Yes.

5   Q    Do you know if that "20" figure is accurate, or do you

6   need to subtract one in the same way that you need to subtract

7   one from the 14 figure that you quoted earlier?

8   A    Yes, it does.  It requires a little bit more discussion.

9   There was an approach taken in which I was trying to

10  understand the difficult problem of how to identify a

11  candidate of choice when no election is held.  And I adopted a

12  decision rule that if someone had been a minority-preferred

13  candidate when they were running in a contested election, I

14  would also classify them as a minority-preferred candidate in

15  an uncontested election.

16        And I believe the controversial case was with Ms.

17  Hogshead.  And we had a discussion during the deposition about

18  whether it was appropriate to consider someone a

19  minority-preferred candidate in an uncontested election that

20  was held prior to the contested election in which I made the

21  determination that the individual was a minority-preferred

22  candidate.

23        And what I -- I think we came to an agreement --

24  perhaps you'll have the same recollection -- that it was --

25  the better decision rule would be to start earlier in time and

1    classify someone as a minority-preferred candidate only later

2    in time, after they had been classified in a contested

3    election as a minority-preferred candidate.

4          I don't believe the initial approach was wrong or

5    misleading.  I believe I agreed that moving forward in time

6    was a better approach.  And I had not realized at the time

7    that, in fact, there were any differences between that

8    approach; and I had created a spreadsheet in which I marked

9    people as minority-preferred candidates, and I had not noticed

10   the subtlety that you raised.

11   Q    And I know you understand that we have different views

12   about uncontested elections, but if we include uncontested

13   elections, in your view how many successful minority-preferred

14   candidates were there out of 37 available seats, including

15   uncontested elections?

16   A    One fewer than the number I reported.

17   Q    So you would say 19 out of 37?

18   A    I believe that's correct.

19   Q    Now, if we look at just -- back to Plaintiffs' Exhibit

20   69.  If we look at just the last ten years, 2006 to the

21   present, I think we established earlier there were seven

22   contested elections.  Correct, Dr. Rodden?

23   A    I believe that's right.

24   Q    And there would be a total of 16 preferred candidates in

25   those seven elections.  Correct, Dr. Rodden?

1    A    That sounds right.

2    Q    And under your point estimate approach of the 16

3    white-preferred candidates during contested elections over the

4    last ten years, 15 were elected, correct?

5    A    That's correct.

6    Q    And that's a success rate of approximately 93 percent.

7    Correct?

8    A    That's correct.

9    Q    And under your point estimate approach of the 16

10   black-preferred candidates in contested elections during the

11   last ten years, six were elected.  Correct?

12   A    Yes.

13   Q    And that's a success rate of about 37.5 percent.

14   Correct?

15   A    Yes.

16   Q    And that's a lower success rate for black-preferred

17   candidates during the last ten years than if we look at the

18   16-year period as a whole.  Correct?

19   A    I'm sorry.  At what period as a whole?

20   Q    The 16-year period.

21   A    Oh, yes.  That's correct.

22   Q    And the success rate for black-preferred candidates

23   during the last ten years is lower than the success rate for

24   white-preferred candidates by over 50 percentage points.  Is

25   that correct?

1   A    Yes.

2   Q    Now, if we look at just the last five years, from 2011

3   through the present, there are a total of five contested

4   elections?

5   A    Yes.

6   Q    And during those five contested elections, there were a

7   total of 12 seats available.  Correct?

8   A    Yes.

9   Q    And under your point estimate approach of the 12

10   white-preferred candidates in contested elections during the

11   last five years, 11 were elected.  Correct?

12   A    Yes.

13   Q    And that's a success rate of about 91 percent.  Correct?

14   A    Yes.

15   Q    And under your point estimate approach of 12

16   black-preferred candidates over the last five years, only four

17   were elected.  Correct?

18   A    Yes.

19   Q    And that's a success rate of 33.3 percent.  Correct?

20   A    Yes.

21   Q    That's a lower success rate for black-preferred

22   candidates during the last five years than if we look at the

23   most recent ten-year period.  Correct?

24   A    Yes.  I believe I explained in my testimony some of the

25   subtleties of those numbers, but these are correct

1    tabulations.

2    Q    And a success rate for black-preferred candidates over

3    the last five years is lower than the success rate for

4    white-preferred candidates during the same time period by

5    almost 60 percentage points.  Correct?

6    A    Yes.

7    Q    Now, Dr. Rodden, given our discussion both before and

8    after lunch, you would agree that under either of the

9    approaches that you endorse for identifying candidates of

10   choice, white voters usually prefer white candidates for the

11   Ferguson-Florissant School Board.  Correct?

12   A    If we tabulate the numbers in these various ways that you

13   have chosen, we can come to the conclusion that -- I'm sorry.

14   Will you state the usual -- I want to listen to it again.

15   Q    Sure.  And I'm not talking about ways that I've chosen.

16   I'm talking about your methods that you endorse for

17   identifying candidates of choice.

18   A    Yes.  You have chosen various periods of years to

19   examine.

20   Q    I'm just talking about the entire time period, Dr.

21   Rodden.  The entire time period that you chose to examine in

22   your report employing either of the methods that you endorse

23   for identifying candidates of choice, you would agree that

24   white voters usually prefer white candidates for the

25   Ferguson-Florissant School Board.  Correct?

1    A    Yes.

2    Q    And, Dr. Rodden, using the entire time period that you

3    chose for your report under either of the methods that you

4    endorse for identifying candidates of choice, you would agree

5    that African-American voters usually prefer African-American

6    candidates for the Ferguson-Florissant School Board.  Correct?

7    A    Yes.

8    Q    And you would agree that under either of the approaches

9    that you endorse for identifying candidates of choice,

10   black-preferred candidates in the Ferguson-Florissant School

11   Board have a lower success rate in contested elections than

12   white-preferred candidates.  Correct?

13   A    That is correct.

14   Q    Okay.  Dr. Rodden, just shifting topics for a moment, you

15   would agree, as a general matter, that people who live in

16   poverty are less likely to become registered to vote.  Right,

17   Dr. Rodden?

18   A    Yes.

19   Q    And you would agree that, as a general matter, people

20   with lower educational levels tend to become less -- tend to

21   be less likely to become registered to vote?

22   A    Yes.

23   Q    And you would agree that, as a general matter, younger

24   people are less likely to register to vote than older people.

25   Right, Dr. Rodden?

1    A    That's correct.

2    Q    Now, Dr. Rodden, you grew up in Florissant.  Right?

3    A    Yes.

4    Q    And you described Florissant in your report, I believe,

5    as still white by a comfortable majority.  Right?

6    A    I'm not sure what the size of that majority is today,

7    because we were discussing earlier that the 2010 decennial

8    census is a snapshot that is quickly becoming stale.  So what

9    the numbers were in the 2000 census, if we just subdivide to

10   the municipality of Florissant, I'm not aware of those

11   numbers.  It was not relevant for this case.  The boundaries

12   of the city of Florissant do not overlap all that well with

13   the Ferguson-Florissant School District.

14   Q    When you grew up in Florissant, you would have described

15   it as majority white by a comfortable margin?

16   A    Yes.

17   Q    And you graduated from high school in the

18   Ferguson-Florissant School District.  Right, Dr. Rodden?

19   A    Yes.

20   Q    It's fair to say this case is important to you

21   personally?

22   A    Yes.

23   Q    Your rate in this case is $300 per hour worked.  Right,

24   Dr. Rodden?

25   A    That's correct.

1  Q    And you sat through every hour of testimony in the trial

2  so far.  Right, Dr. Rodden?

3  A    That's correct.

4  Q    And you are billing the district at that rate for every

5  hour that you've observed testimony, Dr. Rodden?

6  A    I will not do that, no.

7  Q    You're not billing the district for every hour that

8  you're working in this case?

9  A    No.  It would -- it's not something I would be

10 comfortable doing.  And if I might continue?

11 Q    Well, let me ask you --

12 A    May I finish?

13 Q    I just asked you if you were billing them for $300 an

14 hour for every hour that you were here.  I think that was my

15 question.  I can ask you another --

16       THE COURT:  Your attorney can ask some follow-up

17 questions on that topic.

18 Q    So if you were to calculate your hourly rate in this

19 case, Dr. Rodden, it would be well below $300.  Right?

20 A    Yes.

21 Q    Do you know how much below $300 an hour it would be?

22 A    No idea.

23 Q    How many hours are you not billing the district for work

24 in this case, Dr. Rodden?

25 A    Do you mean prior to my visit to St. Louis or earlier?

1    Q    Just total, all of the work that you've done related to

2    this case that you're just not going to bill the district for.

3    A    In my preparation for trial, re-examination of my

4    invoices was not one of the things that I did to prepare.  I'm

5    sorry.  I do not know.

6    Q    Would you say that you decided not to bill the district

7    for 20 hours of work?

8    A    I don't know.

9    Q    Well, you're not billing the district for any of the

10   hours that you spent observing testimony in court today?

11              MS. ORMSBY:  Objection.

12   A    I don't believe that was my response.

13              THE COURT:  You have to make up your mind.  You

14   didn't want him to explain what he wasn't billing, and now

15   you're going to cross-examine him on it.  So you're going to

16   have to pick where you're going with this.

17   Q    Okay.  Point well taken, Your Honor.

18              Now, Dr. Rodden, I will just change topics.  It's

19   fair to say that, in your opinion, in comparison to the St.

20   Louis metro area as a whole, the municipalities that

21   constitute the Ferguson-Florissant School District are not

22   particularly racially segregated.  Is that an accurate

23   summation of your opinion?

24   A    The municipalities?  I did not separately -- yes.  I

25   believe the analysis I did was at the level of municipalities,

1    that's correct.  And as I did mention, the overlap between

2    municipality boundaries and school district boundaries is not

3    perfect.

4    Q    But your opinion in this case is that the

5    Ferguson-Florissant School District and the area that it

6    encompasses is not particularly racially segregated when you

7    compare it to the St. Louis metro area as a whole?

8    A    That's correct.

9    Q    Is that correct?  Now, to be clear, Dr. Rodden, you have

10   not authored any peer-reviewed political science publications

11   on racial segregation in urban areas.  Correct?

12   A    That's correct.

13   Q    Now, Dr. Rodden, you agree that there's an extensive

14   history of housing discrimination that continues to play a

15   role in structuring opportunities for citizens living in the

16   St. Louis metro area.  Correct?

17   A    Absolutely.

18   Q    And you would agree -- sorry.  And in the opinion that

19   you have about segregation levels within the

20   Ferguson-Florissant School District, you didn't compare the

21   degree of segregation in the Ferguson-Florissant School

22   District to areas outside of the St. Louis metro area.

23   Correct?

24   A    In the -- I believe you are referring to a specific

25   publication which was an article in the *Washington Post*.

1    Q    Oh, no.  I'm referring to --

2    A    You're asking whether I have done that?  Well, I was

3    going to continue.  Yes, I have calculated the index of

4    segregation for a variety of other places.  This is not hard

5    to do.  I've compared the area of North County that we're

6    discussing to other places in the United States, and, yes, it

7    is a relatively high degree of racial integration.

8    Q    That wasn't my question, Dr. Rodden.  My question was

9    about your report.  Your report in this case did not compare

10   levels of segregation in the Ferguson-Florissant School

11   District to areas outside of the St. Louis metro area.

12   Correct?

13   A    That's correct.

14   Q    And you agree that the St. Louis metro area -- of which

15   the Ferguson-Florissant School District is a part -- is among

16   the most segregated regions -- metropolitan areas in the

17   United States.  Correct?

18   A    That's correct.

19   Q    You mentioned that the Ferguson-Florissant School

20   District was desegregated by court order in the 1970s.

21   Correct?

22   A    Yes, that's correct.

23   Q    And that litigation was about districts other than just

24   the ones that became part of the Ferguson-Florissant School

25   District.  Correct?

1   A    I don't know the history of the litigation beyond the

2   Ferguson-Florissant district.

3   Q    So you're not aware of the fact that it was a case

4   brought by the United States Department of Justice against the

5   State of Missouri to seek to integrate various school

6   districts in the state, not just the ones that comprise the

7   Ferguson-Florissant School District?

8   A    I'm not aware of the complete list of what those other

9   districts were and how they were constructed.

10  Q    Now, the integration of the Ferguson-Florissant School

11  District in the 1970s -- that was not voluntary, right?  That

12  was imposed by federal decree?

13  A    That is correct.

14  Q    And that was twenty years after *Brown v. Board of*

15  *Education*?

16  A    Yes.

17  Q    Now, you agree, don't you, Dr. Rodden, that the poverty

18  rate among African Americans is higher than among whites

19  within the Ferguson-Florissant School District?

20  A    Unfortunately, yes.

21  Q    And you agree that the unemployment rate amongst African

22  Americans is higher than it is amongst whites in the

23  Ferguson-Florissant School District.  Correct?

24  A    Yes.  My -- the figure we just discussed demonstrates

25  that.

1  Q    And you agree that the rate of being a recipient of SNAP

2  benefits, sometimes referred to as food stamps, among African

3  Americans is higher than amongst whites in the

4  Ferguson-Florissant School District.  Correct?

5  A    Yes.

6  Q    And do you agree that in the Ferguson-Florissant School

7  District African Americans have a lower rate than whites in

8  terms of attaining a bachelor's degree?  Correct?

9  A    Yes.

10  Q    And I believe your direct testimony -- or would it be

11  accurate to characterize your direct testimony as saying that

12  the African-American population in the Ferguson-Florissant

13  School District skews a bit younger than the white population

14  within the Ferguson-Florissant School District.  Correct?

15  A    That is correct.

16  Q    Now, you opined that some of these socioeconomic

17  indicators that we just discussed -- that the gaps with

18  respect to those indicators are smaller within the

19  Ferguson-Florissant School District than within the St. Louis

20  metro area as a whole.  That's your opinion.  Right, Dr.

21  Rodden?

22  A    Yes.  And there was also analysis with respect to

23  Missouri as a whole.

24  Q    And, again, you agree that the St. Louis metro area is

25  one of the ten most segregated metro areas in the United

1  States.  Correct?

2  A    Yes.

3  Q    And there's no information in your report directly

4  comparing the gaps in those socioeconomic indicators in the

5  Ferguson-Florissant School District to areas outside of the

6  St. Louis metro area.  Correct?

7  A    No.  I chose -- but Missouri was one of the comparisons.

8  There was no broader, I thought, that was sufficient.

9  Q    Now, Dr. Rodden, is it fair to say that in your opinion

10  African Americans today already possess an equal opportunity

11  to elect their preferred candidates in the Ferguson-Florissant

12  School District?

13  A    Yes.

14  Q    And to be clear, in your CV there is not a single

15  peer-reviewed paper that you've published concerning whether a

16  particular electoral arrangement or redistricting plan offers

17  minority voters an opportunity to elect their preferred

18  candidates.  Correct?

19  A    That's correct.

20  Q    Now, I believe you mentioned this a moment ago that you

21  wrote an article about representation in the Ferguson area?

22  A    Yes.

23  Q    And that's the article that was in the Monkey Cage blog

24  for the *Washington Post*, right?

25  A    Yes.

1  Q    And that's not a peer-reviewed article, right?

2  A    I would think not.

3  Q    Now, you testified that one of the reasons why you wanted

4  to write this piece on direct, I believe, is you wanted people

5  to know that the Ferguson area is not an impoverished ghetto?

6  A    I wanted to communicate something about the district but

7  also something broader that's related to an interest of mine,

8  which is the transformation of the inner- and middle-ring

9  America suburbs.  I find that the Ferguson-Florissant district

10  is only an example of the transformation of several of the

11  middle- and inner-ring suburbs in other cities, and it's a

12  broader interest of mine in the development of the

13  African-American middle class.  There is a pronounced process

14  of suburbanization that's taking place among African

15  Americans.  And it's a research interest of mine, and it's

16  related to the questions about the district.

17  Q    And I believe you testified that you believed that the

18  views that you expressed in that article about the level of

19  integration in the Ferguson area was confirmed by the

20  testimony of a lot of witnesses that you heard in court today.

21  A    Not --

22  Q    This week.

23  A    Earlier this week, yes.

24  Q    And just so we're clear, which witnesses do you believe

25  testified that there was a high level of integration in the

1    Ferguson area this week, Dr. Rodden?

2    A    I recall Dr. F. Willis Johnson describing his

3    neighborhood as vibrant and racially integrated.  I believe a

4    couple of other witnesses -- I'm going to forget which ones

5    they were -- when they were describing their neighborhoods, I

6    believe also Dr. Thurman described her neighborhood in this

7    way.  So that's two.  And I believe there was one other.

8    Q    Dr. Thurman lives in Florissant, correct?

9    A    That's correct.  Florissant is one of the most racially

10   integrated places you might choose to visit in the United

11   States.

12   Q    That's the area you described as still white by a

13   comfortable majority, Dr. Rodden?

14   A    It's possible to have a white majority and have local

15   level racial integration at the level of blocks and block

16   groups.  It's possible to have a 55 or 60 percent white

17   population and have African Americans and whites living side

18   by side in the same streets.  That is the situation in

19   Florissant.

20   Q    Your assessment of the Ferguson-Florissant School

21   District as relatively integrated, does that include areas

22   like the Park Ridge Apartments or the Courtyard Green

23   Apartments?

24   A    I don't know those particular apartment complexes.

25   Q    Now, back to the piece that you wrote for the *Washington*

1  *Post*, you opined there that white homeowners and municipal

2  employees have been able to dominate local elections in North

3  County.  Correct?

4  A    If I recall correctly what I wrote, I was discussing a

5  dissertation written by a student of mine who established a

6  finding that off-cycle elections allowed municipal

7  employees -- that they were good for labor unions, they were

8  good for municipal employees.  And I was characterizing

9  non-November elections as something that was -- that that was

10  something that was of interest and of value to municipal

11  employees, yes.

12  Q    Could we bring up Plaintiffs' Exhibit 62-A.

13        This is the *Washington Post* article that you referred

14  to on direct and we talked about for a bit.  Right, Dr.

15  Rodden?

16  A    Yes.

17  Q    And could you turn to the sixth page of this?  And this

18  is the last paragraph.  Can you read the last census on this

19  page, please, Dr. Rodden?

20  A    "In north St. Louis County, the most organized groups are

21  white homeowners who have been in the same neighborhood since

22  the 1970s, along with police officers and municipal employees

23  who benefit from the status quo, and they have been able to

24  dominate local elections."

25  Q    The Ferguson-Florissant School District is within the

1    area you describe as North County, correct?

2    A    Yes.

3    Q    And, now, in your report in this case, you didn't mention

4    that you had previously opined in writing that white

5    homeowners and municipal employees have been able to dominate

6    local elections in North County.  Right?

7    A    I believe I opined to that effect earlier today; that in

8    single-member district systems white incumbents have very high

9    success rates, and there's actually something powerful about

10   single-member districts that is beneficial to these

11   individuals that I discuss in this article.  I view at-large

12   districts as an important way for other groups to get a seat

13   at the table.

14   Q    Dr. Rodden, I didn't ask you about what you said at some

15   other time.  I just asked you a simple question.

16   A    You asked about my testimony, I believe.

17   Q    I believe I asked you about your report in this case.

18   Your report in this case did not mention that you had

19   previously opined that white homeowners and municipal

20   employees have been able to dominate local elections in North

21   County.  Correct?

22   A    No.

23   Q    "No" as in no, you didn't mention it in your report, or,

24   "no," as in I'm correct?

25   A    There was no mention of municipal employees or police

1  officers in my report.  I didn't find that to be relevant.

2  Q    And this passage does not mention at-large versus

3  single-member districts in your article in the *Washington*

4  *Post*, does it?

5  A    No.  That wasn't the subject matter of the article.  It

6  was not about electoral institutions.

7  Q    It does, however, mention off-cycle elections as a

8  favored strategy of established ethnic groups in American

9  cities who wish to keep immigrants and minorities out of

10  power.  Those are your words.  Right, Dr. Rodden?

11  A    Those are words that were borrowed from a -- not words

12  that were borrowed but a concept that was borrowed from a

13  student of mine whose book, I believe, was linked in blue

14  where it states "off-cycle elections."  And that was the

15  finding in one of her more interesting chapters about the

16  history of American cities.

17  Q    And you're adopting that finding in your article here in

18  the *Washington Post*.  Right, Dr. Rodden?

19  A    I am describing the finding, yes.

20  Q    You're not disputing it in your article in the *Washington*

21  *Post*.  Right, Dr. Rodden?

22  A    I'm not disputing the history of established ethnic

23  groups in American cities who wish to keep immigrants and

24  minorities out of power, no.  Certainly I'm not disputing

25  that.  That's part of American history.

1  Q    You're not disputing your student's conclusion that

2  off-cycle elections have been a favored strategy to keep

3  immigrants and minorities out of power.  Correct, Dr. Rodden?

4  A    I believe I just answered the question.

5  Q    Now, in this piece in the *Washington Post*, you observed

6  that the population of the Ferguson area has become more

7  African American since the 1980s.  Correct?

8  A    Yes.

9  Q    And you would now describe the student body of the

10  Ferguson-Florissant School District as overwhelmingly black.

11  Correct?

12  A    That's correct.

13  Q    Now, in your opinion as a political scientist, the change

14  in the composition of the population of the Ferguson area in

15  terms of becoming more African American has not been reflected

16  in the diversity of the municipal government in the Ferguson

17  area.  Correct?

18  A    That's correct.

19  Q    And in your article you describe this as a problem.

20  Right, Dr. Rodden?

21  A    Yes.  Absolutely.

22  Q    And in your *Washington Post* piece, you indicate that one

23  example of this problem that local government in the Ferguson

24  area does not reflect the diversity of the local community was

25  that as of August 2014 there was only one African American on

1    the seven-member Ferguson-Florissant School Board.   Correct?

2    A    That's right.

3    Q    And when you offered your report in this case, you didn't

4    mention the fact that you had previously written that the

5    Ferguson-Florissant School District Board is one example in

6    which local government, in your words, "does not reflect the

7    diversity of the community."   You didn't mention that in your

8    report.   Right?

9    A    No.

10   Q    Now, today there are two African Americans on the

11   seven-member school board in Ferguson-Florissant.   Right?

12   A    Yes.

13   Q    And you're aware that as recently as the 2013-2014 school

14   year, there were zero African Americans on the

15   Ferguson-Florissant School Board.   Right?

16   A    That is correct.   As we discussed, Charles Henson lost by

17   a slim margin in 2013.

18   Q    Now, is it your opinion, as a political scientist, that

19   the weight of academic research suggests that off-cycle

20   elections tend to benefit unionized teachers because they tend

21   to be lower turnout affairs?

22   A    Lower turnout relative to November elections, yes.   That

23   was, again, a finding from some well-designed studies that

24   were looking at things like pay for municipal employees and

25   finding that municipal employees were able to do a better job

1    bargaining for higher pay in places that had off-cycle

2    elections.

3    Q    So you don't disagree with that finding that municipal

4    employee unions tend to benefit from off-cycle elections.

5    Correct?

6    A    There are some empirical studies suggesting that's true.

7    They come from a couple of cities.  As I described, they are

8    very well-designed micro-empirical studies.  Whether they are

9    externally valid and true, more broadly, is probably still a

10   matter for some dispute, but I find that research compelling.

11   Q    Dr. Rodden, you would describe the Senate factors as

12   generally being associated with the local political context

13   where a case is being brought.  Is that right?

14   A    Yes.

15   Q    And you have your *Washington Post* piece about the local

16   political context in North County.  Right?

17   A    Uh-huh.

18   Q    And in your extensive publishing history, you do not have

19   any peer-reviewed political science publications on local

20   politics in the St. Louis metro area.  Correct?

21   A    That's not the type of research I do.

22   Q    I want to ask you a few questions about DXD, your

23   rebuttal report concerning Senate factors.  Can we turn to

24   page 4.  Now, starting here on page 4, paragraph 9, you

25   address Senate Factor 3, which is the use of voting practices

1   or procedures that tend to enhance the opportunity for

2   discrimination against minorities.  Right, Dr. Rodden?

3   A   Yes.

4   Q   And this section addressing Senate Factor 3 is a total of

5   three paragraphs running through paragraph 11 on the following

6   page.  Correct?

7   A   Yes.

8   Q   Now, in this section you do not address the fact that

9   Ferguson-Florissant School District holds elections off

10   cycle -- meaning not in November -- for the board.  Right?

11   A   I might need a moment to read my work.

12   Q   Take your time.

13   A   Thank you.  Just to be clear, this is a rebuttal report

14   in which I was discussing Professor Kimball's analysis and

15   responding to it; so I didn't see the need to add my own

16   additional insights.

17   Q   Well, you recall that Dr. Kimball testified under Senate

18   Factor 3 one of the factors that he thought was relevant was

19   the fact that school board elections are off cycle.  Right,

20   Dr. Rodden?

21   A   Yes.

22   Q   And you don't address the fact that school board

23   elections are off cycle in your report.  Correct, Dr. Rodden?

24   A   No.  But I have no empirical reason to believe that -- I

25   mean, I did analysis of turnout in the off-cycle elections,

1   and I did not find strong evidence of difference in turnout

2   between African Americans and whites in recent elections.

3   That is an off-cycle election, and I did not go the extra mile

4   to look at what those differences might be in November

5   elections so as to make a comparison between April and

6   November elections.  So that is empirical analysis that I did

7   not conduct, you are correct.

8   Q    Now, starting on page 6, paragraph 12, you discuss the

9   fourth Senate factor, which concerns whether or not members of

10  a minority group have been excluded from the slating process.

11  Correct?

12  A    Yes.

13  Q    And you do not dispute that the FFNEA provides a variety

14  of services to endorsed candidates such as mailing and

15  distributing fliers.  Correct?

16  A    It is correct that they provide those services, yes.

17  Q    And you do not dispute that the FFNEA pays for signs for

18  endorsed candidates.  Correct?

19  A    Do not dispute that.

20  Q    And you do not dispute that the FFNEA initiates robocalls

21  and phone banking for endorsed candidates.  Correct?

22  A    They do those things, yes.

23  Q    And you do not dispute that the FFNEA gives direct

24  monetary campaign contributions to endorsed candidates.

25  Correct?

1    A    I heard testimony to that effect in this case, yes.

2    Q    You don't dispute that testimony.  Right, Doctor?

3    A    I do not have reason to dispute it, no.

4    Q    And you do not dispute that the FFNEA provides endorsed

5    candidates with access to volunteers for canvassing and

6    passing out campaign information to voters.  Correct?

7    A    That's correct.

8    Q    And in your report, you do not -- I'm sorry.  Strike

9    that.

10            In your report, you do not dispute Dr. Kimball's

11   finding that, for elections in which FFNEA endorsement

12   information is available, 11 out of 19 white candidates, or 58

13   percent, for the school board were endorsed by the FFNEA.

14   Correct?

15   A    I did not go back and collect the data from the school

16   board.  I know they're from the FFNEA.  I have then, as a

17   result, no direct reason to refute those numbers.

18   Q    And in your report you do not dispute Dr. Kimball's

19   finding that, for the elections in which FFNEA endorsement

20   information is available, only three out of 15

21   African-American candidates for the school board, or 20

22   percent, were endorsed by the FFNEA.  Correct?

23   A    Yes.  I believe that issue was addressed by testimony

24   that was much more relevant than my own.

25   Q    Now, in your report you opine that union endorsements

1    don't matter much for incumbents.  Right, Dr. Rodden?

2    A    I don't recall saying that.

3    Q    You testified on direct that incumbents tend to win when

4    they run in an contested election.  You would agree with that.

5    Right, Dr. Rodden?

6    A    That is the history, yes.

7    Q    Something like 95 percent of congressional candidates,

8    when they run for reelection, win.  Right?

9    A    That sounds about right, yes.

10   Q    Something like 90 percent of senators, when they run for

11   reelection, they win.  Right?

12   A    Sounds about right.

13   Q    Now, your report on the Senate factors did not contain a

14   section addressing Senate Factor 6?

15        THE COURT:  Which, by the way, was the opposite of

16   what our Founding Fathers thought would happen.  They thought

17   the Senate would be more stable than the House rather than

18   have a higher turnover rate.  Go figure.

19        MR. HO:  Move to qualify you as an expert on this.

20        THE COURT:  Just saying.

21   Q    (BY MR. HO) Dr. Rodden, your rebuttal report on the Senate

22   factors does not contain a section addressing Senate Factor 6,

23   whether or not there have been racial appeals in campaigns in

24   the jurisdiction.  Correct?

25   A    That's right.  I described what I was --

1      MS. ORMSBY:  Object, Your Honor.  This is not part of

2  the scope of my direct of inquiry, and it's not part of the --

3      MR. HO:  That's precisely what I'm trying to

4  establish here.

5      THE COURT:  It's not part of direct.

6      MR. HO:  Well, Your Honor, in the direct they moved

7  these expert reports into evidence.  I think I'm entitled to

8  ask questions about the expert report.

9      THE COURT:  I will give you some latitude on the

10  expert reports, but they didn't talk about any of this --

11      MR. HO:  I'm not going to go far with it.

12      THE COURT:  Okay.  That's fine.

13      MR. HO:  I'm just establishing he's not opining about

14  this.

15      THE COURT:  Go ahead.

16  Q   (BY MR. HO) Your report does not offer any opinion about

17  whether or not there have been racial appeals in campaigns in

18  the Ferguson-Florissant School District.  Correct?

19  A   I was asked to do quantitive analysis.  I was not asked

20  to do investigative journalism.

21  Q   Your rebuttal report does not contain any opinions

22  addressing whether or not the Ferguson-Florissant School Board

23  has been responsive to the particularized needs of the

24  African-American community in the Ferguson-Florissant School

25  District.  Correct?

1   A    Again, I did not conduct any investigative journalism.

2   Q    I'd like to ask you some questions about your estimates

3 of turnout in Ferguson-Florissant School Board elections, Dr.

4 Rodden.

5   A    Yes.

6   Q    Would it be fair to characterize your opinion as being

7 that there has been rough parity between black and white

8 turnout in the Ferguson-Florissant School Board in recent

9 years with the exception of election years where there was a

10 Florissant mayoral election, Dr. Rodden?

11   A    If we start with 2011, that characterizes my opinion

12 fairly well.

13   Q    And Florissant mayoral elections -- do they happen every

14 three years or every four years?

15   A    I don't recall what the formal schedule is. I know there

16 was one in 2011. There was one in 2015. So I suppose every

17 four years.

18   Q    Every four years or so?

19   A    Yes.

20   Q    So that means that your opinion that there's been rough

21 parity in turnout between whites and blacks in

22 Ferguson-Florissant School Board elections in recent years --

23 that's if we ignore elections that happened every four years

24 because there's a Florissant mayoral election in those years.

25 Right, Dr. Rodden?

1  A    I would view it this way.  When we look at the elections

2  when there's no mayoral election held, we get a clean,

3  unencumbered measure of school board elections.  I think it's

4  as we discussed with on-cycle November elections:  We know

5  it's the case and that when there are other things on the

6  ballot, it kind of contaminates our effort to measure turnout

7  for a particular office.  So in those years when there aren't

8  other things on the ballot contaminating the result, I feel we

9  have a more pure kind of analysis of school board elections,

10  but --

11  Q    Let me stop you right there and ask you about what you

12  just --

13  A    I don't think I was quite finished.  So in 2011 there

14  were mayoral elections -- the point is not that there are

15  mayoral elections.  The point is that they are mayoral

16  elections that are only held in one part of the district; so

17  that some voters are receiving a ballot that has more items on

18  it than other voters.  Those additional items on the ballot

19  attract people's attention.

20        And so in 2011 there was a competitive mayoral

21  election in Florissant that clearly had an impact.  It brought

22  people to the polls.  And as I described, Florissant has a

23  higher white population than the other parts of the district,

24  and so it stands to reason that the gap between white and

25  African-American turnout would be larger in a mayoral year.

1  Q    That's very interesting, Dr. Rodden.  It wasn't really

2  responsive to my question.  My question was --

3  A    I do apologize.

4  Q    -- in three out of four years, you would say that black

5  turnout and white turnout has relative parity, but every

6  fourth year we have an election result that is, as you put it,

7  contaminated when we try to assess comparative rates of

8  turnout because of a Florissant mayoral --

9  A    For purposes of that assessment, yes.

10 Q    Those years when the result is contaminated, those votes

11 count.  Right?

12 A    Of course.

13 Q    It's not like if more white people turn out in years when

14 Florissant mayoral elections happen they don't count their

15 votes for school board?

16 A    That is correct.  In 2011 we can look at the data and

17 assume that there were some additional white voters in that

18 election.

19 Q    Now, when you try to measure turnout in your report, you

20 use two methods similar to what you do when you try to measure

21 voting patterns by race.  You have a bivariate correlation

22 analysis, and you have an ecological inference analysis.

23 Correct?

24 A    That's right.

25 Q    And let me ask you about your bivariate correlation

1    analysis.  Can we bring up Exhibit A, page 13, please.  Figure

2    5.

3         You spoke about this at some length during your

4    direct.  This is your bivariate correlation analysis for

5    turnout.  Right, Dr. Rodden?

6    A    That's right.

7    Q    You take the black voting-age population of the

8    precincts, and you map it against the turnout levels at each

9    precinct.  Right?

10   A    Yes.

11   Q    And you did this for four elections, from 2012 to 2015.

12   Correct?

13   A    That's correct.

14   Q    And you didn't do any bivariate correlation analysis for

15   the 2011 election or any prior years.  Correct?

16   A    I don't recall doing that, no.

17   Q    And when you performed this analysis, you used, in your

18   opinion, the best available data.  Correct?

19   A    I believe so, yes.

20   Q    Now, in this analysis you needed to know the voting-age

21   population and the black voting-age population of every

22   precinct within the Ferguson-Florissant School District.

23   Correct?

24   A    This was data that came from the precinct-level

25   tabulations of the St. Louis County Election Commissioners.

1   Your question is whether I needed to know which variables?

2   Q    Well, one of the variables that you plot on these graphs

3   is the African-American share of the voting-age population.

4   Do you see that, Dr. Rodden?

5   A    Yes.  That comes from the census.

6   Q    Right.  So in order to know that, the African-American

7   share of the voting-age population at each precinct, you need

8   two numbers:  You need the total voting-age population and the

9   black voting-age population at each precinct.  Correct, Dr.

10  Rodden?

11  A    Yes.

12  Q    And for those numbers, the voting-age population and the

13  total black voting-age population at each precinct within the

14  Ferguson-Florissant School District, you relied on the Census

15  Bureau's decennial census data.  Correct?

16  A    Correct.

17  Q    And, now, I believe you testified on direct that you had

18  some concerns about some inaccuracies in the decennial census

19  data.  Right, Dr. Rodden?

20  A    Yes.

21  Q    And now to be clear, though, you did not mention any of

22  those inaccuracies in the decennial census in any of the four

23  expert reports that you presented in this case to the Court.

24  Correct, Dr. Rodden?

25  A    They certainly did not seem relevant in the production of

1  this graph or in the other precinct-level analysis, and I

2  don't -- didn't have any reason to discuss that.

3  Q    And notwithstanding any misgivings you have about

4  potential inaccuracies in the decennial census count, you used

5  the decennial census data and did not attempt to adjust it or

6  correct it in any way when you calculated turnout by precinct

7  with your bivariate correlation analysis.  Correct?

8  A    The decennial census data were the best data at hand for

9  this purpose.  As I believe I've described before, it's

10 necessary to have block-level data in order to aggregate up to

11 the precincts.  The only census product that produces data at

12 the level of blocks is the decennial census.

13 Q    But you didn't say, for example, think to yourself, well,

14 the census undercounts people; so I'm going to add some people

15 to what the census decennial count is for each of these

16 precincts.  Right, Dr. Rodden?  You didn't do something like

17 that, right?

18 A    No.  That didn't seem necessary.

19 Q    Right.  You took the decennial census -- you took the

20 decennial census data on its face and used it as the best data

21 that you could use to assess the total population of each

22 precinct within the Ferguson-Florissant School District.

23 Correct?

24 A    For the reasons I just described, yes.

25 Q    Now, like your bivariate correlation analysis of voting

1  patterns by race, your bivariate correlation analysis here of

2  turnout does not attempt to adjust for the size of the

3  precincts.  Right, Dr. Rodden?

4  A     That's correct.

5  Q     So each dot here represents a precinct, and it doesn't

6  matter if the precinct has two voters or 300 voters; you treat

7  those precincts as equal in your bivariate correlation

8  analysis.  Correct?

9  A     I believe that's what I have done in this graph, yes.

10  Q     Now, when you calculate turnout for each racial group in

11  this graph, you measured turnout as a percentage of registered

12  voters of each racial group who cast a ballot in a

13  Ferguson-Florissant School Board election.  Correct?

14  A     There is no breakdown by racial group in this analysis.

15  I think there may be some misunderstanding.  The vertical axis

16  in this graph is simply overall turnout.  It is not an attempt

17  to divide by racial group.

18  Q     I'm sorry.  I was thinking of your ecological inference

19  analysis.

20         Here on this page when you're calculating the

21  African-American turnout, you are calculating turnout as the

22  percentage of registered African Americans who turn out to

23  vote.  Correct, Dr. Rodden?

24  A     No.

25  Q     Okay.  Do you remember your deposition in this case, Dr.

1   Rodden?

2   A    Yes.

3   Q    Can we turn to page 53 of your deposition, starting with

4   line 8.  "All right.  I think if I remember correctly -- let's

5   see."  On page 12, paragraph 21, the second census.  "I

6   believe you say that turnout is defined by the number of

7   ballots cast in the April election divided by the number of

8   registered voters.  Is that right?"

9         "ANSWER:  That's correct.  It would be the election

10   commissioner's report, a column for each precinct that lets us

11   know the total number of ballots cast, and I -- and we also

12   have the number of registered voters; so those are the data I

13   used.

14         "QUESTION.  Registered voters is the denominator?

15         "ANSWER:  Yes."

16         Was that my question?  Were those my questions, and

17   were those your answers?

18   A    Yes.

19   Q    So when you calculated turnout in this report, you

20   calculated it as the percentage of registered voters who cast

21   a ballot.  Correct, Dr. Rodden?

22   A    Yes.

23   Q    Now, there's no information in any of your reports

24   concerning the registration rates in the Ferguson-Florissant

25   School District.  Correct?

1    A    No.

2    Q    And there's no information in your report that compares

3    the number of registered African Americans to the number of

4    registered white voters in the Ferguson-Florissant School

5    District.  Correct, Dr. Rodden?

6    A    No, there was not.

7    Q    Now, I know you have some testimony about whether or not

8    we can take statewide registration rates and apply them to the

9    Ferguson-Florissant School District.  So let's forget about

10   the Ferguson-Florissant School District for a moment and just

11   talk about the state of Missouri.

12          Now, you agree, do you not, Dr. Rodden, that white

13   voters -- I'm sorry -- that whites in the state of Missouri

14   have a voter registration rate that exceeds the black voter

15   registration rate by about 5 percentage points?

16   A    I do believe that, yes.

17   Q    Now, you also agree, Dr. Rodden, that given this

18   difference in registration rates if we measure turnout as a

19   percentage of registered voters who cast ballots, if someone

20   says that blacks and whites turn out at the same rate in the

21   state of Missouri, you could then infer, could you not, that

22   there are more white voters on election day than black voters

23   on election day because the white registration rate is higher.

24   Right, Dr. Rodden?

25   A    You were inferring this because the Ferguson-Florissant

1   School District is located in the state of Missouri?

2   Q    I didn't ask you any questions about the

3   Ferguson-Florissant School District.  I didn't ask -- my

4   question had nothing to do with the Ferguson-Florissant School

5   District, Dr. Rodden.

6           I'm talking about the state of Missouri.  We

7   established that you agree that the white registration rate is

8   higher than the black registration rate in the state of

9   Missouri by about 5 points.  Right, Dr. Rodden?

10  A    This is something that you have entered.  I don't know

11  the data, but that sounds correct.

12  Q    You don't have any reason to dispute --

13  A    I do not.

14  Q    Now, given the difference in registration rates between

15  whites and blacks in the state of Missouri, if someone

16  calculated turnout the way that you do in this report, by the

17  percentage of registered voters who cast ballots, if that

18  person told you that the black and white turnout rates were

19  equal, you could then infer that there were more white voters

20  on election day than black voters on election day because the

21  difference in registration rates.  Correct, Dr. Rodden?

22  A    Yes, that's correct.

23  Q    Now, there was nothing in your report that directly

24  compares voter registration votes in the Ferguson-Florissant

25  School District to voter registration rates in the state of

1  Missouri.  Correct?

2  A    No.  It seems to be that would have been the job of the

3  plaintiffs in this case, not me.

4  Q    Now, there is no race information in the Missouri voter

5  registration file, correct?  You can't get direct statistics

6  on voter registration from the rates by race about the state

7  of Missouri.  Correct, Dr. Rodden?

8  A    Not from the state of Missouri.  But it is possible to do

9  analysis such as the analysis I've done in the Virginia case

10  where we -- one can geo-code the addresses of every individual

11  in the state, locate them in census blocks, and use the census

12  name registry and get very accurate estimates of each

13  individual's race and conduct analysis of registration by

14  race.  And that would have been a useful analysis to have

15  conducted in this case for the plaintiffs.

16  Q    And it could have been useful analysis in this case to

17  have been conducted by the defendants, but you didn't do that.

18  Right, Dr. Rodden?

19  A    Certainly didn't see that as the defense burden, no.

20  Q    Now, you offered some testimony about Dr. Kimball's

21  turnout estimates in his report.  Right, Dr. Rodden?

22  A    Yes.

23  Q    And you recall, don't you, that Dr. Kimball calculated

24  turnout as a percentage of the voting-age population, not as a

25  percentage of registered voters.  Right, Dr. Rodden?

1    A    I don't recall.  That's possible.

2    Q    I want to ask you about your ecological inference

3    analysis of turnout.  Can we turn to page 15 in DXA, Dr.

4    Rodden's initial report in the case.  Figure 6.

5         Now, this is your ecological inference analysis of

6    turnout, and like your bivariate analysis, you here also

7    calculate turnout as a percentage of registered voters.

8    Correct, Dr. Rodden?

9    A    I believe so.

10   Q    Now, you present turnout data for the 12 contested

11   elections between 2000 and 2012.  Right, Dr. Rodden?

12   A    Yes.

13   Q    And for each contested election, you present turnout

14   levels for each racial group as a dot and lines going up and

15   down from each dot.  Right, Dr. Rodden?

16   A    Yes.

17   Q    Now, on the screen here, I've just realized it's very

18   difficult to see the white dots.  I can give you a hard copy

19   of your report, if that will be --

20   A    That's okay.  I can see them.

21   Q    Why don't I give them -- distribute them for others.

22        MS. ORMSBY:  I can see them.

23   Q    My apologies.  I just can't see on my screen, but

24   everyone else can see it.  Great.

25        Now the lines --

1    THE COURT:  You didn't see the invisible ink on here

2    then either.

3    MR. HO:  Is there a good message for us?

4    THE COURT:  You will always wonder.

5    Q   (BY MR. HO) The lines on this graph, Dr. Rodden, they

6    represent the confidence intervals of your estimates.  Right?

7    A    That's correct.

8    Q    And the confidence intervals that you depict here are the

9    range within which you have a 95 percent degree of certainty

10   of where the actual turnout level is for each group and each

11   election.  Correct?

12   A    That's correct.

13   Q    And that level of certainty, that 95 percent confidence,

14   that's consistent with generally accepted standards in the

15   field of political science, Dr. Rodden?

16   A    Yes.

17   Q    And the dot within each line, that's your point estimate

18   for turnout for each group in each election.  Right, Dr.

19   Rodden?

20   A    Yes.

21   Q    And the relationship between the two, as you depict them

22   here, is that the point estimate is the median value of the

23   confidence interval.  Right, Dr. Rodden?

24   A    These are the point estimates in the confidence

25   intervals, yes.  I think it's clear.

1    Q    Now, one of your decision rules for identifying

2    candidates of choice is to look only at point estimates --

3    right, Dr. Rodden? -- the point estimate approach?

4    A    Yes.  I believe I was clear about the disadvantages of

5    that approach as relates to confidence intervals.

6    Q    Well, let's try applying that approach, that decision

7    rule, here and just look at the point estimates and ignore the

8    confidence levels for now.  We can talk about the confidence

9    intervals in a few minutes, but I just want to focus on the

10   point estimates.  Is that okay?

11   A    Sure.

12   Q    Now, if we look at just the point estimates for these 12

13   elections, we see that the point estimate for white turnout

14   exceeds the point estimate for black turnout in 11 out of 12

15   elections.  Correct, Dr. Rodden?

16   A    Yes.

17   Q    And we established earlier -- or you did on direct --

18   that there's a misstatement in your report about this.  Right,

19   Dr. Rodden?

20   A    Oh, yes.

21   Q    Your report says that black turnout -- the point estimate

22   for black turnout exceeded the point estimate for white

23   turnout three times.  Right, Dr. Rodden?

24   A    I believe that came from squinting at the graph rather

25   than looking at a spreadsheet, which was a bad idea.

Q    So when we do it correctly, it's that the black point

estimate for turnout exceeded the white point estimate for

turnout just one time.  Right, Dr. Rodden?

A    That's correct.

Q    Now, your report -- your opinion in this report about

turnout doesn't just fall on the point estimates, though.

Right, Dr. Rodden?

A    That's right.  I discussed the statistical significance

of the difference.  I think I'm clear about that.

Q    Yeah, I think so.  Your opinion is that white turnout

clearly exceeded black turnout in only six out of the 12

elections that you analyzed.  Correct, Dr. Rodden?

A    That sounds right.

Q    And your opinion was that in the other six elections

turnout levels between whites and blacks were

indistinguishable.  Right, Dr. Rodden?

A    That's right.

Q    And one example is the 2014 election.  Right, Dr. Rodden?

A    Yes.

Q    And what you're saying, then, is that, even though in the

2014 election the point estimate for white turnout is higher

than the point estimate for black turnout, it's

indistinguishable because the point estimate for white turnout

is within the confidence intervals for black turnout.  Is that

a fair description of your opinion?

1   A    Yes.  That's the same way I described the ACS estimates.

2   Q    Right.  And so, generally speaking, not just talking

3   about turnout but generally speaking, you agree that as a rule

4   of thumb, where the point estimate for one value falls within

5   the confidence interval for another value, those are

6   statistically indistinguishable.  Correct, Dr. Rodden?

7   A    With the caveat that we don't know for sure.  They might

8   be.

9   Q    But it's a good rule of thumb that you would use as a

10  political scientist.  Correct?

11  A    Yes.  Right.

12  Q    Now, you agree -- right, Dr. Rodden? -- that it's

13  standard practice in political science publishing to report

14  confidence intervals the way that you do on this figure?

15  A    Yes.

16  Q    And you agree that, as a political scientist, failing to

17  report those confidence intervals and just relying on the

18  point estimates to assess turnout wouldn't -- would not be

19  consistent with peer review standards in your field.  Right,

20  Dr. Rodden?

21  A    Yes.  We like confidence intervals.

22  Q    So your opinion about turnout in the Ferguson-Florissant

23  School District is governed not just by the point estimate but

24  also by the confidence interval.  Right?

25  A    I think my report was clear about that.

Q    So is it fair to say that, if we take the confidence
intervals and do a count and we look here, white turnout
exceeded black turnout to a statistically significant degree
in half the elections?

A    Going all the way back to 2000, yes.  I think in the text
I discussed the time series trend.  There was a reduction in
turnout for both groups, and a turnout gap opened up in the
middle of the decade, and we've seen that it's closed up and
it's converged.  We need to ask ourselves not just about
statistical significance but substantive significance.  We
might like to know what is the size of the difference between
these point estimates.

        And so one of the things that I think for this case
that is interesting since we -- I think we all agree that the
most recent elections are the more probative ones, when we
look at these we need to think about a couple of things in
conjunction because a lot hinges on counts of voters of what
are the racial characteristics of voters, people who show up
on election day.

        I just want to be clear that that number is a
combination of population numbers and turnout numbers, and we
put those two together.  So I have testified that the
African-American population is larger than the white
population.  So if we see that there's a slightly higher white
turnout in -- but statistically insignificant and also

1    substantively tiny, it's going to be offset in a way that I

2    haven't explored in this graph by the larger African-American

3    population.

4         So if we're interested in just the number of voters

5    who show up on election day, those two in 2014 are going to be

6    very close, and I do not have an estimate of the -- of

7    statistical significance of the difference between those.  We

8    have to just say it's very close.

9    Q    You didn't conduct any of that kind of analysis.  Right,

10   Dr. Rodden?

11   A    Which kind of analysis?  Counting up multiple --

12   Q    I kind of lost track of you there for a little bit

13   because my question was much simpler than what you started

14   speaking about.  My question was black turnout is lower than

15   white turnout for -- to a statistically significant degree

16   according to your calculations in half of the elections.

17   Right, Dr. Rodden?

18   A    I believe I already answered that question.

19   Q    And you said, well, we can't go by those numbers alone

20   because we also have to take into account the size of the

21   population, and the black population is larger than the white

22   population.  That's an accurate characterize of what you just

23   said, Dr. Rodden?

24   A    Yes.

25   Q    But you don't calculate turnout as a percentage of the

1  population.  Right, Dr. Rodden?  You calculate turnout as a

2  percentage of registered voters.  Right, Dr. Rodden?

3  A    In the analysis in this graph?  That's correct.  I --

4  Q    And there's no information about registered voters in

5  your report.  Right, Dr. Rodden?

6  A    I believe we just discussed the fact that I used

7  registered voters in the calculation of these figures; so I

8  would say that there is information about --

9  Q    There's no information about the number of registered

10 white voters as compared to the number of registered black

11 voters in the Ferguson-Florissant School District in any of

12 your four reports.  Right, Dr. Rodden?

13 A    Nor is there any such information in any of the reports

14 filed by the plaintiffs whose burden it would be to conduct

15 such analysis.

16 Q    Dr. Rodden, according to your analysis, black turnout has

17 never exceeded white turnout to a statistically significant

18 degree in the Ferguson-Florissant School District.  Correct?

19 A    In Ferguson-Florissant School District April elections?

20 No.

21 Q    "No," as in black turnout has never exceeded white

22 turnout?

23        COURT REPORTER:  I'm sorry.  Can you repeat your

24 question?

25 Q    Sure.  Sometimes when you say "no," Dr. Rodden, it's not

1    clear if you're agreeing with me or disagreeing with my

2    question.  So my question is, according to your analysis,

3    black turnout has never exceeded white turnout to a

4    statistically significant degree in Ferguson-Florissant School

5    Board elections.  Is that correct?

6    A    It comes close in 2012, but it's not quite significant.

7    Q    Dr. Rodden, do you need me to repeat the question?

8    A    No.

9    Q    Would you answer my question, please?

10           THE COURT:  He was.

11           MS. ORMSBY:  Objection, Your Honor.

12           MR. HO:  I'm sorry?

13           THE COURT:  He was answering it.

14           MR. HO:  I was asking about --

15           THE COURT:  You said in 2012 it was, but it's close,

16    and then you started talking again.

17           THE WITNESS:  Yeah.  Sometimes --

18    Q    (BY MR. HO) Do you want to say more?

19    A    No.  I believe I answered the question.

20           THE COURT:  You were finished?  I thought you were

21    still --

22    A    But sometimes I do like to pause and think before

23    completing my answer.

24    Q    Was this one of those --

25    A    Are you asking for a yes-or-no answer?  Are you requiring

1  that?

2  Q    I'm not requiring anything.  I just asked a very simple

3  question.

4        THE COURT:  Why don't you ask your question again.

5  He will answer it, and then we'll move on.  Okay?

6  Q    Is it correct that, according to your calculations, black

7  turnout has never exceeded white turnout to a statistically

8  significant degree in Ferguson-Florissant School Board

9  elections?

10  A    That's correct.

11        MR. HO:  Your Honor, I'm going to move on to another

12  topic.  I can keep going.

13        THE COURT:  Keep going.

14  Q    (BY MR. HO) Okay.  Now, Dr. Rodden, it's fair to say that,

15  in your opinion, African Americans, including individuals who

16  identify as part African American, are a majority of the

17  voting-age population in the Ferguson-Florissant School

18  District today.  Correct?

19  A    Can you repeat that?  I want to make sure I heard you

20  correctly.

21  Q    Your opinion, Dr. Rodden, is that African Americans --

22  defining that term as including individuals who identify as

23  part African American -- constitute a majority of the

24  voting-age population in the Ferguson-Florissant School

25  District today.  Correct?

1    A    Yes, it is.

2    Q    And fair to say that in your various reports you discuss

3    with respect to this opinion three different kinds of data:

4    Decennial census data, the Census Bureau's American Community

5    Survey data, and then some of your own calculations and

6    projections.  Is that right, Dr. Rodden?

7    A    Yes, it is.

8    Q    Let's talk for a minute about the decennial census data.

9    When the federal government apportions representation in

10   Congress among the states, it uses decennial census data and

11   not the American Community Survey data.  Correct?

12   A    That's correct.

13   Q    And the decennial census is an effort by the census to

14   conduct a complete count of the entire United States

15   population rather than an estimate based on a sample.

16   Correct?

17   A    That's correct.

18   Q    Now, I believe you testified on direct that, in your

19   opinion, Missouri state law requires the use of decennial

20   census data for redistricting but not for assessing the

21   population size of a jurisdiction generally.  Is that right?

22   A    Assessing the size of a jurisdiction generally?  I don't

23   know for what purposes that assessment would be made.

24   Q    For purposes of representation.

25   A    For apportionment.

1   Q   Representation.

2   A   Would you explain what you mean by "representation"?

3   Q   Well, maybe the problem is I'm asking --

4   A   I believe you're asking me for a legal conclusion about

5   complexity of interpretation of Missouri law, and I do not

6   have that expertise.

7   Q   Dr. Rodden, you opined about the statute; so I'm asking

8   you about the statute.  Now --

9   A   I do not have a J.D.

10  Q   -- I asked two separate question.  So let me try breaking

11  it up into two parts.  You testified on direct examination

12  that Missouri state law requires the use of decennial census

13  data for redistricting purposes.  Right?  That was your

14  testimony?

15  A   My spoken testimony in court.

16  Q   Yes.

17  A   Yes, that's my understanding.

18  Q   And you distinguish that purpose from what you're trying

19  to do in this case.  You said you're opposing redistricting.

20  Right, Dr. Rodden?

21  A   Well, I've proposed no redistricting plans, that's

22  correct.

23  Q   Can we bring the statute up on the screen, please.

24          Dr. Rodden, can you read the title of Missouri

25  Revised Statutes 1.100?

1  A    "Population, how determined -- effective data of

2  census -- loss or gain in population for certain purposes,

3  effect of."

4  Q    Now, can you read the first sentence of the statute into

5  the record, please?

6  A    "The population of any political subdivision of the state

7  for the purpose of representation or other matters including

8  the ascertainment of the salary of any county officer for any

9  year or for the amount of fees he may retain or the amount he

10  is allowed to pay for deputies and assistants is determined on

11  the basis of the last previous decennial census of the United

12  States."

13  Q    Now, this is the statute that you said pertains

14  specifically to redistricting.  Right, Dr. Rodden?

15  A    Yes.  Oh, to redistricting?  No.  It says "for the

16  purposes of representation," and there's a lot of things about

17  salary.  So I assume the focus here is on questions about the

18  purpose of representation and what is the interpretation of

19  that phrase.

20        And as I stated before, I am not a lawyer.  I do not

21  have any idea whether that is meant to apply to how one might

22  count individuals of different races for the purposes of a

23  Voting Rights Act lawsuit where the effort is to understand

24  the size of the African-American population relative to the

25  white population.  That is not a legal conclusion that I would

1   be interested in making.

2   Q    Where is the word "redistricting" in this statute, Dr.

3   Rodden?

4   A    I don't see it.

5   Q    Could we bring up -- let's talk about now the decennial

6   census data for the school district.  Can we bring up the

7   parties' joint stipulations?  Paragraph 13, on page 4.

8           Now, Dr. Rodden, this is a paragraph from the

9   parties' joint stipulations.  Now, based on what you see here,

10  Dr. Rodden, you agree that, according to the most recent

11  decennial census data, African Americans are less than 50

12  percent of the voting-age population in the

13  Ferguson-Florissant School District.  Correct?

14  A    Yes.

15  Q    You agree that, according to the most recent decennial

16  census data, non-Hispanic whites outnumber African Americans

17  in terms of a voting-age population of the school district.

18  Correct?

19  A    Yes.

20  Q    And you agree that, according to the 2010 decennial

21  census, people who are not African American constitute a

22  majority of the voting-age population in the

23  Ferguson-Florissant School District.  Correct?

24  A    Correct.

25  Q    Okay.  Now, let's talk about the American Community

1    Survey.  The American Community Survey estimates are based on

2    a sample of about 2 percent of the population.  Right, Dr.

3    Rodden?

4    A    Yes.

5    Q    And I believe you acknowledged on direct that, because

6    the ACS estimates are based on a statistical sample, they have

7    confidence intervals associated with them.  Correct?

8    A    Yes.

9    Q    And those confidence intervals are larger if the sample

10   size is smaller.  Right, Dr. Rodden?

11   A    Yes.

12   Q    So when you're dealing with the ACS estimates if you go

13   down to smaller geographic subunits like a county within a

14   state or a city within a county, the error margins increase.

15   Right Dr. Rodden?

16   A    That's correct.

17   Q    And if we try to zero in on individual racial groups

18   within a jurisdiction, the margin of errors also increase.

19   Correct, Dr. Rodden?

20   A    Correct.

21   Q    Now, I believe on direct you described the ACS as

22   something like a social scientist's best friend or something

23   like that.  Right, Dr. Rodden?

24   A    Yes.

25   Q    And one of the reasons for that characterization, correct

1    me if I'm wrong, Dr. Rodden, is that while the decennial

2    census has very basic information in it like age, the ACS has

3    a wealth of other demographic information in it like income,

4    education, and employment status.  Correct?

5    A    Yes.

6    Q    And because the ACS has that information that the

7    decennial census doesn't, you can use the ACS for that

8    demographic information that's not included in the census.

9    You would agree with that.  Right?

10   A    Yes.

11   Q    Now, the ACS like the decennial census also has age and

12   race information, which I believe you noted during your direct

13   testimony.  Correct, Dr. Rodden?

14   A    Yes.

15   Q    And you are aware, are you not, Dr. Rodden, that the

16   Census Bureau itself, when it publishes the ACS data,

17   recommends using the 2010 decennial census data for population

18   totals and basic characteristics such as race and age.

19   Correct?

20   A    I believe this is referring to population totals as in

21   we're trying to understand exactly how many people are in a

22   particular city in total for a variety of official purposes

23   such as the ones you described earlier.

24   Q    Could we bring up Plaintiffs' Exhibit 133, please.  I'm

25   sorry.  Plaintiffs' Exhibit 132.  Can we look at page 2.

1    This is a document that the Census Bureau publishes

2  with the American Community Survey.  You see that.  Right, Dr.

3  Rodden?

4  A    Yes.

5  Q    Now, on the second page, do you see the second-to-last

6  paragraph?  And do you see the census, the last census there,

7  starting with "use numbers"?  Tell me when you see that.

8  A    Yes.

9  Q    Could you read that census into the record, please?

10 A    "Use numbers from the 2010 census to obtain counts of the

11 population and their basic characteristics:  Sex, age, race,

12 Hispanic origin, and homeowner status.  Use data from the

13 Census Bureau's population" --

14 Q    That's --

15 A    -- "estimates program in the years between censuses."

16 Q    I was only asking about that first census, but just since

17 you raised it, the Census Bureau's population estimates

18 program in that census that you just read, that is not the

19 American Community Survey.  Right, Dr. Rodden?

20 A    I'm sorry.  Repeat the question.

21 Q    Sure.

22 A    Oh, the population estimates program?

23 Q    Yes.

24 A    Yes.  That is a different product that does not break

25 down by race, as far as I know.

1  Q    Now, you agree, do you not, Dr. Rodden, that one thing

2  that's preferable about the decennial census is that it's an

3  actual enumeration and therefore minimizes errors associated

4  with estimates based on statistical samples?

5  A    May I return to the previous question and just clarify

6  that, when it says "the ACS should be used to obtain

7  population characteristics, percents, means, medians, and

8  rates rather than estimates of population totals," I believe

9  what is at issue is a percent.  That is something that we are

10 addressing.  So when it says "population characteristics,

11 i.e., percents," I believe that is what we have been arguing

12 about.  We've been arguing about whether the percent of

13 African Americans is above a certain threshold.

14      So I see nothing about that census that undermines

15 the effort to use the ACS to calculate the percent of the

16 population that is African American.  I believe it's trying to

17 communicate in this paragraph that, if we want an estimate of

18 population totals -- and I assume that means for something

19 like redistricting or for perhaps applying for a grant that is

20 going to be allocated on a per capita basis, something like

21 that -- this is what's being referred to when we're being told

22 to use population -- to use the decennial census for

23 population totals.  When the exact number matters, the exact

24 number matters, that's what they're referring to.

25 Q    You see the words "age" and "race" in that paragraph.

1    Right, Dr. Rodden?

2    A    Yes.

3    Q    And you see those terms used in a parenthetical after the

4    term "basic characteristics."  Correct, Dr. Rodden?

5    A    Yes.

6    Q    And the census reads "Use numbers from the 2010 census to

7    obtain counts of the population and their basic

8    characteristics."  Right, Dr. Rodden?

9    A    Yes.  "Counts," yes.

10   Q    Okay.  Now, you agree -- I'm going to go back to the

11   question that I actually asked you, Dr. Rodden.  You agree

12   that one thing that's preferable about the decennial census is

13   that it is an actual enumeration and therefore minimizes

14   errors associated with estimates based on a statistical

15   sample.  Correct?

16   A    Yes.  I discussed a trade-off between sampling error that

17   we get in a sample and nonsampling error that plagues the

18   census.  This is why they use a sample to check up on their

19   success and their enumeration.  There's much value in the

20   enumeration, no doubt.

21   Q    And you agree that one of the values of the enumeration

22   is that it minimizes errors associated with estimates based on

23   statistical samples.  Correct, Dr. Rodden?

24   A    Yes, known as sampling error.

25   Q    Dr. Rodden, let's talk about what the ACS data shows for

1    the Ferguson-Florissant School District.  If we can return to

2    the parties' joint stipulations.  And turn to page 5,

3    paragraph 25.

4         Now, this is the most recent ACS data that's

5    available, the 2011-2013 three-year ACS estimates, that one

6    can use for estimating the population of the

7    Ferguson-Florissant School District.  Correct?

8    A    I believe so.

9    Q    And this is the same data that you rely on in your

10    reports in this case when you attempt to assess the population

11    of the Ferguson-Florissant School District.  Correct?

12    A    I was not involved in the preparation of these documents;

13    so I can't testify to what's in this paragraph.

14    Q    Sorry.  I meant the 2011-2013 ACS data -- that's what you

15    rely on when you offer your opinions about the population of

16    the Ferguson-Florissant School District.  Correct?

17    A    That's one of the sources of data I used.  I believe I

18    described how I arrived at my other conclusions.

19    Q    But this is the most recent ACS data, the 2011 to 2013,

20    that you rely on in your report.  Correct?

21    A    Correct, yes.

22    Q    And according to the most recent ACS data, individuals

23    who are single-race black are less than a majority of the

24    voting-age population in the Ferguson-Florissant School

25    District.  Correct?

1    A    Yes.  We can agree on that.

2    Q    And the ACS on its face does not publish any direct

3    information as to how many voting-age individuals in the

4    Ferguson-Florissant School District are part black, correct?

5    A    I believe I was very clear about what I did with the

6    population totals that were reported as more than one race.

7    But the answer is yes, it does not directly publish that

8    information.

9    Q    Okay.  So let's talk about what you did in your report,

10   in particular Defendants' Exhibit C, your report to -- your

11   rebuttal to Mr. Cooper's report, and a table that you

12   discussed with your counsel, which is located on page 3, Table

13   1.  What's the title of this table, Dr. Rodden?

14   A    "2011-2013 American Community Survey three-year

15   estimates."

16   Q    And what's the source identified for the data in this

17   table, Dr. Rodden?

18   A    American Community Survey and author's calculations.

19   Q    So some of the numbers I think, as you described on your

20   direct examination, come from the American Community Survey,

21   but some of the other numbers on this table are the result of

22   your own calculations.  Correct?

23   A    The lines 9 and 10 of the column entitled "voting-age

24   population" involve a breakdown into the two component parts.

25   That is an estimate based on the breakdown of the overall

1    population, which does come directly from the census.

2    Q    Well, let's just try to break this down a little bit.  On

3    line 4, there are population figures for individuals who

4    identify as African American alone.  Now, the line -- the

5    numbers on this line are all published directly as a part of

6    the American Community Survey.  Correct?

7    A    That's right.  When one downloads the data, one receives

8    directly those numbers.

9    Q    Now, line 9 here, which is "two or more races, some part

10   African American," some of the numbers in this table on this

11   line are the result of your own calculations and are not

12   directly published by the Census Bureau.  Correct?

13   A    I already answered that question, yes.

14   Q    For instance, where you say that there are 681

15   individuals who are some part African American, 18 and above

16   voting-age population, that's the result of your own

17   calculation.  Right?

18   A    Yes.  There was a line called "two or more races" that

19   reported the value 956.  As I explained in my testimony, I

20   turned that number into a breakdown between 681 and 275 based

21   on the breakdown of total population.

22   Q    And you did that based on the percentage of the total

23   population that is some part African American.  Right?

24   A    I did.

25   Q    You testified earlier that you agree that the

1    African-American population tends to skew younger.  Right, Dr.

2    Rodden?

3    A    Yes.

4    Q    But you applied the same percentage for total population

5    that's part African American to the mixed-race voting-age

6    population to try to produce a number of mixed-race

7    individuals who are part African American.  Right, Dr. Rodden?

8    A    Yes.  I had no strong reason to suspect that there would

9    be a difference in the rate of the overall population that was

10   mixed race under the age of 18 and that rate for the entire

11   population.

12   Q    Now, on line 12, you have a line titled "any part African

13   American," and in the final column you have this percentage

14   here -- sorry for my shaky finger -- 51 percent any part

15   African American.  That's a percentage of a voting-age

16   population in the Ferguson-Florissant School District that you

17   report as any part African American.  Right, Dr. Rodden?

18   A    In this ACS?  Yes.

19   Q    But that number is not published by the ACS.  That's

20   based on your calculation of 681 individuals who are of voting

21   age and part African American.  Right?

22   A    Yes.

23   Q    Now, you think that the way that you calculated this

24   number is reliable.  Right, Dr. Rodden?

25   A    I do.

1  Q    You think it's also relatively simple.  Right?  You just

2  take a fraction and you multiply it by a number.  Right?

3  A    Yes.

4  Q    It's a calculation that the demographers at the census

5  who do this for a living -- they can make this calculation

6  pretty easily.  Right?

7  A    I'm sure they could.

8  Q    And the Census Bureau, when it published the American

9  Community Survey, did not make this calculation and did not

10  include any estimates for the number of individuals who are of

11  voting age and are part African American.  Right, Dr. Rodden?

12  A    That's correct.

13  Q    Now, you agree, Dr. Rodden, that there is no census data,

14  decennial census or American Community Survey, that as

15  published on its face directly states that African Americans

16  are a majority of the voting-age population of the

17  Ferguson-Florissant School District.  Correct?

18  A    As I described, it is inappropriate to include the

19  mixed-race population in the denominator without adjusting

20  somehow in the enumerator; so any report of African-American

21  voting-age population that doesn't attempt to deal with the

22  mixed-race population will be flawed.

23  Q    I didn't ask you what you thought was appropriate, what

24  you and your opinion thought was appropriate.  I asked you

25  whether or not the Census Bureau has published any data,

1  either the decennial or the American Community Survey, which

2  says on its face that African Americans are a majority of the

3  voting-age population of the Ferguson-Florissant School

4  District.

5  A    If you by "on its face" you mean when I download the

6  numbers and add them up, ignoring things that I know are

7  missing and I create a misrepresentation and I make a

8  percentage, no, I would not get that number.  That's correct.

9  Q    Right.  The only way to get a number that shows that

10  African Americans are a majority of the voting-age population,

11  according to the American Community Survey, is for you to

12  perform a calculation that the demographers at the Census

13  Bureau themselves do not calculate when they publish the

14  American Community Survey data.  Correct, Dr. Rodden?

15  A    That is correct.

16  Q    Now, we established earlier that the American Community

17  Survey population estimates have confidence intervals.

18  Rights?

19  A    Yes.

20  Q    And because your calculation of voting-age population

21  individuals who are multi-race and part African American is

22  based on an ACS sample, it also has confidence intervals

23  associated with it.  Correct?

24  A    That's correct.

25  Q    Now, we established earlier, when we were talking about

1  turnout, that the standard practice for political scientists

2  when publishing for peer review is to publish the confidence

3  intervals the same way that you did for your turnout

4  calculations.  Right, Dr. Rodden?

5  A    That's correct.  You'll notice that in this table over

6  a -- after population there was a column called "margin of

7  error," and after the voting-age population there should have

8  been a column for margin of error, and it was an oversight on

9  my part not to include it.  But I testified in the text that

10  there was not a statistically significant difference.  So I

11  apologize for the presentational problem in the table, but

12  there was certainly no misrepresentation of the statistical

13  significance in the text.

14  Q    Okay.  Well, I didn't ask you if you misrepresented

15  anything, Dr. Rodden.  I'm just asking this 51 percent figure

16  that I still have circled here for the percent of the

17  voting-age population that you calculate as any part African

18  American, there's no confidence interval here so that the

19  person reading this can understand that 95 percent range of

20  where your estimate may actually -- where the true value may

21  actually fall in relation to your estimate.  Correct, Dr.

22  Rodden?

23  A    When one is adding together line items from the census

24  and trying to create a number, it's not possible to produce a

25  confidence interval.

1   Q    Now, this 681 figure, the number of individuals that you

2   calculate as being voting-age population and two or more races

3   some part African American, that should also have a confidence

4   interval associated with it.  Right, Dr. Rodden?

5   A    Correct.  Because it's a calculation, I had no way,

6   unless I received the micro data from the Census Bureau, to

7   create a confidence interval.  And that's true for the

8   calculations in all the other plaintiffs' experts' reports as

9   well.  They did not calculate confidence intervals when they

10  added together things like single-race African American and

11  multi-race African American because, once you start adding the

12  numbers together, you can't get a clean confidence interval.

13  Q    You don't need a confidence interval for the 2010

14  decennial census -- there is no confidence interval for the

15  2010 decennial census.  Correct, Dr. Rodden?

16  A    Correct, because there's no sample.

17  Q    I believe you said during your direct testimony that it

18  would be absurd to conclude that African Americans are not a

19  majority of the voting-age population in the

20  Ferguson-Florissant School District.  Do you recall that?

21  A    In 2016, that's right.

22  Q    Now, there's no information in your report demonstrating

23  that the black voting-age population of the

24  Ferguson-Florissant School District -- I'm sorry.  Let me back

25  up for a second.

1    Your testimony is that the American Community Survey

2  data shows an increase in the black voting-age population

3  since the 2010 decennial census.  Correct?

4  A    Yes.

5  Q    There is no information in your report, is there, Dr.

6  Rodden, demonstrating that that increase as reported by the

7  American Community Survey in terms of the black voting-age

8  population of the Ferguson-Florissant School District is

9  different to a statistically significant degree from the black

10  voting-age population as reported by the 2010 decennial

11  census, is there?

12  A    I have no way to calculate such a test.

13  Q    Well, we have a number from the decennial census as to

14  what the black voting-age population is of the

15  Ferguson-Florissant School District.  Correct?

16  A    Yes.

17  Q    And you do not report whether or not that number lies

18  outside of the confidence interval for the American Community

19  Survey's estimate for the black voting-age population of the

20  Ferguson-Florissant School District.  Correct?

21  A    It wouldn't occur to me to do such a thing, no.

22    THE COURT:  Why don't we take a 15-minute recess.

23  How much time do you think you have left?

24    MR. HO:  They covered a lot of ground in their

25  direct, Your Honor.  I'm not quite sure how long I've been

1   going for.  Maybe --

2          THE COURT:  Before lunch, if you remember.  Started

3   at about 11:45, 12:00.

4          MR. HO:  I'm going to cut a few things and try to

5   keep it shorter, Your Honor, but --

6          THE COURT:  I'm not telling you what to do.

7          MR. HO:  I think about two hours, Your Honor.

8          MS. ORMSBY:  That's longer than the direct was.

9          THE COURT:  Well, you better bring some laser-like

10  focus because we're not going to be here at 5:30.  And you

11  guys need to talk, then, about what we're going to do if

12  you're going to have, ultimately, four or five hours of

13  cross-examination on a witness who had three hours of direct.

14  So you need to measure yourself --

15         MR. HO:  I can cut it down, Your Honor.

16         THE COURT:  We'll be back in 15 minutes.

17         **(COURT RECESSED FROM 3:30 PM UNTIL 3:47 PM.)**

18         THE COURT:  All right.  Are you ready?

19         MS. ORMSBY:  Yes, Your Honor.

20         THE COURT:  Remind you, sir, you're still under oath.

21         You may proceed.

22  Q   (BY MR. HO) Thank you, Your Honor.

23         Dr. Rodden, is it your opinion that African Americans

24  are not more frequently disenfranchised than whites in the

25  Ferguson-Florissant School District area by the State of

1  Missouri's felon disenfranchisement laws?

2  A    Is it my opinion they're not more frequently

3  disenfranchised?  Double negative.  I believe that we know

4  that African Americans are more frequently disenfranchised by

5  felon laws in larger geographic levels of analysis.  I don't

6  have data on the Ferguson-Florissant School District.

7  Q    So do you believe that blacks and whites are

8  disenfranchised by about the same rate in the

9  Ferguson-Florissant School District area as a result of the

10  State of Missouri's felon disenfranchisement laws?

11  A    I have no opinion.  I have no data.  I need data for an

12  opinion.

13  Q    So you have no opinion one way or the other as to whether

14  or not African Americans or whites are more frequently

15  disenfranchised in the Ferguson-Florissant School District

16  area as a result of the state's criminal disenfranchisement

17  laws?

18  A    I have no opinion.

19  Q    Now, you are aware, are you not, Dr. Rodden, of a United

20  States Department of Justice report, which is in the record at

21  PX120, concerning racially discriminatory policing practice in

22  the Ferguson area?

23  A    Yes.

24  Q    And you are aware that the United States Department of

25  Justice found that Ferguson's approach to law enforcement both

1  reflects and reinforces racial bias?

2  MS. ORMSBY:  Objection.  Outside the scope of direct

3  examination and not in his reports.

4  THE COURT:  Sustained.  I mean, the hard part there

5  is we'd have to drill down -- there isn't anyone in this room

6  who doesn't think there aren't problems in the City of

7  Ferguson Police Department, but ordinance violations and the

8  type of thing to cause the municipal court reform issues are

9  different than disenfranchisement.  And this would require a

10  pretty substantial -- I think, Mr. Rothert, you would agree

11  with that.  There's problems.  I'm just not sure how much that

12  report documents felonies versus the municipal court system

13  problems that are at center stage, and I don't know if we've

14  got the foundation to work through that.  At least it wasn't

15  laid on direct to get into it on cross.

16  Q  Okay.  Thank you, Your Honor.

17  Is it fair to say, Dr. Rodden, that your opinion is

18  that black candidates will do worse under a single-member

19  districting plan than under the current at-large system?

20  A  Yes.

21  Q  And in formulating that opinion, you performed an

22  analysis in your report with Dr. Chen that looked at the rate

23  at which black candidates might be elected under the

24  single-member district plans in Mr. Cooper's report.  Correct?

25  A  That was part of the analysis that led to my conclusion.

1    Q    And you did not look at the success rate for

2    black-preferred candidates; you just looked at the success

3    rate for black candidates.  Correct, Dr. Rodden?

4    A    That is correct.

5    Q    And you're aware, are you not, Dr. Rodden, that under

6    Section 2 plaintiffs have to propose a single-member district

7    plan in order to satisfy the first *Gingles* precondition.

8    Right, Dr. Rodden?

9    A    Yes.

10   Q    And you're also aware that courts in Section 2 cases have

11   ordered remedies after finding liability that preserve

12   at-large systems under alternative voting arrangements rather

13   than ordering single-member districts, are you not, Dr.

14   Rodden?

15   A    I believe that sometimes happens.

16   Q    Now, you testified that -- I think you gave an example

17   under single-member districting system it might be worse, and

18   you gave an example that Dameron, a white candidate, in 2015

19   may have been elected from a single-member district centered

20   in the Berkeley area.  Right, Dr. Rodden?

21   A    Yes, in the southern tier of the district.

22   Q    Now, you're aware that although Ms. Dameron sends her

23   children to Berkeley High School, she doesn't actually live in

24   Berkeley.  Right, Dr. Rodden?

25   A    I believe she might live in Cool Valley, somewhere in the

1  southern tier of the district.  I have looked at the

2  precinct-level data and looked where her support was

3  strongest, made some maps like the one I looked at earlier,

4  and I believe I had a filing address.  So maybe the address

5  was wrong, but I had her address.

6  Q    Now, your testimony in this regard is based on the

7  premise that the same candidates would receive the same vote

8  totals in a single-member district system as they would in

9  an -- under the existing at-large system.  Right, Dr. Rodden?

10 A    That particular analysis with respect to Ms. Dameron?

11 Q    Yes.

12 A    The same vote totals?  No.  I was thinking about who

13 would run.  I expressed a problem that it would be difficult

14 to come up with 14 candidates at one moment, and I was

15 thinking about the candidate recruitment difficulty, and I was

16 imagining that it would be difficult to find two candidates to

17 run in that district.

18 Q    So you didn't consider the possibility that under a

19 single-member districting system with majority-black districts

20 in certain parts of the Ferguson-Florissant School District

21 that might change the candidate pool, did you, Dr. Rodden?

22 A    I did consider that.  I think the problem is the

23 candidate pool would -- it would become much more difficult to

24 recruit candidates.  It would -- someone would have to go and

25 try to round some up.

1  Q    You agree that it might be cheaper to conduct a campaign

2  in a smaller single-member subdistrict of the

3  Ferguson-Florissant School District than trying to campaign at

4  large throughout the entire district.  Don't you, Dr. Rodden?

5  A    Not only would it be cheaper, it would be free because it

6  would be likely to be uncontested, which I don't think is good

7  for the school board.

8  Q    Now, let's turn to your analysis of exogenous elections.

9  Can we turn to Defendants' Exhibit D, page 14, Table 1.

10         Looks like we are having technical difficulties

11  again, Your Honor.  I apologize for that, but we do have hard

12  copies, and I can pass them out.

13         THE COURT:  Why don't we do that.

14         MR. HO:  Permission to approach, Your Honor?

15         THE COURT:  You may.

16         MR. HO:  So this is your -- I'm sorry.  I think I

17  have the wrong -- okay.  It's on the screen.  Sorry.  So it's

18  not this.  It's a different report.  But it's on the screen.

19         THE COURT:  Is the system working?

20         MR. HO:  The system is working.

21         THE COURT:  Okay.  I just yelled at the IT

22  department; so you got to tell me to call them off.

23         MR. HO:  It looks like it's on again.  And I

24  misidentified the exhibit, Your Honor.  I apologize.  It's

25  DXB.

1    THE COURT:  All right.

2    Q   (BY MR. HO) Dr. Rodden's rebuttal to Dr. Engstrom.  This

3    is page 14, Table 1.  These are the results of your analysis

4    of exogenous elections.  Right, Dr. Rodden?

5    A    Yes.

6    Q    And to be clear what we're looking at here, Dr. Rodden,

7    this is not a racial polarization analysis in the sense that

8    you are not comparing the behavior of white voters and black

9    voters in this table.  Correct?

10   A    No.  I don't try to get separate estimates of white

11   voters and black voters for these races.

12   Q    And this is not like the polarization analysis that you

13   conduct for the school board elections.  Right, Dr. Rodden?

14   These are just sheer candidate vote totals.  Right?

15   A    That's right.

16   Q    And you had the ability to conduct a racial polarization

17   analysis for these exogenous elections.  Right, Dr. Rodden?

18   A    Yes.  Yes.  The data are the same form as the other

19   races, yes.

20   Q    And you didn't conduct that analysis.  Right, Dr. Rodden?

21   A    No.

22   Q    And there's nothing in this table that tells us about

23   respective voting patterns among white voters and black voters

24   for any of these candidates.  Right, Dr. Rodden?

25   A    No.

1    Q     And when you examined exogenous elections, you only

2    looked at biracial contests.  Right, Dr. Rodden?

3    A     Yes.  I was following Dr. Engstrom's approach.

4    Q     You did not include any monoracial elections in your

5    analysis.  Right, Dr. Rodden?

6    A     That's right.

7    Q     You could have looked at monoracial exogenous elections

8    and tried to estimate white voters' and black voters' level of

9    support for candidates, but you didn't do that.  Right, Dr.

10   Rodden?

11   A     No.  Again, it was following Dr. Engstrom's approach.

12   Q     Now, you agree that in trying to assess whether or not

13   Ferguson-Florissant School Board elections are polarized,

14   there are limitations to relying on exogenous elections.

15   Right, Dr. Rodden?

16   A     Cost and benefits, that's right.

17   Q     I said limitations, Dr. Rodden.

18   A     Costs.

19   Q     Now, there are some differences between exogenous

20   elections and Ferguson-Florissant School Board elections.

21   Right, Dr. Rodden?

22   A     The month in which they are held, among other things,

23   yes.

24   Q     There's a different level of interest in the elections,

25   different levels of voter participation.  Right, Dr. Rodden?

1    A    Yes.

2    Q    And I think you identified these elections are held in a

3    different time of year.  Right?

4    A    Yes.

5    Q    And none of these candidates live within the

6    Ferguson-Florissant School District as far as you know, right?

7    A    Not to my knowledge.

8        THE COURT:  Well, that may not by true.  The primary

9    election's usually in March or April.  I mean, I know when

10   these elections are held, if that's what you're worried about.

11       MR. HO:  Well, the month is identified for each

12   election, I believe, on the chart, Your Honor.

13   A    The primaries are in August.

14   Q    (BY MR. HO) None of these are held in April.  Right, Dr.

15   Rodden?

16   A    Right.  But August --

17       THE COURT:  But February's sufficient off cycle.

18   You're not going to make a distinction --

19       THE WITNESS:  Turnout is even lower, I think, in some

20   of these other ones.

21   Q    These elections generally have different levels of

22   advertising, say, than Ferguson-Florissant School Board

23   elections.  Right?

24   A    Some more, some perhaps even less.

25   Q    And you would agree that voting behavior with respect to

1    Ferguson-Florissant School Board might differ from voting

2    behavior for other offices at precincts within the Ferguson

3    Florissant School District.  Right, Dr. Rodden?

4    A    Yes.  That's one of the costs of this type of analysis.

5    Q    And you would agree, then, that within the

6    Ferguson-Florissant School District voting might be polarized

7    for school board elections but not polarized for some of these

8    other offices.  Right, Dr. Rodden?

9    A    That is conceivable.

10   Q    And you note here, Dr. Rodden, that -- I'm sorry -- of

11   the 12 elections that you analyze here, Dr. Rodden.  I'm sorry

12   strike that.

13            You testified earlier, Dr. Rodden, do you recall that

14   incumbents usually win elections?

15   A    Right.  Yes.

16   Q    Of the 12 elections, exogenous elections, that you

17   analyze here, ten of them involve a black incumbent.  Is that

18   correct, Dr. Rodden?

19   A    I thought it was lower, but I believe you've done the

20   math.

21   Q    Now, the only exceptions in which the black candidate was

22   not an incumbent were the 2008 presidential election, the

23   primary and the general.  Right, Dr. Rodden?

24   A    That is right.  It was the primary and the general.  I

25   should have put in a column for incumbency.  Okay.  Yes.

1  Q    Now, you --

2  A    He says you're right.

3  Q    Dr. Rodden, you agree that the St. Louis area, including

4  the Ferguson-Florissant School District, consists primarily of

5  Democratic voters.  Correct?

6  A    That's right.  That's why I like the primaries best.

7  Q    So you would expect, as a general matter, that in

8  partisan contests Democratic candidates would do better on

9  this table.  Right, Dr. Rodden?

10  A    Yes.  Your conclusion about the St. Louis area is

11  correct.  I'm not sure what the -- the partisanship of the

12  district, I'm sure, leans Democratic, but I don't know by how

13  much.

14  Q    Now, of the exogenous elections that you examined -- of

15  the two -- I'm sorry.  Of the two exogenous elections that you

16  examined that did not feature a black incumbent, one of them

17  featured a contest between a Republican and a Democrat, the

18  2008 presidential election.  Correct?

19  A    Yes.

20  Q    So you would agree, then, that of these 12 exogenous

21  elections, there's only one, the 2008 Democratic primary, that

22  did not include either a black incumbent or a partisan contest

23  featuring a black Democrat running against a Republican.

24  Correct?

25  A    Yes.

1  Q    Okay.  I'd like to turn to the specific election results.

2            THE COURT:  Mrs. Clinton is going to be very mad that

3  you isolated her like that.

4            MR. HO:  I won't tell her if you won't, Your Honor.

5            THE COURT:  I don't know.  We'll see.

6  Q    (BY MR. HO) Could we turn to the joint stipulations of the

7  parties.  I want to just go through some of the election

8  results that you reported, Dr. Rodden.  I don't know how to

9  make that red circle disappear on the screen.  Thank you.

10           Could we turn to page 30, paragraph 167, the

11  ecological inference estimates for the 2015 election.  Now,

12  it's fair to say, Dr. Rodden, that, in your opinion as a

13  general matter, voting in the Ferguson-Florissant School

14  Board -- for the Ferguson-Florissant School Board is not

15  racially polarized.  Right?

16  A    I do not believe -- I do not see racial polarization as a

17  binary variable, a yes/no variable, where it's either racially

18  polarized or not.  As I hope I tried to communicate, we might

19  think of racial polarization as a concept that ranges from low

20  value to a high value and so we can characterize it as more or

21  less racially polarized.

22  Q    And you'd characterize it as less polarized.  Right, Dr.

23  Rodden?

24  A    Compared to what?

25  Q    You're the one who said you would put racial polarization

1  on a scale, Dr. Rodden.  Do you think it's closer to one end

2  of the scale or closer to the other end of the scale?

3  Polarized or not very polarized?

4  A    Well, that's the problem.  I believe it's the role of the

5  plaintiffs to establish a threshold beyond --

6  Q    Dr. Rodden, I didn't ask you what you think the role of

7  the plaintiffs is.  I asked you for your opinion in this case.

8  What is it?

9  A    I could tell you what the correlation is in my graphs.  I

10  don't know --

11  Q    So you can't tell me -- as the expert for the district

12  here, you can't tell me if you think voting is very polarized

13  or not very polarized in the district.

14  A    I have to ask you compared to what?  I'm sorry.

15  Q    Okay.  So let's look at the 2015 election results.  Now,

16  Dr. Graves received the highest level of support among black

17  voters.  Right, Dr. Rodden?

18  A    Yes.

19  Q    And Dr. Graves is African American.  Right, Dr. Rodden?

20  A    Yes.

21  Q    And you agree that black voters behaved cohesively in

22  their support for Dr. Graves.  Right, Dr. Rodden?

23  A    Yes.

24  Q    And you testified that she ran a sophisticated campaign

25  in which she was elected.  I'm sorry, not "you testified."  In

1  your opinion, Dr. Rodden, she ran a sophisticated campaign in

2  which she was elected in part because she encouraged her

3  supporters to vote single shot for her.  Right, Dr. Rodden?

4  A    Yes.  I don't know that that is responsible for her

5  victory, but she certainly did that.

6  Q    Well, you say that the strategy worked in your report.

7  Right, Dr. Rodden?

8  A    It appears to have, yes.

9  Q    Now, you agree that, according to both yours and Dr.

10  Engstrom's estimates, Dameron received the second highest

11  level of support from black voters.  Correct, Dr. Rodden?

12  A    Yes.

13  Q    And according to both you and Dr. Engstrom, Dameron's

14  level of support amongst black voters was about a third or

15  less than a third of the level of support that Dr. Graves

16  received from black voters.  Correct?

17  A    Yes.

18  Q    And Dameron is white.  Correct, Dr. Rodden?

19  A    Yes.

20  Q    And under your point estimate approach, a victory by

21  either Graves or Dameron would be treated equally as a victory

22  for a black-preferred candidate.  Right, Dr. Rodden?

23  A    That's how the application of that standard works, yes.

24  Q    Now, the point estimates for Dameron's level of support,

25  14.09 percent, that falls within the confidence intervals for

1   black support for two other candidates, Hines and Person.

2   Correct, Dr. Rodden?

3   A     Correct.

4   Q     We established earlier, Dr. Rodden, that, according to

5   the rule of thumb that you employ when offering your opinion

6   about turnout, black and white turnout are indistinguishable

7   when the point estimate for one falls within the confidence

8   interval for the other.  Right, Dr. Rodden?

9   A     Yes.

10  Q     So applying that same rule of thumb here, you would agree

11  that the level of black support for Dameron is statistically

12  indistinguishable from the level of black support for Hines

13  and Person.  Correct?

14  A     Yes.

15  Q     And your point estimate approach, notwithstanding the

16  statistical indistinguishability of the support between those

17  three candidates, treats Dameron as a black-preferred

18  candidate but not Hines or Person.  Correct?

19  A     As we've discussed, this -- as one of the problems with

20  this approach.

21  Q     You agree that black voters were not cohesive behind

22  Dameron as a second choice candidate, wouldn't you?

23  A     Yes.

24  Q     Based on that, you agree that it's difficult to identify

25  a second black-preferred candidate in the 2015 election.

1  Correct?

2  A     Yes.

3  Q     So -- okay.  Now, Dr. Graves received 22.9 percent of

4  white voter support according to your estimates.  Correct?

5  A     Yes.

6  Q     And that's about half the level of support that white

7  voters gave to their top-choice candidate, Mr. Ebert.

8  Correct?

9  A     Yes.

10 Q     And you established -- you identify Graves as a

11 white-preferred candidate in 2015.  Correct?

12 A     She's among the top two, yes.

13 Q     And I believe we established earlier in the beginning of

14 your cross-examination that Graves is one of two black

15 candidates from 2000 through 2015 that under your point

16 estimate approach you identify as a white-preferred candidate

17 who is black.  Correct?

18 A     Yes.

19 Q     Now, you agree, do you not, Dr. Rodden, that the 2015

20 election in the Ferguson-Florissant School Board and the

21 municipal elections in the Ferguson area generally receive

22 national attention because of the Michael Brown shooting.

23 Correct?

24 A     Yes.

25 Q     And you agree, Dr. Rodden, based on media reports, that

1  this national attention combined with "Get Out the Vote"

2  efforts may have caused turnout to increase in the 2015

3  election.  Correct?

4  A    Yes.  I think overall turnout was up slightly.

5  Q    Now, this is a two-seat election.  Right, Dr. Rodden?

6  A    Yes.

7  Q    And you agree that in a two-seat election a voter might

8  not necessarily prefer two candidates.  Right?

9  A    My approach is to classify them as preferring -- oh, I'm

10  sorry.  They might not prefer two candidates.  An individual,

11  you're referring to, might not prefer --

12  Q    Yes.

13  A    Yes.  Someone might decide they'd rather only cast a vote

14  for one candidate, correct.

15  Q    And a voter could cast two votes and feel really strongly

16  about one and not so strongly about the other one.  Right?

17  A    Hard to ascertain people's strength of feelings from the

18  data, but that could be, yes.

19  Q    Let's talk about the 2014 election.  If we can take the

20  red off the screen.  Turn to page 28 of the joint stips,

21  paragraph 146.  Now, I believe you testified on direct, Dr.

22  Rodden, that the three black-preferred candidates in this

23  election were Dr. Paulette-Thurman, Savala, and Johnson.

24  Correct?

25  A    Yes.

1  Q    And they're all African American.  Correct?

2  A    Yes.

3  Q    And one out of the three was elected:  Dr.

4  Paulette-Thurman.  Correct?

5  A    Yes.

6  Q    Now, I believe you offered the opinion in your initial

7  report, Dr. Rodden, that one black-preferred candidate was

8  elected in nine out of the 12 contested elections.  Do you

9  remember that?

10  A    I don't remember the particular counting exercises.  I

11  don't put that much stock in them, but if I -- I believe you.

12  Q    Okay.  That number, one black-preferred candidate was

13  elected in nine out of 12 contested elections, that would

14  count the 2014 election as one of those elections.  Right, Dr.

15  Rodden?

16  A    Yes.

17  Q    And that's because one out of the three black-preferred

18  candidates was elected.  Right?

19  A    Yes.

20  Q    So even though two out of three black-preferred

21  candidates lost, this would count as an election in that

22  number, nine out of 12, in which black-preferred candidates

23  got -- black voters got at least one of their preferred

24  candidates.  Right?

25  A    Yes.

1  Q    And so when we say that a single black-preferred

2  candidate won in nine out of 12 elections, that doesn't tell

3  us anything about the overall success rate for black-preferred

4  candidates.  Right, Dr. Rodden?

5  A    No.  I sliced the data a number of ways.  I believe you

6  sliced it in quite a few more.

7  Q    Let's talk about the 2013 election.  That's on page 25,

8  paragraph 138.  Now, Mr. Henson had the highest estimated

9  level of black support.  Right, Dr. Rodden?

10 A    Yes.

11 Q    And he's black.  Right, Dr. Rodden?

12 A    Yes.

13 Q    And I believe you said on direct that he had relatively

14 strong support from white voters, Dr. Rodden.  Is that right?

15 A    I did, yes.

16 Q    And of the four candidates in this race, Mr. Henson,

17 according to the point estimates, placed third amongst white

18 voters.  Is that right?

19 A    That's right.

20 Q    And Mr. Henson was not elected.  Is that right?

21 A    That's right.

22 Q    Now, Ms. Hogshead -- going back to black voters, Ms.

23 Hogshead had the second highest level of support from black

24 voters.  Right, Dr. Rodden?

25 A    Yes.

1   Q   And Ms. Hogshead is white?

2   A   Yes.

3   Q   Right? And she was elected?

4   A   Yes.

5   Q   Now, according to Dr. Engstrom's estimates, Ms. Hogshead

6   had about half the level of support among white voters as Mr.

7   Henson -- I'm sorry -- amongst black voters as Mr. Henson.

8   Correct?

9   A   Well, I wouldn't call it about half but a little more

10   than that.

11   Q   A little more than half. Can we agree on that?

12   A   Sure.

13   Q   According to your estimates, she got close to but not

14   quite two thirds of the level of support that Mr. Henson

15   received from black voters?

16   A   Yes.

17   Q   Now, under your point estimate approach, the election of

18   Leslie Hogshead in 2013 counts as just as much of a win for

19   black voters as if Mr. Henson had won. Correct?

20   A   That's the way the point estimate works.

21   Q   Now, the point estimate for Ms. Hogshead's level of

22   support among black voters falls within the confidence

23   interval of Mr. Brown's level of support among black voters.

24   Right?

25   A   Yes.

1 Q    And so by the statistical rule of thumb that you employ,

2 we cannot statistically distinguish between Hogshead's level

3 of support from black voters and Brown's level of support from

4 black voters.  Right?

5 A    Correct.

6 Q    And you -- but you still identify Hogshead as black

7 preferred and Brown as not.  Right?

8 A    Correct.

9 Q    Now, I think you testified that in this election Mr.

10 Henson felt some of the lingering anti-incumbent backlash over

11 the incident with former superintendent Spiegel's health

12 insurance.  Do you remember that, Dr. Rodden?

13 A    Yes.  He was president of the board when the vote was

14 taken.

15 Q    Hogshead was on the board when that vote was taken.

16 Right, Dr. Rodden?

17 A    That's correct.

18 Q    She was reelected this year.  Right, Dr. Rodden?

19 A    Yes.  I think she was barely reelected.

20 Q    Now, you stated in your report, I believe, Dr. Rodden,

21 that Ms. Hogshead traditionally performs well among black

22 voters in the Ferguson-Florissant School District.  Do you

23 remember that?

24 A    I did.

25 Q    Let's look at how Ms. Hogshead fares in amongst black

1  voters in Ferguson-Florissant School Board elections.  Can we

2  pull up Defendants' Exhibit A, your initial report in this

3  case, page 25, Figure 8.  Can I get rid of the red circles on

4  the screen.

5          This shows the results of all of your ecological

6  inference estimates for the Ferguson-Florissant School

7  District elections.  Right, Dr. Rodden?

8  A    Yes.

9  Q    Now, Ms. Hogshead, who you state traditionally performs

10  well amongst black voters, she has run in three contested

11  elections in the Ferguson-Florissant School Board, Dr. Rodden:

12  In 2001, 2004, and 2013.  Correct?

13  A    Yes.

14  Q    So let's look at 2001.  There were four candidates in

15  2001.  Correct?

16  A    Yes.

17  Q    And if we look at the base -- at the point estimates,

18  among black voters Ms. Hogshead had the second lowest

19  estimated level of support among black -- I mean among the

20  four candidates from black voters.  Correct?

21  A    Twenty percent.  By your approach, by the plaintiffs'

22  approach, 40 percent of the voters cast a ballot for her.

23  Q    Dr. Rodden, I didn't ask you about the plaintiffs'

24  approach.  I asked about your approach.

25  A    You asked me if she was -- if she had considerable

1  support; so I --

2  Q    That was not my question, Dr. Rodden.

3  A    I believe it was.

4  Q    The question was -- I believe you're wrong.  And I can

5  have the court reporter read it back to you, but we're in a

6  bit of a time crunch, I understand; so why don't you try

7  answering my question, Dr. Rodden.

8         According, to your point estimates, Ms. Hogshead, out

9  of four candidates, had the second lowest level of black

10  support in this election.  Correct, Dr. Rodden?

11  A    Yes.

12         MS. ORMSBY:  Your Honor, this is outside the scope of

13  the direct.

14         THE COURT:  Give you some latitude.

15         MR. HO:  I mean, he identifies Ms. Hogshead.

16         THE COURT:  Did I just overrule the objection?

17         MR. HO:  I'm sorry.

18         THE COURT:  If you want to argue with me, I can

19  reverse my ruling.

20         MR. HO:  I apologize, Your Honor.

21         THE COURT:  That's twice now when I ruled for you,

22  you argued with me.

23  Q    (BY MR. HO) I'm sorry, Your Honor.

24         Now, employing either your top-ranked candidate

25  approach or your point estimate approach, Ms. Hogshead would

1    not be considered a black-preferred candidate in 2001.

2    Correct?

3    A    Nope.

4    Q    Now, in 2004 there were five candidates.  Correct, Dr.

5    Rodden?

6    A    Yes.

7    Q    And among those five candidates, Ms. Hogshead had the

8    lowest estimated level of support from black voters.  Correct?

9    A    Yes.

10   Q    So under either of your methods of identifying

11   black-preferred candidates, Ms. Hogshead would not be

12   considered a candidate of choice among black voters in 2004.

13   Correct?

14   A    That's correct.

15   Q    And there was no election in 2007 or 2010.  Correct?

16   A    Correct.

17   Q    And under -- and prior to 2013, Ms. Hogshead had never

18   been a black-preferred candidate.  Correct?

19   A    That's correct.

20   Q    And when you count up how many black-preferred candidates

21   won in contested elections, do you remember if you considered

22   her wins in 2007 and 2010 as victories by black-preferred

23   candidates?

24   A    I believe we discussed this earlier.

25   Q    Did you or did you not count her as a black-preferred

1  candidate -- as a successful black-preferred candidate in the

2  uncontested 2007 and 2010 elections?

3  A    Yes.

4  Q    You did count her as a successful black-preferred

5  candidate in those two uncontested elections?

6  A    I really don't recall.  I'd have to look at the data.  I

7  assume that you have.  And we're trying to move things along.

8  I can get the data and take a look, but I'm going to take your

9  word for it.

10  Q    Now, I believe, Dr. Rodden, you opined that Mr. Henson

11  could have been elected in the -- getting back to the 2013

12  election, Mr. Henson could have succeeded if more of the

13  people who voted for him had engaged in a single-shot

14  strategy.

15        MS. ORMSBY:  Objection, Your Honor.  I don't believe

16  that was the testimony.

17        MR. HO:  I can bring it up, Your Honor.  It's in his

18  report.

19        THE COURT:  Well, no.  He can answer and tell you he

20  didn't say that.  That's okay.

21  A    So the question was whether he could have won had he --

22  yeah.  He lost by 125 votes.  There are a variety of ways he

23  could have won.

24  Q    So in your opinion, if more black voters had abandoned

25  their second vote, Mr. Henson could have won.  Correct?

A    Anybody who preferred him and felt that if they gave one of their votes to one of the other candidates and thereby, in doing so, would have undermined his chances, they had that option, yes.  That's the idea of bullet voting.

Q    Now, the two preferred candidates among white voters, using your point estimate approach in 2013, were Hogshead and Brown.  Correct?

A    Yes.

Q    And Hogshead and Brown are both white.  Correct?

A    Yes.

Q    And they were both elected.  Correct?

A    Yes.

Q    And the white voters who preferred Hogshead and Brown did not have to abandon their second votes or engage in single-shot voting to elect their two preferred candidates.  Correct?

A    No.  But I did not claim that African Americans had to do so either.  There's no difference between the groups.

Q    Let's turn to the 2012 election.  This is on page 24, paragraph 130.  Now, according to both yours and Dr. Engstrom's estimates, Ms. Morris received over 50 percent of black voters' votes.  Correct?

A    Yes.

Q    That indicates that there was at least some single-shot voting for her by black voters.  Correct?

1    A    That seems to be the case.

2    Q    And according to both yours and Dr. Engstrom's estimates,

3    Ms. Morris received only 12.01 percent of the white voters'

4    votes.  Correct?

5    A    Yes.

6    Q    Ms. Morris is black.  Correct?

7    A    Yes.

8    Q    Ms. Morris was not elected.  Correct?

9    A    That's correct.

10   Q    In your opinion, Ms. Morris' defeat could have been

11   averted if more white voters had crossed over for her.

12   Correct?

13   A    That's always the case, yes.

14   Q    Now, in your view, Ms. Morris could have been elected if

15   even more black voters had engaged in single-shot voting for

16   her.  Correct?

17   A    I don't know if I stated that opinion, but that seems

18   correct to me right now.

19   Q    And the two candidates of choice amongst white voters in

20   this election, according to your point estimate approach, were

21   Ebert and Schroeder.  Correct?

22   A    Yes.

23   Q    They were both elected.  Correct?

24   A    Yes.

25   Q    They're both white.  Correct?

1   A    Yes.

2   Q    White voters did not have to engage in single-shot voting

3   to elect their preferred candidates in this election.

4   Correct?

5   A    No.

6   Q    Now, the candidate with the second highest estimated

7   level of support from black voters in this election is

8   Schroeder.  Correct?

9   A    Yes.

10  Q    And you agree that, according to both yours and Dr.

11  Engstrom's estimates, Schroeder got about half as many votes

12  cast by African Americans as Ms. Morris did.  Correct?

13  A    Yes.

14  Q    And you would also agree that it is fair to say that Ms.

15  Morris received substantially more support among black voters

16  than did Mr. Schroeder.  Correct?

17  A    Yes.

18  Q    And under your point estimate approach, Mr. Schroeder's

19  victory in this election counts as just as much of a victory

20  for black voters as if Ms. Morris had been elected.  Correct?

21  A    Yes.  There are two seats.

22  Q    And you testified, I believe, earlier that you can't

23  understand how someone would not treat Schroeder as a

24  black-preferred candidate.  Correct?

25  A    I don't see why it would be ruled out from possibility.

1   Q    Now, the point estimate for Schroeder's level of support

2   among black voters falls within the confidence interval for

3   Ebert's level of support among black voters.  Correct?

4   A    Yes.

5   Q    And you could fairly say that black voters were not

6   cohesive behind Schroeder.  Correct?

7   A    Yes.

8   Q    And by the same rule of thumb that you employ when

9   analyzing turnout, we cannot statistically distinguish between

10  the level of support that black voters gave to Ebert versus

11  the level of support they gave to Schroeder.  Correct?

12  A    Correct.

13  Q    But still under your point estimate approach, Schroeder

14  is black preferred and Ebert is not, even though their level

15  of support among black voters is statistically

16  indistinguishable.  Correct?

17  A    Correct.

18  Q    Okay.  So you noted on direct that Schroeder got votes

19  from about 50 percent of black voters.  Right?

20  A    Applying the technique suggested by the plaintiffs.

21  Q    And you also testified, I believe, that, when you're

22  trying to understand candidate support levels, you should take

23  into account the number of seats available and the number of

24  candidates running.  Right, Dr. Rodden?

25  A    Yes.

1  Q    Now, if we look at this election, there are a total of

2  three candidates for two seats.  Right?

3  A    Yes.

4  Q    And two of the three candidates had to be elected.

5  Right?

6  A    Yes.

7  Q    So logically speaking under your point estimate approach,

8  because you have three candidates and black voters have to

9  have two preferred candidates and white voters have to have

10  two preferred candidates, it's required under your point

11  estimate approach that black and white voters would share a

12  candidate of choice under these facts.  Correct?

13  A    The candidate pool worked out that way in that election,

14  yes.

15  Q    So, in other words, when you apply the point estimate

16  approach to an election in which there are three candidates

17  for two seats, it's impossible for black voters and white

18  voters to diverge on their preferences.  Correct, Dr. Rodden?

19  A    Yes.

20  Q    Because there are three candidates for two seats and

21  black voters under the point estimate approach have to have

22  two preferred candidates, it's impossible that one of the

23  black-preferred candidates, as you define that term, would

24  fail to be elected.  Right, Dr. Rodden?

25         MS. ORMSBY:  I'm going to object.  Asked and

1    answered.

2              MR. HO:  This is a different question.

3              THE COURT:  It's a different question, but we get it.

4    A    Yeah.  That's a feature of this particular election.

5    Q    (BY MR. HO) Okay.  And when you cite that statistic -- a

6    single black-preferred candidate was successful in nine out of

7    12 contested elections -- that would include the 2012

8    election.  Right, Dr. Rodden?

9    A    It's a mechanical thing, yes.

10   Q    Let's look at the 2011 election, Dr. Rodden.  And,

11   actually, I want to skip the candidate levels of support, the

12   levels of candidate support, and just talk about your turnout

13   estimates for this election.

14              This is Defendants' Exhibit A, page 15, Figure 6.

15   Now, this is one of the elections in which you opine that

16   white turnout clearly exceeded black turnout.  Right, Dr.

17   Rodden?

18   A    Yes.

19   Q    And you recall that under your point estimate approach

20   all three black-preferred candidates lost and all three

21   white-preferred candidates won.  Correct?

22   A    Yes.  Just to be clear, this was the election with the

23   anti-incumbent surge and the Florissant mayoral election.

24   Q    Let's talk about those two things.  Now, your opinion was

25   that the anti-incumbent surge, the tax revolt caused turnout

1  to be unusually high in 2011.  Right?

2  A    Combined with the other things on the ballot, yes.

3  Q    Well, we'll worry about the Florissant elections for a

4  minute, but you believe that the tax revolt was one of the

5  things that caused turnout to surge in 2011.  Correct?

6  A    It's possible.  I don't know what caused it.

7  Q    And if we look at your estimates from 2011, it looks like

8  white turnout surged pretty substantially from previous

9  elections.  Correct?

10 A    Yes.

11 Q    And but it looks like black turnout stayed about the same

12 or even declined from the previous election.  Correct?

13 A    Yes.

14 Q    So it's fair to say that if the tax issue affected

15 turnout, it did not affect black and white voters in the same

16 way.  Correct?

17 A    Evidently.

18 Q    Well, let's look back at the joint stips for a second.

19 Page 22, paragraph 119, at candidate support.  Now, the

20 incumbents in this race were Graham, Clark, and Lentz.

21 Correct?

22 A    Yeah.

23 Q    None of them were white-preferred candidates under your

24 point estimate approach.  Correct?

25 A    I hadn't remembered that.  Okay.

1  Q    Yes?  You agree?

2  A    Yes.

3  Q    But under your point estimate approach, Graham and

4  Clark -- both incumbents -- were two of the black-preferred

5  candidates in this election.  Correct?

6  A    Yes.

7  Q    So it's fair to say that if there were, in fact, a tax

8  revolt in this election, it did not prevent black voters from

9  continuing to support two of the three incumbents.  Correct,

10 Dr. Rodden?

11 A    Did not prevent them from continuing to support the

12 incumbents?

13 Q    Well, continuing to choose them as their preferred

14 candidates.  Right, Dr. Rodden?

15 A    They were still preferred candidates?  Let's see.  You're

16 asking about two of them.  I'm just trying to make sure I

17 understand.  You're asking about Clark and Dr. Graham?

18 Q    That's --

19 A    You're asking me whether they were still

20 minority-preferred candidates?  Yes, that is correct.

21 Q    Now, we noted that Mr. Schroeder was on the board at the

22 time of the health insurance decision with respect to Mr.

23 Spiegel.  Correct?  He's not in this election.

24 A    Right.  I think he was on a different cycle.

25 Q    Right.  He ran the following year, in 2012.  Correct?

1    A    Yes.

2    Q    And he was reelected notwithstanding the fact that he was

3    on the board during the health insurance issue.  Right, Dr.

4    Rodden?

5    A    Yes.  I believe he would be -- survived a narrow

6    reelection, yes.

7    Q    So let's talk about the mayoral election in 2011, the

8    Florissant mayoral election.  Now, you hypothesize that this

9    is one of the reasons why white turnout may have increased in

10   2011.  Right, Dr. Rodden?

11   A    Yes.

12   Q    But you did not in your report attempt to quantitatively

13   measure whether or not the Florissant mayoral election is

14   responsible for that increase in white turnout in the

15   Ferguson-Florissant School District overall.  Correct?

16   A    No.  That would have been a nice thing to have done, but

17   I did not.

18   Q    Right.  You could have, for example, run the turnout

19   numbers without Florissant to see whether or not the increase

20   in white turnout was localized in Florissant and not spread

21   out across the district.  Right, Dr. Rodden?

22   A    I could have.  At the time it didn't strike me as an

23   important thing to do.

24   Q    Right.  And you haven't done that.  Right?

25   A    No.

1    Q    And because you did not quantitatively test that

2    hypothesis, you would agree that that hypothesis would not

3    withstand the rigors of peer review as a conclusion.  Right,

4    Dr. Rodden?

5    A    No.  I characterize it as a post-analysis,

6    end-of-a-journal-article kind of guess as to what's happening

7    but I think an informed one that makes a lot of sense.

8    Q    But you really don't know one way or the other whether or

9    not the Florissant mayoral election in 2011 was responsible

10   for the surge in white turnout that year.  Right?

11   A    Not with any certainty.

12   Q    Now, you, I believe, testified on direct that you believe

13   that black voters were not cohesive in this election.

14   Correct?

15   A    2011?

16   Q    Yes.

17   A    That sounds right.

18   Q    Now, this was a three-seat election.  Right, Dr. Rodden?

19   A    Yes.

20   Q    And if no one engages in single-shot voting, the maximum

21   level of support that a candidate can get is 33.3 percent of

22   the vote.  Right, Dr. Rodden?

23   A    Yes.

24   Q    And you would agree that both Graham and Hawkins got

25   about two thirds of that level of support amongst black

1    voters.  Right, Dr. Rodden?

2    A    Yes.

3    Q    Just two more, Your Honor, and then I'll be finished.

4           Can we talk about the 2010 election?  Now, this was

5    an uncontested election year.  Right, Dr. Rodden?  2010?

6    A    That sounds right, yes.

7    Q    And Henson got his seat back; so you treat that as a

8    victory for a black-preferred candidate in a contested

9    election.  Right?

10   A    An uncontested election.

11   Q    In an uncontested, I'm sorry.

12   A    Uh-huh.

13   Q    And Hogshead got her seat back; so you treat that as a --

14   and you treat that as a victory for a black-preferred

15   candidate in an uncontested election?

16   A    Yes.  We've discussed that.

17   Q    Right.  Even though up until that point she had never

18   been a black-preferred candidate?

19   A    I think this is the third time we've discussed it.  Yes.

20   Q    Now, you can't remember which of the -- I'm sorry.

21   Strike that.  Can we talk about the 2009 election?  This is on

22   page 20 of the joint stipulation.  It's paragraph 112.

23          Now, under your point estimate approach, there's no

24   racial polarization in this election because black and white

25   voters both preferred Knowles and Schroeder.  Correct?

1  A    That's right.  It's an election with no African-American

2  candidates.

3  Q    And under your point estimate approach, both

4  black-preferred candidates won.  Correct?

5  A    That's right.

6  Q    And this is a monoracial contest, as you noted.  Right?

7  A    Yes.

8  Q    And we established earlier that you omitted monoracial

9  contests from your analysis of exogenous elections.  Correct?

10 A    Yes.

11 Q    Now, this was an election in which there were only three

12 candidates for two seats.  Correct?

13 A    That's right.

14 Q    And we established earlier that in elections where there

15 are three candidates and two seats under your point estimate

16 approach, at least one black-preferred candidate has to be

17 successful.  Right?

18 A    Yes.  That's right.

19       MR. HO:  Your Honor, if I can just check with my

20 co-counsel?  Thank you.

21       I don't have any further questions, Your Honor.

22       THE COURT:  Thank you, sir.

23       Give him a minute to get organized.

24       MR. HO:  Ready, Your Honor.

25       THE COURT:  You may proceed.

**REDIRECT EXAMINATION**

**BY MS. ORMSBY:**

Q    Dr. Rodden, do you recall plaintiffs' counsel asking you whether you believe that racially polarized voting is that African-American voters and white voters cast ballots for different candidates?

A    Yes.

Q    I believe you said that that's one way of looking at it; is that right?

A    Well, if we're talking about this in the specific context of the VRA, then I would say there's another component.

Q    Let me ask you, is there another component to racially polarized voting that you believe should be considered?

A    Well, yes.  The other component in the Voting Rights Act is that the white -- that the black minority be subsumed in a white majority such that African-American citizens cannot elect candidates of their choosing.

Q    Do you believe that's the case in Ferguson-Florissant School District?

A    No.  I believe we've been through lots of examples of cases where that's not the case.

Q    Dr. Rodden, did any of the answers that you gave to Mr. Ho in his cross-examination of you change any of the testimony that you gave on your direct exam?

A    No.

1  Q    And would that include your opinion that as of today

2  African Americans are a majority of the voting-age population?

3  A    That opinion has not changed.

4        MS. ORMSBY:  I have nothing further.

5        THE COURT:  Thank you.  Thank you, sir.  You may step

6  down.  We're going to charge you rent, though.

7        As I understand it, the last fact witness for the

8  defendant will be available Tuesday morning.  Is that correct?

9        MS. ORMSBY:  That's right.  Her son's in the hospital

10  and could not be here today.

11        THE COURT:  Anything further?

12        MS. ORMSBY:  Other than our last fact witness, we

13  will be done.  I believe that plaintiffs wanted to call

14  someone out of order.

15        THE COURT:  Okay.  Do you have somebody you wanted to

16  call today, Mr. Rothert?

17        MR. ROTHERT:  We do not want to call any more

18  witnesses in our case-in-chief.

19        THE COURT:  Okay.  That's a pregnant negative.

20        MR. ROTHERT:  So we have no more witnesses in our

21  case-in-chief.

22        THE COURT:  No, no.  In your "case-in-chief."  The

23  pregnant negative is we'll discover on Tuesday if you're

24  planning on calling any rebuttal witnesses.

25        MR. ROTHERT:  Or sooner, yes.

1    THE COURT:  And if you are, I mean, it would be

2  helpful if you would inform them as to who so that --

3    MR. ROTHERT:  We'll let them know before Tuesday.

4    THE COURT:  That laser-like focus piece can kick in

5  as opposed to "I didn't know you were coming, and I don't know

6  what to ask you; so let me just ask you a lot of things and

7  we'll see what happens."

8    It's been a long week.  Thank you all very much.  In

9  November -- and I only repeat this because if you think you

10  know where this case is going, then you should tell me,

11  because I don't know how this case is going to come out.  I

12  have yet to hear closing arguments.  I certainly haven't seen

13  the post-trial briefs or the proposed findings of fact or

14  conclusions of law, but there is a reality.  As I understand

15  under Missouri state law, filing closes on Tuesday.  Is that

16  correct?

17    MS. ORMSBY:  That's correct, Your Honor.  Five

18  o'clock.

19    THE COURT:  Filing closes on Tuesday for the 2016

20  election.  And I spoke in November about this.  I'm going to

21  talk big picture, like I did in November.  Elections only have

22  value, whatever they are, if people participate, if good

23  candidates run, they have the opportunity to plan, raise

24  money, and communicate their views so that citizens can make

25  informed decisions at the ballot box.  It's what democracy is

1   all about, with a small "d."

2         So I just want to reiterate that, as I sit here

3   today, I assume, until something changes, that there is going

4   to be an election in April and that there's a deadline on

5   Tuesday that matters.  And I have no idea -- I have not

6   checked to see who's filed or what's going on, but I just want

7   to reiterate what I -- the *Post Dispatch* reported in November

8   and I said from this bench in November -- that everyone should

9   participate in that election to the best of their ability.

10   And that's still the operative word.

11         I mean, the worst thing I can do -- and one of the

12   reasons your discussion on cross, does the election have an

13   impact on the -- does the case have an impact on the

14   election -- is to interject uncertainty.  Uncertainty is an

15   enemy of all of us in some fashion or capacity certainly, and

16   I don't want to interject uncertainty.  I mean, even if I were

17   to find liability and then we're going to have to come back

18   and have a hearing on remedies and -- you know, we have an

19   August deadline for a November election.  I mean, the

20   capacity -- all deliberate speed does not mean so quick we

21   can't do the right thing is my point.

22         We have to do this and we're doing it, but if we

23   didn't do it now, we couldn't talk about what the election's

24   going to look like in 2017.  If we waited, then we'd be in the

25   same pickle then.

But I just want to reiterate there's no reasonable expectation at this moment, no matter what I do, that that 2016 election isn't an important election that has definite consequences.  So I don't want to interject uncertainty.  I don't want anyone to misunderstand what I'm saying.  It's vitally important the citizens' voices are heard.  None of this matters if that doesn't happen.  People have to participate no matter what happens.

So I don't know what you take from that, but my message is simple.  People who want to run should be running, people who want to be heard should be talking, and people who want to vote should be preparing to vote in April, because at the end of the day I know we all agree that the education of our children is one of the most important things we can care about.

So please don't let this lawsuit impact the April election.  If there are things that need to change, they will change in the future, but that April election is not one of them; so . . .

MS. ORMSBY:  Thank you, Your Honor.

THE COURT:  I talk too much, but you all know what I mean.  So thank you all very much.

**(PROCEEDINGS CONCLUDED AT 4:40 PM.)**

CERTIFICATE

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 221 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 8th day of March, 2016.


_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter