**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF | ) | |
| THE NATIONAL ASSOCIATION FOR THE | ) | |
| ADVANCEMENT OF COLORED PEOPLE, | ) | |
| REDDITT HUDSON, F. WILLIS JOHNSON | ) | |
| and DORIS BAILEY, | ) | |
| | ) | Civ. No. 14-2077 |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FERGUSON-FLORISSANT SCHOOL | ) | |
| DISTRICT and ST. LOUIS COUNTY BOARD | ) | |
| OF ELECTION COMMISSIONERS, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT FERGUSON FLORISSANT SCHOOL DISTRICT'S POST TRIAL BRIEF

Defendant Ferguson-Florissant School District ("District"), by and through Counsel,

hereby files its Post Trial Brief in accordance with this Court's instructions on January 19, 2016.

## Introduction

The Court requested the parties address the following topics:

1.  Evidentiary issues including:

    a.  Whether to admit Dr. Kimball's opinions and testimony that were new and

        previously undisclosed;

    b.  Whether to admit William Cooper as an expert;

    c.  Whether there is a better data set than the 2011 – 2013 ACS for use in this case;

    d.  In addition, the District respectfully requests the Court take judicial notice of the

        April 5, 2016 election returns.

2. Was the Board's justifiable failure to respond to the community's request for information regarding Dr. McCoy's suspension a 'significant lack of response from elected officials?'[1]

3. What is the appropriate remedy in a jurisdiction with a slight majority of African American voters? Is there any precedent for a remedy with a sunset provision?

### **Background**

The parties conducted a six-day bench trial from January 11 – 19, 2016.

Plaintiffs called eleven witnesses, including four expert witnesses and seven fact witnesses. Plaintiffs' experts were the following. William Cooper testified as to the "whether it is possible to create four majority-Black districts," and as to the historical and current demographics in the District. He also compiled population demographics as reported by the 2010 census.[2] Dr. Colin Gordon testified to Senate Factor 5.[3] Dr. David Kimball testified to Senate Factors Two, Three, Four, Five, Seven, Eight and Nine.[4] Dr. Richard Engstrom testified as to racially polarized voting.[5]

Plaintiffs' fact witnesses were Adolphus Pruitt, a Plaintiff and representative of the Missouri N.A.A.C.P.; Charles Henson - former District Board member; Doris Graham - former District Board member, Frank Green[6] – Ferguson Florissant National Education Association representative and District employee; F. Willis Johnson – Plaintiff and unsuccessful candidate in 2014; and Reddit Hudson - a Plaintiff and N.A.A.C.P employee.

---

[1] See, *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) for the first unnumbered senate factor standard.
[2] See, PLTF-44, ¶¶9-10.
[3] Gordon's expert report is limited to Senate Factor Five. PLTF-40, p. 2. However, Gordon gave substantial testimony on the history of segregation used to analyze Senate Factor 1.
[4] Kimball refers to Senate Factors Eight as "the first additional, unnumbered factor" and Senate Factor Nine as the "second additional, unnumbered factor." PLTF-48, p. 14.
[5] See, Engstrom Report, PLTF-50 ¶5.
[6] Frank Green was listed as a fact witness for both parties.

The Ferguson Florissant School District ("District") called one expert, Dr. Jonathan Rodden, to testify to all three *Gingles* preconditions.[7]  Dr. Rodden provided rebuttal reports to each of Plaintiffs' four experts including the *Gingles* preconditions and senate factors.[8]  The District's fact witnesses were two current District Board members: Dr. Donna Thurman – elected in 2014; and Dr. Courtney Graves – elected in 2015.

Plaintiffs' Complaint requests the Court (a) declare the District's at-large method of electing Board members during April violates Section 2 of the Voting Rights Act; (b) enjoin the Defendants from administering or conducting any future elections under the current at-large method of elections in April; (c) order the implementation of an election system that complies with Section 2 and the Fourteenth Amendment; and (d) order that all future elections comply with Section 2 of the Voting Rights Act and the Fourteenth Amendment.[9]  Plaintiffs' Complaint and the District's defense revolve around Plaintiffs' desire to end the multimember system. Plaintiffs' expert reports and the District's defense revolve around Plaintiffs' desire to implement single member districts in its stead.

### Overview of Legal Standard and Argument

"[T]he ultimate right of Section 2 is equality of opportunity, not a guarantee of electoral success for minority preferred candidates of whatever race."[10]  The United States Supreme Court requires Plaintiffs establish three necessary preconditions.  If all three of those preconditions are established, the court proceeds to examine the totality of the circumstances test. [11]

---

[7] See, DEF-A, p. 2
[8] See, DEF-B in response to Engstrom's report, DEF-C in response to Cooper's report and DEF D in response to Kimball and Gordon's reports.
[9] See, Plaintiffs' Complaint dated December 18, 2014, ECF 1, p. 11.
[10] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 508 (2006).
[11] *Thornburg v. Gingles*, 478 U.S. 30 (1986).

In addition, the United States Supreme Court mandates a court find a "reasonable alternative practice as a benchmark against which to measure the existing voting practice."[12] Plaintiffs must provide an alternative electoral system that provides African Americans greater electoral opportunity in order to find liability under Section 2.[13] This honorable Court holds that a Section 2 Plaintiff must establish an available remedy in the liability phase of the litigation to establish liability under the totality of the circumstances test.[14]

No Court has ever found liability when the racial minority population exceeds 50% of the voters in the relevant district.[15] Moreover, Courts have not found liability when the racial minority is a plurality.[16] Courts have and should be reluctant to find liability under these circumstances because Section 2 relies on the notion that the racial minority's votes are submerged and diluted by the white majority. In this case, African Americans are the largest group of voters and became a majority of the voters in the 2011 – 2013 ACS. Submersion, dilution and a "white majority" are illogical and false concepts under these facts. Even if liability were possible, Plaintiffs are not convincing.

In general, Section 2 relies on the assumption that the racial minority is also a numerical minority. The converse of that is the assumption that whites are a numerical and political majority. While the precise standards have been extensively briefed, examples are the "white

---

[12] *Holder v. Hall*, 512 U.S. 784, 880 (1994) citing *Gingles*, 478 at 88.

[13] *Id*. at 887.

[14] *African American Voting Rights Legal Defense Fund v. Missouri*, 994 F.Supp. 1105 (1997).

[15] See, *Aldasoro v. Kennerson*, 922 F.Supp. 339 (1995) while Hispanics presently have the ability to elect in a single member district, this Court also has determined that Hispanics now have the ability to elect at-large. There is no current condition of vote dilution in El Centro. See also, *Jeffers v. Beebe*, 895 F.Supp.2d 920 (E.D.Ark. 2012) The plaintiffs have not cited a case, nor can we find one, in which a §2 vote-dilution claim successfully challenged the drawing of a district with a BVAP greater than 50 percent.

[16] See, *Fairley v. Hattiesburg*, 2:13-CV-18-KS-MTP, August 11, 2015 declining to find liability under the totality of the circumstances when the African American population was a majority of the population and plurality of the voters.

majority," submergence and dilution concepts mentioned above.[17]  The District maintains that the Voting Rights Act "minority" refers to a numerical *and* a racial minority.  The obvious reason is that a racial minority group that is a numerical majority cannot be submerged.[18]

Further, Plaintiffs cannot meet their burden under the first *Gingles* precondition, the totality of the circumstances and the mandates of *Holder v. Hall*, because single member districts are not a reasonable alternative to the current at-large system.  There is "no dilution unless there is an alternative electoral mechanism under which plaintiffs could expect to do better." [19]  The current at-large system is a-winner-take-all system.  It allows the largest group of voters the opportunity to win every single seat.

Instead of the opportunity to win everything, Plaintiffs offer the Court single member districts they hypothesize allow African Americans to win four seats.  The record is absolutely void of evidence that demonstrates African Americans could do better under this system.  The District's evidence to the benefits of the at-large system and to the harmful effects of single member districts is detailed in its Proposed Findings of Fact.  To be clear, Plaintiffs have not offered evidence of a system under which they could do better than the current system that allows African Americans the opportunity to win every single seat.  Without that evidence, Plaintiffs' claim cannot survive under the *Gingles* preconditions and under the totality of the circumstances.

Finally, Plaintiffs have not demonstrated unequal opportunity.  While Plaintiffs could have provided the Court with voter registration information in the District, they did not.  Instead, they provided voter registration data for the state of Missouri by race and asked the Court to

---

[17] *Bone Shirt*, 461 F.3d at 1018 the voting strength of a politically cohesive minority is diluted; 1020 whether the white majority typically votes in a bloc; and see generally, *Gingles*, 478 U.S. 30.
[18] Rodden states the notion that African Americans are submerged in a white majority, which is the assumption of the Voting Rights Act, "I don't have any other word than absurd." *Rodden Testimony*, Vol. V, 70:17-23.
[19] *Aldasoro v. Kennerson*, 922 F.Supp. 339, 373 (1995) citing *Holder v. Hall*.

assume the registration rates are the same as in the District. However, socioeconomic factors indicate that African Americans are better off in the District than state-wide. That suggests registration rates are likely higher for African Americans in the District than state-wide. Regardless, it was Plaintiffs' evidentiary burden to prove that African Americans, as a larger percentage of voters in the District, have a lower "effective" voting age population. Speculation fails to meet that burden.

In addition, Plaintiffs failed to provide the Court with an ecological inference analysis of turnout. Instead, their turnout evidence relies on homogenous precinct analysis that Engstrom, their own expert admits is inferior.[20] They also failed to provide an ecological inference of the number of voters that bullet voted. Plaintiffs' measures for racial polarization assume that every voter used every vote. The evidence demonstrates that is not true.

Plaintiffs stipulated that African Americans are the largest group of voters. However, Plaintiffs stick their head in the sand and assert that time stopped in 2010 to avoid admitting African Americans are a majority. The particular percentage of African American voters that outnumber white voters is not as relevant as the fact that African Americans are the largest group of voters. Plaintiffs have done nothing to diminish that finding.

The District's second argument is that Plaintiffs have not and cannot meet the second and third *Gingles* preconditions because African American voters are not cohesive and do not have preferences distinct from white voters. The Voting Rights Act measures vote dilution in the present tense. Therefore, the most recent elections are the most relevant.[21] The 2014 and 2015 elections have seen two African American candidates elected in the last two years.[22] The District

---

[20] *Engstrom Testimony*, Vol. IV, 11:13-12:21 when he states that EI is "by far the superior methodology."
[21] See, *Uno v. Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995)
[22] *Joint Stip*. ¶145 and ¶166. In addition, the District requests the Court take judicial notice of the 2016 election results.

has requested judicial notice of the April 5, 2016 election whereby an additional African American was elected by a significant margin.[23]  Plaintiffs would diminish the recent success of African American candidates by claiming the results are tainted by this lawsuit or other special circumstances.  However, they provide no evidence for this hypothesis and fact witnesses testify otherwise.

In addition, the last five elections demonstrate significant crossover voting and a lack of cohesion within the African American community.  The most recent election would likely solidify that.  Plaintiffs simply cannot meet the second and third *Gingles* preconditions.

The District's third main argument is that the totality of the circumstances test is decidedly in its favor.  The parties do not dispute a history of segregation or socioeconomic disparities within the District.  However, African Americans that live in the District are better off than those that live outside of it.  Further, there is no evidence to indicate those disparities effect their ability to participate in the political process.[24]  There are no organizations in the District that slate candidates.[25]  The only organization that fits the definition of a slate was the 2014 Grade A for Change slate that benefitted African American candidates.  There is no evidence of racial appeals.[26]  African Americans have been successfully elected in the District.[27]  When African American candidates have lost, their loss can be explained by unpopular votes, slim losses and inferior campaigns.  The Board is responsive to the needs of the African American

---

[23] See Section 1(d) below.
[24] Senate factors one and five require a history of discrimination that touches African American's ability to register, to vote or otherwise to participate in the democratic process.  Senate factor five analyzes socioeconomic disparities that effect African Americans' ability to participate.  See, *Bone Shirt v. Hazeltine*, 461 F.3d 461 F.3d 1011 (8th Cir. 2006).
[25] See, *Bone Shirt*, 461 F.3d at 1021  for senate factor four.
[26] See, *Bone Shirt*, 461 F.3d at 1021 for senate factor six.
[27] See, *Bone Shirt*, 461 F.3d at 1021 for senate factor seven.

community.[28]  Finally, the reasons to maintain the at-large system for school boards are not tenuous.[29]

Plaintiffs cannot meet their burden on any of the *Gingles* precondition, the senate factors, or an effective remedy.  Yet, Plaintiffs' burden was to meet all of them.

### 1. Evidentiary Issues

### (a) Kimball Testimony

On the second and third days of trial, Dr. David Kimball opined about three separate topics that were not included in his expert reports: (1) voter registration rates, (2) bullet voting, and (3) the supermajority percentage for African American voters to be successful.  The District's counsel objected to these questions and the Court took them under submission.

The Federal Rule of Civil Procedure 26 requires disclosure of expert testimony.  Rule 26(a)(2)(B) requires that a witness employed to provide expert testimony in the case must file a report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them."[30]  In addition to the disclosure requirement, there is a duty to supplement.  Rule 26(e) states that a party who has made a disclosure under Rule 26(a) must supplement or correct its disclosure in a timely manner if the party learns that in some material respect the disclosure is incomplete.[31]  Further, an expert's duty to supplement extends both to his report and to the information given during his deposition. [32]

Kimball provided testimony on voter registration rates for black and white voters statewide in Vol. II, 116:20 – 117:15.  While the District argues this testimony is irrelevant

---

[28] See, Bone Shirt, 461 F.3d at 1021 for senate factor eight.
[29] See, Bone Shirt, 461 F.3d at 1021 for senate factor nine.
[30] See, Federal Rule of Civil Procedure 26(a)(2)(B)(i).
[31] See, Federal Rules of Civil Procedures 26(e)(1)(A).
[32] See, Federal Rules of Civil Procedures 26(e)(2) any additions or changes must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

because it does not provide the Court with any indication of voter registration rates within the District, the testimony was a surprise to the District and in violation of the letter and spirit of Rule 26. Neither of Kimball's two expert reports includes this information. Kimball was honest when asked if he included voter registration information in his report. He replied, "I don't think I did."[33] The District requests this testimony stricken from the record.

Kimball was equally as frank with his testimony regarding bullet voting. Kimball testified as to bullet voting in Vol. II, 161:12-162:22. Kimball was asked on cross-examination to point out the portion of his report that opined about bullet voting. Kimball responded, "I don't think I did."[34] On re-direct, Plaintiffs attempted to characterize Kimball's testimony as misleading if he failed to opine about bullet voting.[35] The District respectfully requests the Court to review the testimony and citations involved. The District does not agree with Plaintiffs' reinterpretation of the District's objection.

Finally, Kimball testified on direct and on re-direct about a supermajority concept. On direct, Vol. II, 119:5-24 Kimball hypothesized about the percentage necessary for African American voters to be successful. When asked if that opinion was in his report, he responded flatly "No."[36] Plaintiffs attempted again to discuss the topic on re-direct.[37] The District reiterated its objection to the topic immediately thereafter.[38]

Kimball's reports fail to mention voter registration, bullet voting and a supermajority. His testimony on these topics is highly prejudicial because the District was unable to depose him on the topics and the District's expert was unable to respond. Plaintiffs had a pattern of

---

[33] *Kimball Testimony*, Vol. II, 184:7-23.
[34] *Kimball Testimony*, Vol. II, 184:24-185:2.
[35] *Kimball Testimony*, Vol. II, 32:6-25.
[36] *Kimball Testimony*, Vol. II, 187:22-188:8.
[37] *Kimball Testimony*, Vol. II, 27:20-288.
[38] *Kimball Testimony*, Vol. II, 28:24:29:1.

introducing new evidence on the stand in violation of the Civil Rules and that conduct should not be rewarded. Under Rule 26, Kimball's testimony relating to those topics, as listed above, should be stricken.

### (b) The 2011 – 2013 American Community Survey

The District relies on the 2011 – 2013 American Community Survey ("ACS") as a measure of the District's most recent and reliable population estimates. The District's expert testified clearly and unequivocally that the 3-year estimate is the most appropriate Census product to use in this case.[39] Rodden explained, "for any research question you've got kind of a matrix of things you might care about. You've got to try to decide what's the right census product for you. In this case, there wasn't really much debate. It was clear we wanted recent data and we wanted something that would work for this community of the size of the Ferguson-Florissant School District." Rodden's testimony on this matter was discussed in Vol. IV, 200:15 – 211:11.[40]

The United States Census Bureau compares the 1-year, 3-year and 5-year ACS and offers recommendations for the best use of each. The parties stipulated to the exhibit containing that information.[41] The Census Bureau indicates the three-year estimates are "more reliable than the 1-year" but "less current than the 5-year.[42]" The 1-year ACS includes data for areas with populations of 65,000 or more. The 3-year ACS includes data for areas with populations of

---

[39] *Rodden Testimony*, Vol. IV, 200:18-201:23.
[40] During this testimony, Plaintiffs objected to DEF-R "*Census Bureau Releases Estimates of Undercount and Overcount in the 2010 Census.*" The Court replied that if the foundation is laid that this is the type of information an expert would typically rely on in this type of case, that piece of it is overruled. Vol. IV, 211:7-10. On the following day, the District laid the foundation for DEF-R, Plaintiffs objected and the Court overruled the motion. Vol. V, 4:13-5-2.
[41] See, "*When to Use 1-year, 3-year, or 5-year Estimates*" by the United States Census Bureau, DEF-Q, admitted without objection Vol. IV, 128:25-129:15.
[42] DEF-Q.

20,000 or more.[43]  The District had a total population of 68,663 in the 2010 decennial census and 66,758 according to the 2011 – 2013 ACS.[44]  Thus, the District barely made the cut-off for the 1-year ACS.  Considering the downward trend in overall population, the District may fall below the 1-year ACS threshold in the near future.

The 3-year ACS is "best used when" one wants data that is more precise than the 1-year ACS but more current than the 5-year ACS.  The 3-year ACS is also "best used" when one is analyzing smaller populations like the District. The 1-year ACS is "best used" when it is more important to have current information than precise data and when one is analyzing large populations.[45]  The Census Bureau states, "Choosing which dataset involves more than simply considering the population size in your areas. You must think about the balance between currency and sample size/reliability/precision."[46]

Plaintiffs admitted "A Compass for Understanding and Using American Community Survey Data" by the United States Census Bureau that further explains the advantages and disadvantages of single year versus multiyear estimates.  It states, "The primary advantage of using multiyear estimates is the increased statistical reliability of the data for less population areas and small population subgroups…..the level of precision improves dramatically with the 3- and 5-year estimates…"[47]

Plaintiffs attempted to introduce the  1-year 2014 ACS in the middle of trial through William Cooper's testimony.  The District objected because Plaintiffs failed to disclose it.  The Court sustained the objection.  Plaintiffs' counsel was disingenuous in attempting to explain the

[43] *Id.*
[44] *Joint Stip.* ¶16 and ¶23.
[45] DEF-Q.
[46] DEF-Q.
[47] "*A Compass for Understanding the American Community Survey Data*" by the United States Census Bureau, PLTF-133, p. 9.

non-disclosure. Plaintiffs' counsel stated "we didn't become aware of it until Wednesday." Plaintiffs' counsel further stated "it hadn't been released."[48] Yet, just prior to counsel's statement, Cooper admitted "[t]here's a one-year survey for the year 2014 that was released *in the fall*.[49]" In fact, the survey was available on October 27, 2015, almost eleven weeks before trial.[50]

Courts have not relied on data from the 1-year ACS. For example, the plaintiff in *Benavidez v. Irving Independent School District* sued twice in four years claiming a violation of Section 2.[51] In both cases, Plaintiffs attempted to rely on the 1-year ACS. The Court found the plaintiff failed to prove the 1-year data sufficiently reliable to overcome the presumption for the census.[52] In contrast, the same Plaintiff sued the City of Irving and relied on the 3-year ACS. The Court found the 3-year ACS sufficiently reliable to overcome the presumption for the census.[53]

The District's expert analyzed and opined that the 3-year ACS is the best census product to use in this case. The other census products are either unreliable but recent or unreliable because they are outdated.[54] The District's expert specifically analyzed this topic and placed his analysis in evidence.

Plaintiffs responded by arguing in favor of the 2010 decennial census. Plaintiffs' made the strategic decision to refuse to rely on any data outside of the decennial census. Fairness dictates they cannot now choose to rely on other data. Evidence is closed. In any respect, the

---

[48] *Cooper Testimony*, Vol. I, 212:23-215:11.
[49] *Cooper Testimony*, Vol. I, 212:23-213:1.
[50] According to the United States Census Bureau website at http://www.census.gov/content/census/en/programs-surveys/acs/news/news-releases.2015.html/
[51] See, *Benavidez v. Irving Independent School District*, 690 F.Supp.2d 451 (2010) and *Benavidez v. Irving Independent School District*, 2014 WL 4055366.
[52] *Benavidez v. Irving Independent School District*, 690 F.Supp.2d 451, 459 (2010)
[53] See, *Benavidez v. City of Irving*, 638 F.Supp. 709 (N.D. TX 2009).
[54] The 5-year ACS contains information from 2009 which is clearly outdated.

2011 - 2013 3-year ACS is the most appropriate data set for use in this case as compared to any other data set available. The District respectfully requests the Court rely on it.

### (c) Admission of William Cooper as an Expert

Plaintiffs offer the testimony of William Cooper as an expert in districting and demography and the District timely objected.[55] The District objects to Cooper's testimony in general and his calculation of the any-part black voting age population in particular.

Rule 702 provides that: "If scientific, technical, or other specialized knowledge will assist the trier of fact ..., a witness qualified as an expert ... may testify thereto in the form of an opinion." The trial judge acts as a gatekeeper of the expert's reliability under *Daubert*.[56]

In this case, Plaintiffs seek Cooper's testimony in districting yet Cooper admits he has no formal training in districting. He also admits he does not have undergraduate or graduate training in demography or redistricting.[57] Cooper does not consider himself a statistician and merely learned on the job while working for the A.C.L.U.[58] He explained that the A.C.L.U. needed help drawing districts and he had that skill "of a sort," so he did it.[59]

Cooper's testimony is reliant on statistics yet he does not consider himself a statistician. Cooper drew two Illustrative Plans and two Hypothetical Plans yet has no training in demography. The District objects to Cooper's admission as unreliable pursuant to Rule 702. In the alternative, the District urges the Court to give his testimony less weight.

---

[55] *Cooper Testimony*, Vol. I, 181:6-15.
[56] *Kumho Tire Co., v. Carmichael*, 526 U.S. 137 (1999) citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469.
[57] *Cooper Testimony*, Vol. I, 215:25-217:2.
[58] *Cooper Testimony*, Vol. I, 217:9-218:13.
[59] *Cooper Testimony*, Vol. I, 218:5-13.

**(d) Judicial Notice of the April 5, 2016 Election Returns**

The Ferguson Florissant School District held its most recent Board election on Tuesday, April 5, 2016. The District requests the Court take judicial notice that an additional African American was elected and allow it to supplement the record pursuant to Federal Rule of Civil Procedure 201.

The Rule allows the Court to take judicial notice of adjudicative facts because they are "generally known within the trial court's territorial jurisdiction" or they can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[60] The Court may take judicial notice even after the trial.[61]

The election returns are "generally known in the District" and can also be determined through the St. Louis County Board of Election Commissioners.[62] The official returns will not be certified until April 19, 2016. However, the returns indicate the candidate with the most votes, an African American female, won decisively. Thus, the certified results should not affect her success.

**(2) Was the Board's justifiable failure to respond to the community's request for information regarding McCoy's suspension a "significant lack of response from elected officials?"[63]**

The legal standard in relation to this issue is whether Board officials showed a "significant lack of response" to the African American community by failing to explain McCoy's suspension and ultimate resignation.[64]

---

[60] Federal Rule of Civil Procedure 201(b)(1) and (2).
[61] See, Rule 201(d).
[62] The unofficial election returns can be found at the St. Louis County Board of Election Commissioners website at: http://www.stlouisco.com/Portals/8/docs/Document%20Library/elections/eresults/el160405/el45.htm
[63] See, *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006).
[64] *Id.*

The District has been hamstrung by its own integrity at every step of this controversy. The Board has a policy that it does not discuss personnel issues publicly. Plaintiffs' own witness admitted as much.[65] The evidence demonstrates the Board listened to the concerns of the entire community but did not verbally respond.[66] Plaintiffs would have the Court infer discrimination from that behavior despite all evidence to the contrary.

The evidence demonstrates that Plaintiffs' witnesses were woefully unaware of the circumstances surrounding the personnel decision. When confronted with the Board's dilemma, Plaintiffs tacitly agreed the decision to remain silent was appropriate. For example, Plaintiff Hudson admitted he was unaware that if McCoy had proceeded with the termination process then the reasons for his suspension would become public.[67] Hudson was also unaware McCoy refused to sign a release to allow the Board to discuss the reasons for his suspension and resignation.[68] Hudson agrees the Board should not discuss the reasons for McCoy's suspension and resignation against McCoy's wishes.[69] Plaintiff Johnson agreed.[70] Finally, Plaintiffs Hudson and Johnson and Plaintiffs' witness Henson all admitted to knowing McCoy personally.[71] Curiously, not one of them asked McCoy himself why he was suspended or resigned.[72] Hudson' testimony was that he has not had the opportunity since 2014 to ask McCoy for the reasons.

The Board was placed in the position to either respect McCoy's wishes and refrain from giving the reasons for his suspension and resignation, or disrespect McCoy and respond to the

---

[65] *Graham Testimony*, Vol. II, 98:23-99:5.
[66] *Joint Stip*. ¶¶291-299.
[67] *Hudson Testimony*, Vol. IV, 119:12-18.
[68] *Hudson Testimony*, Vol. IV, 119:23-120:5.
[69] *Hudson Testimony*, Vol. IV, 121:16-20.
[70] *Johnson Testimony*, Vol. III, 140:18-21.
[71] *Henson Testimony*, Vol. II, 54:3-20; *Johnson Testimony*, Vol. III, 140:4-17; and *Hudson Testimony*, Vol. IV, 120:10-121:4.
[72] *Henson Testimony*, Vol. II, 54:3-20; *Johnson Testimony*, Vol. III, 140:4-17; and *Hudson Testimony*, Vol. IV, 120:10-121:4.

community.  The Board maintained its policy and refrained from discussing the details.  This decision respected McCoy's desire to maintain confidentiality.

The evidence demonstrates the Board managed a difficult situation exceedingly well. The Board held a meeting on November 13, 2013 attended by over 1,000 parents, community leaders and other District residents.[73]  Over 50 individuals voiced their support for McCoy, expressed their concerns about the suspension, particularly the lack of transparency in the process that led up to the suspension and the possibility that it had been racially motivated.[74] The meeting lasted close to four hours.[75]

Dr. Thurman testified to attending that meeting.  She admitted she was angry and disappointed going into the meeting because she was thought highly of McCoy.  She noticed how the Board sat in front of the table, not behind it, and listened to every single comment.  At some point during the meeting, it struck her that the Board's situation with McCoy was similar to her situation as a school principal.  She could not discuss personnel issues despite how angry the community was.  It was at that point that she began to realize how difficult it was to be a Board member.[76]

The Board responded to the community by holding a four hour long meeting in a public auditorium to accommodate the crowd. They listened to every single comment.  In a December 11, 2013 meeting, the Board again listened to parents and community member express their concern.[77]  Later that night, the Board voted to issue charges for termination for cause against McCoy.[78]

---

[73] *Joint Stip.* ¶291.
[74] *Joint Stip.* ¶292.
[75] Joint Stip. ¶293.
[76] *Thurman Testimony*, Vol. IV, 141:14-143:16.
[77] *Joint Stip.* ¶297.
[78] *Joint Stip.* ¶298.

The evidence demonstrates this volunteer Board accommodated the community as best it could by conducting large, open meetings with the opportunity for multiple comments from the public. The Board acted with dignity in maintaining its policy to refrain from discussing personnel issues and in abiding by McCoy's desire for confidentiality. The Board never showed a significant lack of response to the African American community, to the community at large and to McCoy.

### 3. The current multimember at-large system is the best electoral system for the largest group of voters. There is no better remedy.

The Court requested the parties discuss the appropriate remedy in a jurisdiction where the African American and white voting age population are roughly equivalent. While the District respects the Court's question regarding parity, the question requires nuance. The District concedes the African American and white voting age population are 'roughly equivalent.' However, it is crucial to the discussion of a remedy to point out that African Americans are the largest group of voters. [79] The precise percentage of African American and white voters and whether African Americans cross the 50% threshold is less important than the fact that they are the largest group. The fact that African American voters are also a majority merely amplifies the District's argument.

The District would first point out that the Complaint specifically requests the Court declare the at-large system in violation of Section 2 of the Voting Rights and requests it enjoin Defendants from holding at-large, April elections.[80] In its stead, Plaintiffs offer single member districting plans. Plaintiffs have not suggested or litigated any other options. Evidence is closed.

---

[79] The District offered ample evidence that this upward trend will continue based on the trend from the last 23 years and the larger African American school age population.
[80] See, Plaintiffs' Complaint dated December 18, 2014, ECF 1, p. 11.

In *Fairley v. Hattiesburg*, the Fifth Circuit held Plaintiffs are required to offer and support illustrative plans in the liability phase.[81]  The Fifth Circuit held,

> "it was solely the plaintiffs' responsibility to develop theories supporting their VRA claims and to provide the district court with the evidentiary basis for evaluating them.  If VRA plaintiffs want the district court to consider plans for creation of additional majority-minority districts, or to rely on appeal on the district court's obligation to consider evidence supporting those plans, they must press them by developing arguments and evidence in support.  Unless the plaintiffs raised the two alternative approaches and supported them with evidence bearing on their legal adequacy, the district court was under no obligation to consider them or to go through the meaningless formality of reciting their insufficiency."[82]

*Fairley* held that Voting Rights Act plaintiffs are entitled to make strategic decisions about which redistricting theories to press in court and which to omit.[83]  The Court states, "[r]equiring the district court to fish through the record for evidence that might conceivably support redistricting approaches that were never urged by the plaintiffs or presented as developed plans would be downright perverse."[84]

The instant Plaintiffs offered single member districts as their alternate plan.  They did not offer any other alternatives.  Plaintiffs must abide by their strategic decision to offer single member districts as a plan that is inferior to the current multi-member, at-large system.  Plaintiffs did not provide the court with any other evidene.

Plaintiffs claim the mere showing that one sub-district out of seven is a majority African American fulfills the first *Gingles* precondition.[85]  It does not.  Plaintiffs must show a system that is better than the current one.[86]  Plaintiffs propose single member districts.  However, the

---

[81] *Fairley v. Hattiesburg*, 584 F.3d 660, 669 (5th Cir. 2009)
[82] Id.
[83] *Id*.
[84] *Id*. at 660.
[85] ECF 84, Plaintiffs' Memorandum in Support of its Motion for Summary Judgment, Section I(A) p. 5.
[86] *Holder*, 512 US at 880.

evidence clearly indicates that single member districts are not better for African Americans under these facts.

If Plaintiffs now attempt to litigate the benefits of cumulative, limited or any other electoral systems, they failed to meet their burden under *Holder v. Hall* and *Fairley v. Hattiesburg*. [87] Plaintiffs cannot, after evidence is closed and after the case has been tried, introduce an entirely new remedy. The District would be severely prejudiced by any such allowance.

Regardless, the District continues to argue the at-large system is the best system for African American representation. Engstrom himself declared the at-large system provides the largest group of voters an *opportunity* to determine the winners of all of the seats.[88] That opportunity is all that is required under the Voting Rights Act.

The District's position remains consistent and well supported. African Americans have the opportunity to determine the representatives of their choice in every single seat on the Ferguson Florissant School District Board. There is no better system than one that allows a slight and growing majority, or the largest group of voters, the ability to elect the entirety. The current at-large multimember system with bullet voting gives African American voters the best possible opportunity.

The Court also requested the parties research whether there are any cases that allow the Court to implement a remedy with a sunset provision. The District has not found one. In addition, the District has not found an instance where the Court maintained jurisdiction through the next decennial census.

---

[87] *Holder v. Hall*, 512 U.S. 784 (1994) and *Fairley*, 584 F.3d 660.
[88] *Cumulative and Limited Voting: Minority Electoral Opportunities and More*, St. Louis University School of Law 2010, Richard L. Engstrom.

## Conclusion

The Ferguson Florissant School District's state-mandated multi-member, at-large system whereby candidates are elected with a plurality of the votes in staggered terms in April does not violate the Voting Rights Act. African Americans in the District have an equal opportunity to participate and their votes have not been diluted. The current at-large system is the best possible electoral arrangement for African Americans as the largest group of voters. Plaintiffs cannot meet their burden under the *Gingles* preconditions or the totality of the circumstances.

The District respectfully requests this Court make a finding the District is not in violation of Section 2 of the Voting Rights Act.

Respectfully submitted,

CROTZER & ORMSBY, LLC

*/s/ Angela Bullock Gabel*
Angela Bullock Gabel, 58227MO
130 S. Bemiston Ave., Suite 602
Clayton, MO 63105
314.726.3040 / 314.726.5120 (fax)
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455

*Attorneys for Defendant Ferguson-Florissant*
*School District*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is a person of such age and discretion as to be competent to serve papers. It is further certified that on April 8, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Anthony E. Rothert
Andrew J. McNulty
Jessie M. Steffan
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, Mo 63108
*Counsel for Plaintiffs*

Dale Hoe
Julie A. Ebenstein
Sophia Lin Lakin
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
*Counsel for Plaintiffs*

M. Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
*Counsel for Plaintiffs*

Gillian R. Wilcox
ACLU of Missouri
3601 Main Street
Kansas City, MO 64111
*Counsel for Plaintiffs*

*/s/ Angela Bullock Gabel*