**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF MISSOURI**

MISSOURI STATE CONFERENCE OF )
THE NATIONAL ASSOCIATION FOR THE )
ADVANCEMENT OF COLORED PEOPLE, )
REDDITT HUDSON, F. WILLIS JOHNSON )
and DORIS BAILEY, )
                            )      Civ. No. 14-2077
       Plaintiffs, )
v. )
                            )
FERGUSON-FLORISSANT SCHOOL )
DISTRICT and ST. LOUIS COUNTY BOARD )
OF ELECTION COMMISSIONERS, )
                            )
       Defendants. )

## DEFENDANT FERGUSON FLORISSANT SCHOOL DISTRICT'S

## POST TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF AUTHORITIES

**Cases**

*African American Voting Rights Legal Defense Fund, Inc. v. State of Missouri,* 994 F.Supp. 1105 (1997)................................... 103, 116

*Aldasoro v. Kennerson,* 922 F.Supp. 339, 369 (S.D. Cal. 1995) ..................................... 85, 87, 88, 95, 102

*Bartlett v. Strickland,* 556 U.S. 1 (2009) ................................................................. 87, 88

*Benavidez v. City of Irving Texas,* 638 F.Supp.2d 709, 729-730 (N.D. Tex. 2009) ............................... 85, 87

*Bone Shirt v. Hazeltine,* 461 F.3d 1011, 1020 (8th Cir. 2006) ........................................... *passim*

*Clark v. Calhoun,* 88 F.3d 1393, 1399 (5th Cir. 1989) ............................................. 110

*Clarke v. City of Cincinnati,* 40 F.3d 807, 810 (6th Cir. 1994) ............................................... 92

*Clay v. Board of Educ. of the City of St. Louis,* 90 F.3d 1357, 1361 (8th Cir. 1996) ................................... 92, 93, 94, 97

*Clay v. Board of Educ. of the City of St. Louis,* 896 F.Supp. 929 (E.D. Mo. 1995)................................... 108, 109, 116, 120, 121

*Colleton County Council v. McConnell,* 201 F.Supp. 2d 618, 642 n.21 (DSC 2002) ............................ 5

*Collins v. City of Norfolk,* 883 F.2d 1232 (4th Cir. 1989) ............................................. 93, 94

*Earl Old Person v. Brown,* 312 F.3d 1036, 1044 (9th Cir. 2002) ................................... 123

*Fairley v. Hattiesburg,* WL4744315, 2:13-CV-KS-MTP (Aug. 11, 2015) ........................... 13, 88

*Gomez v. Watsonville,* 863 F.2d 1407, 1415 (9th Cir. 1998) ................................... 91, 97

*Harvell v. Blytheville Sch. Dist. No. 5,*
71 F.3d 1382, 1386 ............................................................... 92, 93, 112, 113, 114

*Holder v. Hall,*
512 U.S. 874, 879 (1994) ....................................................... 84, 85, 89, 90

*Jeffers v. Beebe,*
985 F.Supp.2d 920 (E.D. Ark. 2010) ......................................... 88

*Jenkins v. Red Clay Consol. Sch. Dist Bd. of Educ.,*
4 F.3d 1103 (3rd Cir. 1993) ...................................................... 104

*Johnson v. DeGrandy,*
512 U.S. 997,v1011-12 (1994) ................................................. 84, 103, 115

*Kirkpatrick v. Preisler,*
294 U.S. 526 (1960) ............................................................. 87

*League of Latin Am. Citizens Council No. 4434 v. Clements,*
999 F.2d 831, 849 (5th Cir.)...................................................... 84

*Mallory v. Ohio,*
38 F.Supp.2d 525, 571 (S.D. Ohio 1997) ...................................... 95

*Martinez v. Busch,*
234 F.Supp.2d 1275, 1303 (S.D. Fla. 2002) ................................... 123

*Milwaukee Branch of the NAACP v. Thompson,*
935 F.Supp. 1419, 1428-29 (E.D. Wis. 1996) ................................ 95

*NAACP v. Fordice,*
252 F.3d 361, 367 (5th Cir. 2001) ............................................. 103, 125, 127

*Nipper v. Smith,*
39 F.3d 1494 (11th Cir. 1994) .................................................. 103

*Overton v. City of Austin,*
871 F.2d 529, 534 (5th Cir. 1989) ............................................. 117

*Reno v. Bossier Parish Sch. Bd.,*
520 U.S. 471, 480 (1997) ....................................................... 89, 90

*Rodriguez v. Bexar County Texas,*
385 F.3d 853, 864 (5th Cir. 2004) ............................................. 95, 102

*Rollins v. Fort Bend Indep. Sch. Dist.,*
89 F.3d 1204 (5th Cir. 1996) ..................................................... 96

*Stabler v. Co. of Thurston,*
129 F.3d 1012, 1020 (8th Cir. 1997) ........................................... 84, 103

*Thornburg v. Gingles,*
478 U.S. 30, 47 (1986) ........................................................ *passim*

*Uno v. City of Holyoke,*
72 F.3d 973, 990 (1st Cir. 1995) ............................................. 85, 110, 123-127

*U.S. v. City of Euclid,*
580 F.Supp.2d 584, 608 (2008) ................................................ 117, 119, 120-122

*U.S. v. Euclid City School Board,*
632 F.Supp.2d 740 (N.D. OH 2009)............................................. 131,132

*Valdespino v. Alamo Heights Indep. Sch. Dist.,*
168 F.3d 848, 853-4 (5th Cir. 1999) ........................................... 85-86

**Statutes**

52 U.S.C. § 10301 (a) .............................................................83

52 U.S.C. § 10301 (b) ............................................................ 83

42 U.S.C. § 1972 (b) .............................................................103

# TABLE OF CONTENTS

I.    PARTIES..................................................................................1

    A.   Plaintiffs.............................................................................1

    B.   Defendants..........................................................................2

II.   FINDINGS OF FACT...............................................................3

    A.   Voting Structure................................................................. 3

    B.   Demographics.................................................................... 4

       1. Population Statistics from 1990 – 2010 according to the
       decennial censuses.......................................................... 4

       2. Voting Age Population ("VAP") in the District from 1990 –
       2010 according to the decennial censuses............................. 5

       3. The 2011 – 2013 American Community Survey................... 6

          a. The 2011 – 2013 Population Counts......................... 8

          b. The 2011 – 2013 Voting Age Population................... 9

       4. Demographic trends in the Ferguson Florissant School District  11

       5. There are no credible estimates on the rate at which felons are
       disenfranchised in the District........................................... 14

    C. The *Gingles* preconditions.................................................... 16

       1. The first *Gingles* precondition....................................... 16

          a. The at-large system favors the largest group of voters... 16

          b. Single member districts are harmful to African American
          representation..................................................... 18

              i. African American voters' support is more
              geographically dispersed than white voters'
              support...................................................... 18

              ii. Single member districts exacerbate the candidate
              recruitment problem..................................... 19

iii. An analysis of Plaintiffs' illustrative and
hypothetical plans.......................................... 21

iv. Local municipalities with single member districts
have majority white representation.......................... 22

2. The second *Gingles* precondition...................................... 23

a. Ecological inference methodology........................... 23

b. Differing approaches based on the same methodology... 26

c. Alternative methods of analysis................................31

d. Historical elections in the District............................ 33

e. EI estimates of cohesion and racially polarized voting
for the 2011 – 2015 elections...................................... 34

i. The 2011 election....................................... 34

ii. The 2012 election....................................... 36

iii. The 2013 election....................................... 37

iv. The 2014 election....................................... 39

v. The 2015 election....................................... 40

vi. Circumstances surrounding the 2015 election.... 41

3. The third *Gingles* precondition........................................ 44

a. There is no white majority in the District................... 44

b. White voters do not vote in a block to defeat African
American candidates. African American voters do not
vote cohesively...................................................... 45

D. Senate Factors – The Totality of the Circumstances Test................... 47

1. Senate Factors One and Five............................................ 47

a. History of Discrimination....................................... 47

ii

        b. Racial Disparities in Socioeconomic Indicators............ 48

        c. African Americans' ability to participate in the process...49

                i. Voter Registration and Turnout within the
                District..................................................... 50

                ii. African American Voter Participation and
                Candidacy in the District................................ 51

2. Senate Factor Two........................................................ 52

3. Senate Factor Three..................................….............. 54

        a. At-Large versus Single Member Districts...................54

                i. Kimball's Research and Testimony on At Large
                Elections...................................................54

                ii. Board Members are in Favor of At Large
                Elections................................................... 55

                iii. A Comparison with Local Municipalities and
                Districts.................................................... 56

        b. April Off-Cycle Elections....................... ............. 57

        c. Staggered Terms................................................ 58

4. Senate Factor Four.....................................…............. 58

5. Senate Factor Six....................................................... 64

        a. Discipline as a Tactic that Preys on Racial Anxiety........ 65

        b. Transfer Students as a Tactic that Preys on Racial
        Anxiety.............................................................. 65

        c. Personal Attacks as a Subtle Racial Appeal................. 66

6. Senate Factor Seven.................................................... 67

        a. Current and Past African American Representation....... 67

        b. The 2011 Spiegel Controversy and Aftermath.............. 70

           c. District Voters elect African American Candidates in Exogenous Elections............................................... 72

           d. The Hazelwood School Board is Majority African American.......................................................... 75

      7. Senate Factor Eight...................................................... 75

           a. The Board's Role with the Achievement Gap and Discipline Disparity................................................ 76

           b. The Board's Relationship with the Current Superintendent............................................................ 78

           c. Dr. McCoy's Suspension and Resignation.................. 79

           d. The Board's Response to the Michael Brown Protests.... 81

      8. Senate Factor Nine...................................................... 82

III.     CONCLUSIONS OF LAW............................................ 83

    A. Legal Framework for a Section 2 Violation................................ 83

    B. The First *Gingles* Precondition................................................ 85

      1. African Americans were a Majority in 2013........................ 85

      2. Single Member Districts must Provide Greater Electoral Opportunity to African Americans........................................ 89

    C. The Second *Gingles* Precondition............................................ 91

      1. The Legal Standard of the Second *Gingles* Precondition.......... 91

      2. Methods and Identification of African American Preferred Candidates.................................................................. 92

      3. Cohesion and Crossover Voting among African American and White Voters................................................................ 97

    D. The Third *Gingles* Precondition.............................................. 99

      1. There is no White Majority in the District............................ 99

2. Whites do not vote in a Bloc to Defeat African American Preferred Candidates……………………………………..…….. 101

3. Graves' Election was not the Result of Special Circumstances… 102

E. Senate Factors – The Totality of the Circumstances…………………… 103

1. Senate Factors One and Five……………………………………… 104

a. Senate Factor One…………………………………………… 104

b. Senate Factor Five…………………………………………… 106

c. African Americans' Ability to Participate……………… 107

2. Senate Factor Two………………………………………………… 110

3. Senate Factor Three……………………………………………….. 111

a. At-Large versus Single Member Districts under these Facts…………………………………………………………….. 112

b. April versus November Elections………………………….. 114

c. Staggered Terms…………………………………………… 115

4. Senate Factor Four……………………………………………………116

5. Senate Factor Six……………………………………………….. 119

a. Discipline is an Issue of Legitimate Issue of Public Concern………………………………………………….......... 120

b. Transfer Students are an Issue of Legitimate Public Concern………………………………………………………… 121

c. Candidate Personal Attacks……………………………….. 122

6. Senate Factor Seven………………………………………………123

a. African Americans maintained Historical Representation…………………………………………………… 124

b. The 2011 Election and Aftermath from the Board's decision to give Speigel Lifetime Health Insurance……… 124

c. African American Success from 2012 – 2015...............126

d. Exogenous Election Results................................. 127

7. Senate Factor Eight.....................................................128

8. Senate Factor Nine...................................................... 131

IV.    CONCLUSION.......................................................................131

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

MISSOURI STATE CONFERENCE OF　　　)
THE NATIONAL ASSOCIATION FOR THE　)
ADVANCEMENT OF COLORED PEOPLE,　　)
REDDITT HUDSON, F. WILLIS JOHNSON　)
and DORIS BAILEY,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　) 　　Civ. No. 14-2077
　　　　　　Plaintiffs,　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
FERGUSON-FLORISSANT SCHOOL　　　　　)
DISTRICT and ST. LOUIS COUNTY BOARD　)
OF ELECTION COMMISSIONERS,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　　)

## DEFENDANT FERGUSON FLORISSANT SCHOOL DISTRICT'S

## POST TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Ferguson Florissant School District ("District") hereby files its Post Trial

Proposed Findings of Facts and Conclusions of Law as required by this Court on January 19,

2016.

## I. PARTIES

### A. Plaintiffs

1.　　　Plaintiff Missouri State Conference of the National Association for the Advancement of

　　　　Colored People ("MO NAACP") is a state affiliate of the National Association for the

　　　　Advancement of Colored People. ECF 124, *Joint Stipulation of Uncontested Facts*

　　　　*("Joint Stip.")* ¶5.

2.　　　Plaintiff Reddit Hudson ("Hudson") is an African American voter and resident in the

　　　　District. Hudson is a current employee of the NAACP, a Plaintiff in this case. Hudson is

　　　　a former employee for the American Civil Liberties Union ("ACLU"). The ACLU is

providing Plaintiffs' representation in this suit. *Joint Stip*. ¶3 and *Hudson Testimony*, Vol. IV, 88:15-19; ECF 1.

3.  Plaintiff F. Willis Johnson ("Johnson") is an African American voter and resident in the District. Johnson was an unsuccessful candidate for the 2014 Ferguson Florissant Board of Education. *Joint Stip*. ¶4; and *Johnson Testimony*, Vol III, 111:19-23.

4.  Plaintiff Doris Bailey is an African American voter and resident in the District. *Joint Stip*. ¶2.

5.  Plaintiffs' experts included the following. William Cooper testified as to the "whether it is possible to create four majority-Black districts," and as to the historical and current demographics in the District. He also compiled population demographics as reported by the 2010 census. PLTF-44, *Cooper Report*, ¶9-10. Dr. Colin Gordon testified to Senate Factor 5. PLTF-40, *Gordon Report*.[1] Dr. David Kimball testified to Senate Factors Two, Three, Four, Five, Seven, Eight and Nine. PLTF-48, *Kimball Report*, p. 14. Dr. Richard Engstrom testified as to racially polarized voting. PLTF-50, *Engstrom Report*, ¶5.

## B. Defendants

6.  Defendant Ferguson Florissant School District ("District") is a governmental entity that maintains an electoral system comprised of at-large elections for seven positions on the Ferguson-Florissant School Board ("Board") as mandated by Sections 162.0261; 162.341 and 162.291 RSMo. The Board is responsible for the governance and administration of FFSD, a political subdivision of the State of Missouri. *Joint Stip*. ¶7.

---

[1] Gordon's expert report is limited to Senate Factor Five. PLTF-40, p. 2. However, Gordon gave substantial testimony on the history of segregation used to analyze Senate Factor 1.

7.    As of the April 2015 election, the District Board is comprised of two African American and five white Board members. *Joint Stip.* ¶33.[2]

8.    The District is located in St. Louis County, Missouri. The District covers all or part of eleven municipalities. The City of Florissant comprises the largest portion of the District while the City of Ferguson makes up approximately 27% of the population of the District. *Joint Stip.* ¶9; ¶11; DEF-D ¶5.

9.    The Ferguson Florissant School District ("District") called one expert, Dr. Jonathan Rodden, to testify to all three *Gingles* preconditions. DEF-A, *Rodden Report*, p. 2. Rodden provided rebuttal reports to each of Plaintiffs' four experts including the *Gingles* preconditions and senate factors. DEF-B in response to *Engstrom's Report*, DEF-C in response to *Cooper's Report* and DEF-D in response to *Kimball and Gordon's Reports*.

10.   Defendant St. Louis County Board of Election Commissioners ("Board of Elections") is the governmental entity charged with conducting elections in St. Louis County. It is responsible for conducting elections for positions to the Board of the Ferguson-Florissant School District. *Joint Stip.* ¶8.

## II. FINDINGS OF FACT

### A. The Voting Structure.

11.   The Board is comprised of seven members who serve three-year terms and who are elected through an at-large election system. Board elections are staggered and held off-cycle so that either two or three Board seats are elected every April in accordance with Missouri law. *Joint Stip.* ¶31; and Sections 162.0261; 162.341 and 162.291 RSMo.

---

[2] The District has requested this information updated to include the April 5, 2016 election results. The composition of the Board has changed so as to dramatically affect the analysis of this case.

12. Each voter has the right to cast up to two votes in a two-seat election and up to three votes in a three-seat election. Voters may only cast one vote per candidate. *Joint Stip*. ¶34.

13. Voters are permitted to engage in "bullet voting." Bullet voting is casting just one vote for a single candidate and not using the remaining votes on any other candidate. Both African American and white voters could bullet vote to increase the likelihood of electing his/her candidate. *Thurman Testimony*, Vol. IV, 161:12-24.

14. Several board members indicate they utilized bullet voting in their campaigns and with their own vote. *Graves Testimony*, Vol VI, 17:4-6; *Graves Depo Designation*, 13:14 – 14:7; *Henson Testimony*, Vol II, 18:20 – 19:6; *Hogshead Depo Designation*, 15:18 – 16:6; *Schroeder Depo Designation*, 19:4-18; *Morris Depo Designation*, 69:2-20.

15. Board seats are awarded to the candidates with the most votes, such that when two seats are contested, the top two vote recipients win the two seats, and when three seats are contested, the top three vote recipients win the three seats. A candidate does not need to attain a majority of the votes cast to win election. *Joint Stip*. ¶35.

## B. Demographics

### 1. Population statistics from 1990 – 2010 according to the decennial censuses.

16. The African American population increased a total of 81.27% from 1990 to 2010. PLTF-44, ¶23. In 1990, the single race black population was 24.33% of the District's population. By 2010, that number increased to 52.03% of the District's population. PLTF-44, *Cooper Report*, Figure 2. In 2010, the any-part black population was 53.84% in the District. *Joint Stip* ¶16.

17. The white population decreased by more than half (-50.69%) from 1990 to 2010. *Joint Stip.* ¶17. In 1990, the non-Hispanic white ("NH white") population was 74.12% of the District's population. By 2010, that number dropped to 43.08% of the District's population. *Joint Stip.* ¶16

18. The total population in the District declined -15.17% from 1990 to 2010. *Joint Stip.* ¶15.

19. According to the 2010 decennial census, the District had a total population of 68,663, with a black population of 36,967 (53.84%), an any part Black ("AP Black") population of 36,967 (53.84%) and a white population of 29,581 (43.08%). *Joint Stip.* ¶13.

20. The AP Black classification counts as "Black" all persons who identify as single-race Black and all persons who identify as more than one race and some part Black. The AP Black category includes persons who are some part Black and Hispanic. *Joint Stip.* ¶19.

21. The 2000 decennial census was the first to report the black population in several racial categories. The "black only" category, later referred to as "single race black," is the least numerous count. The "any part black" category reports the most numerous count. See, *Colleton County Council v. McConnell*, 201 F.Supp.2d 618, 642 n.21 (D.S.C. 2002).

## 2. Voting Age Population ("VAP") in the District from 1990 – 2010 according to the decennial census.

22. The Black Voting Age Population ("BVAP") nearly doubled from 1990 to 2010. The BVAP was 20.77% in 1990 and increased to 47.33% in 2010. PLTF-44, *Cooper Report*, ¶31.

23. At the same time, the NH white VAP plummeted from 77.88% in 1990 to 48.95% in 2010. PLTF-44 ¶29-30. That amounts to a -47.45% decrease in the number of white voters in the District during that twenty year time period. PLTF-44, *Cooper Report*, ¶29.

24.     The overall voting age population mirrored the decline in the overall population in the District.   The overall VAP declined -16.39% from 1990 to 2010. PLTF-44, Cooper Report, ¶28.

25.     According to the 2010 decennial census, the AP BVAP was 24,466, or 48.19% of the District's voters.  The single-race BVAP was 24,030 or 47.33%, and non-Hispanic white VAP was 24,852 or 48.95% of the District's voters. *Joint Stip.* ¶13.

26.     In 2010, there were only 386 more NH white voters than AP Black voters in the District. *Joint Stip.* ¶14.

27.     Non-Hispanic white voters were not a majority in the District in 2010.  Instead, they held a slight plurality of 0.76%.  *Joint Stip.* ¶13.  A plurality is the largest group of voters. *Rodden Testimony*, Vol. V, 19:2-3.  Cooper testified that white voters were a plurality in 2010.  *Cooper Testimony*, Vol. I, 221:14-17.

### 3. The 2011 – 2013 American Community Survey.

28.     The Census Bureau publishes one, three and five year estimates of population demographics based on the American Community Survey. ("ACS")  The ACS is a rolling sample survey based on responses from one in about 40 persons on an annual basis. *Joint Stip.* ¶21.

29.     "A Compass for Understanding and Using American Community Survey Data" issued by the United States Census Bureau states, "The ACS is a nationwide, continuous survey designed to provide communities with reliable and timely demographic, housing, social and economic data every year." PLTF-133, p.1.  The Census Bureau specifically reports "age" and "race" in the ACS. PLTF-133 p. 1.

6

30.     The ACS *is* the Census. It is a well-crafted, well-chosen sample of households that collects all of the information that used to be collected in the decennial census. The information is now collected annually and released in three-year and five-year increments to ensure that the sample size is large enough for inferences. *Rodden Testimony*, Vol. IV, 199:9-18. The Census Bureau indicates that federal agencies, nongovernmental organizations, journalists, and state and local governments all rely on the ACS. *A Compass for Understanding and Using American Community Survey Data*, PLTF-133 p. 2.

31.     The Census Bureau indicates the best use for the one-year, three-year and five-year ACS data. The three-year ACS is appropriate for data areas of populations greater than 20,000. It is more precise than the one-year ACS and more current than the five-year ACS. It has a larger sample size than the one-year ACS. DEF-Q and PLTF-133 p. 3. The District's population was 68,663 according to the 2010 decennial census and 66,758 according to the 2011 – 2013 ACS. *Joint Stip.* ¶16 and ¶23.

32.     In this case, the appropriate census data is recent data that is reliable for a community the size of the District. For that reason, the three-year ACS is most appropriate. It is meant for areas with a population larger than 20,000. The population of the District was more than 60,000 in both the 2010 and 2011 – 2013 ACS. *Rodden Testimony*, Vol. IV, 201:19-23.

33.     Both parties rely on the 2011 – 2013 ACS for data. The District relies on the ACS for the most recent data related to race, age and socioeconomic conditions. Plaintiffs rely on the 2011 – 2013 ACS for socioeconomic information. Plaintiffs rely on the older 2010 decennial census for data related to race and age. DEF C, pp. 2-5 and PLTF 44, Ex. D

34. The decennial census is not foolproof. The decennial census contains errors that include an overcount and an undercount of the white and black populations. The Census Bureau states, "The 2010 census overcounted the non-Hispanic white alone population by 0.8 percent. The 2010 Census undercounted 2.1 percent of the black population." DEF-R.

35. The Census Bureau quantifies the errors in the decennial census by conducting a sample survey. *Rodden Testimony*, Vol. IV, 207:22-208:3. The ACS is a sample survey. The ACS contains sampling errors that quantify the errors in the survey with confidence intervals that give a margin of error. *Rodden Testimony*, Vol. IV, 205:7-14.

36. The 2011 – 2013 ACS is more reliable than the 2010 decennial census because it is more recent. It is not appropriate to rely on the 2010 decennial census to draw conclusions about the African American voting age population in the District today because it is out of date. *Rodden Testimony*, Vol V, 5:8-16. Engstrom testified that a Voting Rights Act analysis is a contemporary one. *Engstrom Testimony,* Vol. IV, 50:25-51:4. With that in mind, the most contemporary analysis involves the use of the 2011 – 2013 ACS.

37. The parties stipulated to all of the voting age population and percentages contained in the 2011 – 2013 ACS except for the AP BVAP estimate. *Joint Stip*. ¶¶23-25 and ¶28.

### a. The 2011 – 2013 ACS Population Estimates.

38. The 2011 – 2013 ACS indicates the single-race black population continued to increase from the 1990, 2000 and 2010 decennial censuses. *Joint Stip*. ¶16 and ¶23. The single race black population increased to 52.6% or by 35,087 individuals in the District. *Joint Stip*. ¶23.

39. The 2011 – 2013 ACS indicates the increase in the any-part Black population continued from the 1990, 2000 and 2010 decennial censuses. The any-part Black population

increased to 55% of the District's population by 2013. DEF-C, *Rodden Report*, Table 1.
This number is reported directly from the ACS and is not an expert calculation. DEF-C,
*Rodden Report*, Table 1 and *Rodden Testimony*, Vol. IV, 212, 20-24.

40.    The 2011 – 2013 ACS continued the downward trend of the white population in the
       District from the 1990, 2000 and 2010 decennial censuses. The single race white
       population fell to 41.3% or 27,587 individuals in the District. *Joint Stip.* ¶23.

### b. The 2011 – 2013 Voting Age Population Estimates.

41.    The 2011 – 2013 ACS indicated the increase in the African American voting age
       populations also continued from the 1990, 2000 and 2010 decennial censuses. The 2011
       – 2013 ACS indicated the single-race Black VAP was 48.94%, or 24,313 voters in the
       District. *Joint Stip.* ¶25.

42.    The AP BVAP continued to increase under the 2011 – 2013 ACS to the point that
       individuals that identify as any-part Black were a majority of the District's voters by
       2013. The AP BVAP was 51% of the District's voters. *Rodden Testimony*, Vol. V,
       16:16.

43.    The NH white VAP continued to decline under the 2011 – 2013 ACS. The NH white
       VAP fell to 46.78% or 23,242 voters in the District. *Joint Stip.* ¶25. Plaintiffs' expert,
       William Cooper, acknowledged the last time whites were a majority of the voters in the
       District was sixteen years ago in the 2000 decennial census. *Cooper Testimony*, Vol. I,
       221: 9-10.

44.    The overall voting age population in the District also decreased in the 2011 – 2013 ACS
       as it did in the 1990, 2000 and 2010 decennial censuses. The overall voting age

population in the District fell to 49,679 in 2013 from 50,771 in 2010. *Joint Stip.* ¶16 and ¶23.

45.     The parties agree that African Americans were a plurality of voters in the District back in 2013. The 2011- 2013 ACS indicated that single-race African Americans were the largest group of voters, with a plurality of 48.94% in the District three years ago. *Joint Stip.* ¶25.

46.     White voters, including both non-Hispanic white and single-race whites were a minority and the smallest group of voters in the District as of the 2011 – 2013 ACS. *Joint Stip.* ¶25.

47.     The parties disagreed over the appropriate method to calculate the AP BVAP under the 2011 – 2013 ACS. Plaintiffs' expert Cooper calculated the AP BVAP using a ratio from the 2010 decennial census. *Cooper Testimony*, Vol. I, 228:25-229:5. After splicing the 2010 decennial census data with the 2011 – 2013 ACS data for AP BVAP, Cooper estimated the AP BVAP according to the 2011 – 2013 ACS was 49.8%. *Joint Stip.* ¶30 and *Cooper Testimony*, Vol. I, 228:25-229:5. Cooper acknowledged that 0.2% of the District's voters amounted to 102 additional black voters. *Cooper Testimony*, Vol. I, 229:21-25. Under Cooper's estimate using both old and new data, African Americans were 103 voters short of a voting age majority in 2013.

48.     The AP BVAP was 51% of the District's voters based on the 2011 – 2013 ACS. *Rodden Testimony*, Vol. V, 16:16. Defendant's expert calculated that percentage based completely on data provided by the 2011 – 2013 ACS. *Rodden Testimony*, Vol. V, 15:15-16:16. Rodden detailed the following analysis. Defendant's Exhibit C, Table 1 indicates that the total population that identifies as two or more races with some part

African American was listed in the 2011 – 2013 ACS as 1,564 individuals. The same table indicates the total population that identifies as two or more races with no part African American was listed as 632. Rodden simply divided the 632 by the sum of 1,564 and 632 to determine the ratio of individuals in the 2011 – 2013 ACS that identify as any-part African American. Both of these numbers come directly from the 2011 – 2013 ACS. Rodden applied the same ratio for individuals that identify as any-part African American in the total population, to the number of voting age individuals identified in the 2011 – 2013 ACS. The total number of voters that identify as any-part black was 24,994. That number expressed as a percentage demonstrates the AP BVAP was 51% of the District's voters. *Rodden Testimony*, Vol. V, 15:23-16:16.

49.   Both parties' experts utilized the same method for determining the AP BVAP under the 2011 – 2013 ACS. The difference is that Defendant's expert relied exclusively on numbers provided by the 2011 – 2013 ACS, while Plaintiffs' expert relied on 2011 – 2013 ACS data with a ratio based on 2010 data. *Rodden Testimony*, Vol. V, 15:23-1616:1 and *Cooper Testimony*, Vol. I, 228:25-229:5.

50.   Plaintiffs' expert admitted the total minority voting age population was over 50% of the District's voters in the 2011 – 2013 ACS. *Joint Stip.* ¶30.

### 4. Demographic trends in the Ferguson Florissant School District.

51.   Trend lines are an acceptable practice among social scientists. *Rodden Testimony*, Vol. V, 10: 12-17. Rodden demonstrates the undeniable trend in his report. *Rodden Report*, DEF-A, Figure 3. The African American population has been growing steadily since 2000 and the white population has been decreasing rapidly. Most of the difference in the

demographics is due to the decline in the white population. DEF-A, Figure 3 and *Rodden Testimony*, Vol. V, 8:15-9:9.

52. Plaintiffs' expert Gordon corroborates that trend. Gordon states, "Rodden and I agree substantially on the basic demographic trends. The district is in the midst of an ongoing racial transition marked by white flight to the outer suburbs. Since 2000, the white population of the Ferguson-Florissant School District (FFSD) has fallen by almost half (50,000 to 28,160) while the black population has grown steadily. And, there is a stark disparity in population by age, with the share of the African-American population much higher among school-age residents." *Gordon Rebuttal Report*, PLTF-41, p. 1; *Rodden Testimony*, Vol. V, 11:4-12. Gordon's report provides an excellent example of the demographic trends in the District by mapping out the school age enrollment in the District by race. *Gordon Supplemental Report*, PLTF-41, Figure 1: Enrollment in FFSD by Race, 1991-2014.

53. The voting age population in the District mirrors the trend from the overall population. *Rodden Testimony*, Vol. IV, 213:18-23.

54. The continuous trend in the District is due to the demographic differences between African Americans and whites. The white population is considerably older than the African American population. African American families tend to be younger. In the 2010 decennial census, there was a large cluster of individuals on the cusp of turning 18, whereas there were far fewer in that category for whites. *Rodden Testimony*, Vol. IV, 214: 1-17. Gordon corroborates that finding in his report. *Gordon Supplemental Report*, PLTF-41, Figure 1: Enrollment in FFSD by Race, 1991-2014.

55.     The BVAP is slightly below the NH white VAP according to the 2010 decennial census. The two groups are at near equality in the 2010 decennial census but by the 2011 – 2013 ACS, the lines have crossed such that African American voters are the larger group. These numbers are not a projection but the hard data from the census and 2011-2013 ACS. *Rodden Testimony*, Vol. IV, 214:25-215:12 and *"Share of Voting-Age Population"* DEF-X.

56.     The evidence demonstrates that the AP BVAP was over 50% several years ago and has only increased since then. *Rodden Testimony*, Vol. V, 18:9-12. The combined vote share of African American candidates surpassed the vote share of white candidates in 2014 and 2015. *Rodden Testimony*, Vol V, 44:5-8. This appears to be a trend. *Rodden Testimony*, Vol. V: 65:24 – 66:1.

57.     None of Plaintiffs' four experts conducted a trend analysis. Cooper admitted that he has conducted a trend analysis in the past for a Section 2 claim. In *Fairley v. Hattiesburg*, Civil Action No. 2:13-CV-18-KS-MTP, August 11, 2015, Cooper analyzed trends such as the number of African American children in the schools, the number of African Americans with a drivers' license, and trend lines based on the 1990 and 2000 decennial censuses to project out past the previous decennial census. Cooper utilized a trend analysis to project that the black voting-age population had increased since the previous decennial census. *Cooper Testimony*, Vol. I, 224:18-226:17. Cooper knows how to conduct a trend analysis but failed to do so in this instance. *Cooper Testimony*, Vol. I, 226: 22-24.

**5. There is no credible evidence to suggest the rate at which felons are disenfranchised in the District.**

58.    Plaintiffs argue the rate at which felons have been disenfranchised in the District lowers the AP BVAP such that they were not a majority in the 2011 – 2013 ACS. Plaintiffs' expert Gordon proffered the testimony. PLTF-41, *Gordon Rebuttal Report*, p. 2. For the reasons cited below, the Court is not persuaded by Gordon's statistical evaluation.

59.    Gordon states that 44% of the District's population was African American under the 2010 decennial census. *Gordon Report*, PLTF-40, Table 1 and *Gordon Testimony*, Vol. I, 148:10-149:4. The stipulated facts indicate the single-race black population was 52.03% and the any-part black population was 53.84%. *Joint Stip.* ¶16. Gordon admits that the census data splits census blocks which enable them to have a precise measurement. He did not use that measurement because he did not believe it necessary. Instead, he relied on data that includes areas outside of the District. *Gordon Testimony*, Vol. I, 167:2-168:6.

60.    Gordon admits that he "used the data which was most relevant to the conclusions I was seeking to draw…" *Gordon Testimony*, Vol. I, 150:1-6. In addition, he admits that his report contains errors in that two maps indicate they were based on 2012 data but are actually based on 2010 data. *Gordon Testimony*, Vol. I, 149:10-21.

61.    Gordon's report states, "The patterns and mechanisms of segregation invented and sustained in the City of St. Louis migrated along this North-South line out into St. Louis County. This extended the contours of segregation so engrained in the City's history, and it reinvented them in new settings (including Ferguson-Florissant) in the inner suburbs. Here, segregation was spatial: African Americans in Ferguson-Florissant have settled

14

overwhelmingly in the apartment complexes (Suburban Heights, Northwinds, Canfield) along Malin Creek in south Ferguson and Kinlock, and in pockets of single-family housing east of West Florissant Avenue and south of I-270." *Gordon Report*, PLTF-40, p. 28 Gordon admits that neither Canfield nor Northwinds are actually inside the District. *Gordon Testimony*, Vol. I, 153:11-18.

62.    Gordon's analysis is based on the flawed premise that African Americans were 44% of the population in 2010. His analysis relied on a blended data set including data from the Housing and Urban Development. *Gordon Testimony* Vol. I, 124:19 – 125:4. Gordon's data yielded completely different results than Cooper and Rodden. Compare *Joint Stip*. ¶16 to PLTF-40, *Gordon Report*, Table 1.

63.    Gordon applied the felony disenfranchisement rate for the State of Missouri to the District's population. He did not attempt to customize it. *Gordon Testimony*, Vol. I, 137:6-10. He did not rely on data specific to the District. *Gordon Testimony*, Vol. I, 137:25-138:4. Gordon admitted that prisoners are counted in areas where a prison is located. He further admitted there are no prisons in the District. He did not adjust his estimate to reflect that. *Gordon Testimony*, Vol. I, 163:15-164:2. In addition, Gordon admits his estimates for felony disenfranchisement are inflated statewide by about 31,000. Again he did not adjust his felony disenfranchisement rates to reflect that. *Gordon Testimony*, Vol. I, 163:21-164:2.

64.    Gordon's testimony regarding the felony disenfranchisement rate is not persuasive because there are no prisons in the District. Gordon inappropriately used the disenfranchisement rate for the entire state of Missouri and simply applied that number to the District. That is an inappropriate use of data because many social and economic

indicators are quite different in the District. *Rodden Testimony*, Vol. V, 17:9-18:8. For the reasons cited above, Gordon's estimates for felony disenfranchisement are not reliable.

## C. The *Gingles* Preconditions

**1. The First *Gingles* Precondition: The minority group must be sufficiently large and geographically compact to constitute a majority in a single member district.**

65. There is an African American majority that is geographically dispersed. The District has not violated the first *Gingles* precondition. *Rodden Testimony*, Vol. V, 36:3-7. African Americans already possess an equal opportunity to elect their preferred candidates in the District. *Rodden Testimony*, Vol. V, 125:9-13.

**a. The at-large system 'provides the largest group of voters the opportunity to determine the winners of all of the seats.'[3]**

66. A group with geographically dispersed support that is also a majority of the voters is the group that benefits the most from the at-large electoral system. *Rodden Testimony*, Vol. V, 28: 14-16.

67. African American representation is more likely under the current system as demonstrated by the 2014 and 2015 elections when African Americans were elected. African Americans are on the cusp of gaining a majority of the board under the at-large system. *Rodden Testimony*, Vol. V, 32:12-15.

68. Plaintiffs' expert Dr. Richard Engstrom authored an article entitled *Cumulative and Limited Voting: Minority Electoral Opportunities and More?* This article was published in the St. Louis University Public Law Review in 2010. *Engstrom Testimony*, Vol. IV, 65:23-66:1 and DEF-NN *Cumulative and Limited Voting: Minority Electoral*

---

[3] This is the precise language Enstrom used in his scholarly article written in 2010.

*Opportunities and More.* The article was written well before the instant litigation was filed in December 2014.

69. Engstrom wrote in his article, "There are numerous variations in how at-large elections are implemented, but regardless of the particular arrangement, this system does have a tendency to favor the candidates preferred by a majority group, or at least the largest group, of voters within the jurisdiction. It provides the largest group of voters an opportunity to determine the winners of all of the seats." *Engstrom Testimony,* Vol. IV, 66:15-67:5; and DEF-NN emphasis added.

70. Engstrom had earlier published an article that concludes at-large elections tend to dilute the votes of minorities. *Engstrom Testimony*, Vol. IV, 69:7-10. *The Underrepresentation of Blacks on City Councils: Comparing the Structural and Socioeconomic Explanations for South/Non-South Differences?*, DEF-OO and *Engstrom Testimony*, Vol. IV, 67:13-68:5. The article made that conclusion based on Engstrom's decision to eliminate cities where the African American population constituted a majority. *Engstrom Testimony*, Vol. IV, 68:22-69:3 and DEF-OO. Therefore, the conclusion was based on an African American population that was also a numerical minority. The conclusion does not relate to an African American majority population.

71. Plaintiffs' expert Kimball relied on an article entitled *The Context Matters: The Effects of Single-Member Versus At-Large Districts* in his expert report. *Kimball Testimony*, Vol. III, 18-21; *Kimball Report*, PLTF-48, footnote 5. The article reads, "Alternatively, if a group composes a majority of the city population in a majoritarian at-large system, the group may be able to win all of the council seats. Districts might even decrease the group's representation on the city council." *Kimball Testimony*, Vol. IV, 8:22-9:12 and

*The Context Matters: The Effects of Single-Member versus At-Large Districts on City Council Diversity*, DEF-SS.

72.    The testimony and scholarly articles indicate the current at-large system allows the largest group of voters to win all of the seats. There is no evidence or testimony that any other electoral system can provide the opportunity for greater representation than a system that allows African Americans the ability to "to determine the winners of all of the seats."[4] Emphasis added.

**b. Single member Districts are Harmful to African American Representation.**

73.    Imposition of single member districts would be a step backward for minority representation for a variety of reasons. *Rodden Testimony*, Vol. IV, 190:23-191:4. *Thurman Testimony*, Vol. IV, 156:10 – 157:6. African American candidates will do worse under a single member districting plan than under the current at-large system. *Rodden Testimony, Vo*l. V, 180:17-20.

74.    There is no evidence to suggest that single member districts would be advantageous to African American representation. *Rodden Testimony*, Vol. V, 35:22-36:2. A geographically insulated minority benefits from the imposition of single-member districts. *Rodden Testimony*, Vol. V, 24:24-25:2. White voters are the minority.[5] *Joint Stip*. ¶25.

**i. African American Voters' Support is more Geographically Dispersed than Whites.**

75.    A group with geographically dispersed support that is also a majority of the voters is the group that benefits the most from the at-large electoral system. *Rodden Testimony*, Vol. V, 28: 14-16. African American support for African American candidates is dispersed

---

[4] This language is taken from Engstrom's 2010 scholarly article that indicates the at-large system is winner-take-all for the largest group of voters.
[5] The geographic dispersion of white and African American voters is discussed in section IIC(1)(b)(i).

throughout the District. It is not geographically concentrated. *Rodden Testimony*, Vol. V, 27: 10-13.

76. Defendant's expert calculated the geographic dispersion of African American voters' support for candidates by calculating a GINI coefficient. A higher GINI coefficient indicates a higher level of geographic concentration. Rodden's rebuttal report, Figures 3 and 4, demonstrate that African American voters' support for African American candidates is more geographically dispersed than white voters' support for white candidates. This is true with few exceptions in every election going back to 2000 in the District. *Rodden Testimony*, Vol. V, 28:17-30:4.

77. In 2015, Dr. Graves, an African American candidate and board member, had a GINI coefficient of .417 and Mr. Ebert, a white candidate and board member, had a GINI coefficient of .456. That indicates that Dr. Graves' support was more geographically dispersed than Mr. Ebert's. *Rodden Testimony*, Vol. V, 30:1-2.

78. In general, support for white candidates is more geographically concentrated than the support for African American candidates. *Rodden Testimony*, Vol. V, 29:20-24. White voters are the minority in the District. *Joint Stip.* ¶25. A geographically insulated minority benefits from the imposition of single-member districts. *Rodden Testimony*, Vol. V, 24:24-25:2. The Court finds white voters would benefit from the imposition of single member districts.

### ii. Single Member Districts Exacerbate the Candidate Recruitment Problem.

79. Dr. Thurman testified that single member sub-districts will exacerbate the candidate recruitment problem in a way that is detrimental to African Americans because African

Americans already have difficulty finding candidates to run for office. *Thurman Testimony*, Vol. IV, 136:23-25. *Rodden Testimony*, Vol. V, 26:1-9.

80.     Imposing single member sub-districts in 2016 would include drawing a district with the intent to achieve African American representation in Berkeley. The only candidate to run from Berkeley since Dr. Graham lost her election in 2011 was Ms. Dameron. Ms. Dameron, a white candidate, would likely win because she has been the only one to file from there. Therefore, there is no reason to expect African American success in that sub-district, despite it being drawn with an African American majority. *Rodden Testimony*, Vol. V, 31:1-20. Dr. Graham corroborated this evidence when she testified it was hard to get an African American from Berkeley to run. *Graham Testimony*, Vol. II, 24-25.

81.     The group that became the Grade A for Change ("Grade A") slate recruited candidates to run for office in the 2014 election. *Thurman Testimony*, Vol. IV, 136:1-5. Initially, a group of citizens met to brainstorm about ways to help Normandy and the District. They decided to recruit more African American candidates to run for the school board. It was difficult. In a room of 100-120 people, only three to four indicated interest. Not all of those ran. *Thurman Testimony*, Vol. IV, 136:1-137:8. The group put together a small committee to interview candidates for the District Board. The group name became Grade A for Change and formed a Political Action Committee. *Thurman Testimony*, Vol. IV, 137:19-138:2. After interviews, Grade A selected a slate of three candidates to run for the board. One of those candidates became ill. At that point, Grade A attempted to recruit an additional candidate. They were left with only one interested person and he was accepted on the slate. *Thurman Testimony*, Vol. IV, 138:21-140:1.

82. Dr. Graves testified that the candidate pool will be negatively impacted by single member districts because voters will be represented by whoever decides to run in that sub-district. The at-large system allows voters to choose from a pool of candidates to determine the best fit for the District. *Graves Testimony*, Vol. VI, 13:18-14:1.

83. Single member districts will make it more difficult for board members to change residences within the District. Dr. Graves moved recently and testified that her move would have been more difficult if she had to determine whether she was moving into another board member's sub-district. She testified that single member sub-districts could force a choice between living in an undesirable area within her sub-district or losing her seat. *Graves Testimony*, Vol. VI, 14:25-15:13.

### iii. An Analysis of Plaintiffs' Illustrative and Hypothetical Plans.

84. Plaintiffs' expert drew two illustrative plans with seven sub-districts. *Joint Stip*. ¶36. Both illustrative plans contain African American majorities for a majority (4 of 7) of the seats on the school board. *Joint Stip*. ¶45 and ¶47.

85. Illustrative Plan 1, based on the 2010 decennial census, contains four sub-districts with African American majorities. *Joint Stip*. ¶45. The sub-districts contain a black majority VAP ranging from 52.86% in sub-district 7 to 74.36% in sub-district 3. *Joint Stip*. ¶45. Illustrative Plan 2, based on the 2010 decennial census, contains four sub-districts with a BVAP ranging from 51.5% in sub-district 6 to 75.67% in sub-district 3. *Joint Stip*. ¶47.

86. Plaintiffs' experts do not know the percent required for African American voters to attain a victory in a District-wide election or in sub-districts in a single member districting scheme. *Kimball Testimony*, Vol III, 11:8-10 and *Engstrom Testimony*, Vol. IV, 65:3-6.

87. Plaintiffs' expert denies that African Americans are a majority of the voting age population in the District. *Cooper Testimony*, Vol. I, 206:7-10. At the same time, Plaintiffs ask the court for the majority of the board's voting power by drawing Illustrative Plans whereby four of the seven sub-districts are African American.[6] *Cooper Testimony*, Vol. I, 190: 20-21.

88. In fact, Plaintiffs drew Hypothetical Plan B that carves six out of seven sub-districts that are a majority African American. *Cooper Supplemental Report*, PLTF-45, Figure 7. *Cooper Testimony*, Vol I, 209: 8-11. The fact that Plaintiffs' expert was able to draw single member sub-districts whereby six of the seven districts are a majority African American merely illustrates that African Americans are a majority of the District's voters and are geographically dispersed. *Rodden Testimony*, Vol. V, 23:24-24:11.

89. Plaintiffs' Illustrative Plan 1 places both African American incumbents in the same sub-district. Imposing such a plan will necessarily result in the loss of an African American incumbent. *Rodden Testimony*, Vol. V, 25:4-13.

90. Imposition of Plaintiffs' Illustrative Plan 2 illustrates the larger problem with recruiting candidates.[7] Plaintiffs' drew Illustrative Plan 2 to solve the problem that they had placed two African American incumbents in the same sub-district. *Cooper Testimony*, Vol. I, 197:2-17 and *Rodden Testimony*, Vol. V, 25:14-26:9.

**iv. Local Municipalities with Single Member Districts have Majority White Representation.**

91. A comparison with local municipalities further demonstrates that single member sub-districts do not provide additional African American representation in majority African American regions. The District has maintained consistent African American

---

[6] This argument assumes the racially polarized voting that Plaintiffs suggest but the District denies.
[7] See, Section IIC(1)(ii).

representation since the 1980's. The municipality of Ferguson, with the functional equivalent of single member sub-districts, has not had African American representation until very recently. *Rodden Testimony*, Vol. V, 34:9-11. Dr. Graham testified that the city council in Ferguson was white until this last election. *Graham Testimony*, Vol. II, 86:20-21.

92.    Plaintiffs' expert Kimball acknowledged in testimony and in the *New York Times* that the 2014 election in the District demonstrated a "modest sign of shifting." *Kimball Testimony*, Vol. III, 14:2-22. In contrast, Kimball noted that the population of Ferguson shifted over the last 25 years from nearly three-quarters white to mostly black. Yet, the Ferguson City Council has five out of six white council members. *Kimball Testimony*, Vol. III, 12:17-13:11.

93.    The Florissant City Council, with single member sub-districts, has no African American representation. *Rodden Testimony*, Vol. V, 34:16-19.

94.    The at-large system favors "the candidates preferred by a majority group, or at least the largest group, of voters within the jurisdiction. It provides the largest group of voters an opportunity to determine the winners of all of the seats."[8]

**2. The Second *Gingles* Precondition: The Minority Group Must Be Politically Cohesive.**

**a. The Ecological Inference Methodology.**

95.    From 2000 through 2015, there have been twelve contested Board elections. *Joint Stip.* ¶53.

96.    When the number of candidates who have filed for a District election equals the number of seats to be elected, no election is held, and the candidates automatically assume Board

---

[8] See, *Engstrom Testimony,* Vol. IV, 66:15-67:5; and DEF-NN.

member responsibilities. From 2000 through 2015, there were four such occurrences. *Joint Stip.* ¶54.

97. Plaintiffs' expert Engstrom and the District's expert Rodden used Gary King's Ecological Inference ("EI") procedure to estimate the level of support for each candidate among African American and white voters. *Joint Stip.* ¶¶55-56. Rodden analyzed every election since 2000. Engstrom analyzed elections from 2011 – 2015. *Joint Stip.* ¶55-56.

98. For purposes of estimating levels of support, EI generates a specific estimate (the "point estimate") of the votes cast for each candidate by African-American voters and white voters as a percentage share of the respective groups' VAP, as well as a confidence interval for that point estimate. The confidence intervals identify the range of estimates within which we can be 95% confident, statistically, of where the actual value of a group's support for a candidate falls. The point estimate lies at the median of the confidence interval. *Joint Stip.* ¶57.

99. A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally-accepted standards in the field of political science and is consistent with peer-review standards for research in that field. *Joint Stip.* ¶58.

100. EI is used widely by expert witnesses in assessing racially polarized voting ("RPV") in voting rights cases. It was developed subsequent to the U.S. Supreme Court's decision in *Gingles* for the explicit purpose of improving estimates of candidate preferences between or among groups of voters. *Joint Stip.* ¶59.

101. Engstrom testified that EI is superior to other methods for determining racially polarized voting. EI is the only method Engstrom typically uses. *Engstrom Testimony*, Vol. IV,

13:3-6. The District's expert relied exclusively on EI estimates and agrees with Engstrom that it is the best method to use in Voting Rights Act cases. *Rodden Testimony*, Vol. V, 36:23-25. If there is a conflict between EI estimates and homogenous precinct analysis estimates, Engstrom relies on EI estimates. *Engstrom Testimony*, Vol. IV, 12:15-17.

102. EI is a method that utilizes all of the precincts in an election and compares the racial composition of the precinct electorates with the votes cast for the various candidates within those precincts. *Engstrom Testimony*, Vol. IV, 13:14-25. The result is that EI estimates group support for different candidates. *Engstrom Testimony*, Vol. IV, 14:3-5.

103. The "point estimate" is the best estimate in terms of the procedure. *Engstrom Testimony*, Vol. IV, 14:3-8. "The best estimate of the true value is the point estimate." *Engstrom Testimony*, Vol. 14:24-25.

104. One can be certain that the estimates are statistically significantly different if the confidence intervals do not overlap. However, it is theoretically possible for confidence intervals to overlap somewhat and still be statistically significantly different. *Engstrom Testimony*, Vol. IV, 16:4-12.

105. The confidence intervals expand to plus and minus other values, but as you go away from the point estimate, the probability that that point in the confidence interval is a true value declines. *Engstrom Testimony*, Vol. IV, 14:24:15:10.

106. Racially polarized voting ("RPV") is a relationship between the race of the voter and his/her vote. In this instance, it is a determination of whether African American voters and other members of the electorate vote differently. *Engstrom Testimony*, Vol. IV, 10:10-15.

107.    Engstrom and Rodden do not materially disagree as to the various levels of support each
        Board candidate received among different racial groups in each election and report
        consistent estimates of the respective levels of support received by the candidates from
        Black and white voters in the past five elections. *Joint Stip.* ¶¶55 and 60.

108.    The parties stipulated to the EI estimates for the elections from 2000 through 2015. For
        each contested election, tables are provided in the Stipulated Facts that identify each
        candidate's name, race, total number of votes received, and the level of support (the
        "point estimate") among Black and white voters with confidence intervals for each
        estimate as calculated by Dr. Rodden and, for 2011 through 2015, Dr. Engstrom, and
        identifies the winning candidates. Percentages reported are the percentage of votes
        received by a candidate from each group, not the percentage of voters supporting each
        candidate. *Joint Stip.* ¶61.

        **b. The Parties have Different Approaches Based on Similar EI Analysis.**

109.    Engstrom's approach for determining African American preferred candidates contains
        multiple rules and exceptions. The first rule is that a second or third African American
        candidate cannot be considered a preferred candidate if the top preferred candidates'
        support is "well above" the second or third candidate's support. *Engstrom Testimony*,
        Vol. IV, 29:20-30:2. Engstrom does not place a numerical range for his opinion of "well
        above." For example, there were three seats up for election in 2011. *Joint Stip.* ¶118.
        Engstrom identified two candidates, Graham and Hawkins, as African American
        preferred candidates that year. *Engstrom Testimony*, Vol. IV, 24:11-18. According to
        Engstrom's EI analysis, Graham's point estimate was 24.1% and Hawkins' point estimate
        was 21.5%. Graham's confidence interval was 21.0-27% and Hawkins' confidence

interval was 17.2-25.5%. The candidate that received the third highest point estimate from African American voters was Clark with a point estimate of 13.5% and a confidence interval of 11.2-16.1%. *Joint Stip.* ¶119. Graham and Hawkins' confidence intervals overlap. *Joint Stip.* ¶119. Yet, Engstrom identifies both Graham and Hawkins as African American preferred candidates. *Engstrom Testimony*, Vol. IV, 24:13-18. Graham and Hawkins are both African Americans. *Joint Stip.* ¶120. Engstrom does not identify Clark as an African American preferred candidate because he claims that Clark's support is too far behind that of Graham and Hawkin. *Engstrom Testimony*, Vol. IV, 26:2-7 and 26:15-20. Engstrom admits that Clark received the third highest percentage of votes from African American voters. *Ensgrom Testimony*, Vol. IV, 26:2-5 and *Joint Stip.* ¶120. Clark is white. *Joint. Stip.* ¶120.

110.   Engstrom's second method for excluding African American preferred candidates is to eliminate candidates with overlapping confidence intervals. *Engstrom Testimony*, Vol. IV, 18, 8-17; 19: 7-16; 30:3-11. Yet, Engstrom failed to eliminate either Graham or Hawkins. . *Engstrom Testimony*, Vol. IV, 24:11-18 and *Joint Stip.* ¶119. Regardless, an example of Engstrom's second exclusionary rule is that he identified one person, Henson, as the African American candidate of choice in 2013. There were two seats up for election that year. Two African American candidates ran and two white candidates ran that year. *Engstrom Testimony*, Vol. IV, 31:12-22. Engstrom's EI analysis indicates that Henson's point estimate was 43.7% and his confidence interval was 37.2 – 50.7%. Hogshead received the next highest black support with a point estimate of 24.2% and a confidence interval of 20 – 27.8%. Brown received the third highest support with a point estimate of 20.2% and a confidence interval of 16.2 – 24.3%. *Joint Stip.* ¶138. If every

voter casts all of his or her votes in a two-seat election, a candidate can receive at most 50% of all votes. *Joint Stip*. ¶34. Engstrom does not identify Hogshead or Brown as African American preferred candidates. *Engstrom Testimony*, Vol. IV, 31:12-22. Engstrom reports that Hogshead cannot be considered an African American preferred candidate because her confidence interval overlaps with Brown's confidence interval. *Engstrom Report*, PLTF-53, ¶14. Both Hogshead and Brown are white. *Joint Stip*. ¶138.

111.	Engstrom's third method for excluding candidates as African American preferred is to eliminate from consideration a candidate that received the second or third highest African American support if the candidate with the highest amount of African American support was unsuccessful. *Engstrom Testimony*, Vol. IV, 33:10-18. For example, there were two seats up for election in 2012. Engstrom identified one African American preferred candidate - B. Morris. *Engstrom Testimony*, Vol. IV, 27:18-21. According to Engstrom's EI analysis, Morris' point estimate was 51.9% and the confidence interval was 45.7 – 58.4%. *Joint Stip*. ¶130. Schroeder received the next highest support from African Americans with a point estimate of 25% and a confidence interval of 19.8 – 29.9%. Ebert received the lowest amount of African American support with a point estimate of 23.1% and a confidence interval of 18.1 – 28.2%. *Joint Stip*. ¶130. B. Morris was identified as the only African American preferred candidate. B. Morris is African American. Schroeder and Ebert were eliminated from consideration due to overlapping confidence intervals. Schroeder and Ebert are both white. *Engstrom Testimony*, Vol. IV, 29:24 – 3:11.

112.	Rodden believes Enstrom designed a set of justifications for his selection of minority preferred candidates that has the effect that voters can only prefer candidates of their own

race. *Rodden Testimony*, Vol. V, 48:1-8. Engstrom admits that every first, second, and third candidate he identified as minority preferred is African American. *Engstrom Testimony*, Vol. IV, 19:17-20:21.

113. The District's expert, Dr. Jonathan Rodden, undertook two approaches for determining African American candidate of choice: the point estimate approach and the top rank candidate approach. *Rodden Testimony*, Vol. V, 38:24-40:14.

114. The point estimate approach includes ranking the candidate's point estimates from the EI analysis. In a year with two seats up for election, the candidates with the two highest point estimates are considered the African American preferred candidates. In a three seat year, the candidates with the three highest point estimates are the African American preferred candidates. *Rodden Testimony*, Vol. VI, 39:2-24.

115. The primary strength of this approach is that it considers all of the elections and treats them in the same way. The weakness of this approach is that there are times when candidates have overlapping confidence intervals. *Rodden Testimony*, Vol. VI, 39: 8-14.

116. Rodden utilized an additional approach for determining African American preferred candidates. In his second approach, Rodden merely analyzed the top-ranked candidate among African Americans and the top-ranked candidate among white voters. (The "top rank candidate" approach).

117. Rodden's approaches consider all of the voters' preferences in the first approach and the top-ranked preferences in the second approach. *Rodden Testimony*, Vol. IV, 40:12-14.

118. Both of Rodden's approaches treat the seats in the same way for every election. Rodden does not exclude seats in one election but consider them in others. *Rodden Testimony*, Vol. IV, 40:10-14.

119. Engstrom's approach includes a basic methodological problem in that he attempts to measure cohesion by eliminating instances of non-cohesion. *Rodden Testimony*, Vol. V, 38:11-131. The result is that, at times, Engstrom identifies one African American preferred candidate in elections with two seats and other times, identifies more than one. This is not an appropriate approach to a multi-winner electoral system when there are always two seats and sometimes three seats up for election. *Rodden Testimony*, Vol. V, 37:22-38:38:10.

120. There is ample testimony that candidates and voters bullet vote. Dr. Graham encouraged voters to bullet vote, or vote only for her, in her elections. *Morris Depo Designation,* 69:2-20. Paul Schroeder would only vote for one candidate for school board rather than using all of his votes. *Schroeder Depo Designation,* 19:4-18. Leslie Hogshead encouraged family and close friends to only vote for her, and not vote for any other candidates for school board in her elections. *Hogshead Depo Designation*, 15:18 – 16:6. Chuck Henson bullet voted for himself and bullet voted for Courtney Graves in 2014. *Henson Testimony*, Vol II, 18:20-19:6. Courtney Graves encouraged voters to bullet vote for only her in her 2014 election. *Graves Testimony,* Vol VI, 17:4-6 and *Graves Depo Designation*, 13:14 – 14:7.

121. Yet, Engstrom and Kimball's approach assumes that every voter utilized every vote. *Engstrom Testimony*, Vol. IV, 24:9-12; 25:2-7; 31:14-17; and *Kimball Testimony*, Vol. II, 181:7-182:5. This is despite Plaintiffs experts' ability to identify whether voters used a bullet-vote. *Kimball Testimony*, Vol. II, 182:1-4.

122. Engstrom designed a set of justifications for his selection of African American preferred candidates that had the effect of finding that African American voters can only prefer candidates of their own race. *Rodden Testimony*, Vol. V, 48:1-5.

### c. Alternative Methods for Analysis.

123. Plaintiffs' experts also utilized homogenous precinct analysis and ecological regression. Engstrom and Rodden agree that Ecological Inference is the best method to use in Voting Rights Act cases. *Rodden Testimony*, Vol. IV, 37:2-5.

124. Plaintiffs' expert Kimball relied on homogenous precinct analysis as his main approach. Homogenous precinct analysis was used before advances in modern statistics. *Rodden Testimony,* Vol. IV, 40:20-41:3.

125. Both Engstrom and Kimball performed HP analysis. *Engstrom Report*, PLTF-52, ¶¶40-42 and *Kimball Reports*, PLTF-48, p. 5 and PLTF-49, Table 2. Engstrom alerted the reader that he had to change the typical HP threshold. Engstrom's report states, "HP analyses are typically based on cutoffs of 90 percent and 10 percent, but in this application 85 percent and 15 percent are employed due to the small number of precincts that satisfy the 90 percent and 10 percent thresholds." *Engstrom Report*, PLTF-52, p. 13, FN 9.

126. Kimball's 2014 HP analysis relied on 11 of 47 precincts when he utilized an 80/20 threshold. LTF-48, *Kimball Report*, p. 4-5. He relied on 3 of 47 precincts when he utilized a 90/10 threshold. PLTF-48, *Kimball Report*, p. 405. Kimball admits that his HP analysis excludes a vast majority of the data. *Kimball Testimony*, Vol. II, 195:17-196:1.

127. Kimball admits that switching thresholds within the same report would not survive the political science peer review process. *Kimball Testimony*, Vol. II, 202: 4-8.

128. Kimball also relied on a regression analysis to compare race and voting. PLTF-48, Kimball Report, p. 5. Kimball admits that "there's political science research indicating that ecological inference tends to be better than ecological regression." *Kimball Testimony*, Vol. II, 169: 19-21.

129. Kimball conducted a regression analysis for 2014. In that analysis, the horizontal axis begins at zero but the first marker on the vertical axis is 20. That gives the false impression of a 45-degree angle. *Rodden Testimony*, Vol. IV, 41:7-20.

130. Kimball's 2014 regression analysis only includes analysis of the top three African American candidates instead of analyzing the five African American candidates that ran that year. *Kimball Testimony*, Vol. II, 187:2-5.

131. The Court finds Kimball's homogenous precinct and regression analysis are not state of the art and would not survive peer review.

132. Rodden conducted a locally weighted regression analysis for 2012, 2013, 2014 and 2015. DEF-A, *Rodden Report*, Figure 7. Rodden's graphs include a red line at a 45-degree angle that represents perfect correlation between the racial composition of the district and voting behavior. The 45-degree angle is a benchmark for racial polarization. The main observations from Rodden's graphs are that the lines are flatter in every other year than in 2014. The 2014 election was racially an outlier for polarization due to contentious events surrounding the suspension of Dr. McCoy. The polarization lines are flatter both before and after that year. *Rodden Testimony*, Vol. V, 43:13-44:8.

133. The 2015 election returned to the lower levels of polarization seen in the elections before 2014. This was an unexpected finding considering the events involving Michael Brown. *Rodden Testimony*, Vol. V, 44:9-17.

#### d. Historical Elections in the District.

134. It is not possible to conduct EI analysis on uncontested elections. However, it is
     important to consider uncontested elections to have a true understanding of events in the
     District, especially in the middle of the 2000's. For example, Dr. Graham and Mr.
     Henson, African American incumbents, did not draw challengers because they were
     popular and successful incumbents. Smart candidates did not run against them until they
     voted in favor of a controversial pension package for the superintendent. *Rodden*
     *Testimony*, Vol. V, 45:20 – 24:17.

135. Henson testified that running unopposed is either an indication that constituents are
     content or that there are no qualified candidates to run for the office. *Henson Testimony*,
     Vol. II, 44:14-25.

136. Dr. Graham won several elections when she drew challengers but many times did not
     draw challengers because she was so popular. Dr. Graham won her seat back in the
     1980's and served until 2011. *Rodden Testimony*, Vol. V, 45: 20 – 47:3.

137. Rodden analyzed all of the data from all of the elections, including single-race elections,
     for the Court to review. Engstrom did not. *Rodden Testimony*, Vol. V, 47:17-25.

138. From 2000 – 2010, the African American share of the population was low. *Rodden*
     *Testimony*, Vol. V, 49:-50:9. According to the 2000 decennial census, the single-race
     African American voting age population was 32.61% of the District's voters. *Cooper*
     *Expert Report*, PLTF-44, Figure 4. Despite that, African American board members
     included: Dr. Graham, Gwen Thomas and Chuck Henson. *Rodden Testimony* Vol. V,
     49:20 – 50:9.

139. The evidence indicates that G. Thomas was elected in 2000 and re-elected in 2003. *Joint Stip.* ¶¶63 and 88. Graham was re-elected in 2002, 2005 and 2008. She lost in 2011. *Joint Stip.* ¶¶79, 101, 109 and 119. Graham testified she was on the board from 1988 – 2011. *Graham Testimony*, Vol. II, 73:10-13. Henson was appointed in 2007 and unopposed in the election that year. He was re-elected in 2010. *Joint Stip.* ¶¶108 and 117. Henson lost in 2013. *Joint Stip.* ¶138.

140. Henson was selected and appointed to serve on the board in January 2007. He was interviewed by the superintendent at that time and several board members. *Henson Testimony*, Vol. II, 19:23-20:4. The superintendent at that time was Jeff Spiegel, who is white. PLTF-130, p. 12 *"School board suffers backlash over deal with superintendent."* The racial make-up of the board at that time was six white members and one African American, Dr. Graham. *Henson Testimony*, Vol. II, 4:15-18.

## e. EI Estimates of Cohesion and Racially Polarized Voting for the 2011 – 2015 Elections.

### i. The 2011 Election.

141. In 2011, nine candidates (incumbents Graham, Clark, and Lentz and six challengers Chris Martinez, Paul Morris, Robert Chabot, Vanessa Hawkins, Brian Scott Ebert, and Joseph Hosea) ran for three seats. Martinez, a white-Hispanic candidate, Chabot and P. Morris, both white, were successful. *Joint Stip.* ¶118.

142. The incumbents that year were Clark, Graham and Lentz. None of the incumbents won. *Joint Stip.* ¶118.

143. The 2011 election was an anti-incumbent year. *Graham Testimony*, Vol. II, 94:23-95:2. Dr. Thurman testified that 2011 was "absolutely" an anti-incumbent year because the

board offered insurance to Jeff Spiegel and his wife. *Thurman Testimony*, Vol. IV, 147:4-10.

144. The candidates with the highest point estimates among African American voters were Graham, Hawkins and Clark. Graham and Hawkins are African American and Clark is white. *Joint Stip.* ¶120. Two of the candidates most preferred by African Americans were incumbents. *Joint Stip.* ¶180; *Rodden Testimony*, Vol. V, 51:6-17.

145. Although three seats were up for election, Engstrom only identified two candidates, Graham and Hawkins, as African American preferred candidates. *Engstrom Testimony*, Vol. IV, 24:13-18 and *Joint Stip.* ¶118. Rodden's point estimate approach identified Graham, Hawkins and Clark. *Rodden Testimony*, Vol. V, 50:12-16. The candidates with the highest point estimates among white voters were Martinez, Morris and Chabot. *Joint Stip.* ¶180.

146. Engstrom's comparisons for African American voters' support for candidates and white voters' support for candidates is not always consistent. For example, Engstrom testified that the greatest vote a candidate could receive in 2011 was 33.3% because there were three seats up for election. *Engstrom Testimony*, Vol. IV, 25:2-7. Graham received support from 21.95% of African American voters according to Rodden and 24.1% support according to Engstrom's EI estimates. Joint Stip. ¶119. Therefore, Engstrom testified that "Graham's vote is somewhere above 70% of that threshold, and Hawkins' vote is about 65% of that threshold." *Engstrom Testimony*, Vol. IV, 25. 8-17. When asked what about Graham and Hawkins' estimated levels of support among white voters, he replied "only 6.1 and 7.4%, respectively, over the two." *Engstrom Testimony*, Vol. IV, 25:18-22. Engstrom testifies that Clark is not an African American preferred

candidate because he received 13.5% of the African American vote. *Engstrom Testimony*, Vol. IV, 26:17-25. Engstrom fails to calculate the threshold of support Graham and Hawkins received among white voters. He fails to calculate that threshold for Clark's support among African American voters as well.

147.   In 2011, African American cast approximately 40% of their votes among six candidates. *Joint Stip.* ¶124. African American voters were not cohesive. *Rodden Testimony*, Vol. V, 51:22-24. African American votes were quite split for the second and third-place candidate of choice. *Rodden Testimony*, Vol. V, 52:18-20.

148.   Hawkins lost her election by 190 votes. Graham lost by 285 votes. *2011 Election Results*, PLTF-8. *Rodden Testimony*, Vol. V, 52:10-17.

149.   One cannot determine that a loss was due to white block voting when minority voting behavior is not cohesive and a candidate loses by a slim margin. This is especially true considering the size and growth of the African American population at that time. *Rodden Testimony*, Vol. V, 52:21-53:9.

### ii. The 2012 Election.

150.   In 2012, three candidates (incumbent Schroeder and two challengers, Ebert and B. Morris) ran for two seats. Ebert and Schroeder, both white, were successful. *Joint Stip.* ¶129.

151.   B. Morris and Schroeder received the highest point estimates among African American voters. Morris is African American and Schoeder is white. *Joint Stip.* ¶130. Rodden's point estimate approach identifies B. Morris and Schroeder as African American preferred candidates. *Rodden Testimony*, Vol. V, 53:10-19. Engstrom only identified

one candidate, B. Morris, as an African American preferred candidate. *Engstrom Testimony*, Vol. IV, 27:18-21.

152.    Ebert and Schroeder received the highest point estimates among white voters. *Joint Stip.* ¶130.

153.    Schroeder was a preferred candidate of both African American and white voters. *Rodden Testimony*, Vol. V, 54:4-7.

154.    Over 48% of African American voters cast votes for the same candidates preferred by white voters. *Joint Stip.* ¶130 and *Rodden Testimony*, Vol. V, 55:4-10. White voters cast 53.7% of their votes for African American preferred candidates. *Joint Stip.* ¶136 and *Rodden Testimony*, Vol. V, 55:12-14.

155.    These results demonstrate considerable crossover voting. *Rodden Testimony*, Vol. V, 55:11-17.

156.    In a two-seat election, the most votes a candidate can receive is 50% of the vote. *Joint Stip.* ¶34. Over 25% of African American voters supported Schroeder. *Joint Stip.* ¶129. According to Plaintiffs' approach, over half of African American voters supported him. *Rodden Testimony*, Vol. IV, 56:8-14.

157.    Schroeder is an African American preferred candidate. *Rodden Testimony*, Vol. V, 54:4-7. Schroeder was elected. *Joint Stip.* ¶130.

### iii. The 2013 Election.

158.    In 2013, four candidates (incumbents Hogshead and Henson, and two challengers, Keith Brown and Larry Thomas) ran for two seats. Brown and Hogshead, both white, were successful. *Joint Stip.* ¶137.

159. The candidates with the highest point estimates among African American voters were Henson and Hogshead. Henson is African American and Hogshead is white. *Joint Stip.* ¶138.

160. There were two African American candidates that year, Henson and Thomas. *Joint Stip.* ¶138. Thomas received a point estimate of 13.6% among African American voters. Hogshead received a point estimate of 25% among African American voters. *Joint Stip.* ¶138.

161. African Americans had a clear preference for Hogshead over Thomas. *Rodden Testimony*, Vol. V, 58:1-4.

162. Engstrom identified Henson as the only African American preferred candidate that year. *Engstrom Testimony*, Vol. IV, 31:18-22. Henson is African American. *Joint Stip.* ¶138. Rodden identified Henson and Hogshead as the African American preferred candidates. *Rodden Testimony,* Vol. V, 57:9-16. Hogshead is white. *Joint Stip.* ¶138.

163. The white preferred candidates were Hogshead and Brown. *Rodden Testimony*, Vol. V, 59:2-3. White voters cast 54.2% of their votes for Henson and Hogshead. African Americans cast 44.4% of their votes for Hogshead and Brown. *Joint Stip.* ¶144.

164. African American voters cast almost 58% of their votes for the white preferred candidates. *Rodden Testimony*, Vol. V, 59:4-6.

165. There was a lot of support for white candidates in African American precincts that year. Crossover voting in 2013 is similar to crossover voting in 2012. *Rodden Testimony*, Vol. V, 59:10-25.

166. Henson lost by 125 votes. *2013 Election Results*, PLTF-10. *Rodden Testimony*, Vol. V, 7-9.

167. Henson received relatively strong support from white voters. *Rodden Testimony*, Vol. V, 60, 10-17. There is no evidence from turnout or the demographics of the District to indicate that Henson's loss was due to white bloc voting. *Rodden Testimony*, Vol. V, 60, 10-24.

168. Henson was president of the board when it voted to provide the former superintendent, Jeff Spiegel and his wife, lifetime health insurance. *Henson Testimony*, Vol. II, 45:10-12.

### iv. The 2014 Election.

169. In 2014, eight candidates (two incumbents Rob Chabot and Paul Morris, and six challengers, Donna Thurman, James Savala, Kimberly Benz, F. Willis Johnson, LaWanda Wallace, and Larry Thomas) ran for three seats. Chabot and P. Morris, both white, and Thurman, an African American challenger, were successful. *Joint Stip.* ¶145.

170. There were five African American candidates in 2014. They were Thurman, Savala, Thomas, Johnson and Wallace. *Joint Stip.* ¶146. The candidates with the highest point estimates among African American voters were Thurman at 24%, Savala at 21% and Johnson at 21.5%. *Joint Stip.* ¶146. All three of these candidates are African American. *Joint Stip.* ¶146; *Rodden Testimony*, Vol. V, 61:14-16.

171. Dr. Thurman was the top ranked African American preferred candidate that year. She was successful. *Joint Stip.* ¶146; *Rodden Testimony*, Vol. V, 61:19-21.

172. Engstrom identified Thurman, Savala and Johnson as the African American preferred candidates. *Engstrom Testimony*, Vol. IV, 34:13-20. Rodden identified the same three candidates. *Rodden Testimony*, Vol. V, 61:5-13.

173. Chabot, P. Morris and Benz were the candidates with the highest point estimates among white voters. *Joint Stip.* ¶146. All three of these candidates are white. *Joint Stip.* ¶146

174. There was no overlap between African American preferred candidates and white preferred candidates in 2014. The 2014 election was racially polarized. *Rodden Testimony*, Vol. V, 62:5-14.

175. African American candidates received more votes in this election than white candidates. *Rodden Testimony*, Vol. V, 62:20-22.

176. African American voters were not cohesive because their votes were split among five candidates in a three-seat election. *Rodden Testimony*, Vol. V, 63:1-5. African American voters spread 25% of their votes among the five non-African American preferred candidates. *Joint Stip.* ¶153.

177. Savala, the second African American preferred candidate, lost his election by 91 votes. PLTF-11, 2014 *Election Results*. There is no evidence to blame Savala's loss on white bloc voting in light of Thurman's success. *Rodden Testimony*, Vol. V. 63:6-9.

### v. The 2015 Election.

178. Five candidates (incumbent Brian Scott Ebert and four challengers, Courtney Graves, Roger Hines, Donna Dameron and Michael Pierson) ran for two seats. Ebert, who is white, and Graves, an African American, were successful. *Joint Stip.* ¶166.

179. The candidates with the highest point estimates among African American voters were Graves and Dameron. *Joint Stip.* ¶167. Graves is African American and Dameron is white. *Joint Stip.* ¶146.

180. Dr. Graves was elected with the largest number of votes cast for any candidate from the 2000 to the 2015 election. *Rodden Testimony*, Vol. V, 65:9-10.

181. Engstrom identified Graves as the only African American candidate of choice in 2015. *Engstrom Testimony*, Vol. IV, 37:19-22. Rodden identified Graves and Dameron.

*Rodden Testimony*, Vol. V, 64:18 – 65:3. The candidates with the highest point estimates among white voters were Ebert and Graves. *Joint Stip.* ¶167.

182. Dr. Graves was a most preferred candidate by both African American and white voters. *Rodden Testimony*, 65:21-23.

183. African American candidates received more votes than white candidates in 2015. The same thing happened in 2014. *Rodden Testimony*, Vol. V, 65:24-66:1.

184. Hines' election was not blocked by white voters. Hines was not a preferred candidate among African American voters. *Rodden Testimony*, Vol. V, 66:2-21.

185. Engstrom estimates Dr. Graves received over 52.4% of the African American vote. That indicates Graves' supporters used bullet voting. *Rodden Testimony*, Vol. V, 67: 20-68:6. Dr. Graves explicitly encouraged bullet voting in her campaign. *Graves Testimony*, Vol. VI, 17:4-6.

186. Engstrom's testified that white bloc voting occurs when crossover support for African American candidates is minimal. *Engstrom Testimony*, Vol. IV, 53:3-5. Engstrom admits that there is "room for growth" for African American voters to vote more cohesively but claims there is more room for growth for white voters to support African American candidates. *Engstrom Testimony*, Vol. IV, 53:6-17.

### vi. Circumstances surrounding the 2015 Election.

187. Engstrom testified that post-litigation elections can entail changes in candidate pools and changes in voting behavior. *Engstrom Testimony*, Vol IV, 40:7-8. Engstrom testified that the post-litigation effect "could be" a one time advantage for the African American candidate. *Engstrom Testimony*, Vol. IV, 41:12-19; and Vol. IV, 51:11-13.

188.   The 2015 election is the only election Engstrom considers unusual. *Engstrom Testimony*, Vol. IV, 51:15-17.

189.   Engstrom admits he does not know if there was direct manipulation of the candidate pool. *Engstrom Testimony*, Vol. IV, 56:2-6. Engstrom admits he has not studied whether the filing of this lawsuit actually affected the election. *Engstrom Testimony*, Vol. IV, 56:2-14. Instead, Engstrom testified that the fact that this lawsuit was filed "could have" caused a phenomenon in which whites felt that Dr. Graves was one of the two best candidates. *Engstrom Testimony*, Vol. IV, 57:2-5.

190.   Engstrom is not aware of any peer review publications that support his theory that the filing of a lawsuit before an election affects the candidate pool. *Engstrom Testimony*, Vol. IV, 57:19-58:2. Rodden is not aware of any peer review publications that support that theory. *Rodden Testimony*, Vol. V, 68:12-16.

191.   Engstrom claims, "my analysis is not a causal analysis. I don't investigate why voters vote the way they do. I ask how did they vote, not why did they vote that way." *Engstrom Testimony*, Vol. IV, 63:16-20.

192.   When asked if Engstrom was providing a causal analysis for the reason voters voted for Dr. Graves in 2015, he admits he "looks at circumstantial evidence of conditions." He even admits, "Now, in terms of special circumstances, you know, you can say that I am looking at some causal thing in terms of the outcome, but that's not Prongs 2 or 3. Prongs 2 and 3 are not causal analysis." *Engstrom Testimony*, Vol. IV, 64:1-12.

193.   Engstrom testified that Dameron was a minor candidate and that the 2015 was aberrational because there was only one major white candidate and one minor white candidate. *Engstrom Testimony*, Vol. IV, 40:13-18. The 2015 election was the only

instance when Engstrom identified a candidate as minor. *Rodden Testimony*, Vol. V, 69:11-70:14.

194. There is no evidence that a candidate decided to run or decided against running for election in 2015 due to this lawsuit. *Graves Testimony*, Vol. VI, 20-25.

195. There was very little media coverage about this lawsuit within the District. There is no indication that affected the 2015 election. *Rodden Testimony*, Vol. V, 68:17-25.

196. Dr. Thurman testified that very little was said about this lawsuit in the District. She testified her own husband did not know about this lawsuit until she told him. *Thurman Testimony*, Vol. IV, 160:14-17. Dr. Graves testified that voters did not ask her about this lawsuit when she was campaigning in 2015. *Graves Testimony*, Vol. VI, 11:1-3. Rob Chabot did not have constituents ask him about this lawsuit. *Joint Stip*. ¶176.

Engstrom does not know how often this case was cited by the press in St. Louis. *Engstrom Testimony*, Vol. IV, 56:15-17.

197. The Michael Brown shooting and subsequent protests drew national attention. *Joint Stip*. ¶178.

198. Dr. Thurman testified that the events surrounding Michael Brown did not change her vote. *Thurman Testimony*, Vol. IV, 161:2-4. There is no indication the Michael Brown protests changed voters' votes. *Thurman Testimony*, Vol. IV, 160:24:161:1; and *Graves Testimony*, Vol. VI, 11:4-6.

199. Rodden testified that he anticipated unusual racial polarization due to the protests involving Michael Brown in 2015. That did not occur. He does not have evidence the protests affected the election. *Rodden Testimony*, Vol. V, 69:1-10.

200.   Dr. Graham's campaign manager was Judy Shaw. *Graham Testimony*, Vol. II, 72:3-7. Dr. Thurman's campaign manager in 2014 was Judy Shaw. *Thurman Testimony*, Vol. IV, 163:24-164:2. Dr. Graves' campaign manager in 2015 was Judy Shaw. *Graves Testimony*, Vol. VI, 8:10-14.

201.   All three candidates had the same campaign manager. *Graham Testimony*, Vol. II, 72:3:7; *Thurman Testimony*, T.R. Vol., IV, 163:24-164:2;   *Graves Testimony*, T.R. Vol. VI, 8:10-14. All three candidates were elected to the Board. *Joint Stip.* ¶¶79, 146, and 167.

202.   The Court finds no evidence that 2015 was unusual or surrounded by special circumstances so as to discount Dr. Graves' success.

### 3. The third Gingles precondition – The White Majority must typically Vote in a Bloc to Defeat the Minority Candidate.

#### a. There is no White Majority in the District.

203.   Whites are not a majority of the voting age population in the District. *Joint Stip.* ¶13.

204.   The white population has not been a documented majority of the population since the 2000 decennial census. *Joint Stip.* ¶16. White voters have not been a majority in the District since the 2000 decennial census. *Cooper Testimony*, Vol. I, 221:3-13 and *Joint Stip.* ¶13.

205.   White voters held a slim plurality of the District's votes according to the 2010 decennial census.  White voters were 48.95% of the District's votes in 2010. *Joint Stip.* ¶13.  That number dropped so that white voters were a minority and the smallest group of voters according to the 2011 – 2013 ACS. *Joint Stip.* ¶25.

206.　The parties stipulated to the following 2011 – 2013 ACS voting age percentages: the single-race BVAP was 48.94; the single race white VAP was 47.34%; and the non-Hispanic white VAP was 46.78%. *Joint Stip.* ¶25.

### b. White Voters do not Vote in a Bloc to Defeat the Minority Candidate. African Americans do not Vote Cohesively.

207.　There is no basis for determining that a loss by a small margin is the result of white bloc voting when the minority voting behavior was not especially cohesive. *Rodden Testimony*, Vol. V, 52:22-53:9.

208.　Hawkins and Graham lost by a slim margin in the 2011 election. There is no basis for determining their loss was due to white bloc voting. *Rodden Testimony*, Vol. V, 52:3-53:9.

209.　African American voters were not cohesive in 2011. *Rodden Testimony*, Vol. V, 51:22-24.

210.　Schroeder was preferred by African American and white voters in the 2012 election. *Rodden Testimony*, Vol. V, 54:4-7. Schroeder was an African American preferred candidate in 2012 that won election. *Rodden Testimony*, Vol. V, 54:4-7 and *Joint Stip*. ¶129. In addition, the 2012 election contained considerable crossover voting. *Rodden Testimony*, Vol. V, 55:11-17.

211.　Hogshead was preferred by both African American and white voters in the 2013 election. *Rodden Testimony*, Vol. V, 58:16-18. In addition, the 2013 election contained considerable crossover voting. *Rodden Testimony*, Vol. V, 59:10-16.

212.　Henson lost by a slim margin of 125 votes that year. PLTF-10, 2013 *Election Returns*. White bloc voting cannot explain Henson's narrow loss in a district that is roughly evenly

split among the races and is now a slight majority of African American voters. *Rodden Testimony*, Vol. V, 60:10-61:4.

213. The 2014 election was racially polarized. *Rodden Testimony*, Vol. V, 62:8-10. Still, Dr. Thurman was a top-ranked African American preferred candidate that won election. *Rodden Testimony,* Vol. V, 61:17-21. Savala lost by a slim margin. It is illogical to claim that Savala was blocked by white voters but Thurman was not. *Rodden Testimony*, Vol. V, 63:6-9.

214. African American voters were not cohesive in the 2014 election because their vote was split among five candidates for three seats. *Rodden Testimony*, Vol. V, 63:1-5 and *Joint Stip.* ¶153.

215. African American candidates received more votes in the 2014 election than white candidates. *Rodden Testimony*, Vol. V, 43:24-44:4.

216. In 2015, Dr. Graves was the top preferred African American candidate. Dr. Graves was also a preferred candidate among white voters. Graves was elected. *Rodden Testimony*, Vol. V, 11-23 and *Engstrom Testimony*, Vol. IV, 27:19-22.

217. Hines' loss cannot be explained by white bloc voting. Hines, an African American candidate, was not preferred among African American voters. He received more support from white voters than from African American voters. It is illogical to claim that his only source of additional support was from white voters. *Rodden Testimony*, Vol. V, 66:2-23.

218. African American candidates received more votes in 2015 than white candidates. *Rodden Testimony*, Vol. V, 65:24-66:1.

219. African American voters are not and cannot be submerged into a white majority in the District. The District is majority African American. *Rodden Testimony*, Vol. V, 15-23.

White voters are a minority. *Joint Stip.* ¶25. In 2015, an African American candidate received the largest vote share of any candidate since 2000. *Rodden Testimony*, Vol. V, 65:8-10. The claim that African American voters are submerged by a white majority is illogical. *Rodden Testimony*, Vol. V, 70:15-23.

### D. Senate Factors – The Totality of the Circumstances Test.

220.   Engstrom testified that a Voting Rights Act case in which the minority VAP and the white VAP are roughly identical is unusual. *Engstrom Testimony*, Vol. IV, 72:23-73:4.

### 1. <u>Senate Factors One and Five</u> – Past history that touches the right of minorities to register, to vote or to otherwise participate; and socioeconomic factors that hinder African Americans' ability to participate.

### a. A History of Discrimination.

221.   The State, and St. Louis area in particular, gave rise to *Dred Scott v. Sandford*, 60 U.S. 393, 398 (1867) 159 years ago. *Joint Stip.* ¶226.

222.   Gordon testified to racially discriminatory zoning practices in the early 1900's. *Gordon Testimony*, Vol. I, 104:21-105:5. Gordon testified to race restricted deed covenants in the City of St. Louis from about 1911 to the 1940's. *Gordon Testimony*, Vol. I, 106:7-18.

223.   Neither party disputes that St. Louis has a history of discrimination. *Rodden Testimony*, Vol. V, 72: 19-23.

224.   Approximately half of Gordon's research and report in this case was taken directly from his 2008 book entitled, *Mapping Decline: St. Louis and the Fate of the American City*. *Gordon Testimony*, Vol. I, 146:18-25. Gordon's research has been focused on the Greater St. Louis Metropolitan Area. That region includes the central city of St. Louis.

In present day, it includes a total of 15 counties on the Illinois and the Missouri sides of the river. *Gordon Testimony*, Vol. I, 90:23:-91:5.

225. Gordon's statistical research relies on a blended data set maintained by the Housing and Urban Development in 2010. *Gordon Testimony*, Vol. I, 124:24-125:4. Gordon did not analyze more recent data. *Gordon Testimony*, Vol. I, 125:25-126:3.

226. Gordon's conclusions are based on generic scholarly research. Gordon states, "I think the scholarly consensus is very clear that when a population is disadvantaged economically, when they're disadvantaged in terms of job opportunities, educational opportunities, or residential opportunities, that these affect civic participation. *Gordon Testimony*, Vol. I, 130:21-131:1.

227. Gordon's historical analysis is not limited to the District but includes a history of the region. *Gordon Testimony*, Vol. I, 100:4:14. Gordon testified that a credible analysis requires placing the District in its state or national context. *Gordon Testimony*, Vol. I, 100:6-14.

### b. Racial Disparities in Socioeconomic Indicators.

228. Rodden analyzed the 2011 – 2013 ACS to compare key socioeconomic indicators for African Americans and whites. He compared the racial differences within the District, to disparities in the St. Louis Metropolitan region and in the state of Missouri. *Rodden Testimony*, Vol. V, 73:6-16; DEF-D *Supplemental Report of Rodden*, Figure 3.

229. Rodden admits there is a disparity between African Americans and whites in the District in the areas he analyzed except for college. *Rodden Testimony*, Vol. V, 73:15:74:5. Gordon testified to a disparity gap within the District. *Gordon Testimony*, Vol. I, 130:6-11.

230.    Rodden compared the disparity between African Americans and whites within the District to the disparity between the races in the St. Louis Metropolitan Region and to the state of Missouri. Rodden compared the following: 1) the gap between African Americans and whites with a bachelor's degree; 2) the gap between African Americans and whites that have at least "some college"; 3) the gap between the two groups in the share of individuals with income below the poverty line; and 4) the gap between the two groups that rely on the Supplemental Nutrition Assistance Program. *Rodden Supplemental Report*, DEF-D, Figure 3. *Rodden Testimony*, Vol. V, 73:17-75:19.228.

231.    The disparity between African Americans and whites is smaller within the District than it is for the St. Louis Metropolitan area and for the state of Missouri. *Rodden Testimony*, Vol. V, 74:6-13.

232.    Cooper admits that the African American home-ownership rates are higher in the District than state-wide. *Cooper Testimony*, Vol. I, 207:3-15.

233.    The Ferguson-Florissant School District has become the heart of the African American middle class in St. Louis. *Rodden Testimony*, Vol. V, 75:3-9.

**c. African Americans' ability to register, to vote or to otherwise participate in the electoral process.**

234.    Kimball introduced a "calculus of voting" as a cost-benefit analysis on the decision of whether to vote. The formula is the likelihood of voting equals $P * B - C$. The letter "P" is the probability that one's own vote might determine the outcome of an election. The letter "B" represents the benefits one would receive of seeing one's preferred candidates win, and "C" represents the costs of voting, including information costs of learning about the candidates and costs association with registering to vote, determining your polling

place and taking time from work. *Kimball Testimony*, Vol. II, 114:12-25. Kimball concludes that several of the Senate Factors "*may* sort of weigh the cost side in such that it *may* be more burdensome on African American voters and make it more difficult for them to influence the outcome of elections." *Kimball Testimony*, Vol. II, 116:4-10.

235. Kimball admits that he does not input numbers or data into his calculus of voting framework. Instead, he claims it is meant to be illustrative. *Kimball Testimony*, Vol. III, 24:7-11.

236. Kimball admits that the process of registering to vote and determining where to vote, included as "costs" in his framework, is the same regardless of the electoral system employed. *Kimball Testimony*, Vol. III, 24:17-25:7.

### i. Voter Registration and Turnout Analysis within the District.

237. Plaintiffs have not submitted data on the voter registration rates of African American and white voters in the District. *Rodden Testimony*, Vol. V, 70:24-71:4. Kimball admits that he did not look at voter registration by race within the District. *Kimball Testimony*, Vol. II, 185:6-9. Kimball admits that he could have performed an EI or HP analysis based on the data provided by the Board of Election but failed to do so. *Kimball Testimony*, Vol. II, 185:6-21. Gordon testified he did not analyze voter registration rates in Missouri. *Gordon Testimony*, Vol. I, 173:16-24.

238. Rodden utilized EI to measure turnout by race of time. *Rodden Report*, DEF-A, Figure 6. In addition, Rodden utilized scatterplots for the 2012-2015 elections to measure the relationship between race and turnout. *Rodden Report*, DEF-A, Figure 5. The scatterplots indicate there is little to no relationship between race and turnout in the District. *Rodden Testimony*, Vol. V, 77:6-13. *Rodden Report*, DEF-A, Figure 5. The EI

analysis indicates there is no difference between African American and white voters' turnout in 2012, 2013 and 2014. *Rodden Testimony,* Vol. V, 77:15-78:3.

239.    Kimball published evidence of a "weak" relationship between race and turnout in the 2014 election but did not initially report that. DEF-QQ *Voting in the 2014 Ferguson Florissant School Board Election* by David Kimball; and *Kimball Testimony,* Vol. II, 188:3-6. Kimball's later analysis of turnout was conducted using Homogenous Precinct analysis. PLTF-49 *Kimball Rebuttal Report* Table 3. Kimball's analysis relied on very few precincts because the District is too integrated racially to provide that sort of inquiry. *Rodden Testimony,* Vol. V, 71:5-25. Ecological inference analysis is a more appropriate tool in this District. *Rodden Testimony,* Vol. V, 71:5-25.

240.    The Court finds there is no evidence in the record about whether African American and white voters' registration rates. The District is the only party to conduct EI analysis of voter turnout rates in the District. The evidence on the relationship between turnout and race is weak.

### ii. Evidence of African American Voter Participation and Candidacy in the District.

241.    Charles Henson testified that he is registered to vote and that he votes regularly. *Henson Testimony,* Vol. II, 18:12-19. Henson was appointed to the board and then ran for election. *Henson Testimony,* Vol. II, 19:18-20.18. Henson was president of the board in 2008. *Henson Testimony,* Vol. II, 32:14-24. Henson was president of the board when it voted to give the former superintendent and his wife lifetime health insurance in 2011. *Henson Testimony,* Vol. II, 45:10-12.

242.    Dr. Doris Graham first ran for the District board in 1988. *Graham Testimony,* Vol. II, 71:23-72:7. Graham served from 1988 – 2011. *Graham Testimony,* Vol. II, 73:10-12.

243. F. Willis Johnson, a Plaintiff in this case, testified that he is registered to vote in the District. *Johnson Testimony*, Vol. III, 111:16-18. Johnson votes regularly. *Johnson Testimony*, Vol. III, 132:8-9. He ran for the District board in 2014. *Johnson Testimony*, Vol. III, 111:19-23. Johnson testified that he feels like he can participate in the political process. *Johnson Testimony*, Vol. III, 132:13-15.

244. Reddit Hudson, a Plaintiff in this case, testified that he votes and votes regularly. *Hudson Testimony*, Vol. IV, 93:1-14. Hudson has been a candidate for office for the Missouri State Senate in 2012 and for the Forest Park Community College Board of Trustees in 2014. *Hudson Testimony*, Vol. IV, 94:7-12.

245. Dr. Thurman, a current African American board member, testified that she votes. She testified she can participate in the political process without interference and that African Americans in the District have the same ability to participate in the process as anyone else. Thurman testified she will run for office again. *Thurman Testimony*, Vol. IV, 161:5-18.

246. Thurman testified she has the opportunity to elect candidates of their choice. *Thurman Testimony*, Vol. IV, 161:13-15.

247. Dr. Graves, a current African American board member, testified that she is registered to vote and that she votes. She testified she is not prevented from participating in the electoral process. *Graves Testimony*, Vol. VI, 13:7-15.

## 2. Senate Factor Two – Racially Polarized Voting.

248. The expert analysis of Racially Polarized Voting is included in Section II(C)(2) supra.

249. Graham testified that she knows she could not have won her election without the help of white voters. *Graham Testimony*, Vol. II, 100:16-18. Graham testified that she knows

white voters supported her because they placed her yard signs in their yards. *Graham Testimony*, Vol. II, 100:19-24.

250. F. Willis Johnson testified that white voters supported his campaign and the Grade A for Change Slate in 2014. *Johnson Testimony*, Vol. III, 137:12-23.

251. Rob Chabot, a white board member, supported F. Willis Johnson in his 2014 campaign by handing out Johnson's literature. F. Willis Johnson took Chabot's literature but did not hand it out. *Johnson Testimony*, Vol. III, 138:12-25.

252. Thurman testified she had significant support from white voters in her 2014 election. Parents from her former elementary school supported her. Her white neighbors supported her and placed signs in their yards. *Thurman Testimony*, Vol IV, 155:20-156:6.

253. Graves, a current African American board member, testified that race is not an important factor when she decides whom to support. *Graves Testimony*, Vol. VI, 11:10-12. Graves testified that she has supported both African American and white candidates for the District's board. *Graves Testimony*, Vol. VI, 11:13-18.

254. Graves received endorsements from past board members Schroeder, Clark and Lentz. Each of these individuals is white. Graves also received endorsements from Henson and Graham, African American former board members. *Graves Testimony*, Vol. VI, 12:1-9.

255. The suspension of Dr. McCoy and the racial tension surrounding that issue created a one-time increase in racial polarization in 2014. *Rodden Testimony*, Vol. V, 43:13-23. Green corroborated this when he testified that race is not as divisive now as it was two years ago. *Green Testimony*, Vol. III, 106:15-16.

### 3. <u>Senate Factor Three</u> – Enhancing Practices.

256.    Kimball testified that off-cycle, at-large elections with staggered terms, contributes to a disproportionately lower turnout among African American voters. *Kimball Testimony*, Vol. II, 122:7-10. Kimball admits that his entire analysis of Senate Factor Three was "citing political science research generally" and is not specific to the District. *Kimball Testimony*, Vol. II, 190:13-24.

### a. At-large versus Single Member Districts.

257.    Additional evidence comparing the at large electoral system to single member districts is found in Section II(C)(1) supra.

### i. Kimball's Research and Testimony on At-Large Elections.

258.    Additional evidence including other scholarly research on at-large elections is found in Section II(C)(1) supra.

259.    Kimball relied on an article entitled *"The Context Matters: The Effects of Single-Member Versus At-Large Districts"* in his initial report. *Kimball Testimony*, Vol. III, 8:18-21; *Kimball Expert Report*, PLTF-48, p. 6, footnote 5 and DEF-SS. The article states, "Alternatively, if a group composes a majority of the city population in a majoritarian at-large system, the group may be able to win all of the council seats. <u>Districts may even decrease the group's representation</u> on the city council." *Kimball Testimony*, Vol. III, 8:22-9:4 and DEF-SS.

260.    Kimball failed to analyze whether the at-large system is better for the largest group of voters in the District. His opinion was formed from generic political science research regarding racial and ethnic minorities. *Kimball Testimony*, Vol. III, 10:14-19.

261. Kimball's testifies the reason the at-large system makes it more difficult for African Americans to elect candidates of their choice is that a "white majority can basically outvote the African American minority" when there is racially polarized voting. *Kimball Testimony*, Vol. II, 118:10-17. The evidence demonstrates there is no white majority. *Joint Stip.* ¶13 and ¶25.

### ii. Board Members are in Favor of At Large Elections.

262. Thurman, a current Board member, is in favor of the at-large system. She testified it is not in the District's best interest to change the electoral system right now. Thurman testified she believes changing the system to single-member districts could still result in no African American representation in Berkeley. *Thurman Testimony*, Vol. IV, 159:4-23.

263. Thurman testified that implementing single-member districts is like segregating all over again. *Thurman Testimony*, Vol. IV, 156:16-157:6.

264. Thurman testified the at-large system is better because a board member's dedication should be to the entire District and not just to the schools in your area. She states, "I don't know what kind of work we can get done if we're segregated." *Thurman Testimony*, 157:23:158:13.

265. Graves, another current Board member, is in favor of the at-large system. Graves testified that at-large elections are better because they give the voter an opportunity to choose from a pool of candidates. She believes that single-member districts will reduce a voter's opportunity to choose a qualified candidate. *Graves Testimony*, Vol VI, 13:16-17:1. Graves testified the new superintendent's slogan is "One District United." She testified that single-member districts would not encourage that approach. *Graves Testimony*, Vol. VI, 14:2-18.

266.    Graves testified that single-member districts would make it harder for incumbents to move within the District, especially for incumbents that rent. She testified that single-member districts may require a choice between keeping her seat and living in an undesirable area. *Graves Testimony*, Vol. VI, 14:25-15:13.

### iii. A Comparison of Local At Large Systems with Single Member District Municipalities.

267.    North County provides an opportunity to compare two forms of elections. School boards have an at-large system and city councils are conducted through wards with two elected candidates from each ward. Since those two candidates' elections are held at different times, the city council system is effectively the same type of single-member district system proposed by Plaintiffs. *Rodden Testimony*, Vol. V, 33:5-24.

268.    A comparison of the two systems with voters in the District demonstrates that the at-large system has yielded consistent African American representation in the District since the 1980's. In contrast, the Ferguson City Council has a long history of little or no African American representation until very recently. *Rodden Testimony*, Vol. V, 33:25-35:7, *Graham Testimony*, Vol. II, 101: 4-17 and *Kimball Testimony*, 13:1-14:7.

269.    Kimball admits that the municipality of Ferguson is majority African American. He admits that Ferguson's electoral system contains three wards. Yet, five of the six city council members are white, as is the mayor. *Kimball Testimony*, Vol. III, 13:4-9. Kimball claims there is a lag time between a population becoming majority African American and electing African American leaders. *Kimball Testimony*, Vol. III, 13:17-24 and "*Getting Ferguson Majority to Show Its Clout at Polls*" DEF-RR.

270.    Hazelwood is another example for comparison. The Hazelwood School District has a similar demographic profile to the District. They conduct at-large elections and maintain

a majority African American board. The Hazelwood City Council has no African American representation. *Rodden Testimony*, Vol. V, 34:20-35:7.

271. In the article entitled "Getting Ferguson Majority to Show its Clout at Polls," Kimball claims the 2014 Ferguson Florissant School District election indicates "a modest sign of shifting." *Kimball Testimony*, Vol. III, 13:16-14:22 and DEF-RR.

### b. April "off-cycle" Elections.

272. Kimball's report states "Local elections held during off-cycle periods such as in April tend to generate relatively low levels of information about the candidates and produce unusually low voter turnout..." Yet, he admits that this is in reference to off-cycle elections generally and was not specific to the District. *Kimball Testimony*, Vol. II, 189:3-21.

273. Kimball did not compare District voters' turnout levels in April to turnout levels in the November election. *Kimball Testimony*, Vol. II, 190:3-12. Kimball admits he never examined whether white voters have higher turnout rates in August or November elections than African Americans. *Kimball Testimony*, Vol. II, 190:25-191:2.

274. Engstrom did not analyze whether African Americans and whites turned out at the same or different rates in April elections. *Joint Stip.* ¶232.

275. School board elections are held in April to allow new board members time to prepare for the upcoming fiscal year and the new school year that beings in July. For that reason, April elections are more advantageous than November elections. *Green Testimony*, Vol. III, 101:8-13.

276. Thurman favors April elections because it allows new board members enough time to acclimate before the new school year. November elections would not provide time to transition into their new roles. *Thurman Testimony*, Vol. IV, 158:7-159:3.

277. Graves favors April elections over November because it allows voters to focus on the school board election. *Graves Testimony*, Vol. VI, 16:11-21.

### c. Staggered Terms

278. Kimball failed to analyze the effect of staggered terms on voting behavior in the District. His opinion was based on generic political science research. *Kimball Testimony*, Vol. III, 11:16-22.

279. Thurman testified that eliminating staggered terms is a bad idea because it takes a long time for new board members to learn their roles. She testified a board needs members with experience on it. *Thurman Testimony*, Vol. IV, 157:16-158:6.

280. Graves testified that staggered terms are beneficial because it allows new board members to learn from veteran board members and to receive mentoring from them. *Graves Testimony*, Vol. VI, 15:22-16:10.

### 4. Senate Factor Four – Whether African Americans have been excluded from any Candidate Slating Processes.

281. Academics define a slate as a group that recruits candidates to run together. The group screens candidates and determines the members of the slate. *Rodden Testimony*, Vol. V, 79:14-19.

282. The National Education Association is a teacher's union. It is the largest union in the nation with 3.1 million members. The Ferguson Florissant National Education Association ("FFNEA") is the smallest unit of the NEA. *Green Testimony*, Vol III,

46:17-47:10. The FFNEA is a voluntary association that includes approximately 930 District employees. Approximately 80% of FFNEA membership is teachers and the remaining 20-25% is support professionals. *Green Testimony*, Vol. III, 47:13-25.

283. Green is African American. He was the president of the FFNEA from 2014 – 2015. He is the current vice treasurer. *Green Testimony*, Vol. III, 50:16-20. Green testified that the FFNEA sends a letter to every candidate that files for the District board asking him/her to interview for their endorsement. *Green Testimony*, Vol. III, 55:1-5. The letter is sent after the candidate filing period has closed. The same letter is sent to every candidate. It states, "The FFNEA invites all candidates to participate in a screening process or interview. Please find the enclosed interview questions for your preview." *Green Testimony*, Vol. III, 87:21-88:11 and DEF-MM.

284. The FFNEA invites every board candidate to apply for the endorsement. *Green Testimony*, Vol. III, 78:15-18. All candidates are invited to apply for the endorsement but not all candidates accept the invitation. *Green Testimony*, Vol. III, 91:3-6.

285. Johnson, a Plaintiff, testified that the FFNEA endorsement process is open to everyone. *Johnson Testimony,* Vol. III, 134:14-18.

286. Green testified the FFNEA endorsement process is that once a candidate files for the District board, that person is sent a letter asking him or her to interview for the endorsement. The FFNEA sends the candidates a list of questions and tries to set up an appointment time for the interview. The FFNEA sets up a voluntary endorsement committee and gives them a copy of the questions. *Green Testimony*, Vol. III, 55:1-56:11. Every candidate interviewed is asked the questions from the list. No questions are added or omitted. The questions are usually the same every year. *Green Testimony*,

Vol. III, 61:10-23. Once the interviews have concluded, the committee discusses each candidate. Then the committee votes on whom to endorse. *Green Testimony*, Vol. III, 62:23-63:2. After that vote, the committee calls the candidates to inform them whether they were successful or not. *Green Testimony*, Vol. III, 64:6-16. The endorsement committee introduces the executive board to the potentially endorsed candidates and invites them to a building representatives meeting. The building representatives conduct a final vote on the candidates and the ones that are successful receive the formal endorsement. *Green Testimony*, Vol. III, 64:17-65:4.

287.	The chair of the Political Action Committee ("PAC") is the leader of the endorsement committee and chooses its members. *Green Testimony*, Vol. III, 55:1-56:11. The PAC chair attempts to make the endorsement committee as racially diverse as possible. The chair also attempts to include a mixture of males, females, teachers and support personnel. *Green Testimony*, Vol. III, 58:18-59:1. Green testified that the endorsement committee has been racially diverse for as long as he can remember. *Green Testimony*, Vol. III, 59:17-20.

288.	Green testified that it is important that the endorsement committee is racially diverse so that candidates cannot claim they did not receive the endorsement because of their race. *Green Testimony*, Vol. III, 90:9-14.

289.	Thurman testified the 2014 endorsement committee was racially diverse. *Thurman Testimony,* Vol. IV, 145:5-12. Graves testified that the 2015 endorsement committee was racially diverse. *Graves Testimony*, Vol. VI, 10:4-7.

290.	Green testified that race is not a factor in the FFNEA's decision on whom to endorse. *Green Testimony*, Vol. III, 90:15-17.

291.   The endorsement decision is based on the candidates' answers to the interview questions. Those questions represent the subjects that are important to the FFNEA. The answers determine whether a candidate is friendly to teachers' interests. *Green Testimony*, Vol. III, 90:18-24.

292.   The committee asks candidates a question on discipline and on class size. Candidates are not asked about the achievement gap. *Green Testimony*, Vol. III, 88:23-89:17.

293.   The FFNEA does not recruit candidates to run for the District board. *Green Testimony*, Vol. III, 87:10-12. It invites candidates to apply for its endorsement after they filed for office. *Green Testimony*, Vol. III, 87:21-88:11.

294.   The FFNEA does not run the campaigns of the candidates it endorses. *Green Testimony*, Vol. III, 91:7-12.

295.   Candidates endorsed by the FFNEA receive a stipend, usually a few hundred dollars. In addition, the FFNEA helps with fliers, phone banks, canvassing and mailings. *Green Testimony*, Vol. III, 66:5-15.

296.   Green testified that the endorsement helps a candidate but does not guarantee victory. *Green Testimony*, Vol. III, 68:3-8. Johnson testified that the FFNEA endorsement is not "the end-all, be-all." *Johnson Testimony*, Vol. III, 145:5-13. Thurman testified that the FFNEA endorsement does not guarantee a win and a lack of endorsement does not guarantee a loss. *Thurman Testimony*, Vol. IV, 146:13-18.

297.   Incumbents and challengers must go through the same endorsement process. However, the FFNEA considers an incumbent's performance as a board member when making the endorsement decision. *Green Testimony*, Vol. III, 91:13-22.

298. The FFNEA decided not to endorse any incumbents in 2011. The incumbents were Doris Graham, Les Lentz and James Clark. One of the reasons incumbents were not endorsed was their vote in favor of lifetime health insurance for the former superintendent and his wife. Another reason was that Les Lentz threatened to lock the teachers out of the bargaining negotiations. Finally, incumbents had voted against giving teachers a pay raise. *Green Testimony*, Vol. III, 91:23-92:21.

299. The failure to give Graham the endorsement in 2011 was not based on her race. *Green Testimony*, Vol. III, 92:22-24.

300. Graham testified that she failed to receive the endorsement in 2011 because she was an incumbent. When asked whether her failure to receive the endorsement was based on her race, she replied, "I think they just didn't endorse me because they said it was time for me to go, time for the incumbents to go and get new blood. So because of my race I can't say. I don't know." *Graham Testimony*, Vol. II, 97:14-21.

301. The FFNEA endorsed Leslie Hogshead in 2013 because she voted for pay raises for teachers. *Green Testimony*, Vol. III, 94:12-24.

302. The FFNEA endorsed Savala, an African American, in 2014. *Green Testimony*, Vol. III, 95:4-15. The FFNEA did not endorse F. Willis Johnson because he did not believe that class size matters. That was an important issue for the FFNEA. *Green Testimony*, Vol. III, 95:25-96:4.

303. Johnson corroborated Green's testimony about his stance on class size. Johnson claims the research on class size is "inconclusive" as to the impact of the student-teacher ratio. *Johnson Testimony*, Vol. III, 115:19-116:5.

304. The failure to give Johnson the endorsement in 2014 was not based on his race. *Green Testimony*, Vol. III, 96:7-9.

305. Thurman testified she did not expect to receive the FFNEA endorsement. She testified that, as a former principal, she was often on the opposite side of the NEA. She testified the FFNEA's role is to protect its teachers. As a principal, she had a tenured teacher released and knew that decision would impact her endorsement. *Thurman Testimony*, Vol. IV, 145:15-146:4.

306. Thurman testified her race was not a factor in her lack of endorsement. *Thurman Testimony*, Vol. IV, 145:5-7.

307. In 2015, the FFNEA endorsed Hines, an African American. He was not successful. Thurman Testimony, Vol. IV, 146:8-12 and *Joint Stip*. ¶145.

308. Graves sought the FFNEA endorsement in 2015. *Graves Testimony*, Vol. VI, 9:13-15. She was not endorsed. She did not perceive her failure to receive the endorsement as racially-based. *Graves Testimony*, Vol. VI, 8-19.

309. Kimball did not directly respond when asked whether African Americans have the same access to the FFNEA endorsement process. Instead, he replied that African Americans are rarely endorsed. *Kimball Testimony*, Vol. II, 132:19-133:1.

310. Kimball testified to the number of African Americans that were endorsed by the FFNEA and by North County Labor. *Kimball Testimony*, Vol. II, 134:6-138:20.

311. Kimball admits that he did not know the FFNEA endorsement or North County Labor endorsement processes when he wrote his report. *Kimball Testimony*, Vol. III, 16:22-17:2.

312. Kimball admits he did not know which candidates applied for the FFNEA and North County Labor endorsements when he wrote his report. *Kimball Testimony*, Vol. III, 17:11-24.

313. Kimball admits he did not know the racial make-up of the FFNEA endorsement committee when he wrote his report and did not know who makes the endorsement decision for North County Labor. *Kimball Testimony*, Vol. III, 17:25-18:4.

314. Kimball admits that Senate Factor Four is about minority exclusion from the slating process. *Kimball Testimony*, Vol. III, 19:3-5. Yet, he admits he did not know the process. *Kimball Testimony*, Vol. III, 16:22-17:2.

315. Thurman testified to the differences between the Grade A for Change Slate and the FFNEA. *Thurman Testimony*, Vol. IV, 163:6-23. Thurman testified she was recruited to run for the District Board by the Grade A for Change Slate. *Thurman Testimony*, Vol. IV, 135:14-136:22. The Grade A for Change Slated interviewed and recruited candidates prior to filing for the District Board. *Thurman Testimony*, Vol. IV, 136:14-140:6. Johnson testified that Grade A for Change reached out to him prior to his filing for the District Board. *Johnson Testimony*, Vol. III, 133:4-9. The Grade A for Change slate supported her campaign financially, helped with signs and pamphlets and "taught her how to be a candidate." In contrast, the FFNEA provided tangible support in terms of finances and signs. *Thurman Testimony*, Vol. IV, 163:163:6-23.

### 5. Senate Factor Six – Overt or Subtle Racial Appeals.

316. Graham was on the District Board twenty-three years. *Graham Testimony*, Vol. II, 73:10-12. Graham was called by the Plaintiffs. When asked whether she observed any subtle or over racial appeals in campaigns for the school board, she replied

"Campaigning? No, I have not, because they all campaign the same way: You know, robocalls, telephone calls, passing out leaflets, and speaking at the different forums that are held district-wide. And so that answer is no." *Graham Testimony*, Vol. II, 91:16-21.

317.  Graham testified that she received polite responses when she campaigned in white areas of the District. She gave examples of responses like, "I'm still considering" or "I vote for you all the time." She claims she never encountered anyone that was belligerent or ill-mannered. *Graham Testimony*, Vol. II, 91:22-92:8.

### a. Discipline as a campaign tactic that preyed on racial anxiety.

318.  Johnson testified that he believed discipline was an important issue when he ran for office in 2014. *Johnson Testimony*, Vol. III, 112:9-113:2. He testified that he campaigned on it. *Johnson Testimony,* Vol. III, 124:8-125:6. Johnson testified that discipline was a concern when McCoy was superintendent. *Johnson Testimony*, Vol. III, 140:1-3.

319.  Graves does not perceive a candidate's discussion of discipline as a subtle racial appeal. *Graves Testimony*, Vol. VI, 8:21-24. Instead, she testified that it is a legitimate issue for candidates. She claims that board members discuss discipline when they review the Code of Conduct policy. *Graves Testimony*, Vol. VI, 9:2-12.

### b. Transfer students as a campaign tactic that preyed on racial anxiety.

320.  Thurman testified that the student transfer issue was a legitimate concern for voters and that it was appropriate for candidates to discuss it. *Thurman Testimony*, Vol. IV, 134:6-11.

321.  Johnson testified the concern with transfer students was that they may have low achievement that would affect the District overall. *Johnson Testimony*, Vol. III, 120:13-24.

322. Johnson claimed he was accused of being too supportive of the student transfer issue. He admits the accusation was not by another candidate. He testified that, in reality, it was just members of the public that talked about it. *Johnson Testimony*, Vol. III, 135:20-136:7. Thurman testified she attended all of the forums in 2014 and never heard that criticism of Johnson. *Thurman Testimony*, Vol. III, 153:20-25.

323. Johnson testified some candidates were resistant to transfer students because of the "fiscal disposition of the district and probably even some of the timing with staffing and internal kinds of structures, there was obviously a concern about costs and probably logistics in those things. But what was seemed to be what was most emphasized was the direct correlation or concern around what these students would mean to the achievement and potential accreditation of the school and what this would mean to the overall culture and management dynamic of students within the district." *Johnson Testimony*, Vol. III, 123:16-124:4.

324. Concerns about absorbing additional African American students into a District that is majority African American, does not make sense. *Thurman Testimony*, Vol. IV, 154:20-23.

### c. Personal attacks as a campaign strategy or subtle racial appeal.

325. Johnson's Declaration states that he was "attacked" using racially coded language during his campaign. PLTF-118, *Johnson Declaration* and *Johnson Testimony*, Vol. III, 134:22-135:19. He clarified at trial that the attack was a reference to him not having children in the District. He also clarified that it was "referenced in passing..." *Johnson Testimony*, Vol. III, 134:22-135:19.

66

326.    Johnson admits that he does not have biological children who attend District schools. Further, he admits that it is not unusual for someone to be on the school board that does not have children in the District. *Johnson Testimony*, Vol. III, 130:25:132:4.

327.    Johnson claims that people were using racially coded language when they made references to candidates that did not own their own home. *Johnson Testimony*, Vol. III, 126:23-127:9. Johnson does not own his own home but lives in a parsonage provided by his church. *Johnson Testimony*, Vol. III, 130:16-23. Thurman, who also ran in 2014, did not hear Johnson criticized in that way. *Thurman Testimony*, Vol. IV 154:24:125:1. Graves does not own her own home. *Graves Testimony*, Vol. VI, 15:4-13. Yet, Graves was the decisive victor in 2015. *Joint Stip.* ¶¶166-167 and *Rodden Testimony*, Vol. V, 64:18-65:13.

### 6. Senate Factor Seven: The Extent to which African Americans have been elected to Office.

#### a. Current and Past African American Representation.[9]

328.    Graves was elected in 2015. She was the top-ranked candidate and received the highest point estimate from African American voters. She was elected with the largest number of votes cast for any candidate from 2000 – 2015. *Rodden Testimony*, Vol. V, 64:18-65:13.

329.    Green testified that the amount of effort a candidate puts into his/her campaign affects how well that candidate will do in his/her election. *Green Testimony*, Vol. III, 98:6-8. Green testified that if candidates "want to win, they do." *Green Testimony*, Vol. III, 54:2-6.

330.    Graves worked hard to win her election. She was at every event Dr. Thurman attended. She attended board meetings. She spoke to parents. She went to PTO meetings at

---

[9] Analysis of this Senate Factor is directly affected by the 2016 election.

schools. She was very visible in the District, prepared and well-spoken. *Thurman Testimony*, Vol. IV, 160:3-13.

331. Graves testified that she attended the Shear Institute to learn how to be a candidate. She attended various activities in the schools, went to black history programs at Berkeley Middle and served pancakes. She bought billboards, knocked on doors, sent robo-calls, printed t-shirts and received endorsements from faculty at different schools. She was active on the internet with a campaign website, Facebook and Twitter. She testified to working extremely hard. *Graves Testimony*, Vol. VI, 7:17-8:9.

332. Thurman ran on the Grade A for Change Slate and was elected in 2014. *Joint Stip*. ¶221. Thurman received the highest point estimate from African American voters. *Joint Stip*. ¶146.

333. Thurman attended two forums at churches, a forum at UMSL, a forum at Commons Lane Elementary, a forum at McCluer, and forums with the Republican and Democratic groups in Ferguson and in Florissant. All of the candidates were invited to attend these events but not all of the candidates actually attended. Thurman never arrived late to the forums. *Thurman Testimony*, Vol. IV, 150:10-151:2. Thurman never talked on the phone during candidate forums. She felt that people might not take you seriously if you did that. *Thurman Testimony*, Vol. IV, 153:13-19.

334. Thurman met weekly with the Grade A for Change slate. They provided opportunities to meet with the public. Everyone was invited to attend and ask questions about their campaigns. Thurman attended the Shear Institute on running for office. She approximates she took advantage of approximately 99% of the opportunities the Grade A for Change Slate provided. She testified that Savala took part in about 80% of the

opportunities and Johnson took part approximately 50-60% of the time. *Thurman Testimony*, Vol. IV, 151:3-152:3.

335.    Thurman testified that the difference between her and the other Grade A for Change candidates is that she was consistent and made sure that she attended as many meetings as possible and she listened to her campaign manager. She did the footwork and went door-door. *Thurman Testimony*, Vol. IV, 152:4-11.

336.    Thurman filled out the League of Women Voters survey. Neither of the other two Grade A for Change slate candidates filled it out. The result of filling out the survey was that the Post-Dispatch printed the information so that it went out all over the city. Thurman testified it was one of the biggest things she could have done to get the word out about her campaign. She testified it was invaluable. *Thurman Testimony*, Vol IV, 152:4-153:12.

337.    Johnson admits that the Grade A for Change slate hosted events for its candidates and held planning meetings but that he did not many of them. *Johnson Testimony*, Vol. III, 133:17-134:13. Johnson admits that he did not fill out the League of Women Voters survey but that other board candidates did fill it out. Johnson admits that he talked on his phone during a candidate forum. He admits he responded to a call in the middle of a campaign event. *Johnson Testimony*, Vol. III, 136:8-137:11.

338.    An intensely local analysis requires knowing whether candidates had run effective campaigns; knowing whether they responded to the League of Women Voters' questions; and knowing whether they attended candidate events. *Rodden Testimony*, Vol. V, 69:23-70:14.

339. Hogshead, elected in 2013, is a current board member and an African American preferred candidate. *Rodden Testimony*, Vol. V, 57:9-21.

340. Graham was a board member from 1988 through 2011. *Graham Testimony*, Vol. II, 73:10-12. Around the time she was elected in 1990, African Americans were 20.77% of the voting age population. *Cooper Report*, PLTF-44, Figure 4. Thomas, an African American, served from 2000 until 2006. *Joint Stip.* ¶63, ¶87, ¶102. Henson, an African American, served from 2007 through 2013. *Henson Testimony*, Vol. II, 19:14-17. African Americans were 32.51% of the voters in the District according to the 2000 decennial census. *Cooper Report*, PLTF-44, Figure 4.

341. Henson lost by 125 votes in 2013. Savala lost by 91 votes in 2014. If 216 votes had been different then African Americans would maintain a majority of the seats on the board and this Section 2 claims would not have been filed. *Rodden Testimony*, Vol. V, 72:1-18.

### b. The 2011 Spiegel Controversy and Aftermath.

342. The 2011 election was an anti-incumbent year. *Graham Testimony*, Vol. II, 94:23-95:2 and *Thurman Testimony*, Vol. IV, 147:4-7. Prior to that election, the board voted unanimously to provide the former superintendent Jeff Spiegel and his wife lifetime health insurance. *Graham Testimony*, Vol. II, 95:3-9. The anti-incumbent sentiment was based on that vote. *Thurman Testimony*, Vol. IV, 147:4-10.

343. The incumbents in 2011 were Graham, Clark and Lentz. None of them were re-elected. *Joint Stip.* ¶118. Graham is African American. Clark and Lentz are white. *Joint Stip.* ¶119.

334.    African American voters preferred two of the incumbents that year: Graham and Clark. Both of them were defeated due to the controversial vote. *Rodden Testimony*, Vol. V, 51:6-21.

335.    Kimball relied on an article written on April 24, 2011 by the St. Louis Post Dispatch entitled "*School board suffers backlash over deal with superintendent.*" The article states, "The three defeated board members agree that the health insurance issue contributed to their loss. But they say the teachers' union – which had butted heads with the board over pay issue – played a major role. The union interviewed each candidate and endorsed the three who won: Morris, Chris Martinez and Robert Chabot. Sandra Goforth-McDougal, president of the Ferguson Florissant National Education Association, said it wasn't the union that turned voters away from the incumbents. "We heard from a number of residents who said it was all about the insurance" she said. "The fact that the board gave the superintendent such a generous stipend for the rest of his lifetime opened the door for the public to look more deeply into what the board was doing. And obviously they came to the conclusion that we did: That there needed to be positive change." *Kimball Testimony*, Vol. III, 21:2-22:12 and *School board suffers backlash over deal with superintendent*, PLTF-130.

336.    Thurman testified to her anger about that vote because she pays almost $700/month for insurance. Spiegel made twice as much money but did not have to pay for his insurance. His wife, who never worked for the District, also received health insurance free of charge. *Thurman Testimony*, Vol. IV, 146:25-147:17.

337.    Thurman did not vote for any of the incumbents in 2011 and was not surprised that they were all defeated. *Thurman Testimony*, Vol. IV, 147:18-148:1.

338. Thurman had always supported Graham prior to that election. *Thurman Testimony*, Vol. IV, 148:9-11. Thurman got emotional when describing Graham. She thinks very highly of Graham but disagreed with that vote so much that she did not vote for Graham in 2011. *Thurman Testimony*, Vol. IV, 148:9-22. Thurman was very upset about that vote and states that it is something voters still talk about. *Thurman Testimony*, Vol. IV, 148:12-24.

339. In 2011, the FFNEA informed Graham they decided not to endorse any incumbents that year. *Graham Testimony*, Vol. II, 77:1-7 and *Green Testimony*, Vol. III, 92:1-18. Graham testified that she was not endorsed because she had been on the board a long time. *Graham Testimony*, Vol. II, 97:14-16. Green testified the FFNEA declined to endorse incumbents because of the board's vote to give the former superintendent lifetime health insurance; because the former president of the board threatened to lock teachers out of negotiations; and the incumbents failed to vote for a pay raise. *Green Testimony*, Vol. III, 92:5-21.

340. Henson was the president of the board when it made the decision to give Spiegel and his wife lifetime health insurance. *Henson Testimony*, Vol. II, 45:10-12, *Thurman Testimony*, Vol. IV, 148:7-8. Henson lost re-election in 2013 by 125 votes. His election was marked by the anger around his support for Jeff Spiegel and his wife's lifetime health insurance package. There is no other evidence to indicate why Henson could not have been elected. There is no evidence that indicates white voters blocked his re-election. *Rodden Testimony*, Vol. V, 60:7-61:4.

**c. District voters elect African American candidates in Exogenous Elections.**

341. It is difficult to identify African American preferred candidates in a multi-winner system that allows bullet voting and elects two to three seats each election. A simpler system to analyze is an election with an African American and white candidate whereby one person wins. Therefore, Rodden examined exogenous races with geographic boundaries larger than the District. He superimposed the District's boundaries onto the electorate so that he only analyzed precincts within the District. If the white majority in the District blocks African American voters, that should show up in a comparison of these exogenous races. *Rodden Testimony*, Vol. V, 80:24-82:22.

342. Rodden examined every election with an African American and white candidate going back to 2008. The results of Rodden's analysis are listed below. *Rodden Rebuttal*, DEF-B, Table 1.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

**Various election results aggregated to the level of the Ferguson-Florissant School District**

| Contest | Month | African-American Candidate | White candidate |
|---|---|---|---|
| 2008 Presidential Democratic Primary | February | Barack Obama 70.3% | Hillary Clinton 29.7% |
| 2008 Presidential General | November | Barack Obama 76.5% | John McCain 23.5% |
| 2008 U.S. Congress General | November | William Lacy Clay 84.6% | Robb Cunningham 15.4% |
| 2010 County Executive Democratic Primary | August | Charlie Dooley 80.0% | Ronald Levy 20.0% |
| 2010 County Executive General | November | Charlie Dooley 70.7% | Bill Corrigan 27.0% |
| 2010 U.S. Congress Democratic Primary | August | William Lacy Clay 78.9% | Candice Britton 21.1% |
| 2010 U.S. Congress General | November | William Lacy Clay 69.8% | Robyn Hamlin 27.1% |
| 2012 U.S. Congress Democratic Primary | August | William Lacy Clay 65.0% | Russ Carnahan 32.6% |
| 2012 U.S. Congress General | November | William Lacy Clay 78.5% | Robyn Hamlin 21.5% |
| 2012 Presidential General | November | Barack Obama 77.9% | Mitt Romney 22.1% |
| 2014 County Executive Democratic Primary | August | Charlie Dooley 50.7% | Steve Stenger 49.3% |
| 2014 U.S. Congress General | November | William Lacy Clay 73.0% | Daniel Elder 27.0% |

343.   African American candidates receive a majority of the votes in the District, and often a super-majority, in every single election. A few elections are close but interesting. For example, Charlie Dooley received more support in the District than Steve Stenger even though Stenger won that election in the remainder of St. Louis County. The key is that African American candidates always win in these comparisons. *Rodden Testimony*, Vol. V, 83:1-17.

### d. The Hazelwood School District maintains a majority African American Board.

344.    The 2010 decennial census data for the Hazelwood School District is attached to the stipulated facts as Exhibit O. *Joint Stip*. ¶217. The 2011 – 2013 ACS estimates for the Hazelwood School District are attached to the stipulated facts as Exhibit P. *Joint Stip*. ¶218.

345.    The current racial makeup of the Hazelwood School District Board of Education is four African Americans (Desiree Whitlock, Cheryl Latham, Brenda Youngblood, Karlton Thornton) and three whites (Chuck Woods, Rick Robert, Ann Gibbons). *Joint Stip*. ¶219.

346.    The Hazelwood School District conducts at-large elections. *Rodden Testimony*, Vol. V, 33:5-35:15.

### 7. <u>Senate Factor Eight</u> – Responsiveness of Board Members as Elected Officials.

347.    Graham testified that the Board was responsive to the particularized needs of the African American community when she was a board member from 1988 – 2011. She testified that the board was "open to all children, black and white. And we did see eye to eye, and we did make a lot of good decisions, and I was happy about that." *Graham Testimony*, Vol. II, 87:21-88:5 and 97:22-98:6. She testified that she and the board shared the same opinion on matters even though the other board members were not African American. She gave an example of how the board listened to her about the naming of the high school and changed the name based on her recommendation. *Graham Testimony*, Vol. II, 98:7-22.

348.    Henson testified that the board was responsive to the particularized needs of African American students when he served from 2007 – 2013. *Henson Testimony*, Vol. II, 19:14-

17 and 31:14-19. Henson admitted that when he was on the board, two African Americans board members were able to appropriately address the concerns of the African American community. Henson admits there are two African Americans on the current board. *Henson Testimony*, Vol. II, 57:15-23.[10]

349. Green testified that he believes the District board advocates for African American and white children equally. *Green Testimony*, Vol. III, 97:12-14. Green testified that the board is trying to make sure that every child has a fair and equal chance at a good education and that it is doing its best to include everyone. *Green Testimony*, Vol. III, 100:2-8.

350. Thurman testified the board responds to the needs of the African American community and accepts her input. *Thurman Testimony*, Vol. IV, 133:1-16. She testified that she's been on the board about 1 ½ years and that "when I do speak, they do listen. It doesn't mean that they always agree with what I say, but they are listening and we do have a lot of discussions about race." *Thurman Testimony*, Vol. IV, 133:21-134:1.

351. Graves testified that the board listens to her perspective and takes it into account when making decisions. She testified that the board does not treat African American students differently than white students. *Graves Testimony*, Vol. VI, 17:13-19.

### a. The Board's Role with the Achievement Gap and Discipline Disparity.

352. The achievement gap refers to a disparity between minorities and non-minority students as it relates to educational outcomes. *Pruitt Testimony*, Vol. I, 23:1-10. Pruitt testified that the District had an achievement gap from 2001 – 2009. His data ended in 2009. *Pruitt Testimony*, Vol. I, 25:10-26:10.

---

[10] The District has requested this information updated to include the April 5, 2016 election returns.

353. Pruitt admits that the achievement gap existed under Dr. Art. McCoy, the District's first African American superintendent. *Pruitt Testimony*, Vol. I, 58:6-13 and 60:16-18.

354. Pruitt admits that he has not attended any curriculum committee meetings, discipline committee meetings or board workshops. He claims the District's board is not responding to the achievement gap based on his discussions with 2-3 parents. *Pruitt Testimony*, Vol. I, 61:2-23.

355. Pruitt testified that the District is not the only school district with an achievement gap. *Pruitt Testimony*, Vol. I, 26:11-14.

356. Henson testified that there are factors beyond just race that factor into the achievement gap. *Henson Testimony*, Vol. II, 49:25-50:3.

357. Thurman testified that the board discusses the achievement gap and how to prevent students from failing. *Thurman Testimony*, Vol. IV, 133:7-20.

358. Thurman testified that the District has an achievement gap. Hazelwood and almost every other district in Missouri have an achievement gap as well. Thurman testified the board's role in addressing the achievement gap is to have a superintendent in place to address it. *Thurman Testimony*, Vol. IV, 134:2-135:10. Thurman testified that the Board's role in addressing the achievement gap is to put a superintendent in place that can counteract it. *Thurman Testimony*, Vol. IV, 135:3-10. She testified the board hired best person (Dr. Davis) to address issues of disparity. *Thurman Testimony*, Vol. IV, 161:22-25.

359. Pruitt testified the District maintains a disparity in the amount of discipline that African American students receive. *Pruitt Testimony*, Vol. I, 29:2-14. Pruitt admits that the achievement gap and the discipline disparity were not solved under Dr. McCoy. *Pruitt*

*Testimony*, Vol. I, 74:2-6.  Henson cannot recall whether McCoy attempted to address discipline disparity.  *Henson Testimony*, Vol. II, 49:13-20.

360.    Green testified he believes the District board tries to ensure that every child has a fair and equal chance at a good education.  He does not believe the achievement gap is worse in the District than anywhere else.  *Green Testimony*, Vol. III, 99:24-100:5.

361.    When asked about whether the board had recommended use of any of the evidence-based strategies for reducing discipline problems and disparities, Green testified that they are trying.  *Green Testimony*, Vol. III, 84:1-7.

362.    Green testified that discipline is a huge issue in the District.  He testified the Board and administrators are working out ways to deal with it.  *Green Testimony*, Vol. III, 84:8-14.

### b. The Board's Relationship with the Current Superintendent Dr. Joe Davis.

363.    Dr. Joseph Davis is the current superintendent of the District.  He is African American.  *Joint Stip.* ¶302.  The racial make-up of the board that hired Dr. Davis was one African American and six white board members.  *Joint Stip.* ¶303.

364.    Thurman was the only African American on the board that hired Dr. Davis.  She testified that the board's intent was to hire the best person for the position.  The board's intent was not focused on hiring an African American.  *Thurman Testimony*, Vol. IV, 162:1-9.

365.    Thurman testified that the board "absolutely" hired the best person for the job.  She testified that Dr. Davis "walks on water."  *Thurman Testimony*, Vol. IV, 162:10-13.

366.    Thurman testified that Dr. Davis is able to stand up to the board members and tell them his opinion.  He has won the board's respect by doing that.  The board is very supportive of him and is behind him 100%.  *Thurman Testimony*, Vol. IV, 162:14-163:1.

367.    Graves testified that the board has a very open relationship with Dr. Davis. She believes the board chose the best person for the job. She testified that she feels like "he is the revitalization we need for our community, for our school." *Graves Testimony*, Vol. VI, 18:3-17.

368.    Green testified that hiring Dr. Davis has had a positive effect. The population of the District is pleased with the board's decision. Green testified the District is headed in the right direction. *Green Testimony*, Vol. III, 102:6-15.

369.    Green testified that the issue of race is not as divisive as it was two years ago. He believes hiring Dr. Davis helped. *Green Testimony*, Vol. III, 106:13-23.

### c. Dr. McCoy's Suspension and Resignation was a Personnel Decision that was not Based on Race.

370.    Dr. McCoy was the District's first African American superintendent. *Joint Stip.* ¶281. On November 6, 2013, the Board voted to suspend Dr. McCoy with pay. *Joint Stip.* ¶285. On November 13, 2013, the Board held a meeting attended by over 1,000 parents, community leaders, and other District residents. *Joint Stip.* ¶291. During the meeting, Rob Chabot read a statement in which he claimed that he had "trust issues" with respect to Dr. McCoy. *Joint Stip.* ¶294. None of the other board members made a statement or responded or otherwise addressed the concerns expressed. *Joint Stip.* ¶295. In the weeks following the November 13, 2013 meeting, Board members did not provide any explanation for their decision to suspend Dr. McCoy citing personnel reasons. *Joint Stip.* ¶296. On December 11, 2013, the Board voted in a closed meeting to issue charges for termination for cause against Dr. McCoy. *Joint Stip.* ¶298. On December 19, 2013, the Board sent a letter to FFSD "Families, Staff and Community" announcing that it had

issued a notice of charges for termination for cause against Dr. McCoy. The letter did not include any explanation for the decision to issue a notice of charges. *Joint Stip.* ¶299. Dr. McCoy resigned as superintendent in March 2014. *Joint Stip.* ¶301.

371.    Graham testified that the board never discusses publicly a personnel issue. The Missouri School Board Association training sessions teach board members that personnel issues are not public. She testified that the board sat and listened to every single comment that was made at the McCluer North meeting regarding Dr. McCoy. *Graham Testimony*, Vol. II, 98:23-99:11.

372.    Green testified that his personal belief is that the board did not act in a racist way when it came to Dr. McCoy and his eventual decision to resign. Green explained that he does not believe the board's decision was based on race because he is privy to certain information. *Green Testimony*, Vol. III, 100:20-101:5.

373.    Thurman testified that one of her motivations for running for election was the Dr. McCoy issue. She did not understand the situation. *Thurman Testimony*, Vol. IV, 140:7-141:5.

374.    Thurman attended the large board meeting at McCluer North. She admitted that she was disappointed going into the meeting. She knows Dr. McCoy and thought highly of him. She attended the meeting and observed how the board was sitting in front of the table, not behind it and listened to the comments from the audience. Then it struck her that the board could not discuss the issue because it was a personnel matter. As a principal, she remembered a time when she put a teacher on notice but could not discuss it even if the other teachers were upset. At that point, she began to understand how difficult it must have been to be on the board. *Thurman Testimony*, Vol. IV, 141:14-143:5.

375.   Thurman, a current board member, does not believe that the white school board terminated or suspended Dr. McCoy because he is black. *Thurman Testimony*, Vol. IV, 143:11-19.

376.   Henson considers Dr. McCoy a personal friend. He never asked Dr. McCoy why he was suspended because he "just knew" the answer. He admits he did not see the notice of charges. Henson did not ask Dr. McCoy why he resigned rather than going forward with a termination hearing. Henson agrees that the decision of whether or not to release the reasons for suspension and resignation should have been left up to Dr. McCoy. *Henson Testimony*, Vol. II, 54:3-55:16.

377.   Johnson testified he knows Dr. McCoy personally. He testified he did not ask Dr. McCoy the reasons for his suspension. Nor did he ask Dr. McCoy the reasons for his resignation. *Johnson Testimony*, Vol. III, 140:4-17.

378.   Hudson testified to knowing Dr. McCoy personally. Hudson did not ask Dr. McCoy the reason for his suspension and resignation. *Hudson Testimony*, Vol. IV, 120:10-20. Hudson was unaware that Dr. McCoy refused to sign a release to allow them to discuss the reasons for his suspension. Hudson was not aware that the reasons for Dr. McCoy's resignation would have become public if Dr. McCoy had chosen to continue with the termination process. Hudson was unaware that Dr. McCoy and the Board issued a joint statement stating that the reasons for Dr. McCoy's suspension were not racial in nature. Hudson agrees that the Board should not release the reasons for Dr. McCoy's suspension against McCoy's wishes. *Hudson Testimony*, Vol. IV, 119:12-120:9.

   **d. The Board Responded to protect its Students during the Michael Brown Protests.**

379. Green testified that Michael Brown's death and subsequent protests had a tremendous effect on the District. The riots and protests scared and worried people. *Green Testimony*, Vol. III, 82:13-83:1. The District board acted appropriately to the situation. They did what they could to help ensure the safety of the children. The board provided counseling to teachers, staff and students. The board allowed the high school students to express themselves in a peaceful march. *Green Testimony*, Vol. III, 98:16-99:5.

**8. Senate Factor Nine – The Policy Underlying the Use of the Current Boundaries.**

380. Section 162.261 RSMo requires the seven-director school district with at-large elections and staggered terms. *Joint Stip. ¶345.*

381. Section 162.261 RSMo requires the seven-director district to hold elections at municipal elections. *Joint Stip. ¶346.* Elections are held in April. *Joint Stip. ¶341.*

382. The at-large system is the most common form of government for school boards. It allows the board to make policies related to the education of children. It is important to have policies that represent the entire district, especially the high schools. Single member districts create distributive battles between different elementary schools and clashes for resources. *Rodden Testimony*, Vol. V, 83:18-84:10.

383. The at-large system is best because it allows board members to represent the entire district rather than the school in that member's area. *Thurman Testimony*, Vol. IV, 157:7-15.

384. A November election would occur in the middle of the school year. April is a better month for board elections because it gives new board members time to learn and train when the school year is winding down and summer is about to begin. *Thurman Testimony*, Vol. IV, 158:7-159:3.

385. School board elections are very important. April elections give the opportunity for school board elections to be voters' main focus. *Graves Testimony*, Vol. VI, 16:11-21.

386. Kimball acknowledged April elections could have legitimate public policy reasons. The legislature may have considered that April elections would allow voters to focus more on municipal elections than if they were held in November. *Kimball Testimony*, Vol. III, 39:4-22. Kimball testified there is a legitimate concern that local elections would get "swamped" by the attention devoted to state and national elections if they were moved to November. *Kimball Testimony,* Vol. III, 42:7-15.

## CONCLUSIONS OF LAW

### A. Legal Framework for a Section 2 Violation.

387. Section 2 of the Voting Rights Act forbids state and local voting processes that "result[]" in a denial or abridgment of the right of any citizen of the Unites States to vote on account of race." 52 U.S.C. § 10301(a). The challenged process is unlawful if "based on the totality of the circumstances, it is shown that the political processes leading to nomination or election" are not "equally open to participation by members" of a racial or ethnic group and members of the group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

388. "[T]he ultimate right of Section 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 508 (2006).

389. At large elections "may not be considered per se violations of Section 2." *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986). Instead, the plaintiff must establish three "necessary

preconditions:" (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single member district," (2) the minority group must be "politically cohesive", and (3) the white majority must vote "sufficiently as a block to enable it. . .usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51.

390. Plaintiffs must show each of the *Gingles* preconditions by a preponderance of the evidence. Failure to satisfy any element results in dismissal of the claim. *Johnson v. DeGrandy*, 512 U.S. 997, 1011-12 (1994).

391. "Once the preconditions have been met, §2 plaintiffs must further show that, under the totality of the circumstances, vote dilution has occurred because the challenged plan denies minority voter equal political opportunity." *Stabler v. County of Thurston*, 129 F.3d 1015, 1020 (8th Cir. 1997) *citing Johnson v. DeGrandy*. "Satisfaction of [the *Gingles*] 'preconditions' is necessary, but not sufficient to establish liability under §2." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993).

392. "In a Section 2 vote dilution suit, along with determining whether the *Gingles* preconditions are met and whether the totality of the circumstances supports a finding of liability, a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practices." *Holder v. Hall*, 512 U.S. 874, 879 (1994)

393. "Vote dilution, then, is a comparative inquiry where the court must measure a minority group's ability to elect under the existing system to some to some "alternative system that would provide greater electoral opportunity to minority voters," which under *Thornburg*

is single member districts." *Aldasoro v. Kennerson*, 922 F.Supp. 339, 369 (1995) citing *Holder v. Hall*, 512 U.S. 874 (1994).

B. The First <em>Gingles</em> Precondition

**1. African Americans were a majority of the at-large District's voters in 2013.**

394. "The ultimate question in any Section 2 case must be posed in the *present tense*, not the past tense. The court must determine whether the challenged electoral structure deprives a racial minority of equal opportunity to participate in the political process at present." *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995) *emphasis added*.[11]

395. Courts have typically relied on decennial census data in Voting Rights Act cases. That reliance has resulted in the following rebuttable presumption. "[C]ensus figures are presumed accurate until proven otherwise. Proof of changed figures must be thoroughly documented, have a high degree of accuracy, and be clear, cogent and convincing to override the presumptive correctness of the prior decennial census." *Valdespino v. Alamo Heights Independent School Dist.*, 168 F.3d 848, 853-854 (5th Cir. 1999).

396. However, the ACS has overcome the rebuttable presumption. "To the extent that ACS data may be regarded as distinguishable from presumptively accurate census figures, ACS data meets the standard to overcome the prior decennial census. ACS sampling errors are transparent; they may be accounted for using the margins of error published by the ACS and the use of confidence intervals. The Court concludes that ACS data is thoroughly documented, has a high degree of accuracy, and is clear, cogent and convincing enough to overcome the *Valdespino* threshold." *Benavidez v. City of Irving, Tex.* 638 F.Supp.2d 709, 729-730 (2009).

---

[11] For this reason, the District requests the record supplemented with the 2016 Election Results.

397. The parties have stipulated to the historical trends in the District's population from 1990 through 2010. The District's total population declined from 1990 to 2010. *Joint Stip.* ¶15. The African American population rose by 81% and the white population dropped by more than half in that time. *Joint Stip.* ¶16 and *Cooper Report*, PLTF 44, ¶23. The voting age populations mirrored those numbers in that the black voting age population ("BVAP") nearly doubled while the NH white VAP decreased by almost half. *Joint Stip.* ¶13 and *Cooper Report*, PLTF-44, ¶¶29-31.

398. In addition, the parties stipulated to all of the voting age population percentages contained in the 2011 – 2013 ACS except for the AP BVAP estimate. *Joint Stip.* ¶¶23-25 and ¶28. The 2011 – 2013 ACS corroborates and continues the trends from the last 1990, 2000 and 2010 decennial censuses. The single-race black population and VAP continued to increase and the white population and VAP continued to decrease. *Joint Stip.* ¶25. The Court has examined the methods employed by the experts for determining the AP BVAP under the 2011 – 2013 ACS and finds the District's calculation persuasive. The District relies exclusively on 2011 – 2013 ACS data whereas Plaintiffs splice the ACS with the 2010 census data.

399. The Court finds the 2011-2013 ACS data accurate and reliable enough to overcome the rebuttable presumption for the decennial census established in *Valdespino*, 168 F.3d 8530854. The 2011 – 2013 ACS merely corroborates the trends from the past. The majority of the estimates are stipulated by the parties. African Americans were undoubtedly the largest group of voters and whites were the smallest group of voters in the District in 2013. Individuals that identify as any-part African American were 51% of the voters in the District in 2013.

400. Where a shift in Missouri's projected population from the date of the last census can be predicted with a high degree of accuracy, the state's congressional redistricting plan may properly consider such shifts. See, *Kirkpatrick v. Preisler*, 294 U.S. 526 (1960).)

401. Courts have relied on trend analysis for projections beyond the decennial census and even the ACS. In *Benavidez*, the Court relied on a projection beyond the 2006 ACS. 638 F.Supp.2d at 730. In *Aldasoro*, the Court accepted defense expert's testimony that the Hispanic proportion of all voting age citizens will continue to increase, as young Hispanics continue to age into maturity. 922 F.Supp. at 355.

402. The twenty-three year trend in the District has been steady and continuous. The Court may rely on the past demographic trend from the decennial censuses and the ACS to conclude that African Americans were the majority of voters in 2013. The Court may rely on the evidence that individuals that were just under the age of maturity in 2010 and in the 2011 – 2013 ACS have now reached maturity. Finally, the Court may rely on the demographics of the student age population by race. The sum of that evidence is that African Americans were a majority of the voting age population in 2013 and that majority has continued to increase since then. See, *Aldasoro*, 922 F.Supp. at 355.

403. The legal ramifications of majority status was first discussed by the United States Supreme Court in the plurality opinion *Bartlett v. Strickland*, 556 U.S. 1 (2009). The *Bartlett* Court adopted a "majority-minority rule" for analyzing Section 2 liability under the first *Gingles* precondition. This rule "relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting age population in the relevant geographic area." *Bartlett*, 556 U.S. at 18. The Court held the plaintiffs satisfied the first *Gingles* factor if they "show[ed] by a preponderance of the evidence that the minority

population in the potential election district is greater than 50 percent." *Id.* at 19-20. In *Bartlett*, the Plaintiffs were arguing in favor of creating a single member district that comprised less than a majority of minority voters. The Court declined. *Id.* Since then, Defendants have used the *Bartlett* argument to mean there is no liability when the contested district is already greater than 50 percent.

404. Courts have relied on *Bartlett* to find that a Voting Rights Act violation does not exist in a district in which the racial or ethnic group already comprises 50% or more of the entire jurisdiction. See, *Jeffers v. Beebe*, 985 F.Supp.2d 920 (E.D.Ark. 2010) (rejecting the plaintiffs' argument that a senate district should be redrawn because the district was "already a majority-minority district under *Bartlett's* decision"; the black VAP was 52.8%, "which is 'greater than 50 percent.'" (quoting *Bartlett*, 556 U.S. at 20). The Court in *Aldasoro v. Kennerson*, 922 F.Supp. 339 (S.D.Cal 1995) made a similar finding even prior to the *Bartlett* decision. The Court held that "[w]hile Hispanics presently have the ability to elect in a single member district, this Court also has determined that Hispanics now have the ability to elect at-large. There is no current condition of vote dilution." *Id.* at 375.

405. No Court has found Section 2 liability when the minority voting age population has exceeded the 50% threshold. (The plaintiffs have not cited a case, nor can we find one, in which a §2 vote-dilution claim successfully challenged the drawing of a district with a BVAP greater than 50 percent. *Jeffers v. Beebe*, 895 F.Supp.2d 920, 935 (E.D.Ark. 2012)); and *Aldasoro*, 922 F.Supp. at 375. In addition, Courts have declined liability when the racial minority comprised the largest group of voters. See, *Fairly v. Hattiesburg*, 2:13-CV-KS-MTP issued August 11, 2015, WL 4744315.

406. African Americans were a slight majority of the District's voters in 2013. That majority has likely increased since that time. As the majority, African Americans already have an equal opportunity to elect representatives of their choice. There is no liability under the first *Gingles* precondition.

## 2. Single Member Districts Must Provide Greater Electoral Opportunity to African Americans.

407. "Section 2 vote dilution plaintiffs must establish that the challenged practice is dilutive. In order for an electoral system to dilute a minority group's voting power, there must be an alternative system that would provide greater electoral opportunity to minority voters." *Holder v. Hall*, 512 U.S. 874, 887 (1994).

408. In *Holder*, the United States Supreme Court held that the liability phase of a Section 2 claim includes determining whether the *Gingles* preconditions are met, whether the totality of the circumstances supports a finding of liability, and whether there is a "reasonable alternative practice" to use as a benchmark against which to measure the existing voting practice. *Holder*, 512 U.S. 880.

409. *Holder v. Hall* is a United States Supreme Court decision involving the potential liability of the Section 2 defendant. *Holder* does not involve the remedial phase after Section 2 liability has attached. *Id.*

410. The United States Supreme Court held that "a §2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark "undiluted voting practice." *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 480 (1997). Section 2 "uses as its benchmark for comparison in vote dilution claims a hypothetical, undiluted plan." *Id.* at 472.

411.    Plaintiffs have offered two sets of single-member Illustrative Districts as their "alternative system" to serve as the benchmark for the "undiluted voting practice." See, *Reno*, 520 U.S. at 480 and *Holder*, 512 U.S. at 887.

412.    The parties conducted a six-day bench trial from January 11 – 19, 2016. Plaintiffs offered seven single-member districts, (in the form of their Illustrative Plans) as the only alternative to the current at-large system. Plaintiffs failed to offer any other alternative when the evidence was open and no other alternative was litigated. Thus, the Court must determine whether single-member districts, as proffered in Plaintiffs' Illustrative Plans, provide greater electoral opportunity to African Americans in the District.

413.    The District proffers a multitude of evidence from various sources that demonstrate single member districts will protect the white minority to the detriment of African American representation. First and foremost, Plaintiffs own experts have authored and relied on scholarly articles that conclude the current at-large system benefits African American voters in the District and that single member districts could harm them. For example, Plaintiffs' main expert on racial polarization authored an article in 2010 that concludes the at-large system favors African American voters in these circumstances. *Engstrom Testimony*, Vol. IV, 66:15-67:5 and DEF-NN "*Cumulative and Limited Voting: Minority Electoral Opportunities and More*. In addition, the District's expert has unrefuted evidence that: 1) African American voters are more geographically dispersed than white voters; 2) single member districts will exacerbate the present candidate recruitment problem; and 3) African American municipalities with single-member districts have majority white representation. The District's expert analyzed and studied the question of whether single-member districts are a reasonable alternative to the current

at-large system and found they are not. Plaintiffs have not provided convincing evidence otherwise.

414. The Court finds the evidence persuasive and convincing that single member districts are not a reasonable alternative to the current, at large system in the District. African Americans are the largest group of voters and became a majority in 2013. Plaintiffs failed to demonstrate how single member districts provide greater electoral opportunity. As such, Plaintiffs have not met their burden or the legal standard as set out by the United State Supreme Court.

### C. The Second Gingles Precondition

#### 1. The Legal Standard for the Second *Gingles* Precondition.

415. "The second *Gingles* precondition requires a showing that the . . . minority is politically cohesive." *Bone Shirt,* 461 F.3d at 1020 (citing *League of United Latin Am. Citizens v. Perry* 548 U.S. 399 (2006). "If the minority group is not politically cohesive, it cannot be said that the . . . electoral structure thwarts distinctive minority group interests. *Gingles,* 478 U.S. at 51.

416. The "inquiry" into political cohesiveness is "essentially whether the minority group has expressed clear political preferences that are distinct from those of the majority." *Gomez v. Watsonville,* 863 F.2d 1407, 1415 (9th Cir. 1998); "Evidence of political cohesiveness is shown by minority voting preferences, distinct from the majority, demonstrated in actual elections." *Bone Shirt,* 461 F.3d at 1020. Proving this factor typically requires a statistical and non-statistical evaluation of the relevant elections. *Id.* at 1020.

**2. Methods and identification of African American Preferred Candidates.**

417.    In *Clay v. Board of Education of the City of St. Louis*, 90 F.3d 1357, 1361 (8th Cir. 1996), the Court specifically rejected the notion that the definition of 'minority preferred candidate' is based solely on the candidate's race. Instead, the court adopted the defendant's definition of "minority preferred candidate" as "the four candidates receiving the highest number of African American votes." *Id.* at 1361-1362. The court notes that "[t]his definitional approach. . . has been used before." Id. at 1362 n.10 (citing *Harvell*, 71 F.3d at 1386-87; *Clarke v. City of Cincinnati*, 40 F.3d 807, 810 (6th Cir. 1994). The instant case refers to African American preferred candidates rather than minority preferred candidates. The term "minority" is confusing under these facts because African Americans are not a numerical minority.

418.    The District's expert relied on the approach as outlined in *Clay*. Rodden used EI to analyze elections in the District from 2000 through 2015. He identified the African American preferred candidates as the two or three candidates that received the highest point estimates. Engstrom analyzed elections from 2011 through 2015 but adopted at least three main exceptions and several minor exceptions to the approach outlined in *Clay*. The Court agrees with the District's assessment that Plaintiffs' methodology is flawed because it often only identifies one candidate of choice despite there being two to three seats up for election each year. *Rodden Testimony*, Vol. V, 37:22-38:10. Plaintiffs could have conducted an analysis regarding bullet voting to prove African American voters only have one preference. They failed to do so.

419.    The District's expert conducted an analysis with an objective standard that the candidates with the highest point estimates from African American voters are the African American

preferred candidates. As the District points out, Plaintiffs designed a set of rules and guidelines that effectively eliminate every white candidate from being identified as an African American preferred candidate. *Rodden Testimony*, Vol. V, 48:1-8. The Court finds Plaintiffs' approach of multiple subjective exceptions unconvincing.

420. The *Clay* Court clearly defined a 'minority preferred candidate.' The *Clay* Plaintiffs offered, "by implication, a definition of "minority preferred candidate" based solely on the candidate's race." *Id.* at 1361. The Court found that definition "untenable" and rejected it in favor of the alternative offered by the defendants. *Id.* at 1361.

421. In a strikingly similar argument, the instant Plaintiffs offer a definition, "by implication," that the African American preferred candidate must be African American. That notion has been specifically rejected because it "offends the principles of equal protection." See, *Harvell v. Blytheville School District No. 5*, 71 F.3d 1382, 1386 (8th Cir. 1995).

422. In addition, the *Clay* Court "identified, in each election, who those candidates were. Since four seats on the Board of Education are contested in every Board election, he designated the four candidates receiving the highest number of African-American votes as the 'minority preferred candidates.'" *Id.* at 1361-1362. The Eighth Circuit affirmed this approach. *Id.* at 1362.

423. Plaintiffs' exceptions for identifying African American preferred candidates are the following. First, Plaintiffs urge an exception to *Clay* from the Fourth Circuit that excludes the Court from considering African American voters' second and third choice candidates when the African American top choice receives a "significantly higher percentage" of votes and is defeated. See, *Collins v. City of Norfolk*, 883 F.2d 1232 (4th Cir. 1989). Engstrom does not have an objective value for the "significantly higher

percentage." Instead, he eliminates second or third choice candidates when the first choice candidate's support was "well above" the others. *Engstrom Testimony*, Vol. IV, 29:20-30:2. Engstrom's approach is more stringent than any court has adopted. Even *Collins* did not exclude African Americans' second and third choice candidates. Instead, it held the second and third place candidates "must be reviewed individually to determine whether the elected candidates can be fairly considered as representatives of the minority community." *Id*. The Court declines to follow the Fourth Circuit *Collins* case in favor of the controlling precedent established by the Eighth Circuit in *Clay*. Thus, the Court rejects this exception urged by Plaintiffs.

424. Second, Plaintiffs urge the Court to ignore African American and white voters' preferences if their EI estimates have overlapping confidence intervals. *Engstrom Testimony*, Vol. IV, 18:8-17; 19:7-16; 30:3-11. The effect of this is to ignore voters' second or third choices if the election is close. Rodden explained this approach as attempting to measure cohesion by eliminating the instances of non-cohesion. *Rodden Testimony*, Vol. V, 38:11-23. Again, this approach has not been endorsed by the Eighth Circuit and this Court declines to adopt it.

425. Third, Plaintiffs claim that African Americans cannot have a second or third preference if their first choice candidate is unsuccessful. This exception was adopted by the Fourth Circuit in *Collins*. Under this exception, Plaintiffs identify only one unsuccessful African American preferred candidate and eliminate the remaining 1-2 seats from consideration. *Engstrom Testimony*, Vol. IV, 33:10-18. Again, this exception has not been adopted in the Eighth Circuit and the Court declines to do so now.

426. In addition to the major exceptions listed above, Plaintiffs claim one cannot assess voter preferences from uncontested elections. *Engstrom Testimony*, Vol. IV, 45:22-46:5. However, Plaintiffs' own witness admits that a reason for uncontested elections is that constituents are content. *Henson Testimony*, Vol. II, 44:14-25. The District's expert considered all of the elections in his analysis, including those that were uncontested, in order to give a complete description of the circumstances in the District. *Rodden Testimony*, Vol. V, 45:2-46:20. The absence of white challengers to black incumbents is indicative of the lack of legally significant racial bloc voting. *Mallory v. Ohio*, 38 F.Supp.2d 525, 571 (S.D. Ohio 1997); *Milwaukee Branch of the N.A.A.C.P. v. Thompson*, 935 F.Supp. 1419, 1428-29 (E.D. Wis. 1996). The Court finds the nature of Voting Rights Act cases is to consider all of the evidence and to weigh it accordingly.

427. Finally, of the four elections Engstrom analyzed, he urges the Court to discount the 2015 election due to special circumstances. "The United States Supreme Court in *Thornburg* held that an isolated minority success should be given less probative value if explained by 'special circumstances.' Examples of special circumstances are a minority candidate running unopposed, incumbency or because of pending litigation, Anglos give unusual support to minority candidates to defeat the lawsuit." *Aldasoro*, 922 F.Supp. 372.

428. "As explained in *Gingles*, the special circumstances analysis was designed to prevent defendant jurisdictions from arguing that a minority candidate's *occasional* victory in an otherwise racially polarized electorate defeats a vote dilution claim." *Rodriguez v Bexar County, Tex.*, 385 F.3d 853, 864 (5th Cir. 2004) citing *Gingles*, 478 U.S. at 57.

429. "...[W]hile special circumstances may be used to "explain *a single minority candidate's victory*," the Supreme Court's comment regarding such circumstances "cannot be

transformed into a legal standard which requires the court to force *each and every victory of several minority candidates* to fit within a prescribed special circumstance." *Id.* citing *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1204 (5th Cir. 1996).

430. The Court is skeptical this 'special circumstances' analysis even applies to the District. The District has maintained consistent African American representation back to the 1980's. Dr. Graves' victory represents more than the 'occasional' victory of an African American. Dr. Thurman was elected the year before. Henson and Graham were on the Board prior to that.

431. Still, Engstrom attempts to discredit Graves' election as special circumstances. *Engstrom Testimony*, Vol. IV, 39:16-40:12 and 51:7-14. Engstrom claims 2015 was post-litigation and contained a different candidate pool from the past. However, Engstrom does not provide evidence for his hypothesis. By 2015, African American voters were a comfortable majority of the voters in the District. African American candidates received more votes than white candidates that year. Further, Graves' election was the second year in a row that an African American was elected. The record contains no evidence that white voters knew about the instant litigation and threw their support behind her to defeat it. There is no evidence that Engstrom's theory about the candidate pool is anything beyond mere speculation. The Court cannot discount the 2015 election on conjecture.

432. The Court declines to adopt Plaintiffs' labyrinth of exceptions to the rule for identifying African American preferred candidates. Instead, the Court adopts the objective reasoning followed by the District and adopted by the Eighth Circuit. This Court finds that African American preferred candidates are simply the candidates that receive the highest number

of African American votes. See, *Clay v. Board of Education of the City of St. Louis*, 90 F.3d 1357, 1361 (8th Cir. 1996).

433. As a result of this finding, the following candidates are African American preferred candidates: (the asterisk identifies white candidates)

- 2011 Election:     Graham, Hawkins and Clark*

- 2012 Election:     B. Morris and Schroeder*

- 2013 Election:     Henson and Hogshead*

- 2014 Election:     Thurman, Savala and Johnson

- 2015 Election:     Graves and Dameron*

434. Based on the evidence presented at trial, the 2015 Board was comprised of the following three African American preferred candidates: Graves, Thurman and Hogshead. *Joint Stip.* ¶31, ¶167, ¶146 and ¶138.[12]

### 3. Cohesion and Crossover Voting among African American and White Voters.

435. The inquiry under the second *Gingles* precondition is whether African American and white voters have distinct preferences and African Americans are politically cohesive. See, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1020 (8th Cir. 2006) and *Gomez v. Watsonville*, 863 F.2d, 1407, 1415 (9th Cir. 1988).

436. The Court finds that African American voters were not cohesive in 2011. The parties stipulated that African American voters cast approximately 40% of the votes among six candidates. *Joint Stip.* ¶124 and *Rodden Testimony*, Vol. V, 51:22-24 and 52:18-20.

437. The Court finds African American and white voters did not have distinct preferences in the 2012 election. Schroeder received the highest point estimate among white voters and

---

[12] The new 2016 board members will be sworn into office in April 2016.

the second highest point estimate among African American voters. *Joint Stip.* ¶130. Schroeder was elected. *Joint Stip.* ¶129. Over 48% of African American voters cast votes for the same candidates preferred by white voters. White voters cast 53.7% of their votes for African American preferred candidates. *Joint Stip.* ¶130 and *Rodden Testimony*, Vol. V, 55:4-10 and Vol. V, 55:12-14. The evidence demonstrates African American voters were not cohesive and that white voters cast a considerable amount of crossover votes for African American preferred candidates.

438.    The Court finds African American and white voters did not have distinct preferences in the 2013 election. Hogshead received the highest point estimate among white voters and the second highest point estimate among African American voters. *Joint Stip.* ¶138. Hogshead was re-elected. *Joint Stip.* ¶137. Two African American candidates ran for election but a white candidate, Hogshead, received higher support than Thomas, an African American candidate. *Joint Stip.* ¶138. The evidence is clear that African American and white voters both preferred Hogshead and she was elected.

439.    The Court finds the 2014 election was racially polarized. There was no overlap between African American and white voters' preferences. The voters' preferences were distinct. However, the parties stipulated that African American voters spread 25% of their votes among the five non-African American preferred candidates. *Joint Stip.* ¶153. In addition, an African American preferred candidate, Savala, lost by 91 votes in a year when African American votes outnumbered white votes. *2014 Election Results*, PLTF-11 and *Rodden Testimony*, Vol. V, 63:6-9 and 62:20-22. Thus, the Court finds that African American voters did not vote cohesively in the 2014 election.

440. The Court finds African American and white voters did not have distinct preferences in the 2015 election. Graves received the highest point estimate among African American voters and the second highest point estimate among white voters. *Joint Stip.* ¶167. Graves was elected. *Joint Stip.* ¶166.

441. As a result, Plaintiffs cannot meet their burden under the second *Gingles* precondition. African American and white voters shared the same preference in three (2012, 2013 and 2015) of the last five elections. African American voters were not cohesive in the 2011 and 2014 elections, especially in light of their numerical superiority in voting strength.

**D. The Third Gingles Precondition** – **The white majority must typically vote in a bloc to defeat the minority candidate.**

**1. There is no white majority in the District.**

442. The third *Gingles* precondition asks whether the white majority typically votes in a bloc to defeat the minority candidate." *Bone Shirt*, 461 F.3d at 1020.

443. The Eighth Circuit has set forth a three-prong inquiry for this precondition: (1) identifying the minority-preferred candidates; (2) determining whether 'the white majority vote as a bloc to defeat the minority preferred candidate;' and (3) determining whether 'there [were] special circumstances such as the minority candidate running unopposed present when minority preferred candidates won.'" *Bone Shirt*, 461 F.3d at 1020.

444. The Supreme Court explained the basis for the "white majority" requirement in *Thornburg v. Gingles*, 478 U.S. 30 (1986). The Court stated that it has "long recognized that multimember districts and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities] in the voting population. The

theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Gingles*, 478 U.S. at 48. "In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives." *Gingles*, 478 U.S. at 51.

445.   The facts in this case are incapable of conforming to the legal standards for liability under the third precondition. First and foremost, the parties have stipulated that there is no white majority through their admission of the decennial census and ACS data. The last time whites were known to be a majority of the population in the District was the 1990 decennial census. *Joint Stip.* ¶16. The last time whites were known to be a majority of the voters in the District was the 1990 decennial census. *Cooper Testimony*, Vol. I, 221:1-13. *Joint Stip.* ¶13. Instead of a white majority, whites are a minority of the population and a minority of the voters in the District. *Cooper Testimony*, Vol. I, 221:1-13. *Joint Stip.* ¶13, ¶16 and ¶25. While the parties disagree as to the percentage of African American voters in the District in 2013, they actually agree on the percentage of white voters as of 2013. *Joint Stip.* ¶25. The Court finds, as a matter of law, that whites are a minority in the District. As a matter of law, there is no "white majority."

446.   The finding that white voters are a minority and not a majority necessarily means that African American voters, as a majority or a plurality, cannot be 'submerged in a white multimember district.' *Gingles*, 478 U.S. at 51. Again, while the parties dispute whether African Americans were a majority of the voters in the District in 2013, they do not dispute white voters' minority status. Equally as important, the parties stipulate that

African Americans were the largest group of voters according to the 2011 – 2013 ACS. *Joint Stip.* ¶25. Plaintiffs cannot meet the third *Gingles* precondition because the facts won't allow it. There is no white majority to submerge into the larger African American vote.

## 2. Whites do not Vote as a Bloc to Defeat African American Preferred Candidates.

447. The Court has already identified the African American preferred candidates. The Court has already determined that African American and white voters shared the same preferences for candidates in three of the last five elections. Thus, the question becomes whether white bloc voting has and does act to defeat African American preferred candidates. *Bone Shirt*, 461 F.3d at 1020.

448. From 2000 through 2015, every top ranked candidate among white voters was elected as compared to six out of twelve top-ranked candidates among black voters. *Joint Stip.* ¶191. However, African Americans were a much lower percentage of the population from 2000 through 2010. *Joint Stip.* ¶16

449. In 2011, Hawkins and Graham lost by slim margins. Graham was an incumbent in an intensely anti-incumbent year. Moreover, African American voters were not cohesive that year when they cast approximately 40% of their votes among six candidates. The Court finds the District's argument persuasive in that one cannot determine a loss was due to white bloc voting when minority voting behavior is not cohesive and a candidate loses by a slim margin. This is especially true considering the size and growth of the African American population at that time. *Rodden Testim*ony, Vol V, 52:21-53:9.

450. In each election from 2012 through 2015 election, an African American preferred candidate was successful. Schroeder was elected in 2012. Hogshead was elected in

2013. Thurman was elected in 2014. Graves was elected in 2015. Thus, whites did not

vote in a bloc to defeat the African American preferred candidates since they won.

### 3. Graves' Election was not the Result of Special Circumstances.

451.  The special circumstances analysis was conducted under the second *Gingles*

precondition. Plaintiffs claim that Graves' election was due to special circumstances

because the instant lawsuit had been filed. Engstrom hypothesized that the lawsuit may

have affected the candidate pool. The Court has already found that argument speculative

and unconvincing. There is no evidence that voters in the District knew of this lawsuit.

In addition, there is no evidence that links knowledge of this lawsuit to voting, candidate

or potential candidate behavior.

452.  While Plaintiffs had initially claimed that the elections of Graves in 2015 and Thurman in

2014 were the result of special circumstances, they abandoned that argument at trial and

in closing. However, to be clear, the special circumstances analysis is meant to apply to

the 'isolated' or 'occasional' success of an African American preferred candidate.

*Aldasoro*, 922 F.Supp. 372 and *Rodriguez*, 385 F.3d at 864. African Americans have

maintained consistent representation on the District's board since Dr. Graham was

elected in 1988. The special circumstances analysis does not apply to Dr. Graves or to

Dr. Thurman.

453.  Plaintiffs fail to meet their burden under the third *Gingles* preconditions. First, there is

no white majority. Second, African American voters are the largest group and cannot be

submerged into the smaller white minority. Third, white bloc voting cannot be the cause

for defeat of any African American preferred candidate due to lack of cohesion, electoral

success and the numerical superiority of African American voters. Fourth, the consistent

and sustained African American representation on the District's board cannot be explained away by the special circumstances analysis.

### E. Senate Factors analysis -The Totality of the Circumstances Test.

454. A voting procedure violates §2 if it has the "result" under the "totality of the circumstances of affording minority voters less opportunity than white voters "to elect representatives of their choice." *Stabler v. County of Thurson*, 129 F.3d 1015, 1020 (8th Cir. 1997), *citing* 42 U.S.C. §1972(b). "Once the preconditions are met, §2 plaintiffs must further show that, under the totality of the circumstances, vote dilution has occurred because the challenged plan denies minority voters equal political opportunity." *Id.* citing *Johnson v. DeGrandy*, 512 U.S. at 1011-12.

455. The totality of the circumstances analysis is a "flexible, fact-intensive inquiry predicated on an intensely local appraisal of the design and impact of the contested electoral mechanisms." *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 367 (5th Cir. 2001). "Courts evaluating vote dilution claims, therefore, must consider all relevant evidence, "no single statistic provides courts with a short-cut to determine whether a set of (electoral structures) unlawfully dilutes the minority voting strength." *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994).

456. This Honorable Court holds that the absence of an available remedy precludes a finding of liability under the totality of the circumstances test. See, *African American Voting Rights Legal Defense Fund, Inc.*, 994 F.Supp. 1105 (1997).

457. "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of §2 under the

totality of the circumstances." *Jenkins v. Red Clay Consolidated School District Board of Education*, 4 F.3d 1103 (3d Cir. 1993).

458.    The instant case is extremely unusual. As demonstrated above, the facts cannot conform to the legal standards designed to determine liability under the Voting Rights Act. To date, neither party has uncovered a case where the Court has found a violation of the Voting Rights Act when the racial minority is a majority of the voting power in the District. In fact, Plaintiffs' own expert acknowledged that a Voting Rights Act case in which the minority VAP and the white VAP are roughly identical is unusual. *Engstrom Testimony*, Vol. IV, 72:23-73:4. Thus, the Court analyzes the 'totality of the circumstances' knowing the instant case is the "very unusual case" where the preconditions may be met without a violation of the Voting Rights Act.

### 1. Senate Factors 1 and 5 – Past history of discrimination and current socioeconomic factors that affect African American's ability to register, to vote or to otherwise participate.

#### a. Senate Factor 1 - Past history of discrimination in the District.

459.    The first Senate Factor is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Bone Shirt*, 461 F.3d at 1021.

460.    The Court looks to the plain language in this factor and its interpretation in the 2009 Eighth Circuit case in *Bone Shirt* to find a two part test: 1) the extent of any history of official discrimination in the state or political subdivision; 2) that touched the right of members...to register, to vote, or otherwise to participate.." *Id.*

461. The parties have stipulated to the history of official discrimination in the State of Missouri and in the St. Louis Metropolitan Region. *Joint Stip.* ¶¶226-230. The District's expert specifically acknowledges it. *Rodden Testimony*, Vol. V, 72:19-23. However, the legal standard is to determine the "extent of any history of discrimination in the state or *political subdivision." Id.* Thus, the legal standard is clear in that the state or region's history of discrimination is not the relevant analysis. The relevant analysis is the extent of discrimination in the District.

462. Plaintiffs' expert Gordon testified to this Senate Factor. Gordon admits that his research has been focused on the Greater St. Louis Metropolitan Area. *Gordon Testimony*, Vol. I, 90:23-91:5. He admits that his research is not limited to the District but claims that a credible analysis requires placing the District in its state or national context. *Gordon Testimony*, Vol. I, 100:6-14. Gordon feels that his research on the Metropolitan Area is relevant. However, Plaintiffs offer his opinion as evidence for the first Senate Factor: the extent of any history of official discrimination <u>in the District</u>.

463. Gordon's evidence that is particular to the District is scant. While Gordon did calculate the District's population and voting age population, he utilized a completely different data set than the other four experts. His data came from a blended data set maintained by the Housing and Urban Development that has not been updated since 2010. His 2010 calculations claim that African Americans were 44% of the District's population when the parties stipulated that it was 52.03% according to the 2010 decennial census. *Joint Stip.* ¶16 and *Gordon Testimony*, Vol. I, 148:25-1. The extent of this error in Gordon's analysis is unclear. In addition, Gordon's report includes apartment complexes such as Canfield and Northwinds as examples of spatial segregation when those complexes are

not within the District. *Gordon Report*, PLTF-40, p. 28 and *Gordon Testimony*, Vol. I, 153:11-18. The extent of this error is unclear as it relates to his overall analysis. Finally, Gordon discounted the voting age population in the District based on felony disenfranchisement. He admits his disenfranchisement numbers are based on state-wide percentages that are inflated by at least 31,000 individuals. He did not adjust his numbers accordingly. *Gordon Testimony*, Vol. I, 163:21-164:2. Gordon's evidence that is particular to the District is not credible. The result is that the Court is left with very little evidence from which to judge the history of discrimination in the District.

**b. Senate Factor 5 - The effects of discrimination in areas such as education, employment and health.**

464. The fifth Senate Factor asks whether African Americans "bear the effects of discrimination in such areas as education, employment and health." *Bone Shirt*, 461 F.3d at 1021.

465. The parties agree there are disparities between African Americans and whites in the District in many areas. *Rodden Testimony*, Vol. V, 73:15-74:5 and *Gordon Testimony*, Vol. I, 130:6-11. The disagreement is whether this disparity should be placed in context or whether it should be taken in isolation. While Plaintiffs' experts urge the Court to review the District's history by analyzing the entire Metropolitan Area, they urge a myopic view of socioeconomic disparities. In context, African Americans in the District are better off than African Americans in the region and in the state in education, the poverty level, reliance on SNAP and homeownership. *Rodden Testimony*, Vol. V, 73:17-75:19 and *Cooper Testimony*, Vol. I, 207:3-15.

466. While the evidence indicates disparities in discipline and in the achievement gap, board members testified that the responsibility for addressing the achievement gap and discipline lies with the superintendent. The Board's role is to hire the superintendent to address those issues. *Thurman Testimony*, Vol. IV, 161:22-25. That being said, the achievement gap has existed in the District under both African American and white superintendents. *Pruitt Testimony*, Vol. I, 25:10-26:10, 58:6-13 and 60:16-18. As with other disparities, the achievement gap is not unique to the District and has been existence for a long time. *Pruitt Testimony*, Vol. I, 26:11-14 and 25:10-26:10. Finally, testimony indicates that the board is trying to address disparities in discipline through evidence-based strategies. *Green Testimony*, Vol. III, 84:1-7.

### c. Both Senate Factors 1 and 5 require a Finding of African American's ability to Register, to Vote and to otherwise Participate.

467. Both Senate Factors 1 and 5 are concerned with the nexus between any history of discrimination or socioeconomic disparities and the "the right of minorities to register, to vote, or to otherwise participates." *Bone Shirt*, 461 F.3d at 1021. Plaintiffs have utterly failed to meet their burden to prove depressed registration, voting or any other participation.

468. "[C]ourts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, *and where the level of black participation in politics is depressed*, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political

107

participation." *Clay v. Board of Education of City of St. Louis*, 896 F.Supp. 929, 943 (1995) citing S.Rep. No. 417 at 29.

469.   This Federal Eastern District of Missouri held that, "[W]hile defendant concedes a history of past discrimination in areas such as education generally, the record fails to support a finding that African-American access to the political process is impaired. In an effort to support its assertion that such discrimination has hindered the ability of minorities to participate in the political process, plaintiffs offer only evidence of low voter turnout. While low minority voter turnout may evidence an electoral scheme in which minorities lack equal opportunity to participate in the electoral process, this Court must consider only the choices of those minority voters who actually voted, rather than engaging in speculation concerning the causes of minority voter apathy. Consequently, the Court finds this contention unpersuasive and this factor unsatisfied." *Id*. at 943.

470.   Plaintiffs failed to submit evidence on the voter registration rates of African American and white voters in the District despite admitting it could have been done. *Rodden Testimony*, Vol. V, 70:24-71:4; *Kimball Testimony*, Vol. II, 185:6-21 and *Gordon Testimony*, Vol. I, 173:16-24. The Court agrees with the District that registration statistics for the state of Missouri cannot substitute for District-specific data.

471.   Both parties analyzed voter turnout by race. The District's expert conducted a complete analysis using EI and scatterplots and found little relationship between a voter's race and turnout. Plaintiffs' expert Kimball conducted Homogenous Precinct analysis. PLTF-49, *Kimball Report*, Table 3. In this District, Homogenous Precinct analysis relies on very few precincts. *Rodden Testimony*, Vol. V, 71:5-25. The Court has already found EI analysis superior to Homogenous Precinct analysis. Thus, the Court agrees with the

District's conclusion that there is very little relationship between race and turnout. *Rodden Testimony*, Vol. V, 76:9-87:3.

472. Every fact witness that lives in the District testified to being registered to vote, to voting regularly and to running for office. *Henson Testimony*, Vol. II, 18:12-19 and 19:18-20:18; *Graham Testimony*, Vol. II, 73:10-12; *Johnson Testimony*, Vol. III, 111:16-18, 132:8-9; 111:19-23 and 132:13-15; *Hudson Testimony*, Vol. IV, 93:1-14 and 94:7-12; *Thurman Testimony*, Vol. IV, 161:5-18; and *Graves Testimony*, Vol. VI, 13:7-15. Every witness that was asked testified to being able to participate in the electoral process. *Johnson Testimony*, Vol. III, 132:13-15; *Thurman Testimony*, Vol. IV, 161:5-18; and *Graves Testimony*, Vol. VI, 13:7-15. The testimony indicates that the amount of effort put into a campaign determines electoral success. *Green Testimony*, Vol. III, 54:2-6 and 98:6-8. There is no evidence in the record to suggest that African Americans do not have equal access to the political process.

473. While the parties do not dispute a history of discrimination in the region, there is a lack of evidence of history of discrimination in the District. While the parties admit socioeconomic disparities within the District, they dispute whether those disparities should be placed in context. Regardless, Plaintiffs have not met their burden to prove that any history of discrimination or socioeconomic disparities limit African American participation in the electoral process.

474. Clearly, Plaintiffs failed to provide evidence that any such discrimination "has hindered the ability of minorities to participate in the political process." *Clay* at 943.

475. "[P]roof of socioeconomic disparities and a history of discrimination without more" is not sufficient to demonstrate African Americans have less opportunity to participate in

the political process. *Clark v. Calhoun*, 88 F.3d 1393, 1399 (5th Cir. 1996). The Court finds these factors weigh in favor of the District.

### 2. Senate Factor Two - Racially Polarized Voting.

476.  The second Senate Factor is the extent to which voting in the elections of the state or political subdivision is racially polarized. *Bone Shirt*, 461 F.3d at 1021. "Evidence of political cohesiveness is shown by minority voting preferences, distinct from the majority, demonstrated in actual elections." *Id.* at 1020.

477.  "Though past elections may be probative of racially polarized voting, they become less so as environmental change occurs. In particular, elections that provide insights into past history are less probative than those that mirror the current political reality." *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1995).

478.  This factor is similar to the second *Gingles* precondition. However, under the totality of the circumstances, the Court conducts a "searching and practical evaluation of the past and present reality" and an "intensely local appraisal." *Gingles*, 478 U.S. at 79. "[A] court has a duty to ponder all available evidence concerning racially polarized voting that promises to cast light on the factors at work in a particular electoral scheme." *Uno* at 990.

479.  In analyzing racial polarization in the District in the 2011 through 2015 elections, the Court finds that 2014 is an outlier. The evidence indicates that racially polarized voting was more prevalent in that election than in 2011, 2013 and 2015. The best evidence for visualizing the level of polarization comes from the *Rodden's Report*, DEF-A, Figure 7. In that illustration, Rodden finds a correlation between race and voting but that the correlation is relatively mild with the exception of 2014. Fact witnesses testified to the

polarizing nature of the issues surrounding Dr. McCoy, the District's first African American superintendent's suspension and resignation. These events occurred just prior to the election and explain District voters' polarization. Most important, the level of polarization decreases in 2015 back to a more typical low level of polarization. This is despite the events involving Michael Brown's death that occurred in the Ferguson municipality. Evidence of the political environment surrounding the District is especially probative in this Senate Factor analysis. Thus, of the past five elections, only one has demonstrated clear and high levels of polarization. The 2015 election "mirrors the current political reality" and more common pattern of polarization in the District. Witness testimony corroborates this finding in that Green testified that race is not as divisive now as it was two years ago. *Green Testimony*, Vol. III, 106:15-16.

480. Witness testimony demonstrates significant crossover voting in that white voters support African American candidates and African American voters support white candidates. *Graham Testimony*, Vol. II, 100:16-18 and 100:19-24, *Johnson Testimony*, Vol. III, 137:12-23. *Thurman Testimony*, Vol. IV, 155:20-156:6. Graves Testimony, Vol. VI, 11:13-18. This indicates that African American and white voters do not have distinct preferences but tend to support an individual's campaign regardless of race.

481. As a result, the Court agrees with the District that racial polarization is relatively mild. The Court finds in favor of the District on this factor.

### 3. Senate Factor 3 – Voting Procedures that Enhance the Opportunity for Discrimination.

482. The third Senate Factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions,

or other voting practices or procedures that may enhance the opportunity for

discrimination against the minority group." *Bone Shirt*, 461 F.3d at 1021.

483. "[E]lectoral devices, such as at-large elections, may not be considered *per se* violative of §2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." *Gingles* at 46.

484. FFSD employs (1) an at-large voting scheme; (2) staggered terms, and (3) off-cycle (i.e. April versus November) elections. *Joint Stip.* ¶341.

485. This electoral system is mandated by Missouri law pursuant to Sections 162.261 and 162.291 RSMo. *Joint Stip.* . ¶¶345-346.

486. Kimball is the Plaintiffs' expert on this factor. He testified that the use of at-large elections in April deprives African Americans an equal opportunity to elect candidates of their choice. *Kimball Testimony*, Vol. III, 113:17-114:4. Kimball testified that the most important features that enhance the opportunity for discrimination is the at-large feature and the off-cycle scheduling of elections. *Kimball Testimony*, Vol. III, 117:16-25.

487. Kimball admits that his entire analysis of Senate Factor 3 was "citing political science research generally" and is not specific to the District. *Kimball Testimony*, Vol. II, 122:7-10.

**a. The At Large System versus Single Member Districts under these Facts.**

488. Plaintiffs offered *Harvell v. Blytheville School District No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995) for the proposition that "the at-large structure. . .tend[s] to suppress minority voters' influence." It is important to note that in *Harvell*, the voting age population was 70% white and 29% black. In other words, the black voting age population was also a numerical minority of the voting age population. *Harvell*, 71 F.3d at 1385. Thus, the

question of whether *Harvell* meant "minority" to mean African Americans as a 'racial minority' or to mean African Americans as a 'numerical minority' is unanswered.

489. Once again, the legal standard is at odds with the facts of this case. Plaintiffs do not directly address whether the at-large system tends to suppress the African American majority's influence. Nor do they address whether the at-large system tends to suppress African American voters' influence when African Americans are the largest group of voters. Plaintiffs merely presume the word 'minority' means a racial minority when the more logical interpretation is that it refers to a numerical one. The District, on the other hand, has addressed the precise issue of whether the at-large system tends to suppress African Americans as the largest group and majority of voters. The District's expert and common sense dictate that African American political power cannot be suppressed by a minority of voters when African Americans have the most political strength. The District's evidence clearly shows that the at-large system benefits the largest group of voters. That group is African Americans.

490. The District offers a tremendous amount of evidence to show that the at-large system does not suppress African American voters' influence. First, the District introduced a scholarly article written by Plaintiffs' own expert Dr. Engstrom prior to his involvement in this case. The article plainly states the at-large system "does have a tendency to favor the candidates preferred by a majority group, or at least the largest group, of voters within the jurisdiction." *"Cumulative and Limited Voting: Minority Electoral Opportunities and More"* St. Louis University Public Law Review, 2010, DEF-NN. Kimball relied on a different scholarly article that supports Engstrom's conclusion. *The Context Matters; The Effects of Single-Member versus At-Large Districts on City Council Diversity*, DEF-SS.

491.    Most importantly, Kimball testified that the reason the at-large systems makes it more difficult for African Americans to elect candidates of their choice is that a "white majority can basically outvote the African American minority." *Kimball Testimony*, Vol. II, 118:10-17. It is that admission that is crucial to this case. There is no white majority to outvote the African American minority. Instead, there is an African American majority that can now outvote the white minority. That is clearly the intended interpretation under *Harvell*. That is the interpretation upheld by this Court.

492.    In addition to the above, the District's expert and fact witness testimony corroborates that single-member districts in municipalities with African American majorities elect white candidates. The District offered the Florissant and Hazelwood City Councils from which to compare. *Rodden Testimony*, Vol. V, 33:5-24 and 33:25-35:7, *Kimball Testimony*, Vol. III, 13:4-9 and *Graham Testimony*, Vol. II, 101:4-17.

493.    Finally, the African American board members testified to the benefits of the at-large system. *Graves Testimony*, Vol., VI, 14:25-15:13, 13:16-17:1 and *Thurman Testimony*, Vol. IV, 159:4-23 and 157:23-158:13.

494.    Based on the legal standard cited above and the facts particular to this case, the Court cannot find the at-large system tends to suppress African American voters' influence in the District.

### b. April elections versus November elections.

495.    Kimball claims that elections held in off-cycle periods such as April tend to generate relatively low levels of information about the candidates and produce unusually low voter turnout. Yet, he admits that this is in reference to off-cycle elections generally and is not based on evidence he gathered about the District. *Kimball Testimony*, Vol. II, 189:3-21.

496.     For Kimball to make this conclusion specific to the District, he would have to know the
         amount of information generated in on-cycle elections such as November. He would also
         need to know African American and white voters' turnout in April and compare it to
         turnout levels in November. His conclusion relies on the premise that there are higher
         levels of information and higher levels of African American voting in November yet he
         admits he did not compare District voters' turnout levels in April with their turnout levels
         in November. *Kimball Testimony*, Vol. II, 190:3-12 and 190:25-191:2. In fact, Plaintiffs
         stipulate they have not conducted turnout differentials in elections held in the District in
         any other months. *Joint Stip.* ¶347. As such, Kimball's conclusion is based on an
         unfounded premise and is not credible as it relates to this case.

497.     In contrast, fact witnesses testify to the benefits of April elections. They claim April
         elections allow board members time to prepare for the new school year and for the
         upcoming fiscal year in July. *Green Testimony*, Vol. III, 101:8-13, *Thurman Testimony*,
         Vol. IV, 158:7-159:3, *Graves Testimony*, Vol. VI, 16:11-21.

498.     The Court finds that Plaintiffs have presented no evidence that April elections tend to
         depress African American voters' influence in the District.

### c. Staggered Terms Promote Stability.

499.     Plaintiffs claim staggered terms and the at-large structure tend to suppress minority
         voters' influence. *Johnson v. DeGrandy*, 512 U.S. 997 (1994).

500.     Plaintiffs fail to provide the Court with evidence of the effect of staggered terms on
         voting behavior in the District. Instead, Kimball's opinion was based on generic research
         in political science. *Kimball Testimony*, Vol. III, 11:16-22.

501. In contrast, the African American board members testified to the benefits of staggered terms. They testified it provides stability on the board while new board members learn their responsibilities. *Thurman Testimony*, Vol. IV, 157:16-158:6 and *Graves Testimony*, Vol. VI, 15:22-16:10.

502. Without any evidence from which to draw a negative inference regarding staggered terms, the Plaintiffs simply failed to meet their burden.

503. The Court finds Plaintiffs have not met their burden on Senate Factor 3. Plaintiffs expert's evidence is based on political science research generally and is not specific to the District. The evidence in this case demonstrates the at-large system is more beneficial to African American representation than single member districts. April elections with staggered terms promote stability and emphasis on school boards. Most importantly, this Court has held that there is no liability under the totality of the circumstances test in the absence of an available remedy. *African American Voting Rights Legal Defense Fund*, 994 F.Supp, 1105. Plaintiffs have not offered a potential remedy. There is no liability.

**4. Senate Factor 4 – Whether African Americans have been excluded from any FFNEA and North County Labor slating process.**

504. The fourth Senate Factor is "if there is a candidate slating process, whether members of the minority group have been denied access to that process." *Bone Shirt*, 461 F.3d at 1021.

505. "A 'slating group' is a group of individuals who select candidates to run as a bloc to fill seats which are currently up for election." *Clay*, 896 F.Supp. at 933. Similarly, slating has been defined as "the creation of a package or slate of candidates, before filing for office, by an organization with sufficient strength to make the election merely a stamp of

approval of the pre-ordained candidate group." *Overton v. City of Austin*, 871 F.2d 529, 534 (5th Cir. 1989).

506. "A nonpartisan or unofficial slating group . . . is "an organization whose purpose is to recruit candidates, nominate them, and campaign for their election to office in a nonpartisan election system." *U.S. v. City of Euclid*, 580 F.Supp.2d 584, 608 (2008).

507. The salient question for purposes of Senate Factor Four is, "where there is an influential official or unofficial slating organization, [what is] the ability of minorities to participate in that slating organization and to receive its endorsement:" *Id.* at 608.

508. The first part of this analysis is to determine whether the FFNEA and North County Labor are an official or unofficial slating group. The evidence demonstrates they are not. Both *City of Euclid* and *Overton* hold that slating organizations recruit candidates. See, *City of Euclid*, 580 F.Supp. at 608 and *Overton*, 871 F.2d at 534. There is no evidence in the record whatsoever that either of these organizations recruit candidates. Frank Green, an African American and former FFNEA president, specifically testified that the FFNEA does not recruit candidates. *Green Testimony*, Vol. III, 87:10-12. There is scant to no evidence in the record involving North County Labor.

509. The *Overton* case holds that a slating organization must be an "organization with sufficient strength to make the election merely a stamp of approval." *Overton*, 871 F.2d at 534. Neither the FFNEA nor North County Labor fit that standard. For example, the FFNEA endorsed Savala, an African American, in 2014. He did not win. Donna Thurman, another African American that ran that year, was not endorsed but she won. *Green Testimony*, Vol. III, 95:25-96:4 and *Thurman Testimony*, Vol. IV, 145:5-7. The same events occurred in 2015. The FFNEA endorsed an African American, Hines, but he

did not win. They did not endorse Graves but she won. *Graves Testimony*, Vol. VI, 8-19 and *Green Testimony*, Vol. III, 68:25-69:6. Further, fact witnesses testified that the endorsement helps but does not guarantee victory. *Green Testimony*, Vol. III, 68:3-8, *Johnson Testimony*, Vol. III, 145:5-13 and *Thurman Testimony,* Vol. IV, 146:13-18.

510. Under these facts, the inquiry can end here. Neither the FFNEA nor the North County Labor organizations are slating organizations.

511. However, the most important legal question is whether African Americans have been denied access to the FFNEA and North County Labor endorsement processes. The evidence clearly demonstrates they have not. Green testified that the FFNEA endorsement process is open to every candidate that files for office. *Green Testimony*, Vol. III, 87:21-88:11. Thurman corroborated Green's testimony. *Thurman Testimony*, Vol. IV, 145:3-4. Johnson, a Plaintiff, admitted that the endorsement process is open to everyone. *Johnson Testimony*, Vol. III, 134:14-18. In fact, not a single witness testified to being excluded from the process.

512. Kimball testified to this Senate Factor on behalf of Plaintiffs. Kimball was asked for his opinion on whether African American candidates have the same access to the slating processes in the District as white candidates. His answer is telling. He replied, "African American candidates are relatively rarely endorsed by each of these groups compared to white candidates." *Kimball Testimony*, Vol. II, 132:19-133:1. In other words, Kimball failed to respond when asked about access to the process.

513. More important, Kimball admits that Senate Factor 4 is about African American exclusion from the process, yet he admits he did not know the endorsement process for

either the North County Labor or the FFNEA when he made his conclusions. *Kimball Testimony*, Vol. III, 19:3-5, 16:22-17:2, 17:3-7.

514.    Again, Kimball's conclusion is not based in evidence. Instead, Kimball reviewed who was actually endorsed rather than reviewing whether the process was equitable. They are different questions and he left the Court with no evidence to address the legal question.

515.    The FFNEA is not a slating organization. Instead, it is an organization with a fair and equitable process that is open to everyone. The evidence demonstrates that every candidate that files for office is invited to apply for the endorsement. In addition, the FFNEA strives to create a racially diverse endorsement committee for this very reason. It does not want a candidate to claim racial discrimination in the endorsement. *Green Testimony*, Vol. Vol. III, 90:9-14 and 58:18-59:1.

516.    There is no evidence from which to find the FFNEA and North County Labor are slating organizations. There is no evidence from which to find African Americans have been denied access to the endorsement process. The Court finds for the District on this factor.

### 5. Senate Factor 6 – Overt or Subtle Racial Appeals.

517.    The sixth Senate Factor is "whether political campaigns have been characterized by overt or subtle racial appeals." *Bone Shirt*, 461 F.3d at 1021.

518.    "Racial appeals can take a variety of forms, from the use of racially-charged campaign issues to candidates using photographs of their African-American opponents on their campaign literature. The use of racially-charged campaign issues, such as campaign literature that preys on racial anxiety, is a well-recognized form of racial appeal." *U.S. v. City of Euclid*, 580 F.Supp.2d 584, 610 (2008). In *Euclid*, plaintiffs offered two pieces of

campaign literature, from different sources, used twenty years apart. The Court held that evidence insufficient to prove subtle or overt racial appeals. *Id.*

519. In the case from the City of St. Louis, the *Clay* Court found, "...debate over issues such as busing and school desegregation reflects legitimate public concern, while also having an undeniable racial dimension. Plaintiffs have not presented any evidence to suggest that such issues have been raised in an effort to appeal to members of a particular race. The absence of evidence on this factor militates against plaintiffs, who bear the burden of proof." *Clay*, 896 F.Supp. at 943.

520. Plaintiffs claim that witnesses Henson, Johnson and Pruitt experienced subtle racial appeals. Henson and Pruitt testified that discussing student discipline and student transfers is racially charged. Johnson testified to racial attacks on him personally. However, each of these claims was either contradicted by the Plaintiffs themselves or went uncorroborated by current and past African American board members.

   **a. Discipline is an issue of legitimate public concern for a school board campaign.**

521. The question for the Court is whether a discussion of discipline is a racially charged campaign tactic or whether it is an issue of legitimate public concern. See, *City of Euclid*, 580 F.Supp.2d at 610 and *Clay*, 896 F.Supp. at 943.

522. The witness with the longest tenure on the District Board was Doris Graham. She served from 1988 to 2011. Dr. Graham testified for the Plaintiffs. On direct, Plaintiffs questioned Dr. Graham about whether she observed subtle or overt racial appeals in campaigns for the school board. Her emphatic reply was, "No, I have not.." *Graham Testimony*, Vol. II, 91:16-21.

523. Dr. Graves testified that she does not perceive a candidate's discussion of discipline as a subtle racial appeal. She testified it is a legitimate issue for school board candidates to discuss. *Graves Testimony*, Vol. VI, 8:21-24 and 9:2-12. Plaintiff Johnson agreed that he believes discipline was an important issue when he campaign for office in 2014. It was important enough for him to have campaigned on it. *Johnson Testimony*, Vol. III, 112:9-113:2 and 124:8-125:6.

524. Plaintiffs failed to produce any evidence that school board candidates utilized discipline as a subtle or overt racial appeal to white voters. Plaintiffs have no tangible evidence such as campaign literature or photos that are racially charged. Plaintiffs have no testimony that indicates a discussion on discipline was meant to incite racial apprehension. Instead, discipline may or may not invoke racial dimensions due to a discipline disparity. That does not transform the issue into a subtle or racial appeal.

**b. Transfer students are an Issue of Legitimate Public Concern for School Board Campaigns.**

525. The Court conducts the same analysis on the issue of transfer students as it did for discipline. The question is whether a discussion regarding students transferring into the District is a racially charged campaign tactic or an issue of legitimate public concern. See, *City of Euclid*, 580 F.Supp.2d at 610 and *Clay*, 896 F.Supp. at 943.

526. Clearly, the issue of students transferring into the District was one of legitimate public concern. Thurman testified as such. *Thurman Testimony*, Vol. IV, 134:6-11. Johnson testified there were concerns about whether transferring students had low achievement that would affect the District overall. He also testified there were issues regarding the fiscal disposition of the district and the practicalities of absorbing additional students.

*Johnson Testimony*, Vol. III, 120:13-24, 123:16-124:4. Thus, the question is whether it was also an issue that 'preys on racial anxiety.' *City of Euclid*, 580 F.Supp.2d at 610.

527.    The parties have stipulated that a 2011 U.S. Department of Education survey indicates 77.1% of the students in the District are black. *Joint Stip.* ¶12. In other words, the District is already majority African American. Thus, as Thurman testified, the notion that voters were concerned about absorbing additional African American students into an already African American District is illogical. *Thurman Testimony*, Vol. IV, 154:20-23. That conclusion is substantiated when one considers the fact that a majority of the District's voters are African American. *Rodden Testimony,* Vol. V, 16:16.

528.    Just as with a discussion of discipline, a discussion regarding transfer students may or may not have a racial dimension because it implicates African American students. That does not transform the issue into one meant to prey on racial anxiety. Plaintiffs' evidence is insufficient.

### c. Personal attacks on Plaintiff Johnson.

529.    Johnson testified that claims that does not own his own home and that he does not have biological children in the District were racial appeals. *Johnson Testimony*, Vol. III, 134:22-135:20-23. Yet Johnson later admitted that other current board members do not have children in District schools and that this comment was referenced in passing. *Johnson Testimony*, Vol. III, 130:25-132:4. Further, Graves testified that she does not own her own home. *Graves Testimony*, Vol. VI, 15:4-13. Despite that, she was the most preferred candidate by African American voters and the second preferred candidate by white voters in 2015. *Rodden Testimony*, Vol. V, 65:9-10. If that accusation were a subtle racial appeal, it did not come to fruition in Graves' campaign.

530.    While Johnson may have subjectively perceived those comments as a subtle racial appeal, there is no evidence that those comments were campaign strategies against him based on his race.

531.    The evidence does not a support a finding in Plaintiffs' favor on Senate Factor 6. The evidence indicates campaigning on discipline and discussing transfer students are issues of legitimate public concern that may also have a racial dimension. There is no evidence those issues were used as campaign strategies meant to prey on racial anxiety. This factor is decidedly in the District's favor.

### 6. <u>Senate Factor 7</u> – The extent to which African Americans have been elected to office.

532.    Senate Factor seven is "the extent to which African Americans have been elected to public office in the jurisdiction." *Bone Shirt*, 461 F.3d at 1021.

533.    Section 2 guarantees an effective equality, although it is not a guarantee of equality of result --- after all, the right to vote was protected, not the right to vote for the winning candidate. *Earl Old Person v. Brown*, 312 F.3d 1036, 1044 (9th Cir. 2002); *Martinez v. Bush*, 234 F.Supp.2d 1275, 1303 (S.D.Fla.2002).

534.    In *Uno v. City of Holyoke*, 72 F.3d 973, 981 (1995), the Fifth Circuit provides guidance on determining whether voting patterns are due to racial animus or due to "whatever else it takes to be successful in politics." The Court held that "the electoral structure is not illegal if the defeat represents nothing more than the routine operation of political factors. In other words, even under the 1982 amendment, a lack of electoral success unrelated to race is not a proxy for lack of opportunity to succeed." *Id.* at 982.

535.    "The burden of proof at all times remains with the plaintiffs; defendant's burden is an entry-level burden of production. Thus, once the defendant proffers enough evidence to

raise a legitimate question in regard to whether nonracial factors adequately explain racial voting patterns, the ultimate burden of persuading the factfinder that the voting patterns were engendered by race rests with the plaintiffs." *Uno*, 72 F.3d at 982.

### a. African Americans Historically Maintained Consistent Representation.

536.   The fact that Graham, Thomas and Henson represented the District for a span of twenty five years (Graham from 1988 – 2011 and Henson from 2007 – 2013) demonstrates that African American representation has been consistent. *Graham Testimony*, Vol. II, 73:10-12 and *Henson Testimony*, Vol. II, 19:14-17. Moreover, the African American population was a much lower percentage of the District than it is today. It went from 24.33% in 1990 to over 52% in 2013. *Joint Stip*. ¶16 and ¶23.

### b. The board's vote to give the former superintendent Spiegel and his wife lifetime health insurance before the 2011 election had long-term ramifications for incumbents, including the African Americans.

537.   Just prior to the 2011 election, the District's board voted to give Jeff Spiegel and his wife lifetime health insurance. Henson was president of the board that made that decision. Graham was a board member that voted in support of it. *Graham Testimony*, Vol. II, 95:3-9, *Henson Testimony*, Vol. II, 45:10-12. Fact witness testimony universally indicates that 2011 was an anti-incumbent year as a result. *Graham Testimony*, Vol. II, 94:23-95:2, *Thurman Testimony*, Vol. IV, 147:4-10. The FFNEA declined to endorse any of the incumbents up for re-election that year. *Graham Testimony*, Vol. II, 77:1-7 and *Green Testimony*, Vol. III, 92:5-11. Green testified the failure to endorse candidates that year was based in part on the incumbents' vote in support of insurance. *Green Testimony*, Vol. III, 92:5-21. The incumbents in 2011 were Graham, Clark and Lentz.

African American voters preferred both Graham and Clark. *Rodden Testimony*, Vol. V, 51:6-21. None of the incumbents were re-elected. Graham is African American. Clark and Lentz are white. Joint Stip. ¶¶118-119.

538. Thurman, an African American board member, gave the most impassioned testimony regarding this issue. She testified she thinks very highly of Graham but was unable to vote for her re-election in 2011 due to Graham's support for insurance. *Thurman Testimony*, Vol. IV, 148:9-22. She testified she was angry about that vote because of the amount she has to pay each month for her own insurance. She claims that voters still discuss that issue. *Thurman Testimony*, Vol. IV, 146:25-147:17.

539. The evidence clearly demonstrates that 2011 was an anti-incumbent year. Graham's loss was not due to her race but was due to the fact that she was an incumbent. Defendant proffers enough evidence to raise a legitimate question in regard to whether nonracial factors adequately explain Graham's loss. See, *Uno*, 72 F.3d at 982. Plaintiffs fail to address this issue but rely instead on the mere fact that Graham was unsuccessful. The mere counting of wins and losses is not the "flexible, fact-intensive inquiry predicated on an intensely local appraisal of the design and impact of the contested electoral mechanisms" required by the totality of the circumstances inquiry. *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 367 (5th Cir. 2001).

540. Furthermore, Chuck Henson was president of the board when it made that controversial vote. Henson was up for re-election two years later in 2013 and lost by 125 votes. *Henson Testimony*, Vol. II, 45:10-12 and *Rodden Testimony*, Vol. V, 60:7-61:4. Henson's slim loss was more likely caused by his controversial vote for insurance than by the at-large electoral structure. As the District's expert concluded, there is no data to

125

indicate why Henson could not have been elected. There is no data that indicates white voters blocked his re-election, especially under these circumstances. *Rodden Testimony*, Vol. V, 60:7-61:4.

541. The Court concludes the controversial vote for lifetime health insurance prior to the 2011 election was the most likely cause of Graham and Henson's loss. Plaintiffs did not meet their ultimate burden to prove otherwise. The electoral structure cannot be blamed when Graham and Henson's loss represents nothing more than the routine operation of political factors. "A lack of electoral success unrelated to race is not a proxy for lack of opportunity to succeed." *Uno*, 72 F.3d at 982.

### c. African American Success from 2012 through 2015.

542. The Court previously ruled in Section II(C)(2) supra that Schroeder and Hogshead, African American preferred candidates, won election in 2012 and 2013.

543. Thurman won election to the District's board in 2014. She ran on the Grade A for Change slate with two other African American candidates. The slate provided strategy meetings, monetary benefits and events with the public. The evidence indicates that Thurman took advantage of almost every opportunity afforded by the slate. It also demonstrates the other two African American candidates did not. *Joint Stip.* ¶221 and *Thurman Testimony*, Vol. IV, 151:3-152:3. Thurman took care to attend every forum on time and without talking on the phone. She filled out the League of Women Voters survey and worked very hard to win her election. *Thurman Testimony*, Vol. IV, 152:4-153:19. Johnson did not attend many of the strategy meetings, talked on the phone during a forum and failed to fill out the League of Women Voters survey. *Johnson Testimony*, Vol. III, 133:17-134:13 and 136:8-137:11. The third candidate on the Grade

A for Change slate, Savala, lost by 91 votes and did not attend as many of the Grade A for Change events and meetings. He also failed to fill out the League of Women Voters survey. *Thurman Testimony*, Vol. IV, 152:4-153:12 and *Rodden Testimony*, Vol V, 72:1-18.

544. The evidence indicates that Savala's 91 vote loss was not due to the at-large system but due to all of the other factors that go into being successful in politics. See, *Uno*, 72 F.3d at 981. Since there are a myriad of reasons for his failure to receive the 91 votes needed to win his election, the Court cannot blame white bloc voting. It is just as likely, if not more, that any one of the factors listed above could have assured his 2014 success.

545. Graves won election to the District's board in 2015. The evidence demonstrates that she worked extremely hard to win her election. *Thurman Testimony*, Vol. IV, 160:3-13 and Vol. VI, 7:17-8:9.

546. The Court finds an intensely local analysis requires knowing whether candidates ran effective campaigns and whether the political environment caused African American losses. The Court finds that Graham, Henson and Savala's loss can be explained by causes other than the at-large system. Plaintiffs' have not met their ultimate burden of proving that Graham, Henson and Savala were afforded an unequal opportunity for representation.

### d. Exogenous elections demonstrate African American electoral success in the District.

547. "[E]xogenous elections are less probative than elections for the particular officer at issue," but "the exogenous character of....elections does not render them nonprobative...." *NAACP v. Fordice*, 252 F.3d 361, 370 (5th Cir. 2001).

548.    The District's expert conducted an analysis of African American electoral success in exogenous races from 2008 through 2014 using only District precincts. Analyzing District voters' preferences for single candidate elections with geographic boundaries larger than the District is a simpler method to check whether white bloc voting thwarts African American electoral success. The result of the District's analysis is that the District votes for African American candidates by large margins. *Rodden Testimony*, Vol. V, 80:24–82:22.

549.    The exogenous election analysis is not the basis for the Court's decision. It does, however, corroborate the finding that African American success or lack thereof is not caused by racial polarization or white bloc voting.

550.    In sum, the evidence is in favor of the District on Senate Factor 7. Two African American incumbents' losses can be explained by their controversial vote for health insurance. At least one additional candidate lost due to his failure to attend and perform campaign functions conducted by the successful candidate. Plaintiffs have not met their ultimate burden to prove white bloc voting, and not legitimate external political factors, were the cause of these losses.

## 7. Senate Factor 8 – District officials are responsive to the needs of the African American community.

551.    "Two additional factors are also probative in determining whether Section 2 was violated: (1) was there a significant lack of response from elected officials to the needs of the minority group (Senate Factor 8); and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous." (Senate Factor 9) *Bone Shirt*, 461 F.3d at 1021. For ease of reference, these factors are considered Senate Factors 8 and 9.

552. While Plaintiffs make claims that the Board was significantly unresponsive because not everyone knew about the achievement gap or discipline disparity, the bulk of Plaintiffs' argument regarding Senate Factor 8 is the claim that the board was unresponsive to the needs of the African American community when they failed to provide the community with the reasons for former superintendent Art McCoy's suspension and ultimate resignation.

553. The District's evidence includes the testimony of Plaintiffs' witnesses, Graham and Henson, the two former African American board members, and the District's witnesses, the two current African American board members, that the board is responsive to the needs of the African American community. *Graham Testimony*, Vol. II, 87:21-88:5, 98:7-22; *Henson Testimony*, Vol. II, 19-14-17, 31:14-19; *Thurman Testimony*, Vol. IV, 133:1-16 and 133:21-134:1; and *Graves Testimony*, Vol. VI, 17:13-19. Moreover, the one witness for both parties, Frank Green, testified the board advocates for African American and white children equally and tries to make sure that every child has a fair and equal chance at a good education. Green testified the board is doing its best to include everyone. *Green Testimony*, Vol. III, 100:2-8. The legal standard for a determination in Plaintiffs' favor on this factor is a significant unresponsiveness to the needs of the African American community. See, *Bone Shirt*, 461 F.3d at 1021. The Court finds the District's evidence credible and persuasive. Both current and former board members testified that the board has been and is currently responsive to the needs of the African American community.

554. Thurman testified to the current board's efforts and role in addressing the achievement gap. Thurman testified the board discusses the achievement gap and ways to prevent

students from failing. While Plaintiffs provided Pruitt's testimony that the board is not addressing the achievement gap, Pruitt is not a board member and does not know what the current board has or has not done to address it. Thurman is a current board member and testified as to the board's current involvement. *Thurman Testimony*, Vol. Vol. IV, 133:7-20 and 134:2-135:10.

555. Plaintiffs' main argument under this factor is that the District must have suspended and ultimately forced the resignation of McCoy based on racial animus. Plaintiffs' claim is based on irreverent speculation and utter disrespect for McCoy's decision to keep the reasons confidential. Rather than blaming McCoy for the confidential nature of the personnel decision, Plaintiffs blame the District. Rather than asking McCoy for the reasons for his suspension and resignation, Plaintiffs cry discrimination. Plaintiffs' argument on this factor represents Plaintiffs' entire case in a microcosm. Plaintiffs made up their mind before knowing the evidence. Even Plaintiffs' own witness testified to the District's policy that it does not discuss personnel decisions publicly. *Graham Testimony*, Vol. II, 98:23-99:11. The District maintained that policy throughout the controversy. *Joint Stip.* ¶296.

556. Thurman, a current board member, testified she does not believe McCoy was suspended for racial reasons. Green, an African American District employee, agrees. His belief was based on private information. *Thurman Testimony*, Vol. IV, 143:11-19 and *Green Testimony*, Vol. III, 100:20-101:5. In contrast, Plaintiffs' evidence is based on sheer speculation. For example, Henson admits he knows McCoy but did not ask him the reasons for his suspension because he "just knew." Plaintiffs Johnson and Hudson are the same. They know McCoy personally but also failed to ask reasons for his suspension.

*Henson Testimony*, Vol. II, 54:3-55:16, *Johnson Testimony*, Vol. III, 140:4-17 and *Hudson Testimony*, Vol. IV, 120:10-20.

557.   The Court finds the District's evidence credible and Plaintiffs' evidence incredible. Plaintiffs' evidence is based on speculation that disrespects the District, McCoy and the judicial process.

558.   Plaintiffs cannot and do not succeed on Senate Factor 8. Current and past board members' testimony indicates the District's board is responsive to the needs of the African American community. There is nothing in the record to indicate a significant lack of response.

   **Senate Factor 9 – The Policy underlying the use of the Current Boundaries.**

559.   Senate Factor Nine is whether "the policy underlying the jurisdiction's use of the current boundaries is tenuous." *Bone Shirt*, 461 F.3d at 1021.

560.   The parties stipulate that at-large, April elections with staggered terms are mandated by Missouri statutes Section 162.261 and 162.291 RSMo. Joint Stip. ¶¶345-346.

561.   Courts have concluded the at-large system is helpful to school districts. In *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (N.D. Ohio 2009), Judge O'Malley "independently conclude[d]" that there were "legitimate, non-discriminatory justifications for the use of both at-large elections and staggered terms" for school districts including that at-large elections are

> Important to school boards because the types of issues those boards address require district-wide support or accountability. For example, school boards must determine whether to close a particular school and how to obtain approval for tax levies. Geographic partisanship would make such decisions far more difficult and, at times, even impossible. Indeed, use of at-large districts appears more important to school boards than other elected bodies, because unlike other political structures, school

boards exist for the precise purpose of cultivating this consensus and shielding the provision of education from the clash of political conflict.

562. In a footnote to the *Euclid* case, Dr. Engstrom, the Board's expert in that case and the expert for Plaintiffs in this case, "explained that at-large voting prevents 'communities of interest' that may be developed around school-related issues (e.g., around academics, discipline, sports, the arts, etc.) from being split by arbitrary geographic divisions...." *Euclid City School Bd.* 632 F.Supp. 2d fn. 19.

563. The evidence demonstrates the at-large system is beneficial for school districts because it allows board members the ability to represent the entire district without concern for any individual school. The Court agrees with the District's expert and board members' testimony. Single member districts would create distributive battles and would not encourage district-wide policies. *Rodden Testimony*, Vol. V, 83:18-84:10. *Thurman Testimony*, Vol. IV, 157:7-15.

564. The Court finds the policy behind April elections for school board is not tenuous. Board member testimony supports April elections because they allow new members time to acclimate before the upcoming school year.

565. Finally, the Court agrees that staggered terms promote stability and mentoring while new board members learn their roles. *Thurman Testimony*, Vol. IV, 158:7-159:3.

566. The Court finds this factor weighs in the District's favor. There are legitimate policy reasons to maintain at-large elections in April with staggered terms for school board candidates. Plaintiffs have not provided evidence otherwise.

## IV. CONCLUSION

Accordingly, the Court finds that Plaintiffs failed to meet their burden on the first *Gingles* precondition because the District is already a majority-minority District. Single member districts are not a workable remedy and Plaintiffs have not presented evidence otherwise. Plaintiffs failed to meet their burden on the second and third *Gingles* preconditions because African American and white voters do not have distinct preferences. Plaintiffs failed to meet their burden under the totality of the circumstances for failure to meet their burden on each and every Senate Factor and for failure to provide an alternative remedy.

Respectfully submitted,

CROTZER & ORMSBY, LLC

*/s/ Angela Bullock Gabel*
Angela Bullock Gabel, 58227MO
130 S. Bemiston Ave., Suite 602
Clayton, MO 63105
314.726.3040 / 314.726.5120 (fax)
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455

*Attorneys for Defendant Ferguson-Florissant School District*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is a person of such age and discretion as to be competent to serve papers. It is further certified that on April 8, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Anthony E. Rothert
Andrew J. McNulty
Jessie M. Steffan
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, Mo 63108

*Counsel for Plaintiffs*

Dale Hoe
Julie A. Ebenstein
Sophia Lin Lakin
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

*Counsel for Plaintiffs*

M. Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303

*Counsel for Plaintiffs*

Gillian R. Wilcox
ACLU of Missouri
3601 Main Street
Kansas City, MO 64111

*Counsel for Plaintiffs*

*/s/ Angela Bullock Gabel*