**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF | ) | |
| THE NATIONAL ASSOCIATION FOR | ) | |
| THE ADVANCEMENT OF COLORED | ) | |
| PEOPLE, REDDITT HUDSON, | ) | |
| F. WILLIS JOHNSON and | ) | |
| DORIS BAILEY, | ) | |
| | ) | Civ. No. 4:14-cv-02077-RWS |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FERGUSON-FLORISSANT SCHOOL | ) | |
| DISTRICT and ST. LOUIS COUNTY | ) | |
| BOARD OF ELECTIONS | ) | |
| COMMISSIONERS, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' POST-TRIAL BRIEF**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

DISCUSSION ........................................................................................................... 2

I.   Issues Related to Expert Testimony.................................................................. 2

   A.   William S. Cooper is qualified as an expert demographer ........................... 2

   B.   Dr. Kimball properly testified as to voter registration rates, bullet voting, and
        the size of majorities needed for effective districts........................................ 4

II.  Discrete Issues Related to Liability .................................................................. 9

   A.   Liability in this case rests on factors particular to FFSD............................... 9

   B.   The suspension of Dr. McCoy demonstrates the Board's unresponsiveness.............. 13

III. Issues Related to the Demographic Breakdown of the Voting-Age population in
     FFSD ................................................................................................ 16

   A.   Neither the rough parity between the Black and white VAPs in FFSD nor
        possible future demographic changes somehow extinguishes the District's
        Section 2 liability. ................................................................. 16

      1.   The size of the Black VAP poses no bar to liability because it is just one of
           the factors in the "totality of circumstances" inquiry. ........................... 17

      2.   Potential future increases in FFSD's Black VAP cannot immunize the
           District from liability. ........................................................... 21

   B.   The District's present and future VAP demographics do not prevent the Court
        from imposing an appropriate remedy................................................... 22

      1.   The ultimate viability and appropriateness of possible remedies is not
           relevant at this stage.............................................................. 22

      2.   Plaintiffs' illustrative plans demonstrate that a single-member district plan
           could serve as a viable solution to the District's Section 2 violation. .................. 24

         a)   Plaintiffs' illustrative plans are likely more effective than the current at-
              large system. ............................................................ 24

         b)   A single-member district plan would neither lead to counterintuitive result
              nor be inconsistent with State policy. ............................................ 29

3.   There exist remedial options other than single-member districts that could also serve as viable and appropriate solutions to the District's Section 2 violation. ...................................................................................................... 33

   a)   Cumulative voting, limited voting, and choice or preference voting can provide minority voters with fair representation ............................................... 34

   b)   These alternative voting systems could provide effective and appropriate solutions under the particular circumstances of this case. ................................ 40

4.   Any remedy can sunset and/or be modified. ............................................................ 42

CONCUSION ........................................................................................................................... 43

# INTRODUCTION

This case is brought under Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ("Section 2") by three African-American citizens who are registered voters in the Ferguson-Florissant School District ("FFSD" or the "District") and the Missouri State Conference of the National Association for the Advancement of Colored People ("MO NAACP") (collectively, "Plaintiffs"). The District's at-large method for electing members of its school board (the "Board") deprives its African-American residents of an equal opportunity to elect representatives of their choice, in violation of Section 2. Plaintiffs' challenge endeavors to change the existing at-large system for electing Board members to an electoral system that is more equitable given a practical evaluation of present realities in the District.

Beginning on January 11, 2016, a six-day bench trial was held in this case. At the close of trial, the Court directed the parties to submit further briefing on the following topics: (1) two issues related to expert testimony, specifically the expert qualifications of Plaintiffs' expert demographer Mr. William S. Cooper and the District's motion to strike certain aspects of the testimony of Plaintiffs' expert witness Dr. David Kimball; (2) two discrete issues related to liability: the FFSD-specific characteristics that support liability and the legal significance of the suspension of Dr. McCoy to Senate Factor 8; and (3) issues related to the demographic breakdown of the voting-age population in FFSD, specifically, the effect, if any, that the rough parity between the Black and white voting-age populations in FFSD and evidence suggesting that the Black VAP is growing, may have on liability and on the remedy imposed in this case. As set forth below, each of these issues should be resolved in favor of Plaintiffs.

**DISCUSSION**

# I. ISSUES RELATED TO EXPERT TESTIMONY

This Court asked the parties to address two issues related to expert testimony in this case: (1) Plaintiffs' expert witness Mr. Cooper's qualification as an expert demographer, and (2) the District's motion to strike Dr. Kimball's testimony regarding voter registration rates, bullet voting, and super majorities needed for effective districts.

### A. William S. Cooper is qualified as an expert demographer

Plaintiffs proffered Mr. Cooper as an expert demographer. Mr. Cooper testified to the data and methodology used to develop Plaintiffs' two illustrative plans. *See* Trial Tr. vol. 1, 181:16–182:9; 194:4–197:17; 198:12–199:6; *see also* Pls.' Proposed Findings of Fact ("PFOF") (filed concurrently herewith) ¶¶ 85, 88-97. At trial, for the very first time, the District objected to Mr. Cooper "being termed an expert." *See* Trial Tr. vol. 1, 181:10-13. This objection fails for two reasons.

*First*, the District waived any objection to Mr. Cooper's reports or testimony. Mr. Cooper submitted two expert reports, on May 27, 2015 and July 2, 2015, and defense counsel deposed Mr. Cooper on August 17, 2015. *See* PLTF-44, *Expert Decl. of William S. Cooper*, May 27, 2015 ("*Cooper Decl.*"); PLTF-45, *Suppl. Decl. of William Cooper*, July 2, 2015 ("*Cooper Suppl. Decl.*"); ECF No. 85-22, *Dep. of William Cooper*, Aug. 17, 2015. Any grounds for objection would have been apparent to the District four months before trial. The District thus had ample time to challenge Mr. Cooper's qualifications or the reliability of his analysis prior to trial. Nevertheless, the District never moved to strike or exclude Mr. Cooper's testimony, or otherwise contest his qualifications, and did not file a *Daubert* motion to exclude Mr. Cooper's reports or testimony prior to trial, despite the Court's December 31, 2015 deadline for filing motions *in limine*. *See* ECF No. 115 at 3. The District has therefore waived this objection. *See McKnight v.*

*Johnson Controls, Inc.*, 36 F.3d 1396, 1406-07 (8th Cir. 1994).

*Second*, the District's vague objection to Mr. Cooper's "being termed an expert" fails on its merits. The District's challenge is not to the validity or reliability of the methodology underlying Mr. Cooper's opinion; rather it is based on his educational qualifications, completed 40 years ago. *See* Trial Tr. vol. 1, 181:6-13; 215:22-220:7. But Mr. Cooper is more than qualified to give testimony as an expert witness in this case. Rule 702 of the Federal Rules of Evidence allows a witness to testify to his or her opinion as an expert qualified "by knowledge, skill, *experience*, training, or education" (emphasis added). *See also* Trial Tr. vol. 2, 5:9-10 ("[Y]ou can be an expert not just on education but on experience."). Mr. Cooper plainly exemplifies these hallmarks of expertise.

Mr. Cooper, in addition to his testimony in this case, has testified as an expert witness on redistricting and demographics in 36 other federal court cases. *See* PFOF ¶ 87; PLTF-44, *Cooper Decl.*, at Ex. A (Summary of Redistricting Work); *see, e.g.*, *Ala. Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1271-72 (M.D. Ala. 2013) (three-judge court) ("William S. Cooper provided expert testimony about alternative redistricting plans for the Black Caucus plaintiffs."); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1392 (E.D. Wash. 2014) ("Plaintiffs' expert, Mr. William Cooper, generated five separate 'plans' which break the City of Yakima into seven individual voting districts."); *Pope v. Cty. of Albany*, No. 1:11-cv-0736, 2014 WL 316703, at *4 (N.D.N.Y. Jan. 28, 2014) ("Plaintiffs' second expert, William Cooper, analyzed demographic and socio-economic Census data for the County."). In addition to testifying at trials, Mr. Cooper, who received a B.A. in Economics from Davidson College in North Carolina, has filed declarations or been deposed in an additional 33 other voting rights cases and has never been deemed not qualified as an expert. PFOF ¶ 87. Since 1986, Mr. Cooper

has prepared proposed redistricting plans for approximately 700 jurisdictions. PFOF ¶ 85. Since the release of the 2010 Census in February 2011, he has developed statewide legislative plans on behalf of clients in six states, as well as over 150 local redistricting plans in approximately 30 states. *See* PFOF ¶ 85; PLTF-44, *Cooper Decl.*, at Ex. A (Summary of Redistricting Work). His election plans have been precleared and/or adopted in state or local jurisdictions on at least 10 occasions, and illustrative plans or proposed plans that he has created have been ordered adopted as Section 2 remedies by the District of South Dakota in *Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035 (D.S.D. 2005), *aff'd*, 461 F.3d 1011 (8th Cir. 2006), and by the Eastern District of Washington in *Montes v. Yakima*, No. 12-CV-3108 TOR (E.D. Wash. Feb. 17, 2015), ECF No. 143. PFOF ¶ 86. As this Court observed at trial, "obviously, [Mr. Cooper] has a substantial amount of experience, nobody is going to deny that." Trial Tr. vol. 2, 5:10-12.

In sum, Mr. Cooper is plainly qualified to be an expert in this case "by knowledge, skill, experience, training, or education," and his testimony is thus admissible. *See Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990) (holding that "an individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise" and collecting cases where experts had properly testified on causes and transmission of diseases without any medical degree). The District's objection should be overruled.

## B. Dr. Kimball properly testified as to voter registration rates, bullet voting, and the size of majorities needed for effective districts.

The District moved to strike the testimony of Dr. David Kimball regarding voter registration, bullet voting, and super majorities. Trial Tr. vol. 2, 184:2-21. For the reasons stated below, the District's motion should be denied.

**Registration Rates.** An expert witness may give opinions if there "are sufficient facts already in evidence or disclosed by the witness" to take his "testimony out of the realm of guesswork and speculation." *Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989) (citation & internal quotation marks omitted). Given that the purpose of expert testimony is to "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, it is entirely appropriate—if not necessary—for an expert to explain how evidence introduced at trial fits with his opinion. That is exactly what Dr. Kimball's testimony regarding voter registration rates sought to do.

Dr. Kimball testified at trial about the gap in registration rates for Black and white voters in Missouri without initial objection from FFSD. Trial Tr. vol. 2, 117:18–119:24. His testimony about the registration rates themselves consisted of reciting numbers from Plaintiffs' Exhibit 63—a November 2014 U.S. Census Bureau report showing state voter registration rates by race. Trial Tr. vol. 2, 116:20–117:15; PLTF-63, *Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States (Nov. 2014) (Ex. 5 to Dep. of Jonathan Rodden, Aug. 20, 2015).* By the time Dr. Kimball testified, Plaintiffs' Exhibit 63 had already been admitted into evidence without objection. Trial Tr. vol. 1, 84:7-9; *see also* ECF No. 154, *Defs.' Am. Objs. to Pls.' Am. Ex. List*, at 8 (stipulating to admissibility of PLTF-63 without objecting); Trial Tr. vol. 3, 29:7-14 (Kimball confirming that he was reading from an exhibit that was already in evidence). The District's expert later testified as to the same registration gap, despite there being nothing in his reports on registration rates. Trial Tr. vol. 5, 147:12-16 (Rodden testifying that he believes whites' registration rate in Missouri exceeds African Americans' registration rate in Missouri by about 5 percentage points); *see also id.*, 71:1-4 (Rodden testifying that "registration varies across

race in Missouri, and, of course, we know that's true"); *id.*, 146:19-147:6 (Rodden admitting that there is nothing in his reports on registration rates).

During cross-examination, the District moved to strike Dr. Kimball's testimony regarding registration rates because it was not in his report. Trial Tr. vol. 2, 184:2-21. But Dr. Kimball's testimony about registration rates was offered merely to explain how the statistics about registration rates that had *already been admitted into evidence* are consistent with the opinion expressed in his report that African Americans in FFSD suffer from a broad range of socioeconomic disparities that inhibit their political participation, *see* PLTF-48, *Expert Report of David Kimball*, May 27, 2015 ("*Kimball Rep.*"), at 2, 10-12, and that, in this context, the use of at-large elections held in April to select members of FFSD's Board deprives African-American residents of FFSD of an equal opportunity to influence the outcome of those elections, *see* Trial Tr. vol 2, 117:18–119:24. Dr. Kimball did not change his opinion or the factual basis for his opinion; depressed registration rates are, in fact, simply another expression of the gap in access to the political process that Dr. Kimball opined results from socioeconomic disparities. *See* PLTF-48, *Kimball Rep.*, at 2, 10-12; Trial Tr. vol. 2, 114:8–116:19; *see also Buckanaga v. Sisseton Indep. Sch. Dist.*, 804 F.2d 469, 474 (8th Cir. 1986) (finding disparity in state registration rates evidence of depressed political participation). It was thus entirely appropriate for Dr. Kimball to explain briefly how the data in Plaintiffs' Exhibit 63 fits with his opinion.

**Bullet Voting.** Dr. Kimball's testimony about bullet voting was proper for the same reasons. Dr. Kimball testified without initial objection that the availability of bullet voting did not change his opinions that Black candidates have generally not been elected to the Board under the at-large method of election and that this relative lack of success results from Black voters' inability to elect their preferred candidates. *See* Trial Tr. vol. 2, 160:25–162:10. The availability

of bullet voting was already in evidence, through both the parties' stipulations, ECF No. 124, *Joint Stipulation of Uncontested Facts* ("*Joint Stip.*") ¶ 34, and Plaintiffs' Exhibit 52, PLTF-52, *Expert Report of Richard L. Engstrom*, May 27, 2015 ("*Engstrom Rep.*"), ¶ 7, which had been admitted without objection, *see* Trial Tr. vol. 1, 83:18-20. As with his testimony on voter registration rates, Dr. Kimball discussed bullet voting only to explain why its existence did not alter one his opinions, namely, that FFSD's use of certain voting procedures tend to enhance the opportunity for discrimination against African Americans, *see* PLTF-48, *Kimball Rep.*, at 5-7 (Senate Factor 3). Rather, Dr. Kimball explained why the possibility of bullet voting does not cure FFSD's use of at-large elections, which he had already opined do enhance the opportunity for discrimination in FFSD.

**Numerical majorities.** Dr. Kimball appropriately discussed the size of a majority sufficient for an effective district in order to explain a mischaracterization of his opinion by the District. Dr. Kimball's opinion is that, because of historical discrimination and ongoing socioeconomic disparities, the at-large election scheme employed by FFSD "may [make it] more burdensome on African-American voters and make it more difficult for them to influence the outcome of elections." Trial Tr. vol. 2, 116:1-19; *see also id.*, 117:16–118:17; PLTF-48, *Kimball Rep.*, at 2-3, 5-6, 12 ("Because African Americans in the Ferguson-Florissant School District bear the effects of discrimination in these areas [such as income, employment, education, criminal justice, and health], they are more likely than whites to be deterred from voting by the additional burdens imposed by the election procedures in the district."), 15 ("I conclude that the use of at-large . . . elections has a disproportionate impact on African Americans in the Ferguson-Florissant School District, particularly on voter participation and the ability to elect candidates of their choice"). In forming this opinion, Dr. Kimball relied on the wealth of research

showing that when there is racially polarized voting, a white majority can more effectively determine the winners of all at-large seats. *See* PLTF-48, *Kimball Rep.*, at 6.

The District misappropriated Dr. Kimball's opinion in applying it to a hypothetical Black majority and had misleadingly informed this Court that "Dr. David Kimball testified that a black majority could potentially determine the winners of all of the seats." ECF No. 131, *Defs.' Pre-Trial Proposed FOF & COL*, ¶ 60. In the course of his testimony on direct examination about features of FFSD elections that increase the opportunity for discrimination against Black residents and voters, Dr. Kimball explained that in a jurisdiction like FFSD, which has white bloc voting, a bare majority would not be enough for Black voters to determine all of the seats in an at-large election but that he "would like to see the racial or ethnic group be a super majority." Trial Tr. vol. 2, 119:5-11. The District did not object at the time. On cross-examination, FFSD persisted in its mistaken understanding of Dr. Kimball's opinion and drew out more discussion of supermajorities by asking Dr. Kimball: "Would you agree with me that if the smallest group of voters is white, that they don't benefit from an at-large system?" Trial Tr. vol. 3, 10:20-22. Dr. Kimball responded, "I think if they are substantially below 50 percent, then they might be on the other end of things in an at-large system." *Id.*, 10:23-25. The District also asked Dr. Kimball about supermajorities by inquiring, "So would you agree, then—or is your testimony, then, if an electoral system goes to single-member districts, that those single-member districts would also have to have a super majority in order to be successful?," which caused Dr. Kimball to respond that he "hadn't really considered that much, but it might help if some of the districts had well above 50 percent minority population." *Id.*, 11:1-7. Given the District's repeated attempts to mischaracterize his opinion, it was only proper for Dr. Kimball to make clear that the District's

suggestion that he believed Blacks could elect all of the members of FFSD Board merely by being a numerical majority was not a fair characterization.

## II. DISCRETE ISSUES RELATED TO LIABILITY

This Court asked the parties to address two discrete issues related to the merits of this case: (1) the FFSD-specific characteristics that support liability, *see* Trial Tr. vol. 6, 86:23–87:3; and (2) the legal significance of the suspension of Dr. McCoy to Senate Factor 8, *i.e.*, the Board's responsiveness to the particularized needs of the African American community, *see* Trial Tr. vol. 6, 87:12-13.

### A. Liability in this case rests on factors particular to FFSD.

Courts evaluating a Section 2 vote dilution claim must engage in "an intensely local appraisal of the design and impact of the contested electoral mechanisms." *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (internal quotation marks omitted) (quoting *Rogers v. Lodge*, 458 U.S. 613, 622 (1982)). As Plaintiffs demonstrated at trial, the failure of FFSD's current electoral system to provide African Americans in the District with an equal opportunity to elect their preferred representatives results from FFSD's specific past and present circumstances. Of particular note are the unique ways in which the District's creation and development is bound up in the St. Louis region's long and dark history of racial discrimination and segregation. Despite some progress, severe patterns of racial segregation and inequality across a wide spectrum of socioeconomic indicators—everything from education to income, poverty, employment, and criminal justice outcomes—persist today in the District. *See* PFOF ¶¶ 224-26. To be sure, FFSD is not alone among the school districts in North St. Louis County ("North County") in its experience with discrimination and unusually tenacious residential segregation. But the requisite "intensely local appraisal" demonstrates that this history and its present effects in FFSD have developed and interacted uniquely with other conditions on the ground such that the existing at-

large electoral system deprives FFSD's Black voters an equal voice in the political process. While there are many factors that contribute to the situation in FFSD, three are especially noteworthy.[1]

*First*, the District is uniquely linked to North County's history of discrimination as its *very existence* is due to a federal court's attempt to dismantle the intractable segregation among the three school districts that now comprise FFSD. *United States v. Missouri*, 515 F.2d 1365 (8th Cir. 1975). As Dr. Colin Gordon testified, historical policies in the region, including not only educational segregation and the racially motivated use of incorporation but also the way houses, streets, and public infrastructure were physically built, were "intended and designed to create starkly segregated and separate [school] districts." Trial Tr. vo1. 1, 121:2-24 (testimony of Colin Gordon). The three formerly fragmented school districts that now comprise the present-day FFSD—the overwhelmingly-white former Ferguson-Florissant and Berkeley school districts and the predominantly-Black Kinloch school district—provide the paradigmatic example of how this political and physical discrimination created and perpetuated a racially dual system of school districts. *See* PLTF-40, Colin Gordon, *Segregation and Uneven Development in Greater St. Louis, St. Louis County, and the Ferguson-Florissant School District*, May 26, 2015 ("*Gordon Rep.*"), at 21-22; Trial Tr. vol. 1, 119:17–121:1 (testimony of Colin Gordon); Trial Tr. vol. 2, 12:4–13:15, 42:1-17 (former Board member Charles Henson explaining that his mother, an African-American resident of what was a smaller FFSD in the 1930s and 1940s, was

---

[1] Because Section 2 requires a local appraisal, Plaintiffs need not prove that the dilutive effects of the District's at-large electoral system is not also experienced by other school districts in the county, metro area, or anywhere else. *See Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995); *see also White v. Regester*, 412 U.S. 755, 769 (1973) (approving district court's totality-of-the-circumstances "assessment of the multimember district, overlaid, as it was, on the cultural and economic realities of the [minority] community in [a particular county] and its relationship with the rest of the county"). Section 2 requires only that under the totality of circumstances in FFSD specifically, African-American residents of FFSD are deprived of a fair opportunity to elect their preferred representatives, not that the state of affairs in FFSD are worse than they are elsewhere. *See Blytheville*, 71 F.3d at 1390; *White*, 412 U.S. at 769; *Gingles*, 478 U.S. at 79.

prohibited from attending school there, so she commuted to Black schools in other districts: elementary school in Kinloch and high school in Webster Groves). This arrangement forced Kinloch to cobble together a separate system of schools that were "markedly inferior to the opportunities offered in the adjoining Berkeley and Ferguson districts." *Missouri*, 515 F.2d at 1367; *see* PLTF-40, *Gordon Rep.*, at 16, 21-22.

The former Ferguson-Florissant and Berkeley school districts, among other state actors, displayed remarkable commitment to unlawfully maintaining Kinloch as a segregated district. In fact, for two decades after the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), this dual system persisted despite school reorganization study recommendations and requests from the school district itself that Kinloch be consolidated with other school districts, flagrantly flouting the constitutional obligation to "take such affirmative measures as are necessary to disestablish that dual system and to eliminate the continuing vestiges of that system." *United States v. Missouri*, 363 F. Supp. 739, 745, 747 (E.D. Mo. 1973). It ultimately took a lawsuit brought by the United States Department of Justice to counter this intransigence and a federal court order to force the reluctant overwhelmingly-white school districts to consolidate with their predominantly-Black neighbor. *See Missouri*, 515 F.2d at 1366; PFOF ¶¶ 9, 211; Trial Tr. vol. 1, 120:11-16 (testimony of Colin Gordon). That history of segregation continues to affect socioeconomic life in the District in "particularly powerful ways." *See* Trial Tr. vol. 1, 115:13–117:14 (testimony of Colin Gordon); PFOF ¶¶ 207-19, 222-25; Trial Tr. vol. 5, 121:13-17; 122:14-18 (testimony of Jonathan Rodden).

*Second*, the hardened, racially motivated physical fragmentation of these three school districts and the resulting federal desegregation order tying them together has worked together with other conditions on the ground to leave an unintended and unfortunate legacy in the

District: it has created a present-day FFSD that has "trade[d] segregation between districts for segregation within a district." Trial Tr. vol. 1, 121:2-24 (testimony of Colin Gordon). This racial divide, following further demographic transition and displacement due in part to the building of the St. Louis International Airport, eventually settled along a north-south "dividing line" largely tracking I-270 that remains in place today. Trial Tr. vol. 3, 81:6-82:5 (testimony of Frank Green); PLTF-40, *Gordon Rep.*, at 2-4, 27-28, Map 10 (p. 29); *see also* PLTF-44, *Cooper Decl.*, ¶ 34, Fig. 7 (p. 14), Ex. C (p. 39). As both parties' witnesses testified at trial, this north-south racial divide is palpable and tangibly experienced through both socioeconomic and educational disparities, including differences in the resources allocated to north-side versus south-side schools. PFOF ¶¶ 216-217.

*Third*, there is a notable degree of racially polarized voting in the District due to the particular development of and current conditions in FFSD. As discussed in greater detail in the Plaintiffs' Proposed Findings of Facts and Proposed Conclusions of Law (filed concurrently herewith), Dr. Engstrom credibly testified that Black voters in the District clearly preferred eight candidates during the five elections between 2011 and 2015. *See* PFOF ¶¶ 113-156, 162-67; Pls.' Proposed Conclusions of Law ("COL") (filed concurrently herewith) Section V.E. Among white voters, however, these same candidates fared poorly. Indeed, none, save for the Black-preferred candidate in the 2015 election—a candidate who received less than half the white votes that white voters' top ranked candidate received in an election that occurred under special circumstances—ever overlapped with those receiving the strongest support from white voters. PFOF ¶¶ 113, 117, 128, 137, 147, 155; COL Section V.E.4. The stark racially polarized voting in FFSD is especially apparent when looking at the top-ranked candidates for Black versus white voters: In the twelve contested elections between 2000 and 2015, Black and white voters in

FFSD have *never* voted for the same top-ranked candidate. PFOF ¶ 178; COL Section V.E.4. In fact, in every election that was biracial (in other words, all but the 2009 election), Black voters' top choice was Black and white voters' top choice was white.[2] PFOF ¶ 179.

Although Plaintiffs need not, and thus did not, perform a localized inquiry into the state of affairs in the Hazelwood School District, a comparison of the FFSD Board to the Hazelwood Board is revealing. The Hazelwood District has the same voting rules and at-large election system FFSD, has similar demographics, and shares the same history of discrimination experienced in North County generally. *Joint Stip.* ¶¶ 217, 219, Ex. O. From the time of its court-ordered inception through the conclusion of trial in this case on January 19, 2016, the FFSD School Board has never had more than two Black members at the same time. *Joint Stip.* ¶ 208. At the time of trial, the Hazelwood School District had four Black school board members. *Joint Stip.* ¶ 219. Black candidates' success in a district with similar demographics is evidence that local circumstances in FFSD, including the three FFSD-specific characteristics discussed above, work in conjunction with the at-large system to deprive African Americans of an equal opportunity to elect their preferred candidates to FFSD's Board. As a result, a finding of liability in this case would not necessarily mean that all school districts in North County would also be liable.

### B. The suspension of Dr. McCoy demonstrates the Board's unresponsiveness.

Although Plaintiffs demonstrated at trial that the FFSD Board has been non-responsive to the needs of the African-American community in several respects, *see* COL Section VI.3.a, one striking example was the Board's refusal to provide any explanation for its November 6, 2013 decision to place Dr. Art McCoy, the District's first African-American superintendent, on

---

[2] Even applying Dr. Rodden's point estimate approach, *see* COL Section V.E.4,, Black and white voters have diverged in terms of candidate preference about two-thirds of the time. Trial Tr. vo. 5, 108:17-25 (testimony of Jonathan Rodden).

administrative leave. PFOF ¶ 240; COL Section VI.3.a. The Board persisted in its refusal despite the widely voiced perception that the decision was related to Dr. McCoy being African-American. PFOF ¶ 239.

The District first hid behind Missouri's Sunshine Law to suggest that it could not discuss a personnel matter. *See, e.g.*, *Dep. of Paul Thomas Morris*, June 15, 2015 ("*Morris Dep.*," previously filed as ECF No. 85-33), 131:17-25; *Dep. of Paul Thomas Morris*, June 15, 2015 ("*Morris Dep.*," previously filed as ECF No. 85-33), 66:22-67:11.[3] But the Sunshine Law does not mandate secrecy; it merely *permits* a local government body to choose to keep personnel matters secret. *See Guyer v. City of Kirkwood*, 38 S.W.3d 412, 414 (Mo. banc 2001) (noting that closure of personnel records under Missouri's public records and meetings law is permissive, not mandatory); *see also* Mo. Rev. Stat. § 610.022.4 ("Nothing in sections 610.010 to 610.028 shall be construed as to require a public governmental body to hold a closed meeting, record or vote to discuss upon any matter.").[4] Plaintiffs do not claim that the Board's choice was illegal, merely that the Board did not adequately respond to the community's voiced concerns and that the excuse that Missouri law required secrecy was a smokescreen.

Next, FFSD offered a Separation Agreement and Release dated March 12, 2014—which was executed more than four months *after* Dr. McCoy was suspended—as an excuse for not having adequately responded to the community. *See, e.g.*, Trial Tr. vol. 2, 54:15-55:16 (testimony of Charles Henson); Trial Tr. vol. 4, 119:5-120:5 (testimony of Redditt Hudson); *see also* Trial Tr. vol. 1, 49:18–51:5 (testimony of Adolphus Pruitt); PLTF-161, *Separation*

<hr>

[3] Plaintiffs designated the portions of depositions cited throughout this document in ECF No. 151; *see also* ECF No. 153 (Defendants' deposition counter-designations).

[4] Somewhat related to this, the District has claimed that Missouri public employees, such as Dr. McCoy, "have a fundamental right of privacy in employment records." *See* ECF No. 33-1, *FFSD's Resp. to Pls.'1st Set of Reqs. for Prod.*, at 5. This is not correct. *See Chasnoff v. Mokwa*, 466 S.W.3d 571, 580 (Mo. Ct. App. 2015) (holding public employees have no privacy interest that prevents disclosure of personnel records, particularly those related to "on-the-job misconduct"), *transfer denied*, Aug. 18, 2015.

*Agreement between McCoy and FFSD*, Mar. 12, 2014 ("*Separation Agreement*"). This Agreement did not prevent the Board from meaningfully responding to the community's concerns about Dr. McCoy's suspension for two reasons. *First*, the Agreement did not even exist until several months *after* the community asked for an explanation in November and December of 2013. Trial Tr. vol. 1, 49:18–51:5 (testimony of Adolphus Pruitt); PLTF-161, *Separation Agreement*. Even if the Agreement required FFSD to keep the reasons for Dr. McCoy's suspension secret after March 12, 2014, which, as explained below, it did not, the Agreement in no way explains the Board's refusal in *November and December 2013* to explain its actions to the community. *Second*, the confidentiality provision of the Agreement is, by its own terms, limited to "the Statement of Charges [for termination for cause] and all documents amassed by the District in support of said charges." PLTF-161, *Separation Agreement*, ¶ 7; Trial Tr. vol. 1, 49:18–51:5 (testimony of Adolphus Pruitt); ECF No. 51-2, Email from Sedey to Ebenstein, (email from McCoy's counsel noting that there has never been a confidentiality agreement between McCoy and the Board related to McCoy's suspension). As both Dr. McCoy and FFSD have explained, the "Statement of Charges" and related records are different from whatever the reasons were for his suspension several months earlier. Indeed, although Board members cited confidentiality concerns and did not testify in the deposition designations about the *charges*, they freely testified about various reasons for Dr. McCoy's *suspension* without objection from their counsel. PFOF ¶¶ 239-40. And Dr. McCoy himself explained that the content of the charges was not relevant to this litigation because it resulted from "a fishing expedition conducted *after* the suspension and with the clear intent to find a basis to justify his termination." ECF No. 44, *McCoy's Mem. to Court*, at 3.[5] In the end, FFSD blames Dr. McCoy for its secrecy. *See, e.g.*,

---

[5] Like this Court, Plaintiffs have no way of knowing the contents of the charges. However, the persons who do know the contents—the Board members and Dr. McCoy—treat them as separate matters that should continue to be

Trial Tr. vol. 6, 79:12-16; 79:21-22. But Dr. McCoy, like the public, was provided "no information about the reasons for the decision to place him on leave." ECF No. 44, *McCoy's Mem. to Court*, at 1.

In the absence of any requirement that the Board refrain from answering the concern of the African-American community that the suspension of Dr. McCoy was racially motivated, what is left is a Board that made a choice not to explain itself. It is *that* decision not to explain— even in the face of the widespread perception of racial motivation—that is evidence of non-responsiveness. To be clear, Plaintiffs do not assert in this case that the forced resignation or even the suspension of Dr. McCoy were themselves racially motivated. But the decision of the Board to respond to the pleas for an explanation and to concerns that the suspension was racially motivated with no explanation at all demonstrates a clear lack of responsiveness to the needs of the African-American community in FFSD.

## III. ISSUES RELATED TO THE DEMOGRAPHIC BREAKDOWN OF THE VOTING-AGE POPULATION IN FFSD

The Court asked the parties to address two questions related to the demographic breakdown of the voting-age population ("VAP") in FFSD: (1) the effect, if any, of the rough parity between the Black and white VAPs in FFSD on a finding of liability; and (2) the effect, if any, that the roughly equal population of African Americans and whites in FFSD and evidence suggesting that the Black VAP is growing, may have on the remedy imposed in this case.

### A. Neither the rough parity between the Black and white VAPs in FFSD nor possible future demographic changes somehow extinguishes the District's Section 2 liability.

That the Black and white VAPs in FFSD may be "roughly equal within the margin of error," Trial Tr. vol. 6, 86:4-5, and may shift in the future is entirely consistent with and does not somehow negate the evidence at trial that proves that African Americans in FFSD today lack an

confidential.

equal opportunity to elect their preferred representatives. The near parity of the Black and white VAPs and the possibility of future demographic changes thus pose no bar to this Court appropriately concluding that the District's electoral system violates Section 2.

1. **The size of the Black VAP poses no bar to liability because it is just one of the factors in the "totality of circumstances" inquiry.**

The critical element of a Section 2 vote dilution claim is a showing that, under "the totality of circumstances," members of a racial or ethnic minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). A court's assessment of a racial minority group's ability to elect its preferred candidates is a functional inquiry that depends "upon a searching practical evaluation of the 'past and present reality.'" *Gingles*, 478 U.S. at 75, 79 (quoting S. Rep. No. 97-417, at 30 (1982)). This inquiry necessarily contemplates the existence of a number of relevant factors.

Thus, although its share of the VAP is one factor in a historically disadvantaged racial minority group's present ability to elect candidates of choice and indicates its maximum theoretical political *potential*, it is not the *only* factor; rather, equal opportunity to elect candidates of choice depends on a range of factors, including, among other things, the relative rates of political participation between minority group members and whites, the strength of minority cohesion, and the degree of racially polarized voting. *See, e.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1023 (8th Cir. 2006) (holding that courts may properly consider factors other than population share, including turnout rate and incumbency, in formulating plan that would "afford [minority voters] a realistic opportunity to elect representatives of their choice"); *see also* Bernard Grofman, Lisa Handley, David Lublin, *Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. Rev. 1383, 1385 (2001)

("[T]he Voting Rights Act, properly interpreted, should focus on actual election outcomes not rigid demographic 'cut-off lines' such as 50% black population. . . . [A] proper analysis of likely election outcomes depends on several factors: the relative rate at which minorities and whites participate in the electoral process [and] the degree to which minority and white voters support minority-preferred candidates . . . ."). These factors are in turn impacted by the barriers to participation faced by minority voters due to historical discrimination, continuing socioeconomic inequality, and processes that favor the status quo, among other things. *See, e.g., Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1389 (8th Cir. 1995) (noting that "recognized historic effects of discrimination in the areas of health, employment, and education impact negatively on minority political participation"); *Kirksey v. Bd. of Supervisors of Hinds Cty.*, 554 F.2d 139, 145 n.13 (5th Cir. 1977), *superseded on other grounds by LULAC, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993) ("Failure to register may be, for example, a residual effect of past non-access, or of disproportionate education, employment, income level or living conditions. Or it may be in whole or in part attributable to bloc voting by the white majority, i.e., a black may think it futile to register."). Ultimately, for purposes of finding liability in this case, the size of the minority population is just one of the factors in the "totality of circumstances" inquiry into whether the voting power of African-American residents of the District is, under the existing electoral system and other conditions at play in the jurisdiction, diluted.

Consistent with this practical reality, courts have long recognized that a racial minority that constitutes not just an equal share but a *majority* of the jurisdiction's VAP is not immune to vote dilution. *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) ("[I]t may be possible for a citizen voting-age majority to lack real electoral opportunity."); *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991) (recognizing that "a

'supermajority' of minority voters in a proposed single-member district" may be necessary to remedy a vote dilution violation). Accordingly, four Courts of Appeals (the Second, Fifth, Eleventh, and D.C. Circuits) have rejected a *per se* rule prohibiting vote dilution claims where a racial minority constitutes a numerical majority of a jurisdiction.[6] *See* COL Section IV.A.3.b (citing *Monroe v. City of Woodville*, 881 F.2d 1327, 1332-33 (5th Cir. 1989); *Meek v. Metro. Dade Cty.*, 908 F.2d 1540, 1545-46 (11th Cir. 1990); *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012); *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003)). As courts in the Eighth Circuit have explained, in reviewing remedial districting plans, "historically disadvantaged minorities require more than a simple majority in a voting district in order to have . . . a practical opportunity to elect candidates of their choice." *Smith v. Clinton*, 687 F. Supp. 1361, 1362 (E.D. Ark. 1988) (three-judge court), *aff'd mem.*, 488 U.S. 988 (1988); *see id.* at 1363 (ordering Board to implement plaintiffs' plan providing for single-member majority-Black district with a 60.55% BVAP to "give blacks a fair opportunity to elect the candidate of their choice . . . and help to eradicate the effect of the dual-member, at-large system on participation by blacks in the political process"); *see also Bone Shirt*, 461 F.3d at 1023 (applying 65% minority population as a "guideline" to consider in fashioning remedial relief and correctly considering turnout rate and incumbency in formulating a districting plan).

This is not simply a theoretical concept. In fact, courts have found Section 2 liability where the minority and white shares of the VAP have approached parity—and even where a racial minority is a *majority* of the VAP—recognizing that the numerical size of a minority group does not eliminate the present-day barriers to electoral participation that members of the

---

[6] Without expressly addressing this issue, the Ninth Circuit has considered claims by minority voters from a group that constituted a plurality of a jurisdiction's VAP, without suggesting that this would act as a *per se* bar to relief. *See Valladolid v. City of Nat'l City*, 976 F.2d 1293, 1294 (9th Cir. 1992) (considering a vote dilution claim in which the plaintiff minority groups formed a plurality of the population (49.6%)).

group face as a result of ongoing socioeconomic effects of discrimination and electoral processes that favor the status quo. *See, e.g.*, *Martin v. Allain*, 658 F. Supp. 1183, 1188-91, 1204-05 (S.D. Miss. 1987) (finding Section 2 violations in certain at-large, multimember districts used to elect circuit, chancery, and county court judges with majority Black total populations and VAPs, among others); *United States v. Dallas Cty. Comm'n*, 636 F. Supp. 704, 710 (S.D. Ala. 1986) (finding at-large system for county commissioners violated Section 2 following remand for, among other things, further consideration of lingering effects of past discrimination in jurisdiction where Blacks comprised 49.8% of the VAP, an almost 5% increase from 4 years prior); *Windy Boy v. Cty. of Big Horn*, 647 F. Supp. 1002, 1004, 1023 (D. Mont. 1986) (finding Section 2 violation and ordering defendants to propose remedy incorporating single-member districts where American Indians comprised 46.2% of the population and whites 52.1%); *Jordan v. City of Greenwood*, 599 F. Supp. 397, 400, 404-05 (N.D. Miss. 1984) (finding Section 2 violation and ordering single member district remedy where Blacks constituted 52% of the total population and 46.2% of the VAP); *N.A.A.C.P. v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978, 980, 983 (11th Cir. 1982) (finding at-large system had effect of diluting Black voting power where African Americans were 59% of the population and 49.36% of the registered voters).

As discussed in detail in Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Black voters in FFSD do not have an equal opportunity to elect candidates of their choice. This is true notwithstanding the near parity of the Black and white VAPs in FFSD, and suggests that given the particular circumstances in FFSD, Black voters in the District will require more than a simple majority "to have . . . a practical opportunity to elect candidates of their choice." *Smith*, 687 F. Supp. at 1362. *See* COL Section IV.A.3.c.

## 2. Potential future increases in FFSD's Black VAP cannot immunize the District from liability.

Faced with the reality that vote dilution is not undermined by rough numerical parity between African-American and white voters, the District has suggested that this Court can ignore the violation of Black residents' right to vote because of the hope that the Black population in FFSD might someday grow so large that it could control the at-large electoral system of the District. Underlying this theory is the peculiar premise that white flight is both inevitable and a suitable substitute for the protections of the Voting Rights Act.

But even accepting that the Black share of the VAP will increase over time, the hope that the effects of discrimination might suddenly evaporate is not a remedy to the present and ongoing violation of Plaintiffs' fundamental right to vote. Racial minorities do not suddenly lose the broad protections of the VRA at the moment that they become 50.1% of the VAP of a jurisdiction. If this Court "finds the three *Gingles* preconditions met and engages in a 'totality of the circumstances' analysis, the proper inquiry is whether changing demographics demonstrate that [African Americans in FFSD] presently have the ability to elect at-large, not whether they will have this ability in the future." *See Ruiz v. City of Santa Maria*, 160 F.3d 543, 555 (9th Cir. 1998), *cert. denied*, 527 U.S. 1022 (1999). "A court may not refuse to fashion a remedy after a claim of vote dilution is established based simply on its belief that the vote dilution injury will be solved in the future by changing demographics." *Id.*

Plaintiffs have met their burden of proving that African Americans in FFSD *today* lack an equal opportunity to elect their preferred representatives. It is not Plaintiffs' burden to somehow demonstrate that this violation will continue *ad infinitum*. If the District seeks to establish that white flight will one day be so complete that the violation might vanish at some undetermined point in the future, it must do more than invite this Court to engage in speculative projections.

Nor would the District be without recourse if this Court finds in Plaintiffs' favor and the demographics of the District were to later change substantially: it can always file a motion for relief from judgment based on changed circumstances, *see infra* Section I11.B.4.

**B. The District's present and future VAP demographics do not prevent the Court from imposing an appropriate remedy.**

There is no reason to believe that, due to the roughly equal VAPs of African Americans and whites in FFSD and evidence suggesting that the Black VAP is growing, the remedy imposed in this case would lead to a "counterintuitive result," Trial Tr. vol. 6, 87:11-12. *First*, any discussion about the ultimate viability and appropriateness of possible remedies is premature. *Second*, although Plaintiffs' illustrative plans are not, as the District insists, being offered as remedies at this stage, they demonstrate that a single-member district remedy would be better than the status quo. *Third*, there are a number of alternative remedial options other than a single-member district plan that the Court may impose which can by their nature adjust to changing circumstances including the possibility of future increases in the African-American population. *Fourth*, any remedy can include a sunset provision or, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, can be modified if necessary a later stage. Thus, there is no reason for concern that changing population trends in the FFSD would somehow hamstring this Court's ability to fashion an effective and appropriate remedy that ensures that African Americans in FFSD have a present and enduring equal opportunity to elect representatives of choice.

**1. The ultimate viability and appropriateness of possible remedies is not relevant at this stage.**

As the Eighth Circuit has made clear, the effectiveness or ultimate viability of possible remedies is not relevant to a liability determination in a Section 2 case. *See Bone Shirt*, 461 F.3d at 1019 (rejecting defendants' argument that "plaintiffs must prove" the effectiveness of an

illustrative plan in the liability stage). Instead, a Section 2 plaintiff seeking to prove liability must, in satisfying the first *Gingles* threshold, show only a "*potentially* viable and stable solution," *id.*, by demonstrating that minority voters are "sufficiently large and geographically compact to constitute a majority" of the VAP in a single-member district, *Gingles*, 478 U.S. at 50. The ultimate viability and effectiveness of this *potential* solution and other possible remedies is an inquiry for the remedial stage of the case. *See, e.g.*, *Bone Shirt*, 461 F.3d at 1019; *accord Gonzalez v. Harris Cty.*, 601 F. App'x 255, 261 (5th Cir. 2015) ("[T]he ultimate viability and effectiveness of a remedy is considered at the remedial stage of litigation and not during analysis of the *Gingles* preconditions." (citation omitted)); *Pope*, 687 F.3d at 576; *Houston v. Lafayette Cty.*, 56 F.3d 606, 611 (5th Cir. 1995) (holding that the first *Gingles* requirement tests only "whether the proposal demonstrated that a geographically compact district *could be drawn*"); *Dickinson*, 933 F.2d at 503 ("The court may consider, at the *remedial* stage, what type of remedy is possible . . . [b]ut this difficulty should not impede the judge at the liability stage of the proceedings.").

Accordingly, any concern about the effectiveness—either in the immediate or long term—of the two illustrative plans Plaintiffs developed to satisfy *Gingles* I is premature. As Plaintiffs' Illustrative Plans make clear, African Americans in FFSD are "sufficiently large and geographically compact to constitute a majority" of the VAP in a single-member district,[7] PFOF ¶¶ 90-95, and thus "possess the *potential* to elect representatives in the absence of the challenged structure or practice." *Gingles*, 478 U.S. at 50 n.17. In demonstrating this potential, Plaintiffs have neither sought nor needed to prove that either illustrative plan is ultimately the appropriate

---

[7] In fact, Plaintiffs' two illustrative plans show that African Americans are "sufficiently large and geographically compact to constitute a majority" of the VAP in not just one but four of seven illustrative single-member districts. PFOF ¶ 89.

and effective solution to the District's Section 2 violation, and neither plan otherwise constrains the Court in crafting a practical and viable remedy at the remedial stage of this case.

**2. Plaintiffs' illustrative plans demonstrate that a single-member district plan could serve as a viable solution to the District's Section 2 violation.**

Putting aside the fact that an inquiry into the effectiveness of potential remedies is premature, Plaintiffs' illustrative plans demonstrate that single-member districts could serve as a viable remedy in this case. *First*, due to the degree of racial polarization in the District, Plaintiffs' illustrative single-member district plans are likely *more* effective than the current at-large system, the District's faulty contrary assertion notwithstanding. *Second*, a single-member district plan would neither necessarily lead to a counterintuitive result nor be inconsistent with State policy.

a) *Plaintiffs' illustrative plans are likely more effective than the current at-large system.*

There can be little doubt that the single-member districts in Mr. Cooper's illustrative plans would give African-American voters in FFSD a better opportunity than the current at-large system to elect candidates of their choice. The parties stipulated that under the 2010 Decennial Census, African Americans comprise a minority of the VAP in the District at large. *Joint Stip.* ¶ 13. But in each illustrative plan, African Americans comprise a majority of the VAP in four of seven single-member districts. Because, as all parties agree, the race of voters correlates with voting patterns in the District, PFOF ¶ 113, African Americans will have more potential in single-member districts than under the status quo to elect candidates of choice in these four districts.[8] *See Bone Shirt*, 461 F.3d at 1023 (holding that remedy giving minority voters a

---

[8] The single-member plans proposed by Mr. Cooper would still be a significant improvement over the status quo even if the Court were to take at face value the District's estimate that African Americans are already a bare majority of the VAP—estimates that, as explained elsewhere, the Court should not credit. *See* COL IV.A.3(a). Specifically, each plan creates three districts in which African Americans constitute more than 60% of the VAP— well above a bare majority—and would have strong opportunities to elect their preferred candidates, *in addition to a*

supermajority in two single-member districts was effective while noting that a supermajority is not required in the *Gingles* liability stage); *see also Ketchum v. Byrne*, 740 F.2d 1398, 1415-16 (7th Cir. 1984) (noting that single-member districts with 60% minority VAPs are proven remedies that afford better protection than simple majorities); *accord African Am. Voting Rights Legal Def. Fund v. Villa*, 54 F.3d 1345, 1348 n.4 (8th Cir. 1995).

In addition, as Dr. Kimball testified and many courts have observed, the sense of futility that ensues when minority voters are unable to elect their preferred candidates under a dilutive electoral system may itself depress political participation. *See* Trial Tr. vol. 2, 166:18–167:3 (Kimball testifying that "we know that African-American voters tend to prefer African-American candidates particularly as their top choice in these elections," and "if African-American voters are seeing that their preferred candidates are usually losing, they may see fewer benefits of participating in local elections, which may then lead them to not vote in future local elections"); *see also Blytheville*, 71 F.3d at 1388 ("[L]ow voter turnout has often been considered the result of the minority's inability to effectively participate in the political process."); *Jeffers v. Clinton*, 730 F. Supp. 106, 213 (E.D. Ark. 1989) (believing where Black candidates successes have been minimal "that many potential black politicians have simply not run. They know as a practical matter their candidacy would probably be futile"); *Kirksey*, 554 F.2d at 145 n.13 ("Failure to register may be, for example, a residual effect of past non-access . . . ."). And, in fact, the evidence in the record demonstrates that this sense of futility and disillusionment exists among African-American voters in FFSD. *See, e.g.*, PLTF-117, *Decl. of Redditt Hudson*, Sept. 18, 2015 ("*Hudson Decl.*"), ¶¶ 11, 17; PLTF-118, *Decl. of F. Willis Johnson*, Sept. 29, 2015 ("*Johnson Decl.*"), ¶ 15; Trial Tr. vol. 2, 74:14–75:8 (testimony of former Board member Doris Graham

---

fourth district in which African Americans would comprise a numerical majority that mirrors the District's estimate of the overall FFSD population. PLTF-44, *Cooper Decl.*, ¶¶ 38-57.

that "it's hard to get [Black candidates from Berkeley] to run, to spend the money, spend the time and the energy to run, because they're looking overwhelmingly at the district and saying it seems like it's impossible"); Trial Tr. vol. 4, 114:15–115:3 (Hudson testifying that "if you are confronted with indifference long enough and an inability to address or change the situation that allows for people to be indifferent to your interest, I think people become disaffected" and that "African-American participation just in the process relative to the school board elections— anything—is diminished by the idea that people in charge of running this district don't care about us and there's nothing you can do about it.").

Electoral outcomes for African-American voters in the District may thus improve by the very move to a single member district plan because "by moving from a dilutive system to a system that is not dilutive, minority groups have improved opportunities to elect candidates of choice, which in turn creates a stimulus to 'organize and mobilize and bring more people to the polls.'" *Benavidez v City of Irving*, 638 F. Supp. 2d 709, 725 (N.D. Tex. 2009) (quoting Dr. Richard Engstrom); *see United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 451 (S.D.N.Y. 2010) ("[B]oth Plaintiffs' and Defendant's experts recognize that the opportunity to elect a candidate of choice tends to dramatically increase voter registration and turnout in the minority community."). The improved opportunities would include, among other things, the reduction of economic and related logistical barriers that hinder representatives of the African-American community in mounting effective political campaigns. *Rural W. Tenn. African Am. Affairs Council v. Sundquist*, 29 F. Supp. 2d 448, 459 (W.D. Tenn. 1998) ("The economic and educational isolation of African-Americans . . . limits their ability to fund and mount political campaigns. In this sense therefore, blacks are not able to equally participate in the political process."); *see also* Trial Tr. vol. 5, 183:1-7 (Rodden agreeing that it would be "cheaper to

conduct a campaign in a smaller single-member subdistrict" of FFSD); PLTF-117, *Hudson Decl.*, at ¶ 17 (noting that Black voters in FFSD may have fewer resources to volunteer or donate to Board campaigns); Trial Tr. vol. 2, 74:14–75:8 (testimony of former Board member Doris Graham that "it's hard to get [Black candidates from Berkeley] to run, to spend the money, spend the time and the energy to run, because they're looking overwhelmingly at the district and saying it seems like it's impossible" and that "it is possible, but you have to get the votes out. You just have to campaign in Ferguson [and] in Florissant, Berkeley, Cool Valley"); *Dep. of Donna Paulette-Thurman*, June 17, 2015 (previously filed as ECF No. 85-36), 45:18–46:4, 48:22–49:9 (naming some Black candidates who relied on public transportation); Trial Tr. vol. 3, 119:10-25 (Plaintiff and former Board candidate F. Willis Johnson testifying that he did not believe all of the candidates in 2014 had access to the same campaign resources because the "ability to raise funds specifically in the community might vary" and there were some candidates who were "representative of the constituency that we serve" but who "used public transportation").

The District's contrary assertion that Black voters will be *worse off* under Plaintiffs' illustrative single-member district plans is meritless. As an initial matter, a comparison of recent Board election results to the results of the simulation run by the District's expert to purportedly examine each plan's effectiveness[9] suggests that African Americans in FFSD would actually be *better*, not worse, off under a single-member district system than under the status quo.[10] In 2012 and 2013, for example, no Black candidates were elected under the existing system, *see* PFOF ¶¶ 138, 148, yet the District's simulation predicts that *two* Black candidates could have been elected under either of Plaintiffs' Illustrative Plans in each of those years, *see* Deft-FFSD C,

---

[9] Dr. Jowei Chen, who created the table of results from this model, had never analyzed an at-large district before. *Deposition of Jowei Chen*, Aug. 19, 2015 ("*Chen Dep.*"), 70:17-18, designated by ECF No. 151.

[10] This is not a perfect comparison because the District's simulation assumes that, unlike FFSD's current electoral system, all seven seats are up for election every year. The District, however, made no attempt to simulate the effectiveness of Plaintiffs' Illustrative Plans under a staggered system.

*Supplemental Report of Jonathan Rodden & Jowei Chen: Assessment of Plaintiffs' Redistricting Proposals*, July 2, 2015 ("*Rodden Redistricting Rep.*"), at Table 2 (p. 8). In 2014, meanwhile, one Black candidate was elected, PFOF ¶ 156, but the simulation predicts two Black candidates could have been elected under either of Plaintiffs' Illustrative Plans, Deft-FFSD C, *Rodden Redistricting Rep.*, at Table 2 (p. 8). And in 2015, one Black candidate was successful, PFOF ¶ 167, the same as is predicted under Plaintiffs' illustrative plans, Deft-FFSD C, *Rodden Redistricting Rep.*, at Table 2 (p. 8).

In addition, the simulation itself is based upon a number of faulty assumptions and premises. *First*, the District used as its measure of effectiveness the purported success of any candidate who is Black, not the success rate of those candidates who are actually minority-preferred.[11] *See* Trial Tr. vol. 5, 180:21−181:4 (testimony of Jonathan Rodden); Deft-FFSD C, *Rodden Redistricting Rep.*, at Table 2 (p. 8); *Chen Dep.*, 52:18-21. This approach has been squarely rejected by the Supreme Court. *See Gingles*, 478 U.S. at 68 ("Under § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important."); *see also Blytheville*, 71 F.3d at 1386 ("We do not categorically state that a candidate is the minority-preferred candidate simply because that candidate is a member of the minority. Such stereotyping runs afoul of the principles embodied in the Equal Protection Clause."); *Clay v. Bd. of Educ. of St. Louis*, 90 F.3d 1357, 1361 (8th Cir. 1996) ("The

---

[11] This same error—looking at the successes of candidates who are Black instead of candidates who are *preferred* by Black voters—also permeates District's evaluation of the second and third *Gingles* preconditions. For example, the District harps on the number of votes that Roger Hines, an African-American candidate, lost by in 2015. Not only is Hines' loss a loss, no matter by how many votes, but Hines was not a Black-preferred candidate in 2015, and so his success or lack thereof has no relevance to whether Black-*preferred* candidates usually lose. *See* Trial Tr. vol. 4, 76:7-10 (Engstrom testifying that he did not identify Hines as a Black-preferred candidate); PFOF ¶¶ 164, 167. The District similarly relies on Charles Henson's uncontested return to the Board in 2007 and 2010 in claiming that there is no minority vote dilution in FFSD. But again, although Henson is Black, there is no evidence that Henson was a Black-preferred candidate in 2007 or 2010 because no election was held in either of those years. *See* PLTF-49, *Rebuttal Report of David Kimball*, July 2, 2015 ("*Kimball Rebuttal*"), at 1 n.1.

notion that a minority candidate is the minority preferred candidate simply because of that candidate's race offends the principles of equal protection.").

*Second*, Dr. Rodden's census block turnout estimates used to create this simulation are unreliable. Dr. Rodden reports turnout based on the number of ballots cast[12] as a percentage of registered voters, not as a percentage of VAP. Deft-FFSD A, *Rodden Rep.*, ¶ 21; Deft-FFSD C, *Rodden Redistricting Rep.*, ¶ 14; Trial Tr. vol 5, 145:20–146:22 (testimony of Jonathan Rodden). Because voter registration rates are lower for African Americans than for whites in Missouri, PFOF ¶ 232, the turnout rate is likely overstated for Black voters and understated for white voters. And Dr. Rodden's simulation does not take into account the positive effect, discussed above, that the very move from an at-large to a single-member district system might have on Black political participation in Board elections. *See supra*, Section III.B.2.a.

b) *A single-member district plan would neither lead to counterintuitive result nor be inconsistent with State policy.*

The District has also claimed that a single-member district remedy would be inappropriate in this case because it would cap Black voters' ability to elect their preferred representative and is inconsistent with State policy. Neither claim is persuasive given the current record.

i) *Single-member districts would not cap Black voters' ability to elect their preferred representatives.*

The District has suggested that a single-member district remedy will ultimately leave Black voters worse off because it will necessarily cap Black voters' ability to elect their preferred representatives by preserving white enclaves even as the Black VAP grows. This suggestion is unfounded.

---

[12] It is also not clear whether "ballots cast" means voters or votes, a meaningful difference in a multi-seat election where each voter may cast multiple votes.

*First*, the District seems to assume that any single-member district remedy would impose immutable subdistricts whose boundaries could never change even if the demographics of the FFSD change. But where Missouri law specifies that a school district have subdistricts, it also calls for redistricting after each Decennial Census. *See* Mo. Rev. Stat. § 162.492.1 (for urban districts: "[T]he board shall redistrict into subdivisions as soon as practicable after each United States decennial census."); Mo. Rev. Stat. § 162.601.7 (for metropolitan school districts: "The subdistricts shall be revised by the state board of education after each decennial census and at any other time the state board determines that the district's demographics have changed sufficiently to warrant redistricting."); Mo. Rev. Stat. § 162.867.7 (for special school districts: "The board of education shall, upon formation and each decade within ninety days following the publication of the final decennial census figures" form a redistricting committee that will adopt a redistricting plan). Thus, insofar as the Court is concerned that drawing subdistrict lines today based on figures from the last Census might not accurately reflect the demographics of the District in the future, there would be a natural opportunity to revisit those lines after the next Census – just four years from now.

*Second*, there is no reason to think that single-member districts will "cap" Black voters' ability to elect their preferred representatives any more than the existing at-large system. The District offers nothing more than speculation and erroneous conclusions from an unreliable effectiveness simulation to support this possibility, *see supra*, Section III.B.2.a. By contrast, the evidence at trial shows that Black' voters' strength is *already capped* under the existing at-large system. From 2011 through 2015, for example, only two of eight Black-preferred candidates prevailed, and both successes came from elections surrounded by special circumstances. PFOF ¶¶ 157-61, 168-71. In addition, as per Senate Factor 7, it is undisputed that the electoral success

30

of Black candidates has also been dismal: there have been numerous elections in which no Black candidate was elected; there has never been an election in which more than one Black candidate has won; and from the Board's court-ordered inception through the end of trial in January 2016, there have never been more than two Black members on the seven-member Board. PFOF ¶ 196. When one contrasts that clear record of low success rates against future speculation that an alternative system might be problematic, the choice seems clear.

*Finally*, the Court may consider a hybrid plan in which some Board members are elected at-large while others are elected from single-member districts (for example, creating a 5-2 plan with five single-member districts and two at-large seats). *See* Mo. Rev. Stat. § 162.492 (specifying a 5-2 hybrid plan for urban school districts); City of Berkeley, Mo., *City Council*, http://www.cityofberkeley.us/index.aspx?nid=128 (utilizing a 5-1 hybrid plan for the Berkeley City Council); *see also Hines v. Mayor of Ahoskie*, 998 F.2d 1266, 1269-70, 1274-75 (4th Cir. 1993) (directing district court to order 2-2-1 plan with two two-member districts and one at-large district). This could provide Black voters with both effective majority-Black single-member district(s) today as well as the potential to control all at-large seats in the future in the event that they overcome barriers to political participation and their relative size in the jurisdiction grows.

### ii) A single-member district remedy would not unduly intrude on legislative policy.

Despite the District's constant refrain that a single-member district plan would be contrary to State policy, single-member districts are well known to the State generally in local elections as well as more specifically in the school district context. Thus, while, as discussed *infra* Section III.B.3, this Court has other remedial options it can impose, a single-member district remedy remains a viable solution.

As an initial matter, it is not clear that the at-large method of electing school Board

members in a generic seven-member school district is mandated by state law. None of the provisions cited by the Board makes this explicit. This is in stark contrast to elections for certain special school districts, in which Missouri law clearly dictates that Board members be elected at-large. *Compare* Mo. Rev. Stat. § 162.291[13] *with* Mo. Rev. Stat. § 162.865.[14]

But aside from this, single-member districts are a well-known method of election in Missouri. Single-member districts are used fairly widely for elections for various local government offices. *See, e.g.*, City of Florissant, Mo., *City Council*, http://www.florissantmo.com/department/official.php?structureid=13 (nine single-member wards for Florissant City Council); City of Hazelwood, Mo., *Council Members*, http://www.hazelwoodmo.org/city-government/city-council/council-members (eight single-member wards for Hazelwood City Council); St. Louis County, Mo., *Saint Louis County Council*, http://stlouisco.com/YourGovernment/CountyCouncil (seven single-member districts for St. Louis County Council); Jefferson County, Mo., *Jefferson County, Missouri, Council*, https://www.jeffcomo.org/CountyCouncil.aspx?nodeID=CountyCouncil (seven single-member districts for Jefferson County Council); Public Water Supply District No. 2 of St. Charles County, Mo., *Board of Directors*, http://waterdistrict2.com/board-of-directors/ (five single-member districts for St. Charles County Water District Board); *see also* St. Louis Community College, *Board of Trustees*, https://www.stlcc.edu/About/Board_of_Trustees/Index.html (two 2-member districts and two single-member districts for St. Louis Community College Board of Trustees). Single-member districts are also well known in the school district context specifically:

---

[13] Mo. Rev. Stat. § 162.291 provides that: "The voters of each seven-director district other than urban districts shall, at municipal elections, elect two directors who are citizens of the United States and resident taxpayers of the district, who have resided in this state for one year next preceding their election or appointment, and who are at least twenty-four years of age."

[14] Mo. Rev. Stat. § 162.865 provides in relevant part that: "The board members of a special school district with a population of not more than one hundred thousand persons shall be elected at large."

urban school districts utilize a 5-2 hybrid system with five members elected from single-member districts and two members elected at-large, Mo. Rev. Stat. § 162.492; metropolitan school districts employ seven single-member subdistricts, Mo. Rev. Stat. § 162.601; and special school districts with populations of more than 100,000 also use a seven single-member subdistrict plan, Mo. Rev. Stat. § 162.867.

Finally, there is nothing in the record about whether at-large elections are born of any particular State policy concerns that single-member districts would contravene. Although the District has offered current and former Board members' personal opinions as to their preference for the at-large electoral system under which they prevailed, there is no evidence that the legislature ever considered those reasons such that a move to single-member districts in FFSD would be contrary to any particular State policy.

### 3. There exist remedial options other than single-member districts that could also serve as viable and appropriate solutions to the District's Section 2 violation.

Ultimately, all of the arguing about single-member districts is irrelevant because, were this Court to conclude that liability is appropriate but in the remedy phase decide that single-member districts are inappropriate, there are other remedies available for the Court's consideration.[15] Alternative voting systems, which courts have ordered or approved as vote-dilution remedies in the past, can remedy vote dilution by changing only the rules under which votes may be cast or are allocated among candidates, while maintaining an at-large electoral structure. *See, e.g.*, *Vill. of Port Chester*, 704 F. Supp. 2d at 447-48; *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 770-71 (N.D. Ohio 2009); *United States v. Marengo Cty.*

---

[15] Plaintiffs' complaint seeks judgment "[o]dering the implementation of an election system for the Ferguson-Florissant School Board that complies with Section 2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment [and] [o]rdering that all future elections for the Ferguson-Florissant School Board comply with Section 2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment[.]" ECF No. 1 at 11.

*Comm'n*, 731 F.2d 1546, 1560 & n.24 (11th Cir. 1984); *see also* Trial Tr. vol. 5, 181:10-15 (Rodden agreeing that "courts in Section 2 cases have ordered remedies after finding liability that preserve at-large systems under alternative voting arrangements rather than ordering single-member districts"). As described below, three such alternative voting systems that can remedy vote dilution within the context of an at-large electoral system are: (1) cumulative voting, (2) limited voting, and (3) choice or preference voting. In addition, because these systems provide minority voters with an opportunity to elect preferred representatives commensurate with the relative size of the minority electorate, they can adjust with changing circumstances, including potential growth of the African-American population.

> a) *Cumulative voting, limited voting, and choice or preference voting can provide minority voters with fair representation*

> i) *Cumulative voting*

Courts and judges have repeatedly described cumulative voting as a potential remedy in Voting Rights Acts cases. *See, e.g.*, *Holder v. Hall*, 512 U.S. 874, 897-99, 908-13 (1994) (Thomas, J., concurring) ("[N]othing in our present understanding of the Voting Rights Act places a principled limit on the authority of federal courts that would prevent them from instituting a system of cumulative voting as a remedy under § 2."); *Branch v. Smith*, 538 U.S. 254, 309-10 (2003) (O'Connor, J., concurring) ("[A] court could design an at-large election plan that awards seats on a cumulative basis, or by some other method that would result in a plan that satisfies the Voting Rights Act."); *Marengo Cty. Comm'n*, 731 F.2d at 1560 n.24; *Dillard v. Town of Louisville*, 730 F. Supp. 1546, 1548 & n.8 (M.D. Ala. 1990); *Dillard v. Chilton Cty. Bd. of Educ.*, 699 F. Supp. 870, 875 (M.D. Ala. 1988), *aff'd*, 868 F.2d 1274 (11th Cir. 1989); *Euclid*, 632 F. Supp. 2d at 752 n.11. Under a cumulative voting system, each voter has as many votes as there are seats to be filled and can either divide her votes between candidates or concentrate her

votes by casting more than one vote for a single candidate. *See Holder*, 512 U.S. at 909 n. 15 (Thomas, J., concurring). Thus, in a three-seat race, a voter could "plump" her three votes for one candidate, give two to one candidate and one to another, or split her votes equally among three candidates. The top *n* vote-getters in an *n*-seat election are elected to the board. *See* Richard L. Engstrom, *Modified Multi-Seat Election Systems as Remedies for Minority Vote Dilution*, 21 Stetson L. Rev. 743, 749 (1992).

A cumulative voting system is different from the voting rules currently in place in FFSD[16] in just one respect: instead of being allowed to cast only one voter per candidate, a voter can "plump" all his votes for one candidate. This feature allows voters to put the full weight of their voting power behind their preferences without forgoing any of the votes to which they are entitled to cast, *i.e.*, bullet voting. *See* PLTF-54, Richard L. Engstrom, *Cumulative and Limited Voting: Minority Electoral Opportunities and More*, 3 St. Louis U. Pub. L. Rev. 97, 102 (2010) ("The removal of the limit of one vote for any particular candidate permits minority voters, and all other voters, to cast a more efficacious type of 'single-shot' vote than they may in more traditional multi-seat elections" where members of a group must withhold remaining votes); *see also* Trial Tr. vol. 2, 162:3-10 (Kimball testifying that bullet voting is not "a very satisfactory long-term solution" because "you're asking voters to give up some of their franchise so that they might elect one candidate that they prefer"); Trial Tr. vol. 4, 46:18–47:13 (Engstrom testifying that if bullet voting is "the way [African-American voters] have to win an election in the Ferguson-Florissant School District, then I would certainly say that's not an opportunity equal to that of other members of the electorate, because they don't have to single-shot vote in order to elect a candidate of their preference."). This is particularly effective in a jurisdiction like FFSD

---

[16] Cumulative voting is also not unknown to Missouri: Article X1, Section 6 of the Missouri Constitution authorizes cumulative voting for the election of corporate managers and directors, and Mo. Rev. Stat. § 355.296 governs cumulative voting for the election of directors of a nonprofit corporation.

where voting patterns demonstrate a high level of political cohesiveness among African Americans. *See Vill. of Port Chester*, 704 F. Supp. 2d at 450 (concluding cumulative voting would be effective remedy where evidence demonstrated that minority voters voted cohesively in previous elections); *Euclid*, 632 F. Supp. 2d at 755 (observing that in a district with extreme racial polarization, cumulative voting "provides a cohesive minority group increased opportunity relative to a traditional voting system"). In addition, by allowing voters to express preference intensity through the division of their votes, this voting system allows a group of voters "to concentrate its voting power behind a given candidate without requiring the minority voters themselves be concentrated into a single district." *Holder*, 512 U.S. at 909 n.15 (Thomas, J., concurring).

Cumulative voting in multimember or at-large districts has proven successful in electing previously un- or under-represented minority candidates in jurisdictions around the United States. *See* Engstrom, *Modified Multi-Seat Election Systems*, 21 Stetson L. Rev. at 752-57 (cataloguing the efficacy of cumulative voting in electing minority candidates in local elections in New Mexico and South Dakota); Richard H. Pildes & Kristen A. Donoghue, *Cumulative Voting in the United States*, 1995 U. Chi. Legal F. 241, 272-76 (analyzing the success of cumulative voting ordered as a Section 2 remedy in Chilton County, Alabama). Consistent with this evidence of effectiveness, courts have ordered or approved cumulative voting as a minority vote dilution remedy in a number of cases. *See, e.g.*, *Vill. of Port Chester*, 704 F. Supp. 2d at 448; *Chilton*, 699 F. Supp. at 875 (approving settlement incorporating cumulative voting scheme); *Cottier v. City of Martin*, 475 F. Supp. 2d 932, 936-37 (D.S.D. 2007), *vacated on other grounds*, 604 F.3d 553 (8th Cir. 2010).

ii)  *Limited voting*

Limited voting is another available alternative remedial option in Section 2 cases. *See, e.g.*, *League of United Latin Am. Citizens v. Clements*, 986 F.2d 728, 814-15 (5th Cir. 1993) ("[S]tate policy choices may require the district court to carefully consider remedies such as cumulative voting [and] limited voting . . . ."), *rev'd on other grounds*, 999 F.2d 831 (5th Cir. 1993) (en banc); *Marengo Cty. Comm'n*, 731 F.2d at 1560 & n.24; *Cleveland Cty. Ass'n for Gov't by People v. Cleveland Cty. Bd. of Comm'rs*, 142 F.3d 468, 478 (D.C. Cir. 1998); *Louisville*, 730 F. Supp. at 1548 & n.8. In a limited-voting system, voters may cast only one vote per candidate and are allocated fewer votes than the number of seats up for election. Engstrom, *Modified Multi-Seat Election Systems*, 21 Stetson L. Rev. at 757. In a three-seat school board election, for instance, voters are given up to two votes; one in a two-seat election. The top *n* vote-getters in an *n*-seat election are then elected to the board.

Like cumulative voting, implementing a limited voting system would require only a slight change to the voting rules currently in place in FFSD. Rather than having the ability to cast the same number of votes as there are seats available, voters in a limited voting system cast fewer votes than seats available. This feature increases a cohesive minority group's ability to elect its preferred candidates without significant coordination by reducing the ability of white voters to win every seat. *See* Michael S. Kang, *Voting as Veto*, 108 Mich. L. Rev. 1221, 1273-74 (2010). In addition, as with cumulative voting, limited voting provides all minority voters with a greater opportunity to elect candidates of choice, not just those residing in effective majority-minority subdistricts. *See, e.g.*, PLTF-54, Engstrom, *Cumulative and Limited Voting*, at 114.

Courts have ordered or approved limited voting as a minority vote dilution remedy in a number of cases. *See, e.g.*, *Moore v. Beaufort Cty.*, 936 F.2d 159 (4th Cir. 1991) (rejecting state law challenge to a remedial limited voting plan and noting that jurisdictions in the state have

implemented limited voting pursuant to consent decrees); *Euclid*, 632 F. Supp. 2d at 770-71 (ordering limited voting remedy over United States' objection); *Dillard v. Town of Cuba*, 708 F. Supp. 1244 (M.D. Ala. 1988) (approving settlement establishing limited voting schemes for town councils).[17]

### iii) Choice or preference voting

A third alternative voting system that could serve as an effective remedy in this case is choice or preference voting.[18] *See, e.g.*, *Marengo Cty. Comm'n*, 731 F.2d at 1560 n.24 (noting that one possible alternative Section 2 remedy is "transferable preferential voting" (citing Joseph F. Zimmerman, *The Federal Voting Rights Act and Alternative Election Systems*, 19 Wm. & Mary L. Rev. 621 (1978)); Note, *Alternative Voting Systems as Remedies for Unlawful At-Large Systems*, 92 Yale L.J. 144 (1982)); *Holder*, 512 U.S. at 910-12 (Thomas, J., concurring) (noting the possibility of "cumulative voting and other non-district-based methods of effecting proportional representation" as a potential Section 2 remedies). Under this voting system, voters rank the candidates in their order of preference. Voters' preferences are then aggregated in a series of vote-counting rounds. Steven J. Mulroy, *Alternative Ways Out: A Remedial Road Map for the Use of Alternative Electoral Systems as Voting Rights Act Remedies*, 77 N.C. L. Rev. 1867, 1878-79 (1999). Candidates who reach a certain threshold of votes are seated, and their "surplus" votes are redistributed among second-choice candidates. *Id.* at 1879. If no candidate reaches the threshold after redistribution, the lowest vote-getter is eliminated and the second-choice votes on those ballots are redistributed. This process continues until all the seats are filled. *Id.*

---

[17] Limited voting has also proven successful in other countries to provide minority representation that might otherwise be submerged in a winner-take-all system. *See* Edward Still, *Alternatives to Single-Member Districts*, in *Minority Vote Dilution* 249, 253 (Chandler Davidson ed., 1984) (collecting data from Japan and the U.K.).

[18] Also known as single transferable voting, or the Hare system, among other things.

Although choice voting is less like the current voting rules in FFSD than the other two voting systems, it can also be implemented and provide minority voters a better ability to elect candidates of choice with minimal changes within the existing at-large structure. As a result, choice voting, like the other alternative remedies, can provide all minority voters in a jurisdiction with a greater opportunity to elect candidates of choice, not just those residing in effective majority-minority subdistricts. *See* Mulroy, *Alternative Ways Out*, 77 N.C. L. Rev. at 1912; *see also* Richard Briffault, *Lani Guinier and the Dilemmas of American Democracy*, 95 Colum. L. Rev. 418, 439 (1995). Choice voting's innovation over the traditional voting rules in place in FFSD is the transfer process, which prevent votes from being "wasted" on losing candidates or already-successful candidates; second- and third-place preferences play a role in electing the full slate of candidates. Mulroy, *Alternative Ways Out*, 77 N.C. L. Rev. at 1911-12.

Choice voting has become increasingly popular in the United States in recent years.[19] Since 1998, choice voting has been adopted and/or used for local elections, including school board elections, in various U.S. cities in twelve states.[20] *See* FairVote, *Ranked Choice Voting in*

---

[19] Choice voting enjoyed a period of popularity in the first half of the 20th century among municipal and local governments around the United States before falling out of favor for a time. Douglas J. Amy, *Real Choices/New Voices: The Case for Proportional Representation in the United States* 267-274 (1993) (detailing its history in the United States).

[20] These cities are: Berkeley, California (adopted in 2004 and first used in 2010 for mayor, city council, and other city offices); Cambridge, Massachusetts (in use since the 1940s in multi-winner ranked choice voting form for the nine-seat city council and six-seat school board); Minneapolis, Minnesota (adopted in 2006 and first used in 2009 in elections for mayor, city council, and several other city offices, including certain multi-seat elections); Oakland, California (adopted in 2006 and first used in 2010 for a total of 18 city offices, including mayor and city council); Portland, Maine (adopted in 2010 and first used in 2011 for mayor only); San Francisco, California (adopted in 2002, first used in 2004 and used every November election since then for mayor, city attorney, Board of Supervisors, and five additional citywide offices); San Leandro, California (adopted as option in 2000 charter amendment and first used in 2010 and every two years since for mayor and city council); St. Paul, Minnesota (adopted in 2009, first used in 2011 and every two years thereafter for mayor and city council); Takoma Park, Maryland (adopted in 2006 and first used in 2007, with elections every two years and with some special elections in between for mayor and city council); Telluride, Colorado (adopted in 2008 and first used in 2011 for mayoral elections); Hendersonville, North Carolina (adopted and used as part of a pilot program in 2007, 2009, and 2011). Eight other cities have adopted choice voting but have yet to use it: Memphis, Tennessee (adopted by voters in 2008, awaiting equipment); Santa Fe, New Mexico (adopted by voters in 2008, awaiting equipment); Davis, California (adopted in 2006 as an advisory referendum for fair representation, awaiting state law change); Ferndale, Michigan (adopted by voters in 2004, awaiting equipment); Santa Clara County, California (voters approved option in 1998);

*US Elections*, http://www.fairvote.org/rcv_in_us_elections. It is also currently used by overseas and military voters to vote in places with runoff elections in five other jurisdictions, including four states.[21] *See id.* Although choice voting has not yet been ordered or approved as a remedy to a Section 2 violation, there is no reason why it could not serve as a remedy in an appropriate case given that it offers a similar opportunity to improve minority voters' ability to elect preferred candidates as cumulative and limited voting. Indeed, the mechanics of choice voting aim to ensure "that any group . . . will be represented in proportion to its voting strength with mathematical exactness." Zimmerman, *Alternative Election Systems*, 19 Wm. & Mary L. Rev. at 640.

      *b)*   *These alternative voting systems could provide effective and appropriate solutions under the particular circumstances of this case.*

Although, as discussed above, the question of what constitutes an appropriate remedy is not before the Court at this time and is therefore premature at this stage of the case, each of the alternative voting systems described above has two features that could render them stable and appropriate solutions to the District's Section 2 violation under the particular circumstances of this case.

*First*, all of these voting schemes can accommodate shifting demographics and continue to provide racial minority communities with fair representation irrespective of increases in the minority share of the VAP generally or in particular areas of the jurisdiction. Because all of the minority group's voters across a jurisdiction have the opportunity to participate in electing a representative of the group's choice in each election, their ability to elect their preferred

Sarasota, Florida (adopted by voters in 2007, awaiting equipment); Vancouver, Washington (voters approved option in 1999).

[21] These jurisdictions are: Arkansas (adopted in 2005 and first used in 2006); Alabama (by agreement with a federal court, used in special election for U.S. House, 2013; became law for all federal runoffs in 2015); Louisiana (adopted and used since the 1990s); South Carolina (adopted and first used in 2006); Springfield, Illinois (adopted in 2007 and first used in 2011).

representatives under these voting arrangements increases naturally as the number of minority voters increases or relocates geographically within the jurisdiction, eliminating any need for future redistricting or continuing judicial intervention. *See, e.g.*, PLTF-54, Engstrom, *Cumulative and Limited Voting*, at 114 (cumulative voting and limited voting "provide all of the minority group's voters in a jurisdiction, regardless of where they reside, with an opportunity to participate in electing a representative of the group's choice, rather than just those residing in the majority-minority district"); Mulroy, *Alternative Ways Out*, 77 N.C. L. Rev. at 1895-96. These systems, moreover, tend toward proportional representation. *See, e.g.*, Zimmerman, *Alternative Election Systems*, 19 Wm. & Mary L. Rev. at 640, 654. Choice voting, in fact, "is designed to ensure that any group with a common political interest will be represented in proportion to its voting strength with mathematical exactness." *Id.* at 640.

*Second*, none of these voting systems would unduly intrude on legislative policy. All of these voting systems could remedy the District's vote dilution violation without altering the overarching structural features of the existing voting system, namely, the at-large scheme, off-cycle timing, and staggered terms. In doing so, none of these alternative voting schemes threatens the current Board members' stated interests in maintaining these practices. *See* PFOF ¶ 254. The use of any of these alternative voting arrangements also does not conflict with the provisions of the Missouri Revised Statutes governing school Board elections. The statute neither dictates that elections in seven-director school districts, like FFSD, employ a particular voting arrangement within an at-large or single-member scheme, *see* Mo. Rev. Stat. §§ 162.291, 162.459, 162.481, 162.492, nor prohibits the use of these alternative voting arrangements, *see generally* Mo. Rev. Stat. ch. 162; *see also Vill. of Port Chester*, 704 F. Supp. 2d at 449 ("The

Court does not find that cumulative voting is prohibited by New York law just because the law is silent on the issue.").[22]

### 4. Any remedy can sunset and/or be modified.

Although there are a number of viable remedial options that this Court can implement that can shift with changing demographics, any remedy imposed need not last forever but can either sunset and/or be modified.

While sunset provisions are often found in the context of consent decrees, *see, e.g.*, *John B. v. Emkes*, 710 F.3d 394, 398-99, 406-07, 409, 411-12 (6th Cir. 2013); *Williams v. Edwards*, 87 F.3d 126, 128, 130-31 (5th Cir. 1996), they have also been included in permanent injunctions, *see, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 687, 704 (Fed. Cir. 2009) (affirming the issuance of a permanent injunction that included a sunset provision in a patent infringement case and indicating that the sunset provision was appropriate in light of the balance of hardship and public interest considerations); *Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, 788 F. Supp. 2d 71, 77 (E.D.N.Y. 2011) (same). And, although "[a] consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature[,] . . . it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 378 (1992). Thus, examples of sunset provisions in the context of consent decrees as well as permanent injunctions support the conclusion that nothing prevents this Court from including a sunset provision as a

---

[22] The Eleventh Circuit's case in *Dillard v. Baldwin County Commissioners*, 376 F.3d 1260 (11th Cir 2004), is not to the contrary. In that case, the Eleventh Circuit affirmed the district court's rejection of a cumulative voting scheme, stating that "[t]he federal courts have no authority to conjure up such an election scheme and impose it on a state government, regardless of the theoretical prospect of increasing minority voting strength." *Id.* at 1268. In that case, however, it was the plaintiffs who submitted the proposed remedy, and not the defendant jurisdiction to whom the court owed deference.

remedy in the present case in order to further the broad remedial purpose of the Voting Rights Act. That said, however, Plaintiffs have not located any judgments in VRA cases that employ a sunset provision.

Perhaps the best explanation for why no VRA cases appear to have employed sunset provisions is that any remedial order would be subject to modification if future new facts changed circumstances such that continuing a remedy is no longer equitable. Any injunction requiring FFSD to alter its election procedures to comply with the Voting Rights Act could be modified pursuant to Rule 60(b). *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 826 (4th Cir. 2005) ("[A] court's inherent authority to modify a[n] injunction is now encompassed in Rule 60(b)(5) of the Federal Rules of Civil Procedure."); *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) ("Courts possess the inherent authority to enforce their own injunctive decrees."). Under Rule 60(b)(5) and (6), a court has to authority to relieve a party from a previous order if "applying [the judgment] prospectively is no longer equitable" or for "any other reason that justifies relief." Thus, should the remedy become inequitable in the future because of changed circumstance, FFSD could request a modification of the injunction pursuant to Rule 60(b).

## CONCUSION

As set forth in greater detail in Plaintiffs' Proposed Findings of Fact and Proposed Conclusions of Law, Plaintiffs established at trial that the District's at-large method for electing Board member deprives its African-American residents of an equal opportunity to elect representatives of their choice, in violation of Section 2. As explained above, none of the issues that this Court asked the parties to brief provide any basis for altering this conclusion.

Dated this 8th day of April, 2016.        Respectfully submitted,

/s/ Sophia Lin Lakin_____
SOPHIA LIN LAKIN*
DALE E. HO*
JULIE A. EBENSTEIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

GILLIAN R. WILCOX, #61278MO
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, MO 64111
Phone: (816) 470-9938

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I, Sophia Lin Lakin, hereby certify that on April 8, 2016, I filed the foregoing document

using the e-filing system, thereby serving electronic copies via email to all named parties below:


Darold E. Crotzer, Jr.
Kathryn B. Forster
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com
kforster@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com


/s/ Sophia Lin Lakin
SOPHIA LIN LAKIN