## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

MISSOURI STATE CONFERENCE OF )
THE NATIONAL ASSOCIATION FOR )
THE ADVANCEMENT OF COLORED )
PEOPLE, REDDITT HUDSON, )
F. WILLIS JOHNSON and )
DORIS BAILEY, )
                                         )   Civ. No. 4:14-cv-02077-RWS
               Plaintiffs, )
                                         )
v. )
                                         )
FERGUSON-FLORISSANT SCHOOL )
DISTRICT and ST. LOUIS COUNTY )
BOARD OF ELECTIONS )
COMMISSIONERS, )
                         Defendants. )


## PLAINTIFFS' PROPOSED FINDINGS OF FACT

**TABLE OF CONTENTS**

FINDINGS OF FACT..............................................................................................1

I.    Background .............................................................................................1

    A.    Parties .........................................................................................1

        1.    Plaintiffs ...............................................................................1

        2.    Defendants ............................................................................2

    B.    Election System ...........................................................................4

        1.    Student Population .................................................................6

        2.    Total Population and Voting-Age Population of the District ...................7

        3.    The District's Population Estimates...........................................16

        4.    Impediments to Voting Faced by African Americans in FFSD.............20

II.    *Gingles* I.................................................................................................25

III.    *Gingles* II and *Gingles* III .....................................................................29

    A.    Ecological Inference Analysis .......................................................29

    B.    Plaintiffs' Evidence Concerning *Gingles* II and *Gingles* III Is Reliable and Establishes the Presence of Racially Polarized Voting................................33

        1.    Elections by Year .................................................................36

    C.    The District's Proposed Methods for Identifying Candidates of Choice...................50

        1.    Top-Ranked Candidate Approach..............................................51

        2.    Point Estimate Approach ........................................................53

    D.    Testimony about Cohesion and Crossover Voting ..................................55

IV.    Totality of the Circumstances .....................................................................57

    A.    The "Predominant" Senate Factors (Factors 2 and 7)...............................57

        1.    Racially Polarized Voting (Senate Factor 2) .................................57

        2.    Election of minorities to the Board (Senate Factor 7) .......................57

B.    Factors Related to Historical Discrimination and its Ongoing Effects (Factors 1, 5) ................................................................................................ 61

    1.    Official discrimination ............................................................... 61

    2.    Continuing effects of past discrimination on political participation ........................ 68

C.    Remaining Senate Factors (Factors 8, 4, 6, 3 and 9) ................................................. 75

    1.    Lack of responsiveness (Senate Factor 8)..................................................... 75

    2.    Access to candidate slating (Senate Factor 4)............................................... 88

    3.    Subtle racial appeals (Senate Factor 6) .................................................... 91

    4.    Discriminatory voting practices and procedures (Senate Factor 3) .......................... 92

    5.    Tenuousness of rationales (Senate Factor 9) ............................................... 94

**FINDINGS OF FACT**

Plaintiffs Doris Bailey, Redditt Hudson, F. Willis Johnson, and the Missouri State Conference of the National Association for the Advancement of Colored People ("MO NAACP") filed this lawsuit on December 18, 2014 against Defendants the Ferguson-Florissant School District ("FFSD" or "the District") and the St. Louis County Board of Elections Commissioners ("St. Louis BOEC"). ECF No. 124, *Joint Stipulation of Uncontested Facts* ("*Joint Stip.*") ¶ 1. This Court held a 6-day bench trial beginning on January 11, 2016. ECF Nos. 155-58, 160-61, *Minute Entries*. After consideration of the testimony adduced at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, the Court makes the following findings of fact.

## I. BACKGROUND

### A. Parties

#### 1. Plaintiffs

1. The individual plaintiffs are U.S. citizens; registered voters; and African Americans who reside in areas of FFSD that could constitute single-member districts in which African Americans are a majority of the voting-age population. *Joint Stip.* ¶¶ 2-4; PLTF-44, *Expert Decl. of William S. Cooper*, May 27, 2015 ("*Cooper Decl.*"), at Ex. E (illustrative plan 1), Ex. F (illustrative plan 2); *see also* Trial Tr. vol. 1, 20:23–21:2 (testimony of Adolphus Pruitt).

2. Plaintiff MO NAACP is a state affiliate of the NAACP, the nation's oldest and largest civil rights organization, whose mission is to ensure the political, educational, social, and economic equality of rights of all persons, to eliminate hatred and racial discrimination, and to remove all barriers of racial discrimination through democratic processes. *Joint Stip.* ¶ 5; *see also* Trial Tr. vol. 1, 19:10-12 (testimony of Adolphus Pruitt that mission of the NAACP is "[t]o ensure the political, social, educational, and economic equality for all folks and also

1

to combat and deal with race-based discrimination"); *id.* 20:8-14 (Pruitt testifying that he is authorized to speak on behalf of MO NAACP on the issues related to this case).

3. Plaintiff MO NAACP is active in efforts to increase voter registration, education, and turnout, and emphasizes the importance of local elections, including local school board elections. *Joint Stip.* ¶ 6; PLTF-119, *Decl. of Adolphus Pruitt on Behalf of MO NAACP*, Sept. 15, 2015 ("*Pruitt Decl.*"), ¶¶ 10-14; *see* PLTF-117, *Decl. of Redditt Hudson*, Sept. 18, 2015 ("*Hudson Decl.*"), ¶ 6; Trial Tr. vol. 1, 19:22–20:3 (Pruitt testifying that in spite of the Voting Rights Act, "we still have local and state governments that employ tactics that will impede the free and unfettered rights of individuals to vote"); Trial Tr. vol. 4, 89:13–90:14 (NAACP employee Redditt Hudson testifying that, among other things, the NAACP does "voter education, voter registration, 'get out the vote' efforts, [and] phone banking" in order to increase turnout because "the relationship between voter turnout and registered voters is obvious").

4. The membership of the MO NAACP includes African Americans who reside, work, and raise families in the District and in areas of the District that could constitute single-member districts in which African Americans are a majority of the voting-age population. *E.g.*, PLTF-117, *Hudson Decl.*, ¶¶ 1, 3-4; PLTF-119, *Pruitt Decl.*, ¶ 4; Trial Tr. vol. 1, 20:23–21:2 (testimony of Adolphus Pruitt); Trial Tr. vol. 4, 86:6-8 (testimony of Redditt Hudson); *see also* PLTF-44, *Cooper Decl.*, at Ex. F (illustrative plan 2).

　　2. Defendants

5. Defendant FFSD is a governmental entity that maintains an electoral system based on at-large elections for seven positions on the Ferguson-Florissant School Board (the "Board"). *Joint Stip.* ¶ 7.

6. The Board is responsible for the governance and administration of FFSD, a political subdivision of the State of Missouri within the meaning of Article 4, Section 12, of the Missouri Constitution. *Joint Stip.* ¶ 7.

7. Defendant St. Louis BOEC is the governmental entity charged with conducting elections in St. Louis County. It is responsible for conducting elections for positions on the Board in FFSD. *Joint Stip.* ¶ 8.

8. FFSD is located in northern St. Louis County, Missouri ("North County"). *Joint Stip.* ¶ 9; PLTF-44, *Cooper Decl.* ¶ 12; Deft-FFSD A, *Report of Jonathan Rodden*, May 27, 2015 ("*Rodden Rep.*"), ¶ 7.

9. The District was created by a 1975 desegregation order, which required the then-Ferguson-Florissant School District to annex the primarily African-American neighboring school district of Kinloch and primarily white neighboring district of Berkeley. *Joint Stip.* ¶ 9; *see also* Trial Tr. vol. 1, 119:14–121:24 (testimony of Colin Gordon describing that "21 years after *Brown*, by court order, the Justice Department sort of recognize[d] the motives that lie behind the separation of the districts and ordered the merger of the district. So this is a sort of microcosm of what happened across St. Louis County where the school districts have begun to have over this period sort of combined[,] either by court order or not, but the municipality fragmentation that lies underneath has remained the same"); *United States v. Missouri*, 515 F.2d 1365, 1369-73 (8th Cir. 1975).

10. As part of the annexation, the order directed that two seats on the then-six-member Ferguson-Florissant School Board be declared vacant and replaced by designees of the annexed Berkeley and Kinloch school boards. The four remaining members were to draw lots to determine the length of their individual terms in office to create staggered elections for an

"initial period of stable governance for the new district." *Joint Stip.* ¶ 10; *Missouri*, 515 F.2d at 1373.

11. The District covers all or part of eleven municipalities: Berkeley, Calverton Park, Cool Valley, and Kinloch in their entirety, and parts of Black Jack (one block), Ferguson, Florissant, Dellwood, Hazelwood, Normandy, and Old Jamestown. *Joint Stip.* ¶ 11. Its headquarters and administration center are in Florissant. *Joint Stip.* ¶ 11; *see also* Trial Tr. vol. 3, 80:20-25, 82:9-11 (testimony of Frank Green).

### B. Election System

12. The Board is composed of seven members who serve three-year terms and who are elected through an at-large election system. Board elections are staggered and held off-cycle so that either two or three Board seats are elected every April. *Joint Stip.* ¶ 31.

13. When the number of candidates equals the number of Board seats to be filled, no election is held, and the candidates automatically assume responsibilities as members of the Board. *Joint Stip.* ¶ 32; Mo. Rev. Stat. § 115.124.

14. As of the date of trial in January 2016, the seven members of the Board were: Mr. Paul Morris, Mr. Robert Chabot, Mr. Brian Scott Ebert, Ms. Leslie Hogshead, Mr. Keith Brown, Dr. Donna Paulette-Thurman, and Dr. Courtney Graves. Dr. Paulette-Thurman and Dr. Graves are African-American. The remaining five Board members are white. *Joint Stip.* ¶ 33.

15. Each voter has the right to cast up to two votes in a two-seat election and up to three in a three-seat election, but cannot vote more than once for the same candidate in a single election. *Joint Stip.* ¶ 34.

16. Board seats are awarded to the candidates with the most votes, such that when two seats are contested, the top two vote recipients win the two seats, and when three seats are contested,

the top three vote recipients win the three seats. *Joint Stip.* ¶ 35; PLTF-52, *Expert Report of Richard L. Engstrom*, May 27, 2015 ("*Engstrom Rep.*"), ¶ 7.

17. Voters can engage in bullet, or single-shot, voting: that is, they can forego casting all of the votes that they are allotted. If every voter casts all of his or her votes in a two-seat election, *i.e.*, voters do not engage in single-shot voting, a candidate can receive at most 50% of all votes. If every voter casts all of his or her votes in a three-seat election, a candidate can receive at most 33.33% of all votes. *Joint Stip.* ¶ 34; PLTF-52, *Engstrom Rep.*, ¶¶ 7, 12-13.

18. The evidence before the Court indicates that single-shot voting is not common in FFSD. With the exception of Courtney Graves's 2015 campaign, the witnesses who had been involved in campaigning in FFSD testified almost uniformly that they rarely, if ever, bullet vote or encourage others to do so, except when they are running for office and bullet vote for themselves. *See* Trial Tr. vol. 2, 19:7-13 (Charles Henson testifying that he had never bullet voted for anyone before 2015 except for himself in 2013); Trial Tr. vol. 6, 26:2-4 (Courtney Graves testifying that she had never bullet voted in a Board election, except for herself in 2015); *Dep. of Brian Scott Ebert*, June 16, 2015 ("*Ebert Dep.*," previously filed as ECF No. 85-34), 19:13-17; *Dep. of Donna Paulette-Thurman*, June 17, 2015 ("*Paulette-Thurman Dep.*," previously filed as ECF No. 85-36), 23:3-6; *Dep. of Keith Brown*, June 16, 2015 ("*Brown Dep.*," previously filed as ECF No. 85-35), 15:12-16; *Dep. of Leslie Hogshead*, July 1, 2015 ("*Hogshead Dep.*," previously filed as ECF No. 85-38), 15:18–16:6 (recommends bullet voting to close friends and family but does not recommend it publicly); *Dep. of Paul Thomas Morris*, June 15, 2015 ("*Morris Dep.*," previously filed as ECF No. 85-33), 69:11-20 (has never used a bullet-voting strategy in his campaigns); *Dep. of Robert Chabot*, July 2, 2015 ("*Chabot Dep.*," previously filed as ECF No. 85-40), 13:22-24 (does not bullet vote in

local elections). *But see Dep. of Paul Schroeder*, July 2, 2015 ("*Schroeder Dep.*," previously filed as ECF No. 85-39), 19:11-18 (has often voted for only one candidate).[1]

19. Other witnesses suggested that a measurable amount of bullet voting occurred in a small handful of contests. Trial Tr. vol. 2, 180:5-11 (testimony of David Kimball that, based on statistical analysis, Charles Henson likely received some bullet votes); Trial Tr. vol. 5, 203:24–204:1 (testimony of Jonathan Rodden that, based on statistical analysis, Barbara Morris likely received some bullet votes); Trial Tr. vol. 5, 67:20–68:6 (testimony of Jonathan Rodden that, based on statistical analysis, Courtney Graves likely received some bullet votes); Trial Tr. vol. 6, 17:1-10 (testimony of Board member Courtney Graves that she had asked people to bullet vote for her as part of her campaign and that "it helped out a lot" in her successful election); *see also Morris Dep.*, 69:2-20 (stating that Graves "ran a bullet vote campaign").

       1. <u>Student Population</u>

20. Based on data provided to the U.S. Department of Education for the 2011 survey year, the District public schools serve 13,234 students from preschool through 12th grade, of whom 77.1% are Black and 15.6% are white. *Joint Stip.* ¶ 12.

21. The enrollment demographics of District schoolchildren are different from the population demographics of District residents at least in part because African-American families and students rely more heavily on public schooling than do white families and students. Trial Tr. vol. 1, 172:2-10 (testimony of Colin Gordon); *see also* PLTF-41, *Colin Gordon, Response to Report of Jonathan Rodden*, June 30, 2015 ("*Gordon Resp.*"), ¶ 3 (describing that the difference arises "given the high rates of white enrolment in private and parochial schools"),

---

[1] Plaintiffs designated the portions of depositions cited throughout this document in ECF No. 151; *see also* ECF No. 153 (Defendants' deposition counter-designations).

Fig. 1 (p. 5) ("Enrollment in FFSD by Race," citing data from Missouri Department of Elementary & Secondary Education).

### 2. Total Population and Voting-Age Population of the District

22. The parties have presented three data sources for counts or estimates of the voting-age population ("VAP") of the District, as described below:

| Summary of FFSD Demographic Data Offered By Parties | | | |
|---|---|---|---|
| **Data Source** | **Total VAP** | **Black VAP** | **% Black VAP** |
| **2010 Decennial Census** (*Joint Stip.* ¶ 13) | 50,771 | Single-race Black: 24,030<br><br>Any-part Black: 24,466 | Single-race Black: 47.33%<br><br>Any-part Black: 48.19% |
| **2011–2013 American Community Survey estimate** (*Joint Stip.* ¶ 28; PLTF-23; PLTF-29; PLTF-32 (ACS tables)) | 49,679 | Single-race Black: 24,313 +/- 1,513 (22,800 to 25,826)<br><br>Any-part Black: No estimate | Single-race Black: 48.94% +/- 3.05% (45.89% to 51.99%)<br><br>Any-part Black: No estimate |
| **Estimates by District's expert Dr. Jonathan Rodden** (Deft-FFSD C, Tbl. 1 (p. 3)) | 49,009 | Single-race Black: 24,313 (no error margin provided)<br><br>Any-part Black: 24,994 (no error margin provided) | Single-race Black: 49.6% (no error margin provided)<br><br>Any-part Black: 51.0% (no error margin provided) |

### a) *2010 Decennial Census*

#### i. *Total population according to the 2010 Decennial Census*

23. The U.S. Census Bureau measures the total population of each jurisdiction in the United States every ten years through the Decennial Census.

24. According to the 2010 Decennial Census, the District has a total population of 68,663, with an any-part ("AP") Black[2] population of 36,967 (53.84%), and a white population of 29,581 (43.08%). *Joint Stip.* ¶ 13; *see also* PLTF-44, *Cooper Decl.*, ¶¶ 16 & n.2, 17 (explaining that "white" refers to single-race, non-Hispanic white persons).

---

[2] The AP Black population is comprised of individuals who identify as single-race Black and individuals who identify as more than one race and part Black. *Joint Stip.* ¶ 19.

25. The boundaries of FFSD as recorded by the Census Bureau are slightly larger than the boundaries of FFSD as recorded by the St. Louis BOEC. For this reason, the most accurate way to count the population is by adding together the populations of the individual census blocks that comprise the District as recorded by the St. Louis BOEC. Calculating the FFSD population in this manner has a net effect of there being 387 fewer persons within the voting district than as recorded by the Census Bureau.[3] PLTF-44, *Cooper Decl.*, ¶ 13.

ii. *Voting-Age Population according to the 2010 Decennial Census*

26. The voting-age population ("VAP") of a jurisdiction includes all individuals age 18 and over. *See, e.g.*, Trial Tr. vol. 1, 137:1-10 (testimony of Colin Gordon).

27. The 2010 Decennial Census is the most recent "complete count" of the VAP of a jurisdiction. PLTF-45, *Suppl. Decl. of William Cooper*, July 2, 2015 ("*Cooper Suppl. Decl.*"), ¶¶ 3, 6; *see also* Trial Tr. vol. 5, 160:13-17 (testimony of Jonathan Rodden).

28. According to the 2010 Decennial Census, the total VAP in the District is 50,771, of whom 24,466 (48.19%) are any-part Black; 24,030 (47.33%) are single-race Black; and 24,852 (48.95%) are non-Hispanic single-race white. *Joint Stip.* ¶ 13; *see also* PLTF-44, *Cooper Decl.*, ¶¶ 16 & n.2, 17. There are 1,324 (1.93% of the total population) Latinos in the District, of whom 824 (1.62% of the VAP) are voting-aged.[4] *Joint Stip.* ¶¶ 13, 16.

---

[3] This discrepancy, although the Plaintiffs' expert demographer described it as "unusual," has no significant impact on the demographics in the Decennial Census count of the District, as the percentage point differences by race between the two geographic definitions are under one tenth of a percent. PLTF-44, *Cooper Decl.*, ¶ 13; *see also* Trial Tr. vol. 1, 188:13–189:4 (testimony of William Cooper).

[4] The U.S. Census "defines 'Hispanic or Latino' as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." Persons who report themselves as Hispanic can be of any race. PLTF-168, U.S. Census Bureau, *About Hispanic Origin* (July 25, 2013).

b) *The American Community Survey or "ACS" Data*

i. *Characteristics of the American Community Survey*

29. In addition to the Decennial Census, the Census Bureau publishes one- and five-year estimates, and previously published three-year estimates,[5] of population demographics estimates based on the American Community Survey ("ACS"). The ACS is a rolling sample survey based on responses from one in about 40 persons on an annual basis. *Joint Stip.* ¶ 21; *see also* Trial Tr. vol. 1, 202:13–203:4 (testimony of William Cooper).

30. Because ACS population estimates are based on a sample, they are subject to sampling bias, *i.e.*, error margins or confidence intervals. *Joint Stip.* ¶ 22; Trial Tr. vol. 1, 135:9-21 (testimony of Colin Gordon), 202:13–203:4 (testimony of William Cooper); *see also Joint Stip.* ¶ 24 (Stip. Ex. B (ECF No. 124-2), 2011-2013 3-Year ACS Table B01001: Sex by Age, FFSD); PLTF-41, *Gordon Resp.*, at 1.

31. All ACS population estimates are published with margins of error "based on a 90 percent confidence level." PLTF-136, ACS Office, U.S. Census Bureau, *American Community Survey Multiyear Accuracy of the Data*, Sept. 24, 2014, at 11. This means that a reader can be 90 percent confident that the true value lies within the confidence interval provided by the ACS. *See* Trial Tr. vol. 4, 14:12-23 (testimony of Richard Engstrom explaining confidence intervals).

32. ACS error margins are larger for smaller sample sizes, smaller geographic units, and smaller demographic groups within geographic areas. *See* Trial Tr. vol. 1, 135:2-8 (Gordon testifying that "the reason why the ACS itself does not recommend that its estimates be used for such purposes as hard counts of the population, and that is even at the five-year average when you look at a small geography, and particularly when you start to break down the geography

---

[5] Three-year ACS estimates were discontinued after the 2011–2013 period. *Joint Stip.* ¶ 21.

demographically, so say you're just looking at black voting-age population, the margin of error of that number is very high."); *see also* Trial Tr. vol. 1, 174:19–175:20 (testimony of Colin Gordon); Trial Tr. vol. 4, 71:1–72:6 (testimony of Richard Engstrom); Trial Tr. vol. 5, 164:5-20 (testimony of Jonathan Rodden); *see also* Br. for Amici Curiae Former Dirs. of U.S. Census Bureau at 4, *Evenwel v. Abbott*, No. 14-940 (U.S. Sept. 25, 2015), *available at* http://www.scotusblog.com/wp-content/uploads/2015/10/Evenwel-FormerCensusBureauDirectorsBrief092515.pdf.

33. Statisticians routinely employ a rule of thumb that when the error margins of two population estimates overlap, there is no statistically significant difference between those two numbers. Trial Tr. vol. 1, 135:22–136:2 (Gordon testifying that "if you're comparing two numbers and the confidence intervals overlap, then there's no statistical significance between those two numbers. There's no basis for claiming that one number is bigger than the other, because the supposed difference between the numbers is completely swallowed by the margin of error as reported by ACS"); Trial Tr. vol. 5, 6:17–7:6 (Rodden testifying that "[w]e have this rule of thumb that we like to use where we look at the confidence intervals to see if they overlap. In this case they overlap slightly. So we cannot say that they are not distinguishable, but I cannot make the claim with great confidence that they are distinguishable.").

34. The Census Bureau cautions that ACS data are estimates and recommends that users turn to other Census products for population counts. It includes a similar warning on the top of every ACS population table it provides. *See* PLTF-132, U.S. Census Bureau, *Comparing ACS Data*, July 14, 2015 (stating, among other things, "Use numbers from the 2010 Census to obtain counts of the population and their basic characteristics (sex, age, race, Hispanic origin, and homeowner status)"); *Joint Stip.* ¶ 24 (Stip. Ex. B (ECF No. 124-2), 2011 – 2013 3-Year

ACS Table B01001: Sex by Age, FFSD); *see also* Trial Tr. vol. 1, 157:17-20 (Gordon testifying that "I would not draw conclusions about voting-age population based on the ACS because it's not designed for that purpose, for a threshold of the population, and because the margins of error are too wide"), *id.*, 133:24–134:21 (Gordon testifying that "there are serious concerns about sample size" with using the ACS in a small jurisdiction like FFSD); *id.*, 203:9-17 (Cooper testifying that the 2011–2013 ACS is "an estimate with large margins of error, and for that reason the only appropriate data set to use is the decennial census."),.

35. Because of these large margins of error, ACS estimates cannot reliably provide an accurate measure of population change. As one example of the danger of relying on the ACS for population counts: the city of St. Louis erroneously believed, based on the 2006-2009 ACS point estimate of the size of the city's population, that its population had grown since the 2000 Census. In fact, when the 2010 Census came out, it showed that the population had actually declined by approximately 30,000 inhabitants. *See* Trial Tr. vol. 1, 136:13-22 (testimony of Colin Gordon).

36. Unlike the ACS, the 2010 Decennial Census is a complete population count and has no margins of error. Trial Tr. vol. 5, 160:13-17 (Rodden testifying that Decennial Census is a "complete count").

    *ii.  VAP Demographics in FFSD as Estimated by the ACS*

37. The 2011–2013 ACS estimates for Sex by Age by Veteran Status for the Civilian Population 18 Years and Over in FFSD is as follows:

| | Ferguson-Florissant School District, Missouri | | | | | |
|---|---|---|---|---|---|---|
| | African-American | Margin of Error (+/-) | % of AA Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **24,313** | **1,513** | **100.0%** | **23,242** | **1,413** | **100.0%** |
| Veteran | 2,380 | NC | 9.8% | 2,728 | NC | 11.7% |
| Nonveteran | 21,933 | NC | 90.2% | 20,514 | NC | 88.3% |
| Male: | 9,582 | 946 | 39.4% | 11,033 | 870 | 47.5% |
| 18 to 64 years: | 8,358 | 954 | 34.4% | 8,499 | 826 | 36.6% |
| Veteran | 1,371 | 377 | 5.6% | 1,051 | 272 | 4.5% |
| Nonveteran | 6,987 | 869 | 28.7% | 7,448 | 748 | 32.0% |
| 65 years and over: | 1,224 | 291 | 5.0% | 2,534 | 363 | 10.9% |
| Veteran | 755 | 261 | 3.1% | 1,593 | 262 | 6.9% |
| Nonveteran | 469 | 190 | 1.9% | 941 | 271 | 4.0% |
| Female: | 14,731 | 1,029 | 60.6% | 12,209 | 808 | 52.5% |
| 18 to 64 years: | 12,879 | 978 | 53.0% | 8,348 | 669 | 35.9% |
| Veteran | 240 | 153 | 1.0% | 66 | 49 | 0.3% |
| Nonveteran | 12,639 | 957 | 52.0% | 8,282 | 661 | 35.6% |
| 65 years and over: | 1,852 | 367 | 7.6% | 3,861 | 534 | 16.6% |
| Veteran | 14 | 23 | 0.1% | 18 | 28 | 0.1% |
| Nonveteran | 1,838 | 370 | 7.6% | 3,843 | 535 | 16.5% |

Source: U.S. Census Bureau, 2011-2013 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology. http://www.census.gov/acs/www/UseData/index.htm

PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46.

38. According to the 2011-2013 three-year ACS, the VAP in the District is 49,679. *Joint Stip.* ¶ 28; PLTF-45, *Cooper Suppl. Decl.*, ¶ 22.

39. The 2011–2013 ACS estimates that the single-race white VAP (including Hispanic whites) is 23,740, or 47.24% of the District's VAP, and the non-Hispanic white VAP is 23,242, or 46.78% of the District's VAP. *Joint Stip.* ¶ 25.

40. According to the 2011–2013 ACS, there are an estimated 1,315 (1.97%) single-race individuals in FFSD who identify as neither Black nor white, 85 of whom identify as American Indian or Alaska Native; 544 of whom identify as Asian; and 686 of whom

identify as "some other race." *See Joint Stip.* ¶ 23 (table); PLTF-30, 2011–2013 3-Year ACS Table C02003: Detailed Race, FFSD; PLTF-41, *Gordon Resp.*, at 2.

41. The 2011–2013 ACS estimates that the FFSD single-race Black VAP is 24,313, or 48.94% of the District's VAP. *Joint Stip.* ¶ 25. The margin of error for the 2011–2013 ACS estimate for the single-race Black VAP is ±1,513, meaning that the 2011–2013 ACS estimates that the single-race Black VAP could be as low as 22,800 or as high as 25,826. PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46.

42. Unlike the Decennial Census, the ACS does not publish estimates for the "AP Black" category. *Joint Stip.* ¶¶ 25, 26. Therefore, the 2011–2013 ACS does not include an estimate of the AP Black VAP, and does not estimate the margin of error associated with the AP Black fraction of the VAP. *See* Trial Tr. vol. 1, 136:5-12 (Gordon testifying that "t[he] margin of error grows larger the smaller the demographic unit you're talking about. So—and this is particularly true when we make any effort to tease out how many African American identified voters are in the nonsingle-race category. There the number reported is in the hundreds, but the margin of error is also in the hundreds. So we really have no confidence as to what the number really is.").

43. The 2011–2013 three-year ACS estimates do not establish to a degree of statistical significance that the single-race Black VAP has grown since the 2010 Census. Trial Tr. vol. 5, 177:1-21 (testimony of Jonathan Rodden).

44. The 2010 Census totals for single-race Black VAP is 24,030, which falls well within the margin of error for the 2011–2013 ACS estimate for the single-race Black VAP of 22,800 to 25,826. In other words, according to the 2011–2013 ACS estimate, the single-race Black

VAP could be as small as 22,800, which is *less than* the 2010 Census count of the single-race Black VAP.

45. The 2011–2013 ACS estimates that the single-race non-Hispanic white VAP of FFSD is 23,242, a difference of 1,610 people from the 2010 Census count of 24,852. The margin of error for the ACS estimate is ±1,413. PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46; *see supra*, ¶ 22.

46. The 2011–2013 ACS survey estimates state with 90% certainty that the single-race BVAP is between 22,800 and 25,826 and that the single-race non-Hispanic white VAP is between 21,829 and 24,655. *See supra*, ¶ 37.

47. Similarly, the 2011–2013 ACS estimates do not establish to a degree of statistical significance that the single-race Black VAP exceeds the white VAP within FFSD. Comparing population sizes as estimated by the 2011–2013 ACS alone, the confidence intervals for the single-race Black VAP and the non-Hispanic white VAP overlap. *See* PLTF-41, *Gordon Resp.*, at 1-2 (noting that the "slim difference" in the respective sizes of the white and Black VAPs "falls well within [the] range of uncertainty" represented by the margin of error); *see* Deft-FFSD C, *Supplemental Report of Jonathan Rodden & Jowei Chen: Assessment of Plaintiffs' Redistricting Proposals*, July 2, 2015 ("*Rodden Redistricting Rep.*"), ¶ 7 ("[D]ue to the sample size, it is possible that the lower bound of the confidence interval of the estimate for 'Any-part African American as a share of voting age population' overlaps slightly with the that of the upper bound of the confidence interval for 'White-alone non-Hispanic as a share of the voting-age population.'"); Trial Tr. vol. 5, 6:17–7:6 (Rodden testifying that "[w]e have this rule of thumb that we like to use where we look at the confidence intervals to see if they overlap. In this case they overlap slightly. So we cannot

say that they are not distinguishable, but I also cannot make the claim with great confidence that they are distinguishable."); *id.*, 154:2-21 (Rodden agreeing that relying on point estimates alone, without reporting confidence intervals, would not be consistent with peer-review standards in the field of political science); *see also generally* Trial Tr. vol. 1, 134:22–136:12 (Gordon describing why margins of error are very high for individual demographic groups within a jurisdiction, providing "no confidence as to what that number really is," and when those margins of error overlap, "the supposed difference between the numbers is completely swallowed by the margin of error as reported by ACS").

48. Moreover, the Black and white VAP estimates from the ACS are independent of one another, and it is not appropriate to assume that any sampling bias in the two numbers "will work in the same direction." Trial Tr. vol. 1, 175:15-20 (testimony of Colin Gordon). That is, if one were to discover that the ACS had, for example, underestimated the size of the Black VAP in the FFSD, one could not then conclude that it had underestimated the size of the white VAP because the ACS estimates for each figure are calculated independently from one another.

49. Given that (1) the Census Bureau has clearly stated the ACS is not to be used for population totals and population characteristics, including race, and (2) there are the enormous margins of error associated with the ACS estimates,[6] the most reliable measure of VAP-by-race in FFSD is the 2010 Decennial Census.

50. In light of this fact, and because (1) the ACS margins of error for the Black VAP do not establish to a degree of statistical certainty that the Black VAP of the FFSD has grown since the 2010 Decennial Census, and (2) the credible testimony of Dr. Gordon that the ACS

---

[6] The 327-person net discrepancy between the Census Bureau boundaries and the Board of Election boundaries, *see supra*, ¶ 25, creates an additional problem. The ACS data use the Census Bureau boundaries for population counts and, since they are based on a small sample rather than a complete count of census-block level data, there is no way to correct for that discrepancy. Trial Tr. vol. 1, 210:1–211:22 (testimony of William Cooper).

provides no basis for supporting a conclusion that African American are now a majority of the VAP in FFSD, *see* Trial Tr. vol. 1, 132:6-15, there is no basis for concluding that African Americans are now a majority of the VAP in FFSD.

### 3. The District's Population Estimates

#### a) *Manufacturing an AP Black VAP figure from the 2011–2013 ACS estimates*

51. Although the 2011–2013 ACS estimates do not include an estimate of the AP Black VAP, the District's expert Dr. Jonathan Rodden attempted to extrapolate that figure, which he estimated as 51.0% of the FFSD VAP. Deft-FFSD C, *Rodden Redistricting Rep.*, Tbl. 1 (p. 3).

52. Dr. Rodden's calculation of the AP Black percentage of the FFSD VAP is unreliable for several reasons.

53. First, Dr. Rodden misreports the total VAP of the FFSD as estimated by the 2011–2013 ACS, which leads him to inflate his calculation of the percentage of the VAP in FFSD that is Black. The 2011–2013 ACS estimates the total VAP for the District as 49,679, *see Joint Stip.* ¶ 28, but because Dr. Rodden excludes without explanation (or even any notice to readers) persons reporting two or more races, he underreports the total VAP of the District as 49,009. *See* Deft-FFSD C, *Rodden Redistricting Rep.*, ¶¶ 5-6, Tbl. 1 (p. 3). Using an incorrect figure for the total VAP of the District, Dr. Rodden then calculates the single-race Black VAP of the District as 49.6% (24,313 / 49,009) and the AP Black BVAP as 51.0% (24,994 / 49,009). But when the correct denominator is used for the total VAP of the District, the single-race Black VAP is 48.9% (24,313 / 49,679) and the any-part Black VAP (as estimated by Dr. Rodden) should be 50.3% (24,994 / 49,679). *See id.*; *Joint Stip.* ¶ 28.

54. Second, in extrapolating his estimate, Dr. Rodden assumed, without any basis, that the percentage of the VAP that is multiracial is equal to the percentage of the total population

that is multiracial, despite his testimony that the multiracial population tends to skew younger than the single-race population. *See* Trial Tr. vol. 5, 171:22–172:11 (testimony of Jonathan Rodden).

55. Third, and most importantly, Dr. Rodden did not and cannot report the margin of error for the estimate, *see* Deft-FFSD C, *Rodden Redistricting Rep.*, ¶ 7 ("I am not able to reproduce this process in order to estimate the margin of error"), despite his testimony that it is inconsistent with generally accepted political science practice to omit error margins. The omission is particularly problematic because the AP Black VAP is relatively small and the error margins for the ACS estimates that contribute to Dr. Rodden's estimate are exceedingly large. S*ee* Trial Tr. vol. 1, 136:5-12 (Gordon testifying that "t[he] margin of error grows larger the smaller the demographic unit you're talking about.  So—and this is particularly true when we make any effort to tease out how many African American identified voters are in the nonsingle-race category. There the number reported is in the hundreds, but the margin of error is also in the hundreds. So we really have no confidence as to what the number really is."); Trial Tr. vol. 5, 174:25–175:13 (Rodden testifying that "it was an oversight on my part not to include" the margin of error for the VAP in his report). And in fact, Dr. Rodden admits that it is impossible to produce an error margin at all under his methodology. *See* Trial Tr. vol. 5, 175:14-25 (Rodden testifying that "[w]hen one is adding together line items from the census and trying to create a number, it's not possible to produce a confidence interval").

56. Given these problems with Dr. Rodden's calculations, the estimates are unreliable.

   *b)* *Creating Linear Projections from Overlapping Three-Year ACS Estimates*

57. Dr. Rodden also created linear projections from the three-year ACS estimates. Dr. Rodden plotted the average population estimates from the midpoint year of four sets of ACS three-year estimates, 2008–2010, 2009–2011, 2010–2012, and 2011–2013, and extended that line

into 2015. Deft-FFSD A, *Rodden Rep.*, ¶¶ 12-13, Fig. 3 (p. 6) (claiming that the projection provides "a sense of the relevant voting age-populations in 2015"); *see also* Trial Tr. vol. 5, 160:2-7 (Rodden testifying that he discussed projections in his reports).

58. Multi-year ACS data is weighted and averaged over time, and thus "it cannot be used as a proxy for a point-in-time sample" and does not represent the midpoint or endpoint of that multiyear period. Trial Tr. vol. 1, 134:6-21 (testimony of Colin Gordon).

59. Nonetheless, based on the midpoints for the four available three-year estimates, Dr. Rodden drew a straight line, which he projected forward through 2015, in order to show that African Americans are now a majority of the District's VAP. Trial Tr. vol. 5, 8:3–13:17 (Rodden describing how he created Figure 3).

60. In justifying his technique, Dr. Rodden testified that "although the data move around up and down and it's hard to identify a trend," social scientists typically rely upon trends and that it is "acceptable among social scientists to use trending in forecasting." Trial Tr. vol. 5, 8:3-11, 10:12-17. Dr. Rodden's justification for using an ACS-based trend line to project the 2015 Black VAP is neither credible nor reliable because the trend line can be only as good as the input data, and those data (the ACS estimates) are plagued with infirmities when misused for this purpose, including (1) large margins of error, which get larger still for individual demographic categories within FFSD; (2) the fact that no error margins at all were published for certain population categories that Dr. Rodden relied upon; (3) the fact that predictions based on trend lines from prior years are highly speculative, PLTF-45, *Cooper Suppl. Decl.*, ¶ 12; and (4) Dr. Rodden's methodological decision to anchor his linear projection in the 2008–2010 ACS estimates, and his projections may have an entirely different slope had he

decided to draw the projection line with data beginning in a different year, ECF No. 85-26, *Dep. of Jonathan Rodden*, Aug. 20, 2015 ("*Rodden Dep.*"), 113:23−114:16.

61. Furthermore, Dr. Rodden's projections ignore the possibility of a demographic effect caused by intervening events in and around FFSD. *See, e.g.,* Trial Tr. vol. 1, 205:14-24 (Cooper testified that the Michael Brown incident in Ferguson "could have completely changed the trend line" and "[t]here's no way to know how that may affect future population changes in the school district."); *see also* PLTF-45, *Cooper Suppl. Decl.*, ¶ 12 ("Projections based on trend lines from prior years are highly speculative, particularly given the recent events in the Ferguson area."). Yet Dr. Rodden did not consider this recent occurrence or other practical factors in his projection.

62. Most importantly, Dr. Rodden's projections are unreliable because they extrapolate from two estimates that are not statistically different from each other. *See supra* ¶ 44. Dr. Rodden acknowledged that within the 2011−2013 ACS, the difference in the respective size of the Black and white VAPs is not statistically significant. *See supra* ¶ 47. Extending trend lines upwards and downwards from these estimates magnifies a difference he cannot say with confidence actually exists. Trial Tr. vol. 5, 6:8−7:6 (Dr. Rodden testifying "I . . . cannot make the claim with great confidence that they are distinguishable"); *see also* Trial Tr. vol. 1, 135:22−136:2 (Dr. Gordon testifying that when confidence intervals overlap, "[t]here is no basis for claiming that one number is bigger than the other because the supposed difference between the numbers is completely swallowed by the margin of error as reported by the ACS").

63. Given the problems with the ACS and Dr. Rodden's projections, there is no reliable data demonstrating that African Americans, either single-race or any-part, are now a majority of the VAP in FFSD.

### 4. Impediments to Voting Faced by African Americans in FFSD

64. The population that can vote in any given election is a subset of the VAP, because the VAP includes some individuals who are old enough to vote, but who cannot vote for some other reason. *See, e.g.*, Trial Tr. vol. 1, 136:23–141:13 (testimony of Colin Gordon); PLTF-41, *Gordon Resp.*, at 2. Based on several factors discussed *infra*, there are reasons to believe that, among the VAP in the District, a lower percentage of Black residents is actually eligible to vote, as compared to white residents.

### a) *Felony Disenfranchisement*

65. In Missouri, individuals who are part of the VAP but who are imprisoned, or who are on probation or parole as part of their sentence for commission of a felony, are not eligible to vote. Trial Tr. vol. 1, 136:23–141:13 (testimony of Colin Gordon); PLTF-41, *Gordon Resp.*, at 2; *see also* Mo. Rev. Stat. §§ 115.133, 115.195; 561.026; Mo. Const. art. 8, § 2.

66. About one-third of the approximately 106,000 Missourians who have lost the right to vote are serving a sentence in a state prison. The remaining more than two-thirds, or 75,000, are held in local jail, or have returned to their home communities on probation or parole. Trial Tr. vol. 1, 163:21–164:2 (testimony of Colin Gordon).

67. In Missouri, the rate of felony disenfranchisement for the population as a whole is 2.32% of VAP. The rate of felony disenfranchisement for the African-American population is approximately triple the overall statewide rate, at 6.88% of the Black VAP. Trial Tr. vol. 1, 139:10-17 (testimony of Colin Gordon); PLTF-41, *Gordon Resp.*, at 2.

68. African Americans of voting age in Missouri are disproportionately affected by felony

disenfranchisement. Trial Tr. vol. 1, 136:23–141:11 (testimony of Colin Gordon); Trial Tr. vol. 3, 40:6-8 (testimony of David Kimball); Trial Tr. vol. 4, 91:7-11 (testimony of Redditt Hudson).

69. Dr. Colin Gordon, a historian and tenured professor, testified on behalf of Plaintiffs on several issues, including the effect of felony disenfranchisement in FFSD. Dr. Gordon is nationally recognized as an expert in urban history, specifically in the history of development, decline, residential patterns, and segregation in St. Louis metropolitan area. *See* Trial Tr. vol. 1, 94:15-23 (no objection to Gordon admission as expert); PLTF-40, Colin Gordon, *Segregation and Uneven Development in Greater St. Louis, St. Louis County, and the Ferguson-Florissant School District*, May 26, 2015 ("*Gordon Rep.*"), at 62 (Gordon CV); PLTF-42, Colin Gordon, *Mapping Decline: St. Louis and the Fate of the American City* (U. of Penn. Press 2008) (book-length monograph on the history of the St. Louis metropolitan area combining archival research and local resources with data on urban-renewal policies, zoning practices and policies, socioeconomic characteristics and disparities of the populations, and Geographic Information System mapping); Trial Tr. vol. 1, 87:4–94:23 (Gordon discussing qualifications and work related to St. Louis since 2008).

70. Dr. Gordon testified that, although there is no reported data specific to FFSD showing the number of individuals by race who are part of the VAP but who have lost the right to vote due to a criminal conviction, *see* Trial Tr. vol. 1, 138:3-4, 165:1-6 (testimony of Colin Gordon), one can reasonably conclude that, in the FFSD, African Americans are disenfranchised due to a criminal conviction at higher rates than whites.

71. Dr. Gordon noted the large racial disparities statewide in felony disenfranchisement rates, and also noted that felony disenfranchisement rates are generally higher in urban areas than

elsewhere, and opined that, "given what we know about patterns of policing in North County in the wake of the Department of Justice report after Ferguson, . . . an application of the [statewide] African-American rate [of disenfranchisement] to voting-eligible African Americans in Ferguson-Florissant would be a conservative estimate of the rate of disenfranchisement [among African Americans there]." Trial Tr. vol. 1, 138:5-19 (also noting that the rate of felony disenfranchisement among non-Hispanic whites is actually *lower* than the rate among the population as a whole, so the disparate impact in FFSD may be higher than estimated).

72. The Court finds Dr. Gordon's testimony credible and concludes that African Americans in FFSD are disproportionately affected by felony disenfranchisement as compared to non-Hispanic whites.

### b) *Voter registration*

73. In Missouri, individuals who are part of the VAP but who fail to register by the operative election registration deadline—which is 27 days before a given election—cannot vote in that election. Mo. Rev. Stat. §§ 115.135, 115.139; Mo. Const. art. 8, § 2; *Marre v. Reed*, 775 S.W.2d 951, 955-56 (Mo. banc 1989).

74. In Missouri, individuals who are part of the VAP and who are registered to vote, but who then move from one jurisdiction to another before an election registration deadline, cannot vote in that election unless they re-register at their new address before that deadline. *See* Mo. Rev. Stat. §§ 115.275, 115.277, 115.135; Mo. Const. art. 8, § 2.

75. In Missouri, individuals who are part of the VAP but who move *within* a jurisdiction can change their address on Election Day, but only at their new polling place or the central polling location of the county, and not at their old polling place. Mo. Rev. Stat. §§ 115.135.1-3, 115.165.

76. In Missouri, individuals who move from one jurisdiction to another after an election registration deadline cannot vote for local offices in that election. Mo. Rev. Stat. §§ 115.275.4, 115.277.4.

77. Dr. David Kimball, a tenured political science professor at the University of Missouri-St. Louis, testified on behalf of the plaintiffs. He has significant and relevant expertise in American politics, specifically voting behavior, public opinion, research methods, and state and local elections. *See* Trial Tr. vol. 2, 110:15-24; *see generally id.*, 106:4–110:24.

78. The state of Missouri does not maintain registration data by race, but there was undisputed evidence from the Census Bureau that single-race African Americans in Missouri register to vote at a lower rate (67.1%) than non-Hispanic whites (72.2%). PLTF-63, *Reported Voting and Registration, by Sex, Race, and Hispanic Origin, for States (Nov. 2014) (Ex. 5 to Dep. of Jonathan Rodden, Aug. 20, 2015)*, at 7; *see* Trial Tr. vol. 2, 119:14-18 (testimony of David Kimball);[7] Trial Tr. vol. 3, 41:6-10 (same); Trial Tr. vol. 5, 71:1-4 (testimony of Jonathan Rodden that "registration varies across race in Missouri, and, of course, we know that's true"); Trial Tr. vol. 5, 147:12-16 (Rodden testifying that he believes whites' registration rate in Missouri exceeds African Americans' registration rate in Missouri by about 5 percentage points); Trial Tr. vol. 4, 89:13–91:11 (Redditt Hudson testifying about his work as a regional field organizer with the NAACP and stating that "historically in many black communities voter registration has been low").

79. The Court finds that African Americans in Missouri register to vote at a rate lower than non-

---

[7] Kimball testified to citizen voting-age population ("CVAP") registration rates by race, not voting-age population ("VAP") registration rates by race. *See* Trial Tr. vol. 2, 116:20–117:15. The figures are similar for single-race African Americans and non-Hispanic whites under both measures; the VAP rates as reported above are 67.1 percent and 72.2 percent, respectively, while the CVAP rates are 67.9 percent and 73.1 percent, respectively. *See id.*; PLTF-63, *Reported Voting and Registration, by Sex, Race, and Hispanic Origin, for States (Nov. 2014) (Ex. 5 to Dep. of Jonathan Rodden, Aug. 20, 2015)*, at 6.

Hispanic whites. There are no statistics about the voter-registration gap in FFSD, but there is no credible evidence to suggest that gap disappears. As described *infra* Section IV.B, FFSD experiences substantial racial disparities along a range of socioeconomic factors. These disparities tend to correlate with lower registration rates, a proposition with which the District's own expert concurred. *See* Trial Tr. vol. 5, 117:14–118:1 (testimony of Jonathan Rodden agreeing that people who live in poverty, have less education, and are younger are less likely to become registered to vote). Accordingly, the Court finds that African Americans in FFSD register to vote at a rate lower than non-Hispanic whites.

### c) *Homeownership*

80. Homeownership is a strong predictor of voting in local elections. Trial Tr. vol. 2, 147:17-24 (testimony of David Kimball).

81. Within FFSD, African Americans own their homes at a significantly lower rate than whites. Trial Tr. vol. 1, 173:7-11 (testimony of Colin Gordon). In FFSD, the homeownership rate among Black residents (50.7%) is more than 30 percentage points lower than the homeownership rate among whites (82.8%). Trial Tr. vol. 1, 174:7-9, 176:11-13 (testimony of Colin Gordon); *see also* PLTF-45, *Cooper Suppl. Decl.*, ¶ 17 (reporting that the FFSD African-American homeownership rate as estimated by ACS has dropped from 61% to 50.7% since the 2005–2007 ACS).

82. Dr. Gordon testified that individuals who do not own their homes experience residential instability and move more frequently than homeowners. *See supra* ¶ 78; Trial Tr. vol. 4, 90:10–91:11 (Hudson testifying that the transience of African Americans in many municipalities is a hurdle in front of black voters when it comes to registering to vote).

83. Based on the undisputed discrepancy in the homeownership rate, Dr. Gordon's credible and undisputed testimony about residential patterns, and Dr. Kimball's testimony about the costs

of voting, as well as state residency rules often requiring voters to re-register when a person changes address, the Court finds that, within FFSD, African Americans are a more transitional population than whites and that characteristic has a negative impact on their voter registration and turnout.

84. Although the most reliable measure of VAP-by-race in FFSD, *i.e.*, the 2010 Decennial Census, *see supra* ¶ 28, shows that African Americans are not a majority of the VAP, the Court finds that even if African Americans were a bare numerical majority of the VAP (50.3% of the VAP, according to Dr. Rodden's estimate of the AP Black VAP, *see supra* ¶ 53),[8] they would not be a majority of *voters* in FFSD, given that impediments to registering to vote and voting—including felony disenfranchisement, poverty, and transience—fall disproportionately on African Americans in FFSD.

## II. *GINGLES* I

85. Mr. William Cooper, Plaintiffs' expert demographer, testified at trial. Since 1986, Mr. Cooper has prepared redistricting plans for approximately 700 jurisdictions. PLTF-44, *Cooper Decl.*, at Ex. A (Summary of Redistricting Work); *see* Trial Tr. vol. 1, 179:23–180:3 (testimony of William Cooper that he has drawn statewide plans in approximately forty states, but his main focus is on local jurisdictions). Since 2011, he has prepared more than 150 redistricting plans for local jurisdictions using the 2010 Decennial Census. PLTF-44, *Cooper Decl.*, at Ex. A (Summary of Redistricting Work).

86. His election plans have been precleared and/or adopted in state or local jurisdictions on at least 10 occasions. *Id.* Illustrative or proposed plans created by Mr. Cooper have also been ordered adopted as Section 2 remedies by the District of South Dakota in *Bone Shirt v.*

---

[8] The 50.3% figure reflects the complete VAP as estimated by the ACS, not the reduced VAP as reported by Dr. Rodden. *See supra* ¶ 53; Deft-FFSD C, *Rodden Redistricting Rep.* ¶¶ 5-6, Tbl. 1 (p. 3); *Joint Stip.* ¶ 28.

*Hazeltine*, 387 F. Supp. 2d 1035 (D.S.D. 2005), *aff'd*, 461 F.3d 1011 (8th Cir. 2006), and by

the Eastern District of Washington in *Montes v. City of Yakima*, No. 12-CV-3108 TOR (E.D.

Wash. Feb. 17, 2015), ECF No. 143.

87. Over the course of his career, Mr. Cooper has testified at trial as an expert witness on
redistricting and demographics in 36 federal voting rights cases and been deposed or entered
declarations in an additional 33 voting rights cases. PLTF-44, *Cooper Decl.*, at Ex. A
(Summary of Redistricting Work).   He has never been deemed not qualified as an expert.
Trial Tr. vol. 1, 181:3-5. Mr. Cooper is a well-qualified expert in redistricting and
demographics.

88. Mr. Cooper, drew two illustrative seven-district plans to show that it is possible to create at
least one subdistrict in which African Americans are a majority of the VAP. *Joint Stip.* ¶ 36;
PLTF-44, *Cooper Decl.*, ¶¶ 38-57.

89. In each of the two illustrative plans drawn by Mr. Cooper, there are four districts in which
Blacks are a majority of the VAP. PLTF-44, *Cooper Decl.*, ¶¶ 38-57.

90. Mr. Cooper used generally accepted demographic methods for creating the two illustrative
plans. *See Joint Stip.* ¶¶ 37, 39, 40, 44, 45, 47; PLTF-44, *Cooper Decl.*, ¶¶ 38, 39-42, 43-46,
51, Fig. 10 (p. 23), 55, Fig. 12 (p. 26); Trial Tr. vol. 1, 181:16–185:8, 188:9-12 (Cooper
describing process for creating illustrative plans).

91. For each of Plaintiffs' illustrative plans, all parts (*i.e.*, census blocks) of each component
election district are connected at some point with the rest of the district, so the each
component district is contiguous. *Joint Stip.* ¶ 49; PLTF-44, *Cooper Decl.*, ¶ 60; Trial Tr.
vol. 1, 182:3-4 (Cooper describing what a "census block" is); *id.*, 127:8-10 (Gordon
confirming definition of "census block").

92. The "compactness" of a district can be measured using the Reock test, which compares the shape of a district to a circle, considered to be the most compact shape possible. The illustrative plans' Reock scores show the component election districts are compact. PLTF-44, *Cooper Decl.*, ¶ 58 n.11 ("The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan." (quoting *Maptitude for Redistricting* documentation)); Trial Tr. vol. 1, 195:7-20 (Cooper testifying about the Reock scores for the districts in illustrative plan 1); *see also* PLTF-44, *Cooper Decl.*, ¶¶ 58-59.

93. In Plaintiffs' Illustrative Plan 1, three of the 96 precincts in the District are split by district boundaries with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to five schools. Based on the addresses, at the time of election, of the individuals who were Board members at the time of trial, PLTF-44, *Cooper Decl.*, at Ex. E-7, Ex. F-7 (addresses), three incumbents are paired in District 2 and two in District 7. *Joint Stip.* ¶ 46; PLTF-44, *Cooper Decl.*, ¶¶ 51-53; Trial Tr. vol. 1, 193:13-14, 195:2-6, 199:3-6, 199:23–200:5 (Cooper describing these features).

94. In Plaintiffs' Illustrative Plan 2, nine of the 96 precincts in the School District are split by district boundaries with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to four schools. Based on the addresses, at the time of election,

of the individuals who were Board members at the time of trial, PLTF-44, *Cooper Decl.*, at Ex. E-7, Ex. F-7 (addresses), two incumbents who reside in District 2 are paired, but no other incumbents are paired. *Joint Stip.* ¶ 48; PLTF-44, *Cooper Decl.*, ¶¶ 55-57. Because two incumbents live within the same Census block, there is no way to draw single-member districts that will separate those incumbents while also complying with traditional redistricting principles. *See* Trial Tr. vol. 1, 197:4-11.

95. Plaintiffs' illustrative plans use the 2010 Decennial Census total population for the apportionment base. *See Joint Stip.* ¶ 43; PLTF-44, *Cooper Decl.* ¶ 40.

96. Mr. Cooper's testimony that illustrative plans must be drawn from the Decennial Census data, rather than the ACS estimates, was credible because it is undisputed that only the Decennial Census data goes down to the census block level. Because the ACS does not report census block-level data, it does not allow a demographer to avoid splitting census blocks, making it is impossible to measure precisely the population in a given voting district. *See* Trial Tr. vol. 1, 200:2-5, 203:5–204:17 (testimony of William Cooper that "you cannot use the American Community Survey for redistricting purposes because it's only available down to the block group level, which is not enough granularity, really, to develop redistricting plans at the local level, where often you need to go down to the block level to follow precinct lines"); *see also supra*, nn.2-3; Mo. Rev. Stat. § 1.100.1; Trial Tr. vol. 1, 192:17–194:25 (Cooper describing ideal population size for a district in FFSD).

97. The addresses of the individuals who were members of the Board at the time of trial are all within Ferguson and Florissant, *see* PLTF-44, *Cooper Decl.*, at Ex. E-7, Ex. F-7, which together make up about two-thirds of the District spatially, Trial Tr. vol. 1, 197:21-198:3 (testimony of William Cooper). It is undisputed that no current Board member resided in

Berkeley, Kinloch, Cool Valley, Normandy, or the other municipalities within FFSD. *See* Trial Tr. vol. 1, 198:1-7 (testimony of William Cooper).

## III. *GINGLES* II AND *GINGLES* III

98. Plaintiffs' expert Dr. Richard Engstrom is a political science professor and social science researcher at Duke University with thirty years of experience related to electoral systems and minority electoral participation. He is one of the nation's leading scholars in political science on the study of racially polarized voting, electoral systems, and vote dilution. *See Joint Stip.* ¶ 56; Trial Tr. vol. 5, 86:13-20 (Rodden testifying that he would describe Engstrom this way); Trial Tr. vol. 4, 5:4–10:3 (Engstrom describing his qualifications). Dr. Engstrom has published a peer-reviewed book on minority politics and election systems, and many peer-reviewed articles on the structure of electoral contests. *See* PLTF-52, *Engstrom Rep.*, at Appendix (CV). Dr. Engstrom has testified at trial or in depositions in approximately one hundred Voting Rights Act cases, including as a court-appointed expert, a special master, and on behalf of both plaintiffs and defendants, and he has never been deemed not qualified as an expert. *See* Trial Tr. vol. 4, 5:6–9:22 (Engstrom describing his qualifications).

99. Dr. Engstrom is an expert in electoral systems, minority politics, racial polarization analysis, and statistical methods related to racial polarization analysis. More specifically, he is a nationally recognized expert in the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice. Trial Tr. vol. 4, 6:21-25, 9:23–10:3 (Engstrom admitted as expert in these areas without objection).

### A. Ecological Inference Analysis

100. From 2000 through 2015, there have been twelve contested Board elections. *Joint Stip.* ¶ 53.

101. By statute, where the number of candidates who have filed for a Board election equals the

number of seats to be elected, no election is held, and the candidates automatically assume Board member responsibilities. From 2000 through 2015, there were four such non-elections (2005, 2007, 2008, 2010). *Joint Stip.* ¶ 54; Mo. Rev. Stat. § 115.124.1.

102.    Dr. Engstrom analyzed FFSD Board elections using Gary King's Ecological Inference ("EI") procedure for the 2011 through 2015 elections. *Joint Stip.* ¶ 56; PLTF-52, *Engstrom Rep.*, ¶¶ 15-39, Tbl. 1 (pp. 17-19); PLTF-53, *Rebuttal Report of Richard L. Engstrom*, July 2, 2015 ("*Engstrom Rebuttal*"), Tbls. 1-5 (pp. 10-13).

103.    Dr. Engstrom focused on the 2011 to 2015 elections because he wanted to analyze at least two three-vote, three-seat elections and because the four-year period immediately preceding 2011 saw no contested interracial elections. In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court found an analysis of three elections to be sufficient. *See also* Trial Tr. vol. 4, 17:5–18:4 (testimony of Richard Engstrom). Like the Court did in *Gingles*, Dr. Engstrom focused on endogenous interracial contested elections.

104.    For each of the past twelve contested Board elections, the District's expert, Dr. Rodden, used EI to estimate the level of support for each candidate among Black and white voters. *Joint Stip.* ¶ 55; *see also* Trial Tr. vol. 4, 11:15-25 (Engstrom description of EI); Trial Tr. vol. 5, 36:22–37:5 (Rodden agreement with Engstrom description of EI).

105.    EI is used widely by expert witnesses in assessing racially polarized voting ("RPV") in voting rights cases. It is used to estimate the true value of the percentage of votes African-American voters cast for a particular candidate. It was developed subsequent to the U.S. Supreme Court's 1986 decision in *Gingles* for the explicit purpose of improving estimates of candidate preferences between or among groups of voters. *See Joint Stip.* ¶ 59; PLTF-52, *Engstrom Rep.*, ¶ 10 n.4; *see also* Trial Tr. vol. 4, 11:15-25 (Engstrom describing

development of EI); Trial Tr. vol. 5, 37:2-5 (Rodden describing same).

106. Although EI is a superior tool for racial polarization analysis, homogenous-precinct analysis, which examines a small number of highly segregated precincts, can be used to confirm the existence and extent of RPV. Trial Tr. vol. 4, 12:15-21 (testimony of Richard Engstrom that "to determine whether it was racially polarized, I did an analysis using homogenous precincts. And if there's any conflict, I would rely on ecological inference. I think it is by far the superior methodology. But homogeneous precinct is another kind of methodology, and so I sought to show basically what I expected, that . . . you're going to find [the polarization in FFSD] whatever methodology you rely on."); *see also* Trial Tr. vol. 3, 36:1-15 (testimony of David Kimball that in a precinct with a roughly even number of Black and white residents, "the same aggregate outcome could be generated by extreme racially polarized voting or no racially polarized voting at all," so "it's helpful to supplement the ecological inference analysis with the homogeneous precincts analysis because the advantage of the homogeneous precincts is you're just looking at—you're comparing precincts that are heavily white to precincts that are heavily African American, and you're more certain about the voting behavior of white candidates in heavily white voting precincts and the African-American candidates in the heavily African-American precincts."); Trial Tr. vol. 2, 127:17–130:8 (Kimball describing the advantages and disadvantages of both analytical methods).

107. EI provides estimates of the true value of a group's support of a candidate, *i.e.*, the actual percent of votes cast by African American voters for a candidate. This estimate is expressed in terms of a point estimate and confidence interval. Trial Tr. vol. 4, 14:1–15:23 (testimony of Richard Engstrom).

108. The point estimate is the value that is closest to the true value as one can get with the

data, or statistically the best estimate of true value. Trial Tr. vol. 4 14:24–15:10 (testimony of Richard Engstrom).

109. The confidence interval is a measure of uncertainty. Trial Tr. vol. 4, 14:11–15:23 (testimony of Richard Engstrom). It provides a range of estimates around the point estimate so that political scientists can establish with 95% confidence that the true value (the candidates' level of support) is within that range. *Joint Stip.* ¶ 57; PLTF-52, *Engstrom Rep.*, ¶ 10; Tr. vol. 4, 14:13-23 (testimony of Richard Engstrom).

110. A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally accepted standards for EI in the field of political science, and is consistent with peer-review standards for research in that field. *Joint Stip.* ¶ 58; Trial Tr. vol. 4, 14:13-23, 15:24–16:1 (testimony of Richard Engstrom); Trial Tr. vol. 5, 151:13-16 (testimony of Jonathan Rodden); *see also* PLTF-52, *Engstrom Rep.*, ¶¶ 10, 14 (using 95-percent confidence intervals); *see also generally* Deft-FFSD A, *Rodden Rep.* (using 95-percent confidence intervals).

111. EI estimates must include a confidence interval to determine whether the difference in the estimated support among candidates can be considered statistically significant. Trial Tr. vol. 4, 16:2-12 (testimony of Richard Engstrom); Trial Tr. vol. 5, 154:2-21 (testimony of Jonathan Rodden) (standard practice in political science to report confidence intervals).

112. As a "rule of thumb," when the point estimate for the level of support for one candidate lies within the confidence interval of support for another candidate, one cannot say that there is a statistically significant difference between the two candidates. *See* Trial Tr. vol. 4, 18:8–17, 19:4-16 (testimony of Richard Engstrom); Trial Tr. vol. 5, 154:2-11 (testimony of Jonathan Rodden).

### B. Plaintiffs' Evidence Concerning *Gingles* II and *Gingles* III Is Reliable and Establishes the Presence of Racially Polarized Voting

113.  The parties' experts agreed that in FFSD Board elections, African Americans were more likely to vote for African-American candidates and whites were more likely to vote for white candidates for the past sixteen years. Deft-FFSD B, *Supplemental Report of Jonathan Rodden: Racial Bloc Voting and Cohesion*, July 2, 2015 ("*Rodden Bloc Voting Rep.*"), at ¶ 2; Trial Tr. vol. 4, 19:17–20:10 (testimony of Richard Engstrom); *see also Dep. of Jowei Chen*, Aug. 19, 2015 ("*Chen Dep.*," previously filed as ECF No. 85-25), at 54:23–56:3; PLTF-52, *Engstrom Rep.*, ¶ 43 (regarding 2011–2015) ("African Americans have clearly shown, through their voting behavior, a preference to be represented on that Board by African American candidates, while non-African Americans have clearly shown, through their voting behavior, a preference to be represented by candidates that are not African American.").

114.  The parties' experts, both using EI analysis, did not materially disagree as to the various levels of support each Board candidate received among different racial groups in each of the elections in 2011–2015, and report consistent estimates of the respective levels of support received by the candidates from Black and white voters. *Joint Stip.* ¶ 60; *see* PLTF-53, *Engstrom Rebuttal*, ¶¶ 3-4, Tbls. 1-5 (pp. 10-13).

115.  Dr. Engstrom applied a case-by-case method for identifying candidates of choice of Black voters. For each election, Dr. Engstrom applied three primary principles: *First*, Dr. Engstrom considered statistically significant differences in levels of support for the candidates in characterizing a second- or third-place finisher among Black voters as a Black candidate of choice. PLTF-52, *Engstrom Rep.*, ¶ 16 (2011); ¶ 20 (2012), ¶ 24 (2013); ¶ 28 (2014); ¶ 34 (2015); *see also* ¶ 17 (statistical significance in 2011); ¶ 20 (statistical significance in 2012); ¶ 28 (statistical significance in 2014); ¶ 34 (statistical significance in

2015).  When the point estimate of one candidate is within the confidence interval of the other, Dr. Engstrom testified that one cannot determine which candidate received a higher level of support. *See* Trial Tr. vol. 4, 16:2-12 (Engstrom testimony).  *Second*, a second- or third-choice candidate is not necessarily minority-preferred if that candidate received significantly less support than the top-choice candidate. *See, e.g.*, Trial Tr. vol. 4, 18:5-21, 19:4-6; *see also id.* 26:2-20 (Engstrom testimony).  Dr. Engstrom testified that Black voters' second- or third-most-favored candidate should be deemed a candidate of choice only if he or she had at least approximately two-thirds of the support of the most-favored candidate. *See, e.g.*, *NAACP v. City of Thomasville*, 401 F. Supp. 2d 489, 498 & n.3 (M.D.N.C. 2005). *Third*, Dr. Engstrom also testified that, where the clear first-choice candidate among African-American voters is an African-American candidate who has lost, courts should be skeptical of attempts to characterize a winning white candidate as a candidate of choice of minority voters, particularly where Black voters show a preference for candidates within their racial group. Trial Tr. Vol. 4, 19:20–20:15 (testimony of Richard Engstrom); *id.*, 30:12-23 (Engstrom testifying to Black voters' preference in 2012); *id.*, 33:13-22 (Engstrom testifying to Black voters' preferences in 2013).

116.    Dr. Engstrom identified eight candidates preferred by Black voters between 2011 and 2015. Dr. Engstrom testified credibly that the case-by-case method for identifying Black-preferred candidates was superior to each of the methods proposed by Dr. Rodden, *see infra* Sections III.B, III.C, in identifying Black voters' preferred-candidates in FFSD elections.

117.    In addition, Dr. Engstrom testified credibly that there was not much crossover voting: white voters did not often support Black-preferred candidates and Black voters did not often support white-preferred candidates. *See, e.g.*, Trial Tr. vol. 4, 28:5-10 (2012 election), 32:9-

14 (2013 election); 35:24–36:5 (2014 election), 54:12-19 (2015 election), 64:13-20 (overall). Under Dr. Engstrom's case-by-case analysis, in the past five years, two out of eight Black-preferred candidates were successful (25%). Analyzing the older, less probative elections (described below) shows a similar pattern: the rates of success of Black-preferred candidates since 2000 were bad and got worse. In the past sixteen years, seven out of nineteen Black-preferred candidates (36.8%) in contested elections were successful. In the past decade, four out of twelve Black-preferred candidates were successful (33.3%). Excluding the monoracial election (2009) exacerbates the trend.

118. Dr. Engstrom's testimony that white bloc voting usually vetoed Black voters' choices since 2011 (with six out of eight Black-preferred candidates defeated during that time period) was credible and persuasive. *See, e.g.*, Trial Tr. vol. 4, 42:5-25 (Engstrom testimony); *see also id.* 46:11-17 (Engstrom rebutting Rodden's assertions); PLTF-52, *Engstrom Rep.*, ¶ 45 (explaining that "not only did the non-African American voters not share the preference for these African American candidates [preferred by Black voters], they usually vetoed their elections," such that few Black-preferred candidates were successfully elected between 2011 and 2015); *see also* PLTF-53, *Engstrom Rebuttal*, ¶¶ 5, 18; Trial Tr. vol. 4, 25:18-23 (white voters' support for Black-preferred candidates was minimal in 2011); *id.*, 28:17-24 (white voters, as a bloc, defeated the Black-preferred candidate in 2012); *id.*, 32:9-18 (white voters' support for sole Black-preferred candidate in 2013 was "small"); *id.*, 36:9-14 (white voters, as a bloc, defeated two of the three Black-preferred candidates in 2014 because crossover voting was "[m]inimal, "minimal," "minimal").

119. Black voters, like white voters, are not required to cast all of the votes to which they are entitled. But voters cannot be required to single-shot vote. Trial Tr. vol. 4, 46:23–47:23

(rejecting the idea that Black voters should be able to elect a single Black-preferred candidate if they just withheld the rest of their franchise, and testifying that, "[i]f that's the way [Black voters] have to win an election in the Ferguson-Florissant School District, then I would certainly say that that's not an opportunity equal to that of other members of the electorate, because they don't have to single-shot vote in order to elect a candidate of their preference"); *id.*, 74:10–75:18 (rejecting the idea that either Black or white voters, or Black-preferred or white-preferred candidates, should have to coordinate to determine who and how many people should run in an election in order to have an equal opportunity to be successfully elected); Trial Tr. vol. 2, 161:12–162:22 (Kimball testifying that increasing African American bullet voting is not "a very satisfactory long-term solution" and "would take a lot of efforts, a lot of coordination," which would increase the costs of voting as measured by the calculus of voting without any guarantee "to prevent white voters from engaging in bullet voting to negate the effect of African-American voters engaging in bullet voting," and "if you're only supporting one candidate and not using your full franchise, you're not seeing the full benefits of voting, particularly if there are other candidates that you also like").

### 1. Elections by Year

120.    In the following section, the Court has identified candidates of choice based on Dr. Engstrom's case-by-case approach. Each of the elections held since 2011 is described briefly below. For contested elections, tables are provided that identify each candidate's name, race, total number of votes received, and level of support (the "point estimate") among Black and white voters with confidence intervals for each estimate as calculated by Dr. Engstrom and Dr. Rodden, and the winning candidates. Percentages reported are the percentage of *votes* received by a candidate from each group, not the percentage of *voters* supporting from each

group supporting each candidate.[9] *Joint Stip.* ¶ 61; *see* Deft-FFSD A, *Rodden Rep.*, ¶ 45, Fig. 8 (p. 25); PLTF-67, *Underlying Data for Fig. 8 in Rodden Report (Ex. 10 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; PLTF-68, *Rodden's Underlying Data Reformatted (Ex. 11 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; PLTF-52, *Engstrom Rep.*, ¶¶ 15-39, Tbl. 1 (pp. 17-19); PLTF-53, *Engstrom Rebuttal*, Tbls. 1-5 (pp. 10-13).

### a) *The 2011 Election*

121. In 2011, nine candidates (incumbents Graham, Clark, and Lentz and six challengers, Chris Martinez, Paul Morris, Robert Chabot, Vanessa Hawkins, Brian Scott Ebert, and Joseph Hosea) ran for three seats. *Joint Stip.* ¶ 118. Martinez, a white-Hispanic candidate, and Chabot and P. Morris, both white, were successful. *Joint Stip.* ¶¶ 118-119; PLTF-53, *Engstrom Rebuttal*, ¶ 9 n.5; PLTF-8, *Official 2011 FFSD Election Results*.

122. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2011 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Chabot* (W) 3,080 votes | 7.31% (5.33 – 11.04%) | 7.1% (4.6 – 9.6%) | 14.05% (11.68 – 17.01%) | 15.6% (13.4% – 18.3%) |
| Clark (W) (incumbent) 2,257 votes | 12.58% (10.33 – 14.42%) | 13.5% (11.2 – 16.1%) | 8.92% (7.96 – 9.97%) | 8.0% (6.5 – 9.3%) |
| Ebert (W) 2,667 votes | 7.45% (4.86 – 10.40%) | 7.9% (5.4 – 11.3%) | 13.61% (11.19 – 16.12%) | 14.1% (11.6 – 16.2%) |
| Graham (B) (incumbent) 2,795 votes | 21.95% (16.32 – 28.80%) | 24.1% (21.0 – 27.0%) | 9.04% (7.76 – 10.43%) | 6.1% (4.3 – 7.7%) |
| Hawkins (B) 2,890 votes | 21.87% (14.10 – 30.46%) | 21.5% (17.2 – 25.5%) | 9.20% (7.52 – 10.68%) | 7.4% (5.4 – 9.4%) |
| Hosea (W) 566 votes | 6.88% (6.18 – 7.80%) | 3.2% (2.8 – 3.5%) | 2.91% (2.65 – 3.21%) | 3.1% (2.8 – 3.5%) |

---

[9] In an at-large district, counting <u>votes</u> versus <u>voters</u> makes a difference. For example, take a jurisdiction with two voters who each cast both votes they have available. A candidate who receives the support of both voters will tally only half (2) of the voters' combined four votes.

| | | | | |
|---|---|---|---|---|
| Lentz (W) (incumbent) 1,027 votes | 7.58% (6.38 – 9.20%) | 4.7% (3.1 – 7.6%) | 4.49% (3.76 – 5.38%) | 4.5% (3.2 – 5.7%) |
| Martinez* (W-H) 4,598 votes | 5.93% (4.60 – 8.17%) | 8.6% (7.0 – 10.6%) | 22.97% (19.58 – 25.63%) | 24.9% (23.7 – 25.9%) |
| P. Morris* (W) 3,305 votes | 8.44% (6.62 – 11.00%) | 9.3% (7.6 – 11.4%) | 14.79% (12.46 – 17.03%) | 16.1% (14.4 – 18.1%) |

\* Indicates winner

*Joint Stip.* ¶ 119.

123.    Because this was a three-seat election, the highest percentage of votes that any candidate could receive in absence of bullet voting is 33%.

124.    Graham received the highest estimated level of support, and Hawkins the second-highest estimated level of support, among Black voters in the 2011 election (24.1% and 21.5%, respectively, according to Engstrom). *Joint Stip.* ¶¶ 119-21. Each of them received cohesive support from Black voters. Trial Tr. vol. 4, 24:25–26:1 (testimony of Richard Engstrom).

125.    Although Clark received the third-highest estimated level of support among Black voters, *Joint Stip.* ¶ 120, his percentage of the Black vote (13.5% according to Engstrom) was substantially lower, and statistically significantly lower than the estimated level of support for Graham or Hawkins. Trial Tr. vol. 4, 26:17-20 (testimony of Richard Engstrom that "[t]here's no cohesive vote for Clark. He may come in third, but that doesn't mean he—I wouldn't call him a black-preferred candidate. He's so far behind the two leading candidates among black voters.").

126.    Graham and Hawkins together received an estimated 45.6% of the total <u>votes</u> cast by African Americans in a race with nine candidates. *Joint Stip.* ¶ 119.

127.    Graham and Hawkins, who are Black, were the only Black-preferred candidates in 2011. Based on the level of support he received, Clark, who is white, was not a Black-preferred candidate. Trial Tr. vol. 4, 25:24–26:7 (testimony of Richard Engstrom).

128. Graham and Hawkins received minimal support from white voters. *See* Trial Tr. vol. 4, 25:18-23 (Engstrom testifying that white crossover voting for Black-preferred candidates in 2011 was "minimal," at 6.1% for Graham and 7.4% for Hawkins).

129. Neither Graham nor Hawkins was elected to one of the three available seats on the Board in 2011. *Joint Stip.* ¶ 123.

### b) The 2012 Election

130. In 2012, three candidates (incumbent Schroeder and two challengers, Ebert and Barbara Morris) ran for two seats. Ebert and Schroeder, both white candidates, were successful. *Joint Stip.* ¶ 129.

131. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2012 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Ebert* (W) 2,809 votes | 23.09% (16.64 – 28.70%) | 23.1% (18.1 – 28.2%) | 46.93% (39.08 – 53.79%) | 46.3% (43.8 – 48.5%) |
| B. Morris (B) 1,988 votes | 51.33% (34.94 – 75.04%) | 51.9% (45.7 – 58.4%) | 12.01% (6.96 – 17.76%) | 12.8% (10.1 – 15.6%) |
| Schroeder* (W) (incumbent) 2,566 votes | 25.58% (15.90 – 36.68%) | 25.0% (19.8 – 29.9%) | 41.05% (33.88 – 47.71%) | 40.9% (38.7 – 43.5%) |

\* Indicates winner

*Joint Stip.* ¶ 130.

132. Because this was a two-seat election, the highest percentage of votes that any candidate could receive in absence of bullet voting is 50%.

133. B. Morris, who was the lone Black candidate, was the top-ranked candidate among Black voters, and received the highest-estimated level of support among Black voters. *Joint Stip.* ¶ 131. In fact, she received over 50% of votes cast by Black voters, indicating essentially unanimous Black support for her candidacy and that at least some single-shot

voted for her. Trial Tr. vol. 5, 67:20-25, 203:19–204:5 (Dr. Rodden testifying that "[e]ven [a votes percentage] being at 50 percent, I think it is likely that there is bullet voting going on here"); *see also* Trial Tr. vol. 5, 203:19–204:5 (testimony of Jonathan Rodden); Trial Tr. vol. 4, 27:24–28:4 (testimony of Richard Engstrom).

134.    Schroeder and Ebert, who are both white, received the second-highest and third-highest estimated levels of support, 25.0 percent and 23.1 percent respectively, among Black voters. *Joint Stip.* ¶¶ 130, 132.

135.    As estimated by Dr. Rodden and Dr. Engstrom, the difference between B. Morris and Schroeder in terms of estimated support among Black voters is statistically significant and substantial, Trial Tr. vol. 5, 205:10-17 (Jonathan Rodden agreeing that Morris received substantially more support among Black voters than Schroeder); *see* PLTF-68, *Rodden's Underlying Data Reformatted*; PLTF-52, *Engstrom Rep.*, ¶ 20, Tbl. 1 (p. 18); PLTF-53, *Engstrom Rebuttal*, Tbl. 2 (p. 11), while the difference in the estimated levels of support among Black voters received by Schroeder and Ebert is not statistically significant, Joint Stip. ¶ 132.

136.    Because Black voters' support for B. Morris was cohesive and about double the support for the next-highest candidate, Schroeder, whose vote total was not statistically different from Ebert's, Trial Tr. vol. 5, 205:10-13, 206:1-12 (Rodden conceding these points), Morris was the only Black-preferred candidate in 2012. PLTF-52, *Engstrom Rep.*, ¶ 20; Trial Tr. vol. 4, 27:24–28:4, 29:15–30:23.

137.    B. Morris received 12.8 percent of white voters' votes, which is "minimal," given that there were only three candidates running for two seats. PLTF-52, *Engstrom Rep.*, ¶ 21; Trial Tr. vol. 4, 28:5-10.

138. Morris was not elected. Schroeder and Ebert were elected. *Joint Stip.* ¶ 129; Trial Tr. vol. 4, 27:22-23.

       *c)* *The 2013 Election*

139. In 2013, four candidates (incumbents Hogshead and Henson, and two challengers, Keith Brown and Larry Thomas) ran for two seats. Brown and Hogshead, both white, were successful. *Joint Stip.* ¶ 137.

140. Hogshead had supported the Board's vote on Jeff Spiegel's health insurance plan. *See* Trial Tr. vol. 2, 103:10-11 (testimony of former Board member Graham, who served with Hogshead) Trial Tr. vol. 5, 198:15-19 (testimony of Jonathan Rodden).

141. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2013 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Brown* (W) 2,234 votes | 22.74% (15.59 – 35.35%) | 20.2% (16.2 – 24.3%) | 32.01% (23.98 – 40.51%) | 33.9% (31.8 – 36.0%) |
| Henson (B) (incumbent) 2,109 votes | 38.66% (29.88 – 48.47%) | 43.7% (37.2 – 50.7%) | 20.06% (12.20 – 27.27%) | 17.0% (13.3 – 20.4%) |
| Hogshead* (W) (incumbent) 2,475 votes | 25.00% (17.41 – 37.61%) | 24.2% (20.0 – 27.8%) | 34.49% (26.31 – 42.70%) | 37.2% (35.0 – 39.4%) |
| L. Thomas (B) 875 votes | 13.60% (11.86 – 16.33%) | 11.9% (9.4 – 15.3%) | 13.44% (11.89 – 15.16%) | 11.8% (10.0 – 13.7%) |

\* Indicates winner
*Joint Stip.* ¶ 138.

142. Henson, who is African-American, received 43.7 percent of Black voters' votes, the highest estimated level of support among Black voters in the 2013 election. *See Joint Stip.* ¶¶ 138, 140.

143. Hogshead, who is white, received 24.2 percent of Black voters' votes, the second-highest estimated level of support among Black voters. *See Joint Stip.* ¶¶ 138, 139.

144. Henson received a statistically significant and substantially greater estimated portion of Black voters' votes than Hogshead. Trial Tr. vol. 4, 31:25–32:8, 32:25–33:12 (testimony of Richard Engstrom).

145. As estimated by Dr. Rodden and Dr. Engstrom, the difference in the levels of support among Black voters received by Hogshead and the third-place candidate, Brown, is not statistically significant. *See Joint Stip.* ¶ 138; Trial Tr. vol. 5, 197:21–198:5 (Rodden testimony).

146. Because he was the only candidate to receive cohesive support from Black voters in 2013, and because his level of support was substantially higher than the candidate with the second-highest level of support, Henson is the only Black-preferred candidate in the 2013 election. *See* Trial Tr. vol. 4, 31:25–33:9 (testimony of Richard Engstrom).

147. Henson was the third-place candidate among white voters, receiving 17.0 percent of their votes, which is a "small" portion of white voters' votes. Trial Tr. vol. 4, 32:9-18 (testimony of Engstrom that Henson received a "[s]mall" amount of crossover votes at 17.0 percent, which was "[a]bsolutely not" considerable); *see Joint Stip.* ¶ 138.

148. Henson was not elected to one of the two available seats in 2013. *Joint Stip.* ¶ 141.

### d) The 2014 Election

149. In 2014, eight candidates (two incumbents Rob Chabot and Paul Morris, and six challengers, Donna Paulette-Thurman, James Savala, Kimberly Benz, F. Willis Johnson, LaWanda Wallace, and Larry Thomas), ran for three seats. *Joint Stip.* ¶ 145. Chabot and P. Morris, both white, and Paulette-Thurman, one of five African-American challengers, were successful. *Joint Stip.* ¶ 145.

150. Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2014 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Benz (W) 2,231 votes | 6.00% (4.79 – 7.49%) | 3.3% (2.1 – 4.7%) | 19.06% (15.29 – 23.34%) | 22.0% (20.5 – 23.4%) |
| Chabot* (W) (incumbent) 2,898 votes | 6.20% (4.28 – 9.02%) | 4.8% (2.4 – 9.4%) | 25.68% (19.80 – 32.40%) | 29.0% (27.1 – 30.6%) |
| Johnson (B) 2,118 votes | 21.54% (15.72 – 29.06%) | 24.5% (21.1 – 27.2%) | 5.71% (4.10 – 7.84%) | 2.8% (1.5 – 4.5%) |
| P. Morris* (W) 2,516 votes | 5.78% (4.39 – 7.90%) | 3.2% (2.0 – 5.4%) | 22.32% (17.69 – 27.83%) | 25.8% (24.4 – 27.1%) |
| Paulette-Thurman* (B) 2,733 votes | 24.21% (17.52 – 32.95%) | 26.1% (23.7 – 28.5%) | 8.92% (6.28 – 11.94%) | 8.4% (6.9 – 10.0%) |
| Savala (B) 2,425 votes | 21.36% (15.76 – 28.73%) | 24.7% (22.3 – 26.8%) | 8.74% (6.09 – 11.37%) | 7.0% (4.9 – 8.7%) |
| L. Thomas (B) 568 votes | 6.61% (5.68 – 7.68%) | 4.7% (3.4 – 6.3%) | 5.09% (4.42 – 5.76%) | 3.2% (2.3 – 4.0%) |
| Wallace (B) 590 votes | 8.31% (6.58 – 10.85%) | 8.6% (6.4 – 10.9%) | 4.47% (3.95 – 5.03%) | 1.9% (1.2 – 2.6%) |

\* Indicates winner

*Joint Stip.* ¶ 146.

151. Paulette-Thurman, Johnson, and Savala, who are all Black, received the highest, second-highest and third-highest estimated level of support among Black voters, respectively in the 2014 election. *See Joint Stip.* ¶¶ 146, 148.

152. The estimated levels of support among Black voters for Paulette-Thurman, Johnson, and Savala are each more than double that for the candidate with the fourth-highest estimated support, Wallace, who is also African-American. *Joint Stip.* ¶ 150.

153. Black voters cohesively supported each of these three candidates. Trial Tr. vol. 4, 34:24–35:23 (testimony of Richard Engstrom that Black voters "cohesively supported each of those three candidates I've identified, all right? And as I said, if you add them together, that's 75

percent of the votes in a nine-candidate contest. That's cohesion. I don't see how you could describe it as anything else.").

154. Because of the cohesive support they received from Black voters, and the substantial difference in support between Black voters' support for those three candidates and the rest of the pool, Paulette-Thurman, Johnson, and Savala were Black voters' preferred candidates in 2014.

155. Each of the three Black-preferred candidates received less than 10 percent of white voters' votes: Paulette Thurman received 8.4 percent, Savala received 7.0 percent, and Johnson received 2.8 percent. Trial Tr. vol. 4, 36:2-14 (Engstrom testifying that Paulette-Thurman, Savala, and Johnson received "minimal" white support);

156. Paulette-Thurman was elected, along with Chabot and Paul Morris, but Johnson and Savala were defeated. *Joint Stip.* ¶¶ 145, 152.

*i.   Special Circumstances in the 2014 Election*

157. The 2014 election took place less than one month after the "controversial" resignation of Dr. Art McCoy, the first African-American District Superintendent. *Joint Stip.* ¶ 160; Deft-FFSD A, *Rodden Rep.*, ¶¶ 39, 50; PLTF-53, *Engstrom Rebuttal*, ¶ 15; *see infra* ¶¶ 237, 239-240 (describing how the African-American community had responded to Dr. McCoy's suspension five months earlier).

158. The separation of the Superintendent from the District led to a high level of interest among African-American voters and "an unprecedented five African American challengers." *Joint Stip.* ¶ 161; Deft-FFSD A, *Rodden Rep.*, ¶¶ 39, 50; *see also* Trial Tr. vol. 5, 43:17-20 (Rodden testimony that "2014 was a year in which there was some—there was an important event. There was a very contentious school board meeting at the McCluer North High School gym. There was a lot of anger about the suspension of Dr. McCoy."); Trial Tr. vol. 3,

132:16-19 (former Board candidate Johnson testifying that McCoy's suspension "strengthened [his] interest" in running for the Board); Trial Tr. vol. 4, 140:23–141:5 (Board member Paulette-Thurman testifying that "initially" she "didn't understand what was going on with that" and it was one of the reasons that "made [her] decide that it was time for [her] to run").

159.    Dr. McCoy is highly respected within the African-American community, whose members viewed him as a very successful and effective superintendent. *Joint Stip.* ¶ 162; PLTF-117, *Hudson Decl.*, ¶ 8; PLTF-119, *Pruitt Decl.*, ¶ 22; PLTF-116, *Decl. of Charles Henson*, Sept. 15, 2015 ("*Henson Decl.*"), ¶ 15; PLTF-115, *Decl. of Doris Graham*, Sept. 23, 2015 ("*Graham Decl.*"), ¶ 18; *Paulette-Thurman Dep.*, 82:1-3; Trial Tr. vol. 1, 45:8–47:12 (testimony of Adolphus Pruitt); Trial Tr. vol. 2, 33:19–35:13, 38:11-12 (former Board member Charles Henson testifying that "I had never seen an administrator loved by so many students in that district"); Trial Tr. vol. 2, 83:9-24 (former Board member Doris Graham testifying that McCoy is an "[e]xcellent educator, excellent visionary, a person who loves children").

160.    The three top-ranked candidates among African-American voters, Paulette-Thurman, Johnson, and Savala, ran together under the name "Grade A for Change." *See* Trial Tr. vol. 6, 12:10-25 (testimony of Board member Courtney Graves).

161.    They were motivated to run as Grade A for Change because "they were concerned about how Dr. McCoy was treated" and "because the Board did not represent the community in terms of race." *Joint Stip.* ¶ 164; *Paulette-Thurman Dep.*, at 37:18-22, 38:5-9; *see* PLTF-118, *Decl. of F. Willis Johnson*, Sept. 29, 2015 ("*Johnson Decl.*"), at ¶¶ 10, 15; *see also* Trial Tr. vol. 4, 136:1-22 (former Board member Donna Paulette-Thurman testifying that the

predecessor to Grade A for Change was "looking for people to run for the Board for several reasons," including "the issue of Dr. McCoy"); *id.*, 138:8-11 (Paulette-Thurman testifying that "[n]umber one, [the people on Grade A for Change] were concerned about what was going on with African-American students in the district").

e) *The 2015 Election*

162.    In 2015, five candidates (incumbent Brian Scott Ebert and four challengers, Courtney Michelle Graves, Roger Hines, Donna Marie Dameron, and Michael Person) ran for two seats. Ebert, who is white, and Graves, who is African-American, were successful. *Joint Stip.* ¶ 166; PLTF-52, *Engstrom Rep.*, ¶¶ 33-34.

163.    Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2015 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Dameron (W) 1,711 | 14.09% (11.18 − 17.92%) | 14.5% (11.1 − 18.3%) | 10.08% (8.56 − 11.54%) | 9.9% (7.5 − 12.1%) |
| Ebert* (W) (incumbent) 4,697 | 10.06% (6.43 − 13.41%) | 9.8% (7.7 − 12.2%) | 40.89% (35.17 − 46.53%) | 43.0% (39.6 − 45.9%) |
| Graves* (B) 5,279 | 49.43% (37.90 − 60.83%) | 52.4% (48.7 − 56.0%) | 22.90% (17.10 − 29.46%) | 21.4% (18.3 − 24.8%) |
| Hines (B) 2,728 | 13.89% (9.84 − 18.26%) | 12.3% (8.9 − 15.9%) | 19.37% (16.06 − 23.09%) | 19.7% (17.7 − 21.9%) |
| Person (B) 1,146 | 12.53% (9.43 − 16.86%) | 11.0% (8.6 − 13.5%) | 6.77% (5.63 − 7.99%) | 6.0% (4.8 − 7.5%) |

* Indicates winner
*Joint Stip.* ¶ 167.

164.    Graves, who is Black, was the top-ranked candidate and received the highest estimated level of support among Black voters in the 2015 election. *See Joint Stip.* ¶¶ 167, 169. Black voters gave cohesive support to Graves. Trial Tr. vol. 4, 37:19–38:4 (testimony of Richard Engstrom). Graves's level of support exceeded 50%, indicating that she likely received the

support of nearly all Black voters, and some cast a bullet vote only for her. *See* Trial Tr. vol. 5, 67:20–68:6, 203:19–204:5 (Dr. Rodden testifying that a votes percentage of at least 50 percent is a sign of bullet voting).

165.    Dameron, who is white, received the second-highest estimated level of support among Black voters. Trial Tr. vol. 4, 38:8-21 (testimony of Richard Engstrom). The difference between Graves and Dameron in terms of estimated support among Black voters is statistically significant. *Joint Stip.* ¶ 169. Dameron's estimated level of support is approximately 35 percentage points lower than and less than one-third, the estimated level of Black support for Graves. *Joint Stip.* ¶ 170.

166.    As estimated by both Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of Black support received by Dameron and the candidate with the third-highest estimated level of Black support, Hines, is not statistically distinguishable. *Joint Stip.* ¶ 171; Trial Tr. vol. 5, 192:4-20 (testimony of Jonathan Rodden).

167.    Based on the cohesive support she received, and only she received, Graves was the only Black-preferred candidate in 2015. PLTF-52, *Engstrom Rep.*, ¶ 34; Trial Tr. vol. 4, 38:1-7 (testimony of Richard Engstrom). Graves was elected.

*i.    Special Circumstances in the 2015 Election*

168.    The 2015 election was held six months after the shooting death of Michael Brown in Ferguson, which had led to large-scale demonstrations in the area, ongoing unrest, national attention, and a Department of Justice investigation into the Ferguson Police Department. The shooting death also had a substantial impact on FFSD itself; a protest was organized by District high school students, schools closed for a week, and counseling was provided to teachers, staff, and students. Deft-FFSD A, *Rodden Rep.*, ¶¶ 28, 40; PLTF-120, U.S. Dep't of Justice, *Investigation of the Ferguson Police Department*, Mar. 4, 2015, at 5-6; *see also*

*Ebert Dep.*, 109:10-20; *Brown Dep.*, 49:7-13; *Morris Dep.*, 98:16-24; *Paulette-Thurman Dep.*, 73:5–74:1; *Dep. of Courtney Graves*, July 1, 2015 ("*Graves Dep.*," previously filed as ECF No. 85-37), 59:4-9; *Joint Stip.* ¶¶ 177-79; *Chabot Dep.* 82:22–83:8; Trial Tr. vol. 3, 82:16–83:4 (former FFNEA president Frank Green testifying that the shooting and aftermath "had a tremendous effect on the district" because "[w]e have kids that lived in that area. The riots and the protests that came through scared a lot of people and worried a lot of people, and we didn't know how far they would go. We also were worried due to the fact that police headquarters—the Ferguson police headquarters is basically across the street from one of our schools. City hall is two doors down from one of our schools.").

169.    On March 4, 2015, one month before the 2015 Board election, the Department of Justice released a report detailing the results of its investigation into the Ferguson Police Department. *Joint Stip.* ¶ 179.  It found extensive discrimination by government officials in Ferguson, including racial bias and intentional discrimination in local law enforcement and municipal court practices, and referenced at least two incidents with school resource officers within FFSD schools. *See* PLTF-120, *Investigation of the Ferguson Police Department*, at 15-41 (racial profiling, excessive force, First Amendment violations, use of tasers); 42-62 (unnecessary obstacles to paying fines, lack of transparency, harsh penalty for missed payments, use of warrants and jail to induce payment); 62-78 (policies driven by racial bias and discriminatory intent); *see also* Trial Tr. vol. 2, 155:7-16 (testimony of David Kimball). The Department of Justice's investigative report specifically cited incidents of unconstitutional policing activities within FFSD schools. Trial Tr. vol. 2, 155:7-16; PLTF-120, *Investigation of the Ferguson Police Department*, at 37-41.

170.    Candidates, and voters more broadly, were aware of the report, which ignited local, national and international interest in the April 2015 elections. *See* Deft-FFSD A, *Rodden Rep.*, ¶ 28; *see also* PLTF-121, John Eligon, *Election in Scarred Ferguson Carries Hope of 'New Tomorrow,'* N.Y. Times (Apr. 4, 2015); PLTF-131, Brent McDonald, *An Election in Ferguson* (video), N.Y. Times (Apr. 5, 2015); PLTF-122, Carey Gillam, *Race, reforms eyed as Ferguson, Missouri, voters head to polls*, Reuters/Business Insider (Apr. 7, 2015); PLTF-123, Carey Gillam, *Surge in voter turnout gives blacks new voice in Ferguson, Missouri*, Reuters (Apr. 9, 2015); *Hogshead Dep.*, 64:5-8 (national media attention on April 2015 election was unique in her 23 years on the board); *Ebert Dep.*, 110:17–111:4 (knows of DOJ report); *Brown Dep.*, 48:10-15 (same); *Paulette-Thurman Dep.*, 74:2-25 (same); *Graves Dep.*, 59:17-20; *Chabot Dep.*, 81:10-23 (same); *Schroeder Dep.*, 37:4-11 (same); Trial Tr. vol. 2, 11:18-24 (former Board member Henson testifying that African Americans in FFSD continue to suffer the effects of discrimination today because he can "look at the evidence of what's happened in the last year and a half in our district area in the city of Ferguson with regard to the Department of Justice report"); Trial Tr. vol. 3, 83:5-8 (former FFNEA president Frank Green testifying that he was aware of the DOJ investigation); Trial Tr. vol. 4, 124:1-10 (FFSD resident and parent Redditt Hudson testifying same).

171.    The national attention surrounding the 2015 election due to the Michael Brown shooting and its aftermath had an effect on the 2015 election, *see Joint Stip.* ¶ 181, and may have caused turnout and get-out-the-vote efforts to increase in that election, *see Joint Stip.* ¶ 182; Deft-FFSD A, *Rodden Rep.*, ¶ 28; *see also* Trial Tr. vol. 4, 109:6-16 (Hudson testifying that "[a]fter Mike Brown was killed, the entire world was paying attention to what was going on in our community, and I think that definitely had an impact on our elections as well"); Trial

Tr. vol. 6, 6:24–7:3 (Board member Courtney Graves giving several reasons that she ran for office and stating that "the second reason came after the Mike Brown incident. There were a lot of people out protesting. And for me . . . I wasn't the type to go out to protest. But I knew that I could do something to help my community and so I decided to run."); *see also Graves Dep.*, 16:9-25; *Joint Stip.* ¶ 185 (Graves explicitly encouraged supporters to engage in a 'single shot' voting strategy, and cast one vote only, a vote for her); Trial Tr. vol. 5, 193:19–194:4 (Rodden acknowledging national media attention and higher turnout in 2015). White candidates chose not to run in local city council elections as a direct result of the events. *Morris Dep.*, 99:2–100:6. And only one incumbent white candidate ran for a Board seat; a longtime incumbent white candidate, Schroeder, decided not to run, leaving open a seat. *See supra* ¶¶ 131, 163.

### C. The District's Proposed Methods for Identifying Candidates of Choice

172.    Using EI, Dr. Rodden analyzed the twelve contested elections that have taken place in FFSD since 2000. *See* Trial Tr. vol. 5, 36:19–37:5; Deft-FFSD A, *Rodden Rep.*, Fig. 8 (p. 25).

173.    Dr. Rodden has not previously served as an expert in a Voting Rights Act challenge to an allegedly dilutive electoral arrangement, Trial Tr. vol. 5, 89:10-14, nor as an expert on racially polarized voting patterns, Trial Tr. vol. 5, 88:22–89:4.

174.    Unlike Dr. Engstrom, whose previous work identifying minority candidates of choice has successfully passed the peer-review process dozens of times and has been credited by many courts, Dr. Rodden has not published any peer-reviewed paper in which he has attempted to identity minority candidates of choice, *see* Trial Tr. vol. 5, 96:12-16, nor more broadly on any electoral arrangements that give minority voters an opportunity to elect their preferred candidates, nor on racially polarized voting patterns. *See* Trial Tr. vol. 5, 86:21-25, 125:14-

19.

175. Dr. Rodden came up with two methods for identifying Black-preferred candidates: the top-ranked candidate approach, in which he identified only the candidate whose point estimate indicated the highest level of support among Black voters; and the point estimate approach, in which he identified the candidates whose point estimates indicated the highest and second-highest estimated levels of support among Black voters in a two-seat contests, and the highest, second-highest, and third-highest estimated levels of support among Black voters in three-seat contests. *See* Trial Tr. vol. 5, 38:24–40:14 (Rodden describing his thought process in preparing the two methods).

### 1. Top-Ranked Candidate Approach

176. The top-ranked candidate approach identifies only a single Black-preferred candidate in each election; it does not consider the possibility that minority voters have clear second- and third-choice candidates in multi-seat elections; and it also does not account for relative levels of support for each candidate among Black voters, treating the single candidate with the highest estimated level of support among Black voters as the only Black-preferred candidate, even if another candidate received a substantially similar or even statistically indistinguishable level of support from Black voters. Trial Tr. vol. 5, 95:23–96:3; 97:5-17 (testimony of Jonathan Rodden).

177. The following table summarizes the preferred candidates among Black and white voters using the top-ranked candidate approach, respectively, and their success rates:

| The District's Top-Ranked Candidate Approach | | | | |
|---|---|---|---|---|
| **Election** | **Black Voters** | | **White Voters** | |
| | **Top Choice Candidate** | **Elected?** | **Top Choice Candidate** | **Elected?** |
| 2000 | G. Thomas (B) | Yes | Hirsch (W) | Yes |
| 2001 | Butler (B) | No | Garofalo (W) | Yes |
| 2002 | Graham (B) | Yes | Fletcher (W) | Yes |
| 2003 | G. Thomas (B) | Yes | Knorr (W) | Yes |
| 2004 | Van (B) | No | Garofalo (W) | Yes |
| 2006 | G. Thomas (B) | No | Schroeder (W) | Yes |
| 2009 | Knowles (W) | Yes | Schroeder (W) | Yes |
| 2011 | Graham (B) | No | Martinez (W-H) | Yes |
| 2012 | B. Morris (B) | No | Ebert (W) | Yes |
| 2013 | Henson (B) | No | Hogshead (W) | Yes |
| 2014 | Paulette-Thurman (B) | Yes | Chabot (W) | Yes |
| 2015 | Graves (B) | Yes | Ebert (W) | Yes |
| | **Overall Success Rate:** | 6/12 | **Overall Success Rate:** | 12/12 |
| | **Success Rate Last 10 Years:** | 3/7 | **Success Rate Last 10 Years:** | 7/7 |
| | **Success Rate Last 5 Years:** | 2/5 | **Success Rate Last 5 Years:** | 5/5 |

PLTF-75, *Top-Ranked Candidate Approach Worksheet (Ex. 18 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; *Rodden Dep.*, 260:21–272:5.

178.     According to Dr. Rodden's top-ranked candidate approach, Black and white voters in FFSD diverge in every election since 2000 in terms of candidate preference. In the twelve contested elections from 2000 through 2015, Black voters and white voters *never* preferred the same candidate as their top choice. *Joint Stip.* ¶ 189; *see also* Trial Tr. vol. 5, 100:1-6 (Rodden testifying that "that result [that Black voters and white voters never preferred the same candidate as their top choice] emerges . . . clearly" when looking only at voters' respective top choices).

179.     According to Dr. Rodden's top-ranked candidate approach, Black and white voters display a consistent preference for candidates from their own racial group. In the twelve contested elections from 2000 through 2015, *every* top-ranked candidate among white voters was white (twelve of twelve). *See Joint Stip.* ¶¶ 64, 71, 79, 88, 96, 103, 112, 119, 130, 138, 146, 167.  In the twelve contested elections from 2000 through 2015, all but one of the top-ranked candidates among Black voters were Black (eleven of twelve). *Joint Stip.* ¶ 190. The

only election in which Black voters' top-ranked candidate was not Black was the 2009 election, which featured no Black candidates. *See Joint Stip.* ¶ 190.

180.     The top-ranked candidate approach also shows that Black-preferred candidates lose much more frequently than do white-preferred candidates. In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was elected (twelve of twelve), as compared to six out of twelve top-ranked candidates among Black voters. *Joint Stip.* ¶ 191.

181.     In the five contested elections over the last five years (*i.e.*, from 2011 through 2015), every top-ranked candidate among white voters was elected (five out of five), as compared to only two out of five top-ranked candidates among Black voters. *Joint Stip.* ¶ 193.

### 2. Point Estimate Approach

182.     The point estimate approach considers a candidate preferred if they receive the highest or second-highest (in a two-seat election), or highest, second-highest, or third-highest (in a three-seat election) estimated level of support from a group of voters in a given election, depending on the number of seats up for election. This approach does not consider relative levels of support for each candidate among African-American voters—for example, in a two-seat election, the two candidates with the highest and second-highest estimated levels of Black support are both considered Black-preferred candidates to the same degree, even if one candidate had a much lower level of support among Black voters than the other.

183.     The point estimate approach also does not consider overlapping confidence intervals among candidates, meaning in comparing two candidates, one could be considered Black-preferred while the other is not simply because the first candidate has a higher point estimate of Black support, even if the two candidates' respective levels of Black support are in fact statistically indistinct from one another. *See, e.g.*, Trial Tr. vol. 4, 29:7–30:2, 30:3-11, 32:22–

33:12 (testimony of Richard Engstrom).

184. Under the point estimate approach, Dr. Rodden identified the following candidates as Black-preferred:

| Comparative Success Rates of White- and Black-Preferred Candidates: The District's Point Estimate Approach | | | | | |
|---|---|---|---|---|---|
| Election Information | | Black Voters | | White Voters | |
| Year | Seats | Candidates with Highest Estimated Support | Number Successful | Candidates with Highest Estimated Support | Number Successful |
| 2000 | 2 | G. Thomas (B), Hirsch (W) | 2 | Hirsch (W), G. Thomas (B) | 2 |
| 2001 | 2 | Butler (B), Garofalo (W) | 1 | Garofalo (W), Hogshead (W) | 2 |
| 2002 | 3 | Graham (B), Butler (B), Clark (W) | 2 | Fletcher(W), Knorr (W), Clark (W) | 2 |
| 2003 | 2 | G. Thomas (B), Knorr (W) | 2 | Knorr (W), Lentz (W) | 1 |
| 2004 | 2 | Van (B), McClendon(B) | 0 | Garofalo (W), Hogshead (W) | 2 |
| 2006 | 2 | G. Thomas (B), Washington (B) | 0 | Schroeder (W), Knowles (W) | 2 |
| 2009 | 2 | Knowles (W), Schroeder (W) | 2 | Knowles (W), Schroeder (W) | 2 |
| 2011 | 3 | Graham (B), Hawkins (B), Clark (W) | 0 | Martinez (W-H), P. Morris (W), Chabot (W) | 3 |
| 2012 | 2 | B. Morris (B), Schroeder (W) | 1 | Ebert (W), Schroeder (W) | 2 |
| 2013 | 2 | Henson (B), Hogshead (W) | 1 | Brown (W), Hogshead (W) | 2 |
| 2014 | 3 | Paulette-Thurman (B), Johnson (B), Savala (B) | 1 | P. Morris (W), Chabot (W), Benz (W) | 2 |
| 2015 | 2 | Graves (B), Dameron (W) | 1 | Ebert (W), Graves (B) | 2 |
| Totals: | 27 | -- | 13/27 | -- | 24/27 |
| Last 10 years | 16 | -- | 6/16 | -- | 15/16 |
| Last 5 years | 12 | -- | 4/12 | -- | 11/12 |

PLTF-69, *Point Estimate Approach Worksheet (Ex. 12 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; *Rodden Dep.*, at 136:22 – 137:6, 356:19 – 357:9.

185. Applying the point estimate approach reveals frequent divergence between Black and white voters in FFSD in terms of candidate preference, and also reveals voters' consistent preference for candidates from their own racial groups. Using this approach, white voters preferred white candidates for 25 of the 27 total seats up for election from 2000 to 2015 (93% of the time), while Black voters preferred Black candidates for 17 of the 27 seats up for election (63% of the time). *See* Trial Tr. vol. 5, 107:11-17 (testimony of Jonathan Rodden). Black and white voters preferred the same candidates only one-third of the time. *See* Deft

FFSD-A, *Rodden Rep.*, ¶ 45, Fig. 8 (p. 25); *see also generally id.* ¶¶ 47-68, Trial Tr. vol. 5, 107:18–108:25 (testimony of Jonathan Rodden).[10]

186.    Similarly, even under the point estimate approach, it is evident that Black-preferred candidates are usually defeated, while white-preferred candidates usually win. Since 2000, 24 out of 27 white-preferred candidates were elected (88.9%), as compared to 13 out of 27 Black-preferred candidates (48.1%). *See* Trial Tr. vol. 5, 110:18–111:9 (testimony of Jonathan Rodden). This gap in success rates has grown in more recent years: during the last five years, eleven out of 12 white-preferred candidates were elected (91.7%), as compared to four out of 12 preferred candidates among Black voters (33.3%).

### D. Testimony about Cohesion and Crossover Voting

187.    For each election, Dr. Engstrom considered what perfect cohesion would look like in the absence of bullet voting: a candidate in a two-seat election could win one-half (50%) of Black voters' votes, and a candidate in a three-seat election could win one-third (33%) of Black voters' votes. *See, e.g.*, PLTF-52, *Engstrom Rep.*, ¶ 13; *see* Trial Tr. vol. 4, 24:7-12 (testimony of Richard Engstrom).

188.    Keeping those thresholds in mind, he classified support for a particular candidate as cohesive if they received a significant portion of the relevant threshold of possible Black votes. *See* Trial Tr. vol. 4, 24:25–26:1 (2011); Trial Tr. 27:24–28:4 (2012); Trial Tr. vol. 4, 31:25–32:8, 32:25–33:12 (2013); Trial Tr. vol. 4, 34:24–35:23 (2014); Trial Tr. vol. 4, 37:23-38:4 (2015).

189.    Dr. Kimball testified credibly that, when characterizing the results EI analysis provides,

---

[10] Overlapping preferences occurred mostly because the point-estimate approach designated as Black-preferred six white candidates who were the second- or third-choice among Black voters. *See supra* ¶ 184 (Hirsch in 2000, Garofolo in 2001, Clark in 2002, Knorr in 2003, Schroeder in 2012, and Hogshead in 2013). In each of those six cases, the white second- or third-choice candidate, who won, received substantially less support from Black voters than the Black top-ranked candidates, who lost.

Dr. Rodden "tend[ed] to understate the degree of racial polarization" by drawing improper conclusions about the level of *voter* support from the *votes* a candidate received. Trial Tr. vol. 2, 178:12–179:12. For example, when discussing the vote total for 2013 candidate Charles Henson in overwhelmingly African-American precincts, Dr. Rodden mischaracterized this as "only" 39%, where—because of the at-large system and the relative rarity of bullet voting—39% almost certainly represents support from a large majority of voters. *See* Trial Tr. 179:19–183:13 (Kimball describing how this type of characterization does not provide "a complete description of what the results show" and testifying that his analysis shows 13 precincts where Henson received a vote on a majority of ballots cast). When discussing B. Morris's level of support in 2012, Dr. Rodden claims that B. Morris "failed to achieve a majority," even though Dr. Rodden estimated that B. Morris received 51.33% of support using EI, and 56% of the votes in precincts where 80 percent of the VAP was Black using HP analysis, *see* PLTF-49, *Kimball Rebuttal Rep.*, p. 5 (Tbl. 2). *See* Deft-FFSD A, *Rodden Rep.*, ¶ 57 (Rodden reporting that, "[l]ike Mr. Henson, Ms. Morris failed to achieve a majority of the votes cast even in the precincts where 80 percent of the voting-age population was African American . . . . it appears to be the case that her minority supporters also cast votes for white candidates," even though both other candidates were white and for Ms. Morris to have achieved a majority of the votes cast in those precincts, voters would have to have voluntarily given up a portion of their votes).

190.    Although Dr. Rodden testified that Black-preferred candidates received some white support, Dr. Engstrom testified credibly that crossover voting (*i.e.*, white support for Black-preferred candidates) was generally "minimal" or "low" in FFSD. *See* Trial Tr. vol. 4, 25:18-23 (Engstrom testifying that white crossover voting for Black-preferred candidates in 2011

was "minimal," at 6.1% and 7.4%, respectively); Trial Tr. vol. 4, 28:5-10 (same in 2012; white support for the sole Black-preferred candidate was a "minimal" 12.8% even though there were only three candidates); Trial Tr. vol. 4, 32:2-14 (in 2013, the sole Black-preferred candidate received a "[s]mall" amount of crossover votes at 17 percent); Trial Tr. vol. 4, 36:2-14 (in 2014, the three Black-preferred candidates received "minimal" white support, at 8.4%, 7.0%, and 2.8%, respectively); Trial Tr. vol. 4, 38:22-24 (in 2015, the sole Black-preferred candidate received 21.4% of white votes and was elected); Trial Tr. vol. 4, 62:25–64:20 (based on Engstrom's calculations of crossover votes in his case-by-case analysis, he "wouldn't say that crossover voting among whites was significant" in any of the elections he analyzed).

191.    Looking directly at the numbers, the Court finds that Dr. Rodden's characterizations of crossover voting as "substantial," *see* Deft-FFSD B, *Rodden Bloc Voting Rep.*, ¶ 6, and white voters' support for certain Black-preferred candidates as "considerable," *see* Trial Tr. vol. 5, 55:11-17, were not credible.

## IV. TOTALITY OF THE CIRCUMSTANCES

### A. The "Predominant" Senate Factors (Factors 2 and 7)

#### 1. Racially Polarized Voting (Senate Factor 2)

192.    *See supra* Sections III.B and II.C.

#### 2. Election of minorities to the Board (Senate Factor 7)

193.    African Americans' representation on the Board is disproportionately low compared to their share of the FFSD population. Single-race African Americans comprise 53.84% of the District's total population, and 47.33% of the District's VAP. *See Joint Stip.* ¶ 13. At the time of trial, there were two African-American Board members—Paulette-Thurman and Graves—out of seven (28.57%). *See Joint Stip.* ¶ 33.

194. Since 2004, 23 white candidates and 19 African-American candidates have run for a seat on the Board in contested races. PLTF-49, *Kimball Rebuttal Rep.*, p. 7. White candidates' success rate was 69.6%, while African-Americans' success rate was 10.5%. Trial Tr. vol. 2, 160:2–161:11 (Kimball testifying that "white candidates have had greater success getting elected to the [B]oard in those elections than African-American candidates" and it was not a "close call"); PLTF-48, *Expert Report of David Kimball*, May 27, 2015 ("*Kimball Rep.*"), at 13; *see generally* Trial Tr. vol. 2, 159:8–167:3 (Kimball testifying on Senate Factor 7 and stating, among other things, that the disparity in success rates is about the same between white-preferred and African-American-preferred candidates as it is between white and African-American candidates and that, since 2000, incumbency helps white candidates (75% success) much more than it helps Black candidates (0% success)).

195. From 1988 until 2000, Dr. Doris Graham was the only African-American member of the Board. *Joint Stip.* ¶ 206.

196. From 2000 to 2015, there were never more than two African-American members on the Board at the same time. *Joint Stip.* ¶ 208.

197. The following table summarizes the number of candidates and overall success rates of candidates of each race in each of the twelve contested election from 2000 through 2015:

| Table 8 - Comparative Success Rates of Black and White Candidates | | | | |
|---|---|---|---|---|
| | **Black Candidates** | | **White Candidates** | |
| **Election** | **Total Number** | **No. Successful** | **Total Number** | **No. Successful** |
| 2000 | 2 | 1 | 4 | 1 |
| 2001 | 1 | 0 | 3 | 2 |
| 2002 | 2 | 1 | 4 | 2 |
| 2003 | 1 | 1 | 2 | 1 |
| 2004 | 3 | 0 | 2 | 2 |
| 2006 | 2 | 0 | 3 | 2 |
| 2009 | 0 | 0 | 3 | 2 |
| 2011 | 2 | 0 | 7 | 3 |
| 2012 | 1 | 0 | 2 | 2 |
| 2013 | 2 | 0 | 2 | 2 |
| 2014 | 5 | 1 | 3 | 2 |
| 2015 | 3 | 1 | 2 | 1 |
| **TOTALS:** | **24** | **5 (20.8%)** | **37** | **22 (59.5%)** |

*Joint Stip.* ¶ 209.

198.    During the twelve contested elections from 2000 to 2015, twenty-four Black candidates ran for Board seats. African-American candidates were successful in obtaining five out of those twenty-four seats (20.8% success) (G. Thomas, Graham, G. Thomas, Paulette-Thurman, Graves). *Joint Stip.* ¶ 210.

199.    During the twelve contested elections from 2000 to 2015, thirty-seven white candidates ran for Board seats. White candidates were successful twenty-two out of thirty-seven times (59.5%) (Hirsch, Garofalo, Hogshead, Clark, Fletcher, Knorr, Garofalo, Hogshead, Schroeder, Knowles, Schroeder, Knowles, Martinez, P. Morris, Chabot, Ebert, Schroeder, Hogshead, Brown, Chabot, P. Morris, Ebert). *Joint Stip.* ¶ 211.

200.    During the five contested elections from 2011 to 2015, thirteen African-American candidates ran for Board seats. African-American candidates were successful in obtaining two out of those thirteen seats (15.38% success) (Paulette-Thurman, Graves). *Joint Stip.* ¶ 212.

201. During the five contested elections from 2011 to 2015, sixteen white candidates ran for Board seats. White candidates were successful in obtaining ten out of those sixteen seats (62.5% success). *Joint Stip.* ¶ 213.

202. Henson, an African American Board member who served from 2007 to 2013, was appointed to the Board in 2007, then retained his seat until he ran in a contested election in 2013 and lost. He has never won a Board election. *See Joint Stip.* ¶ 215.

203. During the 2013-2014 term, following Henson's loss during the April 2013 election, there were no African-American Board members. *Joint Stip.* ¶ 214.

204. Having African-American Board members makes a "difference," because "when issues come up that pertain to race, there's a different perspective now on the Board, who can say we've got to be very cognizant of . . . the dynamics of what's happening in a certain situation," like personnel issues or disciplinary appeals. *Paulette-Thurman Dep.*, 31:6-19; *Joint Stip.* ¶ 207; *see also* Trial Tr. vol. 3, 79:3-9 (former FFNEA president Frank Green testifying that it is important to have a racially diverse school board and an all-white board would concern him given the current school population); Trial Tr. vol. 2, 81:8–83:8 (former Board member Doris Graham describing how she was able to act as liaison for Berkeley residents and "after I wasn't on the board anymore, they felt that like they didn't really have anyone they could just particularly call to and tell what their concerns are"); Trial Tr. vol. 4, 149:21-25 (Board member Paulette-Thurman testifying that, when deciding whom to vote for, "[e]specially in our district where we have predominantly African-American students who are failing, I want to hear what it is [Board candidates] plan to do or want to do or would request of the superintendent to do to help students become successful").

205. African-American Board members serve as role models in school leadership for Black students. *See* Trial Tr. vol. 2, 32:9–33:18 (former Board member Charles Henson describing how he was a role model to African-American students as president of the Board).

206. The lack of African-American representation on the Board exacerbates the Board's non-responsiveness to the needs of African-American students, and members of the African-American community do not feel that they are represented on the Board, all of which ultimately "has a negative effect on the school district, particularly when it comes to black parents' participation and engagement," Trial Tr. vol. 4, 112:6-19, 115:12-24 (testimony of FFSD resident and parent Redditt Hudson); *see* Trial Tr. vol. 2, 31:1-13, 40:1-19 (testimony of Charles Henson); Trial Tr. vol. 4, 133:21–134:1 (African-American Board member Paulette-Thurman testifying that "when I do speak, [other Board members] do listen. It doesn't mean they always agree with what I say, but they are listening, and we do have a lot of discussions about race"); Trial Tr. vol. 4, 168:8-24 (Paulette-Thurman testifying that it is important for her, as an African American, to be on the Board and agreeing that she had previously testified that one of the reasons people asked her to run for the Board is that "the school board didn't represent our neighborhood"); *see also Graves Dep.*, 29:23–30:14, 31:3-7, 31:17–32:10.

## B. Factors Related to Historical Discrimination and its Ongoing Effects (Factors 1, 5)

### 1. Official discrimination

207. Throughout the 19th and 20th centuries, many Missouri statutes and constitutional provisions permitted—or required—discrimination against Black Missourians. *See Joint Stip.* ¶¶ 226-230, 241, 251, 253; *Dred Scott v. Sandford*, 60 U.S. 393, 398 (1856); Mo. Const. of 1865, art. II, § 18 (restricting franchise to white males); U.S. Const. amend. XV; Mo. Const.

of 1865, art. V, § 2 (requiring that the governor be a white man), art. V, § 12 (requiring that the lieutenant governor be a white man), art. IV, § 3 (requiring that members of the Missouri house of representatives be white men), art. IV, § 5 (requiring that state senators be white men), art. III, § 6 (requiring that all voters be white men); Mo. Rev. Stat. ch. "Negroes and Mulattoes," § 2, at 600 (1825) (barring Black Missourians from bearing witness in court); Mo. Rev. Stat. ch. 146, § 2-2, at 797 (1870) (barring Black Missourians from serving as jurors); Mo. Const. of 1875, art. XI, § 3 (amended to require, rather than permit, racially segregated schools); *Missouri v. Jenkins*, 515 U.S. 70, 176 (1995) (Ginsburg, J., dissenting) (noting the "deep, inglorious history of segregation in Missouri").

208.    Jurisdictions within FFSD, including the municipalities of Ferguson and Berkeley, also historically engaged in purposeful discrimination against African Americans in education, housing, and other areas. *See Joint Stip.* ¶¶ 254-60; *United States v. Missouri*, 388 F. Supp. 1058 (E.D. Mo. 1975), *aff'd*, 515 F.2d 1365 (8th Cir. 1975); Trial Tr. vol. 1, 119:17–121:1 (Gordon describing the split of Berkeley from Kinloch in the 1930s as motivated by segregative purpose); PLTF-40, *Gordon Rep.*, at 16; Trial Tr. vol. 2, 12:4–13:15, 42:1-17 (former Board member Charles Henson explaining that his mother, an African-American resident of what was a smaller FFSD in the 1930s and 1940s was prohibited from attending school there because of her race, so she was forced to endure long commutes to Black schools in other districts); Trial Tr. vol. 2, 64:24–65:10 (former Board member Doris Graham testifying that she attended a segregated one-room schoolhouse in another part of St. Louis County, and some of her classmates were bused from Kinloch); *id.* 68:3–69:15 (Graham testifying about being asked to leave a restaurant because of her race when she was a teenager and how that experience "became a part of my fabric, part of me").

209. As Dr. Gordon credibly testified, historical policies, including not only educational segregation and the racially-motivated use of incorporation but also the way houses, streets, and public infrastructure were physically built, were "intended and designed to create starkly segregated and separate [school] districts." Trial Tr. vol. 1, 121:2-24; *see also* PLTF-40, *Gordon Decl.*, pp. 16, 21-23; Trial Tr. vol. 2, 12:9-15 (testimony of Charles Henson).

210. The three school districts that now comprise the present-day FFSD—the overwhelmingly-white former Ferguson-Florissant and Berkeley school districts and the predominantly-Black Kinloch school district—demonstrate how political and physical discrimination created and perpetuated a racially dual system of school districts. *See* PLTF-40, *Gordon Rep.*, at 16, 21-22; Trial Tr. vol. 1, 119:17–121:1 (testimony of Colin Gordon); *see also* Trial Tr. vol. 2, 12:4–13:15, 42:1-17 (testimony of Charles Henson); Trial Tr. vol. 2, 64:24–65:10, 68:3–69:15 (testimony of Doris Graham); *Missouri*, 515 F.2d at 1367 (noting that Kinloch had been forced to cobble together schools "markedly inferior to the opportunities offered in the adjoining Berkeley and Ferguson districts"); *see also* PLTF-40, *Gordon Rep.*, at 16.

211. The former Ferguson-Florissant and Berkeley school districts, among other state actors, displayed commitment to unlawfully maintaining Kinloch as a segregated district. For two decades after the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), this dual system persisted despite school reorganization study recommendations and requests from the school district itself that Kinloch be consolidated with other school districts, *see Missouri*, 515 F.2d at 1367, flouting the constitutional obligation to "take such affirmative measures as are necessary to deestablish that dual system and to eliminate the continuing vestiges of that system." *United States v. Missouri*, 363 F. Supp. 739, 745, 747

(E.D. Mo. 1973). It ultimately took a lawsuit brought by the United States Department of Justice to counter this intransigence and a federal court order to force the reluctant overwhelmingly white school districts to consolidate with their predominantly Black neighbor. *See Missouri*, 515 F.2d at 1366-67; *Missouri*, 388 F. Supp. at 1060; PLTF-40, *Gordon Decl.*, pp. 16, 22-23; Trial Tr. vol. 1, 119:14–121:24 (Dr. Gordon testifying among other things that "the Justice Department sort of recognizes the motives that lie behind the separation of the districts and ordered the merger of the district. So this is a sort of microcosm of what happened across St. Louis County where the school districts have begun to have over this period sort of combined either by court order or not, but the municipality fragmentation that lies underneath has remained the same").

212.     FFSD is part of St. Louis County, the larger St. Louis metropolitan area, and the state of Missouri, each of which has historically engaged in official discrimination. Dr. Gordon testified credibly that the processes of segregation and discrimination of those jurisdictions fundamentally continue to affect the lives of FFSD residents in "particularly powerful" ways. Trial Tr. vol. 1, 115:13–116:13; *see also id.*, 100:4–101:1 (noting that "it's particularly important to have a broader focus for a metropolitan area like St. Louis because the municipal fragments, the corporate fragments, including municipalities and the school districts, are very small and in some respects very artificial political divisions"); *id.*, 101:14–20 (stating that "formalized forms of segregation . . . invented and pursued early in the 20th century . . . live on in fundamental ways, either in their consequences or in the ways in which the spirit of them is imported into other forms of policy that last to the present day"); *id.*, 102:13–103:12 (explaining that official laws and policies restricting land use and regarding urban development, urban redevelopment, zoning, and mortgage finance continue to have

"enormous consequences" on populations' opportunities to purchase house and accumulate housing equity, which in turn affected the quality of schools available to a population and has sustained a "racialized gap in wealth" that "persist[s] to the present day").

213.    Dr. Gordon testified credibly that, up until at least the mid-1960s, official policies in the St. Louis metropolitan area intended to create and perpetuate racial segregation were "at times blocked by the courts," but nonetheless continually "shift[ed] in form" to achieve the same goal of segregation. *See, e.g.,* Trial Tr. vol. 1, 104:5-20; *see also id.*, 105:17–107:18 (explaining how, after St. Louis's explicit racialized zoning ordinance delineating Black and white blocks was effectively struck down by *Buchanan v. Warley*, 245 U.S. 60 (1917), "realtors and civic leaders who had campaigned for that ordinance were not terribly put out . . . and moved quickly to establish the same restrictions by other means," including through realty licensing requirements and race-restrictive deed covenants); Trial Tr. vol. 1, 107:19– 111:9 (noting that, when restrictive covenants were effectively blocked by *Shelley v. Kraemer*, 334 U.S. 1 (1948), realtors and developers "quite publicly mobilized to accomplish the same thing by other means," including strengthening their professional code of ethics to require residential segregation and denying home showings and sales to African Americans, and their efforts were reinforced by official federal mortgage lending policy and redlining, as well as "a flurry of" municipal incorporation for the "quite explicit" purpose of exclusionary zoning); Trial Tr. vol. 1, 110:17-22 (describing the significance of the decision in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), which came out of North St. Louis County and applied the Civil Rights Act to private real estate transactions); *see also Joint Stip.* ¶¶ 235-36; PLTF-40, *Gordon Rep.*, at 7-16; PLTF-48, *Kimball Rep.*, at 8-10; *United States v. City of Black Jack*, 508 F.2d 1179, 1181-82 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975)

(invalidating the North County town of Black Jack's zoning ordinance banning construction of multifamily housing).

214.    Providing multiple salient examples from the St. Louis metropolitan area, including in North St. Louis County and FFSD itself, Dr. Gordon testified credibly that, although official policies of urban renewal and redevelopment in the mid- and late-20th century were ostensibly intended to "address some of the damage . . . of segregation and the collapse of central cities," they "actually sharpen[ed] and deepen[ed] segregation both in St. Louis and St. Louis County" by using federal money and the power of eminent domain to "target[] neighborhoods of mixed use and largely African-American occupancy for removal or destruction so the land could be used for a higher use." *See* Trial Tr. vol. 1, 112:4–115:6 (also describing how, between 1950 and 1970, about 75,000 people were displaced in the metro area by government renewal or development, the "vast majority" without any relocation assistance, 84% of whom were African American, and when they moved from downtown to suburban neighborhoods, which were then "targeted for renewal or code enforcement or other attention"); *see also Joint Stip.* ¶ 242; *see* PLTF-40, *Gordon Rep.*, at 26-27.

215.    Dr. Gordon testified credibly that one can still see once-formalized policies of racial segregation and housing discrimination "inscribed on [the regional] landscape" and that the formalized pattern of segregation by deed covenant had been "written into land use zoning," which is "still very much the way in which we organize property and housing opportunity in a metro area," causing officially sanctioned race discrimination and segregation to "persist to the present day." Trial Tr. vol. 1, 111:15–112:3 (testimony of Colin Gordon).

216. According to Dr. Gordon's credible testimony, because of this persistent physical segregation, when the federal court desegregation order tied together the overwhelmingly white Berkeley and former Ferguson-Florissant and predominantly-Black Kinloch school districts, it created a present-day FFSD that has "trade[d] segregation between districts for segregation within a district." Trial Tr. vol. 1, 121:2-24 (testimony of Colin Gordon).

217. Dr. Gordon and others credibly testified that this racial segregation has settled along a north-south divide that persists today and is reflected in socioeconomic, educational and other disparities. *See* Trial Tr. vol. 1, 122:1–123:14, 126:7–127:5, 127:17–128:1, 128:9–129:11 (Gordon testifying about the north-south racial divide in FFSD which is replicated in poverty rates, unemployment rates, and measure of neighborhood distress); Trial Tr. vol. 3, 81:1–82:12 (Green testifying that "[f]or years there's always been a difference of the north- and south-side areas of the district, especially in the Ferguson area, which is on the south side of the district," that there are socioeconomic differences between the areas, and differences in "being stopped by the police," and that because the administration center is on the north side, there is a "perception" that the north side has "certain advantages"); Trial Tr. vol. 4, 166:19-21 (testimony of Donna Paulette-Thurman agreeing that special concerns affect the African-American community more than the white community, including "different school[] resources allocated for north-side schools as opposed to south-side schools"); *see also* PLTF-40, *Gordon Rep.*, at 2-4, 27-28, Map 10 (p. 29); *see also* PLTF-44, *Cooper Decl.*, ¶ 34, Fig. 7 (p. 14), Ex. C (p. 39).

218. Housing equity is the principal form of wealth for most families, so barriers to equal opportunity to home ownership that African Americans in St. Louis County have faced for decades, have had and continue to have a substantial negative impact on a family's

opportunity to accrue and retain wealth, to get favorable loan terms, to access public services and high-performing schools, and to benefit from increasing property values. *See* Trial Tr. vol. 1, 115:25–118:19 (Gordon explaining that because of housing discrimination, African-American families have been disproportionately prevented from entering the housing market at all, from entering the market at a younger age, and from accessing the kinds of housing stock that would most effectively build housing equity); PLTF-40, *Gordon Rep.*, at 20-21, 23-24, 27-28, 32; *see also* PLTF-41, *Gordon Resp.*, at 3-4; *Joint Stip.* ¶¶ 244-46; Trial Tr. vol. 1, 116:9-13 (Gordon testifying that "the best way to characterize it is that white families in the St. Louis area were able to get on a sort of escalator-of-wealth creation in the 1930s and 1940s that African Americans were largely barred from for at least a generation"), 116:24–117:1 (explaining that the gap has increased recently "as a result of the last housing bubble and bust"); *see also generally* Trial Tr. vol. 1, 99:4–119:7 (testimony of Colin Gordon).

219. The wealth gap is one chief driver of continuing (and in some cases widening) disparities between African Americans and whites in FFSD in areas such as educational achievement, level of poverty, employment, and health care. PLTF-48, *Kimball Rep.*, at 10; PLTF-40, *Gordon Rep.*, at 21.

### 2. Continuing effects of past discrimination on political participation

220. Dr. Kimball testified credibly that political scientists who study voting behavior commonly use the "calculus of voting" as a cost-benefit framework for determining whether and why individuals, as well as groups of people, do and do not vote. The calculus takes into account the probability that one's vote will determine the outcome of an election, the benefits of seeing one's preferred candidate win election and potentially implement preferred policies, and the costs of voting, including: informing oneself about candidates, completing the

administrative process of registering to vote, locating one's polling place, and getting time off work. *See* Trial Tr. vol. 2, 114:8–115:4 (testimony of David Kimball).

221. Dr. Kimball testified credibly that this cost-benefit framework "indicates that for many people the decision of whether to vote or not can be a close call, and that . . . relatively small changes in either the benefits or the cost side of the equation can substantially increase or decrease the likelihood of voting in an election." Trial Tr. vol. 2, 115:5-11 (testimony of David Kimball). A small change in benefit or cost has a more pronounced effect on voters with less education and/or less income, and/or who are "less habitual" voters, because for them "it's a little more difficult to overcome the cost that is associated with registering and turning out to vote, learning about candidates and so forth." Trial Tr. vol. 2, 115:12-25; *see also* PLTF-48, *Kimball Rep.*, at 11-12 (explaining that depressed socioeconomic wellbeing increases voting "costs" and dampens political participation among African Americans); Trial Tr. vol. 1, 130:15–131:1 (Gordon testifying that "the scholarly consensus is very clear that when a population is disadvantaged economically, when they're disadvantaged in terms of job opportunities, educational opportunities, or residential opportunities, that these [disadvantages] affect civic participation").

222. Consistent with Dr. Kimball's "calculus of voting" framework, Dr. Gordon testified credibly that based on his survey of historical discrimination and segregation, African Americans in FFSD bear the effects of past discrimination in ways that affect their ability to participate in the political process. Trial Tr. vol. 1, 145:10-24; *see also* Trial Tr. vol. 2, 144:2–147:24, 148:18–149:1 (agreement of Kimball); Trial Tr. vol. 3, 20:11-17 (Kimball testifying that "because of this history of discrimination and segregation and racial disparities in income and education, that tends to put African-American voters in the Ferguson-

Florissant School District as well as in other parts of St. Louis County at a disadvantage in electing their preferred candidates in at-large elections").

223.    There is ample evidence that the costs of voting are higher and the benefits lower for African-American residents of FFSD as compared to white residents. *See generally infra* ¶¶ 224-232.

224.    There continue to be undisputed disparities between Black and white residents of FFSD on almost every socioeconomic indicator, including employment, wealth, homeownership, access to health care and other factors underlying basic economic security, and most measures of educational attainment. *Joint Stip.* ¶¶ 248, 269-71; PLTF-40, *Gordon Rep.*, at 2-4, 27-28, Map 10 (p. 29); PLTF-41, *Gordon Resp.*, at 3-4; *Paulette-Thurman Dep.*, 63:8-13; PLTF-48, *Kimball Rep.*, at 9-10, 12; PLTF-44, *Cooper Decl.*, ¶¶ 36-37; PLTF-45, *Cooper Suppl. Decl.*, ¶¶ 17-20; Trial Tr. vol. 1, 126:10–127:5 (Gordon testifying that, based on HUD data, rates of poverty are higher in majority-Black block groups in the District); Trial Tr. vol. 1, 128:2–129:11 (same for "neighborhood stress" indexes, which measure block groups' engagement with the labor market and poverty index); Trial Tr. vol. 1, 200:10-14 (Cooper testifying that, based on ACS data about FFSD, "[o]n almost every metric, African Americans lag behind non-Hispanic whites"); Trial Tr. vol. 2, 151:3-19 (Kimball testifying that, in general, the St. Louis region has higher racial disparities in unemployment, poverty, infant mortality, and traffic stops than other metropolitan areas); Trial Tr. vol. 5, 75:20-22 (Rodden acknowledging these disparities).

225.    There are also undisputed disparities between African-American and white FFSD students in educational achievement (including enrollment in advanced classes, the FFSD gifted and talented program, enrichment programs, extracurricular activities) and the

application of discipline (including in-school suspensions, out-of-school suspensions, referrals to law enforcement, and corporal punishment). *Joint Stip.* ¶¶ 261-62, 265-67; PLTF-93, *FFSD Data Reported to Office of Civil Rights – Course Enrollment by Race (Ex. 17 to Dep. of Brian Scott Ebert, June 16, 2015)*, at 1-3, 16, 18; PLTF-84, *FFSD Data on Office of Civil Rights Website – LEA Summary of Selected Facts (Ex. 5 to Dep. of Paul Morris, June 15, 2015)*, at 1-5; PLTF-85, *FFSD Data on Office of Civil Rights Website – Discipline of Students Without Disabilities, Law Enforcement Referral (Ex. 6 to Dep. of Paul Morris, June 15, 2015)*, at 1; PLTF-86, *FFSD Data on Office of Civil Rights Website – Discipline of Students With Disabilities, Law Enforcement Referral (Ex. 7 to Dep. of Paul Morris, June 15, 2015)*, at 1; *Paulette-Thurman Dep.*, at 78:20-22, 79:1-8, 104:16–105:16; PLTF-125, Ferguson Comm'n, *Forward Through Ferguson: A Path Toward Racial Equity*, Sept. 21, 2015, at 56; PLTF-120, *Investigation of the Ferguson Police Department*, at 37-38; PLTF-126, U.S. Dep't of Justice, *Investigation of the St. Louis County Family Court*, July 31, 2015, at 26, 47; *see also* Trial Tr. vol. 1, 22:8-25, 26:7-14 (Adolphus Pruitt testifying about the annual reports of the Black Leadership Roundtable, which assessed the achievement gap in all area school districts).

226.    There also continue to be undisputed disparities between Black and white residents of FFSD in the numbers of law enforcement stops, arrests, fines, and fees. PLTF-127, Better Together, *Public Safety – Municipal Courts*, Oct. 2014, at 8; PLTF-128, excerpts from Mo. Att'y General's Office, *2014 Vehicle Stops Report*, Racial Profiling Data, at 367-68 (Ferguson), 377-78 (Florissant), App'x B pp. 182 (Ferguson), 186 (Florissant) (*full report available at* https://ago.mo.gov/home/vehicle-stops-report/2014-executive-summary); Trial Tr. vol. 2, 151:3-19 (Kimball testifying that, in general, the St. Louis region has higher racial

disparities in unemployment, poverty, infant mortality, and traffic stops than other metropolitan areas); PLTF-48, *Kimball Rep.*, at 9-10, 12. Dr. Kimball testified credibly that "neighborhoods with higher levels of contact with the criminal justice system tend to have lower levels of voter participation" because of the resulting "loss of economic resources," because it "tends to foster more negative attitudes and less trust of local government, which lowers the benefit side of the cost of voting calculation and makes those distrustful individuals less likely to see the benefit of voting in local elections," and because contact causes people "more difficulty engaging in joining in . . . local organizations and social networks that help bring people into local government and local community affairs." Trial Tr. vol. 2, 153:23–155:6 (testimony of David Kimball).

227.    Dr. Gordon testified credibly that, because housing stock already sorts people by income, it would not be plausible for a municipal unit with a much narrower range of housing options to show the same socioeconomic disparities as a metropolitan area that includes both mansions on large lots and "modestly developed" multifamily units. As such, "the surprising fact is not that the gap [within FFSD] is narrower [than when looking at the St. Louis metropolitan area as a whole], but that given the development patterns, the surprising fact is the gap doesn't virtually disappear." Trial Tr. vol. 1, 129:12–130:11.

228.    Substantial, credible testimony from individual African-American witnesses who live and work in FFSD supports Dr. Gordon's conclusion. *See, e.g.*, Trial Tr. vol. 2, 11:18-24 (testimony of Charles Henson); Trial Tr. vol. 2, 86:12–87:14 (Graham describing continued evidence of racial segregation in government and churches); Trial Tr. vol. 4, 167:5-16 (former Board member Donna Paulette-Thurman agreeing that there are ongoing effects of the history of discrimination in St. Louis County in housing, education, and other areas);

Trial Tr. vol. 3, 81:1–82:12 (former FFNEA president Frank Green testifying that there are longstanding socioeconomic differences between the north- and south-side areas of the District; differences in "being stopped by the police"; that because the administration center is on the north side, there is a "perception" that the north side has "certain advantages"; that "a huge part of the African-American population of the district live on the south side, and . . . it's just been always a part of that make-up of that area . . . [f]or a long time"; and that people who live on the south side "have to work harder"); Trial Tr. vol. 2, 75:9-18 (former Board member Doris Graham testifying that African-American candidates face barriers in FFSD campaigns, and that "first of all, [the barrier is] race, the color of their skin"); Trial Tr. vol. 2, 74:14–75:8 (former Board member Graham testifying that "I think the barriers are people vote for people that are much like themselves, and if every black [person] that there was in Berkeley would have voted for me, I still would not have won any election. I would need the votes of white, Hispanic, other people"); *see also Paulette-Thurman Dep.*, 63:1-13; *Graves Dep.*, 57:11-15 (testifying that an African-American in FFSD has to be more qualified than a counterpart to get the same position); Trial Tr. vol. 2, 166:18–167:3 (Kimball testifying that "we know that African-American voters tend to prefer African-American candidates particularly as their top choice in these elections," and "if African-American voters are seeing that their preferred candidates are usually losing, they may see fewer benefits of participating in local elections, which may then lead them to not vote in future elections").

229.    Because African Americans, as a group, continue to suffer socioeconomic consequences as a result of past discrimination, and those socioeconomic disparities raise the costs and decrease the benefits of participating in the political process, the Court finds that effects of past discrimination hinder the ability of African-American voters in FFSD to participate in

the political process. Trial Tr. vol. 2, 144:5-146:7 (Kimball testifying that "because of the history of discrimination and segregation, . . . African-American voters in the district are more likely to be deterred from voting than white voters in the district"); PLTF-117, *Hudson Decl.*, ¶ 17 (noting that Black voters in FFSD may have fewer resources to volunteer or donate to Board campaigns); *Paulette-Thurman Dep.*, 45:18–46:4, 48:22–49:9 (naming some Black candidates who rely on public transportation); Trial Tr. vol. 2, 162:11-22 (Kimball testifying that coordinating and educating African-American voters to single-shot as a group "takes a lot of effort, a lot of resources," and "would make the election process more costly"); Trial Tr. vol. 2, 119:19-24 (Kimball testifying that "[i]n order to win elections, it takes also some coordination, recruiting candidates, coordinating support that impose costs and take organizing and take resources").

230.   Dr. Kimball testified credibly that the off-cycle, staggered, at-large features of FFSD elections contribute to disproportionately lower turnout among African Americans because of the relatively increased costs and relatively decreased benefits. *See* Trial Tr. vol. 2, 116:4-13, 122:2-19 (testimony of David Kimball).

231.   The turnout rates in FFSD provide further evidence that African-American political participation is depressed. *See* PLTF-49, *Rebuttal Report of David Kimball*, July 2, 2015 ("*Kimball Rebuttal*"), at 6 (during the last twelve contested elections, African-American turnout has never exceeded white turnout, but has been lower than white turnout six times); Trial Tr. vol. 2, 120:15–121:6 (Kimball testifying that turnout is higher for on-cycle elections because "the benefit side is more clear," since there are more contests on the ballot, and because "the cost side is a little bit higher for voters" in off-cycle elections since there is less news coverage, making it take "more effort on their part to find out who's running, find out

information about the candidates and their policies"); Trial Tr. vol. 2, 145:22–146:7 (Kimball testifying that "factors like homeownership and education and income are strong predictors of voter turnout. Those factors provide resources that help people overcome the cost side of the calculus of voting and lead to voter turnout. So if there are racial disparities in those factors, they can contribute to racial disparities in political participation as well.")

232. The Court's finding that African Americans in FFSD are hindered in their ability to participate in the political process is also supported by the evidence in the record regarding registration rates. According to Census Bureau data for November 2014, in the state of Missouri, the registration rate for people who identified as Black alone is 67.1 percent. The registration rate for people identifying themselves as white alone is 72.2 percent. PLTF-63, *Reported Voting and Registration, by Sex, Race, and Hispanic Origin*, at 7; *see also* Trial Tr. vol. 3, 41:1-10 (Kimball testifying that the registration differential is about five points); *supra* n.7; Trial Tr. vol. 5, 71:1-4 (Rodden testifying that "of course, we know [it's] true" that "registration varies across race in Missouri"); Trial Tr. vol. 5, 147:12-16 (Rodden testifying that he believes approximately five percent more white Missourians than Black Missourians are registered to vote); Trial Tr. vol. 5, 148:14-22 (Rodden testifying that if white people register at a higher rate than Black people but their respective turnout rates are equal, one can infer that more white voters than Black voters actually cast a ballot on election day); Trial Tr. vol. 5, 117:14–118:1 (Rodden agreeing that people with lower levels of income and education, as well as younger people, are less likely to register to vote).

## C. Remaining Senate Factors (Factors 8, 4, 6, 3 and 9)

### 1. Lack of responsiveness (Senate Factor 8)

233. Plaintiffs provided substantial and credible evidence that the African-American community in FFSD has particularized needs concerning continuing socioeconomic

disparities. *See, e.g.*, Trial Tr. vol. 1, 101:12-20 (Gordon testifying that historical, "formalized forms of segregation" today "live on in fundamental ways, either in their consequences or in the ways in which the spirit of them is imported into other forms of policy that last to the present day"); Trial Tr. vol. 1, 111:1-4 (Gordon testifying that "fair housing advocates routinely, even to the present day, trace patterns of steering by realtors of showing African-American families one set of homes in one neighborhood and white families another in another"); Trial Tr. vol. 1, 115:25–117:14 (Gordon testifying about the sustained and worsening wealth gap); Trial Tr. vol. 1, 124:6–129:11 (Gordon discussing race-based gaps in FFSD in poverty, unemployment, and public assistance rates); Trial Tr. vol. 1, 174:7-9, 176:11-14 (same for homeownership rate); Trial Tr. vol. 1, 200:10–202:8 (Cooper testifying that "[o]n almost every metric, African Americans lag behind non-Hispanic whites" in FFSD, including in poverty rate and median household income); PLTF-44, *Cooper Decl.*, at Ex. D, pp. 1-46 (showing African Americans in FFSD have higher rates of transience, reliance on public transportation, percentage of homes with children headed by a single parent, receipt of food stamps/SNAP, persons under 65 with a disability; and lower median family income, earning level for full-time workers, bachelor degree attainment, percentage of workers in management and professional occupations, and health insurance coverage); Deft-FFSD D, *Supplemental Report of Jonathan Rodden: Senate Factors*, July 2, 2015 ("*Rodden Senate Factors Rep.*"), ¶ 22 (acknowledging that Black-majority census blocks do worse on socioeconomic indicators than even the Black population in FFSD as a whole), ¶ 26 (reporting that "[t]he depressing facts of segregation and the black-white income gap are clear"), ¶¶ 34-36 (acknowledging racial gaps on several socioeconomic indicators); *see also* PLTF-48, *Kimball Rep.*, at 10-12 (discussing St. Louis area gaps in educational

attainment, individual income, infant mortality, and overall mortality, which affect the likelihood of voting).

234.   Plaintiffs provided substantial and credible evidence that the African-American community in FFSD has particularized needs concerning unequal school resources and policies within FFSD. *See, e.g.*, Trial Tr. vol. 3, 84:1-18 (FFSD employee and former FFNEA president Frank Green testifying that "[u]nfortunately, not all schools use the same method" and discipline policies are set on a school-by-school basis); Trial Tr. vol. 3, 82:6-12 (Green testifying that "[t]here's that perception that the north side, because of where they're located and where the administration center is located, they just feel that that area [has] certain advantages"); Trial Tr. vol. 4, 166:19-21 (Board member Paulette-Thurman agreeing that a special concern that affects the African-American community in FFSD more than the white community is different resources allocated for north-side schools as opposed to south-side schools); Deft-FFSD D, *Rodden Senate Factors Rep.*, ¶¶ 26, 29, 30, 31 (reporting that some African Americans in FFSD live in middle-income housing but "the Southern tier of the district, with its dense multi-family dwellings whose residents are increasingly reliant on public assistance, is part of a swath of persistently poor African-American neighborhoods that have become even poorer after the Great Recession"; that "[m]iddle-class African Americans are far more likely than middle-class whites to live in close proximity to pockets of low-income multi-family housing"; that "Ferguson, Florissant, and the surrounding small jurisdictions are no exceptions"; and that "[i]ncome disparities between African-Americans and whites are . . . quite striking in the Southern part of the district"); Trial Tr. vol. 1, 111:15-23 (Gordon testifying that it is "remarkable" that "one can see [segregation and housing discrimination] inscribed on [the metro] landscape"); Trial Tr. vol. 1, 121:4-24, 145:10-24

(Gordon characterizing FFSD as having "trade[d] segregation between districts for segregation within a district").

235.    Plaintiffs provided substantial and credible evidence that the African-American community in FFSD has particularized needs concerning racial profiling by law enforcement. *See, e.g.,* Trial Tr. vol. 1, 51:12–53:2 (MO NAACP representative Pruitt testifying that the Ferguson DOJ report's discussion of incidents involving FFSD school resource officers, staffed by Ferguson police, were "horrific" and "raised the hair on the back of [his] neck"); Trial Tr. vol. 2, 145:7-21 (Dr. Kimball testifying that in FFSD "[t]here's evidence of racial disparities in experiences with law enforcement and local courts and traffic stops"); Trial Tr. vol. 2, 154:2-15 (Dr. Kimball testifying that a 2015 Department of Justice "report found that law enforcement and municipal court practices in Ferguson disproportionately harmed African-American residents and lowered their trust in local government as a result"); PLTF-48, *Kimball Rep.*, at 10-12 (discussing Attorney General's traffic-stop disparity index, showing that in Florissant, African Americans are roughly 7.5 times more likely than whites to be pulled over, and in Ferguson, 3.6 times more likely; and are searched and arrested more frequently, though the "even though the proportion of searches that yield contraband are substantially higher for whites than for blacks in both municipalities"); Trial Tr. vol. 3, 83:5-25 (former FFNEA president Green testifying that he agreed with NEA's press release[11] applauding the DOJ investigation, which stated that "[w]e need to end widespread racial profiling"; that "NEA recognizes that racial profiling is not just a police problem, and we are working to eradicate racial disparities in school discipline"; and that "NEA recognizes that the issue of racial profiling will not be resolved in a day, a week, or a month. Racism is, after

---

[11] PLTF-112, Press Release: *NEA applauds Justice Department's civil rights investigation into Ferguson (Sept. 4, 2014) (Ex. 3 to Dep. of Frank Green, Sept. 2, 2015)* (stipulated to authenticity but not relevance, but relevance objection never renewed after no ruling from judge).

all, the most intractable force in our society — and denial is the life-support system of racism.").

236.   Plaintiffs provided substantial and credible evidence that the African-American community in FFSD has particularized needs concerning disparate use of school discipline against, and disparate educational opportunities for, African-American schoolchildren in the District. *See, e.g.*, Trial Tr. vol. 2, 31:4-13 (former Board member Henson testifying that the African-American community has particularized needs because "any good teacher will tell you that they had to figure out ways how to find the students, you know, because every student doesn't learn the same [way]"); Trial Tr. vol. 4, 166:8-18 (Board member Paulette-Thurman, who is African American, agreeing that there are special concerns that affect the African-American community more than the white community in FFSD, including disparities in achievement and disproportionate discipline); Trial Tr. vol. 1, 22:20–23:10, 29:2-19, 30:13–31:5, 34:16-20 (testimony of MO NAACP representative Pruitt); Trial Tr. vol. 4, 102:20–103:10 (FFSD parent and NAACP employee Hudson testifying that the school-to-prison pipeline "starts in the schools where you have now seen kind of overpolicing or greater law enforcement presence in school settings, policies like zero tolerance that result typically in exponentially higher rates of suspensions and expulsion for black kids" despite "know[ing] that empirically there's almost zero relationship between those policies and educational outcomes"); Trial Tr. vol. 4, 102:9-19 (Hudson testifying that he thought the three Grade A for Change candidates "understood that we needed to take a look at some of the disciplinary policies that are set in the district by the board, some of the zero-tolerance stuff that we had concerns about, because it disproportionately impacts black kids in . . . all our schools"); Trial Tr. vol. 3, 84:21–86:7 (former FFNEA president Green testifying that the

African-American community in FFSD has special needs or concerns, in education specifically, and that those concerns include "[t]he ability to have resources at home for their students, the ability to be home for their students," stating "in the African-American community I think that's a huge problem," and testifying that he sees a difference in the racial makeup of FFSD students versus the racial makeup of administrators, teachers, and support personnel, and also testifying that FFNEA would not endorse a candidate who did not acknowledge the special needs and concerns of the African-American community but stating that he "cannot answer" whether the FFNEA has asked candidates for endorsement questions about those issues, and *see also supra* ¶ 229; *infra* ¶¶ 252-54; Trial Tr. vol. 3, 104:2-5, 104:22-24, showing that FFNEA did in fact endorse candidates who are unaware of any special needs or concerns, including Paul Morris, Brown, Chabot, and Hogshead).

237.    Plaintiffs provided substantial and credible evidence that the African-American community in FFSD has particularized needs concerning the Board's lack of transparency surrounding that suspension of former FFSD superintendent Dr. Art McCoy and its subsequent handling of community outrage about that decision. *See, e.g.*, Trial Tr. vol. 1, 45:4–51:11 (testimony of Pruitt); Trial Tr. vol. 3, 100:20–101:1 (when asked whether he believed the Board "acted in a racist way when it came to the situation with Dr. McCoy," former FFNEA president and witness Green testified, "if I didn't have privy to certain things, I could say yes. But knowing what I know, it's tough to say probably not, but that's because I'm privy to certain things that I can't speak on"); Trial Tr. vol. 3, 120:6–121:12 (Plaintiff and former Board candidate Johnson testifying that the Board did not explain its decision to suspend Dr. McCoy; that the community had respected and trusted him; that "when you have a principal leader like that that is kind of abruptly removed, there is some desire to want to

know what might have preempted that or led to it"; and that that he "believe[d] that [McCoy's] race played a part in some of that decision making"); Trial Tr. vol. 4, 104:12–105:9 (FFSD parent and NAACP employee Hudson describing how Dr. McCoy's recognition by the United States Chamber of Commerce, visiting individual schools to interact with students, and working with High Achievement For All had led him to believe Dr. McCoy had been "doing a fantastic job" as superintendent); Trial Tr. vol. 2, 33:19–35:13 (former Board member Henson, who was part of the Board that hired Dr. McCoy, describing how McCoy had tried "to raise the bar" by recruiting highly qualified people to his cabinet, introducing the district to social media, and at a meeting where parents were "very angry" about a planned merger of two schools, "he stayed and answered every question, embraced everybody. Even the folks that were the most vile, he still supported them").

238.    Plaintiffs provided substantial and credible evidence that the Board is either unaware of or has done little to respond to these needs. *See Ebert Dep.*, 107:3–108:3 (testifying that he knows of no particularized needs); *Brown Dep.*, 49:24–50:4 (same); *Hogshead Dep.*, 73:17–74:15 (same); *Chabot Dep.*, 86:14–87:9 (same); *Morris Dep.*, 97:2-20 (same):

    a.  Evidence that the Board is unaware of socioeconomic disparities: *Ebert Dep.*, 108:9–109:2 (testifying that he is unaware of socioeconomic racial disparities in the District); *Hogshead Dep.*, 73:22–74:23 (same); *Chabot Dep.*, 78:18–80:15 (same); *Morris Dep.*, 97:21–98:11 (same);

    b.  Evidence that the Board is unaware of racial profiling: *Ebert Dep.*, 109:3-9 (testifying that he is unaware of racial profiling by law enforcement); *Brown Dep.*, 48:5-9 (same); *Morris Dep.*, 98:12-15 (same);

c. Evidence that the Board is unaware of historic discrimination: *Joint Stip.* ¶¶ 276-78 (some Board members are unaware of history of official racial discrimination in the area);

d. Evidence that the Board has responded poorly to the transfer of Black students into the District: Trial Tr. vol. 1, 38:12–44:25 (Pruitt testifying that, in response to the school transfer law, the FFSD Board's emergency closed-meeting decision to decrease class sizes, Board candidates' campaigning on this issue, and the Board's later decisions to decline to provide transportation costs or set a lower tuition rate for these students had "very vocal and nasty" racial overtones and were perceived as "sole[ly]" intended "to prevent those kids from transferring to the district"); Trial Tr. vol. 3, 121:13–124:7 (former Board candidate Johnson testifying that when transfer students were discussed it was in "veiled kind[s] of conversation or directives" that were "not a reference to geography" but "some implicit reference to either students who potentially were deficient, potentially a cause for concern . . . because they were poor black and brown children" that could affect "the overall culture and management dynamic of students within the district" and stating that it would be "hard not to say" there were racial overtones to candidates' resistance to the transfer students); Trial Tr. vol. 4, 101:14–102:8 (FFSD parent and Plaintiff Hudson testifying that "I think  a lot of the resistance that parents in the district saw or perceived was based on the fact that these were more black students coming in our district[]");[12]

---

[12] The District requested the Court take judicial notice of Missouri Department of Elementary and Secondary Education Guidance for Student Transfers from Unaccredited Districts to Accredited Districts. Trial Tr. vol. 4, 130: 1-4. Plaintiffs objected that an undisclosed record from a website is not a proper object for judicial notice. *Id.*, 130: 8-9. Although the District did not explain the import of the record, it appears intended to respond to criticism of the Board's response to transfer students in 2013. The record for which the District seeks judicial notice is dated December 18, 2015. No witness explained how guidance issued in 2015 might be relevant to the response of the District in 2013, so, even assuming the record is subject to judicial notice, it is not relevant. In addition, "[u]nless an

e. Evidence that the Board has done little to respond to discipline and achievement gaps: *Ebert Dep.*, 116:15-17 (testifying that he is unaware of the discipline gap); *Brown Dep.*, 55:1-15 (same); *Hogshead Dep.*, 77:24–78:7 (same); *Chabot Dep.*, 88:14-21 (same); *Joint Stip.* ¶ 279 (no FFSD policies to address discipline or academic achievement racial gaps); Trial Tr. vol. 4, 134:23–135:10 (testimony of Donna Paulette-Thurman); *see also* Trial Tr. vol. 3, 124:8–126:5 (former Board candidate Johnson testifying that "it was continually disturbing to know that from hearing from principals and leaders in schools that there seemed to be a situation where people were not either culturally astute or sensitive enough to be able to navigate through some of the daily kinds of interactions that would lead to a student being ultimately dismissed from class," that "this culture that these types of children are not manageable and that we need to separate them out was . . . of concern racially. I believe that has strong racial underpinnings to it."); Trial Tr. vol. 3, 126:6-22 (Johnson testifying that Paul Morris campaigned on "hard enforcement particularly from the board level down" and that a concern Morris provided was "we're not having suspension hearings like at the rate we used to have them"); Trial Tr. vol. 1, 29:2–32:18 (MO NAACP representative Pruitt providing an example of how another area district is addressing the discipline gap and stating that "the number-one indicator of whether a child drops out of school, goes down the path to unemployment, or underemployment, subsequently is adjudicated to wind up in the system is not poverty, it's suspensions"); Trial Tr. vol. 1, 23:11-24, 26:4-5, 32:19–

---

administrative rule or regulation has been published in the Code of State Regulations, . . . a court may not take judicial notice of an administrative rule or regulation." *Powell v. State Farm Mut. Auto. Ins. Co.*, 173 S.W.3d 685, 689–90 (Mo. Ct. App. 2005) (citing Mo. Rev. Stat. § 536.031.5 and *State v. Mullenix*, 73 S.W.3d 32, 37 (Mo. Ct. App. 2002)).

36:22 (Pruitt testifying that the Black Leadership Roundtable, the NEA, the NAACP, and the U.S. Chamber of Commerce have created widely available resources for school districts to use in addressing these gaps but that FFSD has not implemented any policies or new curricula to do so); Trial Tr. vol. 1, 26:11–28:22 (Pruitt describing how one adjacent school district had engaged with parents, done self-assessment, mandated teacher training, and named the achievement gap as "their number-one priority," that another adjacent district had partnered with a food bank to provide dinner and take-home food, kept libraries open late, opened recreational facilities to student use, provided physical- and mental-health services on-site, opened a homeless shelter for transient students, and offered full-day pre-K and kindergarten, and that he viewed both districts' actions as "extremely" responsive to the particularized needs of the African-American community); Trial Tr. vol. 1, 31:20–32:18 (Pruitt stating that, in response to a report about a racial discipline gap, a nearby district "took immediate action" by placing on "moratorium on out-of-school suspensions," implementing faculty training, and requiring staff to document lesser interventions before recommending suspension, and that he viewed those actions as "[v]ery responsive" to the needs of the African-American community); Trial Tr. vol. 1, 24:21–25:6, 36:8–38:11 (Pruitt testifying that "to [his] knowledge," FFSD was not implementing scientifically tested methods for reducing the achievement gap or taking other actions, and for the Board "not to have any concrete policies, activities in place, demonstrates that the [B]oard doesn't care about those African-American children who are suffering," and that, in his opinion, when candidates campaign on the need to impose harsher discipline, "[i]t basically says that, again, they have no

interest in addressing the educational outcomes and the things that impact the educational outcomes of African-American children"); Trial Tr. vol. 2, 26:6–28:15, 29:21–30:25 (Henson testifying about the diversity committee he spearheaded, called High Achievement For All, which was eliminated after he left the Board); Trial Tr. vol. 2, 79:11–80:4 (former Board member Graham testifying that Henson "was always advocating for African-American students," which she believed contributed to his 2013 defeat because "everybody was not in favor of his agenda"); and

f.  Evidence that the Board has assigned blame for race-based discipline and academic disparities to parents: PLTF-119, *Pruitt Decl.*, ¶¶ 15-16 (declaring that Board members blame discipline and academic disparities on families); PLTF-116, *Henson Decl.*, ¶ 11 (same); *Chabot Dep.*, 87:15–88:13 (expressing this view); *Morris Dep.*, 110:13-24, 111:18–113:7 (same); *Brown Dep.*, 50:25–51:17, 53:6-19 (same); *Hogshead Dep.*, 77:2-21 (same); *see Joint Stip.* ¶ 280; PLTF-120, *Investigation of the Ferguson Police Department*, at 5 (as evidence of bias and stereotyping, citing the fact that "[c]ity officials have frequently asserted that harsh and disparate results of Ferguson's law enforcement system do not indicate problems with the police practices, but instead reflect a pervasive lack of 'personal responsibility' among 'certain segments' of the community");

239.  It is undisputed that the Board's decision to suspend Dr. McCoy, the first African-American superintendent of FFSD, was contentious, widely opposed by the African-American community in the District, and perceived—at least by some—as racially motivated. *Joint Stip.* ¶¶ 162, 281-296 (describing Board's communications with the public about McCoy's suspension); *see* Trial Tr. vol. 1, 46:18-19, 48:6-10, 48:17-21 (MO NAACP

representative Pruitt testifying that "[t]he community overall was in an uproar and wanted to know why Dr. McCoy was suspended. . . . It was a big problem. We all were concerned, especially the parents of the kids that attended the district and the people in the community. . . . There were all sort of innuendos and rumors, and we received any number of calls from individuals asking us as to why we were not engaging directly with the school board to have them explain exactly what was going on with Dr. McCoy."); *see also id.*, 47:13-16 (Pruitt testifying that the Board's explanation that it was not about race was not satisfying because "normally when . . . dealing with black children or people of color and the first thing they say [is] 'it's not about race,' in most cases that's exactly what it is"); Trial Tr. vol. 2, 35:14–39:22 (former Board member Henson describing the community's reaction to the suspension and the Board's responses); Trial Tr. vol. 4, 105:15–108:23 (FFSD parent and NAACP employee Hudson describing his reaction to the suspension and public comments at the November 2013 Board meeting, stating that the Board's response was "extremely frustrating" and based on "shifting explanations," initially "difference in philosophy," which was a "puzzle" because "when we looked at the mission statement of the district, his actions as a superintendent were entirely consistent with that"; that although he requested Board meeting minutes he "could find no thing in the record that would indicate what [the Board] had described to" parents about Dr. McCoy's alleged wrongdoing; and that concerned parents "were treated with great indifference, I believe"); PLTF-139, *Nov. 13, 2013 Board Meeting* (video clip played at trial).

240.    Based on the foregoing, the Court finds that the Board's actions in the face of the African-American community's concerns about Dr. McCoy's suspension were not sufficiently responsive. The Court does not find credible testimony from FFSD Board

members that they were not and are not legally permitted to discuss Dr. McCoy's suspension because it is a "personnel" matter. *See, e.g.*, *Morris Dep.* 57:3-16 (former Board member Morris stating that McCoy's suspension "was one of the main topics of the [2014] campaign," and when asked in what way, stating "[t]hey wanted to know why" and when asked how he responded, stating "[i]t's a personnel issue"); *Chabot Dep.* 96:14-22 (testifying that community members "just wanted to know why" McCoy was suspended, but stating that the suspension was of a "personnel nature"). There is no law that would prohibit public comment. *See also, e.g.*, Trial Tr. vol. 2, 99:1-5 (former Board member Graham testifying on cross-examination that "[y]ou do not take anything in public that has to do with personnel *unless there's a decision by the Board to do it*") (emphasis added). In fact, Board members have discussed Dr. McCoy's suspension, and the alleged reasons for that suspension, on multiple occasions when it is advantageous, PLTF-87, *Nov. 7, 2013 Board Letter to FFSD Families (Ex. 8 to Dep. of Paul Morris, June 15, 2015)* ("differences in focus and philosophy"; "not an indication of wrongdoing"); PLTF-88, *Nov. 12, 2013 Board Letter to FFSD Families (Ex. 9 to Dep. of Paul Morris, June 15, 2015)* ("[not] racially motivated"); PLTF-138, *Nov. 13, 2013 Board Meeting Mins*; PLTF-139, *Nov. 13, 2013 Board Meeting* (video) ("trust issues"), and have refused to do so only when it is not advantageous, even in the face of great public and student demand. *See supra, e.g.*, ¶ 239.

241.    Board members' credibility on this point is further undermined by their inaccurate statement that they met with the St. Louis County Executive, *see* PLTF-139, *Nov. 13, 2013 Board Meeting* (video), at 3:18:30 – 3:19:00 (referring to PLTF-88, Nov. 12, 2013 FFSD Letter) (County Executive spokesperson Patricia Washington stating that the Board did not meet with the Executive, contrary to its publicly disseminated letter to the FFSD community,

and described the Board's inaccurate statement as "scurrilous"), and their continuing insistence that a later-signed agreement with Dr. McCoy concerning his *resignation* prevents them from providing a public explanation for the *suspension*. McCoy's own counsel disputes that they are now—or were ever—prevented from publicly explaining the grounds for suspension. *See* ECF No. 44 (memorandum to court); ECF No. 51-2 (email from McCoy's counsel to parties' counsel, stating "[w]e do not oppose, nor do we believe the agreements related to the termination proceeding preclude, inquiry related to the suspension of Dr. McCoy and the process leading to the termination proceedings").

2. Access to candidate slating (Senate Factor 4)

242. The Ferguson-Florissant National Education Association and North County Labor Club are two well-established local slating organizations that endorse candidates for the Board. *See* Trial Tr. vol. 2, 131:7-15 (Kimball testifying that as a political scientist, "[s]lating means organized interests that endorse particular candidates for office," which serves as "a signal to voters that that particular group wants the endorsed candidate to be elected").

243. Each of these organizations promotes its endorsed candidates jointly. *See* Trial Tr. vol. 2, 24:6-21 (Henson testifying that the two 2013 endorsees were endorsed jointly at the polls and on campaign literature); *see also id.*, 131:11-22 (Kimball testifying that a hallmark of slating is the fact that endorsed candidates "can coordinate with other candidates who are endorse to promote" their endorsement by the slating organization, "to share that information to voters through phone calls and mailings and newsletters"); Trial Tr. vol. 3, 66:21–67:4 (former FFNEA president Green testifying that FFNEA campaign materials show the endorsed candidates running jointly and to his knowledge, FFNEA had never produced individual campaign materials in a year where FFNEA had endorsed several candidates); *Chabot Dep.*, 51:9–52:22 (testifying that the literature NCLC sent out included endorsements for him and

Morris together on the same mailing).

244. Beyond providing the signaling value of slating candidates, these organizations provide tangible resources to endorsed candidates, including campaign literature, mailing lists, and access to volunteers. *See* Trial Tr. vol. 2, 25:2-11 (Henson testifying that Paul Morris, former Political Action Committee chair for the Missouri NEA, held a fundraiser for Henson's non-incumbent challenger at Morris' home while Morris was FFSD Board president); *id.*, 131:13-22 (Kimball testifying that one of the benefits of being on a slate is that "endorsed candidates can . . . work with the group making the endorsement to promote" their endorsement "and to help recruit members of the group to volunteer for the candidate's campaign"); *Morris Dep.*, at 29:23–30:1, 30:21–31:11; *Ebert Dep.*, at 32:20-34:12, 37:19–39:3, 52:6-14; *Brown Dep.*, at 21:1-6, 22:16–23:3, 23:17-21, 30:10-19, 31:8-17; *Hogshead Dep.*, at 24:2-20, 25:17–27:6; *Chabot Dep.*, at 21:16-18, 23:15–25:8; 51:9-19, 52:14-22.

245. The FFNEA has endorsed candidates in every contested election at least since 2006. PLTF-130, *Kimball Sources for FFNEA Endorsements*, at 8 (showing 2006 endorsements); *Schroeder Dep.*, 23:4-8 (testifying that he was endorsed by FFNEA in 2009 and believes John Knowles was as well); PLTF-130, *FFNEA Endorsements*, at 13 (showing 2011 endorsements); *Ebert Dep.*, 50:13-22 (testifying that he was endorsed by FFNEA in 2012); PLTF-130, *FFNEA Endorsements*, at 15, 20, 26 (showing 2013, 2014, and 2015 endorsements, respectively); *Joint Stip.* ¶¶ 108, 109, 117 (showing that in 2007, 2008, and 2010 Board seats were uncontested and elections were not held).

246. Since 2006, similar numbers of white and Black candidates have run for office and sought FFNEA endorsement. The FFNEA has endorsed eleven of 19 white candidates (58%) but only 3 of 15 African-American candidates (20%). PLTF-49, *Kimball Rebuttal*, at 7.

247. Since 2004, the North County Labor Club endorsed 13 candidates for the Board, *Joint Stip.* ¶ 323, 12 of whom are white, PLTF-48, *Kimball Report*, at 8.

248. Neither FFNEA nor NCLC has written down or shared with the public their criteria for endorsement, and neither organization informs candidates after the fact why they were or were not endorsed. *See* Trial Tr. vol. 3, 16:17-21 (Kimball testifying that he "wasn't aware of any aware of any published materials that laid out what the criteria that FFNEA used to make endorsements or how they decided which candidates to endorse and which candidates not to endorse"); Trial Tr. vol. 2, 76:25–77:11 (Graham testifying that she was not told why she had not been endorsed and "[t]hey normally don't give you the reasons for the decision"); Trial Tr. vol. 2, 97:5-9 (Graham testifying that she did not believe the answers she gave during her FFNEA interview were a big consideration in whether she was endorsed in 2011); Trial Tr. vol. 2, 23:5–24:5 (former Board member Charles Henson testifying that he had "no idea" why FFNEA did not endorse him because he did not "know what actually they use to decide" and FFNEA does not publish its endorsement criteria); Trial Tr. vol. 3, 116:6-17 (former Board candidate Johnson testifying that he had not been given any explanation for why he was not endorsed); Trial Tr. vol. 3, 55:23–56:3 (former FFNEA president testifying that he had not seen FFNEA's endorsement process written down anywhere but that "it's just been handed down and passed down"); *Chabot Dep.*, 46:18-21 (Board member endorsed by NCLC testifying that he did not know NCLC's endorsement criteria); *Ebert Dep.*, 31:14-16 (same); *Brown Dep.*, 32:13-15 (same).

249. African-American candidates have less access than white candidates to these slating organizations. *See* Trial Tr. vol. 2, 132:25–133:1 (Kimball testifying that African Americans are endorsed "relatively rarely" by both FFNEA and NCLC when "compared to white

candidates"); *see also* Trial Tr. vol. 2, 132:3-10 (Kimball testifying that because off-cycle elections are "lower-information elections" in which "voters are generally receiving less information about the election, about the candidates," the "payoff" of an endorsement "can be bigger").

### 3. Subtle racial appeals (Senate Factor 6)

250. Based on credible testimony from some of the Plaintiffs and other members of the African-American community in and around FFSD, Board candidates in certain years made subtle appeals which African-American members of the community understood to be racial in nature, including advocating for more enforcement of discipline, which is already disproportionately meted out against African-American students in FFSD without candidate recognition of that fact; attributing discipline problems to "bad parenting"; in 2013 exploiting former Board member Henson's outspoken advocacy for racial inclusion; and in 2014 opposing (contrary to then-superintendent Dr. McCoy's position) the transfer of mostly African-American students from unaccredited neighboring school districts even though Missouri state law required FFSD acceptance of transfer students. PLTF-119, *Pruitt Decl.*, ¶¶ 15-17, 19, 21, 23; PLTF-116, *Henson Decl.*, ¶¶ 11-13, PLTF-117, *Hudson Decl.*, ¶¶ 8-10, 13; PLTF-118, *Johnson Decl.*, ¶¶ 12-13; PLTF-115, *Graham Decl.*, ¶ 16; *Joint Stip.* ¶ 335; *Morris Dep.*, 45:20–46:3 (former Board member Morris testifying that race was an explicit issue in the 2014 campaign); *id.*, 33:15-20, 52:4–53:1 (discussing former Board member Henson's tenure); *id.*, 126:10-14 (former Board member Morris agreeing that enforcement of discipline was a priority in his campaign); PLTF-139, *Apr. 3, 2014 Candidate Forum* (video), at 19:26 (former Board member Morris characterizing his vision for FFSD as "[c]reating environments where [students] can . . . feel safe, that they can learn, and they can do it without disruption . . . a school district where discipline is not an issue"); PLTF-139,

*Mar. 6, 2014 Candidate Forum* (video), at 1:10:40 (former Board member Morris stating that the "money issue that follows transfers students is . . . a huge issue" despite state law requiring sending districts to pay full tuition for each transferring student), 1:12:20 (Board member Chabot stating that "student transfer is a punitive law that's destroyed school districts. It's going to be kind of a rippling effect across the State of Missouri."); *Chabot Dep.*, 32:20-24, 41:17–42:6; PLTF-138, *Nov. 13, 2013 Board Meeting Mins.*, at 2; PLTF-115, *Graham Decl.*, ¶ 16; Trial Tr. vol. 1, 39:22–44:25 (MO NAACP representative Adolphus Pruitt describing his perception that the Board's decision to adjust FFSD class sizes downward, decline to reduce tuition, and decline to provide transportation in response to the school transfer law, and candidates' campaigning against the transfer law, had "very vocal and nasty" racial overtones "[b]ecause the districts that the kids will be coming from were predominantly African American, and they did not want to have these African American children in their school district"); Trial Tr. vol. 3, 126:23–128:8 (former Board candidate Johnson testifying that he was questioned about his personal life, including not being a homeowner, whether or not he had biological children in the district, and not being a longstanding resident of the community, that such questions were "[n]ot necessarily" evenly applied to all candidates, and that he perceived these questions as a "kind of cultural standardizing of what leadership could and should be in that community").

### 4. Discriminatory voting practices and procedures (Senate Factor 3)

251.    FFSD employs (1) an at-large voting scheme, (2) staggered terms, and (3) off-cycle ("*i.e.*, April versus November) elections. *Joint Stip.* ¶ 341; PLTF-48, *Kimball Rep.*, at 5-7.

252.    Because of the racially polarized voting present in FFSD and the cost-benefit analysis voters engage in as described credibly by Dr. Kimball, all three of these procedures have a disproportionately suppressive impact on African American voters in FFSD. *See Thornburg*

*v. Gingles*, 478 U.S. 30, 47 (1986); PLTF-48, *Kimball Rep.*, at 5-7; *see also* PLTF-117, *Hudson Decl.*, ¶ 17; PLTF-118, *Johnson Decl.*, ¶¶ 15, 18; *Ward v. Columbus Cty.*, 782 F. Supp. 1097, 1104 (E.D.N.C. 1991); PLTF-62a, Jonathan Rodden, *Is segregation the problem in Ferguson?*, The Washington Post (Blog), Aug. 18, 2014 (legible copy), at 6.

253. Given the continuing socioeconomic effects of past racial discrimination, including transience, the disproportionate effect of felony disenfranchisement, evidence of depressed turnout, and the heightened costs of seeking out information, registering to vote, and voting for persons with less income and less education, Dr. Rodden's testimony that the disproportionate benefits of these voting practices would automatically inure to whatever racial group has even a bare majority of the VAP in any given jurisdiction is not credible. *See* Trial Tr. vol. 2, 119:5-24 (Kimball testifying that an ethnic or racial minority would need a larger majority to control elections because of depressed registration and turnout rates, and because "[i]n order to win elections, it takes also some coordination, recruiting candidates, coordinating support that impose costs and take organizing and take resources. And so being just above 50 percent is probably, in my view, not enough to ensure control of the outcome of . . . at-large elections."); *see also* Trial Tr. vol. 4, 136:1–137:15 (Board member Paulette-Thurman testifying that it was difficult for Grade A for Change to recruit candidates and that Grade A had asked people attending an early meeting to stand up if they'd be willing to run for the Board and only three or four people stood out of 100, and even "[n]ot all of those people decided to do it"); Trial Tr. vol. 4, 139:3–140:1 (Thurman testifying that of the three people eventually recruited, one dropped out; his replacement "decided she did not want to run"; and finally Plaintiff Johnson was selected); Trial Tr. vol. 3, 132:25–133:3 (Plaintiff Johnson testifying that he was not the first choice of Grade A for Change); Trial Tr. vol. 2,

74:18–75:18 (former Board member Graham testifying that "for a black — I'm going to speak specifically from Berkeley — it's hard to get them to run, to spend the money, send the time and the energy to run, because they're looking overwhelmingly at the district and saying it seems like it's impossible").

5. Tenuousness of rationales (Senate Factor 9)

254. FFSD witnesses testified that their justification for the at-large voting scheme is so that they can continue to represent the interests of everyone in the District, rather than representing specific sub-districts of the District. Given that predominantly African-American areas of the District have been chronically underrepresented and that all the current Board members live within two small areas of Ferguson and Florissant, and given credible testimony that there is a widespread perception that schools in certain areas are better-resourced than others, this rationale for maintaining an at-large voting scheme is tenuous. *Joint Stip.* ¶¶ 275, 342-44; PLTF-115, *Graham Decl.*, ¶ 21; *see* Trial Tr. vol. 2, 81:8–83:8 (former Board member Graham testifying that she was the only Board member ever elected from Berkeley, stating that Berkeley residents had called her "many, many times" during her tenure to resolve issues with the school district, that "after I wasn't on the [B]oard anymore, they felt that they didn't really have anyone they could just particularly call," and describing how she fought successfully against naming a new school in Berkeley after a former plantation and slaveowner); *see* Trial Tr. vol. 2, 86:1-11 (former Board member Graham testifying that single-member districts would be "a better reflection o[f] the community that the [B]oard serves"); *id.*, 40:20–41:12 (former Board member Henson testifying that single-member districts are worthy of consideration and would "increase that opportunity for the public to have its voice heard by a neighbor" because "our current situation does not serve the community at its best").

Dated this 8th day of April, 2016.

Respectfully submitted,

/s/ Julie A. Ebenstein
DALE E. HO*
JULIE A. EBENSTEIN*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235
* appearing pursuant to Local Rule 12.01(F)

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, Julie A. Ebenstein, hereby certify that on April 8, 2016, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Kathryn B. Forster
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

/s/ Julie A. Ebenstein