## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

MISSOURI STATE CONFERENCE OF )
THE NATIONAL ASSOCIATION FOR )
THE ADVANCEMENT OF COLORED )
PEOPLE, REDDITT HUDSON, )
F. WILLIS JOHNSON and )
DORIS BAILEY, )
                                                      )    Civ. No. 4:14-cv-02077-RWS

                Plaintiffs, )
                                                     )

v. )
                                                     )

FERGUSON-FLORISSANT SCHOOL )
DISTRICT and ST. LOUIS COUNTY )
BOARD OF ELECTIONS )
COMMISSIONERS, )
                          Defendants. )


## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

# TABLE OF CONTENTS

I.   Jurisdiction ................................................................................................................. 1

II.  Section 2 of the Voting Rights Act ......................................................................... 1

III. Standing ..................................................................................................................... 3

IV.  Gingles 1 ................................................................................................................... 4

  A.   Plaintiffs have satisfied the threshold requirements of Gingles I ................................. 4

  1.   Legal standard ..................................................................................................... 4

  2.   Plaintiffs have satisfied the requirements of *Gingles* I. ............................................. 5

  3.   *Gingles* I does not require additional analysis of the population of the
       illustrative plan districts ......................................................................................... 6

     a)   African Americans do not currently constitute a majority of FFSD's VAP ........... 7

        i.   The presumptively accurate 2010 Decennial Census data show that
             African Americans are not a majority of the District's VAP .............................. 7

        ii.  The District has not overcome the presumptive accuracy of the 2010
             Census data ................................................................................................... 9

     b)   Plaintiffs would not be legally precluded from bringing a vote dilution
          claim even if African Americans were a majority of the VAP ......................... 16

     c)   African Americans lack an equal opportunity to elect their preferred
          candidates in the District's at-large system, even if they are just over
          50% of the VAP. ........................................................................................... 20

V.   *Gingles* II and III .................................................................................................... 24

  A.   The Legal Standard for Gingles II and III ................................................................ 24

  B.   Relevant Elections for Evaluating Gingles II and III ................................................ 25

  C.   Methods for Identifying Black-Preferred Candidates ............................................... 27

  1.   Dr. Richard Engstrom ............................................................................................ 29

  2.   Dr. Engstrom employed an appropriate approach to identifying candidates of
       choice ................................................................................................................. 31

  3.   Dr. Rodden's Approach for Identifying Candidates of Choice among Black
       Voters was Not Reliable ....................................................................................... 33

D.     Black-preferred candidates between 2011 and 2015 ................................... 36

E.     Plaintiffs have met the requirements of Gingles II and III using the appropriate legal standard ............................................................................................... 41

    1.    Plaintiffs' evidence demonstrated cohesiveness and that Black candidates were usually defeated ........................................................................... 41

    2.    Plaintiffs' evidence demonstrated that Black-preferred candidates were usually defeated ...................................................................................... 42

    3.    Special Circumstances ................................................................................. 43

    4.    Plaintiffs have met *Gingles* II and *Gingles* III even under the District's approaches for identifying Black-preferred candidates ......................... 46

    5.    Exogenous elections ..................................................................................... 49

VI.  Senate Factors ...................................................................................................... 51

    1.    The "Predominant" Senate Factors (Factors 2 and 7) Weigh in Favor of Plaintiffs. ..................................................................................................... 52

        a)    Board Elections are characterized by racially polarized voting (Senate Factor 2). ............................................................................. 53

        b)    African Americans are usually unsuccessful in being elected to the Board (Senate Factor 7). ......................................................................... 53

    2.    The Historical and Ongoing Effects of Discrimination in the State, St. Louis Metro Area, and FFSD (*Senate Factors 1 and 5*) Weigh in Favor of Plaintiffs. ..................................................................................................... 55

        a)    The State, St. Louis County, and FFSD have a long history of official discrimination that has touched the right of African Americans in the District to participate in the political process (Senate Factor 1). ...................... 55

        b)    African Americans in FFSD continue to bear the effects of discrimination, and those effects hinder their ability to participate effectively in the political process (Senate Factor 5). ....................................................... 57

    3.    The Remaining Senate Factors (Factors 8, 4, 6, 3, and 9) Also Weigh in Plaintiffs' Favor. ........................................................................................ 60

        a)    FFSD Board members have been unresponsive to the particularized needs of African-American constituents (Senate Factor 8). ....................... 60

        b)    Access to candidate slating (Senate Factor 4) ....................................... 63

c)     Subtle racial appeals (Senate Factor 6) ................................................................... 65

d)     FFSD employs voting practices and procedures that tend to enhance the opportunity for discrimination (Senate Factor 3). ........................................... 67

   i.    At-large elections ............................................................................................. 67

   ii.    Staggered terms ............................................................................................... 68

   iii.    Off-cycle elections ........................................................................................... 68

e)     The District's rationales for maintaining discriminatory practices are tenuous (Senate Factor 9). ............................................................................. 69

Conclusion ..................................................................................................................... 71

**CONCLUSIONS OF LAW**

After consideration of the testimony adduced at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, the Court concludes that, for the reasons provided below, the Ferguson-Florissant School District's at-large method for electing Board members deprives its African-American residents of an equal opportunity to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act. The Court's findings of fact and conclusions of law are set forth below.

**I.  Jurisdiction**

This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 52 U.S.C. § 10308(f) over Plaintiffs' claim against Defendants, which arises under Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

**II.  Section 2 of the Voting Rights Act**

Section 2 of the VRA prohibits the "impos[ition] or appli[cation]" of any electoral practice that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). The Supreme Court has held that "the Act should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (quoting *Allen v. State Bd. of Elections*, 393 U.S. 544, 567 (1969)). To prove a Section 2 violation, a showing of discriminatory intent is not required, as "Congress [has] made clear that a violation of § 2 c[an] be established by proof of discriminatory results alone." *Chisom*, 501 U.S. at 404. The standard for proving prohibited "discriminatory results" is set out in 52 U.S.C. § 10301(b), which provides:

> A violation of [Section 2] is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of

1

a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

A Section 2 vote dilution claim has two components. *First*, Plaintiffs must satisfy the three "*Gingles* preconditions," specifically: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district" ("*Gingles* I"); (2) the minority group must be "politically cohesive" ("*Gingles* II"); and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" ("*Gingles* III"). *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). *Second*, Plaintiffs must demonstrate that, based on the totality of circumstances, "a challenged election practice has resulted in the denial or abridgement of the right to vote based on color or race." *Chisom*, 501 U.S. at 394.

As the statutory language suggests, Section 2 requires a functional analysis of unlawful vote dilution. "[T]he question whether the political processes are equally open depends upon a *searching practical evaluation* of the *past and present reality*, and on *a functional view* of the political process." *Gingles*, 478 U.S. at 45 (emphasis added; internal quotation marks and citation omitted). At-large elections are not a *per se* violation of Section 2. *Id.* at 46. Instead, "[v]ote dilution claims are 'peculiarly dependent upon the facts of each case,' requiring 'an intensely local appraisal of the design and impact of the contested electoral mechanisms.'" *Cottier v. City of Martin*, 604 F.3d 553, 559 (8th Cir. 2010) (quoting *Gingles*, 478 U.S. at 79). To determine Section 2 liability, the Court must make a practical assessment of how at-large elections operate in the Ferguson-Florissant School District ("FFSD" or the "District"), and determine whether African-American voters have actual, not hypothetical, equal access to the political process.

The District's particular history of racial discrimination and resistance to desegregation in education, and the practical ways in which this history lives on in the persistent racial disparities experienced by its residents, therefore guide the Court's assessment of Black voters' access to the political process in the District. Pls.' Proposed Findings of Fact ("PFOF") (filed concurrently herewith) ¶¶ 9, 69, 207, 222, 228, 230. To be sure, FFSD is not alone among North St. Louis County ("North County") school districts in its experience with discrimination. But the "intensely local appraisal" that Section 2 requires, *see Gingles*, 478 U.S. at 79 (citation omitted), demonstrates that this history and its present effects in FFSD have developed and interacted uniquely with other conditions on the ground such that the existing at-large electoral system deprives FFSD's Black voters an equal voice in the political process.

As discussed below, Black and white voters diverge in their preferences as to whom they want to represent them on the Board. PFOF ¶¶ 122, 131, 141, 150, 163, 177-78, 184-85. White voters vote as a bloc to usually defeat Black voters' preferred candidates, which, combined with racial disparities and other local circumstances in the District, denies African-American voters a fair opportunity to elect their candidates of choice. PFOF ¶¶ 118, 207-232.

## III. <u>Standing</u>

Individual Plaintiffs Redditt Hudson, F. Willis Johnson, and Doris Bailey have standing because they are African-American citizens and voters who live in FFSD, in areas that could comprise single-member districts in which African Americans constitute a majority of the voting age population ("VAP"). PFOF ¶ 1. Organizational Plaintiff the Missouri State Conference of the National Association for the Advancement of Colored People ("MO NAACP") has standing because its membership includes African Americans who reside and vote in the District, some of whom reside in areas of the District that could constitute single-member districts in which African Americans are a majority of the VAP. PFOF ¶¶ 2-4. MO NAACP is also active in voter

registration, education, and turnout efforts related to elections for the FFSD Board of Education (the "FFSD Board" or "Board"). PFOF ¶ 3.

# IV. Gingles 1

## A. *Plaintiffs have satisfied the threshold requirements of* Gingles *I*

### 1. Legal standard

To satisfy the requirements of *Gingles* I, Plaintiffs must show that African Americans in the District are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. This straightforward threshold requirement is satisfied by the creation of an illustrative plan containing a single-member district in which Black voters constitute a bare majority of the VAP. *See Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (stating that *Gingles* I asks a simple threshold question: whether the protected group of voters can make up "more than 50 percent of the voting-age population in the relevant geographic area?"); *see also id.* at 16 (describing "the *Gingles* threshold inquiry" as "the baseline of our § 2 jurisprudence"). "[T]he Supreme Court [at this stage] requires only a simple majority of eligible voters in the single-member district. The court may consider, at the *remedial* stage, what type of remedy is possible . . . . But this difficulty should not impede the judge at the liability stage of the proceedings." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) ("*Bone Shirt II*") (alteration in original) (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991)); *see also Pope v. Cty. of Albany*, 687 F.3d 565, 576 (2d Cir. 2012) ("[T]he first *Gingles* question is straightforward and statistical: does the identified minority group form at least a simple majority of the relevant population in the proposed district?").

The plan must (1) satisfy the one person, one vote constitutional requirements, *i.e.*, approximate population equality across all districts in the plan, *see Abrams v. Johnson*, 521 U.S. 74, 98 (1997); and (2) be composed of geographical compact districts that comply with

traditional redistricting principles, including: contiguity; minimizing the splits of counties, municipalities, and precincts; recognizing communities of interest; and avoiding multimember districts, *see Abrams*, 521 U.S. at 92 ("[Section] 2 compactness inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" (citation omitted)); *Bone Shirt II*, 461 F.3d at 1019, and state and county districting requirements, *see Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) (in area of voting and apportionment, "federal courts are bound to respect the States' . . . choices unless those choices contravene federal requirements").

2.  Plaintiffs have satisfied the requirements of *Gingles* I.

Plaintiffs established that the African-American population in the District is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Plaintiffs' expert demographer William S. Cooper presented two illustrative plans in which Black voters constitute a majority of the VAP in not just one but four of seven districts. PFOF ¶ 89. Mr. Cooper is a recognized expert demographer in the context of Section 2 analysis. *See* PFOF ¶¶ 85-87; PLTF-44, *Expert Decl. of William S. Cooper*, May 27, 2015 ("*Cooper Decl.*"), at Ex. A (Summary of Redistricting Work), pp. 3-5; *see, e.g.*, *Ala. Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1271-72 (M.D. Ala. 2013) (three-judge court) ("William S. Cooper provided expert testimony about alternative redistricting plans for the Black Caucus plaintiffs."); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1392 (E.D. Wash. 2014) ("Plaintiffs' expert, Mr. William Cooper, generated five separate 'plans' which break the City of Yakima into seven individual voting districts."); *Pope v. Cty. of Albany*, No. 1:11-cv-0736, 2014 WL 316703, at *4 (N.D.N.Y. Jan. 28, 2014) ("Plaintiffs' second expert, William Cooper,

analyzed demographic and socio-economic Census data for the County.").[1] He testified credibly

to the data and methodology used to develop Plaintiffs' two illustrative plans. PFOF ¶¶ 90-96.

These illustrative plans comply with one-person, one-vote constitutional requirements because

they properly apportion the District's total population across the districts with minor deviation,

*i.e.*, total population deviations of less than 10%. *See* PFOF ¶ 96; *Evenwel v. Abbott*, No. 14-940,

2016 WL 1278477, at *2-3 (U.S. Apr. 4, 2016); *White v. Regester*, 412 U.S. 755, 764 (1973)

(holding that plans with total deviation of less than 10% presumptively comply with one person,

one vote); *accord Brown v. Thomson*, 462 U.S. 835, 842 (1983). The plans also comply with

traditional redistricting principles including contiguity, compactness, appropriate population-size

deviations, keeping census blocks together, and incumbency protection. *See* PFOF ¶¶ 91-97.

The District presented no evidence to contradict either that these plans include majority-

Black single-member districts or that the plans comply with constitutional requirements and

redistricting principles. Accordingly, the Court concludes that Plaintiffs have satisfied the

*Gingles* I threshold requirement by a preponderance of the evidence.[2] PFOF ¶¶ 85-97.

3. <u>*Gingles* I does not require additional analysis of the population of the illustrative plan districts</u>

Despite the fact that Plaintiffs plainly satisfy *Gingles* I, the District argues that Plaintiffs

have not satisfied *Gingles* I because African Americans purportedly constitute a majority of the

VAP in FFSD, and therefore already possess an opportunity to elect their preferred candidates

under the existing at-large system. But this argument is irrelevant because *Gingles* I requires no

additional analysis of the demographics of the District or the illustrative plan districts beyond a

---

[1] For the very first time at trial, the District objected to Mr. Cooper "being termed an expert." *See* Trial Tr. vol. 1, 181:10-13. The Court overrules this objection and concludes that Mr. Cooper qualifies as an expert demographer. *See* Pls.' Post-Trial Br. at 2-4. The Court also concludes that Mr. Cooper's testimony is reliable.

[2] The District's prediction about the effectiveness of Plaintiffs' illustrative single-member district plans is irrelevant to the *Gingles* I threshold determination. *See* Pls.' Post-Trial Br. at 22-29.

showing that African-Americans in the District are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Even if this argument were relevant to the *Gingles* I inquiry, it is unpersuasive for two reasons. *First*, the District has not provided reliable data sufficient to overcome the presumptive validity of the 2010 Decennial Census, which indicates that African Americans are a minority of the FFSD VAP and outnumbered by whites. *Second*, even if Black residents were to constitute a bare majority of the VAP in FFSD, vote dilution claims may go forward where, as here, the racial minority group in question has suffered a history of discrimination that inhibits their participation in the political process, such that they are disadvantaged by an at-large electoral arrangement. *See Pope*, 687 F.3d at 575 n.8; *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003); *Meek v. Metro. Dade Cty.*, 908 F.2d 1540, 1545-46 (11th Cir. 1990); *Monroe v. City of Woodville*, 881 F.2d 1327, 1332-33 (5th Cir. 1989).

a) *African Americans do not currently constitute a majority of FFSD's VAP.*

i. <u>The presumptively accurate 2010 Decennial Census data show that African Americans are not a majority of the District's VAP</u>

The Decennial Census population data is the appropriate metric by which to determine the demographics of FFSD's VAP. PFOF ¶ 23, 30-36. The Decennial Census is a full count of the nation's entire population every ten years and provides an accurate and complete count of FFSD's population and demographics. *See* PFOF ¶ 23; *see Evenwel*, 2016 WL 1278477, at *21 (Alito, J., concurring in judgment) ("The decennial census required by the Constitution tallies total population. Art. I, §2, cl. 3; Amdt. 14, § 2. These statistics are more reliable and less subject to manipulation and dispute than statistics concerning eligible voters."). According to the 2010 Census, African Americans are neither a majority nor a plurality of the total VAP of the District. PFOF ¶ 28.

Courts consider Decennial Census data "presumptively accurate." *See United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 439 (S.D.N.Y. 2010) (recognizing "the presumptive correctness of the prior decennial census" (citation omitted)). As a result, courts resolving VRA claims in the Eighth Circuit regularly rely exclusively on Decennial Census data for determining the demographics of a jurisdiction.[3] *See, e.g.*, *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385 n.1 (8th Cir. 1995) (relying on 1980 Decennial Census figures used at trial in 1995 appeals court decision); *Clay v. Bd. of Educ. of St. Louis*, 90 F.3d 1357, 1359 (8th Cir. 1996) ("*Clay II*") (relying on 1990 census VAP data); *African Am. Voting Rights Legal Def. Fund, Inc. v. Villa*, 54 F.3d 1345, 1347-48 (8th Cir. 1995) (relying on 1990 census VAP data); *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 925-26 (E.D. Ark. 2012) (using 2010 census BVAP data); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 983 (D.S.D. 2004) ("*Bone Shirt I*") (using 2000 census data); *Williams v. City of Texarkana*, 861 F. Supp. 756, 758 (W.D. Ark. 1992) (determining BVAP based on 1980 census data); *Jeffers v. Clinton*, 756 F. Supp. 1195, 1201 (E.D. Ark. 1990) ("using 1980 census numbers, which are the most reliable data we have and the basis for all our other computations").

Courts presume the continued accuracy of the most recent Decennial Census figures absent a party meeting the heavy burden of proving otherwise. In order for a Court to rely on an alternate source of population data, the party challenging Decennial Census data (here, the District) must overcome the strong presumption of its accuracy. *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir. 1988) ("The census is presumed accurate until proven otherwise."). Thus, to show that there has been a substantial population shift rendering the actual count of the Decennial Census data inaccurate, the party challenging the use of the Census data must

---

[3] Missouri state law requires the use of Decennial Census data to determine "the population . . . for the purpose of representation." *See* Mo. Rev. Stat. § 1.100.1 ("The population of any political subdivision of the state for the purpose of representation . . . is determined on the basis of the last previous decennial census of the United States.").

"thoroughly document[]" changed population figures with "a high degree of accuracy," a showing that must be "clear, cogent and convincing." *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1210 (S.D. Tex. 1997) (citation omitted), *aff'd*, 165 F.3d 368 (5th Cir. 1999); *Vill. of Port Chester*, 704 F. Supp. 2d at 439; *see also Kirpatrick v. Preisler*, 394 U.S. 526, 535 (1969) ("Where [substantial population shifts] can be predicted with a high degree of accuracy, States that are redistricting may properly consider them. . . . Findings as to population trends must be thoroughly documented and applied throughout the State in a systematic, not an ad hoc, manner."); *Dixon v. Hassler*, 412 F. Supp. 1036, 1040 (W.D. Tenn. 1976) (three-judge court) ("[T]he decennial census figures will be controlling unless there is 'clear, cogent and convincing evidence' that they are no longer valid and that other figures are valid."), *aff'd sub nom. Republican Party of Shelby Cty. v. Dixon*, 429 U.S. 934 (1976). As explained below, the District has not met the burden of overcoming the presumptive accuracy of the Decennial Census data and has not shown that this Court should consider an alternate source of data.

ii. The District has not overcome the presumptive accuracy of the 2010 Census data

The District presents three sets of data that it argues should be used to determine the Black VAP: (1) 2011–2013 3-year American Community Survey ("ACS") population estimates, PFOF ¶ 29; *see also* PFOF ¶¶ 30-35, (2) calculated estimates of the "any part Black" VAP generated by the District's expert for the purposes of this lawsuit and based in part on the 2011–2013 ACS estimates, *see* Deft-FFSD A, *Report of Jonathan Rodden*, May 27, 2015 ("*Rodden Rep.*"), ¶¶ 12-13; and (3) linear projections by the District's expert of the FFSD VAP based on past ACS population estimates. None of these data sets overcome the presumptive accuracy of the 2010 Decennial Census count, which states that Blacks are a minority of the VAP in the District.

a. *The 2011–2013 ACS estimates neither state that African Americans are a majority of the District's VAP nor overcome the 2010 Census's presumptively accurate count of the Black VAP*

The ACS publishes no data that overcomes the presumptive validity of the 2010 Decennial Census's count of the Black VAP in the District. As an initial matter, there is no information published by the ACS that, on its face, indicates that African Americans are a majority of the VAP in the District. Although the 2011–2013 ACS population estimates for the District suggest that single-race African Americans may now be a plurality of the VAP in the District at 48.9%, they clearly do not show that single-race African Americans are a *majority* of the VAP. *See* PFOF ¶ 41. And the ACS reports no estimate for the percentage of the VAP in the FFSD that is "any part" Black.

But even considering the ACS estimates of the single-race Black VAP in the District, it is critical to recognize that the margins of error in the 2011–2013 ACS for the District's VAP are too wide to establish that the demographics of the FFSD population have substantially changed since 2010. The ACS provides a population estimate with only a sufficient degree of certainty to say that the actual number is within a particular range. *See* PFOF ¶¶ 22 (table), 30-35, 37, 41, 44-46. Because ACS population estimates are based on a sample, and not a complete count like the Decennial Census, they are subject to sampling bias, *i.e.*, error margins or confidence intervals. PFOF ¶¶ 30. The Census Bureau itself cautions against using ACS estimates rather than the Decennial Census complete count to determine the population of a given geographic area.[4] PFOF ¶ 34. Indeed, Justice Alito recently noted that "[t]he decennial census required by the Constitution tallies total population . . . These statistics are more reliable and less subject to

---

[4] The danger of using ACS estimates to determine the population has proven to be well founded. Before the 2010 Decennial Census count, ACS estimates predicted that the City of St. Louis had gained in population after 60 years of decline, only to discover at the 2010 Decennial Census count that the population had declined by approximately 30,000 residents. PFOF ¶ 35; Trial Tr. vol. 1, 136:13-22 (Gordon testimony).

manipulation than statistics concerning eligible voters." *Evenwel v. Abbott*, 2016 WL 1278477, at *21 (Alito, J., concurring in the judgment).

Here, the 2011–2013 ACS estimates fail to establish with statistical confidence that the single-race Black VAP has grown larger than the white VAP in the District. The 2011–2013 ACS survey estimates state with 90% certainty that the single-race BVAP is between 22,800 and 25,826 and that the single-race non-Hispanic white VAP is between 21,829 and 24,655. PFOF ¶¶ 22 (table), 45-46. As estimated by the 2011–2013 ACS, the margins of error for the single-race BVAP and white VAP overlap, *see* PFOF ¶ 47, which means that we cannot say with confidence that the difference in the two population figures is significant. *See* Trial Tr. vol. 1, 135:22–136:2 (testimony of Colin Gordon that "If you're comparing two numbers and the confidence intervals overlap, there's no statistical significance between the two numbers. There's no basis for claiming that one number is bigger than the other, because the supposed difference between the numbers is completely swallowed by the margin of error as reported by the ACS.").

In fact, given the margins of error, the 2011–2013 ACS estimates do not establish that the Black VAP of the District has substantially changed since 2010. The 2011–2013 ACS survey estimates state with 90% certainty that the single-race Black VAP is between 22,800 and 25,826,[5] a margin of error that *includes* the Decennial Census single-race Black VAP count of 24,030. PFOF ¶ 44. Put another way, according to the ACS confidence interval, the single-race Black VAP could be as small as 22,800, which is actually *smaller* than the 2010 Census estimate of 24,030. PFOF ¶ 44. Thus, given the large margin of error, the most recent three-year ACS estimate of the District's single-race Black VAP is not statistically distinguishable from the single-race Black VAP reported by the Decennial Census. *See* PFOF ¶¶ 22 (table), 44; Trial Tr.

---

[5] The 2011–2013 ACS estimates the single-race Black VAP of FFSD as 24,313, a difference of 283 people from the 2010 Census count of 24,030. The margin of error for the ACS estimate is ±1,513. PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46; PFOF ¶ 22 (table).

vol. 5, 177:5-21 (Rodden conceding that he cannot calculate whether the 2011–2013 ACS Black VAP estimate is different to a statistically significant degree from the Decennial Census Black VAP). And the ACS estimated change in the single-race non-Hispanic white VAP is hardly substantial.[6] Accordingly, because the error margins in the 2011–2013 ACS are too large to constitute statistically significant evidence that the Black VAP outnumbers the white VAP in the District, or that the demographics in the District have substantially changed since 2010, the District has failed to meet its burden of proving that the Court should reject the 2010 Decennial Census's count of African Americans as less than a majority of the District's VAP.

> b. *The District's population <u>estimates</u> based on the ACS estimates do not overcome the Decennial Census's presumptively accurate count of the Black VAP in the District*

As noted, the ACS reports that, at most, single-race African Americans are estimated to be a plurality but not a majority of the District's VAP. There are thus no published government data stating that Blacks—including individuals who are two or more races and "some part" Black—are the majority of the VAP. *See* PFOF ¶¶ 22 (table), 37. The only figures that even purport to show that African Americans are a majority of the District's VAP are the District's expert's estimates of the number of voting-age individuals in FFSD who are "any part" Black. *See* Trial Tr. vol. 5, 174:9-15 (Rodden agreeing that the only way to get a number that shows that African Americans are a majority of FFSD's VAP is for District to perform a calculation that the demographers at the Census Bureau do not calculate when they publish the ACS). These estimates, however, which Dr. Rodden generated for the purposes of this litigation, suffer from three infirmities that render them unreliable and otherwise insufficient to overcome the

---

[6] The 2011–2013 ACS estimates that the single-race non-Hispanic white VAP of FFSD is 23,242, a difference of 1,610 people from the 2010 Census count of 24,852.The margin of error for the ACS estimate is ±1,413. PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46; PFOF ¶¶ 37, 45. The decrease in the white VAP since the 2010 Census cannot be accurately documented as more than 197 people.

presumptive validity of the 2010 Decennial Census.

*First*, Dr. Rodden's calculations are based on ACS data, which, for the reasons discussed above, should not be credited over the Decennial Census's presumptively accurate complete count. PFOF ¶¶ 23, 29-36.

*Second*, in his estimate of the number of multi-race individuals in FFSD who are any part Black and 18 years of age or older, *see* PFOF ¶ 51, Dr. Rodden cannot report any error margins, *see* PFOF ¶ 55; Trial Tr. vol. 5, 170:2-8 (testimony of Jonathan Rodden), which, by his own admission, renders this estimate inconsistent with generally accepted professional standards in political science.[7] When making estimates, the smaller the survey sample, the larger the error margin. *See* PFOF ¶¶ 34, 55. Here, the ACS survey samples only about 2% of the total population, *see* Trial Tr. vol. 1, 133:18-134:5 (testimony of Colin Gordon); Dr. Rodden's attempt to produce an estimate of the "any part" Black VAP in FFSD entailed extrapolating from a tiny slice of that 2% sample (*i.e.*, mixed-race individuals who are part-Black and live within FFSD), *see* Trial Tr. vol. 1, 136:5-12 (Gordon testifying that "[t]he margin of error grows larger the smaller the demographic unit you're talking about. So — and this is particularly true when we make any effort to tease out how many African American identified voters are in the nonsingle-race category. There the number reported is in the hundreds, but the margin of error is also in the hundreds. So we really have no confidence as to what the number really is."). It is therefore telling that, while Dr. Rodden described his calculations here as relatively simple, *see* Trial Tr. vol. 5, 173:1-7 (testimony of Jonathan Rodden), the expert demographers at the Census Bureau declined to publish estimates for the category of "any part" Black for the VAP of FFSD in the 2011–2013 three-year ACS, *see id.*, 174:9-15 (testimony of Jonathan Rodden); *cf.* PFOF ¶ 42.

---

[7] In fact, Dr. Rodden testified, in other parts of his testimony, that it is standard practice to report confidence intervals, and leaving them out is inconsistent with peer review standards. *See* Trial Tr. vol. 5, 151:5-16; 154:12-21.

Notably, courts have declined to use sources of population data that do not contain the relevant VAP figures. *Cf. Blytheville*, 71 F.3d at 1385 n.1 (using 1980, rather 1990, Census figures because the panel did not have "the relevant voting age populations" from the 1990 Census before it).

*Third*, there are unexplained errors in Dr. Rodden's estimates, both of which tend to overestimate the District's Black VAP. *See* PFOF ¶¶ 53-55. For instance, Dr. Rodden excludes persons reporting two or more races from the District's full VAP in his calculations, thereby using a smaller denominator and overstating Black VAP proportion of the population. *See* PFOF ¶ 53. Dr. Rodden also does not use the BOEC's FFSD boundaries in his population estimates, because the ACS does not provide tract data, and the exact geographic area of BOEC and the corresponding population, cannot be reproduced. *See* PFOF ¶ 25, FN1; Cooper Report at ¶ 13.

For these reasons, the Court finds that Dr. Rodden's calculations undertaken for the purposes of litigation are unreliable.

      *c. The District's population <u>projections</u> based on the ACS estimates do not overcome the 2010 Census's presumptively accurate of count of the Black VAP in the District*

Next, in an attempt to predict the VAP in the District by race in 2015, the District's expert created a linear projection by plotting the average population estimates from the midpoint year of four sets of ACS three-year estimates, 2008–2010, 2009–2011, 2010–2012, and 2011–2013. PFOF ¶ 57; *see* Deft-FFSD A, *Rodden Rep.*, ¶¶ 12-13, Fig. 3 (p. 6). After plotting the midpoints for these four three-year estimates, which he labeled 2009, 2010, 2011, and 2012,[8] he then simply drew a straight line through these points, which he projected forward through 2015. *See* PFOF ¶ 59; Deft-FFSD A, *Rodden Rep.*, ¶¶ 12-13, Fig. 3 (p. 6).

---

[8] This is methodologically faulty since multiyear ACS data is weighted and averaged over time, and thus "it cannot be used as a proxy for a point-in-time sample" and does not represent the midpoint or endpoint of that multiyear period. *See* PFOF ¶ 58.

Dr. Rodden's simplistic linear projection of FFSD's VAP population by race does not provide clear, cogent, or convincing evidence that it has a high degree of accuracy for a number of reasons. In particular, his calculations are precisely the kind of "overly simplistic, 'crude' analyses that are easy and inexpensive to calculate but too inaccurate to serve as a basis for changing the basis of conducting elections" that courts have repeatedly rejected. *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 459 (N.D. Tex. 2010) (citation omitted) (rejecting expert's projected population estimate based on uncertain ACS estimates as "correspondingly unreliable"); *Perez*, 958 F. Supp. at 1212-13; *Dixon*, 412 F. Supp. at 1041 (rejecting estimates prepared by the National Planning Data Corporation as insufficient proof that the Decennial Census figures are not the best evidence of the current population, and noting that other factors must be taken into account to provide reliable projections).

For one, Dr. Rodden's calculations were derived without heeding the ACS's warnings against using uncertain ACS estimates to project population forward. *See* PFOF ¶¶ 30-36. As with his population estimates, moreover, Dr. Rodden omits margins of error for his projections, which leaves no way for the Court to determine whether an estimated population change since 2010 is a substantial change, rendering the 2010 population count obsolete, or whether it can be explained by the normal population churn in the decade between Decennial Census counts. As *Gaffney v. Cummings*, 412 U.S. 735, 746 (1973) (dicta recognizing that Decennial census population counts are constantly in flux but "[t]hese figures may be as accurate as such immense undertakings can be, . . . they are inherently less than absolutely accurate,"); *see also McNeil*, 851 F.2d 937, 946 (1988) (even if Census data does not reflect present population precisely, it does not require courts to use a different data set); *Perez*, 958 F. Supp. at 1212-13.

In addition, Dr. Rodden does not address factors that may affect demographic change in

the District and impede voting. For example, property ownership and the housing market can affect migration into or out of the District and implicate voting rights. PFOF ¶¶ 80-84 (homeownership), ¶¶ 73-76 (inter-district registration requirements). Local events, including the high profile events in Ferguson the past two years, may affect residents' decision to move to or remain in the district. *See* Trial Tr. vol. 1, 205:14-24 (Cooper testified that the Michael Brown incident in Ferguson "could have completely changed the trend line" and "[t]here's no way to know how that may affect future population changes in the school district."). Yet Dr. Rodden did not consider either factor in his projection. Moreover, Dr. Rodden made the seemingly random methodological decision to anchor his linear projection in the "2009" population estimates. Dr. Rodden's projection would have an entirely different slope had he decided to draw the projection line with data beginning in a different year. ECF No. 85-26, *Dep. of Jonathan Rodden*, Aug. 20, 2015 ("*Rodden Dep.*"), 113:23–114:16.

For these reasons, Dr. Rodden's unsubstantiated linear projection based on four averaged three-year ACS estimates, without more, is not sufficiently convincing to overcome the presumptive accuracy of the 2010 Decennial Census. The Court accepts the Decennial Census figures as the data upon which to assess Plaintiffs' dilution claim. As such, the Court concludes that African Americans remain a minority of the VAP for purposes of assessing this claim.

> b) *Plaintiffs would not be legally precluded from bringing a vote dilution claim even if African Americans were a majority of the VAP.*

Even assuming, *arguendo*, that this Court were to find that African Americans constitute a majority of the District's VAP, that would not be the end of the analysis. Racial minorities do not suddenly lose the broad protections of the VRA at the moment that they surpass 50% of a jurisdiction's VAP. A racial minority group that is a bare majority of a jurisdiction's VAP may still suffer from actionable vote dilution where, as here, its members have suffered from a history

of discrimination and persistent socioeconomic inequalities that hinder their participation in the political process, such that they remain disadvantaged by a traditional at-large electoral arrangement.

A "racial minority," as it is used in the Section 2 context, refers not to a numerical minority, but rather to members of a protected class. Section 2, subsection (a), prohibits voting practices that result in an abridgement of the right to vote "on account of race or color." 52 U.S.C. § 10301(a). Subsection (b) establishes a violation of Section 2 if the political processes are not equally open to "members of a class of citizens protected by subsection (a)," and uses "members of a protected class" two other times in the subsection. 52 U.S.C. § 10301(b). *Gingles* states that Section 2(a) concerns "member[s] of a protected class of racial and language minorities." 478 U.S. at 43; *see also Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542, 1548 (5th Cir. 1992) ("The Act was aimed at measures that dilute the voting strength of groups because of their race, not their numerical inferiority."); *id.* at 1547 (noting that "the plain text of [Section 2 of the VRA], as affirmed by case law, makes clear that the Act is concerned with protecting the minority in its capacity as a national racial or language group," not in its capacity as a numerical minority in any particular jurisdiction). And the Act's legislative history makes clear that Congress passed the law to effectuate the guarantees of the Fifteenth Amendment and remedy "the systematic exclusion of [Black people] from the polls that characterizes certain regions of this Nation." H. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2440. Racial minorities maintain VRA protection even if they reach a bare numerical majority of a jurisdiction.

Indeed, the Supreme Court has made clear that "it may be possible for a citizen voting-age majority to lack real electoral opportunity." *League of United Latin Am. Citizens v. Perry*,

548 U.S. 399, 428 (2006).[9] Consistent with this Supreme Court guidance, four of the five Courts of Appeals that have considered this question (the Second, Fifth, Eleventh, and D.C. Circuits) have rejected the *per se* rule prohibiting vote dilution claims where a racial minority constitutes a numerical majority of a jurisdiction, as proposed by the District in this case.[10] *See Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003) ("Vote dilution claims must be assessed in light of the demographic and political context, and it is conceivable that minority voters might have less opportunity . . . to elect representatives of their choice even where they remain an absolute majority in a contested voting district." (internal quotation marks and citation omitted)); *Monroe v. City of Woodville*, 881 F.2d 1327, 1332-33 (5th Cir. 1989) ("Unimpeachable authority from [the Fifth Circuit] has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution."), *cert. denied*, 498 U.S. 822 (1990);[11] *Meek v. Metro. Dade Cty.*, 908 F.2d 1540, 1545-46 (11th Cir. 1990) (holding that a claim brought by minority voters who constitute a numerical majority could be viable due to "functional effect" of existing system, and that the district court "properly rejected the county's contention that *Gingles* could not apply at all in a setting where the Non Latin White bloc did not constitute a majority of the total population"); *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012) (approvingly citing *Salas*'s conclusion that majority-

---

[9] *Bartlett v. Strickland*, 556 U.S. 1 (2009), is not to the contrary. *Bartlett* stands for the proposition that a racial minority must have a population over 50% to have an "opportunity to elect," but does not say that 50% of the VAP is sufficient to elect a minority-preferred candidate in every instance, such that claims are barred once a minority group becomes 50.1% of a jurisdiction's VAP.

[10] Without expressly addressing this issue, the Ninth Circuit has considered claims by minority voters from a group that constituted a plurality of a jurisdiction's VAP, without suggesting that this would act as a *per se* bar to relief. *See Valladolid v. City of Nat'l City*, 976 F.2d 1293, 1294 (9th Cir. 1992) (considering a vote dilution claim in which the plaintiff minority groups formed a plurality of the population (49.6%)).

[11] The Fifth Circuit has repeatedly reaffirmed this holding. *See Salas*, 964 F.2d at 1547 (reaffirming that minorities may bring *Gingles* claims even if they constitute a voting-age population or registered-voter majority); *Gonzalez v. Harris Cty.*, 601 F. App'x 255, 256 (5th Cir. 2015) (reviewing vote dilution case involving Hispanic plurality).

minority vote dilution claims are not barred as a matter of law).[12]

Courts have found Section 2 liability where a racial minority group comprised a majority or near-majority of the jurisdiction's population. *See, e.g.*, *Martin v. Allain*, 658 F. Supp. 1183, 1188-91, 1204-05 (S.D. Miss. 1987) (finding Section 2 violations in certain at-large, multimember districts with majority Black populations and BVAPs); *United States v. Dallas Cty. Comm'n*, 636 F. Supp. 704, 710 (S.D. Ala. 1986) (finding at-large system for county commissioners violated Section 2 where Blacks comprised 49.8% of the VAP, an almost 5% increase from four years prior); *Windy Boy v. Cty. of Big Horn*, 647 F. Supp. 1002, 1004, 1023 (D. Mont. 1986) (finding Section 2 violation where American Indians comprised 46.2% of the population and whites 52.1%); *Jordan v. City of Greenwood*, 599 F. Supp. 397, 400, 404-05 (N.D. Miss. 1984) (finding Section 2 violation where Blacks constituted 52% of the total population and 46.2% of the VAP); *N.A.A.C.P. v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978, 980, 983 (11th Cir. 1982) (finding at-large system had effect of diluting Black voting power where African Americans constituted a majority of the population and over 49.36% of the registered voters).

Indeed, courts in the Eighth Circuit have recognized in crafting remedial plans that minority voters often require more than a bare numerical majority in order to elect their preferred candidates. *See Smith v. Clinton*, 687 F. Supp. 1361, 1362 (E.D. Ark. 1988) (three-judge court), *aff'd mem.*, 488 U.S. 988 (1988); *see id.* at 1363 (ordering Board to implement plaintiffs' plan providing for single-member majority-Black district with a 60.55% BVAP to "give blacks a fair

---

[12] Only the Fourth Circuit has applied a *per se* rule precluding a Section 2 claim by a numerical majority. *See Smith v. Brunswick Cty. Bd. of Supervisors*, 984 F.2d 1393, 1401 (4th Cir. 1993) (holding that if minority voters "have the numbers necessary to win and members of the group are allowed equal access to the polls, it cannot be rationally maintained that the vote is diluted"). The Fourth Circuit's decision barring the plaintiffs' claim arose in a vastly different context, where African Americans constituted a supermajority of the relevant districts' VAP (60%) and had a consistently higher turnout rate than white voters. *See id.* at 1400-02. Even if African Americans were to constitute a bare majority of a jurisdiction's population, Plaintiffs' claim would not be barred.

opportunity to elect the candidate of their choice . . . and help to eradicate the effect of the dual-member, at-large system on participation by blacks in the political process"); *see also Bone Shirt II*, 461 F.3d at 1023 (applying 65% minority population as a "guideline" to consider in fashioning remedial relief and correctly considering turnout rate and incumbency in formulating a districting plan).

c) *African Americans lack an equal opportunity to elect their preferred candidates in the District's at-large system, even if they are just over 50% of the VAP.*

A local appraisal of the FFSD, as discussed *infra* Section VI, demonstrates precisely why the *per se* rule urged by the District would frustrate the purpose of Section 2: it is clear that voting in the District is racially polarized and Black-preferred candidates have a much lower rate of success than white-preferred candidates, which indicates that, regardless of the precise size of Black VAP in the District, the existing at-large arrangement dilutes Black voting power. Critically, a range of ongoing disparities hinder African Americans' present ability to participate equally in school board elections. Members of the African-American community in FFSD are historically disadvantaged and face functional barriers to electoral participation as a result of the ongoing socioeconomic effects of discrimination, as well as electoral processes that, in practice, favor the status quo. *See* PFOF ¶¶ 207-232, 251-54. Thus, even were the District correct that residents who are any-part Black are not 48.2% of the VAP (as reported by the Census), but rather are slightly over 50% of the VAP (according to Dr. Rodden's highest projections), the District has not shown that such a distinction makes a functional difference in terms of how at-large elections operate to the detriment of African Americans in FFSD. Under the facts of this case, a bare numerical majority of the VAP is insufficient to translate into meaningful electoral opportunity.

*First*, African Americans in Missouri are registered to vote at lower rates than non-

Hispanic whites. PFOF ¶ 78; *see also* Trial Tr. vol. 5, 71:1-4 (Rodden testifying that "of course, we know [it's] true" that "registration varies across race in Missouri").[13] For reasons stated in the Findings of Fact, it is reasonable to infer that these statewide racial disparities in registration rates are replicated in the District. PFOF ¶ 79. That conclusion is consistent with the undisputed testimony of Plaintiffs' experts, who opined that various socioeconomic disparities in the District along racial lines correlate with lower voter registration rates. *See* PFOF ¶ 220-222, 232. Indeed, Dr. Rodden conceded that these factors affect a citizen's propensity to register to vote. *See* PFOF ¶ 232. For instance, there are lower rates of homeownership among Black people in the District, which leads to higher mobility that burdens registration. PFOF ¶¶ 73-76 (registered voters who move from one jurisdiction to another before an election deadline are not eligible to vote unless they re-register at their new address before that deadline); ¶¶ 81-83 (African Americans rent their homes at a significantly higher rate than whites); Trial Tr. vol. 4, 90:2–91:11 (Hudson testifying that Black voter registration rate is low, in part because of the transience of the population). Based on racial disparities in the statewide voter registration rates, and racial disparities in various socioeconomic measures within the District itself, including the homeownership rate, the Court finds that, within FFSD, African Americans are less likely than whites to be registered to vote. PFOF ¶¶ 80-84, 220-232.[14]

---

[13] Black voters are not precluded from bringing a vote-dilution claim even if they constitute a majority of registered voters. *See Salas*, 964 F.2d at 1547.

[14] Black voting-age residents of FFSD are also more likely to be serving a sentence of felony probation or parole, which renders an individual ineligible to vote. African Americans in FFSD are disproportionately affected by felony disenfranchisement as compared to non-Hispanic whites. PFOF ¶ 67; *see also* Trial Tr. vol. 1, 139:3-17 (Gordon providing African-American and overall rates of felony disenfranchisement in Missouri); Trial Tr. vol. 4, 90:21–91:11 (testimony of NAACP regional field organizer Hudson). In Missouri, African Americans are disenfranchised due to a felony conviction at higher rates than whites. PFOF ¶ 67. Given the patterns of policing in North County, *see* PFOF ¶¶ 71, 169; *see generally* PLTF-120, U.S. Dep't of Justice, *Investigation of the Ferguson Police Department*, Mar. 4, 2015, an application of the statewide African-American rate of felon disenfranchisement would be a conservative estimate of the rate of disenfranchisement among African Americans in FFSD, PFOF ¶ 71. The higher rate of felony disenfranchisement among African Americans also lends itself to higher costs for obtaining accurate registration information, which may further depress African Americans' political participation. *See* Trial Tr. vol. 4, 91:7-11 (Hudson testifying that felon disenfranchisement "significantly impacts African Americans'

*Second*, turnout rates differ by race, and African Americans turn out to vote in local elections at a lower rate than whites in the District. PFOF ¶¶ 231-232. One of the Plaintiffs' experts, Dr. Kimball, found that Black residents of FFSD consistently have a lower turnout than whites. PFOF ¶ 231; *see* PLTF-49, *Rebuttal Report of David Kimball*, July 2, 2015 ("*Kimball Rebuttal*"), at 6 (during the last five contested elections, African American turnout has been lower than white turnout four times). The District's expert, Dr. Rodden, testified that he believed that voter turnout rates between Blacks and whites in FFSD were in rough parity, but the Court finds that conclusion unreliable for two reasons. *First*, even taking Dr. Rodden's calculations at face value, they indicate lower turnout among Blacks in the District. PFOF ¶ 232; Trial Tr. vol. 5, 153:1-17; 159:6-10; Deft-FFSD A, *Rodden Rep.*, ¶¶ 25-26, Fig. 6 (p. 15); PLTF-49, *Kimball Rebuttal*, at 6 (Rodden estimated that white turnout exceeded Black turnout in 11 out of 12 elections dating back to 2000, that the difference was statistically significant 6 out of those 11 times, and that Black turnout never exceeded white turnout to a statistically significant degree.). *Second*, unlike Dr. Kimball, Dr. Rodden calculated comparative voter turnout rates as a percentage of *registered voters* rather than as a percentage of the VAP. Dr. Rodden's method understates the difference in Black and white registration rates because it ignores undisputed disparities by race in registration rates. Trial Tr. vol. 5, 148:14-22 (Rodden testifying that if white register at a higher rate than Blacks but their respective turnout rates are equal, one can infer that more white voters than Black voters actually cast a ballot on election day).

That there would be lower turnout rates among African Americans is hardly surprising because a myriad of socioeconomic disparities that correlate with lower turnout rates are present

---

ability to vote and/or feel like they can register to vote."); *see also* Trial Tr. vol. 2, 154:6–155:6 (Kimball testifying that contact with the criminal justice system lowers voter participation because it "means a loss of economic resources"; "tends to foster more negative attitudes and less trust of local government, which lowers the benefit side of the cost of voting calculation"; and may make it harder for individuals to join "local organizations and social networks that help bring people into local government and local community affairs").

in the District. PFOF ¶¶ 220-232. Because African Americans, as a group, continue to suffer from deep socioeconomic consequences along a wide range of measures as a result of past discrimination, and those socioeconomic disparities raise the costs of participating in the political process, the Court finds that effects of past discrimination hinder the ability of African Americans in FFSD to participate in the political process. PFOF ¶ 220-232; *see also* PFOF ¶¶ 80-84 (homeownership is a strong predictor of voting in local elections); Trial Tr. vol. 1, 174:7-9, 176:11-13 (Gordon testifying as to how Black residents lower rate of homeownership burdens political participation); Trial Tr. vol. 2, 145:22–146:7 (Kimball testifying that "factors like homeownership and education and income are strong predictors of voter turnout. Those factors provide resources that help people overcome the cost side of the calculus of voting and lead to voter turnout. So if there are racial disparities in those factors, they can contribute to racial disparities in political participation as well."). Based on the testimony and evidence described above, the Court finds that, within FFSD, African-American voter turnout has been consistently lower than white voter turnout.[15]

Due to the variety of factors that hinder African Americans' political participation in the FFSD, *see* PFOF ¶¶ 64-84, and the extent of racially polarized voting, *see infra*, Section V.E.1, it is unsurprising that, as explained *infra*, Section V.E.2, despite near parity in the demographics of the VAP, Black-preferred candidates tend to have a much lower success rate in Board elections

---

[15] Lower turnout rates among minority voters do not militate against finding a Section 2 violation, *United States v. City of Euclid*, 580 F. Supp. 2d 584, 604 (N.D. Ohio 2008) (citing *Blytheville*, 71 F.3d at 1388). ("Low minority turnout does not militate against finding a Section 2 violation."); Trial Tr. vol. 4, 82:8-11 (Engstrom testimony), but often <u>results</u> from a dilutive system, *see Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 725 (2009); *Blytheville*, 71 F.3d at 1388 ("low voter turnout has often been considered the result of the minority's inability to effectively participate in the political process"). Where, as in the FFSD, Black voters believe their diluted votes are futile in electing their candidates of choice, turnout may remain low. Registration and turnout rates often improve once a Court remedies the Section 2 violation. *See, e.g., City of Irving*, 638 F. Supp. 2d at 725 ("by moving from a dilutive system to a system that is not dilutive, minority groups have improved opportunities to elect the candidates of choice, which in turn creates a stimulus to organize and mobilize and bring people to the polls." (internal quotation marks omitted)); *Vill. of Port Chester*, 704 F. Supp. 2d at 451 ("[T]he opportunity to elect a candidate of choice tends to dramatically increase voter registration and turnout in the minority community.").

as compared to white-preferred candidates. That fact is perhaps the clearest evidence that African Americans are disadvantaged by the FFSD's at-large electoral arrangement, even if they constitute a bare majority of the District's VAP. And population projections indicating that the Black VAP may, at some point in the future, constitute a clear numerical majority of FFSD's total VAP do not negate the District's liability in the present.

## V. *Gingles* **II and III**

### A. *The Legal Standard for Gingles II and III*

Together, *Gingles* II and *Gingles* III ask first, whether Black and white voters tend to "vote differently," *i.e.*, whether there is racially-polarized voting, *Gingles*, 478 U.S. at 53 n.21; and second, whether the candidates preferred by Black voters "usually" lose to candidates preferred by white voters, *Blytheville*, 71 F.3d at 1385.

*Gingles* II is satisfied where the minority group, here African Americans, is politically cohesive. *See Gingles*, 478 U.S. at 51, 56. Cohesiveness exists where "a significant number of minority group members usually vote for the same candidates," *Bone Shirt II*, 461 F.3d at 1025 (citation omitted), and can be established by demonstrating the existence of racially polarized voting ("RPV"), *i.e.*, "a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently," *Gingles*, 478 U.S. at 53 n.21 (alteration in original; citations and internal quotation marks omitted). This "consistent relationship" does not require completely divergent racial preferences, as "the *Gingles* standard presupposes the existence of crossover voting." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir. 1993); *see Sanchez v. Colorado*, 97 F.3d 1303, 1319 (10th Cir. 1996) (same).

*Gingles* III, meanwhile, is satisfied where "the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred

candidate." *Blytheville*, 71 F.3d at 1385 (citing *Gingles*, 478 U.S. at 50-51). There is no requirement that white voters have "an unbending or unalterable hostility" to minority-preferred candidates such that those candidates always lose. *Jenkins*, 4 F.3d at 1123. Rather, *Gingles* III is met where, "as a practical matter, the *usual* result of the bloc voting that exists is the defeat of the minority-preferred candidate." *Id.* (emphasis added); *see also Blytheville*, 71 F.3d at 1389 (marginal minority electoral success "fit[s] precisely in the *Gingles* test as to whether the white majority does indeed vote sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" (alteration in original; citation and internal quotation marks omitted)).

As the Supreme Court observed, "no simple doctrinal test" applies to the third *Gingles* factor because racial bloc voting can "vary according to a variety of factual circumstances." *Gingles*, 478 U.S. at 57-58. *Gingles* III is determined through three inquiries: (1) identifying the minority-preferred candidates; (2) assessing whether "the white majority vote as a bloc to defeat the minority preferred candidate"; and (3) resolving whether "there [were] special circumstances such as the minority candidate running unopposed present when minority-preferred candidates won." *Bone Shirt II*, 461 F.3d at 1020 (alteration in original; citation omitted).

### B. *Relevant Elections for Evaluating Gingles II and III*

Not all elections are probative in assessing *Gingles* II and III. In particular, only contested elections have probative value in evaluating the *Gingles* preconditions because only if elections are held can the outcomes provide relevant information about the ability of Black voters to elect candidates of their choice. *See* Trial Tr. vol. 4, 45:22–46:10 (Engstrom testifying that in years without contested elections, "there's no election, it's uncontested"; "[t]here's nothing to analyze." "[W]e can't assess voter preferences in uncontested elections."). Situations in which candidates ascended to office unopposed (*i.e.*, "uncontested elections"), such as in 2005, 2007, 2008, and 2010 in FFSD, *see* PFOF ¶ 100, have no probative value in the *Gingles* preconditions

analysis. Trial Tr. vol 4, 45:22–46:10 (Engstrom testifying that he could not perform racial polarization analysis in years without a contested election "[b]ecause there's no election, it's uncontested, that's not even on the ballot in FFSD elections. There's nothing to analyze. . . . [W]e can't assess voter preferences in uncontested elections."); *see Blytheville*, 71 F.3d at 1389; *Gingles*, 478 U.S. at 57 (analysis did not include any unopposed elections, and observed that success of minority-preferred candidate under "special circumstances, such as the absence of an opponent" does "not necessarily prove that the district did not experience polarized voting").[16]

Moreover, for purposes of analyzing the *Gingles* preconditions, not all contested elections have equal probative value. *First*, more recent elections are generally more probative. *Bone Shirt II*, 461 F.3d at 1020-21. *Second*, "endogenous" elections—*i.e.*, those elections for the offices at issue, here, the FFSD Board—are more probative than the results of "exogenous" elections—*i.e.*, contests for other offices, such as Congress or President, *id.*; *see also Clay II*, 90 F.3d at 1362 ("[E]xogenous elections . . . should be used only to supplement the analysis of the specific election at issue."). The Court need not supplement endogenous election data where, as here, the Court has sufficient evidence from endogenous elections from which to discern typical voting behavior and usual results. *See, e.g.*, *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1208 n.8 (5th Cir. 1989) (evidence from exogenous elections may be used where evidence from endogenous elections is sparse). *Third*, "interracial elections are the best indicators of whether the white majority usually defeats the minority candidate," *Bone Shirt II*, 461 F.3d at 1020-21,[17] because "[a] system that works for minorities only in the absence of

---

[16] The Eleventh and the First Circuits agree that the uncontested success of a minority-preferred candidate is "not probative of the ability of blacks to elect candidates of their choice," *Askew v. City of Rome*, 127 F.3d 1355, 1384 n.18 (11th Cir. 1997), and "reveal[s] little about either minority cohesion or white bloc voting," *Uno v. City of Holyoke*, 72 F.3d 973, 988 (1st Cir. 1995); *see S. Christian Leadership Conference of Ala. v. Sessions*, 56 F.3d 1281, 1307 (11th Cir. 1995) ("[U]nopposed victories do not count against a finding of racial bloc voting.").

[17] Indeed, the *Gingles* Court relied exclusively on interracial legislative contests. *See* 478 U.S. at 80-82. The Fifth,

white opposition is a system that fails to operate in accord with the law," *Blytheville*, 71 F.3d at 1389-90; *see Jenkins*, 4 F.3d at 1128 ("As a general matter, we believe that elections involving white candidates only are much less probative of racially polarized voting than elections involving both black and white candidates."). *Fourth*, there is less probative value in any election that is marked by special circumstances that suggest that the election "was not representative of the typical way in which the electoral process functions." *Ruiz*, 160 F.3d at 557-58; *see Gingles*, 478 U.S. at 75-76 (holding that district court "could appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance to [plaintiffs'] claim"); *Blytheville*, 71 F.3d at 1389 (removing elections involving special circumstances from analysis of *Gingles* preconditions). This is true whether the special circumstances are manifested through unusual voter, candidate, or campaign behavior. *See, e.g.*, *Ruiz*, 160 F.3d at 557-58 ("special circumstances" inquiry focuses on unusual "voter behavior"); *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-cv-0087-D, 2014 WL 4055366, at *18 (N.D. Tex. Aug. 15, 2014) (observing that a special circumstance "can potentially affect the candidate pool").

C.  *Methods for Identifying Black-Preferred Candidates*

To analyze whether Plaintiffs have met *Gingles* II and III, the Court must necessarily determine whether Black voters have candidates of choice, and if so, identify those candidates. The Supreme Court has explained that, in Section 2 cases, courts must perform "an intensely

---

Ninth, and Eleventh Circuits have followed suit in holding that interracial elections are most probative of RPV. *See Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503-04 (5th Cir. 1987) ("[I]mplicit in the *Gingles* holding is the notion that black preference is determined from elections which offer the choice of a black candidate."); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 552-53 (9th Cir. 1998) ("[A] minority vs. non-minority election is more probative of racially polarized voting than a non-minority vs. non-minority election."); *Nipper v. Smith*, 39 F.3d 1494, 1540 (11th Cir. 1994) ("[Monoracial] elections . . . may reveal little about the issue to be determined: the capacity for white bloc voting usually to defeat black candidates of choice. Particularly where voting is extremely polarized by race in elections in which black candidates participate, white-on-white elections in which a small majority (or a plurality) of black voters prefer the winning candidate seem comparatively less important.").

local appraisal" that accurately reflects voters' preferences. *Gingles*, 478 U.S. at 78 (citation omitted).

Identifying Black voters' candidates of choice is not a mechanical task. Rather, a court must employ a contextual case-by-case approach that, as required by the Eighth Circuit, establishes, "the preferences of the minority voters . . . on an election-specific basis, viewing all the relevant circumstances." *Blytheville*, 71 F.3d at 1386 (citing *Jenkins*, 4 F.3d at 1126); *see also Collins v. City of Norfolk*, 816 F.2d 932, 937 (4th Cir. 1987) ("*Collins I*") ("Each such situation must be reviewed individually to determine whether the elected candidates can be fairly considered as representatives of the minority community."). The Eighth Circuit has observed that "[t]here is no blanket definition of 'minority preferred candidate.'" *Clay II*, 90 F.3d at 1361. Answering the *Gingles* II and III threshold questions "typically requires a statistical and non-statistical evaluation" of the voting behavior and election results in the relevant elections. *Bone Shirt II*, 461 F.3d at 1020.

In the multi-seat contests at issue here, the identification of minority-preferred candidates is complex. Because a voter can cast more than one vote, minority voters may (but will not necessarily) have a second (or third) candidate of choice. *See* Trial Tr. vol. 4, 18:18–19:16 (testimony of Richard Engstrom). A critical question, then, is how to identify whether minority voters in fact have a second or third candidate of choice in a given election.

At trial, Plaintiffs' expert Dr. Richard Engstrom testified to an appropriate case-by-case method for identifying Black voters' candidates of choice. Applying that approach, Black voters are cohesive and Black-preferred candidates usually lose. The District's expert, meanwhile, offered two different approaches for identifying candidates of choice, and came to the contrary conclusion. As discussed below, the Court concludes that Dr. Engstrom's method and analysis is

more appropriate for identifying the preferences of African American voters under the facts of this case.

### 1. Dr. Richard Engstrom

Dr. Engstrom, a political science professor and research scholar at Duke University, appeared at trial on behalf of the Plaintiffs. PFOF ¶ 98; Trial Tr. vol. 4, 5:4-10. Dr. Engstrom is an expert in the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice. PFOF ¶ 98-99; Trial Tr. vol. 4, 6:21-25. His knowledge and expertise is reflected in his academic and professional background, his scholarship on the topic, and his 30 years of experience testifying more than one hundred times in federal and state courts across the United States. PFOF ¶ 98; Trial Tr. vol. 4, 5:4-10:1. Dr. Engstrom is plainly one of the foremost experts in the field of electoral systems, vote dilution, and racial polarization analysis, which the District's own expert acknowledged. Trial Tr. vol. 4, 9:13–10:3; *see also* Trial Tr. vol. 5, 86:13-20 (Rodden's acknowledgment).

Dr. Engstrom analyzed FFSD Board elections using Ecological Inference ("EI") analysis. PFOF ¶ 102; Trial Tr. vol. 4, 13:13-25.[18] EI is a statistical procedure used for racial polarization analysis to determine the percentage of a racial group's votes that went to each candidate. PFOF ¶ 105; Tr. vol. 4, 11:15-25 (Engstrom testimony). As Dr. Engstrom testified, EI measures racially polarized voting ("RPV") by estimating the true value of the percentage of votes African-American voters cast for a particular candidate, expressed in terms of a point estimate and confidence interval. PFOF ¶¶ 105-107; Trial Tr. vol. 4, 14:1–15:23. The point estimate represents the most likely percent of votes cast by a group of voters for a candidate. Trial Tr. vol.

---

[18] As Dr. Engstrom explained, he used another method, Homogenous Precinct ("HP") analysis, to confirm the findings of EI analysis and to establish polarization regardless of the methodology, but relied on his EI analysis as the far superior method. PFOF ¶ 106; Trial Tr. vol. 4, 12:11-21.

4, 14:3-8 (Engstrom testimony). EI provides a range of estimates around the point estimate representing a confidence interval, which political scientists establish with 95% confidence that the true value for a candidate's level of support is within that range. PFOF ¶ 109; Trial Tr. vol. 4, 15:24–16:1 (testimony of Richard Engstrom); Trial Tr. vol. 5, 154:2-21 (testimony of Jonathan Rodden) (standard practice in political science to report confidence intervals). This confidence interval is necessary to determine whether the difference in the estimated support levels among candidates can be considered statistically significant. PFOF ¶ 111. As a general rule of thumb, it is only if the confidence intervals of two candidates do not overlap that the difference between them is determined to be statistically significant. PFOF ¶ 112; Trial Tr. vol. 4, 16:2-12 (Engstrom testimony). If the point-estimate of one candidate is in the confidence interval of another, the levels of support are statistically indistinguishable. Trial Tr. vol. 4, 19:10-16.

Dr. Engstrom's testimony was credible and reliable. Dr. Engstrom's EI analysis was accurate, complete, and confirmed by similar outcomes from Dr. Engstrom's HP analysis, as well as Dr. Rodden's EI analysis. PFOF ¶¶ 106, 114. Based on the EI analysis, Dr. Engstrom determined for each of the five elections from 2011–2015 whether African-American voters expressed a preference for a particular candidate or candidates and identified Black voters' candidates of choice. PFOF ¶¶ 115, 120. Dr. Engstrom's focus on the last five years of endogenous elections was appropriate in the particular circumstances of FFSD. *See* Trial Tr. vol. 4, 17:3–18:4; PFOF ¶ 103. The 2011–2015 elections are all recent, endogenous,[19] and interracial

---

[19] Moreover, because there is extensive data on "endogenous" elections, the Court need not look to exogenous elections. Although Defendants include exogenous election results, they have not performed RPV analyses for these elections. The race of the candidate cannot be assumed to identify that candidate as the candidate of choice for that racial group. *Blytheville*, 71 F.3d at 1386. The exogenous elections here presented by Defendants are also national, partisan elections, held in November, which are not provide useful information for evaluating local, non-partisan, April school board elections.

elections,[20] and five contested elections is more than the three election years the Supreme Court considered sufficient in *Gingles*. 478 U.S. at 61; PFOF ¶ 103; *see also Gingles*, 478 U.S. at 57 n.25 ("The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances."). The five-year period also includes two 3-seat elections, to allow the Court at least two observations of that particular electoral context. PFOF ¶ 103; Trial Tr. vol. 4, 17:3-18:4. Analysis of the endogenous Board elections from 2011 to 2015 is sufficient and appropriate to determine the District's liability.

### 2. Dr. Engstrom employed an appropriate approach to identifying candidates of choice

Evaluating Black-preferred candidates on an election-by-election basis, Dr. Engstrom identified eight candidates preferred by Black voters between 2011 and 2015. He identified a candidate as a Black-preferred candidate based on three principles. PFOF ¶ 115. *First*, Dr. Engstrom followed generally-accepted standards in social science by considering whether or not the estimated levels of support received by the candidates were statistically distinguishable. As Dr. Engstrom explained, the process of identifying a candidate of choice must take statistical significance into consideration, because it is only when a candidate's estimated level of support is statistically distinguishable from that of the others that one can say that the candidate in fact received more support than the others with the level of confidence typically employed in social science. Conversely, as a general rule of thumb, when the point estimate of one candidate is within the confidence interval of the other, we cannot determine which candidate received a higher level of support. *See* Trial Tr. vol. 4, 19:10-16 (Engstrom testimony).

---

[20] There were no contested elections in 2010, 2008, or 2007. PFOF ¶ 101. The election of 2009 had only white candidates and as Dr. Engstrom explained, if Black voters prefer Black candidates, an electoral system does not provide equal opportunity if Black voters cannot elect their top candidate(s) of choice if they are of the same race. PFOF ¶¶ 113, 179; *see* Trial Tr. vol. 4, 19:17–20:10 (testimony of Richard Engstrom); *see, e.g.*, *Blytheville*, 71 F.3d at 1389-90. To find another contested interracial election before 2011, one would need to consider elections from a decade ago and older (*i.e.*, 2006 and earlier).

*Second*, Dr. Engstrom did not mechanically assume that the candidate who received the second-most, or third-most, support from minority voters was necessarily a minority-preferred candidate, particularly if that candidate received significantly less support than the top-ranked candidate. As other courts have observed, and as the facts of this case demonstrate, the identification of a second and/or third preferred candidate, if any, requires nuanced analysis that looks closely at the details of each election. *See, e.g.*, *Lewis v. Alamance Cty.*, 99 F.3d 600, 614 (4th Cir. 1996); *N.A.A.C.P. v. City of Niagara Falls*, 65 F.3d 1002, 1017-19 (2d Cir. 1995); *Askew*, 127 F.3d at 1379. At least one court has accepted a "two-thirds rule," in which a "candidate second-most favored black voters" would be deemed a candidate of choice only if he or she "had at least two-third[s] of the support of the most favored candidate." *N.A.A.C.P. v. City of Thomasville*, 401 F. Supp. 2d 489, 498 & n.3 (M.D.N.C. 2005). As Dr. Engstrom testified, a second or third-choice candidate is not necessarily minority-preferred if that candidate received significantly less support than the top-ranked candidate. *See* Trial Tr. vol. 4, 18:8-17 (Engstrom testimony). *Third*, Dr. Engstrom explained that, where the clear first-choice candidate among African-American voters is an African-American candidate who has lost, courts should be skeptical of attempts to characterize a winning white candidate as a candidate of choice of minority voters. *See* Trial Tr. vol. 4, 19:17-20:15 (Engstrom testimony); *see, e.g.*, *Collins I*, 816 F.2d at 937 & n.6 (casting doubt on whether elected white candidates who received some support from African Americans could "be fairly considered as representatives of the minority community" where those candidates were elected over African-American candidates who were clearly the most minority-preferred candidates). An electoral system does not provide equal opportunity if Black voters cannot elect their top candidate(s) of choice and can only elect lesser preferred candidates, and only if they are white. If Black voters prefer Black candidates, they

must have an opportunity to elect those candidates. *See, e.g.*, *Collins I*, 816 F.2d at 937 & n.6; *Citizens for a Better Gretna*, 834 F.2d at 502; *see also Aldasoro v. Kennerson*, 922 F. Supp. 339, 374 (S.D. Cal. 1995) (citing *Collins v. City of Norfolk*, 883 F.2d 1232, 1238 (4th Cir. 1989) ("*Collins II*")). "*Gingles* addresses not only a group's ability to elect a satisfactory candidate (that is a candidate for whom the minority voter is *willing* to cast a vote), but the group's ability to elect its *preferred* candidate." *Meek*, 908 F.2d 1540, 1547 (11th Cir. 1990). In FFSD, "African Americans have clearly shown, through their voting behavior, a preference to be represented on that Board by African American candidates." PLTF-52, *Expert Report of Richard L. Engstrom*, May 27, 2015 ("*Engstrom Rep.*"), ¶ 43.

Notably, this principle does not assume that a candidate is preferred because of their race. *Blytheville*, 71 F.3d at 1386. Rather, it acknowledges legal guidance that, although the race of a candidate is not dispositive, an electoral system does not truly provide equal opportunity if Black voters cannot elect members of their own group who are their clearly most-preferred candidate(s), and can only elect lesser-preferred candidates who are white. *See* Trial Tr. vol. 4, 20:3-10 (Engstrom testimony); *see also Aldasoro*, 922 F. Supp. at 374 (explaining that, in *Collins II*, where "Black voters favored a Black candidate *first* who lost, the Anglos whom they favored second and third were *not* the Black preferred candidates" (citing *Collins II*, 883 F.2d at 1238)).

### 3. Dr. Rodden's Approach for Identifying Candidates of Choice among Black Voters was Not Reliable

Dr. Rodden testified on behalf of the District, offering opinions on whether voting in FFSD is racially polarized, and identifying Black-preferred candidates in each of the past twelve elections from 2000–2015. *See* PFOF ¶ 172. Dr. Rodden's experience in this area is limited, PFOF ¶¶ 173-174, and his testimony on the *Gingles* preconditions suffers from a number of

methodological defects, *see* PFOF ¶¶ 182-183, 189-191. Moreover, as explained *infra*, Section

V.E.4, even if the Court were to credit that testimony, it would support a finding that Plaintiffs

have satisfied *Gingles* II and III.

Dr. Rodden offered two methods for identifying candidates of choice: the top-preferred

candidate approach and the point-estimate approach. *See* PFOF ¶¶ 175-181 (top-ranked

candidate approach), ¶¶ 175, 182-186 (point estimate approach). Both of Dr. Rodden's

approaches employ a singular mechanical rule for identifying the Black-preferred candidate. As

the Supreme Court observed, "no simple doctrinal test" applies to legally significant bloc voting

because "the degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution

claim will vary according to a variety of factual circumstances." *Gingles*, 478 U.S. at 57-58. The

Eighth Circuit has also made clear that minority candidates of choice should be identified on an

election-specific basis, viewing all the relevant circumstances. *See Blytheville*, 71 F.3d at 1386;

*see also Jenkins*, 4 F.3d at 1126; *see, e.g.*, *Collins I*, 816 F.2d at 937 ("if there were other

candidates, preferred by a significantly higher percentage of the minority community, who were

defeated in the same election, then it cannot fairly be said that the minority community has

successfully elected representatives of its choice. Each such situation must be reviewed

individually to determine whether the elected candidates can be fairly considered as

representatives of the minority community.").

Each of Dr. Rodden's approaches has limitations. Although the top-ranked candidate

provides relevant information—in that, as a general matter, a candidate who receives the greatest

number of votes from minority voters (the "top-ranked candidate" of minority voters) is

appropriately described as a Black-preferred candidate, *see, e.g.*, *Lewis*, 99 F.3d at 614

(candidate who receives most minority votes is a candidate of choice, so long as that candidate

received "substantial" support from minority voters)—looking only at the top-ranked candidate does not capture the full voting preference picture in the context of a multi-seat election, because it disregards the fact that multiple seats are available in each election, and with that the possibility that minority voters prefer more than one candidate.[21] As explained below, this flaw is particularly on display when analyzing the 2011 and 2014 elections, wherein Black voters showed a strong preference for two or three candidates.

Dr. Rodden's other approach, the point estimate approach, takes the two or three candidates with the highest estimates for Black voters' support (depending on whether there are two or three seats available), and designates them all as Black-preferred candidates, regardless of the comparative levels of support. Trial Tr. vol. 5, 95:20–96:11. This mechanical approach fails to identify Black-preferred candidates "on an election-specific basis," with consideration of "all the relevant circumstances," *Blytheville*, 71 F.3d at 1386, and ignores two important factors in identifying candidates of choice.

*First*, this approach ignores the relative levels of support among first-, second-, and third-choice candidates, treating all three equally as candidates of choice in a three-seat election, even where one or two candidates clearly stand out as preferred in terms of support from Black voters. In so doing, this approach ignores case law that warns against treating the election of a second-choice candidate as a victory for minority voters, particularly if minority voters show a clear preference for a candidate from within their racial group who loses and their second-choice candidate, who wins, is white. *Second*, the point estimate approach draws a distinction between candidates even when their levels of support are statistically indistinguishable from each other.

---

[21] Strikingly, even though it only provides a partial picture, the top-choice candidate approach highlights the absolute racial polarization in groups' support for their top choices, with Black and white voters *never* agreeing on a most-preferred candidate, and each year since 2000, Black voters preferring a Black candidate—save for the 2009 election which featured no Black candidates—and white voters preferring a white candidate. PFOF ¶¶ 177-179.

Trial Tr. vol. 5, 154:2-21 (Rodden explaining political scientists' rule of thumb for statistical significance); Trial Tr. vol. 4, 19:4-16 (Engstrom testifying that determining whether there is a second or third candidate of choice among Black voters requires looking at whether "the estimated African-American vote for the candidate is outside the bounds of the confidence interval for another, say, less-preferred candidate and again whether there's statistically significant difference."). In this respect, the point estimate approach is inappropriate in light of generally accepted principles of statistical analysis, and contradicts Dr. Rodden's own testimony that it is standard practice in political science analysis suitable for peer review to include confidence intervals. Trial Tr. vol. 5, 154:2-21 (Rodden testimony). As explained below, these flaws are most clearly on display when analyzing the 2012 and 2013 elections.

### D. *Black-preferred candidates between 2011 and 2015*

This Court concludes that Dr. Engstrom's approach appropriately employed a case-by-case identification of Black voters' candidates of choice "on an election-specific basis, viewing all the relevant circumstances" in a multi-seat election, *Blytheville*, 71 F.3d at 1386, consistent with the Eighth Circuit's observation that "[t]here is no blanket definition of 'minority preferred candidate,'" *Clay II*, 90 F.3d at 1361. In *Clay II*, the Eighth Circuit affirmed the district court's reliance on the defendant's evidence identifying African-American preferred candidates as the top four vote-getters among African-American voters for the four contested board seats. 90 F.3d at 1361-62. Unlike the analysis and proof Plaintiffs have set forth here, however, the plaintiffs in *Clay II* improperly "rel[ied] on the implicit assumption that African-American candidates were the preferred candidates of African-American voters," and failed to identify and "prove, on an election-by-election basis, which candidates are minority-preferred" under a legitimate alternative definition. *Id.* at 1360-61. And it did not confront, as does this Court, elections in which it is frequently impossible to determine with statistical certainty which candidates were

the top vote-getters, or there is a clearly preferred candidate and no statistically distinguishable preference between the second- and third-choice candidates. In light of Plaintiffs' alternate approach for identifying Black-preferred candidates, and the shortcomings of the point estimate approach as applied to the facts of the 2011 to 2015 FFSD Board elections, the point estimate approach is inappropriate to apply in this case. Accordingly, the Court credits Dr. Engstrom's testimony and identifies eight candidates preferred by Black voters between 2011 and 2015.

In the three-seat 2011 election, Graham and Hawkins, who are both Black, received the two highest levels of support among Black voters and were Black voters' candidates of choice. *See* PFOF ¶¶ 122, 124, 127; Trial Tr. vol. 4, 23:17–27:6 (Engstrom testimony regarding the 2011 election). Although Dr. Rodden, employing the point estimate approach, treated Clark, a white candidate who was estimated to have received the third-highest number of votes from Black voters, as a third candidate of choice among Black voters, Dr. Engstrom explained that this conclusion was erroneous given the point estimates. Trial Tr. vol. 4, 26:15-25 (Engstrom testimony). Black voters' support for Graham (24.1%) and Hawkins (21.5%) was "statistically significantly higher" and substantial[ly] differen[t] than Black voters' support for Clark, whose level of support among Black voters (13.5%) was "much lower." Trial Tr. vol. 4, 26:2-14; *see* PLTF-52, *Engstrom Rep.*, Table 1 (p. 17). Clark's level of support was less than two-thirds of that received by Hawkins or Graham. PFOF ¶¶ 122, 125. Because Clark received substantially less support from Black voters than did Graham and Hawkins, it makes little sense to treat Clark as a Black-preferred candidate. Accordingly, the Court finds that there were only two Black-preferred candidates in the 2011 three-seat election: Graham and Hawkins, both of whom lost.[22]

---

[22] The 2011 election results also demonstrate the limitations of Dr. Rodden's top-ranked candidate approach, which identifies only Graham as a candidate of choice among Black voters, despite the fact that Hawkins's level of support from Black voters was essentially the same as Graham's (21.87% and 21.95%, respectively, according to Dr. Rodden); indeed, their levels of support from Black voters were, according to both experts, statistically

In the two-seat 2012 election, Barbara Morris was the only Black-preferred candidate. *See* PFOF ¶¶ 130-131, 136; Trial Tr. vol. 4, 27:7–31:5 (Engstrom testimony regarding the 2012 election). There were three candidates running for the two seats, and Black voters gave essentially unanimous support (including some single-shot voting) to their top choice candidate, B. Morris, who is Black, and who lost. PFOF ¶¶ 133, 138. Dr. Rodden, employing the point estimate approach, mechanically identified Schroeder, who is white and who was elected, as a Black-preferred candidate, because Schroeder was estimated to have received the next-highest number of Black votes. *See* Deft-FFSD A, *Rodden Rep.*, ¶ 57. But as Dr. Engstrom explained, Schroeder's level of support among Black voters (25.0% was "statistically significantly lower" (in fact less than half), than that of B. Morris (51.9%). Trial Tr. vol. 4, 29:15-30:2 (Engstrom testimony) PLTF-52, *Engstrom Rep.*, Table 1 (p. 18); *see also* Trial Tr. vol. 5, 205:10-17 (Rodden testifying that "Ms. Morris received substantially more support among Black voters than Mr. Schreoder"). Moreover, Black voters' estimated support for their last-choice candidate, Ebert (23.1%), was statistically indistinguishable from that of Schroeder. PFOF ¶¶ 131, 134; Trial Tr. vol. 4, 30:3-11 (Engstrom testimony); Trial Tr. vol. 5, 206:1-12 (Rodden testimony). In essence, B. Morris had universal support from Black voters, who (when not single-shot voting) split their remaining votes roughly equally between the two remaining candidates. Under these circumstances, Dr. Engstrom appropriately identified B. Morris as the only Black-preferred candidate, and declined to characterize the election of Schroeder as a win for Black voters. Trial Tr. vol. 4, 30:3-23. The Court finds that there was one Black-preferred candidate in the 2012 two-seat election: B. Morris, who lost.

---

indistinguishable from each other, such that it is impossible to determine with statistical confidence that Graham in fact received more Black votes than Hawkins. PFOF ¶¶ 122. Treating her but not Hawkins as a Black-preferred candidate makes little sense.

In the two-seat 2013 election, Henson was the only candidate of choice among Black voters. *See* PFOF ¶¶ 141-142, 146; Trial Tr. vol. 4, 31:11–34:2 (Engstrom testimony regarding the 2013 election). Of the four candidates, Black voters' clear top choice was Henson (43.7%), an African-American candidate who was not elected, and whose level of support from Black voters was "statistically significantly higher" than, the level of support for the candidate with the second-highest estimated level of Black support, Hogshead (24.2%), a white candidate whose level of support was "considerably below Henson," but who was elected. Trial Tr. vol. 4, 32:22–33:12. Dr. Rodden, employing the point estimate approach, characterized Hogshead as the second Black-preferred candidate in this election. But Hogshead received less than two-thirds of the support from Black voters than did Henson. PFOF ¶¶ 141, 144. Moreover, because Hogshead's level of support among Black voters was statistically indistinguishable from that of another candidate, Brown, one cannot even state with statistical confidence that she in fact received the second-highest number of votes from Black voters. PFOF ¶ 145. In these circumstances, it is inappropriate to characterize Hogshead's election as a victory for Black voters, particularly in light of Henson's loss.[23] Trial Tr. vol. 4, 33:12-33:22. The Court finds that there was one Black-preferred candidate in the 2013 two-seat election: Henson, who lost.

In the three-seat 2014 election, there were three candidates of choice among Black voters, Paulette-Thurman (26.1%), Savala (24.7%), Johnson (24.5%), one of whom was elected (Paulette-Thurman). *See* PFOF ¶¶ 150, 154; Trial Tr. vol. 4, 34:5–37:7 (Engstrom's testimony

---

[23] Based on the fact that Dr. Rodden estimates that Hogshead finished among the top two candidates among Black voters in 2013, Dr. Rodden went back and retroactively designated her as a successful Black-preferred candidate when she ran unopposed in 2010 and 2007. *See* Trial Tr. vol. 5, 112:5–113:10; 201:17–202:3 (Rodden testimony). He did so despite the fact that Hogshead was quite unpopular among Black voters up until that point, finishing fifth-place out of five candidates in terms of Black support in the two-seat 2004 election, and third-place out of four candidates in the 2-seat 2001 election, and could not be considered a Black-preferred candidate in either election. *See id.*, 199:14–201:14. Indeed, when employing the point estimate approach, Hogshead had never been a Black-preferred candidate prior to 2013, and yet Dr. Rodden designated her as a successful Black-preferred candidate in the uncontested elections in 2007 and 2010. *See id.*, 201:17–202:3.

regarding the 2015 election); PLTF-52, *Engstrom Rep.*, Table 1 (p. 19). The parties' experts do not disagree on this point. As Dr. Engstrom testified, the estimated levels of support from Black voters among these three candidates were similar, and statistically indistinguishable from one another. Black support for all of these three candidates is also statistically distinct from and "substantially higher" than that for any other candidate; Wallace, the candidate who received the fourth-highest estimated level of support from Black voters (8.6%), received a little over one-third of their levels of support. Trial Tr. vol. 4, 34:5–37:7. None of these three candidates were preferred by white voters, leading Dr. Rodden to concede that this election was polarized. *See* Trial Tr. vol. 5, 62:8-14. Notably, the 2014 election "took place in the context of unusually strong levels of mobilization among African-American voters in response to the 'controversial' departure of the School District's first African-American superintendent, which [led] to 'unprecedented' participation in the election." PLTF-53, *Rebuttal Report of Richard L. Engstrom*, July 2, 2015 ("*Engstrom Rebuttal*"), ¶ 15 (citing Deft-FFSD A, *Rodden Rep.*, at 27). The Court accordingly finds that there were three Black-preferred candidates in the 2014 three-seat election: Paulette-Thurman, Savala, and Johnson, one of whom (Paulette-Thurman) won, while the other two lost.[24]

In the two-seat 2015 election, *see* PFOF ¶ 162; Trial Tr. vol. 4, 37:11–39:15 (Engstrom testimony regarding the 2015 election), which took place after this lawsuit was filed, there was only one candidate of choice among Black voters, PFOF ¶¶ 167, 168-171. Graves, who is Black,

---

[24] The fact that Black voters in this election were only able to elect one of their three candidates of choice highlights the basic defect in the top-ranked candidate approach. Under the top-ranked candidate approach, the 2014 election counts as an unequivocal win for Black voters because their estimated top-choice candidate (Paulette-Thurman) won. But two other unsuccessful candidates received roughly the *same level* of support from Black voters (in fact, Savala and Johnson each received estimated percentages of Black votes that are statistically indistinguishable as compared to Paulette-Thurman's estimated percentage) both lost. Put another way, there is no dispute among the parties that Black voters supported three candidates in this election at essentially the same level, such that it is impossible to determine with statistical confidence which of the three actually received the highest number of Black votes; and yet the top-ranked candidate approach ignores that two of these three candidates lost.

received substantially higher and statistically significantly higher Black support (52.4%) than the candidate with the second-highest estimated level of Black support, Dameron (14.5%), who is white. PFOF ¶¶ 163-165. The point estimate approach, however, treats Dameron as if she were just as much of a Black-preferred candidate as Graves, even though Dameron was estimated to have received far fewer votes cast by Black voters (less than one-third the number received by Graves). PFOF ¶¶ 163, 165. It does so even though Dameron's level of Black support was statistically indistinguishable from those of two other candidates (Hines and Person), such that one cannot say with statistical confidence that she in fact received the second-highest number of votes cast by Black voters. PFOF ¶¶ 163, 166. The Court finds that there was one Black-preferred candidate in the 2015 two-seat election: Graves, who won.

Based on Dr. Engstrom's credible and reliable methodology, the Court finds that:

- In 2011, Doris Graham and Vanessa Hawkins were the Black-preferred candidates, and both lost. PFOF ¶¶ 127, 129.

- In 2012, Barbara Morris was the Black-preferred candidate, and lost. PFOF ¶¶ 136, 138.

- In 2013, Charles Henson was the Black-preferred candidate, and lost. PFOF ¶¶ 146, 148.

- In 2014, Donna Paulette-Thurman, F. Willis Johnson, and James Savala were the Black-preferred candidates, and two out of three (Johnson and Savala) lost. PFOF ¶¶ 154, 156.

- In 2015, which took place after this lawsuit was filed, Courtney Graves was the Black-preferred candidate, and won. PFOF ¶¶ 163, 167.

E. *Plaintiffs have met the requirements of Gingles II and III using the appropriate legal standard*

1. Plaintiffs' evidence demonstrated cohesiveness and that Black candidates were usually defeated

In addition, Plaintiffs' and the District's experts agreed that voting was racially polarized

in FFSD in that there was a correlation between the race of the voters and the candidates they supported. PFOF ¶¶ 113, 177, 179, 184, 185, 189-190; Trial Tr. vol. 4, 42:13-15 (Engstrom testifying that "voting is racially polarized in each [election] and therefore in the jurisdiction itself when it comes to voting for school board members."). The parties' experts also agreed that African Americans were more likely to vote for African-American candidates and whites were more likely to vote for white candidates for the past sixteen years. PFOF ¶¶ 113, 179, 185. Based on the voting behavior described above, the Court finds that Dr. Engstrom credibly established cohesiveness among Black voters behind candidates of choice in each of the five elections he analyzed. PFOF ¶¶ 124, 136, 146, 153, 164. The Court concludes that voting in FFSD Board elections is racially polarized and that Plaintiffs have established the second *Gingles* prong.

2. Plaintiffs' evidence demonstrated that Black-preferred candidates were usually defeated

In addition, using the Black-preferred candidates identified above, the Court concludes that the 2011–2015 election data shows that Black-preferred candidates were usually not elected. In the past five years, two out of eight Black-preferred candidates were successful (25%). Analyzing the older, less probative elections (described below) shows a similar pattern: the rates of success of Black-preferred candidates since 2000 were bad and got worse. In the past sixteen years, seven out of nineteen Black-preferred candidates (36.8%) in contested elections were successful. In the past decade, four out of twelve Black-preferred candidates were successful (33.3%). Excluding the monoracial election (2009) exacerbates the trend. PFOF ¶ 117.

Meanwhile, the eight Black-preferred candidates identified by Dr. Engstrom received low levels of support among white voters, *see* Trial Tr. vol. 4, 25:18-23 (2011), 28:5-24 (2012), 32:9-18 (2013), 36:2-14 (2014), 38:22-24 (2015), and none, save for the 2015 election under special

circumstances, were ever preferred by white voters.[25] The *Gingles* standard presupposes the existence of some crossover voting, *see Gingles*, 478 U.S. at 56 (defining legally significant white bloc voting as "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes"), and "does not require a showing that white voters vote as an unbending monolithic bloc against whoever happens to be the minority's preferred candidate." *See Jenkins*, 4 F.3d at 1123. The Eighth Circuit has rejected an approach that refuses to see white bloc voting unless a particular percentage of white voters vote against the minority-preferred candidate. *Bone Shirt II*, 461 F.3d at 1026-27 ("Nothing in the case law prescribes that the white majority bloc must be of a certain size beyond the requirement that the bloc be large enough to defeat the [minority-preferred candidate]."); *Blytheville*, 71 F.3d at 1387 ("In the face of the finding of consistent polarization, a legally significant white cross-over vote does not exist under the current election scheme." (citing *Cane v. Worcester Cty.*, 35 F.3d 921, 926 (4th Cir. 1994) (finding 19% crossover insufficient))). Some white support is inevitable, and does not negate the finding that Black-preferred candidates usually lost due to bloc voting.[26] Based on the above discussion, the Court thus concludes that Black-preferred candidates usually lost due to white bloc voting and Plaintiffs have established the third *Gingles* prong.

### 3. Special Circumstances

The conclusion that Plaintiffs have met *Gingles* III finds even stronger footing given that the Court accords less probative value to the 2015 election because it is not indicative of usual

---

[25] The pattern of stark polarization and minimal crossover voting would be even more clear if the Court were to apply the top-ranked candidate approach, *see infra* Section V.E.4.1. In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was white (twelve of twelve). PFOF ¶ 179. All but one of the top-choice candidates among Black voters was Black (eleven of twelve), and Black voters' top-choice candidate was not Black in the 2009 election, which featured no Black candidates. PFOF ¶ 179.

[26] Moreover, Black voters cannot be required to overcome white bloc voting by giving up part of the franchise and single-shot voting. PFOF ¶ 119. Even when they do, such as in 2012, Black-preferred candidates are not elected. *See* PFOF ¶¶ 133, 138.

voting patterns, but occurred under "special circumstances." *See Gingles*, 478 U.S. at 57, 76; *Ruiz*, 160 F.3d at 557-58; *Blytheville*, 71 F.3d at 1389 (removing elections involving special circumstances from analysis of *Gingles* preconditions). Special circumstances are manifested through unusual voter, candidate, or campaign behavior. *See Collins II*, 883 F.2d at 1241-42 (considering unprecedented voter behavior in a post-litigation election as a special circumstance); *see, e.g.*, *Ruiz*, 160 F.3d at 557-58 ("special circumstance" inquiry focuses on unusual "voter behavior"); *Irving Indep. Sch. Dist.*, 2014 WL 4055366, at *18 (observing that a special circumstance "can potentially affect the candidate pool").

The 2015 election took place post-litigation, less than four months after the complaint in this case was filed. PFOF ¶¶ 168-174; *see Gingles*, 478 U.S. at 75-77 (sanctioning court's decision to reduce the weight accorded Black electoral successes where those successes "increased markedly in . . . an election that occurred after the instant lawsuit had been filed" (citing S. Rep. No. 97-417, at 29 n.115 (1982))); *Davis v. Chiles*, 139 F.3d 1414, 1417 n.2 (11th Cir. 1998) ("Elections of minority candidates during the pendency of Section Two litigation . . . have little probative value); *Ruiz*, 160 F.3d at 555-56, 558 (post-complaint election results are discounted where "unusual circumstances surrounded that election"). In addition, the 2015 election was heavily influenced by the unique, aberrant circumstances of the shooting death of Michael Brown and subsequent protests. As Plaintiffs, members of the Board, and community members are aware, the shooting triggered protests in the Ferguson area, and resulted in a highly publicized investigation and report from the Civil Rights Division of the United States Department of Justice in September 2014, *see* PFOF ¶¶ 168-170, and drew national press and public attention to the Ferguson area, and specifically to the local municipal elections held in

April 2015, *see* PFOF ¶ 170; Trial Tr. vol. 4, 109:6–110:17 (Hudson testimony). [27]

The 2015 election saw a significant departure from the pattern of elections seen from 2011 to 2014. The election was heavily affected by those events, in terms of both candidate and voter behavior. White candidates chose not to run in local city council elections as a direct result of the events. PFOF ¶ 171. And only one incumbent white candidate ran for a Board seat; a longtime incumbent white candidate, Schroeder, decided not to run, leaving open a seat. PFOF ¶ 171; Trial Tr. vol. 4, 58:11–59:20 (Engstrom testifying that although we don't know the cause of people's decision not to run, but we know that has not happened before.). At the same time, Black candidates joined the candidate pool in direct response to these events. PFOF ¶ 171 (Graves testimony). As a result, the election saw unprecedented interest among African-American candidates, and only one major white candidate in the candidate pool. *See* Trial Tr. vol. 4, 57:2–59:20 (Engstrom cross).[28]

Voting patterns also changed substantially following Plaintiffs' filing the complaint. Turnout and get-out-the-vote efforts increased in African-American communities. PFOF ¶ 171. A candidate who ran as a direct response to the unique events of 2014 explicitly encouraged a single-shot voting strategy. Trial Tr. vol. 6, 17:4-6 (Graves asked people to bullet vote for her in her campaign); PFOF ¶ 171. As Dr. Rodden acknowledges, Dr. Graves won by a "landslide," there was suddenly a "striking" "surge" in white turnout, and unprecedented white support for Black candidate," and her victory is due, in partly, to her use of a "single-shot" voting strategy.

---

[27] The 2014 election also took place under special circumstances. PFOF ¶¶ 157-161. It occurred less than one month after the controversial resignation of Dr. McCoy, and, as a result, saw a high level of interest among African-American voters and an unprecedented five African-American challengers, motivated in part by their belief that the all-white Board did not represent the community.

[28] Although neither the results nor the voting patterns by race of the 2016 Board election are in the record, the 2016 election displays these ongoing special circumstances. Another incumbent, Chabot, decided not to run, leaving only one major white candidate, Hogshead, and the minor white candidate, Dameron. Once again, a white incumbent declining to run in a post-litigation election left open an unusual opportunity for Black candidate success. Indeed, it is remarkable that the first public announcement that a white, incumbent Board member would not seek reelection in 2016 was a part of the District's closing argument in this case. *See* Trial Tr. vol. 6, 63:3-4.

PLTF-53, *Engstrom Rebuttal*, ¶ 16 (quoting Deft-FFSD A, *Rodden Rep.*, at 22, 26-27). As Dr. Engstrom testified: "In my roughly 40 years as an expert witness in voting rights cases, I do not recall a post-litigation election that departed as dramatically from previous elections." PLTF-53, *Engstrom Rebuttal*, ¶ 17.

The events of late 2014, including the shooting death of Michael Brown, subsequent protests, DOJ action, and national news coverage, along with the filing of this lawsuit, are a more plausible explanation for the success of the Black-preferred candidate, Dr. Graves, in 2015 than the District's proffered explanation that this sudden victory was the product of demographic changes that, according to the District's expert's testimony, have occurred gradually over the past decade.

4.  Plaintiffs have met *Gingles* II and *Gingles* III even under the District's approaches for identifying Black-preferred candidates

Even if this Court were to adopt Dr. Rodden's methods—which it does not for the reasons identified above—the approaches that he offers for identifying candidates of choice support this Court's conclusion that Plaintiffs have satisfied *Gingles* II and III.

1.  Top-ranked candidate approach

The District has not identified any case in which a court exclusively applied a mechanical top-ranked candidate approach to identify the Black-preferred candidates in multi-seat elections, and the Court does not adopt it here. Yet, the top-ranked approach shows absolute polarization and same-group preferences: the top-ranked candidate among Black voters has always been different from the top-ranked candidate among white voters. *See* PFOF ¶¶ 177-179; Trial Tr. vol. 5, 98:5-24 (Rodden testimony). Moreover, in the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was white (twelve of twelve). PFOF ¶ 179.

Meanwhile, all of the top-ranked candidates among Black voters were Black with the exception of the 2009 election, which featured no Black candidates. PFOF ¶ 179.

Using the top-ranked candidate approach, white-preferred candidates always win and black-preferred candidates are often defeated. PFOF ¶ 180. In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was elected (twelve of twelve), as compared to six out of twelve top-ranked candidates among Black voters. PFOF ¶ 180. Excluding the monoracial 2009 election, the success rate is 45.5% (five of eleven) for top-ranked candidates for Black voters. In the five contested elections over the last five years (*i.e.*, from 2011 through 2015), every top-ranked candidate among white voters was elected (five out of five), as compared to only two out of five top-ranked candidates among Black voters. PFOF ¶ 181. Notably, both of those victories occurred under special circumstances.

### 2. Point estimate approach

Applying the point estimate approach, the groups' preferences usually diverge, with white voters almost always preferring white candidates (93% of the time) and Black voters usually preferring Black candidates (63% of the time) (*Gingles* II). PFOF ¶ 185. Under this approach, white voters preferred Black candidates only twice: once in 2000, and not again until 15 years later in 2015. Trial Tr. vol. 5, 106:13–107:10 (Rodden testimony). Moreover, using this approach, Black-preferred candidates usually lost (51.8% of the time) (*Gingles* III), *see* PFOF ¶ 184; Trial Tr. vol. 5, 110:18–111:9 (Rodden testimony), while white-preferred candidates were almost always successful (88.9% won), PFOF ¶ 184. The gap in success rates is larger in more recent years: using the point-estimate approach, 91.7% of white-preferred candidates were successful during the past five years, as compared to 33.3% of Black voters' preferred candidates. PFOF ¶ 184.

The District's argument that under the point estimate approach, voting is not racially polarized because Black and white voters shared at least one preferred candidate in eight of twelve elections focuses on the wrong metric for measuring polarization.[29] With respect to assessing racial polarization, the appropriate yardstick is not the number of *elections* in which minority voters and white voters support different candidates, but rather the total number of *candidates* on which the groups' preferences diverge.[30] *See Gingles*, 478 U.S. at 56 ("The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred *candidates.*" (emphasis added)); *Jeffers v. Clinton*, 730 F. Supp. 196, 208 (E.D. Ark. 1989) (three-judge court) (finding RPV where "black and white voters prefer different *candidates* with a high degree of frequency" (emphasis added)), *aff'd mem.*, 498 U.S. 1019 (1991); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1337 (S.D. Fla. 2002) (three-judge court) (stating that RPV "may most easily be established by a showing that the members of each group tend to vote for the same candidate and that the candidate supported by each group is different from that supported by the other").

As noted, Black and white voters in FFSD rarely have preferred the same candidates; even applying the point estimate approach, Black and white voters have diverged in terms of

---

[29] Notably, using the point estimate approach, much of what the District calls Black-preferred candidates' "success" rests on the election of six white candidates who were Black voters' second- or third-choice candidates *after* an African-American candidate who received more of Black voters' votes lost. *See* PFOF ¶ 184 (chart) (Hirsch in 2000, Garofalo in 2001, Clark in 2002, Knorr in 2003, Schroeder in 2012, and Hogshead in 2013).

[30] The 2012 election highlights the flaws in the point estimate approach's mechanical nature in another respect. The 2012 election featured three candidates running for two seats. Under the point estimate approach, one is required to find that both Black and white voters each preferred two of the three candidates (here, B. Morris and Schroeder among Black voters and Ebert and Schroeder among white voters), and that Black and white voters thus "shared" one candidate preference (Schroeder), Trial Tr. vol. 5, 207:15-19; one would also necessarily have to conclude that at least one Black-preferred candidate was successful, *id.*, 207:20–208:4. The fact that Black voters expressed essentially unanimous support for a Black candidate who lost, while the two winners were white candidates who were the most popular candidates among white voters and received indistinguishable support from Black voters cannot be captured by the point estimate approach.

candidate preference about two-thirds of the time. Trial Tr. vol. 5, 108:17-25 (Rodden testimony). Dr. Rodden noted the existence of some crossover voting from white voters for Black-preferred candidates, but some white support does not cancel out the finding that Black-preferred candidates usually lost due to bloc voting.[31] The eight Black-preferred candidates identified by the Court received low levels of support among white voters, *see* Trial Tr. vol. 4, 25:18-23 (2011), 28:5-24 (2012), 32:9-18 (2013), 36:2-14 (2014), 38:22-24 (2015), and none was ever preferred by white voters, save for the 2015 election under special circumstances when white voters' second-choice candidate, Graves, received less than half the votes of the white voters' most-preferred candidate.

In sum, even under the two methods of identifying candidates of choice employed by Dr. Rodden, this Court finds that Plaintiffs have satisfied *Gingles* II and III.

### 5. Exogenous elections

Exogenous elections have little or no probative value in determining whether Plaintiffs have satisfied *Gingles* II and III. As discussed above, the Court need not supplement endogenous election data where, as here, the Court has sufficient evidence from endogenous elections from which to discern typical voting behavior and usual results. *See, e.g., Westwego*, 872 F.2d at 1208 n.8. But even on its own terms, Dr. Rodden's testimony about exogenous elections fails to provide persuasive evidence about the presence of the *Gingles* preconditions in FFSD elections for a number of reasons. The District's presentation of exogenous election results simply lists the race of the candidates and the aggregate total number of votes received by each candidate; it does

---

[31] Moreover, Black voters cannot be required to overcome white bloc voting by giving up part of the franchise and single-shot voting. PFOF ¶ 119. Trial Tr. vol. 4, 46:23–47:23 (Engstrom testimony rejecting the idea that Black voters should be able to elect a single Black-preferred candidate if they just withheld the rest of their franchise, and testifying that, "[i]f that's the way [Black voters] have to win an election in the Ferguson-Florissant School District, then I would certainly say that that's not an opportunity equal to that of other members of the electorate, because they don't have to single-shot vote in order to elect a candidate of their preference").

not provide a polarization analysis of voting patterns broken down by race that would enable the Court to assess whether Black and white voters in FFSD in fact tended to prefer different candidates in these exogenous elections. The race of the candidate cannot be used as the sole criterion to identify candidate of choice of voters. *Blytheville*, 71 F.3d at 1386.

Moreover, the exogenous elections presented are very different from the local, nonpartisan, April Board elections in FFSD and, thus, do not provide useful evidence about Black voters' ability to elect their preferred candidates in FFSD Board elections. For example, the District introduced data from national, partisan elections held in November and, as Dr. Rodden admitted, voting patterns by race can differ in these sorts of elections, as compared to local, nonpartisan elections. "These partisan exogenous elections cannot be used to overcome the evidence supplied by the non-partisan endogenous elections." *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *22 (S.D. Tex. Apr. 25, 2014).

Additionally, ten of the twelve exogenous contests presented by the District involved Black incumbent candidates. It is hardly surprising that incumbent candidates prevailed; as Dr. Rodden acknowledged, incumbents running for reelection generally win with high levels of support. Trial Tr. vol. 5, 187:13-15 (Rodden testimony); s*ee Gingles*, 478 U.S. at 60 & n.29 (noting that "the [district] court took account of the benefits incumbency and running essentially unopposed conferred on some of the successful black candidates"). And finally, of the two elections that did not involve a Black incumbent candidate, one featured a Black Democrat, who would be expected to win in a partisan contest in the predominantly Democratic St. Louis area. *See Gingles*, 478 U.S. at 60 n.29 (noting that the district court properly took account of elections that were, for all practical purposes, unopposed, including elections in which there was no Democratic opposition in a heavily Democratic district); *see* Trial Tr. vol. 5, 188:3-13 (Rodden

agreeing that FFSD consists primarily of Democratic voters). Taken together, the results of these exogenous elections do not cast doubt on the polarization evident from the endogenous elections in FFSD.

For these reasons, the Court concludes that Plaintiffs have satisfied the three *Gingles* threshold requirements.

## VI. <u>Senate Factors</u>

Satisfaction of the three *Gingles* preconditions takes Plaintiffs "a long way towards showing a Section 2 violation," *Blytheville*, 71 F.3d at 1390; *see also Jenkins*, 4 F.3d at 1135 ("[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances."), but Plaintiffs must still prove that, based on an evaluation of the totality of circumstances, Black voters in FFSD have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Plaintiffs have more than met their ultimate burden.

"[T]he question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Gingles*, 478 U.S. at 45 (internal quotation marks omitted) (citing S. Rep. No. 97-417, at 30 & n.120 (1982)). In undertaking this practical evaluation, courts look to the following non-exhaustive "typical factors" identified in the Senate Report accompanying the 1982 amendments to the VRA ("Senate Factors"), *see* S. Rep. No. 97-417, at 28-29: (1) the prior history of voting-related discrimination; (2) the degree of racially polarized voting; (3) the presence of voting practices or procedures that tend to subjugate the minority group's voting preferences; (4) the exclusion of minority group members from the candidate slating process; (5) the extent to which the minority group bears the effects of past discrimination in areas that

tend to hinder its members' ability to participate effectively in the political process; (6) the use of subtle or overt racial campaign appeals; and (7) the extent to which members of the minority group have succeeded in being elected to public office. *Gingles*, 478 U.S. at 44-45. A court may also consider two additional factors: (1) the extent to which elected officials have been responsive to the particularized needs of the minority group ("Senate Factor 8"); and (2) the tenuousness of the policy underlying the challenged voting practice or procedures ("Senate Factor 9"). *Id.* at 45. Plaintiffs need not prove "any particular number of factors . . . or that a majority of them point one way or the other." *Id.*

Applying this practical evaluation of the past and present realities in the District, this Court concludes that, under the totality of circumstances, African-American residents of FFSD have less opportunity than other members of the electorate to participate in the political process and elect candidates of their choice. Not only do the "predominant" Senate Factors—*i.e.*, "the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme," *Bone Shirt II*, 461 F.3d at 1022 (internal quotation marks omitted) (Factors 2 and 7)—weigh in Plaintiffs' favor, which is sufficient to prove a Section 2 violation, *see Gingles*, 478 U.S. at 48 n.15, but it is undeniable that the entrenched socioeconomic inequalities and other factors in FFSD suppress African-American political participation in a myriad of other ways.

1. The "Predominant" Senate Factors (Factors 2 and 7) Weigh in Favor of Plaintiffs.

"Two factors predominate the totality-of-circumstances analysis: 'the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme.'" *Bone Shirt II*, 461 F.3d at 1022 (quoting *Blytheville*, 71 F.3d at 1390); *see also Gingles*, 478 U.S. at 48 n.15 (citing S. Rep. No. 97-417, at 28-29). Because the trial evidence readily demonstrates that these factors weigh in Plaintiffs' favor, Plaintiffs' claim

succeeds on that basis alone. *See Gingles*, 478 U.S. at 48 n.15 ("If [the "predominant" factors are] present, the other factors . . . are supportive of, but *not essential to*, a minority voter's claim.").

a) *Board Elections are characterized by racially polarized voting (Senate Factor 2).*

The first "predominant" factor (Senate Factor 2), *i.e.*, "the extent to which voting in the elections of the State or political subdivision is racially polarized," *Gingles*, 478 U.S. at 44-45, weighs in favor of Plaintiffs. As discussed in detail above, *see supra* Sections V.D., V.E, Board elections suffer from stark racial polarization. PFOF ¶¶ 113, 177, 179, 184, 185, 189-190; *see Bone Shirt II*, 461 F.3d at 1020-22; *Blytheville*, 71 F.3d at 1386-87, 1390.

b) *African Americans are usually unsuccessful in being elected to the Board (Senate Factor 7).*

The second "predominant" factor (Senate Factor 7), *i.e.*, "the extent to which members of the minority group have been elected to public office in the jurisdiction," *Gingles*, 478 U.S. at 45, also weighs in favor of Plaintiffs. This factor looks at the electoral success of African-American representatives and does not require the total absence of minority electoral success. *See id.* at 75 ("[T]he language of § 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose a § 2 claim."); *Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5*, 804 F.2d 469, 476 (8th Cir. 1986). In fact, even "proportional or near proportional representation of the black population on the school board . . . does not provide an absolute safe harbor in which a defendant can seek refuge from the totality of the circumstances." *Blytheville*, 71 F.3d at 1388. Instead, courts "must conduct an 'independent consideration of the record' and a 'searching practical evaluation' of the circumstances surrounding minority electoral successes." *Buckanaga*, 804 F.2d at 476 (quoting *Gingles*, 478 U.S. at 75-76).

African-American electoral successes have been minimal in FFSD. PFOF ¶ 117. From 1988 until 2000, Dr. Doris Graham was the only African American to be elected to the Board. PFOF ¶ 195. From 2000 to 2015, there were never more than two African-American members on the seven-member Board at the same time (28.6%), despite the fact that, according to the 2010 Decennial Census, African Americans comprise 48.19% of the District's VAP. *See* PFOF ¶ 196. This underrepresentation has not been for lack of trying: twenty-four Black candidates ran for Board seats in the twelve contested elections from 2000 to 2015, but were successful only five times (20.8%), while white candidates have been successful twenty-two out of thirty-seven (59.5%) times since 2000, a success rate almost three times that of Black candidates. *See* PFOF ¶¶ 197-199. The District's predictions that these trends will soon reverse due to its projections that white flight in past decades will continue indefinitely and change FFSD demographics are neither credible nor relevant to the Court's determination. Despite the growth of the African-American population in the District since 2000, minority electoral success has not improved, and as recently as the 2013–2014 term, there were no African-American Board members at all. PFOF ¶ 203.

By its terms, this factor is concerned with "the extent to which members of the minority group have been elected" in the jurisdiction. *Gingles*, 478 U.S. at 37. The District's attempts to rebut the quantitative data by casting aspersion on the campaigns of unsuccessful African-American candidates, Trial Tr. vol. 3, 136:23–137:11 (Johnson testifying that he informed participants in a campaign event that he had a personal rule that he is available to accept calls from his family before checking his phone during the event), or noting the success of Black candidates for offices *outside* FFSD, *see infra*, Section V.E.5, are thus irrelevant to this inquiry, *see, e.g.*, *Bone Shirt II*, 461 F.3d at 1022 & n.10 (considering probative the minimal success of

minority candidates for the relevant office, but not evidence proffered about candidates in "posts not at issue in this case"); *Blytheville*, 71 F.3d at 1390 (in evaluating this factor, relying only the "minimal electoral success" of minority candidates "under the present scheme" for electing school board members). In light of these statistics, the Court concludes that African-American candidates' success in gaining election to seats on the FFSD Board has been minimal.

## 2. The Historical and Ongoing Effects of Discrimination in the State, St. Louis Metro Area, and FFSD (*Senate Factors 1 and 5*) Weigh in Favor of Plaintiffs.

### a) *The State, St. Louis County, and FFSD have a long history of official discrimination that has touched the right of African Americans in the District to participate in the political process (Senate Factor 1).*

Senate Factor 1 weighs in favor of Plaintiffs as the State of Missouri, St. Louis County, and FFSD have a long history of official discrimination that has "touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Bone Shirt II*, 461. F.3d at 1021 (citing S. Rep. No. 97-417, at 28-29). There is an undeniable history of official racial discrimination in the State of Missouri, St. Louis County, and FFSD itself. *See* PFOF ¶¶ 207-219. The "litany of Missouri constitutional provisions, statutes, ordinances, and decisions dating from 1820 to 1976" alone provides strong evidence for this factor. *See African-Am. Voting Rights Legal Def. Fund, Inc. v. Missouri*, 994 F. Supp. 1105, 1125 (E.D. Mo. 1997) (noting that a "litany of Missouri constitutional provisions, statutes, ordinances, and decisions dating from 1820 to 1976" could constitute sufficient evidence of "official discrimination" to satisfy Senate Factor 1), *aff'd*, 133 F.3d 921 (8th Cir. 1998). The creation of FFSD itself was a remedy to state-sanctioned discrimination, and segregation in education, some 20 years after the Supreme Court decided *Brown v. Board of Education*, 347 U.S. 483 (1954). PFOF ¶¶ 9, 216; *United States v. Missouri*, 388 F. Supp. 1058 (E.D. Mo. 1975); Trial Tr. vol. 1, 120:11-16 (testimony of Colin Gordon). Jurisdictions within FFSD, historically

engaged in purposeful discrimination against African Americans in education, housing, and other areas, *United States v. Missouri*, 515 F.2d 1365, 1367 (8th Cir. 1975); *United States v. Missouri*, 388 F. Supp. 1058 (E.D. Mo. 1975). Both parties' witnesses at trial provided substantial, credible testimony about the discrimination that they and their families have experienced in the District. PFOF ¶¶ 208, 228.

This dark history of officially sanctioned discrimination is not just a distant memory. Its effects persist and form the backdrop for present conditions in FFSD that work together to prevent African Americans from having an equal opportunity to elect candidates of their choice. "A history of pervasive, purposeful discrimination" itself is "'strong circumstantial evidence' . . . that the present day ability of minorities to participate on an even footing in the political process has been seriously impaired by the past discrimination." *Buckanaga*, 804 F.2d at 474 (quoting *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984)); *see also Gingles*, 478 U.S. at 44-45.

Dr. Colin Gordon, a historian, tenured professor, and nationally recognized expert in the history of segregation in St. Louis metropolitan area, provided credible expert testimony explaining how this official discrimination has played out in, and continues to affect, the lives of African Americans in FFSD and the metropolitan area. PFOF ¶¶ 222, 224, 227-228. Such disparities place African Americans on an unequal footing as compared to whites when it comes to participating in the political process, *see, e.g.*, *Blytheville*, 71 F.3d at 1390 (concluding that although "strides ha[d] been made," "the district court did not accord sufficient weight to the vestiges of that history," and that "recognized historic effects of discrimination in the areas of health, employment, and education impact negatively on minority political participation"); *Buckanaga*, 804 F.2d at 474 (proof of official discrimination is circumstantial evidence "that past

discrimination has also led to present socio-economic disadvantages, which in turn reduces participation and influence in political affairs" (citing *Marengo Cty. Comm'n*, 731 F.2d at 1567)). The evidence in the record demonstrates that this sense of futility and disillusionment exists among African-American voters in FFSD. *See, e.g.*, PLTF-117, *Decl. of Redditt Hudson*, Sept. 18, 2015 ("*Hudson Decl.*"), ¶¶ 11, 17; PLTF-118, *Decl. of F. Willis Johnson*, Sept. 29, 2015 ("*Johnson Decl.*"), ¶ 15; Trial Tr. vol. 2, 74:14–75:8 (testimony of former Board member Doris Graham that "it's hard to get [Black candidates from Berkeley] to run, to spend the money, spend the time and the energy to run, because they're looking overwhelmingly at the district and saying it seems like it's impossible"); Trial Tr. vol. 4, 114:15–115:3 (Hudson testifying that "if you are confronted with indifference long enough and an inability to address or change the situation that allows for people to be indifferent to your interest, I think people become disaffected" and that "African-American participation just in the process relative to the school board elections—anything—is diminished by the idea that people in charge of running this district don't care about us and there's nothing you can do about it."). Plaintiffs demonstrated at trial that the lingering effects of "[o]fficial discrimination [have] not only prevent[ed] blacks [in FFSD] from electing representatives of their choice, [they have] also [led] to disillusionment, mistrust, and disenfranchisement" that have "cause[d] black voters to drop out of the political process" and likely caused "potential black candidates to forgo an election run." *Rural W. Tenn. African Am. Affairs Council v. Sundquist*, 29 F. Supp. 2d 448, 459 (W.D. Tenn. 1998).

      b) *African Americans in FFSD continue to bear the effects of discrimination, and those effects hinder their ability to participate effectively in the political process (Senate Factor 5).*

Beyond the dark history of discrimination, the trial evidence as a whole overwhelmingly demonstrates that African Americans in Missouri and FFSD in particular "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to

participate effectively in the political process" (Senate Factor 5). *Gingles*, 478 U.S. at 37; PFOF ¶¶ 170, 212, 215, 217, 220-232. These "lingering effects of discrimination a[re] evidenced by economic and social disparity between [African Americans] and whites," *Buckanaga*, 804 F.2d at 474, and, as Plaintiffs established at trial, diminish the effective political participation of both Black voters and Black candidates in FFSD, *see, e.g.*, *Ward v. Columbus Cty.*, 782 F. Supp. 1097, 1104 (E.D.N.C. 1991) (segregation "disadvantages the black community politically by depriving its potential candidates of the opportunity to make acquaintances and to build trust and acceptance among white voters"); *Rural W. Tenn.*, 29 F. Supp. 2d at 459 ("The economic and educational isolation of African-Americans . . . limits their ability to fund and mount political campaigns. In this sense therefore, blacks are not able to equally participate in the political process.").

As Dr. Gordon testified, there are deep and persistent socioeconomic disparities between African Americans and whites in the St. Louis metropolitan area, and in FFSD specifically, across a broad range of indicators including median income, unemployment and poverty rates, and access to healthcare. PFOF ¶¶ 207-232. The Court finds credible Dr. Gordon's sound conclusion that the segregation and disparities experienced by African Americans is pernicious in FFSD.

These continuing effects of past discrimination hinder African Americans' ability to participate in the political process—both as voters and as candidates. PFOF ¶¶ 99, 206, 221-232.[32] Black residents of FFSD have, on average, lower income, less education, and are comparatively younger than white population—and all of these factors correlate with lower participation rates. PFOF ¶¶ 79, 217, 219, 221-222, 231, 233-234. As Dr. Kimball credibly

---

[32] Dr. Kimball is competent to testify on these matters. *See* Plaintiffs' Post-Trial Br. at Section I.B.

testified, depressed socioeconomic wellbeing increases voting "costs" and therefore, under the "calculus of voting," dampens political participation among African Americans. PFOF ¶¶ 220, 222, 231; Trial Tr. vol. 5, 117:14-22 (Rodden concurring that people who live in poverty, people with lower education levels, and younger people are less likely to become registered and vote). Evidence of the disparity between African-American voter registration in Missouri and white voter registration, PFOF ¶ 78, Trial Tr. vol. 4 90:10-91:6 (Hudson testifying that "historically in many Black communities voter registration has been low."); *see Buckanaga*, 804 F.2d at 474-75 (finding disparity in state registration rates evidence of depressed political participation), and lower Black turnout than white turnout in FFSD, PFOF ¶ 231, are evidence of the correlation between economic disparities and disparities in participation.

This is not surprising; the Eighth Circuit has recognized depressed political participation as among "the recognized historic effects of discrimination in the areas of health, employment, and education." *Blytheville*, 71 F.3d at 1390; *see also Gingles*, 478 U.S. at 69 ("[P]olitical participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes."). Socioeconomic disparities and residential and social segregation persist as barriers to equal participation by African-American voters and candidates in FFSD alike.

The District's argument that there can be no Section 2 liability because disparities along some socioeconomic indicators are smaller in the District than the region or State is unpersuasive. Even if isolated statistics showed slightly smaller disparities in FFSD than in the St. Louis metropolitan area,[33] notoriously one of the most segregated cities in the United States *see* Trial Tr. vol. 1, 122:18-24 (testimony of Colin Gordon), the protections of the VRA are not

---

[33] In fact, Dr. Gordon testified that because the St. Louis metropolitan area captures both wealthy and poor areas, "one would expect" there to be larger disparities in the metropolitan area than in FFSD. Trial Tr. vol. 1, 12-25.

triggered only if African Americans in FFSD are worse off from the effects of discrimination, in either an absolute or relative sense, than African Americans elsewhere in the region, the state, or the nation. As Dr. Gordon observed, "the surprising fact is not that the gap is narrower, but given the development patterns in [St. Louis County], the surprising fact is the gap doesn't virtually disappear. . . . The gap reflects sustained patterns of discrimination and sharply disparate life chances and life opportunities. Trial Tr. vol. 1, 130:9-14 (testimony of Colin Gordon). In any event, where courts have considered the existence of socioeconomic disparities outside the jurisdiction in question, they have treated it as *additional* evidence that minorities "in the state or political subdivision" continue to bear the effects of discrimination. *See, e.g.*, *Buckanaga*, 804 F.2d at 474; *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1038-39 (D.S.D. 2004) ("*Bone Shirt I*").

3.   The Remaining Senate Factors (Factors 8, 4, 6, 3, and 9) Also Weigh in Plaintiffs' Favor.

   a)   *FFSD Board members have been unresponsive to the particularized needs of African-American constituents (Senate Factor 8).*

Plaintiffs have presented "evidence demonstrating that elected [Board members] are unresponsive to the particularized needs of the members of the minority group" (Senate Factor 8). *Gingles*, 478 U.S. at 45. Accordingly, the Court concludes that this factor thus weighs in favor of Plaintiffs.

The evidence in the record demonstrates that many of the current Board members are not aware of the particularized needs and concerns of the African-American community. PFOF ¶¶ 206, 233-241. The testimony of current and recent Board members betrayed an unawareness of the historic and ongoing effects of discrimination faced by African Americans in FFSD. PFOF ¶¶ 238. Even in the instances where some Board members seemed cognizant of particularized needs of their African-American students, the evidence shows that they have inadequately

addressed, or inappropriately responded to, those needs by disclaiming and shifting responsibility for educational and disciplinary disparities. PFOF ¶¶ 238d-f, 239-241; *see* Trial Tr. vol. 1, 26:11–28:22 (MO NAACP representative Pruitt testifying that he did not believe FFSD was doing much to ameliorate the achievement gap and pointing out efforts by adjacent school districts that FFSD had not engaged in); Trial Tr. vol. 2, 26:6–28:15, 29:21–30:25 (former Board member Charles Henson, who is African-American, testifying about the diversity committee he spearheaded, called High Achievement For All, which was eliminated after he left the Board).[34]

The evidence also demonstrates that the Board was unresponsive to the African-American community in FFSD with regard to its response to concerns raised about the suspension of Dr. Art McCoy, the District's first African-American superintendent. Witnesses for both Plaintiffs and the District testified that the Board's suspension of Dr. McCoy was widely opposed by the African-American community in the District and perceived as racially motivated. PFOF ¶ 239. African-American residents repeatedly communicated concerns to the Board about its suspension of Dr. McCoy, yet the Board refused to provide any explanation for its action. PFOF ¶¶ 239-240. The Board persisted in its refusal to explain the suspension despite the widely voiced perception that the decision was related to the Board consisting of all white members and Dr. McCoy being African-American.

Testimony from FFSD Board members that they were not legally permitted to discuss Dr. McCoy's suspension because it is a "personnel" matter is not credible. PFOF ¶ 240. There is no law that would prohibit public comment on Dr. McCoy's suspension. *See Guyer v. City of Kirkwood*, 38 S.W.3d 412, 414 (Mo. banc 2001) (noting that closure of personnel records under Missouri's public records and meetings law is permissive, not mandatory); *see also* Mo. Rev.

---

[34] Dr. Rodden did not offer any opinion about whether or not FFSD Board members have been responsive to the particularized needs of the African-American community in the District. Trial Tr. vol. 5, 138:21–139:1.

Stat. § 610.022.4 ("Nothing in sections 610.010 to 610.028 shall be construed as to require a public governmental body to hold a closed meeting, record or vote to discuss upon any matter."). Likewise, the Separation Agreement and Release dated March 12, 2014, which resulted in Dr. McCoy's separation from the District, was executed more than four months *after* Dr. McCoy was suspended, and was limited to specific records not related to the suspension. In addition, testimony from Board members also makes clear that the Board's motivation to suspend Dr. McCoy was *different* from whatever prompted the separation agreement. PFOF ¶ 240. The agreement, then, cannot explain the Board's refusal to explain its actions to the community in November and December 2013.

Furthermore, testimony from Plaintiffs' witnesses Pruitt, Hudson, and Johnson, as well as a video of the Board meeting immediately after the suspension, showed that the African-American community suspected Dr. McCoy's suspension was precipitated by his welcoming attitude toward transfer students from unaccredited, overwhelming African-American adjacent school districts. PFOF ¶¶ 238d, 250. Members of the community expressed concern that the all-white Board suspended Dr. McCoy because he arranged for those students' transportation costs to be covered by private donors after the Board declined to allocate funds for that purpose. PFOF ¶¶ 238d, 250. Because the Board's—and white Board candidates'—opposition to transfer students was *itself* perceived by the African-American community in FFSD as racially motivated, *see* PFOF ¶ 238d, the Board's suspension of Dr. McCoy almost immediately after he made it possible for the transfer students to attend FFSD schools, was perceived as retaliatory and, again, based on race, PFOF ¶¶ 239, 250.

In the absence of any requirement that the Board refrain from answering the concern of the African-American community that the suspension of Dr. McCoy was racially motivated, the

Court finds that the Board simply made a choice not to explain itself to its African-American constituents. The Court therefore concludes that its decision not to explain—even in the face of the widespread perception of racial motivation—is evidence of unresponsiveness.

Plaintiffs also provided substantial and credible evidence that the African-American community in FFSD has particularized needs concerning continuing socioeconomic disparities, PFOF ¶ 233; unequal school resources and policies within FFSD, PFOF ¶ 234; racial profiling by law enforcement, PFOF ¶ 235; disparate use of school discipline against African-American schoolchildren in the District, PFOF ¶ 236; and disparate educational opportunities for African-American schoolchildren in the District, PFOF ¶ 236. Plaintiffs provided substantial and credible evidence that the Board is either unaware of or has done little to respond to these needs. PFOF ¶ 238.

b) *Access to candidate slating (Senate Factor 4)*

Senate Factor 4 also weighs in favor of Plaintiffs. Under this factor, "if there is a candidate slating process," this Court must consider "whether members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37; *accord Clay v. Bd. of Educ. of St. Louis*, 896 F. Supp. 929, 941 (E.D. Mo. 1995) ("*Clay I*"). While there may not be a "consensus in federal law or political science texts on a definitive meaning of the phrase 'slating group[,]' . . . there is no support in the law for [a] restrictive definition." *Collins I*, 816 F.2d at 938. In fact, the Supreme Court has "viewed 'slating' as essentially involving the endorsing of candidates," *see id.* at 938-39 (citing *White*, 412 U.S. at 766-67; *Whitcomb v. Chavis*, 403 U.S. 124, 150-51 & n.30 (1971)), an understanding that comports with Dr. Kimball's, Trial Tr. vol 2, 121:7-15 (Kimball testifying that as a political scientist, "[s]lating means organized interests that endorse particular candidates for office."). And access to a slating process is about more than being allowed to apply for endorsement. As the Eleventh Circuit has noted, "[i]n jurisdictions

where there is an influential official or unofficial slating organization, the ability of minorities to participate in that slating organization *and to receive its endorsement may be of paramount importance*." *Marengo Cty. Comm'n*, 731 F.2d at 1569 (emphasis added). As Dr. Kimball testified, this is due to the signaling effect and other benefits that the endorsement. Trial Tr. vol 2, 131:7-15

There are two primary slating organizations in FFSD Board elections, and African-American candidates have largely been denied access to their slates: the Ferguson-Florissant National Education Association ("FFNEA") and the North County Labor Club ("NCLC"). PFOF ¶¶ 242-249. These two well-established and influential local slating organizations regularly endorse candidates for the Board. PFOF ¶ 242, 245, 247. These slating organizations promote endorsed candidates jointly, a hallmark of slating, and provide tangible resources to endorsed candidates, including campaign literature, mailing lists, robocalls, and access to volunteers, among other things. PFOF ¶¶ 243-244. In the 2014 election, where voters came together to form Grade A for change in response to the Board's unwillingness to explain its treatment of Dr. McCoy, it could not provide comparable resources. Trial Tr. vol. 3, 115:3-6 (Johnson testified that Grade A did not provide advice or volunteers to his campaign). Two of the 2014 Black-preferred candidates testified that the treatment of Dr. McCoy was included in their campaign as one of the reasons for their candidacy. *See* PFOF ¶ 161.

Whatever the criteria and internal process for selecting candidates to endorse, it is clear that African Americans have been denied the ability "to receive [their] endorsement." *Marengo Cty. Comm'n*, 731 F.2d at 1569. It is undisputed that both the FFNEA and the NCLC endorse more white candidates than Black candidates. The FFNEA has endorsed candidates in every contested election at least since 2006. PFOF ¶ 245. Since 2004, the North County Labor Club

endorsed thirteen candidates for the Board but the organizations both endorsed Black candidates less often than white candidates. PFOF ¶ 247. Candidates are not given reasons for the FFNEA or NCLC's decision to endorse or not to endorse a particular candidate. PFOF ¶ 248. The organizations' recent pattern of endorsement reveals racial disparities.

Since 2006, similar numbers of white and Black candidates have run for office and sought FFNEA endorsement. African-American candidates have less access than white candidates to these slating organizations. PFOF ¶ 249. *See* Trial Tr. vol. 2, 132:25–133:1 (Kimball testifying that African Americans are endorsed "relatively rarely" by both FFNEA and NCLC when "compared to white candidates"). MO NAACP representatives, individual Plaintiffs, and lay witnesses who have served on the FFSD Board, testified credibly as to how the slating and campaign processes favor the status quo and hinder African-American voters' ability to elect candidates of their choice. *See* PFOF ¶ 248; Trial Tr. vol. 2, 75:9-18 (former Board member Doris Graham testifying that African-American candidates face barriers in FFSD campaigns, and that "first of all, [is] race, the color of their skin"); Trial Tr. vol. 2, 11:18–24 (testimony of Charles Henson). Because African-American candidates have less access than white candidates to these slating organizations, the slating process limits African-American candidates' ability to get elected to the Board. PFOF ¶ 249. The endorsement patterns for FFNEA and NCLC indicate that African Americans have been denied equal access to this slating process.

c) *Subtle racial appeals (Senate Factor 6)*

The sixth Senate Factor, *i.e.*, "the use of overt or subtle racial appeals in political campaigns," *Gingles*, 478 U.S. at 44-45, likewise supports Plaintiffs' claim. Racial appeals can take a variety of forms, including the use of racially charged campaign tactics and the highlighting of racially charged campaign issues "that prey[] on racial anxiety," *City of Euclid*,

580 F. Supp. 2d at 610; *see id.* at 613, such as campaign literature that "appealed to the fears of Town residents that black students . . . would be bused to schools in the Town," *Goosby v. Town Bd. of Hempstead*, 956 F. Supp. 326, 342 (E.D.N.Y. 1997); *see also, e.g.*, *Bone Shirt I*, 336 F. Supp. 2d at 1041 (evidence of racial appeals included accusations that Native Americans were "trying to take land back and put it in trust"); *Williams v. City of Dallas*, 734 F. Supp. 1317, 1348 (N.D. Tex. 1990) (campaigns employed racial appeals where platforms included opposition to busing for school desegregation); *Cofield v. City of LaGrange*, 969 F. Supp. 749, 777 (N.D. Ga. 1997) (evidence that discussion on districting and school consolidation were racially charged issues).

Policies that result in a perceived or real influx of African-American students—such as the transfer program, *see* PFOF ¶ 238d—are racially charged and that a campaign's focus on such issues constitutes a racial appeal. *See, e.g.*, *Goosby*, 956 F. Supp. at 342-43; *City of Dallas*, 734 F. Supp. at 1348; *Brown v. Bd. Comm'rs of Chattanooga*, 722 F. Supp. 380, 394-96 (E.D. Tenn. 1989) (noting that a Black candidate's perceived "anti-busing" position enabled him to obtain enough white crossover votes to win election).

Plaintiffs and witnesses credibly testified that many African Americans in the FFSD viewed candidates' statements about transfer students and the District's treatment of transfer students as an attempt by an all-white Board to stem growth of the African-American student population in the District. PFOF ¶¶ 238d, 250. Testimony at trial established that the actual cost of tuition is borne by the source school district and outside donations cover the transportation costs. PFOF ¶ 250. As Plaintiffs and other members of the African-American community in FFSD also testified, Board candidates in certain years made other subtle racial appeals, like exploiting an African-American Board member's outspoken advocacy for racial inclusion.

PFOF ¶ 250.[35] Dr. Rodden did not offer any opinion about whether or not there have been racial appeals in FFSD elections. Trial Tr. vol. 5, 138:16-20.

    d) *FFSD employs voting practices and procedures that tend to enhance the opportunity for discrimination (Senate Factor 3).*

FFSD employs three "voting practices or procedures that tend to enhance the opportunity for discrimination against" African Americans in FFSD (Senate Factor 3), *Gingles*, 478 U.S. at 45: (1) an at-large voting scheme, (2) staggered terms, and (3) off-cycle (*i.e.*, April versus November) elections. *See* PFOF ¶ 251. Given the continuing socioeconomic effects of racial discrimination, including transience, the disproportionate effect of felony disenfranchisement, evidence of depressed turnout, and the heightened costs of seeking out information, registering to vote, and voting for persons with less income and less education, the disproportionate benefits of these voting practices would not inure to African-American residents of FFSD, even if they were to reach a bare numerical majority of the VAP. PFOF ¶¶ 252-253. This factor thus weighs in Plaintiffs' favor.

    i. <u>At-large elections</u>

As the Supreme Court has long recognized, at-large voting schemes can "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (alteration in original; citation omitted); *see also Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994); *Blytheville*, 71 F.3d at 1390 ("The majority vote requirement, staggered terms, and at-large structure also tend to suppress minority voters' influence."); *Collins II*, 883 F.2d at 1236 (at-large system and staggered terms susceptible of diluting minority votes). Indeed, as the Eighth Circuit has observed, the 1982 amendment to Section 2 "was aimed particularly at

---

[35] Although "discipline," classroom disruptions, and making students "feel safe" may warrant discussion in a campaign, Plaintiffs presented credible evidence that African-American voters in the District understood the way candidates discussed these issues to be subtle racial appeals. PFOF ¶ 250.

discriminatory at-large election systems which dilute minority voting strength." *Buckanaga*, 804 F.2d at 471. Regarding the ample statistical evidence that at-large voting has this dilutive effect on Black voters in FFSD, *see supra* Section V.D, Plaintiffs' witnesses testified to how at-large voting has worked in conjunction with socioeconomic racial disparities in FFSD to disadvantage Black candidates who "are likely to have less access to the necessary resources for travel and advertising" outside the immediate area surrounding the candidates' homes, *Ward*, 782 F. Supp. at 1104; PFOF ¶¶ 229, 233. Because of continuing racial disparities and racially polarized bloc voting, at-large voting in FFSD does, in fact, fundamentally enhance the opportunity for discrimination against African-American voters and candidates.

## ii.    Staggered terms

Staggered terms in FFSD also enhance the opportunity for discrimination, particularly because they are combined with at-large voting. *See, e.g.*, *Blytheville*, 71 F.3d at 1390 ("[S]taggered terms[] and at-large structure also tend to suppress minority voters' influence." (citing *De Grandy*, 512 U.S. at 1018)); *Collins II*, 883 F.2d at 1236 (noting that the dilutive effect of "at-large voting in a multimember political unit . . . may be enhanced by staggered terms"). In particular, staggered terms "promote the dilution of minority voting strength because they limit the number of seats, [and] create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting." *Buckanaga*, 804 F.2d at 475 (remanding for district court to consider discriminatory effect of school district's use of staggered terms).

## iii.    Off-cycle elections

Off-cycle elections enhance the opportunity for discrimination in two primary ways. First, off-cycle elections tend to generate unusually low voter turnout generally and disproportionately low turnout among African-American voters. PFOF ¶¶ 230, 252-253;

Jonathan Rodden, Is segregation the problem in Ferguson?, The Washington Post (Blog), Aug. 18, 2014, at 6. This should come as no surprise: "holding local elections at a time when only the most engaged and politically astute citizens—those citizens who feel the most enfranchised—are likely to vote will almost certainly result in the diminished influence of groups who feel generally excluded from the political fabric of the community." *Vill. of Port Chester*, 704 F. Supp. 2d at 444; *see also Jones v. City of Lubbock*, 727 F.2d 364, 381 (5th Cir. 1984); *Blytheville*, 71 F.3d at 1388 ("[I]t stands to reason that when an external stimulus dampens the white turnout it may impact even more greatly on a group that has faced historic disadvantages."). The trial evidence showed that this correlation bears out in FFSD, where—at least for the last twelve contested elections—Black turnout has never exceeded white turnout, and has been lower at least half the time. PFOF ¶ 231.

In addition to dampening turnout disproportionately among disadvantaged groups, *see Blytheville*, 71 F.3d at 1388 (noting that Black voters' realization "that they faced a much lower possibility of success under the present scheme" could account for low turnout), off-cycle elections increase the relative influence of well-organized interest groups in maintaining the status quo, PFOF ¶ 249; PLTF-62a, Jonathan Rodden, *Is segregation the problem in Ferguson?*, The Washington Post (Blog), Aug. 18, 2014, at 6. In FFSD, these groups include the FFNEA and the NCLC; as described above in Section VI.3.b, both organizations generally endorse white candidates.

e) *The District's rationales for maintaining discriminatory practices are tenuous (Senate Factor 9).*

The last factor, which considers whether the policies underlying FFSD's use of these discriminatory voting practices are "tenuous," *see Gingles*, 478 U.S. at 45, also weighs in favor of Plaintiffs, particularly when weighed against the fact that these practices, taken together, form

a considerable barrier to African-American voters' ability to elect their preferred candidates.

Current Board members testified that at-large voting ensures that Board members represent the entire school district rather than specific sub-districts. PFOF ¶ 254. Given that predominantly African-American areas of the District have been chronically underrepresented and that all the current Board members live within two small areas of Ferguson and Florissant, this rationale for maintaining an at-large voting scheme is tenuous. PFOF ¶ 254. The lack of geographic representation, evidenced at trial, is especially noteworthy when considering that the district court took pains to ensure that the annexed school districts of Kinloch and Berkeley had representation on the School Board as part of the desegregation order that created the present-day FFSD. *See United States v. Missouri*, 515 F.2d 1365, 1373 (8th Cir 1975). And, given credible testimony that there is a widespread perception that schools in certain areas are better-resourced than others, the absence of Board members from predominantly African-American areas of the District appears only to exacerbate the Board's lack of awareness about the issues facing African-American residents. PFOF ¶ 254. Because the maintenance of at-large voting achieves the opposite of what the District claims justifies it, the justification is tenuous.

District witnesses suggested that off-cycle elections are justified because they allow voters to pay more attention to School Board elections. PFOF ¶ 254. But, the parties' experts agreed that turnout, among all demographics, is *lower* for April elections. PFOF ¶¶ 230, 252-253. Moreover, during the last twelve contested elections, African-American turnout has always been lower than, or statistically indistinguishable from, white turnout. *See supra* Section VI.3.d.iii; PFOF ¶ 231.

Further, Plaintiffs' evidence, including testimony from Plaintiff Hudson, former Board member Henson, and MO NAACP representative Pruitt, showed that African-American voters

are understandably disillusioned with Board elections in which they have had limited success electing candidates who are aware of and responsive to the community's needs. PFOF ¶ 238. In fact, that disillusionment is what prompted, at least in part, the 2013–2014 creation of Grade A for Change, which attempted to encourage and support Black candidates for the Board. PFOF ¶ 161. Even with a highly coordinated effort only one of the three candidates was successfully elected. Grade A For Change no longer exists.

When weighed against these depressive effects that off-cycle elections have on the political participation of minority voters in FFSD, the District's rationale is tenuous.

## CONCLUSION

For the foregoing reasons, this Court concludes that Ferguson-Florissant School District's at-large method for electing Board members deprives its African-American residents of an equal opportunity to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act. African Americans in FFSD have suffered and continue to suffer from the effects of discrimination that have long plagued this District and hindered their ability to participate equally in the political process. Against this backdrop of inequality, a host of other factors hinder African-American electoral success, such as off-cycle elections, lack of access to union endorsements, racial campaign appeals, and the Board's adamant unresponsiveness to the particularized needs of the African-American community. These factors coupled with the unwillingness of white voters to support candidates from the African-American community has effectively blocked African-American voters from exercising effective political power in the District. Accordingly, the Court enjoins Defendants from conducting any elections for the District's Board until a new system may be properly implemented. The Court will set a briefing schedule on remedies forthwith.

Dated this 8th day of April, 2016.        Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

GILLIAN R. WILCOX, #61278MO
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, MO 64111
Phone: (816) 470-9938

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235
* appearing pursuant to Local Rule 12.01(F)

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, Julie A. Ebenstein, hereby certify that on April 8, 2016, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Kathryn B. Forster
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

/s/ Julie A. Ebenstein