# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, REDDITT HUDSON, F. WILLIS JOHNSON and DORIS BAILEY,<br><br>      Plaintiffs,<br><br>v.<br><br>FERGUSON-FLORISSANT SCHOOL DISTRICT and ST. LOUIS COUNTY BOARD OF ELECTIONS COMMISSIONERS,<br>      Defendants. | Civ. No. 4:14-cv-02077-RWS |

## PLAINTIFFS' RESPONSE TO DEFENDANT FERGUSON-FLORISSANT SCHOOL DISTRICT'S POST-TRIAL BRIEF

**OVERVIEW**

The Ferguson-Florissant School District's method for electing members of its school board (the "Board") deprives African-American residents of an equal opportunity to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ("Section 2"). The Ferguson-Florissant School District ("FFSD" or the "District") argues that African-American voters in the District should, *theoretically*, have an equal opportunity to elect candidates of their choice. But a court's assessment of African-American voters' ability to elect their preferred candidates is a *functional* inquiry that depends "upon a searching *practical* evaluation of the 'past and present reality.'" *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (emphasis added) (quoting S. Rep. No. 97-417, at 30 (1982)). Under that practical evaluation, it is clear that the past and present *reality* in FFSD is far from the hypothetical utopia described by the District.

Contrary to the District's overview in its Post-Trial Brief, the evidence at trial establishes conclusively that Plaintiffs have satisfied the three *Gingles* preconditions and that, under the totality of circumstances, the political processes leading to the election of FFSD Board members are not equally open to participation by African Americans, who have less opportunity than other members of the electorate to elect representatives of their choice. The District's position in this case boils down to one principal argument: that because—according to the District's expert—African Americans are a bare numerical majority of the District's voting-age population ("VAP"), Black voters, in theory, *should have been* able to elect their preferred candidates to every single seat on the Board. But the practical reality is very different, for two reasons.

*First*, there is substantial racial polarization between Black and white voters in FFSD elections, and this is true regardless of the method that one employs for identifying candidates of

1

choice.[1] *See* ECF No. 176, *Pls.' Post-Trial Br.*, at 12-13 (summarizing ECF No. 178, *Pls.' Proposed Conclusions of Law* ("*Pls.' COL*"), Section V.E). Black voters express cohesive preferences for particular candidates, often members of their own racial group. *See Pls.' COL*, Section V.E.1. Meanwhile, white voters generally prefer different candidates. *See Pls.' COL*, Section V.E.2. Indeed, it is undisputed that over the twelve contested elections from 2000 to 2015, African-American voters and white voters in FFSD never preferred the same candidate as their top choice for the Board, and white voters never voted for an African-American candidate as their top choice. *Pls.' Post-Trial Br.* at 34-35.

*Second*, against that backdrop of polarization, a host of other factors hinder the electoral success of African-American voters' preferred candidates. Black voters have diminished access to the political process—by way of higher levels of poverty and transience, lower levels of education and homeownership, and other severe patterns of racial inequality across a wide spectrum of socioeconomic indicators, along with lower voter registration and turnout rates. *See Pls.' COL*, Section VI.2. In this context, the persistent unwillingness of white voters to support the candidates preferred by the African-American community has blocked African-American voters from exercising effective political power in the District.

The effects of these barriers are not merely theoretical: they are borne out by the actual election results in FFSD. Plaintiffs' expert Dr. Richard Engstrom explained that only two out of eight (25%) Black-preferred candidates won from 2011–2015. And testimony from the District's own expert is not to the contrary. Applying the District's point estimate approach for identifying Black-preferred candidates, only four out of twelve Black-preferred candidates (33%) were elected during that time period. In those same elections, applying the District's approach, white

---

[1] The District's sleight of hand in identifying, for instance, the two-seat, three-candidate 2012 election as an example of common preferences and Black voters' success, does not disguise this clear pattern. *See* ECF No. 178, *Pls.' Proposed Conclusions of Law* ("*Pls.' COL*"), at 38.

2

voters successfully elected eleven out of twelve (92%) of their preferred candidates. The Black-preferred candidates usually lost because of white voters' opposing preferences. *See Pls.' COL*, Sections V.E.2, V.E.4.2.

The attendant underrepresentation of the African-American community on the District's seven-seat Board is the practical reality for Black residents of the District, who face barriers to political participation. Consequently, the Board has not been responsive to the Black community's particularized needs, and Black voters, in turn, are disillusioned with the political process. *See Pls.' COL*, Sections VI.2, VI.3.a.

The District's projections of shifting demographics do not change Black voters' on-the-ground experience of exclusion, or insulate the District from liability under Section 2. *First*, "numerical minority" is not the appropriate understanding of "minority" as that term is used in Section 2. *See Pls.' COL* at 16-20. *Second*, according to all published government statistics, the Black VAP is not a numerical majority of the District's VAP. *See Pls.' COL*, Section IV.A.3.a. *Third*, the demographic questions raised by the District would not be dispositive even if African Americans were a numerical majority of the VAP, because that is not a *per se* bar to liability. *See Pls.' Post-Trial Br.* at 17-20. Just this week, the U.S. Supreme Court recognized that there are a number of factors besides population that relate to a group's ability to elect their candidate of choice. *See Harris v. Ariz. Indep. Redistricting Comm'n*, No. 14-232, 2016 WL 1574579, at *6 (U.S. Apr. 20, 2016) (noting that, for purposes of assessing a redistricting plan's compliance with the Voting Rights Act, the Department of Justice's "ability-to-elect analysis was complex, involving more than simply adding up census figures. The Department of Justice instead conducted a 'functional analysis of the electoral behavior within the particular . . . election district,'" including "calculations [that] might take into account group voting patterns, electoral

3

participation, election history, and voter turnout." (quoting 76 Fed. Reg. 7471 (Feb. 9, 2011))). Even if African Americans are 50.3% of the VAP in the District, the current system does not result in sweeping victory of African-American voters for every seat in every at-large Board election, as the District predicts. The reality in the District is that, under the current electoral system, the pattern of Black-preferred candidates' losses remains stubbornly entrenched, irrespective of white flight out of the District in the 1990s and 2000s.

The District's claim that there is no better alternative to this system for African-American voters is simply incorrect. Plaintiffs set forth two illustrative plans, each with seven single-member districts, including a Black VAP supermajority in three of those districts and a Black VAP majority in a fourth. *See Pls.' COL*, Section IV.A.2. These plans satisfy the straightforward threshold requirements of *Gingles* I by showing that African Americans could "constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. The illustrative plans demonstrate that there are alternatives to the current dilutive system. *See Pls.' COL*, Section IV.A; *Pls.' Post-Trial Br.* at 24-33. Moreover, during a remedial phase, this Court may consider other plans, such as hybrid single-member and at-large options or alternative voting systems. *See Pls.' Post-Trial Br.* at 33-42.

The District is also mistaken in its analysis of the topics the Court asked the parties to address in post-trial briefing: (1) issues related to expert testimony, including (A) Mr. Cooper's expertise and (B) Dr. Kimball's testimony regarding disparities by race in voter registration rates, on bullet voting, and on the numerical majority needed for an adequate remedy; (2) the admissibility of the preliminary results of the April 2016 school board election, which occurred nearly three months after the trial ended; (3) the District's response to concerns regarding its suspension of Dr. McCoy and its relevance to Senate Factor 8 (lack of responsiveness to the

particularized needs of the African-American community); (4) the appropriate demographic data to use in determining the population by race of FFSD; and (5) the availability of remedies appropriate to address the District's violation. Plaintiffs address these topics in their Post-Trial Brief and below, and respectfully request that this Court rule in their favor.

## DISCUSSION

### I. ISSUES RELATED TO EXPERT TESTIMONY

The District claims that: (1) Plaintiffs' expert witness Mr. Cooper is unreliable and that this Court should be the first federal court among the thirty-six others in which Mr. Cooper has appeared to find that he is not an expert; and (2) Dr. Kimball's testimony regarding racial disparities in voter registration rates, bullet voting, and the need for Black supermajorities, which was responsive to the District's arguments or in direct response to the Court's questions, should be stricken. For the reasons set forth in Plaintiffs' Post-Trial Brief at 2-9, and below, both arguments are without merit.

#### A. William S. Cooper is qualified as an expert demographer.

Mr. Cooper has been consistently recognized for his expertise in districting and demography. Three dozen federal courts have accepted his expert testimony; he has drawn redistricting plans for 700 jurisdictions; and he has drawn legislative plans for 6 states and over 150 localities since the release of the 2010 Census data. *See* ECF No. 177, *Pls.' Proposed Findings of Fact* ("*PFOF*") ¶ 87; PLTF-44, Cooper Decl., at Ex. A (Summary of Redistricting Work). If this Court were to reject Mr. Cooper's testimony as inadmissible, it would be the very first to do so out of dozens of courts that have received his testimony.

The District's objections to Mr. Cooper's testimony fail for two reasons. *First*, the District waived any objection to Mr. Cooper's reports or testimony when it decided not to move to exclude Mr. Cooper's testimony or otherwise contest his qualifications prior to the Court's

December 31, 2015 deadline for filing motions *in limine*. See ECF No. 115, *Order*, at 3; *see McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1406-07 (8th Cir. 1994).

*Second*, the District's challenges to Mr. Cooper's expertise as a statistician (which Plaintiffs never claimed) and to his lack of "training" as a basis for his expertise in demography—the only bases it articulates for its objection to Mr. Cooper, *see Def.'s Post-Trial Br.* at 13; *see also* Trial Tr. vol. 1, 181:6-13; 215:22–220:7—fail on their merits. The District complains that "Cooper's testimony is reliant on statistics yet he does not consider himself a statistician." *Def.'s Post-Trial Br.* at 13. But expert witnesses may rely on data reasonably relied upon in their field of expertise. *See* Fed. R. Evid. 703. Experts in redistricting, demographic analysis, and census mapping regularly rely on census data and statistics. Indeed, the District's own expert, who is not a statistician, relies heavily on and manipulates statistics.

The District next claims that Mr. Cooper "has no training in demography." *Def.'s Post-Trial Br.* at 13. But Rule 702 of the Federal Rules of Evidence allows a witness to testify to his or her opinion as an expert qualified "by knowledge, skill, experience, training, *or* education" (emphasis added). Mr. Cooper is plainly qualified by his extensive experience as a demographer in voting rights matters. *See Pls.' Post-Trial Br.*, Section I.A. He is an expert in this case "by knowledge, skill, experience, training, or education," and his testimony is thus admissible. *See Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990) (holding that "an individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise" and collecting cases where experts had properly testified on causes and transmission of diseases without any medical degree); *United States v. Anderson*, 446 F.3d 870, 875 (8th Cir. 2006) ("Rule 702 does not rank academic training over demonstrated practical experience."); *Garrett v. Albright*, Nos.

06-CV-4137-NKL, 06-CV-4139, 06-CV-4209, 06-CV-4237, 2008 WL 697590, at *2 (W.D. Mo. Mar. 11, 2008) (witness "qualified as an expert by experience, knowledge and training").

### B. Dr. Kimball properly testified as to voter registration rates, bullet voting, and the size of majorities needed for effective districts.

The District's request to strike the testimony of Dr. David Kimball related to voter registration, bullet voting, and supermajorities should be denied. *See Def.'s Post-Trial Br.* at 8-10; Trial Tr. vol. 2, 184:2-21, 184:2–186:15.

**Registration Rates.** It was entirely appropriate—if not necessary—for Dr. Kimball to explain how evidence introduced at trial fits with his opinion that FFSD elections deprive African Americans of an equal opportunity to elect candidates of their choice. That is exactly what Dr. Kimball's testimony regarding the gap in registration rates for Black and white voters in Missouri sought to do. Trial Tr. vol. 2, 116:20–119:24. Dr. Kimball's testimony about the registration rates themselves consisted of reciting numbers from Plaintiffs' Exhibit 63, *see* Trial Tr. vol. 2, 116:20–117:15, which had already been admitted into evidence without objection, *see Pls.' Post-Trial Br.* at 5. Dr. Kimball's testimony about registration rates was offered to explain how the statistics about registration rates that had *already been admitted into evidence* are consistent with the opinion expressed in his report. *See Pls.' Post-Trial Br.* at 5-6. It was entirely appropriate for Dr. Kimball to explain briefly how the data in Plaintiffs' Exhibit 63 fits with his opinion; indeed, Dr. Rodden sought to do same thing during his direct examination, despite the fact that there are no statistics or opinions about registration rates in any of his four reports submitted in this case. *See id.*

**Bullet Voting.** Dr. Kimball's testimony about bullet voting was proper for the same reasons. Dr. Kimball testified without initial objection that the availability of bullet voting did not change his opinions that Black candidates have generally not been elected to the Board under

7

the FFSD method of election and that this relative lack of success results from Black voters' inability to elect their preferred candidates. *See* Trial Tr. vol. 2, 160:25–162:10. The availability of bullet voting was already in evidence. *Pls.' Post-Trial Br.* at 6-7. As with his testimony on voter registration rates, Dr. Kimball discussed bullet voting to explain why it did not alter one his opinions. *See id.*; Trial Tr. vol. 2, 160:25–162:10.

**Numerical majorities.** Dr. Kimball appropriately discussed the size of a majority sufficient to elect preferred candidates in order to explain a mischaracterization of his opinion by the District. *See Pls.' Post-Trial Br.* at 7-9. The District misleadingly informed this Court that "Dr. Kimball testified that a black majority could potentially determine the winners of all of the seats." ECF No. 131, *Defs.' Pre-Trial Proposed FOF & COL*, ¶ 60. In the course of his testimony on direct examination about features of FFSD elections that increase the opportunity for discrimination against Black residents and voters, Dr. Kimball explained that in a jurisdiction like FFSD, a bare majority would not be enough for Black voters to determine all of the seats in an at-large election. Trial Tr. vol. 2, 119:5-11. Given the District's repeated attempts to mischaracterize his opinion, *see Pls.' Post-Trial Br.* at 8, it was only proper for Dr. Kimball to make clear that the District's suggestion that he believed Blacks could elect all of the members of FFSD Board merely by being a numerical majority was not a fair characterization. After cross-examination, Dr. Kimball appropriately responded to the Court's questions with regard to supermajorities. *See* Trial Tr. vol. 2, 181:15–182:22.

## II. ADMISSIBILITY OF NEW 2016 ELECTION RESULTS

The District requests that this Court take judicial notice of the 2016 election results. If the Court determines it is appropriate to take judicial notice of the election results and the race of one of the candidates elected, for the sake of completeness, Plaintiffs request that the Court also take notice that: (1) the 2016 election included another African-American candidate who lost;

(2) a white incumbent chose not to run for re-election; and (3) the only incumbent who did run, Leslie Hogshead, who is white, won.

Ultimately, the fact that a Black candidate was elected in the 2016 election has little bearing on the outcome of this case. Whether or not the Court admits the election results, they do not by themselves provide probative information about voting patterns, polarization among Black and white voters, or overall success of Black-preferred candidates in the District.

By contrast, the available evidence suggests that features of the 2016 election make the results less probative. The 2016 election was held soon after the widely publicized trial in this case, which overlapped with the close of the candidate filing period. As in the other post-litigation election in 2015, *see Pls.' COL* at 43-46, a white incumbent chose not to run—and indeed the District's counsel announced his decision not to run during the closing arguments in this very case, *see* Trial Tr. vol. 6, 63:1-4. As a result, just like in 2015, there was only one major white candidate in the candidate pool. *See Pls.' COL* at 45. This is entirely consistent with Dr. Engstrom's testimony about how VRA suits can change the candidate pool. *See* Trial Tr. vol. 4, 57:2–59:20.

### III. THE RESPONSE TO COMMUNITY CONCERNS ABOUT THE SUSPENSION OF DR. MCCOY DEMONSTRATES THE BOARD'S UNRESPONSIVENESS

In responding to this Court's question concerning the legal significance of the suspension of Dr. McCoy to Senate Factor 8, *i.e.*, the Board's responsiveness to the particularized needs of the African American community, *see* Trial Tr. vol. 6, 87:12-13, the District makes the astonishing claim that it "has been hamstrung by its own integrity at every step of this controversy." *Def.'s Post-Trial Br.* at 15. Witness testimony at trial heartily contradicts this claim. *See Pls.' COL* at 60-63. If anything, this assertion is yet another example of the Board's

unawareness of the concerns of the African-American community and, in particular, the depth of community concern about the suspension of Dr. McCoy by an all-white Board.

Throughout this case, and yet again in its Post-Trial Brief, the District has tried to explain away the Board's insufficient response to the African-American community's concerns about its decision to suspend Dr. McCoy by claiming that it was somehow "respect[ing] McCoy's wishes" and purportedly "abiding by McCoy's desire for confidentiality." *Def.'s Post-Trial Br.* at 15, 17. But despite the District's repeated attempts to blur the lines between the Board's decision to suspend Dr. McCoy and Dr. McCoy's resignation some five months later, there is not a scintilla of evidence that Dr. McCoy wants confidentiality about the reasons for his suspension. Indeed, he does not. ECF No. 51-2, *Email from Mary Anne Sedey to Julie Ebenstein, June 12, 2015* (Dr. McCoy's attorney stating: "We do not oppose, nor do we believe the agreements related to the termination proceeding preclude, inquiry related to the suspension of Dr. McCoy and the process leading to the termination proceedings."). As laid out in Plaintiffs' Post-Trial Brief, there was and continues to be no reason why the Board could not provide an adequate explanation for Dr. McCoy's *suspension*. *See Pls.' Post-Trial Br.* at 13-16.

Thus, Plaintiffs' witnesses were understandably concerned about the absence of a clear justification from the Board for suspending Dr. McCoy, and, to the extent they were, as the District claims, "woefully unaware" of some particular circumstance surrounding the Board's suspension decision, *Def.'s Post-Trial Br.* at 15, that unawareness was a result of the Board's decision to keep secret any explanation from the public. The District's counsel thus misleadingly questioned Mr. Hudson and Mr. Johnson about whether the Board should discuss the reason for the suspension despite Dr. McCoy's wishes, given that there is no evidence that Dr. McCoy wished the Board to withhold an explanation and the fact that he does not oppose inquiry related

to his suspension. *See* ECF No. 44, *McCoy's Mem. to Court*, at 1, 3 (explaining that the Board's motivations for the suspension and the termination were completely separate; that the Board suspended Dr. McCoy without providing him "[any] information about the reasons for the decision to place him on leave" and only after the suspension began a "fishing expedition . . . with the clear intent to find a basis to justify his termination"). And, as the Board members and defense counsel have by their statements and actions conceded, the reasons for Dr. McCoy's suspension were distinct from those that initiated the termination process, *see Pls.' Post-Trial Br.* at 15.[2] The Board's inexcusable silence does not stem from respect for Dr. McCoy, but from a perspective that the Board did not need to be responsive to the concerns of the African-American community.

In the absence of any requirement that the Board refrain from answering the concern of the African-American community that the suspension of Dr. McCoy was racially motivated, what is left is a Board that made a choice not to explain itself to its African-American constituents. Given these concerns, Board members' silence was an insufficient response. Its decision not to explain the suspension in the face of the widespread perception of racial motivation is evidence of non-responsiveness.

## IV. ISSUES RELATED TO THE DEMOGRAPHIC BREAKDOWN OF THE VOTING-AGE POPULATION IN FFSD

The Court asked the parties whether there is "a better set of data as to the voting age population in the school district" than the 2010 Census data. Trial Tr. vol. 6, 84:19-24. As

---

[2] The District first hid behind Missouri's Sunshine Law to suggest that it could not discuss a personnel matter, even though the Sunshine Law does not mandate secrecy. FFSD then offered a Separation Agreement and Release executed more than four months *after* Dr. McCoy was suspended, as an excuse for not having adequately responded to the community. But the Agreement did not even exist until several months after the community asked for an explanation in November and December of 2013. The confidentiality provision of the Agreement is, moreover, by its own terms, limited to "the Statement of Charges [for termination for cause] and all documents amassed by the District in support of said charges." *See Pls.' Post-Trial Br.* at 15; *see also* ECF No. 44, *McCoy's Mem. to Court*.

Plaintiffs discussed in detail in their Proposed Conclusions of Law, the 2010 Decennial Census is the appropriate data to determine the VAP in the District. *See Pls.' COL*, Section IV.A.3.a.

### A. The 2010 Decennial Census data is appropriate to determine VAP in FFSD.

The 2010 Decennial Census data is the appropriate data set to use in this case. The 2010 Decennial Census data is presumptively accurate and the District has not overcome that presumption. *See Pls.' COL*, Sections IV.A.3.a.i-ii. The 2011–2013 3-year ACS estimates are not appropriate for determining the racial demographics of a population, have large margins of error, and do not show a substantial change in the demographics of the District. *See Pls.' COL* at 9-14. The District claims that "the 2011 – 2013 3-year ACS is the most appropriate data set for use in this case as compared to any other data set available" despite the margins of error, and now turns around to argue that the more recent 2014 1-year ACS data cannot be used because it too includes margins of error. *Def.'s Post-Trial Br.* at 12-13. The Court should rely on the complete and presumptively accurate count of the District's population in the 2010 Census, as the Census Bureau recommends, and disregard the District's inconsistent and conflicting claims about the appropriateness of using ACS estimates to determine the demographics of the district.

### B. The Plaintiffs do not seek admission of the 2014 1-year ACS.

The District suggests incorrectly that Plaintiffs are seeking to have the Court admit or rely on the 1-year 2014 ACS estimates. The District opposed Plaintiffs' questions related to the 1-year 2014 ACS data because, while equally available to both sides through the Census Bureau's website, it was not disclosed by Plaintiffs to the District when released in October 2015. Trial Tr. vol. 1, 213:1-7. The Court sustained the objection. Plaintiffs do not seek to revisit this ruling or have the Court admit or rely on the 1-year 2014 ACS estimates which, like the 3-year ACS estimates, is not the appropriate data set to determine the racial demographics of a population. *See Pls.' COL* at 7-16.

The District is correct, however, in its newfound recognition of the infirmities of relying on ACS survey estimates rather than the total population count of the 2010 Decennial Census. The District maintains that the Decennial Census data is not the appropriate data set for the Court to consider—even though it is the most accurate data set, it is presumed accurate by the courts, and the Census Bureau specifies that it should be used for determining population—and persists in urging the Court to rely on ACS survey estimates because they are "more recent." Yet simultaneously, the District quite properly argues that the 2014 1-year ACS estimate is *not* the appropriate data set for the Court to consider, even though it is the most recent ACS estimate for jurisdictions the size of FFSD.

The District's recognition of the reasons for rejecting the 1-year ACS data are aligned with Plaintiffs' consistent explanation of the infirmities in using ACS estimates; the ACS estimates are based on small samples with large margins of error, and are less reliable, especially for small population subgroups. *See Def.'s Post-Trial Br.* at 11. This is the same concern that Plaintiffs have raised with regard to the attempt by the District's expert to estimate the age of the small population subgroup in the District reporting two or more races. The District would have the Court use inaccurate predictions based on 2011–2013 ACS estimates but nonetheless reject the most recent 2014 ACS estimates.

In any event, none of the three data sets supports the District's insistent claim that African Americans are a majority of the VAP in the District. The 2010 Decennial Census data report that African Americans are not a majority of the VAP in the District. The 2011–2013 ACS 3-year estimates report that African Americans are not a majority of the VAP in the District. And the 2014 1-year ACS estimates report that African Americans are not a majority of the VAP in the District.

And ultimately, for purposes of finding liability in this case, the size of the minority population is just one of the factors in the "totality of circumstances" inquiry into whether the voting power of African-American residents of the District is, under the existing electoral system and other conditions at play in the jurisdiction, diluted. As Plaintiffs' Post-Trial Brief explains, a Section 2 claim is not barred even if the racial minority passes 50% of the VAP. *See Pls.' Post-Trial Br.* at 17-20. And the District is incorrect in its claim that "[n]o court has ever found liability when the racial minority population exceeds 50% of the voters in the relevant district." *Def.'s Post-Trial Br.* at 4. Plaintiffs have provided examples. *See Pls.' Post-Trial Br.* at 17-20.

## V. THE AVAILABILITY OF AN APPROPRIATE REMEDY

The District's claim that there are no appropriate alternatives to the District's electoral system, which deprives African-American voters in FFSD of an equal opportunity to elect representatives of their choice, fails for several reasons.

*First*, any discussion about the ultimate viability and appropriateness of possible remedies is premature. *Holder v. Hall*, 512 U.S. 874 (1994), and *Fairley v. Hattiesburg*, 584 F.3d 660 (5th Cir. 2009), are not to the contrary. *Holder* addressed whether there was an appropriate benchmark for comparison when challenging the size of a governmental body. The Plaintiffs in *Fairley*, meanwhile, could not satisfy *Gingles* I because they had not offered sufficient evidence that the African-American community could comprise "legally adequate districts consistent with traditional districting principles such as compactness, contiguity, maintaining communities of interest, and respect for incumbency." 584 F.3d at 669. None of these issues are present here. Plaintiffs are <u>not</u> challenging the size of the Board. Moreover, they have shown with sufficient evidence that possible alternatives exist. Plaintiffs offered two illustrative plans that comport with constitutional requirements and traditional districting principles in which African Americans comprise a majority of the VAP in four of seven districts. *See Pls.' COL*, Section

14

IV.A.2. In addition, although Plaintiffs' illustrative plans are not, as the District insists, being offered as remedies at this stage, they demonstrate that a single-member district remedy would be better than the status quo. *See Pls.' Post-Trial Br.*, Section III.B.2.

*Second*, as Plaintiffs set forth in their Post-Trial Brief, there are a number of alternative remedial options other than a single-member district plan that the Court may impose which can by their nature adjust to changing circumstances, including the possibility of future increases in the African-American population. *See Pls.' Post-Trial Br.*, Section III.B.3. *Third*, any remedy can include a sunset provision or, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, can be modified if necessary a later stage. *See Pls.' Post-Trial Br.*, Section III.B.4. Thus, there is no reason for concern that changing demographics in the FFSD would somehow hamstring this Court's ability to fashion an effective and appropriate remedy that ensures that African Americans in FFSD have a present and enduring equal opportunity to elect representatives of choice.

## CONCUSION

Plaintiffs established at trial that the District's method for electing Board members deprives its African-American residents of an equal opportunity to elect representatives of their choice, in violation of Section 2. As explained above, none of the issues that this Court asked the parties to brief provide any basis for altering this conclusion.

Dated this 22nd day of April, 2016.    Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

GILLIAN R. WILCOX, #61278MO
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, MO 64111
Phone: (816) 470-9938

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I, Julie A. Ebenstein, hereby certify that on April 22, 2016, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Kathryn B. Forster
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com
kforster@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

                                                /s/ Julie A. Ebenstein
                                                JULIE A. EBENSTEIN