# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF )<br>THE NATIONAL ASSOCIATION FOR THE )<br>ADVANCEMENT OF COLORED PEOPLE, )<br>REDDITT HUDSON, F. WILLIS JOHNSON )<br>and DORIS BAILEY, )<br>                                )<br>      Plaintiffs, )<br>v.                                 )<br>                                )<br>FERGUSON-FLORISSANT SCHOOL )<br>DISTRICT and ST. LOUIS COUNTY BOARD )<br>OF ELECTION COMMISSIONERS, )<br>                                )<br>      Defendants. ) | Civ. No. 4:14-cv-02077-RWS |

## DEFENDANT FERGUSON FLORISSANT SCHOOL DISTRICT'S REPLY TO PLAINTIFFS' POST TRIAL BRIEF

Defendant Ferguson-Florissant School District ("District"), by and through Counsel, hereby files its Reply to Plaintiffs' Post Trial Brief in accordance with this Court's instructions on January 19, 2016.

### Introduction

Each party filed its Post Trial Brief on Friday, April 8, 2016. The instant Reply is meant to specifically address Plaintiffs' arguments. The first two issues have been taken out of order due to their importance. The remaining issues are in the order Plaintiffs present.

# I. Overarching Issues Regarding Plaintiffs' Arguments.

## A. Plaintiffs' misunderstand and misrepresent the District's case.

### 1. African Americans have equality of opportunity in the District.

The District has consistently argued that the United States Supreme Court case of *Bartlett v. Strickland* in 2009 changed the landscape of the Voting Rights Act.[1] The *Bartlett* Court clearly held that a district with a minority population over 50 percent is a majority-minority district.[2] It is that status, as a majority-minority district, that allows minorities an opportunity to elect.[3] This majority-minority rule is not qualified or limited to certain facts. Instead, it is a logical basis for courts to conclude whether or not the minority group has an equal opportunity to elect representatives of choice. Since the Voting Rights Act is concerned with equality of opportunity, the 50 percent threshold is an almost insurmountable barrier to liability.[4]

The *Bartlett* reasoning precludes liability in the instant case. The District cannot be liable under Section 2 of the Voting Rights Act because it is already, in its entirety, a majority minority district. African American voters in the District already have an equal (or greater) opportunity to elect in the District as a whole because they exceed the 50 percent threshold.[5]

Throughout this litigation, Plaintiffs' response to the above argument has been that there is no *per se* rule against liability under the first *Gingles* precondition for majority-minority districts.[6] As support for that position, they maintain that four Court of Appeals have rejected a

---

[1] *Bartlett v. Strickland*, 556 U.S. 1 (2009).
[2] *Id.*
[3] *Id.*
[4] The Voting Rights Act is about equality of opportunity. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 508 (2006).
[5] *Jeffers v. Beebe*, 985 F.Supp.2d 920 (E.D.Ark. 2010) rejecting plaintiffs' argument that a senate district should be redrawn because the district was "already a majority-minority district under *Bartlett's* decision."
[6] Plaintiffs' Post Trial Brief, ECF #176, pp. 18-19.

*per se* rule. In addition, Plaintiffs now argue that the size of the African American population is merely one factor in the totality of the circumstances argument.[7]

None of these arguments are persuasive for a multitude of reasons. First, the *Bartlett* Court acknowledged that the Voting Rights Act and the totality of the circumstances test would not normally lend itself to clearly defined rules. Nevertheless, the Court mandated the majority-minority rule in an effort to maintain a consistent interpretation of the Voting Rights Act.[8] Regardless, the District would like to be clear. It is of no consequence whether the Court utilizes the fact that whites are a minority and African Americans are the largest group and majority of the voters as a *per se* rule to bar liability under the first *Gingles* precondition, as a reason to find against Plaintiffs under the third *Gingles* precondition, or as a dispositive factor in the totality of the circumstances. The point is that there is no liability because there is already equality of opportunity. The Court's mechanism for making that finding is ancillary.

Second, Plaintiffs' insistence that "four Courts of Appeals (the Second, Fifth, Eleventh, and D.C. Circuits) have rejected a *per se* rule prohibiting vote dilution claims where a racial minority constitutes a numerical majority of a jurisdiction" is misleading.[9] Three of the four cases Plaintiffs cite for this proposition pre-date *Bartlett* by as much as twenty years.[10] The fourth case cited by Plaintiffs, *Pope v. County of Albany*, is interesting because the "holding" Plaintiffs assert is located in a footnote.[11] First, footnotes are dicta not a holding. Second, the *Pope* footnote states that a bare majority may not equate to real electoral opportunity because of

---

[7] Plaintiffs' Post Trial Brief, ECF #176, p. 17.
[8] "On the other hand, the Court finds support for the clear line drawn by the majority-minority requirement in the need for workable standards and sound judicial and legislative administration." *Bartlett* at 1237.
[9] See, Plaintiffs' Post Trial Brief, ECF #176, p. 19.
[10] See, *Monroe v. City of Woodville*, 881 F.2d 1327 (5th Cir. 1989); *Meek v. Metro. Dade Cty.*, 908 F.2d 1540 (11th Cir. 1990); *Kingman Park Civic Ass'n. v. Williams,* 348 F.3d 1033 (D.C. Cir. 2003).
[11] *Pope v. County of Albany*, 687 F.3d 565 (2012), footnote 8 and Plaintiffs' Post Trial Brief, ECF #176, p. 18.

low registration and voting.[12]  Plaintiffs admit they failed to provide evidence of voter registration in the District.[13]  Thus, the possibility of unequal opportunity due to low registration has not been proved.  The *Pope* case does not support Plaintiffs' position.

The District must also clarify a related and equally misunderstood point.  Plaintiffs claim that liability is not "extinguished" because the races are at near parity.[14]  Plaintiffs misunderstand the District's argument.  This is not a situation where the District would have been liable but that liability is disregarded.  This is a situation where there is no liability.  Liability is not "extinguished" because it does not exist.  Liability requires Plaintiffs' proof of unequal opportunity.  Plaintiffs have not and cannot meet that burden.

### 2. Plaintiffs' legal support is unreliable.

In a similar vein, Plaintiffs' legal support is unreliable.  Plaintiffs make the following claim, "In fact, courts have found Section 2 liability where the minority and white shares of the VAP have approached parity – and even where a racial minority is a majority of the VAP – recognizing that the numerical size of a minority group does not eliminate the present-day barriers to electoral participation that members of the group face as a result of ongoing socioeconomic effects of discrimination and electoral processes that favor the status quo."[15]  Plaintiffs' reliance on two of the cases cited is confusing.  Plaintiffs cite to *United States v. Dallas County Commission*, 636 F.Supp. 704 (S.D. Ala. 1986) and *Martin v. Allain*, 658 F.Supp. 1183 (S.D. Miss. 1987.)[16]  The *Dallas County Commission* case was reversed.  However, even if it weren't, the case contains no details or facts from which to infer whether African Americans

---

[12] *Id.*
[13] *Kimball Testimony*, Vol. II, 185:6-11.
[14] Plaintiffs' Post Trial Brief, ECF 176, p. 16 caption.  Clearly, the District disagrees with the use of the word 'parity' because African American voters are the largest group.
[15] Plaintiffs' Post Trial Brief, ECF #176, pp. 19- 20.
[16] Plaintiffs cite these same two cases for the same proposition in its Proposed Findings of Fact, ECF #178, p. 19.

were a majority or a minority of the voting age population. In fact, the case does not relate to Plaintiffs' point whatsoever.[17] The second case is *Martin v. Allain*, 658 F.Supp. 1183, 1188-91, 1204-05 (S.D. Miss. 1987). Plaintiffs' citation is odd in that it would have the court review multiple statistics in different districts to find what may apply in pages 1188 – 91. Further, the pinpoint citation for pages 1204-1205 consistently refers to the "white majority."[18] The fact that this argument was raised for the first time in Plaintiffs' Post Trial Brief is suspicious. Upon review, the cases cited do not support Plaintiffs' argument.

*Jeffers v. Beebe* held, "In the present case, we conclude that the plaintiffs have not established a claim for vote dilution under §2 because the 2011 Senate District 24 – the challenged district – is *already* a majority-minority district under Bartlett's definition.[19] (emphasis added by the Court) The District has been transparent, consistent and honest on this point. Further, no court has ever found liability under §2 of the Voting Rights Act when the racial minority is a majority of the challenged district's voters. *Beebe* sums it up nicely, "The plaintiffs have not cited a case, nor can we find one, in which a §2 vote-dilution claim successfully challenged the drawing of a district with a BVAP greater than 50 percent."[20]

The remaining cases Plaintiffs cite for the proposition that liability can attach when the races are at near parity are situations in which the racial minority is also a numerical minority of the voters.[21] Not one of the cases cited indicates that African American voters were a majority or the largest group of voters.

---

[17] Plaintiffs' pinpoint cite was *United States v. Dallas Cty. Comm'n*, 636 F.Supp. 704, 710 (S.D. Ala. 1986). There is no reference to Plaintiffs' point on that page.
[18] *Martin v. Allain*, 658 F.Supp. 1183, 1204-1205 (1987).
[19] *Jeffers v. Beebe*, 895 F.Supp.2d 920, 932 (E.D.Ark. 2012).
[20] *Id*. at 935.
[21] See, *Windy Boy v. Cty. Of Big Horn*, 647 F.Supp. 1002 (D. Mont. 1986); *Jordan v. City of Greenwood*, 599 F.Supp. 397 (N.D. Miss. 1984), and *N.A.A.C.P. v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978 (11th Cir. 1982).

### B. The Effect of the 2016 Election.

The District's Post Trial Brief requested the Court take judicial notice of the April 5, 2016 election returns pursuant to Civil Rule 201. The District reiterates that request. In addition, the District filed a Motion to Reopen Case for Additional Evidence to include these returns. The 2016 election contains new evidence that is highly probative to the facts of this case. The District urges the Court to take judicial notice or to enter the returns into evidence.

## II. Discrete Issues Related to Liability.

Plaintiffs place two issues under Roman Numeral II of their Post Trial Brief. They are: A) whether and how the District is unique as compared to North County; and B) the Board's response to Dr. McCoy's suspension. The parties have briefed the Dr. McCoy controversy extensively. The District's argument is contained on page 14 subsection (2) of its Post Trial Brief. For brevity and to avoid repetition, the District stands on its prior argument. Thus, the District merely responds to the first argument.

In its post-trial remarks, the Court questioned the Plaintiffs about how and why the District is unique from other districts in North County.[22] Plaintiffs' Post Trial Brief claims the District is unique in three ways: 1) it was created pursuant to Court order;[23] 2) the races are physically segregated within the District;[24] and 3) voting in the District is racially polarized.[25]

The District is willing to concede that its inception by court order is unique. That is the sole evidence Plaintiffs rely on to answer the Court's precise question. Plaintiffs remaining responses are tangential to the inquiry.

---

[22] *Trial Transcript*, Vol. VI, 86:23-87:3.
[23] Plaintiffs' Post Trial Brief, ECF #176, p. 10.
[24] Plaintiffs' Post Trial Brief, ECF #176, p. 11-12.
[25] Plaintiffs' Post Trial Brief, ECF #176, p. 12.

The Court's question is a comparative one. The Court inquired as to how the District was unique. The question implies a comparison to other districts or areas in North County. Plaintiffs cannot answer that question because they did not analyze any other school district in North County. Instead of testifying to the uniqueness of the District, Plaintiffs' expert Dr. Colin Gordon made the opposite assertion. Gordon was asked whether it was his opinion that the patterns of segregation and discrimination "stop at political boundaries such as those surrounding the Ferguson Florissant School District?" He responded, "No. I mean, I hope I've made it clear that I actually view those boundaries as sort of highly artificial …"[26]

The District's creation via court order does make it unique, but not in the way Plaintiffs' suggest. The uniqueness of the District is that African Americans are better off living within it than living outside of it.[27] The District's expert testified that he tried to put the District into context to "give the reader a sense of the reality" relative to comparable places.[28] Rodden testified the beneficial effect of the 1975 de-segregation order was that African American students were educated and stayed there. As a result, the District has become the heart of the African American middle class in St. Louis.[29] So, while the parties agree the District is unique due to the de-segregation order, the parties completely disagree as to the effect. Plaintiffs point to the order, in itself, as a bad thing. The District analyzed the effect of the order and found it to be beneficial.

Plaintiffs also claim the District is unique because residents are physically segregated and voting is racially polarized. However, there is no comparison for physical segregation and racially polarized voting occurs everywhere. The question, as the Court acknowledged in asking

---

[26] *Gordon Testimony*, Vol. I, 169:10-17.
[27] *Rodden Testimony*, Vol. V, 74:6-13.
[28] *Rodden Testimony*, Vol. V, 74:6-13.
[29] *Rodden Testimony*, Vol. V, 74:22-75:9.

it, is whether the District has more physical segregation and more racially polarized voting than the surrounding area. That question cannot be answered with the evidence submitted.

## III. ISSUES RELATED TO THE DEMOGRAPHIC BREAKDOWN OF THE VOTING AGE POPULATION IN FFSD.

The District's response to the majority of this argument is indicated above. However, Plaintiffs make the additional claim that future increases in the African American VAP do not immunize the District from liability. Plaintiffs claim, "the District has suggested that this Court can ignore the violation of Black residents' right to vote because of the hope that the Black population in FFSD might someday grow so large that it could control the at-large electoral system of the District.[30]"

Plaintiffs' presentation makes it appear they advocate for a present day inquiry and the District advocates for some future, speculative hope. The District readily admits that a Voting Right Act inquiry is measured in the present tense.[31] The District has analyzed the most recent data available, along with reliable trend lines, to bring provide the Court with a present day analysis. The District also claims the evidence indicates this trend will continue. What is surprising is Plaintiffs' claim that they met their burden about a present day violation.[32]

Plaintiffs have yet to analyze the District as it is today. Instead, Plaintiffs have consistently relied on the 2010 decennial census for analysis. Plaintiffs' strategy all along has been to convince the Court that time stopped in 2010. It is surprising that Plaintiffs now admit the Voting Rights Act is a present day inquiry. The District has made this argument from the beginning.

---

[30] Plaintiffs' Post Trial Brief, ECF #176 p. 21.
[31] *Uno v. Holyoke*, 72 F.3d 973 (1st Cir. 1995).
[32] Plaintiffs claim they "have met their burden of proving that African Americans in FFSD *today* lack an equal opportunity to elect their preferred representatives." emphasis in the original. Plaintiffs' Post Trial Brief, ECF #176, p. 21.

In order to convince the Court that single member districts would not lead to a counterintuitive result, Plaintiffs argue that 1) a determination of the ultimate viability of a remedy is premature; 2) single member districts are better than the status quo; 3) remedies involving the current at-large system, such as cumulative and limited voting are workable; and 4) any remedy may contain a sunset provision.

First, the District is not requesting the "ultimate" viability of a remedy. The District argues Plaintiffs must provide the court with a "remedy" that is "viable." They have not done so. The Voting Rights Act requires a comparatively superior system to determine liability.[33] Plaintiffs, by offering Illustrative Plans with single member districts, allege that is superior. That has been their sole legal strategy. Therefore, a predominant, dispositive issue is whether single member districts are better than the current at-large system. The answer is absolutely not.

Plaintiffs have never confronted or denied the argument that the current at-large structure is winner-take-all system for the largest group of voters. They've questioned the African American majority status. They've hypothesized that single member districts would provide four representatives. However, they never explain why their own Voting Rights expert admitted before he was hired, that the at-large system benefits the largest group of voters.[34] Plaintiffs' silence is profound and dispositive. There is simply no way to implement a system better than the current one.

Plaintiffs' second argument is that their illustrative plans are "likely" more effective than the current system.[35] They also claim that single member districts "could" serve as a viable

---

[33] *Holder v. Hall*, 512 U.S. 874, 880 (1994).
[34] Dr. Engstrom wrote, "There are numerous variations in how at-large elections are implemented, but regardless of the particular arrangement, this system does have a tendency to favor candidates preferred by a majority group or at least the largest group of voters within the jurisdiction." *St. Louis Law Review*, 2010, Richard Engstrom. Further, the parties stipulate that African Americans are the largest group of voters. *Joint Stip*. ¶25.
[35] Plaintiffs' Post Trial Brief, ECF #176 p. 24.

solution.[36] Plaintiffs' own language admits their speculation. There is no evidence from which to conclude Plaintiffs are correct. There is ample evidence to conclude they are not.

Plaintiffs claim more African Americans would have been elected under the Illustrative Plans than have been elected under the current system. However, Plaintiffs admit in a footnote they are not making the right comparison. The footnote states, "This is not a perfect comparison because the District's simulation assumes that….all seven seats are up for election every year."[37] In reality, only two or three seats are up for election each year. Thus, one cannot compare a simulation whereby seven seats are up for election with reality whereby two or three seats are up. The simulation was obviously not meant for that. The District's expert analysis on this issue is genuine and correct. The best possible system for a geographically dispersed majority is the at-large system.[38]

Plaintiffs' third argument claims that African American's ability to elect candidates of choice is not capped under single member districts. Instead, Plaintiffs claim, "the evidence at trial shows that Black voters' strength is already capped under the existing system."[39] The District has filed a Motion to Reopen the Case for Additional Evidence and has requested the Court take Judicial Notice of the 2016 elections returns. The District will not point out Plaintiffs' fallacies until that evidence has been accepted.

Plaintiffs also claim that the legislature can remedy any districting problem every ten years with the decennial census.[40] This claim is of little comfort when case law is replete with examples of interim census litigation whereby Plaintiffs have sued multiple times within a decade to obtain their desired result.

---

[36] See, Plaintiffs' Post Trial Brief, ECF #176, p. 24.
[37] *Id*. footnote 10.
[38] *Rodden Testimony*, Vol. V, 24:21-25:3.
[39] See, Plaintiffs' Post Trial Brief, ECF #176, p. 30.
[40] Plaintiffs' Post Trial Brief, ECF #176, p. 32.

Plaintiffs' most interesting argument is an almost implicit acknowledgment that the at-large system works and allows for a growing African American voting age population. Plaintiffs claim that cumulative, limited, and preference voting can adjust to changing circumstances.[41] Cumulative voting is a multimember, at-large system that allows the voter to cast as many votes as there are seats up for election. The voter may distribute these multiple votes among candidates in any way they prefer.[42] Limited voting is an at-large system whereby each voter is given a number of votes that is less than the number of seats to be filled.[43] The rank choice option allows voters to rank their preferences for candidates. Voters' preferences are aggregated in a series of vote-counting rounds and the winners are determined when they meet a certain threshold.[44] This third option also maintains the at-large, multi-member feature.

There are a multitude of problems with Plaintiffs' insertion of these entirely new electoral systems at this point in the litigation. First, as the District pointed out in its Post Trial Brief, Plaintiffs' entire legal strategy has been focused on the illegality of the at-large system. Now, at the eleventh hour, Plaintiffs suggest the appropriateness of modified at-large systems. It is too late. As the Fifth Circuit has held, "[u]nless the plaintiffs raised the two alternative approaches and supported them with evidence bearing on their legal adequacy, the district court was under no obligation to consider them or to go through the meaningless formality of reciting their insufficiency."[45]

Second, allowing consideration of three modified at-large systems that have not been analyzed by experts, cross-examined or even thoroughly briefed would severely prejudice the

---

[41] Plaintiffs' Post Trial Brief, ECF #176, p. 34.
[42] *Cumulative Voting in the United States*, Pildes and Donoghue, The University of Chicago Legal Forum, 1995, p. 254.
[43] *Cumulative and Limited Voting*, 2010 St. Louis University School of Law, Richard L. Engstrom.
[44] *Alternative Ways Out: A Remedial Road Map for the Use of Alternative Electoral Systems as Voting Rights Act Remedies*, Steven J. Mulroy, 77 N.C. L. Rev. 1867, 1878-79 (1999).
[45] *Fairly v. Hattiesburg*, 584 F.3d 660, 669 (5th Cir. 2009)

District's case. The District denies these systems are better than the current one but is unable to prove it at this point. Instead, the District stands by its argument that the current at-large system is most beneficial under the facts of this case.

Third and most important, the at-large system allows the largest group of voters to win every single seat. It is a system that disproportionately rewards African Americans to the detriment of every other group. Cumulative, limited and rank choice voting are systems for proportional representation.[46] In a typical Voting Rights Act case where the racial minority is also a numerical minority, proportional systems like cumulative voting, limited voting and rank choice voting allow for additional African American representation. Under these circumstances, cumulative and limited voting would allow the minority of white voters more proportional representation. To the District's knowledge, the instances when these systems have been successful in increasing African American representation are instances when the "minority" population was both a racial and a numerical one.[47]

Finally, Plaintiffs claim that any remedy this Court orders can sunset or be modified by a subsequent court order pursuant to Civil Rule 60(b)(5) and (6). There are several problems with this claim. First, throughout this litigation, this Court has been concerned with injecting uncertainty into the electoral process. This Court denied Plaintiffs' Motion for Interim Relief to stay the April 2016 election for that very reason. Implementing a sunset provision into this process would insert the very same uncertainty the Court sought to avoid. Second, no court has ever implemented a sunset provision into a Voting Rights Act case before. Finally, Plaintiffs argue the Court may always modify its orders pursuant to Rule 60(b)(5) and (6). Plaintiffs fail to acknowledge that modification must occur "within a reasonable time" under Rule 60(c) and may

---

[46] See generally, David M. Farrell, *Electoral Systems, A Comparative Introduction*, 2001.
[47] *U.S. v. City of Euclid*, 580 F.Supp.2d 584 (2008) and *U.S. v. Euclid City School Bd.*, 632 F.Supp.2d 740 (2009).

12

only occur for the reasons listed in the Rule. Further, a party must solicit said modification. Any modification necessarily results in additional litigation.

Case law indicates that modifications often occur through additional litigation. For example, if Plaintiffs were successful in implementing a system with four majority African American single member districts and the African American population continues to increase, Plaintiffs could sue again. The single member districting system was not meant to accommodate a growing African American population. In this case, Plaintiffs have already demonstrated the District is capable of maintaining six majority African American sub-districts.[48] This plan was based on 2010 data and is already out of date. The District fears implementing single member districts will result in modifications through additional litigation for which the District will be forced to defend.

## CONCLUSION

The Ferguson Florissant School District's entire argument and evidence has remained consistent and reliable. The District has not violated Section 2 of the Voting Rights Act in the past. The District does not violate Section 2 in the present.

Wherefore, Defendant Ferguson Florissant School Board, by counsel, respectfully requests the Court find in its favor and grant the Board any further legal or equitable relief the Court deems appropriate.

                                                            Respectfully submitted,
                                                            CROTZER & ORMSBY, LLC

                                                            */s/ Angela Bullock Gabel*
                                                            Angela Bullock Gabel, 58227MO
                                                           130 S. Bemiston Ave., Suite 602
                                                          Clayton, MO 63105
                                                          314.726.3040 / 314.726.5120 (fax)
                                                          agabel@crotzerormsby.com

---

[48] See, PLTF-45, Figures 6 and 7.

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455

*Attorneys for Defendant Ferguson-Florissant School District*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is a person of such age and discretion as to be competent to serve papers. It is further certified that on April 22, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Anthony E. Rothert
Andrew J. McNulty
Jessie M. Steffan
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, Mo 63108
*Counsel for Plaintiffs*

Dale Hoe
Julie A. Ebenstein
Sophia Lin Lakin
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
*Counsel for Plaintiffs*

M. Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
*Counsel for Plaintiffs*

Gillian R. Wilcox
ACLU of Missouri
3601 Main Street
Kansas City, MO 64111
*Counsel for Plaintiffs*

       */s/ Angela Bullock Gabel*