UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF | ) | |
| THE NATIONAL ASSOCIATION FOR | ) | |
| THE ADVANCEMENT OF COLORED | ) | |
| PEOPLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14 CV 2077 RWS |
| | ) | |
| FERGUSON-FLORISSANT SCHOOL | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Doris Bailey, Redditt Hudson, F. Willis Johnson, and the Missouri State

Conference of the National Association for the Advancement of Colored People ("MO

NAACP") bring suit against Defendants Ferguson-Florissant School District ("FFSD" or "the

District") and the St. Louis County Board of Elections Commissioners ("St. Louis BOEC")

under § 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. Plaintiffs contend that the

electoral structures used in Ferguson-Florissant School Board ("the Board" or "FFSB") elections

interact with historical and socioeconomic conditions to deprive the African American voters in

FFSD of an equal opportunity to elect representatives of their choice.

Section 2 of the Voting Rights Act provides that no "standard, practice, or procedure

shall be imposed or applied by any State or political subdivision in a manner which results in a

denial or abridgement of the right of any citizen of the United States to vote on account of race

or color." 52 U.S.C.A. § 10301(a). A § 2 violation:

is established if, based on the totality of circumstances, it is shown that the

political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C.A. § 10301(b).

To establish a claim of vote dilution under § 2 of the Voting Rights Act, plaintiffs must first establish the following three "preconditions" pursuant to the United States Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986):

1. "[T]he minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district,"

2. "[T]he minority group . . . is politically cohesive," and

3. "[T]he white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . —usually to defeat the minority's preferred candidate."

*Id.* at 50-51.

If all three preconditions are established, then a court must "consider the 'totality of the circumstances' and [] determine, based 'upon a searching practical evaluation of the past and present reality,' whether the political process is equally open to minority voters." *Id.* at 79 (internal citations and quotations omitted). "'This determination is peculiarly dependent upon the facts of each case,' and requires 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms." *Id.* In undertaking this practical evaluation, courts look to the non-exhaustive list of "typical factors" identified in the Senate Report accompanying the 1982 amendments to the VRA ("Senate Factors"), *see* S. Rep. No. 97-417, at 28-29.

I held a six day non-jury trial in this matter beginning on January 11, 2016.  The parties

filed post-trial briefs and proposed findings of fact and conclusions of law on April 8, 2016.  On

April 22, 2016, the parties filed responses to each other's post-trial briefs.  Also on April 22,

2016, the District filed a motion to re-open the case for additional evidence, in which it asks me

to take judicial notice of the election results from the April 5, 2016 school board election in

FFSD.  On April 26, 2016, Plaintiffs responded to the District's motion to re-open the case,

stating that they do not oppose the motion, but requesting that I take judicial notice of additional

facts related to the 2016 election.

After consideration of the testimony given at trial, the exhibits introduced into evidence,

the briefs of the parties, and the applicable law, I make the following findings of fact and

conclusions of law.  As discussed below, I conclude that Plaintiffs have established a § 2

violation.

## I.  BACKGROUND

### A.  Parties

The individual Plaintiffs are U.S. citizens, registered voters, and African Americans who

reside in areas of FFSD that could constitute single-member districts in which African Americans

are a majority of the voting-age population.  *Joint Stip.* ¶¶ 2-4.

Plaintiff MO NAACP is a state affiliate of the NAACP.  The NAACP is the nation's

oldest and largest civil rights organization.  The mission of the NAACP is to ensure the political,

educational, social, and economic equality of rights of all persons, to eliminate hatred and racial

discrimination, and to remove all barriers of racial discrimination through democratic processes.

Plaintiff MO NAACP is active in efforts to increase voter registration, education, and turnout, and

emphasizes the importance of local elections, including local school board elections.  *Joint Stip.*

¶¶ 5-6.  The membership of the MO NAACP includes African Americans who reside, work, and

raise families in the District and in areas of the District that could constitute single-member districts in which African Americans are a majority of the voting-age population. *See* PLTF-117, Hudson Decl., ¶¶ 1, 3-4; PLTF-119, Pruitt Decl., ¶ 4; Trial Tr. vol. 1, 20:23–21:2 (testimony of Adolphus Pruitt); Trial Tr. vol. 4, 86:6-8 (testimony of Redditt Hudson).

Defendant FFSD is a governmental entity that maintains an electoral system based on at-large elections for seven positions on the FFSB. The Board is responsible for the governance and administration of FFSD, a political subdivision of the State of Missouri within the meaning of Article 4, Section 12, of the Missouri Constitution. *Joint Stip.* ¶ 7.

Defendant St. Louis BOEC is the governmental entity charged with conducting elections in St. Louis County. It is responsible for conducting elections for positions on the Board in FFSD. *Joint Stip.* ¶ 8.

FFSD is located in northern St. Louis County, Missouri ("North County"). The District was created by a 1975 desegregation order, which required the then-Ferguson-Florissant School District to annex the primarily African American neighboring school district of Kinloch and primarily white neighboring district of Berkeley. *Joint Stip.* ¶ 9; *see also United States v. Missouri*, 515 F.2d 1365, 1369-73 (8th Cir. 1975). The District covers all or part of eleven municipalities: Berkeley, Calverton Park, Cool Valley, and Kinloch in their entirety, and parts of Black Jack (one block), Ferguson, Florissant, Dellwood, Hazelwood, Normandy, and Old Jamestown. *Joint Stip.* ¶ 11. Its headquarters and administration center are in Florissant. *Id.* The City of Florissant comprises the largest portion of the District while the City of Ferguson comprises the second largest portion of the District. *Joint Stip.* ¶¶ 9, 11.

## B. Expert Witnesses

The following witnesses provided expert testimony for Plaintiffs. William Cooper[1] testified as to "whether it is possible to create four majority-Black districts," and as to the historical and current demographics in the District. He also compiled population demographics as reported by the 2010 census. PLTF-44, *Cooper Report*, ¶9-10. Dr. Colin Gordon testified to Senate Factor 5. PLTF-40, *Gordon Report*.[2] Dr. David Kimball testified to Senate Factors Two, Three, Four, Five, Seven, Eight and Nine.[3] PLTF-48, *Kimball Report*, p. 14. Dr. Richard Engstrom testified to the existence of racially polarized voting. PLTF-50, *Engstrom Report*, ¶5.

FFSD called one expert, Dr. Jonathan Rodden, to testify to all three *Gingles* preconditions. DEF-A, *Rodden Report*, p. 2. Rodden provided rebuttal reports to each of Plaintiffs' four experts including the *Gingles* preconditions and Senate factors. *See* DEF-B in response to *Engstrom's Report*, DEF-C in response to *Cooper's Report* and DEF-D in response to *Kimball and Gordon's Reports*.

## C. The FFSD Election System

### 1. *The FFSD election system at the time of trial*

The Board is composed of seven members who serve three-year terms and who are

---

[1] Plaintiffs offered Mr. Cooper as an expert witness at trial, and Defendants objected. I asked the parties to brief this issue in post-trial briefs and, as will be discussed below, I conclude that Mr. Cooper is qualified as an expert in the testimony he gave.

[2] Gordon's expert report is limited to Senate Factor Five. PLTF-40, p. 2. However, Gordon also gave substantial testimony on the history of segregation used to analyze Senate Factor 1.

[3] At trial, Dr. Kimball testified to voter registration rates, bullet voting, and the size of majorities needed for effective districts. The District moved to strike these topics of testimony because they were not properly disclosed in Dr. Kimball's expert reports under FRCP 26. An expert witness may give opinions if there "are sufficient facts already in evidence or disclosed by the witness" to take his "testimony out of the realm of guesswork and speculation." *Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989). Additionally, under Fed. R. Evid. 702, it is entirely appropriate for an expert to explain how evidence introduced at trial fits with his opinion. Here, Dr. Kimball testified to these three topics related to evidence that had already been introduced into evidence, his testimony was used to explain how that evidence was consistent with or did not alter his opinions in his expert report, and in the case of his testimony on numerical majorities, to rebut a perceived mischaracterization of his opinion by the District. As a result, Dr. Kimball's testimony on these three topics was proper and the District's motion to strike that testimony will be denied.

elected through an at-large election system. Board elections are staggered and held off-cycle so that either two or three Board seats are elected every April in accordance with Missouri law. *Joint Stip*. ¶31; RSMo. §§162.0261; 162.341; 162.291. When the number of candidates equals the number of Board seats to be filled, no election is held, and the candidates automatically assume responsibilities as members of the Board. *Joint Stip.* ¶ 32; RSMo. § 115.124.

As of the date of trial in January 2016, the seven members of the Board were: Mr. Paul Morris, Mr. Robert Chabot, Mr. Brian Scott Ebert, Ms. Leslie Hogshead, Mr. Keith Brown, Dr. Donna Paulette-Thurman, and Dr. Courtney Graves. Dr. Paulette-Thurman and Dr. Graves are African American. The remaining five Board members were white. *Joint Stip.* ¶ 33.

Each voter has the right to cast up to two votes in a two-seat election and up to three in a three-seat election, but cannot vote more than once for the same candidate in a single election. *Joint Stip.* ¶ 34. Board seats are awarded to the candidates with the most votes, such that when two seats are contested, the top two vote recipients win the two seats, and when three seats are contested, the top three vote recipients win the three seats. *Joint Stip.* ¶ 35.

Voters can engage in bullet, or single-shot, voting. Bullet voting is casting just one vote for a single candidate and not using the remaining vote(s) on any other candidate. By engaging in bullet voting, voters increase the likelihood of electing his or her top-choice candidate. If every voter casts all of his or her votes in a two-seat election, *i.e.*, voters do not engage in bullet voting, a candidate can receive at most 50% of all votes. If every voter casts all of his or her votes in a three-seat election, a candidate can receive at most 33.33% of all votes. *Joint Stip.* ¶ 34.

The evidence before me indicates that bullet voting is not very common in FFSD. With the exception of Courtney Graves's 2015 campaign, the witnesses who had been involved in

campaigning in FFSD testified almost uniformly that they rarely, if ever, bullet vote or encourage others to do so, except when they are running for office and bullet vote for themselves. *See Henson Testimony,* Trial Tr. vol. 2, 19:7-13; *Graves Testimony*, Trial Tr. vol. 6, 26:2-4; *Ebert Dep.*, June 16, 2015, 19:13-17; *Paulette-Thurman Dep.*, June 17, 2015, 23:3-6; *Brown Dep.*, June 16, 2015, 15:12-16; *Hogshead Dep.*, July 1, 2015, 15:18–16:6; *Paul Morris Dep.*, June 15, 2015, 69:11-20; *Chabot Dep.*, July 2, 2015, 13:22-24; *but see Schroeder Dep.*, July 2, 2015, 19:11-18 (has often voted for only one candidate). Other witnesses suggested that a measurable amount of bullet voting occurred in a small handful of contests. *Kimball Testimony*, Trial Tr. vol. 2, 180:5-11; *Rodden Testimony*, Trial Tr. vol. 5, 67:20–68:6, 203:24–204:1; *Graves Testimony*, Trial Tr. vol. 6, 17:1-10; *see also Morris Dep.*, 69:2-20 (stating that Graves "ran a bullet vote campaign"); *see also Henson Testimony*, Vol II, 18:20 – 19:6; *Hogshead Dep.*, 15:18 – 16:6; *Schroeder Dep.*, 19:4-18.

## 2.   *The District's motion to re-open the case for additional evidence*

After the trial, the District moved to re-open the case for additional evidence. *See* ECF [#181]. The District seeks to introduce the certified election results for the April 5, 2016, FFSD School Board election, which occurred after the close of evidence in this case.

The certified election results for the April 5, 2016 FFSD School Board election are as follows. There were four candidates vying for the two Board seats available in the 2016 election. Connie Harge, an African American female, received the most votes, totaling 4,572 votes, or 36.53% of the votes cast. Leslie Hogshead, a white incumbent female, received the second most votes, with 3,513 votes, or 28.07% of the votes cast. Roger Hines, an African American male, came in third, with 2,907 votes, or 23.23% of votes cast. Donna M. Dameron, a white female, came in fourth, with 1,357 votes, or 10.84% of votes cast.

The 2016 election resulted in the addition of one African American Board member. As a

result, there are currently three African Americans on the seven-member Board.

Plaintiffs do not oppose admission of the certified election results, and agree that I may take judicial notice of the certified election results. Plaintiffs request, however, that if Defendants' motion to re-open the case for additional evidence is granted, I also take notice of the following facts for the sake of completeness: (1) the 2016 election included another African American candidate who lost; (2) a white incumbent chose not to run for re-election; and (3) the only incumbent who did run, Leslie Hogshead, who is white, won. Plaintiffs also argue that, in the absence of any meaningful expert testimony, the 2016 election results do not provide probative information about voting patterns, polarization among African American and white voters, or the overall success of African American-preferred candidates in FFSD.

It is within a district court's discretion to re-open a case to admit new evidence. *Dent v Beazer Materials and Servs., Incl*, 156 F.3d 523, 533 (4th Cir. 1998). When considering whether to admit new evidence, courts consider three factors: (1) whether the evidence sought to be introduced is especially important and probative; (2) whether the moving party's explanation for failing to introduce the evidence earlier is bona fide; and (3) whether reopening will cause undue prejudice to the nonmoving party. *Rivera-Flores v. Puerto Rico Tel. Co.*, 64 F.3d 742, 746 (1st Cir. 1995). Applying these standards, I find that re-opening the case to take judicial notice of the 2016 certified election results as well as the additional facts that Plaintiffs request is proper and I will take judicial notice of these facts. *Id.*; Fed. R. Evid. 201. However, as Plaintiffs argue, in the absence of meaningful expert testimony regarding these facts, I am unable to draw significant legal conclusions based on these facts.

## II. CENSUS DATA AND THE FFSD POPULATION

### A. Student Population

Based on data provided to the U.S. Department of Education for the 2011 survey year,

the District public schools serve 13,234 students from preschool through 12th grade. 77.1% of the students are African American and 15.6% are white. *Joint Stip.* ¶ 12. The enrollment demographics of District schoolchildren are different from the population demographics of District residents at least in part because African American families and students rely more heavily on public education than do white families and students. *Gordon Testimony*, Trial Tr. vol. 1, 172:2-10; *see also* PLTF-41, *Colin Gordon, Response to Report of Jonathan Rodden*, June 30, 2015 ("*Gordon Resp.*"), ¶ 3, Fig. 1.

### B.  Total Population and Voting-Age Population of the District

One of the central issues raised in this case has been whether African Americans constitute a numerical majority of the voting-age population in the District and if so, whether a numerical majority status is a bar to relief under *Gingles* I. Resolving these questions raises another question: which datasets and methodologies are appropriate bases for determining the makeup of the FFSD voting-age population?

Plaintiffs contend that the only appropriate method for determining the breakdown of the FFSD voting-age population is by using the 2010 Decennial Census, which reports that the "any-part Black"[4] ("AP Black") voting-age population in FFSD is 24,466, or 48.19% of the total voting-age population. Courts consider Decennial Census data "presumptively accurate." *See Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853-54 (5th Cir. 1999). To show that there has been a substantial population shift rendering the actual count of the Decennial Census data inaccurate, the party challenging the use of the Census data must "thoroughly document[]" changed population figures with "a high degree of accuracy," a showing that must

---

[4] "Any-part Black" is a defined Census Bureau term, and refers to the population of individuals who identify as "single-race Black" (another defined Census Bureau term) and individuals who identify as more than one race and part Black. *Joint Stip.* ¶ 19. In this case, it is proper to look at the "any-part Black" population because this case "involves an examination of only one minority group's effective exercise of the electoral franchise." *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1, 123 S.Ct. 2498, 2507-8 n.1, 156 L.Ed.2d 428 (2003).

be "clear, cogent and convincing." *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1210 (S.D. Tex. 1997) (citation omitted), *aff'd*, 165 F.3d 368 (5th Cir. 1999)

The District contends that I should rely on the results of the 2011-2013 American Community Survey ("ACS"), which provides that the "single-race Black" voting-age population in FFSD is 24,313 +/- 1,513 (22,800 to 25,826), or 48.94% +/- 3.05% (45.89% to 51.99%) of the total voting-age population. The District also argues that I should consider the estimates of its expert, Dr. Jonathan Rodden, which are based on the Decennial Census data, ACS data, and trend lines. Under these analyses, the District contends that the current any-part Black voting-age population in FFSD is 24,994, or 51.0% of the total voting-age population.

A summary of the demographic data and data sources offered by the parties is presented below:

| *Summary of FFSD Demographic Data Offered By Parties* | | | |
|---|---|---|---|
| __Data Source__ | __Total VAP__ | __Black VAP__ | __% Black VAP__ |
| **2010 Decennial Census** (*Joint Stip.* ¶ 13) | 50,771 | Single-race Black: 24,030<br><br>Any-part Black: 24,466 | Single-race Black: 47.33%<br><br>Any-part Black: 48.19% |
| **2011–2013 American Community Survey estimate** (*Joint Stip.* ¶ 28; PLTF-23; PLTF-29; PLTF-32 (ACS tables)) | 49,679 | Single-race Black: 24,313 +/- 1,513 (22,800 to 25,826)<br><br>Any-part Black: No estimate | Single-race Black: 48.94% +/- 3.05% (45.89% to 51.99%)<br><br>Any-part Black: No estimate |
| **Estimates by District's expert Dr. Jonathan Rodden** (Deft-FFSD C, Tbl. 1 (p. 3)) | 49,009 | Single-race Black: 24,313 (no error margin provided)<br><br>Any-part Black: 24,994 (no error margin provided) | Single-race Black: 49.6% (no error margin provided)<br><br>Any-part Black: 51.0% (no error margin provided) |

### 1.  *2010 Decennial Census*

#### a)  *Total population according to the 2010 Decennial Census*

The U.S. Census Bureau measures the total population of each jurisdiction in the United States every ten years through the Decennial Census. According to the 2010 Decennial Census,

the District has a total population of 68,663, with an any-part Black population of 36,967 (53.84%), and a white population of 29,581 (43.08%). *Joint Stip.* ¶ 13.

The boundaries of FFSD as recorded by the Census Bureau are slightly larger than the boundaries of FFSD as recorded by the St. Louis BOEC. For this reason, the most accurate way to count the population is by adding together the populations of the individual census blocks that comprise the District as recorded by the St. Louis BOEC. Calculating the FFSD population in this manner has a net effect of there being 387 fewer persons within the voting district than as recorded by the Census Bureau.[5] PLTF-44, *Cooper Decl.*, ¶ 13.

*b) Voting-age population according to the 2010 Decennial Census*

The voting-age population ("VAP") of a jurisdiction includes all individuals age 18 and over. *See, e.g.*, *Gordon Testimony*, Trial Tr. vol. 1, 137:1-10. The 2010 Decennial Census is the most recent "complete count" of the VAP of a jurisdiction. PLTF-45, *Cooper Suppl. Decl.*, July 2, 2015, ¶¶ 3, 6; *see also Rodden Testimony*, Trial Tr. vol. 5, 160:13-17.

According to the 2010 Decennial Census, the total VAP in the District is 50,771, of whom 24,466 (48.19%) are any-part Black; 24,030 (47.33%) are single-race Black; and 24,852 (48.95%) are non-Hispanic single-race white. *Joint Stip.* ¶ 13. There are 1,324 (1.93% of the total population) Latinos in the District, of whom 824 (1.62% of the VAP) are voting-aged. *Joint Stip.* ¶¶ 13, 16.

In 2010, there were only 386 more Non-Hispanic white voters than AP Black voters in the District. *Joint Stip.* ¶14. Non-Hispanic white voters were not a majority in the District in 2010. Instead, they held a slight plurality of 0.76%. *Joint Stip.* ¶13. A plurality is the largest

---

[5] This discrepancy, although the Plaintiffs' expert demographer described it as "unusual," has no significant impact on the demographics in the Decennial Census count of the District, as the percentage point differences by race between the two geographic definitions are under one tenth of a percent. PLTF-44, *Cooper Decl.*, ¶ 13; *see also Cooper Testimony,* Trial Tr. vol. 1, 188:13–189:4.

group of voters.  *Rodden Testimony*, Vol. V, 19:2-3.

2.  *The American Community Survey or "ACS" Data*

a)  *Characteristics of the American Community Survey*

In addition to the Decennial Census, the Census Bureau publishes one- and five-year estimates, and previously published three-year estimates,[6] of population demographics based on the American Community Survey.  The ACS is a rolling sample survey based on responses from one in about forty persons on an annual basis.  *Joint Stip.* ¶ 21; *see also Cooper Testimony*, Trial Tr. vol. 1, 202:13–203:4.

"A Compass for Understanding and Using American Community Survey Data," issued by the United States Census Bureau, states, "The ACS is a nationwide, continuous survey designed to provide communities with reliable and timely demographic, housing, social and economic data every year."  PLTF-133, p.1.  The Census Bureau specifically reports "age" and "race" in the ACS.  *Id.*  According to the Census Bureau, the three-year ACS data is available for populations greater than 20,000.  *Id.* at 3.  It is more precise than the one-year ACS, more current than the five-year ACS, and it has a larger sample size than the one-year ACS.  *Id.*  The District's population was 68,663 according to the 2010 Decennial Census and 66,758 according to the 2011 – 2013 ACS.  *Joint Stip.* ¶16, ¶23.

Because ACS population estimates are based on a sample, they are subject to sampling bias, *i.e.*, error margins or confidence intervals.  *Joint Stip.* ¶ 22; *Gordon Testimony*, Trial Tr. vol. 1, 135:9-21; *Cooper Testimony*, Trial Tr. vol. 1, 202:13–203:4; *see also Joint Stip.* ¶ 24, 2011-2013 3-Year ACS Table B01001: Sex by Age, FFSD; PLTF-41, *Gordon Resp.*, at 1.  All ACS population estimates are published with margins of error "based on a 90 percent confidence level."  PLTF-136, ACS Office, U.S. Census Bureau, *American Community Survey Multiyear*

---

[6] Three-year ACS estimates were discontinued after the 2011–2013 period.  *Joint Stip.* ¶ 21.

*Accuracy of the Data*, Sept. 24, 2014, at 11. This means that a reader can be 90 percent confident that the true value lies within the confidence interval provided by the ACS. *See Engstrom Testimony*, Trial Tr. vol. 4, 14:12-23. ACS error margins are larger for smaller sample sizes, smaller geographic units, and smaller demographic groups within geographic areas. *See Gordon Testiomony,* Trial Tr. vol. 1, 135:2-8, 174:19–175:20; *Engstrom Testimony*, Trial Tr. vol. 4, 71:1–72:6; *Rodden Testimony*, Trial Tr. vol. 5, 164:5-20.

Statisticians routinely employ a rule of thumb that when the error margins of two population estimates overlap, there is no statistically significant difference between those two numbers. *See Gordon Testimony*, Trial Tr. vol. 1, 135:22–136:2 (Gordon testifying that "if you're comparing two numbers and the confidence intervals overlap, then there's no statistical significance between those two numbers. There's no basis for claiming that one number is bigger than the other, because the supposed difference between the numbers is completely swallowed by the margin of error as reported by ACS"); *Rodden Testimony*, Trial Tr. vol. 5, 6:17–7:6.

The Census Bureau cautions that ACS data are estimates and recommends that users turn to other Census products for population counts. It includes a similar warning on the top of every ACS population table it provides. *See* PLTF-132, U.S. Census Bureau, *Comparing ACS Data*, July 14, 2015 ("Use numbers from the 2010 Census to obtain counts of the population and their basic characteristics (sex, age, race, Hispanic origin, and homeowner status)"); *Joint Stip.* ¶ 24, 2011 – 2013 3-Year ACS Table B01001: Sex by Age, FFSD; *see also Gordon Testimony,* Trial Tr. vol. 1, 157:17-20 ("I would not draw conclusions about voting-age population based on the ACS because it's not designed for that purpose, for a threshold of the population, and because the margins of error are too wide"), *id.* at 133:24–134:21; *Cooper Testimony,* Trial Tr. vol. 1 203:9-17.

*b) VAP demographics in FFSD as estimated by the ACS*

The 2011–2013 ACS estimates for Sex by Age by Veteran Status for the Civilian

Population 18 Years and Over in FFSD are as follows:

| | Ferguson-Florissant School District, Missouri | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | African-American | Margin of Error (+/-) | % of AA Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **24,313** | **1,513** | **100.0%** | **23,242** | **1,413** | **100.0%** |
| Veteran | 2,380 | NC | 9.8% | 2,728 | NC | 11.7% |
| Nonveteran | 21,933 | NC | 90.2% | 20,514 | NC | 88.3% |
| Male: | 9,582 | 946 | 39.4% | 11,033 | 870 | 47.5% |
| 18 to 64 years: | 8,358 | 954 | 34.4% | 8,499 | 826 | 36.6% |
| Veteran | 1,371 | 377 | 5.6% | 1,051 | 272 | 4.5% |
| Nonveteran | 6,987 | 869 | 28.7% | 7,448 | 748 | 32.0% |
| 65 years and over: | 1,224 | 291 | 5.0% | 2,534 | 363 | 10.9% |
| Veteran | 755 | 261 | 3.1% | 1,593 | 262 | 6.9% |
| Nonveteran | 469 | 190 | 1.9% | 941 | 271 | 4.0% |
| Female: | 14,731 | 1,029 | 60.6% | 12,209 | 808 | 52.5% |
| 18 to 64 years: | 12,879 | 978 | 53.0% | 8,348 | 669 | 35.9% |
| Veteran | 240 | 153 | 1.0% | 66 | 49 | 0.3% |
| Nonveteran | 12,639 | 957 | 52.0% | 8,282 | 661 | 35.6% |
| 65 years and over: | 1,852 | 367 | 7.6% | 3,861 | 534 | 16.6% |
| Veteran | 14 | 23 | 0.1% | 18 | 28 | 0.1% |
| Nonveteran | 1,838 | 370 | 7.6% | 3,843 | 535 | 16.5% |

Source: U.S. Census Bureau, 2011-2013 American Community Survey

PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46.

According to the 2011–2013 three-year ACS, the VAP in the District is 49,679. *Joint Stip.* ¶ 28. The 2011–2013 ACS estimates that the single-race white VAP (including Hispanic whites) is 23,740, or 47.24% of the District's VAP, and the non-Hispanic white VAP is 23,242, or 46.78% of the District's VAP. *Joint Stip.* ¶ 25. According to the 2011–2013 ACS, there are an estimated 1,315 (1.97%) single-race individuals in FFSD who identify as neither Black nor white, 85 of whom identify as American Indian or Alaska Native; 544 of whom identify as

Asian; and 686 of whom identify as "some other race." *See Joint Stip.* ¶ 23 (table); PLTF-30, 2011–2013 3-Year ACS Table C02003: Detailed Race, FFSD; PLTF-41, *Gordon Resp.*, at 2. The 2011–2013 ACS estimates that the FFSD single-race Black VAP is 24,313, or 48.94% of the District's VAP. *Joint Stip.* ¶ 25. The margin of error for the 2011–2013 ACS estimate for the single-race Black VAP is ±1,513, meaning that the 2011–2013 ACS estimates that the single-race Black VAP could be as low as 22,800 or as high as 25,826. PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46.

Unlike the Decennial Census, the ACS does not publish estimates for the "AP Black" category or estimate the margin of error associated with the AP Black fraction of the VAP. *Joint Stip.* ¶¶ 25, 26; *see also Gordon Testimony,* Trial Tr. vol. 1, 136:5-12. As a result, the 2011–2013 three-year ACS estimates do not establish to a degree of statistical significance that the single-race Black VAP has grown since the 2010 Census. *Rodden Testimony*, Trial Tr. vol. 5, 177:1-21.

The 2010 Census totals for single-race Black VAP is 24,030, which falls well within the margin of error for the 2011–2013 ACS estimate for the single-race Black VAP of 22,800 to 25,826. In other words, according to the 2011–2013 ACS estimate, the single-race Black VAP could be as small as 22,800, which is *less than* the 2010 Census count.

Comparing population sizes as estimated by the 2011–2013 ACS alone, the confidence intervals for the single-race Black VAP and the non-Hispanic white VAP overlap. The 2011–2013 ACS survey estimates state with 90% certainty that the single-race BVAP is between 22,800 and 25,826 and that the single-race non-Hispanic white VAP is between 21,829 and 24,655. PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46. Because these confidence intervals overlap, the 2011–2013 ACS estimates **do not establish to a degree of statistical significance**

that the single-race Black VAP is greater than the non-Hispanic white VAP within FFSD.  *See* PLTF-41, *Gordon Resp.*, at 1-2; *see* Deft-FFSD C, *Supplemental Report of Jonathan Rodden & Jowei Chen: Assessment of Plaintiffs' Redistricting Proposals*, July 2, 2015 ("*Rodden Redistricting Rep.*"), ¶ 7; *see also generally Gordon Testimony,* Trial Tr. vol. 1, 134:22–136:12.

Additionally, the Black and white VAP estimates from the ACS are independent of one another.  As a result, it is not appropriate to assume that any sampling bias in the two numbers "will work in the same direction."  *Gordon Testimony*, Trial Tr. vol. 1, 175:15-20.

### 3.  *The District's population estimates*

#### a)  *Calculating an AP Black VAP figure from the 2011–2013 ACS estimates*

Although the 2011–2013 ACS estimates do not include an estimate of the AP Black VAP, the District's expert, Dr. Jonathan Rodden, attempted to extrapolate that figure, which he estimated as 51.0% of the FFSD VAP.  Deft-FFSD C, *Rodden Redistricting Rep.*, Tbl. 1 (p. 3). Dr. Rodden came to this figure by dividing the number of individuals who identified as two or more races with no-part African American (632) by those who identified as two or more races with some-part African American (1,564), to determine the ratio of individuals in the 2011-2013 ACS that identify as any-part African American.  Then Dr. Rodden applied the same ratio for individuals that identify as any-part African American in the total population to the number of voting-age individuals identified in the 2011-2013 ACS.

Dr. Rodden calculated that the total number of voters that identify as any-part Black was 24,994, which according to Dr. Rodden is 51% of the District's voters.  *Rodden Testimony*, Vol. V, 15:23-16:16; DEF Ex. C, Table 1.  However, Dr. Rodden did not use the total VAP of the FFSD as estimated by the 2011–2013 ACS, which leads him to inflate his calculation of the percentage of the VAP in FFSD that is Black.  The 2011–2013 ACS estimates the total VAP for the District as 49,679, *see Joint Stip.* ¶ 28, but because Dr. Rodden excludes persons reporting

two or more races, he underreports the total VAP of the District as 49,009.  *See* Deft-FFSD C,

*Rodden Redistricting Rep.*, ¶¶ 5-6, Tbl. 1 (p. 3).  When the correct denominator for the total VAP

of the District is used (49,679, as reported by the ACS), the single-race Black VAP is 48.9%

(24,313 / 49,679) of the total VAP and the any-part Black VAP (as estimated by Dr. Rodden)

should be 50.3% (24,994 / 49,679) of the total VAP.  *See id.*; *Joint Stip.* ¶ 28.

> *b)  Demographic trends in the Ferguson-Florissant School District*

Dr. Rodden also created linear projections from the three-year ACS estimates to

demonstrate a trend of steady growth in the African American population in FFSD since 2000.

*Rodden Report*, DEF-A, Figure 3.  To project this trend, Dr. Rodden plotted the average

population estimates from the midpoint year of four sets of ACS three-year estimates, 2008–

2010, 2009–2011, 2010–2012, and 2011–2013, and extended that line into 2015.  DEF-A,

*Rodden Rep.*, ¶¶ 12-13, Fig. 3 (p. 6); *see also Rodden Testimony,* Trial Tr. vol. 5, 160:2-7.

Dr. Rodden attributes most of the difference in demographics to a decline in the white

population.  *See* DEF-A, Figure 3; *Rodden Testimony*, Trial Tr. vol. 5, 8:15-9:9.  Plaintiffs'

expert Dr. Gordon corroborates that trend, stating, "Rodden and I agree substantially on the basic

demographic trends.  The district is in the midst of an ongoing racial transition marked by white

flight to the outer suburbs.  Since 2000, the white population of the Ferguson-Florissant School

District (FFSD) has fallen by almost half (50,000 to 28,160) while the black population has

grown steadily.  And, there is a stark disparity in population by age, with the share of the

African-American population much higher among school-age residents."  *Gordon Rebuttal

Report*, PLTF-41, p. 1; *Rodden Testimony*, Trial Tr. vol. 5, 11:4-12.

Dr. Rodden testified that trends in the voting-age population in the District mirror the

District's overall population trends.  *Rodden Testimony*, Trial Tr. vol. 4, 213:18-23.  Dr. Rodden

testified that the trend is due in part to the demographic differences between African Americans

and whites.  The white population is considerably older than the African American population, as African American families tend to be younger.  In the 2010 Decennial Census, there was a large number of African Americans on the cusp of turning 18, whereas there were far fewer in that category for whites.  *Rodden Testimony*, Vol. IV, 214: 1-17.  Dr. Gordon corroborates that finding in his report.  *Gordon Supplemental Report*, PLTF-41, Figure 1: <u>Enrollment in FFSD by Race</u>, 1991-2014.

Based on his trend analysis, Dr. Rodden concluded that African American voters, who were at near parity with white voters at the time of the 2010 Census, are now a majority of the District's VAP.  *Rodden Testimony*, Trial Tr. vol. 5, 8:3–13:17; *Rodden Testimony*, Trial Tr. vol. 4, 214:25-215:12; DEF-X, "*Share of Voting-Age Population.*"

### 4.  *Impediments to voting faced by African Americans in FFSD*

The population that can vote in any given election is a subset of the VAP because the VAP includes some individuals who are old enough to vote, but who cannot vote for some other reason.  *See, e.g.*, *Gordon Testimony*, Trial Tr. vol. 1, 136:23–141:13; PLTF-41, *Gordon Resp.*, at 2.  Impediments that may prevent or hinder particular groups from exercising their voting rights include felony disenfranchisement, the lack of homeownership, and other socioeconomic indicators that are barriers to registration.

### a)  *Felony disenfranchisement*

In Missouri, individuals who are part of the VAP but who are imprisoned, or who are on probation or parole as part of their sentence for commission of a felony, are not eligible to vote.  *Gordon Testimony*, Trial Tr. vol. 1, 136:23–141:13; PLTF-41, *Gordon Resp.*, at 2; *see also* RSMo. §§ 115.133, 115.195; 561.026; Mo. Const. art. 8, § 2.  About one-third of the approximately 106,000 Missourians who have lost the right to vote are serving a sentence in a state prison.  *Gordon Testimony*, Trial Tr. vol. 1, 163:21–164:2.  The remaining more than two-

thirds, or 75,000, are held in local jail, or have returned to their home communities on probation or parole. *Id.*

In Missouri, the rate of felony disenfranchisement for the population as a whole is 2.32% of VAP. *Gordon Testimony*, Trial Tr. vol. 1, 139:10-17; PLTF-41, *Gordon Resp.*, at 2. The rate of felony disenfranchisement for the African American population is almost triple the overall statewide rate, at 6.88%. *Gordon Testimony*, Trial Tr. vol. 1, 139:10-17; PLTF-41, *Gordon Resp.*, at 2.

Dr. Colin Gordon, a historian and tenured professor, testified on behalf of Plaintiffs on the effect of felony disenfranchisement in FFSD. Dr. Gordon is nationally recognized as an expert in urban history, specifically in the history of development, decline, residential patterns, and segregation in the St. Louis metropolitan area. *See* Trial Tr. vol. 1, 87:4-94:23; PLTF-40, Colin Gordon, *Segregation and Uneven Development in Greater St. Louis, St. Louis County, and the Ferguson-Florissant School District*, May 26, 2015 ("*Gordon Rep.*"), at 62 (Gordon CV); PLTF-42, Colin Gordon, *Mapping Decline: St. Louis and the Fate of the American City* (U. of Penn. Press 2008).

Dr. Gordon testified that, although there is no reported data specific to FFSD showing felony disenfranchisement rates by race, one can reasonably conclude that, in FFSD, African Americans are disenfranchised due to a criminal conviction at higher rates than whites. *See Gordon Testimony,* Trial Tr. vol. 1, 138:3-4, 165:1-6. Dr. Gordon noted the large racial disparities statewide in felony disenfranchisement rates, and also noted that felony disenfranchisement rates are generally higher in urban areas than elsewhere. Trial Tr. vol. 1, 138:5-19. Based on these facts, and "given what we know about patterns of policing in North County in the wake of the Department of Justice report after Ferguson," Dr. Gordon opined that

"an application of the [statewide] African-American rate [of disenfranchisement] to voting-eligible African Americans in Ferguson-Florissant would be a conservative estimate of the rate of disenfranchisement [among African Americans there]." *Id.*

Although Dr. Gordon did not provide District-specific felony disenfranchisement testimony, I find Dr. Gordon's testimony regarding the applicability of the statewide disenfranchisement rate to the District credible and I find that African Americans in FFSD are disproportionately affected by felony disenfranchisement as compared to non-Hispanic whites. However, because there are no prisons in the District, it would not be appropriate to conclude that the same percent of African Americans who are disenfranchised statewide applies equally to the District. Dr. Gordon testified that approximately one-third of the disenfranchised population is located in prisons. As a result, only two-thirds of Dr. Gordon's estimated rate of 6.88% of African American felony disenfranchisement should be applied to the FFSD population, a rate of approximately 4.59%.

### b) *Voter registration*

In Missouri, individuals who are part of the VAP but who fail to register by the operative election registration deadline—which is 27 days before a given election—cannot vote in that election. RSMo. §§ 115.135, 115.139; Mo. Const. art. 8, § 2; *Marre v. Reed*, 775 S.W.2d 951, 955-56 (Mo. banc 1989). Additionally, individuals who are part of the VAP and who are registered to vote, but who then move from one jurisdiction to another before an election registration deadline, cannot vote in that election unless they re-register at their new address before that deadline. *See* RSMo. §§ 115.275, 115.277, 115.135; Mo. Const. art. 8, § 2. Other restrictions may occur, for example, to individuals who are part of the VAP but who move *within* a jurisdiction. These individuals can change their address on Election Day, but only at their new polling place or the central polling location of the county, and not at their old polling place.

RSMo. §§ 115.135.1-3, 115.165. Additionally, individuals who move from one jurisdiction to another after an election registration deadline cannot vote for local offices in that election. RSMo. §§ 115.275.4, 115.277.4.

There is undisputed evidence from the Census Bureau that single-race African Americans in Missouri register to vote at a lower rate (67.1%) than non-Hispanic whites (72.2%). *Kimball Testimony*, Trial Tr. vol. 2, 119:14-18;[7] Trial Tr. vol. 3, 41:6-10 (same); *see also* PLTF-63, *Reported Voting and Registration, by Sex, Race, and Hispanic Origin, for States (Nov. 2014) (Ex. 5 to Rodden Dep., Aug. 20, 2015)*, at 7; *Rodden Testimony*, Trial Tr. vol. 5, 71:1-4, 147:12-16.

Plaintiffs, however, did not produce any statistical evidence showing the voter registration rates of African American and white voters within the District. *Rodden Testimony*, Trial Tr. vol. 5, 70:24-71:4; *Kimball Testimony*, Trial Tr. vol. 2, 185:6-9; *Gordon Testimony*, Trial Tr. vol. 1, 173:16-24. Because Plaintiffs did not provide any such evidence, the District argues that Plaintiffs have failed to meet their burden in establishing a statistically significant difference in voter registration rates in the District.

Moreover, according to the District, the evidence shows that there is little to no difference in registration rates between African Americans and whites in FFSD. To support this argument, the District's expert, Dr. Rodden, analyzed voter turnout in the District. Dr. Rodden examined voter turnout by race using two methods: Ecological Inference and scatterplots for the 2012-2015 elections. *Rodden Report*, DEF-A, Figure 5, 6. Based on these analyses, Dr. Rodden concluded

---

[7] Kimball testified to citizen voting-age population ("CVAP") registration rates by race, not voting-age population ("VAP") registration rates by race. *See* Trial Tr. vol. 2, 116:20–117:15. The figures are similar for single-race African Americans and non-Hispanic whites under both measures; the VAP rates as reported above are 67.1 percent and 72.2 percent, respectively, while the CVAP rates are 67.9 percent and 73.1 percent, respectively. *See id.*; PLTF-63, *Reported Voting and Registration, by Sex, Race, and Hispanic Origin, for States (Nov. 2014) (Ex. 5 to Dep. of Jonathan Rodden, Aug. 20, 2015)*, at 6.

that there was "not much of a relationship or any relationship here between turnout and African-American share," particularly in 2012, 2013, and 2014. *Rodden Testimony*, Trial Tr. vol. 5, 77:11-78:3. Rodden did note that there was evidence of a slight difference in turnout in 2011 and a significant difference in turnout in 2015. *Id.* at 77:18-78:3.

Turnout, however, is different from registration. Dr. Rodden's calculations of turnout merely measure turnout rates *of already registered voters*. Because Dr. Rodden did not first examine or determine voter registration rates by race, his conclusions regarding turnout merely suggest, at best, that turnout to the polls is substantially similar *within* the registered voter population. *Rodden Testimony*, Trial Tr. vol. 5, 146:23-25. As a result, Dr. Rodden's analysis does not inform the inquiry into whether initial registration rates are as disparate in FFSD as they are throughout Missouri, nor does it overcome the Plaintiff's evidence that some difference in registration rates exists.

I find that there is sufficient evidence in the record to conclude that African Americans in FFSD are likely registered to vote at a lower rate than white residents. Neither party produced statistical evidence regarding the voter-registration gap in FFSD in particular. However, FFSD experiences substantial racial disparities along a range of socioeconomic factors. *See, e.g., infra* Section II.B.4(c). These disparities tend to correlate with lower registration rates, a proposition with which the District's own expert concurred. *See Rodden Testimony,* Trial Tr. vol. 5, 117:14–118:1. Additionally, there is no credible evidence to suggest that the statewide gap disappears in FFSD. As a result, it is reasonable to conclude that the statewide disparities in registration rates are similar to those in the District.

Accordingly, based on the credible testimony of Plaintiffs' experts regarding statewide disparities in registration rates and the existence of other racial disparities in FFSD that are likely

to impact voter registration rates, I find that African Americans in FFSD register to vote at a rate lower than non-Hispanic whites.

### c) Homeownership

Homeownership is a strong predictor of voting in local elections. *Kimball Testimony*, Trial Tr. vol. 2, 147:17-24. Dr. Gordon testified that individuals who do not own their homes experience residential instability and move more frequently than homeowners, which impacts the ability to efficiently and effectively register and vote. *See* Trial Tr. vol. 1, 173:7-14; 130:21-313:1; *see also Hudson Testimony*, Trial Tr. vol. 4, 90:10–91:11; *supra* at Section II.B.4(b).

Within FFSD, African Americans own their homes at a significantly lower rate than whites. *Gordon Testimony*, Trial Tr. vol. 1, 173:7-11. In FFSD, the homeownership rate among African American residents is 50.7%, which is more than 30 percentage points lower than the homeownership rate among whites (82.8%). *Id.* at 174:7-9; 176:11-13; *see also* PLTF-45, *Cooper Suppl. Decl.*, ¶ 17 (reporting that the FFSD African American homeownership rate as estimated by ACS has dropped from 61% to 50.7% since the 2005–2007 ACS).

Based on the credible testimony of Plaintiffs' experts, I find that the lower rate of homeownership among African Americans in FFSD, as compared to white residents, contributes to the depressed levels of voter registration in the African American community.

## DISCUSSION

### III. *GINGLES* I

#### A. *Gingles* I Legal Standards

To satisfy the requirements of the *Gingles* I precondition, Plaintiffs must show that African Americans in the District are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. This straightforward threshold requirement is satisfied by the creation of an illustrative plan containing a single-

member district in which Black voters constitute a bare majority of the VAP. *See Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (stating that *Gingles* I asks a simple threshold question: whether the protected group of voters can make up "more than 50 percent of the voting-age population in the relevant geographic area?"). "[T]he Supreme Court [at this stage] requires only a simple majority of eligible voters in the single-member district. The court may consider, at the *remedial* stage, what type of remedy is possible . . . . But this difficulty should not impede the judge at the liability stage of the proceedings." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) ("*Bone Shirt II*") (alteration in original) (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991)).

The plan must also (1) satisfy the one person, one vote constitutional requirements, *i.e.*, approximate population equality across all districts in the plan, *see Abrams v. Johnson*, 521 U.S. 74, 98 (1997); and (2) be composed of geographically compact districts that comply with traditional redistricting principles, including: contiguity; minimizing the splits of counties, municipalities, and precincts; recognizing communities of interest; and avoiding multimember districts, *see id.* at 92 ("[Section] 2 compactness inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'") (citation omitted); *Bone Shirt II*, 461 F.3d at 1019, and state and county districting requirements, *see Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) (in area of voting and apportionment, "federal courts are bound to respect the States' . . . choices unless those choices contravene federal requirements").

## B. *Gingles* I Findings of Fact

Mr. William Cooper, Plaintiffs' expert demographer, testified at trial. Since 1986, Mr. Cooper has prepared redistricting plans for approximately 700 jurisdictions. PLTF-44, *Cooper*

*Decl.*, at Ex. A; *see Cooper Testimony,* Trial Tr. vol. 1, 179:23–180:3 (testifying that he has drawn statewide plans in approximately forty states, but his main focus is on local jurisdictions). Since 2011, he has prepared more than 150 redistricting plans for local jurisdictions using the 2010 Decennial Census. PLTF-44, *Cooper Decl.*, at Ex. A.

Mr. Cooper's election plans have been precleared and/or adopted in state or local jurisdictions on at least ten occasions. *Id.* Illustrative or proposed plans created by Mr. Cooper have also been ordered adopted as Section 2 remedies by the District of South Dakota in *Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035 (D.S.D. 2005), *aff'd*, 461 F.3d 1011 (8th Cir. 2006), and by the Eastern District of Washington in *Montes v. City of Yakima*, No. 12-CV-3108 TOR (E.D. Wash. Feb. 17, 2015). Over the course of his career, Mr. Cooper has testified at trial as an expert witness on redistricting and demographics in 36 federal voting rights cases and been deposed or entered declarations in an additional 33 voting rights cases. PLTF-44, *Cooper Decl.*, at Ex. A. He has never been deemed unqualified to provide expert testimony. Trial Tr. vol. 1, 181:3-5.

Mr. Cooper drew two illustrative seven-district plans on behalf of Plaintiffs to show that it is possible to create at least one subdistrict in which African Americans are a majority of the VAP. *Joint Stip.* ¶ 36; PLTF-44, *Cooper Decl.*, ¶¶ 38-57. In each of the two illustrative plans drawn by Mr. Cooper, there are four districts in which Blacks are a majority of the VAP. PLTF-44, *Cooper Decl.*, ¶¶ 38-57. Mr. Cooper used generally accepted demographic methods for creating the two illustrative plans. *See Joint Stip.* ¶¶ 37, 39, 40, 44, 45, 47; PLTF-44, *Cooper Decl.*, ¶¶ 38, 39-42, 43-46, 51, Fig. 10 (p. 23), 55, Fig. 12 (p. 26); *Cooper Testimony*, Trial Tr. vol. 1, 181:16–185:8, 188:9-12.

For each of Plaintiffs' illustrative plans, all parts (*i.e.*, census blocks) of each component election district are connected at some point with the rest of the district, so each component

district is contiguous. *Joint Stip.* ¶ 49; PLTF-44, *Cooper Decl.*, ¶ 60; *Cooper Testimony*, Trial Tr. vol. 1, 182:3-4; *Gordon Testimony,* Tr. vol. 1, 127:8-10.

The "compactness" of a district can be measured using the Reock test, which compares the shape of a district to a circle, considered to be the most compact shape possible. The illustrative plans' Reock scores show the component election districts are compact. PLTF-44, *Cooper Decl.*, ¶¶ 58 n.11, 59; *Cooper Testimony*, Trial Tr. vol. 1, 195:7-20.

In Plaintiffs' Illustrative Plan 1, three of the 96 precincts in the District are split by district boundaries with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to five schools. Based on the addresses, at the time of election, of the individuals who were Board members at the time of trial, PLTF-44, *Cooper Decl.*, at Ex. E-7, Ex. F-7 (addresses), three incumbents are paired in District 2 and two in District 7. *Joint Stip.* ¶ 46; PLTF-44, *Cooper Decl.*, ¶¶ 51-53; *Cooper Testimony*, Trial Tr. vol. 1, 193:13-14, 195:2-6, 199:3-6, 199:23–200:5.

In Plaintiffs' Illustrative Plan 2, nine of the 96 precincts in the District are split by district boundaries with a few additional precincts split by 2010 Census blocks, but no census blocks are split by district boundaries. Public schools are balanced across all seven districts with each district having two to four schools. Based on the addresses, at the time of election, of the individuals who were Board members at the time of trial, PLTF-44, *Cooper Decl.*, at Ex. E-7, Ex. F-7 (addresses), two incumbents who reside in District 2 are paired, but no other incumbents are paired. *Joint Stip.* ¶ 48; PLTF-44, *Cooper Decl.*, ¶¶ 55-57. Because two incumbents live within the same Census block, there is no way to draw single-member districts that will separate those incumbents while also complying with traditional redistricting principles. *See Cooper*

*Testimony,* Trial Tr. vol. 1, 197:4-11.

Plaintiffs' illustrative plans use the 2010 Decennial Census total population for the apportionment base. *See Joint Stip.* ¶ 43; PLTF-44, *Cooper Decl.* ¶ 40. Mr. Cooper's testimony that illustrative plans must be drawn from the Decennial Census data, rather than the ACS estimates, was credible because it is undisputed that only the Decennial Census data goes down to the census block level. Because the ACS does not report census block-level data, it does not allow a demographer to avoid splitting census blocks, making it is impossible to measure precisely the population in a given voting district. *See* Trial Tr. vol. 1, 200:2-5, 203:5–204:17; *see also* RSMo. § 1.100.1; Trial Tr. vol. 1, 192:17–194:25.

The addresses of the individuals who were members of the Board at the time of trial are all within the municipalities of Ferguson and Florissant, which together make up about two-thirds of the District spatially. *See* PLTF-44, *Cooper Decl.*, at Ex. E-7, Ex. F-7; *Cooper Testimony*, Trial Tr. vol. 1, 197:21-198:3. It is undisputed that no current Board member resided in Berkeley, Kinloch, Cool Valley, or Normandy, which are more predominantly African American areas of the District. *See Cooper Testimony,* Trial Tr. vol. 1, 198:1-7.

### C. *Gingles* I Conclusions of Law

I conclude that Plaintiffs have established *Gingles* I, *i.e.*, that the African American population in the District is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Plaintiffs' expert demographer, William Cooper, presented two illustrative plans in which Black voters constitute a majority of the VAP in not just one but four of seven districts.

As described above, Mr. Cooper is a recognized expert demographer in the context of § 2 analysis. For the very first time at trial, the District objected to Mr. Cooper being an expert. I

overrule this objection and conclude that Mr. Cooper qualifies as an expert demographer and

Plaintiffs have established by a preponderance of the evidence that his testimony is admissible.

*See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 & n.10 (citing Rule 104(a))

(1993); Fed. R. Evid. 702; *see also* Pls.' Post-Trial Br. at 2-4.  I also find that Mr. Cooper's

testimony is reliable, and that Mr. Cooper testified credibly to the data and methodology used to

develop Plaintiffs' two illustrative plans.  As a result, Plaintiffs have established by a

preponderance of the evidence that his testimony is admissible.  *Daubert*, 509 U.S. at 592 & n.10

(citing Rule 104(a)).

## 1. *Plaintiffs' illustrative plans comply with constitutional requirements*

Mr. Cooper's illustrative plans comply with one-person, one-vote constitutional

requirements because they properly apportion the District's total population across the districts

with minor deviation, *i.e.*, total population deviations of less than 10%.  *Evenwel v. Abbott*, 136

S. Ct. 1120, 1124, 194 L. Ed. 2d 291 (2016); *White v. Regester*, 412 U.S. 755, 764 (1973)

(holding that plans with total deviation of less than 10% presumptively comply with one person,

one vote).  The plans also comply with traditional redistricting principles including contiguity,

compactness, appropriate population-size deviations, keeping census blocks together, and

incumbency protection.  The District did not present any evidence to contradict either that these

plans include majority-Black single-member districts or that the plans comply with constitutional

requirements and redistricting principles.

## 2. *Gingles I does not require an effectiveness analysis*

The District argues that Plaintiffs' illustrative plans do not provide an effective remedy.

In fact, the District contends that the implementation of either of Plaintiffs' illustrative single-

member district plans will impede, rather than improve, African American voters' ability to effectively elect candidates of their choice in FFSD Board elections.[8]

*Gingles* I, however, only asks a simple threshold question: whether the protected group of voters can make up "more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). "[T]he Supreme Court [at this stage] requires only a simple majority of eligible voters in the single-member district. The court may consider, at the *remedial* stage, what type of remedy is possible . . . . But this difficulty should not impede the judge at the liability stage of the proceedings." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) ("*Bone Shirt II*") (alteration in original) (internal quotation omitted). As a result, the District's predictions about the ultimate effectiveness of Plaintiffs' illustrative single-member district plans is irrelevant to the *Gingles* I threshold determination.

### 3. *Plaintiffs' claim is not barred because of the size of the African American voting-age population*

The District also argues that Plaintiffs have not satisfied *Gingles* I because African Americans purportedly constitute a majority of the VAP in FFSD, and therefore already possess an opportunity to elect their preferred candidates under the existing at-large system. This argument fails for several reasons.

As an initial matter, this argument is irrelevant because *Gingles* I requires no additional analysis of the demographics of the District or the illustrative plan districts beyond a showing

---

[8] The District argues the plans are ineffective because African Americans are now the majority group in FFSD and are geographically dispersed, which the District argues means they are the group that benefits the most from an at-large system. The District also argues that the Illustrative Plans are ineffective because they create candidate recruiting problems. Because I find that the District's population estimates cannot overcome the presumptive validity of the Decennial Census, and, as stated above, because a determination about what the most effective remedy is is inappropriate at this stage, this argument fails. I will, however, consider such arguments at the remedy phase.

that African Americans in the District are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50.

Moreover, even if this argument were relevant to the *Gingles* I inquiry, it is unpersuasive for two reasons. First, the District has not provided reliable data sufficient to overcome the presumptive validity of the 2010 Decennial Census, which indicates that African Americans are a minority of the FFSD VAP and outnumbered by whites. *See Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853-54 (5th Cir. 1999); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 439 (S.D.N.Y. 2010). Second, even if Black residents were to constitute a bare majority of the VAP in FFSD, vote dilution claims may go forward where, as here, the racial minority group in question has suffered a history of discrimination that inhibits their participation in the political process, such that they are disadvantaged by an at-large electoral arrangement. *See Pope*, 687 F.3d at 575 n.8; *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003); *Meek v. Metro. Dade Cty.*, 908 F.2d 1540, 1545-46 (11th Cir. 1990); *Monroe v. City of Woodville*, 881 F.2d 1327, 1332-33 (5th Cir. 1989).

### a)  *African Americans do not currently constitute a majority of FFSD's VAP*

The Decennial Census population data is the appropriate metric by which to determine the demographics of FFSD's VAP. The Decennial Census is a full count of the nation's entire population every ten years and provides an accurate and complete count of FFSD's population and demographics. *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1140-41, 194 L. Ed. 2d 291 (2016) (Alito, J., concurring in judgment). According to the 2010 Census, African Americans are neither a majority nor a plurality of the total VAP of the District.

Courts consider Decennial Census data "presumptively accurate." *See Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853-54 (5th Cir. 1999); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 439 (S.D.N.Y. 2010). As a result, courts resolving Voting

Rights Act claims in the Eighth Circuit regularly rely on Decennial Census data for determining the demographics of a jurisdiction.[9] *See, e.g.*, *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385 n.1 (8th Cir. 1995); *Clay v. Bd. of Educ. of St. Louis*, 90 F.3d 1357, 1359 (8th Cir. 1996) ("*Clay II*"); *African Am. Voting Rights Legal Def. Fund, Inc. v. Villa*, 54 F.3d 1345, 1347-48 (8th Cir. 1995); *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 925-26 (E.D. Ark. 2012); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 983 (D.S.D. 2004) ("*Bone Shirt I*").

Courts presume the continued accuracy of the most recent Decennial Census figures absent a party meeting the burden of proving otherwise. *See McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir. 1988). To show that there has been a substantial population shift rendering the actual count of the Decennial Census data inaccurate, the party challenging the use of the Census data must "thoroughly document[]" changed population figures with "a high degree of accuracy," a showing that must be "clear, cogent and convincing." *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1210 (S.D. Tex. 1997) (citation omitted), *aff'd*, 165 F.3d 368 (5th Cir. 1999); *Vill. of Port Chester*, 704 F. Supp. 2d at 439; *see also Kirpatrick v. Preisler*, 394 U.S. 526, 535 (1969).

The District presents three sets of data that it argues should be used to determine the Black VAP: (1) 2011–2013 3-year American Community Survey ("ACS") population estimates, (2) Dr. Rodden's estimates of the "any part Black" VAP, and (3) Dr. Rodden's population projections based on his trend analysis. As explained below, none of these data sets are sufficient to overcome the presumptive accuracy of the 2010 Decennial Census count, which states that Blacks are a minority of the VAP in the District.

---

[9] Missouri state law also requires the use of Decennial Census data to determine "the population . . . for the purpose of representation." *See* RSMo. § 1.100.1 ("The population of any political subdivision of the state for the purpose of representation . . . is determined on the basis of the last previous decennial census of the United States.").

i. The 2011–2013 ACS estimates

The ACS publishes no data that overcomes the presumptive validity of the 2010 Decennial Census's count of the Black VAP in the District. As an initial matter, there is no information published by the ACS that, on its face, indicates that African Americans are a majority of the VAP in the District. Although the 2011–2013 ACS population estimates for the District suggest that single-race African Americans may now be a plurality of the VAP in the District at 48.9%, they do not show that single-race African Americans are a *majority* of the VAP. And the ACS reports no estimate for the percentage of the VAP in the FFSD that is "any part" Black.

But even considering the ACS estimates of the single-race Black VAP in the District, it is crucial to recognize that the margins of error in the 2011–2013 ACS for the District's VAP are too wide to establish that the demographics of the FFSD population have substantially changed since 2010. The ACS provides a population estimate with only a sufficient degree of certainty to say that the actual number is within a particular range. Because ACS population estimates are based on a sample, and not a complete count like the Decennial Census, they are subject to sampling bias, *i.e.*, error margins or confidence intervals. The Census Bureau itself cautions against using ACS estimates rather than the Decennial Census complete count to determine the population of a given geographic area.[10]

Here, the 2011–2013 ACS estimates fail to establish with statistical confidence that the single-race Black VAP has grown larger than the white VAP in the District. The 2011–2013 ACS survey estimates state with 90% certainty that the single-race BVAP is between 22,800 and

---

[10] The danger of using ACS estimates to determine the population has proven to be well founded. Before the 2010 Decennial Census count, ACS estimates predicted that the City of St. Louis had gained in population after 60 years of decline, only to discover at the 2010 Decennial Census count that the population had declined by approximately 30,000 residents. *Gordon Testimony*, Trial Tr. vol. 1, 136:13-22.

25,826 and that the single-race non-Hispanic white VAP is between 21,829 and 24,655. As estimated by the 2011–2013 ACS, the margins of error for the single-race BVAP and white VAP overlap, which means that the difference in the two population figures is not statistically significant. *See Gordon Testimony,* Trial Tr. vol. 1, 135:22–136:2.

In fact, given the margins of error, the 2011–2013 ACS estimates do not establish that the Black VAP of the District has substantially changed since 2010. The 2011–2013 ACS survey estimates state with 90% certainty that the single-race Black VAP is between 22,800 and 25,826,[11] a margin of error that *includes* the Decennial Census single-race Black VAP count of 24,030. Put another way, according to the ACS confidence interval, the single-race Black VAP could be as small as 22,800, which is actually *less* than the 2010 Census estimate of 24,030. As a result, given the large margin of error, the most recent three-year ACS estimate of the District's single-race Black VAP is not statistically distinguishable from the single-race Black VAP reported by the Decennial Census. *See Rodden Testimony*, Trial Tr. vol. 5, 177:5-21. And the ACS estimated change in the single-race non-Hispanic white VAP is not substantial.[12]

Accordingly, because the error margins in the 2011–2013 ACS are too large to constitute statistically significant evidence that the Black VAP outnumbers the white VAP in the District, or that the demographics in the District have substantially changed since 2010, the District has failed to meet its burden of proving with "clear, cogent and convincing" evidence, and to a "high degree of accuracy," that there has been a substantial population shift rendering the actual count of the 2010 Decennial Census data inaccurate such that I should reject the 2010 Decennial

---

[11] The 2011–2013 ACS estimates the single-race Black VAP of FFSD as 24,313, a difference of 283 people from the 2010 Census count of 24,030. The margin of error for the ACS estimate is ±1,513. PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46.

[12] The 2011–2013 ACS estimates that the single-race non-Hispanic white VAP of FFSD is 23,242, a difference of 1,610 people from the 2010 Census count of 24,852. The margin of error for the ACS estimate is ±1,413. PLTF-44, *Cooper Decl.*, at Ex. D, p. 29 of 46. The decrease in the white VAP since the 2010 Census cannot be accurately documented as more than 197 people.

Census's count of African Americans as less than a majority of the District's VAP. *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1210 (S.D. Tex. 1997) (citation omitted), *aff'd*, 165 F.3d 368 (5th Cir. 1999).

ii. The District's population estimates of the any-part Black VAP

As noted above, the ACS reports that, at most, single-race African Americans are estimated to be a plurality but not a majority of the District's VAP. Accordingly, there are no published government data stating that African Americans—including individuals who are two or more races and "some part" Black—are the majority of the VAP. The only figures that even purport to show that African Americans are a majority of the District's VAP are Dr. Rodden's estimates of the number of voting-age individuals in FFSD who are "any-part" Black. *See Rodden Testimony,* Trial Tr. vol. 5, 174:9-15. These estimates, however, suffer from three limitations that diminish their reliability, leading me to find that these estimates are not sufficient to overcome the presumptive accuracy of the 2010 Decennial Census.

*First*, Dr. Rodden's calculations are based on ACS data, which, for the reasons discussed above, cannot overcome the Decennial Census's presumptively accurate complete count.

*Second*, in his estimate of the number of multi-race individuals in FFSD who are any-part Black and 18 years of age or older, Dr. Rodden cannot report any error margins, *Rodden Testimony*, Trial Tr. vol. 5, 170:2-8, which renders this estimate inconsistent with generally accepted professional standards in political science. When making estimates, the smaller the survey sample, the larger the error margin. Here, the ACS survey samples only about 2% of the total population. *See Gordon Testimony,* Trial Tr. vol. 1, 133:18-134:5. Dr. Rodden's attempt to produce an estimate of the any-part Black VAP in FFSD entailed extrapolating from a tiny slice of that 2% sample (*i.e.*, mixed-race individuals who are part-Black and live within FFSD). *See Gordon Testimony,* Trial Tr. vol. 1, 136:5-12. Although Dr. Rodden described his calculations

34

here as relatively simple, the expert demographers at the Census Bureau declined to publish estimates for the category of any-part Black for the VAP of FFSD in the 2011–2013 three-year ACS. *See id.*, 174:9-15. Notably, other courts have declined to use sources of population data that do not contain the relevant VAP figures. *Cf. Blytheville*, 71 F.3d at 1385 n.1 (using 1980, rather 1990, Census figures because the panel did not have "the relevant voting-age populations" from the 1990 Census before it).

*Third*, Dr. Rodden's estimates tend to overestimate the District's Black VAP. For instance, Dr. Rodden excludes persons reporting two or more races from the District's full VAP in his calculations, thereby using a smaller denominator and overstating the Black VAP proportion of the population. Dr. Rodden also does not use the BOEC's FFSD boundaries in his population estimates, because the ACS does not provide tract data, and the exact geographic area of BOEC and the corresponding population cannot be reproduced. *See* Cooper Report at ¶ 13.

Accordingly, I find that Dr. Rodden's calculations estimating the AP Black VAP based on the 2011-2013 ACS are insufficient to overcome the presumptive accuracy of the 2010 Decennial Census's count of the AP Black VAP in the District.

### iii. The District's trend analysis and population projections

Next, in an attempt to determine the VAP in the District by race in 2015, Dr. Rodden created a linear projection by plotting the average population estimates from the midpoint year of four sets of ACS three-year estimates, 2008–2010, 2009–2011, 2010–2012, and 2011– 2013; *see* DEF-A, *Rodden Rep.*, ¶¶ 12-13, Fig. 3 (p. 6).[13]

As Dr. Rodden credibly testified, trend lines are an acceptable practice among social scientists. *Rodden Testimony*, Trial Tr. vol. 5, 10: 12-17. And Dr. Rodden demonstrates an

---

[13] This methodology is questionable since multiyear ACS data is weighted and averaged over time, and thus "it cannot be used as a proxy for a point-in-time sample" and does not represent the midpoint or endpoint of that multiyear period.

undeniable trend in his report, showing that the African American population has been growing steadily since 2000 and the white population has been decreasing rapidly. *Rodden Report*, DEF-A, Figure 3; *Rodden Testimony*, Trial Tr. vol. 5, 8:15-9:9; *see also Gordon Rebuttal Report*, PLTF-41, p. 1 (corroborating Rodden's findings).

Overall, however, Dr. Rodden's linear projection of FFSD's VAP population by race does not provide the legally required clear, cogent, or convincing evidence that has a high degree of accuracy necessary to overcome the presumptive accuracy of the Decennial Census. First, Dr. Rodden's calculations are precisely the kind of "analyses that are [] too inaccurate to serve as a basis for changing the basis of conducting elections" that courts have repeatedly rejected. *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 459 (N.D. Tex. 2010) (citation omitted) (rejecting expert's projected population estimate based on uncertain ACS estimates as "correspondingly unreliable"); *Perez*, 958 F. Supp. at 1212-13; *see also Dixon*, 412 F. Supp. at 1041 (rejecting estimates prepared by the National Planning Data Corporation as insufficient proof that the Decennial Census figures are not the best evidence of the current population).

Second, Dr. Rodden's calculations were based on ACS estimates, but the Census Bureau warns against using uncertain ACS estimates to project population forward. Moreover, Dr. Rodden does not provide margins of error for his projections, which prevents the Court from determining whether an estimated population change since 2010 is a substantial change rendering the 2010 population count obsolete. *See McNeil*, 851 F.2d 937, 946 (1988) (even if Census data does not reflect present population precisely, it does not require courts to use a different data set); *Perez*, 958 F. Supp. at 1212-13.

In addition, Dr. Rodden's trend analysis does not address factors that might affect demographic change in the District and impede voting. For example, property ownership and the

housing market can affect migration into or out of the District and implicate voting rights. Local events, including the high profile events in Ferguson the past two years, may affect residents' decisions to move to or remain in the district. *See Cooper Testimony,* Trial Tr. vol. 1, 205:14-24 (testifying that the Michael Brown incident in Ferguson "could have completely changed the trend line" and "[t]here's no way to know how that may affect future population changes in the school district.").[14]

As a result, I find that Dr. Rodden's trend analysis does not overcome the presumptive validity of the 2010 Decennial Census, and I accept the Decennial Census figures as the data upon which to assess Plaintiffs' dilution claim, under which African Americans remain a minority of the VAP.

### b) *No preclusion even if African Americans were a majority of the VAP*

Finally, even if I were to find that African Americans constitute a majority of the District's VAP, that would not be the end of the analysis. Racial minorities do not suddenly lose the broad protections of the VRA at the moment that they surpass 50% of a jurisdiction's VAP. A racial minority group that is a bare majority of a jurisdiction's VAP may still suffer from actionable vote dilution where its members have suffered from a history of discrimination and persistent socioeconomic inequalities that hinder their participation in the political process, such that they remain disadvantaged by a traditional at-large electoral arrangement or other unequally open political processes.

A "racial minority," as it is used in the § 2 context, refers not to a numerical minority, but rather to members of a protected class. Section 2, subsection (a), prohibits voting practices that result in an abridgement of the right to vote "on account of race or color." 52 U.S.C. § 10301(a).

---

[14] Moreover, Dr. Rodden anchored his linear projection in the "2009" population estimates. Dr. Rodden's projection would have an entirely different slope had he decided to draw the projection line with data beginning in a different year. *Dep. of Jonathan Rodden*, Aug. 20, 2015 ("*Rodden Dep.*"), 113:23–114:16.

Subsection (b) establishes a violation of § 2 if the political processes are not equally open to "members of a class of citizens protected by subsection (a)," and uses "members of a protected class" two other times in the subsection. 52 U.S.C. § 10301(b). *Gingles* states that § 2(a) concerns "member[s] of a protected class of racial and language minorities." 478 U.S. at 43; *see also Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542, 1548 (5th Cir. 1992) ("The Act was aimed at measures that dilute the voting strength of groups because of their race, not their numerical inferiority."); *id.* at 1547 (noting that "the plain text of [§ 2 of the VRA], as affirmed by case law, makes clear that the Act is concerned with protecting the minority in its capacity as a national racial or language group," not in its capacity as a numerical minority in any particular jurisdiction). And the Act's legislative history makes clear that Congress passed the law to effectuate the guarantees of the Fifteenth Amendment and remedy "the systematic exclusion of [Black people] from the polls that characterizes certain regions of this Nation." H. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2440. As a result, racial minorities may maintain VRA protection even if they reach a bare numerical majority of a jurisdiction.

Indeed, the Supreme Court has made clear that "it may be possible for a citizen voting-age majority to lack real electoral opportunity." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006).[15] Consistent with this Supreme Court guidance, four of the five Courts of Appeals that have considered this question (the Second, Fifth, Eleventh, and D.C. Circuits) have rejected the *per se* rule prohibiting vote dilution claims where a racial minority constitutes a numerical majority of a jurisdiction. *See Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003) ("Vote dilution claims must be assessed in light of the

---

[15] *Bartlett v. Strickland*, 556 U.S. 1 (2009), is not to the contrary. *Bartlett* stands for the proposition that a racial minority must have a population over 50% to have an "opportunity to elect," but does not say that 50% of the VAP is sufficient to elect a minority-preferred candidate in every instance, such that claims are barred once a minority group becomes 50.1% of a jurisdiction's VAP.

demographic and political context, and it is conceivable that minority voters might have less opportunity . . . to elect representatives of their choice even where they remain an absolute majority in a contested voting district.") (internal quotation marks and citation omitted); *Monroe v. City of Woodville*, 881 F.2d 1327, 1332-33 (5th Cir. 1989) ("Unimpeachable authority from [the Fifth Circuit] has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution."), *cert. denied*, 498 U.S. 822 (1990);[16] *Meek v. Metro. Dade Cty.*, 908 F.2d 1540, 1545-46 (11th Cir. 1990) (holding that a claim brought by minority voters who constitute a numerical majority could be viable due to "functional effect" of existing system, and that the district court "properly rejected the county's contention that *Gingles* could not apply at all in a setting where the Non Latin White bloc did not constitute a majority of the total population"); *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012) (approvingly citing *Salas*'s conclusion that majority-minority vote dilution claims are not barred as a matter of law).[17]

Additionally, courts have found § 2 liability where a racial minority group comprised a majority or near-majority of the jurisdiction's population. *See, e.g.*, *Martin v. Allain*, 658 F. Supp. 1183, 1188-91, 1204-05 (S.D. Miss. 1987) (finding § 2 violations in certain at-large, multimember districts with majority Black populations and BVAPs); *United States v. Dallas Cty. Comm'n*, 636 F. Supp. 704, 710 (S.D. Ala. 1986) (finding at-large system for county commissioners violated § 2 where Blacks comprised 49.8% of the VAP, an almost 5% increase from four years prior); *Windy Boy v. Cty. of Big Horn*, 647 F. Supp. 1002, 1004, 1023 (D. Mont.

---

[16] *See also Salas*, 964 F.2d at 1547.

[17] Only the Fourth Circuit has applied a *per se* rule precluding a § 2 claim by a numerical majority. *See Smith v. Brunswick Cty. Bd. of Supervisors*, 984 F.2d 1393, 1401 (4th Cir. 1993) (holding that if minority voters "have the numbers necessary to win and members of the group are allowed equal access to the polls, it cannot be rationally maintained that the vote is diluted"). The Fourth Circuit's decision barring the plaintiffs' claim arose in a vastly different context, where African Americans constituted a supermajority of the relevant districts' VAP (60%) and had a consistently higher turnout rate than white voters. *See id.* at 1400-02.

1986) (finding § 2 violation where American Indians comprised 46.2% of the population and whites 52.1%); *Jordan v. City of Greenwood*, 599 F. Supp. 397, 400, 404-05 (N.D. Miss. 1984) (finding § 2 violation where Blacks constituted 52% of the total population and 46.2% of the VAP); *N.A.A.C.P. v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978, 980, 983 (11th Cir. 1982) (finding at-large system had effect of diluting Black voting power where African Americans constituted a majority of the population and over 49.36% of the registered voters).

Indeed, courts in the Eighth Circuit have recognized in crafting remedial plans that minority voters often require more than a bare numerical majority in order to elect their preferred candidates. *See Smith v. Clinton*, 687 F. Supp. 1361, 1362 (E.D. Ark. 1988) (three-judge court), *aff'd mem.*, 488 U.S. 988 (1988); *see id.* at 1363 (ordering Board to implement plaintiffs' plan providing for single-member majority-Black district with a 60.55% BVAP to "give blacks a fair opportunity to elect the candidate of their choice . . . and help to eradicate the effect of the dual-member, at-large system on participation by blacks in the political process"); *see also Bone Shirt II*, 461 F.3d at 1023 (applying 65% minority population as a "guideline" to consider in fashioning remedial relief and correctly considering turnout rate and incumbency in formulating a districting plan).

As a result, even if African Americans were a bare majority of the VAP, Plaintiffs' claim would not be barred *per se*.

> c) *There is evidence that African Americans lack an equal opportunity to elect their preferred candidates in the District, even if they are just over 50% of the VAP.*

In addition to finding there is no *per se* bar to Plaintiffs' claim, I also conclude that even if the AP BVAP in FFSD were a slight numerical majority of the population, Plaintiffs' claim in this case would still succeed because a range of socioeconomic and political factors negatively impact their ability to effectively participate in the electoral process.

A local appraisal of FFSD (*see infra* in Section IV.B.3 (regarding the existence of racially polarized voting), and Section V.B. (regarding the historical and ongoing effects of discrimination)), demonstrates precisely why the *per se* rule urged by the District would frustrate the purpose of § 2: it is clear that voting in the District is racially polarized and Black-preferred candidates have a much lower rate of success than white-preferred candidates, which indicates that, regardless of the precise size of Black VAP in the District, the existing at-large arrangement dilutes Black voting power.

Critically, a range of ongoing disparities hinder African Americans' present ability to participate equally in school board elections. *See supra*, Section II.B.4. Members of the African American community in FFSD are historically disadvantaged and face functional barriers to electoral participation as a result of the ongoing socioeconomic effects of discrimination, as well as electoral processes that, in practice, favor the status quo. *See infra*, Sections V.B; V.F. These barriers have likely lead to decreased rates of registration and turnout among African Americans in FFSD. *See supra* Section II.4; *see also* PLTF-49, Rebuttal Report of David Kimball, July 2, 2015 ("Kimball Rebuttal"), at 6 (during the last five contested elections, African American turnout has been lower than white turnout four times).

Importantly, "Low minority turnout does not militate against finding a Section 2 violation . . . . Instead, 'low voter turnout has often been considered *the result* of the minority's inability to effectively participate in the political process." *United States v. City of Euclid*, 580 F. Supp. 2d 584, 604 (N.D. Ohio 2008) (citing *Blytheville*, 71 F.3d at 1388) (emphasis in original); *see also Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 725 (2009); *Engstrom Testimony*, Trial Tr. vol. 4, 82:8-11. Where, as in FFSD, many African-American voters believe their diluted votes are futile in electing their candidates of choice, turnout may remain low. But registration and

turnout rates often improve once a court finds and remedies the § 2 violation.  *See, e.g., City of Irving*, 638 F. Supp. 2d at 725; *Vill. of Port Chester*, 704 F. Supp. 2d at 451.

As a result, even if the any-part Black VAP were slightly over 50% of the VAP, there is no evidence that such a distinction makes a functional difference in terms of how the political processes operate to the detriment of African Americans in FFSD.  Under the facts of this case, a bare numerical majority of the VAP is insufficient to translate into meaningful electoral opportunity.  *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) ("it may be possible for a citizen voting-age majority to lack real electoral opportunity").

For all of these reasons, I conclude that Plaintiffs have established *Gingles* I.

## IV. *GINGLES* II AND III

### A.  *Gingles* II and III Legal Standards

Together, *Gingles* II and *Gingles* III ask first, whether African American and white voters tend to "vote differently," *i.e.*, whether there is racially-polarized voting, *Gingles*, 478 U.S. at 53 n.21; and second, whether the candidates preferred by Black voters "usually" lose to candidates preferred by white voters, *Blytheville*, 71 F.3d at 1385.

*Gingles* II is satisfied where the minority group is politically cohesive.  *See Gingles*, 478 U.S. at 51, 56.  Cohesiveness exists where "a significant number of minority group members usually vote for the same candidates," *Bone Shirt II*, 461 F.3d at 1025 (citation omitted), and can be established by demonstrating the existence of racially polarized voting, *i.e.*, "a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently," *Gingles*, 478 U.S. at 53 n.21 (alteration in original) (citations and internal quotation marks omitted).  This "consistent relationship" does not require completely divergent racial preferences, as "the *Gingles* standard presupposes the existence of crossover voting."  *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of*

*Educ.*, 4 F.3d 1103, 1123 (3d Cir. 1993); *see Sanchez v. Colorado*, 97 F.3d 1303, 1319 (10th Cir. 1996) (same).

*Gingles* III, meanwhile, is satisfied where "the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate." *Blytheville*, 71 F.3d at 1385 (citing *Gingles*, 478 U.S. at 50-51). There is **no** requirement that white voters have "an unbending or unalterable hostility" to minority-preferred candidates such that those candidates always lose. *Jenkins*, 4 F.3d at 1123; *see also Blytheville*, 71 F.3d at 1389 (marginal minority electoral success "fit[s] precisely in the *Gingles* test as to whether the white majority does indeed vote sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate") (alteration in original) (citation and internal quotation marks omitted).

As the Supreme Court observed, "no simple doctrinal test" applies to the third *Gingles* factor because racial bloc voting can "vary according to a variety of factual circumstances." *Gingles*, 478 U.S. at 57-58. *Gingles* III is determined through three inquiries: (1) identifying the minority-preferred candidates; (2) assessing whether "the white majority vote as a bloc to defeat the minority preferred candidate"; and (3) resolving whether "there [were] special circumstances such as the minority candidate running unopposed present when minority-preferred candidates won." *Bone Shirt II*, 461 F.3d at 1020 (alteration in original) (citation omitted).

### 1. *Relevant elections for evaluating Gingles II and III*

Before a court can identify the minority-preferred candidates, it must determine which elections to analyze. Not all elections are equally probative in assessing *Gingles* II and III. In particular, contested elections have much more probative value than uncontested elections because only if elections are held can the outcomes provide relevant information about the ability

of Black voters to elect candidates of their choice. *See Engstrom Testimony,* Trial Tr. vol. 4, 45:22–46:10. Here, the 2005, 2007, 2008, and 2010 elections in FFSD were uncontested and therefore they have little to no probative value in the *Gingles* preconditions analysis. *Id.*; *see also Gingles*, 478 U.S. at 57.[18]

Moreover, for purposes of analyzing the *Gingles* preconditions, not all contested elections have equal probative value. More recent elections are generally more probative. *Bone Shirt II*, 461 F.3d at 1020-21. Additionally, "endogenous" elections—*i.e.*, those elections for the offices at issue, here, the FFSD Board—are more probative than the results of "exogenous" elections—*i.e.*, contests for other offices, such as Congress or President, *id.*; *see also Clay II*, 90 F.3d at 1362. While exogenous elections may still inform the inquiry, the Court need not supplement endogenous election data where, as here, there is sufficient evidence from endogenous elections from which to discern typical voting behavior and usual results. *See, e.g.*, *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1208 n.8 (5th Cir. 1989). Likewise, "interracial elections are the best indicators of whether the white majority usually defeats the minority candidate," *Bone Shirt II*, 461 F.3d at 1020-21,[19] because "[a] system that works for minorities only in the absence of white opposition is a system that fails to operate in accord with the law," *Blytheville*, 71 F.3d at 1389-90; *see Jenkins*, 4 F.3d at 1128. And finally, there is less probative value in an election that is marked by special circumstances that suggest that the election "was not representative of the typical way in which the electoral

---

[18] The Eleventh and First Circuits agree that the uncontested success of a minority-preferred candidate is "not probative of the ability of blacks to elect candidates of their choice," *Askew v. City of Rome*, 127 F.3d 1355, 1384 n.18 (11th Cir. 1997), and "reveal[s] little about either minority cohesion or white bloc voting," *Uno v. City of Holyoke*, 72 F.3d 973, 988 (1st Cir. 1995).

[19] The *Gingles* Court relied exclusively on interracial legislative contests. *See* 478 U.S. at 80-82. The Fifth, Ninth, and Eleventh Circuits have also held that interracial elections are most probative of racially polarized voting. *See Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503-04 (5th Cir. 1987); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 552-53 (9th Cir. 1998); *Nipper v. Smith*, 39 F.3d 1494, 1540 (11th Cir. 1994).

process functions."  *Ruiz*, 160 F.3d at 557-58; *see also Gingles*, 478 U.S. at 75-76; *Blytheville*, 71 F.3d at 1389.

### 2.  *Methods for identifying Black-preferred candidates*

To analyze whether Plaintiffs have met *Gingles* II and III, the Court must determine whether Black voters have candidates of choice, and if so, identify those candidates.  This requires courts to conduct "an intensely local appraisal" that accurately reflects voters' preferences.  *Gingles*, 478 U.S. at 78 (citation omitted).

Identifying Black voters' candidates of choice is not a mechanical task.  Rather, a court must employ a contextual case-by-case approach that, as required by the Eighth Circuit, establishes, "the preferences of the minority voters . . . on an election-specific basis, viewing all the relevant circumstances."  *Blytheville*, 71 F.3d at 1386 (citing *Jenkins*, 4 F.3d at 1126); *see also Collins v. City of Norfolk*, 816 F.2d 932, 937 (4th Cir. 1987) ("*Collins I*").  "There is no blanket definition of 'minority preferred candidate.'"  *Clay II*, 90 F.3d at 1361.  Answering the *Gingles* II and III threshold questions "typically requires a statistical and non-statistical evaluation" of the voting behavior and election results in the relevant elections.  *Bone Shirt II*, 461 F.3d at 1020.

### B.  *Gingles* II and III Findings of Fact

### 1.  *Relevant elections*

From 2000 through 2015, there have been twelve contested Board elections.  *Joint Stip.* ¶ 53.  By statute, where the number of candidates who have filed for a Board election equals the number of seats to be elected, no election is held, and the candidates automatically assume Board member responsibilities.  From 2000 through 2015, there were four such non-elections (2005, 2007, 2008, 2010).  *Joint Stip.* ¶ 54; RSMo. § 115.124.1.

The Plaintiffs' expert Dr. Engstrom analyzed the elections from 2011 through 2015.  Dr.

Engstrom focused on the 2011 to 2015 elections because he wanted to analyze at least two three-vote, three-seat elections and because the four-year period immediately preceding 2011 saw no contested interracial elections. In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court found an analysis of three elections to be sufficient. *See also Engstrom Testimony*, Trial Tr. vol. 4, 17:5–18:4. Like the Court did in *Gingles*, Dr. Engstrom focused on endogenous interracial contested elections.

The District's expert Dr. Rodden analyzed each of the past twelve contested Board elections. *Joint Stip.* ¶ 55; *see also Engstrom Testimony,* Trial Tr. vol. 4, 11:15-25; *Rodden Testimony*, Trial Tr. vol. 5, 36:22–37:5.

### 2. *Methods for identifying Black-preferred candidates*

In the multi-seat contests at issue here, the identification of minority-preferred candidates is complex. Because a voter can cast more than one vote, minority voters may (but will not necessarily) have a second (or third) candidate of choice. *See Engstrom Testimony,* Trial Tr. vol. 4, 18:18–19:16. A critical question, then, is how to identify whether minority voters in fact have a second or third candidate of choice in a given election.

#### a) *Ecological Inference analysis*

Both Dr. Engstrom and Dr. Rodden analyzed FFSD Board elections using Gary King's Ecological Inference ("EI") procedure. *Joint Stip.* ¶¶ 55-56; PLTF-52, Engstrom Rep., ¶¶ 15-39, Tbl. 1 (pp. 17-19); PLTF-53, Rebuttal Report of Richard L. Engstrom, July 2, 2015 ("Engstrom Rebuttal"), Tbls. 1-5 (pp. 10-13); *Rodden Testimony*, Trial Tr. vol. 5, 36:22–37:5.

EI is used widely by expert witnesses in assessing racially polarized voting in voting rights cases. It was developed subsequent to the U.S. Supreme Court's 1986 decision in *Gingles* for the explicit purpose of improving estimates of candidate preferences between or among groups of voters. *See Joint Stip.* ¶ 59. EI provides estimates of the true value of a group's

support of a candidate, i.e., the actual percent of votes cast by African American voters for a candidate. This estimate is expressed in terms of a point estimate and confidence interval. *Engstrom Testimony*, Trial Tr. vol. 4, 14:1–15:23. The point estimate is the value that is closest to the true value as one can get with the data, or statistically the best estimate of true value. *Id.* at 14:24–15:10.

The confidence interval is a measure of uncertainty. *Id.* at 14:11–15:23. It provides a range of estimates around the point estimate so that political scientists can establish with 95% confidence that the true value (the candidates' level of support) is within that range. *Joint Stip.* ¶ 57; PLTF-52, Engstrom Rep., ¶ 10; *Engstrom Testimony*, Trial Tr. vol. 4, 14:13-23. A statistical estimate with a 95% degree of confidence employs the level of statistical certainty that is consistent with generally accepted standards for EI in the field of political science, and is consistent with peer-review standards for research in that field. *Joint Stip.* ¶ 58; *Engstrom Testimony,* Trial Tr. vol. 4, 14:13-23, 15:24–16:1; *Rodden Testimony*, Trial Tr. vol. 5, 151:13-16.

EI estimates must include a confidence interval to determine whether the difference in the estimated support among candidates can be considered statistically significant. *Engstrom Testimony,* Trial Tr. vol. 4, 16:2-12; *Rodden Testimony*, Trial Tr. vol. 5, 154:2-21. As a "rule of thumb," when the point estimate for the level of support for one candidate lies within the confidence interval of support for another candidate, one cannot say that there is a statistically significant difference between the two candidates. *See Engstrom Testimony,* Trial Tr. vol. 4, 18:8–17, 19:4-16; *Rodden Testimony*, Trial Tr. vol. 5, 154:2-11.

### b) Homogenous-precinct analysis

Homogenous-precinct analysis is another tool that can be used to confirm the existence and extent of racially polarized voting. *Engstrom Testimony*, Trial Tr. vol. 4, 12:15-21. Although EI is a superior tool for racial polarization analysis, homogenous-precinct analysis may

47

be a helpful supplement to EI when there are many precincts in a particular area with similar proportions of African American and white adults. *Id.* Homogenous-precinct analysis examines the few but highly segregated precincts and therefore "reduces uncertainty in estimating voting behavior of each racial group." *Kimball Rebuttal* at 4, n.3.

c) *Top-ranked candidate approach*

Dr. Rodden used two methods for identifying Black-preferred candidates: the top-ranked candidate approach, in which he identified only the candidate whose point estimate indicated the highest level of support among Black voters; and the point estimate approach, in which he identified the candidates whose point estimates indicated the highest and second-highest estimated levels of support among Black voters in a two-seat contests, and the highest, second-highest, and third-highest estimated levels of support among Black voters in three-seat contests. *See Rodden Testimony*, Trial Tr. vol. 5, 38:24–40:14.

The top-ranked candidate approach identifies only a single Black-preferred candidate in each election; it does not consider the possibility that minority voters have clear second- and third-choice candidates in multi-seat elections; and it also does not account for relative levels of support for each candidate among Black voters, treating the single candidate with the highest estimated level of support among Black voters as the only Black-preferred candidate, even if another candidate received a substantially similar or even statistically indistinguishable level of support from Black voters. *Rodden Testimony*, Trial Tr. vol. 5, 95:23–96:3; 97:5-17.

The following table summarizes the preferred candidates among Black and white voters using the top-ranked candidate approach, respectively, and their success rates:

| The District's Top-Ranked Candidate Approach | | | | |
|---|---|---|---|---|
| Election | Black Voters | | White Voters | |
| | Top Choice Candidate | Elected? | Top Choice Candidate | Elected? |
| 2000 | G. Thomas (B) | Yes | Hirsch (W) | Yes |
| 2001 | Butler (B) | No | Garofalo (W) | Yes |
| 2002 | Graham (B) | Yes | Fletcher (W) | Yes |
| 2003 | G. Thomas (B) | Yes | Knorr (W) | Yes |
| 2004 | Van (B) | No | Garofalo (W) | Yes |
| 2006 | G. Thomas (B) | No | Schroeder (W) | Yes |
| 2009 | Knowles (W) | Yes | Schroeder (W) | Yes |
| 2011 | Graham (B) | No | Martinez (W-H) | Yes |
| 2012 | B. Morris (B) | No | Ebert (W) | Yes |
| 2013 | Henson (B) | No | Hogshead (W) | Yes |
| 2014 | Paulette-Thurman (B) | Yes | Chabot (W) | Yes |
| 2015 | Graves (B) | Yes | Ebert (W) | Yes |
| | **Overall Success Rate:** | 6/12 | **Overall Success Rate:** | 12/12 |
| | **Success Rate Last 10 Years:** | 3/7 | **Success Rate Last 10 Years:** | 7/7 |
| | **Success Rate Last 5 Years:** | 2/5 | **Success Rate Last 5 Years:** | 5/5 |

PLTF-75, *Top-Ranked Candidate Approach Worksheet (Ex. 18 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; *Rodden Dep.*, 260:21–272:5.

According to Dr. Rodden's top-ranked candidate approach, Black and white voters in FFSD diverge in every election since 2000 in terms of candidate preference. In the twelve contested elections from 2000 through 2015, Black voters and white voters *never* preferred the same candidate as their top choice. *Joint Stip.* ¶ 189; *Rodden Testimony*, Trial Tr. vol. 5, 100:1-6.

According to Dr. Rodden's top-ranked candidate approach, Black and white voters display a consistent preference for candidates from their own racial group. In the twelve contested elections from 2000 through 2015, *every* top-ranked candidate among white voters was white (twelve of twelve). *See Joint Stip.* ¶¶ 64, 71, 79, 88, 96, 103, 112, 119, 130, 138, 146, 167. In the twelve contested elections from 2000 through 2015, all but one of the top-ranked candidates among Black voters were Black (eleven of twelve). *Joint Stip.* ¶ 190. The only election in which Black voters' top-ranked candidate was not Black was the 2009 election, which featured no Black candidates. *See Joint Stip.* ¶ 190.

The top-ranked candidate approach also shows that Black-preferred candidates lose much more frequently than do white-preferred candidates. In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was elected (twelve of twelve), as compared to six out of twelve top-ranked candidates among Black voters. *Joint Stip.* ¶ 191. In the five contested elections over the last five years (*i.e.*, from 2011 through 2015), every top-ranked candidate among white voters was elected (five out of five), as compared to only two out of five top-ranked candidates among Black voters. *Joint Stip.* ¶ 193.

### d) Point estimate approach

Dr. Rodden's point estimate approach considers a candidate preferred if they receive the highest or second-highest (in a two-seat election), or highest, second-highest, or third-highest (in a three-seat election) estimated level of support from a group of voters in a given election, depending on the number of seats up for election. This approach does not consider relative levels of support for each candidate among African American voters—for example, in a two-seat election, the two candidates with the highest and second-highest estimated levels of Black support are both considered Black-preferred candidates to the same degree, even if one candidate had a much lower level of support among Black voters than the other.

The point estimate approach also does not consider overlapping confidence intervals among candidates, meaning in comparing two candidates, one could be considered Black-preferred while the other is not simply because the first candidate has a higher point estimate of Black support, even if the two candidates' respective levels of Black support are in fact statistically indistinct from one another. *See, e.g.*, *Engstrom Testimony,* Trial Tr. vol. 4, 29:7–30:2, 30:3-11, 32:22–33:12. Under the point estimate approach, Dr. Rodden identified the following candidates as Black-preferred:

| Comparative Success Rates of White- and Black-Preferred Candidates: The District's Point Estimate Approach | | | | | |
|---|---|---|---|---|---|
| **Election Information** | | **Black Voters** | | **White Voters** | |
| **Year** | **Seats** | **Candidates with Highest Estimated Support** | **Number Successful** | **Candidates with Highest Estimated Support** | **Number Successful** |
| 2000 | 2 | G. Thomas (B), Hirsch (W) | 2 | Hirsch (W), G. Thomas (B) | 2 |
| 2001 | 2 | Butler (B), Garofalo (W) | 1 | Garofalo (W), Hogshead (W) | 2 |
| 2002 | 3 | Graham (B), Butler (B), Clark (W) | 2 | Fletcher(W), Knorr (W), Clark (W) | 2 |
| 2003 | 2 | G. Thomas (B), Knorr (W) | 2 | Knorr (W), Lentz (W) | 1 |
| 2004 | 2 | Van (B), McClendon(B) | 0 | Garofalo (W), Hogshead (W) | 2 |
| 2006 | 2 | G. Thomas (B), Washington (B) | 0 | Schroeder (W), Knowles (W) | 2 |
| 2009 | 2 | Knowles (W), Schroeder (W) | 2 | Knowles (W), Schroeder (W) | 2 |
| 2011 | 3 | Graham (B), Hawkins (B), Clark (W) | 0 | Martinez (W-H), P. Morris (W), Chabot (W) | 3 |
| 2012 | 2 | B. Morris (B), Schroeder (W) | 1 | Ebert (W), Schroeder (W) | 2 |
| 2013 | 2 | Henson (B), Hogshead (W) | 1 | Brown (W), Hogshead (W) | 2 |
| 2014 | 3 | Paulette-Thurman (B), Johnson (B), Savala (B) | 1 | P. Morris (W), Chabot (W), Benz (W) | 2 |
| 2015 | 2 | Graves (B), Dameron (W) | 1 | Ebert (W), Graves (B) | 2 |
| **Totals:** | **27** | -- | **13/27** | -- | **24/27** |
| **Last 10 years** | **16** | -- | **6/16** | -- | **15/16** |
| **Last 5 years** | **12** | -- | **4/12** | -- | **11/12** |

PLTF-69, *Point Estimate Approach Worksheet (Ex. 12 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; *Rodden Dep.*, at 136:22 – 137:6, 356:19 – 357:9.

Applying the point estimate approach reveals frequent divergence between Black and white voters in FFSD in terms of candidate preference, and also reveals voters' consistent preference for candidates from their own racial groups. Using this approach, white voters preferred white candidates for 25 of the 27 total seats up for election from 2000 to 2015 (93% of the time), while Black voters preferred Black candidates for 17 of the 27 seats up for election (63% of the time). *See Rodden Testimony*, Trial Tr. vol. 5, 107:11-17. Black and white voters preferred the same candidates only one-third of the time. *See* Deft FFSD-A, *Rodden Rep.*, ¶ 45, Fig. 8 (p. 25); *see also generally id.* ¶¶ 47-68; *Rodden Testimony*, Trial Tr. vol. 5, 107:18–108:25.[20]

---

[20] Overlapping preferences occurred mostly because the point-estimate approach designated as Black-preferred six

Under the point estimate approach, it is evident that Black-preferred candidates are usually defeated, while white-preferred candidates usually win. Since 2000, 24 out of 27 white-preferred candidates were elected (88.9%), as compared to 13 out of 27 Black-preferred candidates (48.1%). *See Rodden Testimony*, Trial Tr. vol. 5, 110:18–111:9. This gap in success rates has grown in more recent years: during the last five years, 11 out of 12 white-preferred candidates were elected (91.7%), as compared to 4 out of 12 preferred candidates among Black voters (33.3%).

### 3. *Findings of fact concerning racially polarized voting*

#### a) *Dr. Engstrom's testimony was reliable and highly credible*

For the following reasons, I find that Dr. Engstrom's testimony was reliable and highly credible, and I will adopt his findings concerning racially polarized voting.

Dr. Richard Engstrom is a political science professor and social science researcher at Duke University with thirty years of experience related to electoral systems and minority electoral participation. Dr. Engstrom is an expert in electoral systems, minority politics, racial polarization analysis, and statistical methods related to racial polarization analysis. More specifically, he is a nationally recognized expert in the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice. Trial Tr. vol. 4, 6:21-25, 9:23–10:3 (admitting Engstrom as expert without objection); *Joint Stip*. ¶ 56; *Engstrom Testimony*, Trial Tr. vol. 4, 5:4–10:3.

Dr. Engstrom has published a peer-reviewed book on minority politics and election systems, and many peer-reviewed articles on the structure of electoral contests. *See* PLTF-52,

---

white candidates who were the second- or third-choice among Black voters. *See supra* (Hirsch in 2000, Garofolo in 2001, Clark in 2002, Knorr in 2003, Schroeder in 2012, and Hogshead in 2013). In each of those six cases, the white second- or third-choice candidate, who won, received substantially less support from Black voters than the Black top-ranked candidates, who lost.

Engstrom Rep., at Appendix (CV). Dr. Engstrom has testified at trial or in depositions in approximately 100 Voting Rights Act cases, including as a court-appointed expert, a special master, and on behalf of both plaintiffs and defendants, and he has never been deemed not qualified as an expert. *See Engstrom Testimony*, Trial Tr. vol. 4, 5:6–9:22.

Dr. Engstrom's EI analysis was accurate, complete, and confirmed by similar outcomes from Dr. Engstrom's HP analysis, as well as Dr. Rodden's EI analysis.

Based on the EI analysis, Dr. Engstrom determined for each of the five elections from 2011–2015 whether African American voters expressed a preference for a particular candidate or candidates and identified Black voters' candidates of choice. Dr. Engstrom's focus on the last five years of endogenous elections was appropriate in the particular circumstances of FFSD. *See* Trial Tr. vol. 4, 17:3–18:4. The 2011–2015 elections are all recent, endogenous,[21] and interracial elections,[22] and reviewing five contested elections satisfies the three elections threshold the Supreme Court considered sufficient in *Gingles*. 478 U.S. at 61; *see also Gingles*, 478 U.S. at 57 n.25. The five-year period also includes two three-seat elections, to allow the Court at least two observations of that particular electoral context. Analysis of the endogenous Board elections from 2011 to 2015 is sufficient and appropriate to determine the District's liability.

Dr. Engstrom applied a case-by-case method for identifying candidates of choice of Black voters. Evaluating Black-preferred candidates on an election-by-election basis, Dr.

---

[21] Because there is extensive data on "endogenous" elections, the Court need not look to exogenous elections. Although Defendants include exogenous election results, they have not performed racially polarized voting analyses for these elections. The race of the candidate cannot be assumed to identify that candidate as the candidate of choice for that racial group. *Blytheville*, 71 F.3d at 1386. The exogenous elections here presented by Defendants are also national, partisan elections, held in November, which do not provide useful information for evaluating local, non-partisan, April school board elections.

[22] There were no contested elections in 2010, 2008, or 2007. PFOF ¶ 101. The election of 2009 had only white candidates and as Dr. Engstrom explained, if Black voters prefer Black candidates, an electoral system does not provide equal opportunity if Black voters cannot elect their top candidate(s) of choice if they are of the same race. *See* Trial Tr. vol. 4, 19:17–20:10 (testimony of Richard Engstrom); *see, e.g.*, *Blytheville*, 71 F.3d at 1389-90. To find another contested interracial election before 2011, one would need to consider elections from a decade ago and older (*i.e.*, 2006 and earlier).

Engstrom identified eight candidates preferred by Black voters between 2011 and 2015. He identified a candidate as a Black-preferred candidate based on the three following principles. Dr. Engstrom's reliance on these three principles was appropriate and reliable.

First, Dr. Engstrom considered statistically significant differences in levels of support for the candidates in characterizing a second- or third-place finisher among Black voters as a Black candidate of choice. PLTF-52, Engstrom Rep., ¶ 16 (2011); ¶ 20 (2012), ¶ 24 (2013); ¶ 28 (2014); ¶ 34 (2015); *see also* ¶ 17 (statistical significance in 2011); ¶ 20 (statistical significance in 2012); ¶ 28 (statistical significance in 2014); ¶ 34 (statistical significance in 2015). When the point estimate of one candidate is within the confidence interval of the other, Dr. Engstrom testified that one cannot determine which candidate received a higher level of support. *See Engstrom Testimony*, Trial Tr. vol. 4, 16:2-12. By considering statistically significant differences in levels of support, Dr. Engstrom followed generally-accepted standards in social science.

Second, a second- or third-choice candidate is not necessarily minority-preferred if that candidate received significantly less support than the top-choice candidate. *See, e.g.*, *Engstrom Testimony*, Trial Tr. vol. 4, 18:5-21, 19:4-6; *see also id.* 26:2-20. Dr. Engstrom testified that Black voters' second- or third-most-favored candidate should be deemed a candidate of choice only if he or she had at least approximately two-thirds of the support of the most-favored candidate. *See, e.g.*, *NAACP v. City of Thomasville*, 401 F. Supp. 2d 489, 498 & n.3 (M.D.N.C. 2005). As other courts have observed, and as the facts of this case demonstrate, the identification of a second- or third-choice candidate, if any, requires a detailed and nuanced analysis. *See, e.g., Lewis v. Alamance Cty.*, 99 F.3d 600, 614 (4th Cir. 1996); *N.A.A.C.P. v. City of Niagara Falls*, 65 F.3d 1002, 1017-19 (2d Cir. 1995); *Askew*, 127 F.3d at 1379; *N.A.A.C.P. v.*

*City of Thomasville*, 401 F. Supp. 2d at 498 & n.3.

Third, Dr. Engstrom testified that, where the clear first-choice candidate among Black voters is a Black candidate who has lost, courts should be skeptical of attempts to characterize a winning white candidate as a candidate of choice of minority voters, particularly where Black voters show a preference for candidates within their racial group. *Engstrom Testimony*, Trial Tr. Vol. 4, 19:20–20:15; *id.*, 30:12-23 (testifying to Black voters' preference in 2012); *id.*, 33:13-22 (testifying to Black voters' preferences in 2013); *see also, e.g., Collins I*, 816 F.2d at 937 & n.6 (casting doubt on whether elected white candidates who received some support from Black voters could "be fairly considered as representatives of the minority community" where those candidates were elected over Black candidates who were clearly the most minority-preferred candidates).

An electoral system does not provide equal opportunity if Black voters cannot elect their top candidate(s) of choice and can only elect lesser preferred candidates, and only if they are white. If Black voters prefer Black candidates, they must have an opportunity to elect those candidates. *See, e.g., Collins I*, 816 F.2d at 937 & n.6; *Citizens for a Better Gretna*, 834 F.2d at 502; *see also Aldasoro v. Kennerson*, 922 F. Supp. 339, 374 (S.D. Cal. 1995) (citing *Collins v. City of Norfolk*, 883 F.2d 1232, 1238 (4th Cir. 1989) ("*Collins II*")). "*Gingles* addresses not only a group's ability to elect a satisfactory candidate (that is a candidate for whom the minority voter is *willing* to cast a vote), but the group's ability to elect its *preferred* candidate." *Meek*, 908 F.2d at 1547. In FFSD, "African Americans have clearly shown, through their voting behavior, a preference to be represented on that Board by African American candidates." PLTF-52, *Expert Report of Richard L. Engstrom*, May 27, 2015 ("*Engstrom Rep.*"), ¶ 43.

Notably, this principle does not assume that a candidate is preferred because of their race.

*Blytheville*, 71 F.3d at 1386.  Rather, it acknowledges legal guidance that, although the race of a candidate is not dispositive, an electoral system does not truly provide equal opportunity if Black voters cannot elect members of their own group who are their clearly most-preferred candidate(s), and can only elect lesser-preferred candidates who are white.  *See Engstrom Testimony,* Trial Tr. vol. 4, 20:3-10; *see also Aldasoro*, 922 F. Supp. at 374 (citing *Collins II*, 883 F.2d at 1238)).

Using this case-by-case method, Dr. Engstrom identified eight candidates preferred by Black voters between 2011 and 2015.

As discussed above, in addition to using EI, Dr. Rodden offered two methods for identifying candidates of choice: the top-preferred candidate approach and the point-estimate approach.  Both of Dr. Rodden's approaches employ a singular mechanical rule for identifying the Black-preferred candidate.  As the Supreme Court observed, however, "no simple doctrinal test" applies to legally significant bloc voting because "the degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will vary according to a variety of factual circumstances."  *Gingles*, 478 U.S. at 57-58.  The Eighth Circuit has also made clear that minority candidates of choice should be identified on an election-specific basis, viewing all the relevant circumstances.  *See Blytheville*, 71 F.3d at 1386; *see also Jenkins*, 4 F.3d at 1126; *Collins I*, 816 F.2d at 937.

Dr. Rodden's approaches have limitations.  Although the top-ranked candidate method provides relevant information—in that, as a general matter, a candidate who receives the greatest number of votes from minority voters (the "top-ranked candidate" of minority voters) is appropriately described as a Black-preferred candidate, *see, e.g.*, *Lewis*, 99 F.3d at 614, looking only at the top-ranked candidate does not capture the full voting preference picture in the context

of a multi-seat election because it disregards the fact that multiple seats are available in each election, and with that the possibility that minority voters prefer more than one candidate. As explained below, this flaw is particularly on display when analyzing the 2011 and 2014 elections. In those elections, Black voters showed a strong preference for two or three candidates.

Dr. Rodden's other approach, the point estimate approach, takes the two or three candidates with the highest estimates for Black voters' support (depending on whether there are two or three seats available), and designates them all as Black-preferred candidates, regardless of the comparative levels of support. This mechanical approach fails to identify Black-preferred candidates "on an election-specific basis," with consideration of "all the relevant circumstances," *Blytheville*, 71 F.3d at 1386, and ignores two important factors in identifying candidates of choice. First, this approach ignores the relative levels of support among first-, second-, and third-choice candidates, treating all three equally as candidates of choice in a three-seat election, even where one or two candidates clearly stand out as preferred in terms of support from Black voters. In so doing, this approach ignores case law that warns against treating the election of a second-choice candidate as a victory for minority voters, particularly if minority voters show a clear preference for a candidate from within their racial group who loses and their second-choice candidate, who wins, is white. Second, the point estimate approach draws a distinction between candidates even when their levels of support are statistically indistinguishable from each other. In this respect, the point estimate approach is inappropriate in light of generally accepted principles of statistical analysis. As explained below, these flaws are most clearly on display when analyzing the 2012 and 2013 elections.

For all of these reasons, I find that Dr. Engstrom's EI analysis was accurate, complete, and reliable. His testimony was highly credible, and his case-by-case method for identifying

Black-preferred candidates was done in accordance with relevant legal standards and was superior to the other methods proposed by Dr. Rodden. *See Gingles*, 478 U.S. at 57, 75-76, 78 (setting out standards for determining relevant elections to analyze and requiring "intensely local appraisal" to determine candidates of choice); *see also Bone Shirt II*, 461 F.3d at 1020. Accordingly, the Court credits Dr. Engstrom's testimony.

### b) Candidates of choice by election year

In the following section, I have identified candidates of choice based on Dr. Engstrom's case-by-case approach. Each of the elections held since 2011 is described briefly below. For contested elections, tables are provided that identify each candidate's name, race, total number of votes received, and level of support (the "point estimate") among Black and white voters with confidence intervals for each estimate as calculated by Dr. Engstrom and Dr. Rodden, and the winning candidates. Percentages reported are the percentage of votes received by a candidate from each group, not the percentage of voters supporting from each group supporting each candidate.[23] *Joint Stip.* ¶ 61; *see* Deft-FFSD A, Rodden Rep., ¶ 45, Fig. 8 (p. 25); PLTF-67, Underlying Data for Fig. 8 in Rodden Report (Ex. 10 to Dep. of Jonathan Rodden, Aug. 20, 2015); PLTF-68, Rodden's Underlying Data Reformatted (Ex. 11 to Dep. of Jonathan Rodden, Aug. 20, 2015); PLTF-52, Engstrom Rep., ¶¶ 15-39, Tbl. 1 (pp. 17-19); PLTF-53, Engstrom Rebuttal, Tbls. 1-5 (pp. 10-13).

The parties' experts agreed that in FFSD Board elections, African Americans were more likely to vote for African American candidates and whites were more likely to vote for white candidates for the past sixteen years. Deft-FFSD B, Supplemental Report of Jonathan Rodden: Racial Bloc Voting and Cohesion, July 2, 2015 ("Rodden Bloc Voting Rep."), at ¶ 2; *Engstrom*

---

[23] In an at-large district, counting *votes* versus *voters* makes a difference. For example, take a jurisdiction with two voters who each cast both votes they have available. A candidate who receives the support of both voters will tally only half (2) of the voters' combined four votes.

*Testimony*, Trial Tr. vol. 4, *19:17–20:10*; *see also* Dep. of Jowei Chen, Aug. 19, 2015 ("Chen Dep."), at 54:23–56:3; PLTF-52, Engstrom Rep., ¶ 43 (regarding 2011–2015).

The parties' experts, both using EI analysis, did not materially disagree as to the various levels of support each Board candidate received among different racial groups in each of the elections in 2011–2015, and report consistent estimates of the respective levels of support received by the candidates from Black and white voters. *Joint Stip.* ¶ 60; *see* PLTF-53, Engstrom Rebuttal, ¶¶ 3-4, Tbls. 1-5 (pp. 10-13).

### i.    The 2011 election

In 2011, nine candidates (incumbents Graham, Clark, and Lentz and six challengers, Chris Martinez, Paul Morris, Robert Chabot, Vanessa Hawkins, Brian Scott Ebert, and Joseph Hosea) ran for three seats. *Joint Stip.* ¶ 118. Martinez, a white-Hispanic candidate, and Chabot and P. Morris, both white, were successful. *Joint Stip.* ¶¶ 118-119; PLTF-53, Engstrom Rebuttal, ¶ 9 n.5; PLTF-8, Official 2011 FFSD Election Results.

Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2011 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| Candidate | Rodden | Engstrom | Rodden | Engstrom |
| Chabot* (W) 3,080 votes | 7.31% (5.33 – 11.04%) | 7.1% (4.6 – 9.6%) | 14.05% (11.68 – 17.01%) | 15.6% (13.4 – 18.3%) |
| Clark (W) (incumbent) 2,257 votes | 12.58% (10.33 – 14.42%) | 13.5% (11.2 – 16.1%) | 8.92% (7.96 – 9.97%) | 8.0% (6.5 – 9.3%) |
| Ebert (W) 2,667 votes | 7.45% (4.86 – 10.40%) | 7.9% (5.4 – 11.3%) | 13.61% (11.19 – 16.12%) | 14.1% (11.6 – 16.2%) |
| Graham (B) (incumbent) 2,795 votes | 21.95% (16.32 – 28.80%) | 24.1% (21.0 – 27.0%) | 9.04% (7.76 – 10.43%) | 6.1% (4.3 – 7.7%) |
| Hawkins (B) 2,890 votes | 21.87% (14.10 – 30.46%) | 21.5% (17.2 – 25.5%) | 9.20% (7.52 – 10.68%) | 7.4% (5.4 – 9.4%) |
| Hosea (W) 566 votes | 6.88% (6.18 – 7.80%) | 3.2% (2.8 – 3.5%) | 2.91% (2.65 – 3.21%) | 3.1% (2.8 – 3.5%) |
| Lentz (W) (incumbent) 1,027 votes | 7.58% (6.38 – 9.20%) | 4.7% (3.1 – 7.6%) | 4.49% (3.76 – 5.38%) | 4.5% (3.2 – 5.7%) |
| Martinez* (W-H) 4,598 votes | 5.93% (4.60 – 8.17%) | 8.6% (7.0 – 10.6%) | 22.97% (19.58 – 25.63%) | 24.9% (23.7 – 25.9%) |
| P. Morris* (W) 3,305 votes | 8.44% (6.62 – 11.00%) | 9.3% (7.6 – 11.4%) | 14.79% (12.46 – 17.03%) | 16.1% (14.4 – 18.1%) |

* Indicates winner

*Joint Stip.* ¶ 119.  Because this was a three-seat election, the highest percentage of votes that any candidate could receive in absence of bullet voting is 33%.

Graham received the highest estimated level of support, and Hawkins the second-highest estimated level of support, among Black voters in the 2011 election (24.1% and 21.5%, respectively, according to Engstrom).  *Joint Stip.* ¶¶ 119-21.  Both of these candidates received cohesive support from Black voters.  *Engstrom Testimony*, Trial Tr. vol. 4, 24:25–26:1.

Although Clark received the third-highest estimated level of support among Black voters, *Joint Stip.* ¶ 120, his percentage of the Black vote (13.5% according to Engstrom) was substantially lower, and statistically significantly lower than the estimated level of support for

Graham or Hawkins.  *Engstrom Testimony,* Trial Tr. vol. 4, 26:2-20 ("[t]here's no cohesive vote for Clark. He may come in third, but that doesn't mean he—I wouldn't call him a black-preferred candidate. He's so far behind the two leading candidates among black voters.").

Graham and Hawkins together received an estimated 45.6% of the total votes cast by African Americans in a race with nine candidates.  *Joint Stip.* ¶ 119.  Graham and Hawkins, who are Black, were the only Black-preferred candidates in 2011.  Based on the level of support he received, Clark, who is white, was not a Black-preferred candidate.  *Engstrom Testimony,* Trial Tr. vol. 4, 25:24–26:7.

Graham and Hawkins received minimal support from white voters.  *Engstrom Testimony,* Trial Tr. vol. 4, 25:18-23 (white crossover voting for Black-preferred candidates in 2011 was "minimal," at 6.1% for Graham and 7.4% for Hawkins).  Neither Graham nor Hawkins was elected to one of the three available seats on the Board in 2011.  *Joint Stip.* ¶ 123.

ii.        The 2012 election

In 2012, three candidates (incumbent Schroeder and two challengers, Ebert and Barbara Morris) ran for two seats.  Ebert and Schroeder, both white candidates, were successful.  *Joint Stip.* ¶ 129.

Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2012 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Ebert* (W) 2,809 votes | 23.09% (16.64 – 28.70%) | 23.1% (18.1 – 28.2%) | 46.93% (39.08 – 53.79%) | 46.3% (43.8 – 48.5%) |
| B. Morris (B) 1,988 votes | 51.33% (34.94 – 75.04%) | 51.9% (45.7 – 58.4%) | 12.01% (6.96 – 17.76%) | 12.8% (10.1 – 15.6%) |
| Schroeder* (W) (incumbent) 2,566 votes | 25.58% (15.90 – 36.68%) | 25.0% (19.8 – 29.9%) | 41.05% (33.88 – 47.71%) | 40.9% (38.7 – 43.5%) |

* Indicates winner

*Joint Stip.* ¶ 130.  Because this was a two-seat election, the highest percentage of votes that any candidate could receive in absence of bullet voting is 50%.

B. Morris, who was the lone Black candidate, was the top-ranked candidate among Black voters, and received the highest-estimated level of support among Black voters.  *Joint Stip.* ¶ 131.  In fact, she received over 50% of votes cast by Black voters, indicating essentially unanimous Black support for her candidacy and that at least some bullet-voted for her.  *Rodden Testimony*, Trial Tr. vol. 5, 67:20-25, 203:19–204:5; *see also id.* at 203:19–204:5; *Engstrom Testimony,* Trial Tr. vol. 4, 27:24–28:4.

Schroeder and Ebert, who are both white, received the second-highest and third-highest estimated levels of support, 25.0 percent and 23.1 percent respectively, among Black voters.  *Joint Stip.* ¶¶ 130, 132.

Dr. Rodden, employing the point estimate approach, identified Schroeder, who is white and who was elected, as a Black-preferred candidate, because Schroeder was estimated to have received the next-highest number of Black votes. *See* Deft-FFSD A, *Rodden Rep.*, ¶ 57.  But as Dr. Engstrom explained, Schroeder's level of support among Black voters (25.0% was "statistically significantly lower" (in fact less than half)), than that of B. Morris, who received 51.9%. *Engstrom Testimony*, Trial Tr. vol. 4, 29:15-30:2; PLTF-52, *Engstrom Rep.*, Table 1 (p. 18); *see also Rodden Testimony,* Trial Tr. vol. 5, 205:10-17; *PLTF-68, Rodden's Underlying Data Reformatted; PLTF-53, Engstrom Rebuttal, Tbl. 2 (p. 11).*  Moreover, Black voters' estimated support for their last-choice candidate, Ebert (23.1%), was statistically indistinguishable from that of Schroeder.  *Engstrom Testimony*, Trial Tr. vol. 4, 30:3-11; *Rodden Testimony*, Trial Tr. vol. 5, 206:1-12; *Joint Stip. ¶ 132.*  In essence, B. Morris had universal support from Black voters, who (when not bullet-voting) split their remaining votes roughly

equally between the two remaining candidates.  Because Black voters' support for B. Morris was cohesive and about double the support for the next-highest candidate, Schroeder, whose vote total was not statistically different from Ebert's, Dr. Engstrom appropriately identified B. Morris as the only Black-preferred candidate, and declined to characterize the election of Schroeder as a win for Black voters.  *Engstrom Testimony*, Trial Tr. vol. 4, 30:3-23.  I find that there was one Black-preferred candidate in the 2012 two-seat election: B. Morris, who lost.  Schroeder and Ebert were elected.  *Joint Stip.* ¶ 129; Trial Tr. vol. 4, 27:22-23.

Additionally, B. Morris received 12.8 percent of white voters' votes, which is "minimal," given that there were only three candidates running for two seats.  PLTF-52, Engstrom Rep., ¶ 21; Trial Tr. vol. 4, 28:5-10.

### iii.    The 2013 election

In 2013, four candidates (incumbents Hogshead and Henson, and two challengers, Keith Brown and Larry Thomas) ran for two seats.  Brown and Hogshead, both white, were successful. *Joint Stip.* ¶ 137.

Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2013 Election | | | | |
|---|---|---|---|---|
| | Estimated Black Support (with confidence interval) | | Estimated White Support (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Brown* (W) 2,234 votes | 22.74% (15.59 – 35.35%) | 20.2% (16.2 – 24.3%) | 32.01% (23.98 – 40.51%) | 33.9% (31.8 – 36.0%) |
| Henson (B) (incumbent) 2,109 votes | 38.66% (29.88 – 48.47%) | 43.7% (37.2 – 50.7%) | 20.06% (12.20 – 27.27%) | 17.0% (13.3 – 20.4%) |
| Hogshead* (W) (incumbent) 2,475 votes | 25.00% (17.41 – 37.61%) | 24.2% (20.0 – 27.8%) | 34.49% (26.31 – 42.70%) | 37.2% (35.0 – 39.4%) |
| L. Thomas (B) 875 votes | 13.60% (11.86 – 16.33%) | 11.9% (9.4 – 15.3%) | 13.44% (11.89 – 15.16%) | 11.8% (10.0 – 13.7%) |

* Indicates winner

*Joint Stip.* ¶ 138.

Henson, who is African American, received 43.7 percent of Black voters' votes, the highest estimated level of support among Black voters in the 2013 election. *See Joint Stip.* ¶¶ 138, 140. Hogshead, who is white, received 24.2 percent of Black voters' votes, the second-highest estimated level of support among Black voters. *See Joint Stip.* ¶¶ 138, 139. Henson received a statistically significant and substantially greater estimated portion of Black voters' votes than Hogshead. *Engstrom Testimony,* Trial Tr. vol. 4, 31:25–32:8, 32:25–33:12.

As estimated by Dr. Rodden and Dr. Engstrom, the difference in the levels of support among Black voters received by Hogshead and the third-place candidate, Brown, is not statistically significant. *See Joint Stip.* ¶ 138; *Rodden Testimony*, Trial Tr. vol. 5, 197:21–198:5.

Because he was the only candidate to receive cohesive support from Black voters in 2013, and because his level of support was substantially higher than the candidate with the second-highest level of support, Henson was the only Black-preferred candidate in the 2013 election. *See Engstrom Testimony,* Trial Tr. vol. 4, 31:25–33:9.

Henson was the third-place candidate among white voters, receiving 17.0 percent of their votes, which is a "small" portion of white voters' votes. *Engstrom Testimony,* Trial Tr. vol. 4, 32:9-18; *see Joint Stip.* ¶ 138. Henson was not elected to one of the two available seats in 2013. *Joint Stip.* ¶ 141.

Dr. Rodden, employing the point estimate approach, characterized Hogshead as the second Black-preferred candidate in this election. But Hogshead received less than two-thirds of the support from Black voters than Henson received. Moreover, because Hogshead's level of support among Black voters was statistically indistinguishable from that of another candidate, Brown, one cannot even state with statistical confidence that she in fact received the second-

highest number of votes from Black voters. In these circumstances, it is inappropriate to characterize Hogshead's election as a victory for Black voters, particularly in light of Henson's loss.[24] *Engstrom Testimony*, Trial Tr. vol. 4, 33:12-33:22.  I find that there was one Black-preferred candidate in the 2013 two-seat election: Henson, who lost.

iv.    <u>The 2014 election</u>

In 2014, eight candidates (two incumbents, Rob Chabot and Paul Morris, and six challengers, Donna Paulette-Thurman, James Savala, Kimberly Benz, F. Willis Johnson, LaWanda Wallace, and Larry Thomas), ran for three seats.  *Joint Stip.* ¶ 145.  Chabot and P. Morris, both white, and Paulette-Thurman, one of five African American challengers, were successful.  *Joint Stip.* ¶ 145.

Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

---

[24] Based on the fact that Dr. Rodden estimates that Hogshead finished among the top two candidates among Black voters in 2013, Dr. Rodden retroactively designated her as a successful Black-preferred candidate when she ran unopposed in 2010 and 2007.  *See* Trial Tr. vol. 5, 112:5–113:10; 201:17–202:3 (Rodden testimony). Yet Hogshead was quite unpopular among Black voters up until that point, finishing fifth-place out of five candidates in terms of Black support in the two-seat 2004 election, and third-place out of four candidates in the 2-seat 2001 election, and could not be considered a Black-preferred candidate in either election.  *See id.*, 199:14–201:14. Indeed, when employing the point estimate approach, Hogshead had never been a Black-preferred candidate prior to 2013.  *See id.*, 201:17–202:3.

| The 2014 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Benz (W) 2,231 votes | 6.00% (4.79 – 7.49%) | 3.3% (2.1 – 4.7%) | 19.06% (15.29 – 23.34%) | 22.0% (20.5 – 23.4%) |
| Chabot* (W) (incumbent) 2,898 votes | 6.20% (4.28 – 9.02%) | 4.8% (2.4 – 9.4%) | 25.68% (19.80 – 32.40%) | 29.0% (27.1 – 30.6%) |
| Johnson (B) 2,118 votes | 21.54% (15.72 – 29.06%) | 24.5% (21.1 – 27.2%) | 5.71% (4.10 – 7.84%) | 2.8% (1.5 – 4.5%) |
| P. Morris* (W) 2,516 votes | 5.78% (4.39 – 7.90%) | 3.2% (2.0 – 5.4%) | 22.32% (17.69 – 27.83%) | 25.8% (24.4 – 27.1%) |
| Paulette-Thurman* (B) 2,733 votes | 24.21% (17.52 – 32.95%) | 26.1% (23.7 – 28.5%) | 8.92% (6.28 – 11.94%) | 8.4% (6.9 – 10.0%) |
| Savala (B) 2,425 votes | 21.36% (15.76 – 28.73%) | 24.7% (22.3 – 26.8%) | 8.74% (6.09 – 11.37%) | 7.0% (4.9 – 8.7%) |
| L. Thomas (B) 568 votes | 6.61% (5.68 – 7.68%) | 4.7% (3.4 – 6.3%) | 5.09% (4.42 – 5.76%) | 3.2% (2.3 – 4.0%) |
| Wallace (B) 590 votes | 8.31% (6.58 – 10.85%) | 8.6% (6.4 – 10.9%) | 4.47% (3.95 – 5.03%) | 1.9% (1.2 – 2.6%) |

* Indicates winner

*Joint Stip.* ¶ 146.

Paulette-Thurman, Johnson, and Savala, who are all African American, received the highest, second-highest and third-highest estimated level of support among Black voters, respectively, in the 2014 election. *See Joint Stip.* ¶¶ 146, 148. The estimated levels of support among Black voters for Paulette-Thurman, Johnson, and Savala are each more than double that for the candidate with the fourth-highest estimated support, Wallace, who is also African American. *Joint Stip.* ¶ 150.

Black voters cohesively supported each of these three candidates. *Engstrom Testimony,* Trial Tr. vol. 4, 34:24–35:23 (Black voters "cohesively supported each of those three candidates . . . . if you add them together, that's 75 percent of the votes in a nine-candidate contest. That's cohesion. I don't *see* how you could describe it as anything else."). Because of the cohesive

support they received from Black voters, and the substantial difference in support between Black voters' support for those three candidates and the rest of the pool, Paulette-Thurman, Johnson, and Savala were Black voters' preferred candidates in 2014.

Each of the three Black-preferred candidates received minimal white support, with less than 10 percent of white voters' votes. Paulette-Thurman received 8.4 percent, Savala received 7.0 percent, and Johnson received 2.8 percent. *Engstrom Testimony,* Trial Tr. vol. 4, 36:2-14. None of these three candidates were preferred by white voters, leading Dr. Rodden to concede that this election was polarized. *See Rodden Testimony,* Trial Tr. vol. 5, 62:8-14.

I find that there were three Black-preferred candidates in the 2014 three-seat election: Paulette-Thurman, Savala, and Johnson. Paulette-Thurman was elected, along with Chabot and Paul Morris, but Johnson and Savala were not elected. *Joint Stip.* ¶¶ 145, 152.[25]

Special Circumstances in the 2014 Election

The 2014 election took place less than one month after the "controversial" resignation of Dr. Art McCoy, the first African American District Superintendent. *Joint Stip.* ¶ 160; Deft-FFSD A, Rodden Rep., ¶¶ 39, 50; PLTF-53, Engstrom Rebuttal, ¶ 15. Dr. McCoy is highly respected within the African American community, whose members viewed him as a very successful and effective superintendent. *Joint Stip.* ¶ 162; PLTF-117, Hudson Decl., ¶ 8; PLTF-119, Pruitt Decl., ¶ 22; PLTF-116, Decl. of Charles Henson, Sept. 15, 2015 ("Henson Decl."), ¶ 15; PLTF-115, Decl. of Doris Graham, Sept. 23, 2015 ("Graham Decl."), ¶ 18; Paulette-

---

[25] The fact that Black voters in this election were only able to elect one of their three candidates of choice highlights the basic defect in the top-ranked candidate approach. Under the top-ranked candidate approach, the 2014 election counts as an unequivocal win for Black voters because their estimated top-choice candidate (Paulette-Thurman) won. But two other unsuccessful candidates who received roughly the *same level* of support from Black voters (in fact, Savala and Johnson each received estimated percentages of Black votes that are statistically indistinguishable as compared to Paulette-Thurman's estimated percentage) both lost. Put another way, there is no dispute among the parties that Black voters supported three candidates in this election at essentially the same level, such that it is impossible to determine with statistical confidence which of the three actually received the highest number of Black votes; and yet the top-ranked candidate approach ignores that two of these three candidates lost.

Thurman Dep., 82:1-3; Trial Tr. vol. 1, 45:8–47:12 (Pruitt testimony); Trial Tr. vol. 2, 33:19–35:13, 38:11-12 (Henson testimony); Trial Tr. vol. 2, 83:9-24 (Graham testimony).

It is undisputed that the separation of the Superintendent from the District led to a high level of interest among African American voters and "an unprecedented five African American challengers." *Joint Stip.* ¶ 160-64; Deft-FFSD A, Rodden Rep., ¶¶ 39, 50; *see also Rodden Testimony*, Trial Tr. vol. 5, 43:17-20; *Johnson Testimony*, Trial Tr. vol. 3, 132:16-19; *Paulette-Thurman Testimony*, Trial Tr. vol. 4, 140:23–141:5. The District's expert Dr. Rodden testified that Dr. McCoy's suspension led to an increase in racially polarized voting. *See Rodden Testimony*, Trial Tr. vol. 5, 43:13-23.

The three top-ranked candidates among African American voters, Paulette-Thurman, Johnson, and Savala, ran together under the name "Grade A for Change." *See* Trial Tr. vol. 6, 12:10-25 (Graves testimony). Part of their motivation to run as Grade A for Change was because "they were concerned about how Dr. McCoy was treated" and "because the Board did not represent the community in terms of race." *Joint Stip.* ¶ 164; Paulette-Thurman Dep., at 37:18-22, 38:5-9; *see* PLTF-118, Decl. of F. Willis Johnson, Sept. 29, 2015 ("Johnson Decl."), at ¶¶ 10, 15; *see also* Trial Tr. vol. 4, 136:1-22 (Paulette-Thurman testimony); *id.* at 138:8-11.

While these facts suggest that the 2014 FFSD election was marked in part by special circumstances, neither party has presented evidence showing that or how the suspension of Dr. McCoy or the increase in racial polarization impacted the success of Paulette-Thurman, the one successful Black-preferred candidate that year. As a result, while it is apparent that the 2014 election was marked by somewhat special circumstances in the sense that racial polarization increased, I cannot say that the success of Paulette-Thurman should be discounted. I do find, however, that it should be afforded slightly less probative value than if there were no special

circumstances surrounding the election.

v.     The 2015 election

In 2015, five candidates (incumbent Brian Scott Ebert and four challengers, Courtney Michelle Graves, Roger Hines, Donna Marie Dameron, and Michael Person) ran for two seats. Ebert, who is white, and Graves, who is African American, were elected. *Joint Stip.* ¶ 166; PLTF-52, Engstrom Rep., ¶¶ 33-34.

Dr. Rodden's and Dr. Engstrom's EI estimates and confidence intervals are as follows:

| The 2015 Election | | | | |
|---|---|---|---|---|
| | **Estimated Black Support** (with confidence interval) | | **Estimated White Support** (with confidence interval) | |
| **Candidate** | **Rodden** | **Engstrom** | **Rodden** | **Engstrom** |
| Dameron (W) 1,711 | 14.09% (11.18 – 17.92%) | 14.5% (11.1 – 18.3%) | 10.08% (8.56 – 11.54%) | 9.9% (7.5 – 12.1%) |
| Ebert* (W) (incumbent) 4,697 | 10.06% (6.43 – 13.41%) | 9.8% (7.7 – 12.2%) | 40.89% (35.17 – 46.53%) | 43.0% (39.6 – 45.9%) |
| Graves* (B) 5,279 | 49.43% (37.90 – 60.83%) | 52.4% (48.7 – 56.0%) | 22.90% (17.10 – 29.46%) | 21.4% (18.3 – 24.8%) |
| Hines (B) 2,728 | 13.89% (9.84 – 18.26%) | 12.3% (8.9 – 15.9%) | 19.37% (16.06 – 23.09%) | 19.7% (17.7 – 21.9%) |
| Person (B) 1,146 | 12.53% (9.43 – 16.86%) | 11.0% (8.6 – 13.5%) | 6.77% (5.63 – 7.99%) | 6.0% (4.8 – 7.5%) |

\* Indicates winner

*Joint Stip.* ¶ 167.

Graves was the top-ranked candidate and received the highest estimated level of support among Black voters in the 2015 election. *See Joint Stip.* ¶¶ 167, 169. Black voters gave cohesive support to Graves (52.4%). *Engstrom Testimony*, Trial Tr. vol. 4, 37:19–38:4. Graves's level of support exceeded 50%, indicating that she likely received the support of nearly all Black voters, and some cast a bullet vote only for her. *See Rodden Testimony*, Trial Tr. vol. 5, 67:20–68:6, 203:19–204:5.

Dameron, who is white, received the second-highest estimated level of support among Black voters (14.5%). *Engstrom Testimony*, Trial Tr. vol. 4, 38:8-21. The difference between Graves and Dameron in terms of estimated support among Black voters is statistically significant. *Joint Stip.* ¶ 169. Dameron's estimated level of support is approximately 35 percentage points lower than and less than one-third the estimated level of Black support for Graves. *Joint Stip.* ¶ 170.

The point estimate approach, however, treats Dameron as if she were just as much of a Black-preferred candidate as Graves, even though Dameron was estimated to have received far fewer votes cast by Black voters (less than one-third the number received by Graves). It does so even though Dameron's level of Black support was statistically indistinguishable from those of two other candidates (Hines and Person), such that one cannot say with statistical confidence that she in fact received the second-highest number of votes cast by Black voters.

As estimated by both Dr. Rodden and Dr. Engstrom, the difference in the estimated levels of Black support received by Dameron and the candidate with the third-highest estimated level of Black support, Hines, is not statistically distinguishable. *Joint Stip.* ¶ 171; *Rodden Testimony*, Trial Tr. vol. 5, 192:4-20.

Based on the cohesive support that Graves, and only Graves received, I find that Graves was the only Black-preferred candidate in 2015. PLTF-52, *Engstrom Rep.*, ¶ 34; *Engstrom Testimony*, Trial Tr. vol. 4, 38:1-7. Dr. Graves was also a preferred candidate among white voters. *Rodden Testimony*, Trial Tr. vol. 5, 65:11-23; *Engstrom Testimony*, Trial Tr. vol. 4, 27:19-22. Graves and Ebert were elected.

<u>Special Circumstances in the 2015 Election</u>

The 2015 election was held six months after the death of Michael Brown in Ferguson, which led to large-scale demonstrations in the area, ongoing unrest, national attention, and a

70

Department of Justice investigation into the Ferguson Police Department. Michael Brown's death also had a substantial impact on FFSD itself; a protest was organized by District high school students, schools closed for a week, and counseling was provided to teachers, staff, and students. Deft-FFSD A, Rodden Rep., ¶¶ 28, 40; PLTF-120, U.S. Dep't of Justice, Investigation of the Ferguson Police Department, Mar. 4, 2015, at 5-6; *see also* Ebert Dep., 109:10-20; Brown Dep., 49:7-13; Morris Dep., 98:16-24; Paulette-Thurman Dep., 73:5–74:1; Dep. of Courtney Graves, July 1, 2015 ("Graves Dep."), 59:4-9; *Joint Stip.* ¶¶ 177-79; Chabot Dep. 82:22–83:8; Trial Tr. vol. 3, 82:16–83:4 (Green testimony).

On March 4, 2015, one month before the 2015 Board election, the Department of Justice released a report detailing the results of its investigation into the Ferguson Police Department. *Joint Stip.* ¶ 179. It found extensive discrimination by government officials in Ferguson, including racial bias and intentional discrimination in local law enforcement and municipal court practices, and referenced at least two incidents with school resource officers within FFSD schools. *See* PLTF-120, Investigation of the Ferguson Police Department, at 15-78; *see also Kimball Testimony*, Trial Tr. vol. 2, 155:7-16. The Department of Justice's investigative report specifically cited incidents of unconstitutional policing activities within FFSD schools. *Id.*; PLTF-120, Investigation of the Ferguson Police Department, at 37-41.

The events surrounding the death of Michael Brown and the release of the Department of Justice's report brought national and local attention to the area. *Joint Stip.* ¶ 178. Candidates, and voters more broadly, testified that they were aware of these events and there was some national interest in area elections, including the April 2015 election for the City of Ferguson's City Council, which was on the ballot for many FFSD voters. *See* Hogshead Dep., 64:5-8 (national media attention on April 2015 election was unique in her 23 years on the board); *see*

*also* PLTF-121, John Eligon, Election in Scarred Ferguson Carries Hope of 'New Tomorrow,' N.Y. Times (Apr. 4, 2015) (regarding Ferguson city council race); PLTF-122, Carey Gillam, Race, reforms eyed as Ferguson, Missouri, voters head to polls, Reuters/Business Insider (Apr. 7, 2015) (same).

Plaintiffs argue that the death of Michael Brown and the local events in its aftermath had an impact on the FFSD 2015 election. It is undisputed that there were get-out-the-vote efforts in the area that may have caused greater rates of voter turnout than usual. *See Joint Stip.* ¶ 181-182; Deft-FFSD A, Rodden Rep., ¶ 28; PLTF-123, Carey Gillam, *Surge in voter turnout gives blacks new voice in Ferguson, Missouri*, REUTERS, Apr. 9, 2015 (reporting surge in turnout for Ferguson city council race); *see also* Trial Tr. vol. 4, 109:6-16 (Hudson testifying that "[a]fter Mike Brown was killed, the entire world was paying attention to what was going on in our community, and I think that definitely had an impact on our elections as well").

There is evidence that candidate behavior in the local April 2015 elections was affected by the events surrounding Michael Brown's death. One white candidate chose not to run in the Ferguson city council election as a direct result of the events surrounding Michael Brown's death. Morris Dep., 99:2–100:6. And only one incumbent white candidate ran for a FFSD Board seat; a longtime incumbent white candidate, Schroeder, decided not to run, leaving open a seat. At the same time, Black candidates joined the FFSD candidate pool in direct response to these events. *See* Trial Tr. vol. 6, 6:24–7:3 (Graves testimony). As a result of these events, there was increased interest among African American candidates, and only one major white candidate in the candidate pool. *See Engstrom Testimony*, Trial Tr. vol. 4, 57:2–59:20.

Voting patterns also changed in 2015. Dr. Graves explicitly encouraged a bullet voting strategy. Trial Tr. vol. 6, 17:4-6. As Dr. Rodden acknowledges, Dr. Graves won by a

"landslide," there was suddenly a "striking" "surge" in white turnout, and unprecedented white support for Black candidate," and her victory is due, in partly, to her use of a "single-shot" voting strategy. PLTF-53, *Engstrom Rebuttal*, ¶ 16 (quoting Deft-FFSD A, *Rodden Rep.*, at 22, 26-27).[26] Such changes suggest the existence of special circumstances. *Gingles*, 478 U.S. at 57.

The District argues that the 2015 election was not impacted by special circumstances because Dr. Graves' victory was the product of demographic changes that have occurred gradually over the past decade, as well as Dr. Graves' qualifications and excellent campaign strategy. While there can be little doubt that Dr. Graves ran an effective campaign, it does not diminish the fact that Dr. Graves' overwhelming level of support was an exceptional occurrence rarely experienced by Black-preferred candidates, and therefore not necessarily evidence of a trend or the African American community's sudden equal opportunity to elect preferred candidates. As Dr. Engstrom testified, "In my roughly 40 years as an expert witness in voting rights cases, I do not recall a post-litigation election that departed as dramatically from previous elections." PLTF-53, *Engstrom Rebuttal*, ¶ 17.

Moreover, Dr. Graves' success must be viewed under the totality of the circumstances. Taking the totality of the circumstances into account, I find that Plaintiffs' explanation that the election was impacted by the events of late 2014, including the death of Michael Brown, subsequent protests, DOJ action, and national news coverage, is more plausible than the District's argument that there was no such impact.

---

[26] Plaintiffs also argue that the 2015 election was special because it took place post-litigation, less than four months after the complaint in this case was filed. *See Gingles*, 478 U.S. at 75-77. Courts may reduce the weight accorded to Black electoral successes where those successes "increased markedly in . . . an election that occurred after the instant lawsuit had been filed." *Id.* (citing S. Rep. No. 97-417, at 29 n.115 (1982)). While it is undisputed that the 2015 election took place post-litigation, plaintiffs have not produced evidence showing that a substantial number of voters were aware of this suit being filed or that that knowledge had any impact on their voting behavior. As a result, the mere fact that the election took place post-litigation does not greatly impact my analysis of whether the 2015 election was marked by special circumstances.

Accordingly, I find that the 2015 FFSD election was marked by special circumstances. Plaintiffs have not, however, established that the election was so affected by special circumstances that I should discount the overwhelming success experienced by Dr. Graves in that election. As a result, I will consider the evidence of special circumstances in context, affording slightly less weight to the successes of a Black-preferred candidate than I would in the absence of these special circumstances.

vi.      Summary of findings identifying candidates of choice

In sum, the following eight candidates were preferred by Black voters between 2011 and 2015:

- In 2011, Doris Graham and Vanessa Hawkins were the Black-preferred candidates, and both lost.

- In 2012, Barbara Morris was the Black-preferred candidate, and lost.

- In 2013, Charles Henson was the Black-preferred candidate, and lost.

- In 2014, Donna Paulette-Thurman, F. Willis Johnson, and James Savala were the Black-preferred candidates, and two out of three (Johnson and Savala) lost.

- In 2015, Courtney Graves was the Black-preferred candidate, and won.

4.  *Testimony about cohesion and crossover voting*

For each election, Dr. Engstrom considered what perfect cohesion would look like in the absence of bullet voting: a candidate in a two-seat election could win one-half (50%) of Black voters' votes, and a candidate in a three-seat election could win one-third (33%) of Black voters' votes. *See, e.g.*, PLTF-52, *Engstrom Rep.*, ¶ 13; *see Engstrom Testimony*, Trial Tr. vol. 4, 24:7-12. Keeping those thresholds in mind, he classified support for a particular candidate as cohesive if they received a significant portion of the relevant threshold of possible Black votes. *See Engstrom Testimony*, Trial Tr. vol. 4, 24:25–26:1 (2011); Trial Tr. 27:24–28:4 (2012); Trial

Tr. vol. 4, 31:25–32:8, 32:25–33:12 (2013); Trial Tr. vol. 4, 34:24–35:23 (2014); Trial Tr. vol. 4, 37:23-38:4 (2015).

Dr. Rodden took a slightly different approach, focusing on the number of votes each candidate received. By using this approach, however, Dr. Rodden "tend[ed] to understate the degree of racial polarization" by drawing improper conclusions about the level of *voter* support from the *votes* a candidate received. *Kimball Testimony*, Trial Tr. vol. 2, 178:12–179:12. For example, when discussing the vote total for 2013 candidate Charles Henson in overwhelmingly African American precincts, Dr. Rodden mischaracterized this as "only" 39%, where—because of the at-large system and the relative rarity of bullet voting—39% almost certainly represents support from a large majority of voters. *See Kimball Testimony*, Trial Tr. 179:19–183:13. When discussing B. Morris's level of support in 2012, Dr. Rodden claims that B. Morris "failed to achieve a majority," even though Dr. Rodden estimated that B. Morris received 51.33% of support using EI, and 56% of the votes in precincts where 80 percent of the VAP was Black using HP analysis. *See* PLTF-49, *Kimball Rebuttal Rep.*, p. 5 (Tbl. 2); Deft-FFSD A, *Rodden Rep.*, ¶ 57.

Although both Dr. Rodden and Dr. Engstrom testified that Black-preferred candidates received some white support, Dr. Engstrom testified that the level of crossover voting (*i.e.*, white support for Black-preferred candidates) was generally "minimal" or "low" in FFSD. *See Engstrom Testimony*, Trial Tr. vol. 4, 25:18-23 (white crossover voting for Black-preferred candidates in 2011 was "minimal," at 6.1% and 7.4%, respectively); Trial Tr. vol. 4, 28:5-10 (same in 2012; white support for the sole Black-preferred candidate was a "minimal" 12.8% even though there were only three candidates); Trial Tr. vol. 4, 32:2-14 (in 2013, the sole Black-preferred candidate received a "[s]mall" amount of crossover votes at 17 percent); Trial Tr. vol.

4, 36:2-14 (in 2014, the three Black-preferred candidates received "minimal" white support, at 8.4%, 7.0%, and 2.8%, respectively); Trial Tr. vol. 4, 38:22-24 (in 2015, the sole Black-preferred candidate received 21.4% of white votes and was elected); Trial Tr. vol. 4, 62:25–64:20 (based on Engstrom's calculations of crossover votes in his case-by-case analysis, he "wouldn't say that crossover voting among whites was significant" in any of the elections he analyzed).

Analyzing the older, less probative elections shows a similar pattern. In the past sixteen years, seven out of nineteen Black-preferred candidates (36.8%) in contested elections were successful. In the past decade, four out of twelve Black-preferred candidates were successful (33.3%). Excluding the monoracial election (2009) exacerbates the trend. Dr. Engstrom's testimony that white bloc voting usually vetoed Black voters' choices since 2011 (with six out of eight Black-preferred candidates defeated during that time period) was credible and persuasive. *See, e.g.*, *Engstrom Testimony*, Trial Tr. vol. 4, 42:5-25; *see also id.* 46:11-17 (Engstrom rebutting Rodden's assertions); PLTF-52, Engstrom Rep., ¶ 45; *see also* PLTF-53, Engstrom Rebuttal, ¶¶ 5, 18.

Weighing the testimony, I find that Dr. Engstrom's characterization of crossover voting as "minimal" was more credible than Dr. Rodden's characterizations of crossover voting as "substantial," and white voters' support for certain Black-preferred candidates as "considerable." *See* Deft-FFSD B, *Rodden Bloc Voting Rep.*, ¶ 6; *Rodden Testimony,* Trial Tr. vol. 5, 55:11-17.

### 5. *Exogenous elections*

Exogenous elections generally have little probative value in determining whether Plaintiffs have satisfied *Gingles* II and III. As discussed above, I need not supplement endogenous election data where, as here, I have sufficient evidence from endogenous elections

from which to discern typical voting behavior and usual results. *See, e.g., Westwego*, 872 F.2d at 1208 n.8.

Here, Dr. Rodden's testimony about exogenous elections fails to provide persuasive evidence about the presence of the *Gingles* preconditions in FFSD elections for a number of reasons. The District's presentation of exogenous election results simply lists the race of the candidates and the aggregate total number of votes received by each candidate; it does not provide a polarization analysis of voting patterns broken down by race that would enable the Court to assess whether Black and white voters in FFSD in fact tended to prefer different candidates in these exogenous elections. The race of the candidate cannot be used as the sole criterion to identify candidate of choice of voters. *Blytheville*, 71 F.3d at 1386.

Moreover, the exogenous elections presented are very different from the local, nonpartisan, April Board elections in FFSD and, as a result, do not provide very probative evidence about Black voters' ability to elect their preferred candidates in FFSD Board elections. For example, the District introduced data from national, partisan elections held in November and, as Dr. Rodden agreed, voting patterns by race can differ in these sorts of elections, as compared to local, nonpartisan elections. *See Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *22 (S.D. Tex. Apr. 25, 2014).

Additionally, ten of the twelve exogenous contests presented by the District involved Black incumbent candidates. As Dr. Rodden acknowledged, incumbents running for reelection generally win with high levels of support. *Rodden Testimony*, Trial Tr. vol. 5, 187:13-15; s*ee Gingles*, 478 U.S. at 60 & n.29. And finally, of the two elections that did not involve a Black incumbent candidate, one featured a Black Democrat, who would be expected to win in a partisan contest in the predominantly Democratic St. Louis area, such as FFSD. *See Rodden*

*Testimony,* Trial Tr. vol. 5, 188:3-13. Taken together, the results of these exogenous elections do not cast doubt on the polarization evident from the endogenous elections in FFSD.

### C. *Gingles* II and III Conclusions of Law

As discussed above, I find that Dr. Engstrom's methods and analysis for identifying the preferences of African American voters are reliable and credible. As a result, I credit Dr. Engstrom's findings regarding the presence of racially polarized voting. Based on Dr. Engstrom's analysis and the findings of fact set out above, I conclude that Plaintiffs have met the requirements of *Gingles* II and III.

#### 1. *Plaintiffs have met the requirements of Gingles II and III using the appropriate legal standard*

##### a) *Plaintiffs' evidence demonstrates cohesiveness*

Plaintiffs have presented significant evidence that voting was racially polarized in FFSD in that there was a correlation between the race of the voters and the candidates they supported. *Engstrom Testimony*, Trial Tr. vol. 4, 42:13-15. Additionally, the parties' experts agreed that African Americans were more likely to vote for African American candidates and whites were more likely to vote for white candidates for the past sixteen years. Based on the voting behavior described above, I find that there was cohesiveness among Black voters behind candidates of choice in each of the five elections between 2011-2015. I conclude that voting in FFSD Board elections is racially polarized and that Plaintiffs have established the second *Gingles* prong.

##### b) *Plaintiffs' evidence demonstrates that Black-preferred candidates were usually defeated*

In addition, using the Black-preferred candidates identified above, I conclude that the 2011–2015 election data shows that Black-preferred candidates were usually not elected. In the past five years, two out of eight Black-preferred candidates were successful (25%). Analyzing the older, less probative elections (described below) shows a similar pattern. In the past sixteen

years, seven out of nineteen Black-preferred candidates (36.8%) in contested elections were successful. In the past decade, four out of twelve Black-preferred candidates were successful (33.3%). Excluding the 2009 monoracial election exacerbates the trend.

Meanwhile, the eight Black-preferred candidates identified by Dr. Engstrom received low levels of support among white voters, and none, except for the 2015 election conducted under special circumstances, were ever preferred by white voters. The *Gingles* standard presupposes the existence of some crossover voting, *see Gingles*, 478 U.S. at 56 (defining legally significant white bloc voting as "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes"), and "does not require a showing that white voters vote as an unbending monolithic bloc against whoever happens to be the minority's preferred candidate." *See Jenkins*, 4 F.3d at 1123. The Eighth Circuit has rejected an approach that refuses to see white bloc voting unless a particular percentage of white voters vote against the minority-preferred candidate. *Bone Shirt II*, 461 F.3d at 1026-27; *Blytheville*, 71 F.3d at 1387 (citing *Cane v. Worcester Cty.*, 35 F.3d 921, 926 (4th Cir. 1994) (finding 19% crossover insufficient)). Some white support is inevitable, and does not negate the finding that Black-preferred candidates usually lost due to bloc voting. As a result, the Court concludes that Plaintiffs have established the third *Gingles* prong.

### c)  Special circumstances

The conclusion that Plaintiffs have met *Gingles* III is also supported by my finding that the 2015 election occurred under somewhat "special circumstances." *See Gingles*, 478 U.S. at 57, 76; *Ruiz*, 160 F.3d at 557-58; *Blytheville*, 71 F.3d at 1389. As discussed above, voter and candidate behavior during that election was likely influenced, to some extent, by the death of Michael Brown and the resulting demonstrations. *See Collins II*, 883 F.2d at 1241-42; *see, e.g.*, *Ruiz*, 160 F.3d at 557-58; *Irving Indep. Sch. Dist.*, 2014 WL 4055366, at *18. It is also

undisputed that Dr. Graves ran a highly effective campaign in 2015, and successfully implored voters to bullet vote in an unprecedented effort in the District. The Supreme Court has recognized that especially successful bullet-voting in a given election may constitute special circumstances for purposes of this inquiry. *Gingles*, 478 U.S. at 57. As a result, I have given slightly less weight to the success of Dr. Graves, a Black-preferred candidate.

Plaintiffs also argued that the 2014 election took place under special circumstances. As discussed above, while I find that the 2014 election was marked by somewhat special circumstances, at least in the sense that racially polarized voting increased, I cannot say that the success of Paulette-Thurman should be discounted. I do find, however, that it should be afforded slightly less probative value than if there were no special circumstances surrounding the election.

2. *Plaintiffs have met Gingles II and Gingles III even under the District's approaches for identifying Black-preferred candidates*

Even if I were to adopt Dr. Rodden's methods for identifying Black-preferred candidates, I would conclude that Plaintiffs have satisfied *Gingles* II and III.

First, the top-ranked approach shows absolute polarization and same-group preferences: the top-ranked candidate among Black voters has always been different from the top-ranked candidate among white voters. Moreover, in the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was white (twelve of twelve). Meanwhile, all of the top-ranked candidates among Black voters were Black with the exception of the 2009 election, which featured no Black candidates.

Using the top-ranked candidate approach, white-preferred candidates always win and black-preferred candidates are defeated more often than not. In the twelve contested elections from 2000 through 2015, every top-ranked candidate among white voters was elected (twelve of twelve), as compared to six out of twelve top-ranked candidates among Black voters. Excluding

the monoracial 2009 election, the success rate is 45.5% (five of eleven) for top-ranked candidates for Black voters. In the five contested elections over the last five years (*i.e.*, from 2011 through 2015), every top-ranked candidate among white voters was elected (five out of five), as compared to only two out of five top-ranked candidates among Black voters. Notably, both of those victories occurred under special circumstances.

Second, applying the point estimate approach, the groups' preferences usually diverge, with white voters almost always preferring white candidates (93% of the time) and Black voters usually preferring Black candidates (63% of the time). Under this approach, white voters preferred Black candidates only twice: once in 2000, and not again until 15 years later in 2015. Moreover, using this approach, Black-preferred candidates usually lost (51.8% of the time) (*Gingles* III), while white-preferred candidates were almost always successful (88.9% won). The gap in success rates is larger in more recent years: using the point-estimate approach, 91.7% of white-preferred candidates were successful during the past five years, as compared to 33.3% of Black voters' preferred candidates.

The District's argument that under the point estimate approach, voting is not racially polarized because Black and white voters shared at least one preferred candidate in eight of twelve elections focuses on the wrong metric for measuring polarization.[27] With respect to assessing racial polarization, the appropriate yardstick is not the number of *elections* in which minority voters and white voters support different candidates, but rather the total number of *candidates* on which the groups' preferences diverge.[28] *See Gingles*, 478 U.S. at 56 ("The

---

[27] Notably, using the point estimate approach, much of what the District calls Black-preferred candidates' "success" rests on the election of six white candidates who were Black voters' second- or third-choice candidates *after* an African American candidate who received more of Black voters' votes lost. *See* PLTF-69, *Point Estimate Approach Worksheet (Ex. 12 to Dep. of Jonathan Rodden, Aug. 20, 2015)*; *Rodden Dep.*, at 136:22 – 137:6, 356:19 – 357:9 (chart) (Hirsch in 2000, Garofalo in 2001, Clark in 2002, Knorr in 2003, Schroeder in 2012, and Hogshead in 2013).

[28] The 2012 election highlights the flaws in the point estimate approach's mechanical nature in another respect. The

purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred *candidates*.") (emphasis added); *Jeffers v. Clinton*, 730 F. Supp. 196, 208 (E.D. Ark. 1989) (three-judge court), *aff'd mem.*, 498 U.S. 1019 (1991).

As noted, Black and white voters in FFSD rarely have preferred the same candidates. Even applying the point estimate approach, Black and white voters have diverged in terms of candidate preference about two-thirds of the time. Dr. Rodden noted the existence of some crossover voting from white voters for Black-preferred candidates, but some white support does not cancel out the finding that Black-preferred candidates usually lost due to bloc voting. The eight Black-preferred candidates identified by the Court received low levels of support among white voters, and none was ever preferred by white voters, save for the 2015 election under special circumstances when white voters' second-choice candidate, Graves, received less than half the votes of the white voters' most-preferred candidate.

In sum, even under the two methods of identifying candidates of choice employed by Dr. Rodden, I find and conclude that Plaintiffs have satisfied *Gingles* II and III.

For all of these reasons, I conclude that Plaintiffs have satisfied the three *Gingles* threshold requirements.

---

2012 election featured three candidates running for two seats. Under the point estimate approach, one is required to find that both Black and white voters each preferred two of the three candidates (here, B. Morris and Schroeder among Black voters and Ebert and Schroeder among white voters), and that Black and white voters thus "shared" one candidate preference (Schroeder), Trial Tr. vol. 5, 207:15-19; one would also necessarily have to conclude that at least one Black-preferred candidate was successful, *id.*, 207:20–208:4. The fact that Black voters expressed essentially unanimous support for a Black candidate who lost, while the two winners were white candidates who were the most popular candidates among white voters and received indistinguishable support from Black voters cannot be captured by the point estimate approach.

# V.  TOTALITY OF THE CIRCUMSTANCES AND THE SENATE FACTORS

Satisfaction of the three *Gingles* preconditions takes Plaintiffs "a long way towards showing a Section 2 violation," *Blytheville*, 71 F.3d at 1390, but Plaintiffs must still prove that, based on the totality of circumstances, Black voters in FFSD have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.*  Plaintiffs have met this ultimate burden.

"[T]he question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Gingles*, 478 U.S. at 45 (internal quotation marks omitted) (citing S. Rep. No. 97-417, at 30 & n.120 (1982)).  In undertaking this practical evaluation, courts look to the following non-exhaustive "typical factors" identified in the Senate Report accompanying the 1982 amendments to the VRA ("Senate Factors"), *see* S. Rep. No. 97-417, at 28-29: (1) the prior history of voting-related discrimination; (2) the degree of racially polarized voting; (3) the presence of voting practices or procedures that tend to subjugate the minority group's voting preferences; (4) the exclusion of minority group members from the candidate slating process; (5) the extent to which the minority group bears the effects of past discrimination in areas that tend to hinder its members' ability to participate effectively in the political process; (6) the use of subtle or overt racial campaign appeals; and (7) the extent to which members of the minority group have succeeded in being elected to public office. *Gingles*, 478 U.S. at 44-45.  Courts may also consider two additional factors: (1) the extent to which elected officials have been responsive to the particularized needs of the minority group ("Senate Factor 8"); and (2) the tenuousness of the policy underlying the challenged voting practice or procedures ("Senate Factor 9"). *Id.* at 45.  Plaintiffs need not prove "any particular number of factors . . . or that a majority of them point one way or the other." *Id.*

Applying this practical evaluation of the past and present realities in the District, I conclude that, under the totality of circumstances, African American residents of FFSD have less opportunity than other members of the electorate to participate in the political process and elect candidates of their choice. Not only do the "predominant" Senate Factors—*i.e.*, "the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme" weigh in Plaintiffs' favor, it is clear that entrenched socioeconomic inequalities in FFSD suppress African American political participation in a myriad of ways. *Bone Shirt II*, 461 F.3d at 1022 (internal quotation marks omitted).

### A. The "Predominant" Senate Factors (Factors 2 and 7)

"Two factors predominate the totality-of-circumstances analysis: 'the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme.'" *Bone Shirt II*, 461 F.3d at 1022 (quoting *Blytheville*, 71 F.3d at 1390); *see also Gingles*, 478 U.S. at 48 n.15 (citing S. Rep. No. 97-417, at 28-29). The trial evidence demonstrates that these factors weigh in Plaintiffs' favor, which strongly supports Plaintiffs' claim. *See Gingles*, 478 U.S. at 48 n.15 ("If [the "predominant" factors are] present, the other factors . . . are supportive of, but *not essential to*, a minority voter's claim.").

### 1. *The extent to which Board elections are characterized by racially polarized voting (Senate Factor 2)*

The first "predominant" factor (Senate Factor 2), is "the extent to which voting in the elections of the State or political subdivision is racially polarized." *Gingles*, 478 U.S. at 44-45. As discussed in great detail above, Board elections suffer from stark racial polarization. *See supra* Sections IV.B., IV.C (analysis of *Gingles* II and III); *see also Bone Shirt II*, 461 F.3d at 1020-22; *Blytheville*, 71 F.3d at 1386-87, 1390. As a result, this factor weighs heavily in favor of Plaintiffs.

    2. <u>*The extent to which African Americans have been elected to the Board (Senate*</u>
    <u>*Factor 7)*</u>

The second "predominant" factor (Senate Factor 7) is "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 45. This factor also weighs in favor of Plaintiffs.

Senate Factor 7 looks at the electoral success of African American representatives. It does not require the total absence of minority electoral success. *See id.* at 75; *Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5*, 804 F.2d 469, 476 (8th Cir. 1986). In fact, even "proportional or near proportional representation of the black population on the school board . . . does not provide an absolute safe harbor in which a defendant can seek refuge from the totality of the circumstances." *Blytheville*, 71 F.3d at 1388. Instead, courts "must conduct an 'independent consideration of the record' and a 'searching practical evaluation' of the circumstances surrounding minority electoral successes." *Buckanaga*, 804 F.2d at 476 (quoting *Gingles*, 478 U.S. at 75-76).

The evidence demonstrates that African Americans' representation on the Board during the last fifteen years is disproportionately low compared to their share of the FFSD population. Single-race African Americans comprise 53.84% of the District's total population, and 47.33% of the District's VAP. *See Joint Stip.* ¶ 13. The AP Black population comprises 53.84% of the District's total population and 48.19% of the VAP. *Joint Stip.* ¶ 13.

At the time of trial, there were two African American Board members—Paulette-Thurman and Graves—out of seven (28.57%). *See Joint Stip.* ¶ 33. Today, with the addition of Connie Harge following the 2016 election, there are three African American Board members (42%). Including Connie Harge in the analysis places African American representation at near proportionate levels with their population. However, as stated above, even evidence of

proportionate representation is not a safe harbor. *Blytheville*, 71 F.3d at 1388. And here, the totality of the circumstances and a searching and practical evaluation of the facts suggest that the more recent successes of African American candidates are not representative of the community's ability to be elected to the Board.

Since 2004, twenty-three white candidates and nineteen African American candidates have run for a seat on the Board in contested races. PLTF-49, *Kimball Rebuttal Rep.*, p. 7. White candidates' success rate was 69.6%, while African Americans' success rate was 10.5%. *Kimball Testimony*, Trial Tr. vol. 2, 160:2–161:11; PLTF-48, *Expert Report of David Kimball*, May 27, 2015 ("*Kimball Rep.*"), at 13; *see also generally Kimball Testimony,* Trial Tr. vol. 2, 159:8–167:3 (testifying that the disparity in success rates is about the same between white-preferred and African American-preferred candidates as it is between white and African American candidates and that, since 2000, incumbency helps white candidates (75% success) much more than it helps Black candidates (0% success)).

From 1988 until 2000, Dr. Doris Graham was the only African American member of the Board. *Joint Stip.* ¶ 206. From 2000 to 2015, there were never more than two African American members on the Board at the same time. *Joint Stip.* ¶ 208. Henson, an African American Board member who served from 2007 to 2013, was appointed to the Board in 2007, then retained his seat until he ran in a contested election in 2013 and lost. He has never won a Board election. *See Joint Stip.* ¶ 215. During the 2013-2014 term, following Henson's loss during the April 2013 election, there were no African American Board members. *Joint Stip.* ¶ 214.

The following table summarizes the number of candidates and overall success rates of candidates of each race in each of the twelve contested election from 2000 through 2015:

| Table 8 - Comparative Success Rates of Black and White Candidates | | | | |
|---|---|---|---|---|
| | **Black Candidates** | | **White Candidates** | |
| **Election** | **Total Number** | **No. Successful** | **Total Number** | **No. Successful** |
| 2000 | 2 | 1 | 4 | 1 |
| 2001 | 1 | 0 | 3 | 2 |
| 2002 | 2 | 1 | 4 | 2 |
| 2003 | 1 | 1 | 2 | 1 |
| 2004 | 3 | 0 | 2 | 2 |
| 2006 | 2 | 0 | 3 | 2 |
| 2009 | 0 | 0 | 3 | 2 |
| 2011 | 2 | 0 | 7 | 3 |
| 2012 | 1 | 0 | 2 | 2 |
| 2013 | 2 | 0 | 2 | 2 |
| 2014 | 5 | 1 | 3 | 2 |
| 2015 | 3 | 1 | 2 | 1 |
| **TOTALS:** | **24** | **5 (20.8%)** | **37** | **22 (59.5%)** |

*Joint Stip.* ¶ 209.

During the twelve contested elections from 2000 to 2015, twenty-four Black candidates ran for Board seats. African American candidates were successful in obtaining five out of those twenty-four seats (20.8% success) (G. Thomas, Graham, G. Thomas, Paulette-Thurman, Graves). *Joint Stip.* ¶ 210. During the twelve contested elections from 2000 to 2015, thirty-seven white candidates ran for Board seats. White candidates were successful twenty-two out of thirty-seven times (59.5%) (Hirsch, Garofalo, Hogshead, Clark, Fletcher, Knorr, Garofalo, Hogshead, Schroeder, Knowles, Schroeder, Knowles, Martinez, P. Morris, Chabot, Ebert, Schroeder, Hogshead, Brown, Chabot, P. Morris, Ebert). *Joint Stip.* ¶ 211.

During the five contested elections from 2011 to 2015, thirteen African American candidates ran for Board seats. African American candidates were successful in obtaining two out of those thirteen seats (15.38% success) (Paulette-Thurman, Graves). *Joint Stip.* ¶ 212. During the five contested elections from 2011 to 2015, sixteen white candidates ran for Board

seats.  White candidates were successful in obtaining ten out of those sixteen seats (62.5%

success).  *Joint Stip.* ¶ 213.

Including the results of the 2016 election, of which I took judicial notice, does not

substantially change the results.  As discussed above, *supra*, Section I.C.2., four candidates ran

for two Board seats in 2016.  Connie Harge (African American) and Leslie Hogshead (white)

were elected.  Of the two candidates who lost, one was African American and one was white.  *Id.*

During the thirteen contested elections from 2000 to 2016, twenty-six Black candidates

ran for Board seats.  African American candidates were successful in obtaining six out of those

twenty-six seats (23% success).  During the thirteen contested elections from 2000 to 2016,

thirty-nine white candidates ran for Board seats.  White candidates were successful twenty-three

out of thirty-nine times (58.9%).

During the six contested elections from 2011 to 2016, fifteen African American

candidates ran for Board seats.  African American candidates were successful in obtaining three

out of those fifteen seats (20% success).  During the six contested elections from 2011 to 2016,

eighteen white candidates ran for Board seats.  White candidates were successful in obtaining

eleven out of those sixteen seats (68.7% success).

The District predicts that these trends will soon reverse because white flight in past

decades will continue to change FFSD demographics.  As I found above, however, while there is

evidence of a trend in the changing demographics of FFSD, that evidence is insufficient to

support a finding that African Americans have the present ability to elect candidates of their

choice to the Board.  Moreover, despite the growth of the African American population in the

District since 2000, minority electoral success has not improved, with near equal rates of success

in the last six contested elections as there was between 2000 and 2015.  Additionally, as recently

as the 2013–2014 term, there were no African American Board members at all.[29]

Based on these facts, I conclude that Plaintiffs have established that African American electoral successes have generally been minimal in FFSD, and their overall success rates continue to be disproportionately low compared to those of white candidates.

### B. The Historical and Ongoing Effects of Discrimination in the State, St. Louis Metro Area, and FFSD (Senate Factors 1 and 5)

Senate Factor 1 examines "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Bone Shirt*, 461 F.3d at 1021. Senate Factor 5 asks whether African Americans "bear the effects of discrimination in such areas as education, employment and health." *Id.*

The parties have stipulated to the history of official discrimination in the State of Missouri and in the St. Louis Metropolitan Region. *Joint Stip.* ¶¶ 226-230. The District, however, argues that Plaintiffs have failed to establish the history of discrimination and its effect in the District itself, and have therefore failed to prove Senate Factors 1 and 5. I find that both of these factors weigh heavily in favor of Plaintiffs.

#### 1. *Official discrimination*

Throughout the 19th and 20th centuries, many Missouri statutes and constitutional provisions permitted—or required—discrimination against Black Missourians. *See Joint Stip.* ¶¶ 226-230, 241, 251, 253; *Dred Scott v. Sandford*, 60 U.S. 393, 398 (1856); Mo. Const. of 1865, art. II, § 18 (restricting franchise to white males); U.S. Const. amend. XV; Mo. Const. of 1865,

---

[29] The District also attempts to rebut the quantitative data by casting aspersion on the campaigns of unsuccessful African American candidates, or noting the success of Black candidates for offices *outside* FFSD, *see infra*, Section V.E.5. By its terms, this factor is concerned with "the extent to which members of the minority group have been elected" in the jurisdiction. *Gingles*, 478 U.S. at 37. Accordingly, these arguments are at the best of little probative value, and at worst irrelevant to this inquiry. *See, e.g.*, *Bone Shirt II*, 461 F.3d at 1022 & n.10; *Blytheville*, 71 F.3d at 1390.

art. V, § 2 (requiring that the governor be a white man), art. V, § 12 (requiring that the lieutenant governor be a white man), art. IV, § 3 (requiring that members of the Missouri house of representatives be white men), art. IV, § 5 (requiring that state senators be white men), art. III, § 6 (requiring that all voters be white men); RSMo. ch. "Negroes and Mulattoes," § 2, at 600 (1825) (barring Black Missourians from bearing witness in court); RSMo. ch. 146, § 2-2, at 797 (1870) (barring Black Missourians from serving as jurors); Mo. Const. of 1875, art. XI, § 3 (amended to require, rather than permit, racially segregated schools); *Missouri v. Jenkins*, 515 U.S. 70, 76 (1995) (Ginsburg, J., dissenting).

Jurisdictions within FFSD, including the municipalities of Ferguson and Berkeley, also historically engaged in purposeful discrimination against African Americans in education, housing, and other areas. *See Joint Stip.* ¶¶ 254-60; *United States v. Missouri*, 388 F. Supp. 1058 (E.D. Mo. 1975), *aff'd*, 515 F.2d 1365 (8th Cir. 1975); *Gordon Testimony*, Trial Tr. vol. 1, 119:17–121:1; PLTF-40, *Gordon Rep.*, at 16; Trial Tr. vol. 2, 12:4–13:15, 42:1-17 (Henson explaining that his mother, an African American resident of what was a smaller FFSD in the 1930s and 1940s was prohibited from attending school there because of her race, so she was forced to endure long commutes to Black schools in other districts); Trial Tr. vol. 2, 64:24–65:10 (Graham testifying that she attended a segregated one-room schoolhouse in another part of St. Louis County, and some of her classmates were bused from Kinloch); *id.* 68:3–69:15.

As Dr. Gordon testified, historical policies, including not only educational segregation and the racially-motivated use of incorporation but also the way houses, streets, and public infrastructure were physically built, were "intended and designed to create starkly segregated and separate [school] districts." Trial Tr. vol. 1, 121:2-24; *see also* PLTF-40, *Gordon Decl.*, pp. 16, 21-23.

The three school districts that now comprise the present-day FFSD—the overwhelmingly-white former Ferguson-Florissant and Berkeley school districts and the predominantly-Black Kinloch school district—demonstrate how political and physical discrimination created and perpetuated a racially dual system of school districts. *See* PLTF-40, *Gordon Rep.*, at 16, 21-22; *Gordon Testimony*, Trial Tr. vol. 1, 119:17–121:1; *see also* Trial Tr. vol. 2, 12:4–13:15, 42:1-17 (Henson testimony); Trial Tr. vol. 2, 64:24–65:10, 68:3–69:15 (Graham testimony); *Missouri*, 515 F.2d at 1367 (noting that Kinloch had been forced to cobble together schools "markedly inferior to the opportunities offered in the adjoining Berkeley and Ferguson districts"). The former Ferguson-Florissant and Berkeley school districts displayed commitment to unlawfully maintaining Kinloch as a segregated district. For two decades after the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), this dual system persisted despite school reorganization study recommendations and requests from the school district itself that Kinloch be consolidated with other school districts, *see Missouri*, 515 F.2d at 1367, flouting the constitutional obligation to "take such affirmative measures as are necessary to deestablish that dual system and to eliminate the continuing vestiges of that system." *United States v. Missouri*, 363 F. Supp. 739, 745, 747 (E.D. Mo. 1973). It ultimately took a lawsuit brought by the United States Department of Justice and a federal court order to force the overwhelmingly white school districts to consolidate with their predominantly Black neighbor. *See Missouri*, 515 F.2d at 1366-67; *Missouri*, 388 F. Supp. at 1060; PLTF-40, *Gordon Decl.*, pp. 16, 22-23; Trial Tr. vol. 1, 119:14–121:24.

FFSD is part of St. Louis County, the larger St. Louis metropolitan area, and the state of Missouri, each of which has also historically engaged in official discrimination. Dr. Gordon testified that the processes of segregation and discrimination of those jurisdictions affected and

fundamentally continues to affect the lives of FFSD residents in "particularly powerful" ways. Trial Tr. vol. 1, 115:13–116:13; 100:4–101:1 (noting that "it's particularly important to have a broader focus for a metropolitan area like St. Louis because the municipal fragments, the corporate fragments, including municipalities and the school districts, are very small and in some respects very artificial political divisions"); *id.* at 101:14–20; *id.* at 102:13–103:12 (explaining that official laws and policies restricting land use and regarding urban development, urban redevelopment, zoning, and mortgage finance continue to have "enormous consequences" on populations' opportunities to purchase house and accumulate housing equity, which in turn affected the quality of schools available to a population and has sustained a "racialized gap in wealth" that "persist[s] to the present day").

  Up until at least the mid-1960s, while official policies in the St. Louis metropolitan area intended to create and perpetuate racial segregation were "at times blocked by the courts," they nonetheless continually "shift[ed] in form" to achieve the same goal of segregation. *See, e.g., Gordon Testimony,* Trial Tr. vol. 1, 104:5-20; *see also id.*, 105:17–107:18 (discriminatory real estate practices in the area, including realty licensing requirements and race-restrictive deed covenants); Trial Tr. vol. 1, 107:19–111:9 (noting that, when restrictive covenants were effectively blocked by *Shelley v. Kraemer*, 334 U.S. 1 (1948), realtors and developers "quite publicly mobilized to accomplish the same thing by other means," including strengthening their professional code of ethics to require residential segregation and denying home showings and sales to African Americans, and their efforts were reinforced by official federal mortgage lending policy and redlining, as well as "a flurry of" municipal incorporation for the "quite explicit" purpose of exclusionary zoning); *see also id.* at 110:17-22; *Joint Stip.* ¶¶ 235-36; PLTF-40, *Gordon Rep.*, at 7-16; PLTF-48, *Kimball Rep.*, at 8-10.

Providing multiple salient examples from the St. Louis metropolitan area, including in North St. Louis County and FFSD itself, Dr. Gordon testified that, although official policies of urban renewal and redevelopment in the mid- and late-20th century were ostensibly intended to "address some of the damage . . . of segregation and the collapse of central cities," they "actually sharpen[ed] and deepen[ed] segregation both in St. Louis and St. Louis County" by using federal money and the power of eminent domain to "target[] neighborhoods of mixed use and largely African-American occupancy for removal or destruction so the land could be used for a higher use." *See* Trial Tr. vol. 1, 112:4–115:6 (also describing how, between 1950 and 1970, about 75,000 people were displaced in the metro area by government renewal or development, the "vast majority" without any relocation assistance, 84% of whom were African American, and when they moved from downtown to suburban neighborhoods, were then "targeted for renewal or code enforcement or other attention"); *see also Joint Stip.* ¶ 242; *see* PLTF-40, *Gordon Rep.*, at 26-27.

2.   *Continuing effects of past discrimination on political participation*

African Americans in FFSD continue to bear the effects of past discrimination.  As Dr. Gordon testified, one can still see once-formalized policies of racial segregation and housing discrimination "inscribed on [the regional] landscape" and that the formalized pattern of segregation by deed covenant had been "written into land use zoning," which is "still very much the way in which we organize property and housing opportunity in a metro area," causing officially sanctioned race discrimination and segregation to "persist to the present day."  Trial Tr. vol. 1, 111:15–112:3.

According to Dr. Gordon's testimony, because of this persistent physical segregation, when the federal court desegregation order tied together the overwhelmingly white Berkeley and former Ferguson-Florissant and predominantly-Black Kinloch school districts, it created a

present-day FFSD that has "trade[d] segregation between districts for segregation within a district." Trial Tr. vol. 1, 121:2-24. This racial segregation has settled along a north-south divide within FFSD that persists today and is reflected in socioeconomic, educational, and other disparities. *See Gordon Testimony,* Trial Tr. vol. 1, 122:1–123:14, 126:7–127:5, 127:17–128:1, 128:9–129:11; Trial Tr. vol. 3, 81:1–82:12 (Green testimony); Trial Tr. vol. 4, 166:19 (Thurman testimony); *see also* PLTF-40, *Gordon Rep.*, at 2-4, 27-28, Map 10 (p. 29); *see also* PLTF-44, *Cooper Decl.*, ¶ 34, Fig. 7 (p. 14), Ex. C (p. 39).

Housing equity is the principal form of wealth for most families, so barriers to equal opportunity to home ownership that African Americans in St. Louis County have faced for decades have had and continue to have a substantial negative impact on a family's opportunity to accrue and retain wealth, to get favorable loan terms, to access public services and high-performing schools, and to benefit from increasing property values. *See Gordon Testimony*, Trial Tr. vol. 1, 115:25–118:19; PLTF-40, *Gordon Rep.*, at 20-21, 23-24, 27-28, 32; *see also* PLTF-41, *Gordon Resp.*, at 3-4; *Joint Stip.* ¶¶ 244-46; *Gordon Testimony*, Trial Tr. vol. 1, 116:9-13 ("the best way to characterize it is that white families in the St. Louis area were able to get on a sort of escalator-of-wealth creation in the 1930s and 1940s that African Americans were largely barred from for at least a generation"). As Dr. Gordon also testified, the wealth gap has increased recently "as a result of the last housing bubble and bust." Trial Tr. vol. 1, 116:24–117:1; *see also generally Gordon Testimony*, Trial Tr. vol. 1, 99:4–119:7. The wealth gap is one chief driver of continuing (and in some cases widening) disparities between African Americans and whites in FFSD in areas such as educational achievement, level of poverty, employment, and health care. PLTF-48, *Kimball Rep.*, at 10; PLTF-40, *Gordon Rep.*, at 21.

These continuing effects of past discrimination impact the ability of the African

American community in FFSD to participate in the electoral system.  Dr. Kimball testified that political scientists who study voting behavior commonly use the "calculus of voting" as a cost-benefit framework for determining whether and why individuals, as well as groups of people, do and do not vote.  *See Kimball Testimony,* Trial Tr. vol. 2, 114:8–115:4. The calculus takes into account the probability that one's vote will determine the outcome of an election, the benefits of seeing one's preferred candidate win an election and potentially implement preferred policies, and the costs of voting, including: informing oneself about candidates, completing the administrative process of registering to vote, locating one's polling place, and getting time off work.  *Id.*

Dr. Kimball testified that this cost-benefit framework "indicates that for many people the decision of whether to vote or not can be a close call, and that . . . relatively small changes in either the benefits or the cost side of the equation can substantially increase or decrease the likelihood of voting in an election."  Trial Tr. vol. 2, 115:5-11.  A small change in benefit or cost has a more pronounced effect on voters with less education and/or less income, and/or who are "less habitual" voters, because for them "it's a little more difficult to overcome the cost that is associated with registering and turning out to vote, learning about candidates and so forth." *Kimball Testimony*, Trial Tr. vol. 2, 115:12-25; *see also* PLTF-48, *Kimball Rep.*, at 11-12; *Gordon Testimony*, Trial Tr. vol. 1, 130:15–131:1 ("the scholarly consensus is very clear that when a population is disadvantaged economically, when they're disadvantaged in terms of job opportunities, educational opportunities, or residential opportunities, that these [disadvantages] affect civic participation").  Consistent with Dr. Kimball's "calculus of voting" framework, Dr. Gordon testified that based on his survey of historical discrimination and segregation, African Americans in FFSD bear the effects of past discrimination in ways that affect their ability to

participate in the political process. *Gordon Testimony*, Trial Tr. vol. 1, 145:10-24; *see also Kimball Testimony,* Trial Tr. vol. 2, 144:2–147:24, 148:18–149:1; Trial Tr. vol. 3, 20:11-17.

There is ample evidence that the costs of voting are higher and the benefits lower for African American residents of FFSD as compared to white residents. There continue to be undisputed disparities between Black and white residents of FFSD on almost every socioeconomic indicator, including employment, wealth, homeownership, access to health care, and other factors underlying basic economic security. *Joint Stip.* ¶¶ 248, 269-71; PLTF-40, *Gordon Rep.*, at 2-4, 27-28, Map 10 (p. 29); PLTF-41, *Gordon Resp.*, at 3-4; *Paulette-Thurman Dep.*, 63:8-13; PLTF-48, *Kimball Rep.*, at 9-10, 12; PLTF-44, *Cooper Decl.*, ¶¶ 36-37; PLTF-45, *Cooper Suppl. Decl.*, ¶¶ 17-20; *Gordon Testimony*, Trial Tr. vol. 1, 126:10–127:5 (rates of poverty are higher in majority-Black block groups in the District); Trial Tr. vol. 1, 128:2–129:11 (same for "neighborhood stress" indexes, which measure block groups' engagement with the labor market and poverty index); *Cooper Testimony*, Trial Tr. vol. 1, 200:10-14 (in FFSD, "[o]n almost every metric, African Americans lag behind non-Hispanic whites"); *Kimball Testimony*, Trial Tr. vol. 2, 151:3-19; *Rodden Testimony*, Trial Tr. vol. 5, 75:20-22.

There are also undisputed disparities between African American and white FFSD students in educational achievement (including enrollment in advanced classes, the FFSD gifted and talented program, enrichment programs, extracurricular activities) and the application of discipline (including in-school suspensions, out-of-school suspensions, referrals to law enforcement, and corporal punishment). *Joint Stip.* ¶¶ 261-62, 265-67; PLTF-93, *FFSD Data Reported to Office of Civil Rights – Course Enrollment by* Race (Ex. 17 to Dep. of Brian Scott Ebert, June 16, 2015), at 1-3, 16, 18; PLTF-84, *FFSD Data on Office of Civil Rights Website – LEA Summary of Selected Facts* (Ex. 5 to Dep. of Paul Morris, June 15, 2015), at 1-5; PLTF-85,

*FFSD Data on Office of Civil Rights Website – Discipline of Students Without Disabilities, Law Enforcement Referral* (Ex. 6 to Dep. of Paul Morris, June 15, 2015), at 1; PLTF-86, *FFSD Data on Office of Civil Rights Website – Discipline of Students With Disabilities, Law Enforcement Referral* (Ex. 7 to Dep. of Paul Morris, June 15, 2015), at 1; *Paulette-Thurman Dep.*, at 78:20-22, 79:1-8, 104:16–105:16; PLTF-125, Ferguson Comm'n, *Forward Through Ferguson: A Path Toward Racial Equity*, Sept. 21, 2015, at 56; PLTF-120, *Investigation of the Ferguson Police Department*, at 37-38; PLTF-126, U.S. Dep't of Justice, *Investigation of the St. Louis County Family Court*, July 31, 2015, at 26, 47; *see also* Trial Tr. vol. 1, 22:8-25, 26:7-14 (Pruitt testimony).

There also continue to be undisputed disparities between Black and white residents of FFSD in the numbers of law enforcement stops, arrests, fines, and fees.  PLTF-127, Better Together, *Public Safety – Municipal Courts*, Oct. 2014, at 8; PLTF-128, excerpts from Mo. Att'y General's Office, *2014 Vehicle Stops Report*, Racial Profiling Data, at 367-68 (Ferguson), 377-78 (Florissant), App'x B pp. 182 (Ferguson), 186 (Florissant) (*full report available at* https://ago.mo.gov/home/vehicle-stops-report/2014-executive-summary); *Kimball Testimony*, Trial Tr. vol. 2, 151:3-19; PLTF-48, *Kimball Rep.*, at 9-10, 12.  Dr. Kimball testified that "neighborhoods with higher levels of contact with the criminal justice system tend to have lower levels of voter participation."  *Kimball Testimony*, Trial Tr. vol. 2, 153:23–155:6.  This occurs because of the resulting "loss of economic resources," and because criminal justice system involement "tends to foster more negative attitudes and less trust of local government, which lowers the benefit side of the cost of voting calculation and makes those distrustful individuals less likely to see the benefit of voting in local elections."  *Id.*  Additionally, contact with the criminal justice system causes people "more difficulty engaging in joining in . . . local

organizations and social networks that help bring people into local government and local community affairs." *Id.*

The turnout rates in FFSD Board elections provide further evidence that African American political participation is depressed. *See* PLTF-49, *Rebuttal Report of David Kimball*, July 2, 2015 ("*Kimball Rebuttal*"), at 6 (during the last twelve contested elections, African American turnout has never exceeded white turnout, but has been lower than white turnout six times); *Kimball Testimony*, Trial Tr. vol. 2, 120:15–121:6 (turnout is higher for on-cycle elections because "the benefit side is more clear," since there are more contests on the ballot, and because "the cost side is a little bit higher for voters" in off-cycle elections since there is less news coverage, making it take "more effort on their part to find out who's running, find out information about the candidates and their policies"); *id.* at 145:22–146:7 ("factors like homeownership and education and income are strong predictors of voter turnout. Those factors provide resources that help people overcome the cost side of the calculus of voting and lead to voter turnout. So if there are racial disparities in those factors, they can contribute to racial disparities in political participation as well.").

Likewise, evidence in the record regarding registration rates also supports a finding that African Americans in FFSD are hindered in their ability to participate in the political process. According to Census Bureau data for November 2014, in the state of Missouri, the registration rate for people who identified as Black alone is 67.1%. The registration rate for people identifying themselves as white alone is 72.2%. PLTF-63, *Reported Voting and Registration, by Sex, Race, and Hispanic Origin*, at 7; *see also Kimball Testimony*, Trial Tr. vol. 3, 41:1-10 (the registration differential is about five points); *Rodden Testimony*, Trial Tr. vol. 5, 71:1-4; *id.* at 147:12-16 (approximately five percent more white Missourians than Black Missourians are

registered to vote); *id.* at 48:14-22 (if whites register at a higher rate than African Americans but their respective turnout rates are equal, one can infer that more white voters than African American voters actually cast a ballot on election day); *id.* at 117:14–118:1 (people with lower levels of income and education, as well as younger people, are less likely to register to vote). As discussed above, *see supra*, Section II.B.4(b), based on the substantial racial disparities African Americans in FFSD experience along a range of socioeconomic factors, it is reasonable to conclude that voter registration disparities seen across Missouri are similarly disparate in FFSD. *See also Rodden Testimony,* Trial Tr. vol. 5, 117:14–118:1.

In addition to impacting African American voters in FFSD, these effects of past discrimination hinder the ability of African American candidates in FFSD to participate in the political process. *Kimball Testimony*, Trial Tr. vol. 2, 144:5-146:7; *see also* PLTF-117, *Hudson Decl.*, ¶ 17 (noting that Black voters in FFSD may have fewer resources to volunteer or donate to Board campaigns); *Paulette-Thurman Dep.*, 45:18–46:4, 48:22–49:9 (naming some Black candidates who rely on public transportation); *Kimball Testimony*, Trial Tr. vol. 2, 162:11-22 (coordinating and educating African American voters to single-shot as a group "takes a lot of effort, a lot of resources," and "would make the election process more costly"); *id.* at 119:19-24 ("[i]n order to win elections, it takes also some coordination, recruiting candidates, coordinating support that impose costs and take organizing and take resources").

The District argues that Senate Factors 1 and 5 weigh in its favor because disparities along some socioeconomic indicators are smaller in the District than the region or State. While there is evidence to support their argument, the protections of the VRA are not triggered only if African Americans in FFSD are worse off from the effects of discrimination, in either an absolute or relative sense, than African Americans elsewhere in the region, the state, or the

nation.  Moreover, Dr. Gordon testified credibly that because housing stock already sorts people by income, it would not be plausible for a municipal unit like FFSD with a much narrower range of housing options to show the same socioeconomic disparities as a large metropolitan area that includes both mansions on large lots and "modestly developed" multifamily units.  As such, "the surprising fact is not that the gap [within FFSD] is narrower [than when looking at the St. Louis metropolitan area as a whole], but that given the development patterns, the surprising fact is the gap doesn't virtually disappear."[30]  Trial Tr. vol. 1, 129:12–130:11.  Substantial credible testimony from individual African American witnesses who live and work in FFSD supports Dr. Gordon's conclusion.  *See, e.g.*, Trial Tr. vol. 2, 11:18-24 (Henson testimony); Trial Tr. vol. 2, 75:9-18, 86:12–87:14 (Graham testimony); Trial Tr. vol. 4, 167:5-16 (Paulette-Thurman testimony); Trial Tr. vol. 3, 81:1–82:12 (Green testimony); *see also Paulette-Thurman Dep.*, 63:1-13; *Graves Dep.*, 57:11-15.

Based on the credible and compelling testimony of Plaintiffs' experts and witnesses who live and work in FFSD, and the trial evidence as a whole, I find that there is a history of officially sanctioned discrimination in the region and the District, and that history is not just a distant memory.  Plaintiffs have established that African Americans in FFSD "bear the effects of discrimination in such areas as education, employment and health," among other areas, "which hinder their ability to participate effectively in the political process."  *Gingles*, 478 U.S. at 37.  Given the extent to which African Americans in FFSD continue to experience the effects of discrimination, their ability to participate in the political process is impacted.  As the Eighth Circuit has recognized, depressed political participation is among "the recognized historic effects of discrimination in the areas of health, employment, and education."  *Blytheville*, 71 F.3d at

---

[30] In fact, Dr. Gordon testified that because the St. Louis metropolitan area captures both wealthy and poor areas, "one would expect" there to be larger disparities in the metropolitan area than in FFSD. Trial Tr. vol. 1, 122:12-25.

1390; *see also Gingles*, 478 U.S. at 69 ("[P]olitical participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes."). As a result, I conclude that Senate Factors 1 and 5 weigh in favor of Plaintiffs.

### C. Lack of Responsiveness (Senate Factor 8)

Senate Factor 8 examines whether there is "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 45. Plaintiffs presented evidence that the African American community in FFSD has particularized needs, and that certain members of the Board have been, at times, unresponsive to those particularized needs. In contrast, the District presented evidence showing that the Board has made efforts to meet the particularized needs of the African American community. Overall, I conclude that this factor has neutral weight.

There is significant evidence that the African American community in FFSD has particularized needs concerning several issues, including unequal school resources and policies within FFSD, especially between the northern and southern portions of the district, the disparate use of school discipline against African American schoolchildren, disparate educational opportunities for African American schoolchildren, and racial profiling by law enforcement. *See, e.g.*, Trial Tr. vol. 3, 82:6-12, 83:5-25, 84:1-86:7 (testimony of Frank Green discussing disciplinary policies, racial makeup of FFSD employees, particularized home-life needs, and racial profiling); Trial Tr. vol. 4, 166:8-21 (testimony of Paulette-Thurman about resource allocations, disparities in achievement, and disproportionate discipline); Deft-FFSD D, *Rodden Senate Factors Rep.*, ¶¶ 26, 29, 30, 31 (noting income disparities between African Americans and whites in the Southern part of the district); *Gordon Testimony*, Trial Tr. vol. 1, 111:15-23; *id.* at 121:4-24, 145:10-24; Trial Tr. vol. 1, 51:12–53:2 (testimony of Pruitt regarding incidents

involving FFSD school resource officers); *Kimball Testimony*, Trial Tr. vol. 2, 145:7-21; *id.* at

154:2-15 (testimony regarding law enforcement and municipal court practices); PLTF-48,

*Kimball Rep.*, at 10-12 (discussing Attorney General's traffic-stop disparity index, showing that

in Florissant, African Americans are roughly 7.5 times more likely than whites to be pulled over,

and in Ferguson, 3.6 times more likely, and are searched and arrested more frequently, "even

though the proportion of searches that yield contraband are substantially higher for whites than

for blacks in both municipalities"); Trial Tr. vol. 4, 102:9–103:10 (testimony of Hudson

testifying regarding discipline and school-to-prison pipeline).

There is also evidence suggesting that certain members of the Board are or were unaware

of the African American community's particularized needs. Certain Board members testified

that they were unaware of any particularized needs, and others testified that they were unaware

of socioeconomic disparities, racial profiling, historic discrimination, and the discipline gap. *See*

*Ebert Dep.*, 107:3–109:9, 116:15-17; *Brown Dep.*, 48:5–50:4, 55:1-15; *Hogshead Dep.*, 73:17–

74:23, 77:24–78:7; *Chabot Dep.*, 78:18–80:15, 86:14–87:9, 88:14-21; *Morris Dep.*, 97:2–98:15;

*see also Joint Stip.* ¶¶ 276-78.

Plaintiffs also presented evidence that the Board responded poorly to the transfer of

Black students into the District and that the Board has done little to respond to discipline and

achievement gaps. *See* Trial Tr. vol. 1, 38:12–44:25 (Pruitt testifying that in response to the

school transfer law, the Board's emergency closed-meeting decision to decrease class sizes,

candidates' campaigning on this issue, and the Board's later decisions to decline to provide

transportation costs or set a lower tuition rate for these students had "very vocal and nasty" racial

overtones and were perceived as "sole[ly]" intended "to prevent those kids from transferring to

the district"); *see also Joint Stip.* ¶ 279 (no FFSD policies to address discipline or academic

achievement racial gaps); *see also* Trial Tr. vol. 3, 124:8–126:5 (former Board candidate Johnson testifying that "from hearing from principals and leaders in schools" "there seemed to be a situation where people were not either culturally astute or sensitive enough to be able to navigate through some of the daily kinds of interactions that would lead to a student being ultimately dismissed from class," that "this culture that these types of children are not manageable and that we need to separate them out was . . . of concern racially. I believe that has strong racial underpinnings to it."); *see also generally* Trial Tr. vol. 1, 23:11-38:11 (testimony of Pruitt comparing the FFSD Board's responses to discipline with other districts he considers to be more responsive to the particularized needs African Americans have on the issue); Trial Tr. vol. 2, 79:11–80:4 (former Board member Graham testifying that Henson "was always advocating for African-American students," which she believed contributed to his 2013 defeat because "everybody was not in favor of his agenda").

Plaintiffs also argue that that the African American community in FFSD has particularized needs concerning the Board's lack of transparency surrounding the suspension of former FFSD superintendent Dr. Art McCoy and its subsequent handling of the community's response to that decision. It is undisputed that the Board's decision to suspend Dr. McCoy, the first African American superintendent of FFSD, was contentious and widely opposed by the African American community in the District. *Joint Stip.* ¶¶ 162, 281-296. There is also strong evidence that members of the African American community were frustrated with the Board because they would not give an explanation for the suspension. *See* Trial Tr. vol. 1, 46:18-19, 47:13-16, 48:6-21 (Pruitt testimony); Trial Tr. vol. 2, 35:14–39:22 (Henson testimony); Trial Tr. vol. 4, 105:15–108:23 (Hudson testimony); Trial Tr. vol. 3, 120:6–121:12 (Johnson testimony). Members of the Board testified, however, that they remained silent about the reasons for the

suspension because it was Board policy to keep personnel matters private.[31]  *See* Trial Tr. vol. 2, 98:23-99:11 (Graham Testimony); Trial Tr. vol. 4, 141:14-143:19 (Thurman Testimony); *Morris Dep.* 57:3-16; *Chabot Dep.* 96:14-22.  I find the District's testimony credible.  Moreover, the fact that the Board held a special meeting at the larger venue to respond to the community's concerns is evidence that the Board was making efforts to be responsive to the community's needs at that time.  *See, e.g., Graham Testimony*, Trial Tr. vol. 2, 98:23-99:11.

The District introduced testimony from community members who believe the Board is responsive to the particularized needs of the African American community.[32]  *See, e.g.,* Trial Tr. vol. 3, 97:12-14 (Green testifying that he believes the District board advocates for African American and white children equally); *id.* at 84:8-14 (Green testifying that the Board is working to address disciplinary issues); *Graham Testimony*, Trial Tr. vol. 2, 87:21-88:5, 97:22-98:6; *Henson Testimony*, Trial Tr. vol. 2, 19:14-17, 31:14-19 (testifying that the Board was responsive to particularized African American needs when he was on the Board); *Thurman Testimony*, Trial Tr. vol. 4, 133:21-134:1 (the Board accepts her input and "we do have a lot of discussions about race").

The District also argued that the Board is not responsible for certain school district policies, such as addressing the achievement gap, and that it therefore cannot be found unresponsive when it has no duty to respond to those needs.  Instead, as the District argued and current Board member Dr. Paulette-Thurman testified, the Board responds to the needs of the African American community by hiring a good superintendent to address those needs.  *See Thurman Testimony,* Trial Tr. vol. 4, 134:2-135:10.  Dr. Paulette-Thurman testified that the

<hr>

[31] Plaintiffs argue that the Board members' testimony is not credible because there is no law that would prohibit public comment.  Even accepting that as true, however, the lack of a legal requirement does not negate the testimony that the Board had a policy against such disclosures.

[32] The District did not offer any expert testimony about whether or not FFSD Board members have been responsive to the particularized needs of the African American community in the District.  *See* Trial Tr. vol. 5, 138:21–139:1.

Board hired Dr. Joseph Davis, the current superintendent and an African American, to address issues of disparity. *Id.* at 161:22-25; *see also Joint Stip*. ¶302. Dr. Paulette-Thurman, Dr. Graves, and Frank Green, among others, gave positive testimony about Dr. Davis' performance as superintendent and his responsiveness to the African American community's concerns. *See Thurman Testimony,* Trial Tr. vol. 4, 161:22-25; *Graves Testimony*, Trial Tr. vol. 6, 18:3-17; *Green Testimony*, Trial Tr. vol. 3, 102:6-15, 106:13-23.

Based on the credible testimony of the District's witnesses, I find that the Board is making efforts to respond to the particularized needs of the African American community. However, because Plaintiffs' evidence shows that certain members of the Board have, at times, been unresponsive to the particularized needs of the African American community, I cannot find that this factor clearly weighs in the District's favor. Taking all of the evidence together, I conclude that this factor has neutral weight.

## D. Access to Candidate Slating (Senate Factor 4)

Under this factor, "if there is a candidate slating process," this Court must consider "whether members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37; *accord Clay v. Bd. of Educ. of St. Louis*, 896 F. Supp. 929, 941 (E.D. Mo. 1995) ("*Clay I*"). While there may not be a "consensus in federal law or political science texts on a definitive meaning of the phrase 'slating group[,]' . . . there is no support in the law for [a] restrictive definition." *Collins I*, 816 F.2d at 938. The Supreme Court has "viewed 'slating' as essentially involving the endorsing of candidates." *See id.* at 938-39 (citing *White*, 412 U.S. at 766-67; *Whitcomb v. Chavis*, 403 U.S. 124, 150-51 & n.30 (1971)). The Eighth Circuit has defined a slating group as a group that "consists of a small number of individuals who select candidates to run as a bloc to fill seats which are up for election." *Clay II*, 90 F.3d 1357, 1362, n.11 (8th Cir. 1996).

Based on the evidence at trial, I find that the Ferguson-Florissant National Education Association ("FFNEA") and the North County Labor Club ("NCLC") are two well-established local slating organizations that endorse candidates for the Board. Both organizations are labor organizations. The FFNEA is a unit of the National Education Association. Trial Tr. vol. 3, 46:17-47:10 (Green testimony). Each of these organizations promotes its endorsed candidates jointly. *See* Trial Tr. vol. 2, 24:6-21 (Henson testimony); *see also Kimball Testimony*, Trial Tr. vol. 2, 131:11-22 (a hallmark of slating is the fact that endorsed candidates "can coordinate with other candidates who are endorse to promote" their endorsement by the slating organization, "to share that information to voters through phone calls and mailings and newsletters"); Trial Tr. vol. 3, 66:21–67:4 (Green testimony); *Chabot Dep.*, 51:9–52:22.

Beyond providing the signaling value of slating candidates, these organizations provide tangible resources to endorsed candidates, including campaign literature, mailing lists, and access to volunteers. *See* Trial Tr. vol. 2, 25:2-11 (Henson testimony); *Morris Dep.*, at 29:23–30:1, 30:21–31:11; *Ebert Dep.*, at 32:20-34:12, 37:19–39:3, 52:6-14; *Brown Dep.*, at 21:1-6, 22:16–23:3, 23:17-21, 30:10-19, 31:8-17; *Hogshead Dep.*, at 24:2-20, 25:17–27:6; *Chabot Dep.*, at 21:16-18, 23:15–25:8; 51:9-19, 52:14-22. Because Board elections are off-cycle elections in which "voters are generally receiving less information about the election, about the candidates," the "payoff" of an endorsement "can be bigger." *Kimball Testimony*, Trial Tr. vol. 2, 132:3-10.

The FFNEA has endorsed candidates in every contested election since at least 2006. PLTF-130, *Kimball Sources for FFNEA Endorsements*, at 8 (showing 2006 endorsements); *Schroeder Dep.*, 23:4-8; PLTF-130, *FFNEA Endorsements*, at 13 (showing 2011 endorsements); *Ebert Dep.*, 50:13-22; PLTF-130, *FFNEA Endorsements*, at 15, 20, 26 (showing 2013, 2014, and 2015 endorsements, respectively); *Joint Stip.* ¶¶ 108, 109, 117 (in 2007, 2008, and 2010 Board

106

seats were uncontested and elections were not held).

African American candidates have less success than white candidates in getting endorsed by these organizations. *See Kimball Testimony,* Trial Tr. vol. 2, 132:25–133:1 (African Americans are endorsed "relatively rarely" by both FFNEA and NCLC when "compared to white candidates"). Since 2006, similar numbers of white and Black candidates have run for office and sought FFNEA endorsement. The FFNEA has endorsed eleven of nineteen white candidates (58%) but only three of fifteen African American candidates (20%). PLTF-49, *Kimball Rebuttal*, at 7. Since 2004, the NCLC endorsed thirteen candidates for the Board, twelve of whom are white. *Joint Stip.* ¶ 323; PLTF-48, *Kimball Report*, at 8. In analyzing the candidates' access to the slating groups, however, Plaintiffs' expert, Dr. Kimball, testified that he did not know which candidates applied for the FFNEA and North County Labor endorsements. *Kimball Testimony*, Trial Tr. vol. 3, 17:11-24.

Neither FFNEA nor NCLC has written down or shared with the public their criteria for endorsement, and neither organization informs candidates after the fact why they were or were not endorsed. *See Kimball Testimony,* Trial Tr. vol. 3, 16:17-21; *see also* Trial Tr. vol. 2, 76:25–77:11, 97:5-9 (Graham testimony); Trial Tr. vol. 2, 23:5–24:5 (Henson testimony); Trial Tr. vol. 3, 116:6-17 (Johnson testimony); Trial Tr. vol. 3, 55:23–56:3 (Green testifying that he had not seen FFNEA's endorsement process written down anywhere but that "it's just been handed down and passed down"); *see also Chabot Dep.*, 46:18-21 (unaware of NCLC's endorsement criteria); *Ebert Dep.*, 31:14-16 (same); *Brown Dep.*, 32:13-15 (same).

The District presented credible evidence that the FFNEA endorsement process is open to everyone. Frank Green, former president of the FFNEA from 2014-2015, testified that the FFNEA sends a letter to every candidate that files for the District board asking him or her to

interview for their endorsement. Trial Tr. vol. 3, 55:1-5, 87:21-88:11. Once a candidate applies, the FFNEA sends the candidates a list of questions and sets up an appointment time for the interview. The chair of the FFNEA Political Action Committee ("PAC") is the leader of the endorsement committee and chooses its members. *Id.* at 55:1-56:11. The PAC chair attempts to make the endorsement committee as racially diverse as possible and to include a mixture of males, females, teachers, and support personnel. *Id.* at 58:18-59:1. Green testified that the endorsement committee has been racially diverse for as long as he can remember. *Id.* at 59:17-20.

The endorsement committee interviews candidates, asking the questions from the list of questions given ahead of time. *Id.* at 55:1-56:11. No questions are added or omitted, and the questions are usually the same every year. *Id.* at 61:10-23. Once the interviews have concluded, the committee discusses each candidate and votes on who to endorse. Green testified that the endorsement decision is based on the candidates' answers to the interview questions, which are aimed at finding out if the candidate's interests are aligned with the FFNEA members' interests. *Id.* at 90:18-24. Green testified credibly to the reasons why the FFNEA did not endorse certain African American Board candidates in recent years. In 2011, the FFNEA decided not to endorse any incumbents because, among other reasons, earlier that year the Board voted in favor of lifetime health insurance for the former superintendent and his wife. *Id.* at 91:23-92:21. Although there was still anti-incumbent sentiment in 2013, the FFNEA did endorse Hogshead, an incumbent, because she voted for pay raises for teachers. *Id.* at 94:12-24. The FFNEA did not endorse F. Willis Johnson because he did not believe that class size matters. *Id.* at 95:25-96:4.

In 2014, members of the African American community came together to brainstorm

about ways to help the District.  The group formed a Political Action Committee named "Grade A for Change."  *Thurman Testimony*, Trial Tr. vol. 4, 137:19-138:2.  They decided to interview and recruit more African American candidates to run for the school board.  *Id.* at 136:1-137:8, 151:3-152:3; *Johnson Testimony*, Trial Tr. vol. 4, 133:4-9.  In 2014, three African American candidates ran together under Grade A for Change: Paulette-Thurman, Savala, and Johnson.  *Paulette-Thurman Testimony*, Trial Tr. vol. 4, 151:3-152:3.  Paulette-Thurman was elected to the Board in 2014, but Savala and Johnson were not.  Grade A for Change supported the candidates' campaigns financially and helped with signs and pamphlets.  *Id.* at 163:163:6-23.  Paulette-Thurman testified that it also "taught her how to be a candidate."  *Id.*  Accordingly, I find that Grade A for Change is also a local slating organization for purposes of this analysis, although its existence is much more recent than FFNEA and NCLC and its impact on African American electoral success is less discernable.

Based on the totality of the circumstances, I find that Senate Factor 4 weighs very slightly in favor of Plaintiffs.  This factor primarily examines whether African Americans have been denied access to slating groups.  There is little evidence that African Americans have been denied access to the formal slating process, as the testimony shows that all candidates are sent invitations to seek endorsement.  It is undisputed, however, that both the FFNEA and the NCLC endorse more white candidates than Black candidates.  Moreover, white candidates who are endorsed are more likely to win than African American candidates who receive endorsements.  *See* PLTF-49, *Kimball Rebuttal*, at 7.  Accordingly, African Americans have much less success than white candidates in receiving the established slating groups' endorsements, and in that sense, they are largely denied *meaningful access* to those slating groups.  *See Marengo Cty. Comm'n*, 731 F.2d at 1569 (examining the ability to "receive [the slating group's] endorsement"

under Senate Factor 4).  As a result, this factor weighs very slightly in favor of Plaintiffs.

**E.  Subtle Racial Appeals (Senate Factor 6)**

The sixth Senate Factor examines "the use of overt or subtle racial appeals in political campaigns."  *Gingles*, 478 U.S. at 44-45.  Racial appeals can take a variety of forms, including the use of racially charged campaign tactics and the highlighting of racially charged campaign issues "that prey[] on racial anxiety," *City of Euclid*, 580 F. Supp. 2d at 610, 613, such as campaign literature that "appealed to the fears of Town residents that black students . . . would be bused to schools in the Town," *Goosby v. Town Bd. of Hempstead*, 956 F. Supp. 326, 342 (E.D.N.Y. 1997).  *See also, e.g.*, *Bone Shirt I*, 336 F. Supp. 2d at 1041; *Williams v. City of Dallas*, 734 F. Supp. 1317, 1348 (N.D. Tex. 1990); *Cofield v. City of LaGrange*, 969 F. Supp. 749, 777 (N.D. Ga. 1997).

Based on credible testimony from some of the Plaintiffs and other members of the African American community in and around FFSD, I find that there is some evidence that Board candidates in certain years made subtle appeals that African American members of the community understood to be racial in nature.  These appeals include advocating for more enforcement of discipline, which is disproportionately meted out against African American students in FFSD, and attributing discipline problems to "bad parenting."  PLTF-119, *Pruitt Decl.*, ¶¶ 15-17, 19, 21, 23; PLTF-116, *Henson Decl.*, ¶¶ 11-13, PLTF-117, *Hudson Decl.*, ¶¶ 8-10, 13; PLTF-118, *Johnson Decl.*, ¶¶ 12-13; PLTF-115, *Graham Decl.*, ¶ 16; *Morris Dep.*, 126:10-14; *Joint Stip.* ¶ 335.  There was also evidence that Board candidate Johnson was questioned about facets of his personal life that often reveal racial undertones, including not being a homeowner, whether or not he had biological children in the district, and not being a longstanding resident of the community, and that such questions were "[n]ot necessarily" evenly applied to all candidates, and that he perceived these questions as a "kind of cultural

110

standardizing of what leadership could and should be in that community." Trial Tr. vol. 3, 126:23–128:8.

Finally, there was evidence that certain Board candidates in 2014 made subtle racial appeals in opposing (contrary to then-superintendent Dr. McCoy's position) the transfer of mostly African American students from unaccredited neighboring school districts. *Morris Dep.*, 45:20–46:3; PLTF-139, *Mar. 6, 2014 Candidate Forum* (video) at 1:12:20 (Chabot stating that "student transfer is a punitive law that's destroyed school districts. It's going to be kind of a rippling effect across the State of Missouri."); *Chabot Dep.*, 32:20-24, 41:17–42:6; PLTF-138, *Nov. 13, 2013 Board Meeting Mins.*, at 2; PLTF-115, *Graham Decl.*, ¶ 16. While discussion of impactful issues such as discipline and transferring students in from another district may very well be appropriate campaign topics, Plaintiffs and witnesses credibly testified that many African Americans in FFSD viewed candidates' statements about transfer students and the District's treatment of transfer students as an attempt by an all-white Board to stem growth of the African American student population in the District. *See, e.g.,* Trial Tr. vol. 1, 39:22–44:25 (MO NAACP representative Adolphus Pruitt describing his perception that the Board's decision to adjust FFSD class sizes downward, decline to reduce tuition, and decline to provide transportation in response to the school transfer law, and candidates' campaigning against the transfer law, had "very vocal and nasty" racial overtones "[b]ecause the districts that the kids will be coming from were predominantly African American, and they did not want to have these African American children in their school district"). Additionally, although there was testimony that some of the candidates based their opposition to the transfer program on financial concerns, *see* PLTF-139, *Mar. 6, 2014 Candidate Forum* (video) at 1:10:40 (former Board member Morris stating that the "money issue that follows transfers students is . . . a huge issue" despite state law

requiring sending districts to pay full tuition for each transferring student), that testimony was not credible because other testimony at trial established that the actual cost of tuition is borne by the source school district and outside donations cover the transportation costs.

Based on these facts, I find that Senate Factor 6 weighs slightly in favor of Plaintiffs.

## F. Discriminatory Voting Practices and Procedures (Senate Factor 3)

Senate Factor 3 asks whether there are "voting practices or procedures that tend to enhance the opportunity for discrimination against" African Americans in FFSD. *Gingles*, 478 U.S. at 45. Here, Plaintiffs have challenged the following three voting practices: (1) the at-large voting scheme, (2) off-cycle (*i.e.*, April versus November) elections, and (3) staggered terms. *Joint Stip.* ¶ 341; PLTF-48, *Kimball Rep.*, at 5-7.

Because of the racially polarized voting present in FFSD and the cost-benefit analysis voters engage in as described credibly by Dr. Kimball, I find that the at-large voting scheme and the off-cycle feature of FFSD Board elections have a disproportionately suppressive impact on African American voters in FFSD. *See Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); PLTF-48, *Kimball Rep.*, at 5-7; *see also* PLTF-117, *Hudson Decl.*, ¶ 17; PLTF-118, *Johnson Decl.*, ¶¶ 15, 18; *Ward v. Columbus Cty.*, 782 F. Supp. 1097, 1104 (E.D.N.C. 1991).

As the Supreme Court has long recognized, at-large voting schemes can "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (alteration in original; citation omitted); *see also Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994); *Blytheville*, 71 F.3d at 1390 ("The majority vote requirement, staggered terms, and at-large structure also tend to suppress minority voters' influence."); *Collins II*, 883 F.2d at 1236. Indeed, as the Eighth Circuit has observed, the 1982 amendment to Section 2 "was aimed particularly at discriminatory at-large election systems which dilute minority voting strength." *Buckanaga*, 804 F.2d at 471. Regarding the ample statistical evidence that at-large voting has

this dilutive effect on Black voters in FFSD, *see supra* Section IV.B (finding racially polarized voting), Plaintiffs' witnesses testified to how at-large voting has worked in conjunction with socioeconomic racial disparities in FFSD to disadvantage Black candidates who "are likely to have less access to the necessary resources for travel and advertising" outside the immediate area surrounding the candidates' homes, *Ward*, 782 F. Supp. at 1104. Because of continuing racial disparities and racially polarized bloc voting, at-large voting in FFSD does, in fact, fundamentally enhance the opportunity for discrimination against African American voters and candidates.

Off-cycle elections also enhance the opportunity for discrimination in two primary ways. First, off-cycle elections tend to generate unusually low voter turnout generally and disproportionately low turnout among African American voters. Jonathan Rodden, *Is segregation the problem in Ferguson?*, THE WASHINGTON POST (Blog), Aug. 18, 2014, at 6. This should come as no surprise: "holding local elections at a time when only the most engaged and politically astute citizens—those citizens who feel the most enfranchised—are likely to vote will almost certainly result in the diminished influence of groups who feel generally excluded from the political fabric of the community." *Vill. of Port Chester*, 704 F. Supp. 2d at 444; *see also Jones v. City of Lubbock*, 727 F.2d 364, 381 (5th Cir. 1984); *Blytheville*, 71 F.3d at 1388. The trial evidence showed that this correlation bears out in FFSD, where—at least for the last twelve contested elections—Black turnout has never exceeded white turnout, and has been lower at least half the time. *See Kimball Testimony*, Trial Tr. vol. 2, 120:15–121:6.

In addition to dampening turnout disproportionately among disadvantaged groups, off-cycle elections increase the relative influence of well-organized interest groups in maintaining the status quo. *See Blytheville*, 71 F.3d at 1388 (noting that Black voters' realization "that they

faced a much lower possibility of success under the present scheme" could account for low turnout); PLTF-62a, Jonathan Rodden, *Is segregation the problem in Ferguson?,* THE WASHINGTON POST (Blog), Aug. 18, 2014, at 6. In FFSD, these groups include the FFNEA and the NCLC. As described above, *see* Section V.D., both organizations generally endorse white candidates.

There is also some evidence that staggered terms in FFSD enhance the opportunity for discrimination, particularly because they are combined with at-large voting. *See, e.g.*, *Blytheville*, 71 F.3d at 1390 ("[S]taggered terms[] and at-large structure also tend to suppress minority voters' influence.") (citing *De Grandy*, 512 U.S. at 1018); *Collins II*, 883 F.2d at 1236 (noting that the dilutive effect of "at-large voting in a multimember political unit . . . may be enhanced by staggered terms"). In particular, staggered terms "promote the dilution of minority voting strength because they limit the number of seats, [and] create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting." *Buckanaga*, 804 F.2d at 475 (remanding for district court to consider discriminatory effect of school district's use of staggered terms).

Given the continuing socioeconomic effects of past racial discrimination, including transience, the disproportionate effect of felony disenfranchisement, evidence of depressed turnout, and the heightened costs of seeking out information, registering to vote, and voting for persons with less income and less education, Dr. Rodden's testimony that the disproportionate benefits of these voting practices would automatically inure to whatever racial group has even a bare majority of the VAP in any given jurisdiction is not credible. Rather, as Dr. Kimball credibly testified, an ethnic or racial minority would need a larger majority to control elections because of depressed registration and turnout rates, and because "[i]n order to win elections, it

takes also some coordination, recruiting candidates, coordinating support that impose costs and take organizing and take resources. And so being just above 50 percent is probably, in my view, not enough to ensure control of the outcome of . . . at-large elections." *Kimball Testimony,* Trial Tr. vol. 2, 119:5-24; *see also* Trial Tr. vol. 4, 136:1–137:15 (Paulette-Thurman testifying that it was difficult for Grade A for Change to recruit candidates and that Grade A had asked people attending an early meeting to stand up if they'd be willing to run for the Board and only three or four people stood out of 100, and even "[n]ot all of those people decided to do it"); Trial Tr. vol. 2, 74:18–75:18 (Graham testifying that "for a black — I'm going to speak specifically from Berkeley — it's hard to get them to run, to spend the money, send the time and the energy to run, because they're looking overwhelmingly at the district and saying it seems like it's impossible").

As a result, I find that Senate Factor 3 weighs in favor of Plaintiffs.[33]

### G. Tenuousness of Rationales (Senate Factor 9)

Senate Factor 9 considers whether the policies underlying FFSD's use of the challenged voting practices are "tenuous." *See Gingles*, 478 U.S. at 45. Here, Plaintiffs challenge the fact that Board elections are at-large and off-cycle with staggered terms. For the reasons that follow, I find that the District has legitimate and compelling reasons for using the voting practices at issue. As a result, this factor weighs in favor of Defendants.

First, Defendants employ these voting practices because they are required by Missouri law. RSMo. §§ 162.261; 162.291; *see also Joint Stip.* ¶¶ 341, 345-46. This alone is a compelling reason.

---

[33] While I find that the use of the challenged voting practices enhances the opportunity for discrimination, I do not find, as will be discussed *infra*, Section V.G. (regarding tenuousness of rationales), that there are no benefits to these practices. Nor do I find, as the question is not before me, that any benefits would be outweighed by the potential for discrimination that these practices enhance. Weighing the costs and benefits of the challenged electoral practices is more appropriate for the remedial stage than at this time, where I am merely asked if there are practices present that "tend to enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 45.

Second, the District's witnesses testified credibly to several benefits of these electoral features. FFSD witnesses testified that the at-large voting scheme enables the Board to represent the interests of everyone in the District, rather than representing specific sub-districts of the District. *Thurman Testimony*, Trial Tr. vol. 4, 157:7-15; *Rodden Testimony*, Trial Tr. vol. 5, 83:18-84:10. There was also credible testimony that holding Board elections in April is beneficial because it gives new Board members time to learn and train when the school year is winding down and summer is about to begin. *Thurman Testimony*, Trial Tr. vol. 4, 158:7-159:3. Additionally, holding Board elections off-cycle may allow voters to focus more on municipal elections than if they were held in November, when state and national matters are also on the ballot. *Kimball Testimony*, Trail Tr. vol. 3, 39:4-22; *see also Graves Testimony*, Vol. VI, 16:11-21. Finally, the District presented evidence that staggered terms promote stability and mentoring while new board members learn their roles. *Thurman Testimony*, Trial Tr. vol. 4, 158:7-159:3.

As a result, under the totality of the circumstances, Plaintiffs have not established that Defendants' justifications for employing these voting procedures are tenuous, and this factor weighs in favor of Defendants.[34]

## H. Summary of the Senate Factors and the Totality of the Circumstances

After considering all of the evidence presented at trial and weighing the Senate Factors, I conclude that Plaintiffs have established, based on the totality of the circumstances, that African American voters in FFSD have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *See Gingles*, 478

---

[34] My finding that Defendants' reasons for employing the challenged voting procedures are compelling does not militate against my ultimate conclusion that these same practices (or at least some of them) have diluted the African American vote in FFSD Board elections. Plaintiffs need not establish discriminatory intent to prove a Section 2 violation; nor must they show that there is no benefit to a particular practice to establish that it is harmful. Moreover, while I find that there are benefits to these features, which supports my finding that Defendants' justifications are not tenuous, I do not at this phase make any findings about whether these benefits are actually realized in the District or whether they outweigh the harmful effects of the challenged political procedures. *See supra* note 33. Rather, that analysis will be done at the remedy phase.

U.S. at 45 (internal quotation marks omitted) (citing S. Rep. No. 97-417, at 30 & n.120 (1982)).

## CONCLUSION

Intentional discrimination is not an element of a § 2 violation. *See Gingles*, 478 U.S. at 35-37. Plaintiffs have never alleged that Defendants intentionally discriminate against African Americans, and I do not make any findings that Defendants engaged in intentional discrimination. Rather, it is my finding that the cumulative effects of historical discrimination, current political practices, and the socioeconomic conditions present in the Districtf impact the ability of African Americans in FFSD to participate equally in Board elections.

The ongoing effects of racial discrimination that have long plagued the region, and the District in particular, have affected the ability of African Americans to participate equally in the political process. The fact that the electoral process in FFSD Board elections is not equally open to African Americans is most apparent in the stark levels of racially polarized voting seen in Board elections and the failure of white voters to support candidates from the African American community, which has essentially blocked African American voters from exercising effective political power in the District. Against this backdrop of inequality, a number of other factors hinder African American electoral success, such as an absence of meaningful access to endorsements, and subtle racial campaign appeals. Importantly, each of these factors interact with the voting practices and procedures that are in place for school board elections in FFSD, including the at-large and off-cycle election features, as well as, to some extent, the staggered terms of Board members, to dilute the African American vote. Ultimately, the complex interaction between these processes and conditions has "cause[d] an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47.

Determining whether a § 2 violation exists is a complex, fact-intensive task that requires inquiry into sensitive and often difficult subjects. The facts of this case, which include African American and white voting-age populations at levels of near numerical parity, and a trend in the District that suggests the African American voting-age population is growing, set it apart from most § 2 cases, making review especially challenging. But as the Supreme Court has emphasized time and again, "the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Gingles*, 478 U.S. at 45 (internal quotation marks omitted) (citing S. Rep. No. 97-417, at 30 & n.120 (1982)). Having undertaken that inquiry, I conclude that Plaintiffs have established a § 2 violation. Because the facts of this case are so unique, however, the remedy that is ultimately warranted likely needs to be equally unique. Although I do not make any findings now as to the proper remedy, I encourage the parties, each of whom have a vested interest in the FFSD community, to work together in the remedy phase to devise a solution that effectively addresses the current inequalities impacting the electoral process and accommodates the special characteristics present in the FFSD population.

Accordingly, and for all of the reasons set out above, I conclude that Plaintiffs have established the three *Gingles* preconditions, and have established by a preponderance of the evidence that, under the totality of the circumstances, the political processes for electing Board members in the Ferguson-Florissant School District deprives African American voters of an equal opportunity to elect representatives of their choice in violation of § 2 of the Voting Rights Act. As a result, the Court enjoins Defendants from conducting any elections for the District's Board until a new system may be properly implemented. I will set a briefing schedule on remedies after a conference with the parties.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Ferguson-Florissant School District's motion to reopen case #[180] is **GRANTED**.

**IT IS FURTHER ORDERED** that judgment be entered for Plaintiffs on the issue of vote dilution in violation of § 2 of the Voting Rights Act of 1965.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for interim relief #[118] is **DENIED** as moot.

**IT IS FURTHER ORDERED** that a status conference to discuss a remedies briefing schedule is set for **<u>Friday, August 26, 2016 at 3:00 p.m.</u>** in Courtroom 16-South.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of August, 2016.