## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

MISSOURI STATE CONFERENCE OF )
THE NATIONAL ASSOCIATION FOR THE )
ADVANCEMENT OF COLORED PEOPLE, )
REDDITT HUDSON, F. WILLIS JOHNSON )
and DORIS BAILEY, )
                                      )     Civ. No. 14-2077
           Plaintiffs, )
v. )
                                      )
FERGUSON-FLORISSANT SCHOOL )
DISTRICT and ST. LOUIS COUNTY BOARD )
OF ELECTION COMMISSIONERS, )
                                      )
           Defendants. )

## DEFENDANT FERGUSON FLORISSANT SCHOOL DISTRICT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. §1292(b)

Defendant Ferguson Florissant School District ("District") files the instant Motion pursuant to 28 U.S.C. §1292(b) for Interlocutory Appeal of certain controlling questions of law as to which there is substantial ground for difference of opinion. This Motion for Interlocutory Appeal is based on the Court's August 22, 2016 Memorandum Opinion and Order finding the District liable for violating Section 2 of the Voting Rights Act of 1965, 52 U.S.C. §10301. The Court has indicated a willingness to entertain said Motion. While the District, in general, challenges the Court's determination of liability, the District has narrowed the issues for interlocutory appeal to those that are most necessary to materially advance this stage of the litigation. The District waives no right of appeal for the Court's final judgment in this matter.

## I. OVERVIEW

"The ultimate question in any Section 2 case must be posed in the <u>present</u> tense, not the past tense….In particular, elections that provide insights into past history are less probative than

those that mirror the current political reality." *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995) (internal citations omitted and emphasis added)

"[T]he ultimate right of Section 2 is equality of opportunity, not a guarantee of electoral success for minority preferred candidates of whatever race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 508 (2006) (internal citations omitted.) "Reading Section 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Johnson v. DeGrandy*, 512 U.S. 997, 1016-1017(1994).

The Court found the current electoral system that has elected three African Americans in the last three years violates Section 2 of the Voting Rights Act by depriving African Americans of an equal opportunity for representation. The District contests many of the premises and findings by the Court. In general, the District does not believe the Voting Rights Act was meant to "correct" a system whereby the first-place candidate in 2015 and 2016 is African American; and the net results are that African American board members roughly reflect the African American vote-share of the District population.[1]

Section 2 of the Voting Rights Act provides that "no standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the Unites States to vote on account of race or color" 52. U.S.C. §10301(a). A violation of Section 2:

> Is established if, based on the totality of circumstances, it is shown that the political process leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class or

---

[1] Perfect proportional representation is not attainable in a school district with 7 board members whereby both African American and white voters comprise roughly half of the voting age population each. To the District's knowledge, there is no way to elect half a board member.

> citizens protected by subsection (a) in that its members have less
> opportunity than other members of the electorate to participate in the
> political process and to elect representatives of their choice.  The extent to
> which members of a protected class have been elected to office in the State
> or political subdivision is one circumstance which may be considered:
> Provided, That nothing in this section establishes a right to have members
> of a protected class elected in numbers equal to the proportion in the
> population.
> 52 U.S.C. §10301(b).

To establish a claim of vote dilution under Section 2, plaintiffs must first establish the

following three "preconditions" pursuant to the United States Supreme Court's decision in

*Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986): (1) "the minority

group…is sufficiently large and geographically compact to constitute a majority in a single-

member district," (2) the minority group….is political cohesive," and (3) the white majority

votes sufficiently as a bloc to enable it in the absence of special circumstances…usually to defeat

the minority's preferred candidate." *Id*. at 50-51.

If all three preconditions are established, then a court must "consider the 'totality of the

circumstances' and [] determine, based 'upon a searching practical evaluation of the past and

present reality,' whether the political process is equally open to minority voters." *Id*. at 79

(internal citations and quotations omitted.)  " 'This determination is peculiarly dependent upon

the facts of each case,' and requires 'an intensely local appraisal of the design an impact' of the

contested electoral mechanisms." *Id*. In undertaking this practical evaluation, courts look to the

non-exhaustive list of "typical factors" identified in the Senate Report accompanying the 1982

amendments to the VRA ("Senate Factors"), see S. Rep. No. 97-417, at 28-29.[2]

---

[2] The preceding recitation of the law was taken verbatim from the Court's opinion dated August 22, 2016, ECF #185.

The District board is comprised of three African Americans and four white board members.[3] The seven member board serves three-year terms and are elected through the at-large system. Board elections are staggered and held in April so that either two or three Board seats are elected every April in accordance with Missouri law. *Joint Stip.* §31; Section 115.124 RSMo.

In April 2016, Connie Harge, an African American, was elected by a large margin. Ms. Harge received 1,059 more votes than the second place winner. Leslie Hogshead, a white incumbent received the second most votes with 3,513 votes. African American candidates received 7,479 total votes. White candidates received 4,870 total votes. African American candidates received 65% more votes than the white candidates in 2016.[4] African American candidates placed first and third in terms of votes received.

The Court found that the 2010 Census is the correct measure for demographics. Therefore, according to the Court, there are 386 more white than African American voters in the District today. Of the District's 50,771 voters, there are 24,852 (48.95%) non-Hispanic white voters and 24,030 (48.19%) voters that identify as any-part black. Neither white nor African American voters are a majority or over 50% of the voting age population. Instead, the Court found the 0.76% more white voters satisfy the third *Gingles* precondition such that "the white majority votes sufficiently as a bloc to enable it in the absence of special circumstances.....usually to defeat the minority's preferred candidate.[5]"

The parties agree that the 1990, 2000 and 2010 Census indicate a substantial growth in the African American voting age population and a significant decline in the white voting age

---

[3] The Board consisted of two African Americans and four white board members at the time of trial.
[4] These numbers are simply added and divided according to the numbers provided in the Court's opinion.
[5] That is the standard for finding a violation under the third *Gingles* precondition as stated in *Thornberg v. Gingles*, 478 U.S. 30 (1966).

population. The parties agree that the 2010 Census demonstrates a large number of African Americans on the cusp of turning 18, whereas there were far fewer in that category for whites.

In addition to the evidence from the last three decennial censuses, the District offered Census statistics from the 2011 – 2013 American Community Survey ("ACS") that indicate the African American voting age population has continued to increase. The District also provided a trend analysis that concluded that African American voters, who were at near parity with white voters at the time of the 2010 Census, are now a majority of the District's voting age population.

However, the Court concluded that the more recent Census Bureau statistics and the trends from the last 26 years are not persuasive. Instead, the Court found that the 2010 Census is accurate.

The Court applied the state-wide statistics that African Americans are registered to vote at a lower rate than whites to the District. The Court corrected the Plaintiffs' expert's analysis on the rate at which African Americans are disenfranchised due to a felony conviction in the State of Missouri to find that African Americans are disproportionately disenfranchised in the District. Despite the Court's finding that African Americans are registered at a lower rate than white voters, the Court found that turnout among African American and white voters is substantially similar.

The Court concluded that Plaintiffs met their burden under the first *Gingles* precondition by drawing four African-American majority districts in two single-member district illustrative plans. The Court indicated the illustrative plans paired several incumbents against each other. The Court found that "Because two incumbents live within the same Census block, there is no way to draw single-member districts that will separate those incumbents while also complying

with traditional redistricting principles.[6]"  However, the Court concluded that the first *Gingles* precondition does not require an analysis of whether a remedy is *possible*.  Instead, the Court held that an analysis of whether a remedy is *effective* is appropriate at the remedy phase.[7]

Furthermore, the Court concluded that the number of African American voters does not preclude a finding that the at-large system violates the Voting Rights Act.  That conclusion was based the 2010 Census data, the state-wide felony disenfranchisement rate, the state-wide voter registration rate and the homeownership rate.  The Court failed to base its conclusion on the current board.[8]

The Court found Plaintiffs also met their burden on the second and third *Gingles* preconditions.  The District relied on Plaintiffs' expert, Dr. Richard Engstrom, for the proposition that elections in the District are racially polarized.  Dr. Engstrom analyzed five elections from 2011 - 2015.  The Court held his analysis satisfied the "three election threshold the Supreme Court considered sufficient in *Gingles*.[9]"

Racially polarized voting is "a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently." *Gingles*, 478 U.S. at 53 n.32.  Dr. Engstrom's findings are that African American voters in the District always prefer African American candidates.  Engstrom's analysis was not based on the race of the candidate but on an ecological inference analysis.  The Court found Engstrom's *Gingles* II analysis persuasive.

---

[6] See, ECF 185 p. 26.  The Court failed to indicate that the incumbents paired against each other are African American.

[7] The District maintains there is a vast difference between whether any remedy is possible and the determination that a remedy is effective. The Court did not address the first question.

[8] It appears the Court, at most, addressed the notion that the number of African American board members is proportional to the number of African American voters at the end of the analysis.

[9] See, ECF 195 p. 53 quoting *Gingles*, 478 U.S. at 61.

The Court also found Plaintiffs satisfied the third *Gingles* precondition that "the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate.[10]" *Harvell v. Blytheville*, 71 F.3d 1382, 1385 (8th Cir. 1995) The Court indicated that recent elections are generally more probative.[11] Based on Dr. Engstrom's testimony in the 2011 - 2015 elections, the Court found for Plaintiffs.

While the Court admitted that recent elections are more probative, it discounted the 2014 and 2015 election and failed to utilize information from the 2016 election. The Court found 2014 and 2015 were marked by "special circumstances" such that they were given less weight.[12] In addition, the Court indicated it was unable to draw "significant legal conclusions" from the 2016 election because it was not analyzed by experts.

The Court conducted an analysis of the totality of the circumstances after finding Plaintiffs met the *Gingles* preconditions. The Court began its analysis with the two "predominant" factors: "the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006). It then discussed the remainder of the Senate factors that are illustrative of the totality of the circumstances analysis. The Court found for Plaintiffs on most of these factors.[13]

The Court found liability on Monday, August 22, 2016 and held a status conference on Friday, August 26 to schedule briefing on the remedy phase. The District allowed Plaintiffs to

---

[10] The "white majority" standard runs throughout Section 2 legal standards. The Court admitted whites are not a majority but found liability regardless. See, ECF 185 p. 11.

[11] See, ECF 185, p. 44.

[12] The *Gingles* Court, that analyzed three elections, introduced the special circumstances analysis to "prevent defendant jurisdictions from arguing that a minority candidate's <u>occasional</u> victory in an otherwise racially polarized electorate defeats a vote dilution claim." *Rodriguez v. Bexar County Tex.*, 385 F.3d 853m 864 (5th Cir.2004). (emphasis added)

[13] The above facts and summary cited above are from the Court's Memorandum and Opinion. The District does not agree with these findings but cannot dispute them within the confines of a §1292(b) motion. As a result, the District is merely reciting the facts as determined by the Court and will appeal those findings at a later date if necessary.

provide the first recommendation for remedies. The Court ordered that filed by September 28. The District has until October 14, 2016 to respond.

The District filed a Motion to Amend or Amend Judgment and the instant Motion for Interlocutory Appeal. In this Motion, the District respectfully requests the Court certify its finding of liability pursuant to 29 U.S.C. §1292(b).

## II. LEGAL STANDARD

Litigation involving Section 2 of the Voting Rights Act does not fall within the more common and clearly defined confines of civil litigation. As such, the District respectfully requests the Court certify its recent Memorandum Opinion and Order.

28 U.S.C. 1292 (b) provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

Questions certified under § 1292(b) are to be questions of law that do not require a study of the record.[14] The Court's consideration is whether resolution of these questions "would serve to avoid a trial or otherwise substantially shorten the litigation." *Id*.

Courts have found 'substantial ground for difference of opinion' when "(1) the issue is difficult and of first impression, (2) a difference of opinion as to the issue exists within the controlling circuit, or (3) the circuits are split on the issue." *Id*. However, the fact that the

---

[14] See, *Georgia State Conference of the NAACP v. Fayette County Board of Commissioners*, 952 F.Supp.2d 1360 (N.D. Georgia 2013).

question is one of first impression, standing alone, is insufficient. Instead the court has a duty "to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute." *Id.* (*quoting Max Daetwyler Corp. v. Meyer*, 575 F.Supp. 280, 283 (E.D.Pa.1983).

### III. LEGAL QUESTIONS

The District has four main legal questions in the instant Motion that, once decided, will substantially shorten this litigation. They are:

1.)   Can the Court discern a pattern of racial bias in the District?

2.)   What type and amount of evidence is legally sufficient to overcome the presumptive reliability of the decennial census?  Does the rebuttable presumption require the Court to keep decennial census data static as it becomes stale?

3.)   Does a finding of liability require a determination that a remedy is possible?

4.)   Is the District Court required to analyze the most recent election in the record prior to a liability determination?

### IV. ANALYSIS

#### 1. Can the Court discern a pattern of racial bias in the District?

"The district is in the midst of an ongoing racial transition marked by white flight to the outer suburbs.  Since 2000, the white population of the Ferguson-Florissant School District has fallen by almost half (50,000 to 28,160) while the black population has grown steadily.  And, there is a stark disparity in population by age, with the share of the African-American population much higher among school-age resident."[15]

The parties and the Court agree the District is in the midst of a racial transition.  In addition to the demographic transition, the Court found that the 2014 and 2015 elections were unusual.  As a result, the Court found the 2014 election of Dr. Donna Thurman was surrounded

_____

[15] As quoted in this Court's August 22, 2016 Memorandum Opinion, ECF 185.

in 'special circumstances' and less probative.[16]  Not only was 2014 special but the 2015 election

was found to be special.  As a result, the Court afforded less weight to Dr. Courtney Graves'

2015 election.  Thus, the at-large elections of two African American women in the two most

recently analyzed elections are discounted.

In addition, the at-large system resulted in the 2016 election of Connie Harge.  The

District asked the Court to reopen evidence to take notice of the election results.  Ms. Harge (as

well as Dr. Graves in 2014) received the most votes of any candidate by a large margin.

However, the Court held that it could not analyze this election in the absence of expert

testimony.[17]

The United States Supreme Court held analysis of the "three election threshold" was

sufficient to analyze a Section 2 claim.[18]  The Court's Memorandum Opinion agreed.[19]"  (In the

same opinion, *Gingles* Court authored the 'special circumstances' analysis.)[20]  In addition,

*Gingles* held, "…a <u>pattern</u> of racial bloc voting that extends over a period of time is more

probative of a claim that a district experiences legally significant polarization than are the mere

results of a single election."  The *Gingles* Court determined a pattern by analyzing three election

years.

The question for the Court to certify is whether a Court can establish a <u>pattern</u> of racial

bloc voting in light of the last three elections.  In addition, what does the Court consider as the

---

[16] See, ECF 185 p. 68.
[17] So as not to unfairly quote the Court, the Memorandum Opinion states, "However, as Plaintiffs argue, in the absence of meaningful expert testimony regarding these facts, I am unable to draw significant legal conclusions based on these facts." ECF 185 p. 8.
[18] See, Memorandum Opinion, ECF 185 p. 22 and *Thornberg v. Gingles*, 478 U.S. 30 (1986).
[19] See, ECF 195 p. 53 quoting *Gingles*, 478 U.S. at 61.
[20] It is the District's opinion that the *Gingles* Court could not have meant the 'special circumstances' analysis to apply to two successive elections out of the three elections it analyzed.  Otherwise, it would have only analyzed one probative election.

last three elections? Stated another way, can the Court find a pattern of racial bloc voting when it has discounted and/or disregarded the three most recent elections?

This question is "a controlling question of law as to which there is substantial ground for difference of opinion." See, §1292(b). In addition, this is a question of law that can be decided quickly and cleanly without having to resort to the record.[21]

A pattern of racial bloc voting is at the heart of the Voting Rights Act. *Merriam Webster's* online dictionary defines a "pattern" as "the regular and repeated way in which something happens or is done."[22] According to the Court's analysis, the District has not maintained a normal pattern, due to special circumstances, since 2013.[23] Therefore, at a minimum, a pattern cannot be discerned. However, the District would argue that the recent "pattern" suggests that African Americans are elected at the same rate or almost the same rate as whites.[24]

This is a difficult issue and one of first impression. To the District's knowledge, no Court has ever had to struggle to apply the Voting Rights Act under these circumstances. The Court has been asked to find a pattern amidst a transition on several fronts. The Court has been asked to find a pattern while the District's board was becoming proportional. The Court failed to find a pattern since 2013. Can the Court apply a remedy when it admits the District is in transition? Is a decision based on behavior that occurred more than three years ago "posed in the present tense, not the past tense"? ("The ultimate question in any section 2 case must be posed in the present tense, not the past tense." *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1995).)

---

[21] *Georgia State Conference*, 952 F.2d at 1362.
[22] See, http://www.merriam-webster.com/dictionary/pattern
[23] The District dispute's the Court's factual findings but that it not at issue at the current time.
[24] Again, since the District board only maintains 7 seats, it is impossible to evenly split the rate at which African Americans and white representatives are elected under these circumstances.

Finally, resolution of this issue will substantially shorten this litigation. It will help the parties determine whether the 2016 election can be ignored, whether it will be analyzed, or whether the success of an African American candidate can finally be granted equal weight. Most importantly, it will help the parties fashion a remedy. When does a pattern begin? Are there three minority preferred candidates on the current board?[25] Are there two minority preferred candidates? Or, are any of the current board members considered minority preferred since the Court found they were elected in spite of the at-large system?

The District has argued that the 2014 and 2015 elections are not both special but the Court held otherwise.[26] The District was not advised of the Court's failure to utilize the 2016 election until the Memorandum Opinion. Regardless, the District is not arguing the veracity of these facts. Instead, it argues that a pattern cannot be discerned in light of the demographic transition, the special circumstances[27] and the failure to meaningfully analyze the 2016 election. To the District's knowledge, this is an issue of first impression ripe for §1292 review.

## 2. What type and amount of evidence is legally sufficient to overcome the presumptive reliability of the decennial census? Does the rebuttable presumption require the Court to keep decennial census data static as it becomes stale?

The Court has held that the 2010 decennial census is controlling due to the rebuttable presumption in its favor. Courts presume the continued accuracy of the most recent decennial

---

[25] This presumes Ms. Harge is a minority preferred candidate based on the Court's adoption of Engstrom's racially polarized voting analysis and sheer number of votes she received.

[26] The District denies that either of those elections was special. However, even if one was, the 5th Circuit has held, "…[W]hile special circumstances may be used to "explain a single minority candidate's victory," the Supreme Court's comment regarding such circumstances "cannot be transformed into a legal standard which requires to force each and every victory of several minority candidates to fit within a prescribed special circumstance." *Rodriguez v. Bexar County, Tex.*, 385 F.3d 853, 864 (5th Cir. 2004).

[27] This is as determined by the Court.

census absent a party meeting the burden of proving otherwise. See, *McNeil v. Springfield Park Distr.*, 851 F.2d 937, 946 (7th Cir. 1988)

The District has offered a multitude of evidence to overcome that presumption including newer census data (the ACS), 2010 decennial census data for African Americans about to turn 18, past demographic trends, future projections and the number of African American votes in the last several elections.[28] Despite that, the Court maintains there are 386 more white than African American voters.

The instant case turns on razor thin margins. Everyone agrees that there is near racial parity and that the District is trending African American. The question for the Court was whether the presumption could be rebutted. The Court found that the presumption had not been rebutted, but left open the question whether the presumption *could* be rebutted in a District with small margins. It appears the only evidence sufficient to overcome the presumption is another decennial census. In that world, the 'rebuttable presumption' is not actually rebuttable.

The issue of the amount of evidence, if any, necessary to overcome the presumption in favor of the decennial census is crucial. The parties must be able to rely on the Court's determination that whites are the larger group of voters. Not only does that determination form the premise for evaluating liability, but it is crucial in crafting a remedy.

The above question is a pure question of law and one that does not require the Court to study the record. It is clearly of first impression because the convergence of circumstances surrounding this case, including the situation that the races are at near parity and the use of a six

---

[28] The District's analysis could not have included the 2016 election results. However, the District elected an African American woman by a large margin. The District's history indicates this election of this African American woman that received 1,059 more votes than the second placed longtime white incumbent indicates she had to have been supported by African American voters.

year old decennial census in light of its own internal data that indicates it is no longer accuratge, is highly unusual.

Furthermore, and of the utmost importance, is that resolution of this question has the potential of 'substantially accelerating disposition of the litigation.' ("Thus, the district court's primary consideration should be whether resolution of the question would serve to avoid a trial or otherwise substantially shorten the litigation." *Georgia State Conference*, 952 F.Supp. at 1362. (internal citations omitted)

The Court held a six-day bench trial on the issue of liability. It has now ordered the parties to provide the Court with a "remedy" to the current at-large electoral system.[29] In order to properly analyze a single member districting scheme, the parties must know the number of African American and white voters. Single member districts are drawn based on voting age population and/or population. Furthermore, alternative electoral systems have advantages and disadvantages based on the relative strength of the African American and white voting age populations. An analysis of cumulative and limited voting systems is dependent on knowing which group of voters is larger.

If the Court's determination that the largest group of voters can never be rebutted under these circumstances, then the parties can reasonably rely on that determination to continue the litigation. If the Court's determination is subject to change, then any steps toward a remedy could waste the Court's and the parties' resources.

Just as crucial to the question of whether and what amount of evidence is necessary to overcome the presumption in favor of the decennial census is the question whether census data can be "updated" by its own terms. To be clear, does the rebuttable presumption require the

---

[29] The District vehemently denies liability thus precluding a remedy. However, the Court has ordered the parties to offer analysis of alternative electoral systems by mid-October.

decennial census remain static or can it be adjusted for the age groups that have become voting age according to its own internal data?

The parties and the Court agree there was a large group of African Americans "on the cusp of turning 18" in 2010. The 2010 decennial census includes that information. Therefore, as the decennial census becomes more and more stale, can the decennial census be updated on its own terms? If the presumption is that the decennial census is the only method to accurately count the population, and the decennial census includes the number of African American and white residents that have become voting age since its inception, can that information be 'updated' to include voters that are otherwise excluded?

The Court has a duty "to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a substantial ground of dispute." *Id*. The circumstances of this case are extremely unusual and the questions of first impression are numerous. The District believes the Court will do the right thing and certify this issue for interlocutory appeal.

### 3. Does a finding of liability require a determination that a remedy is possible?

The Eighth Circuit is at odds with itself and with the other circuits on the answer to this question. Therefore, this question is ripe for certification because there is a difference of opinion as to the issue within the controlling circuit. There is also a difference of opinion between the Eighth Circuit and the Eleventh Circuit.

The Court held *Gingles* I requires Plaintiffs show that African Americans are "sufficiently large and geographically compact to constitute a majority in a (one) single-member district."[30] Therefore, since Plaintiffs offered two illustrative plans whereby African Americans

---

[30] ECF 185, p. 23 and *Gingles*, 478 U.S. at 50.

constituted a majority in one single-member district, Plaintiffs met their first requirement for liability.

The Court made this finding without any acknowledgement that the standard it utilized is illogical under these facts. (Vote dilution….is a comparative inquiry where the court must measure a minority group's ability to elect under the existing system to some 'alternative system that would provide greater electoral opportunity to minority voters,' which under *Thornburg* is single member districts." *Aldasoro v. Kennerson*, 922 F.Supp. 339 (S.D. Cal. 1995))

At the time of trial, there were two African American preferred candidates on the Board. Now, there are three African Americans on the board. Yet, the Court held that a Plaintiff can satisfy the first *Gingles* precondition by demonstrating that the District can elect *less* African American representation than it currently maintains. How is it a burden if the Plaintiffs have to show less than the present reality? In effect, the Court found Plaintiffs do not have a burden.

Instead, the Court should have implemented a standard that requires *more* representation than the status quo. For example, the United States Supreme Court has held that the first *Gingles* precondition requires "the possibility of creating *more* than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice" when applied to a system that already uses single-member districts. *Johnson v. De*Grandy, 512 U.S. 997, 1008 (1994). While the District does not currently employ single-member districts, clearly the notion that the Voting Rights Act requires *more* representation than the present should override the notion that it should provide less. By employing an illogical standard, the Court was able to find the District liable under the *Gingles* preconditions.

The United States Court of Appeals for the Eleventh Circuit holds the first *Gingles* precondition requires the Court to determine whether a remedy is possible as part of Plaintiffs'

*prima facie case*. (The first *Gingles* precondition requires a determination "whether the court can fashion a remedy for a demonstrated abridgement." *Nipper v. Smith*, 39 F.3d1494, 1511 (11th Cir. 1994). Unless this Court holds that a "remedy" is fashioned when less representation is demonstrated, then the Court did not fulfill this requirement under the 11th Circuit's interpretation.

Plaintiffs may claim they fulfilled the requirement of fashioning a remedy by offering two illustrative plans whereby African Americans are a majority in four of the seven single member districts.[31] This would mean that Plaintiffs provided a 'remedy' that provides more African American representation than the present. However, the District argued that single member districts, in any form, would not increase African American representation.[32] Therefore, under the District's reasoning, Plaintiffs did not offer a remedy.

The Court refused to entertain or analyze this argument. Instead, the Court held that the District's argument was premature under Eighth Circuit law.[33] The Court quoted the following: "[T]he Supreme Court [at this stage] requires only a simple majority of eligible voters in the single-member district. The court may consider, at the remedial stage, what type of remedy is possible….But this difficulty should not impede the judge at the liability stage of the proceedings." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006).[34] Thus, the Court's finding that *Bone Shirt* does not require a determination whether a remedy is possible is in direct conflict with the Eleventh Circuit in *Nipper v. Smith*. Furthermore, the Eighth Circuit is in conflict with itself.

---

[31] This highlights the inconsistency in Plaintiffs' case. Plaintiffs maintain that African Americans are a minority of the voting age population yet entitled to four of the seven board seats.

[32] The District provided expert testimony and analysis on this point. Plaintiffs did not.

[33] See, ECF 185 p. 29: "[T]he District's predictions about the ultimate effectiveness of Plaintiffs' illustrative single-member district plans is irrelevant to the *Gingles* I threshold determination."

[34] The *Bone Shirt* Plaintiffs offered five illustrative plans that offered *additional* minority representation. The Defendants failed did not argue whether a remedy was possible. Instead, those Defendants took issue with the specifics of the single member plans.

This Eastern District Court held in *African-American Voting Rights Legal Defense Fund v. State of Missouri,* 994 F.Supp. 1105 (E.D. Mo. 1997) that the absence of an available remedy precludes a finding of liability under the 'totality of the circumstances' analysis.  This finding is also at odds with the *Bone Shirt* holding that any analysis of a remedy is premature at the liability phase.

The issue for certification is simple, is the Court required to determine whether a remedy is possible in the liability phase?  It does not matter whether the determination is made under the first *Gingles* precondition or whether the determination is made under the 'totality of the circumstances.'  What matters is that the Plaintiffs offered an electoral system that does not provide African Americans with the opportunity for greater representation.  That is the only "remedy" they offered.  That "remedy" was argued and litigated from the time the Complaint was filed to the post-trial briefing.  The Court has not answered and the Circuits are split.

Clearly, this is a consideration that will "substantially shorten the litigation.[35]"  If the Court was required to determine whether a remedy was possible before finding liability, it did not do that.  The District argues Plaintiffs offered a remedy that was not reasonable because it would result in less African American representation.  The Court deferred.

The District argues the Court should have analyzed the issue based on the Eleventh Circuit, this Eastern District's decisions and the evidence presented at trial.  *Bone Shirt* is at odds with that analysis.

The parties only litigated the issue of single member districts.  The District has made this argument from the beginning and it was no surprise to either the Plaintiffs or the Court.  Plaintiffs made the strategic decision to stick with and to litigate single member districts.  There was no opportunity to litigate any other electoral system.  Thus, the issue of whether Plaintiffs

---

[35] *Georgia State Conference of NAACP*, 952 F.Supp. at 1362.

met their burden of proving a remedy was possible at the liability phase is dispositive and undetermined.

The District agrees with both the Eleventh Circuit and with the earlier Eastern District opinion. There is no liability if there is no remedy. The only remedy available to Plaintiffs is the one offered and litigated from the beginning. Plaintiffs were aware of conflicting case law from the beginning and argued against them. If they made the wrong strategic decision, then they are held to the outcome.

Thus, the District respectfully requests the Court certify the above question and to amend its Memorandum Opinion accordingly.

### 4. Is the Court required to analyze the most recent election in the record?

Again, the circumstances in the instant case are unprecedented. The Ferguson Florissant School District has attained a proportional number of African American board members in the last three years. While the District's demographic analysis predicted this outcome, the Court disagreed. Instead, the Court states it cannot know the effect of the most recent election in 2016 due to the lack of expert testimony.

The Court has indicated it is willing to consider extraordinary remedies because the instant litigation is so unique. Prior to that order, isn't the Court required to fully determine whether a remedy is necessary? Therefore, the question to certify is whether the Court is required to analyze the most recent election in the record before finding liability?

The Court took judicial notice of the certified election results in its August 22, 2016 Memorandum Opinion. At the same time, the Court reiterated and accepted Plaintiffs' position that the election cannot be utilized without meaningful expert testimony.

The Court acknowledges that more recent elections are more probative to a Section 2 Voting Rights Act analysis than older elections.[36]  This election, more than most, is extremely probative.  It will establish that African Americans have attained proportional representation.  It will likely establish there were more African American voters in that election than white voters.[37]  Further, it will likely establish those African American voters utilized their combined and larger political power to elect an additional African American representative in the current at-large system.

While the Court defensively acknowledged proportional representation in its analysis of Senate Factor Seven, it did not provide any indication the most recent election was considered under the *Gingles* factors.[38]  The Court forewarned of its failure to utilize the 2016 election when it stated, "I am unable to draw significant legal conclusions based on these facts."[39]  So instead updating the statistical evidence and charts, the District was effectively penalized as discussed below.  The Court relied heavily Dr. Engstrom's testimony.  In that analysis, Engstrom found the District elected two African American preferred candidates in five years.  The Court discounted both of those elections.  If the Court were to consider the five most *recent* elections, the ratios under which Dr. Engstrom based his analysis would change dramatically.  Either African American preferred candidates were elected in three of the five most recent elections; or African American preferred candidates were elected in three of the six most recent elections.[40]  It would be hard to deny an "equal opportunity to elect" with a current analysis of the District.  ("[T]he ultimate right of Section 2 is *equality of opportunity*, not a guarantee of electoral success for

---

[36] See, ECF 185 p. 44 and *Bone Shirt II*, 461 F.3d at 1020-21.
[37] Expert analysis will likely indicate that African American voters outnumbered white voters for the third straight year.
[38] Failure to establish any one of the *Gingles* preconditions precludes liability.  See *Thornberg* generally.  The 2016 election is crucial to the proper analysis of the third *Gingles* precondition and to any analysis based on ratios.
[39] ECF 185 p. 8.
[40] This is an obviously simplistic analysis of Dr. Engstrom and Plaintiffs' evidence.

minority preferred candidates of whatever race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006).emphasis added)

Again, this is an issue of first impression. The Court accepted the most recent election results but failed to utilize them in its *Gingles* analysis. However, this most recent election establishes proportionality. For that reason, is the Court required to consider additional evidence prior to determining liability? In the alternative, should the Court discount the expert testimony that formed the basis for its decision when it is no longer accurate and up to date?

The *Gingles* analysis is crucial to the Court's determination of liability and the District admits this is a difficult issue of which there is substantial ground for dispute. The question becomes where to draw the line. When does the Court finalize evidence? The District argues the Court agreed to accept evidence of the current reality in the District. However, it admitted it could not utilize that evidence analytically through no fault of either party. The District does not intend to answer this question in every instance. However, in this situation, a fair, impartial and accurate decision rests on it. The decision to litigate a remedy is based on evidence that the Board is comprised of two African Americans. That is no longer true and the conclusion from which it is based is circumspect.

For the reasons stated above, the District respectfully requests the Court amend its order to certify the above cited question.

## V. CONCLUSION

The instant case stretches the Voting Rights Act analysis beyond its limits. The District has attained African American representation in proportion to the African American voting power in the last three years. It has done so under the current at-large system. However, the Court found that African Americans do not "have the present ability to elect candidates of their

choice to the Board."[41]  That finding was based on: 1) A "pattern" that is either three years old or is based on one election; 2) A "rebuttable" presumption that may not exist under these facts; 3) Conflicting law that allowed the Court to defer a crucial determination; and 4) Incomplete and/or incorrect data that changes the landscape of the District.

For the reasons stated above, the District respectfully requests the Court grant the District's Motion.

Respectfully submitted,

CROTZER & ORMSBY, LLC

s/ Angela Bullock Gabel
Cindy Reeds Ormsby, #50986
Angela Gabel, #58227
130 S. Bemiston, Ste. 602
Clayton, MO  63105
(314) 726-3040
(314) 726-5120 (fax)
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

*Attorneys for Defendant Ferguson-*
*Florissant School District*

---

[41] ECF 185 p. 88.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that she is a person of such age and discretion as to be competent to serve papers. It is further certified that on September 1, 2016, the undersigned electronically filed the foregoing document with the Clerk of the Eastern District Court and the Eighth Circuit using the CM/ECF system, which will send notification of such filing to the following CM/ECF participant(s):

Anthony E. Rothert
Andrew J. McNulty
Jessie M. Steffan
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: 314-652-3114
Fax: 314-652-3112
trothert@aclu-mo.org
andrew.joseph.mcnulty@gmail.com
jsteffan@aclu-mo.org
*Counsel for Plaintiffs*

Dale Ho
Julie A. Ebenstein
Sophia Lin Lakin
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: 212-549-2686
dale.ho@aclu.org
jebenstein@aclu.org
slakin@aclu.org
*Counsel for Plaintiffs*

M. Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: 404-500-1235
lmcdonald@aclu.org
*Counsel for Plaintiffs*

Gillian R. Wilcox
ACLU of Missouri
3601 Main St.
Kansas City, MO 64111
gwilcox@aclu-mo.org
*Counsel for Plaintiffs*

Dated this 1st day of September, 2016.

s/ Angela Bullock Gabel_____