# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FERGUSON-FLORISSANT SCHOOL DISTRICT ET AL., | ) ) ) |
| Defendants. | ) |

No. 4:14-cv-02077 RWS

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT FERGUSON FLORISSANT SCHOOL DISTIRCT'S MOTIONS TO AMEND AND FOR LEAVE TO FILE AN INTERLOCUTORY APPEAL

Plaintiffs the Missouri State Conference of the NAACP, Redditt Hudson, F. Willis Johnson, and Doris Bailey (collectively, "Plaintiffs") submit this memorandum in opposition to the motions of Defendant Ferguson-Florissant School District (the "District") to amend (ECF No. 188) and for leave to file an interlocutory appeal (ECF No. 191). Because this court's order does not "involve[] a controlling question of law as to which there is substantial ground for difference of opinion and … an immediate appeal from the order [will not] materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), the District's motions should be denied.

## LEGAL STANDARD

In a matter of weeks, final judgment will be entered in this case and the District will be entitled to appeal as a matter of right. 28 U.S.C. § 1291. Yet the District is requesting the "extraordinary course of interlocutory review," for which the District "bears the heavy burden of

demonstrating that the case is an exceptional one in which immediate appeal is warranted." *Union Cty. v. Piper Jaffray & Co.*, 525 F.3d 643, 646 (8th Cir 2008) (per curiam) (internal quotations omitted). "Certification is designed to be used sparingly and in extraordinary cases." *White v. Nix*, 43 F.3d 374, 379 (8th Cir. 1994). "Section 1292(b) establishes three criteria for certification: the district court must be of the opinion that (1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion; and (3) certification will materially advance the ultimate termination of the litigation." *Union Cty.*, 525 F.3d at 646 (internal quotations omitted). "The criteria are conjunctive, not disjunctive." *Ahrenholz v. Bd. of Trustees of Univ. of Illinois*, 219 F.3d 674, 676 (7th Cir. 2000). "The requirements of § 1292(b) are jurisdictional . . . if the case does not present circumstances satisfying the statutory prerequisites for granting certification," the motion must be denied. *Union Cty.*, 525 F.3d at 645-46 (internal quotation and citation omitted).

## ARGUMENT

This Court should deny certification because this Court's August 22, 2016 order finding liability does not involve a controlling question of law as to whether there is substantial ground for difference of opinion nor would an immediate appeal from the order materially advance the ultimate termination of this litigation. The District suggests four questions meet the criteria to permit an interlocutory appeal. According to the District, they are:

> 1.) Can the Court discern a pattern of racial bias in the District?
>
> 2.) What type and amount of evidence is legally sufficient to overcome the presumptive reliability of the decennial census? Does the rebuttable presumption require the Court to keep decennial census data static as it becomes stale?
>
> 3.) Does a finding of liability require a determination that a remedy is possible?

> 4.) Is the District Court required to analyze the most recent election
> in the record prior to a liability determination?

ECF No. 191 at 9. None of these questions satisfy the requirements of 28 U.S.C. § 1292(b).

### 1. *Certification for interlocutory appeal will not materially advance the ultimate termination of the litigation.*

The District fails to meet its burden of demonstrating that resolution of any of its four identified questions will materially advance the ultimate termination of this litigation. In fact, the District offers *no* argument as to how an interlocutory appeal will materially advance the ultimate termination of this litigation, which is on course to conclude in no more than two months' time.[1] Although the District summarily concludes that consideration of its questions by interlocutory appeal will "substantially shorten this litigation," ECF No. 191 at 12, 14, 18, the District does not explain how, but merely "quote[s] this portion of the statute." *Union Cty.*, 525 F.3d at 647. This is especially problematic because to grant the District's request, this Court must "make the necessary findings to demonstrate that this statutory criterion was satisfied." *Id*.

An interlocutory appeal at this stage would not avoid discovery or a trial, which have already been completed, or avoid significant expense by proceeding with the remedy determination, especially "in comparison with the time and expense of staying the proceedings and pursuing an immediate appeal." *Fenton v. Farmers Ins. Exch.*, No. 07–cv–4864 (JRT/FLN), 2010 WL 1006523, at *2 (D. Minn. Mar. 16, 2010) ("The Court may find that certification of an

---

[1] After issuing its order regarding liability, this Court held a status conference on August 26, 2016, to set a briefing schedule for the remedy phase of trial. Plaintiffs' remedy proposal is due September 28, 2016 and the District's response and/or counter-proposal is due October 14, 2016. ECF No. 197 at 17:8-12. At the August 26, 2016 hearing the Court noted its intention to order a remedy by mid-November, to be implemented before the December 13, 2016 start of the candidate filing period, for the 2017 school board election to go forward as scheduled on April 4, 2017. ECF No. 197 at 13:12; Ferguson-Florissant School District 2016-2017 Policies and Procedures, *4013 Qualification of Members*, 130 (2016), https://data.fergflor.k12.mo.us/policy/policy_book/16-17/Policy%20Book%202016-2017%2009-09-16.pdf.

interlocutory appeal would be appropriate if there would be a great amount of time and expense required to proceed with litigation in comparison with the time and expense of staying the proceedings and pursuing an immediate appeal.") (citation omitted).

In fact, an interlocutory appeal would substantially *delay* resolution of this case. Proceedings in this Court will be complete in a matter of weeks whereas merely briefing an interlocutory appeal would take months. Under similar circumstances, this Court has held that interlocutory appeal is inappropriate. For example, in *United States v. Missouri*, this Court declined to certify a denial of summary judgment for interlocutory appeal. No. 4:11 CV 77 RWS, 2016 WL 783067 (E.D. Mo. Feb. 29, 2016). It acknowledged that if its summary judgment order were reversed on interlocutory appeal, the case would reach termination, but nevertheless found that interlocutory appeal was inappropriate because, if its summary judgment decision were affirmed on appeal, "granting the interlocutory appeal will only have delayed the ultimate resolution of this case" and that "granting interlocutory appeal now will only increase the likelihood of multiple appeals, which would decrease judicial efficiency as well as ultimately delay the final resolution of this case." *Id,* at *3. This Court further observed that interlocutory appeal was not appropriate given the advanced stage of the litigation, noting that when "a case is ready to be set for trial, courts tend to find that granting interlocutory appeal will not materially advance the ultimate termination of the litigation." *Id*. (citing *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minnesota, LLC*, No. 09-CV-3037 SRN/LIB, 2013 WL 4028144, at *6 (D. Minn. Aug. 7, 2013)). These considerations have even greater force here, where a trial has already been conducted and all that remains is the comparatively simple task of determining a remedy.

Because the District has not satisfied its burden of establishing that an interlocutory appeal would materially advance the ultimate termination of this litigation, the motions should be denied.

> 2. ***The order does not involve a controlling question of law for which there is substantial ground for difference of opinion.***

A movant seeking interlocutory appeal must also establish: (1) that there is a controlling question of law, (2) for which there is a substantial ground for difference of opinion. Neither factor is present here.

Under § 1292(b), a "controlling question of law" means "a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine" *McFarlin v. Conseco Servs.,* 381 F.3d 1251, 1258 (11th Cir. 2004). Interlocutory "appeals were intended, and should be reserved, for situations in which the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts." *Id.* at 1259. "The idea [behind § 1292(b)] was that if a case turned on a pure question of law, something the court of appeals could decide quickly and cleanly without having to study the record, the court should be enabled to do so without having to wait till the end of the case." *Ahrenholz v. Bd. of Trustees of Univ. of Illinois*, 219 F.3d 674, 677 (7th Cir. 2000).

In addition to presenting a controlling question of law, the question must be one about which there are substantial grounds for a difference of opinion. "Substantial grounds for a difference of opinion exists when: '(1) the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions'; (2) the question is one of first impression; (3) a difference of opinion exists within the controlling circuit; or (4) the circuits are split on the question." *Emerson Elec. Co. v.*

*Yeo*, No. 4:12CV1578 JAR, 2013 WL 440578, at *2 (E.D. Mo. Feb. 5, 2013) (quoting *Newsome v. Young Supply Co.*, 873 F. Supp. 2d 872, 876 (E.D. Mich. 2012)).

None of the questions the District proposes for interlocutory appeal are controlling questions of law for which there is substantial ground for difference of opinion.

### a. *"Can the Court discern a pattern of racial bias in the District?"*

This Court applied the governing legal standard for the *Gingles* preconditions and, based, in part, on its credibility findings at trial, held that elections in the District are racially polarized and that Black-preferred candidates usually lose to candidates preferred by white voters. ECF No. 185 at 78-80. The District seeks certification of "whether a Court can establish a <u>pattern</u> of racial bloc voting in light of the last three elections." ECF No. 191 at 10.[2] Essentially, the District seeks a do-over on the Court's factual finding that Plaintiffs met *Gingles* III, which is satisfied where "the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate." *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385 (8th Cir. 1995) (citing *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)).

"That the Defendant disagreed with a ruling adverse to its interest is unremarkable." *E.E.O.C. v. Allstate Ins. Co.*, No. 4:04CV01359 ERW, 2007 WL 38675, at *4 (E.D. Mo. Jan. 4, 2007). Based on its disagreement with the Court's ultimate holding that Plaintiffs satisfied the third *Gingles* precondition, the District argues against nearly <u>all</u> of the Court's underlying findings of fact related to that factor. That is insufficient to establish the propriety of interlocutory appeal. Using the established legal standards, the Court made a practical

---

[2] The District's formulation of this question as one of "racial bias," ECF No. 191 at 9, appears to imply that a finding of intentional discrimination is necessary for liability under Section 2 of the Voting Rights Act. To prove a Section 2 violation, however, a showing of discriminatory intent is not required, as "Congress [has] made clear that a violation of § 2 c[an] be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991).

5

assessment of how at-large elections operate in FFSD. *See Gingles*, 478 U.S. at 45 ("The question whether the political processes are equally open depends upon a *searching practical evaluation* of the *past and present reality*, and on *a functional view* of the political process." (emphasis added; internal quotation marks and citation omitted)); *Cottier v. City of Martin*, 604 F.3d 553, 559 (8th Cir. 2010) (quoting *Gingles*, 478 U.S. at 79) ("Vote dilution claims are 'peculiarly dependent upon the facts of each case,' requiring 'an intensely local appraisal of the design and impact of the contested electoral mechanisms.'"). What the District calls a matter of first impression—the combination of every aspect of the Court's determination of liability—is an application of the established legal standards to the facts *particular to the District*. This is not a controlling legal question for purposes of § 1292(b), let alone a matter of first impression, but merely a disagreement with findings of fact—based in part on credibility determinations—to which the Court applied the established standard for *Gingles* III.

To buttress its claim that this Court misapplied a legal standard, the District now, for the first time, claims that the Court can consider only the three most recent school board elections, one of which occurred after trial and the close of evidence, in determining whether *Gingles* III is satisfied, and could not have found liability in light of those three election outcomes. As an initial matter, this new theory is inconsistent with the District's submission at trial of the twelve elections held between 2000 and 2012. ECF No. 185 at 45-46. More fundamentally, the District offers no case law or expert testimony supporting its new theory that the Court can only consider the 2014, 2015, and 2016 elections for purposes of analyzing *Gingles* III. In fact, in its decision, and based on its finding that Plaintiffs' expert's testimony was "reliable and highly credible," ECF No. 185 at 52, this Court simply applied the controlling law to its factual findings, considered the two three-seat and three-seat elections held from 2011 to 2015 elections, and

concluded that Plaintiffs satisfied *Gingles* III. ECF No. 185 at 43-45, 53, 78-80. And, the Court noted that Plaintiffs would have met *Gingles* III had the Court credited the District's approaches for identifying Black-preferred candidates, ECF No. 185 at 80-82, and even if it had used the District's analysis of twelve elections, *see* ECF No. 185 at 48-52.

And, as the Court made clear, while special circumstance findings in 2014 and 2015 supports its ultimate conclusion that Plaintiffs satisfied *Gingles* III, ECF No. 185 at 79, Plaintiffs would have met *Gingles* III even without consideration of special circumstances because overall "Black-preferred candidates were usually not elected." ECF No. 185 at 78-79. Far from presenting a disputed legal question, it is well-established that there is less probative value in any election that is marked by special circumstances that suggest that the election "was not representative of the typical way in which the electoral process functions." *Ruiz v. City of Santa Maria*, 160 F.3d 543, 557-58 (9th Cir. 1998); *see also Gingles*, 478 U.S. at 75-76 (holding that district court "could appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance to [plaintiffs'] claim"); *Blytheville*, 71 F.3d at 1389 (removing elections involving special circumstances from analysis of *Gingles* preconditions).

Even accepting the District's new legal theory that the *Gingles* analysis must be limited to the three most recent elections, the Court's factual findings would still satisfy the established standard for *Gingles* III. The Court found that voting was racially polarized in the 2014 and 2015 elections; that two out of three Black-preferred candidates were defeated in 2014, ECF No. 185 at 65-67, 69-70; and that the victories of one Black-preferred candidate in 2014 and, in particular, one Black-preferred candidate in 2015 were marked by special circumstances that render those victories slightly less probative. ECF No. 185 at 67-68, 70-74. Based on its factual findings about circumstances surrounding the 2014 election—which the District does not argue

7

were erroneous—the Court properly afforded the 2014 election "slightly less probative value than if there were no special circumstances surrounding the election," without discounting the success of Paulette-Thurman. ECF No. 185 at 80. And this Court also determined, in light of its fact-finding about the totality of the circumstances, that special circumstances affected the 2015 election, which changed candidate behavior and voting patterns, and found "Dr. Graves' overwhelming level of support was an exceptional occurrence . . . and therefore not necessarily evidence of a trend or the African American community's sudden equal opportunity to elect preferred candidates." ECF No. 185 at 72-73. This routine application of established legal principles to factual findings based on trial evidence—which, again, the District does not even argue are erroneous—does not constitute a controlling legal question about which there are substantial grounds for dispute.

The Court's treatment of the post-trial 2016 election results was also proper and does not present a controlling or contested legal issue. This Court considered *exactly* the evidence that the District asked this Court to consider: the 2016 certified election results. As the Court found, drawing significant legal conclusions from the 2016 election beyond the evidence presented is impossible and improper. ECF No. 185 at 7-8. The District complains that this Court did not *sua sponte* identify Connie Harge as a Black-preferred candidate in 2016, or make legal conclusions regarding voting patterns, polarization, and the success of Black-preferred candidates in the 2016 election, despite the fact that the District proffered *no evidence* about any of these issues. The District does not cite a single case to support its contention that, merely because Ms. Harge is African-American, she was Black voters' presumptive candidate of choice, or that her election to one of the two open seats in this post-trial election nullifies the Court's determination of the District's liability. ECF No. 191 at 10-11. To the contrary, it is well established that the race of

8

the candidate cannot be used as the sole criterion to identify voters' candidates of choice. *Blytheville*, 71 F.3d at 1386 ("We do not categorically state that a candidate is the minority-preferred candidate simply because that candidate is a member of the minority. Such stereotyping runs afoul of the principles embodied in the Equal Protection Clause."). The Court's failure to presume facts not in evidence or consider analysis never undertaken about the 2016 election does not present a controlling question of law about which there are substantial grounds for disagreement.

> **b. *"What type and amount of evidence is legally sufficient to overcome the presumptive reliability of the decennial census? Does the rebuttable presumption require the Court to keep decennial census data static as it becomes stale?"***

Although the District attempts to cast as a question of law this Court's factual determination—based on findings about what evidence is credible—about the racial makeup of the District, it is not a *controlling* legal question. The Court determined that African Americans do not currently constitute a majority of the FFSD's voting age population. ECF No. 185 at 30-31. But ultimately, the precise count of the Black voting age population ("BVAP") in the District is not a controlling question in this case, because even if the District had met its burden of showing that the Decennial Census population data was unreliable (which it did not), and that the BVAP were over 50% (which it is not), that would not preclude a finding of Section 2 liability. ECF No. 185 at 37-40; *see also id.* at 38 ("Consistent with this Supreme Court guidance, four of the five Courts of Appeals that have considered this question (the Second, Fifth, Eleventh, and D.C. Circuits) have rejected the per se rule prohibiting vote dilution claims where a racial minority constitutes a numerical majority of a jurisdiction.").[3] That is particularly the case here,

---

[3] While the District disagrees with this Court's – and four Appeals Courts' – conclusion that there is no *per se* bar to a Section 2 claim if a minority population surpasses 50 percent of the

9

given the Court's factual findings about the voting strength of the African-American community in the District, which, as the District itself acknowledges, was based on detailed factual determinations about factors other than the Census, including "the state-wide felony disenfranchisement rate, the state-wide voter registration rate, and the homeownership rate." ECF No. 191 at 6.

In any event, the Court properly found that the District's evidence was insufficient to overcome the presumptive reliability of the 2010 Decennial Census data. ECF No. 185 at 31-37. The Court's analysis of the District's failure to satisfy its burden of showing that African Americans are a majority of the BVAP is straightforward. "'Courts consider *Decennial* Census data 'presumptively accurate.'" ECF No. 185 at 9 (emphasis added); *see Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853-54 (5th Cir. 1999). To show that there has been a substantial population shift rendering the actual count of the Decennial Census data inaccurate, the party challenging the use of the Census data must "thoroughly document[]" changed population figures with "a high degree of accuracy," a showing that must be "clear, cogent and convincing." *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1210 (S.D. Tex. 1997) (citation omitted), *aff'd*, 165 F.3d 368 (5th Cir. 1999). The Court provided a detailed analysis of the shortcomings of the District's three proposals for alternative means of estimating the voting age population, finding none of them overcome the presumptive accuracy of the Decennial Census, ECF No. 185 at 31-37, and instead relied on the same Decennial Census data that is regularly relied upon throughout the Eighth Circuit, see ECF No. 185 at 30-31. The Court's determination that the District's evidence was not reliable, does not present a controlling legal question about which there is substantial ground for disagreement.

---

voting age population, that issue is not determinative in light of the Court's factual findings about the *size* of the Black population in the District.

Moreover, the District is incorrect that the use of the Decennial Census population data six years after it is collected is "highly unusual," much less a matter of first impression. ECF No. 191 at 13-14.[4] Citing five examples from the Eighth Circuit, the Court determined that "courts resolving Voting Rights Act claims in the Eighth Circuit regularly rely on Decennial Census data for determining the demographics of a jurisdiction." ECF No. 185 at 30-31. The Court then made a series of factual findings particular to the evidence presented at trial and established that "the District has not provided reliable data sufficient to overcome the presumptive validity of the 2010 Decennial Census, which indicates that African Americans are a minority of the FFSD VAP and outnumbered by whites." ECF No. 185 at 30. The Court did not "keep decennial census data static as it becomes stale," as the District claims. ECF No. 191 at 12. It determined that the District had failed to overcome the presumptive accuracy of the Decennial Census data. The Court's handling of this issue is consistent with how Decennial Census data is utilized in Eighth Circuit cases. It does not, therefore, constitute a controlling legal question about which there is substantial ground for disagreement.

Interlocutory appeal is for controlling questions of law about which there is substantial ground for disagreement. It is not the appropriate forum for the District to re-litigate this Court's credibility determinations of the methods employed by expert witnesses.

### c. *"Does a finding of liability require a determination that a remedy is possible?"*

To the extent there remains a question of whether a remedy is possible, interlocutory appeal is inappropriate while the parties are briefing proposed remedies. *See Johnson v. Jones*, 515 U.S. 304, 309 (1995) (observing that an interlocutory appeal "risks additional, and

---

[4] Whether FFSD is, as the District puts it, "in the midst of a racial transition," ECF No. 191 at 9, is not an element of determining the population demographics or proving vote dilution. The District's prediction of future demographic shifts does not preclude a current finding of liability.

unnecessary, appellate court work either when it presents appellate courts with less developed records or when it brings them appeals that, had the trial simply proceeded, would have turned out to be unnecessary."). This Court's order also does not present a controlling legal issue about which there is substantial ground for dispute.

As the Court observed, "[T]he Supreme Court [at the liability stage] requires only a simple majority of eligible voters in the single-member district. The court may consider, at the *remedial* stage, what type of remedy is possible . . . . But this difficulty should not impede the judge at the liability stage of the proceedings. (quoting *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) ("*Bone Shirt II*") (alteration in original) (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991))" ECF No. 185 at 24. *Gingles* I requires a showing that the African American population in the District is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. As the Court held, Plaintiffs satisfied *Gingles* I by presenting two illustrative plans in which Black voters constitute a majority of the VAP in not just one but four of seven single member districts ("SMDs"). ECF No. 185 at 24, 27; *see Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (stating that *Gingles* I asks a simple threshold question: whether the protected group of voters can make up "more than 50 percent of the voting-age population in the relevant geographic area?"). The *effectiveness* of such a hypothetical redistricting plan need not be proven in order to establish liability under Section 2. *See Bone Shirt II*, 461 F.3d at 1019 (rejecting defendants' argument that "plaintiffs must prove" the effectiveness of an illustrative plan in the liability stage). The ultimate viability and effectiveness of this *potential* solution and other possible remedies is an inquiry for the remedial stage of the case. *See, e.g.*, *id.*; *accord Gonzalez v. Harris Cty.*, 601 F. Appx 255, 261 (5th Cir. 2015) ("[T]he ultimate viability and effectiveness

12

of a remedy is considered at the remedial stage of litigation and not during analysis of the *Gingles* preconditions." (citation omitted)); *Dickinson*, 933 F.2d at 503 ("The court may consider, at the *remedial* stage, what type of remedy is possible . . . [b]ut this difficulty should not impede the judge at the liability stage of the proceedings."). There is no authority to the contrary; this is not a controlling legal question about which there are substantial grounds for disagreement.

Although the District claims that "[t]he parties only litigated the issue of single member districts," ECF No. 191 at 18, this assertion betrays the District's miscomprehension of this case. Plaintiffs litigated the entirety of their Section 2 claim and will submit proposed remedies in accordance with the schedule established by the Court. To the extent that the District implies that Plaintiffs were required to show the effectiveness of the illustrative plans to satisfy *Gingles*, controlling case law does not support this proposition.— Moreover, the District's argument that "single member districts, in any form, would not increase African American representation" at-large system, ECF No. 191 at 17, is both premature, and premised on the District's expert's testimony about population estimates, which this Court rejected as unreliable. ECF No. 185 at 29, FN8.

### d. *"Is the District Court required to analyze the most recent election in the record prior to a liability determination?"*

The District asked that the Court re-open the record after the trial was completed and take judicial notice of the 2016 election results. ECF No. 174 at 14; ECF No. 181. Plaintiffs did not oppose that motion, but instead requested that the Court take judicial notice of additional facts for the sake of completeness. ECF No. 184. Contrary to the District's argument, the Court did not "fail[] to utilize the 2016 election." ECF No. 191 at 12. Rather, the Court granted the

13

District's motion, re-opened the case, and took judicial notice of the new evidence from the 2016 election, ECF No. 185 at 8, including the election results and the race of the two successful candidates. ECF No. 185 at 8, 85-86.

Now, after this Court has made its liability determination, the District contends that additional analysis, never undertaken, *might* have provided probative evidence in its favor on *Gingles* II and III. As noted, however, the Court took notice of precisely the evidence that the District asked it to; the District's claim that the Court erred by failing to consider other, purely hypothetical evidence that the District did not present is a not a substantial legal question about which there is substantial ground for dispute.

The District also uses the Court's judicial notice of the 2016 election results to make a new argument that the District is somehow immune from liability because proportional representation for African Americans has supposedly already been achieved in the District. ECF No. 191 at 20-21. That assertion is mistaken as a factual matter, and it fails to raise a controlling legal issue. As a factual matter, the Court determined that, even taking the 2016 electoral results into account, "African American electoral successes have generally been minimal in FFSD" and "that evidence is insufficient to support a finding that African Americans have the present ability to elect candidates of their choice to the Board." ECF No. 185 at 88-89. And, as a legal matter, this Court correctly recognized that "proportionate representation is not a safe harbor" in which the District can seek refuge from the totality of the circumstances. ECF No. 85-86; *see Blytheville*, 71 F.3d at 1388. This is not an issue of first impression, as the District claims, but a well-established principle in the Eighth Circuit. *See Blytheville*, 71 F.3d at 1388-89 ( "Proportional representation . . . does not preclude finding a violation, because racial reference points do not necessarily reflect political realities."); *Little Rock Sch. Dist. v. Pulaski Cty. Special*

*Sch. Dist., No. 1*, 56 F.3d 904, 911 (8th Cir. 1995) (rejecting the "claim that proportional representation precludes a finding of vote dilution under § 2" and observing that "even if the [defendant] can show proportional representation, the inquiry must not end there.").

## CONCLUSION

After nearly two years of discovery, motion practice, and a trial, this case is nearly concluded. Interlocutory appeals are rarely appropriate, especially where trial is scheduled. Here, a trial has already been held and all that remains is the relatively straight-forward process of determining a remedy, which will likely be complete by mid-November 2016. ECF No. 197 14:4-8. The District has failed to meet its burden of establishing that this Court may allow an interlocutory appeal, much less that this Court *should* exercise its discretion to do so. This Court's order on liability does not raise a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal from the order will not materially advance the ultimate termination of the litigation. The District's motions to amend (ECF No. 188) and for leave to file an interlocutory appeal (ECF No. 191) should be denied.

Dated this 12th day of September, 2016.       Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

GILLIAN R. WILCOX, #61278MO
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, MO 64111
Phone: (816) 470-9938

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235

* *appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

# CERTIFICATE OF SERVICE

I, Julie A. Ebenstein, hereby certify that on September 12, 2016, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Kathryn B. Forster
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com
kforster@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN
