UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) Case No. 4:14 CV 2077 RWS |
| FERGUSON-FLORISSANT SCHOOL DISTRICT, et al., | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This vote dilution case is before me on Defendant Ferguson-Florissant School District ("the School District" or "FFSD")'s Motion for Interlocutory Appeal pursuant to 28 U.S.C. § 1292(b).[1] The School District seeks leave to file an interlocutory appeal of my Memorandum Opinion and Order of August 22, 2016 ("Opinion"), in which I found a violation of § 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. Plaintiffs the Missouri State Conference of the NAACP, Redditt Hudson, F. Willis Johnson, and Doris Bailey oppose the School District's motion. For the reasons that follow, I will deny the School District's motion.

## Background

Plaintiffs brought suit against Defendants Ferguson Florissant School District and the St. Louis City Board of Election Commissioners ("BOEC"), contending that that the electoral

---

[1] On September 1, 2016, the School District filed a "Motion to Amend or Alter Judgment under Rules 54(b) and/or 59(e)" in this case. *See* [#188]. That motion asks me to amend my August 22, 2016 Opinion finding liability to include a statement certifying the Opinion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Also on September 1, the School District filed in this case a Memorandum in Support of its Motion for Interlocutory Appeal pursuant to 28 U.S.C. § 1292(b). *See* [#191]. To the extent the Motion to Amend is not clearly a motion for leave to file interlocutory appeal, I construe the School District's Motion to Amend or Alter Judgment as a motion for leave to file interlocutory appeal, and I have fully considered and rely upon its Memorandum in Support of Interlocutory Appeal in reaching my decision. *See* Fed. R. App. P. 5(a)(3).

structures used in Ferguson-Florissant School Board ("the Board") elections interact with historical and socioeconomic conditions to deprive the African American voters in FFSD of an equal opportunity to elect representatives of their choice.

I held a six day non-jury trial in this matter beginning on January 11, 2016. The parties filed post-trial briefs and proposed findings of fact and conclusions of law on April 8, 2016. On April 22, 2016, the parties filed responses to each other's post-trial briefs. Also on April 22, 2016, the School District filed a motion to re-open the case for additional evidence, in which it asked me to take judicial notice of the election results from the April 5, 2016 school board election in FFSD. On April 26, 2016, Plaintiffs responded to the School District's motion to re-open the case, stating that they do not oppose the motion, but requesting that I take judicial notice of additional facts related to the 2016 election.

After consideration of the testimony given at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, on August 22, 2016, I issued my findings of fact and conclusions of law. *See* Memorandum Opinion and Order of August 22, 2016 [#185]. I found that Plaintiffs had established a § 2 violation of the Voting Right Act and under the standards of *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).

On August 26, 2016, I held a status conference to discuss a remedies briefing schedule. At the August 26 status conference, the School District stated that it would prefer for Plaintiffs to submit remedial proposals first. Neither Plaintiffs nor the BOEC objected to this course of action. I ordered Plaintiffs to submit remedial proposals for the Court's consideration by no later than September 28, 2016. Defendants were given until October 14, 2016, to respond.

On September 1, 2016, the School District filed its current motion for interlocutory appeal. Plaintiffs oppose the motion.

## **Legal Standard**

Under 28 U.S.C. § 1292(b),

> [w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

There are three requirements that must be met before a district court opinion may be certified for interlocutory appeal. *White v. Nix*, 43 F.3d 374, 377 (8th Cir. 1994). "[T]he district court must be of the opinion that (1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion; and (3) certification will materially advance the ultimate termination of the litigation." *Id.* (internal quotations omitted). These three statutory requirements are jurisdictional, and all must be present for certification to be proper. *Id.* at 376.

Controlling questions of law appropriate for certification includes those "in which the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts." *McFarlin v. Conseco Servs.*, 381 F.3d 1251, 1259 (11th Cir. 2004).

"Substantial grounds for a difference of opinion exists when: '(1) the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions'; (2) the question is one of first impression; (3) a difference of opinion exists within the controlling circuit; or (4) the circuits are split on the question." *Emerson Elec. Co. v. Yeo*, No. 4:12CV1578 JAR, 2013 WL 440578, at *2 (E.D. Mo. Feb. 5, 2013) (quoting *Newsome v. Young Supply Co.,* 873 F.Supp.2d 872, 876–77).

It is "the policy of the courts to discourage piece-meal appeals because most often such appeals result in additional burdens on both the court and the litigants." *Id.* In accordance with

the policy of discouraging interlocutory appeals, "§ 1292(b) should and will be used only in exceptional cases where a decision on appeal may avoid protracted and expensive litigation . . . ." *Id.* "The movant bears the heavy burden of demonstrating that the case is an exceptional one in which immediate appeal is warranted." *Id.* It is within the trial court's discretion to grant or deny a motion for interlocutory appeal, and also within the discretion of the court of appeals to certify the appeal. *Id.* (internal citations omitted).

## **Discussion**

### A. Questions for Certification

The School District seeks to certify the following four questions for interlocutory appeal:

1) Can the Court discern a pattern of racial bias in the District?

2) What type and amount of evidence is legally sufficient to overcome the presumptive reliability of the decennial census? Does the rebuttable presumption require the Court to keep decennial census data static as it becomes stale?

3) Does a finding of liability require a determination that a remedy is possible?

4) Is the District Court required to analyze the most recent election in the record prior to a liability determination?

Motion for Interlocutory Appeal, [#191] at 9.

### B. The Legal Standards of § 2 of the Voting Rights Act

The questions the School District seeks to have certified all relate to the findings of fact and conclusions of law that I issued post-trial under the statutory requirements of the Voting Rights Act and the legal standards of *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). As stated in my Opinion, § 2 of the Voting Rights Act provides that no "standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C.A. § 10301(a). A § 2 violation:

4

is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C.A. § 10301(b).

To establish a claim of vote dilution under § 2 of the Voting Rights Act, plaintiffs must first establish the following three "preconditions" under to the United States Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986):

1. "[T]he minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district,"

2. "[T]he minority group . . . is politically cohesive," and

3. "[T]he white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . —usually to defeat the minority's preferred candidate."

*Id.* at 50-51.

If all three preconditions are established, then a court must "consider the 'totality of the circumstances' and [] determine, based 'upon a searching practical evaluation of the past and present reality,' whether the political process is equally open to minority voters." *Id.* at 79 (internal citations and quotations omitted). "'This determination is peculiarly dependent upon the facts of each case,' and requires 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms." *Id.* In undertaking this practical evaluation, courts look to the non-exhaustive list of "typical factors" identified in the Senate Report accompanying the 1982 amendments to the Voting Rights Act ("Senate Factors"), *see* S. Rep. No. 97-417, at 28-29.

C. Analysis

The School District seeks certification of all four questions, arguing that they each involve controlling questions of law for which there is substantial ground for difference of opinion and that they will materially advance the ultimate termination of the litigation. Plaintiffs disagree, and argue that none of questions meet the criteria for certification. For the reasons that follow, I find that none of the four questions presented meet the requirements for certification.

*1. Can the Court discern a pattern of racial bias in the District?*

The School District first seeks certification to ask, "Can the Court discern a pattern of racial bias in the District?" The School District argues that I did not or could not properly find a pattern of racial bias in the School District because the School District is in the midst of an ongoing racial transition, where the African American and white voting age populations are at near numerical parity. The School District also argues that my findings were improper because I "discounted and/or disregarded the three most recent elections," in each of which an African American candidate was elected.[2] The School District appears to contend that I should have limited my review of recent Board elections to just the last three years of elections (from 2014-2016), one of which occurred after the trial ended (2016), and that the review I did conduct of those elections was faulty.

At trial, the parties presented evidence and expert testimony on the 2014 and 2015 elections, as well as several other Board elections going back to 2000.[3] I reviewed these elections, and, as *Gingles* II and III require, considered whether African American and white

---

[2] While I determined that the African American candidates who were elected to the Board in 2014 and 2015 were "Black-preferred candidates" under *Gingles*, I made no finding as to whether the African American candidate who was elected to the Board in 2016, Connie Harge, was a Black-preferred candidate, because there was no testimony or evidence offered to support such a finding.
[3] In fact, it was the School District's expert that urged me to consider more elections, going back to 2000, while Plaintiffs' expert focused his analysis on the five most recent and contested elections.

6

voters tend to "vote differently," *i.e.*, whether there is racially-polarized voting, *Gingles*, 478 U.S. at 53 n.21, and whether the candidates preferred by Black voters "usually" lost to candidates preferred by white voters, *Blytheville*, 71 F.3d at 1385. Consideration of these questions requires a "searching practical evaluation of the past and present reality, and [] a functional view of the political process." *Gingles*, 478 U.S. at 45 (internal quotation marks omitted) (citing S. Rep. No. 97-417, at 30 & n.120 (1982)). Based on the evidence presented at trial, I found that school board elections in the School District are racially polarized and that Black-preferred candidates usually lose.

Because a review of the issues raised by this question would require extensive review of the factual record and my credibility determinations, on this basis alone the question is not a controlling question of *law* and certification for interlocutory appeal would not be proper. *McFarlin v. Conseco Servs.*, 381 F.3d 1251, 1259 (11th Cir. 2004). Likewise, the School District's arguments on this question are essentially disagreements with my findings of fact, or the application of established law to the facts of this case, which is not a sufficient basis for certifying a question for interlocutory appeal.

In addition, the School District's argument that I "discounted and/or disregarded the three most recent elections," in each of which an African American candidate was elected, does not raise a controlling question of law as to which there is substantial ground for disagreement. As *Gingles* requires, I considered whether any of the relevant elections were marked by special circumstances that suggest that the election "was not representative of the typical way in which the electoral process functions." *Ruiz*, 160 F.3d at 557-58; *see also Gingles*, 478 U.S. at 75-76; *Blytheville*, 71 F.3d at 1389. I found that both the 2014 and 2015 elections were marked by somewhat special circumstances, which rendered the successes of the Black-preferred candidates

7

in those elections slightly less probative than they otherwise would be. Plaintiffs do not dispute that *Gingles* requires courts to review elections to determine whether they occurred under special circumstances. Rather, their dispute here is again limited to a disagreement with my application of the prevailing law to the facts of this case. As a result, the question is not a question of *law* as to which there is substantial ground for disagreement. Likewise, the School District's argument that I should not have discounted the probative weight of 2014 and 2015 election results based on my finding that they were marked by special circumstances does not raise a *controlling* question of law because, as I noted in my Opinion, even if I had found that the elections had not occurred under special circumstances, Plaintiffs would have established *Gingles* III. *See* [#185] at 79.

The School District's argument that I did not properly analyze the 2016 election also fails to present a controlling question of law as to which there can be substantial disagreement. After the close of evidence in January 2016, and while the parties were preparing their post-trial briefs, the School District's April 2016 school board election took place. Along with its post-trial briefs, the School District filed a motion to re-open the case and asked me to take judicial notice of the official election results. I granted that motion and took judicial notice of the official election results, which included the fact that one African American candidate, Connie Harge, and one white candidate, were elected to the Board. The School District did not seek to re-open the case to submit expert or additional fact testimony on the 2016 election. As a result, and as noted in my Opinion, I could not draw any significant legal conclusions based on the 2016 election, as the law is clear that courts cannot presume that African American candidates are Black-preferred candidates, the relevant inquiry, without violating the Equal Protection Clause. *See Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1386 (8th Cir. 1995). The School District has not

8

provided any legal support for its theory that a court could identify any candidate as a minority-preferred candidate under these facts, or that a court could also draw legal conclusions regarding voting patterns, polarization, or the overall successes of minority-preferred candidates based on the mere admission of certified election results. As a result, the School District has not established that this issue raises a controlling legal question about which there is substantial ground for disagreement.

Finally, the School District has also failed to establish that resolution of this question on interlocutory appeal will substantially shorten this litigation. Here, trial has already concluded and the remedy phase of the case is set to conclude in the next two to three months. If the School District's motion for interlocutory appeal were granted and my finding of liability were reversed, the case would be resolved without having to go through a remedy phase, hastening the ultimate outcome of the litigation. Absent that outcome, however, an interlocutory appeal would only delay the ultimate termination of this litigation, as the appellate briefing alone would likely take as long as, if not longer than, the time it will take to fashion a remedy.

   2. *What type and amount of evidence is legally sufficient to overcome the presumptive reliability of the decennial census? Does the rebuttable presumption require the Court to keep decennial census data static as it becomes stale?*

The School District also seeks certification of the following question(s): "What type and amount of evidence is legally sufficient to overcome the presumptive reliability of the decennial census? Does the rebuttable presumption require the Court to keep decennial census data static as it becomes stale?" The School District argued at trial that a finding of liability was barred because the African American voting age population in the School District is a numerical majority. The School District based its argument on American Community Survey ("ACS") data from the U.S. Census Bureau and its expert's testimony about the population demographics and

trends in FFSD.

As discussed in my Opinion, decennial census data is presumptively reliable, and parties seeking to establish that population counts are other than what was published in the latest decennial census must overcome that presumption. Here, the 2010 Decennial Census provided that the African American voting age population was not the numerical majority, and while the School District presented evidence in support of its argument that the voting age population had since become a very slight majority, for a variety of reasons, I ultimately found that the School District's evidence was insufficient to overcome the presumption that the Decennial Census provided the most reliable population count. I also noted, however, that my finding that the African American voting age population was not a numerical majority did not preclude a finding of liability under the Voting Rights Act or under the facts of this case because of other circumstances diluting the voting strength of the African American community in the School District. As a result, the question presented is not a controlling question of law.

Moreover, the question the School District presents, and my findings regarding the size of the voting age population in the School District, are fact-based questions requiring a detailed review of the record. There is no blanket standard that courts can set to determine whether a party overcomes the presumption that the decennial census is reliable. Rather, the inquiry requires a factual review and, as this case required, credibility determinations on the parties' expert witnesses. For this reason, too, the School District does not raise a controlling question of law.

Additionally, the School District does not disagree with the law that I applied, or argue that the decennial census is not entitled to a presumption of reliability. Rather, it merely disagrees with how I applied the established law to the facts of this case. Such an argument does

not raise a controlling question of law over which there can be substantial ground for disagreement.

The School District's argument that using decennial census data six years after it was collected is "highly unusual" also does not present a question as to which there are substantial grounds for difference of opinion. As discussed in my Opinion, courts deciding Voting Rights Act cases regularly rely on decennial census data. *See, e.g., Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385 n.1 (8th Cir. 1995); *Clay v. Bd. of Educ. of St. Louis*, 90 F.3d 1357, 1359 (8th Cir. 1996) ("*Clay II*"). To date, the School District has only cited one Voting Rights Act case which declined to use the decennial census and used ACS data instead.

Moreover, even a determination that the ACS data was sufficiently reliable to overcome the presumptive reliability of the decennial census data would not have been enough in this case. Because the ACS does not publish data on the "any-part Black" voting age population, to accept the School District's argument that African Americans are now a majority of the voting age population, I would have also had to accept its expert's analyses extrapolating the published data and applying his findings regarding population trends in the School District to then calculate an "any-part Black" population figure for 2015. For the numerous fact- and credibility-based reasons I set out in my Opinion, I found the School District's evidence insufficient. For these reasons, this question does not present an issue as to which there can be substantial grounds for difference of opinion.

Finally, for the same reasons discussed above, including the already advanced disposition of this case, I do not believe that certification of this question would materially advance the ultimate termination of this litigation.

*3. Does a finding of liability require a determination that a remedy is possible?*

Next, the School District seeks interlocutory appeal to ask "Does a finding of liability require a determination that a remedy is possible?" The School District argues that this question is proper for certification because there is an intra-circuit split on this question, as well as a difference in opinion between the United States Court of Appeals for the Eighth Circuit and the United States Court of Appeals for the Eleventh Circuit.

As an initial matter, the School District's question, as phrased, is somewhat misleading. As the Eighth Circuit has held, *Gingles* I requires a plaintiff to show that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. As discussed in my Opinion, this straightforward threshold requirement is satisfied by the creation of an illustrative plan containing a single-member district in which Black voters constitute a bare majority of the voting age population. *See Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). As the Eighth Circuit has held, "the Supreme Court [at this stage] requires only a simple majority of eligible voters in the single-member district. The court may consider, at the *remedial* stage, what type of remedy is possible . . . . But this difficulty should not impede the judge at the liability stage of the proceedings." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (alteration in original) (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991)).

At trial, Plaintiffs presented two illustrative plans in which African American voters constitute a majority of the voting age population in four of seven single member districts. For this reason and because the illustrative plans met other constitutional requirements, I found that Plaintiffs established *Gingles* I. As a result, the record demonstrates that the Court did find, under the established legal standards, that a remedy is possible.

The School District argues that my review and application of this legal standard was illogical under the facts of the case because under the illustrative plans, African American representation of the Board would actually be limited.[4] However, at the liability phase of a vote dilution case, courts are not required to find that a plaintiff's illustrative plan is the most *effective* remedy.[5] *Bone Shirt*, 461 F.3d at 1019 (alteration in original). Rather, the inquiry at the liability phase merely requires a finding that single member districts could be drawn in which Black voters constitute a bare majority of the voting age population. *Id.*

The School District argues that there is substantial ground for disagreement about the application of this law because there is a split within the Eighth Circuit on how to apply *Gingles* I. The only case the School District cites to establish the existence of this intra-circuit split, however, is a decision from the United States District Court for the Eastern District of Missouri from 1997, *African-American Voting Rights Legal Defense Fund v. State of Missouri*, 994 F.Supp. 1105 (E.D. Mo. 1997). Even assuming that the case conflicts with the Eighth Circuit understanding of *Gingles* I, which it does not, as it merely states that the "absence of an available remedy . . . precludes . . . a finding of liability," *African-American Voting Rights Legal Defense Fund*, 994 F.Supp. at 1110 n.2 (E.D. Mo. 1997), an older district court case that purportedly conflicts with the more recent and clear holding of an Eighth Circuit case does not establish an intra-circuit split creating an issue over which there are substantial grounds for disagreement. *C.f. Bone Shirt*, 461 F.3d at 1019.

The School District also argues that the Eighth and Eleventh Circuits are split on whether

---

[4] Although it's unclear from the School District's brief, I believe their argument here is based on testimony they offered regarding changing demographics and testimony that the Plaintiffs' illustrative plans would put the current Black-preferred Board members in the same single member districts, potentially pitting them against each other.

[5] Not only are courts not required to determine the ultimate effectiveness of a plaintiff's illustrative plan during the liability phase of a vote dilution case, it would be imprudent to do so because defendants do not suggest remedial proposals until after a finding of liability, during the remedy phase.

*Gingles* I requires courts to find a possible remedy or if they are also required to find that there is an effective remedy. To support this argument, the School District cites to *Nipper v. Smith*, 39 F.3d 1494, 1511 (11th Cir. 1994). Again, the case cited is much older than the Eighth Circuit's decision in *Bone Shirt*. Additionally, it does not actually conflict with *Bone Shirt*. Rather, consistent with the Eighth Circuit's holdings, the Eleventh Circuit in *Nipper* merely states that *Gingles* I requires a court to determine whether it can "fashion a remedy for the demonstrated abridgement." *Nipper*, 39 F.3d at 1511. Moreover, even if the Eighth and Eleventh Circuits were in conflict, the mere fact that two circuits disagree does not necessarily establish that the issue is one over which there are substantial grounds for difference of opinion. That is particularly true here, where the other circuits are in accord with the Eighth Circuit. *See, e.g., Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991); *Gonzalez v. Harris Cty.*, 601 F. Appx 255, 261 (5th Cir. 2015).

As a result, the School District has not presented a question of controlling law over which there is substantial ground for disagreement, and this question is not appropriate for certification for interlocutory appeal. Additionally, for the same reasons stated above, including the advanced disposition of this case, I do not believe that certification of this question would materially advance the ultimate termination of this litigation.

4. *Is the District Court required to analyze the most recent election in the record prior to a liability determination?*

The final question the School District seeks to certify for interlocutory appeal asks "Is the District Court required to analyze the most recent election in the record prior to a liability determination?" The School District argues that the 2016 Board election must be considered because, under *Gingles*, more recent elections are generally more probative. The School District also argues that the 2016 Board election in particular would provide highly probative evidence

14

because it saw the election of the third African American candidate to the Board,[6] resulting in proportional representation, and will show that African American voters were able to effectively use their voting power to elect African American candidates.

The School District argues that this question presents is an issue of first impression appropriate for certification because the 2016 election "established proportionality" and therefore the Court should be required to consider additional evidence before determining liability.

While there is no dispute that a meaningful analysis of the 2016 election would provide probative evidence, this question is also inappropriate for certification because it does not assert a question of controlling law over which there are substantial grounds for difference of opinion. The School District's argument that I did not properly consider the 2016 election fails because I did consider that election to the full extent requested by the School District. As discussed above, I granted the School District's motion to re-open evidence to take judicial notice of the 2016 election results. I considered the election results, including the race of the two candidates who were elected in 2016, in my analysis of both the *Gingles* preconditions and the Senate Factors. The School District argues that I "failed to utilize" the 2016 election results because I did not "update the statistical evidence and charts" to include the 2016 election results. As I stated above and in my Opinion, however, the mere fact that an African American candidate was elected to the Board in 2016 cannot be used as substantive evidence under *Gingles*. Rather, in a vote dilution case, a court must make a detailed factual evaluation and carefully analyze relevant elections to determine whether there is racially polarized voting, if there was significant crossover voting, which, if any, candidates were Black-preferred candidates, and whether there

---

[6] As discussed above, the School District's argument here is limited by the fact that the certified election results, in the absence of meaningful expert testimony and analysis, merely show that an African American candidate was elected, and courts cannot assume that African American candidates are also Black-preferred candidates.

were special circumstances surrounded a particular election making a Black-preferred candidate's success unrepresentative of the community's ability to participate equally in the political process. To draw any such conclusions from the certified election results would be wholly inappropriate, and the School District has not provided any legal support to the contrary. As a result, to the extent the School District argues that I should have drawn more conclusions from the admission of the certified election results, the School District has failed to present a question of law as to which there can be substantial disagreement.

Moreover, to the extent the School District argues that African Americans have now achieved proportional representation on the Board and therefore the School District is immune from liability, the law is clear that proportional representation is not a safe harbor. *Blytheville*, 71 F.3d at 1388. Instead, courts "must conduct an 'independent consideration of the record' and a 'searching practical evaluation' of the circumstances surrounding minority electoral successes." *Buckanaga*, 804 F.2d at 476 (quoting *Gingles*, 478 U.S. at 75-76). I applied these standards in my Opinion, and found that, even considering the 2016 election results, African American electoral successes in Board elections have been minimal and there was insufficient evidence to support a finding that African Americans have the present ability to elect candidates of their choice. The School District does not contest that these are the applicable legal standards, but rather, disagrees with my findings. Such a disagreement does not state a controlling question of law as to which there can be substantial ground for disagreement.

Finally, for the same reasons stated above, including the advanced disposition of this case, I do not believe that certification of this question would materially advance the ultimate termination of this litigation.

16

**Conclusion**

None of the four questions the School District seeks to have certified for interlocutory appeal present questions of controlling law as to which there can be substantial ground for difference of opinion and that will materially advance the ultimate termination of this litigation. As a result, the School District has not met the jurisdictional requirements for certification and I will deny the School District's motion for leave to file an interlocutory appeal.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Ferguson Florissant School District's Motion to Amend or Alter Judgment under Rules 54(b) and/or 59(e) #[188] is **DENIED** and the Court will not certify the School District's proposed questions for interlocutory appeal.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 27th day of September, 2016.