## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 4:14-cv-02077 RWS |
| | ) |
| FERGUSON-FLORISSANT SCHOOL DISTRICT, ET AL., | ) ) |
| Defendants. | ) |

## PLAINTIFFS' PROPOSED REMEDIAL PLANS AND MEMORANDUM IN SUPPORT

Plaintiffs the Missouri State Conference of the NAACP (the "Missouri NAACP"), Redditt Hudson, F. Willis Johnson, and Doris Bailey (collectively, "Plaintiffs") respectfully submit three proposed remedial plans for the Court's consideration: (1) cumulative at-large voting; (2) a districting plan with seven single-member districts; and (3) a hybrid districting plan with five single-member districts and two at-large limited-voting districts.

Each proposal is constitutionally valid, compliant with Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and effective in providing African Americans with an equitable opportunity to elect their preferred candidates to the School Board.  Of these three proposals, Plaintiffs' preferred remedy is cumulative voting.  Cumulative voting is particularly suited to remedy the vote dilution in the Ferguson-Florissant School District ("FFSD" or the "District") because of the racially polarized voting in, and racial demographics of, the district.  Additionally, cumulative voting maintains sufficient flexibility to adjust if demographics change or interests

1

are realigned; requires the fewest changes to the existing at-large system; and makes efficient use of election administration resources by avoiding redistricting.

## BACKGROUND

On August 22, 2016, this Court concluded that FFSD's current election system violates Section 2 of the Voting Rights Act ("Section 2") because "under the totality of the circumstances, the political process for electing Board members in the FFSD deprives African-American voters of an equal opportunity to elect representatives of their choice[.]"  Mem. & Order 118, ECF No. 185.

As required in this Circuit, Defendants the Ferguson-Florissant School District (the "District") and the St. Louis Board of Elections Commission (the "Commission") were afforded the first opportunity to submit a remedial plan.  *See Cottier v. City of Martin*, 551 F.3d 733, 743 (8th Cir. 2008) ("Upon finding a Section 2 violation, the district court must develop a constitutional remedy and give the defendant the first opportunity to submit a remedial plan."). They declined and elected instead for Plaintiffs to propose remedial plans, reserving the opportunity to respond.  *See* 8/26/16 Status Conf. Tr. at 5:7-8, ECF No. 197 ("[The District] actually would prefer for Plaintiffs to provide the initial proposal for us to respond to.").[1]  This Court can now "fashion its own remedy or . . . adopt a remedial plan proposed by [Plaintiffs]." *Bone Shirt v. Hazeltine,* 461 F.3d 1011, 1022 (8th Cir. 2006); *Cottier v. City of Martin*, 475 F. Supp. 2d 932, 936 (D.S.D. 2007), *vacated on other grounds*, 604 F.3d 553 (8th Cir. 2010) (concluding that court must "fashion its own remedy" where "court gave defendants, acting on behalf of the City of Martin, the first opportunity to propose a districting plan that would remedy

_____

[1] Plaintiffs met and conferred with Defendants to discuss proposed remedies on September 23, 2016.  No agreement on the appropriate remedy has been reached.

the § 2 violation," but "[d]efendants failed to propose a remedial plan, instead arguing that there is no possible remedy for the violation").

## PLAINTIFFS' PROPOSALS

Plaintiffs propose three prospective plans to remedy the Section 2 violation in FFSD: (1) a cumulative at-large voting plan; (2) a seven single-member district plan; and (3) a hybrid plan with five single-member districts and two at-large limited voting districts.

## I.  PLAINTIFFS' PROPOSED CUMULATIVE VOTING REMEDIAL PLAN

Cumulative at-large voting would ameliorate the Section 2 violation in FFSD while maintaining a familiar at-large electoral system and changing only the rules under which voters may allocate votes among candidates.  African-American voters in FFSD have thus far been unable to elect more than one candidate of choice in either two- or three-seat elections, and recent gains have been attributable, in part to special circumstances.  Mem. & Order 79-80, ECF No. 185.  Cumulative voting would give African Americans in FFSD a strong chance to elect at least one, and possibly two or three, member(s) of the School Board in each election cycle.  *See, e.g.*, *Cottier*, 475 F. Supp. 2d at 936.  Cumulative voting does not guarantee a particular election outcome, but can provide African-American voters in FFSD with meaningful opportunities to elect representatives of their choice.  Engstrom Report at ¶ 18, attached hereto as Ex. 1. Cumulative voting thus remedies the Section 2 violation by providing African Americans in FFSD with consistent opportunities to successfully elect one candidate of choice, and strong opportunities to elect two candidates of choice in a three-seat election, which is a significant improvement to the current at-large system.  In the short term, for instance, cumulative at-large voting could lead in 2017 to the retention of the current Board president Dr. Thurman, an incumbent Black-preferred candidate, as well as the election of another Black-preferred

candidate.  In that scenario, there would be four African Americans on the School Board, producing the most diverse Board in the history of FFSD.[2]

Cumulative voting used in conjunction with the current at-large system also provides substantial benefits that make it uniquely appropriate to serve as a remedy in this case. Cumulative at-large voting confers African Americans throughout the district, regardless of where they reside, with an opportunity to elect their preferred candidates.  Cumulative at-large voting also is flexible in that the relative voting power of any given demographic or interest group shifts automatically with the relative voting size of those groups, without delays until redistricting.  Not only is this especially useful in a jurisdiction like FFSD, where demographic changes may be on the horizon, but it also does not require immediate or repeated redistricting, which will save the District and election administrators time and money.  Additionally, cumulative voting involves only minor changes to the existing electoral structure and maximizes the candidate pool since candidates can reside anywhere throughout the district.  Cumulative voting would thus be an especially appropriate remedy in FFSD.

### A.  Overview of cumulative voting.

Under the existing election scheme, seven FFSD School Board members are elected in staggered, off-cycle, at-large jurisdiction-wide elections, in which all voters can cast votes for as many candidates as there are seats to be filled (*i.e.*, two or three votes), but cannot cast more than one vote for any one candidate.  Mem. & Order 5-6, ECF No. 185.  Should a voter choose to vote for only one candidate, they must relinquish their remaining votes (*i.e.*, single shot or bullet voting).  *Id.* at 6-7.

---

[2] The parties have not analyzed the post-trial 2016 election results to determine whether Connie Harge, who is African-American, was a Black-preferred candidate. *See* Mem. & Order 7-8, ECF No. 185.

4

In contrast, in a cumulative voting system, the restriction that only a single vote may be cast for any particular candidate is removed. Ex. 1, Engstrom Report at ¶ 6; *see* PLTF-54, Richard L. Engstrom, *Cumulative and Limited Voting: Minority Electoral Opportunities and More*, 30 St. Louis U. Pub. L. Rev. 97, 101-02 (2010).  Voters may distribute their votes across their preferred candidates as they wish: they can either divide their votes between different candidates or concentrate their votes by casting more than one vote for a single candidate.  Ex. 1, Engstrom Report at ¶ 7.  Thus, in a three-seat race, a voter could "plump" her three votes for one candidate, give two to one candidate and one to another, or split her votes equally among three candidates.  *Id.*  The top *n* vote-getters in an *n*-seat election are elected.  *Id.* at ¶ 8; *see* Richard L. Engstrom, *Modified Multi-Seat Election Systems as Remedies for Minority Vote Dilution*, 21 Stetson L. Rev. 743, 749 (1992).

Cumulative voting can be viewed as a "more efficacious form of single shot voting," which gives voters more flexibility in exercising their franchise.  *See* Engstrom, *Cumulative and Limited Voting*, 3 St. Louis U. Pub. L. Rev. at 102 ("The removal of the limit of one vote for any particular candidate permits minority voters, and all other voters, to cast a more efficacious type of 'single-shot' vote than they may in more traditional multi-seat elections" where members of a group must withhold remaining votes).  Specifically, this feature allows voters to put the full weight of their voting power behind their preferred candidate or candidates without forgoing any of the votes they are entitled to cast, *i.e.*, bullet or single shot voting.  By allowing voters to express preference intensity through the division of their votes, this voting system allows a group of voters "to concentrate its voting power behind a given candidate without requiring that the minority voters themselves be concentrated into a single district."  *Holder v. Hall*, 512 U.S. 874, 909 n.15 (1994) (Thomas, J., concurring).  Thus, a cumulative voting system is minimally

5

intrusive because it maintains all of the voting rules currently in place in FFSD, and is different in just one respect: instead of being allowed to cast only one vote per candidate, a voter can "plump" all his votes for one candidate.

**B. Cumulative voting has been successfully implemented to remedy Section 2 violations in other/similar jurisdictions.**

Alternative electoral systems, including cumulative voting, limited voting and ranked choice voting "have been adopted in well over 100 local governing bodies across the United States in response to threatened or actual minority vote dilution lawsuits under Section 2." Steven J. Mulroy, *Coloring Outside the Lines: Erasing "One-Person, One-Vote" & Voting Rights Act Line-Drawing Dilemmas By Erasing District Lines*, 85:5 Miss. L. J. 2 at 21 (forthcoming 2016) (distributed at Miss. L. J. Voting Rts. Symp. of Apr.  7-8, 2016), attached hereto as Ex. 2. Specifically, cumulative voting is used in over 60 local governing bodies across the country. Ex. 1, Engstrom Report at ¶ 5.  Cumulative voting has both been cited approvingly by federal courts as a means of ensuring that minority communities have an equal opportunity to elect their preferred candidates and employed as a remedy in Section 2 cases.

Courts and judges have repeatedly described cumulative voting as a potential remedy in Voting Rights Act cases.  *See, e.g.*, *Holder*, 512 U.S. at 897-99, 908-13 (Thomas, J., concurring) ("[N]othing in our present understanding of the Voting Rights Act places a principled limit on the authority of federal courts that would prevent them from instituting a system of cumulative voting as a remedy under § 2."); *Branch v. Smith*, 538 U.S. 254, 309-10 (2003) (O'Connor, J., concurring) ("[A] court could design an at-large election plan that awards seats on a cumulative basis, or by some other method that would result in a plan that satisfies the Voting Rights Act."); *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1560 n.24 (11th Cir. 1984); *Dillard v. Town of Louisville*, 730 F. Supp. 1546, 1548 & n.8 (M.D. Ala. 1990); *Dillard v. Chilton Cty. Bd.*

*of Educ.*, 699 F. Supp. 870, 875 (M.D. Ala. 1988), *aff'd*, 868 F.2d 1274 (11th Cir. 1989); *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 752 n.11 (N.D. Ohio 2009) ("So, too, no particular election scheme is required by Section 2; both limited and cumulative voting systems can be 'legally acceptable.'").   Consistent with this description, district courts have ordered or approved cumulative voting as a vote dilution remedy in a number of Section 2 cases.  *See, e.g.*, *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 448 (S.D.N.Y. 2010); *Chilton*, 699 F. Supp. at 875 (approving settlement incorporating cumulative voting scheme); *Cottier*, 475 F. Supp. 2d at 936-37.

Cumulative voting has proven successful in enabling minority voters to elect previously un- or under-represented minority candidates.  *See* Engstrom, *Modified Multi-Seat Election Systems*, 21 Stetson L. Rev. at 752-57 (cataloguing the efficacy of cumulative voting in electing minority candidates in local elections in New Mexico and South Dakota); Richard H. Pildes & Kristen A. Donoghue, *Cumulative Voting in the United States*, 1995 U. Chi. Legal F. 241, 272-76 (analyzing the success of cumulative voting ordered as a Section 2 remedy in Chilton County, Alabama).   It is particularly effective in a jurisdiction like FFSD where voting patterns demonstrate a high level of political cohesiveness among minority voters.  Mem. & Order 78, ECF No. 185; *see, e.g.*, *Port Chester*, 704 F. Supp. 2d at 450 (concluding cumulative voting would be effective remedy where evidence demonstrated that minority voters voted cohesively in previous elections).

A recent example of court-ordered cumulative voting to remedy a Section 2 violation demonstrates its advantages.  The Village of Port Chester used an at-large election system to elect a six-member village board of trustees to three-year terms in off-cycle, annual, two-seat contests.  *Port Chester*, 704 F. Supp. 2d at 420.  According to the 2000 census, the Port Chester

voting-age population ("VAP") of 21,585 people was 43.4% Hispanic, 45.7% non-Hispanic white, and 6.1% non-Hispanic Black.  *Id.* at 419-420.   The citizen voting age population ("CVAP") of 13,990 was 21.9% Hispanic, 65.5% non-Hispanic white, and 8.9% non-Hispanic Black.  *Id.*  In April 2010, a federal district court held that Port Chester's at-large system diluted the votes of Hispanic voters, in violation of Section 2.  *Id.* at 453.  The jurisdiction proposed, and the court accepted, a cumulative voting remedy.   Notably, the court recognized that as the minority VAP grew relative to the non-minority, as it was expected to do, the opportunity to elect representatives proportionate to the population would grow as well without the need for a new districting plan.  Engstrom, *Cumulative and Limited Voting*, 3 St. Louis U. Pub. L. Rev. at 111.  The court also ordered the parties' consent decree specifying public outreach and education on this election change to cumulative voting.  *Port Chester*, 704 F. Supp. 2d at 453.

The first Port Chester cumulative voting election was held for all 6 seats in June 2010.[3] During that election, Port Chester elected its first Latino Board member, who was the Hispanic preferred candidate.  *See* Kirk Semple, *In a First, Port Chester Puts a Latino On Its Board*, N.Y. Times, June 17, 2010, at A27 http://www.nytimes.com/2010/06/17/nyregion/17chester.html (last accessed on Sep. 27, 2016).   Moreover, Port Chester exit polls on familiarity and feasibility showed cumulative voting is easy to use and understand.  Engstrom, *Cumulative and Limited Voting*, at 127-131.  The cumulative voting arrangement provided Latino voters with meaningful opportunities to elect their preferred candidates.   While it does not guarantee a particular outcome, it gave Latino residents the opportunity to organize to take advantage of the new electoral opportunity.  As the court in *Euclid City School Board* stressed, the standard for a

---

[3] Port Chester suspended-staggered elections and held its first cumulative voting election for all 6 seats on the board.  *Port Chester*, 704 F. Supp. 2d at 450.

remedy is a "reasonable opportunity," not a guaranteed result.  632 F. Supp. 2d at 744, 752, 763.

### C.  Cumulative voting is consistent with one-person, one-vote constitutional requirements.

A cumulative at-large voting remedy in FFSD would meet the constitutional requirements of one-person, one-vote because the entire jurisdiction remains contained in one district and every voter in the district has the same number of votes and the same options through which to cast them.  Ex. 1, Engstrom Report at ¶ 10; *see also Cottier*, 475 F. Supp. 2d at 939 ("Plan C [the cumulative voting system] achieves precise population equality because the entire City of Martin is contained in one district and all voters in that district receive three votes."); *see McCoy v. Chi. Heights*, 6 F. Supp. 2d 973, 984 (N.D. Ill. 1998) ("[A] system of cumulative voting complies with the requirements that the court be mindful of the  'one-person, one-vote' requirement of the Equal Protection Clause."), *rev'd on other ground sub nom.*, *Harper v. City of Chi. Heights*, 223 F.3d 593 (7th Cir. 2000); *Port Chester*, 704 F. Supp. 2d at 452 ("District courts have consistently found that cumulative voting complies with one-person, one-vote because the entire population is contained in one district and each voter is given the same number of votes.").  Every voter, in short, is treated equally.

### D.  Cumulative voting is consistent with state law principles.

A cumulative-voting system would not unduly intrude on state law or legislative policy.  Cumulative voting could remedy the District's vote dilution violation without altering the overarching structural features of the existing voting system, namely, the at-large scheme, off-cycle timing, and staggered terms.

The use of cumulative voting also does not conflict with the provisions of the Missouri law governing School Board elections because it is not clear that the at-large method of electing school board members in a generic seven-member school district is mandated by state law, in

stark contrast to elections for certain special school districts, for which Missouri law clearly dictates that board members be elected at-large. *Compare* Mo. Rev. Stat. § 162.291[4] *with* Mo. Rev. Stat. § 162.865.[5]  Moreover, the statutes neither dictate that elections in FFSD employ a particular voting arrangement within an at-large or single-member scheme, *see* Mo. Rev. Stat. §§ 162.291, 162.459, 162.481, 162.492, nor prohibits the use of these alternative voting arrangements, *see generally* Mo. Rev. Stat. ch. 162; *see also Port Chester*, 704 F. Supp. 2d at 449 ("[T]he Court does not find that cumulative voting is prohibited by New York law just because the law is silent on the issue.").  Although cumulative voting has not been used in FFSD before, it is not unknown to Missouri law: Article X1, Section 6 of the Missouri Constitution authorizes cumulative voting for the election of corporate managers and directors, and Mo. Rev. Stat. § 355.296 governs cumulative voting for the election of directors of a nonprofit corporation.

### E.  Cumulative voting is an effective and appropriate remedy for FFSD.

While a single-member redistricting remedy is the presumptive remedy in most instances of minority vote dilution, *see Wise v. Lipscomb*, 437 U.S. 535, 540 (1978), this Court has the authority to impose an alternative remedy, so long as it has a persuasive justification to deviate from a redistricting remedy.  *See Cottier*, 475 F. Supp. 2d at 939-40 (noting that "a multi-member remedial plan" may be adopted where there is "a singular combination of unique factors that justifies deviation from the preference for single-member plans") (quotation omitted) (citing *Connor v. Finch*, 431 U.S. 407, 415 (1977)); *id*. at 938 (holding that the court can adopt an

---

[4] Mo. Rev. Stat. § 162.291 provides that: "The voters of each seven-director district other than urban districts shall, at municipal elections, elect two directors who are citizens of the United States and resident taxpayers of the district, who have resided in this state for one year next preceding their election or appointment, and who are at least twenty-four years of age."

[5] Mo. Rev. Stat. § 162.865 provides in relevant part that: "The board members of a special school district with a population of not more than one hundred thousand persons shall be elected at large."

alternative remedy not specifically authorized by state law if redistricting will not remedy the

Section 2 violation). Because cumulative voting will "afford minorities a greater opportunity for

participation in the political process than do single-member districts" and is an especially

appropriate remedy given the particular characteristics in FFSD such as the high level of racial

polarization and the substantial African American population, these are "exceptional

circumstance[s] warranting rejection of the preference for single-member districts." *Cottier*, 475

F. Supp. 2d at 939-42.

Courts evaluate the effectiveness of cumulative voting at remedying a dilutive voting

scheme by first determining the "threshold of exclusion."  The threshold identifies the percentage

of the voters in a particular election that a group sharing the same candidate preference must

exceed in order to elect that candidate with no assistance whatsoever from the other voter.  Ex. 1,

Engstrom Report at ¶¶ 11-13. Where the percentage of minority voters sharing the same

candidate preference is above the calculated "threshold of exclusion," cumulative voting may

provide an appropriate remedy.  *Id.* at ¶¶ 11-14, 21-22; *see also Dillard*, 699 F. Supp. at 875.  As

Dr. Engstrom explains:

> The opportunities that cumulative voting systems provide minority voters to elect
> candidates of their choice can be demonstrated theoretically through a coefficient known
> as the threshold of exclusion.  This coefficient identifies the percentage of the electorate
> that a group must exceed in order to elect a candidate of its choice regardless of how the
> rest of the voters vote.  This coefficient is based on a set of worst case assumptions, from
> the minority group's perspective, about the behavior of the other voters.
> . . .
> The formula for calculating the threshold of exclusion values for cumulative voting
> systems, expressed as a percentage, is:
>
> $$\frac{1}{1 + (\text{Number of Seats})} \times 100$$

Ex. 1, Engstrom Report at ¶¶ 11-12; *see also Cottier*, 475 F.Supp.2d at 937 ("The threshold of exclusion is the percentage of the vote that will guarantee the winning of a seat even under the most unfavorable circumstances."); *id*. (The threshold of exclusion is calculated according to the following formula: 1/(1+ the number of seats available)).

This coefficient is based on a set of worst-case assumptions, from the minority group's perspective, about the behavior of the other voters.  These assumptions are: (1) the other voters cast all of the votes available to them, but (2) none of their votes are cast for the candidate preferred by the minority voters, but rather are (3) concentrated entirely on a number of other candidates equal to the number of seats to be filled, and are (4) divided evenly among those other candidates.  Ex. 1, Engstrom Report at ¶ 11; *see* Engstrom, *Cumulative and Limited Voting* at 103-104.

In FFSD, the percentage of Black voters sharing the same candidate preference is above the calculated "threshold of exclusion" of 33.3% for two-seat elections, and 25.0% in three-seat elections.  Ex. 1, Engstrom Report, at ¶ 21.  Thus, under a cumulative voting system Black voters will likely be able to consistently elect at least one candidate of their choice to the Board in each election cycle, and will have strong potential to elect more than one candidate of choice per election cycle because the BVAP substantially exceeds the threshold of exclusion: by 42 percentage points in two-seat elections and by 89.2 percentage points in three-seat elections. *Id*. at ¶ 22.  Because the BVAP is above the threshold of exclusion in FFSD, even given the worst-case assumptions about the behavior of other voters, a cumulative voting plan will provide "a reasonable chance of electing a candidate of their choice in each election, and even two in a three-seat election."  *Id*.

Cumulative voting is also an appropriate remedy given the particular characteristics in FFSD. *See, e.g.*, *Cottier*, 475 F. Supp. 2d at 939-42.[6]  *First*, cumulative voting is particularly effective where, as in FFSD, there is a high level of political cohesion among African Americans.  Mem. & Order at 78, ECF No. 185. (finding that in FFSD "[t]here was cohesiveness among Black voters behind candidates of choice in each of the five elections between 2011-2015"); *see Port Chester*, 704 F. Supp. 2d at 450 (concluding cumulative voting would be effective remedy where evidence demonstrated that minority voters voted cohesively in previous elections); *Euclid*, 632 F. Supp. 2d at 755 (observing that in a district with extreme racial polarization, cumulative voting "provides a cohesive minority group increased opportunity relative to a traditional voting system").  This is because members of the minority racial group – here African Americans – can plump their votes for the cohesively preferred candidate.

*Second*, because a cumulative voting system provides minority voters with an opportunity to elect preferred representatives commensurate with the relative size of the minority electorate,

---

[6] The district court in *Cottier* found circumstances similar to those in FFSD warranted an alternative remedy, such as the relatively small size of the jurisdiction, which could limit the ability to recruit candidates from single-member district.  475 F. Supp. 2d at 940.  The *Cottier* court also noted that the adoption of a multi-member cumulative remedial plan did not conflict with the concerns articulated by the Supreme Court in support of its preference for single-member districts instead of at-large multi-member districts, including the risk of voter confusion, "mak[ing] legislative representatives more remote from their constituents, and tend[ing] to submerge electoral minorities."  *Id.* at 941 (quoting *Connor*, 431 U.S. at 415).

Like the jurisdiction at issue in *Cottier*, cumulative voting is an appropriate remedy in FFSD because it does not raise concerns common to multi-member districts.  Given the minimal change in the voting process to go from at-large voting to a cumulative voting system, the cumulative voting remedy is unlikely to cause confusion in comparison to a change to single-member districts.  Ex. 1, Engstrom Report at ¶ 25.  With the relatively small size of FFSD, a cumulative voting system will not make representatives too remote, and voters will have the opportunity to plump their votes behind a candidate from their neighborhood if they feel other candidates are too remote.  And, in light of the substantial BVAP, submergence is not the primary barrier to Black voters' political participation.  Cumulative voting remedy in FFSD provides minority voters with "a meaningful opportunity" to elect representatives of their choice to each election cycle.  *Cottier*, 475 F. Supp. 2d at 940-41.

it can adjust with changing circumstances, including potential growth of the African-American population.  Because all of the minority group's voters across a jurisdiction have the opportunity to participate in electing a representative of the group's choice in each election, their ability to elect their preferred representatives under this voting arrangement increases naturally as the number of minority voters increases or relocates geographically within the jurisdiction, eliminating any need for future redistricting or continuing judicial intervention.

Cumulative voting allows voters to form "voluntary constituencies" and vote along non-geographic dimensions, whether by cohesive racial groups, ideological groups, or other factors. Ex. 1, Engstrom Report ¶ 24; Engstrom, *Cumulative and Limited Voting*, 3 St. Louis U. Pub. L. Rev. at 114; Ex. 2, *Coloring Outside the Lines*, at 27.  It provides a remedy for African-American voters who reside within compact majority-minority areas, and for those who are dispersed through other areas of the district, which addresses the dilution districtwide.  *See, e.g.*, Engstrom, *Cumulative and Limited Voting*, 3 St. Louis U. Pub. L. Rev. at 114 (cumulative voting and limited voting "provide all of the minority group's voters in a jurisdiction, regardless of where they reside, with an opportunity to participate in electing a representative of the group's choice, rather than just those residing in the majority-minority district"); Steven J. Mulroy, *Alternative Ways Out: A Remedial Road Map for the Use of Alternative Electoral Systems as Voting Rights Act Remedies*, 77 N.C. L. Rev. 1867, 1895-96 (June 1999).

*Third*, there are benefits to implementing cumulative voting in FFSD, which features a relatively small total population and a somewhat dispersed minority population, such as easier candidate recruitment and efficient use of election administration resources.  *See, e.g., Cottier*, 475 F. Supp. 2d at 940-41 (imposing cumulative voting in part on these grounds where the city was less than a square mile in area and noting that candidate recruitment may be difficult in very

14

small sub-districts).  With cumulative voting, voters can choose to vote for a candidate from anywhere in the jurisdiction.  Ex. 1, Engstrom Report at ¶ 24; at 27.  Cumulative voting will therefore maximize opportunities for potential candidate recruitment.  *Id.*; *see* Ex. 2, *Coloring Outside the Lines,* at 28 ("[B]y lowering the threshold of exclusion, these systems remove barriers to entry, ease the path for less well established candidates, and allow "underdog" candidates a chance. This increases competition, which increases turnout.").  And cumulative voting is relatively simple to administer.  It allows the District to avoid the expense of drawing district boundaries, then re-drawing them after every decennial census, and setting up and staffing multiple polling places.  *See* Ex. 2, *Coloring Outside the Lines,* at 28 ("By eliminating districting, alternative systems eliminate the potential for racial or political gerrymandering, along with trouble and expense of having to redistrict every ten years and face potential redistricting-related litigation.").

In sum, implementing cumulative voting in FFSD, in conjunction with a robust voter education program,[7] will provide African Americans with meaningful opportunities to elect their preferred candidates to the school board.  Ex. 1, Engstrom Report at ¶ 25.

## II.  PLAINTIFFS' PROPOSED SINGLE-MEMBER DISTRICT REMEDIAL PLAN

Single-member district plans are the presumptive remedy for a violation of Section 2 of the Voting Rights Act.  *See Wise*, 437 U.S. at 540 ("[A] court-drawn plan should prefer single-member districts over multimember districts, absent persuasive justification to the contrary.").  The canonical remedy has been a court order requiring the jurisdiction to draw a districting plan with the same number of districts as there are seats on the board, commission or council, with an

---

[7] The first use of the cumulative vote in FFSD should be preceded by an educational and outreach program to help voters understand their options under cumulative voting rules and how to implement them.  *See e.g. Port Chester*, 704 F. Supp. 2d at 453; Port Chester Consent Decree, ¶¶ 3-8, 12-14 (Dec. 22, 2009), attached hereto as Ex. 4.

appropriate number of minority-majority single-member districts.  *See* Ex. 2, *Coloring Outside the Lines*, at 12 (citing *Growe v. Emison*, 507 U.S. 25, 40 (1993) (same analysis used whether the challenged system is a districting plan or an at-large electoral scheme)).  In general, "single-member districts are to be preferred in court-ordered legislative reapportionment plans unless the court can articulate a singular combination of unique factors that justifies a different result." *Connor*, 431 U.S. at 415 (citation omitted).  While Section 2 does not "establish[] a right to have members of a protected class elected in numbers equal to their proportion in the population," 42 U.S.C. § 1973(b), the Supreme Court has held that "proportionality" in the relationship between "the number of majority-minority voting districts" and "minority members' share of the relevant population" is relevant to a Section 2 analysis.  *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994); *see also id.* at 1000 (noting proportionality as relevant to the totality of circumstances); An appropriate single-member district plan in FFSD would therefore include seven districts, three or four of which have a sufficient African-American VAP to provide an opportunity for African Americans to elect their preferred candidates.

Thus, while this Court has other remedial options, a single-member district remedy remains a potentially viable solution.

### A.      Overview of the proposed single-member districts remedy.

Plaintiffs' proposed single-member district plan demonstrates a viable solution to the District's Section 2 violation and an improvement over the current at-large system.  Cooper Report at ¶¶ 8-9, 11, attached hereto as Ex. 3, Ex. 3B.  Plaintiffs satisfied *Gingles* 1 at the liability phase of trial by creating an illustrative plan containing a single-member district in which Black voters constitute a bare majority of the VAP to show that African Americans in the district are "sufficiently large and geographically compact to constitute a majority in a single-member district."  *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986); Mem. & Order 27-28, ECF No.

185.  Although the illustrative plans satisfied *Gingles* 1, Plaintiffs' proposed remedial plan differs from the illustrative plans to account for the post-discovery intra-district changes of residence by some incumbents, and the changed membership of the Board.

Plaintiffs' expert demographer, William S. Cooper, created a proposed single-member district remedy in which Black voters constitute a majority of the VAP in four of seven districts. Plaintiffs' proposed plan contains seven single-member districts.  *See* Ex. 3, Cooper Report at ¶¶ 8-9, 11.  In three of these districts, African Americans comprise a clear majority of at least 59% of the VAP. Cooper Report B-2, ("7SMD Pop. Summ. Report"), attached hereto as Ex. 3 B-2; *see Cottier*, 475 F. Supp. 2d at 938 ("An effective majority, and thus an adequate remedy, requires approximately 60 percent minority VAP.").  In two other proposed single-member districts, there is a nearly even split in the VAP between African Americans and whites (50.54% and 51.42% any-part Black VAP ("APBVAP")[8] in proposed District 6; 49.71% BVAP and 50.88% APBVAP in District 7).  Ex. 3 B-2, 7SMD Pop. Summ. Report.

Plaintiffs' proposed single-member district remedy would require candidates for the board to reside in their single-member district in which they are seeking election.  To minimize disruptions, elections would be staggered according to the end of incumbent board members' three-year terms, so that proposed District 2 with 60.57% APBVAP (incumbents Brown and Chabot), proposed District 6 with 51.42% APBVAP (incumbent Thurman), and proposed District 3 with APBVAP 76.54% (with no resident incumbent)[9] would hold elections in 2017;

---

[8] *See* Mem. & Order 9, FN4, ECF No. 185 ("Any-part Black" is a defined Census Bureau term, and refers to the population of individuals who identify as "single-race Black" (another defined Census Bureau term) and individuals who identify as more than one race and part Black.").

[9] There are no incumbent candidates residing in proposed Districts 1 or 3.  Because District 3 has the largest percentage BVAP and has been historically underrepresented, Plaintiffs propose that District 3 should be included in the upcoming 2017 election.

proposed District 5 with APBVAP 21.69% (incumbent Ebert) and proposed District 7 with

50.88% APBVAP (incumbent Graves)[10] would hold elections in 2018; and proposed District 4

with 21.74% APBVAP (incumbent Hogshead) and proposed District 1 with 62.88% APBVAP

(no resident incumbent) would hold elections in 2019. Ex. 3B-2, 7SMD Pop. Summ. Report.

**B.  Plaintiffs' proposed plan is consistent with one-person, one-vote constitutional requirements and established redistricting principles.**

Plaintiffs' proposed plan complies with all constitutional requirements and redistricting

principles.  The proposed plan complies with one-person, one-vote constitutional requirements

because it properly apportions the District's total population across the districts with minor

deviation, *i.e.*, total population deviations of less than 10%.  *See* Ex. 3, Cooper Report at ¶ 11;

*Evenwel v. Abbott*, 136 S. Ct. 1120, 1123-1124 (2016); *White v. Regester*, 412 U.S. 755, 764

(1973) (holding that plans with total deviation of less than 10% presumptively comply with one

person, one vote); *accord Brown v. Thomson*, 462 U.S. 835, 842 (1983).  The plan also complies

with traditional redistricting principles including contiguity, compactness, appropriate

population-size deviations, keeping census blocks together, and incumbency protection.  *See* Ex.

3, Cooper Report at ¶¶ 11, 15.

**C.  Plaintiffs' Proposed single-member districts remedy does not unnecessarily intrude on state law.**

Single-member districts are a well-known method of election in Missouri.  Single-

member districts are a feature of many local elections, including metropolitan school districts,

Mo. Rev. Stat. § 162.601, and special school districts with populations of more than 100,000,

Mo. Rev. Stat. § 162.867, and are used widely for elections for local government offices.  *See,*

---

[10] Harge, who is African-American, also lives in proposed District 7. Harge would not be able to
run in her proposed district when her three-year term ends in 2019 because the election for that
district will have already occurred in 2018, but could run for election in 2021.

*e.g.*, ,City of Florissant, Mo., *City Council, http://www.florissantmo.com/department/ official.php?structureid=13* (nine single-member wards for Florissant City Council); City of Hazelwood, Mo., *Council Members*, http://www.hazelwoodmo.org/city-government/city-council /council-members (eight single-member wards for Hazelwood City Council); St. Louis County, Mo., *Saint Louis County Council,* http://www.stlouisco.com/yourgovernment/countycouncil (seven single-member districts for St. Louis County Council); Jefferson County, Mo., *Jefferson County, Missouri, Council*, https://www.jeffcomo.org/CountyCouncil.aspx?node ID=CountyCouncil (seven single-member districts for Jefferson County Council); Public Water Supply District No. 2 of St. Charles County, Mo., *Board of Directors*, http://waterdistrict2.com/ board-of-directors/ (five single-member districts for St. Charles County Water District Board); *see also* St. Louis Community College, *Board of Trustees*, https://www.stlcc.edu/About/ Board_of_Trustees/Index.html (two 2-member districts and two single-member districts for St. Louis Community College Board of Trustees). Single-member districts are also well known in the school district context specifically: metropolitan school districts employ seven single-member subdistricts, Mo. Rev. Stat. § 162.601; and special school districts with populations of more than 100,000 also use a seven single-member subdistrict plan, Mo. Rev. Stat. § 162.867.

**D.  Single-member districts are a viable remedy to dilution.**

Plaintiffs' proposed single-member district plan provides a meaningful opportunity for African Americans in FFSD to elect their preferred candidates.  This is demonstrated by the demographics of the remedial districts, as compared to those of FFSD as a whole, and evidence that the adoption of remedial voting arrangements is often accompanied by higher levels of minority participation, which enhances the opportunity of minority voters to elect their preferred candidates.  Ex. 1, Engstrom Report at ¶¶ 28-29.  As the Court found, African Americans comprise a minority of the VAP in the District at large.  Mem. & Order 11-12, ECF No. 185. The

single-member districts in Plaintiffs' proposed plan would give African-American voters in

FFSD a meaningful opportunity to elect their preferred candidates in at least the three clear

majority African-American VAP single-member districts, and a viable opportunity in two

additional evenly split VAP districts because of the likely increase in participation.

*First*, voting is highly racially polarized in the District.  Mem & Order 78, ECF No. 185.

While African Americans are just shy of 50% of the VAP in the District overall, the proposed

single-member district plan features three districts in which African Americans are a clear

majority of the VAP, and would have a strong opportunity to elect their preferred candidates.  In

two additional districts the VAP is almost evenly split between African Americans and whites.

*See* Ex. 3 B-2, 7SMD Pop. Summ. Report.  African Americans will therefore have an

opportunity to elect candidates of their choice in three of the seven single-member districts, a

significant improvement over the current at-large system, which has produced disproportionately

few successes for Black-preferred candidates, *see* Mem. & Order 78-79, ECF No. 185.  *See Bone*

*Shirt*, 461 F.3d at 1023 (holding that remedy giving minority voters a 65% majority VAP in two

single-member districts was effective while noting that a 65% majority VAP is not required in

the *Gingles* liability stage); *see also Ketchum v. Byrne*, 740 F.2d 1398, 1415-16 (7th Cir. 1984)

(noting that single-member districts with 60% minority VAPs are proven remedies that afford

better protection than simple majorities); *accord African Am. Voting Rts. Legal Def. Fund v.*

*Villa*, 54 F.3d 1345, 1348 n.4 (8th Cir. 1995). African Americans will also have a competitive

opportunity to elect candidates of choice in proposed Districts 6 and 7, where the BVAP is

hovering around 50% BVAP.

*Second*, single-member districts perform differently after a dilutive at-large system is

remedied.  Ex. 1, Engstrom Report at ¶ 29; *see Port Chester*, 704 F. Supp. 2d at 451 ("[B]oth

Plaintiffs' and Defendant's experts recognize that the opportunity to elect a candidate of choice tends to dramatically increase voter registration and turnout in the minority community.") Although the current turnout disparity by race hinders African-American voters' ability to elect candidates of their choice, Mem. & Order 40-42, ECF No. 185, establishing single-member districts that provide minority voters an opportunity to elect their preferred candidates has, in previous cases, catalyzed dramatic increases in voter registration and turnout in minority communities.  *See Harvell v. Blytheville*, 71 F.3d 1382, 1388 (8th Cir. 1995); *Port Chester*, 704 F. Supp. 2d at 451.  Electoral outcomes for African-American voters in FFSD would likely improve by a change to a remedial single-member district plan, because "by moving from a dilutive system to a system that is not dilutive, minority groups have improved opportunities to elect candidates of choice, which in turn creates a stimulus to 'organize and mobilize and bring more people to the polls.'"  *Benavidez v City of Irving*, 638 F. Supp. 2d 709, 725 (N.D. Tex. 2009) (quoting Dr. Richard Engstrom); *see also* Ex. 1, Engstrom Report at ¶ 29.

### E.  A single-member district remedy would benefit FFSD by addressing some of the jurisdiction-specific concerns raised at trial.

Single-member districts would improve the opportunity for African-American voters to elect their preferred candidates.  The improved opportunities would include, among other things, the reduction of economic and related logistical barriers that hinder representatives of the African-American community in mounting effective jurisdiction wide political campaigns.  *See Rural W. Tenn. African Am. Aff. Council v. Sundquist*, 29 F. Supp. 2d 448, 459 (W.D. Tenn. 1998) ("The economic and educational isolation of African-Americans . . . limits their ability to fund and mount political campaigns.  In this sense therefore, blacks are not able to equally participate in the political process.").  Although a single-member district remedy would limit the candidate pool to residents of each single-member district, it would also reduce the cost of

21

campaigning, which in turn could help with local candidate recruitment in majority African-American areas.  Mem. & Order 112-13 (African American candidates are likely to have less access to the necessary resources for travel and advertising), ECF No. 185.

Plaintiffs' proposed seven single-member district remedy would also encourage adequate representation of the historically underrepresented southern part of the District.  I-270 runs horizontally through the FFSD, splitting the district in two, nearly equal parts.[11]  Currently, all of the African-American school board members live in the northern part of the District.  Cooper Report, ("7SMD Map"), attached hereto as Ex. 3 B-3.  Despite "significant evidence that the African-American community in FFSD has particularized needs concerning several issues, including unequal school resources and policies within FFSD, especially between the northern and southern portions of the district," Mem. & Order 101, ECF No. 185, there have been very few African-American board members who live in the predominantly Black southern part of the District.[12]  A redistricting remedy would ensure that African Americans in the historically underrepresented southern portion of the District have an opportunity to elect candidates of their choice who reside in their geographic region.

**F.  A single-member district remedy will not have a counter-intuitive effect.**

Throughout the liability phase of trial, the District suggested that a single-member district remedy will ultimately leave Black voters worse off because it will necessarily cap Black voters' ability to elect their preferred representatives by preserving white enclaves even as the Black

---

[11] Plaintiffs requested that Mr. Cooper determine the VAP distribution north and south of I-270. The VAP North of I-270 is 25,322, 30.07% of whom are Black.  South of I-270, the VAP is 25,449, 66.21% of whom are Black.

[12] Plaintiffs held a public town hall in Ferguson on September 22, 2016 to solicit feedback from community stakeholders on the proposed remedies.  Participants voiced support for remedies that increased responsiveness to African-American residents in the southern region of the district.

VAP grows.  This suggestion is unfounded.  Single-member districts would not cap Black voters' ability to elect their preferred representatives, or lead to a counterintuitive result, but would likely expand that opportunity if the population grows.

*First*, there is no reason to think that single-member districts will "cap" Black voters' ability to elect their preferred representatives any more than the existing at-large system. In fact, the evidence at trial shows that Black voters' strength is *already capped* under the existing at-large system.  From 2011 through 2015, for example, only two of eight Black-preferred candidates prevailed, and both successes came from elections surrounded by special circumstances.  Mem. & Order 74, 79-80, ECF No. 185. Recent elections have seen limited electoral success of Black candidates: there have been numerous elections in which no Black candidate was elected; there has never been an election in which more than one Black candidate has won; and from 2000 through the end of trial in January 2016, there have not been more than two Black members on the seven-member Board.  *Id.* at 86.  When one contrasts that record of very limited success against a system that provides Black voters with a clear opportunity to elect their preferred candidates in three to five districts, the comparative benefits of a district system is clear.

*Second*, Plaintiffs' single-member district proposal would not impose immutable sub-districts whose boundaries could never change even if the demographics of FFSD change. Where Missouri law specifies that a school district have subdistricts, it also calls for redistricting after each Decennial Census.  *See* Mo. Rev. Stat. § 162.492.1 (for urban districts: "[T]he board shall redistrict the district into subdivisions as soon as practicable after each United States decennial census."); Mo. Rev. Stat. § 162.601.7 (for metropolitan school districts: "The subdistricts shall be revised by the state board of education after each decennial census and at

any other time the state board determines that the district's demographics have changed sufficiently to warrant redistricting."); Mo. Rev. Stat. § 162.867.7 (for special school districts: "The board of education shall, upon formation and each decade within ninety days following the publication of the final decennial census figures" form a redistricting committee that will adopt a redistricting plan).  If the demographic patterns in FFSD change in the future, the decennial redistricting process provides ample opportunity to address such concerns after each successive census.

Thus, Plaintiffs proposed seven single-member district plan provides a viable remedy to the vote dilution in FFSD.

### III. PLAINTIFFS' PROPOSED HYBRID PLAN

#### A.  Overview of a hybrid five single-member and two limited voting at-large seats.

Plaintiffs also propose a hybrid plan in which five board seats are elected from single-member districts, and two seats are elected at-large through limited-voting.  Ex. 3C, Cooper Report.  As set forth above, *supra*, in Section II.A, single-member districts are the most common remedy to vote dilution.  Along with ensuring representatives from all five regions of the district, Plaintiffs' proposed hybrid plan provides an alternative system to remedy dilution in electing members to the two remaining at-large seats.

District courts have ordered or approved limited voting as a remedy to minority vote dilution remedy in a number of cases.  *See, e.g.*, *Euclid*, 632 F. Supp. 2d at 770-71; *Marengo Cty. Comm'n*, 731 F.2d at 1560 & n.24 (ordering limited voting, and retaining staggered three-seat and two-seat elections). Under limited voting, voters are allocated fewer votes than the number of seats at issue in an election.  Ex. 1, Engstrom Report at ¶ 33; Engstrom, *Cumulative and Limited Voting*, 30 St. Louis U. Pub. L. Rev. 106.  As with cumulative voting, winning candidates in a limited voting election are determined by a plurality vote rule so that the two

candidates receiving the most votes are elected.  Ex. 1, Engstrom Report at ¶ 33.  Here, each voter would cast one vote in a two-seat election, which imposes the same threshold of exclusion as cumulative voting.  *Id*. The restriction on the number of votes reduces the larger group of voters' ability to submerge the smaller group of voters. *Id.*; Engstrom, *Cumulative and Limited Voting*, 30 St. Louis U. Pub. L. Rev. at 106.

Plaintiffs' proposed hybrid remedy would require candidates for the Board to reside in the single-member district in which they are seeking election, but permit any qualified district resident to run for the at-large seats.  To minimize disruptions, elections would be staggered according to the end of incumbent board members' three-year terms.  Thus, because in 2017 the terms of Brown, Chabot, and Thurman each expire, Plaintiffs propose that the 2017 election include proposed District 2, where each of the three incumbents reside; proposed District 3 where no incumbent lives, and proposed District 1, where Hogshead lives, although she would not need to stand for re-election until her term expires in 2019.  In 2018, the terms of Graves and Ebert end, so their respective Districts, 4 and 5, would be elected in that year.  In 2019, the terms of Hogshead and Harge would expire; both could run for at-large seats..

The proposed hybrid plan would provide African-American voters with an opportunity to elect their preferred candidates in the majority-Black single-member districts, as well as an opportunity, through the use of limited voting, to elect a preferred candidate to an at-large.

### B.  Plaintiffs' hybrid proposal is consistent with one-person, one-vote requirements

Plaintiffs' proposed hybrid plan complies with all constitutional requirements and redistricting principles. The five single-member districts in Plaintiffs' proposed hybrid plan comply with one-person, one-vote constitutional requirements because they properly apportion the District's total population across the districts with minor deviation, *i.e.*, total population deviations of less than 10%.  *See* Ex. 3, Cooper Report at ¶ 19; *Evenwel*, 136 S. Ct.  at 1122-

1123; *White*, 412 U.S. at 764 (holding that plans with total deviation of less than 10%

presumptively comply with one person, one vote); *accord Brown*, 462 U.S. at 842.  The five

single-member districts also comply with traditional redistricting principles including contiguity,

compactness, appropriate population-size deviations, keeping census blocks together, and

incumbency protection.  *See* Ex. 3, Cooper Report at ¶¶ 19, 26.

The two at-large limited voting seats in Plaintiffs' proposed hybrid plan also comply with

one-person, one-vote constitutional requirements because, like with cumulative voting, every

voter has the same number of votes and the same options throughout the district.  Ex. 1,

Engstrom Report at ¶ 10; Ex. 3, Cooper Report at ¶ 19;  *see Orloski v. Davis*, 564 F. Supp. 526,

530 (M.D. Pa. 1983) (upholding a limited voting scheme in a judicial election over one-person,

one-vote objections); *LoFrisco v. Schaffer*, 341 F. Supp. 743, 748 (D. Conn. 1972) (same), *aff'd*,

409 U.S. 972 (1972); *Euclid*, 632 F. Supp. 2d at 761, 770 (finding that limited voting does not

violate Section 2), *id.* 759-60 (choosing limited voting over cumulative voting to maintain

staggered elections and because limited voting was prevalent in Ohio).

### C.  The hybrid proposal is consistent with state law principles.

Hybrid single-member and at-large district plans are familiar in Missouri.  *See, e.g.*, Mo.

Rev. Stat. § 162.492 (specifying a 5-2 hybrid plan for urban school districts); City of Berkeley,

Mo., *City Council*, http://www.cityofberkeley.us/index.aspx?nid=128 (utilizing a 5-1 hybrid plan

for the Berkeley City Council); *see also Hines v. Mayor of Ahoskie*, 998 F.2d 1266, 1269-70,

1274-75 (4th Cir. 1993) (directing district court to order 2-2-1 plan with two two-member

districts and one at-large district).

Although to date Missouri school districts have not used limited voting, this Court may

nonetheless order it to remedy a Voting Rights Act violation. Limited voting does not directly

conflict with state law, which requires seven seats but does not specify the method of election to

those seats. The use of any of these alternative voting arrangements also does not conflict with the provisions of the Missouri law governing school board elections. The relevant statutes neither dictates that elections in seven-director school districts, like FFSD, employ a particular voting arrangement within an at-large or single-member scheme, *see* Mo. Rev. Stat. §§ 162.291, 162.459, 162.481, 162.492, nor prohibits the use of these alternative voting arrangements, *see generally* Mo. Rev. Stat. ch. 162.  But even if there were a conflict, state law can be altered in order to remedy federal law violations.  *See, e.g.*, *Large v Fremont Cty.*, 670 F.3d 1133, 1145 (10th Cir. 2012) ("In remedial situations under Section 2 where state laws are *necessarily* abrogated, the Supremacy Clause appropriately works to suspend those laws because they are an *unavoidable obstacle* to the vindication of the federal right.") (citation omitted).

### D.  Plaintiffs' hybrid proposal is a viable remedy for FFSD.

Plaintiffs' proposed hybrid plan is a viable remedy for the District's Section 2 violation. As all parties agree, voting is highly racially polarized in the District.  Mem. & Order 78, ECF No. 185.  While African Americans are just shy of 50% of the VAP in the District overall, the proposed single member district plan features three districts  in which African Americans make up 59% of the VAP in each district (proposed Districts 1, 2, and 3), Cooper Report ("5SMD Summ. Pop. Report"), attached hereto as Ex. 3 C-2, and would have a strong opportunity to elect their preferred candidates.  The proposal also contains an additional district (proposed District 4) in which the VAP is almost evenly split between African Americans (49%) and others.  *See* Ex. 3 C-2, 5SMD Summ. Pop. Report.  African Americans will therefore have more potential to elect their candidates of choice in the three majority BVAP single-member districts than under the current at-large system.  *See Bone Shirt*, 461 F.3d at 1023 (holding that remedy giving minority voters a 65% majority in two single-member districts was effective); *see also Ketchum,* 740 F.2d

27

at 1415-16 (noting that single-member districts with 60% minority VAPs are proven remedies that afford better protection than simple majorities); *accord Villa*, 54 F.3d at 1348 n.4.

The two at-large seats will provide an opportunity for Black voters to elect a candidate of choice through limited voting. Ex. 1, Engstrom Report at ¶¶ 33-34. In FFSD the percentage of Black voters sharing the same candidate preference is above the calculated "threshold of exclusion" of 33.3% for two-seat elections, and 25.0% in three-seat elections. Ex. 1, Engstrom Report, at ¶ 21.  Even given the worst-case assumptions, Black voters will be able to consistently elect at least one candidate of their choice to the board in the at-large election year because the BVAP substantially exceeds the threshold of exclusion.  *Id.*  Moreover, because the top-preferred candidate among Black and white voters has diverged in all twelve of the elections held since 2000, Mem. & Order 48-49, ECF No. 185, the limited voting proposal would likely provide an opportunity for Black voters to elect one preferred candidate in each election at-large limited voting election. Ex. 1, Engstrom Report at ¶ 33.  Overall, Plaintiffs' hybrid proposal will afford African-American voters a meaningful opportunity to elect their preferred candidates to four out of the seven total seats: three of the single-member district seats, and one of the at-large seats.

The two proposed at-large seats avoid the pitfalls of most hybrid plans that include at-large seats by electing those members through limited voting.  Courts have rejected hybrid plans that use at-large districts as remedies for voting rights violations, even where such plans contain one or more majority-minority single-member districts.  In *Buchanan v. City of Jackson*, 683 F. Supp. 1537, 1541 (W.D. Tenn. 1988), after finding that at-large elections for the city commission violated Section 2, the court rejected defendants' proposed 6-3 hybrid plan (6 single-member districts and 3 at-large seats). With regard to the at-large seats, the court concluded that "racially polarized voting would still take place," and minority "candidates would face the same

difficulties in being elected as under the current system."  *Id.* at 1543, 1544; *see also id.* at 1545

("The plan proposed by the defendants to remedy the present § 2 violation is itself violative of §

2 of the [VRA].").  Similarly, in *Harvell v. Blytheville Sch. Dist. No. 5*, 126 F.3d 1038, 1040 (8th

Cir. 1997), the Eighth Circuit affirmed the district court's rejection of the 5-2 plan proposed by a

school district as a remedy for a Section 2 violation because "[t]he inability of black voters to

affect the at-large elections under the 5-2 plan is no different from what it was under the previous

electoral scheme."  The use of limited voting for the at-large seats eliminates the existing dilution

plaguing the at-large seats, and gives Black voters an opportunity to elect a candidate of choice

in the 2-seat at-large election years.

A hybrid plan also provides two opportunities for candidates to run for election both in

their single-member district or for FFSD at-large seats.  Given that two of the incumbent

African-American Board members and two of the white Board members are each paired in

proposed single-member districts, a hybrid plan provides a meaningful opportunity for

incumbents to maintain a seat**.**

## IV. NONE OF PLAINTIFFS' PROPOSED REMEDIES ARE IMMUTABLE, BECAUSE DEFENDANTS RETAIN THE ABILITY TO SEEK RELIEF FROM FINAL JUDGMENT UNDER RULE 60(B) IN THE FUTURE

No remedy need last forever.  This Court should permit Rule 60(b) to serve as the

mechanism for altering the remedy.

While sunset provisions are often found in the context of consent decrees, *see, e.g.*,

*John B. v. Emkes*, 710 F.3d 394, 398-99, 406-07, 409, 411-12 (6th Cir. 2013); *Williams v.

Edwards*, 87 F.3d 126, 128, 130-31 (5th Cir. 1996), they have also been included in permanent

injunctions, *see, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 687, 704 (Fed. Cir.

2009) (affirming the issuance of a permanent injunction that included a sunset provision in a

patent infringement case and indicating that the sunset provision was appropriate in light of the

balance of hardship and public interest considerations); *Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, 788 F. Supp. 2d 71, 77 (E.D.N.Y. 2011) (same); Ex. 4, *Port Chester* Consent Decree, ¶¶ 10-11 (voter education plan consent decree, including a sunset provision in which the VEP remained in effect and the court retained jurisdiction for three election cycles). And, although "[a] consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature[,] . . . it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 378 (1992). Thus, examples of sunset provisions in the context of consent decrees as well as permanent injunctions support the conclusion that nothing prevents this Court from including a sunset provision as a remedy in the present case in order to further the broad remedial purpose of the Voting Rights Act.

Any remedial order would also be subject to modification if future new facts changed circumstances such that continuing a remedy is no longer equitable. Any injunction requiring FFSD to alter its election procedures to comply with the Voting Rights Act could be modified pursuant to Rule 60(b). *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 826 (4th Cir. 2005) ("[A] court's inherent authority to modify a[n] injunction is now encompassed in Rule 60(b)(5) of the Federal Rules of Civil Procedure."); *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) ("Courts possess the inherent authority to enforce their own injunctive decrees."). Under Rule 60(b)(5) and (6), a court has to authority to relieve a party from a previous order if "applying [the judgment] prospectively is no longer equitable" or for "any other reason that justifies relief." Thus, should the remedy become unnecessary are inappropriate in

the future because of changed circumstances, FFSD could request a modification of the injunction pursuant to Rule 60(b).

## V.  VOTER EDUCATION PLAN

Any of these remedies will represent a change to the way elections have been conducted in FFSD.  As a result, it will be imperative to undertake a comprehensive voter education plan. This is especially true if cumulative voting is the remedy. "Particularly when a cumulative voting plan is proposed in a jurisdiction where vote dilution is due in part to historical discrimination in education and socio-economic factors, it must contain a plan to educate voters on the new process or else it is counterproductive to correcting the Section 2 violation." *Port Chester*, 704 F. Supp. 2d at 451. In this case, the parties are well-positioned to determine the necessary conditions for implementing a remedy. Thus, the parties should be ordered to propose for court approval a full plan that includes the form, format, and schedule for providing voter education, practice voting, and the duration of such outreach efforts. *See e.g.* Ex. 4, Port Chester Consent Decree.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court order a cumulative voting at-large electoral system for FFSD school board elections, and a comprehensive voter education plan.

Dated this 28th day of September, 2016.          Respectfully submitted,

/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN*
DALE E. HO*
SOPHIA LIN LAKIN*
ACLU Voting Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
Phone: (212) 549-2693

ANTHONY E. ROTHERT, #44827MO
JESSIE STEFFAN, #64861MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, MO 63108
Phone: (314) 652-3114

GILLIAN R. WILCOX, #61278MO
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, MO 64111
Phone: (816) 470-9938

M. LAUGHLIN McDONALD*
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
Phone: (404) 500-1235

*appearing pursuant to Local Rule 12.01(F)*

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I, Julie A. Ebenstein, hereby certify that on September 28, 2016, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Kathryn B. Forster
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com
kforster@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com


/s/ Julie A. Ebenstein
JULIE A. EBENSTEIN