## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

MISSOURI STATE CONFERENCE OF )
THE NATIONAL ASSOCIATION FOR THE )
ADVANCEMENT OF COLORED PEOPLE, )
REDDITT HUDSON, F. WILLIS JOHNSON )
and DORIS BAILEY, )
                                           )    Civ. No. 4:14-cv-02077-RWS
            Plaintiffs, )
v. )
                                           )
FERGUSON-FLORISSANT SCHOOL )
DISTRICT and ST. LOUIS COUNTY BOARD )
OF ELECTION COMMISSIONERS, )
                                           )
           Defendants. )

## DEFENDANT FERGUSON FLORISSANT SCHOOL DISTRICT'S RESPONSE TO PLAINTIFFS' PROPOSED REMEDIAL PLANS AND MEMORANDUM IN OPPOSITION

Defendant Ferguson Florissant School District ("District") hereby files its Response to

Plaintiffs' Proposed Remedial Plans and Memorandum in Opposition. Plaintiffs submit three

proposed remedial plans for the Court's consideration: (1) cumulative at-large voting; (2) a

districting plan with seven single-member districts; and (3) a hybrid districting plan with five

single-member districts and two at-large, limited voting, districts. However, Plaintiffs plainly

state their preference for the cumulative at-large voting system. For the reasons stated below, the

District opposes each of Plaintiffs' proposals.

      The District proposes the Court keep the current, at-large system. This system has

produced three (3) African American Board Members in the last three years, leaving the current

board with three (3) out of seven (7) African American members. This ratio represents a historic

proportionality between the number of African American voters in the district and the number of

African Americans elected and serving on the Board. Since many Courts "assume" that a plan

with rough proportionality does not dilute the vote in violation of Section 2, the District believes this recommendation is appropriate. ("Certainly a given defendant may choose to propose a plan that aims for rough proportionality because it is safe to assume that a plan with such a feature does not dilute the vote in violation of Section 2." *U.S. v. Euclid City School Bd.*, 632 F.Supp.2d 740 (N.D. OH 2009))[1] As such, the current at-large system, with staggered terms and bullet voting in April remains the Board's preference.

On August 22, 2016, this Court held the at-large system for electing board members to the Ferguson Florissant School District violates Section 2 of the Voting Rights Act. As a result, the parties were ordered to prepare and to respond to remedial proposals based on the liability determination.[2] The instant Memorandum is offered to prove that the current system is superior to any of the proposed remedies. It has resulted in minority representation that is proportional to the District's voting age population and it will continue to result in additional African American representation. ("Treating equal political opportunity as the focus of the enquiry, we do not see how these district lines, apparently providing political effectiveness in proportion to voting-age numbers, deny equal political opportunity." *Johnson v. De Grandy*, 512 U.S. 997, 1014 (1994.)) Furthermore, all of the proposed remedies risk reducing African American representation below the *status quo*.

On the last day of trial, the Court stated that he believes in the sincerity and motives of both parties to this litigation.[3] The District firmly believes that each party is invested in a fair and representative school board. More than that, each party believes in the necessity, benefit, and enrichment that African American representation provides. While the parties are

---

[1] The District has yet to find any other case in which the challenged plan yielded proportionality but was still in violation of Section 2.
[2] The District in no way agrees with the Court's liability determination and reserves its right to appeal that decision at the conclusion of this remedial phase.
[3] T.R. Vol VI, 87:15-18.

diametrically opposed to each other's interpretation of past elections and circumstances, our goals are the same. Both the Plaintiffs and the Defendants want the best possible electoral system in place to allow African American voters an equal opportunity at representation.

This Court has stated, "The last thing any of us want is a counterintuitive result."[4]  The District and the Court are in significant agreement on that point. At a very minimum, our priority should be *primum non nocere* or "do no harm."[5]  For that reason alone, the District implores the Court to keep the current system.

## LEGAL STANDARDS FOR REMEDIAL PLANS AND THE DISTRICT'S PROPOSAL

After a court determines liability, the defendants are to be afforded the first opportunity to submit a remedial plan. "A state's redistricting responsibility should be accorded primacy to the extent possible when a federal court exercises remedial power."[6]

If the Court finds that the District has failed to respond or responded with a legally unacceptable remedy, then it must use its discretion to fashion a remedy.[7]  "If the district court must craft its own remedy, that remedy must, to the greatest extent possible, effectuate the policies and preferences expressed in the defendant's remedial plan."[8]

Any remedy enacted must be legally acceptable. "Generally speaking…a legally acceptable plan is one that corrects the existing Section 2 violation without creating one anew. Such a plan must ensure equal opportunity in voting and afford the minority population a

---

[4] T.R. VI, 87:11-12.
[5] As taken from the Hippocratic Oath in medicine. A similar concept appears in Epidemics, Book I of the Hippocratic School: "Practice two things in your dealings with disease: either help or do not harm the patient".
[6] *Harvell v. Blytheville School Dist. No. 5*, 126 F.3d 1038, 1040 (8th Cir. 1998).
[7] *McGhee v. Granville County, N.C.*, 860 F.2d 110 (4th Cir. 1988).
[8] *U.S. v. Euclid City School Bd.*, 632 F.Supp.2d 740, 751 (2009).

reasonable opportunity to elect its preferred candidate through meaningful participation in the political process."[9]

The District proposes to maintain the current at-large system with bullet voting and staggered terms in April. This is a system that has resulted in African American representation proportional to the District's African American voting age population.[10] While this type of proportionality is not an "absolute" safe harbor, it does provide a certain amount of deference.[11] The District litigated the benefits of the current at-large system at trial. The District incorporates those arguments and evidence into this remedial phase.

The District can understand that the Court may not find the current system a palatable option due to its liability finding. However, the Court did not know for certain at the liability phase that the current system results in proportionality. The Court held that it was unable to draw significant legal conclusions from the 2016 election due to the lack of "meaningful expert testimony."[12]

As discussed below, the District's expert provides analysis to enable the Court to interpret the 2016 election results, which is critical for comparing the current system and the consequences of Plaintiffs' proposals. That comparison leads to the undeniable conclusion that none of Plaintiffs' proposals are superior to the current system. Instead, "[t]he proposed plans

---

[9] *Id*. at 752.
[10] This Court held that African Americans are a minority of the District's VAP and a smaller group than white voters. Thus, the Board's composition that 3 of 7 board members are African Americans is proportional to the number of African American voters in the District..
[11] See, *Blytheville*, 71 F.3d at 1388. Even using the term "absolute safe harbor" implies a safe harbor. It is merely a safe harbor that is rebuttable or not absolute. Furthermore, it is ironic this quote is used as an example that proportionality is not absolute. The Blytheville School District maintained proportionality until the electoral scheme changed. After that change, "None of six separate black candidates has defeated a white candidate in eight attempts…" Thus, the defendants were asking the Court to consider the proportionality that occurred under a previous electoral system as evidence that there is no current Section 2 violation under the new system. The Court found evidence that the old electoral system provided proportionality unpersuasive. *Id*. at 1388-1389.
[12] ECF 185 p. 8.

threaten to erase the recent gains of minority candidates and subject the FFSD to costly future litigation that will further undermine its ability to serve the needs of its students."[13]

The District prefers the current electoral system for the following reasons. First, the District and its board members emphasize its priority in maintaining an *at-large* system. The District's motto is "One District United."[14] That alone demonstrates this board's commitment to the unity and to the consensus that at-large elections provide. As stated at trial, the District strongly believes a unified school district prevents board members from advocating for their territory to the disadvantage of the remaining areas. While the at-large system is a common electoral structure for school boards, this board in particular, emphasizes the need for it.

Courts have held the at-large structure is particularly appropriate for school boards. It is a structure that allows for more consensus building and for more attention to the entire school district. The Court in *Euclid City School Board* stated approvingly, "unlike other political structures, school boards exist for the precise purpose of cultivating this consensus and shielding the provision of education from the clash of political conflict."[15]

Second, the District favors the current system because its *staggered electoral terms* maintain continuity in governance. School boards and this District in particular, promote staggered terms for the stability they provide. The District provided ample testimony of such in the liability phase. Again, the *Euclid City School Board* Court considered approvingly the Ohio School Board Association's ("OSBA") plea for staggered terms. The OSBA argued,

> Boards of education have immense responsibilities for the management and control of school districts….Staggered terms provide boards with continuity in the exercise of management discretion over these and other important matters. This method of electing board members allows for a

---

[13] District's Exhibit 1 p. 2.
[14] This is a motto proposed and enacted through Dr. Davis' leadership, the superintendent of FFSD.
[15] *U.S. v. Euclid City School Bd.*, 632 F.Supp.2d 740, 758 (2009).

gradual turnover in membership, rather than having the risk of an entirely
new board take office at once.

[S]taggered terms reduce frequency of…controversies and provide
consistency in a board's management of a district. A Section 2 remedy
that denies boards these benefits would have the undesirable effect of
increasing drastic swings in their membership. This turnover would erase
institutional memory, foment sudden and unpredictable changes in board
actions, and leave superintendents, other employees and students groping
for moorings in fundamental matters ranging from employment security to
curricula. *Id.* at 758-759.

The District argues there are legitimate and non-discriminatory reasons for at-large

elections with staggered terms. Among those, is the fact that these practices are required by

Missouri law.[16] The Court agreed with that finding by holding Senate Factor Nine weighs in the

District's favor.[17] Since the Court is advised that it "should not intrude on state policy any more

than is necessary," the District strongly urges the Court maintain those features. [18]

Finally and most importantly, the current system results in proportionality. The

superiority of the current system was confirmed with the landslide victory for Connie Harge

("Harge") in 2016. The District's expert, Dr. Jonathan Rodden ("Rodden"), conducted an

ecological inference analysis of the 2016 election. That analysis demonstrates that Harge was

the most preferred candidate by African American voters.[19] Importantly, Rodden concludes that

Harge's supporters successfully utilized bullet voting at a much higher level than did supporters

of white candidates.[20] The District has elected Dr. Donna Thurman ("Thurman") in 2014, Dr.

Courtney Graves ("Graves") in 2015, and Connie Harge ("Harge") in 2016. That results in

electing minority preferred candidates in rough proportion to their voting age population in the

District. The question then is whether a remedial electoral method can set a realistic benchmark

---

[16] ECF 185, p. 115.
[17] ECF 185, 115-116.
[18] *U.S. v. Euclid City School Board*, 632 F.Supp. 740, 751 (N.D. OH 2009).
[19] Defendant's Ex. 1, p. 4.
[20] Defendant's Ex. 1, p. 5

that allows, at a minimum, the District to maintain the current representation but is also flexible to allow for additional representation?[21] Rodden addressed this question and concluded that the current system is system to any proposed remedy or benchmark.

However, if the Court wanted to improve on the current system, Rodden suggests the Court could implement an educational component that instructs voters on the effective use of bullet voting.[22] Graves utilized bullet voting in 2015 to win more votes than any other candidate in the District's history. Harge also successfully utilized bullet voting. While additional candidates have utilized bullet voting, its use could become a more common tool for ensuring success for minority voters.[23]

The District argues the current system is the best possible system to allow African American voters an equal opportunity to participate. Section 2(a) of the Voting Rights Act specifically holds:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results* in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color… 52 U.S.C.A. § 10301. (emphasis added)[24]

Subsection (b) states that vote dilution occurs when members of a minority group "have less opportunity than other members of the electorate to participate in the political process…." Under this standard, the District argues the current system is legally acceptable.[25]

Above all, the District implores the Court -- do no harm. Many Section 2 remedial plans are offered with the goal of attaining rough proportionality.[26] The current system has done that.

---

[21] "Section 2, on the other hand, applies in all jurisdictions and uses as its benchmark for comparison in vote dilution claims a hypothetical, undiluted plan." *Reno v. Bossier Parish School Bd*., 530 U.S. 471, 472 (1997).
[22] Defendant's Ex. 1, p. 17
[23] Defendant's Ex. 1, p. 17
[24] U.S.C.A. § 10301(b)
[25] This historic level of proportionality leaves the District at a loss for an alternative. If proportionality means an unequal opportunity to elect, the only other option is disproportionality that amounts to over-representation.

For that reason and for the substantial risk that Plaintiffs' proposals present, the District urges the Court to maintain the current system.

## LIABILITY CANNOT BE DIVORCED FROM THE REMEDY

Plaintiffs present, discuss and evaluate several possible remedies. In particular, they present two single-member district plans.[27] While these plans are significantly altered from the plans offered at the liability phase, they are at least the same electoral structure as the plans litigated at trial. The parties conducted a six day bench trial based on Plaintiffs' illustrative single member district plans. Based on that, the Court concluded Plaintiffs met the first *Gingles* precondition. Yet, surprisingly, Plaintiffs now state their preferred remedy is cumulative voting, not single member districts.[28]

Plaintiffs had every opportunity to suggest cumulative voting as a benchmark in the liability phase. They did not. It would be inherently unfair for the court to establish liability based upon a finding that single member districts are the benchmark remedy, then to pull the rug out from under the District and impose an entirely new electoral system. This is especially true in light of the fact that a seminal part of the District's defense was there was no viable solution to any vote dilution.[29]

At this juncture, the issue is whether an electoral system that forms the basis for liability can be extricated from the remedy. The District argues it cannot.

---

[26] *Id*. at 753.

[27] The proposed plans are significantly altered from the plans presented in the liability phase. However, they are similar in that they are single member districting plans.

[28] ECF 201 p. 1.

[29] "A court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice. The phrase vote dilution itself suggest a norm with respect to which the fact of dilution may be ascertained….in order to decide whether an electoral system has made it harder for minority voters to elect the candidates they prefer, a court must have an idea in mind of how hard it should be for minority voters to elect their preferred candidates under an acceptable system. *Holder v. Hall,* 512 U.S. 874, 880 (1994). Since the Court found liability, it must have, by implication, found that single member districts were the reasonable benchmark.

The Fifth Circuit holds, "any federal decree must be a tailored remedial response to illegality."[30] In addition, the Eleventh Circuit holds, "The inquiries into remedy and liability….cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system.[31] If the Court must impose a "tailored remedial response" then it must impose single member districts. But, as the Court will find and as the Plaintiffs tacitly admit, single member districts are not a remedy.[32] Since liability was based on single member districts, and single member districts lead to the undesirable results described below, the Court is left without a remedy.[33]

## CUMULATIVE VOTING

Plaintiffs offer the cumulative voting system as legally acceptable remedy to the current system. As Plaintiffs describe, cumulative voting in this setting allows voters to cast votes for as many candidates as there are seats to be filled. The only difference with the current system and cumulative voting is that cumulative voting allows voters to "plump" their votes by giving all of their votes to one candidate or by spreading their votes among multiple candidates up to the number of seats.[34] The current system does not allow for "plumping." Instead, a voter may choose to cast less than their full number of votes (e.g. vote for only one candidate in a two seat

---

[30] *LULAC v. Clements*, 999 F.2d 831, 847 (5th Cir. 1993).
[31] *Nipper v. Smith*, 39 F.3d 1494, 1530-1531 (11th Cir. 1994).
[32] The fact that Plaintiffs no longer prefer single member districts when, according to the Court's logic, that system is finally subject to scrutiny, is telling. See, ECF 185, pp. 28-29.
[33] In that situation, the Court would have to reconsider its liability determination because there can be no liability without a remedy. See, *Holder v. Hall*, 512 U.S. 874, 881 (1994); *Nipper v. Smith*, 39 F.3d 1494, 1546-1547 (11th Cir. 1994); and *Stabler v. County of Thurston, Neb*., 129 F.3d 1015, 1025 (8th Cir. 1997).
[34] See, Plaintiffs' Exhibit 1 ¶¶ 7-8.

election).  This type of voting is called bullet voting.[35]  Obviously, both systems are at-large systems and the parties agree that staggered terms can be utilized.[36]

The District recognizes that cumulative voting has been adopted in multiple jurisdictions as a remedy for Section 2 violations.  Importantly, though, the District would point out that each of the jurisdictions that adopted cumulative voting did so with the defendants' consent.[37]  To date, the District has not found a single case whereby the court imposed cumulative voting against the defendants' will.  As such, the District has yet to discover a case whereby cumulative voting was analyzed in an adversarial context.

While the parties agree that cumulative voting is attractive because it retains an at-large system that allows for staggered terms, the parties disagree as to whether cumulative voting would help or hurt African American voters and representation.  This is critical to the evaluation of the remedy.  As Plaintiffs point out, the standard for adopting a remedy for a Section 2 violation is whether it gives the minority group a "reasonable opportunity" to elect candidates of their choice.[38]  However, the current system allows for that.  In electing three minority preferred candidates in three years, the current system clearly offers a reasonable opportunity to elect.  Thus, "reasonable" must be judged in context – that is compared to the *status quo*.

Engstrom concludes that cumulative voting provides African American voters with "meaningful opportunities to elect representatives of their choice" but does not guarantee an electoral result.[39]  Faced with the reality of proportional representation on the board, this ambiguity in expected results is troubling.  The actual record of imposing cumulative voting is

---

[35] ECF 185 p. 6.

[36] Plaintiffs' Ex. 1 ¶20.

[37] Plaintiff cite to *United States v. Village of Port Chester*, 704 F.Supp.2d 411 (S.D.N.Y.2010) and to *Dillard v. Chilton Cty. Bd. of Educ.*, 699 F.Supp. 870, 875 (M.D. Ala. 1998) where the defendants consented to cumulative voting and the court merely approved the consent decree.  Plaintiffs also cite to *Cottier v. City of Martin*, 475 F.Supp.2d  932 (2007) however, as they admit, that judgment was vacated by this Eighth Circuit.

[38] *Euclid City School Bd.*, 632 F.Supp.2d at 763.

[39] Plaintiffs' Exhibit 1 ¶18.  At the same time, he emphasizes that cumulative voting does not guarantee a result.

problematic.  Most, if not all of the Section 2 remedial cases involved jurisdictions without any minority representation.  ("[N]o African American had ever been elected to serve as mayor, Council Member, or Board Member in the City of Euclid."[40])

Rodden finds that the systems Plaintiffs herald as successful under cumulative voting are systems whereby one minority has been elected for the first time in its history.  That is, cumulative voting succeeds in overcoming the 'threshold of exclusion', whereby racially polarized voting effectively denies even one seat to the minority group.

The District agrees that cumulative voting is an effective system for averting absolute exclusion from electoral success through "plumping."  While that may be considered a success for those jurisdictions, it is not a success for minority representation under these facts.[41] Absolute exclusion has never been the issue because African Americans have maintained near constant representation on the board since its inception.

Rodden cites to a particularly troubling example in the Village of Port Chester, New York.  Plaintiffs declare Port Chester as an example of successfully implementing cumulative voting.  However, the most recent election emphasizes the coordination problem voters face with cumulative voting.  While three Hispanic candidates ran for office (two challengers and an incumbent), only the incumbent was re-elected.  Election results indicate the incumbent garnered a 1,304 vote surplus by successfully plumping.  The other two challengers fell 100 and 167 votes shy.  Thus, Rodden concludes that "plumping in Port Chester led to a coordination problem that undermined Hispanic representation."[42]

Rodden's report cites to two main problems with cumulative voting under these facts. First, it intensifies the ongoing problem of coordination for African American voters.

---

[40] *Id*. at 746.
[41] Defendant's Ex. 1, p. 7-8.
[42] Defendant's Ex. 1, p. 16.

Second, it will likely lead to outright exclusion from electing minority preferred candidates based on this Court's finding that white voters exceed the number of African American voters and the premise of racially polarized voting.

Rodden describes how the problems with voter coordination will be exacerbated by cumulative voting. For the last several years, African American candidates have exceeded the number of seats available. Since 2013, there have been 12 black candidates and 9 white candidates.[43] African Americans have won three seats in the last three years despite this lack of coordination. In two of those three elections, they did so using bullet voting. The incentives under cumulative voting would not provide for such success.

Rodden provides an example of how African American success in the two seat elections, would prove disastrous under cumulative voting. Rodden states:

> Imagine a two-seat election with two equally qualified and credible white candidates, and two equally credible and qualified black candidates. Further, following the logic of the "threshold of exclusion," imagine that racial polarization is complete: white voters only vote for white candidates and African Americans only vote for African-American candidates, while whites split their votes with maximum efficiency. We would expect each white candidate to get half of the white votes, and each black candidate to get half of the black votes. If white voters outnumber black voters, as the Court has stipulated is the case in Ferguson-Florissant, the white candidates would win *both* seats.[44]

This example makes clear that cumulative voting is only helpful to African Americans if they have fewer credible candidates than whites, since it assumes that white voters are split between two candidates and black voters would concentrate on one candidate. When African Americans have one credible candidate, they can "plump" and win despite white voters. But when African Americans voters have two credible candidates, cumulative voting requires them

---

[43] Defendant's Ex. 1 p. 12.
[44] Defendant's Ex. 1 p. 11

to coordinate better than white voters in order to succeed.  There is no evidence from past behavior in the District that this would occur.[45]

In the scenario the Court has laid out, there are fewer African American voters than white voters.  Therefore, African American voters must plump to elect their preferred candidates.  But with multiple candidates, voters must coordinate their plumping to be effective.  That coordination is difficult to manage and organize, as related past coordination failures demonstrate.  Either some African American candidates will need to act irrationally and forego asking voters to plump for them in favor of another candidate; or African American voters, on their own, will need to coordinate their votes on fewer candidates than seats.

More likely, Rodden states, "The free-for-all cumulative voting elections would only enhance the coordination problem faced by African Americans in 2014 and lead to an even less-efficient vote spread among the five African American candidates, while likely leaving the position of the top white candidates unchanged."[46]  Thus, cumulative voting enhances the risk of reducing minority representation and limits the gains for additional minority representation going forward.

Engstrom's report utilizes the threshold of exclusion to claim that cumulative voting allows African Americans the opportunity to elect candidates of choice regardless of white voting behavior.[47]  However, Engstrom's report stops short of providing a solution to the coordination problem involved in electing multiple African American candidates, which is critical to preserving or improving on the *status quo*. The reason is that he can't.  Cumulative voting enhances the coordination problem by requiring fewer minority preferred candidates than

---

[45] Defendant's Ex. 1, p. 9.  As Rodden points out, Henson lost by 125 votes and did not effectively use bullet voting. If he could not convince voters to bullet vote for him, there is no evidence that he could convince voters to plump.
[46] Defendant's Ex. 1, p. 14
[47] The threshold of exclusion is aptly explained in Plaintiffs' Exhibit 1 ¶¶11-16.

seats or by requiring African American voters to choose more effectively among their preferences.

Plaintiffs will counter that the failure to coordinate can be corrected through an education campaign. But note that the education campaign regarding coordination will require the same information under cumulative voting as one would under the current system.[48] The systems are very similar in that respect except that cumulative voting requires more coordination.[49]

## PLAINTIFFS' CUMULATIVE VOTING ANALYSIS IGNORES THE REALITY OF THE DISTRICT'S CIRCUMSTANCES

All three of Plaintiffs' plans fail to account for the impediments to voting faced by African American voters in the District.[50] These are impediments that Plaintiffs highlighted and accentuated in the liability phase. The Court's liability determination agreed that African Americans in the District experience impediments to voting.[51] Those impediments include felony disenfranchisement, voter registration and voter turnout. (As it relates to single member districts, the African Americans rate of homeownership and tendency to move more often than whites should be considered.) The Court determined that these impediments are part of the reality of the circumstances in the District.

The legal standard requires the Court to consider these impediments in crafting a remedy. "A court considering a limited or cumulative voting proposal must determine whether that proposal provides minorities a meaningful opportunity to participate in the political process by

---

[48] See, Defendant's Ex.1 p. 18.
[49] For this reason, Rodden suggests an education campaign on the use of bullet voting in the current system. There is less need for coordination thus less risk for reduced representation.
[50] This was Plaintiffs' argument in the liability phase. Defendant disagrees but mentions it to point out the inconsistency in Plaintiffs' position.
[51] ECF 185, pp. 18-23.

considering a combination of VAP and the existing political realities of the district."[52]  This

standard was explained in the *City of Euclid* case.  Dr. Engstrom was the expert.

The *Euclid* Court struggled with the appropriate way to measure the threshold of

exclusion in light of those impediments.[53]  Ultimately, the Court held:

> The Court's function is a predictive one – to use the theoretical construct
> of the threshold of exclusion to help it predict whether minorities will be
> provided a meaningful opportunity to participate in the political process if
> a proposed form of voting were implemented.  Because the Court's
> function is to answer this question to the greatest extent feasible, any
> formula that ignores the reality of the circumstances in which that
> predictive effort occurs would tend to *warp* the results.[54]

Engstrom's analysis of cumulative voting and the threshold of exclusion is warped

because it fails to account for depressed turnout, lower voter registration, lower homeownership,

felony disenfranchisement and the multitude of impediments that Plaintiffs successfully argued

at trial.

Instead, Engstrom's report contains a section entitled "Cumulative Voting and Minority

Opportunities in FFSD elections."  That section contains six paragraphs.  The first paragraph

describes cumulative voting as a "semi-proportional" system.  The second paragraph is a specific

disclaimer that cumulative voting does not guarantee particular outcomes. (i.e. electoral success

for African Americans.) The third paragraph describes the VAP as a way to set up the threshold

of exclusion calculation described in the next two paragraphs.  The final paragraph states that the

African American VAP in the District exceeds the threshold of exclusion.[55] In sum, Engstrom's

report utterly fails to analyze any of the additional factors this Court found dispositive in its

liability determination.

---

[52] *Euclid City School Bd.* at 763.
[53] *Id.*
[54] *Id.* at 762-763.
[55] Plaintiff's Exhibit 1 ¶17-22.

Dr. David Kimball ("Kimball"), one of Plaintiffs' experts in the liability phase, stated that with racially polarized voting, a white majority can effectively determine the winners of all the seats in the at-large setting. He also stated the same was not true for African Americans. Kimball stated that in an at-large setting, "you would want to see the racial or ethnic group be a super majority to be able to control at-large elections."[56] One of the reasons Kimball suggested a super-majority was due to the impediments African American voters face in the District. "So we just looked at the registration rates, and Missouri registration rates tend to be lower for African Americans than for whites. Voter turnout in local elections tends to be lower for racial and ethnic minorities than for whites. In order to win elections, it takes also some coordination, recruiting candidates, coordinating support that impose costs and take organizing and take resources."[57]

Thus, Plaintiffs' own expert admits it is important to account for the multitude of impediments African Americans face in determining whether they have a reasonable opportunity to elect. Plaintiffs may argue that these impediments no longer exist in the cumulative voting setting or have been accounted for in some way in Engstrom's report. The District did not find where these impediments were considered or analyzed.

Plaintiffs claim the standard for adopting a remedial plan is *any* reasonable opportunity. The District disagrees. While case law often fails to make a comparison to the *status quo* a requirement, that requirement would seem inconsequential when the *status quo* is zero. Furthermore, if the standard was *any* reasonable opportunity, then Plaintiffs could proclaim a

---

[56] T.R. Vol. II, 119: 1-11.
[57] T.R. Vol. II 119: 12-21. Again, the District is not agreeing with these findings.

16

violation is remedied when one African American wins election but two African American lose. Under the Section 2 standard, a remedy is a complete and certain cure.[58]

Finally, the District has practical reasons for objecting to cumulative voting. As research and Plaintiffs suggest, cumulative voting requires a substantial voter education campaign. The Village of Port Chester, a community of approximately 3,000 voters, budgeted nearly $300,000 on this education effort.[59] The District objects to liability. It denies that cumulative voting will work. And it definitely does not have an additional $300,000 to implement it.

For the reasons stated above, the District begs the Court "do no harm." The only way to ensure that possibility is maintain the current at-large system. Implementing cumulative voting will limit and/or reduce minority representation.

## SINGLE MEMBER DISTRICTING SYSTEMS

Plaintiffs offer two separate plans involving single member districts. Remedial Plan 2 is a straightforward seven single-member districting plan that places two minority preferred incumbents (Graves and Harge) in the same sub-district and two white incumbents (Chabot and Brown) in another. Remedial Plan 3 is a confusing five district hybrid plan with five single member districts and two at-large limited voting seats. Still, Harge and Graves are in the same sub-district. Thurman, Brown and Chabot are also placed in the same sub-district. The District is convinced these plans result in less African American representation and border (or actually do) create a new Section 2 violation.

---

[58] *Dillard v. Town of Louisville*, 730 F.Supp. 1546, 1549 (1990) citing *Dillard v. Crenshaw County*, 831 F.2d 246, 252 (11th Cir. 1987). This quote originally comes from the Senate Report concerning the 1982 amendments to the Voting Rights Act, "The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution…and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." Senate Report at 31.
[59] http://www.nytimes.com/2010/06/17/nyregion/17chester.html?_r=0

The Court is guided by a multitude of standards for adopting single-member districts. First, the Court must cognizant that any districting plan cannot have race as its predominant motive. "If race is the predominant motive in creating districts, strict scrutiny applies, and the districting plan must be narrowly tailored to serve a compelling governmental interest in order to survive."[60] Second, "…a trial court may not adopt a remedy that does not itself completely and with certitude cure the Section 2 violation."[61] Third, the Eighth Circuit utilizes a 65% guideline for the minority voting age population in each sub-district. (The *Bone Shirt* Court upheld Plaintiffs' redistricting plan because it contained one district with over a 65% Native American voting age population and another district with over a 74% Native American voting age population.[62]) Fourth and finally, the district court must consider factors such as turnout rate and incumbency in formulating a single member plan.[63]

Both of these plans are a disaster for the District and merely invite Plaintiffs to sue again when they fail to "remedy" any violation. In addition to failing the legal standards for a Section 2 remedy, they create additional barriers to African American representation by placing long-time white incumbents in majority African American districts, exacerbate the candidate recruitment problem in certain areas of the District and continue the coordination problem African American voters experienced in the past.

Both plans suffer from many of the same problems. First and foremost, Plaintiffs assume that a sub-district with an majority any-part African American VAP (AP BVAP) will elect minority preferred candidates. They wholly fail to take these plans outside of the hypothetical

---

[60] *Shaw* at 1025.
[61] *Dillard v. Town of Louisville*, 730 F.Supp. 1546, 1549 (1990) citing *Dillard v. Crenshaw County*, 831 F.2d 246, 252 (11th Cir. 1987). This quote originally comes from the Senate Report concerning the 1982 amendments to the Voting Rights Act, "The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution…and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." Senate Report at 31.
[62] *Bone Shirt*, 461 F.3d at 1019.
[63] *Id.* at 1023.

and place them within the confines of the District's reality. Instead, 50% AP BVAP equals African American representation. This is an argument that made their blood boil at the liability phase.[64] And, as with cumulative voting, Plaintiffs make absolutely no adjustments for the impediments of low registration, low turnout, felony disenfranchisement and the fact that African Americans have a lower rate of homeownership in their calculations.

Furthermore, Plaintiffs presume that single member districts are better for minority preferred candidates than at-large elections. Rather than rely on a hypothetical assumption, the District actually analyzed it. In fact, Rodden collected data on city council and aldermanic elections in St. Louis County since 2006 to compare with school district elections. His finding is astounding. A single member district that has a 60% BVAP has a 30% probability of being represented by an African American. A single member district that has an 80% BVAP has only a 50% probability of being represented by an African American.[65] The conclusion from this analysis is that African American representation is much stronger under the current at-large system used by the District than under single-member districts.[66] In other words, single member districts are not a viable remedy to any vote dilution in St. Louis County.

Another interesting finding from his analysis confirms evidence presented in the liability phase. Single member districts exacerbate the candidate recruitment problem. Rodden finds that "over half of all single-member district city council or aldermanic races in St. Louis County since 2006 have been uncontested."[67] He finds that African American candidates are less

---

[64] The District argued that under the 2011 – 2013 ACS, African Americans were a majority of the voting age population. Thus, the District argued that African Americans already had the opportunity to elect candidates of their choice. Plaintiffs vigorously opposed that argument. Now their opposition magically disappears. The same logic that a majority AP BVAP allows equality of opportunity at-large applies to a majority AP BVAP in single member districts.
[65] Defendant's Ex. 1 p. 21
[66] Defendant's Ex. 1 Figures 1 and 2.
[67] Defendant's Ex. 1, p. 24.

successful in single member districts because they are much less likely to run.[68]  Plaintiffs

presume this problem away by offering plans that create additional barriers to running for office

by limiting candidates to a specific geographic region.

## PLAINTIFFS' REMEDIAL PLAN 2

Plaintiffs' Remedial Plan 2 offers seven single-member districts as an alleged remedy to

any Section 2 violation.  The most fatal flaw to this plan is that it forces four incumbents into two

sub-districts.  Incredibly, Plaintiffs would require incumbents Graves and Harge, both African

American preferred candidates, to run against each other in the same sub-district.  Obviously,

this will result in a net loss of African American representation.

### Table 1: AP BVAP and incumbents by district[69]

| District Number | AP BVAP % | Incumbent(s) |
|:---:|:---:|:---|
| 1 | 62.88% | None |
| 2 | 60.57% | Brown (W) and Chabot (W) |
| 3 | 76.54% | None |
| 4 | 21.74% | Hogshead (W) |
| 5 | 21.69% | Ebert (W) |
| 6 | 51.42% | Thurman (AA) |
| 7 | 50.88% | Harge (AA) and Graves (AA) |

From a legal standpoint, only one of these sub-districts exceeds the 65% guideline as

upheld in *Bone Shirt*.  Plaintiffs suggest that 60% is an appropriate guideline.[70]  Even with that

---

[68] Defendant's Ex. 1. p. 24.
[69] See, Plaintiffs' Exhibit B-2 and B-4.
[70] ECF 201 p. 17.

measure, only three sub-districts meet that standard.[71]  The remaining four sub-districts are not

even close.  As the Court will see, there is absolutely no certainty that this plan will remedy any

violation.  In fact, a careful analysis questions whether this plan creates a new violation by

limiting African American success and insulating white incumbents.  (Rodden states, "If the

Plaintiffs' goal had been to maximize white representation going forward, I am not sure they

could have improved upon this plan."[72])  Finally and once again, Plaintiffs do not take any

impediments to African American voting into account.

Rodden conducted a careful and practical analysis of Remedial Plan 2.  As a reminder,

Rodden found that a sub-district with a BVAP of approximately 80% will translate into African

American victories approximately 50% of the time.[73]

To begin with, Rodden notes that Plaintiffs have created white supermajorities in district

4 with incumbent Hogshead and district 5 with incumbent Ebert.  Next, Rodden notes that

district 2 has an African American majority but includes two white incumbents.  Most likely,

Chabot will retain the seat because he received more votes than any other African American

candidate in this sub-district.[74]  Thus, that is three safely white sub-districts.  (Note, Engstrom

claims district 2 will elect a minority preferred representative because the AP BVAP exceeds the

threshold of exclusion for single member districts.[75]  He never takes into account that this sub-

district currently houses 2 white incumbents.[76])

In addition, district 3 has a majority BVAP but has only attracted one white candidate,

Donna Dameron, for the last several years.  It is possible this sub-district will be comparable to

---

[71] For reasons stated below, those three sub-districts are not likely to yield African American candidates.
[72] Defendant's Ex. 1 p. 27
[73] Defendant's Ex. 1. p. 21
[74] Defendant's Ex. 1 p. 25
[75] Plaintiffs' Ex. 1, ¶16.
[76] Again, Engstrom's only analysis is whether the BVAP exceeds the 50% threshold of exclusion.  He cites the Court's statement that "registration and turnout rates *often* improve once a court finds and remedies the § 2 violation." (emphasis added)

the city council and alderman races that are uncontested.  In the alternative, history indicates that if Dameron is the only candidate that chooses to run, this sub-district with a 76% BVAP will be represented by a white candidate.[77]  Again, while Rodden analyzed the past history in this sub-district, Engstrom merely presumes this will be safe minority seat in the hopes that a minority preferred candidate will run.[78]

Rodden predicts Thurman will not retain her seat in district 6.  Thurman, an African American preferred candidate, is the only incumbent in district 6.  However, Rodden found that Thurman lost the precincts in district 6 in 2014 despite winning in the District overall.[79]  Furthermore, district 6 has a BVAP of 51.42%; a number that is well below the 60% or 65% threshold.  The Court determined that Thurman won her seat in 2014 due to special circumstances.  Thus, the Court implicitly found that the AP BVAP it sanctioned as 48.19% was insufficient for her to win under normal circumstances.  Plaintiffs never indicate or analyze why they believe the 3.23% increase in the BVAP from 48.19% to 51.42% overcomes the multitude of impediments they claimed in the liability phase.  Notably, Engstrom does not declare this seat safe for Thurman.  He merely states that it gives African Americans a "competitive opportunity."[80]  Thus, a safe analysis under Rodden and the Court's liability reasoning is that Thurman will lose her seat.

Finally, District 7 contains two of the most popular African American preferred candidates ever elected to the board.  Both Harge (2016) and Graves (2015) were the most preferred candidates in each of their election years.  Yet, Plaintiffs are willing to sacrifice one or both of them with this proposed remedy.

---

[77] Note that Dameron was not a minority preferred candidate in either 2015 or 2016 when she unsuccessfully ran at-large.  See, ECF 185, p. 69 and Defendant's Ex. 1, p. 4.
[78] Plaintiffs' Ex. 1 ¶30.
[79] Defendant's Ex. 1 p. 26.
[80] Plaintiffs' Ex. 1 ¶30.

The Court found that Graves was elected due to the special circumstances involving Michael Brown. Thus, the Court implicitly found the 48.19% BVAP insufficient under normal circumstances. As a remedy, Plaintiffs offer both minority preferred incumbents an additional 2.69% BVAP instead of the requisite 60% or 65% threshold. Incredibly, Plaintiffs place these women in a sub-district with a 50.88% AP BVAP.[81] This is a sub-district that even Plaintiffs' own expert does not consider safe.[82] While everyone would hope one of these ladies would retain the seat, no one can credibly proclaim that.

Finally, the District continues to argue that single member districts are inappropriate for a jurisdiction in the midst of a racial transition. Both Plaintiffs' and the District's expert agree on this trend, stating, "Rodden and I agree substantially on the basic demographic trends. The district is in the midst of an ongoing racial transition marked by white flight to the outer suburbs. Since 2000, the white population of the Ferguson-Florissant School District has fallen by almost half (50,000 to 28,160) while the black population has grown steadily."[83]

Plaintiffs address this argument by claiming that sub-district lines are not immutable. Plaintiffs even suggest re-districting these plans. However, Voting Rights Act case law involves a multitude of lawsuits involving re-districting. At a minimum, the District hopes to avert additional lawsuits by Plaintiffs if they become unhappy with their choice.

The District is at a complete loss as to how this plan is a remedy to the Court's determination that African Americans have an unequal opportunity to elect candidates of their choice. This plan risks losing every single African American incumbent on the board and guarantees the loss of at least one. Rodden's analysis indicates that African Americans will lose

---

[81] Plaintiffs' Ex. B-2 and B-4.
[82] Plaintiffs' Ex. 1, ¶30.
[83] ECF 185 p. 17.

districts 2, 4, 5, 6 and 7. This amounts to a net loss of two but likely three minority preferred representatives. At the same, it insulates the white incumbents.

As a result, the District believes Remedial Plan 2 potentially violates Section 2 by creating a new violation of re-districting the African American incumbents out of office. At a minimum, it is not a remedy that "completely and with certitude cure(s) the Section 2 violation."[84]

## REMEDIAL PLAN 3 – THE HYBRID PLAN

Plaintiffs' Remedial Plan 3 offers a proposed remedy of five single member sub-districts and two at-large seats that are elected through limited voting. This plan is a confusing mix of new district lines and an entirely new electoral system. It appears the Plaintiffs would have the Court implement an entirely new electoral system in just one out of every three elections.

Under limited voting, voters are allocated fewer votes than the number of seats at issue in an election.[85] The candidates that receive the most votes win.[86] As with cumulative voting, the threshold of exclusion analysis applies.[87]

Interestingly, limited voting is extremely similar to the current system. Rodden characterizes this change as a minor "tweak" on the current at-large system with bullet voting.[88] The reason is that it replaces bullet voting -- the voluntary relinquishment of a vote; with limited voting -- the forced relinquishment of a vote.

Table 2 is a compilation of Plaintiffs' exhibits with AP BVAP, the district number, incumbent and electoral system employed.

---

[84] *Dillard*, 730 F.Supp. at 1549.
[85] See, Plaintiffs' Ex. 1 at ¶33.
[86] *Id.*
[87] *Id.*
[88] See, Defendant's Ex. 1 p. 28

| District Number | AP BVAP | Incumbent(s) | Electoral System |
|---|---|---|---|
| 1 | 58.92% | Hogshead (W) | Single Member Districts |
| 2 | 59.41% | Thurman (AA), Brown (W) and Chabot (W) | Single Member Districts |
| 3 | 59.81% | None | Single Member Districts |
| 4 | 48.89% | Harge (AA) and Graves (AA) | Single Member Districts |
| 5 | 18.03% | Ebert (W) | Single Member Districts |
| (2) Unnumbered Seats | 48.19% | Unknown | Limited Voting At-Large |

The legal analysis of Remedial Plan 3 is similar to the analysis in Remedial Plan 2. All of Plaintiffs' sub-districts are well below the 65% guideline in *Bone Shirt*. In fact, all of the sub-districts are below the 60% threshold. Plaintiffs have again failed to explain how or whether they accounted for the impediments the Court found. And again, Rodden's analysis indicates that a single member district with an 80% BVAP only has a 50% chance at providing African American voters' success. The District respectfully describes this plan as disastrous for African American representation and a potential violation of Section 2 by eliminating two and potentially all three African American incumbents.

District 4 is the most fatal flaw in this plan. Again, either Harge or Graves are forced to give up their seat. (Plaintiffs apparently intend for one of them to willingly run at-large so the other one can have the single-member seat.) Even Engstrom admits district 4 does not his

---

[89] Plaintiffs' Ex. C-2 and C-4.

standard for maintaining an African American.[90]  The District cannot imagine how Plaintiffs so willingly sacrifice not one, but likely both, of these women's hard-earned elections.

Again, the Court found that Graves won in 2015 due to special circumstances.  It therefore tacitly concluded the at-large AP BVAP of 48.19%, alone, could not account for her success.  And yet, Plaintiffs place both Graves and Harge in a sub-district with an AP BVAP at 48.89%.  Under the Court's logic, the white majority will block an African American preferred candidate with this percentage of AP BVAP.

And again, Thurman is placed in a sub-district she lost to Chabot in 2014.  Thurman is placed in sub-district 2 with a BVAP of 59.41% and against white incumbents Chabot and Brown.  Rodden's analysis indicates that Chabot received more votes than Thurman in the district at-large and in this sub-district in particular, in their 2014 election.  While Engstrom declares this sub-district a "meaningful opportunity to elect," that declaration was made without any consideration to the white incumbents that are also located there.  After considering and analyzing all of the facts, Rodden concludes Thurman will lose.

Sub-district three has no incumbent.  As with Remedial Plan 2, Rodden predicts that if Dameron (a white challenger) were to run then she would win.  This region has been void of African American candidates for the last several years.

Plaintiffs assume that Hogshead would choose to run at-large than in single-member district 1 in which she lives.  There is no reason from which to base this conclusion except the possible timing of her re-election.  However, it is just as likely that Hogshead would choose to run in the smaller sub-district as to voluntarily run in the district at-large.  For that reason, district 1 is Hogshead's for the taking.  Yet again, Engstrom declares this a competitive seat without any consideration for the fact that Hogshead lives there and is a long-time incumbent.

---

[90] Plaintiffs' Ex. 1 ¶32.

Plaintiffs attempt to remedy the fatal flaw of placing Graves and Harge in the same sub-district by offering two at-large districts with a limited voting structure. This, of course, presumes that one will want to run at-large. (It is just as likely that one will decide not to run at all.)

Thus, an analysis of the five single-member districts indicates that whites will win districts 1, 2 and 5. African American representation will be a net loss of two (Graves or Harge in district 4; and Thurman in district 2), but likely all three incumbents.

Rodden states that limited voting has all of the same coordination problems as cumulative voting.[91] For example, if more African American candidates run than the two seats that are available, African Americans will have to collectively use their sole vote to elect Graves. If two white candidates run for the two seats and more than two African American candidates run, the Court's holding of racially polarized voting would predict that Graves will lose and whites will win both seats.[92]

Plaintiffs never indicate whether limited voting would require an educational campaign. Nor do they indicate when or how this would occur. Thus, voters would be completely on their own to figure out an electoral system that precludes them casting as many votes as there are seats available.[93] As Rodden states, this creates a significant risk of disenfranchising voters that erroneously vote twice.[94]

From a practical aspect, the educational component is quite problematic. If the Court were to *sua sponte* implement an educational component, when would it occur? When the hybrid plan is first implemented? Or would the Court wait to educate voters until two years later when

---

[91] Defendant's Ex. 1 p. 29.
[92] Defendant's Ex. 1, p. 29-30.
[93] Plaintiffs suggest using limited voting in a 2-seat election year. Therefore, voters would only cast one vote despite knowing they will be electing two representatives.
[94] Ballots that include too many votes than allowed are not counted.

limited voting would actually occur?  Furthermore, would limited voting require periodic education whenever it is utilized? Or would voters be expected to remember these rules that are only implemented one out of three years?

Plaintiffs' Remedial Plan 3 is a disastrous risk of losing the current African American representation.  The District is not clear how limited voting would work and why Plaintiffs assume that a candidate would willingly give up running for office in a sub-district in favor of the at-large seats.  Remedial Plan 3 does not completely and with certitude cure the Section 2 violation.  More likely, it is a new violation of Section 2 for recklessly endangering all of the African American incumbents.

## CONCLUSION

The current system provides African American voters with representation proportional to their population in the District.  Thus, the District continues to argue that the current system is the best possible system for African American representation.  That argument is even more compelling when comparing the current system to Plaintiffs' proposed remedies.  The two sub-district plans potentially violate Section 2 anew because they result in the loss of African American incumbents.  For that reason alone, they provide African American voters with less opportunity.  More than that, they insulate the white minority into sub-districts that they will continue to win despite the overall district's transition to an African American majority district.

Plaintiffs' suggestion of cumulative voting is based on hope and an unfamiliar jurisdiction.  Engstrom's report is a recitation of generalized knowledge regarding the threshold of exclusion.  This generalization includes the widely accepted notion that cumulative voting is helpful in propelling a minority group from zero to one representative.  The District agrees with that notion.  The hope is that somehow an additional African American representative would be

elected despite the lack of organization demonstrated in the last several elections.  There is no articulated basis for Engstrom's hope.

It may be that Plaintiffs predict the educational component would aid African American voters' organization.  If that is the case, the District questions the use of resources in implementing an entirely new system to fix a problem that can be fixed under the current system.

Plaintiffs have shifted and reversed their most basic arguments from the liability phase. It appears the six-day trial regarding the calamitous circumstances for African American voters were only useful for liability.  Otherwise, how could they plausibly offer a sub-district with a 48% AP BVAP as a "remedy" or opportunity for African American representation?[95] More than that, how can they now admit that single member districts are not the best remedy when it was the only remedy at trial?  These changes cast doubt on their current and past assertions.

Plaintiffs filed this lawsuit claiming the state law requiring at-large elections violates the federal Voting Rights Act because the District had to have single member districts.  Now Plaintiffs have changed their minds.  At this remedial phase, Plaintiffs claim the state law requiring at-large elections still violates federal law but only because voters cannot use their two or three votes for the same candidate.  Somehow and inexplicably, African American voters will know how to coordinate their votes in the at-large setting such that at-large elections are not so bad.  It is abundantly clear that any cure for this vote dilution is much worse than the disease.

The District has attained a historic proportionality between the number of African American preferred representatives and the number of African American voters.  Somehow, the Court found that amounts to an unequal opportunity for African American voters.  We are, therefore, in unchartered territory.  The District has urged this Court to do no harm.  At a very minimum, allow African American voters to maintain the proportionality they worked hard to

---

[95] See, Remedial Plan 3 sub-district 4.

gain.  Maintaining the current proportionality precludes implementing any of Plaintiffs'
proposals.

The District argues that everyone actually wants the opportunity for additional minority
representation.  The current system allows for that based on the past experience and the current
proportionality.  Plaintiffs' proposals provide risk and harm.  Once again, the District pleads – do
no harm.  Keep the current system.

Respectfully submitted,
CROTZER & ORMSBY, LLC

*/s/ Angela Bullock Gabel*
Angela Bullock Gabel, 58227MO
Cindy Reeds Ormsby, 50986MO
130 S. Bemiston Ave., Suite 602
Clayton, MO 63105
314.726.3040 / 314.726.5120 (fax)
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA  98119
Phone: (206) 441-4455
*Attorneys for Defendant Ferguson-Florissant*
*School District*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is a person of such age and discretion as to be
competent to serve papers.  It is further certified that on October 19, 2016, I electronically filed
the foregoing document with the Clerk of the Court using the CM/ECF system, which will send
notification of such filing to the following CM/ECF participants:

Anthony E. Rothert
Andrew J. McNulty
Jessie M. Steffan
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, Mo 63108
*Counsel for Plaintiffs*

Dale Hoe

Julie A. Ebenstein
Sophia Lin Lakin
ACLU Voting Rights Project
125 Broad Street, 18th Floor
New York, NY  10004
*Counsel for Plaintiffs*

M. Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, GA 30303
*Counsel for Plaintiffs*

Gillian R. Wilcox
ACLU of Missouri
3601 Main Street
Kansas City, MO 64111
*Counsel for Plaintiffs*

*/s/ Angela Bullock Gabel*