### UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF | ) | |
| THE NATIONAL ASSOCIATION FOR | ) | |
| THE ADVANCEMENT OF COLORED | ) | |
| PEOPLE, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:14-cv-02077-RWS |
| | ) | |
| FERGUSON-FLORISSANT SCHOOL | ) | |
| DISTRICT and ST. LOUIS COUNTY | ) | |
| BOARD OF ELECTIONS | ) | |
| COMMISSIONERS, | ) | |
| Defendants. | ) | |

**Reply Memorandum in Support of Motion for Attorneys' Fees and Non-Taxable Costs**

Defendant St. Louis County Board of Election Commissioners does not dispute

Plaintiffs' entitlement to attorneys' fees or the reasonableness of the fees and out-of-pocket costs

submitted, but claims it should not be responsible for any share of the award. Defendant

Ferguson-Florissant School District claims that special circumstances warrant a denial of

attorneys' fees, the amount of fee award should be adjusted based on recent reductions to the

District's annual budget, Plaintiffs caused duplicative costs and fees, Plaintiffs did not prevail on

one aspect of Senate Factor 8, hours unrelated to litigation should not be reimbursed, and the

case was overstaffed. The District claims that fees should be denied, or, in the alternative,

reduced by 120 percent.[1] The District also asserts that the non-taxable costs incurred by

Plaintiffs were unreasonable or duplicative.

---

[1] The district urges across-the-board reductions of seventy-five percent for its alleged inability to pay, thirty percent because this case was bifurcated, five percent because this Court found the evidence on Senate Factor 8 was neutral, and ten percent for claimed overstaffing.

1

## I.      There are no special circumstances that warrant denial of Plaintiffs' motion.

Citing no cases, the District argues that special circumstances would render an award of fees and costs unjust.

Plaintiffs in this matter are private citizens and a non-profit organization, represented by a non-profit organization providing pro bono legal services to enforce fundamental rights protected by the Voting Rights Act. After dispersing the necessary time and resources to litigating this matter, Plaintiffs prevailed in full on their claim.

The District attempts to squirm out of responsibility by asserting it had no choice but to litigate this case as it did. This overlooks that the District could have entered into a consent judgment, defended the case nominally (as its co-defendant did), defaulted, or focused its defense on those factors where it had a reasonable chance of prevailing. The District was aware of its authority to resolve the case before it incurred *any* costs not covered by insurance *See* Tr. (Mar. 5, 2015) at pp. 11-12 (citing Eighth Circuit authority supporting the District's ability to agree to a consent judgment resolving the case).[2]

Neither is the District, as it claims, the victim of the killing of Michael Brown. It is no secret that the unrest following Brown's death highlighted the non-responsiveness of local government to the particularized needs of the African-American community, particularly in North St. Louis County. Indeed, in this case "Plaintiffs' evidence show[ed] that certain members of the Board have, at times, been unresponsive to the particularized needs of the African

---

[2]       Moreover, even if the District's mistaken belief that it had to fight was in good faith, "good faith is not a special circumstance that would render the award of fees unjust." *Bills v. Hodges,* 628 F.2d 844, 847 (4th Cir.1980) (citing *Tillman v. Wheaton–Haven Recreation Ass'n,* 517 F.2d 1141, 1147 (4th Cir.1975)); *see also Lampher v. Zagel,* 755 F.2d 99, 104 (7th Cir.1985) (quoting *Harrington v. DeVito,* 656 F.2d 264, 268 (7th Cir.1981)); *O'Sullivan v. Brier (In re Kansas Congressional Dists. Reapportionment Cases),* 745 F.2d 610, 613 (10th Cir.1984) (citing *Love v. Mayor of Cheyenne,* 620 F.2d 235, 236 (10th Cir.1980)); *Nadeau v. Helgemoe,* 581 F.2d 275, 280 (1st Cir.1978).

2

American community." ECF No. 185 at p. 105. Plaintiffs decision to address this *real* concern by challenging one of its causes—i.e., the Section 2 violation—is in no way untoward and does not constitute a special circumstance.

Finally, the District's failure to budget for this foreseeable expense is not a special circumstance. Although to date the District has not budgeted to pay Plaintiffs' fees and costs, it has, as explained below, saved the money from which to do so. Moreover, there is no indication that the District has had difficulty paying for its own private attorneys or experts even without those items having been budgeted or being under-budgeted. At bottom, finding a special circumstance here would send a perverse incentive to those violating our Nation's civil rights law: run up a civil rights plaintiff's fees and expenses by vigorously contesting a strong claim, then simply fail to budget for the possibility that the plaintiff will prevail. This would be contrary to the purposes of 42 U.S.C. § 1988. *See Fox v. Vice*, 563 U.S. 826, 836 n.3 (2011) ("Congress authorized fees to plaintiffs to compensate them for the costs of redressing civil rights violations").

## II.    The District has the ability to pay.

The District correctly observes that the Eighth Circuit appears not to have addressed whether ability to pay is a factor to consider in determining the amount of attorneys' fees under § 1988. The District fails to note that the out-of-circuit cases it cites arise in the context of the award of fees to a prevailing defendant. *See, e.g.*, *Roth v. Green*, 466 F.3d 1179, 1194 (10th Cir. 2006) (noting that plaintiffs "were paupers who could not afford to pay any amount of fees" based on "each plaintiff's monthly income and expenses"). The District's theory has been rejected when raised by a defendant-government entity. *See, e.g.*, *E.C. v. Sch. Dist. of Philadelphia*, 91 F. Supp. 3d 598, 614 (E.D. Pa. 2015), *aff'd sub nom. E.C. v. Philadelphia Sch.*

*Dist.*, 644 F. App'x 154 (3d Cir. 2016). Indeed, Plaintiffs have found no cases in which a court has reduced an award of attorneys' fees based on a government defendant's alleged inability to pay.

This Court need not decide the novel legal issue of whether a government defendant may avoid payment of the lodestar based on a claimed inability to pay, however, because the District has no such inability. Just in *reserves* the District currently keeps 19.93 percent of its operating budget. *District Budget* (Ex. 11) at p. 20. The current budget anticipates that the District will reach June 30, 2017 with $30,574,488.00 in reserves. *Id.* at  p. 9. The audit of the District's finances for the fiscal year ending June 30, 2016 showed a positive net position of $32,465,457.00. *District Audit* (Ex. 12) at p.5. This includes cash and investments of more than $30,000,000.00. *Id.* at p. 6. Moreover, unlike an impoverished plaintiff, the District has the ability to seek a tax levy, as it did in 2014, or issue a bond, if it is necessary.

No doubt that Board's decisions in this case have placed the District in an unfavorable position, but an award of attorneys' fees will not jeopardize the District. There is no factual or legal basis for the District's plea to reduce the attorneys' fee award by seventy-five percent based on an inability to pay.

### III.    Bifurcation is not a basis for reducing an award of fees

Next the District suggests an across-the-board reduction of thirty percent is warranted because trial was bifurcated. It is true that Plaintiffs initially had hoped that bifurcation would not be necessary—even though the District insisted from the beginning that the case would have to be bifurcated. *See* Tr. (May 20, 2015) at p. 18-19 (defense counsel opining both liability and remedial phases would be needed). [3] It turns out that, in this respect, the case played out the way

---

[3]        Plaintiffs had no way of predicting at the commencement of this case that the District would suggest that it

the District expected, but that is no basis for reducing the award of attorneys' fees.

The District made the unprecedented decision to defend against every single *Gingles* factor and Senate Factor and then claim that the only appropriate remedy to a Section 2 violation is to do nothing. Plaintiffs responded to the District's litigation choices, including by providing this Court with multiple options for curing the Section 2 violation after the District refused the opportunity to first propose a remedy. In any event, it is far from unusual for liability to be decided separately from a remedy in a Section 2 case and bifurcation—to the extent it was even Plaintiffs' choice—is not a basis for reducing a fee award.

## IV.     This Court's finding that Senate Factor 8 has neutral weight is not a basis for reducing fees.

This Court found Senate Factor 8 was neutral, and that determination had no effect on the ultimate finding of liability. Nevertheless, the District suggests that a five percent across-the-board reduction is appropriate. Such a reduction, however, would be contrary to clearly established law.

Plaintiffs prevailed in the case—completely. "A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes." *Holmes v. Slay*, No. 4:12CV2333 HEA, 2017 WL 994473, at *2 (E.D. Mo. Mar. 15, 2017). It would be error to reduce fees based on a failure to prevail on claims rendered irrelevant by Plaintiffs' overall success. *Phelps-Roper v. Koster*, 815 F.3d 393, 398–99 (8th Cir. 2016). "Once a party is found to  have prevailed, '[a] fee award should not be reduced merely because a party did  not prevail on every theory raised in the lawsuit.'" *Casey*, 12 F.3d at

---

is impossible to draw single-member district because Plaintiffs knew that was not true. Once the District decided to challenge even this point, bifurcation became necessary.

806. Instead, for a fee to be reduced because relief was not granted on certain claims, the unsuccessful claims must be "unrelated" to those for which relief was granted. *Hensley*, 461 U.S. at 433. Unrelated claims are "distinctly different claims for relief that are based on different facts and legal theories." *Id*. The Supreme Court observed that in the context of civil rights cases, "such unrelated claims are unlikely to arise with great frequency." *Id*. A fee award should reflect "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id*. A "plaintiff who has won excellent results . . . is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which [the plaintiff] did not win." *Jenkins by Jenkins v. State of Mo.*, 127 F.3d 709, 716 (8th Cir. 1997).

This case raised one claim: a violation of Section 2. Plaintiffs prevailed on that claim. The fact that one aspect of the evidence as to one of a dozen factors considered at the liability phase was not persuasive, causing this Court to find that factor neutral, does not warrant a five percent across-the-board reduction.[4] The finding in no way negatively altered Plaintiffs' overall success on the merits; thus, any reduction of fees on this basis is improper.

**V.    Plaintiffs have not sought compensation for hours unrelated to this litigation.**

The District questions whether certain time entries were related to this litigation. The affidavits submitted with the entries attest that the time was related to this litigation, and the District's rank speculation is insufficient to counter them.

The District takes issue with an attorney's reading Frankie Freeman's autobiography and drafting a memorandum about its contents. When approached as a potential witness in this case for historical information about racial discrimination in the St. Louis area, Ms. Freeman was in ill-

---

[4]    Evidence relating to the Board's refusal to explain its separation from Dr. McCoy was relevant not only to Senate Factor 8, but also to the context and background of the 2014 election for purposes of proving the second and third *Gingles* preconditions.

health and referred counsel to her book, which documents that history. Understanding this history of discrimination was crucial to preparing Plaintiffs' case. The fact that because of Ms. Freeman's health counsel obtained the information from Ms. Freeman's book rather than her mouth does not reduce the reasonableness of gathering the information in this case. This work was related to this litigation. Moreover, counsel reduced by half the time spent on this aspect of case preparation.

The District acknowledges that the attendance of attorney at a community meeting may have "had to do with the litigation," but speculates that "it is equally possible this meeting involving rallying or organizing the community." But it is not equally possible. The attorneys attested that they excluded unnecessary hours. The hours were included because they were a part of the investigation of this case and reasonable to permit the attorneys to understand the circumstances of voting in the District. Similarly, the District claims that a call about this case with the Department of Justice, attending a meeting to understand this Court's technological devices, and drafting and reviewing retainer agreement might all have been unrelated to this case, but the District provides no reason to doubt the sworn attestations of Plaintiffs' attorneys to the contrary.

Because the work the District speculates might not have been related to this case was, in fact, related to this litigation, the portion of the lodestar attributable to it should not be deducted.

## VI.     Plaintiffs staffing of this case is not a basis for reducing the amount of attorneys' fees.

There is nothing unusual or undesirable about the use of multiple attorneys. *A.J. by L.B. v. Kierst*, 56 F.3d 849, 863-64 (8th Cir. 1995) ("The use of more than one attorney in multiple party litigation has been recognized by courts, including our own, as both desirable and common."). There is no indication that any of the five defense attorneys in this case have not been fully compensated for their work on this case, including attendance at trial.

Plaintiffs have excluded hours that were duplicated by other attorneys. And they reduced even their entirely appropriate billing.[5] Indeed, the District does not even suggest that any work for which compensation is sought would not have been performed by a senior attorney (at a higher hourly rate) if not done by a less-senior attorney.

Notably absent from the District's opposition is any acknowledgement that its own vigorous strategy directly led to the hours incurred by Plaintiffs' attorneys or any indication of the number of hours spent by defense attorneys in this case. "Careful preparation often requires collaboration and rehearsal, and the court should not reward defendants for their vehement 'Stalingrad defense,' . . . Indeed . . . a litigant's staffing needs and preparation time will often vary in direct proportion to the ferocity of her adversaries' handling of the case" *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 860 (1st Cir. 1998) (internal quotation marks and citation omitted); *see also*, *White v. McKinley*, No. 05-0203-CV-W-NKL, 2009 WL 813372, at *4 (W.D. Mo.Mar. 26, 2009) ("More specifically, McKinley complains of the approximately six

---

[5]         For instance, Plaintiffs did not seek compensation for: (1) other than co-lead counsel Ms. Ebenstein and Mr. Rothert, attorney hours spent at trial on days where an attorney did not examine a witness; (2) hours spent at any depositions attended by any more than two other plaintiffs' attorneys; (3) hours spent with more than one attorney preparing witnesses for deposition or trial testimony by any attorney other than the attorney defending the deposition or conducting the direct examination; and (4) other than co-lead counsel Ms. Ebenstein and Mr. Rothert, hours spent participating in team meetings and calls.

lawyers and one paralegal White's team devoted to the trial. This number was not unreasonable given the volume of evidence and complexities of the case. It was acceptable for attorneys on White's trial team to observe the trial where they were obviously assigned with researching legal issues and examining witnesses whose testimony overlapped with others on the stand.").

In support of its proposed ten-percent, across-the-board reduction for overstaffing, the District reaches back twenty years for *Morse v. Republican Party of Virginia*, 972 F. Supp. 355, 367 (W.D. Va. 1997). In that case, however, the attorneys had not made voluntary reductions as the attorneys have in this case. In this case, Plaintiffs' counsel have already voluntarily reduced the lodestar by more than ten percent. No further reduction is warranted.

### VII.    Plaintiffs' non-taxable costs are reasonable.

The District's citation to *Hastert v. Illinois State Board of Election Commissioners*, 28 F.3d 1430 (7th Cir. 1993), for the notion that this Court may simply decline to award non-taxable costs is misplaced. The Seventh Circuit noted discretion when awarding "costs" as used in 28 U.S.C. § 1920 and Rule 54(d). *Id.* at 1437. Taxable costs have already been awarded in this case—without opposition from either Defendant. ECF No. 246. The issue before the Court is the awarding of non-taxable costs for reasonable out-of-pocket expenses incurred by attorneys (of the type that normally are charged to fee-paying clients) as part of an attorney fee award under 42 U.S.C. § 1988, as repeatedly recognized by the Eighth Circuit. *Pinkham v. Camex, Inc.*, 84 F.3d 292, 295 (8th Cir. 1996); *Neufeld v. Searle Labs.*, 884 F.2d 335, 342 (8th Cir. 1989); *SapaNajin v. Gunter*, 857 F.2d 463, 465 (8th Cir. 1988). As the Seventh Circuit notes, "[w]hile district courts have broad discretion to award or deny Rule 54(d) costs, their 'discretion to deny a fee award [under section 1988] to a prevailing party is narrow.'" *Hastert*, 28 F.3d at 1438 (quoting *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 68 (1980)).

9

The District takes issue with the amount that Plaintiffs had to pay Dr. Richard Engstrom in this case. They claim his hourly rate of $450.00 is excessive, but they cite no authority for this proposition. The factors that courts consider in determining whether a particular expert witness fee is reasonable include: the witness' area of expertise; education and training required to provide the expert insight that is sought; prevailing rates of other comparably respected available experts; nature, quality, and complexity of opinions provided; fee actually being charged to the party who retained the expert; fees traditionally charged by the expert on related matters; and any other factor that is likely to be of assistance to the court. *See Bowen v. Monahan*, 163 F.R.D. 571 (D. Neb. 1995). Dr. Engstrom is one of the nation's leading scholars in political science on the study of racially polarized voting, electoral systems, and vote dilution. *See Joint Stip.* (ECF No. 124) at ¶ 56; Trial Tr. vol. 5, 86:13-20 (Dr. Rodden testifying that he would describe Dr. Engstrom this way); Trial Tr. vol. 4, 5:4–10:3 (Dr. Engstrom describing his qualifications). His hourly rate is reasonable for someone of his expertise and experience, and it is the rate that Plaintiffs paid for his work on this case.

The District also thinks Dr. Engstrom spent too much time on this case. Plaintiffs' filed Dr. Engstrom's itemized bill, which shows precisely how he spent his time. The District overlooks three important reasons why Dr. Engstrom spent 352.5 hours on this case. First, it was Dr. Engstrom's careful work in this case that made him a credible witness, especially compared to the District's expert, and the testimony of such an expert was essential to persuading this Court to make the factual findings that support the determination that there is a Section 2 violation. Second, it was the District's strategy of contesting every conceivable piece of evidence in this case that required so many hours of Dr. Engstrom's time. Third, the District's employment of a novice expert required Dr. Engstrom to spend significant time uncovering and

10

explaining the mistakes made by the District's expert. The District does not point to a single time entry on Dr. Engstrom's bill that it contends it unreasonable.[6] "A defendant cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986).

Next, the District complains that the hotels where Plaintiffs' attorneys stayed are too nice. The District drops the names of some of the hotels, but District does not mention the prices for these hotels. Plaintiffs' counsel was required to find lodging in St. Louis at different times of the year and often on short notice. The ACLU's internal protocols require them to use American Express Global Business Travel's Concur Travel & Expense Tool to secure the best available rates for a business-travel hotel based on a comparison of area hotels on given dates. It is for these reasons that Plaintiffs' attorneys stayed at not only the Chase Park Plaza, the Cheshire, and the Moonrise, as the District mentions, but also the Union Station Hotel, the Magnolia, the Sheraton, and the Westin—wherever had the best available rate at the time of booking. The federal government base rate for a hotel in St. Louis is $125.00. Of course, Plaintiffs are not the government and cannot obtain a government rate, but nonetheless the base rate for their hotel nights was not much more than that and sometimes less. For the most part, the base rates for hotels ranged from $113.00 to $149.25, which is a reasonable range. On three exceptions, each involving last-minute reservations, the rate was higher, but always less than $200.00 except for the two weekend nights Ms. Ebenstein remained in St. Louis when the trial in this case slipped into a second week. Even then, the $274.00 per night was less expensive than flying to New York and back on short notice and over a holiday weekend. Notably absent from the District's

---

[6]     It might have been useful for the District to share the number of hours that its two experts spent on this case for reference, but the District has not done so.

criticism are any comparative rates for other St. Louis hotels, but Plaintiffs are confident that they obtained reasonable rates under the circumstances.

The District also complains that valet parking was sometimes used. But it is not unreasonable to pay an extra $10.00 for valet parking on those occasions when counsel was hauling around boxes of exhibits. The occasional use of valet parking was not a luxury item here.

Next, the District complains about where counsel ate. Again, the District fails to mention prices, which is not surprising given that internal ACLU protocols impose a maximum per diem of $ 55 per day for meals when traveling.

The District also claims that it was unreasonable to rent work space at the Westin Hotel during trial. It is reasonable to have work space a block away from the courthouse at the hotel where Plaintiffs' out-of-town counsel and witnesses were staying. While it is true that the ACLU of Missouri has an office in St. Louis, utilizing the office would have incurred transportation costs. Moreover, the ACLU has many functions besides this case and it is not feasible to take over the entire office for more than a week. Furthermore, at the time of trial, the ACLU's neighbor was a dance studio, which tried to keep its volume low before 5 p.m., but which was not a conducive work environment after hours or on weekends.[7]

Finally, the District neglects to mention that Plaintiffs have voluntarily reduced their request for reimbursement of travel-related incidental out-of-pocket expenses, including meals, wi-fi access, printing, and other costs by $10,759.41, an amount that dwarfs the cumulative complaints about costs specified by the District.

---

[7]        We have since moved.

12

### VIII. The Board of Election Commissioners is Liable for Fees

This Court's judgment altered the relationship between Plaintiffs and the Board of Election Commissioners as well as the District. In the Amended Judgment, "Defendants Ferguson-Florissant School District and the St. Louis Board of Election Commissioners are enjoined from conducting elections for the Ferguson-Florissant School Board via the traditional at-large electoral method at issue in this litigation." ECF No. 243. Moreover this Court ordered that both "Defendants shall implement a cumulative voting at-large electoral system for Ferguson-Florissant School Board elections with a voter education program." *Id*. Thus, Plaintiffs are prevailing parties against *both* Defendants for purposes of 42 U.S.C. § 1988.

The Board of Election Commissioners has never denied that it carries out the District's elections. Though it took a decidedly passive approach to defending this case, it—like the District—could have resolved this matter by agreeing to a consent judgment that would cure the Section 2 violation. It did not. Nor did the Board of Election Commissioners (like the School Board in *Jenkins*) admit liability before trial or (like the primary defendant in *Torres-Rivera*) allow default judgment to be entered. Instead it sat back and allowed the District, represented by counsel from the same private firm, to mount a zealous defense against Plaintiffs.

The Seventh Circuit addressed precisely this situation:

> It is of no consequence that the State Board of Elections played no active role in the proceedings and agreed to enforce whatever plan the district court adopted, since fees may be taxed even against entities whose role is limited to enforcement of regulations they played no role in promulgating. Nor is the Board's putative "good faith" a special circumstance justifying a refusal to award fees.

*Hastert v. Illinois State Bd. of Election Comm'rs*, 28 F.3d 1430, 1444 (7th Cir. 1993). It is the judgment of Congress that government entities that carryout laws that violate the Constitution or

13

other federal laws are in a superior position to bear the costs of successful litigation than plaintiffs.

## IX.   Additional Fees and Costs

Plaintiffs are entitled to an award of attorneys' fees for the time spent preparing this reply. *See Banks v. Slay*, No. 4:13CV02158 ERW, 2016 WL 5870059, at *4 (E.D. Mo. Oct. 7, 2016) ("Time spent litigating attorneys fees is generally proper.") (citing *El-Tabech v. Clarke*, 616 F.3d 834, 842–43 (8th Cir. 2010)); *see also Freeman v. MH Equip. Co.*, No. 4:15 CV 1473 CDP, 2017 WL 76907, at *2 (E.D. Mo. Jan. 9, 2017) (same). However, Plaintiffs waive their entitlement to these additional fees.

Plaintiffs do, however, seek reimbursement for two costs paid subsequent to submission of their motion. Plaintiffs were required to pay $1,781.25 for mediation as a result of the School Board's vote to reject the settlement agreement reached through alternative dispute resolution. In addition, Plaintiffs paid $127.05 for a transcript of the December 19, 2016 status hearing. As set forth in Mr. Rothert's attached affidavit, these expenses have been paid and are the type of reasonable out-of-pocket expenses incurred by attorneys that normally are charged to fee-paying client.

## X.   Conclusion

For the foregoing reasons, Plaintiffs request this Court award them attorneys' fees in the amount of $1,137,920.05, non-taxable expenses in the amount of $234,228.73.

Respectfully submitted,

/s/ Anthony E. Rothert
ANTHONY E. ROTHERT, #44827MO
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, Missouri 63108
Phone: (314) 652-3114

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2017, I filed the foregoing document using the e-filing system, thereby serving electronic copies via email to all named parties below:

Darold E. Crotzer, Jr.
Kathryn B. Forster
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
dcrotzer@crotzerormsby.com
kforster@crotzerormsby.com

Cindy Reeds Ormsby
Angela Bullock Gabel
Crotzer and Ormsby, LLC
130 S. Bemiston Avenue, Suite 602
Clayton, MO 63105
Phone: (314) 726-3040
cormsby@crotzerormsby.com
agabel@crotzerormsby.com

John A. Safarli
Floyd, Pflueger & Ringer, P.S.
200 W. Thomas Street, Suite 500
Seattle, WA 98119
Phone: (206) 441-4455
jsafarli@floyd-ringer.com

/s/ Anthony E. Rothert