# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-4511

_____

Missouri State Conference of the National Association for the Advancement of Colored People; Redditt Hudson; F. Willis Johnson; Doris Bailey

*Plaintiffs - Appellees*

v.

Ferguson-Florissant School District

*Defendant - Appellant*

St. Louis County Board of Election Commissioners

*Defendant*

------------------------------

Missouri School Boards' Association

*Amicus on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 13, 2017
Filed: July 3, 2018

_____

Before SMITH, Chief Judge, ARNOLD and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

The Missouri State Conference of the National Association for the Advancement of Colored People and the other named plaintiffs (together, the NAACP) sued the Ferguson-Florissant School District (FFSD, or the district) for vote dilution under section 2 of the Voting Rights Act of 1965 (VRA), 52 U.S.C § 10301. After a bench trial, the district court[1] found that (1) the NAACP had proved the preconditions for a section 2 claim, and (2) the totality of the circumstances indicated that the district's black voters had less opportunity to elect their preferred candidate than other members of the electorate. FFSD appeals both determinations.

## I.

We begin with the underlying facts of the case, the legal framework applicable to section 2 vote dilution claims, and the proceedings below.

### a.  Facts

FFSD is a school district located in northern St. Louis County, Missouri. It was created after a 1975 desegregation order required the original FFSD to annex two neighboring school districts "to achieve a meaningful desegregation" within one unified district. United States v. Missouri, 515 F.2d 1365, 1366 (8th Cir. 1975) (en banc). It includes all or part of eleven municipalities, and is governed by a seven-member school board. Each member is elected "at-large" by the popular vote of the entire district. Members of the FFSD board serve three-year terms with two or three seats filled by an election every April.

_____

[1]The Honorable Rodney W. Sippel, Chief Judge, United States District Court for the Eastern District of Missouri.

Appellate Case: 16-4511    Page: 2    Date Filed: 07/03/2018 Entry ID: 4678569

Voting in FFSD board elections works as follows. Assume there are three seats to be filled in a given election. All of the candidates are listed on a single ballot. Each voter gets three votes, one for each seat, and can cast those three votes for any three candidates, but cannot vote for any candidate more than once. The top three vote-getters assume seats on the board. In a two-seat year, the same procedures are followed with two votes rather than three. The only time this procedure is not followed is when the election is uncontested (i.e., there are the same number of candidates as there are available seats). In that circumstance, the candidates simply assume the positions on the board and the election is cancelled.

### b. Legal Framework

Section 2 of the VRA protects against the "denial or abridgement of the right of any citizen of the United States to vote on account of race or color" in any election held by a "State or a political subdivision." Section 2 claims are "established if, based on the totality of circumstances," it is shown that members of a racial minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." One manner in which a violation may occur is when districts that elect several at-large representatives "operate to impair blacks' ability to elect representatives of their choice." Thornburg v. Gingles, 478 U.S. 30, 42 (1986). Such a circumstance gives rise to a "claim of vote dilution." Id.; see also Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5, S.D., 804 F.2d 469, 471 (8th Cir. 1986) ("The legislative history of the 1982 amendment to § 2 indicates that it was aimed particularly at discriminatory at-large election systems which dilute minority voting strength.").

There are two steps to proving a section 2 vote dilution claim: (1) satisfying the so-called "Gingles preconditions," and (2) showing the violation based on a totality of the circumstances. In the first step, plaintiffs are required to prove three preconditions by a preponderance of the evidence:

-3-

Appellate Case: 16-4511    Page: 3    Date Filed: 07/03/2018 Entry ID: 4678569

(1) The racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate.

Bone Shirt v. Hazeltime, 461 F.3d 1011, 1018 (8th Cir. 2006) (cleaned up) (quoting League of United Latin Am. Citizens v. Perry (LULAC), 548 U.S. 399, 425 (2006)). Satisfying these three preconditions "carries a plaintiff a long way towards showing a Section 2 violation," but does not suffice.  Harvell v. Blytheville Sch. Dist. No. 5, 71 F.3d 1382, 1390 (8th Cir. 1995) (en banc).

In the second step, "the statutory test directs us to consider the 'totality of the circumstances' to determine whether members of a racial group have less opportunity than do other members of the electorate."  LULAC, 548 U.S. at 425–26.  The Supreme Court has further instructed that, in applying this standard, we are to consider a list of factors that were included in the Senate Report on the 1982 amendments to the VRA.  Id. at 426.  These factors are:

(1) "the history of voting-related discrimination in the State or political subdivision;"
(2) "the extent to which voting in the elections of that State or political subdivision is racially polarized;"
(3) "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;"
(4) "the exclusion of members of the minority group from candidate slating processes;"
(5) "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;"
(6) "the use of overt or subtle racial appeals in political campaigns;"
(7) "the extent to which members of the minority group have been elected to public office in the jurisdiction;"

-4-

(8) the extent to which "elected officials are unresponsive to the particularized needs of the members of the minority group;" and

(9) whether "the policy underlying the State's or political subdivision's use of the contested practice or structure is tenuous."

Gingles, 478 U.S. at 44–45; see also LULAC, 548 U.S. at 426; Bone Shirt, 461 F.3d at 1021–22.  The Senate Report also "stresses . . . this list of typical factors is neither comprehensive nor exclusive."  Gingles, 478 U.S. at 45.

### c.  Proceedings Below

The NAACP sued FFSD and the St. Louis County Board of Elections, alleging that FFSD's at-large elections violated section 2 of the VRA because the elections—along with the historical and socioeconomic realities present in the district—denied black residents a meaningful opportunity to elect representatives of their choice.  The NAACP proposed several remedies.

The district court conducted a six-day bench trial.  After the trial, it issued a lengthy decision containing both extensive factual findings and thorough legal analysis.  The district court concluded that the NAACP satisfied the Gingles preconditions and proved based on the totality of the circumstances that FFSD's election system provided black voters with less opportunity to elect candidates of their choice compared to white voters.

### II.

On appeal, FFSD contests the district court's findings on both the Gingles preconditions and totality-of-the-circumstances vote dilution.  "We review the district court's factual findings for clear error, including the district court's factual determination of whether the Section 2 requirements are satisfied."  Bone Shirt, 461 F.3d at 1017 (citing LULAC, 548 U.S. at 427).  "Legal questions and mixed questions

-5-

Appellate Case: 16-4511     Page: 5     Date Filed: 07/03/2018 Entry ID: 4678569

of law and fact are . . . reviewed de novo." Id. (citing Harvell, 71 F.3d at 1386); see also LULAC, 548 U.S. at 427 ("Where 'the ultimate finding of dilution' is based on 'a misreading of the governing law,' however, there is reversible error." (quoting Johnson v. De Grandy, 512 U.S. 997, 1022 (1994))).

## III.

FFSD contests the district court's conclusions regarding the first and third Gingles preconditions.  We address each argument in turn.

### a. The First *Gingles* Precondition

The first Gingles precondition requires that "the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district." LULAC, 548 U.S. at 425 (cleaned up).  The district court relied on the 2010 Decennial Census to conclude that whites continued to outnumber blacks within FFSD.  The district court also held that, even if black voters comprised a bare majority of the voting age population in the district, that would not prevent a vote-dilution claim from going forward if the district's black voters had been historically discriminated against and disenfranchised.  On appeal, FFSD contests both determinations.  FFSD also argues that the district court failed to consider whether a revised election system would remedy vote dilution.

### i. Use of Census Data

FFSD argues the district court erred in relying on the 2010 Decennial Census data instead of data it submitted from the American Community Survey (ACS).  As an initial matter—and, as the district court noted—"[t]he census is presumed accurate until proven otherwise."  See McNeil v. Springfield Park Dist., 851 F.2d 937, 946 (7th Cir. 1988); cf. Harvell, 71 F.3d at 1385 & n.1 (citing figures from the 1980

Appellate Case: 16-4511     Page: 6     Date Filed: 07/03/2018 Entry ID: 4678569

census). FFSD asserts that it successfully overcame this presumption based on the ACS and the testimony of its expert. The ACS is a sample survey that seeks to provide up-to-date estimates because the Decennial Census (as is implied by its name) is only conducted every ten years. The 2011–2013 version of the ACS suggested that the black voting age population within FFSD was approximately 50.3%.[2] The district's expert, Dr. Jonathan Rodden, also created projections of the black voting age population in FFSD based on historical trends within the district. These projections were based on the ACS. According to FFSD, the ACS and Dr. Rodden's projections established that black voters made up a majority of the district.

The district court found, however, that changes in the ACS did not show, with any reliable degree of certainty, that the population within the district had shifted since the 2010 Census. Further, the district court noted that "[t]he Census Bureau itself cautions against using ACS estimates rather than the Decennial Census complete count to determine the population of a given geographic area," and cited, as an example, the fact that the ACS had projected that the overall population of St. Louis would grow throughout the 2000s, only to be disproved when the actual data for the 2010 Census were collected. In light of these methodological limitations, the district court determined that the most reliable data available were the 2010 Census data. We detect no clear error in that determination.

## ii. Bare Numerical Majority

The district court also concluded that, "even if [it] were to find that African Americans constitute a majority of the District's [voting age population], that would not be the end of the analysis." The district court explained that "[r]acial minorities

_____

[2]This number comes from the district court's "corrected" estimate of "any-part black" voting age population that extrapolates from the ACS, which only provides an estimate of the "single-race black" population and does not give an estimate of the percentage of "any-part black" population, unlike the Decennial Census itself.

-7-

do not suddenly lose the broad protections of the VRA at the moment that they surpass 50% of a jurisdiction's [voting age population]." FFSD disagrees, asserting that only a numerical minority enjoys the protections of the VRA.

As Gingles notes, under the VRA, the term "minority" does not refer to a purely numerical fact. Rather, section 2(a) protects the voting rights of "any citizen who is a member of a protected class of racial or language minorities." 478 U.S. at 43; see also Salas v. Sw. Tex. Jr. Coll. Dist., 964 F.2d 1542, 1547 (5th Cir. 1992) ("The plain text of the statute, as affirmed by case law, makes clear that the Act is concerned with protecting the minority in its capacity as a national racial or language group."); id. at 1548 ("The Voting Rights Act was passed in 1965 to effectuate the guarantees of the Fifteenth Amendment."). And the Supreme Court has affirmatively stated that "it may be possible for a citizen voting-age majority to lack real electoral opportunity," and thereby require the protection of section 2. LULAC, 548 U.S. at 428.

Nonetheless, FFSD argues for a rule that a racial minority cannot prevail on a section 2 claim when it constitutes a bare numerical majority within the district. To support this per se rule, the district relies on Smith v. Brunswick Cty. Bd. of Supervisors, 984 F.2d 1393 (4th Cir. 1993). Even if Smith can be read as adopting a bright-line rule, however, the weight of authority is to the contrary. The Second, Fifth, Eleventh, and D.C. Circuits all have declined to adopt the rule the district advocates. See Pope v. Cty. of Albany, 687 F.3d 565, 575 n.8 (2d Cir. 2012) ("[T]he law allows plaintiffs to challenge legislatively created bare majority-minority districts on the ground that they do not present the 'real electoral opportunity' protected by Section 2." (quoting LULAC, 548 U.S. at 428)); Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033, 1041 (D.C. Cir. 2003) ("Vote dilution claims must be assessed in light of the demographic and political context, and it is conceivable that minority voters might have less opportunity to elect representatives of their choice even where they remain an absolute majority in a contested voting district." (cleaned

-8-

up)); <u>Salas</u>, 964 F.2d at 1547 ("Unimpeachable authority from our circuit has rejected any *per se* rule that a racial minority that is a majority of a political subdivision cannot experience vote dilution." (quoting <u>Monroe v. City of Woodville</u>, 881 F.2d 1327, 1333 (5th Cir, 1989))); <u>Meek v. Metro. Dade Cty.</u>, 908 F.2d 1540, 1546 (11th Cir. 1990) (reaffirming, post circuit reorganization, <u>Zimmer v. McKeithen</u>, 485 F.2d 1297, 1300 (5th Cir. 1973), which had held "infirm" the conclusion "that an at-large scheme cannot work a dilution of black voting strength where blacks . . . comprise a majority of the total population of the parish").

The section 2 inquiry is one that "requires an 'intensely local appraisal' of the challenged district." <u>LULAC</u>, 548 U.S. at 437 (quoting <u>Gingles</u>, 478 U.S. at 79). We agree with the majority of our sister circuits that such an appraisal should take into account the history of discrimination and disenfranchisement in the district, and the way that those historical problems may still affect the district's political landscape. The district's proposed per se rule would mean that any section 2 claim would be defeated the moment black voters made up a bare numerical majority of the district, regardless of whether minority voters in that district still face actual impediments and disadvantages. Such a rule does not comport with the VRA's substantive requirement that racial minorities have equal opportunity "to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); <u>see also</u> <u>Gingles</u>, 478 U.S. at 34. In short, minority voters do not lose VRA protection simply because they represent a bare numerical majority within the district.

### *iii. History of Disenfranchisement*

FFSD argues that the district court erred in using statewide data about felony disenfranchisement, voter registration, and home ownership to conclude that the voting age population statistics likely overstated the influence that black voters had within the district. Although neither party presented FFSD-specific data as to felony disenfranchisement or voter registration, NAACP submitted evidence about how

Appellate Case: 16-4511     Page: 9     Date Filed: 07/03/2018 Entry ID: 4678569

these issues disproportionately affect black Missourians.  Particularly as to felony disenfranchisement, the district court used the statewide data as a starting point, and then credited and relied on expert testimony about how the high criminal conviction rate of black FFSD residents likely led to a high rate of disenfranchisement in the district.  The court also noted that home ownership, for which FFSD-specific data were presented, "is a strong predictor of voting in local elections."  Whenever possible, of course, parties must provide the court with the most location-specific data available.  But we discern no clear error in this case because the district court still conducted an "intensely local appraisal," even if part of the appraisal included statewide statistics.

### iv.  Remedial Consideration

The Supreme Court has described the Gingles preconditions as "threshold conditions" that must be established before liability can be assessed.  And, only after "a Section 2 violation is found" should a district court turn to the task of "developing a constitutional remedy."  Bone Shirt, 461 F.3d at 1022.  Nevertheless, FFSD takes the position that the first Gingles precondition cannot be satisfied if the single-member districts that the NAACP proposed would give black voters no greater chance to elect a candidate of their choice than the current at-large system.  But as we have said, "at the initial stage of the Gingles precondition analysis, the plaintiffs are only required to produce a *potentially* viable and stable solution."  Id. at 1019 (emphasis in original).  Of course, the district court must still determine that the proposed solution demonstrates that the minority group is "sufficiently large and geographically compact to constitute a majority of a single member district," or, in other words, that it is "potentially viable and stable."  However, at this stage of the proceedings, NAACP is not required to proffer the best option for remedying the asserted violation.  See id. ("As the district court correctly noted, the Gingles preconditions are designed to establish liability, and not a remedy."); see also Gingles, 478 U.S. at 50 n.17 (explaining that the purpose for this requirement is that,

-10-

"[u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."). The first precondition "seeks to establish whether a workable solution is possible," Bone Shirt at 1019, and is met when "the minority group [is] able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district." Gingles, 478 U.S. at 49. To the extent FFSD complains that the proper analysis was lacking in this case, we further note that the district court has since approved a remedial plan—a plan that FFSD does not challenge. Under these circumstances, we discern no clear error in the district court's finding that the first Gingles precondition was satisfied.

### b. The Third *Gingles* Precondition

The third Gingles precondition requires that "the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." LULAC, 548 U.S. at 425 (cleaned up). First, FFSD argues, the district court erred in concluding that it was possible for black voter preferences to be "subsumed" by white majority bloc voting because the racial groups are close to numerical parity within the district. Second, it asserts that the district court failed to consider certain special circumstances and narrow margins of victory that might weigh in its favor. And, third, FFSD claims that the district court put too much weight on the special circumstances that it found attendant to the 2014 and 2015 elections.[3]

---

[3]FFSD asserts that these errors were legal—which would require de novo review—but their true disagreement is with the district court's factual findings and not the legal standard that it applied.

-11-

*i. White Bloc Voting*

The district court made extensive findings in support of its conclusion that white voters in FFSD tended to vote cohesively and that their preferences were sufficiently uniform and distinct from those of black voters (i.e., they voted as a "bloc") such that they were able "usually to defeat the minority's preferred candidate." FFSD argues, however, that the district's demographics make it "impossible" for white bloc voting to defeat a black-preferred candidate because black voters have slight numeric superiority in the district. To the extent this argument is merely a reframing of FFSD's position concerning the racial makeup of the voting age population in the district, we again find it unpersuasive.

Reviewing the district court's analysis as a whole, we see no clear error. The district court looked at all 12 of the contested[4] elections held between 2000 and 2015, with a particular focus on the more recent elections between 2011 and 2015. It assessed the expert testimony about those elections from both Dr. Rodden, the district's expert, and Dr. Richard Engstrom, the NAACP's expert. This testimony aided the district court in determining which candidates were black-preferred, which candidates were supported by the white bloc, and whether white bloc voting has successfully defeated most black-preferred candidates. After analyzing the experts' methodological approaches and the completeness of their analyses, the district court credited Dr. Engstrom's testimony because his analysis was "accurate, complete, and reliable." It relied on some of Dr. Rodden's findings and testimony as well, but noted that they had "limitations" and that the NAACP expert's methods were "superior to the other methods proposed."

---

[4]The 2005, 2007, 2008, and 2010 elections were uncontested and the candidates therefore took the available seats without an election. The uncontested election of black-preferred candidates "reveal[s] little about either minority cohesion or white bloc voting." Uno v. City of Holyoke, 72 F.3d 973, 988 (1st Cir. 1995).

Appellate Case: 16-4511    Page: 12    Date Filed: 07/03/2018 Entry ID: 4678569

The district conducted a thorough analysis of the expert testimony, considering each election individually. It concluded that most of the black candidates over both periods of time had been defeated. There was no clear error in the district court's factual findings, which were supported by careful reasoning and analysis, regarding the prevalence of white bloc voting and its effect on election results.[5]

### ii. Unconsidered Special Circumstances

The third <u>Gingles</u> precondition also requires that the district court analyze the "special circumstances" that attend elections to make sure that there are no non-racial factors at play that would appear to either defeat or demonstrate a section 2 violation. 478 U.S. at 51, 54, 57. In <u>Gingles</u>, the Court discussed special circumstances in the context of explaining why "the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election." <u>Id.</u> at 57. The Court explained, "special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest." <u>Id.</u>[6] It further cautioned that "[t]his list of special circumstances is illustrative not exclusive." <u>Id.</u> at 57 n.26.

FFSD argues that the district court failed to consider special circumstances relating to the 2011 and 2013 elections. In the 2011 election, both of the black-preferred candidates were defeated. In 2013, the sole black-preferred candidate was defeated. FFSD argues that these were only narrow defeats, that black voters did not

---

[5]We also note that the district court concluded that "even under [FFSD]'s approaches," plaintiffs had satisfied the third <u>Gingles</u> precondition. Because we identify no clear error in the district court's fact-findings, we need not address this conclusion.

[6]Bullet voting is when a voter casts their ballot with one vote for the preferred candidate, but leaves the other votes blank in an effort not to dilute the strength of their vote for the preferred candidate.

-13-

allocate their votes efficiently, and that there were other special circumstances. The other special circumstance that FFSD focuses on was a controversial vote by the FFSD school board, just prior to the 2011 election, wherein the board voted unanimously to give the former superintendent of the district (and his wife) a lifetime health insurance policy. FFSD argues that it was this board vote, and not racial bloc voting, that was responsible for the election results in 2011 and 2013.

As an initial matter, it is not clear how much weight should be placed on the narrowness of the black-preferred candidates' defeats. Narrow losses could indicate no meaningful vote dilution at all. Or such losses may signal particularly targeted and effective vote dilution efforts. Of course, "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." Johnson v. De Grandy, 512 U.S. 997, 1014 n.11 (1994). But here, the narrowness of the losses does not change the fact that these candidates *were* defeated and black voters were, therefore, not represented by their preferred candidate on the board. We find no clear error in how the district court factored the close defeats into its analysis. And regarding the alleged inefficient allocation of votes, black voters are not required to vote as a "monolith" in order to make out a vote dilution claim. See Sanchez v. Colorado, 97 F.3d 1303, 1319 (10th Cir. 1996); cf. Gomez v. City of Watsonville, 863 F.2d 1407, 1416 (9th Cir. 1988) (admonishing the district court for speculating about how the minority voting population could have been more cohesive).

As to the controversy surrounding the 2011 health insurance vote, the district court was thorough in its discussion of the elections that followed that vote. And its analysis of the multiple factors that were relevant in those elections is persuasive. Incumbents who cast the purportedly unpopular health insurance vote came up for reelection in 2011, 2012, and 2013, due to the staggered election system. In 2011, only one of the black-preferred candidates running for election was an incumbent (who had voted for the health insurance policy), yet both black-preferred candidates

-14-

were defeated, receiving nearly identical percentages of the vote.[7]  And the black incumbent would have been classified as black-preferred under either Dr. Engstrom's or Dr. Rodden's estimates.  In 2012, there was only one black-preferred candidate.  She received near-unanimous support from black voters in the district, but nonetheless lost to a white incumbent (who had voted for the health insurance policy).  In 2013, there was one black-preferred incumbent and one white incumbent seeking reelection (both of whom had voted for the health insurance policy), but the white incumbent was successful, while the black-preferred incumbent was defeated.  This evidence shows that this health insurance vote—regardless of its perceived popularity or unpopularity—likely did not affect incumbent reelection across racial lines.  Therefore, any error on the part of the district court for not directly addressing this issue in its analysis was harmless.

### iii.  Considered Special Circumstances

FFSD next objects to the special circumstances that the district court *did* consider, which relate to the 2014 and 2015 elections.  In 2014, there were three black-preferred candidates who ran together as a slate called "Grade A for Change."  These candidates were motivated to run, in part, due to the board's treatment of Dr. Art McCoy, the first black superintendent of the district, who had recently resigned.  This issue also served to motivate black voters.  In 2015, the board election followed on the heels of the death of Michael Brown, which had led to large demonstrations, political unrest, and national attention on the Ferguson area.[8]  The district court

---

[7] A white incumbent (who had voted for the health insurance policy) was also defeated in 2011, but no evidence about other possible reasons for that loss was presented to the district court.

[8] Additionally, the one black-preferred candidate who was ultimately successful explicitly encouraged voters to engage in "bullet voting."  Bullet voting is one of the special circumstances specifically noted by the Court in Gingles.  478 U.S. at 57; see

-15-

concluded that special circumstances were present in the 2014 and 2015 elections, but were not overwhelming, and only "slightly" discounted the election of one black-preferred candidate in each of those elections. It is apparent from the record that the district court considered the evidence in context and did not clearly err in deciding how much weight to give those special circumstances.

In sum, we find no clear error in the district court's determination that the third Gingles precondition was satisfied.

## IV.

Once the three preconditions have been satisfied, plaintiffs must still show that the "totality of the circumstances" demonstrates a section 2 violation. More particularly, NAACP "ultimately must prove that the totality of the circumstances indicates minority voters had 'less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." Bone Shirt, 461 F.3d at 1021 (quoting section 2 of the VRA). FFSD challenges the manner in which the district court considered several of the nine non-exhaustive factors in reaching its ultimate conclusion that FFSD's voting system dilutes the votes of black voters. We address each contested factor in turn.

---

also Ruiz v. City of Santa Maria, 160 F.3d 543, 555 (9th Cir. 1998) ("The ability of minority voters to bullet vote does not remedy a vote dilution injury.").

-16-

### a. *Factor 7*

Two factors—Factors 2[9] and 7—"predominate the totality-of-the-circumstances analysis." Id. at 1022; see Harvell, 71 F.3d at 1390; see also Gingles, 478 U.S. at 48 n.15. As to Factor 7—"the extent to which members of the minority group have been elected to public office in the jurisdiction," Bone Shirt, 461 F.3d at 1022—the district court concluded that "African American electoral successes have generally been minimal in FFSD, and their overall success rates continue to be disproportionately low compared to those of white candidates." FFSD makes three arguments as to why this conclusion is wrong.

FFSD argues that the district court "unduly narrowed" its analysis under this factor by failing to consider non-racial reasons for electoral defeat of black-preferred candidates, and alleges that the court "failed to consider the circumstances surrounding electoral defeat" of black-preferred candidates. To some degree, these arguments echo FFSD's arguments under the third Gingles precondition, which we concluded lacked merit. And we note that FFSD does not contest the finding that success rates of black candidates continue to be lower than for white candidates.

What FFSD also asserts, however, is that the district court failed to consider election-specific evidence relevant to the three "Grade A for Change" candidates in 2014: that it was only the winning candidate of the three who was highly qualified, presented herself as a professional, and "campaigned extremely hard." These reasons, not race-based ones, explain the defeat of two black-preferred candidates in that election, according to the district. However, the facts of the 2014 election do not support this argument. In that election, the three black-preferred candidates received

---

[9]Factor 2, "the extent to which voting in the elections of that State or political subdivision is racially polarized," is not at issue on appeal. See Gingles, 478 U.S. at 44–45.

Appellate Case: 16-4511    Page: 17    Date Filed: 07/03/2018 Entry ID: 4678569

similar levels of support. According to estimates of both parties' experts, the winning black-preferred candidate received between one and three percent more black votes than the unsuccessful black-preferred candidates. Due to the significant margins of error, there was no way to conclude with any level of certainty that the winning black-preferred candidates received any more votes from black FFSD residents than did the unsuccessful black-preferred candidates. In short, in spite of the arguments about candidate and campaign quality, all of the black-preferred candidates received effectively equal shares of the vote in 2014. As a result, any error in failing to consider the additional information regarding the campaigns of successful and unsuccessful candidates would not have affected the overall totality-of-the-circumstances analysis.

The core question posed in Factor 7 is whether black candidates have historically been successful in the district, not whether individual black candidates were more attractive candidates or could have run better campaigns. See Bone Shirt, 461 F.3d at 1022 (discussing the number—in that case "not one"—of successful Native-American candidates under Factor 7); Harvell, 71 F.3d at 1390 (noting "only minimal electoral success under the present scheme," as represented by "only [one] minority victory in nine attempts"). The district court considered the evidence FFSD presented, but discounted its usefulness in determining whether NAACP had proven a section 2 violation. Under a totality-of-the-circumstances analysis, the district court's assessment of FFSD's evidence was not clear error.

Next, FFSD argues that the district court "failed to give recent elections more weight." As discussed, the district court "slightly" discounted the 2014 and 2015 elections. And FFSD asserts that the district court failed to accord adequate weight to the 2016 election in particular, wherein one black representative and one white

-18-

Appellate Case: 16-4511    Page: 18    Date Filed: 07/03/2018 Entry ID: 4678569

representative were elected.  In its quantitative analysis,[10] the district court discussed the relative numerical successes of black candidates and white candidates over both a longer window—from 2000 to 2016—and a short window—from 2011 to 2016—and found that white candidates were far more successful across both.  And, in discussing the more recent elections, the district court explained that "despite the growth of the African American population in the District since 2000, minority electoral success has not improved, with near equal rates of success in the last six contested elections as there w[ere] between 2000 and 2015."  The district court considered all the relevant elections appropriately,[11] and accurately noted no change in more recent elections relative to the historical pattern.  This was not clear error.

Finally, FFSD argues that the district court should have given greater weight to the fact that, after the 2016 election, three of the seven members of the FFSD board were black, which "place[d] African American representation at near proportionate levels with their population."  The district court observed that section 2 does not provide a "safe harbor" based solely on current proportionality. It stated, "the totality

---

[10]FFSD argues that it was wrong to engage in this analysis quantitatively, because the focus should have been on the totality of the circumstances.  However, the district court's quantitative assessment was not incompatible with a totality-of-the-circumstances analysis.  Quantitative analysis can help demonstrate trends across a number of elections and the district court assessed each factor individually, before then engaging in a balancing test, which took all of the factors and circumstances into account.

[11]The district court first conducted its quantitative analysis without the 2016 election, but then incorporated it, explaining that "[i]ncluding the results of the 2016 election . . . does not substantially change the results."  Elsewhere in its lengthy opinion, the district court explained that it was reopening evidence to take judicial notice of the results of the 2016 election, but that it was "unable to draw significant legal conclusions" based on that election because it had not been included in the testimony or analysis provided by the experts for either party.

-19-

Appellate Case: 16-4511    Page: 19    Date Filed: 07/03/2018 Entry ID: 4678569

of the circumstances and a searching and practical evaluation of the facts suggest that the more recent successes of African American candidates are not representative of the community's ability to be elected to the Board." See Harvell, 71 F.3d at 1388 (explaining that, while "proportional representation is an important factor to consider in evaluating the validity of an electoral process," it "is not . . . the statutory touchstone and does not provide an absolute safe harbor in which a defendant can seek refuge from the totality of the circumstances" (citing De Grandy, 512 U.S. at 1017–18)).[12] Simply put, proportionality alone does not indicate that a racial minority has achieved the ability to effectively participate in the political process. This is one reason why a totality-of-the-circumstances inquiry is required. It was not erroneous for the district court to note the appearance of proportionality but nevertheless to conclude that a section 2 violation was on-going.

### b. Factors 1, 3, and 5

FFSD also challenges the district court's factual findings under Factor 1 ("the history of voting-related discrimination in the State or political subdivision"), Factor 3 ("the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the

---

[12]We also note that, in most cases, the proportionality inquiry is focused on the number of minority-majority districts being created and proportionality of opportunity, not proportionality of representation. See De Grandy, 512 U.S. at 1014 n.11 (explaining that "'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population," which is consistent with the VRA's requirement that "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."); see also African American Voting Rights Legal Def. Fund, Inc. v. Villa, 54 F.3d 1345, 1353 (8th Cir. 1995) (comparing proportionality "between the percentage of blacks in the voting age population . . . and the percentage of safe black wards").

-20-

minority group, such as unusually large districts, majority vote requirements, and prohibitions against bullet voting"), and Factor 5 ("the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process"). See Gingles, 478 U.S. at 44–45. In finding that each of these factors weighed in favor of the NAACP, the district court extensively recounted the history of official discrimination that had occurred throughout Missouri, Metropolitan St. Louis, and FFSD. The court examined specific jurisdictions within FFSD, and relied on the continued effects of discrimination in the area. FFSD argues, however, that this was clearly erroneous because it did not involve the requisite "intensely local appraisal."

We see no clear error in the district court's exhaustive factual findings, even where some are based on statewide data or expert testimony applying general data to the district. The district court relied on the testimony of Drs. Kimball and Gordon to conclude that "there is a history of officially sanctioned discrimination in the region and the District, and that history is not just a distant memory." It further found that "[g]iven the extent to which African Americans in FFSD continue to experience the effect of discrimination, their ability to participate in the political process is impacted." And, the district court noted, "[t]here is also some evidence that staggered terms in FFSD enhance the opportunity for discrimination, particularly because they are combined with at-large voting." See Harvell, 71 F.3d at 1390 ("[S]taggered terms[] and at-large structure . . . tend to suppress minority voters' influence."). The evidence amply supports these conclusions.

### c. Factors 4 and 8

The district court determined that Factor 4 ("the exclusion of members of the minority group from candidate slating processes") "weigh[ed] very slightly in favor

Appellate Case: 16-4511     Page: 21     Date Filed: 07/03/2018 Entry ID: 4678569

of Plaintiffs" and that Factor 8 (whether "elected official are unresponsive to the particularized needs of the members of the minority group") should be accorded "neutral weight." FFSD, however, argues that both factors should have weighed in its favor.

As to Factor 4, the district court assessed whether slating processes were available in the district, applying Eighth Circuit precedent that defines a slating group as a group that "consists of a small number of individuals who select candidates to run as a bloc to fill seats which are up for election." Clay v. Bd. of Educ. of St. Louis, 90 F.3d 1357, 1362 n.11 (8th Cir. 1996). It determined that there were two local slating organizations and that, while the organizations had endorsement processes that were open to everyone, "African American candidates have less success than white candidates in getting endorsed by these organizations." The district court accorded this factor "very slight[]" weight because there was little evidence that access was explicitly denied to black candidates, but there was undisputed evidence that white candidates were more likely to be endorsed. Even if the district court erred, however, any such error would not have affected the result, as this factor was given such low weight, and no one factor is outcome-determinative.

Similarly, in assessing Factor 8, the district court was faced with conflicting evidence. FFSD had made some efforts to meet the particularized needs of the black community, but there were noted instances of unresponsiveness. The district court's determination that "the Board is making efforts to respond" but "ha[d], at times, been unresponsive" was not clearly erroneous, nor was its ultimate conclusion that this factor should be accorded neutral weight.

-22-

**V.**

The district court found a section 2 violation after engaging in the requisite precondition analysis and conducting a thorough totality-of-the-circumstances balancing.  We affirm.

_____

-23-

# United States Court of Appeals
## *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

July 03, 2018

Ms. Cindy Reeds Ormsby
CROTZER & ORMSBY
Suite 602
130 S. Bemiston
Saint Louis, MO  63105-0000

     RE:  16-4511  NAACP, et al v. Ferguson-Florissant

Dear Counsel:

     The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

     Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

     Michael E. Gans
     Clerk of Court

YML

Enclosure(s)

cc:    Mr. Grant R Doty
       Ms. Julie A. Ebenstein
       Ms. Angela Gabel
       Mr. Michael Keith Hill
       Mr. Dale E. Ho
       Ms. Kelli Hopkins
       Ms. Sophia Lin Lakin
       Mr. Gregory J. Linhares
       Mr. Laughlin McDonald

Mr. Andrew McNulty
Mr. Anthony E. Rothert
Mr. John A. Safarli
Ms. Jessie M. Steffan
Ms. Gillian R. Wilcox

District Court/Agency Case Number(s): 4:14-cv-02077-RWS

Michael E. Gans
*Clerk of Court*

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

July 03, 2018

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

   RE: 16-4511 NAACP, et al v. Ferguson-Florissant

Dear Sirs:

   A published opinion was filed today in the above case.

   Counsel who presented argument on behalf of the appellant was Cindy Reeds Ormsby, of Saint Louis, MO. The following attorney(s) appeared on the appellant brief; Cindy Reeds Ormsby, of Saint Louis, MO., Angela Gabel, of Clayton, MO., John A. Safarli, of Seattle, WA.

   Counsel who presented argument on behalf of the appellees was Julie A. Ebenstein, of New York, NY. The following attorney(s) appeared on the appellees brief; Anthony E. Rothert, of Saint Louis, MO., M. Laughlin McDonald, of San Francisco, CA., Gillian R. Wilcox, of Kansas City, MO., Jessie M. Steffan, of Saint Louis, MO., Dale E. Ho, of New York, NY., Julie A. Ebenstein, of New York, NY., Sophia Lin Lakin, of New York, NY.

   The following attorney(s) appeared on the amicus brief; Kelli Hopkins, of Columbia, MO.

   The judge who heard the case in the district court was Honorable Rodney W. Sippel. The judgment of the district court was entered on November 21, 2016.

   If you have any questions concerning this case, please call this office.

        Michael E. Gans
        Clerk of Court

YML
Enclosure(s)

cc: MO Lawyers Weekly

   District Court/Agency Case Number(s): 4:14-cv-02077-RWS